EXHIBIT A

STATE OF NEW YORK: COUNTY OF ERIE

JAMES KISTNER,

    *Claimant,*

       -against-

THE CITY OF BUFFALO,

    *Respondent.*

*LEFT @ WINDOW 4:32 pm*

MAR 3 1 2017   **NOTICE OF CLAIM**

PLEASE TAKE NOTICE that the Claimant, James Kistner, hereby files this notice of claim with the City of Buffalo pursuant to General Municipal Law Section 50-e.

STATE OF NEW YORK )
COUNTY OF ERIE ) ss.:
CITY OF BUFFALO )

James Kistner, residing at 33 Schmarbeck Ave., Buffalo, New York 14212, being duly sworn, deposes and states:

*Name and post-office address of the claimant:* James Kistner, 33 Schmarbeck Ave., Buffalo, New York, 14212.

*Name and post-office address of claimant's attorney:* James Ostrowski, 63 Newport Ave., Buffalo, New York, 14216 (716) 435-8918.

*The nature of the claim:* The claim is for vehicular negligence or assault, false arrest, assault, battery, and malicious prosecution against the Claimant under state and federal law (42 USC 1983) by the City of Buffalo and the following City employees acting within the scope of their employment and under color of state law: Lauren McDermott, Jenny Velez, Karl Schulz, Kyle Moriarty and "John Doe."





EXHIBIT
39
10-14-20ATH

The respondent's employees initiated false charges against the claimant with malice, including criminal mischief in the third degree (PL 145.05(2)) and disorderly conduct (PL 240.20(3). The criminal mischief charge was first reduced to a misdemeanor and then dismissed on the merits on March 24, 2017 in Buffalo City Court by Judge James McLeod. The disorderly conduct charge is pending. The two accusatory instruments are attached hereto as Exhibit "A".

*The time when, the place where and the manner in which the claim arose:* On January 1, 2017, at about 11:00 a.m., the aforementioned officers responded to a call for assistance concerning a tenant issue at 33 Schmarbeck Ave., owned by the claimant. When claimant went out on the street to speak with the officers about an issue involving his building and his tenant, the car driven by Officers McDermott and Velez drove toward the claimant who was in plain sight and struck the claimant, causing, on information and belief, a possible serious injury. Claimant continues to seek treatment in that regard.

The officers then arrested the claimant, falsely alleging that he intentionally struck and damaged the vehicle. He was handcuffed and forcibly taken into a police car, then transported to Erie County Medical Center (ECMC), allegedly for a forensic examination. After being detained at ECMC for about four hours, and prevented from speaking to his attorney who came to the hospital, he was taken to Central Booking and charged as noted above. He was at Central Booking for about one hour. He was then forcibly taken back to ECMC where he remained for about two hours. He was then released with an appearance ticket and ordered to appear in Buffalo City Court.

Claimant was forced to appear in City Court many times and expend funds for an attorney. His attorney, James Ostrowski, provided a videotape of the arrest to the District

Attorney and the criminal mischief charge was dismissed on the merits on motion of the District

Attorney. The claimant has a motion to dismiss the disorderly conduct charge pending.

*The items of damage or injuries claimed to have been sustained:* Claimant's damages

and injuries include: loss of liberty due to the arrest and prosecution, confinement and

incarceration, pain and suffering, injuries from handcuffing, anxiety, humiliation, loss of

reputation, possible serious injuries from the vehicle collision, attorneys' fees and other out of

pocket expenses. The total amount claimed will be supplied upon demand.

Dated: March 31, 2017
Buffalo, New York

JAMES KISTNER

JAMES OSTROWSKI
Attorney for Claimant
63 Newport Ave.
Buffalo, New York 14216
(716) 435-8918
jameso@apollo3.com

SWORN TO BEFORE ME THIS
31st DAY OF MARCH, 2017
JAMES OSTROWSKI
Notary Public-State of New York
Qualified in Erie County
Commission expires 7/5/2019

# EXHIBIT B

JAMES C. KISTNER

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ERIE

----------------------------------------

IN THE MATTER OF THE CLAIM
OF
JAMES KISTNER,
                    Claimant,
        - against -
THE CITY OF BUFFALO,
                    Respondent.

----------------------------------------

Examination under oath of JAMES C. KISTNER, Claimant, taken pursuant to Section 50-h of the General Municipal Law, in the Office of Buffalo Corporation Counsel, 1137 City Hall, Buffalo, New York, on June 27, 2017, commencing at 11:08 a.m., before ANNE T. BARONE, RPR, Notary Public.

JACK W. HUNT & ASSOCIATES, INC.

---

**2**

1   APPEARANCES:   JAMES M. OSTROWSKI, ESQ.,
                63 Newport Avenue,
2               Buffalo, New York 14216,
                (716) 435-8918,
3               jameso@apollo3.com,
                Appearing for the Claimant.
4
                TIMOTHY A. BALL, ESQ.,
5               Corporation Counsel,
                By MAEVE E. HUGGINS, ESQ.,
6               Assistant Corporation Counsel,
                1137 City Hall,
7               Buffalo, New York 14202,
                (716) 851-4334,
8               mhuggins@city-buffalo.com,
                Appearing for the Respondent,
9               The City of Buffalo.
10  PRESENT:   EARL KISTNER
11
12  J A M E S  C.  K I S T N E R, 33 Schmarbeck,
13  Buffalo, New York 14212, after being duly called
14  and sworn, testified as follows:
15
16      EXAMINATION BY MS. HUGGINS:
17
18      Q.  Nice to see you again.  We met off the
19  record last week.  My name is Maeve Huggins.  I'm
20  an attorney for the City of Buffalo.
21      We're here today to discuss a notice of
22  claim that you filed regarding an incident
23  involving the Buffalo Police Department that you

---

**3**

1   allege caused physical injuries to you.
2       What -- do you recall the date that that
3   incident occurred on?
4       A.  January 1st.
5       Q.  I'm going to ask you some questions
6   about your background, as well as regarding that
7   incident.
8       Have you ever testified before?
9       A.  In a civil case?
10      Q.  Any type of sworn testimony.
11      A.  Yeah.
12      Q.  In what context?
13      A.  Criminal trial.
14      Q.  Have you ever given deposition
15  testimony before?
16      A.  No.
17      Q.  It's going to be similar, but let me
18  just remind you of the ground rules.
19      We have a court reporter here who's taking
20  down everything that's being said.  She can only
21  take down verbal answers.  No head nods, shoulder
22  shrugs.  So I'm going to ask that your responses to
23  my questions be verbal.

---

**4**

1       If I ask you a question and you begin to
2   answer, I'm going to assume that you understood my
3   question.  If you don't, just let me know and I'll
4   rephrase my question.
5       A.  Okay.
6       Q.  If at any point you need a break, let
7   me know.  If I've just posed a question, I'm going
8   to ask that you answer the question before we take
9   that break.
10      The court reporter can't take down when two
11  people are speaking over each other, so I'm just
12  going to ask that you give me the courtesy of
13  allowing me to finish my question before you
14  answer, and I'll extend the same courtesy to you.
15      I think that's it for ground rules.  Do you
16  understand and ready to proceed?
17      A.  Yes.
18      Q.  Before coming in here to testify today,
19  have you taken any drugs or alcohol that would
20  inhibit your ability to give truthful testimony
21  within the last 24 hours?
22      A.  No.
23      Q.  Did you skip taking any medication

J. Kistner - Huggins - 6/27/17

**5**

1  that you should have been taking within those last
2  24 hours?
3      A.  No.
4      Q.  In preparation for your testimony
5  today, did you review any documentation?
6  Photographs?  Video?
7      A.  Within the last 24 hours, no.
8      Q.  Did you do any of that in preparation
9  last week when we had originally scheduled this?
10     A.  No.
11     Q.  Did you look at anything at all knowing
12  that you were going to give testimony today
13  regarding this incident?
14     A.  The best way to answer that is I
15  haven't reviewed the video of what happened -- I
16  haven't reviewed the video in probably a month.
17     Q.  Okay.  And I should say on the record,
18  last week, when we originally had scheduled this
19  50-h, your attorney provided me a disc that
20  contained four separate video files.  It's my
21  understanding that's what your attorney is in
22  possession of.
23     I'm going to ask -- because it's also my

**6**

1  understanding from prior testimony that video was
2  recorded, I'm just going to ask that that video be
3  preserved and that I have an opportunity to inspect
4  the complete video, if anything else exists other
5  than the four video files that I was already given.
6      A.  Okay.
7      Q.  And I'll make that request through your
8  attorney.
9      Aside from conversations with your attorney --
10  those, I don't want to know about -- have you
11  discussed this incident with anyone else?
12     A.  Friends and family, yes.
13     Q.  What friends and family?
14     A.  My sisters.
15     Q.  What are their names?
16     A.  Gwen Cassidy, Gail Malone.  I'm going
17  to call him Mr. Gary.  I don't know Gary's first
18  name, but he was the one that recovered the video
19  from the DVR.  He's an IT guy.
20     Q.  Does he work for you?
21     A.  He -- In this instance, yes.  We gave
22  him $150 to take the DVR and put it to disc because
23  we didn't know how to do it.

**7**

1      Q.  What type of system was this video
2  recorded on?
3      A.  A Swann.
4      Q.  And forgive me.  I don't know what that
5  is.  What is it?
6      A.  It's a Swann DVR with eight cameras.
7      Q.  What location is that video system on?
8      A.  It's at 37 Schmarbeck.  It covers
9  41 Schmarbeck and 33 Schmarbeck.
10     Q.  Are those eight cameras --
11     A.  They're spread out all over those
12  buildings.
13     Q.  So it covers those three addresses?
14     A.  Yeah.  Well, actually, it covers 24 as
15  well.
16     Q.  Do you own and control that system?
17     A.  Rachel Glurich owns the system.
18     Q.  And who is Rachel to you?
19     A.  We have three children in common.
20  She's my next-door neighbor.
21     Q.  Are you currently in a relationship?
22     A.  Yes.
23     Q.  How long have you been together?

**8**

1      A.  12 years at least.  Maybe longer.  I'll
2  be in trouble if that's wrong.
3      Q.  So is Rachel the one that operates that
4  camera system?
5      A.  When you say operates, it kind of
6  operates itself.  You just turn it on.
7      Q.  Like hit a button and it goes?
8      A.  And then if something happens, then you
9  go to the machine and do the best you can to try to
10  say, okay, let me see what just happened down
11  there.
12     Q.  Does that system record over itself, or
13  does it preserve the video?
14     A.  Yeah, it records over -- it depends on
15  how you set it, but yeah, I'm pretty sure the way
16  we've been able to -- we're not expert IT people,
17  and the way it's been essentially set up is it
18  records over itself.
19     That's why we called Gary, this fellow, the
20  IT guy, and said, come over here and get the DVR
21  and make sure this gets preserved, because we're
22  afraid it's going to record over itself if we don't
23  do it quickly.

2 (Pages 5 to 8)

J. Kistner - Huggins - 6/27/17

25

1      A.  No.
2      Q.  Did you have breakfast --
3      A.  Yeah.
4      Q.  -- on January 1st?
5      A.  Yeah.
6      Q.  Do you recall what you had for
7  breakfast?
8      A.  Some kind of eggs.  Just regular fare.
9  Eggs and bacon or something.
10     Q.  Did you skip taking any medication that
11 you should have been taking on that day?
12     A.  No.  I don't take any medication at
13 all.
14     Q.  And I said drugs and alcohol.  Did you
15 take any prescription or other type of like
16 nonillegal drugs that day?
17     A.  No.  I don't take any drugs, legal or
18 illegal.  I haven't drank since 1999.
19     Q.  Well, what happened during this
20 incident?
21     A.  Should I give a narrative?
22     Q.  Yeah.  I wasn't there.  That's why I'm
23 asking you.

26

1      A.  Okay.  All right.  I'll give a narrative.
2  We're upstairs eating.  Earl was there.  We
3  were in Rachel's kitchen on the second floor.  And
4  we had the three boys in highchairs, and we were
5  all eating.
6      And I can't remember whether it was Earl or
7  Rachel or me or somebody said, Mike's driving.  And
8  I looked outside, and Mike Wolfe, the tenant in the
9  first floor at 33, had pulled up in a red van.
10     And I said, are you sure -- whoever it was,
11 I said, are you sure that's Mike who was driving?
12 And they said, yeah.  And I said, well, Mike ain't
13 got a driver's license, and he don't own a van.  So
14 Mike's driving that van?
15     Q.  How do you know he doesn't have a
16 driver's license?
17     A.  Because I had spoken to him probably
18 three or four weeks previous to this about him
19 cashing checks.  He needed a place to cash checks.
20 I said, well, don't you have ID or a driver's
21 license or something?  And he says, no.
22 He explained to me he didn't have a driver's
23 license.

27

1      Q.  Okay.  Had you ever seen that red van
2  before?
3      A.  No.
4      Q.  What happened after you saw the van
5  pull up?
6      A.  Well, first, I was concerned because
7  he -- it was recently he had been staying at -- I
8  want to say the Brothers of the Poor.  It was a
9  social service agency.  He had stayed there from
10 the 18th of December through about the 27th.
11     And when I found out about it, I contacted
12 them, and I said, why is he staying with you?  He's
13 got a subsidized apartment at 33 Schmarbeck.  They
14 didn't know.
15     Q.  How did you come to know he was staying
16 there?
17     A.  He wasn't staying at 33.  I've lived
18 there for a decade.  I can pretty well know when
19 somebody's not there.  And I inquired.  I asked
20 people.  I said, where is Mike?  They said, well, I
21 think he's over at the Little Brothers of the Poor
22 Friary or wherever he's at.  I said, what's he
23 doing there?

28

1      So I called them.  They said, yeah.  He's
2  been here for ten days claiming he's homeless.  So
3  then I called the people that subsidize his rent,
4  the Restoration.  They said, we need to all get on
5  the same page here.
6      Q.  Did you ever have any disputes with
7  Mike about where he was living?
8      A.  The only problem I ever had with Mike
9  was that he had -- he brought somebody else into
10 the apartment, and under the terms of, you know,
11 his tenancy there, it's not that kind of movie.
12 It's for him.  If he wants somebody else to come
13 in, we need to have an application filled out from
14 them.
15     Q.  Like was he subletting it and getting a
16 rent from it or just allowing someone to stay
17 there?
18     A.  I don't know that deep of minutia.  If
19 he was using it as a resource and trying to profit
20 from it, I don't know.
21     But it had been growing and growing and
22 growing out of hand, Mike's tenancy there, so we
23 had given him a 30-day notice on December 30th,

7  (Pages 25 to 28)

J. Kistner - Huggins - 6/27/17

```
                                      29
1    after we had found out that he wasn't in the unit
2    and that he was staying over at the social service
3    agency and making these claims.
4        Q. Did that create any issues -- this
5    30-day notice create any issues between you and
6    Mike?
7        A. Nah, because we had talked, and I told
8    him: You know, you can't really do this here, you
9    know.
10       Q. All right. So what happened on
11   January 1st, when you saw that van?
12       A. I said, oh, well, I hope he doesn't
13   steal the appliances. Because we also furnish all
14   the appliances. The washer, the dryer the stove,
15   and the fringe. I said, just keep an eye on him,
16   and, you know, if he starts loading stuff into the
17   appliances -- he starts loading the appliances,
18   I'll call the cops.
19       Q. Who did you say that to?
20       A. I think Earl and Rachel.
21       Q. Okay. Did you have plans on January 1st?
22   Were you going to be home that day?
23       A. Yeah. No. I don't think we were going
```

```
                                      30
1    anywhere. I was just happy to have all the boys
2    home at once.
3        Q. What happened next?
4        A. I can't tell you how much time elapsed,
5    but I think it was less than a half hour,
6    a policeman pulled up right in front of
7    33 Schmarbeck.
8        Q. Did you ever call the police?
9        A. No. Well --
10       Q. Do you have an idea who called the
11   police?
12       A. I suspect Mike called the police. Mike
13   Wolfe.
14       Q. On January 1st, was Mike Wolfe still
15   permitted to be in that first floor unit?
16       A. You mean had he been evicted or locked
17   out? No.
18       Q. Right.
19       A. He hadn't been evicted. He hadn't been
20   locked out.
21       Q. Okay. What type of -- and I'm sorry.
22   I might have just -- you might have just said this.
23   When the police got there, how many police officers
```

```
                                      31
1    were there?
2        A. I think you have -- one of those video
3    files has that, their arrival.
4            The first police car I saw was in the center
5    of the street. That was the first one that
6    arrived. I looked at the video, so I know the
7    order in which they got there.
8            In the video you see the first policeman
9    pull up. He pulls up in the middle of the street.
10   And there were two men in that car.
11       Q. How were they dressed?
12       A. Like policemen.
13       Q. Were they wearing a uniform?
14       A. Yeah. Yeah.
15       Q. Without watching the video, did you --
16   did you see these things yourself that day?
17       A. When -- when it was brought to my
18   attention, I don't know if it was Rachel or I might
19   have looked out the window and seen it myself,
20   but: The police are here.
21           So I looked outside, and the first thing I
22   thought when I saw the police were here is: Well,
23   Mike's got a stolen car. The red van is stolen.
```

```
                                      32
1    Or he's been out driving recklessly with a borrowed
2    car and they've just found him. That was the first
3    thing I thought.
4        Q. What happened next?
5        A. The policeman in the driver's seat of
6    the car in the street got out of his car and he
7    walked over, and he got four feet away from Mike
8    and he talked to him. I don't know what they were
9    saying back and forth, but they had a conversation
10   for probably two minutes.
11       Q. Were you inside the house still at that
12   point?
13       A. Yeah. I was on the second floor
14   looking out the window watching. I was 60 feet
15   away watching.
16       Q. Okay. What happened next?
17       A. Either Earl or Rachel said: What's
18   going on down there? And I said, well, I don't
19   know, but I'm finishing breakfast before I go down
20   there to find out.
21           I'm not going to go rushing down there
22   because they might be arresting him. And I'm just
23   going to stand here for a minute and watch what
```

J. Kistner - Huggins - 6/27/17

33

1  happens.
2      So Mike was pointing up -- as he was talking
3  to the policeman, was pointing up at the window
4  where Rachel, me, and Earl were with the three kids
5  in the kitchen watching this whole thing.
6      Q.  What happened next?
7      A.  The policeman walks back over and
8  starts talking to the policeman who's still in the
9  car in the passenger seat. I don't know what was
10  said, but they were talking back and forth through
11  the window.
12      About that time another police car pulled up
13  along the curb between the police car in the street
14  and the curb, in a parking spot there, behind this
15  red van that Mike had pulled up in.
16      Q.  Did there come a time when you left
17  your house? Exited your house?
18      A.  Yeah. About this time when all these
19  police cars were arriving, I said to Rachel or
20  Earl, I said, we've got to go down there and find
21  out what's going on.
22      So we finished breakfast, and then I asked
23  Earl to come down with me. I said, let's go find

34

1  out what's going on.
2      Q.  What happened when you went outside?
3      A.  I walked out of the house, down the
4  steps, out in the street, crossed the path of the
5  police car that was in the front -- that was in the
6  middle of the street, and went around like to his
7  driver's door to talk to the driver who had been
8  speaking to Mike.
9      There was a secondary thing here too as well
10  as maybe it's a stolen car. Mike's a mental health
11  patient, so he could have been in crisis. There
12  was no telling what was going on with him. So --
13  and when that happens, you've got to go find out.
14      Q.  So when you walked up by the police in
15  front of the car, did you say anything or identify
16  yourself at all to the police?
17      A.  Yeah. As I was walking toward the
18  police car off to the right, I said, I need to talk
19  to you. Can I talk to you?
20      Q.  Did the police respond at all?
21      A.  The officer who was in the passenger
22  side started yelling.
23      Q.  From which police car?

35

1      A.  The one that was in the middle of the
2  street.
3      Q.  Okay.  What did they yell?
4      A.  He started yelling: I'm not talking to
5  anybody. I'm not talking to anybody. Let's get
6  out of here. Let's get out of here.
7      He started telling the guy that was driving:
8  We've got to leave. We're leaving now. We're
9  leaving now. He said, I'm not talking to anybody.
10  Let's go. Let's go.
11      And he started yelling at the guy that was
12  driving the car to let's go.
13      Q.  How close were you to the car at that
14  point?
15      A.  Honest to God, I can't remember
16  specifically. I know I was within 30 feet.
17      Q.  Sure.  Do you know, were you in front
18  of the car or on the side of the car?
19      A.  When he started yelling, I was in front
20  of the car to the side.
21      Q.  Would that have been to the right or
22  left side of the car?
23      A.  It would have been the driver's side.

36

1  I was off to the driver's side.
2      Q.  Okay.  So you're standing there I
3  presume facing the car?
4      A.  Yeah.
5      Q.  Were you walking towards the car still
6  at that point?
7      A.  Yeah.
8      Q.  What happened next?
9      A.  The driver floored it, so I got out of
10  the way and watched him drive by me. And the two
11  women who were still in the police car by the
12  curb --
13      Q.  The one behind the red van?
14      A.  Yeah. I looked over at them, and I
15  said, can I talk to you?
16      Q.  Did they respond?
17      A.  She smiled at me.
18      Q.  Who's she?
19      A.  The driver.
20      Q.  What did she look like?
21      A.  You. I'm telling the truth. She
22  looked just like you.
23      Q.  Did you ever come to learn her name?

9  (Pages 33 to 36)

J. Kistner - Huggins - 6/27/17

---

**37**

1    A.  I have to be quite frank, I can't put
2  their names with their faces.
3    Q.  Okay.  Did you ever come to learn the
4  names of the police officers that were involved
5  that day?
6    A.  Later on, from the criminal charging
7  documents, I was able to find out who four of them
8  were.
9    Q.  How many police officers were there
10  then total?
11    A.  There were -- there were five
12  altogether.  One didn't arrive until later.
13    Q.  When this happened, the interaction you
14  had with the first car pulling away and then the
15  second one with the two females in it, there's a
16  total of four officers there at that point?
17    A.  Yeah, there's four people there then.
18    Q.  And you said there was -- I apologize
19  if you said this before -- there were two males and
20  two females?
21    A.  Yeah.  The first two were guys and the
22  second two were girls.
23    Q.  Did they ever identify themselves to

---

**38**

1  you at all?
2    A.  No.  I don't think anybody said, my
3  name is Officer -- no, nobody ever did that.  I
4  know nobody ever did that.
5    Q.  Okay.  After that female police officer
6  who was in the driver's seat smiled at you, what
7  happened next?
8    A.  I said, can I talk to you?  And she
9  looked over and smiled at me.  I took two steps
10  toward the car, was crossing that lane of traffic
11  where the officer had just driven away, I was
12  crossing that, and when I looked up, the car was
13  coming at me.
14    Q.  Did you move to get out of the way?
15    A.  I put up my arms, and I closed my eyes,
16  and boom, it hit me.
17    Q.  How long did that take?
18    What was the period of time between that
19  female driver looking at you and smiling and to you
20  getting hit?
21    A.  The time it took me to cross that lane
22  of traffic.  Three to five seconds, I guess.
23    Q.  Why did you walk towards the car?

---

**39**

1    A.  Because I thought she was going to talk
2  to me.
3    Q.  Did she roll down her window?
4    A.  No, but she acknowledged me, and I know
5  she heard me when I said, can I talk to you?  And
6  she looked and went -- she smiled.  I know that
7  won't go into the transcript, but she smiled, and I
8  took it as an acknowledgement that she was going to
9  talk to me.
10    Q.  That somehow she was going to engage in
11  some sort of conversation with you?
12    A.  Yeah.  She was going to tell me why
13  they were there or what had gone on or what their
14  concern was at being at --
15    Q.  Did she say anything verbally to you?
16    A.  Not before she hit me.
17    Q.  What happened after you were struck?
18    Actually, let me ask you this:  Where were
19  you struck on your body?
20    A.  I think primarily my hands, because I
21  put my arms out.  I'm not sure if my torso or my
22  legs ever came in contact with that car, but I --
23    Q.  Did you try to stop the car from

---

**40**

1  moving?
2    A.  No.  I tried to like just -- that's
3  what I did.  I just put my hands up and said, oh,
4  Christ.  In my head I said, oh, Christ.  I'm going
5  to get hit by a car.
6    Q.  Yeah.  The record should reflect you've
7  raised both of your hands with your palms and
8  fingers spread out --
9    A.  Yes.
10    Q.  -- in front of you.
11    What happened after you were struck?
12    A.  I remember opening my eyes and being on
13  my back on the ground.  I remember looking down at
14  my feet, and my feet were between the back wheels
15  and the front wheels of her patrol car.
16    Q.  Under her car?
17    A.  Yes, my feet were under her car.  How
18  deep under her car, I don't know.
19    Q.  What type of car was this?
20    A.  It wasn't like a car.  It was more like
21  an SUV.
22    Q.  Did it have any police markings on it?
23    A.  Yeah.  It was all marked.  Yeah.  They

---

www.jwhcorp.com       716-853-5600       jwhdepo@jwhcorp.com
1120 Liberty Building

J. Kistner - Huggins - 6/27/17

77

1  down at Central Booking, and then they would give
2  me -- give the staff the knowledge that I was
3  leaving.  But I really wasn't leaving.  They had
4  more planned.
5      Q.  At any point were you informed what
6  charges were being pressed?
7      A.  The first time I found out what I was
8  being charged with formally was when I was handed
9  the appearance ticket.
10     Q.  You were still in Central Booking at
11 that point?
12     A.  Yeah.
13     Q.  Were you ever placed in a cell?
14     A.  Yeah.  See, I came in, I sat on a bench
15 in a hallway with like a bank teller window, and
16 then I was taken down the hallway and the pictures
17 and the strip search, and then I was brought back.
18     And there was a cell off to the side.  I
19 think she told me to step into the cell, and I
20 walked into the cell, and then she said, no, come
21 out here and sit in the hallway.
22     I think that's -- but I was never in a cell
23 with other inmates, the way you would think of a

78

1  cell with bars.
2      Q.  Did you ever request medical attention
3  while you were at Central Booking?
4      A.  I had just left the hospital.  I
5  figured the sooner I get this over with, the sooner
6  I can get to a doctor of my own choosing.
7      Q.  So you made no requests to any of the
8  staff at Central Booking for medical treatment?
9      A.  They were -- okay.  This is -- this is
10 in regards to that.  This does answer your question.
11     Inside the bank teller window, the woman
12 that was booking me through, there was an envelope
13 from ECMC, and the lady who was booking us through
14 asked one of the two female police officers:  Where
15 is he coming from?  They said ECMC.  Do you have
16 anything with him?
17     And at this time she was inside this booth,
18 and she opened -- made a flourish to open it up.
19 She says, oh, these must be his medical records.
20 She pulled it out and said, oh, yeah, they're his
21 medical records.
22     And she gave those medical records to the
23 woman that was booking -- that was inside this --

79

1      Q.  Sir, my question, though, was:  Did you
2  ever make a request to any staff at Central
3  Booking?
4      A.  I wasn't there very long.  What I mean
5  by that is I was never asked that question when
6  they took my picture.
7      Q.  Well, my question is:  Did you ever
8  make a request to staff at Central Booking?  It's
9  a yes or no.
10     A.  You're right, it is.  No, I never did.
11     Q.  Were you experiencing any injuries at
12 that point when you were at Central Booking?
13     A.  My head still hurt, but not near as
14 much as it did when I hit the ground.
15     Q.  Were you bleeding?
16     A.  No.  No.  I never had that kind of an
17 injury where, you know, blood was gushing out of
18 me.  The worst that I could see was the handcuff
19 injury and the back of my head.  I couldn't figure
20 out why the back of my head wasn't swelled up.  I
21 kept trying to feel for knots.
22     Q.  You were just experiencing pain there?
23     A.  It hurt.

80

1      Q.  Did you ever see a judge?
2      A.  At Central Booking?
3      Q.  Yes.
4      A.  No.
5      Q.  Were you ever taken in to like
6  arraignment?
7      A.  At Central Booking?  No.
8      Q.  And eventually you were given a desk
9  appearance ticket?
10     A.  I signed an appearance ticket.  I don't
11 know if it's a desk appearance.
12     Q.  Sure.
13     How long were you at Central Booking?
14     A.  I'm going to say about an hour.  I
15 might be wrong.
16     Q.  Did there come a time when you were
17 released from Central Booking?
18     A.  No.  They put me back in a police car
19 and took me back to ECMC.
20     Q.  Do you know why you were taken back to
21 ECMC?
22     A.  Not at the time.  They didn't tell me:
23 We're going to take you back to ECMC.

J. Kistner - Huggins - 6/27/17

81

1    When they loaded me into the car at Central
2    Booking, as in taking me out, I thought they were
3    taking me like to Alden Holding Center or some
4    other jail or some other wing of the prison.
5        Q.   Did you ever ask -- did you ever ask
6    where you were going?
7        A.   At this point I'm still under the power
8    and control of these two feminazis, and I don't
9    think I'm going to get a straight answer from them
10   even if I ask them for something, so --
11       Q.   Well, it's a yes or no question, right?
12   I'm going to direct you to answer my question.
13       A.   Okay.
14       Q.   Did you ever ask them where you were
15   going?
16       A.   No.
17       Q.   What happened when you got back to
18   ECMC?
19       A.   We went back in the emergency room, and
20   I'm not really familiar with like the corridors
21   there, but we went through the emergency room and
22   through a bunch of corridors and we got to a door.
23   It was a CPAP unit.

82

1        Q.   Did you undergo any additional diagnostic
2    testing, like x-rays or CAT scans, when you were
3    there that second time?
4        A.   The question of diagnostic, I -- but
5    I didn't have any like CAT scans or machine
6    diagnostic.
7        Q.   So somebody examined you?
8        A.   Yeah.  I was triaged.
9        Q.   Were you given any medical diagnosis
10   that second stay at ECMC?
11       A.   No.  My understanding -- to be frank,
12   my understanding was gleaned from that experience
13   at the CPAP unit that until halfway through it,
14   they didn't even know I had been in the emergency
15   room that morning, so they were just treating me as
16   if I had been picked up by two policemen and
17   brought there and dropped off.
18       Q.   Did the -- did you speak to a doctor
19   while you were there?
20       A.   After the triage, I spoke to two -- two
21   different people there.  One was a woman.  I think
22   she was a psychiatric nurse.  And then the second
23   one was a man, oriental guy.  I think he was a

83

1    psychiatrist.
2        After the triage, speaking to the woman, I
3    think that interview lasted about five minutes, and
4    then I think the interview with the doctor lasted
5    about two, maybe three minutes.
6        Q.   Did you curse or yell during that exam?
7        A.   No, no, no, no.
8        Q.   Were you prescribed any medication --
9        A.   No.
10       Q.   -- that second trip?
11       A.   No.
12       Q.   At what point did you leave ECMC that
13   second time?
14       A.   The second clinician, the doctor I
15   spoke to for a couple minutes, I essentially
16   explained to him a lot of the ground we've covered
17   here today.  And he said, is there any way I can
18   confirm this?  And I said, well, you can call
19   Rachel.  She was at home.  She watched the whole
20   thing.
21       And he said, so you have a lawyer?  I said,
22   yeah.  I've got a couple of them.  And he said,
23   they're already involved in this?  And I said,

84

1    yeah, I hope.  And he said, well, let me call
2    Rachel.
3        So he left.  About ten, 15 minutes later, a
4    woman called my name, and I walked up and said,
5    yes.  And she said, you've got the golden ticket.
6    And I said, well, that's Charlie and the Chocolate
7    Factory.  She said, no.  The doctor has ordered
8    your release immediately.
9        Q.   Do you recall the name of that doctor?
10       A.   Not off the top of my.  I've got
11   records that indicate who the guy was.
12       Q.   Okay.
13       A.   But I don't -- I don't remember his
14   name.
15       Q.   Did you leave ECMC of your -- on your
16   own?
17       A.   They were going to get me a cab home,
18   but Rachel had followed essentially where I was
19   most of the day, with the help of other people, and
20   she came to the hospital.
21       I think Earl was watching the three boys,
22   and she came to the hospital, and she picked me up
23   right there at the door, and they had already

21  (Pages 81 to 84)

J. Kistner - Huggins - 6/27/17

85

1    called a cab, but Rachel came and got me.
2        Q.   So at what point did the police leave
3    you at ECMC?
4        A.   When I got to the door of the CPAP
5    unit, my hands were still cuffed, and the one
6    police officer said, do you want me to take the
7    handcuffs off now?  We're at the door where the
8    clinicians from the CPAP unit are going to come.
9        And I said, well, you've been brutalizing me
10   all day.  I said, now you're going to take the
11   handcuffs off and try to make yourselves look good
12   in front of these CPAP people?  I said, how much
13   longer do you think they're going to be on?  He
14   said, oh, a minute or so.  I said, well, why don't
15   you just let the handcuffs stay on for the next
16   minute.
17       Q.   So you didn't complain about them
18   hurting you or anything?
19       A.   Well, they weren't on excessively at
20   that point in the day.  The injury had already been
21   sustained, and they were kind of loose.  And I
22   said, well, you know, let's not -- let's show them
23   what you did, you know.

86

1        Q.   But you didn't ask them to be taken off
2    at the point that they offered to take them off?
3        A.   I asked them how much longer they were
4    going to be on.  They said, another minute or so.
5    I said, well, let the staff see how you treat
6    people when you bring them to CPAP who were
7    completely reasonable.
8        Q.   Did you ever threaten the police in the
9    ride from Central Booking --
10       A.   No.
11       Q.   -- to ECMC?
12       A.   No.
13       Q.   Did you ever curse at them during that
14   ride?
15       A.   No.
16       Q.   Did you have any conversation with them
17   during that ride?
18       I'm sorry.  I think I already asked you
19   that.
20       A.   The first two male officers or the
21   second set of female officers?
22       Q.   Second set of females.
23       A.   No.  I don't think I had any -- I don't

87

1    think I had any conversation with them.
2        Q.   When were you arraigned on criminal
3    charges?
4        A.   It was unusual, because it was ten or
5    12 days after.
6        When they gave me that appearance ticket,
7    they gave me an appearance ticket for a felony, and
8    then I had to come back for the arraignment like
9    ten or 12 days later.
10       Q.   Did the ticket direct you what day to
11   come back to court?
12       A.   Yeah.
13       Q.   Do you recall what judge you appeared
14   in front of?
15       A.   McLeod.
16       Q.   Was it the same judge every time?
17       A.   Yeah.
18       Q.   Do you recall how many times you went
19   back to court?
20       A.   If I said six or seven.
21       Q.   On your first arraignment did you enter
22   a plea?
23       A.   I think I did, but I can't remember for

88

1    sure.
2        Q.   Okay.  Did you have an attorney with
3    you?
4        A.   I can't remember if Jim was in the
5    arraignment at that point.  I'm pretty sure he was,
6    because at that point, I didn't know I had been
7    charged with a felony, and I think it was at the
8    arraignment that Jim discovered that it was a
9    felony charge for the first time.  We thought that
10   they had charged me with a misdemeanor.
11       Q.   Was Jim your attorney on the criminal
12   matter?
13       A.   Yes.
14       Q.   Did you incur any fees or expenses as a
15   result of the criminal case?
16       A.   Yes.
17       Q.   What type of fees did you -- or
18   expenses did you incur?
19       A.   Well, I had to pay Jim to represent me
20   in the felony, and there was a violation attached
21   to that as well.
22       Q.   So was there a court mandated fee?
23       A.   No.

22  (Pages 85 to 88)

J. Kistner - Huggins - 6/27/17

89

1    Q.   I'm sorry.  A violation means one thing
2  to me.  Let me just clarify.  What do you mean by
3  violation?
4    A.  A V is below a misdemeanor?
5    Q.   Sure.  Did you end up pleading guilty
6  to a violation?
7    A.  No.  Both the charges were dismissed.
8    Q.   Okay.  Do you know why they were
9  dismissed?
10    A.  I believe it was because I didn't -- I
11  wasn't guilty of either one of them.  If there's a
12  legal minutia in there.
13    Q.   Do you know if they were outright
14  dismissed, or did you take what's called an ACD?
15    A.  No.  They were outright dismissed.
16    Q.   Did you ever give any testimony -- did
17  you ever appear in the grand jury regarding that?
18    A.  No.  The charges -- the felony, they
19  never had a felony hearing and that was never
20  presented to the grand jury.  I was willing to
21  testify at the grand jury but that never happened.
22    Q.   Did you ever give -- I'm sorry.  I may
23  have just asked you this again.  Did you ever give

90

1  any testimony regarding this incident during the
2  criminal case?
3    A.  No.
4    Q.   Are you aware if any police officers
5  gave any testimony during the criminal case?
6    A.  They made sworn statements.  Part of a
7  complaint would be a sworn affidavit.
8    Q.   Sure.  So you're aware of a complaint.
9  Are you aware of them testifying in court at all?
10    A.  I'm not aware of them testifying in
11  court.
12    And there's an additional sworn statement
13  which one of the two female officers made that
14  provided my entry into the CPAP unit.  So there is
15  a -- under mental health law, she had to make a
16  sworn statement there too, so there were two sworn
17  statements by her.
18    Q.   Do you recall the ADA who handled the
19  criminal matter?
20    A.  No, I don't.  It was a man.
21    Q.   Aside from yourself, Earl, Rachel, and
22  the police officers present, are you aware if there
23  were any other witnesses to what happened on

91

1  January 1st, 2017?
2    A.  Mike Wolfe might have been in his house
3  looking out the window.
4    Q.   Did you ever discuss this incident with
5  him?
6    A.  No.
7    Q.   I know you mentioned before that Mike,
8  shortly thereafter, stopped being your tenant.  Did
9  that have any connection to this incident?
10    A.  No.  He was well on his way gone before
11  this ever happened.  In fact, that's why -- one of
12  the reasons I took Earl downstairs and said, let's
13  go find out from these cops what's going on.
14    Because I have a lot of tenants from
15  Restoration, and I have a lot of tenants with
16  mental health problems, and they get in weird
17  things where they're in crisis in weird ways, and
18  if you know them and you've known them for four or
19  five months, sometimes you can see that.
20    But if you're a policeman and you pull up at
21  the curb and you talk to them for 30 seconds,
22  sometimes you don't know or sometimes you don't
23  care.  And in Buffalo's great open-air prison, the

92

1  East Side, a lot of the policemen don't care if
2  they're having a problem.  Let's just get out of
3  here.
4    Q.   So I know you mentioned you had pain to
5  the back of your head, pain to your wrists,
6  numbness to your hands.
7    Any other injuries you suffered on
8  January 1st, 2017?
9    A.  The extent of my injuries right now
10  that I can -- that I relate directly to this, I
11  think I have rotator cuff injuries or something's
12  wrong with my shoulders.  Particularly my right
13  side.  I have numbness, and it moves, but I have
14  problems with my wrists, my elbow, and my shoulder
15  on the right side.  This hurts to touch.  And the
16  left side, the same thing, but to a lesser extent.
17  It comes and goes less over here.
18    Q.   After ECMC on those two days, did you
19  receive any other medical treatment after that?
20    A.  I went to see my primary.
21    Q.   Who is your primary?
22    A.  It's 1500 Broadway.  I want to tell you
23  her name, but I can't.

23 (Pages 89 to 92)

J. Kistner - Huggins - 6/27/17

105

1   or anything else like that.
2      Q.   What's your user name on Facebook?
3      A.   James Kistner.
4      Q.   Is it public or private?
5      A.   It's public.
6      Q.   Do you mean to suggest that you were
7   denied medical care on January 1st, 2017?
8      A.   I mean to suggest that I was denied
9   appropriate medical care on January 1st.
10      The officers at Schmarbeck should have
11   allowed the ambulance to come.  They should have
12   allowed me to go to the hospital of my choosing,
13   like a Catholic Health hospital, not a forensic
14   unit.
15      And they didn't do that because they were
16   more concerned with trying to cover up the fact
17   that they'd run somebody over with a police car
18   than they were -- they had just injured somebody
19   and he was laying in the middle of the street.
20      Q.   Well, did you ever make a request to
21   to a Catholic Health hospital to the Buffalo Police
22   Department?
23      A.   My son was calling an ambulance and

106

1   they told him to stop.
2      Q.   So it's --
3      A.   They were well-aware I wanted to go
4   there.
5      Q.   I want to just direct you to answer my
6   specific question.  Did you ever make a request to
7   the police, on January 1st, 2017, to go to a
8   Catholic Health hospital?
9      A.   I thought I was going to jail.  No.
10      Q.   Okay.  Did you ever make a request for
11   any other type of specific medical treatment that
12   you deemed appropriate for yourself on January 1st,
13   2017, to the Buffalo Police Department?
14      A.   Yeah.  After they had brutalized me and
15   put the handcuffs on and I was in the hospital, I
16   asked them to take the handcuffs off because they
17   had hurt my wrists with the handcuffs and that they
18   had injured me and --
19      Q.   That was that first trip to ECMC?
20      A.   Yeah.
21      Q.   Okay.
22      A.   In the morning.
23      Q.   So with regard that post you think you

107

1   did on Facebook that might vaguely reference
2   this --
3      A.   You're -- you're more than -- I'm
4   sorry.
5      Q.   -- I'm going to ask you just to
6   preserve it, and I will make a request through your
7   attorney for a copy of it.
8      A.   I -- like I said, I don't think there
9   is one, so I would be preserving something that
10   doesn't exist.  I don't think there are any
11   specific references to this.
12      My Facebook account is yours to copy.  It's
13   public.  You can go on there and print all of it or
14   any part of it, but if you want to admit that you
15   want to talk about part of it, then talk about all
16   of it.
17      Q.   The -- have you ever been involved in
18   any civil lawsuits before?
19      A.   Yeah.  I've had small claims as a
20   landlord, and I've had --
21      Q.   Have you ever filed any prior notices
22   of claim against the City of Buffalo?
23      A.   No.

108

1      MS. HUGGINS:  I don't have any other
2   questions.
3      MR. OSTROWSKI:  Thanks a lot.
4      (Proceedings concluded at 1:20 p.m.)
5
6         *   *   *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

27  (Pages 105 to 108)

109

1    STATE OF NEW YORK)
2                ss:
3    COUNTY OF ERIE  )
4
5        I DO HEREBY CERTIFY as a Notary Public in and
6    for the State of New York, that I did attend and
7    report the foregoing proceedings, which were taken
8    down by me in a verbatim manner by means of machine
9    shorthand.  Further, that the proceedings were then
10   reduced to writing in my presence and under my
11   direction.  That the proceedings were taken to be
12   used in the foregoing entitled action.  That the
13   said deponent, before examination, was duly sworn
14   to testify to the truth, the whole truth and
15   nothing but the truth, relative to said action.
16
17
18
         --------------------------
19          ANNE T. BARONE, RPR,
            Notary Public.
20
21
22
23

---

110

1              INDEX TO WITNESSES
2    Witness        Examination        Page
3    JAMES C. KISTNER    BY MS. HUGGINS:       2
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

28 (Pages 109 to 110)

# EXHIBIT C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JAMES C. KISTNER,

                    Plaintiff,

vs.                                                      Civil No.:  18-CV-00402-LJV-JJM

THE CITY OF BUFFALO, *et al.*,

                    Defendants.

---

## PLAINTIFF'S FIRST DOCUMENT REQUEST TO DEFENDANTS

In accordance with Federal Rule of Civil Procedure 34, plaintiff requests that the defendants produce the following documents and things within 30 days of service of this request. Under Federal Rule of Civil Procedure 26(e), these requests are continuing in nature and require you to serve supplemental responses if you obtain further or additional information after your initial answers and before trial commences.

### INSTRUCTIONS AND DEFINITIONS

1.      If you were unable to respond fully to any request, respond to the extent possible and specify the reasons for your inability to respond in full.

2.      The singular form of a noun or pronoun includes within its meaning the plural form of the noun or pronoun so used and vice versa; the use of the masculine form of a pronoun includes within its meaning the feminine form of the pronoun so used and vice versa; and the use of any tense of any verb includes within its meaning all other tenses of the verb so used.

3.     If any document requested is not to be voluntarily produced because of a claim of privilege (including work product doctrine), you must identify the document with sufficient particularity including the date of the document; the author(s) of the document(s); the person or persons to whom the document(s) is addressed or distributed, including persons receiving a copy of the document(s); and the subject matter of the document(s).  You must further state the nature of the privilege or protection claimed and the bases for the claim to enable the plaintiff to assess the applicability of the claim of privilege.

4.     If any document or tangible thing responsive to these requests was, but is no longer in your actual or constructive possession, custody, or control, identify the document, specifying the following information:  date; sender or author; recipient; persons to whom copies were furnished, together with their job titles; a description of the subject matter of the document; and the date and manner of its disposition.

5.     In the event that one or more than one copy of a document exists, the original must be produced, as well as every copy on which appears any notation or marking of any sort not appearing on the original.  For any documents stored or maintained in files in the normal course of business, these documents must be produced in their files, or in such a manner to preserve and identify the file from which the documents were taken.

6.     Documents produced in accordance with these requests must be produced as kept in the regular course of business.  Documents attached to each other should not be separated.

7.      Documents must be produced with a log or other reference indicating the request number(s) to which each document is responsive.

8.      Electronic, computer, or machine-readable data should be produced in an electronic form that does not require specialized or proprietary hardware or software. If you wish to provide electronic, computer, or machine-readable documents in a form different from that described above, contact counsel for plaintiff so that they can determine if the proposed format is appropriate. For all data produced, provide a complete description of the data as necessary for accurate identification of all variables, including but not limited to, definitions of column and row headers and units of measure used.

9.      Each answer to each document request must be preceded by the request to which it responds.

10.     "Communication" means the transmittal of information in the form of facts, ideas, inquiries, or otherwise.

11.     "Document" means writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained directly or, if necessary translated by the plaintiff into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of this term.

12.     "Plaintiff" and "defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation. Throughout these interrogatories, the pronouns "you" and "your" refer to the defendants.

13. "Concerning" means relating to, referring to, describing, evidencing, or constituting.

14. "And" and "or" are construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

15. "All" and "each" will be construed as "all and each."

16. The "accident" refers to the accident shown in the video recording (Exhibit A attached to plaintiff's complaint), where a Buffalo Police vehicle struck plaintiff at approximately 11:00 a.m. on January 1, 2017 on Schmarbeck Avenue.

17. The "incidents" refer to the acts, omissions, conduct, and events that transpired involving the defendants and plaintiff on January 1, 2017, as more fully detailed in his complaint.

18. "Similar incidents" refers to any action, omission, conduct, or complaint concerning any defendant where he or she was accused of violating an individual's First Amendment, Fourth Amendment, or Fourteenth Amendment rights; false arrest; false imprisonment; abuse of prosecution; malicious prosecution; assault; battery; intentional infliction of emotional distress; negligence; failure to intervene; defamation; misconduct; tampering with evidence; spoliation; or otherwise where a person claimed entitlement to damages under 42 U.S.C. § 1983 based on any of their actions, omissions, or conduct.

19. These requests are continuing. The defendants must timely supplement their responses if they obtain further information between the time of responding to this discovery demand and the time of trial.

## REQUESTS FOR PRODUCTION

1.      All accident reports, witness statements, depositions, complaints, informations, investigation materials, certificates of disposition, notices of claim, and criminal and civil litigation documents concerning the accident and the incidents.

2.      All documents concerning the evaluation of, repairs to, or replacement of parts for the Buffalo police vehicle, which, upon information and belief, is vehicle #473, involved in the accident, from January 1, 2017 to the present.

3.      All documents concerning insurance claims or requests made concerning any damage to vehicle #473 from January 1, 2017 to the present.

4.      All documents concerning the defendants' employment with the City of Buffalo, including, without limitation, applications; reference and background check results; resumes or curriculum vitae; any other documents concerning hiring; reviews; documents concerning job offers, promotions, demotions, transfers, and layoffs; records confirming fitness for duty; pay and compensation documents; commendations, awards, or letters of recognition; verbal or written warnings, counseling, reprimands, or other discipline; goal-setting records; garnishments; litigation documents; workplace investigation documents; and handbook, policy, procedure, regulation, guideline, and any other acknowledgments concerning their employment.

5.      A copy of each of the defendants' union files or an authorization to obtain them, including the address of the union.

6.      A copy of the job descriptions for each position the defendants held with the City of Buffalo from the time they began working there to the present.

7.      All documents concerning the defendants' attempts to admit plaintiff into a CPEP unit under Mental Hygiene Law § 9.41, including, without limitation, the "9.41 paper" they submitted to ECMC.

8.      All documents concerning calls to Schmarbeck Avenue involving the defendants from January 1, 2007 to the present.

9.      All documents concerning the defendants' requests to:

      a.      Cancel any and all 911 or other calls concerning the accident or incidents.

      b.      Change any of the defendants' logs concerning their duty on the date of the accident or incidents.

10.     All documents concerning the Buffalo Police Department's policies, procedures, regulations, instructions, or guidance concerning:

      a.      Mental-health interventions or referrals.

      b.      Handcuffing.

      c.      Transporting people who are arrested, in custody, or otherwise being transported in police vehicles.

      d.      Providing medical care or transport to medical care facilities.

      e.      Use of force, including use-of-force investigations and use-of-force reviews, assessments, or complaints.

      f.      Assistance to officers.

      g.      Officer-involved motor-vehicle accidents.

      h.      Damage to police vehicles.

      i.      Court appearances.

j.      Pedestrian accidents.

k.      Employee investigations and discipline.

l.      Incident reporting.

m.      Logging responses and changing logs of responses.

n.      Ethics and professionalism.

o.      Fair and impartial policing.

p.      Roles of each title or classification of each police defendant at the time of the accident and any prior title or classification.

q.      Fitness-for-duty evaluations.

r.      Whistleblowing.

s.      First-Amendment-protected activities.

t.      Interviewing witnesses.

u.      Strip searches and body-cavity searches.

v.      Performance evaluations.

w.      Urinalysis or other capacity or fitness checks on officers.

x.      Completing supporting documents for tasks undertaken by them in their duties.

11.    All documents concerning the use of Mental Hygiene Law § 9.41, staying with detainees or people in custody while they are being evaluated or admitted into CPEP (comprehensive psychiatric emergency program), and use of areas or rooms for CPEP evaluations or admissions.

12.    All documents concerning the defendants' training while employed by the City of Buffalo Police Department.

13.    All documents the defendants intend to rely upon in their defense, including at trial.

14.    All photographs, video recordings, or audio recordings concerning plaintiff, the accident, or the incidents, including, without limitation, any vehicle or vest-recorded footage and any 911 calls.

15.    All statements of the plaintiff, defendants, witnesses, or other parties concerning the accident or the incidents.

16.    Copies of all complaints, accusations, or concerns expressed about the defendants in their performance of their duties for the City of Buffalo.

17.    All documents that you reviewed to answer or that support your interrogatory responses.

18.    All documents concerning the plaintiff's criminal proceeding in Buffalo City Court (CD # 17-10506).

19.    All other documents concerning plaintiff, not otherwise produced in response to these document demands.

20.    All documents concerning the red van shown in Exhibit A to the complaint.

21.    All documents concerning the initial call to Schmarbeck Avenue on the day of the accident that, upon information and belief, was from Michael Wolfe.

22.    All surveillance materials concerning the plaintiff.

23.    All communications concerning the plaintiff.

24.    All communications concerning the defendants concerning the plaintiff, the accident, and the incidents.

25.    All documents concerning similar incidents from the time each defendant began working with the City of Buffalo to the present.

26.    All documents concerning the defendants' records of calls made on the day of the accident.

27.    All documents concerning the defendants' communication with a dispatcher on the day of the accident and the incidents.

28.    All documents referenced in defendants' Rule 26 initial disclosures.


Dated: September 12, 2018
       Buffalo, New York

                         **RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
                         *Attorneys for Plaintiff*

                         By: _____
                             R. Anthony Rupp
                             Jill L. Yonkers
                         1600 Liberty Building
                         Buffalo, New York  14202
                         (716) 854-3400
                         rupp@ruppbaase.com
                         yonkers@ruppbaase.com


TO:    **TIMOTHY A. BALL, ESQ.**
       *Attorneys for defendants*
       Maeve E. Huggins, Esq.
       65 Niagara Square, 11th Floor
       Buffalo, New York  14202
       (716) 851-4317
       mhuggins@city-buffalo.com

EXHIBIT D

EXHIBIT
18
2/14/20



# Fleet Management
## Maintenance Work Order

Printed: 8/3/2018 10:48:04 AM

### Vehicle Information

Unit # 473    Plate POLICE    Vin 1GNLC2E06ER218219    Year 2014
Make CHEV    Model TAH    Type OTH    Mileage 97742

### Service Information

Date 01/05/2017    Invoice 29    Cost
Service COOLING SYSTEM
Remarks r/r water pump, serp.belt

### Repair Notes

| Qty | Part | Cost | Qty | Part | Cost |
|-----|------|------|-----|------|------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

# EXHIBIT E

**JAMES KISTNER**


UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


------------------------------------------
JAMES C. KISTNER,
                        Plaintiff,

              - vs -      Civil Action No.
                          18-cv-00402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
  capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),
                        Defendants.
------------------------------------------


*JACK W. HUNT & ASSOCIATES, INC.*

2

1          Examination before trial of **JAMES KISTNER**,

2  Plaintiff, taken pursuant to the Federal Rules of

3  Civil Procedure, in the law offices of RUPP BAASE

4  PFALZGRAF & CUNNINGHAM, LLC, 1600 Liberty Building,

5  Buffalo, New York, on February 6, 2020, commencing

6  at 10:20 a.m., before ANNE T. BARONE, RPR, Notary

7  Public.

8

9  APPEARANCES:       RUPP BAASE
                      PFALZGRAF & CUNNINGHAM, LLC,
10                    By CHAD DAVENPORT, ESQ.,
                      1600 Liberty Building,
11                    Buffalo, New York  14202,
                      (716) 854-3400,
12                    davenport@ruppbaase.com,
                      Appearing for the Plaintiff.
13
                      TIMOTHY A. BALL, ESQ.,
14                    Corporation Counsel,
                      By MAEVE E. HUGGINS, ESQ.,
15                    Assistant Corporation Counsel,
                      1137 City Hall,
16                    Buffalo, New York  14202,
                      (716) 851-4334,
17                    mhuggins@city-buffalo.com,
                      Appearing for the Defendants.
18

19

10:20:59  20  **J A M E S   K I S T N E R**, 37 Schmarbeck, Buffalo,

10:21:12  21  New York  14212, after being duly called and sworn,

10:21:12  22  testified as follows:

10:21:19  23

3

|  |  |  |
|---|---|---|
| 10:21:19 | 1 | **EXAMINATION BY MS. HUGGINS:** |
| 10:21:19 | 2 | |
| 10:21:19 | 3 | **Q.**    Good morning, Mr. Kistner.  We met |
| 10:21:22 | 4 | again for a second time just a moment ago off the |
| 10:21:25 | 5 | record.  My name is Maeve Huggins.  I'm an attorney |
| 10:21:27 | 6 | for the City of Buffalo.  We're here today for your |
| 10:21:30 | 7 | deposition in regards to a federal lawsuit that you |
| 10:21:32 | 8 | filed involving an incident with the Buffalo Police |
| 10:21:36 | 9 | Department. |
| 10:21:37 | 10 | Have you given any sworn testimony since |
| 10:21:39 | 11 | your 50-h in June of 2017? |
| 10:21:43 | 12 | **A.**    No. |
| 10:21:43 | 13 | **Q.**    Okay.  I'd just like to review the |
| 10:21:46 | 14 | ground rules before we proceed with the deposition. |
| 10:21:48 | 15 | We have -- you're under oath, obviously, |
| 10:21:50 | 16 | and we have a reporter here who's taking down |
| 10:21:52 | 17 | everything that's being said. |
| 10:21:54 | 18 | For the sake of the reporter and so that we |
| 10:21:55 | 19 | have a clean record, I'd ask that you allow me to |
| 10:21:57 | 20 | finish my question before you answer.  I'll extend |
| 10:21:59 | 21 | the same courtesy to you and allow you to finish |
| 10:22:01 | 22 | before I move on to the next question. |
| 10:22:03 | 23 | If at any point you don't understand my |

| | | |
|---|---|---|
| 10:25:51 | 1 | my questioning.  Fair enough? |
| 10:25:52 | 2 | **A.**   Okay. |
| 10:25:55 | 3 | **Q.**   Have you discussed the January 1st, |
| 10:25:57 | 4 | 2017 incident with anyone, aside from your |
| 10:26:02 | 5 | attorneys? |
| 10:26:06 | 6 | **A.**   Yes. |
| 10:26:06 | 7 | **Q.**   Who have you discussed that incident |
| 10:26:08 | 8 | with? |
| 10:26:08 | 9 | **A.**   My family. |
| 10:26:10 | 10 | **Q.**   Who in your family? |
| 10:26:15 | 11 | **A.**   My sister Gwen. |
| 10:26:18 | 12 | **Q.**   Anyone else in your family? |
| 10:26:21 | 13 | **A.**   Well, Rachel and I aren't married, but |
| 10:26:24 | 14 | I've talked to Rachel about it. |
| 10:26:27 | 15 | **Q.**   Anyone else aside from Gwen and Rachel |
| 10:26:33 | 16 | that you recall? |
| 10:26:34 | 17 | **A.**   Since when?  I mean -- |
| 10:26:37 | 18 | **Q.**   Well -- |
| 10:26:38 | 19 | **A.**   WIVB.  I did an interview with them. |
| 10:26:48 | 20 | **Q.**   Anyone else? |
| 10:26:49 | 21 | **A.**   I can't remember anybody off the top of |
| 10:26:55 | 22 | my head. |
| 10:26:55 | 23 | **Q.**   Have you discussed what you were going |

*Kistner - Huggins - 2/6/20*

9

| | | |
|---|---|---|
| 10:26:57 | 1 | to testify about in this deposition with anyone |
| 10:27:00 | 2 | aside from your attorney? |
| 10:27:03 | 3 | **A.** No. Other that Rachel. |
| 10:27:12 | 4 | **Q.** Did you take any photographs of the |
| 10:27:14 | 5 | January 1st, 2017 incident involving the Buffalo |
| 10:27:20 | 6 | Police Department? |
| 10:27:20 | 7 | **A.** No. |
| 10:27:20 | 8 | **Q.** Did you take any photographs of any |
| 10:27:23 | 9 | injuries you allegedly suffered from that incident? |
| 10:27:32 | 10 | **THE WITNESS:** Rachel and Earl used their |
| 10:27:36 | 11 | cell phones, I think, to try to get pictures of my |
| 10:27:39 | 12 | wrists. |
| 10:27:42 | 13 | I'm not exactly sure which one of those cell |
| 10:27:44 | 14 | phones we were able to download, but you got them. |
| 10:27:51 | 15 | Other than that, no. |
| 10:27:52 | 16 | **BY MS. HUGGINS:** |
| 10:27:52 | 17 | **Q.** Are you aware of how many photographs |
| 10:27:54 | 18 | were taken of your wrists? |
| 10:27:55 | 19 | **A.** Not a clue. I mean, off the top of my |
| 10:27:58 | 20 | head, no. |
| 10:27:59 | 21 | **Q.** Do you know when those photographs were |
| 10:28:01 | 22 | taken? |
| 10:28:06 | 23 | **A.** The first week of January 2017. |

```
10:28:10  1    I don't know the day.
10:28:25  2         Q.    Are you aware of any camera or
10:28:27  3    surveillance systems that captured any video of the
10:28:31  4    January 1st, 2017 incident involving the Buffalo
10:28:36  5    Police Department?
10:28:36  6         A.    Yeah.
10:28:37  7         Q.    What camera system or surveillance
10:28:40  8    system are you aware of that may have captured
10:28:44  9    footage on that day?
10:28:45 10         A.    Rachel's house at 37 Schmarbeck has
10:28:49 11    a Swann system.  I think it has eight cameras.
10:28:56 12         There are two of them that are mounted below
10:28:58 13    the eaves up on the third floor that photograph the
10:29:04 14    front of the house.  One on the right and one on
10:29:08 15    the left of those upper windows.
10:29:11 16         Q.    When you said two, are you referring to
10:29:13 17    two individual cameras of the eight?
10:29:15 18         A.    Yeah.
10:29:17 19         Q.    Where are the remaining six cameras
10:29:20 20    positioned?
10:29:20 21         A.    In the backyard, where the kids play;
10:29:22 22    or on the side of the house, looking down where the
10:29:29 23    kids play; or on the back of the house, looking to
```

*Kistner - Huggins - 2/6/20*

11

```
10:29:32   1   the right and the left.
10:29:40   2           Q.    Who purchased that system?
10:29:50   3           A.    Rachel and I went to Walmart, and she
10:29:54   4   paid for it.
10:29:54   5           Q.    When was it installed?
10:30:05   6           A.    I'm going to guess, 2015.  I don't even
10:30:11   7   know the month.
10:30:12   8           Q.    How are the cameras in that system
10:30:15   9   activated?
10:30:17  10           A.    They run all the time.  There are ways
10:30:23  11   you can set it to where they'll just go on when
10:30:27  12   there's motion, but we're not that sophisticated.
10:30:31  13   We never understood how to make that work.
10:30:33  14           So we just took it out of the box, put it
10:30:36  15   on the shelf, plugged it in, wired the cameras up,
10:30:39  16   I mounted them outside, and turned it on.  And
10:30:45  17   that's essentially how it's worked ever since we
10:30:48  18   bought it.  It's still working like that.
10:30:50  19           Q.    Has it been just recording continuously
10:30:52  20   since it was installed?
10:30:53  21           A.    I think so, yeah.  Unless there's
10:30:55  22   a power failure or something, yeah.  But we never
10:30:59  23   turned it off except once, that I remember real
```

10:31:03  1    distinctly.

10:31:04  2         Q.    When did you turn it off?

10:31:09  3         A.    In January of 2017, Jim Ostrowski told

10:31:16  4    me:  You have to save the video on that machine.

10:31:22  5         I called Gary, a fellow who had repaired

10:31:25  6    a computer for me, and said, I've got to get this

10:31:28  7    off of here, and I don't know how to do it.

10:31:33  8         We had unplugged the machine I'm going to

10:31:39  9    say 9 o'clock at night on January 1st, which was

10:31:43 10    after all this was over and I was home, because we

10:31:49 11    were told:  Don't let it keep running, because we

10:31:53 12    don't know when we're going to get there to

10:31:56 13    retrieve it.  Just unplug it, and I'll try to be

10:31:59 14    there tomorrow or the next day.

10:32:01 15         That's what Gary, the guy that told me he

10:32:04 16    was coming to get it, so --

10:32:05 17         Q.    Do you have -- I apologize.  Continue.

10:32:11 18         A.    I don't know when Gary actually showed

10:32:14 19    up.  I think it was probably the next day or the

10:32:16 20    day after.  We gave him the keyboard, the mouse,

10:32:20 21    and the DVR.

10:32:22 22         We didn't give him any of the cameras

10:32:24 23    because they're all hooked up with leads going

| | | |
|---|---|---|
| 10:32:26 | 1 | outside. |
| 10:32:27 | 2 | So he took the machine and the keyboard that |
| 10:32:30 | 3 | came with it and the -- does it -- maybe it didn't |
| 10:32:33 | 4 | have a keyboard.  Just a mouse and the clicker. |
| 10:32:35 | 5 | The remote control. |
| 10:32:38 | 6 | **Q.**    In terms of hardware of that system, |
| 10:32:42 | 7 | there's eight cameras and then there's what you've |
| 10:32:45 | 8 | called a DVR.  Is that -- what is your understanding |
| 10:32:48 | 9 | of what that DVR is and does for the system? |
| 10:32:54 | 10 | **A.**    Just records everything, everything it |
| 10:32:59 | 11 | sees, and then it lets you go back in with the |
| 10:33:01 | 12 | mouse and ask it to replay what is up there. |
| 10:33:06 | 13 | That's about as sophisticated as we ever got |
| 10:33:10 | 14 | with it so we could see what happened outside if |
| 10:33:12 | 15 | something was amiss.  We could rewind it and say, |
| 10:33:16 | 16 | what happened here? |
| 10:33:16 | 17 | **Q.**    Do you view the video on the DVR or is |
| 10:33:20 | 18 | there a screen? |
| 10:33:20 | 19 | **A.**    There's a monitor. |
| 10:33:23 | 20 | **Q.**    Is the monitor something apart of the |
| 10:33:26 | 21 | Swann system? |
| 10:33:26 | 22 | **A.**    No. |
| 10:33:27 | 23 | **Q.**    You've hooked the system up to the |

10:33:28   1  monitor?

10:33:29   2       **A.**    Yeah.   It's a TV.

10:33:30   3       **Q.**    What is your understanding of how

10:33:33   4  frequently the footage will record over itself?

10:33:38   5       **A.**    I don't know.

10:33:44   6       **Q.**    The two cameras that are affixed

10:33:48   7  under the third-floor eaves on the front of

10:33:52   8  37 Schmarbeck, what areas of the street does those

10:34:00   9  cameras capture?

10:34:03  10       **A.**    The one on the left -- if you're in the

10:34:05  11  house looking out, the one on the left, if you're

10:34:08  12  in the house looking out, looks almost like

10:34:10  13  straight down.

10:34:12  14       The one on the right looks to the left, like

10:34:16  15  you're looking up the street toward Broadway.

10:34:20  16       **Q.**    Are other homes located on Schmarbeck

10:34:24  17  within the view of that second camera you've

10:34:27  18  described?

10:34:32  19       **A.**    24 -- to a large part, 24 Schmarbeck,

10:34:40  20  that's on that camera.   I'm pretty sure you can see

10:34:47  21  the profile of 33 on that camera.   The camera on

10:34:57  22  the right, as you're looking toward the street.

10:34:59  23       The camera on the left, I don't think you

*Kistner - Huggins - 2/6/20*

15

| | | |
|---|---|---|
| 10:35:01 | 1 | can see any other houses.  The one that looks |
| 10:35:07 | 2 | almost straight down, I don't think you can see any |
| 10:35:09 | 3 | other houses. |
| 10:35:12 | 4 | **Q.**   Does the camera capture the sidewalk |
| 10:35:18 | 5 | and the streets in front of both 24 and 33 |
| 10:35:23 | 6 | Schmarbeck Avenue? |
| 10:35:26 | 7 | **A.**   The one on the right that looks in that |
| 10:35:30 | 8 | direction, yeah, it captures the sidewalk on both |
| 10:35:36 | 9 | sides of the street. |
| 10:35:38 | 10 | **Q.**   Why did you purchase the -- strike |
| 10:35:41 | 11 | that. |
| 10:35:41 | 12 | Why did Rachel purchase the Swann system, if |
| 10:35:53 | 13 | you know? |
| 10:35:53 | 14 | **A.**   There are two reasons.  For home |
| 10:35:56 | 15 | security, and it was on sale $200 off. |
| 10:36:11 | 16 | **Q.**   Does the Swann system allow someone to |
| 10:36:16 | 17 | access video footage without preserving the |
| 10:36:19 | 18 | footage? |
| 10:36:22 | 19 | **A.**   Say that again. |
| 10:36:24 | 20 | **Q.**   Sure.  Let me rephrase it slightly. |
| 10:36:26 | 21 | Using the system, are you able to view |
| 10:36:29 | 22 | footage without preserving it? |
| 10:36:35 | 23 | **A.**   I don't know.  You mean, can I -- |

10:36:41   1    I don't know.

10:36:42   2        **Q.**    Have you ever gone onto the system,

10:36:46   3    accessed footage from a period of time, and not

10:36:55   4    saved that footage?

10:37:05   5        **A.**    We -- either Rachel or I -- Earl even

10:37:09   6    used it in January, he looked at it. We look at it

10:37:13   7    almost every day. I mean, if there's something --

10:37:16   8    it's kind of like the window on the world outside.

10:37:25   9        If you're missing a garbage can, you can go

10:37:28 10    back and find out what happened to the trash can.

10:37:30 11    Where did the trash can go?

10:37:35 12        If Charlie lost his ball in the backyard,

10:37:37 13    you can look: Where did Charlie's ball go?

10:37:44 14        We use it in that sense to look at what has

10:37:47 15    happened to try to understand.

10:37:54 16        Have we ever used it to look back and not

10:37:57 17    preserved it? I think to preserve it -- it's still

10:38:00 18    beyond me. I've still got to call somebody in and

10:38:03 19    say, get this off of here. I want to keep it

10:38:05 20    forever.

10:38:05 21        **Q.**    Is it your understanding, based on your

10:38:09 22    experience with the Swann system, that you have the

10:38:11 23    ability to access video, and preserving it is

10:38:14  1   something separate?

10:38:16  2       **A.**   I don't know what its abilities are.

10:38:19  3   I don't know.  We just -- we use it for what we use

10:38:22  4   it for.

10:38:23  5       I'm sure it will do all kind of things if

10:38:26  6   you're smart enough to sit there and study the

10:38:29  7   book.  I don't even know if I've got the book

10:38:31  8   anymore.

10:38:38  9       **Q.**   In January of 2017, who had access to

10:38:42 10   the footage on the Swann system DVR?

10:38:46 11       **A.**   Just Rachel and I.  But Earl, he was

10:38:50 12   there that morning, and when I was in the police

10:38:54 13   car and he came back in the house, while Rachel was

10:38:57 14   at the front window, Earl went -- because he's

10:39:02 15   smart enough to figure out how to play and rewind,

10:39:05 16   which is about all I ever showed him, because I

10:39:10 17   don't know any more about it -- he looked at it.

10:39:13 18   So Earl looked at it.

10:39:15 19       Other than Earl looking at it that day --

10:39:18 20   oh, and Earl showed it to Jim Ostrowski that

10:39:22 21   morning.  So that's at least twice that Earl

10:39:25 22   rewound it on that morning and looked at it.

10:39:26 23       **Q.**   How did you come to learn that?

*Kistner - Huggins - 2/6/20*

30

| | | |
|---|---|---|
| 10:56:40 | 1 | **A.** Yeah. I have four big ones and three |
| 10:56:42 | 2 | little ones. |
| 10:56:43 | 3 | **Q.** Who is the mother of Kendall? |
| 10:56:48 | 4 | **A.** I want to make sure I get her last |
| 10:56:50 | 5 | name. I think her name is still Barber. Lisa |
| 10:56:57 | 6 | Barber. |
| 10:56:58 | 7 | **Q.** Do you have any contact with |
| 10:56:59 | 8 | Ms. Barber? |
| 10:57:03 | 9 | **A.** Not in six or seven years. |
| 10:57:06 | 10 | **Q.** Ever discuss this January 1st -- |
| 10:57:09 | 11 | **A.** No. |
| 10:57:10 | 12 | **Q.** -- incident with her? Okay. |
| 10:57:12 | 13 | Were any of your children residing with you |
| 10:57:14 | 14 | on January 1st, 2017? |
| 10:57:22 | 15 | **A.** The three little ones were at Rachel's |
| 10:57:25 | 16 | house at 37, next door. I'm sleeping and staying |
| 10:57:29 | 17 | over at 33, which is the house I own. Earl was |
| 10:57:32 | 18 | home. I can't remember whether he -- I know he had |
| 10:57:39 | 19 | to sleep over at Rachel's on the first floor at 37, |
| 10:57:42 | 20 | so Earl was staying with Rachel that night. I got |
| 10:57:48 | 21 | up early and came over. |
| 10:57:55 | 22 | Almost -- almost constantly since this, |
| 10:57:58 | 23 | though, I've been spending almost all of the time |

*Kistner - Huggins - 2/6/20*

31

10:58:00  1    over at Rachel's because she still worries.

10:58:05  2         Q.   When did you stop residing at 33 and

10:58:09  3    staying at 37?

10:58:10  4         A.   Consistently?

10:58:11  5         Q.   Consistently.

10:58:17  6         A.   I don't know.  Eight months ago.

10:58:19  7    A year ago.

10:58:27  8         Q.   What caused that change in staying at

10:58:30  9    33 to then consistently staying --

10:58:32 10         A.   Rachel's mental health.

10:58:59 11         Q.   -- at 37?

10:58:59 12         Where were Laurel, Joelle, and Kendall

10:59:03 13    living in January of 2017?

10:59:16 14         A.   I don't know.  I don't remember.

10:59:17 15         Q.   Were they residing in the Buffalo area?

10:59:26 16         A.   I want to say Joelle was, but I think

10:59:30 17    the other two were out of town.

10:59:33 18         Q.   Did you ever discuss the January 1st,

10:59:36 19    2017 incident with Laurel, Joelle, or Kendall?

10:59:40 20         A.   No.

10:59:57 21         Q.   What properties, if any, do you own on

11:00:01 22    Schmarbeck Avenue?

11:00:02 23         A.   24, 29, and 33.

| | | | |
|---|---|---|---|
| 11:00:09 | 1 | Q. | What type of property is 24 Schmarbeck? |

11:00:09 1      Q.    What type of property is 24 Schmarbeck?

11:00:11 2      A.    24 is a double.  A traditional 30 by 110.

11:00:17 3      Q.    When you say double, is it like

11:00:19 4 a lower, upper double?

11:00:21 5      A.    Yeah.

11:00:24 6      Q.    How long have you owned 24 Schmarbeck?

11:00:32 7      A.    I'm guessing to say 2007, but I think

11:00:34 8 that's kind of accurate.

11:00:37 9      Q.    What type of property is 29 Schmarbeck?

11:00:40 10      A.    It's an empty lot.

11:00:44 11      Q.    Has it always been an empty lot while

11:00:47 12 you have owned it?

11:00:48 13      A.    Yeah.

11:00:48 14      Q.    And what type of residence -- not

11:00:50 15 residence -- what type of property is 33 Schmarbeck?

11:00:54 16      A.    It's a single-family home.  It's got --

11:01:00 17 it's got an office in the back, and it's got --

11:01:10 18 it's got a finished attic and a two bedroom on the

11:01:14 19 first floor, which if I get rid of the office,

11:01:17 20 I can make a three bedroom on the first floor.  So

11:01:20 21 it's essentially a double.

11:01:21 22      Q.    Are those rooms that you have described

11:01:23 23 separate units?

11:01:26  1          A.     They have been since I got it.

11:01:37  2          Q.     What sources of income did you have in

11:01:38  3   January of 2017?

11:01:47  4          A.     Two apartment rents -- no.   Three

11:01:50  5   apartment rents.   Three apartment rents.   I've got

11:01:53  6   one of Rachel's apartment rents and then the two --

11:01:59  7   the two rooms I had rented, so there were three

11:02:01  8   sources.

11:02:02  9          It's not that way anymore but that's what it

11:02:04 10   was then.

11:02:05 11          Q.     The three units that you have described,

11:02:11 12   does that encompass 24 and 33 Schmarbeck?

11:02:15 13          A.     No.   That would be the two at 33 and

11:02:20 14   one of Rachel's units at 41.

11:02:24 15          Q.     Was 24 Schmarbeck empty?

11:02:28 16          A.     24 has been a project since the day we

11:02:32 17   got it.   Other things are constantly calling me off

11:02:38 18   of it, and then I've got to go back to it, and

11:02:43 19   then --

11:02:46 20          Q.     The unit that Rachel owns at

11:02:47 21   41 Schmarbeck --

11:02:49 22          A.     Yeah.

11:02:50 23          Q.     -- did you ever reside at 41 Schmarbeck?

*Kistner - Huggins - 2/6/20*

34

| | | |
|---|---|---|
| 11:02:52 | 1 | **A.**   Yeah. |
| 11:02:52 | 2 | **Q.**   When did you reside there? |
| 11:02:54 | 3 | **A.**   When Rachel got the first building |
| 11:02:57 | 4 | there, we were still undergrads.  Rachel and |
| 11:03:01 | 5 | I lived together there, and then on the weekends, |
| 11:03:04 | 6 | the three older kids would come over.  They were |
| 11:03:07 | 7 | like eight, nine, and 12.  So -- I don't know |
| 11:03:17 | 8 | how -- that was 20 years ago. |
| 11:03:21 | 9 | We did live there I think for six years. |
| 11:03:27 | 10 | Maybe seven. |
| 11:03:28 | 11 | **Q.**   Some time ago, though? |
| 11:03:29 | 12 | **A.**   Oh, yeah.  It's a long, long time ago. |
| 11:03:31 | 13 | **Q.**   What type of building is 41 Schmarbeck? |
| 11:03:34 | 14 | **A.**   41 is identical to 24.  They're like |
| 11:03:39 | 15 | mirror images of each other.  They're just across |
| 11:03:41 | 16 | the street.  It's a traditional Buffalo double. |
| 11:03:46 | 17 | Four bedrooms on the first floor, three bedrooms on |
| 11:03:49 | 18 | the second floor. |
| 11:03:50 | 19 | **Q.**   With the two units being an upper and |
| 11:03:52 | 20 | a lower? |
| 11:03:52 | 21 | **A.**   Yeah.  And if you finish the attic, |
| 11:03:55 | 22 | that's another 900 square feet. |
| 11:03:58 | 23 | **Q.**   Aside from the rent that you |

| | | |
|---|---|---|
| 11:49:59 | 1 | **Q.** Was anyone present at 33 when you woke |
| 11:50:01 | 2 | up on January 1st? |
| 11:50:04 | 3 | **A.** No. |
| 11:50:05 | 4 | **Q.** What did you do when you woke up? |
| 11:50:10 | 5 | **A.** Got my shoes on and went next door to |
| 11:50:13 | 6 | see if Earl was awake and Rachel and the boys. |
| 11:50:16 | 7 | **Q.** Was Earl staying in Rachel's unit on -- |
| 11:50:20 | 8 | at that time period? |
| 11:50:21 | 9 | **A.** I think Earl was downstairs in the |
| 11:50:23 | 10 | first bedroom. |
| 11:50:24 | 11 | See, 37, where Rachel lived then, it's |
| 11:50:29 | 12 | a double, but she has both units. She uses the |
| 11:50:33 | 13 | whole house. Downstairs, there's a front bedroom |
| 11:50:37 | 14 | downstairs, which has a bed in it, and when Earl |
| 11:50:40 | 15 | comes over, Earl usually sleeps there. |
| 11:50:45 | 16 | There's Rachel and the three little boys, |
| 11:50:48 | 17 | they were in cribs then -- I'm pretty sure they |
| 11:50:50 | 18 | were still in cribs -- and they're all up on the |
| 11:50:54 | 19 | second floor. |
| 11:50:55 | 20 | I have a room in the back on the second |
| 11:50:57 | 21 | floor at 37 that has a bed in it. And then I've |
| 11:51:00 | 22 | got the office that's got a barber chair. I can go |
| 11:51:04 | 23 | over there. I've got two mats in the back, if I want |

*Kistner - Huggins - 2/6/20*

71

| | | |
|---|---|---|
| 11:51:08 | 1 | to lay down. |
| 11:51:09 | 2 | But if I just go over there and turn on the |
| 11:51:11 | 3 | TV and go to sleep, it gives her a sense of she's |
| 11:51:15 | 4 | living by herself for a minute. |
| 11:51:17 | 5 | Q.   What was the weather on January 1st, |
| 11:51:30 | 6 | 2017? |
| 11:51:30 | 7 | A.   I don't remember. |
| 11:51:31 | 8 | Q.   What were you wearing? |
| 11:51:36 | 9 | A.   The whole day?  You mean when I went |
| 11:51:38 | 10 | outside? |
| 11:51:39 | 11 | Q.   That morning. |
| 11:51:42 | 12 | A.   I was wearing my -- a pair of pants and |
| 11:51:45 | 13 | a shirt, and I had -- I think I had a windbreaker |
| 11:51:53 | 14 | on, and I had leather-soled dress shoes on. |
| 11:52:01 | 15 | Q.   What type of tread was on those |
| 11:52:04 | 16 | dress shoes? |
| 11:52:08 | 17 | A.   All I can say is leather soles. |
| 11:52:19 | 18 | Q.   At some point in the morning, you went |
| 11:52:22 | 19 | over to 37 Schmarbeck? |
| 11:52:26 | 20 | A.   Yeah. |
| 11:52:26 | 21 | Q.   What time did you leave 33 and go over |
| 11:52:29 | 22 | to 37? |
| 11:52:30 | 23 | A.   It was early.  Like 6:30, 7 o'clock in |

| | | |
|---|---|---|
| 11:52:32 | 1 | the morning.  It was early. |
| 11:52:36 | 2 | **Q.**   Who was present at 37 that morning? |
| 11:52:44 | 3 | **A.**   From my memory it was me, Rachel, Earl, |
| 11:52:47 | 4 | and the three little boys. |
| 11:52:51 | 5 | **Q.**   At some point that morning your |
| 11:52:54 | 6 | attention was drawn to a red van parked on |
| 11:52:57 | 7 | Schmarbeck Avenue? |
| 11:52:58 | 8 | **A.**   Yeah.  I saw Wolfe -- I saw the van |
| 11:53:01 | 9 | pull up.  I was looking out the window when the van |
| 11:53:06 | 10 | pulled up. |
| 11:53:06 | 11 | **Q.**   What type of street -- actually, strike |
| 11:53:09 | 12 | that. |
| 11:53:09 | 13 | The block that your properties are located |
| 11:53:14 | 14 | on Schmarbeck Avenue, is that a two-way street or |
| 11:53:18 | 15 | a one-way street? |
| 11:53:21 | 16 | **A.**   It's a two-way street. |
| 11:53:23 | 17 | **Q.**   How many lanes of traffic are located |
| 11:53:27 | 18 | on Schmarbeck Avenue within that block? |
| 11:53:44 | 19 | **A.**   I would say you could -- well, I know |
| 11:53:46 | 20 | you could safely put three cars abreast, so you |
| 11:53:49 | 21 | could have a parked car on each side of the street |
| 11:53:51 | 22 | and one car could safely navigate right down the |
| 11:53:55 | 23 | middle. |

11:53:56  1       If it's a fire truck or something big, wide,

11:53:59  2  and I was going to say noisy, sometimes they have

11:54:04  3  trouble getting down the street.  The garbage

11:54:08  4  trucks and the plow trucks sometimes, when there's

11:54:10  5  people parked on both sides, they'll have trouble

11:54:12  6  negotiating the street.

11:54:13  7       Q.   Is there any crosswalk or indication on

11:54:17  8  the road for pedestrians within that block on

11:54:19  9  Schmarbeck?

11:54:22 10       A.   Up at Broadway, after they milled

11:54:28 11  it -- I don't know what year that was -- with

11:54:32 12  enough calls to City Hall, they gave us a half

11:54:35 13  a crosswalk -- a half of paved -- of painted

11:54:39 14  pavement up at the corner.

11:54:41 15      They gave us, you know, a line -- a white

11:54:44 16  line where the car could pull to the white line,

11:54:46 17  but I think that was about it.

11:54:50 18       Q.   And that's at the intersection of

11:54:51 19  Broadway and Schmarbeck?

11:54:52 20       A.   Yeah.  That's another 200 feet up the

11:54:55 21  street.

11:54:58 22       Q.   What time was it when the red van

11:55:00 23  pulled up and parked on Schmarbeck?

*Kistner - Huggins - 2/6/20*

74

| | | |
|---|---|---|
| 11:55:06 | 1 | **A.**   I don't remember the exact time. |
| 11:55:07 | 2 | **Q.**   What drew your attention to the van? |
| 11:55:10 | 3 | **A.**   Well, it pulled up in front of 33, and |
| 11:55:14 | 4 | Mike popped out of it.  Mike Wolfe popped out of |
| 11:55:18 | 5 | the driver's side.  That's what really drew my |
| 11:55:21 | 6 | attention to it was Mike Wolfe was driving it. |
| 11:55:23 | 7 | **Q.**   Was that the first time you had seen |
| 11:55:26 | 8 | Mike since he had stopped staying at 33? |
| 11:55:34 | 9 | **A.**   I think I saw him on like the 28th, but |
| 11:55:37 | 10 | it was like fleeting.  Like he just walked down the |
| 11:55:40 | 11 | street and went in the house.  But, yeah, that |
| 11:55:46 | 12 | was -- that was the first good look I had at him |
| 11:55:49 | 13 | and like that he was going to be there for a while. |
| 11:55:54 | 14 | **Q.**   What about the red van concerned you? |
| 11:55:59 | 15 | **A.**   It was a couple things.  First, six, |
| 11:56:04 | 16 | eight weeks before, Mike had asked me to cash |
| 11:56:07 | 17 | a check, and I said, I'm not cashing your check. |
| 11:56:10 | 18 | I said, take it somewhere and get it cashed.  He |
| 11:56:13 | 19 | said, well, I got no ID. |
| 11:56:15 | 20 | I said, well, how have you been cashing them |
| 11:56:17 | 21 | so far?  And he said, well, I don't want to go |
| 11:56:19 | 22 | there.  And I said, well, tell me.  And he said, |
| 11:56:22 | 23 | I give it to the crack man.  I said, well, go give |

| | | |
|---|---|---|
| 12:00:53 | 1 | really said anything.  And then when I found out |
| 12:00:55 | 2 | where he was and I tried to track him down that way |
| 12:00:57 | 3 | and say, are you going to give me the keys back? |
| 12:01:00 | 4 | Are you done over here?  That didn't work too well |
| 12:01:04 | 5 | because -- |
| 12:01:07 | 6 | Q.    Did Mike owe you any rent on January 1st, |
| 12:01:11 | 7 | 2017? |
| 12:01:11 | 8 | A.    I don't remember. |
| 12:01:12 | 9 | Q.    Did you have a written lease with Mike |
| 12:01:14 | 10 | Wolfe? |
| 12:01:15 | 11 | A.    I had a rental agreement.  We had the |
| 12:01:18 | 12 | same lease with everybody.  If it's a Section 8 |
| 12:01:21 | 13 | tenant, we call it a lease.  If it's a guy on |
| 12:01:24 | 14 | month-to-month, we just call it a rental agreement. |
| 12:01:26 | 15 | But it's the same document. |
| 12:01:28 | 16 | Q.    It's reduced to writing -- |
| 12:01:28 | 17 | A.    Yeah. |
| 12:01:29 | 18 | Q.    -- in a document? |
| 12:01:30 | 19 | A.    Yeah. |
| 12:01:41 | 20 | Q.    The observations you made of the |
| 12:01:45 | 21 | officer conversing with Mike, that occurred from |
| 12:01:48 | 22 | the kitchen -- your vantage point in your kitchen |
| 12:01:54 | 23 | at 37 at the time? |

| | | |
|---|---|---|
| 12:01:55 | 1 | **A.**    Yes. |
| 12:01:55 | 2 | **Q.**    How long did you observe Mike and the |
| 12:01:57 | 3 | officer conversing from your window? |
| 12:01:59 | 4 | **A.**    I don't remember exactly.  And |
| 12:02:01 | 5 | remember, it's you're glancing out the window, |
| 12:02:03 | 6 | you're watching, you know, you're trying to keep |
| 12:02:07 | 7 | on -- I got three little ones.  We're trying to |
| 12:02:09 | 8 | make breakfast. |
| 12:02:10 | 9 | Everybody's moving around the kitchen at |
| 12:02:12 | 10 | once, and we're trying to -- and I think I told |
| 12:02:15 | 11 | Earl:  As long as he don't put nothing in the back |
| 12:02:19 | 12 | of that van, don't worry about it.  You know, as |
| 12:02:22 | 13 | long as he's not hauling off the fridge, just don't |
| 12:02:24 | 14 | worry about it, Earl.  It's no biggie.  He's |
| 12:02:26 | 15 | probably just here getting stuff or something. |
| 12:02:28 | 16 | **Q.**    During the period of time that the |
| 12:02:29 | 17 | officer was conversing with Mike at the curb, how |
| 12:02:35 | 18 | many police vehicles were present? |
| 12:02:44 | 19 | **A.**    See, now, I'm almost relying on the |
| 12:02:46 | 20 | video and not my memory.  Do you know what I mean |
| 12:02:48 | 21 | by that? |
| 12:02:49 | 22 | **Q.**    Do you have difficulty remembering the |
| 12:02:51 | 23 | incident? |

*Kistner - Huggins - 2/6/20*

81

| | | |
|---|---|---|
| 12:02:56 | 1 | **A.** I would be delighted to forget it. |
| 12:03:01 | 2 | **Q.** Do you have difficulty remembering the |
| 12:03:04 | 3 | incident? |
| 12:03:08 | 4 | **A.** The further I get away from it, the |
| 12:03:12 | 5 | less of it I remember real clearly. No, I don't |
| 12:03:15 | 6 | have difficulty remembering it. |
| 12:03:18 | 7 | **Q.** Did there come a time when you observed |
| 12:03:19 | 8 | a second police vehicle park on Schmarbeck in the |
| 12:03:23 | 9 | vicinity of 33? |
| 12:03:29 | 10 | **A.** I don't think I seen them pull up, but |
| 12:03:33 | 11 | yeah, at some point I became aware now there's two |
| 12:03:37 | 12 | cars out there. |
| 12:03:37 | 13 | **Q.** Where were you when you became aware of |
| 12:03:39 | 14 | the second car? |
| 12:03:40 | 15 | **A.** I was still upstairs. |
| 12:03:43 | 16 | **Q.** What point did you choose to exit 37 to |
| 12:03:48 | 17 | go outside? |
| 12:03:50 | 18 | **A.** I don't -- I don't know what -- I don't |
| 12:03:55 | 19 | know what kind of conversation we were having, me |
| 12:03:58 | 20 | and Earl and Rachel, but I think when the second |
| 12:04:04 | 21 | police car got there, I thought: Oh, there's |
| 12:04:06 | 22 | something serious going on down there. |
| 12:04:10 | 23 | **Q.** What, if anything, did you observe |

12:04:11  1    about the interaction between the police and Mike

12:04:14  2    that caused you to form that opinion?

12:04:16  3         **A.**   I'm pretty sure the first police car

12:04:25  4    pulled up, the driver got out, walked over, Mike

12:04:29  5    talked to him.

12:04:29  6         Mike was pointing up at the kitchen window,

12:04:36  7    and I was like -- Rachel was concerned, because

12:04:39  8    Rachel noticed that, and she said, what is he

12:04:42  9    pointing up here for?  And I said, I don't know.

12:04:46 10    Maybe he's telling him where his landlord lives.

12:04:48 11    I don't know.

12:04:48 12         Or maybe he knew I had left, because he

12:04:52 13    could have heard me leave that morning, and maybe

12:04:54 14    he said, well, if he's not back in the back, he's

12:04:57 15    over there.

12:05:00 16         When the second police car -- okay.  They

12:05:03 17    talked for a minute, and then Mike disappears, and

12:05:06 18    then the second police car pulls up.  And I think

12:05:09 19    I thought at the time like:  Okay.  Why are all

12:05:12 20    these cops converging on the house and Mike just --

12:05:18 21    what's going on with Mike?  Mike just went in the

12:05:20 22    house.

12:05:20 23         I wasn't sure what conversation had gone on

*Kistner - Huggins - 2/6/20*

83

| | | |
|---|---|---|
| 12:05:23 | 1 | between Mike, but now more people were coming. |
| 12:05:26 | 2 | Q.   Were you able to hear any of the |
| 12:05:28 | 3 | conversation from where you were? |
| 12:05:29 | 4 | A.   No.  Just -- no, I was not able to be |
| 12:05:31 | 5 | a party to hear any of that, but I know he was |
| 12:05:34 | 6 | pointing up at the house a couple of times. |
| 12:05:37 | 7 | Q.   How long did the conversation between |
| 12:05:40 | 8 | the officers occur before you exited the home? |
| 12:05:48 | 9 | A.   I don't know.  I'd like to know, but |
| 12:05:50 | 10 | I don't. |
| 12:05:51 | 11 | Q.   Did anyone summon you out of 37? |
| 12:05:58 | 12 | A.   No. |
| 12:05:59 | 13 | Q.   Did anyone call you and ask you to come |
| 12:06:03 | 14 | out of 37? |
| 12:06:06 | 15 | A.   No. |
| 12:06:14 | 16 | Q.   Who was with you when you exited the |
| 12:06:16 | 17 | house? |
| 12:06:18 | 18 | A.   I thought Earl was like right with me |
| 12:06:20 | 19 | but he wasn't. |
| 12:06:25 | 20 | Q.   What did you do when you exited 37? |
| 12:06:29 | 21 | A.   I walked over to ask the driver of the |
| 12:06:33 | 22 | first Tahoe what was going on with Mike. |
| 12:06:38 | 23 | Q.   Did you enter the roadway in order to |

12:06:42 1 approach the first Tahoe?

12:06:45 2     **A.**    Yeah.

12:06:48 3     **Q.**    Did you in any manner call out to the

12:06:50 4 police before you entered the roadway?

12:06:55 5     **A.**    No.

12:07:06 6     **Q.**    At the point that you approached the

12:07:08 7 first Tahoe in the roadway, were any of the

12:07:10 8 officers outside of the police vehicles?

12:07:21 9     **A.**    I think when I last looked out the

12:07:26 10 window or watched or saw on the monitor, there was

12:07:30 11 one of the policemen was still out of the car.

12:07:33 12     When I left the house, my impression was

12:07:36 13 that he was still going to be there.  That's what

12:07:41 14 I thought.  I said, well, they're still out there.

12:07:43 15 I'll go talk to them.

12:07:44 16     **Q.**    When you mentioned the monitor, do you

12:07:46 17 mean that your answer is from both your

12:07:48 18 recollection and later viewing video?

12:07:54 19     **A.**    No.  That's a direct recollection from

12:07:57 20 the morning.  I remember there's still somebody out

12:08:00 21 of the car.  Let's go, Earl.

12:08:03 22     And he had to find his boots, and he had to

12:08:05 23 get his boots on.  Just slide them on.  You can tie

| | | |
|---|---|---|
| 12:08:10 | 1 | them outside.  But let's go find out, before they |
| 12:08:14 | 2 | go, what's going on.  Or before Mike gets in deep |
| 12:08:18 | 3 | shit.  Or, you know, before somebody gets in |
| 12:08:22 | 4 | trouble that maybe ought not to be in no trouble. |
| 12:08:25 | 5 | **Q.**   Had you ever intervened with the police |
| 12:08:27 | 6 | and Mike prior to this date? |
| 12:08:28 | 7 | **A.**   No.  No.  I don't do that.  I don't |
| 12:08:31 | 8 | intervene. |
| 12:08:40 | 9 | **Q.**   At some point the first police Tahoe |
| 12:08:43 | 10 | pulled away? |
| 12:08:46 | 11 | **A.**   I left the house, walked down the |
| 12:08:49 | 12 | steps, walked out into the street, and then made |
| 12:08:51 | 13 | a left to walk up to the driver's side. |
| 12:08:55 | 14 | As I was walking up to the vehicle, I said, |
| 12:08:58 | 15 | can I talk to you?  The officer on the left-hand |
| 12:09:02 | 16 | side, in the passenger seat, a male officer, he |
| 12:09:06 | 17 | started waving his arms and screaming really loud: |
| 12:09:09 | 18 | No.  We're leaving now.  We're leaving now.  We're |
| 12:09:12 | 19 | not talking to anybody. |
| 12:09:14 | 20 | **Q.**   Were you in the roadway when the |
| 12:09:17 | 21 | officer yelled? |
| 12:09:19 | 22 | **A.**   No.  I was in the roadway to the right |
| 12:09:21 | 23 | of the Tahoe.  I was already on the -- my right, |

Kistner - Huggins - 2/6/20

86

| | | |
|---|---|---|
| 12:09:27 | 1 | his left.  I was not standing in front of the |
| 12:09:29 | 2 | Tahoe, no. |
| 12:09:30 | 3 | Q.    Would that have been the driver's side |
| 12:09:33 | 4 | vehicle -- the driver's side of the Tahoe that you |
| 12:09:35 | 5 | were on? |
| 12:09:35 | 6 | A.    Yeah.  Yeah.  I was already -- because |
| 12:09:38 | 7 | I was trying to walk up to the door -- to the |
| 12:09:41 | 8 | driver's door of the first Tahoe. |
| 12:09:43 | 9 | Q.    On the roadway of Schmarbeck? |
| 12:09:46 | 10 | A.    Yeah. |
| 12:09:46 | 11 | Q.    How long or how much time elapsed from |
| 12:09:52 | 12 | when you exited 37, to when you approached the |
| 12:09:55 | 13 | first Tahoe? |
| 12:09:58 | 14 | A.    Maybe 14 seconds it takes.  I don't |
| 12:10:03 | 15 | know.  I never timed that. |
| 12:10:05 | 16 | The time it takes to leave the front door, |
| 12:10:07 | 17 | go down the steps.  I might have checked the mail. |
| 12:10:12 | 18 | I don't know.  I might have looked in the mailbox |
| 12:10:14 | 19 | for Rachel.  I don't know. |
| 12:10:15 | 20 | Q.    Where was the second police vehicle at |
| 12:10:17 | 21 | the time that you approached the first Tahoe? |
| 12:10:23 | 22 | A.    She was directly -- she was to the |
| 12:10:29 | 23 | passenger side rear.  Like diagonal, like behind |

Kistner - Huggins - 2/6/20

87

12:10:35   1    him.

12:10:35   2         **Q.**     Behind the first Tahoe?

12:10:37   3         **A.**     Yeah.

12:10:41   4         **Q.**     After the first Tahoe pulled away, did

12:10:44   5    you turn your attention to the second vehicle?

12:10:51   6         **A.**     As soon as I heard the guy in there

12:10:53   7    screaming: I'm not going to talk to anybody --

12:10:55   8    we're not talking to anybody. We're not talking to

12:10:57   9    anybody -- as soon as I heard that, I said, oh,

12:11:00  10    okay. He's not going to talk to nobody. So I just

12:11:03  11    walked past the Tahoe.

12:11:05  12        As soon as I came around the back of that

12:11:07  13    Tahoe, I looked over, and I saw the woman in the

12:11:12  14    other Tahoe parked at the curb, and I said --

12:11:17  15         **Q.**     My question was going to be: Did you

12:11:19  16    have any conversation with that officer?

12:11:20  17         **A.**     I said, can I speak to you? And she

12:11:24  18    cocked her head and smiled.

12:11:27  19         **Q.**     Did the officer -- strike that.

12:11:38  20        After the time that you turned and looked at

12:11:41  21    the second vehicle, had you changed the position of

12:11:45  22    your body with relation to the vehicle -- that's

12:11:51  23    already gotten very convoluted. Let me rephrase

*Kistner - Huggins - 2/6/20*

88

| | |
|---|---|
| 12:11:54 | 1 |

that.

12:11:55   2      At the time that you turned your attention

12:11:57   3   to the second vehicle, where were you positioned on

12:11:59   4   the roadway in Schmarbeck?

12:12:03   5      A.   I want to say I was -- I was -- it

12:12:05   6   seems like I would have been dead in the middle of

12:12:07   7   the road facing her.

12:12:09   8      Q.   Did you ever approach the second police

12:12:13   9   vehicle?

12:12:16  10      A.   Yeah.   I took two steps toward it.

12:12:18  11   After she smiled at me, I took two steps forward

12:12:22  12   and looked up.

12:12:33  13      Q.   Where was your body positioned in

12:12:35  14   relation to that second Tahoe?

12:12:41  15      A.   I don't understand how to answer that.

12:12:44  16   I don't understand the question.

12:12:45  17      Q.   How was your body oriented to that

12:12:48  18   Tahoe?

12:12:48  19      What side of the vehicle were you on or

12:12:51  20   walking towards?

12:12:54  21      MR. DAVENPORT:   Well, form.   He didn't --

12:12:57  22   well, you can go ahead and answer.

12:12:58  23      THE WITNESS:   The driver's side.   The

| | | |
|---|---|---|
| 12:13:00 | 1 | driver's side.  Like I was about even with the |
| 12:13:05 | 2 | front wheel. |
| 12:13:26 | 3 | **BY MS. HUGGINS:** |
| 12:13:26 | 4 | **Q.**   Did the driver of the second Tahoe ever |
| 12:13:28 | 5 | roll down the window? |
| 12:13:36 | 6 | **A.**   I don't know. |
| 12:13:36 | 7 | **Q.**   Did that driver ever summons you |
| 12:13:39 | 8 | towards the vehicle? |
| 12:13:49 | 9 | **A.**   I thought her smile was the |
| 12:13:51 | 10 | acknowledgement that she heard my question and |
| 12:13:54 | 11 | that she wasn't -- that she was going to be |
| 12:14:00 | 12 | receptive to speaking to me. |
| 12:14:01 | 13 | I thought when she looked over at me and she |
| 12:14:04 | 14 | smiled, that that acknowledgement was:  Yeah, I'm |
| 12:14:06 | 15 | here. |
| 12:14:07 | 16 | **Q.**   How much time elapsed from when you |
| 12:14:09 | 17 | began approaching the vehicle, to when you claim |
| 12:14:12 | 18 | you were struck? |
| 12:14:16 | 19 | **A.**   I claim?  I'm going to say five seconds |
| 12:14:32 | 20 | before she crashed into me. |
| 12:14:34 | 21 | **Q.**   Did you take any effort to avoid the |
| 12:14:37 | 22 | vehicle? |
| 12:14:38 | 23 | **A.**   Her vehicle? |

| | | |
|---|---|---|
| 12:14:40 | 1 | **Q.** Correct. Did you take any effort to |
| 12:14:43 | 2 | avoid the vehicle? |
| 12:14:43 | 3 | **A.** I didn't know she was moving her |
| 12:14:47 | 4 | vehicle. |
| 12:15:01 | 5 | **Q.** What part of your bodies -- or what |
| 12:15:05 | 6 | part of your body was struck by the vehicle? |
| 12:15:12 | 7 | **A.** I took two steps around the back of the |
| 12:15:14 | 8 | Tahoe, I looked up, I saw the car was coming at me, |
| 12:15:17 | 9 | I put my hands out in front of me, and I closed my |
| 12:15:20 | 10 | eyes. |
| 12:15:23 | 11 | The next thing I know, I was on the ground |
| 12:15:25 | 12 | and the back of my head hurt. I don't know. |
| 12:15:31 | 13 | I don't know if my hands hit, my hips hit. I don't |
| 12:15:34 | 14 | know. |
| 12:15:36 | 15 | **Q.** Why did you close your eyes? |
| 12:15:38 | 16 | **A.** I was scared she was going to hit me |
| 12:15:40 | 17 | with the car. |
| 12:15:45 | 18 | **Q.** Did you take any other action to try to |
| 12:15:47 | 19 | move out of the way? |
| 12:15:49 | 20 | **A.** There wasn't time to move out of the |
| 12:16:01 | 21 | way. |
| 12:16:01 | 22 | **Q.** Where did you experience the pain to |
| 12:16:04 | 23 | your head? |

| | | |
|---|---|---|
| 12:16:04 | 1 | **A.**   In the back of my head. |
| 12:16:17 | 2 | **Q.**   Do you have any recollection of the |
| 12:16:21 | 3 | vehicle striking you? |
| 12:16:33 | 4 | **A.**   I have -- I don't have a visual |
| 12:16:37 | 5 | recollection of it, but I have a recollection in |
| 12:16:40 | 6 | my head of falling.  I remember falling down. |
| 12:16:44 | 7 | I remember:  Oh, Christ.  It's the first -- you're |
| 12:16:48 | 8 | talking to yourself, you know.  I remember that. |
| 12:16:58 | 9 | **Q.**   What part of the vehicle struck your |
| 12:17:00 | 10 | body? |
| 12:17:03 | 11 | **A.**   I don't know.  I put my hands out. |
| 12:17:05 | 12 | That's all. |
| 12:17:12 | 13 | **Q.**   Did you notice any injury to your hands |
| 12:17:19 | 14 | after you claim the vehicle struck you? |
| 12:17:24 | 15 | **A.**   Like within the first minute?  No. |
| 12:17:28 | 16 | I wasn't -- |
| 12:17:29 | 17 | **Q.**   Immediately after. |
| 12:17:30 | 18 | **A.**   After I hit the ground, my head was |
| 12:17:32 | 19 | hurting so bad, I wasn't paying no attention to |
| 12:17:37 | 20 | nothing else but the back of my head. |
| 12:17:38 | 21 | **Q.**   Where was your body positioned with |
| 12:17:40 | 22 | relation to the Tahoe when you landed on the |
| 12:17:45 | 23 | ground? |

12:17:49   1       **A.**    I don't know when I landed on the

12:17:52   2   ground, but I know when I opened my eyes where

12:17:55   3   I was. Like my first recollection after I hit the

12:17:57   4   ground, I know where I was then.

12:18:01   5       **Q.**    How much period of time elapsed before

12:18:03   6   you opened your eyes while you were on --

12:18:05   7       **A.**    I don't know.

12:18:06   8       **Q.**    -- the ground?

12:18:07   9       **A.**    I don't know.

12:18:08   10       **Q.**    Where were you when you opened your

12:18:09   11   eyes?

12:18:10   12       **A.**    I was laying on my back, and when I go

12:18:15   13   to get up when I'm laying on my back in the street,

12:18:18   14   I kind of bend up forward, and as I bent up

12:18:22   15   forward, I looked at my feet, and my feet was up

12:18:24   16   and underneath the car.

12:18:25   17       And the first thing I thought is: She's

12:18:29   18   going to run over my legs. So I turned to my left

12:18:31   19   side, and it looked like a silent movie. It had to

12:18:39   20   look like a silent movie, because I don't remember

12:18:42   21   hearing anything, and I like moved my feet like

12:18:45   22   I was pedaling to get out from underneath the car.

12:18:47   23       And then when I got out from under it, I was

*Kistner - Huggins - 2/6/20*

160

| | | | |
|---|---|---|---|
| 13:46:01 | 1 | **A.** | Or anything else? |
| 13:46:03 | 2 | **Q.** | Not anything else. |
| 13:46:04 | 3 | **A.** | Not anything else. |
| 13:46:05 | 4 | **Q.** | Just the January 1st incident. |
| 13:46:08 | 5 | **A.** | No. |

13:46:10   6     **Q.**   I don't believe I have any further

13:46:12   7   questions for you.  Oh, I do.

13:46:16   8     Sir, do you recall receiving any type of

13:46:19   9   testing to your head in -- in June of 2009?

13:46:38  10     **A.**   I don't remember that far back.

13:46:40  11     **MS. HUGGINS:**  Okay.  Fair enough.

13:46:42  12     I have no further questions for you.

13:46:43  13   Thank you for your time.

13:46:46  14     **MR. DAVENPORT:**  All set.

13:46:47  15     **THE REPORTER:**  Will Mr. Davenport be

13:46:50  16   supplied?

13:46:50  17     **MS. HUGGINS:**  He will.

18     **THE REPORTER:**  Thank you.

19     (Deposition concluded at 1:46 p.m.)

20

21                    *     *     *

22

23

161

1        I hereby CERTIFY that I have read the

2    foregoing 160 pages, and that except as to those

3    changes (if any) as set forth in an attached errata

4    sheet, they are a true and accurate transcript of

5    the testimony given by me in the above entitled

6    action on February 6, 2020.

7

8

9                    ------------------------
10                    JAMES KISTNER

11

12

13

14

15

16

17

18

19

20

21

22

23

162

```
 1   STATE OF NEW YORK)

 2                           ss:

 3   COUNTY OF ERIE    )

 4

 5        I DO HEREBY CERTIFY as a Notary Public in and

 6   for the State of New York, that I did attend and

 7   report the foregoing deposition, which was taken

 8   down by me in a verbatim manner by means of machine

 9   shorthand.  Further, that the deposition was then

10   reduced to writing in my presence and under my

11   direction.  That the deposition was taken to be

12   used in the foregoing entitled action.  That the

13   said deponent, before examination, was duly sworn

14   to testify to the truth, the whole truth and

15   nothing but the truth, relative to said action.

16

17

18                        ---------------------------

19                        ANNE T. BARONE, RPR,
                          Notary Public.
20

21

22

23
```

163

1                    INDEX TO WITNESSES

2    Witness              Examination              Page

3     JAMES KISTNER        BY MS. HUGGINS:            3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# EXHIBIT F

**VIDEO DEPOSITION**
**KARL SCHULTZ**


UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


------------------------------------------
JAMES C. KISTNER,

                          Plaintiff,

               - vs -        Civil Action No.
                             18-cv-402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
 capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),

                          Defendants.
------------------------------------------

*JACK W. HUNT & ASSOCIATES, INC.*

2

1           Video deposition of **KARL SCHULTZ**,

2    Defendant, taken pursuant to the Federal Rules of

3    Civil Procedure, in the offices of JACK W. HUNT &

4    ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

5    New York, on February 13, 2020, commencing at

6    9:05 a.m., before ANNE T. BARONE, RPR, Notary

7    Public.

8
     APPEARANCES:        RUPP BAASE
9                        PFALZGRAF & CUNNINGHAM, LLC,
                         By JILL L. YONKERS, ESQ.,
10                       yonkers@ruppbaase.com and
                         CHAD DAVENPORT, ESQ.,
11                       davenport@ruppbaase.com,
                         1600 Liberty Building,
12                       Buffalo, New York  14202,
                         (716) 854-3400,
13                       Appearing for the Plaintiff.

14                       TIMOTHY A. BALL, ESQ.,
                         Corporation Counsel,
15                       By MAEVE E. HUGGINS, ESQ.,
                         Assistant Corporation Counsel,
16                       1137 City Hall,
                         Buffalo, New York  14202,
17                       (716) 851-4334,
                         mhuggins@city-buffalo.com,
18                       Appearing for the Defendants.

19   PRESENT:            JAMES KISTNER
                         LAUREN McDERMOTT
20                       MARC R. REBMANN, Videographer

21

09:04:45  22        **THE REPORTER:**  Usual stipulations for federal

09:04:47  23   cases?

3

| | | |
|---|---|---|
| 09:04:48 | 1 | MS. HUGGINS:  We're going to do read and |
| 09:04:50 | 2 | sign. |
| 09:04:50 | 3 | MS. YONKERS:  How long? |
| 09:04:51 | 4 | MS. HUGGINS:  Can I have 45 days? |
| 09:04:53 | 5 | MS. YONKERS:  You may. |
| 09:04:53 | 6 | MS. HUGGINS:  Thank you. |
| 09:04:54 | 7 | THE REPORTER:  And as far as billing, |
| 09:04:55 | 8 | Ms. Huggins will be supplied? |
| 09:04:59 | 9 | MS. YONKERS:  Is that usual in federal? |
| 09:05:01 | 10 | THE REPORTER:  It is. |
| 09:05:02 | 11 | MS. YONKERS:  That's what I thought.  Yes. |
| 09:05:03 | 12 | THE REPORTER:  Okay.  Thank you. |
| 09:05:03 | 13 | |
| 09:06:21 | 14 | **K A R L   S C H U L T Z**, 695 Main Street, Buffalo, |
| 09:06:31 | 15 | New York  14202, after being duly called and sworn, |
| 09:06:31 | 16 | testified as follows: |
| 09:06:34 | 17 | |
| 09:06:34 | 18 | **EXAMINATION BY MS. YONKERS:** |
| 09:06:34 | 19 | |
| 09:06:36 | 20 | Q.   Good morning, Officer Schultz. |
| 09:06:38 | 21 | A.   Good morning. |
| 09:06:39 | 22 | Q.   Again, my name is Jill Yonkers, and in |
| 09:06:42 | 23 | this case, I represent Mr. Kistner.  I'm going to |

| | | |
|---|---|---|
| 09:34:19 | 1 | Q.   Was there a time when you were working |
| 09:34:21 | 2 | a different shift? |
| 09:34:22 | 3 | A.   Yes. |
| 09:34:22 | 4 | Q.   What shift were you working before day |
| 09:34:24 | 5 | shift? |
| 09:34:25 | 6 | A.   I worked the afternoon shift for |
| 09:34:30 | 7 | roughly a year. |
| 09:34:32 | 8 | Q.   And what's the time range for the |
| 09:34:35 | 9 | afternoon shift? |
| 09:34:36 | 10 | A.   3:30 p.m. to 1:30 a.m. |
| 09:34:41 | 11 | Q.   What did you work before afternoons? |
| 09:34:44 | 12 | A.   I worked the night shift.  8 p.m. to |
| 09:34:47 | 13 | 6 a.m. |
| 09:34:51 | 14 | Q.   Do you remember which shift you were |
| 09:34:52 | 15 | working in January of 2017? |
| 09:34:55 | 16 | A.   The day shift. |
| 09:35:12 | 17 | Q.   What's the general geographic area |
| 09:35:15 | 18 | covered by C District? |
| 09:35:17 | 19 | A.   East Ferry and Jefferson.  So Jefferson |
| 09:35:26 | 20 | is the border going to the Cheektowaga border.  It |
| 09:35:31 | 21 | was East Ferry, and then cuts over to Genesee, and |
| 09:35:34 | 22 | then it kind of gets chopped up by streets going on |
| 09:35:40 | 23 | the southern part of the district.  So I'd say like |

*Schultz - Yonkers - 2/13/20*

31

09:35:43  1  William and Clinton area.

09:35:51  2          Q.    Does the C District include the street

09:35:54  3  known as Schmarbeck Avenue?

09:35:56  4          A.    Yes, it does.

09:35:57  5          Q.    Does it also include the area

09:36:00  6  encompassing the ECMC campus?

09:36:02  7          A.    No, it does not.

09:36:04  8          Q.    Which district covers ECMC?

09:36:06  9          A.    E.

09:36:08  10         Q.    That makes it easy.

09:36:11  11         Generally speaking, when you were working

09:36:20  12  for the C District, when you begin a shift, how

09:36:23  13  does the shift start for you?

09:36:26  14         A.    Well, you get there a little early to

09:36:30  15  get -- you know, get ready.  We get our gear on,

09:36:33  16  and then you go to the briefing room, and there the

09:36:37  17  lieutenants will brief you on, you know, what

09:36:40  18  happened the day, night prior.  You know, if

09:36:43  19  there's any -- anything changed -- any changes or

09:36:47  20  anything sent out administratively or departmentally.

09:36:53  21         Q.    Could that include orders for the shift

09:36:56  22  that you're about to undertake?

09:36:58  23         A.    Yes.

*Schultz - Yonkers - 2/13/20*

32

| 09:37:14 | 1 | Q. Can you tell me what you did for |
| 09:37:16 | 2 | C District as a patrol officer in the car? |
| 09:37:20 | 3 | What did you do day to day? |
| 09:37:22 | 4 | MS. HUGGINS: Form. |
| 09:37:25 | 5 | THE WITNESS: Responded to calls that I was |
| 09:37:27 | 6 | dispatched or -- or took. Just normal patrol |
| 09:37:35 | 7 | duties. |
| 09:37:35 | 8 | BY MS. YONKERS: |
| 09:37:35 | 9 | Q. Okay. What types of calls day to day |
| 09:37:41 | 10 | could you get while on patrol? |
| 09:37:44 | 11 | A. Excuse me. Anything from domestics to |
| 09:37:47 | 12 | trespasses to burglaries, robberies, shootings, |
| 09:37:51 | 13 | homicides. |
| 09:38:02 | 14 | Q. And let's say in the period of time |
| 09:38:05 | 15 | from -- of 2016 into January of 2017, were you |
| 09:38:11 | 16 | involved in training any officers at that time? |
| 09:38:15 | 17 | A. From 2016 to 2017? Yes. |
| 09:38:21 | 18 | Q. Okay. Who were you training during |
| 09:38:25 | 19 | that time? |
| 09:38:25 | 20 | A. In 2016, I honestly couldn't tell you. |
| 09:38:32 | 21 | January 2000 -- 2017, Officer Kyle Moriarity. |
| 09:38:40 | 22 | Q. And were you giving him field training |
| 09:38:44 | 23 | similar to what you had gone through? |

*Schultz - Yonkers - 2/13/20*

33

| | | |
|---|---|---|
| 09:38:46 | 1 | **A.**    I'd like to think better, but yes. |
| 09:38:49 | 2 | **Q.**    Very good. |
| 09:38:51 | 3 | And how long had Officer Moriarity been |
| 09:38:59 | 4 | working with you, let's say, before January 1 of |
| 09:39:04 | 5 | 2017? |
| 09:39:10 | 6 | **A.**    Not long.  Maybe a couple weeks. |
| 09:39:21 | 7 | **Q.**    Is there a term known as motorized |
| 09:39:25 | 8 | patrol within the Buffalo Police Department? |
| 09:39:31 | 9 | **A.**    I guess you can call it that. |
| 09:39:32 | 10 | **Q.**    Is that what we're -- you know, what |
| 09:39:34 | 11 | you're talking about as you're in the car on |
| 09:39:37 | 12 | patrol? |
| 09:39:37 | 13 | **A.**    Yeah. |
| 09:39:44 | 14 | **Q.**    Okay. |
| 09:39:45 | 15 | **A.**    Yes. |
| 09:39:46 | 16 | **Q.**    Okay.  And other than when you were |
| 09:39:48 | 17 | training Officer Moriarity, are you by yourself in |
| 09:39:50 | 18 | your car? |
| 09:39:50 | 19 | **A.**    With him? |
| 09:39:51 | 20 | **MS. HUGGINS:**  Form. |
| 09:39:52 | 21 | **BY MS. YONKERS:** |
| 09:39:52 | 22 | **Q.**    Let's say before you were training him, |
| 09:39:56 | 23 | are you usually out on calls in your own car by |

*Schultz - Yonkers - 2/13/20*

34

| | | |
|---|---|---|
| 09:39:59 | 1 | yourself or is someone with you?  How does that |
| 09:40:04 | 2 | work? |
| 09:40:04 | 3 | **MS. HUGGINS:**  Form. |
| 09:40:05 | 4 | **THE WITNESS:**  It would, for the most part, |
| 09:40:07 | 5 | be, yeah, myself in the car, then have a backup or |
| 09:40:12 | 6 | a cover officer that would be dispatched or would |
| 09:40:16 | 7 | respond with me. |
| 09:40:17 | 8 | **BY MS. YONKERS:** |
| 09:40:17 | 9 | **Q.**  But they would be in a separate car? |
| 09:40:20 | 10 | **A.**  Sometimes, yes.  Sometimes I would ride |
| 09:40:23 | 11 | with somebody, depending on the day or the situation. |
| 09:40:26 | 12 | **BY MS. YONKERS:** |
| 09:40:27 | 13 | **Q.**  I see.  Okay. |
| 09:40:27 | 14 | Did you have a particular vehicle that was |
| 09:40:28 | 15 | assigned to you in December 2016 and January 2017? |
| 09:40:32 | 16 | **A.**  Yes. |
| 09:40:33 | 17 | **Q.**  Which car was that? |
| 09:40:36 | 18 | **A.**  I couldn't tell you the number of the |
| 09:40:38 | 19 | vehicle. |
| 09:40:39 | 20 | **Q.**  But it's by number? |
| 09:40:40 | 21 | **A.**  Yes. |
| 09:40:40 | 22 | **Q.**  What type of vehicle was it? |
| 09:40:43 | 23 | **A.**  Well, I had -- I had a Charger was |

09:40:46  1   my -- was my normal vehicle, but we also used Chevy

09:40:57  2   Tahoes as well.

09:40:57  3          Q.    Was there a difference in which vehicle

09:41:00  4   you took depending on the day?  How did that work?

09:41:03  5          A.    No.   It would mainly just be if my --

09:41:06  6   or the Charger that I used was at the garage

09:41:09  7   getting serviced, then you would have to take one

09:41:12  8   of the other vehicles that was left.

09:41:14  9          Q.    I see.

09:41:14  10         And I think you told me earlier that at

09:41:23  11  the -- the briefing that happened at the beginning

09:41:25  12  of every shift, you could get orders for what was

09:41:30  13  going to happen on your shift for that day,

09:41:31  14  correct?

09:41:32  15         A.    Correct.

09:41:33  16         Q.    And that those would be from the

09:41:35  17  lieutenants?

09:41:35  18         A.    Correct.

09:41:39  19         Q.    Does any part of your collective

09:41:42  20  bargaining agreement govern what you do day to day?

09:41:47  21         MS. HUGGINS:    Form.

09:41:52  22         THE WITNESS:    That, I'm unsure of.

09:41:54  23         BY MS. YONKERS:

| | | |
|---|---|---|
| 10:40:55 | 1 | Q.    What do you think, before January 1st |
| 10:41:00 | 2 | of 2017, fewest number of calls you would have gone |
| 10:41:03 | 3 | out on in a particular shift? |
| 10:41:08 | 4 | A.    That could vary. |
| 10:41:10 | 5 | Q.    So it's over a ten-hour period, right? |
| 10:41:12 | 6 | A.    Yeah. |
| 10:41:12 | 7 | Q.    So it could be as few as -- could it be |
| 10:41:15 | 8 | as few as one? |
| 10:41:18 | 9 | A.    I would say no.  More than that. |
| 10:41:22 | 10 | Between maybe five and ten. |
| 10:41:25 | 11 | Q.    Would be the fewest. |
| 10:41:27 | 12 | And then what about on the high end? |
| 10:41:33 | 13 | A.    15 plus.  20 plus.  Depending on the |
| 10:41:38 | 14 | day. |
| 10:41:38 | 15 | Q.    Do you know how many calls you went out |
| 10:41:40 | 16 | on on January 1st, 2017, before going to Schmarbeck? |
| 10:41:45 | 17 | A.    No, I do not. |
| 10:41:46 | 18 | Q.    What about the -- over the course of |
| 10:41:48 | 19 | the entirety of that day, do you know how many you |
| 10:41:51 | 20 | went out on? |
| 10:41:52 | 21 | A.    No. |
| 10:41:52 | 22 | Q.    Do you remember anything about the |
| 10:41:53 | 23 | calls you went out on before going to Schmarbeck? |

*Schultz - Yonkers - 2/13/20*

88

| | | | |
|---|---|---|---|
| 10:41:57 | 1 | **A.** | No. |
| 10:41:57 | 2 | **Q.** | What about the ones after? |
| 10:42:01 | 3 | **A.** | No, I don't. |

10:42:09   4      **Q.**   Are you assigned a particular unit
10:42:14   5   number?

10:42:16   6      **A.**   Like my call sign?

10:42:17   7      **Q.**   Yeah, what's your call sign?

10:42:19   8      **A.**   Right now it's Bravo 243.

10:42:24   9      **Q.**   What was it back in January of 2017?

10:42:27   10      **A.**   I believe it was Charlie 230.

10:42:31   11      **Q.**   At the time of January 1st, 2017, would
10:42:35   12   Officer Moriarity have had his own call sign or
10:42:39   13   would he have been working under yours?

10:42:41   14      **A.**   No.  He would have been working under
10:42:44   15   mine.

10:42:44   16      **Q.**   In terms of your duties that day, would
10:42:46   17   he have been using the radio for communication at
10:42:48   18   all or would that all have been on you?

10:42:54   19      **A.**   It could have been both.  I can't
10:42:57   20   remember if -- it's all on when he or she is
10:43:02   21   comfortable on using the radio.

10:43:06   22      **Q.**   Do you remember going out to Schmarbeck
10:43:09   23   that day?

*Schultz - Yonkers - 2/13/20*

89

| | | |
|---|---|---|
| 10:43:10 | 1 | **A.**   Yes. |
| 10:43:10 | 2 | **Q.**   Do you remember the circumstances that |
| 10:43:12 | 3 | brought you out to Schmarbeck that day? |
| 10:43:15 | 4 | **A.**   I don't remember the initial -- the |
| 10:43:19 | 5 | call that was put in.  I don't remember, no. |
| 10:43:21 | 6 | **Q.**   What do you remember about going out to |
| 10:43:24 | 7 | Schmarbeck? |
| 10:43:29 | 8 | **A.**   Just that entire time that we were |
| 10:43:30 | 9 | there? |
| 10:43:31 | 10 | **Q.**   Start with the first moment.  Did you |
| 10:43:33 | 11 | arrive in the morning? |
| 10:43:35 | 12 | **A.**   I believe so, yes. |
| 10:43:36 | 13 | **Q.**   What do you -- what do you remember |
| 10:43:38 | 14 | doing upon arrival? |
| 10:43:47 | 15 | **A.**   I believe we spoke with somebody that |
| 10:43:49 | 16 | was on the street, that lived on the street, and |
| 10:43:52 | 17 | then as we were leaving, that's when I believe we |
| 10:43:56 | 18 | came into contact with Mr. Kistner, but I don't -- |
| 10:43:58 | 19 | the details on the -- the call, the incident |
| 10:44:02 | 20 | before, I don't -- I don't remember any of that. |
| 10:44:04 | 21 | **Q.**   When you say, we spoke with someone on |
| 10:44:06 | 22 | the street, are you referring to yourself and |
| 10:44:08 | 23 | Officer Moriarity? |

*Schultz - Yonkers - 2/13/20*

90

10:44:11 1          A.    Yes.

10:44:11 2          Q.    Okay.   And did there come a time when

10:44:14 3    additional officers arrived on Schmarbeck?

10:44:16 4          A.    Yes.

10:44:16 5          Q.    What -- what led to that?

10:44:19 6          A.    I believe they were just covering --

10:44:25 7    covering our call.

10:44:25 8          Q.    What does that mean to be covering

10:44:27 9    a call?

10:44:27 10         A.    Just that they were our backup

10:44:29 11   officers.

10:44:32 12         Q.    Do backup officers always arrive or

10:44:35 13   does it depend on the call type?

10:44:37 14         A.    It depends on the call type.

10:44:41 15         Q.    What kind of call types trigger the

10:44:48 16   arrival of a backup covering officer?

10:44:53 17         A.    Well, they try to dispatch at least

10:44:55 18   two -- two officers to a call.   It could be

10:44:59 19   anything from an alarm, to a traffic stop, to

10:45:02 20   a domestic.   Basically anything you want to have

10:45:06 21   more than just one car there.

10:45:07 22         Q.    And is that something that you decide

10:45:08 23   or does dispatch decide that?

*Schultz - Yonkers - 2/13/20*

91

| | | |
|---|---|---|
| 10:45:12 | 1 | A.   We can call for an extra car or two, |
| 10:45:14 | 2 | but also dispatch can -- you know, they'll say, |
| 10:45:17 | 3 | let -- let us get you another car, and they can |
| 10:45:21 | 4 | also dispatch more than one. |
| 10:45:22 | 5 | Q.   Okay.  Do you know what happened on |
| 10:45:24 | 6 | this occasion on January 1st, 2017? |
| 10:45:27 | 7 | A.   I don't remember if the backup car was |
| 10:45:30 | 8 | dispatched or if they had, you know, covered -- |
| 10:45:34 | 9 | taken upon themselves to cover. |
| 10:45:36 | 10 | Q.   Okay.  You said earlier that as you |
| 10:45:39 | 11 | were leaving:  We came in contact with Mr. Kistner. |
| 10:45:42 | 12 | What did you mean by that? |
| 10:45:45 | 13 | A.   He was walking -- walking out or from |
| 10:45:50 | 14 | one of the houses, and it was just a simple, you |
| 10:45:55 | 15 | know, we're leaving.  You know, it's -- you know, |
| 10:45:59 | 16 | it's as simple as that. |
| 10:46:02 | 17 | Q.   Did he try to talk to you in any way? |
| 10:46:04 | 18 | A.   I don't believe he tried to talk to us. |
| 10:46:06 | 19 | Q.   Were you driving the vehicle, or were |
| 10:46:08 | 20 | you the passenger in the vehicle? |
| 10:46:12 | 21 | A.   I -- I want to say I was driving, but |
| 10:46:17 | 22 | I'm -- I'm not sure. |
| 10:46:20 | 23 | Q.   What about the -- the covering |

| | | |
|---|---|---|
| 10:46:23 | 1 | officers?  Who arrived as your backup? |
| 10:46:26 | 2 | **A.**   Officer Velez and McDermott. |
| 10:46:34 | 3 | **Q.**   Do you remember how you reached the |
| 10:46:36 | 4 | decision that it was time to leave the scene? |
| 10:46:46 | 5 | **A.**   I think after we had completed the -- |
| 10:46:49 | 6 | the call that we were sent there for, and that's |
| 10:46:53 | 7 | when we, you know, had -- we try not to, you know, |
| 10:46:58 | 8 | stay stationary, you know, if we don't need to.  If |
| 10:47:01 | 9 | the call is completed, then, you know, we move |
| 10:47:04 | 10 | about our day and get back on actively patrolling. |
| 10:47:07 | 11 | **Q.**   Okay.  And in this case, where was |
| 10:47:10 | 12 | Mr. Kistner in relation to your vehicle? |
| 10:47:14 | 13 | **MS. HUGGINS:**   Form. |
| 10:47:18 | 14 | **THE WITNESS:**   He was on the -- the passenger |
| 10:47:22 | 15 | side, but I'm -- I'm not sure where he went from |
| 10:47:25 | 16 | there, if it was in front or behind.  I'm not sure. |
| 10:47:27 | 17 | **BY MS. YONKERS:** |
| 10:47:27 | 18 | **Q.**   In thinking about that now, since he |
| 10:47:29 | 19 | was on the passenger side, were you closer to him |
| 10:47:32 | 20 | or was Officer Moriarity? |
| 10:47:34 | 21 | **A.**   I can't remember if I was passenger or |
| 10:47:35 | 22 | driver. |
| 10:47:36 | 23 | **Q.**   Okay.  That's okay. |

*Schultz - Yonkers - 2/13/20*

93

| | | |
|---|---|---|
| 10:47:39 | 1 | Did Mr. Kistner -- |
| 10:47:41 | 2 | **A.**   I was passenger.  Sorry. |
| 10:47:42 | 3 | **Q.**   You remember that now? |
| 10:47:46 | 4 | **A.**   Yes. |
| 10:47:46 | 5 | **Q.**   Okay.  Did you -- did Mr. Kistner ask |
| 10:47:52 | 6 | you if he could talk with you at all? |
| 10:47:53 | 7 | **A.**   That, I don't remember. |
| 10:47:59 | 8 | **Q.**   Does Officer Moriarity then pull the |
| 10:48:02 | 9 | car away? |
| 10:48:04 | 10 | **A.**   I believe so, yes. |
| 10:48:05 | 11 | **Q.**   Do you know, at that time, were you on |
| 10:48:07 | 12 | your way to another call? |
| 10:48:10 | 13 | **A.**   At that time I -- I believe so.  That, |
| 10:48:13 | 14 | or, you know, assisting another officer.  I believe |
| 10:48:16 | 15 | so. |
| 10:48:17 | 16 | **Q.**   And what caused you to -- what happened |
| 10:48:21 | 17 | next? |
| 10:48:22 | 18 | **A.**   After we had attempted to -- to pull |
| 10:48:25 | 19 | away? |
| 10:48:30 | 20 | I saw the gentleman going up to Officer |
| 10:48:33 | 21 | McDermott and Officer Velez's vehicle, and that's |
| 10:48:37 | 22 | when I told Officer Moriarity to stop the vehicle |
| 10:48:41 | 23 | so that we could observe -- we didn't want to leave |

*Schultz - Yonkers - 2/13/20*

94

| | | |
|---|---|---|
| 10:48:45 | 1 | officers alone, so I said, stop the vehicle, and |
| 10:48:48 | 2 | observed the interaction. |
| 10:48:51 | 3 |     **Q.**    Who was driving the Velez and McDermott |
| 10:48:53 | 4 | vehicle? |
| 10:48:54 | 5 |     **A.**    I believe it was Officer McDermott. |
| 10:49:00 | 6 |     **Q.**    And when you stopped the car to |
| 10:49:03 | 7 | observe, what was your body position?  Were you |
| 10:49:05 | 8 | looking through mirrors?  Did you turn around? |
| 10:49:07 | 9 | Tell me about that. |
| 10:49:08 | 10 |     **A.**    I was in the passenger side, so I was |
| 10:49:10 | 11 | looking into the driver's side mirror, and I was |
| 10:49:15 | 12 | able to observe the interaction in its entirety. |
| 10:49:21 | 13 |     **Q.**    And when you say -- do you mean the |
| 10:49:23 | 14 | driver's side mirror or the passenger side mirror? |
| 10:49:26 | 15 |     **A.**    No, I couldn't see from my passenger |
| 10:49:28 | 16 | side.  I was observing only through the driver's |
| 10:49:33 | 17 | side mirror. |
| 10:49:33 | 18 |     **Q.**    And how was Officer Moriarity observing |
| 10:49:38 | 19 | the interaction? |
| 10:49:38 | 20 |     **A.**    Excuse me.  He was in the driver's |
| 10:49:41 | 21 | seat, and he was also looking in the driver's side |
| 10:49:43 | 22 | mirror. |
| 10:49:46 | 23 |     **Q.**    What did you observe? |

*Schultz - Yonkers - 2/13/20*

95

| | | |
|---|---|---|
| 10:49:49 | 1 | **A.**    At that time I had observed Officer |
| 10:49:54 | 2 | McDermott and Velez attempt to -- to leave.  Excuse |
| 10:50:03 | 3 | me.  They abruptly stopped.  I observed Mr. Kistner |
| 10:50:07 | 4 | was very close to the vehicle and contact was made |
| 10:50:14 | 5 | with the vehicle.  The driver's side mirror. |
| 10:50:29 | 6 | **Q.**    What's the approximate size of the |
| 10:50:31 | 7 | driver's side mirror of the vehicle that you were |
| 10:50:32 | 8 | using to observe all this? |
| 10:50:37 | 9 | **A.**    I don't want to -- you know, I don't |
| 10:50:40 | 10 | know how -- how big the Tahoe mirrors are. |
| 10:50:43 | 11 | **Q.**    But it was a Chevy Tahoe? |
| 10:50:44 | 12 | **A.**    It was a Chevy Tahoe, yes. |
| 10:50:46 | 13 | **Q.**    Was that one of the new ones that came |
| 10:50:48 | 14 | into place? |
| 10:50:50 | 15 | **A.**    I -- I would have to -- to see.  I'm |
| 10:50:53 | 16 | not sure if it was a 2014 or '15. |
| 10:51:03 | 17 | **Q.**    And to your knowledge, do the police |
| 10:51:04 | 18 | vehicles have any kind of enhanced mirrors? |
| 10:51:06 | 19 | You know how back in the day you could get |
| 10:51:08 | 20 | bigger mirrors on your personal vehicle? |
| 10:51:11 | 21 | **A.**    Yeah, I know what you're speaking of, |
| 10:51:16 | 22 | but no, I don't believe -- I would have to see the |
| 10:51:19 | 23 | mirror, but I don't believe there's any -- you |

*Schultz - Yonkers - 2/13/20*

96

| | | |
|---|---|---|
| 10:51:21 | 1 | know, like the cheater mirrors, the circular ones, |
| 10:51:25 | 2 | I don't -- I don't believe so. |
| 10:51:32 | 3 | Q.    And the -- the action that you |
| 10:51:34 | 4 | observed, you saw the McDermott/Velez vehicle stop? |
| 10:51:38 | 5 | A.    Yes. |
| 10:51:41 | 6 | Q.    And the contact happened after they |
| 10:51:43 | 7 | stopped? |
| 10:51:43 | 8 | A.    Yes. |
| 10:51:44 | 9 | Q.    Was Mr. Kistner still on his feet when |
| 10:51:50 | 10 | they stopped their car? |
| 10:51:51 | 11 | MS. HUGGINS:   Form. |
| 10:51:51 | 12 | THE WITNESS:   Yes. |
| 10:51:53 | 13 | BY MS. YONKERS: |
| 10:51:56 | 14 | Q.    When you say you saw Mr. Kistner close |
| 10:51:58 | 15 | to the vehicle, how close are we talking about? |
| 10:52:03 | 16 | A.    Less than a foot.  From my -- my view |
| 10:52:07 | 17 | in the mirror, less -- I would say less than |
| 10:52:10 | 18 | a foot. |
| 10:52:11 | 19 | Q.    And what part of the car was he closest |
| 10:52:14 | 20 | to? |
| 10:52:15 | 21 | A.    He was closest to the -- where the door |
| 10:52:21 | 22 | opens on the Tahoe, like the front fender, driver's |
| 10:52:24 | 23 | side mirror. |

*Schultz - Yonkers - 2/13/20*

97

| | | |
|---|---|---|
| 10:52:25 | 1 | **Q.**    And when you say contact was made with |
| 10:52:29 | 2 | the vehicle, what do you mean by that? |
| 10:52:32 | 3 | **A.**    Like I said, you know, from my vehicle |
| 10:52:37 | 4 | and the driver's side mirror, it looked like he had |
| 10:52:43 | 5 | reached his hand out, touching the vehicle, and |
| 10:52:54 | 6 | they -- like I said, they -- they had abruptly |
| 10:52:56 | 7 | stopped, he reached his hand out, and then he went |
| 10:52:59 | 8 | to the ground. |
| 10:53:00 | 9 | **Q.**    And just so the record is clear, you |
| 10:53:03 | 10 | were gesturing with your left hand.  Did you see |
| 10:53:05 | 11 | him reaching his left hand out, or is that just |
| 10:53:08 | 12 | a -- a natural reaction you're having? |
| 10:53:10 | 13 | **A.**    Just me replaying in my head to try to |
| 10:53:13 | 14 | think.  I don't know which -- which hand he used, |
| 10:53:15 | 15 | but just from my recollection, one of his hands was |
| 10:53:19 | 16 | reached out.  I'm not sure if it was his left or |
| 10:53:21 | 17 | right. |
| 10:53:21 | 18 | **Q.**    Are you left- or right-handed? |
| 10:53:23 | 19 | **A.**    I am right-handed. |
| 10:53:24 | 20 | **Q.**    Did Mr. Kistner's hand come in contact |
| 10:53:29 | 21 | with the Velez/McDermott vehicle? |
| 10:53:31 | 22 | **A.**    I believe so. |
| 10:53:32 | 23 | **Q.**    And did you see him take any action |

10:53:38   1   other than put his arm out?

10:53:43   2        A.   He took no, I guess, evasive action

10:53:49   3   to -- to attempt to not get hit.

10:53:54   4        Q.   Based on your observation and thinking

10:53:57   5   about it now, do you believe that Mr. Kistner came

10:54:01   6   into contact with the vehicle or the vehicle came

10:54:04   7   in contact with him?

10:54:06   8        A.   I believe that he came into contact

10:54:08   9   with the vehicle.

10:54:09   10        Q.   What makes you think that?

10:54:10   11        A.   Because like I said, from my view,

10:54:14   12   I had saw that the vehicle had stopped abruptly,

10:54:18   13   and then that second later is when his hand or arm

10:54:26   14   made contact with the vehicle.   Split second.

10:54:30   15        Q.   So it was fast?

10:54:31   16        A.   It was very fast.

10:54:32   17        Q.   So from the time -- how much time do

10:54:34   18   you think passed from the time the vehicle stopped,

10:54:37   19   till you saw Mr. Kistner on the ground?

10:54:40   20        A.   Seconds.

10:54:41   21        Q.   Did you see any part of his body other

10:54:45   22   than his hand come in contact with the police

10:54:47   23   vehicle?

*Schultz - Yonkers - 2/13/20*

99

10:54:51  1          **A.**    I -- I don't recall.  I don't remember.

10:54:53  2          **Q.**    You don't remember if his -- his body

10:54:56  3   came in contact, you know, his torso came in

10:54:58  4   contact with the car or the vehicle?

10:55:00  5          **A.**    No.

10:55:02  6          **Q.**    What was his body position after the

10:55:05  7   collision?

10:55:07  8          **A.**    He was laying down on the street, on

10:55:10  9   the driver's side of the vehicle, I believe on

10:55:15 10   his -- on his back.

10:55:16 11          **Q.**    Was his head positioned more toward

10:55:20 12   your vehicle or more toward the opposite end of the

10:55:24 13   street?

10:55:25 14          **MS. HUGGINS:**  Form.

10:55:26 15          **THE WITNESS:**  That, I don't know.

10:55:27 16          **BY MS. YONKERS:**

10:55:27 17          **Q.**    Was he parallel with where the -- the

10:55:32 18   street ran or perpendicular to the street?

10:55:34 19          **MS. HUGGINS:**  Form.

10:55:41 20          **THE WITNESS:**  I -- I don't want to say one

10:55:43 21   thing and it was the other.  I honestly don't

10:55:44 22   remember.

10:55:45 23          **BY MS. YONKERS:**

| | | |
|---|---|---|
| 10:55:45 | 1 | **Q.** Do you remember anything about what |
| 10:55:47 | 2 | Mr. Kistner was wearing that day? |
| 10:55:48 | 3 | **A.** No. |
| 10:55:51 | 4 | **Q.** Do you remember what the weather was |
| 10:55:52 | 5 | like that day? |
| 10:55:56 | 6 | **A.** Cold. |
| 10:55:57 | 7 | **Q.** Were the roads clear? |
| 10:55:59 | 8 | **A.** For the most part, I believe so. |
| 10:56:02 | 9 | **Q.** Have there ever been occasions where |
| 10:56:04 | 10 | you've gone out on a call during the wintertime and |
| 10:56:07 | 11 | you've asked for any kind of snow or ice removal |
| 10:56:12 | 12 | services? Anything like that? |
| 10:56:13 | 13 | **A.** Yes. |
| 10:56:13 | 14 | **Q.** What -- under what circumstances? |
| 10:56:17 | 15 | **A.** It would be either if we, you know, in |
| 10:56:22 | 16 | the police vehicle had slipped, say -- you know, |
| 10:56:25 | 17 | say, you need to get a plow over here to salt, or |
| 10:56:27 | 18 | there was an accident that had happened from, say, |
| 10:56:32 | 19 | ice or snow, so, you know, the plows will come over |
| 10:56:35 | 20 | and give it a good salting. |
| 10:56:37 | 21 | **Q.** Do you remember doing that on this |
| 10:56:39 | 22 | occasion, January 1st, 2017? |
| 10:56:41 | 23 | **A.** No, I don't recall doing that. |

*Schultz - Yonkers - 2/13/20*

101

| | | |
|---|---|---|
| 10:56:43 | 1 | **Q.**   So what happened after you observed |
| 10:56:45 | 2 | Mr. Kistner on the street, what happened next? |
| 10:56:52 | 3 | **A.**   I exited my vehicle, and we walked back |
| 10:56:57 | 4 | to check on Mr. Kistner, just to kind of assess his |
| 10:57:05 | 5 | condition. |
| 10:57:06 | 6 | **Q.**   And were -- by the time you walked |
| 10:57:09 | 7 | back -- I guess let me ask you this first:  How far |
| 10:57:11 | 8 | away from the collision area was your vehicle? |
| 10:57:15 | 9 | **MS. HUGGINS:**  Form. |
| 10:57:17 | 10 | **THE WITNESS:**  I'd say -- |
| 10:57:20 | 11 | **BY MS. YONKERS:** |
| 10:57:20 | 12 | **Q.**   You can do it by feet, car lengths. |
| 10:57:22 | 13 | However it's -- |
| 10:57:23 | 14 | **A.**   I would say maybe two, three car |
| 10:57:27 | 15 | lengths at the most. |
| 10:57:28 | 16 | **Q.**   And as you're walking back to the -- |
| 10:57:33 | 17 | the scene of the collision, what were Officers |
| 10:57:36 | 18 | Velez and McDermott doing? |
| 10:57:40 | 19 | **A.**   That -- that, I don't remember. |
| 10:57:42 | 20 | **Q.**   Had they gotten out of their vehicle by |
| 10:57:44 | 21 | the time you got to Mr. Kistner? |
| 10:57:47 | 22 | **A.**   I -- I believe so.  Either that or |
| 10:57:49 | 23 | they -- they were just getting out. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York 14202 - (716) 853-5600*

10:57:51  1          Q.    Okay.  And what happened next?

10:57:55  2          A.    That's, again, we -- you know, he was

10:57:57  3     alert, so we were -- assessed the situation, him

10:58:01  4     primarily, and made sure that, you know, he was

10:58:10  5     okay.  That was the initial thing.  And then where

10:58:13  6     to go from there.

10:58:15  7          Q.    How did you make sure he was okay?

10:58:17  8     What do you mean by that?

10:58:19  9          A.    We gave him a visual, you know, check,

10:58:23 10     make sure that there's no bleeding; no, you know,

10:58:26 11     head wounds.

10:58:31 12          Q.    Was he saying anything at the time?

10:58:34 13          A.    He was, because he was alert.

10:58:37 14          Q.    What was he saying?

10:58:37 15          A.    I don't -- I honestly don't remember

10:58:40 16     exactly what he was saying.

10:58:41 17          Q.    Did he say anything about any part of

10:58:43 18     his body hurting him?

10:58:46 19          A.    Not that I can recall, no.

10:58:49 20          Q.    Is that something that you would take

10:58:51 21     into account as part of your assessment?

10:58:53 22          A.    Yes.

10:58:54 23          Q.    Did anyone ask Mr. Kistner any

*Schultz - Yonkers - 2/13/20*

103

| | | |
|---|---|---|
| 10:58:58 | 1 | questions at that time? |
| 10:59:01 | 2 | A. That, I don't know. I don't -- I don't |
| 10:59:03 | 3 | believe so. |
| 10:59:04 | 4 | Maybe, you know, are you okay? Can you |
| 10:59:07 | 5 | move? Can you, you know -- |
| 10:59:09 | 6 | Q. But sitting here today, you don't |
| 10:59:11 | 7 | remember his responses? |
| 10:59:12 | 8 | A. No. |
| 10:59:12 | 9 | Q. And that would have been typical |
| 10:59:14 | 10 | protocol, to ask the individual: Are you okay? |
| 10:59:17 | 11 | Do you -- you know -- |
| 10:59:18 | 12 | A. Yes. Just to get an initial |
| 10:59:20 | 13 | assessment. |
| 10:59:20 | 14 | Q. Who was the person asking the |
| 10:59:22 | 15 | questions? |
| 10:59:23 | 16 | MS. HUGGINS: Form. |
| 10:59:29 | 17 | THE WITNESS: I'm not sure at the time. |
| 10:59:30 | 18 | BY MS. YONKERS: |
| 10:59:31 | 19 | Q. Since there's four officers out there |
| 10:59:33 | 20 | at this point in time, how do you figure out -- who |
| 10:59:37 | 21 | takes the lead? |
| 10:59:42 | 22 | A. I guess it's just -- I believe, at that |
| 10:59:49 | 23 | time, I took the lead, you know, in assessing, and |

10:59:54  1   I believe I may have been the one asking questions,

10:59:56  2   but again, I don't -- I'm not a hundred percent

10:59:58  3   certain.

11:00:00  4        So I believe after that moment, I had --

11:00:04  5   I had taken the lead.

11:00:06  6        Q.   Were you the senior -- the person with

11:00:08  7   the most seniority at the scene, do you know?

11:00:13  8        A.   Yes.  Yes, I was.

11:00:14  9        Q.   So what do you remember after questions

11:00:16 10   were asked of Mr. Kistner and he may have given

11:00:20 11   responses?  What do you remember happening next?

11:00:22 12        A.   At that time we had gotten him to his

11:00:29 13   feet and escorted him to our police vehicle,

11:00:34 14   because he was alert and able to -- to be mobile --

11:00:37 15   mobile.  Again, to, you know, assess the situation

11:00:44 16   as to where we need to go from there.

11:00:46 17        Q.   Were his feet ever under the

11:00:52 18   Velez/McDermott vehicle?

11:00:53 19        A.   That, I don't remember.

11:00:56 20        Q.   Did you ask him if he had been taking

11:00:57 21   any medication?

11:01:01 22        A.   At some point I may have.  I don't know

11:01:05 23   if it was, you know, right there or in the vehicle.

11:01:08  1   I'm not -- I'm not certain when it was asked.

11:01:11  2        Q.   Did you ask him if he had hit his head

11:01:14  3   in any way as a result of the collision?

11:01:17  4        A.   Not from the collision, but from the

11:01:20  5   ground.

11:01:20  6        Q.   Okay.  Well, that was the result of the

11:01:22  7   collision, right?  He went to the ground?

11:01:24  8        MS. HUGGINS:  Form.

11:01:24  9        THE WITNESS:  He went -- when he was on the

11:01:26 10   ground, that's why I asked, you know, just to look,

11:01:30 11   an assessment, like I said, to make sure that there

11:01:33 12   was no, you know, head wound that was bleeding, you

11:01:36 13   know, needing stitches or, you know, like brain

11:01:40 14   injury.  Anything, you know.

11:01:41 15        BY MS. YONKERS:

11:01:42 16        Q.   Do you get training on recognizing

11:01:43 17   signs of head injuries as part of your work?

11:01:49 18        A.   Excuse me.  I would say yes, but not,

11:01:53 19   you know, like in detail.  Not that I can diagnose

11:01:56 20   or any of that.

11:01:57 21        Q.   When's the last time you had any kind

11:01:59 22   of training with respect to assessing head injuries

11:02:01 23   before January 1st of 2017?

*Schultz - Yonkers - 2/13/20*

106

| | | |
|---|---|---|
| 11:02:04 | 1 | **A.**    That, I couldn't tell you. |
| 11:02:05 | 2 | **Q.**    Do you yourself have any medical |
| 11:02:07 | 3 | training or emergency technician training? |
| 11:02:10 | 4 | **A.**    Just what was given in the academy and |
| 11:02:13 | 5 | in the military.  You know, certain just annual |
| 11:02:16 | 6 | updates. |
| 11:02:16 | 7 | **Q.**    Do you get any kind of first aid or CPR |
| 11:02:22 | 8 | training? |
| 11:02:24 | 9 | **A.**    We do in the academy, yes. |
| 11:02:26 | 10 | **Q.**    But you hadn't had that since you left |
| 11:02:28 | 11 | the academy? |
| 11:02:30 | 12 | **A.**    Correct. |
| 11:02:34 | 13 | **Q.**    Was Mr. Kistner holding any part of his |
| 11:02:36 | 14 | body while he was on the ground? |
| 11:02:38 | 15 | **A.**    That, I don't remember. |
| 11:02:40 | 16 | **Q.**    How long was he on the ground before |
| 11:02:42 | 17 | you got him to his feet? |
| 11:02:48 | 18 | **A.**    That, I'm not sure. |
| 11:02:51 | 19 | **Q.**    Do you let someone who has been in an |
| 11:02:54 | 20 | accident sit for any length of time before you ask |
| 11:03:00 | 21 | them to get to their feet? |
| 11:03:02 | 22 | **MS. HUGGINS:**  Form. |
| 11:03:02 | 23 | **THE WITNESS:**  Usually if they're alert and |

| | | |
|---|---|---|
| 11:03:04 | 1 | there's no signs of a visible head injury, then no. |
| 11:03:10 | 2 | We'll -- we'll escort them, you know, assist them |
| 11:03:12 | 3 | to their feet or, you know, assist them to a safer |
| 11:03:15 | 4 | location to sit down, instead of having them in the |
| 11:03:17 | 5 | middle of the street or, you know, wherever it may |
| 11:03:20 | 6 | be. |
| 11:03:20 | 7 | **BY MS. YONKERS:** |
| 11:03:21 | 8 | Q.   And in this particular instance, how |
| 11:03:24 | 9 | much assistance did you have to give Mr. Kistner to |
| 11:03:26 | 10 | get him to his feet? |
| 11:03:29 | 11 | A.   You want -- you never really want just |
| 11:03:34 | 12 | one person assisting somebody, you know, to their |
| 11:03:35 | 13 | feet, if you can help it, so I -- I believe me and |
| 11:03:38 | 14 | Officer Moriarity assisted him to his feet. |
| 11:03:41 | 15 | Q.   When you assisted him to his feet, did |
| 11:03:43 | 16 | you put him in handcuffs? |
| 11:03:46 | 17 | A.   At some point we did.  I'm not sure if |
| 11:03:49 | 18 | it was on the ground or standing up. |
| 11:03:51 | 19 | Q.   What would be typical in a situation |
| 11:03:52 | 20 | like this?  Would you put handcuffs on someone on |
| 11:03:55 | 21 | the ground? |
| 11:03:56 | 22 | **MS. HUGGINS:**  Form. |
| 11:03:57 | 23 | **THE WITNESS:**  It would depend.  Like I said, |

*Schultz - Yonkers - 2/13/20*

11:04:01  1   I can't remember if we did on the ground or

11:04:03  2   standing up.

11:04:03  3          **BY MS. YONKERS:**

11:04:04  4          **Q.**   But certainly before he was escorted to

11:04:06  5   your vehicle, he was in handcuffs.

11:04:07  6          **A.**   I believe so, yes.

11:04:08  7          **Q.**   Who put the handcuffs on?

11:04:12  8          **A.**   That, I can't remember.

11:04:12  9          **Q.**   Would it have been you or Officer

11:04:15  10  Moriarity?

11:04:15  11         **A.**   Most likely.

11:04:17  12         **Q.**   Why do you say that?

11:04:18  13         **A.**   Because we were the ones who had

11:04:21  14  assisted him to the feet -- to his feet, and

11:04:24  15  I don't believe that Officer McDermott or Velez had

11:04:28  16  any physical, you know, hands on with him right

11:04:33  17  there.

11:04:33  18         **Q.**   Okay.   Sorry.   Were you done with your

11:04:35  19  answer?

11:04:35  20         **A.**   Yes.

11:04:35  21         **Q.**   I didn't mean to cut you off.

11:04:37  22         And at that time, was there any discussion

11:04:40  23  up and to the time -- I'm sorry -- from the time

| | | |
|---|---|---|
| 11:04:45 | 1 | you walked back to the vehicle, to the time you |
| 11:04:47 | 2 | have Mr. Kistner up and are walking him back to |
| 11:04:49 | 3 | your vehicle, among the officers about what |
| 11:04:51 | 4 | happened? |
| 11:04:54 | 5 | **A.** I don't believe so. I'm unsure of |
| 11:04:58 | 6 | that. |
| 11:04:58 | 7 | **Q.** What was Officer Moriarity's reaction |
| 11:05:00 | 8 | to watching what happened? |
| 11:05:02 | 9 | **MS. HUGGINS:** Form. |
| 11:05:07 | 10 | **THE WITNESS:** His like physical reaction |
| 11:05:10 | 11 | or -- |
| 11:05:10 | 12 | **BY MS. YONKERS:** |
| 11:05:11 | 13 | **Q.** Anything you remember. Physical, if he |
| 11:05:15 | 14 | said anything. |
| 11:05:16 | 15 | **MS. HUGGINS:** Form. |
| 11:05:16 | 16 | **THE WITNESS:** I don't want to put words in |
| 11:05:18 | 17 | his mouth. I don't -- I don't -- I honestly don't |
| 11:05:21 | 18 | remember exactly what he said. |
| 11:05:21 | 19 | **BY MS. YONKERS:** |
| 11:05:21 | 20 | **Q.** What was your understanding of what he |
| 11:05:23 | 21 | said? |
| 11:05:23 | 22 | **MS. HUGGINS:** Form. |
| 11:05:23 | 23 | **THE WITNESS:** Something to the effect of: |

11:05:29   1    This dude just pushed off, or, you know, hit the

11:05:36   2    police -- hit their vehicle.  Something to that

11:05:39   3    effect.  I don't know the exact, but it was

11:05:41   4    something to that --

11:05:42   5          **BY MS. YONKERS:**

11:05:42   6          **Q.**   To that effect?

11:05:43   7          **A.**   Yes.

11:05:44   8          **Q.**   Okay.  Okay.  And when you got to

11:05:46   9    the -- the area where Officers Velez and McDermott

11:05:48  10    were getting out of their car, did they say

11:05:52  11    anything?

11:05:55  12          **A.**   I'm not sure.

11:05:57  13          **Q.**   Did you say anything?

11:05:58  14          **A.**   I don't believe I said anything to

11:06:03  15    them, but again, I'm not sure too.  I know I was

11:06:08  16    more focused on Mr. Kistner laying in the -- in the

11:06:09  17    street.

11:06:10  18          **Q.**   Why did you put him in handcuffs?  Or

11:06:12  19    why did someone put him in handcuffs?

11:06:14  20          **A.**   For something like that, that's -- that

11:06:16  21    situation, you know, is very unique, but per MOP,

11:06:21  22    we were taking him back to our police vehicle, so

11:06:24  23    you need to -- they need to be handcuffed when

| | | |
|---|---|---|
| 11:06:28 | 1 | being placed inside the rear of a police vehicle. |
| 11:06:32 | 2 | **Q.** Were you taking him into custody? |
| 11:06:35 | 3 | **A.** He was not free to -- to leave, but at |
| 11:06:38 | 4 | that point, we were still assessing what exactly we |
| 11:06:41 | 5 | were going -- what our actions were going to be |
| 11:06:43 | 6 | moving forward. |
| 11:06:44 | 7 | **Q.** You said that this was a -- a unique |
| 11:06:47 | 8 | situation. What do you mean by that? |
| 11:06:49 | 9 | **THE WITNESS:** I guess any situation that we |
| 11:06:53 | 10 | come in contact with can be unique, but when you -- |
| 11:06:56 | 11 | you know, when you go to a call, you're not |
| 11:06:58 | 12 | expecting -- you know, you never expect it to go |
| 11:07:03 | 13 | one way and then it goes the other. You know, it's |
| 11:07:06 | 14 | very fluid. |
| 11:07:06 | 15 | So I guess every situation is unique, but, |
| 11:07:09 | 16 | you know, for this one, just didn't see, you know, |
| 11:07:15 | 17 | this playing out, I guess. |
| 11:07:18 | 18 | Can I use the restroom, please? |
| 11:07:20 | 19 | **MS. YONKERS:** Oh, yes. Absolutely. We can |
| 11:07:22 | 20 | take a break. |
| 11:07:22 | 21 | (A recess was then taken at 11:06 a.m.) |
| 11:18:22 | 22 | (On the record at 11:17 a.m.) |
| 11:18:22 | 23 | **BY MS. YONKERS:** |

*Schultz - Yonkers - 2/13/20*

112

| | | |
|---|---|---|
| 11:18:29 | 1 | Q. Officer Schultz, when we last left off, |
| 11:18:32 | 2 | you were talking about kind of the postcollision |
| 11:18:37 | 3 | activities on the scene on Schmarbeck, correct? |
| 11:18:39 | 4 | MS. HUGGINS: Form. |
| 11:18:41 | 5 | BY MS. YONKERS: |
| 11:18:41 | 6 | Q. Before you got Mr. Kistner to his feet, |
| 11:18:46 | 7 | did you do any kind of mental health assessment on |
| 11:18:48 | 8 | him? |
| 11:18:50 | 9 | A. I don't believe we did one, you know, |
| 11:18:53 | 10 | there. I think it was more physical assessment at |
| 11:18:57 | 11 | that point to make sure that he was okay. |
| 11:18:59 | 12 | Q. And when you escorted him to your |
| 11:19:03 | 13 | vehicle, which was a -- a little distance away, who |
| 11:19:05 | 14 | was with you? |
| 11:19:06 | 15 | A. I believe it was Officer Moriarity. |
| 11:19:11 | 16 | Q. Excuse me. What did Officers Velez and |
| 11:19:15 | 17 | McDermott do at the time? |
| 11:19:16 | 18 | A. That, I'm not sure. |
| 11:19:18 | 19 | Q. What was your next step in your |
| 11:19:20 | 20 | process? |
| 11:19:23 | 21 | A. I believe, at that time, just further |
| 11:19:26 | 22 | assessing that situation. I'm not sure if I spoke |
| 11:19:29 | 23 | with Officers McDermott and Velez at that time, but |

*Schultz - Yonkers - 2/13/20*

113

| | | |
|---|---|---|
| 11:19:36 | 1 | assessing Mr. Kistner and where we were going to go |
| 11:19:40 | 2 | from there. |
| 11:19:40 | 3 | Q.   Was he in your vehicle when you were |
| 11:19:42 | 4 | further assessing him or was he outside of your |
| 11:19:44 | 5 | vehicle? |
| 11:19:45 | 6 | A.   Both. |
| 11:19:47 | 7 | Q.   What kind of assessment did you do with |
| 11:19:50 | 8 | him outside of your vehicle? |
| 11:19:51 | 9 | A.   Outside, that was just more the |
| 11:19:53 | 10 | physical assessment.  You know, like I said, making |
| 11:19:56 | 11 | sure that he was able to walk, move his fingers, |
| 11:19:58 | 12 | you know, feet.  His -- you know, make sure there |
| 11:20:02 | 13 | was no visible blood or, you know, bumps, bruises. |
| 11:20:06 | 14 | And then we placed him in our vehicle, and |
| 11:20:08 | 15 | then at that point, from what we had observed and |
| 11:20:14 | 16 | further speaking with him, that's when it turned |
| 11:20:17 | 17 | from the physical assessment to the mental health |
| 11:20:20 | 18 | assessment. |
| 11:20:20 | 19 | Q.   And it was just you and Officer |
| 11:20:23 | 20 | Moriarity performing the -- these later physical |
| 11:20:26 | 21 | assessments and the mental assessment? |
| 11:20:27 | 22 | MS. HUGGINS:   Form. |
| 11:20:28 | 23 | THE WITNESS:   Before we got to the hospital, |

*Schultz - Yonkers - 2/13/20*

| | | |
|---|---|---|
| 11:20:30 | 1 | yes, I believe so. |
| 11:20:33 | 2 | **BY MS. YONKERS:** |
| 11:20:33 | 3 | **Q.** Because he's in -- he's in your car at |
| 11:20:35 | 4 | this point, right? |
| 11:20:36 | 5 | **A.** I -- I believe so, yes. |
| 11:20:37 | 6 | **Q.** Did he have any difficulty putting his |
| 11:20:39 | 7 | feet inside your vehicle?  Did you have to assist |
| 11:20:43 | 8 | him to get in? |
| 11:20:44 | 9 | **A.** That, I'm not sure of.  I don't believe |
| 11:20:47 | 10 | so, but I'm -- I'm not a hundred percent. |
| 11:20:49 | 11 | **Q.** And were you the one to put him into |
| 11:20:52 | 12 | the vehicle or did Officer Moriarity do that? |
| 11:20:54 | 13 | **A.** I'm not sure. |
| 11:20:55 | 14 | **Q.** Did he say anything from the time he's |
| 11:20:57 | 15 | up onto his feet again, to the time he's sitting |
| 11:21:00 | 16 | down at your car, did he say anything? |
| 11:21:04 | 17 | **A.** That, I don't remember. |
| 11:21:05 | 18 | **Q.** Did you read him his rights at all up |
| 11:21:09 | 19 | to this point in time? |
| 11:21:10 | 20 | **A.** No, I don't believe so. |
| 11:21:11 | 21 | **Q.** He wasn't arrest -- under arrest for |
| 11:21:14 | 22 | anything, correct? |
| 11:21:14 | 23 | **A.** At that time, no. |

*Schultz - Yonkers - 2/13/20*

115

| | | |
|---|---|---|
| 11:21:16 | 1 | **Q.**    What do you remember happening next? |
| 11:21:20 | 2 | **A.**    Some -- some point after that, I had |
| 11:21:23 | 3 | contacted Lieutenant McHugh and advised him of the |
| 11:21:28 | 4 | situation, as to what was going on. |
| 11:21:35 | 5 | And that is when, with his recommendation, |
| 11:21:40 | 6 | we had come to the conclusion that we were going |
| 11:21:44 | 7 | to -- excuse me -- take Mr. Kistner up to ECMC for |
| 11:21:47 | 8 | a physical evaluation -- excuse me -- but also to |
| 11:21:51 | 9 | charge him with criminal mischief to the police |
| 11:21:56 | 10 | vehicle. |
| 11:21:56 | 11 | **Q.**    Was Lieutenant McHugh -- were you in |
| 11:21:59 | 12 | contact with him by radio, phone, or did he come |
| 11:22:02 | 13 | down in person? |
| 11:22:03 | 14 | **A.**    No.  It was only the phone call. |
| 11:22:10 | 15 | **Q.**    When you went -- taking you back |
| 11:22:15 | 16 | a little bit, when you see the collision happen, |
| 11:22:17 | 17 | did Officers Velez or McDermott call you guys back, |
| 11:22:20 | 18 | or did you see what happened and come back? |
| 11:22:22 | 19 | **MS. HUGGINS:**    Form. |
| 11:22:22 | 20 | **THE WITNESS:**    No.  We -- myself and Officer |
| 11:22:26 | 21 | Moriarity had observed the entire situation, so we |
| 11:22:32 | 22 | had -- excuse me -- we had got out immediately and |
| 11:22:35 | 23 | had walked back to Officer Velez and McDermott's |

| | | |
|---|---|---|
| 11:22:39 | 1 | vehicle. |
| 11:22:45 | 2 | **BY MS. YONKERS:** |
| 11:22:45 | 3 | Q.   Had you and Officer Moriarity put your |
| 11:22:48 | 4 | seat belts on before, as you were leaving the |
| 11:22:52 | 5 | scene, or before you left initially? |
| 11:22:55 | 6 | A.   That, I don't recall. |
| 11:22:57 | 7 | Q.   Do you remember having to take your |
| 11:22:59 | 8 | seat belt off or Officer Moriarity take his off to |
| 11:23:03 | 9 | get out of your car? |
| 11:23:04 | 10 | A.   I -- no, I don't believe so. |
| 11:23:11 | 11 | Q.   How long of a conversation did you have |
| 11:23:13 | 12 | with Lieutenant McHugh? |
| 11:23:17 | 13 | A.   It was a couple minutes.  Maybe a few |
| 11:23:21 | 14 | minutes.  It wasn't -- it wasn't too long. |
| 11:23:24 | 15 | Q.   Is there any reason why you called him |
| 11:23:26 | 16 | on the phone versus using the radio channel? |
| 11:23:30 | 17 | A.   Yeah.  I didn't want to tie up the |
| 11:23:31 | 18 | radio, meaning continue to go back and forth over |
| 11:23:34 | 19 | the radio, tying it up if another call came out and |
| 11:23:38 | 20 | other officers needed to use it, so I just called |
| 11:23:42 | 21 | his personal cell phone, you know, to advise him of |
| 11:23:46 | 22 | the situation. |
| 11:23:47 | 23 | Q.   Do you remember your words sitting here |

11:23:51  1  today?

11:23:51  2          A.    I had just told him what we observed.

11:23:55  3  I had explained to him that, you know, from my

11:23:58  4  vantage point, Officer McDermott and Velez did not

11:24:03  5  strike the individual.

11:24:04  6          That the individual, you know, had stuck his

11:24:08  7  hand out, coming into contact with the police

11:24:12  8  vehicle, and that there was damage to the mirror.

11:24:19  9          So at that point, you know, we had

11:24:21  10  determined that he did not need to come out,

11:24:23  11  internal affairs did not need to come out, and that

11:24:25  12  it was more of a criminal instead of an accident

11:24:29  13  call.

11:24:32  14          And that's when we made the determination to

11:24:36  15  take Mr. Kistner up to ECMC for further evaluation.

11:24:47  16          Q.    When did you see the damage to the

11:24:50  17  mirror?

11:24:53  18          A.    I don't remember if it was on

11:24:55  19  Schmarbeck or if it was at ECMC.

11:24:57  20          Q.    What do you remember sitting here

11:24:59  21  today?  What kind of damage was there?

11:25:02  22          A.    I don't recall the extent of the damage

11:25:04  23  to the mirror.

| 11:25:04 | 1 | **Q.** Was the mirror hanging off? |
| 11:25:07 | 2 | **A.** I don't -- I honestly don't remember. |
| 11:25:10 | 3 | **Q.** Did Officers Velez or McDermott |
| 11:25:13 | 4 | complain about the functionality of their door |
| 11:25:16 | 5 | or window at that time? |
| 11:25:17 | 6 | **A.** I believe she made a comment about |
| 11:25:20 | 7 | the -- the mirror itself. |
| 11:25:20 | 8 | **Q.** Which -- |
| 11:25:23 | 9 | **A.** The driver's side mirror not being able |
| 11:25:25 | 10 | to function. |
| 11:25:25 | 11 | **Q.** Which -- just for the record, which she |
| 11:25:28 | 12 | are you referring to? |
| 11:25:29 | 13 | **A.** Officer McDermott.  I'm sorry. |
| 11:25:31 | 14 | **Q.** That's okay. |
| 11:25:33 | 15 | And what kind of -- what was your |
| 11:25:34 | 16 | understanding of the lack of functionality in the |
| 11:25:37 | 17 | mirror at that time? |
| 11:25:37 | 18 | **A.** That she wasn't -- it was immobile. |
| 11:25:40 | 19 | It was not able to move -- to move it. |
| 11:25:42 | 20 | **Q.** So it -- |
| 11:25:43 | 21 | **A.** It was damaged. |
| 11:25:44 | 22 | **Q.** To adjust the -- |
| 11:25:45 | 23 | **A.** Correct.  Because it's all electronic. |

| | |
|---|---|
| 11:25:47 | 1 | Sorry.  I didn't mean to cut you off. |
| 11:25:49 | 2 | **Q.**   No.   It's okay. |
| 11:25:50 | 3 | **A.**   But, yeah, it was -- so she wasn't able |
| 11:25:51 | 4 | to move it. |
| 11:25:54 | 5 | **Q.**   Did you yourself ever check out the -- |
| 11:25:57 | 6 | the mirror and its ability to move after the |
| 11:26:00 | 7 | collision? |
| 11:26:00 | 8 | **A.**   No.   No.   Just looked at the mirror. |
| 11:26:03 | 9 | Not -- I didn't try to move it or anything. |
| 11:26:05 | 10 | **Q.**   You mentioned earlier that sometimes |
| 11:26:07 | 11 | your vehicles go in for maintenance.   Does the |
| 11:26:12 | 12 | police department itself maintain the fleet? |
| 11:26:15 | 13 | **A.**   Yes. |
| 11:26:16 | 14 | **Q.**   And is this something -- you know, |
| 11:26:19 | 15 | a broken mirror, would that be something that the |
| 11:26:22 | 16 | fleet could repair? |
| 11:26:22 | 17 | **A.**   Yes, I believe so. |
| 11:26:23 | 18 | **Q.**   You wouldn't send that out to another |
| 11:26:26 | 19 | shop? |
| 11:26:26 | 20 | **MS. HUGGINS:**   Form. |
| 11:26:27 | 21 | **THE WITNESS:**   That, I don't know.   You know, |
| 11:26:29 | 22 | I don't know what the -- the warranty or -- you |
| 11:26:32 | 23 | know, I don't know any of the ins and outs of the |

*Schultz - Yonkers - 2/13/20*

120

| | | |
|---|---|---|
| 11:26:33 | 1 | garage, but most likely take care of it in house, |
| 11:26:37 | 2 | if they can. |
| 11:26:43 | 3 | **BY MS. YONKERS:** |
| 11:26:43 | 4 | **Q.** And since January 1st, 2017, for |
| 11:26:45 | 5 | a period, say, within a few months after that, did |
| 11:26:48 | 6 | you ever see Officer McDermott's vehicle again? |
| 11:26:53 | 7 | **A.** That, I'm unsure of. |
| 11:26:54 | 8 | **Q.** Did you ever take note of the -- the |
| 11:26:57 | 9 | mirror and its condition after January 1st of 2017? |
| 11:27:02 | 10 | **A.** I don't believe so. |
| 11:27:04 | 11 | **Q.** Did Officer McDermott ever tell you |
| 11:27:07 | 12 | anything to the effect that: Hey, I got that |
| 11:27:09 | 13 | mirror fixed? |
| 11:27:10 | 14 | **A.** No. |
| 11:27:10 | 15 | **Q.** What about Officer Velez? |
| 11:27:13 | 16 | **A.** No. |
| 11:27:16 | 17 | **Q.** Do you have any knowledge about the |
| 11:27:17 | 18 | condition of that mirror today? |
| 11:27:19 | 19 | **A.** I do not, no. |
| 11:27:35 | 20 | **Q.** In determining to take Mr. Kistner up |
| 11:27:37 | 21 | to ECMC, did you start filling out a 941 form? |
| 11:27:43 | 22 | **A.** I don't believe I did, no. |
| 11:27:44 | 23 | **Q.** Do you know who did, if anyone? |

*Schultz - Yonkers - 2/13/20*

121

11:27:49   1          A.    I believe it was Officer Velez.

11:27:52   2          Q.    Would she have started doing that right

11:27:54   3    on the scene, or would it have been at the

11:27:56   4    hospital, or does it depend?

11:27:58   5          MS. HUGGINS:  Form.

11:27:59   6          THE WITNESS:  It depends -- it depends on

11:28:00   7    the officer.  I don't know when she started.

11:28:03   8          BY MS. YONKERS:

11:28:03   9          Q.    What's your typical protocol when

11:28:04  10    you're filling out a 941 form?

11:28:09  11          MS. HUGGINS:  Form.

11:28:09  12          THE WITNESS:  It depends on the situation.

11:28:10  13          BY MS. YONKERS:

11:28:10  14          Q.    Do you ever start filling it out on the

11:28:12  15    scene itself?

11:28:12  16          A.    Sometimes, yes.

11:28:15  17          Q.    Would -- Mr. Kistner's situation would

11:28:18  18    have been -- would that have been one where you

11:28:20  19    would have expected the 941 form to start being

11:28:23  20    filled out at the scene?

11:28:25  21          MS. HUGGINS:  Form.

11:28:30  22          THE WITNESS:  No.  It would -- it would be

11:28:32  23    that officer's discretion, so I couldn't say.

*Schultz - Yonkers - 2/13/20*

11:28:34  1      **BY MS. YONKERS:**

11:28:34  2          **Q.**   So I'd have to ask Officer Velez about

11:28:41  3   that?

11:28:42  4          **A.**   Yes.

11:28:42  5          **Q.**   Okay.  Who came up with the charge of

11:28:44  6   criminal mischief?  Was that something you decided?

11:28:50  7   Lieutenant McHugh?  Was it a group decision?

11:28:52  8          How did that come about?

11:28:54  9          **A.**   I believe when I spoke with Lieutenant

11:28:56 10   McHugh, he made -- he made that call.

11:28:58 11          **Q.**   And at that time did he give you the

11:28:59 12   name of the charge and the criminal law or penal

11:29:03 13   law section to go along with it?

11:29:04 14          How did that come about?

11:29:06 15          **A.**   No.  I believe it was just something

11:29:08 16   along the lines of:  Okay.  You know, discharge the

11:29:10 17   criminal mischief and take him to get evaluated.

11:29:14 18          **Q.**   At any time before your phone call with

11:29:17 19   Lieutenant McHugh, did anyone else from the

11:29:21 20   neighborhood come out?

11:29:26 21          **A.**   I -- I don't know what time frame that

11:29:28 22   they -- that they had come out, but I know that

11:29:30 23   there was another male that had come out.  But

*Schultz - Yonkers - 2/13/20*

123

| | | |
|---|---|---|
| 11:29:36 | 1 | I believe he was the only -- only other person that |
| 11:29:38 | 2 | had come out. |
| 11:29:41 | 3 | Q.    And what was your understanding of who |
| 11:29:43 | 4 | this male was? |
| 11:29:45 | 5 | A.    A relative to Mr. Kistner.  I can't |
| 11:29:48 | 6 | remember exact. |
| 11:29:49 | 7 | Q.    And how did you know he was a relative? |
| 11:29:53 | 8 | A.    The individual that had come out, he |
| 11:30:00 | 9 | was making statements that it was -- I think he |
| 11:30:03 | 10 | said, that's my father.  Or uncle.  I think father. |
| 11:30:06 | 11 | I can't remember.  But the individual that had come |
| 11:30:09 | 12 | out. |
| 11:30:09 | 13 | Q.    So you didn't have to ask him; he told |
| 11:30:11 | 14 | you? |
| 11:30:11 | 15 | A.    He volunteered that information, yes. |
| 11:30:16 | 16 | Q.    Other than -- and did you have |
| 11:30:18 | 17 | a conversation with this individual? |
| 11:30:21 | 18 | A.    Initially it was just to, you know, |
| 11:30:23 | 19 | stay back, you know, over there, on the sidewalk. |
| 11:30:27 | 20 | Just to not interfere with, you know, what was |
| 11:30:29 | 21 | going on. |
| 11:30:31 | 22 | Q.    Did he come over -- I'm sorry.  Were |
| 11:30:34 | 23 | you done with your answer? |

| | | |
|---|---|---|
| 11:30:35 | 1 | **A.**   Yes. |
| 11:30:35 | 2 | **Q.**   Okay.  Did he come over while |
| 11:30:38 | 3 | Mr. Kistner was over by the Velez/McDermott |
| 11:30:43 | 4 | vehicle or was it after? |
| 11:30:45 | 5 | **MS. HUGGINS:**  Form. |
| 11:30:47 | 6 | **THE WITNESS:**  He came, I believe, while |
| 11:30:50 | 7 | Mr. Kistner was on the ground. |
| 11:30:55 | 8 | **BY MS. YONKERS:** |
| 11:30:55 | 9 | **Q.**   And is that -- |
| 11:30:57 | 10 | **A.**   Or attempted to. |
| 11:30:59 | 11 | **Q.**   And was that the point where you said, |
| 11:31:00 | 12 | sir, you know, you need to stay over on the |
| 11:31:02 | 13 | sidewalk, please; we're assessing and working here? |
| 11:31:04 | 14 | **A.**   Correct. |
| 11:31:04 | 15 | **Q.**   Okay. |
| 11:31:05 | 16 | **A.**   Yes. |
| 11:31:06 | 17 | **Q.**   Did you have any other interactions or |
| 11:31:08 | 18 | conversations with this particular individual after |
| 11:31:09 | 19 | that initial one? |
| 11:31:10 | 20 | **A.**   I believe we -- he would not leave the |
| 11:31:16 | 21 | immediate area, so we, you know, had gotten his -- |
| 11:31:21 | 22 | I believe his identification to ID him, and I believe |
| 11:31:24 | 23 | that was the extent of it, the interaction with |

*Schultz - Yonkers - 2/13/20*

125

| | | |
|---|---|---|
| 11:31:29 | 1 | him. |
| 11:31:29 | 2 | **Q.**    Did you see him interacting with any of |
| 11:31:31 | 3 | your other fellow officers? |
| 11:31:35 | 4 | **A.**    I don't remember if he did or not. |
| 11:31:36 | 5 | **Q.**    Did he ever go over to your vehicle |
| 11:31:39 | 6 | where Mr. Kistner was now sitting? |
| 11:31:42 | 7 | **MS. HUGGINS:**  Form. |
| 11:31:48 | 8 | **THE WITNESS:**  I know that he was over there. |
| 11:31:50 | 9 | I don't remember -- I can't remember if I had |
| 11:31:54 | 10 | brought him over to get his ID or if he had -- you |
| 11:31:58 | 11 | know, or if we had called him over and he walked |
| 11:32:00 | 12 | over.  I don't remember. |
| 11:32:02 | 13 | **BY MS. YONKERS:** |
| 11:32:02 | 14 | **Q.**    At any time did you feel the need for |
| 11:32:05 | 15 | an ambulance to be called for Mr. Kistner? |
| 11:32:10 | 16 | **A.**    I know that -- I believe radio or |
| 11:32:13 | 17 | dispatch had put it out, but no, an immediate |
| 11:32:17 | 18 | ambulance to come out there, no. |
| 11:32:19 | 19 | **Q.**    Why not? |
| 11:32:21 | 20 | **A.**    Because assessing him, and we had made |
| 11:32:26 | 21 | the determination that it would be quicker for us |
| 11:32:29 | 22 | to assist him and take him for evaluation instead |
| 11:32:32 | 23 | of waiting for an ambulance.  That could take -- |

*Schultz - Yonkers - 2/13/20*

126

| | | |
|---|---|---|
| 11:32:36 | 1 | only knows how long -- |
| 11:32:38 | 2 | **Q.**   Okay. |
| 11:32:38 | 3 | **A.**   -- it would take for an ambulance to |
| 11:32:41 | 4 | get there. |
| 11:32:41 | 5 | **Q.**   Did the individual who came out ever |
| 11:32:43 | 6 | indicate that he wanted to call an ambulance, in |
| 11:32:49 | 7 | your presence? |
| 11:32:49 | 8 | **A.**   He may have, but I can't remember. |
| 11:32:51 | 9 | **Q.**   Do you remember anyone canceling |
| 11:32:55 | 10 | ambulance requests at any point during that |
| 11:32:57 | 11 | morning? |
| 11:32:58 | 12 | **A.**   Yes. |
| 11:32:58 | 13 | **MS. HUGGINS:**   Form. |
| 11:32:58 | 14 | **BY MS. YONKERS:** |
| 11:32:59 | 15 | **Q.**   Who did the cancelation? |
| 11:33:00 | 16 | **A.**   I believe it was me. |
| 11:33:01 | 17 | **Q.**   Why did you do that? |
| 11:33:02 | 18 | **A.**   Because it would have been a lot |
| 11:33:04 | 19 | quicker for us to get him up to ECMC and get the |
| 11:33:07 | 20 | treatment than waiting right there for an ambulance |
| 11:33:10 | 21 | to show up. |
| 11:33:11 | 22 | **Q.**   Did Mr. Kistner at all, during this |
| 11:33:13 | 23 | morning period, request an ambulance? |

```
11:33:16   1        A.    I don't remember.  I do know that we
11:33:18   2   advised him that we were taking him up to ECMC to
11:33:22   3   get treated.  To, you know, get further treatment
11:33:24   4   and evaluation from the medical professionals.
11:33:25   5        Q.    How did he respond to that information?
11:33:29   6        A.    Well, at this point, once he was in
11:33:32   7   the -- the rear of our vehicle, that's just when it
11:33:37   8   went south.
11:33:38   9        Q.    Okay.  Let's get there in a minute.
11:33:41  10        Was there anyone else talking to any of the
11:33:45  11   officers at the scene other than this male
11:33:48  12   individual that you mentioned?
11:33:51  13        A.    I -- I don't believe so.
11:33:53  14        Q.    Was there a woman at all in a -- to
11:33:56  15   your recollection, speaking to officers from an
11:34:00  16   upstairs window?
11:34:01  17        A.    There was a woman there, but she was
11:34:05  18   yelling to the other gentleman that was down there.
11:34:09  19   I don't -- I don't recall if she was speaking to
11:34:12  20   officers or not.  I don't -- I don't know.
11:34:14  21        Q.    At any point did you speak to the --
11:34:20  22   the male individual about what he had seen on
11:34:23  23   the -- on the street that day?
```

*Schultz - Yonkers - 2/13/20*

128

11:34:26   1          A.   I don't remember.

11:34:27   2          Q.   What about the -- the woman who was

11:34:30   3   speaking to the individual?  Did you ever ask her

11:34:35   4   what she saw that day?

11:34:36   5          A.   No, I don't believe so.

11:34:37   6          Q.   Do you know if any of your other

11:34:38   7   officers spoke to either the male individual or the

11:34:41   8   woman about what they saw that day?

11:34:44   9          MS. HUGGINS:   Form.

11:34:44   10         THE WITNESS:   That, I don't know.

11:34:45   11         BY MS. YONKERS:

11:34:45   12         Q.   Did anyone ever advise you at the scene

11:34:47   13   that they had a video recording of what had

11:34:51   14   happened?

11:34:59   15         A.   I believe somebody made mention of

11:35:00   16   a camera, but I can't remember who -- who had said

11:35:06   17   it.

11:35:06   18         Q.   Did you collect the video recording at

11:35:08   19   that time before leaving?

11:35:08   20         A.   No.

11:35:09   21         Q.   Why not?

11:35:10   22         A.   That's not part of patrol duties.  And

11:35:15   23   we had observed the incident through the mirror,

11:35:18  1   like I said, from my vantage point, in its entirety.

11:35:33  2        Q.     After your conversation with Lieutenant

11:35:36  3   McHugh, did you tell Mr. Kistner that he was going

11:35:39  4   to be charged?

11:35:46  5        A.     I don't remember if I had told him

11:35:51  6   there or, you know, if at all.  I don't remember.

11:35:53  7        Q.     Did you read him his rights?

11:35:59  8        A.     I don't -- I don't believe I did.

11:36:02  9        Q.     Did anyone else, in your presence, read

11:36:04  10  him his rights?

11:36:07  11       A.     That, I'm unsure of.  I don't know if

11:36:09  12  one of the other officers did or not.

11:36:11  13       Q.     But you don't have a recollection,

11:36:12  14  sitting here today, of doing so, correct?

11:36:14  15       A.     Correct.  I don't -- I don't believe

11:36:16  16  I did.

11:36:16  17       Q.     So do you then leave Schmarbeck; you

11:36:21  18  have Mr. Kistner in your car?

11:36:22  19       A.     Yes.

11:36:22  20       Q.     And is Officer Moriarity driving again?

11:36:25  21       A.     Yes, I believe so.

11:36:26  22       Q.     And do you go straight from Schmarbeck

11:36:29  23  to ECMC?

*Schultz — Yonkers - 2/13/20*

130

| | | |
|---|---|---|
| 11:36:29 | 1 | **A.**   Yes. |
| 11:36:30 | 2 | **Q.**   About how long of a trip is that? |
| 11:36:34 | 3 | **A.**   Five minutes maybe. |
| 11:36:36 | 4 | **Q.**   And is it a situation where you have |
| 11:36:38 | 5 | lights and sirens going, or are you just driving |
| 11:36:40 | 6 | there? |
| 11:36:42 | 7 | **A.**   No, I don't think we had lights and |
| 11:36:44 | 8 | sirens.  I think we were just -- we were getting |
| 11:36:48 | 9 | there quickly but safely. |
| 11:36:50 | 10 | **Q.**   And are Officers Velez and McDermott |
| 11:36:53 | 11 | accompanying your car to ECMC? |
| 11:36:55 | 12 | **A.**   Yes. |
| 11:36:55 | 13 | **MS. HUGGINS:**  Form. |
| 11:36:55 | 14 | **BY MS. YONKERS:** |
| 11:36:56 | 15 | **Q.**   And what do you do upon arrival at the |
| 11:36:58 | 16 | ECMC campus? |
| 11:37:01 | 17 | **A.**   We pull up the ramp to the ER entrance. |
| 11:37:04 | 18 | We take Mr. Kistner out of our vehicle.  We go in |
| 11:37:09 | 19 | through the ER entrance.  There's a separate |
| 11:37:15 | 20 | entrance for, you know, the ambulance and police. |
| 11:37:17 | 21 | So we take him in there -- excuse me -- and |
| 11:37:21 | 22 | we sit him down.  There's usually like a chair off |
| 11:37:25 | 23 | to the right where the admissions window is to the |

*Schultz - Yonkers - 2/13/20*

131

11:37:26  1   left.

11:37:26  2          Q.   And at any time -- he's still

11:37:29  3   handcuffed at this time, correct?

11:37:30  4          A.   Correct.

11:37:30  5          Q.   Cuffed behind -- hands behind his back?

11:37:32  6          A.   Yes.

11:37:32  7          Q.   At any time from the time you -- he was

11:37:34  8   first handcuffed, to your arrival at ECMC, did he

11:37:38  9   make any complaints about his handcuffing?

11:37:44 10          A.   That, I don't remember.

11:37:45 11          Q.   If he did, would that have been

11:37:47 12   reported anywhere?

11:37:54 13          A.   I don't believe so.  Not for that --

11:37:58 14   this incident.  I don't think there was any -- you

11:38:02 15   know, any reason.

11:38:03 16          Q.   Excuse me.  Are you advising Lieutenant

11:38:09 17   McHugh of your actions as things are going forward?

11:38:12 18          MS. HUGGINS:  Form.

11:38:13 19          THE WITNESS:  No.  After I spoke with him on

11:38:15 20   the phone, we would just let dispatch know, you

11:38:19 21   know, we're going up to ECMC, and then, you know,

11:38:21 22   our actions from there.  Like if we were leaving,

11:38:25 23   if we were going back on patrol.  Whatever we, you

*Schultz - Yonkers - 2/13/20*

132

| | | |
|---|---|---|
| 11:38:28 | 1 | know, were going to be doing. |
| 11:38:29 | 2 | **BY MS. YONKERS:** |
| 11:38:30 | 3 | Q.   Okay.   Do you remember what time you |
| 11:38:32 | 4 | arrived at ECMC? |
| 11:38:34 | 5 | A.   No, I do not. |
| 11:38:38 | 6 | Q.   Do you know if it was still in the |
| 11:38:39 | 7 | morning hours? |
| 11:38:42 | 8 | A.   That, I'm unsure of. |
| 11:38:43 | 9 | Q.   So what happens when you first arrive |
| 11:38:48 | 10 | and after you get Mr. Kistner seated in a chair, |
| 11:38:50 | 11 | what happens next? |
| 11:38:52 | 12 | A.   Well, the intake, the admissions |
| 11:38:58 | 13 | personnel attempted to get information from him |
| 11:39:00 | 14 | just to -- to triage him and get him treatment, but |
| 11:39:05 | 15 | at that time, Mr. Kistner was yelling, being |
| 11:39:11 | 16 | belligerent, refusal to answer questions.   Yeah. |
| 11:39:20 | 17 | Q.   Let me back you up a little bit.   You |
| 11:39:22 | 18 | had mentioned earlier that in the -- as you got |
| 11:39:24 | 19 | Mr. Kistner into your car, as you were leaving for |
| 11:39:26 | 20 | ECMC, things went south.   What do you mean by that? |
| 11:39:30 | 21 | **MS. HUGGINS:**   Form. |
| 11:39:30 | 22 | **THE WITNESS:**   At that point he -- his |
| 11:39:34 | 23 | refusal to answer any questions, just trying to get |

*Schultz - Yonkers - 2/13/20*

133

| | | |
|---|---|---|
| 11:39:38 | 1 | information for the hospital, and then he continued |
| 11:39:43 | 2 | to, you know, be belligerent, curse at officers, |
| 11:39:51 | 3 | you know, call us names, and just completely |
| 11:39:51 | 4 | uncooperative. |
| 11:40:02 | 5 | **BY MS. YONKERS:** |
| 11:40:02 | 6 | **Q.**   For what period of time are we talking |
| 11:40:04 | 7 | about in terms of him being belligerent and cursing |
| 11:40:08 | 8 | at the hospital? |
| 11:40:10 | 9 | **MS. HUGGINS:**   Form. |
| 11:40:10 | 10 | **THE WITNESS:**   The -- the entire time that |
| 11:40:14 | 11 | myself and Officer Moriarity were there at the |
| 11:40:16 | 12 | intake, before we had left to go back on patrol. |
| 11:40:19 | 13 | **BY MS. YONKERS:** |
| 11:40:20 | 14 | **Q.**   About how long of a period of time was |
| 11:40:21 | 15 | that? |
| 11:40:24 | 16 | **A.**   I don't know.  Maybe 20 minutes, half |
| 11:40:26 | 17 | an hour? |
| 11:40:32 | 18 | **Q.**   Definitely less than an hour, fair to |
| 11:40:34 | 19 | say? |
| 11:40:34 | 20 | **A.**   I believe -- I believe so. |
| 11:40:36 | 21 | **Q.**   And was Mr. Kistner cursing at all of |
| 11:40:38 | 22 | the officers or just certain officers? |
| 11:40:40 | 23 | **A.**   I believe it was all four of us. |

*Schultz - Yonkers - 2/13/20*

134

| | | |
|---|---|---|
| 11:40:42 | 1 | **Q.**   What kind of things was he saying? |
| 11:40:44 | 2 | **A.**   He was calling us the fucking Gestapo. |

Calling us the stuff of -- we were Aryans.  We were

there to take his rights away.  We were communist.

You know, anything and everything, curse

words that, you know, you could imagine were

directed right at us.

**Q.**   Did anyone have any further discussions

with him from the police at this point?

**A.**   I don't believe so.

**Q.**   So this was now on to the medical staff

to do their assessment?

**A.**   Yes.

**Q.**   But you're still present because he's

considered in custody now; is that right?

**MS. HUGGINS:**  Form.

**THE WITNESS:**  In custody and, you know,

belligerent.  Just uncooperative right now.  So we

just wanted to make sure that, you know, the other

officers were safe, that it was going to be okay.

**BY MS. YONKERS:**

**Q.**   And so did there come a time where you

made a determination that the other officers were

*Schultz - Yonkers - 2/13/20*

135

| | | |
|---|---|---|
| 11:41:47 | 1 | going to be okay and it was okay for you to leave? |
| 11:41:49 | 2 | **A.**    Yes. |
| 11:41:50 | 3 | **Q.**    And that was that 20 or 30 minutes |
| 11:41:52 | 4 | later? |
| 11:41:52 | 5 | **A.**    I believe so, yes. |
| 11:41:55 | 6 | **Q.**    What else did you observe or hear or do |
| 11:41:59 | 7 | during that 20- to 30-minute time period -- frame? |
| 11:42:03 | 8 | **MS. HUGGINS:**    Form. |
| 11:42:04 | 9 | **THE WITNESS:**    At that point it was just |
| 11:42:05 | 10 | monitoring, you know, just staying there. |
| 11:42:08 | 11 | Nothing really we could do other than make |
| 11:42:10 | 12 | sure he stayed seated, didn't move around, and that |
| 11:42:13 | 13 | the medical personnel were able to do their job. |
| 11:42:16 | 14 | **BY MS. YONKERS:** |
| 11:42:16 | 15 | **Q.**    And are you -- is he being moved from, |
| 11:42:21 | 16 | you know, different chairs into different rooms, |
| 11:42:24 | 17 | different areas during this time, or is he in one |
| 11:42:26 | 18 | place? |
| 11:42:27 | 19 | **A.**    I don't remember going to a different |
| 11:42:29 | 20 | room.  I don't.  I just remember him being in the |
| 11:42:37 | 21 | chair in the -- like the hallway, when you walk in. |
| 11:42:39 | 22 | **Q.**    And this was in the admissions area you |
| 11:42:42 | 23 | would call it?  Triage area? |

12:28:56  1          Q.    The next entry says call type changed –
12:29:00  2   accident/injury PRI: 2.
12:29:04  3          Do you see that?
12:29:05  4          A.    Yes.
12:29:05  5          Q.    Who made the decision to change that
12:29:06  6   call type?
12:29:07  7          MS. HUGGINS:   Form.
12:29:08  8          THE WITNESS:   Initially, that was the
12:29:09  9   dispatcher's.
12:29:10 10          BY MS. YONKERS:
12:29:10 11          Q.    Did that change at some point?
12:29:17 12          A.    From the accident/injury.
12:29:19 13          Q.    Or what -- what did it change from?
12:29:23 14          A.    From the criminal mischief to
12:29:26 15   accident/injury.
12:29:29 16          Q.    I see.
12:29:31 17          Later on there's another entry, at 11:04:26.
12:29:36 18   Again, is that ambulance notified?
12:29:38 19          A.    Yes.
12:29:41 20          Q.    At 11:07:31, there's an entry cameras
12:29:46 21   on 37 has video of the man flopping on the ground.
12:29:50 22          Do you see that?
12:29:51 23          A.    Yes.

*Schultz - Yonkers - 2/13/20*

172

| | | |
|---|---|---|
| 12:29:51 | 1 | **Q.** Who put that entry in? |
| 12:29:53 | 2 | **A.** That, I would say it's the dispatcher. |
| 12:29:57 | 3 | **Q.** At any time when you were on scene, did |
| 12:29:59 | 4 | you ever see Mr. Kistner flopping on the ground? |
| 12:30:02 | 5 | **A.** I don't believe so. |
| 12:30:05 | 6 | **Q.** And the -- I think you pointed this out |
| 12:30:07 | 7 | to me earlier, the 11:22:34 entry was the location |
| 12:30:12 | 8 | changing to ECMC, correct? |
| 12:30:13 | 9 | **A.** Yes. |
| 12:30:13 | 10 | **Q.** And is that when you and Officer |
| 12:30:16 | 11 | Moriarity and Officer McDermott and Officer Velez |
| 12:30:19 | 12 | are transporting and going up to ECMC? |
| 12:30:22 | 13 | **MS. HUGGINS:** Form. |
| 12:30:23 | 14 | **THE WITNESS:** That's when we notified |
| 12:30:26 | 15 | dispatch that we would be going up to ECMC. |
| 12:30:28 | 16 | **BY MS. YONKERS:** |
| 12:30:28 | 17 | **Q.** Okay. And then at 11:23:01, there's |
| 12:30:32 | 18 | a C230 will be a 941. |
| 12:30:34 | 19 | Do you see that? |
| 12:30:35 | 20 | **A.** Yes. |
| 12:30:35 | 21 | **Q.** Does that mean that's something that |
| 12:30:37 | 22 | you relayed as Charlie 230 to dispatch? |
| 12:30:40 | 23 | **A.** Yes. |

*Schultz - Yonkers - 2/13/20*

173

| | | |
|---|---|---|
| 12:30:41 | 1 | **Q.** What does the next entry mean, |
| 12:30:43 | 2 | on scene - C230? |
| 12:30:47 | 3 | **A.** Dispatch is just putting us there |
| 12:30:49 | 4 | on scene of this, the ambulance call, because |
| 12:30:55 | 5 | they're combining the calls. |
| 12:30:58 | 6 | **Q.** And then the next entry, at 11:30:35, |
| 12:31:03 | 7 | says, C230, suspect broke mirr on car 473 |
| 12:31:08 | 8 | intentionally. |
| 12:31:08 | 9 | Do you see -- |
| 12:31:09 | 10 | **A.** Yes. |
| 12:31:09 | 11 | **Q.** -- that? |
| 12:31:10 | 12 | **A.** Yes. |
| 12:31:10 | 13 | **Q.** Mirr, I take it, is short for mirror? |
| 12:31:13 | 14 | **A.** Yes. |
| 12:31:16 | 15 | **Q.** Is this an entry that you yourself made |
| 12:31:18 | 16 | or called in? |
| 12:31:19 | 17 | **A.** I called in.  I did not put it in. |
| 12:31:21 | 18 | **Q.** What was the nature of your belief that |
| 12:31:23 | 19 | Mr. Kistner broke the mirror intentionally? |
| 12:31:25 | 20 | **A.** Just from, like I had said earlier, |
| 12:31:27 | 21 | just my vantage point, his location, and the |
| 12:31:33 | 22 | vehicle's location.  How, you know, I had seen the |
| 12:31:36 | 23 | vehicle abruptly stop, and his arm was outstretched |

*Schultz - Yonkers - 2/13/20*

174

12:31:39  1   to the vehicle.

12:31:41  2          Q.    Had you ever seen anyone, before

12:31:44  3   January 1st of 2017, stretch their arm out because

12:31:47  4   they're about to get hit?

12:31:49  5          MS. HUGGINS:  Form.

12:31:53  6          THE WITNESS:  Not that I can recall, no.

12:31:55  7          BY MS. YONKERS:

12:31:55  8          Q.    Do you ever watch football?  Do you

12:31:57  9   watch the NFL at all?

12:31:58  10         A.    Yes.

12:31:59  11         Q.    Did you ever see anyone putting their

12:32:00  12   hands out before they get hit?

12:32:02  13         A.    Yes.

12:32:05  14         Q.    At 13:14:01, there's an entry that says

12:32:09  15   set to primary - C241.

12:32:13  16         What does that mean?

12:32:16  17         A.    That C241 is now the primary officer

12:32:20  18   going forward on this call.

12:32:23  19         Q.    Let's see.  Is there any entry on

12:32:26  20   Exhibit 4 identifying yourself and Officer Moriarity

12:32:38  21   leaving ECMC?

12:32:40  22         A.    I don't believe so.

12:32:42  23         Q.    The entry at 14:45:35 says, C241 NMT.

*Schultz - Yonkers - 2/13/20*

175

| | | |
|---|---|---|
| 12:32:49 | 1 | Do you see that entry? |
| 12:32:50 | 2 | A.   Yes. |
| 12:32:50 | 3 | Q.   What does NMT mean? |
| 12:32:53 | 4 | A.   That they need more time. |
| 12:32:59 | 5 | Q.   What does that mean from a -- a police |
| 12:33:01 | 6 | and dispatch standpoint? |
| 12:33:03 | 7 | A.   Just letting the dispatch -- the |
| 12:33:05 | 8 | dispatcher know that we're still on this call, so |
| 12:33:09 | 9 | don't preempt us from it.  We're going to need more |
| 12:33:12 | 10 | time on this particular call. |
| 12:33:13 | 11 | Q.   Do you know, at this point, whether you |
| 12:33:16 | 12 | were still at ECMC or not? |
| 12:33:17 | 13 | A.   I don't -- I don't recall, but I don't |
| 12:33:21 | 14 | believe so. |
| 12:33:21 | 15 | Q.   Toward the end there's an entry |
| 12:33:26 | 16 | 16:41:01, and it starts off with an HD01, colon. |
| 12:33:31 | 17 | Do you see that? |
| 12:33:32 | 18 | A.   Yes. |
| 12:33:32 | 19 | Q.   What does HD01 mean? |
| 12:33:34 | 20 | A.   That's the dispatcher, so kind of like |
| 12:33:39 | 21 | a messaging system in the -- in the vehicles.  So |
| 12:33:42 | 22 | HD01 -- you would put in HD01 and you would send |
| 12:33:46 | 23 | them a message. |

12:33:47  1       **Q.**   So this message in this line is coming

12:33:49  2   from Officer Velez or Officer McDermott at this

12:33:53  3   point?

12:33:55  4       **MS. HUGGINS:**  Form.

12:33:56  5       **THE WITNESS:**  That, I don't know.

12:33:57  6       **BY MS. YONKERS:**

12:33:57  7       **Q.**   Who would have been the officers who

12:34:00  8   would have put in a request like this HD01 that

12:34:06  9   we're looking at in Exhibit 4?

12:34:08 10       **MS. HUGGINS:**  Form.

12:34:09 11       **BY MS. YONKERS:**

12:34:11 12       **Q.**   Based on this call.

12:34:11 13       **A.**   It would -- yeah, it would either be

12:34:14 14   Officer Velez or McDermott.

12:34:17 15       **Q.**   Do you have any knowledge why one of

12:34:20 16   them made the request to change the call to

12:34:24 17   criminal mischief?

12:34:32 18       **A.**   Where -- where is that one?

12:34:34 19   Oh, down there --

12:34:34 20       **Q.**   Yeah.

12:34:35 21       **A.**   -- to criminal mischief?

12:34:37 22       **Q.**   Yep.

12:34:38 23       **A.**   Due to the damage to the police

*Schultz - Yonkers - 2/13/20*

182

| | | |
|---|---|---|
| 12:39:47 | 1 | **A.**   No. |
| 12:39:48 | 2 | **Q.**   Right next to that there's a category |
| 12:39:50 | 3 | that says arrest type, and under it it says crime |
| 12:39:54 | 4 | in progress. |
| 12:39:55 | 5 | Do you see that? |
| 12:39:55 | 6 | **A.**   Yes. |
| 12:39:56 | 7 | **Q.**   What does that mean? |
| 12:40:02 | 8 | **A.**   That just means that it was -- it was |
| 12:40:04 | 9 | happening.  It was, you know, physically happening |
| 12:40:06 | 10 | at that time. |
| 12:40:07 | 11 | **Q.**   What other types of arrest types are |
| 12:40:10 | 12 | available to put in a form like this? |
| 12:40:12 | 13 | **A.**   I believe you could use, you know, |
| 12:40:15 | 14 | warrant -- I'm not sure what all the options are. |
| 12:40:20 | 15 | **Q.**   Would this be something that you would |
| 12:40:22 | 16 | have a pull-down menu to use, or is this something |
| 12:40:25 | 17 | that's typed in?  Do you know? |
| 12:40:26 | 18 | **A.**   No.  I believe this portion is put in |
| 12:40:28 | 19 | minus the -- the law -- the law category.  I don't |
| 12:40:33 | 20 | believe that's put in by -- by us as officers. |
| 12:40:36 | 21 | **Q.**   Okay.  In the narrative section at the |
| 12:40:39 | 22 | bottom of the page, there's an entry, the last |
| 12:40:43 | 23 | sentence, talking about Mr. Kistner using obscene |

*Schultz - Yonkers - 2/13/20*

183

12:40:48  1   and offensive language toward officers and medical

12:40:51  2   staff.

12:40:52  3         Do you remember which medical staff he used

12:40:56  4   obscene and offensive language toward?

12:40:59  5         **A.**   When I was there it was the intake and

12:41:02  6   triage personnel.

12:41:03  7         **Q.**   How many people in total are we talking

12:41:05  8   about?  Do you know?

12:41:08  9         **A.**   Three to five.

12:41:12  10        **Q.**   And do you know what their titles were?

12:41:16  11        **A.**   No, I don't know.

12:41:17  12        **Q.**   Were -- were any of them doctors?

12:41:18  13        **A.**   That, I don't know.

12:41:21  14        **Q.**   In this area of ECMC, do the doctors

12:41:24  15   and nurses dress in different scrub types?  Do you

12:41:28  16   know?

12:41:28  17        **A.**   Yeah.  It's not like a one uniform.

12:41:31  18   It's, I guess, whatever their preference is.

12:41:36  19        **Q.**   And do you know what it means when the

12:41:38  20   report says that causing an annoyance and alarm?

12:41:44  21   Do you know what that means?

12:41:48  22        **A.**   So just like to the medical personnel,

12:41:52  23   an annoyance.  It was disrupting their -- you know,

*Schultz - Yonkers - 2/13/20*

184

| | |
|---|---|
| 12:41:56 | 1 |
| 12:41:58 | 2 |
| 12:41:58 | 3 |
| 12:42:03 | 4 |
| 12:42:06 | 5 |
| 12:42:12 | 6 |
| 12:42:17 | 7 |
| 12:42:22 | 8 |
| 12:42:25 | 9 |
| 12:42:26 | 10 |
| 12:42:28 | 11 |
| 12:42:28 | 12 |
| 12:42:30 | 13 |
| 12:42:35 | 14 |
| 12:42:37 | 15 |
| 12:42:41 | 16 |
| 12:42:44 | 17 |
| 12:42:46 | 18 |
| 12:42:49 | 19 |
| 12:42:50 | 20 |
| 12:42:54 | 21 |
| 12:42:57 | 22 |
| 12:42:58 | 23 |

1  their work, what they -- what they were trying to

2  accomplish.

3          And alarm, it was making them nervous, you

4  know, scared, just as a generality.

5          Q.    The -- let's see.

6          Do you know how it was assessed that the

7  driver's side window and mirror damage exceeded

8  $250, as listed in the narrative section?

9          MS. HUGGINS:   Form.

10          THE WITNESS:   An estimation.

11          BY MS. YONKERS:

12          Q.    Who made that estimation?

13          A.    I'm not sure who made that.

14          Q.    Would it have been something you spoke

15  to Lieutenant McHugh about?

16          A.    It -- yeah, it could have been.

17          Q.    Did you talk with any of the other

18  officers at the scene about the amount of damage

19  while you were there?

20          A.    I don't know if it was on the scene or,

21  you know, at the hospital, and I'm not sure if we

22  did or not.

23          Q.    But you -- do you recall yourself ever

*Schultz - Yonkers - 2/13/20*

185

| | | |
|---|---|---|
| 12:43:00 | 1 | making an assessment of the amount of damage? |
| 12:43:03 | 2 | A.   I may have, but I don't know. |
| 12:43:05 | 3 | Q.   How would you have determined that the |
| 12:43:07 | 4 | amount exceeded $250? |
| 12:43:10 | 5 | MS. HUGGINS:  Form. |
| 12:43:11 | 6 | THE WITNESS:  That, I'm unsure of. |
| 12:43:12 | 7 | BY MS. YONKERS: |
| 12:43:13 | 8 | Q.   Would you ever call the garage and say, |
| 12:43:14 | 9 | hey, how much does it cost to fix a mirror? |
| 12:43:17 | 10 | MS. HUGGINS:  Form. |
| 12:43:17 | 11 | BY MS. YONKERS: |
| 12:43:18 | 12 | Q.   Anything like that? |
| 12:43:19 | 13 | A.   Somebody could have, you know.  I didn't. |
| 12:43:22 | 14 | Q.   And no one did in your presence? |
| 12:43:25 | 15 | A.   No. |
| 12:43:36 | 16 | MS. YONKERS:  This I might have another copy |
| 12:43:38 | 17 | of. |
| 12:43:48 | 18 | Officer Schultz, I'm going to have you look |
| 12:43:52 | 19 | at Exhibit 6.  Take a look at it, and let me know |
| 12:43:55 | 20 | if you've ever seen that -- this particular form, |
| 12:43:57 | 21 | as it was completed, please. |
| 12:44:01 | 22 | MS. HUGGINS:  Form.  Asked and answered. |
| 12:44:02 | 23 | THE WITNESS:  Yes. |

| | | |
|---|---|---|
| 12:44:03 | 1 | **BY MS. YONKERS:** |
| 12:44:03 | 2 | **Q.**   You have seen this? |
| 12:44:04 | 3 | **A.**   Briefly, yes. |
| 12:44:05 | 4 | **Q.**   When did you see this document? |
| 12:44:13 | 5 | **A.**   I'm not sure if it was the day of, but |
| 12:44:15 | 6 | it was yesterday. |
| 12:44:16 | 7 | **Q.**   And when you say day of, the day of the |
| 12:44:18 | 8 | incident? |
| 12:44:18 | 9 | **A.**   The incident, correct. |
| 12:44:19 | 10 | **Q.**   Are you familiar with Officer Velez's |
| 12:44:25 | 11 | handwriting? |
| 12:44:25 | 12 | **A.**   I am not. |
| 12:44:27 | 13 | **Q.**   Nonetheless, is it typical for the |
| 12:44:29 | 14 | person who signs the form at the bottom to complete |
| 12:44:32 | 15 | the form? |
| 12:44:33 | 16 | **A.**   Yes. |
| 12:44:34 | 17 | **Q.**   Is any of your handwriting, sir, |
| 12:44:36 | 18 | anywhere on Exhibit 6? |
| 12:44:42 | 19 | **A.**   No, it is not. |
| 12:44:43 | 20 | **Q.**   Did Officer Velez obtain any |
| 12:44:48 | 21 | information from you in completing this form? |
| 12:44:50 | 22 | **A.**   I don't believe so. |
| 12:44:54 | 23 | **Q.**   Were you present when she was filling |

| | | |
|---|---|---|
| 12:44:56 | 1 | it out? |
| 12:44:59 | 2 | **A.**   That, I'm unsure of. |
| 12:45:04 | 3 | **Q.**   Have you ever discussed the content of |
| 12:45:05 | 4 | this form with Officer Velez? |
| 12:45:07 | 5 | **A.**   I don't believe so, no. |
| 12:45:09 | 6 | **Q.**   What about with Officer McDermott? |
| 12:45:11 | 7 | **A.**   No. |
| 12:45:11 | 8 | **Q.**   What about Officer Moriarity? |
| 12:45:15 | 9 | **A.**   No. |
| 12:45:56 | 10 | **Q.**   Officer Schultz, you've been handed |
| 12:45:58 | 11 | what we've marked as Exhibit 7.  Can you take |
| 12:46:00 | 12 | a look at that document, sir, and let me know when |
| 12:46:03 | 13 | you're done? |
| 12:46:13 | 14 | **A.**   Okay.  I'm done. |
| 12:46:14 | 15 | **Q.**   Do you recognize the content of Exhibit |
| 12:46:18 | 16 | 7? |
| 12:46:18 | 17 | **A.**   Yes. |
| 12:46:19 | 18 | **Q.**   What do you recognize it as? |
| 12:46:21 | 19 | **A.**   This is my daily log sheet from the |
| 12:46:24 | 20 | date in question. |
| 12:46:26 | 21 | **Q.**   And is this a document you've seen |
| 12:46:27 | 22 | before? |
| 12:46:32 | 23 | **A.**   I'm not sure if I've seen this one, |

*Schultz - Yonkers - 2/13/20*

| | | |
|---|---|---|
| 13:09:40 | 1 | **BY MS. YONKERS:** |
| 13:10:01 | 2 | **Q.**   And that was through a time of |
| 13:10:03 | 3 | 23 seconds. |
| 13:10:05 | 4 | Other than the dispatcher responding, is |
| 13:10:07 | 5 | that still all your voice? |
| 13:10:08 | 6 | **A.**   Yes. |
| 13:10:11 | 7 | **Q.**   And is that, at 23 seconds, the point |
| 13:10:13 | 8 | where you were canceling ambulance calls, like we |
| 13:10:16 | 9 | discussed earlier? |
| 13:10:16 | 10 | **THE WITNESS:**  Yes. |
| 13:10:33 | 11 | (Audio clip played.) |
| 13:10:33 | 12 | **BY MS. YONKERS:** |
| 13:10:34 | 13 | **Q.**   And that was the time period 23 seconds |
| 13:10:36 | 14 | to 38 seconds that I just played.  In that |
| 13:10:39 | 15 | particular dialogue, you talked about your |
| 13:10:44 | 16 | observations from the car that you were in at the |
| 13:10:47 | 17 | time, correct? |
| 13:10:47 | 18 | **THE WITNESS:**  Correct. |
| 13:10:47 | 19 | (Audio clip played.) |
| 13:11:10 | 20 | **BY MS. YONKERS:** |
| 13:11:10 | 21 | **Q.**   At a time between 35 and 38 seconds, |
| 13:11:13 | 22 | you indicated there that Mr. Kistner threw himself |
| 13:11:15 | 23 | at a car that was parked. |

*Schultz - Yonkers - 2/13/20*

201

| | | |
|---|---|---|
| 13:11:16 | 1 | **A.**   Correct. |
| 13:11:18 | 2 | **Q.**   Was it -- is it your recollection, upon |
| 13:11:21 | 3 | hearing this, that the Velez and McDermott vehicle |
| 13:11:24 | 4 | was actually in park, or do you mean by that that |
| 13:11:27 | 5 | it was stopped? |
| 13:11:29 | 6 | **MS. HUGGINS:**   Form. |
| 13:11:29 | 7 | **THE WITNESS:**   By that, it was stopped. |
| 13:11:31 | 8 | **BY MS. YONKERS:** |
| 13:11:32 | 9 | **Q.**   So -- |
| 13:11:32 | 10 | **A.**   I don't know if she had it in park or |
| 13:11:35 | 11 | not, but it was stopped. |
| 13:11:36 | 12 | **Q.**   So when you say parked on this audio |
| 13:11:39 | 13 | clip of Exhibit 10, you actually don't mean parked, |
| 13:11:43 | 14 | you mean stopped, correct? |
| 13:11:43 | 15 | **THE WITNESS:**   Correct. |
| 13:11:43 | 16 | (Audio clip played.) |
| 13:12:00 | 17 | **BY MS. YONKERS:** |
| 13:12:00 | 18 | **Q.**   That was at a time up through 48 seconds. |
| 13:12:02 | 19 | What did you mean that Mr. Kistner was going to go |
| 13:12:04 | 20 | down for fraud? |
| 13:12:05 | 21 | **A.**   At the time, I was thinking of the |
| 13:12:08 | 22 | charge of insurance fraud, but like I said, at that |
| 13:12:13 | 23 | time, we were still assessing the situation. |

*Schultz - Yonkers - 2/13/20*

202

13:12:15   1         Q.    What would have happened if you had

13:12:19   2   finished your assessment and came to the conclusion

13:12:22   3   that this was an attempted insurance fraud?  What

13:12:25   4   would have happened?

13:12:25   5         MS. HUGGINS:   Form.

13:12:26   6         THE WITNESS:   Then we most likely would have

13:12:29   7   charged the attempted insurance fraud.

13:12:33   8         BY MS. YONKERS:

13:12:33   9         Q.    Sitting here, off the top of your head,

13:12:35  10   do you know what part of the penal law or criminal

13:12:37  11   law that would fall under?

13:12:39  12         A.    No.   I would have to -- to look in the

13:12:41  13   penal law book.

13:12:42  14         Q.    Is that something that you would ask

13:12:44  15   Lieutenant McHugh about before doing the charge

13:12:46  16   because he's the lieutenant, or would you be able

13:12:48  17   to do that yourself as the officer?

13:12:50  18         MS. HUGGINS:   Form.

13:12:54  19         THE WITNESS:   I believe I had spoke with him

13:12:56  20   and just, you know, asked for clarification as to

13:13:00  21   what the proper charge would be, and we came to the

13:13:04  22   conclusion that the criminal mischief would be the

13:13:08  23   better charge.

13:13:08   1          BY MS. YONKERS:

13:13:08   2          Q.   Compared to fraud?

13:13:09   3          A.   Compared to fraud, yes.

13:13:10   4          Q.   And is this audio clip one of the ones

13:13:13   5   that you reviewed to get ready for your testimony

13:13:15   6   here today?

13:13:16   7          A.   Yes.

13:13:17   8          MS. YONKERS:   We'll just finish this clip.

13:13:17   9          (Audio clip played.)

13:13:17  10          BY MS. YONKERS:

13:13:33  11          Q.   And from time 48 to time 1:02 there

13:13:36  12   that we just heard, that was you, again, advising

13:13:39  13   dispatch to disregard the ambulance call, correct?

13:13:41  14          A.   Yes.

13:13:41  15          MS. HUGGINS:   Form.

13:13:48  16          MS. YONKERS:   I'm now going to play a clip

13:13:50  17   that's labeled 010117 04.

13:13:50  18          (Audio clip played.)

13:13:50  19          BY MS. YONKERS:

13:14:03  20          Q.   And, again, this was at the one-second

13:14:06  21   mark of clip number 4.  Is it sill your voice --

13:14:09  22          A.   Yes.

13:14:09  23          Q.   -- on the radio?

*Schultz - Yonkers - 2/13/20*

| | | |
|---|---|---|
| 13:14:10 | 1 | Is this another clip that you reviewed to |
| 13:14:12 | 2 | get ready for your testimony? |
| 13:14:14 | 3 | **MS. HUGGINS:**  He might be able to answer |
| 13:14:15 | 4 | that better after he's heard the whole clip. |
| 13:14:17 | 5 | **MS. YONKERS:**  Okay.  Would it help you, sir, |
| 13:14:19 | 6 | to play the whole clip to know? |
| 13:14:20 | 7 | **THE WITNESS:**  Yes, please. |
| 13:14:33 | 8 | (Audio clip played.) |
| 13:14:33 | 9 | **BY MS. YONKERS:** |
| 13:14:34 | 10 | Q.   That's through a time stamp of |
| 13:14:36 | 11 | 15 seconds.  Is that still your voice? |
| 13:14:38 | 12 | A.   Yes. |
| 13:14:38 | 13 | Q.   Now can you identify this, whether or |
| 13:14:41 | 14 | not you reviewed it to get ready for your testimony? |
| 13:14:43 | 15 | A.   Yes, I did. |
| 13:14:45 | 16 | Q.   Did I hear you correctly, sir, in that |
| 13:14:47 | 17 | clip, did you say the four cars are going up to |
| 13:14:50 | 18 | ECMC? |
| 13:14:52 | 19 | A.   Yes.  The four sector cars. |
| 13:14:54 | 20 | Q.   What do you mean by that? |
| 13:14:56 | 21 | A.   Officer McDermott and Velez.  They |
| 13:15:01 | 22 | were -- they were in the fourth sector, so the four |
| 13:15:03 | 23 | sector cars were coming with me to ECMC. |

*Schultz - Yonkers - 2/13/20*

205

| | | |
|---|---|---|
| 13:15:05 | 1 | **Q.**   I see.  Okay. |
| 13:15:06 | 2 | And by 941 in this clip, you meant you were |
| 13:15:12 | 3 | taking him up for a mental hygiene law examination, |
| 13:15:16 | 4 | correct? |
| 13:15:16 | 5 | **A.**   Mental health, yes. |
| 13:15:19 | 6 | **Q.**   What did I say?  Mental hygiene? |
| 13:15:20 | 7 | **THE WITNESS:**  Hygiene, yes. |
| 13:15:20 | 8 | (Audio clip played.) |
| 13:15:29 | 9 | **BY MS. YONKERS:** |
| 13:15:29 | 10 | **Q.**   And at this point, at around the |
| 13:15:33 | 11 | 20-second mark of this clip, the dispatcher is |
| 13:15:35 | 12 | giving the time of 11:22.  Is that when you're |
| 13:15:38 | 13 | actually in the car en route or about to go? |
| 13:15:41 | 14 | Do you know? |
| 13:15:41 | 15 | **A.**   No, I don't.  I don't remember. |
| 13:15:46 | 16 | **Q.**   I'm also going to play a clip that's |
| 13:15:48 | 17 | labeled as 05 from the same audio CD.  Okay? |
| 13:15:52 | 18 | **A.**   Okay. |
| 13:15:55 | 19 | **MS. HUGGINS:**  The last two numbers? |
| 13:15:56 | 20 | **MS. YONKERS:**  Yes, correct. |
| 13:16:07 | 21 | (Audio clip played.) |
| 13:16:07 | 22 | **BY MS. YONKERS:** |
| 13:16:08 | 23 | **Q.**   And, again, in this very short part, up |

*Schultz - Yonkers - 2/13/20*

223

| | | |
|---|---|---|
| 13:36:12 | 1 | Moriarity was having with the covering officers? |
| 13:36:15 | 2 | **A.**   I may have.  I'm not sure. |
| 13:36:17 | 3 | **Q.**   Do you -- did you have any conversation |
| 13:36:21 | 4 | with them from your vehicle at that time? |
| 13:36:23 | 5 | **A.**   I don't -- I don't believe so. |
| 13:36:31 | 6 | **MS. YONKERS:**  I'm going to put up, from |
| 13:36:34 | 7 | Exhibit 11, the third clip, which is 2017 0101102529. |
| 13:36:53 | 8 | (Video clip played.) |
| 13:36:53 | 9 | **BY MS. YONKERS:** |
| 13:36:53 | 10 | **Q.**   And is this the point where Mr. Kistner |
| 13:36:55 | 11 | has come out to the -- to the street? |
| 13:36:57 | 12 | **A.**   I believe so, yes. |
| 13:36:58 | 13 | **Q.**   Do you know what happened with the |
| 13:37:01 | 14 | individual who was on the sidewalk by this point |
| 13:37:04 | 15 | in time, which is time stamped 10:25:32? |
| 13:37:08 | 16 | **A.**   No, I do not know. |
| 13:37:09 | 17 | **Q.**   Do you know whether he was advised |
| 13:37:11 | 18 | to -- you know, what next steps he could take? |
| 13:37:17 | 19 | Because that's the next step in the process |
| 13:37:19 | 20 | on an advised call, correct? |
| 13:37:20 | 21 | **MS. HUGGINS:**  Form. |
| 13:37:21 | 22 | **THE WITNESS:**  Yes. |
| 13:37:22 | 23 | **BY MS. YONKERS:** |

*Schultz - Yonkers - 2/13/20*

224

| | | |
|---|---|---|
| 13:37:22 | 1 | **Q.**   Do you have any idea what those next |
| 13:37:24 | 2 | steps he was advised to take were? |
| 13:37:25 | 3 | **A.**   No.  I don't remember. |
| 13:37:27 | 4 | **Q.**   Do you remember Mr. Kistner approaching |
| 13:37:29 | 5 | your car, as shown in the third clip of Exhibit 11? |
| 13:37:35 | 6 | **A.**   Yes. |
| 13:37:35 | 7 | **Q.**   And does the third clip shown in |
| 13:37:40 | 8 | Exhibit 11 fairly and accurately show the |
| 13:37:42 | 9 | conditions of the street at that time? |
| 13:37:44 | 10 | **A.**   Yes. |
| 13:37:45 | 11 | **Q.**   Does the clip number 3 fairly and |
| 13:37:49 | 12 | accurately show the positioning of the vehicles as |
| 13:37:52 | 13 | shown at 10:25:32? |
| 13:37:55 | 14 | **MS. HUGGINS:**   Form. |
| 13:37:56 | 15 | **THE WITNESS:**   Yes. |
| 13:37:56 | 16 | **MS. HUGGINS:**   I would just object to the -- |
| 13:37:58 | 17 | there's been no testimony about the time stamp on |
| 13:38:00 | 18 | the top being accurate or where that comes from. |
| 13:38:06 | 19 | **MS. YONKERS:**   Are you done? |
| 13:38:08 | 20 | Your objection is noted.  Are you done? |
| 13:38:10 | 21 | **MS. HUGGINS:**   Yes. |
| 13:38:10 | 22 | **MS. YONKERS:**   I just want to continue with |
| 13:38:11 | 23 | my questioning. |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

*Schultz - Yonkers - 2/13/20*

225

| | | |
|---|---|---|
| 13:38:13 | 1 | And then Officer Moriarity drives past |
| 13:38:18 | 2 | Mr. Kistner, correct? |
| 13:38:18 | 3 | **THE WITNESS:** Correct. |
| 13:38:20 | 4 | **BY MS. YONKERS:** |
| 13:38:20 | 5 | Q. Did you or he have any verbal |
| 13:38:23 | 6 | communication with Mr. Kistner, as you're watching |
| 13:38:26 | 7 | this video? |
| 13:38:27 | 8 | A. Yes. |
| 13:38:27 | 9 | Q. What did you -- what verbal |
| 13:38:30 | 10 | communication did you have? |
| 13:38:31 | 11 | A. It was very brief and something to the |
| 13:38:33 | 12 | effect of: We've got to go. |
| 13:38:35 | 13 | Something along those lines. |
| 13:38:37 | 14 | Q. And as you're driving away, what speed |
| 13:38:40 | 15 | did Officer Moriarity get up to? |
| 13:38:44 | 16 | A. That, I don't know. |
| 13:38:45 | 17 | Q. What's the speed limit on Schmarbeck? |
| 13:38:47 | 18 | A. 30 miles an hour. |
| 13:38:51 | 19 | Q. And as -- as you're driving away, are |
| 13:38:56 | 20 | you looking in the mirror as -- the driver's side |
| 13:39:01 | 21 | mirror, as you're driving away, or does it take |
| 13:39:03 | 22 | a little bit before you look back? |
| 13:39:05 | 23 | A. No. Once Mr. Kistner walked -- once we |

*Schultz - Yonkers - 2/13/20*

226

| | | |
|---|---|---|
| 13:39:08 | 1 | had went past him -- |
| 13:39:09 | 2 | Q. Yes. |
| 13:39:09 | 3 | A. -- and he was behind our vehicle, I was |
| 13:39:11 | 4 | looking in the driver's side mirror the entire |
| 13:39:14 | 5 | time. And I told Officer Moriarity to stop, as |
| 13:39:20 | 6 | something to the effect of: I want to make sure |
| 13:39:21 | 7 | nothing happens. |
| 13:39:22 | 8 | Q. Okay. Now, right around time stamp 7, |
| 13:39:30 | 9 | 8 -- I'm going to back it up a little bit. |
| 13:39:33 | 10 | So at time stamp 6, you're past Mr. Kistner, |
| 13:39:40 | 11 | and he's walking toward the covering officers' |
| 13:39:44 | 12 | vehicle, correct? |
| 13:39:45 | 13 | A. Correct. |
| 13:39:52 | 14 | Q. And we just played up through time stamp |
| 13:39:54 | 15 | 8 seconds, and did you see, at any point, |
| 13:39:57 | 16 | Mr. Kistner put his arm out during that clip? |
| 13:40:01 | 17 | A. Yes. |
| 13:40:01 | 18 | Q. Did you see him throw himself on the |
| 13:40:04 | 19 | vehicle? |
| 13:40:06 | 20 | A. No, not on the vehicle. |
| 13:40:08 | 21 | Q. Did you see him throw himself at the |
| 13:40:12 | 22 | vehicle? |
| 13:40:13 | 23 | A. No. |

*Schultz - Yonkers - 2/13/20*

227

| | | |
|---|---|---|
| 13:40:19 | 1 | Q.   And it looks like the car just stopped |
| 13:40:21 | 2 | at 11 seconds. |
| 13:40:23 | 3 | Looking at this clip, is it fair to say that |
| 13:40:26 | 4 | the vehicle was still in motion, it had not stopped |
| 13:40:28 | 5 | before it came into contact with Mr. Kistner, |
| 13:40:30 | 6 | correct? |
| 13:40:31 | 7 | MS. HUGGINS:   Form. |
| 13:40:32 | 8 | THE WITNESS:   No.   From my vantage point, |
| 13:40:34 | 9 | they were stopped when the contact was made between |
| 13:40:39 | 10 | Mr. Kistner and the vehicle, and then it looks like |
| 13:40:43 | 11 | it went forward again. |
| 13:40:45 | 12 | BY MS. YONKERS: |
| 13:40:46 | 13 | Q.   Okay.   Just to make sure I'm clear for |
| 13:40:49 | 14 | the record, I understand what your recollection was |
| 13:40:52 | 15 | and what your vantage point was. |
| 13:40:54 | 16 | Watching this video here today, did that |
| 13:40:57 | 17 | police vehicle stop before Mr. Kistner and it came |
| 13:41:02 | 18 | into contact? |
| 13:41:04 | 19 | MS. HUGGINS:   Form. |
| 13:41:04 | 20 | THE WITNESS:   It stopped abruptly and then |
| 13:41:08 | 21 | went forward. |
| 13:41:10 | 22 | BY MS. YONKERS: |
| 13:41:10 | 23 | Q.   Let's take it back to the time stamp of |

*Schultz - Yonkers - 2/13/20*

| | | |
|---|---|---|
| 13:41:19 | 1 | 6 seconds, and I'll play it forward until about 14, |
| 13:41:23 | 2 | 15, just straight through. |
| 13:41:24 | 3 |     If you can, by looking at the video, tell me |
| 13:41:28 | 4 | at what time stamp the covering officer vehicle |
| 13:41:31 | 5 | stops abruptly, what time stamp Mr. Kistner is in |
| 13:41:38 | 6 | contact with the vehicle, and what time the vehicle |
| 13:41:43 | 7 | stops again.  Okay? |
| 13:41:44 | 8 | **A.**  All right. |
| 13:41:45 | 9 | **MS. HUGGINS:**  Form. |
| 13:41:50 | 10 | **BY MS. YONKERS:** |
| 13:41:50 | 11 | **Q.**  We may have to play that again.  Sorry. |
| 13:41:52 | 12 | **A.**  Yeah.  I can't tell. |
| 13:41:54 | 13 | **Q.**  I'll back it up further.  It's not |
| 13:41:56 | 14 | cooperating. |
| 13:42:02 | 15 | **A.**  I can't tell -- I can't look at both |
| 13:42:04 | 16 | the -- the numbers and -- |
| 13:42:08 | 17 | **Q.**  Is there a point in time, though, where |
| 13:42:10 | 18 | you see that the car stops, starts again, and stops |
| 13:42:13 | 19 | again? |
| 13:42:13 | 20 | **A.**  From this camera view, no. |
| 13:42:18 | 21 | **Q.**  Does this camera view show the vantage |
| 13:42:20 | 22 | point that you had from your car? |
| 13:42:22 | 23 | **A.**  No. |

*Schultz - Yonkers - 2/13/20*

229

13:42:23   1         **Q.**    You would have been looking from the

13:42:24   2   street view.

13:42:26   3         **A.**    Correct.

13:42:26   4         **Q.**    You would have been lower to the

13:42:28   5   ground, correct?

13:42:28   6         **A.**    Yes.

13:42:29   7         **Q.**    Was there anything impeding your view

13:42:31   8   in terms of sunlight?  Cloud cover?  Obstructions?

13:42:37   9         **A.**    No.

13:42:41 10         **Q.**    There's an individual who's walked down

13:42:43 11   the street at about time stamp 16.  Is that the

13:42:46 12   individual that you spoke with and about earlier in

13:42:56 13   your testimony?

13:42:57 14         **A.**    Yes.

13:42:58 15         **Q.**    The person who just got out of the

13:43:01 16   covering officers' car on the passenger side, do

13:43:03 17   you know which officer that is?

13:43:05 18         **A.**    That's Officer Velez.

13:43:09 19         **Q.**    And the -- to the right-hand side of

13:43:11 20   this clip, there's an officer coming into view.

13:43:16 21   Is that you or Officer Moriarity, can you tell?

13:43:18 22         **A.**    I believe that's me.

13:43:23 23         **Q.**    Now there's two officers.  Are you

*Schultz - Yonkers - 2/13/20*

230

| | | |
|---|---|---|
| 13:43:26 | 1 | shown in the time stamp 27 time frame? |
| 13:43:29 | 2 | A. Yes. |
| 13:43:30 | 3 | Q. And are you closer to the middle of the |
| 13:43:33 | 4 | street or to the side of the street? |
| 13:43:34 | 5 | A. The middle of the street. |
| 13:43:39 | 6 | Q. And it appears that Officer Velez is |
| 13:43:43 | 7 | saying something. Do you remember, sitting here |
| 13:43:47 | 8 | today, what she said? |
| 13:43:48 | 9 | A. No, I don't. |
| 13:43:54 | 10 | Q. And at that point, did you just walk |
| 13:43:57 | 11 | past the individual male who had come out from the |
| 13:44:00 | 12 | sidewalk area? |
| 13:44:00 | 13 | A. Yes. |
| 13:44:01 | 14 | Q. Did you say anything to him at that |
| 13:44:03 | 15 | time? |
| 13:44:03 | 16 | A. At that time, I'm not sure. |
| 13:44:04 | 17 | Q. Did he say anything to you at that |
| 13:44:07 | 18 | time? |
| 13:44:07 | 19 | A. I -- I can't remember if he did or |
| 13:44:10 | 20 | didn't. |
| 13:44:10 | 21 | Q. Was he interfering in any of your |
| 13:44:15 | 22 | assessment at this point in time? |
| 13:44:16 | 23 | A. At this point, no. |

*Schultz - Yonkers - 2/13/20*

280

| | | |
|---|---|---|
| 14:35:54 | 1 | you know, the electronic database of the Buffalo |
| 14:35:59 | 2 | Police Department? |
| 14:36:00 | 3 |     **MS. HUGGINS:**   Form. |
| 14:36:00 | 4 |     **THE WITNESS:**   That, I'm unsure of.   That, |
| 14:36:02 | 5 | I don't know. |
| 14:36:10 | 6 |     **BY MS. YONKERS:** |
| 14:36:11 | 7 |     **Q.**   Your attorney asked you some questions |
| 14:36:12 | 8 | about assignments to other units, like AIU and |
| 14:36:17 | 9 | internal affairs. |
| 14:36:18 | 10 |     Have you ever been assigned to any other |
| 14:36:19 | 11 | units within the Buffalo Police Department? |
| 14:36:21 | 12 |     **A.**   No. |
| 14:36:22 | 13 |     **MS. YONKERS:**   That's all I have.   Thank you. |
| 14:36:25 | 14 |     **THE WITNESS:**   Thank you. |
| | 15 |     (Proceedings of 2/13/20 were then concluded |
| | 16 | at 2:35 p.m.) |
| | 17 | |
| | 18 |              *   *   * |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |

281

1        I hereby CERTIFY that I have read the

2   foregoing 280 pages, and that except as to those

3   changes (if any) as set forth in an attached errata

4   sheet, they are a true and accurate transcript of

5   the testimony given by me in the above entitled

6   action on February 13, 2020.

7

8

9                        ------------------------

10                       KARL SCHULTZ

11

12

13

14

15

16

17

18

19

20

21

22

23

282

1   STATE OF NEW YORK)

2                          ss:

3   COUNTY OF ERIE    )

4

5        I DO HEREBY CERTIFY as a Notary Public in and

6   for the State of New York, that I did attend and

7   report the foregoing deposition, which was taken

8   down by me in a verbatim manner by means of machine

9   shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18                    ---------------------------

19                    ANNE T. BARONE, RPR,
                      Notary Public.

20

21

22

23

283

**INDEX TO EXHIBITS**

| Exhibit | Description | Page |
|---------|-------------|------|
| EXH. 1 | Buffalo Police complaint & summary report, 11/13/15 | 154 |
| EXH. 2 | Buffalo Police complaint & summary report, 6/9/16 | 155 |
| EXH. 3 | Buffalo Police complaint & summary report, 1/1/17, 10:32 a.m. | 155 |
| EXH. 4 | Buffalo Police complaint & summary report, 1/1/17, 10:54 a.m. | 155 |
| EXH. 5 | Buffalo Police criminal mischief form | 155 |
| EXH. 6 | Request for examination - person under Section 9.41 of the NYS Mental Hygiene Law | 155 |
| EXH. 7 | Buffalo Police Dispatch Monitor - Unit History report | 155 |
| EXH. 8 | Cell block form | 155 |
| EXH. 9 | City of Buffalo Police Department Central Booking Bureau case history | 155 |
| EXH. 10 | CD containing radio calls | 195 |
| EXH. 11 | CD containing video clips | 195 |
| EXH. 12 | CD containing video clips | 195 |

284

1    EXH. 13          Answer to first            195
                      interrogatories to
2                     defendants

3

4

5    * Exhibits retained by Ms. Yonkers.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

285

1                    INDEX TO WITNESSES

2  Witness              Examination              Page

3   KARL SCHULTZ        BY MS. YONKERS:            3

4                       BY MS. HUGGINS:          276

5                       BY MS. YONKERS:          278

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*