EXHIBIT G

**VIDEO DEPOSITION**
**LAUREN McDERMOTT**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

----------------------------------------
JAMES C. KISTNER,

                         Plaintiff,

              - vs -      Civil Action No.
                         18-cv-402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
 capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),

                         Defendants.
----------------------------------------

*JACK W. HUNT & ASSOCIATES, INC.*

2

1          Video deposition of **LAUREN McDERMOTT**,

2  Defendant, taken pursuant to the Federal Rules of

3  Civil Procedure, in the offices of JACK W. HUNT &

4  ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

5  New York, on February 19, 2020, commencing at

6  10:07 a.m., before ANNE T. BARONE, RPR, Notary

7  Public.

8

9  APPEARANCES:      RUPP BAASE
                     PFALZGRAF & CUNNINGHAM, LLC,
10                   By R. ANTHONY RUPP, III, ESQ.,
                     rupp@ruppbaase.com and
11                   CHAD DAVENPORT, ESQ.,
                     davenport@ruppbaase.com,
12                   1600 Liberty Building,
                     Buffalo, New York  14202,
13                   (716) 854-3400,
                     Appearing for the Plaintiff.

14

15                   TIMOTHY A. BALL, ESQ.,
                     Corporation Counsel,
16                   By MAEVE E. HUGGINS, ESQ.,
                     Assistant Corporation Counsel,
17                   1137 City Hall,
                     Buffalo, New York  14202,
18                   (716) 851-4334,
                     mhuggins@city-buffalo.com,
19                   Appearing for the Defendants.

20
   PRESENT:          JAMES KISTNER
21                   JENNY VELEZ
                     PATRICK F. MORRIS, Videographer

22

23

10:04:28

3

| | | |
|---|---|---|
| 10:04:28 | 1 | **THE REPORTER:**  Usual stipulations for |
| 10:04:53 | 2 | federal cases and read and sign? |
| 10:04:56 | 3 | **MS. HUGGINS:**  45 days to read and sign. |
| 10:04:58 | 4 | **THE REPORTER:**  Okay. |
| 10:05:00 | 5 | **MR. RUPP:**  No objection. |
| 10:05:00 | 6 | **THE REPORTER:**  And Ms. Huggins will be |
| 10:05:02 | 7 | supplied? |
| 10:05:04 | 8 | **MR. RUPP:**  Yes. |
| 10:05:04 | 9 | **THE REPORTER:**  Thank you. |
| 10:05:04 | 10 | |
| 10:07:49 | 11 | **L A U R E N   M c D E R M O T T**, 1847 South Park |
| 10:07:58 | 12 | Avenue, Buffalo, New York  14220, after being duly |
| 10:07:58 | 13 | called and sworn, testified as follows: |
| 10:08:02 | 14 | |
| 10:08:02 | 15 | **EXAMINATION BY MR. RUPP:** |
| 10:08:02 | 16 | |
| 10:08:03 | 17 | **Q.**    Good morning, Ms. McDermott. |
| 10:08:05 | 18 | **A.**    Good morning. |
| 10:08:05 | 19 | **Q.**    My name's Tony Rupp.  I don't think |
| 10:08:07 | 20 | we've met before today.  Is that fair? |
| 10:08:08 | 21 | **A.**    Yeah, I don't think so. |
| 10:08:09 | 22 | **Q.**    Okay.  You're here for a deposition in |
| 10:08:11 | 23 | the case of James Kistner versus the City of |

*McDermott - Rupp - 2/19/20*

14

| | | |
|---|---|---|
| 10:15:37 | 1 | page? |
| 10:15:38 | 2 | **A.** Yes. |
| 10:15:38 | 3 | **Q.** But, in fact, you had already graduated |
| 10:15:41 | 4 | from the ECC program by the time the training |
| 10:15:45 | 5 | that's listed on this begins; is that right? |
| 10:15:48 | 6 | **A.** Yes. |
| 10:15:48 | 7 | **Q.** Okay. So is the training that you |
| 10:15:51 | 8 | receive once you become an actual officer in the |
| 10:15:55 | 9 | field given through something known as the Buffalo |
| 10:15:58 | 10 | Police Academy? |
| 10:15:59 | 11 | **A.** Yes. We have -- there's ECC Training |
| 10:16:01 | 12 | Academy and then there's a Buffalo Police Academy |
| 10:16:05 | 13 | Division. |
| 10:16:05 | 14 | **Q.** Okay. |
| 10:16:05 | 15 | **A.** And that's where -- what all of this |
| 10:16:07 | 16 | would be. |
| 10:16:07 | 17 | **Q.** All right. So let's just pick the one |
| 10:16:09 | 18 | at the top. 2013 Glock qualification, which took |
| 10:16:12 | 19 | place on January 22nd, 2013, which was after ECC; |
| 10:16:16 | 20 | is that right? |
| 10:16:17 | 21 | **A.** Yes. |
| 10:16:17 | 22 | **Q.** Indicates that you took and completed |
| 10:16:18 | 23 | that course; is that right? |

*McDermott - Rupp - 2/19/20*

15

| | | |
|---|---|---|
| 10:16:19 | 1 | **A.**   Yes. |
| 10:16:20 | 2 | **Q.**   And was that something that would |
| 10:16:23 | 3 | happen, you know, during a regularly scheduled |
| 10:16:26 | 4 | shift that you would be scheduled to go to the |
| 10:16:28 | 5 | police academy to do that? |
| 10:16:29 | 6 | **A.**   It depends.  Glock qualification is |
| 10:16:33 | 7 | qualifying with our firearm. |
| 10:16:34 | 8 | **Q.**   Right. |
| 10:16:35 | 9 | **A.**   So it would be during -- it would be at |
| 10:16:37 | 10 | the range.  So, generally, it would be during the |
| 10:16:38 | 11 | shift but not necessarily. |
| 10:16:42 | 12 | **Q.**   Okay.  So I guess what I'm getting at |
| 10:16:44 | 13 | is:  Was this training in addition to like your |
| 10:16:46 | 14 | regular, I assume, eight-hour shift or -- |
| 10:16:48 | 15 | **A.**   Ten-hour shifts. |
| 10:16:49 | 16 | **Q.**   -- ten-hour shift, or could it |
| 10:16:51 | 17 | happen -- mostly happen during your shift? |
| 10:16:53 | 18 | **A.**   It -- it is usually during the shift. |
| 10:16:55 | 19 | **Q.**   Okay.  And so the list of courses that |
| 10:17:00 | 20 | you took at ECC are not on here; is that right? |
| 10:17:03 | 21 | **A.**   Correct. |
| 10:17:03 | 22 | **Q.**   So if we wanted to see those, we would |
| 10:17:05 | 23 | have to get those records; is that right? |

*McDermott - Rupp - 2/19/20*

16

10:17:09  1          A.    Yes.

10:17:09  2          Q.    Okay.   But with respect to the training

10:17:12  3    that you've received through the Buffalo Police

10:17:18  4    Academy postECC, does this appear to be a full

10:17:23  5    listing of your training at least through the

10:17:27  6    date -- the last date that's referenced there,

10:17:30  7    February 20, 2019?

10:17:33  8          A.    Yes.

10:17:33  9          Q.    Okay.  And I note that you took

10:17:36 10    training -- there's training listed here for Tahoe

10:17:41 11    on May 2, 2014.   What is that training?

10:17:45 12          A.    We had previously had Crown Vics, and

10:17:48 13    we had just gotten a fleet of Tahoes, so we all had

10:17:52 14    to be trained on driving those Tahoes.

10:17:54 15          Q.    All right.   And you received that

10:17:56 16    training on May 2nd of 2014?

10:17:58 17          A.    Yes.

10:17:59 18          Q.    And completed that course?

10:18:01 19          A.    Yes.

10:18:01 20          Q.    And that was a four-hour course?

10:18:02 21          A.    Yes.

10:18:02 22          Q.    All right.   And on the date of the

10:18:04 23    incident involving Mr. Kistner, January 1st, 2017,

*McDermott - Rupp - 2/19/20*

17

| | | |
|---|---|---|
| 10:18:09 | 1 | were you driving a Tahoe? |
| 10:18:10 | 2 | **A.** Yes. |
| 10:18:10 | 3 | **Q.** All right. And was that the same type |
| 10:18:11 | 4 | or model of Tahoe that you had trained on back in |
| 10:18:16 | 5 | 2014? |
| 10:18:16 | 6 | **A.** I believe so. |
| 10:18:17 | 7 | **Q.** All right. And did you take any other |
| 10:18:19 | 8 | training on the operation -- the safe and lawful |
| 10:18:22 | 9 | operation of a Tahoe after May of 2014 and before |
| 10:18:29 | 10 | January 1st of 2017? |
| 10:18:32 | 11 | **A.** I don't remember. |
| 10:18:33 | 12 | **Q.** Okay. Well, if you had, would it be |
| 10:18:35 | 13 | referenced on the Buffalo Police Academy training |
| 10:18:38 | 14 | record that's been marked as Exhibit 14? |
| 10:18:40 | 15 | **A.** I believe so. |
| 10:18:40 | 16 | **Q.** Okay. Do you see anything there that |
| 10:18:43 | 17 | references either Tahoe in particular or any type |
| 10:18:46 | 18 | of driving training that you would have taken |
| 10:18:51 | 19 | between those two dates that I just gave you? |
| 10:18:53 | 20 | **A.** I do not. |
| 10:18:54 | 21 | **Q.** Okay. And are there any other |
| 10:18:55 | 22 | references to any type of driver training anywhere |
| 10:18:59 | 23 | on Exhibit 14 that you can see? |

*McDermott - Rupp - 2/19/20*

18

10:19:10  1       **A.**    Not that I can see.

10:19:11  2       **Q.**    All right.  Did you take driver

10:19:12  3  training operating a police -- a patrol vehicle

10:19:17  4  while you were at the ECC program?

10:19:18  5       **A.**    Yes.

10:19:18  6       **Q.**    Okay.  And what type of vehicles did

10:19:20  7  you train on there?  Were those the Crown Vics?

10:19:22  8       **A.**    Yes.

10:19:23  9       **Q.**    Okay.  And when do -- did the Tahoes

10:19:29 10  first come into the police department where you

10:19:31 11  would have been at C District to either ride in one

10:19:33 12  or operate one?

10:19:33 13       **A.**    I don't know the exact date.

10:19:35 14       **Q.**    Did you start to drive one before you

10:19:37 15  had the Tahoe training, or was that required before

10:19:39 16  you could operate the Tahoe?

10:19:40 17       **A.**    I don't remember.

10:19:41 18       **Q.**    Okay.  All right.  And since -- since

10:19:49 19  2014, you haven't had any updated course -- courses

10:19:53 20  on operation of a patrol vehicle, to the best of

10:19:56 21  your knowledge?

10:19:57 22       **A.**    To the best of my knowledge, no.

10:19:59 23       **Q.**    Okay.  Fair enough.

| | |
|---|---|
| 10:20:01 1 | And, now, I see there's a reference, on the |
| 10:20:05 2 | second page of Exhibit 14, August 4, 2016, to law |
| 10:20:09 3 | enforcement and mental health.  Was that a |
| 10:20:12 4 | three-hour course that you took on that date? |
| 10:20:14 5 | A.    Yes. |
| 10:20:14 6 | Q.    And you completed it? |
| 10:20:16 7 | A.    Yes. |
| 10:20:16 8 | Q.    All right.  And had you also taken |
| 10:20:18 9 | a similar course as part of your ECC training? |
| 10:20:22 10 | A.    Yes.  I just don't know what it was |
| 10:20:24 11 | called. |
| 10:20:24 12 | Q.    Sure. |
| 10:20:26 13 | Do you see anything else on the list of |
| 10:20:30 14 | training courses that's marked as Exhibit 14 from |
| 10:20:34 15 | the Buffalo Police Academy that relates to law |
| 10:20:38 16 | enforcement and mental health or just the mental |
| 10:20:41 17 | health part of it? |
| 10:20:42 18 | MS. HUGGINS:   Form.  You can answer. |
| 10:20:43 19 | THE WITNESS:   I took CIT crisis services |
| 10:20:47 20 | training in December of '18. |
| 10:20:48 21 | BY MR. RUPP: |
| 10:20:49 22 | Q.    And what is CIT? |
| 10:20:50 23 | A.    It is -- gosh.  I'm drawing a blank. |

*McDermott - Rupp - 2/19/20*

30

| | | |
|---|---|---|
| 10:29:25 | 1 | How was it that you were paired up with -- |
| 10:29:28 | 2 | with Officer Velez? |
| 10:29:30 | 3 | **THE WITNESS:**  By choice. |
| 10:29:30 | 4 | **BY MR. RUPP:** |
| 10:29:30 | 5 | **Q.**   Okay.  You got to pick? |
| 10:29:31 | 6 | **A.**   Yes. |
| 10:29:31 | 7 | **Q.**   Was there any effort to match, you |
| 10:29:34 | 8 | know, lesser experienced officers with more |
| 10:29:36 | 9 | experienced officers when you -- |
| 10:29:37 | 10 | **A.**   No. |
| 10:29:37 | 11 | **Q.**   -- doubled up like that? |
| 10:29:38 | 12 | **A.**   No. |
| 10:29:39 | 13 | **Q.**   Okay.  And how was it that you and |
| 10:29:41 | 14 | Officer Velez -- I assume it was mutual -- chose |
| 10:29:43 | 15 | each other? |
| 10:29:45 | 16 | **A.**   We were friends.  I mean -- |
| 10:29:48 | 17 | **Q.**   Did you become -- were you friends |
| 10:29:49 | 18 | before you joined the police department or -- |
| 10:29:51 | 19 | **A.**   No.  We met on the job. |
| 10:29:52 | 20 | **Q.**   Okay.  And do you remain friends with |
| 10:29:56 | 21 | her to this day? |
| 10:29:56 | 22 | **A.**   Yes. |
| 10:29:57 | 23 | **Q.**   All right.  And do you still -- you're |

10:29:58  1    a detective now, so you're not riding patrol.

10:30:01  2          **A.**    Correct.

10:30:01  3          **Q.**    Okay.  As is Ms. Velez?

10:30:05  4          **A.**    She's a lieutenant.

10:30:06  5          **Q.**    She's a lieutenant now.  Okay.  So you

10:30:07  6    don't ride together anymore.

10:30:10  7          **A.**    Correct.

10:30:11  8          **Q.**    Okay.  And you're still with -- with

10:30:13  9    C District?

10:30:14 10          **A.**    A District.

10:30:15 11          **Q.**    I'm sorry.  A District is where you are

10:30:17 12    now.

10:30:19 13          Is she -- what district is she with now?

10:30:21 14          **A.**    C.

10:30:21 15          **Q.**    Okay.  She remained with C.

10:30:24 16          All right.  Prior to your deposition here

10:30:33 17    today, Ms. McDermott, did you review any

10:30:34 18    documentation at all?

10:30:35 19          **A.**    Yes.

10:30:35 20          **Q.**    All right.  What did you review?

10:30:39 21          **A.**    There's a lot of documents that we

10:30:41 22    reviewed.

10:30:42 23          **Q.**    When did you do that review?

*McDermott - Rupp - 2/19/20*

32

10:30:43  1          A.    Yesterday.

10:30:44  2          Q.    Okay.  And how long -- where did that

10:30:46  3   take place?

10:30:47  4          A.    Maeve's office.

10:30:49  5          Q.    Okay.  And approximately how long did

10:30:51  6   you -- did your review of documents take place?

10:30:54  7          A.    A couple hours.

10:30:55  8          Q.    Okay.  And -- and what in particular

10:30:59  9   did you review?

10:31:00 10          Did you review any documents that you signed

10:31:01 11   or arrest records relative to the incident

10:31:05 12   involving Mr. Kistner?

10:31:06 13          A.    Yes.  We reviewed the arrest records.

10:31:08 14          Q.    Okay.  What else did you review?

10:31:10 15          A.    Video.

10:31:11 16          Q.    All right.  Is that video --

10:31:13 17   surveillance video of the incident?

10:31:14 18          A.    Yes.

10:31:14 19          Q.    That was produced by our office?

10:31:16 20          A.    Yes.

10:31:16 21          Q.    Okay.  Had you seen that previously?

10:31:18 22          A.    Yes.

10:31:18 23          Q.    And when -- when is the first time you

*McDermott - Rupp - 2/19/20*

33

| | | |
|---|---|---|
| 10:31:21 | 1 | had seen that surveillance video? |
| 10:31:24 | 2 | **A.** I believe it was after we were served |
| 10:31:28 | 3 | with the -- or I was served with the paperwork for |
| 10:31:30 | 4 | the lawsuit. |
| 10:31:33 | 5 | **Q.** At any time prior to being served with |
| 10:31:35 | 6 | the lawsuit, had you been contacted by anyone from |
| 10:31:39 | 7 | internal affairs at the Buffalo Police Department? |
| 10:31:42 | 8 | **A.** No. |
| 10:31:44 | 9 | **Q.** Are -- were you ever aware of any |
| 10:31:47 | 10 | internal affairs investigations -- |
| 10:31:48 | 11 | **A.** Excuse me. |
| 10:31:49 | 12 | **Q.** -- relative to the arrest of |
| 10:31:51 | 13 | Mr. Kistner on -- and the episode on January 1 of |
| 10:31:56 | 14 | 2017? |
| 10:31:56 | 15 | **A.** No. |
| 10:31:57 | 16 | **Q.** Are you aware of one now? |
| 10:31:58 | 17 | **A.** No. |
| 10:31:58 | 18 | **Q.** Have you ever been contacted by |
| 10:32:01 | 19 | internal affairs? |
| 10:32:02 | 20 | **A.** No. |
| 10:32:02 | 21 | **Q.** Okay. And you're not -- you're not |
| 10:32:05 | 22 | aware of whether they have an open investigation |
| 10:32:07 | 23 | or -- or have never opened one at this time. |

*McDermott - Rupp - 2/19/20*

34

10:32:09  1       **A.**   I'm not aware.

10:32:10  2       **MS. HUGGINS:**   Form.

10:32:10  3       **BY MR. RUPP:**

10:32:10  4       **Q.**   Okay.  Have you ever been disciplined

10:32:22  5  for any reason as a police officer or a police

10:32:24  6  detective?

10:32:24  7       **MS. HUGGINS:**   Form, and a 50-A objection, to

10:32:27  8  the extent it applies.  You may answer.

10:32:30  9       **THE WITNESS:**   Can you define discipline?

10:32:32 10       **BY MR. RUPP:**

10:32:33 11       **Q.**   Well, any type of I guess black mark in

10:32:35 12  your -- in your record where you were reprimanded,

10:32:38 13  where you were censured, where you were disciplined

10:32:40 14  in any way?

10:32:42 15       **A.**   Not anything that would be like a

10:32:45 16  reprimand or a suspension, but I guess if you were

10:32:50 17  to say disciplined in any way, I don't know if

10:32:52 18  I would use the word disciplined, but I've had to

10:32:57 19  speak with, say, a lieutenant or a captain

10:33:00 20  regarding an instance on a call.

10:33:06 21       **Q.**   Okay.  And approximately how many times

10:33:08 22  have you had to do that?

10:33:11 23       **A.**   Not very many, but I couldn't -- I

10:33:15  1   couldn't say.

10:33:15  2       **Q.**   All right.  So nothing that resulted in

10:33:17  3   any type of suspension?

10:33:18  4       **A.**   No.

10:33:18  5       **Q.**   Nothing that resulted in any type of

10:33:21  6   official reprimand?

10:33:22  7       **A.**   Correct.

10:33:22  8       **Q.**   Okay.  And nothing that resulted in

10:33:24  9   anything in your -- in your personal personnel file

10:33:27  10  that would be considered a black mark?

10:33:29  11      **A.**   Correct.

10:33:29  12      **MS. HUGGINS:**  Form objection and a 50-A, to

10:33:32  13  the extent that that applies.

10:33:35  14      **BY MR. RUPP:**

10:33:36  15      **Q.**   All right.  When you received your

10:33:42  16  training on the Tahoe -- well, let's go back to

10:33:45  17  ECC.  When you received your training on the

10:33:47  18  Crown Vic and patrol vehicles generally, what kind

10:33:49  19  of training was that?  What did you receive?

10:33:52  20      **A.**   I believe it was a week-long training.

10:33:55  21  It was out at the airport, and it was different

10:34:00  22  types of driving, maneuvering.  You know, we do

10:34:06  23  have to drive fast sometimes.  Driving fast,

*McDermott - Rupp - 2/19/20*

74

11:07:59  1    earlier, in reference to Exhibit 3 and the initial

11:08:04  2    call to 33 Schmarbeck, that once dispatch puts

11:08:08  3    a final disposition on it and calls it archived, it

11:08:11  4    just kind of disappears from your computer; is that

11:08:14  5    right?

11:08:14  6         A.    Right.

11:08:14  7         Q.    Okay.  Okay.  So let's go through just

11:08:16  8    a couple more of these.

11:08:20  9         At 10:57:17, car C230, with Officer Schultz

11:08:28  10   and Moriarity, is en route to the scene; is that

11:08:32  11   right?

11:08:32  12        MS. HUGGINS:  Form.

11:08:34  13        THE WITNESS:  We were already on scene.

11:08:35  14   That's just how dispatch --

11:08:35  15        BY MR. RUPP:

11:08:35  16        Q.    Okay.

11:08:37  17        A.    -- logs it.

11:08:39  18        Q.    All right.  Fair enough.

11:08:40  19        And you say we.  Was -- were you and -- and

11:08:44  20   Officer Velez also there by that time?

11:08:45  21        A.    Yes.

11:08:46  22        Q.    Okay.  Because at 10:55, there's

11:08:51  23   a call -- there's a dispatch that comes in and

| | | |
|---|---|---|
| 11:08:53 | 1 | there's a call that came in at 10:54 about a male |
| 11:08:57 | 2 | hit by a police car; is that right? |
| 11:08:58 | 3 | **A.** At 10:55:42. |
| 11:09:01 | 4 | **Q.** Right. Okay. So then the computer |
| 11:09:03 | 5 | shows you, C241, and Ms. Velez, C42, as being |
| 11:09:12 | 6 | dispatched/en route in that 10:57 time frame; is |
| 11:09:17 | 7 | that right? |
| 11:09:17 | 8 | **A.** Yes. We were on -- |
| 11:09:17 | 9 | **Q.** But you -- |
| 11:09:18 | 10 | **A.** We were on -- |
| 11:09:18 | 11 | **Q.** But you -- but you were already there. |
| 11:09:20 | 12 | **A.** Yes. |
| 11:09:21 | 13 | **Q.** Okay. Then another call comes in. |
| 11:09:24 | 14 | All right. Now, at -- at 11 -- okay. Well, at |
| 11:09:29 | 15 | 11:04:26, it says ADI notified, and what is ADI? |
| 11:09:33 | 16 | **A.** Ambulance. |
| 11:09:34 | 17 | **Q.** Okay. And do you know who summoned the |
| 11:09:39 | 18 | ambulance? Was that dispatch or -- |
| 11:09:42 | 19 | **A.** I believe it was the call where -- the |
| 11:09:45 | 20 | line right above it, where it says she requested |
| 11:09:47 | 21 | the ambulance. Female requested the ambulance. |
| 11:09:48 | 22 | **Q.** Right. But then the entry under 8790, |
| 11:09:52 | 23 | it says ADI notified, do you know who would have |

| | | |
|---|---|---|
| 11:09:57 | 1 | put that in six seconds later? |
| 11:10:00 | 2 | **A.** It appears to be Edward Sauer. That's |
| 11:10:02 | 3 | his number. |
| 11:10:02 | 4 | **Q.** Okay. All right. So it looks like |
| 11:10:07 | 5 | dispatch ordered an ambulance to 37 Schmarbeck? |
| 11:10:12 | 6 | **A.** I believe so. |
| 11:10:13 | 7 | **Q.** Okay. And then 11:07:31, there's an |
| 11:10:18 | 8 | entry that looks like it was added by -- who is |
| 11:10:26 | 9 | 000478? Is that Joseph Kessler? |
| 11:10:28 | 10 | **A.** Yes. |
| 11:10:28 | 11 | **Q.** It says, cameras on 37 has video of the |
| 11:10:32 | 12 | man flopping on the ground. |
| 11:10:35 | 13 | Do you know what that is in -- refers to? |
| 11:10:38 | 14 | **A.** I don't recall who would have -- he |
| 11:10:43 | 15 | typed it in the call. I don't recall who would |
| 11:10:45 | 16 | have communicated that. It could have been the |
| 11:10:48 | 17 | call -- the person calling 911. It could have been |
| 11:10:50 | 18 | one of us. But I didn't -- I don't recall hearing |
| 11:10:53 | 19 | that on the 911 calls when we reviewed it yesterday. |
| 11:10:57 | 20 | **Q.** Okay. Do you know what 37 refers to? |
| 11:11:00 | 21 | Is that -- 37 Schmarbeck is the address. |
| 11:11:05 | 22 | **A.** Yes. |
| 11:11:06 | 23 | **Q.** Okay. |

11:11:07  1      **A.**    I --

11:11:08  2      **Q.**    So had -- had you -- by 11:07 a.m., had

11:11:12  3  you ever -- had you seen any camera footage of

11:11:16  4  the -- of the actual collision of the -- of the

11:11:17  5  police car with the male?

11:11:19  6          **MS. HUGGINS:**  Form.

11:11:19  7          **THE WITNESS:**  No.  I didn't see the camera

11:11:20  8  footage that day.

11:11:21  9          **BY MR. RUPP:**

11:11:21  10      **Q.**    Okay.  All right.  Okay.  So dispatch

11:11:24  11  you think would have added that remark from some

11:11:26  12  source of information; is that right?

11:11:28  13      **A.**    Correct.

11:11:28  14      **Q.**    Okay.  All right.  Now, just to

11:11:31  15  continue along, at 11:22 a.m., we have a location

11:11:35  16  change of the 230 -- C230 call sign, which I think

11:11:42  17  you told me was both Schultz and the trainee

11:11:44  18  Moriarity, correct?

11:11:45  19      **A.**    Yes.

11:11:45  20      **Q.**    And then you and Velez, C41 and C42,

11:11:50  21  are putting in a location change to ECMC; is that

11:11:54  22  right?

11:11:54  23      **A.**    Yes.

*McDermott - Rupp - 2/19/20*

78

11:11:54   1          Q.    And that was usually -- that was
11:11:56   2   accomplished by radio.  You would radio in and say
11:11:59   3   you're -- you're going somewhere else or your
11:12:01   4   location has changed?
11:12:02   5          A.    Yes.  I believe Karl made that call.
11:12:04   6          Q.    Okay.  But my point is:  Whoever made
11:12:06   7   it might have called in for maybe all three of you
11:12:09   8   or both vehicles, but it's done by radio.
11:12:12   9          A.    Dis -- yeah, by dispatch.
11:12:13  10          MS. HUGGINS:  Form.
11:12:14  11          THE WITNESS:  Right.
11:12:15  12          BY MR. RUPP:
11:12:15  13          Q.    Okay.  I'm calling it radio, so that's
11:12:16  14   the communication --
11:12:16  15          A.    We --
11:12:17  16          Q.    -- with dispatch.  You call it
11:12:18  17   dispatch?
11:12:18  18          A.    We -- we call it radio.
11:12:20  19          Q.    Okay.
11:12:20  20          A.    But I -- that's just our term for it.
11:12:23  21          Q.    Well, and I guess I'm -- okay.  And
11:12:25  22   I'll use that term.
11:12:25  23          A.    Okay.

11:12:26  1            Q.    But I'm kind of wanting to make sure

11:12:28  2    I'm distinguishing it from some other type of

11:12:30  3    communication, like through the computer or through

11:12:32  4    a cell phone or something.

11:12:33  5            This is radio to dispatch:  My location is

11:12:35  6    changing.  I'm going here.

11:12:37  7            A.    Correct.  Radio communications.

11:12:38  8            Q.    Okay.  Fair enough.

11:12:40  9            And would that location change happen when

11:12:43 10    you leave the scene of 37 Schmarbeck or when you

11:12:46 11    arrive at ECMC that you would do that or when

11:12:49 12    you're en route?

11:12:50 13            When would that happen?

11:12:51 14            MS. HUGGINS:  Form.  You can answer.

11:12:52 15            MR. RUPP:  Strike it.

11:12:54 16            When would you normally make a location-change

11:12:57 17    call to dispatch when you're changing your location?

11:13:02 18            THE WITNESS:  Normally it would be when we

11:13:03 19    were leaving the scene to go --

11:13:04 20            BY MR. RUPP:

11:13:04 21            Q.    Okay.

11:13:05 22            A.    -- to the location.  It just depends on

11:13:07 23    when dispatch types it into the computer.

*McDermott - Rupp - 2/19/20*

83

| | | |
|---|---|---|
| 11:16:07 | 1 | some point in time, Karl and Kyle went back into |
| 11:16:09 | 2 | service. |
| 11:16:09 | 3 | Q.    Okay.  And so you and -- and Ms. Velez |
| 11:16:13 | 4 | stayed with Mr. Kistner wherever you were at that |
| 11:16:16 | 5 | point. |
| 11:16:16 | 6 | A.    Correct. |
| 11:16:16 | 7 | Q.    So it was just the two officers at that |
| 11:16:18 | 8 | point; is that right? |
| 11:16:19 | 9 | A.    Myself and Officer Velez. |
| 11:16:21 | 10 | Q.    Yes.  Yes. |
| 11:16:22 | 11 | A.    Yes. |
| 11:16:22 | 12 | Q.    Okay.  So then the next entry, 14:45, |
| 11:16:26 | 13 | says C241 NMT.  Do you know what that means? |
| 11:16:29 | 14 | A.    It stands for need more time. |
| 11:16:31 | 15 | Q.    Okay.  And based on your location |
| 11:16:33 | 16 | changes as logged by dispatch, does it appear that |
| 11:16:37 | 17 | you were still at ECMC? |
| 11:16:40 | 18 | A.    It appears, yes. |
| 11:16:41 | 19 | Q.    Okay.  And would the C241, need more |
| 11:16:45 | 20 | time, was that something you would have radioed |
| 11:16:47 | 21 | into dispatch or typed into your computer, or how |
| 11:16:51 | 22 | would they get that information? |
| 11:16:52 | 23 | A.    One or the other.  I don't recall which |

| | | |
|---|---|---|
| 11:16:53 | 1 | one. |
| 11:16:54 | 2 | **Q.**   Okay. |
| 11:16:54 | 3 | **A.**   Which -- -- which communication I used. |
| 11:16:56 | 4 | **Q.**   Well, when you were at ECMC, you |
| 11:16:58 | 5 | weren't in your patrol vehicle, right? |
| 11:17:01 | 6 | **A.**   I was not. |
| 11:17:02 | 7 | **Q.**   Okay. |
| 11:17:03 | 8 | **A.**   But that doesn't mean I wouldn't have |
| 11:17:05 | 9 | gone out to the car to get, say, paperwork or |
| 11:17:07 | 10 | something and could have messaged. |
| 11:17:08 | 11 | **Q.**   Fair enough. |
| 11:17:09 | 12 | **A.**   I don't recall. |
| 11:17:09 | 13 | **Q.**   Fair enough. |
| 11:17:10 | 14 | All right.  And so then at 1537, which is |
| 11:17:15 | 15 | 3:37 p.m. -- and I'm sorry, what time did you tell |
| 11:17:18 | 16 | me your shift would normally be over? |
| 11:17:19 | 17 | **A.**   At 4 p.m. |
| 11:17:21 | 18 | **Q.**   4 p.m.  Okay. |
| 11:17:23 | 19 | So at -- at 3:50 -- 3:37 p.m., about |
| 11:17:27 | 20 | 23 minutes before your shift would normally be |
| 11:17:29 | 21 | over, you, and then three seconds later, Officer |
| 11:17:34 | 22 | Velez, location changed.  What is CB? |
| 11:17:37 | 23 | **A.**   Central booking. |

*McDermott - Rupp - 2/19/20*

85

| | | |
|---|---|---|
| 11:17:38 | 1 | **Q.**   Okay.  All right. |
| 11:17:41 | 2 | **A.**   And -- |
| 11:17:42 | 3 | **Q.**   And then at -- go ahead. |
| 11:17:43 | 4 | **A.**   I'm sorry.  Or cell block is how we |
| 11:17:45 | 5 | sometimes refer to it as well. |
| 11:17:47 | 6 | **Q.**   Fair enough.  Either -- either acronym. |
| 11:17:49 | 7 | All right.  Then at about -- oh, about |
| 11:17:51 | 8 | 11 minutes later, it shows both of you as being |
| 11:17:54 | 9 | on scene presumably at cell block or central |
| 11:17:57 | 10 | booking; is that right? |
| 11:17:57 | 11 | **A.**   Yes. |
| 11:17:57 | 12 | **Q.**   Okay.  Then we have another location |
| 11:18:01 | 13 | change about nearly an hour later, at -- at |
| 11:18:05 | 14 | 4:36 p.m., it says your location has changed back |
| 11:18:10 | 15 | to ECMC; is that right?  Both you and Officer |
| 11:18:13 | 16 | Velez? |
| 11:18:13 | 17 | **A.**   Yes. |
| 11:18:13 | 18 | **Q.**   Okay.  I mean, they're consecutive |
| 11:18:15 | 19 | entries a few seconds apart, right? |
| 11:18:17 | 20 | **A.**   Yes. |
| 11:18:17 | 21 | **Q.**   Because you're driving together. |
| 11:18:19 | 22 | **A.**   Correct. |
| 11:18:19 | 23 | **Q.**   All right.  So as long as it took |

*McDermott - Rupp - 2/19/20*

86

11:18:21   1   dispatch to type in, you're both going, location

11:18:23   2   change, back to ECMC; is that right?

11:18:25   3         A.   Yes.

11:18:25   4         Q.   Okay.  And then it shows you as being

11:18:27   5   en route.

11:18:31   6         Now, and then it puts you on scene at

11:18:35   7   4:46 p.m.; is that right?

11:18:42   8         On the second page?

11:18:44   9         A.   Oh, yes.  Yes.

11:18:46  10         Q.   Okay.  So, and that means on scene, as

11:18:48  11   you are now back at ECMC; is that right?

11:18:50  12         A.   Yes.

11:18:50  13         Q.   Because that's where your pending

11:18:52  14   location change was -- was put in a few minutes

11:18:54  15   before.

11:18:54  16         A.   Yes.

11:18:55  17         Q.   Okay.  And now it looks like -- so does

11:18:57  18   this mean then that you are actually, you know,

11:19:00  19   driving?

11:19:00  20         When you do the location change, are you --

11:19:03  21   at 1641, are you and Officer Velez driving in the

11:19:09  22   patrol vehicle at that point?

11:19:12  23         **MS. HUGGINS:**   Form.   You can answer.

11:19:13 1       **BY MR. RUPP:**

11:19:13 2       **Q.**   Do you know?

11:19:14 3       Let me -- let me phrase the question

11:19:16 4  a little bit better.

11:19:17 5       You -- you radio in a location change.

11:19:19 6       **A.**   Yes.

11:19:19 7       **Q.**   You're heading back to ECMC; is that

11:19:21 8  right?

11:19:21 9       **A.**   Yes.

11:19:21 10       **Q.**   Okay.  And dispatch says, you know,

11:19:25 11  you're immediately en route; is that right?

11:19:28 12       **A.**   Yes.

11:19:28 13       **Q.**   Okay.  So four to five minutes -- five

11:19:32 14  to four minutes later, at 1641, there's another

11:19:36 15  entry:  Can you please change this call to criminal

11:19:40 16  mischief?  Do you see that?

11:19:41 17       **A.**   Yes.

11:19:41 18       **Q.**   Okay.  And based on the times, if these

11:19:46 19  times are accurate, could you have gotten from

11:19:50 20  central booking to -- back to ECMC inside of five

11:19:55 21  minutes?

11:19:58 22       **A.**   Probably not.

11:19:59 23       **Q.**   Okay.  So does that suggest to you that

*McDermott - Rupp - 2/19/20*

88

11:20:02  1    the dispatch was advised to change the call to

11:20:05  2    criminal mischief took place while you were

11:20:07  3    en route to ECMC the second time that day?

11:20:09  4         A.    Since I was driving, I assume that

11:20:12  5    Officer Velez would have typed it, because it is

11:20:16  6    a message.

11:20:16  7         Q.    Okay.  And -- and I was going to ask

11:20:18  8    you that.  I mean, throughout this whole day, were

11:20:20  9    you the driver of your patrol vehicle --

11:20:24  10        A.    Yes.

11:20:24  11        Q.    -- 473?

11:20:26  12        A.    Yes.

11:20:26  13        Q.    Okay.  And how was it that you decided,

11:20:28  14    as between you and Officer Velez, which one of you

11:20:31  15    would drive that day?

11:20:32  16        A.    I don't remember the exact conversation,

11:20:35  17    but we usually would trade on and off who would

11:20:38  18    drive.

11:20:38  19        Q.    Fair enough.  Okay.

11:20:39  20        All right.  And then if we go to the end of

11:20:46  21    this document, the last few entries, we have you on

11:20:48  22    scene back at ECMC, C241.  There's no reference to

11:20:54  23    C242, but she was with you, right?

11:20:56   1          A.    Yes.

11:20:56   2          Q.    Okay.  And then at what would have been

11:21:02   3   6:16 p.m., 18:16:08, the disposition is added

11:21:09   4   P1375 crime report; is that right?

11:21:13   5          A.    Yes.

11:21:13   6          Q.    And what does the P1375 refer to, if

11:21:16   7   you know?

11:21:16   8          A.    It's what would be -- we generically

11:21:22   9   call a police report.

11:21:23  10          Q.    Okay.  And then that's -- that's the

11:21:24  11   end of the log because it gets archived literally

11:21:27  12   a second later; is that right?

11:21:28  13          A.    Yes.

11:21:28  14          Q.    And I think you told me that would

11:21:30  15   close it out on your computer, and you wouldn't --

11:21:32  16   you wouldn't see that again.

11:21:33  17          A.    Correct.

11:21:34  18          Q.    Okay.

11:21:43  19          A.    Can we take a bathroom break?

11:21:45  20          MR. RUPP:   Sure thing.

11:21:45  21          (A recess was then taken at 11:21 a.m.)

11:30:06  22          (On the record at 11:30 a.m.)

11:30:06  23          BY MR. RUPP:

*McDermott - Rupp - 2/19/20*

90

| | | |
|---|---|---|
| 11:30:12 | 1 | Q. All right. What I want to do now, |
| 11:30:15 | 2 | Ms. McDermott, is listen to a couple of the |
| 11:30:19 | 3 | dispatch radio calls that we were produced in |
| 11:30:22 | 4 | discovery by your attorney, Ms. Huggins. I'm just |
| 11:30:26 | 5 | going to play them and then maybe ask you a few |
| 11:30:29 | 6 | questions about them. |
| 11:30:29 | 7 | I'm not sure that all but the -- maybe the |
| 11:30:32 | 8 | last five don't pertain to you, but perhaps you can |
| 11:30:35 | 9 | tell me that you heard the call or know something |
| 11:30:37 | 10 | about it, so that's why I'm going to play those |
| 11:30:39 | 11 | as well. |
| 11:30:39 | 12 | So starting off with the first file, which |
| 11:30:43 | 13 | was produced as 01011701, so call 1. |
| 11:30:59 | 14 | MS. HUGGINS: And just for the sake of the |
| 11:31:00 | 15 | record, what -- what had we previously marked the |
| 11:31:02 | 16 | disc? |
| 11:31:06 | 17 | MR. RUPP: Exhibit 10. |
| 11:31:07 | 18 | MS. HUGGINS: Thank you. |
| 11:32:03 | 19 | (Audio clip played.) |
| 11:32:03 | 20 | MS. HUGGINS: Do we want to just go off the |
| 11:32:05 | 21 | record while we figure this out? |
| 11:32:07 | 22 | MR. DAVENPORT: Yeah. |
| 11:32:07 | 23 | (A recess was then taken at 11:32 a.m.) |

| | | |
|---|---|---|
| 11:39:04 | 1 | said to cancel the ambulance. |
| 11:39:05 | 2 | **MR. RUPP:**  Okay. |
| 11:39:10 | 3 | (Audio clip played.) |
| 11:39:10 | 4 | **BY MR. RUPP:** |
| 11:39:10 | 5 | **Q.**  Okay.  And so now Karl Schultz is |
| 11:39:12 | 6 | making it clear:  I don't want an ambulance to come |
| 11:39:14 | 7 | to the scene.  Is that right? |
| 11:39:15 | 8 | **A.**  Correct. |
| 11:39:16 | 9 | **Q.**  Okay.  Did you observe Mr. Schultz make |
| 11:39:19 | 10 | an assessment of whether or not Mr. Kistner was |
| 11:39:21 | 11 | injured? |
| 11:39:22 | 12 | **A.**  I would have been there.  I don't |
| 11:39:24 | 13 | recall the exact assessment that was made. |
| 11:39:26 | 14 | **Q.**  Okay.  Well, my question is:  Was an |
| 11:39:28 | 15 | assessment made? |
| 11:39:29 | 16 | **A.**  Yes. |
| 11:39:29 | 17 | **Q.**  Okay.  How do you know that? |
| 11:39:31 | 18 | **A.**  I would have been standing there. |
| 11:39:33 | 19 | **Q.**  Okay.  Well, you're saying, would have |
| 11:39:34 | 20 | been, as if you're almost referring to somebody |
| 11:39:37 | 21 | else. |
| 11:39:37 | 22 | I mean, did you -- do you recall, as you sit |
| 11:39:39 | 23 | here today, watching Mr. Schultz make an assessment |

11:39:42   1    of whether or not Jim Kistner was injured?

11:39:44   2         A.    I was standing there.  I'm saying

11:39:46   3    I don't recall the exact assessment that was made.

11:39:48   4         Q.    Okay.  Do you know how long the

11:39:50   5    assessment took?

11:39:50   6         A.    No.

11:39:51   7         Q.    Do you know if he asked Mr. Kistner any

11:39:54   8    questions?

11:39:54   9         A.    I don't remember.

11:39:55   10        Q.    Okay.  You have no recollection of

11:39:57   11   and -- and you didn't perform an assessment; is

11:39:59   12   that right?

11:39:59   13        A.    I -- there was a visual assessment made

11:40:03   14   that didn't appear to be any outward injuries.

11:40:06   15   There was -- he wasn't bleeding.  Nothing like

11:40:08   16   that.

11:40:08   17        Q.    Okay.  You wouldn't necessarily see,

11:40:10   18   like a back injury, though, it wouldn't be

11:40:14   19   manifested with blood; would you agree with that?

11:40:16   20        A.    A back injury could be manifested with

11:40:18   21   blood.

11:40:18   22        Q.    But not necessarily, right?

11:40:19   23        A.    Not necessarily.

11:40:20  1          **Q.**   Okay.  What about -- what about

11:40:23  2    a spinal cord injury?

11:40:24  3          **A.**   I'm not a medical professional.

11:40:25  4          **Q.**   Okay.  So what -- what was the extent

11:40:27  5    of your assessment of Mr. Kistner?

11:40:29  6          **A.**   My assessment was that he purposely

11:40:32  7    walked towards the vehicle and threw himself into

11:40:34  8    it.

11:40:34  9          **Q.**   Okay.  But what was your assessment of

11:40:36 10    whether or not he was injured from that?

11:40:38 11          **A.**   Again, I'm not a medical -- medical

11:40:41 12    professional.  I did not see -- visually see any

11:40:44 13    injuries.

11:40:44 14          **Q.**   Okay.  Did anybody else do an

11:40:46 15    assessment?

11:40:46 16          You said you were there when Mr. Schultz did

11:40:49 17    one, but you're not sure what he did.  You did one.

11:40:52 18    Did anybody else do an assessment?

11:40:54 19          **A.**   As far as a visual assessment?

11:40:56 20          **Q.**   Any type of assessment.

11:40:57 21          **A.**   You would have to ask the other

11:41:00 22    officers that were there.

11:41:00 23          **Q.**   Okay.  All right.

| | | |
|---|---|---|
| 11:41:01 | 1 | Did you overhear any questions asked of |
| 11:41:04 | 2 | Mr. Kistner as to whether he was injured or not? |
| 11:41:06 | 3 | **A.** I don't recall. |
| 11:41:06 | 4 | **Q.** Okay. And you don't recall asking any |
| 11:41:09 | 5 | yourself? |
| 11:41:09 | 6 | **A.** I don't recall. |
| 11:41:10 | 7 | **Q.** Do you recall speaking to Mr. Kistner |
| 11:41:12 | 8 | at all before, for example, he was handcuffed? |
| 11:41:18 | 9 | **A.** I may have. |
| 11:41:18 | 10 | **Q.** When you first saw Mr. Kistner, where |
| 11:41:20 | 11 | was he? |
| 11:41:20 | 12 | **A.** On the ground. |
| 11:41:21 | 13 | **Q.** Okay. |
| 11:41:21 | 14 | **MS. HUGGINS:** Form. |
| 11:41:23 | 15 | **THE WITNESS:** Well, yeah. Sorry. First |
| 11:41:25 | 16 | saw -- |
| 11:41:25 | 17 | **BY MR. RUPP:** |
| 11:41:25 | 18 | **Q.** Let's say after the impact with the |
| 11:41:26 | 19 | police vehicle, where was he? |
| 11:41:27 | 20 | **A.** On the ground. |
| 11:41:28 | 21 | **Q.** Okay. Was he on his back? Side? |
| 11:41:31 | 22 | Front? |
| 11:41:31 | 23 | **A.** I believe he was rolling. I don't |

11:41:34  1  recall if he was on his stomach or back first, but

11:41:37  2  he was kind of rolling on the ground.

11:41:39  3      Q.   Okay.

11:41:40  4      A.   From side to side.

11:41:41  5      Q.   Did you hear an impact in your -- in

11:41:43  6  your police vehicle or patrol vehicle?

11:41:49  7      A.   I don't recall.

11:41:50  8      Q.   All right.  Well, how did you know that

11:41:52  9  there had been physical contact between Mr. Kistner

11:41:56 10  and your patrol vehicle?

11:41:58 11      A.   I saw it.

11:41:59 12      Q.   Okay.  What did you see?

11:42:01 13      A.   I saw him walking towards my vehicle

11:42:05 14  very fast or quickly, and he didn't stop.

11:42:11 15      Q.   Okay.  And you don't remember whether

11:42:14 16  you were stationary or moving yourself in the

11:42:18 17  patrol vehicle.

11:42:19 18      A.   Prior to him making contact, I was

11:42:23 19  trying to drive away.  As he kept coming, I slammed

11:42:26 20  on the brakes.

11:42:28 21      Q.   Okay.  Had you seen him before you

11:42:31 22  slammed on the brakes?

11:42:34 23      A.   Prior --

*McDermott - Rupp - 2/19/20*

106

11:43:50 1   Does that refresh your recollection at all or

11:43:52 2   whether your window would be up or down or you just

11:43:55 3   don't know?

11:43:55 4        **A.**   I don't remember.

11:43:56 5        **Q.**   Okay.  Was Ms. Velez in the vehicle

11:43:59 6   as well?

11:43:59 7        **A.**   Yes.

11:43:59 8        **Q.**   And do you know whether she was looking

11:44:01 9   at Mr. Kistner?

11:44:02 10       **A.**   I don't recall.

11:44:03 11       **Q.**   Did she say anything to you before the

11:44:05 12  impact?

11:44:06 13       **A.**   I don't recall.

11:44:07 14       **Q.**   Did you say anything to her?

11:44:08 15       **A.**   I don't recall.

11:44:09 16       **Q.**   And you didn't hear anybody call out

11:44:11 17  a warning or say anything.

11:44:13 18       **A.**   No.

11:44:13 19       **Q.**   Okay.  What were you intending to do if

11:44:23 20  the collision or if the impact had not happened?

11:44:27 21       **MS. HUGGINS:**   Form.

11:44:27 22       **BY MR. RUPP:**

11:44:28 23       **Q.**   You're in your vehicle now with

*McDermott - Rupp - 2/19/20*

107

| | | |
|---|---|---|
| 11:44:29 | 1 | Ms. Velez, right? |
| 11:44:31 | 2 | A.   Correct. |
| 11:44:31 | 3 | Q.   Officer Schultz and Moriarity have left |
| 11:44:34 | 4 | in their patrol vehicle, correct? |
| 11:44:36 | 5 | A.   They had started to drive away. |
| 11:44:38 | 6 | Q.   Right.  They were in motion at the time |
| 11:44:39 | 7 | of the impact, right? |
| 11:44:43 | 8 | A.   I don't know if they were in motion or |
| 11:44:44 | 9 | if they had stopped down the street. |
| 11:44:45 | 10 | Q.   Okay.  Do you know where they were |
| 11:44:48 | 11 | going? |
| 11:44:48 | 12 | A.   I don't. |
| 11:44:49 | 13 | Q.   Okay.  And what were you planning to do |
| 11:44:52 | 14 | with Ms. Velez in the passenger seat? |
| 11:44:55 | 15 | A.   We were leaving the scene. |
| 11:44:57 | 16 | Q.   Okay.  You were planning to leave. |
| 11:44:58 | 17 | A.   Yes. |
| 11:44:58 | 18 | Q.   Okay.  And which way were you planning |
| 11:45:00 | 19 | to leave on Schmarbeck? |
| 11:45:02 | 20 | A.   The direction our vehicle was facing. |
| 11:45:05 | 21 | I believe north. |
| 11:45:07 | 22 | Q.   So your plan was to pull forward down |
| 11:45:10 | 23 | Schmarbeck and go where you were going to go next; |

| 11:45:12 | 1 | is that right? |
| 11:45:12 | 2 | **A.**    Correct. |
| 11:45:13 | 3 | **Q.**    You weren't going to turn around in |
| 11:45:14 | 4 | a driveway or turn around, make a three-point turn |
| 11:45:17 | 5 | in the street or anything. |
| 11:45:18 | 6 | **A.**    No. |
| 11:45:18 | 7 | **Q.**    Okay.  And when you -- when you saw |
| 11:45:23 | 8 | Mr. Kistner, did you stop? |
| 11:45:28 | 9 | When you saw him coming, you said approaching |
| 11:45:30 | 10 | the side of your vehicle, what did you do? |
| 11:45:33 | 11 | **A.**    No.  I was trying to pull out of where |
| 11:45:35 | 12 | I was parked. |
| 11:45:36 | 13 | **Q.**    Okay.  Had you started pulling out yet? |
| 11:45:38 | 14 | **A.**    Yes. |
| 11:45:38 | 15 | **Q.**    Okay.  So you were moving? |
| 11:45:41 | 16 | **MS. HUGGINS:**    Form. |
| 11:45:41 | 17 | **THE WITNESS:**    I had backed up, and I had |
| 11:45:44 | 18 | turned the wheel and started to pull around I think |
| 11:45:47 | 19 | it was a red minivan that was parked there. |
| 11:45:49 | 20 | **BY MR. RUPP:** |
| 11:45:49 | 21 | **Q.**    When -- when you backed up, where were |
| 11:45:52 | 22 | you looking? |
| 11:45:54 | 23 | **A.**    I -- I don't -- I don't recall. |

11:45:56  1        Q.    Well, when you were trained to drive

11:45:59  2    a Tahoe and the training you received on the Crown

11:46:02  3    Vic at ECC, what were you trained to do when you

11:46:05  4    backed up a patrol vehicle?

11:46:05  5        A.    Well, I would have -- there's no

11:46:07  6    rearview mirror camera, so I would have looked

11:46:10  7    in both mirrors.  I would have turned around and

11:46:13  8    looked.

11:46:13  9        Q.    What about rear view?

11:46:15  10       A.    Rearview mirror?

11:46:16  11       Q.    Yes.  You had one.

11:46:17  12       A.    I would have looked in it.

11:46:18  13       Q.    Okay.  So you backed up.  How many feet

11:46:21  14   did you back up?

11:46:22  15       A.    I don't know exactly.

11:46:23  16       Q.    We'll look at the video, but why did

11:46:26  17   you back up?  Why didn't you pull straight forward?

11:46:27  18       A.    Because there was a red minivan parked

11:46:29  19   there, and I was -- would have been too close to

11:46:30  20   pull straight forward out.

11:46:30  21       Q.    So you needed to back up and you're

11:46:32  22   checking mirrors; is that right?

11:46:33  23       A.    Yes.

*McDermott - Rupp - 2/19/20*

110

| | | |
|---|---|---|
| 11:46:33 | 1 | **Q.**    So you're not looking ahead at that |
| 11:46:35 | 2 | point.  You're not looking out the windshield. |
| 11:46:37 | 3 | **A.**    Well, I would look in both side-view |
| 11:46:40 | 4 | mirrors, the rearview, and turn around just to |
| 11:46:42 | 5 | confirm that there was nothing behind me. |
| 11:46:44 | 6 | **Q.**    All right.  So -- |
| 11:46:44 | 7 | **A.**    When I was actually going backwards, |
| 11:46:47 | 8 | I don't know what direction I was looking at the |
| 11:46:48 | 9 | time. |
| 11:46:49 | 10 | **Q.**    Do you actually have a recollection of |
| 11:46:52 | 11 | looking in both side-view mirrors, your rearview, |
| 11:46:55 | 12 | and turning around to back up to get around the red |
| 11:46:58 | 13 | vehicle? |
| 11:46:58 | 14 |      Do you actually remember doing that or are |
| 11:47:01 | 15 | you just telling me what you think you would have |
| 11:47:03 | 16 | done? |
| 11:47:03 | 17 | **A.**    I'm telling you what, in the years of |
| 11:47:05 | 18 | driving that I've done, police and outside, that's |
| 11:47:09 | 19 | how I check to make sure before I pull out of -- |
| 11:47:14 | 20 | **Q.**    All right. |
| 11:47:14 | 21 | **A.**    Before I back up. |
| 11:47:15 | 22 | **Q.**    And I understand that, but I just want |
| 11:47:17 | 23 | to make sure that, you know, backing up -- it was |

*McDermott - Rupp - 2/19/20*

111

| | | |
|---|---|---|
| 11:47:20 | 1 | a fairly short distance you backed up on Schmarbeck |
| 11:47:22 | 2 | to get around the red vehicle, right? |
| 11:47:24 | 3 | **A.**   Yes. |
| 11:47:24 | 4 | **Q.**   It wasn't like a long distance, |
| 11:47:25 | 5 | multiple feet.  You just backed up a little bit |
| 11:47:28 | 6 | to be able to pull forward, correct? |
| 11:47:29 | 7 | **A.**   To give myself some front space. |
| 11:47:32 | 8 | **Q.**   And that's the only reason I'm asking |
| 11:47:34 | 9 | you, is under those circumstances, given your |
| 11:47:36 | 10 | experience as a driver and your training, your |
| 11:47:38 | 11 | police training, are -- are -- are you confident |
| 11:47:40 | 12 | that you would have looked in rear -- both |
| 11:47:42 | 13 | rearview -- both side-view mirrors, the rearview, |
| 11:47:45 | 14 | and turned around before you backed up those few |
| 11:47:47 | 15 | feet? |
| 11:47:48 | 16 | **A.**   Yes, I'm confident that I would have |
| 11:47:49 | 17 | done that. |
| 11:47:49 | 18 | **Q.**   Okay.  And you would agree with me that |
| 11:47:51 | 19 | each time you did that, your eyes could not have |
| 11:47:54 | 20 | been looking out the windshield. |
| 11:47:56 | 21 | **A.**   Well, when I turned around and looked, |
| 11:47:58 | 22 | I wouldn't have necessarily been moving backwards. |
| 11:48:01 | 23 | **Q.**   I understand that -- |

*McDermott - Rupp - 2/19/20*

112

| | | | |
|---|---|---|---|
| 11:48:02 | 1 | **A.** | That was -- |
| 11:48:03 | 2 | **Q.** | -- but -- |
| 11:48:03 | 3 | **A.** | That's -- |

11:48:04  4      **Q.**    -- in the moment when you've turned

11:48:05  5   around, you would agree, you're not looking out the

11:48:07  6   windshield, right?

11:48:08  7      **A.**    Yes.

11:48:08  8      **Q.**    You're not looking out the passenger

11:48:10  9   side to see somebody approaching the side of your

11:48:13  10  vehicle, correct?

11:48:13  11     **A.**    But that would have been before

11:48:15  12  I started moving forward.

11:48:16  13     **Q.**    I understand that.  I understand that.

11:48:18  14  But I just want to make sure that, you know, when

11:48:20  15  you turned around, you would have turned around to

11:48:22  16  the right, correct?

11:48:23  17     **A.**    Yes.

11:48:23  18     **Q.**    Okay.  Towards the center of the vehicle.

11:48:26  19     **A.**    Yes.

11:48:26  20     **Q.**    Looked out the back window.

11:48:28  21     **A.**    Correct.

11:48:28  22     **Q.**    Okay.  And at that time, you're not

11:48:29  23  going to be looking out the windshield or your side

*McDermott - Rupp - 2/19/20*

113

| | | |
|---|---|---|
| 11:48:33 | 1 | window, correct? |
| 11:48:33 | 2 | **A.**    Right. |
| 11:48:33 | 3 | **Q.**    Okay.  Now, when you looked at the |
| 11:48:35 | 4 | rear -- the right passenger side-view mirror, your |
| 11:48:38 | 5 | vision is going to be looking out that side of the |
| 11:48:42 | 6 | car by that door post, correct? |
| 11:48:44 | 7 | **A.**    Yes. |
| 11:48:44 | 8 | **Q.**    So you're not going to be looking out |
| 11:48:46 | 9 | the windshield and to your left to see somebody |
| 11:48:48 | 10 | approaching from the side, correct? |
| 11:48:49 | 11 | **A.**    Correct. |
| 11:48:50 | 12 | **Q.**    All right.  And when you looked in the |
| 11:48:51 | 13 | rearview mirror, your eyes were up, you were |
| 11:48:55 | 14 | looking in a mirror, focusing on what that mirror |
| 11:48:58 | 15 | is reflecting from behind you, correct? |
| 11:49:00 | 16 | **A.**    Yes. |
| 11:49:00 | 17 | **Q.**    And so you're not, again, looking out |
| 11:49:02 | 18 | the windshield or looking out the driver's side |
| 11:49:05 | 19 | window to see somebody approaching from the side; |
| 11:49:07 | 20 | is that right? |
| 11:49:07 | 21 | **A.**    Yes. |
| 11:49:07 | 22 | **Q.**    All right.  And when you looked at the |
| 11:49:09 | 23 | left rearview -- or side-view mirror, you were |

11:49:12  1  focusing on what that mirror was reflecting from

11:49:15  2  behind you, not what was out the windshield or what

11:49:18  3  you could see out the left of the driver's side

11:49:21  4  window; is that correct?

11:49:23  5      A.    Well, if I'm looking at the side-view

11:49:25  6  mirror on the driver's side, I can see still past

11:49:29  7  the mirror.

11:49:30  8      Q.    Okay.  At any time prior -- and when

11:49:32  9  you backed up, you -- you obviously put the vehicle

11:49:34 10  in reverse, right?

11:49:35 11      A.    Yes.

11:49:35 12      Q.    Okay.  At any time prior to putting the

11:49:39 13  vehicle into -- I assume you -- you went from

11:49:41 14  reverse then to drive; is that right?

11:49:42 15      A.    Yes.

11:49:42 16      Q.    Okay.  At any time prior to changing

11:49:44 17  the gear of the vehicle to drive, had you seen

11:49:48 18  Mr. Kistner approaching the side of your vehicle?

11:49:51 19      A.    I don't know exactly what moment and

11:49:54 20  where -- what -- if the car was in drive or -- or

11:49:57 21  reverse when I --

11:49:58 22      Q.    Okay.

11:49:59 23      A.    -- first saw him.

| | | |
|---|---|---|
| 11:50:00 | 1 | Q. All right. And as you pulled forward, |
| 11:50:03 | 2 | as of that moment, had you seen Mr. Kistner |
| 11:50:05 | 3 | approaching the side of your vehicle? |
| 11:50:07 | 4 | A. I don't know at what moment I would |
| 11:50:10 | 5 | have first seen him. |
| 11:50:12 | 6 | Q. Okay. How quickly after you checked |
| 11:50:14 | 7 | both side views, the rearview, and turned around |
| 11:50:16 | 8 | and looked behind you did you change the gearshift |
| 11:50:20 | 9 | for the vehicle from reverse to drive? |
| 11:50:22 | 10 | A. I don't recall. |
| 11:50:24 | 11 | Q. Okay. All right. We'll listen to the |
| 11:50:29 | 12 | rest of this. |
| 11:50:31 | 13 | I guess that was the rest of it. |
| 11:50:32 | 14 | MR. DAVENPORT: Yeah. |
| 11:50:35 | 15 | MR. RUPP: Okay. I'm going to look at |
| 11:50:37 | 16 | now -- we have another file that's marked with |
| 11:50:46 | 17 | a suffix of 01. It's 37 Scharmbeck, and it's |
| 11:50:53 | 18 | 01011701. So the only difference in the file name |
| 11:50:57 | 19 | is the change of address from 33 to 37. |
| 11:50:59 | 20 | So I'm going to play that one for you now. |
| 11:51:15 | 21 | (Audio clip played.) |
| 11:51:15 | 22 | BY MR. RUPP: |
| 11:51:16 | 23 | Q. Okay. Would you agree with me that |

*McDermott - Rupp - 2/19/20*

116

| | | |
|---|---|---|
| 11:51:18 | 1 | this appears to be from a 911 call and not from |
| 11:51:21 | 2 | a fellow police officer? |
| 11:51:22 | 3 | **A.**   Yes. |
| 11:51:23 | 4 | **MR. RUPP:**  Okay.  I'm going to play the one |
| 11:51:29 | 5 | marked suffix 2. |
| 11:51:34 | 6 | (Audio clip played.) |
| 11:51:34 | 7 | **BY MR. RUPP:** |
| 11:51:34 | 8 | **Q.**   All right.  Charlie 230 we've |
| 11:51:36 | 9 | established is Mr. Schultz, right? |
| 11:51:37 | 10 | **A.**   Yes. |
| 11:51:38 | 11 | **MR. RUPP:**  Okay. |
| 11:52:12 | 12 | (Audio clip played.) |
| 11:52:12 | 13 | **BY MR. RUPP:** |
| 11:52:12 | 14 | **Q.**   Now, that was Officer Schultz giving |
| 11:52:16 | 15 | his version of -- of what happened when there was |
| 11:52:19 | 16 | the physical contact between your vehicle and |
| 11:52:22 | 17 | Mr. Kistner. |
| 11:52:23 | 18 | Do you know where Mr. Schultz was when that |
| 11:52:28 | 19 | impact took place? |
| 11:52:31 | 20 | **A.**   In his patrol vehicle. |
| 11:52:33 | 21 | **Q.**   Okay.  And how far away was his patrol |
| 11:52:36 | 22 | vehicle from you? |
| 11:52:36 | 23 | **A.**   I don't know. |

*McDermott - Rupp - 2/19/20*

117

11:52:37   1         Q.   Did you see his patrol vehicle, on the
11:52:39   2   videos you watched yesterday, depart and pull down
11:52:43   3   Scharmbeck in the same direction that you just told
11:52:44   4   me you were planning to follow?
11:52:46   5         A.   Yes.
11:52:46   6         Q.   Okay.  And judging from the speed that
11:52:49   7   he departed from the video screen, can you estimate
11:52:51   8   for me approximately how far away he was when the
11:52:54   9   impact happened between your patrol vehicle and
11:52:57  10   Mr. Kistner?
11:52:59  11         A.   I don't know the exact distance.
11:53:00  12         Q.   Okay.  Do you know where Mr. Schultz
11:53:02  13   was looking as he was -- he was the operator of
11:53:04  14   that vehicle, right?
11:53:05  15         A.   I believe he was the passenger.
11:53:06  16         Q.   Okay.  So Officer Moriarity was
11:53:08  17   driving?
11:53:08  18         A.   Yes.
11:53:09  19         Q.   Okay.  Did you have a conversation with
11:53:12  20   Mr. Schultz on Scharmbeck, on January 1, 2017,
11:53:16  21   while you were at the scene, as to what he had
11:53:19  22   seen?
11:53:19  23         A.   Yes.

*McDermott - Rupp - 2/19/20*

126

| | | | |
|---|---|---|---|
| 12:00:13 | 1 | A. | Someone may have. |
| 12:00:14 | 2 | Q. | Okay. But you don't know? |
| 12:00:15 | 3 | A. | Correct. |
| 12:00:15 | 4 | Q. | Who would have those records? |
| 12:00:18 | 5 | A. | I believe the garage. I don't -- I |

12:00:21  6  wouldn't keep those records.

12:00:21  7         Q.   Well, when is the next time you drove

12:00:23  8  this vehicle?

12:00:24  9         A.   I drove it that day.

12:00:26 10         Q.   Well, okay. But then did you drive it

12:00:28 11  the next day, on the 2nd?

12:00:30 12         A.   I believe the next few days were our

12:00:33 13  days off.

12:00:33 14         Q.   Okay. So your platoon was the one that

12:00:35 15  was retiring out on double-up day?

12:00:37 16         A.   I believe so.

12:00:38 17         Q.   Okay. Do you know if anybody else

12:00:40 18  drove that vehicle the next day?

12:00:42 19         A.   I don't know.

12:00:43 20         Q.   Did you ever drive it again?

12:00:46 21         A.   I believe so.

12:00:46 22         Q.   Okay. Was the mirror fixed at that

12:00:49 23  time?

*McDermott - Rupp - 2/19/20*

127

| | | |
|---|---|---|
| 12:00:49 | 1 | **A.**    I don't know when the mirror would have |
| 12:00:51 | 2 | been fixed. |
| 12:00:51 | 3 | **Q.**    Well, you -- you don't -- did you -- |
| 12:00:54 | 4 | I mean, you knew that it was damaged, you told me, |
| 12:00:56 | 5 | on the -- on January 1st. |
| 12:00:59 | 6 | The next time you got in that vehicle, did |
| 12:01:01 | 7 | you check to see whether the mirror and the window |
| 12:01:03 | 8 | had been repaired? |
| 12:01:04 | 9 | **A.**    I just don't remember.  It's been |
| 12:01:06 | 10 | a while. |
| 12:01:06 | 11 | **Q.**    Okay.  Well, did -- did you ever check |
| 12:01:09 | 12 | to see if those had been repaired? |
| 12:01:11 | 13 | You've got this window that won't track up |
| 12:01:13 | 14 | and down properly and you've got a broken mirror, |
| 12:01:15 | 15 | right? |
| 12:01:16 | 16 | **A.**    Yes. |
| 12:01:16 | 17 | **Q.**    Okay.  So did there come a time when |
| 12:01:17 | 18 | you said to yourself:  Oh, you know, they must have |
| 12:01:20 | 19 | fixed that, because it's not broken anymore? |
| 12:01:22 | 20 | **A.**    I -- I don't remember how long after |
| 12:01:25 | 21 | that I would have driven that vehicle. |
| 12:01:28 | 22 | **Q.**    Okay.  Well, your platoon would have |
| 12:01:31 | 23 | been off for how many days? |

*McDermott - Rupp - 2/19/20*

128

| 12:01:32 | 1 | A.   Either three or four. |
|---|---|---|

12:01:33  2   Q.   All right.  So would you have driven

12:01:36  3   that vehicle -- you said you like to drive that one

12:01:38  4   because you and Officer Velez kept it clean, right?

12:01:40  5   A.   Yes.

12:01:41  6   Q.   So when you came back after a three- or

12:01:43  7   four-day break for being off on your normal schedule,

12:01:46  8   was the mirror and the window fixed?

12:01:48  9   A.   I don't -- I don't remember.

12:01:49  10   Q.   Okay.  Well, do you remember checking

12:01:52  11   to see if they had been fixed?

12:01:54  12   A.   I may have, but I don't -- I don't

12:01:56  13   remember.

12:01:56  14   Q.   Okay.  So as you sit here today, you

12:01:59  15   have -- you have no recollection of whether you put

12:02:01  16   in a repair requisition form on the vehicle, and

12:02:04  17   you have no recollection of actually checking to

12:02:06  18   see if repairs had been made?

12:02:07  19   A.   Correct.

12:02:08  20   Q.   Okay.  And I'm sorry.  Maybe you told

12:02:10  21   me and I've forgotten.  My apologies.  What -- what

12:02:12  22   was the actual damage to the mirror?

12:02:15  23   A.   The -- where the mirror connects to the

*McDermott - Rupp - 2/19/20*

129

12:02:17  1  actual vehicle was -- was disconnected and it was

12:02:22  2  shaking, so when you drove, the whole mirror frame

12:02:26  3  would shake.

12:02:26  4      **Q.**   Okay.  So that was something you could

12:02:29  5  see whenever you were looking at those mirrors,

12:02:31  6  right?

12:02:31  7      **A.**   Yes.

12:02:31  8      **Q.**   And you told me that you, in your

12:02:33  9  experience as a driver and your training from the

12:02:35  10  police academy, et cetera, used your side-view

12:02:38  11  mirrors, correct?

12:02:39  12      **A.**   Yes.

12:02:39  13      **Q.**   All right.  So the next time you drove

12:02:40  14  that vehicle, you would have noticed and known if

12:02:44  15  that mirror was still shaking, as you just

12:02:48  16  described, right?

12:02:49  17      **A.**   I would have noticed it, yes.

12:02:51  18      **Q.**   Okay.  So do you recall ever driving

12:02:53  19  the vehicle after January 1 of 2017, at any time

12:02:57  20  when your platoon came back on shift, where that

12:02:59  21  mirror was still jiggling like you just described

12:03:02  22  for the record?

12:03:03  23      **A.**   I -- I may have not --

*McDermott - Rupp - 2/19/20*

130

| | | |
|---|---|---|
| 12:03:07 | 1 | Q.   I'm not asking what you may have.   I'm |
| 12:03:09 | 2 | asking if you remember. |
| 12:03:10 | 3 | A.   I don't remember. |
| 12:03:10 | 4 | Q.   So you have -- as you sit here today, |
| 12:03:12 | 5 | you have no recollection of driving that vehicle |
| 12:03:14 | 6 | after January 1, 2017, with the mirror jiggling -- |
| 12:03:19 | 7 | jiggling, as you just described, because it had |
| 12:03:20 | 8 | been partially detached from the vehicle? |
| 12:03:22 | 9 | A.   Not that I can remember. |
| 12:03:23 | 10 | MR. RUPP:   Okay. |
| 12:03:31 | 11 | (Audio clip played.) |
| 12:03:31 | 12 | MR. RUPP:   I'm going to back this up |
| 12:03:33 | 13 | a little bit. |
| 12:03:50 | 14 | (Audio clip played.) |
| 12:03:50 | 15 | BY MR. RUPP: |
| 12:03:50 | 16 | Q.   Let me ask you:   Did you ever see C230, |
| 12:03:55 | 17 | Officer Schultz, looking at the mirror or testing |
| 12:03:57 | 18 | the window after the incident? |
| 12:04:00 | 19 | A.   I don't remember. |
| 12:04:01 | 20 | Q.   Do you know if that's shown on |
| 12:04:04 | 21 | videotape of the surveillance cameras at |
| 12:04:08 | 22 | 37 Schmarbeck, that Officer Schultz went over to |
| 12:04:10 | 23 | your vehicle and looked at the mirror? |

*McDermott - Rupp - 2/19/20*

131

| | | |
|---|---|---|
| 12:04:12 | 1 | **A.** The vehicle -- or the -- I'm sorry -- |
| 12:04:14 | 2 | the video's all -- is broken up in time frames, so |
| 12:04:18 | 3 | I -- I -- I don't believe that the entire -- the |
| 12:04:21 | 4 | video, in its entirety, was even produced. |
| 12:04:23 | 5 | **Q.** But my question is: Did you ever see, |
| 12:04:25 | 6 | on any of the video segments that you watched, |
| 12:04:27 | 7 | before this call came in, Officer Schultz going up |
| 12:04:31 | 8 | to the mirror on that vehicle and inspecting it? |
| 12:04:36 | 9 | **MS. HUGGINS:** Form. You can answer. |
| 12:04:37 | 10 | **THE WITNESS:** I would have to watch the |
| 12:04:39 | 11 | video again. I don't know if he did or not. |
| 12:04:41 | 12 | **MR. RUPP:** Okay. We -- we will watch the |
| 12:04:43 | 13 | video and -- and I'll ask you that. |
| 12:04:59 | 14 | (Audio clip played.) |
| 12:04:59 | 15 | **BY MR. RUPP:** |
| 12:04:59 | 16 | **Q.** Okay. Let's listen to 6 now. |
| 12:05:07 | 17 | Let me ask you this before I do 6. We know |
| 12:05:10 | 18 | that these calls from Officer Schultz have come in |
| 12:05:15 | 19 | on the times logged on the call log. Can you tell |
| 12:05:24 | 20 | the first time -- can you tell exactly from the |
| 12:05:27 | 21 | call log the moment when the accident happened? |
| 12:05:31 | 22 | **A.** The -- just to clarify, the call log is |
| 12:05:35 | 23 | when dispatch enters it. |

| | | |
|---|---|---|
| 12:05:36 | 1 | **Q.** Right. |
| 12:05:36 | 2 | **A.** That's not necessarily the exact moment |
| 12:05:38 | 3 | it was called in. |
| 12:05:40 | 4 | **Q.** Okay. |
| 12:05:41 | 5 | **A.** That's just a matter of when dispatch |
| 12:05:43 | 6 | types it into the log. |
| 12:05:44 | 7 | **Q.** Sure. |
| 12:05:45 | 8 | Do you know if this was called in right |
| 12:05:46 | 9 | away? |
| 12:05:46 | 10 | **A.** I don't know what the time frame of |
| 12:05:49 | 11 | what it is that was called. |
| 12:05:49 | 12 | **MR. RUPP:** Okay. |
| 12:06:10 | 13 | (Audio clip played.) |
| 12:06:10 | 14 | **BY MR. RUPP:** |
| 12:06:11 | 15 | **Q.** All right. So let's stop there. |
| 12:06:12 | 16 | We already talked about you being made |
| 12:06:14 | 17 | primary, and that was at 1:14 p.m., on January '17; |
| 12:06:20 | 18 | is that right? |
| 12:06:20 | 19 | **A.** That's when dispatch typed it in or |
| 12:06:23 | 20 | changed it. |
| 12:06:24 | 21 | **MR. RUPP:** Sure. Okay. All right. Let's |
| 12:06:29 | 22 | listen to -- this one is 7. |
| 12:06:31 | 23 | (Audio clip played.) |

12:11:26  1       **MR. RUPP:**  That last little blurb there.

12:11:29  2  Okay.

12:11:29  3       All right.  Two more.  This is 10.

12:11:52  4       (Audio clip played.)

12:11:52  5       **BY MR. RUPP:**

12:11:53  6       **Q.**   All right.  So that matches up pretty

12:11:54  7  exactly with the 1636 entries, again, location

12:11:59  8  changed of you and Officer Velez to ECMC, right?

12:12:02  9       **A.**   Yes.

12:12:03  10       **Q.**   So, presumably, you would have made

12:12:05  11  that call sometime before 4:36:51 p.m.; is that

12:12:09  12  right?

12:12:09  13       **A.**   Yes.

12:12:11  14       **MR. RUPP:**  Okay.  And last of the radio

12:12:17  15  dispatch excerpts that were provided to us by

12:12:21  16  counsel is number 11.

12:12:35  17       (Audio clip played.)

12:12:35  18       **BY MR. RUPP:**

12:12:36  19       **Q.**   Okay.  What is it you said there?

12:12:37  20       **A.**   Miles -- I -- I don't --

12:12:39  21       **Q.**   On seen outside of it sounded like, but

12:12:42  22  maybe I have that wrong.

12:12:43  23       **A.**   On -- on scene miles.

*McDermott - Rupp - 2/19/20*

138

| | | |
|---|---|---|
| 12:12:45 | 1 | **Q.** On scene miles? |
| 12:12:46 | 2 | **A.** Because we give -- we give mileage from |
| 12:12:48 | 3 | when we leave one destination and go to the next. |
| 12:12:53 | 4 | **Q.** All right. So you're -- let me just |
| 12:12:54 | 5 | back up a little bit. You're providing the mileage |
| 12:12:58 | 6 | to the dispatch officer -- or dispatch employee? |
| 12:13:00 | 7 | **A.** The last two odometer numbers. |
| 12:13:03 | 8 | **MR. RUPP:** Okay. |
| 12:13:10 | 9 | (Audio clip played.) |
| 12:13:10 | 10 | **BY MR. RUPP:** |
| 12:13:10 | 11 | **Q.** On scene? |
| 12:13:11 | 12 | **A.** Miles five seven. |
| 12:13:13 | 13 | **MR. RUPP:** Miles five seven. Okay. |
| 12:13:19 | 14 | (Audio clip played.) |
| 12:13:19 | 15 | **BY MR. RUPP:** |
| 12:13:20 | 16 | **Q.** All right. And that's 16 -- would you |
| 12:13:23 | 17 | say 1646, that corresponds with the 1646 on scene, |
| 12:13:29 | 18 | C241, on the second page of 4A; is that right? |
| 12:13:34 | 19 | **A.** Yes. |
| 12:13:34 | 20 | **Q.** Okay. That's it for the audio |
| 12:13:38 | 21 | recordings. |
| 12:13:39 | 22 | Now, I want to see if we can get the |
| 12:13:41 | 23 | technology going here to show you some of the video |

*McDermott - Rupp - 2/19/20*

139

| | | |
|---|---|---|
| 12:13:44 | 1 | and ask you some questions about that. |
| 12:13:47 | 2 | We'll plug in the HDMI and see if the TV is |
| 12:13:51 | 3 | up and running. |
| 12:14:03 | 4 | Now, prior to the lawsuit commenced by |
| 12:14:06 | 5 | Mr. Kistner, had -- had you seen any of the video |
| 12:14:09 | 6 | of the incident on January 1, 2017? |
| 12:14:12 | 7 | **A.** No. |
| 12:14:12 | 8 | **Q.** Okay. And after you understood -- or |
| 12:14:16 | 9 | were served and you understood you were part of |
| 12:14:20 | 10 | a lawsuit, how long was it before you -- you saw |
| 12:14:22 | 11 | any video excerpts? |
| 12:14:24 | 12 | Or when was the first -- I guess I'll ask it |
| 12:14:27 | 13 | differently. Strike that. |
| 12:14:28 | 14 | When is the first time you saw the |
| 12:14:29 | 15 | surveillance video excerpts from 37 Scharmbeck -- |
| 12:14:35 | 16 | Schmarbeck? |
| 12:14:35 | 17 | **A.** I believe it was the day that I was |
| 12:14:37 | 18 | served. |
| 12:14:37 | 19 | **Q.** Okay. And how was it that that came |
| 12:14:40 | 20 | about? How did you see the video that day? |
| 12:14:42 | 21 | **A.** I believe it was given in the copy of |
| 12:14:44 | 22 | the -- when I was served with the -- |
| 12:14:47 | 23 | **Q.** The summons and complaint? |

*McDermott - Rupp - 2/19/20*

140

| | | |
|---|---|---|
| 12:14:47 | 1 | **A.**   -- paperwork. |
| 12:14:48 | 2 | **Q.**   Okay. |
| 12:14:48 | 3 | **A.**   Yes. |
| 12:14:49 | 4 | **Q.**   Was there some type of digital media |
| 12:14:51 | 5 | that allowed you to view those? |
| 12:14:53 | 6 | **A.**   Yes. |
| 12:14:54 | 7 | **Q.**   And that was the first time that you |
| 12:14:57 | 8 | had seen them? |
| 12:14:57 | 9 | **A.**   Yes. |
| 12:14:57 | 10 | **Q.**   Okay.  All right.  I'm going to play -- |
| 12:14:59 | 11 | I'll read the last four digits of it. |
| 12:15:01 | 12 | It's a video segment.  On this disc, |
| 12:15:05 | 13 | I believe is how it was produced to the City, is -- |
| 12:15:08 | 14 | ends in 5252.  Okay? |
| 12:15:13 | 15 | We'll just watch that and then we'll |
| 12:15:16 | 16 | probably watch it again.  This is -- I'm going to |
| 12:15:17 | 17 | speed through this one, because I think it's really |
| 12:15:20 | 18 | just mostly video of a red car. |
| 12:15:21 | 19 | **A.**   Yes. |
| 12:15:21 | 20 | **Q.**   Which I think you referenced earlier, |
| 12:15:28 | 21 | but -- |
| 12:15:28 | 22 | **MR. DAVENPORT:**  Can we turn off the lights |
| 12:15:29 | 23 | closest to the TV, just so we don't have the glare? |

12:15:36   1          (Video clip played.)

12:15:36   2      **BY MR. RUPP:**

12:15:37   3      **Q.**    All right.  Now, earlier in your

12:15:39   4   testimony, Ms. McDermott, you gave -- you told me

12:15:41   5   about a -- a red vehicle, and maybe you even

12:15:42   6   referred to it as a red SUV.  Is that the vehicle

12:15:45   7   you were talking about?

12:15:45   8      **A.**    Yes.  I think I said it was a red

12:15:47   9   minivan.

12:15:48  10      **Q.**    Okay.  Is that -- I can't even tell.

12:15:50  11   Is that a minivan?

12:15:51  12      **A.**    It -- I believe so.

12:15:51  13      **Q.**    Okay.  All right.  And fair to say that

12:15:53  14   this video segment, which is marked on the screen

12:15:56  15   anyway as January 1, 2017, at 9:53 p.m., that that

12:16:02  16   is -- that predates in time your arrival at 33,

12:16:08  17   37 Schmarbeck, correct?

12:16:10  18      **MS. HUGGINS:**   Form.

12:16:10  19      **THE WITNESS:**   I think you said p.m.

12:16:12  20      **BY MR. RUPP:**

12:16:12  21      **Q.**    A.m.  My apologies.

12:16:15  22      Is this before you got there?

12:16:16  23      **A.**    I don't know about the -- if the video

*McDermott - Rupp - 2/19/20*

144

12:18:06   1    Moriarity in which Kyle Schultz was a -- Karl

12:18:10   2    Schultz was a passenger?

12:18:11   3         A.    Yes.

12:18:11   4         Q.    Arriving on scene at 33, 37 Schmarbeck?

12:18:17   5         A.    I believe right now they're in front of

12:18:19   6    33.

12:18:19   7         Q.    Okay.  But you do recognize this as

12:18:22   8    Schmarbeck.

12:18:22   9         A.    Yes.

12:18:22  10         Q.    Okay.  And this does appear to be two

12:18:27  11    of the vehicles at least that you saw there when

12:18:30  12    you and Officer Velez arrived on scene, correct?

12:18:33  13         A.    Yes.

12:18:34  14         Q.    Okay.  These two vehicles that are

12:18:35  15    shown here in this frozen screen that I'm circling

12:18:38  16    with the cursor were already there by the time the

12:18:41  17    two of you arrived.

12:18:41  18         A.    Yes.

12:18:42  19         Q.    Okay.  So I'm just going to keep

12:18:43  20    playing this.

12:18:47  21         We see the vehicle being driven by Officer

12:18:50  22    Moriarity backing up and we see an officer getting

12:18:52  23    out, and do you recognize that officer?

| | | |
|---|---|---|
| 12:18:53 | 1 | **A.**   It's -- I believe it's Kyle Moriarity. |
| 12:18:56 | 2 | **Q.**   Okay.  Now, obviously, it's -- it's |
| 12:18:58 | 3 | not -- we can't really zoom in on facial features. |
| 12:19:02 | 4 | What is it that tells you that that's Officer |
| 12:19:06 | 5 | Moriarity? |
| 12:19:06 | 6 | **A.**   He was on scene that day and he was |
| 12:19:08 | 7 | wearing a hat and Karl was not. |
| 12:19:09 | 8 | **Q.**   Okay.  And in that video, maybe you can |
| 12:19:12 | 9 | make it out, the person there is wearing a hat? |
| 12:19:16 | 10 | **A.**   Yes. |
| 12:19:16 | 11 | **Q.**   Okay.  And do you know Officer |
| 12:19:18 | 12 | Moriarity -- Moriarity? |
| 12:19:18 | 13 | **A.**   Yes. |
| 12:19:18 | 14 | **Q.**   Okay.  And -- and he's -- he's still |
| 12:19:21 | 15 | with C District? |
| 12:19:24 | 16 | **A.**   I don't -- I think he might be at |
| 12:19:26 | 17 | B District. |
| 12:19:27 | 18 | **Q.**   Okay.  So he was maybe just training |
| 12:19:28 | 19 | with C District? |
| 12:19:29 | 20 | **A.**   Yes. |
| 12:19:30 | 21 | **Q.**   Okay. |
| 12:19:30 | 22 | **A.**   He did work at C District after he was |
| 12:19:32 | 23 | done training, but at -- at present time, I don't |

| | | |
|---|---|---|
| 12:19:35 | 1 | believe he's at C anymore. |
| 12:19:37 | 2 | Q. So I'm -- I'm letting this play while |
| 12:19:39 | 3 | we're talking because it doesn't really show a lot. |
| 12:19:42 | 4 | There's a gentleman -- or it looks like |
| 12:19:43 | 5 | a man moving his arms around, facing the street |
| 12:19:46 | 6 | Schmarbeck, and then the individual who you think |
| 12:19:49 | 7 | is Kyle Moriarity appears to be speaking to him |
| 12:19:52 | 8 | a few feet away. Would you agree? |
| 12:19:55 | 9 | A. Yes. |
| 12:19:55 | 10 | Q. Okay. Now, in this screen, in the |
| 12:19:57 | 11 | upper left, we see what appears to be another |
| 12:20:00 | 12 | marked BPD patrol vehicle pulling up on the -- I |
| 12:20:07 | 13 | guess the right side of the road, where -- where |
| 12:20:10 | 14 | Officer Moriarity's SUV is kind of blocking the |
| 12:20:13 | 15 | left side of the road. Do you see that? |
| 12:20:14 | 16 | A. Yes. |
| 12:20:14 | 17 | Q. All right. Whose vehicle is that? |
| 12:20:16 | 18 | A. My vehicle. |
| 12:20:17 | 19 | Q. Who's driving? |
| 12:20:17 | 20 | A. I am. |
| 12:20:18 | 21 | Q. And is that patrol vehicle 473? |
| 12:20:21 | 22 | A. Yes. |
| 12:20:21 | 23 | Q. Okay. Now, the dispatch -- the call |

*McDermott - Rupp - 2/19/20*

147

12:20:30  1   log didn't really tell me, but why -- why were two

12:20:32  2   SUVs and four officers dispatched to Schmarbeck for

12:20:37  3   the -- the initial complaint at 33 Schmarbeck?

12:20:41  4        **A.**   I had been to that address earlier in

12:20:43  5   the week, so I was familiar with the situation, so

12:20:49  6   Officer Velez and I just covered, meaning we

12:20:51  7   covered on the call.

12:20:54  8        **Q.**   So that means to say you saw it come

12:20:57  9   across your computer screen; you said, I'm going to

12:20:59 10   go there too.

12:21:00 11        **A.**   Yes.

12:21:00 12        **Q.**   Okay.  Fair enough.

12:21:01 13        All right.  I'm going to let it play

12:21:03 14   a little bit.

12:21:08 15        I believe -- I'm going to finish off you

12:21:09 16   driving up, because I think you -- you come to

12:21:11 17   a parked location somewhere mostly behind the red

12:21:17 18   minivan, right?

12:21:19 19        **A.**   Yes.  I think later on I actually move

12:21:21 20   forward even more.

12:21:22 21        **Q.**   Okay.  That was -- was going to be one

12:21:25 22   of my questions, so I'm glad you mentioned that.

12:21:27 23   I was going to ask you, once you parked there, if

*McDermott - Rupp - 2/19/20*

148

12:21:29 1   you -- you moved the vehicle at all, but you think

12:21:32 2   you did.

12:21:36 3          **A.**   Yes.

12:21:37 4          **Q.**   Okay.  All right.  So you're -- you're

12:21:39 5   pretty much, give or take a foot or two, directly

12:21:42 6   behind the red minivan when you first pull up and

12:21:45 7   come to a stop, and maybe about ten to 15 feet

12:21:49 8   behind it; is that fair?

12:21:51 9          **A.**   I don't know exact measurements.

12:21:53 10         **Q.**   Okay.  How many feet would you

12:21:55 11  estimate, in your police experience, you are from

12:21:57 12  the back of the red minivan?

12:22:00 13         **A.**   It's hard to tell with the angle.

12:22:01 14         **Q.**   Okay.  Now, as you indicated, you

12:22:04 15  do pull up pretty much directly behind the red

12:22:07 16  minivan; is that right?

12:22:09 17         **A.**   Yes.

12:22:09 18         **Q.**   Okay.  So why did you pull up there?

12:22:10 19         **A.**   To speak with Officer Moriarity, which

12:22:14 20  is what I'm doing right now.

12:22:15 21         **Q.**   Okay.  And do you have a recollection

12:22:16 22  of speaking with -- with Officer Moriarity?

12:22:19 23         You've already identified him because of the

*McDermott - Rupp - 2/19/20*

149

| | | |
|---|---|---|
| 12:22:20 | 1 | hat, but as you sit here today, do you recall that |
| 12:22:23 | 2 | that was indeed Officer Moriarity who walked up to |
| 12:22:26 | 3 | your driver's side window of patrol vehicle 473 to |
| 12:22:29 | 4 | talk to you? |
| 12:22:30 | 5 | **A.** Yes. |
| 12:22:30 | 6 | **Q.** Okay. What did you talk about? |
| 12:22:32 | 7 | **A.** I don't remember. |
| 12:22:33 | 8 | **Q.** Okay. Was it relating to the call or |
| 12:22:36 | 9 | the -- or the -- or the incident that you had |
| 12:22:39 | 10 | covered earlier in the week? |
| 12:22:41 | 11 | **A.** Most likely. |
| 12:22:42 | 12 | **Q.** Okay. I'm going to let this play to |
| 12:22:44 | 13 | the end. |
| 12:22:45 | 14 | Do you know who the gentleman is who's |
| 12:22:47 | 15 | coming around from behind the bush I'm circling |
| 12:22:50 | 16 | with the cursor who was talking to Officer Moriarity? |
| 12:22:52 | 17 | **A.** I don't know his name. |
| 12:22:53 | 18 | **Q.** Okay. Had you ever encountered that |
| 12:22:55 | 19 | person before? |
| 12:22:55 | 20 | **A.** It was the person I had encountered |
| 12:22:57 | 21 | earlier in the week. |
| 12:22:58 | 22 | **Q.** It was. So when you saw the address, |
| 12:23:01 | 23 | you said, yep, I know who this is. And you went, |

*McDermott - Rupp - 2/19/20*

151

| | | |
|---|---|---|
| 12:24:16 | 1 | **A.**   Yes. |
| 12:24:17 | 2 | **Q.**   And would you agree that the physical |
| 12:24:19 | 3 | location of those two vehicles, vis-a-vis each |
| 12:24:19 | 4 | other, has not changed? |
| 12:24:22 | 5 | **A.**   It doesn't -- |
| 12:24:22 | 6 | **MS. HUGGINS:**  Form. |
| 12:24:22 | 7 | **THE WITNESS:**  It doesn't appear that they |
| 12:24:23 | 8 | have. |
| 12:24:23 | 9 | **BY MR. RUPP:** |
| 12:24:24 | 10 | **Q.**   Okay.  And then we see the vehicle |
| 12:24:25 | 11 | driven by Officer Moriarity pretty much parallel |
| 12:24:31 | 12 | to your vehicle in the -- in the sort of the center |
| 12:24:36 | 13 | of Schmarbeck.  Do you agree? |
| 12:24:37 | 14 | **A.**   Yes. |
| 12:24:37 | 15 | **Q.**   Okay.  We're going to watch.  Now, do |
| 12:24:40 | 16 | you see an individual -- |
| 12:24:41 | 17 | **A.**   Yes. |
| 12:24:41 | 18 | **Q.**   -- depicted? |
| 12:24:42 | 19 | And I'm circling him with the cursor.  Do |
| 12:24:45 | 20 | you know who that person is? |
| 12:24:46 | 21 | **A.**   James Kistner. |
| 12:24:47 | 22 | **Q.**   Okay.  And where are you at this time? |
| 12:24:50 | 23 | **A.**   In my patrol vehicle. |

*McDermott - Rupp - 2/19/20*

152

12:24:52  1      Q.    Where is Officer Velez?

12:24:54  2      A.    In the passenger side of the patrol

12:24:55  3  vehicle.

12:24:55  4      Q.    Okay.  Are there individuals in the

12:24:58  5  other patrol vehicle that I'm circling with the

12:25:01  6  cursor?

12:25:02  7      A.    Yes.

12:25:02  8      Q.    Who are they?

12:25:02  9      A.    Officer Moriarity and Officer Schultz.

12:25:04  10      Q.    Who's driving?

12:25:06  11      A.    Officer Moriarity.

12:25:07  12      Q.    Okay.  And, you know, what was -- what

12:25:10  13  was your plan at this point -- if there hadn't been

12:25:12  14  an impact with Mr. Kistner, what was the plan at

12:25:15  15  this point for the four officers and the two SUVs?

12:25:18  16      A.    We were leaving to go back in service.

12:25:21  17  It was a pretty busy day.

12:25:22  18      Q.    Okay.  And do you know if, at this

12:25:26  19  point, the 33 Schmarbeck call had been advised?

12:25:33  20      A.    I don't believe it had been.

12:25:35  21      Q.    Okay.  But you were, nevertheless,

12:25:37  22  leaving the scene to go -- to go back in service in

12:25:41  23  C District.

| 12:25:42 | 1 | **A.**   Correct. |
| 12:25:43 | 2 | **Q.**   Okay. |
| 12:25:43 | 3 | **MS. HUGGINS:**  Form as to the -- the previous |
| 12:25:45 | 4 | question. |
| 12:25:55 | 5 | **BY MR. RUPP:** |
| 12:25:55 | 6 | **Q.**   All right.  This is skipping, so I'm |
| 12:25:57 | 7 | going to back it up just a second. |
| 12:25:59 | 8 | All right.  As we -- now, do we see the |
| 12:26:01 | 9 | first vehicle, driven by Officer Moriarity, pull |
| 12:26:05 | 10 | past Mr. Kistner? |
| 12:26:07 | 11 | **A.**   Yes. |
| 12:26:07 | 12 | **MR. RUPP:**  Okay.  And I want to pay -- pay |
| 12:26:11 | 13 | particular attention to your vehicle, so I'm going |
| 12:26:13 | 14 | to back it up again. |
| 12:26:13 | 15 | (Video clip played.) |
| 12:26:13 | 16 | **BY MR. RUPP:** |
| 12:26:17 | 17 | **Q.**   Your vehicle starts to back up; is that |
| 12:26:17 | 18 | right? |
| 12:26:20 | 19 | **A.**   Yes. |
| 12:26:20 | 20 | **Q.**   All right.  Now, in that process of |
| 12:26:24 | 21 | backing up however many feet that was from behind |
| 12:26:26 | 22 | the red SUV, that was the time frame that you told |
| 12:26:29 | 23 | me, in some detail earlier, that you had checked |

12:26:32   1   your left side-view mirror, your right side-view

12:26:35   2   mirror, your rearview mirror, and you had turned

12:26:38   3   around to the back to prepare to back up; is that

12:26:43   4   right?

12:26:43   5   **A.**   That's what I would normally do.

12:26:44   6   **Q.**   Okay. And as you backed up, where

12:26:47   7   would you normally be looking?

12:26:52   8   **A.**   At that exact moment, I don't --

12:26:53   9   **Q.**   Yeah. As you're -- as you're

12:26:56   10   physically moving the SUV backwards, where are you

12:26:58   11   looking?

12:26:58   12   **A.**   I don't remember exactly where I was

12:27:00   13   looking.

12:27:00   14   **Q.**   Well, are you looking in one of those

12:27:03   15   three mirrors or turned around behind you to look?

12:27:05   16   **A.**   I don't remember.

12:27:05   17   **Q.**   Okay. Well, when you customarily back

12:27:08   18   up, do you look out the windshield when you're

12:27:10   19   backing up, or do you look at a mirror or behind

12:27:12   20   you?

12:27:12   21   **A.**   It would depend.

12:27:14   22   **Q.**   Okay. What would it depend on?

12:27:15   23   **A.**   It would depend if I was exiting

12:27:18   1   a driveway, if I was in a parking lot.  It would --

12:27:21   2           Q.    All right.  So let's put the additional

12:27:23   3   condition that you're backing up on the street.

12:27:25   4           A.    Okay.

12:27:25   5           Q.    All right.  Where are you looking?

12:27:27   6           A.    Considering I had already looked behind

12:27:30   7   me and there was clearly nothing there, it's

12:27:32   8   possible I was looking behind me, it's possible

12:27:34   9   I was looking in front of me.

12:27:36  10           Q.    So you don't know one way or the other?

12:27:38  11           A.    I do not remember.

12:27:39  12           Q.    Okay.  So where I have it frozen at the

12:27:44  13   seven-second mark on the video segment marked 2529,

12:27:48  14   Mr. Kistner is approximately six feet from the

12:27:51  15   front left bumper of the SUV.

12:27:54  16           Would you agree with me on the estimate, or

12:27:56  17   do you want to provide a different estimate?

12:27:58  18           A.    I don't know the estimate.

12:27:58  19           Q.    Okay.  Well, you -- you're -- have you

12:28:01  20   taken any courses in accident reconstruction, as

12:28:03  21   a police officer?

12:28:03  22           A.    No.

12:28:04  23           Q.    Do you ever fill out police reports for

*McDermott - Rupp - 2/19/20*

156

| | | |
|---|---|---|
| 12:28:07 | 1 | car accidents? |
| 12:28:07 | 2 | **A.**   Yes. |
| 12:28:08 | 3 | **Q.**   And have you ever had to estimate |
| 12:28:11 | 4 | distances of vehicles traveling or where they ended |
| 12:28:13 | 5 | up from the point of collision? |
| 12:28:16 | 6 | **A.**   We -- no, I don't put the distance in |
| 12:28:20 | 7 | a report, because I was not -- if I -- if I'm not |
| 12:28:24 | 8 | present for an accident, I can't determine that. |
| 12:28:26 | 9 | **Q.**   Have you ever received any training on |
| 12:28:28 | 10 | estimating speed? |
| 12:28:31 | 11 | **A.**   Yes. |
| 12:28:31 | 12 | **Q.**   Okay.  Have you received any estimates |
| 12:28:33 | 13 | on -- any training on estimating distances? |
| 12:28:37 | 14 | **A.**   It may have been in radar training, but |
| 12:28:40 | 15 | I don't recall exactly. |
| 12:28:42 | 16 | **Q.**   Okay.  So as you sit here, you cannot |
| 12:28:44 | 17 | estimate for me how many feet Mr. Kistner is from |
| 12:28:46 | 18 | the front left driver's side bumper of patrol |
| 12:28:52 | 19 | vehicle 473? |
| 12:28:53 | 20 | **A.**   Due to the angle, I definitely cannot. |
| 12:28:56 | 21 | **MR. RUPP:**   Okay.  All right.  So, and I'm |
| 12:29:00 | 22 | going to go back.  We'll go up to the seven-second |
| 12:29:03 | 23 | mark again. |

*McDermott - Rupp - 2/19/20*

157

12:29:03   1          (Video clip played.)

12:29:03   2          **BY MR. RUPP:**

12:29:09   3          **Q.**    Your vehicle backs up, four, five, six,

12:29:15   4    seven.  Now it begins to pull forward; is that

12:29:17   5    correct?

12:29:17   6          **A.**    Yes.

12:29:18   7          **Q.**    Now, earlier you told me that you were

12:29:20   8    not sure whether your vehicle was still moving

12:29:24   9    forward at the time of the impact with Mr. Kistner,

12:29:28  10    despite having seen the videos yesterday; is that

12:29:30  11    right?

12:29:30  12          **A.**    Yes.

12:29:31  13          **Q.**    All right.  I want you to watch this

12:29:33  14    closely and tell me if you can tell from the video

12:29:36  15    whether your vehicle is, in fact, still moving

12:29:38  16    forward at the time of the impact with Mr. Kistner.

12:29:52  17          Can you answer the question?

12:29:54  18          **A.**    What's the question?

12:29:55  19          **Q.**    The question was:  Was your vehicle, in

12:29:58  20    fact, still moving forward at the precise moment of

12:30:01  21    the impact with Mr. Kistner?

12:30:04  22          **A.**    I don't remember the vehicle to have

12:30:06  23    been moving.

*McDermott - Rupp - 2/19/20*

161

| | | |
|---|---|---|
| 12:33:06 | 1 | of the vehicle.  That's not where he made contact |
| 12:33:09 | 2 | with the vehicle. |
| 12:33:10 | 3 | **MR. RUPP:**  Okay.  So let me back up here |
| 12:33:14 | 4 | a little bit.  I want you to look at Mr. Kistner's |
| 12:33:17 | 5 | head.  Okay? |
| 12:33:17 | 6 | (Video clip played.) |
| 12:33:17 | 7 | **BY MR. RUPP:** |
| 12:33:21 | 8 | **Q.**   Can you see his head? |
| 12:33:22 | 9 | **A.**   Yes. |
| 12:33:23 | 10 | **Q.**   Okay.  Now, did you see his head fly |
| 12:33:26 | 11 | backwards? |
| 12:33:27 | 12 | **A.**   I wouldn't say fly backwards. |
| 12:33:29 | 13 | **Q.**   Well, did you see it move backwards? |
| 12:33:31 | 14 | **A.**   It appears to. |
| 12:33:33 | 15 | **Q.**   Okay.  What caused that? |
| 12:33:34 | 16 | **MS. HUGGINS:**  Form. |
| 12:33:36 | 17 | **BY MR. RUPP:** |
| 12:33:36 | 18 | **Q.**   I mean, you were there, right, Officer |
| 12:33:40 | 19 | McDermott? |
| 12:33:40 | 20 | **A.**   Yes. |
| 12:33:40 | 21 | **Q.**   What caused Mr. Kistner's head to go |
| 12:33:42 | 22 | back like that? |
| 12:33:43 | 23 | **A.**   He threw himself backwards. |

*McDermott - Rupp - 2/19/20*

162

| | | |
|---|---|---|
| 12:33:44 | 1 | **Q.**   Okay.  So he simultaneously threw |
| 12:33:46 | 2 | himself at the car and threw his head backwards? |
| 12:33:49 | 3 | **A.**   He walked towards the car, reached his |
| 12:33:52 | 4 | arm out, threw himself into the vehicle and |
| 12:33:58 | 5 | backwards. |
| 12:33:59 | 6 | **Q.**   Okay.  So that was all him, according |
| 12:34:02 | 7 | to your testimony. |
| 12:34:05 | 8 | **A.**   Yes. |
| 12:34:05 | 9 | **Q.**   Okay.  So he touched the vehicle and |
| 12:34:07 | 10 | then swung his head backwards and fell to the |
| 12:34:11 | 11 | ground. |
| 12:34:11 | 12 | **MS. HUGGINS:**  Form.  You can answer. |
| 12:34:12 | 13 | **THE WITNESS:**  He reached his arm out -- I |
| 12:34:17 | 14 | don't know if he touched the vehicle or not, but he |
| 12:34:19 | 15 | reached his arm out, turned his body, and then |
| 12:34:23 | 16 | threw himself backwards. |
| 12:34:24 | 17 | **BY MR. RUPP:** |
| 12:34:24 | 18 | **Q.**   Okay.  So you're not sure that he |
| 12:34:27 | 19 | impacted the vehicle at all? |
| 12:34:29 | 20 | **A.**   Yes, he did. |
| 12:34:30 | 21 | **Q.**   Well, you said you weren't sure. |
| 12:34:32 | 22 | I wasn't sure what you just said. |
| 12:34:34 | 23 | **A.**   When he reached his arm out and touched |

12:34:36  1  closer to the front of the vehicle, if he touched

12:34:39  2  it closer to the front of vehicle, I don't know.

12:34:41  3       What I'm saying is is his arm is not -- his

12:34:47  4  body touched the mirror, not the front of the

12:34:51  5  vehicle.

12:34:52  6       **Q.**   Right.  But you're saying that he

12:34:57  7  touched the mirror himself and then flung his head

12:35:00  8  back.

12:35:01  9       **A.**   Yes.

12:35:01  10      **Q.**   Okay.  And when that happened, would

12:35:04  11  you agree with me, the SUV was still moving

12:35:07  12  forward?

12:35:11  13      Let's watch it again.  I'll back it up all

12:35:21  14  the way.

12:35:31  15      Okay.  Would you agree with me that the

12:35:33  16  vehicle was still moving forward as, as you've

12:35:38  17  described, he touched the vehicle?

12:35:41  18      **MS. HUGGINS:**   Form.

12:35:42  19      **THE WITNESS:**   It appears to be.  I don't

12:35:43  20  remember the vehicle moving forward.

12:35:45  21      **MR. RUPP:**   What's the form objection?

12:35:53  22      **MS. HUGGINS:**   I think there's been a lot of

12:35:54  23  discussion about impact and when and where that

12:35:56  1  happened.

12:35:57  2          **MR. RUPP:**  Well, I think --

12:35:58  3          **MS. HUGGINS:**  I think the question is

12:35:59  4  confusing.

12:36:00  5          **MR. RUPP:**  All right.  So I'm not -- were

12:36:02  6  you confused by my question?

12:36:04  7          **THE WITNESS:**  A little bit, yeah.

12:36:06  8          **BY MR. RUPP:**

12:36:07  9      **Q.**   All right.  So what I think you've told

12:36:08  10  me is that Mr. Kistner came around the front of the

12:36:11  11  vehicle, and he reached out at some point, and he

12:36:14  12  made contact with the vehicle, and he flung his

12:36:17  13  head back, as -- as you saw in the video, correct?

12:36:20  14      **A.**   He came around to the side of the

12:36:21  15  vehicle.

12:36:21  16      **Q.**   Okay.  Came around the front, to the

12:36:23  17  side, right?

12:36:24  18      **A.**   Well, he was already on the side --

12:36:24  19      **Q.**   Okay.

12:36:27  20      **A.**   -- once he walked past the other

12:36:30  21  vehicle.

12:36:30  22      **Q.**   So he's coming up to the side of the

12:36:32  23  vehicle, and you say that he -- he impacted the

12:36:34 1 vehicle and -- and flung his head back and turned

12:36:38 2 at the same time; is that right?

12:36:39 3     **A.**   Yes.

12:36:39 4     **Q.**   Okay.  And my only question to you is:

12:36:41 5 Through that process, was your vehicle still moving

12:36:44 6 forward?

12:36:45 7     So I'm going to play --

12:36:47 8     **A.**   I don't -- I don't -- I don't remember

12:36:50 9 my vehicle moving forward.

12:36:52 10    **MR. RUPP:**  Well, I'm going to ask you to

12:36:53 11 watch.  I'm not asking you what you remember.  I'm

12:36:55 12 asking you to watch on the video, assume that this

12:36:57 13 video is accurate, okay, and you tell me that based

12:37:00 14 on when you just told me Mr. Kistner initiated the

12:37:02 15 contact with the vehicle, whether your vehicle was

12:37:05 16 moving or stationary.  That's what I want to know.

12:37:08 17 Okay?

12:37:08 18     (Video clip played.)

12:37:08 19    **BY MR. RUPP:**

12:37:26 20     **Q.**   Can you answer the question?

12:37:27 21     **A.**   It appears to be slightly moving.

12:37:28 22     **Q.**   Okay.  Now, Mr. Kistner ended up on the

12:37:54 23 ground; is that right?

*McDermott - Rupp - 2/19/20*

166

12:37:56  1      A.    Yes.

12:37:56  2      Q.    Do you know why?

12:37:57  3      A.    Because he put himself there.

12:37:59  4      Q.    Okay.  So I -- I just -- that's what

12:38:02  5  I wanted to make sure.  He approached the side of

12:38:04  6  the vehicle, deliberately made contact with it,

12:38:08  7  flung his head back, turned, and then fell to the

12:38:11  8  ground.

12:38:12  9      A.    The turn was before he threw himself

12:38:15 10  backward.

12:38:15 11      Q.    Maybe I had it in the wrong order.

12:38:17 12  He approached the side of the vehicle,

12:38:19 13  touched it, turned, flung his head back, and fell

12:38:24 14  to the ground.  Is that your testimony?

12:38:25 15      A.    He did make contact with the vehicle.

12:38:26 16      Q.    Sure.

12:38:27 17      A.    But yes.

12:38:27 18      Q.    Okay.  And all of that, in your view,

12:38:29 19  was intentional on his part; is that right?

12:38:31 20      A.    Yes.

12:38:31 21      Q.    And none of that had anything to do

12:38:33 22  with your pulling away, intending to leave

12:38:38 23  Schmarbeck that day.

*McDermott - Rupp - 2/19/20*

167

| | | |
|---|---|---|
| 12:38:39 | 1 | **A.**   No. |
| 12:38:50 | 2 | **Q.**   And when in this process was the first |
| 12:38:52 | 3 | time that you saw Mr. Kistner approaching the side |
| 12:38:54 | 4 | of your vehicle? |
| 12:38:59 | 5 | **A.**   The first time I saw him approaching my |
| 12:39:01 | 6 | vehicle was after the first vehicle had pulled |
| 12:39:04 | 7 | away. |
| 12:39:05 | 8 | **Q.**   Okay.  So let's -- let's move there on |
| 12:39:08 | 9 | the screen. |
| 12:39:08 | 10 | So the first vehicle's pulling away now, |
| 12:39:10 | 11 | right?  And I've frozen it.  We're at the |
| 12:39:13 | 12 | five-second mark.  Your vehicle is backing up. |
| 12:39:17 | 13 | Do you see Mr. Kistner at this point? |
| 12:39:19 | 14 | **A.**   Yes. |
| 12:39:19 | 15 | **Q.**   Okay.  If you see Mr. Kistner |
| 12:39:22 | 16 | approaching the side of your vehicle, why do you |
| 12:39:24 | 17 | pull forward? |
| 12:39:25 | 18 | **A.**   I saw him there.  I didn't -- I didn't |
| 12:39:31 | 19 | know why someone would be approaching a moving |
| 12:39:34 | 20 | vehicle in the middle of the road. |
| 12:39:36 | 21 | **Q.**   Well, I mean, by the time he's in the |
| 12:39:39 | 22 | middle of the road, the vehicles are stationary, |
| 12:39:42 | 23 | right? |

*McDermott - Rupp - 2/19/20*

169

| | | |
|---|---|---|
| 12:40:40 | 1 | **A.**   But I don't know that he wasn't just |
| 12:40:44 | 2 | crossing the street. |
| 12:40:45 | 3 | **Q.**   But that's not my question.  I'm just |
| 12:40:47 | 4 | asking, as of reference to a starting point, you |
| 12:40:49 | 5 | would agree he's three-quarters of the way across |
| 12:40:51 | 6 | the street, he's facing opposite direction of your |
| 12:40:54 | 7 | SUVs.  He's facing towards them, right? |
| 12:40:56 | 8 | He's not -- |
| 12:40:56 | 9 | **A.**   You said opposite direction of the SUV. |
| 12:40:59 | 10 | **Q.**   Yeah.  Your SUV is phasing I think you |
| 12:41:02 | 11 | said north, right? |
| 12:41:02 | 12 | **A.**   Yes. |
| 12:41:02 | 13 | **Q.**   Which would mean that he's facing |
| 12:41:05 | 14 | south, right? |
| 12:41:05 | 15 | **A.**   Right. |
| 12:41:05 | 16 | **Q.**   Okay.  He's not facing to the west, as |
| 12:41:08 | 17 | if he's crossing the street, would you agree with |
| 12:41:10 | 18 | me? |
| 12:41:10 | 19 | **A.**   He -- |
| 12:41:10 | 20 | **Q.**   And that's not his direction of motion |
| 12:41:12 | 21 | either. |
| 12:41:13 | 22 | **A.**   But you can't go backwards from where |
| 12:41:15 | 23 | he is.  I don't -- I don't know, from this video, |

| | | |
|---|---|---|
| 12:41:17 | 1 | that he wasn't walking west. |
| 12:41:18 | 2 |     **Q.**   Fair enough.  But at least -- I'm only |
| 12:41:21 | 3 | asking you about this video.  Okay? |
| 12:41:22 | 4 |     **A.**   I understand that, but -- |
| 12:41:23 | 5 |     **Q.**   At this point, at 01 -- at the 0 mark |
| 12:41:25 | 6 | and the 01 mark, he's walking southbound on |
| 12:41:28 | 7 | Schmarbeck, according to the compass directions you |
| 12:41:30 | 8 | gave me; is that right? |
| 12:41:31 | 9 |     **A.**   He's, I would say, southwest, but also |
| 12:41:35 | 10 | now he's walking south. |
| 12:41:36 | 11 |     **Q.**   Okay.  He's not crossing the street, |
| 12:41:39 | 12 | right? |
| 12:41:40 | 13 |     Now he walks towards your vehicle when he's |
| 12:41:42 | 14 | struck, correct? |
| 12:41:43 | 15 |     **A.**   He's not struck. |
| 12:41:44 | 16 |     **Q.**   Okay.  And so if, as you just told me |
| 12:41:50 | 17 | a minute ago, you saw Mr. Kistner after the first |
| 12:41:55 | 18 | SUV moved away, why did you continue to move |
| 12:41:59 | 19 | forward? |
| 12:42:01 | 20 |     **A.**   I don't recall. |
| 12:42:03 | 21 |     **Q.**   Well, the man was approaching your |
| 12:42:07 | 22 | vehicle, was he not? |
| 12:42:09 | 23 |     **A.**   But at -- |

12:42:10  1      **Q.**   As we've frozen it at 06, he's now not

12:42:15  2  walking southwest.  He's walking southeast, towards

12:42:17  3  your vehicle, which is to the southeast of him,

12:42:19  4  correct?

12:42:19  5      **MS. HUGGINS:**   Form.

12:42:20  6      **THE WITNESS:**   At the time that I -- he had

12:42:21  7  started walking in that direction, I was already

12:42:23  8  backing up and had started, like I -- I was going

12:42:27  9  to proceed forward.

12:42:28  10      **BY MR. RUPP:**

12:42:28  11      **Q.**   Well, that's right.  You were looking

12:42:30  12  out the back or in the side view and rearview

12:42:33  13  mirrors, correct.

12:42:34  14      **A.**   No, not necessarily.

12:42:35  15      **Q.**   Well, you weren't looking in two

12:42:36  16  different places at the same time.  We already

12:42:38  17  covered that, didn't we, Officer?

12:42:39  18      **A.**   Yes, but we also covered that I would

12:42:42  19  have checked behind me, and when I was actually

12:42:45  20  moving forward, I don't know what direction I was

12:42:46  21  looking.

12:42:47  22      **Q.**   Okay.  But you saw Mr. Kistner.  You

12:42:49  23  just told me you saw the man, right?

*McDermott - Rupp - 2/19/20*

172

| | | | |
|---|---|---|---|
| 12:42:51 | 1 | **A.** | Yes. |

12:42:51   1    **A.**   Yes.

12:42:51   2    **Q.**   So why did you pull forward?

12:42:52   3    **A.**   I don't remember.

12:42:53   4    **Q.**   Well, weren't you worried you might hit

12:42:55   5   him?

12:42:56   6    **A.**   I didn't think that someone would walk

12:42:59   7   intentionally directly at a moving vehicle.

12:43:00   8    **Q.**   But if you saw him --

12:43:01   9    **A.**   In the middle of the road.

12:43:02   10   **Q.**   If you saw him and he's in the middle

12:43:04   11   of the road and he's walking towards your vehicle,

12:43:06   12   you could have stopped, right?

12:43:07   13   **MS. HUGGINS:**   Form.

12:43:10   14   **THE WITNESS:**   I stopped as quickly as

12:43:11   15   I could.

12:43:11   16   **BY MR. RUPP:**

12:43:11   17   **Q.**   Okay. Well, if you saw him when he --

12:43:14   18   after the first SUV pulled -- pulled away, you

12:43:16   19   didn't even have to go forward at all.

12:43:19   20   **A.**   Based on the video, that's when I saw

12:43:21   21   him. I don't remember when I actually saw him

12:43:24   22   first.

12:43:24   23   **Q.**   Okay. So you're --

12:43:25  1          **A.**    I mean, I saw him coming down the

12:43:27  2   sidewalk, but the video doesn't show that.

12:43:29  3          **Q.**    All right.  So when you told me that

12:43:30  4   you didn't see him until the first SUV pulled away,

12:43:33  5   now you're not sure that's when you first saw him.

12:43:33  6          **MS. HUGGINS:**   Form.

12:43:36  7          **THE WITNESS:**   Based on watching the video.

12:43:37  8   But I don't remember when I -- that day, when

12:43:39  9   I first saw him.

12:43:39  10         **BY MR. RUPP:**

12:43:39  11         **Q.**    So you might not have seen him when you

12:43:41  12  pulled the vehicle forward.

12:43:42  13         **A.**    I don't remember the very moment I saw

12:43:44  14  him.

12:43:44  15         **Q.**    Right.  So --

12:43:45  16         **A.**    I saw him before --

12:43:46  17         **Q.**    -- it's possible then that you pulled

12:43:48  18  the vehicle forward without having seen Mr. Kistner.

12:43:51  19         **A.**    No.  I saw him prior to the other car

12:43:54  20  pulling away.

12:43:55  21         **Q.**    Well, now, wait a second.  That was

12:43:57  22  earlier.  You told me, in this segment, that you

12:44:00  23  didn't see him until after the other vehicle pulled

12:44:03  1   away.  You just told me that.

12:44:05  2          MS. HUGGINS:  Form.  Are you referring to

12:44:07  3   video segments or her experience that day during --

12:44:07  4          MR. RUPP:  I'm only referring to --

12:44:10  5          MS. HUGGINS:  -- the call?

12:44:11  6          MR. RUPP:  -- video segments.

12:44:12  7          MS. HUGGINS:  Okay.

12:44:13  8          MR. RUPP:  And when I asked her:  When was

12:44:14  9   the first time you saw Mr. Kistner approaching your

12:44:17 10   vehicle, you said it was not until after the first

12:44:20 11   SUV pulled away.

12:44:21 12          THE WITNESS:  Then I must have --

12:44:22 13          MS. HUGGINS:  In the video segment.

12:44:23 14          THE WITNESS:  In the video segment?

12:44:25 15          BY MR. RUPP:

12:44:25 16      Q.    In this video segment.

12:44:29 17      A.    Then I --

12:44:29 18      Q.    Yes.

12:44:30 19      A.    -- misunderstood earlier.

12:44:32 20      Q.    Okay.  So when did you first see Mr. --

12:44:32 21   let's go through it again.

12:44:33 22          When did you first see Mr. Kistner at all

12:44:35 23   that day?

12:44:35   1          A.    The first time I saw him at all was

12:44:37   2   when he was on the sidewalk.

12:44:38   3          Q.    Okay.  When is the first time you saw

12:44:40   4   him in the street that day, in Schmarbeck?

12:44:45   5          A.    I don't remember exactly when I saw him

12:44:47   6   moving across the street.

12:44:49   7          Q.    Okay.  Well, when is -- when is the

12:44:50   8   first time you knew he was in the street at all?

12:44:53   9          A.    I don't remember.

12:44:54  10          Q.    Well, when is the first time you saw

12:44:57  11   him in the street before you hit him with the SUV?

12:45:00  12          A.    I didn't hit him with the SUV.

12:45:02  13          Q.    When is the first time you saw him

12:45:03  14   before there was contact between Mr. Kistner and

12:45:07  15   the SUV?

12:45:07  16          A.    Are you asking what I remember and what

12:45:10  17   I can see in the video?

12:45:11  18          Q.    I'm asking what you remember.  I want

12:45:13  19   to know whether you saw him before there was

12:45:15  20   contact with your SUV.

12:45:16  21          A.    I saw him -- like I said, I saw him on

12:45:18  22   the sidewalk and --

12:45:19  23          Q.    When was the first time you saw him in

*McDermott - Rupp - 2/19/20*

176

| | | |
|---|---|---|
| 12:45:21 | 1 | the street -- |
| 12:45:21 | 2 | **A.**   I don't remember. |
| 12:45:21 | 3 | **Q.**   -- Ms. McDermott?  Okay. |
| 12:45:24 | 4 | So you don't remember whether you saw him or |
| 12:45:27 | 5 | not in the street. |
| 12:45:28 | 6 | **A.**   I saw him.  I don't remember at what |
| 12:45:30 | 7 | moment I first saw him, which is -- |
| 12:45:30 | 8 | **Q.**   So it might have -- |
| 12:45:31 | 9 | **A.**   -- what you asked. |
| 12:45:32 | 10 | **Q.**   -- been after you started pulling |
| 12:45:34 | 11 | forward. |
| 12:45:34 | 12 | **A.**   I don't remember. |
| 12:45:35 | 13 | **Q.**   Okay.  Well, you don't remember either |
| 12:45:36 | 14 | way. |
| 12:45:36 | 15 | **A.**   I -- I don't remember the exact moment |
| 12:45:38 | 16 | I first saw him in the street, no. |
| 12:45:40 | 17 | **Q.**   Okay.  So it may have been after you |
| 12:45:42 | 18 | were already pulling the SUV forward. |
| 12:45:45 | 19 | **A.**   I -- I don't remember the time. |
| 12:45:47 | 20 | **Q.**   Okay.  But that means that you don't |
| 12:45:49 | 21 | remember the time, it could have been after you |
| 12:45:53 | 22 | started pulling the SUV forward after backing it |
| 12:45:55 | 23 | up. |

| | | |
|---|---|---|
| 12:45:59 | 1 | **A.** I don't -- I don't remember. |
| 12:45:59 | 2 | **Q.** Okay. So it's possible then, if you |
| 12:46:01 | 3 | don't remember, that you didn't see Mr. Kistner at |
| 12:46:04 | 4 | all before there was impact with your SUV. |
| 12:46:06 | 5 | **A.** I -- I did see him. I told you |
| 12:46:09 | 6 | earlier, I saw him coming at my vehicle. |
| 12:46:10 | 7 | **Q.** Okay. When? In the street or on the |
| 12:46:12 | 8 | sidewalk? |
| 12:46:14 | 9 | **A.** In the street. |
| 12:46:15 | 10 | **Q.** Okay. When is the first time you saw |
| 12:46:17 | 11 | him? |
| 12:46:17 | 12 | **A.** I don't remember the first time I saw |
| 12:46:19 | 13 | him. I do -- but I do remember him coming at the |
| 12:46:22 | 14 | vehicle. |
| 12:46:22 | 15 | **Q.** Okay. |
| 12:46:22 | 16 | **A.** But I don't know if I could have looked |
| 12:46:25 | 17 | away, looked back. That's what I'm explaining. |
| 12:46:27 | 18 | **Q.** Let's try it this way: How long before |
| 12:46:30 | 19 | the impact was it that you saw Mr. Kistner? |
| 12:46:31 | 20 | **A.** For the very first time? |
| 12:46:33 | 21 | **Q.** In the street. |
| 12:46:34 | 22 | **A.** In the street? |
| 12:46:35 | 23 | **Q.** Not on the sidewalk. That's why I'm |

*McDermott - Rupp - 2/19/20*

178

| | | |
|---|---|---|
| 12:46:38 | 1 | directing you to this video segment.  It's at |
| 12:46:41 | 2 | 000 -- I want to make sure we don't get confused |
| 12:46:43 | 3 | here. |
| 12:46:44 | 4 | We are at 00 on this video, and Mr. Kistner |
| 12:46:46 | 5 | is already in the street, right? |
| 12:46:47 | 6 | **A.**    What I'm -- what I'm explaining is |
| 12:46:50 | 7 | there would have been a gap between when the first |
| 12:46:55 | 8 | patrol vehicle pulled away.  I can't see through |
| 12:46:58 | 9 | the patrol vehicle, so I would not have seen |
| 12:47:00 | 10 | Mr. Kistner's exact location when they pulled away. |
| 12:47:03 | 11 | **Q.**    Right.  So, but they haven't pulled |
| 12:47:06 | 12 | away yet.  We're at 00.  They haven't pulled away. |
| 12:47:08 | 13 | So based on what you just told me, you |
| 12:47:10 | 14 | haven't seen him yet, correct?  You couldn't see |
| 12:47:13 | 15 | him, so you haven't seen him. |
| 12:47:15 | 16 | **A.**    Have I seen him?  Yes, I've seen him. |
| 12:47:16 | 17 | **Q.**    In the street? |
| 12:47:17 | 18 | **A.**    I don't remember if I've seen him in |
| 12:47:18 | 19 | the street.  At what point the first time I saw him |
| 12:47:21 | 20 | in the street. |
| 12:47:22 | 21 | **Q.**    Okay.  And, again, so that means it |
| 12:47:23 | 22 | could have been after you started pulling forward. |
| 12:47:25 | 23 | **A.**    I don't remember. |

*McDermott - Rupp - 2/19/20*

| | | |
|---|---|---|
| 12:47:26 | 1 | **Q.**   Okay.  All right.  So let's watch |
| 12:47:31 | 2 | a little bit more of the segment after the impact |
| 12:47:37 | 3 | between your SUV and Mr. Kistner's vehicle. |
| 12:47:42 | 4 | Now, you've told me that you saw him reach |
| 12:47:47 | 5 | out his arm, deliberately impact the vehicle, turn, |
| 12:47:51 | 6 | fling his head back, and then fall to the ground; |
| 12:47:54 | 7 | is that right? |
| 12:47:54 | 8 | **A.**   Yes. |
| 12:47:54 | 9 | **Q.**   Did you see all of that before you saw |
| 12:47:58 | 10 | the video segments? |
| 12:47:59 | 11 | Is that what you saw when the -- when the |
| 12:48:02 | 12 | incident occurred? |
| 12:48:02 | 13 | **A.**   Yes. |
| 12:48:02 | 14 | **Q.**   Or was that what you saw later? |
| 12:48:04 | 15 | **A.**   That's what I saw that day. |
| 12:48:05 | 16 | **Q.**   Okay.  So you did see him, then, before |
| 12:48:07 | 17 | the impact. |
| 12:48:09 | 18 | **A.**   I said that I did. |
| 12:48:10 | 19 | **Q.**   Okay.  You're just not sure when. |
| 12:48:13 | 20 | **A.**   I'm -- you asked when the first time |
| 12:48:15 | 21 | I saw him enter the street. |
| 12:48:17 | 22 | **Q.**   Yes. |
| 12:48:18 | 23 | **A.**   That, I don't remember the very first |

*McDermott - Rupp - 2/19/20*

180

12:48:20  1   time or how many times I would have looked at him,

12:48:23  2   looked away.

12:48:23  3       **Q.**   Let's try it this way:  How far away

12:48:26  4   was he the first time you saw him in the street?

12:48:28  5       **A.**   I don't remember.

12:48:29  6       **Q.**   Okay.  How much time was it between the

12:48:33  7   first time you saw him in the street and the time

12:48:36  8   your SUV impacted with him?

12:48:38  9       **A.**   I don't remember.

12:48:54 10       **Q.**   Okay.  All right.  Another individual

12:48:55 11   walked into the screen at approximately the 15-,

12:48:58 12   16-second mark.  Do you know who that person is?

12:49:00 13       **A.**   I believe it's Mr. Kistner's son.

12:49:02 14       **Q.**   When is the first time you knew that

12:49:05 15   was Mr. Kistner's son?

12:49:07 16       **A.**   On scene.  I don't remember exactly

12:49:10 17   when I -- he may have referred to him as dad.

12:49:13 18       **Q.**   Now, there's officers approaching from

12:49:17 19   what would be to the north on Scharmbeck, walking

12:49:21 20   back to the south.  Do you see that?

12:49:24 21       **A.**   Yes.

12:49:24 22       **Q.**   All right.  Who are they?

12:49:25 23       **A.**   Officers Schultz and Moriarity.

12:49:27  1          **Q.**    Okay.  Which one is on the left and

12:49:30  2    which one is on the right in the screen?

12:49:32  3          **A.**    Officer Schultz is more towards the

12:49:35  4    middle of the street.

12:49:37  5          **Q.**    Okay.  Now, at this point, have -- has

12:49:41  6    anybody gotten out of your SUV?

12:49:44  7          **A.**    I would have to watch it back.  I can't

12:49:46  8    tell if the door opened or not.

12:49:48  9          **MR. RUPP:**  Okay.  Let's go back.

12:49:48 10          (Video clip played.)

12:49:48 11          **BY MR. RUPP:**

12:50:07 12          **Q.**    All right.  So at approximately the

12:50:08 13    21-second mark, we see the passenger side door of

12:50:11 14    patrol vehicle 473, where Ms. Velez was sitting,

12:50:15 15    open; is that right?

12:50:16 16          **A.**    Yes.

12:50:16 17          **Q.**    Okay.  Has your vehicle door opened?

12:50:19 18          **A.**    It's hard to say.

12:50:21 19          **Q.**    Do you know whether or not you -- did

12:50:23 20    you ever get out of the SUV?

12:50:24 21          **A.**    I did.

12:50:25 22          **Q.**    Okay.  Did you get out before or after

12:50:28 23    Officer Velez opened her door?

12:50:30  1      **A.**   I don't remember at what point I got

12:50:32  2  out.  It's hard to tell with the angle of the

12:50:35  3  video.

12:50:37  4      **Q.**   Okay.  So those are two different

12:50:38  5  things.  One is you don't remember; two is you

12:50:41  6  can't tell from the video.  So do you --

12:50:43  7      **A.**   Well, but you're asking about my memory

12:50:45  8  that day, but, and then also I'm -- I'm watching

12:50:47  9  the video, but I don't -- I don't remember at what

12:50:51 10  point I got out.

12:50:52 11      **Q.**   Okay.  And you can't tell what time you

12:50:53 12  got out.

12:50:54 13      **A.**   If you keep playing the video, it might

12:50:56 14  show it.  I don't know.

12:50:57 15      **MR. RUPP:**  All right.  Let's see.

12:50:57 16      (Video clip played.)

12:50:57 17      **BY MR. RUPP:**

12:50:58 18      **Q.**   So Officer Velez gets out, closes her

12:51:00 19  door, right?

12:51:01 20      **A.**   Yeah.  I just --

12:51:02 21      **Q.**   Is your door open?

12:51:03 22      **A.**   I had gotten out already.

12:51:04 23      **Q.**   Okay.  How do you know that?

*McDermott - Rupp - 2/19/20*

183

| 12:51:05 | 1 | A. If -- you can see it -- |
| 12:51:05 | 2 | Q. Okay. |
| 12:51:06 | 3 | A. -- in the video. |
| 12:51:07 | 4 | Q. Okay. Go ahead and tell me where. |
| 12:51:09 | 5 | At the 20-second mark, when Earl runs into |
| 12:51:12 | 6 | the street, is your door open yet? |
| 12:51:14 | 7 | A. No. |
| 12:51:14 | 8 | Q. Her door opens. When is -- |
| 12:51:16 | 9 | A. Right there. |
| 12:51:17 | 10 | Q. Okay. So that's at the -- we'll go |
| 12:51:19 | 11 | back. |
| 12:51:19 | 12 | A. Maybe 23, 24. |
| 12:51:23 | 13 | MR. RUPP: All right. Let's play it. |
| 12:51:23 | 14 | (Video clip played.) |
| 12:51:34 | 15 | THE WITNESS: Right there. |
| 12:51:34 | 16 | BY MR. RUPP: |
| 12:51:34 | 17 | Q. 23. Okay. |
| 12:51:36 | 18 | So where is Mr. Kistner's body lying as you |
| 12:51:39 | 19 | get out of the SUV? |
| 12:51:41 | 20 | A. On the ground. |
| 12:51:41 | 21 | Q. Okay. Where relative to your door? |
| 12:51:44 | 22 | A. Far enough away that I could step out. |
| 12:51:46 | 23 | Q. Okay. And the door, did the door -- |

*McDermott - Rupp - 2/19/20*

184

| | | |
|---|---|---|
| 12:51:49 | 1 | did you open it fully? |
| 12:51:50 | 2 | Did it clear his body as he was lying on the |
| 12:51:53 | 3 | street? |
| 12:51:53 | 4 | **A.** I don't remember. |
| 12:51:54 | 5 | **Q.** Okay. If you had opened the door |
| 12:51:56 | 6 | fully, would it have been over -- any part of it |
| 12:51:58 | 7 | been over Mr. Kistner's body? |
| 12:51:59 | 8 | **A.** I don't remember. |
| 12:52:00 | 9 | **Q.** Okay. But you were able to get out of |
| 12:52:02 | 10 | your vehicle unobstructed by his body? |
| 12:52:04 | 11 | **A.** Yes. |
| 12:52:04 | 12 | **Q.** Okay. Did you say anything to |
| 12:52:06 | 13 | Mr. Kistner? |
| 12:52:07 | 14 | **A.** I believe I told him to get up. |
| 12:52:10 | 15 | **Q.** How did you know whether he was injured |
| 12:52:12 | 16 | or not at that point? |
| 12:52:14 | 17 | **A.** I don't remember. |
| 12:52:16 | 18 | **Q.** Well, that's not a question you would |
| 12:52:18 | 19 | remember. If you told him to get up right away, |
| 12:52:21 | 20 | how -- what if he had sustained a spinal injury? |
| 12:52:24 | 21 | **MS. HUGGINS:** Form. |
| 12:52:25 | 22 | **THE WITNESS:** I remember him rolling back |
| 12:52:31 | 23 | and forth, and I didn't see any outward physical |

12:52:37  1    injuries.

12:52:37  2         BY MR. RUPP:

12:52:37  3         **Q.**    Let me ask you about your police

12:52:39  4    training and police procedures.

12:52:40  5         Are -- are you told that -- to tell people

12:52:44  6    who have been in an impact or a collision with a

12:52:47  7    vehicle to -- to rise to their feet before you've

12:52:51  8    assessed whether they're injured or not?

12:52:53  9         **A.**    This was the first time I had someone

12:52:55  10   intentionally put themselves into my patrol

12:52:58  11   vehicle, so --

12:52:59  12        **Q.**    You would agree with me that somebody

12:53:01  13   who intentionally did that could injure themselves,

12:53:04  14   right?

12:53:04  15        **A.**    You could.

12:53:05  16        **Q.**    So whether you struck him or he struck

12:53:07  17   the SUV, he could be injured, right?

12:53:09  18        **A.**    He could.

12:53:09  19        **Q.**    All right.  So what does your police

12:53:12  20   procedures and training tell you to do when

12:53:14  21   somebody's been injured or might be injured in an

12:53:16  22   impact between a vehicle and a pedestrian?

12:53:19  23        **A.**    It would depend on the situation.

12:53:20  1          Q.   Well, no.   The -- the -- well, all right.

12:53:24  2          So a vehicle has struck a pedestrian or

12:53:26  3  a pedestrian has struck a vehicle and is lying in

12:53:30  4  the street.   Does any part of your police training

12:53:32  5  at ECC or with the BPD, after you became an officer,

12:53:35  6  tell you that you just tell the person to get up?

12:53:39  7          A.   It would be discretionary.

12:53:41  8          Q.   Okay.   Is that part of your training

12:53:43  9  that it's discretionary for you to decide to tell

12:53:45  10 somebody to get up before you know whether they're

12:53:48  11 injured or not?

12:53:48  12         MS. HUGGINS:   Form.

12:53:48  13         THE WITNESS:   I don't know what the exact

12:53:50  14 verbiage in a training would be.

12:53:52  15         BY MR. RUPP:

12:53:52  16         Q.   Well, what -- what training segment did

12:53:54  17 you take that told you that it's okay to tell

12:53:56  18 somebody to rise to their feet, after there's been

12:53:59  19 a pedestrian/vehicle incident, before you've

12:54:01  20 assessed whether they're injured?

12:54:03  21         MS. HUGGINS:   Form.

12:54:03  22         THE WITNESS:   It would be a fairly normal

12:54:05  23 question to ask if someone can get up.

13:05:59  1       Q.    And he's trying to look around the SUV?

13:06:01  2       A.    Yes.

13:06:02  3       Q.    Okay.  And now we see the two officers

13:06:05  4   returning, Moriarity and Schultz; is that right?

13:06:07  5       A.    Yes.

13:06:07  6       Q.    You're -- you're out of the vehicle.

13:06:10  7   Officer Velez is out of the vehicle.

13:06:12  8       Now, Earl departs and goes back onto the

13:06:15  9   sidewalk.  Would you agree?

13:06:18  10      A.    Yes.

13:06:18  11      Q.    And do you know if -- if he either

13:06:20  12  called or arranged to have a relative at

13:06:22  13  37 Schmarbeck call for an ambulance at that time?

13:06:27  14      A.    I know, based on the call logs, that

13:06:29  15  someone called.

13:06:31  16      Q.    Okay.  And that was the call that was

13:06:34  17  canceled by Officer Schultz, right?

13:06:36  18      MS. HUGGINS:  Form.

13:06:37  19      THE WITNESS:  I believe so.

13:06:38  20      BY MR. RUPP:

13:06:39  21      Q.    Okay.  And we see the officers all kind

13:06:46  22  of huddled around the passenger -- or the driver's

13:06:48  23  side door of patrol vehicle 473.

13:06:53  1          Do you remember anything that anyone said

13:06:55  2    other than you saying to Mr. Kistner that he should

13:06:59  3    get up?

13:07:01  4          **A.**    I don't recall the exact conversation.

13:07:03  5          **Q.**    Okay.  But I -- I know you're not going

13:07:06  6    to recall the exact conversation, but I want to

13:07:08  7    make sure my question's clear.

13:07:10  8          Do you remember any snippets of that

13:07:12  9    conversation or anything that anyone said,

13:07:14  10   including Mr. Kistner, to anyone else beyond you

13:07:16  11   saying to Mr. Kistner:  Get up?

13:07:17  12         **A.**    I don't remember.

13:07:18  13         **Q.**    Okay.  All right.  Now, Mr. Kistner is

13:07:22  14   being walked -- who are the officers we see in the

13:07:25  15   scene there?

13:07:26  16         Who is closest to the pole on Schmarbeck

13:07:29  17   that I'm -- which officer is this officer?

13:07:32  18         **A.**    I believe it's Officer Moriarity.

13:07:33  19         **Q.**    Okay.  And which officer is this

13:07:35  20   officer?

13:07:36  21         **A.**    In the middle?

13:07:37  22         **Q.**    Yes.

13:07:38  23         **A.**    Officer Schultz.

*McDermott - Rupp - 2/19/20*

206

| | | |
|---|---|---|
| 13:07:40 | 1 | Q. And which officer is this officer? |
| 13:07:42 | 2 | A. I believe that's me. |
| 13:07:43 | 3 | Q. Okay. And that leaves Ms. Velez -- |
| 13:07:49 | 4 | A. Yes. |
| 13:07:49 | 5 | Q. -- back at the 473 vehicle; is that |
| 13:07:54 | 6 | right? |
| 13:07:54 | 7 | A. Yes. |
| 13:07:55 | 8 | Q. Okay. Now, is Mr. -- is Mr. Kistner |
| 13:07:59 | 9 | under arrest at this point? |
| 13:08:01 | 10 | A. At this point he was being detained. |
| 13:08:04 | 11 | Q. All right. Well, has he been read his |
| 13:08:07 | 12 | rights? |
| 13:08:08 | 13 | A. I don't remember. |
| 13:08:09 | 14 | Q. Okay. He's been cuffed, right? |
| 13:08:11 | 15 | A. He's been cuffed. |
| 13:08:13 | 16 | Q. Okay. But -- but he's detained but -- |
| 13:08:15 | 17 | but not under arrest. I don't -- and I don't know |
| 13:08:16 | 18 | the difference, so maybe you'll have to clarify |
| 13:08:20 | 19 | that for me. |
| 13:08:21 | 20 | A. I -- I don't remember exactly what -- I |
| 13:08:26 | 21 | don't remember exactly. |
| 13:08:27 | 22 | Q. Well, by this point, you've already |
| 13:08:28 | 23 | told me, and we went through this in some detail, |

*McDermott - Rupp - 2/19/20*

207

13:08:32   1   you've already concluded that this man flung

13:08:35   2   himself deliberately at your SUV, flung his head

13:08:37   3   back, turned, fell --

13:08:38   4        A.    Right.

13:08:39   5        Q.    -- did all that on purpose, right?

13:08:41   6        A.    Right.

13:08:41   7        Q.    And in the course of doing that, you've

13:08:43   8   told us that he damaged the mirror on the vehicle,

13:08:45   9   left it, you know, detached from the car, vibrating

13:08:48  10   when you drove it, and he's also broken the

13:08:50  11   passenger -- the driver's side window to the point

13:08:52  12   where it won't track up and down properly, right?

13:08:54  13        A.    Yes.

13:08:55  14        Q.    So you know at this point that he has

13:08:58  15   done all that deliberately, so why wouldn't he be

13:09:01  16   under arrest at this point?

13:09:02  17        MS. HUGGINS:   Form.

13:09:03  18        THE WITNESS:   I just don't --

13:09:04  19        MR. RUPP:   Why -- strike it.

13:09:04  20        Why didn't you arrest him right away?

13:09:06  21        THE WITNESS:   I -- he -- I don't remember

13:09:08  22   exactly when it was determined that he was placed

13:09:09  23   under arrest.

13:09:10  1          **BY MR. RUPP:**

13:09:10  2          **Q.**    Okay.  Well, who made that determination

13:09:12  3   when it was determined to place him under arrest?

13:09:14  4          **A.**    I believe that was part of the

13:09:16  5   conversation when I spoke with Lieutenant McHugh,

13:09:18  6   because initially we didn't know if it was more of

13:09:23  7   a fraud -- fraudulent-type situation.

13:09:26  8          **Q.**    Well, fraud's a crime too, right?

13:09:27  9          **A.**    Yes.

13:09:28  10         **Q.**    Well, why wouldn't he be arrested for

13:09:31  11  that?

13:09:31  12         **A.**    I just don't remember the exact

13:09:33  13  time frame of when it was determined that that --

13:09:34  14  that he was going to jail for that.

13:09:35  15         **Q.**    Well, are you telling me that

13:09:37  16  Lieutenant McHugh made the call whether to arrest

13:09:39  17  Mr. Kistner or not, not the officers on the scene?

13:09:42  18         **A.**    No.

13:09:42  19         **Q.**    Okay.  So who made the decision to

13:09:44  20  arrest Mr. Kistner?

13:09:44  21         **A.**    The officers on scene.

13:09:45  22         **Q.**    Okay.  Not Lieutenant McHugh?

13:09:47  23         **A.**    No.  It was -- I was -- maybe I'm

13:09:50  1   misexplaining.

13:09:50  2       **Q.**    Maybe I misunderstood.  I thought you

13:09:53  3   told me that that was the time McHugh was called

13:09:55  4   because you weren't sure because maybe it was just

13:09:58  5   a fraud case.

13:09:58  6       **A.**    No.  No.  As far as charges.

13:10:00  7       **Q.**    Okay.

13:10:01  8       **A.**    So at -- at that time, it was -- and

13:10:04  9   I think Karl Schultz put it over the air about

13:10:07  10  fraud.  It was on the air.

13:10:09  11      **Q.**    Okay.

13:10:09  12      **A.**    I just -- and I guess I misunderstood.

13:10:12  13  I don't know at what point it was determined that

13:10:16  14  he was being placed under arrest versus being

13:10:18  15  detained.

13:10:19  16      **Q.**    Okay.  And so a person -- I thought

13:10:23  17  a person in handcuffs typically was being arrested,

13:10:26  18  but they can be in handcuffs and just be detained

13:10:29  19  and then let go, right?

13:10:30  20      **A.**    Correct.

13:10:30  21      **Q.**    Okay.  So that keeps them under

13:10:32  22  control, makes sure they're not a threat, but they

13:10:34  23  may not necessarily be taken to central booking.

*McDermott - Rupp - 2/19/20*

210

13:10:36  1      **A.**    Correct.

13:10:36  2      **Q.**    Okay.  And we don't -- we can't tell

13:10:38  3  and you don't remember, from this video that I've

13:10:41  4  frozen at the 1:17 mark, whether at this point or

13:10:45  5  not a decision had been made merely to detain

13:10:48  6  Mr. Kistner or to arrest him?

13:10:50  7      **A.**    Right.  I don't remember exactly.

13:10:51  8      **Q.**    Fair enough.  Okay.  So let's continue.

13:10:52  9      He's -- he kind of walks eventually kind of

13:10:55 10  out of the frame.  Do you know where he's being

13:10:57 11  taken?

13:10:57 12      **A.**    To Officer Schultz' and Moriarity's

13:10:59 13  patrol vehicle.

13:11:00 14      **Q.**    Why is that?

13:11:01 15      **A.**    I -- I don't remember why we walked him

13:11:03 16  to that vehicle instead -- instead of our vehicle.

13:11:07 17  I -- I don't remember.

13:11:10 18      **Q.**    Okay.  Well, was there -- even if you

13:11:13 19  don't remember why, was there any purpose in going

13:11:15 20  to the other vehicle?

13:11:18 21      **A.**    I -- I don't remember.

13:11:20 22      **Q.**    Well, did that vehicle have more

13:11:22 23  equipment or somehow have a better ability to -- to

*McDermott - Rupp - 2/19/20*

211

| 13:11:25 | 1 | handle Mr. Kistner or process him while a decision |
| 13:11:28 | 2 | was being made? |
| 13:11:30 | 3 | **A.**    No.  I think the vehicles are equipped |
| 13:11:33 | 4 | with pretty much the same equipment. |
| 13:11:35 | 5 | **Q.**    Okay.  So as you sit here, you have no |
| 13:11:38 | 6 | recollection or idea why he was removed from the -- |
| 13:11:42 | 7 | the proximity of your SUV, 473, down to the 532 |
| 13:11:46 | 8 | vehicle? |
| 13:11:47 | 9 | **A.**    Right.  I don't remember. |
| 13:11:47 | 10 | **Q.**    Okay.  Fair. |
| 13:11:49 | 11 | Now, I want to stop the frame right here. |
| 13:11:55 | 12 | Who is the officer in the bottom right-hand corner, |
| 13:11:57 | 13 | at the 1:30 mark? |
| 13:11:58 | 14 | **A.**    Officer Schultz. |
| 13:11:59 | 15 | **Q.**    And who is the officer who's still |
| 13:12:03 | 16 | south on Schmarbeck from Officer Schultz? |
| 13:12:06 | 17 | **A.**    Officer Velez. |
| 13:12:07 | 18 | **Q.**    Okay.  And then do you see Earl there? |
| 13:12:10 | 19 | **A.**    Yes. |
| 13:12:10 | 20 | **Q.**    And was it at some point were you aware |
| 13:12:13 | 21 | that Earl was on the phone? |
| 13:12:14 | 22 | **A.**    Watching the video, that's what it |
| 13:12:17 | 23 | appears to be, but I don't remember. |

*McDermott - Rupp - 2/19/20*

273

13:59:35   1        Q.    Okay.  Do you know who that person was?

13:59:37   2        A.    I don't.

13:59:37   3        Q.    All right.  And I think you told me you

13:59:40   4    had told them that -- that he had deliberately hit

13:59:42   5    the SUV.

13:59:43   6        A.    Yes.

13:59:43   7        Q.    Okay.  At any time in that four hours

13:59:46   8    and seven minutes that you were at ECMC with

13:59:49   9    Mr. Kistner -- and I know you've told me you

13:59:51   10   weren't with him every second -- did you ever hear

13:59:54   11   him say that you had hit him with the SUV?

13:59:57   12       A.    Not that I recall.  And can I --

14:00:00   13       Q.    At any time from the time of the

14:00:02   14   impact, to the location change to central booking

14:00:05   15   at 3:37 that afternoon, did you ever hear

14:00:09   16   Mr. Kistner tell anyone that you had hit him

14:00:13   17   with your SUV?

14:00:15   18       A.    I don't remember.

14:00:15   19       Q.    Do you recall whether any lawyers came

14:00:18   20   to ECMC?

14:00:19   21       A.    Yes.

14:00:19   22       Q.    Tried to meet with Mr. Kistner?

14:00:20   23       A.    Yes.

14:00:20   1          Q.   Okay.  Do you know how they got there
14:00:22   2   or why they came?
14:00:23   3          **MS. HUGGINS:**  Form.
14:00:26   4          **THE WITNESS:**  I don't know why -- how they
14:00:28   5   got there.
14:00:29   6          **BY MR. RUPP:**
14:00:29   7          Q.   Did Mr. Kistner have a cell phone?
14:00:33   8          A.   I don't believe so.
14:00:35   9          Q.   Okay.  Do you know how he got word out
14:00:37  10   to his lawyers that he needed their help?
14:00:39  11          A.   I don't.
14:00:40  12          Q.   Okay.  Did you talk to the lawyers?
14:00:41  13          A.   I did talk to one lawyer.
14:00:43  14          Q.   All right.  Did the lawyers try to go
14:00:45  15   back to talk to Mr. Kistner?
14:00:47  16          A.   He asked to.
14:00:49  17          Q.   And did you allow it?
14:00:50  18          A.   No.
14:00:50  19          Q.   Why not?
14:00:52  20          A.   Because he was in custody, and it was
14:00:56  21   not something that we would normally do.
14:00:59  22          Q.   Okay.  Did the lawyer tell you what --
14:01:00  23   what he had heard or thought happened in the

*McDermott - Rupp - 2/19/20*

275

14:01:02  1    incident on Schmarbeck?

14:01:04  2         A.    The lawyer told me something about

14:01:06  3    there being video, which I had already known that

14:01:09  4    there was video.  I just never saw it.

14:01:11  5         Q.    How did you know there was video?

14:01:13  6         A.    I believe Mr. Kistner or someone

14:01:16  7    on scene -- I don't know if it was Mr. Kistner or

14:01:19  8    Earl -- said, we have cameras.

14:01:21  9         Q.    Okay.  And you didn't ask to retrieve

14:01:24  10   that video footage?

14:01:26  11        A.    Not at that time, no.

14:01:28  12        Q.    Okay.  All right.  So I think you've

14:01:30  13   already -- maybe already answered this, but at no

14:01:34  14   time between 11:30 a.m. and -- and 3:37 p.m. did

14:01:37  15   you ever hear Mr. Kistner say to you or anyone else

14:01:41  16   that you had hit him with the SUV?

14:01:44  17        A.    He may have, but I don't remember.

14:01:46  18        Q.    Fair enough.  And -- and -- and just to

14:01:47  19   be clear, prior -- from the time that the impact

14:01:49  20   happened, up to 3:37 p.m., you hadn't heard him say

14:01:56  21   that either.

14:01:57  22        A.    He may have.  I don't remember.

14:01:59  23        Q.    Okay.  Well, let me ask it this way:

*McDermott - Rupp - 2/19/20*

276

14:02:01  1   Did you ever become aware, prior to being served

14:02:04  2   with the lawsuit in this case, that Mr. Kistner

14:02:07  3   blamed you for hitting him with the SUV as you

14:02:11  4   tried to pull away on Schmarbeck that day?

14:02:14  5        **A.**    I don't remember exactly.

14:02:15  6        **Q.**    Well, okay, but my question is:  Prior

14:02:16  7   to receiving the summons and complaint, were you

14:02:18  8   aware that this man was contending that you had hit

14:02:21  9   him, as opposed to he attacked your police vehicle

14:02:24  10  at any time?

14:02:24  11       **MS. HUGGINS:**  Form.

14:02:24  12       **THE WITNESS:**  Yes.

14:02:25  13       **BY MR. RUPP:**

14:02:26  14       **Q.**    Okay.  Well, and my question now is:

14:02:27  15  When was the first time you were aware that

14:02:30  16  Mr. Kistner said you hit him?

14:02:31  17       **A.**    That's -- I don't remember.

14:02:32  18       **Q.**    Okay.  Well, was it -- okay, but let me

14:02:34  19  try to narrow it down.

14:02:36  20       Was it -- was it any time on January 1 of

14:02:39  21  2017 that you came to learn --

14:02:39  22       **A.**    Yeah.

14:02:41  23       **Q.**    -- that he thought you had hit him?

14:02:43  1          **A.**    Yes.

14:02:43  2          **Q.**    Okay.  So -- so since we know it was

14:02:46  3   that day, do you know whether it was when you were

14:02:49  4   at ECMC, central booking, or back at ECMC?  Do you

14:02:52  5   know?

14:02:52  6          **A.**    I don't remember.

14:02:52  7          **Q.**    Okay.  But at some point you did learn

14:02:54  8   that, right?

14:02:54  9          **A.**    Yes.

14:02:54  10         **Q.**    Okay.  Did that come as a surprise to

14:03:00  11  you?

14:03:00  12         **A.**    I -- I don't remember how -- what

14:03:02  13  I thought that day of it.

14:03:03  14         **Q.**    Okay.  Did you talk it over with

14:03:05  15  anyone?

14:03:07  16         **A.**    Talk over --

14:03:08  17         **Q.**    Well, like with Officer Velez, did you

14:03:10  18  say, are you kidding me?  That guy's saying that

14:03:12  19  I hit him?

14:03:15  20         **A.**    I -- that -- I don't -- I'm sure we

14:03:17  21  talked about it, but I don't remember the exact

14:03:20  22  conversation.

14:03:20  23         **Q.**    Okay.  Did you talk to anybody else

14:03:21  1   about it?

14:03:24  2           A.    Well, I had spoken with Lieutenant

14:03:26  3   McHugh.

14:03:26  4           Q.    Well, that was while you were still on

14:03:28  5   Schmarbeck, right?

14:03:29  6           A.    Right.

14:03:29  7           Q.    Well, you didn't know at that point

14:03:31  8   that Mr. Kistner was taking the position you had

14:03:33  9   hit him, or did you?

14:03:35 10           A.    I may have.  I don't remember.  I --

14:03:36 11           Q.    Oh, so it might have been back at the

14:03:38 12   scene that you knew Mr. Kistner might have said

14:03:40 13   something.  Because I've asked you already, I

14:03:43 14   assume you have told me everything that you

14:03:45 15   remember that he said.  Okay.

14:03:47 16           So if you talked to McHugh at Schmarbeck,

14:03:50 17   and you knew then that Kistner claimed you hit him

14:03:53 18   with the SUV, he must have said that to you, right?

14:03:56 19           A.    He -- he may have.

14:03:57 20           Q.    Okay.  So you may have heard that at --

14:04:00 21   still on Schmarbeck, before he was transported?

14:04:02 22           A.    Right.  I don't remember --

14:04:03 23           Q.    Okay.

*McDermott - Rupp - 2/19/20*

279

14:04:03  1          A.     -- exactly.

14:04:04  2          Q.     Okay.  Well, did you know it --

14:04:06  3   certainly by the time you got to ECMC and you were

14:04:07  4   talking to the doctors, were you aware that he was

14:04:10  5   saying you hit him when you were telling them that

14:04:13  6   no, no, no, he hit me?

14:04:14  7          A.     I may have.  I don't remember.

14:04:17  8          Q.     You don't remember.  Okay.

14:04:18  9          So it was sometime on -- on the -- on the

14:04:21  10  first day of January 2017, but you just -- you have

14:04:23  11  no recollection of when was the first time you were

14:04:25  12  aware he was taking the position you had hit him.

14:04:28  13         A.     Right.

14:04:29  14         Q.     Okay.  All right.  Now, did Mr. Kistner

14:04:34  15  get a clean bill of health at ECMC when you were

14:04:37  16  there until 5:37 on the day of the incident, or do

14:04:42  17  you recall there being something other -- some

14:04:45  18  other determination?

14:04:45  19         MS. HUGGINS:  Form.

14:04:46  20         MR. RUPP:  What was -- strike it.

14:04:47  21         What was the outcome of the first visit to

14:04:50  22  ECMC?

14:04:50  23         THE WITNESS:  I believe he was medically

14:04:51  1    cleared from an injury.

14:04:52  2         **BY MR. RUPP:**

14:04:52  3         **Q.**    Okay.  And he was not admitted.

14:04:54  4         **A.**    No.

14:04:54  5         **Q.**    Okay.  And he never went to CPEP.

14:04:57  6         **A.**    On that first visit?

14:04:59  7         **Q.**    That first visit.

14:05:01  8         **A.**    No, he did not.

14:05:04  9         **Q.**    Okay.  So you took him to central

14:05:06 10    booking, right?

14:05:06 11         **A.**    Myself and Officer Velez.

14:05:07 12         **Q.**    And where is central -- who drove?

14:05:07 13         **A.**    I did.

14:05:07 14         **Q.**    And he was in the back?

14:05:07 15         **A.**    Yes.

14:05:07 16         **Q.**    Handcuffed?

14:05:08 17         **A.**    Yes.

14:05:09 18         **Q.**    Behind a cage?

14:05:09 19         **A.**    Yes.

14:05:13 20         **Q.**    All right.  And at that point, had he

14:05:15 21    been placed under arrest?

14:05:16 22         **A.**    Yes.

14:05:16 23         **Q.**    Okay.  Do you remember when?

14:05:19   1         **MS. HUGGINS:**  Form.

14:05:19   2         **THE WITNESS:**  When it was determined that he

14:05:20   3  was placed under arrest?

14:05:21   4         **BY MR. RUPP:**

14:05:22   5        **Q.**    When -- when he was arrested, and

14:05:22   6  I assume -- I've watched enough police shows --

14:05:25   7  that you have to read him his rights, right?

14:05:27   8         **MS. HUGGINS:**  Form.

14:05:28   9         **THE WITNESS:**  Yes.

14:05:28 10         **BY MR. RUPP:**

14:05:28 11        **Q.**    Okay.  Did you read him his rights?

14:05:30 12        **A.**    I don't remember -- I would have, but

14:05:33 13  I don't remember when.

14:05:33 14        **Q.**    Okay.  Well, do you remember who

14:05:35 15  arrested him?

14:05:36 16        There was four officers there.  Which one of

14:05:38 17  you placed him under arrest and read his rights to

14:05:41 18  him?

14:05:41 19        **A.**    It would have been me.  I was the --

14:05:43 20  I was the arresting officer.

14:05:44 21        **Q.**    Okay.  So you hadn't done that, based

14:05:48 22  on all of the questions I asked you before, before

14:05:50 23  you left Schmarbeck, right?

*McDermott - Rupp - 2/19/20*

282

14:05:52 1          A.    I don't remember at what time his

14:05:55 2    rights were read.  I don't remember.

14:05:57 3          Q.    Well, rights were read and placed under

14:05:59 4    arrest, right?

14:06:00 5          Because when we went through all the videos,

14:06:02 6    I have him sitting in patrol vehicle 532, Schultz's

14:06:05 7    vehicle, and you tell me -- you told me several

14:06:08 8    times he had only been detained at that point and

14:06:11 9    not placed under arrest, right?

14:06:12 10         A.    Because I don't remember at the exact

14:06:14 11   moment that it was determined he was placed under

14:06:16 12   arrest versus detained.

14:06:18 13         Q.    Okay.  But was he placed under arrest

14:06:20 14   still at Schmarbeck, or was he placed under arrest

14:06:22 15   at ECMC?

14:06:23 16         A.    At Schmarbeck, I believe.

14:06:24 17         Q.    Okay.  So he was arrested before

14:06:26 18   anybody drove off to ECMC with him.

14:06:28 19         A.    I believe.  I --

14:06:29 20         Q.    Okay.

14:06:30 21         A.    I don't -- I don't remember exactly.

14:06:31 22         Q.    All right.  And you would have arrested

14:06:32 23   him and you would have read him his rights.

14:06:34  1          **MS. HUGGINS:**  Form.

14:06:34  2          **THE WITNESS:**  Yeah.

14:06:34  3          **BY MR. RUPP:**

14:06:35  4          **Q.**    Okay.

14:06:35  5          **A.**    I believe so.

14:06:38  6          **Q.**    But you don't remember doing that.

14:06:39  7          **A.**    I don't remember exactly when it was

14:06:40  8   done.

14:06:40  9          **Q.**    So are you sure you read him his

14:06:43  10  rights?

14:06:43  11         **A.**    I always read rights.

14:06:43  12         **Q.**    Okay.  All right.

14:06:50  13         **A.**    Can we take a break?

14:06:51  14         **MR. RUPP:**  Sure.

14:06:51  15         (A recess was then taken at 2:06 p.m.)

14:29:50  16         (On the record at 2:29 p.m.)

14:29:50  17         **BY MR. RUPP:**

14:29:50  18         **Q.**    Okay.  We've just had a brief break.

14:29:53  19  I'm going to ask you some questions now about

14:29:56  20  taking Mr. Kistner to central booking.  And that

14:30:02  21  was you and Officer Velez, right?

14:30:05  22         **A.**    Yes.

14:30:05  23         **Q.**    And you both went and stayed with each

*McDermott - Rupp - 2/19/20*

284

| | | |
|---|---|---|
| 14:30:07 | 1 | other for the -- for the whole day, I take it. |
| 14:30:10 | 2 | **A.** Yes. |
| 14:30:10 | 3 | **Q.** Including the overtime. |
| 14:30:11 | 4 | **A.** Yes. |
| 14:30:11 | 5 | **Q.** All right.  So what's the procedure at |
| 14:30:13 | 6 | central booking? |
| 14:30:17 | 7 | At -- at this point and when you arrive at |
| 14:30:18 | 8 | central booking, do -- Mr. Kistner's been arrested, |
| 14:30:20 | 9 | charged.  Do we know what the charges are against |
| 14:30:22 | 10 | him? |
| 14:30:22 | 11 | **A.** Yes. |
| 14:30:22 | 12 | **MS. HUGGINS:** Form. |
| 14:30:23 | 13 | **THE WITNESS:** Yes. |
| 14:30:24 | 14 | **BY MR. RUPP:** |
| 14:30:25 | 15 | **Q.** Okay.  He's been arrested. |
| 14:30:26 | 16 | **A.** He's been placed under arrest. |
| 14:30:27 | 17 | **Q.** Okay.  All right.  And when you arrive |
| 14:30:29 | 18 | at central booking, what is he being charged with? |
| 14:30:33 | 19 | **A.** Criminal mischief and disorderly |
| 14:30:35 | 20 | conduct, if I'm remembering correctly. |
| 14:30:38 | 21 | **Q.** All right.  And as I understand it from |
| 14:30:39 | 22 | looking at the statutes and some of the disclosures |
| 14:30:42 | 23 | from the City, criminal mischief is with respect to |

*McDermott - Rupp - 2/19/20*

285

14:30:45  1    your view that he attacked your SUV.

14:30:48  2          **MS. HUGGINS:**  Form.

14:30:49  3          **BY MR. RUPP:**

14:30:49  4          **Q.**    Right?

14:30:49  5          **A.**    Intentionally caused damage.

14:30:51  6          **Q.**    Intentionally caused damage by flinging

14:30:53  7    himself at the SUV, right?

14:30:55  8          **A.**    Yeah.  Flinging or whatever word you

14:30:58  9    choose to use.

14:30:58  10         **Q.**    Okay.

14:30:59  11         **MS. HUGGINS:**  Form.

14:30:59  12         **BY MR. RUPP:**

14:31:00  13         **Q.**    And the -- the -- what was the second

14:31:04  14   one?

14:31:04  15         **A.**    Disorderly conduct.

14:31:05  16         **Q.**    And that was relative to what?

14:31:07  17         **A.**    His behavior at the hospital.

14:31:08  18         **Q.**    Okay.  All right.  What is the

14:31:12  19   procedure at central booking when you first arrive

14:31:14  20   with somebody who's going to be charged with crimes

14:31:16  21   or has been charged?

14:31:17  22         **A.**    Before we enter the building, we have

14:31:21  23   to lock up our firearms, and we enter the building,

14:31:27  1    and then there's a window where we place our

14:31:31  2    paperwork for a report technician to begin the

14:31:38  3    arrest process, I guess.

14:31:40  4         **Q.**   And what paperwork did you have to give

14:31:43  5    to the central booking people at that time?

14:31:45  6         **A.**   It would have been our arrest -- we

14:31:48  7    refer to it as an arrest card.  It's a normal piece

14:31:52  8    of paper.  It's the arrest form.

14:31:53  9         **Q.**   Okay.  Is that handwritten, or what --

14:31:57 10    what kind of -- what form does that take?

14:31:59 11         **A.**   Are -- I didn't -- I don't write it.

14:32:02 12    Are you asking --

14:32:02 13         **Q.**   Okay.

14:32:03 14         **A.**   I fill it in.

14:32:04 15         **Q.**   Okay.  So is it you fill it in in

14:32:05 16    handwriting?

14:32:05 17         **A.**   Yes.

14:32:06 18         **Q.**   Okay.  And because you haven't really

14:32:08 19    had access to a computer other than the one that's

14:32:11 20    the monitor in your car, right?

14:32:12 21         **A.**   That form's always handwritten.

14:32:14 22         **Q.**   Okay.  Because you're in the field when

14:32:16 23    you do it, right?

14:32:17   1          A.    Correct.

14:32:17   2          Q.    Okay.  And so did you give central

14:32:28   3   booking anything else at that time?

14:32:34   4          A.    I believe we would have given his

14:32:38   5   medical release paperwork.

14:32:41   6          Q.    Okay.  And what -- so you had some

14:32:44   7   paperwork you were given at ECMC when you -- when

14:32:47   8   you departed?

14:32:48   9          A.    Yes.  That he was medically cleared.

14:32:50   10         Q.    Okay.  Did that assess him at all or

14:32:53   11  just -- just a -- a statement from the hospital

14:32:55   12  that he was medically cleared?

14:32:56   13         A.    I don't know what the actual paperwork

14:32:59   14  is called, but his -- we refer to it as medical

14:33:03   15  release paperwork.

14:33:07   16         Q.    All right.  And so after you pass that

14:33:10   17  paperwork -- all right.

14:33:30   18         What else, if anything, do you give to

14:33:33   19  central booking?  Documentation from ECMC and the

14:33:36   20  arrest -- is it called an arrest data form?

14:33:39   21         A.    Yes.

14:33:39   22         MR. RUPP:  All right.  Let's do this.  I'll

14:33:41   23  ask Anne to mark this as -- what are we up to?  15?

*McDermott - Rupp - 2/19/20*

248

| | | |
|---|---|---|
| 13:41:14 | 1 | **Q.**   All right.  Did you take any |
| 13:41:17 | 2 | photographs that day? |
| 13:41:17 | 3 | **A.**   I don't remember taking any. |
| 13:41:19 | 4 | **Q.**   All right.  Do you remember if you're |
| 13:41:20 | 5 | depicted on video taking a photograph? |
| 13:41:22 | 6 | **A.**   It appears that that is what was |
| 13:41:24 | 7 | happening, but I don't remember doing so. |
| 13:41:25 | 8 | **Q.**   Do you still have that photograph? |
| 13:41:27 | 9 | **A.**   No. |
| 13:41:28 | 10 | **Q.**   Do you still have that phone? |
| 13:41:29 | 11 | **A.**   I have that phone, yes. |
| 13:41:31 | 12 | **Q.**   Okay.  What did you do with the |
| 13:41:33 | 13 | photograph you took? |
| 13:41:34 | 14 | **MS. HUGGINS:**   Form. |
| 13:41:36 | 15 | **THE WITNESS:**   So at some point I upgraded to |
| 13:41:40 | 16 | a new phone, and I lost about four years of |
| 13:41:44 | 17 | pictures, videos, music. |
| 13:41:46 | 18 | **BY MR. RUPP:** |
| 13:41:46 | 19 | **Q.**   You didn't have any of that uploaded to |
| 13:41:48 | 20 | the cloud or anything? |
| 13:41:49 | 21 | **A.**   I did not. |
| 13:41:50 | 22 | **Q.**   Okay. |
| 13:41:50 | 23 | **A.**   I didn't start using the cloud until |

*McDermott - Rupp - 2/19/20*

249

| | | |
|---|---|---|
| 13:41:52 | 1 | I think the current phone that I have. |
| 13:41:53 | 2 | Q. Why did you take a photograph? |
| 13:41:55 | 3 | A. I don't -- |
| 13:41:55 | 4 | MS. HUGGINS: Form. |
| 13:41:55 | 5 | THE WITNESS: I don't remember. |
| 13:41:57 | 6 | BY MR. RUPP: |
| 13:41:57 | 7 | Q. Why did you appear to be taking |
| 13:41:58 | 8 | a photograph on the video? |
| 13:42:00 | 9 | A. I honestly don't remember. |
| 13:42:01 | 10 | Q. Okay. Well, would it be to document |
| 13:42:03 | 11 | the alleged damage to the police SUV? |
| 13:42:06 | 12 | A. It could have been. |
| 13:42:09 | 13 | Q. I mean, you knew, and eventually you |
| 13:42:10 | 14 | learned, that Mr. Kistner had been charged with |
| 13:42:12 | 15 | a felony, right? |
| 13:42:13 | 16 | A. Yes. |
| 13:42:14 | 17 | Q. Okay. And you knew that that felony |
| 13:42:16 | 18 | had a threshold for the amount of damage that had |
| 13:42:19 | 19 | to be suffered by the vehicle, correct? |
| 13:42:20 | 20 | A. Yes. |
| 13:42:20 | 21 | Q. And you knew that if you charged |
| 13:42:22 | 22 | somebody with a felony, there's a chance that you |
| 13:42:25 | 23 | might be called upon to testify in court, right? |

13:42:27  1          **A.**    Yes.

13:42:27  2          **Q.**    And you knew that as the driver of the

13:42:29  3   SUV, that might be you, right?

13:42:30  4          **A.**    Yes.

13:42:31  5          **Q.**    And you knew that you might be asked to

13:42:33  6   verify and document how much damage had been caused

13:42:36  7   to patrol vehicle 473, right?

13:42:40  8          **A.**    To the extent that it would be over

13:42:42  9   a dollar amount.  It wouldn't be my determination

13:42:45 10   to determine the exact dollar amount it would cost

13:42:48 11   to repair it.

13:42:48 12          **Q.**    Well, sure, but it might help your

13:42:51 13   testimony to be able to show a photograph saying,

13:42:52 14   see, the mirror is not attached to the car anymore,

13:42:55 15   right?

13:42:55 16          **A.**    That could help in a -- in a case, yes.

13:42:58 17          **Q.**    Right.  So that might have been the

13:43:00 18   reason why you took that photograph, right?

13:43:01 19          **MS. HUGGINS:**  Form.

13:43:01 20          **THE WITNESS:**  I don't remember the reason.

13:43:02 21          **BY MR. RUPP:**

13:43:03 22          **Q.**    That might have been the reason why you

13:43:05 23   were depicted in the video surveillance as having

*McDermott - Rupp - 2/19/20*

251

| | | |
|---|---|---|
| 13:43:07 | 1 | taken a photograph, right? |
| 13:43:08 | 2 | **A.** I don't remember why. |
| 13:43:08 | 3 | **Q.** Okay. Well, would there be any other |
| 13:43:11 | 4 | reason why you would want to take a photograph of |
| 13:43:13 | 5 | your SUV that day, Ms. McDermott? |
| 13:43:15 | 6 | **A.** I don't remember. |
| 13:43:16 | 7 | **Q.** Okay. I'm not asking if you remember. |
| 13:43:18 | 8 | I'm asking if there's any other reason why you |
| 13:43:20 | 9 | would just want to pull out your phone and take |
| 13:43:23 | 10 | a picture of the side of your SUV. |
| 13:43:24 | 11 | **MS. HUGGINS:** Form. |
| 13:43:25 | 12 | **THE WITNESS:** I don't know. |
| 13:43:25 | 13 | **BY MR. RUPP:** |
| 13:43:26 | 14 | **Q.** Okay. Can you think of one, as you sit |
| 13:43:29 | 15 | here, why you might want to have a picture of your |
| 13:43:32 | 16 | SUV from January 1st, 2017, if it's not to document |
| 13:43:35 | 17 | damage? |
| 13:43:35 | 18 | **A.** I wouldn't know. |
| 13:43:36 | 19 | **Q.** Okay. And you don't have that |
| 13:43:38 | 20 | photograph. |
| 13:43:38 | 21 | **A.** No. |
| 13:43:38 | 22 | **MS. HUGGINS:** Form. |
| 13:43:38 | 23 | **BY MR. RUPP:** |

*McDermott - Rupp - 2/19/20*

| | | |
|---|---|---|
| 13:43:39 | 1 | **Q.**   Did you give it to anyone? |
| 13:43:40 | 2 | **MS. HUGGINS:**  Form. |
| 13:43:40 | 3 | **THE WITNESS:**  No. |
| 13:43:41 | 4 | **BY MR. RUPP:** |
| 13:43:42 | 5 | **Q.**   Okay.  Did anybody ever ask you for |
| 13:43:43 | 6 | a photograph? |
| 13:43:45 | 7 | **A.**   Anybody meaning? |
| 13:43:47 | 8 | **Q.**   Anybody at all ever, meaning including |
| 13:43:49 | 9 | Ms. Huggins, as discovery in this case, were you |
| 13:43:52 | 10 | asked about the photograph that you had in your |
| 13:43:53 | 11 | phone? |
| 13:43:54 | 12 | **MS. HUGGINS:**  Form.  Well -- |
| 13:43:54 | 13 | **BY MR. RUPP:** |
| 13:43:55 | 14 | **Q.**   Or if you had one. |
| 13:43:56 | 15 | **MS. HUGGINS:**  -- to the extent that you're |
| 13:43:57 | 16 | asking about conversations I've had with my |
| 13:43:59 | 17 | client -- |
| 13:43:59 | 18 | **MR. RUPP:**  I can -- I can explore compliance |
| 13:44:00 | 19 | with discovery requests. |
| 13:44:01 | 20 | **MS. HUGGINS:**  In -- in terms of not |
| 13:44:02 | 21 | substance of our conversations, but if -- if -- |
| 13:44:04 | 22 | if -- if she provided -- |
| 13:44:05 | 23 | **MR. RUPP:**  Only if she asked. |

13:44:06  1          I'm not asking how you asked --

13:44:08  2          **MS. HUGGINS:**  Correct.

13:44:09  3          **MR. RUPP:**  -- or whether you were polite

13:44:10  4  about it.

13:44:11  5          **MS. HUGGINS:**  I'm okay with that.

13:44:12  6          **MR. RUPP:**  Okay.  That's all I'm asking.

13:44:12  7          **THE WITNESS:**  Yes.

13:44:12  8          **BY MR. RUPP:**

13:44:14  9      Q.   Were you ever asked for photographs?

13:44:15  10     A.   Yes.

13:44:15  11     Q.   Did you search for them?

13:44:17  12     A.   I did search for them.

13:44:18  13     Q.   And you didn't find any.

13:44:19  14     A.   Because I didn't have that phone.

13:44:20  15     Q.   Okay.  Well, you --

13:44:20  16     A.   I'm sorry.

13:44:21  17     Q.   You had the phone.

13:44:21  18     A.   I didn't -- I didn't have the four

13:44:24  19  years of --

13:44:24  20     Q.   Okay.

13:44:25  21     A.   -- anything that was on that phone.

13:44:27  22     Q.   All right.  Did you ever -- do you ever

13:44:27  23  remember printing out a photograph taken of your

*McDermott - Rupp - 2/19/20*

254

13:44:30   1   SUV that day, if you took one?

13:44:31   2         **A.**   I don't remember ever printing one.

13:44:33   3         **Q.**   Okay. Do you know if anyone else took

13:44:35   4   a photograph of the SUV?

13:44:36   5         **A.**   I don't remember.

13:44:37   6         **Q.**   Do you know if the damage that was

13:44:39   7   needed to sustain the felony charge against

13:44:41   8   Mr. Kistner was ever documented by anyone ever in

13:44:46   9   photographic form?

13:44:47   10         **A.**   In photographic form?

13:44:49   11         **Q.**   Yeah.

13:44:50   12         **A.**   I don't know.

13:44:51   13         **Q.**   Was the damage that was needed to

13:44:52   14   sustain the felony charge against Mr. Kistner ever

13:44:55   15   documented in any other form of any kind?

13:44:57   16         Written down. Estimate prepared. Repair

13:45:01   17   logs or records.

13:45:02   18         **A.**   In the arrest paperwork, there would

13:45:05   19   have -- there's -- in the arrest paperwork --

13:45:08   20         **Q.**   We'll get to that.

13:45:10   21         **A.**   Okay.

13:45:10   22         **Q.**   But that was just an allegation of

13:45:12   23   damage and an allegation that it exceeded $250.

*McDermott - Rupp - 2/19/20*

13:45:18   1   I'm asking if there was any documentation of the

13:45:19   2   actual damage and the actual cost ever.

13:45:22   3         **MS. HUGGINS:**   Form.   You can answer.

13:45:23   4         **BY MR. RUPP:**

13:45:24   5         **Q.**   Other than a description.

13:45:24   6         **A.**   I don't know.

13:45:25   7         **Q.**   Okay.   You were designated, by that

13:45:28   8   point, as the primary person in charge of that

13:45:31   9   particular incident, right?

13:45:33  10         **A.**   At what time?

13:45:34  11         **Q.**   Well, I mean, at the time as of

13:45:37  12   1:14 p.m., you knew that you were primary on this

13:45:40  13   particular incident, 17-0010506.

13:45:46  14         **A.**   That's when it was changed with

13:45:48  15   dispatch.

13:45:48  16         **Q.**   Sure.   But, I mean, it was your

13:45:49  17   vehicle, you were driving it, and you were primary,

13:45:52  18   right?

13:45:52  19         **A.**   I was made primary, yes.

13:45:53  20         **Q.**   So fair to say that you knew that you

13:45:55  21   would likely be the officer who would testify

13:45:57  22   against Mr. Kistner in a felony trial, if it went

13:46:00  23   that far?

13:46:02   1        **A.**    I mean, we all could be.

13:46:04   2        **Q.**    Well, you would have been the one who

13:46:07   3  claimed to have seen what Mr. Kistner did, throwing

13:46:10   4  himself at the -- at the vehicle, right?

13:46:11   5        **A.**    Right.

13:46:11   6        **MS. HUGGINS:**   Form.

13:46:12   7        **BY MR. RUPP:**

13:46:12   8        **Q.**    So, I mean, your police experience

13:46:13   9  would tell you that you would be the person who

13:46:15  10  would most likely be called by the district

13:46:18  11  attorney, right?

13:46:18  12        **A.**    Yes.

13:46:18  13        **Q.**    Okay.  And you've testified before in

13:46:20  14  criminal trials, right?

13:46:21  15        **A.**    Yes.

13:46:21  16        **Q.**    And people that you've been involved in

13:46:23  17  arresting.

13:46:23  18        **A.**    Yes.

13:46:23  19        **Q.**    And you've given eyewitness testimony

13:46:26  20  of what you saw, right?

13:46:26  21        **A.**    Yes.

13:46:27  22        **Q.**    And you knew that was a possibility

13:46:29  23  here.

13:46:30  1          **A.**    Yes.

13:46:30  2          **Q.**    Okay.  So what, if anything, did you do

13:46:32  3    to verify the extent of the damage to the vehicle

13:46:34  4    that would sustain the felony charge against

13:46:36  5    Mr. Kistner?

13:46:41  6          **A.**    It would -- that would have been

13:46:43  7    determined by the garage.

13:46:45  8          **Q.**    Okay.  So what, if anything, did you do

13:46:49  9    to make sure that the garage knew to make that

13:46:51  10   assessment and provide you with that information?

13:46:54  11         **MS. HUGGINS:**  Form.  You can answer.

13:46:58  12         **THE WITNESS:**  I -- I don't believe I did

13:46:59  13   anything in regards to that.

13:47:00  14         **BY MR. RUPP:**

13:47:01  15         **Q.**    Okay.  So your testimony is that you

13:47:02  16   didn't take any steps to make sure that you could

13:47:04  17   actually prove that the damage sustained to the SUV

13:47:06  18   exceeded $250.

13:47:09  19         **A.**    That would have had to -- yeah, that

13:47:11  20   would be determined by the -- the garage and what

13:47:13  21   their labor and all that costs.

13:47:14  22         **MR. RUPP:**  I understand that, but listen to

13:47:16  23   my question.

*McDermott - Rupp - 2/19/20*

258

13:47:16  1          Can you read it back, please, Anne?

13:47:23  2          **MS. HUGGINS:**  And if you could read the

13:47:24  3  answer.

13:47:24  4          (The above-requested portion was then read

13:47:51  5  by the reporter.)

13:47:51  6          **BY MR. RUPP:**

13:47:52  7          **Q.**   My question is about what you did, not

13:47:55  8  what the garage would do or should do.

13:47:58  9          **A.**   Then no, I didn't.

13:47:59  10         **MR. RUPP:**  Thank you.

13:48:00  11         All right.  Let's keep watching.

13:48:00  12         (Video clip played.)

13:48:00  13         **BY MR. RUPP:**

13:48:02  14         **Q.**   You and Officer Velez get back in your

13:48:05  15  SUV at roughly the same time.  Santana goes to his.

13:48:08  16  Is that right?

13:48:08  17         **A.**   Yes.

13:48:08  18         **Q.**   We can't see Moriarity and Schultz, but

13:48:10  19  presumably they're departing the scene as well,

13:48:14  20  with Mr. Kistner in the back, correct?

13:48:16  21         **A.**   Correct.

13:48:16  22         **Q.**   All right.  We're just going to watch

13:48:18  23  this to the end.  It's another two minutes and five

13:48:21  1    seconds.

13:48:21  2         That's you pulling away, right?

13:48:23  3         **A.**    Yes.

13:48:23  4         **Q.**    Okay.  And that's Santana following in

13:48:24  5    the Charger.

13:48:25  6         **A.**    Yes.

13:48:25  7         **Q.**    All right.  And this may be all she

13:48:26  8    wrote on this video, but I'll fast-forward it.

13:48:36  9         And does that -- regardless of the time stamp

13:48:40 10    on the video itself, does that, you know, accurately

13:48:43 11    reflect the last time you were on Schmarbeck that

13:48:45 12    day, as you're pulling away?

13:48:47 13         **A.**    Yes.

13:48:47 14         **Q.**    You didn't go back?

13:48:48 15         **A.**    I don't believe so.

13:48:49 16         **Q.**    No further visits?

13:48:50 17         **A.**    No.

13:48:50 18         **Q.**    Your actual involvement in this case

13:48:55 19    continued through the entire rest of your shift and

13:48:57 20    beyond; is that right?

13:48:59 21         **A.**    Yes.

13:48:59 22         **Q.**    Okay.  In fact, you were on overtime

13:49:01 23    for some of the time that you -- you would have

| 13:49:07 | 1 | been off at 4 o'clock, right? |
| 13:49:09 | 2 | A.   Yes. |
| 13:49:09 | 3 | Q.   Okay.  And so when this -- this was |
| 13:49:13 | 4 | finally archived, it was 6:16 p.m.; is that right? |
| 13:49:18 | 5 | A.   Yes. |
| 13:49:18 | 6 | Q.   And as of -- do you know, at 4:16:08, |
| 13:49:28 | 7 | it says disposition added P1375 crime report. |
| 13:49:32 | 8 | Do you know whether that was added because |
| 13:49:34 | 9 | you or -- or Officer Velez radioed it in, or was |
| 13:49:38 | 10 | that just added when the dispatcher got around to |
| 13:49:41 | 11 | it? |
| 13:49:41 | 12 | A.   I -- I don't know.  There -- there are |
| 13:49:45 | 13 | times when the dispatcher will just put their own |
| 13:49:47 | 14 | disposition in to close it out. |
| 13:49:48 | 15 | Q.   And so how long -- how late did you |
| 13:49:50 | 16 | work that day? |
| 13:49:51 | 17 | A.   I don't know exactly. |
| 13:49:52 | 18 | Q.   Do you have payroll records that would |
| 13:49:55 | 19 | show how much overtime you earned? |
| 13:49:56 | 20 | A.   Yes. |
| 13:49:56 | 21 | Q.   And is that to the minute?  To the |
| 13:49:58 | 22 | 15 minutes?  To the half hour? |
| 13:50:00 | 23 | A.   It's generally to the -- to the |

*McDermott - Rupp - 2/19/20*

292

| | | |
|---|---|---|
| 14:37:49 | 1 | not yours? |
| 14:37:50 | 2 | A.   Yes. |
| 14:37:51 | 3 | Q.   What else is not yours? |
| 14:37:52 | 4 | A.   Just below, where it says arrest data |
| 14:37:57 | 5 | form 00023. |
| 14:37:59 | 6 | Q.   That was added? |
| 14:38:00 | 7 | A.   Yes.  I -- |
| 14:38:00 | 8 | Q.   Okay. |
| 14:38:00 | 9 | A.   I believe by the report technician. |
| 14:38:02 | 10 | I don't know. |
| 14:38:02 | 11 | Q.   Fair enough. |
| 14:38:03 | 12 | Anything else? |
| 14:38:04 | 13 | A.   Yes.  The AFN number, 170000998. |
| 14:38:09 | 14 | Q.   Okay. |
| 14:38:10 | 15 | A.   That's the -- |
| 14:38:12 | 16 | Q.   That's also added? |
| 14:38:13 | 17 | A.   Yeah.  That's cell block's.  That's |
| 14:38:15 | 18 | their number to keep records. |
| 14:38:16 | 19 | Q.   Okay. |
| 14:38:19 | 20 | A.   Under where warrants is checked, it |
| 14:38:21 | 21 | says no, it says report tech initials. |
| 14:38:25 | 22 | Q.   Where is that on the form? |
| 14:38:26 | 23 | I see it. |

*McDermott - Rupp - 2/19/20*

293

| | | |
|---|---|---|
| 14:38:27 | 1 | **A.**   Midway -- yep. |
| 14:38:28 | 2 | **Q.**   Okay.  All right. |
| 14:38:29 | 3 | **A.**   And then it says mug ID, yes, |
| 14:38:32 | 4 | satisfactory ID.  That's also the report |
| 14:38:35 | 5 | technician. |
| 14:38:35 | 6 | **Q.**   Okay. |
| 14:38:41 | 7 | **A.**   Are you injured, no.  That would be |
| 14:38:43 | 8 | asked by the report technician and checked off. |
| 14:38:46 | 9 | **Q.**   Okay. |
| 14:38:50 | 10 | **A.**   And I can't tell, but the incident |
| 14:38:52 | 11 | number looks like -- I don't think that's my |
| 14:38:54 | 12 | writing.  It's possible that when you go into -- |
| 14:38:59 | 13 | the computer would have the incident number. |
| 14:39:00 | 14 | **Q.**   Okay. |
| 14:39:01 | 15 | **A.**   But I may have just forgotten to write |
| 14:39:03 | 16 | it in. |
| 14:39:03 | 17 | **Q.**   Fair enough. |
| 14:39:05 | 18 |     How about -- how about on the second page of |
| 14:39:06 | 19 | the form?  Is that anything you -- |
| 14:39:13 | 20 | **A.**   That would all be -- |
| 14:39:14 | 21 | **Q.**   -- do? |
| 14:39:14 | 22 |     That's all -- |
| 14:39:15 | 23 | **A.**   That would be checked by me. |

14:39:16  1       **Q.**   All right.  So you said that they --

14:39:18  2  they take the individual back for a search.

14:39:20  3       Does the degree of the search or the type of

14:39:22  4  search depend on where the person's going to end up

14:39:24  5  that day?

14:39:25  6       **A.**   That would be determined by cell block

14:39:28  7  attendants.

14:39:29  8       **Q.**   All right.  Well, how do cell block

14:39:33  9  attendants know?

14:39:34  10     **MS. HUGGINS:**  Form.

14:39:34  11     **MR. RUPP:**  I mean, if somebody's charged

14:39:36  12  with these crimes, are they going to be released on

14:39:38  13  an appearance ticket or are they going to be

14:39:40  14  jailed?

14:39:40  15     **MS. HUGGINS:**  Form.  Are we just saying

14:39:42  16  generally or in this instance specifically?

14:39:44  17     **MR. RUPP:**  In this instance, I guess.

14:39:45  18     **THE WITNESS:**  In this instance, he was going

14:39:46  19  to be receiving an appearance ticket.

14:39:48  20     **BY MR. RUPP:**

14:39:48  21       **Q.**   Did you know that ahead of time?

14:39:49  22       **A.**   I believe so.

14:39:50  23       **Q.**   Okay.  Did you tell that to the cell

*McDermott - Rupp - 2/19/20*

295

| | | |
|---|---|---|
| 14:39:53 | 1 | block technicians? |
| 14:39:54 | 2 | A.   I may have. |
| 14:39:56 | 3 | Q.   Okay.  Did they ask you? |
| 14:39:57 | 4 | A.   I don't remember. |
| 14:39:59 | 5 | Q.   Okay.  Well, did they ask you what you |
| 14:40:00 | 6 | wanted to happen with Mr. Kistner? |
| 14:40:04 | 7 | A.   I don't understand what you mean. |
| 14:40:06 | 8 | Q.   Well, did they ask you where he was |
| 14:40:07 | 9 | going after booking? |
| 14:40:10 | 10 | A.   I don't remember. |
| 14:40:11 | 11 | Q.   Okay.  What are the choices?  He could |
| 14:40:14 | 12 | go -- in this case, he went back to ECMC.  We knew |
| 14:40:17 | 13 | that, and we're going to talk about that. |
| 14:40:19 | 14 | Where else could he have gone? |
| 14:40:21 | 15 | A.   You would stay at central booking. |
| 14:40:23 | 16 | Q.   Okay.  And is central book -- booking |
| 14:40:24 | 17 | also a lockup?  A jail? |
| 14:40:26 | 18 | A.   Yes. |
| 14:40:26 | 19 | Q.   Okay.  Did you know which -- which was |
| 14:40:28 | 20 | going to happen to him? |
| 14:40:29 | 21 | A.   I believe we knew at that point that he |
| 14:40:32 | 22 | was getting an appearance ticket. |
| 14:40:33 | 23 | Q.   All right.  Did you know at that point, |

*McDermott - Rupp - 2/19/20*

296

```
14:40:35   1   when you arrived at central booking, that he was
14:40:37   2   also going to go back to ECMC?
14:40:42   3        A.    I believe so.
14:40:43   4        Q.    All right.  Does the degree of search
14:40:46   5   that an arrested person undergoes depend on whether
14:40:50   6   they're going to be released on their own
14:40:52   7   recognizances or they're going to be placed in
14:40:57   8   lockup?
14:40:58   9        A.    Are you asking if those searches are
14:40:59  10   different?
14:41:00  11        Q.    Yes.
14:41:02  12        A.    That, I don't know.
14:41:05  13        Q.    Okay.
14:41:05  14        A.    That's -- that's a cell block -- we
14:41:07  15   don't do the searches in either case.
14:41:10  16        Q.    I know you don't do the searches, but,
14:41:12  17   I mean, if somebody's going to end up in the
14:41:14  18   custody of the BPD in lockup, it's true that they
14:41:18  19   receive a more thorough search; isn't that right?
14:41:20  20        MS. HUGGINS:    Form.
14:41:20  21        THE WITNESS:    I -- I think everyone gets the
14:41:23  22   same search, but I don't know that.
14:41:25  23        BY MR. RUPP:
```

14:41:25  1      **Q.**   All right.  So what type of search did

14:41:27  2  Mr. Kistner get?

14:41:28  3      **A.**   I was not present for the search.

14:41:31  4      **Q.**   Are you sure?

14:41:32  5      **A.**   There's a curtain.

14:41:34  6      **Q.**   All right.  Well, there's a difference

14:41:36  7  between having a curtain obstructing your view and

14:41:39  8  not being present for the search.

14:41:40  9      **A.**   I don't know if I was in the room or

14:41:42  10  not.

14:41:42  11      **Q.**   You don't remember?

14:41:43  12      **A.**   I don't remember.

14:41:43  13      **Q.**   Okay.  But you might have been.

14:41:45  14      **A.**   I may have been.

14:41:46  15      **Q.**   And Velez might have been too.

14:41:48  16      **A.**   Usually -- and, again, this is --

14:41:50  17  usually one of us stays in the room and one goes

14:41:53  18  through to continue on with the paperwork.

14:41:55  19      **Q.**   How long did the paperwork take at

14:41:57  20  central booking?

14:41:58  21      **A.**   I don't --

14:41:59  22      **Q.**   You want to look at 4A?

14:42:07  23      **A.**   Looks like we were on scene at CB at

*McDermott - Rupp - 2/19/20*

14:42:11  1  1548, according to dispatch's log, and then

14:42:16  2  location change, 1636.

14:42:19  3      Q.   Now, when you -- you already told me

14:42:21  4  about some of the communications you had with

14:42:24  5  Mr. Kistner or the conversation, comments that you

14:42:27  6  overheard at the first visit to ECMC.

14:42:29  7      When you took him from ECMC to central

14:42:31  8  booking, he's driving in your patrol vehicle,

14:42:33  9  right, in the back?

14:42:34 10      A.   He's in the back, yes.

14:42:35 11      Q.   Is he saying anything?

14:42:38 12      A.   I don't remember.

14:42:38 13      Q.   Okay.

14:42:39 14      A.   He may have.

14:42:39 15      Q.   But you didn't record any more comments

14:42:43 16  that he said about you being a feminazi or anything

14:42:46 17  like that, right, did he?

14:42:47 18      A.   There's -- I believe there's a 71030

14:42:50 19  statement that would probably more clarify it.

14:42:52 20      Q.   Okay.  But did that 7 -- did that

14:42:55 21  statement reference any conversations you had with

14:42:57 22  him in the patrol vehicle, as you were transporting

14:43:00 23  him?

14:43:00  1         **A.**   I don't remember, without looking at

14:43:02  2   the 71030, where that would have taken place.  It

14:43:06  3   may have.

14:43:06  4         **Q.**   How about at central booking?  Were

14:43:09  5   you -- you were there with him for part of the

14:43:10  6   time.  You might have been behind a curtain or

14:43:11  7   maybe not in the room, but how was he acting at

14:43:14  8   central booking?

14:43:14  9         **A.**   I don't remember.

14:43:15  10         **Q.**   Did you hear him say, at central

14:43:19  11   booking, that you had hit him with your patrol car?

14:43:21  12         **A.**   I don't remember.

14:43:21  13         **Q.**   All right.  What kind of a search did

14:43:24  14   Mr. Kistner undergo at central booking?

14:43:27  15         **MS. HUGGINS:**  Form.

14:43:27  16         **THE WITNESS:**  I don't know.  That wouldn't

14:43:30  17   be something that I would handle.

14:43:32  18         **BY MR. RUPP:**

14:43:32  19         **Q.**   Well, did -- was he strip searched?

14:43:35  20   Do you know?

14:43:35  21         **A.**   I don't know.

14:43:36  22         **Q.**   Okay.  You don't know how that

14:43:37  23   procedure happens?

14:43:37  1        **A.**   I know how the procedure happens.

14:43:39  2  I don't know how -- I --

14:43:43  3        **Q.**   Well, what would be the normal

14:43:44  4  procedure for somebody brought in, charged with

14:43:47  5  what Mr. Kistner is charged with?

14:43:48  6        **A.**   I can tell you I've been present for

14:43:50  7  female searches.

14:43:51  8        **Q.**   Okay.  Obviously there's a different

14:43:55  9  body type, but do they differ in terms of the

14:43:57 10  manner in which they're conducted?

14:43:59 11        **A.**   I don't believe so.

14:44:00 12        **Q.**   Okay.  So when you've been present for

14:44:02 13  female searches, were they strip searches?

14:44:04 14        **A.**   Yes.

14:44:04 15        **Q.**   Okay.  So do you have reason to believe

14:44:06 16  then that Mr. Kistner was strip searched?

14:44:10 17        **A.**   He may have been.

14:44:11 18        **Q.**   Okay.  In fact, you think he was.

14:44:12 19        **MS. HUGGINS:**  Form.

14:44:12 20        **THE WITNESS:**  I -- again, I wasn't -- I

14:44:14 21  wouldn't have seen that.  Whether I was in the room

14:44:17 22  or not, I don't even remember.

14:44:18 23        **BY MR. RUPP:**

14:44:18   1       **Q.**   But I'm not asking if you saw it. I'm

14:44:20   2  asking if you know from -- how many people have you

14:44:23   3  taken to central booking under arrest?

14:44:24   4       **A.**   I couldn't -- I couldn't guess.

14:44:25   5       **Q.**   Scores?

14:44:28   6       **A.**   I mean --

14:44:29   7       **Q.**   Scores?

14:44:30   8       **A.**   Scores?

14:44:30   9       **Q.**   20s? Hundreds?

14:44:32 10       **A.**   Oh, I would say over a hundred.

14:44:34 11       **Q.**   Over a hundred. Okay.

14:44:35 12       And those that you were able to see, were

14:44:38 13  they all strip searched?

14:44:40 14       **A.**   I believe so.

14:44:41 15       **Q.**   Okay. So as you sit here, although you

14:44:44 16  may not have seen Mr. Kistner because of the

14:44:46 17  curtain, you believe he was strip searched.

14:44:49 18       **MS. HUGGINS:**   Form.

14:44:49 19       **THE WITNESS:**   It makes sense that he was.

14:44:51 20       **BY MR. RUPP:**

14:44:51 21       **Q.**   Okay. And what other types of searches

14:44:54 22  did he undergo in the -- in the room there with the

14:44:58 23  technicians?

*McDermott - Rupp - 2/19/20*

302

14:44:58  1        **A.**    I don't know.

14:44:58  2        **Q.**    Based on your experience.

14:45:00  3             Well, what else?  What other than a strip

14:45:02  4    search?

14:45:02  5        **MS. HUGGINS:**  Form.

14:45:03  6        **THE WITNESS:**  That's -- I mean, I can go

14:45:05  7    through -- like I said, I can go through --

14:45:05  8        **BY MR. RUPP:**

14:45:05  9        **Q.**    Please --

14:45:06  10       **A.**    -- what a female --

14:45:07  11       **Q.**    Please do.

14:45:07  12       **A.**    -- would have done, but --

14:45:09  13       **Q.**    Sure.  Go ahead.

14:45:10  14       **A.**    Again, depending on the cell block

14:45:13  15   attendant, you have to remove your shirt, your

14:45:18  16   pants, your shoes, your socks, and there's a squat

14:45:25  17   and cough.  That's what I've been present for for

14:45:31  18   females.

14:45:31  19       **Q.**    All right.  Have you ever seen an anal

14:45:34  20   cavity search performed?

14:45:35  21       **A.**    No.

14:45:35  22       **Q.**    Never?

14:45:36  23       **A.**    No.

*McDermott - Rupp - 2/19/20*

303

14:45:36  1        Q.    Okay.  Do you know if Mr. Kistner had
14:45:39  2   one?
14:45:39  3        A.    I don't know that.
14:45:40  4        Q.    Okay.  All right.  And what else
14:45:44  5   happens at -- at central booking?
14:45:46  6        You said he would be -- mug shots were
14:45:49  7   taken.  They were taken, right?
14:45:50  8        A.    After the search is done, then
14:45:53  9   fingerprints would be taken.
14:45:54 10        Q.    Fingerprints are next?  Okay.
14:45:56 11        And were they taken of Mr. Kistner, to the
14:45:59 12   best of your knowledge?
14:45:59 13        A.    To the best of my knowledge, they would
14:46:01 14   be, yes.
14:46:01 15        Q.    Were you present there?
14:46:02 16        A.    That -- that, I don't remember.
14:46:03 17        Q.    Did you speak to anybody when you were
14:46:04 18   at central booking?  Did you talk to the technicians?
14:46:07 19        A.    I may have.
14:46:08 20        Q.    Okay.  Did you -- did you know anybody
14:46:09 21   else at central booking that you spoke to?
14:46:11 22        A.    Not that I remember.
14:46:12 23        Q.    Okay.  How about Officer Velez?

*McDermott - Rupp - 2/19/20*

315

14:53:55  1    so that's --

14:53:56  2           Q.    But I'm giving --

14:53:56  3           A.    That's what I'm --

14:53:57  4           Q.    -- a different scenario.

14:53:58  5           A.    Right.

14:53:58  6           Q.    I'm saying your SUV --

14:53:58  7           A.    And I'm saying, in your scenario, an

14:54:00  8    accident didn't happen, so then --

14:54:00  9           Q.    Well, I'm saying --

14:54:01  10          A.    -- why would it be determined an

14:54:03  11   accident if one didn't happen?

14:54:05  12          Q.    Well, right, but that's just based on

14:54:07  13   your belief that it wasn't an accident, right?

14:54:09  14          A.    And the other three officers on scene.

14:54:11  15          Q.    Well, but how many of them saw it?

14:54:12  16          A.    Saw the accident?

14:54:13  17          Q.    Yeah.

14:54:13  18          A.    I -- I -- from the conversation that

14:54:16  19   I remember, I spoke with Officer Schultz.  I don't

14:54:20  20   remember about the other two officers.

14:54:21  21          Q.    Right.  You already told me about Velez

14:54:23  22   and Moriarity.  You don't know whether they saw

14:54:25  23   anything, right?

14:54:26 1         **A.**    That would be their conversation to

14:54:27 2    have.

14:54:28 3         **Q.**    Right.  But, I mean, if -- if you

14:54:30 4    rear-end somebody in a police SUV, there's going to

14:54:32 5    be an investigation, right?

14:54:33 6         **MS. HUGGINS:**  Form.

14:54:33 7         **THE WITNESS:**  Because an accident actually

14:54:35 8    took place, yes.

14:54:36 9         **BY MR. RUPP:**

14:54:36 10        **Q.**    Right.  But if you then convince the

14:54:39 11   lieutenant that the person backed into you

14:54:41 12   intentionally to cause damage to your SUV, then you

14:54:43 13   won't be investigated, right?

14:54:45 14        **MS. HUGGINS:**  Form.

14:54:45 15        **THE WITNESS:**  Not necessarily.

14:54:46 16        **BY MR. RUPP:**

14:54:46 17        **Q.**    Okay.  But in this case, that's exactly

14:54:49 18   what happened.  The lieutenant, without coming to

14:54:51 19   the scene, decided:  This isn't an accident, you're

14:54:53 20   not going to be investigated.

14:54:54 21        **MS. HUGGINS:**  Form.

14:54:55 22        **BY MR. RUPP:**

14:54:55 23        **Q.**    Right?

14:54:55   1          A.     Based on what I told him, yes.

14:54:57   2          Q.     That's right.  Okay.  All right.

14:55:00   3      So you finish at central booking.  Does

14:55:03   4   anything else happen aside from mug shots,

14:55:05   5   fingerprints, and the search that we discussed?

14:55:10   6          A.     Sign paperwork, and that's -- that's

14:55:14   7   it.

14:55:14   8          Q.     Okay.  And when in this process was

14:55:19   9   Mr. Kistner given his appearance ticket?

14:55:22  10          A.     At central booking.

14:55:23  11          Q.     Okay.  And was he released at that

14:55:27  12   time?

14:55:27  13          A.     He was released to us.

14:55:29  14          Q.     Okay.  For what purpose?

14:55:31  15          A.     We then transported him back up to

14:55:33  16   ECMC.

14:55:33  17          Q.     Why?

14:55:34  18          A.     For a psychological evaluation.

14:55:37  19          Q.     Okay.  On what -- under what authority

14:55:40  20   and on what basis?

14:55:41  21          A.     Under the 941, if you have the

14:55:44  22   paperwork, we -- there's quite a few reasons why

14:55:47  23   based on his behavior and his actions.

| | | |
|---|---|---|
| 14:55:50 | 1 | **Q.** Okay. And what were those behaviors |
| 14:55:52 | 2 | and actions? |
| 14:55:54 | 3 | **A.** If I could -- |
| 14:55:56 | 4 | **Q.** Well, I'm asking you now from your |
| 14:55:57 | 5 | memory. |
| 14:55:58 | 6 | **A.** From my memory? |
| 14:56:00 | 7 | **Q.** Yep. |
| 14:56:00 | 8 | **A.** There were a lot of things. He was |
| 14:56:04 | 9 | very fixated on -- he was very fixated on a couple |
| 14:56:13 | 10 | topics that he continued on again and again and |
| 14:56:16 | 11 | again. |
| 14:56:16 | 12 | Like I said, calling people Nazis, and |
| 14:56:21 | 13 | there -- there were some other derogatory terms |
| 14:56:23 | 14 | that, again, I would have to look at the -- |
| 14:56:23 | 15 | **Q.** And where -- where was this? |
| 14:56:25 | 16 | **A.** -- 71030. |
| 14:56:26 | 17 | **Q.** Any -- anywhere other than at ECMC the |
| 14:56:29 | 18 | first time? |
| 14:56:31 | 19 | **A.** I believe at central booking as well. |
| 14:56:34 | 20 | **Q.** Okay. He might have -- so, okay, |
| 14:56:35 | 21 | I thought I asked you about that, but did he -- |
| 14:56:38 | 22 | what else did he -- what did he say? |
| 14:56:39 | 23 | How was he acting and what did he say at |

*McDermott - Rupp - 2/19/20*

319

| | | |
|---|---|---|
| 14:56:42 | 1 | central booking? |
| 14:56:42 | 2 | **MS. HUGGINS:**  Form. |
| 14:56:43 | 3 | **THE WITNESS:**  It -- it wasn't just based on |
| 14:56:45 | 4 | one -- his behavior at one given time.  It was |
| 14:56:47 | 5 | based on his behavior, a collective of events from |
| 14:56:51 | 6 | that day. |
| 14:56:52 | 7 | **BY MR. RUPP:** |
| 14:56:52 | 8 | Q.    Well, starting with your indication |
| 14:56:57 | 9 | that he flung himself at the SUV, right? |
| 14:57:01 | 10 | A.    Yes. |
| 14:57:01 | 11 | Q.    Okay.  And then apparently continuing |
| 14:57:04 | 12 | with some of the statements he made at ECMC, |
| 14:57:10 | 13 | including the Nazi statements, correct? |
| 14:57:13 | 14 | A.    Yes, that's part of it. |
| 14:57:14 | 15 | Q.    Okay.  Anything else in this universe |
| 14:57:16 | 16 | of reasons why he's going for the 941 evaluation? |
| 14:57:20 | 17 | A.    Like I said, he was very fixated on |
| 14:57:23 | 18 | a couple different topics. |
| 14:57:24 | 19 | Q.    Well, what were they? |
| 14:57:27 | 20 | A.    I don't recall without looking at |
| 14:57:29 | 21 | the -- the paper. |
| 14:57:30 | 22 | Q.    All right.  Let's look at the paper. |
| 14:57:32 | 23 | Exhibit 6 was previously marked. |

*McDermott - Rupp - 2/19/20*

320

14:57:38  1        All right.  So Officer Velez signs this at

14:57:42  2    the bottom of the page, right?

14:57:42  3        A.    She prints her name, yes.

14:57:44  4        Q.    Prints it.

14:57:44  5        You don't sign it, right?

14:57:45  6        A.    Correct.

14:57:46  7        Q.    So she's doing the 941 request for

14:57:48  8    examination form, correct?

14:57:49  9        A.    Yes.

14:57:49  10       Q.    Now, why did you switch off?

14:57:55  11       You're the primary, right?

14:57:56  12       A.    Right.

14:57:56  13       Q.    So why does she do this?

14:57:57  14       A.    No real reason, other than maybe she

14:58:01  15   just filled out the paperwork.  I don't recall.

14:58:04  16       Q.    All right.  So -- and it reads:

14:58:07  17   Justification for transport.  Under describe any

14:58:10  18   known history of violence to self or others,

14:58:13  19   current violent behavior, and harmful or neglectful

14:58:17  20   behavior -- behavior to self or others, including

14:58:19  21   documentation of any plans, means, and acces for

14:58:23  22   suicide/harm to others, colon -- I believe this is

14:58:28  23   Officer Velez writes:  Subject did intentionally

*McDermott - Rupp - 2/19/20*

326

15:02:08  1        Q.    Okay.  And that was where you told me
15:02:11  2   earlier -- you didn't mention conspiracy.  You said
15:02:13  3   that he was referring to you and I guess the other
15:02:15  4   officers as Nazis and fascists.
15:02:18  5        A.    Yes.  He -- well, I remember him using
15:02:21  6   the phrases feminazis, cunts, bitches.  I think
15:02:30  7   he -- he -- I mean, he used a couple other terms,
15:02:32  8   but I don't -- those are the ones that stand out to
15:02:34  9   me.
15:02:34  10       Q.    So at the hospital, was he talking
15:02:36  11  about being the victim of a conspiracy that you
15:02:39  12  guys were covering up the fact that you had
15:02:41  13  negligently struck him with the vehicle and decided
15:02:43  14  to blame him for it?
15:02:44  15       A.    He may have.
15:02:45  16       Q.    Okay.
15:02:45  17       A.    Like I said, his behavior at the
15:02:47  18  hospital to me is what stands out.
15:02:50  19       Q.    Okay.  All right.  And it wasn't -- it
15:02:51  20  wasn't at central booking that was the primary
15:02:53  21  issue?
15:02:53  22       A.    It -- it was at central booking
15:02:55  23  as well, but like I said, from what my memory is

*McDermott - Rupp - 2/19/20*

327

| | | |
|---|---|---|
| 15:02:59 | 1 | the hospital, there were a few particular |
| 15:03:01 | 2 | incidents. |
| 15:03:02 | 3 | Q.    Okay. |
| 15:03:02 | 4 | A.    Or a few particular things that were |
| 15:03:05 | 5 | said. |
| 15:03:05 | 6 | Q.    Okay.  So he goes to ECMC for the 941 |
| 15:03:09 | 7 | evaluation.  Are his attorneys -- do his attorneys |
| 15:03:12 | 8 | go with you or follow you to central booking?  Do |
| 15:03:14 | 9 | they ever show up there?  The attorneys you told me |
| 15:03:17 | 10 | about earlier. |
| 15:03:17 | 11 | MS. HUGGINS:  Form. |
| 15:03:19 | 12 | THE WITNESS:  The one attorney -- |
| 15:03:19 | 13 | BY MR. RUPP: |
| 15:03:19 | 14 | Q.    Yeah. |
| 15:03:20 | 15 | A.    -- I talked to him at the hospital. |
| 15:03:21 | 16 | I don't believe I spoke with him -- I don't know |
| 15:03:22 | 17 | if he went to central booking.  I don't believe |
| 15:03:24 | 18 | I spoke with him there. |
| 15:03:25 | 19 | Q.    Did you tell that individual that you |
| 15:03:27 | 20 | had struck Mr. Kistner with your SUV? |
| 15:03:28 | 21 | A.    No. |
| 15:03:29 | 22 | Q.    What did you tell him? |
| 15:03:30 | 23 | A.    I'm not sure what I would have -- I'm |

*McDermott - Rupp - 2/19/20*

328

| | | |
|---|---|---|
| 15:03:32 | 1 | not sure how much information I would have divulged |
| 15:03:36 | 2 | to him. |
| 15:03:36 | 3 | Q.   Did you know that attorney? |
| 15:03:37 | 4 | A.   No. |
| 15:03:38 | 5 | Q.   Okay.  Were you the one who told him he |
| 15:03:40 | 6 | could not see Mr. Kistner? |
| 15:03:42 | 7 | A.   Yes. |
| 15:03:42 | 8 | Q.   Okay.  Now, did the -- were the -- |
| 15:03:44 | 9 | was the attorney still there when you brought |
| 15:03:47 | 10 | Mr. Kistner back to ECMC for the 941 psych |
| 15:03:49 | 11 | evaluation? |
| 15:03:50 | 12 | A.   I don't remember. |
| 15:03:51 | 13 | Q.   Okay.  So where did you take |
| 15:03:54 | 14 | Mr. Kistner on this second trip to ECMC? |
| 15:03:57 | 15 | A.   To CPEP. |
| 15:03:59 | 16 | Q.   Okay.  And did he meet with |
| 15:04:01 | 17 | a psychologist or a psychiatrist there at that |
| 15:04:04 | 18 | time? |
| 15:04:04 | 19 | A.   We -- that was when myself and |
| 15:04:09 | 20 | Officer Velez -- he -- he was released at that |
| 15:04:11 | 21 | point. |
| 15:04:11 | 22 | Q.   Okay.  So you dropped him off and kind |
| 15:04:13 | 23 | of left? |

15:04:14   1          A.    Yes.   Once there -- there's a double

15:04:17   2    door that -- that's --

15:04:18   3          Q.    I think I've seen it.

15:04:20   4          A.    Yeah.   One is locked and then the other

15:04:21   5    one has to be opened.

15:04:22   6          Q.    So now did you -- did you talk to

15:04:24   7    anybody at CPEP as to why he was being brought in,

15:04:28   8    or did you just drop him off there with this --

15:04:30   9    I assume this form is given to them.

15:04:32   10         A.    Right.

15:04:32   11         Q.    Okay.   But did you or Officer Velez

15:04:34   12   have any other conversations with the intake people

15:04:37   13   at CPEP as to why Mr. Kistner was being dropped

15:04:41   14   there?

15:04:42   15         A.    We would have.   I don't remember the --

15:04:45   16   the content of what was said.

15:04:47   17         Q.    Now, you're -- you're familiar with the

15:04:48   18   concept of an involuntary psych admission to ECMC,

15:04:51   19   right?   Are you not?

15:04:52   20         A.    Yes.

15:04:52   21         Q.    Okay.   And how long does that

15:04:54   22   involuntary stay usually last, in your experience?

15:04:57   23         A.    It depends.   That -- an involuntary,

15:05:00 1   again, that's a conversation between the person and

15:05:05 2   a doctor.

15:05:06 3        Q.   Did you expect that Mr. Kistner, given

15:05:08 4   the behaviors that he had exhibited primarily at

15:05:11 5   ECMC the first time, was going to be admitted?

15:05:13 6        A.   I -- that's up to the doctor to

15:05:15 7   determine.

15:05:15 8        Q.   Okay.  Well, my question was:  Did you

15:05:17 9   expect that he would be admitted, based on your

15:05:19 10  past experience dealing with ECMC's CPEP, 941s, and

15:05:24 11  involuntary admissions?

15:05:25 12       **MS. HUGGINS:**  Form.

15:05:26 13       **THE WITNESS:**  I wouldn't -- I wouldn't

15:05:26 14  always be there.  It -- it would depend on if the

15:05:28 15  person is in custody.

15:05:30 16       If they're in custody, then I would be there

15:05:32 17  when they speak with the doctor, and the doctor

15:05:33 18  would determine whether they would be admitted or

15:05:35 19  not.

15:05:35 20       **BY MR. RUPP:**

15:05:35 21       Q.   Okay.  But my question, again, ma'am,

15:05:37 22  was:  Do you believe that he was going to be

15:05:40 23  admitted when you dropped him off there?

| | | |
|---|---|---|
| 15:05:41 | 1 | **A.**   I'm not a medical professional. |
| 15:05:43 | 2 | **Q.**   Okay.  Did you believe he was going to |
| 15:05:45 | 3 | be admitted or not? |
| 15:05:45 | 4 | **A.**   I don't know. |
| 15:05:46 | 5 | **Q.**   Okay.  You had -- you had no opinion |
| 15:05:48 | 6 | one way or the other? |
| 15:05:48 | 7 | **A.**   It's not for me to determine. |
| 15:05:50 | 8 | **Q.**   Did you care? |
| 15:05:51 | 9 | **A.**   It's -- I mean, care in terms of? |
| 15:05:54 | 10 | **Q.**   Yeah.  Did you -- did you wish that -- |
| 15:05:56 | 11 | one outcome versus the other? |
| 15:05:58 | 12 | Did you want to see him admitted, or did you |
| 15:06:00 | 13 | want to see him go home? |
| 15:06:02 | 14 | **A.**   I think that he needed help and that's |
| 15:06:04 | 15 | what I wanted him to get. |
| 15:06:06 | 16 | **Q.**   Okay.  So you would have liked to |
| 15:06:07 | 17 | see -- you would have liked to have seen him |
| 15:06:11 | 18 | admitted. |
| 15:06:11 | 19 | **MS. HUGGINS:**   Form. |
| 15:06:12 | 20 | **THE WITNESS:**   I wanted to see him get help. |
| 15:06:14 | 21 | **BY MR. RUPP:** |
| 15:06:14 | 22 | **Q.**   Okay.  And you took him to ECMC psych |
| 15:06:16 | 23 | ward to get that help, right? |

*McDermott - Rupp - 2/19/20*

356

15:25:37  1      **Q.**   You wrote or somebody wrote and you

15:25:38  2   adopted it with your signature:  In that the

15:25:41  3   defendant, while at 37 Schmarbeck, did, with intent

15:25:44  4   to damage the property of another person.

15:25:47  5      I'm going to stop there.  Your -- your view

15:25:49  6   is that Mr. Kistner not only threw himself at your

15:25:54  7   vehicle, but that he intended to damage it.

15:25:56  8      **A.**   Yes.

15:25:57  9      **Q.**   Okay.  So -- and what is the basis for

15:26:00 10   your conclusion in that regard that he wanted to

15:26:04 11   damage your vehicle, as opposed to damage himself,

15:26:06 12   or assuming what you say his true, how did you know

15:26:09 13   that he intended to damage your vehicle?

15:26:12 14      **A.**   That was my perception of the events

15:26:14 15   that took place.

15:26:15 16      **Q.**   Okay.  So you thought he was trying to

15:26:17 17   damage your vehicle as opposed to himself or both

15:26:19 18   or what?

15:26:22 19      **A.**   I -- I don't know if he was intending

15:26:25 20   to injure himself.  I perceived that that could be

15:26:29 21   a very strong possibility.  But, yes, I did -- I do

15:26:33 22   believe that he was intending to damage the -- the

15:26:34 23   vehicle.

*McDermott - Rupp - 2/19/20*

357

15:26:35  1          Q.   But you -- you could see that somebody

15:26:37  2     who's intending on hurting themselves might cause

15:26:40  3     damage to something but not intend that damage.

15:26:43  4     They're trying to hurt themselves, right?

15:26:45  5          **MS. HUGGINS:**  Form.

15:26:45  6          **THE WITNESS:**  Could be.

15:26:46  7          **BY MR. RUPP:**

15:26:46  8          Q.   Okay.  Or you could have somebody who's

15:26:49  9     trying to do damage but doesn't want to hurt

15:26:52 10     themselves.  Would you agree that that's

15:26:53 11     a possibility?

15:26:53 12          A.   It's possible.

15:26:54 13          Q.   Okay.  But in this case, based on your

15:26:56 14     recent testimony, it was your conclusion that he --

15:26:58 15     he may have wanted to hurt himself, but he

15:27:01 16     definitely wanted to damage your SUV; is that

15:27:03 17     right?

15:27:03 18          A.   That's what I believe.

15:27:04 19          Q.   Okay.  And that was based on your

15:27:06 20     perception of seeing him put out his hand and do

15:27:09 21     the turn and the head thing that we talked about

15:27:12 22     earlier at length.

15:27:13 23          A.   Yes.

15:27:13 1      **Q.**    Okay.  Any other basis for that

15:27:15 2  statement that you signed under oath and under

15:27:17 3  penalty of perjury?

15:27:18 4      **A.**    No.

15:27:18 5      **Q.**    Okay.  All right.  So continuing along:

15:27:22 6  The City of Buffalo Police Department, and having

15:27:24 7  no right to do so, nor any reasonable ground to

15:27:28 8  believe that he had such right, did damage the

15:27:30 9  property, to wit, driver's side mirror and driver's

15:27:33 10  side mirror of patrol vehicle, in the amount of

15:27:36 11  more than $250.

15:27:38 12      And I've already kind of asked you about

15:27:39 13  that, right?

15:27:40 14      **A.**    Yes.

15:27:40 15      **Q.**    But by the time -- I'll update my

15:27:42 16  questions to the time you signed this form drawn up

15:27:46 17  by the technician, you had no more information

15:27:49 18  about the value of the alleged damage to vehicle

15:27:54 19  473 than when I -- than when I asked you that

15:27:56 20  question before, right?

15:27:58 21      **A.**    Right.

15:27:58 22      **Q.**    Okay.  So you still haven't done any

15:28:01 23  inquiry, not been -- gotten an estimate, not taken

*McDermott - Rupp - 2/19/20*

359

| | | |
|---|---|---|
| 15:28:04 | 1 | it to the police garage, anything like that? |
| 15:28:06 | 2 | **A.**    Correct. |
| 15:28:06 | 3 | **Q.**    Okay.  Then you say, in that the |
| 15:28:08 | 4 | defendant did intentionally throw his body into the |
| 15:28:11 | 5 | driver's side mirror of patrol vehicle 473, causing |
| 15:28:14 | 6 | the mirror to become dislodged from the vehicle and |
| 15:28:17 | 7 | also causing the driver's side window to malfunction. |
| 15:28:20 | 8 | And I don't know if I asked you this |
| 15:28:22 | 9 | specific question, but if -- if those things were |
| 15:28:24 | 10 | true, you would expect that there would be repair |
| 15:28:27 | 11 | records relative to that on that vehicle, right? |
| 15:28:29 | 12 | **MS. HUGGINS:**  Form. |
| 15:28:29 | 13 | **BY MR. RUPP:** |
| 15:28:30 | 14 | **Q.**    Unless it was never fixed, right? |
| 15:28:31 | 15 | **A.**    I would expect there to be a record of |
| 15:28:33 | 16 | it. |
| 15:28:33 | 17 | **Q.**    Okay.  I'm going to represent to you |
| 15:28:35 | 18 | that the City of Buffalo has not turned over any |
| 15:28:37 | 19 | repair records showing that the mirror was fixed or |
| 15:28:39 | 20 | the driver's side window was fixed.  Do you know |
| 15:28:41 | 21 | why? |
| 15:28:41 | 22 | **A.**    I do not know why. |
| 15:28:43 | 23 | **Q.**    Okay.  All right.  The value of said |

15:28:44 1 damage to exceed $250. The defendant did cause

15:28:47 2 said damage to the above-mentioned property without

15:28:49 3 the permission of the owner.

15:28:51 4      And the owner is what? The City of Buffalo?

15:28:54 5      **A.**   Yes.

15:28:54 6      **Q.**   Okay. All right. Okay. Let's turn

15:29:02 7 the page, and the next one, for disorderly conduct,

15:29:04 8 on page 2 of Exhibit 17, reads that that's

15:29:07 9 a violation, as opposed to a felony.

15:29:10 10      It says, the said defendant, at the

15:29:13 11 aforesaid time and place, with intent to cause

15:29:16 12 public inconvenience, annoyance, or alarm, or

15:29:20 13 recklessly creating a risk thereof, while in

15:29:23 14 a public place, did use abusive or obscene

15:29:27 15 language, or made an obscene gesture.

15:29:29 16      We haven't talked about gestures. Did

15:29:31 17 Mr. Kistner make any obscene gestures that you

15:29:34 18 remember?

15:29:34 19      **A.**   I don't remember.

15:29:35 20      **Q.**   Okay. In the time that you saw him

15:29:37 21 from the moment that he was handcuffed and brought

15:29:40 22 to his feet by some officers, was -- was he in

15:29:44 23 handcuffs the entire time?

*McDermott - Rupp - 2/19/20*

361

15:29:47  1      A.    I'm -- I'm sorry.  Could you say

15:29:49  2  that --

15:29:49  3      Q.    Did you ever see him out of handcuffs

15:29:51  4  from the time he was first handcuffed, until you

15:29:53  5  took him, say, to central booking?

15:29:55  6      A.    He was cuffed to the hospital bed with

15:29:57  7  one hand.

15:29:58  8      Q.    Okay.  So was he making gestures with

15:30:01  9  the other hand or --

15:30:01  10     A.    I don't remember.

15:30:02  11     Q.    Okay.  So why did you say, did use

15:30:05  12  abusive or obscene language or made an obscene

15:30:07  13  gesture?

15:30:08  14     A.    That's just the verbiage that is typed

15:30:10  15  up according to the penal law charge.

15:30:12  16     Q.    Okay.  So you don't remember him making

15:30:13  17  any obscene gestures.  He didn't flip anybody the

15:30:17  18  bird or give them the finger or anything.

15:30:18  19     A.    I don't remember.

15:30:19  20     Q.    Okay.  And you wouldn't have charged

15:30:21  21  him with something you didn't remember, right?

15:30:22  22     A.    Right.  That's just -- like I said,

15:30:25  23  that's the -- the verbiage that the report --

15:30:27 1 report technicians type up according to the penal

15:30:28 2 law charge.

15:30:29 3      Q.   Well, I know that, but you said it, so

15:30:32 4 I just want to make sure that you don't recall him

15:30:34 5 making any gestures.

15:30:35 6      A.   I don't remember.

15:30:36 7      Q.   Okay.   In that the defendant did

15:30:38 8 intentionally throw his body into the driver's side

15:30:40 9 mirror, et cetera, and so forth.

15:30:41 10      And that is language that's replicated from

15:30:46 11 the criminal mischief charge, right?

15:30:49 12      A.   Yes.

15:30:49 13      **MS. HUGGINS:**   Form.

15:30:50 14      **BY MR. RUPP:**

15:30:51 15      Q.   All right.   So why is that in the

15:30:52 16 disorderly conduct charge?

15:30:53 17      A.   Again, that's -- the report

15:30:55 18 technicians, that's the way that they type up

15:30:57 19 charges.   That's -- that's how they type it.

15:31:00 20      Q.   Okay.   So could you have made changes

15:31:02 21 to this, if you wanted to?

15:31:03 22      A.   Yes.

15:31:03 23      Q.   Okay.   You didn't ask them to make any

*McDermott - Rupp - 2/19/20*

363

15:31:05  1   changes?

15:31:05  2        A.    I did not.

15:31:06  3        Q.    Okay.  So was the disorderly conduct

15:31:09  4   charge, in your view, because he had thrown his

15:31:12  5   body at the driver's side mirror of your vehicle?

15:31:14  6        A.    No.  The disorderly conduct was

15:31:16  7   pertaining to the next sentence.

15:31:18  8        Q.    Okay.  All right.  So that's in here

15:31:21  9   kind of extraneously, would you agree?

15:31:24  10        A.    Again, I don't know the guidelines that

15:31:27  11   the report -- report technicians type up their

15:31:29  12   charges.

15:31:30  13        MR. RUPP:  Okay.  All right.  I'm going to

15:31:37  14   ask that this be marked.

        15   **The following was marked for Identification:**

        16   **EXH. 18           Fleet management maintenance**

        17   **                   work order**

        18        **BY MR. RUPP:**

15:32:16  19        Q.    All right.  Ms. McDermott, I'm going to

15:32:19  20   show you Exhibit 18 for identification.  First of

15:32:20  21   all, have you seen a form similar to this one

15:32:24  22   before in your work as a police officer for BPD?

15:32:27  23        A.    I have not.

15:32:28   1          Q.    Okay.  So you're not really familiar

15:32:30   2   with this form then.

15:32:31   3          A.    Correct.

15:32:31   4          Q.    Okay.  But do you see that it purports

15:32:34   5   to relate to unit 473, which is your unit, a Tahoe?

15:32:39   6          A.    Yes, I see that.

15:32:40   7          Q.    Being a 2014, is that -- does that also

15:32:44   8   ring a bell?

15:32:45   9          A.    Yes.

15:32:45  10          Q.    Okay.  Being in for service four days

15:32:48  11   after the incident involving Mr. Kistner.  Do you

15:32:49  12   see that?

15:32:50  13          A.    Yes.

15:32:50  14          Q.    And indication that there was

15:32:53  15   apparently work done on the cooling system, some

15:32:58  16   R/R water pump, and the serpentine belt.  Do you

15:33:02  17   see that?

15:33:02  18          A.    Yes.

15:33:02  19          Q.    Would you agree with me there's no

15:33:04  20   references to a mirror or a driver's side front

15:33:08  21   window?

15:33:09  22          A.    Correct.

15:33:09  23          Q.    Okay.  Do you know of any other repair

McDermott - Rupp - 2/19/20

365

15:33:11  1   records that would verify your under-oath statement

15:33:15  2   that the driver's side mirror and the -- well, the

15:33:25  3   driver's side mirror was broken, causing damage of

15:33:31  4   more than $250?

15:33:33  5          **A.**   I don't know of any other maintenance --

15:33:35  6          **Q.**   All right.

15:33:36  7          **A.**   -- paperwork, no.

15:33:37  8          **MR. RUPP:**  Okay.  All right.  Let's have

15:33:48  9   this marked.

         10   **The following was marked for Identification:**

         11   **EXH.  19               Buffalo Police dispatch**

         12   **                       monitor - unit history**

         13   **                       report**

         14          **BY MR. RUPP:**

15:34:34 15          **Q.**   All right.  Showing you what has been

15:34:36 16   marked Exhibit 19 for identification, this is --

15:34:38 17   purports to be the dispatch monitor unit history

15:34:42 18   report for you, who are referred to as unit C241.

15:34:46 19   Do you see that?

15:34:47 20          **A.**   Yes.

15:34:47 21          **Q.**   Okay.  And that's Officer Lauren

15:34:50 22   McDermott.  And that -- that number 172768, what is

15:34:53 23   that?

*McDermott - Rupp - 2/19/20*

366

15:34:54  1          A.    That's my DID number.

15:34:56  2          Q.    What does that stand for?

15:34:59  3          A.    It's my --

15:35:00  4          Q.    Department ID?

15:35:01  5          A.    Yes.

15:35:01  6          Q.    Okay.  And have you had that same

15:35:03  7   number since you joined the BPD?

15:35:05  8          A.    Yes.

15:35:05  9          Q.    And do you still have it today?

15:35:07 10          A.    Yes.

15:35:07 11          Q.    Okay.  It doesn't change with your

15:35:09 12   position.

15:35:10 13          A.    Correct.

15:35:10 14          Q.    Okay.  So this shows that you were

15:35:12 15   dispatched to Schmarbeck on January 1, 2017, at

15:35:18 16   10:57 a.m.  Is that -- do you know if you were

15:35:21 17   there before that or after that or --

15:35:27 18          A.    I believe that's when Officer Schultz

15:35:29 19   called it out.

15:35:29 20          Q.    Okay.

15:35:31 21          A.    When -- yeah.

15:35:32 22          Q.    You were -- you already think you were

15:35:35 23   there before that?

*McDermott - Rupp - 2/19/20*

367

15:35:35  1          A.    I believe so.

15:35:36  2          Q.    Okay.  And I'm not going to go back

15:35:38  3  through 4A again.  I'm just going to see if I can

15:35:41  4  link this up.

15:35:43  5          So this doesn't have the seconds, just

15:35:47  6  the -- the minutes on it, right?

15:35:48  7          A.    Yes.

15:35:49  8          Q.    Okay.  And 4A does show you as being

15:35:53  9  en route/dispatched at the 10:57 mark.

15:35:58 10          A.    Along with -- yes.  Yes, it does.

15:36:00 11          Q.    Along -- along with Officer Velez,

15:36:03 12  of course.

15:36:03 13          A.    Yes.

15:36:03 14          Q.    Okay.  Okay.  And this shows your shift

15:36:05 15  ending at 6:16, so I guess that answers the question

15:36:09 16  that we saw on the second page of whether your

15:36:13 17  overtime that day was -- was just, you know,

15:36:17 18  a few minute -- 45 minutes after your quitting time

15:36:20 19  or -- or over two hours after.

15:36:21 20          A.    This is, again, based on what dispatch

15:36:25 21  is logging.

15:36:26 22          Q.    Oh, so this would -- so the payroll

15:36:29 23  would be what governs.

15:59:22   1       **Q.**    Do you know why Officer Schultz went

15:59:25   2   back to the SUV?

15:59:25   3       **A.**    I don't.

15:59:27   4       **Q.**    Do you know if he was running Earl's

15:59:29   5   license?

15:59:29   6       **A.**    He may have been.

15:59:31   7       **Q.**    Would that be police procedure?

15:59:35   8       **A.**    It might be.  I mean, I don't --

15:59:38   9       **Q.**    To see if he has a warrant or

15:59:39  10   something?

15:59:40  11       **A.**    I -- I don't know why he would have, if

15:59:42  12   that's what he was even doing.

15:59:50  13       **Q.**    Was Earl detained at this point, or was

15:59:52  14   he free to go?

15:59:54  15       **A.**    From what I'm watching, it appears he's

15:59:56  16   free to go, but I don't remember.

15:59:59  17       **Q.**    Do you know if he had been given back

16:00:00  18   his possessions?

16:00:01  19       **A.**    I don't know.

16:00:03  20       **Q.**    Do you know why they were taken from

16:00:04  21   him?

16:00:05  22       **A.**    I do not.

16:00:16  23       **Q.**    Do you know if at this point or by this

16:00:17 1 point Mr. Kistner had complained of being injured?

16:00:20 2 **MS. HUGGINS:** Form.

16:00:20 3 **THE WITNESS:** I don't remember.

16:00:21 4 **BY MR. RUPP:**

16:00:23 5 **Q.** Do you know why it took -- why there

16:00:25 6 was this delay in taking him to the hospital?

16:00:27 7 **A.** I don't know.

16:00:30 8 **Q.** Do you think he should have been taken

16:00:32 9 to the hospital?

16:00:33 10 **A.** I don't remember what the conversation

16:00:36 11 was or if he had complained of injury yet. I don't

16:01:16 12 remember.

16:01:16 13 **Q.** Do you remember anything Earl said?

16:01:18 14 **A.** I don't.

16:01:20 15 **Q.** Do you remember anything that was said

16:01:21 16 by anyone to Earl?

16:01:22 17 **A.** I don't remember.

16:01:23 18 **Q.** Did you speak to Earl?

16:01:26 19 **A.** I may have. I don't remember.

16:01:29 20 **Q.** Okay. Did you see on officer returning

16:01:34 21 some items to Earl?

16:01:34 22 **A.** Yes.

16:01:35 23 **Q.** Do you know which officer that was?

*McDermott - Rupp - 2/19/20*

397

16:01:36   1          A.     Could you go back?  I think it was

16:01:39   2   Moriarity walked back from the patrol vehicle.

16:01:43   3          Moriarity.

16:01:52   4          Q.     Is that the one with the hat?

16:01:54   5          A.     Yes.

16:01:54   6          Q.     Okay.  Are you in this picture?

16:02:17   7          A.     I think that's Officer Velez.

16:02:20   8          Q.     Do you know what's being discussed?

16:02:22   9          A.     I don't.

16:02:30  10          Q.     Who's that gesturing and looking back

16:02:34  11   south on Scharmbeck?

16:02:36  12          A.     I think it's Officer Velez.

16:02:46  13          Q.     Did you ever see Officer Moriarity

16:02:48  14   writing something down?  Writing a note?

16:02:53  15          A.     You'd have to play it again.

16:02:56  16          Q.     Well, do you remember seeing that at

16:02:57  17   the scene?

16:02:58  18          A.     I don't remember it from that day.

16:03:03  19          Q.     Do you remember having any -- any

16:03:05  20   conversations with anybody in the home at

16:03:08  21   37 Scharmbeck?

16:03:12  22          A.     I don't believe I ever went inside.

16:03:13  23          Q.     Well, I didn't ask you that.

*McDermott - Rupp - 2/19/20*

398

16:03:15  1          Did anybody call out the window or purport

16:03:20  2     to speak to the officers on the street from

16:03:22  3     37 Scharmbeck?

16:03:23  4          **A.**    I believe a woman yelled out the

16:03:25  5     window, but I don't remember if I was the one that

16:03:26  6     responded or not.

16:03:27  7          **Q.**    Do you remember what she said?

16:03:28  8          **A.**    I don't.

16:03:30  9          **Q.**    Do you remember anybody saying that you

16:03:32 10     were on camera?

16:03:34 11          **A.**    I remember knowing that there was

16:03:37 12     a camera.  I just don't remember how that

16:03:40 13     information was told to me.  If she yelled that or

16:03:43 14     if someone else said it that day, I -- I don't

16:03:46 15     remember, but I remember it being told to me.

16:03:51 16          **Q.**    Do you have an opinion about

16:03:53 17     surveillance cameras?

16:03:56 18          **A.**    No.

16:04:14 19          **Q.**    In the upper left-hand corner, we see

16:04:16 20     some officers.  Do you know what's being discussed?

16:04:18 21          **A.**    No.

16:04:19 22          **Q.**    Do you have any recollection, from the

16:04:20 23     time Mr. Kistner was placed in the 532 patrol

*McDermott - Rupp - 2/19/20*

399

| | | |
|---|---|---|
| 16:04:24 | 1 | vehicle, what any officers were discussing with |
| 16:04:26 | 2 | each other? |
| 16:04:27 | 3 | **A.**   No. |
| 16:05:02 | 4 | **Q.**   Do you know why Mr. Kistner is not |
| 16:05:04 | 5 | being transported to the hospital? |
| 16:05:05 | 6 | **A.**   I don't. |
| 16:05:08 | 7 | **Q.**   Is this type of delay usual? |
| 16:05:12 | 8 | **MS. HUGGINS:**   Form. |
| 16:05:13 | 9 | **THE WITNESS:**   It would depend on the |
| 16:05:15 | 10 | situation. |
| 16:05:16 | 11 | **BY MR. RUPP:** |
| 16:05:17 | 12 | **Q.**   Would the situation be that you were |
| 16:05:19 | 13 | all talking to each other to get your stories |
| 16:05:20 | 14 | straight? |
| 16:05:21 | 15 | **MS. HUGGINS:**   Form. |
| 16:05:21 | 16 | **THE WITNESS:**   No. |
| 16:05:56 | 17 | **BY MR. RUPP:** |
| 16:05:56 | 18 | **Q.**   Are you shown in the picture as it |
| 16:05:58 | 19 | reads at 10:34:12? |
| 16:06:00 | 20 | **A.**   Am I shown? |
| 16:06:01 | 21 | **Q.**   Yeah. |
| 16:06:01 | 22 | **A.**   I'm not sure if that's -- I think that |
| 16:06:03 | 23 | might be Officer Velez up in the left-hand corner. |

*McDermott - Rupp - 2/19/20*

400

16:06:09  1    I can't tell if that's her or me.

16:06:09  2            **Q.**    Okay.

16:06:15  3            **A.**    I think that's Officer Velez.

16:06:53  4        **MR. RUPP:**   All right.  Thank you,

16:06:54  5    Ms. McDermott.  I have no further questions.

16:07:11  6            **MS. HUGGINS:**   I have no questions.

16:07:13  7        **MR. RUPP:**   Okay.  We're done.

8        (Proceedings of 2/19/20 were then concluded

9    at 4:07 p.m.)

10                        *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

401

1          I hereby CERTIFY that I have read the

2     foregoing 400 pages, and that except as to those

3     changes (if any) as set forth in an attached errata

4     sheet, they are a true and accurate transcript of

5     the testimony given by me in the above entitled

6     action on February 19, 2020.

7

8

9                         ------------------------

10                        LAUREN McDERMOTT

11

12

13

14

15

16

17

18

19

20

21

22

23

402

1   STATE OF NEW YORK)

2                        ss:

3   COUNTY OF ERIE   )

4

5        I DO HEREBY CERTIFY as a Notary Public in and

6   for the State of New York, that I did attend and

7   report the foregoing deposition, which was taken

8   down by me in a verbatim manner by means of machine

9   shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18                      ---------------------------

19                      ANNE T. BARONE, RPR,
                        Notary Public.
20

21

22

23

403

1                        **INDEX TO EXHIBITS**

2    **Exhibit**              **Description**              **Page**

3      EXH. 14        Buffalo Police Academy             13
                      training record
4
       EXH. 4A        Buffalo Police complaint           51
5                     summary report 17-0010506,
                      two pages
6
       EXH. 15        Buffalo Police Department          288
7                     arrest data form, two pages

8      EXH. 16        Buffalo Police shift               344
                      summary report
9
       EXH. 17        Information/complaint, two         353
10                    pages

11     EXH. 18        Fleet management                   363
                      maintenance work order
12
       EXH. 19        Buffalo Police dispatch            365
13                    monitor - unit history
                      report
14
       EXH. 20        Notice to defendant of             368
15                    intention to offer evidence
                      at trial
16
       EXH. 21        Appearance ticket                  378
17

18

19
    * Exhibits retained by Mr. Rupp.
20

21

22

23

---

*JACK W. HUNT & ASSOCIATES, INC.*

*1120 Liberty Building*

*Buffalo, New York  14202  -  (716) 853-5600*

404

1                    INDEX TO WITNESSES

2    Witness              Examination                Page

3    LAUREN McDERMOTT      BY MR. RUPP:                 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

*JACK W. HUNT & ASSOCIATES, INC.*

*1120 Liberty Building*

*Buffalo, New York  14202  -  (716) 853-5600*

EXHIBIT H

**VIDEO DEPOSITION**
**KYLE T. MORIARITY**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------------
JAMES C. KISTNER,

                        Plaintiff,

                - vs -      Civil Action No.
                            18-cv-402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
 capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),

                        Defendants.
------------------------------------------

*JACK W. HUNT & ASSOCIATES, INC.*

2

1           Video deposition of **KYLE T. MORIARITY**,

2    Defendant, taken pursuant to the Federal Rules of

3    Civil Procedure, in the offices of JACK W. HUNT &

4    ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

5    New York, on February 21, 2020, commencing at

6    10:09 a.m., before ANNE T. BARONE, RPR, Notary

7    Public.

8

9    APPEARANCES:        RUPP BAASE
                         PFALZGRAF & CUNNINGHAM, LLC,
10                       By CHAD DAVENPORT, ESQ.,
                         1600 Liberty Building,
11                       Buffalo, New York  14202,
                         (716) 854-3400,
12                       davenport@ruppbaase.com,
                         Appearing for the Plaintiff.
13

14                       TIMOTHY A. BALL, ESQ.,
                         Corporation Counsel,
15                       By MAEVE E. HUGGINS, ESQ.,
                         Assistant Corporation Counsel,
16                       1137 City Hall,
                         Buffalo, New York  14202,
17                       (716) 851-4334,
                         mhuggins@city-buffalo.com,
18                       Appearing for the Defendants.

19
     PRESENT:            JAMES KISTNER
20
                         NOLAN HALE, Rupp Baase
21                       Pfalzgraf & Cunningham, LLC

22                       TIMOTHY M. HUNT, CLVS, Videographer

23
09:43:42

| | | |
|---|---|---|
| 10:07:53 | 1 | **THE REPORTER:**  Read and sign? |
| 10:07:56 | 2 | **MS. HUGGINS:**  45 days, please. |
| 10:07:57 | 3 | **THE REPORTER:**  And Ms. Huggins will be |
| 10:08:00 | 4 | supplied? |
| 10:08:00 | 5 | **MR. DAVENPORT:**  Yes. |
| 10:08:01 | 6 | **THE REPORTER:**  Thank you. |
| 10:08:01 | 7 | |
| 10:09:53 | 8 | **K Y L E   T.   M O R I A R I T Y**, 695 Main Street, |
| 10:10:06 | 9 | Buffalo, New York, after being duly called and |
| 10:10:06 | 10 | sworn, testified as follows: |
| 10:10:11 | 11 | |
| 10:10:11 | 12 | **EXAMINATION BY MR. DAVENPORT:** |
| 10:10:11 | 13 | |
| 10:10:15 | 14 | **Q.**    Good morning, Mr. Moriarity. |
| 10:10:16 | 15 | **A.**    Good morning. |
| 10:10:16 | 16 | **Q.**    My name is Chad Davenport.  I'm an |
| 10:10:18 | 17 | attorney with Rupp Baase Pfalzgraf & Cunningham, |
| 10:10:21 | 18 | representing the plaintiff. |
| 10:10:23 | 19 | So we're here today to discuss a -- an |
| 10:10:26 | 20 | incident that happened on January 1st, 2017. |
| 10:10:29 | 21 | Before we start, I just want to explain |
| 10:10:31 | 22 | a few of the ground rules for this deposition. |
| 10:10:33 | 23 | So our discussion today is being transcribed |

*Moriarity - Davenport - 2/21/20*

25

| | | |
|---|---|---|
| 10:28:38 | 1 | Q.   Where were these other police officers? |
| 10:28:40 | 2 | Where were they located? |
| 10:28:42 | 3 | Were they also in the C District, or were |
| 10:28:44 | 4 | they in other districts? |
| 10:28:45 | 5 | A.   No.  No.  They were in other districts |
| 10:28:47 | 6 | too. |
| 10:28:47 | 7 | Q.   Okay.  Were they all field training |
| 10:28:49 | 8 | officers? |
| 10:28:50 | 9 | A.   No.  These were probationary officers. |
| 10:28:54 | 10 | Q.   They were probationary officers? |
| 10:28:56 | 11 | So what kinds of things would you observe on |
| 10:28:58 | 12 | these cameras? |
| 10:29:00 | 13 | MS. HUGGINS:  Form. |
| 10:29:03 | 14 | THE WITNESS:  At -- at the time, I would say |
| 10:29:07 | 15 | I didn't -- we didn't really know what we were |
| 10:29:09 | 16 | looking at.  It was just people walking around. |
| 10:29:11 | 17 | BY MR. DAVENPORT: |
| 10:29:12 | 18 | Q.   Did they ever say, you know, this |
| 10:29:14 | 19 | person's committing a crime?  You know, we need to |
| 10:29:18 | 20 | dispatch police officers over into that area? |
| 10:29:20 | 21 | A.   No.  It was just us in the room.  There |
| 10:29:23 | 22 | was no one -- |
| 10:29:24 | 23 | Q.   So what kinds of -- |

*Moriarity - Davenport - 2/21/20*

26

10:29:25  1          A.    -- with us.

10:29:26  2          Q.    -- things were you guys looking for on

10:29:28  3    those cameras?

10:29:31  4          A.    I don't remember at the time.  We

10:29:32  5    weren't given much instruction.

10:29:34  6          Q.    Okay.  Were you instructed to take

10:29:36  7    notes on what you saw?

10:29:38  8          A.    We were.

10:29:39  9          Q.    And did you have to turn those notes

10:29:41 10    over to a lieutenant or anybody else to check your

10:29:43 11    work?

10:29:43 12          A.    No.

10:29:44 13          Q.    You just kept those for yourself?

10:29:46 14          A.    I threw mine out, I believe.

10:29:48 15          Q.    Okay.  Did you have to report to

10:29:49 16    anybody what you saw on those cameras?

10:29:51 17          A.    No.

10:29:53 18          Q.    Did you have any cameras that were

10:29:55 19    located on Schmarbeck Avenue?

10:29:58 20          A.    No.

10:30:01 21          Q.    Where, typically, would these cameras

10:30:04 22    be located?

10:30:05 23          Would they be mostly at busy intersections

*Moriarity - Davenport - 2/21/20*

27

| | | |
|---|---|---|
| 10:30:07 | 1 | or businesses? |
| 10:30:08 | 2 | **MS. HUGGINS:**  Form. |
| 10:30:10 | 3 | **THE WITNESS:**  I don't know the rhyme or |
| 10:30:13 | 4 | reason to where the cameras are placed. |
| 10:30:16 | 5 | **BY MR. DAVENPORT:** |
| 10:30:17 | 6 | **Q.**   So this is what you would have done |
| 10:30:19 | 7 | from December 1st, 2016, to December 29th of 2016, |
| 10:30:23 | 8 | correct? |
| 10:30:24 | 9 | **A.**   I don't know if it's exactly until the |
| 10:30:26 | 10 | 29th.  I got my vest a week -- a week or so before |
| 10:30:33 | 11 | the incident. |
| 10:30:34 | 12 | **Q.**   Okay. |
| 10:30:36 | 13 | **A.**   So -- |
| 10:30:36 | 14 | **Q.**   So you would have received that either |
| 10:30:39 | 15 | shortly before or right around Christmas of 2016? |
| 10:30:42 | 16 | **A.**   Yeah. |
| 10:30:44 | 17 | **Q.**   Did you immediately go out into the |
| 10:30:46 | 18 | field after that? |
| 10:30:46 | 19 | **A.**   Yes. |
| 10:30:47 | 20 | **Q.**   Who did you go out with? |
| 10:30:49 | 21 | Who -- who was, you know, taking you around |
| 10:30:51 | 22 | to help you with your training? |
| 10:30:53 | 23 | **A.**   Police Officer Schultz. |

*Moriarity - Davenport - 2/21/20*

28

10:30:55 1      **Q.**   Did you do any other training with any

10:30:56 2  other officers at that time?

10:30:58 3      **A.**   No.

10:30:59 4      **Q.**   How long did your training last for?

10:31:01 5      **A.**   16 weeks.

10:31:03 6      **Q.**   And so that 16 weeks would have been

10:31:06 7  beginning on November 4th of 2016, or would it have

10:31:10 8  been beginning when you received your vest in

10:31:14 9  December of 2016?

10:31:14 10      **A.**   The day I received my vest.

10:31:17 11      **Q.**   Okay.  And so those 16 weeks were just

10:31:19 12  with Officer Schultz?

10:31:21 13      **A.**   Yes.

10:31:24 14      **Q.**   What kinds of things would you -- what

10:31:27 15  kinds of calls would you make with Officer Schultz?

10:31:30 16      **A.**   Our calls --

10:31:32 17      **MS. HUGGINS:**  Form.

10:31:33 18      **THE WITNESS:**  Our calls varied.  Shootings,

10:31:37 19  domestics, car accidents, unknown troubles.

10:31:42 20      **BY MR. DAVENPORT:**

10:31:43 21      **Q.**   Do you remember the first week of

10:31:44 22  training with Officer Schultz?

10:31:47 23      **A.**   I remember the first day.

10:31:48   1       **Q.**    The first day? What happened on the

10:31:51   2   first day?

10:31:51   3       **A.**    There was a shots fired on Deshler.

10:31:54   4       **Q.**    Did you respond to that call?

10:31:56   5       **A.**    Yes.

10:31:56   6       **Q.**    With Officer Schultz?

10:31:58   7       **A.**    Yes.

10:31:59   8       **Q.**    What was the outcome of that call?

10:32:03   9       **A.**    Afternoon -- the afternoon shift took

10:32:07   10   it over, and me and Karl Schultz left around

10:32:13   11   10 minutes before 4 because we were done.

10:32:16   12       **Q.**    Were you working the day shift at the

10:32:17   13   time then?

10:32:18   14       **A.**    We were working the day shift, yeah.

10:32:19   15       **Q.**    Did you work the day shift after your

10:32:22   16   first 16 weeks?

10:32:23   17       **A.**    No. I went to afternoons.

10:32:24   18       **Q.**    Afternoon shift?

10:32:25   19       Did you work any other shifts besides

10:32:26   20   day shift and afternoon shift?

10:32:28   21       **A.**    No.

10:32:30   22       **Q.**    So what time, approximately, did you

10:32:33   23   recall to that call on your first day?

*Moriarity - Davenport - 2/21/20*

51

10:52:07  1          Received might mean that that's when 911

10:52:12  2  gets it to dispatch.

10:52:14  3          Q.   So what is the difference between 911

10:52:17  4  and dispatch?

10:52:19  5          A.   Someone calls 911 and then 911 will

10:52:23  6  give it to dispatch to give to us.

10:52:25  7          Q.   What does 911 refer to?

10:52:27  8          A.   911 is where the 91 -- 911 call goes

10:52:32  9  to.

10:52:33  10          Q.   Okay.  And where does it go to?

10:52:35  11          A.   Wherever that office is.  I have no

10:52:37  12  idea.

10:52:37  13          Q.   Okay.  And then dispatch is the Buffalo

10:52:42  14  Police Department?

10:52:42  15          A.   Yes.

10:52:43  16          Q.   Okay.  So now there's a 20-minute gap

10:52:47  17  in between it going from 911 to dispatch with the

10:52:52  18  Buffalo Police Department?

10:52:53  19          A.   Yes.

10:52:54  20          Q.   Okay.  Is that typical for 20 minutes

10:52:58  21  to elapse before --

10:53:00  22          A.   Yes.

10:53:00  23          MS. HUGGINS:  Form.

*Moriarity - Davenport - 2/21/20*

52

10:53:02  1        **BY MR. DAVENPORT:**

10:53:02  2        **Q.**    Is there a certain type of call that

10:53:04  3   wouldn't take 20 minutes?

10:53:05  4        **A.**    Shootings.

10:53:07  5        **Q.**    Okay.  And what would be the typical

10:53:10  6   response time for that?

10:53:11  7        **MS. HUGGINS:**   Form.

10:53:15  8        **THE WITNESS:**   It's -- it's one of those

10:53:16  9   things you just go to immediately.

10:53:18  10       **BY MR. DAVENPORT:**

10:53:18  11       **Q.**    Okay.  Okay.  So now when it says

10:53:24  12   dispatched, does that refer to dispatch receiving

10:53:27  13   it, or does that refer to somebody accepting that

10:53:30  14   call from dispatch?

10:53:31  15       **MS. HUGGINS:**   Form.

10:53:32  16       **THE WITNESS:**   Someone accepting the call

10:53:35  17   from dispatch.

10:53:35  18       **BY MR. DAVENPORT:**

10:53:36  19       **Q.**    And would that somebody be a police

10:53:38  20   officer in the C District?

10:53:39  21       **A.**    Yes.

10:53:42  22       **Q.**    Do you know if you were responding to

10:53:44  23   another call at that time?

10:53:46 1  **A.** I don't.

10:53:48 2  **Q.** So turning back to Exhibit 7 on the

10:53:50 3 dispatch monitor, it looks like you would have been

10:53:55 4 on scene at 145 Sprenger Avenue?

10:54:00 5  **A.** Yeah.

10:54:00 6  **Q.** Do you see that?

10:54:01 7  **A.** Yes.

10:54:02 8  **Q.** And then it's -- it look -- it appears

10:54:05 9 that you would have been on scene starting at

10:54:07 10 9:27, until would that be 10:56 when you became

10:54:12 11 available?

10:54:12 12  **A.** Yes.

10:54:12 13  **Q.** Okay.  So turning back towards Exhibit 3,

10:54:21 14 what type of call was it that you responded to at

10:54:25 15 33 Schmarbeck?

10:54:26 16  **A.** Larceny.

10:54:29 17  **Q.** And do you remember the nature of that

10:54:30 18 call?

10:54:30 19  **A.** I don't.

10:54:33 20  **Q.** Do you remember the individual that you

10:54:34 21 spoke to that day?

10:54:35 22  **A.** No.

10:54:38 23  **Q.** When it says that the location is

*Moriarity - Davenport - 2/21/20*

54

| | | |
|---|---|---|
| 10:54:40 | 1 | 1800 Broadway and that -- what does that refer |
| 10:54:40 | 2 | to? |
| 10:54:47 | 3 | Do you see on -- |
| 10:54:48 | 4 | **A.**   Oh, yeah.  I don't know what that |
| 10:54:51 | 5 | refers to. |
| 10:54:53 | 6 | **Q.**   Okay.  And then when it says the phone |
| 10:54:55 | 7 | number, do you know what that refers to? |
| 10:54:58 | 8 | **A.**   That's the phone number that was used |
| 10:54:59 | 9 | to call 911. |
| 10:55:01 | 10 | **Q.**   That would have been the complainant's |
| 10:55:02 | 11 | phone call? |
| 10:55:03 | 12 | **A.**   Yeah. |
| 10:55:03 | 13 | **Q.**   Okay.  So at 10:33, the entry says, |
| 10:55:11 | 14 | male, known, took items from his home. |
| 10:55:13 | 15 | Do you know what that entry would refer to? |
| 10:55:16 | 16 | **A.**   Whoever the complainant is knows the |
| 10:55:18 | 17 | male who took items from his home. |
| 10:55:20 | 18 | **Q.**   Now, would that information have been |
| 10:55:22 | 19 | conveyed to you who that individual was that took |
| 10:55:26 | 20 | the items from this individual's home? |
| 10:55:28 | 21 | **MS. HUGGINS:**  Form. |
| 10:55:29 | 22 | **THE WITNESS:**  The -- yeah.  I mean, the -- |
| 10:55:33 | 23 | the complainant would have -- would have told me. |

*Moriarity - Davenport - 2/21/20*

55

10:55:35   1          BY MR. DAVENPORT:

10:55:35   2          Q.    Do you remember if the complainant told

10:55:37   3    you who took the items from his home?

10:55:39   4          A.    I don't remember.

10:55:40   5          Q.    Okay.  Do you remember if dispatch told

10:55:42   6    you who the individual was that took items from his

10:55:45   7    home?

10:55:45   8          A.    No, I don't remember.

10:55:46   9          Q.    But that's what that entry refers to is

10:55:50  10    that it's known who the individual was that took

10:55:52  11    items from this complainant's home?

10:55:54  12          A.    Yes.

10:55:56  13          Q.    Okay.  So now the next entry that

10:55:59  14    I want you to look at is en route, C230.

10:56:03  15          What does that refer to?

10:56:04  16          A.    We are en route to the location.

10:56:07  17          Q.    So when you say we, that refers to Karl

10:56:10  18    Schultz and you?

10:56:11  19          A.    Yes.

10:56:12  20          Q.    Was your call sign C230?

10:56:15  21          A.    Yes.

10:56:15  22          Q.    And that's how it would appear on these

10:56:18  23    complaint summary reports?

*Moriarity - Davenport - 2/21/20*

65

11:18:19  1          A.    No.

11:18:20  2          Q.    No?

11:18:21  3          Do you know who this individual is walking

11:18:30  4    out of the van?

11:18:30  5          And I would say for the record that the time

11:18:32  6    stamp is 9:53:16.  You don't have to verify the

11:18:36  7    time, but the individual who is now walking out of

11:18:38  8    the van, do you -- do you remember this individual?

11:18:44  9          A.    I don't remember.

11:18:45 10          Q.    Do you remember talking to that

11:18:47 11    individual on January 1st of 2017?

11:18:49 12          A.    I do not.

11:18:55 13          Q.    Do you remember what type of a call it

11:18:56 14    was that you responded to on January 1st of 2017,

11:19:01 15    at 33 Schmarbeck?

11:19:02 16          A.    From the complaint summary report, it

11:19:04 17    was a larceny.

11:19:05 18          Q.    Do you remember anything about that

11:19:07 19    call besides what's written on the complaint

11:19:09 20    summary report?

11:19:09 21          A.    I don't.

11:19:12 22          Q.    Do you remember how that call was

11:19:14 23    initiated?

*Moriarity - Davenport - 2/21/20*

66

11:19:16  1        A.    I -- I -- I don't.  It says that it was

11:19:18  2  dispatched.

11:19:21  3        Q.    And dispatched refers to you accepting

11:19:23  4  the call and going to that call, correct?

11:19:25  5        A.    Yes.

11:19:26  6        Q.    But the 911 call was made by the

11:19:28  7  individual, Mike Wolfe?

11:19:29  8        MS. HUGGINS:  Form.

11:19:30  9        THE WITNESS:  I don't know if it was Mike

11:19:34 10  Wolfe, but someone -- someone called 911.

11:19:37 11        BY MR. DAVENPORT:

11:19:38 12        Q.    If I told you that the individual who

11:19:39 13  made the call was Mike Wolfe, would you have any

11:19:41 14  reason to dispute what I say?

11:19:44 15        MS. HUGGINS:  Form.

11:19:46 16        BY MR. DAVENPORT:

11:19:46 17        Q.    Would you have any reason to believe

11:19:48 18  that it was somebody besides Mike Wolfe?

11:19:49 19        MS. HUGGINS:  Form.

11:19:50 20        THE WITNESS:  No, but I also don't remember.

11:19:58 21        MR. DAVENPORT:  All right.

11:20:01 22        MS. HUGGINS:  Do you want to indicate for

11:20:02 23  the record what exhibit you've played?

*Moriarity - Davenport - 2/21/20*

67

| | | |
|---|---|---|
| 11:20:05 | 1 | **MR. DAVENPORT:**  Yes. |
| 11:20:05 | 2 | So for the record, I played the first video |
| 11:20:08 | 3 | of Exhibit A that was turned over to the City as |
| 11:20:10 | 4 | part of our complaint.  The last four digits of |
| 11:20:16 | 5 | that video file -- can you go back to it, please? |
| 11:20:23 | 6 | The last four digits of that video file are |
| 11:20:25 | 7 | 5252. |
| 11:20:28 | 8 | We are now turning to the second video file |
| 11:20:31 | 9 | of Exhibit A that was provided to the City as part |
| 11:20:35 | 10 | of the plaintiff's complaint.  The last four digits |
| 11:20:40 | 11 | are 1342. |
| 11:20:43 | 12 | **MS. HUGGINS:**  The exhibit number, just for |
| 11:20:45 | 13 | the purposes of the deposition. |
| 11:20:46 | 14 | **MR. DAVENPORT:**  This exhibit number is |
| 11:20:48 | 15 | Exhibit number 11. |
| 11:20:51 | 16 | **MS. HUGGINS:**  Thank you. |
| 11:20:59 | 17 | (Video clip played.) |
| 11:20:59 | 18 | **BY MR. DAVENPORT:** |
| 11:20:59 | 19 | **Q.**   Do you see the three digits that are on |
| 11:21:02 | 20 | top of that police vehicle? |
| 11:21:03 | 21 | **A.**   Yeah.  It's kind of clear. |
| 11:21:07 | 22 | **Q.**   And what are those three digits? |
| 11:21:12 | 23 | **A.**   I know the -- I know the truck to be |

*Moriarity - Davenport - 2/21/20*

68

11:21:15  1   532.

11:21:16  2           Oh, that's clear now.  Yeah, 532.

11:21:18  3      **Q.**   Do you recognize that police vehicle?

11:21:19  4      **A.**   Yes.

11:21:20  5      **Q.**   And what do you recognize it as?

11:21:22  6      **A.**   Buffalo Police vehicle.

11:21:24  7      **Q.**   Have you ever been in that vehicle

11:21:26  8   before?

11:21:26  9      **A.**   Yes.

11:21:28  10     **Q.**   How many times before January 1st?

11:21:31  11     **A.**   I'm -- yeah.  I'm unsure.

11:21:33  12     **Q.**   Were you in that vehicle after

11:21:36  13  January 1st of 2017?

11:21:37  14     **A.**   Yeah.

11:21:39  15     **Q.**   Was that a car that you would typically

11:21:41  16  use during your shifts at C District?

11:21:44  17     **A.**   No.  We -- we change depending on what

11:21:49  18  goes to the garage because it's broke.

11:21:51  19     **Q.**   Okay.  Was there a typical vehicle that

11:21:53  20  you would drive?

11:21:55  21     **A.**   This was Karl's assigned truck.

11:22:00  22     **Q.**   Okay.  So Karl Schultz would typically

11:22:03  23  drive this truck then?

11:22:04  1        A.    Yeah.  Yeah.

11:22:04  2        Q.    So during your first 16 weeks of

11:22:06  3   training, this was the vehicle that you were using?

11:22:08  4        A.    Unless it was at the garage, yes.

11:22:11  5        Q.    Okay.  Now, the video shows that you

11:22:15  6   drove past the red van at first.  Do you know why

11:22:18  7   you drove past that red van?

11:22:20  8        A.    I do not.

11:22:21  9        Q.    The video also shows now, at 10:14, in

11:22:24 10   the top corner, that you were now backing up the

11:22:27 11   vehicle down Schmarbeck to where the red van is.

11:22:30 12   Do you know why you did that?

11:22:30 13        MS. HUGGINS:  Form.

11:22:31 14        THE WITNESS:  I don't.

11:22:32 15        BY MR. DAVENPORT:

11:22:33 16        Q.    Were you going to this individual who

11:22:36 17   was out in the -- the sidewalk at this point?

11:22:39 18        A.    I -- I don't remember, but it looks

11:22:43 19   that way.

11:22:47 20        Q.    Now, you parked behind the red van.

11:22:49 21   Was there any reason that you would have done that?

11:22:53 22        A.    Safety.

11:22:54 23        Q.    And what would that safety reason have

*Moriarity - Davenport - 2/21/20*

70

11:22:56  1    been?

11:22:58  2         **A.**    I mean, so I can see someone in case

11:23:02  3    they're going to shoot me or something.

11:23:03  4         **Q.**    Okay.  And who would that person have

11:23:05  5    been?

11:23:06  6         **MS. HUGGINS:**  Form.

11:23:07  7         **THE WITNESS:**  Yeah.  That -- that's just

11:23:09  8    a -- a general safety thing, so, I mean, I'm pretty

11:23:14  9    sure that that's the complainant for the call.

11:23:18  10        **BY MR. DAVENPORT:**

11:23:18  11        **Q.**    Okay.  So it wasn't necessarily that

11:23:20  12   you were driving behind the red van.  You were

11:23:22  13   trying to get a visual on the individual who was

11:23:23  14   standing on the sidewalk, correct?

11:23:25  15        **A.**    Yeah.

11:23:26  16        **Q.**    Okay.

11:23:26  17        **A.**    In the safest way.

11:23:27  18        **Q.**    And that was a safety procedure?

11:23:30  19        **A.**    Yeah.

11:23:30  20        **Q.**    Was that something that Karl Schultz

11:23:32  21   told you to do?

11:23:33  22        **A.**    I -- I don't think he told me to do

11:23:36  23   anything, no.

11:23:37 1     **Q.**    Was that part of your training with the

11:23:39 2  ECC, Erie County Training Academy?

11:23:43 3     **A.**    No, not really.

11:23:43 4     **Q.**    Was that part of your training with

11:23:45 5  Buffalo Police Academy?

11:23:48 6     **A.**    No, not really.

11:23:49 7     **Q.**    So was that something that you were

11:23:51 8  ever taught by ECC or the Buffalo Police Academy?

11:23:54 9     **A.**    No.

11:23:55 10     **Q.**    So that was just something that you did

11:23:56 11  on your own?

11:23:57 12     **A.**    Yes.

11:23:57 13     **Q.**    Okay.  Who's that individual who's

11:24:01 14  getting out of the police vehicle?

11:24:03 15     **A.**    Looks like it's me.

11:24:04 16     **Q.**    Were you driving that day?

11:24:07 17     **A.**    Yes.

11:24:08 18     **Q.**    Did you drive the entire day, or did

11:24:10 19  Karl Schultz drive at any point?

11:24:13 20     **A.**    I don't --

11:24:13 21     **Q.**    On January 1st of 2017?

11:24:16 22     **A.**    I don't know if I drove the whole day.

11:24:19 23     **Q.**    During your first 16 weeks of training,

11:24:21  1   who predominantly did most of the driving?

11:24:26  2        **A.**   The whole 16 weeks, I would say

11:24:29  3   predominantly it was me.

11:24:30  4        **Q.**   Okay.  Was there any reason why you

11:24:32  5   drove instead of Karl?

11:24:34  6        **A.**   So I can learn the streets.

11:24:36  7        **Q.**   Okay.  Did he give you any sort of

11:24:40  8   directions on where to go and how to go to a call?

11:24:42  9        **A.**   Tons of directions.

11:24:44 10        **Q.**   Okay.  Do you have any sort of a GPS in

11:24:46 11   your vehicle?

11:24:48 12        **A.**   They have a map on the computer that we

11:24:52 13   use, but we do not use it for GPS.

11:24:56 14        **Q.**   Okay.  What do you use that map for?

11:25:01 15        **A.**   I -- I never used the map.

11:25:05 16        **Q.**   Okay.

11:25:05 17        **A.**   But people learn how to GPS calls that

11:25:09 18   way.  You can also identify where other officers

11:25:12 19   are.

11:25:12 20        **Q.**   Okay.  So you had a pretty good

11:25:16 21   understanding of all the streets on C District and

11:25:18 22   you didn't use the map?

11:25:18 23        **A.**   No, I didn't --

*Moriarity - Davenport - 2/21/20*

73

11:25:19   1          MS. HUGGINS:   Form.

11:25:20   2          THE WITNESS:   I didn't have a good

11:25:21   3    understanding at all.   Karl said it's better to

11:25:23   4    learn the streets by driving them rather than

11:25:27   5    GPS-ing them and staring at a computer.

11:25:29   6          BY MR. DAVENPORT:

11:25:29   7          Q.   Okay.   Would Karl then give you oral

11:25:32   8    directions of where to drive?

11:25:33   9          A.   Yes.

11:25:33   10         Q.   Okay.   And you never referred to that

11:25:35   11   map during your first 16 weeks then?

11:25:39   12         A.   I can't say never, but I was --

11:25:43   13         Q.   Do you refer to that map at all?

11:25:44   14         MS. HUGGINS:   Well --

11:25:45   15         MR. DAVENPORT:   He said never.

11:25:46   16         MS. HUGGINS:   I wasn't sure if he was

11:25:48   17   finished answering.

11:25:49   18         THE WITNESS:   I can't say -- I can't say

11:25:50   19   never, but we really tried hard to stay away from

11:25:55   20   it.

11:25:56   21         BY MR. DAVENPORT:

11:25:57   22         Q.   Okay.   After your first 16 weeks, have

11:25:58   23   you ever used the map to go respond to a call?

*Moriarity - Davenport - 2/21/20*

74

11:26:02 1         A.    Not to respond to a call, but to find
11:26:05 2    out where an officer was.
11:26:06 3         Q.    Okay.  So now you're walking behind the
11:26:13 4    police vehicle; is that accurate?
11:26:15 5         A.    Yeah.
11:26:15 6         Q.    Was there any reason why you walked
11:26:17 7    behind the police vehicle rather than in front?
11:26:22 8         A.    I don't -- I don't remember that day.
11:26:24 9         Q.    Do you remember any difficulty with
11:26:26 10   walking on the Schmarbeck Drive that day?
11:26:30 11        MS. HUGGINS:  Form.
11:26:31 12        THE WITNESS:  Can you explain that?
11:26:33 13        BY MR. DAVENPORT:
11:26:34 14        Q.    Was it icy?  Was it slippery?
11:26:44 15        A.    I don't remember.
11:26:45 16        Q.    Okay.
11:26:46 17        A.    I don't -- I don't remember.
11:26:47 18        Q.    Okay.  What kinds of shoes were you
11:26:50 19   wearing that day?
11:26:51 20        A.    Boots.
11:26:52 21        Q.    Boots?
11:26:53 22        Did you ever have difficulty walking on
11:26:55 23   streets with those boots?

*Moriarity - Davenport - 2/21/20*

75

| | | |
|---|---|---|
| 11:26:57 | 1 | **A.**   Sometimes. |
| 11:26:58 | 2 | **Q.**   Sometimes? |
| 11:26:58 | 3 | And when would that be? |
| 11:27:00 | 4 | **A.**   Like snow, icy, Buffalo conditions. |
| 11:27:03 | 5 | **Q.**   Did you see any snow on the street that |
| 11:27:05 | 6 | day? |
| 11:27:05 | 7 | **A.**   No. |
| 11:27:06 | 8 | **Q.**   Any ice? |
| 11:27:07 | 9 | **A.**   It's not that clear, but, yeah, I don't |
| 11:27:13 | 10 | know. |
| 11:27:13 | 11 | **Q.**   But as you sit here today, you don't |
| 11:27:16 | 12 | remember any difficulty with walking that day, |
| 11:27:18 | 13 | correct? |
| 11:27:18 | 14 | **A.**   No.   There was no -- not for me. |
| 11:27:20 | 15 | **Q.**   Okay.   Now, it seems that you are |
| 11:27:28 | 16 | approaching the individual who is standing on the |
| 11:27:30 | 17 | sidewalk; is that correct? |
| 11:27:31 | 18 | **A.**   Yes. |
| 11:27:31 | 19 | **Q.**   Why is it just you that is going out to |
| 11:27:34 | 20 | go speak with that individual? |
| 11:27:38 | 21 | **A.**   Excuse me.   I -- I don't remember. |
| 11:27:42 | 22 | I think Karl was letting me deal with a low-priority |
| 11:27:46 | 23 | call. |

*Moriarity - Davenport - 2/21/20*

76

| | | |
|---|---|---|
| 11:27:47 | 1 | **Q.**   And how was that determined to be a |
| 11:27:49 | 2 | low-priority call? |
| 11:27:52 | 3 | **A.**   I mean, there's a lot of variables. |
| 11:27:55 | 4 | You look at officer safety.  There's -- it -- it |
| 11:27:58 | 5 | says right here priority 5, whereas a shooting |
| 11:28:01 | 6 | would be priority 1. |
| 11:28:02 | 7 | **Q.**   Sure. |
| 11:28:03 | 8 | **A.**   Things like that. |
| 11:28:04 | 9 | I'm not saying that a priority 5 can't go in |
| 11:28:08 | 10 | a southern direction, but assessing the video and |
| 11:28:14 | 11 | assessing the scene, you can kind of determine. |
| 11:28:18 | 12 | **Q.**   Now, prior to January 1st, 2017, have |
| 11:28:22 | 13 | you ever -- had you ever responded to a call on |
| 11:28:24 | 14 | Schmarbeck and spoken with this individual? |
| 11:28:26 | 15 | **A.**   I don't -- I don't remember. |
| 11:28:28 | 16 | **Q.**   Do you recall if after January 1st, |
| 11:28:33 | 17 | 2017, did you ever respond to a call on Schmarbeck |
| 11:28:35 | 18 | and speak with this individual? |
| 11:28:36 | 19 | **A.**   No. |
| 11:28:37 | 20 | **Q.**   Now, at this point you know that you're |
| 11:28:39 | 21 | responding to a larceny or a theft, correct? |
| 11:28:42 | 22 | **A.**   Yes. |
| 11:28:43 | 23 | **Q.**   What's part of the normal procedure for |

| | | |
|---|---|---|
| 11:28:46 | 1 | responding to a larceny or theft? |
| 11:28:48 | 2 | Is there a typical procedure that you would |
| 11:28:49 | 3 | follow? |
| 11:28:50 | 4 | **MS. HUGGINS:**  Form. |
| 11:28:54 | 5 | **THE WITNESS:**  I want to get the complainant's |
| 11:28:55 | 6 | name, date of birth, phone number, address, and |
| 11:28:58 | 7 | then find out the story of what had happened. |
| 11:29:01 | 8 | **BY MR. DAVENPORT:** |
| 11:29:01 | 9 | **Q.**   And how would you get that information? |
| 11:29:04 | 10 | **A.**   Just by talking to him. |
| 11:29:06 | 11 | **Q.**   Would you have to get any sort of |
| 11:29:08 | 12 | identification or anything else to verify what the |
| 11:29:11 | 13 | complainant is telling you? |
| 11:29:12 | 14 | **A.**   ID. |
| 11:29:13 | 15 | **Q.**   ID?  Is that typical? |
| 11:29:15 | 16 | **A.**   Yes. |
| 11:29:15 | 17 | **Q.**   Did you do that on this occasion? |
| 11:29:18 | 18 | **A.**   I don't -- I don't remember. |
| 11:29:20 | 19 | **Q.**   Would you have to look at the |
| 11:29:22 | 20 | license plate number for the vehicle?  Would -- |
| 11:29:25 | 21 | what would Karl Schultz be -- excuse me.  Strike |
| 11:29:28 | 22 | that. |
| 11:29:28 | 23 | What would Karl Schultz be doing in the |

*Moriarity - Davenport - 2/21/20*

78

11:29:30  1  vehicle at this point?

11:29:31  2      **MS. HUGGINS:**  Form.

11:29:31  3      **THE WITNESS:**  I don't -- I don't know what

11:29:32  4  Karl Schultz could be doing right now.

11:29:34  5      **BY MR. DAVENPORT:**

11:29:34  6      **Q.**   I'm not asking what could he be doing.

11:29:37  7  I would be asking more so what should he be doing,

11:29:40  8  if he's not going out to go speak with the

11:29:42  9  individual?

11:29:42  10     **MS. HUGGINS:**  Form.

11:29:43  11     **THE WITNESS:**  I -- I think he's just letting

11:29:45  12  me -- me handle a low-priority call to see how I do

11:29:52  13  on it.

11:29:52  14     **BY MR. DAVENPORT:**

11:29:52  15     **Q.**   Assuming --

11:29:53  16     **A.**   And evaluate me.  He's evaluating me.

11:29:56  17     **Q.**   I'm sorry.

11:29:56  18     So assuming that he wasn't evaluating you

11:29:58  19  and that you were out with a partner, somebody

11:30:01  20  who's not in training, would two officers go speak

11:30:06  21  with the individual or would just one officer go

11:30:09  22  speak with the individual?

11:30:09  23     **MS. HUGGINS:**  Form.

11:49:48  1  property from a police -- from a landlord, whether

11:49:51  2  that be in your personal capacity or official

11:49:53  3  capacity?

11:49:55  4  **MS. HUGGINS:**  Form.

11:49:55  5  **THE WITNESS:**  I wouldn't -- yeah, no,

11:49:58  6  I don't think so.

11:49:58  7  **BY MR. DAVENPORT:**

11:49:59  8  Q.  Now, at this time, did you know if

11:50:01  9  the individual had a valid driver's license at

11:50:05  10  33 Schmarbeck?

11:50:06  11  A.  From -- from the video that you played

11:50:09  12  for me, I don't -- I didn't see myself on there

11:50:12  13  ever checking his ID, so I don't really know if

11:50:15  14  I did check his ID or not.

11:50:17  15  Q.  As part of your normal procedure for

11:50:21  16  responding to a -- an accusation of larceny or

11:50:25  17  theft, would you ever have to check the license

11:50:28  18  plate on a -- a vehicle that is at the location --

11:50:28  19  A.  If --

11:50:32  20  Q.  -- of the --

11:50:33  21  A.  If it's apparent that the vehicle was

11:50:36  22  involved, then yes.

11:50:39  23  Q.  Do you recall if on January 1st of 2017,

*Moriarity - Davenport - 2/21/20*

99

| | | |
|---|---|---|
| 11:50:42 | 1 | you had checked the license plate of that red van? |
| 11:50:45 | 2 | **A.**   I don't remember. |
| 11:50:46 | 3 | **Q.**   Would there be any sort of a document |
| 11:50:49 | 4 | that would depict whether you had checked the |
| 11:50:52 | 5 | license of that red van or not? |
| 11:50:58 | 6 | **A.**   I would say -- I would say no. |
| 11:51:04 | 7 | I don't -- I mean, just by the video, again, |
| 11:51:08 | 8 | I don't know if I -- I don't know what the rest |
| 11:51:09 | 9 | of the video showed, so I don't remember if -- if |
| 11:51:14 | 10 | I did anything else with the complainant. |
| 11:51:18 | 11 | **Q.**   Do you recall, as you sit here today, |
| 11:51:22 | 12 | or do you know, as you sit here today, whether that |
| 11:51:24 | 13 | red van belonged to the complainant or not? |
| 11:51:26 | 14 | **A.**   I do not know. |
| 11:51:29 | 15 | **Q.**   So I'm going to ask you a few questions |
| 11:51:32 | 16 | about what happened immediately after that call to |
| 11:51:35 | 17 | 33 Schmarbeck. |
| 11:51:38 | 18 | Do you recall an individual walking out into |
| 11:51:44 | 19 | the street after you responded to that call at |
| 11:51:46 | 20 | 33 Schmarbeck? |
| 11:51:46 | 21 | **MS. HUGGINS:**   Form. |
| 11:51:47 | 22 | **THE WITNESS:**   The videos that we reviewed, |
| 11:51:51 | 23 | yes, I remember, based off the videos we reviewed. |

*Moriarity - Davenport - 2/21/20*

100

| | | |
|---|---|---|
| 11:51:54 | 1 | **BY MR. DAVENPORT:** |
| 11:51:54 | 2 | **Q.** But that's only based off of what you |
| 11:51:56 | 3 | saw in the videos? |
| 11:51:59 | 4 | **A.** Yeah, I mean, I don't -- again, this |
| 11:52:01 | 5 | was a very, very long time ago, and I was very new. |
| 11:52:06 | 6 | **Q.** As you sit here today, do you know who |
| 11:52:08 | 7 | that individual was that's depicted in the video |
| 11:52:11 | 8 | walking out in the street? |
| 11:52:12 | 9 | **MS. HUGGINS:** Form. |
| 11:52:13 | 10 | **THE WITNESS:** Yes. |
| 11:52:13 | 11 | **BY MR. DAVENPORT:** |
| 11:52:14 | 12 | **Q.** And who is that individual? |
| 11:52:15 | 13 | **A.** Mr. Kistner. |
| 11:52:18 | 14 | **Q.** Okay. Do you remember any of the |
| 11:52:19 | 15 | details of a conversation that could have been had |
| 11:52:24 | 16 | between you and Mr. Kistner or Mr. Schultz and |
| 11:52:27 | 17 | Mr. Kistner when he was out in the street? |
| 11:52:30 | 18 | **A.** I don't think I had a conversation with |
| 11:52:34 | 19 | Mr. Kistner. |
| 11:52:35 | 20 | **Q.** Did Mr. Schultz say anything to |
| 11:52:39 | 21 | Mr. Kistner? |
| 11:52:41 | 22 | **A.** No, I don't -- I don't -- I don't think |
| 11:52:45 | 23 | so. Not when we were trying to drive off. |

11:52:48 1      **Q.**   Why were you trying to drive off as
11:52:51 2 there was an individual in the street?
11:52:53 3      **MS. HUGGINS:**   Form.
11:52:54 4      **THE WITNESS:**   At the time, he wasn't
11:52:57 5 involved with our call, so we were leaving.
11:52:59 6      **BY MR. DAVENPORT:**
11:52:59 7      **Q.**   Did he ask to speak to the officers at
11:53:01 8 that time?
11:53:02 9      **A.**   I don't know if he said anything to us.
11:53:04 10      **Q.**   Do you know if he said anything to
11:53:06 11 Ms. McDermott or Ms. Velez?
11:53:11 12      **A.**   I -- yeah, I don't know. I wouldn't --
11:53:13 13      **MS. HUGGINS:**   Form.
11:53:13 14      **THE WITNESS:**   I don't remember.
11:53:15 15      **BY MR. DAVENPORT:**
11:53:16 16      **Q.**   Now, do you recall, as you sit here
11:53:20 17 today, even if it was the video that helped to
11:53:23 18 refresh your recollection, did you drive past the
11:53:25 19 individual who was out in the street?
11:53:27 20      **A.**   I did drive past him, yeah.
11:53:29 21      **Q.**   And how long were you driving -- how
11:53:31 22 far past that individual did you drive?
11:53:34 23      **A.**   I don't remember how -- how far.

11:53:36  1        Q.   Even based off of the video that you

11:53:41  2   saw, would you know approximately how far that you

11:53:44  3   drove?

11:53:44  4        **MS. HUGGINS:**  Form.

11:53:44  5        **THE WITNESS:**  I can't -- I can't judge

11:53:46  6   distance like that.

11:53:47  7        **BY MR. DAVENPORT:**

11:53:48  8        Q.   Do you know approximately how fast you

11:53:49  9   were driving?

11:53:49 10        A.   I -- I don't know how fast I was

11:53:51 11   driving.  I know from -- it's a small street.

11:53:56 12   I can't get up too high in speeds.

11:53:59 13        Q.   How long is Schmarbeck Avenue?

11:54:02 14        A.   I wouldn't -- I wouldn't be able to

11:54:03 15   tell you that.  It's a small city street, though.

11:54:06 16        Q.   Okay.  Is it a one way or a two way?

11:54:09 17        A.   Two way.

11:54:11 18        Q.   Were there any other cars that were

11:54:13 19   coming in the opposite direction from you?

11:54:15 20        **MS. HUGGINS:**  Form.

11:54:16 21        **THE WITNESS:**  I mean, from what the video

11:54:19 22   you guys have, it didn't show any.

11:54:23 23        **BY MR. DAVENPORT:**

*Moriarity - Davenport - 2/21/20*

103

11:54:24  1      Q.    It didn't show any other vehicles

11:54:26  2   coming in the opposite direction?

11:54:27  3      A.    It didn't show any, yeah, coming in the

11:54:31  4   opposite direction, that I remember.

11:54:32  5      Q.    Do you normally wear your seat belt as

11:54:36  6   you're driving?

11:54:38  7      A.    Sometimes.

11:54:40  8      Q.    And that's driving a police vehicle,

11:54:42  9   sometimes you wear a seat belt?

11:54:44 10      MS. HUGGINS:   Form.

11:54:45 11      THE WITNESS:   Yeah, sometimes.

11:54:46 12      BY MR. DAVENPORT:

11:54:47 13      Q.    What situations would you wear

11:54:49 14   a seat belt?

11:54:51 15      MS. HUGGINS:   Form.

11:54:55 16      THE WITNESS:   Situations where I remember or

11:55:00 17   I think it's icy or something.

11:55:04 18      BY MR. DAVENPORT:

11:55:05 19      Q.    As a police officer, are you required

11:55:06 20   to wear a seat belt?

11:55:10 21      MS. HUGGINS:   Form.

11:55:13 22      THE WITNESS:   I'm not sure actually if it's

11:55:15 23   in our Manual of Procedures.

| | | |
|---|---|---|
| 11:55:56 | 1 | **Q.**   With any of the other officers that you |
| 11:55:58 | 2 | have been with in their -- in the vehicle, have any |
| 11:56:00 | 3 | of those officers worn a seat belt in the police |
| 11:56:03 | 4 | vehicle that you were driving? |
| 11:56:04 | 5 | **A.**   Yeah, some do. |
| 11:56:05 | 6 | **MS. HUGGINS:**  Form. |
| 11:56:06 | 7 | **BY MR. DAVENPORT:** |
| 11:56:08 | 8 | **Q.**   Now, when you were driving -- when you |
| 11:56:13 | 9 | typically go to go drive a vehicle, do you check |
| 11:56:16 | 10 | any of your mirrors before you pull away? |
| 11:56:19 | 11 | **A.**   Yes. |
| 11:56:19 | 12 | **Q.**   What mirrors do you check? |
| 11:56:21 | 13 | **A.**   I check all of them because a lot of |
| 11:56:23 | 14 | people are different heights. |
| 11:56:24 | 15 | **Q.**   Okay.  Now, do you check your mirror to |
| 11:56:27 | 16 | see what's around you or just to make sure that you |
| 11:56:30 | 17 | are able to see and you have a good vantage point |
| 11:56:33 | 18 | for looking through your mirrors? |
| 11:56:35 | 19 | **MS. HUGGINS:**  Form. |
| 11:56:35 | 20 | **THE WITNESS:**  To make sure I have a good |
| 11:56:37 | 21 | vantage point and I can see other cars and people |
| 11:56:40 | 22 | and whatnot. |
| 11:56:41 | 23 | **BY MR. DAVENPORT:** |

11:56:42  1          Q.    Okay.  Do you check your left mirror?

11:56:43  2    Your driver's side mirror?

11:56:44  3          A.    Yes.

11:56:44  4          Q.    Do you check your passenger side

11:56:45  5    mirror?

11:56:45  6          A.    Yes.

11:56:46  7          Q.    And then do you check your rearview

11:56:48  8    mirror?

11:56:48  9          A.    Yeah.

11:56:48  10         Q.    Do you look behind you at all?

11:56:49  11         A.    No.  You can't really see because of

11:56:52  12   the cage.

11:56:52  13         Q.    Okay.

11:56:53  14         A.    It's a little difficult.

11:56:54  15         Q.    Okay.  After you make that initial

11:56:56  16   check, do you ever look at your driver's side

11:56:59  17   mirror, your passenger mirror, or your rearview

11:57:02  18   mirror, as you're driving forward?

11:57:03  19         A.    Often.

11:57:04  20         Q.    Often?

11:57:05  21         And what are you looking for typically?

11:57:08  22         A.    Other cars and -- and people to see

11:57:11  23   what -- what they're doing.

11:57:12  1      **Q.**   Okay.  On this occasion do you recall

11:57:16  2  if you looked into your driver's side mirror or

11:57:18  3  your passenger side mirror or your rearview mirror

11:57:22  4  as you were driving away?

11:57:22  5        **MS. HUGGINS:**  Form.

11:57:24  6        **THE WITNESS:**  I remember looking in my

11:57:26  7  driver's side mirror.

11:57:28  8        **BY MR. DAVENPORT:**

11:57:28  9      **Q.**   Okay.  And why were you looking at your

11:57:31 10  driver's side mirror?

11:57:32 11      **A.**   Karl told me to -- he directed my

11:57:35 12  attention to the mirror and said, hold on; let's

11:57:39 13  make sure they get out okay.

11:57:42 14      **Q.**   Okay.  Did you stop your vehicle at

11:57:45 15  that point?

11:57:45 16      **A.**   I don't -- I don't remember.

11:57:47 17      **Q.**   Okay.  Were you -- were you looking

11:57:52 18  only at your driver's side mirror at that point

11:57:54 19  when Karl said, let's hold on; let's wait to see if

11:57:57 20  they make it out okay?

11:57:59 21      **A.**   In between that and looking forward.

11:58:01 22      **Q.**   Okay.  What was the reason for Karl

11:58:06 23  saying, let's make sure that they make it out okay?

11:58:09   1      **MS. HUGGINS:** Form.

11:58:09   2      **THE WITNESS:** At the time, I'm too new.

11:58:12   3   I don't -- I was just doing what he told me --

11:58:15   4      **BY MR. DAVENPORT:**

11:58:15   5      **Q.** Okay.

11:58:16   6      **A.** -- to do.

11:58:17   7      **Q.** Okay. With your experience that you've

11:58:20   8   gained since this incident, would there be any

11:58:22   9   reason why Karl would have told you to make sure

11:58:25   10   that they make it out okay?

11:58:27   11      **MS. HUGGINS:** Form.

11:58:27   12      **THE WITNESS:** Yeah, I mean, there could have

11:58:29   13   been a whole bunch of reasons why someone would

11:58:31   14   walk up to a police vehicle, so for officer safety,

11:58:36   15   he would have told me to look out -- look out the

11:58:39   16   mirror.

11:58:39   17      **BY MR. DAVENPORT:**

11:58:39   18      **Q.** Do you know, on January 1st, why that

11:58:42   19   individual was walking up to a police vehicle?

11:58:43   20      **MS. HUGGINS:** Form.

11:58:44   21      **THE WITNESS:** I -- I don't. I don't know.

11:58:45   22      **BY MR. DAVENPORT:**

11:58:46   23      **Q.** Did Karl Schultz know why that

| | | |
|---|---|---|
| 11:58:49 | 1 | individual was walking up to a police vehicle? |
| 11:58:50 | 2 | **MS. HUGGINS:** Form. |
| 11:58:50 | 3 | **THE WITNESS:** He didn't tell me. No, I don't |
| 11:58:53 | 4 | know. |
| 11:58:53 | 5 | **BY MR. DAVENPORT:** |
| 11:58:53 | 6 | **Q.** Do you remember Karl Schultz ever |
| 11:58:55 | 7 | saying, we're leaving, to that individual? |
| 11:59:00 | 8 | **A.** I -- I don't. I don't remember. |
| 11:59:03 | 9 | **Q.** Would you have any reason to think that |
| 11:59:04 | 10 | he didn't say, we're leaving? |
| 11:59:08 | 11 | **A.** Again, I don't -- I don't remember. |
| 11:59:11 | 12 | I don't remember what he said. |
| 11:59:16 | 13 | **Q.** Now, as Karl Schultz said, wait; let's |
| 11:59:19 | 14 | see what happens; let's make it out of there |
| 11:59:21 | 15 | okay -- let's make sure that they make it out of |
| 11:59:23 | 16 | there okay, were you still driving forward at that |
| 11:59:29 | 17 | time? |
| 11:59:29 | 18 | **A.** I don't know if I -- I don't remember |
| 11:59:31 | 19 | if I was stopped or slowing to a stop or continuing |
| 11:59:38 | 20 | straight. |
| 11:59:39 | 21 | **Q.** Okay. As you were driving away -- as |
| 11:59:49 | 22 | your vehicle was driving away from the incident, |
| 11:59:52 | 23 | did you see anything that was happening behind you? |

11:59:57  1         **A.**    I remember having a conversation with

11:59:59  2    Karl about how it looked like Mr. Kistner threw

12:00:05  3    himself on the vehicle.  I -- I can't remember

12:00:12  4    exactly how it looked because I was so new.  I just

12:00:18  5    remember having the conversation with him.

12:00:19  6         **Q.**    And where did you have that

12:00:21  7    conversation?

12:00:22  8         **A.**    In the -- in the police vehicle.

12:00:24  9         **Q.**    Okay.  Would that have been before or

12:00:26 10    after you got out of the police vehicle after the

12:00:32 11    collision was made with Mr. Kistner?

12:00:34 12         **MS. HUGGINS:**  Form.

12:00:34 13         **THE WITNESS:**  That would have been before.

12:00:41 14         **BY MR. DAVENPORT:**

12:00:41 15         **Q.**    Okay.  So the collision would have

12:00:43 16    happened, you would have been in your police

12:00:44 17    vehicle, and Karl Schultz would have told you that

12:00:48 18    Mr. Kistner threw himself at the police vehicle?

12:00:50 19         **MS. HUGGINS:**  Form.

12:00:50 20         **THE WITNESS:**  Like I said, I remember having

12:00:53 21    a conversation talking about it.  I don't -- I don't

12:00:54 22    remember if we both said it or if he just said it,

12:00:57 23    but the conversation took place, then we exited the

12:00:59 1    vehicle, and walked back.

12:01:01 2            **BY MR. DAVENPORT:**

12:01:01 3        **Q.**   Okay.  How long did that conversation

12:01:02 4    last?

12:01:04 5        **A.**   It probably didn't last very long, but

12:01:08 6    I don't know an approximate time.

12:01:11 7        **Q.**   Did he happen to say what your next

12:01:13 8    steps should be at that point?

12:01:16 9        **A.**   I don't remember.  I just -- we just

12:01:19 10   got out, I think.

12:01:24 11       **Q.**   Did you exit the police vehicle because

12:01:25 12   Karl Schultz exited the police vehicle?

12:01:27 13       **A.**   Yes.

12:01:28 14       **Q.**   Did he tell you to exit the police

12:01:30 15   vehicle?

12:01:30 16       **A.**   No.  I just did it because he did it.

12:01:32 17       **Q.**   As you were walking back to the scene,

12:01:34 18   did you have any personal viewpoints on what had

12:01:40 19   happened at that point?

12:01:41 20       **A.**   Can you -- can you explain that?  What

12:01:44 21   do you mean?

12:01:44 22       **Q.**   Did you happen to view yourself any of

12:01:46 23   the incident, or were you just going based off of

| | | |
|---|---|---|
| 12:01:49 | 1 | what Karl Schultz told you? |
| 12:01:50 | 2 | **A.** No. We were -- we were both walking |
| 12:01:52 | 3 | back. We would have both seen Mr. Kistner. |
| 12:01:59 | 4 | **Q.** Where -- where would you have seen |
| 12:02:01 | 5 | Mr. Kistner as you were walking back? |
| 12:02:03 | 6 | **MS. HUGGINS:** Form. |
| 12:02:03 | 7 | **THE WITNESS:** On the ground. |
| 12:02:04 | 8 | **BY MR. DAVENPORT:** |
| 12:02:05 | 9 | **Q.** So I guess my question is: With what |
| 12:02:08 | 10 | Karl Schultz said, that Mr. Kistner threw himself |
| 12:02:10 | 11 | at the police vehicle, did you happen to watch any |
| 12:02:13 | 12 | of that incident unfold before you exited the |
| 12:02:16 | 13 | police vehicle? |
| 12:02:17 | 14 | **A.** Well, like I said, I -- I remember |
| 12:02:19 | 15 | having a short conversation with Karl about what |
| 12:02:26 | 16 | we -- what we saw from the mirror, but that would |
| 12:02:31 | 17 | have been it. |
| 12:02:32 | 18 | **Q.** So now you're saying, what we saw from |
| 12:02:35 | 19 | the mirror. Were you also looking at the driver's |
| 12:02:37 | 20 | side mirror when the collision was made with |
| 12:02:39 | 21 | Mr. Kistner? |
| 12:02:39 | 22 | **A.** Well, yeah, that's what I said. I said |
| 12:02:42 | 23 | I was looking in the driver's side mirror and |

*Moriarity - Davenport - 2/21/20*

113

| | | |
|---|---|---|
| 12:02:43 | 1 | then -- |
| 12:02:43 | 2 | Q.    And -- |
| 12:02:45 | 3 | MS. HUGGINS:  Well, let -- |
| 12:02:45 | 4 | THE WITNESS:   -- and then also looking |
| 12:02:46 | 5 | forward. |
| 12:02:47 | 6 | BY MR. DAVENPORT: |
| 12:02:48 | 7 | Q.    Okay.  So now you're -- you're looking |
| 12:02:49 | 8 | forward and looking at the driver's side mirror. |
| 12:02:51 | 9 | Were you looking at the driver's side mirror as the |
| 12:02:53 | 10 | collision was made? |
| 12:02:54 | 11 | MS. HUGGINS:  Form. |
| 12:02:54 | 12 | THE WITNESS:  I don't -- I don't remember. |
| 12:02:58 | 13 | In order for me to have the conversation with Karl, |
| 12:03:03 | 14 | I would say I was looking in the mirror at the |
| 12:03:05 | 15 | time. |
| 12:03:06 | 16 | BY MR. DAVENPORT: |
| 12:03:06 | 17 | Q.    And did you have any sort of an opinion |
| 12:03:09 | 18 | of what happened? |
| 12:03:11 | 19 | MS. HUGGINS:  Form. |
| 12:03:11 | 20 | THE WITNESS:  From -- from my perspective |
| 12:03:17 | 21 | looking into the mirror, it looked as though he |
| 12:03:20 | 22 | threw himself on her vehicle. |
| 12:03:23 | 23 | BY MR. DAVENPORT: |

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

12:03:24  1      Q.   And what led you to believe that

12:03:27  2  Mr. Kistner threw himself on the police vehicle?

12:03:29  3      A.   Again, I don't -- all I remember was

12:03:33  4  having the conversation with Karl about his

12:03:36  5  approach to the vehicle, and then from our -- from

12:03:40  6  our perspective, our vehicle was straight down the

12:03:44  7  street, and then we were looking in the mirror, and

12:03:47  8  then her vehicle was -- I don't know the word --

12:03:52  9  just --

12:03:52  10      Q.   Diagonal?

12:03:53  11      A.   Diagonal, yeah.  So it looked like he

12:03:56  12  threw himself on the vehicle.

12:03:57  13      Q.   So besides the fact that Mr. Kistner

12:03:59  14  was walking towards the vehicle and her vehicle was

12:04:01  15  diagonal, what other things did you see that led

12:04:04  16  yourself to believe that Mr. Kistner threw himself

12:04:08  17  at the vehicle, rather than the vehicle colliding

12:04:10  18  with Mr. Kistner?

12:04:11  19      MS. HUGGINS:   Form.

12:04:11  20      THE WITNESS:   Again, long time ago.  I was

12:04:13  21  very, very new, and from our -- from my perspective,

12:04:17  22  because I can't speak on Karl's perspective, from

12:04:19  23  my perspective, that's all I was going off of.

*Moriarity - Davenport - 2/21/20*

115

12:04:23  1          BY MR. DAVENPORT:

12:04:23  2          Q.   Were you going off of what Karl told

12:04:26  3   you, or were you going off of what you saw?

12:04:27  4          A.   No, no, no.  From -- from what I saw.

12:04:30  5   Like I said, from my perspective, that's what it

12:04:32  6   looked like.  But, I mean, even as I sit here right

12:04:35  7   now, I can't remember what it looked like.   It

12:04:38  8   was --

12:04:38  9          Q.   Do you remember if the police vehicle

12:04:39 10   that Lauren McDermott or Jenny Velez, that they

12:04:42 11   were in, was that vehicle stopped or was it moving

12:04:46 12   at the time of the collision?

12:04:47 13          MS. HUGGINS:   Form.

12:04:47 14          THE WITNESS:   From -- from my perspective as

12:04:51 15   I was looking in the mirror, it appeared as though

12:04:53 16   it was stopped.

12:04:55 17          BY MR. DAVENPORT:

12:04:55 18          Q.   How long, approximately, was it stopped

12:04:58 19   before that collision was made?

12:05:00 20          MS. HUGGINS:   Form.

12:05:00 21          THE WITNESS:   I -- I -- I can't judge time

12:05:03 22   like that, but the whole -- the whole incident

12:05:06 23   looked pretty quick.

12:05:08   1        BY MR. DAVENPORT:

12:05:09   2        Q.    Now, what part of Mr. Kistner's body

12:05:11   3   initially contacted the police vehicle?

12:05:14   4        A.    I -- I don't remember.

12:05:16   5        Q.    Do you recall if Mr. Kistner stuck his

12:05:18   6   arm out at all?

12:05:19   7        A.    I don't.

12:05:20   8        Q.    Do you recall how he fell to the

12:05:25   9   ground?

12:05:26  10        A.    I remember having a conversation with

12:05:29  11   Karl about him squatting down, leaning back, and

12:05:36  12   then putting his hand on the ground, and then

12:05:39  13   completing the fall.

12:05:40  14        Q.    Now --

12:05:41  15        A.    But I don't -- I don't remember seeing

12:05:42  16   that because it was so long ago and I was so

12:05:45  17   brand new.

12:05:46  18        Q.    Now, was that something that you saw

12:05:48  19   independently, or was that just something that Karl

12:05:50  20   said?

12:05:51  21        Because you're saying that we had it --

12:05:53  22        A.    That was -- yeah.  That -- well, that

12:05:54  23   was something that I saw and then had the

*Moriarity - Davenport - 2/21/20*

117

12:05:57  1  conversation with Karl about.  But, again, as I sit

12:06:02  2  here right now, I don't remember.

12:06:03  3       I mean, it -- it was -- like I said, it was

12:06:04  4  so long ago and I was so brand new.

12:06:06  5       Q.   Okay.  At the time of the incident, is

12:06:09  6  that what you believed was that Mr. Kistner stuck

12:06:12  7  his arm out and then fell to the ground, as the

12:06:15  8  police vehicle was stopped?

12:06:15  9       A.   At the time of the incident, yes, that

12:06:17 10  is -- that is what I believe.

12:06:19 11       Q.   Okay.  Now, as Mr. Kistner's falling to

12:06:25 12  the ground, is your police vehicle stopped or is it

12:06:27 13  moving at that time?

12:06:28 14       A.   I -- I don't remember.

12:06:30 15       Q.   When approximately did you stop your

12:06:33 16  police vehicle?

12:06:35 17       A.   I -- I don't remember when I stopped

12:06:38 18  it, if it was before the incident or after or

12:06:42 19  during.

12:06:42 20       Q.   Did Karl ask you to stop the police

12:06:44 21  vehicle?

12:06:47 22       A.   I don't remember if he asked me or not.

12:06:50 23  All I know is I did.

*Moriarity - Davenport - 2/21/20*

118

| | | |
|---|---|---|
| 12:06:51 | 1 | **Q.** Did you back up the police vehicle |
| 12:06:53 | 2 | after? |
| 12:06:54 | 3 | **A.** Yes. |
| 12:06:54 | 4 | **Q.** Okay. Approximately how far did you |
| 12:06:57 | 5 | back up the police vehicle? |
| 12:06:58 | 6 | **A.** I can't judge distance like that. |
| 12:07:00 | 7 | I don't -- I don't -- I don't know. I don't even |
| 12:07:02 | 8 | know where I stopped it. |
| 12:07:03 | 9 | **Q.** Okay. Now, why did you back up the |
| 12:07:07 | 10 | police vehicle at that time? |
| 12:07:08 | 11 | **A.** I probably didn't want to walk very |
| 12:07:11 | 12 | far. |
| 12:07:11 | 13 | **Q.** Okay. |
| 12:07:14 | 14 | **A.** Or it was quicker. |
| 12:07:16 | 15 | Could have been either of those. |
| 12:07:17 | 16 | **Q.** Before you and Karl got out of the car, |
| 12:07:19 | 17 | were Jenny Velez or Lauren McDermott out of the |
| 12:07:23 | 18 | police vehicle? |
| 12:07:23 | 19 | **A.** Before -- before me and Karl got out of |
| 12:07:25 | 20 | the car? |
| 12:07:26 | 21 | **Q.** Before you and Karl got out of the car. |
| 12:07:27 | 22 | **A.** I -- I don't know. |
| 12:07:28 | 23 | **Q.** Okay. |

*Moriarity - Davenport - 2/21/20*

119

| | | |
|---|---|---|
| 12:07:29 | 1 | **A.**   I couldn't -- I couldn't see who was -- |
| 12:07:32 | 2 | who was doing what at that point in time.  I was |
| 12:07:35 | 3 | focused on reversing. |
| 12:07:36 | 4 | **Q.**   Now, as you were walking back towards |
| 12:07:40 | 5 | Mr. Kistner, were you and Karl having any sort of |
| 12:07:42 | 6 | a conversation? |
| 12:07:43 | 7 | **A.**   I don't remember if we were or not. |
| 12:07:45 | 8 | **Q.**   Okay.  As you were walking back towards |
| 12:07:49 | 9 | the police vehicle, what did you notice about |
| 12:07:52 | 10 | Mr. Kistner? |
| 12:07:54 | 11 | **A.**   As we were walking back towards Lauren |
| 12:07:56 | 12 | and -- |
| 12:07:57 | 13 | **Q.**   Yes.  Back towards the second police |
| 12:07:59 | 14 | vehicle. |
| 12:08:02 | 15 | **A.**   I just remember him being on the |
| 12:08:03 | 16 | ground. |
| 12:08:05 | 17 | **Q.**   Was he saying anything at that time? |
| 12:08:08 | 18 | **A.**   Don't remember. |
| 12:08:09 | 19 | **Q.**   Do you remember any other individuals |
| 12:08:11 | 20 | besides Jim Kistner being out anywhere in that |
| 12:08:16 | 21 | police scene? |
| 12:08:16 | 22 | **MS. HUGGINS:**   Form. |
| 12:08:17 | 23 | **THE WITNESS:**   I don't know for sure if it |

*Moriarity - Davenport - 2/21/20*

121

12:09:18  1      Q.   Okay.  And so how long approximately

12:09:21  2  was it, after you first saw Mr. Kistner, that you

12:09:24  3  then made it out into the street?

12:09:29  4      A.   From when we were trying to leave, to

12:09:32  5  when I saw him come into the street?  Is that what

12:09:35  6  you're saying?

12:09:36  7      Q.   Well, I guess what you were telling me

12:09:38  8  is that you saw that Mr. Kistner walked out of the

12:09:40  9  same house that the second person came out of.

12:09:42  10      So I guess what my question is:  After you

12:09:46  11  first saw Mr. Kistner come out of that house, how

12:09:48  12  long was it before he entered the street?

12:09:49  13      **MS. HUGGINS:**  Form.  You can answer.

12:09:50  14      **THE WITNESS:**  I don't -- I don't -- I don't

12:09:57  15  know if I'd be able to judge that time.  I'm -- I'm

12:10:01  16  thinking it was quick.

12:10:02  17      **BY MR. DAVENPORT:**

12:10:02  18      Q.   Was it minutes or was it seconds?

12:10:05  19      A.   Not many minutes.

12:10:07  20      Q.   But you're thinking it would have been

12:10:10  21  minutes?

12:10:10  22      A.   Like maybe one or maybe seconds.

12:10:14  23      Q.   Okay.

12:10:16  1      **A.**    Yeah, I don't know.

12:10:17  2      **Q.**    Do you know why you and Karl Schultz

12:10:20  3  would have been sitting in your police vehicle for

12:10:22  4  a few minutes after you first entered your police

12:10:25  5  vehicle?

12:10:26  6      **MS. HUGGINS:**   Form.

12:10:26  7      **THE WITNESS:**   I -- I don't remember.

12:10:29  8  He could have been giving me an on-the-spot

12:10:33  9  evaluation.  We could have just been talking about

12:10:38 10  nothing.  We could have been just sitting there.

12:10:42 11      And like I said, I don't remember what --

12:10:45 12  what all we did on the larceny at 33 Schmarbeck, so

12:10:50 13  we could have just been talking about that right

12:10:53 14  before we were leaving.

12:10:54 15      **BY MR. DAVENPORT:**

12:10:54 16      **Q.**    Would that be something that he would

12:10:56 17  normally do is give you an on-the-spot evaluation?

12:10:58 18      **A.**    Sometimes.

12:10:59 19      **Q.**    Was that often or --

12:11:02 20      **A.**    Over 16 weeks, yeah, I mean, sometimes

12:11:05 21  he would just be like:  You did a good job, or,

12:11:08 22  hey, do this, do this better.

12:11:09 23      **Q.**    What kinds of things would he ask you

12:11:12  1  to -- you know, what kind -- sorry.  Strike that.

12:11:15  2  　　　　What kinds of procedures would he point out

12:11:17  3  that you didn't possibly do correctly during your

12:11:20  4  training?

12:11:20  5  　　　　**MS. HUGGINS:**  Form.

12:11:21  6  　　　　**THE WITNESS:**  Well, like I said, basic

12:11:25  7  information, if you -- if you get their name, date

12:11:28  8  of birth, and phone number, maybe you forget

12:11:30  9  a phone number to write down or something or, you

12:11:34  10  know, something -- something small like that, he

12:11:37  11  would be like:  Hey, go back out there and do this.

12:11:39  12  Or, hey, make sure you do this better next time.

12:11:44  13  　　　　**BY MR. DAVENPORT:**

12:11:44  14  　　　　**Q.**  Now, would you have -- I'm sorry.

12:11:50  15  Strike that.

12:11:51  16  　　　　For -- when you were walking back towards

12:11:54  17  Mr. Kistner towards the police vehicle, you said

12:11:56  18  that you saw him on the ground, correct?

12:11:59  19  　　　　**A.**  Yeah.

12:12:00  20  　　　　**Q.**  Was he sitting up, or was he laying

12:12:02  21  down?

12:12:10  22  　　　　**A.**  I think he was laying down, but

12:12:12  23  I can't -- I can't be too sure.

*Moriarity - Davenport - 2/21/20*

124

| | | |
|---|---|---|
| 12:12:15 | 1 | **Q.**   Okay. |
| 12:12:16 | 2 | **A.**   Very long time ago. |
| 12:12:17 | 3 | **Q.**   No.  Sure.  Sure. |
| 12:12:20 | 4 | Was he holding any part of his body at that |
| 12:12:24 | 5 | time? |
| 12:12:24 | 6 | **A.**   I don't remember. |
| 12:12:24 | 7 | **Q.**   Okay.  Was he complaining about his |
| 12:12:27 | 8 | head hurting him? |
| 12:12:27 | 9 | **A.**   I don't remember. |
| 12:12:31 | 10 | **Q.**   Who was the first person that made it |
| 12:12:34 | 11 | to Mr. Kistner?  Who first spoke to him? |
| 12:12:36 | 12 | **MS. HUGGINS:**   Form. |
| 12:12:38 | 13 | **THE WITNESS:**   I -- at this point in time, it |
| 12:12:40 | 14 | was not me, so I don't know who spoke to him first. |
| 12:12:45 | 15 | **BY MR. DAVENPORT:** |
| 12:12:45 | 16 | **Q.**   Okay.  Once somebody did speak to |
| 12:12:52 | 17 | Mr. Kistner, do you remember what was said to him? |
| 12:12:54 | 18 | **A.**   No. |
| 12:12:54 | 19 | **Q.**   What kinds of things would have been |
| 12:12:56 | 20 | said to him? |
| 12:12:56 | 21 | **MS. HUGGINS:**   Form. |
| 12:12:57 | 22 | **THE WITNESS:**   I'm -- I'm unsure of what type |
| 12:13:00 | 23 | of things could have or would have been said to |

*Moriarity - Davenport - 2/21/20*

125

| | | |
|---|---|---|
| 12:13:05 | 1 | him.  Very new in a very chaotic situation. |
| 12:13:09 | 2 | I didn't do much but attempt to observe as much |
| 12:13:13 | 3 | as I could. |
| 12:13:14 | 4 | **BY MR. DAVENPORT:** |
| 12:13:14 | 5 | **Q.**    And what were you trying to observe? |
| 12:13:17 | 6 | **A.**    What other officers were -- were doing, |
| 12:13:21 | 7 | what Mr. Kistner was doing. |
| 12:13:22 | 8 | **Q.**    Now, I understand that you were new at |
| 12:13:24 | 9 | the time -- |
| 12:13:24 | 10 | **A.**    Yeah. |
| 12:13:24 | 11 | **Q.**    -- but based on the experience that |
| 12:13:27 | 12 | you've been able to gain, what should have been |
| 12:13:29 | 13 | done if there was an individual -- whether he threw |
| 12:13:31 | 14 | himself at the police vehicle or whether the police |
| 12:13:33 | 15 | vehicle struck him, if he was on the ground, what |
| 12:13:36 | 16 | should have been done next? |
| 12:13:37 | 17 | **MS. HUGGINS:**   Form. |
| 12:13:37 | 18 | **THE WITNESS:**   Well, I mean, it's not so much |
| 12:13:40 | 19 | as what should have been done, it's what we did. |
| 12:13:42 | 20 | And what we did was observe what had just taken |
| 12:13:46 | 21 | place in front of us, and then other senior |
| 12:13:51 | 22 | officers assessed what to do. |
| 12:13:53 | 23 | **BY MR. DAVENPORT:** |

*Moriarity - Davenport - 2/21/20*

188

13:24:45   1         **MR. DAVENPORT:**  Sure.  So the disc that

13:24:46   2   I just played was Exhibit 12.  It is Exhibit A

13:24:51   3   supplement that was provided by the plaintiffs.

13:24:56   4         We are now playing Exhibit 11, which was

13:24:58   5   also provided by the plaintiffs.

13:24:58   6         (Video clip played.)

13:24:58   7   **BY MR. DAVENPORT:**

13:25:20   8         Q.   So now I am playing again what has been

13:25:23   9   marked as Exhibit 11, for purposes of the

13:25:26  10   deposition.  The last four digits are 2529.

13:25:31  11         Now, what I want you to pay attention to is

13:25:34  12   when the first instance that you would consider

13:25:37  13   contact has been made between Mr. Kistner and

13:25:41  14   Ms. Velez and Ms. McDermott's vehicle.

13:25:45  15         **A.**   Okay.

13:25:51  16         **MS. HUGGINS:**  Wait for a question.

13:25:52  17   **BY MR. DAVENPORT:**

13:25:52  18         Q.   What time is that?

13:25:54  19         What time -- what's the time stamp in the

13:25:55  20   top part of the video?

13:25:58  21         **MS. HUGGINS:**  Form.

13:25:58  22         **THE WITNESS:**  10:25:36.

13:26:02  23   **BY MR. DAVENPORT:**

*Moriarity - Davenport - 2/21/20*

189

13:26:02  1          Q.    Okay.   Would you agree with me that

13:26:04  2  your vehicle is still in view at that point at

13:26:09  3  10:25:36?

13:26:10  4          A.    Yeah.   Yes.

13:26:11  5          Q.    Okay.   Now, would you agree with me

13:26:13  6  that based on the other camera angle, you did not

13:26:17  7  appear back within view until 10:25:44?

13:26:22  8          MS. HUGGINS:   Form.

13:26:22  9          THE WITNESS:   Yeah, that's correct.

13:26:24  10          BY MR. DAVENPORT:

13:26:24  11          Q.    And that would have been eight seconds

13:26:26  12  after initial contact was made between Mr. Kistner

13:26:28  13  and that vehicle, correct?

13:26:29  14          MS. HUGGINS:   Form.   I'd object to -- we've

13:26:34  15  already indicated that we're not -- the accuracy of

13:26:37  16  these time stamps has not been verified in any way.

13:26:42  17          BY MR. DAVENPORT:

13:26:42  18          Q.    You can answer the question.

13:26:43  19          A.    Can you -- can you repeat the question

13:26:46  20  again?

13:26:46  21          MR. DAVENPORT:   Sure.

13:26:47  22          Can you read back the question that I just

13:26:49  23  asked?

*Moriarity - Davenport - 2/21/20*

190

| | | |
|---|---|---|
| 13:26:49 | 1 | (The above-requested portion was then read |
| 13:27:10 | 2 | by the reporter.) |
| 13:27:10 | 3 | **MS. HUGGINS:**  Same -- same form objection. |
| 13:27:13 | 4 | **THE WITNESS:**  Yeah.  Yes, as per that time |
| 13:27:17 | 5 | on the camera. |
| 13:27:19 | 6 | **BY MR. DAVENPORT:** |
| 13:27:19 | 7 | Q.    Okay.  So now assuming that you were |
| 13:27:21 | 8 | moving forward for six of those seconds, you |
| 13:27:26 | 9 | weren't stopped at the point that contact was made |
| 13:27:28 | 10 | between Mr. Kistner and the police vehicle, |
| 13:27:30 | 11 | correct? |
| 13:27:30 | 12 | **MS. HUGGINS:**  Form. |
| 13:27:32 | 13 | **THE WITNESS:**  No. |
| 13:27:33 | 14 | **BY MR. DAVENPORT:** |
| 13:27:34 | 15 | Q.    Okay.  Would you have been looking into |
| 13:27:37 | 16 | your driver's side mirror at this point? |
| 13:27:41 | 17 | A.    Like I said earlier, I -- I could have |
| 13:27:43 | 18 | been looking at the mirror or forward, but I do |
| 13:27:49 | 19 | remember at some point looking at the driver's side |
| 13:27:52 | 20 | mirror and seeing what I thought I saw. |
| 13:27:56 | 21 | Q.    So now assuming that you saw |
| 13:27:59 | 22 | Mr. Kistner make contact with the vehicle, you're |
| 13:28:01 | 23 | still driving forward for a few seconds, correct? |

*Moriarity - Davenport - 2/21/20*

191

13:28:04  1          MS. HUGGINS:  Form.

13:28:04  2          THE WITNESS:  Correct.

13:28:06  3          BY MR. DAVENPORT:

13:28:06  4          Q.    So why didn't you stop after contact

13:28:08  5     was made between Mr. Kistner and the police

13:28:10  6     vehicle?

13:28:10  7          MS. HUGGINS:  Form.

13:28:10  8          THE WITNESS:  Well, because you have to come

13:28:12  9     to a safe stop.  You can't just slam on the brakes

13:28:15  10    and slam your head into the steering wheel.  You

13:28:18  11    know what I mean?  You still have to stop.

13:28:21  12         BY MR. DAVENPORT:

13:28:21  13         Q.    Okay.  And it would have taken you,

13:28:24  14    let's assume, eight seconds to come back?

13:28:26  15         MS. HUGGINS:  Form.

13:28:27  16         BY MR. DAVENPORT:

13:28:28  17         Q.    To stop your car and come back, that

13:28:30  18    would be a safe stop?

13:28:31  19         MS. HUGGINS:  Form.

13:28:32  20         THE WITNESS:  Yeah.

13:28:32  21         BY MR. DAVENPORT:

13:28:32  22         Q.    Okay.  Now, let's assume that your

13:28:35  23    vehicle is moving away from the incident as it's

*Moriarity - Davenport - 2/21/20*

192

| | | |
|---|---|---|
| 13:28:37 | 1 | happening.  What -- do you think that what you |
| 13:28:43 | 2 | would be able to see would be distorted if you're |
| 13:28:47 | 3 | moving away from a scene rather than closer to |
| 13:28:49 | 4 | a scene? |
| 13:28:50 | 5 | **MS. HUGGINS:**  Form. |
| 13:28:50 | 6 | **THE WITNESS:**  You know, your eyes see what |
| 13:28:54 | 7 | they see, so I don't -- I can't speak on what can |
| 13:28:58 | 8 | be distorted and all that. |
| 13:29:03 | 9 | **BY MR. DAVENPORT:** |
| 13:29:03 | 10 | Q.   But you saw Mr. Kistner make contact |
| 13:29:06 | 11 | with the vehicle? |
| 13:29:07 | 12 | **MS. HUGGINS:**  Form.  Asked and answered. |
| 13:29:09 | 13 | **THE WITNESS:**  Yeah. |
| 13:29:10 | 14 | **BY MR. DAVENPORT:** |
| 13:29:10 | 15 | Q.   And then you kept on driving forward? |
| 13:29:12 | 16 | **MS. HUGGINS:**  Form. |
| 13:29:12 | 17 | **THE WITNESS:**  I was slowing down to a stop |
| 13:29:14 | 18 | and then reversing, yeah. |
| 13:29:15 | 19 | **BY MR. DAVENPORT:** |
| 13:29:15 | 20 | Q.   Was Karl Schultz telling you to stop at |
| 13:29:18 | 21 | that point? |
| 13:29:18 | 22 | A.   Like I said, I don't -- I don't |
| 13:29:21 | 23 | remember if he told me to stop.  I think I -- I |

13:29:24  1   think I just kind of stopped.

13:29:26  2        **Q.**   Okay.  Are you talking at all with Karl

13:29:31  3   Schultz as contact is initially made between the

13:29:33  4   police vehicle and Mr. Kistner?

13:29:34  5        **MS. HUGGINS:**  Form.

13:29:35  6        **THE WITNESS:**  As I already stated, I think --

13:29:40  7   I think we both -- I think either I said something,

13:29:44  8   he said something, or maybe we both said something

13:29:47  9   about what we thought we just saw.

13:29:50 10        **BY MR. DAVENPORT:**

13:29:50 11        **Q.**   Okay.  Now, I want you to watch again

13:30:02 12   the collision that is made between Mr. Kistner and

13:30:04 13   between the police vehicle, and I want you to tell

13:30:08 14   me if you still think that Mr. Kistner was the one

13:30:12 15   that threw himself at the police vehicle.

13:30:14 16        **MS. HUGGINS:**  Form.

13:30:21 17        (Video clip played.)

13:30:21 18        **BY MR. DAVENPORT:**

13:30:21 19        **Q.**   Does it look like Mr. Kistner threw

13:30:23 20   himself at that police vehicle?

13:30:24 21        **MS. HUGGINS:**  Form.

13:30:24 22        **THE WITNESS:**  Again, we're looking at

13:30:27 23   a camera at a different angle.  What I saw from my

13:30:31 1   perspective, it looked like he threw himself at the

13:30:36 2   vehicle.

13:30:37 3        BY MR. DAVENPORT:

13:30:37 4        Q.   But, again --

13:30:38 5        A.   So --

13:30:39 6        Q.   -- your perspective was you looking in

13:30:41 7   your driver's side mirror, as you were driving

13:30:43 8   forward.

13:30:43 9        A.   Correct.

13:30:43 10       Q.   And you were driving forward for eight

13:30:45 11  seconds after initial contact was made.

13:30:49 12       A.   That is correct.

13:30:50 13       MS. HUGGINS:   Form.

13:30:50 14       BY MR. DAVENPORT:

13:30:50 15       Q.   Okay.  Now, after contact was made, did

13:30:52 16  you notice that police vehicle moving forward at

13:30:56 17  all?

13:30:56 18       I can replay it if you need me to.

13:30:59 19       A.   I -- I just need you to say that

13:31:01 20  question again.  What do you mean?

13:31:03 21       Q.   Okay.

13:31:04 22       MS. HUGGINS:   Can you read it back, Anne?

13:31:04 23       (The above-requested portion was then read

*Moriarity - Davenport - 2/21/20*

195

13:31:24  1    by the reporter.)

13:31:24  2             **THE WITNESS:**  By this video, at this angle,

13:31:28  3    that's what it looks like.

13:31:30  4             **BY MR. DAVENPORT:**

13:31:30  5             **Q.**    Okay.

13:31:30  6             **A.**    But from what I saw when -- again, when

13:31:33  7    I was looking in my mirror, that's not what I saw.

13:31:35  8             **Q.**    Okay.  Did anybody talk with -- did

13:31:41  9    either you or Karl Schultz talk with Lauren

13:31:44  10   McDermott and Jenny Velez to see what they saw?

13:31:45  11            **A.**    I -- I would have never have done that.

13:31:48  12   Again, because I was so brand new, I deferred

13:31:51  13   everything to -- to the other officers.

13:31:54  14            **MR. DAVENPORT:**  Okay.  Now, I want you to

13:32:16  15   watch.

13:32:16  16            (Video clip played.)

13:32:16  17            **BY MR. DAVENPORT:**

13:32:18  18            **Q.**    Who is that individual that just came

13:32:21  19   into the scene right here?

13:32:23  20            **A.**    At the time, I -- I didn't know, and,

13:32:32  21   again, I -- I don't think we ever took down info.

13:32:38  22   I'm pretty sure it -- it was his son -- it's his

13:32:40  23   son.

*Moriarity - Davenport - 2/21/20*

196

13:32:43  1       **Q.**   Okay.  Would it be normal for somebody

13:32:45  2 to run out after their father after they've been

13:32:48  3 hit by a police vehicle?

13:32:48  4       **MS. HUGGINS:**  Form.

13:32:50  5       **THE WITNESS:**  You can't -- you can't just

13:32:53  6 determine that from -- from not knowing who he is

13:32:55  7 or anything like that.  You know what I mean?

13:32:57  8 I don't -- I don't -- I don't know who he is.

13:32:58  9       **BY MR. DAVENPORT:**

13:32:58 10       **Q.**   But after you came to -- because you

13:33:00 11 did say that you came to learn that --

13:33:00 12       **A.**   Yeah.  Yeah.

13:33:02 13       **Q.**   -- he may have been his son or --

13:33:03 14       **A.**   So --

13:33:04 15       **Q.**   -- related to him, that it would have

13:33:07 16 been normal for him to run out after his father

13:33:09 17 after he's been hit?

13:33:11 18       **MS. HUGGINS:**  Form.  Asked and answered, and

13:33:11 19 misstates the testimony.

13:33:12 20       **THE WITNESS:**  It's normal for some people.

13:33:14 21 It's normal -- not normal for other people.

13:33:14 22 I mean --

13:33:15 23       **BY MR. DAVENPORT:**

*Moriarity - Davenport - 2/21/20*

197

13:33:15  1      **Q.**   Would you run out after your father, if

13:33:17  2 he was hit by a police vehicle?

13:33:18  3      **A.**   Again, it's normal for some people.

13:33:20  4 It's normal -- not normal for --

13:33:22  5      **Q.**   I'm asking you for what you would

13:33:25  6 specifically do.

13:33:25  7      **A.**   I'm -- I'm going -- I'm going to answer.

13:33:25  8      **MS. HUGGINS:**  Form.

13:33:27  9      **THE WITNESS:**  Just let me answer.

13:33:27 10      **BY MR. DAVENPORT:**

13:33:28 11      **Q.**   Okay.

13:33:28 12      **A.**   It's normal for some people.  It's not

13:33:30 13 normal for other people.  I would.  There's other

13:33:31 14 people that I've seen that don't really care.  So

13:33:34 15 it is normal but it's also not normal.

13:33:36 16      **Q.**   Okay.  Now, at this point he runs out

13:33:40 17 and he stops really quickly.  At this point would

13:33:44 18 you say that he's made any threatening motions or

13:33:46 19 anything that would make you concerned for your

13:33:48 20 safety?

13:33:49 21      **MS. HUGGINS:**  Form.

13:33:50 22      **THE WITNESS:**  No.

13:33:51 23      **BY MR. DAVENPORT:**

*Moriarity - Davenport - 2/21/20*

282

15:02:11  1   driver's side mirror, I would say yes.

15:02:13  2        BY MR. DAVENPORT:

15:02:13  3        Q.   That the subject did intend to damage

15:02:15  4   the vehicle?

15:02:15  5        A.   From my driver's side mirror, yeah.

15:02:17  6        Q.   Okay.   What about the view that you saw

15:02:19  7   on the TV screen?

15:02:21  8        A.   I -- I mean, I'm -- I'm not -- I -- I'm

15:02:23  9   not going to say that because I didn't -- that's

15:02:25  10  not the viewpoint that I had.   I mean, I'm looking

15:02:31  11  through my -- my driver's side mirror.   That's what

15:02:34  12  I'm looking through.

15:02:35  13       Q.   Sure, but I guess just what I'm asking

15:02:37  14  is:   After watching that video, do you think that

15:02:39  15  the subject intended to damage the vehicle?

15:02:41  16       MS. HUGGINS:   Form.

15:02:42  17       THE WITNESS:   The way that he walked up to

15:02:44  18  a moving vehicle, and then it looks like the

15:02:47  19  vehicle was stopping or stopped, and then all of

15:02:51  20  a sudden he falls down, yeah, I would say -- I

15:02:53  21  would say, yeah, it does look like he intended

15:02:56  22  to -- to throw himself into the vehicle, so --

15:02:59  23       BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

283

| | | |
|---|---|---|
| 15:02:59 | 1 | **Q.**   But we talked about before, when we |
| 15:03:01 | 2 | were watching the -- when we were watching the |
| 15:03:03 | 3 | video, the car seemed to still be moving after |
| 15:03:06 | 4 | contact was made, correct? |
| 15:03:07 | 5 | **MS. HUGGINS:**  Form. |
| 15:03:07 | 6 | **THE WITNESS:**  From -- from wherever this |
| 15:03:09 | 7 | viewpoint was, I mean, it -- it can look like all |
| 15:03:12 | 8 | types of stuff, but what -- what did -- what did |
| 15:03:14 | 9 | the officers on the ground view? |
| 15:03:17 | 10 | You know, Lauren is the best person to ask |
| 15:03:19 | 11 | this question to.  I didn't -- I wasn't right here, |
| 15:03:23 | 12 | you know, I -- |
| 15:03:23 | 13 | **BY MR. DAVENPORT:** |
| 15:03:23 | 14 | **Q.**   Right.  No.  I -- I understand. |
| 15:03:24 | 15 | **A.**   I'm way up the street, you know? |
| 15:03:26 | 16 | **Q.**   And, you know, she signed this under |
| 15:03:28 | 17 | the penalties of perjury -- |
| 15:03:28 | 18 | **A.**   Yeah. |
| 15:03:30 | 19 | **Q.**   -- so it's -- you know, this is more so |
| 15:03:31 | 20 | what she said, but I'm just merely asking if you |
| 15:03:33 | 21 | agree with what was written. |
| 15:03:34 | 22 | **A.**   I -- I do agree with what -- |
| 15:03:36 | 23 | **MS. HUGGINS:**  Form. |

15:03:37   1        THE WITNESS:  -- was -- what was written.

15:03:37   2        BY MR. DAVENPORT:

15:03:37   3        Q.   So after what you saw on the video, he

15:03:39   4   intended to damage the vehicle?

15:03:40   5        MS. HUGGINS:  Form.  Asked and answered.

15:03:41   6        THE WITNESS:  Yeah.

15:03:42   7        BY MR. DAVENPORT:

15:03:42   8        Q.   Okay.  So going towards the next line:

15:03:45   9   The property of another person, City of Buffalo

15:03:48  10   Police Department, and having no right to do so,

15:03:51  11   nor any reasonable ground to believe that he had

15:03:54  12   such right, did damage the property, to wit,

15:03:58  13   driver's side mirror and driver's side mirror of

15:04:01  14   patrol vehicle, in the amount of more than $250.

15:04:04  15        Now, my question is:  At any point during

15:04:07  16   that day, was there ever a second opinion that was

15:04:11  17   received, besides the officers on scene, for what

15:04:13  18   the damage to the police vehicle was at that time?

15:04:16  19        A.   I would have absolutely no idea if --

15:04:19  20   if anyone else looked at -- looked at it.

15:04:23  21        I wouldn't even know who to -- who to ask

15:04:26  22   that to.

15:04:27  23        Q.   Okay.

15:04:27 1          **A.**    Maybe the -- I know -- I mean, did they

15:04:29 2     take it to the Seneca garage?  I don't know

15:04:32 3     these -- I don't know those answers.

15:04:33 4          **Q.**    Okay.

15:04:33 5          **A.**    I don't know what they did with -- with

15:04:36 6     anything.

15:04:37 7          **Q.**    So I'm going to show you what's been

15:04:39 8     marked as Exhibit 18.

15:04:42 9          **A.**    What is this?

15:04:45 10          **Q.**    Can you read the date that's right

15:04:48 11     underneath service information?

15:04:53 12          **A.**    Oh, the one that's circled?  1/5/2017.

15:04:57 13          **Q.**    Okay.  So, now, it's been represented

15:04:58 14     to us by your counsel that this is the first

15:05:02 15     maintenance work order after that incident, so --

15:05:06 16          **A.**    Okay.

15:05:06 17          **MS. HUGGINS:**   Form.

15:05:08 18          **BY MR. DAVENPORT:**

15:05:10 19          **Q.**    Do you see anything that's on there

15:05:12 20     where it refers to fixing or repairing a driver's

15:05:19 21     side window or driver's side mirror?

15:05:21 22          **A.**    No.

15:05:21 23          **Q.**    Okay.  Was does it refer to?

*Moriarity - Davenport - 2/21/20*

286

15:05:24　1　　　　A.　　It says service cooling system.　And

15:05:26　2　then remarks -- I don't know what RR means, but

15:05:29　3　water pump and then serp belt.　Maybe serpentine

15:05:36　4　belt.

15:05:36　5　　　　Q.　　Okay.　And would you agree that there's

15:05:38　6　no estimate as to what the cost will be for

15:05:42　7　repairing the vehicle?

15:05:43　8　　　　**MS. HUGGINS:**　Form.

15:05:44　9　　　　**THE WITNESS:**　Yeah.　It's blank.

15:05:45　10　　　　**BY MR. DAVENPORT:**

15:05:45　11　　　　Q.　　Okay.　And you would also agree with me

15:05:48　12　that it in no way refers to the driver's side

15:05:51　13　mirror or the driver's side window.

15:05:52　14　　　　A.　　Correct.

15:05:53　15　　　　Q.　　Okay.　So now turning back to Exhibit 17,

15:06:00　16　would you agree that it was speculation that the

15:06:03　17　amount of the damage was more than $250?

15:06:06　18　　　　**MS. HUGGINS:**　Form.

15:06:06　19　　　　**THE WITNESS:**　That would be speculation,

15:06:11　20　I've got to defer to Lauren.　I don't -- she --

15:06:14　21　again, you know, she signed off on the charges, so

15:06:16　22　I -- I don't know.

15:06:17　23　　　　**BY MR. DAVENPORT:**

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

*Moriarity - Davenport - 2/21/20*

287

15:06:17  1          Q.    Okay.

15:06:18  2          A.    I'm not a mechanic either.  I don't

15:06:20  3    know how much a mirror costs.

15:06:21  4          Q.    Sure.

15:06:21  5          All right.  So next sentence:  In that the

15:06:24  6    defendant did intentionally throw his body into the

15:06:27  7    driver's side mirror of patrol vehicle number 473,

15:06:31  8    causing the mirror to become dislodged from the

15:06:34  9    vehicle.

15:06:34  10         Now, on that day, did you observe the

15:06:36  11   driver's side mirror becoming dislodged from the

15:06:39  12   vehicle?

15:06:40  13         **MS. HUGGINS:**  Form.

15:06:40  14         **THE WITNESS:**  I don't even think I looked at

15:06:43  15   the truck.

15:06:43  16         **BY MR. DAVENPORT:**

15:06:43  17         Q.    Okay.  And also causing the driver's

15:06:47  18   side window to malfunction.  The value of said

15:06:49  19   damage to exceed $250.

15:06:53  20         Now, did anybody at any point talk about the

15:06:58  21   driver's side mirror or the driver's side window

15:07:01  22   being either dislodged or malfunctioning on the

15:07:03  23   day?

15:07:05  1          A.    It --

15:07:05  2          MS. HUGGINS:   Form.

15:07:06  3          THE WITNESS:   If -- if they -- they did,

15:07:09  4    they didn't say it to me, because why would you

15:07:11  5    talk to me?  I'm brand new.  If they said it in

15:07:15  6    front of me, then I don't -- I don't remember,

15:07:17  7    because I probably wasn't either -- I don't know.

15:07:20  8    I wasn't paying attention or I just didn't

15:07:22  9    remember.

15:07:27 10          BY MR. DAVENPORT:

15:07:28 11          Q.    All right.  So we'll turn to the next

15:07:30 12    criminal complaint, which is for disorderly

15:07:33 13    conduct.

15:07:33 14          So now it says, the said defendant, at the

15:07:37 15    aforesaid time and place, with intent to cause

15:07:40 16    public inconvenience, annoyance, or alarm, or

15:07:43 17    recklessly creating a risk thereof, while in

15:07:46 18    a public place, did use abusive or obscene language

15:07:51 19    or made an obscene gesture.

15:07:54 20          Now, at any time that you were with

15:07:57 21    Mr. Kistner, did he ever make an obscene gesture to

15:08:00 22    any of the officers?

15:08:01 23          A.    I mean, even -- even on the video, it

*Moriarity - Davenport - 2/21/20*

289

15:08:05  1  just shows us taking off.  I -- I didn't have any

15:08:11  2  confrontation with him, with the exception of

15:08:13  3  walking him back to patrol vehicle 532 and placing

15:08:18  4  him in the back, and then -- and then that was it.

15:08:22  5       Q.    Now, when you say a confrontation, what

15:08:24  6  are you referring to?

15:08:24  7       A.    Just -- just me in contact with him,

15:08:28  8  bringing him back to the patrol vehicle.  That --

15:08:32  9  that was it.  That's the confrontation.

15:08:34  10       Q.    Okay.  Did he ever make any sort of

15:08:36  11  rude remarks or use any obscene language directed

15:08:40  12  towards you or Mr. Schultz?

15:08:42  13       A.    Not to me.  Not from what I remember.

15:08:45  14       Q.    Okay.  What about to Mr. Schultz?

15:08:49  15       A.    Not to -- not to what I remember.

15:08:50  16       Q.    Okay.  Now, in that the defendant did

15:08:56  17  intentionally throw his body into the driver's side

15:08:59  18  mirror of patrol vehicle number 473, causing the

15:09:02  19  mirror to become dislodged from the vehicle and

15:09:04  20  also causing the driver's side window to

15:09:06  21  malfunction, the value of said damage to exceed

15:09:10  22  $250.

15:09:11  23       Now, do you know if for disorderly conduct,

15:09:14  1   is there some sort of a threshold amount of damage

15:09:17  2   that's recovered -- required in order to charge

15:09:19  3   somebody with that penal law statute?

15:09:21  4        **MS. HUGGINS:**  Form.

15:09:21  5        **THE WITNESS:**  No, there's not.

15:09:23  6        **BY MR. DAVENPORT:**

15:09:23  7        **Q.**   Okay.  And while being treated at ECMC,

15:09:27  8   the defendant did use obscene and offensive

15:09:30  9   language toward officers and medical staff.

15:09:33  10       Do you remember the individual, Mr. Kistner,

15:09:38  11  ever using obscene language towards the medical

15:09:40  12  staff there?

15:09:41  13       **A.**   I wasn't in the room with him.

15:09:43  14       **Q.**   Okay.  Now, have you ever used

15:09:53  15  a strip search or a body cavity search before,

15:09:57  16  after somebody's been taken to cell block or

15:10:01  17  booking?

15:10:01  18       **A.**   No.

15:10:01  19       **Q.**   Never before?

15:10:02  20       **A.**   No.  Cell block does their formal

15:10:05  21  searches, but no.

15:10:06  22       **Q.**   Have you ever directed a cell block

15:10:08  23  attendant to use a body cavity or a strip search?

*Moriarity - Davenport - 2/21/20*

293

15:11:38  1          **A.**    No.

15:11:39  2          **MR. DAVENPORT:**  Okay.  All right.  I think

15:11:41  3  I'm all set.

15:11:42  4          Do you have any questions?

15:11:43  5          **MS. HUGGINS:**  I have no questions.

15:11:44  6          **MR. DAVENPORT:**  All right.  Thank you.

7          (Proceedings of 2/21/20 were then concluded

8  at 3:11 p.m.)

9

10                          *       *       *

11

12

13

14

15

16

17

18

19

20

21

22

23

294

1        I hereby CERTIFY that I have read the

2   foregoing 293 pages, and that except as to those

3   changes (if any) as set forth in an attached errata

4   sheet, they are a true and accurate transcript of

5   the testimony given by me in the above entitled

6   action on February 21, 2020.

7

8

9                        ------------------------

10                       KYLE T. MORIARITY

11

12

13

14

15

16

17

18

19

20

21

22

23

295

1  STATE OF NEW YORK)

2                          ss:

3  COUNTY OF ERIE    )

4

5      I DO HEREBY CERTIFY as a Notary Public in and

6  for the State of New York, that I did attend and

7  report the foregoing deposition, which was taken

8  down by me in a verbatim manner by means of machine

9  shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18

                          ----------------------------
19                          ANNE T. BARONE, RPR,
                          Notary Public.
20

21

22

23

296

1                        **INDEX TO EXHIBITS**

2   **Exhibit**              **Description**              **Page**

3     EXH. 22          Buffalo Police Academy              14
                       training record, two pages
4
      EXH. 23          Verification page                  172
5

6

7
    * Exhibits retained by Mr. Davenport.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

297

```
1                    INDEX TO WITNESSES

2   Witness                Examination              Page

3     KYLE T. MORIARITY     BY MR. DAVENPORT:         3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

EXHIBIT I

1

**VIDEO DEPOSITION**
**JENNY VELEZ**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

-------------------------------------------
JAMES C. KISTNER,

                        Plaintiff,

            - vs -        Civil Action No.
                         18-cv-402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
 capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),

                        Defendants.
-------------------------------------------

2

1            Video deposition of **JENNY VELEZ**,

2  Defendant, taken pursuant to the Federal Rules of

3  Civil Procedure, in the offices of JACK W. HUNT &

4  ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

5  New York, on February 26, 2020, commencing at

6  10:11 a.m., before LYNNE E. DiMARCO, Notary Public.

7

8  APPEARANCES:      RUPP BAASE
                     PFALZGRAF & CUNNINGHAM, LLC,
9                    By CHAD DAVENPORT, ESQ.,
                     1600 Liberty Building,
10                   Buffalo, New York   14202,
                     (716) 854-3400,
11                   davenport@ruppbaase.com,
                     Appearing for the Plaintiff.
12
                     TIMOTHY A. BALL, ESQ.,
13                   Corporation Counsel,
                     By MAEVE E. HUGGINS, ESQ.,
14                   Assistant Corporation Counsel,
                     1137 City Hall,
15                   Buffalo, New York   14202,
                     (716) 851-4334,
16                   mhuggins@city-buffalo.com,
                     Appearing for the Defendants.
17
   PRESENT:          JAMES KISTNER
18                   LAUREN McDERMOTT

19                   PATRICK F. MORRIS, Videographer

20

21

10:02:14
10:11:41  22        **MR. DAVENPORT:**  Chad Davenport here on

10:11:47  23  behalf of the plaintiff Jim Kistner.

3

10:11:49 1          MS. HUGGINS:   Maeve Huggins on behalf of the

10:11:49 2   defendants.

10:11:49 3

10:12:01 4   **J E N N Y    V E L E Z**, 693 East Ferry Street,

10:12:05 5   Buffalo, New York 14211, after being duly called

10:12:07 6   and sworn, testified as follows:

10:12:07 7

10:12:07 8          **EXAMINATION BY MR. DAVENPORT:**

10:12:07 9

10:12:09 10         **Q.**    Good morning, Ms. Velez.

10:12:12 11         **A.**    Good morning.

10:12:13 12         **Q.**    My name is Chad Davenport.  I'm with

10:12:13 13   the law firm Rupp Baase Pfalzgraf Cunningham and we

10:12:15 14   represent the plaintiff Jim Kistner.

10:12:17 15         So we are here today to talk about events

10:12:19 16   that transpired on January 1st of 2017.  Before we

10:12:24 17   start, have you ever given sworn testimony before?

10:12:26 18         **A.**    Yes, I have.

10:12:27 19         **Q.**    And was that in a civil matter or was

10:12:31 20   that in a criminal matter?

10:12:32 21         **A.**    Criminal.

10:12:33 22         **Q.**    Okay.  Have you ever given sworn

10:12:35 23   testimony in front of -- in a civil matter before?

*Velez - Davenport - 02/26/2020*

74

| | | | |
|---|---|---|---|
| 11:16:46 | 1 | **Q.** | Okay. |
| 11:16:46 | 2 | **A.** | -- every single. |
| 11:16:48 | 3 | **Q.** | No, that's okay.  Did you review any |
| 11:16:51 | 4 | videos? | |
| 11:16:52 | 5 | **A.** | Yes. |
| 11:16:52 | 6 | **Q.** | Okay.  What videos did you review? |
| 11:16:55 | 7 | **A.** | I reviewed the video that was provided |
| 11:16:59 | 8 | regarding the incident. | |
| 11:17:00 | 9 | **Q.** | Okay.  How many video segments were |
| 11:17:00 | 10 | there? | |
| 11:17:05 | 11 | **A.** | I don't recall. |
| 11:17:05 | 12 | **Q.** | Okay.  Would it have been four? |
| 11:17:08 | 13 | **A.** | I don't recall. |
| 11:17:08 | 14 | **Q.** | Okay.  Did you watch each of the videos |
| 11:17:12 | 15 | that was on the disc that was provided to you? | |
| 11:17:14 | 16 | **A.** | Yes. |
| 11:17:14 | 17 | **Q.** | Okay.  In their entirety? |
| 11:17:16 | 18 | **A.** | Yes. |
| 11:17:17 | 19 | **Q.** | Okay.  Was that the first time that you |
| 11:17:21 | 20 | saw those video segments? | |
| 11:17:24 | 21 | **A.** | No. |
| 11:17:25 | 22 | **Q.** | Okay.  When was the first time that you |
| 11:17:27 | 23 | saw those video segments? | |

*Velez - Davenport - 02/26/2020*

75

11:17:27   1         A.    When I was served paperwork with

11:17:28   2    the -- regarding the lawsuit and the disc was

11:17:31   3    provided.

11:17:33   4         Q.    After you were served, did you watch

11:17:36   5    those videos again?

11:17:37   6         A.    Yes.

11:17:38   7         Q.    Approximately how many times did you

11:17:40   8    watch those videos?

11:17:44   9         A.    I viewed it the -- when I was served

11:17:48  10    and then that I can recall twice with Maeve.

11:17:56  11         Q.    Sure.  And I'm not going to ask what

11:17:59  12    kinds of discussions that you had with your

11:18:01  13    attorney, that's between you and her, but thank

11:18:03  14    you.

11:18:06  15         So prior to your deposition today, when was

11:18:08  16    the last time that you watched the video?

11:18:11  17         A.    Last week, I believe.

11:18:12  18         Q.    Okay.  And no other times in between

11:18:15  19    the last time that you watched it and your

11:18:18  20    deposition today, no segments or anything?

11:18:21  21         A.    No.

11:18:21  22         Q.    Okay.  So I'm going to --

11:18:21  23         MS. HUGGINS:  Other than obviously she was

*Velez - Davenport - 02/26/2020*

76

| | | |
|---|---|---|
| 11:18:24 | 1 | in attendance with -- for Officer McDermott's. |
| 11:18:24 | 2 | **THE WITNESS:** Right. |
| 11:18:25 | 3 | **MS. HUGGINS:** Detective McDermott's. |
| 11:18:25 | 4 | **MR. DAVENPORT:** Sure. |
| 11:18:26 | 5 | **MS. HUGGINS:** And they were shown during the |
| 11:18:28 | 6 | course of that deposition. |
| 11:18:29 | 7 | **BY MR. DAVENPORT:** |
| 11:18:29 | 8 | Q.   Sure.  So I'm going to show you what's |
| 11:18:32 | 9 | been marked as Exhibit 6.  Do you recognize this |
| 11:18:37 | 10 | document? |
| 11:18:37 | 11 | A.   Yes. |
| 11:18:37 | 12 | Q.   And what do you recognize it to be? |
| 11:18:40 | 13 | A.   A 941. |
| 11:18:45 | 14 | Q.   Okay.  Is the date on here January 1st |
| 11:18:49 | 15 | of 2017? |
| 11:18:49 | 16 | A.   Yes. |
| 11:18:49 | 17 | Q.   And is the time 4:37 for the time of |
| 11:18:53 | 18 | transport? |
| 11:18:54 | 19 | A.   Yes. |
| 11:18:55 | 20 | Q.   Okay.  Now, the time of transport, what |
| 11:19:00 | 21 | would that represent? |
| 11:19:07 | 22 | A.   I believe this was the time that he was |
| 11:19:09 | 23 | brought to ECMC. |

11:19:13  1          **Q.**   Okay.

11:19:14  2          **A.**   To the best of my recollection.

11:19:16  3          **Q.**   Do you know where he was brought to

11:19:18  4    ECMC from?

11:19:18  5          **A.**   Central booking.

11:19:20  6          **Q.**   And how long approximately were you at

11:19:23  7    central booking?

11:19:24  8          **A.**   I don't recall.

11:19:24  9          **Q.**   Okay.  Do you remember approximately

11:19:26  10    what time you got to central booking?

11:19:28  11          **A.**   I don't recall.

11:19:29  12          **Q.**   Okay.  Did you go straight from central

11:19:32  13    booking to ECMC?

11:19:33  14          **A.**   Yes.

11:19:34  15          **Q.**   Approximately how long did it take you

11:19:37  16    to get to ECMC from central booking?

11:19:39  17          **A.**   I don't recall.

11:19:41  18          **Q.**   Have you ever made the drive from

11:19:43  19    central booking to ECMC, other than this date?

11:19:49  20          **A.**   I don't remember.

11:19:50  21          **Q.**   Okay.  Have you ever brought someone in

11:19:56  22    on a 941 form after they had been brought to

11:20:00  23    central booking?

*Velez - Davenport - 02/26/2020*

78

| | | |
|---|---|---|
| 11:20:01 | 1 | **MS. HUGGINS:**  Form.  You can answer. |
| 11:20:03 | 2 | **THE WITNESS:**  I don't recall. |
| 11:20:04 | 3 | **BY MR. DAVENPORT:** |
| 11:20:04 | 4 | **Q.**   Okay.  Approximately -- |
| 11:20:05 | 5 | **A.**   For this incident we did. |
| 11:20:09 | 6 | **Q.**   Sure.  Sure.  Approximately how many |
| 11:20:11 | 7 | times have you used a 941 form before as a police |
| 11:20:15 | 8 | officer or a lieutenant or a detective? |
| 11:20:17 | 9 | **A.**   Numerous. |
| 11:20:18 | 10 | **Q.**   Okay.  Approximately how many times is |
| 11:20:20 | 11 | numerous? |
| 11:20:22 | 12 | **A.**   I don't want to give a false estimate. |
| 11:20:26 | 13 | I -- I don't recall. |
| 11:20:26 | 14 | **Q.**   Would it be more than a hundred? |
| 11:20:30 | 15 | **A.**   Possibly. |
| 11:20:30 | 16 | **Q.**   Okay.  Would it be more than 50? |
| 11:20:36 | 17 | **A.**   Yes. |
| 11:20:36 | 18 | **Q.**   Okay.  So, now, going through this |
| 11:20:41 | 19 | form, what sort of verbal cues did you indicate on |
| 11:20:49 | 20 | this form that Mr. Kistner was exhibiting that made |
| 11:20:53 | 21 | you -- led you to be concerned for his mental |
| 11:20:56 | 22 | health? |
| 11:20:56 | 23 | **A.**   I checked off refusal to respond to |

*Velez - Davenport - 02/26/2020*

79

11:20:59  1   questions, talking to self, hostile, argumentative,

11:20:59  2   belligerent, loud yelling, expresses idea of

11:20:59  3   inflated self-importance, and talks -- oh, I'm

11:20:59  4   sorry.

11:21:09  5        I put refusal to respond to questions,

11:21:11  6   talking to self, hostile, argumentative,

11:21:15  7   belligerent, loud yelling, expresses ideas of

11:21:19  8   inflated self-importance, and talks repeatedly

11:21:24  9   about a single subject, death, religion, illness,

11:21:29 10   government, et cetera.

11:21:30 11        And then in the narrative I put repeatedly

11:21:36 12   called officers Nazis and fascists.

11:21:39 13        Q.   Okay.  So, now, is there ever -- is

11:21:42 14   there a second page to a 941 form?

11:21:46 15        A.   No.

11:21:46 16        Q.   No.  Is there anywhere where you can

11:21:52 17   add to your narrative besides these two and a half

11:21:56 18   lines that are given to you?

11:21:57 19        A.   Just the justification for transport.

11:22:00 20        Q.   Yes, for the just -- justification for

11:22:04 21   transport, is there anywhere else where you can add

11:22:06 22   to the narrative besides that section right there?

11:22:09 23        A.   What was reported to the police about

*Velez - Davenport - 02/26/2020*

89

| | | |
|---|---|---|
| 11:30:55 | 1 | room besides Mr. Kistner? |
| 11:30:57 | 2 | **A.**   At that time, no. |
| 11:30:59 | 3 | **Q.**   Was there any ECMC staff that was in |
| 11:31:02 | 4 | the room? |
| 11:31:02 | 5 | **A.**   When he was talking to himself, not |
| 11:31:05 | 6 | that I could recall. |
| 11:31:08 | 7 | **Q.**   Approximately -- you can give a |
| 11:31:10 | 8 | percentage on this, approximately how much of the |
| 11:31:13 | 9 | time that Mr. Kistner was at ECMC before being |
| 11:31:17 | 10 | transferred to central booking was he in the room |
| 11:31:22 | 11 | by himself? |
| 11:31:22 | 12 | **MS. HUGGINS:**   Form.  You can answer. |
| 11:31:24 | 13 | **THE WITNESS:**   Can you repeat that? |
| 11:31:26 | 14 | **BY MR. DAVENPORT:** |
| 11:31:26 | 15 | **Q.**   So how -- how much of the time that |
| 11:31:28 | 16 | Mr. Kistner spent at ECMC before being transferred |
| 11:31:31 | 17 | to central booking was he in the hospital room by |
| 11:31:35 | 18 | himself? |
| 11:31:38 | 19 | **A.**   We were right outside the door, so if |
| 11:31:41 | 20 | he wasn't being evaluated, that I could recall.  I |
| 11:31:45 | 21 | don't know a specific amount of time. |
| 11:31:48 | 22 | **Q.**   Do you recall approximately how many |
| 11:31:51 | 23 | individuals -- how many ECMC staff individuals |

*Velez - Davenport - 02/26/2020*

90

| | | |
|---|---|---|
| 11:31:58 | 1 | evaluated Mr. Kistner? |
| 11:32:00 | 2 | **A.**   No. |
| 11:32:01 | 3 | **Q.**   Okay.   Would it have been more than |
| 11:32:03 | 4 | five? |
| 11:32:05 | 5 | **MS. HUGGINS:**   Form.   You can answer. |
| 11:32:07 | 6 | **THE WITNESS:**   I don't recall.   I remember |
| 11:32:10 | 7 | one doctor. |
| 11:32:14 | 8 | **BY MR. DAVENPORT:** |
| 11:32:16 | 9 | **Q.**   So, now, you said that you've done |
| 11:32:19 | 10 | other 941 forms before.   Where do you typically |
| 11:32:24 | 11 | send individuals who are being evaluated under a |
| 11:32:28 | 12 | 941? |
| 11:32:28 | 13 | **A.**   We always take them to ECMC. |
| 11:32:28 | 14 | **Q.**   Okay. |
| 11:32:33 | 15 | **A.**   To CPEP. |
| 11:32:33 | 16 | **Q.**   Do you typically deal with the same |
| 11:32:38 | 17 | individuals at ECMC in terms of staff there? |
| 11:32:40 | 18 | **A.**   It varies. |
| 11:32:41 | 19 | **Q.**   Okay.   Was there anybody there present |
| 11:32:45 | 20 | at ECMC that day that you had recognized from a |
| 11:32:49 | 21 | previous 941? |
| 11:32:51 | 22 | **MS. HUGGINS:**   Form.   You can answer. |
| 11:32:54 | 23 | **BY MR. DAVENPORT:** |

*Velez - Davenport - 02/26/2020*

91

| | | |
|---|---|---|
| 11:32:55 | 1 | **Q.**   Was there anybody there -- |
| 11:32:56 | 2 | **A.**   Staff? |
| 11:32:56 | 3 | **Q.**   -- present on January 1st of 2017 that |
| 11:32:59 | 4 | you recognized from a prior time that you had |
| 11:33:02 | 5 | brought an individual to ECMC on a 941? |
| 11:33:05 | 6 | **A.**   I don't recall. |
| 11:33:06 | 7 | **Q.**   Okay.  Who would you typically deal |
| 11:33:10 | 8 | with at ECMC for a 941 evaluation? |
| 11:33:14 | 9 | **A.**   For the 941 evaluation we come in |
| 11:33:18 | 10 | through the emergency room entrance, whether it's a |
| 11:33:22 | 11 | 941 or a regular medical evaluation, we come in the |
| 11:33:27 | 12 | same way. |
| 11:33:28 | 13 | We stop at the reception window.  They're |
| 11:33:33 | 14 | triaged for their vitals, and then they're |
| 11:33:34 | 15 | transported over to the CPEP portion of the |
| 11:33:40 | 16 | hospital. |
| 11:33:40 | 17 | **Q.**   Okay.  Do you typically stay with those |
| 11:33:45 | 18 | individuals after they're brought on a 941, do you |
| 11:33:49 | 19 | stay at ECMC? |
| 11:33:50 | 20 | **A.**   We stay with them until they're taken |
| 11:33:55 | 21 | into the secure part of the psychiatric section. |
| 11:33:57 | 22 | **Q.**   And what would that secure part be |
| 11:34:00 | 23 | called, what is that called? |

*Velez - Davenport - 02/26/2020*

92

11:34:04  1          A.     CPEP.

11:34:07  2          Q.     Okay.  And you mentioned the triage,

11:34:10  3    what was the triage referring to?

11:34:12  4          A.     Just the part -- so you give your

11:34:13  5    paperwork in and then they sit with a nurse and

11:34:16  6    their vitals are taken; blood pressure,

11:34:19  7    temperature.

11:34:20  8          Q.     Are there other individuals, other

11:34:22  9    patients who are in the triage?

11:34:24  10         A.     It's a -- it's a room where just that

11:34:27  11   person is evaluated.

11:34:29  12         Q.     And that person is in there by

11:34:33  13   themselves?

11:34:33  14         A.     While they're being evaluated, yes.

11:34:38  15         Q.     Okay.  Approximately how many --

11:34:38  16         A.     With an officer present, there's an

11:34:40  17   officer for just the vitals for the triage portion.

11:34:41  18         Q.     Okay.  Do you recall on January 1st of

11:34:45  19   2017, did you stay with Mr. Kistner in the triage?

11:34:49  20         A.     I don't recall if we both did or one of

11:34:53  21   us did, myself or Officer McDermott.  I don't

11:34:55  22   recall.

11:34:55  23         Q.     You and Officer McDermott were

11:34:57  1  traveling together on that day, correct?

11:34:59  2        **A.**   Yes.

11:34:59  3        **Q.**   And Officer McDermott is here today?

11:35:01  4        **A.**   Yes.

11:35:01  5        **Q.**   Okay.  So on that day do you recall

11:35:09  6  leaving the hospital without Officer McDermott?

11:35:13  7        **A.**   No.

11:35:14  8        **Q.**   Do you recall Officer McDermott leaving

11:35:16  9  the hospital without you?

11:35:18  10        **A.**   No.

11:35:19  11        **Q.**   If you weren't in the triage when

11:35:26  12  Mr. Kistner was being evaluated, where else would

11:35:30  13  you have been?

11:35:30  14        **A.**   I could possibly been outside the door

11:35:32  15  using the lavatory.  I just -- I don't recall.

11:35:33  16        **Q.**   Do you remember approximately how long

11:35:36  17  Mr. Kistner was in the triage?

11:35:37  18        **A.**   I don't.

11:35:38  19        **Q.**   Okay.  Was it more than an hour?

11:35:40  20        **A.**   I don't recall.

11:35:41  21        **Q.**   Okay.  When an individual is in the

11:35:44  22  triage, are they evaluated only by nurses or are

11:35:48  23  they also evaluated by a physician?

| 12:05:01 | 1 | **A.** Yes. |

**A.** Yes.

12:05:01 2 **Q.** Have you ever checked that box before?

12:05:03 3 **A.** No.

12:05:04 4 **Q.** Okay. What -- what sorts of -- strike
12:05:08 5 that.

12:05:08 6 What would a CIT crisis plan be?

12:05:13 7 **A.** I'm not trained on a CIT crisis plan,
12:05:18 8 so I would have to ask either crisis services about
12:05:21 9 that individual if there is a plan in place, but I
12:05:25 10 have never checked that box.

12:05:26 11 **Q.** Okay. Is a CIT crisis plan required
12:05:34 12 before an individual goes to CPEP?

12:05:38 13 **A.** Not that I'm aware of.

12:05:40 14 **Q.** Is a CIT crisis plan required after an
12:05:48 15 individual leaves CPEP?

12:05:49 16 **A.** I wouldn't know.

12:05:50 17 **Q.** Okay. That's not part of the crisis
12:05:52 18 intervention training that you received in 2019?

12:05:52 19 **A.** No, not for the what happens in the
12:05:54 20 CPEP evaluation, no.

12:05:56 21 **Q.** Okay. Now, turning again to the verbal
12:06:04 22 and behavioral cue talking to self. Now, did you
12:06:10 23 say that that was based on observations while

*Velez - Davenport - 02/26/2020*

113

| | | |
|---|---|---|
| 12:06:14 | 1 | Mr. Kistner was in his room at ECMC? |
| 12:06:16 | 2 | **A.**    That I could recall, yes. |
| 12:06:18 | 3 | **Q.**    Okay.  Do you know if Mr. Kistner was |
| 12:06:21 | 4 | given any sort of a call button at ECMC? |
| 12:06:26 | 5 | **A.**    I -- I know typically beds are equipped |
| 12:06:29 | 6 | with them, but I don't know that he used one. |
| 12:06:33 | 7 | **Q.**    Okay.  Is it possible that Mr. Kistner |
| 12:06:38 | 8 | would have been speaking into the call button at |
| 12:06:43 | 9 | his bed at ECMC? |
| 12:06:43 | 10 | **A.**    It's possible that he did.  I'm not |
| 12:06:47 | 11 | certain. |
| 12:06:47 | 12 | **Q.**    Okay.  Did you ever specifically see |
| 12:06:50 | 13 | Mr. Kistner talking to himself where you were sure |
| 12:06:55 | 14 | that he wasn't speaking into the call button? |
| 12:06:58 | 15 | **A.**    Yes. |
| 12:06:58 | 16 | **Q.**    Okay.  Can you describe that? |
| 12:06:59 | 17 | **A.**    He was laying in his bed laying |
| 12:07:03 | 18 | straight talking out loud. |
| 12:07:04 | 19 | **Q.**    And it's impossible that he could have |
| 12:07:08 | 20 | been pressing the call button at the same time? |
| 12:07:11 | 21 | **A.**    He may have been.  He appeared to me at |
| 12:07:15 | 22 | the time to be talking to himself. |
| 12:07:16 | 23 | **Q.**    Okay. |

*Velez - Davenport - 02/26/2020*

114

| | | |
|---|---|---|
| 12:07:16 | 1 | **A.**   Okay. |
| 12:07:16 | 2 | **Q.**   But you don't know if he was or wasn't |
| 12:07:19 | 3 | pressing the call button at that time? |
| 12:07:22 | 4 | **A.**   Correct, I don't recall. |
| 12:07:23 | 5 | **Q.**   Okay.  Now, you say in your statement |
| 12:07:25 | 6 | for justification for transport that the subject |
| 12:07:28 | 7 | did intentionally throw himself at the patrol |
| 12:07:31 | 8 | vehicle.  Was that what you believed based on what |
| 12:07:37 | 9 | you personally saw that day on January 1st of 2017? |
| 12:07:40 | 10 | **A.**   I did not personally see that. |
| 12:07:42 | 11 | **Q.**   Okay.  Did somebody tell you that |
| 12:07:46 | 12 | Mr. Kistner threw himself at a police vehicle? |
| 12:07:48 | 13 | **A.**   Yes. |
| 12:07:49 | 14 | **Q.**   And who told you that Mr. Kistner threw |
| 12:07:53 | 15 | himself at a patrol vehicle? |
| 12:07:55 | 16 | **A.**   Officer McDermott and Officer Schulz. |
| 12:07:57 | 17 | **Q.**   Okay.  Now, you also have checked, and |
| 12:08:06 | 18 | I'm -- I apologize that there's a hole punch that's |
| 12:08:11 | 19 | through it, there's a check and it looks like it |
| 12:08:15 | 20 | says places self in dangerous situations; do you |
| 12:08:18 | 21 | see where that is? |
| 12:08:18 | 22 | **A.**   Yes. |
| 12:08:19 | 23 | **Q.**   Now, would that have been based off of |

12:08:23  1    your personal observations?

12:08:26  2         **A.**    This was what was told to me by two

12:08:31  3    separate officers.

12:08:32  4         **Q.**    Okay.  But that wasn't based on what

12:08:35  5    you personally observed, correct?

12:08:37  6         **A.**    Correct.

12:08:43  7         **Q.**    Now, based off of what you have now

12:08:48  8    seen on the video, do you still believe that

12:08:52  9    Mr. Kistner threw himself intentionally at the

12:08:56  10   patrol vehicle?

12:08:56  11        **MS. HUGGINS:**  Form.  You may answer.

12:08:58  12        **THE WITNESS:**  Can you repeat that?  I'm

12:08:58  13   sorry.

12:08:58  14        **BY MR. DAVENPORT:**

12:09:01  15        **Q.**    Based on what you saw from the video

12:09:03  16   surveillance that you watched last week, as

12:09:03  17   recently as last week, do you still believe that

12:09:07  18   Mr. Kistner intentionally threw himself at the

12:09:10  19   police vehicle?

12:09:11  20        **MS. HUGGINS:**  Form.  You may answer.

12:09:12  21        **THE WITNESS:**  The perspective of the video

12:09:16  22   and my perspective are different.  I was told

12:09:22  23   what -- what had happened.  And based on what I see

*Velez - Davenport - 02/26/2020*

116

| 12:09:26 | 1 | in the video it does appear that way. |

12:09:26  1  in the video it does appear that way.

12:09:29  2      BY MR. DAVENPORT:

12:09:30  3      Q.   It appears that Mr. Kistner threw

12:09:34  4  himself intentionally at the police vehicle?

12:09:37  5      A.   From my perspective of what I see in

12:09:37  6  the video, yes.

12:09:38  7      Q.   Okay.  So that's based on what you saw

12:09:40  8  in the video, then, correct?

12:09:40  9      A.   From what I -- like I said, I had seen

12:09:44  10  the video after what was told me, so based on what

12:09:47  11  was told to me and what I see in the video

12:09:51  12  I -- that's still my -- my perspective of what I

12:09:54  13  see in the video.

12:09:54  14      Q.   Okay.  Excluding what was told to you,

12:09:58  15  based solely on what you see in the video, do you

12:10:01  16  believe that Mr. Kistner intentionally threw

12:10:04  17  himself at the police vehicle?

12:10:05  18      MS. HUGGINS:   Form.

12:10:07  19      THE WITNESS:   May I answer?

12:10:08  20      MS. HUGGINS:   Yes, you may answer, sorry.

12:10:11  21      THE WITNESS:   Yes.

12:10:11  22      BY MR. DAVENPORT:

12:10:12  23      Q.   Okay.  I just want to make sure.

12:34:38  1   service.

12:34:38  2          Q.    Okay.  Do you get breaks during your

12:34:41  3   shift?

12:34:41  4          A.    We can request a break, yes.

12:34:43  5          Q.    Okay.  How long do you typically take a

12:34:47  6   break, if you do request one?

12:34:48  7          A.    It could be 30 minutes.

12:34:50  8          Q.    Are you required to request a break at

12:34:54  9   some point during your shift?

12:34:54 10          A.    We're not required to, it's optional.

12:34:57 11          Q.    Okay.  Typically your shifts are 10

12:35:00 12   hours, correct?

12:35:00 13          A.    Yes.

12:35:01 14          Q.    Okay.  Do you ever take a break where

12:35:04 15   you don't request one, are there any mandated

12:35:09 16   breaks?

12:35:09 17          A.    There --

12:35:09 18          MS. HUGGINS:  Form.  You can answer.

12:35:13 19          THE WITNESS:  There are no mandated breaks.

12:35:15 20          BY MR. DAVENPORT:

12:35:15 21          Q.    Okay.  How often do you take 30-minute

12:35:17 22   breaks during your shifts?

12:35:19 23          A.    Occasionally.

*Velez - Davenport - 02/26/2020*

143

| | |
|---|---|
| 12:35:21  1 | **Q.**   Okay.  More or less than half the |
| 12:35:24  2 | shifts that you work? |
| 12:35:26  3 | **MS. HUGGINS:**  Form. |
| 12:35:27  4 | **THE WITNESS:**  I'm not certain. |
| 12:35:31  5 | **BY MR. DAVENPORT:** |
| 12:35:32  6 | **Q.**   Do you ever take a lunch break during |
| 12:35:34  7 | your shift? |
| 12:35:34  8 | **A.**   That would be the lunch break. |
| 12:35:36  9 | **Q.**   Okay.  Do you ever eat your lunch in |
| 12:35:39 10 | your car? |
| 12:35:39 11 | **A.**   Yes. |
| 12:35:40 12 | **Q.**   Okay.  Is that most of the time? |
| 12:35:42 13 | **A.**   Sometimes. |
| 12:35:43 14 | **Q.**   Do you sometimes not eat lunch during |
| 12:35:46 15 | the day? |
| 12:35:46 16 | **A.**   I eat something every day. |
| 12:35:48 17 | **Q.**   Okay.  Snacks, then? |
| 12:35:50 18 | **A.**   It could be a snack or it could be a |
| 12:35:53 19 | lunch. |
| 12:35:53 20 | **Q.**   Okay.  Do you recall eating on |
| 12:35:56 21 | January 1st of 2017? |
| 12:35:57 22 | **A.**   I do not. |
| 12:36:00 23 | **Q.**   Okay.  Now, your next call is at |

*Velez - Davenport - 02/26/2020*

144

| | | |
|---|---|---|
| 12:36:07 | 1 | 10:36 a.m. and you were dispatched for domestic |
| 12:36:11 | 2 | trouble; do you see that? |
| 12:36:11 | 3 | **A.**     Yes. |
| 12:36:12 | 4 | **Q.**     Do you remember anything about that |
| 12:36:13 | 5 | call? |
| 12:36:14 | 6 | **A.**     I do not. |
| 12:36:15 | 7 | **Q.**     Okay.  Now, at 10:57 a.m. it says that |
| 12:36:21 | 8 | you were dispatched for an accident or injury at 37 |
| 12:36:26 | 9 | Schmarbeck; do you see that? |
| 12:36:27 | 10 | **A.**     Yes. |
| 12:36:27 | 11 | **Q.**     Who would have made that initial entry |
| 12:36:32 | 12 | for accident or injury? |
| 12:36:33 | 13 | **A.**     The dispatcher enters it. |
| 12:36:35 | 14 | **Q.**     And how would the dispatcher enter that |
| 12:36:38 | 15 | information? |
| 12:36:38 | 16 | **A.**     It could -- it could be a call in from |
| 12:36:41 | 17 | police, it could be a call in from a citizen. |
| 12:36:46 | 18 | However they received the information they would |
| 12:36:49 | 19 | dispatch a call. |
| 12:36:51 | 20 | **Q.**     Okay.  Now, it says at 11:22 your |
| 12:37:02 | 21 | location change was ECMC; do you see that? |
| 12:37:05 | 22 | **A.**     Yes. |
| 12:37:09 | 23 | **Q.**     Would that mean that you had arrived at |

| | | |
|---|---|---|
| 12:37:12 | 1 | ECMC or that you were on your way to ECMC? |
| 12:37:17 | 2 | **A.** It could be either one. |
| 12:37:18 | 3 | **Q.** Okay. What's your typical practice, do |
| 12:37:25 | 4 | you usually radio in when you arrive at a situation |
| 12:37:28 | 5 | or when you're on your way to a -- or a new |
| 12:37:28 | 6 | location? |
| 12:37:31 | 7 | **MS. HUGGINS:** Form. You can answer. |
| 12:37:33 | 8 | **THE WITNESS:** Typically when we're leaving |
| 12:37:34 | 9 | to go to the situation or to the location. Excuse |
| 12:37:39 | 10 | me. |
| 12:37:39 | 11 | **BY MR. DAVENPORT:** |
| 12:37:40 | 12 | **Q.** Okay. I asked both of them, so I |
| 12:37:42 | 13 | definitely understand why you said that. |
| 12:37:44 | 14 | Now, it says at 3:37 your location was to |
| 12:37:52 | 15 | CB; do you see that? |
| 12:37:53 | 16 | **A.** Yes. |
| 12:37:54 | 17 | **Q.** Does that refer to central booking? |
| 12:37:56 | 18 | **A.** Yes, I believe so. |
| 12:37:58 | 19 | **Q.** Okay. Now, at 3:48 p.m. it says on |
| 12:38:09 | 20 | scene; do you see that? |
| 12:38:09 | 21 | **A.** Yes. |
| 12:38:10 | 22 | **Q.** Would that mean that you were on scene |
| 12:38:12 | 23 | at central booking? |

*Velez - Davenport - 02/26/2020*

146

12:38:14  1      A.      Yes.

12:38:21  2      Q.      Now, at 4:36 p.m. your location changed

12:38:27  3  again to ECMC; do you see that?

12:38:28  4      A.      Yes.

12:38:29  5      Q.      Now, that would mean in your typical

12:38:33  6  practice that you were on your way to ECMC,

12:38:37  7  correct, not necessarily what you did that day, I

12:38:39  8  just want to know typical practice, you normally

12:38:42  9  radio in on your way to a new location?

12:38:44 10      A.      Uh-huh.

12:38:45 11      Q.      So based on your typical practice that

12:38:48 12  would mean you're on your way to ECMC, correct?

12:38:48 13      A.      Yes.

12:38:48 14      Q.      Okay.

12:38:53 15      A.      But, again, it would depend on how

12:38:56 16  dispatch took our transmission.  They would be the

12:38:59 17  ones responsible for entering this.

12:39:01 18      Q.      Okay.  Now, at 4:37 p.m. it says en

12:39:07 19  route; do you see that?

12:39:07 20      A.      Yes.

12:39:08 21      Q.      Now, based on that entry, would you say

12:39:11 22  that your location change ECMC was made on your way

12:39:16 23  to ECMC prior to you actually leaving central

*Velez - Davenport - 02/26/2020*

151

12:43:15 1     **Q.**   Okay.  So on this day you would have

12:43:18 2  collected overtime for two hours and 16 minutes

12:43:21 3  over your shift?

12:43:22 4     **MS. HUGGINS:**  Form.

12:43:24 5     **THE WITNESS:**  I'm not certain exactly what

12:43:27 6  time my shift ended.  So if -- like I said, I'm not

12:43:31 7  sure if it was 6:16 or if I had stayed additional

12:43:35 8  time.  I'm not certain.

12:43:36 9     **BY MR. DAVENPORT:**

12:43:36 10     **Q.**   If you stay additional time to work on

12:43:39 11  paperwork, do you have to make any sort of an entry

12:43:42 12  to end your shift?

12:43:43 13     **A.**   We fill out a form.

12:43:45 14     **Q.**   That's each day?

12:43:46 15     **A.**   If we stay, if we fill out an overtime

12:43:52 16  slip if we stay for every time we stay, yes.

12:43:53 17     **Q.**   Okay.  Are there any times that you are

12:43:59 18  required to or that you would fill out paperwork

12:44:03 19  during your regularly scheduled 10-hour shift?

12:44:06 20     **MS. HUGGINS:**  Form.

12:44:07 21     **BY MR. DAVENPORT:**

12:44:08 22     **Q.**   I'm sorry.  That was a bad question.

12:44:10 23     Are you required to patrol for your entire

12:44:15  1  10-hour shift?

12:44:18  2       **A.**    Minus the break we -- yes.

12:44:19  3       **Q.**    Okay.  So there would never be any time

12:44:25  4  that you would end your shift early to complete

12:44:27  5  paperwork, correct?

12:44:29  6       **A.**    It depends.  We would still be working,

12:44:32  7  but I may call myself back to the station house to

12:44:35  8  complete paperwork.  Or field training officers

12:44:37  9  they -- I believe it's -- I don't recall if it's

12:44:39  10  30 minutes or a little bit longer to complete their

12:44:43  11  field training officer paperwork.

12:44:44  12       So there are instances where you would call

12:44:47  13  yourself out of service just prior to the end of

12:44:50  14  your shift to complete documents.

12:44:51  15       **Q.**    Okay.  So I'm going to show you what's

12:45:03  16  been marked as Exhibit 3.  Do you recognize that

12:45:07  17  document?

12:45:09  18       **A.**    Yes.

12:45:11  19       **Q.**    And what do you recognize it to be?

12:45:13  20       **A.**    A complaint summary report.

12:45:14  21       **Q.**    Where was the location for that

12:45:16  22  complaint summary report?

12:45:17  23       **A.**    33 Schmarbeck.

12:45:20  1      Q.    Do you know the individual who was the

12:45:23  2  complainant for that complaint summary report?

12:45:25  3      A.    I do not.

12:45:26  4      Q.    Have you ever encountered any

12:45:28  5  individuals while working at C District at the

12:45:32  6  location 33 Schmarbeck?

12:45:33  7      A.    Not that I can recall.

12:45:36  8      Q.    Okay.  Do you know which officers

12:45:37  9  responded to that call at 33 Schmarbeck?

12:45:40 10      A.    Yes.

12:45:40 11      Q.    Okay.  And which officers were those?

12:45:43 12      A.    Kyle Moriarity and Carl Schulz.

12:45:47 13      Q.    What brought you to the scene that day

12:45:50 14  for that complaint summary report?

12:45:54 15      A.    From what I can recall, Officer

12:45:58 16  McDermott had responded there before, so she wanted

12:46:02 17  to see if they needed any assistance and give them

12:46:05 18  information that she may have had from previously

12:46:08 19  responding.

12:46:08 20      Q.    Okay.  Did she talk to you at all about

12:46:11 21  previously responding for that individual?

12:46:14 22      A.    I don't recall anything specific.

12:46:16 23      Q.    Okay.  Did she tell you when

*Velez - Davenport - 02/26/2020*

154

| | | |
|---|---|---|
| 12:46:18 | 1 | approximately she had previously responded? |
| 12:46:20 | 2 | **A.**   I don't -- |
| 12:46:22 | 3 | **Q.**   For that location? |
| 12:46:22 | 4 | **A.**   I don't recall. |
| 12:46:23 | 5 | **Q.**   Did she tell you the information that |
| 12:46:25 | 6 | she wanted to convey to Mr. Moriarity or Mr. Schulz |
| 12:46:29 | 7 | that day? |
| 12:46:30 | 8 | **A.**   I don't recall. |
| 12:46:31 | 9 | **Q.**   Okay.  Did she say the name of the |
| 12:46:34 | 10 | individual that she had encountered previously? |
| 12:46:37 | 11 | **A.**   Not that I can recall. |
| 12:46:38 | 12 | **Q.**   Okay.  Since this incident has she |
| 12:46:43 | 13 | discussed any incidents that she has responded to |
| 12:46:47 | 14 | at 33 Schmarbeck? |
| 12:46:48 | 15 | **A.**   No. |
| 12:46:49 | 16 | **Q.**   Okay.  What about 37 Schmarbeck? |
| 12:46:51 | 17 | **A.**   No. |
| 12:46:53 | 18 | **Q.**   Okay. |
| 12:46:53 | 19 | **MS. HUGGINS:**   Form. |
| 12:46:53 | 20 | **BY MR. DAVENPORT:** |
| 12:46:54 | 21 | **Q.**   Besides January 1st of 2017, did you |
| 12:46:59 | 22 | ride with Ms. McDermott on any other occasions? |
| 12:47:03 | 23 | **A.**   Yes. |

*Velez - Davenport - 02/26/2020*

155

12:47:03  1        Q.   Okay.  Were there any other times where

12:47:06  2    a call was made from 33 or 37 Schmarbeck where you

12:47:12  3    and Ms. McDermott went to go and investigate the

12:47:15  4    situation?

12:47:15  5        A.   Not that I could recall.

12:47:16  6        Q.   But on this specific day she wanted to

12:47:19  7    go to this call at 33 Schmarbeck, because she

12:47:22  8    recalled responding to a previous incident there?

12:47:25  9        A.   Yes.

12:47:25 10        Q.   Okay.  Approximately what time did you

12:47:33 11    arrive at the scene that day?

12:47:35 12        A.   I don't recall.

12:47:36 13        Q.   Okay.  Was it in the morning?

12:47:38 14        A.   It was.

12:47:38 15        Q.   Do you remember what the weather was

12:47:41 16    like that day?

12:47:42 17        A.   Not specifically.

12:47:43 18        Q.   Was it cold?

12:47:44 19        A.   Yes.

12:47:45 20        Q.   Okay.  Was it icy?

12:47:47 21        A.   I don't recall.

12:47:48 22        Q.   Do you recall any trouble walking that

12:47:51 23    day?

*Velez - Davenport - 02/26/2020*

156

| | | |
|---|---|---|
| 12:47:52 | 1 | **A.**   Not that I could recall. |
| 12:47:54 | 2 | **Q.**   What types of shoes do you typically |
| 12:47:58 | 3 | wear as a patrol officer? |
| 12:48:02 | 4 | **A.**   I wear Bates boots. |
| 12:48:04 | 5 | **Q.**   Okay.  And that was the same at that |
| 12:48:06 | 6 | time in January -- on January 1st of 2017? |
| 12:48:06 | 7 | **A.**   Yes, they're department issued.  I wear |
| 12:48:08 | 8 | them all the time. |
| 12:48:09 | 9 | **Q.**   Okay.  And those are the same boots |
| 12:48:12 | 10 | that are issued today? |
| 12:48:13 | 11 | **A.**   Yes. |
| 12:48:14 | 12 | **Q.**   Do you recall where you were |
| 12:48:17 | 13 | approximately at the time that Ms. McDermott |
| 12:48:20 | 14 | decided that she would help Officer Schulz and |
| 12:48:24 | 15 | Officer Moriarity with that call at 33 Schmarbeck? |
| 12:48:28 | 16 | **MS. HUGGINS:**  Form.  You may answer. |
| 12:48:29 | 17 | **THE WITNESS:**  I don't recall. |
| 12:48:30 | 18 | **BY MR. DAVENPORT:** |
| 12:48:31 | 19 | **Q.**   Do you recall approximately how long it |
| 12:48:32 | 20 | took you to drive from where you were previously to |
| 12:48:34 | 21 | 33 Schmarbeck? |
| 12:48:35 | 22 | **A.**   I don't recall. |
| 12:48:36 | 23 | **Q.**   Okay.  When you arrived at the scene, |

*Velez - Davenport - 02/26/2020*

157

| | | |
|---|---|---|
| 12:48:38 | 1 | what did you see? |
| 12:48:40 | 2 | **A.** I don't recall. |
| 12:48:42 | 3 | **Q.** Was there a car that was present that |
| 12:48:45 | 4 | day? |
| 12:48:50 | 5 | **A.** I believe there -- we had parked behind |
| 12:48:53 | 6 | a car. |
| 12:48:54 | 7 | **Q.** Okay. Do you remember the -- the color |
| 12:48:57 | 8 | of that car? |
| 12:48:58 | 9 | **A.** I do not. |
| 12:48:58 | 10 | **Q.** Do you remember what type of a car it |
| 12:49:06 | 11 | was? |
| 12:49:06 | 12 | **A.** I do not. |
| 12:49:07 | 13 | **Q.** Okay. Was it a large or a small |
| 12:49:10 | 14 | vehicle? |
| 12:49:15 | 15 | **A.** I think it was a van. |
| 12:49:17 | 16 | **Q.** Okay. |
| 12:49:17 | 17 | **A.** I believe it was a van. |
| 12:49:18 | 18 | **Q.** Okay. When you arrived at the scene, |
| 12:49:22 | 19 | were Officer Schulz or Officer Moriarity outside of |
| 12:49:26 | 20 | their vehicle? |
| 12:49:29 | 21 | **A.** I could recall -- I -- no, I don't, I |
| 12:49:35 | 22 | don't recall who was outside of the vehicle. |
| 12:49:36 | 23 | **Q.** Okay. Was there an individual standing |

*Velez - Davenport - 02/26/2020*

158

| | | |
|---|---|---|
| 12:49:41 | 1 | on the sidewalk at that time? |
| 12:49:42 | 2 | A.   I don't recall. |
| 12:49:44 | 3 | Q.   Do you recall at any point was there an |
| 12:49:47 | 4 | individual standing on the sidewalk? |
| 12:49:49 | 5 | A.   I don't recall. |
| 12:49:50 | 6 | Q.   Do you recall at any time was Officer |
| 12:49:52 | 7 | Schulz or Officer Moriarity outside of their |
| 12:49:55 | 8 | vehicle? |
| 12:49:57 | 9 | A.   Can you? |
| 12:49:59 | 10 | Q.   Prior to -- strike that. |
| 12:50:05 | 11 | Do you recall at any time during the |
| 12:50:07 | 12 | incident that was responded to by Officer Schulz |
| 12:50:10 | 13 | and Officer Moriarity at 33 Schmarbeck at any point |
| 12:50:14 | 14 | while you were there were Officer Schulz or Officer |
| 12:50:18 | 15 | Moriarity outside of their vehicle? |
| 12:50:19 | 16 | A.   I recall off -- one of them being |
| 12:50:21 | 17 | outside of their vehicle, but I don't recall who it |
| 12:50:23 | 18 | was. |
| 12:50:23 | 19 | Q.   Now, the officer that was not outside |
| 12:50:25 | 20 | of their vehicle that was still inside the parked |
| 12:50:29 | 21 | car, did they have their window up or down? |
| 12:50:31 | 22 | A.   I don't recall them being inside the |
| 12:50:33 | 23 | parked car.  I just -- I just remember one officer |

12:50:36  1  being outside of the car.  I don't recall where the

12:50:37  2  other officer was and I don't recall if it was

12:50:39  3  Kyle, Officer Moriarity or -- or Officer Schulz.

12:50:42  4       **MS. HUGGINS:**  Do her a favor and just slow

12:50:45  5  down.

12:50:45  6       **THE WITNESS:**  Yeah, on the sidewalk, I don't

12:50:45  7  recall.

12:50:45  8       **BY MR. DAVENPORT:**

12:50:45  9       **Q.**   Okay.

12:50:48 10       **A.**   Or if they were in the street.  I just

12:50:48 11  remember them being outside of the car, one of

12:50:48 12  them.

12:50:54 13       **Q.**   Do you recall approximately how long

12:50:55 14  you were at the scene responding to that incident

12:50:58 15  at 33 Schmarbeck?

12:50:59 16       **A.**   I do not.

12:51:00 17       **Q.**   Okay.  Based on what is recorded on

12:51:04 18  that document, does that refresh your recollection

12:51:05 19  for how long you were at that scene?

12:51:08 20       **A.**   No.

12:51:08 21       **Q.**   Okay.  Is there any reason to dispute

12:51:13 22  that the time entries on there that would indicate

12:51:16 23  that Officer Schulz and Officer Moriarity were at

*Velez - Davenport - 02/26/2020*

197

| | | |
|---|---|---|
| 13:28:20 | 1 | regarding paperwork or anything of that nature with |
| 13:28:23 | 2 | the booking process, I would defer to him, because |
| 13:28:26 | 3 | he was a lieutenant. |
| 13:28:27 | 4 | Q.    What sorts of issues would you have |
| 13:28:29 | 5 | with paperwork, would it be penal statutes or, you |
| 13:28:34 | 6 | know, I guess, what sorts of questions would you |
| 13:28:36 | 7 | ask of this lieutenant at central booking? |
| 13:28:39 | 8 | A.    It depends.  It could vary, it could be |
| 13:28:40 | 9 | paperwork, it could be a situation, correct |
| 13:28:43 | 10 | charges. |
| 13:28:43 | 11 | Q.    Okay.  What other sorts of paperwork |
| 13:28:47 | 12 | would you typically fill out at central booking? |
| 13:28:51 | 13 | A.    We just turn in our 163, the report |
| 13:28:55 | 14 | technicians complete the documentation for us. |
| 13:28:59 | 15 | Q.    And, I'm sorry, what does a 163 refer |
| 13:29:02 | 16 | to? |
| 13:29:03 | 17 | A.    The arrest form. |
| 13:29:05 | 18 | Q.    Okay.  Do you give that 163 arrest form |
| 13:29:16 | 19 | to central booking after it's completed? |
| 13:29:19 | 20 | A.    Yes. |
| 13:29:19 | 21 | Q.    Okay.  And then do you know who central |
| 13:29:23 | 22 | booking takes that arrest form to? |
| 13:29:25 | 23 | A.    As I explained, when we come in for the |

*Velez - Davenport - 02/26/2020*

198

13:29:28  1  arrest process, we give it to the -- at the window.

13:29:30  2  And then that report technician makes a copy, gives

13:29:34  3  us the copy so we can complete the booking process

13:29:37  4  with the prisoner.

13:29:38  5       And then a second copy goes back to the

13:29:40  6  report technicians who complete our court

13:29:43  7  documentation, our complaints, the rest of the

13:29:45  8  forms that need to be completed for the court file.

13:29:47  9       Q.   Okay.  After those forms are completed,

13:29:50  10 would the arresting officer sign off on those

13:29:53  11 criminal complaint documents?

13:29:55  12      A.   If they're the complainant on it, if

13:29:58  13 the State of New York is the complainant on it, if

13:30:00  14 we're the complainant on it, then yes.

13:30:01  15      Q.   Okay.  If an individual who is not a

13:30:04  16 police officer is the complainant, they would sign

13:30:06  17 off on the arrest forms or criminal complaint

13:30:07  18 forms?

13:30:07  19      A.   If they were present, if they came down

13:30:09  20 to central booking, they can sign.  At one time we

13:30:12  21 could sign on information and belief, so we would

13:30:13  22 sign on -- on behalf of them if they gave us a

13:30:17  23 supporting deposition that said we want to be a

13:30:19  1   complaint, they're just not present.  So those are

13:30:22  2   the times we would sign.  I'm sorry.

13:30:25  3        **Q.**   Okay.  Now, do you see underneath zip

13:30:40  4   code on the appearance ticket where it says

13:30:43  5   records?  It's directly above part two that's

13:30:48  6   underlined and bolded; do you see that?

13:30:49  7        **A.**   Yes.

13:30:50  8        **Q.**   What is that referring to?

13:30:54  9        **A.**   What part of it are you referring to

13:30:58  10  that is referring to?

13:30:59  11       **Q.**   Well, there's records that is written

13:31:02  12  underneath zip code and directly above part two

13:31:06  13  which is underlined and bolded.  Do you know why

13:31:10  14  records would be written in that section?

13:31:13  15       **A.**   I did not create this document.  I -- I

13:31:16  16  don't know.

13:31:16  17       **Q.**   Okay.  Now, you were a passenger with

13:31:48  18  Ms. McDermott on January 1st of 2017, correct?

13:31:51  19       **A.**   Yes.

13:31:52  20       **Q.**   Were you a passenger at the time that

13:31:55  21  the car and Mr. Kistner collided with each other?

13:31:59  22       **MS. HUGGINS:**  Form.  You may answer.

13:32:00  23       **THE WITNESS:**  I was in the passenger's side

*Velez - Davenport - 02/26/2020*

200

13:32:02  1    during the incident.

13:32:03  2            **BY MR. DAVENPORT:**

13:32:03  3            **Q.**    Okay.  Did you see that incident?

13:32:05  4            **A.**    I did not.

13:32:06  5            **Q.**    Okay.  So you didn't see the car make

13:32:11  6    contact with Mr. Kistner?

13:32:11  7            **MS. HUGGINS:**  Form.  You may answer.

13:32:13  8            **THE WITNESS:**  I did not see Mr. Kistner make

13:32:16  9    contact with the car.

13:32:16  10           **THE REPORTER:**  I'm sorry?

13:32:16  11           **THE WITNESS:**  I did not see Mr. Kistner make

13:32:18  12   contact with the car.

13:32:18  13           **BY MR. DAVENPORT:**

13:32:18  14           **Q.**    Did Ms. McDermott tell you that she saw

13:32:21  15   the incident, the collision with Mr. Kistner in the

13:32:25  16   vehicle?

13:32:25  17           **A.**    She did.

13:32:26  18           **Q.**    Okay.  And what did she tell you?

13:32:29  19           **A.**    She told me that Mr. Kistner had -- I

13:32:32  20   can't remember if she said threw himself or put

13:32:35  21   himself into the mirror of the car.

13:32:38  22           **Q.**    Okay.  Did you happen to observe what

13:32:41  23   the mirror looked like on the driver's side of that

*Velez - Davenport - 02/26/2020*

201

| | | |
|---|---|---|
| 13:32:45 | 1 | vehicle after the collision? |
| 13:32:46 | 2 | **A.**   I did. |
| 13:32:46 | 3 | **Q.**   Okay.  And how did it appear to you? |
| 13:32:48 | 4 | **A.**   That it was dislodged from the body of |
| 13:32:51 | 5 | the car. |
| 13:32:52 | 6 | **Q.**   Now, when you say dislodged, was it |
| 13:32:55 | 7 | still attached but it was partially detached from |
| 13:32:59 | 8 | the car? |
| 13:32:59 | 9 | **A.**   Yes. |
| 13:32:59 | 10 | **Q.**   Okay.  So it -- it was still there on |
| 13:33:03 | 11 | the car, it hadn't fallen off completely, correct? |
| 13:33:07 | 12 | **A.**   Correct. |
| 13:33:07 | 13 | **Q.**   Okay.  Was there any damage to the |
| 13:33:09 | 14 | glass on that mirror? |
| 13:33:12 | 15 | **A.**   The glass itself was not damaged. |
| 13:33:16 | 16 | **Q.**   Okay.  Did you try to use or did |
| 13:33:24 | 17 | Ms. McDermott try to use the window on the driver's |
| 13:33:27 | 18 | side of that vehicle that day? |
| 13:33:29 | 19 | **A.**   She did. |
| 13:33:29 | 20 | **Q.**   Okay.  Were you present when she tried |
| 13:33:32 | 21 | to use the window? |
| 13:33:33 | 22 | **A.**   Yes. |
| 13:33:33 | 23 | **Q.**   Okay.  Did it make any sort of a |

*Velez - Davenport - 02/26/2020*

202

13:33:37  1  screeching sound or anything like that?

13:33:40  2       **A.**   It did, it -- it made a noise and it

13:33:42  3  like wiggled and hesitated to go up and down.

13:33:45  4       **Q.**   Okay.  What car were you driving that

13:33:47  5  day?

13:33:47  6       **A.**   I wasn't driving that day.

13:33:49  7       **Q.**   Excuse me.  What car were you a

13:33:51  8  passenger in that day?

13:33:53  9       **A.**   I believe it was 473.

13:33:55 10       **Q.**   Okay.  Did you and Ms. McDermott have a

13:33:57 11  specific vehicle that you liked to use?

13:34:00 12       **A.**   She had -- she preferred 473.  I

13:34:05 13  preferred 472.

13:34:06 14       **Q.**   Okay.  Was there any reason why car 473

13:34:11 15  was used on the day of the incident?

13:34:14 16       **A.**   Availability.

13:34:14 17       **Q.**   Okay.  Did you use car 473 again after

13:34:18 18  January 1st of 2017?

13:34:19 19       **A.**   I'm sure we did.  If Officer McDermott

13:34:22 20  was driving, she -- she would drive that car.

13:34:25 21       **Q.**   Okay.  Do you recall when your next

13:34:27 22  shift would have been after January 1st of 2017?

13:34:29 23       **A.**   I don't recall.

*Velez - Davenport - 02/26/2020*

203

13:34:31   1        **Q.**   Okay.   Would it have been before

13:34:36   2   January 5th of 2017?

13:34:40   3        **A.**   It would have.   Well, if January 1 was

13:34:44   4   our last day, the most we could have been off was

13:34:48   5   for four days, so then we would have been back.

13:34:51   6        So if -- if January 1 was our last day,

13:34:55   7   because I don't recall, we would have been -- the

13:34:55   8   most we -- the longest we could have been off was

13:34:56   9   the 2nd, 3rd, 4th, 5th.

13:35:00   10        So the earliest would have been January 6th

13:35:03   11   or 5th, if we were off for three.

13:35:06   12        **Q.**   Okay.   Do you know when the next time

13:35:08   13   would have been that you would use car 473?

13:35:11   14        **A.**   No.

13:35:11   15        **Q.**   Okay.   Do you recall if the next time

13:35:13   16   that you used car 473 did it have a dislodged

13:35:17   17   mirror or were there any issues with the driver's

13:35:20   18   side window?

13:35:20   19        **A.**   I don't recall.

13:35:21   20        **Q.**   Okay.   Do you recall ever driving the

13:35:23   21   vehicle again where it had a dislodged mirror or

13:35:27   22   issues with the driver's side window?

13:35:28   23        **A.**   I don't recall driving 473 at all.

*Velez - Davenport - 02/26/2020*

204

13:35:31  1   Like I said, I would prefer to drive 472, but I

13:35:35  2   don't recall being in that vehicle in -- with an

13:35:39  3   issue.

13:35:39  4       Like I don't recall after that incident when

13:35:41  5   was the next time we had taken that vehicle.  I

13:35:44  6   don't recall.

13:35:44  7       Q.   Do you recall ever being in a police

13:35:47  8   vehicle where the driver's side mirror was

13:35:50  9   dislodged or the driver's side window had issues

13:35:53  10  with going up and down?

13:35:55  11      MS. HUGGINS:   Form.  You can answer.

13:35:57  12      THE WITNESS:   I've driven vehicles that have

13:35:59  13  had issues with windows before.

13:36:02  14      BY MR. DAVENPORT:

13:36:02  15      Q.   And what sort of issues were those?

13:36:05  16      A.   I had one that the window wouldn't go

13:36:08  17  down before.

13:36:09  18      Q.   But you were never in a vehicle where

13:36:13  19  the window would make noises as it was going down,

13:36:17  20  correct?

13:36:17  21      A.   Correct.

13:36:17  22      Q.   Okay.  Do you recall what car you were

13:36:19  23  driving when the window would not go down?

*Velez - Davenport - 02/26/2020*

205

13:36:24    1         **A.**    It may have been a Crown Vic, a Crown

13:36:28    2    Victoria, the old model car we had, because we had

13:36:31    3    some that were very old.

13:36:33    4         **Q.**    Okay.  Now, on the day of the incident

13:36:36    5    did you make any sort of an estimation as to how

13:36:40    6    much damage was caused to car 473 by this incident?

13:36:44    7         **A.**    I did not.

13:36:45    8         **Q.**    Okay.  Would you agree or disagree that

13:36:47    9    it was more than $250 worth of damage to the

13:36:50   10    vehicle?

13:36:51   11         **MS. HUGGINS:**  Form.  You can answer.

13:36:52   12         **THE WITNESS:**  I'm not a professional, I -- I

13:36:54   13    would not know.

13:36:55   14         **BY MR. DAVENPORT:**

13:36:55   15         **Q.**    On the day of the incident did you

13:36:57   16    believe is that it was more than $250 worth of

13:37:01   17    damage to the vehicle?

13:37:02   18         **A.**    Based on the information that was given

13:37:04   19    to me by Officer McDermott on the damage and the

13:37:08   20    charges that she signed on, yes.

13:37:10   21         **Q.**    But that wasn't based off of your

13:37:12   22    personal observation of the damage to the vehicle?

13:37:14   23         **A.**    I can't estimate that.  I don't know

*Velez - Davenport - 02/26/2020*

206

13:37:17  1   how much that would cost.

13:37:18  2         Q.    Do you know if Ms. McDermott can make

13:37:21  3   that estimation?

13:37:21  4         A.    You would have to ask Officer

13:37:21  5   McDermott.

13:37:21  6         Q.    Is she trained on how to make those

13:37:25  7   estimations?

13:37:25  8         A.    You would have to ask Officer

13:37:25  9   McDermott.

13:37:28  10        Q.    Are you trained on how to make those

13:37:29  11  estimations?

13:37:29  12        A.    I am not.

13:37:30  13        Q.    Okay.   Are any police officers trained

13:37:32  14  on how to make those estimations?

13:37:35  15        A.    I don't know.

13:37:36  16        Q.    Okay.   I'm going to show you what's

13:37:37  17  been marked as Exhibit 18.   Do you recognize this

13:37:45  18  document?

13:37:48  19        A.    I've -- no, I haven't seen one of

13:37:51  20  these.

13:37:53  21        Q.    Do you see where it's written

13:37:56  22  underneath fleet management what is written?

13:37:58  23        A.    Yes.

*Velez - Davenport - 02/26/2020*

207

| | | |
|---|---|---|
| 13:37:59 | 1 | **Q.**   What's written? |
| 13:38:00 | 2 | **A.**   Maintenance work order. |
| 13:38:02 | 3 | **Q.**   Okay.  Do you have any reason to |
| 13:38:04 | 4 | dispute that this is a maintenance work order? |
| 13:38:06 | 5 | **A.**   No. |
| 13:38:07 | 6 | **Q.**   Do you have any reason to dispute that |
| 13:38:10 | 7 | this is a maintenance work order that was made and |
| 13:38:12 | 8 | created by the City of Buffalo? |
| 13:38:14 | 9 | **MS. HUGGINS:**  Form. |
| 13:38:14 | 10 | **THE WITNESS:**  It has a seal on it, no. |
| 13:38:17 | 11 | Again, no. |
| 13:38:18 | 12 | **BY MR. DAVENPORT:** |
| 13:38:18 | 13 | **Q.**   Okay.  Now, looking at this for the |
| 13:38:24 | 14 | vehicle information, what car was fixed according |
| 13:38:27 | 15 | to this maintenance work order? |
| 13:38:30 | 16 | **A.**   This has unit 473 on it. |
| 13:38:33 | 17 | **Q.**   Okay.  And what was the date of |
| 13:38:36 | 18 | service? |
| 13:38:37 | 19 | **A.**   1/5 of '17. |
| 13:38:39 | 20 | **Q.**   Okay.  And on the day of the incident |
| 13:38:42 | 21 | you and Ms. McDermott were driving car 473, |
| 13:38:46 | 22 | correct? |
| 13:38:46 | 23 | **A.**   Officer McDermott was driving.  I was |

*Velez - Davenport - 02/26/2020*

171

13:03:00  1          Q.   Would it be fair to say that
13:03:02  2    that -- those would have been the only sources
13:03:04  3    where he could have received that information?
13:03:06  4          MS. HUGGINS:   Form.
13:03:06  5          THE WITNESS:   Again, I'm not certain where
13:03:09  6    he -- how they get their information from -- if
13:03:11  7    they get it from the county, 911, officers,
13:03:14  8    civilians.   I'm not certain where he got this
13:03:17  9    information from.
13:03:17  10          BY MR. DAVENPORT:
13:03:18  11          Q.   Sure.   But you did say it would either
13:03:20  12    come from officers or civilians.   So would it be
13:03:23  13    fair to say that that entry would have to be made
13:03:26  14    by either an officer based on information that he
13:03:29  15    receives either from an officer or an individual at
13:03:31  16    the scene?
13:03:31  17          MS. HUGGINS:   Form.
13:03:32  18          THE WITNESS:   It's a possibly.
13:03:32  19          BY MR. DAVENPORT:
13:03:33  20          Q.   Okay.   Would there be any other sources
13:03:35  21    where he could have received that information from?
13:03:36  22          A.   I'm not trained in dispatch.
13:03:38  23          Q.   Okay.   Now, at 11:22:34 it says

*Velez - Davenport - 02/26/2020*

172

| | | |
|---|---|---|
| 13:03:44 | 1 | location changed, C230 ECMC; do you see that? |
| 13:03:48 | 2 | **A.**    Yes. |
| 13:03:48 | 3 | **Q.**    And call sign C230, do you know who |
| 13:03:54 | 4 | that referred to on the day of the incident? |
| 13:03:57 | 5 | **A.**    I'm not certain who it was assigned to. |
| 13:04:00 | 6 | **Q.**    But it's neither you or Ms. McDermott, |
| 13:04:04 | 7 | correct? |
| 13:04:04 | 8 | **A.**    Correct. |
| 13:04:04 | 9 | **Q.**    Would it be fair to say that it was |
| 13:04:07 | 10 | either Carl Schulz or Kyle Moriarity? |
| 13:04:10 | 11 | **A.**    I believe so. |
| 13:04:12 | 12 | **Q.**    It wouldn't refer to any other |
| 13:04:14 | 13 | officers, correct? |
| 13:04:14 | 14 | **A.**    Correct. |
| 13:04:15 | 15 | **Q.**    Okay.  Now, at 11:22:40 it says |
| 13:04:21 | 16 | location change, C241 ECMC; would that refer to |
| 13:04:26 | 17 | Ms. McDermott? |
| 13:04:27 | 18 | **A.**    Yes. |
| 13:04:27 | 19 | **Q.**    Do you see at 11:22:4 a.m. location |
| 13:04:32 | 20 | change, C242 ECMC? |
| 13:04:34 | 21 | **A.**    Yes. |
| 13:04:34 | 22 | **Q.**    Now, what would cause that six-second |
| 13:04:39 | 23 | difference between you and Ms. McDermott for the |

*Velez - Davenport - 02/26/2020*

173

| | | |
|---|---|---|
| 13:04:42 | 1 | location change? |
| 13:04:42 | 2 | **MS. HUGGINS:** Form. |
| 13:04:43 | 3 | **THE WITNESS:** That would be dispatch. |
| 13:04:44 | 4 | **BY MR. DAVENPORT:** |
| 13:04:45 | 5 | Q. Okay. Did you and Ms. McDermott have |
| 13:04:47 | 6 | to contact dispatch separately in order to change |
| 13:04:51 | 7 | your location? |
| 13:04:52 | 8 | A. We could do it together. Radio |
| 13:04:54 | 9 | may -- dispatch may just do it, because they know |
| 13:04:57 | 10 | we're riding together. |
| 13:04:58 | 11 | Q. Okay. Now, at 11:23:01 C230 will be a |
| 13:05:07 | 12 | 941; do you see that entry? |
| 13:05:09 | 13 | A. Yes. |
| 13:05:09 | 14 | Q. Okay. And C230 does not refer you to |
| 13:05:13 | 15 | either you or Ms. McDermott, correct? |
| 13:05:15 | 16 | A. Correct. |
| 13:05:16 | 17 | Q. When it says will be a 941, what does |
| 13:05:19 | 18 | that say to you? |
| 13:05:20 | 19 | **MS. HUGGINS:** Form. |
| 13:05:20 | 20 | **THE WITNESS:** Will be a 941 it says it's a |
| 13:05:28 | 21 | mental health evaluation. |
| 13:05:31 | 22 | **BY MR. DAVENPORT:** |
| 13:05:32 | 23 | Q. Now, at that time, had you, personally, |

*Velez - Davenport - 02/26/2020*

174

| | | |
|---|---|---|
| 13:05:36 | 1 | made any observations of Mr. Kistner that would |
| 13:05:40 | 2 | lead you to believe that he needed a 941 mental |
| 13:05:44 | 3 | health evaluation? |
| 13:05:46 | 4 | **A.**   That I personally observed? |
| 13:05:47 | 5 | **Q.**   You, personally. |
| 13:05:48 | 6 | **A.**   No. |
| 13:05:49 | 7 | **Q.**   Okay.  Did you and the other officers |
| 13:05:51 | 8 | discuss whether Mr. Kistner would be subjected to a |
| 13:05:52 | 9 | 941 evaluation before leaving Schmarbeck? |
| 13:05:56 | 10 | **A.**   I did not. |
| 13:05:57 | 11 | **Q.**   Do you know if Ms. McDermott discussed |
| 13:06:00 | 12 | with any of the other officers whether Mr. Kistner |
| 13:06:03 | 13 | would be subjected to a 941 -- |
| 13:06:03 | 14 | **A.**   I don't -- |
| 13:06:03 | 15 | **Q.**   -- examination? |
| 13:06:04 | 16 | **A.**   I don't know. |
| 13:06:04 | 17 | **Q.**   When Mr. Kistner was being brought to |
| 13:06:07 | 18 | ECMC, did you have any reason to believe that he |
| 13:06:09 | 19 | would be evaluated for a mental health evaluation? |
| 13:06:12 | 20 | **MS. HUGGINS:**   Form. |
| 13:06:13 | 21 | **THE WITNESS:**   I don't recall knowing that he |
| 13:06:15 | 22 | was going up for a 941.  I recall believing it was |
| 13:06:20 | 23 | going to be a medical evaluation. |

*Velez - Davenport - 02/26/2020*

175

13:06:21  1          **BY MR. DAVENPORT:**

13:06:22  2          **Q.**    And when you say a medical evaluation,

13:06:23  3   that refers to any physical injuries?

13:06:25  4          **A.**    Correct.

13:06:26  5          **Q.**    What about mental health or anything

13:06:28  6   like that?

13:06:29  7          **A.**    No.

13:06:30  8          **Q.**    Okay.  Would physical injuries also

13:06:34  9   include any head trauma?

13:06:36  10         **A.**    It would be a complete evaluation.

13:06:38  11         **Q.**    Okay.  So do you know if the location

13:06:53  12   change at 11:22 -- in between 11:22:34 and

13:07:00  13   11:22:46, were you and the other officers at ECMC

13:07:04  14   at that time or were you preparing to leave for

13:07:06  15   ECMC?

13:07:08  16         **A.**    I'm sorry.  Can you give me those two

13:07:11  17   times again?

13:07:11  18         **Q.**    Sure.  So at location -- at time

13:07:13  19   11:22:34 and 11:22:46, those entries for location

13:07:20  20   change, do you know if you and the other officers

13:07:23  21   would have been traveling to ECMC or if you would

13:07:27  22   have already been at ECMC at that time?

13:07:29  23         **A.**    I don't recall.

*Velez - Davenport - 02/26/2020*

200

| | | |
|---|---|---|
| 13:32:02 | 1 | during the incident. |
| 13:32:03 | 2 | **BY MR. DAVENPORT:** |
| 13:32:03 | 3 | **Q.**   Okay.  Did you see that incident? |
| 13:32:05 | 4 | **A.**   I did not. |
| 13:32:06 | 5 | **Q.**   Okay.  So you didn't see the car make |
| 13:32:11 | 6 | contact with Mr. Kistner? |
| 13:32:11 | 7 | **MS. HUGGINS:**  Form.  You may answer. |
| 13:32:13 | 8 | **THE WITNESS:**  I did not see Mr. Kistner make |
| 13:32:16 | 9 | contact with the car. |
| 13:32:16 | 10 | **THE REPORTER:**  I'm sorry? |
| 13:32:16 | 11 | **THE WITNESS:**  I did not see Mr. Kistner make |
| 13:32:18 | 12 | contact with the car. |
| 13:32:18 | 13 | **BY MR. DAVENPORT:** |
| 13:32:18 | 14 | **Q.**   Did Ms. McDermott tell you that she saw |
| 13:32:21 | 15 | the incident, the collision with Mr. Kistner in the |
| 13:32:25 | 16 | vehicle? |
| 13:32:25 | 17 | **A.**   She did. |
| 13:32:26 | 18 | **Q.**   Okay.  And what did she tell you? |
| 13:32:29 | 19 | **A.**   She told me that Mr. Kistner had -- I |
| 13:32:32 | 20 | can't remember if she said threw himself or put |
| 13:32:35 | 21 | himself into the mirror of the car. |
| 13:32:38 | 22 | **Q.**   Okay.  Did you happen to observe what |
| 13:32:41 | 23 | the mirror looked like on the driver's side of that |

*Velez - Davenport - 02/26/2020*

201

| | | |
|---|---|---|
| 13:32:45 | 1 | vehicle after the collision? |
| 13:32:46 | 2 | **A.** I did. |
| 13:32:46 | 3 | **Q.** Okay. And how did it appear to you? |
| 13:32:48 | 4 | **A.** That it was dislodged from the body of |
| 13:32:51 | 5 | the car. |
| 13:32:52 | 6 | **Q.** Now, when you say dislodged, was it |
| 13:32:55 | 7 | still attached but it was partially detached from |
| 13:32:59 | 8 | the car? |
| 13:32:59 | 9 | **A.** Yes. |
| 13:32:59 | 10 | **Q.** Okay. So it -- it was still there on |
| 13:33:03 | 11 | the car, it hadn't fallen off completely, correct? |
| 13:33:07 | 12 | **A.** Correct. |
| 13:33:07 | 13 | **Q.** Okay. Was there any damage to the |
| 13:33:09 | 14 | glass on that mirror? |
| 13:33:12 | 15 | **A.** The glass itself was not damaged. |
| 13:33:16 | 16 | **Q.** Okay. Did you try to use or did |
| 13:33:24 | 17 | Ms. McDermott try to use the window on the driver's |
| 13:33:27 | 18 | side of that vehicle that day? |
| 13:33:29 | 19 | **A.** She did. |
| 13:33:29 | 20 | **Q.** Okay. Were you present when she tried |
| 13:33:32 | 21 | to use the window? |
| 13:33:33 | 22 | **A.** Yes. |
| 13:33:33 | 23 | **Q.** Okay. Did it make any sort of a |

*Velez - Davenport - 02/26/2020*

202

13:33:37 1  screeching sound or anything like that?

13:33:40 2      **A.**   It did, it -- it made a noise and it

13:33:42 3  like wiggled and hesitated to go up and down.

13:33:45 4      **Q.**   Okay.  What car were you driving that

13:33:47 5  day?

13:33:47 6      **A.**   I wasn't driving that day.

13:33:49 7      **Q.**   Excuse me.  What car were you a

13:33:51 8  passenger in that day?

13:33:53 9      **A.**   I believe it was 473.

13:33:55 10      **Q.**   Okay.  Did you and Ms. McDermott have a

13:33:57 11 specific vehicle that you liked to use?

13:34:00 12      **A.**   She had -- she preferred 473.  I

13:34:05 13 preferred 472.

13:34:06 14      **Q.**   Okay.  Was there any reason why car 473

13:34:11 15 was used on the day of the incident?

13:34:14 16      **A.**   Availability.

13:34:14 17      **Q.**   Okay.  Did you use car 473 again after

13:34:18 18 January 1st of 2017?

13:34:19 19      **A.**   I'm sure we did.  If Officer McDermott

13:34:22 20 was driving, she -- she would drive that car.

13:34:25 21      **Q.**   Okay.  Do you recall when your next

13:34:27 22 shift would have been after January 1st of 2017?

13:34:29 23      **A.**   I don't recall.

*Velez - Davenport - 02/26/2020*

13:34:31   1          **Q.**    Okay.   Would it have been before

13:34:36   2  January 5th of 2017?

13:34:40   3          **A.**    It would have.   Well, if January 1 was

13:34:44   4  our last day, the most we could have been off was

13:34:48   5  for four days, so then we would have been back.

13:34:51   6          So if -- if January 1 was our last day,

13:34:55   7  because I don't recall, we would have been -- the

13:34:55   8  most we -- the longest we could have been off was

13:34:56   9  the 2nd, 3rd, 4th, 5th.

13:35:00  10          So the earliest would have been January 6th

13:35:03  11  or 5th, if we were off for three.

13:35:06  12          **Q.**    Okay.   Do you know when the next time

13:35:08  13  would have been that you would use car 473?

13:35:11  14          **A.**    No.

13:35:11  15          **Q.**    Okay.   Do you recall if the next time

13:35:13  16  that you used car 473 did it have a dislodged

13:35:17  17  mirror or were there any issues with the driver's

13:35:20  18  side window?

13:35:20  19          **A.**    I don't recall.

13:35:21  20          **Q.**    Okay.   Do you recall ever driving the

13:35:23  21  vehicle again where it had a dislodged mirror or

13:35:27  22  issues with the driver's side window?

13:35:28  23          **A.**    I don't recall driving 473 at all.

*Velez - Davenport - 02/26/2020*

204

13:35:31  1  Like I said, I would prefer to drive 472, but I

13:35:35  2  don't recall being in that vehicle in -- with an

13:35:39  3  issue.

13:35:39  4      Like I don't recall after that incident when

13:35:41  5  was the next time we had taken that vehicle.  I

13:35:44  6  don't recall.

13:35:44  7      **Q.**   Do you recall ever being in a police

13:35:47  8  vehicle where the driver's side mirror was

13:35:50  9  dislodged or the driver's side window had issues

13:35:53  10 with going up and down?

13:35:55  11     **MS. HUGGINS:**  Form.  You can answer.

13:35:57  12     **THE WITNESS:**  I've driven vehicles that have

13:35:59  13 had issues with windows before.

13:36:02  14     **BY MR. DAVENPORT:**

13:36:02  15     **Q.**   And what sort of issues were those?

13:36:05  16     **A.**   I had one that the window wouldn't go

13:36:08  17 down before.

13:36:09  18     **Q.**   But you were never in a vehicle where

13:36:13  19 the window would make noises as it was going down,

13:36:17  20 correct?

13:36:17  21     **A.**   Correct.

13:36:17  22     **Q.**   Okay.  Do you recall what car you were

13:36:19  23 driving when the window would not go down?

*Velez - Davenport - 02/26/2020*

294

15:35:45  1        **A.**    I did not ever see him enter the

15:35:48  2   street.

15:35:48  3        **Q.**    Okay.  Did you ever see Mr. Kistner

15:35:51  4   before he entered the street?

15:35:53  5        **A.**    No.

15:35:53  6        **Q.**    What were you doing at this incident?

15:35:56  7        **A.**    I don't recall exactly what I was doing

15:35:59  8   at that moment.

15:35:59  9        **Q.**    Okay.  What -- were you looking forward

15:36:05  10  at this time?

15:36:08  11       **A.**    I don't recall.  I just know that I

15:36:13  12  didn't see him and I -- at all.

15:36:17  13       **Q.**    Okay.

15:36:17  14       **A.**    I don't recall seeing him at all.

15:36:19  15       **Q.**    Okay.  Did you hear Officer McDermott

15:36:22  16  say that she saw an individual out in the street?

15:36:26  17       **A.**    Not that I could recall.

15:36:28  18       **Q.**    Do you recall anything that was said by

15:36:32  19  Mr. Kistner to anybody while he was out in the

15:36:35  20  street?

15:36:35  21       **A.**    No.

15:36:36  22       **Q.**    Okay.  Do you recall any of the

15:36:39  23  officers saying anything to Mr. Kistner while he

*Velez - Davenport - 02/26/2020*

295

| | | |
|---|---|---|
| 15:36:42 | 1 | was in the street? |
| 15:36:43 | 2 | **A.**   No. |
| 15:36:44 | 3 | **Q.**   Okay.  Do you know, were you on your |
| 15:36:55 | 4 | way to go somewhere after this call prior to, you |
| 15:36:59 | 5 | know, the events that transpired shortly after? |
| 15:37:03 | 6 | **A.**   Not that I could recall.  After the |
| 15:37:05 | 7 | event? |
| 15:37:05 | 8 | **Q.**   Well, do you recall, were you |
| 15:37:10 | 9 | dispatched to another location from Schmarbeck? |
| 15:37:14 | 10 | **A.**   Well, from Schmarbeck we did go to |
| 15:37:17 | 11 | ECMC. |
| 15:37:20 | 12 | **Q.**   Were you dispatched prior to any |
| 15:37:23 | 13 | collision between Mr. Kistner and a police vehicle? |
| 15:37:26 | 14 | **MS. HUGGINS:**   Form.  You can answer. |
| 15:37:29 | 15 | **THE WITNESS:**   Prior to? |
| 15:37:31 | 16 | **BY MR. DAVENPORT:** |
| 15:37:32 | 17 | **Q.**   Prior to -- well, after arriving at |
| 15:37:35 | 18 | Schmarbeck and prior to a collision that was made |
| 15:37:38 | 19 | with Mr. Kistner, were you and Officer McDermott |
| 15:37:41 | 20 | dispatched to any other location? |
| 15:37:43 | 21 | **A.**   Not that I could recall. |
| 15:37:44 | 22 | **Q.**   Okay.  Do you know if Officer Schulz or |
| 15:37:47 | 23 | Officer Moriarity were dispatched to another |

*Velez - Davenport - 02/26/2020*

296

| | | |
|---|---|---|
| 15:37:50 | 1 | situation? |
| 15:37:50 | 2 | **A.** I don't recall. |
| 15:37:51 | 3 | **Q.** Did you ever dispatch to Schmarbeck for |
| 15:37:55 | 4 | the 33 Schmarbeck call? |
| 15:37:58 | 5 | **A.** I didn't, no. |
| 15:38:00 | 6 | **Q.** Okay. Did Officer McDermott ever |
| 15:38:03 | 7 | dispatch in for the 33 Schmarbeck call? |
| 15:38:06 | 8 | **A.** Not that I could recall. |
| 15:38:27 | 9 | **Q.** Now, Ms. Velez, based on what you just |
| 15:38:30 | 10 | saw right there, was the police vehicle moving |
| 15:38:33 | 11 | after Mr. Kistner was struck? |
| 15:38:36 | 12 | **A.** It appeared to be so. Well, when |
| 15:38:39 | 13 | Mr. Kistner walked into the vehicle, it appears |
| 15:38:41 | 14 | from this angle of the video to slightly be moving |
| 15:38:46 | 15 | forward. |
| 15:38:46 | 16 | **Q.** Now, when you were in the police |
| 15:38:48 | 17 | vehicle, did you hear any sort of a noise that |
| 15:38:52 | 18 | indicated that a collision had been made? |
| 15:38:53 | 19 | **MS. HUGGINS:** Form. You can answer. |
| 15:38:55 | 20 | **THE WITNESS:** I did hear a noise. |
| 15:38:57 | 21 | **BY MR. DAVENPORT:** |
| 15:38:57 | 22 | **Q.** Okay. What sort of a noise was that? |
| 15:38:59 | 23 | **A.** It was like a -- it sounded like |

| | | |
|---|---|---|
| 15:39:03 | 1 | plastic, like a plastic break. |
| 15:39:05 | 2 | **Q.**   Okay.  At the time did you know -- |
| 15:39:09 | 3 | **A.**   It wasn't -- I'm sorry. |
| 15:39:09 | 4 | **Q.**   No, it's okay.  At the time did you |
| 15:39:12 | 5 | know what that was? |
| 15:39:12 | 6 | **A.**   No. |
| 15:39:13 | 7 | **Q.**   Okay.  Did Officer McDermott say |
| 15:39:17 | 8 | anything after you heard that noise? |
| 15:39:19 | 9 | **A.**   She did. |
| 15:39:19 | 10 | **Q.**   What did she say? |
| 15:39:21 | 11 | **A.**   Again, I don't recall if she said that |
| 15:39:22 | 12 | he had put himself into the vehicle or if he had |
| 15:39:25 | 13 | threw himself into the vehicle. |
| 15:39:28 | 14 | I don't remember which word was used, but |
| 15:39:31 | 15 | she stated that he had put himself into the |
| 15:39:33 | 16 | vehicle. |
| 15:39:33 | 17 | **Q.**   Okay.  Did she yell that, did she sound |
| 15:39:37 | 18 | excited when she said it? |
| 15:39:39 | 19 | **A.**   I don't remember the exact tone. |
| 15:39:40 | 20 | **Q.**   Okay.  Did she say that before you |
| 15:39:44 | 21 | exited the vehicle? |
| 15:39:44 | 22 | **A.**   Yes. |
| 15:39:45 | 23 | **Q.**   Okay.  At that time had you seen |

*Velez - Davenport - 02/26/2020*

298

| | | |
|---|---|---|
| 15:39:50 | 1 | Mr. Kistner up until that point of Ms. McDermott |
| 15:39:53 | 2 | yelling that he either threw himself at the police |
| 15:39:56 | 3 | vehicle or -- I'm sorry, what was the other phrase |
| 15:40:01 | 4 | that she may have possibly said? |
| 15:40:03 | 5 | **A.**   Put himself. |
| 15:40:04 | 6 | **Q.**   Okay.  So asking the question again. |
| 15:40:07 | 7 | At any point did you see Mr. Kistner before |
| 15:40:10 | 8 | Ms. McDermott said that Mr. Kistner threw himself |
| 15:40:14 | 9 | at the vehicle or put himself into the police |
| 15:40:17 | 10 | vehicle? |
| 15:40:17 | 11 | **A.**   No. |
| 15:40:18 | 12 | **Q.**   Okay.  When was the first time that you |
| 15:40:23 | 13 | saw Mr. Kistner? |
| 15:40:23 | 14 | **A.**   On the ground. |
| 15:40:25 | 15 | **Q.**   Was he grabbing any part of his body? |
| 15:40:29 | 16 | **A.**   No. |
| 15:40:31 | 17 | **Q.**   Okay.  Where was he positioned relative |
| 15:40:33 | 18 | to the car? |
| 15:40:34 | 19 | **A.**   I recall him laying parallel to the |
| 15:40:37 | 20 | car. |
| 15:40:38 | 21 | **Q.**   Okay.  Was Mr. Kistner saying anything? |
| 15:40:45 | 22 | **A.**   Not that I could recall. |
| 15:40:47 | 23 | **Q.**   Did you say anything to Mr. Kistner? |

348

1          I hereby CERTIFY that I have read the

2     foregoing 347 pages, and that they are a true and

3     accurate transcript of the testimony given by me in

4     the above-entitled action on February 26, 2020.

5

6

7                          ------------------------
                           JENNY VELEZ
8

9     Sworn to before me this

10

11    -------- day of  ---------, 2020.

12

13    --------------------------

14    NOTARY PUBLIC.

15

16

17

18

19

20

21

22

23

349

STATE OF NEW YORK )

                          ss:

COUNTY OF ERIE    )


    I DO HEREBY CERTIFY as a Notary Public in and

for the State of New York, that I did attend and

report the foregoing deposition, which was taken

down by me in a verbatim manner by means of machine

shorthand.  Further, that the deposition was then

reduced to writing in my presence and under my

direction.  That the deposition was taken to be

used in the foregoing entitled action.  That the

said deponent, before examination, was duly sworn

to testify to the truth, the whole truth and

nothing but the truth, relative to said action.



_Lynne E. DiMarco_
LYNNE E. DiMARCO,
Notary Public.

350

**INDEX TO EXHIBITS**

| Exhibit | Description | Page |
|---------|-------------|------|
| EXH. 24 | Buffalo Police Academy Training Record | 44 |
| EXH. 25 | Dispatch Monitor Unit History Report | 118 |
| EXH. 26 | Arresting Report | 250 |
| EXH. 27 | Buffalo Police Department Prisoner Property Receipt | 252 |
| EXH. 28 | Department of Law Letter dated 12/17/19 | 259 |
| EXH. 29 | Verification Document | 265 |

* Exhibits 24 - 29 retained by Mr. Davenport.

351

1                    INDEX TO WITNESSES

2   Witness              Examination              Page

3    JENNY VELEZ         BY MR. DAVENPORT:          3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

EXHIBIT J

# BUFFALO POLICE

## COMPLAINT SUMMARY REPORT



EXHIBIT
4A

**Report Date:  3/14/2019**

---

## 17-0010506    CRIMINAL MISCHIEF
## 37 SCHMARBECK AV BUF (C3) Priority: 4
### Disposition(s): 1. P1375 Crime Report

| | |
|---|---|
| Reported:     01/01/2017 10:54:42 | Received By:    23892-AYERS, SHEILA |
| Received:     01/01/2017 10:55:42 | Dispatched By: 000478-KESSLER, JOSEPH |
| Dispatched: 01/01/2017 10:57:17 | Source:         E-911 |
| En Route:    01/01/2017 10:57:17 | |
| On Scene:   01/01/2017 11:30:12 | |
| Cleared:      01/01/2017 18:16:09 | |

**Officers:**        1. 169325-SCHULTZ, KARL B.   2. 174122-MORIARITY, KYLE T.   3. 172768-MCDERMOTT, LAUREN M.   4. 172870-VELEZ, JENNY M.

**Other Personnel:** 1. 000788-POLIZZI, SALVATORE A. JR   2. 8790-SAUER, EDWARD   3.

| Remarks: | 10:54:42 | 23892 | Loc:  1250 BAILEY AVE BUFFALO Phone: 716-462-2147 |
|---|---|---|---|
| | | | Comp: Verizon Wireless |
| | 10:54:42 | 23892 | Entry Initiated |
| | 10:55:42 | 23892 | Sent to Dispatch - AMBULANCE - 37 SCHMARBECK AV BUF (C3) Pri: 6 |
| | 10:55:42 | 23892 | MALE HIT BY POLICE CAR...ADI NTFD |
| | 10:55:56 | 23892 | Call Type Changed - ACCIDENT/INJURY Pri: 2 |
| | 10:57:17 | 000478 | Enroute - C230 |
| | 10:57:17 | 000478 | Dispatched (Primary) - C230 |
| | 10:57:39 | 000478 | Enroute - C241 |
| | 10:57:39 | 000478 | Dispatched - C241 |
| | 10:57:41 | 000478 | Dispatched - C242 |
| | 10:57:41 | 000478 | Enroute - C242 |
| | 11:03:52 | 8790 | Loc:  1250 BAILEY AVE BUFFALO Phone: 716-462-2147 |
| | | | Comp: Verizon Wireless |
| | 11:04:20 | 8790 | ANOTHER CALL   -  FEMALEREQ AMB FOR INJURED 54 YO BOYFRIEND |
| | 11:04:26 | 8790 | ADI NTFD |
| | 11:07:31 | 000478 | cameras on 37 has video of the man flopping on the ground |
| | 11:22:34 | 000478 | Location Changed - C230 ECMC |
| | 11:22:40 | 000478 | Location Changed - C241 ECMC |
| | 11:22:46 | 000478 | Location Changed - C242 ECMC |
| | 11:23:01 | 000478 | C230 will be a 941 |
| | 11:30:12 | 000478 | On Scene - C230 |
| | 11:30:35 | 000478 | C230 suspect broke mirr on car 473 intentionally |
| | 13:14:01 | 000478 | Set to Primary - C241 |
| | 14:45:35 | 000788 | C241 nmt |
| | 15:37:06 | 000788 | Location Changed - C241 CB |
| | 15:37:09 | 000788 | Location Changed - C242 CB |
| | 15:48:31 | 000788 | On Scene - C242 |
| | 15:48:35 | 000788 | On Scene - C241 |
| | 16:36:51 | 000788 | Location Changed - C241 ECMC |
| | 16:36:55 | 000788 | Location Changed - C242 ECMC |
| | 16:36:58 | 000788 | Enroute - C241 |
| | 16:37:00 | 000788 | Enroute - C242 |
| | 16:41:01 | 000788 | HD01: 16:40:48 - CAN YOU PLS CHANGE THIS CALL TO CRIMINAL MISCHIEF |
| | | | (Complaint 17-0010506 ACCIDENT/INJURY @ECMC) |
| | 16:41:17 | 000788 | Call Type Changed - CHILD NEGLECT Pri: 3 |
| | 16:41:22 | 000788 | Call Type Changed - CRIMINAL MISCHIEF Pri: 4 |

1

16:46:36   000788   On Scene - C241
18:16:08   173194   Disposition Added - P1375 Crime Report
18:16:09   173194   Archived

**Total Complaints:1**

EXHIBIT K



## BUFFALO PD
## POLICE REPORT
## CRIMINAL MISCHIEF

**Complaint**
**17-0001506**
Report Date & Time
01/01/2017 10:54

| Address of Occurrence 33 SCHMARBECK AV | District 'C' | Tract BU | Occ. Date & Time 01/01/2017 10:54 | Day of Week Sunday | Type of Premise Street |
|---|---|---|---|---|---|

| Status Cleared By Arrest | Follow Up By | Supf N | TT Mess# | TT Entry Date | TT Cancel# | TT Cancel Date |
|---|---|---|---|---|---|---|

| Officers: D674 - MCDERMOTT   P2783 - SCHULTZ | Rep. Off.: D674 - MCDERMOTT |
|---|---|
| L440 - VELEZ   P3617 - MORIARITY | Supervisor: |

| Last Name KISTNER | First Name JAMES | MI | Ext | Birth Date 04/03/1960 | Race White | Sex M | Age 56 | Juvenile N | Arrested N | Report PR |
|---|---|---|---|---|---|---|---|---|---|---|

| Address 37 SCHMARBECK | | City BUFFALO | State NY | Zip 14211 | Home Phone (716) 895-2949 | Work Phone |
|---|---|---|---|---|---|---|

| Height 5' 10" | Weight 195 | Hair GRY | Eyes BLU | Build S | Complexion FAR | Glasses | Scars/Marks/Tattoos |
|---|---|---|---|---|---|---|---|

Victim DID receive Information on Victim's Rights and Services pursuant to New York State Law      **Yes/No**

| Last Name SONY | First Name C DIST | MI | Ext | Birth Date | Race Unknown | Sex U | Age | Juvenile N | Arrested N | Report PR |
|---|---|---|---|---|---|---|---|---|---|---|

| Address 693 E FERRY ST | | City BUFFALO | State NY | Zip 14211 | Home Phone | Work Phone (716) 851-4412 |
|---|---|---|---|---|---|---|

| Height | Weight | Hair | Eyes | Build | Complexion | Glasses | Scars/Marks/Tattoos |
|---|---|---|---|---|---|---|---|

Victim DID receive Information on Victim's Rights and Services pursuant to New York State Law      **Yes/No**

| Law | Section | CA | CL | DG | Description | Report |
|---|---|---|---|---|---|---|
| PL | 145.05-02 | F | E | 3 | CRIMINAL MISCHIEF 3RD:DAMAGE ANOTHERS PROPERTY-AMOUNT> $250 | PR |
| PL | 240.20-03 | V | | 0 | DIS/CON OBSCENE LANG/GESTURES | PR |

| Arrest # Name 223353   KISTNER, JAMES . 4/3/1960 | Date 01-01-2017 | Address 37 SCHMARBECK AV BUFFALO |
|---|---|---|

| Status Held | Arrest Type Crime In Progress | Arresting Officers 172768 MCDERMOTT,I172870 VELEZ,JENNY M |
|---|---|---|

| Law | Section | CA | CL | DG | Description | Counts |
|---|---|---|---|---|---|---|
| PL | 145.05-02 | F | E | 3 | CRIMINAL MISCHIEF 3RD:DAMAGE ANOTHERS PROPERTY-AMOUNT> $250 | 1 |
| PL | 240.20-03 | V | | 0 | DIS/CON OBSCENE LANG/GESTURES | 1 |

ON 1-1-17 AT APPROX 1100 HRS WHILE AT 33 SCHMARBECK THE DEF. DID INTENTIONALLY THROW HIS BODY INTO THE DRIVER'S SIDE MIRROR OF PATROL VEHICLE 473, CAUSING THE MIRROR TO BECOME DISLODGED FROM THE VEHICLE AND THE DRIVER'S SIDE WINDOW TO MALFUNCTION (AMOUNT TO EXCEED $250). WHILE AT ECMC, DEF DID USE OBSCENE AND OFFENSIVE LANGUAGE TOWARD OFFICERS AND MEDICAL STAFF, CAUSING AN ANNOYANCE AND ALARM.

DEF. TRANSPORTED TO ECMC FOR A 941 EVALUATION AFTER ARREST.

**EXHIBIT**
5

| Printed Date: 09/24/2019 01:10 PM | Page: 1 |
|---|---|



EXHIBIT

21

2/19/20 AB

*Agency File No.* 17 00009 GG

# CITY OF BUFFALO - DEPARTMENT OF POLICE
## CRIME AND INCIDENT RECORDS UNIT
### 74 FRANKLIN STREET • ROOM 100 • BUFFALO, NEW YORK • 14202

# APPEARANCE TICKET

Issued to: **KISTNER** **James** — **4/3/60** ☒ Male ☐ Female
(DEFENDANT'S LAST NAME) — FIRST — MI — D.O.B.

**37 Schmarbeck** **Bflo** **14201** ~~Records~~ _____
(ADDRESS) — CITY — ZIP CODE — PHONE

YOU ARE HEREBY DIRECTED TO APPEAR PERSONALLY IN **PART TWO** OF THE
CITY COURT OF BUFFALO **50 DELAWARE AVENUE**, CITY OF BUFFALO, NEW YORK.

ON **JAN** **12**, 20 **17** at 9:30 AM, in connection with your alleged commission of:

**Crim Mschf et al** _____ contrary to the provisions of:

**145.05 - 2** of the: ☒ Penal Law of the State of New York
SECTION — SUBSECTION

☐ Vehicle and Traffic Law of the State of New York

☐ Ordinances of the City of Buffalo

☐ _____ Law.

Committed at: **37 Schmarbeck** _____, in the City of Buffalo

on the **1st** day of **JANUARY**, 20 **17** at **1600** AM / **PM**

> I, the undersigned, do hereby acknowledge receipt of this Appearance Ticket and do agree to appear as directed. I further understand that my failure to appear in City Court as directed, may result in a Criminal Summons or a Warrant for my arrest may be issued (CPL 150.60). If I have posted bail, the bail will become forfeit upon my failure to comply with the directives of this Appearance Ticket (150.30).
>
> _James C Kistner_
> SIGNATURE OF DEFENDANT (SIGNATURE IS NOT AN ADMISSION OF GUILT)

**ISSUED AND SUBSCRIBED BY:**                    Warrant check performed by:

_____                    _____
OFFICER'S SIGNATURE                          MEMBER PROVIDING WARRANT CHECK

**Lt D PANASYL**                          Source of Identification:
ISSUING OFFICER (PRINT)
                                         ☐ New York State Driver's License
_CPL_
_____                    ☐ Known to Issuing Officer
ASSIGNMENT          ISSUE TIME
                                         ☒ Other: **MUG ID**

ECHC - 506 RB (Rev. 6.09)

EXHIBIT L



EXHIBIT
21
2/19/20 AB
PENGAD 800-631-6989

Agency File No. 17 00009 GE

# CITY OF BUFFALO - DEPARTMENT OF POLICE
# CRIME AND INCIDENT RECORDS UNIT
### 74 FRANKLIN STREET • ROOM 100 • BUFFALO, NEW YORK • 14202

# APPEARANCE TICKET

Issued to: _KISTNER_ _James_ _4/3/60_ ☒Male ☐Female
(DEFENDANT'S LAST NAME)   FIRST   MI   D.O.B.

_37 Schmarbeck_ _Bflo_ _14201_ _____
(ADDRESS)   CITY   ZIP CODE   PHONE

_Records_

YOU ARE HEREBY DIRECTED TO APPEAR PERSONALLY IN **PART TWO**, OF THE
CITY COURT OF BUFFALO **50 DELAWARE AVENUE**, CITY OF BUFFALO, NEW YORK.

ON _JAN_ _12_, 20 _17_ at 9:30 AM, in connection with your alleged commission of:

_Cm Mscht et al_ _____ contrary to the provisions of:

_145.05-_ _2_ of the: ☒ Penal Law of the State of New York
SECTION   SUBSECTION

☐ Vehicle and Traffic Law of the State of New York

☐ Ordinances of the City of Buffalo

☐ _____ Law.

Committed at: _37 Schmarbeck_, in the City of Buffalo

on the _1st_ day of _JANUARY_, 20 _17_ at _1600_ AM/PM

> I, the undersigned, do hereby acknowledge receipt of this Appearance Ticket and do agree to appear as directed. I further understand that my failure to appear in City Court as directed, may result in a Criminal Summons or a Warrant for my arrest may be issued. (CPL 150.60). If I have posted bail, the bail will become forfeit upon my failure to comply with the directives of this Appearance Ticket (150.30).
>
> _James C Kistner_
> (SIGNATURE OF DEFENDANT (SIGNATURE IS NOT AN ADMISSION OF GUILT))

**ISSUED AND SUBSCRIBED BY:** Warrant check performed by:

_____ _____
OFFICER'S SIGNATURE   MEMBER PROVIDING WARRANT CHECK

_Lt D PANKSYL_ Source of Identification:
ISSUING OFFICER (PRINT)

_CPL_ ☐ New York State Driver's License
ASSIGNMENT   ISSUE TIME

☐ Known to Issuing Officer

☒ Other: _MUG ID_

ECHC - 506 RB (Rev. 8.09)

EXHIBIT M

EXHIBIT

17

00023

Docket Number _____

*CITY OF BUFFALO*
*COUNTY OF ERIE STATE OF NEW YORK*

CD #:17-0010506

The People of the State of New York )
vs. )
**JAMES KISTNER  DOB: 04/03/1960** )
37 SCHMARBECK )
BUFFALO, NY )
)

**INFORMATION / COMPLAINT**

I, **Police Officer LAUREN M. MCDERMOTT**, a police officer herein, accuse **JAMES KISTNER**, the DEFENDANT of this action, and charge that on or about Sunday, January 1, 2017 at 33  SCHMARBECK AV in the CITY OF BUFFALO, County of ERIE, at about 10:54 AM, said DEFENDANT did commit the offense of:

**CRIMINAL MISCHIEF 3RD - DAMAGE >$250.**

a class E  FELONY contrary to the provisions of section 145.05, subsection(s) 02 of the Penal Law of the State of New York.

145.05-2 - CRIMINAL MISCHIEF IN THE THIRD DEGREE
IN THAT THE DEFENDANT, WHILE AT 37 SCHMARBECK, DID WITH INTENT TO DAMAGE THE PROPERTY OF ANOTHER PERSON, CITY OF BUFFALO POLICE DEPARTMENT, AND HAVING NO RIGHT TO DO SO NOR ANY REASONABLE GROUND TO BELIEVE THAT HE HAD SUCH RIGHT; DID DAMAGE THE PROPERTY, TO WIT; DRIVER'S SIDE MIRROR AND DRIVER'S SIDE MIRROR OF PATROL VEHICLE, IN THE AMOUNT OF MORE THAN $250.00.  IN THAT THE DEFENDANT DID INTENTIONALLY THROW HIS BODY INTO THE DRIVER'S SIDE MIRROR OF PATROL VEHICLE #473, CAUSING THE MIRROR TO BECOME DISLODGED FROM THE VEHICLE AND ALSO CAUSING THE DRIVER'S SIDE WINDOW TO MALFUNCTION, THE VALUE OF SAID DAMAGE TO EXCEED $250.00. THE DEFENDANT DID CAUSE SAID DAMAGE TO THE ABOVE MENTIONED PROPERTY WITHOUT THE PERMISSION OF THE OWNER.

ALL CONTRARY TO THE PROVISIONS OF THE STATUTE IN SUCH CASES MADE AND PROVIDED. THE ABOVE ALLEGATIONS OF FACT ARE MADE BY THE COMPLAINANT HEREIN ON DIRECT KNOWLEDGE.

Therefore, the complainant requests that said defendant be dealt with according to the provisions of the Criminal Procedure Law, and according to law.

**NOTICE**
**(Penal Law, Section 210.45)**
It is a crime, punishable as a Class A Misdemeanor under the Laws of the State of New York, for a person, in a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

_____
Complainant

Subscribed and sworn to me this
1st of January, 2017

Docket Number_____

*CITY OF BUFFALO*                                          CD #:17-0010506
*COUNTY OF ERIE STATE OF NEW YORK*

The People of the State of New York                )
vs.                                  )
**JAMES KISTNER  DOB: 04/03/1960**       )        **INFORMATION / COMPLAINT**
37 SCHMARBECK                          )
BUFFALO, NY                            )
                                       )

I, **Police Officer LAUREN M. MCDERMOTT**, a police officer herein, accuse **JAMES KISTNER**, the DEFENDANT of this action, and charge that on or about Sunday, January 1, 2017 at 33  SCHMARBECK AV in the CITY OF BUFFALO, County of ERIE, at about 10:54 AM, said DEFENDANT did commit the offense of:

**DISORDERLY CONDUCT**

a  VIOLATION contrary to the provisions of section 240.**20**, subsection(s) 03 of the Penal Law of the State of New York.

THE SAID DEFENDANT, AT THE AFORESAID TIME AND PLACE, WITH INTENT TO CAUSE PUBLIC INCONVENIENCE, ANNOYANCE OR ALARM, OR RECKLESSLY CREATING A RISK THEREOF, WHILE IN A PUBLIC PLACE, DID  USE ABUSIVE OR OBSCENE LANGUAGE, OR MADE AN OBSCENE GESTURE.  IN THAT THE DEFENDANT DID INTENTIONALLY THROW HIS BODY INTO THE DRIVER'S SIDE MIRROR OF PATROL VEHICLE #473, CAUSING THE MIRROR TO BECOME DISLODGED FROM THE VEHICLE AND ALSO CAUSING THE DRIVER'S SIDE WINDOW TO MALFUNCTION, THE VALUE OF SAID DAMAGE TO EXCEED $250.00 AND WHILE AT BEING TREATED AT ECMC THE DEFENDANT DID USE OBSCENE AND OFFENSIVE LANGUAGE TOWARD OFFICERS AND MEDICAL STAFF.  SAID ACTIONS BY THE DEFENDANT DID CAUSE A PUBLIC ANNOYANCE AND ALARM.

ALL CONTRARY TO THE PROVISIONS OF THE STATUTE IN SUCH CASES MADE AND PROVIDED. THE ABOVE ALLEGATIONS OF FACT ARE MADE BY THE COMPLAINANT HEREIN ON DIRECT KNOWLEDGE.

Therefore, the complainant requests that said defendant be dealt with according to the provisions of the Criminal Procedure Law, and according to law:

**NOTICE**
(Penal Law, Section 210.45)
It is a crime, punishable as a Class A Misdemeanor under the Laws of the State of New York, for a person, in a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Complainant

Subscribed and sworn to me this
1st of January, 2017

EXHIBIT N

**REQUEST FOR EXAMINATION / PERSON UNDER SECTION 9.41 OF THE NYS MENTAL HYGIENE LAW**

☐ To: **Erie County Medical Center – CPEP**
462 Grider St., Buffalo, NY 14215

☐ To: Lakeshore Health Care Center
845 Routes 5 & 20, Irving, NY 14081

POLICE AGENCY/DISTRICT: _Buffalo PD_

COMPLAINT #: _17-001-05006_

INCIDENT LOCATION: _33 Schmarbeck_

DATE: _1-1-17_   TIME OF TRANSPORT: _1637_

AMB CO: ____   AMB #: ____

Is responding officer CIT-trained? ____ Yes
Does individual have active CIT Crisis Plan? ____ Yes

| Name (L, F, MI) _Kistner, James_ | DOB _4-3-60_ | Age _56_ | Sex _M_ |
|---|---|---|---|

Address (number, street, city, state, zip) _37 Schmarbeck   Buffalo, NY_

Has this individual served in the military/reserves: ☐Yes ☐No ☐Unknown

Known mental health history and/or diagnosis: _unknown_

What was reported to the police about this individual? ____

**EXHIBIT 6**

Name of source of information: ____   Relationship to individual: ____   Phone: ____

Any known linkages to treatment/significant others: _unknown_

Justification for transport - Describe any known history of violence to self or others, current violent behavior, and harmful or neglectful behavior to self or others, including documentation of any plans, means, and access for suicide/harm to others: _Sub. did irk hand_ _threw himself at patrol vehicle. Repeatedly called me Nazis and taxist._

V ____ behaviors or actions indicate that the individual might be a danger to self/others?
☐ Places self in dangerous situations
☐ Unable to care for self
☐ Threat/use of weapon to harm self/others
☐ Verbal threats
☐ Other:
☐ Weapon(s) present (describe):

☐ Talk of hurting/killing ___ self ___ others
☐ Attempting to hurt/kill ___ self ___ others
☐ Plan/means/access available
☐ Physical threats

____ Check here if a continuation page is attached

**WEAPONS CHECK PRIOR TO TRANSPORT**
Searched? ☑Yes ☐No
Found? ☐Yes ☑No
If found, disposition: ____

Check observed and/or reported behavior or actions that indicate that the individual might be a danger to self or others:

| O | R | **Verbal and Behavioral** | O | R | **Appearance and Behavior** |
|---|---|---|---|---|---|
| ☑ | ☐ | Refusal to respond to question | ☐ | ☐ | Paranoia/suspiciousness/feelings of persecution |
| ☑ | ☐ | Talking to self | ☐ | ☐ | Dress indicates lack of awareness of weather/setting |
| ☐ | ☐ | Impaired speech (slurred, slow, illogical/incoherent, fast) | ☐ | ☐ | Confused/disoriented |
| ☐ | ☐ | Reported hearing voices | ☐ | ☐ | Sad expression /crying/depression |
| ☐ | ☐ | Irrational speech/thoughts | ☐ | ☐ | Presence of feces or urine |
| ☑ | ☐ | Hostile/argumentative/belligerent/loud/yelling | ☐ | ☐ | Exhibits extraordinary physical strength |
| ☑ | ☐ | Expresses ideas of inflated self-importance | ☐ | ☐ | Extremely rapid heart rate/respiration |
| ☑ | ☐ | Talks repeatedly about a single subject (death, religion, illness, government, etc.) | ☐ | ☐ | Poor hygiene/living environment |
| | | | ☐ | ☐ | Under the influence |
| | | | ☐ | ☐ | Hyperactivity/psychomotor agitation |

Has a criminal charge been placed? ☑Yes ☐No   If yes, charges: _PL 145.05-2  PL 240.20-3_
Appearance ticked issued? ☑Yes ☐No   Order of protection in force? ☐Yes ☑No

Officer's Name (please print): _J Velez_   Date: _1-1-17_

**HOSPITAL DISPOSITION:** To be completed by Examining Physician/Emergency Room (check appropriate boxes)
☐ Patient admitted to this facility    ☐ Medical admission    ☐ Psychiatric admission
☐ Patient transferred to another facility  ☐ Patient not admitted  ☐ Patient absconded
Staff Signature:

Form Updated 3/24/1

EXHIBIT O

Certificate #: U-000004751-F

Page 1 of 1



**BUFFALO CITY COURT**

50 Delaware Avenue, Buffalo, NY 14202

Phone: (716) 845-2689 Fax: (716) 847-8257

**FEE**
Non-Public
Version

The People of the State of New York
vs.
**James Kistner**

**Certificate of Disposition**
Docket Number:       **CR-00122-17**

Defendant DOB: **04/03/1960**

Arrest Date: **01/01/2017**       Arraignment Date: **01/12/2017**

THIS IS TO CERTIFY that the undersigned has examined the files of the **Buffalo City Court** concerning the above entitled matter and finds the following:

| Count | Arraignment Charge | Charge Weight | Disposition | Disposition Date |
|---|---|---|---|---|
| 1 | PL 240.20 03 V Dis/Con:Obscene Lang/Gestures | V | Dismissed (Interest/Furtherance of Justice (CPL 170.30 (1)(g)), Do Not Seal) | 04/04/2017 |
| 2 | PL 145.05 02 EF Crim Mischief 3:Property>$250 **SEALED 160.50** | EF | Reduced to (Count #3) | 02/01/2017 |
| 3 | PL 145.00 01 AM Crim Mis:Intent Damage Proprty **SEALED 160.50** | AM | Dismissed (Interest/Furtherance of Justice (CPL 170.30 (1)(g)), Sealed 160.50) | 04/04/2017 |

Dated:   **April 2, 2018**

_Erika Lutfy_

**Chief Clerk/Clerk of the Court**

CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT SEAL

It shall be an unlawful discriminatory practice, unless specifically required or permitted by statute, for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to make any inquiry about, whether in any form of application or otherwise, or to act upon adversely to the individual involved, any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law, in connection with the licensing, employment or providing of credit or insurance to such individual; provided, further, that no person shall be required to divulge information pertaining to any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. The provisions of this subdivision shall not apply to the licensing activities of governmental bodies in relation to the regulation of guns, firearms and other deadly weapons or in relation to an application for employment as a police officer or peace officer as those terms are defined in subdivisions thirty-three and thirty-four of section 1.20 of the criminal procedure law; provided further that the provisions of this subdivision shall not apply to an application for employment or membership in any law enforcement agency with respect to any arrest or criminal accusation which was followed by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. [Executive Law § 296 (16)] Arraignment charges may not be the same as the original arrest charges.

CPL 160.50:       All official records (excluding published court decisions or opinions or records and briefs on appeal) related to the arrest or prosecution on file with the Division of Criminal Justice Services, any court, police agency or prosecutor's office shall not be available to any person or public or private agency.