UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JAMES C. KISTNER,

Plaintiff,

vs.                                                      Civil No.:  18-CV-00402

LAUREN McDERMOTT
JENNY VELEZ
KARL SCHULTZ, and
KYLE MORIARITY, *et al.*,

Defendants.

---

## AFFIDAVIT OF JENNIFER L. YAEK, PH.D., P.E.

STATE OF MICHIGAN        )
                         )  ss
COUNTY OF GENESEE        )

**JENNIFER L. YAEK, PH.D., P.E.**, being duly sworn, deposes and says:

1.      I have been retained as an expert witness on behalf of plaintiff, James Kistner, in the above-referenced matter.  I am a biomechanics and accident reconstruction expert, and have received a  Bachelor's Degree and a Master's Degree in Mechanical Engineering with a concentration in Dynamics and a Master's Degree and PhD in Biomedical Engineering with a concentration in Impact Biomechanics.  I conducted a detailed review of all materials that were provided to me by plaintiff's counsel related to the above referenced matter.  Therefore, I fully am familiar with the facts and circumstances set forth herein.

2.      By way of professional background, I am the President and Principal Engineer of Impact Analysis, Inc. I have more than 25 years of extensive experience in accident reconstruction and vehicle dynamics. My work in accident reconstruction has included all types of accidents, including, passenger vehicles, light and heavy-duty trucks, and accidents involving pedestrians. I specialize in the reconstruction of complex accident situations, including low-speed collisions like the accident in this case. Please refer to my curriculum vitae for more details of assignments and experience, a copy of which is attached hereto as **Exhibit A**.

3.      Plaintiff's counsel contacted me in order to review the materials related to this matter and perform an accident reconstruction of the subject incident. A comprehensive list of the materials I reviewed is set forth more fully in the "Materials Reviewed and Received" section of my report. A complete copy of my report—including a copy of all materials summarized in "Appendix A" of my report—is attached hereto as **Exhibit B**.

4.      Here, surveillance cameras owned by Mr. Kistner and mounted to the property located at 37 Schmarbeck Avenue captured the subject incident. *See* Declaration of R. Anthony Rupp III. Copies of these surveillance videos are available on the flash drive attached as **Exhibit C**.

5.      As part of my accident reconstruction, I merged the surveillance footage from two camera angles—Cameras 2 and 6—into a single, comprehensive video that depicts multiple views of the subject accident, which is available on the flash drive attached as **Exhibit D.**

6.      A detailed second-by-second analysis of the surveillance footage can be found on pages 10 through 12 of my report attached as Exhibit B.

7.      Defendants claimed that Mr. Kistner intentionally threw himself at the BPD vehicle, causing damage to the driver's side mirror and window.  Defendants charged Mr. Kistner with a felony—criminal mischief in the third degree—based on the allegation that he intentionally damaged BPD property.

8.      In addition, Officer Schultz testified that he instructed Officer Moriarity to stop their vehicle as it was leaving the scene in order to observe Mr. Kistner's interaction with the Officer McDermott's vehicle.  Schultz further claimed that he was able to view the entire incident through the driver's side mirror of the stopped BPD vehicle.

9.      My accident reconstruction focused on analyzing (1) whether Mr. Kistner intentionally threw himself into the moving BPD vehicle; (2) whether Officer Moriarity and Officer Schultz's vehicle was stopped at the time of impact; and (3) whether it was possible for Officer Schultz to view the incident through the driver's side mirror.

10.      Based upon my training, experience, and examination of the aforesaid materials and factual allegations, it is my professional opinion that: (1) Mr. Kistner did not throw himself into the BPD vehicle; (2) the BPD vehicle driven by Officer Moriarity, with Officer Schultz as a right front passenger, was still in motion at the time that Mr. Kistner was struck; and (3) it was physically impossible for Officer Schultz, as a right front passenger,  to view the

3

subject incident through the driver's side mirror of the BPD vehicle.  The evidence supporting

these conclusions is contained in my attached report.  *See* Exhibit B.


       11.     As described in greater detail in my attached report, Mr. Kistner can be

seen on the surveillance video walking at a steady pace towards the BPD vehicle that struck him.

He then slows as Officer McDermott's vehicle approaches him, after having reversed, come to a

stop, and then began pulling forward into the location of impact.  Exhibit B, pp. 15-16.  A frame-

by-frame analysis of the surveillance footage, together with a distance tracking analysis of the

vehicle and Mr. Kistner, shows that he maintained a steady speed as he approached the vehicle

and he did not lunge, jump towards, or throw himself at the vehicle.  Exhibit B, pp. 15-17.


       12.     The surveillance video also establishes that Officer McDermott's vehicle

was in motion at the time of impact, further discrediting the accusation that Mr. Kistner

intentionally threw himself into the BPD vehicle.  Officer McDermott's vehicle can be seen

reaching speeds of approximately 5.5 mph just before impact with Mr. Kistner, and then

continuing forward after the impact.  Exhibit B, pp. 12, 14-18.


       13.     The vehicle driven by Officer Moriarity, with Officer Schultz as a right

front passenger, was in motion at the time of impact.  By matching the time stamps of the

multiple camera angles and conducting a frame-by-frame analysis, it is clear that Officer

Moriarity's vehicle was still in motion at the time Mr. Kistner was struck by the BPD vehicle.

*See* Exhibit B, pp. 11-17; Exhibit C; Exhibit D.  The video compilation I created, whereby the

multiple camera angles were merged into a single video, conclusively establishes that the BPD

vehicle driven by Officer Moriarity was still in motion at the time Mr. Kistner was struck. Exhibit D.

14.     Finally, based upon my training, experience, and examination of the aforesaid materials and factual allegations, it is my professional opinion that it was physically impossible for Officer Schultz to view the subject incident out of the driver's side mirror of the BPD vehicle, irrespective of whether that vehicle was stopped or in motion.  Exhibit B, pp. 17-22.  According to the Law of Reflection, the angle of reflection equals the angle of incidence. Exhibit B, pp. 17-18.  Schultz, sitting in the passenger seat, would have viewed the driver's side mirror at a 30-degree angle—a conservative estimate.  Therefore, Officer Schultz would only be able to view objects located 30 degrees parallel to the mirror on the opposite side of the vehicle. Exhibit B, p. 18.  In other words, Officer Schultz would only be able to view the lawns and houses located on the west side of the roadway.  Exhibit B, p. 18.

15.     I conducted an exemplar test using a 2015 Chevy Tahoe—the same make and model as the BPD vehicle Officer Schultz was riding in—to illustrate the Law of Reflection and the view Officer Schultz would have seen through the driver's side mirror.  Exhibit B, pp. 18-22.  Although this reenactment was unnecessary since the Law of Reflection is absolute, it nonetheless shows that it would have been physically impossible for Officer Schultz to view the impact that occurred in the roadway through the driver's side mirror of the vehicle.  Exhibit B, pp. 18-22.  Copies of the photographs and videos from the exemplar vehicle and side mirror view demonstration, dated November 23, 2020, are attached as **Exhibit E**.

16.    Please refer to my expert report for a comprehensive analysis of the

opinions contained herein.  *See* Exhibit B.

Sworn to before me this
27 day of April 2021

Jennifer Yaek

Notary Public



Dana S Collins
NOTARY PUBLIC - STATE OF MICHIGAN
County of Livingston
My Commission Expires 10/2027
Acting in the County of *Genesee*

EXHIBIT A



# IMPACT ANALYSIS, INC
Biomechanics ♦ Accident Reconstruction

## Jennifer L. Yaek, PhD, PE
### President and Principal Engineer
jyaek@impactanalysisinc.com

Dr. Jennifer Yaek, President and Principal Engineer of Impact Analysis, Inc. brings more than 25 years of extensive experience in accident reconstruction and vehicle dynamics to the organization. Her work in accident reconstruction includes all types of accidents including passenger vehicles, light and heavy-duty trucks, motorcycles, bicycles, pedestrians, buses, farm equipment, and industrial equipment. She specializes in the reconstruction of complex accident situations including front, rear, and side high-speed collisions, low-speed collisions, pole/guard rail impacts, and post-collision fuel-fed fires. Dr. Yaek also has extensive expertise in the investigation of vehicle rollover crashes including assessments of vehicle handling response, tire/component failure, rollover dynamics, and rollover stability.

Dr. Yaek received her Master Degree and PhD in Biomedical Engineering with a concentration in Impact Biomechanics and has provided expertise in the areas of human injury tolerance, occupant kinematics, and rigid body dynamics associated with transportation related impacts, sports activities, heavy equipment, farm equipment, falls, and consumer products since 2012. While at the University of Michigan, she was involved with the University of Michigan's Transportation Research Institute's (UMTRI) research in the areas of offset frontal impacts and lower extremity injuries, and her dissertation research involved analysis of child impact response in side impact collisions.

Dr. Yaek has conducted and been involved with numerous physical demonstrations including high and low-speed full-scale crash tests, sled tests, vehicle and ATD (anthropometric test device) component testing, and vehicle handling response demonstrations. She is also highly skilled in the analysis and use of computer programs and simulations as well as photogrammetry in the reconstruction of crashes and rollovers.

Prior to founding Impact Analysis, Inc., Dr. Yaek provided analyses, consultation and expert witness testimony for Exponent (2012-2020) and M.P. Holcomb Engineering (1996 -2012).

## ACADEMIC CREDENTIALS & PROFESSIONAL HONORS

Ph.D., Biomedical Engineering, Wayne State University, 2017
M.S., Biomedical Engineering, Wayne State University, 2012
M.S., Mechanical Engineering, University of Michigan, Ann Arbor, 1996
B.S., Mechanical Engineering, Michigan Technological University, magna cum laude, 1994
Pi Tau Sigma
STAPP John Melvin Student Paper Award, 2018 and 2019

## LICENSES AND CERTIFICATIONS

Licensed Professional Engineer, Michigan, #6201045041
Licensed Professional Engineer, Alabama, #28240
Licensed Professional Engineer, Mississippi, #19818
Certified Crash Data Retrieval (CDR) Analyst
Certified Crash Data Retrieval (CDR) Technician
Remote Pilot License, #4111699

## PRIOR EXPERIENCE

Principal Engineer (2017-2020); Senior Managing Engineer (2012-2017), Exponent, Inc.
Partner and Consultant, M.P. Holcomb Engineering Corporation, 2004-2012
Consultant, M.P. Holcomb Engineering Corporation, 2000-2004
Engineer, M.P. Holcomb Engineering Corporation, 1996-2000
Engineering Intern, M.P. Holcomb Engineering Corporation, 1995-1996
Engineering Intern, Detroit Diesel, 1993



**IMPACT ANALYSIS, INC**
Biomechanics ♦ Accident Reconstruction

## Jennifer L. Yaek, PhD, PE
### President and Principal Engineer
jyaek@impactanalysisinc.com

## PROFESSIONAL AFFILIATIONS

Society of Automotive Engineers (SAE)
- Accident Investigation and Reconstruction Practices Standards Committee (AIRP)
- Technical Paper Review/Transactions Selection Committee

Association for the Advancement of Automotive Medicine (AAAM)
- Scientific Program Committee - 2017 to present
- Educational Program Subcommittee Chair - 2019 to present
- Membership and Credentials Committee - 2001 to 2007
- Committee Vice Chair - 2004 to 2005
- Committee Chair - 2005 to 2006
- Nominations and Awards Committee - 2005 to 2006
- Board of Directors - 2006 to 2009

Society of Mechanical Engineers (ASME)

Society of Professional Engineers (NSPE)

Biomedical Engineering Society (BMES)

International Society of Biomechanics (ISB)

## PUBLICATIONS

Yaek, JL, Brown T, Goertz, A. Accidental statistical distributions from NASS CDS – an update. Paper Number 2020-01-0518, Society of Automotive Engineers, 2020.

Parenteau C, Stephens G, Yaek J, and Gregory S. The effect of FMVSS 301R on vehicle structure and rear impact. Paper Number 2020-01-1226, Society of Automotive Engineers, 2020.

Yaek JL, Cavanaugh JM, Rouhana SW. Response Ratio Development for Lateral Pendulum Impact with Porcine Thorax and Abdomen Surrogate Equivalents. Stapp Car Crash Journal 2019 Nov; 63:177-194.

Yaek JL, Cavanaugh JM, Rouhana SW. Epidemiology of Injury Patterns for 4 to 10-Year-Olds in Side and Oblique Impacts. DOI: 10.1080/15389588.2018.1540041, Traffic Injury Prevention, 2018.

Yaek JL, Andrecovich CJ, Cavanaugh JM, Rouhana SW. Side impact and comparison of appropriate size and age equivalent porcine surrogates to scaled human side impact response biofidelity corridors. Stapp Car Crash Journal 2018 Nov; 62:359-377.

Yaek JL, Li Y, Lemanski PJ, Begeman PC, Rouhana SW, Cavanaugh JM. Biofidelity assessment of the 6-Year-Old ATDs in lateral impact. DOI: 10.1080/15389588.2015.1101080, Traffic Injury Prevention, 2015.

Yaek JL, Curry BA, Goertz AR. Review and comparison of published rollover test results. Paper Number 2010-01-0057, Society of Automotive Engineers, 2010.

Goertz AR, Yaek JL, Compton CP. Accident statistical distributions from NASS CDS. Paper Number 2010-01-0139, Society of Automotive Engineers, 2010.



IMPACT ANALYSIS, INC
Biomechanics ♦ Accident Reconstruction

## Jennifer L. Yaek, PhD, PE
### President and Principal Engineer
jyaek@impactanalysisinc.com

### INVITED PRESENTATIONS

Yaek JL, Cavanaugh JM, Rouhana SW. Response Ratio Development for Lateral Pendulum Impact with Porcine Thorax and Abdomen Surrogate Equivalents. Stapp Car Crash Journal 2019 Nov; 63:177-194.

Yaek JL. Accident investigation, accident reconstruction, and the biomechanics of motor vehicle accidents", Guest Lecturer, Wayne State University, BME 8070 – Seminars in Biomedical Engineering, March 13, 2019.

Yaek JL, Andrecovich CJ, Cavanaugh JM, Rouhana SW. Side impact assessment and comparison of appropriate size and age equivalent porcine surrogates to scaled human side impact response biofidelity corridors. Stapp
Yaek JL, Cavanaugh JM, Rouhana SW. Epidemiology of Injury Patterns for 4 to 10-Year-Olds in Side and Oblique Impacts. Association for the Advancement of Automotive Medicine Conference, Nashville, TN, October 8-10, 2018.

Yaek J, Andrewcovich C, Rouhana S, Cavanaugh J. Side impact assessment and comparison of appropriate size and age equivalent porcine surrogates to scaled human side impact response biofidelity corridors. Poster Presentation. 8th World Congress of Biomechanics, Dublin, Ireland, July 8-12, 2018.

Yaek JL. Biofidelity assessment of the 6 Year Old ATDs in side impact. Ohio State University Injury Biomechanics Symposium, 2014.

Yaek JL, Newberry W. Introduction to accident investigation, accident reconstruction, and the biomechanics of motor vehicle accidents. Wisconsin Defense Counsel Young Lawyers Section Event, 2013.

Yaek JL, Newberry W. Introduction to accident investigation, accident reconstruction, and the biomechanics of motor vehicle accidents - Webinar. Ohio Association of Civil Trial Attorneys, 2013.

Yaek JL, Curry BA, Goertz AR. Review and comparison of published rollover test results. Paper Number 2010-01-0057, Society of Automotive Engineers, 2010.

Goertz AR, Yaek JL, Compton CP. Accident statistical distributions from NASS CDS. Paper Number 2010-01-0139, Society of Automotive Engineers, 2010.

Yaek JL. Using science and accident reconstruction effectively at trial. Women Drive Results in Transportation Law National Program, Tort Trial & Insurance Practice Section - American Bar Association, 2008.

Yaek JL. Basics of accident reconstruction and occupant motion. Michigan Association of Traffic Accident Investigators, Training Conference, 2003.

EXHIBIT B



## IMPACT ANALYSIS, INC
Biomechanics ◆ Accident Reconstruction

December 9, 2020

Mr. Anthony Rupp, Esquire
Rupp Baase Pfalzgraf Cunningham
1600 Liberty Building
Buffalo, New York 14202

Via Email: rupp@ruppbaase.com

Subject: *Kistner v City of Buffalo*

Dear Mr. Rupp:

Per your request, an analysis has been performed with regard to the above matter. The purpose of this letter is to provide the results of the analysis and the opinions and conclusions relative to the analysis performed.

## <u>Materials Received and Reviewed</u>

The following is a list of the materials received and reviewed while preparing this report:

- E-mail from Mr. Chad Davenport, Esquire, detailing height and weight of involved officers, dated October 30, 2020
- Deposition transcript of James C. Kistner, dated June 27, 2017
- Deposition transcript of Earl Kistner, dated June 27, 2017
- Deposition transcript of Officer Karl Schultz, dated February 13, 2020
- Deposition transcript of Officer Lauren McDermott, dated February 19, 2020
- Deposition transcript of Officer Kyle Moriarity, dated February 21, 2020
- Deposition transcript of Officer Jenny Velez, dated February 26, 2020
- Notice of Complaint, Dated March 31, 2017
- Verified Complaint, Dated March 30, 2018
- Letter from Mr. James Kistner to Mr. Bryan Lockwood, City of Buffalo Police Commissioner, requesting forwarding of letter and filed complaint to the Internal Affairs Division, Dated February 8, 2019

Mr. Anthony Rupp, Esq.                                                              Page 2
December 9, 2020

- Request for Examination of Person Under Section 9.41 of the NYS Mental Hygiene Law, dated January 1, 2017
- Criminal Complaints in The People of the State of New York vs. James Kistner of Criminal Mischief 3rd – Damage > $250 and Disorderly Conduct, dated January 1, 2017
- Conduct Complaint from James Kistner against Officer Jenney Velez, Officer Lauren McDermott, Police Officer Kurt Schultz, and Police Officer Kyle Moriarity, Date of Occurrence January 1, 2017
- Four videos of subject incident from Camera 6, dated January 1, 2017
- One video of subject incident from Camera 2, dated January 1, 2017
- Audio recording of Officer McDermott's statement in response to an investigation for a complaint of conduct by the City of Buffalo's Internal Affairs Department
- Audio recording of Officer Moriarity's statement in response to an investigation for a complaint of conduct by the City of Buffalo's Internal Affairs Department
- Audio recording of Officer Schultz's statement in response to an investigation for a complaint of conduct by the City of Buffalo's Internal Affairs Department

## Police Records

### Request for Examination of Person

On January 1, 2017, Officer Velez filed a Request for Examination of Person Under Section 9.41 of the New York State Mental Hygiene Law for Mr. Kistner, complaint number 17-001-0506. Under justification for transport, Officer Velez included "[subject] did intentionally throw himself at patrol vehicle. Repeatedly called [officers] Nazis and fascists". Under what behaviors or actions indicate that the individual might be a danger to self/others, Officer Velez marked "places self in dangerous situations". Under check observed and/or reported behavior or actions that indicate that the individual might be a danger to self or others, Officer Velez included refusal to respond to questions, talking to self, hostile/argumentative/belligerent/loud/yelling, expresses ideas of inflated self-importance, and talks repeatedly about a single subject (death, religion, illness, government, etc.).

### Criminal Complaints

On January 1, 2017, Officer McDermott charged Mr. Kistner with criminal mischief in the third degree with damages great than $250. In the complaint, Officer McDermott claimed that Mr. Kistner "intentionally [threw] his body into the driver's side mirror of patrol vehicle #473, causing the mirror to become dislodged from the vehicle and also causing the driver's side window to malfunction, the value of said damage to exceed $250.00".

On January 1, 2017, Officer McDermott charged Mr. Kistner with disorderly conduct. In the complaint, Officer McDermott claimed that Mr. Kistner "intentionally [threw] his body into the driver's side mirror of patrol vehicle #473, causing the mirror to become dislodged from the vehicle and also causing the driver's side window to malfunction, the value of said damage to exceed $250.00 and while being treated at Erie County Medical Center (ECMC) the defendant did use obscene and offensive language toward officers and medical staff".

Mr. Anthony Rupp, Esq.
December 9, 2020

## Conduct Complaint

Mr. Kistner filed a notice of complaint on March 31, 2017 and a verified complaint on March 30, 2018, and against Officer Velez, Officer McDermott, Officer Schultz, and Officer Moriarity, relative to their conduct during the subject incident that occurred on January 1, 2017. Mr. Kistner also sent a letter to the City of Buffalo Police Commissioner on February 8, 2019, requesting an investigation by the Internal Affairs Division regarding the officers conduct on the date of the subject incident. Officer Louis Kelly was listed as the internal affairs investigator for Mr. Kistner's conduct complaint. In the complaint, Mr. Kistner claimed "he was struck by a patrol vehicle and arrested accused of throwing himself at the vehicle… he was subjected to a strip search including an anal cavity search and taken to ECMC for an unnecessary mental health evaluation". The complaint also included notes from Officer Kelly's investigation, and summaries of the witness officers' statements.

On January 16, 2020, Officer Kelly reviewed and summarized Mr. Kistner's deposition, taken on June 37, 2017.[1] According to Officer Kelly's summary of Mr. Kistner's deposition, he did not consume drugs or alcohol 24 hours prior to the subject incident, and did not "skip" any medications. According to Officer Kelly's summary, Mr. Kistner approached the first police car, and the officer in the passenger seat said, "I'm not talking to any one". Mr. Kistner then approached the second police car, "took two steps towards their vehicle, looked up, vehicle was coming at him". According to Officer Kelly's summary, Mr. Kistner put his arms up and closed his eyes, and was struck by the second police vehicle. According to the summary, Mr. Kistner "started to get up, felt pain in back of head, went back down", and was told by a female officer to "get up off the ground [or] she would arrest him". According to Officer Kelly's summary, Mr. Kistner testified that he was handcuffed, "pushed… down the street", and placed in a patrol car. Mr. Kistner witnessed the officers "drag Earl [Mr. Kistner's son] out into the street, pushing him back and forth, barking at him", and they told Earl to turn off his phone. According to Officer Kelly's summary, Mr. Kistner testified that the "officers told nurses at ECMC that he jumped onto police car [and Mr. Kistner was] strip searched at central booking, looked up rectum", and then was taken back to ECMC for an unknown reason. According to Officer Kelly's summary, Mr. Kistner testified that he has "never been diagnosed with mental health related disorders".

On this same date, Officer Kelly reviewed the surveillance video of the subject incident and summarized the footage. According to Officer Kelly's summary, the video shows a police vehicle arrive and an officer exits the vehicle to speak with an "unknown person", and then a second police vehicle arrives. The first police vehicle to arrive pulls away as Mr. Kistner approaches it. According to Officer Kelly's summary, Mr. Kistner then walks towards the second police vehicle, which "pulls away from curb [and] appears to collide with Kistner who falls to the ground". Following the collision, the officers from the first police vehicle return, and officers "pick Kistner up off the ground, appear to have him in custody and walk him away from the scene". According to Officer Kelly's summary, an "unknown person, possibly Kistner's son… appears to be talking on [the] phone. He is approached by an officer who grabs him and walks him over to the other officers".

---

[1] According to Mr. Kistner's deposition transcript, he was deposed on June 27, 2017.

On June 30, 2020, Officer Kelly spoke with Captain Banaszak in regards to Mr. Kistner's claim that he was strip searched. According to Officer Kelly, Captain Banaszak explained that officers must have an "explainable reason" and submit a request to perform a strip search, and no such request was submitted for Mr. Kistner. According to Officer Kelly, Captain Banaszak "believes that Mr. Kistner may have thought he was strip searched because during a normal search, CBA's have detainees pull their underwear out to check for contraband".

Officer Kelly summarized the witness officer statement of Officer Schultz. According to Officer Kelly's summary of Officer Schultz's statement, Mr. Kistner was "well known" to the responding officers due to complaints from the neighbors. Officer Schultz testified that he "told Kistner that the call [did not] concern him" but did not "yell or get hostile with [Mr. Kistner]". According to Officer Kelly's summary of Officer Schultz's statement, Officer Schultz noticed Mr. Kistner's "actions appeared suspicious" as Officer Schultz pulled away. Officer Schultz testified that he saw Officer McDermott pull away from the curb then stop "abruptly", and Officer Schultz saw Mr. Kistner "throw himself into McDermott's vehicle, broke mirror on McDermott's vehicle, [and] Kistner went down slowly, bracing himself". Officer Schultz testified that Mr. Kistner did not appear to be injured and he cancelled the ambulance because they were transporting Mr. Kistner, having been arrested for breaking the mirror of Officer McDermott's vehicle. According to Officer Kelly's summary of Officer Schultz's statement, Officer Schultz testified that Mr. Kistner was "yelling [and] cursing at officers and nurses" and "nurses suggested that he be taken to CPEP". Officer Schultz testified that he "did not take [Mr. Kistner] to booking" and was "not aware of strip/anal cavity search".

Officer Kelly summarized the witness officer statement of Officer McDermott. According to Officer Kelly's summary of Officer McDermott's statement, Mr. Kistner was not involved in the original call that brought Officer McDermott to the location of the subject incident. Officer McDermott testified that she did not see Mr. Kistner as they pulled away from the curb, and attempted to stop when she did see him. Officer McDermott testified that "as he approached he extended his arms out [and] fell to the ground as if he was hit", and he "damaged the side view mirror". According to Officer Kelly's summary of Officer McDermott's statement, Mr. Kistner "started screaming to someone to call for an ambulance". Officer McDermott testified that she told Mr. Kistner to get up or she would arrest him, and she "decided to arrest him because he wouldn't get up". Officer McDermott testified that they took Mr. Kistner to the hospital. According to Officer Kelly's summary of Officer McDermott's statement, Mr. Kistner "was verbally combative" and was "taken to CPEP on advice of hospital staff because of his actions at the hospital". Officer McDermott testified that she "took him to Cell Block to be processed and get an appearance ticket. Then transported him back to ECMC for CPEP". Officer McDermott testified that she didn't "believe he was given [an] anal cavity search".

Officer Kelly summarized the witness officer statement of Officer Velez. According to Officer Kelly's summary of Officer Velez's statement, Officer Velez was the passenger in the police vehicle driven by Officer McDermott and "heard [a] thump sound against the vehicle". Officer Velez testified that "Moriarity and Schultz… said that Kistner threw himself into the police vehicle". Officer Velez testified that Mr. Kistner was not "resistive or combative physically". According to Officer Kelly's summary of Officer Velez's statement, Officer Velez "can't recall why" the ambulance was cancelled for Mr. Kistner. Officer Velez testified that the "decision was

Mr. Anthony Rupp, Esq.                                                                                          Page 5
December 9, 2020

made amongst officers to arrest". Officer Velez testified that Mr. Kistner "was verbally abusive
towards officers and nurses at the hospital" and was "taken to CPEP because of his actions at the
scene and language used at the hospital". According to Officer Kelly's summary of Officer Velez's
statement, Officer Velez "can't recall who was in search room with Kistner", was not told that Mr.
Kistner would be strip searched or anal cavity searched, and they "had no reason to request anal
cavity search".

## Deposition Summaries

## Mr. James Kistner

Mr. Kistner was deposed on June 27, 2017. According to Mr. Kistner's testimony, the subject
incident occurred in the morning of January 1, 2017. Mr. Kistner testified that he was eating
breakfast with his family when he saw a police vehicle arrive in the street and an officer speaking
with Mike Wolfe, a tenant in one of Mr. Kistner's properties. According to Mr. Kistner's
testimony, a second police vehicle arrived, and at approximately that time Mr. Kistner exited his
home to find out what was going on. According to Mr. Kistner's testimony, he asked to speak to
the police as he approached the first police vehicle that arrived, and the officer in the passenger
seat of the first vehicle "started yelling... 'I'm not talking to anybody. Let's get out of here.'" Mr.
Kistner testified that the first police vehicle "floored it" and drove past him, so he "looked over at"
the second police vehicle and asked to speak with them. Mr. Kistner testified that he began
approaching the second vehicle, "and when [he] looked up, the car was coming at [him]". Mr.
Kistner testified that he raised his arms, closed his eyes, and was struck by the second police
vehicle.

According to Mr. Kistner's testimony, after he was struck by the vehicle, he opened his eyes, he
was on his back on the ground and his feet were between the front and back wheels of the second
police vehicle. Mr. Kistner testified that he "tried to roll on [his] side to get out from underneath
the police car" and yelled for his son, Earl, to call an ambulance. Mr. Kistner testified that he saw
the first police vehicle was at the stop sign at the intersection of Schmarbeck and Schlenker.
According to Mr. Kistner's testimony, he tried to get up but felt pain in "the back of [his] head"
and "went back down". Mr. Kistner said the officer that was driving the second vehicle stood over
him and said, "if you don't get up off the ground, I'm going to arrest you". Mr. Kistner testified
that he did not "think there was" any damage to the police vehicle where it struck him. Mr. Kistner
testified that the three officers, two from the first police vehicle and one from the second, picked
him up, placed him in handcuffs, and put him in the first police vehicle.

According to Mr. Kistner's testimony, while sitting in the police vehicle, one of the officer's "stuck
his head in the window" and told him he was "going to jail... [for] fraud". Mr. Kistner testified
that he saw the police "drag" Earl into the street, push him "back and forth", and "bark" at him.
Mr. Kistner testified that he heard the police tell Earl to "turn off the phone". Mr. Kistner testified
that the officers took him to the hospital and told hospital staff that he "jumped out in front of the
police car. One said [Mr. Kistner] had jumped on the police car". According to Mr. Kistner's
testimony, his hands had gone numb from the handcuffs, and when the handcuffs were removed
his wrists "were black and blue". Mr. Kistner testified it "looked like [he] had barbed wire wrapped
around [his] arms". Mr. Kistner testified that the hospital gave him discharge papers about

symptoms of a concussion, but one of the officers "confiscated" the papers. Mr. Kistner testified that he was then taken to central booking.

According to Mr. Kistner's testimony, he sustained injuries to his wrists, elbows, and shoulders on both sides, and his right arm is worse than his left.

## Mr. Earl Kistner

Mr. Earl Kistner was deposed on June 27, 2017. According to Earl Kistner's testimony, he and his father, Mr. James Kistner, saw two police vehicles outside and officers speaking to Mike, one of their tenants. Earl Kistner testified that he and his father went outside to find out what was going on. Earl Kistner testified that "when [he] looked up, [Mr. J. Kistner] was gone. And that's when he had gotten hit by the car". Earl Kistner testified that the first vehicle that had pulled away "backed up the street", then the officers put Mr. J. Kistner in handcuffs and picked him up. Earl Kistner testified that there was no damage to the police vehicle that struck Mr. J. Kistner.

Earl Kistner testified that he tried to call an ambulance when two officers "pulled [him] into the street, yanked [him] back and forth, took [his] phone, and then told [him he] would be arrested if [he] tried to use it to call an ambulance again". According to Earl Kistner's testimony, Officer Schultz cancelled the ambulance over his radio.

## Officer Lauren McDermott

Officer McDermott was deposed on February 19, 2020. According to Officer McDermott's testimony, she was the driver of the vehicle that made contact with Mr. J. Kistner. Officer McDermott testified that, prior to the collision, she saw Mr. Kistner walk from his house, down the sidewalk, across the street in front of the first police vehicle, and then approach the side of her vehicle. Officer McDermott testified that she backed up the police vehicle she was driving to get around the red minivan in front of her, then shifted to drive forward and was "trying to drive away" when she saw Mr. Kistner walking quickly towards her car, and "as he kept coming, [she] slammed on the brakes". Officer McDermott testified that her vehicle was stopped at the time of the impact and Mr. Kistner "threw himself" into the vehicle.

According to Officer McDermott's testimony, after the collision Mr. Kistner was "rolling on the ground", and she told Mr. Kistner to "get up". Officer McDermott testified that Mr. Kistner said he was injured, and she did not believe him because he did not "appear to be injured". Officer McDermott testified that, following the collision, Officer Schultz told her he "saw the whole thing", and that Officer Schultz placed Mr. Kistner in handcuffs. According to Officer McDermott, Mr. Kistner complained of head pain, "yelled… that he wanted an ambulance", and an ambulance was called for him, but Officer Schultz "told dispatch to disregard calls for the ambulance". According to Officer McDermott's testimony, the collision broke the driver's side mirror of the police vehicle and damaged the driver's side window.

According to Officer McDermott's testimony, the first police vehicle transported Mr. Kistner to the hospital, and she and Officer Velez accompanied them. Officer McDermott testified that Mr. Kistner was "screaming at people" and using "very foul language" at the hospital. Officer

McDermott testified that she and Officer Velez transported Mr. Kistner to central booking after he was cleared by the hospital.

## Officer Jenny Velez

Officer Velez was deposed on February 26, 2020. Officer Velez testified that she was the passenger in the police vehicle that struck Mr. Kistner and did not see the collision occur or see Mr. Kistner prior to the collision. Officer Velez testified that she heard the "sound of plastic breaking" when the collision occurred. According to Officer Velez's testimony, Officer McDermott told her that Mr. Kistner "had put himself into the vehicle". Officer Velez testified that the first time she saw Mr. Kistner was following the collision, when she saw him lying on the ground, parallel to the police vehicle. According to Officer Velez's testimony, following the collision, Officer Schulz approached her and said he saw Mr. Kistner "throw himself into the patrol vehicle".

According to Officer Velez's testimony, the collision "dislodged [the driver's side mirror] from the body of the car" and the driver's side window "made a noise and it like wiggled and hesitated to go up and down". Officer Velez testified that she believed Mr. Kistner intended to do damage to the police vehicle she and Officer McDermott were in. According to Officer Velez's testimony, Mr. Kistner was charged with disorderly conduct due to his behavior at the hospital, following the subject incident.

## Officer Kyle Moriarity

Officer Moriarity was deposed on February 21, 2020. Officer Moriarity testified that he drove past Mr. Kistner as he was leaving the scene, prior to the collision. According to Officer Moriarity's testimony, Officer Schultz told him to check the driver's side mirror to "make sure [Officer McDermott and Officer Velez] get out okay", and Officer Moriarity was alternating his attention between the driver's side mirror and looking forward. According to Officer Moriarity's testimony, it appeared that Officer McDermott's vehicle was stopped when the collision occurred. Officer Moriarity testified that he "can't remember exactly how [the collision] looked because [he] was so new" and he had a conversation with Officer Schultz "about how it looked like Mr. Kistner threw himself on the vehicle". Officer Moriarity testified that he remembered "having a conversation with [Officer Schultz] about [Mr. Kistner] squatting down, leaning back, and then putting his hand on the ground, and then completing the fall". According to Officer Moriarity's testimony, he believed that Mr. Kistner was trying to do damage to Officer McDermott's vehicle. Officer Moriarity testified that he backed up his vehicle towards the incident, then he and Officer Schultz exited their vehicle and walked back towards Mr. Kistner and the other officers.

Officer Moriarity testified that, as he and Officer Schultz approached the scene of the subject incident, he saw Mr. Kistner on the ground. Officer Moriarity testified that Mr. Kistner was placed in handcuffs, and he "helped [Mr. Kistner] walk back to the truck" and placed Mr. Kistner in the back of his police vehicle with the help of another officer. Officer Moriarity testified that Officer McDermott and Officer Velez commented that the driver's side mirror was broken.

## Officer Karl Schultz

Officer Schultz was deposed on February 13, 2020. Officer Schultz testified that he and Officer Moriarity were leaving the scene when they came into contact with Mr. Kistner, who had come

out of one of the houses. Officer Schultz testified that Mr. Kistner did not try to talk to them. According to Officer Schultz's testimony, he saw Mr. Kistner approach Officer McDermott's vehicle and told Officer Moriarity "to stop the vehicle so that [they] could observe". Officer Schultz testified that he observed "the interaction in its entirety" through the driver's side mirror. According to Officer Schultz's testimony, the second police vehicle stopped abruptly, and Mr. Kistner contacted the vehicle after it was stopped. Officer Schultz testified that "it looked like he had reached his hand out, touching the vehicle, and... they had abruptly stopped, he reached his hand out, and then he went to the ground". Officer Schultz testified that Mr. Kistner did not appear to attempt to make any kind of evasive maneuver to avoid contact with the vehicle.

According to Officer Schultz's testimony, after the collision, Mr. Kistner was laying in the street on his back on the driver's side of the police vehicle. Officer Schultz testified that he exited his vehicle to assess Mr. Kistner and gave him a "visual check". According to Officer Schultz's testimony, a male relative of Mr. Kistner's approached the scene while Mr. Kistner was on the ground, and Officer Schultz asked him to stay on the sidewalk. Officer Schultz testified that the man "would not leave the immediate area" so they took his identification "to ID him". Officer Schultz testified that they then got Mr. Kistner on his feet and escorted him to Officer Schultz's police vehicle in handcuffs. According to Officer Schultz's testimony, he cancelled the ambulance that had been called for Mr. Kistner because it would be faster for the officers to transport Mr. Kistner to the hospital.

Officer Schultz testified that, once at the hospital, Mr. Kistner "was yelling, being belligerent, refusal to answer questions". According to Officer Schultz's testimony, a nurse told him, "this gentleman doesn't need emergency room treatment. He needs a psychological evaluation".

## Officer Statements from Internal Affairs Investigation

### Officer Lauren McDermott

Officer McDermott was investigated for a complaint of conduct by the City of Buffalo's Internal Affairs. In her statement, Officer McDermott testified that she and Officer Velez responded to a call on Schmarbeck Avenue and Officers Schultz and Moriarity were already there when they arrived. Officer McDermott testified that she saw Mr. Kistner "come off his porch" and approach the officers. According to Officer McDermott's testimony, Mr. Kistner exited his home on the east side of the street, walked down the sidewalk, crossed to the west side of the street, and then "came at [her] vehicle". At this time, Officers Schultz and Moriarity had "pulled forward". Officer McDermott testified that she "didn't realize" that he was approaching her vehicle because she was "pulling away" to leave the scene. According to Officer McDermott's testimony, she was driving the police vehicle at the time of the subject incident.

Officer McDermott testified that she saw Mr. Kistner approaching her vehicle as she pulled away from the curb and she "attempted to stop", and Mr. Kistner "threw himself into the vehicle". Officer McDermott testified that she believed she was stopped when the collision occurred. According to Officer McDermott's testimony, she saw Mr. Kistner "lean towards the vehicle and then he like threw himself backwards off of it". Officer McDermott testified that Mr. Kistner reached an arm out and then "rolled a little bit and then threw himself backward off of the car" and

fell to the ground. According to Officer McDermott's testimony, Mr. Kistner broke the side mirror of the vehicle.

Officer McDermott testified that, following the collision, Mr. Kistner started "screaming" for someone to call an ambulance and said that the police had hit him with their vehicle, and Mr. Kistner's son "came running out". According to Officer McDermott's testimony, the officers told Mr. Kistner that they saw him throw himself intentionally at the vehicle and they told him to get up or he would be "charged with fraud". Officer McDermott testified that they later determined criminal mischief was a "better charge" for the situation. Officer McDermott testified that they decided to arrest Mr. Kistner because he would not get up, at which point they placed him in handcuffs and put him in a patrol vehicle.

Officer McDermott testified that someone called 911 and the officers received a radio call about an "accident with injury and we had cancelled that part of the call". According to Officer McDermott's testimony, Officer Schultz or Moriarity spoke with Mr. Kistner's son, but she did not. Officer McDermott testified that they transported Mr. Kistner to the hospital from the scene because he was "complaining of injury" and all four involved officers went to the hospital.

Officer McDermott testified that she believed Mr. Kistner was medically cleared by the hospital, but that hospital staff recommended he should be "evaluated mentally" based on his behavior and language. According to Officer McDermott's testimony, once Mr. Kistner was medically cleared and discharged, they transported him to "cell block because he still had charges" to be "mugged, printed" and he was given an appearance ticket, and then they took him back to the hospital for a psychiatric evaluation. Officer McDermott testified that Mr. Kistner was strip searched while at the cell block, but was unaware if he received an anal cavity search.

## Officer Kyle Moriarity

Officer Moriarity was investigated for a complaint of conduct the City of Buffalo's Internal Affairs. In his statement, Officer Moriarity testified that they were on Schmarbeck for a call and were leaving the scene when Mr. Kistner exited 37 Schmarbeck and approached his vehicle. Officer Moriarity testified that they continued to drive off and both he and Officer Schultz watched through the driver side mirror and saw Mr. Kistner "throw himself" into Officer McDermott's vehicle. According to Officer Moriarity's testimony, Officer McDermott's vehicle appeared to be stopped when Mr. Kistner "threw himself on the hood, broke the mirror… it looked like he was pretending to fall down because he braced himself with his left arm and then rolled backwards…".

Officer Moriarity testified that he and Officer Schultz went back to help the other officers, then placed Mr. Kistner in Officer Moriarity's vehicle. Officer Moriarity testified that Mr. Kistner did not appear to be injured following the collision. Officer Moriarity testified that Mr. Kistner's son called an ambulance and they cancelled it because the officers were planning to transport Mr. Kistner to the hospital. According to Officer Moriarity's testimony, one of the other officers contacted their Officer, and then they transported Mr. Kistner to the hospital "for medical attention".

Mr. Anthony Rupp, Esq.                                                                                          Page 10
December 9, 2020

## Officer Karl Schultz

Officer Schultz was investigated for a complaint of conduct by the City of Buffalo's Internal
Affairs. In his statement, Officer Schultz testified that they were on Schmarbeck for a call and
were leaving the scene. According to Officer Schultz's testimony, Mr. Kistner was not a part of
reason they had been called Schmarbeck Avenue, so as they were leaving they attempted to avoid
Mr. Kistner at all costs. Officer Schultz testified there was a time when Mr. Kistner was told in a
professional manner they were not here for him and the incident did not concern him. According
to Officer Schulz's testimony, as they began pulling away, he felt Mr. Kistner was acting
suspicious so he told Officer Moriarity to slow down, and then to stop. Officer Schultz testified
that as they stopped, he was looking in Officer Moriarity's driver side mirror and they had a clear
view of Mr. Kistner. Officer Schultz testified that as Officer McDermott started to pull away, she
stopped abruptly, and Mr. Kistner stopped abruptly as if he was caught off guard that the vehicle
stopped, and then Mr. Kistner threw his upper torso into her mirror, and proceeded to let himself
down gently with his hand and arm and lay down in the street. According to Officer Schultz's
testimony, he and Officer Moriarity exited their vehicle and approached Mr. Kistner. According
to Officer Schultz's testimony, he then spoke briefly with Officer McDermott and she told him "I
stopped, I didn't hit him" and Officer Schultz said he told her "I know, I saw the whole thing".
Officer Shultz testified that Officer McDermott then tried to move her mirror but it was broken.
According to Officer Schultz's testimony, he then looked over at Mr. Kistner to verify there were
no "bumps, bruises, bleeding", and there were none, so he told Mr. Kistner to get to his feet, which
Mr. Kistner refused. Officer Shultz testified that then he and Officer Moriarity assisted Mr. Kistner
to his feet and handcuffed him and led him to the Moriarity vehicle. According to Officer Schultz's
testimony, he then noticed an ambulance had been called, and he cancelled the it because Mr.
Kistner was already in their custody, and they would get him to the hospital quicker. Officer
Schultz testified he then called his Officer and told him what Officer Schultz observed, and he was
told by his Officer to charge Mr. Kistner with criminal mischief, so they did. According to Officer
Schultz's testimony, they ported Mr. Kistner to the hospital and during that time Mr. Kistner was
using vulgar language toward he and Officer Moriarity as well as toward the nurse at the hospital,
and the nurse told the officer's Mr. Kistner didn't need physical treatment, that he needed to be
mentally evaluated.

## Analysis

A detailed review of the security camera video footage provided from the 37 Schmarbeck Avenue
location was performed. Based on a detailed review of the time stamped footage, the following
observations were made:

- **10:25:30** - Mr. Kistner is seen walking south toward the two stopped police vehicles
  located just south of 37 Schmarbeck Avenue
- **10:25:31** – The police vehicle driven by Officer Moriarity starts to pull forward (north)
- **10:25:32** – Mr. Kistner is observed walking along the west side of the road toward the left
  side of Officer Moriarity's vehicle. The police vehicle driven by Officer McDermott that
  was parked along the east side of the road is observed beginning to move in reverse
- **10:25:33** – Mr. Kistner is observed walking along the left side of Officer Moriarity's
  vehicle as it continues to accelerate in a northbound direction. Officer McDermott's vehicle
  is observed continuing to move in reverse

- **10:25:34** – Mr. Kistner is observed continuing to walk but is beginning to turn to walk toward Officer McDermott's vehicle. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue. Officer McDermott's vehicle is observed continuing to move in reverse but is observed to be slowing to a stop
- **10:25:35** – Mr. Kistner is observed walking in a southeast direction toward Officer McDermott's vehicle. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue. Officer McDermott's vehicle is observed stopped and its wheels angled toward the middle of the roadway
- **10:25:35 667** – Mr. Kistner is observed walking east across the road toward Officer McDermott's vehicle, he is almost 1/3 of the way into the roadway. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue. Officer McDermott's is observed beginning to pull forward toward the middle of the road
- **10:25:36** – Mr. Kistner is observed slowing his movement around one-third of the way into the road as Officer McDermott's vehicle begins to pull forward toward the middle of the roadway. Mr. Kistner is located roughly in line with the front left corner of Officer McDermott's vehicle. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling between the left third and middle of the roadway
- **10:25:36 200** – Mr. Kistner is observed beginning to reach out with his right hand, and stepping forward as the McDermott vehicle continues to move forward and left toward him. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling between the left third and middle of the roadway
- **10:25:36 333** – Mr. Kistner is observed stopping but continuing to reach out with his right hand as the McDermott vehicle continues to move forward and left toward him. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling between the left third and middle of the roadway
- **10:25:36 467** – Mr. Kistner is observed stopped in the roadway, his right hand stretched out, beginning to bend at the waist as the McDermott vehicle continues to move forward and left into him. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling between the left third and middle of the roadway
- **10:25:36 667** – Mr. Kistner's body is observed moving back west, his hand moving back toward his body, as the McDermott vehicle continues to move forward and left into him. Mr. Kistner's body is located mid to rear portion of the vehicle's left front fender at this point. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling between the left third and middle of the roadway
- **10:25:36 800** – Mr. Kistner's body is observed continuing to move backward (toward west) as the McDermott vehicle continues to move forward and left into him. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling between the left third and middle of the roadway
- **10:25:37** – Mr. Kistner's body is observed continuing to move backward (toward west) and toward the ground as the McDermott vehicle continues to move forward and left into him. His body is approximately at the location of the driver's side mirror at this time. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling between the left third and middle of the roadway, the right rear taillight of his vehicle is barely visible in Camera 6, but is observed moving forward in Camera 2
- **10:25:37 200** – Mr. Kistner's body is observed continuing to move backward (toward west) and toward the ground as the McDermott vehicle continues to move forward and left into

Mr. Anthony Rupp, Esq.                                                    Page 12
December 9, 2020

him. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling
between the left third and middle of the roadway in Camera 2

- **10:25:37 400** – Mr. Kistner's body is observed continuing to move toward the ground
  becoming out of view of the camera, below the vehicle's fender, as the McDermott vehicle
  continues to move forward and left into him. Officer Moriarity's vehicle continues
  northbound on Schmarbeck Avenue, traveling between the left third and middle of the
  roadway in Camera 2
- **10:25:37 600** – Mr. Kistner's body is out of view of the camera, below the vehicle's fender,
  as the McDermott vehicle continues to move forward and left into him but at a slower
  speed. Officer Moriarity's vehicle continues northbound on Schmarbeck Avenue, traveling
  between the left third and middle of the roadway in Camera 2
- **10:25:38** – Officer McDermott's vehicle comes to a stop. Officer Moriarity's vehicle
  continues northbound on Schmarbeck Avenue, traveling between the left third and middle
  of the roadway in Camera 2
- **10:25:44 733** – Officer McDermott's vehicle is at a stop. No one has exited the vehicle.
  The rear of Officer Moriarity's vehicle is first observed moving in reverse southbound on
  Schmarbeck Avenue in Camera 2

Video still frames were obtained from security camera 6 at every second up to time 10:25:36,
wherein still frames were obtained every frame through time 10:25:37. SynthEyes and Blender
computer softwares were used to undistort the video and camera match scaled aerial photographs
of Schmarbeck Avenue with the undistorted security video to establish the 3-dimensional distance
traveled by the two police vehicles and Mr. Kistner per frame in the security video frame by frame.
Based on a review of the video, it was determined to have been recording at 15 frames/second.
Speed calculations were performed using the time established from the video per frame and the
measured distances scaled from the video still frame images.

Aerial images were obtained from Google Earth Pro of the subject incident location encompassing
dates from October 5, 2011, to May 29, 2017, to show there has been no significant geometrical
changes to the roadway or surrounding driveways, sidewalks, or houses over the years (Figure 1).



*Figure 1: Google Earth Pro Images of 37 Schmarbeck Road: (left) taken October 5, 2011,
(right) taken May 29, 2017 (Star designates 37 Schmarbeck Road residence)*

The Google Earth Pro aerial image was used to determine various measurements and distance
relative to the geometry of and along the roadway and to be used as a scaled reference relative to

Mr. Anthony Rupp, Esq.                                                    Page 13
December 9, 2020

items visible in the provided security camera video footage. For example, using Google Earth Pro, the width of the roadway was measured to be 24 feet (Figure 2, top), distance from the north edge of the sidewalk near where the impact occurred (as viewed in the security video – sidewalk to the house just south of 37 Schmarbeck Avenue and perpendicular to the road) to the south edge of the 37 Schmarbeck Avenue driveway visible in the lower right corner of the camera 6 view (and also visible in camera 2 view) was measured to be 55.46 feet  (Figure 2, middle), and the length of the sidewalk concrete slabs between joints (sidewalk parallel to the road) was measured to be 4.97 feet (Figure 2, bottom).



Mr. Anthony Rupp, Esq.                                                                      Page 14
December 9, 2020





*Figure 2: Google Earth Pro image scaled measurements near 37 Schmarbeck Road relative to security cameras, photograph taken May 29, 2017*

Based on this analysis, the impact between Mr. Kistner and the police vehicle Officer McDermott was driving occurred at approximately 10:25:36.667. It was determined that the police vehicle driven by Officer Moriarity began accelerating north on Schmarbeck Avenue at approximately 10:25:30 per the security camera time. The vehicle was positioned on the west side of the road as

Mr. Anthony Rupp, Esq.                                                                                          Page 15
December 9, 2020

it began to move forward and transitioned from the west side of the road to between the west side and mid road position at approximately 10:25:35 and then continued along this path north along Schmarbeck Avenue. The Moriarity vehicle was conservatively determined to have accelerated to a speed of approximately 21 to 23 miles per hour to a distance of approximately 70 feet from the subject incident during the 10:25:36 to 10:25:37 timeframe that the subject incident occurred. The McDermott vehicle was determined to begin pulling forward at the 10:25:36 timeframe and accelerating as it moved forward into Mr. Kistner between the 10:25:36 to 10:25:37 time frame. The McDermott vehicle was determined to be traveling approximately 5.5 miles per hour at initial impact with Mr. Kistner and continuing at that speed as her vehicle engaged with Mr. Kistner, knocking him to the ground. Mr. Kistner was determined to be walking at a fairly constant speed of between 2.1 and 2.7 miles per hour (3.1 to 4.0 feet per second) up to the 10:25:36 timeframe when the McDermott vehicle began to pull forward.  At this point, Mr. Kistner's walking pace slowed and then came to a stop, reversing in the opposite direction as impact occurred between the forward moving McDermott vehicle. Comfortable walking speed for males in their 50s is documented to be between 3.8 and 5.3 feet per second (2.6 to 3.6 miles per hour)[2], supporting the fact that Mr. Kistner was walking up to the McDermott vehicle, as observed in the security video. The video further supports that Mr. Kistner did in fact slow as the McDermott vehicle began to move forward toward him.

According to Officer Schultz's testimony, he was in the passenger seat of Officer Moriarity's vehicle and told Mr. Moriarity to stop the vehicle so he could observe Mr. Kistner. Officer Schultz testified he observed the incident in its entirety through the driver's side mirror of the vehicle. Officer Schultz further testified that he observed Officer McDermott's vehicle stop abruptly and observed Mr. Kistner very close to the vehicle and contact was made with the vehicle, the driver's side mirror.

There are several inconsistencies with Officer Schultz's version of the subject incident. Upon review frame by frame of the security camera footage, and as documented above, it is clearly evident that Officer Moriarity's vehicle never stopped until well after the subject incident was over. Further, the frame by frame security camera video evidence shows that Mr. Kistner slowing and stopping, most likely extending his hand to try to protect himself from the McDermott vehicle as it moved forward and left into him. The frame by frame security video footage clearly shows that the McDermott vehicle did not stop, continuing to move forward through engagement with Mr. Kistner, and  it shows Mr. Kistner's body transition from forward motion to rearward motion due to contact by the McDermott vehicle (Figure 3).

---

[2] Bohannon, RW., "Comfortable and maximum walking speeds of adults aged 20-79 years: reference values and determinants," Age and Ageing 1997, 26: 15-19.

Mr. Anthony Rupp, Esq.                                    Page 16
December 9, 2020





Mr. Anthony Rupp, Esq.                                                                                    Page 17
December 9, 2020



*Figure 3: Distance tracking analysis showing the motion of Mr. Kistner and the two police vehicles frame by frame*

The fact that Officer Schultz claimed he saw the whole incident through the driver's side mirror is not supported by the laws of physics. All passenger vehicles in America are designed with a flat mirror on the driver's side and a convex (curved outward slightly) mirror on the passenger side. The convex mirror on the passenger side provides a wider field of view for the driver. The flat mirror on the driver's side provides a more accurate depiction for the driver of what is behind the vehicle with a narrower field of view. The Law of Reflection states that the angle of reflection equals the angle of incidence. Angles are measured perpendicular to the surface at the point the ray strikes the surface[3] (Figure 4).

---

[3] Wolfson, R, Pasachoff, JM, Physics: Extended with Modern Physics, Scott, Foresman and Company, Glenview, Illinois, 1990.

Mr. Anthony Rupp, Esq.                                                                     Page 18
December 9, 2020



*Figure 4: Law of Reflection*

Officer Schultz was seated in the passenger side of the vehicle at an angle of roughly 30 degrees relative to the driver's mirror. Based on the Law of Reflection, Officer Schultz view from the mirror would then be objects located 30 degrees parallel to the mirror on the opposite side of the vehicle, or basically the lawn and the house(s) located along the west side of the roadway. There is no way, based on physics, that Officer Schultz observed the incident on the roadway behind the Moriarity vehicle through the driver's side mirror.

To further support this conclusion, an exemplar 2015 Chevrolet Tahoe (VIN: 1GNSKBKC3FR187431) and 5' 9" and 5' 8" tall male surrogates representative of the sizes of Officer Moriarity and Officer Schultz, respectively, were obtained on November 23, 2020. The surrogates were placed in the exemplar vehicle and asked to adjust the seat positions to their comfort level. The surrogate driver was also asked to adjust his side mirrors to where he felt were appropriate for his view. GoPro 8 cameras with head straps were placed on both surrogates' heads with the camera view as close to eye level as possible. Images of the demonstration set up are provided in Figure 5 for reference.



*Figure 5: Exemplar Tahoe/Surrogate Side Mirror View Demonstration*

1477 S State Road   ◆   Davison, MI  48423   ◆   810-272-9010   ◆   www.impactanalysisinc.com

Mr. Anthony Rupp, Esq.                                                                   Page 19
December 9, 2020

A ground camera was placed perpendicular to the vehicle for exterior reference. An orange cone
and human surrogate representing Mr. Kistner were placed a distance 50 feet back of the vehicle
and somewhat inboard of the left side of the vehicle, conservatively representing the location of
Mr. Kistner relative to the rear of the vehicle at the time of the incident.  Observation from the
surrogates through the driver's side mirror were made with the vehicle stationary as well as with
the vehicle accelerating to speeds between of up to around 18 miles per hour over a distance of
approximately 50 to 80 feet away.  Runs were also performed with the Kistner surrogate moving
behind the exemplar vehicle to the cone as generally observed in the security video. An example
of what could be observed by the driver versus the passenger with the vehicle stationary (Figure
6) and while moving are provided in Figures 7 and 8 for the driver and the right front passenger,
respectively.



*Figure 6: Exemplar Tahoe/Surrogate Side Mirror View Demonstration – Stationary Vehicle:*
*driver view (top), passenger view (bottom)*

Mr. Anthony Rupp, Esq.
December 9, 2020

Page 20





Mr. Anthony Rupp, Esq.                                                                 Page 21
December 9, 2020



*Figure 7: Exemplar Tahoe/Surrogate Side Mirror View Demonstration – Moving Vehicle: driver view*



Mr. Anthony Rupp, Esq.                                                   Page 22
December 9, 2020



*Figure 8: Exemplar Tahoe/Surrogate Side Mirror View Demonstration – Moving Vehicle: right front passenger view*

Based on the demonstrations performed, at no time was the Kistner surrogate observed through the driver side mirror from the surrogate passenger's point of view. This view was strictly of the grass and roadway area located to the left of the vehicle, validating the Law of Reflection, and proving Officer Schultz did NOT in fact see the incident occur through the driver's side mirror as he testified.

Mr. Anthony Rupp, Esq.                                                                          Page 23
December 9, 2020

Officer Moriarity testified he could not remember if he stopped his vehicle, but he recalled he was looking between his driver's mirror and forward. Officer Moriarity further testified he recalled having a conversation with Officer Schultz how it looked like Mr. Kistner threw himself at the vehicle, but Officer Moriarity never said he actually saw the incident in his mirror. Based on timing of the incident, the location of Mr. Kistner relative to the rear of the Moriarity Tahoe as it was moving away, and Officer Moriarity's testimony that he was looking between forward and in his driver side mirror, it is highly likely that Officer Moriarity did not see the majority of the subject incident. Furthermore, he would not have been able to observe enough of Mr. Kistner and/or Officer McDermott's vehicle, to make a conclusive determination as to what occurred in the subject incident.

According to Officer McDermott's deposition testimony, her vehicle was stopped and Mr. Kistner threw himself into her vehicle. Officer McDermott also testified that Mr. Kistner was walking very quickly toward her vehicle and didn't stop. Through the frame by frame analysis of the security camera video, Officer McDermott's vehicle was not stopped but moving forward and to the left into Mr. Kistner. The analysis further verified that Mr. Kistner was walking at a normal walking speed, slowed and then stopped prior to him being contacted by Officer McDermott's vehicle.

There is a claim that the driver's side mirror and window of Officer McDermott's vehicle was damaged during the subject incident. Fleet management records for the involved Tahoe from January 5, 2017, only document maintenance to the cooling system. There is no reference or evidence to support repair of the driver side mirror or window of the vehicle. Based on the frame by frame video, interaction between Mr. Kistner and the McDermott vehicle was primarily in the area of the left front fender, forward of the driver's side door and mirror. The 2015 Chevrolet Tahoe has folding side mirrors. Any interaction between Mr. Kistner and the driver's mirror would have tended to fold the mirror inboard into its folded position versus actually breaking the mirror from the door.

Observation of the video, as provided, clearly shows that the Moriarity vehicle never stopped moving during the subject incident, the McDermott vehicle was moving at the time of impact with Mr. Kistner, and that Mr. Kistner slowed, stopped, and was forced backward due to the forward moving McDermott vehicle. A thorough, scientifically based analysis was performed relative to this matter in order to support and verify what is observed by watching the security camera video. The analysis that was performed was something that the Buffalo Police Department and the City of Buffalo could have had done to verify the validity of witness testimony relative to this matter.

## **Opinions and Conclusions**

In Summary:

1) The McDermott vehicle was accelerating forward at the time of impact between the vehicle and Mr. Kistner.
2) Mr. Kistner approached the McDermott vehicle at normal walking speeds, slowing pace and stopping before being impacted and knocked backward by the forward moving McDermott vehicle.

Mr. Anthony Rupp, Esq.                                                                    Page 24
December 9, 2020

3) There is no physical evidence to support that Mr. Kistner "charged" or "threw himself at" the McDermott vehicle during the subject incident.

4) There is no physical evidence to support that the driver side mirror or window of Officer McDermott's vehicle were damaged in the subject incident.

5) The Moriarity vehicle was moving at the time of the subject incident.

6) Based on the laws of physics, Officer Schultz would not have seen any of the subject incident in the driver's side mirror as he testified. In fact, Officer Schultz would have only been able to see the lawns and houses located on the north side of the road through the driver's side mirror from his vantage point in the vehicle.

7) Based on timing of the incident, the location of Mr. Kistner relative to the rear of the Moriarity Tahoe as it was moving away, and Officer Moriarity's testimony that he was looking between forward and in his driver side mirror and having to pay attention to his driving task, it is highly likely that Officer Moriarity did not see the majority of the subject incident. Furthermore, he would not have been able to observe enough of Mr. Kistner and/or Officer McDermott's vehicle or the interaction between the two to make a conclusive determination as to what occurred in the subject incident.

This report summarizes work performed to date and presents the findings resulting from that work. The findings presented herein are made to a reasonable degree of scientific, engineering, and biomechanical certainty. I reserve the right to supplement this report and to expand or modify opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

Impact Analysis, Inc. charges $375/hr for my time for all activities. A copy of my current curriculum vitae and 4-year testifying history are provided for reference. Attached as Appendix A to this report is a list of references and/or exhibits relative to my analysis.

Sincerely,

*Jennifer L. Yaek, PhD., P.E.*

Jennifer L. Yaek, Ph.D., P.E.
Principal Engineer

Mr. Anthony Rupp, Esq.                                                    Page 25
December 9, 2020

# Appendix A

- Google Earth Pro aerial and ground view photographs of 37 Schmarbeck Avenue
- Panorama video of accident scene using security cameras 2 and 6
- Frame by Frame images from security camera 6
- Frame by Frame tracking and measurements from camera 6 analysis
- Photographs and videos from exemplar vehicle and side mirror view demonstration, dated November 23, 2020
- Vehicle Specifications for 2015 Chevrolet Tahoe
- Wolfson, R, Pasachoff, JM, Physics: Extended with Modern Physics, Scott, Foresman and Company, Glenview, Illinois, 1990 – Law of Reflection
- Bohannon, RW., "Comfortable and maximum walking speeds of adults aged 20-79 years: reference values and determinants," Age and Ageing 1997, 26: 15-19.
- 2015 Chevrolet Tahoe vehicle brochure
- Four videos of subject incident from Camera 6, dated January 1, 2017
- One video of subject incident from Camera 2, dated January 1, 2017