

# CITY OF BUFFALO

## DEPARTMENT OF LAW

# EXHIBIT

# H

1

### VIDEO DEPOSITION
### JENNY VELEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

-------------------------------------------
JAMES C. KISTNER,

                    Plaintiff,

            - vs -        Civil Action No.
                          18-cv-402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
 capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),

                    Defendants.
-------------------------------------------

CITY OF BUFFALO
DEPARTMENT OF LAW

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

MAR 1 3 2020

RECEIVED
MEH

```
 1              Video deposition of JENNY VELEZ,

 2   Defendant, taken pursuant to the Federal Rules of

 3   Civil Procedure, in the offices of JACK W. HUNT &

 4   ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

 5   New York, on February 26, 2020, commencing at

 6   10:11 a.m., before LYNNE E. DiMARCO, Notary Public.

 7

 8   APPEARANCES:     RUPP BAASE
                      PFALZGRAF & CUNNINGHAM, LLC,
 9                    By CHAD DAVENPORT, ESQ.,
                      1600 Liberty Building,
10                    Buffalo, New York   14202,
                      (716) 854-3400,
11                    davenport@ruppbaase.com,
                      Appearing for the Plaintiff.
12
                      TIMOTHY A. BALL, ESQ.,
13                    Corporation Counsel,
                      By MAEVE E. HUGGINS, ESQ.,
14                    Assistant Corporation Counsel,
                      1137 City Hall,
15                    Buffalo, New York   14202,
                      (716) 851-4334,
16                    mhuggins@city-buffalo.com,
                      Appearing for the Defendants.
17
     PRESENT:         JAMES KISTNER
18                    LAUREN McDERMOTT

19                    PATRICK F. MORRIS, Videographer

20

21
          MR. DAVENPORT:  Chad Davenport here on

23   behalf of the plaintiff Jim Kistner.
```

10:02:14
10:11:41 22
10:11:47 23

| | | |
|---|---|---|
| 10:11:49 | 1 | **MS. HUGGINS:** Maeve Huggins on behalf of the |
| 10:11:49 | 2 | defendants. |
| 10:11:49 | 3 | |
| 10:12:01 | 4 | **J E N N Y   V E L E Z**, 693 East Ferry Street, |
| 10:12:05 | 5 | Buffalo, New York 14211, after being duly called |
| 10:12:07 | 6 | and sworn, testified as follows: |
| 10:12:07 | 7 | |
| 10:12:07 | 8 | **EXAMINATION BY MR. DAVENPORT:** |
| 10:12:07 | 9 | |
| 10:12:09 | 10 | Q.   Good morning, Ms. Velez. |
| 10:12:12 | 11 | A.   Good morning. |
| 10:12:13 | 12 | Q.   My name is Chad Davenport.  I'm with |
| 10:12:13 | 13 | the law firm Rupp Baase Pfalzgraf Cunningham and we |
| 10:12:15 | 14 | represent the plaintiff Jim Kistner. |
| 10:12:17 | 15 | So we are here today to talk about events |
| 10:12:19 | 16 | that transpired on January 1st of 2017.  Before we |
| 10:12:24 | 17 | start, have you ever given sworn testimony before? |
| 10:12:26 | 18 | A.   Yes, I have. |
| 10:12:27 | 19 | Q.   And was that in a civil matter or was |
| 10:12:31 | 20 | that in a criminal matter? |
| 10:12:32 | 21 | A.   Criminal. |
| 10:12:33 | 22 | Q.   Okay.  Have you ever given sworn |
| 10:12:35 | 23 | testimony in front of -- in a civil matter before? |

*Velez - Davenport - 02/26/2020*

4

10:12:37  1          A.    No, I have not.

10:12:38  2          Q.    Okay.  So it's the same thing, your

10:12:40  3   testimony is under oath today.  And do you

10:12:44  4   recognize that your testimony is sworn under oath

10:12:47  5   today?

10:12:47  6          A.    Yes.

10:12:47  7          Q.    Okay.  So our discussion today is being

10:12:51  8   transcribed -- transcribed by a stenographer.  In

10:12:54  9   order to have an accurate transcript I just ask

10:12:57 10   that you wait until I finish my question before you

10:13:01 11   answer.  And I will wait until you finish your

10:13:03 12   answer before I ask my next question.

10:13:07 13          In addition, I just ask that you give verbal

10:13:10 14   answers to each of the question that's -- each of

10:13:12 15   the questions that is asked, noddings of the head

10:13:14 16   or shaking your head, uh-huh, uh-uh won't be able

10:13:19 17   to be tran -- transcribed on the record.  So we

10:13:22 18   just want to make sure that we have an accurate

10:13:25 19   record.

10:13:25 20          If at any time you do not understand a

10:13:28 21   question, you can simply ask me to rephrase the

10:13:32 22   question and I can rephrase it for you, but I do

10:13:35 23   ask that if you understand the question to please

| | | |
|---|---|---|
| 10:13:38 | 1 | answer it to the best of your ability.  Can you do |
| 10:13:41 | 2 | that for me? |
| 10:13:41 | 3 | A.   Yes. |
| 10:13:41 | 4 | Q.   And if at any time you need a break, |
| 10:13:41 | 5 | just ask me and we can absolutely stop and take a |
| 10:13:44 | 6 | break for as long as you need. |
| 10:13:45 | 7 | A.   Okay.   Thank you. |
| 10:13:46 | 8 | MS. HUGGINS:  Before we get started, we'll |
| 10:13:49 | 9 | read and sign and I would request 45 days to do so. |
| 10:13:51 | 10 | MR. DAVENPORT:  And that's fine. |
| 10:13:52 | 11 | MS. HUGGINS:   Thank you. |
| 10:13:55 | 12 | BY MR. DAVENPORT: |
| 10:13:56 | 13 | Q.   Do you have any military service? |
| 10:13:58 | 14 | A.   No. |
| 10:13:59 | 15 | Q.   Okay.  Have you ever been charged or |
| 10:14:02 | 16 | convicted with a crime? |
| 10:14:03 | 17 | A.   No. |
| 10:14:04 | 18 | Q.   What is your highest level of |
| 10:14:07 | 19 | education? |
| 10:14:07 | 20 | A.   I have some graduate level. |
| 10:14:09 | 21 | Q.   Okay.  And what did you go to graduate |
| 10:14:14 | 22 | school for? |
| 10:14:14 | 23 | A.   Adult education. |

*Velez - Davenport - 02/26/2020*

6

| | | |
|---|---|---|
| 10:14:16 | 1 | Q. Okay. And where did you go to graduate |
| 10:14:18 | 2 | school? |
| 10:14:18 | 3 | A. Buffalo State College. |
| 10:14:20 | 4 | Q. Did you go to undergrad as well? |
| 10:14:22 | 5 | A. Yes. |
| 10:14:23 | 6 | Q. And what did you go for undergrad? |
| 10:14:25 | 7 | A. Criminal justice. |
| 10:14:27 | 8 | Q. And was that a four-year degree? |
| 10:14:28 | 9 | A. Yes, I did two years at ECC, got an |
| 10:14:31 | 10 | associate's in criminal justice, followed up at |
| 10:14:32 | 11 | Buff State, got a BS in criminal justice. And then |
| 10:14:34 | 12 | I continued on graduate school, but didn't complete |
| 10:14:37 | 13 | it. |
| 10:14:37 | 14 | Q. Okay. Did you go to high school? |
| 10:14:40 | 15 | A. I did. |
| 10:14:41 | 16 | Q. And where did you go to high school? |
| 10:14:42 | 17 | A. Hutchinson Central Technical High |
| 10:14:46 | 18 | School. |
| 10:14:46 | 19 | Q. Okay. So we discussed a little bit |
| 10:14:54 | 20 | about your background in terms of education. When |
| 10:14:57 | 21 | did you join the Buffalo Police Academy? |
| 10:15:00 | 22 | A. January of 2013. |
| 10:15:02 | 23 | Q. Okay. And did you start right away |

*Velez - Davenport - 02/26/2020*

7

| | | |
|---|---|---|
| 10:15:06 | 1 | with the Buffalo Police Department or did you have |
| 10:15:08 | 2 | to go to training before you started with the |
| 10:15:12 | 3 | Buffalo Police Department? |
| 10:15:13 | 4 | A.    I had to attend the police academy. |
| 10:15:16 | 5 | Q.    Okay.  And was that in 2013? |
| 10:15:20 | 6 | A.    January, yes. |
| 10:15:20 | 7 | Q.    January 2013. |
| 10:15:20 | 8 | A.    January 2013. |
| 10:15:20 | 9 | Q.    Okay.  And then when did you start with |
| 10:15:22 | 10 | the Buffalo Police Department? |
| 10:15:23 | 11 | A.    I started my field training in June of |
| 10:15:26 | 12 | 2013. |
| 10:15:26 | 13 | Q.    Okay. |
| 10:15:27 | 14 | A.    June 7th, I believe.  I'm not certain |
| 10:15:30 | 15 | on the exact date, but I believe it was June 7th. |
| 10:15:32 | 16 | Q.    Okay.  When you started your initial |
| 10:15:34 | 17 | training, did you have a plan to go to the City of |
| 10:15:36 | 18 | Buffalo Police Department? |
| 10:15:37 | 19 | A.    Yes, I was hired by the City of Buffalo |
| 10:15:40 | 20 | and then placed into the police academy. |
| 10:15:43 | 21 | Q.    Okay.  And that was your plan before |
| 10:15:45 | 22 | you entered the ECC training beforehand? |
| 10:15:48 | 23 | A.    Yes. |

*Velez - Davenport - 02/26/2020*

8

10:15:48  1          Q.   Okay.  Did you have a plan of what
10:15:50  2   district you wanted to work in at the time?
10:15:52  3          A.   No.
10:15:52  4          Q.   Okay.  Did you start in -- well, what
10:15:56  5   district did you start in?
10:15:57  6          A.   C.
10:15:58  7          Q.   C District.  And then how long were you
10:16:00  8   there for?
10:16:01  9          A.   I've been in C the entirety of my
10:16:04 10   career.
10:16:04 11          Q.   Okay.  So that's from 2013 to 2020?
10:16:07 12          A.   Correct.
10:16:07 13          Q.   Any gaps in between?
10:16:09 14          A.   I was assigned to A District as a
10:16:12 15   detective for a couple weeks, but I never actually
10:16:14 16   went into the district.  So by the time I was back
10:16:15 17   to work I was in Charlie.  I was transferred back
10:16:19 18   to Charlie.
10:16:20 19          Q.   Okay.  Did you have any sort of
10:16:21 20   training, field training, before you were off on
10:16:24 21   your own as a police officer?
10:16:26 22          A.   Yes.
10:16:26 23          Q.   And that was after you completed

*Velez - Davenport - 02/26/2020*

9

| | | |
|---|---|---|
| 10:16:28 | 1 | training with the Buffalo Police Academy? |
| 10:16:30 | 2 | A.    Yes. |
| 10:16:31 | 3 | Q.    Okay.  And how long was that field |
| 10:16:32 | 4 | training for? |
| 10:16:33 | 5 | A.    I believe it's 16 weeks. |
| 10:16:35 | 6 | Q.    Okay.  Who did you primarily go with |
| 10:16:39 | 7 | for your field training? |
| 10:16:40 | 8 | A.    I was assigned to at the time Officer |
| 10:16:44 | 9 | Darrel Williams. |
| 10:16:44 | 10 | Q.    Okay.  And was that for the entirety of |
| 10:16:46 | 11 | the 16 weeks? |
| 10:16:46 | 12 | A.    Yes, occasionally when he was off of |
| 10:16:49 | 13 | work, I would be assigned to another officer, but I |
| 10:16:53 | 14 | was primarily with him for the majority of the |
| 10:16:54 | 15 | time. |
| 10:16:54 | 16 | Q.    Okay.  Approximately how many hours |
| 10:16:56 | 17 | were you working during those 16 weeks? |
| 10:17:00 | 18 | A.    I'm 40 hours a week at 10 hours a day. |
| 10:17:03 | 19 | Q.    Okay.  So that would have been four |
| 10:17:05 | 20 | shifts a week then? |
| 10:17:06 | 21 | A.    Correct. |
| 10:17:07 | 22 | Q.    Okay. |
| 10:17:07 | 23 | MS. HUGGINS:  Just slow down, wait for -- |

*Velez - Davenport - 02/26/2020*

10

| | | |
|---|---|---|
| 10:17:11 | 1 | THE WITNESS: Oh, I'm sorry. |
| 10:17:13 | 2 | BY MR. DAVENPORT: |
| 10:17:13 | 3 | Q. Where -- what shift did you |
| 10:17:18 | 4 | predominantly work during those 16 weeks? |
| 10:17:21 | 5 | A. 6:00 a.m. to 1600 hours or 4 p.m. |
| 10:17:26 | 6 | Q. Okay. And did you maintain that |
| 10:17:28 | 7 | schedule after your 16 weeks? |
| 10:17:29 | 8 | A. No. |
| 10:17:30 | 9 | Q. What did you switch to? |
| 10:17:31 | 10 | A. I was switched to MP5 overnights. |
| 10:17:34 | 11 | Q. Okay. And then how long did you work |
| 10:17:36 | 12 | overnights for? |
| 10:17:39 | 13 | A. I was overnights for -- I don't recall, |
| 10:17:44 | 14 | because we were assigned for a short amount of time |
| 10:17:47 | 15 | and then there was a manpower change and I was put |
| 10:17:50 | 16 | on afternoons. Possibly six months. I'm not |
| 10:17:57 | 17 | certain. |
| 10:17:57 | 18 | Q. Okay. No, that's okay. |
| 10:17:59 | 19 | A. Maybe longer. |
| 10:17:59 | 20 | Q. And then you were saying that you were |
| 10:18:03 | 21 | switched to afternoons after the night shift? |
| 10:18:05 | 22 | A. Yes. |
| 10:18:05 | 23 | Q. Okay. And how long did you work |

*Velez - Davenport - 02/26/2020*

11

| | | |
|---|---|---|
| 10:18:06 | 1 | afternoon shifts for? |
| 10:18:07 | 2 | A.   I know I went to days in January of |
| 10:18:10 | 3 | 2015, so maybe another six months to a year on |
| 10:18:14 | 4 | afternoons. |
| 10:18:14 | 5 | Q.   Okay.  And did you work the day shift |
| 10:18:17 | 6 | from 2015 forward? |
| 10:18:19 | 7 | A.   Yes. |
| 10:18:19 | 8 | Q.   And you were -- |
| 10:18:20 | 9 | A.   Oh, excuse me.  I was -- when I was |
| 10:18:21 | 10 | promoted to detective, my shift changed.  And then |
| 10:18:25 | 11 | when I was promoted to lieutenant, my |
| 10:18:27 | 12 | shift -- shifts changed as well. |
| 10:18:28 | 13 | Q.   Okay.  When approximately were you |
| 10:18:32 | 14 | promoted detective? |
| 10:18:33 | 15 | A.   November of 2017. |
| 10:18:35 | 16 | Q.   Okay.  And when were you promoted to |
| 10:18:40 | 17 | lieutenant? |
| 10:18:40 | 18 | A.   July of 2018. |
| 10:18:42 | 19 | Q.   Were you working as a detective up |
| 10:18:46 | 20 | until the point that you were promoted to |
| 10:18:48 | 21 | lieutenant? |
| 10:18:48 | 22 | A.   Yes. |
| 10:18:50 | 23 | Q.   Okay.  And so, I'm sorry, what shifts |

*Velez - Davenport - 02/26/2020*

12

| | | |
|---|---|---|
| 10:18:54 | 1 | were you working for as you were a detective? |
| 10:18:57 | 2 | A.   Yes. |
| 10:18:57 | 3 | Q.   And that was with the A District? |
| 10:18:59 | 4 | A.   I was assigned to A, but I didn't |
| 10:19:03 | 5 | actually go in and physically work in there.  I was |
| 10:19:05 | 6 | bark in Charlie. |
| 10:19:07 | 7 | Q.   Okay. |
| 10:19:08 | 8 | A.   Within a couple of weeks. |
| 10:19:09 | 9 | Q.   Okay.  Okay.  So you worked as a |
| 10:19:09 | 10 | detective with the C District as well then? |
| 10:19:09 | 11 | A.   Yes. |
| 10:19:10 | 12 | Q.   Okay.  And what shift were you working |
| 10:19:13 | 13 | as a detective? |
| 10:19:14 | 14 | A.   Initially I was afternoons. |
| 10:19:16 | 15 | Q.   Okay. |
| 10:19:16 | 16 | A.   And then within a few months I was on |
| 10:19:19 | 17 | days. |
| 10:19:19 | 18 | Q.   Okay.  As a lieutenant, what shifts do |
| 10:19:24 | 19 | you currently work? |
| 10:19:24 | 20 | A.   6 to 4. |
| 10:19:26 | 21 | Q.   6 to 4.  Did you ever work the |
| 10:19:28 | 22 | afternoon shifts as a lieutenant? |
| 10:19:29 | 23 | A.   Yes. |

*Velez - Davenport - 02/26/2020*

13

| | | |
|---|---|---|
| 10:19:29 | 1 | Q.   Okay.   And how long approximately did |
| 10:19:32 | 2 | you work the afternoon shift for? |
| 10:19:40 | 3 | A.   About six months, I believe. |
| 10:19:44 | 4 | Q.   So that now correct me if I'm wrong, |
| 10:19:47 | 5 | that would have put you in early of 2019 when you |
| 10:19:51 | 6 | started to work the day shift as a lieutenant? |
| 10:19:56 | 7 | A.   I've changed around so much, let |
| 10:19:59 | 8 | me just -- |
| 10:19:59 | 9 | Q.   Sure. |
| 10:20:00 | 10 | A.   Let me think about it a little bit.   I |
| 10:20:06 | 11 | was promoted in July, I was on afternoons, yeah.   I |
| 10:20:14 | 12 | would say early, early 2019. |
| 10:20:16 | 13 | Q.   Okay. |
| 10:20:16 | 14 | A.   I was on days. |
| 10:20:17 | 15 | Q.   Okay.   So I'm going to show you what |
| 10:20:22 | 16 | has been marked as Exhibit 16.   I'm sorry.   I don't |
| 10:20:29 | 17 | have an extra copy. |
| 10:20:30 | 18 | MS. HUGGINS:   I have one. |
| 10:20:32 | 19 | BY MR. DAVENPORT: |
| 10:20:33 | 20 | Q.   So do you recognize this document? |
| 10:20:34 | 21 | A.   Yes. |
| 10:20:35 | 22 | Q.   Okay.   And what do you recognize that |
| 10:20:37 | 23 | to be? |

*Velez - Davenport - 02/26/2020*

14

10:20:37  1        A.    A shift summary report.

10:20:39  2        Q.    Okay.  Is the date on there -- what's

10:20:44  3   the date on there?

10:20:44  4        A.    1/1 of 2017.

10:20:47  5        Q.    Okay.  Now, reading through this list

10:20:49  6   of officers is there anyone that's on this list who

10:20:53  7   still currently works in C District?

10:21:01  8        A.    Yes.

10:21:01  9        Q.    Okay.  And who is that?

10:21:05 10        A.    Officer David Santana, myself,

10:21:10 11   Lieutenant Anthony McHue.  She's parole on here,

10:21:15 12   but she's now a detective, Erin Haidinger, and that

10:21:19 13   would be all.

10:21:19 14        Q.    Okay.  Now, just because I don't really

10:21:22 15   understand I guess the hierarchy of rankings, where

10:21:26 16   does a detective fall in terms of the ranking or

10:21:31 17   hierarchy for detective as opposed to a lieutenant?

10:21:31 18        A.    Well, detective is on the investigative

10:21:33 19   side.  Where I'm the supervisory side.

10:21:36 20        Q.    Okay.

10:21:37 21        A.    But we would oversee detectives, we

10:21:39 22   would be responsible as a lieutenant to call them

10:21:43 23   out.  So they're investigative, we're supervisory.

| | | |
|---|---|---|
| 10:21:46 | 1 | Q.   Okay.   Okay.   So now you said Officer |
| 10:21:55 | 2 | David Santana is still currently working in the C |
| 10:22:00 | 3 | District.   Is he still -- has his role changed? |
| 10:22:02 | 4 | A.   No. |
| 10:22:02 | 5 | Q.   He's still a police officer? |
| 10:22:04 | 6 | A.   Yes. |
| 10:22:04 | 7 | Q.   Okay.   What about for Anthony McHue, is |
| 10:22:08 | 8 | he a lieutenant still? |
| 10:22:09 | 9 | A.   Yes. |
| 10:22:09 | 10 | Q.   Okay.   And I believe you said for |
| 10:22:12 | 11 | Ms. Haidinger she's now a detective? |
| 10:22:15 | 12 | A.   Yes. |
| 10:22:15 | 13 | Q.   Okay.   And who's, I'm sorry, the fourth |
| 10:22:18 | 14 | person who's still working in the C District? |
| 10:22:23 | 15 | A.   One, two, three, four.   Kevin Quinn, |
| 10:22:24 | 16 | he's a patrol officer, he's also still in the C |
| 10:22:30 | 17 | District. |
| 10:22:30 | 18 | Q.   Okay. |
| 10:22:30 | 19 | A.   And then I had said myself. |
| 10:22:33 | 20 | Q.   Okay.   Now, do you know what shift |
| 10:22:36 | 21 | Mr. McHue is working? |
| 10:22:37 | 22 | A.   He's days. |
| 10:22:38 | 23 | Q.   He's days.   So do you and Lieutenant |

*Velez - Davenport - 02/26/2020*

16

| | | |
|---|---|---|
| 10:22:44 | 1 | McHue work the same day shifts? |
| 10:22:46 | 2 | A.   Currently, yes. |
| 10:22:47 | 3 | Q.   Okay.  And you work on the same days as |
| 10:22:50 | 4 | well? |
| 10:22:50 | 5 | A.   Yes. |
| 10:22:51 | 6 | Q.   Okay.  Are there always two lieutenants |
| 10:22:54 | 7 | who are working at any given time? |
| 10:22:56 | 8 | A.   There are two, on my particular wheel |
| 10:22:59 | 9 | there are two assigned, but we can work with just |
| 10:23:03 | 10 | one if one is out for the day. |
| 10:23:04 | 11 | Q.   Okay.  Are there different groups, I |
| 10:23:09 | 12 | guess, of C District police officers?  Do some work |
| 10:23:13 | 13 | some days while others work another day? |
| 10:23:16 | 14 | A.   In our district we have two wheels, we |
| 10:23:18 | 15 | have an A wheel and a B wheel, so when A wheel is |
| 10:23:22 | 16 | working, the B wheel is off, and that's all three |
| 10:23:25 | 17 | shifts. |
| 10:23:25 | 18 | And when the B wheel is working the A wheel |
| 10:23:26 | 19 | is off, because we work all year-round and they |
| 10:23:28 | 20 | always have to be covered, so we just have two |
| 10:23:30 | 21 | sides.  So when the one side is off, the other side |
| 10:23:32 | 22 | is working. |
| 10:23:33 | 23 | Q.   Okay.  Does -- do you work as a |

*Velez - Davenport - 02/26/2020*

17

| | | |
|---|---|---|
| 10:23:38 | 1 | lieutenant for both the A wheel and the B wheel? |
| 10:23:40 | 2 | A. No, I work on -- there's a discrepancy |
| 10:23:43 | 3 | on which one is labeled the A and the B, but I work |
| 10:23:44 | 4 | on the A side. |
| 10:23:45 | 5 | Q. Okay. And then does Lieutenant McHue |
| 10:23:48 | 6 | work on the B side? |
| 10:23:50 | 7 | A. No, he is on the A side as well. |
| 10:23:53 | 8 | Q. Okay. Who is the lieutenant that works |
| 10:23:55 | 9 | on the B side? |
| 10:23:56 | 10 | A. It is Lieutenant Bradford Pitts |
| 10:24:01 | 11 | and -- and Lieutenant Ibrahim Abdul-Wahed. |
| 10:24:06 | 12 | Q. Thank you. |
| 10:24:09 | 13 | A. You're welcome. |
| 10:24:12 | 14 | Q. So you said that you worked the |
| 10:24:14 | 15 | afternoon shift as a lieutenant in the C District, |
| 10:24:16 | 16 | correct? |
| 10:24:16 | 17 | A. Yes. |
| 10:24:17 | 18 | Q. Who was the other lieutenant that you |
| 10:24:19 | 19 | were working with at the time? |
| 10:24:21 | 20 | A. Leonetta Baskerville. |
| 10:24:23 | 21 | Q. And how long did you work with her for? |
| 10:24:26 | 22 | A. The entirety of the time I was on |
| 10:24:28 | 23 | afternoons, so I believe it was approximately six |

*Velez - Davenport - 02/26/2020*

18

10:24:31 1 months.

10:24:31 2         Q.   Okay.

10:24:31 3         A.   I could be a little bit off on my times

10:24:37 4 it's a lot to try to remember on the shift, how

10:24:37 5 long I was on the shift.

10:24:37 6         Q.   And so for purposes of the deposition

10:24:40 7 it's perfectly fine if you're not specific and

10:24:41 8 exactly right.  I'm just asking for you to give

10:24:44 9 answers to the best of your ability.

10:24:46 10         A.   Okay.

10:24:47 11         Q.   As a detective, who was your lieutenant

10:24:49 12 at the time?

10:24:58 13         A.   I apologize, we've had so much movement

10:25:01 14 and promotions, I'm trying to recall who was my

10:25:05 15 lieutenant when I was an afternoons.  I don't

10:25:13 16 recall who was my lieutenant an afternoons.

10:25:19 17         Q.   And that's okay if you don't recall.

10:25:22 18         A.   We had a whole shift -- a whole shift

10:25:24 19 change.  I cannot recall who was -- I -- I don't

10:25:27 20 recall who was the lieutenant.

10:25:28 21         Q.   And that's okay.  So after lieutenant

10:25:32 22 who was next on the hierarchy after in charge of

10:25:37 23 the C District?

*Velez - Davenport - 02/26/2020*

19

| | | |
|---|---|---|
| 10:25:37 | 1 | A.   It would be the captain. |
| 10:25:39 | 2 | Q.   Okay.  And is the captain in charge of |
| 10:25:42 | 3 | just the C District or does he have other districts |
| 10:25:45 | 4 | that he overlooks as well? |
| 10:25:47 | 5 | A.   It depends on who the captain is -- or, |
| 10:25:49 | 6 | I'm sorry, where the captain is assigned.  We have |
| 10:25:50 | 7 | district captains, so if a captains in C District |
| 10:25:52 | 8 | are just for C District. |
| 10:25:53 | 9 | Q.   And currently who is the C District |
| 10:25:57 | 10 | captain? |
| 10:25:58 | 11 | A.   Jason Whitenight and Joseph Langdon. |
| 10:26:05 | 12 | Q.   And were they the captains in January |
| 10:26:07 | 13 | of 2017? |
| 10:26:09 | 14 | A.   I don't believe so. |
| 10:26:10 | 15 | Q.   Okay.  Do you recall who the captains |
| 10:26:13 | 16 | were in C District at that time? |
| 10:26:15 | 17 | A.   I do not. |
| 10:26:16 | 18 | Q.   Okay.  As a lieutenant, do you report |
| 10:26:19 | 19 | for the captain? |
| 10:26:20 | 20 | A.   Yes. |
| 10:26:21 | 21 | Q.   And how often do you communicate with |
| 10:26:23 | 22 | the captain? |
| 10:26:24 | 23 | A.   The captain that works on my side is |

*Velez - Davenport - 02/26/2020*

10:26:27  1  overnight, he works the night shift, so I will see

10:26:31  2  him in passing in the morning if he's still there.

10:26:34  3  So once or twice in a two-week period I'll cross

10:26:39  4  paths with him.

10:26:39  5      Q.   Okay.   Now, as a lieutenant, you're in

10:26:42  6  charge of briefing the police officers before they

10:26:44  7  start their shift, correct?

10:26:46  8      A.   Correct.

10:26:46  9      Q.   What kinds of things do you discuss

10:26:48 10  during that briefing?

10:26:49 11      A.   We discuss any legal updates that we've

10:26:52 12  been provided by the department.   We discuss any

10:26:54 13  persons of interest that the detectives may be

10:26:57 14  looking for, or warrant arrests and anything

10:27:01 15  pertinent to officer safety, and then we may review

10:27:05 16  vehicle assignments.

10:27:06 17      Q.   Okay.   Now, do you recall on

10:27:10 18  January 1st of 2017 was there some sort of briefing

10:27:15 19  before you started your shift?

10:27:16 20      A.   Yes.

10:27:16 21      Q.   And who gave that briefing?

10:27:20 22      A.   Lieutenant McHugh.

10:27:21 23      Q.   Okay.   Do you remember what was said

*Velez - Davenport - 02/26/2020*

21

| | | |
|---|---|---|
| 10:27:25 | 1 | during that briefing? |
| 10:27:25 | 2 | A.   I do not. |
| 10:27:26 | 3 | Q.   Okay.  Now, you talked about in your |
| 10:27:29 | 4 | experience as a lieutenant you would give legal |
| 10:27:32 | 5 | updates.  What sorts of legal updates would you |
| 10:27:35 | 6 | give to the police officers before they began their |
| 10:27:38 | 7 | shift? |
| 10:27:38 | 8 | MS. HUGGINS:   Form.  You may answer. |
| 10:27:39 | 9 | THE WITNESS:   For example, we recently were |
| 10:27:42 | 10 | experiencing raise the age law changes, so we would |
| 10:27:44 | 11 | just remind officers in dealing with juveniles and |
| 10:27:47 | 12 | any updates or changes in procedures as we were |
| 10:27:50 | 13 | getting into this new process. |
| 10:27:52 | 14 | BY MR. DAVENPORT: |
| 10:27:54 | 15 | Q.   What other sorts of new processes or |
| 10:27:56 | 16 | new updates have you had to brief the officers on |
| 10:28:00 | 17 | as a lieutenant? |
| 10:28:02 | 18 | A.   That was the one that first came to my |
| 10:28:06 | 19 | mind with the raise the age.  I -- I don't recall |
| 10:28:07 | 20 | specifically anything else now. |
| 10:28:08 | 21 | Q.   How often are you giving these sorts of |
| 10:28:12 | 22 | legal updates as a lieutenant? |
| 10:28:14 | 23 | A.   As often as the department gives them |

*Velez - Davenport - 02/26/2020*

22

| | | |
|---|---|---|
| 10:28:17 | 1 | out to us and requires it. |
| 10:28:18 | 2 | Q.   And approximately how often is that? |
| 10:28:20 | 3 | MS. HUGGINS:   Form.   You may answer. |
| 10:28:21 | 4 | THE WITNESS:   It depends on what laws come |
| 10:28:24 | 5 | out and how often legislations pass and it would |
| 10:28:30 | 6 | depend on that, not us. |
| 10:28:32 | 7 | BY MR. DAVENPORT: |
| 10:28:33 | 8 | Q.   So you've been working as a lieutenant |
| 10:28:35 | 9 | since June of 2018, correct, or was it July of |
| 10:28:41 | 10 | 2018? |
| 10:28:41 | 11 | A.   July of 2018. |
| 10:28:42 | 12 | Q.   July of 2018.   So since July of 2018 |
| 10:28:47 | 13 | approximately how many times have you had to give |
| 10:28:50 | 14 | these sorts of legal update briefings to your |
| 10:28:55 | 15 | police officers? |
| 10:28:57 | 16 | A.   I can't give a specific number. |
| 10:28:59 | 17 | Q.   Okay.   Is it more than 10? |
| 10:29:03 | 18 | A.   I would say more than 10. |
| 10:29:05 | 19 | Q.   Is it more than 20? |
| 10:29:08 | 20 | A.   Possibly. |
| 10:29:10 | 21 | Q.   Okay.   Would it be more than 50? |
| 10:29:14 | 22 | A.   I wouldn't say more than 50. |
| 10:29:16 | 23 | Q.   Okay.   Now, you also said that part of |

*Velez - Davenport - 02/26/2020*

23

10:29:21  1   your briefing is persons of interest.  Would that

10:29:25  2   be just within the C District or would that be

10:29:27  3   other districts as well?

10:29:28  4         A.   Citywide.

10:29:30  5         Q.   Citywide.  How often do you get

10:29:36  6   briefings where you discuss a person of interest?

10:29:38  7         MS. HUGGINS:   Form.  You may answer.

10:29:40  8         THE WITNESS:   Daily.

10:29:41  9         BY MR. DAVENPORT:

10:29:42  10        Q.   Are they typically the same persons or

10:29:46  11  do you not repeat those types of briefings?  And,

10:29:49  12  I'm sorry, I'll rephrase my question.

10:29:52  13        After you have given an update regarding a

10:29:55  14  person of interest, do you then update the officers

10:29:58  15  each day until that person of interest is found or

10:30:02  16  located?

10:30:02  17        A.   We will revisit it if there's been a

10:30:05  18  change in the status.  If they've been found or

10:30:08  19  located or we received new information or if

10:30:11  20  they're no longer a person of interest.

10:30:13  21        Q.   Okay.  Has Mr. Kistner ever come up as

10:30:16  22  a person of interest?

10:30:17  23        A.   Not that I can recall.

| | | |
|---|---|---|
| 10:30:19 | 1 | Q. And that would be in your capacity as a |
| 10:30:21 | 2 | police officer and a lieutenant? |
| 10:30:22 | 3 | A. Correct. |
| 10:30:25 | 4 | Q. Okay. So since you started as |
| 10:30:27 | 5 | lieutenant over at C District do you communicate |
| 10:30:31 | 6 | with your police officers? |
| 10:30:32 | 7 | A. Yes. |
| 10:30:32 | 8 | Q. Okay. How do you communicate with your |
| 10:30:36 | 9 | police officers? |
| 10:30:38 | 10 | A. Can you clarify? |
| 10:30:40 | 11 | Q. Do you communicate over the radio? |
| 10:30:42 | 12 | A. Yes. |
| 10:30:42 | 13 | Q. Okay. Now, do you communicate during |
| 10:30:47 | 14 | work about work-related issues, do you communicate |
| 10:30:51 | 15 | by any other method besides radio? |
| 10:30:53 | 16 | A. Yes. |
| 10:30:54 | 17 | Q. And how is that? |
| 10:30:56 | 18 | A. In person or by phone. |
| 10:30:58 | 19 | Q. Okay. And is that by text messages? |
| 10:31:00 | 20 | A. Usually not. |
| 10:31:01 | 21 | Q. Phone calls? |
| 10:31:02 | 22 | A. Yes. |
| 10:31:02 | 23 | Q. Okay. How often do you use phone calls |

*Velez - Davenport - 02/26/2020*

25

10:31:05  1    to communicate with your police officers about

10:31:07  2    work-related incidents?

10:31:09  3         A.   It varies throughout the day.

10:31:11  4         Q.   Okay.  Is it daily?

10:31:12  5         A.   Yes.

10:31:16  6         Q.   Okay.  How many times daily

10:31:18  7    approximately, is it more than once, or --

10:31:21  8         A.   I couldn't give a specific number.  It

10:31:25  9    changes day-to-day.  Every day is different.

10:31:27 10         Q.   Okay.  Do you know if Lieutenant McHugh

10:31:29 11    communicates with his police officers by phone?

10:31:33 12         A.   You would have to ask Lieutenant

10:31:33 13    McHugh.

10:31:33 14         Q.   Okay.  Are you aware of any other

10:31:33 15    lieutenants who communicate with their officers by

10:31:36 16    phone?

10:31:36 17         A.   You would have to ask the other

10:31:36 18    lieutenants.

10:31:36 19         THE REPORTER:  You have to speak up for me.

10:31:36 20         THE WITNESS:  I'm sorry.  Yeah, I would ask

10:31:36 21    other lieutenants.

10:31:43 22         BY MR. DAVENPORT:

10:31:43 23         Q.   Okay.  Do you know if that is part of

10:31:46  1  the policies and procedures to communicate with the

10:31:48  2  other officers by phone?

10:31:49  3       A.   I don't specifically recall reading

10:31:51  4  that in our policy and procedure.

10:31:54  5       Q.   Okay.  As a lieutenant, did you have to

10:31:56  6  get any sort of training before you were promoted?

10:31:59  7       A.   Yes.

10:32:00  8       Q.   Okay.  And what sorts of training do

10:32:03  9  you remember specifically to become a lieutenant?

10:32:06 10       A.   It's not training to become a

10:32:09 11  lieutenant.  Once we're promoted lieutenant we did

10:32:11 12  a short training on our duties and how -- and what

10:32:17 13  was our -- what -- excuse me, what our requirements

10:32:19 14  were as lieutenants and to include new

10:32:22 15  documentation, supervisory reports, things of that

10:32:25 16  nature.

10:32:27 17       Q.   Now, in terms of accidents involving

10:32:32 18  police vehicles, did you get any sort of training

10:32:35 19  involving, you know, those types of incidents?

10:32:37 20       MS. HUGGINS:  Form.  You may answer.

10:32:38 21       THE WITNESS:  As a lieutenant, no.  As a

10:32:42 22  patrol officer, yes.

10:32:43 23       BY MR. DAVENPORT:

*Velez - Davenport - 02/26/2020*

27

10:32:44   1          Q.    What kind of training did you get for
10:32:46   2    accidents involving police vehicles?
10:32:48   3          A.    For -- the procedure for accidents
10:32:53   4    involving police vehicles would be to as a patrol
10:32:56   5    officer notify your supervisor and then proceed
10:33:01   6    with what the supervisor recommends.
10:33:04   7          Q.    Okay.  And who would the supervisor be
10:33:08   8    that you would contact?
10:33:09   9          A.    As a lieutenant or as a patrol officer?
10:33:12  10          Q.    As a patrol officer.
10:33:12  11          A.    My immediate supervisor, the
10:33:12  12    lieutenant.
10:33:12  13          Q.    Okay.  Now, as a lieutenant, what would
10:33:20  14    your responsibilities be once a police officer has
10:33:22  15    contacted you about a -- an accident involving a
10:33:26  16    police vehicle?
10:33:27  17          MS. HUGGINS:    Form.  You may answer.
10:33:28  18          THE WITNESS:    Depending on the facts of
10:33:32  19    the -- I -- I would need more facts regarding the
10:33:35  20    incident, just the patrol, what happened, what
10:33:38  21    exactly happened with that vehicle and the officer.
10:33:41  22    How was the vehicle involved in an accident.
10:33:44  23          BY MR. DAVENPORT:

10:33:45  1          Q.   So after you interview the officer and

10:33:47  2     you get the facts that you need to make your

10:33:50  3     determination, if that officer said that they

10:33:52  4     collided with another vehicle, what would your next

10:33:55  5     steps be?

10:33:56  6          MS. HUGGINS:   Form.   You may answer.

10:33:57  7          THE WITNESS:   It's just that would be a true

10:34:00  8     city involved accident and I would have to call out

10:34:03  9     our accident investigation unit as well as internal

10:34:06 10     affairs.

10:34:06 11          BY MR. DAVENPORT:

10:34:07 12          Q.   Okay.   Now, let's say that that patrol

10:34:11 13     vehicle contacted a person, would the procedure

10:34:13 14     change?

10:34:13 15          MS. HUGGINS:   Form.

10:34:14 16          THE WITNESS:   It would depend on what

10:34:16 17     contact meant.

10:34:17 18          BY MR. DAVENPORT:

10:34:18 19          Q.   Okay.   Let's say that that police

10:34:20 20     vehicle struck an individual and knocked that

10:34:20 21     individual over, what would the next steps be?

10:34:23 22          A.   Excuse me.   Can you repeat that?

10:34:23 23          MS. HUGGINS:   Form.   You may answer.

*Velez - Davenport - 02/26/2020*

29

BY MR. DAVENPORT:

10:34:25  1

10:34:25  2   Q.   Let's say that a patrol vehicle struck

10:34:26  3  an individual and that individual fell to the

10:34:30  4  ground, what would the next steps be as a

10:34:33  5  lieutenant?

10:34:33  6   A.   Again, if that was just the fact

10:34:34  7  pattern that was given, it's just kind of

10:34:36  8  speculating on what it would be, but if a patrol

10:34:40  9  vehicle struck a person, the same procedure would

        10  follow as if two -- two -- a patrol vehicle

        11  collided with another vehicle.

        12   Q.   Okay.

        13   THE REPORTER:  Can you slow down for me a

        14  little.

10:34:49 15   THE WITNESS:  Yes.  Sorry.

10:34:49 16   MS. HUGGINS:  Pause after he asks the

10:34:52 17  questions too.

10:34:52 18   THE WITNESS:  Okay.

10:34:52 19   MS. HUGGINS:  Because at the very end you're

10:34:53 20  overlapping.

10:34:54 21   THE WITNESS:  Okay.

10:34:57 22   BY MR. DAVENPORT:

10:34:58 23   Q.   So after the accident investigation

*Velez - Davenport - 02/26/2020*

30

10:35:01  1  unit has been contacted, what would the accident

10:35:04  2  investigation unit, what would their steps be?

10:35:07  3       A.   I'm not trained in accident

10:35:09  4  investigation, so I wouldn't be able to speculate

10:35:12  5  on what their procedures are.

10:35:13  6       Q.   As a lieutenant, would you have to go

10:35:15  7  to the scene?

10:35:16  8       A.   It depends on the circumstance.

10:35:18  9       Q.   Okay.  Let's say it's the same

10:35:20  10  circumstance, let's say a police vehicle has struck

10:35:23  11  an individual and knocked that individual over, the

10:35:26  12  accident investigation unit has been contacted.  As

10:35:28  13  a lieutenant, would you have to go to the scene to

10:35:30  14  go investigate yourself?

10:35:31  15       MS. HUGGINS:  Form.  You may answer.

10:35:33  16       THE WITNESS:  I would -- as a lieutenant, I

10:35:37  17  would go -- I go to most of my scenes as a

10:35:40  18  lieutenant.

10:35:40  19       BY MR. DAVENPORT:

10:35:40  20       Q.   Okay.  Now, when you say most of your

10:35:43  21  scenes as a lieutenant, what is that referring to?

10:35:45  22       A.   I'm -- I'm out on the streets, I'm

10:35:47  23  active.  I go to my scenes regardless of the

*Velez - Davenport - 02/26/2020*

31

| 10:35:52 | 1 | severity, I'm really interactive. |

10:35:52  1  severity, I'm really interactive.

10:35:54  2      Q.   Okay.

10:35:55  3      A.   If I can make it, depending on the

10:35:58  4  types of calls we have, if there's a lot going on.

10:36:01  5      Q.   Do you try to make yourself available

10:36:05  6  at any call that an officer in C District is

10:36:09  7  dispatched to?

10:36:09  8      A.   That's impossible.  I'm one person.

10:36:12  9      Q.   Sure.  Do you try to make yourself

10:36:15 10  available to as many of those calls as possible as

10:36:20 11  a lieutenant in C District?

10:36:20 12      A.   If they're requesting me, they're

10:36:23 13  asking for me to be there, yes.

10:36:24 14      Q.   What types of calls would you expect

10:36:27 15  your police officers to request your presence at?

10:36:29 16      MS. HUGGINS:  Form.  You may answer.

10:36:31 17      THE WITNESS:  That would depend on the

10:36:33 18  officer, their experience, how much time they have,

10:36:36 19  if they feel they can handle the type of scene.

10:36:39 20  But there are certain scenes that I'm required to

10:36:40 21  respond to.  So I will automatically go to those

10:36:45 22  calls, but any other call that an officer feels

10:36:46 23  like they may need my assistance with I go.

*Velez - Davenport - 02/26/2020*

32

| | | |
|---|---|---|
| 10:36:50 | 1 | **BY MR. DAVENPORT:** |
| 10:36:51 | 2 | Q.   If -- now, you talked about scenes that |
| 10:36:55 | 3 | you're required to go to.  Are one of those types |
| 10:36:58 | 4 | of scenes where a police vehicle is involved with |
| 10:37:03 | 5 | contacting or colliding with an individual and the |
| 10:37:08 | 6 | accident investigation unit going to the scene to |
| 10:37:11 | 7 | go investigate? |
| 10:37:11 | 8 | **MS. HUGGINS:**  Form.  You may answer. |
| 10:37:14 | 9 | **THE WITNESS:**  Can you repeat that question? |
| 10:37:16 | 10 | **BY MR. DAVENPORT:** |
| 10:37:16 | 11 | Q.   Sure.  As a lieutenant, are you |
| 10:37:19 | 12 | required to go to a scene involving a police |
| 10:37:23 | 13 | vehicle contacting an individual where accident |
| 10:37:27 | 14 | investigation unit has gone to go investigate the |
| 10:37:30 | 15 | accident? |
| 10:37:30 | 16 | **MS. HUGGINS:**  Form.  You may answer. |
| 10:37:32 | 17 | **THE WITNESS:**  I would request, I would |
| 10:37:34 | 18 | determine the facts of the incident, and I would |
| 10:37:36 | 19 | request the accident investigation unit to respond. |
| 10:37:39 | 20 | And if the accident investigation unit was called |
| 10:37:42 | 21 | out, then I would respond as well. |
| 10:37:44 | 22 | **BY MR. DAVENPORT:** |
| 10:37:45 | 23 | Q.   Okay.  Now, as a lieutenant, are there |

10:37:48  1   any sort of procedures that you would expect

10:37:52  2   accident investigation unit to go through?  For

10:37:55  3   example, pictures of the accident, statements from

10:37:58  4   witnesses, anything of that nature that you would

10:38:01  5   expect them to go through?

10:38:02  6          MS. HUGGINS:  Form.  You can answer.

10:38:03  7          THE WITNESS:  Again, I can't speculate on

10:38:06  8   what their policy or their procedures are in their

10:38:09  9   course of how they conduct their investigations.

10:38:13  10  I'm not trained in accident investigation.

10:38:15  11         BY MR. DAVENPORT:

10:38:16  12     Q.    As a lieutenant, are you obligated to

10:38:18  13  fill out any paperwork involving a accident

10:38:22  14  involving a police vehicle and an individual?

10:38:24  15     A.    If there is an accident involving a

10:38:26  16  police vehicle, I am required to do the accident

10:38:28  17  report.

10:38:28  18     Q.    Okay.  And what sort of information do

10:38:32  19  you put on that accident report?

10:38:34  20     A.    It depends on the facts of the

10:38:36  21  accident.

10:38:36  22     Q.    Okay.  What sort of information do they

10:38:40  23  ask you to comment on as a lieutenant within the

10:38:42   1   accident report?

10:38:43   2        A.    On an MV-104 it asks if -- there's two

10:38:49   3   sections on it, whether it's a vehicle, pedestrian,

10:38:52   4   bicycle, then just information in regards to

10:38:56   5   registration, insurance, points of impact, most

10:39:01   6   damage on the vehicle.

10:39:02   7        Then you could either circle how the

10:39:07   8   incident -- how the incident occurred or direction

10:39:10   9   of travel, then you would write a small narrative

10:39:14  10   regarding the accident.

10:39:16  11        And then there's boxes on the side that,

10:39:19  12   again, just what may have con -- contributing

10:39:22  13   factors, whether direction of travel, if there was

10:39:30  14   a subsequent event as a result of the first

10:39:33  15   accident.

10:39:34  16        Like if somebody, for instance, hit a

10:39:36  17   vehicle and then they veered off and struck a tree,

10:39:39  18   that would be the second event.  And that's what I

10:39:44  19   can recall at this time that's required on that

10:39:46  20   document.

10:39:46  21        Q.    Okay.  Now, as part of these forms, is

10:39:52  22   there anything besides the MV-104 form that you're

10:39:56  23   required to fill out as a lieutenant?

*Velez - Davenport - 02/26/2020*

35

10:39:57  1        A.    There is, and I don't recall the name

10:39:59  2   of the document at this time.

10:40:00  3        Q.    That's okay.  Do you remember generally

10:40:03  4   what that document asks?

10:40:05  5        A.    It's the same thing, just the fact

10:40:07  6   pattern of the incident, if there's an accident.

10:40:10  7   Based on our investigation it basically would

10:40:13  8   reflect the narrative on the MV-104, what were the

10:40:19  9   contributing factors, what -- what would

10:40:21  10  have -- how the accident occurred.

10:40:22  11       Q.    Now, that MV-104 form as a lieutenant,

10:40:26  12  who would you give that to?

10:40:28  13       A.    That would be filed.  It would go -- it

10:40:31  14  gets sent off to the state.

10:40:33  15       Q.    That's the State of New York?

10:40:35  16       A.    Yes.

10:40:36  17       Q.    And that other form that's not the

10:40:41  18  MV-104 form, who do you file that with?

10:40:43  19       A.    That goes to the department.

10:40:44  20       Q.    The City of Buffalo department?

10:40:46  21       A.    Correct.

10:40:47  22       Q.    And how long would that document be

10:40:50  23  maintained?

*Velez - Davenport - 02/26/2020*

36

| | | |
|---|---|---|
| 10:40:51 | 1 | **A.**   I don't know. |
| 10:40:53 | 2 | **Q.**   After it's filed with the City of |
| 10:40:55 | 3 | Buffalo, are there any officers who review that |
| 10:40:58 | 4 | document? |
| 10:40:58 | 5 | **A.**   I believe the captain does. |
| 10:41:02 | 6 | **Q.**   Now, as a lieutenant, would you expect |
| 10:41:06 | 7 | your police officers to file any sort of paperwork |
| 10:41:10 | 8 | involving -- in an accident involving a police |
| 10:41:13 | 9 | vehicle? |
| 10:41:13 | 10 | **MS. HUGGINS:**   Form.  You may answer. |
| 10:41:20 | 11 | **THE WITNESS:**   They would prepare an |
| 10:41:24 | 12 | interdepartmental memorandum giving their version |
| 10:41:29 | 13 | of events. |
| 10:41:31 | 14 | **BY MR. DAVENPORT:** |
| 10:41:32 | 15 | **Q.**   Are there any other sorts of forms that |
| 10:41:35 | 16 | these officers would have to fill out? |
| 10:41:36 | 17 | **A.**   If they were injured as a result, they |
| 10:41:39 | 18 | would fill out injured-on-duty paperwork. |
| 10:41:42 | 19 | **Q.**   Any other forms? |
| 10:41:43 | 20 | **A.**   Not that I can recall. |
| 10:41:44 | 21 | **Q.**   Now, this interdepartmental form, what |
| 10:41:47 | 22 | sort of information is asked of the officers on |
| 10:41:49 | 23 | that? |

*Velez - Davenport - 02/26/2020*

37

| | | |
|---|---|---|
| 10:41:50 | 1 | MS. HUGGINS: Form. |
| 10:41:50 | 2 | THE WITNESS: Just the facts of the event or |
| 10:41:52 | 3 | the incident. |
| 10:41:54 | 4 | BY MR. DAVENPORT: |
| 10:41:54 | 5 | Q. Is it a long form? |
| 10:41:55 | 6 | A. No, it's a blank document that they |
| 10:41:59 | 7 | create the contents of. |
| 10:42:02 | 8 | Q. Who does that interdepartmental form go |
| 10:42:07 | 9 | to? |
| 10:42:08 | 10 | A. The department, City of Buffalo, the |
| 10:42:10 | 11 | police department. |
| 10:42:10 | 12 | Q. Would you review that as a lieutenant? |
| 10:42:13 | 13 | A. Yes. |
| 10:42:14 | 14 | MS. HUGGINS: Form. |
| 10:42:15 | 15 | BY MR. DAVENPORT: |
| 10:42:16 | 16 | Q. Who else would review that form? |
| 10:42:17 | 17 | A. That would go through the chain of |
| 10:42:22 | 18 | command. |
| 10:42:22 | 19 | Q. So that would be the captain and then |
| 10:42:24 | 20 | would it go beyond the captain as well? |
| 10:42:26 | 21 | A. Yes. |
| 10:42:27 | 22 | MS. HUGGINS: Form. |
| 10:42:27 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

| | | |
|---|---|---|
| 10:42:28 | 1 | Q.  Who -- who else besides the captain |
| 10:42:29 | 2 | would review it that's higher on the hierarchy? |
| 10:42:33 | 3 | A.  I can't speculate on who -- who all |
| 10:42:36 | 4 | would look at it. |
| 10:42:37 | 5 | Q.  Okay.  Do you know who's supposed to |
| 10:42:39 | 6 | look at it? |
| 10:42:39 | 7 | MS. HUGGINS:  Form. |
| 10:42:40 | 8 | THE WITNESS:  I know on the document it's |
| 10:42:43 | 9 | from the commissioner down the chain of command we |
| 10:42:47 | 10 | list on the document. |
| 10:42:50 | 11 | BY MR. DAVENPORT: |
| 10:42:51 | 12 | Q.  Now, after these forms have been filled |
| 10:42:53 | 13 | out, is there any sort of an investigation or -- or |
| 10:42:59 | 14 | questions asked of the police officer besides |
| 10:43:02 | 15 | what's written on that form? |
| 10:43:04 | 16 | MS. HUGGINS:  Form. |
| 10:43:05 | 17 | THE WITNESS:  That depends on the department |
| 10:43:09 | 18 | what they request.  Once I fill out my |
| 10:43:12 | 19 | documentation that incident and the investigation |
| 10:43:14 | 20 | is no longer under my supervision, it goes through |
| 10:43:20 | 21 | the department chain of command. |
| 10:43:21 | 22 | BY MR. DAVENPORT: |
| 10:43:22 | 23 | Q.  Okay.  Do you know who would be making |

*Velez - Davenport - 02/26/2020*

39

| | | |
|---|---|---|
| 10:43:24 | 1 | those decisions, would it be the captain? |
| 10:43:26 | 2 | MS. HUGGINS:  Form. |
| 10:43:26 | 3 | THE WITNESS:  I do not. |
| 10:43:36 | 4 | BY MR. DAVENPORT: |
| 10:43:37 | 5 | Q.   Now, at the scene are there ever |
| 10:43:42 | 6 | statements taken from witnesses of the accident? |
| 10:43:45 | 7 | MS. HUGGINS:  Form. |
| 10:43:46 | 8 | THE WITNESS:  For just in general any |
| 10:43:48 | 9 | accident? |
| 10:43:48 | 10 | BY MR. DAVENPORT: |
| 10:43:49 | 11 | Q.   For an accident involving a police |
| 10:43:51 | 12 | vehicle. |
| 10:43:51 | 13 | A.   In any motor vehicle accident involving |
| 10:43:54 | 14 | any vehicle if there are witnesses available. |
| 10:43:57 | 15 | Q.   Now, what would constitute a witness |
| 10:44:00 | 16 | that's available? |
| 10:44:01 | 17 | A.   If some -- if we were out asking if |
| 10:44:05 | 18 | there were witnesses of if someone would come up to |
| 10:44:05 | 19 | us and state they had seen what happened. |
| 10:44:11 | 20 | Q.   Who would gather those statements from |
| 10:44:15 | 21 | the witnesses, would it be the police officers, the |
| 10:44:17 | 22 | lieutenant, or would it be the accident |
| 10:44:19 | 23 | investigation unit? |

*Velez - Davenport - 02/26/2020*

40

| | | |
|---|---|---|
| 10:44:20 | 1 | **A.**   That would depend. |
| 10:44:22 | 2 | **Q.**   Would you as a lieutenant take |
| 10:44:25 | 3 | statements from witnesses? |
| 10:44:26 | 4 | **A.**   It depends. |
| 10:44:28 | 5 | **Q.**   And what would that depend on? |
| 10:44:30 | 6 | **A.**   If there were other officers available, |
| 10:44:33 | 7 | if somebody came to me, if I had time to take the |
| 10:44:36 | 8 | statement, or if -- who was investigating it. |
| 10:44:38 | 9 | **Q.**   Okay.  Would there be any other sort of |
| 10:44:44 | 10 | tests or statements or anything else of these |
| 10:44:47 | 11 | police officers or the individual who's involved in |
| 10:44:51 | 12 | the accident? |
| 10:44:51 | 13 | **MS. HUGGINS:**  Form. |
| 10:44:52 | 14 | **THE WITNESS:**  It depends. |
| 10:44:52 | 15 | **THE REPORTER:**  I'm sorry.  What was your |
| 10:44:52 | 16 | answer? |
| 10:44:56 | 17 | **THE WITNESS:**  It depends. |
| 10:44:56 | 18 | **BY MR. DAVENPORT:** |
| 10:44:56 | 19 | **Q.**   Okay.  Would there ever be a urine |
| 10:44:59 | 20 | analysis of the officer involved in the accident? |
| 10:45:02 | 21 | **MS. HUGGINS:**  Form. |
| 10:45:03 | 22 | **THE WITNESS:**  I would not know. |
| 10:45:04 | 23 | **BY MR. DAVENPORT:** |

*Velez - Davenport - 02/26/2020*

41

| 10:45:05 | 1 | Q.   Okay.   That's not anywhere in the |
| 10:45:08 | 2 | policies or procedures? |
| 10:45:09 | 3 | A.   Not that I can recall. |
| 10:45:11 | 4 | Q.   Okay.   In a regular motor vehicle |
| 10:45:13 | 5 | accident would there ever be a urine analysis of |
| 10:45:19 | 6 | any of the individuals involved in that motor |
| 10:45:21 | 7 | vehicle accident? |
| 10:45:21 | 8 | MS. HUGGINS:   Form. |
| 10:45:22 | 9 | THE WITNESS:   It would depend on the |
| 10:45:25 | 10 | situation.   And, again, I'm not an accident |
| 10:45:28 | 11 | investigator, so I would not know. |
| 10:45:30 | 12 | BY MR. DAVENPORT: |
| 10:45:30 | 13 | Q.   Sure.   In your experience as a police |
| 10:45:35 | 14 | officer, did you ever witness any accidents not |
| 10:45:38 | 15 | involving police vehicles? |
| 10:45:39 | 16 | A.   Yes. |
| 10:45:41 | 17 | Q.   Was there ever a time where a urine |
| 10:45:45 | 18 | analysis was conducted of any of the drivers? |
| 10:45:48 | 19 | A.   Excuse me.   As a -- I've witnessed |
| 10:45:51 | 20 | accidents as a civilian.   I've never witnessed an |
| 10:45:54 | 21 | accident -- actually, I was in one accident as a |
| 10:45:56 | 22 | passenger, but I didn't -- are you asking as a |
| 10:46:00 | 23 | patrol officer if I've witnessed an accident or as |

*Velez - Davenport - 02/26/2020*

42

10:46:03  1  a civilian if I've witnessed an accident?

10:46:04  2      Q.   Well, my question was more so as a

10:46:07  3  patrol officer, so you can answer that first.

10:46:09  4      A.   Okay.

10:46:09  5      MS. HUGGINS:  As a patrol officer, has she

10:46:12  6  witnessed an accident?

10:46:13  7      BY MR. DAVENPORT:

10:46:13  8      Q.   Correct.

10:46:14  9      A.   Yes.

10:46:15 10      Q.   Okay.  Were you present for the

10:46:17 11  investigation of that accident?

10:46:17 12      A.   Partial.

10:46:19 13      Q.   At any point did it seem like either of

10:46:23 14  the drivers may be intoxicated?

10:46:25 15      A.   No.

10:46:26 16      MS. HUGGINS:  Form.

10:46:26 17      BY MR. DAVENPORT:

10:46:27 18      Q.   Okay.  As a civilian have you ever

10:46:29 19  witnessed a car accident?

10:46:31 20      A.   Yes.

10:46:31 21      Q.   Have you been involved in a car

10:46:34 22  accident?

10:46:34 23      A.   Yes.  Excuse me.  As a civilian or as a

Velez - Davenport - 02/26/2020

43

| | | |
|---|---|---|
| 10:46:39 | 1 | patrol officer? |
| 10:46:40 | 2 | Q.   As a civilian. |
| 10:46:41 | 3 | A.   Yes. |
| 10:46:41 | 4 | Q.   Were you a driver or a passenger as a |
| 10:46:44 | 5 | civilian? |
| 10:46:44 | 6 | A.   Driver. |
| 10:46:45 | 7 | Q.   Driver.  Did it appear that the other |
| 10:46:47 | 8 | driver or you were intoxicated at the time? |
| 10:46:49 | 9 | MS. HUGGINS:  Form. |
| 10:46:49 | 10 | THE WITNESS:  No. |
| 10:46:50 | 11 | BY MR. DAVENPORT: |
| 10:46:52 | 12 | Q.   Okay.  Have you ever witnessed an |
| 10:46:53 | 13 | accident involving somebody who may have been |
| 10:46:56 | 14 | intoxicated at the time? |
| 10:46:58 | 15 | A.   Excuse me.  Could you repeat that. |
| 10:47:00 | 16 | Q.   Have you ever witnessed either as a |
| 10:47:02 | 17 | patrol officer or as a civilian an accident where |
| 10:47:05 | 18 | either of the drivers may have been intoxicated at |
| 10:47:08 | 19 | the time? |
| 10:47:08 | 20 | MS. HUGGINS:  Form.  You may answer. |
| 10:47:09 | 21 | THE WITNESS:  I've never witnessed an |
| 10:47:12 | 22 | accident like that. |
| 10:47:13 | 23 | MR. DAVENPORT:  Okay.  So I'm going to have |

*Velez - Davenport - 02/26/2020*

44

| | | |
|---|---|---|
| 10:47:21 | 1 | this marked as I believe Exhibit 24.  Okay. |
| 10:47:21 | 2 | **The following was marked for Identification:** |
| | 3 | **EXH. 24**                **Buffalo Police Academy** |
| | 4 | **Training Record** |
| 10:48:03 | 5 | BY MR. DAVENPORT: |
| 10:48:04 | 6 | Q.   So I'm going to show you, Ms. Velez, |
| 10:48:06 | 7 | what's been marked as Exhibit 24.  Do you recognize |
| 10:48:08 | 8 | that document? |
| 10:48:09 | 9 | A.   Yes. |
| 10:48:09 | 10 | Q.   And what do you recognize that to be? |
| 10:48:13 | 11 | A.   The Buffalo Police Academy Training |
| 10:48:16 | 12 | Record. |
| 10:48:16 | 13 | Q.   And whose training record is it? |
| 10:48:20 | 14 | A.   It says it is Jenny M. Velez. |
| 10:48:24 | 15 | Q.   Okay.  Now, reviewing this document |
| 10:48:26 | 16 | does it seem that each of your training courses are |
| 10:48:30 | 17 | listed on this document? |
| 10:48:31 | 18 | MS. HUGGINS:  Form.  You can answer. |
| 10:48:46 | 19 | THE WITNESS:  Yes. |
| 10:48:46 | 20 | BY MR. DAVENPORT: |
| 10:48:46 | 21 | Q.   Are there any inaccuracies when going |
| 10:48:49 | 22 | through this document that you would like to point |
| 10:48:51 | 23 | out at this time? |

*Velez - Davenport - 02/26/2020*

45

| | | |
|---|---|---|
| 10:48:55 | 1 | **A.**    No. |
| 10:48:57 | 2 | **Q.**    So my first question is going to be if |
| 10:49:01 | 3 | you could turn to the third page, please.  At the |
| 10:49:04 | 4 | very bottom it says CIT crisis services.  And that |
| 10:49:08 | 5 | would have been date from 3/4/2019, date two, |
| 10:49:14 | 6 | 3/7/2019; do you see where that is? |
| 10:49:15 | 7 | **A.**    Yes. |
| 10:49:15 | 8 | **Q.**    Okay.  What is that training referring |
| 10:49:17 | 9 | to? |
| 10:49:17 | 10 | **A.**    Crisis intervention training. |
| 10:49:19 | 11 | **Q.**    And what is crisis intervention |
| 10:49:22 | 12 | training? |
| 10:49:22 | 13 | **A.**    It is where we learn how to deal with |
| 10:49:26 | 14 | people who may be having mental health issues, are |
| 10:49:29 | 15 | in a crisis. |
| 10:49:29 | 16 | **Q.**    Now, I see that you had 32 hours of |
| 10:49:33 | 17 | training on that; is that correct? |
| 10:49:34 | 18 | **A.**    Yes. |
| 10:49:35 | 19 | **Q.**    And this training would have been after |
| 10:49:38 | 20 | you had been promoted to lieutenant of C District? |
| 10:49:41 | 21 | **A.**    Yes. |
| 10:49:41 | 22 | **Q.**    Okay.  Were police officers required to |
| 10:49:44 | 23 | go through 32 hours of training? |

*Velez - Davenport - 02/26/2020*

10:49:47  1      A.    No.

10:49:48  2      Q.    Was it just lieutenants who were

10:49:50  3  required to go through 32 hours of training?

10:49:52  4      A.    At the time -- currently Buffalo police

10:49:55  5  officers do get CIT training, it's not 32 hours.

10:49:59  6          This is training that's offered.  It's

10:50:01  7  on -- currently it's voluntary.  We sign up for it

10:50:07  8  if it coincides with our schedule.

10:50:10  9      Q.    Okay.

10:50:10 10      A.    For the -- the extended training.

10:50:12 11      Q.    Okay.  What would the normal training

10:50:14 12  be if you didn't sign up for the extended training?

10:50:18 13      A.    I don't recall the exact number of

10:50:20 14  hours --

10:50:20 15      Q.    Okay.

10:50:20 16      A.    -- that the department offers.

10:50:21 17      Q.    Was there any reason why you signed up

10:50:24 18  for the extended training?

10:50:25 19      A.    I wanted to know more about the topic.

10:50:28 20      Q.    Okay.  Were there any events that

10:50:31 21  happened that led you to want that extra knowledge?

10:50:34 22      A.    Nothing specific.

10:50:35 23      Q.    Okay.  Do you know if Lieutenant McHugh

10:50:40  1    also went through 32 hours of training?

10:50:42  2         A.    I don't know.

10:50:43  3         Q.    Okay.  Do you know if any police

10:50:45  4    officers went through the 32 hours of training?

10:50:47  5         A.    There were other police officers with

10:50:49  6    me in the training.  I don't know all of in the

10:50:53  7    Buffalo Police Department who's taken the training.

10:50:55  8         Q.    Okay.  Were those police officers or

10:50:58  9    were they lieutenants?

10:50:59 10         A.    Both.

10:51:00 11         Q.    Okay.  Now, I also see that, turning to

10:51:08 12    the first page, towards the bottom you participated

10:51:10 13    in what is called Tahoe training.  And that would

10:51:14 14    have been on April 10th of 2014; do you see where

10:51:17 15    that is?

10:51:17 16         A.    Yes.

10:51:18 17         Q.    Okay.  What sort of training was that?

10:51:24 18         A.    We had gotten new Tahoes added to the

10:51:29 19    fleet, so we had to drive them and pass a course.

10:51:32 20         Q.    Okay.  What sort of training did

10:51:37 21    they -- strike that.

10:51:37 22              Going through that training, was there any

10:51:43 23    sort of test that you had to complete in order to

*Velez - Davenport - 02/26/2020*

48

10:51:46  1  pass that training?

10:51:47  2        A.    We had to complete the driving course.

10:51:50  3        Q.    Okay.  And what was the driving course,

10:51:53  4  what was -- what did that consist of?

10:51:55  5        A.    It was strategically placed cones we

10:51:59  6  had to maneuver the vehicle through.  I -- I don't

10:52:01  7  remember the exact pattern.

10:52:02  8        Q.    Okay.  Were you driving for the

10:52:05  9  entirety of the four hours?

10:52:06  10       A.    No.

10:52:06  11       Q.    Okay.  Approximately how long were you

10:52:10  12  driving during that course?

10:52:11  13       A.    I don't recall, because we had a

10:52:14  14  certain number of Tahoes, so we'd have to get out

10:52:18  15  and somebody else would have to drive.  And we'd

10:52:21  16  have to take turns, from what I can recall.

10:52:24  17       Q.    Sure.  At any point that you weren't

10:52:26  18  driving what were you doing during this training?

10:52:28  19       A.    This was outdoor training, so I believe

10:52:30  20  I was waiting.

10:52:30  21       Q.    Okay.

10:52:32  22       A.    And observing.

10:52:32  23       Q.    Was there any sort of instruction that

*Velez - Davenport - 02/26/2020*

49

| | | |
|---|---|---|
| 10:52:36 | 1 | was being provided to you at that time? |
| 10:52:39 | 2 | A.    I don't recall. |
| 10:52:39 | 3 | Q.    Okay.   Were there training instructors |
| 10:52:41 | 4 | that were present with you while you were waiting? |
| 10:52:41 | 5 | A.    Yes. |
| 10:52:42 | 6 | Q.    Okay.   Approximately how many people |
| 10:52:45 | 7 | were in that class with you? |
| 10:52:47 | 8 | A.    I don't recall. |
| 10:52:48 | 9 | Q.    Okay.   Was it more than 20? |
| 10:52:51 | 10 | A.    I don't recall. |
| 10:52:53 | 11 | Q.    Was it more than 50? |
| 10:52:57 | 12 | A.    No. |
| 10:52:57 | 13 | Q.    Okay.   The amount of driving that you |
| 10:53:03 | 14 | were doing, was it more than a half an hour? |
| 10:53:06 | 15 | A.    I don't recall. |
| 10:53:07 | 16 | Q.    Okay.   Now, besides the driving, did |
| 10:53:12 | 17 | they give you any sort of instruction on any of the |
| 10:53:16 | 18 | electronics within the vehicle? |
| 10:53:17 | 19 | A.    Yes. |
| 10:53:18 | 20 | Q.    What sorts of electronics did they give |
| 10:53:20 | 21 | you training on? |
| 10:53:21 | 22 | A.    The -- how to operate the lights and |
| 10:53:24 | 23 | sirens, where the buttons were. |

*Velez - Davenport - 02/26/2020*

10:53:26  1          Q.   Okay.   Was there a computer that was in

10:53:29  2   that Tahoe?

10:53:31  3          A.   I don't recall.

10:53:33  4          Q.   Okay.   Besides operating the lights and

10:53:36  5   sirens, was there any sort of electronic

10:53:38  6   instruction that you were given?

10:53:40  7          A.   Not that I can recall.

10:53:41  8          Q.   Okay.   January 18th of 2013 is the

10:53:52  9   first course that's listed; do you see that?

10:53:56 10          MS. HUGGINS:   Form.

10:53:57 11          BY MR. DAVENPORT:

10:53:57 12          Q.   For rules and regulations on the first

10:54:00 13   page?

10:54:00 14          A.   January 18th?

10:54:02 15          Q.   Yes, of 2013.

10:54:04 16          A.   Yes.

10:54:05 17          Q.   Okay.   Was this approximately the date

10:54:08 18   that you started with the Buffalo Police Academy?

10:54:11 19          A.   Yes.

10:54:12 20          Q.   Okay.   And prior to this, what -- where

10:54:15 21   did you receive your training?

10:54:19 22          A.   This would have been when we started

10:54:22 23   the academy, so I had no training prior to

*Velez - Davenport - 02/26/2020*

51

10:54:26   1   January 1 of 2013.

10:54:29   2        Q.   Okay.   Did you receive any training

10:54:32   3   from any entity that wasn't the Buffalo Police

10:54:37   4   Academy before this?   Did you receive -- I'm

10:54:39   5   sorry -- strike that.

10:54:40   6        Did you receive any training through the

10:54:42   7   County before the Buffalo Police Academy?

10:54:44   8        A.   Yes.

10:54:45   9        Q.   Would that have been before

10:54:48  10   January 18th of 2013?

10:54:50  11        A.   Yes.

10:54:50  12        Q.   Okay.   Approximately how long did that

10:54:52  13   training last for?

10:54:53  14        A.   That I had with the -- with Erie

10:54:57  15   County?

10:54:57  16        Q.   With Erie County, yes.

10:54:59  17        A.   That was from my previous employer with

10:55:02  18   Erie County, because --

10:55:03  19        MS. HUGGINS:   I think there's just confusion

10:55:05  20   with the term academy.

10:55:06  21        BY MR. DAVENPORT:

10:55:07  22        Q.   Okay.   Now, when you say your previous

10:55:11  23   employer, who was your previous employer before the

*Velez - Davenport - 02/26/2020*

52

| 10:55:15 | 1 | Buffalo Police Department? |
| 10:55:16 | 2 | A.    Erie County Sheriff's office. |
| 10:55:16 | 3 | Q.    Okay.  Did you work as an Erie County |
| 10:55:16 | 4 | Sheriff? |
| 10:55:16 | 5 | A.    I was a deputy -- |
| 10:55:16 | 6 | Q.    Okay. |
| 10:55:19 | 7 | A.    -- in their jail management division. |
| 10:55:21 | 8 | Q.    Okay.  And how long did you do that |
| 10:55:23 | 9 | for? |
| 10:55:24 | 10 | A.    Approximately three years. |
| 10:55:25 | 11 | Q.    Okay.  So I'm sorry that I didn't ask |
| 10:55:29 | 12 | you this before.  When did you start your graduate |
| 10:55:35 | 13 | program? |
| 10:55:39 | 14 | A.    I graduated with my bachelor's in 2007. |
| 10:55:47 | 15 | I can't recall if I immediately started or if I had |
| 10:55:49 | 16 | taken a break.  Possibly at the end of 2007. |
| 10:55:53 | 17 | Q.    Okay.  After finishing with your |
| 10:55:59 | 18 | graduate program, and I understand that you didn't |
| 10:56:01 | 19 | necessarily finish it, but after completing the |
| 10:56:05 | 20 | amount of course work that you did, did you start |
| 10:56:08 | 21 | with Erie County the deputy -- as a deputy |
| 10:56:10 | 22 | immediately after? |
| 10:56:12 | 23 | A.    It was within that time frame from when |

*Velez - Davenport - 02/26/2020*

10:56:20  1   I -- I started with the County in April or July of

10:56:26  2   2010.  So I don't recall if there was an overlap or

10:56:31  3   if I had stopped and then started, because of the

10:56:34  4   schedule.  I don't recall.

10:56:34  5          Q.    Okay.

10:56:35  6          A.    Exactly.

10:56:36  7          Q.    Okay.  Do you remember any other

10:56:38  8   positions that you would have had in between your

10:56:41  9   graduate program and starting with the County?

10:56:44 10          A.    I did work with the Buffalo Board of

10:56:47 11   Education as a security officer in the schools.

10:56:49 12          Q.    Okay.  Did you require any sort of

10:56:51 13   training as a security officer for the Board of

10:56:54 14   Education?

10:56:54 15          A.    Well, I'm a -- I was a certified

10:56:57 16   security guard, so I had taken that certification.

10:57:00 17          Q.    Okay.  Who was that certification

10:57:03 18   through?

10:57:06 19          A.    I don't remember the name of the

10:57:08 20   company that I did the training with.

10:57:10 21          Q.    Okay.  Who was your employer at the

10:57:14 22   time?

10:57:14 23          A.    The Buffalo Board of Education.

*Velez - Davenport - 02/26/2020*

54

| | | |
|---|---|---|
| 10:57:16 | 1 | Q.    Did you work for -- did you work |
| 10:57:22 | 2 | for -- and, I'm sorry, was the Board of Education, |
| 10:57:25 | 3 | was it City run or was it run by the County? |
| 10:57:28 | 4 | A.    That's the Board of Education.  It's in |
| 10:57:31 | 5 | City Hall, but it's the Board of Education and the |
| 10:57:33 | 6 | City of Buffalo is separate. |
| 10:57:34 | 7 | Q.    Okay. |
| 10:57:35 | 8 | A.    It's the City -- City of Buffalo School |
| 10:57:37 | 9 | District. |
| 10:57:37 | 10 | Q.    Okay.  Okay.  So was your employer |
| 10:57:40 | 11 | the -- the City of Buffalo then, the municipality |
| 10:57:44 | 12 | of the City of Buffalo? |
| 10:57:45 | 13 | A.    It's the City of Buffalo, but it's the |
| 10:57:48 | 14 | Board of -- Buffalo Board of Education. |
| 10:57:49 | 15 | Q.    Sure.  Were you hired by a private |
| 10:57:54 | 16 | security firm at the time or were you hired through |
| 10:57:57 | 17 | the City of Buffalo? |
| 10:57:59 | 18 | A.    I was -- |
| 10:57:59 | 19 | MS. HUGGINS:  Form.  You can answer. |
| 10:58:00 | 20 | THE WITNESS:  I was hired through the Board |
| 10:58:03 | 21 | of Education. |
| 10:58:03 | 22 | BY MR. DAVENPORT: |
| 10:58:03 | 23 | Q.    Okay.  And that would have |

*Velez - Davenport - 02/26/2020*

55

| | | |
|---|---|---|
| 10:58:06 | 1 | been -- there wouldn't have been a private security |
| 10:58:09 | 2 | firm that they would have hired for their security, |
| 10:58:12 | 3 | correct? |
| 10:58:12 | 4 |     A.    Correct. |
| 10:58:13 | 5 |     Q.    Okay.  Now, when you started with Erie |
| 10:58:19 | 6 | County as a deputy, did you have to go through any |
| 10:58:22 | 7 | training before you started that position? |
| 10:58:24 | 8 |     A.    Yes. |
| 10:58:24 | 9 |     Q.    How long did that training last for? |
| 10:58:26 | 10 |     A.    That training I believe was 12 weeks. |
| 10:58:29 | 11 |     Q.    Okay.  Was there multiple phases to the |
| 10:58:36 | 12 | training or was it just 12 weeks that was the one |
| 10:58:40 | 13 | phase? |
| 10:58:42 | 14 |     A.    There was also a -- a field training as |
| 10:58:46 | 15 | well, so there was the -- their academy and then |
| 10:58:49 | 16 | same thing like with the Buffalo Police, then you |
| 10:58:53 | 17 | go into field training where you sit with |
| 10:58:55 | 18 | experienced deputies and learn how to do the job |
| 10:58:59 | 19 | essentially. |
| 10:58:59 | 20 |     Q.    Okay.  How long did that field training |
| 10:59:03 | 21 | last for? |
| 10:59:03 | 22 |     A.    I don't recall the exact amount of |
| 10:59:06 | 23 | time. |

*Velez - Davenport - 02/26/2020*

56

| | | |
|---|---|---|
| 10:59:06 | 1 | Q.   Okay.  Was it more or less than |
| 10:59:09 | 2 | 16 weeks? |
| 10:59:09 | 3 | A.   I don't recall. |
| 10:59:10 | 4 | Q.   Okay.  Do you remember who you did your |
| 10:59:15 | 5 | field training with? |
| 10:59:16 | 6 | A.   That -- for the sheriff's office it's |
| 10:59:19 | 7 | not one set officer, it's multiple different |
| 10:59:22 | 8 | officers. |
| 10:59:23 | 9 | Q.   Okay.  Okay. |
| 10:59:24 | 10 | A.   Deputies, excuse me, multiple different |
| 10:59:27 | 11 | deputies. |
| 10:59:27 | 12 | Q.   Okay.  Now, as a deputy, what were your |
| 10:59:32 | 13 | primary responsibilities at that time for the |
| 10:59:33 | 14 | County? |
| 10:59:34 | 15 | A.   Care, custody, and control of the |
| 10:59:36 | 16 | inmates. |
| 10:59:38 | 17 | Q.   What jailhouse did you work at? |
| 10:59:41 | 18 | A.   I worked at both the Erie County |
| 10:59:44 | 19 | Holding Center and we had an annex at the Erie |
| 10:59:49 | 20 | County Correctional facility in Alden. |
| 10:59:51 | 21 | Q.   Okay.  Where is the Erie County Holding |
| 10:59:54 | 22 | Center located? |
| 10:59:54 | 23 | A.   I believe it's 40 Delaware. |

*Velez - Davenport - 02/26/2020*

57

| | | |
|---|---|---|
| 10:59:56 | 1 | Q. And was that the same location when you |
| 11:00:00 | 2 | were working there? |
| 11:00:00 | 3 | A. Yes. |
| 11:00:01 | 4 | Q. Okay. When you started with the |
| 11:00:05 | 5 | County, did you believe that you would eventually |
| 11:00:12 | 6 | become a police officer with the City of Buffalo at |
| 11:00:15 | 7 | that time? |
| 11:00:15 | 8 | A. I had aspirations to be a police |
| 11:00:18 | 9 | officer. |
| 11:00:18 | 10 | Q. Did you want to work with the City of |
| 11:00:21 | 11 | Buffalo specifically as a police officer? |
| 11:00:23 | 12 | A. Yes. |
| 11:00:24 | 13 | Q. Okay. Were there any other |
| 11:00:27 | 14 | municipalities that you considered at that time? |
| 11:00:29 | 15 | A. No. |
| 11:00:29 | 16 | Q. What was your reason for wanting to |
| 11:00:31 | 17 | work for the City of Buffalo? |
| 11:00:32 | 18 | A. This is what -- this is my home. |
| 11:00:34 | 19 | Q. Okay. So you've always lived in the |
| 11:00:36 | 20 | City then? |
| 11:00:37 | 21 | A. Yes. |
| 11:00:37 | 22 | Q. Okay. Let's see. Now, I see -- if you |
| 11:00:48 | 23 | can turn to your second page on your training |

*Velez - Davenport - 02/26/2020*

58

| 11:00:53 | 1 | towards the bottom there is law enforcement and |
| 11:00:57 | 2 | mental health.  And that would have been completed |
| 11:01:00 | 3 | on August 4th of 2016; do you see where that's |
| 11:01:04 | 4 | located? |
| 11:01:04 | 5 | A.    Yes. |
| 11:01:05 | 6 | Q.    And that would have been for three |
| 11:01:07 | 7 | hours, correct? |
| 11:01:07 | 8 | A.    Yes. |
| 11:01:08 | 9 | Q.    Is there a difference between this |
| 11:01:11 | 10 | course, law enforcement and mental health, and the |
| 11:01:13 | 11 | course you took in 2019 CIT crisis services? |
| 11:01:18 | 12 | A.    The amount hours is significantly |
| 11:01:21 | 13 | different.  It's much more content in the CIT |
| 11:01:26 | 14 | course. |
| 11:01:26 | 15 | Q.    Okay.  Do some of the content from the |
| 11:01:31 | 16 | law enforcement and mental health overlap with what |
| 11:01:34 | 17 | you are taught in the CIT crisis services? |
| 11:01:37 | 18 | A.    I don't recall the specifics. |
| 11:01:38 | 19 | Q.    Okay.  Is there anything that's covered |
| 11:01:42 | 20 | in the law enforcement and mental health that's not |
| 11:01:46 | 21 | covered in the CIT crisis services course? |
| 11:01:48 | 22 | A.    I don't recall the specifics. |
| 11:01:49 | 23 | Q.    Okay.  Do you remember or recall |

*Velez - Davenport - 02/26/2020*

59

| | | |
|---|---|---|
| 11:01:53 | 1 | anything that was specifically gone over with the |
| 11:01:56 | 2 | law enforcement and mental health training course? |
| 11:01:58 | 3 | A.   Not at this time. |
| 11:01:59 | 4 | Q.   Do you know if there was an option to |
| 11:02:02 | 5 | take more hours than the three that's listed on |
| 11:02:07 | 6 | your training course? |
| 11:02:07 | 7 | A.   I don't recall. |
| 11:02:10 | 8 | Q.   Now, there was a voluntary option to |
| 11:02:14 | 9 | take more CIT crisis services training in 2019.  Do |
| 11:02:21 | 10 | you know why there was that option to take more |
| 11:02:24 | 11 | hours of mental health training? |
| 11:02:26 | 12 | MS. HUGGINS:  Form.  You may answer. |
| 11:02:30 | 13 | THE WITNESS:  The Buffalo Police had |
| 11:02:37 | 14 | started a -- we have a new coordinator, we have a |
| 11:02:43 | 15 | new mental health coordinator, Captain Amber Buyer, |
| 11:02:44 | 16 | and she -- I'm trying to think of the correct for |
| 11:02:52 | 17 | how to articulate how she -- she offered these |
| 11:02:56 | 18 | courses. |
| 11:02:57 | 19 | She put it out on a training bulletin |
| 11:03:00 | 20 | through this new initiative the Buffalo Police had |
| 11:03:04 | 21 | engaged in and she had put that training out. |
| 11:03:07 | 22 | BY MR. DAVENPORT: |
| 11:03:07 | 23 | Q.   Okay.  Do you know approximately when |

| | | |
|---|---|---|
| 11:03:11 | 1 | Amber Buyer began with the City of Buffalo? |
| 11:03:14 | 2 | A.   I don't. |
| 11:03:15 | 3 | Q.   Okay.  Do you know approximately when |
| 11:03:17 | 4 | this new initiative was commenced by the City of |
| 11:03:22 | 5 | Buffalo? |
| 11:03:22 | 6 | A.   I can't recall. |
| 11:03:24 | 7 | Q.   Do you know if it was before or after |
| 11:03:28 | 8 | August 4th of 2016 when you took this law |
| 11:03:30 | 9 | enforcement and mental health training course? |
| 11:03:32 | 10 | A.   I don't know. |
| 11:03:33 | 11 | Q.   Okay.  Do you have any reason to |
| 11:03:34 | 12 | believe that it would have been before that date? |
| 11:03:36 | 13 | MS. HUGGINS:  Form.  You can answer. |
| 11:03:37 | 14 | THE WITNESS:  I don't recall it being |
| 11:03:41 | 15 | offered before that date. |
| 11:03:42 | 16 | BY MR. DAVENPORT: |
| 11:03:43 | 17 | Q.   Okay.  Have you ever met with Amber |
| 11:03:46 | 18 | Buyer? |
| 11:03:46 | 19 | MS. HUGGINS:  Form. |
| 11:03:47 | 20 | THE WITNESS:  Could you clarify? |
| 11:03:49 | 21 | BY MR. DAVENPORT: |
| 11:03:49 | 22 | Q.   Personally or professionally have you |
| 11:03:52 | 23 | ever met with Amber Buyer before? |

*Velez - Davenport - 02/26/2020*

61

11:03:54  1      A.    She -- I've crossed paths with her in

11:03:58  2  work.

11:03:58  3      Q.    Okay.

11:03:58  4      A.    Yes.

11:03:59  5      Q.    Do you speak with her often?

11:04:01  6      A.    Currently regarding with this new

11:04:04  7  crisis intervention training we have if we come

11:04:08  8  across any individuals who we believe may need

11:04:12  9  further assistance or we may need some referrals I

11:04:17  10  will defer to her and see if she has any

11:04:22  11  recommendations.

11:04:22  12      Q.    Approximately how often do you go to

11:04:26  13  her with individuals who may need some sort of

11:04:27  14  crisis intervention training?

11:04:27  15      MS. HUGGINS:  Form.  You can answer.

11:04:30  16      THE WITNESS:  I -- that I can recall

11:04:36  17  I -- maybe five to 10 times.

11:04:39  18      BY MR. DAVENPORT:

11:04:39  19      Q.    Okay.  And that would have been since

11:04:41  20  you started as a lieutenant?

11:04:43  21      A.    Since I've had this training, the CIT

11:04:48  22  training.

11:04:48  23      Q.    Okay.  Okay.  So that would have been

| 11:04:50 | 1 | after March 7th of 2019? |
| 11:04:53 | 2 | A.   Correct. |
| 11:04:54 | 3 | Q.   Now, prior to Amber Buyer beginning |
| 11:04:58 | 4 | with her position, was there anybody that |
| 11:05:02 | 5 | lieutenants or police officers could go to to speak |
| 11:05:04 | 6 | about, you know, what should be done about somebody |
| 11:05:06 | 7 | who may exhibit mental health issues? |
| 11:05:09 | 8 | MS. HUGGINS:   Form. |
| 11:05:12 | 9 | THE WITNESS:   We did have crisis services |
| 11:05:16 | 10 | that we could use as an outlet, we can always call |
| 11:05:20 | 11 | them, but in regards to having somebody in the |
| 11:05:23 | 12 | department that we can go to, I -- I didn't know of |
| 11:05:27 | 13 | anyone. |
| 11:05:27 | 14 | BY MR. DAVENPORT: |
| 11:05:28 | 15 | Q.   Okay.  Have you ever gone to Amber |
| 11:05:38 | 16 | Buyer after submitting a 941 form for an |
| 11:05:44 | 17 | individual? |
| 11:05:45 | 18 | MS. HUGGINS:   Form.  You can answer. |
| 11:05:49 | 19 | THE WITNESS:   Can you -- |
| 11:05:51 | 20 | BY MR. DAVENPORT: |
| 11:05:52 | 21 | Q.   Sure. |
| 11:05:52 | 22 | A.   -- clarify. |
| 11:05:53 | 23 | Q.   So as an officer occasionally you fill |

*Velez - Davenport - 02/26/2020*

63

| 11:05:57 | 1 | out a 941 form, correct? |
| 11:05:59 | 2 | A.   Correct. |
| 11:06:00 | 3 | Q.   And what is a 941 form? |
| 11:06:02 | 4 | A.   It's a mental health request to have |
| 11:06:05 | 5 | someone evaluated. |
| 11:06:05 | 6 | Q.   Have you ever gone to Amber Buyer after |
| 11:06:09 | 7 | filling out a 941 form requesting some sort of an |
| 11:06:15 | 8 | evaluation of an individual? |
| 11:06:16 | 9 | A.   I have not, no. |
| 11:06:17 | 10 | Q.   Okay.  Now, these -- these other prior |
| 11:06:22 | 11 | times that you've gone to go speak with Amber Buyer |
| 11:06:26 | 12 | about individuals that you're concerned with, did |
| 11:06:30 | 13 | you at any time fill out a 941 form for those |
| 11:06:34 | 14 | individuals? |
| 11:06:34 | 15 | A.   No. |
| 11:06:35 | 16 | Q.   Did any officers fill out 941 forms for |
| 11:06:38 | 17 | those individuals? |
| 11:06:39 | 18 | A.   I'm not certain. |
| 11:06:40 | 19 | Q.   Okay.  What led you to be concerned |
| 11:06:44 | 20 | about the mental health of these individuals that |
| 11:06:47 | 21 | you spoke with Amber Buyer about? |
| 11:06:49 | 22 | MS. HUGGINS:  Form.  Just it's very broad, |
| 11:06:56 | 23 | so I'm not going to prevent you from asking the |

Velez - Davenport - 02/26/2020

64

11:07:00  1    question, but as it's phrased now I think it's

11:07:02  2    confusing and may encompass a lot of things.

11:07:05  3            BY MR. DAVENPORT:

11:07:06  4        Q.    Do you understand my question?

11:07:06  5        A.    Well, I don't know if I would want to

11:07:10  6    discuss specific mental health issues of people

11:07:13  7    that we have dealings with.

11:07:14  8        Q.    Okay.   Would these individuals be

11:07:18  9    people that you ran into in C District?

11:07:20 10        A.    Yes.

11:07:21 11        Q.    So I'm not asking you to disclose any

11:07:25 12    names, so I will never be able to locate these

11:07:28 13    individuals, but I'm just asking what sorts of

11:07:30 14    mental health concerns did you have for those

11:07:33 15    individuals?

11:07:33 16            MS. HUGGINS:   Same form objection.   I am

11:07:36 17    concerned about HIPAA, depending on her answer.

11:07:39 18    And the way the question is worded it may still

11:07:42 19    implicate that.

11:07:43 20            MR. DAVENPORT:   I don't think that it does.

11:07:45 21    I mean, I'm just asking very broadly about

11:07:49 22    individuals within the City of Buffalo, what sorts

11:07:51 23    of mental health issues they would have had with

Velez - Davenport - 02/26/2020

65

11:07:54  1  those people.

11:07:55  2       MS. HUGGINS:  What I -- as a compromise, I

11:07:58  3  would allow you to ask sort of factors taken into

11:08:01  4  account or looked at in terms of her evaluation,

11:08:05  5  but not any -- anything about someone specific or

11:08:08  6  their own treatment.

11:08:09  7       BY MR. DAVENPORT:

11:08:10  8       Q.   Yeah, sure.  I didn't ask that

11:08:12  9  questions.  Just what sorts of things were you

11:08:14 10  concerned with with those individuals?

11:08:15 11       A.   Okay.  We have -- like I said, I've

11:08:17 12  been in C District for the entirety of my career.

11:08:20 13  We have people who we're very familiar with and

11:08:22 14  that we know that they may have a diagnosis or they

11:08:26 15  require a specific treatment.

11:08:28 16       If I see someone who is displaying some

11:08:30 17  indicators, whether it be verbal, behavioral, or

11:08:32 18  appearance and they're not a current threat to

11:08:35 19  themselves or anyone else, but I feel that they may

11:08:39 20  need some reevaluation and I know who they are, I

11:08:43 21  can call and request some type of assistance for

11:08:47 22  that person or a referral, give their name as a

11:08:49 23  referral for further evaluation, because I know

11:08:51  1    that they're involved in some type of services

11:08:54  2    already.

11:08:54  3          BY MR. DAVENPORT:

11:08:54  4          Q.    Okay.  And what sorts of verbal and

11:08:57  5    behavior things by these individuals would lead you

11:09:00  6    to be concerned for their well-being?

11:09:02  7          A.    For instance, it could be cold outside

11:09:05  8    and they're not dressed appropriately for the

11:09:08  9    weather.  Or it could be very cold outside and they

11:09:11 10    don't have the amount of clothes on that you would

11:09:15 11    think that somebody should have in subfreezing

11:09:18 12    temperatures.  Or their hygiene.

11:09:24 13          Q.    So besides hygiene and not being

11:09:29 14    dressed appropriately, what sorts of verbal cues

11:09:33 15    would be given by these individuals that would lead

11:09:36 16    you to be concerned for their mental health?

11:09:38 17          A.    There's a number of different

11:09:40 18    indicators and there -- there could be more than

11:09:42 19    one.  There could be a multitude of different

11:09:45 20    factors that would cause me to want -- want to have

11:09:48 21    them evaluated or receive more assistance or have a

11:09:52 22    referral or have a team come out that I know may

11:09:56 23    have already -- like I said, the individual may

*Velez - Davenport - 02/26/2020*

67

11:09:58  1  already have services in place that we're aware of

11:10:02  2  and we know the team that they're working with and

11:10:02  3  say they're back out on this corner again.

11:10:06  4        They may be yelling loudly, they may be

11:10:06  5  having a fixated repetitive speech.  It could be

11:10:09  6  something that we -- we see them often and it's not

11:10:11  7  what we would consider a baseline behavior.

11:10:14  8        Q.    Okay.  Now, besides people that you

11:10:17  9  encounter often are there ever any instances where

11:10:21 10  you run -- run into somebody that you've never seen

11:10:24 11  before and they give you some sort of verbal cues

11:10:28 12  that would lead you to be concerned for their

11:10:30 13  mental health?

11:10:31 14        A.    Yes.

11:10:32 15        Q.    What sorts of verbal cues would they

11:10:36 16  give if you have never ran -- come across this

11:10:38 17  person before?

11:10:39 18        A.    That --

11:10:39 19        MS. HUGGINS:  Form.  You can answer.

11:10:40 20        THE WITNESS:  That depends, somebody

11:10:42 21  could -- there's a million different scenarios I

11:10:46 22  could think of off the top of my head, but one of

11:10:48 23  the more severe someone could yell I want to kill

*Velez - Davenport - 02/26/2020*

68

| 11:10:48 | 1 | myself. |

11:10:49 2    BY MR. DAVENPORT:

11:10:50 3    Q.    Okay.   Now, besides yelling something

11:10:53 4  about self-harm or just speaking about self-harm,

11:10:58 5  would you ever have mental health concerns if an

11:11:02 6  individual was speaking about hurting another

11:11:05 7  individual?

11:11:05 8    A.    Can you repeat that?

11:11:06 9    Q.    Sure.   Aside from instances of

11:11:09 10  self-harm, are there any times where you'd be

11:11:12 11  concerned about an individual's self-help -- or

11:11:16 12  mental health if they were talking about injuring

11:11:19 13  another individual, not themselves?

11:11:21 14    A.    Yes.

11:11:22 15    Q.    Okay.   And when would that cross from

11:11:24 16  being a potential crime to one of a mental health

11:11:29 17  concern?

11:11:29 18    MS. HUGGINS:   Form.   You may answer.

11:11:30 19    THE WITNESS:   Could you repeat that?

11:11:32 20    BY MR. DAVENPORT:

11:11:32 21    Q.    Sure.   When would a threat of physical

11:11:36 22  violence upon somebody else be a cross from a crime

11:11:39 23  to a concern for mental health?

*Velez - Davenport - 02/26/2020*

69

| | | |
|---|---|---|
| 11:11:42 | 1 | **A.**   That would depend. |
| 11:11:43 | 2 | **Q.**   Okay.  And this would be on isolated |
| 11:11:47 | 3 | incidents where you've never come across that |
| 11:11:50 | 4 | person before? |
| 11:11:50 | 5 | **A.**   Either/or. |
| 11:11:51 | 6 | **Q.**   Okay.  Have you ever been concerned |
| 11:11:54 | 7 | about an individual's mental health based on what |
| 11:11:58 | 8 | they said to police officers? |
| 11:12:00 | 9 | **MS. HUGGINS:**  Form.  You can answer. |
| 11:12:01 | 10 | **THE WITNESS:**  Could you repeat that? |
| 11:12:02 | 11 | **BY MR. DAVENPORT:** |
| 11:12:03 | 12 | **Q.**   Have you ever been concerned about an |
| 11:12:07 | 13 | individual's mental health based solely on what |
| 11:12:09 | 14 | they said to police officers? |
| 11:12:10 | 15 | **A.**   It depends on what they said. |
| 11:12:11 | 16 | **Q.**   Sure.  I guess my question isn't |
| 11:12:14 | 17 | necessarily what they said, my question is just |
| 11:12:16 | 18 | more so have you ever been concerned about |
| 11:12:18 | 19 | somebody's mental health based on something that |
| 11:12:21 | 20 | they said to police officers? |
| 11:12:22 | 21 | **MS. HUGGINS:**  Form.  You can answer. |
| 11:12:23 | 22 | **THE WITNESS:**  Again, it depends on |
| 11:12:26 | 23 | what -- what was said, how it was said to police |

Velez - Davenport - 02/26/2020

70

| 11:12:29 | 1 | officers, like -- |
| 11:12:30 | 2 | BY MR. DAVENPORT: |
| 11:12:30 | 3 | Q.   I -- I understand that, you know, what |

11:12:29  1   officers, like --

11:12:30  2        BY MR. DAVENPORT:

11:12:30  3        Q.   I -- I understand that, you know, what

11:12:32  4   this individual may have said could be different.

11:12:35  5   I'm more so just asking have you ever been

11:12:38  6   concerned, and this is more so, you know, a

11:12:42  7   numerical answer, so have you ever been concerned

11:12:45  8   with somebody's mental health based on something

11:12:48  9   that they said to police officers?

11:12:50  10       MS. HUGGINS:   Form.

11:12:55  11       THE WITNESS:   Could you -- you said based on

11:12:57  12  something numerical, can you --

11:13:00  13       BY MR. DAVENPORT:

11:13:00  14       Q.   Sure.  So instead of saying what these

11:13:03  15  individuals said, I more so want to know if you

11:13:07  16  have ever been concerned about somebody's mental

11:13:09  17  health and sought out crisis intervention for that

11:13:13  18  individual based solely on statements that they

11:13:16  19  made to police officers in any sort of capacity,

11:13:22  20  what -- what they said to you specifically?

11:13:23  21       A.   Yes.

11:13:24  22       Q.   Okay.

11:13:25  23       MS. HUGGINS:   Form as to the last question.

*Velez - Davenport - 02/26/2020*

71

11:13:27  1        BY MR. DAVENPORT:

11:13:29  2        Q.    So what -- what sort of things have led

11:13:33  3  you to be concerned, what sorts of things did that

11:13:36  4  individual say that led you to be concerned about

11:13:38  5  that individual's mental health based on what they

11:13:42  6  said to you?

11:13:42  7        MS. HUGGINS:   Form.   You may answer.

11:13:43  8        THE WITNESS:   It -- there's been numerous

11:13:49  9  instances, whether they're articulating a homicidal

11:13:54 10  or suicidal ideation.

11:13:57 11        BY MR. DAVENPORT:

11:13:57 12        Q.    Any others that you recall?

11:13:58 13        A.    Yes, if they're fixated.   Like there's

11:14:03 14  different indicators you can listen to in

11:14:07 15  somebody's speech or how they're saying something

11:14:09 16  to you repetitively, whether they are expressing

11:14:15 17  some type of hallucination or delusion.

11:14:19 18        Q.    Okay.   Now, you've used fixated and

11:14:24 19  repetitive language, would those essentially mean

11:14:29 20  the same thing?   If somebody is fixated, is that

11:14:32 21  because they keep on repeating the same thing over

11:14:36 22  and over?

11:14:36 23        A.    Not necessarily.

11:14:37  1         Q.   Okay.  So how would you use those terms

11:14:41  2    fixated and repetitive?

11:14:44  3         MS. HUGGINS:  Form.  Let's just break it

11:14:46  4    into two questions.

11:14:47  5         BY MR. DAVENPORT:

11:14:47  6         Q.   Okay.  How would you use the term

11:14:47  7    fixated?

11:14:47  8         A.   Fixated could be on an idea or a -- a

11:14:52  9    topic.  They can be artic -- they can be fixated on

11:14:57 10    it in having -- without saying the same thing over

11:15:01 11    and over and over again.

11:15:01 12         Q.   Okay.

11:15:03 13         A.   It's the same type of topic, but not

11:15:06 14    repetitive in what is being said.

11:15:09 15         Q.   Okay.  Now, on January 1st of 2017 did

11:15:16 16    you notice any of these verbal indicators of mental

11:15:20 17    health issues with Mr. Kistner?

11:15:22 18         A.   Can you repeat that?  I'm sorry.

11:15:24 19         Q.   On January 1st of 2017 did you witness

11:15:27 20    any of these verbal cues for mental health issues

11:15:31 21    with Mr. Kistner?

11:15:32 22         A.   Yes.

11:15:32 23         Q.   And which of these verbal cues did you

*Velez - Davenport - 02/26/2020*

73

| | | |
|---|---|---|
| 11:15:36 | 1 | recognize at that time? |
| 11:15:37 | 2 | A.    That I can recall, it was fixation and |
| 11:15:39 | 3 | repetitive. |
| 11:15:40 | 4 | Q.    Any others? |
| 11:15:43 | 5 | A.    If I could see the 941 documentation. |
| 11:15:47 | 6 | Q.    Sure.   Before I show you that document, |
| 11:15:50 | 7 | did you review any documents for your deposition |
| 11:15:53 | 8 | testimony today? |
| 11:15:54 | 9 | A.    I did. |
| 11:15:54 | 10 | Q.    Okay.   And what documents did you |
| 11:15:56 | 11 | review? |
| 11:15:59 | 12 | A.    I did review the 941 paperwork, the |
| 11:16:04 | 13 | arrest forms. |
| 11:16:11 | 14 | Q.    Now, when you say arrest forms, what |
| 11:16:14 | 15 | would those include? |
| 11:16:17 | 16 | A.    There was a number of different forms, |
| 11:16:22 | 17 | it was the 1375, it was the 1 -- P163. |
| 11:16:27 | 18 | Q.    Now, what's a P163? |
| 11:16:31 | 19 | A.    The arrest form.   The 1375 is a crime |
| 11:16:36 | 20 | report. |
| 11:16:38 | 21 | Q.    Okay.   Did you review any other |
| 11:16:43 | 22 | documents? |
| 11:16:43 | 23 | A.    Yes, I just don't recall -- |

*Velez - Davenport - 02/26/2020*

74

| 11:16:46 | 1 | Q. Okay. |
| 11:16:46 | 2 | A. -- every single. |
| 11:16:48 | 3 | Q. No, that's okay. Did you review any |
| 11:16:51 | 4 | videos? |
| 11:16:52 | 5 | A. Yes. |
| 11:16:52 | 6 | Q. Okay. What videos did you review? |
| 11:16:55 | 7 | A. I reviewed the video that was provided |
| 11:16:59 | 8 | regarding the incident. |
| 11:17:00 | 9 | Q. Okay. How many video segments were |
| 11:17:00 | 10 | there? |
| 11:17:05 | 11 | A. I don't recall. |
| 11:17:05 | 12 | Q. Okay. Would it have been four? |
| 11:17:08 | 13 | A. I don't recall. |
| 11:17:08 | 14 | Q. Okay. Did you watch each of the videos |
| 11:17:12 | 15 | that was on the disc that was provided to you? |
| 11:17:14 | 16 | A. Yes. |
| 11:17:14 | 17 | Q. Okay. In their entirety? |
| 11:17:16 | 18 | A. Yes. |
| 11:17:17 | 19 | Q. Okay. Was that the first time that you |
| 11:17:21 | 20 | saw those video segments? |
| 11:17:24 | 21 | A. No. |
| 11:17:25 | 22 | Q. Okay. When was the first time that you |
| 11:17:27 | 23 | saw those video segments? |

*Velez - Davenport - 02/26/2020*

75

11:17:27  1          A.    When I was served paperwork with

11:17:28  2   the -- regarding the lawsuit and the disc was

11:17:31  3   provided.

11:17:33  4          Q.    After you were served, did you watch

11:17:36  5   those videos again?

11:17:37  6          A.    Yes.

11:17:38  7          Q.    Approximately how many times did you

11:17:40  8   watch those videos?

11:17:44  9          A.    I viewed it the -- when I was served

11:17:48 10   and then that I can recall twice with Maeve.

11:17:56 11          Q.    Sure.  And I'm not going to ask what

11:17:59 12   kinds of discussions that you had with your

11:18:01 13   attorney, that's between you and her, but thank

11:18:03 14   you.

11:18:06 15          So prior to your deposition today, when was

11:18:08 16   the last time that you watched the video?

11:18:11 17          A.    Last week, I believe.

11:18:12 18          Q.    Okay.  And no other times in between

11:18:15 19   the last time that you watched it and your

11:18:18 20   deposition today, no segments or anything?

11:18:21 21          A.    No.

11:18:21 22          Q.    Okay.  So I'm going to --

11:18:21 23          MS. HUGGINS:  Other than obviously she was

| | | |
|---|---|---|
| 11:18:24 | 1 | in attendance with -- for Officer McDermott's. |
| 11:18:24 | 2 | THE WITNESS:  Right. |
| 11:18:25 | 3 | MS. HUGGINS:  Detective McDermott's. |
| 11:18:25 | 4 | MR. DAVENPORT:  Sure. |
| 11:18:26 | 5 | MS. HUGGINS:  And they were shown during the |
| 11:18:28 | 6 | course of that deposition. |
| 11:18:29 | 7 | BY MR. DAVENPORT: |
| 11:18:29 | 8 | Q.   Sure.  So I'm going to show you what's |
| 11:18:32 | 9 | been marked as Exhibit 6.  Do you recognize this |
| 11:18:37 | 10 | document? |
| 11:18:37 | 11 | A.   Yes. |
| 11:18:37 | 12 | Q.   And what do you recognize it to be? |
| 11:18:40 | 13 | A.   A 941. |
| 11:18:45 | 14 | Q.   Okay.  Is the date on here January 1st |
| 11:18:49 | 15 | of 2017? |
| 11:18:49 | 16 | A.   Yes. |
| 11:18:49 | 17 | Q.   And is the time 4:37 for the time of |
| 11:18:53 | 18 | transport? |
| 11:18:54 | 19 | A.   Yes. |
| 11:18:55 | 20 | Q.   Okay.  Now, the time of transport, what |
| 11:19:00 | 21 | would that represent? |
| 11:19:07 | 22 | A.   I believe this was the time that he was |
| 11:19:09 | 23 | brought to ECMC. |

*Velez - Davenport - 02/26/2020*

77

| | | | |
|---|---|---|---|
| 11:19:13 | 1 | Q. | Okay. |
| 11:19:14 | 2 | A. | To the best of my recollection. |
| 11:19:16 | 3 | Q. | Do you know where he was brought to |

11:19:18  4  ECMC from?

| | | | |
|---|---|---|---|
| 11:19:18 | 5 | A. | Central booking. |
| 11:19:20 | 6 | Q. | And how long approximately were you at |

11:19:23  7  central booking?

| | | | |
|---|---|---|---|
| 11:19:24 | 8 | A. | I don't recall. |
| 11:19:24 | 9 | Q. | Okay.  Do you remember approximately |

11:19:26  10  what time you got to central booking?

| | | | |
|---|---|---|---|
| 11:19:28 | 11 | A. | I don't recall. |
| 11:19:29 | 12 | Q. | Okay.  Did you go straight from central |

11:19:32  13  booking to ECMC?

| | | | |
|---|---|---|---|
| 11:19:33 | 14 | A. | Yes. |
| 11:19:34 | 15 | Q. | Approximately how long did it take you |

11:19:37  16  to get to ECMC from central booking?

| | | | |
|---|---|---|---|
| 11:19:39 | 17 | A. | I don't recall. |
| 11:19:41 | 18 | Q. | Have you ever made the drive from |

11:19:43  19  central booking to ECMC, other than this date?

| | | | |
|---|---|---|---|
| 11:19:49 | 20 | A. | I don't remember. |
| 11:19:50 | 21 | Q. | Okay.  Have you ever brought someone in |

11:19:56  22  on a 941 form after they had been brought to

11:20:00  23  central booking?

*Velez - Davenport - 02/26/2020*

78

| | | |
|---|---|---|
| 11:20:01 | 1 | **MS. HUGGINS:**  Form.  You can answer. |
| 11:20:03 | 2 | **THE WITNESS:**  I don't recall. |
| 11:20:04 | 3 | **BY MR. DAVENPORT:** |
| 11:20:04 | 4 | Q.   Okay.  Approximately -- |
| 11:20:05 | 5 | A.   For this incident we did. |
| 11:20:09 | 6 | Q.   Sure.  Sure.  Approximately how many |
| 11:20:11 | 7 | times have you used a 941 form before as a police |
| 11:20:15 | 8 | officer or a lieutenant or a detective? |
| 11:20:17 | 9 | A.   Numerous. |
| 11:20:18 | 10 | Q.   Okay.  Approximately how many times is |
| 11:20:20 | 11 | numerous? |
| 11:20:22 | 12 | A.   I don't want to give a false estimate. |
| 11:20:26 | 13 | I -- I don't recall. |
| 11:20:26 | 14 | Q.   Would it be more than a hundred? |
| 11:20:30 | 15 | A.   Possibly. |
| 11:20:30 | 16 | Q.   Okay.  Would it be more than 50? |
| 11:20:36 | 17 | A.   Yes. |
| 11:20:36 | 18 | Q.   Okay.  So, now, going through this |
| 11:20:41 | 19 | form, what sort of verbal cues did you indicate on |
| 11:20:49 | 20 | this form that Mr. Kistner was exhibiting that made |
| 11:20:53 | 21 | you -- led you to be concerned for his mental |
| 11:20:56 | 22 | health? |
| 11:20:56 | 23 | A.   I checked off refusal to respond to |

*Velez - Davenport - 02/26/2020*

79

11:20:59  1   questions, talking to self, hostile, argumentative,

11:20:59  2   belligerent, loud yelling, expresses idea of

11:20:59  3   inflated self-importance, and talks -- oh, I'm

11:20:59  4   sorry.

11:21:09  5        I put refusal to respond to questions,

11:21:11  6   talking to self, hostile, argumentative,

11:21:15  7   belligerent, loud yelling, expresses ideas of

11:21:19  8   inflated self-importance, and talks repeatedly

11:21:24  9   about a single subject, death, religion, illness,

11:21:29  10  government, et cetera.

11:21:30  11       And then in the narrative I put repeatedly

11:21:36  12  called officers Nazis and fascists.

11:21:39  13       Q.   Okay.  So, now, is there ever -- is

11:21:42  14  there a second page to a 941 form?

11:21:46  15       A.   No.

11:21:46  16       Q.   No.  Is there anywhere where you can

11:21:52  17  add to your narrative besides these two and a half

11:21:56  18  lines that are given to you?

11:21:57  19       A.   Just the justification for transport.

11:22:00  20       Q.   Yes, for the just -- justification for

11:22:04  21  transport, is there anywhere else where you can add

11:22:06  22  to the narrative besides that section right there?

11:22:09  23       A.   What was reported to the police about

*Velez - Davenport - 02/26/2020*

80

11:22:12  1   the individual.

11:22:12  2            Q.   Okay.  Now, you chose not to write

11:22:16  3   anything on that line.  Why did you not write

11:22:20  4   anything on the section what was reported to the

11:22:22  5   police about this individual?

11:22:24  6            A.   I didn't have any information to add to

11:22:26  7   that.

11:22:26  8            Q.   Okay.  So he was taken to ECMC,

11:22:33  9   correct?

11:22:33 10            A.   Yes.

11:22:33 11            Q.   Okay.  Did he use the sort of language

11:22:38 12   with any of the nurses or physicians that were at

11:22:44 13   ECMC, Nazis, fascists, any other language that

11:22:48 14   would -- I'm sorry.  That was a poorly phrased

11:22:49 15   question, strike that.

11:22:50 16            Did Mr. Kistner use any sort of language

11:22:55 17   with any of the physicians or staff at ECMC that

11:23:00 18   would lead you to be concerned for his mental

11:23:03 19   health?

11:23:03 20            MS. HUGGINS:  Form.  You may answer.

11:23:05 21            THE WITNESS:  Yes.

11:23:06 22            BY MR. DAVENPORT:

11:23:06 23            Q.   Okay.  How did you come to learn about

*Velez - Davenport - 02/26/2020*

81

11:23:09  1   that language that was used to the physicians or

11:23:11  2   ECMC staff?

11:23:12  3        A.   I was present during his transport

11:23:16  4   to -- I don't recall if it was -- it was some type

11:23:20  5   of scan for the transport when he was using the

11:23:25  6   language.

11:23:27  7        Q.   Do you recall, would that have been a

11:23:30  8   CAT scan of Mr. Kistner?

11:23:31  9        A.   I don't recall exactly what type of

11:23:33  10  scan it was.

11:23:34  11       Q.   Okay.  Who was that scan done by, was

11:23:37  12  that ECMC staff?

11:23:38  13       A.   Yes.

11:23:38  14       Q.   Okay.  Now, besides the transport, were

11:23:44  15  you ever present in the room where Mr. Kistner was

11:23:48  16  being evaluated?

11:23:49  17       A.   No.

11:23:51  18       Q.   Okay.  Did you talk with any of the

11:23:53  19  ECMC staff or physicians about what was going on

11:23:57  20  for that physical examination of Mr. Kistner?

11:24:00  21       A.   No.

11:24:01  22       Q.   Okay.  Besides Mr. Kistner being

11:24:08  23  transported, did you come to learn about any other

*Velez - Davenport - 02/26/2020*

82

11:24:11  1   instances or times that Mr. Kistner would have used

11:24:14  2   any language, any verbal cues with ECMC staff that

11:24:19  3   would have led you to be concerned about his mental

11:24:22  4   health?

11:24:22  5        A.   Can you repeat that?

11:24:24  6        Q.   Sure.  Besides Mr. Kistner's transport,

11:24:29  7   were there any other instances of Mr. Kistner using

11:24:33  8   any sort of verbal cues that would cause you to be

11:24:38  9   concerned for his mental health and those verbal

11:24:42 10   cues being directed towards ECMC staff only, not to

11:24:45 11   you?

11:24:45 12        MS. HUGGINS:  Form.  You can answer.

11:24:46 13        THE WITNESS:  The most significant that I

11:24:48 14   can recall at this time was during that transport

11:24:51 15   through the hospital.

11:24:51 16        BY MR. DAVENPORT:

11:24:52 17        Q.   Okay.  Now, you say the most

11:24:54 18   significant, were there any other instances that

11:24:58 19   you can recall?

11:24:58 20        A.   Not that I could recall.

11:24:59 21        Q.   Okay.  During that first initial visit

11:25:08 22   to ECMC, did you have any conversations with any of

11:25:11 23   the physicians or ECMC staff?

*Velez - Davenport - 02/26/2020*

83

| | | |
|---|---|---|
| 11:25:12 | 1 | A.    I did not. |
| 11:25:13 | 2 | Q.    Okay.  Do you know if any of the |
| 11:25:15 | 3 | officers had any conversations with any of the ECMC |
| 11:25:18 | 4 | staff? |
| 11:25:19 | 5 | A.    Officer McDermott did. |
| 11:25:20 | 6 | Q.    Okay.  Do you -- were you present for |
| 11:25:23 | 7 | those conversations? |
| 11:25:24 | 8 | A.    Yes. |
| 11:25:24 | 9 | Q.    Okay.  Do you recall what was said |
| 11:25:27 | 10 | between Ms. McDermott and ECMC staff? |
| 11:25:30 | 11 | A.    The only conversation I remember that |
| 11:25:33 | 12 | I -- I heard the doctor say was that he stated that |
| 11:25:37 | 13 | he fell on ice. |
| 11:25:38 | 14 | Q.    Okay. |
| 11:25:40 | 15 | A.    That he had slipped and fell on ice. |
| 11:25:42 | 16 | That's the only thing that I could recall. |
| 11:25:43 | 17 | Q.    Would that have been inside of the room |
| 11:25:46 | 18 | where Mr. Kistner was being evaluated? |
| 11:25:49 | 19 | A.    No, I stayed in the hallway. |
| 11:25:49 | 20 | Q.    Okay. |
| 11:25:52 | 21 | A.    I don't recall if I ever went in his |
| 11:25:53 | 22 | room when -- when he was being uncuffed to be taken |
| 11:25:56 | 23 | out, because he was cuffed to the bed, but whenever |

*Velez - Davenport - 02/26/2020*

84

11:25:58   1   he was being evaluated I was in the hallway.

11:26:00   2       Q.   Okay.   Were you present when

11:26:03   3   Mr. Kistner was uncuffed?

11:26:08   4       A.   At what point?

11:26:09   5       Q.   Were you part of -- did you actually

11:26:14   6   participate in uncuffing Mr. Kistner from the

11:26:17   7   hospital bed?

11:26:17   8       A.   I don't recall.

11:26:18   9       Q.   Okay.   Do you remember who actually

11:26:21 10   uncuffed Mr. Kistner from the hospital bed?

11:26:23 11       A.   I don't recall.

11:26:25 12       Q.   Would it have been Officer Schulz or

11:26:32 13   Officer Moriarity?

11:26:33 14       A.   When Mr. Kistner was transported from

11:26:37 15   ECMC to central booking, it was just Officer

11:26:42 16   McDermott and myself.   Initially when he was

11:26:44 17   brought to ECMC, Officers Schulz and Moriarity were

11:26:51 18   present, so at some point they may have.

11:26:54 19       I'm not certain who had cuffed him to the

11:26:58 20   bed at that point, but I know when he was taken

11:27:00 21   from ECMC to central booking it was just Officer

11:27:02 22   McDermott and myself.   So she and I would have been

11:27:03 23   the ones, one of the ones who would have uncuffed

*Velez - Davenport - 02/26/2020*

85

| | | |
|---|---|---|
| 11:27:06 | 1 | him. |
| 11:27:07 | 2 | Q.   Okay.   Was he uncuffed at any point |
| 11:27:10 | 3 | before he was transported from ECMC to central |
| 11:27:14 | 4 | booking? |
| 11:27:14 | 5 | MS. HUGGINS:   Form. |
| 11:27:15 | 6 | THE WITNESS:   Could you clarify? |
| 11:27:16 | 7 | BY MR. DAVENPORT: |
| 11:27:17 | 8 | Q.   Was Mr. Kistner uncuffed at any point |
| 11:27:20 | 9 | before you and Ms. McDermott were about to transfer |
| 11:27:24 | 10 | him to central booking from ECMC? |
| 11:27:27 | 11 | A.   He would have -- the cuff would have |
| 11:27:27 | 12 | been removed from the bed.  He had one cuff to the |
| 11:27:30 | 13 | bed, one arm cuffed.  So that would have been |
| 11:27:30 | 14 | removed so he would have been placed in both of his |
| 11:27:34 | 15 | hands put into handcuffs, but I don't recall. |
| 11:27:37 | 16 | Q.   Was that handcuff ever removed from his |
| 11:27:41 | 17 | one wrist? |
| 11:27:42 | 18 | MS. HUGGINS:   Form. |
| 11:27:49 | 19 | THE WITNESS:   I'm not certain.  I don't |
| 11:27:52 | 20 | know.  I -- I don't recall. |
| 11:27:52 | 21 | BY MR. DAVENPORT: |
| 11:27:52 | 22 | Q.   Okay.  At any time were you or |
| 11:27:56 | 23 | Ms. McDermott or Officer Moriarity or Officer |

*Velez - Davenport - 02/26/2020*

86

| | | |
|---|---|---|
| 11:28:00 | 1 | Schulz, were any of the officers at ECMC requested |
| 11:28:03 | 2 | by any of the ECMC staff to uncuff Mr. Kistner? |
| 11:28:07 | 3 | A.    Not that I could recall. |
| 11:28:09 | 4 | Q.    Okay.  Approximately how long were you |
| 11:28:12 | 5 | at ECMC before going to central booking, so during |
| 11:28:17 | 6 | that first visit? |
| 11:28:18 | 7 | A.    I don't recall. |
| 11:28:19 | 8 | Q.    Okay.  So, now, turning to the 941 |
| 11:28:24 | 9 | form.  Refusal to respond to question, that's one |
| 11:28:28 | 10 | of the boxes that you've checked for verbal and |
| 11:28:31 | 11 | behavioral cues.  What sorts of questions was he |
| 11:28:36 | 12 | refusing to respond to? |
| 11:28:38 | 13 | A.    I don't recall at this time. |
| 11:28:39 | 14 | Q.    Okay.  I also noticed that there's an O |
| 11:28:44 | 15 | and an R above those boxes, do you know what O and |
| 11:28:49 | 16 | are stands for? |
| 11:28:50 | 17 | A.    Yeah, observed and reported -- and/or |
| 11:28:53 | 18 | reported. |
| 11:28:53 | 19 | Q.    Okay.  So, now, observed would be your |
| 11:28:56 | 20 | personal observations, correct? |
| 11:28:58 | 21 | A.    Correct. |
| 11:28:58 | 22 | Q.    And reported would be from a |
| 11:29:01 | 23 | third-party? |

*Velez - Davenport - 02/26/2020*

87

| | | |
|---|---|---|
| 11:29:01 | 1 | A.    Yes. |
| 11:29:02 | 2 | Q.    Okay.  Now, another box that you have |
| 11:29:05 | 3 | checked is talking to self.  Do you recall |
| 11:29:09 | 4 | Mr. Kistner talking to himself on January 1st of |
| 11:29:12 | 5 | 2017? |
| 11:29:12 | 6 | A.    Yes. |
| 11:29:12 | 7 | Q.    What kinds of things was he saying? |
| 11:29:15 | 8 | A.    I don't remember the exact -- exactly |
| 11:29:19 | 9 | what he was saying, but I recall when I was in the |
| 11:29:24 | 10 | hallway, he was talking to himself while he was in |
| 11:29:26 | 11 | the hospital bed. |
| 11:29:27 | 12 | Q.    Okay.  Was the door closed when |
| 11:29:32 | 13 | Mr. Kistner was being evaluated and you were out in |
| 11:29:34 | 14 | the hall at ECMC? |
| 11:29:35 | 15 | MS. HUGGINS:  Form.  You can answer. |
| 11:29:38 | 16 | THE WITNESS:  It may have been. |
| 11:29:40 | 17 | BY MR. DAVENPORT: |
| 11:29:41 | 18 | Q.    So these would have been words that |
| 11:29:44 | 19 | Mr. Kistner spoke while he was in the hospital |
| 11:29:48 | 20 | room, correct? |
| 11:29:48 | 21 | MS. HUGGINS:  Form. |
| 11:29:49 | 22 | BY MR. DAVENPORT: |
| 11:29:51 | 23 | Q.    That you heard when you were outside |

*Velez - Davenport - 02/26/2020*

88

| | | |
|---|---|---|
| 11:29:52 | 1 | the hospital room? |
| 11:29:53 | 2 | A.    These are words that were spoken when |
| 11:29:58 | 3 | he was in the hospital room and I was in the |
| 11:30:00 | 4 | hallway, correct. |
| 11:30:00 | 5 | Q.    Okay.  But you're not sure if the door |
| 11:30:03 | 6 | was closed or open? |
| 11:30:04 | 7 | A.    When he -- when he was in there by |
| 11:30:05 | 8 | himself, I recall the door being partially open so |
| 11:30:11 | 9 | we could see him. |
| 11:30:15 | 10 | Q.    Now, who partially opened the door, do |
| 11:30:23 | 11 | you recall? |
| 11:30:23 | 12 | A.    I don't. |
| 11:30:27 | 13 | Q.    Okay.  Was that either you or Officer |
| 11:30:30 | 14 | McDermott that partially opened the door? |
| 11:30:32 | 15 | A.    I don't recall. |
| 11:30:35 | 16 | Q.    What kinds of things did you observe |
| 11:30:37 | 17 | through that partially open door? |
| 11:30:39 | 18 | A.    We could see his self, we could see him |
| 11:30:44 | 19 | laying on the hospital bed. |
| 11:30:46 | 20 | Q.    And was it during this time that you |
| 11:30:49 | 21 | saw Mr. Kistner talking to himself? |
| 11:30:52 | 22 | A.    Heard him, that's all. |
| 11:30:54 | 23 | Q.    Okay.  Was there anybody else in the |

*Velez - Davenport - 02/26/2020*

89

| | | |
|---|---|---|
| 11:30:55 | 1 | room besides Mr. Kistner? |
| 11:30:57 | 2 | A.    At that time, no. |
| 11:30:59 | 3 | Q.    Was there any ECMC staff that was in |
| 11:31:02 | 4 | the room? |
| 11:31:02 | 5 | A.    When he was talking to himself, not |
| 11:31:05 | 6 | that I could recall. |
| 11:31:08 | 7 | Q.    Approximately -- you can give a |
| 11:31:10 | 8 | percentage on this, approximately how much of the |
| 11:31:13 | 9 | time that Mr. Kistner was at ECMC before being |
| 11:31:17 | 10 | transferred to central booking was he in the room |
| 11:31:22 | 11 | by himself? |
| 11:31:22 | 12 | MS. HUGGINS:   Form.   You can answer. |
| 11:31:24 | 13 | THE WITNESS:   Can you repeat that? |
| 11:31:26 | 14 | BY MR. DAVENPORT: |
| 11:31:26 | 15 | Q.    So how -- how much of the time that |
| 11:31:28 | 16 | Mr. Kistner spent at ECMC before being transferred |
| 11:31:31 | 17 | to central booking was he in the hospital room by |
| 11:31:35 | 18 | himself? |
| 11:31:38 | 19 | A.    We were right outside the door, so if |
| 11:31:41 | 20 | he wasn't being evaluated, that I could recall.   I |
| 11:31:45 | 21 | don't know a specific amount of time. |
| 11:31:48 | 22 | Q.    Do you recall approximately how many |
| 11:31:51 | 23 | individuals -- how many ECMC staff individuals |

*Velez - Davenport - 02/26/2020*

90

| | | |
|---|---|---|
| 11:31:58 | 1 | evaluated Mr. Kistner? |
| 11:32:00 | 2 | A. No. |
| 11:32:01 | 3 | Q. Okay. Would it have been more than |
| 11:32:03 | 4 | five? |
| 11:32:05 | 5 | MS. HUGGINS: Form. You can answer. |
| 11:32:07 | 6 | THE WITNESS: I don't recall. I remember |
| 11:32:10 | 7 | one doctor. |
| 11:32:14 | 8 | BY MR. DAVENPORT: |
| 11:32:16 | 9 | Q. So, now, you said that you've done |
| 11:32:19 | 10 | other 941 forms before. Where do you typically |
| 11:32:24 | 11 | send individuals who are being evaluated under a |
| 11:32:28 | 12 | 941? |
| 11:32:28 | 13 | A. We always take them to ECMC. |
| 11:32:28 | 14 | Q. Okay. |
| 11:32:33 | 15 | A. To CPEP. |
| 11:32:33 | 16 | Q. Do you typically deal with the same |
| 11:32:38 | 17 | individuals at ECMC in terms of staff there? |
| 11:32:40 | 18 | A. It varies. |
| 11:32:41 | 19 | Q. Okay. Was there anybody there present |
| 11:32:45 | 20 | at ECMC that day that you had recognized from a |
| 11:32:49 | 21 | previous 941? |
| 11:32:51 | 22 | MS. HUGGINS: Form. You can answer. |
| 11:32:54 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

91

| | | |
|---|---|---|
| 11:32:55 | 1 | Q.    Was there anybody there -- |
| 11:32:56 | 2 | A.    Staff? |
| 11:32:56 | 3 | Q.    -- present on January 1st of 2017 that |
| 11:32:59 | 4 | you recognized from a prior time that you had |
| 11:33:02 | 5 | brought an individual to ECMC on a 941? |
| 11:33:05 | 6 | A.    I don't recall. |
| 11:33:06 | 7 | Q.    Okay.  Who would you typically deal |
| 11:33:10 | 8 | with at ECMC for a 941 evaluation? |
| 11:33:14 | 9 | A.    For the 941 evaluation we come in |
| 11:33:18 | 10 | through the emergency room entrance, whether it's a |
| 11:33:22 | 11 | 941 or a regular medical evaluation, we come in the |
| 11:33:27 | 12 | same way. |
| 11:33:28 | 13 | We stop at the reception window.  They're |
| 11:33:33 | 14 | triaged for their vitals, and then they're |
| 11:33:34 | 15 | transported over to the CPEP portion of the |
| 11:33:40 | 16 | hospital. |
| 11:33:40 | 17 | Q.    Okay.  Do you typically stay with those |
| 11:33:45 | 18 | individuals after they're brought on a 941, do you |
| 11:33:49 | 19 | stay at ECMC? |
| 11:33:50 | 20 | A.    We stay with them until they're taken |
| 11:33:55 | 21 | into the secure part of the psychiatric section. |
| 11:33:57 | 22 | Q.    And what would that secure part be |
| 11:34:00 | 23 | called, what is that called? |

*Velez - Davenport - 02/26/2020*

| | | |
|---|---|---|
| 11:34:04 | 1 | A.    CPEP. |
| 11:34:07 | 2 | Q.    Okay.  And you mentioned the triage, |
| 11:34:10 | 3 | what was the triage referring to? |
| 11:34:12 | 4 | A.    Just the part -- so you give your |
| 11:34:13 | 5 | paperwork in and then they sit with a nurse and |
| 11:34:16 | 6 | their vitals are taken; blood pressure, |
| 11:34:19 | 7 | temperature. |
| 11:34:20 | 8 | Q.    Are there other individuals, other |
| 11:34:22 | 9 | patients who are in the triage? |
| 11:34:24 | 10 | A.    It's a -- it's a room where just that |
| 11:34:27 | 11 | person is evaluated. |
| 11:34:29 | 12 | Q.    And that person is in there by |
| 11:34:33 | 13 | themselves? |
| 11:34:33 | 14 | A.    While they're being evaluated, yes. |
| 11:34:38 | 15 | Q.    Okay.  Approximately how many -- |
| 11:34:38 | 16 | A.    With an officer present, there's an |
| 11:34:40 | 17 | officer for just the vitals for the triage portion. |
| 11:34:41 | 18 | Q.    Okay.  Do you recall on January 1st of |
| 11:34:45 | 19 | 2017, did you stay with Mr. Kistner in the triage? |
| 11:34:49 | 20 | A.    I don't recall if we both did or one of |
| 11:34:53 | 21 | us did, myself or Officer McDermott.  I don't |
| 11:34:55 | 22 | recall. |
| 11:34:55 | 23 | Q.    You and Officer McDermott were |

*Velez - Davenport - 02/26/2020*

93

| | | |
|---|---|---|
| 11:34:57 | 1 | traveling together on that day, correct? |
| 11:34:59 | 2 | A. Yes. |
| 11:34:59 | 3 | Q. And Officer McDermott is here today? |
| 11:35:01 | 4 | A. Yes. |
| 11:35:01 | 5 | Q. Okay. So on that day do you recall |
| 11:35:09 | 6 | leaving the hospital without Officer McDermott? |
| 11:35:13 | 7 | A. No. |
| 11:35:14 | 8 | Q. Do you recall Officer McDermott leaving |
| 11:35:16 | 9 | the hospital without you? |
| 11:35:18 | 10 | A. No. |
| 11:35:19 | 11 | Q. If you weren't in the triage when |
| 11:35:26 | 12 | Mr. Kistner was being evaluated, where else would |
| 11:35:30 | 13 | you have been? |
| 11:35:30 | 14 | A. I could possibly been outside the door |
| 11:35:32 | 15 | using the lavatory. I just -- I don't recall. |
| 11:35:33 | 16 | Q. Do you remember approximately how long |
| 11:35:36 | 17 | Mr. Kistner was in the triage? |
| 11:35:37 | 18 | A. I don't. |
| 11:35:38 | 19 | Q. Okay. Was it more than an hour? |
| 11:35:40 | 20 | A. I don't recall. |
| 11:35:41 | 21 | Q. Okay. When an individual is in the |
| 11:35:44 | 22 | triage, are they evaluated only by nurses or are |
| 11:35:48 | 23 | they also evaluated by a physician? |

*Velez - Davenport - 02/26/2020*

94

11:35:50  1      A.    I've only ever seen a nurse.

11:35:53  2      Q.    Okay.  Now, typically after an

11:36:01  3  individual is brought to CPEP, do you leave ECMC at

11:36:06  4  that time?

11:36:06  5      A.    Once they're in the secure part of CPEP

11:36:09  6  then we leave, yes.

11:36:11  7      Q.    Okay.  Do you remember on that day

11:36:13  8  after Mr. Kistner was brought to CPEP did you stay

11:36:19  9  or did you leave after he was brought into CPEP?

11:36:22 10      A.    Left.

11:36:22 11      Q.    Left.  Okay.  Do you remember

11:36:26 12  approximately what time Mr. Kistner was brought to

11:36:29 13  the triage?

11:36:29 14      A.    I do not.

11:36:31 15      Q.    Okay.  Is an individual who's brought

11:36:35 16  on a 941 brought straight to the triage, or is

11:36:40 17  there another place where they are brought before

11:36:43 18  triage?

11:36:43 19      MS. HUGGINS:  Form.  You can answer.

11:36:44 20      THE WITNESS:  Unless there's a backup,

11:36:46 21  because occasionally there's a lot of people,

11:36:48 22  because, like I said, 941s will go through triage

11:36:53 23  as well as people being medically treated, so if

*Velez - Davenport - 02/26/2020*

95

11:36:55  1  there's a backup, we may have to wait in the

11:36:59  2  hallway or another room they put us in until

11:37:03  3  someone could be seen in the triage.

11:37:05  4       Q.   Okay.  Do you remember on that day, on

11:37:10  5  January 1st of 2017, did you have to wait in the

11:37:11  6  hallway or did you immediately go into the triage?

11:37:14  7       A.   I don't recall.

11:37:14  8       Q.   Okay.  How many times have you gone to

11:37:18  9  the triage where you had to wait out in the

11:37:18 10  hallway?

11:37:22 11       A.   Numerous.

11:37:22 12       Q.   Okay.  Besides officers, who else

11:37:27 13  brings individuals on a 941 or some sort of other

11:37:32 14  mental health evaluation at CPEP?

11:37:36 15       A.   It could also be mental health

11:37:39 16  professionals.

11:37:39 17       Q.   Would that be crisis intervention?

11:37:42 18       A.   Crisis services.

11:37:42 19       Q.   Okay.

11:37:44 20       A.   Yes.

11:37:48 21       Q.   On these times where you had to wait

11:37:51 22  out in the hallway, were they all officers who had

11:37:56 23  brought the individual in for an evaluation, or

*Velez - Davenport - 02/26/2020*

96

| | | |
|---|---|---|
| 11:37:59 | 1 | were there also mental health or crisis services |
| 11:38:04 | 2 | workers who brought individuals in for a mental |
| 11:38:07 | 3 | health evaluation? |
| 11:38:08 | 4 | MS. HUGGINS:   Form.   You may answer. |
| 11:38:10 | 5 | THE WITNESS:   It's been both and for medical |
| 11:38:13 | 6 | treatment as well.   Like there have been people who |
| 11:38:17 | 7 | come in on the ambulance who have to wait as well. |
| 11:38:21 | 8 | It's the County medical center, so sometimes if |
| 11:38:23 | 9 | it's backed up for people being seen for mental |
| 11:38:24 | 10 | health issues or for medical. |
| 11:38:27 | 11 | BY MR. DAVENPORT: |
| 11:38:27 | 12 | Q.   Okay.   So the triage wouldn't just be |
| 11:38:31 | 13 | for a mental health evaluation? |
| 11:38:34 | 14 | A.   Correct. |
| 11:38:34 | 15 | Q.   Okay.   Now, that first time that |
| 11:38:40 | 16 | Mr. Kistner was brought to ECMC did he go to a |
| 11:38:43 | 17 | triage? |
| 11:38:45 | 18 | A.   I don't recall. |
| 11:38:46 | 19 | Q.   Okay.   Where else would he have been |
| 11:38:50 | 20 | brought for that physical examination? |
| 11:38:52 | 21 | MS. HUGGINS:   Form.   You can answer. |
| 11:38:54 | 22 | THE WITNESS:   Typically we would go through |
| 11:38:57 | 23 | triage, I just don't recall going through the |

*Velez - Davenport - 02/26/2020*

97

| | | |
|---|---|---|
| 11:38:57 | 1 | triage. |
| 11:39:01 | 2 | **BY MR. DAVENPORT:** |
| 11:39:01 | 3 | Q.   Okay.   When you were observing |
| 11:39:05 | 4 | Mr. Kistner through the partially open door, was he |
| 11:39:08 | 5 | in a triage room at that time? |
| 11:39:09 | 6 | A.   No. |
| 11:39:10 | 7 | Q.   Okay.   So what room was he in? |
| 11:39:12 | 8 | A.   He was in one of the rooms on the |
| 11:39:14 | 9 | other -- when you go back, I don't know what you |
| 11:39:17 | 10 | would call the room, it's in the emergency room, |
| 11:39:20 | 11 | the emergency department. |
| 11:39:22 | 12 | They have some rooms -- they have some |
| 11:39:24 | 13 | sections with just curtains and then they have |
| 11:39:27 | 14 | rooms with doors and he had a room with a door and |
| 11:39:28 | 15 | a window. |
| 11:39:28 | 16 | Q.   Okay. |
| 11:39:29 | 17 | A.   But it's still in the emergency |
| 11:39:32 | 18 | section.   It's not like a room for someone who's |
| 11:39:35 | 19 | admitted. |
| 11:39:36 | 20 | Q.   Okay.   Now, when you were observing |
| 11:39:41 | 21 | Mr. Kistner through the partially open door, did |
| 11:39:45 | 22 | you observe any sort of physical evaluations that |
| 11:39:47 | 23 | were done of Mr. Kistner? |

*Velez - Davenport - 02/26/2020*

98

| 11:39:48 | 1 | **A.**   No. |
|---|---|---|

11:39:48  1      **A.**   No.

11:39:49  2      **Q.**   Okay.  Do you know if Mr. Kistner was

11:39:53  3  evaluated for a head injury while he was at ECMC?

11:39:56  4      **A.**   I don't recall.

11:39:59  5      **Q.**   On the day of the incident do you

11:40:02  6  recall Mr. Kistner complaining about a head injury?

11:40:05  7      **A.**   I don't recall.

11:40:06  8      **Q.**   Okay.  Do you recall Mr. Kistner making

11:40:09  9  any sorts of complaints on January 1st of 2017,

11:40:14  10  physical complaints?

11:40:15  11      **A.**   I don't recall anything specific.

11:40:16  12      **Q.**   Okay.  Do you remember, do you recall

11:40:20  13  anything generally anything that he was saying to

11:40:24  14  police officers about his physical condition?

11:40:25  15      **A.**   No, I don't recall.

11:40:26  16      **Q.**   Okay.  Now, you also have checked here

11:40:31  17  hostile, argumentative, belligerent, loud yelling,

11:40:35  18  where did you observe these behaviors?

11:40:39  19      **A.**   At the hospital.

11:40:41  20      **Q.**   Did you observe them anywhere else?

11:40:48  21      **A.**   I don't recall if it was on the

11:40:50  22  transport or not.  The hospital is what I recall.

11:40:53  23      **Q.**   Okay.  Who was he hostile,

*Velez - Davenport - 02/26/2020*

99

11:40:59  1  argumentative, belligerent, loud and yelling, who

11:41:03  2  were those actions directed towards?

11:41:05  3       MS. HUGGINS:  Form.  You can answer.

11:41:06  4       THE WITNESS:  Again, from what I can recall

11:41:10  5  during the transport he was just yelling loudly,

11:41:14  6  using derogatory terms that created a disruption,

11:41:18  7  people were walking away trying to go in a

11:41:22  8  different direction.

11:41:23  9       BY MR. DAVENPORT:

11:41:23 10       Q.  Now, when you say the transport, that's

11:41:24 11  referring to taking Mr. Kistner from his hospital

11:41:28 12  room to where he was examined for some sort of an

11:41:31 13  imaging study, correct?

11:41:33 14       A.  Correct.

11:41:33 15       Q.  Okay.  I just want to make sure that

11:41:38 16  wasn't during the transport from ECMC to central

11:41:40 17  booking?

11:41:41 18       A.  Correct.

11:41:41 19       Q.  Okay.  Now, besides the transport, did

11:41:45 20  you observe these types of behaviors anywhere else?

11:41:52 21       A.  To the best of my recollection, the

11:41:54 22  hospital is what I remember.

11:41:55 23       Q.  Okay.  And when you say the hospital,

*Velez - Davenport - 02/26/2020*

100

11:41:57  1  was that also in his hospital room that he --

11:42:01  2      A.   Some of these observations were from

11:42:04  3  his hospital room.

11:42:05  4      Q.   Okay.  And that would have been

11:42:07  5  something that you observed through the partially

11:42:09  6  open door?

11:42:10  7      A.   Correct.

11:42:10  8      Q.   Did he exhibit any of these types of

11:42:14  9  behaviors at central booking?

11:42:16  10      A.   I don't recall.

11:42:17  11      Q.   Okay.  Did he exhibit any of these

11:42:19  12  sorts of behaviors at any point when he was in the

11:42:22  13  car with you and Ms. McDermott?

11:42:24  14      A.   I don't recall.

11:42:24  15      Q.   Okay.  The next box that you have

11:42:27  16  checked is expresses ideas of inflated

11:42:31  17  self-importance.  Have you ever checked that box

11:42:35  18  before on a 941 form?

11:42:41  19      A.   I don't recall.

11:42:42  20      Q.   Okay.  Is that a box that you check

11:42:45  21  often?

11:42:46  22      MS. HUGGINS:  Form.  You may answer.

11:42:46  23      THE WITNESS:  I have checked it, I just -- I

*Velez - Davenport - 02/26/2020*

| 11:42:49 | 1 | don't recall how many times or anything specific. |
| 11:42:52 | 2 |        BY MR. DAVENPORT: |
| 11:42:53 | 3 |        Q.   Okay.  On January 1st of 2017 what |
| 11:42:55 | 4 | sorts of verbal or behavioral cues led you to |
| 11:42:59 | 5 | believe that Mr. Kistner was expressing ideas of |
| 11:43:03 | 6 | inflated self-importance? |
| 11:43:04 | 7 |        A.   I don't recall specifically. |
| 11:43:06 | 8 |        Q.   Okay.  What sorts of actions, verbal or |
| 11:43:11 | 9 | behavioral cues, would lead you to check a box |
| 11:43:16 | 10 | expresses ideas of inflated self-importance? |
| 11:43:19 | 11 |        A.   How they're regarding themselves.  I |
| 11:43:22 | 12 | know in -- from what I could recall before someone, |
| 11:43:25 | 13 | and it wasn't the case with Mr. Kistner, saying |
| 11:43:30 | 14 | that they believe they're God or -- those would be |
| 11:43:33 | 15 | examples of self-importance, but I don't recall |
| 11:43:36 | 16 | exactly what Mr. Kistner had expressed as to why I |
| 11:43:43 | 17 | checked the box. |
| 11:43:44 | 18 |        Q.   Are there ever any other verbal or |
| 11:43:47 | 19 | behavioral cues that would lead you to check that |
| 11:43:50 | 20 | box besides somebody saying that they believe that |
| 11:43:53 | 21 | they're God or Jesus? |
| 11:43:55 | 22 |        A.   Yes, I -- I just can't recall anything |
| 11:43:56 | 23 | at this time. |

*Velez - Davenport - 02/26/2020*

102

11:43:56  1        Q.   Did Mr. Kistner at any time express

11:43:59  2   that he believed that he was God or Jesus?

11:44:02  3        A.   Not that I can recall.

11:44:03  4        Q.   Okay.  The next verbal or behavioral

11:44:09  5   cue that you checked was talks repeatedly about a

11:44:13  6   single subject.  And then in parentheses it's

11:44:17  7   death, comma, religion, comma, illness, comma,

11:44:22  8   government, comma, et cetera.

11:44:24  9        Do you recall what that single subject was

11:44:28 10   that Mr. Kistner repeatedly talked about?

11:44:31 11        A.   I believe it was in here I put

11:44:33 12   repeatedly called officers Nazis and fascists.  And

11:44:36 13   it was hospital staff he referred to as well,

11:44:41 14   feminazis, excuse my language, but he kept

11:44:45 15   referring to lily white pussies.

11:44:48 16        I know that I filled out a 710.30 with his

11:44:51 17   arrest paperwork that I had written -- or I had

11:44:54 18   documented, because at the time I recalled exactly

11:44:59 19   what he had said.  And when we filled out our

11:45:01 20   arrest paperwork, I had documented what he had

11:45:04 21   said.

11:45:07 22        Q.   So that et cetera that's at the end,

11:45:12 23   does that mean that the four topics that are listed

11:45:16  1  in parentheses are not all-inclusive?

11:45:19  2        A.    Correct.

11:45:20  3        Q.    Okay.  So there could be other subjects

11:45:23  4  that an individual would talk about that would lead

11:45:26  5  you to check that box, correct?

11:45:28  6        A.    Yes.

11:45:29  7        Q.    But would you agree that the derogatory

11:45:33  8  terms that Mr. Kistner used would not fall within

11:45:37  9  death, religion, illness, or government?

11:45:39  10        A.    Nazi could be part government.

11:45:43  11        Q.    Okay.  Now, this says talks repeatedly

11:45:50  12  about a single subject.  Could this also -- could

11:45:56  13  this box encompass talking repeatedly about

11:46:01  14  anything, does it necessarily have to be a single

11:46:04  15  subject that this individual is repeatedly talking

11:46:08  16  about?

11:46:08  17        A.    This one specifically says talks

11:46:09  18  repeatedly about a single subject.

11:46:10  19        Q.    Okay.  So you would agree that the

11:46:15  20  derogatory terms that Mr. Kistner used there were

11:46:19  21  multiple derogatory terms that were used, correct?

11:46:23  22        A.    But with this one the -- like I said,

11:46:26  23  there could be a difference between repetitive and

11:46:30  1  fixation, but with a single subject, the fixation

11:46:32  2  on the Nazi feminism with the lily white pussy

11:46:35  3  seemed repetitive to me at the time, that was my

11:46:38  4  perception, it was repetitive, single subject, and

11:46:39  5  same -- relating to the same thing over and over

11:46:41  6  and over and over.

11:46:44  7       Q.   So the single subject that Mr. Kistner

11:46:48  8  would have been focused on in your own words, what

11:46:52  9  would that have been?

11:46:53 10       A.   The -- again, it's in the 710, I don't

11:46:56 11  want to misspeak, I documented what was said, but

11:47:00 12  the fem -- from what I could recall the feminaziism

11:47:04 13  lily white pussies.

11:47:07 14       Q.   So would that be the topic or the

11:47:10 15  subject that he was focused on was the feminazis

11:47:15 16  lily white pussy?

11:47:16 17       A.   That would be the -- the topic, yes.

11:47:18 18       Q.   Okay.  Now, I see that another box has

11:47:38 19  been checked here.  Appearance ticket issued and

11:47:41 20  that box was checked yes, correct?

11:47:43 21       A.   Yes.

11:47:44 22       Q.   Okay.  So would that indicate that an

11:47:47 23  appearance ticket was issued before the 941 form

| | | |
|---|---|---|
| 11:47:51 | 1 | was filled out? |
| 11:47:52 | 2 | A.   Yes. |
| 11:47:52 | 3 | Q.   Okay.  And who would that appearance |
| 11:47:55 | 4 | ticket have been issued to? |
| 11:47:56 | 5 | A.   Mr. Kistner. |
| 11:47:58 | 6 | Q.   Would you hand Mr. Kistner that |
| 11:48:01 | 7 | appearance ticket? |
| 11:48:02 | 8 | MS. HUGGINS:  Form. |
| 11:48:07 | 9 | THE WITNESS:  I don't recall if it was |
| 11:48:10 | 10 | handed to him, but an appearance ticket is given to |
| 11:48:16 | 11 | the individual. |
| 11:48:18 | 12 | BY MR. DAVENPORT: |
| 11:48:18 | 13 | Q.   Okay.  Do you know if Mr. Kistner was |
| 11:48:24 | 14 | handcuffed at the time that you filled out this 941 |
| 11:48:28 | 15 | form? |
| 11:48:28 | 16 | A.   I don't recall. |
| 11:48:29 | 17 | Q.   Would this 941 form have been filled |
| 11:48:33 | 18 | out prior to going to ECMC from central booking? |
| 11:48:36 | 19 | A.   It could have been filled out -- yeah, |
| 11:48:39 | 20 | it would have been filled out -- I'm sorry.  Can |
| 11:48:42 | 21 | you repeat that? |
| 11:48:43 | 22 | Q.   Sure.  Would this 941 form have been |
| 11:48:46 | 23 | filled out before arriving at ECMC from central |

*Velez - Davenport - 02/26/2020*

106

| 11:48:50 | 1 | booking? |
| 11:48:50 | 2 | A.    Yes. |

11:48:50   3        Q.    Okay.  Do you recall when Mr. Kistner

11:48:52   4   was transported from central booking to ECMC, was

11:48:56   5   he handcuffed at the time?

11:48:57   6        A.    I just want to make sure, this -- this

11:48:59   7   would have been filled out before we got to ECMC is

11:49:03   8   what you were asking, correct?

11:49:03   9        Q.    Yes.

11:49:04  10        A.    Yes.

11:49:04  11        Q.    Okay.  So now my -- my second question

11:49:07  12   was, would Mr. Kistner have been handcuffed at the

11:49:12  13   time that he was transported from central booking

11:49:12  14   to ECMC?

11:49:13  15        A.    Yes.

11:49:13  16        Q.    Okay.  If an individual is handcuffed,

11:49:17  17   how are they issued their appearance ticket?

11:49:20  18        A.    At the time --

11:49:20  19        MS. HUGGINS:  Form.  You can answer.

11:49:21  20        THE WITNESS: -- they're issued their

11:49:23  21   appearance ticket while at central booking and it's

11:49:26  22   secured, so they have to sign it, I believe.

11:49:28  23        So they would be uncuffed to sign for their

11:49:32  1    paperwork, unless for some safety issue they may

11:49:35  2    not be and then that would be -- if they weren't

11:49:35  3    safe to be un-handcuffed, it would be documented,

11:49:38  4    it would be indicated that they for whatever reason

11:49:42  5    they could not be un-handcuffed to sign at the

11:49:45  6    time.

11:49:45  7         BY MR. DAVENPORT:

11:49:45  8         Q.   Okay.

11:49:46  9         A.   But I -- I haven't seen that happen.

11:49:47 10         Q.   Okay.  Now, after the individual signs

11:49:49 11    the appearance ticket, is the appearance ticket

11:49:54 12    kept by the officers or is the appearance ticket

11:49:58 13    given to someone else?  Where does the appearance

11:50:01 14    ticket -- I'm sorry, strike that.

11:50:02 15         After the appearance ticket is signed by the

11:50:05 16    individual who was previously in handcuffs, is that

11:50:08 17    individual put back into handcuffs?

11:50:13 18         A.   If they're going to remain in our

11:50:15 19    custody, yes.  Otherwise, if they're going to be

11:50:19 20    released, then we would walk them out.

11:50:21 21         Q.   If you were taking an individual back

11:50:24 22    to ECMC for a 941 evaluation, would they still be

11:50:28 23    in the custody of the police at that time?

| | | |
|---|---|---|
| 11:50:29 | 1 | **A.**  Yes. |
| 11:50:30 | 2 | **Q.**  So would that individual still be in |
| 11:50:33 | 3 | handcuffs then at that time? |
| 11:50:34 | 4 | **A.**  Yes. |
| 11:50:35 | 5 | **Q.**  Okay.  So an individual who is in |
| 11:50:41 | 6 | handcuffs and on his way to ECMC for a 941 form, |
| 11:50:45 | 7 | where does the appearances ticket -- who -- what do |
| 11:50:47 | 8 | you do with the appearance ticket after it's |
| 11:50:49 | 9 | signed? |
| 11:50:49 | 10 | **A.**  Like I said, usually we would give it |
| 11:50:52 | 11 | to the person.  I've had instances at times where |
| 11:50:54 | 12 | someone was handcuffed we'll take it until their |
| 11:50:57 | 13 | next destination and then we -- we can give them |
| 11:51:00 | 14 | their paperwork when they get there. |
| 11:51:02 | 15 | **Q.**  Okay. |
| 11:51:03 | 16 | **A.**  I don't recall in Mr. Kistner's |
| 11:51:06 | 17 | instance. |
| 11:51:06 | 18 | **Q.**  Sure.  So if that individual was being |
| 11:51:09 | 19 | taken to the triage at ECMC and that individual is |
| 11:51:15 | 20 | still in handcuffs at the triage, who would you |
| 11:51:20 | 21 | give that appearance ticket to? |
| 11:51:21 | 22 | **MS. HUGGINS:**  Form. |
| 11:51:23 | 23 | **THE WITNESS:**  In triage? |

*Velez - Davenport - 02/26/2020*

109

11:51:24  1          BY MR. DAVENPORT:

11:51:24  2          Q.    If the -- if the individual is in

11:51:27  3    triage in handcuffs, who would you give the

11:51:30  4    appearance ticket to?

11:51:31  5          A.    The individual may be in possession of

11:51:34  6    their appearance ticket, because it's a piece of

11:51:37  7    paper.  Or we wouldn't give it to anyone in triage.

11:51:40  8          Q.    Okay.  So you wouldn't give it to ECMC

11:51:42  9    staff?

11:51:43 10          A.    Not in triage.

11:51:44 11          Q.    Okay.  Would you give it to any ECMC

11:51:46 12    staff?

11:51:46 13          A.    If he was turned over to CPEP and we

11:51:50 14    still had -- we were in possession of any of his

11:51:52 15    property, we would give it to CPEP, whoever it was

11:51:54 16    who took him into that secure portion of -- of

11:51:56 17    their part of the hospital, we would give it to

11:51:59 18    that person.

11:51:59 19          We would give any property that we had

11:52:02 20    turned over that we were still in custody of, we

11:52:05 21    would give it to the CPEP staff when they took

11:52:08 22    Mr. Kistner into the secure part of their section.

11:52:10 23          Q.    Would you have to fill out any sort of

| | | |
|---|---|---|
| 11:52:12 | 1 | a form for what sort of property was turned over |
| 11:52:15 | 2 | for that individual that was admitted to CPEP? |
| 11:52:18 | 3 | A.   No. |
| 11:52:19 | 4 | Q.   Okay.  Do you recall if any property |
| 11:52:24 | 5 | was given to the individual at ECMC that belonged |
| 11:52:28 | 6 | to Mr. Kistner before he was admitted to CPEP? |
| 11:52:31 | 7 | A.   I don't recall. |
| 11:52:37 | 8 | MR. DAVENPORT:  Okay.  You guys want to take |
| 11:52:39 | 9 | a quick five-minute break? |
| 11:52:41 | 10 | MS. HUGGINS:  Yeah, that's fine. |
| 11:52:41 | 11 | MR. DAVENPORT:  Okay. |
| 11:52:41 | 12 | (Discussion off the record at |
| 11:52:41 | 13 | 1152.) |
| 12:03:42 | 14 | (On the record at 1203.) |
| 12:03:42 | 15 | BY MR. DAVENPORT: |
| 12:03:47 | 16 | Q.   Now, Ms. Velez, turning your attention |
| 12:03:51 | 17 | again to Exhibit 6.  Now, on this 941 form it says, |
| 12:03:57 | 18 | is the responding officer CIT trained; do you see |
| 12:04:00 | 19 | where that is? |
| 12:04:01 | 20 | A.   Yes. |
| 12:04:01 | 21 | Q.   Why did you not check that box? |
| 12:04:04 | 22 | A.   I was not CIT trained at that time. |
| 12:04:07 | 23 | Q.   Okay.  Was Officer McDermott CIT |

12:04:12   1    trained at that time?

12:04:12   2         A.   I don't know.

12:04:13   3         Q.   Okay.  What do you have to -- what sort

12:04:16   4    of training do you have to go through to become CIT

12:04:22   5    trained?

12:04:22   6         A.   Well, at this time when this box was

12:04:25   7    available, I wasn't -- I don't know, but now that I

12:04:27   8    am trained in a specifically titled class, CIT, I

12:04:31   9    know that you have to complete the 32 hours and

12:04:33  10    then you do a ride-along an additional eight hours.

12:04:37  11         I believe it's an additional eight hours,

12:04:37  12    I'm not -- I'm not -- excuse me, I'm not certain if

12:04:40  13    it's included in the 32 hours, but we do the

12:04:40  14    classroom time and then we do a ride-along with

12:04:43  15    crisis services.  So I know that is CIT trained.

12:04:48  16         Q.   Okay.  Is it as of 2019 that you are

12:04:53  17    now CIT trained?

12:04:53  18         A.   Yes.

12:04:53  19         Q.   Now, the next box says, does individual

12:04:56  20    have active CIT crisis plan; do you see where that

12:04:58  21    is?

12:04:58  22         A.   Yes.

12:04:59  23         Q.   And that box is also not checked?

*Velez - Davenport - 02/26/2020*

112

| | | | |
|---|---|---|---|
| 12:05:01 | 1 | **A.** | Yes. |

12:05:01  2      **Q.**   Have you ever checked that box before?

12:05:03  3      **A.**   No.

12:05:04  4      **Q.**   Okay.   What -- what sorts of -- strike

12:05:08  5  that.

12:05:08  6           What would a CIT crisis plan be?

12:05:13  7      **A.**   I'm not trained on a CIT crisis plan,

12:05:18  8  so I would have to ask either crisis services about

12:05:21  9  that individual if there is a plan in place, but I

12:05:25 10  have never checked that box.

12:05:26 11      **Q.**   Okay.   Is a CIT crisis plan required

12:05:34 12  before an individual goes to CPEP?

12:05:38 13      **A.**   Not that I'm aware of.

12:05:40 14      **Q.**   Is a CIT crisis plan required after an

12:05:48 15  individual leaves CPEP?

12:05:49 16      **A.**   I wouldn't know.

12:05:50 17      **Q.**   Okay.   That's not part of the crisis

12:05:52 18  intervention training that you received in 2019?

12:05:52 19      **A.**   No, not for the what happens in the

12:05:54 20  CPEP evaluation, no.

12:05:56 21      **Q.**   Okay.   Now, turning again to the verbal

12:06:04 22  and behavioral cue talking to self.   Now, did you

12:06:10 23  say that that was based on observations while

*Velez - Davenport - 02/26/2020*

113

12:06:14  1   Mr. Kistner was in his room at ECMC?

12:06:16  2        A.    That I could recall, yes.

12:06:18  3        Q.    Okay.  Do you know if Mr. Kistner was

12:06:21  4   given any sort of a call button at ECMC?

12:06:26  5        A.    I -- I know typically beds are equipped

12:06:29  6   with them, but I don't know that he used one.

12:06:33  7        Q.    Okay.  Is it possible that Mr. Kistner

12:06:38  8   would have been speaking into the call button at

12:06:43  9   his bed at ECMC?

12:06:43 10        A.    It's possible that he did.  I'm not

12:06:47 11   certain.

12:06:47 12        Q.    Okay.  Did you ever specifically see

12:06:50 13   Mr. Kistner talking to himself where you were sure

12:06:55 14   that he wasn't speaking into the call button?

12:06:58 15        A.    Yes.

12:06:58 16        Q.    Okay.  Can you describe that?

12:06:59 17        A.    He was laying in his bed laying

12:07:03 18   straight talking out loud.

12:07:04 19        Q.    And it's impossible that he could have

12:07:08 20   been pressing the call button at the same time?

12:07:11 21        A.    He may have been.  He appeared to me at

12:07:15 22   the time to be talking to himself.

12:07:16 23        Q.    Okay.

*Velez - Davenport - 02/26/2020*

114

| | | |
|---|---|---|
| 12:07:16 | 1 | A.    Okay. |
| 12:07:16 | 2 | Q.    But you don't know if he was or wasn't |
| 12:07:19 | 3 | pressing the call button at that time? |
| 12:07:22 | 4 | A.    Correct, I don't recall. |
| 12:07:23 | 5 | Q.    Okay.  Now, you say in your statement |
| 12:07:25 | 6 | for justification for transport that the subject |
| 12:07:28 | 7 | did intentionally throw himself at the patrol |
| 12:07:31 | 8 | vehicle.  Was that what you believed based on what |
| 12:07:37 | 9 | you personally saw that day on January 1st of 2017? |
| 12:07:40 | 10 | A.    I did not personally see that. |
| 12:07:42 | 11 | Q.    Okay.  Did somebody tell you that |
| 12:07:46 | 12 | Mr. Kistner threw himself at a police vehicle? |
| 12:07:48 | 13 | A.    Yes. |
| 12:07:49 | 14 | Q.    And who told you that Mr. Kistner threw |
| 12:07:53 | 15 | himself at a patrol vehicle? |
| 12:07:55 | 16 | A.    Officer McDermott and Officer Schulz. |
| 12:07:57 | 17 | Q.    Okay.  Now, you also have checked, and |
| 12:08:06 | 18 | I'm -- I apologize that there's a hole punch that's |
| 12:08:11 | 19 | through it, there's a check and it looks like it |
| 12:08:15 | 20 | says places self in dangerous situations; do you |
| 12:08:18 | 21 | see where that is? |
| 12:08:18 | 22 | A.    Yes. |
| 12:08:19 | 23 | Q.    Now, would that have been based off of |

*Velez - Davenport - 02/26/2020*

115

12:08:23  1  your personal observations?

12:08:26  2          A.    This was what was told to me by two

12:08:31  3  separate officers.

12:08:32  4          Q.    Okay.  But that wasn't based on what

12:08:35  5  you personally observed, correct?

12:08:37  6          A.    Correct.

12:08:43  7          Q.    Now, based off of what you have now

12:08:48  8  seen on the video, do you still believe that

12:08:52  9  Mr. Kistner threw himself intentionally at the

12:08:56 10  patrol vehicle?

12:08:56 11          MS. HUGGINS:    Form.  You may answer.

12:08:58 12          THE WITNESS:    Can you repeat that?  I'm

12:08:58 13  sorry.

12:08:58 14          BY MR. DAVENPORT:

12:09:01 15          Q.    Based on what you saw from the video

12:09:03 16  surveillance that you watched last week, as

12:09:03 17  recently as last week, do you still believe that

12:09:07 18  Mr. Kistner intentionally threw himself at the

12:09:10 19  police vehicle?

12:09:11 20          MS. HUGGINS:    Form.  You may answer.

12:09:12 21          THE WITNESS:    The perspective of the video

12:09:16 22  and my perspective are different.  I was told

12:09:22 23  what -- what had happened.  And based on what I see

*Velez - Davenport - 02/26/2020*

116

| | | |
|---|---|---|
| 12:09:26 | 1 | in the video it does appear that way. |
| 12:09:29 | 2 | BY MR. DAVENPORT: |
| 12:09:30 | 3 | Q.   It appears that Mr. Kistner threw |
| 12:09:34 | 4 | himself intentionally at the police vehicle? |
| 12:09:37 | 5 | A.   From my perspective of what I see in |
| 12:09:37 | 6 | the video, yes. |
| 12:09:38 | 7 | Q.   Okay.  So that's based on what you saw |
| 12:09:40 | 8 | in the video, then, correct? |
| 12:09:40 | 9 | A.   From what I -- like I said, I had seen |
| 12:09:44 | 10 | the video after what was told me, so based on what |
| 12:09:47 | 11 | was told to me and what I see in the video |
| 12:09:51 | 12 | I -- that's still my -- my perspective of what I |
| 12:09:54 | 13 | see in the video. |
| 12:09:54 | 14 | Q.   Okay.  Excluding what was told to you, |
| 12:09:58 | 15 | based solely on what you see in the video, do you |
| 12:10:01 | 16 | believe that Mr. Kistner intentionally threw |
| 12:10:04 | 17 | himself at the police vehicle? |
| 12:10:05 | 18 | MS. HUGGINS:  Form. |
| 12:10:07 | 19 | THE WITNESS:  May I answer? |
| 12:10:08 | 20 | MS. HUGGINS:  Yes, you may answer, sorry. |
| 12:10:11 | 21 | THE WITNESS:  Yes. |
| 12:10:11 | 22 | BY MR. DAVENPORT: |
| 12:10:12 | 23 | Q.   Okay.  I just want to make sure. |

*Velez - Davenport - 02/26/2020*

117

| | | |
|---|---|---|
| 12:10:15 | 1 | Do you see at the bottom where it says |
| 12:10:17 | 2 | police prints in parentheses and then next to it it |
| 12:10:20 | 3 | says J. Velez? |
| 12:10:22 | 4 | A.    Yes. |
| 12:10:22 | 5 | Q.    Is that your signature? |
| 12:10:24 | 6 | A.    Yes, that's my name. |
| 12:10:26 | 7 | Q.    Okay.  Do you know if that statement is |
| 12:10:30 | 8 | made under penalties of perjury? |
| 12:10:35 | 9 | A.    What statement? |
| 12:10:37 | 10 | Q.    Your signature at the bottom, the |
| 12:10:41 | 11 | information that you give on this 941 form, do you |
| 12:10:44 | 12 | know if that is made under the penalties of |
| 12:10:47 | 13 | perjury? |
| 12:10:48 | 14 | MS. HUGGINS:  Form.  You may answer. |
| 12:10:50 | 15 | THE WITNESS:  I do not know if it's made |
| 12:10:53 | 16 | under penalty of perjury. |
| 12:10:55 | 17 | BY MR. DAVENPORT: |
| 12:10:56 | 18 | Q.    Okay.  Is that anywhere in the CIT |
| 12:10:58 | 19 | crisis training that you received, whether |
| 12:11:00 | 20 | the -- the information that you give on this form |
| 12:11:02 | 21 | is under the penalties of perjury? |
| 12:11:04 | 22 | A.    I don't recall. |
| 12:11:05 | 23 | Q.    Okay.  What about any other classes |

*Velez - Davenport - 02/26/2020*

| | | |
|---|---|---|
| 12:11:09 | 1 | that you took or any other training courses that |
| 12:11:13 | 2 | you received from the Buffalo Police Academy, did |
| 12:11:15 | 3 | they ever tell you if the information that you give |
| 12:11:18 | 4 | on a 941 form is given under the penalties of |
| 12:11:22 | 5 | perjury? |
| 12:11:22 | 6 | MS. HUGGINS:  Form.  You may answer. |
| 12:11:24 | 7 | THE WITNESS:  Not that I could recall. |
| 12:11:25 | 8 | MR. DAVENPORT:  Okay.  Can you please mark |
| 12:11:46 | 9 | this as Exhibit 25. |
| 12:11:46 | 10 | The following was marked for Identification: |
| | 11 | EXH. 25            Dispatch Monitor Unit |
| | 12 | History Report |
| 12:12:25 | 13 | BY MR. DAVENPORT: |
| 12:12:26 | 14 | Q.   Thank you.  Now, I'm showing you, |
| 12:12:28 | 15 | Ms. Velez, what's been marked as Exhibit 25.  Do |
| 12:12:31 | 16 | you recognize this document? |
| 12:12:34 | 17 | A.   Yes. |
| 12:12:34 | 18 | Q.   And what do you recognize it to be? |
| 12:12:37 | 19 | A.   It's a call log. |
| 12:12:38 | 20 | Q.   Okay.  Is there another term that's |
| 12:12:41 | 21 | used for it? |
| 12:12:42 | 22 | A.   Dispatch monitor unit history report. |
| 12:12:46 | 23 | Q.   Okay.  What's the date for this |

*Velez - Davenport - 02/26/2020*

12:12:48  1  dispatch monitor?

12:12:49  2       A.   1/1 of 2017.

12:12:51  3       Q.   Okay.  And which officer does this

12:12:55  4  dispatch monitor correspond with?

12:12:57  5       A.   Myself.

12:12:58  6       Q.   Okay.  And is that your unit sign C242?

12:13:05  7       A.   For that specific date, yes, it was.

12:13:07  8       Q.   Okay.  Was that typically what your

12:13:10  9  call sign would be?

12:13:11  10      A.   No.

12:13:11  11      Q.   What was typically your call sign at

12:13:15  12  that time?

12:13:15  13      A.   C233.

12:13:18  14      Q.   Now, why did you have C242 instead of

12:13:22  15  C233 that day?

12:13:24  16      A.   Because it was our double-up day where

12:13:27  17  both like I explained earlier, the A wheel and the

12:13:28  18  B wheel, every two weeks there's a day where both

12:13:33  19  wheels work.

12:13:33  20           So the purpose is so the other side can get

12:13:36  21  training, so we alternate every other week so we

12:13:38  22  can get training, but this specific date was a

12:13:40  23  holiday.  There were a number of officers off, so

*Velez - Davenport - 02/26/2020*

120

| | | |
|---|---|---|
| 12:13:44 | 1 | they had to backfill cars with -- like our side |
| 12:13:47 | 2 | would have been the training side, but because |
| 12:13:50 | 3 | there was a manpower issue additional units were |
| 12:13:52 | 4 | needed, so I was just given this call sign. |
| 12:13:58 | 5 | Q.   How often -- |
| 12:13:58 | 6 | A.   To backfill. |
| 12:13:58 | 7 | Q.   Oh, I'm sorry.  How often do you have |
| 12:14:00 | 8 | double-up days? |
| 12:14:01 | 9 | A.   Every two weeks. |
| 12:14:01 | 10 | Q.   Okay. |
| 12:14:04 | 11 | A.   Once every two weeks. |
| 12:14:05 | 12 | Q.   Do you receive training once every two |
| 12:14:08 | 13 | weeks? |
| 12:14:08 | 14 | A.   Sometimes we do, sometimes we don't. |
| 12:14:11 | 15 | Q.   How often on double-up days do you |
| 12:14:16 | 16 | receive training? |
| 12:14:17 | 17 | A.   I don't recall. |
| 12:14:19 | 18 | Q.   If you don't receive training, what |
| 12:14:22 | 19 | else would you be doing? |
| 12:14:23 | 20 | A.   We would backfill cars or fulfill a |
| 12:14:28 | 21 | different assignment, whether it be work the desk, |
| 12:14:30 | 22 | do a foot patrol. |
| 12:14:37 | 23 | Q.   Okay.  Now, it says patrol C4; do you |

| | | | |
|---|---|---|---|
| 12:14:45 | 1 | | see that? |
| 12:14:45 | 2 | A. | Yes. |
| 12:14:46 | 3 | Q. | What does C4 refer to? |
| 12:14:49 | 4 | A. | The sector, Charlie District four |
| 12:14:55 | 5 | | sector. |
| 12:14:55 | 6 | Q. | So C would refer to Charlie District? |
| 12:14:58 | 7 | A. | Uh-huh. |
| 12:14:59 | 8 | Q. | And then four is that's a smaller |
| 12:15:04 | 9 | | sector within Charlie? |
| 12:15:04 | 10 | A. | Yes. |
| 12:15:05 | 11 | Q. | Okay.  Was that typically what you were |
| 12:15:08 | 12 | | assigned to was the fourth district within Charlie |
| 12:15:12 | 13 | | District? |
| 12:15:12 | 14 | | MS. HUGGINS:  Form. |
| 12:15:12 | 15 | | BY MR. DAVENPORT: |
| 12:15:12 | 16 | Q. | Or, I'm sorry, strike that. |
| 12:15:13 | 17 | | Was that typically what you were assigned to |
| 12:15:17 | 18 | | was the fourth part of the Charlie District? |
| 12:15:20 | 19 | A. | No. |
| 12:15:21 | 20 | Q. | Okay.  Where were you typically, what |
| 12:15:25 | 21 | | part were you typically assigned to? |
| 12:15:27 | 22 | A. | The three sector. |
| 12:15:29 | 23 | Q. | The three sector.  Do you know why you |

*Velez - Davenport - 02/26/2020*

122

| | | |
|---|---|---|
| 12:15:31 | 1 | were assigned to the four sector at that point? |
| 12:15:36 | 2 | A.   There was a need for a four sector |
| 12:15:39 | 3 | coverage that day. |
| 12:15:44 | 4 | Q.   Who typically would be assigned to the |
| 12:15:47 | 5 | fourth sector at this time? |
| 12:15:50 | 6 | A.   I don't know. |
| 12:15:54 | 7 | Q.   Did you typically work with |
| 12:15:57 | 8 | Ms. McDermott? |
| 12:15:57 | 9 | A.   Yes. |
| 12:15:57 | 10 | Q.   Was she your partner at that time? |
| 12:16:00 | 11 | A.   She and I rode together, yes. |
| 12:16:04 | 12 | Q.   Did the two of you work the third |
| 12:16:06 | 13 | sector together typically? |
| 12:16:08 | 14 | A.   Yes. |
| 12:16:11 | 15 | Q.   Okay.  Are you and Ms. McDermott |
| 12:16:13 | 16 | friends? |
| 12:16:13 | 17 | A.   Yes. |
| 12:16:14 | 18 | Q.   And that would be outside of work as |
| 12:16:16 | 19 | well? |
| 12:16:16 | 20 | A.   Yes. |
| 12:16:17 | 21 | Q.   Do you guys hang out together? |
| 12:16:19 | 22 | A.   Yes. |
| 12:16:20 | 23 | Q.   What sort of things do you guys do |

12:16:24  1  together outside of work?

12:16:26  2       A.   Driveways, seriously, we -- she helped

12:16:30  3  me with my driveway.  We'll have dinner.  We'll

12:16:38  4  visit each other's house.

12:16:41  5       Q.   Now, do you have any children,

12:16:45  6  Ms. Velez?

12:16:45  7       A.   I do.

12:16:46  8       Q.   Okay.  Is Ms. McDermott a godmother or

12:16:51  9  any other sort of title to your children?

12:16:55 10       A.   No.

12:16:55 11       Q.   How do your children refer to

12:16:59 12  Ms. McDermott?

12:16:59 13       A.   Ms. Lauren.

12:17:00 14       Q.   Okay.  Not aunt or anything like that?

12:17:04 15       A.   No.

12:17:06 16       Q.   Now, how was it conveyed to you that

12:17:12 17  you and Ms. McDermott would be working the fourth

12:17:14 18  sector rather than the third sector on January 1st

12:17:18 19  of 2017?

12:17:18 20       A.   I don't recall specifically, but in

12:17:20 21  briefing we would be told, it's something that

12:17:24 22  would be discussed in briefing.

12:17:25 23       Q.   Okay.  Now, we talked about an A wheel

*Velez - Davenport - 02/26/2020*

124

12:17:33  1  and a B wheel.  What wheel were you working at the

12:17:36  2  time, you and Ms. McDermott?

12:17:38  3      A.   I -- I don't know which side would be

12:17:41  4  labeled the A wheel and B wheel at the time.

12:17:44  5      Q.   Okay.  During your A wheel or B wheel,

12:17:50  6  who would typically be working the fourth sector?

12:17:56  7      A.   On our regular side?

12:17:58  8      Q.   Yes, on your regular side.

12:18:00  9      A.   I don't recall.

12:18:01  10     Q.   Okay.  Can you look, please, refer to

12:18:05  11  Exhibit 16 again.  I think it's your bottom sheet.

12:18:12  12     A.   Okay.

12:18:12  13     Q.   Looking through this list of officers,

12:18:17  14  does that refresh your recollection as to who would

12:18:19  15  have been working the fourth sector during your

12:18:24  16  wheel?

12:18:24  17     A.   No.

12:18:25  18     Q.   Okay.  So, now, turning back towards

12:18:32  19  the dispatch monitor, which has been marked as

12:18:35  20  Exhibit 25.  Do you see how right before your name

12:18:38  21  there is a six digit number?

12:18:41  22     A.   Yes.

12:18:41  23     Q.   What does that six digit number refer

*Velez - Davenport - 02/26/2020*

125

| | | |
|---|---|---|
| 12:18:45 | 1 | to? |
| 12:18:45 | 2 | A.   My departmental ID. |
| 12:18:48 | 3 | Q.   Okay.  Has that departmental ID changed |
| 12:18:51 | 4 | at any time? |
| 12:18:51 | 5 | A.   No. |
| 12:18:52 | 6 | Q.   So that was issued to you back in 2013? |
| 12:18:55 | 7 | A.   Yes. |
| 12:18:56 | 8 | Q.   And do you see next to shift where it |
| 12:19:00 | 9 | says second? |
| 12:19:00 | 10 | A.   Yes. |
| 12:19:01 | 11 | Q.   What does that refer to? |
| 12:19:03 | 12 | A.   That would be our day shift or MP2. |
| 12:19:09 | 13 | Q.   What would be considered first shift? |
| 12:19:12 | 14 | A.   I don't know the specific hours, but |
| 12:19:15 | 15 | typically on patrol we have MP2, which is day |
| 12:19:21 | 16 | shift, we have MP4, which is afternoon shift, we |
| 12:19:25 | 17 | have MP5, which is the overnight. |
| 12:19:29 | 18 | Q.   And between MP2 and MP4 what would that |
| 12:19:34 | 19 | shift be considered? |
| 12:19:37 | 20 | MS. HUGGINS:  Form. |
| 12:19:38 | 21 | BY MR. DAVENPORT: |
| 12:19:39 | 22 | Q.   What would MP3 refer to? |
| 12:19:41 | 23 | A.   MP3 is I believe what our community |

*Velez - Davenport - 02/26/2020*

126

12:19:46  1   police officer shift is, it's 10 -- 10 a.m.

12:19:55  2   to -- 10 to 8, 10 to 8:00 p.m.

12:19:56  3          Q.   What does a community officer do?

12:19:58  4          A.   The community police officer they

12:20:02  5   handle a -- a variety of the different issues that

12:20:06  6   we may have that are not criminal, such as neighbor

12:20:11  7   issues, loud noise, complaints of garbage.

12:20:15  8   They -- they go to community events.  They're kind

12:20:18  9   of like the district liaison.

12:20:21 10          Q.   How does somebody get assigned to be a

12:20:24 11   community officer?

12:20:25 12          A.   It could either be you put in a request

12:20:29 13   to be the community police officer or it's the most

12:20:33 14   junior officer in the district.

12:20:34 15          Q.   Have you ever worked as a community

12:20:37 16   officer before?

12:20:37 17          A.   No.

12:20:40 18          Q.   Now, you said that it could be the most

12:20:44 19   junior officer in the district, would that just be

12:20:48 20   somebody that was chosen from your academy class?

12:20:51 21          A.   No, it's different.  It's from the

12:20:54 22   Charlie District.  So whoever is the most junior

12:20:57 23   who has the least amount of time in the whole

| | | |
|---|---|---|
| 12:21:00 | 1 | district on all shifts that would be the person |
| 12:21:03 | 2 | that would have to take that position, if nobody |
| 12:21:06 | 3 | else wanted it. |
| 12:21:06 | 4 | Q.   Okay.  Now, what would MP1 refer to? |
| 12:21:10 | 5 | A.   It's a shift.  I'm -- I'm not even |
| 12:21:13 | 6 | certain what the hours are for that shift.  I've |
| 12:21:17 | 7 | never worked MP1 or know of anyone who worked MP1. |
| 12:21:22 | 8 | Q.   Would that individual also be a |
| 12:21:24 | 9 | community officer? |
| 12:21:25 | 10 | A.   I'm not certain.  Like I said, I don't |
| 12:21:29 | 11 | know who would be assigned to MP1 or what the |
| 12:21:32 | 12 | department has it for. |
| 12:21:33 | 13 | Q.   Okay.  Now, according to your dispatch |
| 12:21:36 | 14 | monitor, it says that your shift started at |
| 12:21:39 | 15 | 6:12 a.m. on January 1st of 2017? |
| 12:21:41 | 16 | A.   Yes. |
| 12:21:42 | 17 | Q.   Okay.  Do you have any reason to |
| 12:21:44 | 18 | dispute the accuracy of that? |
| 12:21:46 | 19 | A.   Our -- excuse me.  Our shift starts at |
| 12:21:49 | 20 | 0600 hours, that's just what time the MCTR shift |
| 12:21:54 | 21 | started in the MCT.  So whether -- it's our |
| 12:21:57 | 22 | computer, so whether the lieutenant clicks start |
| 12:22:01 | 23 | shift or the dispatcher logged our shift at that |

*Velez - Davenport - 02/26/2020*

128

| | | |
|---|---|---|
| 12:22:05 | 1 | time. |
| 12:22:05 | 2 | Q.    Now, it appears that the first time |
| 12:22:09 | 3 | that you were dispatched was at 6:47 a.m.; is that |
| 12:22:13 | 4 | correct? |
| 12:22:13 | 5 | A.    Yes. |
| 12:22:13 | 6 | Q.    Okay.  And you were dispatched for an |
| 12:22:16 | 7 | alarm at 2021 Genesee Street? |
| 12:22:19 | 8 | A.    Yes. |
| 12:22:20 | 9 | Q.    Okay.  What would you typically be |
| 12:22:23 | 10 | doing from the time that your shift started until |
| 12:22:25 | 11 | the first time that you were dispatched? |
| 12:22:29 | 12 | A.    Every day is different. |
| 12:22:30 | 13 | Q.    Do you recall what you did on |
| 12:22:34 | 14 | January 1st of 2017? |
| 12:22:35 | 15 | A.    I do not. |
| 12:22:38 | 16 | Q.    Do you recall this call for an alarm at |
| 12:22:44 | 17 | 2021 Genesee Street? |
| 12:22:44 | 18 | A.    I do not. |
| 12:22:45 | 19 | Q.    Do you know if it is a residential or a |
| 12:22:49 | 20 | commercial building at 2021 Genesee Street? |
| 12:22:51 | 21 | A.    I do not recall. |
| 12:22:52 | 22 | Q.    Okay.  Have you ever appeared for a |
| 12:22:54 | 23 | call other than January 1st of 2017 at 2021 Genesee |

12:22:59  1   Street?

12:22:59  2          A.    I don't recall.

12:23:00  3          Q.    Okay.   Now, the next entry says en

12:23:05  4   route at 6:37 a.m., that would be referring to

12:23:10  5   what?

12:23:14  6          A.    That we were put on the call and we

12:23:17  7   were en route to the alarm.

12:23:18  8          Q.    And, now, when you say we, that's

12:23:21  9   referring to you and Ms. McDermott?

12:23:22 10          A.    Correct.

12:23:23 11          Q.    Okay.   Do you see how there's a number

12:23:25 12   after en route 17-0010383?

12:23:29 13          A.    Yes.

12:23:29 14          Q.    What does that number refer to?

12:23:31 15          A.    That's the incident number.

12:23:33 16          Q.    Okay.   Now, it says that you were

12:23:41 17   available again at 7:02 a.m., correct?

12:23:44 18          A.    Yes.

12:23:44 19          Q.    Okay.   Would that have meant that your

12:23:50 20   response to the alarm situation at 2021

12:23:54 21   Street -- or 2021 Genesee Street had at that point

12:23:58 22   ended?

12:23:59 23          MS. HUGGINS:   Form.

*Velez - Davenport - 02/26/2020*

130

12:24:01  1          THE WITNESS:  That would -- would be the
12:24:02  2  time that the dispatcher put us available.
12:24:06  3          BY MR. DAVENPORT:
12:24:06  4          Q.   Okay.  And how does a dispatcher make
12:24:08  5  you available?
12:24:08  6          A.   Either we can give a disposition and
12:24:11  7  call ourself back or sometimes they do it on their
12:24:15  8  own.  They feel that we've had sufficient time and
12:24:18  9  they put us back in.
12:24:21 10          Q.   Has there ever been a time where a
12:24:24 11  dispatcher has thought that you had a sufficient
12:24:26 12  amount of time and you had to then radio in to say
12:24:29 13  that you need more time at a certain incident
12:24:32 14  location?
12:24:32 15          A.   Yes.
12:24:33 16          Q.   Okay.  Did that happen on January 1st
12:24:38 17  of 2017?
12:24:38 18          A.   For -- do you want to clarify?
12:24:41 19          Q.   For any of the calls.
12:24:43 20          A.   For the incident with Mr. Kistner we
12:24:49 21  did need more time.  I don't know if a specific
12:24:52 22  call was made out, but we were on it for an
12:24:55 23  extended amount of time, but for the previous calls

*Velez - Davenport - 02/26/2020*

131

| | | |
|---|---|---|
| 12:24:58 | 1 | I don't recall. |
| 12:24:58 | 2 | Q.   Do you recall how many times you had to |
| 12:25:00 | 3 | radio in asking for more time with that incident? |
| 12:25:03 | 4 | A.   No. |
| 12:25:05 | 5 | Q.   Was it more than once? |
| 12:25:06 | 6 | A.   I didn't radio in -- |
| 12:25:06 | 7 | Q.   Okay. |
| 12:25:08 | 8 | A.   -- on that date. |
| 12:25:08 | 9 | Q.   Who radioed in asking for more time? |
| 12:25:12 | 10 | A.   I don't recall if they specifically |
| 12:25:12 | 11 | asked for more time.  Typically, we spend about on |
| 12:25:14 | 12 | average 20 minutes on a call, that's like what the |
| 12:25:18 | 13 | average time is. |
| 12:25:19 | 14 | If we need more time than that, we can ask |
| 12:25:22 | 15 | for it.  Or if we feel like we've been on a call |
| 12:25:23 | 16 | for an extended amount of time, we'll let radio |
| 12:25:25 | 17 | know, radio, I'm still on this call. |
| 12:25:27 | 18 | It's not that I've forgotten to give a |
| 12:25:30 | 19 | disposition or I'm in trouble, I just need more |
| 12:25:31 | 20 | time. |
| 12:25:32 | 21 | Q.   Now, is that 20-minute average, is that |
| 12:25:34 | 22 | for every sort of call or are there certain calls |
| 12:25:38 | 23 | that, you know, it would be expected to spend |

*Velez - Davenport - 02/26/2020*

132

| | | |
|---|---|---|
| 12:25:40 | 1 | longer at those types of incidents? |
| 12:25:43 | 2 | A.    It can -- |
| 12:25:43 | 3 | MS. HUGGINS:  Form.  You can answer. |
| 12:25:44 | 4 | THE WITNESS:  It can vary.  We just like to |
| 12:25:47 | 5 | update radio at least every 20 minutes. |
| 12:25:51 | 6 | BY MR. DAVENPORT: |
| 12:25:51 | 7 | Q.    Okay.  Did you update radio every |
| 12:25:54 | 8 | 20 minutes at Mr. Kistner's incident? |
| 12:25:57 | 9 | A.    I did not radio. |
| 12:25:58 | 10 | Q.    Okay.  Who was radioing at that time? |
| 12:26:01 | 11 | A.    I don't recall everyone who radioed. |
| 12:26:03 | 12 | Q.    Was Ms. McDermott radioing? |
| 12:26:05 | 13 | A.    I recall her being on the radio. |
| 12:26:07 | 14 | Q.    Okay.  Would somebody from your car |
| 12:26:09 | 15 | have to radio in to dispatch asking for more time? |
| 12:26:13 | 16 | MS. HUGGINS:  Form. |
| 12:26:14 | 17 | THE WITNESS:  We don't have to.  We can |
| 12:26:17 | 18 | radio from our car or our hand-held radio. |
| 12:26:21 | 19 | BY MR. DAVENPORT: |
| 12:26:22 | 20 | Q.    Okay.  But you and Ms. McDermott were |
| 12:26:25 | 21 | traveling together that day, correct? |
| 12:26:27 | 22 | A.    Correct. |
| 12:26:27 | 23 | Q.    Okay.  So would it only take one |

*Velez - Davenport - 02/26/2020*

133

12:26:30  1  individual traveling within your car to radio back

12:26:33  2  in to dispatch to let them know that you need more

12:26:38  3  time on a call?

12:26:38  4          A.    Pardon?

12:26:38  5          Q.    Would it only take one individual,

12:26:41  6  because you and Ms. McDermott were traveling

12:26:44  7  together, would it only take one individual from

12:26:46  8  your car that you and Ms. McDermott were traveling

12:26:49  9  in together to radio back in to dispatch asking for

12:26:49 10  more time?

12:26:49 11          A.    Only one person can be on the radio at

12:26:57 12  a time.

12:26:57 13          Q.    From your car?

12:26:59 14          A.    From either way or we'll step on each

12:27:01 15  other, whether it's from the car or from our body

12:27:03 16  radio, only one person can be on the air at a time,

12:27:04 17  because it'll negate the other person trying to

12:27:06 18  call.

12:27:07 19          Q.    Now, is that for all the officers

12:27:09 20  within C District?

12:27:10 21          A.    And E District.

12:27:11 22          Q.    Okay.  So E District and C District

12:27:15 23  both radio in to the same dispatcher?

*Velez - Davenport - 02/26/2020*

134

12:27:17  1        A.    Yes.

12:27:18  2        Q.    Are there any other districts within

12:27:26  3   the City of Buffalo that radio in to that

          4   dispatcher.

          5        THE REPORTER:   You've got to slow down,

          6   please.   Can you ask that question again, please.

          7        BY MR. DAVENPORT:

          8        Q.    Are there any other districts within

12:27:29  9   the City of Buffalo that radio in to the same

12:27:29  10  dispatcher besides C and E District?

12:27:32  11       A.    I believe B and D share a dispatcher.

12:27:37  12  And A District shares dispatch with towing, parking

12:27:44  13  enforcement, and I believe dog control.   There may

12:27:47  14  be more, but I'm not on that channel.

12:27:50  15       Q.    Okay.   Now, it appears that at

12:27:57  16  7:09 a.m. you were dispatched to an overdose

12:28:03  17  situation; do you see that?

12:28:04  18       A.    Yes.

12:28:04  19       Q.    And was that at 385 Paderewski Drive?

12:28:09  20       A.    Yes.

12:28:10  21       Q.    Okay.   It appears that you were there

12:28:14  22  for nearly an hour; do you see that?

12:28:16  23       A.    Yes.

*Velez - Davenport - 02/26/2020*

135

| | | |
|---|---|---|
| 12:28:17 | 1 | Q. Okay. You were next made available at |
| 12:28:20 | 2 | 8:07 a.m.? |
| 12:28:21 | 3 | A. Yes. |
| 12:28:24 | 4 | Q. Would it show on this dispatch monitor |
| 12:28:27 | 5 | if you had asked for additional time at a call? |
| 12:28:32 | 6 | A. I'm not certain if it would show on |
| 12:28:35 | 7 | this. |
| 12:28:35 | 8 | Q. Okay. Would it show on the complaint |
| 12:28:37 | 9 | summary report? |
| 12:28:39 | 10 | A. I'm not certain. |
| 12:28:41 | 11 | MS. HUGGINS: Form. |
| 12:28:41 | 12 | BY MR. DAVENPORT: |
| 12:28:41 | 13 | Q. Would it show on any forms that you're |
| 12:28:44 | 14 | aware of? |
| 12:28:45 | 15 | A. Not that I'm aware of. |
| 12:28:46 | 16 | Q. Okay. Do you recall that overdose |
| 12:28:50 | 17 | situation? |
| 12:28:50 | 18 | A. I do. |
| 12:28:52 | 19 | Q. Did the person die? |
| 12:28:53 | 20 | A. No. |
| 12:28:54 | 21 | Q. Do you know what they overdosed on? |
| 12:28:57 | 22 | A. No. |
| 12:28:58 | 23 | MS. HUGGINS: Form. |

*Velez - Davenport - 02/26/2020*

136

| | | |
|---|---|---|
| 12:28:58 | 1 | BY MR. DAVENPORT: |
| 12:29:00 | 2 | Q. Was an ambulance called to that |
| 12:29:03 | 3 | location? |
| 12:29:03 | 4 | MS. HUGGINS: Form. And I'm concerned about |
| 12:29:08 | 5 | HIPAA in terms of questioning and with regard to |
| 12:29:13 | 6 | any medical treatment that was or was not provided |
| 12:29:16 | 7 | for that person. That person is not involved in |
| 12:29:19 | 8 | this lawsuit. |
| 12:29:20 | 9 | MR. DAVENPORT: Sure. They're not involved, |
| 12:29:22 | 10 | but Ms. Velez did respond to that situation. I |
| 12:29:23 | 11 | want to know how she handled it. |
| 12:29:25 | 12 | MS. HUGGINS: I do think that an |
| 12:29:27 | 13 | individual's medical treatment is covered under |
| 12:29:29 | 14 | HIPAA, so I would object and instruct the officer |
| 12:29:32 | 15 | not to answer questions that are specifically |
| 12:29:36 | 16 | relating to medical treatment with relation to that |
| 12:29:39 | 17 | call. |
| 12:29:40 | 18 | MR. DAVENPORT: I didn't ask about medical |
| 12:29:42 | 19 | treatment. I just asked if an ambulance was called |
| 12:29:43 | 20 | or not. If you want to say -- if you want to |
| 12:29:45 | 21 | direct her to not answer that question, you can |
| 12:29:48 | 22 | certainly say that for the record. |
| 12:29:52 | 23 | MS. HUGGINS: I think it gets very close to |

*Velez - Davenport - 02/26/2020*

137

12:29:54  1  the line with HIPAA.  What I'm going to instruct to

12:30:12  2  the officer is you may answer that question

12:30:15  3  specifically without going into any details of what

12:30:20  4  medical treatment, if any, was requested or you

12:30:23  5  observed for that individual.

12:30:24  6      BY MR. DAVENPORT:

12:30:25  7      Q.   So my question is was an ambulance

12:30:27  8  called for that situation?

12:30:28  9      A.   I did not call an ambulance.

12:30:30 10      Q.   Do you know if an ambulance was called

12:30:31 11  by anybody else?

12:30:31 12      A.   I know Buffalo fire and an ambulance

12:30:33 13  did respond.

12:30:34 14      Q.   Okay.  Do you know if that ambulance

12:30:40 15  was called by any police officers?

12:30:43 16      A.   I don't recall.

12:30:45 17      Q.   Was there anyone else there besides the

12:30:48 18  individual who had overdosed?

12:30:52 19      MS. HUGGINS:  Form.  With the exception of

12:30:54 20  fire and the ambulance that she's already

12:30:56 21  discussed?

12:30:56 22      BY MR. DAVENPORT:

12:30:57 23      Q.   Yes.

*Velez - Davenport - 02/26/2020*

138

| | | |
|---|---|---|
| 12:30:58 | 1 | Outside of emergency responding personnel, |
| 12:31:01 | 2 | was there anybody else there besides the individual |
| 12:31:04 | 3 | who had overdosed? |
| 12:31:05 | 4 | A.    Yes. |
| 12:31:06 | 5 | Q.    Any family members? |
| 12:31:07 | 6 | A.    No. |
| 12:31:07 | 7 | Q.    Okay.  Any friends? |
| 12:31:11 | 8 | A.    This was a warming center, there were |
| 12:31:15 | 9 | numerous people there, strangers amongst strangers, |
| 12:31:19 | 10 | some people may have been friendly.  I'm not |
| 12:31:22 | 11 | certain.  There was a large number of people there. |
| 12:31:24 | 12 | Q.    Okay.  Are you aware of any of those |
| 12:31:29 | 13 | friends calling for an ambulance? |
| 12:31:30 | 14 | A.    I don't recall. |
| 12:31:31 | 15 | Q.    Okay.  Now, the next situation that we |
| 12:31:36 | 16 | are looking at is at 8:42 a.m.  It says dispatched |
| 12:31:45 | 17 | for a transport; do you know what that's referring |
| 12:31:48 | 18 | to? |
| 12:31:50 | 19 | A.    I don't recall that call. |
| 12:31:52 | 20 | Q.    Okay.  What sorts of things would a |
| 12:31:55 | 21 | transport refer to? |
| 12:31:58 | 22 | A.    We could have assisted a citizen |
| 12:32:01 | 23 | somewhere.  It -- it could be a number of different |

*Velez - Davenport - 02/26/2020*

12:32:04   1   things, I don't recall specifically what this

12:32:06   2   transport is for.

12:32:07   3        Q.   Okay.  Now, would the police department

12:32:15   4   transport an individual to a location if they don't

12:32:18   5   have a car?

12:32:19   6        A.   Depends.

12:32:20   7        Q.   Okay.  What sorts of situations would

12:32:23   8   the police department transport an individual who

12:32:26   9   doesn't have a vehicle?

12:32:27  10        A.   Again --

12:32:28  11        MS. HUGGINS:  Form.  You may answer.

12:32:29  12        THE WITNESS:  -- it can vary.

12:32:31  13        BY MR. DAVENPORT:

12:32:32  14        Q.   Would there ever be an instance where

12:32:34  15   somebody calls 911 asking for a police transport to

12:32:39  16   a location?

12:32:40  17        A.   Yes.

12:32:40  18        Q.   Okay.  And would you transport that

12:32:45  19   individual in the back of your police vehicle?

12:32:47  20        A.   Depending on the situation, possibly.

12:32:50  21        Q.   What sorts of situations would you have

12:32:53  22   to transport an individual who calls in for a 911

12:32:57  23   transport?

*Velez - Davenport - 02/26/2020*

140

| | | |
|---|---|---|
| 12:32:58 | 1 | **A.**    I -- |
| 12:32:58 | 2 | **MS. HUGGINS:**   Form.   You can answer. |
| 12:32:59 | 3 | **THE WITNESS:**   I specifically had one where |
| 12:33:03 | 4 | it had an elderly woman and it was extremely cold |
| 12:33:07 | 5 | outside.   And she asked for assistance to get to, I |
| 12:33:09 | 6 | forget what relative it was, their house.   It was |
| 12:33:09 | 7 | icy, cold, so I absolutely went over. |
| 12:33:13 | 8 | She does have to ride in the back of patrol |
| 12:33:16 | 9 | vehicle, because that's procedure.   And I assisted |
| 12:33:20 | 10 | her to where she needed to go. |
| 12:33:21 | 11 | **BY MR. DAVENPORT:** |
| 12:33:22 | 12 | **Q.**    That wasn't on this day, though, |
| 12:33:23 | 13 | correct? |
| 12:33:23 | 14 | **A.**    Correct. |
| 12:33:24 | 15 | **Q.**    Correct, it wasn't? |
| 12:33:25 | 16 | **A.**    It was not, yes. |
| 12:33:26 | 17 | **Q.**    So it appears that the next time you |
| 12:33:28 | 18 | became available was at 9:26 a.m.; is that correct? |
| 12:33:31 | 19 | **A.**    Yes. |
| 12:33:32 | 20 | **Q.**    Okay.   So that would have meant from |
| 12:33:35 | 21 | 8:42 a.m. to 9:26 a.m. you were transporting this |
| 12:33:40 | 22 | individual? |
| 12:33:40 | 23 | **A.**    Not necessarily transporting the entire |

*Velez - Davenport - 02/26/2020*

141

12:33:43  1    time.

12:33:43  2         Q.   Okay.  What else could have been

12:33:45  3    happening during that time?

12:33:46  4         A.   This would have been the time that

12:33:49  5    dispatch made us available.  I'm not certain what

12:33:53  6    happened in the interim.  It could have been a

12:33:56  7    transport.  I'm not certain.

12:33:57  8         Q.   Okay.  So the next situation was at

12:34:01  9    9:37 a.m., there was a child neglect situation; do

12:34:06  10   you see that?

12:34:06  11        A.   Yes.

12:34:06  12        Q.   Do you remember that call?

12:34:07  13        A.   I do not.

12:34:09  14        Q.   And that 17-0010471 would refer to the

12:34:16  15   incident number, correct?

12:34:17  16        A.   Yes.

12:34:18  17        Q.   Okay.  Now, it says at 10:12 a.m. you

12:34:25  18   went out of service; what does that refer to?

12:34:28  19        A.   We are no longer available for a call

12:34:32  20   as of 10:12.

12:34:33  21        Q.   Okay.  Is that a break that you're

12:34:34  22   taking?

12:34:35  23        A.   I'm not certain why we went out of

*Velez - Davenport - 02/26/2020*

142

| | | |
|---|---|---|
| 12:34:38 | 1 | service. |
| 12:34:38 | 2 | Q.   Okay.  Do you get breaks during your |
| 12:34:41 | 3 | shift? |
| 12:34:41 | 4 | A.   We can request a break, yes. |
| 12:34:43 | 5 | Q.   Okay.  How long do you typically take a |
| 12:34:47 | 6 | break, if you do request one? |
| 12:34:48 | 7 | A.   It could be 30 minutes. |
| 12:34:50 | 8 | Q.   Are you required to request a break at |
| 12:34:54 | 9 | some point during your shift? |
| 12:34:54 | 10 | A.   We're not required to, it's optional. |
| 12:34:57 | 11 | Q.   Okay.  Typically your shifts are 10 |
| 12:35:00 | 12 | hours, correct? |
| 12:35:00 | 13 | A.   Yes. |
| 12:35:01 | 14 | Q.   Okay.  Do you ever take a break where |
| 12:35:04 | 15 | you don't request one, are there any mandated |
| 12:35:09 | 16 | breaks? |
| 12:35:09 | 17 | A.   There -- |
| 12:35:09 | 18 | MS. HUGGINS:  Form.  You can answer. |
| 12:35:13 | 19 | THE WITNESS:  There are no mandated breaks. |
| 12:35:15 | 20 | BY MR. DAVENPORT: |
| 12:35:15 | 21 | Q.   Okay.  How often do you take 30-minute |
| 12:35:17 | 22 | breaks during your shifts? |
| 12:35:19 | 23 | A.   Occasionally. |

*Velez - Davenport - 02/26/2020*

143

| | | |
|---|---|---|
| 12:35:21 | 1 | Q.   Okay.   More or less than half the |
| 12:35:24 | 2 | shifts that you work? |
| 12:35:26 | 3 | MS. HUGGINS:   Form. |
| 12:35:27 | 4 | THE WITNESS:   I'm not certain. |
| 12:35:31 | 5 | BY MR. DAVENPORT: |
| 12:35:32 | 6 | Q.   Do you ever take a lunch break during |
| 12:35:34 | 7 | your shift? |
| 12:35:34 | 8 | A.   That would be the lunch break. |
| 12:35:36 | 9 | Q.   Okay.   Do you ever eat your lunch in |
| 12:35:39 | 10 | your car? |
| 12:35:39 | 11 | A.   Yes. |
| 12:35:40 | 12 | Q.   Okay.   Is that most of the time? |
| 12:35:42 | 13 | A.   Sometimes. |
| 12:35:43 | 14 | Q.   Do you sometimes not eat lunch during |
| 12:35:46 | 15 | the day? |
| 12:35:46 | 16 | A.   I eat something every day. |
| 12:35:48 | 17 | Q.   Okay.   Snacks, then? |
| 12:35:50 | 18 | A.   It could be a snack or it could be a |
| 12:35:53 | 19 | lunch. |
| 12:35:53 | 20 | Q.   Okay.   Do you recall eating on |
| 12:35:56 | 21 | January 1st of 2017? |
| 12:35:57 | 22 | A.   I do not. |
| 12:36:00 | 23 | Q.   Okay.   Now, your next call is at |

*Velez - Davenport - 02/26/2020*

144

| 12:36:07 | 1 | 10:36 a.m. and you were dispatched for domestic |

12:36:07  1  10:36 a.m. and you were dispatched for domestic

12:36:11  2  trouble; do you see that?

12:36:11  3       A.   Yes.

12:36:12  4       Q.   Do you remember anything about that

12:36:13  5  call?

12:36:14  6       A.   I do not.

12:36:15  7       Q.   Okay.  Now, at 10:57 a.m. it says that

12:36:21  8  you were dispatched for an accident or injury at 37

12:36:26  9  Schmarbeck; do you see that?

12:36:27 10       A.   Yes.

12:36:27 11       Q.   Who would have made that initial entry

12:36:32 12  for accident or injury?

12:36:33 13       A.   The dispatcher enters it.

12:36:35 14       Q.   And how would the dispatcher enter that

12:36:38 15  information?

12:36:38 16       A.   It could -- it could be a call in from

12:36:41 17  police, it could be a call in from a citizen.

12:36:46 18  However they received the information they would

12:36:49 19  dispatch a call.

12:36:51 20       Q.   Okay.  Now, it says at 11:22 your

12:37:02 21  location change was ECMC; do you see that?

12:37:05 22       A.   Yes.

12:37:09 23       Q.   Would that mean that you had arrived at

*Velez - Davenport - 02/26/2020*

145

| | | |
|---|---|---|
| 12:37:12 | 1 | ECMC or that you were on your way to ECMC? |
| 12:37:17 | 2 | A.    It could be either one. |
| 12:37:18 | 3 | Q.    Okay.  What's your typical practice, do |
| 12:37:25 | 4 | you usually radio in when you arrive at a situation |
| 12:37:28 | 5 | or when you're on your way to a -- or a new |
| 12:37:28 | 6 | location? |
| 12:37:31 | 7 | MS. HUGGINS:   Form.  You can answer. |
| 12:37:33 | 8 | THE WITNESS:   Typically when we're leaving |
| 12:37:34 | 9 | to go to the situation or to the location.  Excuse |
| 12:37:39 | 10 | me. |
| 12:37:39 | 11 | BY MR. DAVENPORT: |
| 12:37:40 | 12 | Q.    Okay.  I asked both of them, so I |
| 12:37:42 | 13 | definitely understand why you said that. |
| 12:37:44 | 14 | Now, it says at 3:37 your location was to |
| 12:37:52 | 15 | CB; do you see that? |
| 12:37:53 | 16 | A.    Yes. |
| 12:37:54 | 17 | Q.    Does that refer to central booking? |
| 12:37:56 | 18 | A.    Yes, I believe so. |
| 12:37:58 | 19 | Q.    Okay.  Now, at 3:48 p.m. it says on |
| 12:38:09 | 20 | scene; do you see that? |
| 12:38:09 | 21 | A.    Yes. |
| 12:38:10 | 22 | Q.    Would that mean that you were on scene |
| 12:38:12 | 23 | at central booking? |

*Velez - Davenport - 02/26/2020*

146

| | | |
|---|---|---|
| 12:38:14 | 1 | A.    Yes. |
| 12:38:21 | 2 | Q.    Now, at 4:36 p.m. your location changed |
| 12:38:27 | 3 | again to ECMC; do you see that? |
| 12:38:28 | 4 | A.    Yes. |
| 12:38:29 | 5 | Q.    Now, that would mean in your typical |
| 12:38:33 | 6 | practice that you were on your way to ECMC, |
| 12:38:37 | 7 | correct, not necessarily what you did that day, I |
| 12:38:39 | 8 | just want to know typical practice, you normally |
| 12:38:42 | 9 | radio in on your way to a new location? |
| 12:38:44 | 10 | A.    Uh-huh. |
| 12:38:45 | 11 | Q.    So based on your typical practice that |
| 12:38:48 | 12 | would mean you're on your way to ECMC, correct? |
| 12:38:48 | 13 | A.    Yes. |
| 12:38:48 | 14 | Q.    Okay. |
| 12:38:53 | 15 | A.    But, again, it would depend on how |
| 12:38:56 | 16 | dispatch took our transmission.  They would be the |
| 12:38:59 | 17 | ones responsible for entering this. |
| 12:39:01 | 18 | Q.    Okay.  Now, at 4:37 p.m. it says en |
| 12:39:07 | 19 | route; do you see that? |
| 12:39:07 | 20 | A.    Yes. |
| 12:39:08 | 21 | Q.    Now, based on that entry, would you say |
| 12:39:11 | 22 | that your location change ECMC was made on your way |
| 12:39:16 | 23 | to ECMC prior to you actually leaving central |

*Velez - Davenport - 02/26/2020*

147

12:39:20  1  booking?

12:39:21  2          A.    Can -- can you repeat that again?

12:39:22  3          Q.    Sure.  So at 4:37 p.m. you see the

12:39:27  4  entry en route, correct?

12:39:28  5          A.    Yes.

12:39:28  6          Q.    So based on that entry would you say

12:39:33  7  that the entry at 4:36 p.m. that says location

12:39:38  8  change ECMC means that you are ready or getting

12:39:40  9  ready to leave for ECMC rather than at ECMC?

12:39:45 10          MS. HUGGINS:  Form.  You can answer.

12:39:47 11          THE WITNESS:  I would believe so, but,

12:39:50 12  again, as I said, it would depend on how dispatch

12:39:53 13  took our transmission, whether they would put

12:39:57 14  location change as if we arrived or if we were

12:40:00 15  leaving to go.  I would take location change to

12:40:06 16  mean we were on our way there.

12:40:08 17          BY MR. DAVENPORT:

12:40:08 18          Q.    Okay.  Now, the last entry says

12:40:12 19  6:16 p.m. and shift ended; do you see that?

12:40:14 20          A.    Yes.

12:40:14 21          Q.    Does that mean that your shift had

12:40:17 22  ended at that time?

12:40:20 23          A.    This means that our history report is

*Velez - Davenport - 02/26/2020*

148

12:40:23   1   over.   It doesn't necessarily mean that we're still

12:40:26   2   not completing additional paperwork.

12:40:31   3            Q.   Now, do you recall on January 1st of

12:40:34   4   2017 after 6:16 p.m. did you have any further work

12:40:38   5   that needed to be done before your shift ended that

12:40:41   6   day?

12:40:41   7            A.   I don't recall what time my shift ended

12:40:43   8   that day.

12:40:44   9            Q.   Okay.   Could it have been after

12:40:48  10   6:16 p.m.?

12:40:48  11            A.   It could have been.

12:40:49  12            Q.   Okay.   How often would you go back or

12:40:52  13   how often -- excuse me, strike that.

12:40:53  14            How often would you complete paperwork after

12:40:58  15   your patrol duties were over?

12:41:00  16            MS. HUGGINS:   Form.

12:41:01  17            THE WITNESS:   It depends.

12:41:06  18            BY MR. DAVENPORT:

12:41:06  19            Q.   Would it be more or less than half of

12:41:09  20   the times that you worked?

12:41:11  21            A.   I don't -- I couldn't put a specific

12:41:14  22   number on the times.

12:41:15  23            Q.   Okay.   Now, when this says shift ended

*Velez - Davenport - 02/26/2020*

149

| | | |
|---|---|---|
| 12:41:24 | 1 | at 6:16 p.m., do you believe that that entry was |
| 12:41:30 | 2 | made while you were still at ECMC? |
| 12:41:32 | 3 | A.   I don't recall. |
| 12:41:35 | 4 | Q.   Based on what you see on this dispatch |
| 12:41:38 | 5 | monitor, do you have any reason to believe that |
| 12:41:41 | 6 | that entry would not have been made at ECMC or |
| 12:41:44 | 7 | while you were still at ECMC? |
| 12:41:47 | 8 | MS. HUGGINS:   Form. |
| 12:41:47 | 9 | THE WITNESS:   I -- I'm not certain where I |
| 12:41:49 | 10 | was at 6:16 at that time. |
| 12:41:51 | 11 | BY MR. DAVENPORT: |
| 12:41:51 | 12 | Q.   So I understand that you may not |
| 12:41:54 | 13 | specifically recall, but based on what you see on |
| 12:41:57 | 14 | the dispatch monitor, do you see that there are any |
| 12:42:00 | 15 | other locations that you could have possibly been |
| 12:42:02 | 16 | at at that time? |
| 12:42:03 | 17 | MS. HUGGINS:   Form. |
| 12:42:06 | 18 | THE WITNESS:   It doesn't -- there's no other |
| 12:42:09 | 19 | location listed on here after ECMC. |
| 12:42:11 | 20 | BY MR. DAVENPORT: |
| 12:42:12 | 21 | Q.   So would it be fair to say that that |
| 12:42:14 | 22 | entry was more than likely made at ECMC or while |
| 12:42:18 | 23 | you were still at ECMC? |

12:42:19  1          MS. HUGGINS:  Form.

12:42:20  2          THE WITNESS:  The dispatcher entered that in

12:42:23  3    there, so I don't know where I was at that time.  I

12:42:26  4    don't recall.

12:42:26  5          BY MR. DAVENPORT:

12:42:27  6          Q.   Do you recall responding to any other

12:42:30  7    calls after ECMC?

12:42:30  8          A.   No.

12:42:31  9          Q.   What time should your shift -- was your

12:42:35 10    shift scheduled to have ended that day?

12:42:37 11          A.   4:00 p.m.

12:42:40 12          Q.   So if you worked until 6:16 p.m., would

12:42:45 13    you have collected overtime for that day?

12:42:46 14          A.   Yes.

12:42:47 15          Q.   And how do they determine overtime for

12:42:50 16    officers?

12:42:52 17          A.   When we finish our shift -- or when we

12:42:56 18    finish our shift, any additional time over that, I

12:43:00 19    believe it's on the quarter.

12:43:01 20          Q.   Okay.  So that would be any additional

12:43:05 21    time over 10 hours for each shift or would that be

12:43:09 22    any additional time over 40 hours for a week?

12:43:13 23          A.   After 10 hours of the shift.

*Velez - Davenport - 02/26/2020*

151

12:43:15  1          Q.   Okay.  So on this day you would have

12:43:18  2  collected overtime for two hours and 16 minutes

12:43:21  3  over your shift?

12:43:22  4          MS. HUGGINS:  Form.

12:43:24  5          THE WITNESS:  I'm not certain exactly what

12:43:27  6  time my shift ended.  So if -- like I said, I'm not

12:43:31  7  sure if it was 6:16 or if I had stayed additional

12:43:35  8  time.  I'm not certain.

12:43:36  9          BY MR. DAVENPORT:

12:43:36 10          Q.   If you stay additional time to work on

12:43:39 11  paperwork, do you have to make any sort of an entry

12:43:42 12  to end your shift?

12:43:43 13          A.   We fill out a form.

12:43:45 14          Q.   That's each day?

12:43:46 15          A.   If we stay, if we fill out an overtime

12:43:52 16  slip if we stay for every time we stay, yes.

12:43:53 17          Q.   Okay.  Are there any times that you are

12:43:59 18  required to or that you would fill out paperwork

12:44:03 19  during your regularly scheduled 10-hour shift?

12:44:06 20          MS. HUGGINS:  Form.

12:44:07 21          BY MR. DAVENPORT:

12:44:08 22          Q.   I'm sorry.  That was a bad question.

12:44:10 23          Are you required to patrol for your entire

*Velez - Davenport - 02/26/2020*

152

| | | |
|---|---|---|
| 12:44:15 | 1 | 10-hour shift? |
| 12:44:18 | 2 | A.    Minus the break we -- yes. |
| 12:44:19 | 3 | Q.    Okay.  So there would never be any time |
| 12:44:25 | 4 | that you would end your shift early to complete |
| 12:44:27 | 5 | paperwork, correct? |
| 12:44:29 | 6 | A.    It depends.  We would still be working, |
| 12:44:32 | 7 | but I may call myself back to the station house to |
| 12:44:35 | 8 | complete paperwork.  Or field training officers |
| 12:44:37 | 9 | they -- I believe it's -- I don't recall if it's |
| 12:44:39 | 10 | 30 minutes or a little bit longer to complete their |
| 12:44:43 | 11 | field training officer paperwork. |
| 12:44:44 | 12 | So there are instances where you would call |
| 12:44:47 | 13 | yourself out of service just prior to the end of |
| 12:44:50 | 14 | your shift to complete documents. |
| 12:44:51 | 15 | Q.    Okay.  So I'm going to show you what's |
| 12:45:03 | 16 | been marked as Exhibit 3.  Do you recognize that |
| 12:45:07 | 17 | document? |
| 12:45:09 | 18 | A.    Yes. |
| 12:45:11 | 19 | Q.    And what do you recognize it to be? |
| 12:45:13 | 20 | A.    A complaint summary report. |
| 12:45:14 | 21 | Q.    Where was the location for that |
| 12:45:16 | 22 | complaint summary report? |
| 12:45:17 | 23 | A.    33 Schmarbeck. |

| | | |
|---|---|---|
| 12:45:20 | 1 | Q.   Do you know the individual who was the |
| 12:45:23 | 2 | complainant for that complaint summary report? |
| 12:45:25 | 3 | A.   I do not. |
| 12:45:26 | 4 | Q.   Have you ever encountered any |
| 12:45:28 | 5 | individuals while working at C District at the |
| 12:45:32 | 6 | location 33 Schmarbeck? |
| 12:45:33 | 7 | A.   Not that I can recall. |
| 12:45:36 | 8 | Q.   Okay.  Do you know which officers |
| 12:45:37 | 9 | responded to that call at 33 Schmarbeck? |
| 12:45:40 | 10 | A.   Yes. |
| 12:45:40 | 11 | Q.   Okay.  And which officers were those? |
| 12:45:43 | 12 | A.   Kyle Moriarity and Carl Schulz. |
| 12:45:47 | 13 | Q.   What brought you to the scene that day |
| 12:45:50 | 14 | for that complaint summary report? |
| 12:45:54 | 15 | A.   From what I can recall, Officer |
| 12:45:58 | 16 | McDermott had responded there before, so she wanted |
| 12:46:02 | 17 | to see if they needed any assistance and give them |
| 12:46:05 | 18 | information that she may have had from previously |
| 12:46:08 | 19 | responding. |
| 12:46:08 | 20 | Q.   Okay.  Did she talk to you at all about |
| 12:46:11 | 21 | previously responding for that individual? |
| 12:46:14 | 22 | A.   I don't recall anything specific. |
| 12:46:16 | 23 | Q.   Okay.  Did she tell you when |

12:46:18  1   approximately she had previously responded?

12:46:20  2          A.   I don't --

12:46:22  3          Q.   For that location?

12:46:22  4          A.   I don't recall.

12:46:23  5          Q.   Did she tell you the information that

12:46:25  6   she wanted to convey to Mr. Moriarity or Mr. Schulz

12:46:29  7   that day?

12:46:30  8          A.   I don't recall.

12:46:31  9          Q.   Okay.  Did she say the name of the

12:46:34 10   individual that she had encountered previously?

12:46:37 11          A.   Not that I can recall.

12:46:38 12          Q.   Okay.  Since this incident has she

12:46:43 13   discussed any incidents that she has responded to

12:46:47 14   at 33 Schmarbeck?

12:46:48 15          A.   No.

12:46:49 16          Q.   Okay.  What about 37 Schmarbeck?

12:46:51 17          A.   No.

12:46:53 18          Q.   Okay.

12:46:53 19          MS. HUGGINS:  Form.

12:46:53 20          BY MR. DAVENPORT:

12:46:54 21          Q.   Besides January 1st of 2017, did you

12:46:59 22   ride with Ms. McDermott on any other occasions?

12:47:03 23          A.   Yes.

*Velez - Davenport - 02/26/2020*

155

| 12:47:03 | 1 | Q. Okay. Were there any other times where |
| 12:47:06 | 2 | a call was made from 33 or 37 Schmarbeck where you |
| 12:47:12 | 3 | and Ms. McDermott went to go and investigate the |
| 12:47:15 | 4 | situation? |
| 12:47:15 | 5 | A. Not that I could recall. |
| 12:47:16 | 6 | Q. But on this specific day she wanted to |
| 12:47:19 | 7 | go to this call at 33 Schmarbeck, because she |
| 12:47:22 | 8 | recalled responding to a previous incident there? |
| 12:47:25 | 9 | A. Yes. |
| 12:47:25 | 10 | Q. Okay. Approximately what time did you |
| 12:47:33 | 11 | arrive at the scene that day? |
| 12:47:35 | 12 | A. I don't recall. |
| 12:47:36 | 13 | Q. Okay. Was it in the morning? |
| 12:47:38 | 14 | A. It was. |
| 12:47:38 | 15 | Q. Do you remember what the weather was |
| 12:47:41 | 16 | like that day? |
| 12:47:42 | 17 | A. Not specifically. |
| 12:47:43 | 18 | Q. Was it cold? |
| 12:47:44 | 19 | A. Yes. |
| 12:47:45 | 20 | Q. Okay. Was it icy? |
| 12:47:47 | 21 | A. I don't recall. |
| 12:47:48 | 22 | Q. Do you recall any trouble walking that |
| 12:47:51 | 23 | day? |

*Velez - Davenport - 02/26/2020*

156

| | | |
|---|---|---|
| 12:47:52 | 1 | **A.**    Not that I could recall. |
| 12:47:54 | 2 | **Q.**    What types of shoes do you typically |
| 12:47:58 | 3 | wear as a patrol officer? |
| 12:48:02 | 4 | **A.**    I wear Bates boots. |
| 12:48:04 | 5 | **Q.**    Okay.  And that was the same at that |
| 12:48:06 | 6 | time in January -- on January 1st of 2017? |
| 12:48:06 | 7 | **A.**    Yes, they're department issued.  I wear |
| 12:48:08 | 8 | them all the time. |
| 12:48:09 | 9 | **Q.**    Okay.  And those are the same boots |
| 12:48:12 | 10 | that are issued today? |
| 12:48:13 | 11 | **A.**    Yes. |
| 12:48:14 | 12 | **Q.**    Do you recall where you were |
| 12:48:17 | 13 | approximately at the time that Ms. McDermott |
| 12:48:20 | 14 | decided that she would help Officer Schulz and |
| 12:48:24 | 15 | Officer Moriarity with that call at 33 Schmarbeck? |
| 12:48:28 | 16 | **MS. HUGGINS:**  Form.  You may answer. |
| 12:48:29 | 17 | **THE WITNESS:**  I don't recall. |
| 12:48:30 | 18 | **BY MR. DAVENPORT:** |
| 12:48:31 | 19 | **Q.**    Do you recall approximately how long it |
| 12:48:32 | 20 | took you to drive from where you were previously to |
| 12:48:34 | 21 | 33 Schmarbeck? |
| 12:48:35 | 22 | **A.**    I don't recall. |
| 12:48:36 | 23 | **Q.**    Okay.  When you arrived at the scene, |

12:48:38   1    what did you see?

12:48:40   2              A.    I don't recall.

12:48:42   3              Q.    Was there a car that was present that

12:48:45   4    day?

12:48:50   5              A.    I believe there -- we had parked behind

12:48:53   6    a car.

12:48:54   7              Q.    Okay.   Do you remember the -- the color

12:48:57   8    of that car?

12:48:58   9              A.    I do not.

12:48:58   10             Q.    Do you remember what type of a car it

12:49:06   11   was?

12:49:06   12             A.    I do not.

12:49:07   13             Q.    Okay.   Was it a large or a small

12:49:10   14   vehicle?

12:49:15   15             A.    I think it was a van.

12:49:17   16             Q.    Okay.

12:49:17   17             A.    I believe it was a van.

12:49:18   18             Q.    Okay.   When you arrived at the scene,

12:49:22   19   were Officer Schulz or Officer Moriarity outside of

12:49:26   20   their vehicle?

12:49:29   21             A.    I could recall -- I -- no, I don't, I

12:49:35   22   don't recall who was outside of the vehicle.

12:49:36   23             Q.    Okay.   Was there an individual standing

*Velez - Davenport - 02/26/2020*

158

12:49:41  1  on the sidewalk at that time?

12:49:42  2         A.    I don't recall.

12:49:44  3         Q.    Do you recall at any point was there an

12:49:47  4  individual standing on the sidewalk?

12:49:49  5         A.    I don't recall.

12:49:50  6         Q.    Do you recall at any time was Officer

12:49:52  7  Schulz or Officer Moriarity outside of their

12:49:55  8  vehicle?

12:49:57  9         A.    Can you?

12:49:59 10         Q.    Prior to -- strike that.

12:50:05 11         Do you recall at any time during the

12:50:07 12  incident that was responded to by Officer Schulz

12:50:10 13  and Officer Moriarity at 33 Schmarbeck at any point

12:50:14 14  while you were there were Officer Schulz or Officer

12:50:18 15  Moriarity outside of their vehicle?

12:50:19 16         A.    I recall off -- one of them being

12:50:21 17  outside of their vehicle, but I don't recall who it

12:50:23 18  was.

12:50:23 19         Q.    Now, the officer that was not outside

12:50:25 20  of their vehicle that was still inside the parked

12:50:29 21  car, did they have their window up or down?

12:50:31 22         A.    I don't recall them being inside the

12:50:33 23  parked car.  I just -- I just remember one officer

12:50:36   1   being outside of the car.  I don't recall where the

12:50:37   2   other officer was and I don't recall if it was

12:50:39   3   Kyle, Officer Moriarity or -- or Officer Schulz.

12:50:42   4          MS. HUGGINS:  Do her a favor and just slow

12:50:45   5   down.

12:50:45   6          THE WITNESS:  Yeah, on the sidewalk, I don't

12:50:45   7   recall.

12:50:45   8          BY MR. DAVENPORT:

12:50:45   9          Q.    Okay.

12:50:48  10          A.    Or if they were in the street.  I just

12:50:48  11   remember them being outside of the car, one of

12:50:48  12   them.

12:50:54  13          Q.    Do you recall approximately how long

12:50:55  14   you were at the scene responding to that incident

12:50:58  15   at 33 Schmarbeck?

12:50:59  16          A.    I do not.

12:51:00  17          Q.    Okay.  Based on what is recorded on

12:51:04  18   that document, does that refresh your recollection

12:51:05  19   for how long you were at that scene?

12:51:08  20          A.    No.

12:51:08  21          Q.    Okay.  Is there any reason to dispute

12:51:13  22   that the time entries on there that would indicate

12:51:16  23   that Officer Schulz and Officer Moriarity were at

| | | |
|---|---|---|
| 12:51:19 | 1 | the scene for eight seconds? |
| 12:51:21 | 2 | MS. HUGGINS: Form. |
| 12:51:21 | 3 | THE WITNESS: This would be a dispatch |
| 12:51:23 | 4 | question. They would enter these times and -- |
| 12:51:27 | 5 | BY MR. DAVENPORT: |
| 12:51:28 | 6 | Q. Have you ever had to review a complaint |
| 12:51:30 | 7 | summary report before? |
| 12:51:33 | 8 | A. In criminal court, yes. |
| 12:51:35 | 9 | Q. Okay. Were you asked questions about |
| 12:51:38 | 10 | those complaint summary reports? |
| 12:51:40 | 11 | A. I don't recall. |
| 12:51:42 | 12 | Q. Okay. Have you ever had reason to |
| 12:51:44 | 13 | dispute the time entries that are made on those |
| 12:51:48 | 14 | complaint summary reports? |
| 12:51:49 | 15 | A. Not that I could recall. |
| 12:51:51 | 16 | Q. I'm going to show you what has now been |
| 12:51:55 | 17 | marked as Exhibit 4A. Do you recognize that |
| 12:52:00 | 18 | document? |
| 12:52:01 | 19 | A. Yes. |
| 12:52:01 | 20 | Q. And what do you recognize it to be? |
| 12:52:04 | 21 | A. A complaint summary report. |
| 12:52:05 | 22 | Q. Okay. What was the date that this |
| 12:52:11 | 23 | report was created? |

| | | |
|---|---|---|
| 12:52:12 | 1 | A.   1/1 of 2017. |
| 12:52:17 | 2 | Q.   Okay.  Who are the officers that are |
| 12:52:18 | 3 | listed on this report? |
| 12:52:20 | 4 | A.   Carl Schulz, Kyle Moriarity, Lauren |
| 12:52:26 | 5 | McDermott, and Jenny Velez. |
| 12:52:29 | 6 | Q.   Now, it says that the location of the |
| 12:52:32 | 7 | incident was 37 Schmarbeck, correct? |
| 12:52:36 | 8 | A.   Yes. |
| 12:52:36 | 9 | Q.   And that the disposition was a P1375 |
| 12:52:40 | 10 | crime report? |
| 12:52:44 | 11 | A.   Yes. |
| 12:52:45 | 12 | Q.   Okay.  And so I'm actually looking |
| 12:52:48 | 13 | right underneath the address where it says |
| 12:52:51 | 14 | disposition one and then P1375 crime reports right |
| 12:52:55 | 15 | on the first page.  I don't know.  Do you see that |
| 12:52:58 | 16 | right underneath 37 Schmarbeck it's in bold? |
| 12:53:01 | 17 | A.   Yes. |
| 12:53:01 | 18 | Q.   Okay.  Who makes that entry for what |
| 12:53:07 | 19 | the disposition is? |
| 12:53:08 | 20 | A.   It could be dispatch or we can enter |
| 12:53:11 | 21 | it. |
| 12:53:11 | 22 | Q.   So the officers do have that ability to |
| 12:53:14 | 23 | enter that disposition? |

*Velez - Davenport - 02/26/2020*

162

| | | |
|---|---|---|
| 12:53:15 | 1 | **A.** The primary officer, yes. |
| 12:53:17 | 2 | **Q.** Okay.  And who would be the primary |
| 12:53:19 | 3 | officer, what does that refer to? |
| 12:53:22 | 4 | **A.** The -- |
| 12:53:22 | 5 | **MS. HUGGINS:** Form. |
| 12:53:22 | 6 | **THE WITNESS:** Primary officer would be the |
| 12:53:26 | 7 | officer who was listed as primary on this complaint |
| 12:53:30 | 8 | summary report, if you look at 10:57:17. |
| 12:53:38 | 9 | **BY MR. DAVENPORT:** |
| 12:53:39 | 10 | **Q.** Okay.  Now, would it be the primary |
| 12:53:45 | 11 | officer at the time of the disposition who would |
| 12:53:48 | 12 | make that entry? |
| 12:53:49 | 13 | **A.** It would be who -- from the computer |
| 12:53:53 | 14 | the primary officer who was in the computer as the |
| 12:53:56 | 15 | primary officer can log in a disposition. |
| 12:53:59 | 16 | Otherwise, it has to be a radio, it has to be radio |
| 12:54:05 | 17 | that logs it. |
| 12:54:06 | 18 | **Q.** Would there be any way to tell if it |
| 12:54:09 | 19 | was radioed in or if that officer made that entry |
| 12:54:13 | 20 | themselves? |
| 12:54:14 | 21 | **A.** I can't tell. |
| 12:54:16 | 22 | **Q.** Okay.  Do you see at 1:14:01 the entry |
| 12:54:20 | 23 | set to primary C241? |

*Velez - Davenport - 02/26/2020*

163

12:54:24  1        A.   I'm sorry.  What time was that?

12:54:26  2        Q.   It would be 1:14:01.

12:54:30  3        A.   I see that.

12:54:31  4        Q.   You do see that?

12:54:33  5        A.   Uh-huh, yes.

12:54:34  6        Q.   And that would refer to the call sign

12:54:37  7   C241 becoming the primary officer for this

12:54:41  8   complaint summary report?

12:54:42  9        A.   Yes.

12:54:42 10        Q.   Okay.  Now, based on your general

12:54:46 11   practice, would it be C241 or C230 who would have

12:54:51 12   made that entry for the disposition of P1375 crime

12:54:55 13   report?

12:54:55 14        MS. HUGGINS:  Form.

12:54:56 15        THE WITNESS:  I don't know who entered that.

12:54:57 16   I don't know if it was a patrol or radio at this

12:55:01 17   time.

12:55:01 18        BY MR. DAVENPORT:

12:55:01 19        Q.   Okay.  If the entry was made by a

12:55:05 20   patrol officer, would the entry be made by C241 or

12:55:09 21   C230?

12:55:10 22        MS. HUGGINS:  Form.

12:55:10 23        THE WITNESS:  C24 -- if it was entered by a

*Velez - Davenport - 02/26/2020*

164

| | | |
|---|---|---|
| 12:55:13 | 1 | patrol officer, C241 would have had the ability. |
| 12:55:16 | 2 | BY MR. DAVENPORT: |
| 12:55:17 | 3 | Q.   Okay. |
| 12:55:17 | 4 | A.   If the radio had changed them over, |
| 12:55:19 | 5 | because it -- again, I don't know if that's typed |
| 12:55:21 | 6 | in or if it's entered as a -- I don't know how they |
| 12:55:23 | 7 | do it up in dispatch. |
| 12:55:26 | 8 | Q.   Okay.  Now, it says at 10:55:42 sent to |
| 12:55:36 | 9 | dispatch, ambulance 37 Schmarbeck Avenue, priority |
| 12:55:41 | 10 | six.  What does that priority number refer to? |
| 12:55:46 | 11 | A.   Dispatch sets priority. |
| 12:55:49 | 12 | Q.   Okay.  What are the numbers that are |
| 12:55:53 | 13 | used for that priority scale? |
| 12:55:55 | 14 | A.   I'm not certain. |
| 12:55:56 | 15 | Q.   Do you know the range of numbers that |
| 12:55:59 | 16 | are used? |
| 12:56:03 | 17 | A.   I know the scale, one is highest |
| 12:56:06 | 18 | priority.  I'm not certain.  I can't recall |
| 12:56:12 | 19 | the -- which would be the highest or the lowest |
| 12:56:14 | 20 | priority.  I don't know what the scale ends at.  I |
| 12:56:17 | 21 | don't recall at this time. |
| 12:56:18 | 22 | Q.   Okay.  But one you know is the highest |
| 12:56:23 | 23 | priority? |

12:56:23  1        A.    Correct.

12:56:24  2        Q.    Okay.  So a priority six, is that a low

12:56:29  3   or a high priority?

12:56:30  4        A.    I'm not certain what the scale is.

12:56:33  5        Q.    And you said that that --

12:56:34  6        A.    What it's ranged, where the range is,

12:56:37  7   I'm not certain at this time.

12:56:39  8        Q.    And you said that that determination is

12:56:41  9   made by dispatch?

12:56:43 10        A.    Correct, dispatch sets the priority.

12:56:46 11        Q.    Okay.  Now, it says at 10:55:56 call

12:56:55 12   type changed, accident or injury, and now it says

12:57:01 13   priority to two; do you see that?

12:57:02 14        A.    Yes.

12:57:02 15        Q.    What would be the reason that the

12:57:04 16   priority would change from six to two?

12:57:07 17        MS. HUGGINS:  Form.  You can answer.

12:57:08 18        THE WITNESS:  Dispatch would based on

12:57:11 19   whatever dispatch had that would be -- they would

12:57:14 20   determine that.

12:57:14 21        BY MR. DAVENPORT:

12:57:15 22        Q.    Okay.  In your experience any time that

12:57:21 23   an ambulance is called from dispatch what's the

*Velez - Davenport - 02/26/2020*

166

12:57:24  1   typical priority that's given to those entries?

12:57:27  2        A.    There's no typical priority for the

12:57:30  3   ambulance.  It depends on what the situation that

12:57:33  4   the ambulance is responding to.

12:57:34  5        Q.    Okay.  Now, do you see where it says en

12:57:39  6   route C230 at 10:57:17?

12:57:43  7        A.    Yes.

12:57:45  8        Q.    Would that be en route for 37

12:58:00  9   Schmarbeck Avenue specifically?

12:58:00 10        A.    That would respond to the call, yes.

12:58:09 11   But, again, it's a dispatch entry.

12:58:16 12        Q.    Now, do you see where it says en route

12:58:19 13   C241?

12:58:21 14        A.    Yes.

12:58:21 15        Q.    Okay.  And who does C241 refer to on

12:58:30 16   January 1st of 2017?

12:58:31 17        A.    Officer McDermott.

12:58:32 18        Q.    Okay.  Do you see where it says

12:58:35 19   dispatch C242?

12:58:37 20        A.    Yes.

12:58:39 21        Q.    And who does call sign C242 refer to?

12:58:43 22        A.    Myself.

12:58:47 23        Q.    Now, based on the entries that it says

12:58:54    1    en route at 10:57:17, en route C241 at 10:57:39,

12:59:03    2    and dispatched you at 10:57:41, if it was sent to

12:59:10    3    dispatch at 10:55:42, so that would have been

12:59:15    4    before all three entries, who would that call have

12:59:18    5    been made to to dispatch?

12:59:20    6            MS. HUGGINS:   Form.

12:59:21    7            BY MR. DAVENPORT:

12:59:21    8            Q.   Would that have been an officer or

12:59:24    9    would that have been an individual at the scene?

12:59:24   10            MS. HUGGINS:   The 10:55:42 call, is that

12:59:27   11    what you're referring to?

12:59:27   12            BY MR. DAVENPORT:

12:59:27   13            Q.   Yes, that's what I'm referring to.

12:59:29   14            A.   Could you repeat that question?

12:59:31   15            Q.   Sure.  So you'll notice that it says en

12:59:34   16    route C230, en route C241?

12:59:38   17            A.   Uh-huh.

12:59:39   18            Q.   And dispatch C242, and that all three

12:59:42   19    of those entries were made after 10:55:42, which is

12:59:47   20    when the ambulance call was sent to dispatch; do

12:59:51   21    you see that?

12:59:51   22            A.   Yes.

12:59:51   23            Q.   Now, based on those subsequent entries,

*Velez - Davenport - 02/26/2020*

168

12:59:55  1    would you say that the call to dispatch was made by

12:59:58  2    an individual or by the officers for the ambulance?

13:00:07  3         MS. HUGGINS:  Form.  You can answer.

13:00:09  4         THE WITNESS:  I'm not certain who called

13:00:11  5    that in to the -- to the ambulance -- or to

13:00:14  6    dispatch.

13:00:14  7         BY MR. DAVENPORT:

13:00:15  8         Q.   Okay.  At 10:54:42 do you see at the

13:00:18  9    end where it says phone, 716-462-2147?

13:00:23  10        A.   Yes.

13:00:23  11        Q.   Is that your phone number?

13:00:25  12        A.   No.

13:00:26  13        Q.   Do you know if that's any of the other

13:00:28  14   officers' numbers at that time?

13:00:32  15        A.   I'm not certain whose phone number that

13:00:35  16   is.

13:00:35  17        Q.   Okay.  Now, do you see at 11:03:52

13:00:41  18   there's another phone call received from the same

13:00:44  19   number, 716-462-2147; do you see that?

13:00:48  20        A.   Yes.

13:00:49  21        Q.   Okay.  And, again, that's not your

13:00:51  22   phone number or any of the other officers',

13:00:54  23   correct?

*Velez - Davenport - 02/26/2020*

169

13:00:54  1         A.    It's not my phone number and I'm not

13:00:57  2    certain whose phone number that is.

13:00:59  3         Q.    Okay.  Now, do you see at 11:04:20 it

13:01:05  4    says another call, female requests ambulance for

13:01:09  5    injured 54-year-old boyfriend; do you see that?

13:01:12  6         A.    Yes.

13:01:13  7         Q.    Would that call refer to 716-462-2147?

13:01:20  8         A.    It appears that way based on how

13:01:23  9    they're right after each other.

13:01:25 10         Q.    Okay.  Now, do you see where it says at

13:01:30 11    11:04:26 E-D-I-N-T-F-D?

13:01:34 12         A.    Yes.

13:01:35 13         Q.    What does that stand for?

13:01:37 14         A.    The ambulance is notified.

13:01:38 15         Q.    Okay.  Now, do you see at 11:07:31

13:01:49 16    where it says cameras on 37 has video of man

13:01:54 17    flopping on the ground?

13:01:55 18         A.    Yes.

13:01:56 19         Q.    Now, that entry would have been made by

13:01:59 20    dispatch, correct?

13:02:00 21         A.    Yes.

13:02:00 22         Q.    Okay.  And do you see where it says

13:02:04 23    000478 next to that entry?

13:02:08   1        A.    Yes.

13:02:10   2        Q.    Does that refer to Joseph Kessler in

13:02:16   3   the top corner, it's top right corner, it says

13:02:20   4   dispatched by 000478 Kessler, Joseph; do you see

13:02:24   5   that?

13:02:24   6        A.    Yes.

13:02:25   7        Q.    Okay.  Now, would the 000478 entry at

13:02:29   8   11:07:31 a.m., would that entry have been made by

13:02:35   9   Joseph Kessler?

13:02:35  10        A.    What time was it?

13:02:36  11        Q.    11:07:31.

13:02:38  12        A.    It appears that way on this document.

13:02:41  13        Q.    Okay.  And would Mr. Kessler have made

13:02:46  14   that entry based on what was conveyed to him by

13:02:50  15   either the officers or the individuals at the

13:02:51  16   scene?

13:02:52  17        MS. HUGGINS:   Form.  You may answer.

13:02:54  18        THE WITNESS:   That would be a question for

13:02:56  19   Mr. Kessler.

13:02:56  20        BY MR. DAVENPORT:

13:02:56  21        Q.    Okay.

13:02:57  22        A.    I'm not certain where he received that

13:02:59  23   information.

*Velez - Davenport - 02/26/2020*

13:03:00  1       Q.   Would it be fair to say that

13:03:02  2   that -- those would have been the only sources

13:03:04  3   where he could have received that information?

13:03:06  4       MS. HUGGINS:   Form.

13:03:06  5       THE WITNESS:   Again, I'm not certain where

13:03:09  6   he -- how they get their information from -- if

13:03:11  7   they get it from the county, 911, officers,

13:03:14  8   civilians.   I'm not certain where he got this

13:03:17  9   information from.

13:03:17 10       BY MR. DAVENPORT:

13:03:18 11       Q.   Sure.   But you did say it would either

13:03:20 12   come from officers or civilians.   So would it be

13:03:23 13   fair to say that that entry would have to be made

13:03:26 14   by either an officer based on information that he

13:03:29 15   receives either from an officer or an individual at

13:03:31 16   the scene?

13:03:31 17       MS. HUGGINS:   Form.

13:03:32 18       THE WITNESS:   It's a possibly.

13:03:32 19       BY MR. DAVENPORT:

13:03:33 20       Q.   Okay.   Would there be any other sources

13:03:35 21   where he could have received that information from?

13:03:36 22       A.   I'm not trained in dispatch.

13:03:38 23       Q.   Okay.   Now, at 11:22:34 it says

*Velez - Davenport - 02/26/2020*

172

| | | |
|---|---|---|
| 13:03:44 | 1 | location changed, C230 ECMC; do you see that? |
| 13:03:48 | 2 | A. Yes. |
| 13:03:48 | 3 | Q. And call sign C230, do you know who |
| 13:03:54 | 4 | that referred to on the day of the incident? |
| 13:03:57 | 5 | A. I'm not certain who it was assigned to. |
| 13:04:00 | 6 | Q. But it's neither you or Ms. McDermott, |
| 13:04:04 | 7 | correct? |
| 13:04:04 | 8 | A. Correct. |
| 13:04:04 | 9 | Q. Would it be fair to say that it was |
| 13:04:07 | 10 | either Carl Schulz or Kyle Moriarity? |
| 13:04:10 | 11 | A. I believe so. |
| 13:04:12 | 12 | Q. It wouldn't refer to any other |
| 13:04:14 | 13 | officers, correct? |
| 13:04:14 | 14 | A. Correct. |
| 13:04:15 | 15 | Q. Okay. Now, at 11:22:40 it says |
| 13:04:21 | 16 | location change, C241 ECMC; would that refer to |
| 13:04:26 | 17 | Ms. McDermott? |
| 13:04:27 | 18 | A. Yes. |
| 13:04:27 | 19 | Q. Do you see at 11:22:4 a.m. location |
| 13:04:32 | 20 | change, C242 ECMC? |
| 13:04:34 | 21 | A. Yes. |
| 13:04:34 | 22 | Q. Now, what would cause that six-second |
| 13:04:39 | 23 | difference between you and Ms. McDermott for the |

*Velez - Davenport - 02/26/2020*

173

| | | |
|---|---|---|
| 13:04:42 | 1 | location change? |
| 13:04:42 | 2 | MS. HUGGINS:  Form. |
| 13:04:43 | 3 | THE WITNESS:  That would be dispatch. |
| 13:04:44 | 4 | BY MR. DAVENPORT: |
| 13:04:45 | 5 | Q.   Okay.  Did you and Ms. McDermott have |
| 13:04:47 | 6 | to contact dispatch separately in order to change |
| 13:04:51 | 7 | your location? |
| 13:04:52 | 8 | A.   We could do it together.  Radio |
| 13:04:54 | 9 | may -- dispatch may just do it, because they know |
| 13:04:57 | 10 | we're riding together. |
| 13:04:58 | 11 | Q.   Okay.  Now, at 11:23:01 C230 will be a |
| 13:05:07 | 12 | 941; do you see that entry? |
| 13:05:09 | 13 | A.   Yes. |
| 13:05:09 | 14 | Q.   Okay.  And C230 does not refer you to |
| 13:05:13 | 15 | either you or Ms. McDermott, correct? |
| 13:05:15 | 16 | A.   Correct. |
| 13:05:16 | 17 | Q.   When it says will be a 941, what does |
| 13:05:19 | 18 | that say to you? |
| 13:05:20 | 19 | MS. HUGGINS:  Form. |
| 13:05:20 | 20 | THE WITNESS:  Will be a 941 it says it's a |
| 13:05:28 | 21 | mental health evaluation. |
| 13:05:31 | 22 | BY MR. DAVENPORT: |
| 13:05:32 | 23 | Q.   Now, at that time, had you, personally, |

*Velez - Davenport - 02/26/2020*

174

13:05:36  1    made any observations of Mr. Kistner that would

13:05:40  2    lead you to believe that he needed a 941 mental

13:05:44  3    health evaluation?

13:05:46  4              A.    That I personally observed?

13:05:47  5              Q.    You, personally.

13:05:48  6              A.    No.

13:05:49  7              Q.    Okay.  Did you and the other officers

13:05:51  8    discuss whether Mr. Kistner would be subjected to a

13:05:52  9    941 evaluation before leaving Schmarbeck?

13:05:56 10              A.    I did not.

13:05:57 11              Q.    Do you know if Ms. McDermott discussed

13:06:00 12    with any of the other officers whether Mr. Kistner

13:06:03 13    would be subjected to a 941 --

13:06:03 14              A.    I don't --

13:06:03 15              Q.    -- examination?

13:06:04 16              A.    I don't know.

13:06:04 17              Q.    When Mr. Kistner was being brought to

13:06:07 18    ECMC, did you have any reason to believe that he

13:06:09 19    would be evaluated for a mental health evaluation?

13:06:12 20              MS. HUGGINS:   Form.

13:06:13 21              THE WITNESS:   I don't recall knowing that he

13:06:15 22    was going up for a 941.  I recall believing it was

13:06:20 23    going to be a medical evaluation.

*Velez - Davenport - 02/26/2020*

175

13:06:21   1          BY MR. DAVENPORT:

13:06:22   2          Q.   And when you say a medical evaluation,

13:06:23   3   that refers to any physical injuries?

13:06:25   4          A.   Correct.

13:06:26   5          Q.   What about mental health or anything

13:06:28   6   like that?

13:06:29   7          A.   No.

13:06:30   8          Q.   Okay.  Would physical injuries also

13:06:34   9   include any head trauma?

13:06:36  10          A.   It would be a complete evaluation.

13:06:38  11          Q.   Okay.  So do you know if the location

13:06:53  12   change at 11:22 -- in between 11:22:34 and

13:07:00  13   11:22:46, were you and the other officers at ECMC

13:07:04  14   at that time or were you preparing to leave for

13:07:06  15   ECMC?

13:07:08  16          A.   I'm sorry.  Can you give me those two

13:07:11  17   times again?

13:07:11  18          Q.   Sure.  So at location -- at time

13:07:13  19   11:22:34 and 11:22:46, those entries for location

13:07:20  20   change, do you know if you and the other officers

13:07:23  21   would have been traveling to ECMC or if you would

13:07:27  22   have already been at ECMC at that time?

13:07:29  23          A.   I don't recall.

*Velez - Davenport - 02/26/2020*

176

13:07:29  1      MS. HUGGINS:  Form.  You can answer.

13:07:30  2      THE WITNESS:  I don't recall.  And that

13:07:31  3  would be, again, up to when we notified dispatch

13:07:35  4  and when they entered it as well.

13:07:37  5      BY MR. DAVENPORT:

13:07:38  6      Q.   Okay.  If those entries were correct

13:07:43  7  for location change 11:22:34 for C230 --

13:07:43  8      A.   Excuse me.

13:07:49  9      Q.   -- and then that next entry saying

13:07:51 10  11:23:01, C230 will be a 941, if they were

13:07:57 11  traveling to ECMC during that time, would you agree

13:08:01 12  that that evaluation would have been made -- or

13:08:04 13  that call would have been made while they -- while

13:08:07 14  they were still in their police vehicle?

13:08:09 15      MS. HUGGINS:  Form.

13:08:10 16      THE WITNESS:  It depends, not necessarily.

13:08:13 17  I'm not sure.

13:08:13 18      BY MR. DAVENPORT:

13:08:14 19      Q.   Okay.

13:08:19 20      A.   Again, that would depend on when

13:08:22 21  dispatch entered it.

13:08:23 22      Q.   Now, do you see at 11:30:12 where it

13:08:27 23  says on scene C230?

13:08:29  1          A.    Yes.

13:08:30  2          Q.    Would that have been ECMC that they

13:08:32  3   were on scene for?

13:08:39  4          A.    They changed their location to ECMC.

13:08:41  5   And then the next entry would be on scene, it would

13:08:44  6   appear to be that way.

13:08:45  7          Q.    Okay.  Do you see at 11:30:35 C230

13:08:49  8   suspect broke mirror on car 473 intentionally?

13:08:54  9          A.    Yes.

13:08:54 10          Q.    Okay.  And that entry would have been

13:08:58 11   made based off of information given by the

13:09:01 12   individual with call sign C230?

13:09:04 13          A.    This just said it's information per

13:09:09 14   C230.

13:09:12 15          Q.    It says -- I'm sorry.  It says

13:09:15 16   information per --

13:09:15 17          A.    This is from -- from C230 that this

13:09:18 18   information is coming in there.

13:09:20 19          Q.    Okay.  So the C230 before that

13:09:23 20   information, that means that that information came

13:09:26 21   from call sign C230, correct?

13:09:29 22          A.    It appears to be that way, yes.  The

13:09:31 23   dispatch entered it, yes.

*Velez - Davenport - 02/26/2020*

178

13:09:33　1　　　　Q.　Now, do you see at 1:14:01 where it

13:09:36　2　says set to primary C241?

13:09:37　3　　　　A.　Yes.

13:09:37　4　　　　Q.　And C241 would refer to Ms. McDermott,

13:09:41　5　correct?

13:09:41　6　　　　A.　Yes.

13:09:41　7　　　　Q.　Were you part of that discussion for

13:09:44　8　Ms. McDermott being set to the primary officer?

13:09:47　9　　　　A.　Not that I could recall.

13:09:48 10　　　　Q.　Okay.  Do you know why Ms. McDermott

13:09:53 11　was set to the primary officer?

13:10:00 12　　　　A.　I don't recall.

13:10:01 13　　　　Q.　Okay.  Now, you and Ms. McDermott did

13:10:07 14　not transfer or take Mr. Kistner to ECMC, correct?

13:10:11 15　　　　A.　Correct.

13:10:12 16　　　　Q.　Okay.  Why didn't you and Ms. McDermott

13:10:16 17　take Mr. Kistner to ECMC?

13:10:18 18　　　　A.　From what I can recall, he was placed

13:10:21 19　into the rear of Officer Moriarity and Officer

13:10:25 20　Schulz's car and they -- they transported him up.

13:10:28 21　　　　I don't recall the reason why he wasn't

13:10:30 22　placed in our car, for what reason, I don't recall.

13:10:33 23　　　　Q.　Do you remember any sort of a

13:10:35  1    discussion between you and the other officers who

13:10:41  2    would stay at ECMC at this time?

13:10:43  3         A.   I don't recall the conversation.

13:10:44  4         Q.   But do you recall having that sort of

13:10:47  5    type of -- that sort of a conversation?

13:10:49  6         A.   No.

13:10:49  7         Q.   Okay.  Why was it that you and

13:10:52  8    Ms. McDermott stayed at ECMC and Mr. Schulz and

13:10:55  9    Mr. Moriarity left?

13:10:56 10         A.   That is the decision that was made.  I

13:10:59 11    just don't recall the -- having the conversation or

13:11:02 12    the context of it.  I don't recall if -- I just

13:11:05 13    don't recall it.

13:11:07 14         Q.   So you said generally you work the

13:11:10 15    6:00 a.m. to 4:00 p.m. shift, correct?

13:11:12 16         A.   Yes.

13:11:14 17         Q.   At any times are you tired during your

13:11:17 18    shifts?

13:11:18 19         MS. HUGGINS:   Form.

13:11:21 20         THE WITNESS:   Sometimes.

13:11:22 21         BY MR. DAVENPORT:

13:11:23 22         Q.   Okay.  Do you recall being tired for

13:11:26 23    whatever reason during this shift?

*Velez - Davenport - 02/26/2020*

180

| | | |
|---|---|---|
| 13:11:29 | 1 | A. I don't recall. |
| 13:11:30 | 2 | Q. Okay. Do you recall what you did the |
| 13:11:32 | 3 | night before January 1st of 2017? |
| 13:11:34 | 4 | A. I don't recall. |
| 13:11:35 | 5 | Q. What do you typically do on a New Years |
| 13:11:40 | 6 | Eve? |
| 13:11:40 | 7 | A. Well, I'm a mom and my -- I have a |
| 13:11:43 | 8 | little guy. At the time he would have been was it |
| 13:11:48 | 9 | January '17, three, so I have a three-year-old, so |
| 13:11:54 | 10 | I -- I don't recall, but I know I wasn't out. |
| 13:11:56 | 11 | Q. Okay. Did you have any friends over? |
| 13:12:00 | 12 | A. Not that I recall. |
| 13:12:01 | 13 | Q. Okay. Did you have any police officers |
| 13:12:06 | 14 | over to your house the night before? |
| 13:12:08 | 15 | A. Not that I could recall. I |
| 13:12:09 | 16 | don't -- yeah, not that I could recall. |
| 13:12:14 | 17 | Q. Okay. Now, do you see at 2:45:35 C241 |
| 13:12:21 | 18 | NMT? |
| 13:12:21 | 19 | A. Can you repeat that time again? |
| 13:12:23 | 20 | Q. It would be 2:45:35 C241 MNT? |
| 13:12:29 | 21 | A. Yes. |
| 13:12:30 | 22 | Q. Okay. What does NMT refer to? |
| 13:12:34 | 23 | A. Needed more time. |

*Velez - Davenport - 02/26/2020*

181

13:12:35  1        Q.    Needed more time.  Okay.  Does dispatch

13:12:41  2   always make entries on complaint summary reports

13:12:44  3   when an officer requests more time?

13:12:47  4        A.    That would be a question for dispatch

13:12:49  5   and who the dispatcher is.  Sometimes they change

13:12:54  6   out during the shift, so some may, some may not.

13:12:58  7        Q.    So there's no automatic entry that's

13:13:01  8   made after an officer requests more time, correct?

13:13:03  9        A.    Correct.

13:13:04 10        Q.    And you would agree at this time you

13:13:09 11   had spent nearly four hours on this call, correct?

13:13:13 12        MS. HUGGINS:  Form.  You can answer.

13:13:17 13        THE WITNESS:  What time are we at now, 2:45,

13:13:21 14   correct.

13:13:21 15        BY MR. DAVENPORT:

13:13:22 16        Q.    Okay.  Do you recall if at any other

13:13:26 17   time you asked for more time from dispatch?

13:13:29 18        A.    I -- I didn't.

13:13:29 19        Q.    Do you recall if Ms. McDermott at any

13:13:31 20   time asked for more time?

13:13:33 21        A.    I don't recall.

13:13:33 22        Q.    Okay.  But it's typically every

13:13:36 23   20 minutes, correct, that an officer asks for more

13:13:39  1    time on a certain call?

13:13:41  2         **MS. HUGGINS:**  Form.

13:13:41  3         **THE WITNESS:**  Not typically.  We try, we

13:13:44  4    try, but it doesn't always happen.

13:13:45  5         **BY MR. DAVENPORT:**

13:13:45  6         Q.   Okay.  Do you know if that request for

13:13:47  7    more time would have been made at ECMC or a

13:13:50  8    different location?

13:13:50  9         A.   It appears based on this complaint

13:13:54 10    summary it was at ECMC.

13:13:56 11         Q.   Okay.  Now, at 3:37:06 it says location

13:14:01 12    changed C241 CB.  And then at it would be 3:37:09

13:14:07 13    location changed C242 CB.  Now, C -- CB refers to

13:14:13 14    central booking, correct?

13:14:15 15         A.   Correct.

13:14:15 16         Q.   And that would be you and Ms. McDermott

13:14:19 17    were on your way to central booking?

13:14:21 18         A.   Yes.

13:14:22 19         Q.   Okay.  And then the next entry says

13:14:28 20    3:48:31 on scene C242.  And then at 3:48:35 it says

13:14:36 21    on scene C241.  Would that refer to you and

13:14:41 22    Ms. McDermott being at central booking at that

13:14:44 23    time?

*Velez - Davenport - 02/26/2020*

183

| | | |
|---|---|---|
| 13:14:44 | 1 | **A.** It appears to be so, yes. |
| 13:14:46 | 2 | **Q.** Okay. Now, when it says 4:36:51 and |
| 13:14:52 | 3 | 4:36:55 location changed C241, C242 to ECMC; do you |
| 13:14:59 | 4 | see that? |
| 13:14:59 | 5 | **A.** Yes. |
| 13:15:00 | 6 | **Q.** Okay. And that would refer to you and |
| 13:15:03 | 7 | Ms. McDermott going to ECMC? |
| 13:15:05 | 8 | **A.** Yes. |
| 13:15:06 | 9 | **Q.** Okay. So that would mean that you and |
| 13:15:13 | 10 | Ms. McDermott spent approximately 45 minutes at |
| 13:15:18 | 11 | central booking? |
| 13:15:20 | 12 | **A.** If dispatch entered this at the -- like |
| 13:15:22 | 13 | I said, when we made the call at the right time, it |
| 13:15:27 | 14 | appears to be that way, yes. |
| 13:15:27 | 15 | **Q.** Okay. Do you have any reason to |
| 13:15:30 | 16 | dispute that you and Ms. McDermott spent 45 minutes |
| 13:15:33 | 17 | at central booking? |
| 13:15:35 | 18 | **A.** I don't recall the exact amount of time |
| 13:15:36 | 19 | we were there. |
| 13:15:36 | 20 | **Q.** Now, when you arrived at central |
| 13:15:38 | 21 | booking, was Mr. Kistner in handcuffs? |
| 13:15:39 | 22 | **A.** Yes. |
| 13:15:40 | 23 | **Q.** What did you do, did you walk into |

*Velez - Davenport - 02/26/2020*

184

13:15:43  1  central booking, I'm assuming, with Mr. Kistner in

13:15:47  2  handcuffs?

13:15:48  3      A.    We walk into the -- yes, into central

13:15:50  4  booking with him in handcuffs.

13:15:52  5      Q.    Okay.  Did you speak to anybody at

13:15:54  6  central booking at that time?

13:15:56  7      A.    I don't recall who went up to the

13:15:58  8  window with Officer McDermott and myself, because

13:16:01  9  we have to produce our paperwork at -- to the

13:16:04 10  report technician at the window.  I don't remember

13:16:07 11  which one of us had done that.

13:16:09 12      Q.    What sort of paperwork do you produce

13:16:12 13  to the individual at central booking?

13:16:14 14      A.    The arrest form.

13:16:15 15      Q.    Okay.  Any other paperwork besides the

13:16:19 16  arrest form?

13:16:19 17      A.    Medical clearance paperwork, if we have

13:16:22 18  it.

13:16:22 19      Q.    Okay.  Now, for Mr. Kistner, did you

13:16:26 20  have a medical clearance form?

13:16:28 21      A.    We had his discharge paperwork, I

13:16:30 22  believe.

13:16:30 23      Q.    Okay.  So you would have provided his

*Velez - Davenport - 02/26/2020*

185

13:16:36  1  discharge paperwork to the individual at central

13:16:38  2  booking?

13:16:39  3      A.   We would, any documents we have we

13:16:41  4  would give them to central booking.

13:16:43  5      Q.   Okay.  Besides the arrest form and

13:16:45  6  medical clearance form, do you recall any other

13:16:48  7  paperwork that you had for Mr. Kistner?

13:16:50  8      A.   I don't recall any other that we had.

13:16:52  9      Q.   Okay.  After producing that paperwork

13:16:55 10  to the person at central booking, did you have any

13:16:58 11  further conversations with that individual?

13:17:00 12      A.   Again, I don't remember who produced

13:17:01 13  it.  I don't know if Officer McDermott or myself

13:17:03 14  did, but I don't recall the conversation.

13:17:05 15      Q.   So it was one of you, but not both of

13:17:08 16  you?

13:17:09 17      A.   Correct, one of us would.  I mean, both

13:17:10 18  of us could go up to the window, but one of us

13:17:13 19  would hand over paperwork.  I just don't recall

13:17:17 20  which one of us did.

13:17:18 21      Q.   Now, after either you or Ms. McDermott

13:17:18 22  handed the paperwork to the person at central

13:17:21 23  booking, what would you and Ms. McDermott do next?

13:17:24   1          **MS. HUGGINS:**  Form.  You can answer.

13:17:26   2          **THE WITNESS:**  Mr. Kistner would be sitting

13:17:28   3   on a bench while we handed in the paperwork, any

13:17:32   4   property he had, anything like that, we would also

13:17:35   5   give that for inventory.

13:17:37   6          Then we would just wait for the report

13:17:39   7   technician to complete entering the information,

13:17:42   8   because they have to do background warrant checks,

13:17:47   9   anything like that, and then the cell block

13:17:50  10   attendants call us into the next room.

13:17:52  11          Q.   Do you remember or recall who the

13:17:54  12   report technician was on January 1st of 2017?

13:17:57  13          A.   I do not.

13:17:58  14          Q.   Okay.  Do you recall who the

13:17:59  15   individuals at central booking who would have been

13:18:02  16   the search attendants?

13:18:03  17          A.   I do not.

13:18:04  18          Q.   Okay.  Was their name Joseph?

13:18:07  19          A.   I don't recall.

13:18:08  20          Q.   Have you ever come across a -- an

13:18:12  21   individual at central booking who does the searches

13:18:16  22   named Joseph?

13:18:19  23          A.   I -- is that a first name or a last

*Velez - Davenport - 02/26/2020*

13:18:22   1  name, I don't --

13:18:23   2          Q.   First name.

13:18:23   3          A.   Yeah, I don't recall.

13:18:24   4          Q.   Okay.   Joseph Buyers, does that ring a

13:18:26   5  bell for you?

13:18:27   6          A.   The name sounds familiar, but I

13:18:31   7  can't -- I can't even picture who that is.

13:18:32   8          Q.   Okay.   So besides running a background

13:18:40   9  search for arrest warrants and other information,

13:18:44  10  what else does the report technician do at central

13:18:48  11  book?

13:18:48  12          A.   I'm aware that they do that, but I'm

13:18:52  13  not trained in being a report technician, so I

13:18:53  14  don't know exact -- I don't know everything that

13:18:53  15  they do once we give over the paperwork.

13:18:56  16          Q.   What information would you need to

13:18:58  17  receive from the report technician before having

13:19:02  18  Mr. Kistner searched?

13:19:05  19          MS. HUGGINS:   Form.

13:19:06  20          THE WITNESS:   We would just -- no

13:19:07  21  information.   We would just -- they would -- if he

13:19:08  22  had a warrant or something we weren't aware of,

13:19:11  23  they would put that on -- on the paperwork, but all

*Velez - Davenport - 02/26/2020*

188

13:19:14  1  they do is just give us our paperwork back once

13:19:17  2  they entered it.

13:19:18  3       BY MR. DAVENPORT:

13:19:18  4       Q.   Okay.  Did you receive any sort of

13:19:20  5  paperwork from the report technician before

13:19:23  6  Mr. Kistner was searched?

13:19:24  7       A.   No, we just get a copy of our arrest

13:19:26  8  form and we go back.

13:19:27  9       Q.   Now, when you say go back, are you

13:19:30 10  talking about ECMC?

13:19:31 11       A.   No.  I'm sorry.  We go back to the room

13:19:33 12  with the cellblock attendants where they do

13:19:36 13  fingerprinting, mug shots, and search.

13:19:39 14       Q.   Okay.  Where is that room in relation

13:19:42 15  to the report technician who I think you described

13:19:46 16  as being behind a window?

13:19:47 17       A.   Uh-huh.

13:19:48 18       Q.   Where is that search room in relation

13:19:51 19  to it?

13:19:52 20       MS. HUGGINS:  Form.  She needs a yes or no.

13:19:55 21       THE WITNESS:  Yes.  It's down the hall to

13:19:57 22  the left through another door.

13:19:58 23       BY MR. DAVENPORT:

13:19:59  1          Q.    Okay.  Did you go with Mr. Kistner to

13:20:01  2    that search room?

13:20:02  3          A.    I would have went to the search room.

13:20:06  4    I don't recall which one of us stayed in the search

13:20:09  5    room, because typically one of us goes through to

13:20:13  6    do the arrest paperwork while the person is being

13:20:16  7    processed.

13:20:16  8          One of us will stay with the prisoner.  One

13:20:16  9    of us will do paperwork.  So somebody always has to

13:20:20 10    stay with the prisoner, but I just don't know which

13:20:22 11    one of us had done that.

13:20:24 12          Q.    Okay.  Do you know what sort of a

13:20:27 13    search Mr. Kistner received when he was at central

13:20:30 14    booking?

13:20:30 15          A.    I am in the room, but I'm behind a

13:20:34 16    curtain.  The men search males, so I'm not certain

13:20:37 17    exactly what they did.

13:20:41 18          Q.    Now, is that decision of what type of a

13:20:44 19    search they'll receive, is that decision made by

13:20:47 20    the cell block attendants?

13:20:49 21          MS. HUGGINS:    Form.

13:20:50 22          THE WITNESS:    I'm not trained, they have

13:20:53 23    their own training, they know the extent of the

13:20:56  1  search that they're allowed to do.

13:20:58  2       BY MR. DAVENPORT:

13:20:59  3       Q.   I guess my question is do police

13:21:02  4  officers ever give their input for what type of a

13:21:05  5  search an individual should receive?

13:21:07  6       A.   No, I don't.  I don't know what other

13:21:10  7  officers may or may not do, but I -- I don't.

13:21:11  8       Q.   Do you know what Mr. Kistner was

13:21:14  9  charged with on January 1st of 2017?

13:21:15 10       A.   I do.

13:21:16 11       Q.   What was he charged with?

13:21:18 12       A.   Criminal mischief and disorderly

13:21:21 13  conduct, I believe.

13:21:21 14       Q.   Did you and Ms. McDermott know that

13:21:24 15  prior to arriving at central booking what he would

13:21:28 16  be charged with?

13:21:29 17       A.   Yes.

13:21:29 18       Q.   Okay.  Based on those charges, what

13:21:31 19  type of a search would an individual receive?

13:21:34 20       MS. HUGGINS:  Form.  You can answer.

13:21:35 21       THE WITNESS:  Again, based on my experience,

13:21:38 22  I'm not a cellblock attendant, it's the same search

13:21:42 23  for -- from what I've seen with females.  It's the

13:21:45  1  same search they receive every time.

13:21:48  2          Regardless of the charges, it's procedural,

13:21:48  3  but I'm not trained.  I'm not a trained cellblock

13:21:53  4  attendant, so I don't know what their policy and

13:21:55  5  procedure is.

13:21:56  6          BY MR. DAVENPORT:

13:21:56  7          Q.   So what sort of a search is it that

13:22:00  8  individuals receive?  You're saying it's

13:22:00  9  consistent, so what type of search is that?

13:22:01 10          A.   For the females that I've observed,

13:22:04 11  strip search.

13:22:05 12          Q.   Okay.  And you have no reason to think

13:22:08 13  that males are not also subjected to strip search?

13:22:12 14          MS. HUGGINS:  Form.

13:22:12 15          THE WITNESS:  I'm not certain.

13:22:14 16          BY MR. DAVENPORT:

13:22:14 17          Q.   Okay.  And that's for every sort of

13:22:17 18  arrest where a person is being booked?

13:22:19 19          A.   Every arrest I've taken down that's a

13:22:21 20  female that I've observed it was the same search.

13:22:25 21          Q.   Would that be -- is an individual taken

13:22:27 22  to central booking if they have a misdemeanor?

13:22:30 23          A.   Yes.

*Velez - Davenport - 02/26/2020*

192

13:22:30  1          Q.    And they still receive a strip search?

13:22:34  2          A.    Every arrest I've taken down for

13:22:36  3    females that I've observed it's always been the

13:22:39  4    same search.

13:22:40  5          Q.    And that's even if they are going to be

13:22:44  6    released on an appearance ticket?

13:22:45  7          A.    For the ones that I've been present

13:22:49  8    for, yes.

13:22:49  9          Q.    Okay.   There are no exceptions to an

13:22:55 10    individual not receiving a strip search?

13:22:57 11          MS. HUGGINS:   Form.

13:22:58 12          THE WITNESS:   That would be, again, with the

13:23:01 13    cellblock attendants and their training and their

13:23:04 14    policy and procedures.

13:23:05 15          BY MR. DAVENPORT:

13:23:05 16          Q.    But no arrests that you have personally

13:23:08 17    made?

13:23:08 18          A.    Could you repeat that?

13:23:10 19          Q.    So no arrests that you have personally

13:23:11 20    made where there was an exception why an individual

13:23:13 21    who was brought to central booking did not receive

13:23:15 22    a strip search?

13:23:15 23          MS. HUGGINS:   Form.   You may answer.

| 13:23:22 | 1 | THE WITNESS:  Not that I could recall. |
| 13:23:23 | 2 | BY MR. DAVENPORT: |
| 13:23:23 | 3 | Q.   Okay.  How many arrests have you made |
| 13:23:26 | 4 | during your career? |
| 13:23:28 | 5 | A.   I don't recall a specific number. |
| 13:23:30 | 6 | Q.   Is it more than a hundred? |
| 13:23:31 | 7 | A.   Yes. |
| 13:23:32 | 8 | Q.   Okay.  Is it more than 200? |
| 13:23:35 | 9 | A.   Possibly. |
| 13:23:35 | 10 | Q.   Okay.  I'm going to show you what has |
| 13:23:41 | 11 | been marked as Exhibit A -- 8.  I'm sorry. |
| 13:23:41 | 12 | A.   It's okay. |
| 13:23:51 | 13 | Q.   Do you recognize this document? |
| 13:23:56 | 14 | A.   No. |
| 13:23:57 | 15 | Q.   Okay.  Do you see where individuals |
| 13:24:06 | 16 | listed as Slamba, Buyers, Pinkston, and Borsaleri, |
| 13:24:14 | 17 | do you see where that section is?  It's in the |
| 13:24:17 | 18 | middle, in the very middle of the page. |
| 13:24:24 | 19 | A.   Yes. |
| 13:24:24 | 20 | Q.   Okay.  Do you know a Joseph Slamba? |
| 13:24:28 | 21 | A.   No. |
| 13:24:29 | 22 | Q.   Okay.  Do you know a Joseph Buyers? |
| 13:24:31 | 23 | A.   As I said before, the name is familiar, |

*Velez - Davenport - 02/26/2020*

194

13:24:34  1  but I'm not certain who that is.

13:24:36  2       Q.   Okay.  Do you know an individual

13:24:41  3  cellblock attendant named Pinkston?

13:24:45  4       A.   No.

13:24:46  5       Q.   Do you know an individual cellblock

13:24:48  6  attendant with the last name of Borsaleri?

13:24:51  7       A.   No.

13:24:51  8       Q.   Okay.  So I'm going to show you what's

13:25:04  9  been marked as Exhibit 21.  Do you recognize that

13:25:11 10  document?

13:25:11 11       A.   Yes.

13:25:12 12       Q.   And what do you recognize it to be?

13:25:14 13       A.   An -- an appearance ticket.

13:25:15 14       Q.   Okay.  So do you see the time that's

13:25:23 15  listed as 1600 with PM circled?

13:25:28 16       A.   Yes.

13:25:28 17       Q.   Okay.  And that would be referring to

13:25:32 18  4:00 p.m., correct?

13:25:33 19       A.   Yes.

13:25:50 20       Q.   So turning back to Exhibit 4A.

13:25:55 21       A.   What's 4A?

13:25:58 22       Q.   So that one, yes, okay.  Do you see

13:26:04 23  where the location change for ECMC was made at

13:26:10    1   4:36:51 towards the bottom of the page?

13:26:15    2        A.    Yes.

13:26:15    3        Q.    And 4:36:55 for you?

13:26:18    4        A.    Yes.

13:26:18    5        Q.    Okay.  So now -- oh, excuse me.  So

13:26:29    6   turning back towards Exhibit 21, when it says

13:26:33    7   1600 p.m., before that it says committed at 37

13:26:40    8   Schmarbeck on the 1st day of January of 2017 and

13:26:44    9   then it says at 4:00 p.m.; do you see that?

13:26:47   10        A.    Yes.

13:26:48   11        Q.    Okay.  All right.  So is that in

13:26:51   12   reference to what time the crime was committed?

13:26:56   13        A.    I'm not certain why they put 1600 on

13:27:00   14   there.

13:27:00   15        Q.    Okay.  Would you or Ms. McDermott have

13:27:03   16   given that information to whoever issued the

13:27:06   17   appearance ticket?

13:27:07   18        MS. HUGGINS:    Form.

13:27:07   19        THE WITNESS:    I'm not certain who would have

13:27:10   20   given that information.

13:27:10   21        BY MR. DAVENPORT:

13:27:11   22        Q.    Okay.  Do you believe that the time is

13:27:15   23   incorrect at 1600 p.m. for when the crime was

*Velez - Davenport - 02/26/2020*

196

13:27:20   1   committed?

13:27:20   2          A.   Yes.

13:27:20   3          Q.   Okay.   Now, it looks like the issuing

13:27:27   4   officer for the appearance ticket was Lieutenant D.

13:27:32   5   Banazek; do you see that?

13:27:37   6          A.   I see where the issuing officer is,

13:27:39   7   that's not legible.

13:27:42   8          Q.   Okay.   Do you know an individual by the

13:27:44   9   name of Lieutenant Banazek?

13:27:46  10          A.   Yes.

13:27:47  11          Q.   Okay.   And who is that?

13:27:49  12          A.   Lieutenant Banazek was the lieutenant

13:27:53  13   from -- that was working in central booking.

13:27:56  14          Q.   Okay.   Did he have any other

13:27:58  15   assignments besides central booking at that time?

13:28:01  16          A.   I -- I don't know.

13:28:03  17          Q.   Have you ever spoken to Lieutenant

13:28:06  18   Banazek before?

13:28:06  19          A.   Yes.

13:28:07  20          Q.   Okay.   And in what situations have you

13:28:12  21   spoken to Lieutenant Banazek?

13:28:14  22          A.   While he was down in central booking if

13:28:17  23   we had questions regarding -- if I had questions

13:28:20  1   regarding paperwork or anything of that nature with

13:28:23  2   the booking process, I would defer to him, because

13:28:26  3   he was a lieutenant.

13:28:27  4        Q.    What sorts of issues would you have

13:28:29  5   with paperwork, would it be penal statutes or, you

13:28:34  6   know, I guess, what sorts of questions would you

13:28:36  7   ask of this lieutenant at central booking?

13:28:39  8        A.    It depends.   It could vary, it could be

13:28:40  9   paperwork, it could be a situation, correct

13:28:43 10   charges.

13:28:43 11        Q.    Okay.   What other sorts of paperwork

13:28:47 12   would you typically fill out at central booking?

13:28:51 13        A.    We just turn in our 163, the report

13:28:55 14   technicians complete the documentation for us.

13:28:59 15        Q.    And, I'm sorry, what does a 163 refer

13:29:02 16   to?

13:29:03 17        A.    The arrest form.

13:29:05 18        Q.    Okay.   Do you give that 163 arrest form

13:29:16 19   to central booking after it's completed?

13:29:19 20        A.    Yes.

13:29:19 21        Q.    Okay.   And then do you know who central

13:29:23 22   booking takes that arrest form to?

13:29:25 23        A.    As I explained, when we come in for the

13:29:28  1  arrest process, we give it to the -- at the window.

13:29:30  2  And then that report technician makes a copy, gives

13:29:34  3  us the copy so we can complete the booking process

13:29:37  4  with the prisoner.

13:29:38  5      And then a second copy goes back to the

13:29:40  6  report technicians who complete our court

13:29:43  7  documentation, our complaints, the rest of the

13:29:45  8  forms that need to be completed for the court file.

13:29:47  9      Q.   Okay.  After those forms are completed,

13:29:50  10  would the arresting officer sign off on those

13:29:53  11  criminal complaint documents?

13:29:55  12      A.   If they're the complainant on it, if

13:29:58  13  the State of New York is the complainant on it, if

13:30:00  14  we're the complainant on it, then yes.

13:30:01  15      Q.   Okay.  If an individual who is not a

13:30:04  16  police officer is the complainant, they would sign

13:30:06  17  off on the arrest forms or criminal complaint

13:30:07  18  forms?

13:30:07  19      A.   If they were present, if they came down

13:30:09  20  to central booking, they can sign.  At one time we

13:30:12  21  could sign on information and belief, so we would

13:30:13  22  sign on -- on behalf of them if they gave us a

13:30:17  23  supporting deposition that said we want to be a

*Velez - Davenport - 02/26/2020*

13:30:19   1   complaint, they're just not present.   So those are

13:30:22   2   the times we would sign.   I'm sorry.

13:30:25   3         Q.   Okay.   Now, do you see underneath zip

13:30:40   4   code on the appearance ticket where it says

13:30:43   5   records?   It's directly above part two that's

13:30:48   6   underlined and bolded; do you see that?

13:30:49   7         A.   Yes.

13:30:50   8         Q.   What is that referring to?

13:30:54   9         A.   What part of it are you referring to

13:30:58  10   that is referring to?

13:30:59  11         Q.   Well, there's records that is written

13:31:02  12   underneath zip code and directly above part two

13:31:06  13   which is underlined and bolded.   Do you know why

13:31:10  14   records would be written in that section?

13:31:13  15         A.   I did not create this document.   I -- I

13:31:16  16   don't know.

13:31:16  17         Q.   Okay.   Now, you were a passenger with

13:31:48  18   Ms. McDermott on January 1st of 2017, correct?

13:31:51  19         A.   Yes.

13:31:52  20         Q.   Were you a passenger at the time that

13:31:55  21   the car and Mr. Kistner collided with each other?

13:31:59  22         MS. HUGGINS:   Form.   You may answer.

13:32:00  23         THE WITNESS:   I was in the passenger's side

13:32:02  1   during the incident.

13:32:03  2          BY MR. DAVENPORT:

13:32:03  3          Q.   Okay.  Did you see that incident?

13:32:05  4          A.   I did not.

13:32:06  5          Q.   Okay.  So you didn't see the car make

13:32:11  6   contact with Mr. Kistner?

13:32:11  7          MS. HUGGINS:  Form.  You may answer.

13:32:13  8          THE WITNESS:  I did not see Mr. Kistner make

13:32:16  9   contact with the car.

13:32:16 10          THE REPORTER:  I'm sorry?

13:32:16 11          THE WITNESS:  I did not see Mr. Kistner make

13:32:18 12   contact with the car.

13:32:18 13          BY MR. DAVENPORT:

13:32:18 14          Q.   Did Ms. McDermott tell you that she saw

13:32:21 15   the incident, the collision with Mr. Kistner in the

13:32:25 16   vehicle?

13:32:25 17          A.   She did.

13:32:26 18          Q.   Okay.  And what did she tell you?

13:32:29 19          A.   She told me that Mr. Kistner had -- I

13:32:32 20   can't remember if she said threw himself or put

13:32:35 21   himself into the mirror of the car.

13:32:38 22          Q.   Okay.  Did you happen to observe what

13:32:41 23   the mirror looked like on the driver's side of that

*Velez - Davenport - 02/26/2020*

201

| | | |
|---|---|---|
| 13:32:45 | 1 | vehicle after the collision? |
| 13:32:46 | 2 | A.    I did. |
| 13:32:46 | 3 | Q.    Okay.  And how did it appear to you? |
| 13:32:48 | 4 | A.    That it was dislodged from the body of |
| 13:32:51 | 5 | the car. |
| 13:32:52 | 6 | Q.    Now, when you say dislodged, was it |
| 13:32:55 | 7 | still attached but it was partially detached from |
| 13:32:59 | 8 | the car? |
| 13:32:59 | 9 | A.    Yes. |
| 13:32:59 | 10 | Q.    Okay.  So it -- it was still there on |
| 13:33:03 | 11 | the car, it hadn't fallen off completely, correct? |
| 13:33:07 | 12 | A.    Correct. |
| 13:33:07 | 13 | Q.    Okay.  Was there any damage to the |
| 13:33:09 | 14 | glass on that mirror? |
| 13:33:12 | 15 | A.    The glass itself was not damaged. |
| 13:33:16 | 16 | Q.    Okay.  Did you try to use or did |
| 13:33:24 | 17 | Ms. McDermott try to use the window on the driver's |
| 13:33:27 | 18 | side of that vehicle that day? |
| 13:33:29 | 19 | A.    She did. |
| 13:33:29 | 20 | Q.    Okay.  Were you present when she tried |
| 13:33:32 | 21 | to use the window? |
| 13:33:33 | 22 | A.    Yes. |
| 13:33:33 | 23 | Q.    Okay.  Did it make any sort of a |

*Velez - Davenport - 02/26/2020*

202

13:33:37  1   screeching sound or anything like that?

13:33:40  2        A.    It did, it -- it made a noise and it

13:33:42  3   like wiggled and hesitated to go up and down.

13:33:45  4        Q.    Okay.  What car were you driving that

13:33:47  5   day?

13:33:47  6        A.    I wasn't driving that day.

13:33:49  7        Q.    Excuse me.  What car were you a

13:33:51  8   passenger in that day?

13:33:53  9        A.    I believe it was 473.

13:33:55  10       Q.    Okay.  Did you and Ms. McDermott have a

13:33:57  11  specific vehicle that you liked to use?

13:34:00  12       A.    She had -- she preferred 473.  I

13:34:05  13  preferred 472.

13:34:06  14       Q.    Okay.  Was there any reason why car 473

13:34:11  15  was used on the day of the incident?

13:34:14  16       A.    Availability.

13:34:14  17       Q.    Okay.  Did you use car 473 again after

13:34:18  18  January 1st of 2017?

13:34:19  19       A.    I'm sure we did.  If Officer McDermott

13:34:22  20  was driving, she -- she would drive that car.

13:34:25  21       Q.    Okay.  Do you recall when your next

13:34:27  22  shift would have been after January 1st of 2017?

13:34:29  23       A.    I don't recall.

13:34:31  1          Q.   Okay.  Would it have been before

13:34:36  2   January 5th of 2017?

13:34:40  3          A.   It would have.  Well, if January 1 was

13:34:44  4   our last day, the most we could have been off was

13:34:48  5   for four days, so then we would have been back.

13:34:51  6          So if -- if January 1 was our last day,

13:34:55  7   because I don't recall, we would have been -- the

13:34:55  8   most we -- the longest we could have been off was

13:34:56  9   the 2nd, 3rd, 4th, 5th.

13:35:00  10         So the earliest would have been January 6th

13:35:03  11  or 5th, if we were off for three.

13:35:06  12         Q.   Okay.  Do you know when the next time

13:35:08  13  would have been that you would use car 473?

13:35:11  14         A.   No.

13:35:11  15         Q.   Okay.  Do you recall if the next time

13:35:13  16  that you used car 473 did it have a dislodged

13:35:17  17  mirror or were there any issues with the driver's

13:35:20  18  side window?

13:35:20  19         A.   I don't recall.

13:35:21  20         Q.   Okay.  Do you recall ever driving the

13:35:23  21  vehicle again where it had a dislodged mirror or

13:35:27  22  issues with the driver's side window?

13:35:28  23         A.   I don't recall driving 473 at all.

13:35:31  1   Like I said, I would prefer to drive 472, but I

13:35:35  2   don't recall being in that vehicle in -- with an

13:35:39  3   issue.

13:35:39  4        Like I don't recall after that incident when

13:35:41  5   was the next time we had taken that vehicle.  I

13:35:44  6   don't recall.

13:35:44  7        Q.   Do you recall ever being in a police

13:35:47  8   vehicle where the driver's side mirror was

13:35:50  9   dislodged or the driver's side window had issues

13:35:53  10  with going up and down?

13:35:55  11       MS. HUGGINS:   Form.   You can answer.

13:35:57  12       THE WITNESS:   I've driven vehicles that have

13:35:59  13  had issues with windows before.

13:36:02  14       BY MR. DAVENPORT:

13:36:02  15       Q.   And what sort of issues were those?

13:36:05  16       A.   I had one that the window wouldn't go

13:36:08  17  down before.

13:36:09  18       Q.   But you were never in a vehicle where

13:36:13  19  the window would make noises as it was going down,

13:36:17  20  correct?

13:36:17  21       A.   Correct.

13:36:17  22       Q.   Okay.   Do you recall what car you were

13:36:19  23  driving when the window would not go down?

*Velez - Davenport - 02/26/2020*

205

13:36:24  1        A.    It may have been a Crown Vic, a Crown

13:36:28  2   Victoria, the old model car we had, because we had

13:36:31  3   some that were very old.

13:36:33  4        Q.    Okay.  Now, on the day of the incident

13:36:36  5   did you make any sort of an estimation as to how

13:36:40  6   much damage was caused to car 473 by this incident?

13:36:44  7        A.    I did not.

13:36:45  8        Q.    Okay.  Would you agree or disagree that

13:36:47  9   it was more than $250 worth of damage to the

13:36:50 10   vehicle?

13:36:51 11        MS. HUGGINS:  Form.  You can answer.

13:36:52 12        THE WITNESS:  I'm not a professional, I -- I

13:36:54 13   would not know.

13:36:55 14        BY MR. DAVENPORT:

13:36:55 15        Q.    On the day of the incident did you

13:36:57 16   believe is that it was more than $250 worth of

13:37:01 17   damage to the vehicle?

13:37:02 18        A.    Based on the information that was given

13:37:04 19   to me by Officer McDermott on the damage and the

13:37:08 20   charges that she signed on, yes.

13:37:10 21        Q.    But that wasn't based off of your

13:37:12 22   personal observation of the damage to the vehicle?

13:37:14 23        A.    I can't estimate that.  I don't know

*Velez - Davenport - 02/26/2020*

206

| | | |
|---|---|---|
| 13:37:17 | 1 | how much that would cost. |
| 13:37:18 | 2 | Q. Do you know if Ms. McDermott can make |
| 13:37:21 | 3 | that estimation? |
| 13:37:21 | 4 | A. You would have to ask Officer |
| 13:37:21 | 5 | McDermott. |
| 13:37:21 | 6 | Q. Is she trained on how to make those |
| 13:37:25 | 7 | estimations? |
| 13:37:25 | 8 | A. You would have to ask Officer |
| 13:37:25 | 9 | McDermott. |
| 13:37:28 | 10 | Q. Are you trained on how to make those |
| 13:37:29 | 11 | estimations? |
| 13:37:29 | 12 | A. I am not. |
| 13:37:30 | 13 | Q. Okay. Are any police officers trained |
| 13:37:32 | 14 | on how to make those estimations? |
| 13:37:35 | 15 | A. I don't know. |
| 13:37:36 | 16 | Q. Okay. I'm going to show you what's |
| 13:37:37 | 17 | been marked as Exhibit 18. Do you recognize this |
| 13:37:45 | 18 | document? |
| 13:37:48 | 19 | A. I've -- no, I haven't seen one of |
| 13:37:51 | 20 | these. |
| 13:37:53 | 21 | Q. Do you see where it's written |
| 13:37:56 | 22 | underneath fleet management what is written? |
| 13:37:58 | 23 | A. Yes. |

13:37:59  1        Q.    What's written?

13:38:00  2        A.    Maintenance work order.

13:38:02  3        Q.    Okay.  Do you have any reason to

13:38:04  4   dispute that this is a maintenance work order?

13:38:06  5        A.    No.

13:38:07  6        Q.    Do you have any reason to dispute that

13:38:10  7   this is a maintenance work order that was made and

13:38:12  8   created by the City of Buffalo?

13:38:14  9        MS. HUGGINS:    Form.

13:38:14 10        THE WITNESS:    It has a seal on it, no.

13:38:17 11   Again, no.

13:38:18 12        BY MR. DAVENPORT:

13:38:18 13        Q.    Okay.  Now, looking at this for the

13:38:24 14   vehicle information, what car was fixed according

13:38:27 15   to this maintenance work order?

13:38:30 16        A.    This has unit 473 on it.

13:38:33 17        Q.    Okay.  And what was the date of

13:38:36 18   service?

13:38:37 19        A.    1/5 of '17.

13:38:39 20        Q.    Okay.  And on the day of the incident

13:38:42 21   you and Ms. McDermott were driving car 473,

13:38:46 22   correct?

13:38:46 23        A.    Officer McDermott was driving.  I was

*Velez - Davenport - 02/26/2020*

208

13:38:48　1　in the passenger's side, yes.

13:38:50　2　　　　　Q.　But you and Officer McDermott were in

13:38:52　3　car 473?

13:38:54　4　　　　　A.　On January 1st, 2017, yes.

13:38:56　5　　　　　Q.　Okay.  And this is also the car that

13:38:59　6　Ms. McDermott alleged in her criminal complaint

13:39:02　7　that Mr. Kistner caused more than $250 worth of

13:39:07　8　damage to?

13:39:07　9　　　　　A.　Yes.

13:39:09　10　　　　　Q.　By intentionally throwing himself at

13:39:12　11　the police vehicle?

13:39:12　12　　　　　A.　Yes.

13:39:13　13　　　　　Q.　Okay.  Do you see where it says service

13:39:15　14　underneath the service date?

13:39:16　15　　　　　A.　Yes.

13:39:16　16　　　　　Q.　And what does that say?

13:39:18　17　　　　　A.　Cooling system.

13:39:19　18　　　　　Q.　Does that in any way refer to the

13:39:22　19　mirror on the driver's side or the window on the

13:39:26　20　driver's side of car 473?

13:39:27　21　　　　　MS. HUGGINS:　Form.

13:39:27　22　　　　　THE WITNESS:　I have no idea what a cooling

13:39:29　23　system is.  There's no word window there, no mirror

*Velez - Davenport - 02/26/2020*

| | | |
|---|---|---|
| 13:39:35 | 1 | there. |
| 13:39:35 | 2 | BY MR. DAVENPORT: |
| 13:39:36 | 3 | Q.   But you have no reason to believe that |
| 13:39:38 | 4 | that would refer to the window on the driver's side |
| 13:39:40 | 5 | of the vehicle or the window on the driver's side, |
| 13:39:43 | 6 | correct? |
| 13:39:43 | 7 | MS. HUGGINS:   Form. |
| 13:39:43 | 8 | THE WITNESS:   Again, I'm not a vehicle |
| 13:39:45 | 9 | maintenance worker and this says cooling system. |
| 13:39:47 | 10 | BY MR. DAVENPORT: |
| 13:39:48 | 11 | Q.   Okay.   Now, do you see where it says |
| 13:39:50 | 12 | remarks are, slash are water pump, and then serp |
| 13:39:56 | 13 | period belt; do you see that? |
| 13:39:57 | 14 | A.   Yes. |
| 13:39:58 | 15 | Q.   Now, does that in any way refer to the |
| 13:40:03 | 16 | driver's side mirror or the driver's side window? |
| 13:40:06 | 17 | MS. HUGGINS:   Form.   You can answer. |
| 13:40:09 | 18 | THE WITNESS:   It doesn't say window or |
| 13:40:11 | 19 | mirror here, but it says water pump.   And I don't |
| 13:40:14 | 20 | know what a serp belt is or what RR means. |
| 13:40:18 | 21 | BY MR. DAVENPORT: |
| 13:40:18 | 22 | Q.   Do you see where it's listed as cost |
| 13:40:21 | 23 | underneath the service information? |

*Velez - Davenport - 02/26/2020*

210

| | | |
|---|---|---|
| 13:40:23 | 1 | **A.**    Yes. |
| 13:40:24 | 2 | **Q.**    And do you see where that is listed as |
| 13:40:26 | 3 | blank? |
| 13:40:27 | 4 | **A.**    Yes. |
| 13:40:27 | 5 | **Q.**    So is it fair to say that no estimate |
| 13:40:30 | 6 | was ever made by the City of Buffalo as to the cost |
| 13:40:33 | 7 | of the damage caused by Mr. Kistner on January 1st |
| 13:40:37 | 8 | of 2017? |
| 13:40:37 | 9 | **MS. HUGGINS:**    Form. |
| 13:40:37 | 10 | **THE WITNESS:**    I don't know if an estimate |
| 13:40:39 | 11 | was ever done. |
| 13:40:40 | 12 | **BY MR. DAVENPORT:** |
| 13:40:41 | 13 | **Q.**    Now, as part of the burden of proof for |
| 13:40:46 | 14 | a criminal complaint, that's beyond a reasonable |
| 13:40:49 | 15 | doubt, correct? |
| 13:40:49 | 16 | **MS. HUGGINS:**    Form. |
| 13:40:50 | 17 | **THE WITNESS:**    For a criminal complaint? |
| 13:40:52 | 18 | **BY MR. DAVENPORT:** |
| 13:40:53 | 19 | **Q.**    Yes. |
| 13:40:53 | 20 | **A.**    Yes. |
| 13:40:54 | 21 | **Q.**    Okay.  What sorts of evidence would you |
| 13:40:57 | 22 | use to accuse somebody of causing $250 worth of |
| 13:41:01 | 23 | damage to a vehicle? |

*Velez - Davenport - 02/26/2020*

13:41:02  1          **MS. HUGGINS:**  Form.

13:41:03  2          **THE WITNESS:**  Well, we have at the time

13:41:05  3  probable cause to make the arrest.  Following

13:41:09  4  the -- the District Attorney's office, we would

13:41:12  5  follow -- we would conference with them to

13:41:14  6  determine what documents would be needed.

13:41:16  7          **BY MR. DAVENPORT:**

13:41:18  8      Q.   At any time did the District Attorney

13:41:19  9  tell you what sort of documents were needed in

13:41:22 10  order to sustain a beyond a reasonable doubt

13:41:25 11  standard?

13:41:26 12      A.   I don't recall ever meeting with the

13:41:29 13  District Attorney.

13:41:29 14      Q.   Do you recall ever speaking with

13:41:29 15  Ms. McDermott to know if she ever met with the

13:41:31 16  District Attorney?

13:41:31 17      A.   No.

13:41:34 18      Q.   Were you or Ms. McDermott ever present

13:41:38 19  for any of the criminal proceedings against

13:41:40 20  Mr. Kistner?

13:41:41 21      A.   I don't recall being present.  I don't

13:41:43 22  know if Officer McDermott was.

13:41:48 23      Q.   Now, looking at this information, do

| | | |
|---|---|---|
| 13:41:59 | 1 | you recall if car 473 had any issues with the |
| 13:42:03 | 2 | cooling system prior to January 5th of 2017? |
| 13:42:08 | 3 | A.   I don't recall. |
| 13:42:08 | 4 | Q.   Okay.  Did it have any issues with the |
| 13:42:11 | 5 | cooling system on January 1st of 2017? |
| 13:42:14 | 6 | A.   I don't recall. |
| 13:42:15 | 7 | Q.   Do you know what the cooling system |
| 13:42:17 | 8 | refers to? |
| 13:42:17 | 9 | A.   I don't. |
| 13:42:18 | 10 | Q.   Okay.  Now, as a lieutenant, are you |
| 13:42:26 | 11 | involved at all in the repair and maintenance of |
| 13:42:28 | 12 | the vehicles in your fleet? |
| 13:42:31 | 13 | A.   Involved in the repair and maintenance, |
| 13:42:33 | 14 | no. |
| 13:42:33 | 15 | Q.   Are you involved in the status of the |
| 13:42:36 | 16 | repair of those vehicles in your fleet? |
| 13:42:38 | 17 | A.   As a lieutenant, I follow up, because |
| 13:42:41 | 18 | we have such a shortage of cars.  So the extent of |
| 13:42:46 | 19 | my follow-up is to find out when they're going to |
| 13:42:49 | 20 | be available again for service. |
| 13:42:51 | 21 | Q.   Okay.  If a police officer came to you |
| 13:42:53 | 22 | and told you that the window was malfunctioned and |
| 13:42:57 | 23 | the mirror was dislodged from a police vehicle, |

*Velez - Davenport - 02/26/2020*

213

| | | |
|---|---|---|
| 13:43:01 | 1 | would you have that police officer send it in for |
| 13:43:03 | 2 | service? |
| 13:43:04 | 3 | A. It's situational. |
| 13:43:05 | 4 | Q. Would you have a police officer drive a |
| 13:43:08 | 5 | police vehicle if a mirror was dislodged from that |
| 13:43:12 | 6 | vehicle? |
| 13:43:12 | 7 | A. They -- it depends on the type of |
| 13:43:16 | 8 | damage that's done to it, is it functional. |
| 13:43:20 | 9 | Q. What sorts of mirrors that are |
| 13:43:23 | 10 | dislodged from a police vehicle are still |
| 13:43:26 | 11 | functional? |
| 13:43:26 | 12 | A. If it -- |
| 13:43:26 | 13 | MS. HUGGINS: Form. You can answer. |
| 13:43:28 | 14 | THE WITNESS: If the mirror is still |
| 13:43:30 | 15 | attached and you can see out the mirror. But as I |
| 13:43:33 | 16 | said before, we have such a shortage of vehicles or |
| 13:43:36 | 17 | even if the vehicle has to be driven down to the |
| 13:43:39 | 18 | garage for a repair, if they can safely get there |
| 13:43:39 | 19 | and the mirror is functional and can serve its |
| 13:43:42 | 20 | purpose even though it's broken, they can still |
| 13:43:44 | 21 | operate it. |
| 13:43:45 | 22 | BY MR. DAVENPORT: |
| 13:43:45 | 23 | Q. So besides driving that vehicle to the |

*Velez - Davenport - 02/26/2020*

214

| 13:43:48 | 1 | service garage, you would allow that officer to go |

13:43:48  1  service garage, you would allow that officer to go

13:43:53  2  out on patrol with a dislodged mirror?

13:43:53  3      A.   Again, it's situational.  If the mirror

13:43:55  4  is functional, it could be dislodged, it could even

13:43:56  5  be broken and still functioning.

13:43:59  6      Q.   Just so that I'm clear, what does

13:44:01  7  dislodged mean to you?

13:44:03  8      A.   That it's off track or broken off of

13:44:06  9  where it should be completely attached.

13:44:09  10     Q.   So does dislodged mean that -- well, in

13:44:15  11 specific to this mirror on car 473 on January 1st

13:44:19  12 of 2017, was it dislodged where it was angled

13:44:22  13 downward or upward or was it dislodged where it was

13:44:25  14 angled towards the car or away from the car?

13:44:28  15     MS. HUGGINS:  Form.

13:44:29  16     THE WITNESS:  I don't recall.

13:44:29  17     BY MR. DAVENPORT:

13:44:29  18     Q.   Okay.  Assuming that this mirror was

13:44:35  19 dislodged, would you agree that the view that a

13:44:41  20 driver would have out of that driver's side mirror

13:44:44  21 would be distorted?

13:44:46  22     A.   Depending --

13:44:46  23     MS. HUGGINS:  Form.  You can answer.

13:44:48   1        THE WITNESS:   It's depending on the way it

13:44:50   2   was dislodged, depending on how it was or as you

13:44:53   3   had described which angle it was at.

13:44:53   4        BY MR. DAVENPORT:

13:44:53   5        Q.   Would --

13:44:55   6        A.   Like I said, it could be dislodged and

13:44:58   7   still functioning.

13:44:59   8        Q.   Would any of the angles that I

13:45:02   9   discussed have a mirror that's dislodged where the

13:45:05  10   view would not be distorted for the driver?

13:45:08  11        MS. HUGGINS:   Form.

13:45:09  12        THE WITNESS:   It depends.

13:45:15  13        BY MR. DAVENPORT:

13:45:16  14        Q.   Assuming that a police officer has

13:45:20  15   reported to you that their mirror is dislodged on

13:45:23  16   their police vehicle, how long would you allow that

13:45:27  17   police officer to drive with a dislodged mirror?

13:45:29  18        MS. HUGGINS:   Form.   You can answer.

13:45:31  19        THE WITNESS:   If the garage is open, I would

13:45:33  20   prefer the vehicle be taken immediately down and

13:45:36  21   let's get this vehicle fixed in a reasonable amount

13:45:37  22   of time.

13:45:37  23        BY MR. DAVENPORT:

*Velez - Davenport - 02/26/2020*

13:45:39   1         Q.    When is the garage not open?

13:45:41   2         A.    Holidays, weekends, occasionally now

13:45:45   3    because we have such a shortage of vehicle, they

13:45:50   4    can be open on a Saturday, but typically regular

13:45:50   5    business hours Monday through Friday.

13:45:52   6         Q.    And regular business hours would refer

13:45:54   7    to 9:00 a.m. to 5:00 p.m.?

13:45:56   8         A.    Sometimes it's earlier.  I believe

13:45:58   9    sometimes the garage opens at 7, maybe 7, and I

13:46:02  10    don't recall how late they stay.

13:46:04  11         Q.    Okay.  Was there any reason to believe

13:46:07  12    that the garage was closed prior to January 5th of

13:46:11  13    2017 and after January 1st of 2017?

13:46:14  14         MS. HUGGINS:  Form.  You can answer.

13:46:15  15         THE WITNESS:  I don't know.

13:46:27  16         BY MR. DAVENPORT:

13:46:27  17         Q.    So I'm going to show you what has been

13:46:31  18    marked as Exhibit 17.  Do you recognize that

13:46:36  19    document?

13:46:36  20         A.    Yes.

13:46:37  21         Q.    Okay.  And what do you recognize it to

13:46:40  22    be?

13:46:40  23         A.    Information and complaint.

*Velez - Davenport - 02/26/2020*

217

| 13:46:42 | 1 | Q. Okay. Who was the criminal complainant |
| 13:46:50 | 2 | for this criminal complaint? |
| 13:46:52 | 3 | A. Can you repeat that? |
| 13:46:54 | 4 | Q. Who was the complainant for this |
| 13:46:57 | 5 | criminal complaint? |
| 13:46:58 | 6 | A. Officer McDermott. |
| 13:46:59 | 7 | Q. And why would she have been the |
| 13:47:03 | 8 | complainant for this criminal complaint? |
| 13:47:05 | 9 | A. She was the officer who was signing on |
| 13:47:07 | 10 | the charges. |
| 13:47:08 | 11 | Q. Would you expect that the officer |
| 13:47:10 | 12 | driving the vehicle would be the criminal |
| 13:47:13 | 13 | complainant in a situation that transpired on |
| 13:47:17 | 14 | January 1st of 2017? |
| 13:47:18 | 15 | A. The officer who had witnessed it. She |
| 13:47:23 | 16 | had witnessed it, so she signed on the charges. |
| 13:47:26 | 17 | Q. Okay. Now, reading underneath criminal |
| 13:47:33 | 18 | mischief, damages greater than $250, that's |
| 13:47:38 | 19 | referring to damages to the police vehicle car 473, |
| 13:47:44 | 20 | correct? |
| 13:47:44 | 21 | MS. HUGGINS:  Form. |
| 13:47:49 | 22 | THE WITNESS:  Yes. |
| 13:47:49 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

218

13:47:50  1          Q.    Okay.   And would it be safe to say that

13:47:57  2     that was -- strike that.

13:48:00  3          Let's look underneath criminal mischief in

13:48:06  4     the third degree in the middle of the page.  Do you

13:48:09  5     see that?   It's right underneath -- right after

13:48:12  6     145.05-2.

13:48:15  7          A.    Yes.

13:48:15  8          Q.    Okay.   So reading that first sentence,

13:48:18  9     in that the defendant while at 37 Schmarbeck did

13:48:23  10    with intent to damage the property of another

13:48:26  11    person, City of Buffalo's Police Department, and

13:48:29  12    having no right to do so nor any reasonable ground

13:48:34  13    to believe that he had such right did damage the

13:48:37  14    property.

13:48:38  15         Now, turning to that first line where it

13:48:43  16    says intent to damage, do you agree based off of

13:48:47  17    what you have now seen on the video surveillance

13:48:51  18    that was provided to you that Mr. Kistner intended

13:48:54  19    to damage the police vehicle?

13:48:56  20         MS. HUGGINS:   Form.

13:48:57  21         THE WITNESS:   Yes.

13:48:57  22         BY MR. DAVENPORT:

13:48:57  23         Q.    Okay.   And just so that way I'm clear

13:49:01   1   that's based on what you saw on the video, correct?

13:49:05   2        MS. HUGGINS:  Form.

13:49:05   3        THE WITNESS:  Again, I had two officers

13:49:07   4   describe to me and the video.  And based on that,

13:49:11   5   yes.

13:49:11   6        BY MR. DAVENPORT:

13:49:12   7        Q.  Well, I'm just asking specifically what

13:49:14   8   you saw on the video you still believe that

13:49:17   9   Mr. Kistner intended to damage the vehicle?

13:49:18  10        A.  Well, from --

13:49:18  11        MS. HUGGINS:  Form.

13:49:20  12        THE WITNESS:  -- the perspective of the

13:49:21  13   video it's very hard to see in my -- my view.

13:49:25  14        BY MR. DAVENPORT:

13:49:25  15        Q.  So it's hard to see, but based on what

13:49:28  16   you saw in the -- in the video, do you believe that

13:49:31  17   Mr. Kistner intended to damage the vehicle?

13:49:33  18        A.  I believe Mr. --

13:49:34  19        MS. HUGGINS:  Form.  Are you asking her

13:49:37  20   opinion of -- of the video?

13:49:37  21        MR. DAVENPORT:  Yes.

13:49:38  22        MS. HUGGINS:  -- after viewing it?

13:49:40  23        Form.  You can answer.

13:49:41  1        THE WITNESS:  Like I said, that perspective

13:49:44  2   of the video and from what I can see it's the

13:49:47  3   angle -- it's a difficult angle to see the

13:49:51  4   circumstance, but I believe, yes.

13:49:52  5        BY MR. DAVENPORT:

13:49:52  6        Q.   And that's based on what you saw in the

13:49:54  7   video, correct?

13:49:55  8        A.   Yes.

13:49:55  9        MS. HUGGINS:  Form.

13:49:57 10        MR. DAVENPORT:  Thank you.

13:50:00 11        I'm sorry.  Can we take a break really

13:50:03 12   quick.

13:50:03 13             (Discussion off the record at

13:50:03 14   1550.)

14:00:28 15             (On the record at 1400.)

14:00:28 16        BY MR. DAVENPORT:

14:00:32 17        Q.   So now, Ms. Velez, turning your

14:00:35 18   attention again to Exhibit 17.  It says on here

14:00:40 19   that in that the defendant did intentionally throw

14:00:44 20   his body into the driver's side mirror of patrol

14:00:48 21   vehicle under 473 causing the mirror to become

14:00:54 22   dislodged from the vehicle and also causing

14:00:55 23   the -- the defendant -- or also causing the

*Velez - Davenport - 02/26/2020*

221

| | | |
|---|---|---|
| 14:00:57 | 1 | driver's side window to malfunction; do you see |
| 14:01:00 | 2 | that? |
| 14:01:00 | 3 | A.    Yes. |
| 14:01:00 | 4 | Q.    Now, the driver's side window |
| 14:01:02 | 5 | malfunctioning, what do you recall about the |
| 14:01:06 | 6 | driver's side window malfunctioning? |
| 14:01:08 | 7 | A.    I recall -- I don't exactly remember at |
| 14:01:12 | 8 | what point during the process of transporting |
| 14:01:17 | 9 | Mr. Kistner when Officer McDermott went to roll her |
| 14:01:20 | 10 | window down. |
| 14:01:21 | 11 | I recall her trying to roll her window down |
| 14:01:23 | 12 | and, like I said, it made a noise and then it was |
| 14:01:26 | 13 | like hesitating to go down and up. |
| 14:01:29 | 14 | Q.    Okay.  Do you recall, would that have |
| 14:01:32 | 15 | been attempted at Schmarbeck? |
| 14:01:34 | 16 | A.    I don't recall if it was.  I know we |
| 14:01:40 | 17 | had -- I don't recall if it was when exactly we |
| 14:01:43 | 18 | were leaving Schmarbeck or to ECMC. |
| 14:01:50 | 19 | Q.    So when the incident initially happens, |
| 14:01:55 | 20 | the only information that you knew or that any of |
| 14:02:00 | 21 | the officers knew about damage to the vehicle |
| 14:02:03 | 22 | number 473 was that the mirror, driver's side |
| 14:02:06 | 23 | mirror was dislodged from the vehicle? |

*Velez - Davenport - 02/26/2020*

222

14:02:07   1       **MS. HUGGINS:**   Form.   You may answer.

14:02:09   2       **THE WITNESS:**   Pardon?

14:02:10   3       **BY MR. DAVENPORT:**

14:02:10   4       Q.   When the incident initially happens,

14:02:13   5   the only damage that you or any of the officers at

14:02:19   6   the scene knew was that the mirror was dislodged

14:02:23   7   from vehicle number 473?

14:02:25   8       A.   Correct.

14:02:25   9       Q.   Okay.   Now, on the second page of

14:02:28 10   Exhibit 17, was that criminal charge for disorderly

14:02:37 11   conduct?

14:02:37 12       A.   Yes, the violation disorderly conduct.

14:02:41 13       Q.   Okay.   So it's a violation.   Now, is

14:02:44 14   there any reason to include what the value of the

14:02:48 15   damage to the vehicle was in that criminal

14:02:52 16   complaint where it says the value of said damage to

14:02:52 17   exceed $250?

14:02:55 18       A.   This -- these are created by the report

14:02:59 19   technicians, so that could have just been part of

14:03:03 20   she's doing page 1, page 2.   I'm not certain.

14:03:08 21       Q.   Okay.   For the disorderly conduct, what

14:03:12 22   was that criminal charge for?   What -- what sort of

14:03:16 23   criminal conduct did Mr. Kistner do to deserve that

*Velez - Davenport - 02/26/2020*

223

14:03:16  1  criminal charge?

14:03:17  2       MS. HUGGINS:   Form.   You may answer.

14:03:20  3       THE WITNESS:   From what I recall, this

14:03:21  4  was -- the disorderly conduct was for his behavior

14:03:24  5  at the hospital, the disruption that he created.

14:03:27  6       BY MR. DAVENPORT:

14:03:28  7       Q.   Was any part of this criminal charge

14:03:31  8  due to any of the damage that Mr. Kistner caused to

14:03:35  9  the police vehicle number 473?

14:03:38 10       A.   Not that I could recall.   Again,

14:03:42 11  Officer McDermott signed on these charges, so --

14:03:44 12       Q.   Sure.   Have you ever charged somebody

14:03:47 13  with disorderly conduct, the violation section

14:03:51 14  24020, subsection three of the Penal Law of the

14:03:56 15  State of New York?

14:03:56 16       A.   Ever?

14:03:57 17       Q.   Yes.

14:03:58 18       A.   I don't recall specifics.

14:03:58 19       Q.   Okay.

14:04:00 20       A.   I may have.

14:04:01 21       Q.   Okay.   Are you familiar with that

14:04:03 22  statute?

14:04:04 23       A.   Yes.

*Velez - Davenport - 02/26/2020*

224

| | | |
|---|---|---|
| 14:04:04 | 1 | Q. Okay. If somebody intentionally threw |
| 14:04:09 | 2 | themselves at a police vehicle, would that be |
| 14:04:13 | 3 | conduct that would warrant a disorderly conduct |
| 14:04:17 | 4 | charge under this subsection? |
| 14:04:20 | 5 | A. On a patrol car? |
| 14:04:23 | 6 | Q. Yes. |
| 14:04:24 | 7 | A. It depends. Like it's -- it's |
| 14:04:28 | 8 | circumstantial. It depends on the totality of |
| 14:04:30 | 9 | where they are, how it happened, why they did it. |
| 14:04:33 | 10 | Q. So it's possible, then? |
| 14:04:35 | 11 | A. Possible. |
| 14:04:36 | 12 | Q. Okay. I'm going to show you what's |
| 14:04:48 | 13 | been marked as Exhibit 5. Do you recognize this |
| 14:04:54 | 14 | document? |
| 14:04:54 | 15 | A. I do. |
| 14:04:55 | 16 | Q. And what do you recognize it to be? |
| 14:04:57 | 17 | A. This is a police report. |
| 14:04:59 | 18 | Q. Okay. Is this referred to any -- by |
| 14:05:03 | 19 | any other names or identifications? |
| 14:05:06 | 20 | A. Yes, a P1375. |
| 14:05:09 | 21 | Q. Okay. Now, when would this P1375 |
| 14:05:16 | 22 | report have been filled out? |
| 14:05:20 | 23 | A. It could have been filled out -- I |

*Velez - Davenport - 02/26/2020*

225

14:05:23  1   don't know exactly when it was filled out, but it

14:05:26  2   would typically be done either during the booking

14:05:33  3   process.

14:05:33  4        While the RTs are completing their

14:05:33  5   paperwork, we could possibly fill out, because

14:05:35  6   there's a long form that goes with the -- the paper

14:05:38  7   version.  We would -- we can fill that out or

14:05:44  8   when -- if there's two officers while transporting,

14:05:46  9   we can do the paperwork.

14:05:48  10       Or upon completion of the arrest or the

14:05:51  11  disposition of whatever it was we can complete it

14:05:54  12  after.

14:05:54  13       Q.   When Mr. Kistner was at central

14:05:58  14  booking, did you know where he would be going next?

14:06:02  15       A.   Yes.

14:06:02  16       Q.   Where did you know that he was going

14:06:04  17  to?

14:06:04  18       A.   To ECMC.

14:06:07  19       Q.   At any point, did you and Ms. McDermott

14:06:12  20  discuss sending Mr. Kistner to jail as opposed to

14:06:17  21  ECMC?

14:06:17  22       A.   At central booking, I don't recall.

14:06:20  23  No, once we went to central booking, we knew that

14:06:25  1    he was going to go back at that point.

14:06:26  2              Q.    Okay.  So that would have been when you

14:06:29  3    arrived at central booking that you knew that he

14:06:33  4    was going to ECMC?

14:06:33  5              A.    Correct, we had already knew.

14:06:33  6              Q.    Okay.  Was that information conveyed to

14:06:36  7    any of the cellblock attendants?

14:06:38  8              A.    I don't recall.

14:06:39  9              Q.    Is it part of their job to ask where

14:06:42 10    that individual would be going next?

14:06:44 11              A.    They would have known, I believe, that

14:06:45 12    he was going to get an appearance ticket, but they

14:06:46 13    do their own checklist evaluation.

14:06:49 14              So I don't -- I don't know that we told them

14:06:54 15    that he was going to ECMC afterward.  I don't

14:06:57 16    recall.

14:06:57 17              Q.    Okay.  At what point do they ask you if

14:07:01 18    an individual is being given an appearance ticket?

14:07:04 19              MS. HUGGINS:  Cellblock attendants?

14:07:04 20              BY MR. DAVENPORT:

14:07:04 21              Q.    Cellblock attendants.

14:07:08 22              A.    I don't know that they ask.  I

14:07:11 23    don't -- I -- I can't recall them ever asking me

14:07:13  1  right now if they've ever, if we tell them.   I

14:07:17  2  don't -- honestly, I don't recall right now.

14:07:19  3       Q.    Okay.   Is it possible that this form

14:07:24  4  would have been filled out while you were at ECMC

14:07:27  5  the first time before going to central booking?

14:07:35  6       A.    This has to be entered in -- this, the

14:07:37  7  electronic has to be entered in the MCT.   So, no,

14:07:43  8  it wouldn't have been done at that time.

14:07:46  9       Q.    Is that entered at central booking?

14:07:46 10       A.    No, we can enter it either in our

14:07:47 11  patrol car or at the station house.

14:07:49 12       Q.    Okay.

14:07:51 13       A.    The written form obviously can be

14:07:54 14  completed anywhere, but for it it be entered

14:07:57 15  electronically, which is a requirement, we have to

14:08:00 16  have access to a computer.

14:08:02 17       Q.    Okay.

14:08:02 18       A.    But we wouldn't do this at central

14:08:06 19  booking and we wouldn't enter it at central

14:08:09 20  booking.

14:08:09 21       Q.    Is the information that's in written

14:08:10 22  form transcribed exactly as it appears on written

14:08:11 23  form to this P1375 document?

*Velez - Davenport - 02/26/2020*

228

14:08:15  1        A.    It should be, yes.

14:08:16  2        Q.    Okay.  And who does that transcription?

14:08:19  3        A.    The officer who was typing it in.  Like

14:08:23  4  Officer McDermott and I, when we ride together,

14:08:26  5  typically whoever is in the passenger's side,

14:08:27  6  because someone is driving, would do the writing

14:08:29  7  and the entering.

14:08:30  8        Q.    Okay.  So it's the officer who makes

14:08:33  9  the written document also puts it into electronic

14:08:37 10  form as well?

14:08:37 11        MS. HUGGINS:  Form.

14:08:38 12        THE WITNESS:  Not necessarily.

14:08:39 13        BY MR. DAVENPORT:

14:08:39 14        Q.    Okay.

14:08:39 15        A.    A report technician can enter it as

14:08:39 16  well.

14:08:39 17        Q.    Okay.

14:08:43 18        A.    Can take the written form and enter it

14:08:45 19  as well.

14:08:45 20        Q.    Okay.  So in your experience you have

14:08:48 21  done a written form and then handed it to a report

14:08:51 22  technician and then they've entered it into

14:08:54 23  electronic form?

*Velez - Davenport - 02/26/2020*

229

| | | |
|---|---|---|
| 14:08:55 | 1 | **A.**   Yes. |
| 14:08:55 | 2 | **Q.**   Okay.  Do you know if that was done on |
| 14:08:58 | 3 | this occasion on January 1st of 2017? |
| 14:09:00 | 4 | **A.**   I don't recall. |
| 14:09:00 | 5 | **Q.**   Okay.  Do you recall if either you or |
| 14:09:02 | 6 | Ms. McDermott filled out the written form for the |
| 14:09:06 | 7 | P1375 report? |
| 14:09:06 | 8 | **A.**   I filled out the written form. |
| 14:09:08 | 9 | **Q.**   You did.  Okay.  Did you also fill out |
| 14:09:11 | 10 | the electronic form? |
| 14:09:12 | 11 | **A.**   I don't recall. |
| 14:09:13 | 12 | **Q.**   Okay.  Would it have either been you, |
| 14:09:19 | 13 | Ms. McDermott, or the report technician? |
| 14:09:21 | 14 | **A.**   Correct. |
| 14:09:21 | 15 | **Q.**   Okay.  I'm going to show you what's |
| 14:09:40 | 16 | been marked as Exhibit 9.  Do you recognize this |
| 14:09:45 | 17 | document? |
| 14:09:46 | 18 | **A.**   Yes. |
| 14:09:46 | 19 | **Q.**   And what do you recognize it to be? |
| 14:09:48 | 20 | **A.**   The case history. |
| 14:09:52 | 21 | **Q.**   Now, which officer signed on this case |
| 14:09:57 | 22 | history form? |
| 14:09:59 | 23 | **A.**   This looks like Officer McDermott. |

*Velez - Davenport - 02/26/2020*

230

14:10:04  1        Q.   Do you have any recollection of you

14:10:07  2   signing this document?

14:10:08  3        A.   I do not.

14:10:08  4        Q.   Okay.  Do you see where your name is

14:10:12  5   listed on this form?

14:10:14  6        A.   I do.

14:10:14  7        Q.   Okay.  Do you see where it says

14:10:17  8   functions performed?

14:10:17  9        A.   Yes.

14:10:18 10        Q.   And it says assisted with investigation

14:10:20 11   and arrest and then 710.30; do you see that?

14:10:25 12        A.   Yes.

14:10:25 13        Q.   What does the 710.30 refer to?

14:10:29 14        A.   The statements that I documented on the

14:10:32 15   710.30.

14:10:34 16        Q.   Which officers are required to enter

14:10:38 17   statements on a 710.30?

14:10:39 18        A.   Any officer that has a statement that

14:10:42 19   needed to be documented.

14:10:44 20        Q.   Would it be expected that any of the

14:10:46 21   assisting officers would enter their statements on

14:10:50 22   a 710.30?

14:10:51 23        A.   If they had anything pertinent that the

*Velez - Davenport - 02/26/2020*

231

14:10:54  1    defendant said, they would have to have it on a

14:10:57  2    710.30.

14:10:58  3         Q.   Okay.  So what exactly does -- is a

14:11:03  4    710.30 used for?

14:11:04  5         MS. HUGGINS:  Form.  You can answer.

14:11:05  6         THE WITNESS:  It's used to assist with

14:11:09  7    substantiating charges or for the District Attorney

14:11:14  8    to see.  And even the defense attorney as well to

14:11:18  9    see what was said by their client or the defendant.

14:11:21 10    And it could also be used to substantiate charges.

14:11:26 11    Sometimes they say things that are incriminating.

14:11:30 12         BY MR. DAVENPORT:

14:11:30 13         Q.   Okay.  Would it ever be on a 710.30

14:11:33 14    what actions the individual did for their criminal

14:11:33 15    charges?

14:11:36 16         A.   Not necessary --

14:11:36 17         MS. HUGGINS:  Form.  You can answer.

14:11:37 18         THE WITNESS:  Not necessarily.  Sometimes I

14:11:40 19    have seen officers put in a little parenthesis it's

14:11:43 20    not a direct quote.  And then just maybe a behavior

14:11:47 21    that was done while the defendant was saying

14:11:50 22    something, like whether they were smacking

14:11:53 23    themselves in the face while yelling something.

*Velez - Davenport - 02/26/2020*

232

14:11:55  1  Like that would be an example of a 710.30 that

14:11:58  2  would have an action in parenthesis, but typically

14:12:01  3  it's a statement that's quoted.

14:12:01  4          BY MR. DAVENPORT:

14:12:03  5          Q.   Would it be expected that an officer

14:12:05  6  who witnessed an individual throw themselves

14:12:08  7  intentionally at a police vehicle would offer a

14:12:12  8  statement in a 710.30?

14:12:13  9          MS. HUGGINS:   Form.

14:12:13 10          THE WITNESS:   No.

14:12:14 11          BY MR. DAVENPORT:

14:12:14 12          Q.   No.   And why is that?

14:12:15 13          A.   Because it's a -- it's a question and

14:12:16 14  answer type of thing or something that a

14:12:18 15  spontaneous utterance that the defendant might say.

14:12:21 16          Q.   Okay.   So the 710.30s are more so for

14:12:27 17  verbal statements made by the individual.   I

14:12:30 18  understand that there are instances where physical

14:12:34 19  actions may be included, but it's mostly used for

14:12:37 20  verbal things said by the -- the criminal, I guess,

14:12:41 21  in this case?

14:12:41 22          A.   Correct.

14:12:42 23          Q.   Okay.   Okay.   And is it fair to say

*Velez - Davenport - 02/26/2020*

233

14:12:45  1   that no other officer offered a statement on a

14:12:48  2   710.30?

14:12:48  3          A.   Based on this case history, that's

14:12:51  4   correct.

14:12:51  5          Q.   Okay.  So I'm going to show you what's

14:13:08  6   been marked as Exhibit 20.  Do you recognize that

14:13:13  7   document?

14:13:13  8          A.   Yes.

14:13:14  9          Q.   And what do you recognize it to be?

14:13:16  10         A.   710.30.

14:13:17  11         Q.   Okay.  Do you see on there where it

14:13:23  12   says 710.30 and 700.70?

14:13:23  13         A.   Where are you?

14:13:32  14         Q.   On the right-hand side towards the top.

14:13:34  15         A.   The notice to defendant of intention to

14:13:42  16   offer evidence at trial?

14:13:42  17         THE REPORTER:  I'm sorry.  What was that?

14:13:42  18         THE WITNESS:  The notice to defendant of

14:13:42  19   intention to offer evidence at trial.

14:13:45  20         BY MR. DAVENPORT:

14:13:45  21         Q.   Do you see where after that it says

14:13:48  22   710.30 and 700.70?

14:13:51  23         A.   Yes.

14:13:52   1          Q.     What does a 700.70 refer to?

14:13:56   2          A.     Criminal procedural law.

14:13:57   3          Q.     What in the criminal procedural law

14:14:00   4    does that refer to?

14:14:00   5          A.     I'm not exactly sure.

14:14:02   6          Q.     And what under the criminal procedural

14:14:05   7    law does 710.30 refer to?

14:14:07   8          MS. HUGGINS:    Form.

14:14:08   9          THE WITNESS:    It's -- it's referring to the

14:14:10  10    statements made by the defendant.

14:14:11  11          BY MR. DAVENPORT:

14:14:11  12          Q.     Okay.   Do you know if 700.70 refers to

14:14:17  13    statements made by officers as well?

14:14:19  14          MS. HUGGINS:    Form.

14:14:19  15          THE WITNESS:    I can't recall at this time.

14:14:21  16          BY MR. DAVENPORT:

14:14:21  17          Q.     Okay.   Do you know why it's call -- you

14:14:23  18    call it a 710.30 as opposed to a 700.70?

14:14:29  19          A.     That's just how we refer to the

14:14:32  20    defendant statements, a 710.30.

14:14:34  21          Q.     Okay.   Now, at what time did you become

14:14:38  22    aware that Mr. Kistner was alleging that

14:14:42  23    Ms. McDermott had driven her police vehicle into

| | | |
|---|---|---|
| 14:14:48 | 1 | him as opposed to Mr. Kistner throwing himself at |
| 14:14:53 | 2 | the police vehicle? |
| 14:14:53 | 3 | A.    I don't remember the exact time. |
| 14:14:56 | 4 | Q.    Was it on Schmarbeck? |
| 14:14:58 | 5 | A.    I don't -- I don't recall anything |
| 14:15:01 | 6 | Mr. -- Mr. Kistner said on Schmarbeck.  If he said |
| 14:15:04 | 7 | anything, I don't recall. |
| 14:15:04 | 8 | Q.    Okay.  Do you recall, did Mr. Kistner |
| 14:15:08 | 9 | make his accusations while at ECMC? |
| 14:15:11 | 10 | A.    Not that I could recall. |
| 14:15:13 | 11 | Q.    Okay.  Did Mr. Kistner ever say that |
| 14:15:16 | 12 | Ms. McDermott struck him with the police vehicle as |
| 14:15:20 | 13 | opposed to him throwing himself at a police |
| 14:15:24 | 14 | vehicle? |
| 14:15:24 | 15 | A.    I'm sorry.  Can you say that again? |
| 14:15:25 | 16 | Q.    Did Mr. Kistner ever say with you being |
| 14:15:30 | 17 | present or you hearing that Ms. McDermott hit him |
| 14:15:31 | 18 | with the police vehicle rather than Mr. Kistner |
| 14:15:34 | 19 | throwing himself at the police vehicle? |
| 14:15:34 | 20 | A.    Not that I could recall. |
| 14:15:35 | 21 | Q.    No.  Okay.  Now, the statements that |
| 14:15:39 | 22 | are offered on a 710.30, do they all have to be |
| 14:15:42 | 23 | statements that you personally hear? |

*Velez - Davenport - 02/26/2020*

236

14:15:44   1        A.    Yes.

14:15:44   2        Q.    Okay.   Did Mr. Kistner make any

14:15:49   3   reference to Ms. McDermott striking him with the

14:15:52   4   police vehicle as opposed to him intentionally

14:15:58   5   throwing himself at the police vehicle?

14:16:00   6        A.    I don't recall him saying that

14:16:01   7   specifically.

14:16:01   8        Q.    Did Mr. Kistner at any time say that

14:16:05   9   the criminal charges against him were false?

14:16:07  10        A.    Not specifically.

14:16:10  11        Q.    Generally?

14:16:11  12        MS. HUGGINS:   Form.

14:16:13  13        THE WITNESS:   If you read in my 710s what he

14:16:16  14   said, he did say charge me criminal -- charge me

14:16:17  15   criminally to cover yourselves.   Again, as I said,

14:16:20  16   the reference to the lily white pussies, if you

14:16:23  17   keep telling your lies so wildly, someone might

14:16:27  18   believe you, but that was the extent of what he was

14:16:30  19   saying.

14:16:31  20        Like we're telling lies and charge me

14:16:33  21   criminally to cover yourselves, but I don't recall

14:16:36  22   him saying anything specifically about the nature

14:16:39  23   of the events that had transpired that morning.

*Velez - Davenport - 02/26/2020*

237

14:16:42  1      Q.   And were you present for those

14:16:44  2  statements made by Mr. Kistner?

14:16:45  3      A.   Yes, that's why I documented them.

14:16:47  4      Q.   Okay.  At any point did you ask

14:16:49  5  Mr. Kistner what he meant by charge me criminally

14:16:50  6  to cover yourselves?

14:16:50  7      A.   I did not.

14:16:51  8      Q.   At any time did you ask Mr. Kistner

14:16:54  9  what he meant by if you keep telling your lies so

14:16:55 10  wildly, someone might believe you?

14:16:57 11      A.   I did not.

14:16:58 12      Q.   Did you at any time ask him what he

14:17:01 13  meant by your story ain't going to fly?

14:17:10 14      A.   I did not.

14:17:10 15      Q.   At any time did you ask him what he

14:17:10 16  meant --

14:17:10 17      THE REPORTER:  You've got to slow down,

14:17:10 18  please.  Slow down.

14:17:10 19      BY MR. DAVENPORT:

14:17:14 20      Q.   At any time did you ask Mr. Kistner

14:17:14 21  what he meant by internal affairs is going to eat

14:17:18 22  your ass alive?

14:17:18 23      A.   I did not.

*Velez - Davenport - 02/26/2020*

238

| | | |
|---|---|---|
| 14:17:19 | 1 | Q.   At any time were you investigated by |
| 14:17:20 | 2 | internal affairs for the incident on January 1st of |
| 14:17:24 | 3 | 2017? |
| 14:17:24 | 4 | A.   Not that I know of. |
| 14:17:25 | 5 | Q.   Not that you know of? |
| 14:17:26 | 6 | A.   I -- I don't know what internal affairs |
| 14:17:29 | 7 | is doing.  I don't know.  I've never been notified. |
| 14:17:32 | 8 | Q.   Okay.  Have you ever been investigated |
| 14:17:35 | 9 | by internal affairs before? |
| 14:17:37 | 10 | A.   No. |
| 14:17:38 | 11 | Q.   Okay.  Have you ever had to explain |
| 14:17:40 | 12 | yourself to any superior officers about conduct |
| 14:17:44 | 13 | while working? |
| 14:17:45 | 14 | A.   No. |
| 14:17:45 | 15 | MS. HUGGINS:  Form.  You can answer. |
| 14:17:55 | 16 | BY MR. DAVENPORT: |
| 14:17:55 | 17 | Q.   Now, have you ever been accused by |
| 14:18:00 | 18 | anybody before of falsely arresting that |
| 14:18:03 | 19 | individual? |
| 14:18:04 | 20 | A.   Not that I can recall. |
| 14:18:06 | 21 | Q.   An individual has never told you before |
| 14:18:10 | 22 | that they did not believe that the criminal charges |
| 14:18:13 | 23 | or the criminal arrest was valid? |

*Velez - Davenport - 02/26/2020*

239

14:18:16   1          **MS. HUGGINS:**  Form.  You can answer.

14:18:19   2          **THE WITNESS:**  In the numerous encounters

14:18:22   3   I've had I'm sure there are people yell out that I

14:18:26   4   didn't do it, things of that nature, but I can't

14:18:29   5   recall anything specific at this time.

14:18:30   6          **BY MR. DAVENPORT:**

14:18:31   7          Q.   Okay.  So it's safe to say that this

14:18:33   8   doesn't happen often?

14:18:34   9          **MS. HUGGINS:**  Form.  Just the this, yeah.

14:18:38  10          **BY MR. DAVENPORT:**

14:18:39  11          Q.   Sure.  It's safe to say that it doesn't

14:18:41  12   happen often where somebody accuses you of falsely

14:18:47  13   arresting them?

14:18:47  14          **MS. HUGGINS:**  Form.  You can answer.

14:18:49  15          **THE WITNESS:**  In regards -- like can

14:18:50  16   you -- can you clarify that, be a little more

14:18:52  17   specific, please.

14:18:53  18          **BY MR. DAVENPORT:**

14:18:53  19          Q.   Sure.  An individual that you have

14:18:55  20   arrested has that -- have any individuals that you

14:18:59  21   have arrested claimed that you falsely arrested

14:19:01  22   them?

14:19:01  23          A.   Formally, I've had -- as I said before,

*Velez - Davenport - 02/26/2020*

240

| | | |
|---|---|---|
| 14:19:05 | 1 | at times we have encounters people are yelling I |
| 14:19:10 | 2 | didn't do it, things like that, you're getting the |
| 14:19:12 | 3 | wrong person.  Clearly we need probable cause, we |
| 14:19:13 | 4 | have to have sufficient amount of evidence to make |
| 14:19:14 | 5 | an arrest, so at the time we believe we have -- we |
| 14:19:18 | 6 | need to make an arrest and they yell that out, but |
| 14:19:21 | 7 | as far as being formally accused of false arrest, |
| 14:19:24 | 8 | not that I could recall. |
| 14:19:26 | 9 | Q.   I'm more so talking about informally. |
| 14:19:29 | 10 | During the actual arrest and investigation of that |
| 14:19:31 | 11 | person, you know, how often does it happen where, |
| 14:19:36 | 12 | you know, you're at the scene on that day arresting |
| 14:19:39 | 13 | somebody and that person accuses you of falsely |
| 14:19:42 | 14 | arresting them? |
| 14:19:43 | 15 | MS. HUGGINS:  Form.  Asked and answered. |
| 14:19:46 | 16 | THE WITNESS:  I -- I think I'm |
| 14:19:48 | 17 | misunderstanding.  It does happen often when people |
| 14:19:54 | 18 | yell out, not every single day or every single |
| 14:19:58 | 19 | arrest, but there are times when you arrest people |
| 14:20:01 | 20 | and they don't want to go to jail or they try to |
| 14:20:06 | 21 | deflect away and it's not me, you have the wrong |
| 14:20:07 | 22 | person, if that's what you're considering false |
| 14:20:08 | 23 | arrest.  I'm trying to understand. |

*Velez - Davenport - 02/26/2020*

241

14:20:11   1          BY MR. DAVENPORT:

14:20:11   2          Q.   Sure.   So those times where somebody

14:20:18   3   says that, you know, it wasn't me, do you ever ask

14:20:22   4   that person any follow-up questions why it could

14:20:25   5   have been somebody else?

14:20:27   6          A.   Well, at that --

14:20:27   7          MS. HUGGINS:   Form.

14:20:27   8          THE WITNESS:   At that point when we put

14:20:30   9   somebody in handcuffs and we place them under

14:20:32  10   arrest, we have probable cause to believe that they

14:20:35  11   did it, that they're the ones who committed that

14:20:38  12   crime.

14:20:39  13          BY MR. DAVENPORT:

14:20:39  14          Q.   Okay.   Has it ever happened where you

14:20:42  15   believe that you had probable cause and then later

14:20:44  16   determined that you did not actually have probable

14:20:45  17   cause for the arrest?

14:20:45  18          A.   Not that I could recall.

14:20:46  19          Q.   Okay.   Now, it says that Mr. Kistner

14:21:00  20   said spontaneously to you and Ms. McDermott, if you

14:21:05  21   keep telling your lies so wildly, someone might

14:21:08  22   believe you, your story ain't going to fly,

14:21:12  23   internal affairs is going to eat your ass alive.

*Velez - Davenport - 02/26/2020*

242

14:21:16  1          At any time did you and Ms. McDermott on the

14:21:18  2    day of the incident speak to each other about what

14:21:22  3    Mr. Kistner was referring to?

14:21:23  4          A.    Not that I could recall.

14:21:26  5          Q.    At any time that was not January 1st of

14:21:31  6    2017, did you and Ms. McDermott ever speak about

14:21:34  7    this incident involving Mr. Kistner on January 1st

14:21:38  8    of 2017?

14:21:38  9          A.    Yes.

14:21:39  10         Q.    Okay.  And when did you speak about it?

14:21:42  11         A.    We spoke when we received paperwork

14:21:45  12   about, you know, we're going through this.  And

14:21:50  13   then about scheduling, do you have to go in, you

14:21:54  14   know -- or, you know, as the process is going

14:21:55  15   along, we're new to the process, so when -- you

14:21:58  16   know, when are you going in, you know, just things

14:22:00  17   of that nature.

14:22:01  18         Q.    Would you and Ms. McDermott go

14:22:04  19   together?

14:22:04  20         A.    When?

14:22:05  21         Q.    Well, I'm sorry, let's -- what do you

14:22:08  22   refer -- what do you mean by when you say we are

14:22:10  23   going in for this process, when -- what does that

*Velez - Davenport - 02/26/2020*

243

14:22:14  1  refer to?

14:22:14  2       A.   To meet with our attorney.

14:22:16  3       Q.   Okay.  Would you and Ms. McDermott go

14:22:19  4  together?

14:22:19  5       MS. HUGGINS:  Form.

14:22:21  6       THE WITNESS:  I believe we may have

14:22:25  7  conferenced once or twice together.

14:22:26  8       BY MR. DAVENPORT:

14:22:26  9       Q.   Okay.

14:22:27  10       A.   I'm not certain.

14:22:28  11       Q.   Okay.  So when you guys are asking, are

14:22:32  12  you going in, it's not referring to, you know, a

14:22:35  13  carpooling situation or something like that, right?

14:22:38  14       A.   Correct.

14:22:38  15       Q.   Okay.  What is Ms. McDermott's current

14:22:47  16  roll in the Buffalo Police Department?

14:22:49  17       A.   She's a detective.

14:22:51  18       Q.   Is she a detective in the C District?

14:22:54  19       A.   No.

14:22:54  20       Q.   Okay.  Do you have any sort of a work

14:22:59  21  interaction with Ms. McDermott as a lieutenant of

14:23:02  22  the C District and her a detective in a separate

14:23:07  23  district?

*Velez - Davenport - 02/26/2020*

244

14:23:08  1        A.    I don't recall if we've had any cases

14:23:10  2   that overlapped in the district, not that I can

14:23:14  3   recall right now.   But if she would need

14:23:18  4   assistance, if one of her suspects were living in

14:23:21  5   my district, we may speak in regards to that, but

14:23:25  6   not that I could recall.

14:23:25  7        Q.    Okay.   Now, when you and Ms. McDermott

14:23:28  8   received the paperwork for this lawsuit, what did

14:23:31  9   you do next?

14:23:35 10        A.    I don't recall.

14:23:37 11        Q.    Did you speak with somebody in the

14:23:40 12   union about this lawsuit?

14:23:42 13        A.    No, not that I could recall.

14:23:45 14        Q.    Okay.   What did you do with that

14:23:47 15   paperwork?

14:23:54 16        A.    I did speak to the union.   I was

14:23:57 17   advised to take our paperwork up to corporation

14:24:01 18   counsel.

14:24:01 19        Q.    Okay.   Did you take that paperwork

14:24:03 20   personally?

14:24:04 21        A.    Yes.

14:24:04 22        Q.    Okay.   When you were handed that

14:24:06 23   paperwork, did you review the videos that were

*Velez - Davenport - 02/26/2020*

245

14:24:09  1    enclosed?

14:24:09  2         A.    Yes.

14:24:10  3         Q.    Did you review those on your own or did

14:24:14  4    you review them with the union representative?

14:24:17  5         A.    On my own.

14:24:18  6         Q.    And that would have been when you

14:24:20  7    initially received the paperwork?

14:24:22  8         A.    Yes.

14:24:23  9         Q.    Okay.   Did you contact Ms. McDermott

14:24:25 10    after watching the video?

14:24:29 11         A.    I know I contacted her as soon as I

14:24:32 12    received the packet for this -- the -- I don't know

14:24:37 13    whatever you want to call it, when I was served the

14:24:40 14    paperwork.   I don't specifically remember calling

14:24:43 15    her after watching the video.

14:24:47 16         Q.    When you did contact Ms. McDermott or

14:24:49 17    spoke with Ms. McDermott, did she say that she also

14:24:53 18    had watched the video?

14:24:57 19         A.    I don't recall.

14:25:00 20         Q.    Okay.   Did you speak with either Carl

14:25:03 21    Schulz or Kyle Moriarity about the paperwork when

14:25:08 22    you received the complaint?

14:25:09 23         A.    Yes.

*Velez - Davenport - 02/26/2020*

246

14:25:09    1          Q.    Okay.   At what point did you speak with
14:25:14    2   those individuals?
14:25:15    3          A.    I believe it was the same day that we
14:25:18    4   were served.
14:25:18    5          Q.    Okay.   Did you contact all of them
14:25:22    6   individually?
14:25:23    7          A.    Yes.
14:25:24    8          Q.    What did you all say about the
14:25:29    9   complaint?
14:25:29   10          MS. HUGGINS:   Form.
14:25:30   11          THE WITNESS:   I just -- it was so long ago.
14:25:33   12   I vaguely remember just saying, hey, I was just
14:25:37   13   served with this lawsuit.   I don't know if one is
14:25:40   14   coming to you, but we were all there for the
14:25:40   15   incident.
14:25:43   16          You know, let me know if, you know,
14:25:45   17   you -- you get paperwork as well.   And then I
14:25:47   18   remember them all responding I got -- I received
14:25:49   19   paperwork as well.
14:25:50   20          Q.    Okay.   Was that a phone conversation?
14:25:52   21          A.    Yes.
14:25:52   22          Q.    Okay.   No text messages?
14:25:55   23          A.    No.

*Velez - Davenport - 02/26/2020*

247

14:25:57   1        Q.   Okay.  With Ms. McDermott did you talk

14:26:00   2   about any of the contents of the complaint?

14:26:02   3        A.   Not that I could recall.

14:26:04   4        Q.   Any of the specific allegations that

14:26:06   5   were made?

14:26:06   6        A.   Not that I could recall.

14:26:08   7        Q.   Okay.  Do you know what the disposition

14:26:13   8   was of Mr. Kistner's criminal charges?

14:26:16   9        A.   No.

14:26:16   10        Q.   As you sit here today, you do not know?

14:26:19   11        A.   Well, I sat in for Officer McDermott's

14:26:23   12   deposition, I learned that day what had happened,

14:26:26   13   but at the time up until last week I had no idea.

14:26:29   14        Q.   Okay.  After receiving that initial

14:26:32   15   paperwork and aside from contacting Ms. McDermott

14:26:36   16   about whether you would be going to go speak with

14:26:39   17   your attorney, have you had any other conversations

14:26:43   18   with any of the other defendants?

14:26:45   19        MS. HUGGINS:   Form.

14:26:45   20        BY MR. DAVENPORT:

14:26:46   21        Q.   Outside of the presence of your

14:26:47   22   attorney?

14:26:47   23        A.   In regards --

*Velez - Davenport - 02/26/2020*

248

14:26:48  1          MS. HUGGINS:  Same form objection.  You can

14:26:51  2    answer.

14:26:51  3          THE WITNESS:  I'm sorry.  Can you repeat

14:26:53  4    that again?

14:26:53  5          BY MR. DAVENPORT:

14:26:54  6          Q.    Aside from conversations with the other

14:26:57  7    defendants the day that you received the paperwork

14:26:59  8    and aside from conversations that you had with

14:27:03  9    Ms. McDermott about times that you would have been

14:27:06 10    going to go meet with your attorney, have you had

14:27:09 11    any other conversations with any of the other

14:27:11 12    defendants who are named in this lawsuit?

14:27:13 13          A.    Regarding in general or regarding?

14:27:17 14          Q.    Regarding this complaint and lawsuit

14:27:19 15    specifically.

14:27:20 16          A.    Again, just with the scheduling.

14:27:22 17          Q.    Okay.  Are you aware that there was a

14:27:27 18    news report that was done on this incident?

14:27:28 19          A.    Yes.

14:27:29 20          Q.    Okay.  Did you contact any of the

14:27:31 21    officers to discuss that news report?

14:27:33 22          A.    To discuss it, no.

14:27:40 23          Q.    Okay.  Now, is there a signature

*Velez - Davenport - 02/26/2020*

249

| | | |
|---|---|---|
| 14:27:45 | 1 | page for this 710.30 form? |
| 14:27:48 | 2 | A. No. |
| 14:27:49 | 3 | Q. Okay. So officers aren't required to |
| 14:27:52 | 4 | sign off on these statements that are authored? |
| 14:27:58 | 5 | A. Excuse me. Can you repeat that? |
| 14:27:59 | 6 | Q. Officers aren't required to sign off on |
| 14:28:01 | 7 | a 710.30 form? |
| 14:28:01 | 8 | A. No. |
| 14:28:02 | 9 | Q. Okay. Did you ever receive any |
| 14:28:05 | 10 | training on how to fill out a 710.30 form? |
| 14:28:08 | 11 | A. In the academy. |
| 14:28:09 | 12 | Q. Which academy, the Buffalo? |
| 14:28:11 | 13 | A. The Erie County -- |
| 14:28:13 | 14 | Q. Okay. |
| 14:28:13 | 15 | A. -- training academy. |
| 14:28:15 | 16 | Q. And never with the Buffalo Police |
| 14:28:17 | 17 | Department? |
| 14:28:17 | 18 | A. Correct. |
| 14:28:19 | 19 | Q. Okay. |
| 14:28:19 | 20 | A. That I can recall. |
| 14:28:20 | 21 | Q. Okay. |
| 14:28:31 | 22 | MR. DAVENPORT: Can we mark this as |
| 14:28:34 | 23 | Exhibit 26. |

*Velez - Davenport - 02/26/2020*

250

14:28:34  1  The following was marked for Identification:

        2    EXH. 26               Arresting Report

14:29:09  3       BY MR. DAVENPORT:

14:29:10  4       Q.   I'm going to show you what's been

14:29:13  5  marked as Exhibit 26.  Do you recognize that

14:29:18  6  document?

14:29:18  7       A.   Yes.

14:29:19  8       Q.   And what do you recognize it to be?

14:29:21  9       A.   An arrest booking report.

14:29:23 10       Q.   Okay.  Who would have created the

14:29:25 11  arresting or booking report?

14:29:28 12       A.   I'm not certain if this is the report

14:29:30 13  technician or the cellblock attendant enters the

14:29:36 14  information for it.

14:29:36 15       Q.   But this would have been a document

14:29:40 16  that's created by somebody at central booking?

14:29:42 17       A.   Correct.

14:29:43 18       MS. HUGGINS:  Form.

14:29:43 19       BY MR. DAVENPORT:

14:29:44 20       Q.   Okay.

14:29:45 21       A.   I believe so.

14:29:45 22       Q.   Do you know an individual named

14:29:48 23  Christine Young?

*Velez - Davenport - 02/26/2020*

251

| | | |
|---|---|---|
| 14:29:49 | 1 | **A.** No. |
| 14:29:51 | 2 | **Q.** Is it possible that she was the report |
| 14:29:53 | 3 | technician at central booking on the day of the |
| 14:29:58 | 4 | incident? |
| 14:29:58 | 5 | **A.** I don't recognize that name at all. |
| 14:30:01 | 6 | **Q.** Okay. |
| 14:30:02 | 7 | **A.** She may be. I don't know who she is. |
| 14:30:04 | 8 | **Q.** Okay. You haven't come across her at |
| 14:30:08 | 9 | any point during your career? |
| 14:30:09 | 10 | **A.** Again, I don't recognize the name and I |
| 14:30:09 | 11 | can't put a face to it. So I may have, I'm just |
| 14:30:13 | 12 | not certain who that is right now. |
| 14:30:13 | 13 | **Q.** Okay. Now, when would this form have |
| 14:30:20 | 14 | been given to you? |
| 14:30:22 | 15 | **MS. HUGGINS:** Form. |
| 14:30:22 | 16 | **THE WITNESS:** I don't get this form. |
| 14:30:24 | 17 | **BY MR. DAVENPORT:** |
| 14:30:24 | 18 | **Q.** Okay. Who does central booking give |
| 14:30:30 | 19 | this form to? |
| 14:30:32 | 20 | **A.** I don't work down in central booking, |
| 14:30:36 | 21 | I'm not certain what their policies and procedures |
| 14:30:38 | 22 | are. |
| 14:30:52 | 23 | **MR. DAVENPORT:** Okay. Can I mark this as |

14:30:54   1    Exhibit 27.

14:30:54   2    **The following was marked for Identification:**

           3       **EXH. 27              Buffalo Police Department**

           4                            **Prisoner Property Receipt**

14:31:28   5              BY MR. DAVENPORT:

14:31:29   6         Q.   So I'm going to show you what's been

14:31:32   7    marked as Exhibit 27.  Do you recognize this

14:31:34   8    document?

14:31:36   9         A.   Yes.

14:31:36  10         Q.   Okay.  What do you recognize that to

14:31:38  11    be?

14:31:38  12         A.   A prisoner property receipt.

14:31:41  13         Q.   Okay.  Now, do you see underneath

14:31:43  14    property list where it says no property taken,

14:31:46  15    dash, appearance ticket?

14:31:47  16         A.   Yes.

14:31:48  17         Q.   Now, if it says, dash, appearance

14:31:53  18    ticket, does that mean he is being given an

14:31:56  19    appearance ticket?

14:31:59  20         A.   I don't recall this -- this specific

14:32:01  21    sheet, so I don't know what the -- and we don't

14:32:05  22    create this, again, so I don't know what the report

14:32:08  23    technician who put this on here why they did that,

14:32:13  1  I don't.

14:32:13  2          Q.   Okay.  All right.  So do you see where

14:32:17  3  it says prisoner signature and then it says CL and

14:32:20  4  it's circled?

14:32:21  5          A.   Uh-huh.

14:32:22  6          Q.   Do you know what that's referring to?

14:32:28  7          MS. HUGGINS:   You have to say yes or no.

14:32:30  8  She can't record a uh-huh.

14:32:30  9          THE WITNESS:   Oh, no, I'm thinking.  I'm

14:32:30  10 sorry.

14:32:35  11         MS. HUGGINS:   Yeah, no, the last question.

14:32:36  12         THE WITNESS:   Oh, I'm sorry, what was the

14:32:39  13 last question.

14:32:39  14         MS. HUGGINS:   Just so it's clearly on the

14:32:41  15 record.

14:32:41  16         THE WITNESS:   Can you repeat what the last

14:32:44  17 question was?

14:32:44  18         BY MR. DAVENPORT:

14:32:45  19         Q.   Yeah, sure.  So do you see prisoner

14:32:48  20 signature in the bottom left corner?

14:32:50  21         A.   Yes.

14:32:50  22         Q.   Okay.  Do you see where it says CL with

14:32:53  23 a circle?

*Velez - Davenport - 02/26/2020*

254

14:32:53   1          A.    Yes.

14:32:54   2          Q.    Do you know what that's referring to?

14:32:58   3          A.    As I said earlier, it could possibly

14:33:02   4   mean that he was cuffed for the signature -- or

14:33:06   5   I -- honestly, I don't know.

14:33:06   6          Q.    Okay.  Do you see where it says

14:33:08   7   property received time 1600?

14:33:11   8          A.    Yes.

14:33:12   9          Q.    Now, does that mean that he was issued

14:33:16  10   an appearance ticket at 1600?

14:33:22  11          A.    Again, I didn't write this time on

14:33:25  12   here.  I don't know exactly what -- it says

14:33:28  13   property received at 1600.

14:33:30  14          Q.    So I understand that you've never

14:33:32  15   created one of these documents, but have you ever

14:33:35  16   seen one of them before?

14:33:36  17          A.    Not the typed.

14:33:38  18          Q.    Okay.  How does it typically appear to

14:33:41  19   you, then?

14:33:41  20          A.    Written.

14:33:43  21          Q.    Okay.  And who handwrites that?

14:33:43  22          A.    The report technician.

14:33:45  23          Q.    And have you ever been handed a

*Velez - Davenport - 02/26/2020*

255

14:33:46  1 │ handwritten property receipt form before?

14:33:48  2 │        A.    We give it to the defendant.

14:33:50  3 │        Q.    You give it to the defendant?

14:33:52  4 │        A.    Correct, they give it to us and we give

14:33:55  5 │ it to the defendant and they take it back with

14:33:56  6 │ them.  It stays with them the whole time, because

14:34:00  7 │ that's how they get their property back.

14:34:00  8 │        Q.    Okay.  So that would have been

14:34:01  9 │ something that would have been given to Mr. Kistner

14:34:01 10 │ with his appearance ticket?

14:34:03 11 │        A.    Correct.

14:34:04 12 │        Q.    Okay.  Are there any --

14:34:06 13 │        A.    If one was created for him, because,

14:34:09 14 │ like I said, I don't know what this is.

14:34:11 15 │        Q.    Are there any other documents that an

14:34:14 16 │ individual who's receiving an appearance ticket

14:34:14 17 │ would receive besides a prisoner's property

14:34:19 18 │ receipt?

14:34:19 19 │        MS. HUGGINS:  Form.  You may answer.

14:34:20 20 │        THE WITNESS:  Not that I could recall.

14:34:23 21 │        BY MR. DAVENPORT:

14:34:23 22 │        Q.    Okay.  I'm going to show you what's

14:34:38 23 │ been marked as Exhibit 15.  Do you recognize that

14:34:46  1  document?

14:34:46  2       A.    Yes.

14:34:47  3       Q.    Okay.   What do you recognize that to

14:34:49  4  be?

14:34:49  5       A.    The arrest form.

14:34:50  6       Q.    Okay.   And that was the P163 that you

14:34:54  7  referred to before?

14:34:55  8       A.    Yes.

14:34:56  9       Q.    Okay.   Is this the handwritten form

14:35:01 10  that would be transferred into a 1375 report?

14:35:06 11       A.    No.

14:35:06 12       Q.    Okay.   So those are different?

14:35:08 13       A.    Yes.

14:35:09 14       Q.    Is the P163 changed into an electronic

14:35:15 15  form?

14:35:17 16       A.    I'm not certain.

14:35:19 17       Q.    Okay.   Who would fill out the

14:35:23 18  handwritten P163 form?

14:35:26 19       A.    The arresting officer.

14:35:27 20       Q.    Okay.   So that would have been

14:35:30 21  Ms. McDermott?

14:35:30 22       A.    Correct.

14:35:30 23       Q.    Okay.   Now, where it says the

14:35:36  1   processing report technician, would that be the

14:35:40  2   person at central booking?

14:35:44  3         A.   Yes.

14:35:45  4         Q.   Okay.  Do you know whose signature that

14:35:50  5   is?

14:35:50  6         A.   I do not.

14:35:51  7         Q.   Okay.  Now, would this be a form that

14:35:58  8   either you or Ms. McDermott would have filled out

14:36:01  9   at central booking?

14:36:03 10         A.   It could have been filled out at

14:36:05 11   central booking.

14:36:06 12         Q.   Okay.  Would it be handed to the report

14:36:09 13   technician at central booking?

14:36:11 14         A.   Yes.

14:36:12 15         Q.   Okay.  Would this form ever be handed

14:36:14 16   to Mr. Kistner?

14:36:16 17         A.   No.

14:36:16 18         Q.   Okay.  So he would never have a chance

14:36:20 19   to see this document on the day of his arrest?

14:36:22 20         A.   No.

14:36:32 21         Q.   Now, where it says the complainant's

14:36:35 22   name is SONY, what does that refer to?

14:36:40 23         A.   State of New -- State of New York.

*Velez - Davenport - 02/26/2020*

258

14:36:41   1          Q.    Okay.   Why wouldn't Ms. McDermott's
14:36:45   2   name be listed as the complainant?
14:36:48   3          A.    It's just a procedural thing we do.   We
14:36:51   4   work on -- our charges are filed on behalf of the
14:36:54   5   State of New York.
14:36:54   6          Q.    Okay.   Where it says use of force,
14:37:01   7   that's checked no, correct?
14:37:02   8          A.    Yes.
14:37:04   9          Q.    So would striking an individual with a
14:37:10  10   car be considered a use of force?
14:37:13  11          MS. HUGGINS:   Form.   You can answer.
14:37:14  12          THE WITNESS:   That would depend on the
14:37:18  13   circumstance in which a vehicle struck an
14:37:18  14   individual.
14:37:21  15          BY MR. DAVENPORT:
14:37:21  16          Q.    Is it possible?
14:37:23  17          A.    Pardon?
14:37:23  18          Q.    Is it possible that a use of force
14:37:27  19   could include striking an individual with a police
14:37:29  20   car?
14:37:29  21          MS. HUGGINS:   Form.   You can answer.
14:37:30  22          THE WITNESS:   If a person was intentionally
14:37:31  23   struck with a police vehicle, yes.

14:37:33  1          BY MR. DAVENPORT:

14:37:33  2          Q.   What if that individual was negligently

14:37:38  3  struck by a police vehicle?

14:37:39  4          MS. HUGGINS:   Form.

14:37:39  5          THE WITNESS:   Then that wouldn't be

14:37:41  6  considered -- I don't believe that would be

14:37:42  7  considered a use of force.

14:37:44  8          MR. DAVENPORT:   Okay.   I'm going to show you

14:38:16  9  what's been marked as Exhibit 13.   And then I would

14:38:24 10  like to mark this as Exhibit 28.

14:38:24 11  **The following was marked for Identification:**

         12  **EXH. 28                Department of Law Letter**

         13                          **dated 12/17/19**

14:39:10 14          BY MR. DAVENPORT:

14:39:10 15          Q.   I'm going to also show you what's been

14:39:14 16  marked as Exhibit 28.   Now, on Exhibit 13 would you

14:39:18 17  please turn to page 13?

14:39:20 18          Now, question 19 asks identify the badge or

14:39:37 19  identification number, rank, or title, and height

14:39:41 20  and weight of all defendants shown in the video

14:39:44 21  attached as Exhibit A to the complaint as of

14:39:48 22  January 1st, 2017.

14:39:51 23          Now, I would also like you to turn to

*Velez - Davenport - 02/26/2020*

260

14:39:56  1    page 16 on Exhibit 13.  What is the date that's

14:40:07  2    listed on page 16?

14:40:09  3         A.   December 12th, 2018.

14:40:12  4         Q.   Okay.  I want to now direct your

14:40:15  5    attention to Exhibit 28.  Now, in response to the

14:40:21  6    question that was posed on page 13 of Exhibit 13

14:40:26  7    it's the same question, identify the badge or

14:40:29  8    identification number, rank, or title, and height

14:40:33  9    and weight of all defendants shown in the video

14:40:36  10   attached as Exhibit A to the complaint as of

14:40:39  11   January 1st of 2017.

14:40:40  12        Now, the second to last sentence says that

14:40:44  13   Jenny Velez was promoted to lieutenant on July 2nd

14:40:49  14   of 2018.  Now, I want you to again look at

14:40:53  15   response 19 on Exhibit 13 and tell me do you see

14:40:57  16   that information anywhere in response to

14:41:01  17   interrogatory 19?

14:41:02  18        MS. HUGGINS:  Form.

14:41:07  19        BY MR. DAVENPORT:

14:41:08  20        Q.   Exhibit 13, page 19, do you see Jenny

14:41:12  21   Velez?

14:41:13  22        A.   Page 13, 19.  Okay.  Slow it down for

14:41:14  23   me, because this is a lot of words everywhere.

*Velez - Davenport - 02/26/2020*

261

| | | |
|---|---|---|
| 14:41:17 | 1 | So page 13, 19, I see this.  Now, what are |
| 14:41:23 | 2 | you asking me in regards to the other page? |
| 14:41:25 | 3 | Q.   Okay.  I want you to look on Exhibit 28 |
| 14:41:30 | 4 | and tell me do you see the line that says Jenny |
| 14:41:32 | 5 | Velez was promoted to lieutenant on July 2nd of |
| 14:41:36 | 6 | 2018? |
| 14:41:36 | 7 | A.   Yes. |
| 14:41:36 | 8 | Q.   Do you see that? |
| 14:41:37 | 9 | A.   Yes. |
| 14:41:37 | 10 | Q.   Okay.  Now, I want you to look at |
| 14:41:41 | 11 | Exhibit 13, response number 19. |
| 14:41:43 | 12 | A.   Uh-huh, yes. |
| 14:41:44 | 13 | Q.   And I want you to tell me do you see |
| 14:41:47 | 14 | that information as it's written on Exhibit 28 |
| 14:41:49 | 15 | anywhere on Exhibit 13? |
| 14:41:52 | 16 | MS. HUGGINS:  Form. |
| 14:41:55 | 17 | THE WITNESS:  The line that says Jenny Velez |
| 14:41:57 | 18 | was promoted to lieutenant on July 2nd, 2018 is not |
| 14:42:01 | 19 | on page 13. |
| 14:42:02 | 20 | BY MR. DAVENPORT: |
| 14:42:03 | 21 | Q.   Thank you.  Now, turning back towards |
| 14:42:06 | 22 | Exhibit 28, what is the date of this letter? |
| 14:42:12 | 23 | A.   December 17th, 2019. |

14:42:15  1          Q.    And as you stated before, the date on

14:42:19  2   Exhibit 13 is December 12th of 2018.

14:42:26  3          A.    Yes.

14:42:26  4          Q.    So this correction would have been made

14:42:30  5   more than a year after Exhibit 13 had been put

14:42:33  6   together, correct?

14:42:35  7          MS. HUGGINS:   Form.

14:42:38  8          THE WITNESS:   This is dated December 12th,

14:42:41  9   2018.   And this one is dated December 17th, 2019.

14:42:45 10          BY MR. DAVENPORT:

14:42:45 11          Q.    So you agree that would have been more

14:42:45 12   than a year?

14:42:45 13          MS. HUGGINS:   Form.

14:42:47 14          THE WITNESS:   The difference between the two

14:42:48 15   dates is more than a year.

14:42:51 16          BY MR. DAVENPORT:

14:42:51 17          Q.    Okay.   So I guess my question is, if

14:42:54 18   you were promoted on July 2nd of 2018, which is

14:42:57 19   before the date of Exhibit 13, which is

14:43:00 20   December 12th of 2018, why did you not include that

14:43:04 21   information for the question that was posed to you

14:43:09 22   in this interrogatory on Exhibit 13?

14:43:12 23          MS. HUGGINS:   Form.

*Velez - Davenport - 02/26/2020*

263

14:43:13  1        THE WITNESS:  I don't understand the

14:43:14  2  question.

14:43:14  3        BY MR. DAVENPORT:

14:43:15  4        Q.   You were promoted on July 2nd of 2018,

14:43:18  5  correct?

14:43:18  6        A.   Yes.

14:43:18  7        Q.   Okay.  And the date of Exhibit 13 is

14:43:22  8  December 12th of 2018?

14:43:25  9        A.   Yes.

14:43:25 10        Q.   And December 12th, 2018 would have been

14:43:28 11  after you were promoted on July 2nd of 2018?

14:43:31 12        MS. HUGGINS:  Form.

14:43:32 13        THE WITNESS:  I was promoted after.  Yeah, I

14:43:37 14  was -- this was done after I was promoted.

14:43:39 15        BY MR. DAVENPORT:

14:43:39 16        Q.   Okay.

14:43:40 17        A.   It's dated after I was promoted anyway.

14:43:42 18        Q.   So why on the document that was created

14:43:45 19  or dated on December 12th of 2018 was the

14:43:48 20  information that's on Exhibit 28 not included in

14:43:52 21  the response on Exhibit 13?

14:43:55 22        MS. HUGGINS:  Form.

14:43:56 23        THE WITNESS:  It -- it seems to be an error,

14:43:58  1  because on January 1, 2017 I was a patrol officer,

14:44:01  2  not a lieutenant.  So it appears that this is just

14:44:07  3  articulating that at the time of the incident I was

14:44:07  4  a patrol officer, not a lieutenant.

14:44:08  5          So this was entered in error, so it's just

14:44:11  6  correcting the fact that I was promoted to

14:44:14  7  lieutenant after the date of the incident after 1/1

14:44:17  8  of 7 -- 2017.

14:44:17  9          BY MR. DAVENPORT:

14:44:17 10          Q.   Did you review the responses on

14:44:20 11  Exhibit 13 before they were signed by your

14:44:22 12  attorney?

14:44:23 13          A.   I believe I did read this.

14:44:26 14          Q.   Did you review it before December 12th

14:44:29 15  of 2018?

14:44:29 16          MS. HUGGINS:   Form.

14:44:31 17          THE WITNESS:   I don't recall the exact date.

14:44:34 18  There's a lot of writing, it may have been an

14:44:37 19  oversight.  I'm not certain.

14:44:38 20          BY MR. DAVENPORT:

14:44:39 21          Q.   Okay.  At any point were you asked for

14:44:43 22  a verification for any sort of documents, were you

14:44:50 23  ever asked for a verification?

*Velez - Davenport - 02/26/2020*

265

14:44:52  1          MS. HUGGINS:  Form.

14:44:52  2          THE WITNESS:  That's vague.  What kind of

14:44:55  3  document?

14:44:55  4          BY MR. DAVENPORT:

14:44:56  5          Q.  Here, I'll show you.

14:45:08  6          MS. HUGGINS:  She has it in front of her

14:45:12  7  right now.

14:45:13  8          MR. DAVENPORT:  No, she doesn't have her

14:45:16  9  verification.

14:45:16 10          MS. HUGGINS:  Oh, I'm sorry, I thought you

14:45:19 11  were referring to the interrogator.

14:45:21 12          MR. DAVENPORT:  Can I have this marked as

14:45:23 13  Exhibit 29.

14:45:23 14  **The following was marked for Identification:**

         15  **EXH. 29              Verification Document**

14:45:30 16          MR. DAVENPORT:  And, also, it's 2:45, I

14:45:32 17  don't know if you guys want to take a break or not.

14:45:34 18          MS. HUGGINS:  Let's do that.

14:45:34 19                  (Discussion off the record at

14:45:34 20  1445.)

15:07:47 21                  (On the record at 1507.)

15:07:47 22          BY MR. DAVENPORT:

15:07:49 23          Q.  So, Ms. Velez, we were reviewing

15:07:53  1    Exhibit 28 and Exhibit 13.  I will now show you

15:07:59  2    what has been marked as Exhibit 29.  Do you

15:08:06  3    recognize that document?

15:08:07  4         A.   Yes.

15:08:08  5         Q.   And what do you recognize it to be?

15:08:10  6         A.   I believe it's the back page to this

15:08:14  7    when I signed that I reviewed this.

15:08:15  8         Q.   Okay.  Do you know approximately when

15:08:17  9    you signed this document?

15:08:18 10         MS. HUGGINS:   Form.

15:08:19 11         THE WITNESS:   No.

15:08:20 12         BY MR. DAVENPORT:

15:08:20 13         Q.   Okay.  Would it have been

15:08:23 14    in -- recently?

15:08:25 15         A.   I don't recall.

15:08:27 16         Q.   Would it have been within the last

15:08:29 17    year?

15:08:29 18         A.   Yes.

15:08:30 19         Q.   Okay.

15:08:31 20         A.   I believe so.  I -- I recall going

15:08:36 21    through this page by page.  I recall doing this, I

15:08:40 22    just don't recall when.

15:08:41 23         Q.   Okay.  Did you sign this document at

15:08:45   1   the same day that you went through this Exhibit 13

15:08:47   2   page by page?

15:08:48   3       MS. HUGGINS:   Form.   Well, I'm going to

15:08:52   4   object, because I think that you're very close if

15:08:56   5   not over the line of attorney/client.

15:08:58   6       Without revealing discussions that you and I

15:09:01   7   may have had, have you met with me to discuss the

15:09:03   8   incident that is the subject of this lawsuit?

15:09:06   9       MR. DAVENPORT:   Well, no, that wasn't my

15:09:08  10   question.

15:09:08  11       MS. HUGGINS:   No.

15:09:08  12       MR. DAVENPORT:   You're mischaracterizing my

15:09:11  13   question entirely.   I just asked her did you sign

15:09:14  14   this document on the same day that you went through

15:09:17  15   Exhibit 13.

15:09:18  16       MS. HUGGINS:   Form.   I -- I believe that you

15:09:22  17   may have even crossed the line into attorney/client

15:09:26  18   privilege.   If not, you are up -- up against that

15:09:27  19   line right now.

15:09:28  20       MR. DAVENPORT:   Okay.

15:09:29  21       MS. HUGGINS:   What -- what was I going to

15:09:33  22   inquire of my client without revealing or waiving

15:09:39  23   that privilege is if legal documents were prepared,

15:09:44  1    if she's had conversations with me, and if she has

15:09:48  2    reviewed those documents and signed off on them.

15:09:52  3         I believe that's what you're trying to do,

15:09:54  4    but at -- at this point you have gotten to a point

15:09:54  5    where you're asking about when certain things were

15:09:58  6    done, who clearly she has not signed her name to,

15:10:01  7    which would be Exhibit 28, and that is a document

15:10:03  8    that I signed my name to -- to as an attorney in

15:10:05  9    this matter.

15:10:06  10        And I think that you veered towards

15:10:09  11   attorney/client privilege in a way that is not

15:10:12  12   necessary and not discoverable in this matter.

15:10:16  13        MR. DAVENPORT:  Are you going to direct her

15:10:18  14   to not answer the question?

15:10:20  15        MS. HUGGINS:  I think what you're trying to

15:10:21  16   ask is did you look at -- did you read a document

15:10:23  17   before you signed a verification page.

15:10:25  18        That is fine.  I'm perfectly okay with that,

15:10:28  19   but I'm not okay with you continuing to ask

15:10:32  20   questions about meeting about the content of

15:10:35  21   documents when an attorney is involved and present

15:10:35  22   for it.

15:10:39  23        MR. DAVENPORT:  Didn't ask about that.  I

*Velez - Davenport - 02/26/2020*

269

| | | |
|---|---|---|
| 15:10:40 | 1 | asked did she -- |
| 15:10:40 | 2 | MS. HUGGINS:  I respectfully disagree and I |
| 15:10:43 | 3 | think the record will reflect what you've asked. |
| 15:10:45 | 4 | And -- and so at this point I'm -- I'll -- I'm |
| 15:10:50 | 5 | willing to allow her to ask questions about the |
| 15:10:50 | 6 | verification page and what she reviewed before she |
| 15:10:56 | 7 | signed that, but I'm not willing to allow her to |
| 15:10:58 | 8 | ask questions -- or answer questions with regard to |
| 15:11:02 | 9 | documents that were prepared in conjunction with |
| 15:11:05 | 10 | her attorney during the course of representation in |
| 15:11:09 | 11 | this case. |
| 15:11:09 | 12 | BY MR. DAVENPORT: |
| 15:11:09 | 13 | Q.   Would you agree that what is written in |
| 15:11:12 | 14 | the interrogatories were -- was provided to us? |
| 15:11:14 | 15 | MS. HUGGINS:  Okay.  This is not my |
| 15:11:18 | 16 | deposition. |
| 15:11:19 | 17 | MR. DAVENPORT:  That's correct, but you are |
| 15:11:20 | 18 | intruding on my deposition right now. |
| 15:11:20 | 19 | MS. HUGGINS:  No, I am making a record, |
| 15:11:25 | 20 | because I believe that you have now veered into |
| 15:11:28 | 21 | privileged matter. |
| 15:11:29 | 22 | I'm permitted to do so in a deposition. |
| 15:11:32 | 23 | MR. DAVENPORT:  You are absolutely |

*Velez - Davenport - 02/26/2020*

270

15:11:33  1  privileged to do so.  You are also privileged to

15:11:37  2  tell your client to not answer the questions that

15:11:38  3  I've asked, which it seems that you are veering

15:11:41  4  towards doing.

15:11:41  5      Just know that if you obstruct my

15:11:45  6  deposition, you, your clients, the City of Buffalo,

15:11:49  7  will be responsible for bringing this individual

15:11:51  8  back to testify.

15:11:53  9      So, Ms. Velez, I would assume that you do

15:11:57 10  not want to come back --

15:11:57 11          MS. HUGGINS:  No.

15:11:59 12          MR. DAVENPORT:  -- for a deposition to do

15:12:00 13  so.

15:12:00 14          MS. HUGGINS:  No, no, no, no, we're

15:12:02 15  not -- we're not going to continue this way.  Okay?

15:12:04 16          MR. DAVENPORT:  Okay.

15:12:04 17          MS. HUGGINS:  She is -- she is going to

15:12:06 18  answer questions that are proper deposition

15:12:10 19  questions, but if a question asks about

15:12:14 20  attorney/client privilege, I'm going to invoke that

15:12:17 21  and she is not going to answer those questions.

15:12:21 22      Now, I -- I have no problem with you asking

15:12:24 23  her if she reviewed documentation before she signed

*Velez - Davenport - 02/26/2020*

271

15:12:28  1    a verification page, but you're not going to go

15:12:32  2    into what was -- when and where and who and what

15:12:35  3    was discussed during meetings with her attorney.

15:12:36  4    She -- you're not going to do that and I'm going to

15:12:36  5    invoke privilege for that -- those questions.

15:12:36  6        **BY MR. DAVENPORT:**

15:12:39  7        Q.    Okay.   I haven't asked her a single

15:12:40  8    question about what was said to you during her

15:12:42  9    meeting, so I'm going to continue asking you,

15:12:46  10   Ms. Velez, when approximately did you sign this

15:12:49  11   verification page?

15:12:49  12       A.    I don't recall the exact date.

15:12:50  13       Q.    Okay.   Would it have been roughly

15:12:55  14   around December of 2019?

15:12:57  15       A.    I don't recall.

15:12:58  16       Q.    Okay.   When you signed this

15:13:03  17   verification page, did you review the responses in

15:13:07  18   Exhibit 13?

15:13:08  19       A.    I did read this packet.

15:13:11  20       Q.    Okay.   So when you reviewed the

15:13:18  21   responses in Exhibit 13, did you notice any

15:13:22  22   responses that you wished to amend or change?

15:13:25  23       A.    I was not -- at this time the one that

*Velez - Davenport - 02/26/2020*

272

15:13:29   1   was brought to my attention is the one where it

15:13:31   2   says that I held the rank of lieutenant on

15:13:34   3   January 1, 2017, because I did not.

15:13:36   4        Q.   Okay.  So prior to December of 2018,

15:13:46   5   did you review the response to Exhibit 19 -- or

15:13:50   6   question 19?

15:13:51   7        A.   I don't recall the exact date.

15:13:53   8        Q.   Was it more than a year ago that you

15:13:59   9   would have reviewed this document and reviewed the

15:14:03  10   response to question 19?

15:14:06  11        A.   Again, I don't remember the exact date.

15:14:11  12   I don't believe it was more than a year, but I

15:14:14  13   don't recall the exact date.  If it's the date

15:14:18  14   dated, I don't recall.

15:14:18  15        Q.   Okay.  Did you review these responses

15:14:25  16   before you signed your verification?

15:14:28  17        A.   I believe so.

15:14:29  18        Q.   Okay.  Did you review them more than

15:14:33  19   one time before you signed this verification?

15:14:36  20        A.   I don't recall.

15:14:37  21        Q.   Okay.  When you reviewed your response

15:14:43  22   to number 19, did you contact your attorney to tell

15:14:48  23   her that you did not agree with the response to

*Velez - Davenport - 02/26/2020*

273

| | | |
|---|---|---|
| 15:14:53 | 1 | number 19? |
| 15:14:54 | 2 | MS. HUGGINS:  Form.  And, again, you just |
| 15:14:54 | 3 | asked what she told her attorney, it's |
| 15:14:54 | 4 | attorney/client. |
| 15:14:56 | 5 | MR. DAVENPORT:  I asked did she contact her, |
| 15:14:58 | 6 | did she contact you. |
| 15:14:58 | 7 | MS. HUGGINS:  Form. |
| 15:15:00 | 8 | MR. DAVENPORT:  I just want to know how that |
| 15:15:03 | 9 | amendment was made? |
| 15:15:04 | 10 | MS. HUGGINS:  No, you are -- |
| 15:15:05 | 11 | MR. DAVENPORT:  You're misconstruing my |
| 15:15:08 | 12 | questions and you're obstructing -- |
| 15:15:08 | 13 | MS. HUGGINS:  No. |
| 15:15:08 | 14 | MR. DAVENPORT:  -- right now in my |
| 15:15:08 | 15 | deposition. |
| 15:15:09 | 16 | MS. HUGGINS:  No, I know exactly what has |
| 15:15:11 | 17 | gone on between my client and me and that -- and I |
| 15:15:15 | 18 | am invoking attorney/client privilege. |
| 15:15:16 | 19 | MR. DAVENPORT:  Are you directing her to not |
| 15:15:16 | 20 | answer my question? |
| 15:15:16 | 21 | MS. HUGGINS:  This is the problem here. |
| 15:15:16 | 22 | MR. DAVENPORT:  What's that? |
| 15:15:20 | 23 | MS. HUGGINS:  And this is why I made that |

15:15:20  1    objection earlier.  You're asking questions about

15:15:23  2    when legal documents were prepared with an attorney

15:15:27  3    that -- that undoubtedly invokes and involves

15:15:32  4    privilege.

15:15:33  5        I will never, ever ask your client about any

15:15:38  6    document that you -- that he has he ever worked or

15:15:40  7    collaborated on with you in the course of the

15:15:43  8    representation of this case.

15:15:45  9        BY MR. DAVENPORT:

15:15:45 10        Q.   Okay.  I am not asking any questions

15:15:46 11    about what was said between you and her.  I just

15:15:49 12    asked after you saw that discrepancy on response to

15:15:52 13    question 19, did you contact your attorney to let

15:15:58 14    her know that you did not agree to the response on

15:16:02 15    number 19?

15:16:03 16        MS. HUGGINS:  Form.  And same objection.

15:16:04 17        MR. DAVENPORT:  Are you going direct her to

15:16:07 18    not answer?

15:16:08 19        MS. HUGGINS:  Was there -- was there a

15:16:08 20    correction or supplement made to that -- to the

15:16:11 21    response to question 19?

15:16:11 22        MR. DAVENPORT:  This is my deposition.  You

15:16:13 23    don't get to ask her the questions yet.

15:16:16  1          **MS. HUGGINS:**  She's going to -- she's going

15:16:18  2  to waive privilege if she answers that question the

15:16:18  3  way you've worded it.

15:16:18  4          **BY MR. DAVENPORT:**

15:16:22  5      **Q.**  No, not -- I'm just simply asking when

15:16:23  6  you reviewed and saw that discrepancy -- here's a

15:16:26  7  question.

15:16:26  8          When you reviewed these interrogatories,

15:16:29  9  were you in the presence of your attorney?

15:16:31 10      **A.**  Yes.

15:16:31 11      **Q.**  Okay.  Did you ever review these

15:16:34 12  interrogatories not in the presence of your

15:16:37 13  attorney?

15:16:37 14      **A.**  Not that I could recall.

15:16:38 15      **Q.**  Okay.  So when you signed your

15:16:44 16  verification, did you sign your verification at the

15:16:48 17  same time that you were with your attorney?

15:16:50 18      **A.**  Yes.

15:16:51 19      **Q.**  Okay.  Did you -- here's a question.

15:17:09 20          How do you receive notifications to meet

15:17:12 21  with your attorney?

15:17:13 22      **A.**  It could either be through -- through

15:17:16 23  the department or in conversation.

*Velez - Davenport - 02/26/2020*

276

15:17:19  1          Q.    Okay.  Do you typically receive some

15:17:25  2    sort of notification?

15:17:26  3          A.    Yes.

15:17:27  4          Q.    Okay.  How many times have you received

15:17:28  5    that notification?

15:17:29  6          MS. HUGGINS:   Form.

15:17:30  7          THE WITNESS:   I don't recall.

15:17:31  8          BY MR. DAVENPORT:

15:17:32  9          Q.    Okay.  Was it more than five?

15:17:35  10         MS. HUGGINS:   Form.

15:17:36  11         THE WITNESS:   Possibly, I'm not certain the

15:17:38  12   exact number.

15:17:38  13         BY MR. DAVENPORT:

15:17:39  14         Q.    Okay.  Did you receive a notification

15:17:46  15   for your deposition today?

15:17:49  16         A.    I received a notification from my

15:17:52  17   attorney.

15:17:52  18         Q.    Okay.  Did you receive a notification

15:17:55  19   for your deposition that was scheduled for last

15:17:58  20   Wednesday?

15:17:59  21         A.    From my attorney, yes.

15:18:00  22         Q.    Okay.  Aside from those two instances,

15:18:05  23   have you received notifications from your

*Velez - Davenport - 02/26/2020*

277

| | | |
|---|---|---|
| 15:18:08 | 1 | attorney -- |
| 15:18:11 | 2 | MS. HUGGINS:  Form. |
| 15:18:11 | 3 | BY MR. DAVENPORT: |
| 15:18:12 | 4 | Q.   -- more or less than five times? |
| 15:18:14 | 5 | MS. HUGGINS:  Form.  What is the relevance |
| 15:18:16 | 6 | of how frequently you've met with an attorney on a |
| 15:18:17 | 7 | case? |
| 15:18:17 | 8 | MR. DAVENPORT:  I'm trying to figure out |
| 15:18:17 | 9 | discovery compliance, Ms. Huggins, and it might be |
| 15:18:19 | 10 | subject to a motion later. |
| 15:18:20 | 11 | I'm just trying to make a record for |
| 15:18:24 | 12 | potential motion practice.  You're now obstructing |
| 15:18:27 | 13 | my deposition and I would like the record to be |
| 15:18:29 | 14 | clear on exactly what compliance was with discovery |
| 15:18:33 | 15 | in this matter. |
| 15:18:34 | 16 | MS. HUGGINS:  I'm instructing my client that |
| 15:18:37 | 17 | she is not to reveal the substance of any |
| 15:18:37 | 18 | conversations we've had with any -- |
| 15:18:37 | 19 | BY MR. DAVENPORT: |
| 15:18:41 | 20 | Q.   I haven't asked for the substance one |
| 15:18:41 | 21 | time. |
| 15:18:42 | 22 | How many times have you been contacted by |
| 15:18:44 | 23 | your attorney besides your deposition for last week |

*Velez - Davenport - 02/26/2020*

278

15:18:47  1  and today?

15:18:49  2       MS. HUGGINS:  Form.

15:18:51  3       BY MR. DAVENPORT:

15:18:52  4       Q.   How many times have you received

15:18:53  5  notifications involving this proceeding to meet

15:18:56  6  with your attorney outside of last Wednesday and

15:18:58  7  today?

15:19:00  8       A.   I don't recall.

15:19:01  9       Q.   Was it more or less than five times?

15:19:04 10       A.   I don't recall.

15:19:06 11       Q.   Okay.  When you meet, do you meet with

15:19:13 12  other defendants, or is it just you?

15:19:15 13       MS. HUGGINS:  Form.  And, again, now

15:19:16 14  that -- that does veer into attorney/client.

15:19:21 15       MR. DAVENPORT:  Are you going to direct her

15:19:23 16  to not answer?

15:19:24 17       MS. HUGGINS:  You can't ask her about what

15:19:27 18  happens during meetings with -- with her attorney.

15:19:29 19       MR. DAVENPORT:  I didn't ask her about what

15:19:31 20  happened during the meeting, I just asked who was

15:19:33 21  present.

15:19:35 22       MS. HUGGINS:  I don't think that that is a

15:19:36 23  proper question.

15:19:38  1          MR. DAVENPORT:  I'm just asking are you

15:19:41  2  going to direct her to not answer, because I'm

15:19:44  3  going to ask her the question.

15:19:52  4          MS. HUGGINS:  Do you have authority that

15:19:55  5  supports that as a proper deposition question?

15:19:57  6          MR. DAVENPORT:  I don't on me right now, but

15:19:59  7  I'm going to ask her, unless you direct her to not

15:20:03  8  answer.

15:20:11  9          MS. HUGGINS:  I'm objecting to the form of

15:20:14 10  the question.  I've obviously alerted to you that

15:20:18 11  my concerns are that this is breaching

15:20:21 12  attorney/client privilege.

15:20:22 13          Who -- who is present during -- during

15:20:24 14  meetings with attorneys I -- I do not think is

15:20:28 15  discoverable.

15:20:31 16          And, again, I'm reminding my client not

15:20:35 17  to -- to disclose any of the discussions we've had

15:20:35 18  during the course of any of those meetings.

15:20:39 19          You can answer to the best of your ability.

15:20:41 20          MR. DAVENPORT:  Of course.

15:20:41 21          Can you please read back my last question.

15:20:44 22          (The above-requested question was then read

15:21:09 23  by the reporter.)

*Velez - Davenport - 02/26/2020*

280

|  |  |  |
|---|---|---|
| 15:21:09 | 1 | **BY MR. DAVENPORT:** |
| 15:21:10 | 2 | Q.   With your attorney.   Are the other |
| 15:21:13 | 3 | defendants present when you went to go meet with |
| 15:21:16 | 4 | your attorney? |
| 15:21:16 | 5 | **MS. HUGGINS:**   Form.   You can answer. |
| 15:21:18 | 6 | **THE WITNESS:**   I recall one time, at least |
| 15:21:20 | 7 | one time Officer McDermott was there, but she's the |
| 15:21:23 | 8 | only one that I recall ever being there. |
| 15:21:25 | 9 | **BY MR. DAVENPORT:** |
| 15:21:26 | 10 | Q.   Thank you. |
| 15:21:26 | 11 | A.   You're welcome. |
| 15:21:28 | 12 | Q.   All right.   I'm going to move on to the |
| 15:21:31 | 13 | video portion.   Do you mind, can we get the lights |
| 15:21:35 | 14 | on it?   Thank you. |
| 15:21:47 | 15 | So I'm going to show you what has been |
| 15:21:50 | 16 | marked as Exhibit 11 in this deposition.   The last |
| 15:21:54 | 17 | four numbers are 5252. |
| 15:21:54 | 18 | (Playing video.) |
| 15:22:20 | 19 | Now, Ms. Velez, do you recognize the vehicle |
| 15:22:23 | 20 | that is depicted in this video? |
| 15:22:25 | 21 | A.   Yes. |
| 15:22:25 | 22 | Q.   Have you seen that vehicle before? |
| 15:22:27 | 23 | A.   Yes. |

*Velez - Davenport - 02/26/2020*

281

15:22:28   1          Q.    And when did you see it?

15:22:29   2          A.    1/1 of 2017.

15:22:30   3          Q.    Had you ever seen that vehicle before?

15:22:32   4          A.    Not that I could recall.

15:22:34   5          Q.    When you arrived at the scene, did

15:22:37   6    Ms. McDermott say that she had seen that vehicle

15:22:40   7    before?

15:22:40   8          A.    Not that I could recall.

15:22:46   9          Q.    Do you know who this individual is?

15:22:48  10          A.    I do not.

15:23:38  11          Q.    I am now showing you last four digits

15:23:45  12    1342 what has been marked as Exhibit 11 in this

15:23:49  13    deposition.  What are the three numbers located on

15:23:51  14    the top of that police vehicle?

15:23:53  15          A.    532.

15:23:56  16          Q.    Okay.  Do you know who was driving that

15:23:59  17    car on January 1st of 2017?

15:24:04  18          A.    I don't recall who was driving it.

15:24:06  19          Q.    Do you recall who was in that vehicle

15:24:08  20    that day?

15:24:09  21          A.    Yes, Officer Kyle Moriarity and Carl

15:24:13  22    Schulz.

15:24:14  23          Q.    Do you remember what either of them

*Velez - Davenport - 02/26/2020*

282

15:24:17  1    were wearing that day, aside from their police

15:24:21  2    uniform?

15:24:22  3         A.   I believe Kyle had a hat on.

15:24:31  4         Q.   Now, the police officer that is walking

15:24:33  5    over to this individual on the sidewalk, is he

15:24:36  6    wearing a hat?

15:24:37  7         A.   It appears to be so.

15:24:40  8         Q.   Would you believe that that's Kyle

15:24:42  9    Moriarity?

15:24:42 10         A.   Yes.

15:24:46 11         Q.   Now, assuming that -- well, let's turn

15:24:50 12    to the complaint summary report that I provided

15:24:54 13    you, it should be Exhibit 3.  It might be closer to

15:25:13 14    the bottom.

15:25:16 15         A.   Okay.

15:25:17 16         Q.   So what was the call that Officer

15:25:21 17    Schulz and Officer Moriarity were responding to?

15:25:25 18         A.   Larceny/theft.

15:25:28 19         Q.   Okay.  So based on the knowledge that

15:25:32 20    the call they were responding to was a larceny or

15:25:35 21    theft, what do you think Officer Moriarity is doing

15:25:39 22    right here?

15:25:39 23         A.   I can't speculate as to what he's

*Velez - Davenport - 02/26/2020*

283

15:25:42  1   doing.

15:25:42  2          Q.   In your role as a police officer what

15:25:44  3   would you do speaking to a complainant who is

15:25:49  4   complaining of a larceny or a theft?

15:25:50  5          MS. HUGGINS:   Form.

15:25:51  6          THE WITNESS:   It depends on the type of

15:25:53  7   call, what he's complaining of a theft of, if -- if

15:25:55  8   we have time for questions, if it's something we

15:25:55  9   need to act on immediately, then we would proceed a

15:25:58 10   little quicker, but initially you're fact finding,

15:26:02 11   who, what, when, how, what's missing, what's going

15:26:06 12   on.

15:26:06 13          BY MR. DAVENPORT:

15:26:06 14          Q.   Okay.   Now, during your investigation

15:26:08 15   would you ask for any sort of identification of

15:26:11 16   this individual?

15:26:12 17          MS. HUGGINS:   Form.

15:26:12 18          A.   Depending on if I'm familiar --

15:26:14 19          MR. DAVENPORT:   I would ask what's the form

15:26:16 20   objection?

15:26:16 21          MS. HUGGINS:   You're asking a hypothetical

15:26:18 22   question of this individual who appears to be on a

15:26:21 23   video where this lieutenant is not pictured on that

15:26:25   1   video.  She's already indicated in previous

15:26:28   2   testimony that they weren't there at this point.

15:26:31   3   It's a hypothetical question, it calls for

15:26:35   4   speculation.

15:26:35   5       MR. DAVENPORT:  I would just ask what's

15:26:36   6   wrong with a hypothetical or a speculative answer

15:26:38   7   in a deposition?

15:26:39   8       MS. HUGGINS:  That is not a proper question.

15:26:43   9   I am -- I am preserving a form objection.  If you

15:26:46  10   would like to reword your question so it's not

15:26:49  11   speculative and it's possibly admissible later and

15:26:50  12   you may be able to use it later, you may.

15:26:55  13       But I am -- I am preserving a form

15:26:57  14   objection.  I -- she is answering your question,

15:27:00  15   your deposition is proceeding.

15:27:00  16       BY MR. DAVENPORT:

15:27:01  17       Q.   Sure.  So would it also be true that

15:27:04  18   somebody can ask that -- a question during a

15:27:07  19   deposition that wouldn't be --

15:27:07  20       MS. HUGGINS:  Sir, I'm not going to debate

15:27:09  21   how to -- how to --

15:27:09  22       MR. DAVENPORT:  It's your form objection, so

15:27:11  23   I would like to know and I would like to try to fix

15:27:14   1   it if, you know, we can sort that out.

15:27:16   2         MS. HUGGINS:  For the benefit of the

15:27:17   3   reporter I would appreciate it if you don't speak

15:27:17   4   over me.

15:27:21   5         You asked me what the basis of my form

15:27:22   6   objection was and I told you.  If you want to

15:27:25   7   reword the question, you may.  If you don't, she's

15:27:27   8   going to be permitted to answer the question.

15:27:30   9         I did not tell her that she could not answer

15:27:32  10   the question.

15:27:32  11         BY MR. DAVENPORT:

15:27:32  12         Q.    Okay.  So, Ms. Velez, would -- as part

15:27:36  13   of investigating a theft or burglary, would you ask

15:27:41  14   the complainant for some sort of identification?

15:27:45  15         A.    It depends on if I'm familiar with that

15:27:47  16   person.  I may already know it or I could ask for

15:27:48  17   identification, depending on what part of the

15:27:52  18   investigation we're in.

15:27:52  19         It's not typical that as soon as you walk up

15:27:55  20   to someone you say can I have your license or can I

15:27:57  21   have a ident -- a form of identification.

15:27:59  22         Sometimes you just -- you have to ease into

15:28:01  23   an investigation.  They're some -- they're usually

*Velez - Davenport - 02/26/2020*

286

15:28:04   1   upset, they have a complaint.

15:28:06   2        So at some point, yes, if I'm not familiar

15:28:10   3   with the person, I will ask for identification, but

15:28:11   4   it doesn't necessarily -- it doesn't necessarily

15:28:12   5   have to be instantaneous as soon as I arrive.

15:28:16   6        Q.   But you would expect at some point some

15:28:17   7   officer would ask for identification?

15:28:19   8        A.   Again, if I wasn't familiar or if the

15:28:21   9   officer wasn't familiar with the person who makes

15:28:23  10   the complaint, yes.

15:28:25  11        Q.   Okay.  Now, as part of your

15:28:30  12   investigation, would you also run the license plate

15:28:33  13   on that vehicle?

15:28:34  14        A.   If I didn't have a -- if the license

15:28:36  15   plate wasn't part of my investigation, not

15:28:39  16   necessarily.

15:28:40  17        Q.   Okay.  When would the license plate be

15:28:43  18   part of the investigation?

15:28:44  19        A.   If based on the investigation it's

15:28:46  20   deemed to be part of the investigation.

15:28:48  21        Q.   Okay.  At any point was there any

15:28:52  22   discussion about what's this burglary or theft call

15:28:56  23   related to?

*Velez - Davenport - 02/26/2020*

287

15:28:56   1          A.    Pardon?

15:28:57   2          Q.    At any point was there any discussion

15:28:59   3   between you and the other officers about what this

15:29:02   4   burglary or theft call what this person's complaint

15:29:06   5   was?

15:29:06   6          A.    I don't recall having a conversation

15:29:08   7   with the officers about it.

15:29:09   8          Q.    Okay.  Did you ever have a conversation

15:29:11   9   with the complainant?

15:29:12  10          A.    No.

15:29:12  11          Q.    Okay.  Did Officer McDermott ever have

15:29:14  12   a conversation with the complainant?

15:29:17  13          A.    I don't recall.

15:29:17  14          Q.    Now, is that your police vehicle that

15:29:21  15   Ms. McDermott was driving that just arrived on the

15:29:24  16   scene?

15:29:24  17          A.    Yes.

15:29:25  18          Q.    Okay.  And that was because

15:29:27  19   Ms. McDermott was familiar with this 33 Schmarbeck

15:29:30  20   location?

15:29:31  21          A.    Yes.

15:29:37  22          Q.    So, now, I see that you're a little bit

15:29:41  23   behind Officer Schulz's and Officer Moriarity's

*Velez - Davenport - 02/26/2020*

288

| | | |
|---|---|---|
| 15:29:45 | 1 | police vehicle.  Is there any specific reason why |
| 15:29:48 | 2 | Ms. McDermott parked her vehicle behind Officer |
| 15:29:51 | 3 | Moriarity and Officer Schulz's police vehicle? |
| 15:29:55 | 4 | A.   You would -- |
| 15:29:55 | 5 | MS. HUGGINS:   Form. |
| 15:29:56 | 6 | THE WITNESS:   You would have to ask Officer |
| 15:29:59 | 7 | McDermott that.  I'm not certain. |
| 15:30:00 | 8 | BY MR. DAVENPORT: |
| 15:30:00 | 9 | Q.   Okay.  Would there be any reason why |
| 15:30:02 | 10 | you as a police officer would park behind Officer |
| 15:30:06 | 11 | Schulz and Officer Moriarity's police vehicle? |
| 15:30:08 | 12 | A.   It depends on the situation, the type |
| 15:30:10 | 13 | of call.  It possibly could be tactical.  It |
| 15:30:14 | 14 | depends on what we're responding to. |
| 15:30:16 | 15 | Q.   Okay.  Based on what you have seen in |
| 15:30:16 | 16 | this -- in this video, would there be any reason |
| 15:30:19 | 17 | why you would park your police vehicle behind |
| 15:30:21 | 18 | Officer Moriarity and Officer Schulz's police |
| 15:30:23 | 19 | vehicle? |
| 15:30:24 | 20 | A.   No particular reason. |
| 15:30:30 | 21 | Q.   Officer Moriarity, was he in training |
| 15:30:33 | 22 | at this time? |
| 15:30:33 | 23 | A.   Yes. |

15:30:34   1          Q.   Field training?

15:30:36   2          A.   Yes.

15:30:36   3          Q.   Okay.   What do you think that he is

15:30:40   4   discussing with Officer Schulz?

15:30:43   5          MS. HUGGINS:   Form.

15:30:43   6          THE WITNESS:   I don't know.

15:30:45   7          BY MR. DAVENPORT:

15:30:45   8          Q.   Okay.   Have you ever done field

15:30:46   9   training for any police officers in C District?

15:30:49  10          A.   I've never been a field training

15:30:52  11   officer, no.

15:30:52  12          Q.   Okay.   As a lieutenant, what would you

15:30:55  13   expect a field training officer to be discussing

15:30:57  14   with their trainee in this situation?

15:31:00  15          MS. HUGGINS:   Form.

15:31:00  16          THE WITNESS:   Again, I have never been

15:31:03  17   trained as a field training officer, so I don't

15:31:06  18   know what that field training officer has been

15:31:10  19   trained to discuss or do or the -- the steps that

15:31:17  20   they would take to ensure that the trainee is

15:31:20  21   getting everything they need or how to respond to

15:31:25  22   questions that they may have.   I don't know what

15:31:27  23   their training encompasses.

15:31:28  1          BY MR. DAVENPORT:

15:31:29  2          Q.    Okay.   Now, if Officer Moriarity never

15:31:35  3    asked for the identification of this individual,

15:31:38  4    would you expect the field training officer to tell

15:31:41  5    Officer Moriarity to ask for that identification?

15:31:44  6          MS. HUGGINS:   Form.

15:31:45  7          THE WITNESS:   Can you repeat that?

15:31:46  8          BY MR. DAVENPORT:

15:31:47  9          Q.    If Officer Moriarity never asked for

15:31:49  10   the identification of the complainant, would you

15:31:52  11   expect the field training officer to tell Officer

15:31:56  12   Moriarity to ask for the ID from that complainant?

15:32:00  13         MS. HUGGINS:   Form.

15:32:01  14         THE WITNESS:   Again, that would depend on

15:32:02  15   the scenario.   I don't know what information

15:32:06  16   Officer Moriarity discussed with that person, if he

15:32:08  17   knows who it is, if he's already been identified,

15:32:13  18   if Officer Schulz identified him.

15:32:15  19         I don't know what they're discussing, so

15:32:15  20   I -- I couldn't say what I would expect him to do,

15:32:19  21   because I don't know what information they have

15:32:19  22   right now.

15:32:20  23         BY MR. DAVENPORT:

*Velez - Davenport - 02/26/2020*

291

15:32:22    1        Q.    So if Officer Moriarity did not know

15:32:24    2    the individual and Officer Schulz did not ask the

15:32:27    3    individual for an identification, would you expect

15:32:29    4    Officer Schulz to tell Officer Moriarity to ask for

15:32:32    5    the identification of that individual?

15:32:33    6        MS. HUGGINS:  Form.

15:32:34    7        MR. DAVENPORT:  What's the form objection?

15:32:35    8        MS. HUGGINS:  Same, it calls for -- it calls

15:32:36    9    for speculation.

15:32:37   10        MR. DAVENPORT:  No, I'm asking in her

15:32:40   11    capacity as a lieutenant what would she

15:32:42   12    ask -- expect a field training officer to do.

15:32:42   13        MS. HUGGINS:  You may disagree with my form

15:32:44   14    objection.  I'm simply making it on the record.

15:32:46   15    I've not prevented her from answering that question

15:32:49   16    and I'm trying to do it in as minimal way as

15:32:51   17    possible as to not influence her testimony.

15:32:54   18        So I'm not going to debate with you my form

15:32:58   19    objections.  You can proceed and ask her questions

15:33:00   20    if you would like.

15:33:00   21        MR. DAVENPORT:  Well, I just want to make

15:33:01   22    sure that the record is clear exactly what your

15:33:02   23    objection is and then I can make my response to

*Velez - Davenport - 02/26/2020*

292

15:33:05  1  your objection.

15:33:06  2       MS. HUGGINS:  No, I'm not debating you.

15:33:09  3  This is an officer's deposition, please proceed

15:33:11  4  with her deposition.  I'm not going to debate you

15:33:12  5  right now.

15:33:13  6       MR. DAVENPORT:  So just so --

15:33:15  7       MS. HUGGINS:  You're distracting from your

15:33:15  8  own deposition.

15:33:17  9       MR. DAVENPORT:  Just so that way we're

15:33:17 10  clear, Ms. Huggins, your objection is form,

15:33:19 11  speculation.

15:33:20 12       MS. HUGGINS:  As I stated on the record.

15:33:22 13       MR. DAVENPORT:  Okay.  Can you please read

15:33:24 14  back the last question.

15:33:26 15       (The above-requested question was then read

15:34:21 16  by the reporter.)

15:34:21 17       THE WITNESS:  I would -- again, with the

15:34:24 18  field training, I don't know that Officer

15:34:29 19  Schulz -- like, again, it's speculation and there's

15:34:32 20  a million different things that can happen while

15:34:34 21  investigating.  At some point the identification of

15:34:38 22  the complainant would need to be made.

15:34:40 23       BY MR. DAVENPORT:

*Velez - Davenport - 02/26/2020*

293

| | | |
|---|---|---|
| 15:34:41 | 1 | Q. Okay. That works. Just at some point |
| 15:34:43 | 2 | identification would need to be made of that |
| 15:34:46 | 3 | individual, correct? |
| 15:34:47 | 4 | A. Correct. |
| 15:34:47 | 5 | (Playing video.) |
| 15:34:47 | 6 | Q. Okay. Now, Officer McDermott pulled |
| 15:34:55 | 7 | her vehicle up; do you see that? |
| 15:34:57 | 8 | A. Yes. |
| 15:34:57 | 9 | Q. Do you know why she pulled her vehicle |
| 15:35:00 | 10 | up? |
| 15:35:00 | 11 | A. It appears to speak to Officer |
| 15:35:03 | 12 | Moriarity. |
| 15:35:03 | 13 | Q. Okay. Do you have any idea what |
| 15:35:07 | 14 | Ms. McDermott said to Officer Moriarity? |
| 15:35:09 | 15 | A. I do not. |
| 15:35:11 | 16 | Q. Did you say anything to Officer |
| 15:35:14 | 17 | Moriarity? |
| 15:35:14 | 18 | A. Not that I could recall. |
| 15:35:20 | 19 | Q. Okay. So I'm now going to show you |
| 15:35:30 | 20 | what has been marked as Exhibit 11 with the last |
| 15:35:35 | 21 | four digits 2529. |
| 15:35:38 | 22 | So when did you first see or did you ever |
| 15:35:41 | 23 | see Mr. Kistner enter the street? |

*Velez - Davenport - 02/26/2020*

294

15:35:45   1          A.    I did not ever see him enter the
15:35:48   2   street.
15:35:48   3          Q.    Okay.  Did you ever see Mr. Kistner
15:35:51   4   before he entered the street?
15:35:53   5          A.    No.
15:35:53   6          Q.    What were you doing at this incident?
15:35:56   7          A.    I don't recall exactly what I was doing
15:35:59   8   at that moment.
15:35:59   9          Q.    Okay.  What -- were you looking forward
15:36:05  10   at this time?
15:36:08  11          A.    I don't recall.  I just know that I
15:36:13  12   didn't see him and I -- at all.
15:36:17  13          Q.    Okay.
15:36:17  14          A.    I don't recall seeing him at all.
15:36:19  15          Q.    Okay.  Did you hear Officer McDermott
15:36:22  16   say that she saw an individual out in the street?
15:36:26  17          A.    Not that I could recall.
15:36:28  18          Q.    Do you recall anything that was said by
15:36:32  19   Mr. Kistner to anybody while he was out in the
15:36:35  20   street?
15:36:35  21          A.    No.
15:36:36  22          Q.    Okay.  Do you recall any of the
15:36:39  23   officers saying anything to Mr. Kistner while he

*Velez - Davenport - 02/26/2020*

295

| | | |
|---|---|---|
| 15:36:42 | 1 | was in the street? |
| 15:36:43 | 2 | A. No. |
| 15:36:44 | 3 | Q. Okay. Do you know, were you on your |
| 15:36:55 | 4 | way to go somewhere after this call prior to, you |
| 15:36:59 | 5 | know, the events that transpired shortly after? |
| 15:37:03 | 6 | A. Not that I could recall. After the |
| 15:37:05 | 7 | event? |
| 15:37:05 | 8 | Q. Well, do you recall, were you |
| 15:37:10 | 9 | dispatched to another location from Schmarbeck? |
| 15:37:14 | 10 | A. Well, from Schmarbeck we did go to |
| 15:37:17 | 11 | ECMC. |
| 15:37:20 | 12 | Q. Were you dispatched prior to any |
| 15:37:23 | 13 | collision between Mr. Kistner and a police vehicle? |
| 15:37:26 | 14 | MS. HUGGINS: Form. You can answer. |
| 15:37:29 | 15 | THE WITNESS: Prior to? |
| 15:37:31 | 16 | BY MR. DAVENPORT: |
| 15:37:32 | 17 | Q. Prior to -- well, after arriving at |
| 15:37:35 | 18 | Schmarbeck and prior to a collision that was made |
| 15:37:38 | 19 | with Mr. Kistner, were you and Officer McDermott |
| 15:37:41 | 20 | dispatched to any other location? |
| 15:37:43 | 21 | A. Not that I could recall. |
| 15:37:44 | 22 | Q. Okay. Do you know if Officer Schulz or |
| 15:37:47 | 23 | Officer Moriarity were dispatched to another |

15:37:50   1   situation?

15:37:50   2          A.    I don't recall.

15:37:51   3          Q.    Did you ever dispatch to Schmarbeck for

15:37:55   4   the 33 Schmarbeck call?

15:37:58   5          A.    I didn't, no.

15:38:00   6          Q.    Okay.   Did Officer McDermott ever

15:38:03   7   dispatch in for the 33 Schmarbeck call?

15:38:06   8          A.    Not that I could recall.

15:38:27   9          Q.    Now, Ms. Velez, based on what you just

15:38:30  10   saw right there, was the police vehicle moving

15:38:33  11   after Mr. Kistner was struck?

15:38:36  12          A.    It appeared to be so.   Well, when

15:38:39  13   Mr. Kistner walked into the vehicle, it appears

15:38:41  14   from this angle of the video to slightly be moving

15:38:46  15   forward.

15:38:46  16          Q.    Now, when you were in the police

15:38:48  17   vehicle, did you hear any sort of a noise that

15:38:52  18   indicated that a collision had been made?

15:38:53  19          MS. HUGGINS:   Form.   You can answer.

15:38:55  20          THE WITNESS:   I did hear a noise.

15:38:57  21          BY MR. DAVENPORT:

15:38:57  22          Q.    Okay.   What sort of a noise was that?

15:38:59  23          A.    It was like a -- it sounded like

15:39:03  1  plastic, like a plastic break.

15:39:05  2          Q.    Okay.  At the time did you know --

15:39:09  3          A.    It wasn't -- I'm sorry.

15:39:09  4          Q.    No, it's okay.  At the time did you

15:39:12  5  know what that was?

15:39:12  6          A.    No.

15:39:13  7          Q.    Okay.  Did Officer McDermott say

15:39:17  8  anything after you heard that noise?

15:39:19  9          A.    She did.

15:39:19 10          Q.    What did she say?

15:39:21 11          A.    Again, I don't recall if she said that

15:39:22 12  he had put himself into the vehicle or if he had

15:39:25 13  threw himself into the vehicle.

15:39:28 14          I don't remember which word was used, but

15:39:31 15  she stated that he had put himself into the

15:39:33 16  vehicle.

15:39:33 17          Q.    Okay.  Did she yell that, did she sound

15:39:37 18  excited when she said it?

15:39:39 19          A.    I don't remember the exact tone.

15:39:40 20          Q.    Okay.  Did she say that before you

15:39:44 21  exited the vehicle?

15:39:44 22          A.    Yes.

15:39:45 23          Q.    Okay.  At that time had you seen

*Velez - Davenport - 02/26/2020*

298

15:39:50　1　Mr. Kistner up until that point of Ms. McDermott

15:39:53　2　yelling that he either threw himself at the police

15:39:56　3　vehicle or -- I'm sorry, what was the other phrase

15:40:01　4　that she may have possibly said?

15:40:03　5　　　　A.　Put himself.

15:40:04　6　　　　Q.　Okay.  So asking the question again.

15:40:07　7　　　　At any point did you see Mr. Kistner before

15:40:10　8　Ms. McDermott said that Mr. Kistner threw himself

15:40:14　9　at the vehicle or put himself into the police

15:40:17　10　vehicle?

15:40:17　11　　　　A.　No.

15:40:18　12　　　　Q.　Okay.  When was the first time that you

15:40:23　13　saw Mr. Kistner?

15:40:23　14　　　　A.　On the ground.

15:40:25　15　　　　Q.　Was he grabbing any part of his body?

15:40:29　16　　　　A.　No.

15:40:31　17　　　　Q.　Okay.  Where was he positioned relative

15:40:33　18　to the car?

15:40:34　19　　　　A.　I recall him laying parallel to the

15:40:37　20　car.

15:40:38　21　　　　Q.　Okay.  Was Mr. Kistner saying anything?

15:40:45　22　　　　A.　Not that I could recall.

15:40:47　23　　　　Q.　Did you say anything to Mr. Kistner?

*Velez - Davenport - 02/26/2020*

299

15:40:49  1        A.    No.

15:40:50  2        Q.    Okay.   Did you perform any sort of a

15:40:55  3   physical assessment of Mr. Kistner or a physical

15:40:59  4   examination?

15:41:00  5        A.    When I came around the car, the side of

15:41:03  6   the car, he was moving his body side to side, like

15:41:08  7   rolling side to side.

15:41:09  8        And that's what I could recall that he had

15:41:12  9   the ability to move.   Like he had the ability to --

15:41:15 10   to move his arms and legs and his body.

15:41:18 11        Q.    Okay.   So what does that tell you if

15:41:20 12   he's able to move?

15:41:21 13        A.    That he can move.   Like it didn't

15:41:24 14   appear from the way he was moving that he had any

15:41:27 15   of his limbs were broken.

15:41:29 16        Q.    Okay.   Did you perform any sort of an

15:41:32 17   assessment to see if he had a head injury at that

15:41:35 18   time?

15:41:35 19        A.    I did not.

15:41:36 20        Q.    Okay.   Do you know if any of the other

15:41:38 21   officers performed an assessment to see if he had a

15:41:41 22   head injury at that time?

15:41:42 23        A.    I do not.

*Velez - Davenport - 02/26/2020*

300

15:41:42  1          Q.    Do you know if Mr. Kistner ever

15:41:45  2     complained of a head injury at Schmarbeck Avenue?

15:41:47  3          A.    Not that I could recall.

15:41:48  4          Q.    Okay.  So why was Mr. Kistner taken to

15:41:52  5     ECMC for a physical assessment?

15:41:54  6          A.    For a medical evaluation.

15:41:55  7          Q.    What were -- what did you expect them

15:41:57  8     to evaluate?

15:41:58  9          A.    To clear him medically, to -- based on

15:42:01 10     him being on the ground rolling back and forth,

15:42:04 11     what I had seen.

15:42:05 12          Q.    Okay.  Did you have an expectation that

15:42:07 13     they would examine any certain part of his body?

15:42:10 14          A.    I'm not a medical professional, so I

15:42:13 15     don't know exactly what -- what criteria they would

15:42:14 16     need to determine the extent of an evaluation.

15:42:18 17          Q.    Is a medical examination required for

15:42:21 18     an individual who is on the ground after a

15:42:23 19     collision with a vehicle?

15:42:24 20          MS. HUGGINS:    Form.  You can answer.

15:42:26 21          THE WITNESS:    It would depend.  It would

15:42:31 22     depend on -- it could be a multitude of different

15:42:34 23     things.

*Velez - Davenport - 02/26/2020*

301

| | | |
|---|---|---|
| 15:42:34 | 1 | **BY MR. DAVENPORT:** |
| 15:42:34 | 2 | Q.   Was a physical examination required in |
| 15:42:37 | 3 | this case? |
| 15:42:37 | 4 | A.   Based on the officers stating that he |
| 15:42:42 | 5 | put himself into a vehicle and now he's on the |
| 15:42:45 | 6 | ground, it would make sense to have him medically |
| 15:42:49 | 7 | cleared, evaluated. |
| 15:42:49 | 8 | Q.   Okay.  Was there any sort of a |
| 15:42:52 | 9 | discussion amongst the officers about potential |
| 15:42:55 | 10 | injuries that Mr. Kistner may have had? |
| 15:42:57 | 11 | A.   Not that I could recall. |
| 15:42:59 | 12 | Q.   Did anybody ever ask Mr. Kistner if |
| 15:43:01 | 13 | anything was hurting him? |
| 15:43:02 | 14 | A.   I did not. |
| 15:43:03 | 15 | Q.   Did any of the other officers? |
| 15:43:04 | 16 | A.   I don't know. |
| 15:43:05 | 17 | Q.   Not -- no one asked in your presence, |
| 15:43:08 | 18 | correct? |
| 15:43:08 | 19 | A.   Correct. |
| 15:43:08 | 20 | Q.   Okay.  So, now, watching this vehicle |
| 15:43:12 | 21 | again -- or this video again. |
| 15:43:16 | 22 | A.   Or I would say no one asked that I |
| 15:43:22 | 23 | could recall, because there was three other |

15:43:23  1   officers there.

15:43:24  2          Q.    Sure.   So I want you to watch this

15:43:27  3   video and pay particular attention to your and

15:43:32  4   Ms. McDermott's vehicle and Mr. Kistner as well.

15:43:32  5               (Playing video.)

15:43:32  6          BY MR. DAVENPORT:

15:43:41  7          Q.    Did it appear to you that Mr. Kistner

15:43:44  8   intentionally threw himself at the vehicle?

15:43:46  9          A.    Yes.

15:43:47 10          Q.    And what led you to believe that?

15:43:49 11          A.    I could -- it appears that he's

15:43:51 12   reaching his arm out into the vehicle.

15:43:54 13          Q.    Would it be possible that he was trying

15:43:56 14   brace himself for a collision?

15:43:59 15          A.    I can't speculate what he may have

15:44:02 16   thought.   I only see what I see here and what was

15:44:05 17   told to me by officers.

15:44:07 18          Q.    I guess I'm just asking is there an

15:44:07 19   alternative explanation for why Mr. Kistner may

15:44:07 20   have stuck his arm out for the police vehicle?

15:44:14 21          MS. HUGGINS:   Form.

15:44:14 22          THE WITNESS:   Again, in my opinion based on

15:44:16 23   the video and what was told to me by two other

*Velez - Davenport - 02/26/2020*

15:44:19  1   officers, no.

15:44:20  2         BY MR. DAVENPORT:

15:44:20  3         Q.   So let's exclude anything that was told

15:44:24  4   to you by the other officers.  Based on what you

15:44:27  5   see in this video, does it appear that Mr. Kistner

15:44:30  6   intentionally threw himself at the vehicle?

15:44:31  7         A.   Unfortunately I can't take away my

15:44:33  8   thoughts on what was told to me and the video now.

15:44:39  9         In retrospect I can't -- what I see and what

15:44:39  10  I've been told is the totality of what my opinion

15:44:42  11  is based on.

15:44:43  12        Q.   How much of your opinion is based on

15:44:45  13  what you see in this video?  Again, does it look as

15:44:54  14  if Mr. Kistner intentionally threw himself at that

15:44:58  15  police vehicle?

15:44:58  16        MS. HUGGINS:   Form.

15:45:00  17        THE WITNESS:   Again, from my perspective

15:45:02  18  this -- the perception of this video -- the angle

15:45:05  19  of this video is difficult.

15:45:06  20        But as I said, my opinion on what -- what I

15:45:11  21  can see on here he appears to reach into the

15:45:14  22  vehicle.

15:45:14  23        BY MR. DAVENPORT:

*Velez - Davenport - 02/26/2020*

304

15:45:14  1          Q.    Does it at least appear questionable

15:45:15  2   that Mr. Kistner may have not intentionally thrown

15:45:18  3   himself at a police vehicle?

15:45:19  4          MS. HUGGINS:    Form.

15:45:19  5          THE WITNESS:    Not from my perspective.

15:45:22  6          BY MR. DAVENPORT:

15:45:22  7          Q.    Okay.  If it was questionable whether

15:45:24  8   an individual threw himself at a police vehicle or

15:45:27  9   if the police vehicle negligently struck him, would

15:45:30 10   you expect there to be an investigation?

15:45:32 11          A.    Can you repeat that.

15:45:33 12          Q.    If there was a question as to whether

15:45:36 13   the police vehicle negligently struck the

15:45:39 14   individual or if the individual intentionally threw

15:45:41 15   himself at the police vehicle, would you expect

15:45:43 16   there to be an investigation by the accident

15:45:46 17   investigation unit?

15:45:46 18          A.    That's speculative as well.  There's a

15:45:50 19   lot of ifs in there.  So when we have two officers

15:45:53 20   who witnessed the event that I have knowledge of at

15:46:00 21   that point, no.

15:46:01 22          If a pedestrian is struck by a vehicle, it's

15:46:05 23   a different -- different scenario and yes.

*Velez - Davenport - 02/26/2020*

305

15:46:08  1          Q.    Okay.  So I understand what these

15:46:13  2    police officers told you at the scene, but I guess

15:46:17  3    taking yourself away from what this video is, if

15:46:22  4    there is a question at the scene as to whether an

15:46:25  5    officer observed a police vehicle negligently

15:46:29  6    striking an individual or another police officer

15:46:32  7    saying that that individual threw himself at the

15:46:35  8    police vehicle, would you expect there to be an

15:46:38  9    investigation --

15:46:38  10          MS. HUGGINS:    Form.

15:46:39  11          BY MR. DAVENPORT:

15:46:39  12          Q.    -- of that situation?

15:46:42  13          A.    As a patrol officer, I would defer to

15:46:45  14    the supervisor and give them all the information we

15:46:48  15    have and let them determine whether or not accident

15:46:53  16    investigation needs to come out or what type of

15:46:55  17    investigation would need to -- need to be done, if

15:46:57  18    any.

15:46:58  19          Q.    As a supervisor, if you had one of your

15:47:00  20    police officers in C District telling you that the

15:47:02  21    individual intentionally threw himself at the

15:47:04  22    police vehicle and you had another police officer

15:47:08  23    who was at the scene who said that the police

*Velez - Davenport - 02/26/2020*

306

| 15:47:09 | 1 | vehicle negligently struck the individual, would |
| 15:47:12 | 2 | you order an investigation of that situation? |
| 15:47:14 | 3 | **MS. HUGGINS:**  Form. |
| 15:47:17 | 4 | **THE WITNESS:**  You have two sworn officers |
| 15:47:18 | 5 | giving two different version of events, I would |
| 15:47:20 | 6 | come to the scene to determine what type of |
| 15:47:22 | 7 | investigation had been conducted at that point to |
| 15:47:24 | 8 | determine what fact pattern we have and then make a |
| 15:47:27 | 9 | decision. |
| 15:47:27 | 10 | **BY MR. DAVENPORT:** |
| 15:47:28 | 11 | Q.    But you would go to the scene, correct? |
| 15:47:30 | 12 | A.    Yes. |
| 15:47:30 | 13 | (Playing video.) |
| 15:47:30 | 14 | Q.    Okay.  Do you know who this individual |
| 15:47:42 | 15 | is who's on the sidewalk and now appearing to run |
| 15:47:45 | 16 | towards the street? |
| 15:47:46 | 17 | A.    I believe that's Mr. Kistner's son. |
| 15:47:48 | 18 | Q.    And what led you to believe that that |
| 15:47:51 | 19 | was Mr. Kistner's son? |
| 15:47:52 | 20 | A.    Because I recall him being there. |
| 15:47:54 | 21 | Q.    Did he say anything to you that would |
| 15:47:58 | 22 | have made you think that this was Mr. Kistner's |
| 15:47:59 | 23 | son? |

*Velez - Davenport - 02/26/2020*

307

15:47:59  1        A.    I believe he was yelling, not to me

15:48:01  2   specifically, but I believe he was yelling dad.

15:48:04  3        Q.    Okay.  Did you hear him make those

15:48:08  4   statements?

15:48:08  5        A.    I heard him say dad, I believe it was

15:48:11  6   dad.

15:48:12  7        Q.    Okay.

15:48:13  8        A.    Not at this point, but when we were

15:48:16  9   obviously out of the vehicle.

15:48:18 10        Q.    Now, you saw yourself exit the police

15:48:22 11   vehicle there, correct?

15:48:24 12        A.    Yes.

15:48:24 13        Q.    At this time, did you know that there

15:48:29 14   was an individual who was lying on the ground next

15:48:32 15   to a police vehicle?

15:48:33 16        A.    Yes.

15:48:33 17        Q.    Okay.  And how did you know that?

15:48:35 18        A.    Because when I heard the noise, Officer

15:48:38 19   McDermott had said he had -- like I said, I can't

15:48:41 20   remember the exact verbiage he put himself or threw

15:48:44 21   himself into the vehicle, so I -- I knew he was

15:48:46 22   there.

15:48:47 23        Q.    Okay.  As you're exiting the police

*Velez - Davenport - 02/26/2020*

308

| | | |
|---|---|---|
| 15:48:49 | 1 | vehicle, what -- what are you going to go do at |
| 15:48:53 | 2 | this situation? |
| 15:48:55 | 3 | A. I'm going to see what happened. |
| 15:48:57 | 4 | Q. Are you going to go examine the |
| 15:49:00 | 5 | individual on the ground? |
| 15:49:01 | 6 | A. I went around and -- visual and I -- |
| 15:49:08 | 7 | oh, I'm sorry. I went -- I was going to go around |
| 15:49:10 | 8 | to do a visual to see what had happened. |
| 15:49:12 | 9 | Q. Okay. Now, at this time, did you see |
| 15:49:19 | 10 | the individual who you've identified as |
| 15:49:23 | 11 | Mr. Kistner's son? |
| 15:49:24 | 12 | A. I don't know if I seen him at that |
| 15:49:27 | 13 | point. He walked past me, but I don't know if I |
| 15:49:30 | 14 | made eye -- you know what I mean, if I had made eye |
| 15:49:33 | 15 | contact with him at that point. |
| 15:49:34 | 16 | Q. Were you ever concerned about that |
| 15:49:36 | 17 | individual at any point when you saw him run past |
| 15:49:40 | 18 | your police vehicle? |
| 15:49:42 | 19 | A. As I said, I don't -- at that moment I |
| 15:49:49 | 20 | don't exactly recall if I had made eye contact with |
| 15:49:53 | 21 | him as he went by. |
| 15:49:53 | 22 | Q. At any point when Mr. Kistner's son was |
| 15:49:56 | 23 | out in the street, did you ever feel concern for |

15:49:58  1 | your safety?

15:49:59  2 |         A.   At that point?

15:50:01  3 |         Q.   Well, at any point that Mr. Kistner's

15:50:04  4 | son was out in the street, did you ever feel that

15:50:08  5 | your safety was threatened?

15:50:10  6 |         A.   Not that I could recall.

15:50:23  7 |         Q.   Now, knowing at that time that there

15:50:27  8 | was an individual where there was a collision with

15:50:30  9 | the police vehicle and that he was on the ground,

15:50:33 10 | why did you not -- it appears that you're walking,

15:50:37 11 | you're standing still, you're looking at Officer

15:50:41 12 | Schulz and Officer Moriarity, did you have any

15:50:44 13 | concern for the individual's potential physical

15:50:46 14 | condition at that time?

15:50:47 15 |         A.   Well, as I was looking at Officer

15:50:50 16 | Schulz, he as he was walking toward me, as I was

15:50:53 17 | coming around the front of the car, that's when he

15:50:55 18 | told me I had seen the whole thing.  He said I had

15:50:57 19 | seen him throw himself into the patrol vehicle.

15:51:01 20 |         Q.   And that was Officer Schulz that told

15:51:04 21 | you that?

15:51:05 22 |         A.   Yes.

15:51:05 23 |         Q.   Okay.  Did Officer Moriarity say

*Velez - Davenport - 02/26/2020*

310

15:51:09   1    anything at that time?

15:51:10   2         A.    Not that I could recall.

15:51:14   3         Q.    Okay.   So Officer Schulz would have

15:51:17   4    made that statement to you.   Was it at this point

15:51:17   5    right here where it appears that you're facing

15:51:35   6    Officer Schulz and Officer Moriarity that that

15:51:35   7    statement was made to you?

15:51:36   8         A.    Most likely, yes.

15:51:38   9         Q.    Okay.   So now you've had two officers

15:51:42  10    that have told you that Mr. Kistner intentionally

15:51:45  11    threw himself at the police vehicle, correct?

15:51:47  12         A.    Correct.

15:51:47  13         Q.    Okay.   So with that knowledge, what

15:51:51  14    steps would you take knowing that there's an

15:51:55  15    individual on the ground?

15:51:56  16         A.    Well, having that information now and

15:51:59  17    when I come around the car, I see the individual.

15:52:01  18    The two officers who had actually eye witnessed the

15:52:06  19    incident, they're -- they're there.

15:52:09  20         So I have no -- aside from what they told me

15:52:13  21    at that point, I didn't observe anything, so they

15:52:13  22    would have more information and they would know

15:52:17  23    better how to proceed than I would, because I

*Velez - Davenport - 02/26/2020*

311

| | | |
|---|---|---|
| 15:52:18 | 1 | didn't see it. |
| 15:52:19 | 2 | Q.   If you have two officers that are |
| 15:52:21 | 3 | telling you that somebody intentionally threw |
| 15:52:24 | 4 | themselves at a police vehicle, is that a crime to |
| 15:52:27 | 5 | throw yourself at a police vehicle? |
| 15:52:29 | 6 | A.   It could be. |
| 15:52:30 | 7 | Q.   Okay.  Would you arrest that |
| 15:52:31 | 8 | individual? |
| 15:52:32 | 9 | A.   Depending on the totality of the |
| 15:52:35 | 10 | circumstance. |
| 15:52:35 | 11 | Q.   Would you detain that individual? |
| 15:52:37 | 12 | A.   Yes. |
| 15:52:37 | 13 | Q.   Okay.  Would you detain that individual |
| 15:52:39 | 14 | and then determine the totality of the |
| 15:52:42 | 15 | circumstances? |
| 15:52:42 | 16 | A.   It depends on the information that we |
| 15:52:42 | 17 | have. |
| 15:52:45 | 18 | Q.   Is that what you did in this situation? |
| 15:52:48 | 19 | A.   In this situation we had information. |
| 15:52:50 | 20 | Like I said, we had two officers witness what was |
| 15:52:53 | 21 | told to me that this individual threw himself into |
| 15:52:56 | 22 | the vehicle and we had damage to the vehicle.  So, |
| 15:52:59 | 23 | yes, he was detained. |

*Velez - Davenport - 02/26/2020*

312

| | | |
|---|---|---|
| 15:53:12 | 1 | (Playing video.) |
| 15:53:12 | 2 | Q. Now, it appears that there's you, |
| 15:53:16 | 3 | Officer Schulz, and Officer Moriarity.  You were |
| 15:53:19 | 4 | all around the individual at this point.  Was |
| 15:53:22 | 5 | anything being said to Mr. Kistner? |
| 15:53:25 | 6 | A. I don't recall. |
| 15:53:26 | 7 | Q. Did anybody tell Mr. Kistner to get up? |
| 15:53:29 | 8 | A. I don't recall. |
| 15:53:30 | 9 | Q. Did you tell Mr. Kistner to get up? |
| 15:53:32 | 10 | A. I did not. |
| 15:53:33 | 11 | Q. Did anybody tell Mr. Kistner that he |
| 15:53:36 | 12 | would be arrested? |
| 15:53:37 | 13 | A. I don't recall. |
| 15:53:38 | 14 | Q. Did you tell Mr. Kistner that he would |
| 15:53:40 | 15 | be arrested? |
| 15:53:41 | 16 | A. I did not. |
| 15:53:58 | 17 | Q. Now, it appears that either Officer |
| 15:54:00 | 18 | Schulz or Officer Moriarity are reaching down.  Are |
| 15:54:07 | 19 | they picking up Mr. Kistner at that point? |
| 15:54:09 | 20 | A. I don't recall. |
| 15:54:09 | 21 | Q. Was Mr. Kistner ever brought into a |
| 15:54:13 | 22 | seated position? |
| 15:54:13 | 23 | A. I don't recall. |

*Velez - Davenport - 02/26/2020*

313

15:54:15  1          Q.   If an individual has been struck on

15:54:17  2     their head, would you examine that individual for a

15:54:21  3     head injury while he's lying down on the ground or

15:54:24  4     while he's in a seated position?

15:54:25  5          A.   If I had -- that's -- again, it's

15:54:27  6     situational, it's circumstantial.

15:54:30  7          Q.   Assuming that there's a potential for a

15:54:32  8     head injury, should that individual be brought to a

15:54:36  9     seated position?

15:54:37  10         MS. HUGGINS:   Form.

15:54:37  11         THE WITNESS:   Again, that depends on their

15:54:39  12    physical abilities, capabilities, if there's a

15:54:39  13    visible injury, if there's a complaint, if we can

15:54:42  14    see blood, it depends.

15:54:43  15         BY MR. DAVENPORT:

15:54:43  16         Q.   But what if -- what if there's an

15:54:46  17    internal injury, should that individual be brought

15:54:49  18    to a seated position?

15:54:50  19         A.   I'm not a medical --

15:54:50  20         MS. HUGGINS:   Form.

15:54:50  21         THE WITNESS:   -- professional.

15:54:53  22         BY MR. DAVENPORT:

15:54:53  23         Q.   Do they give you any sort of training

*Velez - Davenport - 02/26/2020*

314

15:54:56  1  on how to handle these situations?

15:54:57  2          A.    We have first aid.

15:54:59  3          Q.    Okay.  During your first aid training

15:54:59  4  did they ever discuss how to handle an individual

15:55:01  5  who may have an internal head injury while lying

15:55:04  6  down on the ground?

15:55:04  7          A.    Yes.

15:55:05  8          Q.    Okay.  And what do they teach you?

15:55:07  9          A.    If we know that they -- they have an

15:55:11 10  injury, they've expressed to us that they have some

15:55:15 11  type of injury that they believe they're immobile

15:55:16 12  and they cannot move, something of that nature,

15:55:17 13  then we would not move them.

15:55:20 14          Q.    Okay.  Now, if that person has

15:55:22 15  expressed to you that they have a head injury and

15:55:26 16  they're still rolling down on the ground, would you

15:55:30 17  bring that person into a seated position?

15:55:31 18          A.    It depends on their physical

15:55:35 19  capabilities, abilities.  If we ask them to and

15:55:38 20  they can, it depends.

15:55:40 21          Q.    Okay.  Was -- were handcuffs put on

15:55:45 22  Mr. Kistner by any of the officers?

15:55:47 23          A.    I believe so.

*Velez - Davenport - 02/26/2020*

315

15:55:48   1         Q.   And who put those handcuffs on

15:55:51   2   Mr. Kistner?

15:55:51   3         A.   I do not recall.

15:55:52   4         Q.   Okay.  How was Mr. Kistner handcuffed,

15:55:55   5   was he handcuffed while he was sitting down, while

15:55:59   6   he was laying down on the ground?

15:56:00   7         A.   I don't recall.

15:56:01   8         Q.   Was he handcuffed while he was standing

15:56:04   9   up?

15:56:04  10         A.   I don't recall.

15:56:05  11         Q.   How was Mr. Kistner brought from a

15:56:07  12   seated position to a standing position?

15:56:07  13         A.   I don't recall how Mr. Kistner was

15:56:09  14   brought up.

15:56:09  15         Q.   Did you bring --

15:56:10  16         A.   If he was.

15:56:11  17         Q.   Did you bring Mr. Kistner into -- from

15:56:13  18   a seated position to a standing position?

15:56:16  19         A.   I did not.

15:56:17  20         Q.   Do you recall who did bring Mr. Kistner

15:56:20  21   from a seated position to a standing position?

15:56:20  22         A.   I don't recall what officer handcuffed

15:56:22  23   him or how he was brought up.  I'm not certain.

*Velez - Davenport - 02/26/2020*

15:56:25  1          Q.    Now, at any point during this was there

15:56:33  2     any discussion that was had between any of the

15:56:36  3     officers at this point about what just happened?

15:56:38  4          A.    I don't recall.

15:56:40  5          Q.    Did Mr. Kistner say anything to any of

15:56:42  6     the officers?

15:56:43  7          A.    I don't recall.

15:56:48  8          Q.    Was he being belligerent?

15:56:51  9          A.    I don't recall.

15:56:54 10          Q.    What was Mr. Kistner's son saying at

15:56:58 11     this point?

15:56:58 12          A.    I don't know.

15:57:01 13          Q.    Based on where is he positioned, is he

15:57:04 14     in the police scene?

15:57:06 15          A.    Pardon?

15:57:07 16          Q.    Based on where Mr. Kistner's son is

15:57:10 17     located, is he within the police scene?

15:57:13 18          A.    Well, they're in the midst of bringing

15:57:16 19     him over to the other vehicle, so it's technically

15:57:21 20     part of where we were working.

15:57:27 21          Q.    Where Mr. Kistner's son is standing is

15:57:29 22     part of where the officers are working?

15:57:29 23          A.    Well, they're going to go past that

*Velez - Davenport - 02/26/2020*

317

15:57:32 1    area, so technically for right now as

15:57:33 2    they're -- they're moving this individual, that's

15:57:35 3    our -- our workable area.

15:57:36 4         So the scene where the incident happened is

15:57:38 5    where the patrol car is, but we're still in control

15:57:41 6    of everything happening while we have someone in

15:57:45 7    our custody and make sure they safely get to where

15:57:48 8    they need to go.

15:57:49 9         Q.   Okay.  Is Mr. Kistner's son doing

15:57:52 10   anything threatening at this point?

15:57:54 11         A.   I can't see exactly what he's doing.

15:57:54 12   His back is facing me right now --

15:57:54 13         Q.   Does it appear from the video --

15:57:58 14         A.   -- from this video.

15:57:58 15         Q.   -- that Mr. Kistner's son is doing

15:58:00 16   anything threatening at this point?

15:58:01 17         A.   I can't speculate what he's doing that

15:58:05 18   I cannot see.

15:58:08 19         Q.   But you agree that you can't see

15:58:10 20   anything that is threatening any of the officers,

15:58:14 21   correct?

15:58:14 22         A.   Again, I don't know what he's doing or

15:58:19 23   saying, if he's saying or doing anything, because I

15:58:24   1   can't tell and I don't recall.

15:58:24   2           Q.    Sure.   Do you see Mr. Kistner's son's

15:58:28   3   right hand?

15:58:29   4           A.    I do.

15:58:30   5           Q.    Okay.   And is it positioned where his

15:58:34   6   hand is on the right side of his face?

15:58:39   7           A.    Yes.

15:58:40   8           Q.    Okay.   What do you think he's doing?

15:58:46   9           MS. HUGGINS:   Form.

15:58:47  10           THE WITNESS:   I have no idea what he's

15:58:49  11   doing.

15:58:50  12           BY MR. DAVENPORT:

15:58:50  13           Q.    When you hold a cell phone, do you hold

15:58:53  14   it up next to your ear?

15:58:55  15           A.    Yes.

15:58:56  16           Q.    Is it possible that he has a cell phone

15:58:59  17   in his right hand and it's next to his ear?

15:59:02  18           MS. HUGGINS:   Form.

15:59:03  19           THE WITNESS:   It could be.

15:59:04  20           BY MR. DAVENPORT:

15:59:04  21           Q.    Okay.   Now, would there be any reason

15:59:09  22   for any of the officers to go speak with this

15:59:11  23   individual while he's on his cell phone?

15:59:15  1        A.    I don't know what the other officers,

15:59:17  2    what information they have, what they're observing,

15:59:21  3    if a conversation ensued that would cause them to.

15:59:23  4    I don't know.

15:59:23  5        Q.    What kind of a conversation would ensue

15:59:25  6    where an officer would need to go speak with an

15:59:29  7    individual who's on his cell phone?

15:59:29  8        A.    I don't know if he's engaging them

15:59:30  9    first.  I don't know.  It's speculation.  It

15:59:32 10    depends on if he asked them to come over.

15:59:36 11        We have lots of times when people are on

15:59:37 12    their cell phone and they still want to talk to us.

15:59:40 13        They sometimes are still with 911 on the

15:59:41 14    phone and they want to talk to us.  And we're like

15:59:42 15    we're here now, you can hang up the phone.

15:59:43 16        And so there's lots of times where we engage

15:59:46 17    and they're on their phone or they engage us and

15:59:48 18    they're on their phone.

15:59:48 19        Q.    Do you recall any time where

15:59:50 20    Mr. Kistner's son asked to speak with a police

15:59:53 21    officer?

15:59:53 22        A.    I don't recall.

15:59:53 23        Q.    Okay.  Do you know what officer is

16:00:03  1  facing towards Mr. Kistner's son?

16:00:07  2         A.    I believe that's Officer Schulz.

16:00:10  3         Q.    Okay.  Do you have -- do you know what

16:00:13  4  Mr. Schulz is saying to Mr. Kistner's son?

16:00:16  5         A.    I do not.

16:00:24  6         Q.    Now, at this time, does it appear that

16:00:26  7  Mr. Kistner's son is walking away from Mr. Schulz?

16:00:30  8         A.    I can't tell, he's half off the video.

16:00:33  9         Q.    He's not taking steps towards

16:00:37 10  Mr. Schulz, though, correct?

16:00:37 11         A.    If you could back it up, I could see it

16:00:40 12  again.

16:00:40 13         Q.    Sure?

16:00:42 14         A.    Where he was moving to.

16:00:49 15         Q.    At any time did he take steps towards

16:00:53 16  Mr. Schulz before he left the view of the camera?

16:00:55 17         A.    He took a few steps to the right and

16:00:59 18  then I couldn't tell.

16:01:03 19         Q.    Why would Officer Schulz be following

16:01:06 20  this individual at this point?

16:01:07 21         A.    You would have to ask Officer Schulz.

16:01:15 22         Q.    At this time, does it appear that

16:01:19 23  Mr. Kistner's son is voluntarily walking out into

16:01:22  1  the street?

16:01:24  2       A.    Possibly, I can't tell.

16:01:27  3       Q.    Does it appear that Mr. Schulz has his

16:01:30  4  arm on Mr. Kistner's son?

16:01:32  5       A.    There's a line through the middle.  I

16:01:35  6  can't tell.

16:01:35  7       Q.    I'll try to get rid of that.

16:01:39  8       Well, we'll just continue forward with the

16:01:43  9  video a little bit.

16:02:02 10       At this time, does it appear that Officer

16:02:04 11  Schulz's arm is on Mr. Kistner's son?

16:02:07 12       A.    Yes.

16:02:07 13       Q.    Okay.  Do you think that Mr. Kistner's

16:02:09 14  son is voluntarily walking out into the street?

16:02:12 15       A.    I'm not certain if he was voluntarily

16:02:16 16  or Officer Schulz is guiding him.  I'm -- again,

16:02:19 17  I'm not -- I don't know the circumstance of what

16:02:21 18  was happening there.

16:02:28 19       Q.    Now, at this time, does it appear that

16:02:31 20  Officer Schulz is controlling the movement of

16:02:33 21  Mr. Kistner's son?

16:02:35 22       A.    It's off screen.  I honestly can't

16:02:37 23  tell.

Velez - Davenport - 02/26/2020

322

16:02:38   1          Q.    Does it appear that he has his right

16:02:40   2   hand and his left arm raised towards Mr. Kistner's

16:02:44   3   son?

16:02:44   4          A.    I can't see that.

16:02:46   5          Q.    We'll get another view of that.

16:02:49   6          A.    Okay.

16:02:56   7          Q.    What happened right there between

16:02:58   8   Mr. Kistner's son and Mr. Schulz?

16:03:00   9          A.    It appears to be some type of furtive

16:03:03  10   movement, but I can't tell the specifics of what

16:03:06  11   happened, it's pixilated.

16:03:08  12          Q.    Does it appear that there was some sort

16:03:11  13   of a struggle between the two of them?

16:03:13  14          A.    Again, I would describe it as a furtive

16:03:18  15   movement.  I can't -- based on with the pixilation

16:03:21  16   of the video, I can't say what exactly was

16:03:24  17   happening there and I don't recall.

16:03:26  18          Q.    Okay.  Does it appear that there's now

16:03:35  19   another officer who's put their hands on

16:03:39  20   Mr. Kistner's son?

16:03:40  21          A.    Could you play it again?

16:03:42  22          Q.    Sure.  At any point, did you see

16:03:58  23   another officer put their hands on Mr. Kistner's

*Velez - Davenport - 02/26/2020*

16:04:01  1   son?

16:04:02  2          A.   Yes.

16:04:02  3          Q.   Okay.  And would you -- how would you

16:04:06  4   describe what you just saw?  Was there any sort of

16:04:11  5   resistance between Mr. Kistner's son and the

16:04:14  6   officers?

16:04:14  7          MS. HUGGINS:   Form.

16:04:15  8          THE WITNESS:   I -- I can't speculate as to

16:04:21  9   what was happening.  I don't -- I don't recall.

16:04:27 10   And this view --

16:04:28 11          BY MR. DAVENPORT:

16:04:28 12          Q.   Now, at this time, based on this view,

16:04:31 13   does it appear that you and Officer McDermott are

16:04:33 14   facing whatever is going on between Officer Schulz,

16:04:37 15   Officer Moriarity, and Mr. Kistner's son?

16:04:39 16          A.   Yes.

16:04:39 17          Q.   Okay.  So at any time you and Officer

16:04:43 18   McDermott could have stopped what was transpiring

16:04:46 19   between Officer Schulz, Officer Moriarity, and

16:04:49 20   Mr. Kistner's son?

16:04:50 21          A.   Could you repeat that?

16:04:52 22          Q.   At any time you or Officer McDermott

16:04:54 23   could have stopped what was transpiring between

*Velez - Davenport - 02/26/2020*

324

16:04:57    1    Officer Schulz, Officer Moriarity, and

16:04:59    2    Mr. Kistner's son?

16:05:00    3             A.    We were present.  If we felt there was

16:05:03    4    a need to intervene, we could have, we were there.

16:05:06    5             Q.    Okay.  Do you recall what Mr. Kistner's

16:05:09    6    son looks like?

16:05:10    7             A.    I don't.

16:05:11    8             Q.    Do you remember his physical stature?

16:05:14    9             A.    I don't.

16:05:15   10             Q.    Was he a tall guy, a short guy?

16:05:18   11             A.    I don't recall.

16:05:19   12             Q.    Was he skinny or was he fat?

16:05:21   13             A.    I believe he was more slender, but I

16:05:26   14    don't recall his exact physique.

16:05:29   15             Q.    Was he taller or shorter than you?

16:05:32   16             A.    I don't recall.

16:05:33   17             Q.    How tall are you?

16:05:34   18             A.    Five-two.

16:05:39   19             Q.    Now, it appears that Officer Schulz is

16:05:44   20    radioing in from his shoulder radio; do you see

16:05:51   21    that?

16:05:51   22             A.    Is he the one on the far -- I'm not

16:05:55   23    certain.

*Velez - Davenport - 02/26/2020*

325

16:05:55  1          MS. HUGGINS:  Just ask for a replay.

16:05:57  2          THE WITNESS:  Yeah, if you could just replay

16:05:58  3     it.

16:05:58  4          BY MR. DAVENPORT:

16:05:59  5          Q.   Sure.  Do you see that right there?

16:06:05  6          A.   Yes.

16:06:06  7          Q.   Does it appear that Officer Schulz is

16:06:09  8     radioing in?

16:06:09  9          A.   It appears so, yes.

16:06:11 10          Q.   Okay.  Do you know what Officer Schulz

16:06:13 11     was radioing in at that point?

16:06:14 12          A.   I do not.

16:06:15 13          Q.   Okay.  Was anything being said amongst

16:06:20 14     the officers?

16:06:22 15          A.   I don't recall.

16:06:23 16          Q.   Was anything being said to

16:06:26 17     Mr. Kistner's son?

16:06:26 18          A.   I don't recall.

16:06:28 19          Q.   Why was Mr. Kistner's son standing in

16:06:32 20     the street at this time?

16:06:32 21          A.   I don't recall.

16:06:33 22          Q.   Why would he have been standing in the

16:06:36 23     street at this time?

*Velez - Davenport - 02/26/2020*

326

| | | |
|---|---|---|
| 16:06:36 | 1 | A.    I don't recall. |
| 16:06:36 | 2 | MS. HUGGINS:   Form. |
| 16:06:37 | 3 | THE WITNESS:   So I can't speculate. |
| 16:06:39 | 4 | BY MR. DAVENPORT: |
| 16:06:45 | 5 | Q.    If there's an individual who is |
| 16:06:47 | 6 | invading a crime scene, would you have that |
| 16:06:51 | 7 | individual then stand where other officers can view |
| 16:06:54 | 8 | that person to detain them? |
| 16:06:57 | 9 | MS. HUGGINS:   Form. |
| 16:06:58 | 10 | THE WITNESS:   It depends on the situation. |
| 16:07:00 | 11 | BY MR. DAVENPORT: |
| 16:07:01 | 12 | Q.    Was Mr. Kistner's son being detained at |
| 16:07:04 | 13 | this time? |
| 16:07:04 | 14 | A.    He wasn't in my custody, so I'm not |
| 16:07:08 | 15 | certain.   I don't recall what he was doing standing |
| 16:07:10 | 16 | there. |
| 16:07:10 | 17 | Q.    Whose custody was he in? |
| 16:07:13 | 18 | A.    I don't know if he was in anyone's |
| 16:07:16 | 19 | custody at that point.   I'm not certain. |
| 16:07:19 | 20 | Q.    Okay.   I'm now going to show you what |
| 16:07:22 | 21 | has been marked as Exhibit 11 and the last four |
| 16:07:25 | 22 | numbers are 5233. |
| 16:08:08 | 23 | Now, it appears that there are now five |

*Velez - Davenport - 02/26/2020*

16:08:10  1    police officers within the view of this video; do

16:08:10  2    you see that?

16:08:13  3         A.   Yes.

16:08:13  4         Q.   Who is that fifth police officer that

16:08:16  5    arrived at the scene?

16:08:16  6         A.   Officer Dave Santana.

16:08:18  7         Q.   Okay.  Have you worked with Mr. Santana

16:08:19  8    in the past?

16:08:20  9         A.   Yes.

16:08:21 10         Q.   Have you ever ridden along with him in

16:08:24 11    the same police vehicle?

16:08:25 12         A.   Not that I could recall.

16:08:26 13         Q.   Okay.  Do you know why Officer Santana

16:08:28 14    arrived at the scene that day?

16:08:30 15         A.   I don't.

16:08:30 16         Q.   Okay.  Do you recall what he was saying

16:08:33 17    to you at this time?

16:08:34 18         A.   I don't.

16:08:36 19         Q.   Did he have any sort of a conversation

16:08:39 20    with Lieutenant McHugh before he arrived at the

16:08:47 21    scene?

16:08:47 22         A.   I don't know.

16:08:47 23         THE REPORTER:   Lieutenant who?

*Velez - Davenport - 02/26/2020*

328

| | | |
|---|---|---|
| 16:08:47 | 1 | BY MR. DAVENPORT: |
| 16:08:47 | 2 | Q.   McHugh. |
| 16:08:48 | 3 | Did any of the officers at the scene have a |
| 16:08:51 | 4 | conversation with Lieutenant McHugh at the scene? |
| 16:08:54 | 5 | A.   I believe so, yes. |
| 16:08:55 | 6 | Q.   And which officers were they? |
| 16:08:57 | 7 | A.   Officer McDermott and Schulz. |
| 16:09:02 | 8 | Q.   Do you recall what was said -- |
| 16:09:04 | 9 | A.   I don't. |
| 16:09:05 | 10 | Q.   -- to Mr. McHugh? |
| 16:09:11 | 11 | So after Mr. Kistner has been placed in the |
| 16:09:15 | 12 | back of the police vehicle, what sort of a |
| 16:09:18 | 13 | conversation would be had between officers in this |
| 16:09:20 | 14 | situation? |
| 16:09:21 | 15 | A.   I don't recall what the conversation |
| 16:09:23 | 16 | was. |
| 16:09:25 | 17 | Q.   Would there have been anything that you |
| 16:09:28 | 18 | would have had to have discussed at this point? |
| 16:09:30 | 19 | MS. HUGGINS:   Form. |
| 16:09:31 | 20 | THE WITNESS:   Possibly, but I don't recall. |
| 16:09:34 | 21 | BY MR. DAVENPORT: |
| 16:09:41 | 22 | Q.   Did anybody -- at any point after the |
| 16:09:44 | 23 | complaint summary report was closed for 33 |

*Velez - Davenport - 02/26/2020*

329

| | | |
|---|---|---|
| 16:09:49 | 1 | Schmarbeck, did anybody go talk with that |
| 16:09:53 | 2 | complainant again while at the scene of Schmarbeck? |
| 16:09:55 | 3 | A.    I'm not certain. |
| 16:10:09 | 4 | Q.    Did you see that gesture that was just |
| 16:10:12 | 5 | made by the police officer who's closest to the |
| 16:10:15 | 6 | camera at this point? |
| 16:10:16 | 7 | A.    No, could you back it up. |
| 16:10:18 | 8 | Q.    Well, with my curser on this |
| 16:10:21 | 9 | individual, I just want you to focus on that |
| 16:10:25 | 10 | individual.  Now, did you see his left hand right |
| 16:10:25 | 11 | there? |
| 16:10:33 | 12 | A.    Uh-huh, yes. |
| 16:10:34 | 13 | Q.    Okay.  What sort of a gesture is he |
| 16:10:37 | 14 | making? |
| 16:10:40 | 15 | A.    He moved his arm from left to right. |
| 16:10:42 | 16 | Q.    Okay. |
| 16:10:44 | 17 | A.    Or she.  I don't know who that is. |
| 16:10:46 | 18 | Q.    Was he discussing the incident at that |
| 16:10:49 | 19 | point? |
| 16:10:49 | 20 | A.    I don't recall. |
| 16:10:53 | 21 | Q.    At any point before you arrived at |
| 16:10:56 | 22 | ECMC, did you and the other officers discuss about |
| 16:10:59 | 23 | what you saw on Schmarbeck Avenue? |

*Velez - Davenport - 02/26/2020*

330

16:11:03  1         A.    Possibly, I just don't recall it.   I

16:11:07  2    don't recall the content or the context of

16:11:11  3    the -- of the conversation.

16:11:11  4         Q.    What's the physical stature of

16:11:14  5    Mr. Santana, is he a big guy?

16:11:17  6         A.    He's taller than me.

16:11:20  7         Q.    What's his weight, is he a skinny guy,

16:11:23  8    a bigger guy?

16:11:25  9         A.    He's medium.   I can't estimate his

16:11:25 10    weight.

16:11:25 11         Q.    Okay.

16:11:30 12         A.    I would say medium.

16:11:31 13         Q.    How long has Officer Santana worked in

16:11:34 14    the C District?

16:11:35 15         A.    I don't know.

16:11:36 16         Q.    Has he worked continuously in the C

16:11:40 17    District since January 1st of 2017?

16:11:43 18         A.    I believe so.

16:11:45 19         Q.    Okay.   Have you had any conversations

16:11:51 20    with Officer Santana since January 1st of 2017

16:11:55 21    regarding this incident?

16:11:58 22         A.    Aside from scheduling and if he has

16:12:05 23    appearances coming up, no.

*Velez - Davenport - 02/26/2020*

16:12:06  1          Q.   Okay.  Have you had any discussions
16:12:08  2     with any of the officers in the City of Buffalo
16:12:12  3     Police Department regarding this incident with
16:12:15  4     Mr. Kistner?
16:12:15  5          A.   Not that I could recall.
16:12:16  6          Q.   No discussions were had after a news
16:12:20  7     report came out regarding this incident?
16:12:23  8          A.   With other officers, not that I could
16:12:26  9     recall.
16:12:26 10          Q.   That you were present for?
16:12:28 11          A.   Correct.
16:12:28 12          Q.   Okay.  Now, it appears that you are all
16:12:34 13     dispersing at this point.  Did you know that you
16:12:36 14     would be going to ECMC from Schmarbeck?
16:12:39 15          A.   I believe so, yes.
16:12:41 16          Q.   Why isn't Officer Santana going with
16:12:45 17     you guys -- with you officers to ECMC?
16:12:50 18          A.   I -- I don't know.  We wouldn't need
16:12:53 19     him to come with us, but I don't know exactly why
16:12:57 20     he didn't come.
16:12:58 21          Q.   Okay.  Why does it require four
16:13:00 22     officers to transport Mr. Kistner to ECMC?
16:13:03 23          A.   Sometimes both cars will go up.  It's

*Velez - Davenport - 02/26/2020*

332

16:13:07  1 | not uncommon.

16:13:08  2 |         Q.   Have you ever experienced that before

16:13:11  3 | where two patrol vehicles are used to transport one

16:13:15  4 | individual to ECMC besides January 1st of 2017?

16:13:19  5 |         A.   Yes, I've seen it before.

16:13:20  6 |         Q.   Have you ever participated, have you

16:13:22  7 | ever been a passenger in that vehicle or driven a

16:13:26  8 | vehicle where there's been more than one patrol car

16:13:29  9 | to transport an individual?

16:13:30 10 |         A.   Yes.

16:13:31 11 |         Q.   Okay.   How many times has that

16:13:31 12 | happened?

16:13:31 13 |         A.   I don't recall a specific number of

16:13:34 14 | times.

16:13:34 15 |         Q.   Is it more or less than five?

16:13:35 16 |         A.   I would say more than five.

16:13:37 17 |         Q.   Is it more or less than 10?

16:13:41 18 |         A.   I -- I don't know.  I don't recall.  I

16:13:46 19 | can't put an exact number on it.

16:13:48 20 |         Q.   More or less than 20?

16:13:51 21 |         A.   Possibly more.  I've been on for about

16:13:54 22 | seven years now, so.

16:13:55 23 |         Q.   More or less than 50?

*Velez - Davenport - 02/26/2020*

333

| 16:13:57 | 1 | A. Maybe, possibly less than 50. |
| 16:14:00 | 2 | Q. More or less than a hundred? |
| 16:14:03 | 3 | A. Possibly, possibly less. |
| 16:14:08 | 4 | Q. Okay. Is there any sort of a |

16:14:23  5  circumstance that would -- that would indicate to

16:14:27  6  you as a police officer that more than one police

16:14:31  7  vehicle is required to transport an individual to

16:14:35  8  ECMC?

16:14:35  9      A. Could you repeat that?

16:14:36  10      Q. Is there anything that you would

16:14:38  11  observe as a police officer that would tell you

16:14:38  12  that more than one patrol vehicle is required to

16:14:41  13  transport an individual to ECMC?

16:14:43  14      A. Required, no. I mean, not required.

16:14:45  15  It would -- it depends, it's circumstantial.

16:14:47  16      Q. On January 1st of 2017 were two patrol

16:14:51  17  vehicles required to transport Mr. Kistner to ECMC?

16:14:54  18      A. Required, not that I can recall, no.

16:14:57  19      Q. So it would have been voluntary that

16:15:00  20  for one of the patrol vehicles to have gone to

16:15:04  21  ECMC?

16:15:04  22      A. Correct. But, again, I don't remember

16:15:06  23  the exact -- the -- the totality of that

*Velez - Davenport - 02/26/2020*

334

16:15:10  1  circumstance.  I'm not certain at what

16:15:19  2  point -- like I said, sir, like in the -- in the

16:15:22  3  CAD call, primary -- primary officer was changed.

16:15:25  4       There are conversations that I don't recall

16:15:28  5  that were had with other officers.  So at that

16:15:31  6  point I don't exactly recall why both cars went up.

16:15:34  7       It wouldn't have been required, but I don't

16:15:37  8  recall the exact reasoning for both cars going up,

16:15:40  9  but it's not completely uncommon.

16:15:43  10      Q.   Is it more typical where the injuries

16:15:46  11 are more serious that two patrol vehicles would be

16:15:48  12 required to go to ECMC?

16:15:48  13      A.   If injuries were deemed to be more

16:15:50  14 serious, an ambulance would have been required to

16:15:57  15 take somebody up.  We wouldn't transport them.

16:16:00  16      And possibly too, depending on how many

16:16:05  17 people were there.  It's circumstantial, it

16:16:06  18 depends.

16:16:06  19      Q.   Under what circumstances would an

16:16:11  20 officer cancel an ambulance and drive that

16:16:15  21 individual to ECMC himself?

16:16:17  22      A.   It would depend.

16:16:18  23      Q.   In this situation why was an ambulance

*Velez - Davenport - 02/26/2020*

335

16:16:20  1    canceled and Mr. Kistner driven to ECMC by Officer

16:16:24  2    Schulz and Officer Moriarity?

16:16:24  3         A.    You would have to ask the officer who

16:16:25  4    canceled the ambulance.

16:16:26  5         Q.    Did you agree that an ambulance should

16:16:29  6    be canceled at that point?

16:16:31  7         A.    I wasn't a part of that decision, so

16:16:34  8    and, again, I didn't witness the incident.  And

16:16:36  9    other officers were present who did and that was

16:16:37 10    the determination that was made.

16:16:39 11         Q.    If during your physical examination of

16:16:42 12    Mr. Kistner you deemed that an ambulance was

16:16:45 13    necessary to bring Mr. Kistner to ECMC, could you

16:16:48 14    have called for an ambulance?

16:16:49 15         A.    Based on what I had observed, he was

16:16:53 16    moving, he was able to stand up, he walked over to

16:16:57 17    the patrol car, he sat down.  So at that point he

16:17:01 18    was mobile and he was moving.

16:17:02 19         Q.    Well, Ms. Velez --

16:17:04 20         A.    He was conscious.

16:17:05 21         Q.    Ms. Velez, my question was if you

16:17:08 22    deemed it necessary to call an ambulance when

16:17:11 23    another officer had canceled that ambulance, could

16:17:14  1   you call and have that ambulance arrive?

16:17:17  2        A.    If I deemed it necessary that he needed

16:17:20  3   an ambulance and another officer canceled the

16:17:24  4   ambulance, if I deemed it necessary, then I could

16:17:25  5   always call an ambulance.

16:17:26  6        Q.    Okay.  Do you know why Officer Schulz

16:17:29  7   or Officer Moriarity or Officer McDermott canceled

16:17:33  8   the ambulance?

16:17:33  9        A.    I do not.

16:18:14 10              (Playing video.)

16:18:14 11        Q.    Okay.  Do you recognize the individual

16:18:15 12   who is now standing on the sidewalk on the left

16:18:18 13   part of the screen?

16:18:18 14        A.    Yes.

16:18:18 15        Q.    And who is that individual?

16:18:19 16        A.    Mr. Kistner's son.

16:18:19 17        Q.    Okay.  Do you know who the officer is

16:18:22 18   who is now facing Mr. Kistner's son?

16:18:24 19        A.    I believe that's Officer Schulz.

16:18:26 20        Q.    Okay.  Did you see Mr. Kistner's son

16:18:36 21   raise his left arm?

16:18:38 22        A.    Could you play it back?

16:18:39 23        Q.    Yes.  Do you see Mr. Kistner's son

*Velez - Davenport - 02/26/2020*

337

16:19:03  1  raise his left arm?

16:19:04  2         A.    Yes.

16:19:05  3         Q.    Okay.  Did he also take steps away from

16:19:08  4  Mr. Schulz?

16:19:08  5         A.    Yes.

16:19:09  6         Q.    Based on those two actions by

16:19:12  7  Mr. Kistner's son, do you think that he was looking

16:19:14  8  to speak with Mr. Schulz?

16:19:16  9         A.    I don't know what he was doing.

16:19:18 10         Q.    If an individual raises their left arm

16:19:21 11  and starts to walk away from you as a police

16:19:25 12  officer, do you think that that individual wants to

16:19:26 13  speak with you?

16:19:26 14         A.    Possibly, they could.  I don't know

16:19:28 15  what he's doing.  There's -- he could be saying

16:19:32 16  wait a minute, hold on, I still want to talk.  I

16:19:35 17  don't know.  I don't recall.

16:19:35 18         Q.    Would you follow that individual if

16:19:37 19  they took steps away from you and put their left

16:19:40 20  arm up and said wait a minute?

16:19:43 21         A.    It depends.

16:19:46 22         Q.    I'm sorry.  Ms. Velez, can you watch

16:19:50 23  the video?

16:19:51   1        A.    Yes, I didn't know if you had more

16:19:54   2    questions.

16:19:54   3        Q.    No, that was it.

16:20:23   4        Now, watching this video, it appears -- does

16:20:25   5    it appear that Mr. Kistner's son has his right arm

16:20:30   6    raised?

16:20:30   7        And I can go back, if you need me to.

16:20:32   8        A.    No, I can see it.  It appears that he

16:20:36   9    does have his right arm raised.

16:20:38  10        Q.    Okay.  And does it appear that his

16:20:40  11    right hand is on the right side of his face?

16:20:43  12        A.    Yes.

16:20:44  13        Q.    What would you expect Mr. Kistner's son

16:20:48  14    to be doing in this situation if his right arm is

16:20:48  15    raised to his face in that way?

16:20:51  16        A.    He could be on the phone.

16:20:53  17        Q.    Okay.  Now, if Mr. Kistner's son is on

16:21:01  18    the phone, what reason would Mr. Schulz have to

16:21:05  19    grab Mr. Kistner's son and drag him back out into

16:21:09  20    the street?

16:21:09  21        MS. HUGGINS:    Form.

16:21:10  22        THE WITNESS:    You would have to ask Officer

16:21:15  23    Schulz about his interaction at that point.

*Velez - Davenport - 02/26/2020*

339

16:21:16  1          BY MR. DAVENPORT:

16:21:17  2          Q.   Is there anything that Mr. Kistner's

16:21:19  3   son could have said on the phone that would have

16:21:22  4   caused Officer Schulz to drag him out into the

16:21:25  5   street?

16:21:25  6          A.   I don't know.

16:21:25  7          Q.   Have you ever encountered somebody

16:21:28  8   where you had to drag them out into the street

16:21:29  9   based on something that they said during a phone

16:21:29 10   call?

16:21:30 11          A.   Me, personally?

16:21:32 12          Q.   You, personally.

16:21:33 13          A.   Not that I could recall.

16:21:34 14          Q.   Okay.   Now, at any time did it appear

16:21:45 15   that Mr. Kistner's son walked out there voluntarily

16:21:49 16   or was he guided out there by Mr. Schulz?

16:21:53 17          A.   Can you play it back?

16:21:55 18          Q.   I can play it again.

16:21:57 19          A.   Thank you.

16:22:20 20          Q.   At any time did it appear that

16:22:23 21   Mr. Kistner's son voluntarily walked out into the

16:22:25 22   street?

16:22:25 23          A.   It appears as though he was guided by

*Velez - Davenport - 02/26/2020*

340

16:22:26   1    Officer Schulz.

16:22:28   2         Q.   Now, I want you to watch Mr. Kistner's

16:22:35   3    son's right hands and I want you to tell me if at

16:22:40   4    any point it leaves from the right side of his head.

16:22:55   5         At any time did Mr. Kistner's hand leave the

16:22:59   6    right side of his head before Officer Schulz

16:23:05   7    reached across Mr. Kistner's son's body?

16:23:05   8         A.   I see his arm away from his head right

16:23:10   9    now at 10:27:15 mark.

16:23:10  10         Q.   But would that have been done before or

16:23:13  11    after Officer Schulz reached across Mr. Kistner's

16:23:14  12    son's body?

16:23:14  13         A.   It happened so fast and it's pixilated,

16:23:17  14    I can't tell which action was first.

16:23:20  15         Q.   I'll play it again and I want you to

16:23:22  16    watch his right hand carefully.

16:23:42  17         Prior to Officer Schulz reaching across

16:23:45  18    Mr. Kistner's son's body, did Mr. Kistner's son's

16:23:49  19    hand ever leave the right side of his face?

16:23:52  20         A.   It appears that happened -- it appears

16:23:53  21    as if Officer Schulz's body turns in, the right arm

16:23:59  22    of the subject comes down.

16:24:03  23         Q.   When Mr. Schulz turns his body towards

*Velez - Davenport - 02/26/2020*

341

16:24:07  1   Mr. Kistner's son, Mr. Kistner's son, does

16:24:12  2   Mr. Schulz reach across Mr. Kistner's son's body?

16:24:16  3        MS. HUGGINS:  Form.

16:24:16  4        THE WITNESS:  I can't tell.

16:24:17  5        BY MR. DAVENPORT:

16:24:18  6        Q.   I'll play it again.

16:24:45  7        Prior -- well, in this case when Mr. -- when

16:24:47  8   Mr. Schulz turned his body towards Mr. Kistner's

16:24:50  9   son, did he reach across Mr. Kistner's son's body?

16:24:54 10        A.   My answer doesn't change.  I can't

16:24:57 11   tell.  And it appears to me as if Officer Schulz

16:25:01 12   turns his body, Mr. Kistner's son's arm comes down,

16:25:01 13   his right arm comes down at the same time.

16:25:03 14        Q.   Does it appear that Mr. Schulz grabbed

16:25:06 15   something from Mr. Kistner's son?

16:25:09 16        A.   I can't tell.

16:25:15 17        Q.   Now, I want to play this video again.

16:25:32 18   Now, as this whole exchange is happening between

16:25:36 19   Mr. Schulz and Mr. Kistner's son, I want you to

16:25:40 20   watch and see where are you located at this time,

16:25:56 21   where are you located?

16:25:57 22        A.   Top left.

16:25:58 23        Q.   Okay.  Are you facing the incident at

*Velez - Davenport - 02/26/2020*

342

16:26:02   1   this point?

16:26:02   2         A.   Yes.

16:26:03   3         Q.   Okay.  Were you facing the incident

16:26:05   4   when Mr. Kistner's son was led out into the

16:26:08   5   driveway or into the street?

16:26:10   6         A.   I don't recall.

16:26:31   7         Q.   While Mr. Kistner's son is being

16:26:35   8   dragged out into the street, are you facing

16:26:38   9   Mr. Kistner's son and Mr. Schulz?

16:26:40  10         MS. HUGGINS:   Form.

16:26:40  11         THE WITNESS:   As Mr. Kistner's son is being

16:26:40  12   guided out, what appears to be guided out into the

16:26:43  13   street, I am standing in the middle of the street.

16:26:47  14   I can't tell which way I'm looking and I don't

16:26:49  15   recall.

16:26:49  16         BY MR. DAVENPORT:

16:26:49  17         Q.   Okay.  Does it appear at this point

16:26:51  18   that Mr. Son -- Mr. Kistner's son was being guided

16:26:56  19   with that exchange right there?

16:26:57  20         And I can replay it again for you.

16:27:01  21         A.   I -- I can see it.

16:27:06  22         Q.   Is Mr. Kistner's son being guided?

16:27:09  23         A.   Mr. Kistner's son looks like he's

*Velez - Davenport - 02/26/2020*

343

16:27:14  1  pulling away.

16:27:14  2       Q.    Does it appear that the officers,

16:27:18  3  Officer Schulz and Officer Moriarity, both have

16:27:21  4  their hands on Mr. Kistner's son?

16:27:24  5       A.    At this point it looks like only one

16:27:27  6  officer has their hands on Mr. Kistner's son.

16:27:30  7       Q.    At any point does it appear that

16:27:31  8  Mr. Schulz and Mr. Moriarity both have their hands

16:27:33  9  on Mr. Kistner's son?

16:27:33 10       A.    Yes.

16:27:34 11       Q.    Okay.   What are they doing right here?

16:27:40 12       A.    They both have their hands on him.   I

16:27:44 13  don't know the exact scenario of the situation

16:27:48 14  that's happening.   I don't recall it.

16:27:49 15       Q.    But you were standing there, correct?

16:27:51 16       A.    Correct.

16:27:53 17       Q.    And if you thought that there was any

16:27:53 18  incorrect police conduct that was going on at this

16:27:53 19  point, you could have stopped it?

16:27:55 20       A.    I could have intervened.

16:27:57 21       Q.    Okay.   Have you ever taken an

16:27:59 22  individual's cell phone away from them at a police

16:28:03 23  scene, Ms. Velez?

*Velez - Davenport - 02/26/2020*

344

16:28:08   1          A.    I'm trying to think of a specific

16:28:12   2    incident, but I can't recall.  I'm sure I have, but

16:28:15   3    I just can't recall anything specific at this time.

16:28:17   4          Q.    What reasons would you take away an

16:28:20   5    individual's cell phone at a scene?

16:28:23   6          MS. HUGGINS:  Form.

16:28:23   7          THE WITNESS:  If we're taking them into

16:28:26   8    custody, we would take their property, they cannot

16:28:29   9    have it if it's evidence.

16:28:30  10          BY MR. DAVENPORT:

16:28:31  11          Q.    Was Mr. Kistner's son being taken into

16:28:34  12    custody at this time?

16:28:34  13          A.    I don't know what was happening at this

16:28:35  14    time.  I don't recall.

16:28:35  15          Q.    Was Mr. Kistner's son ever taken into

16:28:39  16    custody at this -- on this day?

16:28:41  17          A.    Not that I could recall.

16:28:43  18          Q.    Okay.  So if Mr. Kistner's son wasn't

16:28:46  19    being taken into custody, why would his cell phone

16:28:48  20    be taken away from him?

16:28:50  21          MS. HUGGINS:  Form.

16:28:51  22          THE WITNESS:  I don't know that it was taken

16:28:53  23    from him.

16:28:53  1          BY MR. DAVENPORT:

16:28:54  2          Q.   Assuming that a cell phone was taken

16:28:54  3   away from Mr. Kistner's son, why would a cell phone

16:28:57  4   be taken away from him?

16:28:57  5          A.   Again, it depends on the situation.

16:28:59  6          Q.   Besides if he's being taken into

16:29:02  7   custody, when would -- when would he have his cell

16:29:06  8   phone taken away from him?

16:29:08  9          A.   I've already discussed that in

16:29:09 10   different scenarios.  If it's evidence, it was used

16:29:11 11   as a weapon.  If somebody is using it to obstruct.

16:29:13 12          I'm not -- there's a bunch of different

16:29:14 13   scenarios.  It would depend on the circumstance,

16:29:15 14   the situation, the totality of what was happening

16:29:17 15   at the time.

16:29:19 16          Q.   How would Mr. Kistner's son have used

16:29:21 17   his cell phone to obstruct what you police officers

16:29:24 18   were doing?

16:29:24 19          MS. HUGGINS:   Form.

16:29:24 20          THE WITNESS:   I don't know at that time.

16:29:26 21          BY MR. DAVENPORT:

16:29:26 22          Q.   Have you ever taken away an

16:29:28 23   individual's cell phone because they were

*Velez - Davenport - 02/26/2020*

346

| | | |
|---|---|---|
| 16:29:30 | 1 | obstructing what police officers were doing? |
| 16:29:33 | 2 | A.   I have not. |
| 16:29:37 | 3 | Q.   Now, Ms. Velez -- can we just turn on |
| 16:29:41 | 4 | the -- thank you. |
| 16:30:00 | 5 | Ms. Velez, were you ever paid a witness fee |
| 16:30:05 | 6 | for Mr. Kistner's criminal proceeding? |
| 16:30:07 | 7 | A.   A witness fee? |
| 16:30:08 | 8 | Q.   Yes. |
| 16:30:09 | 9 | A.   No. |
| 16:30:09 | 10 | Q.   Okay.  Were you paid any sort of a wage |
| 16:30:13 | 11 | involving Mr. Kistner's criminal proceeding for an |
| 16:30:16 | 12 | appearance that you made? |
| 16:30:18 | 13 | MS. HUGGINS:  Form. |
| 16:30:19 | 14 | THE WITNESS:  I would -- I could get court |
| 16:30:21 | 15 | time if it's on my scheduled day off. |
| 16:30:24 | 16 | BY MR. DAVENPORT: |
| 16:30:24 | 17 | Q.   Okay.  What is court time? |
| 16:30:27 | 18 | A.   It's paid for your appearance at court, |
| 16:30:28 | 19 | it's paid time for your appearance at court. |
| 16:30:30 | 20 | Q.   Is that just for criminal matters? |
| 16:30:32 | 21 | A.   No. |
| 16:30:32 | 22 | Q.   It's for civil matters as well? |
| 16:30:34 | 23 | A.   Yes. |

*Velez - Davenport - 02/26/2020*

347

16:30:35  1          Q.    Are you being paid a court fee for your

16:30:39  2    appearance today?

16:30:39  3          A.    Yes.

16:30:39  4          Q.    And is that your normal rate?

16:30:42  5          A.    I don't recall exactly what it is.

16:30:44  6          Q.    Is today one of your scheduled days off?

16:30:48  7          A.    It is.

16:30:49  8          Q.    Okay.  Are you being paid overtime for

16:30:51  9    your appearance today?

16:30:51 10          A.    I know that it's not an overtime rate.

16:30:54 11          Q.    Okay.  When you appeared for

16:30:57 12    Ms. McDermott's deposition, were you paid an

16:31:01 13    appearance fee or a court fee?

16:31:03 14          MS. HUGGINS:  Form.

16:31:04 15          THE WITNESS:  I believe I was on duty that

16:31:06 16    day, so, no.

16:31:07 17          BY MR. DAVENPORT:

16:31:07 18          Q.    Were you still paid your normal -- your

16:31:09 19    normal duty wage?

16:31:10 20          A.    Yes.

16:31:11 21          MR. DAVENPORT:  Okay.  No further questions.

16:31:24 22          (Deposition concluded at 4:31 p.m.)

         23                         *    *    *

348

1        I hereby CERTIFY that I have read the

2   foregoing 347 pages, and that they are a true and

3   accurate transcript of the testimony given by me in

4   the above-entitled action on February 26, 2020.

5

6

7                        ------------------------

                         JENNY VELEZ

8

9   Sworn to before me this

10

11  -------- day of  ---------, 2020.

12

13  --------------------------

14  NOTARY PUBLIC.

15

16

17

18

19

20

21

22

23

1  STATE OF NEW YORK )

2                         ss:

3  COUNTY OF ERIE     )

4

5       I DO HEREBY CERTIFY as a Notary Public in and

6  for the State of New York, that I did attend and

7  report the foregoing deposition, which was taken

8  down by me in a verbatim manner by means of machine

9  shorthand.  Further, that the deposition was then

10 reduced to writing in my presence and under my

11 direction.  That the deposition was taken to be

12 used in the foregoing entitled action.  That the

13 said deponent, before examination, was duly sworn

14 to testify to the truth, the whole truth and

15 nothing but the truth, relative to said action.

16

17

18                    *Lynne E. DiMarco*

19                    LYNNE E. DiMARCO,
                       Notary Public.

20

21

22

23

350

1                        INDEX TO EXHIBITS

2    Exhibit                    Description                    Page

3      EXH. 24          Buffalo Police Academy                 44
                        Training Record
4
       EXH. 25          Dispatch Monitor Unit                 118
5                       History Report

6      EXH. 26          Arresting Report                      250

7      EXH. 27          Buffalo Police Department             252
                        Prisoner Property Receipt
8
       EXH. 28          Department of Law Letter              259
9                       dated 12/17/19

10     EXH. 29          Verification Document                 265

11

12

13   * Exhibits 24 - 29 retained by Mr. Davenport.

14

15

16

17

18

19

20

21

22

23

351

1                           INDEX TO WITNESSES

2       Witness                  Examination              Page

3       JENNY VELEZ          BY MR. DAVENPORT:              3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23