

# CITY OF BUFFALO

## DEPARTMENT OF LAW

# EXHIBIT

# J

# ORIGINAL

## VIDEO DEPOSITION
## KYLE T. MORIARITY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------------

JAMES C. KISTNER,

                       Plaintiff,

          - vs -     Civil Action No.
                       18-cv-402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
 capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),

                    Defendants.

------------------------------------------

*JACK W. HUNT & ASSOCIATES, INC.*

CITY OF BUFFALO
DEPARTMENT OF LAW

MAR 0 6 2020

RECEIVED



2

1          Video deposition of **KYLE T. MORIARITY**,

2   Defendant, taken pursuant to the Federal Rules of

3   Civil Procedure, in the offices of JACK W. HUNT &

4   ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

5   New York, on February 21, 2020, commencing at

6   10:09 a.m., before ANNE T. BARONE, RPR, Notary

7   Public.

8

9   APPEARANCES:        RUPP BAASE
                        PFALZGRAF & CUNNINGHAM, LLC,
10                      By CHAD DAVENPORT, ESQ.,
                        1600 Liberty Building,
11                      Buffalo, New York  14202,
                        (716) 854-3400,
12                      davenport@ruppbaase.com,
                        Appearing for the Plaintiff.

13

14                      TIMOTHY A. BALL, ESQ.,
                        Corporation Counsel,
15                      By MAEVE E. HUGGINS, ESQ.,
                        Assistant Corporation Counsel,
16                      1137 City Hall,
                        Buffalo, New York  14202,
17                      (716) 851-4334,
                        mhuggins@city-buffalo.com,
18                      Appearing for the Defendants.

19

20  PRESENT:            JAMES KISTNER

                        NOLAN HALE, Rupp Baase
21                      Pfalzgraf & Cunningham, LLC

22                      TIMOTHY M. HUNT, CLVS, Videographer

23

09:43:42

3

10:07:53  1          THE REPORTER:  Read and sign?

10:07:56  2          MS. HUGGINS:  45 days, please.

10:07:57  3          THE REPORTER:  And Ms. Huggins will be

10:08:00  4  supplied?

10:08:00  5          MR. DAVENPORT:  Yes.

10:08:01  6          THE REPORTER:  Thank you.

10:08:01  7

10:09:53  8  K Y L E   T.   M O R I A R I T Y, 695 Main Street,

10:10:06  9  Buffalo, New York, after being duly called and

10:10:06 10  sworn, testified as follows:

10:10:11 11

10:10:11 12          EXAMINATION BY MR. DAVENPORT:

10:10:11 13

10:10:15 14          Q.    Good morning, Mr. Moriarity.

10:10:16 15          A.    Good morning.

10:10:16 16          Q.    My name is Chad Davenport.  I'm an

10:10:18 17  attorney with Rupp Baase Pfalzgraf & Cunningham,

10:10:21 18  representing the plaintiff.

10:10:23 19          So we're here today to discuss a -- an

10:10:26 20  incident that happened on January 1st, 2017.

10:10:29 21  Before we start, I just want to explain

10:10:31 22  a few of the ground rules for this deposition.

10:10:33 23          So our discussion today is being transcribed

*Moriarity - Davenport - 2/21/20*

4

| | | |
|---|---|---|
| 10:10:38 | 1 | by a stenographer.  In order to have an accurate |
| 10:10:40 | 2 | testimony here today and an accurate record of that |
| 10:10:43 | 3 | testimony, I'm going to ask that you wait until |
| 10:10:45 | 4 | I finish any question before giving your answer. |
| 10:10:49 | 5 | Can you do that for me? |
| 10:10:51 | 6 | A.    Yeah.   Yeah. |
| 10:10:51 | 7 | Q.    So, in addition, I just want to make |
| 10:10:53 | 8 | sure that you use verbal responses for each of the |
| 10:10:58 | 9 | questions that I ask of you.  Head nods, shaking of |
| 10:11:00 | 10 | the head, neither of those will be able to appear |
| 10:11:02 | 11 | on our transcript, so I'm going to ask that you |
| 10:11:05 | 12 | respond to each question verbally.  Can you do that |
| 10:11:08 | 13 | for me? |
| 10:11:08 | 14 | A.    Yes. |
| 10:11:10 | 15 | Q.    Thank you. |
| 10:11:10 | 16 | And if any time you don't understand |
| 10:11:13 | 17 | a question, if you want me to rephrase it, simply |
| 10:11:17 | 18 | ask me and I'm more than happy to do so.  Can you |
| 10:11:19 | 19 | do that for me? |
| 10:11:20 | 20 | A.    Yes. |
| 10:11:21 | 21 | Q.    And if at any time you need to take -- |
| 10:11:23 | 22 | take a break, you're more than welcome to.  Just |
| 10:11:26 | 23 | let me know, let the court reporter know, and we |

10:11:29 1 | can take that break for you.

10:11:30 2 | A. Okay.

10:11:31 3 | Q. Have you taken any drugs or alcohol

10:11:33 4 | that would affect your testimony here today --

10:11:35 5 | A. No.

10:11:36 6 | Q. -- within the last 24 hours?

10:11:37 7 | A. Sorry. No.

10:11:39 8 | Q. Thank you.

10:11:40 9 | Where were you born?

10:11:44 10 | A. Here in Buffalo.

10:11:46 11 | Q. Okay. Where do you live currently?

10:11:49 12 | MS. HUGGINS: Well, form, and I would

10:11:52 13 | object. He is an active duty police officer. He's

10:11:54 14 | given a business address. He's currently employed

10:11:57 15 | by the City of Buffalo.

10:11:58 16 | MR. DAVENPORT: We're also suing them in

10:11:59 17 | their individual capacity, so that means we would

10:12:02 18 | have to know where their residence is as well. You

10:12:04 19 | can put your objections on the record.

10:12:06 20 | But you may answer. You can answer.

10:12:08 21 | MS. HUGGINS: What I would -- what I would

10:12:11 22 | propose to counsel is I would provide that

10:12:13 23 | information, not in the form of a video deposition,

*Moriarity - Davenport - 2/21/20*

6

| | | |
|---|---|---|
| 10:12:17 | 1 | but I -- |
| 10:12:17 | 2 | BY MR. DAVENPORT: |
| 10:12:17 | 3 | Q.    You can answer. |
| 10:12:17 | 4 | MS. HUGGINS:   -- would provide that. |
| 10:12:19 | 5 | MR. DAVENPORT:  You don't have to -- you |
| 10:12:20 | 6 | can't tell him to not answer that question.  He can |
| 10:12:22 | 7 | answer that question.  You can't direct him to not |
| 10:12:25 | 8 | answer the question. |
| 10:12:25 | 9 | You may answer the question. |
| 10:12:27 | 10 | MS. HUGGINS:  Counsel, I -- I've indicated |
| 10:12:28 | 11 | I would provide that information to you but in -- |
| 10:12:28 | 12 | MR. DAVENPORT:  I understand that you will |
| 10:12:30 | 13 | provide -- |
| 10:12:30 | 14 | MS. HUGGINS:   --  another form. |
| 10:12:31 | 15 | MR. DAVENPORT:  -- that information in |
| 10:12:33 | 16 | another form, but he can answer that question, and |
| 10:12:35 | 17 | you cannot direct him to not answer that question. |
| 10:12:37 | 18 | You may answer the question. |
| 10:12:40 | 19 | You cannot direct him to not answer the |
| 10:12:43 | 20 | question. |
| 10:12:43 | 21 | You may answer the question. |
| 10:12:45 | 22 | THE WITNESS:  I'll keep it as 695 Main Street. |
| 10:12:48 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

7

10:12:48  1          Q.    Is that here in Buffalo?

10:12:49  2          A.    Yes.

10:12:51  3          Q.    Have you served in the military?

10:12:53  4          A.    Yes.

10:12:54  5          Q.    Were you honorably discharged?

10:12:57  6          A.    Yes.

10:12:58  7          Q.    Do you have any criminal convictions?

10:13:01  8          A.    No.

10:13:03  9          Q.    What is your highest level of

10:13:05 10   education?

10:13:06 11          A.    College.  Associate's degree.

10:13:09 12          Q.    And what was that associate's degree

10:13:11 13   in?

10:13:11 14          A.    Criminal justice.

10:13:13 15          Q.    So did you go -- did you go for your

10:13:16 16   associate's degree before or after the military?

10:13:18 17          A.    After.

10:13:19 18          Q.    And what years did you go for education

10:13:23 19   for your associate's degree?

10:13:24 20          A.    2014 -- or I'm sorry.  2012, 2014.

10:13:29 21          Q.    And then did you go into police academy

10:13:33 22   training immediately after?

10:13:35 23          A.    I went in 2015.  January 2015.

*Moriarity - Davenport - 2/21/20*

8

| | | |
|---|---|---|
| 10:13:41 | 1 | Q.    So what did you do between 2014 to |
| 10:13:45 | 2 | 2015? |
| 10:13:45 | 3 | A.    Side jobs. |
| 10:13:48 | 4 | Q.    Did you have a plan, after your |
| 10:13:51 | 5 | associate's degree, to become a police officer? |
| 10:13:52 | 6 | A.    Yes. |
| 10:13:53 | 7 | Q.    Where did you want to serve? |
| 10:13:57 | 8 | Did you have any municipality that you |
| 10:13:59 | 9 | wished to go to? |
| 10:14:00 | 10 | A.    Buffalo. |
| 10:14:01 | 11 | Q.    City of Buffalo? |
| 10:14:02 | 12 | A.    Yeah. |
| 10:14:02 | 13 | Q.    Did you take any training as part of |
| 10:14:04 | 14 | your ECC courses? |
| 10:14:08 | 15 | A.    What do you mean by that? |
| 10:14:09 | 16 | Q.    So with Erie County, you did some |
| 10:14:11 | 17 | training before you were able to enter as a city |
| 10:14:15 | 18 | police -- Buffalo police officer, correct? |
| 10:14:17 | 19 | MS. HUGGINS:   Form.   You can answer. |
| 10:14:18 | 20 | THE WITNESS:   Yeah.   As a pre-employment. |
| 10:14:20 | 21 | I paid -- paid my way through academy before I was |
| 10:14:23 | 22 | hired. |
| 10:14:23 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

9

| | | |
|---|---|---|
| 10:14:23 | 1 | Q.   Okay.  And so you started in 2015? |
| 10:14:26 | 2 | A.   2015, yeah. |
| 10:14:27 | 3 | Q.   And how long did that last for?  How |
| 10:14:29 | 4 | long was the training? |
| 10:14:30 | 5 | A.   Six months. |
| 10:14:30 | 6 | Q.   Six months?  Okay. |
| 10:14:32 | 7 | So would that have been in 2016 that you |
| 10:14:35 | 8 | completed that training? |
| 10:14:36 | 9 | A.   No.  It was 2015. |
| 10:14:37 | 10 | Q.   End of 2015? |
| 10:14:39 | 11 | Do you remember roughly what month that was? |
| 10:14:41 | 12 | A.   January to June. |
| 10:14:42 | 13 | Q.   Okay.  So did you immediately start |
| 10:14:50 | 14 | working in the City of Buffalo as a police officer? |
| 10:14:52 | 15 | A.   No.  The exam -- the exam was given |
| 10:14:58 | 16 | three or four months after I completed academy. |
| 10:15:01 | 17 | Q.   Okay. |
| 10:15:01 | 18 | A.   And then I waited on the list and |
| 10:15:04 | 19 | waited to get hired. |
| 10:15:05 | 20 | Q.   Okay.  So when would that have been |
| 10:15:08 | 21 | that you had been hired? |
| 10:15:10 | 22 | A.   November 4th of 2016. |
| 10:15:12 | 23 | Q.   Of 2016? |

*Moriarity - Davenport - 2/21/20*

10

10:15:13  1        A.    Yeah.

10:15:13  2        Q.    Okay.  So was there an interim in between

10:15:17  3    when you finished your training and before you were

10:15:20  4    hired?

10:15:21  5        Because I -- I think you said that at the

10:15:22  6    end of 2015 was when you completed that training,

10:15:25  7    correct?

10:15:25  8        A.    I completed -- I completed academy in

10:15:28  9    2015.

10:15:29  10        Q.    Okay.

10:15:29  11        A.    June.  Got hired November 4th of 2016.

10:15:35  12    Was sent back to Erie Community College for the

10:15:39  13    rest of phase 2 for academy.  So firearms, there

10:15:44  14    was some more like motor vehicle stuff.  There was

10:15:48  15    some other terrorism classes.

10:15:50  16        And then I came back to the Buffalo Police

10:15:54  17    unit's academy, where I went through policy

10:15:57  18    training, and I was done with that in late

10:16:02  19    December.

10:16:03  20        Q.    Okay.  So there's two phases then to

10:16:08  21    your training with --

10:16:10  22        A.    There's two phases --

10:16:11  23        Q.    Okay.

10:16:12  1          A.     -- through -- through a police academy,

10:16:16  2   yeah.

10:16:16  3          Q.     Okay.  So what would the first phase

10:16:18  4   consist of?

10:16:18  5          A.     Article 35, penal law, drug recognition,

10:16:24  6   EVOC training, so like motor, driving stuff.

10:16:26  7          Q.     Okay.  And then what would the second

10:16:29  8   phase consist of?

10:16:30  9          A.     Firearms.  I believe there was

10:16:32 10   a terrorism class in there.  There might have been

10:16:38 11   like an explosive class in there.

10:16:41 12          Q.     Okay.  So do you have to pass the first

10:16:44 13   phase in order to make it to the second phase, or

10:16:47 14   does everybody who enters the academy move on to

10:16:49 15   the second phase?

10:16:49 16          MS. HUGGINS:  Well, form.  Do you mean for

10:16:52 17   this officer in particular, his academy experience,

10:16:56 18   or in general?

10:16:57 19          MR. DAVENPORT:  I'm just asking him

10:16:58 20   a general question.

10:16:59 21          MS. HUGGINS:  Okay.

10:17:00 22          THE WITNESS:  You have to pass every event

10:17:04 23   daily as they -- as they come through to move on to

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 10:17:06 | 1 | the next.  But, yeah, you would have to pass |
| 10:17:09 | 2 | phase 1 to go to phase 2. |
| 10:17:11 | 3 | BY MR. DAVENPORT: |
| 10:17:11 | 4 | Q.   Okay.  And so you passed phase 1? |
| 10:17:13 | 5 | A.   Yeah. |
| 10:17:13 | 6 | Q.   Okay.  So you ended phase 1 I believe |
| 10:17:16 | 7 | at the end of 2015, and then did you begin phase 2 |
| 10:17:20 | 8 | during 2016?  Is that how that worked? |
| 10:17:22 | 9 | A.   So I -- I ended phase 1 in June of |
| 10:17:27 | 10 | 2015, was hired in November 4th of 2016, completed |
| 10:17:33 | 11 | phase 2 by middle of December -- |
| 10:17:37 | 12 | Q.   Okay. |
| 10:17:38 | 13 | A.   -- 2016. |
| 10:17:40 | 14 | Q.   So you -- you wait until after you're |
| 10:17:42 | 15 | hired then before you begin phase 2? |
| 10:17:43 | 16 | A.   I have to be hired to do phase 2. |
| 10:17:46 | 17 | Q.   Okay.  Okay.  So from 2015, when you |
| 10:17:51 | 18 | completed phase 1, to beginning phase 2, did you |
| 10:17:52 | 19 | work at all with any City of Buffalo departments? |
| 10:17:56 | 20 | A.   No.  I entered my first semester at |
| 10:18:00 | 21 | Buff State, which I did not complete. |
| 10:18:02 | 22 | Q.   Okay.  And what were you going for? |
| 10:18:04 | 23 | A.   Criminal justice. |

*Moriarity - Davenport - 2/21/20*

13

| | | |
|---|---|---|
| 10:18:06 | 1 | Q.   It was criminal justice? |
| 10:18:07 | 2 | Would that be -- have been beyond your |
| 10:18:10 | 3 | associate's degree? |
| 10:18:10 | 4 | A.   Yes. |
| 10:18:10 | 5 | Q.   Okay.  So, now, after you completed |
| 10:18:15 | 6 | phase 2, did you begin any training with the City |
| 10:18:18 | 7 | of Buffalo Police Department? |
| 10:18:18 | 8 | A.   Yes. |
| 10:18:22 | 9 | Q.   And what kind of training did you do |
| 10:18:24 | 10 | for that? |
| 10:18:24 | 11 | A.   I did additional driving training. |
| 10:18:31 | 12 | I did some policy training. |
| 10:18:39 | 13 | I'm un -- I'm unsure of what else was on |
| 10:18:42 | 14 | that training. |
| 10:18:45 | 15 | Q.   Now, would you have done -- |
| 10:18:46 | 16 | A.   Yeah, I don't remember. |
| 10:18:47 | 17 | Q.   I'm sorry. |
| 10:18:49 | 18 | Would you have done that training before you |
| 10:18:50 | 19 | actually entered a patrol car, or would that |
| 10:18:53 | 20 | training have been done concurrently with some |
| 10:18:55 | 21 | training -- field training that you would have |
| 10:18:58 | 22 | received? |
| 10:18:58 | 23 | A.   This would have been -- |

14

10:18:59    1         MS. HUGGINS:  Form.  You can answer.

10:19:00    2         THE WITNESS:  This would have been before.

10:19:02    3         BY MR. DAVENPORT:

10:19:02    4         Q.   Okay.  Did you have to complete any

10:19:04    5    courses administered by the Buffalo Police

10:19:07    6    Department before you were able to enter the field

10:19:10    7    training portion?

10:19:10    8         A.   The training that I'm referring to,

10:19:12    9    yes.

10:19:13   10         MR. DAVENPORT:  Okay.  So I'm -- I have --

10:19:16   11    I'm not really sure what exhibit we're on at this

10:19:24   12    point.  I believe, I want to say, 24, but I'm not

10:19:27   13    a hundred percent sure.

10:19:28   14         THE REPORTER:  22.

10:19:29   15         MR. DAVENPORT:  22?  Okay.

10:19:30   16         So I'll have this marked as Exhibit 22.

           17    The following was marked for Identification:

           18    EXH. 22              Buffalo Police Academy

           19                         training record, two pages

           20         BY MR. DAVENPORT:

10:20:06   21         Q.   Sir, I'm showing -- showing you what's

10:20:08   22    been marked as Exhibit 22.  Do you recognize this

10:20:10   23    document?

*Moriarity - Davenport - 2/21/20*

15

| | | |
|---|---|---|
| 10:20:10 | 1 | **A.**    Yes. |
| 10:20:10 | 2 | **Q.**    And what do you recognize it to be? |
| 10:20:12 | 3 | **A.**    This is a list of academy training that |
| 10:20:14 | 4 | I did with the BPD. |
| 10:20:16 | 5 | **Q.**    And would you -- reading through the |
| 10:20:19 | 6 | document very quickly, would you agree that it |
| 10:20:21 | 7 | shows all courses that you've taken with the |
| 10:20:24 | 8 | Buffalo Police Department? |
| 10:20:25 | 9 | **A.**    Up to date, yes. |
| 10:20:31 | 10 | **Q.**    So now starting with the first one, |
| 10:20:33 | 11 | drug test policy, that was administered November 4th, |
| 10:20:35 | 12 | 2016, to the same day, November 4th, 2016. |
| 10:20:39 | 13 | Was that drug test administered to you |
| 10:20:41 | 14 | before you started your field training? |
| 10:20:43 | 15 | **MS. HUGGINS:**    Form. |
| 10:20:45 | 16 | **THE WITNESS:**    No.    That was -- if it -- if |
| 10:20:47 | 17 | it says that it's on there that day, that's -- |
| 10:20:49 | 18 | that's the date that I did it. |
| 10:20:51 | 19 | **BY MR. DAVENPORT:** |
| 10:20:51 | 20 | **Q.**    Okay. |
| 10:20:52 | 21 | **A.**    Because I would -- I would have signed |
| 10:20:53 | 22 | something. |
| 10:20:54 | 23 | **Q.**    Okay.    So you also did, on the same |

10:20:58  1  day, EAP training.  What would that refer to?

10:21:02  2          A.    I don't know what EAP training is.

10:21:06  3          Q.    Okay.  What about rules and

10:21:08  4  regulations?  That was also on the same day.

10:21:10  5          A.    Yeah, I did that then.

10:21:11  6          Q.    What would that refer to?

10:21:13  7          A.    You're probably going over MOP stuff.

10:21:17  8  BPD's like operational handbook.  Your uniform

10:21:23  9  regulations.  Rules of wearing certain things or

10:21:29  10  speaking to, you know, a lieutenant a certain way.

10:21:35  11  That -- that type of stuff.

10:21:36  12          Q.    Do you remember any specific sections

10:21:38  13  that they went over for the MOP?

10:21:42  14          And that would be referring to the

10:21:44  15  procedures -- policies and procedures.

10:21:45  16          A.    The handbook, yeah.

10:21:46  17          Q.    Okay.

10:21:48  18          A.    No, I wouldn't remember.

10:21:49  19          Q.    Okay.  Did they discuss at all, you

10:21:51  20  know, how to arrest individuals?

10:21:55  21          Did they go over certain procedures for

10:21:58  22  accidents with patrol vehicles or --

10:22:00  23          MS. HUGGINS:  Form.  You can answer.

*Moriarity - Davenport - 2/21/20*

17

10:22:01  1          THE WITNESS:  It's -- it's in there.

10:22:03  2    I don't remember what we did that day.

10:22:06  3          BY MR. DAVENPORT:

10:22:06  4          Q.    Okay.  So you also did sexual harassment,

10:22:11  5    discrimination in the workplace.  I would assume

10:22:14  6    that we all know what that is.

10:22:16  7          Rules and regulations, chapter 3, general

10:22:18  8    conduct.  What does general conduct refer to in the

10:22:23  9    procedure -- policies and procedures handbook?

10:22:26 10          A.    I'd have to -- I'd have to open up a --

10:22:30 11    open up the handbook.

10:22:32 12          Q.    When they were going through these

10:22:34 13    sections in the handbook, did they go through the

10:22:36 14    individual sections of the handbook?

10:22:38 15          Did they go through what those provisions

10:22:40 16    said?

10:22:40 17          MS. HUGGINS:  Form.

10:22:41 18          THE WITNESS:  They briefly skimmed over

10:22:43 19    them, so I -- I'm -- I honestly don't know.  Or

10:22:47 20    don't remember.  I'm sorry.

10:22:48 21          BY MR. DAVENPORT:

10:22:48 22          Q.    Did they ask if you understood what

10:22:50 23    those sections meant?

*Moriarity - Davenport - 2/21/20*

18

10:22:53  1           MS. HUGGINS:  Form.  You can answer.

10:22:56  2           THE WITNESS:  It's a long time ago.  I -- I

10:22:58  3     don't remember.  I'm -- I'm sorry.

10:22:59  4           BY MR. DAVENPORT:

10:23:00  5           Q.   So, now, on November 23rd, you did

10:23:03  6     MOP 1 training.

10:23:05  7           A.   Yep.

10:23:06  8           Q.   Do you know what that refers to?

10:23:09  9           A.   More MOP training on the -- on the

10:23:14 10     procedural handbook.

10:23:15 11           Q.   So that's procedural handbook training?

10:23:17 12           A.   Yeah.

10:23:17 13           Q.   Okay.  So now it's 1.  Does that refer

10:23:20 14     to the first phase?

10:23:24 15           MS. HUGGINS:  Form.

10:23:25 16           THE WITNESS:  Maybe it's chapter 1.  I'm --

10:23:29 17     I'm really un -- unsure of what --

10:23:33 18           BY MR. DAVENPORT:

10:23:33 19           Q.   But this would have all been training

10:23:35 20     that you would have had to complete before -- or

10:23:37 21     while concurrently you were doing your field

10:23:39 22     training exercises; is that correct?

10:23:40 23           A.   This was done prior to field training.

*Moriarity - Davenport - 2/21/20*

19

10:23:42  1        Q.    Okay.  So, now, at what point do you

10:23:46  2    actually enter in and begin field training?

10:23:49  3        Was there a certain course that you needed

10:23:51  4    to complete on this training course outline before

10:23:54  5    you could actually enter the field?

10:24:13  6        A.    It looks like there's going to be

10:24:14  7    a break between December 1st and December 29th,

10:24:19  8    where I went to phase 2.

10:24:24  9        Q.    So this would have been --

10:24:26 10        A.    And completed my --

10:24:28 11        Q.    This would have been phase 2 of the

10:24:31 12    field training with the Buffalo Police Department,

10:24:33 13    correct?

10:24:33 14        MS. HUGGINS:   Form.

10:24:34 15        THE WITNESS:   I'm sorry.  I'm going to be

10:24:37 16    completing phase 2 right through here.

10:24:39 17        BY MR. DAVENPORT:

10:24:39 18        Q.    Okay.

10:24:39 19        A.    During -- during the --

10:24:40 20        Q.    So from November 4th to --

10:24:43 21        A.    To the 23rd.

10:24:44 22        Q.    Okay.

10:24:44 23        A.    And then --

*Moriarity - Davenport - 2/21/20*

20

10:24:46   1        Q.   You would have been completing phase 2

10:24:47   2    at that point?

10:24:48   3        A.   Yeah, I would have been completing

10:24:49   4    phase 2 then, and then between December 1st and

10:24:54   5    December 29th -- I don't know.  I wasn't in

10:25:03   6    a vehicle yet because I was waiting for a vest up

10:25:05   7    in the camera room.

10:25:09   8        Q.   Okay.  So what would phase 1 have

10:25:11   9    consisted of?

10:25:12  10        Would it just be these training courses that

10:25:14  11    are listed on your training course outline?

10:25:15  12        MS. HUGGINS:  Form.

10:25:16  13        THE WITNESS:  Phase 1 of academy?

10:25:18  14        BY MR. DAVENPORT:

10:25:18  15        Q.   Well, it would have been phase 1 of

10:25:20  16    your Buffalo Police Department field training,

10:25:22  17    correct?

10:25:24  18        MS. HUGGINS:  Form.

10:25:26  19        BY MR. DAVENPORT:

10:25:26  20        Q.   Because I -- I guess what you're saying

10:25:28  21    is that phase 2 was completed and you began your

10:25:31  22    field training on November 23rd, correct?

10:25:33  23        A.   Yeah.  Yeah.

10:25:34  1        Q.    Was there a phase 1 specifically just

10:25:36  2   for --

10:25:36  3        A.    They didn't --

10:25:36  4        Q.    -- the police department?

10:25:36  5        A.    They didn't -- no.  They didn't -- they

10:25:39  6   didn't call it anything like that.

10:25:40  7        We just went straight from phase 2 of police

10:25:43  8   academy, straight to the academy unit at -- at

10:25:46  9   headquarters, and we just sat in there and got all

10:25:49 10   these classes.

10:25:50 11        Q.    Okay.  So it would have been phase 2 at

10:25:58 12   the Erie County Academy and --

10:25:58 13        A.    Yeah.  Yeah.

10:25:59 14        Q.    -- then phase 2 --

10:25:59 15        THE REPORTER:  Hold on.  Hold on.

10:25:59 16        THE WITNESS:  Sorry.

10:25:59 17        (Discussion off the record.)

10:25:59 18        BY MR. DAVENPORT:

10:26:00 19        Q.    Okay.  So it would have been phase 2 at

10:26:00 20   the Erie County academy, and then you would have

10:26:00 21   immediately gone into phase 2 at the Buffalo

10:26:03 22   academy?

10:26:03 23        A.    Yeah.

*Moriarity - Davenport - 2/21/20*

22

10:26:03  1          Q.    Okay.   So there's no phase 1 at the
10:26:06  2    Buffalo --
10:26:06  3          A.    No.
10:26:07  4          Q.    -- training academy?   Okay.
10:26:09  5          So now phase 2, is there a mix of actually
10:26:13  6    being out in the field, as well as classroom
10:26:16  7    training, or was it just limited to classroom
10:26:19  8    training at that point?
10:26:20  9          A.    Not -- they're not concurrent.   It's
10:26:23 10    just classroom training, then we were waiting for
10:26:27 11    our gear up in the camera room, and then once we
10:26:31 12    got our gear, then we went to field training.
10:26:33 13          Q.    Besides the security vest, was there
10:26:36 14    any other equipment that you needed at that time?
10:26:38 15          A.    That was the only thing I was waiting
10:26:40 16    on.
10:26:40 17          Q.    Okay.   What other -- other equipment do
10:26:45 18    they give you as a field training officer?
10:26:47 19          A.    Your duty belt and your -- your
10:26:49 20    assignment room.
10:26:51 21          MS. HUGGINS:   Just slow down too.
10:26:53 22          THE WITNESS:   Okay.
10:26:53 23          MS. HUGGINS:   You're speaking fast.

*Moriarity - Davenport - 2/21/20*

23

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 10:26:56 | 1  | BY MR. DAVENPORT:                                         |
| 10:26:57 | 2  | Q.    So now this vest that they gave to you,            |
| 10:26:59 | 3  | were you wearing that immediately when you went out      |
| 10:27:01 | 4  | into the field?                                          |
| 10:27:01 | 5  | A.    Yes.                                                |
| 10:27:02 | 6  | Q.    And when did you receive that again?               |
| 10:27:07 | 7  | A.    I don't remember.                                   |
| 10:27:08 | 8  | Q.    Would it have been between November --             |
| 10:27:09 | 9  | or December 1st of 2016 and December 29th of 2016?       |
| 10:27:14 | 10 | A.    Yeah.  Closer to the 29th.                         |
| 10:27:16 | 11 | Q.    Closer to the 29th?                                |
| 10:27:18 | 12 | So what were you doing from December 1st of              |
| 10:27:20 | 13 | 2016 to December 29th of 2016?                           |
| 10:27:24 | 14 | A.    Sitting around at headquarters and then            |
| 10:27:26 | 15 | sitting around in the camera room at headquarters.       |
| 10:27:30 | 16 | Q.    Okay.  What kinds of things would they             |
| 10:27:34 | 17 | have you doing when you were sitting there?              |
| 10:27:38 | 18 | A.    In the camera room, observing city                |
| 10:27:41 | 19 | camera locations and just writing things down of         |
| 10:27:43 | 20 | what we were observing.                                   |
| 10:27:47 | 21 | Q.    So you would have been observing city              |
| 10:27:49 | 22 | cameras.  Where would those cameras typically be         |
| 10:27:53 | 23 | located?                                                  |

10:27:53  1       A.    All over.   All over the city.

10:27:56  2   Intersections.

10:27:56  3       Q.    Would -- would they be located in -- so

10:27:58  4   you -- you eventually went to C District, correct?

10:28:01  5       A.    Yes.

10:28:01  6       Q.    Would some of those cameras be located

10:28:03  7   in C District?

10:28:04  8       A.    Yes.

10:28:04  9       Q.    Did they have you exclusively looking

10:28:06 10   at those cameras at C District?

10:28:07 11       A.    No.

10:28:08 12       Q.    They would have been in A District,

10:28:09 13   B District, C District?

10:28:11 14       MS. HUGGINS:   She needs a verbal answer.

10:28:13 15       THE WITNESS:   Yes.  I'm sorry.  Yes.

10:28:15 16       BY MR. DAVENPORT:

10:28:15 17       Q.    So were you there, looking at these

10:28:18 18   cameras, with any other lieutenants or other field

10:28:22 19   training -- or other police officers who were out

10:28:25 20   in the field?

10:28:25 21       A.    I don't think there were any

10:28:27 22   lieutenants.   There was 14 to 16 other police

10:28:33 23   officers that were with -- with me.

10:28:38  1          Q.    Where were these other police officers?

10:28:40  2     Where were they located?

10:28:42  3          Were they also in the C District, or were

10:28:44  4     they in other districts?

10:28:45  5          A.    No.   No.   They were in other districts

10:28:47  6     too.

10:28:47  7          Q.    Okay.   Were they all field training

10:28:49  8     officers?

10:28:50  9          A.    No.   These were probationary officers.

10:28:54 10          Q.    They were probationary officers?

10:28:56 11          So what kinds of things would you observe on

10:28:58 12     these cameras?

10:29:00 13          MS. HUGGINS:   Form.

10:29:03 14          THE WITNESS:   At -- at the time, I would say

10:29:07 15     I didn't -- we didn't really know what we were

10:29:09 16     looking at.   It was just people walking around.

10:29:11 17          BY MR. DAVENPORT:

10:29:12 18          Q.    Did they ever say, you know, this

10:29:14 19     person's committing a crime?   You know, we need to

10:29:18 20     dispatch police officers over into that area?

10:29:20 21          A.    No.   It was just us in the room.   There

10:29:23 22     was no one --

10:29:24 23          Q.    So what kinds of --

*Moriarity - Davenport - 2/21/20*

26

| | | |
|---|---|---|
| 10:29:25 | 1 | **A.**    -- with us. |
| 10:29:26 | 2 | **Q.**    -- things were you guys looking for on |
| 10:29:28 | 3 | those cameras? |
| 10:29:31 | 4 | **A.**    I don't remember at the time.  We |
| 10:29:32 | 5 | weren't given much instruction. |
| 10:29:34 | 6 | **Q.**    Okay.  Were you instructed to take |
| 10:29:36 | 7 | notes on what you saw? |
| 10:29:38 | 8 | **A.**    We were. |
| 10:29:39 | 9 | **Q.**    And did you have to turn those notes |
| 10:29:41 | 10 | over to a lieutenant or anybody else to check your |
| 10:29:43 | 11 | work? |
| 10:29:43 | 12 | **A.**    No. |
| 10:29:44 | 13 | **Q.**    You just kept those for yourself? |
| 10:29:46 | 14 | **A.**    I threw mine out, I believe. |
| 10:29:48 | 15 | **Q.**    Okay.  Did you have to report to |
| 10:29:49 | 16 | anybody what you saw on those cameras? |
| 10:29:51 | 17 | **A.**    No. |
| 10:29:53 | 18 | **Q.**    Did you have any cameras that were |
| 10:29:55 | 19 | located on Schmarbeck Avenue? |
| 10:29:58 | 20 | **A.**    No. |
| 10:30:01 | 21 | **Q.**    Where, typically, would these cameras |
| 10:30:04 | 22 | be located? |
| 10:30:05 | 23 | Would they be mostly at busy intersections |

*Moriarity - Davenport - 2/21/20*

27

10:30:07  1    or businesses?

10:30:08  2          MS. HUGGINS:   Form.

10:30:10  3          THE WITNESS:   I don't know the rhyme or

10:30:13  4    reason to where the cameras are placed.

10:30:16  5          BY MR. DAVENPORT:

10:30:17  6          Q.   So this is what you would have done

10:30:19  7    from December 1st, 2016, to December 29th of 2016,

10:30:23  8    correct?

10:30:24  9          A.   I don't know if it's exactly until the

10:30:26 10    29th.  I got my vest a week -- a week or so before

10:30:33 11    the incident.

10:30:34 12          Q.   Okay.

10:30:36 13          A.   So --

10:30:36 14          Q.   So you would have received that either

10:30:39 15    shortly before or right around Christmas of 2016?

10:30:42 16          A.   Yeah.

10:30:44 17          Q.   Did you immediately go out into the

10:30:46 18    field after that?

10:30:46 19          A.   Yes.

10:30:47 20          Q.   Who did you go out with?

10:30:49 21          Who -- who was, you know, taking you around

10:30:51 22    to help you with your training?

10:30:53 23          A.   Police Officer Schultz.

*Moriarity - Davenport - 2/21/20*

28

| | | |
|---|---|---|
| 10:30:55 | 1 | Q.   Did you do any other training with any |
| 10:30:56 | 2 | other officers at that time? |
| 10:30:58 | 3 | A.   No. |
| 10:30:59 | 4 | Q.   How long did your training last for? |
| 10:31:01 | 5 | A.   16 weeks. |
| 10:31:03 | 6 | Q.   And so that 16 weeks would have been |
| 10:31:06 | 7 | beginning on November 4th of 2016, or would it have |
| 10:31:10 | 8 | been beginning when you received your vest in |
| 10:31:14 | 9 | December of 2016? |
| 10:31:14 | 10 | A.   The day I received my vest. |
| 10:31:17 | 11 | Q.   Okay.  And so those 16 weeks were just |
| 10:31:19 | 12 | with Officer Schultz? |
| 10:31:21 | 13 | A.   Yes. |
| 10:31:24 | 14 | Q.   What kinds of things would you -- what |
| 10:31:27 | 15 | kinds of calls would you make with Officer Schultz? |
| 10:31:30 | 16 | A.   Our calls -- |
| 10:31:32 | 17 | MS. HUGGINS:   Form. |
| 10:31:33 | 18 | THE WITNESS:   Our calls varied.  Shootings, |
| 10:31:37 | 19 | domestics, car accidents, unknown troubles. |
| 10:31:42 | 20 | BY MR. DAVENPORT: |
| 10:31:43 | 21 | Q.   Do you remember the first week of |
| 10:31:44 | 22 | training with Officer Schultz? |
| 10:31:47 | 23 | A.   I remember the first day. |

| | | |
|---|---|---|
| 10:31:48 | 1 | Q. The first day?  What happened on the |
| 10:31:51 | 2 | first day? |
| 10:31:51 | 3 | A. There was a shots fired on Deshler. |
| 10:31:54 | 4 | Q. Did you respond to that call? |
| 10:31:56 | 5 | A. Yes. |
| 10:31:56 | 6 | Q. With Officer Schultz? |
| 10:31:58 | 7 | A. Yes. |
| 10:31:59 | 8 | Q. What was the outcome of that call? |
| 10:32:03 | 9 | A. Afternoon -- the afternoon shift took |
| 10:32:07 | 10 | it over, and me and Karl Schultz left around |
| 10:32:13 | 11 | 10 minutes before 4 because we were done. |
| 10:32:16 | 12 | Q. Were you working the day shift at the |
| 10:32:17 | 13 | time then? |
| 10:32:18 | 14 | A. We were working the day shift, yeah. |
| 10:32:19 | 15 | Q. Did you work the day shift after your |
| 10:32:22 | 16 | first 16 weeks? |
| 10:32:23 | 17 | A. No.  I went to afternoons. |
| 10:32:24 | 18 | Q. Afternoon shift? |
| 10:32:25 | 19 | Did you work any other shifts besides |
| 10:32:26 | 20 | day shift and afternoon shift? |
| 10:32:28 | 21 | A. No. |
| 10:32:30 | 22 | Q. So what time, approximately, did you |
| 10:32:33 | 23 | recall to that call on your first day? |

*Moriarity - Davenport - 2/21/20*

30

10:32:38   1          A.     Later in the day.   I'm not -- I don't

10:32:41   2    remember.

10:32:41   3          Q.     Do you remember approximately how long

10:32:42   4    you were at that first call for?

10:32:47   5          A.     I do not know.   I don't remember.

10:32:49   6          Q.     Was anybody injured at that call?

10:32:51   7          A.     No.

10:32:56   8          Q.     So how do you typically begin each day,

10:33:02   9    you know, during your first 16 weeks -- we'll --

10:33:04  10    we'll start with your first 16 weeks.

10:33:06  11          During your first 16 weeks, how would you

10:33:08  12    begin each shift during the day shift?

10:33:12  13          A.     We show up to work at 5:30.   We get

10:33:17  14    dressed.   6 o'clock is brief by the lieutenant.

10:33:20  15    Lieutenant McHugh.   And then we start going to

10:33:25  16    calls.

10:33:25  17          Q.     Was Lieutenant McHugh your lieutenant

10:33:27  18    at the time?

10:33:27  19          A.     Yes.

10:33:29  20          Q.     Did you report to any other lieutenants

10:33:31  21    at that time?

10:33:32  22          A.     No.

10:33:36  23          Q.     Did you have a set schedule for when

10:33:38  1  you would work during that time, besides the day

10:33:40  2  shift?  Did you have set days that you would work?

10:33:43  3       A.   We work four days on, four days off;

10:33:47  4  four days on, three days off.

10:33:51  5       Q.   And that was consistent for your entire

10:33:53  6  16 weeks?

10:33:53  7       A.   Yes.

10:33:53  8       Q.   Do you remember if you worked the day

10:33:55  9  before the incident on January 1st, 2016 -- or

10:34:02 10  2017?

10:34:03 11       A.   I don't remember.

10:34:03 12       Q.   Do you remember if you worked the day

10:34:04 13  after?

10:34:09 14       A.   I don't, no.  Sorry.

10:34:11 15       Q.   Do you remember what you did the night

10:34:12 16  before January 1st, 20 -- 2017?

10:34:18 17       A.   No.

10:34:19 18       Q.   Did you celebrate the new year?

10:34:21 19       A.   No.

10:34:21 20       Q.   No?

10:34:22 21       A.   No.

10:34:23 22       Q.   What time did you report to work on

10:34:29 23  January 1st, 2017?

*Moriarity - Davenport - 2/21/20*

32

| | | |
|---|---|---|
| 10:34:29 | 1 | A.   6.   6 a.m. |
| 10:34:30 | 2 | Q.   Okay.  And did you get a briefing from |
| 10:34:34 | 3 | Lieutenant McHugh? |
| 10:34:35 | 4 | A.   Yes. |
| 10:34:36 | 5 | Q.   Do you remember what he said that day? |
| 10:34:38 | 6 | A.   I do not. |
| 10:34:40 | 7 | Q.   Do you remember if you made any calls |
| 10:34:43 | 8 | before going to Schmarbeck? |
| 10:34:45 | 9 | A.   If I -- I'm sorry? |
| 10:34:46 | 10 | MS. HUGGINS:   Form. |
| 10:34:46 | 11 | BY MR. DAVENPORT: |
| 10:34:47 | 12 | Q.   Did you remember responding to any |
| 10:34:49 | 13 | calls before going to Schmarbeck? |
| 10:34:52 | 14 | A.   One.  I responded to the first call. |
| 10:34:55 | 15 | I think it was a robbery. |
| 10:34:56 | 16 | Q.   Okay.  Approximately what time was that |
| 10:35:09 | 17 | robbery that you responded to? |
| 10:35:12 | 18 | A.   It was early.  I don't remember, |
| 10:35:16 | 19 | though. |
| 10:35:16 | 20 | Q.   Was it before you arrived at Schmarbeck |
| 10:35:21 | 21 | or was it on Schmarbeck? |
| 10:35:22 | 22 | A.   It was before Schmarbeck. |
| 10:35:25 | 23 | Q.   Okay.  So I'm going to show you what's |

*Moriarity - Davenport - 2/21/20*

33

| | | |
|---|---|---|
| 10:35:27 | 1 | been marked as Exhibit 7. |
| 10:35:42 | 2 | So the only robbery that I'm finding is on |
| 10:35:47 | 3 | Schmarbeck.  Do you see any other robberies or |
| 10:35:50 | 4 | anything that could possibly have been a robbery? |
| 10:35:52 | 5 | A.   Well, Schmarbeck is a larceny, but |
| 10:35:55 | 6 | Sattler was the robbery. |
| 10:35:56 | 7 | Q.   Okay.  So it's listed as a fight. |
| 10:35:59 | 8 | Do you know why it was listed as a fight instead |
| 10:36:02 | 9 | of a robbery? |
| 10:36:02 | 10 | A.   I don't.  I don't know why that's |
| 10:36:04 | 11 | listed as a fight. |
| 10:36:05 | 12 | Q.   So what was that situation?  What |
| 10:36:09 | 13 | happened there? |
| 10:36:12 | 14 | MS. HUGGINS:   Form.  You can answer. |
| 10:36:16 | 15 | THE WITNESS:   I don't remember the nature of |
| 10:36:19 | 16 | the call, because Karl was talking to the |
| 10:36:25 | 17 | complainant, but I looked down a driveway and |
| 10:36:28 | 18 | a dude was hopping the fence, and apparently that |
| 10:36:31 | 19 | was the guy that we were looking for. |
| 10:36:32 | 20 | BY MR. DAVENPORT: |
| 10:36:32 | 21 | Q.   Did you go after him? |
| 10:36:33 | 22 | A.   I didn't. |
| 10:36:34 | 23 | Q.   Did you catch him? |

| | | |
|---|---|---|
| 10:36:35 | 1 | **A.**   I didn't. |
| 10:36:35 | 2 | **Q.**   Did Karl catch him? |
| 10:36:38 | 3 | **A.**   No.   There were other officers that |
| 10:36:41 | 4 | caught him. |
| 10:36:42 | 5 | **Q.**   Would they have been other C District |
| 10:36:45 | 6 | officers? |
| 10:36:45 | 7 | **A.**   Yes. |
| 10:36:46 | 8 | **Q.**   Do you remember who? |
| 10:36:47 | 9 | **A.**   I don't. |
| 10:36:48 | 10 | **Q.**   If you saw a list of officers that were |
| 10:36:51 | 11 | working that shift that day, would that possibly |
| 10:36:53 | 12 | refresh your recollection? |
| 10:36:54 | 13 | **A.**   It's -- it's not going to, just because |
| 10:36:59 | 14 | I was so brand new, I wouldn't know who -- I |
| 10:37:06 | 15 | wouldn't know who caught him. |
| 10:37:07 | 16 | **Q.**   Okay.   So how did you decide, between |
| 10:37:12 | 17 | you and Karl, who would go to go speak with the |
| 10:37:14 | 18 | person initially?  Who would leave the car to go |
| 10:37:17 | 19 | speak with somebody? |
| 10:37:18 | 20 | **MS. HUGGINS:**   Form. |
| 10:37:19 | 21 | **THE WITNESS:**   At -- at this point in time, |
| 10:37:20 | 22 | I'm so brand new that Karl is doing everything. |
| 10:37:23 | 23 | **BY MR. DAVENPORT:** |

10:37:23  1          Q.   Would there have been any times that

10:37:25  2    you would have gone to go speak with the

10:37:27  3    complainant rather than Karl?

10:37:29  4          A.   On -- on things that weren't as high of

10:37:34  5    a priority.

10:37:35  6          Q.   Okay.

10:37:35  7          A.   Maybe things that are less dangerous.

10:37:37  8          Q.   Okay.   Was there any set priority that

10:37:42  9    it would be Karl going instead of you to go make

10:37:45  10   that first initial contact with the complainant?

10:37:48  11         MS. HUGGINS:   Form.

10:37:48  12         THE WITNESS:   No.   He -- he would just

10:37:53  13   observe whether or not it was something that he

10:37:56  14   wanted me to handle.

10:37:58  15         BY MR. DAVENPORT:

10:37:59  16         Q.   Okay.   And how would he make that

10:38:00  17   decision?

10:38:00  18         MS. HUGGINS:   Form.

10:38:01  19         THE WITNESS:   I can't -- I can't answer

10:38:02  20   that.   You would have to ask -- ask him.

10:38:05  21         BY MR. DAVENPORT:

10:38:05  22         Q.   What kinds of calls would he allow you

10:38:07  23   to go speak with the complainant rather than Karl

*Moriarity - Davenport - 2/21/20*

36

10:38:10  1    to go speak with the complainant?

10:38:15  2         A.   I -- I don't remember the nature of the

10:38:17  3    call, but I know he let me do the 33 Schmarbeck

10:38:22  4    call.

10:38:22  5         Q.   Do you remember if he let you do -- to

10:38:25  6    go speak with the complainant for any of the other

10:38:27  7    calls that you responded to before 33 Schmarbeck?

10:38:29  8         A.   I don't.

10:38:31  9         Q.   So this -- this first call where there

10:38:34  10   was an accident or injury over at Sycamore, and the

10:38:38  11   time would have been 6:14 a.m., do you remember

10:38:41  12   that call?

10:38:42  13        A.   I don't.

10:38:42  14        Q.   No?

10:38:44  15        What about the alarm that was at

10:38:46  16   1830 Genesee Street?

10:38:48  17        A.   I don't remember.

10:38:49  18        Q.   Do you know why, for that accident or

10:38:52  19   injury, you would have been going to the next call

10:38:56  20   four minutes after the accident or injury call?

10:39:01  21        A.   What do --

10:39:01  22        Q.   So --

10:39:03  23        A.   -- you mean?   Just -- just why it goes

*Moriarity - Davenport - 2/21/20*

37

| | | |
|---|---|---|
| 10:39:03 | 1 | from 6:14 to 6:18? |
| 10:39:06 | 2 | Q. Well, I -- I guess what I'm saying is: |
| 10:39:08 | 3 | If there's an accident or injury that you responded |
| 10:39:09 | 4 | to, would you know why it would only take four |
| 10:39:12 | 5 | minutes for responding to that accident or injury? |
| 10:39:15 | 6 | A. I don't remember -- I don't remember |
| 10:39:18 | 7 | the specifics of that. |
| 10:39:20 | 8 | Q. Okay. Did you ever respond to any |
| 10:39:23 | 9 | other accidents or injuries that day? |
| 10:39:30 | 10 | A. Yeah. The one on 37 Schmarbeck. And |
| 10:39:35 | 11 | then it looks like that's it. |
| 10:39:40 | 12 | Q. After 37 Schmarbeck, where was the next |
| 10:39:45 | 13 | call that you responded to? |
| 10:39:49 | 14 | A. The traffic stop at 1773 Bailey. |
| 10:39:53 | 15 | Q. And what time would that have been at? |
| 10:39:57 | 16 | A. 1314. |
| 10:39:58 | 17 | Q. And that would refer to 1:14 p.m.? |
| 10:40:01 | 18 | A. Yes. |
| 10:40:03 | 19 | Q. So it looks like you were there at that |
| 10:40:06 | 20 | call for four minutes. Would that be accurate? |
| 10:40:10 | 21 | Because your next dispatch -- |
| 10:40:11 | 22 | A. Oh, okay. |
| 10:40:12 | 23 | Q. -- was at 1:18 p.m. |

*Moriarity - Davenport - 2/21/20*

38

10:40:15  1          A.    Yeah, that's what it says.

10:40:18  2          Q.    Is there any reason to expect that that

10:40:21  3   would not be accurate?

10:40:22  4          Was there some times where they would have

10:40:26  5   you dispatched for the next call before you had

10:40:29  6   actually finished at the call that you were

10:40:32  7   responding to?

10:40:32  8          MS. HUGGINS:   Form.   You've just asked two

10:40:34  9   questions in a row.

10:40:35  10         MR. DAVENPORT:   So I'll start with my first

10:40:37  11  question.

10:40:40  12         Is there any reason to believe that this

10:40:41  13  record is not accurate?

10:40:43  14         THE WITNESS:   No.   This is -- this is

10:40:44  15  accurate.

10:40:45  16         BY MR. DAVENPORT:

10:40:45  17         Q.    Is there any time where you would

10:40:48  18  respond to a call and it would not be entered on

10:40:51  19  your dispatch monitor until sometime after you had

10:40:55  20  actually responded to that call?

10:40:56  21         A.    No.   We -- we respond to the calls when

10:40:59  22  they're given.

10:41:00  23         Q.    And how do you respond to those calls?

10:41:02  1        A.    We drive there and we go speak to

10:41:04  2    someone.

10:41:04  3        Q.    Do you have to call in when you're

10:41:07  4    responding to a call?

10:41:09  5        A.    Can you rephrase that?

10:41:11  6        Q.    Do you have to radio in when you're

10:41:13  7    responding to a call?

10:41:16  8        A.    They'll dispatch a call and then we

10:41:18  9    say, clear, and then we go to it.

10:41:21 10        Q.    Is there any other way to respond to

10:41:24 11    a call and have it entered on this form?

10:41:28 12        A.    I mean, if these are -- if these are

10:41:30 13    self-initiated traffic stops, we call radio and

10:41:32 14    say, hey, we're at a traffic stop.

10:41:34 15        Q.    And who enters these entries?  Is it

10:41:38 16    made by the Buffalo Police Department or is it made

10:41:40 17    by another entity?

10:41:42 18        A.    Dispatch, so, yeah, BPD.

10:41:45 19        Q.    It would be the Buffalo Police

10:41:48 20    Department?

10:41:48 21        A.    Yeah.

10:41:48 22        Q.    They control the dispatching?

10:41:51 23        MS. HUGGINS:   Form.

*Moriarity - Davenport - 2/21/20*

40

| | | |
|---|---|---|
| 10:41:52 | 1 | **THE WITNESS:**  Who -- yeah, whoever controls |
| 10:41:54 | 2 | the dispatching. |
| 10:41:55 | 3 | **BY MR. DAVENPORT:** |
| 10:41:56 | 4 | Q.   Okay.  Do you know who controls the |
| 10:41:58 | 5 | dispatch?  Do you know any individuals who -- |
| 10:42:01 | 6 | A.   No. |
| 10:42:01 | 7 | Q.   -- are in charge of that? |
| 10:42:03 | 8 | Do you ever speak with them over the radio |
| 10:42:05 | 9 | besides saying clear or that you're responding to |
| 10:42:07 | 10 | a call? |
| 10:42:09 | 11 | A.   In what context? |
| 10:42:11 | 12 | Q.   Do you, you know, speak to them about |
| 10:42:13 | 13 | any personal matters? |
| 10:42:14 | 14 | A.   No. |
| 10:42:15 | 15 | Q.   Just about work? |
| 10:42:17 | 16 | A.   Yes. |
| 10:42:17 | 17 | Q.   Do you ever get names of those |
| 10:42:19 | 18 | individuals? |
| 10:42:21 | 19 | A.   No, I don't know their names. |
| 10:42:24 | 20 | Q.   So the criminal mischief that was at |
| 10:42:26 | 21 | 1964 Bailey Avenue, do you remember anything about |
| 10:42:29 | 22 | that call? |
| 10:42:30 | 23 | A.   No. |

*Moriarity - Davenport - 2/21/20*

41

| | | |
|---|---|---|
| 10:42:32 | 1 | Q.   So I'm actually going to direct your |
| 10:42:34 | 2 | attention to at -- it would be 2:27 p.m., there was |
| 10:42:39 | 3 | an assault that was on North Ogden Street. |
| 10:42:42 | 4 | Do you see where that is? |
| 10:42:45 | 5 | A.   Yes. |
| 10:42:48 | 6 | Q.   Now, that says that you were at that |
| 10:42:50 | 7 | call until 1816, and that would refer to 6:16 p.m., |
| 10:42:56 | 8 | correct? |
| 10:42:56 | 9 | MS. HUGGINS:   Form. |
| 10:42:57 | 10 | THE WITNESS:   Yes. |
| 10:42:58 | 11 | BY MR. DAVENPORT: |
| 10:43:00 | 12 | Q.   Do you remember anything about that |
| 10:43:01 | 13 | assault?   About that call? |
| 10:43:03 | 14 | A.   I do not. |
| 10:43:05 | 15 | Q.   Do you have any reason to know why you |
| 10:43:07 | 16 | were there at that call for four hours? |
| 10:43:10 | 17 | A.   I do not. |
| 10:43:12 | 18 | Q.   Is there any reason to believe that |
| 10:43:15 | 19 | that time would not be accurate for 6:16 p.m.? |
| 10:43:18 | 20 | A.   I do not know. |
| 10:43:25 | 21 | Q.   How long have you been with the Buffalo |
| 10:43:27 | 22 | Police Department now? |
| 10:43:27 | 23 | A.   A little over three years. |

*Moriarity - Davenport - 2/21/20*

42

| | | |
|---|---|---|
| 10:43:28 | 1 | Q. Are you still with the C District? |
| 10:43:31 | 2 | A. No. |
| 10:43:31 | 3 | Q. Where are you now? |
| 10:43:32 | 4 | A. I'm in Bravo. |
| 10:43:33 | 5 | Q. How long have you been with the |
| 10:43:34 | 6 | B District? |
| 10:43:35 | 7 | We'll refer to it as B District. |
| 10:43:37 | 8 | A. Since October. |
| 10:43:38 | 9 | Q. And were you with C District prior to |
| 10:43:41 | 10 | that? |
| 10:43:41 | 11 | A. I was in C District prior to that. |
| 10:43:44 | 12 | Q. So that would have been about two years |
| 10:43:45 | 13 | that you were with C District? |
| 10:43:47 | 14 | A. I was in Delta District for two months |
| 10:43:52 | 15 | somewhere in there. |
| 10:43:54 | 16 | Q. That would have been during your time |
| 10:43:56 | 17 | at C District? |
| 10:43:57 | 18 | MS. HUGGINS: Form. |
| 10:43:58 | 19 | BY MR. DAVENPORT: |
| 10:43:58 | 20 | Q. During the two years that you would |
| 10:44:00 | 21 | have been in C District? |
| 10:44:01 | 22 | A. Yeah. Somewhere in there I was in |
| 10:44:02 | 23 | Delta for -- for two months. Two or three months. |

*Moriarity - Davenport - 2/21/20*

43

10:44:05  1          Q.   And what was that reason for

10:44:06  2   transferring over to Delta District?

10:44:08  3          A.   Just wanted to see something new.

10:44:10  4          Q.   Okay.  Do you get to make that

10:44:12  5   decision, as a police officer, where you want

10:44:13  6   to patrol?

10:44:14  7          A.   We have to request a transfer.

10:44:15  8          Q.   Okay.  And then who approves those

10:44:18  9   transfers?

10:44:20 10          A.   Commissioner Lockwood.

10:44:22 11          Q.   Okay.  Is there any other officers that

10:44:25 12   can approve those transfers?

10:44:27 13          A.   It all goes through Commissioner

10:44:31 14   Lockwood.

10:44:31 15          Q.   So now to go to C District, you had to

10:44:34 16   request a transfer as well, correct?

10:44:35 17          A.   Yes.

10:44:38 18          Q.   When did you request that transfer to

10:44:45 19   Bravo District?

10:44:46 20          A.   I -- I don't remember.  I know I went

10:44:48 21   to Bravo in October, though.

10:44:53 22          Q.   When -- was there any time gap

10:45:00 23   in between at C District and Bravo District?

*Moriarity - Davenport - 2/21/20*

44

| | | |
|---|---|---|
| 10:45:02 | 1 | **A.** I don't know what you mean. |
| 10:45:04 | 2 | **Q.** Did you finish working at C District |
| 10:45:08 | 3 | and then take some time off before entering in |
| 10:45:10 | 4 | Bravo District? |
| 10:45:11 | 5 | **A.** No. |
| 10:45:12 | 6 | **Q.** Okay. After you finished -- completed |
| 10:45:16 | 7 | your first 16 weeks of training in C District, who |
| 10:45:19 | 8 | would you patrol with mostly? |
| 10:45:22 | 9 | **A.** Other C District officers. |
| 10:45:24 | 10 | **Q.** Okay. Was there anybody in particular? |
| 10:45:28 | 11 | **A.** I don't -- I don't understand what you |
| 10:45:30 | 12 | mean. That was my -- my unit. |
| 10:45:32 | 13 | **Q.** No. I understand that -- |
| 10:45:33 | 14 | **A.** Okay. |
| 10:45:34 | 15 | **Q.** -- C District was your unit, but we |
| 10:45:36 | 16 | talked about how, you know, during your first |
| 10:45:38 | 17 | 16 weeks, you were always with Karl Schultz. |
| 10:45:40 | 18 | **A.** Oh, okay. |
| 10:45:41 | 19 | **Q.** So after your first 16 weeks, were |
| 10:45:43 | 20 | there any other officers that you would patrol |
| 10:45:45 | 21 | with besides Karl Schultz? |
| 10:45:47 | 22 | **A.** Yes. There were other officers at C |
| 10:45:51 | 23 | that were in my platoon. They've all changed and |

*Moriarity - Davenport - 2/21/20*

45

| | | |
|---|---|---|
| 10:45:55 | 1 | went to other areas. |
| 10:45:57 | 2 | Q.   So going back to going to D District |
| 10:46:02 | 3 | and now B District, were there any reasons for your |
| 10:46:05 | 4 | request to transfer out of C District besides |
| 10:46:07 | 5 | seeing something new? |
| 10:46:09 | 6 | Were you happy in C District? |
| 10:46:11 | 7 | **MS. HUGGINS:**   Form. |
| 10:46:11 | 8 | **THE WITNESS:**   Indifferent.   My partner |
| 10:46:17 | 9 | wanted to go to Bravo, so I went with him. |
| 10:46:21 | 10 | **BY MR. DAVENPORT:** |
| 10:46:21 | 11 | Q.   Okay.   Who -- who's your partner that |
| 10:46:22 | 12 | wanted to leave? |
| 10:46:23 | 13 | A.   Christopher Brigett. |
| 10:46:25 | 14 | Q.   Okay.   And how do you get assigned |
| 10:46:26 | 15 | a partner in a certain district? |
| 10:46:29 | 16 | A.   We can choose. |
| 10:46:30 | 17 | Q.   Okay.   Was this individual somebody |
| 10:46:33 | 18 | that you chose while you were in C District? |
| 10:46:36 | 19 | A.   Yes. |
| 10:46:38 | 20 | Q.   And when, approximately, did you make |
| 10:46:42 | 21 | that request to have him be your partner? |
| 10:46:47 | 22 | A.   When I came back from Delta. |
| 10:46:49 | 23 | Q.   Okay.   Did you work with him at all |

*Moriarity - Davenport - 2/21/20*

46

| | | |
|---|---|---|
| 10:46:51 | 1 | before you went to Delta District? |
| 10:46:53 | 2 | A.    We went to academy together. |
| 10:46:54 | 3 | Q.    Okay.  Did you patrol with him at all? |
| 10:46:56 | 4 | A.    Never. |
| 10:46:57 | 5 | Q.    Okay.  So he would have been training |
| 10:46:59 | 6 | around the same time as you, correct? |
| 10:47:00 | 7 | A.    Same exact time. |
| 10:47:01 | 8 | Q.    Okay.  Did he receive his vest at the |
| 10:47:03 | 9 | same time? |
| 10:47:08 | 10 | A.    I'm unsure. |
| 10:47:09 | 11 | Q.    Did he start with the Buffalo training |
| 10:47:10 | 12 | academy approximately at the same time? |
| 10:47:12 | 13 | A.    Same time. |
| 10:47:29 | 14 | Q.    So I want to go back to your dispatch |
| 10:47:31 | 15 | monitor. |
| 10:47:33 | 16 | So the first time that you went to |
| 10:47:34 | 17 | Schmarbeck on that day was 10:56 a.m., correct? |
| 10:47:40 | 18 | A.    Yes.  That's what it says, yeah. |
| 10:47:43 | 19 | Q.    And you made -- did you happen to drive |
| 10:47:46 | 20 | on Schmarbeck at all as part of your patrol duties |
| 10:47:49 | 21 | prior to that day? |
| 10:47:51 | 22 | A.    I don't know.  I don't remember. |
| 10:47:55 | 23 | Q.    Would you ever make driving through |

| | | |
|---|---|---|
| 10:47:58 | 1 | Schmarbeck part of your normal patrol duties for |
| 10:48:00 | 2 | a day if you weren't responding to a call there? |
| 10:48:03 | 3 | **MS. HUGGINS:**  Form. |
| 10:48:04 | 4 | **THE WITNESS:**  Back then, I -- I can tell you |
| 10:48:08 | 5 | that I don't -- I don't remember. |
| 10:48:15 | 6 | **BY MR. DAVENPORT:** |
| 10:48:16 | 7 | Q.   So even if it wasn't back then, |
| 10:48:17 | 8 | recently, because you were in C District as close |
| 10:48:20 | 9 | to as last year, in 2019, during that time in 2019, |
| 10:48:24 | 10 | would you ever patrol on Schmarbeck if it wasn't |
| 10:48:27 | 11 | for responding to a call there? |
| 10:48:28 | 12 | A.   Rarely. |
| 10:48:29 | 13 | Q.   Rarely? |
| 10:48:30 | 14 | A.   Rarely. |
| 10:48:32 | 15 | Q.   Were there any streets that you would |
| 10:48:34 | 16 | typically patrol, as opposed to others? |
| 10:48:36 | 17 | A.   Broadway. |
| 10:48:41 | 18 | Q.   Besides Broadway, were there any other |
| 10:48:44 | 19 | streets that you would typically patrol? |
| 10:48:49 | 20 | A.   I mean, C District is a small district, |
| 10:48:52 | 21 | so a lot of them, but -- |
| 10:49:00 | 22 | Q.   I'm sorry.  I've just got to find an |
| 10:49:03 | 23 | exhibit really quickly. |

10:49:40  1          So I'm going to show you what's been marked

10:49:43  2  as Exhibit 3.

10:50:06  3          All right.  So do you recognize this

10:50:07  4  document?

10:50:09  5          A.   This one, yes.

10:50:10  6          Q.   And what do you recognize it to be?

10:50:12  7          A.   A CAD report.

10:50:14  8          Q.   Did you review any documents before

10:50:17  9  your deposition today?

10:50:19 10          A.   Yes.

10:50:19 11          Q.   And what documents did you review?

10:50:21 12          A.   Actually, it was these three.

10:50:23 13          Q.   It was just those three documents?

10:50:26 14          MS. HUGGINS:   Form.  Did you -- did you

10:50:27 15  review this before your testimony today?

10:50:32 16          THE WITNESS:   Yeah.  Yeah.  You did show

10:50:34 17  this to me.

10:50:35 18          MS. HUGGINS:   Did you review any other CAD

10:50:37 19  reports?

10:50:38 20          THE WITNESS:   No, no other CAD reports.

10:50:40 21          MS. HUGGINS:   Did you review the CAD report

10:50:41 22  for 37 Schmarbeck call?

10:50:43 23          THE WITNESS:   Oh, yes, I did do that.

| | | |
|---|---|---|
| 10:50:46 | 1 | I did. |
| 10:50:47 | 2 | **BY MR. DAVENPORT:** |
| 10:50:47 | 3 | **Q.** Besides these -- those four documents, |
| 10:50:49 | 4 | did you review any other documents? |
| 10:50:53 | 5 | **A.** There was a -- that thick one. |
| 10:50:56 | 6 | **MS. HUGGINS:** Only for the preparation of |
| 10:50:57 | 7 | your testimony -- |
| 10:50:57 | 8 | **THE WITNESS:** Oh. |
| 10:50:58 | 9 | **MS. HUGGINS:** -- is what he's asking you. |
| 10:50:59 | 10 | **THE WITNESS:** Then no. |
| 10:51:01 | 11 | **BY MR. DAVENPORT:** |
| 10:51:02 | 12 | **Q.** What was the thick document that you're |
| 10:51:03 | 13 | referring to? |
| 10:51:03 | 14 | **A.** I don't know the name of it. |
| 10:51:05 | 15 | **MS. HUGGINS:** I think he's referring to the |
| 10:51:06 | 16 | interrogatories, when they were prepared and |
| 10:51:07 | 17 | reviewed by him. |
| 10:51:08 | 18 | **MR. DAVENPORT:** Okay. |
| 10:51:08 | 19 | **MS. HUGGINS:** But, obviously, not for the |
| 10:51:10 | 20 | deposition. |
| 10:51:10 | 21 | **MR. DAVENPORT:** I understand. |
| 10:51:11 | 22 | Did you watch any videos? |
| 10:51:11 | 23 | **THE WITNESS:** Yes. |

| | | |
|---|---|---|
| 10:51:13 | 1 | BY MR. DAVENPORT: |
| 10:51:13 | 2 | Q.   What video did you watch? |
| 10:51:15 | 3 | A.   His -- his video. |
| 10:51:16 | 4 | Q.   Okay.  Did you watch any other videos |
| 10:51:18 | 5 | in preparation for this? |
| 10:51:19 | 6 | A.   No. |
| 10:51:21 | 7 | Q.   So now going -- turning back to the |
| 10:51:23 | 8 | complaint summary report, this says that it was |
| 10:51:27 | 9 | reported at 10:32 a.m.  Does that -- is that |
| 10:51:31 | 10 | accurate to you? |
| 10:51:33 | 11 | A.   It -- I mean, if it's on here, yes, |
| 10:51:36 | 12 | it's accurate. |
| 10:51:37 | 13 | Q.   Okay.  And it says that -- I -- I |
| 10:51:40 | 14 | believe it would refer to you, Kyle Moriarity, and |
| 10:51:44 | 15 | Karl Schultz being dispatched at 10:56 a.m.; is |
| 10:51:49 | 16 | that correct? |
| 10:51:49 | 17 | A.   Yeah, 10:56. |
| 10:51:51 | 18 | Q.   So what is the difference between |
| 10:51:53 | 19 | dispatched and received? |
| 10:51:57 | 20 | Does -- what -- what does received refer to? |
| 10:51:59 | 21 | Let's start with that. |
| 10:52:00 | 22 | A.   I -- I don't know what received means, |
| 10:52:03 | 23 | but 10:56 is when they give us the call. |

*Moriarity - Davenport - 2/21/20*

10:52:07  1          Received might mean that that's when 911

10:52:12  2     gets it to dispatch.

10:52:14  3          Q.   So what is the difference between 911

10:52:17  4     and dispatch?

10:52:19  5          A.   Someone calls 911 and then 911 will

10:52:23  6     give it to dispatch to give to us.

10:52:25  7          Q.   What does 911 refer to?

10:52:27  8          A.   911 is where the 91 -- 911 call goes

10:52:32  9     to.

10:52:33 10          Q.   Okay.  And where does it go to?

10:52:35 11          A.   Wherever that office is.  I have no

10:52:37 12     idea.

10:52:37 13          Q.   Okay.  And then dispatch is the Buffalo

10:52:42 14     Police Department?

10:52:42 15          A.   Yes.

10:52:43 16          Q.   Okay.  So now there's a 20-minute gap

10:52:47 17     in between it going from 911 to dispatch with the

10:52:52 18     Buffalo Police Department?

10:52:53 19          A.   Yes.

10:52:54 20          Q.   Okay.  Is that typical for 20 minutes

10:52:58 21     to elapse before --

10:53:00 22          A.   Yes.

10:53:00 23          MS. HUGGINS:   Form.

| | | |
|---|---|---|
| 10:53:02 | 1 | BY MR. DAVENPORT: |
| 10:53:02 | 2 | Q.  Is there a certain type of call that |
| 10:53:04 | 3 | wouldn't take 20 minutes? |
| 10:53:05 | 4 | A.  Shootings. |
| 10:53:07 | 5 | Q.  Okay.  And what would be the typical |
| 10:53:10 | 6 | response time for that? |
| 10:53:11 | 7 | MS. HUGGINS:  Form. |
| 10:53:15 | 8 | THE WITNESS:  It's -- it's one of those |
| 10:53:16 | 9 | things you just go to immediately. |
| 10:53:18 | 10 | BY MR. DAVENPORT: |
| 10:53:18 | 11 | Q.  Okay.  Okay.  So now when it says |
| 10:53:24 | 12 | dispatched, does that refer to dispatch receiving |
| 10:53:27 | 13 | it, or does that refer to somebody accepting that |
| 10:53:30 | 14 | call from dispatch? |
| 10:53:31 | 15 | MS. HUGGINS:  Form. |
| 10:53:32 | 16 | THE WITNESS:  Someone accepting the call |
| 10:53:35 | 17 | from dispatch. |
| 10:53:35 | 18 | BY MR. DAVENPORT: |
| 10:53:36 | 19 | Q.  And would that somebody be a police |
| 10:53:38 | 20 | officer in the C District? |
| 10:53:39 | 21 | A.  Yes. |
| 10:53:42 | 22 | Q.  Do you know if you were responding to |
| 10:53:44 | 23 | another call at that time? |

*Moriarity - Davenport - 2/21/20*

53

10:53:46   1          A.    I don't.

10:53:48   2          Q.    So turning back to Exhibit 7 on the

10:53:50   3   dispatch monitor, it looks like you would have been

10:53:55   4   on scene at 145 Sprenger Avenue?

10:54:00   5          A.    Yeah.

10:54:00   6          Q.    Do you see that?

10:54:01   7          A.    Yes.

10:54:02   8          Q.    And then it's -- it look -- it appears

10:54:05   9   that you would have been on scene starting at

10:54:07  10   9:27, until would that be 10:56 when you became

10:54:12  11   available?

10:54:12  12          A.    Yes.

10:54:12  13          Q.    Okay.  So turning back towards Exhibit 3,

10:54:21  14   what type of call was it that you responded to at

10:54:25  15   33 Schmarbeck?

10:54:26  16          A.    Larceny.

10:54:29  17          Q.    And do you remember the nature of that

10:54:30  18   call?

10:54:30  19          A.    I don't.

10:54:33  20          Q.    Do you remember the individual that you

10:54:34  21   spoke to that day?

10:54:35  22          A.    No.

10:54:38  23          Q.    When it says that the location is

10:54:40  1  1800 Broadway and that -- what does that refer

10:54:40  2  to?

10:54:47  3      Do you see on --

10:54:48  4      A.   Oh, yeah.  I don't know what that

10:54:51  5  refers to.

10:54:53  6      Q.   Okay.  And then when it says the phone

10:54:55  7  number, do you know what that refers to?

10:54:58  8      A.   That's the phone number that was used

10:54:59  9  to call 911.

10:55:01  10      Q.   That would have been the complainant's

10:55:02  11  phone call?

10:55:03  12      A.   Yeah.

10:55:03  13      Q.   Okay.  So at 10:33, the entry says,

10:55:11  14  male, known, took items from his home.

10:55:13  15      Do you know what that entry would refer to?

10:55:16  16      A.   Whoever the complainant is knows the

10:55:18  17  male who took items from his home.

10:55:20  18      Q.   Now, would that information have been

10:55:22  19  conveyed to you who that individual was that took

10:55:26  20  the items from this individual's home?

10:55:28  21      MS. HUGGINS:   Form.

10:55:29  22      THE WITNESS:   The -- yeah.  I mean, the --

10:55:33  23  the complainant would have -- would have told me.

*Moriarity - Davenport - 2/21/20*

55

| | | |
|---|---|---|
| 10:55:35 | 1 | BY MR. DAVENPORT: |
| 10:55:35 | 2 | Q.   Do you remember if the complainant told |
| 10:55:37 | 3 | you who took the items from his home? |
| 10:55:39 | 4 | A.   I don't remember. |
| 10:55:40 | 5 | Q.   Okay.  Do you remember if dispatch told |
| 10:55:42 | 6 | you who the individual was that took items from his |
| 10:55:45 | 7 | home? |
| 10:55:45 | 8 | A.   No, I don't remember. |
| 10:55:46 | 9 | Q.   But that's what that entry refers to is |
| 10:55:50 | 10 | that it's known who the individual was that took |
| 10:55:52 | 11 | items from this complainant's home? |
| 10:55:54 | 12 | A.   Yes. |
| 10:55:56 | 13 | Q.   Okay.  So now the next entry that |
| 10:55:59 | 14 | I want you to look at is en route, C230. |
| 10:56:03 | 15 | What does that refer to? |
| 10:56:04 | 16 | A.   We are en route to the location. |
| 10:56:07 | 17 | Q.   So when you say we, that refers to Karl |
| 10:56:10 | 18 | Schultz and you? |
| 10:56:11 | 19 | A.   Yes. |
| 10:56:12 | 20 | Q.   Was your call sign C230? |
| 10:56:15 | 21 | A.   Yes. |
| 10:56:15 | 22 | Q.   And that's how it would appear on these |
| 10:56:18 | 23 | complaint summary reports? |

*Moriarity - Davenport - 2/21/20*

56

10:56:19    1          A.     Yes.

10:56:21    2          Q.     Now, when it says dispatched at the

10:56:23    3    same time, what does that refer to?

10:56:28    4          A.     We're --

10:56:32    5          MS. HUGGINS:    Form.

10:56:33    6          THE WITNESS:    We're en route at the same

10:56:34    7    time that we're dispatched.    They dispatch it and

10:56:36    8    we're on our way.

10:56:38    9          BY MR. DAVENPORT:

10:56:38   10          Q.     Okay.  Now, do you see that at

10:56:40   11    10:56:53 -- so this would have been six seconds

10:56:43   12    after -- that a disposition has been added --

10:56:45   13          A.     Yes.

10:56:45   14          Q.     -- to that complaint summary report?

10:56:48   15          So now I guess what you're telling me is

10:56:51   16    that you would have been dispatched and en route at

10:56:54   17    10:56:47 and that you would have disposed of the

10:56:57   18    case in six seconds?

10:56:58   19          MS. HUGGINS:    Form.

10:56:59   20          THE WITNESS:    I don't -- I don't know why --

10:57:05   21    I don't remember.

10:57:06   22          BY MR. DAVENPORT:

10:57:06   23          Q.     And then that last entry says archived

*Moriarity - Davenport - 2/21/20*

57

| | | |
|---|---|---|
| 10:57:09 | 1 | at the same exact time, correct? |
| 10:57:11 | 2 | A.    Yes. |
| 10:57:11 | 3 | Q.    Okay.  And what does archived refer to? |
| 10:57:13 | 4 | A.    This was dispo'd as archived for |
| 10:57:19 | 5 | whatever reason. |
| 10:57:21 | 6 | Q.    Do officers receive any sort of |
| 10:57:23 | 7 | training for what these complaint summary reports |
| 10:57:24 | 8 | are and how to read them? |
| 10:57:27 | 9 | A.    Not -- not really, no. |
| 10:57:28 | 10 | Q.    Do they give you any -- does the |
| 10:57:31 | 11 | Buffalo Police Academy give you any training how to |
| 10:57:35 | 12 | make entries onto complaint summary reports? |
| 10:57:36 | 13 | A.    We don't make these entries.  Dispatch |
| 10:57:39 | 14 | does. |
| 10:57:39 | 15 | Q.    Just dispatch? |
| 10:57:40 | 16 | A.    Yeah. |
| 10:57:40 | 17 | Q.    Is it possible for an officer to make |
| 10:57:43 | 18 | entries on the complaint summary reports? |
| 10:57:45 | 19 | A.    We can add things to it. |
| 10:57:47 | 20 | Q.    And then how would you make those |
| 10:57:49 | 21 | additions? |
| 10:57:49 | 22 | A.    On the computer in the vehicle. |
| 10:57:51 | 23 | Q.    Okay.  Have you ever done that before? |

*Moriarity - Davenport - 2/21/20*

58

10:57:55   1          A.     Yes.

10:57:55   2          Q.     And did they give you any training on

10:57:57   3   how to make those entries from your computer?

10:57:59   4          A.     No.

10:58:03   5          Q.     Is it a certain program that you use

10:58:05   6   for making those entries?

10:58:08   7          A.     Yes.

10:58:09   8          Q.     Do you know what kind of a program that

10:58:11   9   is?

10:58:11  10          A.     I do not.

10:58:11  11          Q.     Okay.  How does that appear on your

10:58:16  12   computer screen?

10:58:19  13          How -- how does the complaint summary report

10:58:21  14   where you can make entries, how does that appear on

10:58:23  15   your computer screen?

10:58:24  16          MS. HUGGINS:   Form.

10:58:26  17          THE WITNESS:   It does not look like this.

10:58:27  18          BY MR. DAVENPORT:

10:58:28  19          Q.     Okay.  Can you generally describe what

10:58:30  20   that -- what it kind of looks like?

10:58:32  21          A.     Something similar to it.  I mean, all

10:58:34  22   this -- all the same information shows up.

10:58:37  23          Q.     Okay.  And what kinds of changes can

10:58:41  1  you make from your computer screen?

10:58:43  2       A.   I can't change anything.  I can just

10:58:45  3  add to it.

10:58:45  4       Q.   Okay.  Okay.  So if -- if the time was

10:58:48  5  incorrect, you wouldn't be able to change that?

10:58:50  6       A.   No.  I can call dispatch and then they

10:58:53  7  can change it.

10:58:53  8       Q.   Okay.

10:58:54  9       A.   But it will just continue on with

10:58:56 10  adding.  It won't change it change it.

10:58:58 11       Q.   Okay.  Besides this lawsuit here, have

10:59:03 12  you been involved with any other lawsuits?

10:59:05 13       A.   No.

10:59:05 14       Q.   What about have you been involved with

10:59:07 15  any criminal proceedings?

10:59:08 16       A.   No.

10:59:09 17       MS. HUGGINS:   Form.  Do you mean as

10:59:11 18  a witness?

10:59:12 19       MR. DAVENPORT:   Well, yeah.  I was going to

10:59:13 20  get to that.

10:59:14 21       MS. HUGGINS:   You were going to get to that.

10:59:14 22  Okay.

10:59:14 23       BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

60

| | | |
|---|---|---|
| 10:59:15 | 1 | Q.   As a witness, have you ever been called |
| 10:59:16 | 2 | to testify in a criminal proceeding? |
| 10:59:19 | 3 | A.   Yes. |
| 10:59:20 | 4 | Q.   What kinds of documents would you |
| 10:59:21 | 5 | review for those criminal proceedings? |
| 10:59:24 | 6 | A.   Similar documents.   Arrest forms, crime |
| 10:59:31 | 7 | reports. |
| 10:59:32 | 8 | Q.   Would they have you review the |
| 10:59:33 | 9 | complaint summary report? |
| 10:59:34 | 10 | A.   Sometimes. |
| 10:59:35 | 11 | Q.   And would you have to give testimony on |
| 10:59:37 | 12 | those complaint summary reports? |
| 10:59:38 | 13 | A.   Yes. |
| 10:59:38 | 14 | Q.   What kinds of things would you have to |
| 10:59:40 | 15 | give testimony on? |
| 10:59:42 | 16 | MS. HUGGINS:   Form. |
| 10:59:42 | 17 | BY MR. DAVENPORT: |
| 10:59:43 | 18 | Q.   What kinds of entries on the complaint |
| 10:59:44 | 19 | summary report would you have to give testimony on? |
| 10:59:47 | 20 | MS. HUGGINS:   Form.   You can answer. |
| 10:59:48 | 21 | THE WITNESS:   Just like here.   Maybe things |
| 10:59:51 | 22 | that were -- were written on here or time frames. |
| 10:59:55 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

61

| 10:59:56 | 1 | Q.   Have you ever found that a complaint |
| 10:59:58 | 2 | summary report was entered incorrectly? |
| 11:00:02 | 3 | A.   I'm confused.  What do you mean? |
| 11:00:04 | 4 | Q.   In your three years as a Buffalo police |
| 11:00:07 | 5 | officer, have you ever found that a complaint |
| 11:00:09 | 6 | summary report did not accurately reflect a call |
| 11:00:12 | 7 | that you made specifically or a call that you |
| 11:00:14 | 8 | responded to? |
| 11:00:14 | 9 | A.   Well, just like -- just like here, they |
| 11:00:17 | 10 | entered it as a fight but it was a robbery. |
| 11:00:19 | 11 | Q.   Okay. |
| 11:00:20 | 12 | A.   So -- |
| 11:00:22 | 13 | Q.   So those types of errors then? |
| 11:00:23 | 14 | A.   Yeah. |
| 11:00:24 | 15 | Q.   Have you ever encountered any |
| 11:00:28 | 16 | discrepancies with the time that are on the |
| 11:00:30 | 17 | complaint summary report? |
| 11:00:34 | 18 | MS. HUGGINS:  Form. |
| 11:00:34 | 19 | THE WITNESS:  Can you -- |
| 11:00:36 | 20 | BY MR. DAVENPORT: |
| 11:00:36 | 21 | Q.   So on the complaint summary report it |
| 11:00:37 | 22 | gives a general time for when these actions would |
| 11:00:40 | 23 | have occurred. |

11:00:41   1        Have you ever noticed that there may be

11:00:43   2    errors with the entry for the time on those

11:00:46   3    complaint summary reports?

11:00:46   4        A.   No.  So everything is computer

11:00:50   5    documented --

11:00:51   6        Q.   Right.

11:00:51   7        A.   -- as it -- as it occurs.  So the entry

11:00:54   8    initiated at 10:32:23.  That's when said person

11:00:59   9    called from this number, and then it just -- it

11:01:01  10    just goes.

11:01:02  11        Q.   Okay.

11:01:04  12        A.   There will never be a discrepancy

11:01:06  13    with -- with the time.

11:01:06  14        Q.   Is that entered by a computer or is it

11:01:10  15    entered by a person at dispatch?

11:01:14  16        MS. HUGGINS:   Form.

11:01:15  17        THE WITNESS:   I don't -- I don't know.

11:01:16  18        MR. DAVENPORT:   Okay.  So now I want to turn

11:01:19  19    your attention to the video.

11:01:21  20        And would you mind if we could get the

11:01:23  21    lights?  That way there's no glare on the screen.

11:01:28  22        They just have to be the lights right in

11:01:31  23    front of the TV.

11:01:44  1      **MS. HUGGINS:**  It may be the shades to the

11:01:45  2  window.

11:01:46  3      **MR. DAVENPORT:**  Okay.  Could we redirect the

11:02:08  4  camera towards the television rather than towards

11:02:10  5  the witness for this segment?  Is that possible?

11:02:17  6      **THE VIDEOGRAPHER:**  Could we go off the

11:02:18  7  record?

11:02:18  8      **MR. DAVENPORT:**  Yes, we can.

11:02:18  9      **THE VIDEOGRAPHER:**  Thank you.

11:02:18 10      (A recess was then taken at 11:02 a.m.)

11:17:11 11      (On the record at 11:17 a.m.)

11:17:11 12      **MR. DAVENPORT:**  All right, Mr. Moriarity, so

11:17:14 13  I asked you a few questions about the complaint

11:17:16 14  summary report for the first call that you made on

11:17:18 15  Schmarbeck at 33 Schmarbeck Avenue.

11:17:20 16      We are now going to watch a video that

11:17:23 17  depicts the events from that day for that first

11:17:26 18  call.

11:17:28 19      Mr. Hunt, would you please turn the video

11:17:30 20  camera towards the TV screen.

11:17:32 21      **MS. HUGGINS:**  Form.

11:17:33 22      (Video clip played.)

11:17:33 23      **BY MR. DAVENPORT:**

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 11:17:33 | 1 | Q.   So, now, Mr. Moriarity, watching this |
| 11:17:36 | 2 | video, do you remember what the weather was like |
| 11:17:39 | 3 | that day? |
| 11:17:41 | 4 | A.   I -- I don't.  I don't remember what it |
| 11:17:43 | 5 | was like. |
| 11:17:47 | 6 | Q.   Do you remember, was it cold?  Was it |
| 11:17:49 | 7 | warm? |
| 11:17:49 | 8 | A.   January 1st, it was probably cold. |
| 11:17:50 | 9 | Q.   Did you have to wear any sort of a hat |
| 11:17:52 | 10 | or gloves? |
| 11:17:54 | 11 | A.   I -- I think I was wearing a beanie. |
| 11:17:57 | 12 | Q.   A beanie? |
| 11:17:58 | 13 | A.   Yeah. |
| 11:18:00 | 14 | Q.   Now, this red van, have you seen this |
| 11:18:02 | 15 | red van before? |
| 11:18:02 | 16 | A.   No. |
| 11:18:05 | 17 | Q.   Did you happen to see that red van when |
| 11:18:08 | 18 | you appeared on Schmarbeck Avenue on January 1st, |
| 11:18:12 | 19 | 2017? |
| 11:18:12 | 20 | A.   I don't remember. |
| 11:18:13 | 21 | Q.   Seeing this red van here today, does |
| 11:18:15 | 22 | that refresh your recollection of seeing a van that |
| 11:18:18 | 23 | day? |

| | | |
|---|---|---|
| 11:18:19 | 1 | **A.**    No. |
| 11:18:20 | 2 | **Q.**    No? |
| 11:18:21 | 3 | Do you know who this individual is walking |
| 11:18:30 | 4 | out of the van? |
| 11:18:30 | 5 | And I would say for the record that the time |
| 11:18:32 | 6 | stamp is 9:53:16.  You don't have to verify the |
| 11:18:36 | 7 | time, but the individual who is now walking out of |
| 11:18:38 | 8 | the van, do you -- do you remember this individual? |
| 11:18:44 | 9 | **A.**    I don't remember. |
| 11:18:45 | 10 | **Q.**    Do you remember talking to that |
| 11:18:47 | 11 | individual on January 1st of 2017? |
| 11:18:49 | 12 | **A.**    I do not. |
| 11:18:55 | 13 | **Q.**    Do you remember what type of a call it |
| 11:18:56 | 14 | was that you responded to on January 1st of 2017, |
| 11:19:01 | 15 | at 33 Schmarbeck? |
| 11:19:02 | 16 | **A.**    From the complaint summary report, it |
| 11:19:04 | 17 | was a larceny. |
| 11:19:05 | 18 | **Q.**    Do you remember anything about that |
| 11:19:07 | 19 | call besides what's written on the complaint |
| 11:19:09 | 20 | summary report? |
| 11:19:09 | 21 | **A.**    I don't. |
| 11:19:12 | 22 | **Q.**    Do you remember how that call was |
| 11:19:14 | 23 | initiated? |

*Moriarity - Davenport - 2/21/20*

66

11:19:16   1        **A.**   I -- I -- I don't.  It says that it was

11:19:18   2   dispatched.

11:19:21   3        **Q.**   And dispatched refers to you accepting

11:19:23   4   the call and going to that call, correct?

11:19:25   5        **A.**   Yes.

11:19:26   6        **Q.**   But the 911 call was made by the

11:19:28   7   individual, Mike Wolfe?

11:19:29   8        **MS. HUGGINS:**  Form.

11:19:30   9        **THE WITNESS:**  I don't know if it was Mike

11:19:34  10   Wolfe, but someone -- someone called 911.

11:19:37  11        **BY MR. DAVENPORT:**

11:19:38  12        **Q.**   If I told you that the individual who

11:19:39  13   made the call was Mike Wolfe, would you have any

11:19:41  14   reason to dispute what I say?

11:19:44  15        **MS. HUGGINS:**  Form.

11:19:46  16        **BY MR. DAVENPORT:**

11:19:46  17        **Q.**   Would you have any reason to believe

11:19:48  18   that it was somebody besides Mike Wolfe?

11:19:49  19        **MS. HUGGINS:**  Form.

11:19:50  20        **THE WITNESS:**  No, but I also don't remember.

11:19:58  21        **MR. DAVENPORT:**  All right.

11:20:01  22        **MS. HUGGINS:**  Do you want to indicate for

11:20:02  23   the record what exhibit you've played?

*Moriarity - Davenport - 2/21/20*

11:20:05  1          **MR. DAVENPORT:**  Yes.

11:20:05  2          So for the record, I played the first video

11:20:08  3  of Exhibit A that was turned over to the City as

11:20:10  4  part of our complaint.  The last four digits of

11:20:16  5  that video file -- can you go back to it, please?

11:20:23  6          The last four digits of that video file are

11:20:25  7  5252.

11:20:28  8          We are now turning to the second video file

11:20:31  9  of Exhibit A that was provided to the City as part

11:20:35  10  of the plaintiff's complaint.  The last four digits

11:20:40  11  are 1342.

11:20:43  12          **MS. HUGGINS:**  The exhibit number, just for

11:20:45  13  the purposes of the deposition.

11:20:46  14          **MR. DAVENPORT:**  This exhibit number is

11:20:48  15  Exhibit number 11.

11:20:51  16          **MS. HUGGINS:**  Thank you.

11:20:59  17          (Video clip played.)

11:20:59  18          **BY MR. DAVENPORT:**

11:20:59  19          Q.   Do you see the three digits that are on

11:21:02  20  top of that police vehicle?

11:21:03  21          A.   Yeah.  It's kind of clear.

11:21:07  22          Q.   And what are those three digits?

11:21:12  23          A.   I know the -- I know the truck to be

*Moriarity - Davenport - 2/21/20*

68

11:21:15  1  | 532.

11:21:16  2  |         Oh, that's clear now.  Yeah, 532.

11:21:18  3  |         Q.   Do you recognize that police vehicle?

11:21:19  4  |         A.   Yes.

11:21:20  5  |         Q.   And what do you recognize it as?

11:21:22  6  |         A.   Buffalo Police vehicle.

11:21:24  7  |         Q.   Have you ever been in that vehicle

11:21:26  8  | before?

11:21:26  9  |         A.   Yes.

11:21:28  10 |         Q.   How many times before January 1st?

11:21:31  11 |         A.   I'm -- yeah.  I'm unsure.

11:21:33  12 |         Q.   Were you in that vehicle after

11:21:36  13 | January 1st of 2017?

11:21:37  14 |         A.   Yeah.

11:21:39  15 |         Q.   Was that a car that you would typically

11:21:41  16 | use during your shifts at C District?

11:21:44  17 |         A.   No.   We -- we change depending on what

11:21:49  18 | goes to the garage because it's broke.

11:21:51  19 |         Q.   Okay.  Was there a typical vehicle that

11:21:53  20 | you would drive?

11:21:55  21 |         A.   This was Karl's assigned truck.

11:22:00  22 |         Q.   Okay.  So Karl Schultz would typically

11:22:03  23 | drive this truck then?

11:22:04  1        A.    Yeah.   Yeah.

11:22:04  2        Q.    So during your first 16 weeks of

11:22:06  3   training, this was the vehicle that you were using?

11:22:08  4        A.    Unless it was at the garage, yes.

11:22:11  5        Q.    Okay.   Now, the video shows that you

11:22:15  6   drove past the red van at first.   Do you know why

11:22:18  7   you drove past that red van?

11:22:20  8        A.    I do not.

11:22:21  9        Q.    The video also shows now, at 10:14, in

11:22:24 10   the top corner, that you were now backing up the

11:22:27 11   vehicle down Schmarbeck to where the red van is.

11:22:30 12   Do you know why you did that?

11:22:30 13        MS. HUGGINS:   Form.

11:22:31 14        THE WITNESS:   I don't.

11:22:32 15        BY MR. DAVENPORT:

11:22:33 16        Q.    Were you going to this individual who

11:22:36 17   was out in the -- the sidewalk at this point?

11:22:39 18        A.    I -- I don't remember, but it looks

11:22:43 19   that way.

11:22:47 20        Q.    Now, you parked behind the red van.

11:22:49 21   Was there any reason that you would have done that?

11:22:53 22        A.    Safety.

11:22:54 23        Q.    And what would that safety reason have

| | | |
|---|---|---|
| 11:22:56 | 1 | been? |
| 11:22:58 | 2 | **A.** I mean, so I can see someone in case |
| 11:23:02 | 3 | they're going to shoot me or something. |
| 11:23:03 | 4 | **Q.** Okay. And who would that person have |
| 11:23:05 | 5 | been? |
| 11:23:06 | 6 | **MS. HUGGINS:** Form. |
| 11:23:07 | 7 | **THE WITNESS:** Yeah. That -- that's just |
| 11:23:09 | 8 | a -- a general safety thing, so, I mean, I'm pretty |
| 11:23:14 | 9 | sure that that's the complainant for the call. |
| 11:23:18 | 10 | **BY MR. DAVENPORT:** |
| 11:23:18 | 11 | **Q.** Okay. So it wasn't necessarily that |
| 11:23:20 | 12 | you were driving behind the red van. You were |
| 11:23:22 | 13 | trying to get a visual on the individual who was |
| 11:23:23 | 14 | standing on the sidewalk, correct? |
| 11:23:25 | 15 | **A.** Yeah. |
| 11:23:26 | 16 | **Q.** Okay. |
| 11:23:26 | 17 | **A.** In the safest way. |
| 11:23:27 | 18 | **Q.** And that was a safety procedure? |
| 11:23:30 | 19 | **A.** Yeah. |
| 11:23:30 | 20 | **Q.** Was that something that Karl Schultz |
| 11:23:32 | 21 | told you to do? |
| 11:23:33 | 22 | **A.** I -- I don't think he told me to do |
| 11:23:36 | 23 | anything, no. |

*Moriarity - Davenport - 2/21/20*

71

| 11:23:37 | 1 | Q. Was that part of your training with the |
| 11:23:39 | 2 | ECC, Erie County Training Academy? |
| 11:23:43 | 3 | A. No, not really. |
| 11:23:43 | 4 | Q. Was that part of your training with |
| 11:23:45 | 5 | Buffalo Police Academy? |
| 11:23:48 | 6 | A. No, not really. |
| 11:23:49 | 7 | Q. So was that something that you were |
| 11:23:51 | 8 | ever taught by ECC or the Buffalo Police Academy? |
| 11:23:54 | 9 | A. No. |
| 11:23:55 | 10 | Q. So that was just something that you did |
| 11:23:56 | 11 | on your own? |
| 11:23:57 | 12 | A. Yes. |
| 11:23:57 | 13 | Q. Okay. Who's that individual who's |
| 11:24:01 | 14 | getting out of the police vehicle? |
| 11:24:03 | 15 | A. Looks like it's me. |
| 11:24:04 | 16 | Q. Were you driving that day? |
| 11:24:07 | 17 | A. Yes. |
| 11:24:08 | 18 | Q. Did you drive the entire day, or did |
| 11:24:10 | 19 | Karl Schultz drive at any point? |
| 11:24:13 | 20 | A. I don't -- |
| 11:24:13 | 21 | Q. On January 1st of 2017? |
| 11:24:16 | 22 | A. I don't know if I drove the whole day. |
| 11:24:19 | 23 | Q. During your first 16 weeks of training, |

*Moriarity - Davenport - 2/21/20*

72

| | | |
|---|---|---|
| 11:24:21 | 1 | who predominantly did most of the driving? |
| 11:24:26 | 2 | A. The whole 16 weeks, I would say |
| 11:24:29 | 3 | predominantly it was me. |
| 11:24:30 | 4 | Q. Okay. Was there any reason why you |
| 11:24:32 | 5 | drove instead of Karl? |
| 11:24:34 | 6 | A. So I can learn the streets. |
| 11:24:36 | 7 | Q. Okay. Did he give you any sort of |
| 11:24:40 | 8 | directions on where to go and how to go to a call? |
| 11:24:42 | 9 | A. Tons of directions. |
| 11:24:44 | 10 | Q. Okay. Do you have any sort of a GPS in |
| 11:24:46 | 11 | your vehicle? |
| 11:24:48 | 12 | A. They have a map on the computer that we |
| 11:24:52 | 13 | use, but we do not use it for GPS. |
| 11:24:56 | 14 | Q. Okay. What do you use that map for? |
| 11:25:01 | 15 | A. I -- I never used the map. |
| 11:25:05 | 16 | Q. Okay. |
| 11:25:05 | 17 | A. But people learn how to GPS calls that |
| 11:25:09 | 18 | way. You can also identify where other officers |
| 11:25:12 | 19 | are. |
| 11:25:12 | 20 | Q. Okay. So you had a pretty good |
| 11:25:16 | 21 | understanding of all the streets on C District and |
| 11:25:18 | 22 | you didn't use the map? |
| 11:25:18 | 23 | A. No, I didn't -- |

*Moriarity - Davenport - 2/21/20*

73

11:25:19   1          MS. HUGGINS:  Form.

11:25:20   2          THE WITNESS:  I didn't have a good

11:25:21   3   understanding at all.  Karl said it's better to

11:25:23   4   learn the streets by driving them rather than

11:25:27   5   GPS-ing them and staring at a computer.

11:25:29   6          BY MR. DAVENPORT:

11:25:29   7          Q.   Okay.  Would Karl then give you oral

11:25:32   8   directions of where to drive?

11:25:33   9          A.   Yes.

11:25:33  10          Q.   Okay.  And you never referred to that

11:25:35  11   map during your first 16 weeks then?

11:25:39  12          A.   I can't say never, but I was --

11:25:43  13          Q.   Do you refer to that map at all?

11:25:44  14          MS. HUGGINS:  Well --

11:25:45  15          MR. DAVENPORT:  He said never.

11:25:46  16          MS. HUGGINS:  I wasn't sure if he was

11:25:48  17   finished answering.

11:25:49  18          THE WITNESS:  I can't say -- I can't say

11:25:50  19   never, but we really tried hard to stay away from

11:25:55  20   it.

11:25:56  21          BY MR. DAVENPORT:

11:25:57  22          Q.   Okay.  After your first 16 weeks, have

11:25:58  23   you ever used the map to go respond to a call?

*Moriarity - Davenport - 2/21/20*

74

| | | |
|--|--|--|
| 11:26:02 | 1 | **A.** Not to respond to a call, but to find |
| 11:26:05 | 2 | out where an officer was. |
| 11:26:06 | 3 | **Q.** Okay. So now you're walking behind the |
| 11:26:13 | 4 | police vehicle; is that accurate? |
| 11:26:15 | 5 | **A.** Yeah. |
| 11:26:15 | 6 | **Q.** Was there any reason why you walked |
| 11:26:17 | 7 | behind the police vehicle rather than in front? |
| 11:26:22 | 8 | **A.** I don't -- I don't remember that day. |
| 11:26:24 | 9 | **Q.** Do you remember any difficulty with |
| 11:26:26 | 10 | walking on the Schmarbeck Drive that day? |
| 11:26:30 | 11 | **MS. HUGGINS:** Form. |
| 11:26:31 | 12 | **THE WITNESS:** Can you explain that? |
| 11:26:33 | 13 | **BY MR. DAVENPORT:** |
| 11:26:34 | 14 | **Q.** Was it icy? Was it slippery? |
| 11:26:44 | 15 | **A.** I don't remember. |
| 11:26:45 | 16 | **Q.** Okay. |
| 11:26:46 | 17 | **A.** I don't -- I don't remember. |
| 11:26:47 | 18 | **Q.** Okay. What kinds of shoes were you |
| 11:26:50 | 19 | wearing that day? |
| 11:26:51 | 20 | **A.** Boots. |
| 11:26:52 | 21 | **Q.** Boots? |
| 11:26:53 | 22 | Did you ever have difficulty walking on |
| 11:26:55 | 23 | streets with those boots? |

*Moriarity - Davenport - 2/21/20*

75

| | | |
|---|---|---|
| 11:26:57 | 1 | A.  Sometimes. |
| 11:26:58 | 2 | Q.  Sometimes? |
| 11:26:58 | 3 | And when would that be? |
| 11:27:00 | 4 | A.  Like snow, icy, Buffalo conditions. |
| 11:27:03 | 5 | Q.  Did you see any snow on the street that |
| 11:27:05 | 6 | day? |
| 11:27:05 | 7 | A.  No. |
| 11:27:06 | 8 | Q.  Any ice? |
| 11:27:07 | 9 | A.  It's not that clear, but, yeah, I don't |
| 11:27:13 | 10 | know. |
| 11:27:13 | 11 | Q.  But as you sit here today, you don't |
| 11:27:16 | 12 | remember any difficulty with walking that day, |
| 11:27:18 | 13 | correct? |
| 11:27:18 | 14 | A.  No.  There was no -- not for me. |
| 11:27:20 | 15 | Q.  Okay.  Now, it seems that you are |
| 11:27:28 | 16 | approaching the individual who is standing on the |
| 11:27:30 | 17 | sidewalk; is that correct? |
| 11:27:31 | 18 | A.  Yes. |
| 11:27:31 | 19 | Q.  Why is it just you that is going out to |
| 11:27:34 | 20 | go speak with that individual? |
| 11:27:38 | 21 | A.  Excuse me.  I -- I don't remember. |
| 11:27:42 | 22 | I think Karl was letting me deal with a low-priority |
| 11:27:46 | 23 | call. |

11:27:47  1        Q.    And how was that determined to be a

11:27:49  2   low-priority call?

11:27:52  3        A.    I mean, there's a lot of variables.

11:27:55  4   You look at officer safety.  There's -- it -- it

11:27:58  5   says right here priority 5, whereas a shooting

11:28:01  6   would be priority 1.

11:28:02  7        Q.    Sure.

11:28:03  8        A.    Things like that.

11:28:04  9        I'm not saying that a priority 5 can't go in

11:28:08  10  a southern direction, but assessing the video and

11:28:14  11  assessing the scene, you can kind of determine.

11:28:18  12       Q.    Now, prior to January 1st, 2017, have

11:28:22  13  you ever -- had you ever responded to a call on

11:28:24  14  Schmarbeck and spoken with this individual?

11:28:26  15       A.    I don't -- I don't remember.

11:28:28  16       Q.    Do you recall if after January 1st,

11:28:33  17  2017, did you ever respond to a call on Schmarbeck

11:28:35  18  and speak with this individual?

11:28:36  19       A.    No.

11:28:37  20       Q.    Now, at this point you know that you're

11:28:39  21  responding to a larceny or a theft, correct?

11:28:42  22       A.    Yes.

11:28:43  23       Q.    What's part of the normal procedure for

*Moriarity - Davenport - 2/21/20*

77

| | | |
|---|---|---|
| 11:28:46 | 1 | responding to a larceny or theft? |
| 11:28:48 | 2 | Is there a typical procedure that you would |
| 11:28:49 | 3 | follow? |
| 11:28:50 | 4 | MS. HUGGINS:  Form. |
| 11:28:54 | 5 | THE WITNESS:  I want to get the complainant's |
| 11:28:55 | 6 | name, date of birth, phone number, address, and |
| 11:28:58 | 7 | then find out the story of what had happened. |
| 11:29:01 | 8 | BY MR. DAVENPORT: |
| 11:29:01 | 9 | Q.   And how would you get that information? |
| 11:29:04 | 10 | A.   Just by talking to him. |
| 11:29:06 | 11 | Q.   Would you have to get any sort of |
| 11:29:08 | 12 | identification or anything else to verify what the |
| 11:29:11 | 13 | complainant is telling you? |
| 11:29:12 | 14 | A.   ID. |
| 11:29:13 | 15 | Q.   ID?  Is that typical? |
| 11:29:15 | 16 | A.   Yes. |
| 11:29:15 | 17 | Q.   Did you do that on this occasion? |
| 11:29:18 | 18 | A.   I don't -- I don't remember. |
| 11:29:20 | 19 | Q.   Would you have to look at the |
| 11:29:22 | 20 | license plate number for the vehicle?  Would -- |
| 11:29:25 | 21 | what would Karl Schultz be -- excuse me.  Strike |
| 11:29:28 | 22 | that. |
| 11:29:28 | 23 | What would Karl Schultz be doing in the |

*Moriarity - Davenport - 2/21/20*

78

| 11:29:30 | 1 | vehicle at this point? |
| 11:29:31 | 2 | MS. HUGGINS:  Form. |
| 11:29:31 | 3 | THE WITNESS:  I don't -- I don't know what |
| 11:29:32 | 4 | Karl Schultz could be doing right now. |
| 11:29:34 | 5 | BY MR. DAVENPORT: |
| 11:29:34 | 6 | Q.   I'm not asking what could he be doing. |
| 11:29:37 | 7 | I would be asking more so what should he be doing, |
| 11:29:40 | 8 | if he's not going out to go speak with the |
| 11:29:42 | 9 | individual? |
| 11:29:42 | 10 | MS. HUGGINS:  Form. |
| 11:29:43 | 11 | THE WITNESS:  I -- I think he's just letting |
| 11:29:45 | 12 | me -- me handle a low-priority call to see how I do |
| 11:29:52 | 13 | on it. |
| 11:29:52 | 14 | BY MR. DAVENPORT: |
| 11:29:52 | 15 | Q.   Assuming -- |
| 11:29:53 | 16 | A.   And evaluate me.  He's evaluating me. |
| 11:29:56 | 17 | Q.   I'm sorry. |
| 11:29:56 | 18 | So assuming that he wasn't evaluating you |
| 11:29:58 | 19 | and that you were out with a partner, somebody |
| 11:30:01 | 20 | who's not in training, would two officers go speak |
| 11:30:06 | 21 | with the individual or would just one officer go |
| 11:30:09 | 22 | speak with the individual? |
| 11:30:09 | 23 | MS. HUGGINS:  Form. |

11:30:10  1        THE WITNESS:  I -- I'm not going to assume.

11:30:14  2  There's a bunch of different variables that can be

11:30:19  3  taken into place -- or can be taken into

11:30:22  4  consideration for various different calls.

11:30:24  5        BY MR. DAVENPORT:

11:30:24  6        Q.   Okay.  What types of various

11:30:27  7  circumstances would there be?

11:30:29  8        Would it be based off of the priority of the

11:30:31  9  call?

11:30:34 10        You know, I guess what other variables

11:30:34 11  would you --

11:30:34 12        A.   It --

11:30:36 13        Q.   -- take into consideration?

11:30:37 14        A.   It could be --

11:30:38 15        MS. HUGGINS:   Form.

11:30:39 16        THE WITNESS:  It could be based off the

11:30:41 17  priority of the call.  It could be based off the

11:30:44 18  complainant's actions.  It could be based off of

11:30:48 19  third-, fourth-, fifth-party people that are

11:30:51 20  on scene.

11:30:53 21        BY MR. DAVENPORT:

11:30:53 22        Q.   If there's one individual complainant,

11:30:56 23  would it be typical for one police officer to go

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 11:30:59 | 1 | respond to that individual rather than two police |
| 11:31:02 | 2 | officers for a priority 5 larceny/theft? |
| 11:31:05 | 3 | **MS. HUGGINS:**  Form. |
| 11:31:05 | 4 | **THE WITNESS:**  No.  I've done both depending |
| 11:31:10 | 5 | on other variables. |
| 11:31:13 | 6 | **BY MR. DAVENPORT:** |
| 11:31:13 | 7 | Q.  Was there any reason why, on January 1st, |
| 11:31:17 | 8 | 2017, there was only one officer that responded and |
| 11:31:19 | 9 | went out to go talk with that individual? |
| 11:31:22 | 10 | A.  I don't -- I don't remember why I was |
| 11:31:25 | 11 | the only one that -- that got out -- |
| 11:31:29 | 12 | Q.  But -- |
| 11:31:29 | 13 | A.  -- of the vehicle. |
| 11:31:30 | 14 | Q.  -- at this point, what kind of |
| 11:31:33 | 15 | information besides that basic information are you |
| 11:31:36 | 16 | trying to get from this complainant? |
| 11:31:38 | 17 | A.  Just -- just the basic info. |
| 11:31:40 | 18 | Q.  Would you be asking him any details |
| 11:31:42 | 19 | about what his complaint is? |
| 11:31:45 | 20 | **MS. HUGGINS:**  Form. |
| 11:31:49 | 21 | **THE WITNESS:**  Yeah.  I would say that |
| 11:31:50 | 22 | I would be asking him about details about what had |
| 11:31:54 | 23 | happened to him. |

11:31:54   1          BY MR. DAVENPORT:

11:31:54   2          Q.   Do you remember if this individual told

11:31:56   3   you -- told you any details about what his

11:31:59   4   complaint was?

11:31:59   5          A.   I don't.  I don't remember.

11:32:08   6          Q.   Do you know what he was pointing to,

11:32:10   7   that individual complainant?

11:32:12   8          A.   I don't.

11:32:19   9          Q.   Was there any reason why you were still

11:32:21  10   standing on the street, away from the individual on

11:32:25  11   the sidewalk?

11:32:26  12          A.   Safety.

11:32:27  13          Q.   And what would those safety reasons be?

11:32:31  14          A.   When someone's really close to you,

11:32:32  15   they can punch you or stab you.

11:32:56  16          Q.   Do you remember if Karl Schultz was

11:32:57  17   saying anything from the police vehicle at this

11:32:59  18   time?

11:32:59  19          A.   I don't remember.

11:32:59  20          Q.   Can you see if his window is up or down

11:33:01  21   at this time?

11:33:02  22          A.   No, not -- no, I can't.

11:33:08  23          Q.   Do you remember if his window was up or

*Moriarity - Davenport - 2/21/20*

82

| | | |
|---|---|---|
| 11:33:10 | 1 | down at this time? |
| 11:33:11 | 2 | A.   I don't. |
| 11:33:14 | 3 | Q.   Do you remember if Karl Schultz was |
| 11:33:17 | 4 | giving you any sort of directions on how to handle |
| 11:33:19 | 5 | the call? |
| 11:33:20 | 6 | A.   I don't remember. |
| 11:33:33 | 7 | Q.   Now, at the time 10:15:11, there's |
| 11:33:36 | 8 | a second police vehicle arriving.  Do you agree |
| 11:33:38 | 9 | with that? |
| 11:33:38 | 10 | A.   Yes. |
| 11:33:41 | 11 | Q.   Do you happen to -- |
| 11:33:42 | 12 | MS. HUGGINS:   Form. |
| 11:33:43 | 13 | BY MR. DAVENPORT: |
| 11:33:45 | 14 | Q.   Do you agree that there is a second |
| 11:33:47 | 15 | police vehicle arriving at this time? |
| 11:33:49 | 16 | A.   Yes. |
| 11:33:49 | 17 | Q.   Do you know who the two police officers |
| 11:33:52 | 18 | were in that police vehicle? |
| 11:33:54 | 19 | A.   At -- at the time, I believe I just met |
| 11:33:58 | 20 | them. |
| 11:33:59 | 21 | Q.   Okay.  Do you remember, as you sit here |
| 11:34:03 | 22 | today, who was in that police vehicle? |
| 11:34:05 | 23 | A.   As I sit here today, yes. |

*Moriarity - Davenport - 2/21/20*

83

| | | |
|---|---|---|
| 11:34:06 | 1 | Q.   Who are those two individuals? |
| 11:34:08 | 2 | A.   Lauren McDermott and Jenny Velez. |
| 11:34:10 | 3 | Q.   Did you have any prior conversations |
| 11:34:12 | 4 | with them before January 1st of 2017? |
| 11:34:15 | 5 | A.   No.   I -- I just met them this day. |
| 11:34:18 | 6 | Q.   Okay.   Did you meet them on this first |
| 11:34:20 | 7 | initial call? |
| 11:34:21 | 8 | A.   No.   I believe I met them on Sattler. |
| 11:34:25 | 9 | Q.   Okay.   So they were with you at a prior |
| 11:34:29 | 10 | call then, according to -- what exhibit is it? |
| 11:34:35 | 11 | A.   7. |
| 11:34:35 | 12 | Q.   -- Exhibit 7, that would have been at |
| 11:34:40 | 13 | 8:02 a.m.; is that correct? |
| 11:34:43 | 14 | MS. HUGGINS:   Form. |
| 11:34:44 | 15 | THE WITNESS:   Looks like 6:51. |
| 11:34:49 | 16 | BY MR. DAVENPORT: |
| 11:34:49 | 17 | Q.   Excuse me.   I didn't realize that there |
| 11:34:51 | 18 | were two of them. |
| 11:34:54 | 19 | Did you see them when you went back to |
| 11:34:56 | 20 | Sattler at 8:02 a.m.? |
| 11:35:01 | 21 | A.   I don't remember if -- it was -- it was |
| 11:35:04 | 22 | during that call, so -- |
| 11:35:07 | 23 | Q.   It was during the 6:51 a.m. call? |

*Moriarity - Davenport - 2/21/20*

84

| | | |
|---|---|---|
| 11:35:09 | 1 | A.   Yeah, it was during the 6:51. |
| 11:35:12 | 2 | Q.   Okay.  Did you speak both with Lauren |
| 11:35:14 | 3 | McDermott and Jenny Velez at that time? |
| 11:35:16 | 4 | A.   Nothing beyond an introduction. |
| 11:35:18 | 5 | Q.   Okay.  Who were the primary officers on |
| 11:35:21 | 6 | that call? |
| 11:35:22 | 7 | A.   That was -- |
| 11:35:23 | 8 | MS. HUGGINS:   Form. |
| 11:35:23 | 9 | THE WITNESS:   Yeah.  I'd have to see the CAD |
| 11:35:26 | 10 | on that. |
| 11:35:27 | 11 | BY MR. DAVENPORT: |
| 11:35:27 | 12 | Q.   Okay. |
| 11:35:28 | 13 | A.   Yeah.  I'd have to see the -- the |
| 11:35:30 | 14 | complaint summary -- summary report on that. |
| 11:35:32 | 15 | Q.   Was it you and Karl Schultz? |
| 11:35:34 | 16 | A.   I would -- I would have to see the |
| 11:35:38 | 17 | complaint summary report.  I know we were the first |
| 11:35:41 | 18 | ones on scene for that. |
| 11:35:42 | 19 | Q.   Okay.  Were Jenny Velez and Lauren |
| 11:35:48 | 20 | McDermott -- were they driving around at that time, |
| 11:35:52 | 21 | or were they dispatched to that call? |
| 11:35:54 | 22 | MS. HUGGINS:   Form. |
| 11:35:55 | 23 | THE WITNESS:   I don't know if they were |

*Moriarity - Davenport - 2/21/20*

85

| | | |
|---|---|---|
| 11:35:58 | 1 | driving around or not.  I -- yeah, I can't speak on |
| 11:36:07 | 2 | what they were -- what they were doing. |
| 11:36:08 | 3 | And I don't remember if -- if they were |
| 11:36:10 | 4 | dispatched or not.  I would need to see the summary |
| 11:36:12 | 5 | report for that. |
| 11:36:13 | 6 | **BY MR. DAVENPORT:** |
| 11:36:14 | 7 | Q.   Okay.  Besides introductions, did you |
| 11:36:16 | 8 | have any sort of a conversation with Lauren |
| 11:36:19 | 9 | McDermott and Jenny Velez? |
| 11:36:20 | 10 | A.   No. |
| 11:36:20 | 11 | Q.   Okay.  Besides 6:51 a.m., was the next |
| 11:36:24 | 12 | time that you saw Jenny Velez and Lauren McDermott |
| 11:36:28 | 13 | at 33 Schmarbeck? |
| 11:36:33 | 14 | A.   I don't -- I don't remember. |
| 11:36:35 | 15 | Q.   Okay.  Now, at this time, you're still |
| 11:36:41 | 16 | speaking with the individual complainant, correct? |
| 11:36:44 | 17 | A.   Yes. |
| 11:36:46 | 18 | Q.   Were Lauren McDermott and Jenny Velez, |
| 11:36:48 | 19 | were they saying anything to you at this time? |
| 11:36:51 | 20 | A.   I don't remember.  It doesn't -- it |
| 11:36:53 | 21 | doesn't look that way, but I don't remember. |
| 11:36:55 | 22 | Q.   Would they have also been evaluating |
| 11:36:57 | 23 | how you responded to the call? |

*Moriarity - Davenport - 2/21/20*

11:36:58  1          **MS. HUGGINS:**  Form.

11:36:59  2          **THE WITNESS:**  Not an official form of

11:37:02  3  evaluation like Karl.

11:37:04  4          **BY MR. DAVENPORT:**

11:37:05  5          Q.   Okay.  Would it be an informal

11:37:06  6  evaluation?

11:37:08  7          A.   I don't know if they were evaluating me

11:37:10  8  or not.

11:37:11  9          Q.   Okay.  What type of an evaluation would

11:37:14 10  Karl Schultz do?

11:37:15 11          Would it just be what he sees, or would he

11:37:18 12  also have to put together some sort of

11:37:21 13  documentation?

11:37:22 14          A.   Every day of the 16 weeks, there was

11:37:26 15  a form that he filled out at the end of the -- the

11:37:29 16  shift.  There was an evaluation form.

11:37:32 17          Q.   Would that evaluation form take into

11:37:34 18  account each of the calls that you made that day,

11:37:36 19  or would it only take into account certain calls

11:37:39 20  that you responded to?

11:37:40 21          A.   No.  Every call.

11:37:40 22          Q.   Every call?

11:37:42 23          Now, you would have taken the background

*Moriarity - Davenport - 2/21/20*

87

| | | |
|---|---|---|
| 11:37:46 | 1 | information for this individual.  Would you then go |
| 11:37:50 | 2 | report that background information to Karl Schultz |
| 11:37:52 | 3 | in the car? |
| 11:37:56 | 4 | A.    Yeah. |
| 11:37:56 | 5 | Q.    Did you do that on this occasion? |
| 11:38:02 | 6 | A.    I don't -- I don't remember. |
| 11:38:03 | 7 | Q.    Would there be any reason to not report |
| 11:38:05 | 8 | that information to Karl Schultz? |
| 11:38:08 | 9 | A.    No, there wouldn't be any reason. |
| 11:38:10 | 10 | Q.    Would that be normal police procedure |
| 11:38:13 | 11 | is to take the background information and go report |
| 11:38:15 | 12 | it back to the officer who's in the car? |
| 11:38:17 | 13 | MS. HUGGINS:    Form. |
| 11:38:18 | 14 | THE WITNESS:    To a field training officer, |
| 11:38:19 | 15 | yes. |
| 11:38:21 | 16 | BY MR. DAVENPORT: |
| 11:38:21 | 17 | Q.    Do you remember, did you report that |
| 11:38:24 | 18 | information to Jenny Velez or Lauren McDermott? |
| 11:38:28 | 19 | A.    No, I wouldn't -- I wouldn't report it |
| 11:38:30 | 20 | to them.  I would report it to Karl. |
| 11:38:46 | 21 | Q.    Now, at this moment, you've walked back |
| 11:38:48 | 22 | to the police vehicle, correct? |
| 11:38:49 | 23 | A.    Yes. |

*Moriarity - Davenport - 2/21/20*

88

| | | |
|---|---|---|
| 11:38:50 | 1 | Q.   Did you see yourself, prior to this, |
| 11:38:53 | 2 | grabbing anything from the individual? |
| 11:38:56 | 3 | A.   No. |
| 11:39:00 | 4 | Q.   But you would have checked his ID or |
| 11:39:02 | 5 | verified his background information with some sort |
| 11:39:05 | 6 | of documentation, correct? |
| 11:39:06 | 7 | MS. HUGGINS:   Form. |
| 11:39:06 | 8 | THE WITNESS:   I don't know if I verified it |
| 11:39:08 | 9 | or not. |
| 11:39:09 | 10 | BY MR. DAVENPORT: |
| 11:39:09 | 11 | Q.   Okay.   Would there be any reason to not |
| 11:39:13 | 12 | verify his background information? |
| 11:39:15 | 13 | A.   One of the -- I mean, one of the |
| 11:39:17 | 14 | reasons why I'm being evaluated is to make sure |
| 11:39:20 | 15 | I started doing those things, so maybe I -- maybe |
| 11:39:22 | 16 | I didn't do it on scene. |
| 11:39:23 | 17 | Q.   Would Karl Schultz have told you -- if |
| 11:39:26 | 18 | you did or did not ask for that ID, would he have |
| 11:39:30 | 19 | told you to go back and get the ID from the |
| 11:39:32 | 20 | individual? |
| 11:39:32 | 21 | A.   Yeah, he would have told me. |
| 11:39:34 | 22 | Q.   Did he tell you on this occasion? |
| 11:39:36 | 23 | A.   I have no idea. |

*Moriarity - Davenport - 2/21/20*

89

| | | |
|---|---|---|
| 11:39:36 | 1 | **MR. DAVENPORT:** So I'm playing the video |
| 11:39:38 | 2 | back, and I want you to see if you did or did not |
| 11:39:41 | 3 | ever grab anything -- any item whatsoever from this |
| 11:39:45 | 4 | individual. |
| 11:39:45 | 5 | (Video clip played.) |
| 11:39:45 | 6 | **BY MR. DAVENPORT:** |
| 11:40:38 | 7 | Q.   Mr. Moriarity, before you went back to |
| 11:40:40 | 8 | your police vehicle, did you ever grab any items or |
| 11:40:42 | 9 | any identification from that individual? |
| 11:40:43 | 10 | A.   No. |
| 11:40:45 | 11 | Q.   I want you to watch after you've gone |
| 11:40:47 | 12 | back to the police vehicle and spoken -- are you |
| 11:40:49 | 13 | speaking now with Karl Schultz? |
| 11:40:50 | 14 | A.   Yes. |
| 11:40:52 | 15 | Q.   I want you to now watch and see if you |
| 11:40:53 | 16 | ever go back to the individual to grab any sort of |
| 11:40:56 | 17 | identification. |
| 11:41:08 | 18 | Now, Officer Moriarity, I just also want to |
| 11:41:10 | 19 | ask you very quickly:  Why did Lauren McDermott and |
| 11:41:13 | 20 | Jenny Velez pull up their vehicle directly behind |
| 11:41:16 | 21 | that minivan? |
| 11:41:18 | 22 | **MS. HUGGINS:**  Form. |
| 11:41:18 | 23 | **THE WITNESS:**  I have no idea. |

| | | |
|---|---|---|
| 11:41:19 | 1 | BY MR. DAVENPORT: |
| 11:41:19 | 2 | Q.   Would there be any Buffalo Police |
| 11:41:21 | 3 | procedure reason why they would have to pull up |
| 11:41:23 | 4 | their vehicle at that time? |
| 11:41:25 | 5 | A.   No.   I don't know. |
| 11:41:28 | 6 | Q.   No safety reasons or anything like |
| 11:41:30 | 7 | that?   Okay. |
| 11:41:33 | 8 | MS. HUGGINS:   She just needs a verbal |
| 11:41:34 | 9 | answer. |
| 11:41:34 | 10 | THE WITNESS:   I'm sorry.   I'm -- I'm unsure |
| 11:41:36 | 11 | why they -- why they pulled up their vehicle, if |
| 11:41:38 | 12 | for a safety reason, maybe they were listening, |
| 11:41:41 | 13 | maybe they wanted to hear what I was saying or what |
| 11:41:43 | 14 | the complainant was saying, maybe the complainant |
| 11:41:46 | 15 | was talking to them, maybe Karl was talking to |
| 11:41:48 | 16 | them. |
| 11:41:49 | 17 | BY MR. DAVENPORT: |
| 11:41:49 | 18 | Q.   Okay. |
| 11:41:49 | 19 | A.   I don't know. |
| 11:41:50 | 20 | Q.   All right.   Now, Mr. Moriarity, would |
| 11:41:58 | 21 | you agree that at this time, you were talking with |
| 11:42:00 | 22 | the driver of that second police vehicle, or at |
| 11:42:04 | 23 | least standing next to the window of that? |

| | | |
|---|---|---|
| 11:42:06 | 1 | **A.** I'm standing somewhere in between the |
| 11:42:08 | 2 | two vehicles, yes. |
| 11:42:09 | 3 | **Q.** Are you facing the second police |
| 11:42:11 | 4 | vehicle? |
| 11:42:12 | 5 | **A.** It looks that way, yeah. |
| 11:42:13 | 6 | **Q.** Would there be any reason to stand |
| 11:42:16 | 7 | facing the direction of that police vehicle besides |
| 11:42:19 | 8 | speaking to the driver of that second police |
| 11:42:21 | 9 | vehicle? |
| 11:42:22 | 10 | **MS. HUGGINS:** Form. |
| 11:42:23 | 11 | **THE WITNESS:** I mean, if they were talking |
| 11:42:24 | 12 | to me, I'm -- I'm acknowledging the fact that they |
| 11:42:28 | 13 | were talking to me and I'm saying something in |
| 11:42:31 | 14 | response. |
| 11:42:32 | 15 | **BY MR. DAVENPORT:** |
| 11:42:32 | 16 | **Q.** Do you remember any details of that |
| 11:42:34 | 17 | conversation? |
| 11:42:35 | 18 | **MS. HUGGINS:** Form. |
| 11:42:35 | 19 | **THE WITNESS:** No. |
| 11:42:36 | 20 | **BY MR. DAVENPORT:** |
| 11:42:36 | 21 | **Q.** They wouldn't have been giving you any |
| 11:42:39 | 22 | directions on how to handle that call? |
| 11:42:40 | 23 | **A.** I don't even know if we're -- I don't |

*Moriarity - Davenport - 2/21/20*

92

11:42:43  1  know what we're talking about, so no.

11:42:45  2       Q.    But there would be no reason why they

11:42:47  3  would give you directions on how to handle the call

11:42:49  4  correctly, correct?

11:42:51  5       A.    They could be.

11:43:06  6       Q.    Now, Mr. Moriarity, after you went back

11:43:08  7  to the police vehicle, you did not see yourself

11:43:11  8  check the identification of that individual,

11:43:12  9  correct?

11:43:13  10      MS. HUGGINS:   Form.

11:43:14  11      THE WITNESS:   With the video provided, I --

11:43:20  12  the one that we just watched, I did not go back to

11:43:22  13  the complainant.

11:43:23  14      BY MR. DAVENPORT:

11:43:23  15      Q.    Would there be any sort of a document

11:43:25  16  that would say whether you checked the ID of that

11:43:28  17  individual or not?

11:43:32  18      A.    No.

11:43:33  19      Q.    Is there any sort of a document that's

11:43:36  20  generated for when you do check the ID of somebody?

11:43:43  21      A.    No.

11:43:43  22      Q.    What would be the reason for checking

11:43:45  23  the ID of somebody?

*Moriarity - Davenport - 2/21/20*

11:43:46  1          MS. HUGGINS:  Form.

11:43:47  2          THE WITNESS:  The reason why I do it is to

11:43:50  3     make sure that I'm talking to the person that

11:43:52  4     they're claiming to be.

11:43:55  5          BY MR. DAVENPORT:

11:43:55  6          Q.   And there's no sort of documentation

11:43:56  7     that comes back to verify that this is a valid

11:43:59  8     license or anything else to help you verify that

11:44:04  9     fact?

11:44:04 10          MS. HUGGINS:  Form.

11:44:05 11          THE WITNESS:  If I'm running someone's

11:44:07 12     license to see if they have a suspended license or

11:44:10 13     something, then yeah, there is, but, I mean, if I'm

11:44:13 14     just looking at an ID and seeing if that's the

11:44:17 15     person that's on the ID, then no, there's no --

11:44:20 16     there's no form.

11:44:21 17          BY MR. DAVENPORT:

11:44:21 18          Q.   Okay.  So you would only check at that

11:44:22 19     point if there was a suspended license, correct?

11:44:27 20          That would be the only time a document is

11:44:28 21     generated?

11:44:29 22          MS. HUGGINS:  Form.

11:44:31 23          THE WITNESS:  I just want -- I just want to

11:44:34  1  be clear.  It's not -- there's no document that's

11:44:37  2  generated.  It just shows up on our computer, the

11:44:40  3  person's info, when we type in their -- their

11:44:44  4  license.  There's no -- there's no document that is

11:44:47  5  spit out of a computer or anything like that.

11:44:53  6         MR. DAVENPORT:  Now, as part of -- and you

11:44:55  7  can turn the camera back towards the witness.

11:45:00  8         Could we also maybe just go off the record

11:45:02  9  just to get the lights back on?

11:45:02  10        THE VIDEOGRAPHER:  Yes.

11:45:02  11        MR. DAVENPORT:  Okay.

11:45:02  12        (A recess was then taken at 11:45 a.m.)

11:46:26  13        (On the record at 11:46 a.m.)

11:46:26  14        BY MR. DAVENPORT:

11:46:26  15        Q.   Now, Mr. Moriarity, we just

11:46:28  16  watched a video of you responding to the call

11:46:31  17  at 33 Schmarbeck.  At this time, you would have

11:46:33  18  asked the individual for his background

11:46:37  19  information.

11:46:39  20        Now, at this time, do you -- do you recall

11:46:45  21  what you did after going back to go talk with Karl

11:46:51  22  Schultz?

11:46:52  23        Did you go back to go speak with the

*Moriarity - Davenport - 2/21/20*

95

| 11:46:53 | 1 | complaint? |
| 11:46:54 | 2 | MS. HUGGINS:   Form. |
| 11:46:54 | 3 | THE WITNESS:   No, I don't remember. |
| 11:46:55 | 4 | BY MR. DAVENPORT: |
| 11:46:55 | 5 | Q.   Do you remember going into the house at |
| 11:46:58 | 6 | that time? |
| 11:46:58 | 7 | A.   No, I don't. |
| 11:46:59 | 8 | Q.   Okay. |
| 11:47:00 | 9 | A.   No. |
| 11:47:01 | 10 | Q.   Would there be any sort of a document |
| 11:47:03 | 11 | or some sort of a recording or anything else that |
| 11:47:05 | 12 | would help to refresh your recollection? |
| 11:47:09 | 13 | A.   If I went back into the house? |
| 11:47:11 | 14 | Q.   If you went back into the house. |
| 11:47:12 | 15 | A.   I -- I -- I never -- I don't think |
| 11:47:14 | 16 | I went in the house.  But no, I mean, there |
| 11:47:18 | 17 | wouldn't -- there wouldn't be a -- a paper that |
| 11:47:20 | 18 | would say that I did. |
| 11:47:23 | 19 | Q.   Now, prior to this occasion on |
| 11:47:26 | 20 | January 1st, have you ever responded to a call |
| 11:47:29 | 21 | where a tenant had stole property from a landlord? |
| 11:47:33 | 22 | A.   I don't -- I don't know.  I don't |
| 11:47:35 | 23 | remember. |

Moriarity - Davenport - 2/21/20

96

11:47:35  1        Q.    Have you ever responded to one of those

11:47:37  2   types of calls after January 1st of 2017?

11:47:41  3        A.    Yes.

11:47:42  4        Q.    How many of those types of calls where

11:47:45  5   a tenant stole property from a landlord?

11:47:48  6        A.    I don't -- I don't know an approximate

11:47:50  7   number.  Not as often as you think.

11:47:56  8        Q.    Would it be more or less than ten?

11:48:00  9        A.    Over three years, probably more.

11:48:02 10        Q.    Would it be more or less than 50?

11:48:06 11        A.    Over three years, probably around that

11:48:09 12   maybe.

11:48:11 13        Q.    Okay.  Did you ever respond to a call

11:48:13 14   on Schmarbeck Avenue where a tenant stole property

11:48:16 15   from a landlord?

11:48:19 16        A.    I don't remember if that was the nature

11:48:21 17   of this call, but I -- I haven't had many calls on

11:48:27 18   Schmarbeck, so --

11:48:29 19        Q.    Did you ever respond to a call where an

11:48:31 20   individual was walking out with appliances from

11:48:35 21   their apartment that belonged to the landlord?

11:48:41 22        A.    I -- no, I don't -- I don't remember.

11:48:43 23        Q.    Would you agree with me that if

*Moriarity - Davenport - 2/21/20*

97

| | | |
|---|---|---|
| 11:48:44 | 1 | an individual wanted to take appliances from |
| 11:48:48 | 2 | a landlord, they would need to drive a large |
| 11:48:50 | 3 | vehicle? |
| 11:48:50 | 4 | MS. HUGGINS:  Form. |
| 11:48:52 | 5 | THE WITNESS:  Yeah, I mean, I don't -- just |
| 11:49:01 | 6 | to pull appliances out of a house and put them in |
| 11:49:03 | 7 | a -- in a vehicle and drive off, I would say that's |
| 11:49:08 | 8 | probably smart to have a big vehicle. |
| 11:49:12 | 9 | BY MR. DAVENPORT: |
| 11:49:12 | 10 | Q.   At this time did you know if the |
| 11:49:14 | 11 | individual that you were speaking to at |
| 11:49:16 | 12 | 33 Schmarbeck was a tenant or if he owned the |
| 11:49:20 | 13 | property? |
| 11:49:22 | 14 | A.   I -- I do not remember the nature of |
| 11:49:25 | 15 | the -- the call and what was said between me and |
| 11:49:28 | 16 | the complainant for 33. |
| 11:49:30 | 17 | Q.   Any of those instances that you |
| 11:49:32 | 18 | responded to a tenant who was stealing property |
| 11:49:37 | 19 | from a landlord, were there ever any times where |
| 11:49:39 | 20 | the crime was actually in progress at the time of |
| 11:49:43 | 21 | you responding to that call? |
| 11:49:44 | 22 | A.   No. |
| 11:49:44 | 23 | Q.   Have you ever witnessed a tenant taking |

11:49:48  1   property from a police -- from a landlord, whether

11:49:51  2   that be in your personal capacity or official

11:49:53  3   capacity?

11:49:55  4          MS. HUGGINS:   Form.

11:49:55  5          THE WITNESS:   I wouldn't -- yeah, no,

11:49:58  6   I don't think so.

11:49:58  7          BY MR. DAVENPORT:

11:49:59  8          Q.   Now, at this time, did you know if

11:50:01  9   the individual had a valid driver's license at

11:50:05 10   33 Schmarbeck?

11:50:06 11          A.   From -- from the video that you played

11:50:09 12   for me, I don't -- I didn't see myself on there

11:50:12 13   ever checking his ID, so I don't really know if

11:50:15 14   I did check his ID or not.

11:50:17 15          Q.   As part of your normal procedure for

11:50:21 16   responding to a -- an accusation of larceny or

11:50:25 17   theft, would you ever have to check the license

11:50:28 18   plate on a -- a vehicle that is at the location --

11:50:28 19          A.   If --

11:50:32 20          Q.   -- of the --

11:50:33 21          A.   If it's apparent that the vehicle was

11:50:36 22   involved, then yes.

11:50:39 23          Q.   Do you recall if on January 1st of 2017,

*Moriarity - Davenport - 2/21/20*

99

| | | |
|---|---|---|
| 11:50:42 | 1 | you had checked the license plate of that red van? |
| 11:50:45 | 2 | A. I don't remember. |
| 11:50:46 | 3 | Q. Would there be any sort of a document |
| 11:50:49 | 4 | that would depict whether you had checked the |
| 11:50:52 | 5 | license of that red van or not? |
| 11:50:58 | 6 | A. I would say -- I would say no. |
| 11:51:04 | 7 | I don't -- I mean, just by the video, again, |
| 11:51:08 | 8 | I don't know if I -- I don't know what the rest |
| 11:51:09 | 9 | of the video showed, so I don't remember if -- if |
| 11:51:14 | 10 | I did anything else with the complainant. |
| 11:51:18 | 11 | Q. Do you recall, as you sit here today, |
| 11:51:22 | 12 | or do you know, as you sit here today, whether that |
| 11:51:24 | 13 | red van belonged to the complainant or not? |
| 11:51:26 | 14 | A. I do not know. |
| 11:51:29 | 15 | Q. So I'm going to ask you a few questions |
| 11:51:32 | 16 | about what happened immediately after that call to |
| 11:51:35 | 17 | 33 Schmarbeck. |
| 11:51:38 | 18 | Do you recall an individual walking out into |
| 11:51:44 | 19 | the street after you responded to that call at |
| 11:51:46 | 20 | 33 Schmarbeck? |
| 11:51:46 | 21 | MS. HUGGINS: Form. |
| 11:51:47 | 22 | THE WITNESS: The videos that we reviewed, |
| 11:51:51 | 23 | yes, I remember, based off the videos we reviewed. |

11:51:54  1          BY MR. DAVENPORT:

11:51:54  2          Q.   But that's only based off of what you

11:51:56  3  saw in the videos?

11:51:59  4          A.   Yeah, I mean, I don't -- again, this

11:52:01  5  was a very, very long time ago, and I was very new.

11:52:06  6          Q.   As you sit here today, do you know who

11:52:08  7  that individual was that's depicted in the video

11:52:11  8  walking out in the street?

11:52:12  9          MS. HUGGINS:   Form.

11:52:13 10          THE WITNESS:   Yes.

11:52:13 11          BY MR. DAVENPORT:

11:52:14 12          Q.   And who is that individual?

11:52:15 13          A.   Mr. Kistner.

11:52:18 14          Q.   Okay.   Do you remember any of the

11:52:19 15  details of a conversation that could have been had

11:52:24 16  between you and Mr. Kistner or Mr. Schultz and

11:52:27 17  Mr. Kistner when he was out in the street?

11:52:30 18          A.   I don't think I had a conversation with

11:52:34 19  Mr. Kistner.

11:52:35 20          Q.   Did Mr. Schultz say anything to

11:52:39 21  Mr. Kistner?

11:52:41 22          A.   No, I don't -- I don't -- I don't think

11:52:45 23  so.   Not when we were trying to drive off.

| 11:52:48 | 1 | Q. Why were you trying to drive off as |
| 11:52:51 | 2 | there was an individual in the street? |
| 11:52:53 | 3 | MS. HUGGINS: Form. |
| 11:52:54 | 4 | THE WITNESS: At the time, he wasn't |
| 11:52:57 | 5 | involved with our call, so we were leaving. |
| 11:52:59 | 6 | BY MR. DAVENPORT: |
| 11:52:59 | 7 | Q. Did he ask to speak to the officers at |
| 11:53:01 | 8 | that time? |
| 11:53:02 | 9 | A. I don't know if he said anything to us. |
| 11:53:04 | 10 | Q. Do you know if he said anything to |
| 11:53:06 | 11 | Ms. McDermott or Ms. Velez? |
| 11:53:11 | 12 | A. I -- yeah, I don't know. I wouldn't -- |
| 11:53:13 | 13 | MS. HUGGINS: Form. |
| 11:53:13 | 14 | THE WITNESS: I don't remember. |
| 11:53:15 | 15 | BY MR. DAVENPORT: |
| 11:53:16 | 16 | Q. Now, do you recall, as you sit here |
| 11:53:20 | 17 | today, even if it was the video that helped to |
| 11:53:23 | 18 | refresh your recollection, did you drive past the |
| 11:53:25 | 19 | individual who was out in the street? |
| 11:53:27 | 20 | A. I did drive past him, yeah. |
| 11:53:29 | 21 | Q. And how long were you driving -- how |
| 11:53:31 | 22 | far past that individual did you drive? |
| 11:53:34 | 23 | A. I don't remember how -- how far. |

*Moriarity - Davenport - 2/21/20*

102

11:53:36  1          Q.   Even based off of the video that you

11:53:41  2   saw, would you know approximately how far that you

11:53:44  3   drove?

11:53:44  4          MS. HUGGINS:   Form.

11:53:44  5          THE WITNESS:   I can't -- I can't judge

11:53:46  6   distance like that.

11:53:47  7          BY MR. DAVENPORT:

11:53:48  8          Q.   Do you know approximately how fast you

11:53:49  9   were driving?

11:53:49 10          A.   I -- I don't know how fast I was

11:53:51 11   driving.  I know from -- it's a small street.

11:53:56 12   I can't get up too high in speeds.

11:53:59 13          Q.   How long is Schmarbeck Avenue?

11:54:02 14          A.   I wouldn't -- I wouldn't be able to

11:54:03 15   tell you that.  It's a small city street, though.

11:54:06 16          Q.   Okay.  Is it a one way or a two way?

11:54:09 17          A.   Two way.

11:54:11 18          Q.   Were there any other cars that were

11:54:13 19   coming in the opposite direction from you?

11:54:15 20          MS. HUGGINS:   Form.

11:54:16 21          THE WITNESS:   I mean, from what the video

11:54:19 22   you guys have, it didn't show any.

11:54:23 23          BY MR. DAVENPORT:

11:54:24  1          Q.    It didn't show any other vehicles

11:54:26  2  coming in the opposite direction?

11:54:27  3          A.    It didn't show any, yeah, coming in the

11:54:31  4  opposite direction, that I remember.

11:54:32  5          Q.    Do you normally wear your seat belt as

11:54:36  6  you're driving?

11:54:38  7          A.    Sometimes.

11:54:40  8          Q.    And that's driving a police vehicle,

11:54:42  9  sometimes you wear a seat belt?

11:54:44  10          MS. HUGGINS:   Form.

11:54:45  11          THE WITNESS:   Yeah, sometimes.

11:54:46  12          BY MR. DAVENPORT:

11:54:47  13          Q.    What situations would you wear

11:54:49  14  a seat belt?

11:54:51  15          MS. HUGGINS:   Form.

11:54:55  16          THE WITNESS:   Situations where I remember or

11:55:00  17  I think it's icy or something.

11:55:04  18          BY MR. DAVENPORT:

11:55:05  19          Q.    As a police officer, are you required

11:55:06  20  to wear a seat belt?

11:55:10  21          MS. HUGGINS:   Form.

11:55:13  22          THE WITNESS:   I'm not sure actually if it's

11:55:15  23  in our Manual of Procedures.

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 11:55:17 | 1 | BY MR. DAVENPORT: |
| 11:55:18 | 2 | Q.   Is it a violation of the New York |
| 11:55:19 | 3 | traffic law to not wear your seat belt? |
| 11:55:22 | 4 | A.   It is a violation for moving cars, |
| 11:55:24 | 5 | yeah, but if you look up our New York State VTL, |
| 11:55:30 | 6 | we're exempt from doing a lot of things. |
| 11:55:32 | 7 | Q.   Do you know if you are exempt from |
| 11:55:34 | 8 | wearing a seat belt? |
| 11:55:35 | 9 | A.   I don't actually. |
| 11:55:36 | 10 | Q.   Was that ever told to you by Karl |
| 11:55:39 | 11 | Schultz? |
| 11:55:39 | 12 | A.   No. |
| 11:55:39 | 13 | Q.   Was that told to you by any other |
| 11:55:42 | 14 | officer, that you were not -- that you were exempt |
| 11:55:44 | 15 | from wearing a seat belt? |
| 11:55:45 | 16 | A.   No. |
| 11:55:45 | 17 | Q.   Do you know if Karl Schultz was wearing |
| 11:55:47 | 18 | a seat belt on that day? |
| 11:55:48 | 19 | A.   I don't know. |
| 11:55:49 | 20 | Q.   Do you know if Jenny Velez and Lauren |
| 11:55:52 | 21 | McDermott were wearing a seat belt on that day? |
| 11:55:54 | 22 | A.   They were in a different car.  I don't |
| 11:55:56 | 23 | know. |

*Moriarity - Davenport - 2/21/20*

105

11:55:56  1        Q.    With any of the other officers that you

11:55:58  2   have been with in their -- in the vehicle, have any

11:56:00  3   of those officers worn a seat belt in the police

11:56:03  4   vehicle that you were driving?

11:56:04  5        A.    Yeah, some do.

11:56:05  6        MS. HUGGINS:   Form.

11:56:06  7        BY MR. DAVENPORT:

11:56:08  8        Q.    Now, when you were driving -- when you

11:56:13  9   typically go to go drive a vehicle, do you check

11:56:16 10   any of your mirrors before you pull away?

11:56:19 11        A.    Yes.

11:56:19 12        Q.    What mirrors do you check?

11:56:21 13        A.    I check all of them because a lot of

11:56:23 14   people are different heights.

11:56:24 15        Q.    Okay.   Now, do you check your mirror to

11:56:27 16   see what's around you or just to make sure that you

11:56:30 17   are able to see and you have a good vantage point

11:56:33 18   for looking through your mirrors?

11:56:35 19        MS. HUGGINS:   Form.

11:56:35 20        THE WITNESS:   To make sure I have a good

11:56:37 21   vantage point and I can see other cars and people

11:56:40 22   and whatnot.

11:56:41 23        BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

106

| | | |
|---|---|---|
| 11:56:42 | 1 | Q. Okay. Do you check your left mirror? |
| 11:56:43 | 2 | Your driver's side mirror? |
| 11:56:44 | 3 | A. Yes. |
| 11:56:44 | 4 | Q. Do you check your passenger side |
| 11:56:45 | 5 | mirror? |
| 11:56:45 | 6 | A. Yes. |
| 11:56:46 | 7 | Q. And then do you check your rearview |
| 11:56:48 | 8 | mirror? |
| 11:56:48 | 9 | A. Yeah. |
| 11:56:48 | 10 | Q. Do you look behind you at all? |
| 11:56:49 | 11 | A. No. You can't really see because of |
| 11:56:52 | 12 | the cage. |
| 11:56:52 | 13 | Q. Okay. |
| 11:56:53 | 14 | A. It's a little difficult. |
| 11:56:54 | 15 | Q. Okay. After you make that initial |
| 11:56:56 | 16 | check, do you ever look at your driver's side |
| 11:56:59 | 17 | mirror, your passenger mirror, or your rearview |
| 11:57:02 | 18 | mirror, as you're driving forward? |
| 11:57:03 | 19 | A. Often. |
| 11:57:04 | 20 | Q. Often? |
| 11:57:05 | 21 | And what are you looking for typically? |
| 11:57:08 | 22 | A. Other cars and -- and people to see |
| 11:57:11 | 23 | what -- what they're doing. |

*Moriarity - Davenport - 2/21/20*

107

11:57:12 1      Q.   Okay.  On this occasion do you recall

11:57:16 2  if you looked into your driver's side mirror or

11:57:18 3  your passenger side mirror or your rearview mirror

11:57:22 4  as you were driving away?

11:57:22 5      MS. HUGGINS:  Form.

11:57:24 6      THE WITNESS:  I remember looking in my

11:57:26 7  driver's side mirror.

11:57:28 8      BY MR. DAVENPORT:

11:57:28 9      Q.   Okay.  And why were you looking at your

11:57:31 10  driver's side mirror?

11:57:32 11      A.   Karl told me to -- he directed my

11:57:35 12  attention to the mirror and said, hold on; let's

11:57:39 13  make sure they get out okay.

11:57:42 14      Q.   Okay.  Did you stop your vehicle at

11:57:45 15  that point?

11:57:45 16      A.   I don't -- I don't remember.

11:57:47 17      Q.   Okay.  Were you -- were you looking

11:57:52 18  only at your driver's side mirror at that point

11:57:54 19  when Karl said, let's hold on; let's wait to see if

11:57:57 20  they make it out okay?

11:57:59 21      A.   In between that and looking forward.

11:58:01 22      Q.   Okay.  What was the reason for Karl

11:58:06 23  saying, let's make sure that they make it out okay?

11:58:09  1          MS. HUGGINS:  Form.

11:58:09  2          THE WITNESS:  At the time, I'm too new.

11:58:12  3   I don't -- I was just doing what he told me --

11:58:15  4          BY MR. DAVENPORT:

11:58:15  5          Q.   Okay.

11:58:16  6          A.   -- to do.

11:58:17  7          Q.   Okay.  With your experience that you've

11:58:20  8   gained since this incident, would there be any

11:58:22  9   reason why Karl would have told you to make sure

11:58:25 10   that they make it out okay?

11:58:27 11          MS. HUGGINS:  Form.

11:58:27 12          THE WITNESS:  Yeah, I mean, there could have

11:58:29 13   been a whole bunch of reasons why someone would

11:58:31 14   walk up to a police vehicle, so for officer safety,

11:58:36 15   he would have told me to look out -- look out the

11:58:39 16   mirror.

11:58:39 17          BY MR. DAVENPORT:

11:58:39 18          Q.   Do you know, on January 1st, why that

11:58:42 19   individual was walking up to a police vehicle?

11:58:43 20          MS. HUGGINS:  Form.

11:58:44 21          THE WITNESS:  I -- I don't.  I don't know.

11:58:45 22          BY MR. DAVENPORT:

11:58:46 23          Q.   Did Karl Schultz know why that

11:58:49  1  individual was walking up to a police vehicle?

11:58:50  2        MS. HUGGINS:  Form.

11:58:50  3        THE WITNESS:  He didn't tell me.  No, I don't

11:58:53  4  know.

11:58:53  5        BY MR. DAVENPORT:

11:58:53  6        Q.   Do you remember Karl Schultz ever

11:58:55  7  saying, we're leaving, to that individual?

11:59:00  8        A.   I -- I don't.  I don't remember.

11:59:03  9        Q.   Would you have any reason to think that

11:59:04 10  he didn't say, we're leaving?

11:59:08 11        A.   Again, I don't -- I don't remember.

11:59:11 12  I don't remember what he said.

11:59:16 13        Q.   Now, as Karl Schultz said, wait; let's

11:59:19 14  see what happens; let's make it out of there

11:59:21 15  okay -- let's make sure that they make it out of

11:59:23 16  there okay, were you still driving forward at that

11:59:29 17  time?

11:59:29 18        A.   I don't know if I -- I don't remember

11:59:31 19  if I was stopped or slowing to a stop or continuing

11:59:38 20  straight.

11:59:39 21        Q.   Okay.  As you were driving away -- as

11:59:49 22  your vehicle was driving away from the incident,

11:59:52 23  did you see anything that was happening behind you?

11:59:57  1      **A.**    I remember having a conversation with

11:59:59  2    Karl about how it looked like Mr. Kistner threw

12:00:05  3    himself on the vehicle.  I -- I can't remember

12:00:12  4    exactly how it looked because I was so new.  I just

12:00:18  5    remember having the conversation with him.

12:00:19  6          **Q.**    And where did you have that

12:00:21  7    conversation?

12:00:22  8          **A.**    In the -- in the police vehicle.

12:00:24  9          **Q.**    Okay.  Would that have been before or

12:00:26  10   after you got out of the police vehicle after the

12:00:32  11   collision was made with Mr. Kistner?

12:00:34  12         **MS. HUGGINS:**  Form.

12:00:34  13         **THE WITNESS:**  That would have been before.

12:00:41  14         **BY MR. DAVENPORT:**

12:00:41  15         **Q.**    Okay.  So the collision would have

12:00:43  16   happened, you would have been in your police

12:00:44  17   vehicle, and Karl Schultz would have told you that

12:00:48  18   Mr. Kistner threw himself at the police vehicle?

12:00:50  19         **MS. HUGGINS:**  Form.

12:00:50  20         **THE WITNESS:**  Like I said, I remember having

12:00:53  21   a conversation talking about it.  I don't -- I don't

12:00:54  22   remember if we both said it or if he just said it,

12:00:57  23   but the conversation took place, then we exited the

| | | |
|---|---|---|
| 12:00:59 | 1 | vehicle, and walked back. |
| 12:01:01 | 2 | BY MR. DAVENPORT: |
| 12:01:01 | 3 | Q.   Okay.   How long did that conversation |
| 12:01:02 | 4 | last? |
| 12:01:04 | 5 | A.   It probably didn't last very long, but |
| 12:01:08 | 6 | I don't know an approximate time. |
| 12:01:11 | 7 | Q.   Did he happen to say what your next |
| 12:01:13 | 8 | steps should be at that point? |
| 12:01:16 | 9 | A.   I don't remember.   I just -- we just |
| 12:01:19 | 10 | got out, I think. |
| 12:01:24 | 11 | Q.   Did you exit the police vehicle because |
| 12:01:25 | 12 | Karl Schultz exited the police vehicle? |
| 12:01:27 | 13 | A.   Yes. |
| 12:01:28 | 14 | Q.   Did he tell you to exit the police |
| 12:01:30 | 15 | vehicle? |
| 12:01:30 | 16 | A.   No.   I just did it because he did it. |
| 12:01:32 | 17 | Q.   As you were walking back to the scene, |
| 12:01:34 | 18 | did you have any personal viewpoints on what had |
| 12:01:40 | 19 | happened at that point? |
| 12:01:41 | 20 | A.   Can you -- can you explain that?   What |
| 12:01:44 | 21 | do you mean? |
| 12:01:44 | 22 | Q.   Did you happen to view yourself any of |
| 12:01:46 | 23 | the incident, or were you just going based off of |

*Moriarity - Davenport - 2/21/20*

12:01:49  1  what Karl Schultz told you?

12:01:50  2      A.    No.   We were -- we were both walking

12:01:52  3  back.   We would have both seen Mr. Kistner.

12:01:59  4      Q.    Where -- where would you have seen

12:02:01  5  Mr. Kistner as you were walking back?

12:02:03  6      MS. HUGGINS:   Form.

12:02:03  7      THE WITNESS:   On the ground.

12:02:04  8      BY MR. DAVENPORT:

12:02:05  9      Q.   So I guess my question is:   With what

12:02:08 10  Karl Schultz said, that Mr. Kistner threw himself

12:02:10 11  at the police vehicle, did you happen to watch any

12:02:13 12  of that incident unfold before you exited the

12:02:16 13  police vehicle?

12:02:17 14      A.   Well, like I said, I -- I remember

12:02:19 15  having a short conversation with Karl about what

12:02:26 16  we -- what we saw from the mirror, but that would

12:02:31 17  have been it.

12:02:32 18      Q.   So now you're saying, what we saw from

12:02:35 19  the mirror.   Were you also looking at the driver's

12:02:37 20  side mirror when the collision was made with

12:02:39 21  Mr. Kistner?

12:02:39 22      A.   Well, yeah, that's what I said.   I said

12:02:42 23  I was looking in the driver's side mirror and

12:02:43   1    then --

12:02:43   2           Q.   And --

12:02:45   3           MS. HUGGINS:   Well, let --

12:02:45   4           THE WITNESS:   -- and then also looking

12:02:46   5    forward.

12:02:47   6           BY MR. DAVENPORT:

12:02:48   7           Q.   Okay.  So now you're -- you're looking

12:02:49   8    forward and looking at the driver's side mirror.

12:02:51   9    Were you looking at the driver's side mirror as the

12:02:53  10    collision was made?

12:02:54  11           MS. HUGGINS:   Form.

12:02:54  12           THE WITNESS:   I don't -- I don't remember.

12:02:58  13    In order for me to have the conversation with Karl,

12:03:03  14    I would say I was looking in the mirror at the

12:03:05  15    time.

12:03:06  16           BY MR. DAVENPORT:

12:03:06  17           Q.   And did you have any sort of an opinion

12:03:09  18    of what happened?

12:03:11  19           MS. HUGGINS:   Form.

12:03:11  20           THE WITNESS:   From -- from my perspective

12:03:17  21    looking into the mirror, it looked as though he

12:03:20  22    threw himself on her vehicle.

12:03:23  23           BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

114

| | | |
|---|---|---|
| 12:03:24 | 1 | Q.   And what led you to believe that |
| 12:03:27 | 2 | Mr. Kistner threw himself on the police vehicle? |
| 12:03:29 | 3 | A.   Again, I don't -- all I remember was |
| 12:03:33 | 4 | having the conversation with Karl about his |
| 12:03:36 | 5 | approach to the vehicle, and then from our -- from |
| 12:03:40 | 6 | our perspective, our vehicle was straight down the |
| 12:03:44 | 7 | street, and then we were looking in the mirror, and |
| 12:03:47 | 8 | then her vehicle was -- I don't know the word -- |
| 12:03:52 | 9 | just -- |
| 12:03:52 | 10 | Q.   Diagonal? |
| 12:03:53 | 11 | A.   Diagonal, yeah.  So it looked like he |
| 12:03:56 | 12 | threw himself on the vehicle. |
| 12:03:57 | 13 | Q.   So besides the fact that Mr. Kistner |
| 12:03:59 | 14 | was walking towards the vehicle and her vehicle was |
| 12:04:01 | 15 | diagonal, what other things did you see that led |
| 12:04:04 | 16 | yourself to believe that Mr. Kistner threw himself |
| 12:04:08 | 17 | at the vehicle, rather than the vehicle colliding |
| 12:04:10 | 18 | with Mr. Kistner? |
| 12:04:11 | 19 | MS. HUGGINS:   Form. |
| 12:04:11 | 20 | THE WITNESS:   Again, long time ago.  I was |
| 12:04:13 | 21 | very, very new, and from our -- from my perspective, |
| 12:04:17 | 22 | because I can't speak on Karl's perspective, from |
| 12:04:19 | 23 | my perspective, that's all I was going off of. |

12:04:23   1          BY MR. DAVENPORT:

12:04:23   2          Q.   Were you going off of what Karl told

12:04:26   3   you, or were you going off of what you saw?

12:04:27   4          A.   No, no, no.  From -- from what I saw.

12:04:30   5   Like I said, from my perspective, that's what it

12:04:32   6   looked like.  But, I mean, even as I sit here right

12:04:35   7   now, I can't remember what it looked like.  It

12:04:38   8   was --

12:04:38   9          Q.   Do you remember if the police vehicle

12:04:39  10   that Lauren McDermott or Jenny Velez, that they

12:04:42  11   were in, was that vehicle stopped or was it moving

12:04:46  12   at the time of the collision?

12:04:47  13          MS. HUGGINS:   Form.

12:04:47  14          THE WITNESS:   From -- from my perspective as

12:04:51  15   I was looking in the mirror, it appeared as though

12:04:53  16   it was stopped.

12:04:55  17          BY MR. DAVENPORT:

12:04:55  18          Q.   How long, approximately, was it stopped

12:04:58  19   before that collision was made?

12:05:00  20          MS. HUGGINS:   Form.

12:05:00  21          THE WITNESS:   I -- I -- I can't judge time

12:05:03  22   like that, but the whole -- the whole incident

12:05:06  23   looked pretty quick.

| | | |
|---|---|---|
| 12:05:08 | 1 | BY MR. DAVENPORT: |
| 12:05:09 | 2 | Q.   Now, what part of Mr. Kistner's body |
| 12:05:11 | 3 | initially contacted the police vehicle? |
| 12:05:14 | 4 | A.   I -- I don't remember. |
| 12:05:16 | 5 | Q.   Do you recall if Mr. Kistner stuck his |
| 12:05:18 | 6 | arm out at all? |
| 12:05:19 | 7 | A.   I don't. |
| 12:05:20 | 8 | Q.   Do you recall how he fell to the |
| 12:05:25 | 9 | ground? |
| 12:05:26 | 10 | A.   I remember having a conversation with |
| 12:05:29 | 11 | Karl about him squatting down, leaning back, and |
| 12:05:36 | 12 | then putting his hand on the ground, and then |
| 12:05:39 | 13 | completing the fall. |
| 12:05:40 | 14 | Q.   Now -- |
| 12:05:41 | 15 | A.   But I don't -- I don't remember seeing |
| 12:05:42 | 16 | that because it was so long ago and I was so |
| 12:05:45 | 17 | brand new. |
| 12:05:46 | 18 | Q.   Now, was that something that you saw |
| 12:05:48 | 19 | independently, or was that just something that Karl |
| 12:05:50 | 20 | said? |
| 12:05:51 | 21 | Because you're saying that we had it -- |
| 12:05:53 | 22 | A.   That was -- yeah.  That -- well, that |
| 12:05:54 | 23 | was something that I saw and then had the |

*Moriarity - Davenport - 2/21/20*

117

| | | |
|---|---|---|
| 12:05:57 | 1 | conversation with Karl about.  But, again, as I sit |
| 12:06:02 | 2 | here right now, I don't remember. |
| 12:06:03 | 3 | I mean, it -- it was -- like I said, it was |
| 12:06:04 | 4 | so long ago and I was so brand new. |
| 12:06:06 | 5 | Q.   Okay.  At the time of the incident, is |
| 12:06:09 | 6 | that what you believed was that Mr. Kistner stuck |
| 12:06:12 | 7 | his arm out and then fell to the ground, as the |
| 12:06:15 | 8 | police vehicle was stopped? |
| 12:06:15 | 9 | A.   At the time of the incident, yes, that |
| 12:06:17 | 10 | is -- that is what I believe. |
| 12:06:19 | 11 | Q.   Okay.  Now, as Mr. Kistner's falling to |
| 12:06:25 | 12 | the ground, is your police vehicle stopped or is it |
| 12:06:27 | 13 | moving at that time? |
| 12:06:28 | 14 | A.   I -- I don't remember. |
| 12:06:30 | 15 | Q.   When approximately did you stop your |
| 12:06:33 | 16 | police vehicle? |
| 12:06:35 | 17 | A.   I -- I don't remember when I stopped |
| 12:06:38 | 18 | it, if it was before the incident or after or |
| 12:06:42 | 19 | during. |
| 12:06:42 | 20 | Q.   Did Karl ask you to stop the police |
| 12:06:44 | 21 | vehicle? |
| 12:06:47 | 22 | A.   I don't remember if he asked me or not. |
| 12:06:50 | 23 | All I know is I did. |

*Moriarity - Davenport - 2/21/20*

118

| | | |
|---|---|---|
| 12:06:51 | 1 | Q.   Did you back up the police vehicle |
| 12:06:53 | 2 | after? |
| 12:06:54 | 3 | A.   Yes. |
| 12:06:54 | 4 | Q.   Okay.   Approximately how far did you |
| 12:06:57 | 5 | back up the police vehicle? |
| 12:06:58 | 6 | A.   I can't judge distance like that. |
| 12:07:00 | 7 | I don't -- I don't -- I don't know.   I don't even |
| 12:07:02 | 8 | know where I stopped it. |
| 12:07:03 | 9 | Q.   Okay.   Now, why did you back up the |
| 12:07:07 | 10 | police vehicle at that time? |
| 12:07:08 | 11 | A.   I probably didn't want to walk very |
| 12:07:11 | 12 | far. |
| 12:07:11 | 13 | Q.   Okay. |
| 12:07:14 | 14 | A.   Or it was quicker. |
| 12:07:16 | 15 | Could have been either of those. |
| 12:07:17 | 16 | Q.   Before you and Karl got out of the car, |
| 12:07:19 | 17 | were Jenny Velez or Lauren McDermott out of the |
| 12:07:23 | 18 | police vehicle? |
| 12:07:23 | 19 | A.   Before -- before me and Karl got out of |
| 12:07:25 | 20 | the car? |
| 12:07:26 | 21 | Q.   Before you and Karl got out of the car. |
| 12:07:27 | 22 | A.   I -- I don't know. |
| 12:07:28 | 23 | Q.   Okay. |

*Moriarity - Davenport - 2/21/20*

119

12:07:29    1         A.    I couldn't -- I couldn't see who was --

12:07:32    2    who was doing what at that point in time.  I was

12:07:35    3    focused on reversing.

12:07:36    4         Q.    Now, as you were walking back towards

12:07:40    5    Mr. Kistner, were you and Karl having any sort of

12:07:42    6    a conversation?

12:07:43    7         A.    I don't remember if we were or not.

12:07:45    8         Q.    Okay.  As you were walking back towards

12:07:49    9    the police vehicle, what did you notice about

12:07:52   10    Mr. Kistner?

12:07:54   11         A.    As we were walking back towards Lauren

12:07:56   12    and --

12:07:57   13         Q.    Yes.  Back towards the second police

12:07:59   14    vehicle.

12:08:02   15         A.    I just remember him being on the

12:08:03   16    ground.

12:08:05   17         Q.    Was he saying anything at that time?

12:08:08   18         A.    Don't remember.

12:08:09   19         Q.    Do you remember any other individuals

12:08:11   20    besides Jim Kistner being out anywhere in that

12:08:16   21    police scene?

12:08:16   22         MS. HUGGINS:    Form.

12:08:17   23         THE WITNESS:    I don't know for sure if it

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 12:08:21 | 1 | was his son, but a young -- young male came out |
| 12:08:26 | 2 | from -- from that house. |
| 12:08:27 | 3 | BY MR. DAVENPORT: |
| 12:08:27 | 4 | Q.   What led you to believe that it may |
| 12:08:29 | 5 | have been Mr. Kistner's son? |
| 12:08:30 | 6 | A.   I don't -- I don't know if it was ever |
| 12:08:38 | 7 | said that it was his son, but he came out of the |
| 12:08:41 | 8 | same house that Mr. Kistner came out of. |
| 12:08:43 | 9 | Q.   So you did see Mr. Kistner come out of |
| 12:08:45 | 10 | the house, the same house that that individual came |
| 12:08:48 | 11 | out of? |
| 12:08:49 | 12 | A.   Yeah. |
| 12:08:49 | 13 | Q.   Okay.  Did you watch Mr. Kistner leave |
| 12:08:53 | 14 | that house initially? |
| 12:08:55 | 15 | A.   It -- it wasn't too important enough |
| 12:08:59 | 16 | for me at the time.  We were just leaving. |
| 12:09:03 | 17 | Q.   Was -- were you in your police vehicle |
| 12:09:06 | 18 | when you saw Mr. Kistner first? |
| 12:09:09 | 19 | MS. HUGGINS:  Form. |
| 12:09:12 | 20 | THE WITNESS:  Yeah, I don't remember. |
| 12:09:13 | 21 | BY MR. DAVENPORT: |
| 12:09:13 | 22 | Q.   Were you out in the street? |
| 12:09:16 | 23 | A.   No.  I would have been in the car. |

*Moriarity - Davenport - 2/21/20*

121

| | | |
|---|---|---|
| 12:09:18 | 1 | Q.   Okay.  And so how long approximately |
| 12:09:21 | 2 | was it, after you first saw Mr. Kistner, that you |
| 12:09:24 | 3 | then made it out into the street? |
| 12:09:29 | 4 | A.   From when we were trying to leave, to |
| 12:09:32 | 5 | when I saw him come into the street?  Is that what |
| 12:09:35 | 6 | you're saying? |
| 12:09:36 | 7 | Q.   Well, I guess what you were telling me |
| 12:09:38 | 8 | is that you saw that Mr. Kistner walked out of the |
| 12:09:40 | 9 | same house that the second person came out of. |
| 12:09:42 | 10 | So I guess what my question is:  After you |
| 12:09:46 | 11 | first saw Mr. Kistner come out of that house, how |
| 12:09:48 | 12 | long was it before he entered the street? |
| 12:09:49 | 13 | MS. HUGGINS:   Form.  You can answer. |
| 12:09:50 | 14 | THE WITNESS:   I don't -- I don't -- I don't |
| 12:09:57 | 15 | know if I'd be able to judge that time.  I'm -- I'm |
| 12:10:01 | 16 | thinking it was quick. |
| 12:10:02 | 17 | BY MR. DAVENPORT: |
| 12:10:02 | 18 | Q.   Was it minutes or was it seconds? |
| 12:10:05 | 19 | A.   Not many minutes. |
| 12:10:07 | 20 | Q.   But you're thinking it would have been |
| 12:10:10 | 21 | minutes? |
| 12:10:10 | 22 | A.   Like maybe one or maybe seconds. |
| 12:10:14 | 23 | Q.   Okay. |

12:10:16  1          A.    Yeah, I don't know.

12:10:17  2          Q.    Do you know why you and Karl Schultz

12:10:20  3    would have been sitting in your police vehicle for

12:10:22  4    a few minutes after you first entered your police

12:10:25  5    vehicle?

12:10:26  6          MS. HUGGINS:    Form.

12:10:26  7          THE WITNESS:    I -- I don't remember.

12:10:29  8    He could have been giving me an on-the-spot

12:10:33  9    evaluation.    We could have just been talking about

12:10:38 10    nothing.    We could have been just sitting there.

12:10:42 11          And like I said, I don't remember what --

12:10:45 12    what all we did on the larceny at 33 Schmarbeck, so

12:10:50 13    we could have just been talking about that right

12:10:53 14    before we were leaving.

12:10:54 15          BY MR. DAVENPORT:

12:10:54 16          Q.    Would that be something that he would

12:10:56 17    normally do is give you an on-the-spot evaluation?

12:10:58 18          A.    Sometimes.

12:10:59 19          Q.    Was that often or --

12:11:02 20          A.    Over 16 weeks, yeah, I mean, sometimes

12:11:05 21    he would just be like:    You did a good job, or,

12:11:08 22    hey, do this, do this better.

12:11:09 23          Q.    What kinds of things would he ask you

| | | |
|---|---|---|
| 12:11:12 | 1 | to -- you know, what kind -- sorry.  Strike that. |
| 12:11:15 | 2 | What kinds of procedures would he point out |
| 12:11:17 | 3 | that you didn't possibly do correctly during your |
| 12:11:20 | 4 | training? |
| 12:11:20 | 5 | MS. HUGGINS:  Form. |
| 12:11:21 | 6 | THE WITNESS:  Well, like I said, basic |
| 12:11:25 | 7 | information, if you -- if you get their name, date |
| 12:11:28 | 8 | of birth, and phone number, maybe you forget |
| 12:11:30 | 9 | a phone number to write down or something or, you |
| 12:11:34 | 10 | know, something -- something small like that, he |
| 12:11:37 | 11 | would be like:  Hey, go back out there and do this. |
| 12:11:39 | 12 | Or, hey, make sure you do this better next time. |
| 12:11:44 | 13 | BY MR. DAVENPORT: |
| 12:11:44 | 14 | Q.   Now, would you have -- I'm sorry. |
| 12:11:50 | 15 | Strike that. |
| 12:11:51 | 16 | For -- when you were walking back towards |
| 12:11:54 | 17 | Mr. Kistner towards the police vehicle, you said |
| 12:11:56 | 18 | that you saw him on the ground, correct? |
| 12:11:59 | 19 | A.   Yeah. |
| 12:12:00 | 20 | Q.   Was he sitting up, or was he laying |
| 12:12:02 | 21 | down? |
| 12:12:10 | 22 | A.   I think he was laying down, but |
| 12:12:12 | 23 | I can't -- I can't be too sure. |

| | | |
|---|---|---|
| 12:12:15 | 1 | Q.   Okay. |
| 12:12:16 | 2 | A.   Very long time ago. |
| 12:12:17 | 3 | Q.   No.   Sure.   Sure. |
| 12:12:20 | 4 | Was he holding any part of his body at that |
| 12:12:24 | 5 | time? |
| 12:12:24 | 6 | A.   I don't remember. |
| 12:12:24 | 7 | Q.   Okay.   Was he complaining about his |
| 12:12:27 | 8 | head hurting him? |
| 12:12:27 | 9 | A.   I don't remember. |
| 12:12:31 | 10 | Q.   Who was the first person that made it |
| 12:12:34 | 11 | to Mr. Kistner?   Who first spoke to him? |
| 12:12:36 | 12 | MS. HUGGINS:   Form. |
| 12:12:38 | 13 | THE WITNESS:   I -- at this point in time, it |
| 12:12:40 | 14 | was not me, so I don't know who spoke to him first. |
| 12:12:45 | 15 | BY MR. DAVENPORT: |
| 12:12:45 | 16 | Q.   Okay.   Once somebody did speak to |
| 12:12:52 | 17 | Mr. Kistner, do you remember what was said to him? |
| 12:12:54 | 18 | A.   No. |
| 12:12:54 | 19 | Q.   What kinds of things would have been |
| 12:12:56 | 20 | said to him? |
| 12:12:56 | 21 | MS. HUGGINS:   Form. |
| 12:12:57 | 22 | THE WITNESS:   I'm -- I'm unsure of what type |
| 12:13:00 | 23 | of things could have or would have been said to |

*Moriarity - Davenport - 2/21/20*

125

12:13:05  1    him.  Very new in a very chaotic situation.

12:13:09  2    I didn't do much but attempt to observe as much

12:13:13  3    as I could.

12:13:14  4         BY MR. DAVENPORT:

12:13:14  5         Q.   And what were you trying to observe?

12:13:17  6         A.   What other officers were -- were doing,

12:13:21  7    what Mr. Kistner was doing.

12:13:22  8         Q.   Now, I understand that you were new at

12:13:24  9    the time --

12:13:24 10         A.   Yeah.

12:13:24 11         Q.   -- but based on the experience that

12:13:27 12    you've been able to gain, what should have been

12:13:29 13    done if there was an individual -- whether he threw

12:13:31 14    himself at the police vehicle or whether the police

12:13:33 15    vehicle struck him, if he was on the ground, what

12:13:36 16    should have been done next?

12:13:37 17         MS. HUGGINS:  Form.

12:13:37 18         THE WITNESS:  Well, I mean, it's not so much

12:13:40 19    as what should have been done, it's what we did.

12:13:42 20    And what we did was observe what had just taken

12:13:46 21    place in front of us, and then other senior

12:13:51 22    officers assessed what to do.

12:13:53 23         BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

126

12:13:53  1           Q.    Okay.   And was there any sort of an

12:13:54  2    assessment of any physical injuries or medical

12:13:57  3    conditions that he may have had?

12:14:00  4           A.    Yeah.   I mean, as we're -- as we were

12:14:02  5    walking up, you can -- you can assess the person as

12:14:07  6    they are visually in front of you.

12:14:12  7           You know, he didn't have bones sticking out.

12:14:17  8    There was no tons of blood or anything leaking out

12:14:21  9    anywhere.   That was the assessment that I made.

12:14:24 10    I don't know what the other officers -- senior

12:14:28 11    officers did.   Or observed.   I'm sorry.

12:14:31 12           Q.    Right.

12:14:32 13           Now, would it only take bones sticking out

12:14:35 14    or blood gushing all over the place for that person

12:14:37 15    to have a physical examination by a physician of

12:14:40 16    any injuries he may have had?

12:14:41 17           MS. HUGGINS:   Form.

12:14:44 18           THE WITNESS:   No, but we did take him to

12:14:46 19    ECMC.

12:14:46 20           BY MR. DAVENPORT:

12:14:46 21           Q.    And how long, approximately, after he

12:14:49 22    had been on the ground, was he taken to ECMC?

12:14:51 23           A.    I'm -- I'm unsure.

12:14:53  1        Q.   What would be the appropriate response

12:14:56  2   time for getting him to ECMC after a car -- a

12:14:59  3   collision with a car?

12:14:59  4        MS. HUGGINS:   Form.

12:15:00  5        THE WITNESS:   I -- I would say that there's --

12:15:03  6   the appropriate response time would be determined

12:15:08  7   by the actions of the person that was -- that was

12:15:12  8   hit and the officer's assessment.

12:15:15  9        BY MR. DAVENPORT:

12:15:15  10       Q.   Now, why would the actions of the

12:15:17  11  individual play a part in whether that person

12:15:20  12  should go to the hospital for an assessment of

12:15:21  13  physical injuries?

12:15:22  14       A.   Well, I say -- I say the actions of the

12:15:25  15  person because I'm going off of what I had

12:15:28  16  previously stated about observations.

12:15:30  17       If you're bleeding from a gunshot wound, and

12:15:33  18  sometimes ADI, there's just no -- I'm sorry.  Not

12:15:36  19  ADI, but an ambulance, sometimes there's no

12:15:38  20  ambulance even available, so we might take them

12:15:41  21  immediately.

12:15:42  22       Q.   Now, even assuming that there might not

12:15:45  23  be blood gushing, would you sometimes take

*Moriarity - Davenport - 2/21/20*

128

12:15:49  1  individuals to ECMC yourself rather than waiting

12:15:51  2  for an ambulance to arrive?

12:15:53  3          A.    There are -- there are times, yes.

12:15:56  4          Q.    And what would be those times where an

12:15:58  5  officer rather than an ambulance would take that

12:16:01  6  individual to assess them for physical injuries?

12:16:04  7          MS. HUGGINS:   Form.

12:16:05  8          THE WITNESS:   Maybe because -- I mean, this

12:16:08  9  goes back to where I said that there's a lot of

12:16:10  10  different variables.

12:16:11  11         Maybe the officer wants to just get them

12:16:14  12  there quicker.   Maybe there's no ambulance

12:16:17  13  available.   Maybe they're saying that the ambulance

12:16:20  14  is taking too long.   The observed potential

12:16:26  15  injuries.

12:16:27  16         I mean, there's -- there's a lot of

12:16:28  17  different variables that would -- that would make

12:16:31  18  someone take them to ECMC in their patrol vehicle

12:16:35  19  or not to.

12:16:36  20         BY MR. DAVENPORT:

12:16:36  21         Q.    So what types of observed personal

12:16:39  22  injuries would make it where an officer rather than

12:16:41  23  an ambulance would take that person to ECMC?

| | | |
|---|---|---|
| 12:16:45 | 1 | **MS. HUGGINS:**  Form. |
| 12:16:45 | 2 | **THE WITNESS:**  So -- so, again, it would |

12:16:48   3   go -- it would go back to other different variables.

12:16:51   4       If -- there's -- there's been times where

12:16:52   5   people have been shot and we let them go in an

12:16:55   6   ambulance.  There's other times where we rush them

12:16:58   7   there in our -- in our patrol car.

12:16:59   8       **BY MR. DAVENPORT:**

12:17:00   9       Q.   Well, sure, but let's move away from

12:17:02   10   a gunshot wound.  Let's say that a person had some

12:17:06   11   sort of a head injury, because that's, you know,

12:17:09   12   more pertinent to this case.

12:17:10   13       What sorts of circumstances would make it

12:17:12   14   where a police officer rather than an ambulance

12:17:16   15   would drive that individual to the hospital?

12:17:19   16       **MS. HUGGINS:**  Form.

12:17:24   17       **THE WITNESS:**  Maybe we're just trying to get

12:17:27   18   them quicker attention, and it's -- it's -- if

12:17:33   19   the -- maybe if the subject is still moving around,

12:17:35   20   we know that there's no neck injury, so you can

12:17:38   21   still take them.

12:17:40   22       **BY MR. DAVENPORT:**

12:17:40   23       Q.   Is that --

12:17:41   1          A.    There's other -- there's a lot of

12:17:43   2   different variables.

12:17:46   3          Q.    Now --

12:17:46   4          A.    Going off of observations from that

12:17:50   5   specific time.  There's no -- there's no set rule

12:17:53   6   that one follows.

12:17:56   7          Q.    Now, would you agree with me that if

12:17:59   8   there was some sort of internal brain bleeding,

12:18:01   9   that would be something that would be not

12:18:03  10   observable, correct?

12:18:04  11          MS. HUGGINS:   Form.

12:18:05  12          THE WITNESS:   Internal brain bleeding would

12:18:06  13   not be observable, that is correct.

12:18:07  14          BY MR. DAVENPORT:

12:18:07  15          Q.    And would that be part of your

12:18:09  16   assessment of the individual, whether he should be

12:18:12  17   driven by police officers or driven by an ambulance?

12:18:15  18          MS. HUGGINS:   Form.

12:18:16  19          THE WITNESS:   Can you -- can you say that

12:18:18  20   again?

12:18:19  21          BY MR. DAVENPORT:

12:18:19  22          Q.    Would it be part of your consideration

12:18:21  23   as a police officer, if that person may have

*Moriarity - Davenport - 2/21/20*

131

| | | |
|---|---|---|
| 12:18:23 | 1 | internal brain bleeding, that that person should go |
| 12:18:26 | 2 | by ambulance or by a police vehicle? |
| 12:18:30 | 3 | A.    Sure, if there was something that we |
| 12:18:33 | 4 | thought was happening internally. |
| 12:18:35 | 5 | Q.    And what kinds of things would you |
| 12:18:38 | 6 | observe that would lead you to believe that |
| 12:18:40 | 7 | something was happening internally? |
| 12:18:41 | 8 | MS. HUGGINS:    Form. |
| 12:18:42 | 9 | THE WITNESS:    Maybe discoloration of the |
| 12:18:45 | 10 | face.    Maybe there was some breathing problems. |
| 12:18:52 | 11 | Before we might do something like that, maybe an |
| 12:18:55 | 12 | officer with experience might make some type of |
| 12:18:59 | 13 | decision as far as whether or not to take someone. |
| 12:19:05 | 14 | BY MR. DAVENPORT: |
| 12:19:05 | 15 | Q.    If a person had an abrasion on their |
| 12:19:07 | 16 | head after a car accident, would it be an ambulance |
| 12:19:11 | 17 | or a police officer that would drive that individual |
| 12:19:13 | 18 | to the hospital? |
| 12:19:14 | 19 | MS. HUGGINS:    Form. |
| 12:19:15 | 20 | THE WITNESS:    That can be determined on scene. |
| 12:19:20 | 21 | That can change from -- from accident to accident. |
| 12:19:24 | 22 | BY MR. DAVENPORT: |
| 12:19:24 | 23 | Q.    And what sorts of things in your |

12:19:26  1  training would lead you to believe that that is

12:19:28  2  something that is an officer's discretion rather

12:19:30  3  than something that you are mandated to do?

12:19:32  4      MS. HUGGINS:  Form.

12:19:37  5      THE WITNESS:  You mean taking them in the

12:19:39  6  patrol vehicle --

12:19:40  7      BY MR. DAVENPORT:

12:19:40  8      Q.   Rather than an ambulance.

12:19:41  9      A.   -- up to ECMC?

12:19:43  10      Maybe the -- the -- the person is

12:19:47  11  complaining of pain -- severe pain and there's no

12:19:50  12  ambulance available.  Or maybe we're just trying to

12:19:53  13  get them quicker medical attention.

12:19:55  14      Q.   If somebody noticed an abrasion on

12:19:57  15  their head, would they have to be medically

12:20:00  16  examined?

12:20:00  17      MS. HUGGINS:  Form.

12:20:02  18      THE WITNESS:  No, not necessarily.  They

12:20:03  19  don't have to be.  They can deny medical attention.

12:20:07  20      BY MR. DAVENPORT:

12:20:07  21      Q.   If that person doesn't deny medical

12:20:09  22  attention, are you obligated, as a police officer,

12:20:11  23  to ensure that that person gets medical attention?

*Moriarity - Davenport - 2/21/20*

133

| | | |
|---|---|---|
| 12:20:13 | 1 | A.   Yeah. |
| 12:20:13 | 2 | Q.   Do you, as you sit here today, know if |
| 12:20:17 | 3 | Mr. Kistner had an abrasion on his head that day? |
| 12:20:19 | 4 | A.   I don't -- I don't remember.  I was |
| 12:20:23 | 5 | observing what the other officers were doing. |
| 12:20:24 | 6 | Q.   Now, if somebody was complaining that |
| 12:20:28 | 7 | their head hurt, are you obligated, as a police |
| 12:20:30 | 8 | officer, to then go and check that person's head? |
| 12:20:39 | 9 | A.   Yeah. |
| 12:20:41 | 10 | Q.   Do you know, as you sit here today, if |
| 12:20:43 | 11 | anybody went to go check Mr. Kistner's head? |
| 12:20:46 | 12 | A.   I don't know if -- I don't know if -- |
| 12:20:49 | 13 | if the other officers were just observing from |
| 12:20:52 | 14 | where they were standing or not. |
| 12:20:56 | 15 | They very well could have been just |
| 12:20:59 | 16 | observing from where -- where they were standing. |
| 12:21:02 | 17 | Q.   Do you agree that if a person has hair |
| 12:21:04 | 18 | rather than no hair, it may not be something that's |
| 12:21:08 | 19 | observable without actually putting your hands |
| 12:21:11 | 20 | through that individual's hair to notice if there's |
| 12:21:13 | 21 | an abrasion or not? |
| 12:21:14 | 22 | MS. HUGGINS:   Form. |
| 12:21:19 | 23 | THE WITNESS:   I would say that the relevance |

12:21:23  1  to do that wouldn't be there when we can just have

12:21:27  2  a medical professional do that and be the -- be the

12:21:31  3  judge on that.

12:21:33  4        BY MR. DAVENPORT:

12:21:33  5        Q.   Now, I agree that, you know, this

12:21:36  6  person should eventually be checked by a medical

12:21:38  7  professional, but if at the scene that person is

12:21:41  8  complaining of a head injury, you don't observe any

12:21:44  9  abrasions, and they might be located in the hair

12:21:45  10  somewhere where there's hair located, what would

12:21:49  11  determine whether that person needs to go directly

12:21:52  12  to the hospital through an ambulance or whether the

12:21:55  13  police officer can drive that person to go get the

12:22:00  14  medical attention that they need?

12:22:02  15        MS. HUGGINS:   Form.   Asked and answered.

12:22:03  16        THE WITNESS:   There's -- there's a -- it's

12:22:05  17  just police discretion.

12:22:06  18        Like I said, I've -- I've done that a few

12:22:09  19  times where I've just driven them up there and

12:22:12  20  never observed any -- any -- any physical or

12:22:16  21  medical injury and just took them in there to see

12:22:18  22  a medical professional.

12:22:20  23        There's other times where I just call on the

*Moriarity - Davenport - 2/21/20*

135

12:22:25  1  scene and I've never observed anything, and there's

12:22:28  2  times where I have observed things and I've taken

12:22:29  3  them to ECMC or let an ambulance come to the scene.

12:22:34  4      I mean, it just depends on -- on the call.

12:22:36  5  But I wasn't making that call that day.

12:22:37  6      BY MR. DAVENPORT:

12:22:37  7      Q.   Sure.

12:22:38  8      If somebody has an abrasion on their

12:22:41  9  forehead, would they be required to get medical

12:22:44 10  attention?

12:22:44 11      A.   They're not required to, if they can

12:22:47 12  decline medical attention, if they choose to.

12:22:49 13      Q.   If they decline -- if they don't

12:22:51 14  decline medical attention, are you required, as

12:22:53 15  a police officer, to make sure that they have their

12:22:55 16  head checked, if you see an --

12:22:55 17      A.   If they --

12:22:58 18      Q.   -- abrasion on there?

12:22:59 19      A.   If they -- if they don't decline, yeah.

12:23:01 20  I mean, there's times where -- like I said, it

12:23:03 21  depends on what -- what the person wants, because

12:23:06 22  people have said, well, I'll just go get it checked

12:23:09 23  out later.

*Moriarity - Davenport - 2/21/20*

136

| | | |
|---|---|---|
| 12:23:09 | 1 | They've told us that, and we don't have to -- |
| 12:23:13 | 2 | Q.   Did Mr. -- |
| 12:23:14 | 3 | A.   -- to wait for them. |
| 12:23:15 | 4 | Q.   Did Mr. Kistner tell you that he was |
| 12:23:17 | 5 | going to go get his head checked out later? |
| 12:23:19 | 6 | A.   I don't remember if Mr. Kistner told |
| 12:23:21 | 7 | me -- anything specifically to me.  He could have |
| 12:23:25 | 8 | told other officers that. |
| 12:23:27 | 9 | Q.   Now, when you were walking back towards |
| 12:23:30 | 10 | Mr. Kistner, you said that he was on the ground, |
| 12:23:32 | 11 | correct? |
| 12:23:33 | 12 | A.   Yeah.  Yeah. |
| 12:23:34 | 13 | Q.   And when you first got to Mr. Kistner, |
| 12:23:38 | 14 | did you make your own visual assessment of |
| 12:23:40 | 15 | Mr. Kistner? |
| 12:23:42 | 16 | A.   Yeah. |
| 12:23:42 | 17 | Q.   Was he on the ground, or was he sitting |
| 12:23:45 | 18 | up at that time? |
| 12:23:47 | 19 | MS. HUGGINS:  Form. |
| 12:23:48 | 20 | THE WITNESS:  I don't -- I don't -- |
| 12:23:49 | 21 | MS. HUGGINS:  Asked and answered. |
| 12:23:51 | 22 | THE WITNESS:  I don't remember if he was |
| 12:23:52 | 23 | sitting down.  I'm pretty sure he was laying down. |

*Moriarity - Davenport - 2/21/20*

137

12:23:54  1          BY MR. DAVENPORT:

12:23:54  2          Q.    Did Mr. Kistner ever sit up at any

12:23:56  3    time?

12:23:58  4          A.    I don't remember.

12:23:59  5          Q.    Did anybody bring Mr. Kistner to his

12:24:03  6    feet?

12:24:03  7          A.    I know that I helped him walk back to

12:24:08  8    the truck.  I don't know if I was one of the ones

12:24:10  9    that sat him up and helped him to his feet.

12:24:18 10          Q.    Do you remember who put the handcuffs

12:24:20 11    on Mr. Kistner?

12:24:21 12          A.    I don't.

12:24:22 13          Q.    Were handcuffs put on Mr. Kistner?

12:24:24 14          A.    I believe so.

12:24:26 15          Q.    And who would have been the person to

12:24:28 16    put those handcuffs on Mr. Kistner?

12:24:30 17          A.    I don't remember.

12:24:31 18          Q.    Up until this point, have you ever put

12:24:35 19    handcuffs on an individual?

12:24:36 20          A.    Yes.

12:24:36 21          Q.    And was that something that you did

12:24:38 22    before January 1st of 2017?

12:24:44 23          A.    I don't know if I had used my own cuffs

*Moriarity - Davenport - 2/21/20*

138

| | | |
|---|---|---|
| 12:24:47 | 1 | on someone up until this point. |
| 12:24:49 | 2 | Q.   Had you ever used somebody else's |
| 12:24:51 | 3 | handcuffs before January 1st of 2017? |
| 12:24:56 | 4 | A.   I don't remember yet. |
| 12:24:58 | 5 | Q.   Okay.  During your 16 weeks, do you |
| 12:25:00 | 6 | have an approximation for how many times you used |
| 12:25:03 | 7 | handcuffs on an -- an individual? |
| 12:25:05 | 8 | A.   It was -- it was often, but up until |
| 12:25:09 | 9 | this date, I don't -- I don't remember if I had |
| 12:25:10 | 10 | done that yet. |
| 12:25:11 | 11 | Q.   Okay.  As you were walking Mr. Kistner |
| 12:25:14 | 12 | back towards your vehicle, what was the purpose for |
| 12:25:16 | 13 | walking him towards your vehicle rather than Lauren |
| 12:25:21 | 14 | McDermott and Jenny Velez's vehicle? |
| 12:25:23 | 15 | A.   I don't remember why that call was |
| 12:25:24 | 16 | made. |
| 12:25:25 | 17 | Q.   Do you know who that call was made by? |
| 12:25:30 | 18 | A.   I don't remember. |
| 12:25:31 | 19 | Q.   Who was the most senior officer at that |
| 12:25:34 | 20 | situation? |
| 12:25:36 | 21 | A.   I don't know how much time Lieutenant |
| 12:25:39 | 22 | Velez has on. |
| 12:25:40 | 23 | Q.   Okay. |

*Moriarity - Davenport - 2/21/20*

139

| | | |
|---|---|---|
| 12:25:41 | 1 | A.   Maybe -- maybe Karl, though. |
| 12:25:42 | 2 | Q.   Okay.  Who -- at that point, was there |
| 12:25:46 | 3 | any conversation that was had between any of the |
| 12:25:49 | 4 | officers? |
| 12:25:50 | 5 | A.   What do you mean? |
| 12:25:53 | 6 | Q.   Was there any sort of a conversation, |
| 12:25:55 | 7 | prior to getting Mr. Kistner to his feet, between |
| 12:25:58 | 8 | you, Mr. Schultz, Ms. McDermott, and Ms. Velez? |
| 12:26:04 | 9 | A.   I don't know what anyone would be |
| 12:26:07 | 10 | talking about.  I think I was more in the state of |
| 12:26:11 | 11 | trying to observe what was going on. |
| 12:26:17 | 12 | Q.   Did you at all help -- well, you said |
| 12:26:20 | 13 | that you helped Mr. Kistner walk him back towards |
| 12:26:23 | 14 | your police vehicle, correct? |
| 12:26:25 | 15 | A.   Yeah.  Per -- per the video that you |
| 12:26:28 | 16 | guys have, yeah.  That's -- |
| 12:26:29 | 17 | Q.   Okay. |
| 12:26:30 | 18 | A.   That's what I was going off of. |
| 12:26:32 | 19 | Q.   And do you know who else was helping to |
| 12:26:34 | 20 | get Mr. Kistner back to the police vehicle? |
| 12:26:35 | 21 | A.   I'd have to see the video again. |
| 12:26:36 | 22 | Q.   Okay.  Okay.  Where did you put |
| 12:26:39 | 23 | Mr. Kistner after you walked him back to your |

*Moriarity - Davenport - 2/21/20*

140

12:26:42   1   police vehicle?

12:26:43   2          A.   It was me and another officer.  I don't

12:26:47   3   remember which one.  We put him in the back of 532.

12:26:51   4          Q.   Now, was he arrested at that point?

12:26:55   5          A.   At -- at this point I don't -- I didn't

12:26:58   6   know.  I was way too brand new.

12:27:00   7          Q.   Okay.

12:27:00   8          A.   I didn't -- I didn't know what was

12:27:01   9   going on.

12:27:04  10          Q.   Now, at any point before handcuffs were

12:27:07  11   put on Mr. Kistner, was -- did anybody read him his

12:27:10  12   Miranda rights?

12:27:12  13          A.   I don't remember.

12:27:13  14          Q.   After handcuffs were put on Mr. Kistner,

12:27:16  15   did anybody read him his Miranda rights?

12:27:18  16          A.   If -- if they didn't, I don't -- I

12:27:27  17   don't remember.

12:27:27  18          Q.   Now, once Mr. Kistner was in the back

12:27:29  19   of your police vehicle, what were the next steps at

12:27:37  20   that point?

12:27:37  21          A.   I believe I just referred to whatever

12:27:40  22   Karl Schultz was -- was doing.

12:27:42  23          Q.   Do you recall what was done after

*Moriarity - Davenport - 2/21/20*

141

12:27:44 1   Mr. Kistner was put in the back of the police

12:27:46 2   vehicle?

12:27:46 3       A.   I don't.

12:27:49 4       Q.   Was there any reason to keep him in the

12:27:51 5   back of the police vehicle rather than outside the

12:27:53 6   police vehicle?

12:27:55 7       A.   I wouldn't know what the senior

12:27:57 8   officers were -- were thinking at the time.

12:28:00 9       Q.   But as you sit here today, with the

12:28:02 10  experience that you now have, would there be any

12:28:05 11  reason to have Mr. Kistner in the back of the

12:28:06 12  police vehicle rather than outside the police

12:28:08 13  vehicle?

12:28:09 14      MS. HUGGINS:   Form.

12:28:09 15      THE WITNESS:   If -- if the officers had him

12:28:13 16  under arrest, then yeah, we would -- we would have

12:28:18 17  him in the back of a vehicle.

12:28:23 18      BY MR. DAVENPORT:

12:28:23 19      Q.   Would there be any reason to have him

12:28:26 20  in the back of the police vehicle if he was not

12:28:27 21  arrested?

12:28:29 22      A.   Yeah, you can detain people in the back

12:28:31 23  of a vehicle.

*Moriarity - Davenport - 2/21/20*

142

| | | |
|---|---|---|
| 12:28:32 | 1 | Q.   And could you explain to me what is the |
| 12:28:34 | 2 | difference between being detained, as opposed to |
| 12:28:36 | 3 | arrested? |
| 12:28:37 | 4 | A.   Someone that -- someone that is not |
| 12:28:39 | 5 | free to go and they're going to go to jail is under |
| 12:28:42 | 6 | arrest. |
| 12:28:42 | 7 | There's other times where I've detained |
| 12:28:44 | 8 | people to write them tickets and they're totally |
| 12:28:48 | 9 | free to go.  You know what I mean? |
| 12:28:51 | 10 | They can -- they can still be in the back of |
| 12:28:53 | 11 | a patrol vehicle and not be under arrest. |
| 12:28:55 | 12 | Q.   Now, when a person is detained, do you |
| 12:28:57 | 13 | have to read that person their Miranda rights? |
| 12:29:00 | 14 | MS. HUGGINS:   Form. |
| 12:29:00 | 15 | THE WITNESS:   No. |
| 12:29:01 | 16 | BY MR. DAVENPORT: |
| 12:29:03 | 17 | Q.   Is it only when they're arrested that |
| 12:29:05 | 18 | you then have to read them their Miranda rights? |
| 12:29:07 | 19 | A.   Yeah. |
| 12:29:07 | 20 | MS. HUGGINS:   Form. |
| 12:29:07 | 21 | THE WITNESS:   Yeah. |
| 12:29:09 | 22 | BY MR. DAVENPORT: |
| 12:29:11 | 23 | Q.   Okay.  Do you know at what point it |

12:29:13  1  went from Mr. Kistner being detained, as opposed to

12:29:15  2  arrested?

12:29:15  3         A.   I -- the day that I was on scene, no,

12:29:17  4  I don't.

12:29:17  5         Q.   Was it on Schmarbeck?

12:29:27  6         A.   I'm unsure.  I can't speak for -- for

12:29:29  7  Lauren and -- and Jenny.  I don't -- I don't know

12:29:32  8  when it is -- when it was that it was determined

12:29:35  9  that they were going to arrest him.

12:29:37 10         Q.   Now, why do you say that it would have

12:29:39 11  been Lauren and Jenny that would have made that

12:29:42 12  determination to arrest Mr. Kistner?

12:29:43 13         MS. HUGGINS:   Form.

12:29:44 14         THE WITNESS:   They were directly involved

12:29:46 15  with the incident.

12:29:46 16         BY MR. DAVENPORT:

12:29:47 17         Q.   Why wouldn't Karl Schultz have any sort

12:29:49 18  of a say in when Mr. Kistner was arrested?

12:29:52 19         MS. HUGGINS:   Form.

12:29:53 20         THE WITNESS:   The incident didn't involve

12:29:55 21  me, Karl, or our truck.  It involved Jenny Velez

12:29:59 22  and Lauren and -- and their truck.

12:30:02 23         BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

144

12:30:02  1          Q.   Would you have been able to make the

12:30:05  2    arrest even though it did not involve your truck?

12:30:15  3          A.   I wouldn't see any reason why we would

12:30:17  4    make that arrest.

12:30:18  5          MS. HUGGINS:   Form.

12:30:22  6          BY MR. DAVENPORT:

12:30:22  7          Q.   Now, once you got Mr. Kistner back to

12:30:25  8    your police vehicle, he was sitting down in your

12:30:29  9    police vehicle, in the back of your police vehicle;

12:30:31  10   is that correct?

12:30:31  11         A.   Yes.

12:30:35  12         Q.   Now, were any sort of assessments of

12:30:37  13   his physical condition made at that time?

12:30:40  14         A.   I don't -- I don't remember.

12:30:41  15         Q.   What about emotionally?

12:30:44  16         Are you obligated, as a police officer, to

12:30:45  17   check on a person emotionally when they're placed

12:30:48  18   under arrest or detained?

12:30:49  19         A.   Sure.

12:30:49  20         MS. HUGGINS:   Form.

12:30:50  21         BY MR. DAVENPORT:

12:30:51  22         Q.   Was there anything concerning about

12:30:54  23   Mr. Kistner's emotional or psychological state at

12:31:00 1 | that time?

12:31:00 2 |     A.    Not that I -- not that I remember.

12:31:04 3 |     Q.    Did Mr. Kistner say anything in the

12:31:05 4 | back of the police vehicle?

12:31:07 5 |     A.    I don't know.  I think -- I think the

12:31:09 6 | video you guys have, we walked away from the

12:31:12 7 | vehicle.

12:31:12 8 |     Q.    Okay.

12:31:13 9 |     A.    So I don't -- I don't -- the time that

12:31:15 10 | I was in the vehicle with Karl, taking him to ECMC,

12:31:19 11 | I don't even remember what was said in there.

12:31:20 12 |     Q.    Okay.  So after you walked away from

12:31:24 13 | the police vehicle, where did you go next?

12:31:32 14 |     A.    I have to refer back to the -- the

12:31:36 15 | video.

12:31:36 16 |     Q.    Do you remember at all where Jim's son

12:31:38 17 | was at that point, or the other individual who ran

12:31:41 18 | out from the same house as Jim?

12:31:43 19 |     MS. HUGGINS:   Form.

12:31:44 20 |     THE WITNESS:   I don't remember at this

12:31:45 21 | point.

12:31:45 22 |     BY MR. DAVENPORT:

12:31:48 23 |     Q.    Okay.  Was there ever a concern with

12:31:50  1 | this individual who ran out from Jim's house?

12:31:53  2 |        A.   We would have to refer back to the

12:31:57  3 | video.

12:31:58  4 |        Q.   Well, I guess not --

12:32:00  5 |        A.   He -- he approached -- he approached

12:32:04  6 | officers.  He approached officers and wanted to

12:32:11  7 | speak to us.  I remember that.

12:32:17  8 |        And I remember for purposes of officer

12:32:19  9 | safety, we made him pat down, and we gave him

12:32:23 10 | a -- a waistband pat-down.  Make sure there was

12:32:25 11 | no weapons or anything.

12:32:26 12 |        Q.   Now, when was that pat-down done?

12:32:29 13 | Was it when he initially made contact with the

12:32:33 14 | police officers, or was that done later, the

12:32:35 15 | pat-down of this individual?

12:32:35 16 |        A.   We'd have to look at the video.

12:32:38 17 | I don't remember.

12:32:38 18 |        Q.   Okay.  So this pat-down was made

12:32:42 19 | because why?

12:32:43 20 |        MS. HUGGINS:  Form.  Asked and answered.

12:32:45 21 |        THE WITNESS:  For safety reasons.

12:32:46 22 |        BY MR. DAVENPORT:

12:32:46 23 |        Q.   And those safety reasons were why?

12:32:50  1  What?

12:32:51  2       A.    It's -- it's common that people

12:32:53  3  approach police with weapons on them.

12:32:55  4       Q.    Okay.  Did you have any reason to

12:32:57  5  believe that this individual approached police

12:32:59  6  officers with weapons?

12:33:00  7       A.    There's no reason why I would believe

12:33:03  8  that anyone would walk up to us without weapons.

12:33:06  9       Q.    There's never a time that individuals

12:33:09 10  would walk up to police officers without weapons?

12:33:11 11       MS. HUGGINS:   Form.

12:33:12 12       THE WITNESS:   It happens often.

12:33:13 13       BY MR. DAVENPORT:

12:33:14 14       Q.    I guess -- I understand that it happens

12:33:16 15  often.

12:33:16 16       A.    So -- so for -- for -- for my safety

12:33:18 17  and everyone else that's nearby, yeah, we always --

12:33:21 18  or I'm not going to say always, but often we'll --

12:33:24 19  we'll do pat-downs for weapons.

12:33:26 20       Q.    Okay.  So --

12:33:27 21       A.    Because even someone that's just trying

12:33:29 22  to talk to us or make a complaint, they have

12:33:32 23  weapons on them.

*Moriarity - Davenport - 2/21/20*

148

| | | |
|---|---|---|
| 12:33:33 | 1 | Q.   Okay.  So I guess that's my question is |
| 12:33:35 | 2 | that I understand that, you know, for officer |
| 12:33:38 | 3 | safety -- |
| 12:33:38 | 4 | A.   Yeah. |
| 12:33:38 | 5 | Q.   -- you would always want to have that |
| 12:33:41 | 6 | pant-down, but there are other instances where |
| 12:33:44 | 7 | individuals approach police officers without |
| 12:33:45 | 8 | weapons, correct? |
| 12:33:46 | 9 | A.   Yeah, correct. |
| 12:33:47 | 10 | Q.   Okay.  Now, do you remember approximately |
| 12:33:51 | 11 | what this individual looked like that was coming |
| 12:33:53 | 12 | out of the house? |
| 12:33:54 | 13 | MS. HUGGINS:   Form. |
| 12:33:55 | 14 | THE WITNESS:   Younger, white male. |
| 12:33:58 | 15 | BY MR. DAVENPORT: |
| 12:33:58 | 16 | Q.   Okay.  Do you remember approximately |
| 12:34:01 | 17 | what his size was? |
| 12:34:02 | 18 | A.   I don't. |
| 12:34:05 | 19 | Q.   Okay. |
| 12:34:07 | 20 | A.   Yeah, I don't. |
| 12:34:08 | 21 | Q.   Okay.  Was he saying anything at that |
| 12:34:14 | 22 | time, when he first initially came out? |
| 12:34:19 | 23 | A.   I think he was trying to find out what |

*Moriarity - Davenport - 2/21/20*

149

12:34:21  1    was going on, but I don't remember anything, what

12:34:24  2    he was saying.

12:34:24  3            Q.   Okay.  Do you know, was he using his

12:34:27  4    cell phone or any other sort of communicating

12:34:31  5    device?

12:34:31  6            A.   I don't.  I don't remember.

12:34:33  7            Q.   Okay.  Do you remember if he was trying

12:34:36  8    to make a call to an ambulance?

12:34:42  9            A.   I don't remember if he had a phone or

12:34:44 10    not.  I know that 911 calls were made.

12:34:50 11            Q.   Do you remember him referring to an

12:34:52 12    ambulance being called?

12:34:53 13            A.   I don't.

12:34:53 14            Q.   Do you remember Jim being on the

12:34:56 15    ground, asking for an ambulance?

12:34:58 16            A.   I don't.

12:34:59 17            Q.   Okay.  Where was that individual

12:35:04 18    standing when you performed the pat-down?

12:35:08 19            MS. HUGGINS:   Form.

12:35:08 20            THE WITNESS:   We'd -- we'd have to look at

12:35:10 21    the video that was provided.

12:35:12 22            BY MR. DAVENPORT:

12:35:12 23            Q.   Okay.

12:35:13  1          A.    Because I don't -- I don't remember.

12:35:15  2          Q.    Okay.  And what would generally consist

12:35:17  3  of that pat-down?

12:35:19  4          MS. HUGGINS:   Form.

12:35:20  5          THE WITNESS:   Just patting -- patting down

12:35:22  6  the outside of his pants pockets, waistband.

12:35:27  7  Anyplace where I would think he might have a knife

12:35:30  8  or a gun or something.

12:35:31  9          But it was quite clear that, after the

12:35:33 10  pat-down, he didn't -- I mean, he didn't have

12:35:35 11  anything.  I don't remember, but maybe he just

12:35:40 12  wanted to find out what was going on.

12:35:42 13          BY MR. DAVENPORT:

12:35:42 14          Q.    If an individual went into -- close to

12:35:46 15  police officers and then walked away from those

12:35:48 16  police officers and tried to go back into their

12:35:50 17  home, would there be any reason to begin, commence

12:35:55 18  a pat-down of that individual?

12:35:57 19          MS. HUGGINS:   Form.

12:35:58 20          THE WITNESS:   Can you --

12:36:00 21          MR. DAVENPORT:   So if -- I'm sorry.  You can

12:36:03 22  strike that.

12:36:04 23          If -- if an individual approached police

*Moriarity - Davenport - 2/21/20*

151

12:36:06   1   officers and then walked away from those police

12:36:08   2   officers, and then he tried to go back into the

12:36:10   3   house where he came from, would there be any reason

12:36:14   4   to do a pat-down of that individual?  Bring him

12:36:17   5   back out, away from the house?

12:36:18   6           MS. HUGGINS:  Form.

12:36:19   7           THE WITNESS:  He could have -- he could have

12:36:22   8   said something that one of the officers might have

12:36:24   9   wanted to investigate further.

12:36:26   10          BY MR. DAVENPORT:

12:36:26   11          Q.   And what kind of --

12:36:27   12          A.   And then --

12:36:32   13          Q.   -- things would those have been?

12:36:34   14          MS. HUGGINS:  Form.

12:36:36   15          THE WITNESS:  Could be tons of things.

12:36:38   16   I don't want to speculate what other officers heard

12:36:41   17   or what judgment calls or decisions they were

12:36:43   18   making.

12:36:43   19          BY MR. DAVENPORT:

12:36:43   20          Q.   If that individual was saying that he

12:36:45   21   was going to call an ambulance, would that be

12:36:46   22   a reason to do a pat-down of that individual?

12:36:48   23          MS. HUGGINS:  Form.

12:36:48   1          THE WITNESS:  No.

12:36:49   2          BY MR. DAVENPORT:

12:36:49   3          Q.   Okay.  So after the pat-down was done,

12:36:53   4   what would be the next steps?

12:36:55   5          Would you have to get background information

12:36:58   6   for that individual?

12:37:03   7          A.   You know, you're -- I mean, it's not

12:37:05   8   required.  Maybe -- like maybe we're just having

12:37:07   9   the conversation that he wanted to have now, now

12:37:10  10   that we know that the scene is safer.

12:37:12  11          Q.   So after having that conversation -- to

12:37:16  12   have that conversation with somebody, would you

12:37:18  13   also want to verify any sort of identification or

12:37:21  14   anything like that?

12:37:23  15          A.   I mean, you might want to, you might

12:37:26  16   not want to.

12:37:27  17          Q.   What would be the reasons that you

12:37:29  18   would want to verify the identification?

12:37:31  19          MS. HUGGINS:  Form.

12:37:31  20          THE WITNESS:  Maybe his -- who he's claiming

12:37:36  21   to be is relevant to the scene that we were at.

12:37:40  22   Maybe -- for example, if he told us that

12:37:45  23   Mr. Kistner was his father, maybe I didn't -- or,

12:37:47  1   you know, no one needed to really look into him

12:37:53  2   being who he says.  Like it's:  Okay.  You're his

12:37:57  3   son.  We believe you.

12:37:59  4       BY MR. DAVENPORT:

12:38:01  5       Q.   Was anything said to him about where

12:38:03  6   his father was going or how his father was doing?

12:38:06  7       A.   I don't -- I don't remember.

12:38:07  8       Q.   Okay.  Was there anything that was said

12:38:11  9   to this individual, whether he could go speak to

12:38:14 10   his father or not?

12:38:18 11       Would there be any reason why a police

12:38:20 12   officer would allow a son to speak with his

12:38:22 13   officer?  I -- I got --

12:38:23 14       MS. HUGGINS:  Form.  Now that's two

12:38:26 15   questions in a row.

12:38:27 16       THE WITNESS:  If -- if I was present for

12:38:28 17   that conversation, I don't remember.  Sometimes we

12:38:32 18   do let people speak to subjects in the back of our

12:38:38 19   patrol vehicle, other times we don't.

12:38:40 20       BY MR. DAVENPORT:

12:38:40 21       Q.   Do you remember if you let this

12:38:41 22   individual speak to the individual in the back of

12:38:42 23   your police vehicle?

12:38:43   1        A.    It was never asked of me, that

12:38:45   2    I remember.  If it was asked of me, I deferred

12:38:50   3    to senior officers.

12:38:53   4        Q.    Do you have any reason to believe that

12:38:54   5    this individual did speak to the -- Mr. Kistner in

12:38:57   6    the back of the police vehicle?

12:38:59   7        A.    I don't want to speculate if he did or

12:39:02   8    didn't.  It was never anything that was mentioned

12:39:06   9    to me that I remember, and I would have deferred.

12:39:08  10        Q.    Okay.  Do you remember seeing that

12:39:10  11    individual at all after leaving Schmarbeck that

12:39:16  12    day?

12:39:16  13        A.    I don't think I've had a run-in with

12:39:20  14    Mr. Kistner or his son since that day.

12:39:21  15        MR. DAVENPORT:  Okay.

12:39:21  16        (Discussion off the record.)

12:39:21  17    BY MR. DAVENPORT:

12:39:35  18        Q.    So when you say run-ins with Mr. Kistner,

12:39:38  19    does that pertain to just calls, or does that

12:39:41  20    pertain to any times that you may have seen him on

12:39:43  21    the street when you weren't necessarily responding

12:39:45  22    to a call?

12:39:46  23        MS. HUGGINS:  Form.

12:39:46  1      THE WITNESS:  What I mean by that is -- by

12:39:49  2  a run-in is I don't think I've ever seen him

12:39:52  3  outside of that call, period.  I don't think I've

12:39:57  4  ever seen him in a store, no other calls.  Yeah,

12:40:03  5  I don't think I've ever seen him or his son since.

12:40:07  6      BY MR. DAVENPORT:

12:40:08  7      Q.  Now, did you have any conversations

12:40:09  8  with anybody about this incident on January 1st of

12:40:15  9  2017?

12:40:15 10      MS. HUGGINS:  Well --

12:40:16 11      THE WITNESS:  Her and --

12:40:18 12      MS. HUGGINS:  He's asking outside of me.

12:40:20 13      THE WITNESS:  Oh, outside of -- Karl and

12:40:24 14  Jenny and Lauren.

12:40:28 15      BY MR. DAVENPORT:

12:40:28 16      Q.  Did you ever have any conversations

12:40:29 17  with your lieutenant, McHugh?

12:40:31 18      A.  I did not.

12:40:32 19      Q.  Okay.  Do you know if anybody had

12:40:34 20  conversations with Lieutenant McHugh?

12:40:35 21      A.  I believe someone on scene made

12:40:38 22  a phone call to him, but I don't remember which

12:40:40 23  officer that was.

| | | |
|---|---|---|
| 12:40:44 | 1 | Q. Do you remember, besides January 1st of |
| 12:40:47 | 2 | 2017, any of the officers that were on scene having |
| 12:40:50 | 3 | a conversation with Lieutenant McHugh about the |
| 12:40:52 | 4 | incident on January 1st of 2017? |
| 12:40:53 | 5 | A. Not that I was present for. |
| 12:40:54 | 6 | Q. What about other senior officers? Any |
| 12:40:58 | 7 | captains or anybody higher than lieutenant? |
| 12:41:01 | 8 | A. Definitely not while I was present for. |
| 12:41:04 | 9 | Q. Have you ever been investigated by |
| 12:41:05 | 10 | internal affairs? |
| 12:41:06 | 11 | MS. HUGGINS: Form, and 50-a objection, to |
| 12:41:10 | 12 | the extent that applies. You can answer. |
| 12:41:11 | 13 | THE WITNESS: Okay. No suspensions or |
| 12:41:14 | 14 | anything like that, no. |
| 12:41:15 | 15 | BY MR. DAVENPORT: |
| 12:41:16 | 16 | Q. Have you ever been -- had a discussion |
| 12:41:18 | 17 | with internal affairs about January 1st of 2017? |
| 12:41:21 | 18 | A. No. |
| 12:41:24 | 19 | Q. When was the first time that you were |
| 12:41:27 | 20 | aware that a lawsuit had been commenced against |
| 12:41:31 | 21 | you? |
| 12:41:31 | 22 | A. I believe I saw it on the news. |
| 12:41:32 | 23 | Q. That was the first time? |

*Moriarity - Davenport - 2/21/20*

157

12:41:33  1        A.    Yes.

12:41:34  2        Q.    Did you receive a summons or a complaint?

12:41:38  3        A.    I received some type of packet that I was

12:41:43  4    served with that I gave to our union.

12:41:46  5        Q.    Okay.  When, approximately, did you

12:41:50  6    receive that packet?

12:41:50  7        A.    Or I'm -- I'm sorry.  I received the

12:41:52  8    packet before I saw it on the news, but yeah, I'm

12:41:55  9    sorry, yeah, I remember, yeah, I received the

12:41:59 10    packet first.  That's when I knew that this whole

12:42:02 11    thing was taking place, and then I saw it on -- on

12:42:05 12    the news.

12:42:05 13        Q.    Okay.  Okay.

12:42:06 14        A.    Yeah.

12:42:07 15        Q.    Did you happen to look at any of the

12:42:09 16    materials that were in that packet?

12:42:10 17        A.    I read it over with a union rep.

12:42:12 18        Q.    Okay.  When, approximately, did that

12:42:15 19    take place?

12:42:17 20        A.    I don't -- I don't remember exactly

12:42:21 21    when I was served with those papers.

12:42:23 22        Q.    Okay.  So if you were served with those

12:42:26 23    papers in 2018, would it have been during that year

12:42:29 1    that you sat down with the union rep?

12:42:34 2         A.   I -- like I said, I don't remember the

12:42:36 3    date that I was served the --

12:42:40 4         Q.   Sure.

12:42:41 5         A.   -- the papers.  I either gave the union

12:42:43 6    rep the papers the day of or the day after I was

12:42:46 7    served with those papers.

12:42:47 8         Q.   Okay.  And when you gave the papers to

12:42:50 9    that union rep, did you sit down that day?

12:42:53 10        A.   Yeah.

12:42:54 11        Q.   Okay.  What did the union rep say to

12:42:57 12   you?

12:42:57 13        A.   He said he -- he gave me her phone

12:43:00 14   number and that someone would be contacting me

12:43:03 15   about it, but he didn't -- he didn't really say --

12:43:06 16   say much.

12:43:07 17        Q.   Okay.  Now, did you reach out to

12:43:10 18   Ms. Huggins, or did Ms. Huggins reach out to you

12:43:12 19   first?

12:43:13 20        MS. HUGGINS:  Well, form.  I -- I don't know

12:43:15 21   why you're inquiring into contact between counsel

12:43:17 22   and client.

12:43:18 23        MR. DAVENPORT:  Well, I just want to know,

12:43:19   1  you know, after he received these papers, you know,

12:43:21   2  what were the next steps that you took?

12:43:23   3         Did you reach out to your attorney, or did

12:43:25   4  you wait for your attorney to contact you?

12:43:27   5         MS. HUGGINS:  Again --

12:43:27   6         MR. DAVENPORT:  You -- you can answer,

12:43:28   7  because I'm not asking what the substance was.

12:43:30   8  I'm just asking when you contacted -- whether you

12:43:33   9  contacted Ms. Huggins or whether she contacted you.

12:43:36  10         That's not attorney-compliant privilege.

12:43:38  11  I'm just merely asking when he contacted you or you

12:43:41  12  contacted him.  I don't want to know --

12:43:41  13         MS. HUGGINS:  I'm asking for the basis of

12:43:43  14  inquiry into contact with counsel, and I'm allowed

12:43:46  15  to ask the basis of --

12:43:46  16         MR. DAVENPORT:  Are you going -- are you

12:43:47  17  going to direct him to not answer the question?

12:43:48  18         MS. HUGGINS:  I just inquired the basis of

12:43:50  19  your question.  That's what --

12:43:53  20         MR. DAVENPORT:  Well, I'm asking because --

12:43:53  21         MS. HUGGINS:  -- I just did.

12:43:53  22         THE REPORTER:  Don't talk over each other,

12:43:53  23  please.

*Moriarity - Davenport - 2/21/20*

160

12:43:53   1          MR. DAVENPORT:  Okay.

12:43:53   2          So what I'm asking is:  Why -- or if he

12:43:57   3   received these papers and if he discussed them with

12:44:00   4   the union rep, what was his concern level?

12:44:02   5          I want to know his concern level with what

12:44:04   6   happened.

12:44:04   7          MS. HUGGINS:  So that was not your question.

12:44:06   8          MR. DAVENPORT:  Well, I know, it's --

12:44:06   9   it's --

12:44:06  10          MS. HUGGINS:  You can pose --

12:44:07  11          MR. DAVENPORT:  -- different, but --

12:44:08  12          MS. HUGGINS:  You can pose your question to

12:44:09  13   him.

12:44:09  14          MR. DAVENPORT:  It's certainly relevant to

12:44:12  15   that.  It's relevant to that inquiry.

12:44:14  16          MS. HUGGINS:  Sir, I objected to a totally

12:44:16  17   different question that veers on attorney-client

12:44:19  18   privilege.  You have now posed a different question.

12:44:21  19          You can ask that of the witness, but

12:44:23  20   I am allowed to ask the basis of your question for

12:44:26  21   an objection.  That's -- that's all I'm doing.

12:44:28  22   You may ask.

12:44:28  23          BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

161

12:44:29  1         Q.   You can answer.

12:44:29  2         A.   I received a court notification

12:44:32  3  by the court liaison.

12:44:34  4         Q.   Okay.  So when did you receive that

12:44:36  5  court notification?

12:44:37  6         A.   There would be records of it somewhere,

12:44:40  7  but no, I don't -- I don't remember.

12:44:42  8         Q.   Okay.

12:44:43  9         A.   There's definitely records of it at

12:44:46 10  City Court or something.

12:44:47 11         Q.   Okay.  So now when you reached out to

12:44:49 12  that court liaison --

12:44:50 13         A.   No, no.  They --

12:44:52 14         Q.   Or they -- they reached out to you.

12:44:54 15         A.   Yeah.

12:44:54 16         Q.   Okay.  Or when you got notification of

12:44:55 17  that court liaison, had you contacted an attorney

12:44:58 18  at that point?

12:44:58 19         A.   No.

12:44:59 20         Q.   Okay.

12:45:00 21         A.   No.

12:45:00 22         Q.   Was it after you received that

12:45:02 23  notification?

*Moriarity - Davenport - 2/21/20*

162

| | | |
|---|---|---|
| 12:45:03 | 1 | MS. HUGGINS:  Form. |
| 12:45:04 | 2 | BY MR. DAVENPORT: |
| 12:45:05 | 3 | Q.    That you contacted an attorney? |
| 12:45:06 | 4 | A.    I never contacted an attorney. |
| 12:45:07 | 5 | Q.    Okay.  Okay.  So did you watch the |
| 12:45:14 | 6 | video when you received that packet? |
| 12:45:16 | 7 | A.    No.  The video wasn't provided at that |
| 12:45:19 | 8 | time. |
| 12:45:20 | 9 | Q.    Okay.  You didn't receive any exhibits |
| 12:45:25 | 10 | or anything else besides that initial complaint in |
| 12:45:28 | 11 | that packet? |
| 12:45:29 | 12 | A.    No.  The packet was -- it was pretty |
| 12:45:35 | 13 | thick.  There was like a list of -- a list of |
| 12:45:39 | 14 | charges in there.  If there were -- if there were |
| 12:45:41 | 15 | exhibits in there, I don't remember -- I don't |
| 12:45:45 | 16 | remember reading -- reading that or -- or -- or it |
| 12:45:48 | 17 | being a topic of discussion with the union rep. |
| 12:45:51 | 18 | Q.    Okay.  What kinds of things did you |
| 12:45:56 | 19 | discuss with the union rep about the complaint? |
| 12:45:57 | 20 | A.    It was along the lines of me handing |
| 12:46:00 | 21 | him the packet.  He flipped through it a couple |
| 12:46:05 | 22 | times and just said, just wait for court to notify |
| 12:46:09 | 23 | you.  And then that's what I did. |

| | | |
|---|---|---|
| 12:46:13 | 1 | Q.   Were you ever -- did you ever have |
| 12:46:15 | 2 | another discussion with that union rep? |
| 12:46:17 | 3 | A.   No. |
| 12:46:25 | 4 | Q.   How long, approximately, was that |
| 12:46:27 | 5 | initial meeting with the union rep? |
| 12:46:32 | 6 | A.   It was a pretty informal thing.  It |
| 12:46:37 | 7 | wasn't long.  Five minutes or so for him to just |
| 12:46:41 | 8 | skim through it. |
| 12:46:41 | 9 | Q.   Okay. |
| 12:46:43 | 10 | A.   And I went on my way. |
| 12:46:45 | 11 | Q.   Have you had to meet with that union |
| 12:46:46 | 12 | rep or any other union reps for any other lawsuits |
| 12:46:49 | 13 | that were commenced against you? |
| 12:46:50 | 14 | A.   No. |
| 12:46:51 | 15 | Q.   Okay.  Is this the only lawsuit that |
| 12:46:54 | 16 | has ever been commenced against you? |
| 12:46:56 | 17 | A.   Yeah.  Yes. |
| 12:46:57 | 18 | Q.   Okay.  When was the next time that you |
| 12:46:58 | 19 | spoke to somebody about this lawsuit? |
| 12:47:02 | 20 | A.   Whenever we have court notifications to |
| 12:47:05 | 21 | talk to her.  I might have talked to Karl about it |
| 12:47:15 | 22 | two or three times, but it's not a huge discussion. |
| 12:47:21 | 23 | Q.   Okay. |

12:47:22  1        A.    You know, me and Karl are on two

12:47:25  2   different shifts, and we talk about two different

12:47:28  3   things.

12:47:28  4        Q.    Okay.   So when you say two different

12:47:31  5   shifts, are you referring to like maybe --

12:47:33  6        A.    I'm -- I'm sorry.   He's on -- he's on

12:47:35  7   day shift and I'm on afternoons.

12:47:36  8        Q.    Okay.

12:47:37  9        A.    So we don't -- we don't really cross

12:47:39 10   paths as much.

12:47:41 11        Q.    Sure.

12:47:41 12        So after that first initial 16 weeks, did

12:47:44 13   you automatically go to the afternoon shift?

12:47:46 14        A.    Yes.

12:47:46 15        Q.    Okay.   So the only time that you would

12:47:50 16   have seen Karl Schultz, would that be typically

12:47:52 17   during briefing --

12:47:53 18        MS. HUGGINS:   Form.

12:47:54 19        BY MR. DAVENPORT:

12:47:54 20        Q.    -- before you started the afternoon

12:47:55 21   shift?

12:47:55 22        A.    No.   I went to -- so when he was

12:48:01 23   working, I was on my off days, and then when I was

*Moriarity - Davenport - 2/21/20*

165

| 12:48:05 | 1 | working, he was on his off days, so I didn't really |
| 12:48:08 | 2 | see him too much in Charlie. |
| 12:48:11 | 3 | He transferred to Bravo, and then I went to |
| 12:48:13 | 4 | Delta for a little bit and came back, and he was |
| 12:48:15 | 5 | still in Bravo. |
| 12:48:16 | 6 | Q.   Okay. |
| 12:48:17 | 7 | A.   And now we're -- we're both in Bravo, |
| 12:48:19 | 8 | and I don't see him too often because he's usually |
| 12:48:22 | 9 | on calls when I'm in briefing. |
| 12:48:24 | 10 | Q.   Okay.  Were you involved in the |
| 12:48:26 | 11 | criminal proceedings at all against Mr. Kistner? |
| 12:48:32 | 12 | A.   I don't remember if I was notified to |
| 12:48:35 | 13 | go to court for that. |
| 12:48:36 | 14 | Q.   Okay.  Which officers are typically |
| 12:48:40 | 15 | notified to go to court for criminal proceedings? |
| 12:48:42 | 16 | A.   The arresting and assisting officers. |
| 12:48:44 | 17 | It could also be whoever is on the case history, |
| 12:48:49 | 18 | but they don't always notify everyone in. |
| 12:48:53 | 19 | Q.   Okay. |
| 12:48:55 | 20 | A.   And I don't really know how that's |
| 12:48:57 | 21 | determined. |
| 12:48:57 | 22 | Q.   Okay. |
| 12:48:58 | 23 | A.   But definitely the arresting officer. |

*Moriarity - Davenport - 2/21/20*

166

12:49:01  1        Q.   What would be the circumstances where

12:49:03  2   an assisting officer would be required to go into

12:49:07  3   court for a court proceeding -- a criminal

12:49:09  4   proceeding?

12:49:09  5        MS. HUGGINS:   Form.

12:49:12  6        THE WITNESS:   I don't know the requirements

12:49:15  7   for an assisting officer because on -- on an arrest

12:49:20  8   form, there's the arresting officer and assisting

12:49:23  9   officer, and they've gone sometimes and not

12:49:27 10   notified the assisting officer and notified way

12:49:31 11   down the case history list, other people.  So I'm

12:49:34 12   not -- I'm not sure how that is determined.

12:49:36 13        BY MR. DAVENPORT:

12:49:36 14        Q.   Okay.  Now, after you received that

12:49:42 15   initial packet, when did you first watch the video

12:49:47 16   that was provided as part of the complaint?

12:49:53 17        A.   One of the times I met with my

12:49:55 18   attorney, and I don't know which time that was.

12:49:57 19        Q.   Okay.  Okay.  Do you know if it was

12:50:01 20   shortly after the lawsuit was commenced?

12:50:04 21        A.   I don't know.

12:50:05 22        Q.   Okay.  Do you know, was it within

12:50:07 23   a year of the lawsuit being commenced?

*Moriarity - Davenport - 2/21/20*

167

| | | |
|---|---|---|
| 12:50:15 | 1 | A.    I don't remember the time that my first |
| 12:50:18 | 2 | court notification was with my attorney and the |
| 12:50:22 | 3 | time that I received the packet. |
| 12:50:26 | 4 | Q.    How do you receive those court |
| 12:50:28 | 5 | notifications? |
| 12:50:28 | 6 | A.    They're given to our -- our stationhouse, |
| 12:50:31 | 7 | and then a report technician will contact us via |
| 12:50:36 | 8 | phone or -- I'm sorry -- there's -- depending on |
| 12:50:41 | 9 | the stationhouse, they might just put your |
| 12:50:44 | 10 | notification in your -- your mailbox.  Other ones |
| 12:50:46 | 11 | it's in a binder and you have to check yourself. |
| 12:50:48 | 12 | Q.    Okay.  Do you know where those court |
| 12:50:51 | 13 | notifications come from? |
| 12:50:52 | 14 | A.    The Court Liaison Bureau. |
| 12:50:54 | 15 | Q.    Okay.  Do you have records of those |
| 12:50:57 | 16 | court notifications from the liaison? |
| 12:51:01 | 17 | A.    I usually throw mine out once the court |
| 12:51:05 | 18 | date is over.  I mean, they -- I don't know if they |
| 12:51:11 | 19 | keep it or not or how long they would keep it. |
| 12:51:13 | 20 | Q.    Do you know, is the court liaison, is |
| 12:51:17 | 21 | that somebody affiliated with the courts or the |
| 12:51:18 | 22 | Buffalo Police Department? |
| 12:51:21 | 23 | A.    Courts, and then it goes to BPD. |

*Moriarity - Davenport - 2/21/20*

168

12:51:23  1          Q.    Okay.   Do you know who that individual

12:51:25  2    is for the court liaison?

12:51:27  3          A.    I don't, actually.

12:51:28  4          Q.    Okay.   How often did you receive

12:51:32  5    notifications from the court liaison?

12:51:33  6          A.    It depends on how frequently you arrest

12:51:36  7    or you're -- you're -- you're needed in -- in court.

12:51:40  8          Q.    Okay.   Pertaining to this lawsuit,

12:51:45  9    how -- how often were you notified by the court

12:51:47 10    liaison?

12:51:49 11          MS. HUGGINS:   Form.   And, again, to the

12:51:52 12    extent that you're going into contact he's had with

12:51:55 13    counsel, I mean --

12:51:55 14          MR. DAVENPORT:   I'm not.

12:51:56 15          MS. HUGGINS:   -- that would be privileged.

12:51:57 16          MR. DAVENPORT:   Well, no.   Not --

12:51:58 17          MS. HUGGINS:   He's already indicated that

12:52:00 18    that's --

12:52:00 19          MR. DAVENPORT:   Not the times that he's had

12:52:01 20    contact with you.   What is said during that contact

12:52:03 21    is absolutely privileged.   I am not asking that.

12:52:05 22          I'm just simply asking:   Pertaining to this

12:52:08 23    lawsuit, how many notifications did you receive

12:52:10  1  from the court liaison?

12:52:11  2        And if you want to argue that that's

12:52:12  3  privileged, you can make that argument, but he can

12:52:15  4  answer it, and then you can make that objection

12:52:17  5  later, and it can be struck from the record.

12:52:19  6        So you may answer.

12:52:20  7        MS. HUGGINS:  Well, that's not how

12:52:22  8  objections work.  If something is privileged,

12:52:24  9  that's an objection that is preserved and he would

12:52:27 10  not answer during a deposition.

12:52:28 11        MR. DAVENPORT:  Are you going to direct him

12:52:29 12  to not answer?

12:52:30 13        MS. HUGGINS:  Sir, you can ask that

12:52:32 14  question, but I object to the -- to the extent that

12:52:35 15  you're veering towards that.

12:52:37 16        He's already indicated that court liaison is

12:52:40 17  the mechanism by which counsel directs him to come

12:52:44 18  meet with him.

12:52:45 19        MR. DAVENPORT:  And I just asked him how

12:52:47 20  many times he received that notification from the

12:52:48 21  court liaison for this case.

12:52:52 22        You can answer.

12:52:55 23        MS. HUGGINS:  You may answer.

*Moriarity - Davenport - 2/21/20*

170

12:52:56  1    THE WITNESS:  I think two or three.

12:52:57  2    BY MR. DAVENPORT:

12:52:58  3    Q.   Okay.  Would those have been the only

12:53:01  4  times that you would have met with Ms. Huggins?

12:53:04  5    A.   Yep.  Yes.

12:53:05  6    Q.   Okay.  When, approximately, was that

12:53:09  7  first notification?

12:53:10  8    Was it recently or was it a while ago?

12:53:12  9    MS. HUGGINS:  Form.  Asked and answered.

12:53:14 10    THE WITNESS:  No.  That would have been

12:53:16 11  a while ago.

12:53:17 12    BY MR. DAVENPORT:

12:53:18 13    Q.   Like more than a year ago?

12:53:19 14    A.   I don't -- I don't remember.

12:53:21 15    Q.   Okay.  When was the second time that

12:53:26 16  you received that notification?

12:53:29 17    A.   I don't -- I don't remember -- I don't

12:53:38 18  remember.  I know I saw her last week --

12:53:40 19    Q.   Okay.

12:53:41 20    A.   -- for something.

12:53:41 21    Q.   Did you receive a notification from the

12:53:43 22  court liaison?

12:53:44 23    A.   Yeah.

12:53:44  1        Q.   Okay.  So one of -- one of the three

12:53:46  2   times that you received a notification was for this

12:53:48  3   deposition?

12:53:49  4        A.   Like I -- like I said, I don't remember

12:53:51  5   if it was two or three times, but I know I saw her

12:53:55  6   like last week, yeah.

12:53:56  7        Q.   Okay.  When was the first time that you

12:53:59  8   watched the video with your attorney or with

12:54:04  9   anybody else affiliated with the City of Buffalo

12:54:08 10   Law Department?

12:54:14 11        A.   I think it was the -- I think it was

12:54:17 12   the first time.

12:54:18 13        Q.   Okay.  Now, at that time, do you know

12:54:28 14   if the second notification that you received, did

12:54:33 15   you have to sign a verification at all?

12:54:37 16        MS. HUGGINS:   Form.

12:54:37 17        THE WITNESS:   What do you mean?   That

12:54:39 18   I showed up to court?

12:54:40 19        BY MR. DAVENPORT:

12:54:41 20        Q.   For the interrogatories that you

12:54:42 21   referred to earlier, the thicker packet that you

12:54:45 22   reviewed that you said that, you know, wasn't one

12:54:48 23   of the four documents in front of you?

12:54:56  1          I'm sorry.

12:54:56  2          MS. HUGGINS:  There might just be

12:54:58  3   confusion --

12:54:58  4          MR. DAVENPORT:  Yeah.

12:54:58  5          THE WITNESS:  Yeah.

12:54:58  6          MS. HUGGINS:  -- between the complaint and

12:54:59  7   interrogatories.

12:55:00  8          MR. DAVENPORT:  No.  No.  I know.  I know.

12:55:00  9          MS. HUGGINS:  Yeah.

12:55:01 10          MR. DAVENPORT:  I understand.

12:55:01 11          THE WITNESS:  I don't --

12:55:02 12          MR. DAVENPORT:  All right.  So --

12:55:02 13          MS. HUGGINS:  It's your examination, but,

12:55:04 14   I mean, if I can help clear it up, I will.

12:55:08 15          MR. DAVENPORT:  Here you go.

12:55:11 16          Can we have this exhibit marked, please?

12:55:11 17   The following was marked for Identification:

        18      EXH. 23              Verification page

12:55:11 19      BY MR. DAVENPORT:

12:55:53 20          Q.   So I'm now showing you what has been

12:55:56 21   marked as Exhibit 23.  Do you recognize that

12:55:58 22   document?

12:56:03 23          A.   Yes.

Moriarity - Davenport - 2/21/20

173

| | | |
|---|---|---|
| 12:56:03 | 1 | Q.   Okay.  Do you recall, was that document |
| 12:56:09 | 2 | given to you through the mail? |
| 12:56:14 | 3 | Was it given to you in person? |
| 12:56:15 | 4 | A.   In person. |
| 12:56:15 | 5 | Q.   Okay.  And who gave you that document? |
| 12:56:18 | 6 | A.   I don't know the dude's name.  I've |
| 12:56:23 | 7 | never -- |
| 12:56:24 | 8 | Q.   Okay. |
| 12:56:24 | 9 | A.   Yeah. |
| 12:56:24 | 10 | Q.   Okay. |
| 12:56:24 | 11 | MS. HUGGINS:  I think there's confusion |
| 12:56:26 | 12 | about what we're talking about right now. |
| 12:56:27 | 13 | MR. DAVENPORT:  Sure.  No.  That -- no. |
| 12:56:28 | 14 | I understand.  But he said that he recalled that |
| 12:56:29 | 15 | document, and he said he has seen it and that he |
| 12:56:32 | 16 | received it from some individual, so I'm just |
| 12:56:34 | 17 | asking questions about that document. |
| 12:56:37 | 18 | THE WITNESS:  Was this part -- this was part |
| 12:56:40 | 19 | of the packet, right, that I -- |
| 12:56:41 | 20 | MS. HUGGINS:  Yeah, I think there's |
| 12:56:44 | 21 | confusion. |
| 12:56:44 | 22 | THE WITNESS:  -- that I was served? |
| 12:56:44 | 23 | MS. HUGGINS:  He's confused about the |

Moriarity - Davenport - 2/21/20
174

| | | |
|---|---|---|
| 12:56:45 | 1 | summons and complaint -- |
| 12:56:45 | 2 | MR. DAVENPORT: I'll -- I'll clarify it. |
| 12:56:46 | 3 | MS. HUGGINS: -- versus this. |
| 12:56:46 | 4 | MR. DAVENPORT: I'll clarify it. Thank you. |
| 12:56:49 | 5 | So this exhibit has been marked as Exhibit |
| 12:56:51 | 6 | number 13. Do you recognize that document? |
| 12:56:56 | 7 | THE WITNESS: Yeah, I believe this is what |
| 12:56:58 | 8 | I was served with at my front doorstep, I think. |
| 12:57:02 | 9 | BY MR. DAVENPORT: |
| 12:57:02 | 10 | Q. Okay. So do you see in bold lettering |
| 12:57:08 | 11 | what that says? |
| 12:57:09 | 12 | A. Right here? |
| 12:57:10 | 13 | Q. Yes. |
| 12:57:11 | 14 | A. Yeah. Answer to first interrogatories |
| 12:57:13 | 15 | to defendants. |
| 12:57:14 | 16 | Q. And, Mr. Moriarity, are you familiar |
| 12:57:17 | 17 | with what a complaint is? |
| 12:57:19 | 18 | A. Yeah. Someone makes a complaint on |
| 12:57:22 | 19 | you. |
| 12:57:22 | 20 | Q. Like a -- a lawsuit complaint -- |
| 12:57:24 | 21 | A. Okay. |
| 12:57:24 | 22 | Q. -- is part of a legal proceeding; do |
| 12:57:28 | 23 | you know what that is? |

| 12:57:28 | 1 | A.    If you want to explain it to me so |
| 12:57:31 | 2 | I understand -- |
| 12:57:31 | 3 | Q.    Yeah.  Yeah. |
| 12:57:31 | 4 | A.    -- better. |
| 12:57:32 | 5 | Q.    Of course.  Of course. |
| 12:57:33 | 6 | All right.  So a legal complaint that |
| 12:57:34 | 7 | initiates the action, that would have been what you |
| 12:57:37 | 8 | had received on your front doorstep, that would |
| 12:57:39 | 9 | have been served to you, correct? |
| 12:57:40 | 10 | A.    Okay.  Yeah. |
| 12:57:41 | 11 | Q.    So now what I'm asking is:  These are |
| 12:57:44 | 12 | called interrogatories, so these probably would |
| 12:57:48 | 13 | have been a second document, a thicker document |
| 12:57:51 | 14 | that you would have reviewed. |
| 12:57:52 | 15 | A.    Oh, okay.  Okay. |
| 12:57:54 | 16 | Q.    So now I guess what my question is: |
| 12:57:58 | 17 | Did you receive that thick packet and then later |
| 12:58:02 | 18 | receive another criminal -- or legal document that |
| 12:58:06 | 19 | kind of looks something like this? |
| 12:58:09 | 20 | MS. HUGGINS:  Form. |
| 12:58:09 | 21 | THE WITNESS:  I received this later then. |
| 12:58:13 | 22 | BY MR. DAVENPORT: |
| 12:58:13 | 23 | Q.    Okay.  So it would have been something |

12:58:14  1  that was received later?

12:58:15  2        A.    Yeah.

12:58:16  3        Q.    Okay.   Now, was that received with this

12:58:19  4  verification?

12:58:22  5        MS. HUGGINS:   Form.

12:58:23  6        THE WITNESS:   That, I don't remember.

12:58:25  7  I mean, I -- I know that this is my signature.

12:58:28  8        BY MR. DAVENPORT:

12:58:28  9        Q.    Okay.

12:58:28  10        A.    And I'm not disputing that.

12:58:31  11        Q.    No.   No.   Of course.   Of course.

12:58:32  12        A.    I don't remember when --

12:58:33  13        Q.    Do you remember if this verification

12:58:34  14  was given with anything else?   Any other documents

12:58:38  15  that would have been handed to you at that time?

12:58:41  16        MS. HUGGINS:   Form.

12:58:41  17        THE WITNESS:   I -- no, I -- I don't -- I

12:58:49  18  don't remember.

12:58:49  19        BY MR. DAVENPORT:

12:58:49  20        Q.    Okay.   I'm going to direct your

12:58:55  21  attention to page 4.

12:58:58  22        A.    Page 4?

12:58:59  23        Q.    Or let's see here.

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 12:59:03 | 1 | Excuse me.  Page 5.  And I want you to go to |
| 12:59:06 | 2 | demand number 2. |
| 12:59:07 | 3 | Now, that -- that interrogatory says, |
| 12:59:10 | 4 | identify the police officers shown in the video |
| 12:59:13 | 5 | attached as Exhibit A to the complaint. |
| 12:59:14 | 6 | Now, if I represent to you that Exhibit A to |
| 12:59:17 | 7 | the complaint is those four video segments that you |
| 12:59:19 | 8 | said that you have watched, are you able to |
| 12:59:23 | 9 | identify who those police officers are by watching |
| 12:59:27 | 10 | the video? |
| 12:59:28 | 11 | MS. HUGGINS:  Form. |
| 12:59:30 | 12 | THE WITNESS:  Some of them, yeah. |
| 12:59:32 | 13 | BY MR. DAVENPORT: |
| 12:59:32 | 14 | Q.  Okay.  Who were you able to identify |
| 12:59:35 | 15 | when watching the video? |
| 12:59:37 | 16 | MS. HUGGINS:  Form. |
| 12:59:37 | 17 | THE WITNESS:  Karl.  And then the other two, |
| 12:59:43 | 18 | Lauren and Jenny, I would get confused. |
| 12:59:45 | 19 | BY MR. DAVENPORT: |
| 12:59:45 | 20 | Q.  Okay.  But you knew that they were |
| 12:59:48 | 21 | there? |
| 12:59:48 | 22 | A.  I knew that they were there, yeah. |
| 12:59:50 | 23 | Q.  Okay.  Did you know -- did you watch -- |

| | | |
|---|---|---|
| 12:59:52 | 1 | there was a fourth video segment that was provided? |
| 12:59:54 | 2 | A.   I don't remember which video was the |
| 12:59:56 | 3 | fourth. |
| 12:59:57 | 4 | Q.   Okay.  Did you watch a video segment |
| 12:59:59 | 5 | where there was a fifth police officer on scene? |
| 13:00:01 | 6 | A.   Yes. |
| 13:00:01 | 7 | Q.   And did you know, when watching that |
| 13:00:04 | 8 | video, who that individual officer was? |
| 13:00:06 | 9 | A.   No.  I -- I -- I forgot who showed up |
| 13:00:09 | 10 | on scene. |
| 13:00:09 | 11 | Q.   Okay.  Okay. |
| 13:00:10 | 12 | A.   And when the video was replayed, it was |
| 13:00:14 | 13 | also what the -- the department refers to as |
| 13:00:17 | 14 | double-up day, so both shifts are working, and |
| 13:00:21 | 15 | I don't remember who all was on those shifts |
| 13:00:23 | 16 | because people get promoted or transferred. |
| 13:00:27 | 17 | Q.   Okay.  Now, have you later learned who |
| 13:00:28 | 18 | that fifth individual was? |
| 13:00:30 | 19 | A.   Yes. |
| 13:00:30 | 20 | Q.   Was that individual's name David |
| 13:00:32 | 21 | Santana? |
| 13:00:33 | 22 | A.   Yes. |
| 13:00:33 | 23 | Q.   Now, is that somebody that you had |

*Moriarity - Davenport - 2/21/20*

179

13:00:35  1  worked with before?

13:00:37  2       A.    Yeah, he was.  And like I said, I'm

13:00:40  3  about a week old on here.

13:00:42  4       Q.    Okay.

13:00:42  5       A.    So I had just basically met him.

13:00:46  6       Q.    Okay.

13:00:48  7       A.    So I -- I did forget that he was even

13:00:51  8  on scene, but then looking at the video, I mean, it

13:00:55  9  kind of took a little bit to realize it was him.

13:01:01 10       Q.    So David Santana, is that somebody that

13:01:05 11  you worked with after the incident on January 1st

13:01:08 12  of 2017?

13:01:08 13       A.    Only the 16 weeks --

13:01:10 14       Q.    Okay.

13:01:10 15       A.    -- that I worked with him.

13:01:12 16       Q.    Okay.  So he would have been somebody

13:01:16 17  that worked on a different shift or a different --

13:01:18 18       A.    He -- he would have been the same

13:01:20 19  shift.

13:01:21 20       Q.    He would have been the same shift, but

13:01:23 21  would he also work the same days that you work?

13:01:26 22       A.    The same, yep.

13:01:26 23       Q.    Okay.

*Moriarity - Davenport - 2/21/20*

180

13:01:26  1      A.    Same days.

13:01:28  2      Q.    Okay.  Do you recall from the video

13:01:30  3  whether he was driving with somebody or whether he

13:01:32  4  was by himself?

13:01:32  5      A.    I don't.

13:01:33  6      Q.    Okay.  If I represented to you that he

13:01:37  7  was driving by himself, would you have any reason

13:01:39  8  to dispute that?

13:01:40  9      MS. HUGGINS:    Form.

13:01:43 10      THE WITNESS:    No, but again, I mean, I don't

13:01:45 11  know what other people were doing.

13:01:47 12      BY MR. DAVENPORT:

13:01:48 13      Q.    No.  Sure.  Sure.

13:01:49 14      A.    Yeah.

13:01:49 15      Q.    Would there be any reason why he would

13:01:51 16  be driving a Dodge Charger or a Charger rather than

13:01:56 17  the Chevy Tahoe that you and the other car were

13:02:01 18  driving?

13:02:02 19      A.    Could be a number of reasons.  I don't

13:02:03 20  know what the car situation was back then.

13:02:06 21      MR. DAVENPORT:    Okay.  Okay.  So if we could

13:02:11 22  just go to the video.

13:02:12 23      And then we can go off the record really

*Moriarity - Davenport - 2/21/20*

181

| | | |
|---|---|---|
| 13:02:14 | 1 | quickly. |
| | 2 | THE VIDEOGRAPHER:  Sure. |
| | 3 | MR. DAVENPORT:  Okay. |
| | 4 | THE WITNESS:  And can we take a break? |
| | 5 | MR. DAVENPORT:  Yeah.  Yeah.  Of course. |
| | 6 | Of course. |
| | 7 | (A recess was then taken at 1:02 p.m.) |
| 13:16:28 | 8 | (On the record at 1:16 p.m.) |
| 13:16:28 | 9 | MR. DAVENPORT:  So, now, Mr. Moriarity, we |
| 13:16:31 | 10 | are going to watch the third video segment that has |
| 13:16:33 | 11 | been provided by the plaintiff during discovery. |
| 13:16:36 | 12 | The last four digits of that video are 2529. |
| 13:16:36 | 13 | Now can we please direct the camera towards |
| 13:16:36 | 14 | the TV screen? |
| 13:16:52 | 15 | Perfect.  Thank you. |
| 13:16:54 | 16 | So before we start the video, where is |
| 13:16:58 | 17 | the -- is there an individual that is standing in |
| 13:17:00 | 18 | the street? |
| 13:17:00 | 19 | THE WITNESS:  Yes. |
| 13:17:02 | 20 | BY MR. DAVENPORT: |
| 13:17:02 | 21 | Q.   Where is that individual standing? |
| 13:17:05 | 22 | MS. HUGGINS:  Form. |
| 13:17:07 | 23 | THE WITNESS:  From the video, in the middle |

*Moriarity - Davenport - 2/21/20*

182

13:17:10   1  of the street.

13:17:10   2          BY MR. DAVENPORT:

13:17:10   3          Q.   Okay.  Is he standing in front of your

13:17:13   4  police vehicle or the other police vehicle?

13:17:19   5          A.   It looks like from the video's

13:17:21   6  perspective, in front of my vehicle.

13:17:27   7          Q.   Okay.  What direction is this

13:17:28   8  individual facing?

13:17:29   9          A.   South.

13:17:30  10          Q.   Okay.  And is that just based off of

13:17:33  11  your recollection of Schmarbeck Avenue, or is that

13:17:36  12  based off of any reference point on the video that

13:17:41  13  you know that that direction he's facing is south?

13:17:43  14          A.   No.  It's based off of my knowledge of

13:17:45  15  C District streets.

13:17:46  16          Q.   Okay.  And what direction is your car

13:17:49  17  facing?

13:17:50  18          A.   North.

13:17:51  19          MR. DAVENPORT:  Okay.  Now I'm going to play

13:17:54  20  the video.

13:18:08  21          (Video clip played.)

13:18:08  22          BY MR. DAVENPORT:

13:18:09  23          Q.   Now, what direction was that individual

13:18:12  1  walking for the first three seconds of the video?

13:18:19  2        A.    South.

13:18:20  3        Q.    Okay.   And your car is moving or is it

13:18:22  4  stationary?

13:18:23  5        A.    Stationary, still.

13:18:24  6        Q.    Okay.   So now what would be your

13:18:27  7  typical thing that you would do next, if you saw an

13:18:31  8  individual that was walking towards your police

13:18:33  9  vehicle and you were still stopped and -- and

13:18:36 10  hadn't been in motion?

13:18:38 11        MS. HUGGINS:   Form.

13:18:38 12        THE WITNESS:   Well, at the time, you

13:18:40 13  don't -- you can't say if you know that he's

13:18:42 14  walking towards my police vehicle or towards the

13:18:45 15  sidewalk or, you know, behind my police vehicle,

13:18:47 16  but I'm thinking officer safety.

13:18:52 17        BY MR. DAVENPORT:

13:18:52 18        Q.    Okay.

13:18:52 19        A.    But at that -- at that time, you know,

13:18:53 20  years ago, I don't remember what I was thinking.

13:18:55 21        Q.    Okay.   But the individual did take

13:19:01 22  a few steps, and he did -- he was closer to your

13:19:05 23  police vehicle than he was at the beginning of the

13:19:08   1 | video, correct?

13:19:08   2 |      A.   Yes.

13:19:09   3 |      Q.   Okay.  Now -- now, we're still on three

13:19:23   4 | seconds of the video.  Your video -- your car has

13:19:26   5 | gone into motion at this point, correct?  It

13:19:28   6 | started moving forward?

13:19:29   7 |      A.   Yes.

13:19:29   8 |      Q.   And where is the individual at this

13:19:32   9 | point with reference to your police vehicle?

13:19:37  10 |      A.   The driver's side, in between my truck

13:19:41  11 | and the grass.

13:19:43  12 |      Q.   Okay.  Now, what I want you to do is

13:19:46  13 | I want you to make reference of the time stamp, and

13:19:49  14 | I don't want you to verify its accuracy.  I just

13:19:52  15 | want you to look at what the time is.

13:19:55  16 |      Would you agree that is 10:25:32 when your

13:19:58  17 | car first starts in motion?

13:20:00  18 |      MS. HUGGINS:  Form.

13:20:03  19 |      THE WITNESS:  Based on this video and the

13:20:06  20 | numbers that are on the screen, it says 10:25:32.

13:20:12  21 |      BY MR. DAVENPORT:

13:20:12  22 |      Q.   Okay.  Now, focusing on your car --

13:20:18  23 |      A.   You said focusing on my car?

*Moriarity - Davenport - 2/21/20*

13:20:20  1        Q.    Yes.   Oh, I'm sorry.   We'll -- we'll

13:20:22  2   play it again.   I'll start it from three seconds.

13:20:27  3        Well, we'll start it from three seconds.

13:20:27  4        THE WITNESS:   Yeah.

13:20:27  5        (Video clip played.)

13:20:27  6        BY MR. DAVENPORT:

13:20:29  7        Q.    Now, focusing on your car, I want you

13:20:31  8   to tell me when it is off the screen.   And I'll do

13:20:35  9   my best to stop the video when your car is out of

13:20:39 10   the scene.

13:20:39 11        MS. HUGGINS:   Form.

13:20:40 12        THE WITNESS:   All right.

13:20:45 13        BY MR. DAVENPORT:

13:20:46 14        Q.    Now, do you see on that top time stamp

13:20:48 15   what the time is?

13:20:50 16        A.    Yeah.   The top time stamp on the -- the

13:20:54 17   video is 10:25:37.

13:20:57 18        Q.    Okay.   So 10:25:37.

13:20:59 19        And when you first started in motion, it was

13:21:01 20   10:25:32, correct?

13:21:05 21        A.    Yeah.

13:21:05 22        MR. DAVENPORT:   Okay.   So now what I want

13:21:11 23   you to do -- well, I want to play a second video.

*Moriarity - Davenport - 2/21/20*

186

13:21:11   1          (Discussion off the record.)

13:21:11   2          (Video clip played.)

13:21:11   3     BY MR. DAVENPORT:

13:23:00   4          Q.   Now, assuming that these cameras are

13:23:02   5     calibrated where the times are accurately

13:23:04   6     reflecting each other -- they don't have to be

13:23:06   7     accurate in terms of what time it actually is, but

13:23:08   8     just assuming that they're all calibrated together,

13:23:11   9     what is the time stamp in that top video frame

13:23:14  10     right there?

13:23:15  11          MS. HUGGINS:   Form.

13:23:16  12          THE WITNESS:   Again, don't want to speculate

13:23:21  13     or assume anything, but the time on that screen is

13:23:26  14     10:25:38.

13:23:28  15     BY MR. DAVENPORT:

13:23:28  16          Q.   Okay.   Now, your car, although it was

13:23:30  17     in the camera view one second before, so that would

13:23:34  18     have been -- well, hold on.

13:23:37  19          Now, would you agree with me that your car

13:23:39  20     is in view at 10:25:36?

13:23:44  21          A.   Yes.

13:23:44  22          MR. DAVENPORT:   Okay.   Now watching the

13:23:46  23     video, would you agree that your car --

13:23:46  1      (Discussion off the record.)

13:23:46  2      BY MR. DAVENPORT:

13:23:59  3      Q.   All right.  Now, would you agree that

13:23:59  4   at 10:25:38, your car is outside of the view of the

13:24:03  5   camera?

13:24:04  6      A.   Yes.

13:24:04  7      MS. HUGGINS:  Form.

13:24:04  8      THE WITNESS:  Yes.

13:24:05  9      BY MR. DAVENPORT:

13:24:06  10     Q.   Okay.  Now, I want you to pay attention

13:24:09  11   and see when the next time your police vehicle is

13:24:13  12   in the view of the camera.

13:24:19  13     A.   Okay.

13:24:24  14     Yeah.  44, I think.

13:24:27  15     Q.   Okay.

13:24:27  16     A.   10:25:44.

13:24:29  17     Q.   Okay.  So the time stamp in the top

13:24:32  18   would have been 10:25:44, correct?

13:24:35  19     A.   Yeah.

13:24:35  20     MR. DAVENPORT:  Okay.

13:24:43  21     (Discussion off the record.)

13:24:43  22     MS. HUGGINS:  Do you want to identify the

13:24:44  23   discs that you've played for the record?

*Moriarity - Davenport - 2/21/20*

| | |
|---|---|
| 13:24:45 1 | MR. DAVENPORT:  Sure.  So the disc that |
| 13:24:46 2 | I just played was Exhibit 12.  It is Exhibit A |
| 13:24:51 3 | supplement that was provided by the plaintiffs. |
| 13:24:56 4 | We are now playing Exhibit 11, which was |
| 13:24:58 5 | also provided by the plaintiffs. |
| 13:24:58 6 | (Video clip played.) |
| 13:24:58 7 | BY MR. DAVENPORT: |
| 13:25:20 8 | Q.   So now I am playing again what has been |
| 13:25:23 9 | marked as Exhibit 11, for purposes of the |
| 13:25:26 10 | deposition.  The last four digits are 2529. |
| 13:25:31 11 | Now, what I want you to pay attention to is |
| 13:25:34 12 | when the first instance that you would consider |
| 13:25:37 13 | contact has been made between Mr. Kistner and |
| 13:25:41 14 | Ms. Velez and Ms. McDermott's vehicle. |
| 13:25:45 15 | A.   Okay. |
| 13:25:51 16 | MS. HUGGINS:  Wait for a question. |
| 13:25:52 17 | BY MR. DAVENPORT: |
| 13:25:52 18 | Q.   What time is that? |
| 13:25:54 19 | What time -- what's the time stamp in the |
| 13:25:55 20 | top part of the video? |
| 13:25:58 21 | MS. HUGGINS:  Form. |
| 13:25:58 22 | THE WITNESS:  10:25:36. |
| 13:26:02 23 | BY MR. DAVENPORT: |

Moriarity - Davenport - 2/21/20

189

13:26:02  1        Q.   Okay.   Would you agree with me that

13:26:04  2   your vehicle is still in view at that point at

13:26:09  3   10:25:36?

13:26:10  4        A.   Yeah.   Yes.

13:26:11  5        Q.   Okay.   Now, would you agree with me

13:26:13  6   that based on the other camera angle, you did not

13:26:17  7   appear back within view until 10:25:44?

13:26:22  8        MS. HUGGINS:   Form.

13:26:22  9        THE WITNESS:   Yeah, that's correct.

13:26:24 10        BY MR. DAVENPORT:

13:26:24 11        Q.   And that would have been eight seconds

13:26:26 12   after initial contact was made between Mr. Kistner

13:26:28 13   and that vehicle, correct?

13:26:29 14        MS. HUGGINS:   Form.   I'd object to -- we've

13:26:34 15   already indicated that we're not -- the accuracy of

13:26:37 16   these time stamps has not been verified in any way.

13:26:42 17        BY MR. DAVENPORT:

13:26:42 18        Q.   You can answer the question.

13:26:43 19        A.   Can you -- can you repeat the question

13:26:46 20   again?

13:26:46 21        MR. DAVENPORT:   Sure.

13:26:47 22        Can you read back the question that I just

13:26:49 23   asked?

13:26:49   1          (The above-requested portion was then read
13:27:10   2   by the reporter.)
13:27:10   3          MS. HUGGINS:  Same -- same form objection.
13:27:13   4          THE WITNESS:  Yeah.  Yes, as per that time
13:27:17   5   on the camera.
13:27:19   6          BY MR. DAVENPORT:
13:27:19   7          Q.   Okay.  So now assuming that you were
13:27:21   8   moving forward for six of those seconds, you
13:27:26   9   weren't stopped at the point that contact was made
13:27:28  10   between Mr. Kistner and the police vehicle,
13:27:30  11   correct?
13:27:30  12          MS. HUGGINS:  Form.
13:27:32  13          THE WITNESS:  No.
13:27:33  14          BY MR. DAVENPORT:
13:27:34  15          Q.   Okay.  Would you have been looking into
13:27:37  16   your driver's side mirror at this point?
13:27:41  17          A.   Like I said earlier, I -- I could have
13:27:43  18   been looking at the mirror or forward, but I do
13:27:49  19   remember at some point looking at the driver's side
13:27:52  20   mirror and seeing what I thought I saw.
13:27:56  21          Q.   So now assuming that you saw
13:27:59  22   Mr. Kistner make contact with the vehicle, you're
13:28:01  23   still driving forward for a few seconds, correct?

13:28:04   1          MS. HUGGINS:  Form.

13:28:04   2          THE WITNESS:  Correct.

13:28:06   3       BY MR. DAVENPORT:

13:28:06   4          Q.   So why didn't you stop after contact

13:28:08   5   was made between Mr. Kistner and the police

13:28:10   6   vehicle?

13:28:10   7          MS. HUGGINS:  Form.

13:28:10   8          THE WITNESS:  Well, because you have to come

13:28:12   9   to a safe stop.  You can't just slam on the brakes

13:28:15  10   and slam your head into the steering wheel.  You

13:28:18  11   know what I mean?  You still have to stop.

13:28:21  12       BY MR. DAVENPORT:

13:28:21  13          Q.   Okay.  And it would have taken you,

13:28:24  14   let's assume, eight seconds to come back?

13:28:26  15          MS. HUGGINS:  Form.

13:28:27  16       BY MR. DAVENPORT:

13:28:28  17          Q.   To stop your car and come back, that

13:28:30  18   would be a safe stop?

13:28:31  19          MS. HUGGINS:  Form.

13:28:32  20          THE WITNESS:  Yeah.

13:28:32  21       BY MR. DAVENPORT:

13:28:32  22          Q.   Okay.  Now, let's assume that your

13:28:35  23   vehicle is moving away from the incident as it's

*Moriarity - Davenport - 2/21/20*

192

13:28:37  1  happening.  What -- do you think that what you

13:28:43  2  would be able to see would be distorted if you're

13:28:47  3  moving away from a scene rather than closer to

13:28:49  4  a scene?

13:28:50  5          MS. HUGGINS:  Form.

13:28:50  6          THE WITNESS:  You know, your eyes see what

13:28:54  7  they see, so I don't -- I can't speak on what can

13:28:58  8  be distorted and all that.

13:29:03  9          BY MR. DAVENPORT:

13:29:03  10         Q.  But you saw Mr. Kistner make contact

13:29:06  11 with the vehicle?

13:29:07  12         MS. HUGGINS:  Form.  Asked and answered.

13:29:09  13         THE WITNESS:  Yeah.

13:29:10  14         BY MR. DAVENPORT:

13:29:10  15         Q.  And then you kept on driving forward?

13:29:12  16         MS. HUGGINS:  Form.

13:29:12  17         THE WITNESS:  I was slowing down to a stop

13:29:14  18 and then reversing, yeah.

13:29:15  19         BY MR. DAVENPORT:

13:29:15  20         Q.  Was Karl Schultz telling you to stop at

13:29:18  21 that point?

13:29:18  22         A.  Like I said, I don't -- I don't

13:29:21  23 remember if he told me to stop.  I think I -- I

*Moriarity - Davenport - 2/21/20*

193

13:29:24   1  think I just kind of stopped.

13:29:26   2       Q.   Okay.  Are you talking at all with Karl

13:29:31   3  Schultz as contact is initially made between the

13:29:33   4  police vehicle and Mr. Kistner?

13:29:34   5       MS. HUGGINS:  Form.

13:29:35   6       THE WITNESS:  As I already stated, I think --

13:29:40   7  I think we both -- I think either I said something,

13:29:44   8  he said something, or maybe we both said something

13:29:47   9  about what we thought we just saw.

13:29:50  10       BY MR. DAVENPORT:

13:29:50  11       Q.   Okay.  Now, I want you to watch again

13:30:02  12  the collision that is made between Mr. Kistner and

13:30:04  13  between the police vehicle, and I want you to tell

13:30:08  14  me if you still think that Mr. Kistner was the one

13:30:12  15  that threw himself at the police vehicle.

13:30:14  16       MS. HUGGINS:  Form.

13:30:21  17       (Video clip played.)

13:30:21  18       BY MR. DAVENPORT:

13:30:21  19       Q.   Does it look like Mr. Kistner threw

13:30:23  20  himself at that police vehicle?

13:30:24  21       MS. HUGGINS:  Form.

13:30:24  22       THE WITNESS:  Again, we're looking at

13:30:27  23  a camera at a different angle.  What I saw from my

13:30:31  1  perspective, it looked like he threw himself at the

13:30:36  2  vehicle.

13:30:37  3        BY MR. DAVENPORT:

13:30:37  4        Q.   But, again --

13:30:38  5        A.   So --

13:30:39  6        Q.   -- your perspective was you looking in

13:30:41  7  your driver's side mirror, as you were driving

13:30:43  8  forward.

13:30:43  9        A.   Correct.

13:30:43  10       Q.   And you were driving forward for eight

13:30:45  11  seconds after initial contact was made.

13:30:49  12       A.   That is correct.

13:30:50  13       MS. HUGGINS:   Form.

13:30:50  14       BY MR. DAVENPORT:

13:30:50  15       Q.   Okay.   Now, after contact was made, did

13:30:52  16  you notice that police vehicle moving forward at

13:30:56  17  all?

13:30:56  18       I can replay it if you need me to.

13:30:59  19       A.   I -- I just need you to say that

13:31:01  20  question again.   What do you mean?

13:31:03  21       Q.   Okay.

13:31:04  22       MS. HUGGINS:   Can you read it back, Anne?

13:31:04  23       (The above-requested portion was then read

*Moriarity - Davenport - 2/21/20*

195

13:31:24  1  by the reporter.)

13:31:24  2          THE WITNESS:  By this video, at this angle,

13:31:28  3  that's what it looks like.

13:31:30  4          BY MR. DAVENPORT:

13:31:30  5          Q.   Okay.

13:31:30  6          A.   But from what I saw when -- again, when

13:31:33  7  I was looking in my mirror, that's not what I saw.

13:31:35  8          Q.   Okay.  Did anybody talk with -- did

13:31:41  9  either you or Karl Schultz talk with Lauren

13:31:44 10  McDermott and Jenny Velez to see what they saw?

13:31:45 11          A.   I -- I would have never have done that.

13:31:48 12  Again, because I was so brand new, I deferred

13:31:51 13  everything to -- to the other officers.

13:31:54 14          MR. DAVENPORT:  Okay.  Now, I want you to

13:32:16 15  watch.

13:32:16 16          (Video clip played.)

13:32:16 17          BY MR. DAVENPORT:

13:32:18 18          Q.   Who is that individual that just came

13:32:21 19  into the scene right here?

13:32:23 20          A.   At the time, I -- I didn't know, and,

13:32:32 21  again, I -- I don't think we ever took down info.

13:32:38 22  I'm pretty sure it -- it was his son -- it's his

13:32:40 23  son.

*Moriarity - Davenport - 2/21/20*

13:32:43  1          Q.   Okay.  Would it be normal for somebody

13:32:45  2   to run out after their father after they've been

13:32:48  3   hit by a police vehicle?

13:32:48  4          MS. HUGGINS:  Form.

13:32:50  5          THE WITNESS:  You can't -- you can't just

13:32:53  6   determine that from -- from not knowing who he is

13:32:55  7   or anything like that.  You know what I mean?

13:32:57  8   I don't -- I don't -- I don't know who he is.

13:32:58  9          BY MR. DAVENPORT:

13:32:58 10          Q.   But after you came to -- because you

13:33:00 11   did say that you came to learn that --

13:33:00 12          A.   Yeah.  Yeah.

13:33:02 13          Q.   -- he may have been his son or --

13:33:03 14          A.   So --

13:33:04 15          Q.   -- related to him, that it would have

13:33:07 16   been normal for him to run out after his father

13:33:09 17   after he's been hit?

13:33:11 18          MS. HUGGINS:  Form.  Asked and answered, and

13:33:11 19   misstates the testimony.

13:33:12 20          THE WITNESS:  It's normal for some people.

13:33:14 21   It's normal -- not normal for other people.

13:33:14 22   I mean --

13:33:15 23          BY MR. DAVENPORT:

13:33:15  1        Q.    Would you run out after your father, if

13:33:17  2    he was hit by a police vehicle?

13:33:18  3        A.    Again, it's normal for some people.

13:33:20  4    It's normal -- not normal for --

13:33:22  5        Q.    I'm asking you for what you would

13:33:25  6    specifically do.

13:33:25  7        A.    I'm -- I'm going -- I'm going to answer.

13:33:25  8        MS. HUGGINS:   Form.

13:33:27  9        THE WITNESS:   Just let me answer.

13:33:27  10        BY MR. DAVENPORT:

13:33:28  11        Q.    Okay.

13:33:28  12        A.    It's normal for some people.  It's not

13:33:30  13    normal for other people.  I would.  There's other

13:33:31  14    people that I've seen that don't really care.  So

13:33:34  15    it is normal but it's also not normal.

13:33:36  16        Q.    Okay.  Now, at this point he runs out

13:33:40  17    and he stops really quickly.  At this point would

13:33:44  18    you say that he's made any threatening motions or

13:33:46  19    anything that would make you concerned for your

13:33:48  20    safety?

13:33:49  21        MS. HUGGINS:   Form.

13:33:50  22        THE WITNESS:   No.

13:33:51  23        BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

198

13:33:51 1       Q.   Okay.  Now he runs out again -- well,

13:33:54 2  he's not even running at this point.  He's just

13:33:57 3  kind of inching his way over to see what his

13:33:59 4  father's doing.

13:34:00 5       Is he at all concerned with what you or the

13:34:02 6  other officers are doing, or is he just trying to

13:34:05 7  see what his father's doing on the other side of

13:34:07 8  the police vehicle?

13:34:07 9       MS. HUGGINS:  Form.  Calls for speculation.

13:34:10 10      THE WITNESS:  Yeah, I mean, I don't -- I

13:34:12 11  don't know what he's doing.  He's not concerned

13:34:14 12  with the officers, though.

13:34:15 13      BY MR. DAVENPORT:

13:34:15 14      Q.   Okay.

13:34:16 15      A.   It doesn't -- it doesn't look like he

13:34:19 16  is.

13:34:19 17      Q.   Now what's he doing there?

13:34:22 18      What do you think he's doing, based on the

13:34:24 19  video?

13:34:24 20      MS. HUGGINS:  Form.

13:34:24 21      THE WITNESS:  Bending over.

13:34:25 22      MS. HUGGINS:  Compound question.

13:34:26 23      BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

199

13:34:26   1          Q.   Based on the video, why would he be

13:34:28   2   bending over?

13:34:29   3          MS. HUGGINS:   Form.

13:34:30   4          THE WITNESS:   I -- I can't answer why he's

13:34:31   5   bending over.   He could -- yeah.   I mean, he could

13:34:34   6   be checking on his dad.

13:34:36   7          BY MR. DAVENPORT:

13:34:36   8          Q.   Well, his father's on the ground,

13:34:38   9   right?

13:34:39  10          A.   Yeah.

13:34:39  11          Q.   Do you think maybe he's bending down to

13:34:41  12   get a better vantage point of his father?

13:34:44  13          A.   Yeah.

13:34:44  14          MS. HUGGINS:   Form.

13:34:44  15          THE WITNESS:   I just said that he could be

13:34:46  16   checking on his dad.

13:34:48  17          BY MR. DAVENPORT:

13:34:48  18          Q.   Okay.   Now, at this point he walks

13:34:50  19   right past the officers, correct?

13:34:52  20          A.   Yes.

13:34:52  21          Q.   At this point has he made any

13:34:55  22   threatening motions or anything -- threatening

13:34:57  23   maneuvers that would cause the police officers

*Moriarity - Davenport - 2/21/20*

13:34:59  1  concern?

13:35:04  2          A.    No.

13:35:05  3          Q.    Okay.  Now, he walks back towards the

13:35:13  4  sidewalk, correct?

13:35:15  5          A.    Yeah.

13:35:15  6          Q.    Would you consider him to now be in the

13:35:17  7  scene of a police incident?

13:35:22  8          A.    No.

13:35:22  9          Q.    Okay.  At any point before he left the

13:35:30 10  view of that camera, would you consider him to be

13:35:32 11  in the scene of a police -- police incident?

13:35:35 12          MS. HUGGINS:  Form.

13:35:37 13          THE WITNESS:  At the time and how brand new

13:35:41 14  I was, I would say no.

13:35:43 15          I would say, given my time on the job now,

13:35:46 16  he was in the scene at one point in time and now

13:35:49 17  he's no longer in the scene.

13:35:50 18          BY MR. DAVENPORT:

13:35:50 19          Q.    Okay.  Has he made any sort of

13:35:53 20  threatening motions or any sort of movements that

13:35:56 21  would cause you alarm?

13:35:57 22          A.    No.

13:36:02 23          MR. DAVENPORT:  Okay.  Now, I want you to

*Moriarity - Davenport - 2/21/20*

201

13:36:03  1  watch and see if this individual appears back in

13:36:05  2  the screen.

13:36:05  3          (Video clip played.)

13:36:32  4          **THE WITNESS:**  So wherever that was -- what

13:36:34  5  was that?  42?

13:36:35  6          **BY MR. DAVENPORT:**

13:36:35  7          Q.   Yes.  We'll say 10:26:42, he's back in

13:36:38  8  the scene?

13:36:39  9          **MS. HUGGINS:**  Form.

13:36:40  10         **BY MR. DAVENPORT:**

13:36:41  11         Q.   Is he in the scene at this point?

13:36:43  12 Police scene.

13:36:43  13         A.   On the -- on the -- wait.  Say that

13:36:46  14 again.

13:36:47  15         Q.   Is this individual in the police scene

13:36:49  16 at 10:40 -- 10:26:42?

13:36:52  17         A.   He's in the -- the view of the camera.

13:36:53  18 I wouldn't say he's in the scene.

13:36:57  19         Q.   Okay.  At any point does he enter the

13:37:00  20 police scene?

13:37:08  21         At any point before I stopped?

13:37:10  22         A.   No, but there's some type of contact

13:37:14  23 made.  It looks like --

13:37:14   1        Q.    When --

13:37:16   2        A.    It looks like there's some type of

13:37:18   3   contact made either between the officer and him or

13:37:21   4   him and the officer.

13:37:23   5        Q.    Now, when you say contact, what are you

13:37:26   6   referring to?

13:37:28   7        A.    Maybe he said something or the officer

13:37:32   8   said something to him.  I don't know.

13:37:34   9        Q.    Okay.  So contact refers to something

13:37:35  10   that is verbally said.

13:37:37  11        MS. HUGGINS:  Form.

13:37:38  12        THE WITNESS:  Verbally, physically, yeah,

13:37:41  13   but in this scenario, verbal.

13:37:44  14        BY MR. DAVENPORT:

13:37:44  15        Q.    Okay.

13:37:44  16        A.    Some -- something -- something made the

13:37:45  17   officer direct his attention to the male.

13:37:50  18        Q.    Okay.

13:37:51  19        A.    Something.

13:37:51  20        Q.    Now, I understand that it might be

13:37:53  21   different from what you saw that day, but now

13:37:55  22   watching the video, what does it appear that that

13:38:01  23   individual is doing?

13:38:01   1          MS. HUGGINS:  Form.

13:38:02   2          THE WITNESS:  It appears as though he's on

13:38:04   3   his phone.

13:38:04   4          BY MR. DAVENPORT:

13:38:04   5          Q.   Okay.  Do you have any reason to know

13:38:07   6   today why he was on his phone at that time?

13:38:12   7          A.   I -- I can't speculate why he's on his

13:38:17   8   phone.  I don't know.

13:38:17   9          Q.   Would that be something that's a

13:38:19  10   threatening motion made?

13:38:21  11          A.   No.

13:38:21  12          Q.   For a police officer, if somebody was

13:38:24  13   on their phone?

13:38:25  14          A.   No.

13:38:32  15          Q.   Okay.  Now, when initial contact is

13:38:33  16   made between a police officer and this individual,

13:38:35  17   would you have to do some sort of a visual

13:38:37  18   assessment?

13:38:38  19          A.   Can you explain that?

13:38:39  20          MS. HUGGINS:  Form.

13:38:40  21          BY MR. DAVENPORT:

13:38:40  22          Q.   Well, you -- you were saying that

13:38:41  23   contact has been made between the police officer

13:38:43   1  and this individual.

13:38:46   2         What would be the next steps after that

13:38:47   3  contact is made in this situation?

13:38:50   4         MS. HUGGINS:   Form.   Are you asking what

13:38:52   5  happened or procedure?

13:38:53   6         MR. DAVENPORT:   Procedure.

13:38:54   7         MS. HUGGINS:   Form.

13:38:55   8         THE WITNESS:   That can be dictated by other

13:39:00   9  variables.   I don't know what is about to be said

13:39:04  10  or what the subject does or acts out.

13:39:10  11         BY MR. DAVENPORT:

13:39:10  12         Q.   Okay.   So let's say in this situation,

13:39:15  13  an individual is on their cell phone and contact

13:39:19  14  has been made between the police officer and this

13:39:22  15  individual.

13:39:22  16         What should the next steps be in this

13:39:25  17  situation, knowing that some individual has been

13:39:30  18  contacted by a police vehicle?

13:39:31  19         MS. HUGGINS:   Form.

13:39:33  20         THE WITNESS:   Well, I'm confused if you're

13:39:38  21  asking about two different things.   About the --

13:39:42  22  the officers with the subject who --

13:39:47  23         BY MR. DAVENPORT:

13:39:47  1          Q.    Oh, no.   I'm --

13:39:49  2          A.    -- was contacted by the police vehicle

13:39:51  3    or -- or the subject that was contacted by this

13:39:53  4    officer.   What are you -- what are you talking

13:39:55  5    about?   Which one?

13:39:57  6          Q.    So I'm not talking about the individual

13:39:58  7    that was contacted by the police vehicle.   We were

13:40:01  8    talking about the contact that is made between the

13:40:03  9    individual who is on his phone and the individual --

13:40:06 10    the police officer who was out in the street.

13:40:09 11          What I want to know is --

13:40:10 12          A.    Yeah.   There's --

13:40:11 13          Q.    -- in this situation, you know, what --

13:40:12 14    what should he be doing if an individual is on his

13:40:15 15    phone after somebody, possibly his father, has been

13:40:18 16    struck by a police vehicle?

13:40:19 17          MS. HUGGINS:   Form.

13:40:19 18          THE WITNESS:   There's -- there's no written

13:40:21 19    procedure.   You can speak to him and leave.   You

13:40:25 20    can speak to him and stay.   You can -- I don't know

13:40:28 21    what they're talking about.

13:40:30 22          BY MR. DAVENPORT:

13:40:31 23          Q.    Okay.   Well, would there be any reason

| | | |
|---|---|---|
| 13:40:33 | 1 | to take that cell phone from that individual? |
| 13:40:35 | 2 | MS. HUGGINS:  Form. |
| 13:40:37 | 3 | THE WITNESS:  It -- it -- no, not right now. |
| 13:40:42 | 4 | BY MR. DAVENPORT: |
| 13:40:43 | 5 | Q.   Okay.  Would there be any reason -- |
| 13:40:49 | 6 | well, we'll keep on watching. |
| 13:40:56 | 7 | So now an individual -- this individual is, |
| 13:41:00 | 8 | would you agree, walking away from the police |
| 13:41:03 | 9 | officer that first made contact with him? |
| 13:41:05 | 10 | A.   Mm-hmm.  I'm sorry.  Yes. |
| 13:41:08 | 11 | Q.   And would you agree that he is still on |
| 13:41:10 | 12 | his cell phone at this point? |
| 13:41:13 | 13 | A.   Yes. |
| 13:41:13 | 14 | Q.   Okay.  Now, what reasons would the |
| 13:41:15 | 15 | police officer have to go to that individual while |
| 13:41:19 | 16 | he's on his cell phone? |
| 13:41:21 | 17 | MS. HUGGINS:  Form. |
| 13:41:23 | 18 | THE WITNESS:  I can't -- |
| 13:41:23 | 19 | MS. HUGGINS:  Calls for speculation. |
| 13:41:25 | 20 | THE WITNESS:  Yeah.  I can't speculate |
| 13:41:25 | 21 | for -- and that's -- |
| 13:41:25 | 22 | BY MR. DAVENPORT: |
| 13:41:25 | 23 | Q.   Well, you were there. |

13:41:25  1          A.    That's --

13:41:26  2          Q.    You were there.

13:41:26  3          A.    Well, let me -- let me talk.

13:41:28  4          MS. HUGGINS:   Form.

13:41:29  5          THE WITNESS:   I can't speculate for what

13:41:33  6    Karl's doing, but you can, in many scenarios, when

13:41:37  7    someone's walking away, detain them for whatever

13:41:41  8    reason.   Whatever reason is -- is legal in that

13:41:44  9    moment.

13:41:46 10          And for you to say that I was there, I wasn't.

13:41:48 11    I was over at a totally different vehicle.

13:41:50 12          BY MR. DAVENPORT:

13:41:50 13          Q.    Okay.

13:41:50 14          A.    So I don't know what they were talking

13:41:52 15    about.   That's speculation.

13:41:53 16          Q.    Okay.   So now this individual is

13:41:55 17    walking away from Karl Schultz, and Karl Schultz is

13:41:58 18    walking towards him.   I mean, this guy's still on

13:42:02 19    his cell phone, correct?

13:42:03 20          What -- what possible things could he have

13:42:04 21    said where Karl Schultz would still be following

13:42:06 22    after him?

13:42:07 23          MS. HUGGINS:   Form.   There's a lot of

13:42:09   1   foundational problems with that question.  It's

13:42:11   2   compound.  It's --

13:42:11   3        MR. DAVENPORT:  It's a deposition.  He can

13:42:13   4   answer the question.

13:42:14   5        You can -- you can move to strike it if you

13:42:16   6   would like, but he can answer the question.

13:42:18   7        MS. HUGGINS:  You have to ask -- ask proper

13:42:19   8   questions.

13:42:19   9        MR. DAVENPORT:  It's a proper question.

13:42:21  10        I'm asking -- he's on his cell phone.  He's

13:42:23  11   walking away from Karl Schultz.  What possible

13:42:26  12   things could he have said that would need Karl

13:42:29  13   Schultz to keep on walking after him?

13:42:31  14        MS. HUGGINS:  Form.  It calls for

13:42:32  15   speculation, and it's a compound question.

13:42:33  16        MR. DAVENPORT:  I'm just asking what things

13:42:35  17   could have possibly been said.  He can answer the

13:42:37  18   question.

13:42:38  19        THE WITNESS:  I would still defer to Karl

13:42:40  20   Schultz.  I -- I don't know --

13:42:40  21        BY MR. DAVENPORT:

13:42:40  22    Q.   Would there be any reason --

13:42:43  23    A.   -- what was said.

13:42:44  1       Q.    -- why you would go?

13:42:45  2       **MS. HUGGINS:**  Allow him to finish an answer.

13:42:48  3       **THE WITNESS:**  I don't know what was said.

13:42:53  4       In many different scenarios I've just let

13:42:57  5 people walk away.  In other scenarios I've kept

13:43:00  6 them on scene.

13:43:01  7       I don't know.  I don't know -- I don't know

13:43:01  8 what was said during the interaction between Karl

13:43:05  9 and the subject, so I don't know.

13:43:08 10       **BY MR. DAVENPORT:**

13:43:08 11       Q.   Now, situations where you have kept the

13:43:10 12 person on scene, what types of things did that

13:43:13 13 individual say?

13:43:14 14       **MS. HUGGINS:**  Form.

13:43:16 15       **THE WITNESS:**  They could say something

13:43:19 16 specific to the scene, and -- I don't know -- maybe

13:43:25 17 they -- they witnessed something and you need

13:43:28 18 a statement from them.

13:43:28 19       Maybe -- maybe they said something that

13:43:34 20 would elicit a disorderly conduct penal law charge

13:43:40 21 and get arrested.

13:43:41 22       You could -- you know, there's -- there's

13:43:43 23 many different things that someone would say where

13:43:45   1 | you would keep someone on scene and detain them and

13:43:49   2 | take it from there.

13:43:51   3 |       BY MR. DAVENPORT:

13:43:51   4 |       Q.   Now, assuming that this person said

13:43:54   5 | something about the scene that would have made them

13:43:57   6 | a witness, did anybody take a statement from him

13:44:02   7 | that day?

13:44:03   8 |       MS. HUGGINS:   Form.

13:44:04   9 |       THE WITNESS:   I never said that he was

13:44:05  10 | a witness.   I don't know if any statement was

13:44:09  11 | taken.   I would have deferred to the senior

13:44:11  12 | officers.

13:44:11  13 |       BY MR. DAVENPORT:

13:44:11  14 |       Q.   Okay.   Now, would you agree that the

13:44:22  15 | individual is now out of the scene and so is

13:44:25  16 | Officer Karl Schultz at this point?

13:44:28  17 |       A.   Yes.

13:44:28  18 |       Q.   Okay.   Where are you at this point?

13:44:29  19 |       A.   I'm in the lower right-hand corner of

13:44:32  20 | the video screen.

13:44:33  21 |       Q.   And what direction are you facing?

13:44:36  22 |       A.   East.

13:44:38  23 |       Q.   And east would be in the -- you were

| | | |
|---|---|---|
| 13:44:40 | 1 | facing the direction where that individual was, |
| 13:44:44 | 2 | correct? |
| 13:44:45 | 3 | A.   The subject with Karl, yes. |
| 13:44:48 | 4 | Q.   Okay.  Do you know how -- approximately |
| 13:44:53 | 5 | how far away from the subject you were? |
| 13:44:55 | 6 | A.   I -- I -- no, I don't. |
| 13:44:57 | 7 | Q.   Okay.  Now, at this point is Karl |
| 13:45:05 | 8 | Schultz leading the individual out -- back out into |
| 13:45:07 | 9 | the street? |
| 13:45:09 | 10 | A.   Yes. |
| 13:45:09 | 11 | Q.   Does it look like he's going out there |
| 13:45:11 | 12 | voluntarily, the individual? |
| 13:45:13 | 13 | A.   No.  It looks from -- from this camera, |
| 13:45:16 | 14 | he was being detained for some reason. |
| 13:45:19 | 15 | Q.   Okay.  Where were you at this time? |
| 13:45:23 | 16 | A.   On the left side of Karl. |
| 13:45:25 | 17 | Q.   Okay.  Were you facing the individual? |
| 13:45:28 | 18 | A.   Yeah.  And -- yeah.  Karl and the |
| 13:45:30 | 19 | individual, yeah. |
| 13:45:31 | 20 | Q.   Okay.  Now, where is the individual at |
| 13:45:41 | 21 | this time? |
| 13:45:41 | 22 | A.   Lower right. |
| 13:45:42 | 23 | Q.   Okay.  Is any officer touching the |

*Moriarity - Davenport - 2/21/20*

212

13:45:47  1 | individual?

13:45:48  2 |       **A.**    Yes.

13:45:49  3 |       **Q.**    And who is that individual?

13:45:50  4 |       **A.**    Karl Schultz.

13:45:51  5 |       **Q.**    And where are you at this time?

13:45:53  6 |       **A.**    On the same side.  The left side of

13:45:57  7 | Karl Schultz.

13:45:57  8 |       **Q.**    Okay.  And are you facing the

13:45:59  9 | individual?

13:46:00 10 |       **A.**    Yes.

13:46:01 11 |       **Q.**    Okay.  Has any pat-down been done of

13:46:03 12 | the individual at this point?

13:46:04 13 |       **A.**    Not yet.

13:46:05 14 |       **Q.**    Okay.  Has any pat-down been done of

13:46:14 15 | the individual at this point?

13:46:14 16 |       **A.**    You can't really see, but I don't -- I

13:46:17 17 | don't believe so.

13:46:18 18 |       **Q.**    Well, you told me that the pat-down

13:46:21 19 | would consist of patting down the pant legs,

13:46:23 20 | correct?

13:46:23 21 |       **A.**    Yeah.

13:46:23 22 |       **Q.**    Has any -- does it look like Karl

13:46:25 23 | Schultz has reached down at all, or does he still

Moriarity - Davenport - 2/21/20

213

13:46:28  1   have his hands up, near the individual's head?

13:46:30  2          MS. HUGGINS:   Form.

13:46:30  3          THE WITNESS:   This camera view, it looks

13:46:32  4   like they're still up, upper body.

13:46:34  5          BY MR. DAVENPORT:

13:46:34  6          Q.   Okay.   Now, what just happened there?

13:46:40  7          A.   A little bit of resistance.

13:46:45  8          Q.   So when you say there was a little bit

13:46:47  9   of resistance, by who?   The individual or the

13:46:49  10  police officer?

13:46:50  11         A.   It looks like the subject, but that

13:46:54  12  doesn't always mean anything.   It's an emotional

13:46:59  13  state.   People sometimes act on emotion and kind of

13:47:06  14  pull away and push off a cop and then -- and then

13:47:10  15  they calm down.

13:47:13  16         Q.   Now, where -- where are you at this

13:47:15  17  time?   Can you be seen in the camera?

13:47:18  18         A.   Can you start it over two seconds

13:47:20  19  before this so I can see exactly where I am?

13:47:23  20         Q.   Sure.   It might skip, so I might have

13:47:28  21  to go back again.

13:47:33  22         A.   It looks like I'm on the right side.

13:47:36  23         Q.   I'm sorry.   I'm sorry.   One second.

*Moriarity - Davenport - 2/21/20*

214

13:47:40  1         A.    Oh, sorry.

13:47:40  2         Q.    Okay.  All right.  So we have it the

13:47:42  3    two seconds before my previous question, so now my

13:47:44  4    question is:  From the time stamp 10:27:16, until

13:47:50  5    the time stamp 10:27:18, where we were previously

13:47:54  6    stopped, just kind of watch yourself, and tell me

13:47:57  7    where you're positioned at 10:27:18.

13:48:00  8         A.    Okay.

13:48:01  9         Q.    Or where -- you know, where you would

13:48:03 10    think that you are.

13:48:04 11         MS. HUGGINS:   Form.

13:48:07 12         THE WITNESS:   So I'm on the western side of

13:48:11 13    the subject that Karl made contact with, or he made

13:48:15 14    contact with Karl.

13:48:16 15         BY MR. DAVENPORT:

13:48:16 16         Q.    Okay.  So, now, when an individual

13:48:19 17    tries to struggle to get away from an officer or

13:48:22 18    there's some sort of resistance, did you receive

13:48:25 19    any training at that point on how to handle that

13:48:28 20    situation?

13:48:29 21         A.    Yeah.  There's like some -- they call

13:48:35 22    it verbal judo.  You just kind of talk and

13:48:38 23    deescalate situations.

13:48:40  1          Q.    But verbal, not physical?

13:48:42  2          A.    You can -- you can be physical to help

13:48:45  3    calm someone down, yeah, absolutely.

13:48:46  4          Q.    Was that part of your training?

13:48:51  5          A.    I don't remember if it was part of

13:48:53  6    academy or anything.

13:48:54  7          Q.    Okay.  At this point have you -- had

13:48:59  8    you encountered any individuals who had tried to

13:49:01  9    resist a police officer?

13:49:02 10          A.    Yeah.  Yeah.  This morning, on the

13:49:04 11    Sattler call.

13:49:05 12          Q.    Okay.  And what sort of resistance did

13:49:09 13    you encounter in that situation?

13:49:12 14          A.    Totally different scenario.  Someone

13:49:15 15    that was running from police.

13:49:17 16          Q.    And what -- what did you do in that

13:49:19 17    situation?

13:49:19 18          A.    I ran after him.

13:49:21 19          Q.    Okay.  Did you actually catch the

13:49:24 20    individual --

13:49:24 21          A.    I didn't.

13:49:25 22          Q.    -- that was trying to run away?

13:49:26 23          A.    I didn't.

13:49:26  1          MS. HUGGINS:  Form.  Asked and answered.

13:49:28  2          THE WITNESS:  I did not apprehend him, no.

13:49:30  3          BY MR. DAVENPORT:

13:49:30  4          Q.    Were you involved at all in trying to

13:49:33  5     keep the individual from resisting?

13:49:37  6          A.    The one from the Sattler call?

13:49:38  7          Q.    Sattler.

13:49:39  8          A.    No.

13:49:40  9          Q.    Okay.  So was that the only other time

13:49:42 10     that you had encountered somebody resisting being

13:49:46 11     detained by a police officer?

13:49:47 12          A.    At that -- at that time I don't

13:49:49 13     remember any other incidents before -- before this

13:49:56 14     where someone had resisted.  Very -- still very

13:50:01 15     new.

13:50:01 16          Q.    Okay.  Now, at this point we're at

13:50:08 17     10:27:21.  It's three seconds after you had been on

13:50:11 18     the right side of the individual.  Has there been

13:50:14 19     any pat-down that's been done of the subject?

13:50:18 20          A.    It didn't -- didn't look -- look like

13:50:20 21     it so far, no.

13:50:21 22          Q.    Okay.

13:50:34 23          A.    So he's emptying out his own pockets

*Moriarity - Davenport - 2/21/20*

217

13:50:37  1  right now.

13:50:37  2       Q.   Okay.  Why would he be emptying his

13:50:39  3  pockets?

13:50:41  4       A.   Discretion.  Maybe -- you know, I've

13:50:44  5  had people just empty out their pockets and pull up

13:50:47  6  their shirt to make sure they don't have anything

13:50:50  7  in their waistband.

13:50:51  8       I don't have to touch anybody if I don't

13:50:53  9  want to on a pat-down.  They can pat themselves

13:50:55  10  down, and I can see inside their pockets -- well,

13:50:58  11  not see inside their pockets, but they can print

13:51:01  12  their pockets, fine.

13:51:03  13       Q.   Okay.

13:51:03  14       A.   You know, I don't need to -- I don't

13:51:04  15  need to do it myself.

13:51:06  16       And he was willing to and then spoke to us.

13:51:08  17       Q.   If he was shaking his pockets, would

13:51:10  18  that count as a pat-down?

13:51:14  19       Would that be a proper pat-down?

13:51:16  20       MS. HUGGINS:   Form.

13:51:18  21       THE WITNESS:   I mean, if -- I guess if the

13:51:20  22  officer was satisfied with it.

13:51:23  23       BY MR. DAVENPORT:

13:51:23   1         Q.    So it would be officer discretion then?

13:51:25   2         A.    Yeah.

13:51:28   3         Q.    Now, at this point does it appear that

13:51:33   4    he's patting his pants or is he checking his coat?

13:51:38   5         A.    It looks like he could have been doing

13:51:40   6    something with his coat.  Maybe emptying out coat

13:51:42   7    pockets or something.  I don't --

13:51:43   8         Q.    Okay.

13:51:44   9         A.    I don't know.  Or I'm sorry.  I don't

13:51:46  10    remember.

13:51:46  11         Q.    It looks like he pulled something out

13:51:50  12    of his coat pocket.  Do you know what that would

13:51:52  13    be?

13:51:52  14         A.    I -- no.  I don't remember.

13:51:53  15         Q.    Okay.  In this situation, what would

13:51:55  16    you expect him to pull out of his pockets?

13:51:57  17         MS. HUGGINS:   Form.

13:51:58  18         THE WITNESS:   I don't remember if anyone

13:52:01  19    asked him to go in his pockets or to get anything

13:52:06  20    out of his pockets.

13:52:07  21         BY MR. DAVENPORT:

13:52:07  22         Q.    Okay.

13:52:10  23         A.    Just because of the fact that I was so

13:52:13   1  brand new, I don't know.

13:52:14   2       Q.   Sure.

13:52:15   3       Would it be proper to ask this person for

13:52:18   4  an identification in this situation?

13:52:20   5       A.   I mean, it -- it -- it falls back on

13:52:22   6  officer discretion.  I think that if someone

13:52:27   7  said -- let's say in this example he did, and, of

13:52:30   8  course, I don't want to speculate -- if he was

13:52:31   9  like, that's my dad, then I can just ask someone

13:52:35  10  their name, and I could be okay with that, and then

13:52:39  11  other cops would still want to see an ID.

13:52:42  12       Q.   Okay.

13:52:46  13       A.   Or maybe what -- whatever he pulled out

13:52:48  14  of his pockets was an ID.  I don't -- I don't know.

13:52:50  15       Q.   Okay.  Did he pat down his pants at all

13:52:52  16  during that exchange?

13:52:54  17       A.   Yeah.  There was a few seconds prior to

13:52:57  18  this that you showed where he was doing stuff with

13:53:00  19  his pants.

13:53:01  20       MR. DAVENPORT:  Okay.  We'll watch it again.

13:53:01  21       (Video clip played.)

13:53:01  22       BY MR. DAVENPORT:

13:53:19  23       Q.   Did you notice him pat his pants at any

*Moriarity - Davenport - 2/21/20*

13:53:21  1   point?

13:53:22  2        A.   Yeah.   You've just got to rewind it

13:53:25  3   further, because he did it on camera.

13:53:27  4        Q.   Okay.   So it would have been before the

13:53:28  5   point that I went back to?

13:53:31  6        THE WITNESS:   Yeah.

13:53:31  7        (Video clip played.)

13:53:37  8        BY MR. DAVENPORT:

13:53:37  9        Q.   Now, I just want you to focus on any

13:53:39  10  time that he patted his pants, and then I would ask

13:53:41  11  you to please tell me to stop.

13:53:42  12       MS. HUGGINS:   Form.

13:53:43  13       THE WITNESS:   So right there.

13:53:44  14       BY MR. DAVENPORT:

13:53:44  15       Q.   He's patting his pants at that point?

13:53:45  16       A.   Well, he's already on to his coat, but

13:53:49  17  it looked like he was patting his pants down real

13:53:51  18  quick.

13:53:54  19       Q.   Did he pat his pants at any point

13:53:56  20  during that?

13:53:57  21       A.   No.   No.   That was his coat.

13:54:16  22       Q.   Okay.   Now, during a pat-down, would

13:54:19  23  you expect somebody to reach down towards their

13:54:21   1   ankles to show that they don't have a weapon in

13:54:23   2   their sock or shoe?

13:54:24   3          MS. HUGGINS:   Form.

13:54:26   4          THE WITNESS:   That's discretion.

13:54:27   5          BY MR. DAVENPORT:

13:54:28   6          Q.   What would be proper for a pat-down?

13:54:29   7          MS. HUGGINS:   Form.

13:54:29   8          THE WITNESS:   Again, that's -- that's

13:54:32   9   discretion.   I've -- I've given full pat-downs

13:54:35  10   before and -- and I went from their sleeves, all

13:54:39  11   the way down to their ankles, and then other times

13:54:42  12   I've had someone lift up their shirt to make sure

13:54:46  13   they didn't have a gun in their waistband and left

13:54:49  14   it as that.

13:54:49  15          BY MR. DAVENPORT:

13:54:49  16          Q.   Okay.

13:54:50  17          A.   So it all falls on discretion.

13:54:52  18          Q.   Okay.   How many times have you allowed

13:54:53  19   the individual to pat themselves down, as opposed

13:54:56  20   to you doing that pat-down?

13:54:57  21          MS. HUGGINS:   Form.

13:54:57  22          THE WITNESS:   I don't know specifics.

13:54:59  23          MR. DAVENPORT:   I would ask also what's the

*Moriarity - Davenport - 2/21/20*

222

| | | |
|---|---|---|
| 13:55:01 | 1 | form objection there? |
| 13:55:02 | 2 | MS. HUGGINS:  How many times have you asked |
| 13:55:03 | 3 | a person to pat down themselves before you doing |
| 13:55:06 | 4 | it? |
| 13:55:08 | 5 | MR. DAVENPORT:  I don't think that was the |
| 13:55:09 | 6 | question. |
| 13:55:09 | 7 | MS. HUGGINS:  We can read back the question. |
| 13:55:11 | 8 | MR. DAVENPORT:  Yes, please. |
| 13:55:11 | 9 | (The above-requested portion was then read |
| 13:55:32 | 10 | by the reporter.) |
| 13:55:32 | 11 | MS. HUGGINS:  It's the use of the term |
| 13:55:33 | 12 | pat-down. |
| 13:55:34 | 13 | MR. DAVENPORT:  Okay.  You can answer. |
| 13:55:34 | 14 | THE WITNESS:  Yeah, I wouldn't have |
| 13:55:38 | 15 | a specific number on that. |
| 13:55:39 | 16 | BY MR. DAVENPORT: |
| 13:55:40 | 17 | Q.    But you have done that before? |
| 13:55:43 | 18 | A.    Yeah. |
| 13:55:44 | 19 | Q.    Okay.  Now, at this point it appears |
| 13:56:00 | 20 | that you are no longer in the camera view and |
| 13:56:02 | 21 | Officer Schultz is no longer in the camera view, |
| 13:56:05 | 22 | but the individual's still standing in the street. |
| 13:56:08 | 23 | What would have been done -- what was being |

13:56:11   1   done at this point?

13:56:15   2           A.    I don't remember.   I would -- I would

13:56:17   3   defer to Karl on that.

13:56:18   4           Q.    Okay.   Why would you go back to the

13:56:21   5   police vehicle at that point?

13:56:23   6           A.    I was probably following Karl around

13:56:25   7   and shadowing him.

13:56:34   8           Q.    Okay.

13:56:42   9           A.    So in the lower -- lower right.

13:56:53  10           Q.    Now, at this point it appears that Karl

13:56:56  11   is radioing in.   Would you agree to that?

13:56:58  12           A.    Yes.

13:56:59  13           Q.    Do you know what he was radioing in?

13:57:01  14           A.    I don't.   I don't remember.

13:57:02  15           Q.    What would he possibly be radioing in

13:57:04  16   at that point?

13:57:05  17           MS. HUGGINS:   Form.

13:57:09  18           THE WITNESS:   I don't -- I actually don't

13:57:12  19   recall.   I don't know -- I don't know.   I mean,

13:57:16  20   I -- I did hear the -- the radio things over the

13:57:19  21   radio, but I didn't -- I don't know what he was

13:57:22  22   calling in right now.

13:57:30  23           BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

224

13:57:30  1          Q.   Okay.  Did you have access to a radio

13:57:35  2   at this point?

13:57:35  3          A.   I did have access to a radio, yeah.

13:57:37  4          Q.   Okay.

13:57:38  5          A.   I didn't -- I didn't use it.

13:57:39  6          Q.   What situations would you have used

13:57:43  7   that radio?

13:57:43  8          MS. HUGGINS:   Form.

13:57:44  9          THE WITNESS:   At -- at this point in time,

13:57:47 10   I probably -- and, again, I -- I don't remember in

13:57:55 11   total.  I probably wasn't on the radio at all

13:57:57 12   because I was so brand new.

13:57:59 13          This -- this would have been Karl on the

13:58:01 14   radio, and I think I just started driving.

13:58:08 15          BY MR. DAVENPORT:

13:58:08 16          Q.   Okay.  Now, it appears at this point

13:58:39 17   that you're just walking around.  Would there have

13:58:44 18   been anything that you would have had to do in this

13:58:48 19   situation?

13:58:48 20          Was -- were you receiving any directions

13:58:49 21   from any of the other officers?

13:58:51 22          A.   I don't -- I don't think so.

13:58:53 23          Q.   Okay.  Why would that individual still

*Moriarity - Davenport - 2/21/20*

225

| | | |
|---|---|---|
| 13:59:01 | 1 | be in the street at this point? |
| 13:59:06 | 2 | MS. HUGGINS: Form. |
| 13:59:06 | 3 | THE WITNESS: Honestly, I don't -- I don't |
| 13:59:09 | 4 | know.  I'm sorry.  I don't remember. |
| 13:59:12 | 5 | MR. DAVENPORT: Okay. |
| 13:59:19 | 6 | THE VIDEOGRAPHER: Mr. Davenport, for the |
| 13:59:20 | 7 | purposes of the media, could we take a quick |
| 13:59:22 | 8 | off-the-record break and -- |
| 13:59:22 | 9 | MR. DAVENPORT: Yes, we can. |
| 13:59:23 | 10 | THE VIDEOGRAPHER:  -- then start back up? |
| 13:59:24 | 11 | MR. DAVENPORT: Yes, we can. |
| 13:59:28 | 12 | THE VIDEOGRAPHER: Okay. |
| 13:59:28 | 13 | (A recess was then taken at 1:59 p.m.) |
| 13:59:28 | 14 | (On the record at 2:01 p.m.) |
| 14:02:18 | 15 | (Video clip played.) |
| 14:02:18 | 16 | BY MR. DAVENPORT: |
| 14:02:19 | 17 | Q.   Now, at this point it's 10:25:48.  The |
| 14:02:21 | 18 | police vehicle has just stopped, and it appears |
| 14:02:24 | 19 | that the person on the passenger side door has |
| 14:02:27 | 20 | opened the door.  Would you agree with that? |
| 14:02:29 | 21 | A.   Yeah.  It -- it looks that way through |
| 14:02:31 | 22 | the trees. |
| 14:02:32 | 23 | Q.   Okay.  So now you -- it appears that |

Moriarity - Davenport - 2/21/20

226

| | | |
|---|---|---|
| 14:02:37 | 1 | you and Officer Schultz have exited the vehicle? |
| 14:02:41 | 2 | A.   Yes. |
| 14:02:43 | 3 | Q.   It -- |
| 14:02:44 | 4 | A.   I'm sorry. |
| 14:02:44 | 5 | Q.   No.   I'm sorry. |
| 14:02:45 | 6 | And the time is 10:25:51.  I'm not asking |
| 14:02:48 | 7 | you to verify the accuracy of it, just whether you |
| 14:02:52 | 8 | see 10:25:51 on the screen. |
| 14:02:54 | 9 | A.   Oh, yeah. |
| 14:02:57 | 10 | Q.   Okay.   Thank you. |
| 14:03:10 | 11 | Do you know what that car -- the beige car |
| 14:03:37 | 12 | or gray car that was there? |
| 14:03:38 | 13 | A.   No. |
| 14:03:39 | 14 | Q.   Okay.   Now, the subject that we were |
| 14:04:03 | 15 | referring to before who was on his cell phone, does |
| 14:04:07 | 16 | he appear in the screen at 10:26:42? |
| 14:04:11 | 17 | A.   Yes. |
| 14:04:11 | 18 | Q.   Okay.   Once again, not asking you to |
| 14:04:13 | 19 | verify the accuracy, just what time you see on the |
| 14:04:16 | 20 | screen. |
| 14:04:23 | 21 | So now at this point, do you see the subject |
| 14:04:30 | 22 | who was struck by the car walking back towards your |
| 14:04:33 | 23 | police vehicle? |

14:04:36  1          A.    The subject, yeah, that threw himself

14:04:39  2    on the car and the officer's walking him back,

14:04:42  3    yeah.

14:04:44  4          Q.    Now, when you say, threw himself at the

14:04:46  5    car, is that based on what you remember or based on

14:04:49  6    what you saw on the video?

14:04:50  7          A.    No.   That's based off what I remember

14:04:52  8    seeing.

14:04:53  9          Q.    Okay.   What about based off of what you

14:04:56 10    see in the video, what do you think?

14:04:57 11          MS. HUGGINS:   Form.

14:04:58 12          THE WITNESS:   Based on what I see in the

14:04:59 13    video, it's a different perspective than what I saw

14:05:02 14    in real life.

14:05:03 15          BY MR. DAVENPORT:

14:05:03 16          Q.    Okay.   Now, at 10:27:00, we see an

14:05:21 17    officer that's walking towards the sidewalk; is

14:05:23 18    that correct?

14:05:23 19          A.    Yeah.   Yes.

14:05:24 20          Q.    Do you know who that officer was?

14:05:28 21          A.    Karl Schultz.

14:05:29 22          Q.    Okay.   Now, at 10:27:04, we see the

14:05:39 23    individual.   Is he facing Karl Schultz?

*Moriarity - Davenport - 2/21/20*

228

14:05:43  1          A.    In a bladed stance, yeah.

14:05:46  2          Q.    What do you mean by a bladed stance?

14:05:48  3          A.    It looks like his feet are facing

14:05:50  4    north, but his upper body is facing Karl, which is

14:05:53  5    west.

14:05:55  6          Q.    Okay.  I just want to rewind.

14:05:57  7          A.    It looks like that.

14:05:59  8          Q.    Okay.  Okay.  Now, immediately before

14:06:16  9    this 10:27 time stamp, did you see Karl Schultz

14:06:19 10    make any sort of gestures?

14:06:21 11          And I'll replay it.

14:06:23 12          A.    Yeah.  Can you go -- can you go back,

14:06:24 13    please?

14:06:24 14          Q.    Yeah.

14:06:28 15          THE WITNESS:  Thank you.

14:06:28 16          (Video clip played.)

14:06:41 17          THE WITNESS:  He did something with his left

14:06:42 18    hand.

14:06:43 19          BY MR. DAVENPORT:

14:06:43 20          Q.    Could you tell what that was?

14:06:46 21          A.    Not -- not with this camera, no.

14:06:48 22          Q.    Did it look like he was motioning for

14:06:50 23    someone to come towards him?

14:06:54   1          A.    Either that or he was gesturing

14:06:56   2    towards -- towards someone.

14:06:57   3          Q.    Okay.   Did he make that same gesture

14:07:01   4    again?

14:07:02   5          A.    Yeah.   Yes.   I'm sorry.

14:07:10   6          Q.    Okay.   Now, at this point, where is the

14:07:14   7    subject's right hand?

14:07:16   8          MS. HUGGINS:   Form.

14:07:16   9          THE WITNESS:   Up by his face.

14:07:18   10          BY MR. DAVENPORT:

14:07:18   11          Q.    Okay.   Does it appear that it's on the

14:07:22   12    side of his face?   In front of his face?

14:07:24   13          A.    The side of his face.

14:07:26   14          Q.    Okay.   Why do you think his hand would

14:07:28   15    be on the side of his face?

14:07:29   16          MS. HUGGINS:   Form.

14:07:31   17          THE WITNESS:   As we discussed earlier, it

14:07:32   18    appeared as though he was on his phone.

14:07:34   19          BY MR. DAVENPORT:

14:07:34   20          Q.    Okay.   So now the individual's still on

14:07:38   21    his phone, correct?

14:07:40   22          A.    Yes.

14:07:40   23          Q.    And did the officer make contact --

*Moriarity - Davenport - 2/21/20*

230

14:07:44  1  physical contact with the subject?

14:07:46  2        A.   It -- you can't tell, but it looks as

14:07:51  3  though, with Karl's right arm, he might have made

14:07:55  4  contact with the left side of the subject's body.

14:07:57  5        Q.   Okay.  I'll just play it in one

14:08:00  6  continuous motion so that way hopefully you can see

14:08:03  7  that a little bit better.

14:08:04  8        MS. HUGGINS:  Do you want to even go back

14:08:06  9  like one more second?

14:08:09 10        MR. DAVENPORT:  Yeah.

14:08:10 11        MS. HUGGINS:  I don't want it to skip.

14:08:10 12        (Video clip played.)

14:08:24 13        BY MR. DAVENPORT:

14:08:24 14        Q.   So now did you see the subject also

14:08:26 15  raise his left arm?

14:08:27 16        A.   I did.

14:08:28 17        Q.   What did it look like he was doing?

14:08:31 18        A.   I -- I -- I don't know what they

14:08:33 19  were -- I'm sorry -- I don't remember what they

14:08:35 20  were talking about, so I don't -- I don't know what

14:08:39 21  he was doing.

14:08:39 22        Q.   Someone --

14:08:40 23        A.   I just came around from the other side

*Moriarity - Davenport - 2/21/20*

231

14:08:42  1  of the vehicle, as we just watched, so I don't know

14:08:44  2  what is taking place between the officer and the

14:08:49  3  subject.

14:08:49  4       Q.   So, now, when somebody raises their

14:08:51  5  left hand, as the subject did, and then they start

14:08:55  6  walking away from the officer, what would that say

14:08:57  7  to you?

14:08:57  8       **MS. HUGGINS:**   Form.

14:08:58  9       **THE WITNESS:**   I -- it could mean a whole

14:09:00  10  bunch of things, and I don't know because, you

14:09:04  11  know -- and I can't even tell what I'm looking at,

14:09:07  12  you know, behind -- behind the tree.

14:09:08  13       Maybe I'm talking to, you know, Lauren.

14:09:10  14  Maybe I'm saying something to Lauren.  Because I'm

14:09:13  15  still bladed south, so I -- I don't know exactly

14:09:16  16  what they were talking about, and I -- and I --

14:09:18  17  maybe I didn't even see him, you know, raise his

14:09:22  18  left hand, and maybe I didn't see Karl make the

14:09:24  19  motions with -- with his hands.  I don't know

14:09:26  20  what's going on there.

14:09:27  21       **BY MR. DAVENPORT:**

14:09:27  22       Q.   Sure.   No.   And I'm -- I'm sorry,

14:09:29  23  Officer Moriarity.   I'm not talking about what you

*Moriarity - Davenport - 2/21/20*

232

14:09:32   1  saw.

14:09:32   2       A.    Okay.

14:09:32   3       Q.    I'm just merely talking about what you

14:09:34   4  are seeing currently in the video.  I understand

14:09:36   5  that on the day of the incident, you may have not

14:09:38   6  have seen every event that unfolded.  I'm just

14:09:41   7  merely asking your opinion on what you just saw

14:09:43   8  between the subject and Officer Schultz.

14:09:44   9       MS. HUGGINS:   Form.

14:09:44  10       THE WITNESS:   Yeah, I mean, I -- I don't --

14:09:46  11  I don't know what that hand motion could have been.

14:09:49  12       BY MR. DAVENPORT:

14:09:49  13       Q.    Okay.  But he did raise out his left

14:09:52  14  arm and then walk away from Officer Schultz,

14:09:55  15  correct?

14:09:55  16       A.    Yes, he definitely did do that.

14:09:57  17       Q.    Okay.  So, now, did you see that

14:10:01  18  contact was made between Officer Schultz and the

14:10:04  19  individual?

14:10:04  20       A.    Yes, I did.

14:10:05  21       Q.    Physical contact.

14:10:08  22       I'm sorry, Officer Moriarity.

14:10:08  23       A.    Yes.

*Moriarity - Davenport - 2/21/20*

233

| | | |
|---|---|---|
| 14:10:09 | 1 | Q. Physical contact? |
| 14:10:10 | 2 | A. Yeah. Yeah. |
| 14:10:13 | 3 | Q. Okay. Now, at this point, |
| 14:10:14 | 4 | Officer Schultz is bringing the individual |
| 14:10:16 | 5 | out, back towards the street, correct? |
| 14:10:19 | 6 | A. Yes. |
| 14:10:19 | 7 | Q. And where are you at that point? |
| 14:10:21 | 8 | A. Right in front of him. |
| 14:10:22 | 9 | Q. Right in front of him? Okay. |
| 14:10:24 | 10 | Are you facing the -- the subject? |
| 14:10:25 | 11 | A. I am. |
| 14:10:26 | 12 | Q. Okay. Now, at this point does it |
| 14:10:32 | 13 | appear that the individual still had his right arm |
| 14:10:36 | 14 | up near his face? |
| 14:10:37 | 15 | And I'll rewind it a little bit just so we |
| 14:10:40 | 16 | can see it again. |
| 14:10:41 | 17 | A. Correct, he does. |
| 14:10:41 | 18 | Q. Okay. |
| 14:10:46 | 19 | A. Excuse me. |
| 14:10:56 | 20 | Q. So now I just want you to pay attention |
| 14:10:59 | 21 | and see, did that individual ever take his right |
| 14:11:01 | 22 | arm away from the side of his face? |
| 14:11:03 | 23 | A. No. |

*Moriarity - Davenport - 2/21/20*

234

14:11:03   1          Q.   Okay.  And what would that lead you to

14:11:06   2   believe?

14:11:06   3          MS. HUGGINS:  Form.

14:11:06   4          THE WITNESS:  He -- he could still be on his

14:11:08   5   phone.

14:11:15   6          BY MR. DAVENPORT:

14:11:15   7          Q.   Okay.  Now, did you see Officer Schultz

14:11:17   8   grab something from the individual?

14:11:20   9          And I can replay it.

14:11:22  10          A.   Yeah, could you, please?  Thank you.

14:11:26  11          MR. DAVENPORT:  Sure.

14:11:26  12          (Video clip played.)

14:11:26  13          BY MR. DAVENPORT:

14:11:44  14          Q.   Did it appear that he grabbed something

14:11:46  15   out of the individual's right hand?

14:11:48  16          A.   It looked that way.

14:11:50  17          Q.   Okay.  What do you think he grabbed?

14:11:52  18          A.   He could have grabbed his phone.

14:11:54  19          MS. HUGGINS:  Form.

14:11:55  20          BY MR. DAVENPORT:

14:11:56  21          Q.   Where are you facing at that time?

14:11:57  22          A.   It looks like I'm facing them.

14:11:59  23          Q.   So you would assume that you probably

14:12:00   1 | saw that?

14:12:01   2 |          MS. HUGGINS:   Form.

14:12:01   3 |          THE WITNESS:   Yeah.   I mean, I -- I -- yeah.

14:12:09   4 | BY MR. DAVENPORT:

14:12:09   5 |          Q.   Okay.   So what did you just see right

14:12:11   6 | there?

14:12:11   7 |          A.   I don't know what I just -- I don't --

14:12:13   8 | it looked like he pulled away and resisted whatever

14:12:19   9 | Karl was doing.

14:12:22  10 |          Q.   Did it look like it needed two officers

14:12:25  11 | to keep that subject under control?

14:12:28  12 |          A.   I would -- I would think so, yeah.

14:12:29  13 |          Q.   Is that something that's typically done

14:12:32  14 | is two officers --

14:12:33  15 |          A.   Yes.

14:12:33  16 |          Q.   -- to keep someone under control?

14:12:37  17 |          MS. HUGGINS:   Form.

14:12:44  18 | BY MR. DAVENPORT:

14:12:44  19 |          Q.   Now, we talked about verbal cues before

14:12:46  20 | as something that was part of your training.   When

14:12:48  21 | would it be appropriate to use verbal cues as

14:12:51  22 | opposed to physical cues to subdue somebody who is

14:12:54  23 | trying to resist detainment?

*Moriarity - Davenport - 2/21/20*

14:12:56  1          A.    It all depends on --

14:12:56  2          MS. HUGGINS:    Form.

14:12:58  3          THE WITNESS:   -- the actions of the person.

14:13:00  4          BY MR. DAVENPORT:

14:13:00  5          Q.    What actions that you see in this video

14:13:02  6    would lead you to believe that physical methods

14:13:06  7    rather than verbal methods should have been used

14:13:08  8    for that individual?

14:13:09  9          A.    Right now it's verbal, and then if you

14:13:13 10    press play, right now.

14:13:16 11          Q.    And what -- what leads you to believe

14:13:18 12    that physical --

14:13:20 13          A.    He did a pushing off or a jerking

14:13:23 14    motion from Karl when Karl was trying to talk to

14:13:26 15    him and continue whatever contact he was originally

14:13:31 16    trying to make with him in -- in -- in detainment.

14:13:36 17    In a form of detainment.

14:13:38 18          Q.    Now, who pushed away first?  Was it the

14:13:41 19    subject?

14:13:41 20          A.    It appeared that way, yeah.

14:13:43 21          Q.    Okay.  We'll watch it again.

14:14:01 22          At what point --

14:14:02 23          A.    Yeah.

*Moriarity - Davenport - 2/21/20*

237

| | | |
|---|---|---|
| 14:14:02 | 1 | Q. -- did he -- |
| 14:14:02 | 2 | A. Right -- |
| 14:14:04 | 3 | Q. -- push -- |
| 14:14:04 | 4 | A. Right -- |
| 14:14:04 | 5 | Q. -- away? |
| 14:14:04 | 6 | A. Right before -- right before he turned |
| 14:14:06 | 7 | to face Karl, he pushed. He pushed away. |
| 14:14:10 | 8 | Q. Did he extend his arm? |
| 14:14:11 | 9 | A. You don't need to extend your arm. You |
| 14:14:12 | 10 | can keep your arm close to your body and -- and use |
| 14:14:15 | 11 | your legs to power away. |
| 14:14:17 | 12 | Q. So it wouldn't have necessarily been |
| 14:14:19 | 13 | a push with the arms. He was just trying to escape |
| 14:14:21 | 14 | the officer's grasp? Would that be a more fair |
| 14:14:25 | 15 | characterization? |
| 14:14:26 | 16 | MS. HUGGINS: Form. |
| 14:14:26 | 17 | THE WITNESS: I don't know if he was trying |
| 14:14:27 | 18 | to escape the officer's grasp. He was in an |
| 14:14:32 | 19 | emotional state, as per the video. |
| 14:14:37 | 20 | People -- people react in certain ways. |
| 14:14:41 | 21 | And after this, he was fine, from what the video |
| 14:14:44 | 22 | showed. |
| 14:14:44 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

238

| | | |
|---|---|---|
| 14:14:44 | 1 | Q.   But I guess did he ever use his legs to |
| 14:14:46 | 2 | try to push away from the officer? |
| 14:14:48 | 3 | A.   Play it again, please. |
| 14:14:52 | 4 | Q.   Yeah. |
| 14:14:53 | 5 | I guess a couple of quick questions while |
| 14:16:05 | 6 | we're waiting for this to load up. |
| 14:16:07 | 7 | Do you receive an hourly wage, or are you |
| 14:16:09 | 8 | salaried? |
| 14:16:10 | 9 | A.   Salaried. |
| 14:16:11 | 10 | Q.   You're salaried? |
| 14:16:13 | 11 | A.   Yeah. |
| 14:16:13 | 12 | Q.   Okay.  Do you have to hit a certain |
| 14:16:16 | 13 | number of hours to receive your salary for a week? |
| 14:16:18 | 14 | A.   40. |
| 14:16:19 | 15 | Q.   Okay.  Do you receive any overtime |
| 14:16:22 | 16 | beyond what your salary is? |
| 14:16:24 | 17 | A.   If I choose to take it, yeah. |
| 14:16:25 | 18 | Q.   Okay.  And how is your overtime rate |
| 14:16:28 | 19 | determined? |
| 14:16:29 | 20 | A.   Time and a half. |
| 14:16:31 | 21 | Q.   Time and -- so how do you determine |
| 14:16:34 | 22 | what time and a half is if you're not paid hourly? |
| 14:16:38 | 23 | MS. HUGGINS:  Form. |

Moriarity - Davenport - 2/21/20

14:16:38  1        THE WITNESS:  Yeah.  That's broken down by

14:16:45  2   payroll.  I mean, yeah, there -- there's an hourly

14:16:47  3   rate, but I make -- I made -- at the time, I think

14:16:51  4   it was forty-three seven.

14:16:55  5        BY MR. DAVENPORT:

14:16:55  6        Q.   Okay.  So were you salaried at that

14:16:57  7   time as well?

14:16:58  8        A.   Yeah.

14:16:59  9        Q.   Okay.  Are all officers salaried

14:17:01 10   workers or are some of them hourly?

14:17:03 11        A.   No.  It's all salary.

14:17:04 12        Q.   It is all salary?  Okay.

14:17:07 13        So, now, just so that way we can go back to

14:17:16 14   what we were trying to look at before, I just want

14:17:19 15   you to focus on whether the subject ever extends

14:17:22 16   his arm or uses his legs in any sort of fashion

14:17:24 17   that would lead you to believe that he's trying to

14:17:27 18   push away from Officer Karl Schultz.

14:17:28 19        MS. HUGGINS:  If it's possible, can you go

14:17:30 20   back one more second?

14:17:31 21        MR. DAVENPORT:  Yeah, I'll try.

14:17:34 22        MS. HUGGINS:  I know it's not cooperating,

14:17:37 23   but --

Moriarity - Davenport - 2/21/20

240

14:17:37  1         (Video clip played.)

14:17:51  2         MS. HUGGINS:   Okay.   Thank you.

14:17:57  3         THE WITNESS:   So, yeah, with his left leg,

14:18:01  4  he kind of made a -- a sudden -- a sudden I would

14:18:04  5  say minorly chaotic movement to face Karl, and Karl

14:18:11  6  completed the motion to spin him around and kind of

14:18:15  7  get him under control real quick.

14:18:18  8         BY MR. DAVENPORT:

14:18:18  9         Q.   So what's -- I guess in your terms,

14:18:21  10  what a minor chaotic move is?

14:18:23  11        A.   Just moving -- moving real quick in --

14:18:25  12  in front of officers when a number 1 concern for

14:18:29  13  everyone -- everyone involved in a scene --

14:18:33  14  subjects, officers, defendants, victims -- moving

14:18:38  15  real quick can mean someone's, you know, got

14:18:41  16  a knife that passed maybe a -- a pat-down or -- or

14:18:44  17  they're going to punch someone or something.

14:18:47  18        So, yeah, a chaotic movement.   I know I did

14:18:51  19  a pat-down.   I've been punched in the face before

14:18:54  20  because I was too close to someone because they

14:18:57  21  made a chaotic movement.   It's -- it's normal.   It

14:19:00  22  happens.

14:19:00  23        Q.   Sure.   But the only minor chaotic move

14:19:03  1 | that you have seen at that point was something that

14:19:05  2 | he did with his left leg to face towards Karl

14:19:08  3 | Schultz?

14:19:08  4 |         A.    Yeah.   In a not normal way to face

14:19:11  5 | someone.   It looks from the video, and, again,

14:19:14  6 | it's -- it's from a -- a viewpoint that's not on

14:19:17  7 | street level, it looks -- it looked a little

14:19:23  8 | chaotic, and it looks like not a normal turning,

14:19:25  9 | facing movement.

14:19:26 10 |         Q.    All right.   I just want to watch it one

14:19:28 11 | more time --

14:19:28 12 |         A.    Sure.

14:19:28 13 |         Q.    -- just to make sure that there was

14:19:30 14 | nothing else besides that left leg movement that

14:19:32 15 | you noticed.

14:19:32 16 |         MS. HUGGINS:   Form.

14:21:50 17 |         (Discussion off the record.)

14:21:50 18 |         MR. DAVENPORT:   So we're just watching one

14:21:52 19 | more time to make sure there was nothing besides

14:21:55 20 | that left leg movement that you saw.

14:21:56 21 |         MS. HUGGINS:   From his view of the video?

14:21:58 22 |         MR. DAVENPORT:   Correct.

14:21:58 23 |         (Video clip played.)

| | | |
|---|---|---|
| 14:21:58 | 1 | BY MR. DAVENPORT: |
| 14:22:05 | 2 | Q.   So did you notice anything else? |
| 14:22:07 | 3 | I can replay it if you would like me to. |
| 14:22:09 | 4 | A.   No.   No.   I mean, yeah, the -- the |
| 14:22:11 | 5 | left leg movement, and then if -- if you want to |
| 14:22:15 | 6 | continue pressing play, once -- once he was under |
| 14:22:19 | 7 | control, for lack of better terms, from whatever |
| 14:22:26 | 8 | this was, he was fine. |
| 14:22:28 | 9 | MR. DAVENPORT:   Okay.   So I want you to |
| 14:22:35 | 10 | watch again. |
| 14:22:35 | 11 | (Video clip played.) |
| 14:22:36 | 12 | THE WITNESS:   There's your pat-down. |
| 14:22:38 | 13 | BY MR. DAVENPORT: |
| 14:22:38 | 14 | Q.   Okay.   Now, why would Karl Schultz be |
| 14:23:03 | 15 | going back to the vehicle at that point? |
| 14:23:04 | 16 | MS. HUGGINS:   Form. |
| 14:23:04 | 17 | THE WITNESS:   I -- I don't remember what he |
| 14:23:06 | 18 | went back to the vehicle for. |
| 14:23:08 | 19 | BY MR. DAVENPORT: |
| 14:23:08 | 20 | Q.   Is it possible that he took his ID? |
| 14:23:11 | 21 | MS. HUGGINS:   Form. |
| 14:23:11 | 22 | THE WITNESS:   It's a possibility.   I would |
| 14:23:13 | 23 | defer to -- to Karl. |

14:23:14  1          BY MR. DAVENPORT:

14:23:14  2          Q.   Okay.  For what reasons would somebody

14:23:17  3   take their ID in this situation?

14:23:21  4          MS. HUGGINS:   Form.

14:23:21  5          THE WITNESS:   Now that he's made contact

14:23:27  6   with him or he made contact with Karl, you can

14:23:31  7   check someone's ID and find out who they are and,

14:23:35  8   you know, you can search for whatever reason

14:23:40  9   you're -- you're looking at him for.

14:23:43 10          You can find out if he's got warrants.  I'm

14:23:45 11   not saying it was ever a thing that we thought he

14:23:50 12   did have.  I don't know why he -- I'm sorry.  I

14:23:53 13   don't remember why he ran his ID, if he's even

14:23:58 14   running his ID.

14:24:00 15          BY MR. DAVENPORT:

14:24:00 16          Q.   Okay.  Do you recall what was said to

14:24:23 17   the subject at this point?

14:24:25 18          A.   I don't remember, no.

14:24:26 19          Q.   Do you see that Karl Schultz is now

14:24:29 20   radioing in?

14:24:30 21          A.   Yes.

14:24:30 22          Q.   What reason would he be radioing in at

14:24:33 23   that point?

14:24:33  1          MS. HUGGINS:  Form.

14:24:35  2          THE WITNESS:  There's -- there's a radio

14:24:38  3    log.  I mean, whatever -- whatever he said

14:24:40  4    immediately goes on a radio log.  I don't know --

14:24:43  5    I don't remember what he said over the radio.

14:24:45  6          BY MR. DAVENPORT:

14:24:46  7          Q.   Let's say he had checked that person's

14:24:48  8    ID, what things would he have to call into dispatch?

14:24:52  9          A.   He doesn't have to call anything in if

14:24:56  10   he doesn't want to call anything in about -- about

14:24:58  11   an ID check.  He could have just checked the ID --

14:25:03  12   if he did check an ID, he could have checked it

14:25:05  13   over the computer.

14:25:06  14         Q.   Would it be required for that

14:25:07  15   individual, that subject to stand there and wait

14:25:10  16   for his ID to be checked?

14:25:12  17         MS. HUGGINS:  Form.

14:25:12  18         THE WITNESS:  If -- if Karl was detaining

14:25:15  19   him, then -- then, yeah, I mean, he's not under

14:25:24  20   arrest.  He didn't -- he's free to leave, though,

14:25:24  21   too, so --

14:25:27  22         BY MR. DAVENPORT:

14:25:27  23         Q.   But if you're detained, are you allowed

*Moriarity - Davenport - 2/21/20*

245

| 14:25:30 | 1 | to leave? |
|---|---|---|

14:25:30   2            MS. HUGGINS:   Form.

14:25:31   3            THE WITNESS:   Yeah, when everything's done.

14:25:32   4            BY MR. DAVENPORT:

14:25:32   5            Q.   But he's not -- he's not allowed to

14:25:34   6    leave at this point, correct?

14:25:35   7            MS. HUGGINS:   Form.

14:25:37   8            THE WITNESS:   I would still defer to -- to

14:25:40   9    Karl.

14:25:41  10            BY MR. DAVENPORT:

14:25:42  11            Q.   At any point did anybody hand him back

14:25:43  12    that cell phone that was taken earlier?

14:25:45  13            MS. HUGGINS:   Form.

14:25:46  14            THE WITNESS:   I am -- I don't remember if he

14:25:49  15    snatched a cell phone from him or not.   I don't

14:25:51  16    know what that motion was in front of his face.

14:25:55  17            BY MR. DAVENPORT:

14:25:55  18            Q.   But whatever --

14:25:56  19            A.   So --

14:25:58  20            Q.   -- was taken from him, did anybody ever

14:26:02  21    hand back whatever was taken from him initially?

14:26:02  22            MS. HUGGINS:   Form.

14:26:05  23            THE WITNESS:   I can't honestly say

14:26:06   1   I remember if anything was taken yet.

14:26:07   2        BY MR. DAVENPORT:

14:26:07   3        Q.   Okay.  But no -- nothing in the

14:26:09   4   video -- well, would that be the first time, at

14:26:11   5   10:30:08, that something was handed back to the

14:26:16   6   individual?

14:26:16   7        A.   I don't know about handed back to the

14:26:17   8   individual.  I know that I handed him something

14:26:20   9   right there.

14:26:21  10        Q.   Okay.  We'll just go back a little bit.

14:26:24  11   I just want to make sure that nothing was handed to

14:26:27  12   the individual before then.

14:26:39  13        I want to go back to the moment it looked

14:26:40  14   like something may have been taken from him.

14:27:29  15        Now, I just want you to watch and see.  Are

14:27:31  16   officers handing anything to him at this point?

14:27:33  17        MS. HUGGINS:   Form.

14:27:39  18        BY MR. DAVENPORT:

14:27:39  19        Q.   Has anything been handed to him at this

14:27:41  20   point?

14:27:41  21        A.   No, not yet.

14:27:42  22        Q.   Okay.  At 10:28:24, has anything been

14:28:11  23   handed to the subject at that point?

*Moriarity - Davenport - 2/21/20*

247

14:28:12   1          A.   No, not yet.

14:28:44   2          Q.   Okay.   At 10:29, has anything been

14:28:46   3   handed back to the individual?

14:28:48   4          A.   No.

14:29:20   5          Q.   Okay.   10:29:35, had anything been

14:29:23   6   handed to the individual?

14:29:24   7          A.   No.

14:29:51   8          Q.   Now, at 10:30:06, is that the first

14:29:55   9   time anything had been handed to the individual?

14:29:57  10          MS. HUGGINS:   Form.

14:29:57  11          THE WITNESS:   Yeah, it looks that way, yeah.

14:29:59  12          MR. DAVENPORT:   Thank you.

14:30:04  13          We are now going to Exhibit 11.

14:30:45  14          Now I'm showing what has been marked Exhibit

14:30:47  15   11.   The last four digits are 5233.

14:31:59  16          (Video clip played.)

14:31:59  17          BY MR. DAVENPORT:

14:31:59  18          Q.   Now, what's the time at that upper --

14:32:01  19   upper section?   What -- what does it read?

14:32:03  20          I'm not asking you to verify the accuracy.

14:32:06  21   Just what does it read?

14:32:07  22          A.   The time on the video is 10:52:36.

14:32:11  23          Q.   Okay.   So you guys -- what -- what's

*Moriarity - Davenport - 2/21/20*

248

14:32:15   1   depicted in the video currently right now is the

14:32:19   2   five officers -- there's now five officers standing

14:32:23   3   in a circle -- circular kind of --

14:32:26   4           A.   Correct.

14:32:26   5           Q.   -- formation?

14:32:28   6           What was going on here?

14:32:31   7           A.   I don't -- I don't remember what we all

14:32:34   8   were talking about.  I -- I can tell you that I was

14:32:38   9   probably just standing there watching them all,

14:32:41  10   but --

14:32:41  11           Q.   Do you remember what types of things

14:32:43  12   were being said?

14:32:44  13           A.   No.  No, I don't.

14:32:46  14           Q.   Do you remember approximately what time

14:32:48  15   that fifth police officer arrived at the scene?

14:32:52  16           A.   I don't.

14:32:52  17           Q.   Like, you know, roughly, let's use as

14:32:55  18   a reference point the time that the collision was

14:32:58  19   made.

14:32:59  20           What time -- or how much time elapsed before

14:33:04  21   that fifth police officer arrived at the scene?

14:33:05  22           MS. HUGGINS:   Form.

14:33:06  23           THE WITNESS:   I don't -- I don't remember.

*Moriarity - Davenport - 2/21/20*

14:33:06   1          BY MR. DAVENPORT:

14:33:07   2          Q.   Okay.   Do you remember anything

14:33:08   3     appreciable happening in between the time of the

14:33:12   4     end of that third video segment and this fourth

14:33:16   5     video segment, where we see a fifth police officer

14:33:18   6     arriving at the scene?

14:33:19   7          MS. HUGGINS:   Form.

14:33:21   8          THE WITNESS:   I don't -- no, I don't --

14:33:21   9          BY MR. DAVENPORT:

14:33:21  10          Q.   Okay.

14:33:23  11          A.   I don't think there was anything.

14:33:25  12     Yeah, I don't -- I don't think there was -- there

14:33:26  13     was anything.

14:33:27  14          Q.   Okay.   Do you see the individual

14:33:30  15     standing by the red van?

14:33:33  16          A.   Yeah.   Yes.

14:33:35  17          Q.   Now, what initially did you arrive at

14:33:40  18     the scene for for this individual standing near the

14:33:44  19     red van?

14:33:44  20          MS. HUGGINS:   Form.   Asked and answered.

14:33:46  21          THE WITNESS:   Yeah.   I -- I went to

14:33:48  22     33 Schmarbeck for a larceny.   I don't know if

14:33:52  23     that's the same -- same complainant.   I don't know

14:33:54   1  if that's the same person.

14:33:56   2          BY MR. DAVENPORT:

14:33:56   3          Q.   Okay.  Is that individual holding

14:33:58   4  something in his hand?

14:34:01   5          A.   Yeah.  It looks like something.

14:34:02   6          Q.   What do you -- what does it look like?

14:34:04   7          A.   Something blue.

14:34:05   8          Q.   Okay.  Does it look like a bag?

14:34:08   9          A.   It could be a bag, yeah.  I don't know.

14:34:14  10          Q.   Okay.  So, now, going back towards the

14:34:21  11  beginning, you know that you have an individual,

14:34:26  12  who there was a collision with a -- with a police

14:34:30  13  vehicle, that's sitting in the back of your police

14:34:33  14  vehicle, correct?

14:34:33  15          MS. HUGGINS:  Form.

14:34:33  16          THE WITNESS:  Yes.

14:34:34  17          BY MR. DAVENPORT:

14:34:36  18          Q.   Had any other assessments been done to

14:34:38  19  assess his physical condition at this point?

14:34:42  20          A.   Not by -- not by me.  I don't know if

14:34:45  21  other officers did.

14:34:46  22          Q.   Okay.  So, now, the time is 10:52:33,

14:34:53  23  and there's five police officers that are standing

14:34:56  1   in a circle, correct?

14:34:58  2        A.    Yes.

14:34:58  3        MS. HUGGINS:   Form.

14:34:58  4        MR. DAVENPORT:   Okay.   So we're just going to

14:35:02  5   watch through, and we're going to see what time --

14:35:04  6   at what time the officers breaked at that point for

14:35:08  7   their police vehicles.

14:35:08  8        (Video clip played.)

14:35:08  9        BY MR. DAVENPORT:

14:35:29 10        Q.    What kinds of discussions would have

14:35:30 11   been had by the police officers at this time?

14:35:32 12        MS. HUGGINS:   Form.

14:35:33 13        THE WITNESS:   There could have been many

14:35:37 14   discussions.   Maybe about what took place on

14:35:39 15   Sattler.   It's New Year's Day.   They could have

14:35:42 16   been talking about what was taking place on

14:35:44 17   New Year's Eve.

14:35:47 18        It could have been anything.   I know at one

14:35:50 19   point in time someone called Lieutenant McHugh.

14:35:52 20        BY MR. DAVENPORT:

14:35:52 21        Q.    Was it at this time that that call was

14:35:54 22   made?

14:35:55 23        A.    I -- I don't remember.   I remember -- I

14:35:57  1   remember that someone did contact him.

14:36:00  2          Q.   Okay.  Okay.  Were you there present

14:36:02  3   for that conversation with Lieutenant McHugh?

14:36:04  4          A.   I don't -- I don't think so.  I don't

14:36:08  5   think so, but I wouldn't -- I wouldn't remember if

14:36:15  6   I was.

14:36:15  7          Q.   Have you ever used your cell phone to

14:36:17  8   contact a lieutenant before?

14:36:18  9          A.   Yeah.

14:36:19 10          Q.   Okay.  How often do you do that?

14:36:20 11          A.   It depends on the lieutenant.  Some

14:36:21 12   like it over the phone, some like it over the

14:36:24 13   radio.

14:36:24 14          Q.   Okay.

14:36:24 15          A.   Some -- yeah.

14:36:25 16          Q.   But, I mean, roughly, how many times

14:36:27 17   have you had to do that?

14:36:28 18          MS. HUGGINS:   Form.

14:36:29 19          THE WITNESS:   Tons.

14:36:31 20          BY MR. DAVENPORT:

14:36:31 21          Q.   Okay.  Would you -- Lieutenant McHugh

14:36:35 22   was your lieutenant at the time at C District --

14:36:37 23          A.   At the time, yeah.

*Moriarity - Davenport - 2/21/20*

253

| | | |
|---|---|---|
| 14:36:39 | 1 | Q.   -- correct? |
| 14:36:40 | 2 | Did Lieutenant McHugh prefer that officers |
| 14:36:44 | 3 | contact him by phone? |
| 14:36:45 | 4 | A.   He was probably indifferent. |
| 14:36:46 | 5 | Q.   Okay.  Did you ever contact Lieutenant |
| 14:36:46 | 6 | McHugh -- |
| 14:36:46 | 7 | A.   No. |
| 14:36:49 | 8 | Q.   -- by phone? |
| 14:36:50 | 9 | A.   Karl would do that.  He's the FTO. |
| 14:36:52 | 10 | Q.   Okay.  After your 16 weeks of training |
| 14:36:54 | 11 | were over with Karl Schultz, did you ever contact |
| 14:36:56 | 12 | Lieutenant McHugh? |
| 14:36:57 | 13 | A.   No. |
| 14:36:57 | 14 | Q.   You would have had a different |
| 14:36:59 | 15 | lieutenant at the time? |
| 14:37:00 | 16 | A.   Yeah, I had a different lieutenant. |
| 14:37:01 | 17 | Q.   Do you remember who that lieutenant |
| 14:37:02 | 18 | was? |
| 14:37:03 | 19 | A.   Yes. |
| 14:37:03 | 20 | Q.   Who was your lieutenant? |
| 14:37:05 | 21 | A.   Lieutenant Long and Lieutenant Nigrelli. |
| 14:37:08 | 22 | Q.   Okay.  Did you ever use your phone to |
| 14:37:10 | 23 | contact either of those two lieutenants? |

14:37:11  1        A.    For sure, yeah.

14:37:12  2        Q.    Okay.  About how often did you contact

14:37:14  3   those two lieutenants?

14:37:15  4        A.    Job related, not often.

14:37:18  5        Q.    Okay.  So it would have been more so

14:37:20  6   nonjob-related instances?

14:37:21  7        A.    Yeah.  Yeah.

14:37:21  8        Q.    Okay.  How many times have you contacted

14:37:24  9   a lieutenant for a job-related situation?

14:37:28 10        A.    A lieutenant in general, and when

14:37:32 11   I say tons, maybe 20 -- 20 or so.

14:37:39 12        Q.    Okay.  And what --

14:37:40 13        A.    Over the course of years.

14:37:41 14        Q.    What types of situations would lead

14:37:42 15   you to use your phone rather than radio to contact

14:37:45 16   a lieutenant?

14:37:45 17        A.    Like I said, some lieutenants just

14:37:47 18   don't want to be contacted over the radio, so --

14:37:51 19        Q.    Is there a specific lieutenant that

14:37:53 20   you're thinking of that doesn't want to be

14:37:55 21   contacted by radio?

14:37:56 22        A.    No.

14:37:57 23        Q.    So it wasn't a lieutenant that --

*Moriarity - Davenport - 2/21/20*

14:38:02  1          A.    But some -- some don't, so --

14:38:03  2          Q.    But no lieutenants that you ever worked

14:38:05  3   with that don't like to be contacted by radio?

14:38:07  4          A.    None that I've worked --

14:38:09  5          MS. HUGGINS:   Form.

14:38:11  6          THE WITNESS:   None that I've worked for

14:38:12  7   directly, but there are other lieutenants that

14:38:14  8   work around you that don't like to be contacted by

14:38:16  9   radio.

14:38:16 10          (Video clip played.)

14:38:16 11          BY MR. DAVENPORT:

14:38:16 12          Q.    Okay.  Did you see that motion that was

14:38:44 13   just made right there?

14:38:45 14          A.    I did.

14:38:46 15          Q.    What do you think that was in reference

14:38:48 16   to?

14:38:48 17          MS. HUGGINS:   Form.

14:38:49 18          THE WITNESS:   That would be speculation,

14:38:54 19   and, again, I -- I don't remember.  I'm taking it

14:38:58 20   all in like the first week or two that I was even

14:39:01 21   on.

14:39:02 22          BY MR. DAVENPORT:

14:39:02 23          Q.    Sure.

*Moriarity - Davenport - 2/21/20*

256

| | | |
|---|---|---|
| 14:39:02 | 1 | **A.** So I'm standing there. I don't even |
| 14:39:04 | 2 | know what's going on. |
| 14:39:05 | 3 | **Q.** But it looked like he took himself and |
| 14:39:09 | 4 | kind of thrusted his legs out and his midsection, |
| 14:39:14 | 5 | correct? |
| 14:39:15 | 6 | **A.** Yeah. |
| 14:39:16 | 7 | **Q.** Do you know which officer that was? |
| 14:39:18 | 8 | **A.** I don't. |
| 14:39:18 | 9 | **Q.** Okay. Can you tell from this video who |
| 14:39:21 | 10 | that officer is? |
| 14:39:23 | 11 | **A.** No, not really. |
| 14:39:24 | 12 | **Q.** Okay. Now, at this time, was there |
| 14:39:43 | 13 | another officer who was in that Dodge Charger in |
| 14:39:49 | 14 | the back? |
| 14:39:50 | 15 | **MS. HUGGINS:** Form. |
| 14:39:50 | 16 | **THE WITNESS:** There -- I wouldn't even |
| 14:39:52 | 17 | remember. |
| 14:39:52 | 18 | **BY MR. DAVENPORT:** |
| 14:39:52 | 19 | **Q.** Okay. So it was double-up that -- |
| 14:39:55 | 20 | double-up day -- |
| 14:39:56 | 21 | **A.** Double-up day, yes. |
| 14:39:58 | 22 | **Q.** -- that day, correct? |
| 14:39:59 | 23 | How often does double-up day occur? |

| | | |
|---|---|---|
| 14:40:00 | 1 | **A.**    Twice a month. |
| 14:40:01 | 2 | **Q.**    Okay.   Now, when there's double-up day, |
| 14:40:05 | 3 | are there ever any police vehicles for C District |
| 14:40:08 | 4 | that are left over that are not being used by any |
| 14:40:11 | 5 | of the officers? |
| 14:40:11 | 6 | **A.**    Sometimes. |
| 14:40:12 | 7 | **Q.**    Sometimes?   Okay. |
| 14:40:14 | 8 | Would it be typical for an officer, on |
| 14:40:16 | 9 | double-up day, to drive by themselves, without |
| 14:40:19 | 10 | another officer present? |
| 14:40:21 | 11 | **A.**    Yes. |
| 14:40:21 | 12 | **Q.**    That has happened before? |
| 14:40:23 | 13 | **A.**    Yes. |
| 14:40:23 | 14 | **Q.**    Okay.   Okay. |
| 14:40:35 | 15 | So now at this time, you still know that |
| 14:40:37 | 16 | there's an individual in your car who was on the |
| 14:40:39 | 17 | ground after colliding -- a collision with |
| 14:40:42 | 18 | a vehicle, correct? |
| 14:40:43 | 19 | **A.**    Yes. |
| 14:40:43 | 20 | **MS. HUGGINS:**   Form. |
| 14:40:44 | 21 | **BY MR. DAVENPORT:** |
| 14:40:44 | 22 | **Q.**    Okay.   And nobody's doing any sort of |
| 14:40:47 | 23 | a physical assessment of him at this time. |

*Moriarity - Davenport - 2/21/20*

258

14:40:50  1        A.   I would defer to the senior officers

14:40:52  2   that had already done their physical assessment

14:40:57  3   with their years of experience.

14:40:59  4        Q.   But one of the things that we talked

14:41:00  5   about before was you would be able to know if

14:41:04  6   somebody had some sort of internal bleeding if

14:41:06  7   maybe they had gone pale --

14:41:08  8        A.   Right.

14:41:08  9        Q.   -- or you noticed some other

14:41:10 10   circumstances, but nobody's checking for that at

14:41:12 11   this point.

14:41:12 12        A.   No.  At 10:54:25 is when they all split

14:41:17 13   up.

14:41:18 14        Q.   Okay.

14:41:18 15        A.   We all split up.

14:41:19 16        Q.   Okay.  Where were you guys going next

14:41:21 17   at this point?

14:41:24 18        A.   I don't -- excuse me.

14:41:29 19        It was E -- ECMC.  I don't remember how that

14:41:32 20   was all determined, though.

14:41:34 21        Q.   Okay.  Have you ever been involved, as

14:41:40 22   either a driver or a passenger, in any sort of

14:41:43 23   motor vehicle collision --

*Moriarity - Davenport - 2/21/20*

259

| | | |
|---|---|---|
| 14:41:43 | 1 | A.   No. |
| 14:41:43 | 2 | Q.   -- with a police vehicle? |
| 14:41:45 | 3 | A.   No. |
| 14:41:45 | 4 | Q.   Okay.  Do you know what the proper |
| 14:41:47 | 5 | procedure is if a police vehicle is involved in |
| 14:41:50 | 6 | some sort of a motor -- motor vehicle collision? |
| 14:41:53 | 7 | A.   In a motor vehicle accident between two |
| 14:41:58 | 8 | vehicles, you would call a lieutenant and accident |
| 14:42:03 | 9 | investigation unit. |
| 14:42:04 | 10 | Q.   What about if that police vehicle |
| 14:42:07 | 11 | struck an individual?  What would be the -- |
| 14:42:10 | 12 | A.   If -- |
| 14:42:11 | 13 | Q.   -- proper procedure? |
| 14:42:12 | 14 | A.   If the police vehicle struck |
| 14:42:14 | 15 | a pedestrian, it would be the same thing.  You |
| 14:42:18 | 16 | would call a lieutenant and accident investigation |
| 14:42:22 | 17 | unit. |
| 14:42:23 | 18 | If -- in this case, which I think the other |
| 14:42:28 | 19 | officers made the call to contact the lieutenant -- |
| 14:42:32 | 20 | or our -- our lieutenant, it was determined by them |
| 14:42:37 | 21 | that it was not a motor vehicle accident and a |
| 14:42:42 | 22 | penal law issue.  There was an arrest made. |
| 14:42:46 | 23 | Q.   So if it's a penal law issue, some sort |

14:42:49  1  of a crime, the accident investigation unit does

14:42:51  2  not need to arrive --

14:42:52  3       **A.**   No.

14:42:52  4       **Q.**   -- at the scene?

14:42:53  5       Now, if the accident investigation unit

14:42:56  6  arrives at the scene, do you know if statements are

14:42:58  7  supposed to be take -- taken by witnesses?

14:43:00  8       **A.**   Accident investigation unit would do

14:43:02  9  that.

14:43:02  10       **Q.**   Do you know if the accident

14:43:03  11  investigation unit would need to investigate or

14:43:06  12  take a statement from the individual that was

14:43:08  13  struck by the police vehicle?

14:43:10  14       **A.**   In -- in an accident, yeah, they

14:43:15  15  take -- they take the statement.

14:43:16  16       **Q.**   Of the individual that's been struck?

14:43:18  17       **A.**   Of the individual, yeah.

14:43:19  18       **Q.**   Okay.  And they would also need to take

14:43:21  19  statements from anybody who possibly witnessed?

14:43:23  20       **A.**   Yes.

14:43:24  21       **Q.**   Okay.  Now, as part of accident

14:43:36  22  investigation unit's investigation, are they taking

14:43:38  23  photographs of the vehicle?  The scene?  Is that

14:43:40   1  part of what they --

14:43:40   2          A.   I'm --

14:43:41   3          Q.   -- do?

14:43:42   4          A.   I'm not in that -- that unit.  I wouldn't

14:43:44   5  know what determines whether or not they take

14:43:47   6  pictures or don't take pictures of -- I wouldn't --

14:43:50   7  I wouldn't know.

14:43:50   8          Q.   Let me ask you, I guess, a different

14:43:53   9  question.

14:43:53  10          Have you ever been involved with somebody

14:43:55  11  damaging a police vehicle intentionally?

14:43:58  12          A.   This would be -- this would be one of

14:44:04  13  them, and then there was another time where someone

14:44:08  14  was in the back seat, kicking out a window.

14:44:10  15          Q.   Okay.  Now --

14:44:10  16          A.   And, again, that was not my vehicle.

14:44:15  17          Q.   The person whose vehicle it was, do you

14:44:18  18  recall who was driving that vehicle?

14:44:20  19          A.   No.

14:44:20  20          Q.   Okay.  Do you remember if they took

14:44:21  21  a photograph of the window?

14:44:24  22          A.   No.

14:44:25  23          Q.   Do you recall if --

*Moriarity - Davenport - 2/21/20*

14:44:26   1          A.    I didn't -- I didn't help with that

14:44:28   2   arrest.

14:44:28   3          Q.    Do you recall if anybody took

14:44:29   4   a photograph of the vehicle, the window that was

14:44:32   5   kicked out?

14:44:33   6          A.    No.

14:44:34   7          Q.    No, they didn't take one, or no, you

14:44:38   8   don't recall?

14:44:38   9          A.    No, I don't -- I don't recall.

14:44:38  10          Q.    Okay.

14:44:42  11          A.    Sorry.

14:44:42  12          Q.    Now, in this case, what does it appear

14:44:46  13   that that officer is doing?

14:44:48  14          MS. HUGGINS:   Well, to be fair, there's

14:44:50  15   three people in the screen.

14:44:51  16          MR. DAVENPORT:   I'll go back.

14:44:58  17          Now, there's an individual who was walking

14:45:00  18   away from the driver's side vehicle --

14:45:00  19          THE WITNESS:   Right.

14:45:00  20          BY MR. DAVENPORT:

14:45:02  21          Q.    -- of the Chevy Tahoe that is currently

14:45:04  22   in view of the camera, correct?

14:45:06  23          A.    Right.   Yes.

14:45:06  1      Q.   And that individual is now standing in

14:45:08  2  the center of the street -- in the center of the

14:45:12  3  street?

14:45:13  4      A.   Mm-hmm.   Yes.   I'm sorry.

14:45:14  5      Q.   Okay.   What direction is she now

14:45:18  6  facing?

14:45:18  7      A.   South.

14:45:19  8      Q.   South, towards the police vehicle?

14:45:20  9      A.   Yes.

14:45:21 10      Q.   Okay.   Why do you think that she would

14:45:23 11  have walked away from the police vehicle and then

14:45:27 12  faced in the direction of the police vehicle after

14:45:29 13  walking up to the driver's side door?

14:45:31 14      MS. HUGGINS:   Form.

14:45:32 15      THE WITNESS:   So I can't -- I can't speak on

14:45:33 16  her behalf.   I'm already at my vehicle off screen.

14:45:37 17  I don't know -- I don't know if I'm in the truck

14:45:40 18  yet, or I don't know -- I don't know what she's

14:45:40 19  doing.

14:45:43 20      BY MR. DAVENPORT:

14:45:43 21      Q.   So I guess --

14:45:44 22      A.   I mean, you -- you can't even really

14:45:47 23  see what's in front of her because it's -- it's

*Moriarity - Davenport - 2/21/20*

264

14:45:49   1   pretty pixilated or -- or blurry or whatever you

14:45:51   2   want to call it, but I -- I don't know.

14:45:54   3            Q.   Okay.  Now --

14:45:57   4            A.   You know, you can't even really see

14:45:59   5   what she -- if she's -- you can't see what she's

14:46:02   6   doing.

14:46:02   7            Q.   Is she standing in front of the police

14:46:04   8   vehicle?

14:46:04   9            A.   She's definitely standing in front of

14:46:06  10   the police vehicle, yeah, but --

14:46:06  11            Q.   And she's standing stationary?

14:46:08  12            A.   Yeah.

14:46:08  13            Q.   Okay.  Now she's walking towards the

14:46:14  14   police vehicle, correct?

14:46:15  15            A.   Correct.

14:46:16  16            Q.   Okay.  Were you ever shown any pictures

14:46:21  17   or photographs of the police vehicle in question

14:46:24  18   that day?

14:46:25  19            A.   No.

14:46:25  20            Q.   Okay.  Do you know if anybody was shown

14:46:28  21   any pictures of the police vehicle that day?

14:46:30  22            A.   No, I don't know.

14:46:33  23            Q.   Are you familiar with the penal law

14:46:35  1  statute for criminal mischief in the third degree,

14:46:38  2  which is a felony?

14:46:40  3      A.   Yeah, I'm familiar with it.  I would

14:46:42  4  have to have it in front of me to recite it.

14:46:44  5      Q.   Sure.

14:46:45  6      Do you recall if there's a threshold in

14:46:46  7  damage that's required in order to meet the burden

14:46:50  8  of proving that criminal statute?

14:46:53  9      MS. HUGGINS:  Form.

14:46:53 10      THE WITNESS:  I would have to have it in

14:46:55 11  front of me to -- to recite it.

14:46:57 12      MR. DAVENPORT:  Okay.  Can we point the

14:47:02 13  camera back at the witness?

14:47:05 14      THE VIDEOGRAPHER:  Sure.

14:47:05 15      MR. DAVENPORT:  Thank you.

14:47:06 16      And then we can turn on the lights too.

14:47:09 17  Thank you.

14:47:41 18      Okay.  So I'm going to show you what's been

14:47:42 19  marked as Exhibit 4A.  I only have a copy of

14:47:48 20  Exhibit 4.

14:47:51 21      MS. HUGGINS:  That's okay.  I know what it

14:47:55 22  is.  Why don't you keep this as your original.

14:47:57 23  I believe I have 4A.

*Moriarity - Davenport - 2/21/20*

14:47:58   1          MR. DAVENPORT:   Okay.

14:48:02   2          So, now, after you've left the scene at

14:48:04   3   Schmarbeck, you went to ECMC; is that correct?

14:48:04   4          THE WITNESS:   Yes.

14:48:07   5          BY MR. DAVENPORT:

14:48:07   6      Q.   Okay.   Were you having any discussions

14:48:10   7   with Karl Schultz at that time?

14:48:12   8      A.   I don't -- I don't remember.   We

14:48:15   9   probably were, yeah.

14:48:16  10      Q.   Okay.   Do you remember any discussions

14:48:19  11   about a 941 procedure?

14:48:21  12      A.   No, I -- I don't.   And I -- even at the

14:48:23  13   time, I wouldn't have had a clue what it was.

14:48:25  14      Q.   Okay.   That wasn't any training that

14:48:27  15   you had received beforehand?

14:48:28  16      A.   It -- you know, it -- it -- it was.   It

14:48:31  17   was very, very quick training in academy, but --

14:48:36  18      Q.   Which academy?   Was it the Buffalo --

14:48:38  19      A.   This was -- this was the police

14:48:39  20   academy, not Buffalo academy.

14:48:41  21      Q.   Okay.   Okay.   So when you arrived at

14:48:46  22   ECMC, do you remember approximately how long you

14:48:48  23   stayed there?

*Moriarity - Davenport - 2/21/20*

14:48:49   1          A.   I -- no, I don't.  I don't remember.

14:48:52   2          Q.   Okay.  At any point during your shift,

14:48:54   3   did you have anything to eat?  Lunch or anything

14:48:56   4   like that?

14:48:58   5          A.   Yeah.  I don't remember what time or

14:48:59   6   what I ate or nothing, though.

14:49:00   7          Q.   Do you remember what you had to eat

14:49:01   8   that day?

14:49:02   9          A.   No.

14:49:02  10          Q.   Okay.  Do you remember if you ate at

14:49:05  11   the hospital?

14:49:05  12          A.   I definitely didn't eat there.  I don't

14:49:07  13   eat there.

14:49:07  14          Q.   Okay.  And when you say you definitely

14:49:10  15   don't eat there --

14:49:11  16          A.   Yeah.

14:49:11  17          Q.   -- what reason is that?

14:49:12  18          A.   I just don't.  I just don't eat at

14:49:15  19   hospitals, Tim Hortons.  I just don't do it.

14:49:19  20          Q.   Okay.  So more so the food, not like --

14:49:20  21          A.   Yeah.

14:49:20  22          Q.   -- germs or anything like that?

14:49:22  23          A.   Oh, no.  No, no, no.

14:49:24   1       Q.   Okay.  Okay.  So do you see on -- now,

14:49:33   2   do you see at 11:22:34, there's a location change

14:49:38   3   for C230 to ECMC?

14:49:40   4       A.   Yes.

14:49:40   5       Q.   Okay.  And C230, on the day of the

14:49:45   6   incident, that was your call sign, correct?

14:49:47   7       A.   That was -- yeah, that was mine and

14:49:49   8   Karl's, yeah.

14:49:49   9       Q.   Okay.  So, now, when it says location

14:49:51  10   changed, is that somebody radioing in to say where

14:49:56  11   you are located at that point, or is there some

14:49:57  12   sort of a tracker on your car?

14:49:59  13       A.   No.  That would be someone calling in

14:50:01  14   over the radio saying we're going to ECMC.

14:50:04  15       Q.   Okay.  Did Karl Schultz make that call?

14:50:06  16       A.   We would have to look -- listen to

14:50:09  17   the --

14:50:09  18       Q.   Okay.

14:50:09  19       A.   -- to the radio, yeah.

14:50:10  20       Q.   Okay.  So, now, do you see at 11:23:01,

14:50:18  21   C230 will be a 941?  Do you see that entry?

14:50:21  22       A.   Yes.

14:50:22  23       Q.   Is there any way to enter that

*Moriarity - Davenport - 2/21/20*

269

| | | |
|---|---|---|
| 14:50:23 | 1 | manually, or would that have to be something that's |
| 14:50:26 | 2 | over the radio? |
| 14:50:26 | 3 | A.   So it looks like it was entered in over |
| 14:50:30 | 4 | the radio because the numbers before that, 000478, |
| 14:50:38 | 5 | is going to be one of these other -- other |
| 14:50:41 | 6 | personnel, not the officers.   And I don't know |
| 14:50:45 | 7 | why -- |
| 14:50:45 | 8 | Q.   Okay. |
| 14:50:46 | 9 | A.   That's -- that's dispatch, the -- the |
| 14:50:48 | 10 | Sal Polizzi.   Salvatore Polizzi. |
| 14:50:51 | 11 | Q.   Yep. |
| 14:50:51 | 12 | A.   That would be like one of -- one of |
| 14:50:53 | 13 | them or something. |
| 14:50:54 | 14 | Q.   Okay.   So now we have on scene C230. |
| 14:51:01 | 15 | Would that still be referring to ECMC? |
| 14:51:03 | 16 | A.   That would be referring to -- to ECMC. |
| 14:51:06 | 17 | So now we're on scene at ECMC at 11:30. |
| 14:51:11 | 18 | Q.   Okay.   And then there's a call in at |
| 14:51:13 | 19 | 11:30:35, C230, suspect broke mirror on car 473 |
| 14:51:19 | 20 | intentionally. |
| 14:51:19 | 21 | Would that be something that's radioed in, |
| 14:51:21 | 22 | or would that be something that is entered by the |
| 14:51:24 | 23 | police officer? |

14:51:24  1        A.   So that would be radioed in because of

14:51:26  2   who -- whoever entered it in had, you know, the --

14:51:28  3   their work ID number is 000478.

14:51:31  4        Q.   Okay.  Is there ever any time that

14:51:34  5   there's an entry made for somebody that would have

14:51:37  6   had an officer radio something in, but really it

14:51:41  7   was the officer that manually entered it in?

14:51:43  8        A.   It would be --

14:51:43  9        MS. HUGGINS:   Form.

14:51:44 10        THE WITNESS:   It would be -- so like in

14:51:47 11   front of Karl Schultz, the numbers 169325, that

14:51:51 12   would be where the 000470 would be.

14:51:55 13        BY MR. DAVENPORT:

14:51:55 14        Q.   Okay.  Now, we have at -- let's see

14:52:00 15   here.

14:52:01 16        Let's go back to the previous exhibit.

14:52:17 17   I think it's Exhibit 7 for you.

14:52:35 18        So now we have an entry at 11:22 that says,

14:52:38 19   location change to ECMC, which matches up with

14:52:42 20   what's on the complaint summary report.

14:52:44 21        Do you see that between Exhibit 7 and

14:52:46 22   Exhibit 4A?

14:52:48 23        A.   Yeah.  11:22, location change, and then

*Moriarity - Davenport - 2/21/20*

271

14:52:51  1   over here, 11:22, location change.

14:52:54  2        Q.   Okay.  And then we have an entry at

14:52:56  3   11:30 saying that you are on scene.  That's on

14:52:58  4   Exhibit 7.  And that would still be referring to

14:53:02  5   you being on scene at ECMC, correct?

14:53:05  6        A.   Wait a minute.

14:53:06  7        Q.   For Exhibit 7, there's a time 11:30 a.m.

14:53:10  8        A.   Oh, yeah.  Yeah.

14:53:12  9        Q.   Okay.

14:53:13 10        A.   Yep, 11:30 a.m.

14:53:16 11        Q.   Now, at the point that it says, on your

14:53:19 12   dispatch monitor -- so that would be Exhibit 7 --

14:53:24 13   1314, that would be in reference to 1:14 p.m.,

14:53:24 14   correct?

14:53:24 15        A.   Yes.

14:53:27 16        Q.   And it says available?

14:53:28 17        A.   I'm available now.  I'm available --

14:53:28 18        Q.   Okay.

14:53:30 19        A.   -- to take a call.

14:53:31 20        Q.   Okay.  So would you have made your

14:53:33 21   availability as you were leaving ECMC?

14:53:35 22        A.   I don't -- I don't remember when I made

14:53:37 23   myself available.  I'm pretty sure Karl's going to

*Moriarity - Davenport - 2/21/20*

272

14:53:41  1  be the one that made us available, not me.

14:53:44  2          Q.   Sure.

14:53:44  3          A.   And you can do it at ECMC.  You can do

14:53:47  4  it anywhere driving around.  The stationhouse.  You

14:53:50  5  can do it -- you can do it whenever.

14:53:51  6          Q.   Okay.

14:53:53  7          A.   So yeah.

14:53:54  8          Q.   Okay.  So we wouldn't necessarily know

14:53:57  9  if he made himself available at ECMC or if he made

14:53:59 10  himself available at the stationhouse?

14:54:02 11          A.   Or -- or like I said, or -- or

14:54:04 12  anywhere.

14:54:04 13          Q.   Okay.

14:54:05 14          A.   But no, I wouldn't -- I wouldn't be

14:54:06 15  able to remember that -- that.

14:54:08 16          Q.   Okay.  So the next time, according to

14:54:12 17  your dispatch monitor, it looks like you were

14:54:17 18  dispatched at 1:14 p.m.?

14:54:19 19          A.   Yeah, 1:14.

14:54:20 20          Q.   For a traffic stop?

14:54:22 21          A.   Yes.

14:54:23 22          Q.   Okay.  Is there any reason why you

14:54:27 23  would have made yourself available at the same

14:54:29  1  time that you were responding to an incident for

14:54:33  2  a traffic stop?

14:54:35  3        Is that -- is that something that you ever

14:54:36  4  do?

14:54:36  5        A.   So, yeah, you can -- you can be on --

14:54:41  6  you can -- you can be on a call, like the

14:54:45  7  accident/injury at Schmarbeck, and then you can

14:54:47  8  call back in service on something else, and then

14:54:51  9  they just put you back in as available, and then

14:54:53 10  immediately put you on whatever you're either

14:54:56 11  calling out on -- or no matter what, dispatch is

14:54:59 12  going to say you're available first and then, boom,

14:55:02 13  you're at a call.

14:55:02 14        Q.   Okay.

14:55:04 15        A.   So even if -- even if I'm not

14:55:07 16  initiating the traffic stop, let's say -- let's say

14:55:09 17  it was the criminal mischief instead of the traffic

14:55:12 18  stop, it's still going to say, you know, available,

14:55:14 19  boom, criminal mischief, you know?

14:55:16 20        Q.   Mm-hmm.

14:55:18 21        So on the day of the accident, did you ever

14:55:21 22  investigate or get a visual of what the mirror was?

14:55:25 23        A.   I didn't.  I didn't look at the truck

| | | |
|---|---|---|
| 14:55:27 | 1 | at all. |
| 14:55:27 | 2 | Q.   Okay. |
| 14:55:27 | 3 | A.   Not that I -- not that I remember, but, |
| 14:55:31 | 4 | you know. |
| 14:55:31 | 5 | Q.   Okay.  Do you know if it was broken or |
| 14:55:34 | 6 | not? |
| 14:55:35 | 7 | A.   I don't even know if I looked. |
| 14:55:38 | 8 | Q.   Okay.  Okay.  Did you hear any of the |
| 14:55:44 | 9 | other officers talking about any difficulties with |
| 14:55:46 | 10 | using the driver's side mirror? |
| 14:55:49 | 11 | A.   No. |
| 14:55:50 | 12 | Q.   Okay. |
| 14:55:51 | 13 | A.   No. |
| 14:55:51 | 14 | Q.   And that was on the day of the |
| 14:55:53 | 15 | incident, you didn't hear anybody talking about |
| 14:55:55 | 16 | any difficulties with the driver's side mirror? |
| 14:55:57 | 17 | A.   If -- maybe if it was said at ECMC, but |
| 14:56:01 | 18 | I don't remember.  I was out in the hallway the |
| 14:56:03 | 19 | whole time. |
| 14:56:04 | 20 | Q.   Okay.  Driver's side window.  Also you |
| 14:56:06 | 21 | didn't hear anybody say that they had any |
| 14:56:08 | 22 | difficulties with that? |
| 14:56:09 | 23 | A.   No, not that I remember. |

*Moriarity - Davenport - 2/21/20*

14:56:12  1        Q.   Okay.  Did you ever go into the room

14:56:13  2   where Mr. Kistner was --

14:56:14  3        A.   I did not.

14:56:15  4        Q.   -- at that time?

14:56:16  5        Okay.  Did you have any discussions with any

14:56:19  6   of the hospital staff while you were there?

14:56:21  7        A.   My mouth was shut the entire time I was

14:56:23  8   at ECMC.

14:56:23  9        Q.   Okay.  Was that a direction that was

14:56:26 10   given to you?

14:56:26 11        A.   No.  That was just me knowing my place

14:56:30 12   as someone brand new.

14:56:31 13        Q.   Okay.  Was that ever something that was

14:56:34 14   told to you by Karl Schultz, that as a new person,

14:56:38 15   you shouldn't say anything unless directed to say

14:56:41 16   something?

14:56:41 17        A.   No.  No.  That was just something

14:56:43 18   I felt wasn't appropriate at the time.

14:56:45 19        MR. DAVENPORT:  Okay.  I'm going to show you

14:56:48 20   something that's been marked as Exhibit 16.

14:56:51 21        And I'm sorry that I don't have --

14:56:51 22        MS. HUGGINS:  I have --

14:56:51 23        MR. DAVENPORT:  -- another one.

*Moriarity - Davenport - 2/21/20*

276

| | | |
|---|---|---|
| 14:56:52 | 1 | **MS. HUGGINS:** I have one. Thank you. |
| 14:56:53 | 2 | **MR. DAVENPORT:** Okay. Okay. |
| 14:56:55 | 3 | So, now, directing your attention to shift |
| 14:57:00 | 4 | 2nd, do you know what that's referring to? |
| 14:57:03 | 5 | **THE WITNESS:** Day shift. |
| 14:57:03 | 6 | **BY MR. DAVENPORT:** |
| 14:57:03 | 7 | **Q.** Okay. So day shift would be considered |
| 14:57:07 | 8 | the second shift? |
| 14:57:08 | 9 | **A.** Yes. |
| 14:57:10 | 10 | **Q.** Was there different designations that |
| 14:57:12 | 11 | were used for officers working one day as opposed |
| 14:57:16 | 12 | to another? |
| 14:57:17 | 13 | Like, did you guys ever -- excuse me. |
| 14:57:19 | 14 | Strike that. |
| 14:57:20 | 15 | Did you ever reference to platoons for |
| 14:57:23 | 16 | people on day shift? |
| 14:57:27 | 17 | **A.** Some -- some people do. Like this |
| 14:57:31 | 18 | would be McHugh's platoon. |
| 14:57:34 | 19 | **Q.** Okay. |
| 14:57:34 | 20 | **A.** You know. |
| 14:57:36 | 21 | I -- I don't make references like that, |
| 14:57:38 | 22 | though. |
| 14:57:38 | 23 | **Q.** Okay. What -- what do you use for your |

14:57:40  1    reference?

14:57:40  2        A.    I just say day shift.

14:57:41  3        Q.    Okay.   Now, looking at this list, who

14:57:47  4    was the officer that had the most experience at

14:57:51  5    that time?

14:57:53  6        MS. HUGGINS:   Form.

14:57:55  7        THE WITNESS:   Yeah, I mean, some of -- some

14:58:01  8    of these guys, like Ronnie Daniels, and I don't

14:58:03  9    know who William Johnson is.   Clarence Sampson,

14:58:07 10    he's been retired.   So those guys.

14:58:12 11        BY MR. DAVENPORT:

14:58:12 12        Q.    Okay.   Looking over this list, were

14:58:16 13    these all the officers who typically worked

14:58:18 14    C District at that time?

14:58:23 15        A.    Some of them, like, like I said,

14:58:25 16    Clarence and Ronnie Daniels, those guys were not on

14:58:28 17    my platoon.   I don't think Kevin Quinn was on --

14:58:35 18    was there.

14:58:37 19        I don't know who Erin is.   Erin Heidinger.

14:58:42 20    I don't know who that is.

14:58:42 21        Q.    So is it possible that they were people

14:58:45 22    who were working the other platoon for day shift?

14:58:49 23        A.    That -- yeah, that could be.

14:58:52  1      Q.   Okay.   After police officers complete

14:58:57  2  the academy, where are they typically sent to if

14:59:01  3  they're working in the City of Buffalo?

14:59:02  4      Is there a certain district that they're

14:59:04  5  normally sent to?

14:59:04  6      A.   No.   They're sent to one of the five.

14:59:06  7      Q.   Did you choose, at that time, to be in

14:59:08  8  the C District, as opposed to the other districts?

14:59:11  9      A.   You don't get to choose.

14:59:12 10      Q.   Okay.

14:59:12 11      A.   As -- as far as the FTO, field

14:59:15 12  training, no, you don't get to choose.

14:59:17 13      Q.   Okay.   How would you classify

14:59:19 14  C District, as opposed to the other districts?

14:59:23 15      MS. HUGGINS:   Form.

14:59:23 16      THE WITNESS:   Can you explain that question?

14:59:25 17      BY MR. DAVENPORT:

14:59:25 18      Q.   What's the crime rate in C District,

14:59:27 19  as opposed to the other districts in the City of

14:59:35 20  Buffalo?

14:59:35 21      A.   I mean, different crimes vary in

14:59:39 22  different areas.

14:59:40 23      C District has a lot of -- a lot of

*Moriarity - Davenport - 2/21/20*

279

14:59:41   1  violence.  E district has a lot of violence.  But

14:59:45   2  then so do all the other ones.

14:59:47   3       Maybe certain neighborhoods -- neighborhoods

14:59:49   4  have more car thefts, like Hertel, you know,

14:59:55   5  North Buffalo has a lot of car thefts.  Bravo's got

15:00:00   6  a lot of car thefts.  You know, I mean, it -- it --

15:00:04   7  it varies.

15:00:04   8       Q.   Okay.  But, I guess, going back to what

15:00:07   9  you were saying before, does C District have more

15:00:09  10  violent crimes, as opposed to --

15:00:10  11       A.   I would --

15:00:11  12       Q.   -- other districts?

15:00:12  13       A.   I would say so, yeah, as of C and E.

15:00:16  14       Q.   And you're currently in Bravo District

15:00:18  15  now.

15:00:18  16       A.   I'm in Bravo.

15:00:19  17       Q.   Okay.  Is that because you didn't want

15:00:21  18  to have to deal with the more violent crimes?

15:00:23  19       A.   No.  No.

15:00:24  20       Q.   Not really something that phases you

15:00:26  21  then?

15:00:26  22       A.   No.  That -- it -- yeah, that doesn't

15:00:29  23  phase me, but it's nice to see Christmas lights

15:00:31  1    sometimes, so it's good to see something different.

15:00:34  2         MR. DAVENPORT:  So I'm going to show you

15:00:36  3    something that's been marked as Exhibit 17.

15:00:38  4         And, again, I apologize.  I don't have

15:00:40  5    another copy of Exhibit 17.

15:00:42  6         It's the complaint -- the criminal

15:00:45  7    complaint.

15:00:45  8         MS. HUGGINS:  I have all the exhibits except

15:00:47  9    for the first day.  No copies were provided from

15:00:49 10    the first day.

15:00:51 11         MR. DAVENPORT:  Okay.

15:00:51 12         MS. HUGGINS:  And I also -- just in general,

15:00:53 13    cover pages with the exhibit tabs can be sent to me

15:00:58 14    at some point.

15:00:59 15         MR. DAVENPORT:  Okay.

15:01:01 16         Now, reading after what's in the middle

15:01:05 17    listed as criminal mischief in the third degree?

15:01:09 18         THE WITNESS:  Mm-hmm.  Yes.

15:01:10 19         BY MR. DAVENPORT:

15:01:10 20         Q.   Okay.  Now, I know -- I understand that

15:01:13 21    you didn't sign this, but in terms of the

15:01:16 22    accusations that are made in this criminal

15:01:19 23    document, I just want to see if you agree with what

*Moriarity - Davenport - 2/21/20*

281

| | | |
|---|---|---|
| 15:01:21 | 1 | was written. |
| 15:01:23 | 2 | So for the first sentence it says, in that |
| 15:01:26 | 3 | the defendant, while at 37 Schmarbeck, did with |
| 15:01:30 | 4 | intent to damage. |
| 15:01:31 | 5 | Now, would you agree that the subject |
| 15:01:35 | 6 | intended to damage the police vehicle? |
| 15:01:36 | 7 | MS. HUGGINS:  Form. |
| 15:01:40 | 8 | THE WITNESS:  Look -- I'm -- I'm looking |
| 15:01:42 | 9 | through a -- a driver's side mirror, so, I mean, |
| 15:01:44 | 10 | I don't have the -- the view of the person driving |
| 15:01:47 | 11 | the vehicle, so I'm not going to be the one that |
| 15:01:53 | 12 | says with intent or -- or -- or whatnot. |
| 15:01:56 | 13 | I mean, that's why Lauren signed off on the |
| 15:01:59 | 14 | charges, not me. |
| 15:02:00 | 15 | BY MR. DAVENPORT: |
| 15:02:00 | 16 | Q.   What about based off of what you saw in |
| 15:02:02 | 17 | the video?  Would you say that the subject intended |
| 15:02:04 | 18 | to damage the vehicle? |
| 15:02:04 | 19 | A.   I can't -- |
| 15:02:04 | 20 | MS. HUGGINS:  Form. |
| 15:02:05 | 21 | THE WITNESS:  -- because that's not -- |
| 15:02:06 | 22 | that's not the view that I had.  I had a view from |
| 15:02:09 | 23 | my driver's side mirror, and -- and through my |

*Moriarity - Davenport - 2/21/20*

282

| | | |
|---|---|---|
| 15:02:11 | 1 | driver's side mirror, I would say yes. |
| 15:02:13 | 2 | BY MR. DAVENPORT: |
| 15:02:13 | 3 | Q.   That the subject did intend to damage |
| 15:02:15 | 4 | the vehicle? |
| 15:02:15 | 5 | A.   From my driver's side mirror, yeah. |
| 15:02:17 | 6 | Q.   Okay.   What about the view that you saw |
| 15:02:19 | 7 | on the TV screen? |
| 15:02:21 | 8 | A.   I -- I mean, I'm -- I'm not -- I -- I'm |
| 15:02:23 | 9 | not going to say that because I didn't -- that's |
| 15:02:25 | 10 | not the viewpoint that I had.   I mean, I'm looking |
| 15:02:31 | 11 | through my -- my driver's side mirror.   That's what |
| 15:02:34 | 12 | I'm looking through. |
| 15:02:35 | 13 | Q.   Sure, but I guess just what I'm asking |
| 15:02:37 | 14 | is:   After watching that video, do you think that |
| 15:02:39 | 15 | the subject intended to damage the vehicle? |
| 15:02:41 | 16 | MS. HUGGINS:   Form. |
| 15:02:42 | 17 | THE WITNESS:   The way that he walked up to |
| 15:02:44 | 18 | a moving vehicle, and then it looks like the |
| 15:02:47 | 19 | vehicle was stopping or stopped, and then all of |
| 15:02:51 | 20 | a sudden he falls down, yeah, I would say -- I |
| 15:02:53 | 21 | would say, yeah, it does look like he intended |
| 15:02:56 | 22 | to -- to throw himself into the vehicle, so -- |
| 15:02:59 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

15:02:59  1        Q.   But we talked about before, when we

15:03:01  2   were watching the -- when we were watching the

15:03:03  3   video, the car seemed to still be moving after

15:03:06  4   contact was made, correct?

15:03:07  5        MS. HUGGINS:   Form.

15:03:07  6        THE WITNESS:   From -- from wherever this

15:03:09  7   viewpoint was, I mean, it -- it can look like all

15:03:12  8   types of stuff, but what -- what did -- what did

15:03:14  9   the officers on the ground view?

15:03:17  10       You know, Lauren is the best person to ask

15:03:19  11  this question to.  I didn't -- I wasn't right here,

15:03:23  12  you know, I --

15:03:23  13       BY MR. DAVENPORT:

15:03:23  14       Q.   Right.  No.  I -- I understand.

15:03:24  15       A.   I'm way up the street, you know?

15:03:26  16       Q.   And, you know, she signed this under

15:03:28  17  the penalties of perjury --

15:03:28  18       A.   Yeah.

15:03:30  19       Q.   -- so it's -- you know, this is more so

15:03:31  20  what she said, but I'm just merely asking if you

15:03:33  21  agree with what was written.

15:03:34  22       A.   I -- I do agree with what --

15:03:36  23       MS. HUGGINS:   Form.

15:03:37  1          THE WITNESS:  -- was -- what was written.

15:03:37  2          BY MR. DAVENPORT:

15:03:37  3          Q.   So after what you saw on the video, he

15:03:39  4   intended to damage the vehicle?

15:03:40  5          MS. HUGGINS:   Form.   Asked and answered.

15:03:41  6          THE WITNESS:   Yeah.

15:03:42  7          BY MR. DAVENPORT:

15:03:42  8          Q.   Okay.   So going towards the next line:

15:03:45  9   The property of another person, City of Buffalo

15:03:48  10  Police Department, and having no right to do so,

15:03:51  11  nor any reasonable ground to believe that he had

15:03:54  12  such right, did damage the property, to wit,

15:03:58  13  driver's side mirror and driver's side mirror of

15:04:01  14  patrol vehicle, in the amount of more than $250.

15:04:04  15         Now, my question is:   At any point during

15:04:07  16  that day, was there ever a second opinion that was

15:04:11  17  received, besides the officers on scene, for what

15:04:13  18  the damage to the police vehicle was at that time?

15:04:16  19         A.   I would have absolutely no idea if --

15:04:19  20  if anyone else looked at -- looked at it.

15:04:23  21         I wouldn't even know who to -- who to ask

15:04:26  22  that to.

15:04:27  23         Q.   Okay.

*Moriarity - Davenport - 2/21/20*

285

15:04:27  1          A.   Maybe the -- I know -- I mean, did they

15:04:29  2   take it to the Seneca garage?  I don't know

15:04:32  3   these -- I don't know those answers.

15:04:33  4          Q.   Okay.

15:04:33  5          A.   I don't know what they did with -- with

15:04:36  6   anything.

15:04:37  7          Q.   So I'm going to show you what's been

15:04:39  8   marked as Exhibit 18.

15:04:42  9          A.   What is this?

15:04:45 10          Q.   Can you read the date that's right

15:04:48 11   underneath service information?

15:04:53 12          A.   Oh, the one that's circled?  1/5/2017.

15:04:57 13          Q.   Okay.  So, now, it's been represented

15:04:58 14   to us by your counsel that this is the first

15:05:02 15   maintenance work order after that incident, so --

15:05:06 16          A.   Okay.

15:05:06 17          MS. HUGGINS:  Form.

15:05:08 18          BY MR. DAVENPORT:

15:05:10 19          Q.   Do you see anything that's on there

15:05:12 20   where it refers to fixing or repairing a driver's

15:05:19 21   side window or driver's side mirror?

15:05:21 22          A.   No.

15:05:21 23          Q.   Okay.  Was does it refer to?

*Moriarity - Davenport - 2/21/20*

286

15:05:24  1        A.   It says service cooling system.   And

15:05:26  2   then remarks -- I don't know what RR means, but

15:05:29  3   water pump and then serp belt.   Maybe serpentine

15:05:36  4   belt.

15:05:36  5        Q.   Okay.   And would you agree that there's

15:05:38  6   no estimate as to what the cost will be for

15:05:42  7   repairing the vehicle?

15:05:43  8        MS. HUGGINS:   Form.

15:05:44  9        THE WITNESS:   Yeah.   It's blank.

15:05:45 10        BY MR. DAVENPORT:

15:05:45 11        Q.   Okay.   And you would also agree with me

15:05:48 12   that it in no way refers to the driver's side

15:05:51 13   mirror or the driver's side window.

15:05:52 14        A.   Correct.

15:05:53 15        Q.   Okay.   So now turning back to Exhibit 17,

15:06:00 16   would you agree that it was speculation that the

15:06:03 17   amount of the damage was more than $250?

15:06:06 18        MS. HUGGINS:   Form.

15:06:06 19        THE WITNESS:   That would be speculation,

15:06:11 20   I've got to defer to Lauren.   I don't -- she --

15:06:14 21   again, you know, she signed off on the charges, so

15:06:16 22   I -- I don't know.

15:06:17 23        BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

287

15:06:17  1      Q.   Okay.

15:06:18  2      A.   I'm not a mechanic either.  I don't

15:06:20  3  know how much a mirror costs.

15:06:21  4      Q.   Sure.

15:06:21  5      All right.  So next sentence:  In that the

15:06:24  6  defendant did intentionally throw his body into the

15:06:27  7  driver's side mirror of patrol vehicle number 473,

15:06:31  8  causing the mirror to become dislodged from the

15:06:34  9  vehicle.

15:06:34 10      Now, on that day, did you observe the

15:06:36 11  driver's side mirror becoming dislodged from the

15:06:39 12  vehicle?

15:06:40 13      MS. HUGGINS:   Form.

15:06:40 14      THE WITNESS:   I don't even think I looked at

15:06:43 15  the truck.

15:06:43 16      BY MR. DAVENPORT:

15:06:43 17      Q.   Okay.  And also causing the driver's

15:06:47 18  side window to malfunction.  The value of said

15:06:49 19  damage to exceed $250.

15:06:53 20      Now, did anybody at any point talk about the

15:06:58 21  driver's side mirror or the driver's side window

15:07:01 22  being either dislodged or malfunctioning on the

15:07:03 23  day?

15:07:05    1          A.    It --

15:07:05    2          MS. HUGGINS:   Form.

15:07:06    3          THE WITNESS:   If -- if they -- they did,

15:07:09    4    they didn't say it to me, because why would you

15:07:11    5    talk to me?  I'm brand new.  If they said it in

15:07:15    6    front of me, then I don't -- I don't remember,

15:07:17    7    because I probably wasn't either -- I don't know.

15:07:20    8    I wasn't paying attention or I just didn't

15:07:22    9    remember.

15:07:27   10          BY MR. DAVENPORT:

15:07:28   11          Q.    All right.  So we'll turn to the next

15:07:30   12    criminal complaint, which is for disorderly

15:07:33   13    conduct.

15:07:33   14          So now it says, the said defendant, at the

15:07:37   15    aforesaid time and place, with intent to cause

15:07:40   16    public inconvenience, annoyance, or alarm, or

15:07:43   17    recklessly creating a risk thereof, while in

15:07:46   18    a public place, did use abusive or obscene language

15:07:51   19    or made an obscene gesture.

15:07:54   20          Now, at any time that you were with

15:07:57   21    Mr. Kistner, did he ever make an obscene gesture to

15:08:00   22    any of the officers?

15:08:01   23          A.    I mean, even -- even on the video, it

15:08:05  1    just shows us taking off.  I -- I didn't have any

15:08:11  2    confrontation with him, with the exception of

15:08:13  3    walking him back to patrol vehicle 532 and placing

15:08:18  4    him in the back, and then -- and then that was it.

15:08:22  5         Q.   Now, when you say a confrontation, what

15:08:24  6    are you referring to?

15:08:24  7         A.   Just -- just me in contact with him,

15:08:28  8    bringing him back to the patrol vehicle.  That --

15:08:32  9    that was it.  That's the confrontation.

15:08:34  10         Q.   Okay.  Did he ever make any sort of

15:08:36  11   rude remarks or use any obscene language directed

15:08:40  12   towards you or Mr. Schultz?

15:08:42  13        A.   Not to me.  Not from what I remember.

15:08:45  14        Q.   Okay.  What about to Mr. Schultz?

15:08:49  15        A.   Not to -- not to what I remember.

15:08:50  16        Q.   Okay.  Now, in that the defendant did

15:08:56  17   intentionally throw his body into the driver's side

15:08:59  18   mirror of patrol vehicle number 473, causing the

15:09:02  19   mirror to become dislodged from the vehicle and

15:09:04  20   also causing the driver's side window to

15:09:06  21   malfunction, the value of said damage to exceed

15:09:10  22   $250.

15:09:11  23        Now, do you know if for disorderly conduct,

15:09:14  1    is there some sort of a threshold amount of damage

15:09:17  2    that's recovered -- required in order to charge

15:09:19  3    somebody with that penal law statute?

15:09:21  4            MS. HUGGINS:  Form.

15:09:21  5            THE WITNESS:  No, there's not.

15:09:23  6            BY MR. DAVENPORT:

15:09:23  7        Q.    Okay.  And while being treated at ECMC,

15:09:27  8    the defendant did use obscene and offensive

15:09:30  9    language toward officers and medical staff.

15:09:33  10        Do you remember the individual, Mr. Kistner,

15:09:38  11    ever using obscene language towards the medical

15:09:40  12    staff there?

15:09:41  13        A.    I wasn't in the room with him.

15:09:43  14        Q.    Okay.  Now, have you ever used

15:09:53  15    a strip search or a body cavity search before,

15:09:57  16    after somebody's been taken to cell block or

15:10:01  17    booking?

15:10:01  18        A.    No.

15:10:01  19        Q.    Never before?

15:10:02  20        A.    No.  Cell block does their formal

15:10:05  21    searches, but no.

15:10:06  22        Q.    Have you ever directed a cell block

15:10:08  23    attendant to use a body cavity or a strip search?

15:10:11   1          A.    I don't have the authority to do that.

15:10:13   2          Q.    Okay.  Are you aware of any

15:10:14   3    strip searches or body cavity searches that

15:10:17   4    were done by cell block attendants from someone

15:10:20   5    that you arrested?

15:10:21   6          **MS. HUGGINS:**  Form.

15:10:21   7          **THE WITNESS:**  Can you -- can you explain

15:10:23   8    what you mean by that?

15:10:24   9          Their policy is you have to strip down to

15:10:26   10   your boxers.

15:10:27   11         **BY MR. DAVENPORT:**

15:10:27   12         Q.    Right.

15:10:27   13         A.    Okay.

15:10:28   14         Q.    No.  I understand what the policy is.

15:10:29   15   I guess what I'm asking is:  Are you aware of

15:10:31   16   anyone that you arrested then having a strip search

15:10:34   17   or a body cavity search while at cell block?

15:10:38   18         **MS. HUGGINS:**  Form.

15:10:38   19         **THE WITNESS:**  No to body cavity searches.

15:10:41   20   I didn't know that that was a thing.

15:10:42   21         And then strip search, yeah, everyone we

15:10:45   22   arrest gets stripped down to -- for males, they get

15:10:48   23   stripped down to their boxers.

15:10:50  1        BY MR. DAVENPORT:

15:10:50  2        Q.   Okay.   And that's every arrest, for any

15:10:53  3    offense whatsoever?

15:10:54  4        A.   That's correct.

15:10:54  5        Q.   Okay.   How many arrests have you made

15:10:57  6    personally?

15:10:58  7        A.   The number's up there, but I don't

15:11:00  8    know.

15:11:00  9        Q.   Okay.   Would it be more or less than

15:11:03  10   a hundred?

15:11:03  11       A.   More.

15:11:04  12       Q.   Okay.   So for each of those hundred

15:11:08  13   individuals, you have -- you are aware that

15:11:09  14   a strip search was done?

15:11:10  15       A.   Yeah, absolutely.

15:11:11  16       Q.   Okay.   Now, at this time, after

15:11:20  17   Mr. Kistner has been criminally charged according

15:11:22  18   to those criminal complaints, did you ever talk

15:11:24  19   with Mr. Schultz or Ms. McDermott or Ms. Velez

15:11:28  20   about the criminal charges against Mr. Kistner?

15:11:30  21       A.   I never knew what was actually charged.

15:11:32  22       Q.   Okay.   So no further conversations with

15:11:35  23   those individuals about what happened on January 1st?

*Moriarity - Davenport - 2/21/20*

293

15:11:38 1          A.    No.

15:11:39 2          MR. DAVENPORT:   Okay.   All right.   I think

15:11:41 3 I'm all set.

15:11:42 4          Do you have any questions?

15:11:43 5          MS. HUGGINS:   I have no questions.

15:11:44 6          MR. DAVENPORT:   All right.   Thank you.

7          (Proceedings of 2/21/20 were then concluded

8 at 3:11 p.m.)

9

10                        *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

1        I hereby CERTIFY that I have read the
2    foregoing 293 pages, and that except as to those
3    changes (if any) as set forth in an attached errata
4    sheet, they are a true and accurate transcript of
5    the testimony given by me in the above entitled
6    action on February 21, 2020.
7
8
9                    ------------------------
                     KYLE T. MORIARITY
10
11
12
13
14
15
16
17
18
19
20
21
22
23

295

1   STATE OF NEW YORK)

2                    ss:

3   COUNTY OF ERIE   )

4

5       I DO HEREBY CERTIFY as a Notary Public in and

6   for the State of New York, that I did attend and

7   report the foregoing deposition, which was taken

8   down by me in a verbatim manner by means of machine

9   shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18                      *Anne T. Barone*
                    ----------------------------
19                    ANNE T. BARONE, RPR,
                      Notary Public.
20

21

22

23