EXHIBIT G

**DAVID SANTANA**


UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


------------------------------------------
JAMES C. KISTNER,
                        Plaintiff,

              - vs -      Civil Action No.
                         18-cv-00402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
  capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),
                        Defendants.
------------------------------------------


*JACK W. HUNT & ASSOCIATES, INC.*

2

1          Examination before trial of **DAVID**

2   **SANTANA**, Defendant, taken pursuant to the Federal

3   Rules of Civil Procedure, in the offices of JACK W.

4   HUNT & ASSOCIATES, 1120 Liberty Building, Buffalo,

5   New York, on September 8, 2020, commencing at

6   10:13 a.m., before RICHARD B. WHALEN, CM, Notary

7   Public.

8   APPEARANCES:      RUPP BAASE
                      PFALZGRAF & CUNNINGHAM, LLC,
9                     By CHAD DAVENPORT, ESQ.,
                      1600 Liberty Building,
10                    Buffalo, New York  14202,
                      (716) 854-3400,
11                    davenport@ruppbaase.com,
                      Appearing for the Plaintiff.
12
                      TIMOTHY A. BALL, ESQ.,
13                    Corporation Counsel,
                      By MAEVE E. HUGGINS, ESQ.,
14                    Assistant Corporation Counsel,
                      1137 City Hall,
15                    Buffalo, New York  14202,
                      (716) 851-4334,
16                    mhuggins@city-buffalo.com,
                      Appearing for the Defendants.
17
    PRESENT:          JAMES C. KISTNER

10:13:14 18

10:13:14 19          **THE COURT REPORTER:**  Read and sign,

10:13:16 20   Ms. Huggins?

10:13:17 21          **MS. HUGGINS:**  Yes, please.

10:13:17 22

10:13:17 23

3

10:13:36  1   **D A V I D   S A N T A N A**, 633 East Ferry, Buffalo,

10:13:42  2 New York  14211, after being duly called and sworn,

10:13:42  3 testified as follows:

10:13:42  4

     5         **EXAMINATION BY MR. DAVENPORT:**

     6

10:13:48  7     **Q.**   Good morning, Mr. Santana. As I'm sure

10:13:51  8 that you are aware, we are here to discuss an

10:13:53  9 incident that occurred on January 1st of 2017.

10:13:57 10 Have you ever given sworn deposition testimony

10:13:59 11 before?

10:14:00 12     **A.**   Yes.

10:14:00 13     **Q.**   Was that a in a civil or criminal

10:14:03 14 context?

10:14:07 15     **A.**   For this?

10:14:09 16     **MS. HUGGINS:** He's asking if it was in the

10:14:10 17 context of civil lawsuit or if it was in criminal

10:14:14 18 court.

10:14:14 19     **THE WITNESS:** Civil. Well, I'm assuming --

10:14:16 20 it's just for this. That's the only one I've done,

10:14:19 21 so.

10:14:19 22     **BY MR. DAVENPORT:**

10:14:20 23     **Q.**   Okay. Who took that deposition

*Santana - Davenport - 9/8/20*

4

| | |
|---|---|
| 10:14:21 | 1 |
| 10:14:22 | 2 |
| 10:14:24 | 3 |

10:14:21  1   testimony?

10:14:22  2        A.    Was that the one we did last time when

10:14:24  3   I was --

10:14:26  4        MS. HUGGINS:  Are you asking the attorney

10:14:28  5   who asked -- who took the deposition?

10:14:31  6        MR. DAVENPORT:  Yeah.

10:14:32  7        BY MR. DAVENPORT:

10:14:33  8        Q.    So for this civil lawsuit, who was the

10:14:34  9   attorney that took the deposition testimony that

10:14:37 10   you appeared for?

10:14:39 11        MS. HUGGINS:  I think you guys are both

10:14:41 12   confused about what you're asking about.  He's

10:14:44 13   asking have you ever testified in a deposition

10:14:46 14   before.

10:14:46 15        THE WITNESS:  Oh, I thought -- I assumed the

10:14:48 16   last time that we did it was for this, but.

10:14:50 17        MS. HUGGINS:  No, not this case.

10:14:51 18        THE WITNESS:  No, no.

10:14:52 19        BY MR. DAVENPORT:

10:14:53 20        Q.    Okay.  Was that recently that you gave

10:14:58 21   deposition testimony then?

10:14:59 22        A.    The last time when I was at city hall.

10:15:02 23        Q.    When was that?

*Santana - Davenport - 9/8/20*

5

| | | |
|---|---|---|
| 10:15:04 | 1 | **MS. HUGGINS:**  If you -- I can't answer the |
| 10:15:06 | 2 | questions for you -- |
| 10:15:06 | 3 | **THE WITNESS:**  Yeah. |
| 10:15:06 | 4 | **MS. HUGGINS:**  -- so if you don't remember -- |
| 10:15:08 | 5 | **THE WITNESS:**  I don't recall. |
| 10:15:09 | 6 | **MS. HUGGINS:**  Yeah. |
| 10:15:10 | 7 | **BY MR. DAVENPORT:** |
| 10:15:10 | 8 | **Q.**   Okay.  So I'm just going to go over a |
| 10:15:13 | 9 | couple of ground rules for deposition testimony, |
| 10:15:15 | 10 | the first one being that I'm going to ask you to |
| 10:15:20 | 11 | give all verbal responses.  Don't shake your head |
| 10:15:21 | 12 | or nod your head for responses to any of the |
| 10:15:23 | 13 | questions. |
| 10:15:24 | 14 | The other thing is, you know, I'm going to |
| 10:15:26 | 15 | ask that you answer the questions to the best of |
| 10:15:30 | 16 | your ability without conferring with your attorney. |
| 10:15:31 | 17 | This is a deposition of you and I want your |
| 10:15:33 | 18 | testimony.  So whatever answer you can give, and "I |
| 10:15:37 | 19 | don't recall" is an acceptable answer.  Please give |
| 10:15:40 | 20 | me this answer without conferring with your |
| 10:15:43 | 21 | attorney beforehand. |
| 10:15:44 | 22 | If at any time you need to take a break, |
| 10:15:46 | 23 | just let ME know, I'm more than happy to accommodate. |

*Santana - Davenport - 9/8/20*

6

| | | |
|---|---|---|
| 10:15:51 | 1 | And we'll try to get this done as quickly as |
| 10:15:53 | 2 | possible so that way, we can get you out of here |
| 10:15:56 | 3 | and we can all get on with our days. |
| 10:15:59 | 4 | So the prior deposition testimony that you |
| 10:16:01 | 5 | gave, was that -- that was in the context of a |
| 10:16:04 | 6 | civil lawsuit, correct? |
| 10:16:05 | 7 | **A.** Yes. |
| 10:16:05 | 8 | **Q.** Okay. Now, was that within the past |
| 10:16:10 | 9 | year? |
| 10:16:10 | 10 | **A.** Yes. |
| 10:16:11 | 11 | **Q.** Okay. And that took place at city |
| 10:16:13 | 12 | hall? |
| 10:16:13 | 13 | **A.** Yes. |
| 10:16:13 | 14 | **Q.** Okay. Were you named as a defendant in |
| 10:16:16 | 15 | that lawsuit? |
| 10:16:16 | 16 | **A.** Yes. |
| 10:16:17 | 17 | **Q.** What stage is that case at right now? |
| 10:16:23 | 18 | **A.** I don't know. |
| 10:16:24 | 19 | **Q.** Okay. When did that incident take |
| 10:16:28 | 20 | place for that lawsuit? |
| 10:16:29 | 21 | **A.** January 1st of 2017. |
| 10:16:33 | 22 | **MS. HUGGINS:** Wait. He's not talking about |
| 10:16:35 | 23 | this lawsuit. |

*Santana - Davenport - 9/8/20*

7

| 10:16:36 | 1 | THE WITNESS:  Oh, when I gave my -- |
| 10:16:39 | 2 | MS. HUGGINS:  He's asking about -- maybe |
| 10:16:41 | 3 | rephrase your question. |
| 10:16:42 | 4 | MR. DAVENPORT:  Sure. |
| 10:16:42 | 5 | BY MR. DAVENPORT: |
| 10:16:44 | 6 | Q.    So for the other lawsuit that you gave |
| 10:16:46 | 7 | deposition testimony in, when did that incident |
| 10:16:48 | 8 | take place for that lawsuit? |
| 10:16:50 | 9 | A.    I don't recall. |
| 10:16:51 | 10 | Q.    Okay.  Was it in 2017? |
| 10:16:54 | 11 | A.    No. |
| 10:16:55 | 12 | Q.    Okay.  Was it after 2017? |
| 10:16:58 | 13 | A.    Yes. |
| 10:16:58 | 14 | Q.    Okay.  Do you know who the attorney was |
| 10:17:04 | 15 | that took the deposition testimony? |
| 10:17:05 | 16 | A.    No, I don't recall. |
| 10:17:06 | 17 | Q.    Do you know what law office he was |
| 10:17:08 | 18 | affiliated with? |
| 10:17:09 | 19 | A.    No. |
| 10:17:10 | 20 | Q.    What's your highest level of education, |
| 10:17:13 | 21 | Mr. Santana? |
| 10:17:14 | 22 | A.    Associate's degree. |
| 10:17:15 | 23 | Q.    And where did you study for that |

Santana - Davenport - 9/8/20

8

| | | |
|---|---|---|
| 10:17:17 | 1 | associate's degree? |
| 10:17:18 | 2 | A.    Online at American Intercontinental |
| 10:17:24 | 3 | University. |
| 10:17:27 | 4 | Q.    When did you graduate? |
| 10:17:31 | 5 | A.    I don't recall the dates. |
| 10:17:33 | 6 | Q.    Do you remember roughly what year it |
| 10:17:36 | 7 | was? |
| 10:17:37 | 8 | A.    No, I don't recall the dates.  I don't |
| 10:17:40 | 9 | recall the year. |
| 10:17:40 | 10 | Q.    Okay.  Was it 2005 to 2010? |
| 10:17:45 | 11 | A.    If I was going to give a date, it would |
| 10:17:48 | 12 | be before 2012. |
| 10:17:50 | 13 | Q.    Okay.  Why do you say that is before |
| 10:17:52 | 14 | 2012? |
| 10:17:53 | 15 | A.    Because I needed to have a degree in |
| 10:17:55 | 16 | order to become an officer at that time. |
| 10:17:56 | 17 | Q.    Okay.  When did you become an officer? |
| 10:17:59 | 18 | A.    January 13th, 2012. |
| 10:18:02 | 19 | Q.    Okay.  Now, before you became an |
| 10:18:08 | 20 | officer, were you employed? |
| 10:18:09 | 21 | A.    I was. |
| 10:18:10 | 22 | Q.    Where were you employed? |
| 10:18:12 | 23 | A.    HSBC Mortgage Corporation. |

*Santana - Davenport - 9/8/20*

9

| | | |
|---|---|---|
| 10:18:14 | 1 | **Q.**   And what kind of work did you do that? |
| 10:18:16 | 2 | **A.**   Post-closing, I reviewed mortgages |
| 10:18:19 | 3 | after closing. |
| 10:18:20 | 4 | **Q.**   Okay.  How long did you work at HSBC |
| 10:18:25 | 5 | for? |
| 10:18:25 | 6 | **A.**   About five years. |
| 10:18:28 | 7 | **Q.**   Was that a job that was right after |
| 10:18:30 | 8 | high school? |
| 10:18:31 | 9 | **A.**   No. |
| 10:18:32 | 10 | **Q.**   Did you work somewhere before HSBC? |
| 10:18:37 | 11 | **A.**   I was in the military. |
| 10:18:38 | 12 | **Q.**   Okay.  How long were you in the |
| 10:18:39 | 13 | military for? |
| 10:18:40 | 14 | **A.**   I did the reserves for 11 years.  Prior |
| 10:18:43 | 15 | to HSBC, I was in Iraq for a year, a year and three |
| 10:18:48 | 16 | months. |
| 10:18:48 | 17 | **Q.**   Okay.  Do you remember what year you |
| 10:18:50 | 18 | were in Iraq? |
| 10:18:51 | 19 | **A.**   2004 to 2005. |
| 10:18:55 | 20 | **Q.**   Okay.  And then you remained in the |
| 10:18:59 | 21 | reserves from 2005 afterwards? |
| 10:19:01 | 22 | **A.**   Yes. |
| 10:19:02 | 23 | **Q.**   Okay.  When were you no longer a part |

| | | |
|---|---|---|
| 10:19:05 | 1 | of the reserves?  Do you remember what year? |
| 10:19:07 | 2 | **A.**   I don't remember what year I left. |
| 10:19:10 | 3 | **Q.**   Okay.  Was it 11 years after 2005? |
| 10:19:15 | 4 | **MS. HUGGINS:**  Form. |
| 10:19:16 | 5 | **THE WITNESS:**  No.  No, because I joined |
| 10:19:19 | 6 | before that.  I can't recall what years. |
| 10:19:23 | 7 | **BY MR. DAVENPORT:** |
| 10:19:24 | 8 | **Q.**   Okay.  How many years were you in the |
| 10:19:26 | 9 | reserves before you were deployed to Iraq? |
| 10:19:28 | 10 | **A.**   Two years. |
| 10:19:29 | 11 | **Q.**   And were you honorably discharged? |
| 10:19:36 | 12 | **A.**   I was. |
| 10:19:37 | 13 | **Q.**   So when you -- the year that you became |
| 10:19:42 | 14 | part of the Buffalo Police Department was in 2012? |
| 10:19:45 | 15 | **A.**   That's right. |
| 10:19:46 | 16 | **Q.**   Okay.  And it was January 13th? |
| 10:19:47 | 17 | **A.**   Yes. |
| 10:19:48 | 18 | **Q.**   Okay.  Did you have to take part in any |
| 10:19:51 | 19 | training before? |
| 10:19:52 | 20 | **A.**   No. |
| 10:19:54 | 21 | **Q.**   Okay.  Did you participate in the |
| 10:19:57 | 22 | Buffalo Police Academy before? |
| 10:20:00 | 23 | **A.**   Before I was assigned or when I was |

*Santana - Davenport - 9/8/20*

11

| 10:20:02 | 1 | sworn in? |

10:20:02  1  sworn in?

10:20:03  2  **Q.**   Before January 13th of 2012.

10:20:05  3  **A.**   Yes.

10:20:07  4  **Q.**   Okay.  And how long were you in the

10:20:08  5  Buffalo Police Academy for?

10:20:10  6  **A.**   Six months.

10:20:12  7  **Q.**   Do you remember what six months you

10:20:16  8  entered the Buffalo Police Academy and

10:20:19  9  participated?

10:20:19  10  **A.**   No, I do not.

10:20:20  11  **Q.**   Okay.  Do you remember what year?

10:20:23  12  **A.**   2012.

10:20:26  13  **Q.**   So when did you -- how long were you in

10:20:31  14  the Buffalo Police Academy before January 13th of

10:20:35  15  2012?

10:20:36  16  **A.**   No, actually, let me rephrase that.  I

10:20:41  17  was sworn in on January 13th, 2012, and I don't

10:20:46  18  know what time I went to the academy shortly after.

10:20:49  19  **Q.**   Okay.

10:20:50  20  **A.**   The six months from that date, but like

10:20:52  21  I said, I can't recall times and dates.

10:20:55  22  **Q.**   Okay.  So it was six months after you

10:20:57  23  were sworn in?

*Santana - Davenport - 9/8/20*

12

| | | |
|---|---|---|
| 10:20:59 | 1 | **A.**    Yes. |
| 10:20:59 | 2 | **Q.**    Okay.  Do you remember what year you |
| 10:21:06 | 3 | completed your training with the Buffalo Police |
| 10:21:08 | 4 | Academy? |
| 10:21:09 | 5 | **A.**    2012. |
| 10:21:09 | 6 | **Q.**    Okay.  Now, did you take any training |
| 10:21:24 | 7 | with the Buffalo Police Academy before 2012? |
| 10:21:28 | 8 | **A.**    No. |
| 10:21:29 | 9 | **Q.**    Okay. |
| 10:21:40 | 10 | **MR. DAVENPORT:**  Can I have this marked as -- |
| 10:21:42 | 11 | I believe we're up to Exhibit 35. |
| | 12 | (Discussion off the record.) |
| | 13 | **The following was marked for Identification:** |
| | 14 | **EXH. 35**                 **Buffalo Police Academy** |
| | 15 | **training records, three** |
| | 16 | **pages** |
| 10:23:10 | 17 | **BY MR. DAVENPORT:** |
| 10:23:11 | 18 | **Q.**    So Mr. Santana, I'm going to hand to |
| 10:23:13 | 19 | you what's been marked as Exhibit 35.  Do you |
| 10:23:16 | 20 | recognize this document? |
| 10:23:17 | 21 | **A.**    I do. |
| 10:23:18 | 22 | **Q.**    And what do you recognize it to be? |
| 10:23:19 | 23 | **A.**    A Buffalo Police Academy training |

*Santana - Davenport - 9/8/20*

13

| | | |
|---|---|---|
| 10:23:22 | 1 | record. |
| 10:23:24 | 2 | **Q.** Now, do you see in the first column |
| 10:23:26 | 3 | where it says active shooter training in |
| 10:23:29 | 4 | February 8th of 2008? |
| 10:23:31 | 5 | **A.** I do see that. |
| 10:23:32 | 6 | **Q.** Do you believe that to be correct? |
| 10:23:33 | 7 | **A.** No, I believe that to be false. |
| 10:23:36 | 8 | **Q.** Okay. And why do you believe that to |
| 10:23:37 | 9 | be false? |
| 10:23:38 | 10 | **A.** Because I wasn't in the police |
| 10:23:40 | 11 | department in 2008. |
| 10:23:40 | 12 | **Q.** Okay. Do you know when you participated |
| 10:23:42 | 13 | in the active shooter training? |
| 10:23:46 | 14 | **A.** On this document in front of my face |
| 10:23:49 | 15 | right here, it says May 27th of 2015 on the first |
| 10:23:57 | 16 | page and at the bottom. |
| 10:23:58 | 17 | **Q.** Was that the first time that you took |
| 10:24:00 | 18 | active shooter training? |
| 10:24:02 | 19 | **A.** Yes, it is, according to this document |
| 10:24:04 | 20 | here. |
| 10:24:05 | 21 | **Q.** Okay. But you do see in the first |
| 10:24:08 | 22 | column where it says active shooter training in |
| 10:24:10 | 23 | 2008, correct? |

*Santana - Davenport - 9/8/20*

14

| | | |
|---|---|---|
| 10:24:11 | 1 | **A.**   I do see that. |
| 10:24:12 | 2 | **Q.**   Okay.  Does the Buffalo Police Academy |
| 10:24:15 | 3 | ever use training that you may have taken in the |
| 10:24:17 | 4 | military as part of its training courses? |
| 10:24:20 | 5 | **A.**   No. |
| 10:24:20 | 6 | **Q.**   Okay.  So when it's written that you |
| 10:24:27 | 7 | took active shooter training in 2008, would that be |
| 10:24:32 | 8 | a concern that you would bring up to a supervisor |
| 10:24:34 | 9 | or somebody with the Buffalo Police Department to |
| 10:24:38 | 10 | have them take that training off of your record? |
| 10:24:40 | 11 | **MS. HUGGINS:**   Form. |
| 10:24:42 | 12 | **THE WITNESS:**   I'm not concerned in regards |
| 10:24:44 | 13 | to this because I don't see this documentation, |
| 10:24:46 | 14 | this paper that often. |
| 10:24:48 | 15 | **BY MR. DAVENPORT:** |
| 10:24:49 | 16 | **Q.**   How often do you see that documentation? |
| 10:24:50 | 17 | **A.**   This is actually the first time I've |
| 10:24:52 | 18 | seen it. |
| 10:24:52 | 19 | **Q.**   Okay.  Are officers required to keep up |
| 10:24:58 | 20 | to date with their training? |
| 10:24:59 | 21 | **A.**   Yes. |
| 10:25:00 | 22 | **Q.**   And who is responsible for making sure |
| 10:25:02 | 23 | that officers keep up with their training? |

*Santana - Davenport - 9/8/20*

15

| | | | |
|---|---|---|---|
| 10:25:05 | 1 | **A.** | The training academy. |
| 10:25:07 | 2 | **Q.** | And who runs the training academy? |
| 10:25:08 | 3 | **A.** | I do not know. |
| 10:25:09 | 4 | **Q.** | Is it the City of Buffalo? |
| 10:25:11 | 5 | **A.** | The City of Buffalo does, that's |
| 10:25:12 | 6 | correct. | |
| 10:25:13 | 7 | **Q.** | Okay.  Is there a specific department |
| 10:25:19 | 8 | that's in charge of making sure that officers are | |
| 10:25:23 | 9 | up to date on their training? | |
| 10:25:25 | 10 | **A.** | The Buffalo City Police Department, |
| 10:25:27 | 11 | yes. | |
| 10:25:27 | 12 | **Q.** | Is there a certain department within |
| 10:25:29 | 13 | the Buffalo Police Department? | |
| 10:25:30 | 14 | **A.** | The training academy. |
| 10:25:31 | 15 | **Q.** | Okay.  So the training academy is a |
| 10:25:34 | 16 | department of the Buffalo Police Department? | |
| 10:25:36 | 17 | **A.** | Yes, it's within the Buffalo Police |
| 10:25:38 | 18 | Department. | |
| 10:25:38 | 19 | **Q.** | Okay.  Now, based on what you see in |
| 10:25:47 | 20 | this document, and I'll give you a second to review | |
| 10:25:49 | 21 | it, is there any training courses that you do not | |
| 10:25:52 | 22 | see in here that you did take between the time of | |
| 10:25:57 | 23 | we'll say June 6th, 2012, to January 21st of 2019? | |

*Santana - Davenport - 9/8/20*

16

10:26:02   1       **A.**    No, everything that I took would be on

10:26:05   2   this form.

10:26:06   3       **Q.**    After you take a training course, are

10:26:08   4   you required to fill out any documentation showing

10:26:10   5   that you took this -- such a course?

10:26:13   6       **A.**    No.

10:26:15   7       **Q.**    Is there a sign-in sheet for the

10:26:17   8   training courses?

10:26:18   9       **A.**    There is.

10:26:19 10       **Q.**    Okay. Do all the officers sign that

10:26:21 11   sign-in sheet?

10:26:23 12       **A.**    I do. I don't know about the others,

10:26:25 13   but yes.

10:26:27 14       **Q.**    And is there a sign-out portion as

10:26:30 15   well?

10:26:30 16       **A.**    No, just the sign-in sheet.

10:26:34 17       **Q.**    Is attendance kept during these

10:26:37 18   training courses?

10:26:38 19       **A.**    Yes.

10:26:39 20       **Q.**    Is there some sort of roll call or

10:26:41 21   anything like that?

10:26:42 22       **A.**    Yes.

10:26:43 23       **Q.**    Okay. So in addition to the sign-in

*Santana - Davenport - 9/8/20*

17

| | | |
|---|---|---|
| 10:26:47 | 1 | sheet, there's also a roll call that takes place |
| 10:26:49 | 2 | for each of the training courses? |
| 10:26:53 | 3 | **A.** Yes. |
| 10:26:53 | 4 | **Q.** Now, after your six-month course with |
| 10:27:06 | 5 | the Buffalo training academy in 2012, did you |
| 10:27:09 | 6 | become a field training officer after that? |
| 10:27:11 | 7 | **A.** No, I did not. |
| 10:27:12 | 8 | **Q.** And why was that? |
| 10:27:14 | 9 | **A.** Because at that time, I believe you had |
| 10:27:17 | 10 | to have three years, but I'm not certain on how |
| 10:27:20 | 11 | much time you had in patrol in order to become a |
| 10:27:23 | 12 | field training officer. |
| 10:27:24 | 13 | **Q.** Okay. So you started off as a patrol |
| 10:27:27 | 14 | officer then? |
| 10:27:28 | 15 | **A.** That's correct. |
| 10:27:28 | 16 | **Q.** Do you know what year you started as a |
| 10:27:32 | 17 | patrol officer? |
| 10:27:32 | 18 | **A.** 2012. |
| 10:27:36 | 19 | **Q.** Now, how long were you a patrol officer |
| 10:27:38 | 20 | for? |
| 10:27:40 | 21 | **A.** What year are you talking about?  In |
| 10:27:42 | 22 | 2012 or are you talking about now? |
| 10:27:45 | 23 | **Q.** So how many years from 2012 forward |

*Santana - Davenport - 9/8/20*

18

| | | |
|---|---|---|
| 10:27:48 | 1 | were you a field -- a patrol officer for? |
| 10:27:52 | 2 | **A.**   Eight years, eight years and some |
| 10:27:54 | 3 | months. |
| 10:27:55 | 4 | **Q.**   So you're a patrol officer today then? |
| 10:27:58 | 5 | **A.**   Yes. |
| 10:27:59 | 6 | **Q.**   Have you applied to be a field training |
| 10:28:08 | 7 | officer? |
| 10:28:08 | 8 | **A.**   I did. |
| 10:28:10 | 9 | **Q.**   And were you denied that position? |
| 10:28:13 | 10 | **A.**   No, I wasn't. |
| 10:28:15 | 11 | **Q.**   Are you a field training officer today? |
| 10:28:17 | 12 | **A.**   I am. |
| 10:28:18 | 13 | **Q.**   So you're a patrol officer and also a |
| 10:28:20 | 14 | field training officer? |
| 10:28:22 | 15 | **A.**   Yes. |
| 10:28:23 | 16 | **Q.**   How long have you been a field training |
| 10:28:25 | 17 | officer for? |
| 10:28:25 | 18 | **A.**   I can't tell you the times, but a |
| 10:28:27 | 19 | couple of years. |
| 10:28:29 | 20 | **Q.**   Okay.  Was it approximately three years |
| 10:28:34 | 21 | after you became a patrol officer for the first |
| 10:28:37 | 22 | time? |
| 10:28:37 | 23 | **A.**   No, I don't recall. |

| | | |
|---|---|---|
| 10:28:42 | 1 | **Q.** Was it in the last three years that you |
| 10:28:46 | 2 | became a field training officer? |
| 10:28:48 | 3 | **A.** Possible, but I don't recall the dates. |
| 10:28:51 | 4 | **Q.** Were you a field training officer on |
| 10:28:54 | 5 | January 1st of 2017? |
| 10:28:55 | 6 | **A.** I don't -- I don't recall. |
| 10:28:57 | 7 | **Q.** Okay. But you were a patrol officer on |
| 10:29:00 | 8 | January 1st of 2017? |
| 10:29:01 | 9 | **A.** That's correct. |
| 10:29:02 | 10 | **Q.** Okay. Did you have a partner at the |
| 10:29:04 | 11 | time? |
| 10:29:05 | 12 | **A.** Yes. |
| 10:29:05 | 13 | **Q.** Okay. Who was your partner? |
| 10:29:07 | 14 | **A.** Joseph Petronella. |
| 10:29:24 | 15 | **Q.** Was Joseph working on January 1st of |
| 10:29:26 | 16 | 2017? |
| 10:29:27 | 17 | **A.** Yes, he was. |
| 10:29:29 | 18 | **Q.** Okay. Was he your partner, your |
| 10:29:35 | 19 | assigned partner that day? |
| 10:29:36 | 20 | **A.** No, he wasn't. |
| 10:29:37 | 21 | **Q.** Did you have an assigned partner that |
| 10:29:40 | 22 | day? |
| 10:29:40 | 23 | **A.** No, I don't. |

| | | |
|---|---|---|
| 10:29:42 | 1 | **Q.** Why on January 1st of 2017 did you not |
| 10:29:45 | 2 | have an assigned partner? |
| 10:29:47 | 3 | **A.** We don't get assigned partners. It's |
| 10:29:49 | 4 | usually if someone wants to ride with you, they can |
| 10:29:52 | 5 | ride with you, but it's not assigned. |
| 10:29:54 | 6 | **Q.** Okay. Would you say that on the |
| 10:29:58 | 7 | majority of your shifts, is Joseph riding around |
| 10:30:02 | 8 | with you? |
| 10:30:03 | 9 | **A.** I can't recall that, the period of |
| 10:30:05 | 10 | time. It could have been many people, but no. |
| 10:30:09 | 11 | **Q.** Is Joseph your partner today? |
| 10:30:11 | 12 | **A.** No, he isn't. |
| 10:30:13 | 13 | **Q.** Do you have a new partner? |
| 10:30:14 | 14 | **A.** Yes, I do. |
| 10:30:15 | 15 | **Q.** And who is that? |
| 10:30:17 | 16 | **A.** Officer Margaret Alvardo. |
| 10:30:35 | 17 | **Q.** When did Officer Margaret become your |
| 10:30:38 | 18 | partner? |
| 10:30:38 | 19 | **A.** She became my partner back in January. |
| 10:30:41 | 20 | I can't tell you the date in January of 2020. |
| 10:30:45 | 21 | **Q.** Was Joseph your partner for -- before |
| 10:30:51 | 22 | that time? |
| 10:30:51 | 23 | **A.** Not before that because he transferred |

*Santana - Davenport - 9/8/20*

21

10:30:53  1     to a different district years ago.

10:30:56  2           **Q.**    What district did he transfer to?

10:30:57  3           **A.**    Bravo District.

10:31:03  4           **Q.**    Was Joseph your first partner with the

10:31:06  5     Buffalo Police Department?

10:31:07  6           **A.**    That, I can't recall.

10:31:09  7           **Q.**    Besides Joseph and Margaret, who else

10:31:13  8     have been your partners?

10:31:15  9           **A.**    You have to specify whether or not on a

10:31:17  10    regular basis or -- because anybody within the

10:31:20  11    department could jump in the car and ride with me

10:31:22  12    for that patrol day.

10:31:24  13          **Q.**    What about regular partners that you've

10:31:26  14    had?

10:31:27  15          **A.**    Nope.

10:31:27  16          **Q.**    Just Joseph and Margaret?

10:31:29  17          **A.**    Yes.

10:31:29  18          **Q.**    Okay.

10:31:29  19          (Discussion off the record.)

10:31:29  20    **BY MR. DAVENPORT:**

10:31:59  21          **Q.**    Now, do you remember January 1st of

10:32:01  22    2017?

10:32:01  23          **A.**    No, I do not.

*Santana - Davenport - 9/8/20*

22

| | | |
|---|---|---|
| 10:32:04 | 1 | **Q.** Do you remember responding to a call at |
| 10:32:07 | 2 | 33 Schmarbeck? |
| 10:32:08 | 3 | **A.** No, I do not. |
| 10:32:09 | 4 | **Q.** Do you remember any places or any |
| 10:32:15 | 5 | incidents on January 1st of 2017? |
| 10:32:17 | 6 | **A.** No, I do not. |
| 10:32:31 | 7 | **Q.** So I'm gong to show you what's been |
| 10:32:32 | 8 | marked as Exhibit 16.  All right.  You see on the |
| 10:32:42 | 9 | fourth line down where it says that Joseph |
| 10:32:46 | 10 | Petronella was an officer? |
| 10:32:48 | 11 | **A.** I do. |
| 10:32:48 | 12 | **Q.** Okay.  And I'm sorry, do you recognize |
| 10:32:51 | 13 | this document? |
| 10:32:52 | 14 | **A.** Yes, I do. |
| 10:32:53 | 15 | **Q.** And what do you recognize it to be? |
| 10:32:54 | 16 | **A.** It's the shift summary sheet. |
| 10:32:56 | 17 | **Q.** Okay.  And it is the shift summary |
| 10:32:59 | 18 | sheet for what date? |
| 10:33:01 | 19 | **A.** To this document, it is January 1st of |
| 10:33:05 | 20 | 2017. |
| 10:33:05 | 21 | **Q.** Okay.  And what shift is it for? |
| 10:33:07 | 22 | **A.** The second shift. |
| 10:33:09 | 23 | **Q.** Were you working this shift? |

*Santana - Davenport - 9/8/20*

23

10:33:11 1      **A.**    Yes, I was.

10:33:12 2      **Q.**    And you said at this time Joseph

10:33:15 3  Petronella was your partner, correct, on

10:33:17 4  January 1st of 2017?

10:33:18 5      **A.**    That is correct.

10:33:19 6      **Q.**    Okay.  And you see where Joseph

10:33:23 7  Petronella is listed as the fourth officer down?

10:33:26 8      **A.**    I do.

10:33:27 9      **Q.**    So that would indicate that he was

10:33:29 10  working on this day?

10:33:30 11      **A.**    It does.

10:33:32 12      **Q.**    But Joseph Petronella was not working

10:33:36 13  as your partner on this date, correct?

10:33:38 14      **A.**    He was riding with me, so he was

10:33:41 15  working with me.

10:33:42 16      **Q.**    Okay.  Was he riding with you for the

10:33:46 17  entire day?

10:33:46 18      **A.**    Yes.

10:33:48 19      **Q.**    Do you remember if he was riding with

10:33:54 20  you for the incident at 33 Schmarbeck?

10:33:57 21      **A.**    Well, I don't remember that incident

10:33:58 22  and whether or not he was riding with me, but

10:34:00 23  according to this documentation here with the car

10:34:02  1   number listed as 625, he was with me.

10:34:05  2        **Q.**   Is that the car that you normally

10:34:07  3   drive, is car six 25?

10:34:10  4        **A.**   At that time, yes.

10:34:11  5        **Q.**   And what kind of car is that?

10:34:12  6        **A.**   A Dodge Charger.

10:34:15  7        **Q.**   Were there other types of patrol

10:34:18  8   vehicles that were being used at that time?

10:34:20  9        **A.**   Yes.

10:34:20 10        **Q.**   Okay.  And what kind of car was that?

10:34:22 11        **A.**   A Chevy Tahoe.  You have some Crown

10:34:26 12   Vices, Victorias.  The old patrol vehicles were

10:34:29 13   still in service at that time.

10:34:31 14        **Q.**   How do officers determine what type of

10:34:34 15   vehicle they're driving?

10:34:35 16        **A.**   Generally it's the most senior person

10:34:38 17   within this shift has the first pick of the

10:34:41 18   vehicles.

10:34:41 19        **Q.**   Okay.  Now, looking at Exhibit 16, who

10:34:45 20   was the most senior person at that time?

10:34:48 21        **A.**   Let's see here.  According to this

10:34:51 22   document right here that I have in front of me,

10:34:54 23   it's officer Ronnie Daniels.

| | | |
|---|---|---|
| 10:34:57 | 1 | **Q.**    Okay.   Now, is that just something that |
| 10:35:01 | 2 | you know off the top of your head or is that |
| 10:35:03 | 3 | something from the document that you are able to |
| 10:35:05 | 4 | determine? |
| 10:35:06 | 5 | **A.**    Our identifying numbers, our DID |
| 10:35:11 | 6 | numbers, his number starts with a 000217, he must |
| 10:35:16 | 7 | have gotten that DID way before, like a long time |
| 10:35:19 | 8 | ago. |
| 10:35:20 | 9 | **Q.**    Does Ronnie Daniels, does he still work |
| 10:35:23 | 10 | in C District? |
| 10:35:24 | 11 | **A.**    No, he does not. |
| 10:35:26 | 12 | **Q.**    Does he work in another district? |
| 10:35:28 | 13 | **A.**    He does. |
| 10:35:28 | 14 | **Q.**    What district does he work in? |
| 10:35:30 | 15 | **A.**    Traffic. |
| 10:35:35 | 16 | **Q.**    Is that still with the City of Buffalo? |
| 10:35:37 | 17 | **A.**    That is. |
| 10:35:42 | 18 | **Q.**    What selection did you have on |
| 10:35:45 | 19 | January 1st of 2017 for the vehicles on this date? |
| 10:35:50 | 20 | **MS. HUGGINS:**   Form. |
| 10:35:51 | 21 | **THE WITNESS:**   On this sheet here, 625. |
| 10:35:55 | 22 | **BY MR. DAVENPORT:** |
| 10:35:56 | 23 | **Q.**    In terms of order for officers who are |

*Santana - Davenport - 9/8/20*

| | | |
|---|---|---|
| 10:36:00 | 1 | picking their vehicles, do you know where you |
| 10:36:02 | 2 | ranked? |
| 10:36:02 | 3 | **A.**   At this time?  At this point in time, I |
| 10:36:04 | 4 | think -- I believe I was right in the middle of the |
| 10:36:07 | 5 | pack. |
| 10:36:11 | 6 | **Q.**   Do you know where Karl Schultz, Jenny |
| 10:36:18 | 7 | Velez, Laura McDermott, and Kyle Moriarity would |
| 10:36:24 | 8 | have ranked for their car selection? |
| 10:36:26 | 9 | **A.**   Well, this right here, it's, like I |
| 10:36:29 | 10 | said earlier, their DID numbers.  That's usually |
| 10:36:33 | 11 | the most senior guy would get the vehicle. |
| 10:36:35 | 12 | And it's sometimes not the case because they |
| 10:36:38 | 13 | prefer driving the Tahoe over the Charger.  I don't |
| 10:36:41 | 14 | know.  It's their preference, but it's generally |
| 10:36:43 | 15 | the most senior guy. |
| 10:36:45 | 16 | But who do you want to know who I have more |
| 10:36:49 | 17 | time on this paper and I can tell you if I did? |
| 10:36:49 | 18 | **Q.**   Okay.  What about Mr. Moriarity? |
| 10:36:51 | 19 | **A.**   I do have more time than he does. |
| 10:36:54 | 20 | **Q.**   Okay.  What about Ms. McDermott? |
| 10:36:56 | 21 | **A.**   I do have more time than she does. |
| 10:36:58 | 22 | **Q.**   What about Ms. Velez? |
| 10:37:00 | 23 | **A.**   I do have more time than she does. |

| 10:37:03 | 1 | **Q.** And what about Mr. Schultz? |
| 10:37:04 | 2 | **A.** He has more time than me. |
| 10:37:06 | 3 | **Q.** So it's the lower DID number |
| 10:37:09 | 4 | references -- |
| 10:37:09 | 5 | **A.** Usually the lower DID number is the |
| 10:37:11 | 6 | most senior officer.  That's to my understanding. |
| 10:37:24 | 7 | **Q.** Was there any reason that you a |
| 10:37:26 | 8 | preference for the Charger? |
| 10:37:28 | 9 | **A.** Well, it's all-wheel drive, perfect in |
| 10:37:32 | 10 | the winter. |
| 10:37:34 | 11 | **Q.** And that's not a feature that's with |
| 10:37:36 | 12 | the Chevy Tahoe? |
| 10:37:38 | 13 | **A.** No, I believe the Chevy Tahoes were |
| 10:37:41 | 14 | front-wheel drives. |
| 10:37:42 | 15 | **Q.** And what about the Crown Vic, does that |
| 10:37:45 | 16 | have all-wheel drive or front-wheel drive? |
| 10:37:47 | 17 | **A.** I believe they have front-wheel drive. |
| 10:37:49 | 18 | I don't think they have all-wheel drive, but I'm |
| 10:37:51 | 19 | not sure in regards to that. |
| 10:37:59 | 20 | **Q.** Are any of the cars more comfortable |
| 10:38:01 | 21 | than the other? |
| 10:38:02 | 22 | **A.** It's on your preference, so I don't |
| 10:38:04 | 23 | know.  It depends on who is going to drive it. |

*Santana - Davenport - 9/8/20*

28

| | | |
|---|---|---|
| 10:38:06 | 1 | **Q.**    What about for you? |
| 10:38:07 | 2 | **A.**    For me, I just love the fact that it's |
| 10:38:09 | 3 | all-wheel drive. |
| 10:38:10 | 4 | **Q.**    Okay.  So during the winter, you |
| 10:38:14 | 5 | typically pick a Dodge Charger if it's available? |
| 10:38:17 | 6 | **A.**    Winter, summer, spring, fall I pick the |
| 10:38:21 | 7 | Dodge Charger. |
| 10:38:21 | 8 | **Q.**    Okay.  Is that a car that you still |
| 10:38:24 | 9 | select today? |
| 10:38:24 | 10 | **A.**    It is. |
| 10:38:25 | 11 | **Q.**    Now, who drives typically between you |
| 10:38:39 | 12 | and your partner, Joseph? |
| 10:38:41 | 13 | **A.**    I do. |
| 10:38:43 | 14 | **Q.**    Okay.  Is that just a preference |
| 10:38:45 | 15 | between the officers? |
| 10:38:46 | 16 | **A.**    I prefer to drive. |
| 10:38:48 | 17 | **Q.**    Okay.  Is that a preference that you |
| 10:38:53 | 18 | have in your personal life, too? |
| 10:38:55 | 19 | **A.**    It is. |
| 10:39:03 | 20 | **Q.**    How long would you say on an average |
| 10:39:05 | 21 | shift you are out on patrol? |
| 10:39:09 | 22 | **A.**    10 hours. |
| 10:39:10 | 23 | **Q.**    Okay.  And when does your shift |

10:39:12   1   typically start?

10:39:14   2          **A.**   06 in the morning.

10:39:16   3          **Q.**   Okay.  And when does it go until?

10:39:18   4          **A.**   1600, 4:00 o'clock p.m.

10:39:21   5          **Q.**   Okay.  So you're out patrolling the

10:39:24   6   entire time then?

10:39:25   7          **A.**   Yes.

10:39:29   8          **Q.**   Do you ever get time to fill out

10:39:32   9   paperwork?

10:39:32  10          **A.**   Within the duty of that time, you have

10:39:35  11   to fill out paperwork whether it's inside the

10:39:38  12   vehicle or inside the station house.

10:39:39  13          **Q.**   Do you typically fill out the paperwork

10:39:42  14   inside of the vehicle then?

10:39:42  15          **A.**   Yes, I do.

10:39:49  16          **Q.**   Between you and Joseph, how do you

10:39:52  17   determine who fills out the paperwork at a certain

10:39:55  18   incident?

10:39:55  19          **A.**   Generally it's my rule of thumb if I'm

10:39:58  20   driving, the person who is the passenger will be

10:40:00  21   filling the paperwork out.  But if there's some

10:40:03  22   instances where there's a lot of people working,

10:40:09  23   then we split it.

*Santana - Davenport - 9/8/20*

30

| | | |
|---|---|---|
| 10:40:10 | 1 | **MS. HUGGINS:**  Form.  Just to clarify, you've |
| 10:40:11 | 2 | asked the present tense.  You're referring to in |
| 10:40:15 | 3 | January of 2017? |
| 10:40:18 | 4 | **MR. DAVENPORT:**  Yeah, in January of 2017. |
| 10:40:21 | 5 | **BY MR. DAVENPORT:** |
| 10:40:28 | 6 | Q.    On January 1st of 2017, do you recall |
| 10:40:30 | 7 | filling out any paperwork? |
| 10:40:31 | 8 | A.    No, I do not recall. |
| 10:40:33 | 9 | Q.    Do you remember generally any incidents |
| 10:40:38 | 10 | that you responded to on January 1st? |
| 10:40:41 | 11 | A.    No, I do not recall. |
| 10:40:44 | 12 | Q.    Okay. |
| 10:41:19 | 13 | **MR. DAVENPORT:**  Could I have this marked as |
| 10:41:20 | 14 | Exhibit 36? |
| 10:41:20 | 15 | **The following was marked for Identification:** |
| | 16 | **EXH. 36             Buffalo Police Complaint** |
| | 17 | **Summary Report, six pages** |
| 10:42:08 | 18 | **MR. DAVENPORT:**  Thank you. |
| 10:42:09 | 19 | **BY MR. DAVENPORT:** |
| 10:42:12 | 20 | Q.    Mr. Santana, do you recall this |
| 10:42:15 | 21 | document or do you recognize this document? |
| 10:42:16 | 22 | A.    I do recognize this document. |
| 10:42:18 | 23 | Q.    What do you recognize it to be? |

*Santana - Davenport - 9/8/20*

31

10:42:20  1        **A.**    It's the complaint summary report.

10:42:24  2        **Q.**    And on what date was this complaint

10:42:26  3  summary report -- what date does it represent?

10:42:29  4        **A.**    January 1st of 2017.

10:42:33  5        **Q.**    Okay.  Does the complaint summary

10:42:38  6  report tell you on the first page an incident that

10:42:42  7  you assisted with?

10:42:45  8        **A.**    It does.

10:42:46  9        **Q.**    Okay.  And what is the location of that

10:42:50  10  incident?

10:42:50  11        **A.**    Sycamore Street at Loepere Street.

10:42:54  12        **Q.**    Now, who were the officers that

10:42:59  13  responded to that call with you?

10:43:00  14        **A.**    On this first page, Officer Petronella,

10:43:06  15  Officer Zak, Officer Burgess, Officer Schultz,

10:43:10  16  Officer Moriarity, and myself.

10:43:16  17        **Q.**    And what type of a call was that?

10:43:18  18        **A.**    This is a hit-and-run, property damage

10:43:20  19  only.

10:43:21  20        **Q.**    Okay.  What does that mean, for

10:43:23  21  property damage only?

10:43:25  22        **A.**    That is when a vehicle or an object

10:43:28  23  strikes a fixed object usually.

10:43:32 1       **Q.**   Okay.  Does it represent a single-car
10:43:35 2 accident then?

10:43:36 3       **A.**   Yes, that's involving a car.

10:43:40 4       **Q.**   And then the other property in this
10:43:45 5 instance, would it be another car?

10:43:46 6       **A.**   Yeah, it could another car, it could be
10:43:48 7 a house, but a hit-and-run is when someone hits
10:43:52 8 something and then flees the scene.

10:43:54 9       **Q.**   Right.  But I guess in this instance
10:43:57 10 when it says property damage only, that's referring
10:44:01 11 to there not being another driver who was injured?

10:44:04 12       **A.**   That's correct.

10:44:05 13       **Q.**   Okay.  Now, how long does it say that
10:44:12 14 this call lasted for?

10:44:16 15       **A.**   This call according to this sheet came
10:44:18 16 out at 0608.  And this call was cleared at 0732.

10:44:29 17       **Q.**   Now, is there any way to determine from
10:44:31 18 this complaint summary report who the initial
10:44:33 19 officers were that responded to this call?

10:44:35 20       **A.**   Yes.

10:44:35 21       **Q.**   Okay.  And how would one determine
10:44:38 22 that?

10:44:38 23       **A.**   Usually, dispatch will assign a call to

10:44:42  1  an officer and they become the primary officer.

10:44:46  2  They're the officer in charge of that call.

10:44:48  3          And afterwards, it's generally dispatch will

10:44:52  4  assign other cars to go with that officer or other

10:44:55  5  officers will assign themselves to go to that call.

10:45:02  6          Q.   Now, looking at this complaint summary

10:45:04  7  report, who is the officer who was assigned as the

10:45:08  8  primary officer?

10:45:09  9          A.   Charlie 222.

10:45:14  10         Q.   Now, Charlie 222, that refers to the

10:45:17  11  call sign?

10:45:17  12         A.   Yes, that's your call sign.

10:45:19  13         Q.   Okay.   So keeping with this document,

10:45:24  14  Exhibit 16, who was Charlie 222?

10:45:28  15         A.   Officer Petronella.

10:45:32  16         Q.   Now, was there a reason why he was

10:45:34  17  assigned as the primary officer on this call?

10:45:38  18         A.   This is a C2.   That's a sector within

10:45:41  19  Charlie District.   So being the two sector, it's a

10:45:44  20  two sector car.

10:45:45  21          So generally if a call comes out within a

10:45:48  22  certain sector within the district, the person who

10:45:50  23  is assigned to that sector will get that call.

10:45:53 1      **Q.**    Okay.  So there's individual sectors

10:45:55 2  within C District?

10:45:57 3      **A.**    There is.

10:45:57 4      **Q.**    And how many sectors are there?

10:45:59 5      **A.**    Four sectors.

10:46:00 6      **Q.**    Okay.  How do officers determine which

10:46:05 7  sector they're within C District?

10:46:08 8      **A.**    They do not determine that.  It's up to

10:46:10 9  their lieutenant to determine.

10:46:14 10      **Q.**    Is the sector that you're assigned to

10:46:15 11  on any given day, is that fluid?

10:46:17 12      **A.**    No, it's usually if you're assigned a

10:46:19 13  sector, that's your sector.

10:46:21 14      **Q.**    Okay.  And that's your sector for an

10:46:23 15  entire day?

10:46:23 16      **A.**    No, that's your sector for the entire

10:46:27 17  time that you're working within that platoon.

10:46:31 18      **Q.**    Understood.  So if Joseph was working

10:46:38 19  in the second sector, it's safe to assume that you

10:46:42 20  also were in the second sector as well?

10:46:43 21      **MS. HUGGINS:**  Form.

10:46:44 22      **THE WITNESS:**  Yes.  This form, yes.

10:46:45 23  According to this document here, I am dispatched at

| | | |
|---|---|---|
| 10:46:49 | 1 | this call. |
| 10:46:50 | 2 | **BY MR. DAVENPORT:** |
| 10:46:50 | 3 | **Q.** Okay. Do you know when you were |
| 10:46:54 | 4 | assigned to second sector? |
| 10:46:56 | 5 | **A.** I was not assigned to second sector. |
| 10:47:01 | 6 | **Q.** So for this call, you responded to |
| 10:47:03 | 7 | second sector? |
| 10:47:04 | 8 | **A.** Yes. You could generally cover other |
| 10:47:06 | 9 | officers within different sectors. You don't have |
| 10:47:09 | 10 | to be assigned and only stay within that sector. |
| 10:47:13 | 11 | **Q.** Okay. What would you say the |
| 10:47:17 | 12 | percentage of your calls are that you responded to |
| 10:47:20 | 13 | within second sector as opposed to other four |
| 10:47:22 | 14 | sectors? |
| 10:47:23 | 15 | **MS. HUGGINS:** Form. |
| 10:47:23 | 16 | **THE WITNESS:** I can't tell you. It's |
| 10:47:24 | 17 | different every day. There's no exact number. |
| 10:47:28 | 18 | It's totally different. |
| 10:47:29 | 19 | **BY MR. DAVENPORT:** |
| 10:47:29 | 20 | **Q.** Would you say on a general basis the |
| 10:47:31 | 21 | majority of your calls are responded to in the |
| 10:47:33 | 22 | second sector? |
| 10:47:33 | 23 | **A.** On that day in particular or are you |

*Santana - Davenport - 9/8/20*

36

| | | |
|---|---|---|
| 10:47:36 | 1 | talking about in general? |
| 10:47:37 | 2 | **Q.** On January 1st of 2017, around that |
| 10:47:40 | 3 | time -- |
| 10:47:41 | 4 | **A.** I don't recall. |
| 10:47:42 | 5 | **Q.** Okay. Do you know what sector you were |
| 10:47:46 | 6 | assigned to today? |
| 10:47:47 | 7 | **A.** This day? |
| 10:47:50 | 8 | **Q.** Today, present day. |
| 10:47:51 | 9 | **A.** All right. This day, I'm assigned to |
| 10:47:53 | 10 | the three sector. |
| 10:47:54 | 11 | **Q.** Okay. Do you know when you were |
| 10:47:56 | 12 | assigned to the three sector? |
| 10:47:57 | 13 | **A.** I don't recall. |
| 10:47:58 | 14 | **Q.** Was it within the last year? |
| 10:48:00 | 15 | **A.** No, it was not. |
| 10:48:01 | 16 | **Q.** Do you know roughly how many years |
| 10:48:05 | 17 | you've been assigned to the three sector? |
| 10:48:06 | 18 | **A.** It's years, but I can't give you an |
| 10:48:08 | 19 | exact amount because I don't recall. |
| 10:48:10 | 20 | **Q.** Do you know if it is roughly three |
| 10:48:13 | 21 | years? |
| 10:48:13 | 22 | **A.** Yes, it is. |
| 10:48:15 | 23 | **Q.** Were you assigned to three sector |

*Santana - Davenport - 9/8/20*

37

| | | |
|---|---|---|
| 10:48:18 | 1 | around January 1st of 2017? |
| 10:48:20 | 2 | **A.** Yes, I was. |
| 10:48:21 | 3 | **Q.** But you don't know if you were assigned |
| 10:48:23 | 4 | to three sector or a different sector on |
| 10:48:25 | 5 | January 1st of 2017? |
| 10:48:26 | 6 | **A.** Well, according to this documentation, |
| 10:48:28 | 7 | the shift summary report, I'm assigned to that |
| 10:48:30 | 8 | sector.  I am listed as Charlie 232. |
| 10:48:36 | 9 | **Q.** Okay.  So how do you know that you were |
| 10:48:39 | 10 | assigned to three sector based on Charlie 232? |
| 10:48:42 | 11 | **A.** How do I know I was in what, like how |
| 10:48:46 | 12 | did I get assigned or I just -- when I first came |
| 10:48:48 | 13 | into this platoon many years ago, and I can't give |
| 10:48:50 | 14 | you the exact date, I was assigned to that sector. |
| 10:48:53 | 15 | **Q.** Okay.  But I guess you implied that by |
| 10:48:58 | 16 | looking at your call sign, Charlie 232, you were |
| 10:49:01 | 17 | able to determine that you were assigned to three |
| 10:49:02 | 18 | sector on January 1st of 2017? |
| 10:49:04 | 19 | **A.** That's correct. |
| 10:49:04 | 20 | **Q.** And what is it about that call sign |
| 10:49:08 | 21 | that indicates that you were assigned to three |
| 10:49:12 | 22 | sector? |
| 10:49:12 | 23 | **A.** 32 -- 232, the three within that, |

*Santana - Davenport - 9/8/20*

38

| 10:49:15 | 1 | that's the sector. |
| 10:49:16 | 2 | Q. Okay. So it's the middle number that |
| 10:49:19 | 3 | tells you what sector you're assigned to? |
| 10:49:22 | 4 | A. That's correct. |
| 10:49:24 | 5 | Q. Now, looking at Exhibit 16, does it |
| 10:49:28 | 6 | appear that Mr. Schultz and Mr. Moriarity were also |
| 10:49:33 | 7 | assigned to the three sector on this date? |
| 10:49:35 | 8 | A. That is correct. |
| 10:49:35 | 9 | Q. Okay. But Ms. McDermott and Ms. Velez |
| 10:49:40 | 10 | were assigned to the four sector? |
| 10:49:42 | 11 | A. That is correct. |
| 10:49:43 | 12 | Q. Okay. Now, the call that you responded |
| 10:49:52 | 13 | to at Sycamore Street, that was in the two sector, |
| 10:49:57 | 14 | correct? |
| 10:49:57 | 15 | A. That is correct. |
| 10:49:57 | 16 | Q. Okay. And Mr. Petronella was assigned |
| 10:50:04 | 17 | as the primary officer, correct? |
| 10:50:06 | 18 | A. That's correct. |
| 10:50:07 | 19 | Q. So I'm just looking at Exhibit 16 again |
| 10:50:12 | 20 | and I see that Mr. Petronella was assigned to the |
| 10:50:14 | 21 | two sector on January 1st of 2017 but you were |
| 10:50:18 | 22 | assigned to the three sector. Do you see that? |
| 10:50:19 | 23 | A. That is correct. I do see that. |

*Santana - Davenport - 9/8/20*

39

10:50:21  1      **Q.**   Okay.  So how is it that you know you

10:50:26  2  both were partners but you were being assigned to

10:50:28  3  different sectors?

10:50:30  4      **A.**   Like I said earlier, it doesn't matter

10:50:32  5  what sector you're in within the whole Charlie

10:50:35  6  District.  If you want to ride with someone in the

10:50:37  7  four sector, that's fine as long as you could cover

10:50:40  8  the area.

10:50:41  9      But like I said, we were assigned to our

10:50:44 10  sectors, but in regards to riding together, it

10:50:48 11  doesn't have to be just a three sector riding in

10:50:51 12  one car, it could be someone from another sector

10:50:54 13  who could ride with you.

10:50:55 14      **Q.**   Okay.  So it's expected that you will

10:50:58 15  respond to all calls that are necessary in the

10:51:00 16  three sector and Mr. Petronella will respond to all

10:51:03 17  calls that are necessary in the two sector?

10:51:05 18      **A.**   Yes.

10:51:05 19      **Q.**   Okay.  Do you know roughly the area

10:51:07 20  that each of those sectors covers?

10:51:09 21      **A.**   Yes, I do, but I can't give you like

10:51:13 22  the miles or how big it is.  But yeah, I have a

10:51:17 23  sense.

*Santana - Davenport - 9/8/20*

40

10:51:18  1        Q.    Okay.  Do you have markers that
10:51:23  2    determine where the two sector starts and where it
10:51:26  3    ends?
10:51:26  4        A.    Yes, we do have maps in regards to the
10:51:29  5    boundaries of each sector.
10:51:33  6        Q.    Okay.  And is that something that's
10:51:35  7    maintained by the Buffalo Police Department?
10:51:37  8        A.    Yes, it is.
10:51:39  9        Q.    Is that something that's still
10:51:40  10   maintained today?
10:51:41  11       A.    That, I do not know.
10:51:43  12       Q.    Okay.  Do you know if those sectors,
10:51:48  13   the guidelines have changed since January 1st of
10:51:51  14   2017?
10:51:51  15       A.    That, I do not know.
10:52:13  16       Q.    Do you know where in second -- in
10:52:20  17   second sector Sycamore Street would be?  Is it
10:52:22  18   closer to the border or is it more towards the
10:52:25  19   middle?
10:52:25  20       A.    Sycamore, it runs into my sector, the
10:52:30  21   sector three.  It also runs into four sector
10:52:33  22   because it's a long street.  So it encompasses
10:52:37  23   different sectors.

*Santana - Davenport - 9/8/20*

41

| | | |
|---|---|---|
| 10:52:38 | 1 | Q. Okay. Now, one of the officers who |
| 10:52:45 | 2 | responded to Sycamore Street was Zakary Burgess? |
| 10:52:50 | 3 | A. That is correct. |
| 10:52:51 | 4 | Q. Okay. And according to Exhibit 16, he |
| 10:52:54 | 5 | would have been in the first sector? |
| 10:52:57 | 6 | A. According to Exhibit 16, he would have |
| 10:53:00 | 7 | been on the three sector. |
| 10:53:08 | 8 | Q. Is his call sign 213? |
| 10:53:12 | 9 | A. His call sign is 230 along with Officer |
| 10:53:17 | 10 | Schultz. |
| 10:53:17 | 11 | Q. Oh, no, I'm sorry. Mr. Burgess, Zakary |
| 10:53:22 | 12 | Burgess. |
| 10:53:22 | 13 | A. Mr. Burgess, it is Charlie 232 -- 213, |
| 10:53:26 | 14 | sorry. |
| 10:53:27 | 15 | Q. So Mr. Burgess would be in the first |
| 10:53:29 | 16 | sector? |
| 10:53:30 | 17 | A. That is correct. |
| 10:53:31 | 18 | Q. Now, do you know on any given date how |
| 10:53:39 | 19 | many centers roughly are assigned to each sector |
| 10:53:44 | 20 | for? |
| 10:53:45 | 21 | A. I can't tell you the exact amount |
| 10:53:46 | 22 | because it changes from time to time depending on |
| 10:53:49 | 23 | the environment and on like the wave of crime, but |

*Santana - Davenport - 9/8/20*

42

| | | |
|---|---|---|
| 10:53:52 | 1 | I can't give you that specific number. |
| 10:53:54 | 2 | Q.    Okay.  Does it appear on January 1st, |
| 10:53:56 | 3 | 2017, based on Exhibit 16 that two officers were |
| 10:54:03 | 4 | assigned to each of the four districts? |
| 10:54:06 | 5 | A.    Just give me one second here.  The |
| 10:54:09 | 6 | three sector, you have three -- three officers |
| 10:54:13 | 7 | within that sector.  Other than that, everyone |
| 10:54:18 | 8 | else -- every other sector has two officers. |
| 10:54:21 | 9 | Q.    Now, do you see for Anthony McHugh his |
| 10:54:24 | 10 | call sign is 254 on Exhibit 16? |
| 10:54:27 | 11 | A.    I do see that. |
| 10:54:28 | 12 | Q.    But there's no fifth sector within |
| 10:54:31 | 13 | C District, correct? |
| 10:54:32 | 14 | A.    No, the five is usually for |
| 10:54:33 | 15 | supervisors. |
| 10:54:34 | 16 | Q.    Okay.  Do you see that the remaining |
| 10:54:39 | 17 | five officers after Anthony McHugh on Exhibit 16, |
| 10:54:43 | 18 | they have a call sign with an eight in the middle? |
| 10:54:48 | 19 | A.    I do see that. |
| 10:54:49 | 20 | Q.    Okay.  What does that eight represent? |
| 10:54:50 | 21 | A.    Usually the eight is -- it's generally |
| 10:54:55 | 22 | a car that could go within Charlie District. |
| 10:54:58 | 23 | They're not assigned to a certain sector, but from |

*Santana - Davenport - 9/8/20*

43

| | | |
|---|---|---|
| 10:55:01 | 1 | viewing this document here -- well, seeing so many |
| 10:55:05 | 2 | eight officers assigned, this is the other day |
| 10:55:08 | 3 | shift that is training on this day, but they're |
| 10:55:11 | 4 | assigned the eight. |
| 10:55:15 | 5 | Q.    Okay.  Do you know why there were more |
| 10:55:21 | 6 | officers on this date? |
| 10:55:22 | 7 | A.    Because there's one day that it |
| 10:55:24 | 8 | overlaps where both the day shifts from each side |
| 10:55:28 | 9 | works together on that one day. |
| 10:55:29 | 10 | Q.    And that was on this day, January 1st, |
| 10:55:32 | 11 | 2017? |
| 10:55:32 | 12 | A.    Yes. |
| 10:55:33 | 13 | Q.    Okay. |
| 10:55:33 | 14 | A.    It's just from me viewing this |
| 10:55:35 | 15 | documentation right here with the amount of eight |
| 10:55:38 | 16 | sectors or eight cars, that's what I'm deducing in |
| 10:55:42 | 17 | regards to this. |
| 10:55:43 | 18 | Q.    Okay.  Now, listed on Exhibit 16, who |
| 10:55:48 | 19 | were the officers who were assigned to your day |
| 10:55:51 | 20 | shift on January 1st of 2017? |
| 10:55:53 | 21 | A.    Do you want me to say the names or do |
| 10:55:58 | 22 | you want me to give the number of officers? |
| 10:56:00 | 23 | Q.    If you could give me the names, that |

*Santana - Davenport - 9/8/20*

44

| | | |
|---|---|---|
| 10:56:03 | 1 | would be best. |
| 10:56:03 | 2 | **A.**   All right.  According to this document, |
| 10:56:05 | 3 | Officer Velez, Officer McDermott, myself, Officer |
| 10:56:12 | 4 | Lucia Schultz, Officer Karl Schultz with Kyle |
| 10:56:15 | 5 | Moriarity, Officer Petronella, Officer Gorski, |
| 10:56:22 | 6 | Officer Burgess, and Officer Zak. |
| 10:56:28 | 7 | **Q.**   Okay.  And for that last one, his name |
| 10:56:31 | 8 | is Thomas G. Zak.  That's his full name? |
| 10:56:34 | 9 | **A.**   It is according to this document here. |
| 10:56:36 | 10 | **Q.**   Okay.  So for Kevin Quinn, Erin |
| 10:56:43 | 11 | Heidinger, Ronnie Daniels, William Johnson, and |
| 10:56:44 | 12 | Clarence Sampson, those are officers who worked on |
| 10:56:47 | 13 | a different day shift typically? |
| 10:56:49 | 14 | **A.**   Yes. |
| 10:56:49 | 15 | **Q.**   Now, why was it that the other day |
| 10:56:55 | 16 | shift was not assigned a sector? |
| 10:56:58 | 17 | **A.**   Because generally their training |
| 10:57:01 | 18 | starts -- it works usually the one training -- it's |
| 10:57:04 | 19 | a training day. |
| 10:57:04 | 20 | So one shift would be on the patrol.  The |
| 10:57:07 | 21 | other shift will have a training.  I don't know.  I |
| 10:57:10 | 22 | can't tell you about this particular day here, but |
| 10:57:14 | 23 | it switches on and off. |

*Santana - Davenport - 9/8/20*

45

10:57:17   1          But we always have that overlap where the

10:57:20   2   one day both the day shifts -- because we work

10:57:24   3   four, we're off four, we work four, we're off

10:57:29   4   three.  So eventually we can get all the days off,

10:57:32   5   but I believe it's every two weeks we have the

10:57:34   6   training day together.

10:57:34   7          Q.   And when you say training, are they

10:57:36   8   participating in the type of training that is

10:57:38   9   listed on Exhibit 35?

10:57:41  10          A.   Quite possibly, but I can't answer to

10:57:43  11   that.

10:57:46  12          Q.   But generally it's that type of

10:57:48  13   training, there's no other forms of training that

10:57:50  14   would take place?

10:57:51  15          A.   Generally, yes.

10:57:53  16          Q.   Do you know if on January 1st of 2017

10:58:03  17   those officers who were assigned an eight in their

10:58:06  18   call sign, if they were participating in any

10:58:12  19   training?

10:58:12  20          A.   I don't recall.

10:58:15  21          Q.   Now, if training doesn't -- is it

10:58:18  22   typical that training doesn't last the entire day?

10:58:22  23          A.   Generally if you're not training,

| | | |
|---|---|---|
| 10:58:24 | 1 | you're out on patrol, but you're assigned a number |
| 10:58:28 | 2 | so you don't have to answer calls and dispatch |
| 10:58:32 | 3 | won't give any call to you, but you are on the |
| 10:58:35 | 4 | streets. |
| 10:58:36 | 5 | Q.    Okay. |
| 10:58:36 | 6 | A.    But it varies. |
| 10:58:38 | 7 | Q.    Okay.  Would those officers who are |
| 10:58:45 | 8 | designated a training number typically not be |
| 10:58:48 | 9 | labeled as the primary officer on a call? |
| 10:58:51 | 10 | A.    That's correct. |
| 10:58:52 | 11 | Q.    Okay.  They're more so there for |
| 10:58:56 | 12 | backup? |
| 10:58:56 | 13 | A.    That's correct. |
| 10:58:56 | 14 | Q.    Okay.  So I'm going to point you to |
| 10:59:41 | 15 | page 3. |
| 10:59:42 | 16 | A.    Of? |
| 10:59:43 | 17 | Q.    Of, I'm sorry, Exhibit 36.  Now, do you |
| 10:59:58 | 18 | see that there's an incident that is listed at |
| 11:00:02 | 19 | Liddell Street? |
| 11:00:03 | 20 | A.    On page 3, 129 Liddell Street. |
| 11:00:06 | 21 | Q.    Okay.  What type of a call was that? |
| 11:00:09 | 22 | A.    An irrational person. |
| 11:00:11 | 23 | Q.    What was the outcome of that call? |

*Santana - Davenport - 9/8/20*

47

| | | |
|---|---|---|
| 11:00:14 | 1 | **A.**    The outcome of this call, and this is |
| 11:00:20 | 2 | me gathering this information from this very |
| 11:00:22 | 3 | document, it is a -- P1321 is a mental health exam, |
| 11:00:35 | 4 | 941. |
| 11:00:37 | 5 | **Q.**    Do you know who the primary officer was |
| 11:00:40 | 6 | for this call? |
| 11:00:41 | 7 | **A.**    That would be me. |
| 11:00:43 | 8 | **Q.**    Okay.  Were you the only officer that |
| 11:00:51 | 9 | responded to that call? |
| 11:00:52 | 10 | **A.**    According to this document I have in |
| 11:00:55 | 11 | front of me, one, two, and it was just myself and |
| 11:00:59 | 12 | Charlie 221. |
| 11:01:02 | 13 | **Q.**    Okay.  So Charlie 221, turning to |
| 11:01:09 | 14 | Exhibit 16, that would be Pamela? |
| 11:01:12 | 15 | **A.**    That's correct. |
| 11:01:14 | 16 | **Q.**    Not Officer Joseph? |
| 11:01:16 | 17 | **A.**    No, not on this call log right here. |
| 11:01:20 | 18 | **Q.**    Okay.  Now, I'm going to point you back |
| 11:01:24 | 19 | to page 3 on Exhibit 36.  Do you see the incident |
| 11:01:30 | 20 | that happened at Brownell Street? |
| 11:01:34 | 21 | **A.**    If you're referring to Brownell Street |
| 11:01:37 | 22 | at Ashley Street, the traffic stop, then yes. |
| 11:01:40 | 23 | **Q.**    Okay.  And Joseph Petronella was the |

| | | |
|---|---|---|
| 11:01:44 | 1 | other officer who was with you for that incident? |
| 11:01:46 | 2 | **A.** Yes. |
| 11:01:47 | 3 | **Q.** Okay. And that incident was cleared at |
| 11:01:49 | 4 | 9:50? |
| 11:01:51 | 5 | **A.** Yes, it is. |
| 11:01:53 | 6 | **Q.** Okay. And the incident was reported |
| 11:01:57 | 7 | first at 7:18 a.m.? |
| 11:01:58 | 8 | **A.** That's right. |
| 11:01:59 | 9 | **Q.** Okay. What type of a traffic stop was |
| 11:02:02 | 10 | that? |
| 11:02:02 | 11 | **A.** I don't recall the details of that |
| 11:02:04 | 12 | traffic stop. |
| 11:02:05 | 13 | **Q.** Okay. Do you know why that traffic |
| 11:02:08 | 14 | stop would have lasted for almost two-and-a-half |
| 11:02:11 | 15 | hours? |
| 11:02:11 | 16 | **A.** I don't recall. |
| 11:02:15 | 17 | **Q.** Is it typical for traffic stops to last |
| 11:02:18 | 18 | that long? |
| 11:02:21 | 19 | **A.** According to this documentation, there |
| 11:02:23 | 20 | was one arrest. So if you see right there, Charlie |
| 11:02:27 | 21 | 232 has one arrest, and you also see CB, which |
| 11:02:31 | 22 | means central booking, and underneath that the lab, |
| 11:02:34 | 23 | so there must have been narcotics involved, so yes. |

*Santana - Davenport - 9/8/20*

49

| 11:02:38 | 1 | **Q.** Okay. All right. So turning back to |
| 11:03:03 | 2 | the incident at Liddell Street. |
| 11:03:06 | 3 | **A.** Okay. |
| 11:03:07 | 4 | **Q.** You see that your partner, Joseph, was |
| 11:03:11 | 5 | no longer with you for that call? |
| 11:03:13 | 6 | **A.** Yes, I do see that. |
| 11:03:15 | 7 | **Q.** Okay. And instead, Pamela was the |
| 11:03:18 | 8 | other officer who responded to the call with you? |
| 11:03:20 | 9 | **A.** Yes. |
| 11:03:20 | 10 | **Q.** All right. Do you know if Pamela was |
| 11:03:24 | 11 | in the same car as you? |
| 11:03:26 | 12 | **A.** She was not. |
| 11:03:27 | 13 | **Q.** And is that something that you recall |
| 11:03:29 | 14 | or is that something that you can tell from the |
| 11:03:31 | 15 | document? |
| 11:03:32 | 16 | **A.** Well, it's from the document here and |
| 11:03:34 | 17 | from Exhibit 16. She was assigned her own vehicle |
| 11:03:39 | 18 | and she was driving her own vehicle, vehicle 530. |
| 11:03:46 | 19 | **Q.** Okay. Do you know if you requested |
| 11:03:53 | 20 | backup or did dispatch request the backup? |
| 11:04:02 | 21 | **A.** Dispatch according to this |
| 11:04:05 | 22 | documentation, dispatch Charlie 221. |
| 11:04:10 | 23 | **Q.** So that would indicate that Pamela |

*Santana - Davenport - 9/8/20*

50

| | | |
|---|---|---|
| 11:04:14 | 1 | assigned herself to this call? |
| 11:04:16 | 2 | **A.**    That would indicate whether -- it could |
| 11:04:19 | 3 | be Pamela assigning herself to this call or it |
| 11:04:21 | 4 | could be dispatch assigning her to assist me upon |
| 11:04:25 | 5 | this call. |
| 11:04:25 | 6 | **Q.**    Okay.  But you're not able to determine |
| 11:04:27 | 7 | that from the document, correct? |
| 11:04:28 | 8 | **A.**    I can't recall. |
| 11:04:28 | 9 | **Q.**    Okay.  Do you remember this incident at |
| 11:04:34 | 10 | Liddell Street? |
| 11:04:35 | 11 | **A.**    No, I do not. |
| 11:04:36 | 12 | **Q.**    Okay.  By this document, are you able |
| 11:04:41 | 13 | to determine any of the details of this call? |
| 11:04:48 | 14 | **A.**    Yes.  There are details that was put |
| 11:04:51 | 15 | forth from the dispatch.  What would you like to |
| 11:04:56 | 16 | know from this call? |
| 11:04:57 | 17 | **Q.**    Was the paranoid, irrational person a |
| 11:05:02 | 18 | 27-year-old? |
| 11:05:03 | 19 | **A.**    According to this document, yes. |
| 11:05:04 | 20 | **Q.**    C female right before the line that |
| 11:05:10 | 21 | says that it's a 27-year-old, does that refer to |
| 11:05:12 | 22 | the call being made by a female? |
| 11:05:15 | 23 | **A.**    It says right here C female, so yes, I |

11:05:20  1   would -- I would assume that it's talking about

11:05:23  2   female.

11:05:23  3         **Q.**   Okay.  Does it also refer to the call

11:05:26  4   being made by a female?

11:05:29  5         **A.**   No, it does not.

11:05:30  6         **Q.**   What the does the C stand for?

11:05:32  7         **A.**   C as in see somebody, S-E-E.  That's --

11:05:37  8   that's usually what it is.

11:05:38  9         **Q.**   Okay.  So it' a shorthand for see?

11:05:41 10         **A.**   Yes.

11:05:41 11         **Q.**   Okay.  So this would also indicate that

11:05:46 12   the 27-year-old was the son of somebody present at

11:05:49 13   the -- at Liddell Street?

11:05:51 14         **A.**   According to this documentation, yes.

11:05:54 15   And according to what I'm getting from this very

11:05:56 16   document, yes.

11:05:57 17         **Q.**   Okay.  And the son threatened to shoot

11:06:02 18   this woman?

11:06:04 19         **A.**   Yes, according to this document, which

11:06:06 20   states threatening to shoot her.

11:06:09 21         **Q.**   Do you remember -- do you recall if you

11:06:13 22   were there present when those threats were being

11:06:16 23   made?

*Santana - Davenport - 9/8/20*

52

| | | |
|---|---|---|
| 11:06:16 | 1 | **A.**   I do not recall being there while he |
| 11:06:21 | 2 | was making threats. |
| 11:06:24 | 3 | **Q.**   What time was this call cleared at? |
| 11:06:32 | 4 | **A.**   This call was cleared at 11:03:20. |
| 11:06:38 | 5 | **Q.**   Okay.  And in reviewing this document, |
| 11:06:41 | 6 | does it indicate to you that both you and Pamela |
| 11:06:44 | 7 | drove this individual to ECMC for a 941 |
| 11:06:48 | 8 | examination? |
| 11:06:48 | 9 | **A.**   Yes, according to this documentation in |
| 11:06:50 | 10 | front of me, yes, it does state that. |
| 11:06:52 | 11 | **Q.**   Okay.  Do you recall staying at ECMC |
| 11:06:57 | 12 | while this individual was being evaluated? |
| 11:06:59 | 13 | **A.**   I do not recall staying here, but from |
| 11:07:01 | 14 | this documentation right here, I was there. |
| 11:07:05 | 15 | **Q.**   And you were there for the 941 mental |
| 11:07:09 | 16 | health examination? |
| 11:07:09 | 17 | **A.**   That is -- that is correct. |
| 11:07:13 | 18 | **Q.**   How long do those typically take? |
| 11:07:15 | 19 | **A.**   I can't give you the exact number.  It |
| 11:07:17 | 20 | could be -- well, the old ECMC before they made the |
| 11:07:27 | 21 | new mental health, it could take -- the short is 20 |
| 11:07:31 | 22 | minutes.  The longest I've been there, six-seven |
| 11:07:33 | 23 | hours. |

11:07:34  1          **Q.**    Is that just for the 941 mental health

11:07:36  2  examination?

11:07:37  3          **A.**    Yes, but it varies.  There's no

11:07:39  4  specific time frame that you're inside ECMC.  It's

11:07:41  5  depending on how busy that hospital is and whatnot.

11:07:46  6          **Q.**    Okay.  So if you're not staying at ECMC

11:07:51  7  and waiting, how long roughly would you say the

11:07:54  8  actual 941 examination itself takes?

11:07:57  9          **MS. HUGGINS:**    Form.

11:07:58  10          **THE WITNESS:**    I can't give you -- I can't

11:08:00  11  give you that exact amount.  That's something that

11:08:02  12  you would have to touch base with the ECMC

11:08:04  13  personnel.

11:08:06  14          **BY MR. DAVENPORT:**

11:08:06  15          **Q.**    Okay.  Do you typically stay there at

11:08:08  16  ECMC for the actual 941 examination that takes

11:08:11  17  place?

11:08:11  18          **A.**    Generally if it's an arrest, you have

11:08:13  19  to stay there until they're cleared through ECMC.

11:08:17  20  So in regards to a time frame, I can't give you a

11:08:22  21  time frame because it's different.

11:08:23  22          **Q.**    Now, when you say stay through, what --

11:08:28  23  at what point are you -- is the officer no longer

*Santana - Davenport - 9/8/20*

54

| | | |
|---|---|---|
| 11:08:31 | 1 | needed at ECMC? |
| 11:08:32 | 2 | **A.**   When they cleared that individual who |
| 11:08:34 | 3 | is 941 from ECMC. |
| 11:08:37 | 4 | **Q.**   Okay.  And what does clearing an |
| 11:08:39 | 5 | individual mean? |
| 11:08:40 | 6 | **A.**   Well, whatever the doctors do at ECMC. |
| 11:08:43 | 7 | I can't tell you what they do. |
| 11:08:45 | 8 | **Q.**   Okay.  Could clearing be allowing a |
| 11:08:47 | 9 | person to leave? |
| 11:08:49 | 10 | **A.**   From their facility? |
| 11:08:50 | 11 | **Q.**   Yes. |
| 11:08:51 | 12 | **A.**   But like I said if a person is under |
| 11:08:53 | 13 | arrest, they're under your jurisdiction, they're |
| 11:08:56 | 14 | under you.  So from then, from there, you have to |
| 11:08:59 | 15 | take them to central booking to get booked and |
| 11:09:01 | 16 | processed. |
| 11:09:02 | 17 | **Q.**   Okay.  Could clearing also represent |
| 11:09:14 | 18 | somebody remains at ECMC to be observed? |
| 11:09:19 | 19 | **A.**   You -- |
| 11:09:19 | 20 | **MS. HUGGINS:**   Form.  You can answer. |
| 11:09:22 | 21 | **THE WITNESS:**   It's in regards to -- let's |
| 11:09:24 | 22 | say if a person was not under arrest and you have |
| 11:09:29 | 23 | them on 941 paperwork. |

*Santana - Davenport - 9/8/20*

55

| | | |
|---|---|---|
| 11:09:31 | 1 | You take them to ECMC to get evaluated but |
| 11:09:34 | 2 | you're no longer required to stay there.  There's |
| 11:09:36 | 3 | no need for you, the officer, to stay there. |
| 11:09:39 | 4 | **BY MR. DAVENPORT:** |
| 11:09:39 | 5 | **Q.**   But if somebody is arrested, you are |
| 11:09:41 | 6 | required to stay there? |
| 11:09:42 | 7 | **A.**   Yes. |
| 11:09:42 | 8 | **Q.**   And that officer who brings an |
| 11:09:53 | 9 | individual who is arrested, that officer is |
| 11:09:55 | 10 | required to stay there even through the 941 |
| 11:09:58 | 11 | examination? |
| 11:09:59 | 12 | **A.**   Yes, but there's many circumstances |
| 11:10:01 | 13 | where it could be beyond their tour of duty, so |
| 11:10:06 | 14 | they will assign another officer to stay with this |
| 11:10:08 | 15 | individual who is being given the 941. |
| 11:10:30 | 16 | **Q.**   In reviewing Exhibit 36, is there any |
| 11:10:34 | 17 | way to determine what the outcome was for the 941 |
| 11:10:39 | 18 | mental health examination? |
| 11:10:40 | 19 | **A.**   In regards to the call that we were |
| 11:10:42 | 20 | just discussing? |
| 11:10:43 | 21 | **Q.**   Correct. |
| 11:10:44 | 22 | **A.**   The Liddell call? |
| 11:10:47 | 23 | **Q.**   Correct. |

*Santana - Davenport - 9/8/20*

56

| | | |
|---|---|---|
| 11:10:48 | 1 | **A.** The 1:29? According to this document |
| 11:10:50 | 2 | here, it's the mental health exam and that's what |
| 11:10:54 | 3 | this document states. |
| 11:10:55 | 4 | **Q.** Okay. But there's no way to determine |
| 11:10:57 | 5 | what the outcome was of the 941 call? |
| 11:11:00 | 6 | **A.** No, I can't determine that. You'll |
| 11:11:02 | 7 | have to take it up at headquarters. |
| 11:11:04 | 8 | **Q.** Okay. |
| 11:11:06 | 9 | **MS. HUGGINS:** Form. Do you mean the outcome |
| 11:11:08 | 10 | of the exam? Is that when you're asking? |
| 11:11:11 | 11 | **MR. DAVENPORT:** Outcome of the 941 mental |
| 11:11:13 | 12 | health exam. |
| 11:11:13 | 13 | **THE WITNESS:** Right. |
| 11:11:13 | 14 | **MS. HUGGINS:** Can you answer that? |
| 11:11:14 | 15 | **THE WITNESS:** Yeah. There's no way for me |
| 11:11:16 | 16 | to determine what was the outcome of it, no. |
| 11:11:18 | 17 | **BY MR. DAVENPORT:** |
| 11:11:19 | 18 | **Q.** Okay. Would the fact that there's |
| 11:11:24 | 19 | nothing on this call about central booking indicate |
| 11:11:28 | 20 | that that person remained at ECMC? |
| 11:11:30 | 21 | **A.** Yes, that is correct. |
| 11:11:33 | 22 | **Q.** Okay. Now, you've been a patrol |
| 11:11:38 | 23 | officer for eight years, correct? |

*Santana - Davenport - 9/8/20*

57

| | | |
|---|---|---|
| 11:11:40 | 1 | **A.**   That's correct. |
| 11:11:40 | 2 | **Q.**   Approximately how many 941 forms and |
| 11:11:46 | 3 | 941 examinations have you participated in or been a |
| 11:11:49 | 4 | part of? |
| 11:11:49 | 5 | **A.**   You want to know an exact number of how |
| 11:11:53 | 6 | many I've done? |
| 11:11:53 | 7 | **Q.**   It doesn't have to be exact, it could |
| 11:11:55 | 8 | be an approximation. |
| 11:11:56 | 9 | **A.**   I can't really give you that number. |
| 11:11:58 | 10 | It's been -- it's been a lot.  I can say over 100. |
| 11:12:03 | 11 | **Q.**   Do you and other officers receive |
| 11:12:12 | 12 | training on 941 mental health examinations? |
| 11:12:14 | 13 | **A.**   Yes, we do. |
| 11:12:15 | 14 | **Q.**   And what type of training do you |
| 11:12:17 | 15 | receive? |
| 11:12:18 | 16 | **A.**   Mental health law and training given by |
| 11:12:21 | 17 | the academy. |
| 11:12:24 | 18 | **Q.**   What specifically with mental health |
| 11:12:27 | 19 | law do they train you on? |
| 11:12:30 | 20 | **A.**   The 941. |
| 11:12:31 | 21 | **Q.**   Now, do they just review the statute |
| 11:12:33 | 22 | 941 with you? |
| 11:12:34 | 23 | **A.**   I can't recall the basis of the |

*Santana - Davenport - 9/8/20*

58

| | | |
|---|---|---|
| 11:12:36 | 1 | training that I received because it's been a while |
| 11:12:39 | 2 | now, but it's generally the whole process in |
| 11:12:41 | 3 | regards to the 941.  It's from like the transport, |
| 11:12:46 | 4 | the paperwork that you have to fill out. |
| 11:12:48 | 5 | Q.    Okay.  Do you know off the top of your |
| 11:12:52 | 6 | head approximately when you would have taken the |
| 11:12:54 | 7 | 941 training? |
| 11:12:55 | 8 | A.    No, I do not.  Do you want me to grab |
| 11:13:04 | 9 | Exhibit 35? |
| 11:13:05 | 10 | Q.    Yes, please, because my next question |
| 11:13:07 | 11 | is going to be based on that document.  Now in |
| 11:13:16 | 12 | reviewing Exhibit 35, would you say that's -- that |
| 11:13:20 | 13 | this training took place on June 20th of 2016? |
| 11:13:26 | 14 | A.    Let's see, June 20th.  That is correct. |
| 11:13:38 | 15 | Q.    Would there be any other training that |
| 11:13:42 | 16 | is listed on page 2 of Exhibit 35 that would |
| 11:13:48 | 17 | represent 941 training? |
| 11:13:59 | 18 | A.    No. |
| 11:14:00 | 19 | Q.    Okay.  What about page 3 of Exhibit 35? |
| 11:14:06 | 20 | A.    Yes. |
| 11:14:07 | 21 | Q.    Okay.  And what training would that be? |
| 11:14:09 | 22 | A.    2018, mental health.  That occurred on |
| 11:14:13 | 23 | March 12th of 2018. |

*Santana - Davenport - 9/8/20*

59

11:14:16  1          Q.    And the number of hours that you

11:14:17  2     participated in that training was three hours?

11:14:19  3          A.    That is correct.

11:14:20  4          Q.    Okay.  And the training that you

11:14:23  5     participated in on June 28th of 2016 was also three

11:14:27  6     hours?

11:14:30  7          A.    Give me a second.  Yes, it is.

11:14:32  8          Q.    Turning to the first page of Exhibit 35,

11:14:35  9     are there any other training courses that would

11:14:38  10    represent training on the 941 process?

11:14:43  11         A.    No.

11:14:48  12         Q.    So it's safe to say that according to

11:14:50  13    the documentation that we have been provided from

11:14:52  14    the city, you had participated in six hours of

11:14:55  15    training on the 941 process?

11:14:57  16         A.    Yes, it is.

11:14:58  17         Q.    Okay.  Do you know if since January

11:15:03  18    21st of 2019, you have taken any training on mental

11:15:06  19    health or the 941 process?

11:15:09  20         A.    No, I can't recall.

11:15:12  21         Q.    Do you have any reason to believe that

11:15:14  22    you did take some sort of training?

11:15:17  23         A.    Well, if I don't recall, I don't

11:15:19  1    remember.

11:15:29  2              **Q.**    So specifically during your training

11:15:31  3    for the 941 mental health examination, when you

11:15:34  4    refer to the process, can you describe generally

11:15:37  5    what that process is that they train you on?

11:15:39  6              **A.**    I don't recall the process of what they

11:15:41  7    train you on.  I'm just giving you a general idea

11:15:43  8    of what the training might have consisted of, but

11:15:46  9    in regards to the exact training, I don't recall

11:15:48  10   that.

11:15:48  11             **Q.**    What about to the best of your

11:15:52  12   recollection for the 941 processes that you had

11:15:55  13   been involved with, what is typically the process?

11:15:57  14             **A.**    On a 941, usually when the call comes

11:16:01  15   out, the person making that call will give us

11:16:03  16   something in regards to the behavior of the

11:16:07  17   individual.

11:16:08  18             Once we show up on scene, we interview that

11:16:11  19   person, generally ask them whether or not they feel

11:16:16  20   like harming themselves or others or -- and then

11:16:20  21   from there, we will determine whether or not they

11:16:24  22   need to be transported to ECMC.

11:16:29  23             **Q.**    Now, is each step that you just

*Santana - Davenport - 9/8/20*

61

11:16:31   1    described, is that a mandatory part of the process?

11:16:34   2         A.    That is part of the process, yes,

11:16:36   3    that's correct.

11:16:37   4         Q.    But is it a mandatory part of the

11:16:40   5    process?

11:16:40   6         A.    Yes, because you have to determine what

11:16:41   7    their mental issues are and whether or not -- what

11:16:45   8    their mental health is at that point in time and

11:16:49   9    whether or not they pose a threat to themselves or

11:16:51  10    the family.

11:16:54  11         Q.    Are those the two major questions that

11:16:56  12    you ask the person who would be subjected to the

11:16:59  13    941 is if they would harm themselves or harm their

11:17:02  14    families?

11:17:03  15         A.    I do, yes.

11:17:04  16         Q.    Are there any other questions that you

11:17:06  17    would ask?

11:17:06  18         A.    Other questions would be what type of

11:17:09  19    medication they have been taking, if there's any

11:17:13  20    diagnosis that they have.  All of this information

11:17:17  21    is needed to put on that 941 paperwork.  It helps

11:17:23  22    ECMC in regards to getting that -- that individual

11:17:25  23    help.

*Santana - Davenport - 9/8/20*

62

11:17:26    1          **Q.**    All right.  Have you ever filled out a
11:17:28    2    941 form before?

11:17:29    3          **A.**    I have.

11:17:30    4          **Q.**    Do you know if on January 1st of 2017
11:17:32    5    you filled out any 941 forms?

11:17:36    6          **A.**    I'm going to look at Exhibit 36.

11:17:38    7          **Q.**    Okay.

11:17:38    8          **A.**    And I will let you know.  We're talking
11:17:42    9    about earlier, the one that we have been
11:17:45   10    discussing, the 129 Liddell.  It states the 941
11:17:49   11    exam has been completed on that.

11:17:52   12          I'm looking through the other call logs that
11:17:56   13    I have here and that was the only one that I filled
11:18:02   14    out that day.

11:18:03   15          **Q.**    Okay.  So, I'm sorry, can you tell from
11:18:08   16    the complaint summary report that you filled out a
11:18:10   17    941 form?

11:18:11   18          **A.**    Yes.

11:18:11   19          **Q.**    Okay.  And what is it that you see on
11:18:15   20    the complaint summary report that tells you that
11:18:17   21    you filled out the 941 form?

11:18:19   22          **A.**    Let me go back to that page.  It says
11:18:24   23    disposition added, the P1321, which is the 941

Santana - Davenport - 9/8/20

63

11:18:28  1  mental health exam.

11:18:30  2       **Q.**   Okay.  And that would tell you that

11:18:34  3  you, rather than the other officer, Pamela --

11:18:40  4       **A.**   It would say that that form was

11:18:41  5  completed, but it doesn't say who completed that

11:18:43  6  form.

11:18:44  7       **Q.**   Is there a requirement for who would be

11:18:47  8  required to fill out that form?

11:18:48  9       **A.**   No requirement whatsoever.

11:18:50 10      **Q.**   So it's not the primary officer that's

11:18:53 11 required to fill it out?

11:18:53 12      **A.**   No.  If the assisting officer wants to

11:18:56 13 complete it, it's up to them.  It's usually

11:18:58 14 something that officers will discuss.

11:19:04 15      **Q.**   So -- I'm sorry.

11:19:06 16      **A.**   No, go ahead.

11:19:07 17      **Q.**   I hate to keep making you go back to

11:19:11 18 it, but for Exhibit 36, the P1321, what does that

11:19:17 19 refer to?

11:19:17 20      **A.**   That to my understanding is the

11:19:19 21 document number to that form.  And that could be

11:19:23 22 like the way that the city identifies document

11:19:26 23 numbers or something like that.  That's like the

*Santana - Davenport - 9/8/20*

64

| | | |
|---|---|---|
| 11:19:29 | 1 | document number to that form. |
| 11:19:31 | 2 | Q.   Okay.   So the P1321 is the document |
| 11:19:35 | 3 | form -- document identifier from the city? |
| 11:19:39 | 4 | A.   That's correct. |
| 11:19:40 | 5 | Q.   Is the P1321 a separate document |
| 11:19:46 | 6 | besides the 941 form? |
| 11:19:48 | 7 | A.   Yes.   Well, that's that form but that's |
| 11:19:50 | 8 | the document number to that form.   That's the |
| 11:19:54 | 9 | document number.   The 941 is for the mental health |
| 11:19:57 | 10 | exam. |
| 11:19:59 | 11 | Q.   Understood.   Okay.   Do officers |
| 11:20:04 | 12 | typically refer to the form that's filled out for a |
| 11:20:07 | 13 | 941 examination as a 941 form or a P1321 form? |
| 11:20:11 | 14 | A.   941 form.   And that's my understanding. |
| 11:20:14 | 15 | I don't know in regards to other officers. |
| 11:20:16 | 16 | Q.   Okay.   But you typically refer to it as |
| 11:20:18 | 17 | the -- |
| 11:20:19 | 18 | A.   As the 941. |
| 11:20:20 | 19 | Q.   And the 941 one is the P1321 form? |
| 11:20:23 | 20 | A.   That's correct. |
| 11:20:25 | 21 | Q.   All right. |
| 11:20:27 | 22 | MS. HUGGINS:   Give him a moment before you |
| 11:20:29 | 23 | say your answer because you guys are talking quite |

11:20:32   1    fast.

11:20:32   2           **THE WITNESS:** Oh, I'm sorry.

11:20:42   3           (Discussion off the record.)

11:20:42   4           **BY MR. DAVENPORT:**

11:20:43   5       **Q.** Now, where do officers typically ask a

11:20:47   6    person that would be subjected to the 941

11:20:50   7    examination if they've had thoughts about harming

11:20:52   8    themselves or others?

11:20:53   9       **A.** Where do officers ask?

11:20:55  10       **Q.** Is it at the scene or is it at ECMC?

11:20:58  11       **A.** It could be at the scene. It could be

11:21:00  12    at the scene and ECMC. It depends on the officers.

11:21:03  13    They could ask many times within the whole call in

11:21:07  14    itself.

11:21:07  15       **Q.** Is there a requirement that they would

11:21:08  16    have to ask about whether that person is thinking

11:21:11  17    about harming themselves or others at the scene?

11:21:15  18       **A.** There is no requirement whatsoever, but

11:21:17  19    generally if you're responding to a call, you want

11:21:19  20    to ask in regards to the whole situation.

11:21:22  21       So to my understanding, there's no

11:21:24  22    requirement, but the way I operate, yes, when I

11:21:28  23    first show up on the scene, I'm going to talk to

*Santana - Davenport - 9/8/20*

66

11:21:30  1   the family and I'm going to talk to the individual

11:21:33  2   to get my understanding of the whole situation.

11:21:35  3        Q.   Okay.  Typically how long does the

11:21:39  4   questioning of the family and the individual last?

11:21:42  5        A.   There's no specific time per se.  It

11:21:48  6   could be minutes, but I can't give you a precise

11:21:52  7   number in regards to the questioning and how long

11:21:55  8   it takes.

11:21:56  9        Q.   Has the 941 process to your knowledge

11:21:59 10   changed at all since January 1st of 2017?

11:22:03 11        A.   No, it hasn't.

11:22:04 12        Q.   Okay.  So the training that was done in

11:22:09 13   2018, that was more of a refresher on what you

11:22:11 14   learned in 2016?

11:22:12 15        A.   Yes.  The only thing different that I

11:22:17 16   do in regards to a 941 is we used to do it on paper

11:22:22 17   form, but now it's through the computer, but it's

11:22:24 18   the same thing.  That's the only difference.

11:22:29 19        Q.   Was it on paper or on the computer in

11:22:33 20   2017?

11:22:34 21        A.   It's on paper because the computer

11:22:40 22   version came out within a year -- like within the

11:22:42 23   year or so.

*Santana - Davenport - 9/8/20*

67

11:22:44  1          Q.    Okay.  Have you been trained on the

11:22:48  2    computer version?

11:22:49  3          A.    Yes.

11:22:50  4          Q.    And when did you participate in that

11:22:53  5    training?

11:22:53  6          A.    I don't recall the dates.

11:22:56  7          Q.    But it was in -- within the last year?

11:22:58  8          A.    Yes.

11:22:59  9          Q.    Okay.  Was that with the Buffalo

11:23:03 10    training academy?

11:23:05 11          A.    That was with the Buffalo training

11:23:08 12    academy, that's correct.

11:23:09 13          Q.    Okay.  Now, turning back to Exhibit 36.

11:23:18 14          A.    Okay.

11:23:20 15          Q.    After the incident on Liddell Street

11:23:24 16    ended at 11:03, when was the next call that you

11:23:27 17    responded to according to the document?

11:23:29 18          A.    According to this documentation here,

11:23:32 19    1305 is the next call.

11:23:34 20          Q.    And that would represent 1:05 p.m.?

11:23:36 21          A.    That is correct.

11:23:37 22          Q.    Okay.  So what are officers expected to

11:23:45 23    do during that downtime when they're not responding

*Santana - Davenport - 9/8/20*

68

11:23:48   1    to a call?

11:23:49   2         A.   It's different with each officer, but

11:23:52   3    if you're -- from my perspective, if you're not

11:23:55   4    assigned a call, you generally just drive around

11:23:58   5    your sector.

11:23:59   6         So it's either -- I'm just throwing some

11:24:04   7    examples out.  If there's calls in other sectors,

11:24:07   8    you could see if they need any assistance, or if

11:24:10   9    you want to do a traffic stop, you could do that if

11:24:13   10   you see a traffic infraction.  Generally, you're

11:24:16   11   within your sector and you're patrolling.

11:24:20   12        Q.   Okay.  Do you see how the next call

11:24:23   13   that you responded to at 1:05 p.m. on Bailey Avenue

11:24:27   14   was again without your partner, Joseph?

11:24:31   15        A.   I do see that.

11:24:32   16        Q.   Okay.  Do you know why Joseph wasn't

11:24:35   17   out patrolling with you at that time?

11:24:37   18        A.   I can't tell you why.  He probably was

11:24:40   19   in the car and didn't assign himself to this call.

11:24:44   20   There's many possibilities.  He could be at the

11:24:46   21   station house using the bathroom.  I don't know

11:24:49   22   because I don't recall.

11:24:51   23        Q.   Okay.  But he also didn't respond to

*Santana - Davenport - 9/8/20*

69

| | | |
|---|---|---|
| 11:24:53 | 1 | the call that was at Liddell Street, correct? |
| 11:25:00 | 2 | **A.** Let's go back to that. No. According |
| 11:25:03 | 3 | to this document, no. |
| 11:25:04 | 4 | **Q.** Okay. Now, according again to the |
| 11:25:08 | 5 | complaint summary report, the call that you |
| 11:25:11 | 6 | responded to on Bailey Avenue was call sign C232, |
| 11:25:16 | 7 | which refers to you, correct? |
| 11:25:17 | 8 | **A.** No, there's two Bailey Avenues. Which |
| 11:25:19 | 9 | one are you specifically talking about? |
| 11:25:22 | 10 | **Q.** 964 Bailey Avenue. |
| 11:25:25 | 11 | **A.** Okay. And you would like to know |
| 11:25:26 | 12 | whether or not I was the -- the two primary |
| 11:25:29 | 13 | officers? |
| 11:25:29 | 14 | **Q.** Call sign 232 refers to you, correct? |
| 11:25:33 | 15 | **A.** Yes, that is correct. |
| 11:25:34 | 16 | **Q.** Okay. And call sign 230 responds to |
| 11:25:38 | 17 | Karl Schultz and Karl Moriarity on January 1st of |
| 11:25:41 | 18 | 2017? |
| 11:25:42 | 19 | **A.** That is correct. |
| 11:25:43 | 20 | **Q.** Do you see any other call signs that |
| 11:25:45 | 21 | were associated with the call at 1964 Bailey |
| 11:25:48 | 22 | Avenue? |
| 11:25:48 | 23 | **A.** No, I do not. |

*Santana - Davenport - 9/8/20*

70

| | | |
|---|---|---|
| 11:25:49 | 1 | **Q.** Okay. Do you see the next call that |
| 11:25:55 | 2 | was at 1773 Bailey Avenue? |
| 11:25:57 | 3 | **A.** I do. |
| 11:25:58 | 4 | **Q.** Okay. Who were the officers that |
| 11:26:00 | 5 | responded to that call? |
| 11:26:01 | 6 | **A.** Myself, Officer Schultz, and Officer |
| 11:26:06 | 7 | Moriarity. |
| 11:26:08 | 8 | **Q.** Now, the call signs that are associated |
| 11:26:11 | 9 | with this call are call sign 232 and call sign 230; |
| 11:26:14 | 10 | is that correct? |
| 11:26:15 | 11 | **A.** That is correct. |
| 11:26:15 | 12 | **Q.** Are there any other call signs that are |
| 11:26:17 | 13 | associated with this call? |
| 11:26:18 | 14 | **A.** No, there isn't. |
| 11:26:19 | 15 | **Q.** Okay. Do you see the next call that is |
| 11:26:22 | 16 | at 788 Fillmore Avenue? |
| 11:26:24 | 17 | **A.** I do. |
| 11:26:25 | 18 | **Q.** Who were the officers that responded to |
| 11:26:27 | 19 | that call? |
| 11:26:27 | 20 | **A.** Just myself. |
| 11:26:28 | 21 | **Q.** And it's just call sign 232? |
| 11:26:32 | 22 | **A.** That is correct. |
| 11:26:33 | 23 | **Q.** Okay. Do you see the next incident |

*Santana - Davenport - 9/8/20*

71

| | | |
|---|---|---|
| 11:26:40 | 1 | that occurred at 575 High Street? |
| 11:26:43 | 2 | **A.**   I do. |
| 11:26:43 | 3 | **Q.**   Okay.  Who were the officers that |
| 11:26:47 | 4 | responded to that call? |
| 11:26:48 | 5 | **A.**   So it's Charlie 232, which is myself. |
| 11:26:53 | 6 | Charlie 231, according to the shift summary report, |
| 11:26:56 | 7 | it is Officer Gorski.  And that's it. |
| 11:27:02 | 8 | **Q.**   Okay.  And then the last call for the |
| 11:27:06 | 9 | day was 568 Doat Street? |
| 11:27:08 | 10 | **A.**   That is correct. |
| 11:27:09 | 11 | **Q.**   Okay.  And who were the officers that |
| 11:27:13 | 12 | responded to that call? |
| 11:27:13 | 13 | **A.**   Myself. |
| 11:27:14 | 14 | **Q.**   Okay.  Were there any other officers |
| 11:27:17 | 15 | who responded to that call? |
| 11:27:18 | 16 | **A.**   I don't recall. |
| 11:27:21 | 17 | **Q.**   So now would it be safe to assume from |
| 11:27:24 | 18 | this document that from 9:50 a.m. onward, Joseph, |
| 11:27:30 | 19 | your partner, was not with you for the rest of the |
| 11:27:33 | 20 | day? |
| 11:27:33 | 21 | **MS. HUGGINS:**  Form.  You can answer. |
| 11:27:35 | 22 | **THE WITNESS:**  You're talking about in |
| 11:27:37 | 23 | regards to that Brownell and Ashley, from that |

*Santana - Davenport - 9/8/20*

72

| | | |
|---|---|---|
| 11:27:39 | 1 | call? |
| 11:27:40 | 2 | **BY MR. DAVENPORT:** |
| 11:27:40 | 3 | **Q.**   Yep. |
| 11:27:41 | 4 | **A.**   And if he was with me for the entire |
| 11:27:43 | 5 | day after that call? |
| 11:27:44 | 6 | **Q.**   That's correct. |
| 11:27:45 | 7 | **A.**   That, I can't recall. |
| 11:27:47 | 8 | **Q.**   But based on this documentation, would |
| 11:27:48 | 9 | it be safe to assume that he was not with you for |
| 11:27:51 | 10 | the rest of the day? |
| 11:27:51 | 11 | **MS. HUGGINS:**  Form.  You can answer. |
| 11:27:53 | 12 | **THE WITNESS:**  Based on this, yes. |
| 11:27:54 | 13 | **BY MR. DAVENPORT:** |
| 11:27:55 | 14 | **Q.**   Okay.  Would there be anything from |
| 11:28:01 | 15 | this document that would indicate that from 9:50 |
| 11:28:04 | 16 | a.m. onward, your partner, Joseph, was with you at |
| 11:28:06 | 17 | any other part of the day? |
| 11:28:08 | 18 | **A.**   No. |
| 11:28:08 | 19 | **Q.**   Okay.  Do you have any idea why Joseph |
| 11:28:15 | 20 | may have not been with you for the rest of the day? |
| 11:28:18 | 21 | **MS. HUGGINS:**  Form. |
| 11:28:18 | 22 | **THE WITNESS:**  Like I said, I don't recall |
| 11:28:20 | 23 | the whole entire day during that day, but if he was |

*Santana - Davenport - 9/8/20*

73

| | | |
|---|---|---|
| 11:28:24 | 1 | with me the entire day, he could have been, but he |
| 11:28:27 | 2 | is not required if I answer my sector calls to put |
| 11:28:30 | 3 | himself on my calls. |
| 11:28:32 | 4 | So from this documentation that you see here |
| 11:28:35 | 5 | where I'm the only one responding to that, I'm the |
| 11:28:37 | 6 | one who is taking that call. |
| 11:28:39 | 7 | He has the option whether or not he wants to |
| 11:28:42 | 8 | take it or not, so he could have been with me the |
| 11:28:45 | 9 | entire day.  It's just from this documentation |
| 11:28:47 | 10 | here, you'll see me on certain calls by myself, but |
| 11:28:51 | 11 | in fact, he could have been with me. |
| 11:28:52 | 12 | Q.   Okay.  I think I understand what you're |
| 11:28:55 | 13 | saying.  So for the Brownell and Ashley Street |
| 11:29:01 | 14 | traffic stop, that call ended with you and Joseph |
| 11:29:07 | 15 | going to central booking and the lab.  Correct? |
| 11:29:10 | 16 | A.   That is correct. |
| 11:29:11 | 17 | Q.   Okay.  How long would an officer be |
| 11:29:15 | 18 | expected to stay at the lab? |
| 11:29:17 | 19 | A.   It also -- it's -- each -- each |
| 11:29:21 | 20 | situation is different.  The lab takes until -- |
| 11:29:27 | 21 | it's narcotics, it's firearms.  So you could be |
| 11:29:30 | 22 | there minutes or you could be there over a |
| 11:29:33 | 23 | half-hour.  But each -- situation is different, so |

*Santana - Davenport - 9/8/20*

74

| | | |
|---|---|---|
| 11:29:37 | 1 | I'm not sure. |
| 11:29:38 | 2 | Q. Okay. But you wouldn't expect to be at |
| 11:29:41 | 3 | the lab for longer than a half-hour? |
| 11:29:44 | 4 | A. Like I said earlier, each -- I mean, |
| 11:29:47 | 5 | it's possible that you could be there a lot longer, |
| 11:29:49 | 6 | but each situation is different, so I can't give |
| 11:29:53 | 7 | you the exact number. |
| 11:29:54 | 8 | Q. Have you ever gone to the narcotics lab |
| 11:29:57 | 9 | before? |
| 11:29:57 | 10 | A. I have. |
| 11:29:58 | 11 | Q. Okay. What's the longest that you've |
| 11:30:00 | 12 | ever stayed at the narcotics lab? |
| 11:30:02 | 13 | A. I can't tell you because I can't |
| 11:30:04 | 14 | recall. |
| 11:30:04 | 15 | Q. Was it longer than an hour? |
| 11:30:06 | 16 | A. I can't recall. Possibly, but I'm not |
| 11:30:08 | 17 | sure. I can't give you that exact number because |
| 11:30:10 | 18 | I've had so many narcotics arrests, so I can't tell |
| 11:30:13 | 19 | you. |
| 11:30:13 | 20 | Q. Okay. Ever longer than two hours? |
| 11:30:17 | 21 | A. I don't believe so, but I can't -- |
| 11:30:21 | 22 | don't quote me on it. |
| 11:30:22 | 23 | Q. Sure. If you were able to give a rough |

*Santana - Davenport - 9/8/20*

75

11:30:25  1   estimate for how long you would stay in the

11:30:26  2   narcotics lab, what would that rough estimate be?

11:30:29  3       **A.**   On average you're talking about?  20

11:30:35  4   minutes.

11:30:35  5       **Q.**   Now, according to the complaint summary

11:30:39  6   report, it also says that there was a location

11:30:43  7   change to central booking.  Do you see that?

11:30:46  8       **A.**   Yes.  Let me get to that page real

11:30:49  9   quick here.  Yes, I do see that.

11:30:51 10       **Q.**   And that would have taken place at 8:12

11:30:54 11   a.m.?

11:30:54 12       **A.**   That's correct.

11:30:55 13       **Q.**   Okay.  And then the next location

11:30:57 14   change was at 9:25 a.m.?

11:30:59 15       **A.**   Yes.

11:31:04 16       **Q.**   So that would indicate to you that no

11:31:11 17   officers were at central booking after 9:25 a.m.?

11:31:16 18       **A.**   There could be officers at central

11:31:18 19   booking because this is the City of Buffalo and

11:31:21 20   there's many districts, so I can't tell you how

11:31:24 21   many officers were at central booking after that

11:31:26 22   time.

11:31:27 23       **Q.**   What about for you and your partner,

11:31:29  1  Joseph?

11:31:30  2          **MS. HUGGINS:**  Form.

11:31:31  3          **THE WITNESS:**  According to this, I am at

11:31:33  4  central booking because I put myself out on central

11:31:35  5  booking.

11:31:36  6          **BY MR. DAVENPORT:**

11:31:37  7          **Q.**    But the fact that there was a location

11:31:38  8  change for your call sign at 9:25 a.m. would infer

11:31:42  9  that you were no longer at central booking at --

11:31:45 10  after 9:25 a.m.?

11:31:46 11          **A.**    Yes.  So to this document here, I

11:31:49 12  called out that I was at central booking at 8:12.

11:31:54 13  Generally after the arrest process is done, and

11:31:57 14  that takes a long time, that takes a while, I will

11:31:59 15  call out afterwards that I'm going to the lab,

11:32:02 16  Charlie 232 lab.  So 9:25 would have been the time

11:32:07 17  that I left central booking to go to the lab and

11:32:11 18  submit.

11:32:14 19          **Q.**    And there would be no way to know if

11:32:16 20  your partner, Joseph, remained at central booking?

11:32:20 21          **A.**    There will be -- I mean, there might be

11:32:23 22  video, there might be cameras, but he's not

11:32:25 23  required to put himself on the lab because I put

| | |
|---|---|
| 11:32:28 | 1 |

11:32:28  1  myself out and he was riding with me that day, so

11:32:31  2  he came along with me.

11:32:33  3       But he is not required to stay after I said

11:32:37  4  that Charlie 232 will be on central booking for him

11:32:42  5  to say, "I'm going with him, too."

11:32:44  6       Generally like if he's in the car here with

11:32:46  7  that summary sheet that you have right here,

11:32:49  8  dispatch would know whether or not there's two

11:32:51  9  individuals within that car.

11:32:53  10      Q.    Okay.  You were the primary officer for

11:33:00  11  that call at Brownell Street and Ashley?

11:33:03  12      A.    That's correct.

11:33:03  13      Q.    Okay.  Is it typically the primary

11:33:05  14  officer who guess to the narcotics lab?

11:33:07  15      A.    It could be the primary officer, but if

11:33:11  16  you have other officers assisting on your call,

11:33:15  17  that other officer can take the narcotics or

11:33:19  18  whatnot to the lab.

11:33:22  19      It's -- generally it's up to the primary

11:33:24  20  officer whether or not he wants the help to do all

11:33:28  21  that stuff.

11:33:29  22      Q.    Okay.  Now, I'm going to ask you to

11:33:43  23  turn to page 5 on Exhibit 36.  Do you see the

*Santana - Davenport - 9/8/20*

78

| 11:33:48 | 1 | incident that occurred at 575 High Street? |
| 11:33:52 | 2 | **A.** I do see it. |
| 11:33:53 | 3 | **Q.** Okay. And what -- what was that call |
| 11:33:55 | 4 | referring to? |
| 11:33:56 | 5 | **A.** A female caller said she was suicidal |
| 11:34:00 | 6 | and is going to burn the house down and kill her |
| 11:34:03 | 7 | mother. |
| 11:34:03 | 8 | **Q.** Okay. What was the outcome of that |
| 11:34:05 | 9 | call? |
| 11:34:06 | 10 | **A.** That outcome of that call was can't |
| 11:34:11 | 11 | raise anyone. So from this -- from this |
| 11:34:17 | 12 | documentation here and from me reading this |
| 11:34:19 | 13 | documentation, it's they couldn't get a hold of the |
| 11:34:23 | 14 | person who called 911. |
| 11:34:32 | 15 | **Q.** Based on what you see on the complaint |
| 11:34:34 | 16 | summary report for 575 High Street -- |
| 11:34:38 | 17 | **A.** Can't raise anyone, right there on that |
| 11:34:40 | 18 | form. So I don't know what happened at that day |
| 11:34:44 | 19 | because I don't remember that day. |
| 11:34:45 | 20 | But from reading this documentation right |
| 11:34:47 | 21 | here leads me to believe that whoever responded to |
| 11:34:52 | 22 | this asked radio to contact the person who made the |
| 11:34:55 | 23 | initial 911 call because they're knocking on doors, |

*Santana - Davenport - 9/8/20*

79

| | | |
|---|---|---|
| 11:34:59 | 1 | they couldn't get anybody. |
| 11:35:00 | 2 | So when dispatch attempted to call whoever, |
| 11:35:02 | 3 | they couldn't get anyone on the other line.  So |
| 11:35:05 | 4 | that's from me picking out this documentation right |
| 11:35:10 | 5 | here. |
| 11:35:10 | 6 | **Q.**   Okay.  Again, you know, just based on |
| 11:35:13 | 7 | what you see on the complaint summary report, it |
| 11:35:15 | 8 | was the person who made the call that was suicidal, |
| 11:35:17 | 9 | correct? |
| 11:35:18 | 10 | **MS. HUGGINS:**   Form. |
| 11:35:22 | 11 | **THE WITNESS:**   Yes.  The caller according to |
| 11:35:25 | 12 | this document, yes. |
| 11:35:26 | 13 | **BY MR. DAVENPORT:** |
| 11:35:26 | 14 | **Q.**   Okay.  And that's the person who you as |
| 11:35:30 | 15 | the responding officer could not find at this |
| 11:35:32 | 16 | location? |
| 11:35:33 | 17 | **A.**   I don't recall the -- this incident, |
| 11:35:37 | 18 | but from this documentation here, it would be -- |
| 11:35:42 | 19 | officer Gorski would be the primary officer. |
| 11:35:45 | 20 | I don't -- I don't recollect this incident. |
| 11:35:48 | 21 | I don't remember doing anything because I don't |
| 11:35:50 | 22 | recollect that day, so I don't know who did what in |
| 11:35:55 | 23 | regards to this. |

*Santana - Davenport - 9/8/20*

80

11:35:55  1          Q.    Okay.  But based on, you know, what you

11:36:02  2     saw on the -- you know, based on your best

11:36:04  3     interpretation of what the can't raise anyone part

11:36:07  4     of the complaint summary report says, you were

11:36:11  5     unable to find whoever this caller was?

11:36:14  6          A.    Yes.

11:36:14  7          MS. HUGGINS:   Form.

11:36:15  8          BY MR. DAVENPORT:

11:36:15  9          Q.    Okay.  And the caller was the person

11:36:19 10     who was suicidal at this time?

11:36:22 11          A.    According to this document, that's

11:36:26 12     right.

11:36:26 13          Q.    Okay.  Would you be able to tell from

11:36:27 14     this document if there was anybody else who was at

11:36:30 15     this residence?

11:36:31 16          A.    No.

11:36:32 17          Q.    Okay.  When it says 52-year-old female

11:36:35 18     is that referring to the caller?

11:36:41 19          A.    Yes, possibly, but I'm not sure,

11:36:44 20     because it doesn't specify whether that 52-year-old

11:36:47 21     is the person.

11:36:53 22          Q.    Okay.  Now, if somebody calls saying

11:36:56 23     that they are suicidal, would that result in a 941

| | | |
|---|---|---|
| 11:37:01 | 1 | mental health examination? |
| 11:37:03 | 2 | **A.** Generally it's you as an officer has to |
| 11:37:07 | 3 | make that determination when you talk to that |
| 11:37:09 | 4 | individual. And you talk to the person who called |
| 11:37:12 | 5 | 911 in regards to that person. |
| 11:37:17 | 6 | **Q.** If you as the officer was able to |
| 11:37:19 | 7 | locate the person who said that they were suicidal, |
| 11:37:22 | 8 | would you ask them certain questions? |
| 11:37:23 | 9 | **A.** Yes. |
| 11:37:24 | 10 | **MS. HUGGINS:** Form. You can answer. |
| 11:37:26 | 11 | **THE WITNESS:** Yes. |
| 11:37:27 | 12 | **BY MR. DAVENPORT:** |
| 11:37:27 | 13 | **Q.** Okay. And what types of questions |
| 11:37:29 | 14 | would you ask? |
| 11:37:30 | 15 | **A.** How they're feeling, if they want to |
| 11:37:33 | 16 | harm themselves, if there's a situation that made |
| 11:37:37 | 17 | them the way they are. |
| 11:37:39 | 18 | It's not like -- we don't have standard |
| 11:37:41 | 19 | questions, but we do ask questions primarily to see |
| 11:37:45 | 20 | whether or not they want to harm themselves or |
| 11:37:48 | 21 | others. |
| 11:37:51 | 22 | **Q.** Are there any typical answers that |
| 11:37:53 | 23 | would result in you realizing that this person |

*Santana - Davenport - 9/8/20*

82

| | | |
|---|---|---|
| 11:37:55 | 1 | should be subjected to a 941 mental health |
| 11:37:58 | 2 | examination? |
| 11:37:59 | 3 | **MS. HUGGINS:**  Form.  You can answer. |
| 11:38:00 | 4 | **THE WITNESS:**  There could be many answers to |
| 11:38:03 | 5 | my questioning.  It's broadly -- I mean, it's all |
| 11:38:07 | 6 | over the place. |
| 11:38:08 | 7 | **BY MR. DAVENPORT:** |
| 11:38:08 | 8 | **Q.**   Okay.  If this woman did confirm that |
| 11:38:12 | 9 | she was feeling suicidal in response to your |
| 11:38:15 | 10 | questions, would you subject her to a 941 mental |
| 11:38:20 | 11 | health examination? |
| 11:38:21 | 12 | **MS. HUGGINS:**  Form. |
| 11:38:22 | 13 | **THE WITNESS:**  Yes.  If she did state to me |
| 11:38:26 | 14 | that she wanted to harm herself or to harm others, |
| 11:38:28 | 15 | yes, I will -- I am required to do that 941 |
| 11:38:32 | 16 | paperwork on her. |
| 11:38:34 | 17 | **BY MR. DAVENPORT:** |
| 11:38:34 | 18 | **Q.**   Okay.  What if that woman said that she |
| 11:38:39 | 19 | was no longer feeling suicidal? |
| 11:38:42 | 20 | **A.**   Generally if someone just outright says |
| 11:38:45 | 21 | that they're suicidal and then a minute later, they |
| 11:38:47 | 22 | say they don't because they don't want to see |
| 11:38:50 | 23 | anybody, then that's not going -- generally you |

| | | |
|---|---|---|
| 11:38:51 | 1 | want to make sure that person is being seen because |
| 11:38:54 | 2 | we don't know. |
| 11:38:54 | 3 | I'm not a mental health expert, so if that |
| 11:38:59 | 4 | scenario happened to me, I would still take them to |
| 11:39:05 | 5 | get evaluated. |
| 11:39:07 | 6 | **Q.** Okay. |
| 11:39:08 | 7 | **MS. HUGGINS:** Form to the last question. |
| 11:39:16 | 8 | **BY MR. DAVENPORT:** |
| 11:39:16 | 9 | **Q.** Turning back to page 4 from 11:03 a.m. |
| 11:39:19 | 10 | to 1:05 p.m., you don't see anything else on this |
| 11:39:24 | 11 | document for calls that you would have responded |
| 11:39:26 | 12 | to? |
| 11:39:28 | 13 | **A.** 11:03 a.m.? No, I do not. |
| 11:39:35 | 14 | **Q.** Do you ever take lunch breaks during |
| 11:39:38 | 15 | your shift? |
| 11:39:39 | 16 | **A.** I do, yes. |
| 11:39:41 | 17 | **Q.** Do you typically take those lunch |
| 11:39:46 | 18 | breaks in your car, at the station? Where do you |
| 11:39:48 | 19 | typically take them? |
| 11:39:49 | 20 | **A.** It depends on the day, really. Busy |
| 11:39:53 | 21 | days, I eat my sandwich or whatever I have for |
| 11:39:57 | 22 | lunch in the car. Sometimes I'll eat at the |
| 11:40:02 | 23 | station house, but that's pretty much the only two |

*Santana - Davenport - 9/8/20*

84

| | | |
|---|---|---|
| 11:40:04 | 1 | places, really. |
| 11:40:06 | 2 | Q.   Okay.  Do you know if on January 1st of |
| 11:40:08 | 3 | 2017, did you take a lunch break? |
| 11:40:10 | 4 | A.   I do not. |
| 11:40:11 | 5 | Q.   Okay.  How long are your lunch breaks |
| 11:40:14 | 6 | typically for? |
| 11:40:15 | 7 | A.   That, I can't tell you because I eat |
| 11:40:19 | 8 | while I work and I really don't put myself out on |
| 11:40:22 | 9 | breaks.  Me, I'm assuming a half-hour, but that's |
| 11:40:29 | 10 | not like per se, that's me. |
| 11:40:33 | 11 | Q.   Okay.  When did you first become |
| 11:40:38 | 12 | notified of a lawsuit regarding the incident that |
| 11:40:41 | 13 | occurred on January 1st of 2017? |
| 11:40:43 | 14 | A.   Last year, I believe. |
| 11:40:46 | 15 | Q.   Okay.  Do you remember roughly what |
| 11:40:48 | 16 | time? |
| 11:40:49 | 17 | A.   I do not, no. |
| 11:40:52 | 18 | Q.   Do you recall there being a video |
| 11:40:55 | 19 | recording that was given to you with that |
| 11:40:57 | 20 | complaint? |
| 11:40:57 | 21 | A.   When I went to discuss this the last |
| 11:41:02 | 22 | time I was here, yes.  But in regards to -- I'm |
| 11:41:06 | 23 | sorry. |

*Santana - Davenport - 9/8/20*

85

11:41:06  1          **MS. HUGGINS:**  No.  I think he's just

11:41:08  2  confused.  I think he's conflating talking and

11:41:10  3  meeting with me and what you're asking.

11:41:13  4          **THE WITNESS:**  Right.

11:41:13  5          **MS. HUGGINS:**  You're asking about being

11:41:14  6  served with a lawsuit?

11:41:15  7          **MR. DAVENPORT:**  Yes.

11:41:15  8          **MS. HUGGINS:**  Okay.

11:41:16  9          **THE WITNESS:**  No.

11:41:17 10          **MS. HUGGINS:**  If at any point you don't

11:41:20 11  understand his question, just ask for

11:41:22 12  clarification.

11:41:23 13          **MR. DAVENPORT:**  Sure.

11:41:24 14          **BY MR. DAVENPORT:**

11:41:24 15          **Q.**   So in response to my question, you

11:41:26 16  don't recall having a video recording that was

11:41:28 17  served to you with the complaint?

11:41:30 18          **A.**   No.

11:41:35 19          **Q.**   After receiving the complaint, did you

11:41:39 20  call anyone?

11:41:40 21          **A.**   No.

11:41:41 22          **Q.**   Okay.  Do you typically give a copy of

11:41:48 23  the complaint to the police union or somebody

*Santana - Davenport - 9/8/20*

86

| | | |
|---|---|---|
| 11:41:50 | 1 | within the police department? |
| 11:41:51 | 2 | A.   No. |
| 11:41:52 | 3 | Q.   Okay.  Did you speak to any of the |
| 11:41:58 | 4 | other officers who were named in this lawsuit? |
| 11:42:01 | 5 | A.   No. |
| 11:42:02 | 6 | Q.   Okay.  What did you do after you were |
| 11:42:05 | 7 | served with the complaint? |
| 11:42:06 | 8 | A.   Just waited until I had to show up, but |
| 11:42:10 | 9 | I didn't do anything in between that. |
| 11:42:12 | 10 | Q.   Okay.  How were you notified when to |
| 11:42:16 | 11 | show up? |
| 11:42:17 | 12 | A.   Generally, the court office will call |
| 11:42:19 | 13 | the station house and they will send out notices. |
| 11:42:23 | 14 | Q.   Okay.  And what courthouse is that? |
| 11:42:30 | 15 | A.   Buffalo City Court.  County Court. |
| 11:42:39 | 16 | Q.   How do they become notified of a |
| 11:42:41 | 17 | lawsuit? |
| 11:42:42 | 18 | A.   I don't know. |
| 11:42:43 | 19 | Q.   Okay. |
| 11:42:58 | 20 | MS. HUGGINS:   I think there's some overlap |
| 11:43:00 | 21 | in terminology.  The department within the police |
| 11:43:01 | 22 | department is called the court liaison department |
| 11:43:04 | 23 | that notified officers. |

| | | |
|---|---|---|
| 11:43:05 | 1 | MR. DAVENPORT:  Okay. |
| 11:43:06 | 2 | BY MR. DAVENPORT: |
| 11:43:08 | 3 | Q.   Do you have to give the complaint to |
| 11:43:10 | 4 | the court liaison officer? |
| 11:43:12 | 5 | A.   No. |
| 11:43:13 | 6 | Q.   Okay.  So after you or another officer |
| 11:43:19 | 7 | is served with papers for a lawsuit, how does the |
| 11:43:23 | 8 | liaison officer become notified of the lawsuit |
| 11:43:26 | 9 | against you or another officer? |
| 11:43:28 | 10 | A.   I don't know the whole process in |
| 11:43:30 | 11 | regards to that.  I just get the notification to |
| 11:43:33 | 12 | show up to do a deposition and that's pretty much |
| 11:43:35 | 13 | it. |
| 11:43:36 | 14 | Q.   Do you put some sort of a notification |
| 11:43:39 | 15 | in a system or something like that? |
| 11:43:41 | 16 | A.   No. |
| 11:43:44 | 17 | Q.   Okay.  Did you ever speak with a union |
| 11:43:50 | 18 | rep about this lawsuit? |
| 11:43:52 | 19 | A.   No. |
| 11:43:53 | 20 | Q.   Okay.  Did you speak with anybody, any |
| 11:43:57 | 21 | supervisors, any employee within the Buffalo Police |
| 11:44:03 | 22 | Department, not the law department, the Buffalo |
| 11:44:05 | 23 | Police Department about this lawsuit? |

```
11:44:06   1        A.    No.
11:44:08   2        Q.    Okay.  So I guess I'm just lost.  Maybe
11:44:12   3   you can explain this to me.  How is it when you are
11:44:15   4   served with a lawsuit that the Buffalo Police
11:44:19   5   Department becomes notified of a lawsuit against
11:44:22   6   you?
11:44:22   7        A.    Well, because it happened during work,
11:44:24   8   so if I get notification, they will call me and a
11:44:29   9   copy of the notice would be sent to the station
11:44:30  10   house.
11:44:31  11        So in regards to how do they not know, I'm
11:44:35  12   assuming that they do know, but I don't know the
11:44:36  13   whole process.
11:44:38  14        Q.    So you were served at work then?
11:44:41  15        A.    Possibly, yeah, it could be at work.
11:44:44  16   Yes, it could be at work or it could be a phone
11:44:47  17   call letting me know from the report technicians,
11:44:50  18   but that's pretty much it.
11:44:51  19        Q.    Okay.  Okay.  Do you know if the
11:44:56  20   service papers were handed to you specifically?
11:44:58  21        A.    No, I don't recall.  Generally the
11:45:01  22   whole process is I will get a phone call letting me
11:45:05  23   know when I have court.
```

*Santana - Davenport - 9/8/20*

89

| | | |
|---|---|---|
| 11:45:06 | 1 | And in the station house, there's a binder |
| 11:45:09 | 2 | with all the notifications.  So once I get that |
| 11:45:12 | 3 | phone call, I'll go to the station house and see |
| 11:45:14 | 4 | the notification myself. |
| 11:45:15 | 5 | Q.   Okay.  Did you ever watch any videos of |
| 11:45:20 | 6 | the incident on January 1st of 2017? |
| 11:45:22 | 7 | A.   Like ever? |
| 11:45:24 | 8 | Q.   Yes. |
| 11:45:25 | 9 | A.   I have in the news. |
| 11:45:26 | 10 | Q.   Okay.  Is that the only time that you |
| 11:45:28 | 11 | watched it? |
| 11:45:28 | 12 | A.   Yes. |
| 11:45:32 | 13 | Q.   Did you speak with any of the other |
| 11:45:33 | 14 | defendants who are named in this action? |
| 11:45:35 | 15 | A.   No. |
| 11:45:42 | 16 | Q.   Do you typically watch Channel 4 news |
| 11:45:45 | 17 | then? |
| 11:45:45 | 18 | A.   I generally don't watch any news, but |
| 11:45:48 | 19 | my fiancée will have the news on, so whenever she |
| 11:45:51 | 20 | watches it. |
| 11:45:52 | 21 | Q.   Okay.  Did your fiancée tell you that a |
| 11:45:56 | 22 | video of the incident was on Channel 4 news? |
| 11:45:58 | 23 | A.   She didn't have to tell me, I saw it. |

*Santana - Davenport - 9/8/20*

90

11:46:01 1          Q.    Okay.  Were you watching Channel 4 news

11:46:03 2     then when that story aired?

11:46:04 3          A.    I don't know what channel it was.  It

11:46:07 4     could have been Channel 2, 4, 7.  I'm not sure.

11:46:09 5          Q.    But you were watching it live then?

11:46:11 6          A.    I don't know if it was live.

11:46:13 7          Q.    Okay.  Do you remember roughly what

11:46:15 8     time or what date you watched that news story?

11:46:18 9          A.    It was recent, but other than that, no,

11:46:23 10    that's it.

11:46:24 11         Q.    Okay.  Did you watch that news story in

11:46:32 12    2020 or 2019?

11:46:33 13         A.    2020.

11:46:35 14         Q.    Was it in the last couple of months

11:46:38 15    then?

11:46:39 16         A.    Possibly, yes.

11:46:41 17         Q.    Okay.  And was that the first time that

11:46:43 18    you ever watched the video clip of what happened on

11:46:46 19    that day?

11:46:47 20         A.    Yes.

11:46:48 21         MS. HUGGINS:  Form.

11:46:50 22         BY MR. DAVENPORT:

11:46:51 23         Q.    What was your opinion of what you saw

*Santana - Davenport - 9/8/20*

91

| | | |
|---|---|---|
| 11:46:53 | 1 | on the screen? |
| 11:46:54 | 2 | **A.** I don't have an opinion of anything. |
| 11:46:55 | 3 | **MS. HUGGINS:** Form. What do you mean, what |
| 11:46:56 | 4 | you saw on the screen? What are you referring to? |
| 11:46:58 | 5 | **BY MR. DAVENPORT:** |
| 11:46:58 | 6 | **Q.** What was your opinion when you saw that |
| 11:47:00 | 7 | news story of what you saw -- |
| 11:47:02 | 8 | **A.** What I saw from the video, I had no |
| 11:47:04 | 9 | opinion whatsoever. |
| 11:47:05 | 10 | **Q.** Did you know that that news story was |
| 11:47:07 | 11 | referring to the lawsuit that you had been named |
| 11:47:11 | 12 | in? |
| 11:47:11 | 13 | **A.** I don't recall the particulars of that |
| 11:47:12 | 14 | news article, but no, I don't recall. |
| 11:47:15 | 15 | **Q.** Okay. So you don't recall if you knew |
| 11:47:18 | 16 | at the time of watching the news story that it was |
| 11:47:20 | 17 | referring to the lawsuit that you had been named as |
| 11:47:23 | 18 | a defendant in? |
| 11:47:25 | 19 | **A.** Well, the news, it possibly stated that |
| 11:47:27 | 20 | it was part of that, the whole lawsuit, but like I |
| 11:47:30 | 21 | said, I don't really remember the newscast or what |
| 11:47:33 | 22 | was reported on that day. I do remember seeing it |
| 11:47:36 | 23 | on the news. |

*Santana - Davenport - 9/8/20*

92

11:47:36  1       Q.    Okay.  What do you remember seeing?

11:47:38  2       A.    Just the video of the whole incident,

11:47:41  3  just that small clip and that's pretty much it.

11:47:45  4  And I believe his son was on the news and he was

11:47:48  5  talking about his father.

11:47:49  6       Q.    Okay.  Did you happen to see any sort

11:47:54  7  of a collision between a police car and a

11:47:57  8  pedestrian?

11:47:58  9       **MS. HUGGINS:**  Form.

11:47:58 10       **THE WITNESS:**  On that video, yes.

11:48:00 11       **BY MR. DAVENPORT:**

11:48:00 12       Q.    Okay.  Was your opinion that the

11:48:04 13  pedestrian threw himself at the police vehicle?

11:48:07 14       **MS. HUGGINS:**  Form.

11:48:07 15       **THE WITNESS:**  I don't have --

11:48:08 16       **MS. HUGGINS:**  So, can you -- he's a fact

11:48:10 17  witness and he's been named as a defendant.  He's

11:48:13 18  not here to provide opinion testimony.

11:48:17 19       **MR. DAVENPORT:**  Okay.

11:48:17 20       **BY MR. DAVENPORT:**

11:48:18 21       Q.    Actually, did you think that the

11:48:19 22  pedestrian threw himself at the police vehicle?

11:48:22 23       **MS. HUGGINS:**  The same objection to that

*Santana - Davenport - 9/8/20*

93

| | | |
|---|---|---|
| 11:48:24 | 1 | question. |
| 11:48:24 | 2 | **BY MR. DAVENPORT:** |
| 11:48:25 | 3 | Q.   You can answer. |
| 11:48:25 | 4 | **MS. HUGGINS:**  No, it's -- it's asking for an |
| 11:48:27 | 5 | opinion.  He's a fact witness in this case. |
| 11:48:30 | 6 | **BY MR. DAVENPORT:** |
| 11:48:31 | 7 | Q.   I'm asking factually did you think that |
| 11:48:33 | 8 | the pedestrian threw himself at the police vehicle? |
| 11:48:35 | 9 | **MS. HUGGINS:**  No, you -- same objection. |
| 11:48:37 | 10 | You're asking him for his viewpoint of a video. |
| 11:48:40 | 11 | **MR. DAVENPORT:**  Right. |
| 11:48:40 | 12 | **BY MR. DAVENPORT:** |
| 11:48:41 | 13 | Q.   Based on what you saw on the video, did |
| 11:48:43 | 14 | you think that he -- |
| 11:48:43 | 15 | **THE WITNESS:**  I -- |
| 11:48:44 | 16 | **MS. HUGGINS:**  That's still a problematic |
| 11:48:46 | 17 | question. |
| 11:48:46 | 18 | **MR. DAVENPORT:**  I'm going to ask the |
| 11:48:47 | 19 | question.  I'm not going to rephrase it. |
| 11:48:47 | 20 | **MS. HUGGINS:**  No, we -- |
| 11:48:49 | 21 | **MR. DAVENPORT:**  You can direct him to not |
| 11:48:50 | 22 | answer it or we can call -- |
| 11:48:51 | 23 | **MS. HUGGINS:**  We can call the judge. |

*Santana - Davenport - 9/8/20*

94

| | | |
|---|---|---|
| 11:48:52 | 1 | **MR. DAVENPORT:** You can call the judge if |
| 11:48:54 | 2 | you would like. |
| 11:48:54 | 3 | **MS. HUGGINS:** If you want to proceed with |
| 11:48:56 | 4 | the question, we can get the Court's guidance, but |
| 11:49:01 | 5 | he's not going to answer the question. |
| 11:49:01 | 6 | **MR. DAVENPORT:** All right. I'm going to |
| 11:49:03 | 7 | proceed with the question, so call up the judge. |
| 12:15:57 | 8 | (Discussion off the record.) |
| 12:15:57 | 9 | (A recess was then taken.) |
| 12:16:07 | 10 | **MR. DAVENPORT:** So back on the record. |
| 12:16:13 | 11 | Counsel for the defendant has objected to a line of |
| 12:16:16 | 12 | questioning by the plaintiffs. |
| 12:16:18 | 13 | The last question that was asked was whether |
| 12:16:20 | 14 | Mr. Santana believed that the individual seen on |
| 12:16:23 | 15 | the video in the news story that he watched threw |
| 12:16:26 | 16 | himself at a police vehicle. |
| 12:16:28 | 17 | The plaintiff reserves his rights to bring |
| 12:16:32 | 18 | Mr. Santana back for another deposition after |
| 12:16:35 | 19 | making a motion to determine whether that question |
| 12:16:38 | 20 | was proper and reserves his rights to request |
| 12:16:42 | 21 | attorneys fees as well as deposition costs |
| 12:16:44 | 22 | associated with bringing Mr. Santana back for |
| 12:16:48 | 23 | another deposition. |

Santana - Davenport - 9/8/20

95

12:16:50  1        MS. HUGGINS:  I just want to add for the

12:16:52  2   record that while off the record, I contacted the

12:16:57  3   chambers of Magistrate McCarthy and spoke with his

12:17:01  4   law clerk, Matthew Yusick, who indicated that Judge

12:17:06  5   McCarthy was not in the office today and was not

12:17:10  6   reachable in order to provide guidance or an

12:17:13  7   informal ruling on that question.

12:17:16  8        We briefly outlined but did not lead the

12:17:18  9   question and answer -- or question and objection to

12:17:18  10  the court.

12:17:20  11       And the law clerk's guidance was to continue

12:17:27  12  with the deposition and -- in other areas that were

12:17:34  13  not objectionable and to try to complete as much of

12:17:39  14  this as possible.

12:17:41  15       If there's anything more that you want to

12:17:43  16  add to, we did that off the record, but that was on

12:17:46  17  the speakerphone with both sides indicating their

12:17:48  18  position.

12:17:50  19       MR. DAVENPORT:  Sure.  So I'm going to try

12:17:52  20  one more time to rephrase the question in a way

12:17:54  21  that is not objectionable.

12:17:54  22       BY MR. DAVENPORT:

12:17:55  23       Q.   Mr. Santana, when you watched the news

*Santana - Davenport - 9/8/20*

96

| | | |
|---|---|---|
| 12:17:56 | 1 | story, did you see an individual throw himself at a |
| 12:17:59 | 2 | police car? |
| 12:18:00 | 3 | **MS. HUGGINS:** Form. You can answer. |
| 12:18:02 | 4 | **THE WITNESS:** I wasn't there when the |
| 12:18:04 | 5 | incident occurred, so I can't give you an opinion |
| 12:18:07 | 6 | as to that incident. |
| 12:18:09 | 7 | **BY MR. DAVENPORT:** |
| 12:18:10 | 8 | Q. Not necessarily an opinion, you know, |
| 12:18:13 | 9 | with you not being there, but based on what you saw |
| 12:18:15 | 10 | on that news story, did you see an video throw |
| 12:18:18 | 11 | himself at a police vehicle? |
| 12:18:20 | 12 | **MS. HUGGINS:** Form. You can answer. |
| 12:18:21 | 13 | **THE WITNESS:** That video is so grainy, I |
| 12:18:24 | 14 | can't even see much of anything. Sorry, I can't |
| 12:18:26 | 15 | form an opinion on something that's not -- the |
| 12:18:28 | 16 | quality of that video is not that good. |
| 12:18:31 | 17 | **BY MR. DAVENPORT:** |
| 12:18:31 | 18 | Q. So once again not an opinion, I just |
| 12:18:33 | 19 | want to know did you see an individual throw |
| 12:18:35 | 20 | himself at the police vehicle? |
| 12:18:37 | 21 | **MS. HUGGINS:** Form, asked and answered. |
| 12:18:40 | 22 | **THE WITNESS:** No, I did not see him throw |
| 12:18:42 | 23 | himself. |

*Santana - Davenport - 9/8/20*

97

| | | |
|---|---|---|
| 12:18:43 | 1 | **BY MR. DAVENPORT:** |
| 12:18:44 | 2 | **Q.**    Okay.  When you arrived on the scene |
| 12:18:46 | 3 | that day, who did you speak to on the scene? |
| 12:18:50 | 4 | **A.**    I don't recall who I talked to. |
| 12:18:52 | 5 | **Q.**    Okay.  Do you recall if Officer Schultz |
| 12:18:59 | 6 | or Officer Moriarity were at the scene? |
| 12:19:01 | 7 | **A.**    I know they were at the scene, yes. |
| 12:19:03 | 8 | **Q.**    Do you know if Officer McDermott and |
| 12:19:07 | 9 | Officer Velez were at the scene? |
| 12:19:09 | 10 | **A.**    Yes. |
| 12:19:09 | 11 | **Q.**    Do you recall speaking with any of the |
| 12:19:10 | 12 | officers? |
| 12:19:12 | 13 | **A.**    I don't recall speaking to any of them. |
| 12:19:14 | 14 | **Q.**    Okay.  Do you know why you went to the |
| 12:19:20 | 15 | scene? |
| 12:19:21 | 16 | **A.**    No. |
| 12:19:24 | 17 | **Q.**    Did you assign yourself? |
| 12:19:27 | 18 | **A.**    The incident is within my sector, so if |
| 12:19:31 | 19 | I see patrol cars there, I'm going to go over there |
| 12:19:36 | 20 | and make sure everything is okay, whatever |
| 12:19:38 | 21 | happened.  That's just me. |
| 12:19:39 | 22 | **Q.**    Okay.  So you were just patrolling at |
| 12:19:41 | 23 | this time? |

*Santana - Davenport - 9/8/20*

98

12:19:41   1        **A.**    Yes.

12:19:44   2        **Q.**    Based on what you saw on the news

12:19:46   3   story, did you have your partner, Joseph, with you

12:19:49   4   at that time?

12:19:50   5        **A.**    Yes.

12:19:51   6        **Q.**    Okay.

12:19:53   7        **A.**    Not based on the news story, based on

12:19:55   8   all these documentations, these exhibits that you

12:19:59   9   have before me.

12:20:00  10        **Q.**    Okay.  In the news story, did you see

12:20:04  11   the portion of the video where you actually arrived

12:20:05  12   at the scene?

12:20:06  13        **A.**    No.

12:20:08  14        **Q.**    Okay.  Have you ever seen that portion?

12:20:10  15        **A.**    Of me on that scene?  Yes, I have.

12:20:12  16        **Q.**    Okay.  And when did you watch that?

12:20:14  17        **A.**    Today, actually.

12:20:15  18        **Q.**    Have you watched it at any other time

12:20:20  19   besides that?

12:20:22  20        **A.**    The last time I was given a deposition

12:20:24  21   and that was it.

12:20:28  22        **Q.**    For this specific incident, you watched

12:20:32  23   the video at that deposition?

12:20:33  1      **A.**   Yes.

12:20:34  2      **MS. HUGGINS:**  I think he might be confusing

12:20:35  3  what he did during the interrogatories.  Are you

12:20:35  4  talking --

12:20:35  5      **THE WITNESS:**  Yeah, the one --

12:20:38  6      **MS. HUGGINS:**  -- about when we got the

12:20:38  7  paperwork together?

12:20:39  8      **THE WITNESS:**  Yeah.  That was the last time.

12:20:40  9      **MS. HUGGINS:**  He's just confusing the term

12:20:42 10  "interrogatories" with "deposition."

12:20:43 11      **THE WITNESS:**  Right.  Right.

12:20:44 12      **BY MR. DAVENPORT:**

12:20:44 13      **Q.**   Understood.  Understood.  So besides

12:20:49 14  watching the video with you arriving at the scene

12:20:51 15  for the interrogatories and this morning, have you

12:20:55 16  ever watched that video besides those two

12:20:57 17  instances?

12:20:57 18      **A.**   No.

12:20:58 19      **Q.**   Okay.

12:20:58 20      **MS. HUGGINS:**  And you know what?  To be

12:21:00 21  fair, that may have been the confusion at the

12:21:02 22  beginning of the deposition, confusing --

12:21:03 23      **THE WITNESS:**  Right.

12:21:03  1          **MS. HUGGINS:**  -- the term "deposition" with

12:21:08  2    "interrogatories."

12:21:08  3          **MR. DAVENPORT:**  Okay.

12:21:09  4          **THE WITNESS:**  Yeah, I'm not sure.

12:21:11  5          **BY MR. DAVENPORT:**

12:21:11  6          **Q.**    That's perfectly fine.  You go to law

12:21:12  7    school to learn that type of stuff.  No one is

12:21:16  8    expected or probably wants to know about it.

12:21:18  9          So I'm going to show you what has been

12:21:24 10    marked as Exhibit 11.  So this is a video of

12:21:33 11    surveillance footage that was obtained for the

12:21:35 12    incident that occurred on January 1st of 2017.

12:21:45 13          (Discussion off the record.)

12:21:45 14          **BY MR. DAVENPORT:**

12:22:03 15          **Q.**    So this was previously marked as

12:22:04 16    Exhibit 11.  It is the forth video segment.  Its

12:22:09 17    numbers are 06_20170101105233.  How many officers

12:22:44 18    do you see at the beginning of this video segment?

12:22:47 19          **A.**    This right here?  Five.

12:22:49 20          **Q.**    Were you one of the five officers that

12:22:51 21    were there?

12:22:51 22          **A.**    Yes.

12:22:52 23          **Q.**    Do you see where your car is parked?

*Santana - Davenport - 9/8/20*

101

| | | |
|---|---|---|
| 12:22:55 | 1 | **A.**    I do. |
| 12:22:56 | 2 | **Q.**    Okay.   Where on the video screen do you |
| 12:22:58 | 3 | see your car parked? |
| 12:22:59 | 4 | **A.**    In the upper left-hand corner of the |
| 12:23:01 | 5 | screen. |
| 12:23:02 | 6 | **Q.**    Okay.   Is it right next to another |
| 12:23:05 | 7 | Chevy Tahoe? |
| 12:23:06 | 8 | **A.**    It's right next to it. |
| 12:23:07 | 9 | **Q.**    Okay.   And that's a police vehicle? |
| 12:23:09 | 10 | **A.**    That is. |
| 12:23:09 | 11 | **Q.**    Okay.   So I'm going to play the |
| 12:23:13 | 12 | duration of that video and I'm just going to ask if |
| 12:23:17 | 13 | you see another officer appear on the screen. |
| 12:23:24 | 14 | **MS. HUGGINS:**   Other than the five that -- |
| 12:23:26 | 15 | **MR. DAVENPORT:**   Other -- |
| 12:23:26 | 16 | **MS. HUGGINS:**   Okay. |
| 12:23:26 | 17 | **BY MR. DAVENPORT:** |
| 12:23:27 | 18 | **Q.**    Other than the five officers seen at |
| 12:23:29 | 19 | the beginning of the video, do you see any other |
| 12:23:31 | 20 | officers appear on screen? |
| 12:23:36 | 21 | And then also, you know -- well, let me wait |
| 12:23:39 | 22 | for the video to kind of play.   Do you recall the |
| 12:23:44 | 23 | weather conditions that day? |

*Santana - Davenport - 9/8/20*

102

| | | |
|---|---|---|
| 12:23:45 | 1 | A.    No, I don't recall. |
| 12:23:47 | 2 | Q.    Based on what you see on the video, |
| 12:23:49 | 3 | would you say that was a cold or a warm day? |
| 12:23:51 | 4 | A.    Well, it's January, January is cold, |
| 12:23:53 | 5 | but I don't know particularly on that day. |
| 12:23:55 | 6 | Q.    Okay.  Do you see any snow on the |
| 12:23:57 | 7 | ground? |
| 12:23:58 | 8 | A.    That could be snow, yes, I do. |
| 12:24:01 | 9 | Q.    What else do you think it could be? |
| 12:24:05 | 10 | MS. HUGGINS:  Form. |
| 12:24:05 | 11 | THE WITNESS:  I don't know.  I mean, it's |
| 12:24:07 | 12 | white stuff, so it could be snow, it could be ice, |
| 12:24:10 | 13 | it could be anything, I guess. |
| 12:24:12 | 14 | BY MR. DAVENPORT: |
| 12:24:13 | 15 | Q.    Okay.  So either snow or ice then? |
| 12:24:15 | 16 | A.    Yes, but this video is not like really |
| 12:24:17 | 17 | clear. |
| 12:24:18 | 18 | Q.    Sure.  Did you walk at all on the |
| 12:24:22 | 19 | pavement to get to where you're currently standing |
| 12:24:26 | 20 | in the video? |
| 12:24:26 | 21 | A.    I don't recall. |
| 12:24:28 | 22 | Q.    Well, your car is parked maybe 20 feet |
| 12:24:31 | 23 | away from you; is that correct? |

*Santana - Davenport - 9/8/20*

103

| | | |
|---|---|---|
| 12:24:33 | 1 | **A.**    Yes. |
| 12:24:34 | 2 | **Q.**    So did you walk from your car to where |
| 12:24:37 | 3 | the officers are positioned in the middle of the |
| 12:24:39 | 4 | street? |
| 12:24:39 | 5 | **A.**    Quite possibly, yes. |
| 12:24:41 | 6 | **Q.**    Is there any other way that you would |
| 12:24:43 | 7 | have gotten to there? |
| 12:24:45 | 8 | **A.**    Maybe Petronella was driving and he |
| 12:24:47 | 9 | dropped me off, or -- I don't know.  I don't |
| 12:24:49 | 10 | remember anything about that day, so there's many |
| 12:24:53 | 11 | possibilities, but that's my car. |
| 12:24:53 | 12 |      I could have drove it and went over the dirt |
| 12:24:57 | 13 | patch or the concrete or whatever that area is, |
| 12:25:01 | 14 | it's quite possible, yes. |
| 12:25:02 | 15 | **Q.**    So I guess what you're saying is the |
| 12:25:04 | 16 | other alternate is Petronella dropped you off and |
| 12:25:06 | 17 | backed his vehicle up in his position now behind |
| 12:25:10 | 18 | the Chevy Tahoe while you stand in a circle with |
| 12:25:12 | 19 | the other officers. |
| 12:25:13 | 20 | **MS. HUGGINS:**  Form. |
| 12:25:14 | 21 | **THE WITNESS:**  That, I do not know because I |
| 12:25:16 | 22 | don't recall that day. |
| 12:25:18 | 23 | **BY MR. DAVENPORT:** |

*Santana - Davenport - 9/8/20*

104

12:25:18  1          Q.    Did you see Petronella at all on the

12:25:20  2    scene?

12:25:20  3          A.    I don't see anything indicating

12:25:23  4    Petronella on that screen.

12:25:24  5          Q.    Do you see anything indicating that

12:25:26  6    there's more than five officers on the scene?

12:25:28  7          A.    No.

12:25:28  8          Q.    Are you one of the five officers that's

12:25:31  9    there?

12:25:31  10          A.    I am.

12:25:32  11          Q.    Is there any reason for you to believe

12:25:34  12    that any of the officers who were there are not

12:25:37  13    Officer Velez, Officer McDermott, Officer

12:25:41  14    Moriarity, and Officer Schultz?

12:25:42  15          A.    Possibly Officer Petronella was inside

12:25:45  16    the vehicle the entire time, but viewing this

12:25:47  17    video, you can't really see inside the patrol

12:25:49  18    vehicle.

12:25:49  19          Q.    Okay.  Now we're almost at the end of

12:25:57  20    the video.  The police cars are starting to pull

12:25:59  21    away.  At any time, did you see a sixth officer out

12:26:03  22    on the street?

12:26:03  23          A.    No.

*Santana - Davenport - 9/8/20*

12:26:04  1       **Q.**    So it's safe to say that in this video

12:26:08  2   segment, there were five officers and at no point

12:26:12  3   were there more than five officers?

12:26:13  4       **MS. HUGGINS:**   Form.

12:26:14  5       **THE WITNESS:**   That is -- on the video,

12:26:15  6   that's correct.

12:26:15  7       **BY MR. DAVENPORT:**

12:26:16  8       **Q.**    Okay.

12:26:16  9       **A.**    But like I said, Petronella was

12:26:18  10  possibly inside sitting in the patrol vehicle.

12:26:20  11      **Q.**    Okay.  Would there be any reason why

12:26:24  12  Petronella would not have gotten out to speak with

12:26:26  13  the officers?

12:26:27  14      **A.**    I wouldn't know the reason why.  I

12:26:30  15  don't know.  It could be many factors.

12:26:35  16      **Q.**    Do you remember what your reason was

12:26:37  17  for appearing at the scene on this date?

12:26:41  18      **A.**    Maybe I happened to drive down Broadway

12:26:43  19  and I happened to see that patrol vehicle, so I

12:26:46  20  just went over just to see if everyone was okay and

12:26:50  21  whatnot.

12:26:51  22      **Q.**    Are you familiar with Schmarbeck

12:26:53  23  Avenue?

*Santana - Davenport - 9/8/20*

106

| | | |
|---|---|---|
| 12:26:53 | 1 | **A.**   I am. |
| 12:26:54 | 2 | **Q.**   Are you familiar with where 33 Schmarbeck |
| 12:26:57 | 3 | is positioned? |
| 12:26:57 | 4 | **A.**   No, I'm not. |
| 12:26:58 | 5 | **Q.**   What is the general structure of |
| 12:27:08 | 6 | Schmarbeck?  Is it a straight street or is there a |
| 12:27:10 | 7 | curve? |
| 12:27:11 | 8 | **A.**   It's a straight street.  There's no |
| 12:27:16 | 9 | curve, but there's a -- Schlenker I think is the |
| 12:27:19 | 10 | street that is behind.  It's Schmarbeck and |
| 12:27:23 | 11 | Schlenker, but no, there's no curve to that street. |
| 12:27:26 | 12 | **Q.**   Okay.  So it's a straight street and |
| 12:27:27 | 13 | then it meets with -- is it Schlenker? |
| 12:27:29 | 14 | **A.**   Yeah, that's the intersection with |
| 12:27:31 | 15 | that.  That's another street. |
| 12:27:33 | 16 | **Q.**   Do they run perpendicular with each |
| 12:27:36 | 17 | other? |
| 12:27:36 | 18 | **A.**   Horizontal and vertical, so Schmarbeck |
| 12:27:44 | 19 | is horizontal and then vertical is Schlenker.  I |
| 12:27:48 | 20 | might be butchering that name, but that's -- I |
| 12:27:52 | 21 | think that's how you say it. |
| 12:27:53 | 22 | **Q.**   All right.  Can you see the entirety of |
| 12:27:57 | 23 | Schmarbeck from Broadway? |

*Santana - Davenport - 9/8/20*

107

| | | |
|---|---|---|
| 12:27:59 | 1 | **A.**   Yes, you can.  When you drive by it, |
| 12:28:01 | 2 | yes. |
| 12:28:01 | 3 | **Q.**   So it would have been your assumption |
| 12:28:05 | 4 | that you were driving down Broadway and saw other |
| 12:28:08 | 5 | officers who were on Schmarbeck and that's why you |
| 12:28:10 | 6 | arrived? |
| 12:28:10 | 7 | **MS. HUGGINS:**  Form. |
| 12:28:11 | 8 | **THE WITNESS:**  Yes, because I'm always -- I'm |
| 12:28:13 | 9 | trying to look everywhere while I'm on patrol. |
| 12:28:16 | 10 | **BY MR. DAVENPORT:** |
| 12:28:17 | 11 | **Q.**   Okay.  I'm going to show you what's |
| 12:28:20 | 12 | been marked as Exhibit 4-A.  Now, have you seen |
| 12:28:32 | 13 | this document before? |
| 12:28:34 | 14 | **A.**   I have. |
| 12:28:37 | 15 | **Q.**   Okay.  This specific complaint summary |
| 12:28:40 | 16 | report you have seen? |
| 12:28:40 | 17 | **A.**   Yes, I have. |
| 12:28:41 | 18 | **Q.**   Okay.  When did you see that document? |
| 12:28:43 | 19 | **A.**   I saw it today. |
| 12:28:45 | 20 | **Q.**   At any other time, have you reviewed |
| 12:28:50 | 21 | this document? |
| 12:28:51 | 22 | **A.**   No, I haven't. |
| 12:28:52 | 23 | **Q.**   Now, the officers that are listed, you |

*Santana - Davenport - 9/8/20*

108

| | | |
|---|---|---|
| 12:29:02 | 1 | don't see your name on there, do you? |
| 12:29:04 | 2 | **A.**   No. |
| 12:29:04 | 3 | **Q.**   Okay.  Do you see your call sign |
| 12:29:08 | 4 | anywhere? |
| 12:29:08 | 5 | **A.**   No, I do not. |
| 12:29:10 | 6 | **Q.**   Okay.  And what is an officer's |
| 12:29:15 | 7 | obligation to report themselves if they are |
| 12:29:18 | 8 | assisting with the call? |
| 12:29:20 | 9 | **A.**   In regards to me being there per se |
| 12:29:23 | 10 | you're talking about? |
| 12:29:23 | 11 | **Q.**   Uh-huh. |
| 12:29:24 | 12 | **A.**   I'm not obligated to let dispatch know |
| 12:29:27 | 13 | that I'm over at the area.  Generally if I show up |
| 12:29:31 | 14 | on a scene and that officer needs assistance, then |
| 12:29:35 | 15 | I will go to dispatch and say put me out on this |
| 12:29:37 | 16 | call.  But from this document here, I didn't feel |
| 12:29:40 | 17 | like I needed to be on this call. |
| 12:29:42 | 18 | **Q.**   Okay.  Did you feel differently after |
| 12:29:48 | 19 | speaking with the officers who were at the scene? |
| 12:29:50 | 20 | **MS. HUGGINS:**   Form.  You can answer. |
| 12:29:51 | 21 | **THE WITNESS:**   I didn't have no opinion |
| 12:29:53 | 22 | because I didn't know what was going on and I don't |
| 12:29:56 | 23 | recollect that day. |

*Santana - Davenport - 9/8/20*

109

12:29:56  1        **BY MR. DAVENPORT:**

12:29:57  2        **Q.**   Okay.  Did you ask the officers that

12:29:59  3   were present at the scene what was going on?

12:30:01  4        **A.**   I don't recall.

12:30:03  5        **Q.**   Would that be something that you would

12:30:05  6   generally do?

12:30:06  7        **A.**   That's something that I would generally

12:30:08  8   do with every single call.  And I'm talking about

12:30:11  9   thousands, maybe, of calls that I've answered

12:30:13  10  throughout my career.

12:30:14  11       But yes, that's typically for me, my

12:30:18  12  perspective, I will ask to see whether or not they

12:30:19  13  need help or anything.

12:30:20  14       **Q.**   Okay.  Would you also ask them general

12:30:22  15  details about the -- what the incident that took

12:30:27  16  place?

12:30:27  17       **A.**   No, because generally, if it's not my

12:30:29  18  call, I don't want to stick around.  If they don't

12:30:32  19  need my help, then I'm on my merry way.

12:30:35  20       **Q.**   So that's generally you're not going to

12:30:38  21  ask details about what the call is for those

12:30:40  22  officers being there?

12:30:41  23       **A.**   No.  Every single call, if I show up on

*Santana - Davenport - 9/8/20*

110

12:30:44   1   a call and I ask to see if they need help and they

12:30:48   2   say no, I'm going back on patrol.  That's the way

12:30:51   3   it operates.

12:30:53   4        Q.   So what would happen if you asked

12:30:55   5   questions?  Would you be required to stay at the

12:30:56   6   scene if you knew why those officers were there?

12:30:59   7        A.   It depends on whether or not they

12:31:00   8   needed my help.  And if they did, then I'd say,

12:31:04   9   hey, what do you want me to do?  And that's pretty

12:31:06  10   much it.

12:31:06  11        Q.   Okay.  But you're never asking the

12:31:10  12   officers, you know, just general details about the

12:31:14  13   call they're responding to?

12:31:15  14        A.   No.

12:31:15  15        MS. HUGGINS:  Form.

12:31:16  16        THE WITNESS:  No, I do not.

12:31:18  17        BY MR. DAVENPORT:

12:31:19  18        Q.   And just so it's clear for the record,

12:31:22  19   if you ask general questions about the call that

12:31:25  20   they're responding to, is there any obligation on

12:31:27  21   your part to stay at that call if you know those

12:31:27  22   details?

12:31:31  23        A.   Well, if I --

12:31:31   1                **MS. HUGGINS:**   Form.

12:31:32   2                **THE WITNESS:**   If I did ask, yes.   Like I

12:31:36   3   said before, if it's something that they need my

12:31:38   4   assistance with, then I will ask questions.

12:31:40   5                But if I just stop by and say, hey, what's

12:31:43   6   up, you know, you guys need anything or something

12:31:45   7   like that, and that's general.

12:31:47   8                If they don't need my help, I don't ask no

12:31:49   9   further questions and I'm on my way.   But I do not

12:31:52  10   talk to officers in regard to calls because

12:31:55  11   generally when I take my call and if an officer

12:31:57  12   shows up and I don't need their help, I'll them I

12:32:02  13   don't need your help and that's it.

12:32:03  14                Pretty much when I do my calls generally, I

12:32:05  15   just want me and other person and that's it.   So

12:32:08  16   that's the way I operate.   I don't know about other

12:32:11  17   officers, but that's just me.

12:32:12  18                **Q.**   Okay.   When you're asking other

12:32:16  19   officers if they need any assistance, do you

12:32:18  20   typically do that from your car or did you get out

12:32:21  21   of your car to ask that question?

12:32:22  22                **A.**   I'll get out of my vehicle.   It depends

12:32:26  23   on where they're standing at that point in time.

*Santana - Davenport - 9/8/20*

112

12:32:28  1   Sometimes I'll drive up and I'll ask and if they

12:32:32  2   say they'll all good, I drive away, but it depends.

12:32:36  3        Q.   Is there any reason why on this last

12:32:41  4   video segment that you watched that you parked

12:32:44  5   behind the Chevy Tahoe instead of pulling up where

12:32:48  6   the officers were?

12:32:48  7        A.   There was no reason whatsoever why I

12:32:50  8   parked that like that.  I don't know.  I can't tell

12:32:53  9   you because I don't remember that day.

12:32:54  10       Q.   Okay.  At the time when you got to the

12:32:57  11  scene, did you know that an individual had been

12:32:59  12  arrested?

12:33:00  13       A.   No.

12:33:02  14       Q.   And that's you recall not remembering --

12:33:05  15  you recall not knowing that somebody had been

12:33:07  16  arrested?

12:33:08  17       A.   Well, if I was only there for one

12:33:09  18  second, I'm pretty sure they're all good, so I

12:33:14  19  don't recall what conversation we had at that point

12:33:15  20  in time --

12:33:16  21       Q.   Is that how long --

12:33:18  22       A.   -- or with everybody else.

12:33:18  23       Q.   I'm sorry.

12:33:20  1          A.     I wasn't there that long, so.

12:33:21  2          Q.     Okay.  When you arrived at the scene,

12:33:28  3     were the other officers talking amongst themselves?

12:33:31  4          A.     According to the video, yes.

12:33:33  5          Q.     Okay.  And they were talking amongst

12:33:37  6     themselves when you arrived at the scene for the

12:33:41  7     first time?

12:33:41  8          A.     I don't recall the situation, so it's

12:33:44  9     possible.

12:33:45 10          Q.     Okay.  Did you have any general sense

12:33:50 11     of how long those officers were at this incident at

12:33:53 12     this time?

12:33:53 13          A.     No.

12:33:56 14          Q.     Did you receive any sort of calls at

12:34:00 15     that time asking, you know, if the officers were

12:34:04 16     spending too much time at a call?

12:34:06 17          A.     No.

12:34:08 18          Q.     Did you receive any calls from Anthony

12:34:12 19     McHugh relating to this incident?

12:34:14 20          A.     No.

12:34:16 21          Q.     Do you typically use your personal cell

12:34:19 22     phone to communicate with Mr. McHugh?

12:34:21 23          A.     No.  Generally me, I will let dispatch

*Santana - Davenport - 9/8/20*

114

12:34:25  1    know to raise my lieutenant.  And from there,

12:34:29  2    usually I'd rather just go to the station house to

12:34:32  3    see him in person.  I don't do anything in regards

12:34:35  4    to work over my cell phone.

12:34:37  5         Q.    Okay.  Is that just a personal

12:34:42  6    preference of yours?

12:34:43  7         A.    Yeah, that's -- yeah, that's my

12:34:45  8    personal preference.  I just don't like too much of

12:34:47  9    anything.  I just like to be to myself generally.

12:34:51  10   So I don't use anything in regards to just work.  I

12:34:55  11   just use work, everything work, radios or

12:34:58  12   face-to-face conversations.

12:34:59  13        Q.    Is there a requirement to only use work

12:35:02  14   devices to communicate with other officers?

12:35:04  15        A.    I don't think that's -- there's a

12:35:06  16   requirement for it, but that's my personal

12:35:13  17   preference.

12:35:13  18        Q.    Do you know if there are other officers

12:35:16  19   that also share that personal preference?

12:35:18  20        A.    No, I do not.

12:35:19  21        Q.    Do you know if your partner at the

12:35:22  22   time, Joseph Petronella, had that preference?

12:35:26  23        A.    No.

*Santana - Davenport - 9/8/20*

115

12:35:28  1    **Q.**    No, he didn't have that preference or

12:35:31  2   no, you don't know if he has that preference?

12:35:32  3    **A.**    I don't know if he has that preference,

12:35:33  4   but that's just my personal preference.

12:35:39  5    **Q.**    Do you remember having any

12:35:44  6   conversations with anybody at the scene on

12:35:50  7   January 1st of 2017, any individuals besides the

12:35:53  8   officers?

12:35:54  9    **A.**    No.

12:35:57  10    **Q.**    No, you didn't have any conversations

12:35:59  11   or no, you don't recall?

12:36:00  12    **A.**    No, I do not recall any conversations

12:36:02  13   that I had that day.

12:36:03  14    **Q.**    Okay.  For the news story that you

12:36:14  15   watched, what do you recall seeing on the screen?

12:36:21  16   What from --

12:36:21  17    **A.**    Just that little snippet of the vehicle

12:36:25  18   colliding with that person.  That's all I saw.

12:36:29  19   That's all the news played.

12:36:30  20    **Q.**    All right.  And then you also referred

12:36:35  21   to another video segment where Mr. Kistner's son --

12:36:35  22    **A.**    Yeah.

12:36:38  23    **Q.**    -- approached you?

*Santana - Davenport - 9/8/20*

116

| | | |
|---|---|---|
| 12:36:38 | 1 | **A.**    Yes.  He was just talking about his |
| 12:36:40 | 2 | father. |
| 12:36:42 | 3 | **Q.**    Do you have any opinion of that news |
| 12:36:44 | 4 | story? |
| 12:36:44 | 5 | **A.**    No, I do not. |
| 12:36:47 | 6 | **Q.**    Do you believe that it was accurate |
| 12:36:50 | 7 | reporting? |
| 12:36:50 | 8 | **A.**    My personal opinion is that I don't |
| 12:36:52 | 9 | trust anything that the media puts out.  Generally |
| 12:36:55 | 10 | I will do -- I'm mainly the facts, so if I can't |
| 12:36:59 | 11 | see the facts in front of me, then I'm not going to |
| 12:37:02 | 12 | believe it. |
| 12:37:03 | 13 | **Q.**    Turning to -- |
| 12:37:03 | 14 | **MS. HUGGINS:**  Form as to the last question. |
| 12:37:07 | 15 | **MR. DAVENPORT:**  Can we go off the record |
| 12:37:13 | 16 | really quick? |
| 12:37:50 | 17 | (Discussion off the record.) |
| 12:37:50 | 18 | **BY MR. DAVENPORT:** |
| 12:37:55 | 19 | **Q.**    Now, turning again to Exhibit 4-A, do |
| 12:38:04 | 20 | you see where at 10:55:42, it says:  Male hit my |
| 12:38:08 | 21 | car, ADI needed? |
| 12:38:10 | 22 | **A.**    ADI notified. |
| 12:38:12 | 23 | **Q.**    ADI notified. |

*Santana - Davenport - 9/8/20*

117

| | | |
|---|---|---|
| 12:38:12 | 1 | **A.** I do see that. |
| 12:38:14 | 2 | **Q.** Now, what does ADI notify refer to? |
| 12:38:21 | 3 | **A.** The ambulance was notified. |
| 12:38:23 | 4 | **Q.** Okay. Does it say who notified the |
| 12:38:27 | 5 | ambulance? |
| 12:38:29 | 6 | **A.** No, it does not. |
| 12:38:31 | 7 | **Q.** Okay. Would you expect an ambulance to |
| 12:38:34 | 8 | be notified if a male was hit by a car? |
| 12:38:37 | 9 | **A.** Yes. |
| 12:38:39 | 10 | **Q.** Would you expect an ambulance to |
| 12:38:42 | 11 | respond to an individual being hit by a car? |
| 12:38:45 | 12 | **MS. HUGGINS:** Form. |
| 12:38:45 | 13 | **THE WITNESS:** Yes. |
| 12:38:46 | 14 | **BY MR. DAVENPORT:** |
| 12:38:46 | 15 | **Q.** Okay. Do you know if an ambulance |
| 12:38:48 | 16 | responded to the incident here? |
| 12:38:52 | 17 | **A.** No, I do not. |
| 12:38:53 | 18 | **Q.** Okay. What about based on what you see |
| 12:38:55 | 19 | on this Exhibit 4-A? Can you tell us if an |
| 12:39:00 | 20 | ambulance responded? |
| 12:39:14 | 21 | **A.** No. |
| 12:39:15 | 22 | **Q.** You can't tell or no, an ambulance |
| 12:39:17 | 23 | didn't respond? |

*Santana - Davenport - 9/8/20*

118

| | | |
|---|---|---|
| 12:39:17 | 1 | **A.**    Well, it's saying that the female |
| 12:39:20 | 2 | called for the ambulance for her boyfriend and then |
| 12:39:24 | 3 | it states that the other one was the ADI notified. |
| 12:39:29 | 4 | Where was that one now? |
| 12:39:33 | 5 | Oh, that's the only two times that I see |
| 12:39:35 | 6 | here:  Male hit by police car.  ADI notified. |
| 12:39:39 | 7 | Another call came out female requests ambulance for |
| 12:39:42 | 8 | injured boyfriend.  ADI notified. |
| 12:39:44 | 9 | **Q.**    Okay.  But there's nothing on this |
| 12:39:47 | 10 | document that says that an ambulance actually |
| 12:39:49 | 11 | arrived? |
| 12:39:51 | 12 | **A.**    I can't see an ambulance arriving.  It |
| 12:39:54 | 13 | doesn't state on this document. |
| 12:39:55 | 14 | **Q.**    Is that something that you would expect |
| 12:39:57 | 15 | to see on the document if an ambulance did arrive? |
| 12:39:59 | 16 | **MS. HUGGINS:**  Form. |
| 12:40:00 | 17 | **THE WITNESS:**  It depends on the situation. |
| 12:40:03 | 18 | Sometimes officers will state on the air that the |
| 12:40:06 | 19 | ambulance has arrived or we'll put it on paperwork |
| 12:40:09 | 20 | if there is paperwork, but on this document per se, |
| 12:40:12 | 21 | no, I don't see it, that they arrived. |
| 12:40:15 | 22 | **BY MR. DAVENPORT:** |
| 12:40:16 | 23 | **Q.**    Okay.  Did you speak with any of the |

*Santana - Davenport - 9/8/20*

119

| | | |
|---|---|---|
| 12:40:21 | 1 | officers to know if -- you know, what happened to |
| 12:40:25 | 2 | this male who was hit by a police car? |
| 12:40:27 | 3 | **MS. HUGGINS:**  Form. |
| 12:40:27 | 4 | **THE WITNESS:**  No. |
| 12:40:28 | 5 | **MS. HUGGINS:**  Asked and answered. |
| 12:40:30 | 6 | **THE WITNESS:**  No. |
| 12:40:31 | 7 | **BY MR. DAVENPORT:** |
| 12:40:32 | 8 | Q.   Did you know when you were responding |
| 12:40:33 | 9 | to the call that a male had been hit by a police |
| 12:40:35 | 10 | car? |
| 12:40:35 | 11 | **MS. HUGGINS:**  Form. |
| 12:40:36 | 12 | **THE WITNESS:**  No. |
| 12:40:37 | 13 | **BY MR. DAVENPORT:** |
| 12:40:44 | 14 | Q.   Have you ever canceled ambulances |
| 12:40:47 | 15 | before during your line of duty? |
| 12:40:50 | 16 | A.   I have. |
| 12:40:51 | 17 | Q.   And under what circumstances did you |
| 12:40:53 | 18 | cancel ambulances? |
| 12:40:54 | 19 | A.   Generally at an accident, usually we'll |
| 12:41:01 | 20 | call for the ambulance to respond on the scene.  If |
| 12:41:04 | 21 | they don't -- if the patient himself don't require |
| 12:41:09 | 22 | any assistant, we'll call them off, but generally |
| 12:41:12 | 23 | it's -- if they don't need to go to the hospital or |

12:41:15  1  anything like that, we'll cancel it.

12:41:19  2      **Q.**   Okay.  Are there any other circumstances

12:41:24  3  where you would cancel an ambulance?

12:41:27  4      **A.**   That's pretty much it.

12:41:28  5      **Q.**   Okay.  So you would never cancel an

12:41:31  6  ambulance because you believed that you could get

12:41:33  7  the individual to ECMC quicker?

12:41:35  8      **A.**   I would not cancel ADI for that.

12:41:38  9  That's their job, so I'd rather them take them to

12:41:41 10  the hospital.

12:41:42 11      But I mean, for -- from my experience, the

12:41:45 12  only time I cancel ADI is when they don't want it,

12:41:51 13  when they refuse to go to the hospital because they

12:41:53 14  don't seem like they don't need it.

12:41:56 15      **Q.**   Okay.  So when you say "they," you're

12:41:58 16  referring to --

12:41:59 17      **A.**   I'm referring to injured parties.

12:42:03 18  Yeah, that's what I'm referring to.

12:42:05 19      **Q.**   Okay.  Is that something that officers

12:42:10 20  are trained on, when to cancel ADI?

12:42:14 21      **A.**   No, there's no -- to my recollection,

12:42:19 22  there's no training with regards to when to cancel

12:42:22 23  ADI.

12:42:23  1       I do it just so that if the ambulance does

12:42:26  2  respond and that injured person doesn't require

12:42:29  3  them, I want that ambulance to go back in service

12:42:31  4  so they can serve someone else. That's why I do

12:42:34  5  it, but that's just me.

12:42:37  6       **Q.**   Have you ever received training that

12:42:39  7  says anywhere in that training to cancel ADI if an

12:42:42  8  officer feels that they can get the injured party

12:42:45  9  to the hospital quicker?

12:42:46 10       **MS. HUGGINS:**   Form.

12:42:46 11       **THE WITNESS:**   I can't -- I can't recall.

12:42:47 12       **BY MR. DAVENPORT:**

12:42:48 13       **Q.**   All right. Do you know if there's any

12:42:50 14  training that says that an officer should not

12:42:52 15  cancel ADI just because they believe that they can

12:42:55 16  get the individual to the hospital quicker?

12:42:56 17       **A.**   I am not sure.

12:43:01 18       **Q.**   But as you sit here today, you do not

12:43:05 19  recall being told one way or the other whether to

12:43:08 20  cancel --

12:43:10 21       **A.**   Yes, I don't recall ever being trained

12:43:11 22  on how to cancel or when to cancel the ambulance.

12:43:14 23  This is just going on my own experience.

*Santana - Davenport - 9/8/20*

122

| | | |
|---|---|---|
| 12:43:16 | 1 | **Q.**   Okay.   Are you aware of officers who |
| 12:43:26 | 2 | cancel ambulances because they believe that they |
| 12:43:29 | 3 | can get the injured party to the hospital quicker? |
| 12:43:31 | 4 | **MS. HUGGINS:**  Form.  You can answer. |
| 12:43:32 | 5 | **THE WITNESS:**  I've been aware of certain |
| 12:43:35 | 6 | situations of a life-and-death situation where it |
| 12:43:40 | 7 | was best that they transported that individual. |
| 12:43:44 | 8 | **BY MR. DAVENPORT:** |
| 12:43:44 | 9 | **Q.**   Is that something that happens |
| 12:43:46 | 10 | routinely or is that -- |
| 12:43:48 | 11 | **A.**   No, it's just you can't control that. |
| 12:43:50 | 12 | I mean, it just happens, so you just have to use |
| 12:43:52 | 13 | your judgment. |
| 12:43:53 | 14 | **Q.**   Okay.  So it's rare that those officers |
| 12:43:57 | 15 | are faced with those types of situations? |
| 12:44:00 | 16 | **A.**   It is a rare event, yes. |
| 12:44:02 | 17 | **Q.**   And that's generally only in |
| 12:44:04 | 18 | life-and-death situations that you've heard of |
| 12:44:06 | 19 | officers canceling ambulances to drive the |
| 12:44:09 | 20 | individual to ECMC? |
| 12:44:10 | 21 | **MS. HUGGINS:**  Form. |
| 12:44:10 | 22 | **THE WITNESS:**  Well, it's not pretty much |
| 12:44:13 | 23 | canceling, it's just putting that individual and |

*Santana - Davenport - 9/8/20*

123

| | | |
|---|---|---|
| 12:44:15 | 1 | transporting them to the hospital. |
| 12:44:17 | 2 | But yes, there's been circumstances where in |
| 12:44:20 | 3 | regards to that person's life-or-death situation |
| 12:44:23 | 4 | that they've transported them to the hospital, yes. |
| 12:44:25 | 5 | **BY MR. DAVENPORT:** |
| 12:44:25 | 6 | **Q.** Okay. Are you aware of any other times |
| 12:44:28 | 7 | when an officer has canceled an ambulance besides |
| 12:44:32 | 8 | life-and-death situation for the injured party? |
| 12:44:35 | 9 | **A.** Like I mentioned earlier in regards to |
| 12:44:37 | 10 | accidents, it's pretty much that injured person |
| 12:44:39 | 11 | whether or not they want to be seen or taken to the |
| 12:44:41 | 12 | hospital. It's up to them. |
| 12:44:43 | 13 | **Q.** So besides life-and-death situations |
| 12:44:46 | 14 | and instances where the injured party says that |
| 12:44:48 | 15 | they do not want to go to a hospital by an |
| 12:44:52 | 16 | ambulance, are you aware of any other circumstances |
| 12:44:54 | 17 | where officers canceled ambulances for an injured |
| 12:44:57 | 18 | party? |
| 12:44:57 | 19 | **MS. HUGGINS:** Form. |
| 12:44:57 | 20 | **THE WITNESS:** No. No, I can't speak to -- |
| 12:45:01 | 21 | in regards to other officers. I'm just saying in |
| 12:45:03 | 22 | regards to myself, and what I've been through. |
| 12:45:06 | 23 | **BY MR. DAVENPORT:** |

*Santana - Davenport - 9/8/20*

124

| | | |
|---|---|---|
| 12:45:06 | 1 | Q.    But also for yourself, have you heard |
| 12:45:08 | 2 | of any other circumstances or instances where an |
| 12:45:11 | 3 | officer has canceled an ambulance besides |
| 12:45:14 | 4 | life-and-death situations and instances where an |
| 12:45:16 | 5 | injured party has refused an ambulance? |
| 12:45:20 | 6 | A.    No. |
| 12:45:20 | 7 | MS. HUGGINS:  Form. |
| 12:45:20 | 8 | THE WITNESS:  No. |
| 12:45:22 | 9 | BY MR. DAVENPORT: |
| 12:45:22 | 10 | Q.    Okay.  Are you aware that the officers |
| 12:45:29 | 11 | on the scene canceled the ambulance for this |
| 12:45:32 | 12 | incident? |
| 12:45:33 | 13 | A.    No, I was not aware. |
| 12:45:35 | 14 | Q.    Is this the first time, me telling you |
| 12:45:38 | 15 | that that happened? |
| 12:45:38 | 16 | A.    I'm not aware because I don't recall. |
| 12:45:41 | 17 | Q.    Before this deposition today, were you |
| 12:45:44 | 18 | aware that the officers canceled the ambulance to |
| 12:45:50 | 19 | arrive at 33 Schmarbeck? |
| 12:45:51 | 20 | A.    No. |
| 12:45:51 | 21 | Q.    So this is the first time that you are |
| 12:45:53 | 22 | learning of that? |
| 12:45:54 | 23 | A.    Yes. |

*Santana - Davenport - 9/8/20*

125

12:45:54   1          **Q.**   What's your opinion of those
12:45:56   2   officers -- strike that.
12:46:02   3          **A.**   I don't -- I'm not going to --
12:46:04   4          **MS. HUGGINS:**   No, no.
12:46:05   5          **MR. DAVENPORT:**   That's okay.
12:46:05   6          **MS. HUGGINS:**   Yeah, he didn't complete his
12:46:11   7   question.
12:46:14   8          **BY MR. DAVENPORT:**
12:46:14   9          **Q.**   Is that something that you would expect
12:46:15  10   for a male getting hit by a car, if that male did
12:46:18  11   not request to have the ambulance canceled that
12:46:22  12   that ambulance would actually still be canceled?
12:46:24  13          **MS. HUGGINS:**   Form.   That calls for
12:46:25  14   speculation.
12:46:27  15          **THE WITNESS:**   If I dealt with the situation
12:46:30  16   where someone that was hit by a car and they told
12:46:32  17   me that they didn't require the ambulance, then I'm
12:46:35  18   going to respect their wishes and cancel the
12:46:38  19   ambulance.
12:46:40  20          **BY MR. DAVENPORT:**
12:46:40  21          **Q.**   But if the individual didn't say that
12:46:42  22   they wanted to have the ambulance canceled, you
12:46:45  23   would not cancel the ambulance?

*Santana - Davenport - 9/8/20*

126

12:46:48  1          MS. HUGGINS:  Form.

12:46:49  2          THE WITNESS:  Well, I will not, no and

12:46:51  3     that's their wishes.  If they want to be

12:46:53  4     transported, they can be transported.

12:46:54  5          BY MR. DAVENPORT:

12:46:55  6          Q.    Okay.  So we've heard testimony before

12:46:57  7     from Officer Schultz that his reason -- that he

12:47:02  8     canceled the ambulance, but this is the first time

12:47:05  9     that you learned of that.  Correct?

12:47:06  10          A.    That's correct.

12:47:08  11          Q.    And Officer Schultz testified that the

12:47:12  12     reason why he canceled the ambulance was because he

12:47:15  13     believed that he could get the pedestrian to -- the

12:47:19  14     injured party to the hospital quicker than an

12:47:21  15     ambulance would.

12:47:22  16          A.    Okay.

12:47:23  17          Q.    Okay.  Now, in looking at the complaint

12:47:30  18     summary report, what is the time between the time

12:47:34  19     stamp 10:55:42, male hit by police car, and the

12:47:38  20     time that the location was changed to ECMC?

12:47:43  21          A.    11:22:34 for the first.

12:47:48  22          Q.    Okay.  So would it be safe to assume

12:47:53  23     that it was approximately a half an hour before

*Santana - Davenport - 9/8/20*

127

| | | |
|---|---|---|
| 12:47:56 | 1 | that individual was transported to the ECMC? |
| 12:48:00 | 2 | **A.** No, 28 minutes. |
| 12:48:03 | 3 | **Q.** But it was approximately a half an |
| 12:48:05 | 4 | hour? |
| 12:48:06 | 5 | **A.** It wasn't a half-hour according to the |
| 12:48:08 | 6 | document right here. |
| 12:48:09 | 7 | **Q.** 28 minutes is roughly close to 30 |
| 12:48:12 | 8 | minutes. |
| 12:48:12 | 9 | **A.** Yeah, but it's not a half-hour. |
| 12:48:14 | 10 | **Q.** Would you be more comfortable if I said |
| 12:48:17 | 11 | 28 minutes? |
| 12:48:18 | 12 | **A.** According this documentation, yes, that |
| 12:48:19 | 13 | is correct. |
| 12:48:19 | 14 | **Q.** Okay. So 28 minutes was the time that |
| 12:48:23 | 15 | elapsed between a male being hit by the car and the |
| 12:48:26 | 16 | officer's transporting the individual to ECMC? |
| 12:48:28 | 17 | **A.** Yes, according to this document in |
| 12:48:30 | 18 | front of me. |
| 12:48:30 | 19 | **Q.** Okay. How long does it take an |
| 12:48:32 | 20 | ambulance to arrive at a scene after they are |
| 12:48:34 | 21 | notified? |
| 12:48:35 | 22 | **A.** I cannot give you the times on when |
| 12:48:37 | 23 | they respond on scenes. It could be minutes and |

*Santana - Davenport - 9/8/20*

128

| | | |
|---|---|---|
| 12:48:40 | 1 | they could call back and say it's going to take |
| 12:48:43 | 2 | some time, so I don't know.  It depends on how busy |
| 12:48:46 | 3 | they are. |
| 12:48:47 | 4 | Q.    Do you know how long it takes to drive |
| 12:48:54 | 5 | from 33 Schmarbeck to ECMC roughly? |
| 12:48:58 | 6 | A.    It also depends on various -- it -- it |
| 12:49:03 | 7 | could be heavy traffic.  Heavy traffic could be |
| 12:49:05 | 8 | over 20 minutes; light traffic probably 10, 15 |
| 12:49:09 | 9 | minutes.  It all depends on really how many cars |
| 12:49:13 | 10 | are on the road. |
| 12:49:14 | 11 | Q.    What about lights and sirens? |
| 12:49:16 | 12 | MS. HUGGINS:   Form. |
| 12:49:17 | 13 | THE WITNESS:   It's depending on traffic, |
| 12:49:19 | 14 | too, because even if you do have your lights and |
| 12:49:22 | 15 | sirens, you have to like find your way around it, |
| 12:49:25 | 16 | but I could say 10 minutes, maybe. |
| 12:49:29 | 17 | BY MR. DAVENPORT: |
| 12:49:29 | 18 | Q.    So maybe 10 minutes with lights and |
| 12:49:31 | 19 | sirens? |
| 12:49:31 | 20 | A.    Yeah, but that's not even -- that's a |
| 12:49:33 | 21 | residential area and you're not like going like |
| 12:49:36 | 22 | super-fast because there's people all around that. |
| 12:49:39 | 23 | So you have to be -- you're going fast but you're |

12:49:41   1   not going so fast because of the pedestrians that

12:49:45   2   are all over the streets.

12:49:47   3        Q.   Is there a general speed that officers

12:49:49   4   are expected to not surpass when they're driving

12:49:53   5   through residential areas?

12:49:54   6        **MS. HUGGINS:**   Form.

12:49:55   7        **THE WITNESS:**   Generally, and this is from my

12:49:57   8   point of view, while at patrol, I follow the rules

12:50:01   9   of the road.

12:50:02   10       I don't know if you want to expand that to

12:50:05   11   when I respond to a priority call, which -- which

12:50:07   12   is like a -- it could be a rescue, it could be a

12:50:14   13   burglary in progress.

12:50:16   14       I'm not pushing over 60 because, like I

12:50:18   15   said, I'm watching out for pedestrians.  I'm going

12:50:20   16   with haste but I'm also going -- like safety is my

12:50:25   17   number one priority when I'm responding to calls.

12:50:28   18       **BY MR. DAVENPORT:**

12:50:28   19       Q.   When you're not responding to a

12:50:29   20   high-priority call, what general speed are you

12:50:32   21   driving through residential areas?

12:50:34   22       **MS. HUGGINS:**   Form.

12:50:36   23       **THE WITNESS:**   25, 30.  Within 20, 30.  But

12:50:44  1   if I'm like on Broadway, the main intersection, I'm

12:50:47  2   going 30, 35, but if I'm driving the streets, kind

12:50:51  3   of like between 20 and 30 miles an hour.

12:50:53  4         **BY MR. DAVENPORT:**

12:50:54  5         **Q.**   Okay.  Besides the speed limit, are

12:50:56  6   there other vehicle and traffic laws that you abide

12:51:01  7   by?

12:51:01  8         **A.**   Everything.

12:51:03  9         **Q.**   Does that include wearing a seatbelt?

12:51:04 10         **A.**   Oh, yeah, absolutely.

12:51:06 11         **Q.**   All right.  Does that include checking

12:51:08 12   your mirrors?

12:51:09 13         **A.**   Every morning, I check my entire patrol

12:51:12 14   vehicle to make sure that it's functioning.

12:51:15 15         **Q.**   Okay.  Do officers ever face discipline

12:51:24 16   for driving too fast through residential areas?

12:51:27 17         **MS. HUGGINS:**  Form.

12:51:27 18         **THE WITNESS:**  I've never heard of anything,

12:51:32 19   so I can't really answer that question.

12:51:33 20         **BY MR. DAVENPORT:**

12:51:35 21         **Q.**   Do officers ever face discipline for

12:51:38 22   not wearing a seatbelt?

12:51:39 23         **A.**   Again, I've never heard of anything

12:51:42  1  from my point of view, so I can't really answer

12:51:45  2  that.  But I've never heard of anything, no.

12:51:47  3       Q.    Do you receive training on how to drive

12:51:49  4  a vehicle?

12:51:51  5       A.    The only training that we receive is

12:51:54  6  during the academy.  And that's all -- that's all

12:51:59  7  the training I received in regards to driving.

12:52:03  8       Q.    So that would have been through your

12:52:05  9  first initial six months of training?

12:52:07  10      A.    Yes.

12:52:08  11      Q.    And what kind of things are they

12:52:12  12  teaching you about vehicle and traffic safety

12:52:14  13  during those initial classes?

12:52:16  14      A.    In a vehicle, it's driving the patrol

12:52:20  15  car at a high rate of speed.  Stopping.  Driving

12:52:24  16  backwards.  Yeah, that's all I can remember in

12:52:29  17  regards to that.

12:52:31  18      Q.    With regard to driving backwards, what

12:52:36  19  specifically do they train you on?

12:52:39  20      A.    As far as I know, driving backwards,

12:52:42  21  when I did it, it was pretty much like going over

12:52:47  22  30 miles an hour and pretty much just driving, just

12:52:50  23  driving backwards and positioning yourself when you

*Santana - Davenport - 9/8/20*

132

12:52:54  1  do drive backwards to be like within certain cones

12:52:58  2  or whatever.  But that was a long time ago, but

12:53:01  3  that's pretty much all I remember in regards to

12:53:03  4  that.

12:53:04  5       Q.   Do they do anything -- do they do any

12:53:07  6  training for driving backwards and then pulling

12:53:10  7  forwards?

12:53:10  8       A.   During that training, yes.  Not only do

12:53:12  9  you drive backwards, I mean, it's turning the

12:53:15 10  vehicle over and there's an obstacle that you have

12:53:18 11  to avoid like at certain points.

12:53:20 12       And you have to like make a split-second

12:53:21 13  decision whether you need to take a right or a

12:53:24 14  left.  Yeah, that's pretty much all I could -- I

12:53:27 15  could remember.

12:53:28 16       Q.   Is there somebody who was in the car

12:53:30 17  with you during this training?

12:53:32 18       A.   Yes.  There's an instructor with you.

12:53:35 19       Q.   All right.  And how long during this

12:53:38 20  training are you actually driving for?

12:53:41 21       A.   We were there the entire day, so we

12:53:44 22  were driving that whole day.  I don't know what day

12:53:48 23  it was, but I do remember it was a whole day that

12:53:51  1    we were there training in vehicles.

12:53:53  2         **Q.**    Okay.  As part of that day, were you

12:53:56  3    also doing some in-class instruction?

12:53:59  4         **A.**    No.  I don't recall back then when we

12:54:03  5    did classrooms, no.

12:54:05  6         **Q.**    Okay.

12:54:08  7         **MR. DAVENPORT:**  I'm sorry, could we go off

12:54:09  8    the record really quick?

12:55:16  9         (Discussion off the record.)

12:55:16  10        **BY MR. DAVENPORT:**

12:55:26  11        **Q.**    Now, sticking with Exhibit 4-A, do you

12:55:30  12   see at 11:30:35, it says that the suspect broke the

12:55:35  13   mirror on car 473 intentionally?

12:55:38  14        **A.**    I do see that.

12:55:39  15        **Q.**    Okay.  And what does that tell you when

12:55:45  16   you read that?

12:55:47  17        **A.**    That the suspect broke the mirror

12:55:49  18   intentionally, with intent.

12:55:52  19        **Q.**    Okay.  Do you see at 11:07:31 where it

12:56:01  20   says cameras have -- on 37 has video of the man

12:56:06  21   flopping on the ground?

12:56:07  22        **A.**    I do see that.

12:56:09  23        **Q.**    And what does that tell you?

*Santana - Davenport - 9/8/20*

134

| | | |
|---|---|---|
| 12:56:10 | 1 | **A.**   The cameras on 37 has a video of the |
| 12:56:13 | 2 | man flopping on the ground, so some man flopping on |
| 12:56:17 | 3 | the ground. |
| 12:56:18 | 4 | **Q.**   Okay.  Would that tell you that the |
| 12:56:21 | 5 | suspect was flopping on the ground? |
| 12:56:24 | 6 | **A.**   No, it just says a man flopping on the |
| 12:56:26 | 7 | ground, so it doesn't specify who. |
| 12:56:29 | 8 | **Q.**   Okay.  So I'm going to show you what's |
| 12:56:32 | 9 | been previously marked as Exhibit 11.  And it is |
| 12:56:39 | 10 | video number 06_20170101102529.  I'm just going to |
| 12:56:52 | 11 | rewind it so you can see the beginning.  So I would |
| 12:56:55 | 12 | just like you to watch this video. |
| 12:58:18 | 13 | Now, at this portion of the video segment, |
| 12:58:20 | 14 | we are a minute and 13 seconds into the video clip. |
| 12:58:26 | 15 | Do you agree that the individual has been taken |
| 12:58:30 | 16 | into custody or detained at this time? |
| 12:58:32 | 17 | **MS. HUGGINS:**   Form.  You can answer. |
| 12:58:33 | 18 | **THE WITNESS:**   All I can see is that there's |
| 12:58:35 | 19 | officers on either side of him, but I don't know |
| 12:58:38 | 20 | whether or not he's in custody because of the |
| 12:58:40 | 21 | quality of this video. |
| 12:58:41 | 22 | **BY MR. DAVENPORT:** |
| 12:58:41 | 23 | **Q.**   Okay.  Is the individual standing at |

*Santana - Davenport - 9/8/20*

135

| | | |
|---|---|---|
| 12:58:43 | 1 | this time? |
| 12:58:44 | 2 |     **A.**   Yes, he is. |
| 12:58:45 | 3 |     **Q.**   Okay.  At any point before that man was |
| 12:58:49 | 4 | standing, did you see him flopping around on the |
| 12:58:51 | 5 | ground? |
| 12:58:52 | 6 |     **A.**   No, I did not. |
| 12:58:54 | 7 |     **Q.**   Okay.  So I'm going to play that exact |
| 12:59:08 | 8 | segment again and I just want you to generally |
| 12:59:10 | 9 | describe what you see in the video. |
| 12:59:17 | 10 |     **A.**   The patrol vehicle is driving away |
| 12:59:22 | 11 | initially, so he's walking towards the other one as |
| 12:59:25 | 12 | the patrol vehicle is pulling out.  And that's when |
| 12:59:29 | 13 | vehicle and person collide with each other. |
| 12:59:33 | 14 |     **Q.**   Okay. |
| 12:59:34 | 15 |     **MS. HUGGINS:**  Form.  The exhibit speaks for |
| 12:59:36 | 16 | itself. |
| 12:59:37 | 17 |     **BY MR. DAVENPORT:** |
| 12:59:38 | 18 |     **Q.**   What do you see right here? |
| 12:59:40 | 19 |     **A.**   I don't know who that individual is |
| 12:59:41 | 20 | walking up there.  I see two officers approaching |
| 12:59:46 | 21 | the vehicle and someone exiting the patrol vehicle. |
| 12:59:50 | 22 |     The person who is not on officer is walking |
| 12:59:53 | 23 | back towards the sidewalk and now I see three |

*Santana - Davenport - 9/8/20*

| | | |
|---|---|---|
| 12:59:57 | 1 | officers on the driver's side door. |
| 13:00:00 | 2 | **MS. HUGGINS:**  Form to the last question. |
| 13:00:02 | 3 | **BY MR. DAVENPORT:** |
| 13:00:03 | 4 | **Q.**   Now, at any point for that individual |
| 13:00:07 | 5 | who is not an officer who appeared on the screen, |
| 13:00:09 | 6 | did he do anything that was threatening to the |
| 13:00:11 | 7 | officers? |
| 13:00:12 | 8 | **MS. HUGGINS:**  Form. |
| 13:00:13 | 9 | **THE WITNESS:**  I can't see anything because |
| 13:00:14 | 10 | the view is obstructed by the truck itself. |
| 13:00:19 | 11 | **BY MR. DAVENPORT:** |
| 13:00:19 | 12 | **Q.**   Besides the part that was obstructed by |
| 13:00:21 | 13 | the truck, did you see that individual do anything |
| 13:00:23 | 14 | threatening to the officers? |
| 13:00:25 | 15 | **MS. HUGGINS:**  Form. |
| 13:00:26 | 16 | **THE WITNESS:**  The quality of this video, you |
| 13:00:27 | 17 | can't see anything. |
| 13:00:29 | 18 | **BY MR. DAVENPORT:** |
| 13:00:30 | 19 | **Q.**   Well, I mean, you can see something on |
| 13:00:31 | 20 | the video, right? |
| 13:00:32 | 21 | **A.**   I can't see him on that video.  All I |
| 13:00:35 | 22 | can see is the officers standing around him.  I |
| 13:00:37 | 23 | didn't see anything else because the view is |

13:00:39  1  obstructed by the truck.

13:00:42  2        He was obstructed by the truck.  The

13:00:43  3  officers were around the truck.  That's all I saw.

13:00:46  4        **Q.**   Did you see the portion where he was

13:00:48  5  standing out in the middle of the street?

13:00:51  6        **A.**   Before he got with the vehicle?  Yes, I

13:00:54  7  seen that before, but you're asking me in regards

13:00:57  8  to if I seen an incident with the officers.

13:00:59  9        And I'm telling you no because the -- the

13:01:03  10  view is obstructed by the truck so you can't see

13:01:05  11  anything.  All I can see is two officers on the

13:01:07  12  driver's side of that vehicle.  That's it.

13:01:10  13        **Q.**   When he was standing or walking in the

13:01:13  14  middle of the street, was he doing anything

13:01:15  15  threatening to the officers?

13:01:17  16        **MS. HUGGINS:**   Form.

13:01:18  17        **THE WITNESS:**   No.

13:01:18  18        **BY MR. DAVENPORT:**

13:01:19  19        **Q.**   Okay.  Based on what you saw on that

13:01:21  20  video?

13:01:21  21        **A.**   Based on what I saw on that

13:01:25  22  grainy-quality video, yes.

13:01:26  23        **Q.**   Okay.  Now, as an officer, do you ever

*Santana - Davenport - 9/8/20*

138

13:01:31   1   use surveillance footage when you're at a crime

13:01:34   2   scene?

13:01:35   3         **A.**   If that individual has footage, yes.

13:01:42   4   If the owner has access to it, I will view it, but

13:01:45   5   it's pertaining on a particular crime.

13:01:48   6         You would have to like specify what type of

13:01:51   7   view you want me to talk about, but yes, I have

13:01:54   8   used surveillance videos in the past.

13:01:57   9         **Q.**   Okay.  Have you ever let's say gone to

13:02:00  10   a gas station to respond to a potential crime and

13:02:03  11   the gas station owner has surveillance cameras that

13:02:06  12   are set up?

13:02:07  13         **A.**   Yes.

13:02:08  14         **Q.**   Okay.  And how would you say the

13:02:11  15   quality of those videos compares to this video?

13:02:14  16         **MS. HUGGINS:**   Form.

13:02:16  17         **THE WITNESS:**   Gas stations, some of them, I

13:02:18  18   mean, they're not really good quality and others,

13:02:21  19   they're really fine quality, so.

13:02:24  20         I mean, it depends on whether or not they

13:02:27  21   want to spend money on a top-notch security system.

13:02:30  22   I mean, I've seen some that are really good quality

13:02:33  23   and I've seen a lot that are not that great.

13:02:35 1       **BY MR. DAVENPORT:**

13:02:36 2       **Q.**    Okay.  Do you ever watch the

13:02:40 3   surveillance footage with the gas station owner?

13:02:42 4       **A.**    Yes, I have, actually.

13:02:43 5       **Q.**    Okay.  Have you watched surveillance

13:02:45 6   footage with a gas station owner who has a

13:02:48 7   lower-quality surveillance camera?

13:02:50 8       **A.**    I have.

13:02:51 9       **MS. HUGGINS:**  Form.

13:02:51 10       **BY MR. DAVENPORT:**

13:02:51 11       **Q.**    And when you're watching that

13:02:53 12   surveillance footage, do you typically tell the gas

13:02:57 13   station owner that they're low-quality grainy video

13:02:59 14   that can't -- you can't see anything that's

13:03:01 15   happening in the video?

13:03:02 16       **MS. HUGGINS:**  Form.

13:03:02 17       **THE WITNESS:**  If it's something that's

13:03:04 18   not -- if it's a video that doesn't have that much

13:03:06 19   clarity, that's something that I can't use because

13:03:09 20   I'm going to need something that actually has a

13:03:10 21   specific item on that person.

13:03:11 22           So if he shows me a video of someone grainy

13:03:15 23   and stuff like that, that's nothing I can go

13:03:17  1  forward with.

13:03:17  2      Maybe if that video shows a -- like a

13:03:19  3  colored shirt or something like that, that's

13:03:20  4  something to go on.

13:03:21  5      And then for like be on the lookout for this

13:03:27  6  individual, if it's something that's low quality,

13:03:28  7  to me, it's not that reliable because it's -- it's

13:03:31  8  low quality.  It's not that good.

13:03:33  9      **BY MR. DAVENPORT:**

13:03:33  10     **Q.**   But you still watch it and you try to

13:03:35  11 decipher as much as you can from that video, you

13:03:38  12 don't just blanketly say that it's low-quality

13:03:41  13 grainy video.  Correct?

13:03:43  14     **A.**   Yeah, I --

13:03:43  15     **MS. HUGGINS:**  Form.

13:03:44  16     **THE WITNESS:**  -- do.  I still watch it.  I

13:03:45  17 mean, you can pretty much put everything in place,

13:03:48  18 but in regards to like a situation that you're

13:03:50  19 trying to get me to explain in regards to an

13:03:53  20 incident with him and the officers, I don't see

13:03:55  21 anything because it's obstructed by that truck.

13:03:57  22     **BY MR. DAVENPORT:**

13:03:57  23     **Q.**   Right.

*Santana - Davenport - 9/8/20*

141

13:03:58   1          A.    So I can't see whether or not there was

13:04:00   2     an incident or something that happened because

13:04:02   3     that's me basing it on what I'm seeing on this

13:04:04   4     video.

13:04:05   5          Q.    But I also asked the question of did

13:04:08   6     you see the individual do anything threatening when

13:04:10   7     he was not obstructed by the truck, correct?

13:04:13   8          A.    No, because I --

13:04:14   9          MS. HUGGINS:   Form.

13:04:15  10          THE WITNESS:   -- can't really attest to

13:04:16  11     that, too, because I wasn't on the scene.  So I

13:04:18  12     don't know whether or not his demeanor was a

13:04:20  13     threatening manner.

13:04:22  14          So I can't attest to that, but on this

13:04:24  15     video, I don't see it, but it's a different

13:04:27  16     perspective if you're officers on the scene, which

13:04:30  17     I can't attest to because I wasn't there.

13:04:32  18          BY MR. DAVENPORT:

13:04:32  19          Q.    And that's all I'm asking you, just

13:04:33  20     based on what you see on this video just so that

13:04:35  21     we're clear, you know.  I don't want you to attest

13:04:36  22     to what the officer saw --

13:04:36  23          A.    Right.

*Santana - Davenport - 9/8/20*

142

| 13:04:37 | 1 | Q. | -- I just want you to say -- |

13:04:37  1    Q.    -- I just want you to say --

13:04:38  2    A.    Yeah.

13:04:38  3    Q.    -- what you see on this video.

13:04:40  4    A.    Yeah.

13:04:41  5    Q.    Do you see this video do anything

13:04:42  6  threatening to any of the officers besides the time

13:04:45  7  that he is obstructed by the vehicle?

13:04:47  8         MS. HUGGINS:   Form.   You're asking for his

13:04:48  9  opinion of the video.

13:05:00  10        MR. DAVENPORT:   No, I'm asking does he see

13:04:52  11 anything on the video that shows this individual

13:04:54  12 doing anything threatening.

13:05:00  13        MS. HUGGINS:   Form objection.   It's not --

13:05:04  14 it's been asked and answered several times.

13:05:06  15        THE WITNESS:   Yeah, I already touched base

13:05:07  16 on that.   This video that I'm viewing, no, I don't

13:05:11  17 see anything threatening, but like I said, there's

13:05:14  18 different perspectives from the person who was

13:05:16  19 actually there in that vehicle.

13:05:18  20        I mean, it's totally different from what

13:05:19  21 they see and what I see on video, but to answer

13:05:21  22 your question, I don't see anything threatening

13:05:23  23 from this video from my point of view sitting in

*Santana - Davenport - 9/8/20*

143

| | | |
|---|---|---|
| 13:05:26 | 1 | this chair. |
| 13:05:26 | 2 | **BY MR. DAVENPORT:** |
| 13:05:26 | 3 | **Q.** Okay. Thank you. That was the |
| 13:05:28 | 4 | question that I asked. |
| 13:05:29 | 5 | Did you see anything -- well, do you recall |
| 13:05:38 | 6 | seeing the individual that the car collided with? |
| 13:05:42 | 7 | **MS. HUGGINS:** Form. Just at what time frame |
| 13:05:45 | 8 | are you talking about? |
| 13:05:45 | 9 | **THE WITNESS:** Right. |
| 13:05:46 | 10 | **BY MR. DAVENPORT:** |
| 13:05:47 | 11 | **Q.** Well, it was at the beginning of this |
| 13:05:48 | 12 | video. Do you recall seeing an individual where a |
| 13:05:51 | 13 | car collided with an individual? |
| 13:05:54 | 14 | **MS. HUGGINS:** Form. |
| 13:05:54 | 15 | **THE WITNESS:** On this video right here or |
| 13:05:56 | 16 | are you talking about me at that date and time? |
| 13:05:59 | 17 | **BY MR. DAVENPORT:** |
| 13:05:59 | 18 | **Q.** I'm saying what you're seeing right |
| 13:06:01 | 19 | here on this video. |
| 13:06:02 | 20 | **A.** Did I see him colliding with the |
| 13:06:04 | 21 | vehicle? |
| 13:06:04 | 22 | **Q.** Well, did you see an individual and a |
| 13:06:06 | 23 | car collide with each other? |

*Santana - Davenport - 9/8/20*

144

13:06:07  1        A.    Yes.

13:06:08  2        Q.    Okay.  And we can just replay it really

13:06:11  3   quickly.

13:06:18  4        MS. HUGGINS:  I'm not sure why you're

13:06:20  5   replaying it.  He just answered your question.

13:06:21  6        THE WITNESS:  Yeah, I'm getting --

13:06:21  7        MR. DAVENPORT:  Well, it seems that there's

13:06:23  8   some confusion over what we're talking about, so I

13:06:25  9   want to make sure that we're absolutely crystal

13:06:28 10   clear on what we're seeing.

13:06:29 11        MS. HUGGINS:  He asked if are you talking

13:06:30 12   about the day and time or the video and you said

13:06:32 13   the video.  And then he answered your question

13:06:35 14   directly.  We can read it back.

13:06:36 15        MR. DAVENPORT:  I just don't understand why

13:06:38 16   we just can't play the video and just that way, we

13:06:40 17   can have him refreshed and watch the video.

13:06:40 18        MS. HUGGINS:  Because that's asking and

13:06:42 19   answering a question repeatedly.

13:06:43 20        MR. DAVENPORT:  Okay.  I'm going to play the

13:06:45 21   video.

13:06:57 22        BY MR. DAVENPORT:

13:06:58 23        Q.    Okay.  Now, on the video, did you just

*Santana - Davenport - 9/8/20*

145

| | | |
|---|---|---|
| 13:07:06 | 1 | see a car and a person collide together? |
| 13:07:08 | 2 | **A.**   Yes. |
| 13:07:08 | 3 | **MS. HUGGINS:**   Form. |
| 13:07:09 | 4 | **THE WITNESS:**   On the video, I seen the |
| 13:07:10 | 5 | person and the car collide with each other. |
| 13:07:13 | 6 | **BY MR. DAVENPORT:** |
| 13:07:13 | 7 | **Q.**   Based on what you saw in the video, did |
| 13:07:15 | 8 | you see a crime occur? |
| 13:07:16 | 9 | **MS. HUGGINS:**   Form.   That's definitely an |
| 13:07:17 | 10 | opinion question. |
| 13:07:18 | 11 | **MR. DAVENPORT:**   Well, he's an officer.   He |
| 13:07:20 | 12 | can certainly testify as to whether based on what |
| 13:07:22 | 13 | he sees in this video actually if he thinks that a |
| 13:07:25 | 14 | crime just occurred. |
| 13:07:26 | 15 | **THE WITNESS:**   Well, based on this video -- |
| 13:07:27 | 16 | **MS. HUGGINS:**   No, no.   No, no.   Wait a |
| 13:07:28 | 17 | minute.   That is an opinion question. |
| 13:07:32 | 18 | **MR. DAVENPORT:**   He's watching a video, so he |
| 13:07:34 | 19 | can provide factually if he thinks that a -- that a |
| 13:07:37 | 20 | crime just occurred when a car and an individual |
| 13:07:40 | 21 | were struck together. |
| 13:07:43 | 22 | If you want to instruct him not to answer |
| 13:07:44 | 23 | it, I'll just -- I'll preserve it for the record |

*Santana - Davenport - 9/8/20*

146

| | | |
|---|---|---|
| 13:07:46 | 1 | and we'll bring him back in.  That's perfectly |
| 13:07:49 | 2 | fine. |
| 13:07:49 | 3 | MS. HUGGINS:  Your question is if watching a |
| 13:07:51 | 4 | video he is able to say whether he observed a crime |
| 13:07:54 | 5 | take place? |
| 13:07:55 | 6 | MR. DAVENPORT:  Yeah.  Based on what he just |
| 13:07:56 | 7 | saw, was there any criminal action that took place. |
| 13:07:59 | 8 | MS. HUGGINS:  On the part of who? |
| 13:08:02 | 9 | MR. DAVENPORT:  Well, I don't know.  You |
| 13:08:05 | 10 | tell me. |
| 13:08:06 | 11 | MS. HUGGINS:  I'm objecting -- I'm objecting |
| 13:08:09 | 12 | on the -- to the form of the question and that it's |
| 13:08:12 | 13 | asking for an opinion of the video that clearly |
| 13:08:16 | 14 | speaks for itself. |
| 13:08:17 | 15 | So I mean, I want to get this over with, so |
| 13:08:20 | 16 | he can answer this, but I'm... |
| 13:08:23 | 17 | MR. DAVENPORT:  You can preserve your |
| 13:08:25 | 18 | objection. |
| 13:08:26 | 19 | BY MR. DAVENPORT: |
| 13:08:26 | 20 | Q.   Do you think a crime occurred based on |
| 13:08:28 | 21 | what you just saw? |
| 13:08:29 | 22 | A.   In viewing this video, no, I don't |
| 13:08:33 | 23 | think a crime occurred because I'm just getting a |

*Santana - Davenport - 9/8/20*

147

13:08:36  1  little bit of it from this video.

13:08:38  2         If you asked me if I was there, yeah, it

13:08:40  3  would be a totality different opinion.  But from

13:08:43  4  viewing this video right here, no, I do not see a

13:08:46  5  crime being occurred.

13:08:48  6         But that's all I have, so you can't ask me a

13:08:52  7  question on whether something has been like committed

13:08:56  8  just by seeing this little snippet of a video.

13:08:59  9         Q.    Okay.  At this point of the video, do

13:09:01  10  you see a second police car that's in the video?

13:09:03  11         A.    No, I don't see one.

13:09:06  12         Q.    Okay.  Do you know who these two

13:09:36  13  officers are that are walking back toward the

13:09:38  14  scene?

13:09:38  15         A.    No, I do not know them.

13:09:40  16         Q.    Do you have any reason to believe that

13:09:42  17  they are not Officer Moriarity and Officer Schultz?

13:09:46  18         A.    They're wearing the same colors as the

13:09:49  19  officers that got out of that Tahoe, that Chevy

13:09:51  20  Tahoe, so I'm assuming they're officers, too.

13:09:53  21         Q.    Okay.  But do you have any reason to

13:09:56  22  believe that they're not Officer Schultz and

13:09:58  23  Officer Moriarity, the officers that were walking

*Santana - Davenport - 9/8/20*

148

13:10:00   1   down the street?

13:10:00   2        **A.**   That, I can't tell you because you

13:10:02   3   can't get a look at their faces on the video.

13:10:04   4        **Q.**   My question is do you have any reason

13:10:06   5   to believe that they are not those two individuals?

13:10:08   6        **A.**   No.

13:10:08   7        **MS. HUGGINS:**   And form.

13:10:08   8        **THE WITNESS:**   No.

13:10:09   9        **MS. HUGGINS:**   He answered your question.

13:10:10   10       **THE WITNESS:**   No.

13:10:11   11       **BY MR. DAVENPORT:**

13:10:12   12       **Q.**   Okay.   Thank you.   Does it appear that

13:10:22   13   this individual may have been arrested or detained

13:10:24   14   at this time?

13:10:25   15       **A.**   Like I said earlier, I don't know

13:10:27   16   whether or not he was handcuffed.   All I see is

13:10:29   17   just two officers walking to that gentleman.

13:10:32   18       **Q.**   Okay.   Based on what you see on

13:10:34   19   Exhibit 4-A, was this individual arrested?

13:10:44   20       **A.**   Yes.

13:10:46   21       **Q.**   Okay.   And what tells you that?

13:10:48   22       **A.**   The CB, central booking.   The CB on

13:10:53   23   this document here.

*Santana - Davenport - 9/8/20*

149

13:10:55  1          Q.    Did you also discern that from the

13:10:58  2   disposition that says P1375 crime report?

13:11:01  3          A.    Well, doing a P1375 crime report

13:11:04  4   doesn't constitute an arrest because you do it

13:11:06  5   without even doing no arrests.  What got me to that

13:11:11  6   conclusion was CB.

13:11:14  7          Q.    Okay.  What times would you do a

13:11:16  8   criminal report without arresting or detaining

13:11:19  9   somebody?

13:11:19 10          A.    What time would you do it?

13:11:21 11          Q.    What instances.

13:11:22 12          A.    Every single call that requires an

13:11:25 13   incident that a crime did occur.  So an example, a

13:11:30 14   broken window, you could do it.  Harassment, phone

13:11:35 15   harassment.  There's many outcomes for you to do

13:11:37 16   the 1375.

13:11:39 17          Q.    Okay.  As you sit here today, do you

13:11:50 18   know what Mr. Kistner was charged with on January 1st

13:11:53 19   of 2017?

13:11:54 20          A.    No, I do not.

13:11:58 21          Q.    Would you believe me if I told you that

13:12:00 22   he was charged with a felony for what happened on

13:12:02 23   January 1st of 2017?

13:12:04  1      **A.**     It's not that I don't believe you, it's
13:12:06  2   that I don't know what he's been charged with.
13:12:09  3   That's up to the officers, whether or not they want
13:12:11  4   to charge a specific crime to an individual, but
13:12:15  5   whatever they charge is what they charge.
13:12:17  6      **Q.**     Based on what you saw on that video,
13:12:20  7   did a felony occur?
13:12:21  8      **MS. HUGGINS:**  Form.  Same -- same objection
13:12:24  9   as to calling for opinion testimony.
13:12:26  10     **THE WITNESS:**  That, I can't tell you.
13:12:27  11     **BY MR. DAVENPORT:**
13:12:28  12     **Q.**     Based on what you saw on the video --
13:12:30  13     **A.**     Based on what I saw, no.
13:12:32  14     **Q.**     Okay.
13:12:33  15     **A.**     But it's just video, there's more to
13:12:35  16   it, so.  And I wasn't there, so I wouldn't know.
13:12:38  17     **Q.**     Are you familiar with the crime
13:12:45  18   criminal mischief in the third degree?
13:12:47  19     **A.**     I am.
13:12:48  20     **Q.**     Okay.  Do you know the elements that
13:12:51  21   are required for the crime of criminal mischief in
13:12:55  22   the third degree?
13:12:56  23     **A.**     It's damage over a specified amount.  I

13:13:00  1  can't recall what amount.  I believe it's $1,500.

13:13:05  2      **Q.**  So do you know if -- what the

13:13:13  3  designation of that crime is?  Is it a felony, a

13:13:15  4  violation, a misdemeanor?

13:13:17  5      **A.**  That, I can't tell you unless I have

13:13:18  6  the penal law book in front of me.

13:13:20  7      **Q.**  Okay.  So I'm going to show you what's

13:13:27  8  been marked as Exhibit 17.

13:13:35  9      **A.**  Okay.

13:13:36  10     **Q.**  Do you recognize this document?

13:13:38  11     **A.**  I do.

13:13:39  12     **Q.**  And what do you recognize it to be?

13:13:42  13     **A.**  It's the charge, what they are charging

13:13:45  14  the defendant.

13:13:47  15     **Q.**  Okay.  Do you see in the part at the

13:13:52  16  very top -- well, close to the top where it says

13:13:55  17  criminal mischief third with damages greater than

13:14:04  18  250?

13:14:05  19     **A.**  I do see that.

13:14:06  20     **Q.**  Okay.  Does that indicate to you that

13:14:09  21  the damage must be in excess of $250?

13:14:13  22     **A.**  Yes.

13:14:14  23     **Q.**  So that would be the threshold amount

*Santana - Davenport - 9/8/20*

152

| | | |
|---|---|---|
| 13:14:16 | 1 | that's required? |
| 13:14:17 | 2 | **A.**    Yes.   For that penal law charge, that's |
| 13:14:21 | 3 | correct. |
| 13:14:21 | 4 | **Q.**    Okay.   Now, do you see where it |
| 13:14:26 | 5 | describes the damage that was done to the vehicle |
| 13:14:29 | 6 | to support this criminal charge? |
| 13:14:33 | 7 | **A.**    Driver's side mirror and driver's side |
| 13:14:36 | 8 | mirror of patrol vehicle.   That's what they have |
| 13:14:39 | 9 | listed.   And it's causing the mirror to be |
| 13:14:43 | 10 | dislodged from the vehicle and also causing the |
| 13:14:46 | 11 | driver's side window to malfunction. |
| 13:14:49 | 12 | **Q.**    Okay.   Do you remember looking at the |
| 13:14:57 | 13 | vehicle that was parked next to you on the day of |
| 13:14:59 | 14 | the incident? |
| 13:14:59 | 15 | **A.**    No, I don't recall. |
| 13:15:00 | 16 | **Q.**    Do you recall seeing a mirror that was |
| 13:15:03 | 17 | dislodged on any of the vehicles? |
| 13:15:04 | 18 | **A.**    I don't recall. |
| 13:15:06 | 19 | **Q.**    Did any of the officers complain about |
| 13:15:14 | 20 | a window not being able to function properly on |
| 13:15:17 | 21 | this date? |
| 13:15:17 | 22 | **A.**    I don't recall. |
| 13:15:21 | 23 | **Q.**    When you -- have you ever sent one of |

*Santana - Davenport - 9/8/20*

153

| | | |
|---|---|---|
| 13:15:27 | 1 | your patrol cars in for service? |
| 13:15:28 | 2 | **A.**   Yes, I have. |
| 13:15:29 | 3 | **Q.**   Okay.  Do you ever review those |
| 13:15:33 | 4 | documents that -- that has to do with the car |
| 13:15:37 | 5 | repair? |
| 13:15:37 | 6 | **A.**   I do.  The person who is taking the |
| 13:15:39 | 7 | vehicle out to the garage has to fill out a form. |
| 13:15:42 | 8 | You have to do like your own personal inspection of |
| 13:15:45 | 9 | it, so yes. |
| 13:15:48 | 10 | **Q.**   Okay.  So you being the person that's |
| 13:15:50 | 11 | taking the vehicle also has to complete a form for |
| 13:15:53 | 12 | what needs to be completed? |
| 13:15:54 | 13 | **A.**   Yes. |
| 13:15:55 | 14 | **Q.**   Okay. |
| 13:16:14 | 15 | **MR. DAVENPORT:**  Now, I don't believe that we |
| 13:16:16 | 16 | received that form from Ms. Velasquez on McDermott, |
| 13:16:20 | 17 | so to the extent that that form does exist, we are |
| 13:16:22 | 18 | just putting on the record that we are requesting |
| 13:16:24 | 19 | the document that was filled out when they took the |
| 13:16:26 | 20 | car in for service. |
| 13:16:33 | 21 | **MS. HUGGINS:**  So that was a part of your |
| 13:16:35 | 22 | discovery demand and there was a response |
| 13:16:37 | 23 | indicating that there's no such form. |

*Santana - Davenport - 9/8/20*

154

13:16:39   1         **MR. DAVENPORT:** Okay.

13:16:39   2         **BY MR. DAVENPORT:**

13:16:41   3         **Q.** Is that a requirement, for officers to

13:16:43   4   fill out that form?

13:16:44   5         **A.** To my understanding, yes.

13:16:46   6         **Q.** How often do you take your car in for

13:16:49   7   service in a given year?

13:16:51   8         **A.** Generally, I take my patrol vehicle in

13:16:54   9   for an oil change. If there's something that

13:16:58  10   occurs, I document it and then take it to the

13:17:01  11   garage. And they service it for whatever I wrote

13:17:05  12   it up for.

13:17:06  13         **Q.** Okay. But my question is do you have a

13:17:10  14   rough estimate for how many times in a given year

13:17:13  15   you would take your patrol vehicle in?

13:17:14  16         **A.** I would say four to six times a year.

13:17:16  17         **Q.** And each those four to six times, you

13:17:18  18   would be expected to fill out a form when taking it

13:17:22  19   into service?

13:17:22  20         **A.** Well, I do, yes.

13:17:23  21         **Q.** Okay. Are there any circumstances or

13:17:29  22   instances that you would take your patrol vehicle

13:17:31  23   in for service where you would not fill out that

13:17:35   1   form?

13:17:36   2        **A.**   Me, I fill it out whenever I go to the

13:17:38   3   garage whether I need a new tire replaced or this

13:17:41   4   or that.  That's me.

13:17:43   5        In regards to other officers, I don't know

13:17:45   6   what their preference is.  But I'm all about paper

13:17:49   7   details, so I have to have something documented.

13:17:52   8        **Q.**   Okay.  The Dodge Charger that you were

13:17:57   9   driving on January 1st, 2017, is that the car that

13:18:00  10   you typically drive?

13:18:01  11        **A.**   Yes.

13:18:01  12        **Q.**   Okay.  Is that the car that you also

13:18:05  13   typically take in for service and repair?

13:18:07  14        **A.**   Yes.

13:18:07  15        **Q.**   Okay.  Now, I understand that there may

13:18:13  16   be days where you don't specifically drive this

13:18:15  17   vehicle, but has car number 625 generally been the

13:18:20  18   car that you have driven from January 1st, 2017, to

13:18:24  19   today?

13:18:25  20        **A.**   I don't drive 625 anymore.

13:18:29  21        **Q.**   Okay.  What car do you drive?

13:18:31  22        **A.**   810, Charger 810.

13:18:34  23        **Q.**   And when approximately did you switch

*Santana - Davenport - 9/8/20*

156

| | | |
|---|---|---|
| 13:18:37 | 1 | over to the Charger 810? |
| 13:18:39 | 2 | **A.** I can't give you -- I don't know. I |
| 13:18:43 | 3 | don't recall when I took over that. It could be |
| 13:18:46 | 4 | two years. |
| 13:18:48 | 5 | **Q.** Okay. |
| 13:18:50 | 6 | **A.** Because the designators on the vehicle |
| 13:18:53 | 7 | like 625, six being 16, so that's the year of the |
| 13:18:57 | 8 | car. So 810 is -- 18 was when the vehicle was |
| 13:19:02 | 9 | manufactured. |
| 13:19:03 | 10 | **Q.** Okay. |
| 13:19:05 | 11 | **A.** But, yeah. |
| 13:19:11 | 12 | **Q.** So then since car 625 would have been |
| 13:19:15 | 13 | in 2016, the 2016 model, from 2016 to 2018, that |
| 13:19:18 | 14 | was your primary vehicle, was 625? |
| 13:19:21 | 15 | **A.** That was it, but on patrol, you're not |
| 13:19:24 | 16 | assigned like -- there's a preference of a vehicle |
| 13:19:27 | 17 | that you want. |
| 13:19:28 | 18 | 625 was the vehicle because I took care of |
| 13:19:31 | 19 | it. When that was out of service, that vehicle, |
| 13:19:34 | 20 | you pretty much had whatever what was left on the |
| 13:19:38 | 21 | lot. |
| 13:19:38 | 22 | So it could be a Tahoe that you get one day |
| 13:19:40 | 23 | and it can be like a Crown Vic the next day and |

*Santana - Davenport - 9/8/20*

157

13:19:42  1  stuff because you're just waiting for your car to

13:19:45  2  come back from being serviced.

13:19:47  3       So you're not assigned a particular car,

13:19:49  4  it's just you have a preference for that one

13:19:51  5  vehicle.

13:19:52  6       **Q.**  Okay.  Being that car 625 was your

13:19:58  7  preference, that was generally the car that you

13:20:00  8  drove, though, from 2016 to 2018?

13:20:02  9       **A.**  That's correct.

13:20:03  10      **Q.**  Okay.  And also it's generally your

13:20:05  11 understanding that every time that you take -- took

13:20:07  12 in car 625 for service, you filled out a form

13:20:11  13 before the service actually took place?

13:20:13  14      **A.**  That's correct.

13:20:14  15      **Q.**  Okay.  Would it be your expectation

13:20:19  16 that this type of damage that was caused to a

13:20:21  17 vehicle would have been filled out on some type of

13:20:25  18 form?

13:20:25  19      **MS. HUGGINS:**  Form.

13:20:26  20      **THE WITNESS:**  On my -- my expectations, yes,

13:20:29  21 because I will take care of it and that's me.  I

13:20:32  22 can't speak on other officers and how they do

13:20:34  23 things, but if it was me, yes.

13:20:37   1        **BY MR. DAVENPORT:**

13:20:37   2        **Q.**   Now, are your expectations shared with

13:20:40   3    your supervisor?

13:20:42   4        **A.**   They're aware of my expectations and

13:20:44   5    they know how I operate, so yes, they assume

13:20:49   6    nothing but the best with me.

13:20:51   7        **Q.**   Okay.  Is it your -- well, who was your

13:20:54   8    supervisor?

13:20:54   9        **A.**   Anthony McHugh and Jenny Velez.

13:20:59  10        **Q.**   Okay.  Now, does your supervisor expect

13:21:04  11    other officers in the C District to fill out the

13:21:09  12    forms that are required for the necessary repairs?

13:21:11  13        **MS. HUGGINS:**   Form.

13:21:14  14        **THE WITNESS:**   Every officer?

13:21:15  15        **MS. HUGGINS:**   That question calls for

13:21:16  16    speculation.

13:21:16  17        **MR. DAVENPORT:**   No, I mean, he's a

13:21:17  18    C District officer.  He knows what a supervisor's

13:21:20  19    expectations are.

13:21:20  20        **THE WITNESS:**   It's not just on the

13:21:21  21    expectations of the supervisors, it's on the

13:21:25  22    officer itself.  Like you have the manual

13:21:28  23    procedures and you have to like follow pretty much

*Santana - Davenport - 9/8/20*

159

13:21:30  1   what they state.

13:21:31  2        It's not up to the supervisors to come up

13:21:33  3   behind your back and say, hey, make sure you take

13:21:37  4   care of this and that.  You as an officer have to

13:21:40  5   take it upon yourself to take care of that issue.

13:21:43  6        **Q.**   So would you face any discipline if you

13:21:46  7   didn't fill out the necessary paperwork for these

13:21:49  8   repairs?

13:21:49  9        **A.**   Absolutely, yes.

13:21:50 10        **Q.**   And who would discipline you?

13:21:52 11        **A.**   Internal affairs.

13:21:53 12        **Q.**   Okay.  Not your supervisor?

13:21:55 13        **A.**   The supervisor will be aware of the

13:21:58 14   incident and they will be brought up to internal

13:22:03 15   affairs, but it's the person who did the

13:22:05 16   infraction, their immediate supervisor.  Then it

13:22:08 17   goes up the chain.  So they're aware of the

13:22:10 18   situation, too.

13:22:10 19        **Q.**   Okay.  Would you ever have any sort of

13:22:13 20   a conference with your lieutenants, Anthony McHugh

13:22:18 21   or Jenny Velez, if you weren't meeting the

13:22:20 22   expectations that were expected of you as an

13:22:22 23   officer?

*Santana - Davenport - 9/8/20*

160

| 13:22:23 | 1 | **MS. HUGGINS:**  Form.  You can answer. |
| 13:22:24 | 2 | **THE WITNESS:**  Well, if an incident did not |

13:22:26  3   occur, then you're not going to have a conference.

13:22:29  4   Generally, the only time you're talking to a

13:22:32  5   supervisor in regards to -- I don't know.  What

13:22:33  6   situation do you want me to talk about?

13:22:35  7   **BY MR. DAVENPORT:**

13:22:35  8   Q.   I'm just talking about filling out

13:22:38  9   paperwork for car repairs.

13:22:39  10  A.   Yes, because it goes to the supervisor

13:22:40  11  and they have to sign it, too.  It could be my

13:22:43  12  immediate supervisors or it could be the person who

13:22:45  13  is running the police garage.  But it's -- my

13:22:49  14  signature is not the only signature that goes on

13:22:51  15  that document.

13:22:52  16  Q.   Okay.  So the supervisor would also put

13:22:54  17  their signature on the form for a repair?

13:22:57  18  A.   Yes.  Because they will see everything,

13:22:59  19  yes.

13:22:59  20  Q.   Okay.  Now, as an officer, do you

13:23:07  21  typically document evidence that's required to

13:23:11  22  prove a crime that you accuse someone with?

13:23:13  23  A.   Yes.

*Santana - Davenport - 9/8/20*

161

| | | |
|---|---|---|
| 13:23:13 | 1 | **Q.**   Okay.   In the instance of accusing |
| 13:23:17 | 2 | somebody of intentionally dislodging a driver's |
| 13:23:21 | 3 | side mirror and causing damage to the malfunction |
| 13:23:25 | 4 | or function of the driver's side mirror(sic), how |
| 13:23:28 | 5 | would you document that evidence? |
| 13:23:30 | 6 | **MS. HUGGINS:**   Form. |
| 13:23:32 | 7 | **THE WITNESS:**   Okay.   For me in regards to |
| 13:23:34 | 8 | that, generally you have -- if it's vehicle -- |
| 13:23:37 | 9 | damage done to your patrol vehicle, you have to |
| 13:23:40 | 10 | notify your supervisor. |
| 13:23:41 | 11 | And they will notify the accident |
| 13:23:43 | 12 | investigation unit.   And they will come by and they |
| 13:23:46 | 13 | will take pictures and collect evidence. |
| 13:23:50 | 14 | **BY MR. DAVENPORT:** |
| 13:23:51 | 15 | **Q.**   Would an officer ever be able to take |
| 13:23:53 | 16 | their own photographs to document it? |
| 13:23:54 | 17 | **A.**   Well, it depends on that officer, but |
| 13:23:56 | 18 | if they want their phones taken away or whatever, I |
| 13:24:00 | 19 | mean, by all means they could do that. |
| 13:24:02 | 20 | But generally if they do do that, it's up to |
| 13:24:05 | 21 | them.   But it's usually the specialized units that |
| 13:24:07 | 22 | will take the photos, not the officers. |
| 13:24:12 | 23 | **Q.**   Okay.   Why would the officer have to |

*Santana - Davenport - 9/8/20*

| | | |
|---|---|---|
| 13:24:14 | 1 | have their phone taken away if they took a |
| 13:24:17 | 2 | photograph? |
| 13:24:17 | 3 | **A.**   I'm not saying -- |
| 13:24:17 | 4 | **MS. HUGGINS:**  Form. |
| 13:24:18 | 5 | **THE WITNESS:**  -- per se.  Generally, it's |
| 13:24:21 | 6 | the courts or whatever.  I mean, if you have |
| 13:24:22 | 7 | something on your phone, then the Court will |
| 13:24:25 | 8 | subpoena that and grab your phone. |
| 13:24:26 | 9 | But it's -- it's more or less -- like I |
| 13:24:29 | 10 | said, I don't know what everyone else does, but for |
| 13:24:32 | 11 | me, I usually let our units take care of that and |
| 13:24:36 | 12 | let them collect the evidence. |
| 13:24:38 | 13 | **BY MR. DAVENPORT:** |
| 13:24:39 | 14 | **Q.**   Okay.  Are you aware of officers who |
| 13:24:42 | 15 | take photographs on their phone and use it as |
| 13:24:44 | 16 | evidence? |
| 13:24:45 | 17 | **A.**   No, I'm not. |
| 13:24:46 | 18 | **Q.**   Now, if you appeared in court and there |
| 13:24:59 | 19 | was no evidence to support the crime that you |
| 13:25:01 | 20 | accuse somebody with, how would that reflect on you |
| 13:25:05 | 21 | as an officer? |
| 13:25:07 | 22 | **MS. HUGGINS:**  Form. |
| 13:25:08 | 23 | **THE WITNESS:**  My opinion?  If something like |

*Santana - Davenport - 9/8/20*

163

| | | |
|---|---|---|
| 13:25:11 | 1 | that didn't turn out the way I want it to turn out |
| 13:25:14 | 2 | in regards to a court case? |
| 13:25:16 | 3 | I mean, it's due process. It's the courts. |
| 13:25:19 | 4 | If the Court finds that the person is not guilty, |
| 13:25:21 | 5 | then I did my job, I did it to the best of my |
| 13:25:24 | 6 | ability, and then I just move on. I don't hold any |
| 13:25:27 | 7 | grudges or anything like that. |
| 13:25:28 | 8 | **BY MR. DAVENPORT:** |
| 13:25:28 | 9 | **Q.** What if you accuse somebody of |
| 13:25:30 | 10 | something and you didn't have any evidence to |
| 13:25:31 | 11 | support the crime that you charged that individual |
| 13:25:34 | 12 | with, how would that reflect on you? |
| 13:25:35 | 13 | **A.** It wouldn't -- |
| 13:25:35 | 14 | **MS. HUGGINS:** Form. |
| 13:25:36 | 15 | **THE WITNESS:** -- have reflected -- |
| 13:25:39 | 16 | **MS. HUGGINS:** And that calls for |
| 13:25:39 | 17 | speculation. What do you mean, how -- what do you |
| 13:25:41 | 18 | mean by the phrase "how it reflects on you"? |
| 13:25:43 | 19 | **BY MR. DAVENPORT:** |
| 13:25:44 | 20 | **Q.** Well, would a supervisor have to talk |
| 13:25:45 | 21 | to you about why you brought charges against |
| 13:25:48 | 22 | somebody without evidence? |
| 13:25:49 | 23 | **MS. HUGGINS:** Form. Calls for speculation. |

13:25:51  1    You can answer.

13:25:52  2         **THE WITNESS:**  I wouldn't know because I've

13:25:53  3    never been in that situation.

13:25:55  4         **BY MR. DAVENPORT:**

13:25:55  5         **Q.**   Are you aware of officers who have been

13:25:57  6    in that situation?

13:25:57  7         **A.**   I wouldn't know, either.

13:25:59  8         **Q.**   Do you not talk with other officers?

13:26:01  9         **A.**   I do talk to other officers but I don't

13:26:03  10   talk in regards to stuff at work, incidents that

13:26:10  11   occurred at work.

13:34:39  12        (A recess was then taken.)

13:34:39  13        **BY MR. DAVENPORT:**

13:34:47  14        **Q.**   So showing you what has been marked as

13:34:50  15   Exhibit 11, it is the fourth video segment.  The

13:34:54  16   number is 06_20170101105233.  The timestamp is one

13:35:08  17   minute and 44 seconds into this video segment.

13:35:15  18        Now, Officer Santana, I just want you to

13:35:18  19   tell me, do you see all five officers currently

13:35:21  20   standing in a group?

13:35:22  21        **A.**   Yes.

13:35:22  22        **Q.**   Okay.  Now, does it appear that the

13:35:32  23   officers are breaking from the group and walking

*Santana - Davenport - 9/8/20*

165

| | | |
|---|---|---|
| 13:35:34 | 1 | back towards their respective vehicles? |
| 13:35:37 | 2 | **A.**   Yes. |
| 13:35:38 | 3 | **Q.**   Do you see one officer who is currently |
| 13:35:49 | 4 | standing in the middle of the street at timestamp |
| 13:35:52 | 5 | two minutes and four seconds into the video |
| 13:35:56 | 6 | segment? |
| 13:35:56 | 7 | **A.**   Yes. |
| 13:35:57 | 8 | **Q.**   Okay.  I just want you to generally |
| 13:35:59 | 9 | describe what you see this officer doing from this |
| 13:36:02 | 10 | moment forward. |
| 13:36:04 | 11 | **MS. HUGGINS:**  Form. |
| 13:36:07 | 12 | **THE WITNESS:**  He's standing in the middle of |
| 13:36:09 | 13 | the street. |
| 13:36:12 | 14 | **BY MR. DAVENPORT:** |
| 13:36:12 | 15 | **Q.**   What reason do you think that she was |
| 13:36:14 | 16 | standing in front of the car? |
| 13:36:16 | 17 | **MS. HUGGINS:**  Form. |
| 13:36:17 | 18 | **THE WITNESS:**  I can't tell you.  I don't |
| 13:36:18 | 19 | know. |
| 13:36:19 | 20 | **BY MR. DAVENPORT:** |
| 13:36:19 | 21 | **Q.**   Is it possible that she was taking a |
| 13:36:21 | 22 | photograph? |
| 13:36:21 | 23 | **MS. HUGGINS:**  Form. |

*Santana - Davenport - 9/8/20*

166

13:36:22 1          **THE WITNESS:**  You can't tell from that

13:36:24 2  video.

13:36:24 3          **BY MR. DAVENPORT:**

13:36:27 4          **Q.**   Is it possible that she was taking a

13:36:29 5  photograph to document the damage to her vehicle?

13:36:31 6          **MS. HUGGINS:**  Form.

13:36:32 7          **THE WITNESS:**  I can't see a camera.  I can't

13:36:36 8  see anything from this video.  I can't see it.

13:36:38 9          **BY MR. DAVENPORT:**

13:36:38 10         **Q.**   Okay.  Do you recall if anybody told

13:36:42 11  that officer to take a photograph of the vehicle?

13:36:44 12         **A.**   I don't recall.

13:36:46 13         **Q.**   Okay.  Do you recall anything about any

13:36:50 14  of those discussions with any of those officers

13:36:53 15  that day?

13:36:54 16         **A.**   No, I don't recall.

13:36:55 17         **Q.**   All right.  Do you recall any

13:37:07 18  individuals talking to any of the officers at the

13:37:11 19  scene?

13:37:12 20         **A.**   No, I don't recall.

13:37:13 21         **Q.**   Nobody from the apartment complex or

13:37:17 22  the houses that were nearby?

13:37:19 23         **A.**   No, I don't recall.

*Santana - Davenport - 9/8/20*

| | | |
|---|---|---|
| 13:37:20 | 1 | Q. Okay. Nobody was screaming from a |
| 13:37:24 | 2 | window or anything like that? |
| 13:37:25 | 3 | A. I don't recall. |
| 13:37:27 | 4 | Q. Do you recall if at any point any |
| 13:37:31 | 5 | pedestrian or anybody from a house said that we |
| 13:37:33 | 6 | have this on video? |
| 13:37:34 | 7 | A. No, I don't recall. |
| 13:37:36 | 8 | Q. Okay. Did you know at this time that |
| 13:37:39 | 9 | there was surveillance video that was focused on |
| 13:37:43 | 10 | where the officers were standing? |
| 13:37:45 | 11 | A. No. |
| 13:37:46 | 12 | Q. Did you come to learn of that fact at |
| 13:37:48 | 13 | any point on that day? |
| 13:37:49 | 14 | A. No. |
| 13:37:51 | 15 | Q. Did you come to learn of that fact at |
| 13:37:53 | 16 | any point before your deposition today? |
| 13:37:55 | 17 | A. No. |
| 13:37:56 | 18 | Q. Not even when you saw on the news story |
| 13:37:59 | 19 | that there was surveillance footage of everything |
| 13:38:01 | 20 | that happened? |
| 13:38:02 | 21 | A. Well, besides the news story, no. |
| 13:38:04 | 22 | Q. And then when you watched the video |
| 13:38:06 | 23 | this morning, correct? |

*Santana - Davenport - 9/8/20*

168

| | | |
|---|---|---|
| 13:38:07 | 1 | **A.** That's correct. |
| 13:38:08 | 2 | **Q.** And then when you watched the video for |
| 13:38:10 | 3 | your interrogatories? |
| 13:38:10 | 4 | **A.** That's correct. |
| 13:38:11 | 5 | **Q.** And at all those times, you knew that |
| 13:38:13 | 6 | there was surveillance footage of the incident on |
| 13:38:15 | 7 | that day? |
| 13:38:16 | 8 | **A.** That's correct, from viewing it. |
| 13:38:17 | 9 | **Q.** Okay. Thank you. I'm going to show |
| 13:38:33 | 10 | you what has been marked as Exhibit 18. Do you |
| 13:38:42 | 11 | recognize this document? |
| 13:38:43 | 12 | **A.** No, I do not. |
| 13:38:44 | 13 | **Q.** Do you know generally what this |
| 13:38:47 | 14 | document is used for? |
| 13:38:49 | 15 | **A.** No, I do not. |
| 13:38:51 | 16 | **Q.** Have you ever seen this document |
| 13:38:52 | 17 | before? |
| 13:38:53 | 18 | **A.** No, I haven't. |
| 13:38:54 | 19 | **Q.** Have you ever seen a general form of |
| 13:38:56 | 20 | this document? |
| 13:38:56 | 21 | **A.** No, I haven't. |
| 13:38:57 | 22 | **Q.** Okay. Do you have any reason to |
| 13:39:00 | 23 | believe that this is not a fleet management |

*Santana - Davenport - 9/8/20*

169

| | | |
|---|---|---|
| 13:39:03 | 1 | maintenance work order? |
| 13:39:04 | 2 | **A.** No. |
| 13:39:05 | 3 | **Q.** Okay. Who fills out this work order? |
| 13:39:09 | 4 | **A.** I do not know. |
| 13:39:10 | 5 | **Q.** Okay. But it's not the officers who |
| 13:39:13 | 6 | fill it out? |
| 13:39:13 | 7 | **A.** No. |
| 13:39:14 | 8 | **Q.** Do you think it's filled out by the |
| 13:39:16 | 9 | garage? |
| 13:39:16 | 10 | **A.** Probably filled out by the maintenance |
| 13:39:19 | 11 | work -- the worker within the maintenance shop. |
| 13:39:21 | 12 | **Q.** Okay. Does the City of Buffalo have |
| 13:39:24 | 13 | its own maintenance shop? |
| 13:39:25 | 14 | **A.** That, I can't tell you. |
| 13:39:28 | 15 | **Q.** Where do you take your car when it |
| 13:39:30 | 16 | needs to be repaired? |
| 13:39:31 | 17 | **A.** Seneca garage, but it's -- I don't know |
| 13:39:35 | 18 | if they work for the city or they're contracted |
| 13:39:37 | 19 | with the city. I don't know. |
| 13:39:38 | 20 | **Q.** Do you ever take your vehicle to any |
| 13:39:40 | 21 | other garage? |
| 13:39:41 | 22 | **A.** No. |
| 13:39:43 | 23 | **Q.** Okay. And that's where you've taken |

*Santana - Davenport - 9/8/20*

170

13:39:45 1  your vehicle to -- that's the garage that you've

13:39:49 2  taken your vehicle to since you started?

13:39:50 3      **A.**   That's correct.

13:39:51 4      **Q.**   Do you ever see other police vehicles

13:39:53 5  that are there at Seneca garage?

13:39:55 6      **A.**   In regards to what?  From different

13:39:57 7  agencies or?

13:39:58 8      **Q.**   Specifically for the City of Buffalo.

13:40:00 9      **A.**   No, just -- just our vehicles, anything

13:40:04 10 with the City of Buffalo.

13:40:05 11     **Q.**   Okay.  So it's more than just your

13:40:07 12 vehicle that goes to Seneca garage?

13:40:09 13     **A.**   Yes, it's any city vehicle.

13:40:11 14     **Q.**   Okay.  So the form that you typically

13:40:13 15 fill out that you would give to the service garage

13:40:16 16 is different from this form?

13:40:18 17     **A.**   Yes.

13:40:18 18     **Q.**   Okay.  Do you know what car number this

13:40:21 19 form refers to?

13:40:23 20     **A.**   It refers to vehicle number 473.

13:40:27 21     **Q.**   Okay.  And then looking again at

13:40:29 22 Exhibit 16, who was driving vehicle number 473 on

13:40:34 23 January 1st of 2017?

*Santana - Davenport - 9/8/20*

| | | |
|---|---|---|
| 13:40:36 | 1 | **A.**   Officer McDermott and Officer Velez. |
| 13:40:40 | 2 | **Q.**   Okay.  Do you see on the service |
| 13:40:44 | 3 | information the date that this service took place? |
| 13:40:50 | 4 | **A.**   January 5th of 2017. |
| 13:40:53 | 5 | **Q.**   Okay.  And do you see where it says |
| 13:40:55 | 6 | what the service was done right below it? |
| 13:40:57 | 7 | **A.**   Cooling system. |
| 13:40:58 | 8 | **Q.**   Okay.  And then what about the line |
| 13:41:00 | 9 | right below that? |
| 13:41:01 | 10 | **A.**   R&R water pump, serp belt. |
| 13:41:15 | 11 | (Discussion off the record.) |
| 13:41:19 | 12 | **BY MR. DAVENPORT:** |
| 13:41:20 | 13 | **Q.**   Do you see anything that would indicate |
| 13:41:21 | 14 | that the driver's side mirror was fixed on this |
| 13:41:24 | 15 | date? |
| 13:41:25 | 16 | **A.**   No. |
| 13:41:25 | 17 | **Q.**   Okay.  Anything that says that the |
| 13:41:27 | 18 | driver's side mirror was dislodged from the |
| 13:41:29 | 19 | vehicle? |
| 13:41:30 | 20 | **A.**   No. |
| 13:41:31 | 21 | **Q.**   Okay.  Anything that talks about a |
| 13:41:33 | 22 | driver's side window malfunctioning? |
| 13:41:42 | 23 | **A.**   No. |

*Santana - Davenport - 9/8/20*

172

| | | |
|---|---|---|
| 13:41:42 | 1 | **Q.**    Okay.  Did you ever speak to Ms. Velez |
| 13:41:47 | 2 | and Ms. McDermott about the condition of their |
| 13:41:50 | 3 | vehicle after January 1st of 2017? |
| 13:41:52 | 4 | **A.**    No. |
| 13:41:52 | 5 | **Q.**    Okay.  Did they ever make any general |
| 13:41:54 | 6 | complaints about their vehicle after January 1st of |
| 13:41:57 | 7 | 2017? |
| 13:41:57 | 8 | **A.**    I would not know. |
| 13:41:59 | 9 | **Q.**    Well, did they ever make any general |
| 13:42:01 | 10 | complaints to you? |
| 13:42:02 | 11 | **A.**    No. |
| 13:42:03 | 12 | **Q.**    Okay.  How often do you talk to |
| 13:42:06 | 13 | Ms. McDermott and Ms. Velez? |
| 13:42:07 | 14 | **A.**    Not often. |
| 13:42:09 | 15 | **Q.**    Maybe once a week? |
| 13:42:11 | 16 | **A.**    No. |
| 13:42:12 | 17 | **Q.**    Okay.  Less than once a week? |
| 13:42:14 | 18 | **A.**    Yes. |
| 13:42:15 | 19 | **Q.**    Once a month? |
| 13:42:16 | 20 | **A.**    I don't know.  Whenever I walk by, hi, |
| 13:42:18 | 21 | 'bye and that's it, but we don't have |
| 13:42:20 | 22 | conversations. |
| 13:42:20 | 23 | **Q.**    Okay.  How many people are in your |

13:42:23  1    platoon for day shift?

13:42:25  2             A.    Right now, 12, I believe.

13:42:28  3             Q.    Of those 12 people, do you have anybody

13:42:33  4    that you speak to on a regular basis at work?

13:42:36  5             A.    At work or outside of work?

13:42:39  6             Q.    At work.

13:42:40  7             A.    I talk to everybody that I work with.

13:42:42  8             Q.    But regularly that you speak to them?

13:42:44  9             A.    Yes.

13:42:45 10             Q.    What do you define regularly as?

13:42:49 11             A.    How many times -- it's pretty much just

13:42:52 12    basically in the morning when we arrive at work and

13:42:54 13    we have briefings and pretty much just -- usually

13:43:00 14    just how it's going and this and that, but that's

13:43:02 15    pretty much it, so just once.

13:43:04 16             Q.    During those briefings, did Ms. McDermott

13:43:07 17    or Ms. Velez ever bring up complaints of their

13:43:10 18    after January 1st of 2017?

13:43:11 19             A.    No.

13:43:12 20             Q.    I'm going to show what's been marked as

13:43:43 21    Exhibit 9.  Do you recognize that document?

13:43:48 22             A.    Yes.

13:43:48 23             Q.    What do you otherwise recognize it to

*Santana - Davenport - 9/8/20*

174

| | | |
|---|---|---|
| 13:43:50 | 1 | be? |
| 13:43:50 | 2 | **A.** It's the case history. |
| 13:43:52 | 3 | **Q.** Okay. And what kind of information |
| 13:43:53 | 4 | goes on a case history? |
| 13:43:55 | 5 | **A.** Who did what in the incident. |
| 13:43:56 | 6 | **Q.** Okay. Do you see your name listed at |
| 13:43:59 | 7 | all on this case history? |
| 13:44:00 | 8 | **A.** No. |
| 13:44:01 | 9 | **Q.** Okay. Do officers who respond to a |
| 13:44:05 | 10 | call typically end up on a case history? |
| 13:44:07 | 11 | **A.** If they're assigned to that call, yes, |
| 13:44:10 | 12 | but it depends on the primary officer whether or |
| 13:44:14 | 13 | not they have them do a specific function with that |
| 13:44:16 | 14 | call. |
| 13:44:17 | 15 | **Q.** Okay. Are there only four officers who |
| 13:44:27 | 16 | are listed on this case history? |
| 13:44:28 | 17 | **A.** That's correct. |
| 13:44:28 | 18 | **Q.** Okay. And what is this case history |
| 13:44:33 | 19 | used for? What's the purpose? |
| 13:44:34 | 20 | **A.** The purpose of this case history is to |
| 13:44:36 | 21 | have it in one sheet who did what in that incident. |
| 13:44:41 | 22 | That's the main purpose of this. |
| 13:44:42 | 23 | **Q.** Okay. Is this something that's |

*Santana - Davenport - 9/8/20*

175

13:44:46  1  reviewed by anybody?

13:44:49  2       A.   Generally this goes to the court

13:44:51  3  paperwork.

13:44:53  4       Q.   Besides the courts, is there any other

13:44:55  5  officer supervisors who review this document?

13:44:57  6       A.   Not that I'm aware of, no.

13:44:59  7       Q.   So it's just mostly used for court

13:45:02  8  purposes then?

13:45:03  9       A.   That's correct.

13:45:04  10      Q.   Okay.  And so it generally describes

13:45:06  11 the functions that took place for each of the

13:45:09  12 officers who responded to the incident?

13:45:11  13      A.   That's correct.

13:45:50  14      Q.   Do you still maintain a copy of the

13:45:52  15 complaint that was served upon you?

13:45:54  16      A.   No.

13:45:56  17      Q.   Where did you give that complaint to?

13:46:00  18 Who has it?

13:46:01  19      A.   In regards to the copy that's given to

13:46:02  20 us?

13:46:03  21      Q.   Uh-huh.

13:46:04  22      A.   A shredder place.

13:46:08  23      Q.   You guys shred the complaints?

*Santana - Davenport - 9/8/20*

176

13:46:11    1          A.   No, we have bins in the station house

13:46:13    2    where we recycle documentation.  It's a locked bin

13:46:16    3    that -- I believe the company is called White

13:46:18    4    Mountain.  I don't keep anything on file.

13:46:20    5          **MS. HUGGINS:**  When you say complaint, just

13:46:22    6    to be clear, what are you referring to?

13:46:23    7          **MR. DAVENPORT:**  The complaint that he was

13:46:24    8    served with when he was notified of this lawsuit.

13:46:26    9          **MS. HUGGINS:**  Did you understand the

13:46:27   10    question to refer to that?

13:46:29   11          **THE WITNESS:**  Yeah, whether or not I kept a

13:46:31   12    copy of this thing myself.  My answer to that is

13:46:33   13    I'll view it and I'll go to it and I'll get rid of

13:46:37   14    that paperwork in that respective bin.

13:46:40   15          **BY MR. DAVENPORT:**

13:46:40   16          Q.   So when you drop off the paperwork into

13:46:43   17    the bin, do you know what happens to it afterwards?

13:46:46   18          A.   Well, it's up to the company and the

13:46:47   19    city.  I'm assuming they destroy everything.

13:46:50   20          Q.   What other types of paperwork do you

13:46:53   21    put into that bin?

13:46:53   22          A.   Anything work related, any information.

13:46:58   23          Q.   And how often are you putting documents

*Santana - Davenport - 9/8/20*

13:47:00  1    into that bin?

13:47:01  2         **A.**    Every day.

13:47:09  3         **Q.**    Do you think that that may have been a

13:47:11  4    document that you would want to hold on to if you

13:47:14  5    were named in a lawsuit?

13:47:15  6         **A.**    If I was named in a lawsuit, I would

13:47:17  7    assume that the city attorneys will have all that

13:47:21  8    documentation.  I don't need to carry that with me.

13:47:25  9         **Q.**    What happens if you wanted to go to

13:47:26  10   your own attorney besides the city attorney, would

13:47:29  11   you want to keep that complaint?

13:47:31  12        **MS. HUGGINS:**   Form.

13:47:32  13        **THE WITNESS:**   Absolutely.

13:47:37  14        **BY MR. DAVENPORT:**

13:47:38  15        **Q.**    If you got rid of the document, would

13:47:40  16   there be another way of notifying a new attorney of

13:47:43  17   what the allegations are in that complaint?

13:47:45  18        **A.**    That, I don't know the ins and outs of

13:47:48  19   that, so I'm not sure.  It's got to be with the

13:47:51  20   city attorneys in their department.

13:47:54  21        **Q.**    Is that something that's generally done

13:47:56  22   in the City of Buffalo, is recycle complaints that

13:48:00  23   are served upon their officers?

*Santana - Davenport - 9/8/20*

178

13:48:02  1      A.    Well, that's what I do.  I don't know

13:48:04  2  what other officers do.

13:48:05  3      Q.    How many lawsuits have you been named

13:48:08  4  in?

13:48:08  5      A.    One.

13:48:11  6      Q.    Just this one?

13:48:12  7      A.    No, there's another one.

13:48:14  8      Q.    So two then?

13:48:15  9      A.    Yes.

13:48:16  10      Q.    Okay.  Do you know when the file date

13:48:22  11  was for that other lawsuit?

13:48:25  12      A.    It's when I broke my arm in a

13:48:29  13  city-involved accident.  I can't tell you the exact

13:48:31  14  year.  I believe it's 2014.

13:48:36  15      Q.    So was that a complaint that was filed

13:48:38  16  by you?

13:48:39  17      A.    No.  It was an insurance company trying

13:48:41  18  to go after me on behalf of their client.

13:48:45  19      Q.    Okay.

13:48:56  20      A.    Did you have a question about that?

13:48:59  21      Q.    No, he can't ask questions.  Don't

13:49:01  22  worry about it.

13:49:11  23          So after you were served with the complaint,

*Santana - Davenport - 9/8/20*

179

13:49:13  1   did you read any of the allegations that were in

13:49:15  2   there?

13:49:15  3         **A.**   No.   The only thing I read was to

13:49:18  4   report to Corporation Counsel and that's pretty

13:49:21  5   much it.

13:49:22  6         **Q.**   Okay.   Did it give you like a date when

13:49:25  7   to report or anything like that?

13:49:26  8         **A.**   Yes, there was a date and time given to

13:49:28  9   me.

13:49:28  10        **Q.**   And then did you calendar it and make

13:49:30  11  that scheduled appointment?

13:49:32  12        **A.**   Yeah, I kept it in my mailbox at work.

13:49:35  13  And then after I showed up, after I went, when I

13:49:39  14  came back to work, I used the recycling.

13:49:41  15       **MS. HUGGINS:**   I think there's another

13:49:42  16  terminology confusion.   Are you talking about the

13:49:45  17  court liaison notice to come and appear for court?

13:49:48  18       **THE WITNESS:**   Yes, that's what he --

13:49:49  19       **MS. HUGGINS:**   I think he's unsure what you

13:49:51  20  mean by complaint.

13:49:52  21       **MR. DAVENPORT:**   Got you.   Okay.

13:49:58  22       **MS. HUGGINS:**   So when he said served with a

13:50:00  23  complaint, are you thinking of a court liaison

*Santana - Davenport - 9/8/20*

180

| | | |
|---|---|---|
| 13:50:03 | 1 | document? |
| 13:50:03 | 2 | **THE WITNESS:**  Yeah, serving me saying that |
| 13:50:04 | 3 | you have to show up for this and that.  Is that |
| 13:50:07 | 4 | what you were talking about? |
| 13:50:09 | 5 | **BY MR. DAVENPORT:** |
| 13:50:09 | 6 | **Q.**   No.  So I'm talking about at the |
| 13:50:14 | 7 | initial stages of the lawsuit, were you ever |
| 13:50:16 | 8 | handed -- it was about a 60-page document that |
| 13:50:20 | 9 | would have had the allegations for this lawsuit as |
| 13:50:23 | 10 | well as a recording of what happened? |
| 13:50:25 | 11 | **A.**   Thanks for clearing it up.  No. |
| 13:50:28 | 12 | **Q.**   You never received that document? |
| 13:50:29 | 13 | **A.**   Never did. |
| 13:50:30 | 14 | **Q.**   Are you aware if somebody at your |
| 13:50:33 | 15 | office received that document on your behalf? |
| 13:50:35 | 16 | **A.**   No. |
| 13:50:36 | 17 | **Q.**   Okay.  But as you sit here today, you |
| 13:50:39 | 18 | have never seen that document before? |
| 13:50:40 | 19 | **A.**   Never did. |
| 13:50:42 | 20 | **Q.**   Okay.  For the other lawsuit that you |
| 13:50:49 | 21 | were named in, did you ever review the allegations |
| 13:50:51 | 22 | in that complaint? |
| 13:50:51 | 23 | **A.**   With my attorney I had, yes. |

*Santana - Davenport - 9/8/20*

181

13:50:54  1      **Q.**    But you haven't done the same thing

13:50:56  2  here?

13:50:56  3      **A.**    No.

13:50:59  4      **Q.**    Do you know any of the details of

13:51:03  5  anything that happened on January 1st of 2017?

13:51:06  6      **A.**    No.

13:51:07  7      **MS. HUGGINS:**  Just to be clear since there

13:51:10  8  was confusion on terminology, when you were

13:51:13  9  referring to shredding a document, the document was

13:51:15  10  the court liaison notice?

13:51:16  11      **THE WITNESS:**  Yes.  That document stating

13:51:19  12  that I have to show up at court at a specific date

13:51:21  13  and time, that's what I'm talking about.

13:51:23  14      **BY MR. DAVENPORT:**

13:51:24  15      **Q.**    But you've never reviewed the 60-page

13:51:27  16  complaint that initiated this lawsuit --

13:51:29  17      **A.**    No.

13:51:30  18      **Q.**    -- against you?  Okay.  But you did

13:51:34  19  review the complaint for the other incident that

13:51:37  20  you were involved in?

13:51:38  21      **A.**    Yes.

13:51:38  22      **Q.**    Okay.  Did you keep that complaint?

13:51:42  23      **A.**    No, I don't have it anymore.

*Santana - Davenport - 9/8/20*

182

| | | |
|---|---|---|
| 13:51:44 | 1 | **Q.**   Well, did you keep it at the time? |
| 13:51:46 | 2 | **A.**   I didn't keep it but my attorney did. |
| 13:51:48 | 3 | **Q.**   Okay.  Did you also shred that |
| 13:51:51 | 4 | complaint? |
| 13:51:51 | 5 | **A.**   Well, everything that I have, yes, I |
| 13:51:53 | 6 | do.  I don't keep anything.  I don't keep files. |
| 13:51:56 | 7 | **Q.**   Okay.  Have you ever been subjected to |
| 13:52:06 | 8 | an internal affairs investigation? |
| 13:52:08 | 9 | **A.**   No. |
| 13:52:10 | 10 | **Q.**   Not once? |
| 13:52:12 | 11 | **A.**   No.  I was a witness but I wasn't the |
| 13:52:14 | 12 | target. |
| 13:52:14 | 13 | **Q.**   Okay.  Were you a witness for this |
| 13:52:17 | 14 | incident that transpired on January 1st of 2017? |
| 13:52:20 | 15 | **MS. HUGGINS:**  Form. |
| 13:52:21 | 16 | **THE WITNESS:**  No, I don't recall. |
| 13:52:23 | 17 | **BY MR. DAVENPORT:** |
| 13:52:23 | 18 | **Q.**   Were you ever interviewed or deposed by |
| 13:52:26 | 19 | anybody with internal affairs for this incident? |
| 13:52:29 | 20 | **A.**   No. |
| 13:52:29 | 21 | **Q.**   Okay.  Are you aware of any officers |
| 13:52:35 | 22 | who were deposed or required to give statements as |
| 13:52:39 | 23 | witnesses for this incident? |

*Santana - Davenport - 9/8/20*

183

13:52:40  1      MS. HUGGINS: I'm going to object to that

13:52:43  2  under the language in the order to show cause.

13:52:48  3  That is very broad language there. I don't know

13:52:51  4  what it encompasses and I am --

13:52:53  5      MR. DAVENPORT: Well, I have a copy if you

13:52:54  6  want to look at it.

13:52:55  7      MS. HUGGINS: I have a copy as well with me.

13:52:56  8      MR. DAVENPORT: Okay.

13:52:56  9      MS. HUGGINS: The issue is that it's still

13:52:58 10  the subject of litigation and I don't believe the

13:53:00 11  Court has specifically ruled with regard to

13:53:04 12  deposition testimony.

13:53:07 13      MR. DAVENPORT: So I think on the safe side,

13:53:10 14  we should probably ask the questions. You can

13:53:11 15  object to it and then it will stricken from the

13:53:13 16  record.

13:53:14 17      MS. HUGGINS: Well, no. Here's the problem.

13:53:17 18  That says no public disclosure and that is a

13:53:20 19  lawsuit --

13:53:20 20      MR. DAVENPORT: For documents. It doesn't

13:53:22 21  say anything about deposition testimony. It also

13:53:24 22  doesn't say anything if you're involved -- Jim,

13:53:26 23  don't say anything.

*Santana - Davenport - 9/8/20*

184

13:53:28  1      It doesn't say anything about if you are

13:53:30  2  named as a party in lawsuit.  This is just talking

13:53:33  3  about general disclosure under Public Officers Law.

13:53:35  4  This is a lawsuit.  You've been named in a lawsuit,

13:53:38  5  respectfully, sir.

13:53:39  6      So, you know, you can object to the

13:53:41  7  production of documents, I'm not -- I'm not asking

13:53:44  8  for any documents to be produced, but this does not

13:53:46  9  say anything about deposition testimony.

13:53:47 10     **MS. HUGGINS:**  It says publicly disclosing

13:53:51 11  records --

13:53:52 12     **MR. DAVENPORT:**  Documents.

13:53:53 13     **MS. HUGGINS:**  Okay.  The issue is that that

13:53:56 14  language is incredibly broad.  I am fine if you ask

13:54:00 15  the questions.  I'm not going to permit him to

13:54:02 16  answer them.

13:54:04 17      This is why I raised this earlier with you,

13:54:06 18  is that that -- if we run afoul of that, we are

13:54:18 19  subject to further suit by the PBA.

13:54:20 20      And I cannot put the city or this officer in

13:54:24 21  that position or myself in that position as a City

13:54:28 22  of Buffalo employee.

13:54:29 23      So I understand maybe you want to preserve

13:54:31  1  the record by indicating what questions you wish to

13:54:34  2  ask, but my concern is him answering any of those

13:54:36  3  questions that may reveal the contents of records.

13:54:41  4       **MR. DAVENPORT:**  Your concern is noted.

13:54:45  5       **MS. HUGGINS:**  So in citing that order to

13:54:47  6  show cause, depending on what your question is, I

13:54:50  7  may instruct him not to answer it.

13:54:52  8       But it's only -- my concern is, is having --

13:54:56  9  having a verbal answer here inadvertently disclose

13:55:00 10  the contents of an investigation.

13:55:01 11       **MR. DAVENPORT:**  Okay.  Plaintiff preserves

13:55:03 12  his rights to be able to bring Mr. Santana back in

13:55:05 13  for a deposition to answer the questions that

13:55:07 14  counsel will, it seems --

13:55:07 15       **MS. HUGGINS:**  And that's --

13:55:09 16       **MR. DAVENPORT:**  -- object to.

13:55:10 17       **MS. HUGGINS:**  And that's fine.  On this

13:55:12 18  issue, specifically because of this order to show

13:55:15 19  cause, that is my concern.

13:55:16 20       **MR. DAVENPORT:**  Okay.  So I would just like

13:55:18 21  to say on the record that it says records.  It does

13:55:22 22  not say anything about deposition testimony.

13:55:23 23       So plaintiff respectfully disagrees that

| | |
|---|---|
| 13:55:27 1 | this TRO has anything to do with this deposition |
| 13:55:30 2 | testimony here today. |
| 13:55:30 3 | And we will preserve that right to move |
| 13:55:34 4 | forward with asking Mr. Santana the questions that |
| 13:55:37 5 | we are about to ask in a further deposition. |
| 13:55:40 6 | **BY MR. DAVENPORT:** |
| 13:55:41 7 | Q. So Mr. Santana, are you aware of any |
| 13:55:44 8 | officers who were investigated or asked to provide |
| 13:55:48 9 | a statement as a witness by internal affairs for |
| 13:55:50 10 | this January 1st, 2017, incident? |
| 13:55:52 11 | A. No. |
| 13:55:53 12 | Q. Are you aware of the process that |
| 13:56:02 13 | internal affairs goes through for investigating |
| 13:56:04 14 | complaints against officers? |
| 13:56:06 15 | A. No. |
| 13:56:07 16 | Q. When you participated as a witness, |
| 13:56:12 17 | what was the outcome of that complaint? |
| 13:56:15 18 | **MS. HUGGINS:** Well, that, I am going to |
| 13:56:17 19 | object to. I don't know the answer to that |
| 13:56:18 20 | question, but you're saying what is the outcome of |
| 13:56:21 21 | the complaint. That could reveal -- |
| 13:56:23 22 | **MR. DAVENPORT:** Because if it was |
| 13:56:25 23 | substantiated, then I would be able to ask him |

*Santana - Davenport - 9/8/20*

13:56:27   1   questions.  This TRO has nothing to do with

13:56:30   2   substantiated complaints.

13:56:30   3        MS. HUGGINS:  It says settled.

13:56:31   4        MR. DAVENPORT:  Okay.  Well, how do you

13:56:33   5   interpret settled?

13:56:34   6        MS. HUGGINS:  I'm not interpreting settled.

13:56:37   7   In the labor context, settled is anything that --

13:56:40   8   settled is anything that is ranging from an other

13:56:44   9   disposition to a settled disposition.

13:56:49   10       MR. DAVENPORT:  Okay.  So what you're saying

13:56:50   11   is that if the outcome was not settled, then you're

13:56:55   12   going to object and direct Mr. Santana not to

13:56:57   13   answer?

13:56:58   14       MS. HUGGINS:  The way that that is written

13:57:00   15   and --

13:57:01   16       MR. DAVENPORT:  I have it if you need it.

13:57:02   17       MS. HUGGINS:  I have it.  Hang on.

13:57:04   18       MR. DAVENPORT:  Okay.  I'm reading this and

13:57:06   19   it says that:  Disclosure is not allowed if there

13:57:09   20   is pending unsubstantiated, unfounded, exonerated,

13:57:13   21   or otherwise found not guilty.  It doesn't say

13:57:16   22   anything about settled.

13:57:16   23       MS. HUGGINS:  It is the --

*Santana - Davenport - 9/8/20*

188

13:57:19  1        **MR. DAVENPORT:**  Or regarding settlement

13:57:23  2   agreements.

13:57:23  3        **MS. HUGGINS:**  It is on page 2, the middle

13:57:26  4   paragraph:  It is further ordered that pending the

13:57:28  5   hearing schedule above for the preliminary

13:57:30  6   injunction, a temporary restraining order is hereby

13:57:32  7   issued restraining respondents and those acting in

13:57:35  8   concert with them from publicly disclosing any

13:57:38  9   records concerning unsubstantiated and pending

13:57:42  10  allegations or settlement agreements entered into

13:57:44  11  prior to June 12, 2020.

13:57:46  12       **MR. DAVENPORT:**  I see nothing in there about

13:57:47  13  settled, so I'd just --

13:57:49  14       **MS. HUGGINS:**  Settlement agreement.

13:57:50  15       **MR. DAVENPORT:**  Well, you said settled and I

13:57:53  16  have no idea what settled means, but if I'm looking

13:57:55  17  at this and if what happens in this internal

13:57:59  18  affairs investigation was a finding of

13:58:03  19  substantiated, then there's nothing in this TRO

13:58:05  20  that would prevent Mr. Santana from talking about

13:58:07  21  it.

13:58:09  22       **MS. HUGGINS:**  Respectfully, the TRO

13:58:11  23  restrains the City of Buffalo, its employees from

13:58:15  1  publicly disclosing any records that would fall

13:58:17  2  into that.

13:58:19  3      Those concerns may not trouble you as a

13:58:22  4  nonlabor attorney who does not understand what

13:58:25  5  settlement agreement means, but I am telling you as

13:58:27  6  his attorney, out of an abundance of caution, I'm

13:58:31  7  going to object to the answer to that question

13:58:33  8  based upon this order to show cause.

13:58:34  9      I understand you may want to bring him back

13:58:37 10  once this litigation is completed and ask those

13:58:38 11  questions and that is different and we can address

13:58:40 12  that with the Court.

13:58:41 13      This is -- is very much an order from the

13:58:44 14  Court that I have concerns regarding.

13:58:47 15      **MR. DAVENPORT:**  So does a settlement

13:58:48 16  agreement mean anything besides a lawsuit that is

13:58:52 17  put forth against an officer where it results in a

13:58:54 18  settlement agreement?

13:58:56 19      **MS. HUGGINS:**  Lawsuit is different.  We're

13:58:57 20  talking about internal affairs.

13:58:59 21      **MR. DAVENPORT:**  Are there settlement

13:59:01 22  agreements for what internal affairs investigates?

13:59:03 23      **MS. HUGGINS:**  My understanding is that there

13:59:04  1    is.

13:59:05  2              **MR. DAVENPORT:**  Okay.  All right.

13:59:05  3              **MS. HUGGINS:**  And that where is my concern

13:59:07  4    lies.

13:59:08  5              **MR. DAVENPORT:**  All right.

13:59:08  6              **BY MR. DAVENPORT:**

13:59:09  7        Q.   Well, I'm going to ask the question and

13:59:12  8    it sounds like Ms. Huggins will object to it.  What

13:59:14  9    was the outcome of that other internal affairs

13:59:16 10    investigation?

13:59:17 11              **MS. HUGGINS:**  And citing Judge Sedita's

13:59:19 12    order to show cause, I'm going to object to that

13:59:23 13    question and ask that the witness not answer it.

13:59:28 14              **BY MR. DAVENPORT:**

13:59:28 15        Q.   As a witness, what sort of information

13:59:30 16    did you provide for that internal affairs

13:59:32 17    investigation?

13:59:34 18        A.   Pretty much it's just --

13:59:35 19              **MS. HUGGINS:**  Wait just a second.  Can you

13:59:35 20    read that back to me?

13:59:35 21              (The above-requested question was then read

13:59:47 22    by the reporter.)

13:59:47 23              **MS. HUGGINS:**  I'll allow that question to be

*Santana - Davenport - 9/8/20*

191

13:59:54   1   asked and answered generally without revealing the

14:00:08   2   specifics of what may be contained in that

14:00:10   3   investigation citing this order to show cause.

14:00:16   4         **BY MR. DAVENPORT:**

14:00:16   5         **Q.**   As a witness, what sort of information

14:00:18   6   were you required or did you provide as part of

14:00:21   7   this internal affairs investigation?

14:00:24   8         **A.**   Generally what happened in relating to

14:00:27   9   that incident where I was involved in as a witness.

14:00:34   10        **Q.**   Were you there present at the scene

14:00:36   11   when this incident took place that was the subject

14:00:37   12   of the internal affairs investigation?

14:00:39   13        **A.**   Are you talking about this incident or

14:00:41   14   are you just talking about in general?

14:00:42   15        **Q.**   Well, I'm talking about the previous

14:00:43   16   incident that you acted as a witness for.

14:00:46   17        **A.**   Yes, I was.

14:00:47   18        **Q.**   So you were present at the scene?

14:00:48   19        **A.**   Yes.   I was in the call log.   It didn't

14:00:51   20   mean that I was present when the incident happened.

14:00:54   21   Somehow it could have been where I was involved in

14:00:56   22   a call and they called me in to see what my role

14:00:59   23   was within that call.

*Santana - Davenport - 9/8/20*

192

14:01:00  1          Q.    So is it your understanding that only

14:01:03  2   those officers who are involved on the call log are

14:01:06  3   asked to give a witness statement for internal

14:01:09  4   affairs investigations?

14:01:10  5          A.    Everybody involved in that call whether

14:01:12  6   or not they were there or not.

14:01:15  7          Q.    But if they're listed on the call log,

14:01:17  8   correct?

14:01:18  9          A.    Yes.

14:01:18  10         Q.    Okay.  Because you weren't listed on

14:01:20  11  the call log for this incident that we're talking

14:01:22  12  about today.

14:01:23  13         A.    No.

14:01:24  14         Q.    Okay.  So that's why you wouldn't be

14:01:26  15  expected to provide a statement as a witness for

14:01:28  16  this internal affairs investigation?

14:01:31  17         MS. HUGGINS:    Form.  You're asking him to

14:01:32  18  speculate why internal affairs would do something.

14:01:35  19         MR. DAVENPORT:    No.  He said that we --

14:01:38  20  witnesses -- witness statements are expected of

14:01:40  21  people who are on a call log, so I'm just merely

14:01:43  22  clarifying that the reason why he was not expected

14:01:45  23  to give a witness statement was because he was not

14:01:48  1    listed on the call log.  It's -- it's already

14:01:50  2    been --

14:01:51  3         **MS. HUGGINS:**  Form.  Form.

14:01:52  4         **MR. DAVENPORT:**  Okay.  All right.

14:01:53  5         **MS. HUGGINS:**  Do you know why you didn't --

14:01:55  6    why you did or did not give a statement?

14:01:56  7         **MR. DAVENPORT:**  That's not the question I

14:01:57  8    asked.

14:01:58  9         **BY MR. DAVENPORT:**

14:01:59 10         Q.    My question is, is it because you were

14:02:01 11    not listed on the call log for this incident that

14:02:02 12    you were not asked to give a witness statement for

14:02:04 13    this incident that transpired on January 1st, 2017?

14:02:08 14         **MS. HUGGINS:**  Form.

14:02:09 15         **THE WITNESS:**  No, it's because I didn't see

14:02:11 16    the incident.  That's why I wasn't called.

14:02:14 17         **BY MR. DAVENPORT:**

14:02:14 18         Q.    Did they ask you if --

14:02:15 19         A.    I wasn't there.

14:02:16 20         Q.    -- you saw the incident?

14:02:18 21         A.    No one ever asked me anything, but I

14:02:20 22    wasn't there and I didn't see the incident, so

14:02:22 23    that's why they didn't call me in.

*Santana - Davenport - 9/8/20*

194

14:02:24  1        Q.   Okay.  Well, how do they know that you
14:02:27  2   didn't see the incident?
14:02:27  3        A.   I don't know.
14:02:28  4        MS. HUGGINS:  Form.
14:02:29  5        BY MR. DAVENPORT:
14:02:29  6        Q.   They never asked you, though, right?
14:02:30  7        MS. HUGGINS:  Form.
14:02:31  8        THE WITNESS:  No, I never got notified to go
14:02:33  9   up to internal affairs, no.
14:02:35 10        BY MR. DAVENPORT:
14:02:35 11        Q.   Did anybody besides somebody with
14:02:39 12   internal affairs ask you if you saw the incident?
14:02:41 13        A.   No.
14:02:41 14        Q.   So nobody ever asked you if you saw
14:02:43 15   what happened on January 1st of 2017 that's with
14:02:51 16   the City of Buffalo?
14:02:51 17        A.   No one asked, no.
14:02:54 18        Q.   But you yourself, you have never been
14:02:56 19   the target of an internal affairs investigation?
14:02:58 20        MS. HUGGINS:  No. That, I'm going to object
14:02:59 21   to under this TRO.
14:03:03 22        MR. DAVENPORT:  Okay.  I'm just going to
14:03:04 23   preserve the record and our ability to ask that

*Santana - Davenport - 9/8/20*

195

14:03:07  1    question.

14:03:07  2         MS. HUGGINS:   That's understood and then I

14:03:10  3    expect that we will probably have a conference and

14:03:11  4    address it with the Court.

14:03:12  5         MR. DAVENPORT:   I'm fine with that.

14:03:13  6         MS. HUGGINS:   Yeah.

14:03:16  7         BY MR. DAVENPORT:

14:03:17  8         Q.   Were you involved at all in the

14:03:18  9    criminal proceeding for Mr. Kistner?

14:03:21  10        A.   No.

14:03:23  11        Q.   Do you know the outcome --

14:03:25  12        A.   No, I --

14:03:26  13        Q.   -- of that criminal proceeding?

14:03:27  14        A.   -- do not.

14:03:31  15        MR. DAVENPORT:   All right.  I think that's

14:03:31  16    all that I have.

14:03:36  17        (Discussion off the record.)

14:03:36  18    **The following was marked for Identification:**

          19     **EXH. 37              Proposed Order to Show Cause**

14:04:15  20        MR. DAVENPORT:   I think we're all set for

14:04:16  21    today.

14:04:17  22        (Deposition concluded at 2:04 p.m.)

          23                  *    *    *

196

1          I hereby CERTIFY that I have read the

2     foregoing 195 pages, and that except as to those

3     changes (if any) as set forth in an attached errata

4     sheet, they are a true and accurate transcript of

5     the testimony given by me in the above entitled

6     action on September 8, 2020.

7

8

9                              ------------------------

10                                DAVID SANTANA

11

12

13

14

15

16

17

18

19

20

21

22

23

197

```
 1   STATE OF NEW YORK )

 2                            ss:

 3   COUNTY OF ERIE    )

 4

 5       I DO HEREBY CERTIFY as a Notary Public in and

 6   for the State of New York, that I did attend and

 7   report the foregoing deposition, which was taken

 8   down by me in a verbatim manner by means of machine

 9   shorthand.  Further, that the deposition was then

10   reduced to writing in my presence and under my

11   direction.  That the deposition was taken to be

12   used in the foregoing entitled action.  That the

13   said deponent, before examination, was duly sworn

14   to testify to the truth, the whole truth and

15   nothing but the truth, relative to said action.

16

17

18                        RICHARD B. WHALEN, CM,
                          Notary Public.
19

20

21

22

23
```

198

1                          INDEX TO EXHIBITS

2    Exhibit                 Description                    Page

3    EXH. 35          Buffalo Police Academy                 12
                      training records, three
4                     pages

5    EXH. 36          Buffalo Police Complaint               30
                      Summary Report, six pages
6
     EXH. 37          Proposed Order to Show                195
7                     Cause

8

9

10   * Exhibits retained by Mr. Davenport.

11

12

13

14

15

16

17

18

19

20

21

22

23

JACK W. HUNT & ASSOCIATES, INC.
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

199

1                           INDEX TO WITNESSES

2    Witness                Examination              Page

3     DAVID SANTANA          BY MR. DAVENPORT:          3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

*JACK W. HUNT & ASSOCIATES, INC.*

*1120 Liberty Building*

*Buffalo, New York  14202  -  (716) 853-5600*

1

## $

**$1,500** [1] - 151:1
**$250** [1] - 151:21

## '

**'bye** [1] - 172:21

## 0

**000217** [1] - 25:6
**06** [1] - 29:2
**0608** [1] - 32:16
**06_
20170101102529** [1] -
134:10
**06_
20170101105233** [2] -
100:17, 164:16
**0732** [1] - 32:16

## 1

**10** [4] - 28:22, 128:8,
128:16, 128:18
**100** [1] - 57:10
**10:13** [1] - 2:6
**10:55:42** [2] -
116:20, 126:19
**11** [6] - 9:14, 10:3,
100:10, 100:16,
134:9, 164:15
**1120** [1] - 2:4
**1137** [1] - 2:14
**11:03** [3] - 67:16,
83:9, 83:13
**11:03:20** [1] - 52:4
**11:07:31** [1] - 133:19
**11:22:34** [1] - 126:21
**11:30:35** [1] - 133:12
**12** [4] - 173:2, 173:3,
188:11, 198:3
**129** [2] - 46:20, 62:10
**12th** [1] - 58:23
**13** [1] - 134:14
**1305** [1] - 67:19
**1375** [1] - 149:16
**13th** [5] - 8:18,
10:16, 11:2, 11:14,
11:17
**14202** [2] - 2:10, 2:15
**14211** [1] - 3:2
**15** [1] - 128:8
**16** [15] - 22:8, 24:19,
33:14, 38:5, 38:19,
41:4, 41:6, 42:3,
42:10, 42:17, 43:18,
47:14, 49:17, 156:7,
170:22

**1600** [2] - 2:9, 29:4
**17** [1] - 151:8
**1773** [1] - 70:2
**18** [2] - 156:8, 168:10
**18-cv-00402** [1] - 1:8
**195** [2] - 196:2, 198:6
**1964** [1] - 69:21
**1:05** [3] - 67:20,
68:13, 83:10
**1:29** [1] - 56:1
**1st** [45] - 3:9, 6:21,
19:5, 19:8, 19:15,
20:1, 21:21, 22:5,
22:19, 23:4, 25:19,
30:6, 30:10, 31:4,
36:2, 37:1, 37:5,
37:18, 38:21, 40:13,
42:2, 43:10, 43:20,
45:16, 62:4, 66:10,
69:17, 84:2, 84:13,
89:6, 100:12, 115:7,
149:18, 149:23,
155:9, 155:18,
170:23, 172:3, 172:6,
173:18, 181:5,
182:14, 186:10,
193:13, 194:15

## 2

**2** [3] - 58:16, 90:4,
188:3
**20** [6] - 52:21, 75:3,
102:22, 128:8,
129:23, 130:3
**2004** [1] - 9:19
**2005** [4] - 8:10, 9:19,
9:21, 10:3
**2008** [4] - 13:4,
13:11, 13:23, 14:7
**2010** [1] - 8:10
**2012** [15] - 8:12,
8:14, 8:18, 10:14,
11:2, 11:12, 11:15,
11:17, 12:5, 12:7,
15:23, 17:5, 17:18,
17:22, 17:23
**2014** [1] - 178:14
**2015** [1] - 13:15
**2016** [7] - 58:13,
59:5, 66:14, 156:13,
157:8
**2017** [50] - 3:9, 6:21,
7:10, 7:12, 19:5, 19:8,
19:16, 20:1, 21:22,
22:5, 22:20, 23:4,
25:19, 30:3, 30:4,
30:6, 31:4, 36:2, 37:1,
37:5, 37:18, 38:21,
40:14, 42:3, 43:11,

43:20, 45:16, 62:4,
66:10, 66:20, 69:18,
84:3, 84:13, 89:6,
100:12, 115:7,
149:19, 149:23,
155:9, 155:18,
170:23, 171:4, 172:3,
172:7, 173:18, 181:5,
182:14, 186:10,
193:13, 194:15
**2018** [5] - 58:22,
58:23, 66:13, 156:13,
157:8
**2019** [3] - 15:23,
59:18, 90:12
**2020** [6] - 2:5, 20:20,
90:12, 90:13, 188:11,
196:6
**20th** [2] - 58:13,
58:14
**213** [2] - 41:8, 41:13
**21st** [2] - 15:23,
59:18
**221** [3] - 47:12,
47:13, 49:22
**222** [3] - 33:9, 33:10,
33:14
**230** [3] - 41:9, 69:16,
70:9
**231** [1] - 71:6
**232** [12] - 37:8,
37:10, 37:16, 37:23,
41:13, 48:21, 69:14,
70:9, 70:21, 71:5,
76:16, 77:4
**25** [2] - 24:3, 129:23
**250** [1] - 151:18
**254** [1] - 42:10
**27-year-old** [3] -
50:18, 50:21, 51:12
**27th** [1] - 13:15
**28** [4] - 127:2, 127:7,
127:11, 127:14
**28th** [1] - 59:5
**2:04** [1] - 195:22

## 3

**3** [5] - 46:15, 46:20,
47:19, 58:19, 199:3
**30** [7] - 127:7,
129:23, 130:2, 130:3,
131:22, 198:5
**32** [1] - 37:23
**33** [5] - 22:2, 23:20,
106:2, 124:19, 128:5
**35** [11] - 12:11,
12:14, 12:19, 45:9,
58:9, 58:12, 58:16,
58:19, 59:8, 130:2,

198:3
**36** [10] - 30:14,
30:16, 46:17, 47:19,
55:16, 62:6, 63:18,
67:13, 77:23, 198:5
**37** [4] - 133:20,
134:1, 195:19, 198:6

## 4

**4** [5] - 83:9, 89:16,
89:22, 90:1, 90:4
**4-A** [5] - 107:12,
116:19, 117:19,
133:11, 148:19
**44** [1] - 164:17
**473** [3] - 133:13,
170:20, 170:22
**4:00** [1] - 29:4

## 5

**5** [1] - 77:23
**52-year-old** [2] -
80:17, 80:20
**530** [1] - 49:18
**568** [1] - 71:9
**575** [3] - 71:1, 78:1,
78:16
**5th** [1] - 171:4

## 6

**60** [1] - 129:14
**60-page** [2] - 180:8,
181:15
**625** [10] - 24:1,
25:21, 155:17,
155:20, 156:7,
156:12, 156:14,
156:18, 157:6, 157:12
**633** [1] - 3:1
**6th** [1] - 15:23

## 7

**7** [1] - 90:4
**716** [2] - 2:10, 2:15
**788** [1] - 70:16
**7:18** [1] - 48:7

## 8

**8** [2] - 2:5, 196:6
**810** [4] - 155:22,
156:1, 156:8
**851-4334** [1] - 2:15
**854-3400** [1] - 2:10
**8:12** [2] - 75:10,
76:12
**8th** [1] - 13:4

## 9

**9** [1] - 173:21
**911** [3] - 78:14,
78:23, 81:5
**941** [49] - 47:4, 52:7,
52:15, 53:1, 53:8,
53:16, 54:3, 54:23,
55:10, 55:15, 55:17,
56:5, 56:11, 57:2,
57:3, 57:12, 57:20,
57:22, 58:3, 58:7,
58:17, 59:10, 59:15,
59:19, 60:3, 60:12,
60:14, 61:13, 61:21,
62:2, 62:5, 62:10,
62:17, 62:21, 62:23,
64:6, 64:9, 64:13,
64:14, 64:18, 64:19,
65:6, 66:9, 66:16,
80:23, 82:1, 82:10,
82:15
**964** [1] - 69:10
**9:25** [5] - 75:14,
75:17, 76:8, 76:10,
76:16
**9:50** [3] - 48:4, 71:18,
72:15

## A

**a.m** [11] - 2:6, 48:7,
71:18, 72:16, 75:11,
75:14, 75:17, 76:8,
76:10, 83:9, 83:13
**abide** [1] - 130:6
**ability** [3] - 5:16,
163:6, 194:23
**able** [12] - 25:3,
37:17, 50:6, 50:12,
74:23, 80:13, 81:6,
146:4, 152:20,
161:15, 185:12,
186:23
**above-requested** [1]
- 190:21
**absolutely** [4] -
130:10, 144:9, 159:9,
177:13
**abundance** [1] -
189:6
**Academy** [10] -
10:22, 11:5, 11:8,
11:14, 12:4, 12:7,
12:14, 12:23, 14:2,
198:3
**academy** [10] -
11:18, 15:1, 15:2,
15:14, 15:15, 17:5,
57:17, 67:10, 67:12,

131:6
acceptable [1] - 5:19
access [1] - 138:4
accident [4] - 32:2, 119:19, 161:11, 178:13
accidents [1] - 123:10
accommodate [1] - 5:23
according [33] - 13:19, 23:23, 24:21, 32:15, 34:23, 37:6, 41:4, 41:6, 44:2, 44:9, 47:10, 48:19, 49:21, 50:19, 51:14, 51:15, 51:19, 52:9, 56:1, 59:12, 67:17, 67:18, 69:2, 69:4, 71:6, 75:5, 76:3, 79:11, 80:11, 113:4, 127:5, 127:12, 127:17
accurate [2] - 116:6, 196:4
accuse [3] - 160:22, 162:20, 163:9
accusing [1] - 161:1
acted [1] - 191:16
acting [1] - 188:7
Action [1] - 1:7
action [5] - 89:14, 146:7, 196:6, 197:12, 197:15
active [5] - 13:3, 13:13, 13:18, 13:22, 14:7
actual [2] - 53:8, 53:16
add [2] - 95:1, 95:16
added [1] - 62:23
addition [1] - 16:23
address [2] - 189:11, 195:4
ADI [13] - 116:21, 116:22, 116:23, 117:2, 118:3, 118:6, 118:8, 120:8, 120:12, 120:20, 120:23, 121:7, 121:15
affairs [19] - 159:11, 159:15, 182:8, 182:19, 186:9, 186:13, 188:18, 189:20, 189:22, 190:9, 190:16, 191:7, 191:12, 192:4, 192:16, 192:18, 194:9, 194:12, 194:19
affiliated [1] - 7:18
afoul [1] - 184:18

afterwards [4] - 9:21, 33:3, 76:15, 176:17
agencies [1] - 170:7
ago [4] - 21:1, 25:8, 37:13, 132:2
agree [1] - 134:15
agreement [4] - 188:14, 189:5, 189:16, 189:18
agreements [3] - 188:2, 188:10, 189:22
ahead [1] - 63:16
air [1] - 118:18
aired [1] - 90:2
all-wheel [4] - 27:9, 27:16, 27:18, 28:3
allegations [5] - 177:17, 179:1, 180:9, 180:21, 188:10
allow [1] - 190:23
allowed [1] - 187:19
allowing [1] - 54:8
almost [2] - 48:14, 104:19
alternate [1] - 103:16
Alvarado [1] - 20:16
ambulance [35] - 117:3, 117:5, 117:7, 117:10, 117:15, 117:20, 117:22, 118:2, 118:7, 118:10, 118:12, 118:15, 118:19, 119:20, 120:3, 120:6, 121:1, 121:3, 121:22, 123:7, 123:16, 124:3, 124:5, 124:11, 124:18, 125:11, 125:12, 125:17, 125:19, 125:22, 125:23, 126:8, 126:12, 126:15, 127:20
ambulances [5] - 119:14, 119:18, 122:2, 122:19, 123:17
American [1] - 8:2
amount [7] - 36:19, 41:21, 43:15, 53:11, 150:23, 151:1, 151:23
answer [40] - 5:1, 5:15, 5:18, 5:19, 5:20, 45:10, 46:2, 54:20, 56:14, 64:23, 71:21, 72:11, 73:2, 81:10, 82:3, 93:3, 93:22, 94:5, 95:9, 96:3, 96:12, 108:20, 122:4, 130:19, 131:1, 134:17, 142:21,

145:22, 146:16, 160:1, 164:1, 176:12, 184:16, 185:7, 185:9, 185:13, 186:19, 187:13, 189:7, 190:13
answered [8] - 96:21, 109:9, 119:5, 142:14, 144:5, 144:13, 148:9, 191:1
answering [2] - 144:19, 185:2
answers [2] - 81:22, 82:4
Anthony [5] - 42:9, 42:17, 113:18, 158:9, 159:20
apartment [1] - 166:21
appear [1] - 38:6, 42:2, 101:13, 101:20, 148:12, 164:22, 179:17
APPEARANCES [1] - 2:8
appeared [3] - 4:10, 136:5, 162:18
appearing [1] - 105:17
Appearing [2] - 2:11, 2:16
applied [1] - 18:6
appointment [1] - 179:11
approached [1] - 115:23
approaching [1] - 135:20
approximation [1] - 57:8
area [5] - 39:8, 39:19, 103:13, 108:13, 128:21
areas [4] - 95:12, 129:5, 129:21, 130:16
arm [1] - 178:12
arrest [7] - 48:20, 48:21, 53:18, 54:13, 54:22, 76:13, 149:4
arrested [6] - 55:5, 55:9, 112:12, 112:16, 148:13, 148:19
arresting [1] - 149:8
arrests [2] - 74:18, 149:5
arrive [4] - 118:15, 124:19, 127:20, 173:12
arrived [8] - 97:2, 98:11, 107:6, 113:2, 113:6, 118:11,

118:19, 118:21
arriving [2] - 99:14, 118:12
article [1] - 91:14
Ashley [4] - 47:22, 71:23, 73:13, 77:11
assign [6] - 32:23, 33:4, 33:5, 55:14, 68:19, 97:17
assigned [49] - 10:23, 19:19, 19:21, 20:2, 20:3, 20:5, 33:7, 33:17, 33:23, 34:10, 34:12, 35:4, 35:5, 35:10, 36:6, 36:9, 36:12, 36:17, 36:23, 37:3, 37:7, 37:10, 37:12, 37:14, 37:17, 37:21, 38:3, 38:7, 38:10, 38:16, 38:20, 38:22, 39:2, 39:9, 41:19, 42:4, 42:23, 43:2, 43:4, 43:19, 44:16, 45:17, 46:1, 49:17, 50:1, 68:4, 156:16, 157:3, 174:11
assigning [2] - 50:3, 50:4
assist [1] - 50:4
assistance [4] - 68:8, 108:14, 111:4, 111:19
Assistant [1] - 2:14
assistant [1] - 119:22
assisted [1] - 31:7
assisting [3] - 63:12, 77:16, 108:8
associate's [2] - 7:22, 8:1
associated [4] - 69:21, 70:8, 70:13, 94:22
ASSOCIATES [1] - 2:4
assume [7] - 34:19, 51:1, 71:17, 72:9, 126:22, 158:5, 177:7
assumed [1] - 4:15
assuming [5] - 3:19, 84:9, 88:12, 147:20, 176:19
assumption [1] - 107:3
attached [1] - 196:3
attempted [1] - 79:2
attend [1] - 197:6
attendance [1] - 16:17
attest [4] - 141:10,

118:19, 118:21
141:14, 141:17, 141:21
attorney [12] - 4:4, 4:9, 5:16, 5:21, 7:14, 177:10, 177:16, 180:23, 182:2, 189:4, 189:6
attorneys [3] - 94:21, 177:7, 177:20
available [1] - 28:5
Avenue [7] - 68:13, 69:6, 69:10, 69:22, 70:2, 70:16, 105:23
Avenues [1] - 69:8
average [2] - 28:20, 75:3
avoid [1] - 132:11
aware [19] - 3:8, 122:1, 122:5, 123:6, 123:16, 124:10, 124:13, 124:16, 124:18, 158:4, 159:13, 159:17, 162:14, 164:5, 175:6, 180:14, 182:21, 186:7, 186:12

B

BAASE [1] - 2:8
backed [1] - 103:17
backup [3] - 46:12, 49:20
backwards [7] - 131:16, 131:18, 131:20, 131:23, 132:1, 132:6, 132:9
Bailey [6] - 68:13, 69:6, 69:8, 69:10, 69:21, 70:2
BALL [1] - 2:12
base [3] - 53:12, 142:15
based [30] - 15:19, 37:10, 42:3, 58:11, 72:8, 72:12, 78:15, 79:6, 80:1, 80:2, 93:13, 96:9, 98:2, 98:7, 102:2, 117:18, 137:19, 137:21, 141:20, 145:7, 145:12, 145:15, 146:6, 146:20, 148:18, 150:6, 150:12, 150:13, 189:8
basing [1] - 141:3
basis [4] - 21:10, 35:20, 57:23, 173:4
bathroom [1] - 68:21
became [5] - 8:19,

10:13, 18:21, 19:2, 20:19
**become** [9] - 8:16, 8:17, 17:6, 17:11, 20:17, 33:1, 84:11, 86:16, 87:8
**becomes** [1] - 88:5
**beforehand** [1] - 5:21
**beginning** [5] - 99:22, 100:18, 101:19, 134:11, 143:11
**behalf** [2] - 178:18, 180:15
**behavior** [1] - 60:16
**behind** [4] - 103:17, 106:10, 112:5, 159:3
**below** [2] - 171:6, 171:9
**belt** [1] - 171:10
**best** [7] - 5:15, 44:1, 60:11, 80:2, 122:7, 158:6, 163:5
**between** [9] - 15:22, 28:11, 28:15, 29:16, 86:9, 92:7, 126:18, 127:15, 130:3
**beyond** [1] - 55:13
**big** [1] - 39:22
**bin** [5] - 176:2, 176:14, 176:17, 176:21, 177:1
**binder** [1] - 89:1
**bins** [1] - 176:1
**bit** [1] - 147:1
**blanketly** [1] - 140:12
**book** [1] - 151:6
**booked** [1] - 54:15
**booking** [16] - 48:22, 54:15, 56:19, 73:15, 75:7, 75:17, 75:19, 75:21, 76:4, 76:5, 76:9, 76:12, 76:17, 76:20, 77:4, 148:22
**border** [1] - 40:18
**bottom** [1] - 13:16
**boundaries** [1] - 40:5
**boyfriend** [2] - 118:2, 118:8
**Bravo** [1] - 21:3
**break** [2] - 5:22, 84:3
**breaking** [1] - 164:23
**breaks** [4] - 83:14, 83:18, 84:5, 84:9
**briefings** [2] - 173:13, 173:16
**briefly** [1] - 95:8

**bring** [6] - 14:8, 94:17, 146:1, 173:17, 185:12, 189:9
**bringing** [1] - 94:22
**brings** [1] - 55:8
**broad** [2] - 183:3, 184:14
**broadly** [1] - 82:5
**Broadway** [4] - 105:18, 106:23, 107:4, 130:1
**broke** [3] - 133:12, 133:17, 178:12
**broken** [1] - 149:14
**brought** [2] - 159:14, 163:21
**Brownell** [5] - 47:20, 47:21, 71:23, 73:13, 77:11
**BUFFALO** [1] - 1:9
**Buffalo** [50] - 1:11, 1:12, 1:13, 1:14, 1:15, 1:16, 1:17, 1:18, 2:4, 2:10, 2:15, 3:1, 10:14, 10:22, 11:5, 11:8, 11:14, 12:3, 12:7, 12:14, 12:23, 14:2, 14:9, 15:4, 15:5, 15:10, 15:13, 15:16, 15:17, 17:5, 21:5, 25:16, 30:16, 40:7, 67:9, 67:11, 75:19, 86:15, 87:21, 87:22, 88:4, 169:12, 170:8, 170:10, 177:22, 184:22, 188:23, 194:16, 198:3, 198:5
**buffalo.com** [1] - 2:16
**Building** [2] - 2:4, 2:9
**Burgess** [7] - 31:15, 41:2, 41:11, 41:12, 41:13, 41:15, 44:6
**burglary** [1] - 129:13
**burn** [1] - 78:6
**busy** [3] - 53:5, 83:20, 128:2
**butchering** [1] - 106:20
**BY** [117] - 3:5, 3:22, 4:7, 4:19, 5:7, 7:5, 10:7, 12:17, 14:15, 21:20, 25:22, 30:5, 30:19, 35:2, 35:19, 53:14, 55:4, 56:17, 65:4, 72:2, 72:13, 76:6, 79:13, 80:8, 81:12, 82:7, 82:17, 83:8, 85:14, 87:2,

90:22, 91:5, 92:11, 92:20, 93:2, 93:6, 93:12, 95:22, 96:7, 96:17, 97:1, 99:12, 100:5, 100:14, 101:17, 102:14, 103:23, 105:7, 107:10, 109:1, 110:17, 116:18, 117:14, 118:22, 119:7, 119:13, 121:12, 122:8, 123:5, 123:23, 124:9, 125:8, 125:20, 126:5, 128:17, 129:18, 130:4, 130:20, 133:10, 134:22, 135:17, 136:3, 136:11, 136:18, 137:18, 139:1, 139:10, 140:9, 140:22, 141:18, 143:2, 143:10, 143:17, 144:22, 145:6, 146:19, 148:11, 150:11, 154:2, 158:1, 160:7, 161:14, 162:13, 163:8, 163:19, 164:4, 164:13, 165:14, 165:20, 166:3, 166:9, 171:12, 176:15, 177:14, 180:5, 181:14, 182:17, 186:6, 190:6, 190:14, 191:4, 193:9, 193:17, 194:5, 194:10, 195:7, 199:3
**BYRON** [1] - 1:10

# C

**c/o** [1] - 1:9
**C2** [1] - 33:18
**C232** [1] - 69:6
**calendar** [1] - 179:10
**caller** [5] - 78:5, 79:11, 80:5, 80:9, 80:18
**camera** [2] - 139:7, 166:7
**cameras** [4] - 76:22, 133:20, 134:1, 138:11
**cancel** [16] - 119:18, 120:1, 120:3, 120:5, 120:8, 120:12, 120:20, 120:22, 121:7, 121:15, 121:20, 121:22, 122:2, 125:18, 125:23
**canceled** [11] -

119:14, 123:7, 123:17, 124:3, 124:11, 124:18, 125:11, 125:12, 125:22, 126:8, 126:12
**canceling** [2] - 122:19, 122:23
**cannot** [2] - 127:22, 184:20
**capacity** [8] - 1:10, 1:12, 1:13, 1:14, 1:15, 1:16, 1:17, 1:18
**car** [69] - 21:11, 23:23, 24:2, 24:3, 24:5, 24:10, 26:8, 28:8, 32:1, 32:3, 32:5, 32:6, 33:20, 39:12, 42:22, 49:11, 68:19, 77:6, 77:9, 83:18, 83:22, 92:7, 96:2, 100:23, 101:3, 102:22, 103:2, 103:11, 111:20, 111:21, 116:21, 117:8, 117:11, 118:6, 119:2, 119:10, 125:10, 125:16, 126:19, 127:15, 131:15, 132:16, 133:13, 143:6, 143:13, 143:23, 145:1, 145:5, 145:20, 147:10, 153:4, 153:20, 154:6, 155:9, 155:12, 155:17, 155:18, 155:21, 156:8, 156:12, 157:1, 157:3, 157:6, 157:7, 157:12, 160:9, 165:16, 169:15, 170:18
**care** [5] - 156:18, 157:21, 159:4, 159:5, 162:11
**career** [1] - 109:10
**carry** [1] - 177:8
**cars** [7] - 27:20, 33:4, 43:16, 97:19, 104:20, 128:9, 153:1
**case** [12] - 4:17, 6:17, 26:12, 93:5, 163:2, 174:2, 174:4, 174:7, 174:10, 174:16, 174:18, 174:20
**caused** [1] - 157:16
**causing** [3] - 152:9, 152:10, 161:3
**caution** [1] - 189:6
**CB** [4] - 48:21,

148:22, 149:6
**cell** [2] - 113:21, 114:4
**centers** [1] - 41:19
**central** [16] - 48:22, 54:15, 56:19, 73:15, 75:7, 75:17, 75:18, 75:21, 76:4, 76:9, 76:12, 76:17, 76:20, 77:4, 148:22
**certain** [10] - 15:12, 17:10, 29:17, 33:22, 42:23, 73:10, 81:8, 122:5, 132:1, 132:11
**certainly** [1] - 145:12
**CERTIFY** [2] - 196:1, 197:5
**CHAD** [1] - 2:9
**chain** [1] - 159:17
**chair** [1] - 143:1
**chambers** [1] - 95:3
**change** [4] - 75:7, 75:14, 76:8, 154:9
**changed** [3] - 40:13, 66:10, 126:20
**changes** [2] - 41:22, 196:3
**Channel** [4] - 89:16, 89:22, 90:1, 90:4
**channel** [1] - 90:3
**charge** [8] - 15:8, 33:2, 150:4, 150:5, 151:13, 152:2, 152:6
**charged** [4] - 149:18, 149:22, 150:2, 163:11
**Charger** [8] - 24:6, 26:13, 27:8, 28:5, 28:7, 155:8, 155:22, 156:1
**charges** [1] - 163:21
**charging** [1] - 151:13
**Charlie** [18] - 33:9, 33:10, 33:14, 33:19, 37:8, 37:10, 37:16, 39:5, 41:13, 42:22, 47:12, 47:13, 48:20, 49:22, 71:5, 71:6, 76:16, 77:4
**check** [1] - 130:13
**checking** [1] - 130:11
**Chevy** [7] - 24:11, 27:12, 27:13, 101:7, 103:18, 112:5, 147:19
**circle** [1] - 103:18
**circumstances** [7] - 55:12, 119:17, 120:2, 123:2, 123:16, 124:2, 154:21
**citing** [3] - 185:5,

4

190:11, 191:3
**CITY** [1] - 1:9
**City** [14] - 2:14, 15:4, 15:5, 15:10, 25:16, 75:19, 86:15, 169:12, 170:8, 170:10, 177:22, 184:21, 188:23, 194:16
**city** [14] - 4:22, 6:11, 59:14, 63:22, 64:3, 169:18, 169:19, 170:13, 176:19, 177:7, 177:10, 177:20, 178:13, 184:20
**city-involved** [1] - 178:13
**Civil** [2] - 1:7, 2:3
**civil** [5] - 3:13, 3:17, 3:19, 4:8, 6:6
**Clarence** [1] - 44:12
**clarification** [1] - 85:12
**clarify** [1] - 30:1
**clarifying** [1] - 192:22
**clarity** [1] - 139:19
**class** [1] - 133:3
**classes** [1] - 131:13
**classrooms** [1] - 133:5
**clear** [6] - 102:17, 110:18, 141:21, 144:10, 176:6, 181:7
**cleared** [6] - 32:16, 48:3, 52:3, 52:4, 53:19, 54:2
**clearing** [4] - 54:4, 54:8, 54:17, 180:11
**clearly** [1] - 146:13
**clerk** [1] - 95:4
**clerk's** [1] - 95:11
**client** [1] - 178:18
**clip** [3] - 90:18, 92:3, 134:14
**close** [2] - 127:7, 151:16
**closer** [1] - 40:18
**closing** [2] - 9:2, 9:3
**CM** [2] - 2:6, 197:18
**cold** [2] - 102:3, 102:4
**collect** [2] - 161:13, 162:12
**collide** [4] - 135:13, 143:23, 145:1, 145:5
**collided** [2] - 143:6, 143:13
**colliding** [2] - 115:18, 143:20

**collision** [1] - 92:7
**colored** [1] - 147:8
**colors** [1] - 147:18
**column** [2] - 13:2, 13:22
**comfortable** [2] - 27:20, 127:10
**commencing** [1] - 2:5
**Commissioner** [2] - 1:10, 1:12
**committed** [1] - 147:7
**communicate** [2] - 113:22, 114:14
**company** [3] - 176:3, 176:18, 178:17
**compares** [1] - 138:15
**complain** [1] - 152:19
**Complaint** [2] - 30:16, 198:5
**complaint** [37] - 31:1, 31:2, 31:5, 32:18, 33:6, 62:16, 62:20, 69:5, 75:5, 78:15, 79:7, 80:4, 84:20, 85:17, 85:19, 85:23, 86:7, 87:3, 107:15, 126:17, 175:15, 175:17, 176:5, 176:7, 177:11, 177:17, 178:15, 178:23, 179:20, 179:23, 180:22, 181:16, 181:19, 181:22, 182:4, 186:17, 186:21
**complaints** [7] - 172:6, 172:10, 173:17, 175:23, 177:22, 186:14, 187:2
**complete** [4] - 63:13, 95:13, 125:6, 153:11
**completed** [6] - 12:3, 62:11, 63:5, 153:12, 189:10
**complex** [1] - 166:21
**computer** [4] - 66:17, 66:19, 66:21, 67:2
**concern** [6] - 14:8, 185:2, 185:4, 185:8, 185:19, 190:3
**concerned** [1] - 14:12
**concerning** [1] - 188:9
**concerns** [2] - 189:3,

189:14
**concert** [1] - 188:8
**concluded** [1] - 195:22
**conclusion** [1] - 149:6
**concrete** [1] - 103:13
**condition** [1] - 172:2
**conditions** [1] - 101:23
**cones** [1] - 132:1
**conference** [3] - 159:20, 160:3, 195:3
**conferring** [2] - 5:16, 5:20
**confirm** [1] - 82:8
**conflating** [1] - 85:2
**confused** [2] - 4:12, 85:2
**confusing** [3] - 99:2, 99:9, 99:22
**confusion** [4] - 99:21, 144:8, 179:16, 181:8
**consisted** [1] - 60:8
**constitute** [1] - 149:4
**contact** [1] - 78:22
**contacted** [1] - 95:2
**contained** [1] - 191:2
**contents** [2] - 185:3, 185:10
**context** [4] - 3:14, 3:17, 6:5, 187:7
**continue** [1] - 95:11
**contracted** [1] - 169:18
**control** [1] - 122:11
**conversation** [1] - 112:19
**conversations** [5] - 114:12, 115:6, 115:10, 115:12, 172:22
**cooling** [1] - 171:7
**copy** [7] - 85:22, 88:9, 175:14, 175:19, 176:12, 183:5, 183:7
**corner** [1] - 101:4
**Corporation** [5] - 1:9, 2:13, 2:14, 8:23, 179:4
**correct** [73] - 6:6, 13:6, 13:23, 15:6, 17:15, 19:9, 23:3, 23:5, 23:13, 32:12, 37:19, 38:4, 38:8, 38:11, 38:14, 38:15, 38:17, 38:18, 38:23, 41:3, 41:17, 42:13, 46:10, 46:13, 47:15,

50:7, 52:17, 55:21, 55:23, 56:21, 56:23, 57:1, 58:14, 59:3, 61:3, 64:4, 64:20, 67:12, 67:21, 69:1, 69:7, 69:14, 69:15, 69:19, 70:10, 70:11, 70:22, 71:10, 72:6, 73:15, 73:16, 75:12, 77:12, 79:9, 102:23, 105:6, 126:9, 126:10, 127:13, 140:13, 141:7, 152:3, 157:9, 157:14, 167:23, 168:1, 168:4, 168:8, 170:3, 174:17, 175:9, 175:13, 192:8
**costs** [1] - 94:21
**Counsel** [4] - 1:9, 2:13, 2:14, 179:4
**counsel** [2] - 94:11, 185:14
**County** [1] - 86:15
**COUNTY** [1] - 197:3
**couple** [3] - 5:9, 18:19, 90:14
**course** [3] - 16:3, 16:5, 17:4
**courses** [6] - 14:4, 15:21, 16:8, 16:18, 17:2, 59:9
**COURT** [2] - 1:3, 2:19
**Court** [8] - 86:15, 162:7, 163:4, 183:11, 189:12, 189:14, 195:4
**court** [15] - 3:18, 86:12, 86:22, 87:4, 88:23, 95:10, 162:18, 163:2, 175:2, 175:7, 179:17, 179:23, 181:10, 181:12
**Court's** [1] - 94:4
**courthouse** [1] - 86:14
**courts** [3] - 162:6, 163:3, 175:4
**cover** [2] - 35:8, 39:7
**covers** [1] - 39:20
**crime** [21] - 41:23, 138:1, 138:5, 138:10, 145:8, 145:14, 145:20, 146:4, 146:20, 146:23, 147:5, 149:2, 149:3, 149:13, 150:4, 150:17, 150:21, 151:3, 160:22, 162:19, 163:11
**criminal** [10] - 3:13,

3:17, 146:7, 149:8, 150:18, 150:21, 151:17, 152:6, 195:9, 195:13
**Crown** [3] - 24:11, 27:15, 156:23
**crystal** [1] - 144:9
**CUNNINGHAM** [1] - 2:8
**curve** [3] - 106:7, 106:9, 106:11
**custody** [2] - 134:16, 134:20

---

**D**

**damage** [10] - 31:18, 31:21, 32:10, 150:23, 151:21, 152:5, 157:16, 161:3, 161:9, 166:5
**damages** [1] - 151:17
**DANIEL** [1] - 1:11
**Daniels** [3] - 24:23, 25:9, 44:11
**date** [24] - 8:11, 11:20, 14:20, 15:9, 20:20, 22:18, 23:13, 25:19, 31:2, 31:3, 37:14, 38:7, 41:18, 43:6, 90:8, 105:17, 143:16, 152:21, 171:3, 171:15, 178:10, 179:6, 179:8, 181:12
**dates** [5] - 8:5, 8:8, 11:21, 19:3, 67:6
**davenport** [1] - 198:10
**DAVENPORT** [183] - 2:9, 3:5, 3:22, 4:6, 4:7, 4:19, 5:7, 7:4, 7:5, 10:7, 12:10, 12:17, 14:15, 21:20, 25:22, 30:4, 30:5, 30:13, 30:18, 30:19, 35:2, 35:19, 53:14, 55:4, 56:11, 56:17, 65:4, 72:2, 72:13, 76:6, 79:13, 80:8, 81:12, 82:7, 82:17, 83:8, 85:7, 85:13, 85:14, 87:1, 87:2, 90:22, 91:5, 92:11, 92:19, 92:20, 93:2, 93:6, 93:11, 93:12, 93:18, 93:21, 94:1, 94:6, 94:10, 95:19, 95:22, 96:7, 96:17,

97:1, 99:12, 100:3,
100:5, 100:14,
101:15, 101:17,
102:14, 103:23,
105:7, 107:10, 109:1,
110:17, 116:15,
116:18, 117:14,
118:22, 119:7,
119:13, 121:12,
122:8, 123:5, 123:23,
124:9, 125:5, 125:8,
125:20, 126:5,
128:17, 129:18,
130:4, 130:20, 133:7,
133:10, 134:22,
135:17, 136:3,
136:11, 136:18,
137:18, 139:1,
139:10, 140:9,
140:22, 141:18,
142:10, 143:2,
143:10, 143:17,
144:7, 144:15,
144:20, 144:22,
145:6, 145:11,
145:18, 146:6, 146:9,
146:17, 146:19,
148:11, 150:11,
153:15, 154:1, 154:2,
158:1, 158:17, 160:7,
161:14, 162:13,
163:8, 163:19, 164:4,
164:13, 165:14,
165:20, 166:3, 166:9,
171:12, 176:7,
176:15, 177:14,
179:21, 180:5,
181:14, 182:17,
183:5, 183:8, 183:13,
183:20, 184:12,
185:4, 185:11,
185:16, 185:20,
186:6, 186:22, 187:4,
187:10, 187:16,
187:18, 188:1,
188:12, 188:15,
189:15, 189:21,
190:2, 190:5, 190:6,
190:14, 191:4,
192:19, 193:4, 193:7,
193:9, 193:17, 194:5,
194:10, 194:22,
195:5, 195:7, 195:15,
195:20, 199:3
davenport@
ruppbase.com [1] -
2:11
**DAVID** [5] - 1:1, 1:17,
2:1, 196:9, 199:3
**days** [4] - 6:3, 45:4,
83:21, 155:16

**dealt** [1] - 125:15
**death** [6] - 122:6,
122:18, 123:3, 123:8,
123:13, 124:4
**decipher** [1] - 140:11
**decision** [1] - 132:13
**deducing** [1] - 43:16
**Defendant** [1] - 2:2
**defendant** [1] - 6:14,
91:18, 92:17, 94:11,
151:14
**defendants** [1] -
89:14
**Defendants** [2] -
1:19, 2:16
**define** [1] - 173:10
**definitely** [1] - 145:9
**degree** [5] - 7:22,
8:1, 8:15, 150:18,
150:22
**demand** [1] - 153:22
**demeanor** [1] -
141:12
**denied** [1] - 18:9
**department** [11] -
13:11, 15:7, 15:12,
15:16, 21:11, 86:1,
86:21, 86:22, 87:22,
177:20
**Department** [13] -
1:11, 1:12, 10:14,
14:9, 15:10, 15:13,
15:16, 15:18, 21:5,
40:7, 87:22, 87:23,
88:5
**deployed** [1] - 10:9
**deponent** [1] -
197:13
**deposed** [2] -
182:18, 182:22
**Deposition** [1] -
195:22
**deposition** [33] -
3:10, 3:23, 4:5, 4:9,
4:13, 4:21, 5:9, 5:17,
6:4, 7:7, 7:15, 87:12,
94:18, 94:21, 94:23,
95:12, 98:20, 98:23,
99:10, 99:22, 100:1,
124:17, 167:16,
183:12, 183:21,
184:9, 185:13,
185:22, 186:1, 186:5,
197:7, 197:9, 197:11
**DERENDA** [1] - 1:11
**describe** [3] - 60:4,
135:9, 165:9
**described** [1] - 61:1
**describes** [2] -
152:5, 175:10

**Description** [1] -
198:2
**designated** [1] - 46:8
**designation** [1] -
151:3
**designators** [1] -
156:6
**destroy** [1] - 176:19
**details** [9] - 48:11,
50:13, 50:14, 109:15,
109:21, 110:12,
110:22, 155:7, 181:4
**detained** [2] -
134:16, 148:13
**detaining** [1] - 149:8
**determination** [1] -
81:3
**determine** [19] -
24:14, 25:4, 29:17,
32:17, 32:21, 34:6,
34:8, 34:9, 37:17,
40:2, 50:6, 50:13,
55:17, 56:4, 56:6,
56:16, 60:21, 61:6,
94:19
**devices** [1] - 114:14
**diagnosis** [1] - 61:20
**DID** [5] - 25:5, 25:7,
26:10, 27:3, 27:5
**difference** [1] - 66:18
**different** [22] - 21:1,
35:9, 35:17, 35:18,
37:4, 39:3, 40:23,
44:13, 53:21, 66:15,
68:2, 73:20, 73:23,
74:6, 141:15, 142:18,
142:20, 147:3, 170:6,
170:16, 189:11,
189:19
**differently** [1] -
108:18
**direct** [2] - 93:21,
187:12
**direction** [1] - 197:11
**directly** [1] - 144:14
**dirt** [1] - 103:12
**disagrees** [1] -
185:23
**discern** [1] - 149:1
**discharged** [1] -
10:11
**discipline** [4] -
130:15, 130:21,
159:6, 159:10
**disclose** [1] - 185:9
**disclosing** [3] -
184:10, 188:8, 189:1
**disclosure** [3] -
183:18, 184:3, 187:19
**discovery** [1] -

153:22
**discuss** [3] - 3:8,
63:14, 84:21
**discussing** [2] -
55:20, 62:10
**Discussion** [9] -
12:12, 21:19, 65:3,
94:8, 100:13, 116:17,
133:9, 171:11, 195:17
**discussions** [1] -
166:14
**dislodged** [3] -
152:10, 152:17,
171:18
**dislodging** [1] -
161:2
**dispatch** [13] -
32:23, 33:3, 46:2,
49:20, 49:21, 49:22,
50:4, 50:15, 77:8,
79:2, 108:12, 108:15,
113:23
**dispatched** [1] -
34:23
**disposition** [4] -
62:23, 149:2, 187:9
**district** [5] - 21:1,
21:2, 25:12, 25:14,
33:22
**DISTRICT** [2] - 1:3,
1:4
**District** [10] - 21:3,
25:10, 33:19, 34:2,
34:7, 39:6, 42:13,
42:22, 158:11, 158:18
**districts** [2] - 42:4,
75:20
**DO** [1] - 197:5
**Doat** [1] - 71:9
**doctors** [1] - 54:6
**document** [81] -
12:20, 13:14, 13:19,
15:20, 22:13, 22:19,
24:22, 25:3, 30:21,
30:22, 33:13, 34:23,
43:1, 44:2, 44:9, 47:3,
47:10, 49:15, 49:16,
50:7, 50:12, 50:19,
51:16, 51:19, 52:5,
56:1, 56:3, 58:11,
63:21, 63:22, 64:1,
64:2, 64:3, 64:5, 64:8,
64:9, 67:17, 69:3,
71:18, 72:15, 76:11,
79:12, 80:11, 80:14,
83:11, 107:13,
107:18, 107:21,
108:16, 118:10,
118:13, 118:15,
118:20, 127:6,

127:17, 148:23,
151:10, 153:19,
154:10, 160:15,
160:21, 161:5,
161:16, 166:5,
168:11, 168:14,
168:16, 168:20,
173:21, 175:5, 177:4,
177:15, 180:1, 180:8,
180:12, 180:15,
180:18, 181:9, 181:11
**documentation** [24] -
14:13, 14:16, 16:4,
23:23, 37:6, 43:15,
48:19, 49:22, 51:14,
52:9, 52:14, 59:13,
67:18, 72:8, 73:4,
73:9, 78:12, 78:13,
78:20, 79:4, 79:18,
127:12, 176:2, 177:8
**documentations** [1]
- 98:8
**documented** [1] -
155:7
**documents** [6] -
153:4, 176:23,
183:20, 184:7, 184:8,
184:12
**Dodge** [4] - 24:6,
28:5, 28:7, 155:8
**DOE(S** [1] - 1:18
**done** [10] - 3:20, 6:1,
57:6, 66:12, 76:13,
152:5, 161:9, 171:6,
177:21, 181:1
**door** [1] - 136:1
**doors** [1] - 78:23
**down** [7] - 22:9,
23:7, 78:6, 105:18,
107:4, 148:1, 197:8
**downtime** [1] - 67:23
**drive** [23] - 24:3,
27:9, 27:16, 27:17,
27:18, 27:23, 28:3,
28:16, 68:4, 105:18,
107:1, 112:1, 112:2,
122:19, 128:4, 131:3,
132:1, 132:9, 155:10,
155:16, 155:20,
155:21
**driven** [1] - 155:18
**driver** [1] - 32:11
**driver's** [10] - 136:1,
137:12, 152:7,
152:11, 161:2, 161:4,
171:14, 171:18,
171:22
**drives** [2] - 27:14,
28:11
**driving** [23] - 24:15,

6

26:13, 29:20, 49:18,
103:8, 107:4, 129:4,
129:21, 130:2,
130:16, 131:7,
131:14, 131:15,
131:18, 131:20,
131:22, 131:23,
132:6, 132:20,
132:22, 135:10,
155:9, 170:22
  **drop** [1] - 176:16
  **dropped** [2] - 103:9,
103:16
  **drove** [3] - 52:7,
103:12, 157:8
  **due** [1] - 163:3
  **duly** [2] - 3:2, 197:13
  **duration** [1] - 101:12
  **during** [15] - 16:17,
28:4, 60:2, 67:23,
72:23, 83:14, 88:7,
99:3, 119:15, 131:6,
131:13, 132:8,
132:17, 132:19,
173:16
  **duty** [3] - 29:10,
55:13, 119:15

**E**

  **East** [1] - 3:1
  **eat** [3] - 83:21, 83:22,
84:7
  **ECMC** [24] - 52:7,
52:11, 52:20, 53:4,
53:6, 53:12, 53:16,
53:19, 54:1, 54:3,
54:6, 54:18, 55:1,
56:20, 60:22, 61:22,
65:10, 65:12, 120:7,
122:20, 126:20,
127:1, 127:16, 128:5
  **education** [1] - 7:20
  **eight** [11] - 18:2,
42:18, 42:20, 42:21,
43:2, 43:4, 43:15,
43:16, 45:17, 56:23
  **either** [4] - 68:6,
102:15, 134:19, 164:7
  **elapsed** [1] - 127:15
  **elements** [1] -
150:20
  **employed** [2] - 8:20,
8:22
  **employee** [2] -
87:21, 184:22
  **employees** [1] -
188:23
  **encompasses** [2] -
40:22, 183:4

  **end** [2] - 104:19,
174:10
  **ended** [2] - 67:16,
73:14
  **ends** [1] - 40:3
  **entered** [2] - 11:8,
188:10
  **entire** [12] - 23:17,
29:6, 34:15, 34:16,
45:22, 72:4, 72:23,
73:1, 73:9, 104:16,
130:13, 132:21
  **entirety** [1] - 106:22
  **entitled** [2] - 196:5,
197:12
  **environment** [1] -
41:23
  **ERIE** [1] - 197:3
  **Erin** [1] - 44:10
  **errata** [1] - 196:3
  **ESQ** [3] - 2:9, 2:12,
2:13
  **estimate** [3] - 75:1,
75:2, 154:14
  **evaluated** [3] -
52:12, 55:1, 83:5
  **event** [1] - 122:16
  **eventually** [1] - 45:4
  **everywhere** [1] -
107:9
  **evidence** [8] -
160:21, 161:5,
161:13, 162:12,
162:16, 162:19,
163:10, 163:22
  **exact** [13] - 35:17,
36:19, 37:14, 41:21,
52:19, 53:11, 57:5,
57:7, 60:9, 74:7,
74:17, 135:7, 178:13
  **exam** [7] - 47:3, 56:2,
56:10, 56:12, 62:11,
63:1, 64:10
  **EXAMINATION** [1] -
3:5
  **examination** [14] -
52:8, 52:16, 53:2,
53:8, 53:16, 55:11,
55:18, 60:3, 64:13,
65:7, 81:1, 82:2,
82:11, 197:13
  **Examination** [2] -
2:1, 199:2
  **examinations** [2] -
57:3, 57:12
  **example** [1] - 149:13
  **examples** [1] - 68:7
  **except** [1] - 196:2
  **excess** [1] - 151:21
  **EXH** [6] - 12:14,

30:16, 195:19, 198:3,
198:5, 198:6
  **exhibit** [1] - 135:15
  **Exhibit** [43] - 12:11,
12:19, 22:8, 24:19,
30:14, 33:14, 38:5,
38:19, 41:4, 41:6,
42:3, 42:10, 42:17,
43:18, 45:9, 46:17,
47:14, 47:19, 49:17,
55:16, 58:9, 58:12,
58:16, 58:19, 59:8,
62:6, 63:18, 67:13,
77:23, 100:10,
100:16, 107:12,
116:19, 117:19,
133:11, 134:9,
148:19, 151:8,
164:15, 168:10,
170:22, 173:21, 198:2
  **EXHIBITS** [1] - 198:1
  **exhibits** [1] - 98:8
  **Exhibits** [1] - 198:10
  **exist** [1] - 153:17
  **exiting** [1] - 135:21
  **exonerated** [1] -
187:20
  **expand** [1] - 129:10
  **expect** [7] - 74:2,
117:7, 117:10,
118:14, 125:9,
158:10, 195:3
  **expectation** [1] -
157:15
  **expectations** [6] -
157:20, 158:2, 158:4,
158:19, 158:21,
159:22
  **expected** [10] -
39:14, 67:22, 73:18,
100:8, 129:4, 154:18,
159:22, 192:15,
192:20, 192:22
  **experience** [2] -
120:11, 121:23
  **expert** [1] - 83:3
  **explain** [2] - 88:3,
140:19
  **extent** [1] - 153:17

**F**

  **face** [6] - 13:14,
114:12, 130:15,
130:21, 159:6
  **face-to-face** [1] -
114:12
  **faced** [1] - 122:15
  **faces** [1] - 148:3
  **facility** [1] - 54:10

  **fact** [8] - 28:2, 56:18,
73:11, 76:7, 92:16,
93:5, 167:12, 167:15
  **factors** [1] - 105:15
  **facts** [2] - 116:10,
116:11
  **factually** [2] - 93:7,
145:19
  **fair** [1] - 99:21
  **fall** [2] - 28:6, 189:1
  **false** [2] - 13:7, 13:9
  **familiar** [3] - 105:22,
106:2, 150:17
  **families** [1] - 61:14
  **family** [3] - 61:10,
66:1, 66:4
  **far** [1] - 131:20
  **fast** [5] - 65:1,
128:22, 128:23,
129:1, 130:16
  **father** [2] - 92:5,
116:2
  **feature** [1] - 27:11
  **February** [1] - 13:4
  **Federal** [1] - 2:2
  **fees** [1] - 94:21
  **feet** [1] - 102:22
  **felony** [2] - 149:22,
150:7, 151:3
  **female** [9] - 50:20,
50:22, 50:23, 51:2,
51:4, 78:5, 80:17,
118:1, 118:7
  **Ferry** [1] - 3:1
  **fiancée** [2] - 89:19,
89:21
  **field** [9] - 17:6,
17:12, 18:1, 18:6,
18:11, 18:14, 18:16,
19:2, 19:4
  **fifth** [1] - 42:12
  **file** [2] - 176:4,
178:10
  **filed** [1] - 178:15
  **files** [1] - 182:6
  **fill** [16] - 16:4, 29:8,
29:11, 29:13, 58:4,
63:8, 63:11, 153:7,
154:4, 154:18,
154:23, 155:2,
158:11, 159:7, 169:6,
170:15
  **filled** [11] - 62:1,
62:5, 62:13, 62:16,
62:21, 64:12, 153:19,
157:12, 157:17,
169:8, 169:10
  **filling** [3] - 29:21,
30:7, 160:8
  **Fillmore** [1] - 70:16

  **fills** [2] - 29:17, 169:3
  **fine** [7] - 39:7, 100:6,
138:19, 146:2,
184:14, 185:17, 195:5
  **firearms** [1] - 73:21
  **first** [25] - 5:10, 13:2,
13:15, 13:17, 13:21,
14:17, 18:21, 21:4,
24:17, 31:6, 31:14,
37:12, 41:5, 41:15,
48:7, 59:8, 65:23,
84:11, 90:17, 113:7,
124:14, 124:21,
126:8, 126:21, 131:9
  **five** [12] - 9:6, 42:14,
42:17, 100:19,
100:20, 101:14,
101:18, 104:6, 104:8,
105:2, 105:3, 164:19
  **fixed** [2] - 31:23,
171:14
  **flees** [1] - 32:8
  **fleet** [1] - 168:23
  **flopping** [6] - 133:21,
134:2, 134:5, 134:6,
135:4
  **fluid** [1] - 34:11
  **focused** [1] - 167:9
  **follow** [2] - 129:8,
158:23
  **following** [3] - 12:13,
30:15, 195:18
  **follows** [1] - 3:3
  **footage** [2] - 100:11,
138:1, 138:3, 139:3,
139:6, 139:12,
167:19, 168:6
  **foregoing** [3] -
196:2, 197:7, 197:12
  **form** [126] - 10:4,
14:11, 16:2, 25:20,
30:1, 34:21, 34:22,
35:15, 53:9, 54:20,
56:9, 62:2, 62:17,
62:21, 63:4, 63:6,
63:8, 63:21, 64:1,
64:3, 64:6, 64:7, 64:8,
64:12, 64:13, 64:14,
64:19, 66:17, 71:21,
72:11, 72:21, 76:2,
78:18, 79:10, 80:7,
81:10, 82:3, 82:12,
83:7, 90:21, 91:3,
92:9, 92:14, 96:3,
96:12, 96:15, 96:21,
102:10, 103:20,
105:4, 107:7, 108:20,
110:15, 111:1,
116:14, 117:12,
118:16, 119:3,

119:11, 121:10,
122:4, 122:21,
123:19, 124:7,
125:13, 126:1,
128:12, 129:6,
129:22, 130:17,
134:17, 135:15,
136:2, 136:8, 136:15,
137:16, 138:16,
139:9, 139:16,
140:15, 141:9, 142:8,
142:13, 143:7,
143:14, 145:3, 145:9,
146:12, 148:7, 150:8,
153:7, 153:11,
153:16, 153:17,
153:23, 154:4,
154:18, 155:1,
157:12, 157:18,
157:19, 158:13,
160:1, 160:17, 161:6,
162:4, 162:22,
163:14, 163:23,
165:11, 165:17,
165:23, 166:6,
168:19, 170:14,
170:16, 170:19,
177:12, 182:15,
192:17, 193:3,
193:14, 194:4, 194:7

**forms** [4] - 45:13,
57:2, 62:5, 158:12

**forth** [4] - 50:15,
100:16, 189:17, 196:3

**forward** [4] - 17:23,
140:1, 165:10, 186:4

**forwards** [1] - 132:7

**four** [13] - 34:5,
35:13, 38:10, 39:7,
40:21, 42:4, 45:3,
154:16, 154:17,
165:5, 174:15

**fourth** [3] - 22:9,
23:7, 164:15

**frame** [4] - 53:4,
53:20, 53:21, 143:7

**front** [11] - 13:14,
24:22, 27:14, 27:16,
27:17, 47:11, 52:10,
116:11, 127:18,
151:6, 165:16

**front-wheel** [3] -
27:14, 27:16, 27:17

**full** [1] - 44:8

**function** [3] - 152:20,
161:4, 174:13

**functioning** [1] -
130:14

**functions** [1] -
175:11

## G

**garage** [11] - 153:7,
154:11, 155:3,
160:13, 169:9,
169:17, 169:21,
170:1, 170:5, 170:12,
170:15

**gas** [6] - 138:10,
138:11, 138:17,
139:3, 139:6, 139:12

**gathering** [1] - 47:2

**general** [16] - 35:20,
36:1, 60:7, 106:5,
109:14, 110:12,
110:19, 111:7,
113:10, 129:3,
129:20, 168:19,
172:5, 172:9, 184:3,
191:14

**generally** [58] -
24:16, 26:14, 29:19,
30:9, 33:3, 33:21,
35:8, 42:21, 44:17,
45:12, 45:15, 45:23,
53:18, 58:2, 60:4,
60:19, 65:19, 68:4,
68:10, 76:13, 77:6,
77:19, 81:2, 82:20,
82:23, 86:12, 88:21,
89:18, 108:13, 109:6,
109:7, 109:17,
109:20, 111:11,
111:14, 113:23,
114:9, 116:9, 119:19,
119:22, 122:17,
129:7, 135:8, 154:8,
155:17, 157:7,
157:10, 160:4, 161:8,
161:20, 162:5, 165:8,
168:13, 175:2,
175:10, 177:21,
191:1, 191:8

**gentleman** [1] -
148:17

**given** [12] - 3:10,
34:11, 41:18, 55:15,
57:16, 84:19, 98:20,
154:7, 154:14,
175:19, 179:8, 196:5

**gong** [1] - 22:7

**Gorski** [3] - 44:5,
71:7, 79:19

**grab** [2] - 58:8, 162:8

**graduate** [1] - 8:4

**grainy** [6] - 96:13,
137:22, 139:13,
139:22, 140:13

**grainy-quality** [1] -
137:22

**great** [1] - 138:23

**greater** [1] - 151:17

**ground** [8] - 5:9,
102:7, 133:21, 134:2,
134:3, 134:5, 134:7,
135:5

**group** [2] - 164:20,
164:23

**grudges** [1] - 163:7

**guess** [6] - 32:9,
37:15, 77:14, 88:2,
102:13, 103:15

**guidance** [3] - 94:4,
95:6, 95:11

**guidelines** [1] -
40:13

**guilty** [2] - 163:4,
187:21

**guy** [2] - 26:11,
26:15

**guys** [4] - 4:11,
64:23, 111:6, 175:23

## H

**half** [8] - 48:14,
73:23, 74:3, 84:9,
126:23, 127:3, 127:5,
127:9

**half-hour** [5] - 73:23,
74:3, 84:9, 127:5,
127:9

**Hall** [1] - 2:14

**hall** [2] - 4:22, 6:12

**hand** [2] - 12:18,
101:4

**handcuffed** [1] -
148:16

**handed** [2] - 88:20,
180:8

**hang** [1] - 187:17

**happy** [1] - 5:23

**harassment** [2] -
149:14, 149:15

**harm** [6] - 61:13,
81:16, 81:20, 82:14

**harming** [2] - 60:20,
65:7, 65:17

**haste** [1] - 129:16

**hate** [1] - 63:17

**head** [4] - 5:11, 5:12,
25:2, 58:6

**headquarters** [1] -
56:7

**health** [20] - 47:3,
52:16, 52:21, 53:1,
55:18, 56:2, 56:12,
57:12, 57:16, 57:18,
58:22, 59:19, 60:3,
61:8, 63:1, 64:9, 81:1,

82:1, 82:11, 83:3

**heard** [6] - 122:18,
124:1, 126:6, 130:18,
130:23, 131:2

**hearing** [1] - 188:5

**heavy** [2] - 128:7

**Heidinger** [1] - 44:11

**help** [9] - 61:23,
77:20, 109:13,
109:19, 110:1, 110:8,
111:8, 111:12, 111:13

**helps** [1] - 61:21

**hereby** [2] - 188:6,
196:1

**HEREBY** [1] - 197:5

**herself** [3] - 50:1,
50:3, 82:14

**hi** [1] - 172:20

**High** [3] - 71:1, 78:1,
78:16

**high** [3] - 9:8,
129:20, 131:15

**high-priority** [1] -
129:20

**highest** [1] - 7:20

**himself** [12] - 68:19,
73:3, 76:23, 92:13,
92:22, 93:8, 94:16,
96:1, 96:11, 96:20,
96:23, 119:21

**his/their** [1] - 1:18

**history** [7] - 174:2,
174:4, 174:7, 174:10,
174:16, 174:18,
174:20

**hit** [12] - 31:18, 32:7,
116:20, 117:8,
117:11, 118:6, 119:2,
119:9, 125:10,
125:16, 126:19,
127:15

**hit-and-run** [2] -
31:18, 32:7

**hits** [1] - 32:7

**hold** [3] - 78:13,
163:6, 177:4

**honorably** [1] -
10:11

**horizontal** [2] -
106:18, 106:19

**hospital** [12] - 53:5,
119:23, 120:10,
120:13, 121:9,
121:16, 122:3, 123:1,
123:4, 123:12,
123:15, 126:14

**hour** [10] - 73:23,
74:3, 74:15, 84:9,
126:23, 127:4, 127:5,
127:9, 130:3, 131:22

**hours** [8] - 28:22,
48:15, 52:23, 59:1,
59:2, 59:6, 59:14,
74:20

**house** [12] - 29:12,
32:7, 68:21, 78:6,
83:23, 86:13, 88:10,
89:1, 89:3, 114:2,
167:5, 176:1

**houses** [1] - 166:22

**HSBC** [4] - 8:23, 9:4,
9:10, 9:15

**HUGGINS** [169] -
2:13, 2:21, 3:16, 4:4,
4:11, 4:17, 5:1, 5:4,
5:6, 6:22, 7:2, 10:4,
14:11, 25:20, 30:1,
34:21, 35:15, 53:9,
54:20, 56:9, 56:14,
64:22, 71:21, 72:11,
72:21, 76:2, 79:10,
80:7, 81:10, 82:3,
82:12, 83:7, 85:1,
85:5, 85:8, 85:10,
86:20, 90:21, 91:3,
92:9, 92:14, 92:16,
92:23, 93:4, 93:9,
93:16, 93:20, 93:23,
94:3, 95:1, 96:3,
96:12, 96:21, 99:2,
99:6, 99:9, 99:20,
100:1, 101:14,
101:16, 102:10,
103:20, 105:4, 107:7,
108:20, 110:15,
111:1, 116:14,
117:12, 118:16,
119:3, 119:5, 119:11,
121:10, 122:4,
122:21, 123:19,
124:7, 125:4, 125:6,
125:13, 126:1,
128:12, 129:6,
129:22, 130:17,
134:17, 135:15,
136:2, 136:8, 136:15,
137:16, 138:16,
139:9, 139:16,
140:15, 141:9, 142:8,
142:13, 143:7,
143:14, 144:4, 144:8,
144:11, 144:18,
145:3, 145:9, 145:16,
146:3, 146:8, 146:11,
148:7, 148:9, 150:8,
153:21, 157:19,
158:13, 158:15,
160:1, 161:6, 162:4,
162:22, 163:14,
163:16, 163:23,

165:11, 165:17, 165:23, 166:6, 176:5, 176:9, 177:12, 179:15, 179:19, 179:22, 181:7, 182:15, 183:1, 183:7, 183:9, 183:17, 184:10, 184:13, 185:5, 185:15, 185:17, 186:18, 187:3, 187:6, 187:14, 187:17, 187:23, 188:3, 188:14, 188:22, 189:19, 189:23, 190:3, 190:11, 190:19, 190:23, 192:17, 193:3, 193:5, 193:14, 194:4, 194:7, 194:20, 195:2, 195:6
**Huggins** [2] - 2:20, 190:8
**HUNT** [1] - 2:4

**I**

**I'm..** [1] - 146:16
**ice** [2] - 102:12, 102:15
**idea** [3] - 60:7, 72:19, 188:16
**Identification** [3] - 12:13, 30:15, 195:18
**identifier** [1] - 64:3
**identifies** [1] - 63:22
**identifying** [1] - 25:5
**immediate** [2] - 159:16, 160:12
**implied** [1] - 37:15
**in-class** [1] - 133:3
**inadvertently** [1] - 185:9
**incident** [63] - 3:9, 6:19, 7:7, 23:20, 23:21, 29:18, 31:6, 31:10, 46:18, 47:19, 48:1, 48:3, 48:6, 49:2, 50:9, 67:15, 70:23, 78:1, 79:17, 79:20, 84:12, 89:6, 89:22, 92:2, 96:5, 96:6, 97:18, 98:22, 100:12, 109:15, 113:11, 113:19, 117:16, 124:12, 137:8, 140:20, 141:2, 149:13, 152:14, 159:14, 160:2, 168:6, 174:5, 174:21, 175:12, 181:19,

182:14, 182:19, 182:23, 186:10, 191:9, 191:11, 191:13, 191:16, 191:20, 192:11, 193:11, 193:13, 193:16, 193:20, 193:22, 194:2, 194:12
**incidents** [3] - 22:5, 30:9, 164:10
**include** [2] - 130:9, 130:11
**incredibly** [1] - 184:14
**INDEX** [2] - 198:1, 199:1
**indicate** [10] - 23:9, 49:23, 50:2, 51:11, 52:6, 56:19, 72:15, 75:16, 151:20, 171:13
**indicated** [1] - 95:4
**indicates** [1] - 37:21
**indicating** [5] - 95:17, 104:3, 104:5, 153:23, 185:1
**individual** [43] - 34:1, 52:7, 52:12, 54:2, 54:5, 55:9, 55:15, 60:17, 61:22, 66:1, 66:4, 81:4, 94:14, 96:1, 96:19, 112:11, 117:11, 120:7, 121:16, 122:7, 122:20, 122:23, 125:21, 127:1, 127:16, 134:15, 134:23, 135:19, 136:4, 136:13, 138:3, 140:6, 141:6, 142:11, 143:6, 143:12, 143:13, 143:22, 145:20, 148:13, 148:19, 150:4, 163:11
**individually** [8] - 1:10, 1:11, 1:13, 1:14, 1:15, 1:16, 1:17, 1:18
**individuals** [4] - 77:9, 115:7, 148:5, 166:18
**infer** [1] - 76:8
**informal** [1] - 95:7
**information** [7] - 47:2, 61:20, 171:3, 174:3, 176:22, 190:15, 191:5
**infraction** [2] - 68:10, 159:16
**initial** [5] - 32:18, 78:23, 131:9, 131:13, 180:7

**initiated** [1] - 181:16
**injunction** [1] - 188:6
**injured** [12] - 32:11, 118:8, 120:17, 121:2, 121:8, 122:3, 123:8, 123:10, 123:14, 123:17, 124:5, 126:14
**inside** [7] - 29:11, 29:12, 29:14, 53:4, 104:15, 104:17, 105:10
**inspection** [1] - 153:8
**instance** [3] - 32:5, 32:9, 161:1
**instances** [7] - 29:22, 99:17, 123:14, 124:2, 124:4, 149:11, 154:22
**instead** [2] - 49:7, 112:5
**instruct** [2] - 145:22, 185:7
**instruction** [1] - 133:3
**instructor** [1] - 132:18
**insurance** [1] - 178:17
**intent** [1] - 133:18
**intentionally** [3] - 133:13, 133:18, 161:2
**Intercontinental** [1] - 8:2
**internal** [19] - 159:11, 159:14, 182:8, 182:19, 186:9, 186:13, 188:17, 189:20, 189:22, 190:9, 190:16, 191:7, 191:12, 192:3, 192:16, 192:18, 194:9, 194:12, 194:19
**interpret** [1] - 187:5
**interpretation** [1] - 80:3
**interpreting** [1] - 187:6
**interrogatories** [5] - 99:3, 99:10, 99:15, 100:2, 168:3
**intersection** [2] - 106:14, 130:1
**interview** [1] - 60:18
**interviewed** [1] - 182:14
**investigated** [1] - 186:8
**investigates** [1] - 189:22

**investigating** [1] - 186:13
**investigation** [11] - 161:12, 182:8, 185:10, 188:18, 190:10, 190:17, 191:3, 191:7, 191:12, 192:16, 194:19
**investigations** [1] - 192:4
**involved** [10] - 48:23, 60:13, 178:13, 181:20, 183:22, 191:9, 191:21, 192:2, 192:5, 195:8
**involving** [1] - 32:3
**Iraq** [3] - 9:15, 9:18, 10:9
**irrational** [2] - 46:22, 50:17
**issue** [4] - 159:5, 183:9, 184:13, 185:18
**issued** [1] - 188:7
**issues** [1] - 61:7
**it'** [1] - 51:9
**item** [1] - 139:21
**itself** [6] - 53:8, 65:14, 135:16, 136:10, 146:14, 158:22

**J**

**JACK** [1] - 2:3
**JAMES** [2] - 1:6, 2:17
**January** [59] - 3:9, 6:21, 8:18, 10:16, 11:2, 11:14, 11:17, 15:23, 19:5, 19:8, 19:15, 20:1, 20:19, 20:20, 21:21, 22:5, 22:19, 23:4, 25:19, 30:3, 30:4, 30:6, 30:10, 31:4, 36:2, 37:1, 37:5, 37:18, 38:21, 40:13, 42:2, 43:10, 43:20, 45:16, 59:17, 62:4, 66:10, 69:17, 84:2, 84:13, 89:6, 100:12, 102:4, 115:7, 149:18, 149:23, 155:9, 155:18, 170:23, 171:4, 172:3, 172:6, 173:18, 181:5, 182:14, 186:10, 193:13, 194:15
**Jenny** [3] - 26:6, 158:9, 159:21
**JENNY** [1] - 1:14

**Jim** [1] - 183:22
**job** [3] - 9:7, 120:9, 163:5
**JOHN** [1] - 1:18
**Johnson** [1] - 44:11
**joined** [1] - 10:5
**Joseph** [28] - 19:14, 19:15, 20:7, 20:11, 20:21, 21:4, 21:7, 21:16, 22:9, 23:2, 23:6, 23:12, 28:12, 29:16, 34:18, 47:16, 47:23, 49:4, 68:14, 68:16, 71:18, 72:16, 72:19, 73:14, 76:1, 76:20, 98:3, 114:22
**judge** [3] - 93:23, 94:1, 94:7
**Judge** [2] - 95:4, 190:11
**judgment** [1] - 122:13
**jump** [1] - 21:11
**June** [5] - 15:23, 58:13, 58:14, 59:5, 188:11
**jurisdiction** [1] - 54:13

**K**

**KARL** [1] - 1:15
**Karl** [4] - 26:6, 44:4, 69:17
**keep** [10] - 14:19, 14:23, 63:17, 176:4, 177:11, 181:22, 182:1, 182:2, 182:6
**keeping** [1] - 33:13
**kept** [3] - 16:17, 176:11, 179:12
**Kevin** [1] - 44:10
**kill** [1] - 78:6
**kind** [7] - 9:1, 24:5, 24:10, 101:22, 130:2, 131:11, 174:3
**Kistner** [2] - 149:18, 195:9
**KISTNER** [2] - 1:6, 2:17
**Kistner's** [1] - 115:21
**knocking** [1] - 78:23
**knowing** [1] - 112:15
**knowledge** [1] - 66:9
**knows** [1] - 158:18
**KYLE** [1] - 1:16
**Kyle** [2] - 26:7, 44:4

9

## L

**lab** [14] - 48:22, 73:15, 73:18, 73:20, 74:3, 74:8, 74:12, 75:2, 76:15, 76:16, 76:17, 76:23, 77:14, 77:18
**labeled** [1] - 46:9
**labor** [1] - 187:7
**language** [3] - 183:2, 183:3, 184:14
**last** [21] - 4:2, 4:16, 4:22, 19:1, 36:14, 44:7, 45:22, 48:17, 66:4, 67:7, 71:8, 83:7, 84:14, 84:21, 90:14, 94:13, 98:20, 99:8, 112:3, 116:14, 136:2
**lasted** [2] - 32:14, 48:14
**Laura** [1] - 26:7
**LAUREN** [1] - 1:13
**Law** [1] - 184:3
**law** [9] - 7:17, 57:16, 57:19, 87:22, 95:4, 95:11, 100:6, 151:6, 152:2
**laws** [1] - 130:6
**lawsuit** [35] - 3:17, 4:8, 6:6, 6:15, 6:20, 6:23, 7:6, 7:8, 84:12, 85:6, 86:4, 86:17, 87:7, 87:8, 87:18, 87:23, 88:4, 88:5, 91:11, 91:17, 91:20, 176:8, 177:5, 177:6, 178:11, 180:7, 180:9, 180:20, 181:16, 183:19, 184:2, 184:4, 189:16, 189:19
**lawsuits** [1] - 178:3
**lead** [1] - 95:8
**leads** [1] - 78:21
**learn** [3] - 100:7, 167:12, 167:15
**learned** [2] - 66:14, 126:9
**learning** [1] - 124:22
**leave** [1] - 54:9
**left** [5] - 10:2, 76:17, 101:4, 132:14, 156:20
**left-hand** [1] - 101:4
**less** [2] - 162:9, 172:17
**letting** [2] - 88:17, 88:22
**level** [1] - 7:20
**liaison** [6] - 86:22, 87:4, 87:8, 179:17,

179:23, 181:10
**Liberty** [2] - 2:4, 2:9
**Liddell** [9] - 46:19, 46:20, 49:2, 50:10, 51:13, 55:22, 62:10, 67:15, 69:1
**lies** [1] - 190:4
**lieutenant** [2] - 34:9, 114:1
**lieutenants** [1] - 159:20
**life** [7] - 28:18, 122:6, 122:18, 123:3, 123:8, 123:13, 124:4
**life-and-death** [5] - 122:6, 122:18, 123:8, 123:13, 124:4
**life-or-death** [1] - 123:3
**light** [1] - 128:8
**lights** [3] - 128:11, 128:14, 128:18
**limit** [1] - 130:5
**line** [6] - 22:9, 50:20, 79:3, 94:11, 119:15, 171:8
**listed** [15] - 23:7, 24:1, 37:8, 43:18, 45:9, 46:18, 58:16, 107:23, 152:9, 174:6, 174:16, 192:7, 192:10, 193:1, 193:11
**litigation** [2] - 183:10, 189:10
**live** [2] - 90:5, 90:6
**LLC** [1] - 2:8
**locate** [1] - 81:7
**location** [6] - 31:9, 75:6, 75:13, 76:7, 79:16, 126:20
**locked** [1] - 176:2
**LOCKWOOD** [1] - 1:10
**Loepere** [1] - 31:11
**log** [8] - 47:17, 191:19, 192:2, 192:7, 192:11, 192:21, 193:1, 193:11
**logs** [1] - 62:12
**longest** [2] - 52:22, 74:11
**look** [4] - 62:6, 107:9, 148:3, 183:6
**looking** [1] - 24:19, 33:6, 37:16, 38:5, 38:19, 62:12, 126:17, 152:12, 170:21, 188:16
**lookout** [1] - 140:5
**lost** [1] - 88:2

**love** [1] - 28:2
**low** [4] - 139:13, 140:6, 140:8, 140:12
**low-quality** [2] - 139:13, 140:12
**lower** [3] - 27:3, 27:5, 139:7
**lower-quality** [1] - 139:7
**Lucia** [1] - 44:4
**lunch** [5] - 83:14, 83:17, 83:22, 84:3, 84:5

## M

**machine** [1] - 197:8
**MAEVE** [1] - 2:13
**Magistrate** [1] - 95:3
**mailbox** [1] - 179:12
**main** [2] - 130:1, 174:22
**maintain** [1] - 175:14
**maintained** [2] - 40:7, 40:10
**maintenance** [4] - 169:1, 169:10, 169:11, 169:13
**major** [1] - 61:11
**majority** [2] - 20:7, 35:21
**male** [9] - 116:20, 117:8, 118:6, 119:2, 119:9, 125:10, 126:19, 127:15
**malfunction** [2] - 152:11, 161:3
**malfunctioning** [1] - 171:22
**man** [3] - 133:20, 134:2, 134:6, 135:3
**management** [1] - 168:23
**mandatory** [2] - 61:1, 61:4
**manner** [2] - 141:13, 197:8
**manual** [1] - 158:22
**manufactured** [1] - 156:9
**maps** [1] - 40:4
**March** [1] - 58:23
**Margaret** [4] - 20:16, 20:17, 21:7, 21:16
**marked** [15] - 12:10, 12:13, 12:19, 22:8, 30:13, 30:15, 100:10, 100:15, 107:12, 134:9, 151:8, 164:14, 168:10, 173:20,

195:18
**markers** [1] - 40:1
**matter** [1] - 39:4
**Matthew** [1] - 95:4
**McCarthy** [2] - 95:3, 95:5
**McDermott** [12] - 1:13, 26:7, 26:20, 38:9, 44:3, 97:8, 104:13, 153:16, 171:1, 172:2, 172:13, 173:16
**McHugh** [6] - 42:9, 42:17, 113:19, 113:22, 158:9, 159:20
**ME** [1] - 5:23
**mean** [27] - 31:20, 54:5, 56:9, 74:4, 76:21, 82:5, 91:3, 102:11, 120:11, 122:12, 132:9, 136:19, 138:18, 138:20, 138:22, 140:17, 142:20, 146:15, 158:17, 161:19, 162:6, 163:3, 163:17, 163:18, 179:20, 189:16, 191:20
**means** [5] - 48:22, 161:19, 188:16, 189:5, 197:8
**media** [1] - 116:9
**medication** [1] - 61:19
**meeting** [2] - 85:3, 159:21
**meets** [1] - 106:13
**mental** [21] - 47:3, 52:15, 52:21, 53:1, 55:18, 56:2, 56:11, 57:12, 57:16, 57:18, 58:22, 59:18, 60:3, 61:7, 61:8, 63:1, 64:9, 81:1, 82:1, 82:10, 83:3
**mentioned** [1] - 123:9
**merely** [1] - 192:21
**merry** [1] - 109:19
**mhuggins@city** [1] - 2:16
**mhuggins@city-buffalo.com** [1] - 2:16
**middle** [10] - 26:4, 38:2, 40:19, 42:18, 103:3, 137:5, 137:14, 165:4, 165:12, 188:3
**might** [5] - 60:8, 76:21, 76:22, 99:2,

106:20
**miles** [3] - 39:22, 130:3, 131:22
**military** [3] - 9:11, 9:13, 14:4
**minute** [4] - 82:21, 134:14, 145:17, 164:17
**minutes** [15] - 52:22, 66:6, 73:22, 75:4, 127:2, 127:7, 127:8, 127:11, 127:14, 127:23, 128:8, 128:9, 128:16, 128:18, 165:5
**mirror** [9] - 133:13, 133:17, 152:7, 152:8, 152:9, 152:16, 161:3, 171:14, 171:18
**mirror(sic** [1] - 161:4
**mirrors** [1] - 130:12
**mischief** [3] - 150:18, 150:21, 151:17
**misdemeanor** [1] - 151:4
**model** [1] - 156:13
**moment** [2] - 64:22, 165:10
**money** [1] - 138:21
**month** [2] - 17:4, 172:19
**months** [8] - 9:16, 11:6, 11:7, 11:20, 11:22, 18:3, 90:14, 131:9
**Moriarty** [11] - 26:7, 26:18, 31:16, 38:6, 44:5, 69:17, 70:7, 97:6, 104:14, 147:17, 147:23
**MORIARTY** [1] - 1:16
**morning** [6] - 3:7, 29:2, 99:15, 130:13, 167:23, 173:12
**Mortgage** [1] - 8:23
**mortgages** [1] - 9:2
**most** [5] - 24:16, 24:20, 26:11, 26:15, 27:6
**mostly** [1] - 175:7
**mother** [1] - 78:7
**motion** [1] - 94:19
**Mountain** [1] - 176:4
**move** [2] - 163:6, 186:3
**MR** [182] - 3:5, 3:22, 4:6, 4:7, 4:19, 5:7, 7:4, 7:5, 10:7, 12:10, 12:17, 14:15, 21:20, 25:22, 30:4, 30:5,

30:13, 30:18, 30:19,
35:2, 35:19, 53:14,
55:4, 56:11, 56:17,
65:4, 72:2, 72:13,
76:6, 79:13, 80:8,
81:12, 82:7, 82:17,
83:8, 85:7, 85:13,
85:14, 87:1, 87:2,
90:22, 91:5, 92:11,
92:19, 92:20, 93:2,
93:6, 93:11, 93:12,
93:18, 93:21, 94:1,
94:6, 94:10, 95:19,
95:22, 96:7, 96:17,
97:1, 99:12, 100:3,
100:5, 100:14,
101:15, 101:17,
102:14, 103:23,
105:7, 107:10, 109:1,
110:17, 116:15,
116:18, 117:14,
118:22, 119:7,
119:13, 121:12,
122:8, 123:5, 123:23,
124:9, 125:5, 125:8,
125:20, 126:5,
128:17, 129:18,
130:4, 130:20, 133:7,
133:10, 134:22,
135:17, 136:3,
136:11, 136:18,
137:18, 139:1,
139:10, 140:9,
140:22, 141:18,
142:10, 143:2,
143:10, 143:17,
144:7, 144:15,
144:20, 144:22,
145:6, 145:11,
145:18, 146:6, 146:9,
146:17, 146:19,
148:11, 150:11,
153:15, 154:1, 154:2,
158:1, 158:17, 160:7,
161:14, 162:13,
163:8, 163:19, 164:4,
164:13, 165:14,
165:20, 166:3, 166:9,
171:12, 176:7,
176:15, 177:14,
179:21, 180:5,
181:14, 182:17,
183:5, 183:8, 183:13,
183:20, 184:12,
185:4, 185:11,
185:16, 185:20,
186:6, 186:22, 187:4,
187:10, 187:16,
187:18, 188:1,
188:12, 188:15,
189:15, 189:21,

190:2, 190:5, 190:6,
190:14, 191:4,
192:19, 193:4, 193:7,
193:9, 193:17, 194:5,
194:10, 194:22,
195:5, 195:7, 195:15,
195:20, 199:3
  MS [168] - 2:21, 3:16,
4:4, 4:11, 4:17, 5:1,
5:4, 5:6, 6:22, 7:2,
10:4, 14:11, 25:20,
30:1, 34:21, 35:15,
53:9, 54:20, 56:9,
56:14, 64:22, 71:21,
72:11, 72:21, 76:2,
79:10, 80:7, 81:10,
82:3, 82:12, 83:7,
85:1, 85:5, 85:8,
85:10, 86:20, 90:21,
91:3, 92:9, 92:14,
92:16, 92:23, 93:4,
93:9, 93:16, 93:20,
93:23, 94:3, 95:1,
96:3, 96:12, 96:21,
99:2, 99:6, 99:9,
99:20, 100:1, 101:14,
101:16, 102:10,
103:20, 105:4, 107:7,
108:20, 110:15,
111:1, 116:14,
117:12, 118:16,
119:3, 119:5, 119:11,
121:10, 122:4,
122:21, 123:19,
124:7, 125:4, 125:6,
125:13, 126:1,
128:12, 129:6,
129:22, 130:17,
134:17, 135:15,
136:2, 136:8, 136:15,
137:16, 138:16,
139:9, 139:16,
140:15, 141:9, 142:8,
142:13, 143:7,
143:14, 144:4,
144:11, 144:18,
145:3, 145:9, 145:16,
146:3, 146:8, 146:11,
148:7, 148:9, 150:8,
153:21, 157:19,
158:13, 158:15,
160:1, 161:6, 162:4,
162:22, 163:14,
163:16, 163:23,
165:11, 165:17,
165:23, 166:6, 176:5,
176:9, 177:12,
179:15, 179:19,
179:22, 181:7,
182:15, 183:1, 183:7,
183:9, 183:17,

184:10, 184:13,
185:5, 185:15,
185:17, 186:18,
187:3, 187:6, 187:14,
187:17, 187:23,
188:3, 188:14,
188:22, 189:19,
189:23, 190:3,
190:11, 190:19,
190:23, 192:17,
193:3, 193:5, 193:14,
194:4, 194:7, 194:20,
195:2, 195:6
  must [3] - 25:6,
48:23, 151:21

**N**

  name [5] - 44:7,
44:8, 106:20, 108:1,
174:6
  named [12] - 6:14,
86:4, 89:14, 91:11,
91:17, 92:17, 177:5,
177:6, 178:3, 180:21,
184:2, 184:4
  names [2] - 43:21,
43:23
  narcotics [8] - 48:23,
73:21, 74:8, 74:12,
74:18, 75:2, 77:14,
77:17
  nearby [1] - 166:22
  necessarily [1] -
96:8
  necessary [4] -
39:15, 39:17, 158:12,
159:7
  need [20] - 5:22,
55:3, 60:22, 68:8,
109:13, 109:19,
110:1, 111:3, 111:6,
111:8, 111:12,
111:13, 111:19,
119:23, 120:14,
132:13, 139:20,
155:3, 177:8, 187:16
  needed [6] - 8:15,
54:1, 61:21, 108:17,
110:8, 116:21
  needs [3] - 108:14,
153:12, 169:16
  never [14] - 110:11,
120:5, 130:18,
130:23, 131:2, 164:3,
180:12, 180:13,
180:18, 180:19,
181:15, 194:6, 194:8,
194:18
  new [4] - 20:13,

52:21, 155:3, 177:16
  NEW [2] - 1:4, 197:1
  New [5] - 2:5, 2:10,
2:15, 3:2, 197:6
  news [26] - 89:9,
89:16, 89:18, 89:19,
89:22, 90:1, 90:8,
90:11, 91:7, 91:10,
91:14, 91:16, 91:19,
91:23, 92:4, 94:15,
95:23, 96:10, 98:2,
98:7, 98:10, 115:14,
115:19, 116:3,
167:18, 167:21
  newscast [1] - 91:21
  next [12] - 58:10,
67:16, 67:19, 68:12,
70:1, 70:15, 70:23,
75:13, 101:6, 101:8,
152:13, 156:23
  nobody [3] - 166:21,
167:1, 194:14
  nonlabor [1] - 189:4
  normally [1] - 24:2
  Notary [3] - 2:6,
197:5, 197:18
  notch [1] - 138:21
  noted [1] - 185:4
  nothing [8] - 56:19,
118:9, 139:23, 158:6,
187:1, 188:12,
188:19, 197:15
  notice [3] - 88:9,
179:17, 181:10
  notices [1] - 86:13
  notification [4] -
87:11, 87:14, 88:8,
89:4
  notifications [1] -
89:2
  notified [17] - 84:12,
86:10, 86:16, 86:23,
87:8, 88:5, 116:22,
116:23, 117:3, 117:4,
117:8, 118:3, 118:6,
118:8, 127:21, 176:8,
194:8
  notify [3] - 117:2,
161:10, 161:11
  notifying [1] - 177:16
  number [28] - 24:1,
25:6, 27:3, 27:5,
35:17, 38:2, 42:1,
43:22, 46:1, 46:8,
52:19, 57:5, 57:9,
59:1, 63:21, 64:1,
64:8, 64:9, 66:7, 74:7,
74:17, 129:17,
134:10, 155:17,
164:16, 170:18,

170:20, 170:22
  numbers [5] - 25:5,
25:6, 26:10, 63:23,
100:17

**O**

  o'clock [1] - 29:4
  object [12] - 31:22,
31:23, 183:1, 183:15,
184:6, 185:16,
186:19, 187:12,
189:7, 190:8, 190:12,
194:20
  objected [1] - 94:11
  objecting [2] -
146:11
  objection [6] - 92:23,
93:9, 95:9, 142:13,
146:18, 150:8
  objectionable [2] -
95:13, 95:21
  obligated [1] -
108:12
  obligation [2] -
108:7, 110:20
  observed [2] - 54:18,
146:4
  obstacle [1] - 132:10
  obstructed [8] -
136:10, 136:12,
137:1, 137:2, 137:10,
140:21, 141:7, 142:7
  obtained [1] - 100:11
  occur [4] - 145:8,
149:13, 150:7, 160:3
  occurred [13] - 3:9,
58:22, 71:1, 78:1,
84:13, 96:5, 100:12,
145:14, 145:20,
146:20, 146:23,
147:5, 164:11
  occurs [1] - 154:10
  OF [4] - 1:4, 1:9,
197:1, 197:3
  office [4] - 7:17,
86:12, 95:5, 180:15
  Officer [41] - 1:13,
1:14, 1:15, 1:16, 1:17,
20:17, 31:14, 31:15,
31:16, 41:9, 44:3,
44:4, 44:5, 44:6,
47:16, 70:6, 71:7,
97:5, 97:6, 97:8, 97:9,
104:13, 104:14,
104:15, 126:7,
126:11, 147:17,
147:22, 147:23,
164:18, 171:1
  officer [94] - 8:16,

11

8:17, 8:20, 17:6, 17:12, 17:14, 17:17, 17:19, 18:1, 18:4, 18:7, 18:11, 18:13, 18:14, 18:17, 18:21, 19:2, 19:4, 19:7, 20:16, 22:10, 23:7, 24:23, 27:6, 33:1, 33:2, 33:4, 33:7, 33:8, 33:15, 33:17, 38:17, 46:9, 47:5, 47:8, 48:1, 49:8, 53:23, 55:3, 55:8, 55:9, 55:14, 56:23, 63:3, 63:10, 63:12, 68:2, 73:17, 77:10, 77:14, 77:15, 77:17, 77:20, 79:15, 79:19, 81:2, 81:6, 87:4, 87:6, 87:8, 87:9, 101:13, 104:21, 108:14, 111:11, 121:8, 121:14, 123:7, 124:3, 135:22, 136:5, 137:23, 141:22, 145:11, 158:14, 158:18, 158:22, 159:4, 159:23, 160:20, 161:15, 161:17, 161:23, 162:21, 165:3, 165:9, 166:11, 171:1, 174:12, 175:5, 184:20, 189:17
  **officer's** [2] - 108:6, 127:16
  **Officer(s** [1] - 1:18
  **officers** [132] - 14:19, 14:23, 15:8, 16:10, 24:14, 25:23, 28:15, 31:12, 32:19, 33:5, 34:6, 35:9, 41:1, 42:3, 42:6, 42:8, 42:17, 43:2, 43:6, 43:19, 43:22, 44:12, 45:17, 46:7, 57:11, 63:14, 64:11, 64:15, 65:5, 65:9, 65:12, 67:22, 69:13, 70:4, 70:18, 71:3, 71:11, 71:14, 75:17, 75:18, 75:21, 77:16, 86:4, 86:23, 97:12, 100:17, 100:20, 101:18, 101:20, 103:3, 103:19, 104:6, 104:8, 104:12, 105:2, 105:3, 105:13, 107:5, 107:23, 108:19, 109:2, 109:22, 110:6, 110:12, 111:10, 111:17, 111:19,

112:6, 113:3, 113:11, 113:15, 114:14, 114:18, 115:8, 118:18, 119:1, 120:19, 122:1, 122:14, 122:19, 123:17, 123:21, 124:10, 124:18, 125:2, 129:3, 130:15, 130:21, 134:19, 135:20, 136:1, 136:7, 136:14, 136:22, 137:3, 137:8, 137:11, 137:15, 140:20, 141:16, 142:6, 147:13, 147:19, 147:20, 147:23, 148:17, 150:3, 152:19, 154:3, 155:5, 157:22, 158:11, 161:22, 162:14, 164:5, 164:8, 164:9, 164:19, 164:23, 166:14, 166:18, 167:10, 169:5, 174:9, 174:15, 175:12, 177:23, 178:2, 182:21, 186:8, 186:14, 192:2
  **Officers** [1] - 184:3
  **offices** [1] - 2:3
  **often** [6] - 14:14, 14:16, 154:6, 172:12, 172:14, 176:23
  **oil** [1] - 154:9
  **old** [2] - 24:12, 52:20
  **once** [9] - 60:18, 89:2, 96:18, 172:15, 172:17, 172:19, 173:15, 182:10, 189:10
  **one** [45] - 3:20, 4:2, 5:10, 32:21, 39:12, 41:1, 42:5, 43:7, 43:9, 44:7, 44:18, 44:20, 45:2, 47:11, 48:20, 48:21, 62:9, 62:13, 64:19, 69:9, 73:5, 73:6, 95:20, 99:5, 100:7, 100:20, 104:8, 112:17, 118:3, 118:4, 121:19, 129:17, 135:11, 147:11, 152:23, 156:22, 157:4, 164:16, 165:3, 174:21, 178:5, 178:6, 178:7, 193:21, 194:17
  **online** [1] - 8:2
  **onward** [2] - 71:18, 72:16

**operate** [3] - 65:22, 111:16, 158:5
  **operates** [1] - 110:3
  **opinion** [22] - 90:23, 91:2, 91:6, 91:9, 92:12, 92:18, 93:5, 96:5, 96:8, 96:15, 96:18, 108:21, 116:3, 116:8, 125:1, 142:9, 145:10, 145:17, 146:13, 147:3, 150:9, 162:23
  **opposed** [1] - 35:13
  **option** [1] - 73:7
  **Order** [2] - 195:19, 198:6
  **order** [14] - 8:16, 17:11, 25:23, 95:6, 169:1, 169:3, 183:2, 185:5, 185:18, 186:6, 189:8, 189:13, 190:12, 191:3
  **ordered** [1] - 188:4
  **otherwise** [2] - 173:23, 187:21
  **outcome** [14] - 46:23, 47:1, 55:17, 56:5, 56:9, 56:11, 56:16, 78:8, 78:10, 186:17, 186:20, 187:11, 190:9, 195:11
  **outcomes** [1] - 149:15
  **outlined** [1] - 95:8
  **outright** [1] - 82:20
  **outs** [1] - 177:18
  **outside** [1] - 173:5
  **overlap** [2] - 45:1, 86:20
  **overlaps** [1] - 43:8
  **own** [7] - 49:17, 49:18, 121:23, 153:8, 161:16, 169:13, 177:10
  **owner** [5] - 138:4, 138:11, 139:3, 139:6, 139:13

## P

**p.m** [5] - 29:4, 67:20, 68:13, 83:10, 195:22
  **P1321** [7] - 47:3, 62:23, 63:18, 64:2, 64:5, 64:13, 64:19
  **P1375** [2] - 149:2, 149:3
  **pack** [1] - 26:5
  **Page** [2] - 198:2, 199:2

**page** [14] - 13:16, 31:6, 31:14, 46:15, 46:20, 47:19, 58:16, 58:19, 59:8, 62:22, 75:8, 77:23, 83:9, 188:3
  **pages** [5] - 12:16, 30:17, 196:2, 198:4, 198:5
  **Pamela** [7] - 47:14, 49:7, 49:10, 49:23, 50:3, 52:6, 63:3
  **paper** [6] - 14:14, 26:17, 66:16, 66:19, 66:21, 155:6
  **papers** [2] - 87:7, 88:20
  **paperwork** [19] - 29:9, 29:11, 29:13, 29:17, 29:21, 30:7, 54:23, 58:4, 61:21, 82:16, 99:7, 118:19, 118:20, 159:7, 160:9, 175:3, 176:14, 176:16, 176:20
  **paragraph** [1] - 188:4
  **paranoid** [1] - 50:17
  **parked** [6] - 100:23, 101:3, 102:22, 112:4, 112:8, 152:13
  **part** [18] - 9:23, 10:14, 10:18, 14:4, 57:4, 61:1, 61:2, 61:4, 72:17, 80:3, 91:20, 110:21, 133:2, 136:12, 146:8, 151:15, 153:21, 191:6
  **participate** [2] - 10:21, 67:4
  **participated** [7] - 11:9, 13:12, 57:3, 59:2, 59:5, 59:14, 186:16
  **participating** [2] - 45:8, 45:18
  **particular** [4] - 35:23, 44:22, 138:5, 157:3
  **particularly** [1] - 102:5
  **particulars** [1] - 91:13
  **parties** [1] - 120:17
  **partner** [23] - 19:10, 19:13, 19:18, 19:19, 19:21, 20:2, 20:11, 20:13, 20:18, 20:19, 20:21, 21:4, 23:3, 23:13, 28:12, 49:4,

68:14, 71:19, 72:16, 75:23, 76:20, 98:3, 114:21
  **partners** [4] - 20:3, 21:8, 21:13, 39:2
  **party** [8] - 121:8, 122:3, 123:8, 123:14, 123:18, 124:5, 126:14, 184:2
  **passenger** [1] - 29:20
  **past** [2] - 6:8, 138:8
  **patch** [1] - 103:13
  **patient** [1] - 119:21
  **patrol** [35] - 17:11, 17:13, 17:17, 17:19, 18:1, 18:4, 18:13, 18:21, 19:7, 21:12, 24:7, 24:12, 28:21, 44:20, 46:1, 56:22, 97:19, 104:17, 105:10, 105:19, 107:9, 110:2, 129:8, 130:13, 131:14, 135:10, 135:12, 135:21, 152:8, 153:1, 154:8, 154:15, 154:22, 156:15, 161:9
  **patrolling** [4] - 29:5, 68:11, 68:17, 97:22
  **pavement** [1] - 102:19
  **PBA** [1] - 184:14
  **pedestrian** [6] - 92:8, 92:13, 92:22, 93:8, 126:13, 167:5
  **pedestrians** [2] - 129:1, 129:15
  **penal** [2] - 151:6, 152:2
  **pending** [3] - 187:20, 188:4, 188:9
  **people** [6] - 20:10, 29:22, 128:22, 172:23, 173:3, 192:21
  **per** [5] - 66:5, 84:10, 108:9, 118:20, 162:5
  **percentage** [1] - 35:12
  **perfect** [1] - 27:9
  **perfectly** [2] - 100:6, 146:1
  **period** [1] - 20:9
  **permit** [1] - 184:15
  **perpendicular** [1] - 106:16
  **person** [42] - 24:16, 24:20, 29:20, 33:22, 46:22, 50:17, 54:9, 54:12, 54:22, 56:20,

60:15, 60:19, 61:12, 65:6, 65:16, 78:14, 78:22, 79:8, 79:14, 80:9, 80:21, 81:4, 81:5, 81:7, 81:23, 83:1, 111:15, 114:3, 115:18, 121:2, 123:10, 135:13, 135:22, 139:21, 142:18, 145:1, 145:5, 153:6, 153:10, 159:15, 160:12, 163:4

**person's** [1] - 123:3
**personal** [9] - 28:18, 113:21, 114:5, 114:8, 114:16, 114:19, 115:4, 116:8, 153:8
**personnel** [1] - 53:13
**perspective** [3] - 68:3, 109:12, 141:16
**perspectives** [1] - 142:18
**pertaining** [1] - 138:5
**Petronella** [20] - 19:14, 22:10, 23:3, 23:7, 23:12, 31:14, 33:15, 38:16, 38:20, 39:16, 44:5, 47:23, 103:8, 103:16, 104:1, 104:4, 104:15, 105:9, 105:12, 114:22
**PFALZGRAF** [1] - 2:8
**phone** [10] - 88:16, 88:22, 89:3, 113:22, 114:4, 149:14, 162:1, 162:7, 162:8, 162:15
**phones** [1] - 161:18
**photograph** [4] - 162:2, 165:22, 166:5, 166:11
**photographs** [2] - 161:16, 162:15
**photos** [1] - 161:22
**phrase** [1] - 163:18
**pick** [3] - 24:17, 28:5, 28:6
**picking** [2] - 26:1, 79:4
**pictures** [1] - 161:13
**place** [18] - 6:11, 6:20, 7:8, 17:1, 45:14, 53:17, 58:13, 75:10, 82:6, 109:16, 140:17, 146:5, 146:7, 157:13, 171:3, 175:11, 175:22, 191:11
**places** [2] - 22:4, 84:1

**plaintiff** [3] - 94:17, 185:11, 185:23
**Plaintiff** [2] - 1:6, 2:11
**plaintiffs** [1] - 94:12
**platoon** [3] - 34:17, 37:13, 173:1
**play** [5] - 101:11, 101:22, 135:7, 144:16, 144:20
**played** [1] - 115:19
**point** [18] - 26:3, 46:14, 47:18, 53:23, 61:8, 85:10, 105:2, 111:23, 112:19, 129:8, 131:1, 135:3, 136:4, 142:23, 147:9, 167:4, 167:13, 167:16
**points** [1] - 132:11
**police** [21] - 13:10, 85:23, 86:1, 86:21, 92:7, 92:13, 92:22, 93:8, 94:16, 96:2, 96:11, 96:20, 101:9, 104:20, 118:6, 119:2, 119:9, 126:19, 147:10, 160:13, 170:4
**Police** [33] - 1:10, 1:11, 1:12, 1:12, 1:13, 1:14, 1:15, 1:16, 1:17, 1:18, 10:14, 10:22, 11:5, 11:8, 11:14, 12:3, 12:7, 12:14, 12:23, 14:2, 14:9, 15:10, 15:13, 15:16, 15:17, 21:5, 30:16, 40:7, 87:21, 87:23, 88:4, 198:3, 198:5
**portion** [5] - 16:14, 98:11, 98:14, 134:13, 137:4
**pose** [1] - 61:9
**position** [3] - 18:9, 95:18, 103:17, 184:21
**positioned** [2] - 103:3, 106:3
**positioning** [1] - 131:23
**possibilities** [2] - 68:20, 103:11
**possible** [8] - 6:2, 19:3, 74:5, 95:14, 103:14, 113:9, 165:21, 166:4
**possibly** [9] - 45:10, 74:16, 80:19, 88:15, 90:16, 91:19, 103:5, 104:15, 105:10
**post** [1] - 9:2
**post-closing** [1] -

9:2
**potential** [1] - 138:10
**precise** [1] - 66:6
**prefer** [2] - 26:13, 28:16
**preference** [18] - 26:14, 27:8, 27:22, 28:14, 28:17, 114:6, 114:8, 114:17, 114:19, 114:22, 115:1, 115:2, 115:3, 115:4, 155:6, 156:16, 157:4, 157:7
**preliminary** [1] - 188:5
**presence** [1] - 197:10
**PRESENT** [1] - 2:17
**present** [8] - 30:2, 36:8, 51:12, 51:22, 109:3, 191:10, 191:18, 191:20
**preserve** [5] - 145:23, 146:17, 184:23, 186:3, 194:23
**preserves** [1] - 185:11
**pretty** [22] - 83:23, 87:12, 88:18, 92:3, 110:9, 111:14, 112:18, 120:4, 122:22, 123:10, 131:21, 131:22, 132:3, 132:14, 140:17, 156:20, 158:23, 173:11, 173:13, 173:15, 179:4, 190:18
**prevent** [1] - 188:20
**previous** [1] - 191:15
**previously** [2] - 100:15, 134:9
**primarily** [1] - 81:19
**primary** [15] - 33:1, 33:8, 33:17, 38:17, 46:9, 47:5, 63:10, 69:12, 77:10, 77:13, 77:15, 77:19, 79:19, 156:14, 174:12
**priority** [3] - 129:11, 129:17, 129:20
**problem** [1] - 183:17
**problematic** [1] - 93:16
**Procedure** [1] - 2:3
**procedures** [1] - 158:23
**proceed** [2] - 94:3, 94:7
**proceeding** [2] -

195:9, 195:13
**process** [18] - 58:2, 59:10, 59:15, 59:19, 60:4, 60:5, 60:6, 60:13, 61:1, 61:2, 61:5, 66:9, 76:13, 87:10, 88:13, 88:22, 163:3, 186:12
**processed** [1] - 54:16
**processes** [1] - 60:12
**produced** [1] - 184:8
**production** [1] - 184:7
**progress** [1] - 129:13
**proper** [1] - 94:20
**properly** [1] - 152:20
**property** [4] - 31:18, 31:21, 32:4, 32:10
**Proposed** [2] - 195:19, 198:6
**prove** [1] - 160:22
**provide** [7] - 92:18, 95:6, 145:19, 186:8, 190:16, 191:6, 192:15
**provided** [1] - 59:13
**Public** [4] - 2:7, 184:3, 197:5, 197:18
**public** [1] - 183:18
**publicly** [3] - 184:10, 188:8, 189:1
**pull** [1] - 104:20
**pulling** [3] - 112:5, 132:6, 135:12
**pump** [1] - 171:10
**purpose** [3] - 174:19, 174:20, 174:22
**purposes** [1] - 175:8
**pursuant** [1] - 2:2
**pushing** [1] - 129:14
**put** [15] - 50:14, 61:21, 73:2, 76:4, 76:23, 84:8, 87:14, 108:15, 118:19, 140:17, 160:16, 176:21, 184:20, 189:17
**puts** [1] - 116:9
**putting** [3] - 122:23, 153:18, 176:23

**Q**

**quality** [13] - 96:16, 134:21, 136:16, 137:22, 138:15, 138:18, 138:19, 138:22, 139:7,

139:13, 140:6, 140:8, 140:12
**questioning** [4] - 66:4, 66:7, 82:5, 94:12
**questions** [24] - 5:2, 5:13, 5:15, 61:11, 61:16, 61:18, 81:8, 81:13, 81:19, 82:10, 110:5, 110:19, 111:4, 111:9, 178:21, 183:14, 184:15, 185:1, 185:3, 185:13, 186:4, 187:1, 189:11
**quick** [3] - 75:9, 116:16, 133:8
**quicker** [5] - 120:7, 121:9, 121:16, 122:3, 126:14
**quickly** [2] - 6:1, 144:3
**Quinn** [1] - 44:10
**quite** [4] - 45:10, 64:23, 103:5, 103:14
**quote** [1] - 74:22

**R**

**R&R** [1] - 171:10
**radio** [1] - 78:22
**radios** [1] - 114:11
**raise** [4] - 78:11, 78:17, 80:3, 114:1
**raised** [1] - 184:17
**ranging** [1] - 187:8
**ranked** [2] - 26:2, 26:8
**rare** [2] - 122:14, 122:16
**rate** [1] - 131:15
**rather** [3] - 63:3, 114:2, 120:9
**reachable** [1] - 95:6
**read** [8] - 2:19, 133:16, 144:14, 179:1, 179:3, 190:20, 190:21, 196:1
**reading** [3] - 78:12, 78:20, 187:18
**real** [1] - 75:8
**realizing** [1] - 81:23
**really** [17] - 57:9, 83:20, 84:1, 84:8, 91:21, 102:16, 104:17, 116:16, 128:9, 130:19, 131:1, 133:8, 138:18, 138:19, 138:22, 141:10, 144:2
**reason** [17] - 27:7,

13

33:16, 59:21, 104:11,
105:11, 105:14,
105:16, 112:3, 112:7,
126:7, 126:12,
147:16, 147:21,
148:4, 165:15,
168:22, 192:22
**receive** [6] - 57:11,
57:15, 113:14,
113:18, 131:3, 131:5
**received** [6] - 58:1,
121:6, 131:7, 153:16,
180:12, 180:15
**receiving** [1] - 85:19
**recent** [1] - 90:9
**recently** [1] - 4:20
**recess** [2] - 94:9,
164:12
**recognize** [12] -
12:20, 12:22, 22:12,
22:15, 30:21, 30:22,
30:23, 151:10,
151:12, 168:11,
173:21, 173:23
**recollect** [3] - 79:20,
79:22, 108:23
**recollection** [2] -
60:12, 120:21
**record** [24] - 12:12,
13:1, 14:10, 21:19,
65:3, 94:8, 94:10,
95:2, 95:16, 100:13,
110:18, 116:15,
116:17, 133:8, 133:9,
145:23, 153:18,
171:11, 183:16,
185:1, 185:21,
194:23, 195:17
**recording** [3] -
84:19, 85:16, 180:10
**records** [7] - 12:15,
184:11, 185:3,
185:21, 188:9, 189:1,
198:3
**recycle** [2] - 176:2,
177:22
**recycling** [1] -
179:14
**reduced** [1] - 197:10
**refer** [8] - 50:21,
51:3, 60:4, 63:19,
64:12, 64:16, 117:2,
176:10
**references** [1] - 27:4
**referred** [1] - 115:20
**referring** [13] - 30:2,
32:10, 47:21, 78:4,
80:18, 91:4, 91:11,
91:17, 120:16,
120:17, 120:18,

176:6, 181:9
**refers** [5] - 33:10,
69:7, 69:14, 170:19,
170:20
**reflect** [2] - 162:20,
163:12
**reflected** [1] - 163:15
**reflects** [1] - 163:18
**refreshed** [1] -
144:17
**refresher** [1] - 66:13
**refuse** [1] - 120:13
**refused** [1] - 124:5
**regard** [3] - 111:10,
131:18, 183:11
**regarding** [3] -
84:12, 188:1, 189:14
**regards** [43] - 14:12,
27:19, 39:10, 40:4,
43:17, 53:20, 54:21,
55:19, 58:3, 60:9,
60:16, 61:22, 64:15,
65:20, 66:7, 66:16,
71:23, 79:23, 81:5,
84:22, 87:11, 88:11,
108:9, 114:3, 114:10,
120:22, 123:3, 123:9,
123:21, 123:22,
131:7, 131:17, 132:3,
137:7, 140:18,
140:19, 155:5, 160:5,
161:7, 163:2, 164:10,
170:6, 175:19
**regular** [3] - 21:10,
21:13, 173:4
**regularly** [2] - 173:8,
173:10
**related** [1] - 176:22
**relating** [2] - 113:19,
191:8
**relative** [1] - 197:15
**reliable** [1] - 140:7
**remained** [3] - 9:20,
56:20, 76:20
**remaining** [1] - 42:16
**remains** [1] - 54:18
**remember** [33] - 5:4,
8:6, 9:17, 10:1, 10:2,
11:7, 11:11, 12:2,
21:21, 22:1, 22:4,
23:19, 23:21, 30:9,
50:9, 51:21, 60:1,
78:19, 79:21, 84:15,
90:7, 91:21, 91:22,
92:1, 103:10, 105:16,
112:9, 115:5, 131:16,
132:3, 132:15,
132:23, 152:12
**remembering** [1] -
112:14

**rep** [1] - 87:18
**repair** [3] - 153:5,
155:13, 160:17
**repaired** [1] - 169:16
**repairs** [3] - 158:12,
159:8, 160:9
**repeatedly** [1] -
144:19
**rephrase** [4] - 7:3,
11:16, 93:19, 95:20
**replaced** [1] - 155:3
**replay** [1] - 144:2
**replaying** [1] - 144:5
**Report** [2] - 30:17,
198:5
**report** [24] - 31:1,
31:3, 31:6, 32:18,
33:7, 37:7, 62:16,
62:20, 69:5, 71:6,
75:6, 78:16, 79:7,
80:4, 88:17, 107:16,
108:7, 126:18, 149:2,
149:3, 149:8, 179:4,
179:7, 197:7
**reported** [2] - 48:6,
91:22
**REPORTER** [1] -
2:19
**reporter** [1] - 190:22
**reporting** [1] - 116:7
**represent** [7] - 31:3,
32:1, 42:20, 54:17,
58:17, 59:10, 67:20
**request** [3] - 49:20,
94:20, 125:11
**requested** [2] -
49:19, 190:21
**requesting** [1] -
153:18
**requests** [1] - 118:7
**require** [3] - 119:21,
121:2, 125:17
**required** [18] - 14:19,
16:4, 55:2, 55:6,
55:10, 63:8, 63:11,
73:2, 76:23, 77:3,
82:15, 110:5, 150:21,
152:1, 158:12,
160:21, 182:22, 191:6
**requirement** [8] -
63:7, 63:9, 65:15,
65:18, 65:22, 114:13,
114:16, 154:3
**requires** [1] - 149:12
**rescue** [1] - 129:12
**reserves** [8] - 9:14,
9:21, 10:1, 10:9,
94:17, 94:20
**residence** [1] - 80:15
**residential** [4] -

128:21, 129:5,
129:21, 130:16
**respect** [1] - 125:18
**respectfully** [2] -
184:5, 185:23, 188:22
**respective** [2] -
165:1, 176:14
**respond** [11] - 39:15,
39:16, 68:23, 117:11,
117:23, 119:20,
121:2, 127:23,
129:11, 138:10, 174:9
**responded** [23] -
30:10, 31:13, 32:19,
35:6, 35:12, 35:21,
38:12, 41:2, 47:9,
49:8, 67:17, 68:13,
69:6, 70:5, 70:18,
71:4, 71:12, 71:15,
78:21, 83:11, 117:16,
117:20, 175:12
**respondents** [1] -
188:7
**responding** [10] -
22:1, 65:19, 67:23,
73:5, 79:15, 110:13,
110:20, 119:8,
129:17, 129:19
**responds** [1] - 69:16
**response** [3] - 82:9,
85:15, 153:22
**responses** [2] - 5:11,
5:12
**responsible** [1] -
14:22
**rest** [3] - 71:19,
72:10, 72:20
**restraining** [2] -
188:6, 188:7
**restrains** [1] - 188:23
**result** [2] - 80:23,
81:23
**results** [1] - 189:17
**retained** [1] - 198:10
**reveal** [2] - 185:3,
186:21
**revealing** [1] - 191:1
**review** [6] - 15:20,
57:21, 153:3, 175:5,
180:21, 181:19
**reviewed** [4] - 9:2,
107:20, 175:1, 181:15
**reviewing** [3] - 52:5,
55:16, 58:12
**rewind** [1] - 134:11
**RICHARD** [2] - 2:6,
197:18
**rid** [2] - 176:13,
177:15
**ride** [5] - 20:4, 20:5,

21:11, 39:6, 39:13
**riding** [8] - 20:7,
23:14, 23:16, 23:19,
23:22, 39:10, 39:11,
77:1
**rights** [3] - 94:17,
94:20, 185:12
**road** [2] - 128:10,
129:9
**role** [1] - 191:22
**roll** [2] - 16:20, 17:1
**Ronnie** [3] - 24:23,
25:9, 44:11
**rough** [3] - 74:23,
75:2, 154:14
**roughly** [10] - 8:6,
36:16, 36:20, 39:19,
41:19, 53:7, 84:15,
90:7, 127:7, 128:5
**routinely** [1] - 122:10
**rule** [1] - 29:19
**ruled** [1] - 183:11
**rules** [2] - 5:9, 129:8
**Rules** [1] - 2:3
**ruling** [1] - 95:7
**run** [4] - 31:18, 32:7,
106:16, 184:18
**running** [1] - 160:13
**runs** [3] - 15:2,
40:20, 40:21
**RUPP** [1] - 2:8

**S**

**S-E-E** [1] - 51:7
**safe** [7] - 34:19,
59:12, 71:17, 72:9,
105:1, 126:22, 183:13
**safety** [2] - 129:16,
131:12
**Sampson** [1] - 44:12
**sandwich** [1] - 83:21
**SANTANA** [5] - 1:1,
1:17, 2:2, 196:9,
199:3
**Santana** [14] - 3:7,
7:21, 12:18, 30:20,
94:14, 94:18, 94:22,
95:23, 164:18,
185:12, 186:4, 186:7,
187:12, 188:20
**saw** [27] - 80:2,
89:23, 90:23, 91:4,
91:6, 91:7, 91:8,
93:13, 96:9, 98:2,
107:4, 107:19,
115:18, 137:3,
137:19, 137:21,
141:22, 145:7, 146:7,
146:21, 150:6,

150:12, 150:13,
167:18, 193:20,
194:12, 194:14
    scenario [1] - 83:4
    scene [37] - 32:8,
60:18, 65:10, 65:11,
65:12, 65:17, 65:23,
97:2, 97:3, 97:6, 97:7,
97:9, 97:15, 98:12,
98:15, 99:14, 104:2,
104:6, 105:17,
108:14, 108:19,
109:3, 110:6, 112:11,
113:2, 113:6, 115:6,
119:20, 124:11,
127:20, 138:2,
141:11, 141:16,
147:14, 166:19,
191:10, 191:18
    scenes [1] - 127:23
    schedule [1] - 188:5
    scheduled [1] -
179:11
    Schlenker [4] -
106:9, 106:11,
106:13, 106:19
    Schmarbeck [11] -
22:2, 23:20, 105:22,
106:2, 106:6, 106:10,
106:18, 106:23,
107:5, 124:19, 128:5
    school [2] - 9:8,
100:7
    Schultz [15] - 26:6,
27:1, 31:15, 38:6,
41:10, 44:4, 69:17,
70:6, 97:5, 104:14,
126:7, 126:11,
147:17, 147:22
    SCHULZ [1] - 1:15
    screaming [1] -
167:1
    screen [9] - 91:1,
91:4, 101:2, 101:5,
101:13, 101:20,
104:4, 115:15, 136:5
    se [5] - 66:5, 84:10,
108:9, 118:20, 162:5
    seatbelt [2] - 130:9,
130:22
    second [17] - 15:20,
22:22, 34:19, 34:20,
35:4, 35:5, 35:7,
35:13, 35:22, 40:16,
40:17, 42:5, 59:7,
112:18, 132:12,
147:10, 190:19
    seconds [3] -
134:14, 164:17, 165:5
    sector [64] - 33:18,

33:19, 33:20, 33:22,
33:23, 34:7, 34:10,
34:13, 34:14, 34:16,
34:19, 34:20, 35:4,
35:5, 35:7, 35:10,
35:13, 35:22, 36:5,
36:10, 36:12, 36:17,
36:23, 37:4, 37:8,
37:10, 37:14, 37:18,
37:22, 38:1, 38:3,
38:7, 38:10, 38:13,
38:21, 38:22, 39:5,
39:7, 39:11, 39:12,
39:16, 39:17, 40:2,
40:5, 40:17, 40:20,
40:21, 41:5, 41:7,
41:16, 41:19, 42:6,
42:7, 42:8, 42:12,
42:23, 44:16, 68:5,
68:11, 73:2, 97:18
    sectors [12] - 34:1,
34:4, 34:5, 35:9,
35:14, 39:3, 39:10,
39:20, 40:12, 40:23,
43:16, 68:7
    security [1] - 138:21
    Sedita's [1] - 190:11
    see [149] - 13:2, 13:5,
13:21, 14:1, 14:13,
14:16, 15:19, 15:22,
22:8, 23:6, 24:21,
38:20, 38:22, 38:23,
42:9, 42:11, 42:16,
42:19, 46:18, 47:19,
48:20, 48:21, 49:4,
49:6, 51:7, 51:9,
58:14, 62:19, 68:8,
68:10, 68:12, 68:15,
69:20, 70:1, 70:15,
70:23, 73:4, 73:10,
75:7, 75:9, 77:23,
78:2, 78:15, 79:7,
81:19, 82:22, 83:10,
89:3, 92:6, 96:1,
96:10, 96:14, 96:19,
96:22, 97:19, 98:10,
100:18, 100:23,
101:3, 101:13,
101:19, 102:2, 102:6,
104:1, 104:3, 104:5,
104:17, 104:21,
105:19, 105:20,
106:22, 107:18,
108:1, 108:3, 109:12,
110:1, 114:3, 116:11,
116:20, 117:1,
117:18, 118:5,
118:12, 118:15,
118:21, 133:12,
133:14, 133:19,
133:22, 134:11,

134:18, 135:4, 135:9,
135:18, 135:20,
135:23, 136:9,
136:13, 136:17,
136:19, 136:21,
136:22, 136:23,
137:4, 137:10,
137:11, 139:14,
140:20, 141:1, 141:6,
141:15, 141:20,
142:3, 142:5, 142:10,
142:17, 142:21,
142:22, 143:5,
143:20, 143:22,
145:1, 145:8, 147:4,
147:10, 147:11,
148:16, 148:18,
151:15, 151:19,
152:4, 160:18,
164:19, 165:3, 165:9,
166:7, 166:8, 170:4,
171:2, 171:5, 171:13,
174:6, 188:12,
191:22, 193:15,
193:22, 194:2
    seeing [11] - 43:1,
91:22, 92:1, 115:15,
141:3, 143:6, 143:12,
143:18, 144:10,
147:8, 152:16
    seem [1] - 120:14
    sees [1] - 145:13
    segment [10] -
100:16, 100:18,
105:2, 112:4, 115:21,
134:13, 135:8,
164:15, 164:17, 165:6
    select [1] - 28:9
    selection [2] - 25:18,
26:8
    send [1] - 86:13
    Seneca [3] - 169:17,
170:5, 170:12
    senior [5] - 24:16,
24:20, 26:11, 26:15,
27:6
    sense [2] - 39:23,
113:10
    sent [2] - 88:9,
152:23
    separate [1] - 64:5
    September [2] - 2:5,
196:6
    serp [1] - 171:10
    serve [1] - 121:4
    served [11] - 85:6,
85:17, 86:7, 87:7,
88:4, 88:14, 175:15,
176:8, 177:23,
178:23, 179:22

service [17] - 24:13,
88:20, 121:3, 153:1,
153:20, 154:7,
154:11, 154:19,
154:23, 155:13,
156:19, 157:12,
157:13, 170:15,
171:2, 171:3, 171:6
    serviced [1] - 157:2
    serving [1] - 180:2
    set [3] - 138:12,
195:20, 196:3
    settled [11] - 187:3,
187:5, 187:6, 187:7,
187:8, 187:9, 187:11,
187:22, 188:13,
188:15, 188:16
    settlement [7] -
188:1, 188:10,
188:14, 189:5,
189:15, 189:18,
189:21
    seven [1] - 52:22
    several [1] - 142:14
    shake [1] - 5:11
    share [1] - 114:19
    shared [1] - 158:2
    sheet [11] - 16:7,
16:11, 16:16, 17:1,
22:16, 22:18, 25:21,
32:15, 77:7, 174:21,
196:4
    shift [18] - 22:16,
22:17, 22:21, 22:22,
22:23, 24:17, 28:21,
28:23, 37:7, 43:3,
43:20, 44:13, 44:16,
44:20, 44:21, 71:6,
83:15, 173:1
    shifts [3] - 20:7,
43:8, 45:2
    shirt [1] - 140:3
    shoot [2] - 51:17,
51:20
    shooter [5] - 13:3,
13:13, 13:18, 13:22,
14:7
    shop [2] - 169:11,
169:13
    short [1] - 52:21
    shorthand [2] - 51:9,
197:9
    shortly [1] - 11:18
    Show [2] - 195:19,
198:6
    show [22] - 22:7,
60:18, 65:23, 86:8,
86:11, 87:12, 100:9,
107:11, 108:13,
109:23, 134:8, 151:7,

168:9, 173:20, 180:3,
181:12, 183:2, 185:6,
185:18, 189:8,
190:12, 191:3
    showed [1] - 179:13
    showing [2] - 16:4,
164:14
    shows [4] - 111:12,
139:22, 140:2, 142:11
    shred [2] - 175:23,
182:3
    shredder [1] -
175:22
    shredding [1] -
181:9
    side [13] - 43:8,
134:19, 136:1,
137:12, 152:7,
152:11, 161:3, 161:4,
171:14, 171:18,
171:22, 183:13
    sides [1] - 95:17
    sidewalk [1] - 135:23
    sign [25] - 2:19, 16:7,
16:10, 16:11, 16:14,
16:16, 16:23, 33:11,
33:12, 37:16, 37:20,
41:8, 41:9, 42:10,
42:18, 45:18, 69:6,
69:14, 69:16, 70:9,
70:21, 76:8, 108:3,
160:11
    sign-in [4] - 16:7,
16:11, 16:16, 16:23
    sign-out [1] - 16:14
    signature [3] -
160:14, 160:17
    signs [3] - 69:20,
70:8, 70:12
    single [4] - 32:1,
109:8, 109:23, 149:12
    single-car [1] - 32:1
    sirens [3] - 128:11,
128:15, 128:19
    sit [3] - 121:18,
149:17, 180:17
    sitting [2] - 105:10,
142:23
    situation [17] -
65:20, 66:2, 73:20,
73:23, 74:6, 81:16,
113:8, 118:17, 122:6,
123:3, 123:8, 125:15,
140:18, 159:18,
160:6, 164:3, 164:6
    situations [5] -
122:6, 122:15,
122:18, 123:13, 124:4
    six [14] - 11:6, 11:7,
11:20, 11:22, 17:4,

24:3, 30:17, 52:22, 59:14, 131:9, 154:16, 154:17, 156:7, 198:5
**six-month** [1] - 17:4
**six-seven** [1] - 52:22
**sixth** [1] - 104:21
**small** [1] - 92:3
**snippet** [2] - 115:17, 147:8
**snow** [4] - 102:6, 102:8, 102:12, 102:15
**someone** [10] - 20:4, 32:7, 39:6, 39:12, 82:20, 121:4, 125:16, 135:21, 139:22, 160:22
**sometimes** [4] - 26:12, 83:22, 112:1, 118:18
**somewhere** [1] - 9:10
**son** [4] - 51:12, 51:17, 92:4, 115:21
**sorry** [11] - 22:12, 41:11, 41:14, 46:17, 62:15, 63:15, 65:2, 84:23, 96:14, 112:23, 133:7
**sort** [8] - 16:20, 59:22, 87:14, 92:6, 113:14, 159:19, 190:15, 191:5
**sounds** [1] - 190:8
**speakerphone** [1] - 95:17
**speaking** [3] - 97:11, 97:13, 108:19
**speaks** [2] - 135:15, 146:14
**specialized** [1] - 161:21
**specific** [10] - 15:7, 42:1, 53:4, 66:5, 98:22, 107:15, 139:21, 150:4, 174:13, 181:12
**specifically** [9] - 57:18, 60:2, 69:9, 88:20, 131:19, 155:16, 170:8, 183:11, 185:18
**specifics** [1] - 191:2
**specified** [1] - 150:23
**specify** [4] - 21:9, 80:20, 134:7, 138:6
**speculate** [1] - 192:18
**speculation** [4] - 125:14, 158:16,

163:17, 163:23
**speed** [4] - 129:3, 129:20, 130:5, 131:15
**spend** [1] - 138:21
**spending** [1] - 113:16
**split** [2] - 29:23, 132:12
**split-second** [1] - 132:12
**spring** [1] - 28:6
**ss** [1] - 197:2
**stage** [1] - 6:17
**stages** [1] - 180:7
**stamp** [1] - 126:19
**stand** [2] - 51:6, 103:18
**standard** [1] - 81:18
**standing** [12] - 102:19, 111:23, 134:23, 135:4, 136:22, 137:5, 137:13, 164:20, 165:4, 165:12, 165:16, 167:10
**start** [1] - 29:1
**started** [3] - 17:13, 17:16, 170:2
**starting** [1] - 104:20
**starts** [3] - 25:6, 40:2, 44:18
**STATE** [1] - 197:1
**State** [1] - 197:6
**state** [5] - 52:10, 82:13, 118:13, 118:18, 159:1
**statement** [6] - 186:9, 192:3, 192:15, 192:23, 193:6, 193:12
**statements** [2] - 182:22, 192:20
**STATES** [1] - 1:3
**states** [4] - 51:20, 56:3, 62:10, 118:3
**stating** [1] - 181:11
**station** [15] - 29:12, 68:21, 83:18, 83:23, 86:13, 88:9, 89:1, 89:3, 114:2, 138:10, 138:11, 139:3, 139:6, 139:13, 176:1
**stations** [1] - 138:17
**statute** [1] - 57:21
**stay** [14] - 35:10, 53:15, 53:19, 53:22, 55:2, 55:3, 55:6, 55:10, 55:14, 73:18, 75:1, 77:3, 110:5, 110:21
**stayed** [1] - 74:12

**staying** [3] - 52:11, 52:13, 53:6
**step** [1] - 60:23
**stick** [1] - 109:18
**sticking** [1] - 133:11
**still** [12] - 24:13, 25:9, 25:16, 28:8, 40:9, 83:4, 93:16, 125:12, 140:10, 140:16, 175:14, 183:9
**stop** [7] - 47:22, 48:9, 48:12, 48:14, 68:9, 73:14, 111:5
**stopping** [1] - 131:15
**stops** [1] - 48:17
**story** [16] - 90:2, 90:8, 90:11, 91:7, 91:10, 91:16, 94:15, 96:1, 96:10, 98:3, 98:7, 98:10, 115:14, 116:4, 167:18, 167:21
**straight** [3] - 106:6, 106:8, 106:12
**street** [14] - 40:22, 103:4, 104:22, 106:6, 106:8, 106:10, 106:11, 106:12, 106:15, 137:5, 137:14, 148:1, 165:4, 165:13
**Street** [21] - 31:11, 38:13, 40:17, 41:2, 46:19, 46:20, 47:20, 47:21, 47:22, 49:2, 50:10, 51:13, 67:15, 69:1, 71:1, 71:9, 73:13, 77:11, 78:1, 78:16
**streets** [3] - 46:4, 129:2, 130:2
**stricken** [1] - 183:15
**strike** [1] - 125:2
**strikes** [1] - 31:23
**struck** [1] - 145:21
**structure** [1] - 106:5
**study** [1] - 7:23
**stuff** [6] - 77:21, 100:7, 102:12, 139:23, 157:1, 164:10
**subject** [4] - 82:10, 183:10, 184:19, 191:11
**subjected** [4] - 61:12, 65:6, 82:1, 182:7
**submit** [1] - 76:18
**subpoena** [1] - 162:8
**substantiated** [3] - 186:23, 187:2, 188:19
**suicidal** [8] - 78:5,

79:8, 80:10, 80:23, 81:7, 82:9, 82:19, 82:21
**suit** [1] - 184:19
**Summary** [2] - 30:17, 198:5
**summary** [19] - 22:16, 22:17, 31:1, 31:3, 31:5, 32:18, 33:6, 37:7, 62:16, 62:20, 69:5, 71:6, 75:5, 77:7, 78:16, 79:7, 80:4, 107:15, 126:18
**summer** [1] - 28:6
**super** [1] - 128:22
**super-fast** [1] - 128:22
**supervisor** [12] - 14:8, 158:3, 158:8, 158:10, 159:12, 159:13, 159:16, 160:5, 160:10, 160:16, 161:10, 163:20
**supervisor's** [1] - 158:18
**supervisors** [6] - 42:15, 87:21, 158:21, 159:2, 160:12, 175:5
**support** [3] - 152:6, 162:19, 163:11
**surpass** [1] - 129:4
**surveillance** [1] - 100:11, 138:1, 138:8, 138:11, 139:3, 139:5, 139:7, 139:12, 167:9, 167:19, 168:6
**suspect** [3] - 133:12, 133:17, 134:5
**switch** [1] - 155:23
**switches** [1] - 44:23
**sworn** [6] - 3:2, 3:10, 11:1, 11:17, 11:23, 197:13
**Sycamore** [5] - 31:11, 38:13, 40:17, 40:20, 41:2
**system** [3] - 87:15, 138:21, 171:7

---

## T

**Tahoe** [9] - 24:11, 26:13, 27:12, 101:7, 103:18, 112:5, 147:19, 147:20, 156:22
**Tahoes** [1] - 27:13
**talks** [1] - 171:21

**target** [2] - 182:12, 194:19
**teaching** [1] - 131:12
**technicians** [1] - 88:17
**temporary** [1] - 188:6
**tense** [1] - 30:2
**term** [2] - 99:9, 100:1
**terminology** [3] - 86:21, 179:16, 181:8
**terms** [1] - 25:23
**testified** [3] - 3:3, 4:13, 126:11
**testify** [2] - 145:12, 197:14
**testimony** [18] - 3:10, 4:1, 4:9, 4:21, 5:9, 5:18, 6:4, 7:7, 7:15, 92:18, 126:6, 150:9, 183:12, 183:21, 184:9, 185:22, 186:2, 196:5
**THE** [100] - 1:9, 2:19, 3:19, 4:15, 4:18, 5:3, 5:5, 7:1, 10:5, 14:12, 25:21, 34:22, 35:16, 53:10, 54:21, 56:13, 56:15, 65:2, 71:22, 72:12, 72:22, 76:3, 79:11, 81:11, 82:4, 82:13, 85:4, 85:9, 92:10, 92:15, 93:15, 96:4, 96:13, 96:22, 99:5, 99:8, 99:11, 99:23, 100:4, 102:11, 103:21, 105:5, 107:8, 108:21, 110:16, 111:2, 117:13, 118:17, 119:4, 119:6, 119:12, 121:11, 122:5, 122:22, 123:20, 124:8, 125:15, 126:2, 128:13, 129:7, 129:23, 130:18, 134:18, 136:9, 136:16, 137:17, 138:17, 139:17, 140:16, 141:10, 142:15, 143:9, 143:15, 144:6, 145:4, 145:15, 148:8, 148:10, 150:10, 157:20, 158:14, 158:20, 160:2, 161:7, 162:5, 162:23, 163:15, 164:2, 165:12, 165:18, 166:1, 166:7, 176:11,

177:13, 179:18,
180:2, 181:11,
182:16, 193:15, 194:8
themselves [11] -
33:5, 60:20, 61:9,
61:13, 65:8, 65:17,
81:16, 81:20, 108:7,
113:3, 113:6
they've [2] - 65:7,
123:4
thinking [2] - 65:16,
179:23
thinks [2] - 145:13,
145:19
third [3] - 150:18,
150:22, 151:17
Thomas [1] - 44:8
thoughts [1] - 65:7
thousands [1] -
109:9
threat [1] - 61:9
threatened [1] -
51:17
threatening [10] -
51:20, 136:6, 136:14,
137:15, 141:6,
141:13, 142:6,
142:12, 142:17,
142:22
threats [2] - 51:22,
52:2
three [29] - 9:15,
12:15, 17:10, 18:20,
19:1, 36:10, 36:12,
36:17, 36:20, 36:23,
37:4, 37:10, 37:17,
37:21, 37:23, 38:7,
38:22, 39:11, 39:16,
40:21, 41:7, 42:6,
45:4, 59:2, 59:5,
135:23, 198:3
threshold [1] -
151:23
threw [4] - 92:13,
92:22, 93:8, 94:15
throughout [1] -
109:10
throw [4] - 96:1,
96:10, 96:19, 96:22
throwing [1] - 68:6
thumb [1] - 29:19
timestamp [2] -
164:16, 165:4
TIMOTHY [1] - 2:12
tire [1] - 155:3
TO [2] - 198:1, 199:1
today [19] - 18:4,
18:11, 20:11, 28:9,
36:6, 36:8, 40:10,
95:5, 98:17, 107:19,

121:18, 124:17,
149:17, 155:19,
167:16, 180:17,
186:2, 192:12, 195:21
together [6] - 39:10,
43:9, 45:6, 99:7,
145:1, 145:21
took [21] - 3:23, 4:5,
4:9, 6:11, 7:15, 13:17,
14:7, 16:1, 16:5,
58:13, 109:15, 146:7,
153:19, 156:3,
156:18, 157:11,
157:13, 162:1, 171:3,
175:11, 191:11
top [5] - 25:2, 58:5,
138:21, 151:16
top-notch [1] -
138:21
totality [1] - 147:3
totally [2] - 35:18,
142:20
touch [1] - 53:12
touched [1] - 142:15
tour [1] - 55:13
toward [1] - 147:13
towards [4] - 40:18,
135:11, 135:23, 165:1
traffic [15] - 25:15,
47:22, 48:9, 48:12,
48:13, 48:17, 68:9,
68:10, 73:14, 128:7,
128:8, 128:13, 130:6,
131:12
train [4] - 57:19,
60:5, 60:7, 131:19
trained [3] - 67:1,
120:20, 121:21
training [86] - 10:19,
12:3, 12:6, 12:15,
12:23, 13:3, 13:13,
13:18, 13:22, 14:3,
14:4, 14:7, 14:10,
14:20, 14:23, 15:1,
15:2, 15:9, 15:14,
15:15, 15:21, 16:3,
16:8, 16:18, 17:2,
17:5, 17:6, 17:12,
18:6, 18:11, 18:14,
18:16, 19:2, 19:4,
43:3, 44:17, 44:18,
44:19, 44:21, 45:6,
45:7, 45:8, 45:13,
45:19, 45:21, 45:22,
45:23, 46:8, 57:12,
57:14, 57:16, 58:1,
58:7, 58:13, 58:15,
58:17, 58:21, 59:2,
59:4, 59:9, 59:10,
59:15, 59:18, 59:22,

60:2, 60:8, 60:9,
66:12, 67:5, 67:10,
67:11, 120:22, 121:6,
121:7, 121:14, 131:3,
131:5, 131:7, 131:9,
132:6, 132:8, 132:17,
132:20, 133:1, 198:3
transcript [1] - 196:4
transfer [1] - 21:2
transferred [1] -
20:23
transpired [2] -
182:14, 193:13
transport [1] - 58:3
transported [6] -
60:22, 122:7, 123:4,
126:4, 127:1
transporting [2] -
123:1, 127:16
trial [1] - 2:1
TRO [5] - 186:1,
187:1, 188:19,
188:22, 194:21
trouble [1] - 189:3
truck [8] - 136:10,
136:13, 137:1, 137:2,
137:3, 137:10,
140:21, 141:7
true [1] - 196:4
trust [1] - 116:9
truth [3] - 197:14,
197:15
try [4] - 6:1, 95:13,
95:19, 140:10
trying [3] - 107:9,
140:19, 178:17
turn [3] - 77:23,
163:1
turning [8] - 47:13,
49:1, 59:8, 67:13,
83:9, 116:13, 116:19,
132:9
two [28] - 10:10,
33:19, 33:20, 38:13,
38:21, 39:17, 40:2,
42:3, 42:8, 45:5,
47:11, 48:14, 61:11,
69:8, 69:12, 74:20,
77:8, 83:23, 99:16,
118:5, 135:20,
137:11, 147:12,
148:5, 148:17, 156:4,
165:5, 178:8
two-and-a-half [1] -
48:14
type [12] - 24:14,
31:17, 45:8, 45:12,
46:21, 48:9, 57:14,
61:18, 100:7, 138:6,
157:16, 157:17

types [4] - 24:7,
81:13, 122:15, 176:20
typical [3] - 45:22,
48:17, 81:22
typically [28] - 28:5,
28:11, 29:1, 29:13,
44:13, 46:8, 52:18,
53:15, 60:13, 64:12,
64:16, 65:5, 66:3,
77:13, 83:17, 83:19,
84:6, 85:22, 89:16,
109:11, 111:20,
113:21, 139:12,
155:10, 155:13,
160:21, 170:14,
174:10

                    U

unable [1] - 80:5
under [9] - 54:12,
54:13, 54:14, 54:22,
119:17, 183:2, 184:3,
194:21, 197:10
underneath [1] -
48:22
understood [5] -
34:18, 64:11, 99:13,
195:2
unfounded [1] -
187:20
union [2] - 85:23,
87:17
unit [1] - 161:12
UNITED [1] - 1:3
units [2] - 161:21,
162:11
University [1] - 8:3
unless [1] - 151:5
unsubstantiated [2]
- 187:20, 188:9
unsure [1] - 179:19
up [40] - 12:11, 14:8,
14:19, 14:23, 15:9,
34:8, 56:7, 60:18,
63:13, 65:23, 77:19,
86:8, 86:11, 87:12,
94:7, 103:17, 108:13,
109:23, 111:6,
111:12, 112:1, 112:5,
123:12, 135:20,
138:12, 150:3,
154:12, 159:2,
159:14, 159:17,
161:20, 173:17,
174:10, 176:18,
179:13, 180:3,
180:11, 181:12, 194:9
upper [1] - 101:4

                    V

varies [2] - 46:6,
53:3
various [1] - 128:6
vehicle [70] - 24:15,
26:11, 29:12, 29:14,
31:22, 49:17, 49:18,
92:13, 92:22, 93:8,
94:16, 96:11, 96:20,
101:9, 103:17,
104:16, 104:18,
105:10, 105:19,
111:22, 115:17,
130:6, 130:14, 131:4,
131:12, 131:14,
132:10, 135:10,
135:12, 135:13,
135:21, 137:6,
137:12, 142:7,
142:19, 143:21,
152:5, 152:8, 152:10,
152:13, 153:7,
153:11, 154:8,
154:15, 154:22,
155:17, 156:6, 156:8,
156:14, 156:16,
156:18, 156:19,
157:5, 157:17, 161:8,
161:9, 166:5, 166:11,
169:20, 170:1, 170:2,
170:12, 170:13,
170:20, 170:22,
171:19, 172:3, 172:6
vehicles [10] - 24:8,
24:12, 24:18, 25:19,
26:1, 133:1, 152:17,
165:1, 170:4, 170:9
Velasquez [1] -
153:16
VELEZ [1] - 1:14
Velez [12] - 26:7,
26:22, 38:9, 44:3,
97:9, 104:13, 158:9,
159:21, 171:1, 172:1,
172:13, 173:17
verbal [2] - 5:11,
185:9
verbatim [1] - 197:8
version [2] - 66:22,
67:2
vertical [2] - 106:18,
106:19
Vic [2] - 27:15,
156:23
Vices [1] - 24:12
Victorias [1] - 24:12
video [101] - 76:22,
84:18, 85:16, 89:22,
90:18, 91:8, 92:2,

92:10, 93:10, 93:13, 94:15, 96:10, 96:13, 96:16, 98:11, 98:23, 99:14, 99:16, 100:10, 100:16, 100:18, 101:2, 101:12, 101:19, 101:22, 102:2, 102:16, 102:20, 104:17, 104:20, 105:1, 105:5, 112:4, 113:4, 115:21, 133:20, 134:1, 134:10, 134:12, 134:13, 134:14, 134:21, 135:9, 136:16, 136:20, 136:21, 137:20, 137:22, 138:15, 139:13, 139:15, 139:18, 139:22, 140:2, 140:11, 140:13, 141:4, 141:15, 141:20, 142:3, 142:5, 142:9, 142:11, 142:16, 142:21, 142:23, 143:12, 143:15, 143:19, 144:12, 144:13, 144:16, 144:17, 144:21, 144:23, 145:4, 145:7, 145:13, 145:15, 145:18, 146:4, 146:13, 146:22, 147:1, 147:4, 147:8, 147:9, 147:10, 148:3, 150:6, 150:12, 150:15, 164:15, 164:17, 165:5, 166:2, 166:8, 167:6, 167:9, 167:22, 168:2
    **videos** [3] - 89:5, 138:8, 138:15
    **view** [9] - 129:8, 131:1, 136:10, 136:23, 137:10, 138:4, 138:7, 142:23, 176:13
    **viewing** [7] - 43:1, 43:14, 104:16, 142:16, 146:22, 147:4, 168:8
    **viewpoint** [1] - 93:10
    **violation** [1] - 151:4
    **vs** [1] - 1:7

## W

    **wait** [4] - 6:22, 101:21, 145:16, 190:19

    **waited** [1] - 86:8
    **waiting** [2] - 53:7, 157:1
    **walk** [3] - 102:18, 103:2, 172:20
    **walking** [8] - 135:11, 135:20, 135:22, 137:13, 147:13, 147:23, 148:17, 164:23
    **wants** [5] - 20:4, 63:12, 73:7, 77:20, 100:8
    **warm** [1] - 102:3
    **watch** [10] - 89:5, 89:16, 89:18, 90:11, 98:16, 134:12, 139:2, 140:10, 140:16, 144:17
    **watched** [13] - 89:11, 90:8, 90:18, 94:15, 95:23, 98:18, 98:22, 99:16, 112:4, 115:15, 139:5, 167:22, 168:2
    **watches** [1] - 89:20
    **watching** [8] - 90:1, 90:5, 91:16, 99:14, 129:15, 139:11, 145:18, 146:3
    **water** [1] - 171:10
    **wave** [1] - 41:23
    **wearing** [3] - 130:9, 130:22, 147:18
    **weather** [1] - 101:23
    **week** [2] - 172:15, 172:17
    **weeks** [1] - 45:5
    **WESTERN** [1] - 1:4
    **WHALEN** [2] - 2:6, 197:18
    **whatnot** [3] - 53:5, 77:18, 105:21
    **whatsoever** [4] - 63:9, 65:18, 91:9, 112:7
    **wheel** [7] - 27:9, 27:14, 27:16, 27:17, 27:18, 28:3
    **white** [1] - 102:12
    **White** [1] - 176:3
    **whole** [14] - 39:5, 58:2, 65:13, 65:20, 66:2, 72:23, 87:10, 88:13, 88:22, 91:20, 92:2, 132:22, 132:23, 197:14
    **William** [1] - 44:11
    **window** [5] - 149:14, 152:11, 152:20, 167:2, 171:22

    **winter** [3] - 27:10, 28:4, 28:6
    **wish** [1] - 185:1
    **wishes** [2] - 125:18, 126:3
    **witness** [16] - 92:17, 93:5, 182:11, 182:13, 186:9, 186:16, 190:13, 190:15, 191:5, 191:9, 191:16, 192:3, 192:15, 192:20, 192:23, 193:12
    **Witness** [1] - 199:2
    **WITNESS** [98] - 3:19, 4:15, 4:18, 5:3, 5:5, 7:1, 10:5, 14:12, 25:21, 34:22, 35:16, 53:10, 54:21, 56:13, 56:15, 65:2, 71:22, 72:12, 72:22, 76:3, 79:11, 81:11, 82:4, 82:13, 85:4, 85:9, 92:10, 92:15, 93:15, 96:4, 96:13, 96:22, 99:5, 99:8, 99:11, 99:23, 100:4, 102:11, 103:21, 105:15, 107:8, 108:21, 110:16, 111:2, 117:13, 118:17, 119:4, 119:6, 119:12, 121:11, 122:5, 122:22, 123:20, 124:8, 125:15, 126:2, 128:13, 129:7, 129:23, 130:18, 134:18, 136:9, 136:16, 137:17, 138:17, 139:17, 140:16, 141:10, 142:15, 143:9, 143:15, 144:6, 145:4, 145:15, 148:8, 148:10, 150:10, 157:20, 158:14, 158:20, 160:2, 161:7, 162:5, 162:23, 163:15, 164:2, 165:12, 165:18, 166:1, 166:7, 176:11, 177:13, 179:18, 180:2, 181:11, 182:16, 193:15, 194:8
    **witnesses** [2] - 182:23, 192:20
    **WITNESSES** [1] - 199:1
    **woman** [3] - 51:18, 82:8, 82:18

    **worker** [1] - 169:11
    **works** [2] - 43:9, 44:18
    **worry** [1] - 178:22
    **writing** [1] - 197:10
    **written** [2] - 14:6, 187:14
    **wrote** [1] - 154:11

## Y

    **year** [23] - 6:9, 8:6, 8:9, 9:15, 9:17, 10:1, 10:2, 10:13, 11:11, 12:2, 17:16, 17:21, 36:14, 66:22, 66:23, 67:7, 84:14, 154:7, 154:14, 154:16, 156:7, 178:14
    **years** [20] - 9:6, 9:14, 10:3, 10:6, 10:8, 10:10, 17:10, 17:23, 18:2, 18:19, 18:20, 19:1, 21:1, 36:16, 36:18, 36:21, 37:13, 56:23, 156:4
    **YORK** [2] - 1:4, 197:1
    **York** [5] - 2:5, 2:10, 2:15, 3:2, 197:6
    **yourself** [5] - 97:17, 124:1, 131:23, 159:5, 194:18
    **Yusick** [1] - 95:4

## Z

    **Zak** [3] - 31:15, 44:6, 44:8
    **Zakary** [2] - 41:2, 41:11

EXHIBIT H

Certificate #: U-000004751-F

Page 1 of 1



# BUFFALO CITY COURT

50 Delaware Avenue, Buffalo, NY 14202

Phone: (716) 845-2689  Fax: (716) 847-8257

# FEE
**Non-Public
Version**

The People of the State of New York
vs.
**James Kistner**

**Certificate of Disposition**
Docket Number:     **CR-00122-17**

Defendant DOB: **04/03/1960**          Arrest Date: **01/01/2017**      Arraignment Date: **01/12/2017**

THIS IS TO CERTIFY that the undersigned has examined the files of the **Buffalo City Court** concerning the above entitled matter and finds the following:

| Count | Arraignment Charge | Charge Weight | Disposition | Disposition Date |
|-------|-------------------|---------------|-------------|------------------|
| 1 | PL 240.20 03 V Dis/Con:Obscene Lang/Gestures | V | Dismissed (Interest/Furtherance of Justice (CPL 170.30 (1)(g)), Do Not Seal) | 04/04/2017 |
| 2 | PL 145.05 02 EF Crim Mischief 3:Property> $250 **SEALED 160.50** | EF | Reduced to (Count #3) | 02/01/2017 |
| 3 | PL 145.00 01 AM Crim Mis:Intent Damage Proprty **SEALED 160.50** | AM | Dismissed (Interest/Furtherance of Justice (CPL 170.30 (1)(g)), Sealed 160.50) | 04/04/2017 |

Dated:   **April 2, 2018**

*Erika Lutab*

**Chief Clerk/Clerk of the Court**

## CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT SEAL

It shall be an unlawful discriminatory practice, unless specifically required or permitted by statute, for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to make any inquiry about, whether in any form of application or otherwise, or to act upon adversely to the individual involved, any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law, in connection with the licensing, employment or providing of credit or insurance to such individual; provided, further, that no person shall be required to divulge information pertaining to any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. The provisions of this subdivision shall not apply to the licensing activities of governmental bodies in relation to the regulation of guns, firearms and other deadly weapons or in relation to an application for employment as a police officer or peace officer as those terms are defined in subdivisions thirty-three and thirty-four of section 1.20 of the criminal procedure law; provided further that the provisions of this subdivision shall not apply to an application for employment or membership in any law enforcement agency with respect to any arrest or criminal accusation which was followed by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. [Executive Law § 296 (16)]
Arraignment charges may not be the same as the original arrest charges.
CPL 160.50:      All official records (excluding published court decisions or opinions or records and briefs on appeal) related to the arrest or prosecution on file with the Division of Criminal Justice Services, any court, police agency or prosecutor's office shall not be available to any person or public or private agency.

# EXHIBIT I

February 8, 2019

Bryan C. Lockwood
City of Buffalo Police Commissioner
74 Franklin Street
Buffalo, NY 14202

Dear Commissioner Lockwood:

      Re:    Complaint of James C. Kistner
             <u>Incident Date: January 1, 2017</u>

      As you may know, I recently filed a lawsuit against the City of Buffalo and other defendants (case number 18-cv-00402) relating to police misconduct that occurred on January 1, 2017. I was surprised to learn during the discovery process in my action that none of the officers involved were ever investigated or disciplined for what they did to me and my family. I am writing to you directly, asking you to remedy this oversight. Please forward this letter to your Internal Affairs Division immediately.

      I have enclosed a copy of the complaint that my attorneys filed on my behalf. It will provide you with all the information needed for the IA investigation. Please let me know when your investigation begins, and if you need to speak with me about the officers' acts and omissions. Thank you.

               Sincerely,

               James Kistner



EXHIBIT
41
10-14-20ATH

EXHIBIT J



EXHIBIT
38
9/24/2020 LND

# CITY OF BUFFALO
## DEPARTMENT OF POLICE

BYRON Wb BROWN
MAYOR

SCANNED
AUG 25 2020



BYRON C. LOCKWOOD
COMMISSIONER

August 13, 2020

James Kistner
33 Schmarbeck Ave.
Buffalo, New York 14212

Ms. Kistner,

The Buffalo Police Department's Internal Affairs Division has investigated the complaint you initiated on December 19, 2019, as thoroughly as possible. Statements and reports were gathered from the persons involved and their superiors, where necessary. The Commissioner of Police then reviewed these statements and reports.

Based on a thorough review of this case, the Commissioner of Police has determined that there is not sufficient evidence at this time to clearly prove your case and has determined that the case disposition be carried as "not sustained."

If you have questions regarding your complaint, please feel free to contact the Internal Affairs Division at 851-4557. Refer to IAD Case Number EC2019-046. Thank you for bringing this matter to our attention.

Regards,

Lieutenant Louis Kelly
Internal Affairs Division

EXHIBIT K

# EXHIBIT L

EXHIBIT M

EXHIBIT N

**VIDEO DEPOSITION**
**DANIEL DERENDA**


UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


------------------------------------------
JAMES C. KISTNER,

                              Plaintiff,

                - vs -        Civil Action No.
                              18-cv-402

THE City of Buffalo,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
 capacity as a Buffalo Police Officer,
KARL SCHULTZ, individually and in his
 capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
 capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
 capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),


                              Defendants.
------------------------------------------

2

1              Video deposition of **DANIEL DERENDA**,

2    Defendant, taken pursuant to the Federal Rules of

3    Civil Procedure, in the offices of JACK W. HUNT &

4    ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

5    New York, on September 24, 2020, commencing at

6    10:10 a.m., before LETITIA N. DAVIES, Notary Public.

7    APPEARANCES:      RUPP BAASE
                       PFALZGRAF & CUNNINGHAM, LLC,
8                      By CHAD DAVENPORT, ESQ.,
                       1600 Liberty Building,
9                      Buffalo, New York  14202,
                       (716) 854-3400,
10                     davenport@ruppbaase.com,
                       Appearing for the Plaintiff.
11
                       TIMOTHY A. BALL, ESQ.,
12                     Corporation Counsel,
                       By MAEVE E. HUGGINS, ESQ.,
13                     Assistant Corporation Counsel,
                       1137 City Hall,
14                     Buffalo, New York  14202,
                       (716) 851-4334,
15                     mhuggins@city-buffalo.com,
                       Appearing for the Defendants.
16
     PRESENT:          JAMES KISTNER
17                     PATRICK F. MORRIS, Videographer

18

10:09:44
10:10:25  19         **THE VIDEOGRAPHER:**  This will begin the video

20   recorded testimony of Daniel Derenda, taken for a

10:10:30  21   case to be tried in the United States District

10:10:33  22   Court in the Western District of New York.  To be

10:10:33  23   used in the matter of James Kistner versus the

3

1   City of Buffalo, et al.

10:10:38   2        This testimony is being taken at the office

10:10:39   3   of Jack W. Hunt & Associates at 1120 Liberty

10:10:43   4   Building in Buffalo, New York on September 24th,

10:10:46   5   2020 and is commencing at a time of 10:10 as

10:10:49   6   indicated on the video screen.

10:10:51   7        The court reporter and notary public, who is

8   from the firm of Jack W. Hunt & Associates is

9   Letitia Davies.  My name is Patrick Morris and I'm

10:10:58  10   a video technician of the same firm.

11        Counsel for the plaintiff will now introduce

12   themself, followed by counsel for the defendant and

10:11:04  13   the reporter will then swear in the witness.

10:11:07  14        **MR. DAVENPORT:**  Chad Davenport appearing on

10:11:08  15   behalf of the plaintiff, Jim Kistner.

16        **MS. HUGGINS:**  Maeve Huggins on behalf of the

17   defendants.

18        **THE REPORTER:**  Will this be usual

19   stipulations?

20        **MS. HUGGINS:**  We'll read and sign, 45 days,

21   please.

22

23

4

1   **D A N I E L   D E R E N D A**, 47 Seward Street,

2   Buffalo, New York 14206, after being duly called

3   and sworn, testified as follows:

4

5       **EXAMINATION BY MR. DAVENPORT:**

6

10:11:40   7       **Q.**   Good morning, Mr. Derenda.

10:11:41   8       **A.**   How are you?

10:11:42   9       **Q.**   My name is Chad Davenport.  I am the

10:11:44   10  attorney on behalf of the plaintiff, Jim Kistner in

10:11:47   11  this case versus the city of Buffalo.  It pertains

10:11:50   12  to an incident that happened on January 1st of 2017.

10:11:54   13      Have you ever given sworn testimony before

10:11:57   14  in a civil case?

10:11:58   15      **A.**   Yes.

10:11:58   16      **Q.**   Approximately how many times have you

10:12:01   17  given sworn testimony?

10:12:03   18      **A.**   At least a half dozen.  Just recently a

10:12:06   19  lot, so several different cases.

10:12:08   20      **Q.**   So same ground rules apply.  I just ask

10:12:12   21  that you wait for me to finish my question before

10:12:14   22  you answer any question.

10:12:16   23      I also ask that you give all verbal

*Derenda - Davenport - 9/24/2020*

5

| | | |
|---|---|---|
| 10:12:18 | 1 | responses to any of the questions that I ask. |
| 10:12:22 | 2 | Please refrain from shaking or nodding your head. |
| 10:12:26 | 3 | If at any time you need to take a break, |
| 10:12:28 | 4 | just let me know.  I'm more than happy to |
| 10:12:30 | 5 | accommodate. |
| 10:12:33 | 6 | And then also, if you need me to rephrase |
| 10:12:34 | 7 | any questions, just ask me.  I'm more than happy to |
| 10:12:37 | 8 | rephrase any question if you don't understand it. |
| 10:12:40 | 9 | And I just ask that you answer all questions to the |
| 10:12:42 | 10 | best of your ability. |
| 10:12:43 | 11 | And if you don't recall you can simply tell |
| 10:12:46 | 12 | me that you do not recall.  And that is an |
| 10:12:49 | 13 | acceptable answer, as well. |
| 10:12:51 | 14 | **A.**   Okay. |
| 10:12:51 | 15 | **Q.**   Mr. Derenda, what -- what would you |
| 10:12:55 | 16 | like me to refer to you during this deposition? |
| | 17 | Should I refer to you as Commissioner Derenda? |
| 10:13:01 | 18 | Mr. Derenda?  Daniel?  Dan? |
| 10:13:01 | 19 | **A.**   Dan is fine. |
| 10:13:02 | 20 | **Q.**   Dan.  So Dan, what is your educational |
| 10:13:07 | 21 | background? |
| 10:13:08 | 22 | **A.**   Educational background, high school |
| 10:13:10 | 23 | grad with some college courses.  I do not have a |

*Derenda - Davenport - 9/24/2020*

6

10:13:14  1  college degree.

10:13:14  2          Q.    Where -- where did you take those

10:13:16  3  college courses?

10:13:17  4          A.    ECC.

10:13:18  5          Q.    And approximately what years did you go

10:13:21  6  to ECC?

10:13:22  7          A.    It was a long time ago.  It was just a

10:13:28  8  couple courses.  Plus then also, the police academy

10:13:32  9  in '86, which would be some courses there.  So

10:13:35 10  prior to '86.

10:13:38 11          Q.    Were you taking those classes at ECC

10:13:41 12  outside of the police academy?

10:13:43 13          A.    Yes, that was prior to the police

10:13:47 14  academy.

10:13:47 15          Q.    So that would have been before 1986

10:13:50 16  then?

10:13:50 17          A.    Correct.

10:13:51 18          Q.    And do you recall what classes you took

10:13:52 19  at ECC?

10:13:53 20          A.    Not specifically, they were criminal

10:13:55 21  justice related.

10:13:58 22          Q.    How many years did you take courses at

10:14:01 23  ECC for?

*Derenda - Davenport - 9/24/2020*

7

| | | |
|---|---|---|
| 10:14:02 | 1 | **A.**    I just took a class here and there. |
| 10:14:04 | 2 | Just a couple classes. |
| 10:14:06 | 3 | **Q.**    Were those classes required to get into |
| 10:14:11 | 4 | the police academy at that time? |
| 10:14:11 | 5 | **A.**    No. |
| 10:14:12 | 6 | **Q.**    Now, do you recall what month you |
| 10:14:14 | 7 | started in the police academy in 1986? |
| 10:14:17 | 8 | **A.**    March 24th, 1986 I was sworn in.  So I |
| 10:14:22 | 9 | would have started the following Monday in the |
| 10:14:25 | 10 | academy. |
| 10:14:26 | 11 | **Q.**    So you were sworn in before you passed |
| 10:14:31 | 12 | through the police academy? |
| 10:14:32 | 13 | **A.**    Correct. |
| 10:14:33 | 14 | **Q.**    And then, how long after March 24th of |
| 10:14:37 | 15 | 1986 were you in the police academy for? |
| 10:14:41 | 16 | **A.**    I think I graduated three months later. |
| 10:14:44 | 17 | Somewhere around there, March, April.  Might have |
| 10:14:46 | 18 | been even longer than that.  Might have been |
| 10:14:49 | 19 | August.  I don't recall, specifically. |
| 10:14:52 | 20 | **Q.**    After you had graduated from the police |
| 10:14:54 | 21 | academy, did you start as a patrol officer? |
| 10:14:57 | 22 | **A.**    Correct. |
| 10:15:00 | 23 | **Q.**    Were there different districts within |

*Derenda - Davenport - 9/24/2020*

8

| | | |
|---|---|---|
| 10:15:03 | 1 | the city of Buffalo at that time? |
| 10:15:03 | 2 | **A.**     There were precincts at the time. |
| 10:15:06 | 3 | **Q.**     And -- I'm sorry for assuming.  But did |
| 10:15:07 | 4 | you start your career with the city of Buffalo |
| 10:15:11 | 5 | Police Department? |
| 10:15:11 | 6 | **A.**     Yes, I did. |
| 10:15:12 | 7 | **Q.**     And that would have been August or July |
| 10:15:14 | 8 | of 1986? |
| 10:15:16 | 9 | **A.**     Technically, it would have been |
| 10:15:17 | 10 | March 24th of '86.  You go through the academy and |
| 10:15:20 | 11 | then you get assigned to a precinct back then. |
| 10:15:24 | 12 | Now, it would be a district. |
| 10:15:26 | 13 | **Q.**     Do you recall what precinct you were |
| 10:15:28 | 14 | originally assigned to? |
| 10:15:28 | 15 | **A.**     Precinct 8 Broadway/Fillmore. |
| 10:15:31 | 16 | **Q.**     And how long were you in that precinct |
| 10:15:33 | 17 | for? |
| 10:15:33 | 18 | **A.**     Approximately 10 years until it closed. |
| 10:15:37 | 19 | **Q.**     Do you know why that precinct closed? |
| 10:15:40 | 20 | **A.**     The commissioner consolidated with |
| 10:15:43 | 21 | moving to a district system.  They closed |
| 10:15:46 | 22 | Precinct 8, combined them with Precinct 11. |
| 10:15:49 | 23 | I was at Precinct 11 for a short period on |

*Derenda - Davenport - 9/24/2020*

9

| | | |
|---|---|---|
| 10:15:50 | 1 | patrol.  And I transferred to Precinct 16, which |
| 10:15:55 | 2 | would have been the Bailey/Kensington area. |
| 10:15:56 | 3 | Q.    Would that have been during the |
| 10:15:59 | 4 | 10 years that you were working in Precinct 8?  Or |
| 10:16:00 | 5 | after the initial 10 years with Precinct 8? |
| 10:16:02 | 6 | A.    Precinct 8 was probably just under |
| 10:16:05 | 7 | 10 years, about the same timeframe.  Most of it was |
| 10:16:08 | 8 | spent at -- most of my patrol time was spent at |
| 10:16:10 | 9 | Precinct 8.  A very short period at -- at 11, moved |
| 10:16:16 | 10 | to Precinct 16 for maybe about a year. |
| 10:16:18 | 11 | And then I was made detective and actually |
| 10:16:21 | 12 | assigned to Precinct 16.  But then when D-District |
| 10:16:25 | 13 | opened up on Hertel Avenue I transferred there. |
| 10:16:28 | 14 | That might have been '96, '97, somewhere around |
| 10:16:32 | 15 | there. |
| 10:16:37 | 16 | Q.    And how long did you work in D-District |
| 10:16:41 | 17 | for? |
| 10:16:42 | 18 | A.    In D-District as a detective, I was |
| 10:16:45 | 19 | there as a detective.  Then I was promoted to |
| 10:16:50 | 20 | detective sergeant.  I stayed there probably a few |
| 10:16:52 | 21 | years total. |
| 10:16:53 | 22 | And then at some point I transferred down to |
| 10:16:59 | 23 | the Buffalo Police Headquarters Narcotics.  I was |

*Derenda - Davenport - 9/24/2020*

10

| | | |
|---|---|---|
| 10:16:59 | 1 | there for a short period of time. |
| 10:17:01 | 2 | And I was transferred to homicide after |
| 10:17:03 | 3 | that, as a detective sergeant to both narcotics and |
| 10:17:11 | 4 | homicide. |
| 10:17:11 | 5 | Q.   Now, what's the difference between a |
| 10:17:15 | 6 | detective and a detective sergeant? |
| 10:17:15 | 7 | A.   The sergeant is the supervisor. |
| 10:17:17 | 8 | Q.   Is there a supervisor above detective |
| 10:17:20 | 9 | sergeant? |
| 10:17:20 | 10 | A.   Well, yeah, obviously.  In the |
| 10:17:24 | 11 | detective division the next would be the chief of |
| | 12 | detectives.  However, it was a convoluted system. |
| 10:17:30 | 13 | So although I was a detective under |
| 10:17:33 | 14 | detective sergeant, I still reported to the |
| 10:17:36 | 15 | district inspector.  And lieutenants that were |
| 10:17:37 | 16 | patrol lieutenants out ranked me also or captains. |
| 10:17:40 | 17 | So there's a whole chain of command that way. |
| 10:17:44 | 18 | Q.   How long did you work with the |
| 10:17:46 | 19 | detective division for? |
| 10:17:48 | 20 | A.   I think it was from '98 through 2000 -- |
| 10:17:52 | 21 | up until 2006.  February of 2006, when I was |
| 10:17:56 | 22 | promoted to deputy police commissioner in charge of |
| 10:18:02 | 23 | operations. |

*Derenda - Davenport - 9/24/2020*

11

| 10:18:02 | 1 | Q. How many deputy police commissioners |
| 10:18:05 | 2 | are there? |
| 10:18:05 | 3 | A. Two. |
| 10:18:06 | 4 | Q. And your title was in control of |
| 10:18:08 | 5 | operations? |
| 10:18:08 | 6 | A. Correct. |
| 10:18:09 | 7 | Q. And then, what were the other deputy |
| 10:18:11 | 8 | commissioners? |
| 10:18:12 | 9 | A. Administrative. |
| 10:18:16 | 10 | Q. Now, for operations, what were your |
| 10:18:20 | 11 | typical -- your responsibilities as the |
| | 12 | detective -- as -- excuse me, the deputy in |
| 10:18:28 | 13 | charge -- |
| 10:18:28 | 14 | A. Operations. There's five districts, so |
| 10:18:31 | 15 | the chiefs of each district would report to the |
| 10:18:34 | 16 | deputy of operations. |
| 10:18:35 | 17 | And basically, the detective division, |
| 10:18:39 | 18 | basically, gave the day operations of the police |
| 10:18:40 | 19 | department. Patrol, detective division, anything |
| 10:18:44 | 20 | to do with operations, accident investigation, |
| 10:18:51 | 21 | homicide. All the units. |
| 10:18:54 | 22 | Q. What was your role with accident |
| 10:18:57 | 23 | investigation? What were your responsibilities for |

*Derenda - Davenport - 9/24/2020*

12

10:19:02 | 1    the job -- overseeing them?

10:19:03 | 2         **A.**    Well, they would report up through a

10:19:05 | 3    chain of command to me.  So basically, you oversee

10:19:08 | 4    all of operations.  They're part of the operations.

10:19:10 | 5         **Q.**    So you would have been last in line for

10:19:13 | 6    any accident investigation that took place?

10:19:16 | 7         **A.**    Yes -- second last in line.  Because

10:19:17 | 8    then it would go up to the commissioner.

10:19:20 | 9         **Q.**    But you would provide your

10 | recommendation to the commissioner?

10:19:26 | 11    **MS. HUGGINS:**   Form.

12    **THE WITNESS:**   For --

13    **MS. HUGGINS:**   You can answer.

14    **BY MR. DAVENPORT:**

10:19:27 | 15         **Q.**    For any accident investigation, would

16    you provide your recommendation to the

10:19:30 | 17    commissioner?

10:19:30 | 18         **A.**    Recommendation on what?

10:19:32 | 19         **Q.**    On the facts and circumstances

10:19:35 | 20    surrounding an accident, whether it be accidents

10:19:41 | 21    involving negligence or that sort of --

10:19:44 | 22         **A.**    Very little of what accident

10:19:46 | 23    investigation would do would even reach me.  And I

*Derenda - Davenport - 9/24/2020*

13

10:19:50  1  don't recall what might have or not, but very

10:19:52  2  little would have.

10:19:54  3        **MS. HUGGINS:**  Form as to the last question.

        4        **BY MR. DAVENPORT:**

10:19:58  5        **Q.**    With accident investigation, was there

10:20:00  6  somebody who was the supervisor at the time when

10:20:05  7  you were working as the deputy commissioner?

10:20:07  8        **A.**    I don't recall who it was because it's

10:20:09  9  a position by seniority.  So there would be a

10:20:14 10  lieutenant and there would be a captain, probably

10:20:15 11  from traffic that would oversee that.

10:20:16 12        It's changed numerous times over the years.

10:20:19 13  And there would be an inspector after that.  And

10:20:22 14  then it would get to me.

10:20:24 15        **Q.**    Would the inspector be above the

10:20:28 16  captain?

10:20:28 17        **A.**    Correct, there were only a few

10:20:31 18  inspectors.  So he might have certain people he

10:20:34 19  would -- he'd be responsible for.  But a group of

10:20:37 20  different types of things, so.

10:20:40 21        **Q.**    Do you know, approximately how many

10:20:45 22  personnel were working in the accident

10:20:48 23  investigation unit, more particularly around in

10:20:50 1   2017?

10:20:51 2           **A.**    I don't recall.

10:20:52 3           **Q.**    If you were to provide an estimate,

10:20:55 4   would it be above 20 personnel?

10:20:58 5           **A.**    I wouldn't provide an estimate.  I

10:21:00 6   don't recall.  I don't believe it would be above

10:21:04 7   20, but.

10:21:05 8           **Q.**    Do you know, approximately how many

10:21:06 9   times accident investigation is called to a scene

10:21:10 10  to investigate an accident?

10:21:12 11          **MS. HUGGINS:**   Form.

10:21:12 12          **THE WITNESS:**   I don't have those numbers.

13          **BY MR. DAVENPORT:**

10:21:16 14          **Q.**    Would it be more or less than once a

10:21:20 15  week?

10:21:20 16          **A.**    It would be in serious matters where

10:21:23 17  there was death, serious injury.  It would not be

10:21:26 18  routine to call out an accident investigation.

10:21:33 19          **Q.**    And was that the normal protocol in

10:21:38 20  2017, as well?

10:21:39 21          **A.**    I would believe that would be, correct.

10:21:44 22          **Q.**    Would accident investigation be

10:21:48 23  required to investigate any police involved motor

*Derenda - Davenport - 9/24/2020*

15

| | | |
|---|---|---|
| 10:21:51 | 1 | vehicle accident? |
| 10:21:52 | 2 | **A.**     What would have taken place, the policy |
| 10:21:54 | 3 | I put in place for any officer involved vehicle |
| 10:21:58 | 4 | accidents, internal affairs would respond to every |
| 10:22:01 | 5 | one of those scenes of an officer involved vehicle |
| 10:22:03 | 6 | accidents. |
| 10:22:04 | 7 | But at times accident investigation could |
| 10:22:08 | 8 | depending on the seriousness. |
| 10:22:09 | 9 | **Q.**     Would IAD be required to go to any |
| 10:22:14 | 10 | police involved motor vehicle accident? |
| 10:22:16 | 11 | **A.**     Correct. |
| 10:22:16 | 12 | **Q.**     And then accident investigation would |
| 10:22:18 | 13 | only come in if it was a serious injury? |
| 10:22:21 | 14 | **A.**     Correct, or other circumstances that |
| 10:22:24 | 15 | they would feel that you would need them. |
| 10:22:27 | 16 | **Q.**     What were some of those other |
| 10:22:29 | 17 | circumstances? |
| 10:22:30 | 18 | **A.**     Again, death, serious -- serious |
| 10:22:33 | 19 | physical injury, it could be a large amount of |
| 10:22:37 | 20 | property damage.  Again, depending on the scenario |
| 10:22:41 | 21 | they would call them if they needed them or they |
| 10:22:44 | 22 | thought they needed them. |
| 10:22:45 | 23 | But internal affairs was tasked with |

*Derenda - Davenport - 9/24/2020*

16

| | | |
|---|---|---|
| 10:22:47 | 1 | investigating every accident.  That's a policy I |
| 10:22:49 | 2 | put in place. |
| 10:22:50 | 3 | Q.   Do you know, approximately when you put |
| 10:22:52 | 4 | that policy in place? |
| 10:22:53 | 5 | A.   Sometime after 2010 when I became |
| 10:22:57 | 6 | commissioner. |
| 10:22:57 | 7 | Q.   So you would have been deputy police |
| 10:22:58 | 8 | commissioner from 2006 to 2010? |
| 10:23:01 | 9 | A.   From February 1st, 2006.  In January of |
| 10:23:06 | 10 | 2010 I was appointed interim.  And six months later |
| 10:23:10 | 11 | I was appointed permanent, so July 2010. |
| 10:23:16 | 12 | Q.   Who was the police commissioner right |
| 10:23:18 | 13 | before you? |
| 10:23:18 | 14 | A.   McCarthy Gibson. |
| 10:23:21 | 15 | Q.   And how long was he the police |
| 10:23:22 | 16 | commissioner for? |
| 10:23:23 | 17 | A.   Four years. |
| 10:23:24 | 18 | Q.   Who appointed you to be police |
| 10:23:27 | 19 | commissioner for the city of Buffalo? |
| 10:23:29 | 20 | A.   Commissioners and deputy commissioners |
| 10:23:31 | 21 | were appointed by the mayor. |
| 10:23:34 | 22 | Q.   Is there any input that comes in from |
| 10:23:39 | 23 | Common Council?  Or other city of Buffalo |

*Derenda - Davenport - 9/24/2020*

17

1    representatives?

10:23:41    2         **A.**    For -- for commissioner you have to go

10:23:43    3    before the Council, but deputy not.  But for

10:23:46    4    commissioner you go before Council, you do a

10:23:48    5    hearing and they vote on your appointment.

10:23:53    6         **Q.**    So the mayor would nominate you and

10:23:57    7    then Common Council would vote you in?

10:23:59    8         **A.**    Correct.

10:23:59    9         **Q.**    Do you recall how many Common Council

10:24:05   10    members voted on your status as police

10:24:08   11    commissioner?

10:24:08   12         **A.**    I don't recall.

10:24:12   13         **Q.**    Do you know if there was a quorum that

10:24:16   14    day?

10:24:17   15         **A.**    I don't recall.

10:24:22   16         **Q.**    In 2010 -- July of 2010, you were

10:24:26   17    appointed as full-time police commissioner?

10:24:30   18         **A.**    Correct.

10:24:30   19         **Q.**    But prior to that, for six months you

10:24:32   20    had been the interim police commissioner?

10:24:34   21         **A.**    Correct.

10:24:35   22         **Q.**    Why was it that you were appointed as

10:24:38   23    the interim police commissioner for six months?

*Derenda - Davenport - 9/24/2020*

18

| 10:24:41 | 1 |  A.    Until the mayor made the decision to |
| 10:24:44 | 2 | put me up for permanent and go before the Council. |
| 10:24:47 | 3 |  Q.    Had the previous police commissioner |
| 10:24:49 | 4 | retired then -- at that time? |
| 10:24:51 | 5 |  A.    He wasn't reappointed. |
| 10:24:55 | 6 |  Q.    How often are police commissioners |
| 10:25:00 | 7 | appointed?  Or reappointed? |
| 10:25:01 | 8 |  A.    Every four years.  Or if they're |
| 10:25:04 | 9 | removed they can be appointed.  It's the mayor -- |
| 10:25:07 | 10 | mayor selection -- selected by the mayor.  You |
| 10:25:10 | 11 | serve at the discretion of the mayor. |
| 10:25:11 | 12 |  So therefore, if he wants you removed now |
| 10:25:14 | 13 | and it's not a four-year term, you're removed.  But |
| 10:25:18 | 14 | every four years you go through the process again. |
| 10:25:21 | 15 |  Q.    And is that in the Buffalo Charter that |
| 10:25:24 | 16 | police commissioners serve for four years? |
| 10:25:26 | 17 |  A.    Not 100% certain.  But no, there's no |
| 10:25:29 | 18 | term -- I believe, you get sworn in for four -- |
| 10:25:32 | 19 | four years later you have to be reappointed.  I |
| 10:25:36 | 20 | don't know if it's in the Charter or not. |
| 10:25:37 | 21 |  Q.    Would you have been reappointed then in |
| 10:25:39 | 22 | 2014? |
| 10:25:40 | 23 |  A.    I was. |

*Derenda - Davenport - 9/24/2020*

19

| | | |
|---|---|---|
| 10:25:42 | 1 | Q. Did you seek reappointment in 2018? |
| 10:25:47 | 2 | A. I left January of 2018. |
| 10:25:53 | 3 | Q. And do you know when the reappointment |
| 10:25:56 | 4 | would have been?  Would it have been July of 2018? |
| 10:25:58 | 5 | A. No, it would have been January. |
| 10:26:00 | 6 | Q. So -- |
| 10:26:01 | 7 | A. I believe it went before the Council |
| 10:26:05 | 8 | prior to a week, but I knew I was leaving.  I just |
| 10:26:08 | 9 | didn't tell anybody. |
| 10:26:15 | 10 | Q. So when you were reappointed in 2014, |
| 10:26:19 | 11 | that would have been in January of 2014? |
| 10:26:21 | 12 | A. Somewhere around there.  Maybe not |
| 10:26:23 | 13 | exactly January, but whenever they got the Council |
| 10:26:26 | 14 | hearing.  Could have been February. |
| 10:26:37 | 15 | Q. During the reappointment process, what |
| 10:26:40 | 16 | kinds of questions would Common Council ask you? |
| 10:26:43 | 17 | A. I don't recall specifics.  More about |
| 10:26:47 | 18 | crime issues, different issues, community issues. |
| 10:26:49 | 19 | Specifically, I don't recall. |
| 10:26:52 | 20 | Q. And are those the questions -- the |
| 10:26:54 | 21 | types of questions that they would have asked you |
| 10:26:56 | 22 | in 2014? |
| 10:26:58 | 23 | A. Probably, both in '10 and '14. |

*Derenda - Davenport - 9/24/2020*

20

10:27:01  1        Q.    In 2010 when you were initially

10:27:04  2    appointed, did they ask you those types of

10:27:06  3    questions?

10:27:06  4        A.    I'll make the assumption, yes.

10:27:08  5        Q.    As the police commissioner, were you in

6    charge of all districts?

10:27:14  7        A.    Responsible for all police departments

10:27:16  8    both operations and administrative, yes.

10:27:20  9        Q.    And when you were appointed in 2010,

10:27:23 10    was there a district system rather than a precinct

10:27:26 11    system?

10:27:26 12        A.    District system, correct.

10:27:27 13        Q.    But that was something that the

10:27:28 14    previous commissioner had --

10:27:30 15        A.    It was a couple commissioners before

10:27:32 16    him.  So R. Gil Kerlikowske started consolidating

17    the precincts.  After R. Gil left, Rocco Diina

10:27:43 18    became the commissioner and, I believe, the process

10:27:44 19    was complete during his term.

10:27:47 20        Q.    How many districts would there have

10:27:51 21    been when you first started as police commissioner?

10:27:53 22        A.    Five.

10:27:54 23        Q.    And those five districts would have

*Derenda - Davenport - 9/24/2020*

21

| | | |
|---|---|---|
| 10:27:57 | 1 | been A through E districts? |
| 10:28:00 | 2 | **A.** Correct. |
| 10:28:01 | 3 | **Q.** Were those the same districts that were |
| 10:28:02 | 4 | in place when you left the position as police |
| 10:28:06 | 5 | commissioner? |
| 10:28:06 | 6 | **A.** Yes. |
| 10:28:06 | 7 | **Q.** Was there any change in the zones for |
| 10:28:13 | 8 | each of those districts during your tenure? |
| 10:28:15 | 9 | **A.** Meaning, zones -- meaning? |
| 10:28:17 | 10 | **Q.** I should have used districts.  Was |
| 10:28:21 | 11 | there any change in the mapping for the districts |
| 10:28:25 | 12 | during your tenure as commissioner? |
| 10:28:27 | 13 | **A.** Possibly, I don't remember. |
| 10:28:29 | 14 | **Q.** But they generally remained the same? |
| 10:28:32 | 15 | **A.** Generally, again, they divided it up |
| 10:28:36 | 16 | into different areas.  But I don't recall. |
| 10:28:40 | 17 | **Q.** Do you know what the zone or map is for |
| 10:28:46 | 18 | the C-District, where that district is placed? |
| 10:28:50 | 19 | **A.** C-District it is the -- it's actually |
| 10:28:54 | 20 | the building is on Fillmore going up to Ferry.  I'm |
| 10:28:58 | 21 | not sure where the boundaries are.  Boundaries |
| 10:29:01 | 22 | might be Bailey Avenue up to -- up to Walden. |
| 10:29:07 | 23 | Might even go up to Genesee.  I'm not 100% certain. |

*Derenda - Davenport - 9/24/2020*

22

10:29:13  1          Q.    And to the best of your recollection,

10:29:16  2    is that the zone that was in place for

10:29:19  3    C-District -- the mapping that was in place for

10:29:22  4    C-District on January 1st, 2017?

10:29:23  5          A.    Yes.

10:29:24  6          Q.    Do you know who the captain is for

10:29:28  7    C-District?

10:29:29  8          A.    Currently?

10:29:30  9          Q.    Currently.  We'll start with currently.

10:29:32  10         A.    I have no idea.

10:29:34  11         Q.    Do you know who the captain was for

10:29:35  12   C-District in 2017?

10:29:38  13         A.    I don't recall.

10:29:40  14         Q.    Now, who would be below captain in the

10:29:47  15   chain of command?

10:29:47  16         A.    A lieutenant.

10:29:48  17         Q.    And how many --

10:29:49  18         A.    For districts, there would be a chief

10:29:53  19   in charge of a district.  And then there would be

10:29:56  20   captains assigned.  And there would be lieutenants

10:29:59  21   assigned and right on down.

10:30:01  22         Q.    How many chiefs would be assigned to

10:30:03  23   any one --

*Derenda - Davenport - 9/24/2020*

23

10:30:03  1          A.    It's one chief for every district.

10:30:05  2          Q.    And then how many captains would be

10:30:07  3    assigned?

10:30:08  4          A.    In some cases there was one, maybe two.

10:30:11  5    Depending on what district, call volumes.

10:30:14  6          Q.    Do you know in C-District if they had

10:30:15  7    one or two captains?

10:30:17  8          A.    I don't recall.

10:30:17  9          Q.    And then below that would have been

10:30:21  10   lieutenants?

10:30:21  11         A.    Yes.

10:30:22  12         Q.    And how many lieutenants would there

10:30:23  13   be?

10:30:23  14         A.    There's a lieutenant assigned to every

10:30:26  15   shift.  So sometimes -- well, it might be two

10:30:29  16   because they overlap and move around.

10:30:32  17         Q.    Do you know who the lieutenants were in

10:30:35  18   C-District in 2017?

10:30:36  19         A.    I don't recall.

10:30:37  20         Q.    Do you know if one of those lieutenants

10:30:40  21   was Anthony McHugh?

10:30:42  22         A.    I don't recall.

10:30:44  23         Q.    Are you familiar with the name

| | | |
|---|---|---|
| 10:30:49 | 1 | Anthony McHugh? |
| 10:30:49 | 2 | **A.** I've heard the name. |
| 10:30:51 | 3 | **Q.** Have you ever worked with him before? |
| 10:30:53 | 4 | **A.** Not to my knowledge. |
| 10:30:54 | 5 | **Q.** As the police commissioner, do you |
| 10:31:01 | 6 | review, generally, reports of crime in certain |
| 10:31:03 | 7 | districts? |
| 10:31:03 | 8 | **A.** I would look at different crime |
| 10:31:06 | 9 | reports, what's going on. |
| 10:31:07 | 10 | **Q.** Besides crime reports, what else would |
| 10:31:09 | 11 | you review? |
| 10:31:12 | 12 | **A.** Look at crime patterns, what's going |
| 10:31:15 | 13 | on, different things.  I overlook everything.  So I |
| 10:31:18 | 14 | would receive reports.  Occasionally read through |
| 10:31:21 | 15 | them, different reports. |
| 10:31:22 | 16 | **Q.** Do you ever receive reports on |
| 10:31:25 | 17 | disciplinary matters? |
| 10:31:27 | 18 | **A.** You would -- you would do what they |
| 10:31:29 | 19 | called an internal affairs review process. |
| 10:31:34 | 20 | **Q.** And what would -- what would take part |
| 10:31:35 | 21 | in that process during an internal affairs review? |
| 10:31:38 | 22 | **A.** So basically, there would be a |
| 10:31:40 | 23 | complaint filed or an investigation initiated by |

*Derenda - Davenport - 9/24/2020*

25

| | | |
|---|---|---|
| 10:31:42 | 1 | the department.  It would investigate it and then |
| 10:31:46 | 2 | bring it for review before me, the deputy |
| 10:31:49 | 3 | commissioner.  And there's usually a legal counsel |
| 10:31:51 | 4 | there. |
| 10:31:52 | 5 | And you -- they would review the case, tell |
| 10:31:55 | 6 | you what they have.  Then you'd make a decision |
| 10:31:58 | 7 | what to do with that case at that point, sustained, |
| 10:32:04 | 8 | not sustained, unfounded.  But you would review the |
| 10:32:08 | 9 | cases. |
| 10:32:08 | 10 | Q.    And would the legal counselor be |
| 10:32:11 | 11 | somebody with the city of Buffalo? |
| 10:32:13 | 12 | A.    Yes. |
| 10:32:13 | 13 | Q.    And generally, not outside counsel, |
| 10:32:15 | 14 | correct? |
| 10:32:15 | 15 | A.    Correct. |
| 10:32:17 | 16 | Q.    Would that attorney generally be the |
| 10:32:21 | 17 | same?  Or does it switch? |
| 10:32:23 | 18 | A.    It was generally the same. |
| 10:32:26 | 19 | Q.    And then you gave a couple of different |
| 10:32:30 | 20 | possible outcomes, one of those being not |
| 10:32:33 | 21 | sustained? |
| 10:32:34 | 22 | A.    Correct. |
| 10:32:34 | 23 | Q.    What's a not sustained finding? |

| | | |
|---|---|---|
| 10:32:37 | 1 | A.    Not sustained means, I couldn't prove |
| 10:32:39 | 2 | the allegation one way or the other.  Sustained |
| 10:32:43 | 3 | means, I could prove it.  Unfounded, in my opinion, |
| 10:32:47 | 4 | means, it didn't happen as reported. |
| 10:32:51 | 5 | Q.    So a not sustained would just be based |
| 10:32:53 | 6 | on the evidence that was put before you? |
| 10:32:56 | 7 | A.    Correct. |
| 10:32:57 | 8 | Q.    Would it be your job to review the |
| 10:33:02 | 9 | amount of evidence that is placed before you in an |
| 10:33:06 | 10 | internal affairs investigation? |
| 10:33:07 | 11 | A.    The investigator would bring up the |
| 10:33:09 | 12 | evidence, what he had, give an opinion, |
| 10:33:12 | 13 | recommendation. |
| 10:33:13 | 14 | We'd also confer with legal counsel and make |
| 10:33:15 | 15 | a determination whether we believe it was sustained |
| 10:33:19 | 16 | or not sustained or unfounded. |
| 10:33:20 | 17 | Q.    Would that meeting between you, the |
| 10:33:23 | 18 | internal affairs investigator and legal counsel |
| 10:33:26 | 19 | take place with all of you in the same room at the |
| 10:33:27 | 20 | same time? |
| 10:33:27 | 21 | A.    All in the same room, along with the |
| 10:33:32 | 22 | internal affairs inspector.  And he would bring in |
| 10:33:33 | 23 | investigators one at a time to present their cases. |

*Derenda - Davenport - 9/24/2020*

27

| | | |
|---|---|---|
| 10:33:39 | 1 | Q.   Would you ever bring in the complainant |
| 10:33:43 | 2 | as part of -- |
| 10:33:44 | 3 | A.   No. |
| 10:33:46 | 4 | Q.   And you said it would be the internal |
| 10:33:50 | 5 | affairs investigator? |
| 10:33:50 | 6 | A.   It would be to interview the |
| 10:33:53 | 7 | complainants, correct. |
| 10:33:53 | 8 | Q.   Would it just be the investigator who |
| 10:33:57 | 9 | interviewed the complainants who would be present |
| 10:34:03 | 10 | for this presentation of the evidence to you? |
| 10:34:03 | 11 | A.   Yes. |
| 10:34:03 | 12 | Q.   Is there any supervisors from internal |
| 10:34:06 | 13 | affairs who are also part of this meeting? |
| 10:34:09 | 14 | A.   The inspector. |
| 10:34:10 | 15 | Q.   And how many internal affairs |
| 10:34:12 | 16 | inspectors are there? |
| 10:34:13 | 17 | A.   One. |
| 10:34:14 | 18 | Q.   What would -- |
| 10:34:18 | 19 | A.   Sometimes the captain, too, would be |
| 10:34:21 | 20 | there.   Internal affairs captain may attend a |
| 10:34:25 | 21 | review. |
| 10:34:25 | 22 | Q.   And then would inspector be above |
| 10:34:29 | 23 | captain in the chain of command? |

*Derenda - Davenport - 9/24/2020*

28

| | | |
|---|---|---|
| 10:34:30 | 1 | A.    Correct. |
| 10:34:31 | 2 | Q.    And then, what would be below captain? |
| 10:34:33 | 3 | A.    Lieutenant. |
| 10:34:35 | 4 | Q.    And then, would there be a position |
| 10:34:39 | 5 | below lieutenant for internal affairs? |
| 10:34:42 | 6 | A.    No, at one point they had detectives up |
| 10:34:46 | 7 | there, but we switched to lieutenants. |
| 10:34:46 | 8 | Q.    Do you know, approximately when it |
| 10:34:49 | 9 | switched from detectives to lieutenants? |
| 10:34:51 | 10 | A.    I do not.  I don't recall. |
| 10:34:53 | 11 | Q.    Was that during your tenure as |
| 10:34:56 | 12 | commissioner? |
| 10:34:56 | 13 | A.    I don't recall. |
| 10:34:57 | 14 | Q.    Do you know when, approximately that |
| 10:35:02 | 15 | change would have been made? |
| 10:35:04 | 16 | A.    No, I don't. |
| 10:35:05 | 17 | Q.    So there's one inspector; is that |
| 10:35:09 | 18 | correct? |
| 10:35:09 | 19 | A.    Correct. |
| 10:35:10 | 20 | Q.    And then how many captains? |
| 10:35:11 | 21 | A.    Just one captain that generally over -- |
| 10:35:14 | 22 | oversaw the drug testing and would assist on other |
| 10:35:18 | 23 | things, occasionally. |

*Derenda - Davenport - 9/24/2020*

29

10:35:22  1       Q.     And who would that drug testing be for?

10:35:26  2       A.     Police officers.

10:35:28  3       Q.     Is that a requirement to become a

10:35:31  4  police officer that they pass a drug test?

10:35:33  5       A.     It was initially when I started.  It's

10:35:37  6  a union issue that they didn't do drug testing for

10:35:42  7  a while.  Then we finally got an agreement within

10:35:44  8  the last few years before I left to drug test.

10:35:47  9       They had to sign off on the agreement and

10:35:50 10  they did.  So we restarted testing at some point

10:35:54 11  during my administration.

10:35:57 12       Q.     Now, you said that would have been

10:35:59 13  within the last couple of years before you left the

       14  position of police commissioner?

10:36:02 15       A.     Within the last few years prior when we

10:36:03 16  signed the contract.  We got some other things

10:36:06 17  agreed upon.

10:36:06 18       Q.     Do you know if that would have been

10:36:09 19  before or after January 1st of 2017?

10:36:11 20       A.     That was before.

10:36:13 21       Q.     Do you know what kinds of drugs they

10:36:17 22  were testing for at that time?

10:36:18 23       A.     I don't recall.  Probably, opioids,

10:36:20   1    marijuana, different things.   Whatever was agreed

10:36:28   2    to by the -- with the union.   They had to sign off

10:36:31   3    on it.

10:36:31   4          Q.   Now, the captain in internal affairs

10:36:34   5    who's overseeing the drug testing, would their

10:36:38   6    role -- would they also oversee drug testing that

10:36:41   7    takes place after a police officer is initially

10:36:45   8    hired?

10:36:47   9          A.   Yes, that's when he would oversee -- he

10:36:50  10    would oversee it, they had a specific position.

10:36:52  11    For a while we weren't allowed to test, for years.

10:36:56  12          And then we gained the testing ability back

10:36:59  13    through a negotiation with the union and he oversaw

10:37:03  14    that.   He wouldn't oversee the initial testing,

10:37:06  15    that would be the academy when people are coming in

          16    we have to test.

10:37:10  17          Or HR and City Hall would do the drug test

10:37:13  18    when they are being hired.

10:37:15  19          Q.   So the captain for internal affairs

10:37:18  20    who's overseeing drug testing, is there a drug test

10:37:21  21    that's administered as part of the internal affairs

10:37:25  22    review process?

10:37:25  23          A.   Meaning, an internal affairs case drug

*Derenda - Davenport - 9/24/2020*

31

| | | |
|---|---|---|
| 10:37:29 | 1 | tested?  Is that what you're saying? |
| 10:37:30 | 2 | **Q.**   So if a police office is named in a |
| | 3 | complaint -- |
| | 4 | **A.**   Correct. |
| 10:37:33 | 5 | **Q.**   -- would that officer be subjected to a |
| 10:37:37 | 6 | drug test? |
| 10:37:37 | 7 | **A.**   No. |
| 10:37:38 | 8 | **Q.**   So for the internal affairs captain, |
| 10:37:41 | 9 | who is in charge of overseeing drug testing, what |
| 10:37:47 | 10 | role would he play in an internal affairs |
| 10:37:50 | 11 | investigation? |
| 10:37:50 | 12 | **A.**   He also assisted in other cases.  He |
| 10:37:53 | 13 | would sit in on reviews, occasionally. |
| 10:38:02 | 14 | **Q.**   And would it be at your discretion |
| 10:38:07 | 15 | whether the captain would sit in or not? |
| 10:38:09 | 16 | **A.**   The internal affairs inspector was |
| 10:38:16 | 17 | there all the time, mandated to. |
| 10:38:18 | 18 | **Q.**   Would the lieutenant for internal |
| 10:38:20 | 19 | affairs also be present during the internal affairs |
| 10:38:22 | 20 | investigation? |
| 10:38:22 | 21 | **A.**   The lieutenant whose case it was would |
| 10:38:25 | 22 | be present.  He would come with numerous files -- |
| 10:38:28 | 23 | he or she would come with numerous files and |

| | | |
|---|---|---|
| 10:38:31 | 1 | present their cases. |
| 10:38:32 | 2 | **Q.** Would it be in charge of the lieutenant |
| 10:38:34 | 3 | for internal affairs to present the case? |
| 10:38:39 | 4 | **A.** Yes. |
| 10:38:39 | 5 | **Q.** And then, would the inspector at all |
| 10:38:41 | 6 | present a case during the internal affairs process? |
| 10:38:44 | 7 | **A.** No. |
| 10:38:44 | 8 | **Q.** The inspector was more so there to |
| 10:38:46 | 9 | provide an opinion based on the evidence that's |
| 10:38:49 | 10 | provided? |
| 10:38:49 | 11 | **A.** Opinion and what knowledge he had |
| 10:38:52 | 12 | working with, you know, working with the inspector. |
| 10:38:53 | 13 | But it was the lieutenants that did the |
| 10:38:54 | 14 | investigations. |
| 10:38:55 | 15 | **Q.** Is there some sort of a vote with the |
| 10:39:05 | 16 | other persons who are present for the internal |
| 10:39:10 | 17 | affairs review process on whether -- on what the |
| 10:39:10 | 18 | finding would be? |
| 10:39:11 | 19 | **A.** Not a vote. I would ask opinions and |
| 10:39:14 | 20 | then I would make the final determination if I |
| 10:39:16 | 21 | believed it was sustained or not sustained or |
| 10:39:17 | 22 | unfounded. |
| 10:39:18 | 23 | **Q.** So it would just be your -- your |

| | | |
|---|---|---|
| 10:39:22 | 1 | finding of the evidence would be what would |
| 10:39:25 | 2 | determine the outcome for the case? |
| 10:39:27 | 3 | **A.**    Correct, based on other people's |
| 10:39:30 | 4 | opinions and based on my own opinion. |
| 10:39:33 | 5 | In some cases if I didn't do the review the |
| 10:39:35 | 6 | deputy would do the review and make the |
| 10:39:38 | 7 | determination.  But most of the time I did the |
| 10:39:40 | 8 | reviews. |
| 10:39:40 | 9 | **Q.**    And which -- that would be the deputy |
| 10:39:43 | 10 | commissioner, correct? |
| 10:39:44 | 11 | **A.**    That would be, correct.  At the time, |
| 10:39:44 | 12 | could be either one.  But in my place it was |
| 10:39:47 | 13 | usually Lockwood if I needed him to sub in for me. |
| 10:39:52 | 14 | **Q.**    And which title for deputy commissioner |
| | 15 | would Lockwood have had during your tenure? |
| 10:40:08 | 16 | **A.**    Administrative. |
| 10:40:08 | 17 | **Q.**    And was Mr. Lockwood the deputy |
| 10:40:15 | 18 | commissioner for admin during your entire tenure as |
| 10:40:19 | 19 | police commissioner? |
| 10:40:19 | 20 | **A.**    Yes. |
| 10:40:20 | 21 | **Q.**    When you were deputy commissioner for |
| 10:40:23 | 22 | the day-to-day activities -- day-to-day actions, |
| 10:40:28 | 23 | was Mr. Lockwood the deputy commissioner for the |

*Derenda - Davenport - 9/24/2020*

34

| | | |
|---|---|---|
| 10:40:31 | 1 | admin at that time? |
| 10:40:32 | 2 | **A.**   Yes. |
| 10:40:32 | 3 | **Q.**   So that would have been from 2006 to |
| 10:40:35 | 4 | 2010? |
| 10:40:35 | 5 | **A.**   Correct. |
| 10:40:36 | 6 | **Q.**   How would you make a determination |
| 10:40:41 | 7 | whether it would be you or Mr. Lockwood who would |
| 10:40:44 | 8 | sit in on the internal affairs review process? |
| 10:40:45 | 9 | **A.**   I would sit on just about all of them, |
| 10:40:49 | 10 | unless there was some conflict.  In most cases we |
| 10:40:53 | 11 | would just cancel the review and move the date. |
| 10:40:56 | 12 | But if there -- if there was a conflict or |
| 10:40:57 | 13 | if there was a conflict of interest, if I knew one |
| 10:40:59 | 14 | of the officers really well, I would turn it over |
| 10:41:03 | 15 | to let him handle the cases. |
| 10:41:08 | 16 | **Q.**   So how often would you say that that |
| 10:41:11 | 17 | arose where there was a conflict of interest where |
| 10:41:16 | 18 | you knew the officer very well? |
| 10:41:18 | 19 | **A.**   Not often. |
| 10:41:20 | 20 | **Q.**   Was there ever a time where both you |
| 10:41:27 | 21 | and Mr. Lockwood had a conflict due to knowing |
| 10:41:33 | 22 | the -- an officer very well that was being |
| 10:41:35 | 23 | investigated? |

10:41:35  1     **A.**    I don't recall.

10:41:37  2     **Q.**    What sorts of evidence is presented to

10:41:44  3 you during an internal affairs review process?

10:41:47  4     **A.**    All type of evidence. Whatever the

10:41:49  5 case -- whatever type of case it is, what the

10:41:51  6 evidence would be. If it was an accident being

10:41:53  7 investigated every accident -- they would give me

10:41:57  8 their opinion.

10:41:59  9     Would they present actual evidence? No.

10:42:00 10 But they would tell me about it and give an opinion

10:42:04 11 of the whole case. And we would go around the room

10:42:07 12 with legal counsel, internal affairs inspectors,

10:42:12 13 deputy commissioners and we all make a

10:42:14 14 determination based on the evidence that was

10:42:16 15 presented to me.

10:42:17 16     It wouldn't be like a court scenario where

10:42:19 17 they'd be laying out evidence. At times there may

10:42:22 18 be video. At times there may be other things, but

10:42:22 19 not the norm.

10:42:24 20     **Q.**    As part of the internal affairs review

        21 process, is there certain evidence that you would

10:42:29 22 expect to be present for the internal affairs

10:42:32 23 review process?

*Derenda - Davenport - 9/24/2020*

36

10:42:32  1          A.    Depending on the file.

10:42:33  2          Q.    Would you expect there to be statements

10:42:36  3    from the complainant?

10:42:36  4          A.    There was definitely statements in all

10:42:38  5    the cases with complainant's, correct --

         6          Q.    I mean, where --

10:42:41  7          A.    -- generally speaking.

10:42:43  8          Q.    I'm sorry.  Who would take those

10:42:46  9    statements?

10:42:46 10          A.    The investigator.

10:42:47 11          Q.    Was there a requirement for the

10:42:49 12    investigator to take those statements from the

10:42:52 13    witness?

10:42:53 14          A.    It would be part of the procedure.

10:42:59 15    Some complainants wouldn't give statement, so that

10:43:02 16    would be a reason why they wouldn't have one,

10:43:04 17    but -- and also a lot of cases were initiated from

10:43:10 18    the department.  Meaning, so if an officer was

10:43:12 19    involved -- we'll go with an accident -- was

10:43:13 20    involved in an accident, that would be a

         21    departmental initiation of the accident.  Be it he

10:43:19 22    ran into a tree.  It would be something along those

10:43:22 23    lines.  That would be something initiated by the

10:43:25  1   department.

10:43:25  2       **Q.**    Who would initiate those complaints?

10:43:30  3       **A.**    Procedure, meaning, if there was an

10:43:31  4   accident you have to notify internal affairs, the

10:43:34  5   supervisor.  They would notify radio.  And somebody

10:43:36  6   would be called in if there was nobody working.

10:43:39  7       **Q.**    If a police vehicle struck an

10:43:41  8   individual or pedestrian there would be an internal

10:43:45  9   affairs process?

10:43:47 10       **A.**    Correct.

10:43:47 11       **Q.**    Do you know what the process is for

10:43:54 12   commencing an internal affairs review if a notice

10:43:59 13   of claim is filed against the city the Buffalo?

10:44:02 14       **MS. HUGGINS:**  Form.  You can answer.

10:44:02 15       **THE WITNESS:**  The notice of claim if it was

10:44:03 16   filed, generally speaking in those cases a lot of

10:44:06 17   times that's the first time internal affairs hears

10:44:10 18   about a case.

10:44:11 19       Many times the complainants don't come to

10:44:13 20   internal affairs.  They'll file a lawsuit and that

10:44:17 21   will trigger an internal affairs investigation.

         22       **BY MR. DAVENPORT:**

10:44:23 23       **Q.**    Now, is that part of the policies and

*Derenda - Davenport - 9/24/2020*

38

10:44:27  1   procedures that the filing of the Notice of Claim

10:44:30  2   would trigger an internal affairs review process?

10:44:32  3        **A.**   I don't know as to the policies and

10:44:33  4   procedures, but that's what was done.

10:44:36  5        **Q.**   Do you know if that was done every

10:44:38  6   time?

10:44:38  7        **A.**   It should be.  And again, sometimes

10:44:41  8   there's not a whole lot there that they can

10:44:45  9   investigate.  Because a lot of times attorneys, as

10:44:47  10  you know, won't let their clients talk to the

10:44:49  11  investigators depending on what the lawsuit is,

10:44:53  12  depending on what's going on until after the --

10:44:56  13  after the lawsuit.

10:44:57  14       **Q.**   And would that be the same process for

10:45:00  15  if a -- just -- a complaint connecting a lawsuit

10:45:03  16  was filed against the city of Buffalo?  Would it be

10:45:06  17  the same process as filing a notice of claim for

10:45:10  18  commencing an internal affairs review process?

10:45:13  19       **MS. HUGGINS:**   Form.  You can answer.

10:45:13  20       **THE WITNESS:**   I believe, that we would

10:45:14  21  receive the Notice of Claim and open up a case.

10:45:17  22  Sometimes we could investigate it and sometimes we

10:45:21  23  couldn't based on what the complaint was,

10:45:25 1  cooperation from the complainant and whatever we

10:45:26 2  could do.

10:45:26 3       So sometimes that investigation had to wait

10:45:29 4  until the end of the lawsuit depending on what

10:45:31 5  we -- who we could talk to or not.  And that

10:45:35 6  wouldn't just be involved in accident cases, all

10:45:37 7  cases.

8  **BY MR. DAVENPORT:**

10:45:41 9       **Q.**  So waiting until after the lawsuit,

10:45:43 10 that would be based on a conversation that someone

10:45:46 11 with internal affairs would have with an attorney,

10:45:50 12 where the attorney says you can't speak with my

10:45:53 13 client?

10:45:53 14      **A.**  Yes.  And it happened quite often,

10:45:55 15 correct.  And in some cases attorneys did let their

10:45:59 16 clients speak.

10:46:01 17      **Q.**  If the attorneys let their client

10:46:04 18 speak, would the internal affairs review process

10:46:06 19 proceed as it normally would?

10:46:08 20      **A.**  Yes.

10:46:10 21      **Q.**  Would review of the Notice of Claim and

10:46:14 22 lawsuit complaint be part of the internal affairs

10:46:19 23 review process?

*Derenda - Davenport - 9/24/2020*

40

| | | |
|---|---|---|
| 10:46:20 | 1 | **A.**   Lawsuit complaint? |
| 10:46:21 | 2 | **Q.**   The complaint commencing a lawsuit. |
| 10:46:24 | 3 | **A.**   Information from the complaint? |
| 10:46:27 | 4 | **Q.**   Yes. |
| 10:46:27 | 5 | **A.**   Maybe, but, again, they would wait |

10:46:30  6   until they could complete their investigation.  If

10:46:32  7   you had a complainant who would cooperate, I guess,

10:46:34  8   that would be an interview.

10:46:36  9        But at the time it's just the complaint

10:46:39  10   itself, written material, they would sit there and

10:46:42  11   wait until they get more evidence before they bring

10:46:45  12   it for review.

10:46:47  13        **Q.**   Was it ever brought to your attention

10:46:49  14   that a Notice of Claim had been filed against the

10:46:54  15   city of Buffalo and no internal affairs review

10:46:56  16   process had started?

10:46:56  17        **A.**   I don't recall that.

10:46:57  18        **Q.**   If it had been brought to your

10:47:01  19   attention, what actions would you have taken?

10:47:03  20        **A.**   If there was a lawsuit Notice of Claim,

10:47:09  21   generally speaking, I don't recall any time that

10:47:10  22   they didn't open up a case.  Or -- and again, it

10:47:13  23   could sit dormant until they get more information,

10:47:18 1  but there would be a case waiting for more

2  information.

10:47:22 3       I don't know or I don't recall any situation

10:47:24 4  that was ever brought up to me that that didn't

10:47:26 5  occur.  It could have, but I don't recall.

10:47:29 6       Q.   Now, before your deposition today, did

10:47:31 7  you review any documents?

10:47:33 8       A.   I did not.

10:47:34 9       Q.   When you were served with the complaint

10:47:38 10 initially in this case, did you review the

10:47:43 11 complaint?

10:47:43 12      A.   Months ago I might have reviewed the

10:47:46 13 complaint before -- prior to COVID.  I did not

10:47:51 14 today.

10:47:53 15      Q.   Did you happen to review the video that

10:47:58 16 was provided with that complaint?

10:48:00 17      A.   I did not.

10:48:01 18      Q.   Prior to your deposition today, have

10:48:03 19 you seen that video?

10:48:04 20      A.   I seen it on the news.  I believe,

10:48:08 21 that's the case.

10:48:09 22      Q.   Do you know if a Notice of Claim was

10:48:11 23 filed in this case?

*Derenda - Davenport - 9/24/2020*

42

10:48:12  1         **A.**    I do not.

10:48:13  2         **Q.**    If I told you that a Notice of Claim

10:48:18  3  had been filed in March of 2017, do you have any

10:48:21  4  reason to believe that that's not true?

10:48:22  5         **A.**    I don't know that to be true or not

10:48:24  6  true.

10:48:24  7         **Q.**    Did you happen to look at the date for

10:48:27  8  when the Notice -- when the complaint was filed in

10:48:30  9  this case?

10:48:30  10         **A.**    I did not.

10:48:31  11         **Q.**    If I told you that it was filed in

10:48:32  12  March of 2018, would you have any reason to believe

10:48:35  13  that that's not true?

10:48:36  14         **A.**    Again, I wouldn't know one way or the

10:48:39  15  other.

10:48:40  16         **Q.**    Do you know if there was an internal

10:48:45  17  affairs investigation for Mr. Kistner's claim?

10:48:48  18         **A.**    I do not.

19

20  **The following was marked for Identification:**

21    **EXH. 37**              **Letter to Mr. Kistner from**

22                            **Internal Affairs Division**

23                            **dated August 13, 2020.**

*Derenda - Davenport - 9/24/2020*

43

| | | |
|---|---|---|
| 10:48:54 | 1 | **BY MR. DAVENPORT:** |
| 10:48:54 | 2 | **Q.**    Mr. Derenda, I'm going to show you |
| 10:50:38 | 3 | what's been marked as Exhibit 37.  Do you recognize |
| 10:50:40 | 4 | this document, sir? |
| 10:50:41 | 5 | **A.**    I do not. |
| 10:50:44 | 6 | **Q.**    Have you ever seen a document like this |
| 10:50:46 | 7 | before? |
| 10:50:47 | 8 | **A.**    This particular document?  I do not |
| 10:50:50 | 9 | recognize this particular document.  I have seen |
| 10:50:52 | 10 | documents like this, correct. |
| 10:50:54 | 11 | **Q.**    And what type of a document would this |
| 10:50:58 | 12 | be? |
| 10:50:58 | 13 | **A.**    This is a -- this is just a letter to |
| 10:51:09 | 14 | the complainant stating the outcome of the case, |
| 10:51:13 | 15 | sustained, not sustained or unfounded. |
| 10:51:15 | 16 | **Q.**    Now, is this the same type of letter |
| 10:51:18 | 17 | that you would have sent during your tenure as |
| 10:51:20 | 18 | commissioner? |
| 10:51:20 | 19 | **A.**    I wouldn't send it, internal affairs |
| 10:51:23 | 20 | would have sent it. |
| 10:51:25 | 21 | **Q.**    Is this the same type of letter |
| 10:51:27 | 22 | internal affairs would have sent? |
| 10:51:28 | 23 | **A.**    Yes. |

*Derenda - Davenport - 9/24/2020*

44

10:51:29   1        **Q.**    Now do you --

2        **MS. HUGGINS:**  I apologize for interrupting.

3        **MR. DAVENPORT:**  Sure.

4        **MS. HUGGINS:**  The last exhibit we marked

5    previously was 37.  If we could have this one

6    marked as 38.  So I just --

7        **MR. DAVENPORT:**  That's why 37 was sticking

8    out for me.

9        **MS. HUGGINS:**  Yup.

10        **THE REPORTER:**  I can change it.  Seven can

11    be changed to eight easily.

12        **MR. DAVENPORT:**  That's okay.  Thank you.

13        **THE REPORTER:**  Is that okay with you?

14        **MR. DAVENPORT:**  Yes, that's fine with me.

15    Thank you.  Very nice.

16    **The following was marked for Identification:**

17     **Corrected from        Letter to Mr. Kistner from**

18     **EXH 37 to EXH. 38      Internal Affairs Division**

19                            **dated August 13, 2020.**

20        **BY MR. DAVENPORT:**

10:52:06  21        **Q.**    Now, do you see where James Kistner is

10:52:10  22    listed on the letter?

10:52:11  23        **A.**    Yes.

*Derenda - Davenport - 9/24/2020*

45

| | | |
|---|---|---|
| 10:52:12 | 1 | **Q.**    Is that the same place where the |
| 10:52:16 | 2 | complainant's address would have been listed? |
| 10:52:18 | 3 | **A.**    It appears to be. |
| 10:52:19 | 4 | **Q.**    So would it be fair to say that |
| 10:52:22 | 5 | Mr. Kistner was the complainant for this action? |
| 10:52:25 | 6 | **A.**    Correct. |
| 10:52:25 | 7 | **Q.**    And now, do you see where it says the |
| 10:52:28 | 8 | internal affairs process was commenced or |
| 10:52:32 | 9 | initiated? |
| 10:52:33 | 10 | **A.**    Based on a thorough review of this |
| 10:52:35 | 11 | case, yes. |
| 10:52:36 | 12 | **Q.**    Okay.  And what's that date? |
| 10:52:37 | 13 | **A.**    Initiated on December 19th, 2019. |
| 10:52:45 | 14 | **Q.**    Now, you said that you watched news |
| 10:52:48 | 15 | reports on Mr. Kistner's case, correct? |
| 10:52:51 | 16 | **A.**    I seen news reports, correct. |
| 10:52:53 | 17 | **Q.**    Do you know when those news reports |
| 10:52:56 | 18 | first aired? |
| 10:52:57 | 19 | **A.**    I do not recall. |
| 10:52:58 | 20 | **Q.**    Do you recall which news station aired |
| 10:53:04 | 21 | those reports? |
| 10:53:06 | 22 | **A.**    I usually watch channel 4, so I'll make |
| 10:53:11 | 23 | that assumption.  But I do flip around a little |

*Derenda - Davenport - 9/24/2020*

46

10:53:11  1   bit.

10:53:11  2        **Q.**   Do you believe that the news reports

10:53:14  3   would have been on channel WIVB?

10:53:16  4        **A.**   I believe so.

10:53:18  5        **Q.**   Do you know if the first time that you

10:53:19  6   watched the news stories would have been in

10:53:23  7   December of 2019?

10:53:24  8        **A.**   I think, it would have been recently

10:53:27  9   that I seen something on TV about it.

10:53:30  10       **Q.**   And when you say recently, do you refer

10:53:32  11  to the last couple of months?

10:53:33  12       **A.**   Probably, within the last month or so.

10:53:36  13       **Q.**   Okay.  But you didn't watch a news

10:53:41  14  story that was on December 19th of 2019?

10:53:43  15       **A.**   Not to my recollection.

10:53:46  16       **Q.**   Now, the December 19th of 2019 date,

10:53:50  17  that's after March of 2017, correct?

10:53:52  18       **A.**   Correct.

10:53:54  19       **Q.**   It's nearly three years after March of

10:53:57  20  2017.

10:53:59  21       **A.**   At the time, pretty close.

10:54:00  22       **Q.**   So according to your reading of this

10:54:03  23  letter, the internal affairs investigation wouldn't

10:54:06  1   have started from nearly three years after the

10:54:08  2   Notice of Claim had been filed?

10:54:10  3        **A.**   So apparently, has investigated the

10:54:14  4   complaint you initiated on December 19th, 2019.  So

10:54:17  5   they're responding to his complaint that apparently

10:54:20  6   was filed on that date.

10:54:24  7        **Q.**   Has internal affairs ever investigated

10:54:29  8   complaints -- well, actually -- I'm sorry.  I'm

10:54:33  9   going to retract that question.

10:54:35 10        Does internal affairs start an investigation

10:54:41 11   based on news reports that are aired?

10:54:43 12        **A.**   Sometimes, the possibility could exist,

10:54:45 13   yes.

10:54:45 14        **Q.**   And who would make that determination

10:54:50 15   if they saw a news report and an internal affairs

10:54:52 16   investigation hadn't been started?

10:54:52 17        **A.**   Well, again, it might be brought to

10:54:54 18   their attention, it could be brought to another

10:54:56 19   supervisors attention.  I can recall seeing a news

10:54:59 20   report of an incident of brutality on TV and

10:55:03 21   obviously initiated a case immediately.

10:55:06 22        But in that case I contacted the

10:55:12 23   US Attorneys Office.  So I have initiated cases if

*Derenda - Davenport - 9/24/2020*

48

10:55:14  1   I've seen something to do, but I'm sure it could

10:55:17  2   be.

10:55:17  3        **Q.**   Do you recall who that individual was

10:55:20  4   that you saw on TV where you initiated?

10:55:23  5        **A.**   I don't recall really.  It was a high

10:55:26  6   profile incident where the officer was arrested and

10:55:29  7   charged.  Cirulli -- Cirullo -- I don't recall the

10:55:33  8   officer's name.

10:55:33  9        **Q.**   Was the first name John?

10:55:35  10        **A.**   Could be.

10:55:36  11        **Q.**   And was that where the officer had

10:55:40  12   struck a man with his hand, a slap?

10:55:44  13        **A.**   I believe, handcuffed.  Yeah, I believe

10:55:47  14   that was the case.

10:55:48  15        I remember seeing it on TV and getting in

10:55:51  16   touch with, like, US Attorney Bill Hochul.  And I

10:55:55  17   might have called some other people.

10:55:57  18        **Q.**   And when you had contacted the

10:55:59  19   US Attorney's Office, did you give them any

10:56:01  20   direction at that point?

10:56:02  21        **A.**   We don't give -- we don't give them a

10:56:04  22   direction, they're aware of it.  And they would

10:56:06  23   also pass it on to the proper people to

*Derenda - Davenport - 9/24/2020*

49

10:56:09  1    investigate.

10:56:10  2         So whenever there was a criminal action

10:56:12  3    internal affairs investigation would be on hold

10:56:15  4    until the criminal action was done.  So meaning,

10:56:19  5    that the district attorney was investigating a

10:56:21  6    criminal complaint.  It would be on hold, the

10:56:25  7    internal affairs investigation until they were done

10:56:26  8    with it.

10:56:27  9         And that would be the same regarding the

10:56:39  10   US Attorney's Office.

10:56:39  11        Q.    Besides you actually seeing a news

10:56:47  12   report for what you believe should commence an

10:56:52  13   internal affairs investigation, are there any other

10:56:54  14   officers who could view a news story and then

10:56:58  15   commence an internal affairs investigation based on

10:57:01  16   what they see?

10:57:02  17        A.    The inspector from internal affairs

10:57:05  18   deputy commissioner.  Another officer could refer

10:57:08  19   it to internal affairs.  An internal affairs

10:57:10  20   investigator could have seen it and spoke to the

10:57:14  21   inspector about it and commenced an investigation.

10:57:16  22        I guess, there's a lot of ways that could

10:57:19  23   have happened.

| | | |
|---|---|---|
| 10:57:21 | 1 | **Q.**   Do you know if Mr. Lockwood has the |
| 10:57:27 | 2 | same protocol or policy in place that wherever a |
| 10:57:29 | 3 | Notice of Claim is filed an internal affairs |
| 10:57:34 | 4 | investigation commences? |
| 10:57:35 | 5 | **A.**   I don't if there was -- I don't know |
| 10:57:36 | 6 | what he has in place currently.  And I don't know |
| 10:57:38 | 7 | if there was a policy in place.  But I know that's |
| 10:57:42 | 8 | what took place. |
| 10:57:43 | 9 | I've been told about a Notice of Claim that |
| 10:57:47 | 10 | would initiate an investigation.  Whether it's |
| 10:57:47 | 11 | written policy or not, I don't recall. |
| 10:57:50 | 12 | **Q.**   Okay.  Do you know who you were told |
| 10:57:52 | 13 | that by? |
| 10:57:53 | 14 | **A.**   Probably, by the internal affairs |
| 10:57:57 | 15 | inspector. |
| 10:57:57 | 16 | **Q.**   Okay.  Do you recall who the internal |
| 10:58:01 | 17 | affairs inspector -- |
| 10:58:01 | 18 | **A.**   Harry McCullen. |
| 10:58:03 | 19 | **Q.**   And was he the internal affairs |
| 10:58:07 | 20 | inspector during your entire tenure as police |
| 10:58:07 | 21 | commissioner? |
| 10:58:07 | 22 | **A.**   He was not. |
| 10:58:09 | 23 | **Q.**   When approximately was Harry McCullen |

| 10:58:12 | 1 | appointed? |

10:58:14  2        **A.**    It was -- Pat Stafford was the internal

10:58:18  3    affairs inspector, he retired.  And then I put

10:58:20  4    Harry in that position.  He was captain of internal

10:58:24  5    affairs at the time.  We moved him into that

10:58:26  6    position he made -- he actually made inspector.  He

10:58:28  7    was put in that position.

10:58:31  8        **Q.**    Would Harry McCullen have been the

10:58:33  9    inspector on January 1st, 2017?

10:58:36  10       **A.**    I want to say, yes.  I know he retired.

10:58:41  11   He retired before I did.  But I believe he was

10:58:43  12   probably still the inspector.

10:58:45  13       **Q.**    And then who would have been the

10:58:48  14   inspector who was appointed just after Harry?

10:58:50  15       **A.**    Rob Rosenswie, I believe.

10:58:52  16       **Q.**    And do you know approximately when he

10:58:56  17   was appointed to inspector?

10:58:56  18       **A.**    I don't.  Right after Harry left.  I'm

10:58:59  19   not sure what the day, whether it was months before

10:59:00  20   me or -- I'm not sure.

10:59:06  21       **Q.**    Now, when did you put in place the

10:59:11  22   policy that any police involved motor vehicle

10:59:16  23   accident would trigger an internal affairs

*Derenda - Davenport - 9/24/2020*

52

| | | |
|---|---|---|
| 10:59:18 | 1 | investigation? |
| 10:59:18 | 2 | **A.** It was after 2010 when I was appointed. |
| 10:59:23 | 3 | I'm not sure of the date. 2011, 2012, somewhere |
| 10:59:27 | 4 | around there. |
| 10:59:28 | 5 | **Q.** And after you put that policy in place |
| 10:59:30 | 6 | in 2012, were there any changes to that policy? |
| 10:59:35 | 7 | **A.** From the time it was put in place -- |
| 10:59:36 | 8 | again, after -- until the day I left they would |
| 10:59:40 | 9 | have called internal affairs if an accident took |
| 10:59:43 | 10 | place. |
| 10:59:43 | 11 | **Q.** Would there have been any changes or |
| 10:59:46 | 12 | revisions to the policy? Just changing language? |
| 10:59:49 | 13 | Or changing -- adding circumstances where internal |
| 10:59:51 | 14 | affairs would be obligated to go -- |
| 10:59:55 | 15 | **A.** Not to my recollection. But every |
| 11:00:01 | 16 | accident needed to be investigated, that was my |
| 11:00:03 | 17 | policy. Even minor accidents. |
| 11:00:07 | 18 | **Q.** When you put that policy in place, who |
| 11:00:10 | 19 | did you notify? |
| 11:00:11 | 20 | **A.** That was notified through the deputies, |
| 11:00:15 | 21 | the inspector, everybody knew about the policy. |
| 11:00:19 | 22 | Written policy would have went right down, would |
| 11:00:20 | 23 | have went down to the command staff to lieutenants, |

*Derenda - Davenport - 9/24/2020*

53

| | | |
|---|---|---|
| 11:00:22 | 1 | supervisors, officers knew the policy. |
| 11:00:24 | 2 | **Q.**   Was there any training session on that |
| 11:00:29 | 3 | new policy? |
| 11:00:30 | 4 | **A.**   Not that I believe.  The policy is |
| 11:00:34 | 5 | simple, if you're involved in an accident call |
| 11:00:37 | 6 | internal affairs. |
| 11:00:41 | 7 | **Q.**   As part of that policy, would you |
| 11:00:45 | 8 | expect officers to call in internal affairs if an |
| 11:00:49 | 9 | individual had thrown himself at a police vehicle? |
| 11:00:52 | 10 | **A.**   Thrown himself at a police vehicle? |
| 11:00:55 | 11 | **Q.**   Yes. |
| 11:00:56 | 12 | **A.**   The policy was for an accident.  Any |
| 11:00:58 | 13 | officer involved accident. |
| 11:01:01 | 14 | **Q.**   So if an individual threw himself at |
| 11:01:04 | 15 | the police vehicle, even though a police vehicle |
| 11:01:06 | 16 | may have been damaged, that wouldn't count as a |
| 11:01:10 | 17 | motor vehicle accident? |
| 11:01:10 | 18 | **A.**   Might be counted as criminal mischief. |
| 11:01:13 | 19 | Again, I don't know the circumstances.  Any |
| 11:01:19 | 20 | accident they're involved in needed to call |
| 11:01:21 | 21 | internal affairs. |
| 11:01:22 | 22 | If it was an individual that damaged a |
| 11:01:25 | 23 | police car, I don't believe that's an accident. |

*Derenda - Davenport - 9/24/2020*

54

| | | |
|---|---|---|
| 11:01:29 | 1 | Deliberately or somehow damage a police car that |
| 11:01:33 | 2 | may not qualify as an accident. |
| 11:01:36 | 3 | Q.   As part of that policy that you put in |
| 11:01:39 | 4 | place, would lieutenants also be expected to go to |
| 11:01:43 | 5 | the scene and investigate an accident involving a |
| 11:01:46 | 6 | police vehicle? |
| 11:01:46 | 7 | A.   If there was an accident involved the |
| 11:01:49 | 8 | lieutenant would go to the scene, notify the 911 |
| 11:01:51 | 9 | lieutenant and the officer would do it, too, |
| 11:01:54 | 10 | through the radio. |
| 11:01:55 | 11 | And 911 would notify -- and they start |
| 11:01:57 | 12 | making the calls.  The 911 lieutenant would start |
| 11:01:59 | 13 | making the calls if somebody was not working to get |
| 11:02:03 | 14 | some investigator to the scene. |
| 11:02:09 | 15 | Q.   Would internal affairs arrive at the |
| 11:02:13 | 16 | scene before or after the lieutenant? |
| 11:02:15 | 17 | A.   Generally speaking, after especially if |
| 11:02:19 | 18 | they weren't working.  They work days.  So any |
| 11:02:22 | 19 | accident that took place after the 9 to 5 they |
| 11:02:26 | 20 | would be called in. |
| 11:02:28 | 21 | The -- there could be a scenario where they |
| 11:02:32 | 22 | would arrive before, but highly unlikely. |
| 11:02:34 | 23 | Q.   So the internal affairs investigations |

*Derenda - Davenport - 9/24/2020*

55

| | | |
|---|---|---|
| 11:02:38 | 1 | would generally take place during the hours of |
| 11:02:41 | 2 | 9 to 5? |
| 11:02:42 | 3 | **A.**    No, or they would be called in for any |
| 11:02:46 | 4 | accident or other investigation that they needed to |
| 11:02:48 | 5 | be called in on. |
| 11:02:49 | 6 | **Q.**    So they would more so be on call at |
| 11:02:50 | 7 | that time? |
| 11:02:51 | 8 | **A.**    Correct. |
| 11:02:52 | 9 | **Q.**    And would those -- would that be a |
| 11:02:56 | 10 | communication to -- through the radio if it was |
| 11:02:58 | 11 | after hours?  Or would it be through personal cell |
| 11:03:02 | 12 | phones? |
| 11:03:02 | 13 | **A.**    It would -- communication they would be |
| 11:03:04 | 14 | called from the 911 lieutenant.  Whether they would |
| 11:03:07 | 15 | be calling their home phone, on their cell phone, |
| 11:03:10 | 16 | the 911 lieutenant would make the call. |
| 11:03:13 | 17 | Whoever was on call that day, that night |
| 11:03:15 | 18 | would come in and do the investigation.  And they |
| 11:03:17 | 19 | took turns who was on call. |
| 11:03:25 | 20 | **Q.**    If -- if there's a city involved police |
| 11:03:29 | 21 | accident -- police vehicle involved accident, how |
| 11:03:34 | 22 | would you expect the officers to communicate with |
| 11:03:38 | 23 | their lieutenant?  Would it be through the radio? |

*Derenda - Davenport - 9/24/2020*

56

| | | |
|---|---|---|
| 11:03:40 | 1 | Or personal cell phone? |
| 11:03:42 | 2 | **A.**   They would call him through the radio. |
| 11:03:43 | 3 | They may call him on the cell phone.  They may ask |
| 11:03:47 | 4 | for him to respond if there was an accident. |
| 11:03:50 | 5 | Again, there's no provided phones for every |
| 11:03:53 | 6 | officer or supervisor in the city.  I don't believe |
| 11:03:58 | 7 | there was then, I don't believe there is now. |
| 11:04:00 | 8 | **Q.**   When you say no phones that are |
| 11:04:02 | 9 | provided, you're talking about personal cell |
| | 10 | phones? |
| 11:04:07 | 11 | **A.**   Correct. |
| 11:04:07 | 12 | **Q.**   But it doesn't matter if they |
| 11:04:08 | 13 | communicate through personal cell phones or radio? |
| 11:04:11 | 14 | **A.**   If they call -- they would -- usually |
| 11:04:13 | 15 | call on the radio that there was an accident.  911 |
| 11:04:16 | 16 | would notify the lieutenant or the lieutenant would |
| 11:04:19 | 17 | be monitoring the radio and come down. |
| 11:04:23 | 18 | Is there a case where somebody could have |
| | 19 | called somebody on the cell phone?  I believe so. |
| 11:04:25 | 20 | Probably. |
| 11:04:25 | 21 | **Q.**   And that wouldn't violate any policies |
| 11:04:28 | 22 | or procedures? |
| 11:04:29 | 23 | **A.**   Not that I recall. |

*Derenda - Davenport - 9/24/2020*

57

11:04:34  1      Q.     When a -- when a police officer

11:04:37  2  notifies their lieutenant of a motor vehicle

11:04:40  3  accident -- a police involved motor vehicle

11:04:44  4  accident, would you expect the lieutenant to ask

11:04:46  5  the officer what he saw?

11:04:49  6      A.     In cases or to call internal affairs

11:04:52  7  for the investigation.  I believe that sometimes

11:04:55  8  they may discuss what took place or they might wait

11:04:59  9  for the internal affairs investigation.  I guess,

11:05:01 10  that would be dependant on each individual.

11:05:04 11      Q.     If the officers told the lieutenant

11:05:06 12  that a man threw himself at the police vehicle,

11:05:11 13  would you ask -- would you expect the lieutenant to

11:05:14 14  ask the officer if he was driving the vehicle that

11:05:17 15  the man threw himself at?

11:05:19 16      MS. HUGGINS:  Form.  You can answer.

11:05:20 17      THE WITNESS:  If I expect them to?  Was he

11:05:26 18  told that?  Did he ask him?  Again, I guess

11:05:26 19  depending on the circumstances.

         20      BY MR. DAVENPORT:

11:05:32 21      Q.     In the circumstances where a lieutenant

11:05:36 22  is not at the scene and receives a personal

11:05:39 23  phone -- a personal cell phone call from an

*Derenda - Davenport - 9/24/2020*

58

| | |
|---|---|
| 11:05:41 | 1 |
individual officer saying that a man threw himself

| 11:05:43 | 2 | at a police vehicle.

| 11:05:45 | 3 |         Would you expect the lieutenant to ask the

| 11:05:47 | 4 | officer if it was his vehicle that he threw himself

| 11:05:50 | 5 | at?

| 11:05:51 | 6 |         **MS. HUGGINS:** Form. You can answer.

| 11:05:51 | 7 |         **THE WITNESS:** I believe he would expect

| 11:05:53 | 8 | him -- he would ask that. What happened? If he

| 11:05:56 | 9 | threw himself at the vehicle.

| | 10 |         **BY MR. DAVENPORT:**

| 11:05:59 | 11 |    **Q.**    And do you know if the lieutenant in

| 11:06:03 | 12 | this case -- in Mr. Kistner's case asked the police

| 11:06:09 | 13 | officer if Mr. Kistner threw himself at his police

| 11:06:13 | 14 | vehicle?

| 11:06:13 | 15 |    **A.**    I do not know.

| 11:06:18 | 16 |    **Q.**    Would you also expect the lieutenant to

| 11:06:22 | 17 | ask the police officer if it wasn't his police

| 11:06:26 | 18 | vehicle that the man threw himself at, how he saw

| 11:06:29 | 19 | this man throw himself at the police vehicle?

| | 20 |    **A.**    I guess --

| 11:06:32 | 21 |         **MS. HUGGINS:** Form. You can answer.

| 11:06:33 | 22 |         **THE WITNESS:** I guess, circumstances would

| 11:06:35 | 23 | dictate what happened. Again, I don't have all the

11:06:39  1   facts.

2        **BY MR. DAVENPORT:**

11:06:47  3        **Q.**   If an individual threw himself at a

11:06:50  4   police vehicle and the officers claimed that there

11:06:52  5   was damage that was done to the vehicle, would

11:06:56  6   there be any sort of investigation that would

11:06:59  7   commence immediately afterwards?

11:07:01  8        **MS. HUGGINS:**   Form.  You can answer.

11:07:02  9        **THE WITNESS:**   An investigation?  When you

11:07:04 10   say threw himself into a vehicle, deliberately

11:07:09 11   damaging the vehicle?  If somebody did that, I

11:07:12 12   believe, they would be charged with criminal

13   mischief.

11:07:16 14        And I don't believe that would be considered

11:07:17 15   an accident.  Again, I don't have knowledge of the

11:07:21 16   case.

17        **BY MR. DAVENPORT:**

11:07:23 18        **Q.**   Now, if part of one of the elements for

11:07:30 19   criminal mischief is a certain amount of damage

11:07:33 20   that's caused to the vehicle, how would the

11:07:36 21   officers prove the amount of damage that was done

11:07:38 22   to a vehicle?

11:07:39 23        **A.**   Probably, would have to get an estimate

*Derenda - Davenport - 9/24/2020*

60

| | | |
|---|---|---|
| 11:07:42 | 1 | for collision or whatever -- for whatever damage, |
| 11:07:44 | 2 | mirror, whatever. |
| 11:07:45 | 3 | **Q.**   And who would that estimate come from? |
| 11:07:48 | 4 | **A.**   Well, I'm sure the city would get -- |
| 11:07:50 | 5 | through the garage, police garage to fix. |
| 11:07:53 | 6 | **Q.**   And do you know what police garage the |
| 11:07:57 | 7 | police department was using during your tenure? |
| 11:07:58 | 8 | **A.**   The police garage down on Seneca Street. |
| 11:08:04 | 9 | **Q.**   Do you know the address for that police |
| 11:08:06 | 10 | garage? |
| 11:08:06 | 11 | **A.**   It's on Seneca and Chicago behind |
| 11:08:11 | 12 | Chef's.  And they would send it out for an |
| 11:08:13 | 13 | estimate.  They don't do collision work at the |
| 11:08:14 | 14 | police garage. |
| 11:08:14 | 15 | **Q.**   And do you know who they would send |
| 11:08:17 | 16 | that to? |
| 11:08:18 | 17 | **A.**   I do not. |
| 11:08:19 | 18 | **Q.**   Would it vary? |
| 11:08:20 | 19 | **A.**   It could. |
| 11:08:22 | 20 | **Q.**   Do you know if there was a list of |
| 11:08:27 | 21 | collision mechanics that would work on police |
| 11:08:31 | 22 | vehicles? |
| 11:08:32 | 23 | **A.**   I'm not aware of that. |

*Derenda - Davenport - 9/24/2020*

61

| | | |
|---|---|---|
| 11:08:35 | 1 | **Q.**    Would those collision mechanics work |
| 11:08:38 | 2 | here in the city of Buffalo? |
| 11:08:39 | 3 | **A.**    For the city of Buffalo? |
| 11:08:40 | 4 | **Q.**    Work within the city of Buffalo. |
| 11:08:42 | 5 | **A.**    I don't know that to be true or not. |
| 11:08:45 | 6 | **Q.**    Would they be outside of the city of |
| 11:08:47 | 7 | Buffalo potentially? |
| 11:08:49 | 8 | **A.**    I don't know how they would choose |
| 11:08:50 | 9 | vendors or where the list would come from.  So |
| 11:08:53 | 10 | potentially they could be from different locations. |
| 11:08:55 | 11 | **Q.**    So what type of work did the police car |
| 11:09:00 | 12 | garage on Seneca Street and Chicago, what type of |
| 11:09:03 | 13 | work would they do? |
| 11:09:03 | 14 | **A.**    Mechanical, what they could handle. |
| 11:09:06 | 15 | Oil changes, brakes, things of that nature. |
| 11:09:15 | 16 | Batteries. |
| 11:09:15 | 17 | **Q.**    Did they do private work for |
| 11:09:18 | 18 | individuals who weren't police officers? |
| 11:09:21 | 19 | **A.**    Meaning -- |
| | 20 | **Q.**    Would -- |
| 11:09:24 | 21 | **A.**    -- individual job? |
| 11:09:24 | 22 | **Q.**    At the shop on Seneca Street and |
| 11:09:27 | 23 | Chicago, would they perform work for private |

| | | |
|---|---|---|
| 11:09:30 | 1 | citizens? |
| 11:09:30 | 2 | **A.**   No. |
| 11:09:31 | 3 | **Q.**   So they just exclusively worked for the |
| 11:09:34 | 4 | police department? |
| 11:09:35 | 5 | **A.**   For the police garage, correct. |
| 11:09:37 | 6 | **Q.**   They would have been hired by the |
| 11:09:39 | 7 | city of Buffalo? |
| 11:09:39 | 8 | **A.**   Correct. |
| 11:09:42 | 9 | **Q.**   Prior to an officer bringing their car |
| 11:09:46 | 10 | to the police garage, would they have to fill out |
| 11:09:50 | 11 | any forms about what was wrong with the vehicle and |
| 11:09:53 | 12 | why they were bringing it in? |
| 11:09:55 | 13 | **A.**   They should.  I mean, there's a form |
| 11:09:57 | 14 | whether you need an oil change or whatever issues. |
| 11:10:00 | 15 | You would have to bring it in and leave a form. |
| 11:10:02 | 16 | **Q.**   And that would have been completed by |
| 11:10:04 | 17 | the officer driving the vehicle? |
| 11:10:07 | 18 | **A.**   Could have been completed by an officer |
| 11:10:09 | 19 | on a different shift, depending on what they were |
| 11:10:11 | 20 | taking it down for.  Could have been various |
| 11:10:14 | 21 | people -- officers. |
| 11:10:15 | 22 | **Q.**   But it would be a patrol officer not a |
| 11:10:18 | 23 | lieutenant that would have completed that form, |

| | | |
|---|---|---|
| 11:10:21 | 1 | correct? |
| 11:10:21 | 2 | **A.**   I guess, it could be done by a |
| 11:10:24 | 3 | lieutenant taking a vehicle down.  It could be |
| 11:10:26 | 4 | either or. |
| 11:10:28 | 5 | **Q.**   Was there a policy or procedure that |
| 11:10:32 | 6 | was in place that required officers to fill out |
| 11:10:35 | 7 | that form when they were bringing it in for |
| | 8 | service? |
| 11:10:39 | 9 | **A.**   There was a policy and there was a form |
| 11:10:39 | 10 | to fill out if you were bringing it down for |
| 11:10:42 | 11 | service, correct. |
| 11:10:42 | 12 | **Q.**   Would an officer be subjected to |
| 11:10:46 | 13 | discipline if they did not complete that form? |
| 11:10:48 | 14 | **A.**   I don't ever recall that being the |
| 11:10:51 | 15 | case. |
| 11:10:52 | 16 | **Q.**   Would that -- would that be something |
| 11:10:54 | 17 | that an officer would be disciplined for, though, |
| 11:10:58 | 18 | if that had been the case for somebody? |
| 11:11:00 | 19 | **A.**   Possibly. |
| 11:11:01 | 20 | **Q.**   Is there discipline for officers who |
| 11:11:05 | 21 | don't complete necessary paperwork? |
| 11:11:07 | 22 | **A.**   I guess, there could be. |
| 11:11:10 | 23 | **Q.**   And who would that discipline come |

*Derenda - Davenport - 9/24/2020*

64

11:11:14   1    from?

11:11:14   2        **A.**    Meaning, from the department?  So that

11:11:15   3    would -- again, be something brought through

11:11:17   4    internal affairs, brought up to internal affairs.

11:11:20   5    Whether it from a supervisor if the officer didn't

11:11:22   6    do something, to internal affairs.  And then right

11:11:25   7    up through the same process.

11:11:28   8        **Q.**    So if a supervisor found an individual

11:11:31   9    not completing necessary paperwork, the supervisor

11:11:35 10    would be the person who would commence an internal

11:11:41 11    affairs investigation?

11:11:41 12        **A.**    Who could send it up.  Not all the time

11:11:44 13    do they or would they.  If somebody didn't complete

11:11:47 14    something it may or may not result.

11:11:49 15       I don't remember too many cases where

11:11:51 16    paperwork cases that came before me.

11:11:57 17        **Q.**    Would that be something -- would the

11:12:00 18    failure to fill out paperwork by a police officer

11:12:03 19    be something that the lieutenant can handle for

          20    discipline?

11:12:06 21        **A.**    We would handle it in-house and make

11:12:08 22    him redo it correctly.

11:12:10 23        **Q.**    If they weren't completing the

*Derenda - Davenport - 9/24/2020*

65

11:12:11  1  paperwork, would the supervisor then have the

11:12:15  2  police officer complete the necessary paperwork?

11:12:17  3       **A.**    Possible.

11:12:23  4       **Q.**    Now, for the cases where officers were

11:12:27  5  not filling out the necessary paperwork, were any

11:12:30  6  of those officers from C-District?

11:12:34  7       **MS. HUGGINS:**  Form.  You can answer.

11:12:34  8       **THE WITNESS:**  I don't recall any of those

11:12:36  9  cases.  Possibly, but I don't recall.

          10       **BY MR. DAVENPORT:**

11:12:40 11       **Q.**    Do you know if there were any sustained

11:12:46 12  internal affairs complaints for officers not

11:12:48 13  filling out necessary paperwork?

11:12:50 14       **A.**    Off the top of my head, I don't recall.

11:12:57 15       **Q.**    Now, you said that there was a

11:13:00 16  difference between not sustained and unfounded, I

11:13:03 17  believe it was, the other one?

11:13:04 18       **A.**    Correct.

11:13:05 19       **Q.**    And what would be the difference

11:13:08 20  between not sustained and unfounded?

11:13:09 21       **A.**    Not sustained doesn't mean it didn't

11:13:11 22  happen, it just means I couldn't prove it.

11:13:13 23       **Q.**    Do you know if there's a certain burden

*Derenda - Davenport - 9/24/2020*

66

| | |
|---|---|
| 11:13:16 | 1 | of proof that must be established for a sustained |
| 11:13:21 | 2 | versus not sustained findings? |
| 11:13:21 | 3 | **A.**   I guess, it would be the commissioners |
| 11:13:23 | 4 | opinion. |
| 11:13:26 | 5 | **Q.**   Turning back to Exhibit 38.  Do you see |
| 11:13:34 | 6 | in the second paragraph where it says:  At this |
| 11:13:38 | 7 | time to clearly prove your case? |
| 11:13:42 | 8 | **A.**   Based on a thorough review of the case, |
| 11:13:44 | 9 | the Commissioner of Police has determined there is |
| 11:13:44 | 10 | not sufficient evidence at this time to clearly |
| 11:13:48 | 11 | prove your case and has determined that the case |
| 11:13:53 | 12 | disposition be carried as not sustained. |
| 11:13:54 | 13 | Which goes back to as I said, couldn't prove |
| 11:13:59 | 14 | the allegations. |
| 11:13:59 | 15 | **Q.**   Now, clearly prove your case, is that |
| 11:14:02 | 16 | the same -- and I'm going to use the term burden of |
| 11:14:07 | 17 | proof.  And you can tell me if you don't know what |
| 11:14:08 | 18 | that terms means -- if you want me to explain a |
| 11:14:10 | 19 | little bit further. |
| 11:14:11 | 20 | **A.**   Burden of proof -- again, he -- not |
| 11:14:14 | 21 | sustained means he can't prove his case because |
| 11:14:18 | 22 | these cases have to go -- will have a chance to go |
| 11:14:22 | 23 | before an arbitrator. |

*Derenda - Davenport - 9/24/2020*

67

| | | |
|---|---|---|
| 11:14:23 | 1 | So you have an arbitrator sitting that will |
| 11:14:24 | 2 | make the final determination.  If the city can't |
| 11:14:27 | 3 | prove its case, then it gets not sustained by an |
| 11:14:35 | 4 | arbitrator.  So I can't look at this and go yup, I |
| 11:14:36 | 5 | sustain this.  And at times I offer a penalty for |
| 11:14:40 | 6 | what I found. |
| 11:14:41 | 7 | So you did something the case is sustained, |
| 11:14:43 | 8 | I'm going to suspend you for 30 days.  They can |
| 11:14:47 | 9 | fight that and not take that 30 days and go through |
| | 10 | arbitration and have an arbitrator determine |
| 11:14:54 | 11 | whether it happened or not. |
| 11:14:55 | 12 | When it's not sustained that's basically |
| 11:14:58 | 13 | saying they couldn't prove it in front of an |
| 11:15:02 | 14 | arbitrator.  They did not have enough evidence to |
| 11:15:04 | 15 | do that. |
| 11:15:05 | 16 | **MS. HUGGINS:**  Form as to the last question. |
| 11:15:07 | 17 | And I'm just going to make an objection just based |
| 11:15:08 | 18 | on the timeframe.  You're asking him about an |
| 11:15:11 | 19 | exhibit after his retirement, interpreting. |
| 11:15:16 | 20 | **MR. DAVENPORT:**  Well, I'm just asking if the |
| 11:15:17 | 21 | burden of proof was the same. |
| 11:15:20 | 22 | **MS. HUGGINS:**  And that's my objection is |
| 11:15:21 | 23 | you're asking about something from August 13, 2020. |

*Derenda - Davenport - 9/24/2020*

68

| 11:15:24 | 1 | And he's already testified to the date of his |
| 11:15:25 | 2 | retirement as being January of 2018. |
| 11:15:29 | 3 | I don't have -- I don't have objections to |
| 11:15:30 | 4 | asking with regard to when he was the commissioner. |
| | 5 | **BY MR. DAVENPORT:** |
| 11:15:33 | 6 | **Q.** That's -- I mean, that's kind of what |
| 11:15:34 | 7 | I'm asking. I'm asking on this form it says: At |
| 11:15:39 | 8 | this time to clearly prove your case. |
| 11:15:42 | 9 | And during the deposition you've used a |
| 11:15:44 | 10 | couple of times just the word proof -- rather than |
| 11:15:46 | 11 | clearly prove. My question is: Was clearly, was |
| 11:15:51 | 12 | that the same language that you would have used or |
| 11:15:55 | 13 | the same burden that you would have looked for |
| 11:15:58 | 14 | officers to prove? |
| | 15 | **A.** I would look at the -- |
| | 16 | **MS. HUGGINS:** Hang on. Objection to form. |
| 11:16:01 | 17 | I just want to put this objection on the record. I |
| 11:16:04 | 18 | understand your question. Again, I don't have a |
| 11:16:06 | 19 | problem with you asking that in terms of his -- |
| 11:16:07 | 20 | when he was commissioner. |
| 11:16:09 | 21 | But you continue to refer to Exhibit 38. |
| 11:16:11 | 22 | Which, again, is from August 13 of 2020, two years |
| 11:16:16 | 23 | after his retirement. |

11:16:18  1        **MR. DAVENPORT:**  Correct.  Because he's

11:16:19  2    reviewing this document where it says what the

11:16:22  3    burden is to prove the case.

11:16:24  4        And I'm asking if it -- it's the same burden

11:16:26  5    that was in place when he was the police

11:16:29  6    commissioner.

          7        **MS. HUGGINS:**  And you're asking him to

          8    interpret a document for a position he hasn't

          9    worked at --

11:16:34 10        **Q.**   I'm not asking him to interpret the

         11    document.  I'm asking him, based on what he sees on

11:16:36 12    this document, is that the same burden that was in

11:16:38 13    place when he was the commissioner.

11:16:39 14        I'm not asking him to interpret the

11:16:43 15    document.  I'm just asking him if this is the same

11:16:47 16    burden that was in place.

11:16:48 17        **MS. HUGGINS:**  Okay.  I will allow him to

11:16:50 18    answer that specific question.

11:16:52 19        **MR. DAVENPORT:**  That's what I've been

11:16:54 20    asking.

         21        **MS. HUGGINS:**  Okay.  I don't know if that --

         22    it's a form objection.  And I don't believe that's

11:16:56 23    been entirely clear from your questioning.

*Derenda - Davenport - 9/24/2020*

70

11:16:59  1          **BY MR. DAVENPORT:**

11:16:59  2          Q.   Okay.  So Mr. Derenda, my question is

11:17:02  3   just simply, you've used the words --

11:17:06  4          A.   Proof.

11:17:06  5          Q.   -- proof.  And I want to know, during

11:17:08  6   your tenure as commissioner was it clearly proof or

11:17:11  7   was it just proof?

11:17:11  8          A.   In my mind -- in my time it was whether

11:17:14  9   I could prove the case or not.  Whether the

11:17:16 10   investigators proved the case to me.

11:17:19 11          As I said, I got everybody's opinion from

11:17:22 12   corporation counsel to the internal affairs

11:17:25 13   inspector to the deputy commissioner.  And then I

11:17:26 14   make my determination whether they could prove the

11:17:32 15   case to an arbitrator.

11:17:35 16          Q.   Now, would the arbitrator be sitting in

11:17:42 17   on the internal affairs review process?

11:17:42 18          A.   They would not.  It would be a hearing

11:17:44 19   setup sometimes later, sometimes it was years

11:17:46 20   later.

11:17:48 21          Q.   Who would request an arbitrator?  Would

11:17:52 22   it be the police officer that was disciplined?

11:17:54 23          A.   It would be the -- the police officer

| | | |
|---|---|---|
| 11:17:57 | 1 | is represented by the Buffalo Police Benevolent |
| 11:17:59 | 2 | Association.  And they would request a hearing. |
| 11:18:02 | 3 | So basically, if I found somebody -- if I |
| 11:18:03 | 4 | sustained some charges and I would say 30 days |
| 11:18:07 | 5 | suspension.  They would request a hearing, they |
| 11:18:09 | 6 | would not accept that finding. |
| 11:18:11 | 7 | Therefore, go before an arbitrator.  If I -- |
| 11:18:15 | 8 | non -- not sustained case, obviously, there would |
| 11:18:17 | 9 | be no further proceedings. |
| 11:18:19 | 10 | Q.    And what would the city of Buffalo's |
| 11:18:21 | 11 | role be during that arbitration process?  Would you |
| 11:18:24 | 12 | have representatives there? |
| 11:18:24 | 13 | A.    We would have an attorney from the city |
| 11:18:27 | 14 | that was assigned to the police. |
| 11:18:28 | 15 | Q.    Would you also be there, as well? |
| 11:18:30 | 16 | A.    Generally speaking, the |
| 11:18:34 | 17 | Deputy Commissioner Lockwood was at those hearings. |
| 11:18:36 | 18 | Q.    During your tenure, do you know how |
| 11:18:40 | 19 | many arbitration hearings Deputy Lockwood was a |
| 11:18:41 | 20 | part of? |
| 11:18:42 | 21 | A.    I don't know a number, but it was a |
| 11:18:44 | 22 | lot.  Probably, all of them. |
| 11:18:46 | 23 | Q.    Okay.  And when you say all of them, do |

*Derenda - Davenport - 9/24/2020*

72

11:18:49  1  you mean, all times where there was a sustained

11:18:50  2  finding against one of the police officers?

11:18:52  3      **A.**   All the times when there was

11:18:56  4  arbitration.  So if it was sustained and you wanted

11:18:56  5  a hearing, hearings would get backed up.  As I

11:19:01  6  said, it may take a year or two to get to them in

11:19:05  7  some cases.  Or where the process was slowed down.

11:19:07  8  But he would attend those hearings.

11:19:10  9      **Q.**   Would officers be entitled to an

11:19:14 10  arbitration for a not sustained finding?

11:19:16 11      **A.**   No, it would be no further proceedings

11:19:19 12  at that point.

11:19:21 13      **Q.**   Had you ever had a case where you found

11:19:24 14  that the evidence sustained the internal affairs

11:19:29 15  investigation or internal affairs complaint and you

11:19:31 16  were overturned by the arbitrator, have it be a not

11:19:35 17  sustained finding?

11:19:36 18      **A.**   Yes.

11:19:37 19      **Q.**   Do you know approximately how many

11:19:39 20  times that happened?

11:19:40 21      **A.**   Too many.

11:19:41 22      **Q.**   Do you know a certain percentage of

11:19:44 23  times that happened?

*Derenda - Davenport - 9/24/2020*

73

11:19:45   1       **A.**     I do not.

11:19:46   2       **Q.**     Was it more than half?

11:19:48   3       **A.**     I don't know. In my opinion, one is

11:19:53   4   too many.

11:19:55   5       **Q.**     Now, the arbitrator, you're saying that

11:20:00   6   was somebody who's affiliated with the police

11:20:02   7   union?

11:20:02   8       **A.**     No, it was selected by both the police

11:20:05   9   department and by the PBA. They select an

11:20:08   10   arbitrator for the hearing. They both agreed upon

       11   the arbitrator. There was a -- there was an

11:20:13   12   agreement that we had one arbitrator that was

11:20:16   13   handling the discipline in the case.

11:20:16   14       **Q.**     As was that agreement in the union

11:20:20   15   contract between the city of Buffalo Police

       16   Department --

11:20:23   17       **A.**     It wouldn't be in the contract it would

11:20:26   18   have been something separate, signed agreement.

11:20:27   19       **Q.**     I'm just going to ask, just wait for me

11:20:29   20   to finish my question before you start answering

11:20:30   21   it. I just want to make sure the record stays

11:20:33   22   clear.

11:20:35   23       Do you know who that arbitrator was that was

11:20:39  1    selected?

11:20:39  2          **A.**    Yes.

11:20:39  3          **Q.**    Who was that arbitrator?

11:20:40  4          **A.**    Jeffrey Selchick.

11:20:43  5          **Q.**    Is Jeffrey an attorney?

11:20:45  6          **A.**    I believe he is.

11:20:46  7          **Q.**    And does he work here in the city of

11:20:49  8    Buffalo?

11:20:50  9          **A.**    He's not from Buffalo.

11:20:51 10          **Q.**    Do you know where he's from?

11:20:53 11          **A.**    I want to say Albany area, but I may be

11:20:57 12    wrong.

11:20:57 13          **Q.**    Do you know if he's an arbitrator for

11:21:00 14    any other police departments and police unions?

11:21:03 15          **A.**    I'm sure he is.

11:21:06 16          **Q.**    Do you know, does the city of Buffalo

11:21:12 17    pay for these arbitration hearings?

11:21:14 18          **A.**    We pay part of it and the union pays

11:21:17 19    part of it.

11:21:18 20          **Q.**    And do you know what part the city of

11:21:20 21    Buffalo pays?

11:21:21 22          **A.**    I would make the assumption 50/50 with

11:21:24 23    the union.

*Derenda - Davenport - 9/24/2020*

75

11:21:32   1          Q.    Have you negotiated any of the union

         2    contracts between the city of Buffalo and the

         3    police union?

11:21:40   4          A.    The attorneys negotiate the contracts.

11:21:41   5    I've had some input.

11:21:43   6          Q.    And what was your input?

11:21:45   7          A.    Different things we wanted or needed,

11:21:47   8    we always didn't get.  Again, the attorneys would

11:21:51   9    negotiate the contract.  I believe, only one was

11:21:55  10    signed the time -- during the time I was

11:21:56  11    commissioner.

11:21:57  12          Q.    Do you know when approximately that

11:21:59  13    union contract was signed?

11:22:02  14          A.    Maybe around 2015.  I'm not sure of the

11:22:05  15    date, but it was only one that we signed.  I

11:22:08  16    believe, when I was commissioner.

11:22:11  17          Q.    Is there a certain time period that

11:22:14  18    these union contracts stay in place?

11:22:17  19          A.    For whatever's stipulated in the

11:22:19  20    contract.

11:22:19  21          Q.    Do you know the contract that was

11:22:21  22    signed in 2015, was there a time period that was

11:22:24  23    stipulated to?

*Derenda - Davenport - 9/24/2020*

76

11:22:25  1           **A.**     I don't recall what the time period

11:22:27  2    was.  Again, I'm not sure if it was 2015.  I know

11:22:30  3    that there was one contract we were able to get.

11:22:33  4    It's very difficult to get a signed contract with a

11:22:36  5    union.

11:22:36  6           **Q.**     And then do you know before

11:22:39  7    approximately 2015 when the previous union contract

11:22:42  8    would have been agreed to?

11:22:44  9           **A.**     I don't recall.  Again, you're using

11:22:49  10   2015, I don't know that date to be certain.

11:22:54  11          **Q.**     I'll just -- instead of saying 2015,

11:22:56  12   I'll just say the union contract that was signed

11:22:59  13   during your tenure.

11:23:00  14          **A.**     Correct.

11:23:01  15          **Q.**     Okay.  Now, for the union contract that

11:23:05  16   was signed during your tenure, what were certain --

11:23:09  17   what were certain negotiating points that you

11:23:09  18   wanted to have in the union contract?

11:23:12  19          **A.**     I don't recall exactly.  But it was --

11:23:15  20   it entailed raises.  Many things were talked about,

11:23:20  21   few things ended up in the contract.

11:23:23  22          I know city residency was one of them.  I

11:23:27  23   believe, it was a seven year or nine year city

*Derenda - Davenport - 9/24/2020*

77

| | | |
|---|---|---|
| 11:23:29 | 1 | residency for new employees that was put in, but |
| 11:23:34 | 2 | that is sunsetted now.  Different things we wanted |
| 11:23:35 | 3 | that never made it to the contract. |
| 11:23:39 | 4 | Again, negotiations between the PBA |
| 11:23:41 | 5 | attorneys and the city attorneys. |
| 11:23:46 | 6 | Q.    As part of your negotiating points for |
| 11:23:50 | 7 | this contract, was there anything in there about |
| 11:23:52 | 8 | the internal affairs review process? |
| 11:23:53 | 9 | A.    Not that I recall.  I don't think I |
| 11:24:00 | 10 | would negotiate an internal affairs process.  I |
| 11:24:02 | 11 | don't think that would have to be negotiated. |
| 11:24:05 | 12 | Q.    So the PBA really wouldn't have much of |
| 11:24:10 | 13 | a say in the internal affairs review process. |
| 11:24:13 | 14 | A.    In the review process, no.  Again, they |
| 11:24:16 | 15 | have the hearing process if they have something to |
| 11:24:18 | 16 | say.  Because, I believe, they're going under state |
| 11:24:20 | 17 | law that may allow us -- allows them to have |
| 11:24:23 | 18 | hearings for officers. |
| 11:24:24 | 19 | I can't make the final determination on |
| 11:24:26 | 20 | discipline if it's not accepted.  Meaning, if they |
| 11:24:29 | 21 | choose not to accept my findings, they have the |
| 11:24:34 | 22 | option for a hearing before an arbitrator. |
| 11:24:35 | 23 | Q.    And would that be the police union or |

| | | |
|---|---|---|
| | 1 | the police officer who would have to accept the |
| 11:24:39 | 2 | findings? |
| 11:24:39 | 3 | **A.** It would have to be the officer through |
| 11:24:41 | 4 | the police union. The officer could request a |
| 11:24:45 | 5 | hearing. |
| 11:24:45 | 6 | **Q.** But that's typically done by a union |
| 11:24:48 | 7 | representative? |
| 11:24:49 | 8 | **A.** The officer talking to the union |
| 11:24:52 | 9 | representative that he wants a hearing. |
| 11:24:55 | 10 | **Q.** Do you know with the PBA, how many |
| 11:24:58 | 11 | representatives they have working for the PBA? |
| 11:25:00 | 12 | **A.** How many they have working? Meaning, |
| 11:25:03 | 13 | attorneys or -- |
| 11:25:06 | 14 | **Q.** Well, when you say that a |
| 11:25:08 | 15 | representative would ask for an arbitration, would |
| 11:25:11 | 16 | that be an attorney with the PBA? Or would that |
| 11:25:13 | 17 | just be an employee? |
| 11:25:15 | 18 | **A.** He would have -- you would have, if you |
| 11:25:17 | 19 | had an informal hearing where you -- so you do |
| 11:25:20 | 20 | the -- you would do the internal affairs review. |
| 11:25:22 | 21 | The next step would be an informal hearing. |
| 11:25:25 | 22 | So I would look at the case, guilty of this charge |
| 11:25:29 | 23 | subsection and the penalty we want to impose is a |

| | | |
|---|---|---|
| 11:25:34 | 1 | 30 day suspension. |
| 11:25:36 | 2 | And then the attorney for the PBA would be |
| 11:25:38 | 3 | there as the attorney for the officer and talking |
| 11:25:43 | 4 | with their client, the officer.  They make the |
| 11:25:46 | 5 | determination whether they want to accept or they |
| 11:25:48 | 6 | would ask for a hearing.  And that would take place |
| 11:25:51 | 7 | through the attorney for the PBA. |
| 11:25:53 | 8 | Q.    When they make the request for the |
| 11:25:54 | 9 | hearing, the arbitration hearing, would that |
| 11:25:57 | 10 | request be made through you?  Or somebody else? |
| 11:25:59 | 11 | A.    They would make the request to the |
| 11:26:01 | 12 | department that they want a hearing.  Then they |
| 11:26:04 | 13 | would be set up through Commission Lockwood's -- |
| 11:26:09 | 14 | Deputy Commissioner Lockwood's office. |
| 11:26:09 | 15 | Q.    And when you say the department, you |
| 11:26:11 | 16 | mean the police department? |
| 11:26:11 | 17 | A.    Correct. |
| 11:26:12 | 18 | Q.    Was there somebody within the police |
| 11:26:15 | 19 | department who that request would have been made |
| 11:26:18 | 20 | for arbitration? |
| 11:26:19 | 21 | A.    The arbitration is still through the |
| 11:26:22 | 22 | deputy of administration.  So he would be in that |
| 11:26:24 | 23 | process of setting up those arbitrations with the |

*Derenda - Davenport - 9/24/2020*

80

| | | |
|---|---|---|
| 11:26:27 | 1 | union. |
| 11:26:28 | 2 | **Q.** Okay. |
| 11:26:28 | 3 | **A.** And in my case it would have been |
| 11:26:31 | 4 | Lockwood's office. |
| 11:26:31 | 5 | **Q.** And the arbitration would have taken |
| 11:26:36 | 6 | place in Lockwood's office? |
| 11:26:36 | 7 | **A.** The arbitration would have been taken |
| 11:26:39 | 8 | in the conference room.  Where a -- it's sort of |
| 11:26:39 | 9 | just, like, a little hearing.  Where the arbitrator |
| 11:26:42 | 10 | sits at the head of the table and we bring |
| 11:26:44 | 11 | witnesses in from both sides.  And it's not |
| 11:26:48 | 12 | informal, but not, like, a total court hearing. |
| 11:26:52 | 13 | **Q.** And would those witnesses include the |
| 11:26:55 | 14 | complainant? |
| 11:26:55 | 15 | **A.** It could. |
| 11:26:57 | 16 | **Q.** Do you know if there was a requirement |
| 11:27:00 | 17 | for the arbitrations to have witness statements |
| 11:27:03 | 18 | from the complainant? |
| 11:27:04 | 19 | **A.** I believe, that would be part of the |
| 11:27:07 | 20 | process.  But I don't know if it was called a |
| | 21 | requirement. |
| 11:27:12 | 22 | **Q.** Would the officers be required to give |
| 11:27:14 | 23 | statements during the arbitration hearing? |

*Derenda - Davenport - 9/24/2020*

81

11:27:17  1      **A.**    Yes.

11:27:18  2      **Q.**    Now, I just want to turn your

11:27:23  3  attention, again, to Exhibit 38.  One question that

11:27:26  4  I have is for the not sustained findings, would

11:27:31  5  that be a finding that's after an arbitration

11:27:36  6  process?  Or would that be a finding that's made by

11:27:39  7  the police commissioner?

11:27:40  8      **A.**    I think it could be by both.  So

11:27:43  9  initially if -- in this one it says, after a

         10  thorough review of the case police commissioner

         11  determined there's not sufficient evidence.

11:27:47 12      So this was determined by the commissioner

11:27:50 13  of police.  If you go to a hearing and the hearing

11:27:54 14  officer would find it not sustained and the letter

11:27:57 15  would say that after a hearing it was found to be

11:28:01 16  insufficient and not sustained.

11:28:03 17      And that's the language, I believe, would

11:28:05 18  come from the arbitrator.

11:28:07 19      **Q.**    Okay.  So because it says that the

11:28:09 20  police commissioner has determined that there's not

11:28:11 21  sufficient evidence.  That means that it would have

11:28:13 22  stopped at that process, there wouldn't have been

11:28:15 23  an arbitration?

*Derenda - Davenport - 9/24/2020*

82

| | | |
|---|---|---|
| 11:28:17 | 1 | **A.**   That would have been -- that would have |
| 11:28:19 | 2 | been the end of the review. |
| | 3 | **Q.**   Okay. |
| 11:28:20 | 4 | **MS. HUGGINS:**  Form to the last question. |
| | 5 | **BY MR. DAVENPORT:** |
| 11:28:24 | 6 | **Q.**   All right.  I'm going to start asking |
| 11:28:25 | 7 | some questions about the video.  Which I'll need |
| 11:28:28 | 8 | some time to set up. |
| 11:28:30 | 9 | So if you want to take a bathroom break or |
| 11:28:32 | 10 | anything like that, you can certainly do that right |
| | 11 | now. |
| | 12 | **MS. HUGGINS:**  Go off the record for a |
| | 13 | moment? |
| | 14 | **MR. DAVENPORT:**  Yeah, let's go off. |
| | 15 | **THE VIDEOGRAPHER:**  Off the record at 11:28. |
| 11:31:53 | 16 | (Off the record.) |
| 11:42:47 | 17 | **THE VIDEOGRAPHER:**  We are on the record at |
| 11:42:51 | 18 | 11:42. |
| | 19 | **BY MR. DAVENPORT:** |
| 11:42:52 | 20 | **Q.**   All right.  So Mr. Derenda, we talked |
| 11:42:55 | 21 | earlier about you watching news stories based on |
| 11:42:59 | 22 | this case involving Mr. Kistner.  During those news |
| 11:43:03 | 23 | stories, was this one of the videos that you |

*Derenda - Davenport - 9/24/2020*

83

11:43:06   1   watched?

11:43:07   2         MS. HUGGINS:   Form.   You just have a still

11:43:08   3   of a video on the screen.   Do you want to play it

11:43:13   4   and then ask the questions?

11:43:16   5         MR. DAVENPORT:   Sure.   We can do that.   I'll

11:43:21   6   play the first 15 seconds or so of this video.

11:43:26   7         MS. HUGGINS:   Can you identify the exhibit

11:43:29   8   and the file number.

           9         BY MR. DAVENPORT:

11:43:30  10         Q.   So we are reviewing Exhibit 11.   It is

11:43:33  11   the third video on Exhibit 11.   And it's number is

11:43:39  12   0620170101102529.

11:43:54  13         Mr. Derenda, let me know if you have any

11:43:58  14   trouble seeing the video.   Now, based on what you

11:44:16  15   saw right there, was that one of the videos that

11:44:19  16   you saw during the news story?

11:44:22  17         A.   I believe that it was.

11:44:23  18         Q.   Okay.   And was that the first time that

11:44:26  19   you saw that video was during the news story?

11:44:30  20         A.   I don't believe I seen the video any

11:44:32  21   other place, but the news story.   I had the news

11:44:36  22   on, I was doing something and I looked up and I

11:44:38  23   believe that was the video.

*Derenda - Davenport - 9/24/2020*

84

11:44:38  1      Q.    And that would have been the only time
11:44:41  2   that you had ever reviewed that video?
11:44:44  3      A.    To my recollection.
11:44:45  4      Q.    And you never reviewed this video
11:44:49  5   during your tenure as police commissioner?
11:44:52  6      A.    I do not.   I have no recollection of
11:44:54  7   reviewing this video.
11:44:57  8      Q.    Okay.   Now, do you see an individual
11:45:12  9   who is in the street?
11:45:14 10      A.    Yes.
11:45:15 11      Q.    And do you know who that individual is?
11:45:17 12      A.    I do not.
11:45:19 13      Q.    Do you have any reason to believe that
11:45:21 14   it's not Mr. Kistner?
11:45:24 15      A.    From the video I couldn't tell you who
11:45:26 16   it is.
11:45:27 17      Q.    But as you sit here today, do you have
11:45:29 18   any reason to believe that the individual who is
11:45:32 19   pictured in this video is not Mr. Kistner?
11:45:35 20      A.    If you're telling me it's Mr. Kistner,
11:45:38 21   I believe you.
11:45:39 22      Q.    Thank you.   Do you see Mr. Kistner
11:45:42 23   where he is situated.

*Derenda - Davenport - 9/24/2020*

85

11:45:43  1        **A.**    Yes.

11:45:44  2        **Q.**    Okay.  And where is he currently

11:45:47  3  situated?

11:45:47  4        **A.**    A few feet from the police vehicle.

11:45:49  5        **Q.**    Okay.  Now, approximately how far away

11:45:58  6  are the two police vehicles from each other?

11:46:01  7        **A.**    I can't tell.

11:46:02  8        **Q.**    Okay.  Now, I'm going to have you watch

11:46:10  9  the first couple of seconds, the first 10 seconds.

11:46:16  10  And I just want you to generally describe what you

11:46:20  11  see.

11:46:22  12        **MS. HUGGINS:**  Form.

         13        **BY MR. DAVENPORT:**

11:46:35  14        **Q.**    So Mr. Derenda, during the first

11:46:39  15  10 seconds of that video, what did you see?

11:46:39  16        **MS. HUGGINS:**  Form.  You can answer.

11:46:40  17        **THE WITNESS:**  I see an individual walking

11:46:42  18  past one police vehicle that left and towards the

11:46:45  19  other police vehicle.  And it appears they come in

11:46:47  20  contact.

         21        **BY MR. DAVENPORT:**

11:46:50  22        **Q.**    Now, when watching that video, did it

11:46:53  23  appear that the individual threw himself at the

| | | |
|---|---|---|
| 11:46:57 | 1 | police vehicle? |
| 11:46:57 | 2 | **A.** It's really not clear. You see that |
| 11:47:00 | 3 | there's contact. But I can't tell you what took |
| 11:47:02 | 4 | place with what you're showing me. |
| 11:47:05 | 5 | **Q.** Now -- |
| 11:47:08 | 6 | **A.** Inconclusive. |
| 11:47:09 | 7 | **Q.** In this -- in this type of situation |
| 11:47:13 | 8 | where it's, you know, based on what you see it's |
| 11:47:17 | 9 | inconclusive, if he threw himself at the police |
| 11:47:20 | 10 | vehicle or if the police vehicle struck the |
| 11:47:22 | 11 | individual. |
| 11:47:22 | 12 | Would you expect the supervisor to be called |
| 11:47:25 | 13 | to the scene by the officers? |
| 11:47:27 | 14 | **MS. HUGGINS:** Form. You can answer. |
| 11:47:27 | 15 | **THE WITNESS:** Again, based on what I see and |
| 11:47:29 | 16 | what the officers -- again, it's yes and no. From |
| 11:47:34 | 17 | what I see it's inconclusive. So if the officers |
| 11:47:38 | 18 | are saying he threw himself into the car, they may |
| 11:47:42 | 19 | or may not have called the supervisor. |
| | 20 | **BY MR. DAVENPORT:** |
| 11:47:46 | 21 | **Q.** Do you believe that in watching this |
| 11:47:48 | 22 | video, it was conclusive enough that Mr. Kistner |
| 11:47:51 | 23 | threw himself at the police vehicle where internal |

| | | |
|---|---|---|
| 11:47:54 | 1 | affairs did not need to be called to the scene? |
| | 2 | **A.** I'm saying -- |
| 11:47:57 | 3 | **MS. HUGGINS:** Form. |
| 11:47:57 | 4 | **THE WITNESS:** I'm saying the video is |
| 11:47:59 | 5 | inconclusive to what took place, in my opinion. |
| | 6 | **BY MR. DAVENPORT:** |
| 11:48:04 | 7 | **Q.** In this type of situation as a police |
| 11:48:08 | 8 | commissioner, would you want internal affairs to go |
| 11:48:10 | 9 | and review what happened? |
| 11:48:11 | 10 | **A.** I don't know all the circumstances. If |
| 11:48:14 | 11 | the complainant was injured. I don't know if it |
| 11:48:17 | 12 | was damage to the vehicle. |
| 11:48:19 | 13 | Again, for me to make an opinion on what I |
| 11:48:22 | 14 | know very little about or what I'm seeing in a |
| 11:48:26 | 15 | video that's inconclusive to what took place. |
| 11:48:28 | 16 | **Q.** Now, during your review of the |
| 11:48:30 | 17 | allegations in the complaint, do you know if |
| 11:48:33 | 18 | Mr. Kistner was criminally charged for what just |
| 11:48:36 | 19 | took place? |
| 11:48:36 | 20 | **A.** I don't believe I reviewed this |
| 11:48:39 | 21 | complaint. |
| 11:48:42 | 22 | **Q.** Now, in watching that video, did you |
| 11:48:45 | 23 | believe that Mr. Kistner intentionally threw |

*Derenda - Davenport - 9/24/2020*

88

| | | |
|---|---|---|
| 11:48:50 | 1 | himself at that police vehicle to sustain a |
| | 2 | criminal mischief allegation? |
| 11:48:55 | 3 | **MS. HUGGINS:**  Form. |
| 11:48:55 | 4 | **THE WITNESS:**  Again, the video to me is |
| 11:48:57 | 5 | inconclusive. |
| | 6 | **BY MR. DAVENPORT:** |
| 11:49:03 | 7 | **Q.**    I'm going to show the witness what's |
| 11:49:05 | 8 | been marked as Exhibit 17.  Now, Dan, in reviewing |
| 11:49:20 | 9 | that document that I just placed in front of you, |
| 11:49:24 | 10 | do you recognize what that document is? |
| 11:49:26 | 11 | **A.**    Appears to be a charging document. |
| 11:49:29 | 12 | **Q.**    Do you see who the individual is being |
| 11:49:33 | 13 | charged with the crime? |
| 11:49:34 | 14 | **A.**    Yes. |
| 11:49:36 | 15 | **Q.**    And is that individual Mr. Kistner? |
| 11:49:40 | 16 | **A.**    James Kistner, correct. |
| 11:49:42 | 17 | **Q.**    And do you see the date that he was |
| 11:49:46 | 18 | charged with this crime? |
| 11:49:49 | 19 | **A.**    January 1st, 2017. |
| 11:49:54 | 20 | **Q.**    And do you see what he was charged |
| 11:49:56 | 21 | with? |
| 11:49:56 | 22 | **A.**    Criminal mischief third, Class C |
| 11:50:00 | 23 | felony. |

*Derenda - Davenport - 9/24/2020*

89

| | | |
|---|---|---|
| 11:50:01 | 1 | **Q.**    And if you would like I could give you |
| 11:50:03 | 2 | some time to review the allegations that support |
| 11:50:06 | 3 | that criminal charge.   Would you like some time to |
| 11:50:08 | 4 | review that? |
| 11:50:09 | 5 | **A.**    No, I'm good.   That would be -- the |
| 11:50:12 | 6 | damage would be in a certain amount. |
| 11:50:14 | 7 | **Q.**    Correct. |
| 11:50:15 | 8 | **A.**    They're saying more than $250. |
| 11:50:28 | 9 | **Q.**    Now, do you see in the first line where |
| 11:50:32 | 10 | there's the allegations that support the criminal |
| 11:50:37 | 11 | charge where it says intent to damage? |
| 11:50:38 | 12 | **A.**    With intent to damage the property of |
| 11:50:42 | 13 | another person, city of Buffalo Police Department |
| 11:50:44 | 14 | and having no right to do so nor any reasonable |
| 11:50:46 | 15 | ground to believe that he had such right did damage |
| 11:50:47 | 16 | the property.   To wit; driver's side mirror. |
| 11:50:51 | 17 | **Q.**    But you do see the part where it says |
| 11:50:53 | 18 | intent to damage? |
| 11:50:54 | 19 | **A.**    Correct. |
| 11:50:55 | 20 | **Q.**    Now, to the best of your recollection, |
| 11:50:57 | 21 | is that one of the elements to support a criminal |
| 11:51:00 | 22 | mischief charge? |
| 11:51:01 | 23 | **A.**    It could be.   For different charges I |

| | | |
|---|---|---|
| 11:51:05 | 1 | don't know -- I haven't read the statute in a long |
| 11:51:09 | 2 | time, but it could be recklessly damage or -- I'm |
| 11:51:09 | 3 | not sure. But intent was definitely one of the -- |
| 11:51:13 | 4 | one of them. |
| 11:51:14 | 5 | Q. Okay. Now, based on what you just saw |
| 11:51:16 | 6 | on that video, do you think that Mr. Kistner had an |
| 11:51:20 | 7 | intent to damage the police vehicle? |
| | 8 | A. What I saw -- |
| 11:51:21 | 9 | MS. HUGGINS: Form. |
| 11:51:22 | 10 | THE WITNESS: What I saw in the video is |
| 11:51:23 | 11 | inconclusive. I can't tell what took place. I can |
| 11:51:25 | 12 | tell you they did come in contact. |
| | 13 | BY MR. DAVENPORT: |
| 11:51:28 | 14 | Q. Now, if you had been reviewing this |
| 11:51:32 | 15 | during internal affairs process, if officers had |
| 11:51:34 | 16 | brought felony charges against that individual for |
| 11:51:38 | 17 | criminal mischief, would that result in a sustained |
| 11:51:41 | 18 | or not sustained finding? |
| 11:51:43 | 19 | MS. HUGGINS: Form. |
| 11:51:43 | 20 | THE WITNESS: I cannot tell you that. I |
| 11:51:46 | 21 | don't know what the investigation -- I don't have |
| 11:51:48 | 22 | the opinion of the investigators. I don't have |
| 11:51:50 | 23 | witness statements. I don't have officer |

*Derenda - Davenport - 9/24/2020*

91

11:51:52  1   statements.

11:51:53  2        I don't -- couldn't tell you what it would

11:51:55  3   be or what it wouldn't be.  I did not review this

11:51:58  4   case, to my knowledge.  Therefore, I really

11:52:01  5   shouldn't give an opinion on something I don't

        6   know.

        7        **BY MR. DAVENPORT:**

11:52:04  8        **Q.**   Now, during that internal affairs

11:52:06  9   review process, would you expect that there would

11:52:08  10  be statements from the officers as to what formed

11:52:11  11  their belief that Mr. Kistner had an intent to

11:52:15  12  damage the vehicle?

11:52:16  13       **A.**   Yes.

11:52:17  14       **Q.**   And if the officer driving the vehicle

11:52:19  15  said that she did not see Mr. Kistner before he

11:52:26  16  struck the vehicle and another officer had seen

11:52:27  17  what had taken place, would you then ask questions

11:52:30  18  about what that other officer saw and how he saw

11:52:34  19  what he claims to have seen?

11:52:36  20       **MS. HUGGINS:**   Form.

11:52:36  21       **THE WITNESS:**   Again, I'd have to review all

11:52:38  22  the evidence that would be presented to me.  So

11:52:41  23  there's no way I can tell you what I would have

*Derenda - Davenport - 9/24/2020*

92

11:52:44  1  done, could have done or should have done. But I
11:52:46  2  would have to see the total body of evidence.
          3          BY MR. DAVENPORT:
11:52:49  4          Q.   Did you see how prior to Mr. Kistner
11:52:51  5  and the car coming in contact, there was another
11:52:55  6  police vehicle that was driving away?
11:52:57  7          A.   Correct.
11:52:58  8          Q.   Now, in this case, the one officer who
11:53:02  9  said that he saw the entire thing was sitting in
11:53:05 10  the passenger's seat of that vehicle. And that he
11:53:07 11  looked through the driver's side mirror and saw
11:53:10 12  Mr. Kistner throw himself at the police vehicle.
11:53:13 13  Do you find that to be a creditable statement?
11:53:16 14          MS. HUGGINS:  Form. Calls for speculation.
11:53:18 15          THE WITNESS:  Again, I don't have the
11:53:19 16  statements that the officers made. I don't have
11:53:21 17  the full investigation in front of me. So I don't
11:53:26 18  believe I can render an opinion.
          19          BY MR. DAVENPORT:
11:53:29 20          Q.   Mr. Derenda, have you ever sat in the
11:53:32 21  passenger's seat of a vehicle before?
11:53:32 22          A.   I'm sure I have.
11:53:33 23          Q.   And have you ever looked through the

*Derenda - Davenport - 9/24/2020*

93

| | | |
|---|---|---|
| 11:53:35 | 1 | passenger's -- the driver's side mirror? |
| 11:53:38 | 2 | A.   Driver's side mirror? |
| 11:53:40 | 3 | Q.   Yes. |
| 11:53:41 | 4 | A.   Not to my recollection. |
| 11:53:43 | 5 | Q.   Are you familiar with the general |
| 11:53:49 | 6 | layout of mirrors on a vehicle? |
| 11:53:51 | 7 | A.   Yes. |
| 11:53:51 | 8 | Q.   And if a mirror is correctly placed on |
| 11:53:54 | 9 | the driver's side, what would the person in the |
| 11:53:59 | 10 | passenger seat be able to see? |
| 11:54:01 | 11 | A.   I don't know. |
| 11:54:02 | 12 | Q.   What would the individual in the |
| 11:54:05 | 13 | driver's side be able to see? |
| 11:54:06 | 14 | A.   What's behind, whatever is in the |
| 11:54:08 | 15 | mirror, however he had it set.  Again, for me to |
| 11:54:11 | 16 | speculate what they seen or didn't see, I don't |
| 11:54:16 | 17 | know. |
| 11:54:16 | 18 | Q.   Have you ever looked in the mirror, |
| 11:54:20 | 19 | whether that be the passenger's side mirror or the |
| 11:54:23 | 20 | rear view mirror as a vehicle is driving away? |
| 11:54:28 | 21 | A.   As a vehicle is driving away? |
| 11:54:29 | 22 | Q.   As the vehicle that you're sitting in |
| 11:54:31 | 23 | is driving away? |

11:54:32 1      **A.**    Have I ever looked in the mirror while

11:54:34 2  something -- while I'm driving away?  I'm sure I

11:54:36 3  have.

11:54:36 4      **Q.**    As a passenger have you ever done that?

11:54:39 5      **A.**    I can't say I have or haven't.

11:54:42 6      **Q.**    Even if you'd done that as a driver,

11:54:44 7  you had sat in a vehicle and looked in mirrors as

11:54:47 8  you were driving away?

11:54:49 9      **A.**    There may be a reason to look in the

11:54:52 10  mirror as you're pulling way.  But, again, probably

11:54:54 11  have, but can't say when or why.  If you're pulling

11:54:59 12  away from something you'll look in the mirror to

11:55:00 13  make sure nothing is coming out or whatever.

11:55:04 14     But I'm sure there's been a reason why I've

11:55:06 15  looked, I just can't tell you why.

11:55:08 16      **Q.**    Now, when the vehicle is driving away,

11:55:12 17  is images that you are seeing in the mirror easier

11:55:16 18  or harder to see as you drive further and further

11:55:19 19  away from whatever that image is?

11:55:21 20      **MS. HUGGINS:**  Form.

11:55:22 21      **THE WITNESS:**  Obviously, the image would get

11:55:24 22  smaller and smaller the further you get.

23      **BY MR. DAVENPORT:**

*Derenda - Davenport - 9/24/2020*

95

| | | |
|---|---|---|
| 11:55:26 | 1 | Q.    And it would be more difficult to see |
| 11:55:28 | 2 | what that image is and be able to identify it? |
| 11:55:32 | 3 | MS. HUGGINS:  Form. |
| 11:55:33 | 4 | THE WITNESS:  I believe so. |
| | 5 | BY MR. DAVENPORT: |
| 11:55:34 | 6 | Q.    And if an individual is sitting in the |
| 11:55:37 | 7 | passenger's seat and looking in the rearview |
| 11:55:41 | 8 | mirror, as the car is driving further and further |
| 11:55:44 | 9 | away it would be more difficult for the officer to |
| 11:55:46 | 10 | identify what is taking place between the other |
| 11:55:50 | 11 | police vehicle and the citizen? |
| 11:55:51 | 12 | MS. HUGGINS:  Form. |
| 11:55:52 | 13 | THE WITNESS:  Again, the further away you |
| 11:55:53 | 14 | get the less you're going to be able to see.  I |
| 11:55:56 | 15 | don't know the circumstances.  So I really can't |
| 11:55:59 | 16 | tell you what they seen or didn't see or how they |
| 11:56:02 | 17 | seen it. |
| 11:56:02 | 18 | But yes, the further away you get the less |
| 11:56:06 | 19 | ability you have to see. |
| | 20 | BY MR. DAVENPORT: |
| 11:56:10 | 21 | Q.    Now, I'm going to show you some more |
| 11:56:14 | 22 | parts of this video.  But before I do so, an |
| 11:56:19 | 23 | individual has just, in a police vehicle, have just |

*Derenda - Davenport - 9/24/2020*

96

11:56:21  1   come in contact with each other.

11:56:23  2          Would you expect there to be some sort of a

11:56:27  3   health assessment of the individual who was just

11:56:30  4   struck?

11:56:30  5          **A.**   Again, I don't know the circumstances.

11:56:33  6   I don't know if there was damage to the vehicle.  I

11:56:36  7   don't know if the person that came in contact with

11:56:39  8   the vehicle claimed injury.  I don't know any of

11:56:41  9   that.

11:56:42  10          So sometimes I would say yes, sometimes no,

11:56:47  11  depending on the circumstances.  And as I said,

11:56:49  12  when you look at this video from where I sit and

11:56:50  13  what I know, it's inconclusive.  If he was injured,

11:56:53  14  not injured, damage, no damage, you can't tell.

11:56:56  15          **Q.**   If the individual told the officers

11:56:59  16  that his head was hurting, would you expect there

11:57:03  17  to be some sort of a health assessment?

11:57:05  18          **MS. HUGGINS:**  Form.

11:57:05  19          **THE WITNESS:**  If he says he was injured, was

11:57:08  20  he arrested at the time?  What was going on?

11:57:12  21  Again, different circumstances.  Is he saying --

11:57:16  22  the officers apparently say in their complaint that

11:57:19  23  he threw himself on the vehicle.

*Derenda - Davenport - 9/24/2020*

97

| | | |
|---|---|---|
| 11:57:20 | 1 | If he's claiming injury at that point, he'd |
| 11:57:24 | 2 | have a right to get checked out medically at that |
| 11:57:27 | 3 | point.  And should have been, if that's the case. |
| 11:57:29 | 4 | But, again, I wasn't there. |
| | 5 | **BY MR. DAVENPORT:** |
| 11:57:31 | 6 | Q.   Now, would that health assessment be |
| 11:57:35 | 7 | done by the officers at the scene?  Or would there |
| 11:57:37 | 8 | be other ambulance or emergency personnel that |
| 11:57:39 | 9 | would go? |
| 11:57:40 | 10 | A.   If somebody is claiming an injury, they |
| 11:57:41 | 11 | have a right to go see medical personnel or |
| 11:57:45 | 12 | somebody respond. |
| | 13 | **BY MR. DAVENPORT:** |
| 11:57:47 | 14 | Q.   Would -- would you expect the officers |
| 11:57:51 | 15 | to have an ambulance arrive at the scene for |
| 11:57:55 | 16 | somebody whose head is hurting? |
| 11:57:56 | 17 | A.   Sometimes, yes.  Sometimes, no. |
| 11:58:00 | 18 | Depending -- again, circumstances.  Does his |
| 11:58:02 | 19 | head -- does he have a headache.  It -- depending |
| 11:58:03 | 20 | on the circumstances.  Again, I could say yes or |
| 11:58:05 | 21 | no, either way. |
| 11:58:07 | 22 | Q.   Now, in circumstances where you would |
| 11:58:09 | 23 | say no, what circumstances would those be where you |

*Derenda - Davenport - 9/24/2020*

98

| 11:58:14 | 1 | wouldn't expect an ambulance to go to the scene? |
| 11:58:16 | 2 | A.   I don't know what was communicated.  I |
| 11:58:18 | 3 | don't know what was said.  I don't know what the |
| 11:58:20 | 4 | officers are saying he said.  If he's saying I'm |
| 11:58:23 | 5 | injured and he's under arrest then they should have |
| 11:58:26 | 6 | either A, called an ambulance or taken him to the |
| 11:58:29 | 7 | hospital. |
| 11:58:30 | 8 | MS. HUGGINS:  Form as to last question. |
| | 9 | BY MR. DAVENPORT: |
| 11:58:32 | 10 | Q.   If one of the individuals who witnessed |
| 11:58:35 | 11 | what took place called for an ambulance, would the |
| 11:58:40 | 12 | officers have the ability to cancel the ambulance? |
| 11:58:44 | 13 | MS. HUGGINS:  Form. |
| 11:58:45 | 14 | THE WITNESS:  Could they have canceled the |
| 11:58:48 | 15 | ambulance?  I'm sure they could have told them that |
| 11:58:52 | 16 | they don't need an ambulance.  They'll take him to |
| 11:58:55 | 17 | the hospital.  Or again, I don't know the |
| | 18 | circumstances. |
| | 19 | BY MR. DAVENPORT: |
| 11:58:57 | 20 | Q.   Now, would it be proper for an officer |
| 11:58:59 | 21 | to cancel an ambulance if an individual said that |
| 11:59:02 | 22 | his head hurt and there was another individual who |
| 11:59:06 | 23 | called an ambulance to arrive? |

11:59:09  1        **MS. HUGGINS:**  Form.

11:59:09  2        **THE WITNESS:**  Again, I don't know the

11:59:10  3  circumstances.  I don't know what the officers knew

11:59:11  4  or didn't know at the time.  If he's injured and

11:59:14  5  he's under arrest, he's saying he's injured, needs

11:59:19  6  medical attention.  Then they should have let the

11:59:22  7  ambulance come at that -- if they didn't.

11:59:25  8        I don't know if they canceled it or didn't.

11:59:26  9  Or they should have taken him for observation to a

11:59:30 10  medical facility.

        11        **BY MR. DAVENPORT:**

11:59:32 12        **Q.**  Now, if you were sitting in an internal

11:59:35 13  affairs review process and the officer told you

11:59:37 14  that he canceled the ambulance because the officers

11:59:39 15  could get the individual to ECMC faster than the

11:59:44 16  ambulance.  Would that be a proper reason to cancel

11:59:47 17  an ambulance?

11:59:48 18        **MS. HUGGINS:**  Form.

11:59:48 19        **THE WITNESS:**  Depending on the

11:59:49 20  circumstances.  If there -- if he said I have a

11:59:51 21  headache, if they could get him there faster he's

11:59:54 22  in custody, if he's able to walk and has no issues

11:59:59 23  there's no serious medical issues that they see or

*Derenda - Davenport - 9/24/2020*

100

12:00:03  1   he's claiming.  Then I wouldn't have a problem with

12:00:05  2   them taking him to the hospital.

12:00:08  3        But I don't know if they took him to the

12:00:10  4   hospital.  I don't know what he's claiming.  I

12:00:11  5   don't know what they seen.  But in some cases yes.

12:00:15  6   In some cases no.  Again, depending on the

12:00:18  7   circumstances.

12:00:18  8        You're putting me in something that I'm not

12:00:21  9   there or not aware of all the circumstances.  So I

12:00:22 10   can't give you a definitive answer.

        11   **BY MR. DAVENPORT:**

12:00:25 12        **Q.**   Would that excuse be appropriate if the

12:00:27 13   officers took 25 minutes between the initial

12:00:30 14   collision and actually transporting the individual

12:00:33 15   to ECMC?

        16   **MS. HUGGINS:**  Form.

12:00:35 17   **THE WITNESS:**  Again, depending on the

12:00:37 18   circumstances.  I don't know the extent of injuries

12:00:39 19   being claimed or extent of injuries.  I don't know.

12:00:43 20   That would be a judgment call.

12:00:46 21   **BY MR. DAVENPORT:**

12:00:46 22        **Q.**   Now, if the individual claimed that he

12:00:49 23   had a head injury and the officers performed no

| 12:00:52 | 1 | physical assessment whatsoever and did not know |
| 12:00:54 | 2 | what his injuries were and sat at the scene for |
| 12:00:58 | 3 | 25 minutes without transporting that individual to |
| 12:01:00 | 4 | ECMC, would that be a problem? |
| 12:01:02 | 5 | **MS. HUGGINS:** Form. |
| 12:01:03 | 6 | **THE WITNESS:** If there was a significant |
| 12:01:05 | 7 | injury and -- then the ambulance should have came |
| 12:01:08 | 8 | and taken care of him. And they shouldn't have |
| 12:01:11 | 9 | canceled the ambulance. |
| 12:01:12 | 10 | Again, I don't know what they thought. What |
| 12:01:13 | 11 | they seen or what they knew at the time to make |
| 12:01:16 | 12 | that judgment. It would be -- I would have to be |
| 12:01:19 | 13 | there. I would have to be the one assessing what's |
| 12:01:22 | 14 | going on. |
| 12:01:22 | 15 | If he wants to go to the hospital, he's |
| 12:01:24 | 16 | claiming injury, then they should have taken him |
| 12:01:26 | 17 | there. If it was bad enough that they shouldn't |
| 12:01:30 | 18 | have waited around 25 minutes, they should have let |
| 12:01:33 | 19 | the ambulance come and assess the situation. |
|  | 20 | But again, I don't know all the |
| 12:01:37 | 21 | circumstances. So for me to comment on what they |
| 12:01:39 | 22 | did or didn't do, I don't know the circumstances. |
|  | 23 | **BY MR. DAVENPORT:** |

*Derenda - Davenport - 9/24/2020*

12:01:41  1      Q.    But then another thing that took place

12:01:44  2  during this case the officers actually canceled

12:01:47  3  ambulances not just for the location where the

12:01:50  4  incident took place, but multiple locations on

          5  Schmarbeck Avenue.

12:01:58  6      There were five or six house numbers that

12:02:01  7  they canceled all the ambulances for.  Is that a

12:02:03  8  proper --

12:02:03  9      A.    I don't understand what you're saying.

12:02:04  10  More people called an ambulance than one?

12:02:07  11      Q.    No, there were no ambulances that were

12:02:10  12  called.  However, the officers proactively canceled

12:02:15  13  all ambulances that may have been called from

12:02:16  14  multiple locations on Schmarbeck Avenue.  Some

12:02:20  15  individuals had no affiliation whatsoever with the

12:02:23  16  Kistner case and collision.

12:02:25  17      MS. HUGGINS:    Form.   I'm sorry.   You're

12:02:27  18  talking about other dates?

12:02:30  19      MR. DAVENPORT:    No, on January 1st of 2019.

12:02:30  20      THE WITNESS:    So on this date, they got on

12:02:32  21  the radio, from what you're telling me.   They said

12:02:34  22  cancel all ambulances, we're going to take him to

12:02:38  23  the hospital?

*Derenda - Davenport - 9/24/2020*

103

1    **BY MR. DAVENPORT:**

12:02:38 2    **Q.** So what they -- what they said was,

12:02:40 3 cancel all ambulances for 24 Schmarbeck,

12:02:46 4 28 Schmarbeck, 33 Schmarbeck, 37 Schmarbeck.  And

12:02:46 5 they canceled all of those ambulances not knowing

12:02:50 6 where Mr. Kistner or where calls for ambulances

12:02:54 7 were coming from.

12:02:55 8    Is that a proper police procedure technique

12:02:58 9 to use?

12:02:59 10    **MS. HUGGINS:** Form.

12:02:59 11    **THE WITNESS:** Again, if you're looking at --

12:02:59 12 I'm looking at what appears to be vacant lots.  So

12:03:03 13 maybe they didn't know what address it exactly sat

12:03:07 14 at.  I don't know how they canceled the ambulance.

12:03:10 15 I don't know what they said.  If they were

12:03:12 16 transporting to the hospital.  I don't know if

12:03:15 17 there were multiple ambulances called from

12:03:16 18 different sources.

12:03:18 19    But apparently, they canceled the ambulance

12:03:22 20 to transport the individual to the hospital on

12:03:23 21 their own.  And could it be justified?  Yes.  Could

12:03:26 22 it be wrong?  Yes.  Depending on the circumstances,

12:03:30 23 which I'm not aware of.

*Derenda - Davenport - 9/24/2020*

104

12:03:32  1         I'm not -- I don't know what they knew or
12:03:33  2   what they thought.  So for me to make a judgment or
12:03:37  3   what they did or didn't do, it wouldn't be right.
          4         BY MR. DAVENPORT:
12:03:43  5         Q.   So I'm going to play -- we'll replay
12:03:45  6   the first 10 seconds and then I'm going to ask
12:03:48  7   questions about what took place afterwards.
12:03:55  8         A.   Okay.
12:04:00  9         MS. HUGGINS:  And for the written record,
12:04:03 10   you're resuming the video at 10 seconds.
12:04:09 11         MR. DAVENPORT:  Correct.  Well, for the
12:04:11 12   record I resumed the video from 0 seconds.  My
12:04:15 13   questions will pertain to what took place after
12:04:19 14   10 seconds.
12:04:26 15         MS. HUGGINS:  And Chad, just so you know.
12:04:27 16   Due to the screen, I can't see the timestamps on
12:04:31 17   the bottom.  That's also for my purpose now, I
          18   can't see them.
          19         MR. DAVENPORT:  Okay.  I understand.
12:04:32 20         MS. HUGGINS:  If you don't mind repeating
12:04:34 21   them out loud.
          22         MR. DAVENPORT:  Understood.
          23         BY MR. DAVENPORT:

| | | |
|---|---|---|
| 12:04:37 | 1 | **Q.** So we are at currently 11 seconds in |
| 12:04:41 | 2 | the video. Do you agree that collision has been |
| 12:04:45 | 3 | made between the police vehicle and Mr. Kistner? |
| 12:04:49 | 4 | **A.** Contact has been made, correct. |
| 12:04:50 | 5 | **Q.** Okay. For the other police vehicle |
| 12:04:53 | 6 | that was previously in the screen, do you agree |
| 12:04:53 | 7 | that it's outside of the screen at this point? |
| 12:04:55 | 8 | **A.** It is. |
| 12:04:56 | 9 | **Q.** Okay. Making a visual estimate, what |
| 12:05:00 | 10 | would you say the distance is between the front of |
| 12:05:05 | 11 | the police vehicle that is still in the screen and |
| 12:05:05 | 12 | the end of the screen? |
| 12:05:07 | 13 | **MS. HUGGINS:** Form. |
| 12:05:07 | 14 | **THE WITNESS:** I can't tell. Maybe -- |
| 12:05:12 | 15 | talking maybe about two house lengths. Maybe one |
| 12:05:17 | 16 | and half length of a house. |
| | 17 | **BY MR. DAVENPORT:** |
| 12:05:20 | 18 | **Q.** Okay. |
| 12:05:23 | 19 | **A.** Width of a house. Excuse me. |
| 12:05:25 | 20 | **Q.** So one and a half to two lengths of the |
| | 21 | houses? |
| 12:05:26 | 22 | **A.** Of the width. Yeah, it appears to be. |
| 12:05:27 | 23 | **Q.** Okay. Now, at this point do you see |

*Derenda - Davenport - 9/24/2020*

106

| | | |
|---|---|---|
| 12:05:34 | 1 | another individual walking into the screen? |
| 12:05:36 | 2 | **A.**   I do. |
| 12:05:38 | 3 | **Q.**   I want you to focus on that individual. |
| 12:06:07 | 4 | Has that individual now left the screen at |
| 12:06:10 | 5 | 44 seconds in this video? |
| 12:06:12 | 6 | **A.**   Yes. |
| 12:06:12 | 7 | **Q.**   And during that time that he could be |
| 12:06:14 | 8 | seen in the video, did he take or make any |
| 12:06:18 | 9 | threatening movements?  Or take any threatening |
| 12:06:20 | 10 | actions towards any of the officers? |
| 12:06:22 | 11 | **MS. HUGGINS:**  Form. |
| 12:06:22 | 12 | **THE WITNESS:**  Inconclusive.  I don't know |
| 12:06:24 | 13 | what he was saying.  He walked up, walked back.  I |
| 12:06:28 | 14 | can't tell what he did.  I don't know what he |
| 12:06:31 | 15 | motioned.  I don't know what he said.  I don't |
| | 16 | know. |
| | 17 | **BY MR. DAVENPORT:** |
| 12:06:34 | 18 | **Q.**   Based on what you see in the video |
| 12:06:36 | 19 | because the video does not have any audio.  Was |
| 12:06:39 | 20 | there any action that that individual took that was |
| 12:06:43 | 21 | threatening to any of the officers? |
| 12:06:45 | 22 | **A.**   Not that I can see from the video. |
| 12:06:47 | 23 | It's inconclusive, his actions. |

*Derenda - Davenport - 9/24/2020*

107

| | | |
|---|---|---|
| 12:06:49 | 1 | **MS. HUGGINS:** Form. |
| 12:06:50 | 2 | **THE WITNESS:** I can't tell you what he did |
| 12:06:52 | 3 | or didn't do. |
| | 4 | **BY MR. DAVENPORT:** |
| 12:06:54 | 5 | **Q.** So I'm going to go back to 11 seconds. |
| 12:07:11 | 6 | I just want you to focus this time on the officers. |
| 12:07:36 | 7 | We're now at 39 seconds in the video. Have you |
| 12:07:40 | 8 | seen the driver of the vehicle get out of her car. |
| 12:07:43 | 9 | **A.** I don't believe so. |
| | 10 | **Q.** Okay. |
| 12:07:45 | 11 | **A.** I was paying attention to the officer |
| 12:07:47 | 12 | walking around and the two officers walking up. |
| 12:07:49 | 13 | **Q.** Okay. Who were the first officers that |
| 12:07:52 | 14 | arrived at where the citizen -- pedestrian was down |
| 12:07:57 | 15 | on the ground? |
| 12:07:59 | 16 | **A.** It appears the first officer was the |
| 12:08:02 | 17 | officer that got out of the passenger's side. The |
| 12:08:05 | 18 | other two walked up. |
| 12:08:06 | 19 | **Q.** Okay. Now, what would a physical |
| 12:08:13 | 20 | assessment of somebody who's claiming a head injury |
| 12:08:16 | 21 | look like by the officers? What process would they |
| 12:08:19 | 22 | go through? |
| 12:08:20 | 23 | **A.** Again, I can't see the individual -- |

*Derenda - Davenport - 9/24/2020*

108

| | | |
|---|---|---|
| 12:08:22 | 1 | the complainant in the video. If he's claiming an |
| 12:08:26 | 2 | injury, that he's hurt, can't move. Again, could |
| 12:08:28 | 3 | be a variety of responses based on what they see in |
| 12:08:33 | 4 | front of them. |
| 12:08:34 | 5 | And through this video I don't know what |
| 12:08:36 | 6 | they're seeing. I don't know what they're hearing. |
| 12:08:39 | 7 | Q.   Okay. I just want to be clear. Not -- |
| 12:08:41 | 8 | I don't want to know what you see in the video. I |
| 12:08:42 | 9 | just want to know as an officer or somebody's |
| 12:08:45 | 10 | claiming a head injury, what would that physical |
| 12:08:48 | 11 | process look like for a health assessment? |
| 12:08:50 | 12 | A.   For a health assessment? Again, case |
| 12:08:54 | 13 | by case. What you see in front of you dictates |
| 12:08:55 | 14 | your actions. |
| 12:08:57 | 15 | If you have somebody laying on the ground |
| 12:09:00 | 16 | with their head split open, you're going to call |
| 12:09:02 | 17 | for an ambulance and you're not going to move them. |
| 12:09:03 | 18 | If you have a guy that says I hit my head |
| 12:09:05 | 19 | now, I have a headache and he's getting up and |
| 12:09:08 | 20 | moving around and he wants to go see a doctor, you |
| 12:09:11 | 21 | may or may not wait for an ambulance. |
| 12:09:14 | 22 | Again, depending on the severity of the |
| 12:09:18 | 23 | injury or your perception of the assessment of -- |

*Derenda - Davenport - 9/24/2020*

109

12:09:20  1    the severity of the injury.  Again, it could vary

12:09:23  2    by each situation.  I'm not there.  I'm not -- I

12:09:26  3    can't tell you what they're seeing or not seeing.

12:09:29  4    Or what they're hearing.

12:09:31  5         Q.    Now, if an individual is claiming a

12:09:33  6    head injury and officers have not performed a

12:09:36  7    physical assessment to assess that head injury,

12:09:42  8    would it be appropriate for the officers to pick

12:09:42  9    that person up off the ground?

12:09:44  10        MS. HUGGINS:  Form.

12:09:45  11        THE WITNESS:  Again, the scenario, I don't

12:09:47  12   know what the officers are hearing or saying.  If

12:09:50  13   he's saying I have a headache.  Again, depending on

12:09:53  14   what they're seeing in front of them.  I don't

12:09:56  15   know.

12:09:58  16        It's an assessment or judgment made right

12:10:01  17   there and then.  There's times you would not move

12:10:04  18   somebody with a head injury, correct.  I don't know

12:10:06  19   what they seen or what they thought or what they

12:10:09  20   heard.  So I can't make an assessment on their

          21   actions.

          22        BY MR. DAVENPORT:

12:10:12  23        Q.    If the officers did not know the

*Derenda - Davenport - 9/24/2020*

110

| 12:10:15 | 1 | severity of the individual's head injury that he |
| 12:10:17 | 2 | was claiming, would it be appropriate for them to |
| 12:10:19 | 3 | pick him up off the ground? |
| 12:10:21 | 4 | **A.**   If they believed he didn't have an |
| 12:10:26 | 5 | injury, then it would be appropriate to pick him up |
|  | 6 | off the ground. |
|  | 7 | **Q.**   But if they didn't know? |
|  | 8 | **A.**   If there was -- |
| 12:10:26 | 9 | **MS. HUGGINS:**  Form as to the last question. |
| 12:10:30 | 10 | Sorry.  It' a form objection.  You can answer. |
| 12:10:30 | 11 | **THE WITNESS:**  If there was an injury they |
| 12:10:32 | 12 | could see and it was being relayed to them, there |
| 12:10:35 | 13 | might be times where it would be very inappropriate |
| 12:10:38 | 14 | for them to move him or pick him off the ground. |
| 12:10:41 | 15 | Again, from what I'm seeing I can't give you |
| 12:10:44 | 16 | my opinion. |
|  | 17 | **BY MR. DAVENPORT:** |
| 12:10:47 | 18 | **Q.**   Are the officers, are they provided any |
| 12:10:49 | 19 | medical training during their training academy? |
| 12:10:53 | 20 | **A.**   They do go through first aid training. |
| 12:10:57 | 21 | **Q.**   And how often do they go through first |
| 12:11:00 | 22 | aid training? |
| 12:11:00 | 23 | **A.**   I went through it in the academy and I |

12:11:02 1   don't believe I had a follow up after.

12:11:06 2          Q.    And what kinds of things do you learn

12:11:09 3   during that first aid training?

12:11:11 4          A.    Just when you should move a person or

12:11:14 5   not move a person.  You learn when somebody is

12:11:17 6   choking.  All different basic -- basic first --

12:11:20 7   first aid.

12:11:24 8          And 20 something years later that class my

12:11:26 9   wife was -- my then girlfriend, now my wife, was

12:11:29 10  choking on a sandwich and that class saved her

12:11:33 11  life.  Because I remembered what I was taught in

12:11:35 12  the academy.

12:11:37 13         I had to go back and check the book to make

12:11:40 14  sure I did it right, but in the end I did.

12:11:44 15         Q.    And all officers would go through

12:11:47 16  similar types of training?

12:11:47 17         A.    First aid in the academy.  There may be

12:11:50 18  some additional training afterwards.  I know that

12:11:52 19  we had different training with Narcan.  We had

12:11:57 20  different training with tourniquets.  And there may

12:11:58 21  have been, depending on different positions they

12:12:02 22  were in, they could have received additional

12:12:03 23  training.

12:12:04 1          I don't know what they -- I'm telling you

12:12:06 2     what I -- my experience has been that I was trained

12:12:08 3     in the academy.  And I don't ever remember taking a

12:12:11 4     first aid course after that.

12:12:12 5          **Q.**   So to the best of your knowledge, all

12:12:15 6     officers would receive some sort of training on

12:12:19 7     when an individual has a head injury, when to pick

12:12:23 8     that person up off the ground?

12:12:26 9          **A.**   I believe, there would by some basic

12:12:28 10    training pertaining to that.  Moving people in

12:12:31 11    general.  Head injury, whatever, but there would be

12:12:36 12    some basic first aid -- a basic first aid course.

12:12:38 13         **Q.**   And one of the things that the officers

12:12:40 14    would learn is, if they do not know the severity of

12:12:43 15    the head injury they should not pick an individual

12:12:45 16    up off the ground?

12:12:47 17         **MS. HUGGINS:**  Form.

12:12:47 18         **THE WITNESS:**  I don't know exactly what they

12:12:49 19    would have been trained on.  That would be for the

12:12:53 20    review the manuals from the academy and/or whatever

12:12:56 21    training records they were trained on.

22         **BY MR. DAVENPORT:**

12:12:59 23         **Q.**   If you learned that an officer picked

*Derenda - Davenport - 9/24/2020*

113

12:13:01  1   an individual up off the ground with a head injury

12:13:04  2   and the officer did not know the severity of the

12:13:08  3   head injury, would that be an issue that would

12:13:11  4   require discipline?

12:13:13  5            MS. HUGGINS:  Form.

12:13:13  6            THE WITNESS:  Again, depending on the

12:13:16  7   circumstances, what they knew, what they observed,

12:13:18  8   what they were told.  Yes, maybe and yes -- no,

12:13:22  9   maybe.  Depending on the circumstances.

12:13:25 10            Each individual case, I would need to know

12:13:27 11   detailed, what took place, what they were seeing,

12:13:30 12   what were the extent of the injuries.  The

12:13:34 13   individual cases.

12:13:36 14            Again, I don't know what they knew or didn't

12:13:38 15   know.  So I really can't comment.  Yes, sometimes.

12:13:42 16   No, sometimes.  Depending on each -- each case

12:13:45 17   would probably be an individual assessment.

         18            BY MR. DAVENPORT:

12:13:50 19            Q.   Would it be appropriate for officers to

12:13:53 20   put an individual with a head injury in the back of

12:13:58 21   their police vehicle and not check on that

12:13:59 22   individual while he's sitting in the back?

12:14:02 23            MS. HUGGINS:  Form.

*Derenda - Davenport - 9/24/2020*

114

12:14:02  1          **THE WITNESS:**  Again, depending on the

12:14:04  2    severity of the injury.  Or what they believed or

12:14:06  3    knew about an injury.

12:14:07  4          If there was a head injury that needed

12:14:10  5    medical treatment to sit him in a car I would say

12:14:14  6    get him -- if it was -- if he needed immediate

12:14:17  7    treatment they should have waited for the

12:14:19  8    ambulance.

12:14:20  9          Or if he didn't need immediate treatment

12:14:22  10   they could have taken him, if it was something that

12:14:25  11   wasn't an emergency circumstance.

12:14:27  12         Again, circumstances will dictate their

12:14:29  13   response or should dictate their response.  Could

12:14:32  14   they be wrong in what they did?  Yes.  Could they

12:14:34  15   be right in what they did?  Yes.

          16          **BY MR. DAVENPORT:**

12:14:37  17         Q.    Would it about inappropriate for an

12:14:40  18   officer to say to an individual down on the ground,

12:14:42  19   if you don't get up I'm going to arrest you?

12:14:45  20         **MS. HUGGINS:**  Form.

12:14:45  21         **THE WITNESS:**  I don't know why they would

12:14:49  22   say that.  Would it be inappropriate if somebody's

12:14:53  23   on the ground, get up or I'm going to arrest you.

| | | |
|---|---|---|
| 12:14:54 | 1 | I would say that's inappropriate. |
| | 2 | **BY MR. DAVENPORT:** |
| 12:15:41 | 3 | **Q.** We're now at a minute and 17 seconds in |
| 12:15:45 | 4 | this video. Does it appear that Mr. Kistner has |
| 12:15:49 | 5 | been handcuffed at this point? |
| 12:15:50 | 6 | **A.** It appears so. |
| 12:15:50 | 7 | **Q.** So he would also be detained? |
| 12:15:53 | 8 | **MS. HUGGINS:** Form. |
| 12:15:53 | 9 | **THE WITNESS:** Handcuffed, he would be |
| 12:15:54 | 10 | detained, correct. |
| | 11 | **BY MR. DAVENPORT:** |
| 12:16:03 | 12 | **Q.** And do you see the individual who is |
| 12:16:05 | 13 | standing on the sidewalk? |
| 12:16:06 | 14 | **A.** Yes, I do. |
| 12:16:07 | 15 | **Q.** Now, I understand that we don't have |
| 12:16:11 | 16 | audio. But based on what you see in this video, |
| 12:16:14 | 17 | focusing on him, I want you to tell me if you see |
| 12:16:18 | 18 | him do anything threatening to any of the officers. |
| 12:16:22 | 19 | **MS. HUGGINS:** Form. |
| 12:16:23 | 20 | **THE WITNESS:** He appears to be on a |
| 12:16:25 | 21 | telephone. |
| 12:16:28 | 22 | **MR. DAVENPORT:** And we're at a minute 25 in |
| 12:16:29 | 23 | the video. |

*Derenda - Davenport - 9/24/2020*

116

12:16:30 1          **THE WITNESS:**  I don't know what he's saying.

12:16:33 2     I don't know if he's making threats.  At this point

12:16:37 3     from the video, inconclusive to what exactly he's

4     doing.

5          **BY MR. DAVENPORT:**

12:16:41 6          **Q.**    Does it appear that one of the officers

12:16:43 7     has turned towards the individual?

12:16:46 8          **A.**    It has.

12:16:47 9          **Q.**    And did it appear that he is now

12:16:49 10    speaking or engaging with the individual?

12:16:52 11         **A.**    It's what it appears to be.

12:16:53 12         **Q.**    And it appears that the individual is

12:16:55 13    still on his cell phone at this time?

12:16:59 14         **MS. HUGGINS:**  Form.

12:16:59 15         **THE WITNESS:**  It appears he's on his cell

12:17:01 16    phone.  Again, that's what it looks like.

17          **BY MR. DAVENPORT:**

12:17:06 18         **Q.**    Now, at a minute 35, just before, do

12:17:10 19    you see the individual take steps away from the

12:17:13 20    officer?

12:17:13 21         **A.**    The individual backed up as the officer

12:17:16 22    approached.

12:17:17 23         **Q.**    So the officer also simultaneously had

*Derenda - Davenport - 9/24/2020*

117

12:17:20 1  approached the individual?

12:17:22 2          A.   Correct.

12:17:25 3          Q.   Did you see the individual stick his

12:17:28 4  arm up away from the officer?

12:17:29 5          A.   I seen his arm come up, correct.

12:17:33 6          Q.   And then walk away from the officer?

12:17:35 7          A.   That's what it appears to be, yes.

12:17:37 8          Q.   Does it appear that the individual

12:17:38 9  wants to engage or discuss anything with this

12:17:41 10 officer?

12:17:42 11         MS. HUGGINS:  Form.

12:17:42 12         THE WITNESS:  From the video I can't at this

12:17:45 13 point tell you what was going on.

         14         BY MR. DAVENPORT:

12:17:48 15         Q.   Based on his physical actions that he

12:17:50 16 took, does it appear that he wants to speak to this

         17 officer?

12:17:54 18         MS. HUGGINS:  Form.

12:17:54 19         THE WITNESS:  He backed away from the

12:17:56 20 officer and I seen his arm go up.  And at this

12:17:57 21 point I can't tell you where he's at or what

12:18:00 22 he's -- obviously, can't tell you what he's saying.

         23         BY MR. DAVENPORT:

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

12:18:20   1      **Q.**   Now, if that individual had been on his

12:18:24   2   cell phone, would it be appropriate for the

12:18:26   3   officers to take the cell phone away from him?

12:18:29   4      **MS. HUGGINS:**   Form.

12:18:29   5      **THE WITNESS:**   Yes and no, depending on the

12:18:33   6   circumstances.   I can't tell you what the

12:18:34   7   circumstances are from this video.

         8      **BY MR. DAVENPORT:**

12:18:37   9      **Q.**   Do you recall a policy that would have

12:18:39   10   been an issue during your tenure on cell phone use

12:18:45   11   by citizens?

12:18:45   12      **A.**   They have a right to videotape

12:18:47   13   officers, if that's what you're talking about.   I

12:18:49   14   made that very clear.

12:18:52   15      **Q.**   Do citizens also have a right to speak

12:18:54   16   on the cell phone the same way that they would have

12:18:55   17   a right to video an officer?

12:18:56   18      **A.**   Obviously.

12:18:58   19      **Q.**   So that policy would pertain equally to

12:19:02   20   speaking on a cell phone or videotaping with a cell

         21   phone?

         22      **A.**   If somebody had --

12:19:07   23      **MS. HUGGINS:**   Form.

*Derenda - Davenport - 9/24/2020*

119

| | | |
|---|---|---|
| 12:19:07 | 1 | **THE WITNESS:** -- a citizen has a right to |
| 12:19:10 | 2 | videotape with their cell phone and/or speak on |
| 12:19:12 | 3 | their cell phone, correct. |
| | 4 | **BY MR. DAVENPORT:** |
| 12:19:14 | 5 | **Q.** And an officer must have a sufficient |
| 12:19:17 | 6 | reason to take a cell phone away from an |
| 12:19:19 | 7 | individual? |
| 12:19:19 | 8 | **A.** An officer would need a reason to take |
| 12:19:22 | 9 | that phone away, correct. Other than him using the |
| 12:19:23 | 10 | phone to video or talk on, correct. I -- there |
| 12:19:27 | 11 | must -- I don't -- I can't tell you what was going |
| 12:19:28 | 12 | on from what you're showing me. |
| 12:19:30 | 13 | **Q.** Does it appear that the individual was |
| 12:19:33 | 14 | dragged out into the street by the officer or led |
| 12:19:37 | 15 | out into the street by the officer? |
| 12:19:40 | 16 | **A.** The individual appeared to be walked |
| 12:19:42 | 17 | out towards the street. I don't know what took |
| 12:19:44 | 18 | place prior to that. |
| 12:19:45 | 19 | **Q.** Did the officer have his hands on the |
| 12:19:48 | 20 | individual? |
| 12:19:48 | 21 | **A.** It appeared so. At least was guiding |
| 12:19:52 | 22 | him along. You'll have to replay it and let me see |
| 12:19:56 | 23 | it again. |

*Derenda - Davenport - 9/24/2020*

120

12:19:56  1        **Q.**    Sure.

12:20:09  2        **A.**    It appears he's holding onto his coat

12:20:13  3    and guiding him towards the center of the street

12:20:17  4    where you see him now.

12:20:19  5        **Q.**    And did you see the part where the

12:20:21  6    individual had his cell phone taken from him?

12:20:23  7        **A.**    I couldn't tell you that.

          8        **Q.**    Okay.

12:20:25  9        **A.**    Seemed like he was struggling with

12:20:27 10    something.

12:20:28 11        **Q.**    Okay.  We have a different view that we

12:20:31 12    can show you.

12:20:35 13        Did you see any sort of a physical

12:20:37 14    interaction between the officers and the

12:20:40 15    individual?

12:20:40 16        **A.**    It appeared to be a bit of a struggle

12:20:44 17    starting.

12:20:45 18        **Q.**    Did it appear that the struggle between

12:20:48 19    the officer and the citizen was caused by the

12:20:50 20    officers?  Or the citizen?

12:20:52 21        **MS. HUGGINS:**  Form.

12:20:52 22        **THE WITNESS:**  I can't tell from the video.

          23        **BY MR. DAVENPORT:**

*Derenda - Davenport - 9/24/2020*

121

| | | |
|---|---|---|
| 12:21:02 | 1 | **Q.**   Okay.   Now, at this point with an |
| 12:21:10 | 2 | individual being dragged out into the street or led |
| 12:21:13 | 3 | out into the street by the officers, would the |
| 12:21:16 | 4 | officers then be performing a pat down afterwards? |
| 12:21:21 | 5 | **MS. HUGGINS:**  Form. |
| 12:21:22 | 6 | **THE WITNESS:**  Again, I don't -- I can't see |
| 12:21:25 | 7 | what he's doing or not doing.   Would it be |
| 12:21:28 | 8 | appropriate to pat somebody down?   Yes and no, |
| 12:21:31 | 9 | depending on the circumstances. |
| | 10 | **BY MR. DAVENPORT:** |
| 12:21:33 | 11 | **Q.**   Would it be appropriate for them to pat |
| 12:21:36 | 12 | him down if he wasn't being detained? |
| 12:21:38 | 13 | **A.**   For the safety of the officers and the |
| 12:21:41 | 14 | individual, at times it would be appropriate. |
| 12:21:45 | 15 | **Q.**   If he had been detained, he would be |
| | 16 | patted down? |
| 12:21:49 | 17 | **MS. HUGGINS:**  Form. |
| 12:21:49 | 18 | **THE WITNESS:**  He would be searched, correct. |
| 12:21:51 | 19 | But prior to that if you're in close contact with |
| 12:21:54 | 20 | somebody, you think there's a threat, you might pat |
| 12:21:57 | 21 | him down to make sure he does not have a weapon for |
| 12:22:01 | 22 | the safety of the officer and the individual. |
| | 23 | **BY MR. DAVENPORT:** |

*Derenda - Davenport - 9/24/2020*

122

| | | |
|---|---|---|
| 12:22:02 | 1 | Q.   Now, I understand that we don't have |
| 12:22:05 | 2 | audio, but based on the physical interactions that |
| 12:22:07 | 3 | you saw in the video, is there anything threatening |
| 12:22:09 | 4 | to any of the officers by that individual? |
| 12:22:12 | 5 | MS. HUGGINS:   Form. |
| 12:22:12 | 6 | THE WITNESS:   From the video I've seen I |
| 12:22:15 | 7 | can't tell you what exactly is going on.  It |
| 12:22:17 | 8 | appears the officer led the individual out into the |
| 12:22:21 | 9 | street.  It appeared to be a little bit of a |
| | 10 | struggle. |
| 12:22:24 | 11 | And that's about all I can tell at this |
| 12:22:26 | 12 | point.  So I can't tell you what was appropriate or |
| 12:22:30 | 13 | not, based on what I'm seeing. |
| | 14 | BY MR. DAVENPORT: |
| 12:22:32 | 15 | Q.   Prior to the struggle and prior to the |
| 12:22:34 | 16 | individual being led out into the street by the |
| 12:22:37 | 17 | officers, was there any threatening action that |
| 12:22:40 | 18 | that individual took? |
| 12:22:41 | 19 | A.   Not that I could see or know about. |
| 12:23:08 | 20 | Q.   Now, if that individual had been |
| 12:23:11 | 21 | calling for an ambulance for the individual that |
| 12:23:14 | 22 | was just hit by the police vehicle, would that be |
| 12:23:17 | 23 | an appropriate reason for officers to take that |

*Derenda - Davenport - 9/24/2020*

123

| | | |
|---|---|---|
| 12:23:19 | 1 | individual's cell phone? |
| 12:23:21 | 2 | **MS. HUGGINS:**  Form. |
| 12:23:21 | 3 | **THE WITNESS:**  He has a right to make a phone |
| 12:23:24 | 4 | call to whoever he wants.  Whether it's for an |
| 12:23:26 | 5 | ambulance or anybody else.  He has a right to |
| 12:23:28 | 6 | videotape a police officer that would -- it would |
| 12:23:30 | 7 | be appropriate for him to do that. |
| 12:23:32 | 8 | Again, why they would take the phone is very |
| 12:23:35 | 9 | unclear from what I'm seeing. |
| | 10 | **BY MS. HUGGINS:** |
| 12:23:37 | 11 | Q.  Would it be inappropriate for the |
| 12:23:38 | 12 | officers to take a cell phone if he was merely |
| 12:23:41 | 13 | using it to call for an ambulance? |
| 12:23:41 | 14 | A.  If he was calling for an ambulance it's |
| 12:23:44 | 15 | his right to do so.  And if that was strictly the |
| 12:23:46 | 16 | only reason then -- then it was inappropriate for |
| 12:23:51 | 17 | them to take the phone. |
| 12:23:53 | 18 | **MS. HUGGINS:**  Form as to the last question. |
| 12:23:56 | 19 | **THE WITNESS:**  And I say if -- because, |
| 12:23:58 | 20 | again, I don't know the circumstances nor can I |
| 12:24:00 | 21 | tell from what you're showing me. |
| | 22 | **BY MR. DAVENPORT:** |
| 12:24:02 | 23 | Q.  Understood.  Thank you. |

*Derenda - Davenport - 9/24/2020*

124

1          All right.  I'm going to load up this new

2    disc.  Hopefully, this one goes quicker.  We can go

3    off the record for a minute then.

12:24:30   4          **THE VIDEOGRAPHER:**  Off the record at 12:24.

12:24:30   5          (Off the record.)

12:26:04   6          **THE VIDEOGRAPHER:**  On the record at 12:26.

7          **BY MR. DAVENPORT:**

12:26:11   8          **Q.**   Now, I'm showing you what has been

12:26:13   9    marked previously as Exhibit 12.  It is called

12:26:17  10    footage two Emerson.  And this is another view of

12:26:25  11    what happened on January 1st of 2017.

12:26:39  12          Now, do you see the individual who's not a

12:26:43  13    police officer who just appeared in the screen?

12:26:44  14          **A.**   Yes.

12:26:45  15          **Q.**   And if I told you that he was the same

12:26:47  16    individual who was on the cell phone from the

12:26:49  17    previous video that you watched, would you have any

12:26:53  18    reason to disagree with what I say?

12:26:53  19          **A.**   No, he appears to be.

12:26:55  20          **Q.**   Okay.  Do you see where his right hand

12:26:57  21    is positioned in the video?

22          **A.**   Yes.

23          **Q.**   And I can play it a little bit more if

*Derenda - Davenport - 9/24/2020*

125

| | | |
|---|---|---|
| 12:27:00 | 1 | you need me to. |
| 12:27:00 | 2 | **A.**   Can you back it up a second? |
| 12:27:07 | 3 | **Q.**   Yeah, sure.  I'm just going to go back |
| 12:27:09 | 4 | 10 seconds, it's easier to do that. |
| 12:27:26 | 5 | Now, do you see where his right hand is |
| 12:27:29 | 6 | positioned? |
| 12:27:30 | 7 | **A.**   He appears to have his cell phone. |
| 12:27:33 | 8 | **Q.**   Okay.  And did you see just before -- |
| 12:27:35 | 9 | so we're at a minute and 28 in the video.  Did you |
| 12:27:36 | 10 | see just before where he stuck his arm out away |
| 12:27:40 | 11 | from the officer? |
| 12:27:41 | 12 | **A.**   Yes. |
| 12:27:41 | 13 | **Q.**   And does it appear that he is now |
| 12:27:44 | 14 | walking away from the officers? |
| 12:27:45 | 15 | **A.**   It appears -- we have a frozen frame, |
| 12:27:49 | 16 | yes. |
| 12:27:49 | 17 | **Q.**   Okay.  And does it appear that the |
| 12:27:50 | 18 | officer is walking after him? |
| 12:27:51 | 19 | **A.**   Correct. |
| 12:27:56 | 20 | **Q.**   Now, we're at a minute and 32 seconds. |
| 12:27:59 | 21 | Did you see the officer grab the individual by the |
| 12:28:02 | 22 | coat or arm? |
| 12:28:02 | 23 | **A.**   Correct. |

*Derenda - Davenport - 9/24/2020*

126

| 12:28:04 | 1 | **Q.**    Okay.  Now, can you see where his right |
| 12:28:11 | 2 | arm is positioned? |
| 12:28:12 | 3 | **A.**    It appears he still has the phone in |
| 12:28:16 | 4 | his hand. |
| 12:28:16 | 5 | **Q.**    Okay.  Does it appear that he is |
| 12:28:17 | 6 | still -- still has the cell phone up near his ear? |
| 12:28:20 | 7 | **A.**    It appears so. |
| 12:28:26 | 8 | **Q.**    Now, I can back it up if you need me |
| 12:28:30 | 9 | to.  But did you see the officer take the phone |
| 12:28:34 | 10 | from the individual? |
| 12:28:36 | 11 | **A.**    I see a struggle start.  I didn't |
| 12:28:38 | 12 | actually see it being taken. |
| 12:28:42 | 13 | **Q.**    Okay.  I'm going to replay it.  Did you |
| 12:28:54 | 14 | see where the officer left arm reached across the |
| 12:28:57 | 15 | individual? |
| 12:28:58 | 16 | **A.**    It appears to be such, correct. |
| 12:29:00 | 17 | **Q.**    Okay.  Did it appear that the officer |
| 12:29:02 | 18 | took the cell phone from the individual? |
| 12:29:04 | 19 | **A.**    From what I see, he reached his hand |
| 12:29:07 | 20 | up, I don't -- if you're telling me he took the |
| 12:29:09 | 21 | cell phone I'll agree with you. |
|  | 22 | **Q.**    Okay. |
| 12:29:11 | 23 | **A.**    But I can't tell what exactly took |

place from the video you're showing me.

Q.   Okay.  Now, did you see the struggle take place between the two officers?

A.   Yes, I did.

Q.   Did you see anything before that that would have led you to believe that there should have been a struggle between the officers and the individual?

MS. HUGGINS:  Form.

THE WITNESS:  I can't tell you what the individual's actions were or what he was saying. There's -- so I can't tell you if their actions were warranted or not.

BY MR. DAVENPORT:

Q.   Okay.  So I understand that we don't have audio.  But based off of what you see for physical interactions, did you see any threatening behavior from the individual that would lead you to believe that the officers need to use force to control him?

A.   From the video you're showing me.  It's inconclusive.  I can't tell you why they used force.  Whether they should have or shouldn't have,

*Derenda - Davenport - 9/24/2020*

128

12:30:00  1  I can't tell from the video.  I don't know what the

12:30:03  2  individual was saying.  I don't know the

3  circumstances.

12:30:07  4       They appear to lead him out.  It seemed like

12:30:10  5  a struggle maybe when he took the phone from him,

12:30:13  6  if that's what he was doing.  But I can't tell you

12:30:16  7  the circumstances of what took place or why they

12:30:17  8  took place.

12:30:18  9       **MS. HUGGINS:**  Form as to the last question.

10       **BY MR. DAVENPORT:**

12:30:20  11       **Q.**   Does it appear that the officers did

12:30:22  12  use force with that individual?

12:30:23  13       **A.**   They appeared --

12:30:24  14       **MS. HUGGINS:**  Form.

12:30:25  15       **THE WITNESS:**  -- appeared to bring him out

12:30:27  16  into the street, guide him out.  And they appear to

12:30:31  17  reach -- and you said he took a phone out of his

12:30:34  18  hand, I believe, that was the struggle then that

12:30:35  19  was -- yes, that was force to take the phone.

20       **BY MR. DAVENPORT:**

12:30:38  21       **Q.**   And would there be a form that officers

12:30:40  22  would be required to fill out for using force on an

12:30:44  23  individual?

*Derenda - Davenport - 9/24/2020*

129

12:30:44  1        A.    If it's physical force -- taking out --

12:30:48  2   depending on -- there's a force when you're

12:30:49  3   fighting with somebody.  This appeared just to be a

12:30:54  4   bit of a struggle.  I don't know exactly what took

12:30:56  5   place.

12:30:57  6        So again, there could be a form that had to

12:31:02  7   be filled out and maybe no.  Because the use of

12:31:03  8   force when you're fighting with an individual to

12:31:06  9   control him.  They don't appear to be fighting with

12:31:09  10  him, they appear to be struggling.  Not the

12:31:13  11  officers, but the individual seems to be struggling

12:31:17  12  with the officers a bit, correct.

12:31:18  13       Q.    And would it be a judgment call by the

12:31:22  14  officers if it was a struggle or whether they were

12:31:23  15  in a fight to control?

12:31:24  16       A.    It didn't appear to be a fight to

12:31:26  17  control, it appeared to be a momentary struggle.

12:31:29  18  Or the guy pulling back.

12:31:31  19       I don't think it appears -- and I'll take

12:31:32  20  your word for it that he reached and grabbed the

12:31:35  21  phone.  I don't know why he would have done that.

12:31:38  22  I don't know the circumstances.

12:31:39  23       Q.    And just to be clear.  What would be

*Derenda - Davenport - 9/24/2020*

130

12:31:46 1   the difference between a fight and a struggle?  Is

12:31:52 2   there a defined term for either one of those?

12:31:53 3       A.   If he started the fight with the

12:31:55 4   officers, they would have to use the use of force.

5   If they had to wrestle him to the ground, handcuff

12:31:59 6   him and place him under arrest that would be a

12:32:02 7   definite use of force.

12:32:05 8       This might be on the borderline.  He

12:32:08 9   struggled and pulled away from the officers.  I

12:32:11 10  don't know how much force they used.  If it would

12:32:13 11  rise to that level.

12:32:14 12      Q.   Would there be another form besides the

12:32:17 13  fighting use of form -- use of force form that an

12:32:22 14  individual -- that an officer would fill out if it

12:32:24 15  was just a struggle?

12:32:26 16      A.   It didn't look like much of a struggle.

12:32:30 17  It appeared to be a two second.  I don't believe

12:32:33 18  there would be another form.  It would be a use of

12:32:33 19  force or not.

12:32:34 20      And from the video you were showing me, I

12:32:35 21  don't know if it rises to the level of use of

12:32:38 22  force.

12:32:38 23      Q.   And then if a use of force form is

*Derenda - Davenport - 9/24/2020*

131

| | | |
|---|---|---|
| 12:32:41 | 1 | filled out, who is that reviewed by? |
| 12:32:43 | 2 | **A.**   It goes to internal affairs. |
| 12:32:44 | 3 | **Q.**   Would the lieutenants or any other |
| 12:32:47 | 4 | supervisors within the districts review that |
| 12:32:50 | 5 | paperwork? |
| 12:32:50 | 6 | **A.**   I'm sure they would review it and pass |
| 12:32:54 | 7 | it up, sign off on it. |
| 12:32:55 | 8 | **Q.**   And that would just be their one |
| 12:32:58 | 9 | responsibility to sign off on the form? |
| 12:32:59 | 10 | **A.**   And pass is forward, correct. |
| 12:33:01 | 11 | **Q.**   And then internal affairs would be |
| 12:33:04 | 12 | responsible -- |
| 12:33:04 | 13 | **A.**   For doing the investigation, correct. |
| 12:33:05 | 14 | Or the lieutenant might do an initial investigation |
| 12:33:08 | 15 | on it and pass up any comments.  May or may not. |
| 12:33:11 | 16 | **Q.**   Okay. |
| 12:33:14 | 17 | **A.**   But that would -- but that form would |
| 12:33:16 | 18 | have to be initiated by the officers. |
| 12:33:25 | 19 | **Q.**   Okay.  Now, up to the point where this |
| 12:34:02 | 20 | officer is walking away at two minutes and |
| 12:34:05 | 21 | 13 seconds, has there been a pat down of this |
| 12:34:09 | 22 | individual? |
| 12:34:10 | 23 | **A.**   It appeared that something like that |

*Derenda - Davenport - 9/24/2020*

132

| | | |
|---|---|---|
| 12:34:12 | 1 | was going on.  I can't -- I couldn't tell.  It |
| 12:34:14 | 2 | looked like the -- the individual was patting |
| 12:34:16 | 3 | himself down. |
| 12:34:17 | 4 | If you go back -- if you go back and show it |
| 12:34:20 | 5 | appears that something was taken from his hand. |
| 12:34:22 | 6 | And it appears that there might have been some type |
| 12:34:26 | 7 | of pat down. |
| 12:34:27 | 8 | Do you want to go back about that 30 |
| 12:34:29 | 9 | seconds. |
| 12:34:30 | 10 | **Q.**   Well, I agree with you that the |
| 12:34:31 | 11 | individual was patting himself down.  But did you |
| 12:34:34 | 12 | see the officers pat down the individual? |
| 12:34:36 | 13 | **A.**   It didn't appear that way. |
| 12:34:38 | 14 | **Q.**   Okay.  Now, if the officers perceive |
| 12:34:41 | 15 | this individual as a threat, would the officers be |
| 12:34:44 | 16 | required to perform the pat down? |
| 12:34:47 | 17 | **MS. HUGGINS:**  Form. |
| 12:34:47 | 18 | **THE WITNESS:**  If I was the officer for my |
| 12:34:50 | 19 | safety I would have -- if I thought it was a threat |
| 12:34:53 | 20 | I would have performed a pat down. |
| | 21 | **BY MR. DAVENPORT:** |
| 12:34:54 | 22 | **Q.**   And is that what officers are trained |
| 12:34:56 | 23 | to do?  If they perceive somebody to be a threat |

*Derenda - Davenport - 9/24/2020*

133

12:35:01  1   they did it themselves, pat that individual down?

12:35:03  2          **MR. DAVENPORT:**  Form.

12:35:03  3          **THE WITNESS:**  They're trained that in close

        4   proximity -- again, depending on circumstances or

12:35:08  5   what's in their head and what they believe.

12:35:09  6          If I would have thought that he was a threat

12:35:11  7   to me I would have patted him down.

        8          **BY MR. DAVENPORT:**

12:35:20  9          **Q.**   Are officers trained to allow

12:35:23 10   individuals to pat themselves down?

12:35:26 11          **A.**   He patted himself down.  I don't know

12:35:29 12   how to -- again, if he wants to pat himself down, I

12:35:33 13   don't know why you would stop him.  If you see him

12:35:36 14   reaching for something that would be a whole nother

12:35:38 15   story.

12:35:38 16          **Q.**   But, I guess, my question is, are

12:35:41 17   officers trained to ever allow individuals to pat

12:35:43 18   themselves down as opposed to an officer pat down?

12:35:46 19          **A.**   If the officer thought he was

12:35:49 20   threatened and felt that he had something, he

12:35:52 21   should have patted him down themselves.  I don't

12:35:59 22   know what their perception is at that point.  If an

12:36:01 23   individual starts patting himself down, okay.

*Derenda - Davenport - 9/24/2020*

134

| | | |
|---|---|---|
| 12:36:04 | 1 | Again, I don't know what the officers -- |
| 12:36:05 | 2 | what they perceived.  What they're seeing.  I don't |
| 12:36:09 | 3 | know.  I don't know what's being said.  So I can't |
| 12:36:11 | 4 | tell you whether their actions are right or wrong. |
| 12:36:15 | 5 | **Q.**   So I just want to go back to the |
| 12:36:19 | 6 | beginning of the video. |
| 12:36:23 | 7 | **A.**   Okay. |
| 12:36:25 | 8 | **Q.**   Now, we're at 0 seconds of the video. |
| 12:36:30 | 9 | Do you see a police vehicle that is currently in |
| 12:36:32 | 10 | the footage right now? |
| 12:36:33 | 11 | **A.**   Yes. |
| 12:36:33 | 12 | **Q.**   Okay.  And do you see another gray |
| 12:36:40 | 13 | sedan that is currently in the view? |
| 12:36:41 | 14 | **A.**   Everything looks gray.  But yes, I see |
| 12:36:44 | 15 | another vehicle. |
| 12:36:45 | 16 | **Q.**   Now, did you see this other vehicle |
| 12:36:47 | 17 | from the other view that I previously showed you? |
| 12:36:50 | 18 | **A.**   I believe so.  I believe it was.  I |
| 12:36:55 | 19 | don't recall. |
| 12:36:55 | 20 | **Q.**   Okay.  I'll show that again just for |
| 12:36:58 | 21 | your clarification. |
| 12:37:00 | 22 | **A.**   Okay. |
| 12:37:00 | 23 | **Q.**   But now, watching this video, I just |

| | | |
|---|---|---|
| 12:37:04 | 1 | want you to see and tell me, does it appear that |
| 12:37:09 | 2 | the police vehicle drives outside of the camera |
| 12:37:12 | 3 | view at this time? |
| 12:37:21 | 4 | **A.** It does. |
| 12:37:22 | 5 | **Q.** Okay. Does it appear that the vehicle |
| 12:37:29 | 6 | was moving quickly or slowly through the camera |
| 12:37:33 | 7 | view? |
| 12:37:34 | 8 | **MS. HUGGINS:** Form. |
| 12:37:34 | 9 | **THE WITNESS:** I can't tell from the video. |
| | 10 | **BY MR. DAVENPORT:** |
| 12:37:38 | 11 | **Q.** Do you see the time stamp that's listed |
| 12:37:41 | 12 | at the top 10:25:36? |
| 12:37:46 | 13 | **A.** Correct. |
| 12:37:47 | 14 | **Q.** And then I want you to watch and tell |
| 12:37:51 | 15 | me when you see the vehicle leave the view of the |
| 12:37:54 | 16 | camera. |
| 12:37:57 | 17 | **A.** Two seconds -- two and a half seconds |
| 12:38:00 | 18 | later? |
| 12:38:00 | 19 | **Q.** Okay. And so that would have been at |
| 12:38:02 | 20 | 10:25:39 is where it has left the camera view? |
| 12:38:07 | 21 | **MS. HUGGINS:** Form. |
| 12:38:07 | 22 | **THE WITNESS:** 10:25:39 -- or 38.5 or |
| 12:38:11 | 23 | whatever. Two and a half to three seconds. |

*Derenda - Davenport - 9/24/2020*

136

**BY MR. DAVENPORT:**

12:38:13  2   **Q.**   Okay.  And now, I want you to tell me

12:38:15  3   when you next see the police vehicle arrive in this

12:38:19  4   camera view.

12:38:23  5   **A.**   Five seconds, six seconds.

12:38:31  6   **Q.**   And what would the time have been?

12:38:34  7   **A.**   10:25:44.

12:38:37  8   **Q.**   Okay.

12:38:41  9   **MS. HUGGINS:**  Form as to the last question.

12:38:43  10  Are you asking time of day?  Or the amount of time

11  from the video?

12:38:45  12  **MR. DAVENPORT:**  Just the time that's shown

12:38:47  13  on the video.

14  **BY MR. DAVENPORT:**

12:39:02  15  **Q.**   Does it appear that the police vehicle

12:39:04  16  is backing up?

12:39:05  17  **A.**   Correct.

12:39:06  18  **Q.**   Does it appear now that officers are

12:39:08  19  getting out of the vehicle?

12:39:09  20  **A.**   Yes.

12:39:10  21  **Q.**   What time is that at?

12:39:12  22  **A.**   10:25:48.

23  **MR. DAVENPORT:**  I'm going to switch back.

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

*Derenda - Davenport - 9/24/2020*

137

1    We can go back off the record.

2            **THE VIDEOGRAPHER:**  Off the record at 12:39.

3            (Off the record.)

12:41:32   4    **THE VIDEOGRAPHER:**  We're back on the record

12:41:34   5    at 12:41.

6            **BY MR. DAVENPORT:**

12:41:39   7    **Q.**   So I'm showing you what's been marked

12:41:41   8    previously as Exhibit 11.  It's the video that you

12:41:44   9    previously watched.  The number is

12:42:02  10    06_20170101102529.  We're at two seconds in the

12:42:06  11    video.

12:42:12  12        Now, Dan, do you see that sedan that was in

12:42:16  13    the previous video?

12:42:17  14    **A.**   I do not.

12:42:19  15    **Q.**   Okay.  And do you see in the top part

12:42:22  16    where it says 10:25:31?

12:42:25  17    **A.**   Yes.

12:42:26  18    **Q.**   I want you to tell me when you see the

12:42:29  19    vehicle what time that is at the time top, what

12:42:32  20    time you see the vehicle leave the camera screen?

21        **MS. HUGGINS:**  Just for clarification, you

12:42:39  22    mean the SUV?

12:42:43  23        **MR. DAVENPORT:**  Correct.  The SUV, the

| | | |
|---|---|---|
| 12:42:46 | 1 | police SUV that is currently moving forward. |
| | 2 | **THE WITNESS:** 36 and a half, 37. 10:25:36, |
| | 3 | 37. |
| 12:42:50 | 4 | **BY MR. DAVENPORT:** |
| 12:42:56 | 5 | Q. From your previous testimony it was |
| 12:43:00 | 6 | 10:25:37 where you first saw the police vehicle |
| 12:43:06 | 7 | within the camera screen? |
| 12:43:10 | 8 | **MS. HUGGINS:** Form. |
| | 9 | **THE WITNESS:** You'd have to show me again. |
| 12:43:11 | 10 | **MS. HUGGINS:** Are you asking him to compare |
| 12:43:13 | 11 | the two videos and the time stamps? |
| | 12 | **MR. DAVENPORT:** Correct. |
| | 13 | **MS. HUGGINS:** He's not a custodian and he |
| 12:43:17 | 14 | didn't -- of this video system. |
| 12:43:20 | 15 | **MR. DAVENPORT:** I'm just asking if he saw |
| 12:43:21 | 16 | and what he previously testified to. I'm not |
| 12:43:24 | 17 | asking him to say that it's right. I'm not asking |
| 12:43:27 | 18 | him to say that it's accurate. I'm just asking him |
| 12:43:28 | 19 | what he sees. That's all I'm asking. |
| 12:43:29 | 20 | **MS. HUGGINS:** He can testify to the time |
| 12:43:32 | 21 | stamps, they're on there. They obviously speak for |
| | 22 | themselves. |
| | 23 | **MR. DAVENPORT:** Correct. |

*Derenda - Davenport - 9/24/2020*

139

| | | |
|---|---|---|
| 12:43:33 | 1 | **MS. HUGGINS:** But I would object to |
| 12:43:34 | 2 | testimony comparing the time stamps or an attempt |
| 12:43:39 | 3 | to authenticate. |
| 12:43:41 | 4 | **MR. DAVENPORT:** Not attempting to |
| 12:43:43 | 5 | authenticate. I'm just asking what he sees. |
| 12:43:45 | 6 | **MS. HUGGINS:** Then it's a form objection to |
| 12:43:46 | 7 | your question. |
| 12:43:48 | 8 | **MR. DAVENPORT:** Okay. |
| 12:43:48 | 9 | **THE WITNESS:** I'd have to see the other |
| 12:43:51 | 10 | video again to give you the time stamp. If that's |
| 12:43:53 | 11 | what it was what I said, then that's what it was. |
| | 12 | **BY MR. DAVENPORT:** |
| 12:43:55 | 13 | Q. Yeah, and that's okay. We have the |
| 12:43:56 | 14 | transcript. So I don't need you to verify what you |
| 12:44:00 | 15 | said before. |
| 12:44:17 | 16 | Up until -- is 10:25:53 the first time you |
| 12:44:22 | 17 | see officers appear on the screen? |
| 12:44:24 | 18 | A. 52, 53, yes. |
| 12:44:26 | 19 | Q. And you don't see the police vehicle at |
| 12:44:28 | 20 | all on that screen? |
| 12:44:29 | 21 | A. I do not. |
| 12:44:30 | 22 | Q. Okay. Thank you. I'm going to show |
| 12:47:10 | 23 | you what's been marked as Exhibit 4A. Now, Dan, do |

*Derenda - Davenport - 9/24/2020*

140

| | | |
|---|---|---|
| 12:47:22 | 1 | you recognize what this document is generally? |
| 12:47:25 | 2 | A.    A call log. |
| 12:47:29 | 3 | Q.    And do you see what the date is for |
| 12:47:34 | 4 | this complaint summary report? |
| 12:47:36 | 5 | A.    The report date is March 14th, 2019. |
| 12:47:43 | 6 | Well, actually no, the report date -- if you look |
| 12:47:47 | 7 | at the report it's also showing 1/1/2017. |
| 12:47:52 | 8 | Q.    Okay.  Thank you.  That's more so the |
| 12:47:53 | 9 | date that I'm concerned with is January 1st of |
| 12:47:57 | 10 | 2017. |
| 12:47:58 | 11 | Now, in reviewing the complaint summary |
| 12:48:02 | 12 | report, do you see where it was first reported to |
| 12:48:05 | 13 | dispatch that a male was hit by a police car? |
| 12:48:16 | 14 | A.    Male hit by police car 10:55:42. |
| | 15 | Q.    Okay. |
| 12:48:20 | 16 | A.    AID -- ADI notified, ambulance. |
| 12:48:26 | 17 | Q.    And then was the location changed to |
| 12:48:29 | 18 | ECMC at any point on this complaint summary report? |
| 12:48:37 | 19 | A.    Location changed, ECMC. |
| 12:48:48 | 20 | Q.    What time would that have taken place |
| 12:48:51 | 21 | at? |
| 12:48:51 | 22 | A.    11:22:34. |
| 12:48:54 | 23 | Q.    So it appears that it would have been |

*Derenda - Davenport - 9/24/2020*

141

12:48:56  1  27 minutes approximately between the time that the

12:49:00  2  male was hit by the car and the officers started to

12:49:03  3  go to ECMC?

12:49:05  4       **MS. HUGGINS:**  Form.

12:49:05  5       **THE WITNESS:**  It says location changed to

12:49:07  6  ECMC.  It would appear that it was that time, but I

12:49:10  7  don't when they left or if they did it on route.

         8       **BY MR. DAVENPORT:**

12:49:14  9       **Q.**    Okay.  Now, I'm showing you what has

12:49:19 10  also been marked as Exhibit 11.  This is the fourth

12:49:23 11  video in that sequence.  It is listed as

12:49:32 12  06_20170101105233.

12:49:38 13       Now, do you see the time stamp in the upper

12:49:41 14  part of the video?

12:49:44 15       **A.**    Yes, 10:52:36.

12:49:47 16       **Q.**    And we were previously talking about

12:49:50 17  times that would have been around 10:25 when we

12:49:55 18  were speaking about when officers vehicles were in

12:49:58 19  the scene?

12:49:58 20       **A.**    I believe so.

12:49:59 21       **Q.**    So there would be according to the

12:50:03 22  video and the recording system on the video there

12:50:07 23  would have been approximately 30 minutes or

*Derenda - Davenport - 9/24/2020*

142

12:50:10  1    30 minutes on the security camera's time that would

12:50:12  2    have elapsed while these officers are still viewed

12:50:17  3    in the video?

4         **MS. HUGGINS:**   Form.   That -- that's what was

12:50:19  5    the heart of my objection before.   That he's not a

12:50:23  6    system -- custodian of.   We you don't know if that

12:50:24  7    time is accurately recorded or not.

12:50:27  8         **MR. DAVENPORT:**   Right.   But based on what he

12:50:29  9    is seeing in the video there would have been

12:50:33  10   30 minutes on this video system that would have

11   elapsed.

12:50:37  12        **MS. HUGGINS:**   No, that's the same form

12:50:39  13   objection.   That's the same objection to this.   The

12:50:41  14   time stamp is obviously on there and it speaks for

12:50:44  15   itself.

12:50:44  16        But as we know in this case it doesn't match

12:50:47  17   up with any of the actual timeframes when you

12:50:50  18   compare all of the discs.   And so I don't know how

12:50:54  19   he can provide competent testimony as to that.

20        **BY MR. DAVENPORT:**

12:50:57  21        Q.   Okay.   Dan, would the 30 minutes that

12:51:01  22   appears to have elapsed on the security camera

12:51:05  23   comport with what you see on the complaint summary

*Derenda - Davenport - 9/24/2020*

143

12:51:06  1   reports where 27 minutes have elapsed?

12:51:10  2         **A.**   Close to it.

12:51:10  3         **Q.**   Okay.  Do you see that officers are

12:51:13  4   currently standing out in the street?

12:51:15  5         **A.**   I see officers.  I don't know which

12:51:17  6   officers.  And I don't know what car the suspect or

12:51:23  7   the complainant was transported in.

          8         **Q.**   Okay.

12:51:27  9         **A.**   I believe he was put in the other car,

12:51:29  10  so I don't know where he is right now in this

12:51:31  11  video.

12:51:31  12        **Q.**   Okay.  If an individual is claiming a

12:51:34  13  head injury, would it be appropriate for the

12:51:39  14  officers to stand out in the middle of the street

12:51:41  15  after canceling an ambulance service and not drive

12:51:43  16  that individual to ECMC?

12:51:43  17        **MS. HUGGINS:**  Form.

12:51:43  18        **THE WITNESS:**  Again, I don't have all the

          19  facts or knowledge of why they're standing in the

12:51:44  20  street.  And why they didn't take him to the

12:51:49  21  hospital immediately.  Or why they canceled the

12:51:52  22  ambulance.  I don't know what their thought process

12:51:53  23  was.

BY MR. DAVENPORT:

12:51:54  Q.   Would there be any reason for those
12:51:57  officers to still be standing in the street at this
12:51:59  point?

12:52:00  MS. HUGGINS:  Form.

12:52:00  THE WITNESS:  Again, I don't know what --
12:52:02  what they're thinking.  What they seen.  What
12:52:04  they're doing.  I don't have an explanation.

BY MR. DAVENPORT:

12:52:07  Q.   If the alleged suspect had already been
12:52:11  placed into -- had already been arrested and
12:52:16  detained and placed in the back of a police
12:52:17  vehicle, would there be any reason for those
12:52:20  officers to still be at the scene at this point?

12:52:24  MS. HUGGINS:  Form.

12:52:24  THE WITNESS:  Again, I don't know the
12:52:26  circumstances of why they're standing in the
street.  Or what they're doing.

BY MR. DAVENPORT:

12:52:28  Q.   If the individual is sitting in the
12:52:31  back of the police vehicle complaining to officers
12:52:33  of a head injury, should the officers be driving
12:52:36  him to ECMC at this point?

*Derenda - Davenport - 9/24/2020*

145

| | |
|---|---|
| 12:52:37 | 1 |

**MS. HUGGINS:**  Form.

**THE WITNESS:**  If I had a prisoner in the backseat that was complaining with a head injury, I would be driving him to ECMC at that point.  I would, but I don't know what they knew, didn't know or what they seen.  Or -- again, I can't comment on what they're doing.

BY MR. DAVENPORT:

Q.   And what you would do by driving that individual to ECMC, would that be proper procedure and proper protocol for a police officer?

**MS. HUGGINS:**  Form.

**THE WITNESS:**  Again, depending on the circumstance or perception of the injury that he had.

BY MR. DAVENPORT:

Q.   If you did not know the severity of that individual's head injury, would you drive that individual to ECMC?

**MS. HUGGINS:**  Form.

**THE WITNESS:**  If I thought it was a severe injury I would wait for the ambulance.

BY MR. DAVENPORT:

```
12:53:17  1        Q.   If you decided to drive that individual
12:53:18  2   to ECMC, would you prolong driving him to ECMC?  Or
12:53:24  3   would you drive as quickly as possible?
          4        MS. HUGGINS:  Form.
12:53:27  5        THE WITNESS:  Again, depending on the
12:53:29  6   circumstances of what I perceived.  If I perceived
12:53:32  7   he was injured I would have taken him to ECMC.
12:53:34  8        Again, I don't know the circumstances of
12:53:37  9   what they know or don't know at that time based on
12:53:40 10   the video you're showing me.
         11        BY MR. DAVENPORT:
12:53:44 12        Q.   If there was an internal affairs
12:53:47 13   complaint that came to you claiming that an
12:53:49 14   individual sat in the back of a police vehicle for
12:53:52 15   nearly a half an hour with a head injury and
12:53:54 16   officers did not drive him to ECMC, would that
         17   result in discipline for the officers?
12:53:58 18        MS. HUGGINS:  Form.
12:53:59 19        THE WITNESS:  It could.
         20        BY MR. DAVENPORT:
12:54:00 21        Q.   Should it?
12:54:01 22        A.   Depending on the circumstances.  What
12:54:03 23   they knew, didn't know.  What they were told by the
```

*Derenda - Davenport - 9/24/2020*

147

1    complainant or suspect.

12:54:09  2        Again, depending on what their perception,

12:54:13  3    what was going on.  If he had an injury, if it was

12:54:18  4    a severe injury, as I said, I would have called an

5    ambulance.

12:54:21  6        If he's injured just says he has a headache

12:54:23  7    and you're taking him, I would have taken to the

12:54:26  8    hospital on route if he was under arrest.

12:54:32  9        I don't know what they're doing and I can't

12:54:33  10   comment on what they're or why they're doing it.

12:54:33  11   There's times that yes, it could result in

12:54:36  12   discipline based on the facts of the case.  Every

12:54:38  13   case is individual, as you know, based on the

12:54:42  14   facts.

12:54:42  15       Q.    Even if there wasn't an individual

12:54:46  16   sitting in the back of the police vehicle, would it

12:54:48  17   be appropriate for officers to stand out in the

18   middle of the street during their patrol duties?

12:54:54  19       MS. HUGGINS:  Form.

12:54:55  20       THE WITNESS:  Could be.  Again, I don't know

12:54:57  21   what they're doing or why they're doing it.

22       BY MR. DAVENPORT:

12:55:47  23       Q.    Now, Dan, are you familiar with

| | | |
|---|---|---|
| 12:55:49 | 1 | Officer Schultz? |
| 12:55:51 | 2 | **A.** I know the name. |
| 12:55:53 | 3 | **Q.** Karl Schultz? |
| 12:55:54 | 4 | **A.** I know the name. |
| 12:55:56 | 5 | **Q.** Is he somebody that you knew during |
| 12:55:59 | 6 | your tenure as the Buffalo Commissioner? |
| 12:56:02 | 7 | **A.** Know personally? No. |
| 12:56:05 | 8 | **Q.** Is he somebody that you ever worked |
| 12:56:07 | 9 | with as a police commissioner? |
| 12:56:08 | 10 | **A.** No. |
| 12:56:09 | 11 | **Q.** And how did you know Karl Schultz? |
| 12:56:11 | 12 | **A.** I've heard the name. I believe, there |
| 12:56:14 | 13 | were other internal affairs cases with him. |
| 12:56:17 | 14 | **Q.** Okay. What was the nature of those |
| 12:56:21 | 15 | internal affairs cases? |
| 12:56:22 | 16 | **A.** I don't recall. There was one where |
| 12:56:25 | 17 | there was -- involved with a shooting. It was |
| 12:56:26 | 18 | investigated by the District Attorney's Office. |
| 12:56:34 | 19 | **Q.** Does this appear to be Karl Schultz? |
| 12:56:38 | 20 | **MS. HUGGINS:** Form. Stop. If you're going |
| 12:56:40 | 21 | to put -- if you're going to show him this it needs |
| 12:56:41 | 22 | to be marked as an exhibit. |
| | 23 | **MR. DAVENPORT:** Okay. That's fine. |

*Derenda - Davenport - 9/24/2020*

149

| | | |
|---|---|---|
| 12:56:44 | 1 | **MS. HUGGINS:**  If you want to go off of the |
| 12:56:46 | 2 | record to do so. |
| | 3 | **MR. DAVENPORT:**  Yeah, we can do that. |
| | 4 | **THE VIDEOGRAPHER:**  Off the record at 12:56. |
| | 5 | (Off the record.) |
| 12:59:36 | 6 | **THE VIDEOGRAPHER:**  Back on the record at |
| 12:59:37 | 7 | 12:59. |
| | 8 | **The following was marked for Identification:** |
| | 9 | **EXH. 39**                    **USB flash drive that** |
| | 10 | **contains the video** |
| | 11 | **deposition of Karl Schultz,** |
| | 12 | **three segments.** |
| 12:59:39 | 13 | **MR. DAVENPORT:**  So we would like to mark as |
| 12:59:43 | 14 | Exhibit 39 a USB flash drive that contains the |
| 12:59:47 | 15 | video deposition of Karl Schultz. |
| 12:59:51 | 16 | It's broken down into three sections -- |
| 12:59:56 | 17 | three segments labeled Schultz_A, Schultz_B and |
| 13:00:02 | 18 | Schultz_C.  This deposition took place in February |
| 13:00:04 | 19 | of 2020 and we are currently showing footage from |
| 13:00:08 | 20 | that deposition to the witness Dan Derenda. |
| | 21 | **BY MR. DAVENPORT:** |
| 13:00:37 | 22 | **Q.**    Now, Dan, I asked you right before we |
| 13:00:41 | 23 | went off the record briefly, do you recognize this |

*Derenda - Davenport - 9/24/2020*

150

13:00:42  1  individual who you see in the video?

13:00:45  2      **A.**    Appears to be Karl Schultz.

13:00:47  3      **Q.**    Okay.  And before today, have you ever

13:00:50  4  seen Karl Schultz in person?

13:00:51  5      **A.**    I'm sure I have.

13:00:54  6      **Q.**    Okay.  And how do you know that this is

13:00:56  7  Karl Schultz?

13:00:57  8      **A.**    Like I said, I've come across him

13:01:00  9  before in the course of my duties.  So I'm -- I

13:01:06  10  know he had some other internal affairs cases as I

13:01:08  11  stated.

13:01:09  12      And, I believe, one was an officer involved

13:01:11  13  shooting that went to the District Attorney's Office.

13:01:14  14      **Q.**    Okay.  And you were commissioner at

13:01:16  15  that time, correct?

13:01:17  16      **A.**    Yes.

13:01:18  17      **Q.**    Now, I want you -- so from the video,

13:01:25  18  Karl Schultz and his partner Kyle Moriarty were in

13:01:30  19  the vehicle just in front where the collision had

13:01:34  20  occurred between Lauren McDermott and

13:01:36  21  Officer Velez's vehicle.

22      **MS. HUGGINS:**  Form.

23      **BY MR. DAVENPORT:**

*Derenda - Davenport - 9/24/2020*

151

13:01:38　1　　　　Q.　Just that way you have context for what

13:01:41　2　Karl Schultz will be testifying to.

13:01:45　3　　　　MS. HUGGINS:　Form.　You're playing

13:01:54　4　Schultz_A, at what time?

13:01:57　5　　　　MR. DAVENPORT:　A minute 43 and it is

13:01:58　6　currently at nine -- excuse me, nine seconds.

　　　　　　7　　　　BY MS. HUGGINS:　Is it a minute or an hour?

　　　　　　8　　　　MR. DAVENPORT:　It's an -- I'm sorry.　It's

13:02:09　9　an hour and 43 minutes and 10 seconds.

　　　　　10　　　　(Video of Officer Schultz playing.)

　　　　　11　　　　BY MR. DAVENPORT:

13:04:24　12　　　　Q.　Now, Dan, would you agree after

13:04:26　13　watching that segment of Karl Schultz's vehicle,

13:04:29　14　the only viewpoint that he had was through the

13:04:31　15　driver's side mirror of the police vehicle that he

13:04:35　16　was a passenger in?

　　　　　17　　　　MS. HUGGINS:　Form.

13:04:37　18　　　　THE WITNESS:　That's what he stated.

13:04:39　19　　　　BY MR. DAVENPORT:

13:04:39　20　　　　Q.　Okay.　Do you find that credible, that

13:04:42　21　an officer would be able to see an interaction like

13:04:46　22　that through the driver's side mirror while sitting

13:04:50　23　in the passenger's seat?

*Derenda - Davenport - 9/24/2020*

152

13:04:51  1      **MS. HUGGINS:**  Form.  That's not an

13:04:53  2  appropriate question.

3      **BY MR. DAVENPORT:**

13:04:56  4      **Q.**   Well, do you find that to be something

13:04:58  5  that an officer would be able to perceive if he was

13:05:02  6  sitting in the passenger's seat through a driver's

13:05:05  7  side mirror?

13:05:08  8      **MS. HUGGINS:**  Form.  You can answer.

13:05:09  9      **THE WITNESS:**  I don't know.

10      **BY MR. DAVENPORT:**

13:05:13  11      **Q.**   In watching this video, if

13:05:15  12  Officer Schultz, as we have learned throughout the

13:05:19  13  course of this litigation, was the only officer who

13:05:23  14  purportedly saw the collision between Mr. Kistner

13:05:25  15  and the police vehicle.

13:05:27  16      Do you find his viewpoint to be sufficient

13:05:32  17  to bring criminal charges against Mr. Kistner?

13:05:37  18      **MS. HUGGINS:**  Form.

13:05:37  19      **THE WITNESS:**  Again, I don't know what he --

13:05:40  20  what he saw or how he seen it.  He says in the

13:05:43  21  mirror.  I don't know what the capability, how far

13:05:47  22  away he was.  I just don't know.

13:05:49  23      Again, I can't comment on something if I'm

*Derenda - Davenport - 9/24/2020*

153

13:05:51 1   not -- that I don't know.

2         **BY MR. DAVENPORT:**

13:05:52 3      **Q.**   Well, you might recall from watching

13:05:55 4   the previous videos that you watched, that there

13:05:58 5   was at least one and half to two house lengths in

13:06:02 6   between the police vehicle and where the collision

13:06:05 7   took place.

13:06:06 8      **A.**   Correct.

13:06:06 9      **Q.**   Now, would that be something that an

13:06:09 10  officer would be able to perceive through a tiny

13:06:13 11  driver's side mirror, a collision that takes place

13:06:16 12  between an individual and a police car?

13:06:19 13      **MS. HUGGINS:**  Form.

13:06:19 14      **THE WITNESS:**  I don't think I can comment on

13:06:21 15  that because I don't know.  I don't know the size

13:06:22 16  of the mirror.  I don't know how far away he was.

13:06:25 17  I don't know what he seen.  So it's very difficult

13:06:29 18  for me to comment on that.

19        **BY MR. DAVENPORT:**

13:06:31 20     **Q.**   Well, as a police commissioner, you're

13:06:33 21  familiar with the size of the driver's side and

13:06:35 22  passenger's side mirrors?

13:06:37 23     **A.**   An SUV, correct.

*Derenda - Davenport - 9/24/2020*

154

| | | |
|---|---|---|
| 13:06:39 | 1 | **Q.** And you're familiar, generally, with |
| 13:06:40 | 2 | how large the passenger's side and driver's side |
| 13:06:44 | 3 | mirrors typically are? |
| 13:06:46 | 4 | **A.** Correct. |
| 13:06:47 | 5 | **Q.** A very tiny mirror? |
| 13:06:48 | 6 | **A.** I wouldn't say it was a tiny.  The |
| 13:06:51 | 7 | trucks are a little bit bigger than cars. |
| 13:06:54 | 8 | On my Jeep Cherokee the mirror is bigger |
| 13:06:55 | 9 | than on the rental I had when they were repairing |
| 13:06:59 | 10 | it.  It was small, a big difference. |
| 13:07:02 | 11 | Again, I can't tell you how he seen or what |
| 13:07:04 | 12 | he seen.  I don't know how far away.  I guess, I'd |
| 13:07:06 | 13 | have to try it myself. |
| 13:07:09 | 14 | **Q.** If the only officer who had viewed the |
| 13:07:12 | 15 | collision between Mr. Kistner and the police |
| 13:07:15 | 16 | vehicle was an officer who was two house lengths |
| 13:07:18 | 17 | away and who only viewed the interaction through a |
| 13:07:21 | 18 | driver's side mirror, would you find that the |
| 13:07:23 | 19 | officers could bring criminal charges based off of |
| 13:07:27 | 20 | what they claimed to have seen? |
| 13:07:29 | 21 | **MS. HUGGINS:** Form. |
| 13:07:30 | 22 | **THE WITNESS:** Again, I would have to see the |
| 13:07:33 | 23 | whole situation laid out in front of me.  What they |

13:07:35 1  seen.  What, how, why they did what they did,

13:07:37 2  period.  What the officer -- other officers seen,

13:07:41 3  didn't see.

13:07:42 4        Again, for me to make a judgment on what

13:07:45 5  he's saying there or his ability to see in the

13:07:46 6  mirror that he says, I can't answer that.  Is it

13:07:50 7  possible?  Yes.  Is it possible he's wrong?  Yes.

13:07:53 8        Again, I hate to keep giving you both

13:07:55 9  answers, but from what you're showing me I can't

       10  give you a definitive.

       11        **BY MR. DAVENPORT:**

13:07:59 12       Q.    Now, during that entire testimony that

13:08:01 13  you just gave, at any point did he say that

13:08:05 14  Mr. Kistner intentionally threw himself at the

13:08:07 15  police vehicle?

13:08:09 16       **MS. HUGGINS:**  Form.

13:08:10 17       **MR. DAVENPORT:**  He just listened to it.

13:08:12 18       **MS. HUGGINS:**  I know.  The problem is that

13:08:12 19  was an hour long deposition.  You asked him and --

13:08:14 20  he doesn't know.  He wasn't present for the

13:08:17 21  testimony.

13:08:19 22       **MR. DAVENPORT:**  Just based off of what he

13:08:20 23  just heard.

*Derenda - Davenport - 9/24/2020*

156

1          MS. HUGGINS:   Form.

13:08:22   2          THE WITNESS:   What he said, I believe, was

13:08:23   3    contact.

4          BY MR. DAVENPORT:

13:08:24   5          Q.    But he never said that Mr. Kistner

13:08:28   6    intentionally threw himself at the police vehicle?

13:08:28   7          A.    Not in the clip you showed me.

13:08:34   8          Q.    Now, could I actually get -- we can go

9    off the record.

10          (Off the record to reposition camera.)

11          BY MR. DAVENPORT:

13:10:12   12          Q.    So Dan, I just want to go back to the

13:10:16   13    internal affairs process.   We've talked about some

13:10:18   14    of the potential outcomes was unfounded, not

13:10:22   15    sustained and sustained.

13:10:24   16          Are there any times where officers will

13:10:28   17    reach a settlement to -- as a disposition for an

13:10:33   18    internal affairs complaint?

13:10:34   19          A.    Settlement meaning?   So basically, if I

13:10:38   20    find it -- I sustain it, I believe, you did it.

13:10:40   21    Here's the penalty I'm offering.   They may try to

13:10:44   22    bargain that penalty down with the union prior to

13:10:47   23    going to a hearing.

*Derenda - Davenport - 9/24/2020*

157

13:10:49  1      As I said, sometimes hearings could be a

13:10:51  2  year or two later.  So sometimes I would bargain

13:10:56  3  that penalty down if I believed it was appropriate.

13:10:58  4      Or I might start higher knowing that they're

13:11:02  5  going to want to bargain it down to come to where

13:11:05  6  we need to be.  But sometimes I wouldn't, sometimes

13:11:08  7  I would.

13:11:08  8      **Q.**   So the settlement would take place

13:11:10  9  after a sustained finding has been made in an

13:11:14  10  internal affairs investigation?

13:11:15  11      **A.**   It would be once it's been sustained at

13:11:21  12  the review and then a formal hearing takes place.

13:11:21  13  I give them an offer.

13:11:22  14      After that the union might come back and

13:11:25  15  say, okay.  He'll accept this, otherwise he wants

13:11:29  16  to go to a hearing.  So there could be an agreement

13:11:33  17  or a compromise.

13:11:35  18      **Q.**   Would there ever be a settlement that's

13:11:37  19  reached between the officers and you and the police

13:11:40  20  department prior to a disposition being reached?

13:11:45  21      **A.**   A settlement prior to that?  No.

13:11:48  22      **Q.**   Okay.  Now, are you familiar at all

13:11:52  23  with the document retention cycle for the city of

| | | |
|---|---|---|
| 13:11:57 | 1 | Buffalo? |
| 13:11:57 | 2 | **A.**    I don't know what it is. |
| 13:11:59 | 3 | **Q.**    Is there some sort of a document |
| 13:12:04 | 4 | retention cycle that's in place for the city of |
| 13:12:05 | 5 | Buffalo Police Department -- |
| 13:12:05 | 6 | **A.**    Internal affairs records. |
| 13:12:10 | 7 | **Q.**    I'm just going to ask that you wait for |
| | 8 | me to finish my question. |
| 13:12:10 | 9 | We'll start with internal affairs records. |
| 13:12:12 | 10 | Is there a document retention cycle for internal |
| 13:12:16 | 11 | affairs records? |
| 13:12:16 | 12 | **A.**    If there is -- I believe, there is, but |
| 13:12:19 | 13 | I don't know what it is. |
| 13:12:20 | 14 | **Q.**    Is there a document retention cycle for |
| 13:12:26 | 15 | general police documents and police reports? |
| 13:12:27 | 16 | **A.**    I would imagine there is, but I don't |
| 13:12:29 | 17 | know the timeframe. |
| 13:12:31 | 18 | **Q.**    As a police officer, would you dispose |
| 13:12:34 | 19 | of police records that you've maintained for X |
| 13:12:39 | 20 | amount of years? |
| 13:12:40 | 21 | **A.**    The department maintains the records. |
| 13:12:43 | 22 | So basically, everything now is on a computer.  Or |
| 13:12:46 | 23 | years past when I started, because I'm old, they |

*Derenda - Davenport - 9/24/2020*

159

| | | |
|---|---|---|
| 13:12:49 | 1 | were in a little file.  But they don't -- no longer |
| 13:12:51 | 2 | do that.  So everything is computerized. |
| 13:12:54 | 3 | **Q.**   So it would be up to the department |
| 13:12:57 | 4 | when to dispose of the records? |
| 13:12:58 | 5 | **A.**   Up to the department or by law, if and |
| 13:13:01 | 6 | when, they would dispose of them. |
| 13:13:03 | 7 | **Q.**   And it wouldn't be the individual |
| 13:13:05 | 8 | police officers who would choose when to dispose -- |
| 13:13:07 | 9 | **A.**   Correct. |
| 13:13:07 | 10 | **Q.**   -- the records? |
| 13:13:07 | 11 | **A.**   Correct. |
| 13:13:08 | 12 | **Q.**   After officers pass through the police |
| 13:13:20 | 13 | academy, was there a certain district that new |
| 13:13:23 | 14 | trainees are assigned to? |
| 13:13:24 | 15 | **A.**   They get assigned to all districts. |
| 13:13:27 | 16 | They get assigned to -- once they graduate.  I |
| 13:13:29 | 17 | don't know if they were -- when they were field |
| 13:13:31 | 18 | training that they were temporarily assigned. |
| 13:13:33 | 19 | But, I believe, once they graduated from the |
| 13:13:36 | 20 | academy they had a right to bid on a district by |
| 13:13:41 | 21 | seniority in the academy.  They could go to that |
| | 22 | district. |
| | 23 | So they're -- let's say, for example, |

*Derenda - Davenport - 9/24/2020*

160

13:13:44  1    there's five openings at A-District, there's 10

13:13:45  2    openings at E-District.  First come by seniority to

13:13:50  3    fill those positions.

13:13:52  4          **Q.**    And then how is the seniority

13:13:55  5    determined for the police academy?

13:13:56  6          **A.**    By where they scored on the exam.  So

13:13:59  7    if I scored number one in the academy, to get into

13:14:02  8    the academy that's where the seniority, I believe,

13:14:03  9    would take place.  One, to whatever number and

13:14:06  10   you'll make your choice that way.

13:14:08  11         **Q.**    And then the officers themselves are

13:14:10  12   the ones who bid for which district they want to be

13:14:15  13   in?

13:14:15  14         **A.**    Correct.  And they will put down

13:14:17  15   multiple, first choice, second choice, third

13:14:18  16   choice.  So when you come to the opening, oh, who's

13:14:20  17   next?  What's he want in for?  Oops that's filled,

13:14:23  18   so you go to the next choice, in that manner.

13:14:26  19         **Q.**    During your tenure, were any of the

13:14:32  20   districts more prone to internal affairs complaints

13:14:36  21   than the others?

13:14:36  22         **A.**    Any other districts, specifically?  I

13:14:40  23   can't say that to be a fact or not.  Busier

*Derenda - Davenport - 9/24/2020*

161

| | | |
|---|---|---|
| 13:14:45 | 1 | districts might have more complaints. |
| 13:14:46 | 2 | **Q.**    Is C-District a busier district? |
| 13:14:49 | 3 | **A.**    It is. |
| 13:14:50 | 4 | **Q.**    Is C-District the busiest district? |
| 13:14:53 | 5 | **A.**    I don't -- by number of calls or type |
| 13:14:56 | 6 | of calls, I think D-District is probably the |
| | 7 | busiest. |
| 13:15:05 | 8 | Again, I don't know for sure.  But |
| 13:15:06 | 9 | A-District is a lot slower than C-District. |
| 13:15:11 | 10 | D-District is always busy. |
| 13:15:12 | 11 | **Q.**    And would the staffing reflect that? |
| 13:15:14 | 12 | Are there more officers in C-District or A-District |
| 13:15:17 | 13 | than there would be or -- excuse me.  I'm sorry. |
| 13:15:19 | 14 | Strike that question. |
| 13:15:20 | 15 | Would there be more officers assigned in |
| 13:15:23 | 16 | C-District and E-District than there would be in |
| 13:15:27 | 17 | A-District? |
| 13:15:27 | 18 | **A.**    Potentially, because of the call |
| 13:15:30 | 19 | volume, correct. |
| 13:15:31 | 20 | **Q.**    And approximately how many more |
| 13:15:33 | 21 | officers would be assigned to C-District as |
| 13:15:36 | 22 | compared to A-District? |
| 13:15:38 | 23 | **MS. HUGGINS:**  Form.  Just timeframe here. |

*Derenda - Davenport - 9/24/2020*

162

| | |
|---|---|
| 13:15:42 | 1 |
| 13:15:45 | 2 |
| 13:15:46 | 3 |
| 13:15:48 | 4 |
| 13:15:50 | 5 |
| 13:15:50 | 6 |
| 13:15:53 | 7 |
| 13:15:54 | 8 |
| 13:15:55 | 9 |
| 13:15:58 | 10 |
| 13:16:00 | 11 |
| 13:16:03 | 12 |
| 13:16:07 | 13 |
| 13:16:09 | 14 |
| 13:16:11 | 15 |
| 13:16:13 | 16 |
| 13:16:16 | 17 |
| 13:16:19 | 18 |
| 13:16:22 | 19 |
| 13:16:23 | 20 |
| 13:16:25 | 21 |
| 13:16:27 | 22 |
| 13:16:28 | 23 |

1       MR. DAVENPORT:  Sure.  In January of 2017.

2       THE WITNESS:  I don't have the answer to

3  that question.  But there would have been more at

4  C-District than A.  That I know for a fact.

5       BY MR. DAVENPORT:

6       Q.  And that would have about reflected in

7  all shifts?

8       A.  It would be the number of cars on the

9  street.  And again, based on the number of calls.

10  We look at where you need the number -- the most

11  calls for service you need more officers.

12       Q.  Okay.  And then just currently, right

13  now, are you working with any police department?

14       A.  I am not.

15       Q.  Have you worked with any police

16  departments since leaving the city of Buffalo?

17       A.  I have not.

18       Q.  And do you currently hold employment --

19       A.  I do.

20       Q.  And what do you do currently?

21       A.  Well, when I left the police

22  department, it would be -- for a company called

23  G4S Secure Solutions.  It's a security company.  I

*Derenda - Davenport - 9/24/2020*

163

13:16:31  1    started out as a general manager,

13:16:34  2    Buffalo/Rochester.

13:16:35  3         And then I found myself as the director of

13:16:38  4    operations for all of New England.  And I just got

13:16:42  5    back from that.  Now, I'm district manager back to

13:16:43  6    Buffalo/Rochester.  But I just got Hartford added

13:16:47  7    on, so.

13:16:47  8         Q.    So that's the company that you've

13:16:51  9    worked for since 2015?

13:16:52  10        A.    Since I left, correct.

13:16:55  11        MR. DAVENPORT:  I think that's it.  I'm all

         12    set.

         13        THE VIDEOGRAPHER:  Off the record at 13:16.

         14

         15        (Deposition concluded at 1:16 p.m.)

         16                     *    *    *

         17

         18

         19

         20

         21

         22

         23

164

1        I hereby CERTIFY that I have read the

2   foregoing 163 pages, and that except as to those

3   changes (if any) as set forth in an attached errata

4   sheet, they are a true and accurate transcript of

5   the testimony given by me in the above entitled

6   action on September 24, 2020.

7

8

9                        ------------------------
                          DANIEL DERENDA
10

11  Sworn to before me this

12

13  -------- day of  ---------, 2020.

14

15  ---------------------------

16  NOTARY PUBLIC.

17

18

19

20

21

22

23

165

1  STATE OF NEW YORK    )

2                        ss:

3  COUNTY OF ERIE        )

4

5       I DO HEREBY CERTIFY as a Notary Public in and

6  for the State of New York, that I did attend and

7  report the foregoing deposition, which was taken

8  down by me in a verbatim manner by means of machine

9  shorthand.  Further, that the deposition was then

10 reduced to writing in my presence and under my

11 direction.  That the deposition was taken to be

12 used in the foregoing entitled action.  That the

13 said deponent, before examination, was duly sworn

14 to testify to the truth, the whole truth and

15 nothing but the truth, relative to said action.

16

17

18

19 ------------------------------
   LETITIA N. DAVIES,
20 Notary Public.

21

22

23

166

1                          **INDEX TO EXHIBITS**

2    **Exhibit**                    **Description**                    **Page**

3    EXH. 37            Letter to Mr. Kistner from          42
                        Internal Affairs Division
4                       dated August 13, 2020.

5    Corrected          Letter to Mr. Kistner from          44
     from EXH 37        Internal Affairs Division
6    to EXH. 38         dated August 13, 2020.

7    EXH. 39            USB flash drive that               149
                        contains the video
8                       deposition of Karl Schultz,
                        three segments.

9

10

11   *Copy of exhibit 38 supplied to all counsel.
     Counsel agreed the contents of Exhibit 39
12   (thumb drive) sent to Ms. Huggins.

13

14

15

16

17

18

19

20

21

22

23

167

1                          **INDEX TO WITNESSES**

2     **Witness                    Examination                    Page**

3       DANIEL DERENDA         BY MR. DAVENPORT:              4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

**$**

$250 [1] - 89:8

**'**

'10 [1] - 19:23
'14 [1] - 19:23
'86 [3] - 6:9, 6:10, 8:10
'96 [1] - 9:14
'97 [1] - 9:14
'98 [1] - 10:20

**0**

0 [2] - 104:12, 134:8
0620170101102529 [1] - 83:12
06_ 20170101102529 [1] - 137:10
06_ 20170101105233 [1] - 141:12

**1**

1/1/2017 [1] - 140:7
10 [12] - 8:18, 9:4, 9:5, 9:7, 85:9, 85:15, 104:6, 104:10, 104:14, 125:4, 151:9, 160:1
100% [2] - 18:17, 21:23
10:10 [2] - 2:6, 3:5
10:25 [1] - 141:17
10:25:31 [1] - 137:16
10:25:36 [2] - 135:12, 138:2
10:25:37 [1] - 138:6
10:25:39 [2] - 135:20, 135:22
10:25:44 [1] - 136:7
10:25:48 [1] - 136:22
10:25:53 [1] - 139:16
10:52:36 [1] - 141:15
10:55:42 [1] - 140:14
11 [9] - 8:22, 8:23, 9:9, 83:10, 83:11, 105:1, 107:5, 137:8, 141:10
1120 [2] - 2:4, 3:3
1137 [1] - 2:13
11:22:34 [1] - 140:22
11:28 [1] - 82:15
11:42 [1] - 82:18
12 [1] - 124:9
12:24 [1] - 124:4

12:26 [1] - 124:6
12:39 [1] - 137:2
12:41 [1] - 137:5
12:56 [1] - 149:4
12:59 [1] - 149:7
13 [7] - 42:23, 44:19, 67:23, 68:22, 131:21, 166:4, 166:6
13:16 [1] - 163:13
14202 [2] - 2:9, 2:14
14206 [1] - 4:2
149 [1] - 166:7
14th [1] - 140:5
15 [1] - 83:6
16 [3] - 9:1, 9:10, 9:12
1600 [1] - 2:8
163 [1] - 164:2
17 [2] - 88:8, 115:3
18-cv-402 [1] - 1:8
1986 [5] - 6:15, 7:7, 7:8, 7:15, 8:8
19th [4] - 45:13, 46:14, 46:16, 47:4
1:16 [1] - 163:15
1st [9] - 4:12, 16:9, 22:4, 29:19, 51:9, 88:19, 102:19, 124:11, 140:9

**2**

20 [3] - 14:4, 14:7, 111:8
2000 [1] - 10:20
2006 [5] - 10:21, 16:8, 16:9, 34:3
2010 [10] - 16:5, 16:8, 16:10, 16:11, 17:16, 20:1, 20:9, 34:4, 52:2
2011 [1] - 52:3
2012 [2] - 52:3, 52:6
2014 [4] - 18:22, 19:10, 19:11, 19:22
2015 [7] - 75:14, 75:22, 76:2, 76:7, 76:10, 76:11, 163:9
2017 [15] - 4:12, 14:1, 14:20, 22:4, 22:12, 23:18, 29:19, 42:3, 46:17, 46:20, 51:9, 88:19, 124:11, 140:10, 162:1
2018 [5] - 19:1, 19:2, 19:4, 42:12, 68:2
2019 [7] - 45:13, 46:7, 46:14, 46:16, 47:4, 102:19, 140:5
2020 [2] - 2:5, 3:5,

42:23, 44:19, 67:23, 68:22, 149:19, 164:6, 164:13, 166:4, 166:6
24 [3] - 2:5, 103:3, 164:6
24th [4] - 3:4, 7:8, 7:14, 8:10
25 [4] - 100:13, 101:3, 101:18, 115:22
27 [2] - 141:1, 143:1
28 [2] - 103:4, 125:9

**3**

30 [9] - 67:8, 67:9, 71:4, 79:1, 132:8, 141:23, 142:1, 142:10, 142:21
32 [1] - 125:20
33 [1] - 103:4
35 [1] - 116:18
36 [1] - 138:2
37 [10] - 42:21, 43:3, 44:5, 44:7, 44:18, 103:4, 138:2, 138:3, 166:3, 166:5
38 [7] - 44:6, 44:18, 66:5, 68:21, 81:3, 166:6, 166:11
38.5 [1] - 135:22
39 [5] - 107:7, 149:9, 149:14, 166:7, 166:11

**4**

4 [2] - 45:22, 167:3
42 [1] - 166:3
43 [2] - 151:5, 151:9
44 [2] - 106:5, 166:5
45 [1] - 3:20
47 [1] - 4:1
4A [1] - 139:23

**5**

5 [2] - 54:19, 55:2
50/50 [1] - 74:22
52 [1] - 139:18
53 [1] - 139:18

**7**

716 [2] - 2:9, 2:14

**8**

8 [6] - 8:15, 8:22, 9:4, 9:5, 9:6, 9:9
851-4334 [1] - 2:14
854-3400 [1] - 2:9

**9**

9 [2] - 54:19, 55:2
911 [6] - 54:8, 54:11, 54:12, 55:14, 55:16, 56:15

**A**

A-District [5] - 160:1, 161:9, 161:12, 161:17, 161:22
a.m [1] - 2:6
ability [5] - 5:10, 30:12, 95:19, 98:12, 155:5
able [9] - 76:3, 93:10, 93:13, 95:2, 95:14, 99:22, 151:21, 152:5, 153:10
academy [23] - 6:8, 6:12, 6:14, 7:4, 7:7, 7:10, 7:12, 7:15, 7:21, 8:10, 30:15, 110:19, 110:23, 111:12, 111:17, 112:3, 112:20, 159:13, 159:20, 159:21, 160:5, 160:7, 160:8
accept [5] - 71:6, 77:21, 78:1, 79:5, 157:15
acceptable [1] - 5:13
accepted [1] - 77:20
accident [45] - 11:20, 11:22, 12:6, 12:15, 12:20, 12:22, 13:5, 13:22, 14:9, 14:10, 14:18, 14:22, 15:1, 15:7, 15:10, 15:12, 16:1, 35:6, 35:7, 36:19, 36:20, 36:21, 37:4, 39:6, 51:23, 52:9, 52:16, 53:5, 53:12, 53:13, 53:17, 53:20, 53:23, 54:2, 54:5, 54:7, 54:19, 55:4, 55:21, 56:4, 56:15, 57:3, 57:4, 59:15
accidents [4] - 12:20, 15:4, 15:6, 52:17
accommodate [1] - 5:5
according [2] - 46:22, 141:21
accurate [2] - 138:18, 164:4
accurately [1] -

142:7
Action [1] - 1:8
action [8] - 45:5, 49:2, 49:4, 106:20, 122:17, 164:6, 165:12, 165:15
actions [10] - 33:22, 40:19, 106:10, 106:23, 108:14, 109:21, 117:15, 127:11, 127:12, 134:4
activities [1] - 33:22
actual [2] - 35:9, 142:17
added [1] - 163:6
adding [1] - 52:13
additional [2] - 111:18, 111:22
address [2] - 45:2, 60:9, 103:13
ADI [1] - 140:16
admin [2] - 33:18, 34:1
administered [1] - 30:21
administration [2] - 29:11, 79:22
administrative [3] - 11:9, 20:8, 33:16
affairs [103] - 15:4, 15:23, 24:19, 24:21, 26:10, 26:18, 26:22, 27:5, 27:13, 27:15, 27:20, 28:5, 30:4, 30:19, 30:21, 30:23, 31:8, 31:10, 31:16, 31:19, 32:3, 32:6, 32:17, 34:8, 35:3, 35:12, 35:20, 35:22, 37:4, 37:9, 37:12, 37:17, 37:20, 37:21, 38:2, 38:18, 39:11, 39:18, 39:22, 40:15, 42:17, 43:19, 43:22, 45:8, 46:23, 47:7, 47:10, 47:15, 49:3, 49:7, 49:13, 49:15, 49:17, 49:19, 50:3, 50:14, 50:17, 50:19, 51:3, 51:5, 51:23, 52:9, 52:14, 53:6, 53:8, 53:21, 54:15, 54:23, 57:6, 57:9, 64:4, 64:6, 64:11, 65:12, 70:12, 70:17, 72:14, 72:15, 77:8, 77:10, 77:13, 78:20, 87:1, 87:8, 90:15, 91:8, 99:13, 131:2, 131:11, 146:12,

148:13, 148:15, 150:10, 156:13, 156:18, 157:10, 158:6, 158:9, 158:11, 160:20
**Affairs** [4] - 42:22, 44:18, 166:3, 166:5
**affiliated** [1] - 73:6
**affiliation** [1] - 102:15
**afterwards** [4] - 59:7, 104:7, 111:18, 121:4
**ago** [2] - 6:7, 41:12
**agree** [5] - 105:2, 105:6, 126:21, 132:10, 151:12
**agreed** [5] - 29:17, 30:1, 73:10, 76:8, 166:11
**agreement** [6] - 29:7, 29:9, 73:12, 73:14, 73:18, 157:16
**AID** [1] - 140:16
**aid** [8] - 110:20, 110:22, 111:3, 111:7, 111:17, 112:4, 112:12
**aired** [3] - 45:18, 45:20, 47:11
**al** [1] - 3:1
**Albany** [1] - 74:11
**allegation** [2] - 26:2, 88:2
**allegations** [4] - 66:14, 87:17, 89:2, 89:10
**alleged** [1] - 144:10
**allow** [4] - 69:17, 77:17, 133:9, 133:17
**allowed** [1] - 30:11
**allows** [1] - 77:17
**ambulance** [32] - 97:8, 97:15, 98:1, 98:6, 98:11, 98:12, 98:15, 98:16, 98:21, 98:23, 99:7, 99:14, 99:16, 99:17, 101:7, 101:9, 101:19, 102:10, 103:14, 103:19, 108:17, 108:21, 114:8, 122:21, 123:5, 123:13, 123:14, 140:16, 143:15, 143:22, 145:22, 147:5
**ambulances** [9] - 102:3, 102:7, 102:11, 102:13, 102:22, 103:3, 103:5, 103:6, 103:17

**amount** [7] - 15:19, 26:9, 59:19, 59:21, 89:6, 136:10, 158:20
**answer** [19] - 4:22, 5:9, 5:13, 12:13, 37:14, 38:19, 57:16, 58:6, 58:21, 59:8, 65:7, 69:18, 85:16, 86:14, 100:10, 110:10, 152:8, 155:6, 162:2
**answering** [1] - 73:20
**answers** [1] - 155:9
**Anthony** [2] - 23:21, 24:1
**apologize** [1] - 44:2
**appear** [26] - 85:23, 115:4, 116:6, 116:9, 117:8, 117:16, 119:13, 120:18, 125:13, 125:17, 126:5, 126:17, 128:4, 128:11, 128:16, 129:9, 129:10, 129:16, 132:13, 135:1, 135:5, 136:15, 136:18, 139:17, 141:6, 148:19
**APPEARANCES** [1] - 2:7
**appeared** [11] - 119:16, 119:21, 120:16, 122:9, 124:13, 128:13, 128:15, 129:3, 129:17, 130:17, 131:23
**appearing** [1] - 3:14
**Appearing** [2] - 2:10, 2:15
**apply** [1] - 4:20
**appointed** [14] - 16:10, 16:11, 16:18, 16:21, 17:17, 17:22, 18:7, 18:9, 20:2, 20:9, 51:1, 51:14, 51:17, 52:2
**appointment** [1] - 17:5
**approached** [2] - 116:22, 117:1
**appropriate** [16] - 100:12, 109:8, 110:2, 110:5, 113:19, 118:2, 121:8, 121:11, 121:14, 122:12, 122:23, 123:7, 143:13, 147:17, 152:2, 157:3

**April** [1] - 7:17
**arbitration** [15] - 67:10, 71:11, 71:19, 72:4, 72:10, 74:17, 78:15, 79:9, 79:20, 79:21, 80:5, 80:7, 80:23, 81:5, 81:23
**arbitrations** [2] - 79:23, 80:17
**arbitrator** [20] - 66:23, 67:1, 67:4, 67:10, 67:14, 70:15, 70:16, 70:21, 71:7, 72:16, 73:5, 73:10, 73:11, 73:12, 73:23, 74:3, 74:13, 77:22, 80:9, 81:18
**area** [2] - 9:2, 74:11
**areas** [1] - 21:16
**arm** [7] - 117:4, 117:5, 117:20, 125:10, 125:22, 126:2, 126:14
**arose** [1] - 34:17
**arrest** [6] - 98:5, 99:5, 114:19, 114:23, 130:6, 147:8
**arrested** [3] - 48:6, 96:20, 144:11
**arrive** [5] - 54:15, 54:22, 97:15, 98:23, 136:3
**arrived** [1] - 107:14
**assess** [2] - 101:19, 109:7
**assessing** [1] - 101:13
**assessment** [12] - 96:3, 96:17, 97:6, 101:1, 107:20, 108:11, 108:12, 108:23, 109:7, 109:16, 109:20, 113:17
**assigned** [15] - 8:11, 8:14, 9:12, 22:20, 22:21, 22:22, 23:3, 23:14, 71:14, 159:14, 159:15, 159:16, 159:18, 161:15, 161:21
**assist** [1] - 28:22
**Assistant** [1] - 2:13
**assisted** [1] - 31:12
**Associates** [2] - 3:3, 3:8
**ASSOCIATES** [1] - 2:4
**Association** [1] - 71:2

**assuming** [1] - 8:3
**assumption** [3] - 20:4, 45:23, 74:22
**attached** [1] - 164:3
**attempt** [1] - 139:2
**attempting** [1] - 139:4
**attend** [3] - 27:20, 72:8, 165:6
**attention** [7] - 40:13, 40:19, 47:18, 47:19, 81:3, 99:6, 107:11
**Attorney** [1] - 48:16
**attorney** [11] - 4:10, 25:16, 39:11, 39:12, 49:5, 71:13, 74:5, 78:16, 79:2, 79:3, 79:7
**Attorney's** [4] - 48:19, 49:10, 148:18, 150:13
**attorneys** [8] - 38:9, 39:15, 39:17, 75:4, 75:8, 77:5, 78:13
**Attorneys** [1] - 47:23
**audio** [4] - 106:19, 115:16, 122:2, 127:16
**August** [8] - 7:19, 8:7, 42:23, 44:19, 67:23, 68:22, 166:4, 166:6
**authenticate** [2] - 139:3, 139:5
**Avenue** [4] - 9:13, 21:22, 102:5, 102:14
**aware** [4] - 48:22, 60:23, 100:9, 103:23

**B**

**BAASE** [1] - 2:7
**backed** [3] - 72:5, 116:21, 117:19
**background** [2] - 5:21, 5:22
**backing** [1] - 136:16
**backseat** [1] - 145:3
**bad** [1] - 101:17
**Bailey** [1] - 21:22
**Bailey/Kensington** [1] - 9:2
**BALL** [1] - 2:11
**bargain** [3] - 156:22, 157:2, 157:5
**Based** [1] - 66:8
**based** [31] - 26:5, 32:9, 33:3, 33:4, 35:14, 38:23, 39:10, 45:10, 47:11, 49:15, 67:17, 69:11, 82:21,

83:14, 86:8, 86:15, 90:5, 106:18, 108:3, 115:16, 117:15, 122:2, 122:13, 127:16, 142:8, 146:9, 147:12, 147:13, 154:19, 155:22, 162:9
**basic** [5] - 111:6, 112:9, 112:12
**bathroom** [1] - 82:9
**batteries** [1] - 61:16
**became** [2] - 16:5, 20:18
**become** [1] - 29:3
**begin** [1] - 2:19
**beginning** [1] - 134:6
**behalf** [3] - 3:15, 3:16, 4:10
**behavior** [1] - 127:18
**behind** [2] - 60:11, 93:14
**belief** [1] - 91:11
**below** [4] - 22:14, 23:9, 28:2, 28:5
**Benevolent** [1] - 71:1
**best** [4] - 5:10, 22:1, 89:20, 112:5
**between** [23] - 10:5, 26:17, 65:16, 65:20, 73:15, 75:2, 77:4, 95:10, 100:13, 105:3, 105:10, 120:14, 120:18, 127:3, 127:7, 130:1, 141:1, 150:20, 152:14, 153:6, 153:12, 154:15, 157:19
**bid** [2] - 159:20, 160:12
**big** [1] - 154:10
**bigger** [2] - 154:7, 154:8
**Bill** [1] - 48:16
**bit** [8] - 46:1, 66:19, 120:16, 122:9, 124:23, 129:4, 129:12, 154:7
**body** [1] - 92:2
**book** [1] - 111:13
**borderline** [1] - 130:8
**bottom** [1] - 104:17
**boundaries** [2] - 21:21
**brakes** [1] - 61:15
**break** [2] - 5:3, 82:9
**briefly** [1] - 149:23
**bring** [10] - 25:2, 26:11, 26:22, 27:1,

40:11, 62:15, 80:10,
128:15, 152:17,
154:19
  **bringing** [4] - 62:9,
62:12, 63:7, 63:10
  **Broadway/Fillmore**
[1] - 8:15
  **broken** [1] - 149:16
  **brought** [8] - 40:13,
40:18, 41:4, 47:17,
47:18, 64:3, 64:4,
90:16
  **brutality** [1] - 47:20
  **Buffalo** [43] - 1:9,
1:11, 1:13, 1:14, 1:15,
1:16, 1:17, 1:18, 1:19,
2:4, 2:9, 2:14, 3:1,
3:4, 4:2, 4:11, 8:1,
8:4, 9:23, 16:19,
16:23, 18:15, 25:11,
37:13, 38:16, 40:15,
61:2, 61:3, 61:4, 61:7,
62:7, 71:1, 73:15,
74:8, 74:9, 74:16,
74:21, 75:2, 89:13,
148:6, 158:1, 158:5,
162:16
  **Buffalo's** [1] - 71:10
  **buffalo.com** [1] -
2:15
  **Buffalo/Rochester**
[2] - 163:2, 163:6
  **building** [1] - 21:20
  **Building** [3] - 2:4,
2:8, 3:4
  **burden** [9] - 65:23,
66:16, 66:20, 67:21,
68:13, 69:3, 69:4,
69:12, 69:16
  **busier** [2] - 160:23,
161:2
  **busiest** [2] - 161:4,
161:7
  **busy** [1] - 161:10
  **BY** [100] - 4:5, 12:14,
13:4, 14:13, 37:22,
39:8, 43:1, 44:20,
57:20, 58:10, 59:2,
59:17, 65:10, 68:5,
70:1, 82:5, 82:19,
83:9, 85:13, 85:21,
86:20, 87:6, 88:6,
90:13, 91:7, 92:3,
92:19, 94:23, 95:5,
95:20, 97:5, 97:13,
98:9, 98:19, 99:11,
100:11, 100:21,
101:23, 103:1, 104:4,
104:23, 105:17,
106:17, 107:4,

109:22, 110:17,
112:22, 113:18,
114:16, 115:2,
115:11, 116:5,
116:17, 117:14,
117:23, 118:8, 119:4,
120:23, 121:10,
121:23, 122:14,
123:10, 123:22,
124:7, 127:14,
128:10, 128:20,
132:21, 133:8,
135:10, 136:1,
136:14, 137:6, 138:4,
139:12, 141:8,
142:20, 144:1, 144:9,
144:19, 145:8,
145:16, 145:23,
146:11, 146:20,
147:22, 149:21,
150:23, 151:7,
151:11, 151:19,
152:3, 152:10, 153:2,
153:19, 155:11,
156:4, 156:11, 162:5,
167:3
  **BYRON** [1] - 1:10

## C

  **C-District** [16] -
21:18, 21:19, 22:3,
22:4, 22:7, 22:12,
23:6, 23:18, 65:6,
161:2, 161:4, 161:9,
161:12, 161:16,
161:21, 162:4
  **c/o** [1] - 1:10
  **camera** [9] - 135:2,
135:6, 135:16,
135:20, 136:4,
137:20, 138:7,
142:22, 156:10
  **camera's** [1] - 142:1
  **cancel** [6] - 34:11,
98:12, 98:21, 99:16,
102:22, 103:3
  **canceled** [11] -
98:14, 99:8, 99:14,
101:9, 102:2, 102:7,
102:12, 103:5,
103:14, 103:19,
143:21
  **canceling** [1] -
143:15
  **cannot** [1] - 90:20
  **capability** [1] -
152:21
  **capacity** [8] - 1:11,
1:12, 1:14, 1:15, 1:16,

1:17, 1:18, 1:19
  **captain** [15] - 13:10,
13:16, 22:6, 22:11,
22:14, 27:19, 27:20,
27:23, 28:2, 28:21,
30:4, 30:19, 31:8,
31:15, 51:4
  **captains** [5] - 10:16,
22:20, 23:2, 23:7,
28:20
  **car** [15] - 53:23, 54:1,
61:11, 62:9, 86:18,
92:5, 95:8, 107:8,
114:5, 140:13,
140:14, 141:2, 143:6,
143:9, 153:12
  **care** [1] - 101:8
  **career** [1] - 8:4
  **carried** [1] - 66:12
  **cars** [2] - 154:7,
162:8
  **case** [65] - 2:21,
4:11, 4:14, 25:5, 25:7,
30:23, 31:21, 32:3,
32:6, 33:2, 35:5,
35:11, 37:18, 38:21,
40:22, 41:1, 41:10,
41:21, 41:23, 42:9,
43:14, 45:11, 45:15,
47:21, 47:22, 48:14,
56:18, 58:12, 59:16,
63:15, 63:18, 66:7,
66:8, 66:11, 66:15,
66:21, 67:3, 67:7,
68:8, 69:3, 70:9,
70:10, 70:15, 71:8,
72:13, 73:13, 78:22,
80:3, 81:10, 82:22,
91:4, 92:8, 97:3,
102:2, 102:16,
108:12, 108:13,
113:10, 113:16,
142:16, 147:12,
147:13
  **cases** [29] - 4:19,
23:4, 25:9, 26:23,
31:12, 32:1, 33:5,
34:10, 34:15, 36:5,
36:17, 37:16, 39:6,
39:7, 39:15, 47:23,
57:6, 64:15, 64:16,
65:4, 65:9, 66:22,
72:7, 100:5, 100:6,
113:13, 148:13,
148:15, 150:10
  **caused** [2] - 59:20,
120:19
  **cell** [27] - 55:11,
55:15, 56:1, 56:3,
56:9, 56:13, 56:19,

57:23, 116:13,
116:15, 118:2, 118:3,
118:10, 118:16,
118:20, 119:2, 119:3,
119:6, 120:6, 123:1,
123:12, 124:16,
125:7, 126:6, 126:18,
126:21
  **center** [1] - 120:3
  **certain** [14] - 13:18,
18:17, 21:23, 24:6,
35:21, 59:19, 65:23,
72:22, 75:17, 76:10,
76:16, 76:17, 89:6,
159:13
  **certainly** [1] - 82:10
  **CERTIFY** [2] - 164:1,
165:5
  **Chad** [3] - 3:14, 4:9,
104:15
  **CHAD** [1] - 2:8
  **chain** [4] - 10:17,
12:3, 22:15, 27:23
  **chance** [1] - 66:22
  **change** [5] - 21:7,
21:11, 28:15, 44:10,
62:14
  **changed** [5] - 13:12,
44:11, 140:17,
140:19, 141:5
  **changes** [4] - 52:6,
52:11, 61:15, 164:3
  **changing** [2] - 52:12,
52:13
  **channel** [2] - 45:22,
46:3
  **charge** [10] - 10:22,
11:13, 20:6, 22:19,
31:9, 32:2, 78:22,
89:3, 89:11, 89:22
  **charged** [6] - 48:7,
59:12, 87:18, 88:13,
88:18, 88:20
  **charges** [5] - 71:4,
89:23, 90:16, 152:17,
154:19
  **charging** [1] - 88:11
  **Charter** [2] - 18:15,
18:20
  **check** [2] - 111:13,
113:21
  **checked** [1] - 97:2
  **Chef's** [1] - 60:12
  **Cherokee** [1] - 154:8
  **Chicago** [3] - 60:11,
61:12, 61:23
  **chief** [3] - 10:11,
22:18, 23:1
  **chiefs** [2] - 11:15,
22:22

  **choice** [5] - 160:10,
160:15, 160:16,
160:18
  **choking** [2] - 111:6,
111:10
  **choose** [3] - 61:8,
77:21, 159:8
  **circumstance** [2] -
114:11, 145:14
  **circumstances** [41] -
12:19, 15:14, 15:17,
52:13, 53:19, 57:19,
57:21, 58:22, 87:10,
95:15, 96:5, 96:11,
96:21, 97:18, 97:20,
97:22, 97:23, 98:18,
99:3, 99:20, 100:7,
100:9, 100:18,
101:21, 101:22,
103:22, 113:7, 113:9,
114:12, 118:6, 118:7,
121:9, 123:20, 128:3,
128:7, 129:22, 133:4,
144:17, 146:6, 146:8,
146:22
  **Cirulli** [1] - 48:7
  **Cirullo** [1] - 48:7
  **citizen** [5] - 95:11,
107:14, 119:1,
120:19, 120:20
  **citizens** [3] - 62:1,
118:11, 118:15
  **city** [32] - 4:11, 8:1,
8:4, 16:19, 16:23,
25:11, 37:13, 38:16,
40:15, 55:20, 56:6,
60:4, 61:2, 61:3, 61:4,
61:6, 62:7, 67:2,
71:10, 71:13, 73:15,
74:7, 74:16, 74:20,
75:2, 76:22, 76:23,
77:5, 89:13, 157:23,
158:4, 162:16
  **City** [4] - 1:9, 2:13,
3:1, 30:17
  **civil** [1] - 4:14
  **Civil** [2] - 1:8, 2:3
  **claim** [4] - 37:13,
37:15, 38:17, 42:17
  **Claim** [10] - 38:1,
38:21, 39:21, 40:14,
40:20, 41:22, 42:2,
47:2, 50:3, 50:9
  **claimed** [5] - 59:4,
96:8, 100:19, 100:22,
154:20
  **claiming** [12] - 97:1,
97:10, 100:1, 100:4,
101:16, 107:20,
108:1, 108:10, 109:5,

4

110:2, 143:12, 146:13
**claims** [1] - 91:19
**clarification** [2] - 134:21, 137:21
**Class** [1] - 88:22
**class** [3] - 7:1, 111:8, 111:10
**classes** [4] - 6:11, 6:18, 7:2, 7:3
**clear** [6] - 69:23, 73:22, 86:2, 108:7, 118:14, 129:23
**clearly** [7] - 66:7, 66:10, 66:15, 66:8, 68:11, 70:6
**client** [3] - 39:13, 39:17, 79:4
**clients** [2] - 38:10, 39:16
**clip** [1] - 156:7
**close** [4] - 46:21, 121:19, 133:3, 143:2
**closed** [3] - 8:18, 8:19, 8:21
**coat** [2] - 120:2, 125:22
**college** [3] - 5:23, 6:1, 6:3
**collision** [12] - 60:1, 60:13, 60:21, 61:1, 100:14, 102:16, 105:2, 150:19, 152:14, 153:6, 153:11, 154:15
**combined** [1] - 8:22
**coming** [4] - 30:15, 92:5, 94:13, 103:7
**command** [5] - 10:17, 12:3, 22:15, 27:23, 52:23
**commence** [4] - 49:12, 49:15, 59:7, 64:10
**commenced** [2] - 45:8, 49:21
**commences** [1] - 50:4
**commencing** [5] - 2:5, 3:5, 37:12, 38:18, 40:2
**comment** [7] - 101:21, 113:15, 145:6, 147:10, 152:23, 153:14, 153:18
**comments** [1] - 131:15
**Commission** [1] - 79:13
**commissioner** [54] -

8:20, 10:22, 12:8, 12:10, 12:17, 13:7, 16:6, 16:8, 16:12, 16:16, 16:19, 17:2, 17:4, 17:11, 17:17, 17:20, 17:23, 18:3, 20:5, 20:14, 20:18, 20:21, 21:5, 21:12, 24:5, 25:3, 28:12, 29:14, 33:10, 33:14, 33:18, 33:19, 33:21, 33:23, 43:18, 49:18, 50:21, 68:4, 68:20, 69:6, 69:13, 70:6, 70:13, 75:11, 75:16, 81:7, 81:10, 81:12, 81:20, 84:5, 87:8, 148:9, 150:14, 153:20
**Commissioner** [7] - 1:11, 1:12, 5:17, 66:9, 71:17, 79:14, 148:6
**commissioners** [9] - 11:1, 11:8, 16:20, 18:6, 18:16, 20:15, 35:13, 66:3
**Common** [4] - 16:23, 17:7, 17:9, 19:16
**communicate** [2] - 55:22, 56:13
**communicated** [1] - 98:2
**communication** [2] - 55:10, 55:13
**community** [1] - 19:18
**company** [3] - 162:22, 162:23, 163:8
**compare** [2] - 138:10, 142:18
**compared** [1] - 161:22
**comparing** [1] - 139:2
**competent** [1] - 142:19
**complainant** [12] - 27:1, 36:3, 39:1, 40:7, 43:14, 45:5, 80:14, 80:18, 87:11, 108:1, 143:7, 147:1
**complainant's** [2] - 36:5, 45:2
**complainants** [4] - 27:7, 27:9, 36:15, 37:19
**complaining** [2] - 144:21, 145:3
**complaint** [27] - 24:23, 31:3, 38:15, 38:23, 39:22, 40:1,

40:2, 40:3, 40:9, 41:9, 41:11, 41:13, 41:16, 42:8, 47:4, 47:5, 49:6, 72:15, 87:17, 87:21, 96:22, 140:4, 140:11, 140:18, 142:23, 146:13, 156:18
**complaints** [5] - 37:2, 47:8, 65:12, 160:20, 161:1
**complete** [6] - 20:19, 40:6, 63:13, 63:21, 64:13, 65:2
**completed** [3] - 62:16, 62:18, 62:23
**completing** [2] - 64:9, 64:23
**comport** [1] - 142:23
**compromise** [1] - 157:17
**computer** [1] - 158:22
**computerized** [1] - 159:2
**concerned** [1] - 140:9
**concluded** [1] - 163:15
**conclusive** [1] - 86:22
**confer** [1] - 26:14
**conference** [1] - 80:8
**conflict** [5] - 34:10, 34:12, 34:13, 34:17, 34:21
**connecting** [1] - 38:15
**considered** [1] - 59:14
**consolidated** [1] - 8:20
**consolidating** [1] - 20:16
**contact** [9] - 85:20, 86:3, 90:12, 92:5, 96:1, 96:7, 105:4, 121:19, 156:3
**contacted** [2] - 47:22, 48:18
**contains** [3] - 149:10, 149:14, 166:7
**contents** [1] - 166:11
**context** [1] - 151:1
**continue** [1] - 68:21
**contract** [16] - 29:16, 73:15, 73:17, 75:9, 75:13, 75:20, 75:21, 76:3, 76:4, 76:7, 76:12, 76:15, 76:18, 76:21, 77:3, 77:7

**contracts** [3] - 75:2, 75:4, 75:18
**control** [5] - 11:4, 127:20, 129:9, 129:15, 129:17
**conversation** [1] - 39:10
**convoluted** [1] - 10:12
**cooperate** [1] - 40:7
**cooperation** [1] - 39:1
**Copy** [1] - 166:11
**Corporation** [3] - 1:10, 2:12, 2:13
**corporation** [1] - 70:12
**correct** [79] - 6:17, 7:13, 7:22, 11:6, 13:17, 14:21, 15:11, 15:14, 17:8, 17:18, 17:21, 20:12, 21:2, 25:14, 25:15, 25:22, 26:7, 27:7, 28:1, 28:18, 28:19, 31:4, 33:3, 33:10, 33:11, 34:5, 36:5, 37:10, 39:15, 43:10, 45:6, 45:15, 45:16, 46:17, 46:18, 55:8, 56:11, 62:5, 62:8, 63:1, 63:11, 65:18, 69:1, 76:14, 79:17, 88:16, 89:7, 89:19, 92:7, 104:11, 105:4, 109:18, 115:10, 117:2, 117:5, 119:3, 119:9, 119:10, 121:18, 125:19, 125:23, 126:16, 129:12, 131:10, 131:13, 135:13, 136:17, 137:23, 138:12, 138:23, 150:15, 153:8, 153:23, 154:4, 159:9, 159:11, 160:14, 161:19, 163:10
**Corrected** [2] - 44:17, 166:5
**correctly** [2] - 64:22, 93:8
**Council** [9] - 16:23, 17:3, 17:4, 17:7, 17:9, 18:2, 19:7, 19:13, 19:16
**counsel** [8] - 3:12, 25:3, 25:13, 26:14, 26:18, 35:12, 70:12, 166:11

**Counsel** [5] - 1:10, 2:12, 2:13, 3:11, 166:11
**counselor** [1] - 25:10
**count** [1] - 53:16
**counted** [1] - 53:18
**COUNTY** [1] - 165:3
**couple** [8] - 6:8, 7:2, 20:15, 25:19, 29:13, 46:11, 68:10, 85:9
**course** [4] - 112:4, 112:12, 150:9, 152:13
**courses** [5] - 5:23, 6:3, 6:8, 6:9, 6:22
**COURT** [1] - 1:3
**Court** [1] - 2:22
**court** [3] - 3:7, 35:16, 80:12
**COVID** [1] - 41:13
**credible** [1] - 151:20
**creditable** [1] - 92:13
**crime** [7] - 19:18, 24:6, 24:8, 24:10, 24:12, 88:13, 88:18
**criminal** [15] - 6:20, 49:2, 49:4, 49:6, 53:18, 59:12, 59:19, 88:2, 88:22, 89:3, 89:10, 89:21, 90:17, 152:17, 154:19
**criminally** [1] - 87:18
**CUNNINGHAM** [1] - 2:7
**custodian** [2] - 138:13, 142:6
**custody** [1] - 99:22
**cycle** [4] - 157:23, 158:4, 158:10, 158:14

**D**

**D-District** [5] - 9:12, 9:16, 9:18, 161:6, 161:10
**damage** [18] - 15:20, 54:1, 59:5, 59:19, 59:21, 60:1, 87:12, 89:6, 89:11, 89:12, 89:15, 89:18, 90:2, 90:7, 91:12, 96:6, 96:14
**damaged** [2] - 53:16, 53:22
**damaging** [1] - 59:11
**dan** [1] - 5:18
**Dan** [12] - 5:19, 5:20, 88:8, 137:12, 139:23, 142:21, 147:23, 149:20, 149:22, 151:12, 156:12

5

Daniel [1] - 2:20
daniel [1] - 5:18
DANIEL [5] - 1:1, 1:12, 2:1, 164:9, 167:3
date [15] - 34:11, 42:7, 45:12, 46:16, 47:6, 52:3, 68:1, 75:15, 76:10, 88:17, 102:20, 140:3, 140:5, 140:6, 140:9
dated [4] - 42:23, 44:19, 166:4, 166:6
dates [1] - 102:18
DAVENPORT [133] - 2:8, 3:14, 4:5, 12:14, 13:4, 14:13, 37:22, 39:8, 43:1, 44:3, 44:7, 44:12, 44:14, 44:20, 57:20, 58:10, 59:2, 59:17, 65:10, 67:20, 68:5, 69:1, 69:19, 70:1, 82:5, 82:14, 82:19, 83:5, 83:9, 85:13, 85:21, 86:20, 87:6, 88:6, 90:13, 91:7, 92:3, 92:19, 94:23, 95:5, 95:20, 97:5, 97:13, 98:9, 98:19, 99:11, 100:11, 100:21, 101:23, 102:19, 103:1, 104:4, 104:11, 104:19, 104:22, 104:23, 105:17, 106:17, 107:4, 109:22, 110:17, 112:22, 113:18, 114:16, 115:2, 115:11, 115:22, 116:5, 116:17, 117:14, 117:23, 118:8, 119:4, 120:23, 121:10, 121:23, 122:14, 123:22, 124:7, 127:14, 128:10, 128:20, 132:21, 133:2, 133:8, 135:10, 136:1, 136:12, 136:14, 136:23, 137:6, 137:23, 138:4, 138:12, 138:15, 138:23, 139:4, 139:8, 139:12, 141:8, 142:8, 142:20, 144:1, 144:9, 144:19, 145:8, 145:16, 145:23, 146:11, 146:20, 147:22, 148:23, 149:3, 149:13,

149:21, 150:23, 151:5, 151:8, 151:11, 151:19, 152:3, 152:10, 153:2, 153:19, 155:11, 155:17, 155:22, 156:4, 156:11, 162:1, 162:5, 163:11, 167:3
Davenport [2] - 3:14, 4:9
davenport@ ruppbaase.com [1] - 2:10
DAVID [1] - 1:17
DAVIES [2] - 2:6, 165:19
Davies [1] - 3:9
day-to-day [2] - 33:22
days [5] - 3:20, 54:18, 67:8, 67:9, 71:4
death [2] - 14:17, 15:18
December [5] - 45:13, 46:7, 46:14, 46:16, 47:4
decided [1] - 146:1
decision [2] - 18:1, 25:6
Defendant [1] - 2:2
defendant [1] - 3:12
Defendants [2] - 1:20, 2:15
defendants [1] - 3:17
defined [1] - 130:2
definite [1] - 130:7
definitely [2] - 36:4, 90:3
definitive [2] - 100:10, 155:10
degree [1] - 6:1
Deliberately [1] - 54:1
deliberately [1] - 59:10
Department [6] - 1:11, 1:13, 8:5, 73:16, 89:13, 158:5
department [18] - 11:19, 25:1, 36:18, 37:1, 60:7, 62:4, 64:2, 73:9, 79:12, 79:15, 79:16, 79:19, 157:20, 158:21, 159:3, 159:5, 162:13, 162:22
departmental [1] - 36:21
departments [3] - 20:7, 74:14, 162:16

dependant [1] - 57:10
deponent [1] - 165:13
DEPOSITION [1] - 1:1
Deposition [1] - 163:15
deposition [14] - 2:1, 5:16, 41:6, 41:18, 68:9, 149:11, 149:15, 149:18, 149:20, 155:19, 165:7, 165:9, 165:11, 166:8
deputies [1] - 52:20
Deputy [3] - 71:17, 71:19, 79:14
deputy [20] - 10:22, 11:1, 11:7, 11:12, 11:16, 13:7, 16:7, 16:20, 17:3, 25:2, 33:6, 33:9, 33:14, 33:17, 33:21, 33:23, 35:13, 49:18, 70:13, 79:22
Derenda [12] - 2:20, 4:7, 5:15, 5:17, 5:18, 43:2, 70:2, 82:20, 83:13, 85:14, 92:20, 149:20
DERENDA [5] - 1:1, 1:12, 2:1, 164:9, 167:3
describe [1] - 85:10
Description [1] - 166:2
detailed [1] - 113:11
detained [5] - 115:7, 115:10, 121:12, 121:15, 144:12
detective [15] - 9:11, 9:18, 9:19, 9:20, 10:3, 10:6, 10:8, 10:11, 10:13, 10:14, 10:19, 11:12, 11:17, 11:19
detectives [3] - 10:12, 28:6, 28:9
determination [10] - 26:15, 32:20, 33:7, 34:6, 35:14, 47:14, 67:2, 70:14, 77:19, 79:5
determine [2] - 33:2, 67:10
determined [6] - 66:9, 66:11, 81:11, 81:12, 81:20, 160:5
dictate [3] - 58:23, 114:12, 114:13
dictates [1] - 108:13

difference [5] - 10:5, 65:16, 65:19, 130:1, 154:10
different [22] - 4:19, 7:23, 13:20, 19:18, 21:16, 24:8, 24:13, 24:15, 25:19, 30:1, 61:10, 62:19, 75:7, 77:2, 89:23, 96:21, 103:18, 111:6, 111:19, 111:20, 111:21, 120:11
difficult [4] - 76:4, 95:1, 95:9, 153:17
Diina [1] - 20:17
direction [3] - 48:20, 48:22, 165:11
director [1] - 163:3
disagree [1] - 124:18
disc [1] - 124:2
disciplinary [1] - 24:17
discipline [9] - 63:13, 63:20, 63:23, 64:20, 73:13, 77:20, 113:4, 146:17, 147:12
disciplined [2] - 63:17, 70:22
discretion [2] - 18:11, 31:14
discs [1] - 142:18
discuss [2] - 57:8, 117:9
dispatch [1] - 140:13
dispose [4] - 158:18, 159:4, 159:6, 159:8
disposition [3] - 66:12, 156:17, 157:20
distance [1] - 105:10
District [32] - 2:21, 2:22, 9:12, 9:16, 9:18, 21:18, 21:19, 22:3, 22:4, 22:7, 22:12, 23:6, 23:18, 65:6, 148:18, 150:13, 160:1, 160:2, 161:2, 161:4, 161:6, 161:9, 161:10, 161:12, 161:16, 161:17, 161:21, 161:22, 162:4
district [18] - 8:12, 8:21, 10:15, 11:15, 20:10, 20:12, 21:18, 22:19, 23:1, 23:5, 49:5, 159:13, 159:20, 159:22, 160:12, 161:2, 161:4, 163:5
DISTRICT [2] - 1:3, 1:4
districts [17] - 7:23,

11:14, 20:6, 20:20, 20:23, 21:1, 21:3, 21:8, 21:10, 21:11, 22:18, 24:7, 131:4, 159:15, 160:20, 160:22, 161:1
divided [1] - 21:15
Division [4] - 42:22, 44:18, 166:3, 166:5
division [4] - 10:11, 10:19, 11:17, 11:19
DO [1] - 165:5
doctor [1] - 108:20
document [18] - 43:4, 43:6, 43:8, 43:9, 43:11, 69:2, 69:8, 69:11, 69:12, 69:15, 88:9, 88:10, 88:11, 140:1, 157:23, 158:3, 158:10, 158:14
documents [3] - 41:7, 43:10, 158:15
DOE(S [1] - 1:18
done [15] - 38:4, 38:5, 49:4, 49:7, 59:5, 59:21, 63:2, 78:6, 92:1, 94:4, 94:6, 97:7, 129:21
dormant [1] - 40:23
down [39] - 9:22, 22:21, 52:22, 52:23, 56:17, 60:8, 62:20, 63:3, 63:10, 72:7, 107:14, 114:18, 121:4, 121:8, 121:12, 121:16, 121:21, 131:21, 132:3, 132:7, 132:11, 132:12, 132:16, 132:20, 133:1, 133:7, 133:10, 133:11, 133:12, 133:18, 133:21, 133:23, 149:16, 156:22, 157:3, 157:5, 160:14, 165:8
dozen [1] - 4:18
dragged [2] - 119:14, 121:2
drive [10] - 94:18, 143:15, 145:18, 146:1, 146:3, 146:16, 149:9, 149:14, 166:7, 166:12
driver [2] - 94:6, 107:8
driver's [13] - 89:16, 92:11, 93:1, 93:2, 93:9, 93:13, 151:15, 151:22, 152:6, 153:11, 153:21,

6

154:2, 154:18
**drives** [1] - 135:2
**driving** [15] - 57:14,
62:17, 91:14, 92:6,
93:20, 93:21, 93:23,
94:2, 94:8, 94:16,
95:8, 144:22, 145:4,
145:9, 146:2
**drug** [13] - 28:22,
29:1, 29:4, 29:6, 29:8,
30:5, 30:6, 30:17,
30:20, 30:23, 31:6,
31:9
**drugs** [1] - 29:21
**due** [2] - 34:21,
104:16
**duly** [2] - 4:2, 165:13
**during** [43] - 5:16,
9:3, 19:15, 20:19,
21:8, 21:12, 24:21,
28:11, 29:11, 31:19,
32:6, 33:15, 33:18,
35:3, 43:17, 50:20,
55:1, 60:7, 68:9, 70:5,
71:11, 71:18, 75:10,
76:13, 76:16, 80:23,
82:22, 83:16, 83:19,
84:5, 85:14, 87:16,
90:15, 91:8, 102:2,
106:7, 110:19, 111:3,
118:10, 147:18,
148:5, 155:12, 160:19
**duties** [2] - 147:18,
150:9

**E**

**E-District** [2] - 160:2,
161:16
**ear** [1] - 126:6
**easier** [2] - 94:17,
125:4
**easily** [1] - 44:11
**ECC** [5] - 6:4, 6:6,
6:11, 6:19, 6:23
**ECMC** [16] - 99:15,
100:15, 101:4,
140:18, 140:19,
141:3, 141:6, 143:16,
144:23, 145:4,
145:10, 145:19,
146:2, 146:7, 146:16
**educational** [1] -
5:20
**Educational** [1] -
5:22
**eight** [1] - 44:11
**either** [5] - 33:12,
63:4, 97:21, 98:6,
130:2

**elapsed** [4] - 142:2,
142:11, 142:22, 143:1
**elements** [2] - 59:18,
89:21
**emergency** [2] -
97:8, 114:11
**Emerson** [1] -
124:10
**employee** [1] - 78:17
**employees** [1] - 77:1
**employment** [1] -
162:18
**end** [4] - 39:4, 82:2,
105:12, 111:14
**ended** [1] - 76:21
**engage** [1] - 117:9
**engaging** [1] -
116:10
**England** [1] - 163:4
**entailed** [1] - 76:20
**entire** [4] - 33:18,
50:20, 92:9, 155:12
**entirely** [1] - 69:23
**entitled** [3] - 72:9,
164:5, 165:12
**equally** [1] - 118:19
**ERIE** [1] - 165:3
**errata** [1] - 164:3
**especially** [1] - 54:17
**ESQ** [3] - 2:8, 2:11,
2:12
**established** [1] -
66:1
**estimate** [6] - 14:3,
14:5, 59:23, 60:3,
60:13, 105:9
**et** [1] - 3:1
**evidence** [21] - 26:6,
26:9, 26:12, 27:10,
32:9, 33:1, 35:2, 35:4,
35:6, 35:9, 35:14,
35:17, 35:21, 40:11,
66:10, 67:14, 72:14,
81:11, 81:21, 91:22,
92:2
**exactly** [8] - 19:13,
76:19, 103:13,
112:18, 116:3, 122:7,
126:23, 129:4
**exam** [1] - 160:6
**EXAMINATION** [1] -
4:5
**Examination** [1] -
167:2
**examination** [1] -
165:13
**example** [1] - 159:23
**except** [1] - 164:2
**exclusively** [1] - 62:3
**excuse** [5] - 11:12,

100:12, 105:19,
151:6, 161:13
**EXH** [8] - 42:21,
44:18, 149:9, 166:3,
166:5, 166:6, 166:7
**Exhibit** [14] - 43:3,
66:5, 68:21, 81:3,
83:10, 83:11, 88:8,
124:9, 137:8, 139:23,
141:10, 149:14,
166:2, 166:11
**exhibit** [1] - 44:4,
67:19, 83:7, 148:22,
166:11
**EXHIBITS** [1] - 166:1
**exist** [1] - 47:12
**expect** [16] - 35:22,
36:2, 53:8, 55:22,
57:4, 57:13, 57:17,
58:3, 58:7, 58:16,
86:12, 91:9, 96:2,
96:16, 97:14, 98:1
**expected** [1] - 54:4
**experience** [1] -
112:2
**explain** [1] - 66:18
**explanation** [1] -
144:8
**extent** [3] - 100:18,
100:19, 113:12

**F**

**facility** [1] - 99:10
**fact** [2] - 160:23,
162:4
**facts** [5] - 12:19,
59:1, 143:19, 147:12,
147:14
**failure** [1] - 64:18
**fair** [1] - 45:4
**familiar** [6] - 23:23,
93:5, 147:23, 153:21,
154:1, 157:22
**far** [4] - 85:5, 152:21,
153:16, 154:12
**faster** [2] - 99:15,
99:21
**February** [4] - 10:21,
16:9, 19:14, 149:18
**Federal** [1] - 2:2
**feet** [1] - 85:4
**felony** [2] - 88:23,
90:16
**felt** [1] - 133:20
**Ferry** [1] - 21:20
**few** [6] - 9:20, 13:17,
29:8, 29:15, 76:21,
85:4
**field** [1] - 159:17

**fight** [5] - 67:9,
129:15, 129:16,
130:1, 130:3
**fighting** [4] - 129:3,
129:8, 129:9, 130:13
**file** [4] - 36:1, 37:20,
83:8, 159:1
**filed** [12] - 24:23,
37:13, 37:16, 38:16,
40:14, 41:23, 42:3,
42:8, 42:11, 47:2,
47:6, 50:3
**files** [2] - 31:22,
31:23
**filing** [2] - 38:1,
38:17
**fill** [7] - 62:10, 63:6,
63:10, 64:18, 128:22,
130:14, 160:3
**filled** [1] - 129:7,
131:1, 160:17
**filling** [2] - 65:5,
65:13
**Fillmore** [1] - 21:20
**final** [3] - 32:20,
67:2, 77:19
**finally** [1] - 29:7
**findings** [4] - 66:2,
77:21, 78:2, 81:4
**fine** [3] - 5:19, 44:14,
148:23
**finish** [3] - 4:21,
73:20, 158:8
**firm** [2] - 3:8, 3:10
**first** [26] - 20:21,
37:17, 45:18, 46:5,
48:9, 83:6, 83:18,
85:9, 85:14, 89:9,
104:6, 107:13,
107:16, 110:20,
110:21, 111:3, 111:6,
111:7, 111:17, 112:4,
112:12, 138:6,
139:16, 140:12,
160:2, 160:15
**five** [6] - 11:14,
20:22, 20:23, 102:6,
136:5, 160:1
**fix** [1] - 60:5
**flash** [3] - 149:9,
149:14, 166:7
**flip** [1] - 45:23
**focus** [2] - 106:3,
107:6
**focusing** [1] - 115:17
**follow** [1] - 111:1
**followed** [1] - 3:12
**following** [4] - 7:9,
42:20, 44:16, 149:8
**follows** [1] - 4:3

**footage** [3] - 124:10,
134:10, 149:19
**force** [15] - 127:19,
127:23, 128:12,
128:19, 128:22,
129:1, 129:2, 129:8,
130:4, 130:7, 130:10,
130:13, 130:19,
130:22, 130:23
**foregoing** [2] -
164:2, 165:7, 165:12
**form** [108] - 12:11,
13:3, 14:11, 37:14,
38:19, 57:16, 58:6,
58:21, 59:8, 62:13,
62:15, 62:23, 63:7,
63:9, 63:13, 65:7,
67:16, 68:7, 68:16,
69:22, 82:4, 83:2,
85:12, 85:16, 86:14,
87:3, 88:3, 90:9,
90:19, 91:20, 92:14,
94:20, 95:3, 95:12,
96:18, 98:8, 98:13,
99:1, 99:18, 100:16,
101:5, 102:17,
103:10, 105:13,
106:11, 107:1,
109:10, 110:9,
110:10, 112:17,
113:5, 113:23,
114:20, 115:8,
115:19, 116:14,
117:11, 117:18,
118:4, 118:23,
120:21, 121:5,
121:17, 122:5, 123:2,
123:18, 127:9, 128:9,
128:14, 128:21,
129:6, 130:12,
130:13, 130:18,
130:23, 131:9,
131:17, 132:17,
133:2, 135:8, 135:21,
136:9, 138:8, 139:6,
141:4, 142:4, 142:12,
143:17, 144:5,
144:15, 145:1,
145:12, 145:20,
146:4, 146:18,
147:19, 148:20,
151:3, 151:17, 152:1,
152:8, 152:18,
153:13, 154:21,
155:16, 156:1, 161:23
**Form** [1] - 150:22
**formal** [1] - 157:12
**formed** [1] - 91:10
**forms** [1] - 62:11
**forth** [1] - 164:3

**forward** [2] - 131:10, 138:1
**four** [7] - 16:17, 18:8, 18:13, 18:14, 18:16, 18:18, 18:19
**four-year** [1] - 18:13
**fourth** [1] - 141:10
**frame** [1] - 125:15
**front** [9] - 67:13, 88:9, 92:17, 105:10, 108:4, 108:13, 109:14, 150:19, 154:23
**frozen** [1] - 125:15
**full** [2] - 17:17, 92:17
**full-time** [1] - 17:17

## G

**G4S** [1] - 162:23
**gained** [1] - 30:12
**garage** [9] - 60:5, 60:6, 60:8, 60:10, 60:14, 61:12, 62:5, 62:10
**general** [4] - 93:5, 112:11, 158:15, 163:1
**generally** [16] - 21:14, 21:15, 24:6, 25:13, 25:16, 25:18, 28:21, 36:7, 37:16, 40:21, 54:17, 55:1, 71:16, 85:10, 140:1, 154:1
**Genesee** [1] - 21:23
**Gibson** [1] - 16:14
**Gil** [2] - 20:16, 20:17
**girlfriend** [1] - 111:9
**given** [3] - 4:13, 4:17, 164:5
**grab** [1] - 125:21
**grabbed** [1] - 129:20
**grad** [1] - 5:23
**graduate** [1] - 159:16
**graduated** [3] - 7:16, 7:20, 159:19
**gray** [2] - 134:12, 134:14
**ground** [14] - 4:20, 89:15, 107:15, 108:15, 109:9, 110:3, 110:6, 110:14, 112:8, 112:16, 113:1, 114:18, 114:23, 130:5
**group** [1] - 13:19
**guess** [11] - 40:7, 49:22, 57:9, 57:18, 58:20, 58:22, 63:2, 63:22, 66:3, 133:16, 154:12

**guide** [1] - 128:16
**guiding** [2] - 119:21, 120:3
**guilty** [1] - 78:22
**guy** [2] - 108:18, 129:18

## H

**half** [9] - 4:18, 73:2, 105:16, 105:20, 135:17, 135:23, 138:2, 146:15, 153:5
**Hall** [2] - 2:13, 30:17
**hand** [7] - 48:12, 124:20, 125:5, 126:4, 126:19, 128:18, 132:5
**handcuff** [1] - 130:5
**handcuffed** [3] - 48:13, 115:5, 115:9
**handle** [4] - 34:15, 61:14, 64:19, 64:21
**handling** [1] - 73:13
**hands** [1] - 119:19
**hang** [1] - 68:16
**happy** [2] - 5:4, 5:7
**harder** [1] - 94:18
**Harry** [6] - 50:18, 50:23, 51:4, 51:8, 51:14, 51:18
**Hartford** [1] - 163:6
**hate** [1] - 155:8
**head** [2] - 5:2, 65:14, 80:10, 96:16, 97:16, 97:19, 98:22, 100:23, 107:20, 108:10, 108:16, 108:18, 109:6, 109:7, 109:18, 110:1, 112:7, 112:11, 112:15, 113:1, 113:3, 113:20, 114:4, 133:5, 143:13, 144:22, 145:3, 145:18, 146:15
**headache** [5] - 97:19, 99:21, 108:19, 109:13, 147:6
**Headquarters** [1] - 9:23
**health** [5] - 96:3, 96:17, 97:6, 108:11, 108:12
**heard** [4] - 24:2, 109:20, 148:12, 155:23
**hearing** [29] - 17:5, 19:14, 70:18, 71:2, 71:5, 72:5, 73:10, 77:15, 77:22, 78:5, 78:9, 78:19, 78:21,

79:6, 79:9, 79:12, 80:9, 80:12, 80:23, 81:13, 81:15, 108:6, 109:4, 109:12, 156:23, 157:12, 157:16
**hearings** [7] - 71:17, 71:19, 72:5, 72:8, 74:17, 77:18, 157:1
**hears** [1] - 37:17
**heart** [1] - 142:5
**hereby** [1] - 164:1
**HEREBY** [1] - 165:5
**Hertel** [1] - 9:13
**high** [2] - 5:22, 48:5
**higher** [1] - 157:4
**highly** [1] - 54:22
**himself** [27] - 53:9, 53:10, 53:14, 57:12, 57:15, 58:1, 58:4, 58:9, 58:13, 58:18, 58:19, 59:3, 59:10, 85:23, 86:9, 86:18, 86:23, 88:1, 92:12, 96:23, 132:3, 132:11, 133:11, 133:12, 133:23, 155:14, 156:6
**hired** [3] - 30:8, 30:18, 62:6
**his/their** [1] - 1:18
**hit** [5] - 108:18, 122:22, 140:13, 140:14, 141:2
**Hochul** [1] - 48:16
**hold** [3] - 49:3, 49:6, 162:18
**holding** [1] - 120:2
**home** [1] - 55:15
**homicide** [3] - 10:2, 10:4, 11:21
**Hopefully** [1] - 124:2
**hospital** [10] - 98:7, 98:17, 100:2, 100:4, 101:15, 102:23, 103:16, 103:20, 143:21, 147:8
**hour** [4] - 146:15, 151:7, 151:9, 155:19
**hours** [2] - 55:1, 55:11
**house** [7] - 64:21, 102:6, 105:15, 105:16, 105:19, 153:5, 154:16
**houses** [1] - 105:21
**HR** [1] - 30:17
**HUGGINS** [115] - 2:12, 3:16, 3:20, 12:11, 12:13, 13:3, 14:11, 37:14, 38:19,

44:2, 44:4, 44:9, 57:16, 58:6, 58:21, 59:8, 65:7, 67:16, 67:22, 68:16, 69:7, 69:17, 69:21, 82:4, 82:12, 83:2, 83:7, 85:12, 85:16, 86:14, 87:3, 88:3, 90:9, 90:19, 91:20, 92:14, 94:20, 95:3, 95:12, 96:18, 98:8, 98:13, 99:1, 99:18, 100:16, 101:5, 102:17, 103:10, 104:9, 104:15, 104:20, 105:13, 106:11, 107:1, 109:10, 110:9, 112:17, 113:5, 113:23, 114:20, 115:8, 115:19, 116:14, 117:11, 117:18, 118:4, 118:23, 120:21, 121:5, 121:17, 122:5, 123:2, 123:10, 123:18, 127:9, 128:9, 128:14, 132:17, 135:8, 135:21, 136:9, 137:21, 138:8, 138:10, 138:13, 138:20, 139:1, 139:6, 141:4, 142:4, 142:12, 143:17, 144:5, 144:15, 145:1, 145:12, 145:20, 146:4, 146:18, 147:19, 148:20, 149:1, 150:22, 151:3, 151:7, 151:17, 152:1, 152:8, 152:18, 153:13, 154:21, 155:16, 155:18, 156:1, 161:23
**Huggins** [2] - 3:16, 166:12
**HUNT** [1] - 2:3
**Hunt** [1] - 3:8
**hunt** [1] - 3:3
**hurt** [2] - 98:22, 108:2
**hurting** [2] - 96:16, 97:16

## I

**IAD** [1] - 15:9
**idea** [1] - 22:10
**Identification** [3] - 42:20, 44:16, 149:8
**identify** [3] - 83:7,

95:2, 95:10
**image** [3] - 94:19, 94:21, 95:2
**images** [1] - 94:17
**imagine** [1] - 158:16
**immediate** [2] - 114:6, 114:9
**immediately** [3] - 47:21, 59:7, 143:21
**impose** [1] - 78:23
**in-house** [1] - 64:21
**inappropriate** [6] - 110:13, 114:17, 114:22, 115:1, 123:11, 123:16
**INC** [1] - 2:4
**incident** [4] - 4:12, 47:20, 48:6, 102:4
**include** [1] - 80:13
**Inconclusive** [1] - 106:12
**inconclusive** [11] - 86:6, 86:9, 86:17, 87:5, 87:15, 88:5, 90:11, 96:13, 106:23, 116:3, 127:22
**INDEX** [2] - 166:1, 167:1
**indicated** [1] - 3:6
**individual** [104] - 37:8, 48:3, 53:9, 53:14, 53:22, 57:10, 58:1, 59:3, 61:21, 64:8, 84:8, 84:11, 84:18, 85:17, 85:23, 86:11, 88:12, 88:15, 90:16, 93:12, 95:6, 95:23, 96:3, 96:15, 98:21, 98:22, 99:15, 100:14, 100:22, 101:3, 103:20, 106:1, 106:3, 106:4, 106:20, 107:23, 109:5, 112:7, 112:15, 113:1, 113:10, 113:13, 113:17, 113:20, 113:22, 114:18, 115:12, 116:7, 116:10, 116:12, 116:19, 116:21, 117:1, 117:3, 117:8, 118:1, 119:7, 119:13, 119:16, 119:20, 120:6, 120:15, 121:2, 121:14, 121:22, 122:4, 122:8, 122:16, 122:18, 122:20, 122:21, 124:12, 124:16, 125:21, 126:10, 126:15,

126:18, 127:8,
127:18, 128:2,
128:12, 128:23,
129:8, 129:11,
130:14, 131:22,
132:2, 132:11,
132:12, 132:15,
133:1, 133:23,
143:12, 143:16,
144:20, 145:10,
145:19, 146:1,
146:14, 147:13,
147:15, 150:1,
153:12, 159:7
**individual's** [4] -
110:1, 123:1, 127:11,
145:18
**individually** [8] -
1:10, 1:12, 1:13, 1:14,
1:15, 1:16, 1:17, 1:18
**individuals** [5] -
61:18, 98:10, 102:15,
133:10, 133:17
**informal** [3] - 78:19,
78:21, 80:12
**information** [3] -
40:3, 40:23, 41:2
**initial** [4] - 9:5,
30:14, 100:13, 131:14
**initiate** [2] - 37:2,
50:10
**initiated** [10] - 24:23,
36:17, 36:23, 45:9,
45:13, 47:4, 47:21,
47:23, 48:4, 131:18
**initiation** [1] - 36:21
**injured** [9] - 87:11,
96:13, 96:14, 96:19,
98:5, 99:4, 99:5,
146:7, 147:6
**injuries** [4] - 100:18,
100:19, 101:2, 113:12
**injury** [38] - 14:17,
15:13, 15:19, 96:8,
97:1, 97:10, 100:23,
101:7, 101:16,
107:20, 108:2,
108:10, 108:23,
109:1, 109:6, 109:7,
109:18, 110:1, 110:5,
110:11, 112:7,
112:11, 112:15,
113:1, 113:3, 113:20,
114:2, 114:3, 114:4,
143:13, 144:22,
145:3, 145:14,
145:18, 145:22,
146:15, 147:3, 147:4
**input** [3] - 16:22,
75:5, 75:6

**inspector** [24] -
10:15, 13:13, 13:15,
26:22, 27:14, 27:22,
28:17, 31:16, 32:5,
32:8, 32:12, 49:17,
49:21, 50:15, 50:17,
50:20, 51:3, 51:6,
51:9, 51:12, 51:14,
51:17, 52:21, 70:13
**inspectors** [3] -
13:18, 27:16, 35:12
**instead** [1] - 76:11
**insufficient** [1] -
81:16
**intent** [6] - 89:11,
89:12, 89:18, 90:3,
90:7, 91:11
**intentionally** [3] -
87:23, 155:14, 156:6
**interaction** [3] -
120:14, 151:21,
154:17
**interactions** [2] -
122:2, 127:17
**interest** [2] - 34:13,
34:17
**interim** [3] - 16:10,
17:20, 17:23
**internal** [4] - 42:22,
44:18, 166:3, 166:5
**internal** [103] - 15:4,
15:23, 24:19, 24:21,
26:10, 26:18, 26:22,
27:4, 27:12, 27:15,
27:20, 28:5, 30:4,
30:19, 30:21, 30:23,
31:8, 31:10, 31:16,
31:18, 31:19, 32:3,
32:6, 32:16, 34:8,
35:3, 35:12, 35:20,
35:22, 37:4, 37:8,
37:12, 37:17, 37:20,
37:21, 38:2, 38:18,
39:11, 39:18, 39:22,
40:15, 42:16, 43:19,
43:22, 45:8, 46:23,
47:7, 47:10, 47:15,
49:3, 49:7, 49:13,
49:15, 49:17, 49:19,
50:3, 50:14, 50:16,
50:19, 51:2, 51:4,
51:23, 52:9, 52:13,
53:6, 53:8, 53:21,
54:15, 54:23, 57:6,
57:9, 64:4, 64:6,
64:10, 65:12, 70:12,
70:17, 72:14, 72:15,
77:8, 77:10, 77:13,
78:20, 86:23, 87:8,
90:15, 91:8, 99:12.

131:2, 131:11,
146:12, 148:13,
148:15, 150:10,
156:13, 156:18,
157:10, 158:6, 158:9,
158:10, 160:20
**interpret** [3] - 69:8,
69:10, 69:14
**interpreting** [1] -
67:19
**interrupting** [1] -
44:2
**interview** [2] - 27:6,
40:8
**interviewed** [1] -
27:9
**introduce** [1] - 3:11
**investigate** [7] -
14:10, 14:23, 25:1,
38:9, 38:22, 49:1,
54:5
**investigated** [6] -
34:23, 35:7, 47:3,
47:7, 52:16, 148:18
**investigating** [2] -
16:1, 49:5
**investigation** [44] -
11:20, 11:23, 12:6,
12:15, 12:23, 13:5,
13:23, 14:9, 14:18,
14:22, 15:7, 15:12,
24:23, 26:10, 31:11,
31:20, 37:21, 39:3,
40:6, 42:17, 46:23,
47:10, 47:16, 49:3,
49:7, 49:13, 49:15,
49:21, 50:4, 50:10,
52:1, 55:4, 55:18,
57:7, 57:9, 59:6, 59:9,
64:11, 72:15, 90:21,
92:17, 131:13,
131:14, 157:10
**investigations** [2] -
32:14, 54:23
**investigator** [8] -
26:11, 26:18, 27:5,
27:8, 36:10, 36:12,
49:20, 54:14
**investigators** [4] -
26:23, 38:11, 70:10,
90:22
**involved** [17] - 14:23,
15:3, 15:5, 15:10,
36:19, 36:20, 39:6,
51:22, 53:5, 53:13,
53:20, 54:7, 55:20,
55:21, 57:3, 148:17,
150:12
**involving** [3] - 12:21,
54:5, 82:22

**issue** [3] - 29:6,
113:3, 118:10
**issues** [6] - 19:18,
62:14, 99:22, 99:23
**It'** [1] - 110:10
**itself** [2] - 40:10,
142:15

**J**

**Jack** [2] - 3:3, 3:8
**JACK** [1] - 2:3
**James** [3] - 2:23,
44:21, 88:16
**JAMES** [2] - 1:6, 2:16
**January** [15] - 4:12,
16:9, 19:2, 19:5,
19:11, 19:13, 22:4,
29:19, 51:9, 68:2,
88:19, 102:19,
124:11, 140:9, 162:1
**Jeep** [1] - 154:8
**Jeffrey** [2] - 74:4,
74:5
**JENNY** [1] - 1:14
**Jim** [2] - 3:15, 4:10
**job** [3] - 12:1, 26:8,
61:21
**JOHN** [1] - 1:18
**John** [1] - 48:9
**judgment** [6] -
100:20, 101:12,
104:2, 109:16,
129:13, 155:4
**July** [4] - 8:7, 16:11,
17:16, 19:4
**justice** [1] - 6:21
**justified** [1] - 103:21

**K**

**Karl** [12] - 148:3,
148:11, 148:19,
149:11, 149:15,
150:2, 150:4, 150:7,
150:18, 151:2,
151:13, 166:8
**KARL** [1] - 1:15
**keep** [1] - 155:8
**Kerlikowske** [1] -
20:16
**kind** [1] - 68:6
**kinds** [3] - 19:16,
29:21, 111:2
**kistner** [1] - 84:22
**KISTNER** [2] - 1:6,
2:16
**Kistner** [23] - 2:23,
3:15, 4:10, 42:21,
44:17, 44:21, 45:5,

58:13, 82:22, 84:14,
84:19, 84:20, 86:22,
87:18, 87:23, 88:15,
88:16, 90:6, 91:11,
91:15, 92:4, 92:12,
102:16, 103:6, 105:3,
115:4, 152:14,
152:17, 154:15,
155:14, 156:5, 166:3,
166:5
**Kistner's** [2] - 42:17,
45:15
**kistner's** [1] - 58:12
**knowing** [3] - 34:21,
103:5, 157:4
**knowledge** [6] -
24:4, 32:11, 59:15,
91:4, 112:5, 143:19
**KYLE** [1] - 1:16
**Kyle** [1] - 150:18

**L**

**labeled** [1] - 149:17
**laid** [1] - 154:23
**language** [3] - 52:12,
68:12, 81:17
**large** [2] - 15:19,
154:2
**last** [16] - 12:5, 12:7,
13:3, 29:8, 29:13,
29:15, 44:4, 46:11,
46:12, 67:16, 82:4,
98:8, 110:9, 123:18,
128:9, 136:9
**LAUREN** [1] - 1:13
**Lauren** [1] - 150:20
**law** [2] - 77:17, 159:5
**lawsuit** [10] - 37:20,
38:11, 38:13, 38:15,
39:4, 39:9, 39:22,
40:1, 40:2, 40:20
**laying** [1] - 35:17,
108:15
**layout** [1] - 93:6
**lead** [2] - 127:18,
128:4
**learn** [3] - 111:2,
111:5, 112:14
**learned** [2] - 112:23,
152:12
**least** [3] - 4:18,
119:21, 153:5
**leave** [3] - 62:15,
135:15, 137:20
**leaving** [2] - 19:8,
162:16
**led** [5] - 119:14,
121:2, 122:8, 122:16,
127:6

**left** [14] - 19:2, 20:17, 21:4, 29:8, 29:13, 51:18, 52:8, 85:18, 106:4, 126:14, 135:20, 141:7, 162:21, 163:10
**legal** [5] - 25:3, 25:10, 26:14, 26:18, 35:12
**length** [1] - 105:16
**lengths** [4] - 105:15, 105:20, 153:5, 154:16
**less** [3] - 14:14, 95:14, 95:18
**LETITIA** [2] - 2:6, 165:19
**Letitia** [1] - 3:9
**Letter** [4] - 42:21, 44:17, 166:3, 166:5
**letter** [6] - 43:13, 43:16, 43:21, 44:22, 46:23, 81:14
**level** [2] - 130:11, 130:21
**Liberty** [3] - 2:4, 2:8, 3:3
**lieutenant** [29] - 13:10, 22:16, 23:14, 28:3, 28:5, 31:18, 31:21, 32:2, 54:8, 54:9, 54:12, 54:16, 55:14, 55:16, 55:23, 56:16, 57:2, 57:4, 57:11, 57:13, 57:21, 58:3, 58:11, 58:16, 62:23, 63:3, 64:19, 131:14
**lieutenants** [13] - 10:15, 10:16, 22:20, 23:10, 23:12, 23:17, 23:20, 28:7, 28:9, 32:13, 52:23, 54:4, 131:3
**life** [1] - 111:11
**line** [3] - 12:5, 12:7, 89:9
**lines** [1] - 36:23
**list** [2] - 60:20, 61:9
**listed** [4] - 44:22, 45:2, 135:11, 141:11
**listened** [1] - 155:17
**litigation** [1] - 152:13
**LLC** [1] - 2:7
**load** [1] - 124:1
**location** [4] - 102:3, 140:17, 140:19, 141:5
**locations** [3] - 61:10, 102:4, 102:14
**LOCKWOOD** [1] - 1:10

**Lockwood** [6] - 33:13, 33:15, 34:7, 34:21, 71:17, 71:19
**lockwood** [3] - 33:17, 33:23, 50:1
**Lockwood's** [4] - 79:13, 79:14, 80:4, 80:6
**log** [1] - 140:2
**look** [14] - 24:8, 24:12, 42:7, 67:4, 68:15, 78:22, 94:9, 94:12, 96:12, 107:21, 108:11, 130:16, 140:6, 162:10
**looked** [9] - 68:13, 83:22, 92:11, 92:23, 93:18, 94:1, 94:7, 94:15, 132:2
**looking** [3] - 95:7, 103:11, 103:12
**looks** [2] - 116:16, 134:14
**loud** [1] - 104:21

## M

**machine** [1] - 165:8
**Maeve** [1] - 3:16
**MAEVE** [1] - 2:12
**maintained** [1] - 158:19
**maintains** [1] - 158:21
**male** [3] - 140:13, 140:14, 141:2
**man** [8] - 48:12, 57:12, 57:15, 58:1, 58:18, 58:19
**manager** [2] - 163:1, 163:5
**mandated** [1] - 31:17
**manner** [2] - 160:18, 165:8
**manuals** [1] - 112:20
**map** [1] - 21:17
**mapping** [2] - 21:11, 22:3
**March** [9] - 7:8, 7:14, 7:17, 8:10, 42:3, 42:12, 46:17, 46:19, 140:5
**marijuana** [1] - 30:1
**mark** [1] - 149:13
**marked** [12] - 42:20, 43:3, 44:4, 44:6, 44:16, 88:8, 124:9, 137:7, 139:23, 141:10, 148:22, 149:8
**match** [1] - 142:16

**material** [1] - 40:10
**matter** [2] - 2:23, 56:12
**matters** [2] - 14:16, 24:17
**mayor** [7] - 16:21, 17:6, 18:1, 18:9, 18:10, 18:11
**McCarthy** [1] - 16:14
**McCullen** [3] - 50:18, 50:23, 51:8
**McDermott** [2] - 1:13, 150:20
**McHugh** [2] - 23:21, 24:1
**mean** [7] - 36:6, 62:13, 65:21, 68:6, 72:1, 79:16, 137:22
**meaning** [11] - 21:9, 30:23, 36:18, 37:3, 49:4, 61:19, 64:2, 77:20, 78:12, 156:19
**means** [8] - 26:1, 26:3, 26:4, 65:22, 66:18, 66:21, 81:21, 165:8
**mechanical** [1] - 61:14
**mechanics** [2] - 60:21, 61:1
**medical** [6] - 97:11, 99:6, 99:10, 99:23, 110:19, 114:5
**medically** [1] - 97:2
**meeting** [2] - 26:17, 27:13
**members** [1] - 17:10
**merely** [1] - 123:12
**mhuggins@city** [1] - 2:15
**mhuggins@city-buffalo.com** [1] - 2:15
**middle** [2] - 143:14, 147:18
**might** [22] - 7:17, 7:18, 9:14, 13:1, 13:18, 21:22, 21:23, 23:15, 41:12, 47:17, 48:17, 53:18, 57:8, 110:13, 121:20, 130:8, 131:14, 132:6, 153:3, 157:4, 157:14, 161:1
**mind** [2] - 70:8, 104:20
**minor** [1] - 52:17
**minute** [8] - 115:3, 115:22, 116:18, 124:3, 125:9, 125:20, 151:5, 151:7

**minutes** [11] - 100:13, 101:3, 101:18, 131:20, 141:1, 141:23, 142:1, 142:10, 142:21, 143:1, 151:9
**mirror** [25] - 60:2, 89:16, 92:11, 93:1, 93:2, 93:8, 93:15, 93:18, 93:19, 93:20, 94:1, 94:10, 94:12, 94:17, 95:8, 151:15, 151:22, 152:7, 152:21, 153:11, 153:16, 154:5, 154:8, 154:18, 155:6
**mirrors** [4] - 93:6, 94:7, 153:22, 154:3
**mischief** [7] - 53:18, 59:13, 59:19, 88:2, 88:22, 89:22, 90:17
**moment** [2] - 82:13
**momentary** [1] - 129:17
**Monday** [1] - 7:9
**monitoring** [1] - 56:17
**month** [2] - 7:6, 46:12
**months** [7] - 7:16, 16:10, 17:19, 17:23, 41:12, 46:11, 51:19
**MORIARTY** [1] - 1:16
**Moriarty** [1] - 150:18
**morning** [1] - 4:7
**MORRIS** [2] - 2:17
**Morris** [1] - 3:9
**most** [5] - 9:7, 9:8, 33:7, 34:10, 162:10
**motioned** [1] - 106:15
**motor** [6] - 14:23, 15:10, 51:22, 53:17, 57:2, 57:3
**move** [8] - 23:16, 34:11, 108:2, 108:17, 109:17, 110:14, 111:4, 111:5
**moved** [2] - 9:9, 51:5
**movements** [1] - 106:9
**moving** [5] - 8:21, 108:20, 112:10, 135:6, 138:1
**MR** [132] - 3:14, 4:5, 12:14, 13:4, 14:13, 37:22, 39:8, 43:1, 44:3, 44:7, 44:12, 44:14, 44:20, 57:20, 58:10, 59:2, 59:17,

65:10, 67:20, 68:5, 69:1, 69:19, 70:1, 82:5, 82:14, 82:19, 83:5, 83:9, 85:13, 85:21, 86:20, 87:6, 88:6, 90:13, 91:7, 92:3, 92:19, 94:23, 95:5, 95:20, 97:5, 97:13, 98:9, 98:19, 99:11, 100:11, 100:21, 101:23, 102:19, 103:1, 104:4, 104:11, 104:19, 104:22, 104:23, 105:17, 106:17, 107:4, 109:22, 110:17, 112:22, 113:18, 114:16, 115:2, 115:11, 115:22, 116:5, 116:17, 117:14, 117:23, 118:8, 119:4, 120:23, 121:10, 121:23, 122:14, 123:22, 124:7, 127:14, 128:10, 128:20, 132:21, 133:2, 133:8, 135:10, 136:1, 136:12, 136:14, 136:23, 137:6, 137:23, 138:4, 138:12, 138:15, 138:23, 139:4, 139:8, 139:12, 141:8, 142:8, 142:20, 144:1, 144:9, 144:19, 145:8, 145:16, 145:23, 146:11, 146:20, 147:22, 148:23, 149:3, 149:13, 149:21, 150:23, 151:5, 151:8, 151:11, 151:19, 152:3, 152:10, 153:2, 153:19, 155:11, 155:17, 155:22, 156:4, 156:11, 162:1, 162:5, 163:11, 167:3
**MS** [114] - 3:16, 3:20, 12:11, 12:13, 13:3, 14:11, 37:14, 38:19, 44:2, 44:4, 44:9, 57:16, 58:6, 58:21, 59:8, 65:7, 67:16, 67:22, 68:16, 69:7, 69:17, 69:21, 82:4, 82:12, 83:2, 83:7, 85:12, 85:16, 86:14, 87:3, 88:3, 90:9, 90:19, 91:20, 92:14, 94:20, 95:3, 95:12,

*JACK W. HUNT & ASSOCIATES, INC.*
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

96:18, 98:8, 98:13, 99:1, 99:18, 100:16, 101:5, 102:17, 103:10, 104:9, 104:15, 104:20, 105:13, 106:11, 107:1, 109:10, 110:9, 112:17, 113:5, 113:23, 114:20, 115:8, 115:19, 116:14, 117:11, 117:18, 118:4, 118:23, 120:21, 121:5, 121:17, 122:5, 123:2, 123:10, 123:18, 127:9, 128:9, 128:14, 132:17, 135:8, 135:21, 136:9, 137:21, 138:8, 138:10, 138:13, 138:20, 139:1, 139:6, 141:4, 142:4, 142:12, 143:17, 144:5, 144:15, 145:1, 145:12, 145:20, 146:4, 146:18, 147:19, 148:20, 149:1, 150:22, 151:3, 151:7, 151:17, 152:1, 152:8, 152:18, 153:13, 154:21, 155:16, 155:18, 156:1, 161:23

**multiple** [4] - 102:4, 102:14, 103:17, 160:15

**must** [3] - 66:1, 119:5, 119:11

**N**

**name** [9] - 3:9, 4:9, 23:23, 24:2, 48:8, 48:9, 148:2, 148:4, 148:12
**named** [1] - 31:2
**Narcan** [1] - 111:19
**Narcotics** [1] - 9:23
**narcotics** [1] - 10:3
**nature** [2] - 61:15, 148:14
**near** [1] - 126:6
**nearly** [3] - 46:19, 47:1, 146:15
**necessary** [5] - 63:21, 64:9, 65:2, 65:5, 65:13
**need** [17] - 5:3, 5:6, 15:15, 62:14, 82:7, 87:1, 98:16, 113:10,

114:9, 119:8, 125:1, 126:8, 127:19, 139:14, 157:6, 162:10, 162:11
**needed** [9] - 15:21, 15:22, 33:13, 52:16, 53:20, 55:4, 75:7, 114:4, 114:6
**needs** [2] - 99:5, 148:21
**negligence** [1] - 12:21
**negotiate** [3] - 75:4, 75:9, 77:10
**negotiated** [2] - 75:1, 77:11
**negotiating** [2] - 76:17, 77:6
**negotiation** [1] - 30:13
**negotiations** [1] - 77:4
**never** [4] - 77:3, 84:4, 156:5
**new** [4] - 53:3, 77:1, 124:1, 159:13
**NEW** [2] - 1:4, 165:1
**New** [8] - 2:5, 2:9, 2:14, 2:22, 3:4, 4:2, 163:4, 165:6
**news** [19] - 41:20, 45:14, 45:16, 45:17, 45:20, 46:2, 46:6, 46:13, 47:11, 47:15, 47:19, 49:11, 49:14, 82:21, 82:22, 83:16, 83:19, 83:21
**next** [5] - 10:11, 78:21, 136:3, 160:17, 160:18
**nice** [1] - 44:15
**night** [1] - 55:17
**nine** [3] - 76:23, 151:6
**nobody** [1] - 37:6
**nominate** [1] - 17:6
**non** [1] - 71:8
**norm** [1] - 35:19
**normal** [1] - 14:19
**normally** [1] - 39:19
**notary** [1] - 3:7
**Notary** [3] - 2:6, 165:5, 165:20
**NOTARY** [1] - 164:16
**nother** [1] - 133:14
**nothing** [2] - 94:13, 165:15
**notice** [3] - 37:12, 37:15, 38:17
**Notice** [11] - 38:1,

38:21, 39:21, 40:14, 40:20, 41:22, 42:2, 42:8, 47:2, 50:3, 50:9
**notified** [2] - 52:20, 140:16
**notifies** [1] - 57:2
**notify** [6] - 37:4, 37:5, 52:19, 54:8, 54:11, 56:16
**number** [10] - 71:21, 83:8, 83:11, 137:9, 160:7, 160:9, 161:5, 162:8, 162:9, 162:10
**numbers** [2] - 14:12, 102:6
**numerous** [3] - 13:12, 31:22, 31:23

**O**

**object** [1] - 139:1
**objection** [10] - 67:17, 67:22, 68:16, 68:17, 69:22, 110:10, 139:6, 142:5, 142:13
**objections** [1] - 68:3
**obligated** [1] - 52:14
**observation** [1] - 99:9
**observed** [1] - 113:7
**obviously** [8] - 10:10, 47:21, 71:8, 94:21, 117:22, 118:18, 138:21, 142:14
**occasionally** [3] - 24:14, 28:23, 31:13
**occur** [1] - 41:5
**occurred** [1] - 150:20
**OF** [3] - 1:4, 165:1, 165:3
**offer** [2] - 67:5, 157:13
**offering** [1] - 156:21
**Office** [5] - 47:23, 48:19, 49:10, 148:18, 150:13
**office** [5] - 3:2, 31:2, 79:14, 80:4, 80:6
**officer** [95] - 7:21, 15:3, 15:5, 29:4, 30:7, 31:5, 34:18, 34:22, 36:18, 48:6, 48:11, 49:18, 53:13, 54:9, 56:6, 57:1, 57:5, 57:14, 58:1, 58:4, 58:13, 58:17, 62:9, 62:17, 62:18, 62:22, 63:12, 63:17, 64:5,

64:18, 65:2, 70:22, 70:23, 78:1, 78:3, 78:4, 78:8, 79:3, 79:4, 81:14, 90:23, 91:14, 91:16, 91:18, 92:8, 95:9, 98:20, 99:13, 107:11, 107:16, 107:17, 108:9, 112:23, 113:2, 114:18, 116:20, 116:21, 116:23, 117:4, 117:6, 117:10, 117:17, 117:20, 118:17, 119:5, 119:8, 119:14, 119:15, 119:19, 120:19, 121:22, 122:8, 123:6, 124:13, 125:11, 125:18, 125:21, 126:9, 126:14, 126:17, 130:14, 131:20, 132:18, 133:18, 133:19, 145:11, 150:12, 151:21, 152:5, 152:13, 153:10, 154:14, 154:16, 155:2, 158:18
**Officer** [9] - 1:14, 1:15, 1:16, 1:17, 1:18, 148:1, 150:21, 151:10, 152:12
**officer's** [1] - 48:8
**Officer(s** [1] - 1:19
**officers** [113] - 29:2, 34:14, 49:14, 53:1, 53:8, 55:22, 57:11, 59:4, 59:21, 61:18, 62:21, 63:6, 63:20, 65:4, 65:6, 65:12, 68:14, 72:2, 72:9, 77:18, 80:22, 86:13, 86:16, 86:17, 90:15, 91:10, 92:16, 96:15, 96:22, 97:7, 97:14, 98:4, 98:12, 99:3, 99:14, 100:13, 100:23, 102:2, 102:12, 106:10, 106:21, 107:6, 107:12, 107:13, 107:21, 109:6, 109:8, 109:12, 109:23, 110:18, 111:15, 112:6, 112:13, 113:19, 115:18, 116:6, 118:3, 118:13, 120:14, 120:20, 121:3, 121:4, 121:13, 122:4, 122:17, 122:23, 123:12,

125:14, 127:3, 127:7, 127:19, 128:11, 128:21, 129:11, 129:12, 129:14, 130:4, 130:9, 131:18, 132:12, 132:14, 132:15, 132:22, 133:9, 133:17, 134:1, 136:18, 139:17, 141:2, 141:18, 142:2, 143:3, 143:5, 143:6, 143:14, 144:3, 144:14, 144:21, 144:22, 146:16, 146:17, 147:17, 154:19, 155:2, 156:16, 157:19, 159:8, 159:12, 160:11, 161:12, 161:15, 161:21, 162:11
**offices** [1] - 2:3
**often** [5] - 18:6, 34:16, 34:19, 39:14, 110:21
**oil** [2] - 61:15, 62:14
**old** [1] - 158:23
**once** [4] - 14:14, 157:11, 159:16, 159:19
**one** [51] - 15:5, 22:23, 23:1, 23:4, 23:7, 23:20, 25:20, 26:2, 26:23, 27:17, 28:6, 28:17, 28:21, 33:12, 34:13, 36:16, 42:14, 44:5, 59:18, 65:17, 72:2, 73:3, 73:12, 75:9, 75:15, 76:3, 76:22, 81:3, 81:9, 82:23, 83:15, 85:18, 89:21, 90:3, 90:4, 92:8, 98:10, 101:13, 102:10, 105:15, 105:20, 112:13, 116:6, 124:2, 130:2, 131:8, 148:16, 150:12, 153:5, 160:7, 160:9
**ones** [1] - 160:12
**oops** [1] - 160:17
**open** [3] - 38:21, 40:22, 108:16
**opened** [1] - 9:13
**opening** [1] - 160:16
**openings** [2] - 160:1, 160:2
**operations** [11] - 10:23, 11:5, 11:10, 11:14, 11:16, 11:18,

11:20, 12:4, 20:8,
163:4
  opinion [16] - 26:3,
26:12, 32:9, 32:11,
33:4, 35:8, 35:10,
66:4, 70:11, 73:3,
87:5, 87:13, 90:22,
91:5, 92:18, 110:16
  opinions [2] - 32:19,
33:4
  opioids [1] - 29:23
  opposed [1] - 133:18
  option [1] - 77:22
  originally [1] - 8:14
  otherwise [1] -
157:15
  outcome [2] - 33:2,
43:14
  outcomes [2] -
25:20, 156:14
  outside [5] - 6:12,
25:13, 61:6, 105:7,
135:2
  overlap [1] - 23:16
  overlook [1] - 24:13
  oversaw [2] - 28:22,
30:13
  oversee [6] - 12:3,
13:11, 30:6, 30:9,
30:10, 30:14
  overseeing [4] -
12:1, 30:5, 30:20,
31:9
  overturned [1] -
72:16
  own [2] - 33:4,
103:21

P

  p.m [1] - 163:15
  Page [2] - 166:2,
167:2
  pages [1] - 164:2
  paperwork [9] -
63:21, 64:9, 64:16,
64:18, 65:1, 65:2,
65:5, 65:13, 131:5
  paragraph [1] - 66:6
  part [22] - 12:4,
24:20, 27:2, 27:13,
30:21, 35:20, 36:14,
37:23, 39:22, 53:7,
54:3, 59:18, 71:20,
74:18, 74:19, 74:20,
77:6, 80:19, 89:17,
120:5, 137:15, 141:14
  particular [2] - 43:8,
43:9
  particularly [1] -

13:23
  partner [1] - 150:18
  parts [1] - 95:22
  pass [6] - 29:4,
48:23, 131:6, 131:10,
131:15, 159:12
  passed [1] - 7:11
  passenger [3] -
93:10, 94:4, 151:16
  passenger's [10] -
92:10, 92:21, 93:1,
93:19, 95:7, 107:17,
151:23, 152:6,
153:22, 154:2
  past [2] - 85:18,
158:23
  pat [14] - 121:4,
121:8, 121:11,
121:20, 131:21,
132:7, 132:12,
132:16, 132:20,
133:1, 133:10,
133:12, 133:17,
133:18
  Pat [1] - 51:2
  Patrick [1] - 3:9
  PATRICK [1] - 2:17
  patrol [7] - 7:21, 9:1,
9:8, 10:16, 11:19,
62:22, 147:18
  patted [4] - 121:16,
133:7, 133:11, 133:21
  patterns [1] - 24:12
  patting [3] - 132:2,
132:11, 133:23
  pay [2] - 74:17, 74:18
  paying [1] - 107:11
  pays [2] - 74:18,
74:21
  PBA [8] - 73:9, 77:4,
77:12, 78:10, 78:11,
78:16, 79:2, 79:7
  pedestrian [2] - 37:8,
107:14
  penalty [5] - 67:5,
78:23, 156:21,
156:22, 157:3
  people [7] - 13:18,
30:15, 48:17, 48:23,
62:21, 102:10, 112:10
  people's [1] - 33:3
  perceive [4] -
132:14, 132:23,
152:5, 153:10
  perceived [3] -
134:2, 146:6
  percentage [1] -
72:22
  perception [4] -
108:23, 133:22,

145:14, 147:2
  perform [2] - 61:23,
132:16
  performed [3] -
100:23, 109:6, 132:20
  performing [1] -
121:4
  period [7] - 8:23, 9:9,
10:1, 75:17, 75:22,
76:1, 155:2
  permanent [2] -
16:11, 18:2
  person [9] - 64:10,
89:13, 93:9, 96:7,
109:9, 111:4, 111:5,
112:8, 150:4
  personal [6] - 55:11,
56:1, 56:9, 56:13,
57:22, 57:23
  personally [1] -
148:7
  personnel [4] -
13:22, 14:4, 97:8,
97:11
  persons [1] - 32:16
  pertain [2] - 104:13,
118:19
  pertaining [1] -
112:10
  pertains [1] - 4:11
  PFALZGRAF [1] -
2:7
  phone [37] - 55:15,
56:1, 56:3, 56:19,
57:23, 116:13,
116:16, 118:2, 118:3,
118:10, 118:16,
118:20, 118:21,
119:2, 119:3, 119:6,
119:9, 119:10, 120:6,
123:1, 123:3, 123:8,
123:12, 123:17,
124:16, 125:7, 126:3,
126:6, 126:9, 126:18,
126:21, 128:5,
128:17, 128:19,
129:21
  phones [5] - 55:12,
56:5, 56:8, 56:10,
56:13
  physical [10] - 15:19,
101:1, 107:19,
108:10, 109:7,
117:15, 120:13,
122:2, 127:17, 129:1
  pick [6] - 109:8,
110:3, 110:5, 110:14,
112:7, 112:15
  picked [1] - 112:23
  pictured [1] - 84:19

  place [61] - 12:6,
15:2, 15:3, 16:2, 16:4,
21:4, 22:2, 22:3,
26:19, 30:7, 33:12,
45:1, 50:2, 50:6, 50:7,
50:8, 51:21, 52:5,
52:7, 52:10, 52:18,
54:4, 54:19, 55:1,
57:8, 63:6, 69:5,
69:13, 69:16, 75:18,
79:6, 80:6, 83:21,
86:4, 87:5, 87:15,
87:19, 90:11, 91:17,
95:10, 98:11, 102:1,
102:4, 104:7, 104:13,
113:11, 119:18,
127:1, 127:3, 128:7,
128:8, 129:5, 130:6,
140:20, 149:18,
153:7, 153:11, 157:8,
157:12, 158:4, 160:9
  placed [6] - 21:18,
26:9, 88:9, 93:8,
144:11, 144:12
  plaintiff [3] - 3:11,
3:15, 4:10
  Plaintiff [2] - 1:7,
2:10
  play [5] - 31:10, 83:3,
83:6, 104:5, 124:23
  playing [2] - 151:3,
151:10
  plus [1] - 6:8
  point [24] - 9:22,
25:7, 28:6, 29:10,
48:20, 72:12, 97:1,
97:3, 105:7, 105:23,
115:5, 116:2, 117:13,
117:21, 121:1,
122:12, 131:19,
133:22, 140:18,
144:4, 144:14,
144:23, 145:4, 155:13
  points [2] - 76:17,
77:6
  Police [17] - 1:11,
1:11, 1:12, 1:13, 1:14,
1:15, 1:16, 1:17, 1:18,
1:19, 8:5, 9:23, 66:9,
71:1, 73:15, 89:13,
158:5
  police [148] - 6:8,
6:12, 6:13, 7:4, 7:7,
7:12, 7:15, 7:20,
10:22, 11:1, 11:18,
14:23, 15:10, 16:7,
16:12, 16:15, 16:18,
17:10, 17:17, 17:20,
17:23, 18:3, 18:6,
18:16, 20:5, 20:7,

20:21, 21:4, 24:5,
29:2, 29:4, 29:14,
30:7, 31:2, 33:19,
37:7, 50:20, 51:22,
53:9, 53:10, 53:15,
53:23, 54:1, 54:6,
55:20, 55:21, 57:1,
57:3, 57:12, 58:2,
58:12, 58:13, 58:17,
58:19, 59:4, 60:5,
60:6, 60:7, 60:8, 60:9,
60:14, 60:21, 61:11,
61:18, 62:4, 62:5,
62:10, 64:18, 65:2,
69:5, 70:22, 70:23,
71:14, 72:2, 73:6,
73:8, 74:14, 75:3,
77:23, 78:1, 78:4,
79:16, 79:18, 81:7,
81:10, 81:13, 81:20,
84:5, 85:4, 85:6,
85:18, 85:19, 86:1,
86:9, 86:10, 86:23,
87:7, 88:1, 90:7, 92:6,
92:12, 95:11, 95:23,
103:8, 105:3, 105:5,
105:11, 113:21,
122:22, 123:6,
124:13, 134:9, 135:2,
136:3, 136:15, 138:1,
138:6, 139:19,
140:13, 140:14,
144:12, 144:21,
145:11, 146:14,
147:16, 148:9,
151:15, 152:15,
153:6, 153:12,
153:20, 154:15,
155:15, 156:6,
157:19, 158:15,
158:18, 158:19,
159:8, 159:12, 160:5,
162:13, 162:15,
162:21
  policies [3] - 37:23,
38:3, 56:21
  policy [24] - 15:2,
16:1, 16:4, 50:2, 50:7,
50:11, 51:22, 52:5,
52:6, 52:12, 52:17,
52:18, 52:21, 52:22,
53:1, 53:3, 53:4, 53:7,
53:12, 54:3, 63:5,
63:9, 118:9, 118:19
  position [9] - 13:9,
21:4, 28:4, 29:14,
30:10, 51:4, 51:6,
51:7, 69:8
  positioned [3] -
124:21, 125:6, 126:2

positions [2] - 111:21, 160:3
possibility [1] - 47:12
possible [5] - 25:20, 65:3, 146:3, 155:7
possibly [3] - 21:13, 63:19, 65:9
potential [1] - 156:14
potentially [3] - 61:7, 61:10, 161:18
precinct [7] - 8:11, 8:13, 8:15, 8:16, 8:19, 9:6, 20:10
Precinct [9] - 8:22, 8:23, 9:1, 9:4, 9:5, 9:9, 9:10, 9:12
precincts [2] - 8:2, 20:17
presence [1] - 165:10
PRESENT [1] - 2:16
present [11] - 26:23, 27:9, 31:19, 31:22, 32:1, 32:3, 32:6, 32:16, 35:9, 35:22, 155:20
presentation [1] - 27:10
presented [3] - 35:2, 35:15, 91:22
pretty [1] - 46:21
previous [7] - 18:3, 20:14, 76:7, 124:17, 137:13, 138:5, 153:4
previously [8] - 44:5, 105:6, 124:9, 134:17, 137:8, 137:9, 138:16, 141:16
prisoner [1] - 145:2
private [2] - 61:17, 61:23
proactively [1] - 102:12
problem [4] - 68:19, 100:1, 101:4, 155:18
procedure [5] - 36:14, 37:3, 63:5, 103:8, 145:10
Procedure [1] - 2:3
procedures [3] - 38:1, 38:4, 56:22
proceed [1] - 39:19
proceedings [2] - 71:9, 72:11
process [42] - 18:14, 19:15, 20:18, 24:19, 24:21, 30:22, 32:6, 32:17, 34:8, 35:3, 35:21, 35:23, 37:9,

37:11, 38:2, 38:14, 38:17, 38:18, 39:18, 39:23, 40:16, 45:8, 64:7, 70:17, 71:11, 72:7, 77:8, 77:10, 77:13, 77:14, 77:15, 79:23, 80:20, 81:6, 81:22, 90:15, 91:9, 99:13, 107:21, 108:11, 143:22, 156:13
profile [1] - 48:6
prolong [1] - 146:2
promoted [2] - 9:19, 10:22
prone [1] - 160:20
proof [9] - 66:1, 66:17, 66:20, 67:21, 68:10, 70:4, 70:5, 70:6, 70:7
proper [7] - 48:23, 98:20, 99:16, 102:8, 103:8, 145:10, 145:11
property [3] - 15:20, 89:12, 89:16
protocol [3] - 14:19, 50:2, 145:11
prove [17] - 26:1, 26:3, 59:21, 65:22, 66:7, 66:11, 66:13, 66:15, 66:21, 67:3, 67:13, 68:8, 68:11, 68:14, 69:3, 70:9, 70:14
proved [1] - 70:10
provide [6] - 12:9, 12:16, 14:3, 14:5, 32:9, 142:19
provided [5] - 32:10, 41:16, 56:5, 56:9, 110:18
proximity [1] - 133:4
PUBLIC [1] - 164:16
public [1] - 3:7
Public [3] - 2:6, 165:5, 165:20
pulled [1] - 130:9
pulling [3] - 94:10, 94:11, 129:18
purportedly [1] - 152:14
purpose [1] - 104:17
pursuant [1] - 2:2
put [18] - 15:3, 16:2, 16:3, 18:2, 26:6, 51:3, 51:7, 51:21, 52:5, 52:7, 52:18, 54:3, 68:17, 77:1, 113:20, 143:9, 148:21, 160:14
putting [1] - 100:8

Q

qualify [1] - 54:2
questioning [1] - 69:23
questions [12] - 5:1, 5:7, 5:9, 19:16, 19:20, 19:21, 20:3, 82:7, 83:4, 91:17, 104:7, 104:13
quicker [1] - 124:2
quickly [2] - 135:6, 146:3
quite [1] - 39:14
quorum [1] - 17:13

R

radio [9] - 37:5, 54:10, 55:10, 55:23, 56:2, 56:13, 56:15, 56:17, 102:21
raises [1] - 76:20
ran [1] - 36:22
ranked [1] - 10:16
rather [2] - 20:10, 68:10
reach [3] - 12:23, 128:17, 156:17
reached [5] - 126:14, 126:19, 129:20, 157:19, 157:20
reaching [1] - 133:14
read [4] - 3:20, 24:14, 90:1, 164:1
reading [1] - 46:22
really [7] - 34:14, 48:5, 77:12, 86:2, 91:4, 95:15, 113:15
reappointed [5] - 18:5, 18:7, 18:19, 18:21, 19:10
reappointment [3] - 19:1, 19:3, 19:15
rear [1] - 93:20
rearview [1] - 95:7
reason [15] - 36:16, 42:4, 42:12, 84:13, 84:18, 94:9, 94:14, 99:16, 119:6, 119:8, 122:23, 123:16, 124:18, 144:2, 144:13
reasonable [1] - 89:14
receive [4] - 24:14, 24:16, 38:21, 112:6
received [1] - 111:22
receives [1] - 57:22
recently [3] - 4:18, 46:8, 46:10

recklessly [1] - 90:2
recognize [5] - 43:3, 43:9, 88:10, 140:1, 149:23
recollection [7] - 22:1, 46:15, 52:15, 84:3, 84:6, 89:20, 93:4
recommendation [4] - 12:10, 12:16, 12:18, 26:13
record [24] - 68:17, 73:21, 82:12, 82:15, 82:16, 82:17, 104:9, 104:12, 124:3, 124:4, 124:5, 124:6, 137:1, 137:2, 137:3, 137:4, 149:2, 149:4, 149:5, 149:6, 149:23, 156:9, 156:10, 163:13
recorded [2] - 2:20, 142:7
recording [1] - 141:22
records [8] - 112:21, 158:6, 158:9, 158:11, 158:19, 158:21, 159:4, 159:10
redo [1] - 64:22
reduced [1] - 165:10
refer [5] - 5:16, 5:17, 46:10, 49:18, 68:21
reflect [1] - 161:11
reflected [1] - 162:6
refrain [1] - 5:2
regard [1] - 68:4
regarding [1] - 49:9
related [1] - 6:21
relative [1] - 165:15
relayed [1] - 110:12
remained [1] - 21:14
remember [4] - 21:13, 48:15, 64:15, 112:3
remembered [1] - 111:11
removed [3] - 18:9, 18:12, 18:13
render [1] - 92:18
rental [1] - 154:9
repairing [1] - 154:9
repeating [1] - 104:20
rephrase [2] - 5:6, 5:8
replay [3] - 104:5, 119:22, 126:13
report [12] - 11:15, 12:2, 47:15, 47:20, 49:12, 140:4, 140:5,

140:6, 140:7, 140:12, 140:18, 165:7
reported [3] - 10:14, 26:4, 140:12
reporter [2] - 3:7, 3:13
REPORTER [3] - 3:18, 44:10, 44:13
reports [14] - 24:6, 24:9, 24:10, 24:14, 24:15, 24:16, 45:15, 45:16, 45:17, 45:21, 46:2, 47:11, 143:1, 158:15
reposition [1] - 156:10
representative [3] - 78:7, 78:9, 78:15
representatives [3] - 17:1, 71:12, 78:11
represented [1] - 71:1
request [8] - 70:21, 71:2, 71:5, 78:4, 79:8, 79:10, 79:11, 79:19
require [1] - 113:4
required [7] - 7:3, 14:23, 15:9, 63:6, 80:22, 128:22, 132:16
requirement [4] - 29:3, 36:11, 80:16, 80:21
residency [2] - 76:22, 77:1
respond [3] - 15:4, 56:4, 97:12
responding [1] - 47:5
response [2] - 114:13
responses [2] - 5:1, 108:3
responsibilities [2] - 11:11, 11:23
responsibility [1] - 131:9
responsible [3] - 13:19, 20:7, 131:12
restarted [1] - 29:10
result [4] - 64:14, 90:17, 146:17, 147:11
resumed [1] - 104:12
resuming [1] - 104:10
retention [4] - 157:23, 158:4, 158:10, 158:14
retired [4] - 18:4, 51:3, 51:10, 51:11
retirement [3] -

67:19, 68:2, 68:23
**retract** [1] - 47:9
**review** [50] - 24:6, 24:11, 24:19, 24:21, 25:2, 25:5, 25:8, 26:8, 27:21, 30:22, 32:17, 33:5, 33:6, 34:8, 34:11, 35:3, 35:20, 35:23, 37:12, 38:2, 38:18, 39:18, 39:21, 39:23, 40:12, 40:15, 41:7, 41:10, 41:15, 45:10, 66:8, 70:17, 77:8, 77:13, 77:14, 78:20, 81:10, 82:2, 87:9, 87:16, 89:2, 89:4, 91:3, 91:9, 91:21, 99:13, 112:20, 131:4, 131:6, 157:12
**reviewed** [5] - 41:12, 84:2, 84:4, 87:20, 131:1
**reviewing** [6] - 69:2, 83:10, 84:7, 88:8, 90:14, 140:11
**reviews** [2] - 31:13, 33:8
**revisions** [1] - 52:12
**rise** [1] - 130:11
**rises** [1] - 130:21
**rob** [1] - 51:15
**Rocco** [1] - 20:17
**role** [4] - 11:22, 30:6, 31:10, 71:11
**room** [4] - 26:19, 26:21, 35:11, 80:8
**Rosenswie** [1] - 51:15
**route** [2] - 141:7, 147:8
**routine** [1] - 14:18
**Rules** [1] - 2:2
**rules** [1] - 4:20
**RUPP** [1] - 2:7

**S**

**safety** [3] - 121:13, 121:22, 132:19
**sandwich** [1] - 111:10
**SANTANA** [1] - 1:17
**sat** [5] - 92:20, 94:7, 101:2, 103:13, 146:14
**saved** [1] - 111:10
**saw** [19] - 47:15, 48:4, 57:5, 58:18, 83:15, 83:16, 83:19, 90:5, 90:8, 90:10, 91:18, 92:9, 92:11,

122:3, 138:6, 138:15, 152:14, 152:20
**scenario** [4] - 15:20, 35:16, 54:21, 109:11
**scene** [14] - 14:9, 54:5, 54:8, 54:14, 54:16, 57:22, 86:13, 87:1, 97:7, 97:15, 98:1, 101:2, 141:19, 144:14
**scenes** [1] - 15:5
**Schmarbeck** [2] - 102:5, 102:14, 103:3, 103:4
**school** [1] - 5:22
**SCHULTZ** [1] - 1:15
**Schultz** [14] - 148:1, 148:3, 148:11, 148:19, 149:11, 149:15, 150:2, 150:4, 150:7, 150:18, 151:2, 151:10, 152:12, 166:8
**Schultz's** [1] - 151:13
**Schultz_A** [2] - 149:17, 151:4
**Schultz_B** [1] - 149:17
**Schultz_C** [1] - 149:18
**scored** [2] - 160:6, 160:7
**screen** [14] - 3:6, 83:3, 104:16, 105:6, 105:7, 105:11, 105:12, 106:1, 106:4, 124:13, 137:20, 138:7, 139:17, 139:20
**searched** [1] - 121:18
**seat** [6] - 92:10, 92:21, 93:10, 95:7, 151:23, 152:6
**second** [5] - 12:7, 66:6, 125:2, 130:17, 160:15
**seconds** [26] - 83:6, 85:9, 85:15, 104:6, 104:10, 104:12, 104:14, 105:1, 106:5, 107:5, 107:7, 115:3, 125:4, 125:20, 131:21, 132:9, 134:8, 135:17, 135:23, 136:5, 137:10, 151:6, 151:9
**sections** [1] - 149:16
**Secure** [1] - 162:23
**security** [3] - 142:1, 142:22, 162:23

**sedan** [2] - 134:13, 137:12
**see** [97] - 44:21, 45:7, 49:16, 66:5, 84:8, 84:22, 85:11, 85:15, 85:17, 86:2, 86:8, 86:15, 86:17, 88:12, 88:17, 88:20, 89:9, 89:17, 91:15, 92:2, 92:4, 93:10, 93:13, 93:16, 94:18, 95:1, 95:14, 95:16, 95:19, 97:11, 99:23, 104:16, 104:18, 105:23, 106:18, 106:22, 107:23, 108:3, 108:8, 108:13, 108:20, 110:12, 115:12, 115:16, 115:17, 116:19, 117:3, 119:22, 120:4, 120:5, 120:13, 121:6, 122:19, 124:12, 124:20, 125:5, 125:8, 125:10, 125:21, 126:1, 126:9, 126:11, 126:12, 126:14, 126:19, 127:2, 127:5, 127:16, 127:17, 132:12, 133:13, 134:9, 134:12, 134:14, 134:16, 135:1, 135:11, 135:15, 136:3, 137:12, 137:15, 137:18, 137:20, 139:9, 139:17, 139:19, 140:3, 140:12, 141:13, 142:23, 143:3, 143:5, 150:1, 151:21, 154:22, 155:3, 155:5
**seeing** [16] - 47:19, 48:15, 49:11, 83:14, 87:14, 94:17, 108:6, 109:3, 109:14, 110:15, 113:11, 122:13, 123:9, 134:2, 142:9
**seek** [1] - 19:1
**sees** [3] - 69:11, 138:19, 139:5
**segment** [1] - 151:13
**segments** [3] - 149:12, 149:17, 166:8
**Selchick** [1] - 74:9
**select** [1] - 73:9
**selected** [3] - 18:10, 73:8, 74:1
**selection** [1] - 18:10

**send** [4] - 43:19, 60:12, 60:15, 64:12
**Seneca** [4] - 60:8, 60:11, 61:12, 61:22
**seniority** [5] - 13:9, 159:21, 160:2, 160:4, 160:8
**sent** [4] - 43:17, 43:20, 43:22, 166:12
**separate** [1] - 73:18
**September** [3] - 2:5, 3:4, 164:6
**sequence** [1] - 141:11
**sergeant** [6] - 9:20, 10:3, 10:6, 10:7, 10:9, 10:14
**serious** [6] - 14:16, 14:17, 15:13, 15:18, 99:23
**seriousness** [1] - 15:8
**serve** [2] - 18:11, 18:16
**served** [1] - 41:9
**service** [4] - 63:8, 63:11, 143:15, 162:11
**session** [1] - 53:2
**set** [5] - 79:13, 82:8, 93:15, 163:12, 164:3
**setting** [1] - 79:23
**settlement** [5] - 156:17, 156:19, 157:8, 157:18, 157:21
**setup** [1] - 70:19
**seven** [2] - 44:10, 76:23
**several** [1] - 4:19
**severe** [2] - 145:21, 147:4
**severity** [7] - 108:22, 109:1, 110:1, 112:14, 113:2, 114:2, 145:17
**Seward** [1] - 4:1
**shaking** [1] - 5:2
**sheet** [1] - 164:4
**shift** [2] - 23:15, 62:19
**shifts** [1] - 162:7
**shooting** [2] - 148:17, 150:13
**shop** [1] - 61:22
**short** [3] - 8:23, 9:9, 10:1
**shorthand** [1] - 165:9
**show** [9] - 43:2, 88:7, 95:21, 120:12, 132:4, 134:20, 138:9, 139:22, 148:21

**showed** [2] - 134:17, 156:7
**showing** [13] - 86:4, 119:12, 123:21, 124:8, 127:1, 127:21, 130:20, 137:7, 140:7, 141:9, 146:10, 149:19, 155:9
**shown** [1] - 136:12
**side** [17] - 89:16, 92:11, 93:1, 93:2, 93:9, 93:13, 93:19, 107:17, 151:15, 151:22, 152:7, 153:11, 153:21, 153:22, 154:2, 154:18
**sides** [1] - 80:11
**sidewalk** [1] - 115:13
**sign** [5] - 3:20, 29:9, 30:2, 131:7, 131:9
**signed** [9] - 29:16, 73:18, 75:10, 75:13, 75:15, 75:22, 76:4, 76:12, 76:16
**significant** [1] - 101:6
**similar** [1] - 111:16
**simple** [1] - 53:5
**simply** [2] - 5:11, 70:3
**simultaneously** [1] - 116:23
**sit** [9] - 31:13, 31:15, 34:8, 34:9, 40:10, 40:23, 84:17, 96:12, 114:5
**sits** [1] - 80:10
**sitting** [11] - 67:1, 70:16, 92:9, 93:22, 95:6, 99:12, 113:22, 144:20, 147:16, 151:22, 152:6
**situated** [2] - 84:23, 85:3
**situation** [6] - 41:3, 86:7, 87:7, 101:19, 109:2, 154:23
**six** [5] - 16:10, 17:19, 17:23, 102:6, 136:5
**size** [2] - 153:15, 153:21
**slap** [1] - 48:12
**slowed** [1] - 72:7
**slower** [1] - 161:9
**slowly** [1] - 135:6
**small** [1] - 154:10
**smaller** [2] - 94:22
**Solutions** [1] - 162:23
**someone** [1] - 39:10

**sometime** [1] - 16:5
**sometimes** [20] - 23:15, 27:19, 38:7, 38:22, 39:3, 47:12, 57:7, 70:19, 96:10, 97:17, 113:15, 113:16, 157:1, 157:2, 157:6
**somewhere** [4] - 7:17, 9:14, 19:12, 52:3
**Sorry** [1] - 110:10
**sorry** [6] - 8:3, 36:8, 47:8, 102:17, 151:8, 161:13
**sort** [9] - 12:21, 32:15, 59:6, 80:8, 96:2, 96:17, 112:6, 120:13, 158:3
**sorts** [1] - 35:2
**sources** [1] - 103:18
**speaking** [8] - 36:7, 37:16, 40:21, 54:17, 71:16, 116:10, 118:20, 141:18
**speaks** [1] - 142:14
**specific** [2] - 30:10, 69:18
**specifically** [4] - 6:20, 7:19, 19:19, 160:22
**specifics** [1] - 19:17
**speculate** [1] - 93:16
**speculation** [1] - 92:14
**spent** [2] - 9:8
**split** [1] - 108:16
**ss** [1] - 165:2
**staff** [1] - 52:23
**staffing** [1] - 161:11
**Stafford** [1] - 51:2
**stamp** [4] - 135:11, 139:10, 141:13, 142:14
**stamps** [3] - 138:11, 138:21, 139:2
**stand** [2] - 143:14, 147:17
**standing** [5] - 115:13, 143:4, 143:19, 144:3, 144:17
**start** [11] - 7:21, 8:4, 22:9, 47:10, 54:11, 54:12, 73:20, 82:6, 126:11, 157:4, 158:9
**started** [12] - 7:7, 7:9, 20:16, 20:21, 29:5, 40:16, 47:1, 47:16, 130:3, 141:2, 158:23, 163:1

**starting** [1] - 120:17
**starts** [1] - 133:23
**STATE** [1] - 165:1
**state** [1] - 77:16
**State** [1] - 165:6
**statement** [2] - 36:15, 92:13
**statements** [10] - 36:2, 36:4, 36:9, 36:12, 80:17, 80:23, 90:23, 91:1, 91:10, 92:16
**States** [1] - 2:21
**STATES** [1] - 1:3
**stating** [1] - 43:14
**station** [1] - 45:20
**status** [1] - 17:10
**statute** [1] - 90:1
**stay** [1] - 75:18
**stayed** [1] - 9:20
**stays** [1] - 73:21
**step** [1] - 78:21
**steps** [1] - 116:19
**stick** [1] - 117:3
**sticking** [1] - 44:7
**still** [12] - 10:14, 51:12, 79:21, 83:2, 105:11, 116:13, 126:3, 126:6, 142:2, 144:3, 144:14
**stipulated** [2] - 75:19, 75:23
**stipulations** [1] - 3:19
**stop** [2] - 133:13, 148:20
**stopped** [1] - 81:22
**stories** [3] - 46:6, 82:21, 82:23
**story** [6] - 46:14, 49:14, 83:16, 83:19, 83:21, 133:15
**Street** [4] - 4:1, 60:8, 61:12, 61:22
**street** [17] - 84:9, 119:14, 119:15, 119:17, 120:3, 121:2, 121:3, 122:9, 122:16, 128:16, 143:4, 143:14, 143:20, 144:3, 144:18, 147:18, 162:9
**strictly** [1] - 123:15
**strike** [1] - 161:14
**struck** [5] - 37:7, 48:12, 86:10, 91:16, 96:4
**struggle** [15] - 120:16, 120:18, 122:10, 122:15,

126:11, 127:2, 127:7, 128:5, 128:18, 129:4, 129:14, 129:17, 130:1, 130:15, 130:16
**struggled** [1] - 130:9
**struggling** [3] - 120:9, 129:10, 129:11
**stuck** [1] - 125:10
**sub** [1] - 33:13
**subjected** [2] - 31:5, 63:12
**subsection** [1] - 78:23
**sufficient** [5] - 66:10, 81:11, 81:21, 119:5, 152:16
**summary** [4] - 140:4, 140:11, 140:18, 142:23
**sunsetted** [1] - 77:2
**supervisor** [11] - 10:7, 10:8, 13:6, 37:5, 56:6, 64:5, 64:8, 64:9, 65:1, 86:12, 86:19
**supervisors** [4] - 27:12, 47:19, 53:1, 131:4
**supplied** [1] - 166:11
**support** [2] - 89:2, 89:10, 89:21
**surrounding** [1] - 12:20
**suspect** [3] - 143:6, 144:10, 147:1
**suspend** [1] - 67:8
**suspension** [2] - 71:5, 79:1
**sustain** [3] - 67:5, 88:1, 156:20
**sustained** [40] - 25:7, 25:8, 25:21, 25:23, 26:1, 26:2, 26:5, 26:15, 26:16, 32:21, 43:15, 65:11, 65:16, 65:20, 65:21, 66:1, 66:2, 66:12, 66:21, 67:3, 67:7, 67:12, 71:4, 71:8, 72:1, 72:4, 72:10, 72:14, 72:17, 81:4, 81:14, 81:16, 90:17, 90:18, 156:15, 157:9, 157:11
**SUV** [4] - 137:22, 137:23, 138:1, 153:23
**swear** [1] - 3:13
**switch** [2] - 25:17, 136:23
**switched** [2] - 28:7, 28:9

**Sworn** [1] - 164:11
**sworn** [7] - 4:3, 4:13, 4:17, 7:8, 7:11, 18:18, 165:13
**system** [9] - 8:21, 10:12, 20:10, 20:11, 20:12, 138:14, 141:22, 142:6, 142:10

**T**

**table** [1] - 80:10
**tasked** [1] - 15:23
**taught** [1] - 111:11
**technically** [1] - 8:9
**technician** [1] - 3:10
**technique** [1] - 103:8
**telephone** [1] - 115:21
**temporarily** [1] - 159:18
**tenure** [16] - 21:8, 21:12, 28:11, 33:15, 33:18, 43:17, 50:20, 60:7, 70:6, 71:18, 76:13, 76:16, 84:5, 118:10, 148:6, 160:19
**term** [5] - 18:13, 18:18, 20:19, 66:16, 130:2
**terms** [2] - 66:18, 68:19
**test** [7] - 29:4, 29:8, 30:11, 30:16, 30:17, 30:20, 31:6
**tested** [1] - 31:1
**testified** [3] - 4:3, 68:1, 138:16
**testify** [2] - 138:20, 165:14
**testifying** [1] - 151:2
**testimony** [10] - 2:20, 3:2, 4:13, 4:17, 138:5, 139:2, 142:19, 155:12, 155:21, 164:5
**testing** [11] - 28:22, 29:1, 29:6, 29:10, 29:22, 30:5, 30:6, 30:12, 30:14, 30:20, 31:9
**THE** [91] - 1:9, 2:19, 3:18, 12:12, 14:12, 37:15, 38:20, 44:10, 44:13, 57:17, 58:7, 58:22, 59:9, 65:8, 82:15, 82:17, 85:17, 86:15, 87:4, 88:4, 90:10, 90:20, 91:21, 92:15, 94:21, 95:4, 95:13, 96:19, 98:14,

99:2, 99:19, 100:17, 101:6, 102:20, 103:11, 105:14, 106:12, 107:2, 109:11, 110:11, 112:18, 113:6, 114:1, 114:21, 115:9, 115:20, 116:1, 116:15, 117:12, 117:19, 118:5, 119:1, 120:22, 121:6, 121:18, 122:6, 123:3, 123:19, 124:4, 124:6, 127:10, 128:15, 132:18, 133:3, 135:9, 135:22, 137:2, 137:4, 138:2, 138:9, 139:9, 141:5, 143:18, 144:6, 144:16, 145:2, 145:13, 145:21, 146:5, 146:19, 147:20, 149:4, 149:6, 151:18, 152:9, 152:19, 153:14, 154:22, 156:2, 162:2, 163:13
**themself** [1] - 3:12
**themselves** [6] - 133:1, 133:10, 133:18, 133:21, 138:22, 160:11
**therefore** [3] - 18:12, 71:7, 91:4
**thinking** [1] - 144:7
**third** [3] - 83:11, 88:22, 160:15
**thorough** [3] - 45:10, 66:8, 81:10
**threat** [5] - 121:20, 132:15, 132:19, 132:23, 133:6
**threatened** [1] - 133:20
**threatening** [7] - 106:9, 106:21, 115:18, 122:3, 122:17, 127:17
**threats** [1] - 116:2
**three** [8] - 7:16, 46:19, 47:1, 135:23, 149:12, 149:16, 149:17, 166:8
**threw** [18] - 53:14, 57:12, 57:15, 58:1, 58:4, 58:9, 58:13, 58:18, 59:3, 59:10, 85:23, 86:9, 86:18, 86:23, 87:23, 96:23, 155:14, 156:6
**throughout** [1] -

152:12
throw [2] - 58:19, 92:12
thrown [2] - 53:9, 53:10
thumb [1] - 166:12
timeframe [4] - 9:7, 67:18, 158:17, 161:23
timeframes [1] - 142:17
timestamps [1] - 104:16
TIMOTHY [1] - 2:11
tiny [3] - 153:10, 154:5, 154:6
title [2] - 11:4, 33:14
TO [2] - 166:1, 167:1
today [5] - 41:6, 41:14, 41:18, 84:17, 150:3
took [35] - 6:18, 7:1, 12:6, 50:8, 52:9, 54:19, 55:19, 57:8, 86:3, 87:5, 87:15, 87:19, 90:11, 98:11, 100:3, 100:13, 102:1, 102:4, 104:7, 104:13, 106:20, 113:11, 117:16, 119:17, 122:18, 126:18, 126:20, 126:23, 128:5, 128:7, 128:8, 128:17, 129:4, 149:18, 153:7
top [4] - 65:14, 135:12, 137:15, 137:19
total [3] - 9:21, 80:12, 92:2
touch [1] - 48:16
tourniquets [1] - 111:20
towards [5] - 85:18, 106:10, 116:7, 119:17, 120:3
traffic [1] - 13:11
trained [7] - 112:2, 112:19, 112:21, 132:22, 133:3, 133:9, 133:17
trainees [1] - 159:14
training [15] - 53:2, 110:19, 110:20, 110:22, 111:3, 111:16, 111:18, 111:19, 111:20, 111:23, 112:6, 112:10, 112:21, 159:18
transcript [2] -

139:14, 164:4
transferred [4] - 9:1, 9:13, 9:22, 10:2
transport [1] - 103:20
transported [1] - 143:7
transporting [3] - 100:14, 101:3, 103:16
treatment [3] - 114:5, 114:7, 114:9
tree [1] - 36:22
tried [1] - 2:21
trigger [3] - 37:21, 38:2, 51:23
trouble [1] - 83:14
trucks [1] - 154:7
true [6] - 42:4, 42:5, 42:6, 42:13, 61:5, 164:4
truth [3] - 165:14, 165:15
try [2] - 154:13, 156:21
turn [2] - 34:14, 81:2
turned [1] - 116:7
turning [1] - 66:5
turns [1] - 55:19
TV [4] - 46:9, 47:20, 48:4, 48:15
two [23] - 11:3, 23:4, 23:7, 23:15, 68:22, 72:6, 85:6, 105:15, 105:20, 107:12, 107:18, 124:10, 127:3, 130:17, 131:20, 135:17, 135:23, 137:10, 154:16, 157:2
type [11] - 35:4, 35:5, 43:11, 43:16, 43:21, 61:11, 61:12, 86:7, 87:7, 132:6, 161:5
types [4] - 13:20, 19:21, 20:2, 111:16
typical [1] - 11:11
typically [2] - 78:6, 154:3

## U

unclear [1] - 123:9
under [8] - 9:6, 10:13, 77:16, 98:5, 99:5, 130:6, 147:8, 165:10
understood [2] - 104:22, 123:23
unfounded [8] -

25:8, 26:3, 26:16, 32:22, 43:15, 65:16, 65:20, 156:14
union [23] - 29:6, 30:2, 30:13, 73:7, 73:14, 74:18, 74:23, 75:1, 75:3, 75:13, 75:18, 76:5, 76:7, 76:12, 76:15, 76:18, 77:23, 78:4, 78:6, 78:8, 80:1, 156:22, 157:14
unions [1] - 74:14
unit [1] - 13:23
UNITED [1] - 1:3
United [1] - 2:21
units [1] - 11:21
unless [1] - 34:10
unlikely [1] - 54:22
up [54] - 9:13, 10:21, 12:2, 12:8, 18:2, 21:15, 21:20, 21:22, 21:23, 26:11, 28:6, 38:21, 40:22, 41:4, 64:4, 64:7, 64:12, 72:5, 76:21, 79:13, 79:23, 82:8, 83:22, 106:13, 107:12, 107:18, 108:19, 109:9, 110:3, 110:5, 111:1, 112:8, 112:16, 113:1, 114:19, 114:23, 116:21, 117:4, 117:5, 117:20, 124:1, 125:2, 126:6, 126:8, 126:20, 131:7, 131:15, 131:19, 136:16, 139:16, 142:17, 159:3, 159:5
upper [1] - 141:13
US [4] - 47:23, 48:16, 48:19, 49:10
USB [3] - 149:9, 149:14, 166:7
usual [1] - 3:18

## V

vacant [1] - 103:12
variety [1] - 108:3
various [1] - 62:20
vary [2] - 60:18, 109:1
vehicle [92] - 15:1, 15:3, 15:5, 15:10, 37:7, 51:22, 53:9, 53:10, 53:15, 53:17, 54:6, 55:21, 57:2, 57:3, 57:12, 57:14, 58:2, 58:4, 58:9,

58:14, 58:18, 58:19, 59:4, 59:5, 59:10, 59:11, 59:20, 59:22, 62:11, 62:17, 63:3, 85:4, 85:18, 85:19, 86:1, 86:10, 86:23, 87:12, 88:1, 90:7, 91:12, 91:14, 91:16, 92:6, 92:10, 92:12, 92:21, 93:6, 93:20, 93:21, 93:22, 94:7, 94:16, 95:11, 95:23, 96:6, 96:8, 96:23, 105:3, 105:5, 105:11, 107:8, 113:21, 122:22, 134:9, 134:15, 134:16, 135:2, 135:5, 135:15, 136:3, 136:15, 136:19, 137:19, 137:20, 138:6, 139:19, 144:13, 144:21, 146:14, 147:16, 150:19, 150:21, 151:13, 151:15, 152:15, 153:6, 154:16, 155:15, 156:6
vehicles [3] - 60:22, 85:6, 141:18
VELEZ [1] - 1:14
Velez's [1] - 150:21
vendors [1] - 61:9
verbal [1] - 4:23
verbatim [1] - 165:8
verify [1] - 139:14
versus [2] - 2:23, 4:11, 66:2
VIDEO [1] - 1:1
video [86] - 2:19, 3:6, 3:10, 35:18, 41:15, 41:19, 82:7, 83:3, 83:6, 83:11, 83:14, 83:19, 83:20, 83:23, 84:2, 84:4, 84:7, 84:15, 84:19, 85:15, 85:22, 86:22, 87:4, 87:15, 87:22, 88:4, 90:6, 90:10, 95:22, 96:12, 104:10, 104:12, 105:2, 106:5, 106:8, 106:18, 106:19, 106:22, 107:7, 108:1, 108:5, 108:8, 115:4, 115:16, 115:23, 116:3, 117:12, 118:7, 118:17, 119:10, 120:22, 122:3, 122:6, 124:17, 124:21,

125:9, 127:1, 127:21, 128:1, 130:20, 134:6, 134:8, 134:23, 135:9, 136:11, 136:13, 137:8, 137:11, 137:13, 138:14, 139:10, 141:11, 141:14, 141:22, 142:3, 142:9, 142:10, 143:11, 146:10, 149:10, 149:15, 150:1, 150:17, 152:11, 166:7
Video [2] - 2:1, 151:10
Videographer [1] - 2:17
VIDEOGRAPHER [10] - 2:19, 82:15, 82:17, 124:4, 124:6, 137:2, 137:4, 149:4, 149:6, 163:13
videos [4] - 82:23, 83:15, 138:11, 153:4
videotape [3] - 118:12, 119:2, 123:6
videotaping [1] - 118:20
view [11] - 49:14, 93:20, 120:11, 124:10, 134:13, 134:17, 135:3, 135:7, 135:15, 135:20, 136:4
viewed [3] - 142:2, 154:14, 154:17
viewpoint [2] - 151:14, 152:16
violate [1] - 56:21
visual [1] - 105:9
volume [1] - 161:19
volumes [1] - 23:5
vote [4] - 17:5, 17:7, 32:15, 32:19
voted [1] - 17:10
vs [1] - 1:8

## W

wait [9] - 4:21, 39:3, 40:5, 40:11, 57:8, 73:19, 108:21, 145:22, 158:7
waited [2] - 101:18, 114:7
waiting [2] - 39:9, 41:1
Walden [1] - 21:22
walk [2] - 99:22, 117:6
walked [4] - 106:13,

16

107:18, 119:16
**walking** [7] - 85:17, 106:1, 107:12, 125:14, 125:18, 131:20
**wants** [9] - 18:12, 78:9, 101:15, 108:20, 117:9, 117:16, 123:4, 133:12, 157:15
**warranted** [1] - 127:13
**watch** [4] - 45:22, 46:13, 85:8, 135:14
**watched** [6] - 45:14, 46:6, 83:1, 124:17, 137:9, 153:4
**watching** [8] - 82:21, 85:22, 86:21, 87:22, 134:23, 151:13, 152:11, 153:3
**ways** [1] - 49:22
**weapon** [1] - 121:21
**week** [2] - 14:15, 19:8
**Western** [1] - 2:22
**WESTERN** [1] - 1:4
**whatever's** [1] - 75:19
**whatsoever** [2] - 101:1, 102:15
**whole** [6] - 10:17, 35:11, 38:8, 133:14, 154:23, 165:14
**width** [2] - 105:19, 105:22
**wife** [2] - 111:9
**wit** [1] - 89:16
**Witness** [1] - 167:2
**WITNESS** [77] - 12:12, 14:12, 37:15, 38:20, 57:17, 58:7, 58:22, 59:9, 65:8, 85:17, 86:15, 87:4, 88:4, 90:10, 90:20, 91:21, 92:15, 94:21, 95:4, 95:13, 96:19, 98:14, 99:2, 99:19, 100:17, 101:6, 102:20, 103:11, 105:14, 106:12, 107:2, 109:11, 110:11, 112:18, 113:6, 114:1, 114:21, 115:9, 115:20, 116:1, 116:15, 117:12, 117:19, 118:5, 119:1, 120:22, 121:6, 121:18, 122:6, 123:3, 123:19, 127:10, 128:15, 132:18,

133:3, 135:9, 135:22, 138:2, 138:9, 139:9, 141:5, 143:18, 144:6, 144:16, 145:2, 145:13, 145:21, 146:5, 146:19, 147:20, 151:18, 152:9, 152:19, 153:14, 154:22, 156:2, 162:2
**witness** [6] - 3:13, 36:13, 80:17, 88:7, 90:23, 149:20
**witnessed** [1] - 98:10
**WITNESSES** [1] - 167:1
**witnesses** [2] - 80:11, 80:13
**WIVB** [1] - 46:3
**word** [2] - 68:10, 129:20
**words** [1] - 70:3
**wrestle** [1] - 130:5
**writing** [1] - 165:10
**written** [4] - 40:10, 50:11, 52:22, 104:9

---

## Y

**year** [6] - 9:10, 18:13, 72:6, 76:23, 157:2
**years** [24] - 6:5, 6:22, 8:18, 9:4, 9:5, 9:7, 9:21, 13:12, 16:17, 18:8, 18:14, 18:16, 18:19, 29:8, 29:13, 29:15, 30:11, 46:19, 47:1, 68:22, 70:19, 111:8, 158:20, 158:23
**York** [7] - 2:5, 2:9, 2:14, 2:22, 3:4, 4:2, 165:6
**YORK** [2] - 1:4, 165:1
**yup** [2] - 44:9, 67:4

---

## Z

**zone** [2] - 21:17, 22:2
**zones** [2] - 21:7, 21:9