UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES C. KISTNER,

               Plaintiff,

      vs.                                        Civil No.:  18-CV-00402

THE CITY OF BUFFALO, BYRON LOCKWOOD,
DANIEL DERENDA, LAUREN McDERMOTT,
KARL SCHULTZ, KYLE MORIARITY, DAVID T.
SANTANA, and ANTHONY McHUGH,

               Defendants.
_____


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS
<u>AND FOR SUMMARY JUDGMENT</u>**


**RUPP BAASE PFALZGRAF CUNNINGHAM** LLC
*Attorneys for Plaintiff, James C. Kistner*
R. Anthony Rupp III
Jill L. Yonkers
Chad A. Davenport
1600 Liberty Building
Buffalo, New York  14202
rupp@ruppbaase.com
yonkers@ruppbaase.com
davenport@ruppbaase.com
(716) 854-3400

## PRELIMINARY STATEMENT[1]

In the typical Section 1983 claim for false arrest, false imprisonment, and malicious prosecution, it is not uncommon for the defendant police officers to move for summary judgment claiming that they are entitled to qualified immunity because they had probable cause to effect the arrest.  If the facts and information known by the arresting officers at the time of the arrest are not in dispute between the parties, probable cause should be determined by the trial court as a matter of law.  In many if not most cases, the facts are not in dispute, and the only issue is whether the arresting officers did or did not have probable cause.

Here, Defendants have moved for summary judgment claiming that Officer Lauren McDermott had probable cause to arrest James Kistner because she "perceived the contact between her patrol vehicle and Plaintiff to be the result of him walking into the vehicle" and "[t]his perception is supported by [Officer] Schultz's observations."  (Dkt. 69-1, p. 21).  If Officer McDermott's account were not in dispute as Defendants impliedly claim, this Court ordinarily would proceed to determine the issue of probable cause as a matter of law and resolve the motions accordingly.

In this case, however, Plaintiff disputes Officer McDermott's claim as to what she perceived and Officer Schultz's claim as to what he observed and contends that the credibility of these officers is an issue of fact for the jury to determine at the time of trial.  Plaintiff further contends and seeks to adduce evidence at trial that Defendants knew all along that Officer McDermott negligently struck Plaintiff with her SUV and that she and her colleagues concocted

---

[1] Plaintiff agrees that there is no standalone claim for respondeat superior, punitive damages, and attorneys' fees, and that dismissal of those claims is proper.  Plaintiff instead relies on his prayer for relief and allegations in the Complaint that support Plaintiff's recovery of punitive damages and attorneys' fees, as well as his recovery against the City of Buffalo under a theory of respondeat superior for his New York State law claims.  *See, infra.*  In addition, Plaintiff agrees that, to the extent this Court agrees that there are more traditional tort theories available – *i.e.* false arrest, false imprisonment, and malicious prosecution – dismissal of his intentional infliction of emotional distress claim is proper.  Finally, Plaintiff agrees that dismissal of his claim for assault is proper.

the story that Plaintiff threw himself at the vehicle to spare Officer McDermott the embarrassment and aggravation of multiple investigations into her negligent driving and possible discipline for causing the accident.  Because the facts pertaining to what the officers perceived, knew, and observed at the time of the incident are very much in dispute, this Court cannot simply assume that the officers' accounts are accurate, and proceed to decide the issue of probable cause in Defendants' favor on a motion for summary judgment.[2]

As a point of clarity, Plaintiff's false arrest, false imprisonment, and malicious prosecution claims relate to the criminal mischief charge (for allegedly damaging McDermott's vehicle), and Plaintiff's First Amendment retaliation claim is based on the disorderly conduct charge (for language allegedly used by Kistner at the hospital).  These criminal charges are separate and distinct charges that arise out of different alleged conduct by Mr. Kistner.  Therefore, a finding by the Court that Defendants had probable cause to arrest Kistner for one of the criminal charges will not affect his claims regarding the other criminal charge.  *See Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989).

**ARGUMENT I[3]:      EACH DEFENDANT WAS PERSONALLY INVOLVED
                                    IN VIOLATING PLAINTIFF'S CIVIL RIGHTS**

To hold a defendant liable in his or her individual capacity under Section 1983, there must be personal involvement in the constitutional deprivations at issue by each individual held liable.  *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).  In this case, Plaintiff adequately has shown personal involvement by defendants Schultz, Moriarity, McDermott, and

---

[2] As is set forth in Plaintiff's motion for summary judgment, this Court is empowered to reject the version of events proffered by Officers McDermott and Schultz on the ground that those versions are incredible as a matter of law because they are contradicted by video evidence and the laws of physics.  Were this Court to do so, it could dismiss Defendants' defenses based on probable cause and qualified immunity and grant summary judgment to Plaintiff on his causes of action for false arrest, false imprisonment, and malicious prosecution.

[3] Defendants' motion explains at length the standard for their summary judgment and motion for judgment on the pleadings.  Plaintiff will not repeat those standards here and, instead, will assume the Court's familiarity.

Velez as they all were present at the scene of the incident.  (SOF, ¶¶ 1-9).  In addition, for the reasons explained below, Officer David Santana may be held liable for his failure to intervene and prevent the false arrest and prosecution of Mr. Kistner.  (*See* Point VI, *infra*).

For Defendants Lockwood, Derenda, and McHugh, a supervisory official can be found to have been personally involved in an alleged constitutional violation in a number of ways, including: "(1) actual direct participation (2) failure to remedy a wrong after being informed through a report or appeal; (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring."  *Guillory v. Cuomo*, 616 Fed. Appx. 12, 13 (2d Cir. 2015) (citing *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003)).

Here, Lt. McHugh testified that, on the day of the incidents, he was called on his cell phone by Officers McDermott and Schultz who told him that Kistner threw himself against McDermott's stopped patrol car intentionally causing damage to the driver's side mirror and window.  (*See* SOF, ¶ 9).  Rather than drive to the scene to investigate the accident, as he was obligated to do as the only working supervisor in C-District on New Year's Day 2017, McHugh advised the on-scene officers to charge Mr. Kistner criminally.  (Huggins Decl., Exhibit K, pp. 115-16, 122).  McHugh even suggested the Penal Law section to use in charging Kistner.  (*Id.*).  By directing the on-scene officers to arrest Kistner, Lt. McHugh may be held liable for his "actual direct participation" in the false arrest and prosecution of Kistner.  *See, e.g., Colon v. City of Rochester*, 419 F. Supp. 3d 586, 609 (W.D.N.Y. 2019) (holding that supervisor may be held liable for directing officers to arrest plaintiff).

The complaint's allegations and evidence before the Court also satisfy the grossly-negligent-supervision standard, "where the plaintiff established that the defendant-supervisor was aware of a subordinate's substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Raspardo v. Calone*, 770 F.3d 97, 116-17 (2d Cir. 2014) (citations omitted).  Here, Lt. McHugh knew, or should have known, that Shultz repeatedly had violated the civil rights of Buffalo citizens, as Schultz was identified as being within the top 10% of Buffalo police officers who received excessive-force and other general complaints from 2015 to 2020.  (Rupp Decl., Ex. P, pp. 21-22, identifying 17 complaints made against Officer Schultz, 12 of which occurred before January 1, 2017, the date of the underlying incidents here).  McHugh's length of time on the force, his time in C-District, and his service in a supervisory capacity (Huggins Decl., Exhibit K, pp. 10-14), also should have caused him to question the veracity of Schultz's purported observations.  Instead, McHugh took the officers' statements as fact and never responded to the scene of the accident, Central Booking, or the hospital where officers took Kistner.  If Lt. McHugh had responded to Schmarbeck Avenue, he would have learned of the existence of the surveillance video and that the accident did not cause any damage to McDermott's patrol vehicle, either of which would have cast doubt as to what the officers told him and triggered a full and proper investigation.  (*See* Campanella, Exhibit B, pp. 20-21).  Indeed, even if McHugh continued to believe his officers' version of the events even after viewing the video evidence, his viewing of the video would have triggered an investigation by the City of Buffalo's Accident Investigation Unit ("AIU") and Internal Affairs Department ("IAD"), as there are "no exceptions" to the MOP policy requiring a full investigation whenever there is a city-involved motor vehicle accident.  (SOF, ¶ 85).

Additionally, the Court may find Lt. McHugh was personally involved in the violation of Plaintiff's civil rights due to his failure to take proper measures to investigate or discipline Schultz for his repeated violations of the civil rights of City of Buffalo citizens, even before the violations of Kistner's rights on New Year's Day 2017.  (*See* Rupp Decl., Exhibit P). Notably, in 2012, Officer Schultz was involved in shooting a civilian, which cost the City of Buffalo $4.5 million to settle.[4]  An investigation of the incident was commenced by IAD, which found the complaint against Schultz for his role in the civilian shooting was "not sustained." (*See* Rupp Decl., Exhibit P).  On September 12, 2020, a month after the IAD investigation resulted in a "not sustained" finding for his role in the incidents that are the subject of this lawsuit, Officer Schultz was the triggerman who shot and seriously injured a 60-year-old homeless man while responding to a call involving a man in apparent mental distress.[5]  Since Schultz joined BPD in 2008, he has been investigated by IAD seventeen times.  Eleven of those investigations ended in a finding of "not sustained," he was exonerated once, and three of those cases resulted in a conference with his supervisors.[6]  (*See* Rupp Decl., Exhibit P).  Obviously, receiving a 'talking-to' by his supervisors is not sufficient to change this delinquent officer's behavior.

In fact, not only did Lt. McHugh tacitly approve of Schultz's repeated violations of citizen's rights by failing to discipline him, he encouraged the continuation of Schultz's bad behavior by permitting and likely approving Schultz's position as Officer Moriarity's Field

---

[4] The Court may take judicial notice of the public settlement made by the City of Buffalo: https://www.investigativepost.org/2020/02/04/police-shooting-costs-buffalo-4-5-million/

[5] The Court may take judicial notice of this story as well: https://www.investigativepost.org/2020/09/14/saturdays-shooting-wasnt-buffalo-cops-first/

[6] Two IAD complaints against Schultz were still pending at the time of the City of Buffalo's disclosure of his disciplinary card.

Training Officer ("FTO").  (SOF, ¶ 38).  As explained by Mr. Campanella, the role of the FTO is

one of the most important aspects of leadership in any police department.  (Campanella Aff.,

Exhibit B, p. 22).  The FTO is supposed to set an example for the trainee by modeling correct

police behavior and closely monitoring the trainee's behavior.  (*Id*.)  On New Year's Day 2017,

Moriarity was a rookie officer in his first week of training.  (SOF, ¶ 38).  As Moriarity's FTO,

Schultz set a poor example for the young officer he was responsible for training and supervising.

Due to these numerous bad examples, including Moriarity and Schultz's rough handling of

Mr. Kistner's son, Earl Kistner, and improper confiscation of his cell phone (SOF, ¶ 57),

Moriarity now has become his own menace to City of Buffalo citizens.  Notably, despite only

recently being added to the BPD roster in November of 2016, Moriarity was listed in the top

10% of Buffalo police officers who received excessive-force complaints from 2015 to 2020.

(*See* Rupp Decl., Exhibit P).

       McHugh's tolerance of the officers' misconduct should not be surprising, as the

City of Buffalo has an informal policy or custom that allows its officers, including Schultz,

repeatedly to violate the civil rights of citizens with absolute impunity.  (*See* Point II, *infra*).  As

the lead policymakers for the City of Buffalo Police Department, former BPD Commissioner

Daniel Derenda and current BPD Commissioner Byron Lockwood's personal involvement is

demonstrated through their "(3) creation of a policy or custom that sanctioned conduct

amounting to a constitutional violation, or allowing such a policy or custom to continue."

*Guillory*, 616 Fed. Appx. at 13.  The complaint's allegations and evidence before this Court,

therefore, demonstrate that each individual defendant was personally involved in the multiple

violations of Kistner's constitutional rights.

**ARGUMENT II:      PLAINTIFF'S ALLEGATIONS AND THE EVIDENCE BEFORE THE COURT SUPPORT A VIABLE *MONELL* CLAIM AGAINST THE CITY OF BUFFALO UNDER 42 U.S.C. § 1983[7]**

Although a municipality may not be held liable under Section 1983 under a theory of respondeat superior,[8] a municipality may be held liable for the constitutional violations of its employees when such violations result from a municipal custom, policy, or practice. *See Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658, 692-94 (1978). Despite Defendants' contention to the contrary, the Second Circuit has made clear that showing a pattern of constitutional violations is not necessary to establish deliberate indifference for all *Monell* claims. *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("It is not necessary, therefore, for plaintiffs to prove that a municipality has followed a particular course of action repeatedly in order to establish the existence of a municipal policy; rather, a single action taken by a municipality is sufficient to expose it to liability."); *see also Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 331-32 (2d Cir. 1986) (City's "uninterested and superficial" response to complaint "would have been viewed by the officers and should have been viewed by an objective observer, as reflecting an indifference by the City" to civil rights violations by its officers).

Indeed, the law is clear that municipal policymakers may not fail to supervise subordinates to such an extent that the failure amounts to deliberate indifference to the rights of those who interact with them. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Failures

---

[7] Plaintiff respectfully requests that the Court take notice that Defendants failed to make any specific arguments relating to Plaintiff's pleadings in this section of their motion and, instead, simply recite case law that they believe to be pertinent to their defense.

[8] Notably, the City of Buffalo *can* be held liable under a theory of respondeat superior for Plaintiff's false arrest, false imprisonment, and malicious prosecution claims under New York State law. *Holland v. City of Poughkeepsie*, 90 A.D.3d 841, 844 (2d Dept. 2011); *see also Raysor v. Port Authority of New York and New Jersey*, 768 F.2d 34, 38 (2d Cir. 1985) (Port Authority of New York and New Jersey may be held liable as employer for state law false arrest claim effected by its police officer).

by the municipality to investigate, retrain, and discipline a subordinate after a single incident can

all be sufficient evidence of a failure to supervise theory of *Monell* liability.  *See, e.g., Amnesty*,

361 F.3d at 125; *Greenway v. County of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015)

("single instance of deliberate indifference to subordinate's actions" is sufficient to expose

municipality to liability); *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014)

(denying City's motion for summary judgment regarding the plaintiff's *Monell* claim concluding

"[t]he single action or inaction of a municipal policy maker, such as a specific failure to

adequately supervise or discipline an officer, can also form an official policy or custom

attributable to a municipality for purposes of municipal liability").  Thus, a municipality can be

found to be deliberately indifferent based on a single instance of a failure to discipline or retrain

officers after a clear civil rights violation.  *See Greenway*, 97 F. Supp. 3d at 238 ("policymaker's

failure to investigate or rectify the situation evidences deliberate indifference rather than mere

negligence or bureaucratic inaction") (citing *Amnesty*, 261 F.3d at 128; *Vann v. City of New

York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).

      Here, Plaintiff has presented substantial evidence demonstrating that the City of

Buffalo's IAD process for investigating and disciplining officers is flawed, and that there exists

an informal policy or custom that allows Schultz and other BPD officers to violate the civil rights

of others without any serious consequences.  *See Cash v. County of Erie*, 654 F.3d 324 (2d Cir.

2011) ("municipal policy may be pronounced or tacit and reflected in either action or inaction").

On March 31, 2017, Kistner filed a Notice of Claim against the City of Buffalo.  (SOF, ¶ 70).

According to the public spokesman for BPD, Captain Rinaldo, Kistner's filing of the Notice of

Claim should have triggered an Internal Affairs Investigation.  (SOF, ¶ 76).  On March 30, 2018,

Kistner filed a lawsuit naming, inter alia, the City of Buffalo, Daniel Derenda, and Byron

Lockwood as defendants.  (SOF, ¶ 73).  Notably, each defendant was served with a copy of the complaint as well as a copy of the surveillance video capturing the incidents.  On February 8, 2019, Kistner sent a letter to Commissioner Byron Lockwood requesting an investigation into the officers' actions.  (SOF, ¶ 74).  However, it was not until December 19, 2019 that The City of Buffalo commenced an Internal Affairs investigation for the New Year's Day 2017 incident. (SOF, ¶ 75).  Notably, December 19, 2019 is the same day WIVB Channel 4 News first aired a news story about this lawsuit and the incidents underlying Kistner's claims, suggesting that BPD was not interested in investigating this incident until it started to cause The City public embarrassment.  (SOF, ¶ 75).

As explained by Plaintiff's unchallenged expert, John Campanella, the on-scene officers as well as Lt. McHugh violated BPD policy and procedures when they failed to notify AIU and IAD to conduct a proper investigation, as they were required to do pursuant to BPD's MOP.  (Campanella Aff., Exhibit B, pp. 11, 20-21).  Commissioner Lockwood testified during his deposition that AIU and IAD should have been notified to investigate, and that there are "no exception[s]" to this policy.  (SOF, ¶ 85).  Commissioner Lockwood further stated that AIU and IAD should have been notified even if the on-scene officers perceived the incident to be criminal mischief or a suicide attempt involving a BPD vehicle in motion.  (SOF, ¶ 85).  It is undisputed that the on-scene officers did not notify AIU or IAD.  Lockwood admitted during his deposition "IAD should have been notified.  (Rupp Decl., Exhibit A, 165:11).

Despite this admission, as well as his numerous admissions of other clear violations of the MOP,[9] on August 13, 2020, Kistner received a letter from the City of Buffalo

---

[9] During Lockwood's deposition, he admitted to multiple violations of the MOP by the on-scene officers, including, inter alia, the seizure of Earl Kistner's cell phone when he tried to call an ambulance for his father, McDermott's failure to document the alleged damage to her vehicle caused by the accident, and Schultz's decision to transport Kistner to ECMC rather than allow an ambulance to come to the scene.  (SOF, ¶ 57).

reporting that "[b]ased on a thorough review of this case, the Commissioner of Police has determined . . . that the case disposition be carried as 'not sustained.'"  (Rupp Decl., Exhibit J). During Lockwood's deposition, however, he admitted that he is not sure if he even viewed the video of the incidents before deciding if charges or discipline against the on-scene officers was warranted.  (SOF, ¶ 86).  Notably, the IAD Case Index does not list the ***surveillance videos of the incident*** as evidence that was reviewed and included in the investigation of the on-scene officers' conduct.  (Rupp Decl., Exhibit O).  This appalling and glaring omission supports Mr. Campanella's conclusion that the IAD investigation by the City was "more obligatory than investigatory."  (*See* Campanella Aff., Exhibit B, p. 33).

The evidence before this Court also demonstrates that, when IAD finally commenced an investigation regarding the on-scene officers' conduct nearly three years after the incident, the scope of that investigation was circumscribed in curious fashion.  (*Id.*, pp. 22-25). During Lockwood's deposition, he stated that when reviewing the IAD case file, his only concern was whether Officer McDermott ***intentionally*** struck James Kistner with her patrol car. (SOF, ¶ 83).  Upon further examination, when questioned on whether he was at all concerned with any of the other admitted policy violations, Lockwood testified as follows:

> Q:  You knew that . . . [the] incident that's depicted in that video that you saw at some point was never reported to the lieutenant, to IAD, or AIU to perform the types of investigation that we spoke about at length earlier today, correct?
>
> A:  Correct.
>
> Q:  What corrective actions did you take or discipline did you impose against the officers who did not report that incident as required by the MOP?
>
> A:  None.

Rupp Decl., Exhibit A, pp. 163-64.

As a result of the narrow investigation, IAD and Commissioner Lockwood ignored or failed to consider evidence of *thirteen* violations of the MOP and *four* crimes committed by the on-scene officers.  (*See* Campanella Aff., Exhibit B, p. 34).  This evidence is sufficient to raise a jury issue that BPD had a preconceived disposition when it commenced the IAD investigation, and that Commissioner Lockwood and his subordinates crafted a limited investigation of the incidents that they knew would result in the officers' exoneration.  The City of Buffalo's failure properly to investigate, retrain, and discipline the on-scene officers for their clear misconduct in this single incident is sufficient to subject the City to liability under 42 U.S.C. § 1983.  *See, e.g., Amnesty*, 361 F.3d at 125; *Greenway*, 97 F. Supp. 3d at 239; *Pipitone*, 57 F. Supp. 3d 173.

However, even if the Court were to disagree and find that this single instance of deliberate indifference to the on-scene officers' conduct is not sufficient to trigger *Monell* liability, Plaintiff has presented substantial evidence demonstrating that Commissioner Lockwood's lack of care for disciplining and retraining these officers is merely a continuation of former Commissioner Derenda's informal policy of not disciplining officers who violate the MOP or engage in criminal behavior.  As explained above, prior to the New Year's Day 2017 incident, Officer Schultz had twelve IAD complaints against him, one of which included an officer-involved shooting that led to a $4.5 million settlement paid by The City.  *See, supra*.  The IAD investigation of the 2012 shooting concluded with former Commissioner Derenda finding the allegations of wrongdoing by Schultz were "not sustained."  (Rupp Decl., Exhibit P). Commissioner Derenda is responsible for this policy as he was the BPD Commissioner on New Year's Day 2017, and the officers behaved in a way demonstrating they relied on Derenda's informal policy of not disciplining subordinates when they falsely arrested Kistner.

Accordingly, dismissal of Plaintiff's *Monell* claim against the City of Buffalo is inappropriate as Plaintiff has come forward with substantial evidence demonstrating flaws in the City's investigation and discipline process for its officers. *See Ramos v. County of Suffolk*, No. 07-CV-1250, 2009 WL 10708571, at *5 (E.D.N.Y. Sept. 8, 2009) ("post-incident conduct may be probative to show the existence of a municipal custom").[10]

**ARGUMENT III:   DISMISSAL OF PLAINTIFF'S FALSE ARREST AND FALSE IMPRISONMENT CLAIMS BASED ON McDERMOTT'S 'PERCEPTION' OF THE ACCIDENT IS NOT PROPER AS OFFICERS McDERMOTT AND SCHULTZ ARE INCREDIBLE AS A MATTER OF LAW**

It is undisputed that Defendants: (1) intended to confine Mr. Kistner on New Year's Day 2017—they placed him under arrest, escorted him to their patrol car, and transported him to ECMC and later booking; (2) Mr. Kistner was conscious of his confinement; and (3) Mr. Kistner did not consent to the confinement. (SOF, ¶¶ 1-9).[11]  In Defendants' motion, they argue that their arrest and confinement of Mr. Kistner was based on probable cause or arguable probable cause, and therefore privileged. Defendants, however, provide no evidence in support of their contention aside from the self-serving testimony of the on-scene officers who are incredible as a matter of law. (*See* Dkt. 69-1, p. 21).

Where, as here, an arrest is made without a warrant, a presumption arises that the arrest was unlawful, and the burden of proving the arrest was privileged—*i.e.*, was based on probable cause—is cast upon Defendants. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).  Here,

---

[10] To the extent the Court finds that the evidence supports that there are triable issues regarding Plaintiff's *Monell* claim against the City of Buffalo, Plaintiff agrees that his official claims against the individual defendants are duplicative and should be dismissed.

[11] In Defendants' affirmative motion, they do not challenge Plaintiff's false arrest and false imprisonment claims on any of these grounds, and thereby have implicitly agreed that there is no genuine dispute regarding Plaintiff's ability to establish the first three elements. (*See* Dkt. 69-1, pp. 18-22).

Defendants contend that, because "McDermott did not appreciate the incident to be a motor vehicle accident," and rather, "perceived the contact between her patrol vehicle and Plaintiff to be the result of him walking into the vehicle and observing damages after," there existed sufficient probable cause to arrest Kistner.  (*See* Dkt. 69-1, p. 21).  Defendants attempt to bolster this argument by asserting McDermott's "perception [was] supported by Schultz's observations." (*Id.*)  Therefore, whether probable cause existed to arrest Kistner on New Year's Day 2017 turns on whether the Court finds, as a matter of law, that McDermott and Schultz are credible and saw what they claim they saw.[12]

A.      **The Reasonableness of Officer McDermott's "Perception" of the Incident is a Jury Issue.**

Because Officer McDermott lost sight of plaintiff immediately before the impact, she did not actually observe Mr. Kistner walk into the vehicle.  (Huggins Decl., Ex. G, pp. 108-15, 153-55, 171-80).  Lacking any personal observations, she instead offers her "perception" of what happened, impliedly claiming that her perception – whatever it may be – provides probable cause to charge Mr. Kistner with a felony for damaging the SUV.  (*See* Dkt. 69-1, p. 21).

At a minimum, however, for it to be credited, Officer McDermott's perception must be objectively reasonable.  Occam's razor suggests that the most likely explanation for what happened is that Officer McDermott took her eyes off the road – as she has admitted – lost sight of Mr. Kistner – as she also admitted  – and struck Mr. Kistner with her vehicle – as is shown on the surveillance video of the incident (Yaek Aff., Ex. C) – as she pulled away to

---

[12] Should this Court agree that Officers McDermott and Schultz are not credible and did not see what they claim they saw, as a matter of law, defendants Moriarity, Velez, Santana, and McHugh are presumed to know that McDermott and Schultz were lying regarding their purported observations to establish probable cause to arrest Kistner.  *See Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) ("where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all"); *see also United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987).

follow Officers Moriarity and Schultz.  Plaintiff had not exhibited any signs of distress or

aberrant behavior before the impact to suggest that he planned to attack or walk into

McDermott's vehicle, and he had allowed the other marked police vehicle driven by Officer

Moriarity to pass without attacking or walking into it.  (Yaek Aff., Exhibit C).  Yet, Officer

McDermott's would have this Court believe that it was her perception that as soon as she took

her eyes off Mr. Kistner, he suddenly took leave of his senses and deliberately walked into or

attacked her vehicle.

    Because Officer McDermott's account of the incident is not based on personal

observations but instead on her (claimed) perception of what happened, an issue of fact remains

as to whether her perception is reasonable, and a further issue of credibility exists as to whether

her stated account of her perception is even true.  Because issues of reasonability and credibility

abound, defendants' motion relating to the defenses of probable cause and qualified immunity

must be denied.  *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003)

(holding that courts must not consider only a police officer's "self-serving account").

  **B.**  **The Video of the Incident Does Not Lie and Raises Credibility Questions.**

    Officer McDermott's self-serving claim that she "perceived" plaintiff to have

walked into her vehicle flatly is contradicted by the surveillance video of the incident, as is

Officer Schultz's claim that he saw Plaintiff throw himself at Officer McDermott's parked patrol

vehicle and that Kistner broke McDermott's driver's side mirror intentionally.  (Yaek Aff.,

Exhibit B).  The video shows that Officer McDermott's vehicle drove forward into Mr. Kistner

and continued moving forward even after Mr. Kistner had been thrown to the ground by the

impact.  (Yaek Aff., Exhibit B).  The video alone is sufficient to call the credibility of the two

officers into question.  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).  Moreover, the officers

were under a duty of inquiry to review the surveillance video before they effected Mr. Kistner's arrest.  *See Walsh v. Lunsford*, No. 14-CV-7108, 2017 WL 2895943, at *8 (S.D.N.Y. July 7, 2017) (although "[i]t is true that an arresting officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest . . . [r]easonable avenues of investigation must be pursued [to establish probable cause], and a police officer may not close her or his eyes to facts that would help clarify the circumstance of an arrest") (alterations in original) (internal quotations omitted).   The proof in the record establishes that the officers knew that the surveillance video existed yet declined to review it.  Huggins Decl., Ex. B.

## C.  Officer McDermott's Credibility Also is At Issue on the Question of the Damage Caused to Her Vehicle.

To arrest Mr. Kistner for felony property damage under New York Penal Law § 145.05, Officer McDermott must have had probable cause to believe that ***all*** elements of the charge had been met.  *See, e.g., Ackerson v. City of White Plains*, 702 F.3d 15, 19-22 (2d Cir. 2012).  The elements of the charge include that Mr. Kistner caused at least $250 damage to the police vehicle.  *See* N.Y. Pen. L. § 145.05 ("a person is guilty of criminal mischief in the third degree when . . . [he] damages property of another in an amount exceeding two hundred fifty dollars").

Significant credibility questions exist as to whether Officer McDermott truly believed that $250 in damage had been caused to the vehicle.  Although she claimed in the criminal complaint that the mirror had become detached from the impact and the driver's side window did not work, evidence in the case contradicts these assertions.  No visible damage to the vehicle is seen on the surveillance video, and from the degree and point of impact, it is hard to believe that the vehicle could have suffered any damage of the nature and severity described by Officer McDermott.  (Yaek Aff., Exhibit B, pp. 23-24).  Moreover, the vehicle was serviced at

the Buffalo Police Garage four days after the incident, and there is no record of the mirror or window being repaired at that time, or ever.  (*See* Rupp Decl., Exhibit B).  Finally, Officer McDermott acknowledge taking a photograph of the damage after the incident, but that photograph was either discarded or lost, and never was disclosed to Plaintiff (nor, apparently, to the District Attorney's office) despite repeated demands that it be produced.  (SOF, ¶ 62).

Based on the above, whether Officer McDermott truly believed that at least $250 in damage was caused to the police vehicle is an issue of fact that relies on a credibility determination.  Ample circumstantial evidence suggests that the vehicle sustained no damage and needed no repairs, and that Officer McDermott's claims to the contrary are as false as they are convenient.

### D.    Officer McDermott's Credibility as a Whole is an Issue of Fact for the Jury to Consider.

At her deposition in this matter, which was videotaped, Officer McDermott not only stuck to her story that Mr. Kistner caused the impact with her vehicle, but she repeatedly denied obvious facts about the incident that were depicted with clarity on the surveillance video and could not reasonably be subject to debate.  For example, Officer McDermott repeatedly was asked whether her vehicle was moving forward at the point of impact with Mr. Kistner and in fact continued to move forward even after impact.  Officer McDermott repeatedly denied that her vehicle was moving at the point of impact or that it continued to move thereafter.  Huggins Decl., Ex. G, pp. 108-15, 153-55, 171-80.  Yet, the video undeniably contradicted Officer McDermott's sworn testimony literally as she was watching it.[13]  It was only after several views that Officer McDermott finally admitted the obvious truth.

---

[13] Plaintiff has attached this portion of Officer McDermott's videotaped deposition so that the Court can see what the jury should be allowed to see—the exact video segments that Officer McDermott was asked to view as she was being asked questions about what she saw, and her testimony contradicting what was depicted in the video

Officer McDermott's performance at her deposition cannot be ignored, as it calls into question both her objectivity and her credibility. She was so wedded to her narrative about Plaintiff causing the impact with her police vehicle that she was willing to deny what could be seen with her own eyes on the video – video that she did not bother to review before she made the arrest. (*See* Rupp Decl., Exhibit S)

### E. Officer McDermott Had Substantial Motive to Falsify Her Account of the Incident.

Plaintiff will challenge Officer McDermott's credibility at trial by pointing to the jury the motive she had to blame Plaintiff falsely for her own negligent driving. As a trained police officer, and pursuant to the MOP, Officer McDermott knew that an accident involving a city-owned vehicle would trigger no fewer than three different investigations into the incident by the AIU, IAD, and her shift supervisor, Lt. McHugh. Officer McDermott acknowledged at her deposition that she was aware of these different investigations and the paperwork and headaches that they would cause. Huggins Decl., Exhibit G, pp. 200-01.

On the other hand, Officer McDermott and her colleagues also knew that if they blamed Mr. Kistner for walking into or throwing himself at the police vehicle and charged him with a felony, ***none*** of the aforesaid investigation or inquiries would take place – and that is exactly what occurred in this case. (*Id.*) By charging plaintiff with a felony and seeking to have him admitted involuntarily to the CPEP unit at ECMC, Officer McDermott and her colleagues saved themselves the hassle of being involved in multiple investigations, together with all the associated interviews and paperwork that those investigations would entail. (*Id.*) Moreover, in Officer McDermott's case, she saved herself the awkwardness of explaining why she took her

---

segments. Plaintiff contends that Officer McDermott's performance at her deposition raises significant questions concerning her veracity and credibility. (*See* Rupp Decl., Exhibit S)

eyes off Mr. Kistner and drove into him, and thus avoided the possibility of departmental discipline for her negligent driving.

In short, Defendants' contention that summary judgment is appropriate based on McDermott's "perception," and Schultz's observations that were physically impossible for him to observe (*see* Yaek Aff., Ex. B, pp. 10-24), should be summarily rejected by the Court.

**ARGUMENT IV:     DEFENDANTS LACKED PROBABLE CAUSE TO COMMENCE
                   AND CONTINUE THE CRIMINAL PROSECUTION**

Defendants' motion attacks Plaintiff's malicious prosecution claim on the issue of probable cause.[14]  "[I]n the context of malicious prosecution, probable cause exists when the facts and circumstances would lead a reasonably prudent person to believe the plaintiff is guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).  The issue with respect to malicious prosecution is whether probable cause exists "at the time the judicial proceeding is commenced," as opposed to at the time of the arrest.  *Peterson v. Regina*, 935 F. Supp. 2d 628, 642 (S.D.N.Y. 2013) (citation omitted).  Additionally, "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause."  *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).

As explained above, Defendants did not have probable cause to arrest Kistner, let alone prosecute him.  (*See* Point III(A)-(E), *supra*).  However, assuming, arguendo, that this Court finds an issue of fact related to probable cause to arrest, Defendants absolutely did not have probable cause to prosecute Kistner due to their utter failure to perform any investigation of

---

[14] Although Defendants' motion identifies five elements necessary to establish a malicious prosecution claim under Federal law, the first four of which also establish a claim for malicious prosecution under New York State law, Defendants' motion does not challenge Plaintiff's ability to satisfy the other four elements, and thereby has implicitly agreed that the only disputed issue is whether probable cause to prosecute Mr. Kistner continued throughout the criminal proceeding.  (*See* Dkt. 69-1, pp. 22-23).

the criminal charges they lodged against Plaintiff.  Indeed, at the time of Mr. Kistner's initial

arrest, Defendants were aware that the accident was recorded on surveillance cameras owned by

Plaintiff.  (Huggins Decl., Exhibit B).  In fact, the BPD "Complaint Summary Report" explicitly

notes that cameras on 37 Schmarbeck captured the incident.  Huggins Decl., Exhibit B (this entry

to the BPD CAD report was made at 11:07 a.m. on January 1, 2017).  However, no officer or

City employee attempted to view or obtain copies of the surveillance footage.  Instead,

Defendants continued their lawless prosecution of Mr. Kistner.

     The video of the accident establishes that Mr. Kistner did not throw himself at the

BPD vehicle (Yaek Aff., Exhibit B, pp. 10-13), thereby undermining an essential element for

Defendants' criminal charge against Plaintiff for criminal mischief in the third degree.  *See* N.Y.

Pen. L. 145.05(2).  Defendants' failure to pursue "reasonable avenues of investigation" to

establish material facts relied upon for the prosecution of Mr. Kistner evidences a lack of

probable cause as a matter of law.  *See, e.g., Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571-

72 (2d Cir. 1996).

     Additionally, Defendants lacked probable cause to prosecute Kistner for criminal

mischief because there is no evidence that Kistner caused $250.00 in damage to the BPD vehicle.

The criminal complaint, signed by Officer McDermott, alleged that the driver's side mirror was

"dislodged" from the vehicle and that the driver's side window was malfunctioning.  (Huggins

Decl., Exhibit C).  Although it should have been obvious that the vehicle was not damaged no

later than January 5, 2017 when it was serviced at the BPD Garage at the time the vehicle was

serviced, Plaintiff nonetheless was arraigned twelve days after the accident and forced to return

to court on several occasions to defend himself against these charges.  Defendants lacked

probable cause to prosecute Kistner once it was determined that the BPD vehicle was not

damaged, yet they continued to pursue the criminal charges without probable cause.

Accordingly, Defendants are liable for continuing the prosecution without probable cause.

**ARGUMENT V:    PLAINTIFF CAN SUSTAIN A FAILURE TO INTEVENE CLAIM BECAUSE HIS CONSTITUTIONAL RIGHTS WERE VIOLATED AND QUALIFIED IMMUNITY DOES NOT SHIELD LIABILITY**

Police officers have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. *See Savatxath v. Stoeckel*, No. 10-CV-1089, 2011 WL 1790159, at *5 (N.D.N.Y. May 10, 2011) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)).  "To establish such a claim of failure to intervene, a plaintiff must prove the following four elements: (1) that a constitutional violation was being committed against the plaintiff, (2) that the officers knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene."  *Krzeminski v. City of Buffalo*, No. 17-CV-00245, 2018 WL 10335659, at *6 (W.D.N.Y. Dec. 10, 2018) (citing *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 296 (N.D.N.Y. 2018)).

Here, Defendants argue that "[b]ecause there was no Constitutional violation, there was no reason for any of the officers to intervene."  (Dkt. 69-1, p. 31)  Similar to the finding of this Court in *Krzeminski*, however, since the record confirms that there are triable issues of fact regarding alleged violations of Plaintiff's constitutional rights, Defendants have failed to meet their burden for dismissal of Plaintiff's failure-to-intervene claim with their singular argument, and the Court should not grant their motion on this basis alone.  *See, e.g., Krzeminksi*, 2018 WL 10335659, at *6 ("Since I have concluded that triable issues of fact exist

concerning at least some of plaintiffs' alleged constitutional violations, I recommend that plaintiffs' related failure to intervene claims also not be dismissed.") (McCarthy, J.)

Assuming, arguendo, that the Court considers the merits of Defendants' request for dismissal, it is well-settled that "[w]hether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Kimbrough v. Town of Dewitt Police Dept.*, No. 9:08-CV-03, 2010 WL 3724017, at *4 (N.D.N.Y. Sept. 15, 2010) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  Here, the evidence demonstrates there are at least triable issues of material fact regarding Plaintiff's failure-to-intervene claim for officers Schultz, Moriarity, McDermott, Velez, and Lt. McHugh. *Smith v. P.O. Canine Dog Chas, Shield No. 170*, No. 02-CV-6240, 2004 WL 2202564, at *8 (S.D.N.Y. Sept. 28, 2004) ("a plaintiff need not establish who, among a group of officers, directly participated in [the civil rights violation] and who failed to intervene"); *see also Colon v. City of Rochester*, 419 F. Supp. 3d 586, (W.D.N.Y. 2019) (concluding supervisor could be held liable for false arrest for "approv[ing] the arrest[ ]" of the plaintiff).

For Officer Santana, the video shows him huddled in the middle of Schmarbeck Avenue with other officers discussing the accident.  (Yaek Aff., Exhibit C).  When the officers told Santana that McDermott was involved in an accident with her patrol vehicle, Santana should have questioned the officers' decision not to notify AIU and IAD as they were required to do under the MOP.  (SOF, ¶¶ 61, 85).  As former Commissioner Derenda stated during his deposition:  "Everybody knew about the policy" that "[e]very accident needed to be investigated . . . [e]ven minor accidents."  (Rupp Decl., Exhibit N, pp. 52).  It was unreasonable for Santana not to investigate the validity of what his fellow officers presented when a reasonable officer

would have.  Had Santana taken this simple step, he would have realized that McDermott and

Schultz's claimed observations were questionable at best, which would have triggered a full

investigation by AIU and IAD.  That investigation would have revealed the surveillance videos

that captured the accident, which show that the officers were lying when they said Kistner

intentionally threw himself at McDermott's vehicle with the intent to cause damage.  (*See* Yaek

Aff., Exhibit C).  At this juncture, these disputes of fact cannot be resolved as a matter of law.

Accordingly, Defendants' motion concerning failure-to-intervene claims should not be granted.

**ARGUMENT VI:   DEFENDANTS' CONDUCT ROSE TO THE LEVEL OF
FIRST AMENDMENT RETALIATORY ACTION[15]**

To support a First Amendment retaliation claim, a plaintiff must show that:

"(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated

or substantially caused by his exercise of that right; and (3) the defendant's actions caused him

some injury."[16]  *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *See Smith v.

Campbell*, 782 F.3d 93, 100 (2d Cir. 2015).  Here, the admissible evidence in the record shows

that Plaintiff has a viable claim for First Amendment retaliation.

It is a fundamental bedrock of the Constitution that voicing complaint about a

police officer is protected speech under the First Amendment and will satisfy the first element in

a retaliation claim.  *See, e.g, City of Houston v.* Hill, 482 U.S. 451, 461 (1987) (explaining that

---

[15] Plaintiff asks the Court to deny Defendants' request for dismissal of his First Amendment retaliation claim as Defendants failed to meet their burden of proof for summary judgment.  The medical records used by Defendants in an attempt to establish the statements for which Mr. Kistner was arrested for are not certified or otherwise in proper evidentiary form and, therefore, the statements contained therein are hearsay and not admissible.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Defendants do not submit any affidavits from the hospital staff and have utterly failed to meet the burden required for this Court to grant summary judgment in their favor on this claim.

[16] Defendants' assertion that there exists a requirement for Plaintiff to demonstrate his First Amendment Rights were "chilled" relies on outdated law.  *Mangino v. Incorporated Village of Patchogue*, 808 F.3d 951, 955-56 (2d Cir. 2015) (overruling *Curley* and eliminating the requirement that civil rights plaintiffs allege and prove that their speech was chilled to maintain a First Amendment retaliation claim).

"the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"); *Lewis v. City of New* Orleans, 415 U.S. 130, 134 (1974) (invalidating an ordinance that criminalized cursing at an officer); *Campbell*, 782 F.3d at 100. Moreover, in the context of speech, "the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense." *Cohen v. California*, 403 U.S. 15, 21 (1971). "Criticism of the police is not a crime." *Houston v. Hill*, 482 U.S. 451, 461-63 (1987).

Plaintiff's criticism of the officers after he was falsely arrested on Schmarbeck was protected by the First Amendment, and Defendants admit that they arrested him for exercising that right while in their custody at the hospital. (Dkt. 69-1, at p. 24). The criticism of public officials lies at the heart of speech protected by the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964). Additionally, the First Amendment protects speech in public places about public officials, *United States v. Grace*, 461 U.S. 171, 180 (1983), including speech that is critical of police officers. *See City of Houston, Tx. v. Hill*, 482 U.S. 451, 460 (1987); *Lewis v. City of New Orleans*, 415 U.S. 130, 131-34 (1974). The presence of hospital staff when Mr. Kistner criticized the officers does not defeat his claim for First Amendment retaliation. *Cohen*, 403 U.S. at 21. Accordingly, there are triable issues of fact regarding the first two elements of Mr. Kistner's First Amendment retaliation claim.

Regarding the third element – injury – civil rights plaintiffs can show "either that [their] speech has been adversely affected by the government retaliation or that [they have] suffered some other concrete harm." *Dorsett*, 732 F.3d at 160. "Being subjected to criminal charges is a cognizable concrete harm." *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 382 (S.D.N.Y. 2015); *see, e.g., Campbell*, 782 F.3d at 100 (in the context of a First

Amendment claim, the Second Circuit held that issuance of three traffic tickets "was an injury in that it subjected [the plaintiff] to a state action requiring that she either appear in court, pay a fine, or both"); *Brink v. Muscente*, 2013 WL 5366371, at *8 (S.D.N.Y. Sept. 25, 2013) (stating "[i]t is well-settled that the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out").

Here, in retaliation for Plaintiff's criticism of the arresting officers, Defendants lodged an additional criminal charge against Kistner for disorderly conduct. Notably, Defendants' allegations supporting the disorderly conduct charge against Plaintiff included the incredible accusations of Officers McDermott and Schultz that Kistner intentionally threw himself at the vehicle with the intent to cause it damage. (Huggins Decl., Exhibit C). Thus, the admissible evidence before this Court demonstrates there are triable issues as to whether that the disorderly conduct charge against Plaintiff was in violation of his First Amendment rights.

## ARGUMENT VII:   DEFENDANTS ARE NOT PROTECTED BY QUALIFIED IMMUNITY

Although an officer needs only "arguable" probable cause to rely on the qualified immunity defense, it is crucial to note that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (citing *Anderson v. Creighton*, 483 U.S. 635, 644 (1987)). Arguable probable cause is assessed under the same definition and requirements as probable cause and exists only "if '*at the moment the arrest was made* . . . the facts and circumstances *within the [officers'] knowledge* and of which they *had reasonable trustworthy information* were sufficient to warrant a prudent man in believing' that [the suspect] had violated the law." *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (citations omitted) (emphasis in original). In addition, the Second Circuit is clear that courts reviewing the application of qualified immunity should not consider

only a police officer's "self-serving account," but also must consider "circumstantial evidence

that, if believed, would tend to discredit that police officer's story, and consider whether this

evidence would convince a rational factfinder that the officer acted unreasonably." *O'Bert ex*

*rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (upholding district court's denial

of summary judgment on qualified immunity grounds).

        Here, Mr. Kistner has provided uncontested evidence that he was arrested and

prosecuted without probable cause in violation of the Fourth Amendment.  The rights defined for

purposed of this motion are clear.  *See Golino v. New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)

("[t]he right not to be arrested or prosecuted without probable cause has, of course, long been a

clearly established constitutional right").  No rational officer could argue that it was reasonable

for Defendants to arrest Mr. Kistner based on facts that could not have been observed or that

were physically impossible.  (*See* Point III(A)-(E), *supra*).  Accordingly, the Court should deny

Defendants' request for summary judgment on qualified immunity grounds.

### <u>CONCLUSION</u>

        Defendants have not met the high burden of establishing their entitlement to

dismissal of Plaintiff's causes of action against the named defendants under Rule 12, nor have

they presented sufficient evidentiary proof to be granted summary judgment.  Therefore,

Defendants' motion should be denied in its entirety, and the Court should award Plaintiff any

other and further relief it deems proper.


Dated: May 14, 2021
       Buffalo, New York

                          **RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
                          *Attorneys for Plaintiff, James C. Kistner*

                          By:   *s/R. Anthony Rupp III*
                               R. Anthony Rupp III