UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JAMES C. KISTNER,

          Plaintiff,

vs.                                            Civil No.:  18-CV-00402

THE CITY OF BUFFALO, BYRON LOCKWOOD,
DANIEL DERENDA, LAUREN McDERMOTT,
KARL SCHULTZ, KYLE MORIARITY, DAVID T.
SANTANA, and ANTHONY McHUGH,

          Defendants.

---

## AFFIDAVIT OF JOHN CAMPANELLA

STATE OF DELAWARE      )
                            ) ss
COUNTY OF NEW CASTLE   )

      **JOHN CAMPANELLA**, being duly sworn, deposes and says:

      1.     I have been retained as an expert witness on behalf of plaintiff, James Kistner, in the above-referenced matter.  I am a law enforcement policies and procedures expert, and I have extensive experience and knowledge in researching, developing, implementing, and evaluating police policy and procedure that reflect the best practices of the law enforcement industry.  I conducted a detailed review of all materials that were provided to me by Plaintiff's counsel related to the above referenced matter.  Therefore, I fully am familiar with the facts and circumstances set forth herein.

2.      By way of professional background, I have worked in law enforcement for

over 32 years, I retired from the Delaware State Police at the rank of Captain where I served my

last four years as the Director of Human Resources.  I have been a certified assessor for the

Commission on Accreditation for Law Enforcement Agencies (CALEA) since September of

2014, and in that role I travel the county evaluating the policies and procedures of law

enforcement agencies to be sure that they meet the best practice standards set forth by CALEA.

Please refer to my curriculum vitae for more details of assignments and experience, a copy of

which is attached hereto as **Exhibit A**.

3.      Plaintiff's counsel contacted me in order to review the materials related to

this matter and evaluate the conduct of the defendant officers during an incident involving the

plaintiff, James C. Kistner, on January 1, 2017.  A comprehensive list of the materials I reviewed

is set forth more fully in the "Materials Reviewed and Received" section of my report.  A

complete copy of my report including a copy of all materials summarized in "Appendix A" of

my report is attached hereto as **Exhibit B**.

4.      As part of my evaluation of the defendant officers' conduct, I reviewed

and analyzed the City of Buffalo Police Department's Manual of Procedures ("MOP"), which is

available at:  https://www.buffalony.gov/DocumentCenter/View/7559/BPD-MANUAL-OF-

PROCEDURES-FULL.

5.      As detailed in my report, after reviewing the materials provided to me,

including surveillance videos capturing the incidents, I concluded there were no less than thirteen

violations of the MOP (including four potential crimes) by officers Schultz, Moriarity,
McDermott, and Velez that, according to the MOP, should have subjected the officers to
discipline and retraining by The City of Buffalo Police Department ("BPD").  Nevertheless, as
explained in my report, the Internal Affairs Department ("IAD") and City of Buffalo Police
Commissioner Byron Lockwood ignored or failed to consider these violations, and instead
improperly constrained the IAD investigation to one dispositive question: "Did Officer
McDermott intentionally strike James Kistner with her patrol car?"

6.      Failing to find any evidence that Officer McDermott intentionally struck
James Kistner with her vehicle, BPD Commissioner Byron Lockwood made the decision to clear
all officers of any wrongdoing, and the IAD complaint was dismissed as "not substantiated."

7.      As I explain in my expert report, the officers provided markedly different
testimony in their deposition as compared to their recollection of the incidents when providing
statements to the IAD investigating officer, Lt. Kelly.  Given the severity of the allegations
against officers Schultz, Moriarity, McDermott, and Velez, an experienced investigator would
have thoroughly reviewed the officers' sworn testimony in their depositions (which were
completed and available to Lt. Kelly when he took statements from the officers), and a properly
trained investigator would have challenged the officers' inconsistencies in their recollection of
the incidents.  In reviewing the summaries and audiotapes of the IAD investigation, I opined that
the interviews of officers McDermott, Velez, Schultz, and Moriarity by Lt. Kelly "sounded more
obligatory than investigatory."  *See* Ex. B, p. 33.

8.      Please refer to my expert report for a comprehensive analysis of the

opinions contained herein.  *See* Exhibit B.

Sworn to before me this

14 day of May 2021

_____

Notary Public

John Campanella

CHAD ALAN DAVENPORT
Notary Public, State of New York
No. 02DA6401208
Qualified in Erie County
Commission Expires 12/09/2023

EXHIBIT A

# CURRICULUM VITAE

## JOHN A. CAMPANELLA, SHRM-SCP

### PROFESSIONAL SUMMARY

A self-motivated, results-driven human resources and law enforcement professional – with a proven ability to impact complex business challenges and deliver solutions and results. Retiring after 32-years from the Delaware State Police at the rank of Captain, serving the last four years as the Director of Human Resources, with a career that included increasingly responsible roles and achievement in the areas of: Policy/Procedure Development; Human Resource Management; Compliance Monitoring; Internal and External Investigations; Training/Development; Program and Project Management. Executive level leadership and managerial experience exercised in both direct supervision and in a project/ team environment.

Excellent academic preparation – received Summa Cum Laude honors while earning undergraduate and master's degrees as an adult student.

- Workforce Planning
- Benefits Administration
- Employee Relations
- Compensation
- On-boarding/Orientation
- Complex Investigations
- Security Reviews

- Recruitment(Screening/Hiring)
- Performance Management
- Regulatory Compliance
- Labor Relations
- Operational Excellence
- Risk Assessment
- Generalist HR Background

- Organizational Development
- Training/Development
- Leadership Development
- Project Management
- Information Technology
- Crisis Management
- Budget Management

### EXPERIENCE

**CAMPANELLA CONSULTING GROUP – *President and Founder***   2016 – Present
Conducting confidential workplace and internal investigations, executive pre-employment background investigations, training, critical incident planning/response, reducing law enforcement and emergency services fatigue. John Campanella is an expert law enforcement witness and subject matter expert specializing in human resources, fatigue, policy development, accreditation, and project management. Licensed Private Investigator- State of Delaware.

**GUARDIAN ALLIANCE TECHNOLOGIES, INC. – *Business Development Consultant***   Apr 2019 – Present
Developing sales leads from the law enforcement industry for the client who provides a software platform solution standardizing the pre-employment background and investigative process.

**COMMISSION on ACCREDITATION for LAW ENFORCEMENT AGENCIES – *Assessor***   2014 – Present
Part time assessor conducting compliance monitoring and inspections of law enforcement agencies across the country seeking accreditation or re-accreditation.
> *The Commission on Accreditation for Law Enforcement Agencies, Inc. is a credentialing authority, based in the United States, whose primary mission is to accredit public safety agencies, namely law enforcement agencies, training academies, communications centers, and campus public safety agencies.*

**DELAWARE STATE POLICE**   1986 –2017

***Significant Accomplishments***

- *Developed and implemented a highly progressive Fatigue Management Policy and Plan. This was innovative within the law enforcement profession and reduced the state's exposure to related potential litigation.*

- *Implemented an effective web-based Special Duty scheduling program which significantly improved efficiency and transparency while delivering $150,000 in annual cost savings in the first year. Took what was a contentious function, with the internal perception of favoritism and political decision-making and made it a transparent, completely fair system.*

- *Developed and successfully implemented strategies which optimizing hiring and testing of quality recruits, adapting the model to accommodate growth and consolidation.*

- *Drove the successful process which resulted in numerous Meritorious Re-accreditations with the Commission on Accreditation for Law Enforcement Agencies (CALEA).*

- *Chaired five command staff working groups revising the Division's policies and procedures.  This was a major undertaking, involving the review, revision and finalization of 1,200 pages of content.*

- *Led a widely successful multi-agency "Gun Buy Back" program, a multi-agency effort between the State Police and two local police departments.  Partnered with church and community groups. More than 2,000 guns were surrendered.*

- *Played a leading role in creating the Governor's Task Force, which had the ability to convene high level professionals across all state agencies to provide focus on a specific problem within the state.  The concept proved itself highly successful, and this task force remains in effect today.*

- *Obtained Delaware's first "no-knock" search warrant after making application for warrant to the Deputy Attorney General and a Superior Court Judge based on "exigent circumstances." This was the first such warrant granted in the State of Delaware and remains a foundation for best practices today.*

- *Award winning Trooper receiving numerous commendations, recognition, and awards throughout career.*

<u>DELAWARE STATE POLICE</u> – *Rank and Positions* (in order of recency)                    1986 – 2017

### Captain – Director – Human Resources (4 years)
Report directly to the Administrative Major. Manage 12 Troopers and 19 Civilian employees. Provide oversight for the recruitment, pre-employment investigations, hiring, retention, and separation of all sworn and civilian employees, cadet and explorer programs, polygraph unit, interns, activity sheets and payroll.

### Captain – Director – Headquarters Planning & Research Section; Inspections & Accreditation (3 years)
Reported directly to the Deputy Superintendent. Commanded two administrative divisions responsible for researching, reviewing, writing, and implementing statewide policies, procedures and strategies. Identified, developed, and led statewide projects to meet changing business needs. Conducted internal investigations. Worked closely with the Executive staff. Commanded the Inspections Office responsible for the meritorious re-accreditation.

### Lieutenant – Acting Troop Commander – Patrol Troop 9 (1 year)
Managed 38 Troopers and three civilian employees in a dual managerial capacity to provide police services 24-hours a day. Interacted with local businesses to protect critical infrastructure from acts of terrorism. Served as liaison with community leaders.

### Lieutenant – Inspections Officer – Office of Professional Responsibility (4 years)
Served as the Division's Accreditation Manager leading the State Police through two successful meritorious re-accreditation processes.

### Lieutenant – Special Projects Manager – Headquarters Intelligence Unit (1 year)
Member of the team which established the newly created <u>Delaware Information and Analysis Center</u>. Secured federal grant monies through a funding partnership with Citizens Corps. Deployed personal protective equipment to 625 Troopers.

### Lieutenant – Assistant Director – Headquarters Traffic Control Section (1 year)
Managed ten troopers assigned to the statewide Commercial Motor Vehicle Enforcement Unit. Provided indirect management of eight civilian employees. Acted in the capacity of Director in his/her absence.

### Sergeant – Supervisor – Special Investigations Vice Unit (5 years)
Led the statewide unit investigating prostitution, gambling, adult entertainment, public corruption, child pornography, pedophiles, on-line child predators, and developed and presented Internet Safety Seminars for area school groups.

### Detective – Special Investigation Statewide Drug Unit (6 years)
As an undercover drug investigator, managed long-term multi-agency drug trafficking investigations. Gained extensive knowledge in the use of wire taps, electronic surveillance, evidence preservation, Obtained Delaware's first "no-knock" search warrant.

### Patrol Trooper – Patrol Troop 6  (7 years)
Consistently led the troop in measurable standards of quality and productivity.

## EDUCATION AND PROFESSIONAL DEVELOPMENT

WILMINGTON UNIVERSITY – Wilmington, Delaware
*Master of Science in Management, Organizational Leadership, 2015*          *Summa Cum Laude*
*Bachelor of Arts, General Studies, 2001*          *Summa Cum Laude*

*Curriculum*

The Master of Science in Management program incorporates a methodology that provides students with a deep appreciation of the skills and knowledge required for decision making and problem solving. Streams of emphasis include today's contemporary organization, strategy, global realities of diversity and culture, management for innovation and change, creativity, leadership, technology, the global market and the management of teams. By focusing on the role of the manager at the micro and macro levels, and embracing the manager-as-leader paradigm, the program recognizes the reality and challenging nature of contemporary organizational systems that require change and innovation for organizations to remain competitive in a global environment. The program is designed for individuals who are seeking to make a strong contribution to their organization, profession, and global society.

FBI NATIONAL ACADEMY – Law Enforcement Executive Leadership – 239th Session – Certificate in Law Enforcement accredited by University of Virginia – September 2009.

UNIVERSITY OF DELAWARE – Criminal Justice Leadership Institute – 1998

VILLANOVA UNIVERSITY – Professional Human Resource Management Certificate – May 2015

## LICENSES AND CERTIFICATIONS

- Licensed Private Investigator- State of Delaware
- Senior Certified Professional – Society for Human Resource Management
- Certified Instructor – State of Delaware Council on Police Training

## PROFESSIONAL AFFILIATIONS

FBI National Academy Associates, Maryland-Delaware Chapter, *Executive Board Past President*
FBI National Academy Associates, *Member*
       *Co-Chair FBINAA 2017 Annual Conference, July 2017, Washington DC
International Association of Chiefs of Police (IACP), *Member*
Mill Creek Fire Company, Marshallton, Delaware, *Volunteer Firefighter, By-Law, Apparatus Committee, Asst. Engineer*
Delaware State Police Museum and Education Center, *Board of Directors (former)*
Delaware State Police Diversity Council, *Member (former)*

Guardian Alliance Technologies, Advisory Board Member, January 2019 – Present

International Association of Chiefs of Police (IACP), *Secondary Employment Working Group, February 2019 - Present*

State of Delaware Commission on Adult Entertainment Establishments – Appointed Member on October 2020 by Governor John Carney, First term expires August 2023

### ADDITIONAL ACADEMIC AND PROFESSIONAL TRAINING (Not All Inclusive)

1. Delaware State Police Academy Basic Training - 448 hours to include:
   a. Arson Investigations
   b. Auto Theft
   c. Crimes Against Persons
   d. Crimes Against Property
   e. Death Investigations
   f. Fraud
   g. Gambling
   h. Minor Crimes
   i. Robbery Investigations
   j. Sex Crimes
   k. Charting and Drawing
   l. Constitution and Bill of Rights
   m. Courtroom Procedures
   n. Criminal Code
   o. Drug Identification and Investigation
   p. Field Notes and Crime Scene Reporting
   q. Handling Abnormal Behavior
   r. Identification and Records
   s. Interview and Interrogation
   t. Juvenile Offenders
   u. Laws of Arrest
   v. Laws of Evidence
   w. Notes and Maintaining Notebooks
   x. Organized Crime
   y. Photography
   z. Preservation of Crime Scene
   aa. Report Writing
   bb. Accident Investigation (Basic and Advanced)
2. Delaware State Police Academy Advanced Training
   a. Search Warrant Execution
   b. Officer Survival
   c. Handling Confidential Informants
   d. Major Case Management
   e. Pedophile Investigations
   f. Cultural Diversity
   g. Electronic Wiretap Procedures
   h. Technical Surveillance
   i. Project Management
   j. Internal Affairs Investigations
   k. Field Training Officer
   l. Background Investigators Course
   m. Certified Instructor Course
   n. Vehicle-borne Terrorism Awareness
   o. Islamic Terrorism Familiarization
   p. Gambling and Drugs
   q. Use of Force
   r. Risk Management
   s. Mental Health
3. United States Department of Justice
   a. Drug Enforcement Agency
      i. Basic Narcotics and Dangerous Drug Law Enforcement
      ii. Asset Forfeiture
      iii. Federal Bureau of Investigation, Post Blast Investigator

      b.  Department of Military Affairs
         i.  Dynamic Entry Class
        ii.  Marijuana Eradication
      c.  Office of the United States Attorney
         i.  Street/Urban Drug Interdictions

4.  United States Department of Homeland Security Emergency Management Institute (FEMA)
    a.  Managing Civil Actions in Threat Incidents (MCATI) Protestor Devices
    b.  WMD: Incident Management & Unified Command
    c.  Port & Vessel Security for Public Safety and Maritime Personnel, AWR-144
    d.  National Incident Management System to include:
       i.  ICS-100, ICS-200, ICS-300, ICS-400, IS-700, IS-800, IS-546, IS-547, L-960

5.  Delaware Emergency Management Agency
    a.  Command and General Staff Functions
    b.  Leadership and Influence

6.  Law Enforcement Mobile Video Institute
    a.  Mobile Video Instructors Course

7.  ODV Incorporated
    a.  Senior Instructors Narcotic Identification Course

## PUBLIC SPEAKING, PUBLICATIONS, AND TRAINING SEMINARS

1. Recruiting and Retention during Challenging Times, November 18, 2020, Wisconsin Department of Justice
2. Pre-Employment Background Investigation Technology Webinar, October 20, 2020, PoliceOne.com Sponsored Content
3. Publication: How to Enhance Your Police Department's Recruiting Efforts and Hire the Best Candidate – October 8, 2020; PoliceOne.com; Sponsored Content
4. Publication: The silver lining: Why it's time to fish for candidates – May 22, 2020; PoliceOne.com OpEd
5. Missouri Police Chief's Association Command College, Conducting Effective Pre-Employment Background Investigations, February 2020
6. Missouri Police Chief's Association Command College, Police Fatigue, February 2020
7. National Water Resources Association Annual Conference Houston, Texas, Respectful Workplaces, November 2019
8. Bucks County Police Training Center, Conducting Effective Pre-Employment Background Investigations, October 2019
9. FBI National Academy Associates California Chapter Re-Trainer, Police Fatigue, September 2019
10. United States Marine Corps Police Commanders Course, Mitigating Police Fatigue, August 2019
11. Missouri Police Chief's Association Command College, Conducting Effective Pre-Employment Background Investigations, April 2019
12. Leveraging Technology to Expedite Your Hiring Process, Guardian Alliance Technologies-FBI National Academy Webinar, March 2019
13. Missouri Police Chief's Association Command College, Police Fatigue, February 2019
14. Goldey Beacom College, Character Matters, February 2019
15. FBI National Academy Associates Alaska Chapter Re-Trainer, Police Fatigue, December 2018
16. Goldey Beacom College, Character Matters, November 2018
17. Chester County Pennsylvania Public Safety Training Academy, Conducting Effective Pre-employment Background Investigations, October 2018
18. Delaware Public Employer Labor Relations Association (DELPELRA), Workplace Investigations, October 2018
19. Recognizing The Right Police Candidate, InTime.com Webinar, September 2018
20. Police Fatigue Part 2: How Fatigue Impacts Performance, September 2018
21. Police Fatigue: Why We Need To Change The Culture, August 2018
22. International Association of Chiefs of Police Annual Conference, Philadelphia, Police Fatigue, October 2017
23. Southwestern Illinois Law Enforcement Commission, Police Fatigue, October 2017
24. FBI National Academy Associates New Jersey Chapter Re-Trainer, Police Fatigue, October 2017
25. FBI National Academy Associates Georgia Chapter Re-Trainer, Police Fatigue, January 2017
26. Delaware State Police, Background Investigations, 2014, 2015, 2016, 2017
27. BASF, Personal Safety, October 2016
28. University of Delaware, Leadership Ethics, October 2013
29. Delaware State Police, Pedophile Investigations, Vice Investigations, 2005, 2006, 2007
30. Wilmington University, Pedophile Investigations, May 2005
31. Wilmington Friends School, On-Line Child Predators and Internet Safety, April 2005
32. Delaware State Police, Undercover Investigations, Handling Confidential Informants, 1993, 1994

EXHIBIT B

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

CIVIL ACTION: 18-cv-402


IN THE MATTER OF

JAMES C. KISTNER

Plaintiff,


vs.


THE CITY OF BUFFALO, BRYON LOCKWOOD, DANIEL DARENDA,
LAUREN MCDERMOTT, JENNY VELEZ, KARL SCHULTZ, KYLE
MORIARTY

Defendants




REPORT OF JOHN CAMPANELLA

LAW ENFORCEMENT POLICY, PROCEDURES AND
PROFESSIONAL STANDARDS
EXPERT/CONSULTANT

## INTRODUCTION

The following report details my analysis of materials that have been provided to me for review related to civil action 18-cv-402 concerning the conduct of officers from the Buffalo Police Department during an incident which began on January 1, 2017.

This report was developed by me, John A. Campanella, a law enforcement policy, procedures and professional standards consultant and expert. (See attachment #1, C.V. of John A. Campanella)

I have reviewed materials forwarded to my office by attorney Chad Davenport of the law firm Rupp Baase Pfalzgraf & Cunningham, who represent James Kistner as the plaintiff in this matter. A list of all materials that I have reviewed and relied upon in the formulation of my opinion and in the preparation of this document are listed in this report and can be found under the section entitled "Materials Reviewed".  The opinions that I have expressed in this report are based upon my detailed review of this material and my experience, knowledge and training in the generally accepted best practices in law enforcement.  I reserve the right to amend this report if other evidence becomes available.

## MATERIALS REVIEWED

To render my opinion in this case, I have reviewed the following material relating to this matter provided by Chad Davenport in electronic or written format.  (Not listed in order of review)

1. Verified Complaint and Jury Demand Civil Action no. 18-cv-402 filed by Plaintiff Attorneys as affirmed by James Kistner, Plaintiff Exhibit (Exhibit) 40.
2. Transcript of James Kistner's 50-h Examination dated June 27, 2017.
3. Transcript of Earl Kistner's 50-h Examination dated June 27, 2017.
4. Transcription of Officer McDermott's video deposition dated February 19, 2020.
5. Transcription of Officer Velez's video deposition dated February 26, 2020.
6. Transcription of Officer Schultz's video deposition dated February 13, 2020.
7. Transcription of Officer Moriarty's video deposition dated February 21, 2020.
8. Transcription of Lieutenant McHugh's video deposition dated February 28, 2020.
9. Transcription of Booking Clerk Slomba's video deposition dated March 3, 2020.
10. Transcription of Officer Santana's video deposition dated September 8, 2020.
11. Transcription & video recording of Former Police Commissioner Derenda's video deposition – Sept. 24, 2020.
12. Transcription & video recording of Commissioner Lockwood's deposition – Oct. 14, 2020.
13. Five segments of video surveillance of Schmarbeck Avenue.
14. Video of WIVB Ch 4 news story from July 2020.
15. BPD Complaint Summary report for 33 Schmarbeck Avenue.

16. BPD Complaint Summary report for 37 Schmarbeck Avenue.
17. Thirteen audio clips from BPD Police Radio of 911 calls and communications between officers on Schmarbeck Avenue.
18. Audio of Officer McDermott's BPD Internal Affairs statement on May 22, 2020.
19. Audio of Officer Velez's BPD Internal Affairs statement on May 22, 2020.
20. Audio of Officer Schultz's BPD Internal Affairs statement on May 22, 2020.
21. Audio of Officer Moriarty's BPD Internal Affairs statement on May 22, 2020.
22. BPD Manual on Procedures, version in effect January 1, 2017 as provided by the City of Buffalo[1].
23. BPD Complaint Summary 33 Schmarbeck Nov 2015 – Schultz – Assist with mental health, Exhibit 1.
24. BPD Complaint Summary 33 Schmarbeck June 2016 – Schultz – Unwelcomed guest, Exhibit 2.
25. BPD Cad Report, Exhibit 3.
26. BPD Police Report 17-0010506, from 01-01-17, Criminal Mischief, Disorderly Conduct, Exhibit 5.
27. NYS Form 9.41, Exhibit 6.
28. BPD Unit History Report – Schultz & Moriarty, Exhibit 7.
29. BPD Central Booking Bureau Case History, Exhibit 9.
30. BPD Academy Training Record, McDermott, Exhibit 14.
31. BPD Arrest Data Form, Exhibit 15.
32. City of Buffalo Complaint Summary Form Exhibit 17.
33. BPD Fleet Management Maintenance Work Order for Veh 473, dated January 5, 2017, Exhibit 18.
34. BPD Unit History Report – McDermott, Exhibit 19.
35. City of Buffalo Notice to Defendant, Exhibit 20.
36. BPD Appearance Ticket, Exhibit 21.
37. BPD Academy Training Record – Moriarty, Exhibit 22.
38. BPD Academy Training Record – Velez, Exhibit 24.
39. ECMC Discharge Instruction, Exhibit 32.
40. ECMC Initial ER Report, Exhibit 33.
41. BPD IA letter to plaintiff dated August 13, 2020, Exhibit 38.
42. State of New York, Notice of Claim filed by plaintiff, Exhibit 39.
43. Letter from plaintiff to BPD Commissioner Lockwood dated February 8, 2020, Exhibit 41.
44. BPD IA Case Index, Exhibit 43.
45. BPD Disciplinary card – Schultz, Exhibit 45.
46. BPD IA Summary Report, Exhibit 46.
47. BPD IA Disposition for each officer.

---

[1] Did not include Rules and Regulations

48. IAD Emails regarding the incident.
49. IAD notes on surveillance video.
50. BPD Disciplinary card – Velez.
51. Buffalo City Court certification of charge disposition for plaintiff.
52. BPD Disciplinary card – Moriarty.
53. BPD Disciplinary card – McDermott.
54. BPD Academy Training Record – Schultz.
55. Plaintiff Expert Report dated December 9, 2020 from Impact Analysis, Inc, Jennifer L. Yaek.

The following references were accessed via the internet and not supplied by the plaintiff's attorney:

1. NYS Vehicle and Traffic Laws, Sections 600 & 603, accessed via Internet December 2020.
2. BPD Rules and Regulations attested by Commissioner Lockwood January 2018 as viewed on the internet in December 2020.

## CASE EXAMINATION PROCESS

In accordance with my training and experience, I conducted a detailed review of materials listed in the Materials Reviewed Section of this report that were provided to me by attorney Chad Davenport who retained me in this matter. I have also reviewed additional information that I know, based upon my training and expertise, is relevant to the examination of the facts is this case. This additional information is identified as attachments or footnotes to this report. Documented hereinafter are excerpts from that material that are critical to the formulation of my opinion in this case.

## SITE INSPECTION

In order to evaluate the context and veracity of statements given by the participants in this case I viewed surveillance videos provided by the plaintiff's attorneys. The five video segments came from surveillance equipment owned by James Kistner's with camera views from the exterior second floor of #37 Schmarbeck Avenue Buffalo, New York.

Based upon the supplied surveillance video, the street appears to be a two-way street that is clear of obvious obstructions and there are no signs of snow or ice on the roadway. There appears to be a small amount of residual snow on the grass. The street is lined with sidewalks on both sides along with multi-story dwellings and open spaces.

The date stamp on the video is correct, but the time is unverified and may vary up to 30 minutes from that of official police reports. The alleged times in this report are drawn from the police reports. The times on the video were only used to determine elapsed time during the incident.

There is no reason to believe the video tape segments are not an accurate depiction of the events on Schmarbeck Avenue on the morning of January 1, 2017 between the hours of 09:00 and 12:00 p.m.

## EXAMINATION OF CASE FACTS

1. The incident occurred on Sunday, January 1, 2017 (New Year's Day), at approximately 10:55 a.m. (time according to the police report) near 33 and 37 Schmarbeck Avenue, a public roadway in Buffalo, New York.

2. James Kistner is the landlord of at least two multi-unit houses on Schmarbeck Avenue to include #33 & #37.

3. Officers McDermott, Velez, Schultz, Moriarty, and Santana as well as Lieutenant McHugh, are all police officers with the Buffalo Police Department (BPD), had previously received all required training, and were up to date on pertinent training.

4. On January 1, 2017, Officers McDermott, Velez, Schultz, Moriarty, and Santana as well as Lieutenant McHugh were working day shift on patrol.

5. Officers Schultz and Moriarty were dispatched to 33 Schmarbeck Avenue for a theft investigation, arrived in a marked BPD Patrol SUV (Chevrolet Tahoe), and conducted an interview of a male (Mike Wolfe). Officer Moriarty was a brand-new officer on his first week of field training and was driving the patrol vehicle while Officer Schultz was seated in the right front seat.

6. Officer McDermott was driving a marked BPD Patrol SUV #473 (Chevrolet Tahoe) with her partner, Officer Velez, in the right front passenger seat and had self-responded to Schmarbeck as a backup.

7. Officer McDermott parked on the side of road at 33 Schmarbeck Avenue facing north with the passenger side closest to the curb behind a parked red minivan. Officers Moriarty and Schultz were seated in their patrol vehicle and were stopped in the middle of the road facing north next to Officer McDermott's vehicle. Officer Schultz, McDermott, and Velez were conversing through open windows.

8. James Kistner and his son (Earl Kistner) were on the second floor of 37 Schmarbeck Avenue having breakfast with James' girlfriend and mother of three of children (Rachel Glurich). James and Earl Kistner observed the officers speaking with their tenant, Mike Wolfe,

9. James and Earl Kistner exited 37 Schmarbeck Avenue to learn why the police were parked outside their property.

10. James Kistner entered the roadway and walked south towards the stopped police vehicles. Earl Kistner stayed on the sidewalk near #37 out of view of the cameras.

11. James Kistner called out to speak with the officers because he knew the tenant struggled with mental illness and wanted to be sure the police were aware.

12. As James Kistner approached, Schultz loudly stated "This has nothing to do with you…we are leaving." According to Officer Schultz's statement to Internal Affairs they wanted to avoid James Kistner "at all cost."

13. At Officers Schultz's prompting, Officer Moriarty abruptly accelerated north down Schmarbeck Avenue passing within one feet of James Kistner on the driver's side.

14. James Kistner continued to walk south in the road as the first BPD vehicle passed him while Officer McDermott began to slowly back up.

15. James Kistner walked behind Schultz/Moriarty's departing police car, angled to his left (southeast), and began to cross the street diagonally towards Officer McDermott's vehicle.

16. As James Kistner lawfully crossed the road, he called out to Officer McDermott, who Kistner claimed looked over at him.

17. As James Kistner continued to walk, Officer McDermott stopped backing and quickly pulled forward to the left (northwest) to enter the travel lane.

18. Just prior to impact, James Kistner can be seen on the video raising his left hand and putting it out in front as if he were bracing for impact.

19. James Kistner was then struck by the driver's side fender, and possibly side mirror, of Officer McDermott's BPD Vehicle #473 knocking him backwards to the ground.

20. Officer McDermott's vehicle continued forward in motion for approximately 6 to 8 feet before coming to a complete stop still slightly angled in the roadway.

21. James Kistner was laying on the ground next to the driver's door of Officer McDermott's vehicle and out of view of the camera.

22. At some point, Officers Moriarty and Schultz slowed to a stop, backed down the street, and parked their patrol car in the road in front of 37 Schmarbeck Avenue.

23. After the collision, Officer Velez existed the patrol vehicle and was joined by Officers Schultz and Moriarty, who briskly walked back to the scene.

24. Officer McDermott opened her door and stepped out as all officers converged over James Kistner.

25. James Kistner (confirmed by Officer McDermott) called out loudly and yelled numerous times to his son (Earl Kistner) to call ambulance because he had been hit by a police car.

26. Earl Kistner ran out into the street to his father's aide, and then walked back to #37 Schmarbeck to retrieve his cellphone so he could call an ambulance.

27. Within 63 seconds of the collision, James Kistner was lifted to his feet by officers, handcuffed behind his back, forcibly walked down the street to Schultz and Moriarty's vehicle, and secured in the back seat separated from the front by a security cage.

28. As James Kistner is being led down the street, Earl Kistner reappears in the video at the edge the grass and appeared to be on his cellphone. Earl Kistner does not enter the roadway.

29. At least one phone call is placed to 911 requesting an ambulance.

30. Officer Schultz veered off from the group escorting James Kistner, engaged Earl Kistner in conversation, and appeared to motion for him to come toward the officer.

31. Earl Kistner turned and walked back toward #37 with his cell phone to his ear.

32. Officer Schultz quickly walked over to Earl Kistner, grabbed Earl by the left arm, and forced him out into the middle of the road while Earl held a cell phone with his right hand to his ear.

33. Once in the middle of the road, Earl Kistner is still holding the phone to his right ear as Officer Schultz attempted to take the phone.

34. Earl Kistner turned away from Officer Schultz but is grabbed forcibly by Officer Schultz and eventually by Officer Moriarty.

35. Earl Kistner is pushed back and forth by the officers as Officer Schultz forcibly grabbed the cell phone from Earl Kistner.

36. Dispatch notified the officers that an ambulance was responding for a person struck by a car.

37. Officer Schultz utilized his BPD radio notifying dispatch to cancel the ambulance and to disregard any additional requests.

38. Officer Schultz advised dispatch by BPD radio that suspect (Kistner) "thew himself against one of our cars that was parked" and shortly thereafter radioed that "will be a 941", which is a police term for taking someone for a mental health examination derived from NY State Form 9.41 used to certify an officer's request for evaluation.

39. The officers are seen huddled in the middle of the street and eventually another BPD Police car (Charger) stopped by the scene. Officer Santana had a brief conversation with the officers on scene.

40. Officer McDermott can be seen on video taking a picture of the driver's side front of BPD Veh #473 from approximately 20 feet away. At no time on video is anyone seen examining the mirror, the door window or the driver's side fender of BPD Veh #473.

41. After approximately 30 minutes, Officers Schultz and Moriarty transport James Kistner to the Erie County Medical Center (ECMC) for medical treatment followed by Officers McDermott and Velez.

42. Officers McDermott and Velez stayed at the hospital with James Kistner since he was under arrest. Officers Schultz and Moriarty left the hospital shortly after arrival.

43. During the first visit to the ECMC, James Kistner was upset with his mistreatment and verbally expressed his displeasure using profanity and derogatory comments directed at the police officers. He eventually calmed down as noted in the discharge papers.

44. James Kistner is treated at ECMC and after 4 hours is released to Officers McDermott and Velez with a diagnosis of an abrasion on his forehead and a concussion. The hospital discharge papers indicate there are no mental health concerns.

45. Officers McDermott and Velez transport James Kistner to Central Booking for arrest processing. Upon arrival James Kistner was processed by receiving in accordance with BPD Policy. The process included a search where he was required to strip down to his underwear, squat-and-cough, and pull his underwear back to verify he was not in possession of weapons or contraband.

46. James Kistner was issued an appearance ticket for Felony Criminal Mischief (Damage greater than $250.00) and Disorderly Conduct.

47. Officer McDermott completed the requisite police and arrest reports, as well as arrest affidavits.

48. Officer McDermott had Police Dispatch change the status of the (Kistner) complaint from a crash to a criminal mischief.

49. James Kistner was handcuffed and transported back to ECMC to the CPEP Unit (Comprehensive Psychiatric Emergency Program) processed on a NYS Mental Health Law Request for Examination Form 9.41 prepared by Officer Velez. Officer McDermott and Velez left all paperwork for James Kistner with the CPEP staff and departed the ECMC.

50. James Kistner was released from CPEP shortly thereafter.

51. On February 1, 2017, James Kistner's criminal charge of Felony Criminal Mischief was reduced by Buffalo City Court to a Misdemeanor Criminal Mischief charge, (Damage less than $250.00).

52. On March 31, 2017, James Kistner filed a Notice of Claim against the City of Buffalo.

53. On April 4, 2017, all criminal charges were dismissed by Buffalo City Court.

54. On June 27, 2017, James Kistner was deposed by Maeve Huggins, Assistant Corporation Counsel for the City of Buffalo in response to the Notice of Claim filed by James Kistner.

55. On March 30, 2018, James Kistner filed a lawsuit against the City of Buffalo et al.

56. On February 8, 2019, James Kistner sent a letter to Commissioner Bryon Lockwood, BPD, requesting an investigation into the officer's actions.

57. On December 19, 2019, a news story aired on WIVB Ch 4 about the lawsuit and incident.

58. On or about the same time, or before January 9, 2020, BPD began an internal affairs investigation.

59. On or about February and March 2020, Officers McDermott, Velez, Schultz, and Moriarty and Booking Clerk Slomba were deposed by plaintiff counsel.

60. On May 22, 2020, Officers McDermott, Velez, Schultz, and Moriarty gave sworn statements to the BPD Internal Affairs Unit.

61. In August 2020, James Kistner received a letter dated August 13, 2020 from Lt Kelly, BPD Internal Affairs Division stating the allegations were "not sustained."

62. On September 24, 2020, Former Commissioner Derenda was deposed by Plaintiff Counsel.

63. On October 14, 2020, Commissioner Lockwood was deposed by Plaintiff Counsel.

# CONCLUSIONS

## Conclusion #1:

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that on January 1, 2017, at approximately 10:55 a.m. Officer McDermott was involved in a motor vehicle collision injuring James Kistner on Schmarbeck Avenue Buffalo, New York.**

**James Kistner** testified that he was struck by Buffalo Police Department (BPD) Vehicle #473 driven by Officer McDermott knocking him to ground where he hit his head that caused an abrasion and possible concussion. Immediately after the impact he realized his legs were under the moving patrol vehicle and he tried to roll away to prevent further injury.

**Officer McDermott, Schultz, and Moriarty** testified that James Kistner intentionally threw himself against a stopped patrol vehicle intentionally causing damage to the driver's side mirror and window.

**Officer Velez**, who was a passenger in Veh #473, testified she didn't see the collision, but heard a sound as Officer McDermott abruptly stopped, and was told by the other officers that James Kistner intentionally threw himself against the patrol car intentionally causing damage to the driver's side mirror and window.

**Lieutenant McHugh** testified he was called on the cell phone by Officer McDermott and Schultz and told that James Kistner threw himself against the stopped patrol car intentionally causing damage to the driver's side mirror and window.

**Earl Kistner** testified he was on the sidewalk, saw the vehicles in motion, didn't see the collision, but heard his father yelling to call an ambulance because he was hit by a police car and was hurt. Earl Kistner ran into the roadway, saw his injured father laying on the road, and ran back into 37 Schmarbeck Avenue to retrieve his cell phone to call an ambulance.

*Officers McDermott's, Velez's, Schultz's, and Moriarty's testimony were unsupported by the evidence reviewed to render this opinion.*

*The testimony of Lieutenant McHugh is a recollection of unsupported statements made by Officers McDermott, Schultz, and Moriarty.*

*Officer McDermott was involved in a traffic collision resulting in injuries. It is more likely than not that she failed to pay full and proper attention as she was pulling forward.*

Refer to Examination of Case Facts for the sequence of events supporting the opinion.

**Training and Experience:**

Officers McDermott, Velez, Schultz, and Moriarty had basic training and all, except Moriarty, had experience investigating motor vehicle collisions. All of them should have recognized it was a reportable accident that required an investigation and proper medical response. Officers Schultz, and McDermott had knowledge and personal experience, as testified to under oath in their depositions, with collisions involving a BPD Vehicle. The investigative process for a collision involving a BPD vehicle involves a plethora of reports, memorandum, statements, and notifications to the command staff.

1. The Buffalo Police Department (BPD) Manual of Procedures (MOP) defines a motor vehicle accident as "any accident involving a motor vehicle in motion, including the vehicle's load or contents, that results in death, injury, or property damage."[2]
2. Accidents involving BPD vehicles, regardless of injury, trigger a response from the on-duty Lieutenant and the Accident Investigation and Internal Affairs Unit[3].
3. Commissioner Bryon Lockwood testified in his deposition after reviewing the video:
   a. "I look at it as an accident...it is hard to say if he threw himself into the vehicle because both he (Kistner) and the vehicle are moving."
   b. Accident Investigation and Internal Affairs Units should have been notified to investigate; "it didn't happen in this case.[4]"
   c. There are no exceptions to the MOP.
   d. The internal units would still be called out even for a criminal mischief or suicidal person involving a BPD vehicle in motion.

**Command and Control:**

Officer Schultz was the most senior officer on Schmarbeck Avenue at that time of the incident and took control of the scene, as he should have, as the senior officer. In any para-military organization with rank and structure, or a chain-of-command[5], as with the Buffalo Police Department, officers of the same rank defer to the officer with the most time in rank.[6]

1. Officer Moriarty was a rookie officer on his first week of field training and Officer Schultz was his Field Training Officer (FTO).
   a. As the FTO, Officer Schultz is Moriarty's immediate supervisor for the day and is responsible for Officer Moriarty's training and actions.

---

[2] BPD MOP CH 2: Aided and Accident Cases, 1.2.B
[3] BPD MOP CH 2: Aided and Accident Cases, 3.3.E Police Vehicles
[4] BPD MOP CH 2: Aided and Accident Cases, 3.3.E Police Vehicles
[5] BPD MOP, CH 8 1.2 Chain of Command; 1.3 District Chiefs et al.
[6] BPD Rules and Regulations, Definition: Officer in Charge; Supervisor

2. Both Officers McDermott and Velez had comparable years of service, however Officer Schultz was the senior officer as acknowledged in their depositions.
3. Officer Schultz's communications with dispatch clearly indicated that he was in command.
4. Officer Schultz's status as the "Officer in Charge" of the Schmarbeck Avenue incident was further validated when Lieutenant McHugh failed to respond to the scene of a departmental accident, deferring to Officer Schultz's on-scene perspective leaving Schultz to make decisions.

It became clear within minutes that Officer Schultz was controlling the direction and actions concerning James Kistner.

When radio dispatch notified on-scene officers that an ambulance was responding for a person hit by a car, Officer Schultz is the one who canceled the response. He instructs dispatch to disregard ALL calls for EMS service to a series of addresses on Schmarbeck Avenue. If the ambulance had been allowed to respond to the scene, the EMS records would have indicated it was a motor vehicle accident and that would have forced the BPD to conduct a motor vehicle collision investigation.

Everyone on scene, except Officer Moriarty, knew an officer involved crash meant a response by a supervisor, activation of the Accident Investigation and Internal Affairs Units on a Sunday, New Year's Day.

Officer Schultz began to create a false record by radioing dispatch stating

1. Subject (Kistner) "threw himself into one of our cars that was parked"[7] Officer Schultz knew this was false as the patrol car wasn't parked, it was in motion in the roadway.
2. The "mirror was broken intentionally."

The officers quickly learn from Earl and James Kistner there was surveillance video and that their actions were being recorded. Now they had a conundrum, not only was Earl Kistner a potential witness but there was a video too.

Officer Schultz initiated at least one cell phone call to Lieutenant McHugh who was the only working supervisor. Lieutenant McHugh was on the scene of a homicide investigation and had been for some time. According to Lieutenant McHugh in his deposition, Officers Schultz and McDermott told him that James Kistner had intentionally thrown himself against McDermott's stopped patrol vehicle causing some damage to the mirror. It is unknown what, if any, additional questions were asked by Lieutenant McHugh. McHugh took the officers statements to be fact and concurred on a charge of felony criminal mischief. Lieutenant McHugh never responded to the scene, Central Booking, or the hospital. If Lieutenant McHugh had responded to Schmarbeck Avenue he would have learned of the video, been able to see if there was in fact any damage,

---

[7] Audio recording from BPD Radio files of C230 – Officer Schultz radio transmission

perhaps reviewed the video, and would have heard both sides of the story. Anyone one of the three would have cast doubt to what the officers told him and trigger a full and proper investigation.

Officer Schultz eventually told dispatch that they will be transporting (James Kistner) to ECMC and that it will "be a 941", a common term for a mental evaluation, again creating a record to cover their actions. Officer Schultz testified in his deposition, and to the internal affairs, he canceled the ambulance because it would be quicker for them to take James Kistner for medical treatment. Officers Schultz, McDermott, and Velez all testified that they were taking James Kistner for medical treatment and that the 941 evaluation was initiated based on recommendations from the attending medical staff at ECMC. The radio transmission by Officer Schultz that this will "be a 941" indicated a clear predisposition that contradicts their sworn testimony.

## Conclusion #2:

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that Officers McDermott and Schultz intentionally violated New York State Vehicle and Traffic Laws[8], BPD Policies, and BPD Rules and Regulations by making false statements to their supervisor, hospital personnel, and the submission of false reports that resulted in the failure by Buffalo Police Department to investigate a personal injury motor vehicle accident involving a City of Buffalo Police vehicle and the subsequent mental evaluation of James Kistner.**

**Furthermore, Officer Velez was complicit in allowing violations of New York State Vehicle and Traffic Laws, BPD Policies, and BPD Rules and Regulations when she failed to intervene contributing to the failure by Buffalo Police Department to investigate a personal injury motor vehicle accident involving a City of Buffalo Police vehicle and the subsequent mental evaluation of James Kistner.**

**Furthermore, Officers Schultz, McDermott, Velez, and Moriarty provided false sworn testimony about the incident that occurred on January 1, 2017 in violation of BPD Rule & Regulation 3.5 Truthfulness, Code of Ethics,[9] and applicable state laws.**

As opined in Conclusion #1, a motor vehicle collision occurred between the vehicle being operated by Officer McDermott and James Kistner, refer to Examination of Case Facts for the sequence of events.

---

[8] New York VAT Title 6, Article 22, 603, Accidents, Police Authority to Report
[9] Code of Ethics "...*Honest in thought and deed in my personal and official life,...*"

The State of New York requires that all motor vehicle accidents resulting in injury[10] must be immediately investigated by the police agency with jurisdiction who must then submit a report of investigation to the commissioner on form MV104.[11] The Buffalo Police Department has sole jurisdiction within the city limits that includes Schmarbeck Avenue.

Officers McDermott and Schultz quickly fabricated details that they purported to be fact to their supervisor (Lieutenant McHugh) that preempted the response of BPD internal units, the subsequent motor vehicle crash investigation, and completion of form MV104.

Officer McDermott then falsified police reports and an affidavit of arrest for James Kistner while allowing Officer Velez to submit an official document to force the involuntary mental health exam of James Kistner.

The Officers gave inconsistent and false testimony in a civil deposition and in a BPD Internal Affairs Investigation.

**Complicity:**

Officer Velez may not have seen the collision since she was a passenger, but she should have recognized that an accident had occurred. Her testimony that she based her actions on statements from other officers, without independent thought, demonstrated her complicity.

Her testimony that she didn't see James Kistner prior to seeing him lying on the ground is not believable.

1. The other three officers clearly indicated they saw James Kistner come down the sidewalk and walk towards their vehicles.
2. Both vehicles were side-by-side with windows down as they were all conversing.
3. At Officer Schultz's prompting, both drivers were attempting to avoid James Kistner.
4. Officer Schultz testified to Internal Affairs that the reason he claimed to have told Officer Moriarty to stop was because he thought James Kistner was acting suspicious and was about to "do something."
5. It is not believable that Officer Velez would not be exercising a minimal amount of officer safety by observing her surroundings.

Officer Velez's complicit actions caused her to submit false information on Form 9.41 that resulted in the unnecessary second medical and mental evaluation of James Kistner.

---

[10] New York VAT Title 6, Article 22, 600 2(a), Personal Injury Accident
[11] New York VAT Title 6, Article 22, 603, Accidents, Police Authority to Report

Officer Moriarty was a rookie officer on his first week of training, would not have the standing to intervene with respects to a motor vehicle accident investigation, and was following orders of senior officers.

BPD MOP Policy Violations:

Officers McDermott, Schultz, and Lieutenant McHugh violated BPD policy and procedures when they failed to notify the Accident Investigation Unit and Internal Affairs Office to respond to Schmarbeck Avenue to conduct a proper investigation. This failure to notify the proper investigatory units, resulted in numerous BPD Policy violations with respect to an accident investigation for a city owned police car that includes, but not limited to, the following:

1. Interviewing participants and witnesses
2. Verification of damage
3. Evidentiary documentation of damage
4. Notifications of command staff
5. Preparation of reports to be filed with the chain of command
6. Accountability

Officers McDermott, Schultz, Velez, and Moriarty violated BPD Rule & Regulation 3.5 Truthfulness, Code of Ethics,[12] when they made false statements, filed false reports, and provided false testimony; refer to Witness Credibility Assessment.

***Officers McDermott's, Velez's, Schultz's, and Moriarty's testimony were unsupported by the evidence reviewed to render this opinion.***

BPD MOP Policy Violations:

Officers McDermott, Schultz, and Lieutenant McHugh violated BPD policy and procedures when they failed to notify the Accident Investigation Unit and Internal Affairs Office to respond to Schmarbeck Avenue to conduct a proper investigation.

This failure to notify the proper investigatory units, resulted in numerous BPD Policy violations with respect to an accident investigation for a city owned police car that includes, but not limited to, the following:

1. Interviewing participants and witnesses
2. Verification of damage
3. Evidentiary documentation of damage
4. Notifications of command staff

---

[12] Code of Ethics *"...Honest in thought and deed in my personal and official life,..."*.

5.  Preparation of reports to be filed with the chain of command
6.  Accountability

Officers McDermott, Schultz, Velez, and Moriarty violated BPD Rule & Regulation 3.5 Truthfulness, Code of Ethics,[13] when they made false statements, filed false reports, and provided false testimony.


## Conclusion #3:

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that the officers lacked probable cause, or even reasonable suspicion, to detain and arrest James Kistner for criminal mischief.**

**Intent:**

There can't be a crime of criminal mischief unless there was intent to cause damage. If there was any merit to the allegations that James Kistner was a danger to himself and in need of an immediate mental evaluation, the intent of his actions would have been to cause harm to himself, not to damage someone's property. Refer to Examination of Case Facts.

There is no possible way that James Kistner could have predicted the sudden movement of Officer McDermott's vehicle and subsequent collision resulting in him being knocked to the ground. Even if there was damage to McDermott's vehicle, it wouldn't be criminally intended damage, but that from a motor vehicle accident as opined in Conclusion #1.

Officer Schultz articulated in his Internal Affairs interview that it was "…very obvious and evident to him and Officer Moriarty, and later after speaking to Officers McDermott and Velez, that it was done on purpose." In Officer Schultz deposition he testified "…he (Kistner) made no attempt to stop, to move out of the way of the vehicle, he (Kistner) walked purposively towards the driver's side of her (McDermott) vehicle and when she stopped the vehicle abruptly because he (Kistner) was approaching, he threw himself into it, maybe even more like lunged into it…that is when we decided where we going to go from there…after I of course was speaking with Lieutenant McHugh."

Both Officers McDermott and Velez claimed in their depositions that they couldn't recall specifics of their conversations as they evaluated the situation. Officer Moriarty was in his first week of training and had testified he was merely observing, listening, not contributing to any decisions, and was focused on learning.

---

[13] Code of Ethics *"…Honest in thought and deed in my personal and official life,…".*

To believe the assertions made by the officers, James Kistner would have had to formulate and initiate a plan in less than three seconds of time from when he passed behind Officer Schultz and Moriarty's vehicle and to when he was struck by Officer McDermott's vehicle.

Additionally, there is no way James Kistner could have predicted the officers would ignore his requests for an ambulance, arrest him, and then delay a transport for medical treatment for thirty minutes.

**Questionable Damage:**

When reviewing the video and considering the varying descriptions of damage by the officers, it is unlikely that James Kistner caused any measurable or permanent damage to the mirror.

1. Officer McDermott claimed in her deposition that the mirror was "disconnected and it shook when you drove" but later described the damage to the Internal Affairs as it "…was jiggling…shaking off the car."
2. When Officer Schultz was asked about the damage in his deposition, he said he didn't remember what kind of damage the mirror sustained.  He recalled Officer McDermott making a comment that the "driver's side mirror not being able to function" but then he told Internal Affairs that the mirror wasn't moving right, "…it skipped, not move right…"
3. Officer Velez testified in her deposition that she never saw the collision with James Kistner and was relying on what Officer McDermott had told her.  Officer Velez was very vague on most of her answers claiming lack of knowledge or the ability to remember, but when asked about the damage to the mirror she had specific recollections that the mirror "…was dislodged…the mirror itself was not broken…partially dislodged."

The side view mirrors on a Chevrolet Tahoe are set inside of a larger plastic durable frame that is mounted on the forward most portion of the door next to the fender.  The mirror unit is designed to be folded inward toward the window for maintenance, security, clearance, or storage.    It is more likely than not that when Officer McDermott's vehicle struck James Kistner a portion of his body, possibly his shoulder as suggested by Officer Schultz in his statements to Internal Affairs, pushed the plastic frame inward.  This would **not** have caused any damage to the mirror which was confirmed independently by Plaintiff's Expert Jennifer Yaek.

The assertions by officers that the driver's side window was damaged is unsupported by the evidence reviewed and confirmed independently by Plaintiff's Expert Jennifer Yaek.

**Lack of Proof of Damage:**

Officer McDermott testified in her deposition that she does not recall if she ever completed a work order request to have the mirror or window on Veh#473 repaired.  She couldn't testify if any repairs were ever completed only that at some later time, she didn't take notice to any damage.

The Buffalo Police Department failed to present any documentation, photographs, or records as proof that BPD Veh #473 was damaged beyond police reports falsified by Officer McDermott.

A routine work order for BPD Veh #473[14] supplied by BPD indicates the vehicle #473 was serviced four days after the accident on January 5, 2017 for cooling problems, replacement of water pump, and serpentine belt.  There were no notes on the work order about the mirror or window being damaged, repaired, or replaced.

Officer McDermott was seen on video taking a picture of the mirror on Veh #473 while on Schmarbeck Avenue.  Officer McDermott said she did not retain a copy of the picture even though she was photographing evidence needed to prove felony criminal mischief.

Officer McDermott never sought or obtained any estimates of damages.  There must have been a question about the damages because the court reduced the charge on February 1, 2017 to a misdemeanor indicating if there was any damage, it was less than $250.00.

In April 2017, all criminal charges were dropped by the prosecutor's office.

*Officers McDermott's, Velez's, Schultz's, and Moriarty's testimony were unsupported by the evidence reviewed to render this opinion.*


**Conclusion #4:**

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that on January 1, 2017, at approximately 11:00 a.m., Officers McDermott, Velez, Schultz, and Moriarty failed to provide immediate medical aid for James Kistner.**

The officers used poor judgement when they physically lifted James Kistner off the ground after being struck by Officer McDermott's vehicle, handcuffing his hands behind his back, forcing him to walk down the street, and placing him in the rear of a patrol vehicle.  These actions could have resulted in further injury to James Kistner especially since they knew he was struck by a police car and he was making multiple requests for an ambulance.  Refer to Examination of Case Facts

---

[14] BPD Fleet Management Maintenance Work Order, Plaintiff Exhibit 18

**Injury Assessment and Arrest:**

James Kistner testified he immediately began requesting medical assistance yelling out to his son multiple times to call an ambulance. James Kistner said when he was being handcuffed by the officers, he realized they were ignoring his requests for an ambulance.

Earl Kistner testified he heard his Dad yell and ran out into the street to see what happened. Earl Kistner said the officers were telling him (James Kistner) to get off the ground or he was going to be arrested for being in the road.

The officers gave conflicting statements under oath in their depositions and Internal Affairs Interviews as to James Kistner's injuries or requests for medical treatment.

Officer McDermott testimony varied from telling James Kistner "she didn't believe he was hurt" to "I don't remember what I was thinking."

Officer Velez testified she didn't remember hearing what anyone said and relied on what she was told at the scene, yet she specifically recalled hearing a noise or bump at the time of the collision.

Officer Schultz testified in his deposition that he honestly didn't remember what James Kistner said or what he said to him. Officer Schultz had specific recollections in his Internal Affairs interview ranging from Kistner claimed he was struck, answered all my questions, he was moving, I didn't think he was injured, and I canceled the ambulance because we could get him medical attention quicker.

Officer Moriarty's testimony differed between his deposition where he said he was new and didn't remember much and his Internal Affairs interview where he described Kistner as "doing a weird faking flopping around."

*James and Earl Kistner's testimony were consistent and supported by the evidence reviewed to render this opinion.*

*Officers McDermott's, Velez's, Schultz's, and Moriarty's testimony were unsupported by the evidence reviewed to render this opinion.*

BPD MOP Policy Violations:

All four of the officers violated BPD MOP[15] for investigating motor vehicle collisions when they failed to obtain proper medical care for an injured party. Additionally, the officers violated the BPD's policy for the Transportation of Sick or Injured[16], by placing him in the rear of the patrol car where he remained for approximately 30 minutes before being transported to the emergency center. The policy says in part:

> "...It is rarely, if ever, in the victim's best interest to be transported by police vehicle. Police vehicles shall not be used to transport persons who are sick or injured unless the victim is extremely critical and his/her life would be jeopardized by waiting for the arrival of an ambulance..."

The fact that there was a significant delay in transporting **negates** Officer Schultz's assertion that they canceled the ambulance because they could transport quicker to the emergency center and supports the concept that he canceled the ambulance to avoid a motor vehicle accident investigation.


## Conclusion #5:

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that Lieutenant McHugh failed to properly supervise his subordinate officers and failed to follow BPD Procedures requiring him to respond and take command of any motor vehicle accident involving a BPD vehicle.**

Lieutenant McHugh's failure to respond to the scene on January 1, 2017 contributed to James Kistner being falsely arrested and denied timely medical attention. If Lieutenant McHugh had responded and conducted a preliminary investigation, he would have learned at minimum that there was a video of the incident which he could have viewed. Even if he still believed his officers, he would have seen the video evidence that should have triggered an accident investigation by the BPD Accident Investigation and Internal Affairs Units.

Lieutenant McHugh chose to rely on a lower ranking officer's description of the events, albeit false, to make his decision. Furthermore, Lieutenant McHugh carelessly chose to interview a participant in the crash, Officer McDermott, by phone trusting that her statements were factual versus verifying in person as required by policy.

---

[15] BPD MOP CH 2: Aided and Accident Cases, 2.2 Responding Officers, A. Initial Procedures
[16] BPD MOP CH 2: Aided and Accident Cases, 9.3 Transportation of Sick or Injured

BPD MOP does not give Lieutenant McHugh the autonomy to *not* respond to the investigation of any motor vehicle collision involving a city owned police vehicle. In Commissioner Lockwood's deposition he said there were "no exceptions" to the MOP on departmental accidents and that he even would have expected a supervisor to respond to a scene with felony level damage to a police car.

Lieutenant McHugh acknowledged in his deposition that he was fully aware of departmental policy.

Lieutenant McHugh never initiated any accountability measures regarding the actions of his subordinate officers even after viewing the surveillance video.

## Conclusion #6:

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that Officer Schultz unlawfully seized Earl Kistner's cell phone denying him the ability to call an ambulance for his father, James Kistner.**

Officer Schultz's interactions with Earl Kistner demonstrated a clear lack of courtesy as required by BPD Rule and Regulations.[17] Officer Schultz's lack of compassion for a son who witnessed the aftermath of his father being struck by a police car, rough-handling, and confiscation of the cell phone does not conform with law enforcement best practices.

Officer Schultz's reasoning, as articulated in his deposition, that he viewed Earl Kistner's actions as threatening and possession of a cell phone posed an "officer safety risk" are without merit. The video clearly shows none of the officers conducted a pat-down search of Earl Kistner to ensure their safety. Officer Schultz allows Earl Kistner to rifle through his own pockets to obtain identification supporting the opinion that his seizure of the phone was to prevent Earl Kistner from using his cell phone to call an ambulance.

Based on the review of the video, Earl Kistner did not appear to pose a threat to the officers.

Commissioner Lockwood affirmed in his deposition that Officer Schultz should not have taken Earl Kistner's cell phone.

Officer Schultz's actions did not conform with law enforcement best practices and as a Field Training Officer set a poor example for a rookie officer under his charge to properly train and supervise.

---

[17] BPD CH 16 Courtesies and Recognition, 1.8 Courtesy, 1.3 Assist Citizens

The Field Training Program is one of the most crucial portions of a new officer's training. It is the time when the rookie takes what they learned in a classroom and apply it in a closely supervised environment. The role of the Field Training Officer (FTO) is one of the most important aspects of leadership in any department. The FTO sets the example by modeling the correct behavior and closely monitors the trainee's behavior. Often, the FTO assignment is an officer's first opportunity to supervise and influence a young officer's future and on January 1, 2017, Officer Schultz failed in this role demonstrated by the *numerous* bad examples for Officer Moriarty.

## Conclusion #7:

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that Officer McDermott violated BPD's Evidence Policy when she used her personal cell phone to photograph alleged damage to the patrol vehicle #473 and by failing properly handle evidence.**

The policy clearly states that only the Crime Scene Unit can take photographs of evidence, however it does provide an exception for some units that includes the Accident Investigation Unit. It also states that regardless of who is photographing, the use of a personally owned device is prohibited. Officer McDermott testified that she didn't print the photo or retain the image for evidence. Not only did she fail to notify the proper unit, but she also failed to retain potential evidence for the purported felony arrest.

If the Accident Investigation Unit been called there would have been documented photographic evidence of any possible damage, or lack thereof, that could have been used to exonerate James Kistner.

## Conclusion #8:

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that the Buffalo Police Department failed to conduct a timely, thorough, and proper Internal Affairs investigation, as required by BPD Policy[18] into the actions of Officers McDermott, Velez, Schultz, Moriarty, and Lieutenant McHugh.**

The investigation conducted by the Internal Affairs Unit was significantly delayed, complacent, incomplete, and was improperly narrow in scope. In addition, Commissioner Lockwood decided the outcome of the case void of all the facts and evidence required to render a proper decision.

---

[18] BPD MOP Chapter 15, Discipline and Discharge

**Responsibility:**

According to Commissioner Lockwood's deposition he:

1. Assumed command of the BPD at the beginning of 2018.
2. Is responsible for all discipline at the Buffalo Police Department.
3. Had no previous knowledge of James Kistner's lawsuit or complaint.
4. Could not provide any explanation why, after receiving notice of a lawsuit on/or about March 30, 2018 and a letter dated February 8, 2019 from James Kistner, that no investigation had begun.
5. Could not explain why the Internal Affairs Division disposition letter dated August 13, 2020 claimed James Kistner initiated a complaint on December 19, 2019, when in fact it should have commenced upon receipt of the lawsuit.
6. Could not explain the significant delay in the investigation given the BPD's Policy that all Internal Affairs Complaints will be completed within 30 days.[19]
   a. The letter to James Kistner from Lieutenant Louis Kelly regarding the disposition of his complaints is dated August 13, 2020, almost 8 months after BPD inaccurately asserts James Kistner filed a complaint.
7. Did not review the video before deciding if charges or discipline was warranted.
8. Stated it "looked like an accident" and that Internal Affairs and the Lieutenant were required to respond, but that didn't happen.

Commissioner Lockwood acknowledged there were policy violations and an unexplained significant delay in the internal affairs investigation but has not taken any action to remedy the transgressions. The actions of the highest-ranking officer in an organization establishes the organizational culture. The lack of accountability in this matter by Commissioner Lockwood did not conform with law enforcement best practices.

**Improper Internal Affairs Investigation.**

A proper internal affairs investigation should identify all potential violations of any laws or departmental policies.

As part of BPD discipline process, the Internal Affairs Unit is charged with identifying any potential violations, investigate the allegations, and prepare a summary of facts. Internal Affairs then presents the summary, evidence, and a recommendation to the Police Commissioner for a determination.

---

[19] Plaintiff Exhibit 38, BPD IAD Letter of Disposition dated August 8, 2020.

Commissioner Lockwood stated in his deposition that when reviewing the case file with Internal Affairs he made his decision to clear all the officers as "not substantiated" on one fact: "Did Officer McDermott intentionally strike James Kistner with her patrol car?" Lockwood said there was no evidence Officer McDermott intentionally struck James Kistner.

The BPD failed to provide any documentation identifying the scope of the investigation. It appears, based on what is revealed in the audio tapes of the officer interviews, and by the testimony of Commissioner Lockwood, the focus was narrowly focused.

The Internal Affairs Unit failed to follow BPD policy on Discipline and Discharge in several areas:

1.  Upon receipt of the lawsuit[20] filed on March 30, 2018 by attorneys for plaintiff, on behalf of James Kistner,
    a.  They did not immediately notify the commissioner.[21]
    b.  Internal Affairs did not review the lawsuits for allegations of violations of policy and did not act.[22]

In a video clip provided by Chad Davenport, attorney for James Kistner, a follow-up news story ran on local TV WIVB Channel 4. The video references and shows highlights of a news story from December 19, 2019 in which James Kistner was interviewed about the lawsuit. There appears to be correlation between the date of the December 19, 2019 news story and the date referenced in the IAD letter giving the impression that BPD didn't begin an investigation until after the news story.

BPD Captain Rinaldo was interviewed on camera as part of the new story and made statements that validate it is BPD policy to launch an internal investigation whenever they receive a claim of civil action. Captain Rinaldo stated in part:

> *"...you can't defend yourself in civil lawsuit and not have any type of internal investigation to determine exactly what the circumstances where surrounding the incident."*

Captain Rinaldo statements further validate BPD practice and underscores policy failures and the significant delay in this investigation.

---

[20] US District Court Western District of New York, Civil Action 18-cv-402
[21] BPD MOP Chapter 15, Discipline and Discharge, 2.2 "...allegation of a crime..." & 2.2.1 "...incidents of misconduct...likely to generate substantial public attention."
[22] BPD MOP Chapter 15, Discipline and Discharge, 2.5 refer to CH 6 Courts, 5.2.B, IAD will review all lawsuits for violations...

**Failure to Properly Investigate**

Lieutenant Kelly did not conduct a thoroughly investigation[23] when he failed to interview all the witnesses.  There is no indication he interviewed Lieutenant McHugh (On-duty supervisor), Booking Clerk Slomba (Central Booking), Earl Kistner (James Kistner son), or Rachel Glurich (James Kistner girlfriend).

Given the severity of the allegations, an experienced investigator would have asked more probing questions to assess the validity of what was being presented.  By the time Lieutenant Kelly conducted the interviews in May 2020, he had complete access to the videos and sworn depositions.  If Lieutenant Kelly had properly prepared for the interviews, he would have thoroughly reviewed all relevant data so that he would be prepared to challenge inconsistencies.

Anytime you have two different set of facts in an investigation you must ask probing questions so you can establish validity.  An experienced investigator would have considered the following when assessing the validity of witnesses in this case:

James Kistner

There was no possible way that James Kistner could have predicted the sudden movement of Officer McDermott's vehicle and subsequent collision resulting in him being knocked to the ground.

To believe the assertions made by the officers, James Kistner would have had to formulate and initiate a plan in less than three seconds of time from when he passed behind Officer Schultz and Moriarty's vehicle and when he was struck by Officer McDermott's vehicle.

If there was any merit to their allegations that James Kistner was a danger to himself, and in need of an immediate mental evaluation, the intent of his actions would have been to cause harm to himself, not to damage someone's property.

Additionally, there was no way James Kistner could have predicted the officers would ignore his requests for an ambulance, arrest him, and then delay a transport for medical treatment for thirty minutes.

James Kistner's recollection of the events on January 1, 2017 did not changed and were supported by the video.

James Kistner's recollection of conversations with Officer Schultz was actually bolstered by Officer Schultz in his statements to Internal Affairs.  Officer Schultz gave evasive and vague

---

[23] BPD MOP Chapter 15, Discipline and Discharge, 3.1 Policy, Thoroughly investigate; 3.8.B Interview witnesses

testimony in his deposition, but later changed his story with Internal Affairs when he admitted to having a verbal exchange with James Kistner as he approached the patrol cars.

<u>Earl Kistner</u>

Earl Kistner's testimony aligned with other witnesses' statements and what was seen on the video.

<u>Officer Schultz</u>

As the senior officer in charge at the scene, Officer Schultz propagated a series of deceptions designed to steer junior officers' actions.   Officer Schultz's deposition and internal affairs testimony lacked credibility.

Officer Schultz's testimony had numerous inconsistent, or in probable, statements, as noted below:

1. Unbelievable proclamation that he "clearly saw the whole thing in its entirety" through the driver's mirror of his patrol vehicle because:
   a. Of an improbable vantage point
      i. Seated in the front passenger seat in a moving vehicle, quickly accelerating away.
      ii. From a distance of at least 70 feet away.[24]
      iii. Must look past mounted police equipment (computer, etc.), the driver (Officer Moriarty) who would have at least one, if not both, hands on the steering wheel, and the steering wheel itself.
      iv. That the driver's side rear view mirror was at the exact angle to for him to see to the rear, even though that mirror is adjusted for the driver, not the passenger.
   b. His claim that their patrol car had come to a complete stop prior to the contact between Officer McDermott's car and Kistner.
      i. Two video angles clearly show his car, in which he was riding, was still accelerating away when Kistner was struck.
      ii. Gave two different explanations of why he knew they were stopped.
         1. In his deposition claims he told Moriarty to stop to be sure the other officers were able to leave without issue.
         2. In his Internal Affairs interview, claims he told Moriarty to slow down "this guy is going to do something."
   c. And that within six seconds he could give Officer Moriarty instructions to stop an accelerating car, provide a reason, and have established a clear line of sight through the opposite side mirror at the precise moment to see the collision.

---

[24] Plaintiff's Expert Report dated December 9, 2020 from Impact Analysis, Inc, Jennifer L. Yaek.

2. Testified in his February 2020 deposition that:
   a. He hadn't had any distinctive interactions with James Kistner prior to January 1, 2017, beyond normal police contact.
   b. Couldn't remember facts from the day such as:
      i. Who was driving the patrol car.
      ii. If he said anything as James Kistner approached their patrol vehicles
      iii. If James Kistner said anything to him.
      iv. Claims they were leaving because they were done with the prior call or they were responding to another call.
   c. Then with remarkable clarity, describes events that took place inside of six seconds while he was watching James Kistner through the rear-view mirror on the opposite side of the vehicle.
      i. Kistner was walking towards McDermott's vehicle as she was pulling out.
      ii. Kistner made no evasive actions to avoid McDermott's vehicle.
      iii. Saw McDermott come to an abrupt and complete stop.
      iv. Saw Kistner put his left hand out onto the fender.
      v. Then Kistner fell to the ground.
   d. When asked what happened next, Schultz's answers became vague or he answered, "I don't remember."
   e. Officer Schultz's vague and amnesic answers for questions posed by the plaintiff's attorney, his sudden clarity for events that support their narrative, and then return to hazy answers is suspect.
3. Testimony from Officer Schultz's May 2020 Internal Affairs Statement included specific answers that were different from his deposition such as:
   a. He was very familiar with James Kistner.
      i. He was the guy that must get involved in police matters on that street, so we wanted to avoid him at all costs.
      ii. I believe he somehow knew the previous complainant and I told him "We are not here for you...this doesn't concern you."
      iii. These statements are *contrary* to his deposition testimony and gives credibility to James Kistner's testimony by confirming:
         1. There was a verbal exchange before the drove away.
         2. James Kistner intended to help the officers by providing vital information about the complainant's potential mental status.
   b. Provided a detailed, yet different description from his deposition, of the collision.
      i. McDermott came to a sudden stop.
      ii. Kistner came to a sudden stop as if it caught him off guard
      iii. Then Kistner threw his upper body against McDermott's vehicle using his shoulder to contact the mirror.
      iv. Then Kistner proceeded to let himself down gently to the ground.

          v.  Laid down on the street.

    c.  Both versions of what happened to James Kistner at point of impact differ from that described by Officer McDermott who was in the best place to observe. [25]

4.  Officer Schultz gave conflicting statements about James Kistner's injuries or requests for medical treatment.

    a.  Officer Schultz testified in his deposition:

        i.  James Kistner was alert and talking but that he "honestly didn't remember" what Kistner was saying or any questions he asked while assessing his injuries.

        ii.  James Kistner did not have any obvious injuries.

        iii.  Decided it would be quicker for them to take him for medical evaluation rather than wait for an ambulance.

    b.  However, in Officer Schultz's Internal Affairs interview he stated:

        i.  I looked at Kistner, didn't see any injuries, told him to get to his feet, he refused, we assisted him to his feet, and placed him in handcuffs.

        ii.  I knew that an ambulance was called, I canceled the ambulance because he was already in our custody because we would get him up to the hospital quicker for a further evaluation.

        iii.  He (Kistner) had no apparent injuries and was conscious, answering all my questions, and could move his head and arms.

        iv.  When asked was he (Kistner) complaining he was hurt? Schultz replied:

            1.  He was saying…(Schultz stops mid-sentence)…he wasn't specific at all just, but he was just like "oh, she hit me."

            2.  I explained to him "…we'd observed the whole thing…" but decided that was not the time or place to argue.

            3.  It would be better for us to get him treatment just to validate what we had observed in our profession, you know what we had seen.

Based on Officer Schultz's predisposition of James Kistner and his first statement to Officer McDermott, it appeared that Officer Schultz had decided as soon as he saw the accident, or while he was walking back, that he was going to arrest James Kistner. As the senior officer on the scene, Officer Schultz decided that they were not going to handle the matter as a departmental accident.

Officer McDermott did not challenge the decision. It may have given her a way out of an accident without all the work and scrutiny of an internal inquiry. Both she and Officer Schultz had previously been involved in internal affairs crash investigations, so they knew what they were avoiding.

---

[25] Officer McDermott who was the closest to the collision testified under oath that James Kistner never stopped, he continued walking into her car

Officer Velez should have asked a few questions but chose to be complicit and not challenge Schultz's decision. Moriarty would not have standing to question his FTO's decision.

Officer Schultz affirmed his decision after selectively feeding Lieutenant McHugh a story, as he described it in his Internal Affairs interview, telling him it wasn't an accident, that a patrol car was damaged, and getting his blessings to arrest James Kistner.

Officer McDermott

Officer McDermott was in the best position to observe the accident or "contact" (using McDermott's words) and provide the most accurate account.

Officer McDermott's sworn deposition testimony was evasive and amnesic when questioned repeatedly about what she remembered from the day of the incident. Like Officer Schultz, when it came to describing the impact Officer McDermott had clear and specific, yet unbelievable, recollection. Officer McDermott contradicted herself numerous times in her deposition as to when she first saw James Kistner even giving the impression that she didn't see him until the actual impact. Officer McDermott's testimony lacked credibility.

In Officer McDermott's deposition, she was not able to remember:

1. If James Kistner said anything as he approached their vehicles.
2. If Officer Schultz said anything to Kistner.
3. If her window was up or down.
    a. She just had her window down conversing with Schultz.
    b. Velez said she heard McDermott speaking to Kistner through the open window.
4. What kind of medical assessment that was conducted, beyond observations.
5. If Schultz asked Kistner any questions.
6. Doesn't recall if she asked Kistner if he was injured.
7. If she heard an impact. (As described by Officer Velez)
8. If Velez said anything to her or if she said anything to Velez, before or after impact.
9. The exact wording of the initial conversation with Schultz other than he said "he (or we) saw the whole thing."
10. Why, after seeing James Kistner walking towards her vehicle, she continued moving forward.
    a. She claimed she didn't think someone would intentionally walk towards a moving car.
11. When James Kistner was placed under arrest.
12. If she completed a vehicle repair request or if the vehicle was fixed.

In Officer McDermott's Internal Affairs interview she gave conflicting statements:

1. That she didn't realize James Kistner "was still coming toward my vehicle."
2. When I saw him coming I tried to stop.
3. They arrested James Kistner when he refused to get off the ground.

Officer McDermott's version of James Kistner's actions differ significantly from that of Officer Schultz, and eventually Officer Moriarty in his internal affairs interview, as follows:

1. She claims James Kistner continuously walks into her vehicle.
   a. Officers Schultz and Moriarty said he stopped and then made contact.
2. She describes James Kistner throwing himself against her vehicle and at the same time throwing his head back while simultaneously throwing himself backwards onto the ground.
   a. Officers Schultz and Moriarty said James Kistner slowly crouched down, placed a hand on the ground, and then laid down.
3. At no time does Officer McDermott give consideration that James Kistner movements were caused by her striking him with her moving vehicle.

Officer McDermott gave conflicting statements under oath as to James Kistner's injuries or requests for medical treatment.

1. In Officer McDermott's deposition she stated that she:
   a. Didn't know why the ambulance was cancelled or who canceled it, but thought it was Officer Schultz.
   b. I believe he (Kistner) claimed to be injured…I didn't believe him.
   c. He had no obvious injuries…I told him to get up.
   d. When asked why she didn't allow the ambulance to respond replied "…don't know what I was thinking."
2. However, in Officer McDermott's Internal Affairs Interview she said:
   e. James Kistner was laying on the ground yelling for his son to call an ambulance.
   f. Kistner said "You (McDermott) hit me with the police car" to which she replied, "all of us saw what happened…get up…we didn't hit you…you threw yourself intentionally at the car…get up or you will be charged with fraud."

Officer Velez

Officer Velez presented the most consistent testimony in her two interviews.  Officer Velez attempted to separate herself from the actions and decisions of her fellow officers by saying she didn't witness the contact, had little or no interaction with James Kistner, or didn't recall events specifics.

Officer Velez's vague testimony, while consistent, did not reflect that of an experienced officer who is now a first line supervisor for the BPD.

At minimum, Officer Velez's lack of intervention on January 1, 2017 was derelict and unprofessional.  She possessed the knowledge and experience to recognize a traffic accident but capitulated to a senior officer of the same rank.  Officer Velez used information she should have known was untrue to complete a medical form used to force James Kistner to be subjected to an involuntary mental health assessment.

There were inconsistencies in Officer Velez's testimony:

1. In her deposition, she described hearing a noise described as a "..plastic sound, or plastic break", but in her Internal Affairs interview, she describe the sound as a thump.
2. In her both of her statements, she claimed she didn't recall or hear James Kistner make any statements.
    a. Officer McDermott confirmed James Kistner's testimony that he yelled out loudly, numerous times, to his son to call an ambulance.
    b. It was unlikely that Officer Velez could have heard a slight bump or plastic noise, but not hear a man yelling for an ambulance.
3. In her Internal Affairs interview, she said she first spoke to Officer Moriarty and then Schultz about what they had seen.
    a. Officer Moriarty testified that he did not participate in any discussions about James Kistner as he was brand new and just observing.
    b. The video shows that Officer Moriarty was not close to Velez and there was no apparent communication seen.
4. In Officer Velez's deposition she claimed her recollection of facts was based on what other officers told her.
5. Officer Velez said she couldn't separate what she was told by the other officers and watch the video to offer any different opinions of what happened.

## Officer Moriarty

Officer Moriarty was a rookie officer on his first week of training on January 1, 2017 and would not have the standing to intervene with respects to a motor vehicle accident investigation and was following orders of senior officers. Officer Moriarty described the FTO-Trainee relationship in that his job was to listen and learn.

It is unlikely that Officer Schultz would have conferred with Officer Moriarty on his perspective and highly unlikely Moriarty discussed the situation with Officer Velez.

There was no evidence to suggest Officer Moriarty did anything wrong on January 1, 2017 but his credibility came under scrutiny in his sworn testimony at his deposition and Internal Affairs interview.

Officer Moriarty's initial deposition testimony appeared to be a combination of what he was told by Officer Schultz and what he observed.  Officer Moriarty was vague and amnesic with his responses, except when it came to his description of the impact.

Officer Moriarty's vague testimony at his deposition included:

1. He was driving away per his FTO (Officer Schultz) direction.
2. Officer Schultz told him to look back to be sure Officers McDermott and Velez get out ok.
3. Doesn't remember if Schultz told him to stop or slow down.
4. Couldn't remember if his vehicle had stopped or was coming to a stop.
5. Not certain if McDermott's vehicle was stopped, then later says it was stopped.
6. Said it looked like he (Kistner) threw himself on McDermott's vehicle, then changed his story to say he didn't remember what it looked like.
7. Made repeated statements that it was so long ago he really didn't remember.
8. Doesn't remember what part of Kistner's body hit the car.
9. When asked to describe how James Kistner fell, gave a very descriptive response.
   a. Remembers having a conversation with Officer Schultz in the car immediately after contact was made and that James Kistner:
      i. Put his hand on the car
      ii. Squatted down
      iii. Leaned back
      iv. Put his hand on the ground
      v. Then completed his fall to ground
   b. Officer Moriarty's was not clear if his recollection was what he saw or what he was told by Officer Schultz, but it is what they agreed happened.
   c. Officer Moriarty gave a different version of the events at his Internal Affairs interview three months later.  At that time, he said he observed through his mirror that McDermott stopped and James Kistner:

    i. Threw himself on the hood

    ii. Made a weird move

    iii. Broke the mirror

    iv. Braced himself with his left arm

    v. Pretended to fall

    vi. Rolled backwards

    vii. Started flopping around on the street

10. In his deposition, Officer Moriarty said he didn't conduct any medical assessment of James Kistner because he was too new other than to say he didn't remember any injuries.

    a. In Officer Moriarty's internal affairs interview he had specific recollections of the assessment.

    b. Officer Moriarty falsely claimed he testified in his deposition that "…he had a lot of experience in the military with injuries of real people injured…and that he (Kistner) did not appear injured.

    c. When asked by Internal Affairs if James Kistner complained of injuries, he said "…No, he was just doing this weird fake flopping around."

**Complacency**

In reviewing the summaries and listening to the audio tapes, the interviews of Officers McDermott, Velez, Schultz, and Moriarty by Lieutenant Kelly sounded more obligatory than investigatory. Kelly did not challenge any of the officers on their statements.

Lieutenant Kelly complaisant actions continued when he failed to provide all the evidentiary materials available in the case to Commissioner Lockwood so that a full and proper conclusion of facts could be determined and if charges or actions were warranted. The Internal Affairs Unit Case Index[26] does not list the videos of the events on Schmarbeck Avenue on the morning of January 1, 2017. Commissioner Lockwood acknowledged in his sworn deposition that he did not review the videos prior to concluding fact.

---

[26] Plaintiff Exhibit 43, BPD Case Index IAD Case EC2019-046

As a result of Lieutenant Kelly improper failure to challenge the officers on their unsupported statements, the Internal Affairs Unit and Police Commissioner Lockwood failed, or ignored, to consider the following violations:

1. Criminal
    a. Official misconduct
    b. Falsifying a report
    c. False arrest
    d. Conspiracy
2. MOP violations
    a. Ch 2.3: Aided and Accident Cases
    b. Ch 2.9: Transportation of Sick or Injured
    c. Ch 3: Arrests
    d. Ch 5: Evidence
    e. Ch 8: Patrol, Supervisor Responsibilities
    f. Ch 15: Discipline and Discharge
    g. Rules and Regulations
        i. Familiarity with laws
        ii. Assist Citizens
        iii. Truthfulness
        iv. Falsifying Reports
        v. Fail to Supervise
        vi. Fail to Thoroughly Investigate

**Conclusion #9:**

**Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that on January 1, 2017, at approximately 10:55 a.m., Officers McDermott, Velez, Schultz, and Moriarty violated the BPD's MOP for Courtesy and Duty to Assist Citizens[27].**

At the very start of the chain of events that led to the accident, the officers saw James Kistner approaching their vehicles. According to Officer Schultz's sworn statements to BPD Internal Affairs inquiry they were "…attempting to avoid him (Kistner) at all costs…." None of the officers made any attempt to ascertain why James Kistner wanted to speak to them, and in fact were discourteous choosing just to yell out that "…this has nothing to do with you…" and that they were leaving. Officers Schultz and Moriarty then sped off down the road and Officer's McDermott and Velez attempted to follow.

---

[27] BPD CH 16 Courtesies and Recognition, 1.8 Courtesy, 1.3 Assist Citizens

## QUALIFICATIONS

I have worked in Law Enforcement for over 32-years retiring from the Delaware State Police in September 2017 at the rank of Captain, serving the last four years as the Director of Human Resources.   My law enforcement experience includes increasingly responsible roles and achievement in the areas of: Policy/Procedure Development; Human Resource Management; Compliance Monitoring; Internal and External Investigations; Training/Development; Program and Project Management; Executive level leadership and managerial.  During my career I testified in State of Delaware Courts (Magistrate, Court of Common Pleas, and Superior Court), Federal Court, as well as Chester County Court of Common Pleas.  Refer to my curriculum vitae, which is attached, for more details of assignments and experience.


I have extensive experience and knowledge in researching, developing, implementing, and evaluating police policy and procedure that reflect best practices of the law enforcement industry. I served as the Accreditation Manager for the Delaware State Police responsible for two meritorious re-accreditations with the Commission on Accreditation for Law Enforcement Agencies (CALEA) and supervised a third meritorious re-accreditation as a commander.

I have been a certified assessor for the Commission on Accreditation for Law Enforcement Agencies (CALEA) since September 2014 where I travel the country evaluating the policies and procedures of law enforcement agencies to be sure they meet the best practice standards set forth by CALEA.

I am a graduate of the FBI National Academy Law Enforcement Executive Leadership Development Program which is accredited by the University of Virginia.  The FBI National Academy is considered the "West Point" of leadership development in the law enforcement community where less than 1% of police leaders from around the world qualify and are selected to attend.  I earned a master's degree (summa cum laude) in Organizational Leadership from Wilmington University.  I have trained, supervised, and mentored police officers from basic training through first and second level supervision.

I have worked as a law enforcement consultant for the past four years, initially part-time while still employed as a Trooper, and now full time as the president of Campanella Consulting Group, Inc. Campanella Consulting Group offers services that include conducting confidential work place and internal investigations, law enforcement and human resources training, critical incident planning/response, and expert law enforcement services.   Clients include law enforcement agencies and training academies, law enforcement accreditation entities, municipalities, private industry, attorneys, law firms, human resource providers, and educational institutions.

Refer to my curriculum vitae for certifications and licenses.

## STATEMENT OF COMPENSATION

As the expert retained by the defendant in this matter, I have been or will be compensated at a rate of $200.00 per hour for my services related to this case.

## ATTACHMENTS

1.  Curriculum vitae for John A. Campanella

This report was developed by me, John A. Campanella, a law enforcement policy, procedures and professional standards consultant and expert.

Date: <u>December 11, 2020</u>

_(signature)_

_____

John A. Campanella

8.      Please refer to my expert report for a comprehensive analysis of the

opinions contained herein.  *See* Exhibit B.

Sworn to before me this
14 day of May 2021

John Campanella

_____
Notary Public

4