UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES C. KISTNER,

                Plaintiff,

     vs.                                       Civil No.:  18-CV-00402

THE CITY OF BUFFALO, BYRON LOCKWOOD,
DANIEL DERENDA, LAUREN McDERMOTT,
KARL SCHULTZ, KYLE MORIARITY, DAVID T.
SANTANA, and ANTHONY McHUGH,


                Defendants.
_____

## LOCAL RULE 56(A)(2) RESPONE TO DEFENDANTS' PROPOSED STATEMENT OF MATERIAL FACTS

Pursuant to Local Rules of Civil Procedure 7(a)(5) and 56, plaintiff James C. Kistner submits this response to Defendants' Statement of Material Facts, as follows:

1.     *On January 1, 2017, at approximately 10:56 AM, Buffalo Police Department Officers Schultz and Moriarity responded to a 911 call at 33 Schmarbeck Avenue. Ex. B at 1; Ex. G at 143-44; Ex. H at 153; Ex. J at 50. Officers McDermott and Velez also responded to back up Schultz and Moriarity. Ex. G at 144, 147; Ex. H at 153; Ex. I at 90, 92; Ex. J at 82-3.*

**Response:**    Plaintiff does not dispute this statement.

2.      *Officers completed their response to the 911 call. Ex. G at 152; Ex. I at 89.*

**<u>Response:</u>**      Plaintiff disputes this statement as it is incomplete and misleading. According to the Complaint Summary Report provided by the City of Buffalo during discovery, the call at 33 Schmarbeck that Officers Schultz and Moriarity responded to initially was not "completed" until 10:56:53 a.m., which was after Mr. Kistner was hit by Officer McDermott's police vehicle.  According to the Complaint Summary Report for the call at 37 Schmarbeck, the incident that is the subject of this lawsuit, it was reported that Mr. Kistner was hit by Officer McDermott's police vehicle at 10:54:42 a.m.  Huggins Decl., Exhibit B.

3.      *Plaintiff did not contact 911 regarding the van parked on Schmarbeck Avenue on the morning of January 1, 2017. Ex. E at 75. He was never summonsed out of 37 Schmarbeck. Ex. E at 83. No one called him and asked that he come out. Ex. E at 83.*

**<u>Response:</u>**      Plaintiff does not dispute this statement.

4.      *Plaintiff exited 37 Schmarbeck and approached the police vehicles by jaywalking across Schmarbeck Avenue. Dkt. No. 61 ¶60; Ex. D at 34; Ex. E at 84, 86; Ex. G at 104. He was wearing dress shoes. Ex. D at 45; Ex. E at 71.*

**<u>Response:</u>**      Plaintiff disputes Defendants' conclusory assertion that Mr. Kistner was "jaywalking" across Schmarbeck Avenue.  Kistner entered the roadway with the intention of speaking to the officers, not to cross Schmarbeck Avenue.  When Mr. Kistner entered the roadway, the officers parked their vehicles in a way that blocked all traffic from traveling north and south on Schmarbeck Avenue.  Therefore, at the time Mr. Kistner entered Schmarbeck

Avenue and approached the vehicles, Schmarbeck was not a "roadway" as that term is used in the context of New York's Vehicle and Traffic Laws as no traffic could possibly travel on Schmarbeck Avenue.  *See* Yaek Aff., Exhibit C.  Further, to the extent that Defendants attempt to argue that they could have arrested Mr. Kistner for jaywalking, it should be noted that a traffic infraction is not a crime, and under New York's Vehicle and Traffic Law § 155, jaywalking is considered a traffic infraction.


5.	*The police vehicle operated by Moriarity began to pull away and drive north on Schmarbeck. Ex. I at 93; Ex. J at 101. Schultz instructed Moriarity to stop the vehicle so that they could observe Plaintiff's interaction with the female officers' vehicle. Ex. I at 93-94; Ex. J at 107-108.*

**Response:**	Plaintiff takes no position as to whether Schultz instructed Moriarity to stop, but it is clear from the video of the incident that Moriarity did not actually stop until well after Plaintiff had been struck by the vehicle operated by Officer McDermott.  Indeed, Moriarity's vehicle was still in motion and driving forward at the time of the impact (Yaek Affidavit., Exhibits C and D), suggesting either that Schultz never told Moriarity to stop as he has claimed, or Moriarity disobeyed Schultz's instruction.  Given that Moriarity was in training on the day of the incident with Schultz as his training officer, it is unlikely that Moriarity refused to follow Schultz's instruction, leaving the more likely conclusion that Schultz lied about instructing Moriarity to stop.

6.      *McDermott operated the other patrol vehicle. Ex. G at 146; Ex. I at 94.*
*Plaintiff continued to approach the vehicle. Ex. D at 38. She did not roll down the driver's*
*window, say anything verbally to Plaintiff, or summons him to her vehicle. Ex. D at 39.*

**Response:**      Plaintiff disputes that McDermott did not summon Plaintiff to her vehicle.
McDermott looked in Plaintiff's direction and smiled, which signaled to plaintiff that could
approach her vehicle.  Huggins Decl., Ex. D, p. 36; and Ex. E, p. 87.

7.      *McDermott observed Plaintiff walk towards the driver's side of the patrol*
*vehicle without stopping. Ex. G at 103-105, 162.*

**Response:**      Plaintiff does not dispute that McDermott observed Plaintiff walk towards
her vehicle at one point in time.  However, McDermott took her eyes off Kistner when she
reversed her vehicle and never regained sight of Plaintiff prior to shifting gears, driving forward,
and striking him with her vehicle.  Huggins Decl., Ex. G, pp. 108-15, 153-55, 171-80.  In
addition, the video shows that Kistner stopped before he was struck by McDermott's patrol
vehicle.  Yaek Aff., Exhibit B, pp. 10-11; and Exhibit C.

8.      *Plaintiff extended his hands and closed his eyes. Ex. E at 90; Ex. G at 158,*
*160, 162; Ex. I at 97, 207. His hands came into contact with the vehicle. Ex. D at 39; Ex. G at*
*95-97, 163-164; Ex. I at 97. He went to the ground on his back. Ex. D at 41; Ex. G at 166, 183;*
*Ex. I at 97, 99; Ex. J at 119. Plaintiff has no "visual recollection" of the vehicle striking him. Ex.*
*E at 91.*

**Response:**      Plaintiff disputes this statement as incomplete and misleading.  Plaintiff
testified that his hands and hips may have been struck by the vehicle.  Huggins Decl., at Ex. E.,

pp. 90-91.  In addition, Plaintiff's head hit the pavement as a result of the collision with McDermott's vehicle.  *Id*.  Moreover, Plaintiff disputes Defendants' characterization of the accident, as the video clearly shows that he was struck by Officer McDermott's vehicle, not the other way around.  Yaek Aff., Exhibit C.

9.     *McDermott did not consider this to be an accident. Ex. G at 198, 201-202.*

**Response:**    Plaintiff disputes this statement for the reasons more fully set forth in his memorandum of law opposing Defendants' motion for summary judgment.  McDermott is not a credible witness, and the Court should give no weight to whether she "considered" the collision with Kistner to be a motor vehicle accident.  Given that McDermott's vehicle struck Mr. Kistner and not the other way around, if she is claiming it was not an accident, then she is saying in effect that she struck him on purpose, as that is the only other possibility.  As Byron Lockwood testified during his deposition, he considered what he saw on the videos to be a motor vehicle accident, and that required the officers to notify the City of Buffalo's Accident Investigation Unit ("AIU") and Internal Affairs Department ("IAD").  Rupp Decl., Ex. A 172:7; *see also* Plaintiff's Memorandum of Law submitted in opposition to Defendants' Motion for Summary Judgment, dated pp. 13-19.

10.     *Schultz observed Plaintiff make contact with the vehicle's driver's side mirror. Ex. I at 95.*

**Response:**    Plaintiff disputes that Schultz was able to observe the subject incident.  He also claimed that the vehicle in which he was a passenger came to a stop, thus allowing him to observe the incident through the driver's side mirror, but the vehicle did not stop and continued

to drive away from the scene as the incident occurred and even afterwards.  As explained by Plaintiff's unchallenged accident reconstruction expert, Schultz's claimed observations of the accident were physically impossible for him to observe.  Yaek Aff., Exhibit B, pp. 10-24.

      11.    *The patrol vehicle's mirror was damaged. Ex. G at 121; Ex. H at 200-201; Ex. I at 117-118.*

**<u>Response:</u>**     Plaintiff disputes that McDermott's patrol vehicle sustained any damage as a result of her negligently striking Plaintiff.  No repairs were made to the vehicle's window or mirror, despite being brought in for routine maintenance just four days after the accident. Huggins Decl., at Ex. G, pp. 206-09, 363-65; Rupp Decl., Exhibit B.  The photograph that McDermott took of the alleged damage never was produced to the prosecutor or in discovery in this case.

      12.    *Schultz and Moriarity exited their patrol vehicle and walked towards Plaintiff. Ex. G at 181; Ex. I at 101, 115-6; Ex. J at 111.*

**<u>Response:</u>**     Plaintiff does not dispute this statement.

      13.    *Plaintiff claims to have experienced pain to the back of his head. Ex. D at 44; Ex. E at 90-91. He did not have any visible physical injuries and was not bleeding. Ex. D at 41, 44-45, 79; Ex. E at 93; Ex. G at 100, 185-186; Ex. I at 105, 107; Ex. J at 126. Plaintiff's clothing was not damaged or torn. Ex. D at 46.*

**<u>Response:</u>**     Plaintiff disputes this statement to the extent that it claims Plaintiff did not have any visible physical injuries.  As shown in the colored photograph that was taken of

Mr. Kistner at booking on the day of the accident, there was an abrasion to his head caused by this accident.  In addition, the medical records show that hospital staff observed and noted abrasions to Mr. Kistner's head as a result of the accident.  Mr. Kistner was also diagnosed with a concussion by ECMC staff.  *See* Rupp Decl., Exhibit C; Huggins Decl., Exhibit F, pp. 3, 5, 11, 25.

14.   *Plaintiff refused to get off the ground. Ex. D at 43. He did not identify any physical injuries to the officers. Ex. D at 43-44.*

**Response:**      Plaintiff disputes this statement.  Plaintiff testified that he was unable to get off the ground, not that he refused to get off the ground.  Huggins Decl., at Ex. E, p. 93, 99. In addition, Plaintiff yelled to his son, in the presence of the officers "Call an ambulance. The back of my head hurts."  *Id*. at 94, 99.  Plaintiff told the officers that he was experiencing pain in the back of his head.  *Id*. at 99.

15.   *Plaintiff did not hear the conversation between the officers. Ex. E at 97.*

**Response:**      Plaintiff does not dispute this statement.

16.   *Plaintiff did not make any specific requests for medical treatment to the officers. Ex. D at 58-59; Ex. E at 99, 100.*

**Response:**      Plaintiff disputes this statement.  While lying on the ground as a result of being struck by the police vehicle, Plaintiff yelled to his son, in the presence of the officers, to call an ambulance.  Huggins Decl., at Ex. E., pp. 94, 99.  Officer Schultz canceled the ambulance request.  Huggins Decl., Ex. I, pp. 125-26; Huggins Decl., Exhibit B.

- 7 -

17.     *Plaintiff was handcuffed (Ex. I at 107-108; Ex. J at 137) and was walked to Moriarity's patrol vehicle. Ex. D at 49; Ex. I at 105; Ex. J at 137-138. He did not say anything to the officers. Ex. D at 49, 50, 55.*

**Response:**     Plaintiff does not dispute this statement.

18.     *McHugh was the lieutenant for all of C District on January 1. Ex. G at 27; Ex. K. Schultz and McDermott contacted McHugh and explained what they just observed. Ex. G at 197, 202-203; Ex. I at 115-117; Ex. J at 155; Ex. K at 46, 108, 110-111.*

**Response:**     Plaintiff disputes this statement to the extent that it claims Schultz and McDermott explained to Lt. McHugh what they "observed."  As explained in the report of Plaintiff's unchallenged accident reconstruction expert, it was physically impossible for Schultz to see what he claims he saw.  In addition, as explained more fully in the accompanying memorandum of law, McDermott is not credible, and the Court should not give any weight to what she claims she observed on the day of the accident.  Yaek Aff., Exhibit B, pp. 10-24; *see also* Plaintiff's Memorandum of Law submitted in opposition to Defendants' Motion for Summary Judgment, dated pp. 13-19.

19.     *Santana arrived at Schmarbeck. He had no interaction with Plaintiff. Ex. G at 223; Ex. I at 147; Ex. N. Santana did not go to Erie County Medical Center ("ECMC"). Ex. G at 238.*

**Response:**     Plaintiff does not dispute this statement.

- 8 -

20.     *Moriarity and Schultz drove Plaintiff to ECMC. Ex. D at 57; Ex. E at 101-102; Ex. H at 178; Ex. I at 129; Ex. J at 126. He was taken to the emergency room. Ex. D at 59; Ex. G at 238, 262; Ex. I at 130, 132. ECMC staff examined Plaintiff. Ex. D at 63; Ex. E at 103; Ex. G at 262.*

**Response:**     Plaintiff does not dispute this statement.


21.     *Plaintiff loudly yelled, refused to answer questions posed by ECMC staff, and was uncooperative while at ECMC. Ex. D at 44, 72; Ex. G at 268; Ex. I at 132-134, 136-137. He admits to have been "boisterous and loud," called the female officers "feminazis," and cursed at the officers. Ex. D at 73; Ex. G at 268; Ex. H at 99, 103; Ex. I at 134. Medical records indicate that Plaintiff was agitated, screaming, and calling people present "fascists" and "Nazis." Ex. F at 1, 11. This language disrupted staff. Ex. F at 14.*

**Response:**     Plaintiff disputes this statement to the extent that it is alleged plaintiff's conduct disrupted staff at ECMC.  Plaintiff's medical records that are attached as Exhibit F to Huggins Declaration do not state that the staff was disrupted by Plaintiff's conduct.  Further, even if the medical records did state that the hospital staff was disrupted by Kistner's conduct, those statements contained in the medical records should not be considered as they are hearsay. The medical records are not certified, and Defendants do not include affidavits from the hospital staff to corroborate their conclusory argument.  *See* Huggins Decl., Exhibit F.

22.     *Plaintiff requested that the handcuffs be loosened only when he was at ECMC. Ex. D at 65-67.*

**Response:**     Plaintiff does not dispute this statement; however, Plaintiff was left alone in the back of Moriarity's and Schultz's police vehicle for upwards of 30 minutes while the officers on scene met and conversed in the middle of Schmarbeck Ave., and during this time he was not afforded the opportunity to complain about the handcuffs.  *See* Yaek Aff., Exhibit C.

23.     *Schultz and Moriarity eventually left and went back on patrol. They had no further interaction with Plaintiff that day. Ex. G at 82-83, 270; Ex. H at 179; Ex. I at 134-135, 153.*

**Response:**     Plaintiff does not dispute this statement.

24.     *Plaintiff told officers while at ECMC that he would go to Internal Affairs. Ex. D at 74.*

**Response:**     Plaintiff does not dispute this statement.

25.     *ECMC emergency department medically cleared Plaintiff following evaluation for physical injuries. Ex. F; Ex. G at 280.*

**Response:**     Plaintiff disputes this statement to the extent that it is misleading and incomplete.  As noted above, Kistner was diagnosed with a concussion and abrasions to his forehead.  Huggins Decl., Exhibit F, pp. 3, 5, 11, 25.

26.     *McDermott and Velez transported Plaintiff to central booking following his discharge from the ECMC emergency room. Ex. D at 75; Ex. E at 114; Ex. G at 270, 280.*

**Response:**     Plaintiff does not dispute this statement.

27.     *At central booking, no anal cavity search was performed on Plaintiff. Anal cavity searches are not performed at central booking. Ex. L at 16. Plaintiff was not physically touched during the search. Ex. E at 125-126.*

**Response:**     Plaintiff disputes this statement to the extent that it is incomplete and misleading.  Plaintiff was subjected to a strip search, which required Plaintiff to squat and cough. Although Defendants do not consider this to be an anal cavity search, Plaintiff felt violated when Defendants required him to undergo this invasive search.  Huggins Decl., at Ex. D, p. 76; Ex. F, pp. 123-24.

28.     *Officers do not perform the searches at central booking. Ex. G at 296, 299, 302. Neither McDermott nor Velez observed the search performed on Plaintiff. Ex. G at 297; Ex. H at 189.*

**Response:**     Plaintiff does not dispute this statement.

29.     *Plaintiff was issued an appearance ticket while at central booking. Ex. C at 8; Ex. D at 77; Ex. G at 317; Ex. H at 105.*

**Response:**     Plaintiff does not dispute this statement.

30.     *Plaintiff never requested medical treatment while at Central Booking. Ex.*
*D at 79.*

**Response:**     Plaintiff does not dispute this statement.


31.     *McDermott and Velez transported Plaintiff to ECMC for a mental health*
*evaluation. Ex. C at 9; Ex. D at 80; Ex. G at 317; Ex. H at 76-77, 80. Velez filled out a request*
*for evaluation. Ex. C at 9; Ex. H at 73, 78-9, 117. McDermott and Velez dropped Plaintiff off for*
*the examination and left. Ex. G at 328-329; Ex. H at 94.*

**Response:**     Plaintiff does not dispute this statement.


32.     *Plaintiff was later arraigned on the criminal charges. Ex. D at 87. After*
*several court dates, the charges were dismissed. Ex. D at 87, 89.*

**Response:**     Plaintiff does not dispute this statement.


33.     *Plaintiff sought medical treatment from his primary care physician. Ex. D*
*at 92-93.*

**Response:**     Plaintiff does not dispute this statement.


34.     *Plaintiff received no mental health treatment for this incident. Ex. D at 97;*
*Ex. E at 155.*

**Response:**     Plaintiff disputes this statement to the extent that it is incomplete and
misleading.  Plaintiff was diagnosed at the hospital with Adjustment Disorder, and although he

did not receive treatment for this psychological injury, he still deals with emotional and psychological distress caused by these incidents.  *See* Huggins Decl., Ex. F, p. 36.


35.     *Plaintiff was not employed on January 1, 2017. Ex. D at 19, 72; Ex. E at 64. Plaintiff does not claim any loss of income from the incident. Ex. D at 99; Ex. E at 35, 158.*

**Response:**     Plaintiff disputes this statement.  As explained in Mr. Kistner's interrogatory responses, Plaintiff is self-employed, and he lost time from work on the day of the subject incidents and thereafter, including to attend multiple hearings related to the false criminal charges and defend himself against the criminal charges asserted against him at Defendants' behest.  Further, since the New Year's Day 2017 incidents, the resulting injuries caused by Defendants has caused Mr. Kistner to lose the ability to perform certain maintenance, repair, and similar work at the rental properties that he owns, that he ordinarily would have performed himself, before the accident.  Rupp Decl., Exhibit D, ¶¶ 10-11.


36.     *Plaintiff mailed a complaint to the Buffalo Police Department Internal Affairs Division. Ex. E at 132.*

**Response:**     Plaintiff does not dispute this statement.

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS

37.     James Kistner is the landlord of multiple multi-unit houses on Schmarbeck Avenue, including 33 and 37 Schmarbeck.  *See* Huggins, Ex. E, pp. 13-18.

38.     On the day of the incident, Officer Moriarity was a brand-new officer in his first week of field training.  Officer Schultz was assigned as Moriarity's Field Training Officer ("FTO").  *See* Huggins Decl., Exhibit I, pp. 32-33; Exhibit J, pp. 27-28.

39.     Officer McDermott was driving the marked BPD Patrol SUV No. 473, and she parked her vehicle on the side of the road at 33 Schmarbeck behind a parked red minivan. Officers Moriarity and Schultz were seated in the patrol vehicle that was driven by Officer Moriarity.  Officer Moriarity parked his vehicle in the middle of the road next to Officer McDermott's vehicle.  *See* Yaek Aff., Exhibit C; Huggins Decl., Exhibit J, pp. 67-68; Exhibit G, pp. 16-17.

40.     Kistner was on the second floor of 37 Schmarbeck Avenue having breakfast with his family when he observed the officers outside speaking with his tenant at 33 Schmarbeck Avenue, Mike Wolfe.  Huggins Decl., Exhibit D, pp. 30-33.

41.     Kistner exited 37 Schmarbeck Avenue to learn why the police were parked outside the property.  Kistner called out to speak with the officers because he knew Mr. Wolfe struggles with mental illness, and because Kistner had recently evicted Mr. Wolfe from the unit at 33 Schmarbeck.  Huggins Decl., Exhibit D, pp. 30-34.

42.     After he exited 37 Schmarbeck, Kistner started to walk south towards the stopped police vehicles.  As Kistner approached, Officer Schultz loudly stated "This has nothing to do with you  . . . we are leaving."  According to Officer Schultz's statement to IAD, the

officers wanted to avoid Kistner "at all costs."  Huggins Decl., Exhibit D, pp. 34-35; Rupp Decl., Exhibit E.

43.     Officer Schultz instructed Moriarity to leave the scene.  At Officer Schultz's prompting, Officer Moriarity abruptly accelerated north down Schmarbeck Avenue passing within a few feet of Kistner on the driver's side.  Yaek Aff, Exhibit C; Huggins Decl., Exhibit I, pp. 92-93; Exhibit J

44.     After Moriarity drove away, Kistner started to walk towards McDermott's vehicle, who smiled and waived at Kistner appearing to invite a conversation with him.  Huggins Decl., Exhibit E, pp. 87-89.

45.     After smiling and waiving at Kistner, McDermott began to slowly back up her vehicle.  *See* Yaek Aff., Exhibit C; Huggins Decl., Exhibit E, p. 87.

46.     Officer McDermott suddenly stopped backing up her vehicle and quickly pulled forward and to the left (northwest) where Kistner was standing.  *See* Yaek Aff., Exhibit C.

47.     Kistner stopped walking and raised his left hand to brace for impact with McDermott's vehicle, which was traveling quickly towards him.  *See* Yaek Aff., Exhibit C.

48.     McDermott then negligently struck Kistner with the driver's side fender of her police vehicle.  The force of the impact knocked Kistner backwards to the ground.  *See* Yaek Aff., Exhibit C.

49.     After her collision with Kistner, Officer McDermott's vehicle continued to move forward before coming to a complete stop.  *See* Yaek Aff., Exhibit C.  Immediately after the impact, Kistner realized his legs were under McDermott's moving patrol vehicle and he rolled away to prevent further injury.  Huggins Decl., Exhibit E, p. 92.

50.     At some point after the collision, the patrol vehicle driven by Officer Moriarity slowed to a stop, backed down the street, and they parked their vehicle in front of 37 Schmarbeck Avenue.  *See* Yaek Aff., Exhibits C and D.

51.     The officers exited their vehicle and started to converge where Kistner was laying on the pavement.  *See* Yaek Aff., Exhibit C.

52.     While still on the ground, Kistner called out loudly and yelled numerous times to his son, Earl Kistner, to call an ambulance because he had been hit by a police car. Huggins Decl., Exhibit E, pp. 93-94.  Earl Kistner went back into 37 Schmarbeck to retrieve his cell phone to call an ambulance.  *See* Yaek Aff., Exhibit C.

53.     Within 63 seconds of the collision, Kistner was lifted to his feet by officers, handcuffed, forcibly walked down the street to Schultz and Moriarity's vehicle, and placed in the back seat of their patrol car.  *See* Yaek Aff., Exhibit C.

54.     As Kistner is being led down the street, Earl Kistner reappears in the video at the edge of the grass and appeared to be on his cell phone.  *See* Yaek Aff., Exhibit C.  At least one phone call is placed to 911 requesting an ambulance.  Huggins Decl., Exhibit B.

55.     Schultz engaged Earl Kistner in conversation, and appears to motion to him to come toward the officers who were in the process of arresting his father.  Earl Kistner walked away from Officer Schultz and back towards 37 Schmarbeck with his cell phone to his ear.  Officer Schultz followed Earl Kistner, grabbed him by the left arm, and dragged him out into the middle of the road while Earl Kistner still held a cell phone with his right hand to his ear. *See* Yaek Aff., Exhibit C.

56.     Officer Schultz suddenly attempted to take the cell phone, and Earl Kistner turned away from Schultz.  In response, Officers Schultz and Moriarity forcibly grabbed

Earl Kistner and pushed him back and forth.  Schultz eventually forcibly grabs Earl Kistner's cell phone and confiscates it.  *See* Yaek Aff., Exhibit C.

57.     BPD Commissioner Byron Lockwood confirmed during his deposition that the officers should not have taken Earl Kistner's cell phone, and that Officer Schultz should not have cancelled the ambulance.  Rupp Decl., Exhibit A, pp. 188, 207.

58.     Dispatch notified the officers that an ambulance was responding for a person struck by a car.  Officer Schultz used his BPD radio to notify dispatch and cancel the ambulance.  Schultz further instructed dispatch to disregard any additional requests for an ambulance on Schmarbeck Avenue.  *See* Huggins Decl., Exhibit B; Rupp Decl., Exhibit F.

59.     Officer Schultz advised dispatch that Kistner "threw himself against one of our cars that was parked" and shortly thereafter told dispatch that this "will be a 941" (*see* Rupp Decl., Exhibit F; Huggins Decl., Exhibit B), which is a police term for taking someone for a mental health examination under New York State's Mental Hygiene Law.  Officer Schultz also falsely stated to dispatch that the "mirror was broken intentionally."  Rupp Decl., Exhibit F

60.     The officers are seen huddled in the middle of the street, and eventually another BPD vehicle stopped at the scene.  Officer Santana can be seen on the video having a conversation with the officers, and the video shows the officers making hand gestures that simulate the accident.  Yaek Aff., Exhibit C.

61.     Despite knowing that Officer McDermott was involved in a car accident with her city-owned vehicle, Santana did not question the officers' decision not to notify AIU and IAD of the accident.  Santana did not notify AIU, IAD, or any other City of Buffalo employee or BPD supervisor that Officer McDermott was involved in a motor vehicle accident

with her vehicle, and that an investigation was required to determine what happened.  Rupp

Decl., Exhibit G, pp. 109-10.

62.     Officer McDermott is seen on video taking a picture of the driver's side

front of her BPD vehicle.  Yaek Aff., Exhibit C.  McDermott admitted during her deposition that

she took a picture of the alleged damage to her vehicle using her cell phone camera.  Huggins

Decl., Exhibit G, pp. 247-249.

63.     Approximately 30 minutes after the collision took place, Officers Schultz

and Moriarity transported Kistner to Erie County Medical Center (ECMC).  Officers McDermott

and Velez followed the officers to ECMC.  Huggins Decl., Exhibit B.

64.     Officers McDermott and Velez stayed at the hospital with Kistner since he

was under arrest.  Officers Schultz and Moriarity left the hospital and went back out on patrol.

Huggins Decl., Exhibit B.

65.     Kistner was at ECMC for more than four hours.  Kistner was diagnosed

with an abrasion on his forehead and a concussion.  The discharge paperwork stated that Kistner

was not under acute mental distress, and did not require a 9.41 mental health examination.  *See*

Huggins Decl., Exhibit F.

66.     McDermott and Velez transported Kistner from ECMC to Central

Booking for arrest processing.  Huggins Decl., Exhibit B.  Upon arrival, Kistner was processed

in accordance with the Central Booking policy.  That process included a search where Kistner

was required to strip down to his underwear, squat and cough, and pull his underwear back to

verify he was not in possession of weapons or contraband.  Huggins Decl., Exhibit E, pp. 120-26.

67.     McDermott completed the requisite police and arrest reports, as well as

arrest affidavits.  Huggins Decl., Exhibit C.  McDermott instructed dispatch to change the status

of the complaint from a crash to criminal mischief.  Rupp Decl., Exhibit F; Huggins Decl., Exhibit B.

68.     Kistner was handcuffed and transported by Officers McDermott and Velez back to ECMC to the Comprehensive Psychiatric Emergency Program (CPEP) Unit.  Huggins Decl., Exhibit B.  Officer Velez completed a 9.41 Form where she falsely claimed that Kistner intentionally threw himself at McDermott's vehicle, and that he was suicidal.  Huggins Decl., Exhibit C.

69.     Officers Velez and McDermott dropped Kistner off with CPEP staff and left ECMC.  Huggins Decl., Exhibit B.  Velez and McDermott left all paperwork for Kistner with CPEP staff, including the appearance ticket.  Huggins Decl., Exhibit G, pp. 328-39.  Kistner was released from CPEP shortly after the hospital staff determined a second time that he was not in acute mental distress requiring a 9.41 examination and observation.  Huggins Decl., Exhibit F.

70.     On March 31, 2017, James Kistner filed a Notice of Claim against the City of Buffalo.  Huggins Decl., Exhibit A.

71.     On April 4, 2017, all charges against Kistner for the January 1, 2017 incident were dismissed by Buffalo City Court.  Rupp Decl., Exhibit H.

72.     On June 27, 2017, Kistner was deposed by attorney Maeve Huggins in response to the Notice of Claim that was filed by Kistner.  *See* Huggins Decl., Exhibit D.

73.     On March 30, 2018, Kistner filed a complaint commencing the instant action.  *See* Docket Entry No. 1.

74.     On February 8, 2019, Kistner sent a letter to BPD Commissioner Byron Lockwood requesting an IAD investigation into the officers' conduct and actions.  Rupp Decl., Exhibit I.

75.     On December 19, 2019, a news story aired on WIVB Channel 4 regarding this lawsuit and the incidents underlying this action.[1]  According to BPD paperwork, that is the same day that the City of Buffalo commenced an IAD investigation into the incidents and the officers' conduct.  Rupp Decl., Exhibit I.

76.     Commissioner Byron Lockwood could not explain the delay in commencing an IAD investigation into this incident, and confirmed that an IAD investigation should have commenced after Kistner filed his Notice of Claim.  Rupp Decl., Exhibit A, p. 250. A public spokesman for the BPD, Captain Jeff Rinaldo, stated during an interview with WIVB Channel 4 that it is BPD policy to commence an IAD investigation whenever they receive a Notice of Claim regarding police misconduct.[2]

77.     In February and March of 2020, Officers McDermott, Velez, Schultz, and Moriarity were deposed by Plaintiff's counsel.  *See* Huggins Decl., Exhibits G-J.

78.     On May 22, 2020, Officers McDermott, Velez, Schultz, and Moriarity gave sworn statements to the IAD officer responsible for investigating their conduct, Lt. Louis Kelly.  *See* Rupp Decl., Exhibits E, K-M.  The officers each gave inconsistent testimony of the incidents when compared to their deposition testimony.

79.     For example, during Officer Moriarity's deposition, he testified that he was new and did not remember much regarding the incident.  Huggins Decl., Exhibit J, pp. 109-11 and 113-17.  During his IAD interview, he described Kistner as "doing a weird fake flopping around" after the collision with McDermott's vehicle.  Rupp Decl., Exhibit K.

---

[1] The Court may take judicial notice of the publishing of the news story.  The news story can be found at the following web address:  https://www.wivb.com/news/buffalo-man-sues-police-officers-after-being-hit-by-cruiser-on-new-years-day-2017/.
[2] Again, the Court may take judicial notice of Captain Rinaldo's public statement.  His interview can be found at the following web address:  https://www.wivb.com/news/buffalo-police-internal-affairs-to-probe-new-years-day-2017-incident/.

80.     Officer Schultz told the Lt. Kelly during his IAD interview that the decision to subject Kistner to a 9.41 examination as made by ECMC staff (Rupp Decl., Exhibit E), but the CAD report shows that Schultz made the decision that this "would be a 941" before arriving at ECMC.  Huggins Decl., Exhibit B.

81.     In addition, Officer Schultz testified during his deposition that he canceled the ambulance because it was quicker for officers to transport Kistner to ECMC.  Huggins Decl., Exhibit I, pp. 125-26.  However, the officers did not transport Kistner to ECMC until nearly 30 minutes after the accident.  Huggins Decl., Exhibit B.

82.     In Officer McDermott's IAD interview, she admitted that Kistner told her "You hit me with the police car," to which she replied "all of us saw what happened . . . get up . . . we didn't hit you . . .  you threw yourself intentionally at the car . . . get up or you will be charged with fraud."  Rupp Decl., Exhibit M.

83.     On August 13, 2020, Kistner received a letter from Lt. Kelly stating that the allegations of misconduct by Officers McDermott, Velez, Schultz, and Moriarity were "not sustained."  Rupp Decl., Exhibit J.  During his deposition, BPD Commissioner Lockwood testified that the IAD investigation was limited to one dispositive question: Did Officer McDermott intentionally strike James Kistner with her patrol car?  Lockwood dismissed the IAD complaint against the officers when he concluded there was no evidence that Officer McDermott intentionally struck Kistner with her vehicle.  *See* Rupp Decl., Exhibit A, pp. 156-73.

84.     On October 14, 2020, current BPD Commissioner Byron Lockwood was deposed by Plaintiff's counsel.  Lockwood testified that he looks at the collision between McDermott and Kistner "as an accident . . . [and] it is hard to say if he [Kistner] threw himself at the vehicle because both he and the vehicle are moving."  Rupp Decl., Exhibit A, p. 172.

85.     Lockwood also testified that AIU and IAD should have been notified to investigate the accident, but it didn't happen in this case.  Lockwood agreed there are "no exception[s]" to the MOP which requires an investigation from AIU, IAD, and the on-duty lieutenant for any accident involving a city-owned vehicle, regardless of injury.  Lockwood was clear during his deposition that AIU and IAD would still be called to the scene even for a criminal mischief or suicide attempt, as the officers alleged against Kistner.  Rupp Decl., Exhibit A, p. 85-87.

86.     Commissioner Lockwood admitted during his deposition that he is not sure if he reviewed the video before deciding if charges or discipline against the officers was warranted.  The videos of the incidents were not included on the Case Index of material reviewed and considered by IAD during its investigation of the on-scene officers' conduct.  Rupp Decl., Exhibit A, pp. 154, 225-227.

87.     Commissioner Byron Lockwood acknowledged that there were numerous policy violations, and an unexplained significant delay in the IAD investigation.  *See, e.g.,* Rupp Decl., Exhibit A, pp. 188, 207, 250, To date, Lockwood has not taken any action to remedy these issues.

Dated: May 14, 2021
          Buffalo, New York

                              **RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
                              *Attorneys for Plaintiff, James C. Kistner*


                              By:_____*s/R. Anthony Rupp III*_____
                                        R. Anthony Rupp III
                                  1600 Liberty Building, 424 Main Street
                                  Buffalo, New York  14202
                                  (716) 854-3400
                                  rupp@ruppbaase.com

TO:    **CITY OF BUFFALO**
       Corporation Counsel
       Attorneys for Defendants
       Maeve E. Huggins, Esq.
       65 Niagara Square, 11th Floor
       Buffalo, New York 14202
       (716) 851-4317