

# CITY OF BUFFALO

## DEPARTMENT OF LAW

# EXHIBIT

# G

ORIGINAL

1

# VIDEO DEPOSITION
## JENNY VELEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

-------------------------------------------
JAMES C. KISTNER,

                        Plaintiff,

              - vs -       Civil Action No.
                           18-cv-402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
 capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
 capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),

                        Defendants.
-------------------------------------------

CITY OF BUFFALO
DEPARTMENT OF LAW

MAR 1 3 2020

RECEIVED
MEH

2

1                    Video deposition of **JENNY VELEZ**,

2    Defendant, taken pursuant to the Federal Rules of

3    Civil Procedure, in the offices of JACK W. HUNT &

4    ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

5    New York, on February 26, 2020, commencing at

6    10:11 a.m., before LYNNE E. DiMARCO, Notary Public.

7

8    APPEARANCES:      RUPP BAASE
                        PFALZGRAF & CUNNINGHAM, LLC,
9                      By CHAD DAVENPORT, ESQ.,
                        1600 Liberty Building,
10                      Buffalo, New York  14202,
                        (716) 854-3400,
11                      davenport@ruppbaase.com,
                        Appearing for the Plaintiff.
12
                        TIMOTHY A. BALL, ESQ.,
13                      Corporation Counsel,
                        By MAEVE E. HUGGINS, ESQ.,
14                      Assistant Corporation Counsel,
                        1137 City Hall,
15                      Buffalo, New York  14202,
                        (716) 851-4334,
16                      mhuggins@city-buffalo.com,
                        Appearing for the Defendants.
17
     PRESENT:          JAMES KISTNER
18                     LAUREN McDERMOTT

19                     PATRICK F. MORRIS, Videographer

20

21
10:02:14
10:11:41 22          **MR. DAVENPORT:**  Chad Davenport here on

10:11:47 23   behalf of the plaintiff Jim Kistner.

3

| | | |
|---|---|---|
| 10:11:49 | 1 | **MS. HUGGINS:**  Maeve Huggins on behalf of the |
| 10:11:49 | 2 | defendants. |
| 10:11:49 | 3 | |
| 10:12:01 | 4 | **J E N N Y    V E L E Z**, 693 East Ferry Street, |
| 10:12:05 | 5 | Buffalo, New York 14211, after being duly called |
| 10:12:07 | 6 | and sworn, testified as follows: |
| 10:12:07 | 7 | |
| 10:12:07 | 8 | **EXAMINATION BY MR. DAVENPORT:** |
| 10:12:07 | 9 | |
| 10:12:09 | 10 | Q.    Good morning, Ms. Velez. |
| 10:12:12 | 11 | A.    Good morning. |
| 10:12:13 | 12 | Q.    My name is Chad Davenport.  I'm with |
| 10:12:13 | 13 | the law firm Rupp Baase Pfalzgraf Cunningham and we |
| 10:12:15 | 14 | represent the plaintiff Jim Kistner. |
| 10:12:17 | 15 | So we are here today to talk about events |
| 10:12:19 | 16 | that transpired on January 1st of 2017.  Before we |
| 10:12:24 | 17 | start, have you ever given sworn testimony before? |
| 10:12:26 | 18 | A.    Yes, I have. |
| 10:12:27 | 19 | Q.    And was that in a civil matter or was |
| 10:12:31 | 20 | that in a criminal matter? |
| 10:12:32 | 21 | A.    Criminal. |
| 10:12:33 | 22 | Q.    Okay.  Have you ever given sworn |
| 10:12:35 | 23 | testimony in front of -- in a civil matter before? |

10:12:37  1          A.    No, I have not.

10:12:38  2          Q.    Okay.  So it's the same thing, your

10:12:40  3    testimony is under oath today.  And do you

10:12:44  4    recognize that your testimony is sworn under oath

10:12:47  5    today?

10:12:47  6          A.    Yes.

10:12:47  7          Q.    Okay.  So our discussion today is being

10:12:51  8    transcribed -- transcribed by a stenographer.  In

10:12:54  9    order to have an accurate transcript I just ask

10:12:57 10    that you wait until I finish my question before you

10:13:01 11    answer.  And I will wait until you finish your

10:13:03 12    answer before I ask my next question.

10:13:07 13          In addition, I just ask that you give verbal

10:13:10 14    answers to each of the question that's -- each of

10:13:12 15    the questions that is asked, noddings of the head

10:13:14 16    or shaking your head, uh-huh, uh-uh won't be able

10:13:19 17    to be tran -- transcribed on the record.  So we

10:13:22 18    just want to make sure that we have an accurate

10:13:25 19    record.

10:13:25 20          If at any time you do not understand a

10:13:28 21    question, you can simply ask me to rephrase the

10:13:32 22    question and I can rephrase it for you, but I do

10:13:35 23    ask that if you understand the question to please

*Velez - Davenport - 02/26/2020*

5

| | | |
|---|---|---|
| 10:13:38 | 1 | answer it to the best of your ability.  Can you do |
| 10:13:41 | 2 | that for me? |
| 10:13:41 | 3 | A.    Yes. |
| 10:13:41 | 4 | Q.    And if at any time you need a break, |
| 10:13:41 | 5 | just ask me and we can absolutely stop and take a |
| 10:13:44 | 6 | break for as long as you need. |
| 10:13:45 | 7 | A.    Okay.   Thank you. |
| 10:13:46 | 8 | MS. HUGGINS:   Before we get started, we'll |
| 10:13:49 | 9 | read and sign and I would request 45 days to do so. |
| 10:13:51 | 10 | MR. DAVENPORT:   And that's fine. |
| 10:13:52 | 11 | MS. HUGGINS:   Thank you. |
| 10:13:55 | 12 | BY MR. DAVENPORT: |
| 10:13:56 | 13 | Q.    Do you have any military service? |
| 10:13:58 | 14 | A.    No. |
| 10:13:59 | 15 | Q.    Okay.   Have you ever been charged or |
| 10:14:02 | 16 | convicted with a crime? |
| 10:14:03 | 17 | A.    No. |
| 10:14:04 | 18 | Q.    What is your highest level of |
| 10:14:07 | 19 | education? |
| 10:14:07 | 20 | A.    I have some graduate level. |
| 10:14:09 | 21 | Q.    Okay.   And what did you go to graduate |
| 10:14:14 | 22 | school for? |
| 10:14:14 | 23 | A.    Adult education. |

*Velez - Davenport - 02/26/2020*

6

| | | |
|---|---|---|
| 10:14:16 | 1 | Q. Okay. And where did you go to graduate |
| 10:14:18 | 2 | school? |
| 10:14:18 | 3 | A. Buffalo State College. |
| 10:14:20 | 4 | Q. Did you go to undergrad as well? |
| 10:14:22 | 5 | A. Yes. |
| 10:14:23 | 6 | Q. And what did you go for undergrad? |
| 10:14:25 | 7 | A. Criminal justice. |
| 10:14:27 | 8 | Q. And was that a four-year degree? |
| 10:14:28 | 9 | A. Yes, I did two years at ECC, got an |
| 10:14:31 | 10 | associate's in criminal justice, followed up at |
| 10:14:32 | 11 | Buff State, got a BS in criminal justice. And then |
| 10:14:34 | 12 | I continued on graduate school, but didn't complete |
| 10:14:37 | 13 | it. |
| 10:14:37 | 14 | Q. Okay. Did you go to high school? |
| 10:14:40 | 15 | A. I did. |
| 10:14:41 | 16 | Q. And where did you go to high school? |
| 10:14:42 | 17 | A. Hutchinson Central Technical High |
| 10:14:46 | 18 | School. |
| 10:14:46 | 19 | Q. Okay. So we discussed a little bit |
| 10:14:54 | 20 | about your background in terms of education. When |
| 10:14:57 | 21 | did you join the Buffalo Police Academy? |
| 10:15:00 | 22 | A. January of 2013. |
| 10:15:02 | 23 | Q. Okay. And did you start right away |

*Velez - Davenport - 02/26/2020*

7

| | | |
|---|---|---|
| 10:15:06 | 1 | with the Buffalo Police Department or did you have |
| 10:15:08 | 2 | to go to training before you started with the |
| 10:15:12 | 3 | Buffalo Police Department? |
| 10:15:13 | 4 | A.    I had to attend the police academy. |
| 10:15:16 | 5 | Q.    Okay.  And was that in 2013? |
| 10:15:20 | 6 | A.    January, yes. |
| 10:15:20 | 7 | Q.    January 2013. |
| 10:15:20 | 8 | A.    January 2013. |
| 10:15:20 | 9 | Q.    Okay.  And then when did you start with |
| 10:15:22 | 10 | the Buffalo Police Department? |
| 10:15:23 | 11 | A.    I started my field training in June of |
| 10:15:26 | 12 | 2013. |
| 10:15:26 | 13 | Q.    Okay. |
| 10:15:27 | 14 | A.    June 7th, I believe.  I'm not certain |
| 10:15:30 | 15 | on the exact date, but I believe it was June 7th. |
| 10:15:32 | 16 | Q.    Okay.  When you started your initial |
| 10:15:34 | 17 | training, did you have a plan to go to the City of |
| 10:15:36 | 18 | Buffalo Police Department? |
| 10:15:37 | 19 | A.    Yes, I was hired by the City of Buffalo |
| 10:15:40 | 20 | and then placed into the police academy. |
| 10:15:43 | 21 | Q.    Okay.  And that was your plan before |
| 10:15:45 | 22 | you entered the ECC training beforehand? |
| 10:15:48 | 23 | A.    Yes. |

*Velez - Davenport - 02/26/2020*

8

| | | |
|---|---|---|
| 10:15:48 | 1 | Q.   Okay.   Did you have a plan of what |
| 10:15:50 | 2 | district you wanted to work in at the time? |
| 10:15:52 | 3 | A.   No. |
| 10:15:52 | 4 | Q.   Okay.   Did you start in -- well, what |
| 10:15:56 | 5 | district did you start in? |
| 10:15:57 | 6 | A.   C. |
| 10:15:58 | 7 | Q.   C District.   And then how long were you |
| 10:16:00 | 8 | there for? |
| 10:16:01 | 9 | A.   I've been in C the entirety of my |
| 10:16:04 | 10 | career. |
| 10:16:04 | 11 | Q.   Okay.   So that's from 2013 to 2020? |
| 10:16:07 | 12 | A.   Correct. |
| 10:16:07 | 13 | Q.   Any gaps in between? |
| 10:16:09 | 14 | A.   I was assigned to A District as a |
| 10:16:12 | 15 | detective for a couple weeks, but I never actually |
| 10:16:14 | 16 | went into the district.   So by the time I was back |
| 10:16:15 | 17 | to work I was in Charlie.   I was transferred back |
| 10:16:19 | 18 | to Charlie. |
| 10:16:20 | 19 | Q.   Okay.   Did you have any sort of |
| 10:16:21 | 20 | training, field training, before you were off on |
| 10:16:24 | 21 | your own as a police officer? |
| 10:16:26 | 22 | A.   Yes. |
| 10:16:26 | 23 | Q.   And that was after you completed |

*Velez - Davenport - 02/26/2020*

9

| 10:16:28 | 1 | training with the Buffalo Police Academy? |
| 10:16:30 | 2 | A.   Yes. |
| 10:16:31 | 3 | Q.   Okay.  And how long was that field |
| 10:16:32 | 4 | training for? |
| 10:16:33 | 5 | A.   I believe it's 16 weeks. |
| 10:16:35 | 6 | Q.   Okay.  Who did you primarily go with |
| 10:16:39 | 7 | for your field training? |
| 10:16:40 | 8 | A.   I was assigned to at the time Officer |
| 10:16:44 | 9 | Darrel Williams. |
| 10:16:44 | 10 | Q.   Okay.  And was that for the entirety of |
| 10:16:46 | 11 | the 16 weeks? |
| 10:16:46 | 12 | A.   Yes, occasionally when he was off of |
| 10:16:49 | 13 | work, I would be assigned to another officer, but I |
| 10:16:53 | 14 | was primarily with him for the majority of the |
| 10:16:54 | 15 | time. |
| 10:16:54 | 16 | Q.   Okay.  Approximately how many hours |
| 10:16:56 | 17 | were you working during those 16 weeks? |
| 10:17:00 | 18 | A.   I'm 40 hours a week at 10 hours a day. |
| 10:17:03 | 19 | Q.   Okay.  So that would have been four |
| 10:17:05 | 20 | shifts a week then? |
| 10:17:06 | 21 | A.   Correct. |
| 10:17:07 | 22 | Q.   Okay. |
| 10:17:07 | 23 | MS. HUGGINS:  Just slow down, wait for -- |

| | | |
|---|---|---|
| 10:17:11 | 1 | THE WITNESS:  Oh, I'm sorry. |
| 10:17:13 | 2 | BY MR. DAVENPORT: |
| 10:17:13 | 3 | Q.   Where -- what shift did you |
| 10:17:18 | 4 | predominantly work during those 16 weeks? |
| 10:17:21 | 5 | A.   6:00 a.m. to 1600 hours or 4 p.m. |
| 10:17:26 | 6 | Q.   Okay.  And did you maintain that |
| 10:17:28 | 7 | schedule after your 16 weeks? |
| 10:17:29 | 8 | A.   No. |
| 10:17:30 | 9 | Q.   What did you switch to? |
| 10:17:31 | 10 | A.   I was switched to MP5 overnights. |
| 10:17:34 | 11 | Q.   Okay.  And then how long did you work |
| 10:17:36 | 12 | overnights for? |
| 10:17:39 | 13 | A.   I was overnights for -- I don't recall, |
| 10:17:44 | 14 | because we were assigned for a short amount of time |
| 10:17:47 | 15 | and then there was a manpower change and I was put |
| 10:17:50 | 16 | on afternoons.  Possibly six months.  I'm not |
| 10:17:57 | 17 | certain. |
| 10:17:57 | 18 | Q.   Okay.  No, that's okay. |
| 10:17:59 | 19 | A.   Maybe longer. |
| 10:17:59 | 20 | Q.   And then you were saying that you were |
| 10:18:03 | 21 | switched to afternoons after the night shift? |
| 10:18:05 | 22 | A.   Yes. |
| 10:18:05 | 23 | Q.   Okay.  And how long did you work |

*Velez - Davenport - 02/26/2020*

11

| | | |
|---|---|---|
| 10:18:06 | 1 | afternoon shifts for? |
| 10:18:07 | 2 | A.   I know I went to days in January of |
| 10:18:10 | 3 | 2015, so maybe another six months to a year on |
| 10:18:14 | 4 | afternoons. |
| 10:18:14 | 5 | Q.   Okay.  And did you work the day shift |
| 10:18:17 | 6 | from 2015 forward? |
| 10:18:19 | 7 | A.   Yes. |
| 10:18:19 | 8 | Q.   And you were -- |
| 10:18:20 | 9 | A.   Oh, excuse me.  I was -- when I was |
| 10:18:21 | 10 | promoted to detective, my shift changed.  And then |
| 10:18:25 | 11 | when I was promoted to lieutenant, my |
| 10:18:27 | 12 | shift -- shifts changed as well. |
| 10:18:28 | 13 | Q.   Okay.  When approximately were you |
| 10:18:32 | 14 | promoted detective? |
| 10:18:33 | 15 | A.   November of 2017. |
| 10:18:35 | 16 | Q.   Okay.  And when were you promoted to |
| 10:18:40 | 17 | lieutenant? |
| 10:18:40 | 18 | A.   July of 2018. |
| 10:18:42 | 19 | Q.   Were you working as a detective up |
| 10:18:46 | 20 | until the point that you were promoted to |
| 10:18:48 | 21 | lieutenant? |
| 10:18:48 | 22 | A.   Yes. |
| 10:18:50 | 23 | Q.   Okay.  And so, I'm sorry, what shifts |

| | | |
|---|---|---|
| 10:18:54 | 1 | were you working for as you were a detective? |
| 10:18:57 | 2 | A.   Yes. |
| 10:18:57 | 3 | Q.   And that was with the A District? |
| 10:18:59 | 4 | A.   I was assigned to A, but I didn't |
| 10:19:03 | 5 | actually go in and physically work in there.  I was |
| 10:19:05 | 6 | bark in Charlie. |
| 10:19:07 | 7 | Q.   Okay. |
| 10:19:08 | 8 | A.   Within a couple of weeks. |
| 10:19:09 | 9 | Q.   Okay.  Okay.  So you worked as a |
| 10:19:09 | 10 | detective with the C District as well then? |
| 10:19:09 | 11 | A.   Yes. |
| 10:19:10 | 12 | Q.   Okay.  And what shift were you working |
| 10:19:13 | 13 | as a detective? |
| 10:19:14 | 14 | A.   Initially I was afternoons. |
| 10:19:16 | 15 | Q.   Okay. |
| 10:19:16 | 16 | A.   And then within a few months I was on |
| 10:19:19 | 17 | days. |
| 10:19:19 | 18 | Q.   Okay.  As a lieutenant, what shifts do |
| 10:19:24 | 19 | you currently work? |
| 10:19:24 | 20 | A.   6 to 4. |
| 10:19:26 | 21 | Q.   6 to 4.  Did you ever work the |
| 10:19:28 | 22 | afternoon shifts as a lieutenant? |
| 10:19:29 | 23 | A.   Yes. |

*Velez - Davenport - 02/26/2020*

13

| | | |
|---|---|---|
| 10:19:29 | 1 | Q. Okay. And how long approximately did |
| 10:19:32 | 2 | you work the afternoon shift for? |
| 10:19:40 | 3 | A. About six months, I believe. |
| 10:19:44 | 4 | Q. So that now correct me if I'm wrong, |
| 10:19:47 | 5 | that would have put you in early of 2019 when you |
| 10:19:51 | 6 | started to work the day shift as a lieutenant? |
| 10:19:56 | 7 | A. I've changed around so much, let |
| 10:19:59 | 8 | me just -- |
| 10:19:59 | 9 | Q. Sure. |
| 10:20:00 | 10 | A. Let me think about it a little bit. I |
| 10:20:06 | 11 | was promoted in July, I was on afternoons, yeah. I |
| 10:20:14 | 12 | would say early, early 2019. |
| 10:20:16 | 13 | Q. Okay. |
| 10:20:16 | 14 | A. I was on days. |
| 10:20:17 | 15 | Q. Okay. So I'm going to show you what |
| 10:20:22 | 16 | has been marked as Exhibit 16. I'm sorry. I don't |
| 10:20:29 | 17 | have an extra copy. |
| 10:20:30 | 18 | MS. HUGGINS: I have one. |
| 10:20:32 | 19 | BY MR. DAVENPORT: |
| 10:20:33 | 20 | Q. So do you recognize this document? |
| 10:20:34 | 21 | A. Yes. |
| 10:20:35 | 22 | Q. Okay. And what do you recognize that |
| 10:20:37 | 23 | to be? |

| 10:20:37 | 1 | A. A shift summary report. |

10:20:37  1          A.    A shift summary report.

10:20:39  2          Q.    Okay.  Is the date on there -- what's

10:20:44  3  the date on there?

10:20:44  4          A.    1/1 of 2017.

10:20:47  5          Q.    Okay.  Now, reading through this list

10:20:49  6  of officers is there anyone that's on this list who

10:20:53  7  still currently works in C District?

10:21:01  8          A.    Yes.

10:21:01  9          Q.    Okay.  And who is that?

10:21:05 10          A.    Officer David Santana, myself,

10:21:10 11  Lieutenant Anthony McHue.  She's parole on here,

10:21:15 12  but she's now a detective, Erin Haidinger, and that

10:21:19 13  would be all.

10:21:19 14          Q.    Okay.  Now, just because I don't really

10:21:22 15  understand I guess the hierarchy of rankings, where

10:21:26 16  does a detective fall in terms of the ranking or

10:21:31 17  hierarchy for detective as opposed to a lieutenant?

10:21:31 18          A.    Well, detective is on the investigative

10:21:33 19  side.  Where I'm the supervisory side.

10:21:36 20          Q.    Okay.

10:21:37 21          A.    But we would oversee detectives, we

10:21:39 22  would be responsible as a lieutenant to call them

10:21:43 23  out.  So they're investigative, we're supervisory.

*Velez - Davenport - 02/26/2020*

15

| 10:21:46 | 1 | Q. Okay. Okay. So now you said Officer |
| 10:21:55 | 2 | David Santana is still currently working in the C |
| 10:22:00 | 3 | District. Is he still -- has his role changed? |
| 10:22:02 | 4 | A. No. |
| 10:22:02 | 5 | Q. He's still a police officer? |
| 10:22:04 | 6 | A. Yes. |
| 10:22:04 | 7 | Q. Okay. What about for Anthony McHue, is |
| 10:22:08 | 8 | he a lieutenant still? |
| 10:22:09 | 9 | A. Yes. |
| 10:22:09 | 10 | Q. Okay. And I believe you said for |
| 10:22:12 | 11 | Ms. Haidinger she's now a detective? |
| 10:22:15 | 12 | A. Yes. |
| 10:22:15 | 13 | Q. Okay. And who's, I'm sorry, the fourth |
| 10:22:18 | 14 | person who's still working in the C District? |
| 10:22:23 | 15 | A. One, two, three, four. Kevin Quinn, |
| 10:22:24 | 16 | he's a patrol officer, he's also still in the C |
| 10:22:30 | 17 | District. |
| 10:22:30 | 18 | Q. Okay. |
| 10:22:30 | 19 | A. And then I had said myself. |
| 10:22:33 | 20 | Q. Okay. Now, do you know what shift |
| 10:22:36 | 21 | Mr. McHue is working? |
| 10:22:37 | 22 | A. He's days. |
| 10:22:38 | 23 | Q. He's days. So do you and Lieutenant |

| | | |
|---|---|---|
| 10:22:44 | 1 | McHue work the same day shifts? |
| 10:22:46 | 2 | A.   Currently, yes. |
| 10:22:47 | 3 | Q.   Okay.  And you work on the same days as |
| 10:22:50 | 4 | well? |
| 10:22:50 | 5 | A.   Yes. |
| 10:22:51 | 6 | Q.   Okay.  Are there always two lieutenants |
| 10:22:54 | 7 | who are working at any given time? |
| 10:22:56 | 8 | A.   There are two, on my particular wheel |
| 10:22:59 | 9 | there are two assigned, but we can work with just |
| 10:23:03 | 10 | one if one is out for the day. |
| 10:23:04 | 11 | Q.   Okay.  Are there different groups, I |
| 10:23:09 | 12 | guess, of C District police officers?  Do some work |
| 10:23:13 | 13 | some days while others work another day? |
| 10:23:16 | 14 | A.   In our district we have two wheels, we |
| 10:23:18 | 15 | have an A wheel and a B wheel, so when A wheel is |
| 10:23:22 | 16 | working, the B wheel is off, and that's all three |
| 10:23:25 | 17 | shifts. |
| 10:23:25 | 18 | And when the B wheel is working the A wheel |
| 10:23:26 | 19 | is off, because we work all year-round and they |
| 10:23:28 | 20 | always have to be covered, so we just have two |
| 10:23:30 | 21 | sides.  So when the one side is off, the other side |
| 10:23:32 | 22 | is working. |
| 10:23:33 | 23 | Q.   Okay.  Does -- do you work as a |

*Velez - Davenport - 02/26/2020*

17

| | | |
|---|---|---|
| 10:23:38 | 1 | lieutenant for both the A wheel and the B wheel? |
| 10:23:40 | 2 | A.    No, I work on -- there's a discrepancy |
| 10:23:43 | 3 | on which one is labeled the A and the B, but I work |
| 10:23:44 | 4 | on the A side. |
| 10:23:45 | 5 | Q.    Okay.  And then does Lieutenant McHue |
| 10:23:48 | 6 | work on the B side? |
| 10:23:50 | 7 | A.    No, he is on the A side as well. |
| 10:23:53 | 8 | Q.    Okay.  Who is the lieutenant that works |
| 10:23:55 | 9 | on the B side? |
| 10:23:56 | 10 | A.    It is Lieutenant Bradford Pitts |
| 10:24:01 | 11 | and -- and Lieutenant Ibrahim Abdul-Wahed. |
| 10:24:06 | 12 | Q.    Thank you. |
| 10:24:09 | 13 | A.    You're welcome. |
| 10:24:12 | 14 | Q.    So you said that you worked the |
| 10:24:14 | 15 | afternoon shift as a lieutenant in the C District, |
| 10:24:16 | 16 | correct? |
| 10:24:16 | 17 | A.    Yes. |
| 10:24:17 | 18 | Q.    Who was the other lieutenant that you |
| 10:24:19 | 19 | were working with at the time? |
| 10:24:21 | 20 | A.    Leonetta Baskerville. |
| 10:24:23 | 21 | Q.    And how long did you work with her for? |
| 10:24:26 | 22 | A.    The entirety of the time I was on |
| 10:24:28 | 23 | afternoons, so I believe it was approximately six |

| | | |
|---|---|---|
| 10:24:31 | 1 | months. |
| 10:24:31 | 2 | Q.   Okay. |
| 10:24:31 | 3 | A.   I could be a little bit off on my times |
| 10:24:37 | 4 | it's a lot to try to remember on the shift, how |
| 10:24:37 | 5 | long I was on the shift. |
| 10:24:37 | 6 | Q.   And so for purposes of the deposition |
| 10:24:40 | 7 | it's perfectly fine if you're not specific and |
| 10:24:41 | 8 | exactly right.  I'm just asking for you to give |
| 10:24:44 | 9 | answers to the best of your ability. |
| 10:24:46 | 10 | A.   Okay. |
| 10:24:47 | 11 | Q.   As a detective, who was your lieutenant |
| 10:24:49 | 12 | at the time? |
| 10:24:58 | 13 | A.   I apologize, we've had so much movement |
| 10:25:01 | 14 | and promotions, I'm trying to recall who was my |
| 10:25:05 | 15 | lieutenant when I was an afternoons.  I don't |
| 10:25:13 | 16 | recall who was my lieutenant an afternoons. |
| 10:25:19 | 17 | Q.   And that's okay if you don't recall. |
| 10:25:22 | 18 | A.   We had a whole shift -- a whole shift |
| 10:25:24 | 19 | change.  I cannot recall who was -- I -- I don't |
| 10:25:27 | 20 | recall who was the lieutenant. |
| 10:25:28 | 21 | Q.   And that's okay.  So after lieutenant |
| 10:25:32 | 22 | who was next on the hierarchy after in charge of |
| 10:25:37 | 23 | the C District? |

*Velez - Davenport - 02/26/2020*

19

10:25:37  1        A.   It would be the captain.

10:25:39  2        Q.   Okay.   And is the captain in charge of

10:25:42  3   just the C District or does he have other districts

10:25:45  4   that he overlooks as well?

10:25:47  5        A.   It depends on who the captain is -- or,

10:25:49  6   I'm sorry, where the captain is assigned.   We have

10:25:50  7   district captains, so if a captains in C District

10:25:52  8   are just for C District.

10:25:53  9        Q.   And currently who is the C District

10:25:57 10   captain?

10:25:58 11        A.   Jason Whitenight and Joseph Langdon.

10:26:05 12        Q.   And were they the captains in January

10:26:07 13   of 2017?

10:26:09 14        A.   I don't believe so.

10:26:10 15        Q.   Okay.   Do you recall who the captains

10:26:13 16   were in C District at that time?

10:26:15 17        A.   I do not.

10:26:16 18        Q.   Okay.   As a lieutenant, do you report

10:26:19 19   for the captain?

10:26:20 20        A.   Yes.

10:26:21 21        Q.   And how often do you communicate with

10:26:23 22   the captain?

10:26:24 23        A.   The captain that works on my side is

10:26:27  1  overnight, he works the night shift, so I will see

10:26:31  2  him in passing in the morning if he's still there.

10:26:34  3  So once or twice in a two-week period I'll cross

10:26:39  4  paths with him.

10:26:39  5      Q.   Okay.  Now, as a lieutenant, you're in

10:26:42  6  charge of briefing the police officers before they

10:26:44  7  start their shift, correct?

10:26:46  8      A.   Correct.

10:26:46  9      Q.   What kinds of things do you discuss

10:26:48 10  during that briefing?

10:26:49 11      A.   We discuss any legal updates that we've

10:26:52 12  been provided by the department.  We discuss any

10:26:54 13  persons of interest that the detectives may be

10:26:57 14  looking for, or warrant arrests and anything

10:27:01 15  pertinent to officer safety, and then we may review

10:27:05 16  vehicle assignments.

10:27:06 17      Q.   Okay.  Now, do you recall on

10:27:10 18  January 1st of 2017 was there some sort of briefing

10:27:15 19  before you started your shift?

10:27:16 20      A.   Yes.

10:27:16 21      Q.   And who gave that briefing?

10:27:20 22      A.   Lieutenant McHugh.

10:27:21 23      Q.   Okay.  Do you remember what was said

*Velez - Davenport - 02/26/2020*

21

10:27:25  1  during that briefing?

10:27:25  2       A.   I do not.

10:27:26  3       Q.   Okay.  Now, you talked about in your

10:27:29  4  experience as a lieutenant you would give legal

10:27:32  5  updates.  What sorts of legal updates would you

10:27:35  6  give to the police officers before they began their

10:27:38  7  shift?

10:27:38  8       **MS. HUGGINS:**  Form.  You may answer.

10:27:39  9       **THE WITNESS:**  For example, we recently were

10:27:42 10  experiencing raise the age law changes, so we would

10:27:44 11  just remind officers in dealing with juveniles and

10:27:47 12  any updates or changes in procedures as we were

10:27:50 13  getting into this new process.

10:27:52 14       **BY MR. DAVENPORT:**

10:27:54 15       Q.   What other sorts of new processes or

10:27:56 16  new updates have you had to brief the officers on

10:28:00 17  as a lieutenant?

10:28:02 18       A.   That was the one that first came to my

10:28:06 19  mind with the raise the age.  I -- I don't recall

10:28:07 20  specifically anything else now.

10:28:08 21       Q.   How often are you giving these sorts of

10:28:12 22  legal updates as a lieutenant?

10:28:14 23       A.   As often as the department gives them

*Velez - Davenport - 02/26/2020*

22

| | | |
|---|---|---|
| 10:28:17 | 1 | out to us and requires it. |
| 10:28:18 | 2 |      Q.  And approximately how often is that? |
| 10:28:20 | 3 |      **MS. HUGGINS:**  Form.  You may answer. |
| 10:28:21 | 4 |      **THE WITNESS:**  It depends on what laws come |
| 10:28:24 | 5 | out and how often legislations pass and it would |
| 10:28:30 | 6 | depend on that, not us. |
| 10:28:32 | 7 |      **BY MR. DAVENPORT:** |
| 10:28:33 | 8 |      Q.  So you've been working as a lieutenant |
| 10:28:35 | 9 | since June of 2018, correct, or was it July of |
| 10:28:41 | 10 | 2018? |
| 10:28:41 | 11 |      A.  July of 2018. |
| 10:28:42 | 12 |      Q.  July of 2018.  So since July of 2018 |
| 10:28:47 | 13 | approximately how many times have you had to give |
| 10:28:50 | 14 | these sorts of legal update briefings to your |
| 10:28:55 | 15 | police officers? |
| 10:28:57 | 16 |      A.  I can't give a specific number. |
| 10:28:59 | 17 |      Q.  Okay.  Is it more than 10? |
| 10:29:03 | 18 |      A.  I would say more than 10. |
| 10:29:05 | 19 |      Q.  Is it more than 20? |
| 10:29:08 | 20 |      A.  Possibly. |
| 10:29:10 | 21 |      Q.  Okay.  Would it be more than 50? |
| 10:29:14 | 22 |      A.  I wouldn't say more than 50. |
| 10:29:16 | 23 |      Q.  Okay.  Now, you also said that part of |

10:29:21   1   your briefing is persons of interest.  Would that

10:29:25   2   be just within the C District or would that be

10:29:27   3   other districts as well?

10:29:28   4           A.    Citywide.

10:29:30   5           Q.    Citywide.  How often do you get

10:29:36   6   briefings where you discuss a person of interest?

10:29:38   7           MS. HUGGINS:   Form.  You may answer.

10:29:40   8           THE WITNESS:   Daily.

10:29:41   9           BY MR. DAVENPORT:

10:29:42  10           Q.    Are they typically the same persons or

10:29:46  11   do you not repeat those types of briefings?  And,

10:29:49  12   I'm sorry, I'll rephrase my question.

10:29:52  13           After you have given an update regarding a

10:29:55  14   person of interest, do you then update the officers

10:29:58  15   each day until that person of interest is found or

10:30:02  16   located?

10:30:02  17           A.    We will revisit it if there's been a

10:30:05  18   change in the status.  If they've been found or

10:30:08  19   located or we received new information or if

10:30:11  20   they're no longer a person of interest.

10:30:13  21           Q.    Okay.  Has Mr. Kistner ever come up as

10:30:16  22   a person of interest?

10:30:17  23           A.    Not that I can recall.

*Velez - Davenport - 02/26/2020*

24

| 10:30:19 | 1 | Q. And that would be in your capacity as a |
| 10:30:21 | 2 | police officer and a lieutenant? |
| 10:30:22 | 3 | A. Correct. |
| 10:30:25 | 4 | Q. Okay. So since you started as |
| 10:30:27 | 5 | lieutenant over at C District do you communicate |
| 10:30:31 | 6 | with your police officers? |
| 10:30:32 | 7 | A. Yes. |
| 10:30:32 | 8 | Q. Okay. How do you communicate with your |
| 10:30:36 | 9 | police officers? |
| 10:30:38 | 10 | A. Can you clarify? |
| 10:30:40 | 11 | Q. Do you communicate over the radio? |
| 10:30:42 | 12 | A. Yes. |
| 10:30:42 | 13 | Q. Okay. Now, do you communicate during |
| 10:30:47 | 14 | work about work-related issues, do you communicate |
| 10:30:51 | 15 | by any other method besides radio? |
| 10:30:53 | 16 | A. Yes. |
| 10:30:54 | 17 | Q. And how is that? |
| 10:30:56 | 18 | A. In person or by phone. |
| 10:30:58 | 19 | Q. Okay. And is that by text messages? |
| 10:31:00 | 20 | A. Usually not. |
| 10:31:01 | 21 | Q. Phone calls? |
| 10:31:02 | 22 | A. Yes. |
| 10:31:02 | 23 | Q. Okay. How often do you use phone calls |

*Velez - Davenport - 02/26/2020*

25

| | | |
|---|---|---|
| 10:31:05 | 1 | to communicate with your police officers about |
| 10:31:07 | 2 | work-related incidents? |
| 10:31:09 | 3 | A.   It varies throughout the day. |
| 10:31:11 | 4 | Q.   Okay.  Is it daily? |
| 10:31:12 | 5 | A.   Yes. |
| 10:31:16 | 6 | Q.   Okay.  How many times daily |
| 10:31:18 | 7 | approximately, is it more than once, or -- |
| 10:31:21 | 8 | A.   I couldn't give a specific number.  It |
| 10:31:25 | 9 | changes day-to-day.  Every day is different. |
| 10:31:27 | 10 | Q.   Okay.  Do you know if Lieutenant McHugh |
| 10:31:29 | 11 | communicates with his police officers by phone? |
| 10:31:33 | 12 | A.   You would have to ask Lieutenant |
| 10:31:33 | 13 | McHugh. |
| 10:31:33 | 14 | Q.   Okay.  Are you aware of any other |
| 10:31:33 | 15 | lieutenants who communicate with their officers by |
| 10:31:36 | 16 | phone? |
| 10:31:36 | 17 | A.   You would have to ask the other |
| 10:31:36 | 18 | lieutenants. |
| 10:31:36 | 19 | THE REPORTER:  You have to speak up for me. |
| 10:31:36 | 20 | THE WITNESS:  I'm sorry.  Yeah, I would ask |
| 10:31:36 | 21 | other lieutenants. |
| 10:31:43 | 22 | BY MR. DAVENPORT: |
| 10:31:43 | 23 | Q.   Okay.  Do you know if that is part of |

*Velez - Davenport - 02/26/2020*

26

| | | |
|---|---|---|
| 10:31:46 | 1 | the policies and procedures to communicate with the |
| 10:31:48 | 2 | other officers by phone? |
| 10:31:49 | 3 | A.   I don't specifically recall reading |
| 10:31:51 | 4 | that in our policy and procedure. |
| 10:31:54 | 5 | Q.   Okay.  As a lieutenant, did you have to |
| 10:31:56 | 6 | get any sort of training before you were promoted? |
| 10:31:59 | 7 | A.   Yes. |
| 10:32:00 | 8 | Q.   Okay.  And what sorts of training do |
| 10:32:03 | 9 | you remember specifically to become a lieutenant? |
| 10:32:06 | 10 | A.   It's not training to become a |
| 10:32:09 | 11 | lieutenant.  Once we're promoted lieutenant we did |
| 10:32:11 | 12 | a short training on our duties and how -- and what |
| 10:32:17 | 13 | was our -- what -- excuse me, what our requirements |
| 10:32:19 | 14 | were as lieutenants and to include new |
| 10:32:22 | 15 | documentation, supervisory reports, things of that |
| 10:32:25 | 16 | nature. |
| 10:32:27 | 17 | Q.   Now, in terms of accidents involving |
| 10:32:32 | 18 | police vehicles, did you get any sort of training |
| 10:32:35 | 19 | involving, you know, those types of incidents? |
| 10:32:37 | 20 | MS. HUGGINS:  Form.  You may answer. |
| 10:32:38 | 21 | THE WITNESS:  As a lieutenant, no.  As a |
| 10:32:42 | 22 | patrol officer, yes. |
| 10:32:43 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

27

| | | |
|---|---|---|
| 10:32:44 | 1 | Q. What kind of training did you get for |
| 10:32:46 | 2 | accidents involving police vehicles? |
| 10:32:48 | 3 | A. For -- the procedure for accidents |
| 10:32:53 | 4 | involving police vehicles would be to as a patrol |
| 10:32:56 | 5 | officer notify your supervisor and then proceed |
| 10:33:01 | 6 | with what the supervisor recommends. |
| 10:33:04 | 7 | Q. Okay. And who would the supervisor be |
| 10:33:08 | 8 | that you would contact? |
| 10:33:09 | 9 | A. As a lieutenant or as a patrol officer? |
| 10:33:12 | 10 | Q. As a patrol officer. |
| 10:33:12 | 11 | A. My immediate supervisor, the |
| 10:33:12 | 12 | lieutenant. |
| 10:33:12 | 13 | Q. Okay. Now, as a lieutenant, what would |
| 10:33:20 | 14 | your responsibilities be once a police officer has |
| 10:33:22 | 15 | contacted you about a -- an accident involving a |
| 10:33:26 | 16 | police vehicle? |
| 10:33:27 | 17 | MS. HUGGINS: Form. You may answer. |
| 10:33:28 | 18 | THE WITNESS: Depending on the facts of |
| 10:33:32 | 19 | the -- I -- I would need more facts regarding the |
| 10:33:35 | 20 | incident, just the patrol, what happened, what |
| 10:33:38 | 21 | exactly happened with that vehicle and the officer. |
| 10:33:41 | 22 | How was the vehicle involved in an accident. |
| 10:33:44 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

28

| | | |
|---|---|---|
| 10:33:45 | 1 | Q.   So after you interview the officer and |
| 10:33:47 | 2 | you get the facts that you need to make your |
| 10:33:50 | 3 | determination, if that officer said that they |
| 10:33:52 | 4 | collided with another vehicle, what would your next |
| 10:33:55 | 5 | steps be? |
| 10:33:56 | 6 | MS. HUGGINS:   Form.   You may answer. |
| 10:33:57 | 7 | THE WITNESS:   It's just that would be a true |
| 10:34:00 | 8 | city involved accident and I would have to call out |
| 10:34:03 | 9 | our accident investigation unit as well as internal |
| 10:34:06 | 10 | affairs. |
| 10:34:06 | 11 | BY MR. DAVENPORT: |
| 10:34:07 | 12 | Q.   Okay.   Now, let's say that that patrol |
| 10:34:11 | 13 | vehicle contacted a person, would the procedure |
| 10:34:13 | 14 | change? |
| 10:34:13 | 15 | MS. HUGGINS:   Form. |
| 10:34:14 | 16 | THE WITNESS:   It would depend on what |
| 10:34:16 | 17 | contact meant. |
| 10:34:17 | 18 | BY MR. DAVENPORT: |
| 10:34:18 | 19 | Q.   Okay.   Let's say that that police |
| 10:34:20 | 20 | vehicle struck an individual and knocked that |
| 10:34:20 | 21 | individual over, what would the next steps be? |
| 10:34:23 | 22 | A.   Excuse me.   Can you repeat that? |
| 10:34:23 | 23 | MS. HUGGINS:   Form.   You may answer. |

*Velez - Davenport - 02/26/2020*

29

| | | |
|---|---|---|
| 10:34:25 | 1 | BY MR. DAVENPORT: |
| 10:34:25 | 2 | Q.   Let's say that a patrol vehicle struck |
| 10:34:26 | 3 | an individual and that individual fell to the |
| 10:34:30 | 4 | ground, what would the next steps be as a |
| 10:34:33 | 5 | lieutenant? |
| 10:34:33 | 6 | A.   Again, if that was just the fact |
| 10:34:34 | 7 | pattern that was given, it's just kind of |
| 10:34:36 | 8 | speculating on what it would be, but if a patrol |
| 10:34:40 | 9 | vehicle struck a person, the same procedure would |
| | 10 | follow as if two -- two -- a patrol vehicle |
| | 11 | collided with another vehicle. |
| | 12 | Q.   Okay. |
| | 13 | THE REPORTER:  Can you slow down for me a |
| | 14 | little. |
| 10:34:49 | 15 | THE WITNESS:  Yes.  Sorry. |
| 10:34:49 | 16 | MS. HUGGINS:  Pause after he asks the |
| 10:34:52 | 17 | questions too. |
| 10:34:52 | 18 | THE WITNESS:  Okay. |
| 10:34:52 | 19 | MS. HUGGINS:  Because at the very end you're |
| 10:34:53 | 20 | overlapping. |
| 10:34:54 | 21 | THE WITNESS:  Okay. |
| 10:34:57 | 22 | BY MR. DAVENPORT: |
| 10:34:58 | 23 | Q.   So after the accident investigation |

*Velez - Davenport - 02/26/2020*

30

10:35:01   1   unit has been contacted, what would the accident

10:35:04   2   investigation unit, what would their steps be?

10:35:07   3        A.   I'm not trained in accident

10:35:09   4   investigation, so I wouldn't be able to speculate

10:35:12   5   on what their procedures are.

10:35:13   6        Q.   As a lieutenant, would you have to go

10:35:15   7   to the scene?

10:35:16   8        A.   It depends on the circumstance.

10:35:18   9        Q.   Okay.  Let's say it's the same

10:35:20 10   circumstance, let's say a police vehicle has struck

10:35:23 11   an individual and knocked that individual over, the

10:35:26 12   accident investigation unit has been contacted.  As

10:35:28 13   a lieutenant, would you have to go to the scene to

10:35:30 14   go investigate yourself?

10:35:31 15        MS. HUGGINS:  Form.  You may answer.

10:35:33 16        THE WITNESS:  I would -- as a lieutenant, I

10:35:37 17   would go -- I go to most of my scenes as a

10:35:40 18   lieutenant.

10:35:40 19        BY MR. DAVENPORT:

10:35:40 20        Q.   Okay.  Now, when you say most of your

10:35:43 21   scenes as a lieutenant, what is that referring to?

10:35:45 22        A.   I'm -- I'm out on the streets, I'm

10:35:47 23   active.  I go to my scenes regardless of the

10:35:52  1   severity, I'm really interactive.

10:35:54  2          Q.   Okay.

10:35:55  3          A.   If I can make it, depending on the

10:35:58  4   types of calls we have, if there's a lot going on.

10:36:01  5          Q.   Do you try to make yourself available

10:36:05  6   at any call that an officer in C District is

10:36:09  7   dispatched to?

10:36:09  8          A.   That's impossible.  I'm one person.

10:36:12  9          Q.   Sure.  Do you try to make yourself

10:36:15 10   available to as many of those calls as possible as

10:36:20 11   a lieutenant in C District?

10:36:20 12          A.   If they're requesting me, they're

10:36:23 13   asking for me to be there, yes.

10:36:24 14          Q.   What types of calls would you expect

10:36:27 15   your police officers to request your presence at?

10:36:29 16          MS. HUGGINS:   Form.  You may answer.

10:36:31 17          THE WITNESS:   That would depend on the

10:36:33 18   officer, their experience, how much time they have,

10:36:36 19   if they feel they can handle the type of scene.

10:36:39 20   But there are certain scenes that I'm required to

10:36:40 21   respond to.  So I will automatically go to those

10:36:45 22   calls, but any other call that an officer feels

10:36:46 23   like they may need my assistance with I go.

10:36:50  1        BY MR. DAVENPORT:

10:36:51  2        Q.   If -- now, you talked about scenes that

10:36:55  3   you're required to go to.  Are one of those types

10:36:58  4   of scenes where a police vehicle is involved with

10:37:03  5   contacting or colliding with an individual and the

10:37:08  6   accident investigation unit going to the scene to

10:37:11  7   go investigate?

10:37:11  8        MS. HUGGINS:   Form.  You may answer.

10:37:14  9        THE WITNESS:   Can you repeat that question?

10:37:16 10        BY MR. DAVENPORT:

10:37:16 11        Q.   Sure.  As a lieutenant, are you

10:37:19 12   required to go to a scene involving a police

10:37:23 13   vehicle contacting an individual where accident

10:37:27 14   investigation unit has gone to go investigate the

10:37:30 15   accident?

10:37:30 16        MS. HUGGINS:   Form.  You may answer.

10:37:32 17        THE WITNESS:   I would request, I would

10:37:34 18   determine the facts of the incident, and I would

10:37:36 19   request the accident investigation unit to respond.

10:37:39 20   And if the accident investigation unit was called

10:37:42 21   out, then I would respond as well.

10:37:44 22        BY MR. DAVENPORT:

10:37:45 23        Q.   Okay.  Now, as a lieutenant, are there

| | | |
|---|---|---|
| 10:37:48 | 1 | any sort of procedures that you would expect |
| 10:37:52 | 2 | accident investigation unit to go through?  For |
| 10:37:55 | 3 | example, pictures of the accident, statements from |
| 10:37:58 | 4 | witnesses, anything of that nature that you would |
| 10:38:01 | 5 | expect them to go through? |
| 10:38:02 | 6 | **MS. HUGGINS:**  Form.  You can answer. |
| 10:38:03 | 7 | **THE WITNESS:**  Again, I can't speculate on |
| 10:38:06 | 8 | what their policy or their procedures are in their |
| 10:38:09 | 9 | course of how they conduct their investigations. |
| 10:38:13 | 10 | I'm not trained in accident investigation. |
| 10:38:15 | 11 | **BY MR. DAVENPORT:** |
| 10:38:16 | 12 | Q.   As a lieutenant, are you obligated to |
| 10:38:18 | 13 | fill out any paperwork involving a accident |
| 10:38:22 | 14 | involving a police vehicle and an individual? |
| 10:38:24 | 15 | A.   If there is an accident involving a |
| 10:38:26 | 16 | police vehicle, I am required to do the accident |
| 10:38:28 | 17 | report. |
| 10:38:28 | 18 | Q.   Okay.  And what sort of information do |
| 10:38:32 | 19 | you put on that accident report? |
| 10:38:34 | 20 | A.   It depends on the facts of the |
| 10:38:36 | 21 | accident. |
| 10:38:36 | 22 | Q.   Okay.  What sort of information do they |
| 10:38:40 | 23 | ask you to comment on as a lieutenant within the |

10:38:42  1  accident report?

10:38:43  2      A.   On an MV-104 it asks if -- there's two

10:38:49  3  sections on it, whether it's a vehicle, pedestrian,

10:38:52  4  bicycle, then just information in regards to

10:38:56  5  registration, insurance, points of impact, most

10:39:01  6  damage on the vehicle.

10:39:02  7      Then you could either circle how the

10:39:07  8  incident -- how the incident occurred or direction

10:39:10  9  of travel, then you would write a small narrative

10:39:14 10  regarding the accident.

10:39:16 11      And then there's boxes on the side that,

10:39:19 12  again, just what may have con -- contributing

10:39:22 13  factors, whether direction of travel, if there was

10:39:30 14  a subsequent event as a result of the first

10:39:33 15  accident.

10:39:34 16      Like if somebody, for instance, hit a

10:39:36 17  vehicle and then they veered off and struck a tree,

10:39:39 18  that would be the second event.  And that's what I

10:39:44 19  can recall at this time that's required on that

10:39:46 20  document.

10:39:46 21      Q.   Okay.  Now, as part of these forms, is

10:39:52 22  there anything besides the MV-104 form that you're

10:39:56 23  required to fill out as a lieutenant?

*Velez - Davenport - 02/26/2020*

35

10:39:57  1        A.    There is, and I don't recall the name
10:39:59  2   of the document at this time.
10:40:00  3        Q.    That's okay.  Do you remember generally
10:40:03  4   what that document asks?
10:40:05  5        A.    It's the same thing, just the fact
10:40:07  6   pattern of the incident, if there's an accident.
10:40:10  7   Based on our investigation it basically would
10:40:13  8   reflect the narrative on the MV-104, what were the
10:40:19  9   contributing factors, what -- what would
10:40:21 10   have -- how the accident occurred.
10:40:22 11        Q.    Now, that MV-104 form as a lieutenant,
10:40:26 12   who would you give that to?
10:40:28 13        A.    That would be filed.  It would go -- it
10:40:31 14   gets sent off to the state.
10:40:33 15        Q.    That's the State of New York?
10:40:35 16        A.    Yes.
10:40:36 17        Q.    And that other form that's not the
10:40:41 18   MV-104 form, who do you file that with?
10:40:43 19        A.    That goes to the department.
10:40:44 20        Q.    The City of Buffalo department?
10:40:46 21        A.    Correct.
10:40:47 22        Q.    And how long would that document be
10:40:50 23   maintained?

*Velez - Davenport - 02/26/2020*

36

| | | |
|---|---|---|
| 10:40:51 | 1 | A. I don't know. |
| 10:40:53 | 2 | Q. After it's filed with the City of |
| 10:40:55 | 3 | Buffalo, are there any officers who review that |
| 10:40:58 | 4 | document? |
| 10:40:58 | 5 | A. I believe the captain does. |
| 10:41:02 | 6 | Q. Now, as a lieutenant, would you expect |
| 10:41:06 | 7 | your police officers to file any sort of paperwork |
| 10:41:10 | 8 | involving -- in an accident involving a police |
| 10:41:13 | 9 | vehicle? |
| 10:41:13 | 10 | MS. HUGGINS: Form. You may answer. |
| 10:41:20 | 11 | THE WITNESS: They would prepare an |
| 10:41:24 | 12 | interdepartmental memorandum giving their version |
| 10:41:29 | 13 | of events. |
| 10:41:31 | 14 | BY MR. DAVENPORT: |
| 10:41:32 | 15 | Q. Are there any other sorts of forms that |
| 10:41:35 | 16 | these officers would have to fill out? |
| 10:41:36 | 17 | A. If they were injured as a result, they |
| 10:41:39 | 18 | would fill out injured-on-duty paperwork. |
| 10:41:42 | 19 | Q. Any other forms? |
| 10:41:43 | 20 | A. Not that I can recall. |
| 10:41:44 | 21 | Q. Now, this interdepartmental form, what |
| 10:41:47 | 22 | sort of information is asked of the officers on |
| 10:41:49 | 23 | that? |

10:41:50  1          MS. HUGGINS:  Form.

10:41:50  2          THE WITNESS:  Just the facts of the event or

10:41:52  3  the incident.

10:41:54  4          BY MR. DAVENPORT:

10:41:54  5          Q.   Is it a long form?

10:41:55  6          A.   No, it's a blank document that they

10:41:59  7  create the contents of.

10:42:02  8          Q.   Who does that interdepartmental form go

10:42:07  9  to?

10:42:08 10          A.   The department, City of Buffalo, the

10:42:10 11  police department.

10:42:10 12          Q.   Would you review that as a lieutenant?

10:42:13 13          A.   Yes.

10:42:14 14          MS. HUGGINS:  Form.

10:42:15 15          BY MR. DAVENPORT:

10:42:16 16          Q.   Who else would review that form?

10:42:17 17          A.   That would go through the chain of

10:42:22 18  command.

10:42:22 19          Q.   So that would be the captain and then

10:42:24 20  would it go beyond the captain as well?

10:42:26 21          A.   Yes.

10:42:27 22          MS. HUGGINS:  Form.

10:42:27 23          BY MR. DAVENPORT:

*Velez - Davenport - 02/26/2020*

38

| | | |
|---|---|---|
| 10:42:28 | 1 | Q. Who -- who else besides the captain |
| 10:42:29 | 2 | would review it that's higher on the hierarchy? |
| 10:42:33 | 3 | A. I can't speculate on who -- who all |
| 10:42:36 | 4 | would look at it. |
| 10:42:37 | 5 | Q. Okay. Do you know who's supposed to |
| 10:42:39 | 6 | look at it? |
| 10:42:39 | 7 | MS. HUGGINS: Form. |
| 10:42:40 | 8 | THE WITNESS: I know on the document it's |
| 10:42:43 | 9 | from the commissioner down the chain of command we |
| 10:42:47 | 10 | list on the document. |
| 10:42:50 | 11 | BY MR. DAVENPORT: |
| 10:42:51 | 12 | Q. Now, after these forms have been filled |
| 10:42:53 | 13 | out, is there any sort of an investigation or -- or |
| 10:42:59 | 14 | questions asked of the police officer besides |
| 10:43:02 | 15 | what's written on that form? |
| 10:43:04 | 16 | MS. HUGGINS: Form. |
| 10:43:05 | 17 | THE WITNESS: That depends on the department |
| 10:43:09 | 18 | what they request. Once I fill out my |
| 10:43:12 | 19 | documentation that incident and the investigation |
| 10:43:14 | 20 | is no longer under my supervision, it goes through |
| 10:43:20 | 21 | the department chain of command. |
| 10:43:21 | 22 | BY MR. DAVENPORT: |
| 10:43:22 | 23 | Q. Okay. Do you know who would be making |

| | | |
|---|---|---|
| 10:43:24 | 1 | those decisions, would it be the captain? |
| 10:43:26 | 2 | MS. HUGGINS:  Form. |
| 10:43:26 | 3 | THE WITNESS:  I do not. |
| 10:43:36 | 4 | BY MR. DAVENPORT: |
| 10:43:37 | 5 | Q.   Now, at the scene are there ever |
| 10:43:42 | 6 | statements taken from witnesses of the accident? |
| 10:43:45 | 7 | MS. HUGGINS:  Form. |
| 10:43:46 | 8 | THE WITNESS:  For just in general any |
| 10:43:48 | 9 | accident? |
| 10:43:48 | 10 | BY MR. DAVENPORT: |
| 10:43:49 | 11 | Q.   For an accident involving a police |
| 10:43:51 | 12 | vehicle. |
| 10:43:51 | 13 | A.   In any motor vehicle accident involving |
| 10:43:54 | 14 | any vehicle if there are witnesses available. |
| 10:43:57 | 15 | Q.   Now, what would constitute a witness |
| 10:44:00 | 16 | that's available? |
| 10:44:01 | 17 | A.   If some -- if we were out asking if |
| 10:44:05 | 18 | there were witnesses of if someone would come up to |
| 10:44:05 | 19 | us and state they had seen what happened. |
| 10:44:11 | 20 | Q.   Who would gather those statements from |
| 10:44:15 | 21 | the witnesses, would it be the police officers, the |
| 10:44:17 | 22 | lieutenant, or would it be the accident |
| 10:44:19 | 23 | investigation unit? |

*Velez - Davenport - 02/26/2020*

40

| | | |
|---|---|---|
| 10:44:20 | 1 | A.    That would depend. |
| 10:44:22 | 2 | Q.    Would you as a lieutenant take |
| 10:44:25 | 3 | statements from witnesses? |
| 10:44:26 | 4 | A.    It depends. |
| 10:44:28 | 5 | Q.    And what would that depend on? |
| 10:44:30 | 6 | A.    If there were other officers available, |
| 10:44:33 | 7 | if somebody came to me, if I had time to take the |
| 10:44:36 | 8 | statement, or if -- who was investigating it. |
| 10:44:38 | 9 | Q.    Okay.  Would there be any other sort of |
| 10:44:44 | 10 | tests or statements or anything else of these |
| 10:44:47 | 11 | police officers or the individual who's involved in |
| 10:44:51 | 12 | the accident? |
| 10:44:51 | 13 | MS. HUGGINS:  Form. |
| 10:44:52 | 14 | THE WITNESS:  It depends. |
| 10:44:52 | 15 | THE REPORTER:  I'm sorry.  What was your |
| 10:44:52 | 16 | answer? |
| 10:44:56 | 17 | THE WITNESS:  It depends. |
| 10:44:56 | 18 | BY MR. DAVENPORT: |
| 10:44:56 | 19 | Q.    Okay.  Would there ever be a urine |
| 10:44:59 | 20 | analysis of the officer involved in the accident? |
| 10:45:02 | 21 | MS. HUGGINS:  Form. |
| 10:45:03 | 22 | THE WITNESS:  I would not know. |
| 10:45:04 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

41

| | | |
|---|---|---|
| 10:45:05 | 1 | Q.   Okay.   That's not anywhere in the |
| 10:45:08 | 2 | policies or procedures? |
| 10:45:09 | 3 | A.   Not that I can recall. |
| 10:45:11 | 4 | Q.   Okay.   In a regular motor vehicle |
| 10:45:13 | 5 | accident would there ever be a urine analysis of |
| 10:45:19 | 6 | any of the individuals involved in that motor |
| 10:45:21 | 7 | vehicle accident? |
| 10:45:21 | 8 | MS. HUGGINS:   Form. |
| 10:45:22 | 9 | THE WITNESS:   It would depend on the |
| 10:45:25 | 10 | situation.   And, again, I'm not an accident |
| 10:45:28 | 11 | investigator, so I would not know. |
| 10:45:30 | 12 | BY MR. DAVENPORT: |
| 10:45:30 | 13 | Q.   Sure.   In your experience as a police |
| 10:45:35 | 14 | officer, did you ever witness any accidents not |
| 10:45:38 | 15 | involving police vehicles? |
| 10:45:39 | 16 | A.   Yes. |
| 10:45:41 | 17 | Q.   Was there ever a time where a urine |
| 10:45:45 | 18 | analysis was conducted of any of the drivers? |
| 10:45:48 | 19 | A.   Excuse me.   As a -- I've witnessed |
| 10:45:51 | 20 | accidents as a civilian.   I've never witnessed an |
| 10:45:54 | 21 | accident -- actually, I was in one accident as a |
| 10:45:56 | 22 | passenger, but I didn't -- are you asking as a |
| 10:46:00 | 23 | patrol officer if I've witnessed an accident or as |

*Velez - Davenport - 02/26/2020*

42

10:46:03  1  a civilian if I've witnessed an accident?

10:46:04  2       Q.   Well, my question was more so as a

10:46:07  3  patrol officer, so you can answer that first.

10:46:09  4       A.   Okay.

10:46:09  5       MS. HUGGINS:   As a patrol officer, has she

10:46:12  6  witnessed an accident?

10:46:13  7       BY MR. DAVENPORT:

10:46:13  8       Q.   Correct.

10:46:14  9       A.   Yes.

10:46:15 10       Q.   Okay.   Were you present for the

10:46:17 11  investigation of that accident?

10:46:17 12       A.   Partial.

10:46:19 13       Q.   At any point did it seem like either of

10:46:23 14  the drivers may be intoxicated?

10:46:25 15       A.   No.

10:46:26 16       MS. HUGGINS:   Form.

10:46:26 17       BY MR. DAVENPORT:

10:46:27 18       Q.   Okay.   As a civilian have you ever

10:46:29 19  witnessed a car accident?

10:46:31 20       A.   Yes.

10:46:31 21       Q.   Have you been involved in a car

10:46:34 22  accident?

10:46:34 23       A.   Yes.   Excuse me.   As a civilian or as a

Velez - Davenport - 02/26/2020

43

| | | |
|---|---|---|
| 10:46:39 | 1 | patrol officer? |
| 10:46:40 | 2 | Q. As a civilian. |
| 10:46:41 | 3 | A. Yes. |
| 10:46:41 | 4 | Q. Were you a driver or a passenger as a |
| 10:46:44 | 5 | civilian? |
| 10:46:44 | 6 | A. Driver. |
| 10:46:45 | 7 | Q. Driver. Did it appear that the other |
| 10:46:47 | 8 | driver or you were intoxicated at the time? |
| 10:46:49 | 9 | MS. HUGGINS: Form. |
| 10:46:49 | 10 | THE WITNESS: No. |
| 10:46:50 | 11 | BY MR. DAVENPORT: |
| 10:46:52 | 12 | Q. Okay. Have you ever witnessed an |
| 10:46:53 | 13 | accident involving somebody who may have been |
| 10:46:56 | 14 | intoxicated at the time? |
| 10:46:58 | 15 | A. Excuse me. Could you repeat that. |
| 10:47:00 | 16 | Q. Have you ever witnessed either as a |
| 10:47:02 | 17 | patrol officer or as a civilian an accident where |
| 10:47:05 | 18 | either of the drivers may have been intoxicated at |
| 10:47:08 | 19 | the time? |
| 10:47:08 | 20 | MS. HUGGINS: Form. You may answer. |
| 10:47:09 | 21 | THE WITNESS: I've never witnessed an |
| 10:47:12 | 22 | accident like that. |
| 10:47:13 | 23 | MR. DAVENPORT: Okay. So I'm going to have |

*Velez - Davenport - 02/26/2020*

44

10:47:21  1  this marked as I believe Exhibit 24.  Okay.

10:47:21  2  **The following was marked for Identification:**

3  **EXH. 24            Buffalo Police Academy**

4  **Training Record**

10:48:03  5       BY MR. DAVENPORT:

10:48:04  6       Q.    So I'm going to show you, Ms. Velez,

10:48:06  7  what's been marked as Exhibit 24.  Do you recognize

10:48:08  8  that document?

10:48:09  9       A.    Yes.

10:48:09 10       Q.    And what do you recognize that to be?

10:48:13 11       A.    The Buffalo Police Academy Training

10:48:16 12  Record.

10:48:16 13       Q.    And whose training record is it?

10:48:20 14       A.    It says it is Jenny M. Velez.

10:48:24 15       Q.    Okay.  Now, reviewing this document

10:48:26 16  does it seem that each of your training courses are

10:48:30 17  listed on this document?

10:48:31 18       MS. HUGGINS:  Form.  You can answer.

10:48:46 19       THE WITNESS:  Yes.

10:48:46 20       BY MR. DAVENPORT:

10:48:46 21       Q.    Are there any inaccuracies when going

10:48:49 22  through this document that you would like to point

10:48:51 23  out at this time?

*Velez - Davenport - 02/26/2020*

45

10:48:55   1          A.    No.

10:48:57   2          Q.    So my first question is going to be if

10:49:01   3    you could turn to the third page, please.   At the

10:49:04   4    very bottom it says CIT crisis services.   And that

10:49:08   5    would have been date from 3/4/2019, date two,

10:49:14   6    3/7/2019; do you see where that is?

10:49:15   7          A.    Yes.

10:49:15   8          Q.    Okay.   What is that training referring

10:49:17   9    to?

10:49:17  10          A.    Crisis intervention training.

10:49:19  11          Q.    And what is crisis intervention

10:49:22  12    training?

10:49:22  13          A.    It is where we learn how to deal with

10:49:26  14    people who may be having mental health issues, are

10:49:29  15    in a crisis.

10:49:29  16          Q.    Now, I see that you had 32 hours of

10:49:33  17    training on that; is that correct?

10:49:34  18          A.    Yes.

10:49:35  19          Q.    And this training would have been after

10:49:38  20    you had been promoted to lieutenant of C District?

10:49:41  21          A.    Yes.

10:49:41  22          Q.    Okay.   Were police officers required to

10:49:44  23    go through 32 hours of training?

*Velez - Davenport - 02/26/2020*

46

| | | |
|---|---|---|
| 10:49:47 | 1 | A.   No. |
| 10:49:48 | 2 | Q.   Was it just lieutenants who were |
| 10:49:50 | 3 | required to go through 32 hours of training? |
| 10:49:52 | 4 | A.   At the time -- currently Buffalo police |
| 10:49:55 | 5 | officers do get CIT training, it's not 32 hours. |
| 10:49:59 | 6 | This is training that's offered.  It's |
| 10:50:01 | 7 | on -- currently it's voluntary.  We sign up for it |
| 10:50:07 | 8 | if it coincides with our schedule. |
| 10:50:10 | 9 | Q.   Okay. |
| 10:50:10 | 10 | A.   For the -- the extended training. |
| 10:50:12 | 11 | Q.   Okay.  What would the normal training |
| 10:50:14 | 12 | be if you didn't sign up for the extended training? |
| 10:50:18 | 13 | A.   I don't recall the exact number of |
| 10:50:20 | 14 | hours -- |
| 10:50:20 | 15 | Q.   Okay. |
| 10:50:20 | 16 | A.   -- that the department offers. |
| 10:50:21 | 17 | Q.   Was there any reason why you signed up |
| 10:50:24 | 18 | for the extended training? |
| 10:50:25 | 19 | A.   I wanted to know more about the topic. |
| 10:50:28 | 20 | Q.   Okay.  Were there any events that |
| 10:50:31 | 21 | happened that led you to want that extra knowledge? |
| 10:50:34 | 22 | A.   Nothing specific. |
| 10:50:35 | 23 | Q.   Okay.  Do you know if Lieutenant McHugh |

*Velez - Davenport - 02/26/2020*

10:50:40  1   also went through 32 hours of training?

10:50:42  2        A.    I don't know.

10:50:43  3        Q.    Okay.  Do you know if any police

10:50:45  4   officers went through the 32 hours of training?

10:50:47  5        A.    There were other police officers with

10:50:49  6   me in the training.  I don't know all of in the

10:50:53  7   Buffalo Police Department who's taken the training.

10:50:55  8        Q.    Okay.  Were those police officers or

10:50:58  9   were they lieutenants?

10:50:59  10       A.    Both.

10:51:00  11       Q.    Okay.  Now, I also see that, turning to

10:51:08  12  the first page, towards the bottom you participated

10:51:10  13  in what is called Tahoe training.  And that would

10:51:14  14  have been on April 10th of 2014; do you see where

10:51:17  15  that is?

10:51:17  16       A.    Yes.

10:51:18  17       Q.    Okay.  What sort of training was that?

10:51:24  18       A.    We had gotten new Tahoes added to the

10:51:29  19  fleet, so we had to drive them and pass a course.

10:51:32  20       Q.    Okay.  What sort of training did

10:51:37  21  they -- strike that.

10:51:37  22       Going through that training, was there any

10:51:43  23  sort of test that you had to complete in order to

*Velez - Davenport - 02/26/2020*

48

10:51:46  1    pass that training?

10:51:47  2         A.    We had to complete the driving course.

10:51:50  3         Q.    Okay.  And what was the driving course,

10:51:53  4    what was -- what did that consist of?

10:51:55  5         A.    It was strategically placed cones we

10:51:59  6    had to maneuver the vehicle through.  I -- I don't

10:52:01  7    remember the exact pattern.

10:52:02  8         Q.    Okay.  Were you driving for the

10:52:05  9    entirety of the four hours?

10:52:06 10         A.    No.

10:52:06 11         Q.    Okay.  Approximately how long were you

10:52:10 12    driving during that course?

10:52:11 13         A.    I don't recall, because we had a

10:52:14 14    certain number of Tahoes, so we'd have to get out

10:52:18 15    and somebody else would have to drive.  And we'd

10:52:21 16    have to take turns, from what I can recall.

10:52:24 17         Q.    Sure.  At any point that you weren't

10:52:26 18    driving what were you doing during this training?

10:52:28 19         A.    This was outdoor training, so I believe

10:52:30 20    I was waiting.

10:52:30 21         Q.    Okay.

10:52:32 22         A.    And observing.

10:52:32 23         Q.    Was there any sort of instruction that

| | | |
|---|---|---|
| 10:52:36 | 1 | was being provided to you at that time? |
| 10:52:39 | 2 | A.   I don't recall. |
| 10:52:39 | 3 | Q.   Okay.  Were there training instructors |
| 10:52:41 | 4 | that were present with you while you were waiting? |
| 10:52:41 | 5 | A.   Yes. |
| 10:52:42 | 6 | Q.   Okay.  Approximately how many people |
| 10:52:45 | 7 | were in that class with you? |
| 10:52:47 | 8 | A.   I don't recall. |
| 10:52:48 | 9 | Q.   Okay.  Was it more than 20? |
| 10:52:51 | 10 | A.   I don't recall. |
| 10:52:53 | 11 | Q.   Was it more than 50? |
| 10:52:57 | 12 | A.   No. |
| 10:52:57 | 13 | Q.   Okay.  The amount of driving that you |
| 10:53:03 | 14 | were doing, was it more than a half an hour? |
| 10:53:06 | 15 | A.   I don't recall. |
| 10:53:07 | 16 | Q.   Okay.  Now, besides the driving, did |
| 10:53:12 | 17 | they give you any sort of instruction on any of the |
| 10:53:16 | 18 | electronics within the vehicle? |
| 10:53:17 | 19 | A.   Yes. |
| 10:53:18 | 20 | Q.   What sorts of electronics did they give |
| 10:53:20 | 21 | you training on? |
| 10:53:21 | 22 | A.   The -- how to operate the lights and |
| 10:53:24 | 23 | sirens, where the buttons were. |

| 10:53:26 | 1 | Q. Okay. Was there a computer that was in |
| 10:53:29 | 2 | that Tahoe? |
| 10:53:31 | 3 | A. I don't recall. |
| 10:53:33 | 4 | Q. Okay. Besides operating the lights and |
| 10:53:36 | 5 | sirens, was there any sort of electronic |
| 10:53:38 | 6 | instruction that you were given? |
| 10:53:40 | 7 | A. Not that I can recall. |
| 10:53:41 | 8 | Q. Okay. January 18th of 2013 is the |
| 10:53:52 | 9 | first course that's listed; do you see that? |
| 10:53:56 | 10 | MS. HUGGINS: Form. |
| 10:53:57 | 11 | BY MR. DAVENPORT: |
| 10:53:57 | 12 | Q. For rules and regulations on the first |
| 10:54:00 | 13 | page? |
| 10:54:00 | 14 | A. January 18th? |
| 10:54:02 | 15 | Q. Yes, of 2013. |
| 10:54:04 | 16 | A. Yes. |
| 10:54:05 | 17 | Q. Okay. Was this approximately the date |
| 10:54:08 | 18 | that you started with the Buffalo Police Academy? |
| 10:54:11 | 19 | A. Yes. |
| 10:54:12 | 20 | Q. Okay. And prior to this, what -- where |
| 10:54:15 | 21 | did you receive your training? |
| 10:54:19 | 22 | A. This would have been when we started |
| 10:54:22 | 23 | the academy, so I had no training prior to |

10:54:26  1  January 1 of 2013.

10:54:29  2      Q.   Okay.  Did you receive any training

10:54:32  3  from any entity that wasn't the Buffalo Police

10:54:37  4  Academy before this?  Did you receive -- I'm

10:54:39  5  sorry -- strike that.

10:54:40  6      Did you receive any training through the

10:54:42  7  County before the Buffalo Police Academy?

10:54:44  8      A.   Yes.

10:54:45  9      Q.   Would that have been before

10:54:48 10  January 18th of 2013?

10:54:50 11      A.   Yes.

10:54:50 12      Q.   Okay.  Approximately how long did that

10:54:52 13  training last for?

10:54:53 14      A.   That I had with the -- with Erie

10:54:57 15  County?

10:54:57 16      Q.   With Erie County, yes.

10:54:59 17      A.   That was from my previous employer with

10:55:02 18  Erie County, because --

10:55:03 19      MS. HUGGINS:  I think there's just confusion

10:55:05 20  with the term academy.

10:55:06 21      BY MR. DAVENPORT:

10:55:07 22      Q.   Okay.  Now, when you say your previous

10:55:11 23  employer, who was your previous employer before the

*Velez - Davenport - 02/26/2020*

52

| | | |
|---|---|---|
| 10:55:15 | 1 | Buffalo Police Department? |
| 10:55:16 | 2 | A.    Erie County Sheriff's office. |
| 10:55:16 | 3 | Q.    Okay.  Did you work as an Erie County |
| 10:55:16 | 4 | Sheriff? |
| 10:55:16 | 5 | A.    I was a deputy -- |
| 10:55:16 | 6 | Q.    Okay. |
| 10:55:19 | 7 | A.    -- in their jail management division. |
| 10:55:21 | 8 | Q.    Okay.  And how long did you do that |
| 10:55:23 | 9 | for? |
| 10:55:24 | 10 | A.    Approximately three years. |
| 10:55:25 | 11 | Q.    Okay.  So I'm sorry that I didn't ask |
| 10:55:29 | 12 | you this before.  When did you start your graduate |
| 10:55:35 | 13 | program? |
| 10:55:39 | 14 | A.    I graduated with my bachelor's in 2007. |
| 10:55:47 | 15 | I can't recall if I immediately started or if I had |
| 10:55:49 | 16 | taken a break.  Possibly at the end of 2007. |
| 10:55:53 | 17 | Q.    Okay.  After finishing with your |
| 10:55:59 | 18 | graduate program, and I understand that you didn't |
| 10:56:01 | 19 | necessarily finish it, but after completing the |
| 10:56:05 | 20 | amount of course work that you did, did you start |
| 10:56:08 | 21 | with Erie County the deputy -- as a deputy |
| 10:56:10 | 22 | immediately after? |
| 10:56:12 | 23 | A.    It was within that time frame from when |

*Velez - Davenport - 02/26/2020*

53

10:56:20  1  I -- I started with the County in April or July of

10:56:26  2  2010.  So I don't recall if there was an overlap or

10:56:31  3  if I had stopped and then started, because of the

10:56:34  4  schedule.  I don't recall.

10:56:34  5          Q.   Okay.

10:56:35  6          A.   Exactly.

10:56:36  7          Q.   Okay.  Do you remember any other

10:56:38  8  positions that you would have had in between your

10:56:41  9  graduate program and starting with the County?

10:56:44 10          A.   I did work with the Buffalo Board of

10:56:47 11  Education as a security officer in the schools.

10:56:49 12          Q.   Okay.  Did you require any sort of

10:56:51 13  training as a security officer for the Board of

10:56:54 14  Education?

10:56:54 15          A.   Well, I'm a -- I was a certified

10:56:57 16  security guard, so I had taken that certification.

10:57:00 17          Q.   Okay.  Who was that certification

10:57:03 18  through?

10:57:06 19          A.   I don't remember the name of the

10:57:08 20  company that I did the training with.

10:57:10 21          Q.   Okay.  Who was your employer at the

10:57:14 22  time?

10:57:14 23          A.   The Buffalo Board of Education.

*Velez - Davenport - 02/26/2020*

54

| | | |
|---|---|---|
| 10:57:16 | 1 | Q.   Did you work for -- did you work |
| 10:57:22 | 2 | for -- and, I'm sorry, was the Board of Education, |
| 10:57:25 | 3 | was it City run or was it run by the County? |
| 10:57:28 | 4 | A.   That's the Board of Education.  It's in |
| 10:57:31 | 5 | City Hall, but it's the Board of Education and the |
| 10:57:33 | 6 | City of Buffalo is separate. |
| 10:57:34 | 7 | Q.   Okay. |
| 10:57:35 | 8 | A.   It's the City -- City of Buffalo School |
| 10:57:37 | 9 | District. |
| 10:57:37 | 10 | Q.   Okay.  Okay.  So was your employer |
| 10:57:40 | 11 | the -- the City of Buffalo then, the municipality |
| 10:57:44 | 12 | of the City of Buffalo? |
| 10:57:45 | 13 | A.   It's the City of Buffalo, but it's the |
| 10:57:48 | 14 | Board of -- Buffalo Board of Education. |
| 10:57:49 | 15 | Q.   Sure.  Were you hired by a private |
| 10:57:54 | 16 | security firm at the time or were you hired through |
| 10:57:57 | 17 | the City of Buffalo? |
| 10:57:59 | 18 | A.   I was -- |
| 10:57:59 | 19 | MS. HUGGINS:  Form.  You can answer. |
| 10:58:00 | 20 | THE WITNESS:  I was hired through the Board |
| 10:58:03 | 21 | of Education. |
| 10:58:03 | 22 | BY MR. DAVENPORT: |
| 10:58:03 | 23 | Q.   Okay.  And that would have |

*Velez - Davenport - 02/26/2020*

55

10:58:06   1   been -- there wouldn't have been a private security

10:58:09   2   firm that they would have hired for their security,

10:58:12   3   correct?

10:58:12   4         A.   Correct.

10:58:13   5         Q.   Okay.  Now, when you started with Erie

10:58:19   6   County as a deputy, did you have to go through any

10:58:22   7   training before you started that position?

10:58:24   8         A.   Yes.

10:58:24   9         Q.   How long did that training last for?

10:58:26   10        A.   That training I believe was 12 weeks.

10:58:29   11        Q.   Okay.  Was there multiple phases to the

10:58:36   12   training or was it just 12 weeks that was the one

10:58:40   13   phase?

10:58:42   14        A.   There was also a -- a field training as

10:58:46   15   well, so there was the -- their academy and then

10:58:49   16   same thing like with the Buffalo Police, then you

10:58:53   17   go into field training where you sit with

10:58:55   18   experienced deputies and learn how to do the job

10:58:59   19   essentially.

10:58:59   20        Q.   Okay.  How long did that field training

10:59:03   21   last for?

10:59:03   22        A.   I don't recall the exact amount of

10:59:06   23   time.

*Velez - Davenport - 02/26/2020*

56

| 10:59:06 | 1 | Q. Okay. Was it more or less than |
| 10:59:09 | 2 | 16 weeks? |
| 10:59:09 | 3 | A. I don't recall. |
| 10:59:10 | 4 | Q. Okay. Do you remember who you did your |
| 10:59:15 | 5 | field training with? |
| 10:59:16 | 6 | A. That -- for the sheriff's office it's |
| 10:59:19 | 7 | not one set officer, it's multiple different |
| 10:59:22 | 8 | officers. |
| 10:59:23 | 9 | Q. Okay. Okay. |
| 10:59:24 | 10 | A. Deputies, excuse me, multiple different |
| 10:59:27 | 11 | deputies. |
| 10:59:27 | 12 | Q. Okay. Now, as a deputy, what were your |
| 10:59:32 | 13 | primary responsibilities at that time for the |
| 10:59:33 | 14 | County? |
| 10:59:34 | 15 | A. Care, custody, and control of the |
| 10:59:36 | 16 | inmates. |
| 10:59:38 | 17 | Q. What jailhouse did you work at? |
| 10:59:41 | 18 | A. I worked at both the Erie County |
| 10:59:44 | 19 | Holding Center and we had an annex at the Erie |
| 10:59:49 | 20 | County Correctional facility in Alden. |
| 10:59:51 | 21 | Q. Okay. Where is the Erie County Holding |
| 10:59:54 | 22 | Center located? |
| 10:59:54 | 23 | A. I believe it's 40 Delaware. |

*Velez - Davenport - 02/26/2020*

57

| | | |
|---|---|---|
| 10:59:56 | 1 | Q. And was that the same location when you |
| 11:00:00 | 2 | were working there? |
| 11:00:00 | 3 | A. Yes. |
| 11:00:01 | 4 | Q. Okay. When you started with the |
| 11:00:05 | 5 | County, did you believe that you would eventually |
| 11:00:12 | 6 | become a police officer with the City of Buffalo at |
| 11:00:15 | 7 | that time? |
| 11:00:15 | 8 | A. I had aspirations to be a police |
| 11:00:18 | 9 | officer. |
| 11:00:18 | 10 | Q. Did you want to work with the City of |
| 11:00:21 | 11 | Buffalo specifically as a police officer? |
| 11:00:23 | 12 | A. Yes. |
| 11:00:24 | 13 | Q. Okay. Were there any other |
| 11:00:27 | 14 | municipalities that you considered at that time? |
| 11:00:29 | 15 | A. No. |
| 11:00:29 | 16 | Q. What was your reason for wanting to |
| 11:00:31 | 17 | work for the City of Buffalo? |
| 11:00:32 | 18 | A. This is what -- this is my home. |
| 11:00:34 | 19 | Q. Okay. So you've always lived in the |
| 11:00:36 | 20 | City then? |
| 11:00:37 | 21 | A. Yes. |
| 11:00:37 | 22 | Q. Okay. Let's see. Now, I see -- if you |
| 11:00:48 | 23 | can turn to your second page on your training |

11:00:53  1  towards the bottom there is law enforcement and

11:00:57  2  mental health.  And that would have been completed

11:01:00  3  on August 4th of 2016; do you see where that's

11:01:04  4  located?

11:01:04  5          A.    Yes.

11:01:05  6          Q.    And that would have been for three

11:01:07  7  hours, correct?

11:01:07  8          A.    Yes.

11:01:08  9          Q.    Is there a difference between this

11:01:11 10  course, law enforcement and mental health, and the

11:01:13 11  course you took in 2019 CIT crisis services?

11:01:18 12          A.    The amount hours is significantly

11:01:21 13  different.  It's much more content in the CIT

11:01:26 14  course.

11:01:26 15          Q.    Okay.  Do some of the content from the

11:01:31 16  law enforcement and mental health overlap with what

11:01:34 17  you are taught in the CIT crisis services?

11:01:37 18          A.    I don't recall the specifics.

11:01:38 19          Q.    Okay.  Is there anything that's covered

11:01:42 20  in the law enforcement and mental health that's not

11:01:46 21  covered in the CIT crisis services course?

11:01:48 22          A.    I don't recall the specifics.

11:01:49 23          Q.    Okay.  Do you remember or recall

| | | |
|---|---|---|
| 11:01:53 | 1 | anything that was specifically gone over with the |
| 11:01:56 | 2 | law enforcement and mental health training course? |
| 11:01:58 | 3 | A.   Not at this time. |
| 11:01:59 | 4 | Q.   Do you know if there was an option to |
| 11:02:02 | 5 | take more hours than the three that's listed on |
| 11:02:07 | 6 | your training course? |
| 11:02:07 | 7 | A.   I don't recall. |
| 11:02:10 | 8 | Q.   Now, there was a voluntary option to |
| 11:02:14 | 9 | take more CIT crisis services training in 2019.  Do |
| 11:02:21 | 10 | you know why there was that option to take more |
| 11:02:24 | 11 | hours of mental health training? |
| 11:02:26 | 12 | MS. HUGGINS:   Form.   You may answer. |
| 11:02:30 | 13 | THE WITNESS:   The Buffalo Police had |
| 11:02:37 | 14 | started a -- we have a new coordinator, we have a |
| 11:02:43 | 15 | new mental health coordinator, Captain Amber Buyer, |
| 11:02:44 | 16 | and she -- I'm trying to think of the correct for |
| 11:02:52 | 17 | how to articulate how she -- she offered these |
| 11:02:56 | 18 | courses. |
| 11:02:57 | 19 | She put it out on a training bulletin |
| 11:03:00 | 20 | through this new initiative the Buffalo Police had |
| 11:03:04 | 21 | engaged in and she had put that training out. |
| 11:03:07 | 22 | BY MR. DAVENPORT: |
| 11:03:07 | 23 | Q.   Okay.   Do you know approximately when |

*Velez - Davenport - 02/26/2020*

60

| | | |
|---|---|---|
| 11:03:11 | 1 | Amber Buyer began with the City of Buffalo? |
| 11:03:14 | 2 | A.   I don't. |
| 11:03:15 | 3 | Q.   Okay.  Do you know approximately when |
| 11:03:17 | 4 | this new initiative was commenced by the City of |
| 11:03:22 | 5 | Buffalo? |
| 11:03:22 | 6 | A.   I can't recall. |
| 11:03:24 | 7 | Q.   Do you know if it was before or after |
| 11:03:28 | 8 | August 4th of 2016 when you took this law |
| 11:03:30 | 9 | enforcement and mental health training course? |
| 11:03:32 | 10 | A.   I don't know. |
| 11:03:33 | 11 | Q.   Okay.  Do you have any reason to |
| 11:03:34 | 12 | believe that it would have been before that date? |
| 11:03:36 | 13 | MS. HUGGINS:  Form.  You can answer. |
| 11:03:37 | 14 | THE WITNESS:  I don't recall it being |
| 11:03:41 | 15 | offered before that date. |
| 11:03:42 | 16 | BY MR. DAVENPORT: |
| 11:03:43 | 17 | Q.   Okay.  Have you ever met with Amber |
| 11:03:46 | 18 | Buyer? |
| 11:03:46 | 19 | MS. HUGGINS:  Form. |
| 11:03:47 | 20 | THE WITNESS:  Could you clarify? |
| 11:03:49 | 21 | BY MR. DAVENPORT: |
| 11:03:49 | 22 | Q.   Personally or professionally have you |
| 11:03:52 | 23 | ever met with Amber Buyer before? |

*Velez - Davenport - 02/26/2020*

61

11:03:54  1        A.    She -- I've crossed paths with her in

11:03:58  2    work.

11:03:58  3        Q.    Okay.

11:03:58  4        A.    Yes.

11:03:59  5        Q.    Do you speak with her often?

11:04:01  6        A.    Currently regarding with this new

11:04:04  7    crisis intervention training we have if we come

11:04:08  8    across any individuals who we believe may need

11:04:12  9    further assistance or we may need some referrals I

11:04:17 10    will defer to her and see if she has any

11:04:22 11    recommendations.

11:04:22 12        Q.    Approximately how often do you go to

11:04:26 13    her with individuals who may need some sort of

11:04:27 14    crisis intervention training?

11:04:27 15        MS. HUGGINS:    Form.    You can answer.

11:04:30 16        THE WITNESS:    I -- that I can recall

11:04:36 17    I -- maybe five to 10 times.

11:04:39 18        BY MR. DAVENPORT:

11:04:39 19        Q.    Okay.    And that would have been since

11:04:41 20    you started as a lieutenant?

11:04:43 21        A.    Since I've had this training, the CIT

11:04:48 22    training.

11:04:48 23        Q.    Okay.    Okay.    So that would have been

| 11:04:50 | 1 | after March 7th of 2019? |
| 11:04:53 | 2 | A.    Correct. |
| 11:04:54 | 3 | Q.    Now, prior to Amber Buyer beginning |
| 11:04:58 | 4 | with her position, was there anybody that |
| 11:05:02 | 5 | lieutenants or police officers could go to to speak |
| 11:05:04 | 6 | about, you know, what should be done about somebody |
| 11:05:06 | 7 | who may exhibit mental health issues? |
| 11:05:09 | 8 | MS. HUGGINS:  Form. |
| 11:05:12 | 9 | THE WITNESS:  We did have crisis services |
| 11:05:16 | 10 | that we could use as an outlet, we can always call |
| 11:05:20 | 11 | them, but in regards to having somebody in the |
| 11:05:23 | 12 | department that we can go to, I -- I didn't know of |
| 11:05:27 | 13 | anyone. |
| 11:05:27 | 14 | BY MR. DAVENPORT: |
| 11:05:28 | 15 | Q.    Okay.  Have you ever gone to Amber |
| 11:05:38 | 16 | Buyer after submitting a 941 form for an |
| 11:05:44 | 17 | individual? |
| 11:05:45 | 18 | MS. HUGGINS:  Form.  You can answer. |
| 11:05:49 | 19 | THE WITNESS:  Can you -- |
| 11:05:51 | 20 | BY MR. DAVENPORT: |
| 11:05:52 | 21 | Q.    Sure. |
| 11:05:52 | 22 | A.    -- clarify. |
| 11:05:53 | 23 | Q.    So as an officer occasionally you fill |

11:05:57  1   out a 941 form, correct?

11:05:59  2       A.    Correct.

11:06:00  3       Q.    And what is a 941 form?

11:06:02  4       A.    It's a mental health request to have

11:06:05  5   someone evaluated.

11:06:05  6       Q.    Have you ever gone to Amber Buyer after

11:06:09  7   filling out a 941 form requesting some sort of an

11:06:15  8   evaluation of an individual?

11:06:16  9       A.    I have not, no.

11:06:17 10       Q.    Okay.  Now, these -- these other prior

11:06:22 11   times that you've gone to go speak with Amber Buyer

11:06:26 12   about individuals that you're concerned with, did

11:06:30 13   you at any time fill out a 941 form for those

11:06:34 14   individuals?

11:06:34 15       A.    No.

11:06:35 16       Q.    Did any officers fill out 941 forms for

11:06:38 17   those individuals?

11:06:39 18       A.    I'm not certain.

11:06:40 19       Q.    Okay.  What led you to be concerned

11:06:44 20   about the mental health of these individuals that

11:06:47 21   you spoke with Amber Buyer about?

11:06:49 22       MS. HUGGINS:    Form.  Just it's very broad,

11:06:56 23   so I'm not going to prevent you from asking the

11:07:00   1   question, but as it's phrased now I think it's
11:07:02   2   confusing and may encompass a lot of things.
11:07:05   3           BY MR. DAVENPORT:
11:07:06   4       Q.   Do you understand my question?
11:07:06   5       A.   Well, I don't know if I would want to
11:07:10   6   discuss specific mental health issues of people
11:07:13   7   that we have dealings with.
11:07:14   8       Q.   Okay.  Would these individuals be
11:07:18   9   people that you ran into in C District?
11:07:20  10       A.   Yes.
11:07:21  11       Q.   So I'm not asking you to disclose any
11:07:25  12   names, so I will never be able to locate these
11:07:28  13   individuals, but I'm just asking what sorts of
11:07:30  14   mental health concerns did you have for those
11:07:33  15   individuals?
11:07:33  16           MS. HUGGINS:  Same form objection.  I am
11:07:36  17   concerned about HIPAA, depending on her answer.
11:07:39  18   And the way the question is worded it may still
11:07:42  19   implicate that.
11:07:43  20           MR. DAVENPORT:  I don't think that it does.
11:07:45  21   I mean, I'm just asking very broadly about
11:07:49  22   individuals within the City of Buffalo, what sorts
11:07:51  23   of mental health issues they would have had with

11:07:54  1  those people.

11:07:55  2      MS. HUGGINS:   What I -- as a compromise, I

11:07:58  3  would allow you to ask sort of factors taken into

11:08:01  4  account or looked at in terms of her evaluation,

11:08:05  5  but not any -- anything about someone specific or

11:08:08  6  their own treatment.

11:08:09  7      BY MR. DAVENPORT:

11:08:10  8      Q.   Yeah, sure.   I didn't ask that

11:08:12  9  questions.   Just what sorts of things were you

11:08:14 10  concerned with with those individuals?

11:08:15 11      A.   Okay.   We have -- like I said, I've

11:08:17 12  been in C District for the entirety of my career.

11:08:20 13  We have people who we're very familiar with and

11:08:22 14  that we know that they may have a diagnosis or they

11:08:26 15  require a specific treatment.

11:08:28 16      If I see someone who is displaying some

11:08:30 17  indicators, whether it be verbal, behavioral, or

11:08:32 18  appearance and they're not a current threat to

11:08:35 19  themselves or anyone else, but I feel that they may

11:08:39 20  need some reevaluation and I know who they are, I

11:08:43 21  can call and request some type of assistance for

11:08:47 22  that person or a referral, give their name as a

11:08:49 23  referral for further evaluation, because I know

11:08:51  1   that they're involved in some type of services

11:08:54  2   already.

11:08:54  3          BY MR. DAVENPORT:

11:08:54  4          Q.   Okay.  And what sorts of verbal and

11:08:57  5   behavior things by these individuals would lead you

11:09:00  6   to be concerned for their well-being?

11:09:02  7          A.   For instance, it could be cold outside

11:09:05  8   and they're not dressed appropriately for the

11:09:08  9   weather.  Or it could be very cold outside and they

11:09:11 10   don't have the amount of clothes on that you would

11:09:15 11   think that somebody should have in subfreezing

11:09:18 12   temperatures.  Or their hygiene.

11:09:24 13          Q.   So besides hygiene and not being

11:09:29 14   dressed appropriately, what sorts of verbal cues

11:09:33 15   would be given by these individuals that would lead

11:09:36 16   you to be concerned for their mental health?

11:09:38 17          A.   There's a number of different

11:09:40 18   indicators and there -- there could be more than

11:09:42 19   one.  There could be a multitude of different

11:09:45 20   factors that would cause me to want -- want to have

11:09:48 21   them evaluated or receive more assistance or have a

11:09:52 22   referral or have a team come out that I know may

11:09:56 23   have already -- like I said, the individual may

*Velez - Davenport - 02/26/2020*

67

| | | |
|---|---|---|
| 11:09:58 | 1 | already have services in place that we're aware of |
| 11:10:02 | 2 | and we know the team that they're working with and |
| 11:10:02 | 3 | say they're back out on this corner again. |
| 11:10:06 | 4 | They may be yelling loudly, they may be |
| 11:10:06 | 5 | having a fixated repetitive speech.  It could be |
| 11:10:09 | 6 | something that we -- we see them often and it's not |
| 11:10:11 | 7 | what we would consider a baseline behavior. |
| 11:10:14 | 8 | Q.   Okay.  Now, besides people that you |
| 11:10:17 | 9 | encounter often are there ever any instances where |
| 11:10:21 | 10 | you run -- run into somebody that you've never seen |
| 11:10:24 | 11 | before and they give you some sort of verbal cues |
| 11:10:28 | 12 | that would lead you to be concerned for their |
| 11:10:30 | 13 | mental health? |
| 11:10:31 | 14 | A.   Yes. |
| 11:10:32 | 15 | Q.   What sorts of verbal cues would they |
| 11:10:36 | 16 | give if you have never ran -- come across this |
| 11:10:38 | 17 | person before? |
| 11:10:39 | 18 | A.   That -- |
| 11:10:39 | 19 | MS. HUGGINS:   Form.  You can answer. |
| 11:10:40 | 20 | THE WITNESS:   That depends, somebody |
| 11:10:42 | 21 | could -- there's a million different scenarios I |
| 11:10:46 | 22 | could think of off the top of my head, but one of |
| 11:10:48 | 23 | the more severe someone could yell I want to kill |

11:10:48  1    myself.

11:10:49  2             BY MR. DAVENPORT:

11:10:50  3             Q.    Okay.   Now, besides yelling something

11:10:53  4    about self-harm or just speaking about self-harm,

11:10:58  5    would you ever have mental health concerns if an

11:11:02  6    individual was speaking about hurting another

11:11:05  7    individual?

11:11:05  8             A.    Can you repeat that?

11:11:06  9             Q.    Sure.   Aside from instances of

11:11:09  10   self-harm, are there any times where you'd be

11:11:12  11   concerned about an individual's self-help -- or

11:11:16  12   mental health if they were talking about injuring

11:11:19  13   another individual, not themselves?

11:11:21  14            A.    Yes.

11:11:22  15            Q.    Okay.   And when would that cross from

11:11:24  16   being a potential crime to one of a mental health

11:11:29  17   concern?

11:11:29  18            MS. HUGGINS:   Form.   You may answer.

11:11:30  19            THE WITNESS:   Could you repeat that?

11:11:32  20            BY MR. DAVENPORT:

11:11:32  21            Q.    Sure.   When would a threat of physical

11:11:36  22   violence upon somebody else be a cross from a crime

11:11:39  23   to a concern for mental health?

*Velez - Davenport - 02/26/2020*

69

| | | |
|---|---|---|
| 11:11:42 | 1 | A.   That would depend. |
| 11:11:43 | 2 | Q.   Okay.  And this would be on isolated |
| 11:11:47 | 3 | incidents where you've never come across that |
| 11:11:50 | 4 | person before? |
| 11:11:50 | 5 | A.   Either/or. |
| 11:11:51 | 6 | Q.   Okay.  Have you ever been concerned |
| 11:11:54 | 7 | about an individual's mental health based on what |
| 11:11:58 | 8 | they said to police officers? |
| 11:12:00 | 9 | MS. HUGGINS:  Form.  You can answer. |
| 11:12:01 | 10 | THE WITNESS:  Could you repeat that? |
| 11:12:02 | 11 | BY MR. DAVENPORT: |
| 11:12:03 | 12 | Q.   Have you ever been concerned about an |
| 11:12:07 | 13 | individual's mental health based solely on what |
| 11:12:09 | 14 | they said to police officers? |
| 11:12:10 | 15 | A.   It depends on what they said. |
| 11:12:11 | 16 | Q.   Sure.  I guess my question isn't |
| 11:12:14 | 17 | necessarily what they said, my question is just |
| 11:12:16 | 18 | more so have you ever been concerned about |
| 11:12:18 | 19 | somebody's mental health based on something that |
| 11:12:21 | 20 | they said to police officers? |
| 11:12:22 | 21 | MS. HUGGINS:  Form.  You can answer. |
| 11:12:23 | 22 | THE WITNESS:  Again, it depends on |
| 11:12:26 | 23 | what -- what was said, how it was said to police |

*Velez - Davenport - 02/26/2020*

70

| | | |
|---|---|---|
| 11:12:29 | 1 | officers, like -- |
| 11:12:30 | 2 | BY MR. DAVENPORT: |
| 11:12:30 | 3 | Q.   I -- I understand that, you know, what |
| 11:12:32 | 4 | this individual may have said could be different. |
| 11:12:35 | 5 | I'm more so just asking have you ever been |
| 11:12:38 | 6 | concerned, and this is more so, you know, a |
| 11:12:42 | 7 | numerical answer, so have you ever been concerned |
| 11:12:45 | 8 | with somebody's mental health based on something |
| 11:12:48 | 9 | that they said to police officers? |
| 11:12:50 | 10 | MS. HUGGINS:   Form. |
| 11:12:55 | 11 | THE WITNESS:   Could you -- you said based on |
| 11:12:57 | 12 | something numerical, can you -- |
| 11:13:00 | 13 | BY MR. DAVENPORT: |
| 11:13:00 | 14 | Q.   Sure.   So instead of saying what these |
| 11:13:03 | 15 | individuals said, I more so want to know if you |
| 11:13:07 | 16 | have ever been concerned about somebody's mental |
| 11:13:09 | 17 | health and sought out crisis intervention for that |
| 11:13:13 | 18 | individual based solely on statements that they |
| 11:13:16 | 19 | made to police officers in any sort of capacity, |
| 11:13:22 | 20 | what -- what they said to you specifically? |
| 11:13:23 | 21 | A.   Yes. |
| 11:13:24 | 22 | Q.   Okay. |
| 11:13:25 | 23 | MS. HUGGINS:   Form as to the last question. |

*Velez - Davenport - 02/26/2020*

71

| | | |
|---|---|---|
| 11:13:27 | 1 | **BY MR. DAVENPORT:** |
| 11:13:29 | 2 | Q.   So what -- what sort of things have led |
| 11:13:33 | 3 | you to be concerned, what sorts of things did that |
| 11:13:36 | 4 | individual say that led you to be concerned about |
| 11:13:38 | 5 | that individual's mental health based on what they |
| 11:13:42 | 6 | said to you? |
| 11:13:42 | 7 | **MS. HUGGINS:**  Form.  You may answer. |
| 11:13:43 | 8 | **THE WITNESS:**  It -- there's been numerous |
| 11:13:49 | 9 | instances, whether they're articulating a homicidal |
| 11:13:54 | 10 | or suicidal ideation. |
| 11:13:57 | 11 | **BY MR. DAVENPORT:** |
| 11:13:57 | 12 | Q.   Any others that you recall? |
| 11:13:58 | 13 | A.   Yes, if they're fixated.  Like there's |
| 11:14:03 | 14 | different indicators you can listen to in |
| 11:14:07 | 15 | somebody's speech or how they're saying something |
| 11:14:09 | 16 | to you repetitively, whether they are expressing |
| 11:14:15 | 17 | some type of hallucination or delusion. |
| 11:14:19 | 18 | Q.   Okay.  Now, you've used fixated and |
| 11:14:24 | 19 | repetitive language, would those essentially mean |
| 11:14:29 | 20 | the same thing?  If somebody is fixated, is that |
| 11:14:32 | 21 | because they keep on repeating the same thing over |
| 11:14:36 | 22 | and over? |
| 11:14:36 | 23 | A.   Not necessarily. |

11:14:37   1          Q.    Okay.  So how would you use those terms

11:14:41   2    fixated and repetitive?

11:14:44   3          MS. HUGGINS:   Form.   Let's just break it

11:14:46   4    into two questions.

11:14:47   5          BY MR. DAVENPORT:

11:14:47   6          Q.    Okay.  How would you use the term

11:14:47   7    fixated?

11:14:47   8          A.    Fixated could be on an idea or a -- a

11:14:52   9    topic.  They can be artic -- they can be fixated on

11:14:57  10    it in having -- without saying the same thing over

11:15:01  11    and over and over again.

11:15:01  12          Q.    Okay.

11:15:03  13          A.    It's the same type of topic, but not

11:15:06  14    repetitive in what is being said.

11:15:09  15          Q.    Okay.  Now, on January 1st of 2017 did

11:15:16  16    you notice any of these verbal indicators of mental

11:15:20  17    health issues with Mr. Kistner?

11:15:22  18          A.    Can you repeat that?  I'm sorry.

11:15:24  19          Q.    On January 1st of 2017 did you witness

11:15:27  20    any of these verbal cues for mental health issues

11:15:31  21    with Mr. Kistner?

11:15:32  22          A.    Yes.

11:15:32  23          Q.    And which of these verbal cues did you

*Velez - Davenport - 02/26/2020*

73

| | | |
|---|---|---|
| 11:15:36 | 1 | recognize at that time? |
| 11:15:37 | 2 | A.    That I can recall, it was fixation and |
| 11:15:39 | 3 | repetitive. |
| 11:15:40 | 4 | Q.    Any others? |
| 11:15:43 | 5 | A.    If I could see the 941 documentation. |
| 11:15:47 | 6 | Q.    Sure.  Before I show you that document, |
| 11:15:50 | 7 | did you review any documents for your deposition |
| 11:15:53 | 8 | testimony today? |
| 11:15:54 | 9 | A.    I did. |
| 11:15:54 | 10 | Q.    Okay.  And what documents did you |
| 11:15:56 | 11 | review? |
| 11:15:59 | 12 | A.    I did review the 941 paperwork, the |
| 11:16:04 | 13 | arrest forms. |
| 11:16:11 | 14 | Q.    Now, when you say arrest forms, what |
| 11:16:14 | 15 | would those include? |
| 11:16:17 | 16 | A.    There was a number of different forms, |
| 11:16:22 | 17 | it was the 1375, it was the 1 -- P163. |
| 11:16:27 | 18 | Q.    Now, what's a P163? |
| 11:16:31 | 19 | A.    The arrest form.  The 1375 is a crime |
| 11:16:36 | 20 | report. |
| 11:16:38 | 21 | Q.    Okay.  Did you review any other |
| 11:16:43 | 22 | documents? |
| 11:16:43 | 23 | A.    Yes, I just don't recall -- |

*Velez - Davenport - 02/26/2020*

74

| 11:16:46 | 1 | Q. | Okay. |
|---|---|---|---|

11:16:46  2    A.    -- every single.

11:16:48  3    Q.    No, that's okay.  Did you review any

11:16:51  4  videos?

11:16:52  5    A.    Yes.

11:16:52  6    Q.    Okay.  What videos did you review?

11:16:55  7    A.    I reviewed the video that was provided

11:16:59  8  regarding the incident.

11:17:00  9    Q.    Okay.  How many video segments were

11:17:00 10  there?

11:17:05 11    A.    I don't recall.

11:17:05 12    Q.    Okay.  Would it have been four?

11:17:08 13    A.    I don't recall.

11:17:08 14    Q.    Okay.  Did you watch each of the videos

11:17:12 15  that was on the disc that was provided to you?

11:17:14 16    A.    Yes.

11:17:14 17    Q.    Okay.  In their entirety?

11:17:16 18    A.    Yes.

11:17:17 19    Q.    Okay.  Was that the first time that you

11:17:21 20  saw those video segments?

11:17:24 21    A.    No.

11:17:25 22    Q.    Okay.  When was the first time that you

11:17:27 23  saw those video segments?

| | | |
|---|---|---|
| 11:17:27 | 1 | A.   When I was served paperwork with |
| 11:17:28 | 2 | the -- regarding the lawsuit and the disc was |
| 11:17:31 | 3 | provided. |
| 11:17:33 | 4 | Q.   After you were served, did you watch |
| 11:17:36 | 5 | those videos again? |
| 11:17:37 | 6 | A.   Yes. |
| 11:17:38 | 7 | Q.   Approximately how many times did you |
| 11:17:40 | 8 | watch those videos? |
| 11:17:44 | 9 | A.   I viewed it the -- when I was served |
| 11:17:48 | 10 | and then that I can recall twice with Maeve. |
| 11:17:56 | 11 | Q.   Sure.  And I'm not going to ask what |
| 11:17:59 | 12 | kinds of discussions that you had with your |
| 11:18:01 | 13 | attorney, that's between you and her, but thank |
| 11:18:03 | 14 | you. |
| 11:18:06 | 15 | So prior to your deposition today, when was |
| 11:18:08 | 16 | the last time that you watched the video? |
| 11:18:11 | 17 | A.   Last week, I believe. |
| 11:18:12 | 18 | Q.   Okay.  And no other times in between |
| 11:18:15 | 19 | the last time that you watched it and your |
| 11:18:18 | 20 | deposition today, no segments or anything? |
| 11:18:21 | 21 | A.   No. |
| 11:18:21 | 22 | Q.   Okay.  So I'm going to -- |
| 11:18:21 | 23 | MS. HUGGINS:  Other than obviously she was |

11:18:24  1    in attendance with -- for Officer McDermott's.

11:18:24  2         THE WITNESS:  Right.

11:18:25  3         MS. HUGGINS:  Detective McDermott's.

11:18:25  4         MR. DAVENPORT:  Sure.

11:18:26  5         MS. HUGGINS:  And they were shown during the

11:18:28  6    course of that deposition.

11:18:29  7         BY MR. DAVENPORT:

11:18:29  8         Q.    Sure.  So I'm going to show you what's

11:18:32  9    been marked as Exhibit 6.  Do you recognize this

11:18:37 10    document?

11:18:37 11         A.    Yes.

11:18:37 12         Q.    And what do you recognize it to be?

11:18:40 13         A.    A 941.

11:18:45 14         Q.    Okay.  Is the date on here January 1st

11:18:49 15    of 2017?

11:18:49 16         A.    Yes.

11:18:49 17         Q.    And is the time 4:37 for the time of

11:18:53 18    transport?

11:18:54 19         A.    Yes.

11:18:55 20         Q.    Okay.  Now, the time of transport, what

11:19:00 21    would that represent?

11:19:07 22         A.    I believe this was the time that he was

11:19:09 23    brought to ECMC.

*Velez - Davenport - 02/26/2020*

77

| | | |
|---|---|---|
| 11:19:13 | 1 | Q.    Okay. |
| 11:19:14 | 2 | A.    To the best of my recollection. |
| 11:19:16 | 3 | Q.    Do you know where he was brought to |
| 11:19:18 | 4 | ECMC from? |
| 11:19:18 | 5 | A.    Central booking. |
| 11:19:20 | 6 | Q.    And how long approximately were you at |
| 11:19:23 | 7 | central booking? |
| 11:19:24 | 8 | A.    I don't recall. |
| 11:19:24 | 9 | Q.    Okay.  Do you remember approximately |
| 11:19:26 | 10 | what time you got to central booking? |
| 11:19:28 | 11 | A.    I don't recall. |
| 11:19:29 | 12 | Q.    Okay.  Did you go straight from central |
| 11:19:32 | 13 | booking to ECMC? |
| 11:19:33 | 14 | A.    Yes. |
| 11:19:34 | 15 | Q.    Approximately how long did it take you |
| 11:19:37 | 16 | to get to ECMC from central booking? |
| 11:19:39 | 17 | A.    I don't recall. |
| 11:19:41 | 18 | Q.    Have you ever made the drive from |
| 11:19:43 | 19 | central booking to ECMC, other than this date? |
| 11:19:49 | 20 | A.    I don't remember. |
| 11:19:50 | 21 | Q.    Okay.  Have you ever brought someone in |
| 11:19:56 | 22 | on a 941 form after they had been brought to |
| 11:20:00 | 23 | central booking? |

11:20:01  1        **MS. HUGGINS:**  Form.  You can answer.

11:20:03  2        **THE WITNESS:**  I don't recall.

11:20:04  3        **BY MR. DAVENPORT:**

11:20:04  4        **Q.**  Okay.  Approximately --

11:20:05  5        **A.**  For this incident we did.

11:20:09  6        **Q.**  Sure.  Sure.  Approximately how many

11:20:11  7  times have you used a 941 form before as a police

11:20:15  8  officer or a lieutenant or a detective?

11:20:17  9        **A.**  Numerous.

11:20:18  10        **Q.**  Okay.  Approximately how many times is

11:20:20  11  numerous?

11:20:22  12        **A.**  I don't want to give a false estimate.

11:20:26  13  I -- I don't recall.

11:20:26  14        **Q.**  Would it be more than a hundred?

11:20:30  15        **A.**  Possibly.

11:20:30  16        **Q.**  Okay.  Would it be more than 50?

11:20:36  17        **A.**  Yes.

11:20:36  18        **Q.**  Okay.  So, now, going through this

11:20:41  19  form, what sort of verbal cues did you indicate on

11:20:49  20  this form that Mr. Kistner was exhibiting that made

11:20:53  21  you -- led you to be concerned for his mental

11:20:56  22  health?

11:20:56  23        **A.**  I checked off refusal to respond to

*Velez - Davenport - 02/26/2020*

79

| | | |
|---|---|---|
| 11:20:59 | 1 | questions, talking to self, hostile, argumentative, |
| 11:20:59 | 2 | belligerent, loud yelling, expresses idea of |
| 11:20:59 | 3 | inflated self-importance, and talks -- oh, I'm |
| 11:20:59 | 4 | sorry. |
| 11:21:09 | 5 | I put refusal to respond to questions, |
| 11:21:11 | 6 | talking to self, hostile, argumentative, |
| 11:21:15 | 7 | belligerent, loud yelling, expresses ideas of |
| 11:21:19 | 8 | inflated self-importance, and talks repeatedly |
| 11:21:24 | 9 | about a single subject, death, religion, illness, |
| 11:21:29 | 10 | government, et cetera. |
| 11:21:30 | 11 | And then in the narrative I put repeatedly |
| 11:21:36 | 12 | called officers Nazis and fascists. |
| 11:21:39 | 13 | Q.   Okay.  So, now, is there ever -- is |
| 11:21:42 | 14 | there a second page to a 941 form? |
| 11:21:46 | 15 | A.   No. |
| 11:21:46 | 16 | Q.   No.  Is there anywhere where you can |
| 11:21:52 | 17 | add to your narrative besides these two and a half |
| 11:21:56 | 18 | lines that are given to you? |
| 11:21:57 | 19 | A.   Just the justification for transport. |
| 11:22:00 | 20 | Q.   Yes, for the just -- justification for |
| 11:22:04 | 21 | transport, is there anywhere else where you can add |
| 11:22:06 | 22 | to the narrative besides that section right there? |
| 11:22:09 | 23 | A.   What was reported to the police about |

11:22:12   1   the individual.

11:22:12   2        Q.   Okay.  Now, you chose not to write

11:22:16   3   anything on that line.  Why did you not write

11:22:20   4   anything on the section what was reported to the

11:22:22   5   police about this individual?

11:22:24   6        A.   I didn't have any information to add to

11:22:26   7   that.

11:22:26   8        Q.   Okay.  So he was taken to ECMC,

11:22:33   9   correct?

11:22:33  10        A.   Yes.

11:22:33  11        Q.   Okay.  Did he use the sort of language

11:22:38  12   with any of the nurses or physicians that were at

11:22:44  13   ECMC, Nazis, fascists, any other language that

11:22:48  14   would -- I'm sorry.  That was a poorly phrased

11:22:49  15   question, strike that.

11:22:50  16        Did Mr. Kistner use any sort of language

11:22:55  17   with any of the physicians or staff at ECMC that

11:23:00  18   would lead you to be concerned for his mental

11:23:03  19   health?

11:23:03  20        MS. HUGGINS:   Form.  You may answer.

11:23:05  21        THE WITNESS:   Yes.

11:23:06  22        BY MR. DAVENPORT:

11:23:06  23        Q.   Okay.  How did you come to learn about

*Velez - Davenport - 02/26/2020*

81

11:23:09   1   that language that was used to the physicians or

11:23:11   2   ECMC staff?

11:23:12   3         A.   I was present during his transport

11:23:16   4   to -- I don't recall if it was -- it was some type

11:23:20   5   of scan for the transport when he was using the

11:23:25   6   language.

11:23:27   7         Q.   Do you recall, would that have been a

11:23:30   8   CAT scan of Mr. Kistner?

11:23:31   9         A.   I don't recall exactly what type of

11:23:33 10   scan it was.

11:23:34 11         Q.   Okay.   Who was that scan done by, was

11:23:37 12   that ECMC staff?

11:23:38 13         A.   Yes.

11:23:38 14         Q.   Okay.   Now, besides the transport, were

11:23:44 15   you ever present in the room where Mr. Kistner was

11:23:48 16   being evaluated?

11:23:49 17         A.   No.

11:23:51 18         Q.   Okay.   Did you talk with any of the

11:23:53 19   ECMC staff or physicians about what was going on

11:23:57 20   for that physical examination of Mr. Kistner?

11:24:00 21         A.   No.

11:24:01 22         Q.   Okay.   Besides Mr. Kistner being

11:24:08 23   transported, did you come to learn about any other

11:24:11  1  instances or times that Mr. Kistner would have used

11:24:14  2  any language, any verbal cues with ECMC staff that

11:24:19  3  would have led you to be concerned about his mental

11:24:22  4  health?

11:24:22  5          A.   Can you repeat that?

11:24:24  6          Q.   Sure.  Besides Mr. Kistner's transport,

11:24:29  7  were there any other instances of Mr. Kistner using

11:24:33  8  any sort of verbal cues that would cause you to be

11:24:38  9  concerned for his mental health and those verbal

11:24:42 10  cues being directed towards ECMC staff only, not to

11:24:45 11  you?

11:24:45 12          MS. HUGGINS:   Form.  You can answer.

11:24:46 13          THE WITNESS:   The most significant that I

11:24:48 14  can recall at this time was during that transport

11:24:51 15  through the hospital.

11:24:51 16          BY MR. DAVENPORT:

11:24:52 17          Q.   Okay.  Now, you say the most

11:24:54 18  significant, were there any other instances that

11:24:58 19  you can recall?

11:24:58 20          A.   Not that I could recall.

11:24:59 21          Q.   Okay.  During that first initial visit

11:25:08 22  to ECMC, did you have any conversations with any of

11:25:11 23  the physicians or ECMC staff?

11:25:12   1        A.    I did not.

11:25:13   2        Q.    Okay.  Do you know if any of the

11:25:15   3    officers had any conversations with any of the ECMC

11:25:18   4    staff?

11:25:19   5        A.    Officer McDermott did.

11:25:20   6        Q.    Okay.  Do you -- were you present for

11:25:23   7    those conversations?

11:25:24   8        A.    Yes.

11:25:24   9        Q.    Okay.  Do you recall what was said

11:25:27  10    between Ms. McDermott and ECMC staff?

11:25:30  11        A.    The only conversation I remember that

11:25:33  12    I -- I heard the doctor say was that he stated that

11:25:37  13    he fell on ice.

11:25:38  14        Q.    Okay.

11:25:40  15        A.    That he had slipped and fell on ice.

11:25:42  16    That's the only thing that I could recall.

11:25:43  17        Q.    Would that have been inside of the room

11:25:46  18    where Mr. Kistner was being evaluated?

11:25:49  19        A.    No, I stayed in the hallway.

11:25:49  20        Q.    Okay.

11:25:52  21        A.    I don't recall if I ever went in his

11:25:53  22    room when -- when he was being uncuffed to be taken

11:25:56  23    out, because he was cuffed to the bed, but whenever

11:25:58 1 | he was being evaluated I was in the hallway.

11:26:00 2 |      Q.   Okay.  Were you present when

11:26:03 3 | Mr. Kistner was uncuffed?

11:26:08 4 |      A.   At what point?

11:26:09 5 |      Q.   Were you part of -- did you actually

11:26:14 6 | participate in uncuffing Mr. Kistner from the

11:26:17 7 | hospital bed?

11:26:17 8 |      A.   I don't recall.

11:26:18 9 |      Q.   Okay.  Do you remember who actually

11:26:21 10 | uncuffed Mr. Kistner from the hospital bed?

11:26:23 11 |      A.   I don't recall.

11:26:25 12 |      Q.   Would it have been Officer Schulz or

11:26:32 13 | Officer Moriarity?

11:26:33 14 |      A.   When Mr. Kistner was transported from

11:26:37 15 | ECMC to central booking, it was just Officer

11:26:42 16 | McDermott and myself.  Initially when he was

11:26:44 17 | brought to ECMC, Officers Schulz and Moriarity were

11:26:51 18 | present, so at some point they may have.

11:26:54 19 |     I'm not certain who had cuffed him to the

11:26:58 20 | bed at that point, but I know when he was taken

11:27:00 21 | from ECMC to central booking it was just Officer

11:27:02 22 | McDermott and myself.  So she and I would have been

11:27:03 23 | the ones, one of the ones who would have uncuffed

| 11:27:06 | 1 | him. |
| 11:27:07 | 2 | Q. Okay. Was he uncuffed at any point |
| 11:27:10 | 3 | before he was transported from ECMC to central |
| 11:27:14 | 4 | booking? |
| 11:27:14 | 5 | MS. HUGGINS: Form. |
| 11:27:15 | 6 | THE WITNESS: Could you clarify? |
| 11:27:16 | 7 | BY MR. DAVENPORT: |
| 11:27:17 | 8 | Q. Was Mr. Kistner uncuffed at any point |
| 11:27:20 | 9 | before you and Ms. McDermott were about to transfer |
| 11:27:24 | 10 | him to central booking from ECMC? |
| 11:27:27 | 11 | A. He would have -- the cuff would have |
| 11:27:27 | 12 | been removed from the bed. He had one cuff to the |
| 11:27:30 | 13 | bed, one arm cuffed. So that would have been |
| 11:27:30 | 14 | removed so he would have been placed in both of his |
| 11:27:34 | 15 | hands put into handcuffs, but I don't recall. |
| 11:27:37 | 16 | Q. Was that handcuff ever removed from his |
| 11:27:41 | 17 | one wrist? |
| 11:27:42 | 18 | MS. HUGGINS: Form. |
| 11:27:49 | 19 | THE WITNESS: I'm not certain. I don't |
| 11:27:52 | 20 | know. I -- I don't recall. |
| 11:27:52 | 21 | BY MR. DAVENPORT: |
| 11:27:52 | 22 | Q. Okay. At any time were you or |
| 11:27:56 | 23 | Ms. McDermott or Officer Moriarity or Officer |

| | | |
|---|---|---|
| 11:28:00 | 1 | Schulz, were any of the officers at ECMC requested |
| 11:28:03 | 2 | by any of the ECMC staff to uncuff Mr. Kistner? |
| 11:28:07 | 3 | A.   Not that I could recall. |
| 11:28:09 | 4 | Q.   Okay.  Approximately how long were you |
| 11:28:12 | 5 | at ECMC before going to central booking, so during |
| 11:28:17 | 6 | that first visit? |
| 11:28:18 | 7 | A.   I don't recall. |
| 11:28:19 | 8 | Q.   Okay.  So, now, turning to the 941 |
| 11:28:24 | 9 | form.  Refusal to respond to question, that's one |
| 11:28:28 | 10 | of the boxes that you've checked for verbal and |
| 11:28:31 | 11 | behavioral cues.  What sorts of questions was he |
| 11:28:36 | 12 | refusing to respond to? |
| 11:28:38 | 13 | A.   I don't recall at this time. |
| 11:28:39 | 14 | Q.   Okay.  I also noticed that there's an O |
| 11:28:44 | 15 | and an R above those boxes, do you know what O and |
| 11:28:49 | 16 | are stands for? |
| 11:28:50 | 17 | A.   Yeah, observed and reported -- and/or |
| 11:28:53 | 18 | reported. |
| 11:28:53 | 19 | Q.   Okay.  So, now, observed would be your |
| 11:28:56 | 20 | personal observations, correct? |
| 11:28:58 | 21 | A.   Correct. |
| 11:28:58 | 22 | Q.   And reported would be from a |
| 11:29:01 | 23 | third-party? |

*Velez - Davenport - 02/26/2020*

| | | |
|---|---|---|
| 11:29:01 | 1 | **A.**    Yes. |
| 11:29:02 | 2 | **Q.**    Okay.  Now, another box that you have |
| 11:29:05 | 3 | checked is talking to self.  Do you recall |
| 11:29:09 | 4 | Mr. Kistner talking to himself on January 1st of |
| 11:29:12 | 5 | 2017? |
| 11:29:12 | 6 | **A.**    Yes. |
| 11:29:12 | 7 | **Q.**    What kinds of things was he saying? |
| 11:29:15 | 8 | **A.**    I don't remember the exact -- exactly |
| 11:29:19 | 9 | what he was saying, but I recall when I was in the |
| 11:29:24 | 10 | hallway, he was talking to himself while he was in |
| 11:29:26 | 11 | the hospital bed. |
| 11:29:27 | 12 | **Q.**    Okay.  Was the door closed when |
| 11:29:32 | 13 | Mr. Kistner was being evaluated and you were out in |
| 11:29:34 | 14 | the hall at ECMC? |
| 11:29:35 | 15 | **MS. HUGGINS:**  Form.  You can answer. |
| 11:29:38 | 16 | **THE WITNESS:**  It may have been. |
| 11:29:40 | 17 | **BY MR. DAVENPORT:** |
| 11:29:41 | 18 | **Q.**    So these would have been words that |
| 11:29:44 | 19 | Mr. Kistner spoke while he was in the hospital |
| 11:29:48 | 20 | room, correct? |
| 11:29:48 | 21 | **MS. HUGGINS:**  Form. |
| 11:29:49 | 22 | **BY MR. DAVENPORT:** |
| 11:29:51 | 23 | **Q.**    That you heard when you were outside |

*Velez - Davenport - 02/26/2020*

88

| | | |
|---|---|---|
| 11:29:52 | 1 | the hospital room? |
| 11:29:53 | 2 | A.    These are words that were spoken when |
| 11:29:58 | 3 | he was in the hospital room and I was in the |
| 11:30:00 | 4 | hallway, correct. |
| 11:30:00 | 5 | Q.    Okay.  But you're not sure if the door |
| 11:30:03 | 6 | was closed or open? |
| 11:30:04 | 7 | A.    When he -- when he was in there by |
| 11:30:05 | 8 | himself, I recall the door being partially open so |
| 11:30:11 | 9 | we could see him. |
| 11:30:15 | 10 | Q.    Now, who partially opened the door, do |
| 11:30:23 | 11 | you recall? |
| 11:30:23 | 12 | A.    I don't. |
| 11:30:27 | 13 | Q.    Okay.  Was that either you or Officer |
| 11:30:30 | 14 | McDermott that partially opened the door? |
| 11:30:32 | 15 | A.    I don't recall. |
| 11:30:35 | 16 | Q.    What kinds of things did you observe |
| 11:30:37 | 17 | through that partially open door? |
| 11:30:39 | 18 | A.    We could see his self, we could see him |
| 11:30:44 | 19 | laying on the hospital bed. |
| 11:30:46 | 20 | Q.    And was it during this time that you |
| 11:30:49 | 21 | saw Mr. Kistner talking to himself? |
| 11:30:52 | 22 | A.    Heard him, that's all. |
| 11:30:54 | 23 | Q.    Okay.  Was there anybody else in the |

11:30:55 1 room besides Mr. Kistner?

11:30:57 2          A.    At that time, no.

11:30:59 3          Q.    Was there any ECMC staff that was in

11:31:02 4 the room?

11:31:02 5          A.    When he was talking to himself, not

11:31:05 6 that I could recall.

11:31:08 7          Q.    Approximately -- you can give a

11:31:10 8 percentage on this, approximately how much of the

11:31:13 9 time that Mr. Kistner was at ECMC before being

11:31:17 10 transferred to central booking was he in the room

11:31:22 11 by himself?

11:31:22 12          MS. HUGGINS:    Form.   You can answer.

11:31:24 13          THE WITNESS:    Can you repeat that?

11:31:26 14          BY MR. DAVENPORT:

11:31:26 15          Q.    So how -- how much of the time that

11:31:28 16 Mr. Kistner spent at ECMC before being transferred

11:31:31 17 to central booking was he in the hospital room by

11:31:35 18 himself?

11:31:38 19          A.    We were right outside the door, so if

11:31:41 20 he wasn't being evaluated, that I could recall.   I

11:31:45 21 don't know a specific amount of time.

11:31:48 22          Q.    Do you recall approximately how many

11:31:51 23 individuals -- how many ECMC staff individuals

*Velez - Davenport - 02/26/2020*

90

| | | |
|---|---|---|
| 11:31:58 | 1 | evaluated Mr. Kistner? |
| 11:32:00 | 2 | A.   No. |
| 11:32:01 | 3 | Q.   Okay.   Would it have been more than |
| 11:32:03 | 4 | five? |
| 11:32:05 | 5 | MS. HUGGINS:   Form.   You can answer. |
| 11:32:07 | 6 | THE WITNESS:   I don't recall.   I remember |
| 11:32:10 | 7 | one doctor. |
| 11:32:14 | 8 | BY MR. DAVENPORT: |
| 11:32:16 | 9 | Q.   So, now, you said that you've done |
| 11:32:19 | 10 | other 941 forms before.   Where do you typically |
| 11:32:24 | 11 | send individuals who are being evaluated under a |
| 11:32:28 | 12 | 941? |
| 11:32:28 | 13 | A.   We always take them to ECMC. |
| 11:32:28 | 14 | Q.   Okay. |
| 11:32:33 | 15 | A.   To CPEP. |
| 11:32:33 | 16 | Q.   Do you typically deal with the same |
| 11:32:38 | 17 | individuals at ECMC in terms of staff there? |
| 11:32:40 | 18 | A.   It varies. |
| 11:32:41 | 19 | Q.   Okay.   Was there anybody there present |
| 11:32:45 | 20 | at ECMC that day that you had recognized from a |
| 11:32:49 | 21 | previous 941? |
| 11:32:51 | 22 | MS. HUGGINS:   Form.   You can answer. |
| 11:32:54 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

91

11:32:55  1          Q.    Was there anybody there --

11:32:56  2          A.    Staff?

11:32:56  3          Q.    -- present on January 1st of 2017 that

11:32:59  4   you recognized from a prior time that you had

11:33:02  5   brought an individual to ECMC on a 941?

11:33:05  6          A.    I don't recall.

11:33:06  7          Q.    Okay.  Who would you typically deal

11:33:10  8   with at ECMC for a 941 evaluation?

11:33:14  9          A.    For the 941 evaluation we come in

11:33:18 10   through the emergency room entrance, whether it's a

11:33:22 11   941 or a regular medical evaluation, we come in the

11:33:27 12   same way.

11:33:28 13          We stop at the reception window.  They're

11:33:33 14   triaged for their vitals, and then they're

11:33:34 15   transported over to the CPEP portion of the

11:33:40 16   hospital.

11:33:40 17          Q.    Okay.  Do you typically stay with those

11:33:45 18   individuals after they're brought on a 941, do you

11:33:49 19   stay at ECMC?

11:33:50 20          A.    We stay with them until they're taken

11:33:55 21   into the secure part of the psychiatric section.

11:33:57 22          Q.    And what would that secure part be

11:34:00 23   called, what is that called?

*Velez - Davenport - 02/26/2020*

92

| | | |
|---|---|---|
| 11:34:04 | 1 | A.    CPEP. |
| 11:34:07 | 2 | Q.    Okay.  And you mentioned the triage, |
| 11:34:10 | 3 | what was the triage referring to? |
| 11:34:12 | 4 | A.    Just the part -- so you give your |
| 11:34:13 | 5 | paperwork in and then they sit with a nurse and |
| 11:34:16 | 6 | their vitals are taken; blood pressure, |
| 11:34:19 | 7 | temperature. |
| 11:34:20 | 8 | Q.    Are there other individuals, other |
| 11:34:22 | 9 | patients who are in the triage? |
| 11:34:24 | 10 | A.    It's a -- it's a room where just that |
| 11:34:27 | 11 | person is evaluated. |
| 11:34:29 | 12 | Q.    And that person is in there by |
| 11:34:33 | 13 | themselves? |
| 11:34:33 | 14 | A.    While they're being evaluated, yes. |
| 11:34:38 | 15 | Q.    Okay.  Approximately how many -- |
| 11:34:38 | 16 | A.    With an officer present, there's an |
| 11:34:40 | 17 | officer for just the vitals for the triage portion. |
| 11:34:41 | 18 | Q.    Okay.  Do you recall on January 1st of |
| 11:34:45 | 19 | 2017, did you stay with Mr. Kistner in the triage? |
| 11:34:49 | 20 | A.    I don't recall if we both did or one of |
| 11:34:53 | 21 | us did, myself or Officer McDermott.  I don't |
| 11:34:55 | 22 | recall. |
| 11:34:55 | 23 | Q.    You and Officer McDermott were |

*Velez - Davenport - 02/26/2020*

93

| | | |
|---|---|---|
| 11:34:57 | 1 | traveling together on that day, correct? |
| 11:34:59 | 2 | A.   Yes. |
| 11:34:59 | 3 | Q.   And Officer McDermott is here today? |
| 11:35:01 | 4 | A.   Yes. |
| 11:35:01 | 5 | Q.   Okay.  So on that day do you recall |
| 11:35:09 | 6 | leaving the hospital without Officer McDermott? |
| 11:35:13 | 7 | A.   No. |
| 11:35:14 | 8 | Q.   Do you recall Officer McDermott leaving |
| 11:35:16 | 9 | the hospital without you? |
| 11:35:18 | 10 | A.   No. |
| 11:35:19 | 11 | Q.   If you weren't in the triage when |
| 11:35:26 | 12 | Mr. Kistner was being evaluated, where else would |
| 11:35:30 | 13 | you have been? |
| 11:35:30 | 14 | A.   I could possibly been outside the door |
| 11:35:32 | 15 | using the lavatory.  I just -- I don't recall. |
| 11:35:33 | 16 | Q.   Do you remember approximately how long |
| 11:35:36 | 17 | Mr. Kistner was in the triage? |
| 11:35:37 | 18 | A.   I don't. |
| 11:35:38 | 19 | Q.   Okay.  Was it more than an hour? |
| 11:35:40 | 20 | A.   I don't recall. |
| 11:35:41 | 21 | Q.   Okay.  When an individual is in the |
| 11:35:44 | 22 | triage, are they evaluated only by nurses or are |
| 11:35:48 | 23 | they also evaluated by a physician? |

*Velez - Davenport - 02/26/2020*

94

11:35:50    1          A.    I've only ever seen a nurse.

11:35:53    2          Q.    Okay.  Now, typically after an

11:36:01    3    individual is brought to CPEP, do you leave ECMC at

11:36:06    4    that time?

11:36:06    5          A.    Once they're in the secure part of CPEP

11:36:09    6    then we leave, yes.

11:36:11    7          Q.    Okay.  Do you remember on that day

11:36:13    8    after Mr. Kistner was brought to CPEP did you stay

11:36:19    9    or did you leave after he was brought into CPEP?

11:36:22   10          A.    Left.

11:36:22   11          Q.    Left.  Okay.  Do you remember

11:36:26   12    approximately what time Mr. Kistner was brought to

11:36:29   13    the triage?

11:36:29   14          A.    I do not.

11:36:31   15          Q.    Okay.  Is an individual who's brought

11:36:35   16    on a 941 brought straight to the triage, or is

11:36:40   17    there another place where they are brought before

11:36:43   18    triage?

11:36:43   19          MS. HUGGINS:  Form.  You can answer.

11:36:44   20          THE WITNESS:  Unless there's a backup,

11:36:46   21    because occasionally there's a lot of people,

11:36:48   22    because, like I said, 941s will go through triage

11:36:53   23    as well as people being medically treated, so if

*Velez - Davenport - 02/26/2020*

95

11:36:55  1  there's a backup, we may have to wait in the

11:36:59  2  hallway or another room they put us in until

11:37:03  3  someone could be seen in the triage.

11:37:05  4      Q.   Okay.  Do you remember on that day, on

11:37:10  5  January 1st of 2017, did you have to wait in the

11:37:11  6  hallway or did you immediately go into the triage?

11:37:14  7      A.   I don't recall.

11:37:14  8      Q.   Okay.  How many times have you gone to

11:37:18  9  the triage where you had to wait out in the

11:37:18  10  hallway?

11:37:22  11      A.   Numerous.

11:37:22  12      Q.   Okay.  Besides officers, who else

11:37:27  13  brings individuals on a 941 or some sort of other

11:37:32  14  mental health evaluation at CPEP?

11:37:36  15      A.   It could also be mental health

11:37:39  16  professionals.

11:37:39  17      Q.   Would that be crisis intervention?

11:37:42  18      A.   Crisis services.

11:37:42  19      Q.   Okay.

11:37:44  20      A.   Yes.

11:37:48  21      Q.   On these times where you had to wait

11:37:51  22  out in the hallway, were they all officers who had

11:37:56  23  brought the individual in for an evaluation, or

11:37:59  1  were there also mental health or crisis services

11:38:04  2  workers who brought individuals in for a mental

11:38:07  3  health evaluation?

11:38:08  4          MS. HUGGINS:  Form.  You may answer.

11:38:10  5          THE WITNESS:  It's been both and for medical

11:38:13  6  treatment as well.  Like there have been people who

11:38:17  7  come in on the ambulance who have to wait as well.

11:38:21  8  It's the County medical center, so sometimes if

11:38:23  9  it's backed up for people being seen for mental

11:38:24 10  health issues or for medical.

11:38:27 11          BY MR. DAVENPORT:

11:38:27 12      Q.   Okay.  So the triage wouldn't just be

11:38:31 13  for a mental health evaluation?

11:38:34 14      A.   Correct.

11:38:34 15      Q.   Okay.  Now, that first time that

11:38:40 16  Mr. Kistner was brought to ECMC did he go to a

11:38:43 17  triage?

11:38:45 18      A.   I don't recall.

11:38:46 19      Q.   Okay.  Where else would he have been

11:38:50 20  brought for that physical examination?

11:38:52 21          MS. HUGGINS:  Form.  You can answer.

11:38:54 22          THE WITNESS:  Typically we would go through

11:38:57 23  triage, I just don't recall going through the

*Velez - Davenport - 02/26/2020*

97

| | | |
|---|---|---|
| 11:38:57 | 1 | triage. |
| 11:39:01 | 2 | BY MR. DAVENPORT: |
| 11:39:01 | 3 | Q. Okay. When you were observing |
| 11:39:05 | 4 | Mr. Kistner through the partially open door, was he |
| 11:39:08 | 5 | in a triage room at that time? |
| 11:39:09 | 6 | A. No. |
| 11:39:10 | 7 | Q. Okay. So what room was he in? |
| 11:39:12 | 8 | A. He was in one of the rooms on the |
| 11:39:14 | 9 | other -- when you go back, I don't know what you |
| 11:39:17 | 10 | would call the room, it's in the emergency room, |
| 11:39:20 | 11 | the emergency department. |
| 11:39:22 | 12 | They have some rooms -- they have some |
| 11:39:24 | 13 | sections with just curtains and then they have |
| 11:39:27 | 14 | rooms with doors and he had a room with a door and |
| 11:39:28 | 15 | a window. |
| 11:39:28 | 16 | Q. Okay. |
| 11:39:29 | 17 | A. But it's still in the emergency |
| 11:39:32 | 18 | section. It's not like a room for someone who's |
| 11:39:35 | 19 | admitted. |
| 11:39:36 | 20 | Q. Okay. Now, when you were observing |
| 11:39:41 | 21 | Mr. Kistner through the partially open door, did |
| 11:39:45 | 22 | you observe any sort of physical evaluations that |
| 11:39:47 | 23 | were done of Mr. Kistner? |

*Velez - Davenport - 02/26/2020*

98

| 11:39:48 | 1 | A. No. |
|---|---|---|

**Q.** Okay. Do you know if Mr. Kistner was evaluated for a head injury while he was at ECMC?

**A.** I don't recall.

**Q.** On the day of the incident do you recall Mr. Kistner complaining about a head injury?

**A.** I don't recall.

**Q.** Okay. Do you recall Mr. Kistner making any sorts of complaints on January 1st of 2017, physical complaints?

**A.** I don't recall anything specific.

**Q.** Okay. Do you remember, do you recall anything generally anything that he was saying to police officers about his physical condition?

**A.** No, I don't recall.

**Q.** Okay. Now, you also have checked here hostile, argumentative, belligerent, loud yelling, where did you observe these behaviors?

**A.** At the hospital.

**Q.** Did you observe them anywhere else?

**A.** I don't recall if it was on the transport or not. The hospital is what I recall.

**Q.** Okay. Who was he hostile,

11:40:59  1    argumentative, belligerent, loud and yelling, who

11:41:03  2    were those actions directed towards?

11:41:05  3         MS. HUGGINS:  Form.  You can answer.

11:41:06  4         THE WITNESS:  Again, from what I can recall

11:41:10  5    during the transport he was just yelling loudly,

11:41:14  6    using derogatory terms that created a disruption,

11:41:18  7    people were walking away trying to go in a

11:41:22  8    different direction.

11:41:23  9         BY MR. DAVENPORT:

11:41:23  10        Q.   Now, when you say the transport, that's

11:41:24  11   referring to taking Mr. Kistner from his hospital

11:41:28  12   room to where he was examined for some sort of an

11:41:31  13   imaging study, correct?

11:41:33  14        A.   Correct.

11:41:33  15        Q.   Okay.  I just want to make sure that

11:41:38  16   wasn't during the transport from ECMC to central

11:41:40  17   booking?

11:41:41  18        A.   Correct.

11:41:41  19        Q.   Okay.  Now, besides the transport, did

11:41:45  20   you observe these types of behaviors anywhere else?

11:41:52  21        A.   To the best of my recollection, the

11:41:54  22   hospital is what I remember.

11:41:55  23        Q.   Okay.  And when you say the hospital,

*Velez - Davenport - 02/26/2020*

100

| 11:41:57 | 1 | was that also in his hospital room that he -- |
| 11:42:01 | 2 | A.   Some of these observations were from |
| 11:42:04 | 3 | his hospital room. |
| 11:42:05 | 4 | Q.   Okay.  And that would have been |
| 11:42:07 | 5 | something that you observed through the partially |
| 11:42:09 | 6 | open door? |
| 11:42:10 | 7 | A.   Correct. |
| 11:42:10 | 8 | Q.   Did he exhibit any of these types of |
| 11:42:14 | 9 | behaviors at central booking? |
| 11:42:16 | 10 | A.   I don't recall. |
| 11:42:17 | 11 | Q.   Okay.  Did he exhibit any of these |
| 11:42:19 | 12 | sorts of behaviors at any point when he was in the |
| 11:42:22 | 13 | car with you and Ms. McDermott? |
| 11:42:24 | 14 | A.   I don't recall. |
| 11:42:24 | 15 | Q.   Okay.  The next box that you have |
| 11:42:27 | 16 | checked is expresses ideas of inflated |
| 11:42:31 | 17 | self-importance.  Have you ever checked that box |
| 11:42:35 | 18 | before on a 941 form? |
| 11:42:41 | 19 | A.   I don't recall. |
| 11:42:42 | 20 | Q.   Okay.  Is that a box that you check |
| 11:42:45 | 21 | often? |
| 11:42:46 | 22 | MS. HUGGINS:  Form.  You may answer. |
| 11:42:46 | 23 | THE WITNESS:  I have checked it, I just -- I |

*Velez - Davenport - 02/26/2020*

| | | |
|---|---|---|
| 11:42:49 | 1 | don't recall how many times or anything specific. |
| 11:42:52 | 2 | BY MR. DAVENPORT: |
| 11:42:53 | 3 | Q.   Okay.   On January 1st of 2017 what |
| 11:42:55 | 4 | sorts of verbal or behavioral cues led you to |
| 11:42:59 | 5 | believe that Mr. Kistner was expressing ideas of |
| 11:43:03 | 6 | inflated self-importance? |
| 11:43:04 | 7 | A.   I don't recall specifically. |
| 11:43:06 | 8 | Q.   Okay.   What sorts of actions, verbal or |
| 11:43:11 | 9 | behavioral cues, would lead you to check a box |
| 11:43:16 | 10 | expresses ideas of inflated self-importance? |
| 11:43:19 | 11 | A.   How they're regarding themselves.   I |
| 11:43:22 | 12 | know in -- from what I could recall before someone, |
| 11:43:25 | 13 | and it wasn't the case with Mr. Kistner, saying |
| 11:43:30 | 14 | that they believe they're God or -- those would be |
| 11:43:33 | 15 | examples of self-importance, but I don't recall |
| 11:43:36 | 16 | exactly what Mr. Kistner had expressed as to why I |
| 11:43:43 | 17 | checked the box. |
| 11:43:44 | 18 | Q.   Are there ever any other verbal or |
| 11:43:47 | 19 | behavioral cues that would lead you to check that |
| 11:43:50 | 20 | box besides somebody saying that they believe that |
| 11:43:53 | 21 | they're God or Jesus? |
| 11:43:55 | 22 | A.   Yes, I -- I just can't recall anything |
| 11:43:56 | 23 | at this time. |

*Velez - Davenport - 02/26/2020*

102

| | | |
|---|---|---|
| 11:43:56 | 1 | Q. Did Mr. Kistner at any time express |
| 11:43:59 | 2 | that he believed that he was God or Jesus? |
| 11:44:02 | 3 | A. Not that I can recall. |
| 11:44:03 | 4 | Q. Okay. The next verbal or behavioral |
| 11:44:09 | 5 | cue that you checked was talks repeatedly about a |
| 11:44:13 | 6 | single subject. And then in parentheses it's |
| 11:44:17 | 7 | death, comma, religion, comma, illness, comma, |
| 11:44:22 | 8 | government, comma, et cetera. |
| 11:44:24 | 9 | Do you recall what that single subject was |
| 11:44:28 | 10 | that Mr. Kistner repeatedly talked about? |
| 11:44:31 | 11 | A. I believe it was in here I put |
| 11:44:33 | 12 | repeatedly called officers Nazis and fascists. And |
| 11:44:36 | 13 | it was hospital staff he referred to as well, |
| 11:44:41 | 14 | feminazis, excuse my language, but he kept |
| 11:44:45 | 15 | referring to lily white pussies. |
| 11:44:48 | 16 | I know that I filled out a 710.30 with his |
| 11:44:51 | 17 | arrest paperwork that I had written -- or I had |
| 11:44:54 | 18 | documented, because at the time I recalled exactly |
| 11:44:59 | 19 | what he had said. And when we filled out our |
| 11:45:01 | 20 | arrest paperwork, I had documented what he had |
| 11:45:04 | 21 | said. |
| 11:45:07 | 22 | Q. So that et cetera that's at the end, |
| 11:45:12 | 23 | does that mean that the four topics that are listed |

11:45:16  1    in parentheses are not all-inclusive?

11:45:19  2         A.    Correct.

11:45:20  3         Q.    Okay.  So there could be other subjects

11:45:23  4    that an individual would talk about that would lead

11:45:26  5    you to check that box, correct?

11:45:28  6         A.    Yes.

11:45:29  7         Q.    But would you agree that the derogatory

11:45:33  8    terms that Mr. Kistner used would not fall within

11:45:37  9    death, religion, illness, or government?

11:45:39  10        A.    Nazi could be part government.

11:45:43  11        Q.    Okay.  Now, this says talks repeatedly

11:45:50  12   about a single subject.  Could this also -- could

11:45:56  13   this box encompass talking repeatedly about

11:46:01  14   anything, does it necessarily have to be a single

11:46:04  15   subject that this individual is repeatedly talking

11:46:08  16   about?

11:46:08  17        A.    This one specifically says talks

11:46:09  18   repeatedly about a single subject.

11:46:10  19        Q.    Okay.  So you would agree that the

11:46:15  20   derogatory terms that Mr. Kistner used there were

11:46:19  21   multiple derogatory terms that were used, correct?

11:46:23  22        A.    But with this one the -- like I said,

11:46:26  23   there could be a difference between repetitive and

*Velez - Davenport - 02/26/2020*

104

11:46:30  1  fixation, but with a single subject, the fixation

11:46:32  2  on the Nazi feminism with the lily white pussy

11:46:35  3  seemed repetitive to me at the time, that was my

11:46:38  4  perception, it was repetitive, single subject, and

11:46:39  5  same -- relating to the same thing over and over

11:46:41  6  and over and over.

11:46:44  7       Q.   So the single subject that Mr. Kistner

11:46:48  8  would have been focused on in your own words, what

11:46:52  9  would that have been?

11:46:53 10       A.   The -- again, it's in the 710, I don't

11:46:56 11  want to misspeak, I documented what was said, but

11:47:00 12  the fem -- from what I could recall the feminaziism

11:47:04 13  lily white pussies.

11:47:07 14       Q.   So would that be the topic or the

11:47:10 15  subject that he was focused on was the feminazis

11:47:15 16  lily white pussy?

11:47:16 17       A.   That would be the -- the topic, yes.

11:47:18 18       Q.   Okay.  Now, I see that another box has

11:47:38 19  been checked here.  Appearance ticket issued and

11:47:41 20  that box was checked yes, correct?

11:47:43 21       A.   Yes.

11:47:44 22       Q.   Okay.  So would that indicate that an

11:47:47 23  appearance ticket was issued before the 941 form

*Velez - Davenport - 02/26/2020*

105

| | | |
|---|---|---|
| 11:47:51 | 1 | was filled out? |
| 11:47:52 | 2 | A.   Yes. |
| 11:47:52 | 3 | Q.   Okay.  And who would that appearance |
| 11:47:55 | 4 | ticket have been issued to? |
| 11:47:56 | 5 | A.   Mr. Kistner. |
| 11:47:58 | 6 | Q.   Would you hand Mr. Kistner that |
| 11:48:01 | 7 | appearance ticket? |
| 11:48:02 | 8 | MS. HUGGINS:  Form. |
| 11:48:07 | 9 | THE WITNESS:  I don't recall if it was |
| 11:48:10 | 10 | handed to him, but an appearance ticket is given to |
| 11:48:16 | 11 | the individual. |
| 11:48:18 | 12 | BY MR. DAVENPORT: |
| 11:48:18 | 13 | Q.   Okay.  Do you know if Mr. Kistner was |
| 11:48:24 | 14 | handcuffed at the time that you filled out this 941 |
| 11:48:28 | 15 | form? |
| 11:48:28 | 16 | A.   I don't recall. |
| 11:48:29 | 17 | Q.   Would this 941 form have been filled |
| 11:48:33 | 18 | out prior to going to ECMC from central booking? |
| 11:48:36 | 19 | A.   It could have been filled out -- yeah, |
| 11:48:39 | 20 | it would have been filled out -- I'm sorry.  Can |
| 11:48:42 | 21 | you repeat that? |
| 11:48:43 | 22 | Q.   Sure.  Would this 941 form have been |
| 11:48:46 | 23 | filled out before arriving at ECMC from central |

| | | |
|---|---|---|
| 11:48:50 | 1 | booking? |
| 11:48:50 | 2 | A.    Yes. |
| 11:48:50 | 3 | Q.    Okay.   Do you recall when Mr. Kistner |
| 11:48:52 | 4 | was transported from central booking to ECMC, was |
| 11:48:56 | 5 | he handcuffed at the time? |
| 11:48:57 | 6 | A.    I just want to make sure, this -- this |
| 11:48:59 | 7 | would have been filled out before we got to ECMC is |
| 11:49:03 | 8 | what you were asking, correct? |
| 11:49:03 | 9 | Q.    Yes. |
| 11:49:04 | 10 | A.    Yes. |
| 11:49:04 | 11 | Q.    Okay.   So now my -- my second question |
| 11:49:07 | 12 | was, would Mr. Kistner have been handcuffed at the |
| 11:49:12 | 13 | time that he was transported from central booking |
| 11:49:12 | 14 | to ECMC? |
| 11:49:13 | 15 | A.    Yes. |
| 11:49:13 | 16 | Q.    Okay.   If an individual is handcuffed, |
| 11:49:17 | 17 | how are they issued their appearance ticket? |
| 11:49:20 | 18 | A.    At the time -- |
| 11:49:20 | 19 | MS. HUGGINS:   Form.   You can answer. |
| 11:49:21 | 20 | THE WITNESS:   -- they're issued their |
| 11:49:23 | 21 | appearance ticket while at central booking and it's |
| 11:49:26 | 22 | secured, so they have to sign it, I believe. |
| 11:49:28 | 23 | So they would be uncuffed to sign for their |

*Velez - Davenport - 02/26/2020*

107

11:49:32  1  paperwork, unless for some safety issue they may

11:49:35  2  not be and then that would be -- if they weren't

11:49:35  3  safe to be un-handcuffed, it would be documented,

11:49:38  4  it would be indicated that they for whatever reason

11:49:42  5  they could not be un-handcuffed to sign at the

11:49:45  6  time.

11:49:45  7       BY MR. DAVENPORT:

11:49:45  8       Q.   Okay.

11:49:46  9       A.   But I -- I haven't seen that happen.

11:49:47 10       Q.   Okay.  Now, after the individual signs

11:49:49 11  the appearance ticket, is the appearance ticket

11:49:54 12  kept by the officers or is the appearance ticket

11:49:58 13  given to someone else?  Where does the appearance

11:50:01 14  ticket -- I'm sorry, strike that.

11:50:02 15       After the appearance ticket is signed by the

11:50:05 16  individual who was previously in handcuffs, is that

11:50:08 17  individual put back into handcuffs?

11:50:13 18       A.   If they're going to remain in our

11:50:15 19  custody, yes.  Otherwise, if they're going to be

11:50:19 20  released, then we would walk them out.

11:50:21 21       Q.   If you were taking an individual back

11:50:24 22  to ECMC for a 941 evaluation, would they still be

11:50:28 23  in the custody of the police at that time?

11:50:29  1       A.    Yes.

11:50:30  2       Q.    So would that individual still be in

11:50:33  3   handcuffs then at that time?

11:50:34  4       A.    Yes.

11:50:35  5       Q.    Okay.  So an individual who is in

11:50:41  6   handcuffs and on his way to ECMC for a 941 form,

11:50:45  7   where does the appearances ticket -- who -- what do

11:50:47  8   you do with the appearance ticket after it's

11:50:49  9   signed?

11:50:49  10      A.    Like I said, usually we would give it

11:50:52  11  to the person.  I've had instances at times where

11:50:54  12  someone was handcuffed we'll take it until their

11:50:57  13  next destination and then we -- we can give them

11:51:00  14  their paperwork when they get there.

11:51:02  15      Q.    Okay.

11:51:03  16      A.    I don't recall in Mr. Kistner's

11:51:06  17  instance.

11:51:06  18      Q.    Sure.  So if that individual was being

11:51:09  19  taken to the triage at ECMC and that individual is

11:51:15  20  still in handcuffs at the triage, who would you

11:51:20  21  give that appearance ticket to?

11:51:21  22      MS. HUGGINS:   Form.

11:51:23  23      THE WITNESS:   In triage?

11:51:24  1          BY MR. DAVENPORT:

11:51:24  2          Q.    If the -- if the individual is in

11:51:27  3    triage in handcuffs, who would you give the

11:51:30  4    appearance ticket to?

11:51:31  5          A.    The individual may be in possession of

11:51:34  6    their appearance ticket, because it's a piece of

11:51:37  7    paper.  Or we wouldn't give it to anyone in triage.

11:51:40  8          Q.    Okay.  So you wouldn't give it to ECMC

11:51:42  9    staff?

11:51:43 10          A.    Not in triage.

11:51:44 11          Q.    Okay.  Would you give it to any ECMC

11:51:46 12    staff?

11:51:46 13          A.    If he was turned over to CPEP and we

11:51:50 14    still had -- we were in possession of any of his

11:51:52 15    property, we would give it to CPEP, whoever it was

11:51:54 16    who took him into that secure portion of -- of

11:51:56 17    their part of the hospital, we would give it to

11:51:59 18    that person.

11:51:59 19          We would give any property that we had

11:52:02 20    turned over that we were still in custody of, we

11:52:05 21    would give it to the CPEP staff when they took

11:52:08 22    Mr. Kistner into the secure part of their section.

11:52:10 23          Q.    Would you have to fill out any sort of

*Velez - Davenport - 02/26/2020*

110

| | | |
|---|---|---|
| 11:52:12 | 1 | a form for what sort of property was turned over |
| 11:52:15 | 2 | for that individual that was admitted to CPEP? |
| 11:52:18 | 3 | A.   No. |
| 11:52:19 | 4 | Q.   Okay.  Do you recall if any property |
| 11:52:24 | 5 | was given to the individual at ECMC that belonged |
| 11:52:28 | 6 | to Mr. Kistner before he was admitted to CPEP? |
| 11:52:31 | 7 | A.   I don't recall. |
| 11:52:37 | 8 | MR. DAVENPORT:  Okay.  You guys want to take |
| 11:52:39 | 9 | a quick five-minute break? |
| 11:52:41 | 10 | MS. HUGGINS:  Yeah, that's fine. |
| 11:52:41 | 11 | MR. DAVENPORT:  Okay. |
| 11:52:41 | 12 | (Discussion off the record at |
| 11:52:41 | 13 | 1152.) |
| 12:03:42 | 14 | (On the record at 1203.) |
| 12:03:42 | 15 | BY MR. DAVENPORT: |
| 12:03:47 | 16 | Q.   Now, Ms. Velez, turning your attention |
| 12:03:51 | 17 | again to Exhibit 6.  Now, on this 941 form it says, |
| 12:03:57 | 18 | is the responding officer CIT trained; do you see |
| 12:04:00 | 19 | where that is? |
| 12:04:01 | 20 | A.   Yes. |
| 12:04:01 | 21 | Q.   Why did you not check that box? |
| 12:04:04 | 22 | A.   I was not CIT trained at that time. |
| 12:04:07 | 23 | Q.   Okay.  Was Officer McDermott CIT |

*Velez - Davenport - 02/26/2020*

111

12:04:12  1  trained at that time?

12:04:12  2        A.    I don't know.

12:04:13  3        Q.    Okay.  What do you have to -- what sort

12:04:16  4  of training do you have to go through to become CIT

12:04:22  5  trained?

12:04:22  6        A.    Well, at this time when this box was

12:04:25  7  available, I wasn't -- I don't know, but now that I

12:04:27  8  am trained in a specifically titled class, CIT, I

12:04:31  9  know that you have to complete the 32 hours and

12:04:33  10 then you do a ride-along an additional eight hours.

12:04:37  11       I believe it's an additional eight hours,

12:04:37  12 I'm not -- I'm not -- excuse me, I'm not certain if

12:04:40  13 it's included in the 32 hours, but we do the

12:04:40  14 classroom time and then we do a ride-along with

12:04:43  15 crisis services.  So I know that is CIT trained.

12:04:48  16       Q.    Okay.  Is it as of 2019 that you are

12:04:53  17 now CIT trained?

12:04:53  18       A.    Yes.

12:04:53  19       Q.    Now, the next box says, does individual

12:04:56  20 have active CIT crisis plan; do you see where that

12:04:58  21 is?

12:04:58  22       A.    Yes.

12:04:59  23       Q.    And that box is also not checked?

*Velez - Davenport - 02/26/2020*

112

| | | |
|---|---|---|
| 12:05:01 | 1 | A.    Yes. |
| 12:05:01 | 2 | Q.    Have you ever checked that box before? |
| 12:05:03 | 3 | A.    No. |
| 12:05:04 | 4 | Q.    Okay.   What -- what sorts of -- strike |
| 12:05:08 | 5 | that. |
| 12:05:08 | 6 | What would a CIT crisis plan be? |
| 12:05:13 | 7 | A.    I'm not trained on a CIT crisis plan, |
| 12:05:18 | 8 | so I would have to ask either crisis services about |
| 12:05:21 | 9 | that individual if there is a plan in place, but I |
| 12:05:25 | 10 | have never checked that box. |
| 12:05:26 | 11 | Q.    Okay.   Is a CIT crisis plan required |
| 12:05:34 | 12 | before an individual goes to CPEP? |
| 12:05:38 | 13 | A.    Not that I'm aware of. |
| 12:05:40 | 14 | Q.    Is a CIT crisis plan required after an |
| 12:05:48 | 15 | individual leaves CPEP? |
| 12:05:49 | 16 | A.    I wouldn't know. |
| 12:05:50 | 17 | Q.    Okay.   That's not part of the crisis |
| 12:05:52 | 18 | intervention training that you received in 2019? |
| 12:05:52 | 19 | A.    No, not for the what happens in the |
| 12:05:54 | 20 | CPEP evaluation, no. |
| 12:05:56 | 21 | Q.    Okay.   Now, turning again to the verbal |
| 12:06:04 | 22 | and behavioral cue talking to self.   Now, did you |
| 12:06:10 | 23 | say that that was based on observations while |

*Velez - Davenport - 02/26/2020*

113

12:06:14  1    Mr. Kistner was in his room at ECMC?

12:06:16  2            A.    That I could recall, yes.

12:06:18  3            Q.    Okay.  Do you know if Mr. Kistner was

12:06:21  4    given any sort of a call button at ECMC?

12:06:26  5            A.    I -- I know typically beds are equipped

12:06:29  6    with them, but I don't know that he used one.

12:06:33  7            Q.    Okay.  Is it possible that Mr. Kistner

12:06:38  8    would have been speaking into the call button at

12:06:43  9    his bed at ECMC?

12:06:43  10           A.    It's possible that he did.  I'm not

12:06:47  11   certain.

12:06:47  12           Q.    Okay.  Did you ever specifically see

12:06:50  13   Mr. Kistner talking to himself where you were sure

12:06:55  14   that he wasn't speaking into the call button?

12:06:58  15           A.    Yes.

12:06:58  16           Q.    Okay.  Can you describe that?

12:06:59  17           A.    He was laying in his bed laying

12:07:03  18   straight talking out loud.

12:07:04  19           Q.    And it's impossible that he could have

12:07:08  20   been pressing the call button at the same time?

12:07:11  21           A.    He may have been.  He appeared to me at

12:07:15  22   the time to be talking to himself.

12:07:16  23           Q.    Okay.

*Velez - Davenport - 02/26/2020*

114

| | | |
|---|---|---|
| 12:07:16 | 1 | A.   Okay. |
| 12:07:16 | 2 | Q.   But you don't know if he was or wasn't |
| 12:07:19 | 3 | pressing the call button at that time? |
| 12:07:22 | 4 | A.   Correct, I don't recall. |
| 12:07:23 | 5 | Q.   Okay.  Now, you say in your statement |
| 12:07:25 | 6 | for justification for transport that the subject |
| 12:07:28 | 7 | did intentionally throw himself at the patrol |
| 12:07:31 | 8 | vehicle.  Was that what you believed based on what |
| 12:07:37 | 9 | you personally saw that day on January 1st of 2017? |
| 12:07:40 | 10 | A.   I did not personally see that. |
| 12:07:42 | 11 | Q.   Okay.  Did somebody tell you that |
| 12:07:46 | 12 | Mr. Kistner threw himself at a police vehicle? |
| 12:07:48 | 13 | A.   Yes. |
| 12:07:49 | 14 | Q.   And who told you that Mr. Kistner threw |
| 12:07:53 | 15 | himself at a patrol vehicle? |
| 12:07:55 | 16 | A.   Officer McDermott and Officer Schulz. |
| 12:07:57 | 17 | Q.   Okay.  Now, you also have checked, and |
| 12:08:06 | 18 | I'm -- I apologize that there's a hole punch that's |
| 12:08:11 | 19 | through it, there's a check and it looks like it |
| 12:08:15 | 20 | says places self in dangerous situations; do you |
| 12:08:18 | 21 | see where that is? |
| 12:08:18 | 22 | A.   Yes. |
| 12:08:19 | 23 | Q.   Now, would that have been based off of |

*Velez - Davenport - 02/26/2020*

115

12:08:23  1    your personal observations?

12:08:26  2          A.    This was what was told to me by two

12:08:31  3    separate officers.

12:08:32  4          Q.    Okay.  But that wasn't based on what

12:08:35  5    you personally observed, correct?

12:08:37  6          A.    Correct.

12:08:43  7          Q.    Now, based off of what you have now

12:08:48  8    seen on the video, do you still believe that

12:08:52  9    Mr. Kistner threw himself intentionally at the

12:08:56  10   patrol vehicle?

12:08:56  11         MS. HUGGINS:    Form.  You may answer.

12:08:58  12         THE WITNESS:    Can you repeat that?  I'm

12:08:58  13   sorry.

12:08:58  14         BY MR. DAVENPORT:

12:09:01  15         Q.    Based on what you saw from the video

12:09:03  16   surveillance that you watched last week, as

12:09:03  17   recently as last week, do you still believe that

12:09:07  18   Mr. Kistner intentionally threw himself at the

12:09:10  19   police vehicle?

12:09:11  20         MS. HUGGINS:    Form.  You may answer.

12:09:12  21         THE WITNESS:    The perspective of the video

12:09:16  22   and my perspective are different.  I was told

12:09:22  23   what -- what had happened.  And based on what I see

*Velez - Davenport - 02/26/2020*

116

| 12:09:26 | 1 | in the video it does appear that way. |
| 12:09:29 | 2 | BY MR. DAVENPORT: |
| 12:09:30 | 3 | Q. It appears that Mr. Kistner threw |
| 12:09:34 | 4 | himself intentionally at the police vehicle? |
| 12:09:37 | 5 | A. From my perspective of what I see in |
| 12:09:37 | 6 | the video, yes. |
| 12:09:38 | 7 | Q. Okay. So that's based on what you saw |
| 12:09:40 | 8 | in the video, then, correct? |
| 12:09:40 | 9 | A. From what I -- like I said, I had seen |
| 12:09:44 | 10 | the video after what was told me, so based on what |
| 12:09:47 | 11 | was told to me and what I see in the video |
| 12:09:51 | 12 | I -- that's still my -- my perspective of what I |
| 12:09:54 | 13 | see in the video. |
| 12:09:54 | 14 | Q. Okay. Excluding what was told to you, |
| 12:09:58 | 15 | based solely on what you see in the video, do you |
| 12:10:01 | 16 | believe that Mr. Kistner intentionally threw |
| 12:10:04 | 17 | himself at the police vehicle? |
| 12:10:05 | 18 | MS. HUGGINS: Form. |
| 12:10:07 | 19 | THE WITNESS: May I answer? |
| 12:10:08 | 20 | MS. HUGGINS: Yes, you may answer, sorry. |
| 12:10:11 | 21 | THE WITNESS: Yes. |
| 12:10:11 | 22 | BY MR. DAVENPORT: |
| 12:10:12 | 23 | Q. Okay. I just want to make sure. |

*Velez - Davenport - 02/26/2020*

117

| | | |
|---|---|---|
| 12:10:15 | 1 | Do you see at the bottom where it says |
| 12:10:17 | 2 | police prints in parentheses and then next to it it |
| 12:10:20 | 3 | says J. Velez? |
| 12:10:22 | 4 | A.   Yes. |
| 12:10:22 | 5 | Q.   Is that your signature? |
| 12:10:24 | 6 | A.   Yes, that's my name. |
| 12:10:26 | 7 | Q.   Okay.  Do you know if that statement is |
| 12:10:30 | 8 | made under penalties of perjury? |
| 12:10:35 | 9 | A.   What statement? |
| 12:10:37 | 10 | Q.   Your signature at the bottom, the |
| 12:10:41 | 11 | information that you give on this 941 form, do you |
| 12:10:44 | 12 | know if that is made under the penalties of |
| 12:10:47 | 13 | perjury? |
| 12:10:48 | 14 | MS. HUGGINS:  Form.  You may answer. |
| 12:10:50 | 15 | THE WITNESS:  I do not know if it's made |
| 12:10:53 | 16 | under penalty of perjury. |
| 12:10:55 | 17 | BY MR. DAVENPORT: |
| 12:10:56 | 18 | Q.   Okay.  Is that anywhere in the CIT |
| 12:10:58 | 19 | crisis training that you received, whether |
| 12:11:00 | 20 | the -- the information that you give on this form |
| 12:11:02 | 21 | is under the penalties of perjury? |
| 12:11:04 | 22 | A.   I don't recall. |
| 12:11:05 | 23 | Q.   Okay.  What about any other classes |

*Velez - Davenport - 02/26/2020*

118

12:11:09  1  that you took or any other training courses that

12:11:13  2  you received from the Buffalo Police Academy, did

12:11:15  3  they ever tell you if the information that you give

12:11:18  4  on a 941 form is given under the penalties of

12:11:22  5  perjury?

12:11:22  6      MS. HUGGINS:  Form.  You may answer.

12:11:24  7      THE WITNESS:  Not that I could recall.

12:11:25  8      MR. DAVENPORT:  Okay.  Can you please mark

12:11:46  9  this as Exhibit 25.

12:11:46 10  **The following was marked for Identification:**

         11  **EXH. 25           Dispatch Monitor Unit**

         12                     **History Report**

12:12:25 13  **BY MR. DAVENPORT:**

12:12:26 14      Q.   Thank you.  Now, I'm showing you,

12:12:28 15  Ms. Velez, what's been marked as Exhibit 25.  Do

12:12:31 16  you recognize this document?

12:12:34 17      A.   Yes.

12:12:34 18      Q.   And what do you recognize it to be?

12:12:37 19      A.   It's a call log.

12:12:38 20      Q.   Okay.  Is there another term that's

12:12:41 21  used for it?

12:12:42 22      A.   Dispatch monitor unit history report.

12:12:46 23      Q.   Okay.  What's the date for this

| | | |
|---|---|---|
| 12:12:48 | 1 | dispatch monitor? |
| 12:12:49 | 2 | A.   1/1 of 2017. |
| 12:12:51 | 3 | Q.   Okay.  And which officer does this |
| 12:12:55 | 4 | dispatch monitor correspond with? |
| 12:12:57 | 5 | A.   Myself. |
| 12:12:58 | 6 | Q.   Okay.  And is that your unit sign C242? |
| 12:13:05 | 7 | A.   For that specific date, yes, it was. |
| 12:13:07 | 8 | Q.   Okay.  Was that typically what your |
| 12:13:10 | 9 | call sign would be? |
| 12:13:11 | 10 | A.   No. |
| 12:13:11 | 11 | Q.   What was typically your call sign at |
| 12:13:15 | 12 | that time? |
| 12:13:15 | 13 | A.   C233. |
| 12:13:18 | 14 | Q.   Now, why did you have C242 instead of |
| 12:13:22 | 15 | C233 that day? |
| 12:13:24 | 16 | A.   Because it was our double-up day where |
| 12:13:27 | 17 | both like I explained earlier, the A wheel and the |
| 12:13:28 | 18 | B wheel, every two weeks there's a day where both |
| 12:13:33 | 19 | wheels work. |
| 12:13:33 | 20 | So the purpose is so the other side can get |
| 12:13:36 | 21 | training, so we alternate every other week so we |
| 12:13:38 | 22 | can get training, but this specific date was a |
| 12:13:40 | 23 | holiday.  There were a number of officers off, so |