*Velez - Davenport - 02/26/2020*

240

| | | |
|---|---|---|
| 14:19:05 | 1 | at times we have encounters people are yelling I |
| 14:19:10 | 2 | didn't do it, things like that, you're getting the |
| 14:19:12 | 3 | wrong person.  Clearly we need probable cause, we |
| 14:19:13 | 4 | have to have sufficient amount of evidence to make |
| 14:19:14 | 5 | an arrest, so at the time we believe we have -- we |
| 14:19:18 | 6 | need to make an arrest and they yell that out, but |
| 14:19:21 | 7 | as far as being formally accused of false arrest, |
| 14:19:24 | 8 | not that I could recall. |
| 14:19:26 | 9 |       Q.   I'm more so talking about informally. |
| 14:19:29 | 10 | During the actual arrest and investigation of that |
| 14:19:31 | 11 | person, you know, how often does it happen where, |
| 14:19:36 | 12 | you know, you're at the scene on that day arresting |
| 14:19:39 | 13 | somebody and that person accuses you of falsely |
| 14:19:42 | 14 | arresting them? |
| 14:19:43 | 15 |       MS. HUGGINS:  Form.  Asked and answered. |
| 14:19:46 | 16 |       THE WITNESS:  I -- I think I'm |
| 14:19:48 | 17 | misunderstanding.  It does happen often when people |
| 14:19:54 | 18 | yell out, not every single day or every single |
| 14:19:58 | 19 | arrest, but there are times when you arrest people |
| 14:20:01 | 20 | and they don't want to go to jail or they try to |
| 14:20:06 | 21 | deflect away and it's not me, you have the wrong |
| 14:20:07 | 22 | person, if that's what you're considering false |
| 14:20:08 | 23 | arrest.  I'm trying to understand. |

*Velez - Davenport - 02/26/2020*

241

| | | |
|---|---|---|
| 14:20:11 | 1 | BY MR. DAVENPORT: |
| 14:20:11 | 2 | Q.   Sure.   So those times where somebody |
| 14:20:18 | 3 | says that, you know, it wasn't me, do you ever ask |
| 14:20:22 | 4 | that person any follow-up questions why it could |
| 14:20:25 | 5 | have been somebody else? |
| 14:20:27 | 6 | A.   Well, at that -- |
| 14:20:27 | 7 | MS. HUGGINS:   Form. |
| 14:20:27 | 8 | THE WITNESS:   At that point when we put |
| 14:20:30 | 9 | somebody in handcuffs and we place them under |
| 14:20:32 | 10 | arrest, we have probable cause to believe that they |
| 14:20:35 | 11 | did it, that they're the ones who committed that |
| 14:20:38 | 12 | crime. |
| 14:20:39 | 13 | BY MR. DAVENPORT: |
| 14:20:39 | 14 | Q.   Okay.   Has it ever happened where you |
| 14:20:42 | 15 | believe that you had probable cause and then later |
| 14:20:44 | 16 | determined that you did not actually have probable |
| 14:20:45 | 17 | cause for the arrest? |
| 14:20:45 | 18 | A.   Not that I could recall. |
| 14:20:46 | 19 | Q.   Okay.   Now, it says that Mr. Kistner |
| 14:21:00 | 20 | said spontaneously to you and Ms. McDermott, if you |
| 14:21:05 | 21 | keep telling your lies so wildly, someone might |
| 14:21:08 | 22 | believe you, your story ain't going to fly, |
| 14:21:12 | 23 | internal affairs is going to eat your ass alive. |

*Velez - Davenport - 02/26/2020*

242

14:21:16  1          At any time did you and Ms. McDermott on the
14:21:18  2    day of the incident speak to each other about what
14:21:22  3    Mr. Kistner was referring to?
14:21:23  4          A.    Not that I could recall.
14:21:26  5          Q.    At any time that was not January 1st of
14:21:31  6    2017, did you and Ms. McDermott ever speak about
14:21:34  7    this incident involving Mr. Kistner on January 1st
14:21:38  8    of 2017?
14:21:38  9          A.    Yes.
14:21:39 10          Q.    Okay.  And when did you speak about it?
14:21:42 11          A.    We spoke when we received paperwork
14:21:45 12    about, you know, we're going through this.  And
14:21:50 13    then about scheduling, do you have to go in, you
14:21:54 14    know -- or, you know, as the process is going
14:21:55 15    along, we're new to the process, so when -- you
14:21:58 16    know, when are you going in, you know, just things
14:22:00 17    of that nature.
14:22:01 18          Q.    Would you and Ms. McDermott go
14:22:04 19    together?
14:22:04 20          A.    When?
14:22:05 21          Q.    Well, I'm sorry, let's -- what do you
14:22:08 22    refer -- what do you mean by when you say we are
14:22:10 23    going in for this process, when -- what does that

*Velez - Davenport - 02/26/2020*

243

14:22:14  1  refer to?

14:22:14  2        A.    To meet with our attorney.

14:22:16  3        Q.    Okay.  Would you and Ms. McDermott go

14:22:19  4  together?

14:22:19  5        MS. HUGGINS:  Form.

14:22:21  6        THE WITNESS:  I believe we may have

14:22:25  7  conferenced once or twice together.

14:22:26  8        BY MR. DAVENPORT:

14:22:26  9        Q.    Okay.

14:22:27 10        A.    I'm not certain.

14:22:28 11        Q.    Okay.  So when you guys are asking, are

14:22:32 12  you going in, it's not referring to, you know, a

14:22:35 13  carpooling situation or something like that, right?

14:22:38 14        A.    Correct.

14:22:38 15        Q.    Okay.  What is Ms. McDermott's current

14:22:47 16  roll in the Buffalo Police Department?

14:22:49 17        A.    She's a detective.

14:22:51 18        Q.    Is she a detective in the C District?

14:22:54 19        A.    No.

14:22:54 20        Q.    Okay.  Do you have any sort of a work

14:22:59 21  interaction with Ms. McDermott as a lieutenant of

14:23:02 22  the C District and her a detective in a separate

14:23:07 23  district?

*Velez - Davenport - 02/26/2020*

244

| | | |
|---|---|---|
| 14:23:08 | 1 | A.   I don't recall if we've had any cases |
| 14:23:10 | 2 | that overlapped in the district, not that I can |
| 14:23:14 | 3 | recall right now.  But if she would need |
| 14:23:18 | 4 | assistance, if one of her suspects were living in |
| 14:23:21 | 5 | my district, we may speak in regards to that, but |
| 14:23:25 | 6 | not that I could recall. |
| 14:23:25 | 7 | Q.   Okay.  Now, when you and Ms. McDermott |
| 14:23:28 | 8 | received the paperwork for this lawsuit, what did |
| 14:23:31 | 9 | you do next? |
| 14:23:35 | 10 | A.   I don't recall. |
| 14:23:37 | 11 | Q.   Did you speak with somebody in the |
| 14:23:40 | 12 | union about this lawsuit? |
| 14:23:42 | 13 | A.   No, not that I could recall. |
| 14:23:45 | 14 | Q.   Okay.  What did you do with that |
| 14:23:47 | 15 | paperwork? |
| 14:23:54 | 16 | A.   I did speak to the union.  I was |
| 14:23:57 | 17 | advised to take our paperwork up to corporation |
| 14:24:01 | 18 | counsel. |
| 14:24:01 | 19 | Q.   Okay.  Did you take that paperwork |
| 14:24:03 | 20 | personally? |
| 14:24:04 | 21 | A.   Yes. |
| 14:24:04 | 22 | Q.   Okay.  When you were handed that |
| 14:24:06 | 23 | paperwork, did you review the videos that were |

*Velez - Davenport - 02/26/2020*

245

| | | |
|---|---|---|
| 14:24:09 | 1 | enclosed? |
| 14:24:09 | 2 | A.    Yes. |
| 14:24:10 | 3 | Q.    Did you review those on your own or did |
| 14:24:14 | 4 | you review them with the union representative? |
| 14:24:17 | 5 | A.    On my own. |
| 14:24:18 | 6 | Q.    And that would have been when you |
| 14:24:20 | 7 | initially received the paperwork? |
| 14:24:22 | 8 | A.    Yes. |
| 14:24:23 | 9 | Q.    Okay.  Did you contact Ms. McDermott |
| 14:24:25 | 10 | after watching the video? |
| 14:24:29 | 11 | A.    I know I contacted her as soon as I |
| 14:24:32 | 12 | received the packet for this -- the -- I don't know |
| 14:24:37 | 13 | whatever you want to call it, when I was served the |
| 14:24:40 | 14 | paperwork.  I don't specifically remember calling |
| 14:24:43 | 15 | her after watching the video. |
| 14:24:47 | 16 | Q.    When you did contact Ms. McDermott or |
| 14:24:49 | 17 | spoke with Ms. McDermott, did she say that she also |
| 14:24:53 | 18 | had watched the video? |
| 14:24:57 | 19 | A.    I don't recall. |
| 14:25:00 | 20 | Q.    Okay.  Did you speak with either Carl |
| 14:25:03 | 21 | Schulz or Kyle Moriarity about the paperwork when |
| 14:25:08 | 22 | you received the complaint? |
| 14:25:09 | 23 | A.    Yes. |

*Velez - Davenport - 02/26/2020*

246

| | | |
|---|---|---|
| 14:25:09 | 1 | Q. Okay. At what point did you speak with |
| 14:25:14 | 2 | those individuals? |
| 14:25:15 | 3 | A. I believe it was the same day that we |
| 14:25:18 | 4 | were served. |
| 14:25:18 | 5 | Q. Okay. Did you contact all of them |
| 14:25:22 | 6 | individually? |
| 14:25:23 | 7 | A. Yes. |
| 14:25:24 | 8 | Q. What did you all say about the |
| 14:25:29 | 9 | complaint? |
| 14:25:29 | 10 | MS. HUGGINS: Form. |
| 14:25:30 | 11 | THE WITNESS: I just -- it was so long ago. |
| 14:25:33 | 12 | I vaguely remember just saying, hey, I was just |
| 14:25:37 | 13 | served with this lawsuit. I don't know if one is |
| 14:25:40 | 14 | coming to you, but we were all there for the |
| 14:25:40 | 15 | incident. |
| 14:25:43 | 16 | You know, let me know if, you know, |
| 14:25:45 | 17 | you -- you get paperwork as well. And then I |
| 14:25:47 | 18 | remember them all responding I got -- I received |
| 14:25:49 | 19 | paperwork as well. |
| 14:25:50 | 20 | Q. Okay. Was that a phone conversation? |
| 14:25:52 | 21 | A. Yes. |
| 14:25:52 | 22 | Q. Okay. No text messages? |
| 14:25:55 | 23 | A. No. |

*Velez - Davenport - 02/26/2020*

247

| | | |
|---|---|---|
| 14:25:57 | 1 | Q.   Okay.  With Ms. McDermott did you talk |
| 14:26:00 | 2 | about any of the contents of the complaint? |
| 14:26:02 | 3 | A.   Not that I could recall. |
| 14:26:04 | 4 | Q.   Any of the specific allegations that |
| 14:26:06 | 5 | were made? |
| 14:26:06 | 6 | A.   Not that I could recall. |
| 14:26:08 | 7 | Q.   Okay.  Do you know what the disposition |
| 14:26:13 | 8 | was of Mr. Kistner's criminal charges? |
| 14:26:16 | 9 | A.   No. |
| 14:26:16 | 10 | Q.   As you sit here today, you do not know? |
| 14:26:19 | 11 | A.   Well, I sat in for Officer McDermott's |
| 14:26:23 | 12 | deposition, I learned that day what had happened, |
| 14:26:26 | 13 | but at the time up until last week I had no idea. |
| 14:26:29 | 14 | Q.   Okay.  After receiving that initial |
| 14:26:32 | 15 | paperwork and aside from contacting Ms. McDermott |
| 14:26:36 | 16 | about whether you would be going to go speak with |
| 14:26:39 | 17 | your attorney, have you had any other conversations |
| 14:26:43 | 18 | with any of the other defendants? |
| 14:26:45 | 19 | MS. HUGGINS:  Form. |
| 14:26:45 | 20 | BY MR. DAVENPORT: |
| 14:26:46 | 21 | Q.   Outside of the presence of your |
| 14:26:47 | 22 | attorney? |
| 14:26:47 | 23 | A.   In regards -- |

*Velez - Davenport - 02/26/2020*

248

14:26:48  1          MS. HUGGINS:  Same form objection.  You can

14:26:51  2   answer.

14:26:51  3          THE WITNESS:  I'm sorry.  Can you repeat

14:26:53  4   that again?

14:26:53  5          BY MR. DAVENPORT:

14:26:54  6      Q.    Aside from conversations with the other

14:26:57  7   defendants the day that you received the paperwork

14:26:59  8   and aside from conversations that you had with

14:27:03  9   Ms. McDermott about times that you would have been

14:27:06 10   going to go meet with your attorney, have you had

14:27:09 11   any other conversations with any of the other

14:27:11 12   defendants who are named in this lawsuit?

14:27:13 13      A.    Regarding in general or regarding?

14:27:17 14      Q.    Regarding this complaint and lawsuit

14:27:19 15   specifically.

14:27:20 16      A.    Again, just with the scheduling.

14:27:22 17      Q.    Okay.  Are you aware that there was a

14:27:27 18   news report that was done on this incident?

14:27:28 19      A.    Yes.

14:27:29 20      Q.    Okay.  Did you contact any of the

14:27:31 21   officers to discuss that news report?

14:27:33 22      A.    To discuss it, no.

14:27:40 23      Q.    Okay.  Now, is there a signature

*Velez - Davenport - 02/26/2020*

249

| | | |
|---|---|---|
| 14:27:45 | 1 | page for this 710.30 form? |
| 14:27:48 | 2 | A.    No. |
| 14:27:49 | 3 | Q.    Okay.  So officers aren't required to |
| 14:27:52 | 4 | sign off on these statements that are authored? |
| 14:27:58 | 5 | A.    Excuse me.  Can you repeat that? |
| 14:27:59 | 6 | Q.    Officers aren't required to sign off on |
| 14:28:01 | 7 | a 710.30 form? |
| 14:28:01 | 8 | A.    No. |
| 14:28:02 | 9 | Q.    Okay.  Did you ever receive any |
| 14:28:05 | 10 | training on how to fill out a 710.30 form? |
| 14:28:08 | 11 | A.    In the academy. |
| 14:28:09 | 12 | Q.    Which academy, the Buffalo? |
| 14:28:11 | 13 | A.    The Erie County -- |
| 14:28:13 | 14 | Q.    Okay. |
| 14:28:13 | 15 | A.    -- training academy. |
| 14:28:15 | 16 | Q.    And never with the Buffalo Police |
| 14:28:17 | 17 | Department? |
| 14:28:17 | 18 | A.    Correct. |
| 14:28:19 | 19 | Q.    Okay. |
| 14:28:19 | 20 | A.    That I can recall. |
| 14:28:20 | 21 | Q.    Okay. |
| 14:28:31 | 22 | MR. DAVENPORT:  Can we mark this as |
| 14:28:34 | 23 | Exhibit 26. |

14:28:34  1  The following was marked for Identification:

       2    EXH. 26              Arresting Report

14:29:09  3        BY MR. DAVENPORT:

14:29:10  4        Q.   I'm going to show you what's been

14:29:13  5  marked as Exhibit 26.  Do you recognize that

14:29:18  6  document?

14:29:18  7        A.   Yes.

14:29:19  8        Q.   And what do you recognize it to be?

14:29:21  9        A.   An arrest booking report.

14:29:23 10        Q.   Okay.  Who would have created the

14:29:25 11  arresting or booking report?

14:29:28 12        A.   I'm not certain if this is the report

14:29:30 13  technician or the cellblock attendant enters the

14:29:36 14  information for it.

14:29:36 15        Q.   But this would have been a document

14:29:40 16  that's created by somebody at central booking?

14:29:42 17        A.   Correct.

14:29:43 18        MS. HUGGINS:   Form.

14:29:43 19        BY MR. DAVENPORT:

14:29:44 20        Q.   Okay.

14:29:45 21        A.   I believe so.

14:29:45 22        Q.   Do you know an individual named

14:29:48 23  Christine Young?

*Velez - Davenport - 02/26/2020*

251

| | | |
|---|---|---|
| 14:29:49 | 1 | A. No. |
| 14:29:51 | 2 | Q. Is it possible that she was the report |
| 14:29:53 | 3 | technician at central booking on the day of the |
| 14:29:58 | 4 | incident? |
| 14:29:58 | 5 | A. I don't recognize that name at all. |
| 14:30:01 | 6 | Q. Okay. |
| 14:30:02 | 7 | A. She may be. I don't know who she is. |
| 14:30:04 | 8 | Q. Okay. You haven't come across her at |
| 14:30:08 | 9 | any point during your career? |
| 14:30:09 | 10 | A. Again, I don't recognize the name and I |
| 14:30:09 | 11 | can't put a face to it. So I may have, I'm just |
| 14:30:13 | 12 | not certain who that is right now. |
| 14:30:13 | 13 | Q. Okay. Now, when would this form have |
| 14:30:20 | 14 | been given to you? |
| 14:30:22 | 15 | MS. HUGGINS: Form. |
| 14:30:22 | 16 | THE WITNESS: I don't get this form. |
| 14:30:24 | 17 | BY MR. DAVENPORT: |
| 14:30:24 | 18 | Q. Okay. Who does central booking give |
| 14:30:30 | 19 | this form to? |
| 14:30:32 | 20 | A. I don't work down in central booking, |
| 14:30:36 | 21 | I'm not certain what their policies and procedures |
| 14:30:38 | 22 | are. |
| 14:30:52 | 23 | MR. DAVENPORT: Okay. Can I mark this as |

14:30:54  1  Exhibit 27.

14:30:54  2  **The following was marked for Identification:**

3     **EXH. 27              Buffalo Police Department**

4                              **Prisoner Property Receipt**

14:31:28  5          BY MR. DAVENPORT:

14:31:29  6          Q.   So I'm going to show you what's been

14:31:32  7  marked as Exhibit 27.  Do you recognize this

14:31:34  8  document?

14:31:36  9          A.   Yes.

14:31:36 10          Q.   Okay.  What do you recognize that to

14:31:38 11  be?

14:31:38 12          A.   A prisoner property receipt.

14:31:41 13          Q.   Okay.  Now, do you see underneath

14:31:43 14  property list where it says no property taken,

14:31:46 15  dash, appearance ticket?

14:31:47 16          A.   Yes.

14:31:48 17          Q.   Now, if it says, dash, appearance

14:31:53 18  ticket, does that mean he is being given an

14:31:56 19  appearance ticket?

14:31:59 20          A.   I don't recall this -- this specific

14:32:01 21  sheet, so I don't know what the -- and we don't

14:32:05 22  create this, again, so I don't know what the report

14:32:08 23  technician who put this on here why they did that,

*Velez - Davenport - 02/26/2020*

253

14:32:13  1  I don't.

14:32:13  2          Q.   Okay.  All right.  So do you see where

14:32:17  3  it says prisoner signature and then it says CL and

14:32:20  4  it's circled?

14:32:21  5          A.   Uh-huh.

14:32:22  6          Q.   Do you know what that's referring to?

14:32:28  7          MS. HUGGINS:  You have to say yes or no.

14:32:30  8  She can't record a uh-huh.

14:32:30  9          THE WITNESS:  Oh, no, I'm thinking.  I'm

14:32:30  10  sorry.

14:32:35  11         MS. HUGGINS:  Yeah, no, the last question.

14:32:36  12         THE WITNESS:  Oh, I'm sorry, what was the

14:32:39  13  last question.

14:32:39  14         MS. HUGGINS:  Just so it's clearly on the

14:32:41  15  record.

14:32:41  16         THE WITNESS:  Can you repeat what the last

14:32:44  17  question was?

14:32:44  18         BY MR. DAVENPORT:

14:32:45  19         Q.   Yeah, sure.  So do you see prisoner

14:32:48  20  signature in the bottom left corner?

14:32:50  21         A.   Yes.

14:32:50  22         Q.   Okay.  Do you see where it says CL with

14:32:53  23  a circle?

*Velez - Davenport - 02/26/2020*

254

14:32:53   1          A.    Yes.

14:32:54   2          Q.    Do you know what that's referring to?

14:32:58   3          A.    As I said earlier, it could possibly

14:33:02   4    mean that he was cuffed for the signature -- or

14:33:06   5    I -- honestly, I don't know.

14:33:06   6          Q.    Okay.  Do you see where it says

14:33:08   7    property received time 1600?

14:33:11   8          A.    Yes.

14:33:12   9          Q.    Now, does that mean that he was issued

14:33:16  10    an appearance ticket at 1600?

14:33:22  11          A.    Again, I didn't write this time on

14:33:25  12    here.  I don't know exactly what -- it says

14:33:28  13    property received at 1600.

14:33:30  14          Q.    So I understand that you've never

14:33:32  15    created one of these documents, but have you ever

14:33:35  16    seen one of them before?

14:33:36  17          A.    Not the typed.

14:33:38  18          Q.    Okay.  How does it typically appear to

14:33:41  19    you, then?

14:33:41  20          A.    Written.

14:33:43  21          Q.    Okay.  And who handwrites that?

14:33:43  22          A.    The report technician.

14:33:45  23          Q.    And have you ever been handed a

*Velez - Davenport - 02/26/2020*

255

14:33:46   1    handwritten property receipt form before?

14:33:48   2         A.    We give it to the defendant.

14:33:50   3         Q.    You give it to the defendant?

14:33:52   4         A.    Correct, they give it to us and we give

14:33:55   5    it to the defendant and they take it back with

14:33:56   6    them.  It stays with them the whole time, because

14:34:00   7    that's how they get their property back.

14:34:00   8         Q.    Okay.  So that would have been

14:34:01   9    something that would have been given to Mr. Kistner

14:34:01  10    with his appearance ticket?

14:34:03  11         A.    Correct.

14:34:04  12         Q.    Okay.  Are there any --

14:34:06  13         A.    If one was created for him, because,

14:34:09  14    like I said, I don't know what this is.

14:34:11  15         Q.    Are there any other documents that an

14:34:14  16    individual who's receiving an appearance ticket

14:34:14  17    would receive besides a prisoner's property

14:34:19  18    receipt?

14:34:19  19         MS. HUGGINS:   Form.  You may answer.

14:34:20  20         THE WITNESS:   Not that I could recall.

14:34:23  21         BY MR. DAVENPORT:

14:34:23  22         Q.    Okay.  I'm going to show you what's

14:34:38  23    been marked as Exhibit 15.  Do you recognize that

14:34:46  1    document?

14:34:46  2         A.    Yes.

14:34:47  3         Q.    Okay.   What do you recognize that to

14:34:49  4    be?

14:34:49  5         A.    The arrest form.

14:34:50  6         Q.    Okay.   And that was the P163 that you

14:34:54  7    referred to before?

14:34:55  8         A.    Yes.

14:34:56  9         Q.    Okay.   Is this the handwritten form

14:35:01 10    that would be transferred into a 1375 report?

14:35:06 11         A.    No.

14:35:06 12         Q.    Okay.   So those are different?

14:35:08 13         A.    Yes.

14:35:09 14         Q.    Is the P163 changed into an electronic

14:35:15 15    form?

14:35:17 16         A.    I'm not certain.

14:35:19 17         Q.    Okay.   Who would fill out the

14:35:23 18    handwritten P163 form?

14:35:26 19         A.    The arresting officer.

14:35:27 20         Q.    Okay.   So that would have been

14:35:30 21    Ms. McDermott?

14:35:30 22         A.    Correct.

14:35:30 23         Q.    Okay.   Now, where it says the

*Velez - Davenport - 02/26/2020*

257

14:35:36  1    processing report technician, would that be the

14:35:40  2    person at central booking?

14:35:44  3          A.    Yes.

14:35:45  4          Q.    Okay.  Do you know whose signature that

14:35:50  5    is?

14:35:50  6          A.    I do not.

14:35:51  7          Q.    Okay.  Now, would this be a form that

14:35:58  8    either you or Ms. McDermott would have filled out

14:36:01  9    at central booking?

14:36:03 10          A.    It could have been filled out at

14:36:05 11    central booking.

14:36:06 12          Q.    Okay.  Would it be handed to the report

14:36:09 13    technician at central booking?

14:36:11 14          A.    Yes.

14:36:12 15          Q.    Okay.  Would this form ever be handed

14:36:14 16    to Mr. Kistner?

14:36:16 17          A.    No.

14:36:16 18          Q.    Okay.  So he would never have a chance

14:36:20 19    to see this document on the day of his arrest?

14:36:22 20          A.    No.

14:36:32 21          Q.    Now, where it says the complainant's

14:36:35 22    name is SONY, what does that refer to?

14:36:40 23          A.    State of New -- State of New York.

14:36:41  1         Q.   Okay.  Why wouldn't Ms. McDermott's

14:36:45  2    name be listed as the complainant?

14:36:48  3         A.   It's just a procedural thing we do.  We

14:36:51  4    work on -- our charges are filed on behalf of the

14:36:54  5    State of New York.

14:36:54  6         Q.   Okay.  Where it says use of force,

14:37:01  7    that's checked no, correct?

14:37:02  8         A.   Yes.

14:37:04  9         Q.   So would striking an individual with a

14:37:10  10   car be considered a use of force?

14:37:13  11        MS. HUGGINS:  Form.  You can answer.

14:37:14  12        THE WITNESS:  That would depend on the

14:37:18  13   circumstance in which a vehicle struck an

14:37:18  14   individual.

14:37:21  15        BY MR. DAVENPORT:

14:37:21  16        Q.   Is it possible?

14:37:23  17        A.   Pardon?

14:37:23  18        Q.   Is it possible that a use of force

14:37:27  19   could include striking an individual with a police

14:37:29  20   car?

14:37:29  21        MS. HUGGINS:  Form.  You can answer.

14:37:30  22        THE WITNESS:  If a person was intentionally

14:37:31  23   struck with a police vehicle, yes.

14:37:33  1          BY MR. DAVENPORT:

14:37:33  2          Q.    What if that individual was negligently

14:37:38  3     struck by a police vehicle?

14:37:39  4          MS. HUGGINS:    Form.

14:37:39  5          THE WITNESS:    Then that wouldn't be

14:37:41  6     considered -- I don't believe that would be

14:37:42  7     considered a use of force.

14:37:44  8          MR. DAVENPORT:    Okay.   I'm going to show you

14:38:16  9     what's been marked as Exhibit 13.   And then I would

14:38:24 10     like to mark this as Exhibit 28.

14:38:24 11     **The following was marked for Identification:**

         12     **EXH. 28              Department of Law Letter**

         13     **                     dated 12/17/19**

14:39:10 14          BY MR. DAVENPORT:

14:39:10 15          Q.    I'm going to also show you what's been

14:39:14 16     marked as Exhibit 28.   Now, on Exhibit 13 would you

14:39:18 17     please turn to page 13?

14:39:20 18          Now, question 19 asks identify the badge or

14:39:37 19     identification number, rank, or title, and height

14:39:41 20     and weight of all defendants shown in the video

14:39:44 21     attached as Exhibit A to the complaint as of

14:39:48 22     January 1st, 2017.

14:39:51 23          Now, I would also like you to turn to

14:39:56   1    page 16 on Exhibit 13.   What is the date that's

14:40:07   2    listed on page 16?

14:40:09   3         A.    December 12th, 2018.

14:40:12   4         Q.    Okay.   I want to now direct your

14:40:15   5    attention to Exhibit 28.   Now, in response to the

14:40:21   6    question that was posed on page 13 of Exhibit 13

14:40:26   7    it's the same question, identify the badge or

14:40:29   8    identification number, rank, or title, and height

14:40:33   9    and weight of all defendants shown in the video

14:40:36  10    attached as Exhibit A to the complaint as of

14:40:39  11    January 1st of 2017.

14:40:40  12         Now, the second to last sentence says that

14:40:44  13    Jenny Velez was promoted to lieutenant on July 2nd

14:40:49  14    of 2018.   Now, I want you to again look at

14:40:53  15    response 19 on Exhibit 13 and tell me do you see

14:40:57  16    that information anywhere in response to

14:41:01  17    interrogatory 19?

14:41:02  18         MS. HUGGINS:   Form.

14:41:07  19         BY MR. DAVENPORT:

14:41:08  20         Q.    Exhibit 13, page 19, do you see Jenny

14:41:12  21    Velez?

14:41:13  22         A.    Page 13, 19.   Okay.   Slow it down for

14:41:14  23    me, because this is a lot of words everywhere.

*Velez - Davenport - 02/26/2020*

261

| | | |
|---|---|---|
| 14:41:17 | 1 | So page 13, 19, I see this.  Now, what are |
| 14:41:23 | 2 | you asking me in regards to the other page? |
| 14:41:25 | 3 | Q.  Okay.  I want you to look on Exhibit 28 |
| 14:41:30 | 4 | and tell me do you see the line that says Jenny |
| 14:41:32 | 5 | Velez was promoted to lieutenant on July 2nd of |
| 14:41:36 | 6 | 2018? |
| 14:41:36 | 7 | A.  Yes. |
| 14:41:36 | 8 | Q.  Do you see that? |
| 14:41:37 | 9 | A.  Yes. |
| 14:41:37 | 10 | Q.  Okay.  Now, I want you to look at |
| 14:41:41 | 11 | Exhibit 13, response number 19. |
| 14:41:43 | 12 | A.  Uh-huh, yes. |
| 14:41:44 | 13 | Q.  And I want you to tell me do you see |
| 14:41:47 | 14 | that information as it's written on Exhibit 28 |
| 14:41:49 | 15 | anywhere on Exhibit 13? |
| 14:41:52 | 16 | MS. HUGGINS:  Form. |
| 14:41:55 | 17 | THE WITNESS:  The line that says Jenny Velez |
| 14:41:57 | 18 | was promoted to lieutenant on July 2nd, 2018 is not |
| 14:42:01 | 19 | on page 13. |
| 14:42:02 | 20 | BY MR. DAVENPORT: |
| 14:42:03 | 21 | Q.  Thank you.  Now, turning back towards |
| 14:42:06 | 22 | Exhibit 28, what is the date of this letter? |
| 14:42:12 | 23 | A.  December 17th, 2019. |

*Velez - Davenport - 02/26/2020*

262

| | | |
|---|---|---|
| 14:42:15 | 1 | Q.   And as you stated before, the date on |
| 14:42:19 | 2 | Exhibit 13 is December 12th of 2018. |
| 14:42:26 | 3 | A.   Yes. |
| 14:42:26 | 4 | Q.   So this correction would have been made |
| 14:42:30 | 5 | more than a year after Exhibit 13 had been put |
| 14:42:33 | 6 | together, correct? |
| 14:42:35 | 7 | MS. HUGGINS:  Form. |
| 14:42:38 | 8 | THE WITNESS:  This is dated December 12th, |
| 14:42:41 | 9 | 2018.  And this one is dated December 17th, 2019. |
| 14:42:45 | 10 | BY MR. DAVENPORT: |
| 14:42:45 | 11 | Q.   So you agree that would have been more |
| 14:42:45 | 12 | than a year? |
| 14:42:45 | 13 | MS. HUGGINS:  Form. |
| 14:42:47 | 14 | THE WITNESS:  The difference between the two |
| 14:42:48 | 15 | dates is more than a year. |
| 14:42:51 | 16 | BY MR. DAVENPORT: |
| 14:42:51 | 17 | Q.   Okay.  So I guess my question is, if |
| 14:42:54 | 18 | you were promoted on July 2nd of 2018, which is |
| 14:42:57 | 19 | before the date of Exhibit 13, which is |
| 14:43:00 | 20 | December 12th of 2018, why did you not include that |
| 14:43:04 | 21 | information for the question that was posed to you |
| 14:43:09 | 22 | in this interrogatory on Exhibit 13? |
| 14:43:12 | 23 | MS. HUGGINS:  Form. |

*Velez - Davenport - 02/26/2020*

263

14:43:13   1        THE WITNESS:  I don't understand the

14:43:14   2    question.

14:43:14   3        BY MR. DAVENPORT:

14:43:15   4        Q.   You were promoted on July 2nd of 2018,

14:43:18   5    correct?

14:43:18   6        A.   Yes.

14:43:18   7        Q.   Okay.  And the date of Exhibit 13 is

14:43:22   8    December 12th of 2018?

14:43:25   9        A.   Yes.

14:43:25  10        Q.   And December 12th, 2018 would have been

14:43:28  11    after you were promoted on July 2nd of 2018?

14:43:31  12        MS. HUGGINS:  Form.

14:43:32  13        THE WITNESS:  I was promoted after.  Yeah, I

14:43:37  14    was -- this was done after I was promoted.

14:43:39  15        BY MR. DAVENPORT:

14:43:39  16        Q.   Okay.

14:43:40  17        A.   It's dated after I was promoted anyway.

14:43:42  18        Q.   So why on the document that was created

14:43:45  19    or dated on December 12th of 2018 was the

14:43:48  20    information that's on Exhibit 28 not included in

14:43:52  21    the response on Exhibit 13?

14:43:55  22        MS. HUGGINS:  Form.

14:43:56  23        THE WITNESS:  It -- it seems to be an error,

| | | |
|---|---|---|
| 14:43:58 | 1 | because on January 1, 2017 I was a patrol officer, |
| 14:44:01 | 2 | not a lieutenant.  So it appears that this is just |
| 14:44:07 | 3 | articulating that at the time of the incident I was |
| 14:44:07 | 4 | a patrol officer, not a lieutenant. |
| 14:44:08 | 5 | So this was entered in error, so it's just |
| 14:44:11 | 6 | correcting the fact that I was promoted to |
| 14:44:14 | 7 | lieutenant after the date of the incident after 1/1 |
| 14:44:17 | 8 | of 7 -- 2017. |
| 14:44:17 | 9 | BY MR. DAVENPORT: |
| 14:44:17 | 10 | Q.    Did you review the responses on |
| 14:44:20 | 11 | Exhibit 13 before they were signed by your |
| 14:44:22 | 12 | attorney? |
| 14:44:23 | 13 | A.    I believe I did read this. |
| 14:44:26 | 14 | Q.    Did you review it before December 12th |
| 14:44:29 | 15 | of 2018? |
| 14:44:29 | 16 | MS. HUGGINS:    Form. |
| 14:44:31 | 17 | THE WITNESS:    I don't recall the exact date. |
| 14:44:34 | 18 | There's a lot of writing, it may have been an |
| 14:44:37 | 19 | oversight.  I'm not certain. |
| 14:44:38 | 20 | BY MR. DAVENPORT: |
| 14:44:39 | 21 | Q.    Okay.  At any point were you asked for |
| 14:44:43 | 22 | a verification for any sort of documents, were you |
| 14:44:50 | 23 | ever asked for a verification? |

| | | |
|---|---|---|
| 14:44:52 | 1 | MS. HUGGINS:  Form. |
| 14:44:52 | 2 | THE WITNESS:  That's vague.  What kind of |
| 14:44:55 | 3 | document? |
| 14:44:55 | 4 | BY MR. DAVENPORT: |
| 14:44:56 | 5 | Q.  Here, I'll show you. |
| 14:45:08 | 6 | MS. HUGGINS:  She has it in front of her |
| 14:45:12 | 7 | right now. |
| 14:45:13 | 8 | MR. DAVENPORT:  No, she doesn't have her |
| 14:45:16 | 9 | verification. |
| 14:45:16 | 10 | MS. HUGGINS:  Oh, I'm sorry, I thought you |
| 14:45:19 | 11 | were referring to the interrogator. |
| 14:45:21 | 12 | MR. DAVENPORT:  Can I have this marked as |
| 14:45:23 | 13 | Exhibit 29. |
| 14:45:23 | 14 | **The following was marked for Identification:** |
| | 15 | **EXH. 29              Verification Document** |
| 14:45:30 | 16 | MR. DAVENPORT:  And, also, it's 2:45, I |
| 14:45:32 | 17 | don't know if you guys want to take a break or not. |
| 14:45:34 | 18 | MS. HUGGINS:  Let's do that. |
| 14:45:34 | 19 | (Discussion off the record at |
| 14:45:34 | 20 | 1445.) |
| 15:07:47 | 21 | (On the record at 1507.) |
| 15:07:47 | 22 | BY MR. DAVENPORT: |
| 15:07:49 | 23 | Q.  So, Ms. Velez, we were reviewing |

*Velez - Davenport - 02/26/2020*

266

| | | |
|---|---|---|
| 15:07:53 | 1 | Exhibit 28 and Exhibit 13.  I will now show you |
| 15:07:59 | 2 | what has been marked as Exhibit 29.  Do you |
| 15:08:06 | 3 | recognize that document? |
| 15:08:07 | 4 | **A.**   Yes. |
| 15:08:08 | 5 | **Q.**   And what do you recognize it to be? |
| 15:08:10 | 6 | **A.**   I believe it's the back page to this |
| 15:08:14 | 7 | when I signed that I reviewed this. |
| 15:08:15 | 8 | **Q.**   Okay.  Do you know approximately when |
| 15:08:17 | 9 | you signed this document? |
| 15:08:18 | 10 | **MS. HUGGINS:**   Form. |
| 15:08:19 | 11 | **THE WITNESS:**   No. |
| 15:08:20 | 12 | **BY MR. DAVENPORT:** |
| 15:08:20 | 13 | **Q.**   Okay.  Would it have been |
| 15:08:23 | 14 | in -- recently? |
| 15:08:25 | 15 | **A.**   I don't recall. |
| 15:08:27 | 16 | **Q.**   Would it have been within the last |
| 15:08:29 | 17 | year? |
| 15:08:29 | 18 | **A.**   Yes. |
| 15:08:30 | 19 | **Q.**   Okay. |
| 15:08:31 | 20 | **A.**   I believe so.  I -- I recall going |
| 15:08:36 | 21 | through this page by page.  I recall doing this, I |
| 15:08:40 | 22 | just don't recall when. |
| 15:08:41 | 23 | **Q.**   Okay.  Did you sign this document at |

| | |
|---|---|
| 15:08:45 1 | the same day that you went through this Exhibit 13 |
| 15:08:47 2 | page by page? |
| 15:08:48 3 | MS. HUGGINS: Form. Well, I'm going to |
| 15:08:52 4 | object, because I think that you're very close if |
| 15:08:56 5 | not over the line of attorney/client. |
| 15:08:58 6 | Without revealing discussions that you and I |
| 15:09:01 7 | may have had, have you met with me to discuss the |
| 15:09:03 8 | incident that is the subject of this lawsuit? |
| 15:09:06 9 | MR. DAVENPORT: Well, no, that wasn't my |
| 15:09:08 10 | question. |
| 15:09:08 11 | MS. HUGGINS: No. |
| 15:09:08 12 | MR. DAVENPORT: You're mischaracterizing my |
| 15:09:11 13 | question entirely. I just asked her did you sign |
| 15:09:14 14 | this document on the same day that you went through |
| 15:09:17 15 | Exhibit 13. |
| 15:09:18 16 | MS. HUGGINS: Form. I -- I believe that you |
| 15:09:22 17 | may have even crossed the line into attorney/client |
| 15:09:26 18 | privilege. If not, you are up -- up against that |
| 15:09:27 19 | line right now. |
| 15:09:28 20 | MR. DAVENPORT: Okay. |
| 15:09:29 21 | MS. HUGGINS: What -- what was I going to |
| 15:09:33 22 | inquire of my client without revealing or waiving |
| 15:09:39 23 | that privilege is if legal documents were prepared, |

15:09:44  1   if she's had conversations with me, and if she has

15:09:48  2   reviewed those documents and signed off on them.

15:09:52  3        I believe that's what you're trying to do,

15:09:54  4   but at -- at this point you have gotten to a point

15:09:54  5   where you're asking about when certain things were

15:09:58  6   done, who clearly she has not signed her name to,

15:10:01  7   which would be Exhibit 28, and that is a document

15:10:03  8   that I signed my name to -- to as an attorney in

15:10:05  9   this matter.

15:10:06 10        And I think that you veered towards

15:10:09 11   attorney/client privilege in a way that is not

15:10:12 12   necessary and not discoverable in this matter.

15:10:16 13        MR. DAVENPORT:  Are you going to direct her

15:10:18 14   to not answer the question?

15:10:20 15        MS. HUGGINS:  I think what you're trying to

15:10:21 16   ask is did you look at -- did you read a document

15:10:23 17   before you signed a verification page.

15:10:25 18        That is fine.  I'm perfectly okay with that,

15:10:28 19   but I'm not okay with you continuing to ask

15:10:32 20   questions about meeting about the content of

15:10:35 21   documents when an attorney is involved and present

15:10:35 22   for it.

15:10:39 23        MR. DAVENPORT:  Didn't ask about that.  I

*Velez - Davenport - 02/26/2020*

269

15:10:40    1    asked did she --

15:10:40    2          MS. HUGGINS:   I respectfully disagree and I

15:10:43    3    think the record will reflect what you've asked.

15:10:45    4    And -- and so at this point I'm -- I'll -- I'm

15:10:50    5    willing to allow her to ask questions about the

15:10:50    6    verification page and what she reviewed before she

15:10:56    7    signed that, but I'm not willing to allow her to

15:10:58    8    ask questions -- or answer questions with regard to

15:11:02    9    documents that were prepared in conjunction with

15:11:05   10    her attorney during the course of representation in

15:11:09   11    this case.

15:11:09   12          BY MR. DAVENPORT:

15:11:09   13          Q.   Would you agree that what is written in

15:11:12   14    the interrogatories were -- was provided to us?

15:11:14   15          MS. HUGGINS:   Okay.   This is not my

15:11:18   16    deposition.

15:11:19   17          MR. DAVENPORT:   That's correct, but you are

15:11:20   18    intruding on my deposition right now.

15:11:20   19          MS. HUGGINS:   No, I am making a record,

15:11:25   20    because I believe that you have now veered into

15:11:28   21    privileged matter.

15:11:29   22          I'm permitted to do so in a deposition.

15:11:32   23          MR. DAVENPORT:   You are absolutely

15:11:33  1  privileged to do so.  You are also privileged to

15:11:37  2  tell your client to not answer the questions that

15:11:38  3  I've asked, which it seems that you are veering

15:11:41  4  towards doing.

15:11:41  5       Just know that if you obstruct my

15:11:45  6  deposition, you, your clients, the City of Buffalo,

15:11:49  7  will be responsible for bringing this individual

15:11:51  8  back to testify.

15:11:53  9       So, Ms. Velez, I would assume that you do

15:11:57 10  not want to come back --

15:11:57 11       MS. HUGGINS:  No.

15:11:59 12       MR. DAVENPORT:  -- for a deposition to do

15:12:00 13  so.

15:12:00 14       MS. HUGGINS:  No, no, no, no, we're

15:12:02 15  not -- we're not going to continue this way.  Okay?

15:12:04 16       MR. DAVENPORT:  Okay.

15:12:04 17       MS. HUGGINS:  She is -- she is going to

15:12:06 18  answer questions that are proper deposition

15:12:10 19  questions, but if a question asks about

15:12:14 20  attorney/client privilege, I'm going to invoke that

15:12:17 21  and she is not going to answer those questions.

15:12:21 22       Now, I -- I have no problem with you asking

15:12:24 23  her if she reviewed documentation before she signed

15:12:28  1   a verification page, but you're not going to go

15:12:32  2   into what was -- when and where and who and what

15:12:35  3   was discussed during meetings with her attorney.

15:12:36  4   She -- you're not going to do that and I'm going to

15:12:36  5   invoke privilege for that -- those questions.

15:12:36  6          BY MR. DAVENPORT:

15:12:39  7          Q.    Okay.   I haven't asked her a single

15:12:40  8   question about what was said to you during her

15:12:42  9   meeting, so I'm going to continue asking you,

15:12:46 10   Ms. Velez, when approximately did you sign this

15:12:49 11   verification page?

15:12:49 12          A.    I don't recall the exact date.

15:12:50 13          Q.    Okay.   Would it have been roughly

15:12:55 14   around December of 2019?

15:12:57 15          A.    I don't recall.

15:12:58 16          Q.    Okay.   When you signed this

15:13:03 17   verification page, did you review the responses in

15:13:07 18   Exhibit 13?

15:13:08 19          A.    I did read this packet.

15:13:11 20          Q.    Okay.   So when you reviewed the

15:13:18 21   responses in Exhibit 13, did you notice any

15:13:22 22   responses that you wished to amend or change?

15:13:25 23          A.    I was not -- at this time the one that

15:13:29  1   was brought to my attention is the one where it

15:13:31  2   says that I held the rank of lieutenant on

15:13:34  3   January 1, 2017, because I did not.

15:13:36  4          Q.    Okay.   So prior to December of 2018,

15:13:46  5   did you review the response to Exhibit 19 -- or

15:13:50  6   question 19?

15:13:51  7          A.    I don't recall the exact date.

15:13:53  8          Q.    Was it more than a year ago that you

15:13:59  9   would have reviewed this document and reviewed the

15:14:03  10  response to question 19?

15:14:06  11         A.    Again, I don't remember the exact date.

15:14:11  12  I don't believe it was more than a year, but I

15:14:14  13  don't recall the exact date.   If it's the date

15:14:18  14  dated, I don't recall.

15:14:18  15         Q.    Okay.   Did you review these responses

15:14:25  16  before you signed your verification?

15:14:28  17         A.    I believe so.

15:14:29  18         Q.    Okay.   Did you review them more than

15:14:33  19  one time before you signed this verification?

15:14:36  20         A.    I don't recall.

15:14:37  21         Q.    Okay.   When you reviewed your response

15:14:43  22  to number 19, did you contact your attorney to tell

15:14:48  23  her that you did not agree with the response to

*Velez - Davenport - 02/26/2020*

15:14:53  1  number 19?

15:14:54  2          MS. HUGGINS:  Form.  And, again, you just

15:14:54  3  asked what she told her attorney, it's

15:14:54  4  attorney/client.

15:14:56  5          MR. DAVENPORT:  I asked did she contact her,

15:14:58  6  did she contact you.

15:14:58  7          MS. HUGGINS:  Form.

15:15:00  8          MR. DAVENPORT:  I just want to know how that

15:15:03  9  amendment was made?

15:15:04 10          MS. HUGGINS:  No, you are --

15:15:05 11          MR. DAVENPORT:  You're misconstruing my

15:15:08 12  questions and you're obstructing --

15:15:08 13          MS. HUGGINS:  No.

15:15:08 14          MR. DAVENPORT:  -- right now in my

15:15:08 15  deposition.

15:15:09 16          MS. HUGGINS:  No, I know exactly what has

15:15:11 17  gone on between my client and me and that -- and I

15:15:15 18  am invoking attorney/client privilege.

15:15:16 19          MR. DAVENPORT:  Are you directing her to not

15:15:16 20  answer my question?

15:15:16 21          MS. HUGGINS:  This is the problem here.

15:15:16 22          MR. DAVENPORT:  What's that?

15:15:20 23          MS. HUGGINS:  And this is why I made that

| | | |
|---|---|---|
| 15:15:20 | 1 | objection earlier. You're asking questions about |
| 15:15:23 | 2 | when legal documents were prepared with an attorney |
| 15:15:27 | 3 | that -- that undoubtedly invokes and involves |
| 15:15:32 | 4 | privilege. |
| 15:15:33 | 5 | I will never, ever ask your client about any |
| 15:15:38 | 6 | document that you -- that he has he ever worked or |
| 15:15:40 | 7 | collaborated on with you in the course of the |
| 15:15:43 | 8 | representation of this case. |
| 15:15:45 | 9 | BY MR. DAVENPORT: |
| 15:15:45 | 10 | Q. Okay. I am not asking any questions |
| 15:15:46 | 11 | about what was said between you and her. I just |
| 15:15:49 | 12 | asked after you saw that discrepancy on response to |
| 15:15:52 | 13 | question 19, did you contact your attorney to let |
| 15:15:58 | 14 | her know that you did not agree to the response on |
| 15:16:02 | 15 | number 19? |
| 15:16:03 | 16 | MS. HUGGINS: Form. And same objection. |
| 15:16:04 | 17 | MR. DAVENPORT: Are you going direct her to |
| 15:16:07 | 18 | not answer? |
| 15:16:08 | 19 | MS. HUGGINS: Was there -- was there a |
| 15:16:08 | 20 | correction or supplement made to that -- to the |
| 15:16:11 | 21 | response to question 19? |
| 15:16:11 | 22 | MR. DAVENPORT: This is my deposition. You |
| 15:16:13 | 23 | don't get to ask her the questions yet. |

*Velez - Davenport - 02/26/2020*

275

| | | |
|---|---|---|
| 15:16:16 | 1 | **MS. HUGGINS:** She's going to -- she's going |
| 15:16:18 | 2 | to waive privilege if she answers that question the |
| 15:16:18 | 3 | way you've worded it. |
| 15:16:18 | 4 | **BY MR. DAVENPORT:** |
| 15:16:22 | 5 | **Q.** No, not -- I'm just simply asking when |
| 15:16:23 | 6 | you reviewed and saw that discrepancy -- here's a |
| 15:16:26 | 7 | question. |
| 15:16:26 | 8 | When you reviewed these interrogatories, |
| 15:16:29 | 9 | were you in the presence of your attorney? |
| 15:16:31 | 10 | **A.** Yes. |
| 15:16:31 | 11 | **Q.** Okay. Did you ever review these |
| 15:16:34 | 12 | interrogatories not in the presence of your |
| 15:16:37 | 13 | attorney? |
| 15:16:37 | 14 | **A.** Not that I could recall. |
| 15:16:38 | 15 | **Q.** Okay. So when you signed your |
| 15:16:44 | 16 | verification, did you sign your verification at the |
| 15:16:48 | 17 | same time that you were with your attorney? |
| 15:16:50 | 18 | **A.** Yes. |
| 15:16:51 | 19 | **Q.** Okay. Did you -- here's a question. |
| 15:17:09 | 20 | How do you receive notifications to meet |
| 15:17:12 | 21 | with your attorney? |
| 15:17:13 | 22 | **A.** It could either be through -- through |
| 15:17:16 | 23 | the department or in conversation. |

*Velez - Davenport - 02/26/2020*

276

15:17:19  1          Q.   Okay.   Do you typically receive some

15:17:25  2     sort of notification?

15:17:26  3          A.   Yes.

15:17:27  4          Q.   Okay.   How many times have you received

15:17:28  5     that notification?

15:17:29  6          MS. HUGGINS:   Form.

15:17:30  7          THE WITNESS:   I don't recall.

15:17:31  8          BY MR. DAVENPORT:

15:17:32  9          Q.   Okay.   Was it more than five?

15:17:35 10          MS. HUGGINS:   Form.

15:17:36 11          THE WITNESS:   Possibly, I'm not certain the

15:17:38 12     exact number.

15:17:38 13          BY MR. DAVENPORT:

15:17:39 14          Q.   Okay.   Did you receive a notification

15:17:46 15     for your deposition today?

15:17:49 16          A.   I received a notification from my

15:17:52 17     attorney.

15:17:52 18          Q.   Okay.   Did you receive a notification

15:17:55 19     for your deposition that was scheduled for last

15:17:58 20     Wednesday?

15:17:59 21          A.   From my attorney, yes.

15:18:00 22          Q.   Okay.   Aside from those two instances,

15:18:05 23     have you received notifications from your

*Velez - Davenport - 02/26/2020*

15:18:08   1   attorney --

15:18:11   2         MS. HUGGINS:   Form.

15:18:11   3         BY MR. DAVENPORT:

15:18:12   4         Q.    -- more or less than five times?

15:18:14   5         MS. HUGGINS:   Form.   What is the relevance

15:18:16   6   of how frequently you've met with an attorney on a

15:18:17   7   case?

15:18:17   8         MR. DAVENPORT:   I'm trying to figure out

15:18:17   9   discovery compliance, Ms. Huggins, and it might be

15:18:19  10   subject to a motion later.

15:18:20  11         I'm just trying to make a record for

15:18:24  12   potential motion practice.   You're now obstructing

15:18:27  13   my deposition and I would like the record to be

15:18:29  14   clear on exactly what compliance was with discovery

15:18:33  15   in this matter.

15:18:34  16         MS. HUGGINS:   I'm instructing my client that

15:18:37  17   she is not to reveal the substance of any

15:18:37  18   conversations we've had with any --

15:18:37  19         BY MR. DAVENPORT:

15:18:41  20         Q.    I haven't asked for the substance one

15:18:41  21   time.

15:18:42  22         How many times have you been contacted by

15:18:44  23   your attorney besides your deposition for last week

*Velez - Davenport - 02/26/2020*

278

| | | |
|---|---|---|
| 15:18:47 | 1 | and today? |
| 15:18:49 | 2 | MS. HUGGINS:  Form. |
| 15:18:51 | 3 | BY MR. DAVENPORT: |
| 15:18:52 | 4 | Q.   How many times have you received |
| 15:18:53 | 5 | notifications involving this proceeding to meet |
| 15:18:56 | 6 | with your attorney outside of last Wednesday and |
| 15:18:58 | 7 | today? |
| 15:19:00 | 8 | A.   I don't recall. |
| 15:19:01 | 9 | Q.   Was it more or less than five times? |
| 15:19:04 | 10 | A.   I don't recall. |
| 15:19:06 | 11 | Q.   Okay.  When you meet, do you meet with |
| 15:19:13 | 12 | other defendants, or is it just you? |
| 15:19:15 | 13 | MS. HUGGINS:  Form.  And, again, now |
| 15:19:16 | 14 | that -- that does veer into attorney/client. |
| 15:19:21 | 15 | MR. DAVENPORT:  Are you going to direct her |
| 15:19:23 | 16 | to not answer? |
| 15:19:24 | 17 | MS. HUGGINS:  You can't ask her about what |
| 15:19:27 | 18 | happens during meetings with -- with her attorney. |
| 15:19:29 | 19 | MR. DAVENPORT:  I didn't ask her about what |
| 15:19:31 | 20 | happened during the meeting, I just asked who was |
| 15:19:33 | 21 | present. |
| 15:19:35 | 22 | MS. HUGGINS:  I don't think that that is a |
| 15:19:36 | 23 | proper question. |

15:19:38  1        MR. DAVENPORT:  I'm just asking are you

15:19:41  2   going to direct her to not answer, because I'm

15:19:44  3   going to ask her the question.

15:19:52  4        MS. HUGGINS:  Do you have authority that

15:19:55  5   supports that as a proper deposition question?

15:19:57  6        MR. DAVENPORT:  I don't on me right now, but

15:19:59  7   I'm going to ask her, unless you direct her to not

15:20:03  8   answer.

15:20:11  9        MS. HUGGINS:  I'm objecting to the form of

15:20:14 10   the question.  I've obviously alerted to you that

15:20:18 11   my concerns are that this is breaching

15:20:21 12   attorney/client privilege.

15:20:22 13        Who -- who is present during -- during

15:20:24 14   meetings with attorneys I -- I do not think is

15:20:28 15   discoverable.

15:20:31 16        And, again, I'm reminding my client not

15:20:35 17   to -- to disclose any of the discussions we've had

15:20:35 18   during the course of any of those meetings.

15:20:39 19        You can answer to the best of your ability.

15:20:41 20        MR. DAVENPORT:  Of course.

15:20:41 21        Can you please read back my last question.

15:20:44 22        (The above-requested question was then read

15:21:09 23   by the reporter.)

15:21:09  1         **BY MR. DAVENPORT:**

15:21:10  2         Q.   With your attorney.  Are the other

15:21:13  3  defendants present when you went to go meet with

15:21:16  4  your attorney?

15:21:16  5         **MS. HUGGINS:**  Form.  You can answer.

15:21:18  6         **THE WITNESS:**  I recall one time, at least

15:21:20  7  one time Officer McDermott was there, but she's the

15:21:23  8  only one that I recall ever being there.

15:21:25  9         **BY MR. DAVENPORT:**

15:21:26 10         Q.   Thank you.

15:21:26 11         A.   You're welcome.

15:21:28 12         Q.   All right.  I'm going to move on to the

15:21:31 13  video portion.  Do you mind, can we get the lights

15:21:35 14  on it?  Thank you.

15:21:47 15         So I'm going to show you what has been

15:21:50 16  marked as Exhibit 11 in this deposition.  The last

15:21:54 17  four numbers are 5252.

15:21:54 18                 (Playing video.)

15:22:20 19         Now, Ms. Velez, do you recognize the vehicle

15:22:23 20  that is depicted in this video?

15:22:25 21         A.   Yes.

15:22:25 22         Q.   Have you seen that vehicle before?

15:22:27 23         A.   Yes.

*Velez - Davenport - 02/26/2020*

281

| | | |
|---|---|---|
| 15:22:28 | 1 | Q. And when did you see it? |
| 15:22:29 | 2 | A. 1/1 of 2017. |
| 15:22:30 | 3 | Q. Had you ever seen that vehicle before? |
| 15:22:32 | 4 | A. Not that I could recall. |
| 15:22:34 | 5 | Q. When you arrived at the scene, did |
| 15:22:37 | 6 | Ms. McDermott say that she had seen that vehicle |
| 15:22:40 | 7 | before? |
| 15:22:40 | 8 | A. Not that I could recall. |
| 15:22:46 | 9 | Q. Do you know who this individual is? |
| 15:22:48 | 10 | A. I do not. |
| 15:23:38 | 11 | Q. I am now showing you last four digits |
| 15:23:45 | 12 | 1342 what has been marked as Exhibit 11 in this |
| 15:23:49 | 13 | deposition. What are the three numbers located on |
| 15:23:51 | 14 | the top of that police vehicle? |
| 15:23:53 | 15 | A. 532. |
| 15:23:56 | 16 | Q. Okay. Do you know who was driving that |
| 15:23:59 | 17 | car on January 1st of 2017? |
| 15:24:04 | 18 | A. I don't recall who was driving it. |
| 15:24:06 | 19 | Q. Do you recall who was in that vehicle |
| 15:24:08 | 20 | that day? |
| 15:24:09 | 21 | A. Yes, Officer Kyle Moriarity and Carl |
| 15:24:13 | 22 | Schulz. |
| 15:24:14 | 23 | Q. Do you remember what either of them |

*Velez - Davenport - 02/26/2020*

282

| | | |
|---|---|---|
| 15:24:17 | 1 | were wearing that day, aside from their police |
| 15:24:21 | 2 | uniform? |
| 15:24:22 | 3 | A.   I believe Kyle had a hat on. |
| 15:24:31 | 4 | Q.   Now, the police officer that is walking |
| 15:24:33 | 5 | over to this individual on the sidewalk, is he |
| 15:24:36 | 6 | wearing a hat? |
| 15:24:37 | 7 | A.   It appears to be so. |
| 15:24:40 | 8 | Q.   Would you believe that that's Kyle |
| 15:24:42 | 9 | Moriarity? |
| 15:24:42 | 10 | A.   Yes. |
| 15:24:46 | 11 | Q.   Now, assuming that -- well, let's turn |
| 15:24:50 | 12 | to the complaint summary report that I provided |
| 15:24:54 | 13 | you, it should be Exhibit 3.  It might be closer to |
| 15:25:13 | 14 | the bottom. |
| 15:25:16 | 15 | A.   Okay. |
| 15:25:17 | 16 | Q.   So what was the call that Officer |
| 15:25:21 | 17 | Schulz and Officer Moriarity were responding to? |
| 15:25:25 | 18 | A.   Larceny/theft. |
| 15:25:28 | 19 | Q.   Okay.  So based on the knowledge that |
| 15:25:32 | 20 | the call they were responding to was a larceny or |
| 15:25:35 | 21 | theft, what do you think Officer Moriarity is doing |
| 15:25:39 | 22 | right here? |
| 15:25:39 | 23 | A.   I can't speculate as to what he's |

15:25:42  1  doing.

15:25:42  2          Q.   In your role as a police officer what

15:25:44  3  would you do speaking to a complainant who is

15:25:49  4  complaining of a larceny or a theft?

15:25:50  5          MS. HUGGINS:  Form.

15:25:51  6          THE WITNESS:  It depends on the type of

15:25:53  7  call, what he's complaining of a theft of, if -- if

15:25:55  8  we have time for questions, if it's something we

15:25:55  9  need to act on immediately, then we would proceed a

15:25:58 10  little quicker, but initially you're fact finding,

15:26:02 11  who, what, when, how, what's missing, what's going

15:26:06 12  on.

15:26:06 13          BY MR. DAVENPORT:

15:26:06 14          Q.   Okay.  Now, during your investigation

15:26:08 15  would you ask for any sort of identification of

15:26:11 16  this individual?

15:26:12 17          MS. HUGGINS:  Form.

15:26:12 18          A.   Depending on if I'm familiar --

15:26:14 19          MR. DAVENPORT:  I would ask what's the form

15:26:16 20  objection?

15:26:16 21          MS. HUGGINS:  You're asking a hypothetical

15:26:18 22  question of this individual who appears to be on a

15:26:21 23  video where this lieutenant is not pictured on that

15:26:25  1    video.  She's already indicated in previous

15:26:28  2    testimony that they weren't there at this point.

15:26:31  3    It's a hypothetical question, it calls for

15:26:35  4    speculation.

15:26:35  5        MR. DAVENPORT:  I would just ask what's

15:26:36  6    wrong with a hypothetical or a speculative answer

15:26:38  7    in a deposition?

15:26:39  8        MS. HUGGINS:  That is not a proper question.

15:26:43  9    I am -- I am preserving a form objection.  If you

15:26:46  10   would like to reword your question so it's not

15:26:49  11   speculative and it's possibly admissible later and

15:26:50  12   you may be able to use it later, you may.

15:26:55  13       But I am -- I am preserving a form

15:26:57  14   objection.  I -- she is answering your question,

15:27:00  15   your deposition is proceeding.

15:27:00  16       BY MR. DAVENPORT:

15:27:01  17       Q.   Sure.  So would it also be true that

15:27:04  18   somebody can ask that -- a question during a

15:27:07  19   deposition that wouldn't be --

15:27:07  20       MS. HUGGINS:  Sir, I'm not going to debate

15:27:09  21   how to -- how to --

15:27:09  22       MR. DAVENPORT:  It's your form objection, so

15:27:11  23   I would like to know and I would like to try to fix

15:27:14   1   it if, you know, we can sort that out.

15:27:16   2        MS. HUGGINS:  For the benefit of the

15:27:17   3   reporter I would appreciate it if you don't speak

15:27:17   4   over me.

15:27:21   5        You asked me what the basis of my form

15:27:22   6   objection was and I told you.  If you want to

15:27:25   7   reword the question, you may.  If you don't, she's

15:27:27   8   going to be permitted to answer the question.

15:27:30   9        I did not tell her that she could not answer

15:27:32  10   the question.

15:27:32  11        BY MR. DAVENPORT:

15:27:32  12        Q.   Okay.  So, Ms. Velez, would -- as part

15:27:36  13   of investigating a theft or burglary, would you ask

15:27:41  14   the complainant for some sort of identification?

15:27:45  15        A.   It depends on if I'm familiar with that

15:27:47  16   person.  I may already know it or I could ask for

15:27:48  17   identification, depending on what part of the

15:27:52  18   investigation we're in.

15:27:52  19        It's not typical that as soon as you walk up

15:27:55  20   to someone you say can I have your license or can I

15:27:57  21   have a ident -- a form of identification.

15:27:59  22        Sometimes you just -- you have to ease into

15:28:01  23   an investigation.  They're some -- they're usually

15:28:04  1  upset, they have a complaint.

15:28:06  2          So at some point, yes, if I'm not familiar

15:28:10  3  with the person, I will ask for identification, but

15:28:11  4  it doesn't necessarily -- it doesn't necessarily

15:28:12  5  have to be instantaneous as soon as I arrive.

15:28:16  6          Q.   But you would expect at some point some

15:28:17  7  officer would ask for identification?

15:28:19  8          A.   Again, if I wasn't familiar or if the

15:28:21  9  officer wasn't familiar with the person who makes

15:28:23 10  the complaint, yes.

15:28:25 11          Q.   Okay.   Now, as part of your

15:28:30 12  investigation, would you also run the license plate

15:28:33 13  on that vehicle?

15:28:34 14          A.   If I didn't have a -- if the license

15:28:36 15  plate wasn't part of my investigation, not

15:28:39 16  necessarily.

15:28:40 17          Q.   Okay.   When would the license plate be

15:28:43 18  part of the investigation?

15:28:44 19          A.   If based on the investigation it's

15:28:46 20  deemed to be part of the investigation.

15:28:48 21          Q.   Okay.   At any point was there any

15:28:52 22  discussion about what's this burglary or theft call

15:28:56 23  related to?

*Velez - Davenport - 02/26/2020*

287

| | | |
|---|---|---|
| 15:28:56 | 1 | **A.** Pardon? |
| 15:28:57 | 2 | **Q.** At any point was there any discussion |
| 15:28:59 | 3 | between you and the other officers about what this |
| 15:29:02 | 4 | burglary or theft call what this person's complaint |
| 15:29:06 | 5 | was? |
| 15:29:06 | 6 | **A.** I don't recall having a conversation |
| 15:29:08 | 7 | with the officers about it. |
| 15:29:09 | 8 | **Q.** Okay. Did you ever have a conversation |
| 15:29:11 | 9 | with the complainant? |
| 15:29:12 | 10 | **A.** No. |
| 15:29:12 | 11 | **Q.** Okay. Did Officer McDermott ever have |
| 15:29:14 | 12 | a conversation with the complainant? |
| 15:29:17 | 13 | **A.** I don't recall. |
| 15:29:17 | 14 | **Q.** Now, is that your police vehicle that |
| 15:29:21 | 15 | Ms. McDermott was driving that just arrived on the |
| 15:29:24 | 16 | scene? |
| 15:29:24 | 17 | **A.** Yes. |
| 15:29:25 | 18 | **Q.** Okay. And that was because |
| 15:29:27 | 19 | Ms. McDermott was familiar with this 33 Schmarbeck |
| 15:29:30 | 20 | location? |
| 15:29:31 | 21 | **A.** Yes. |
| 15:29:37 | 22 | **Q.** So, now, I see that you're a little bit |
| 15:29:41 | 23 | behind Officer Schulz's and Officer Moriarity's |

*Velez - Davenport - 02/26/2020*

288

| | | |
|---|---|---|
| 15:29:45 | 1 | police vehicle.  Is there any specific reason why |
| 15:29:48 | 2 | Ms. McDermott parked her vehicle behind Officer |
| 15:29:51 | 3 | Moriarity and Officer Schulz's police vehicle? |
| 15:29:55 | 4 | A.   You would -- |
| 15:29:55 | 5 | MS. HUGGINS:   Form. |
| 15:29:56 | 6 | THE WITNESS:   You would have to ask Officer |
| 15:29:59 | 7 | McDermott that.   I'm not certain. |
| 15:30:00 | 8 | BY MR. DAVENPORT: |
| 15:30:00 | 9 | Q.   Okay.   Would there be any reason why |
| 15:30:02 | 10 | you as a police officer would park behind Officer |
| 15:30:06 | 11 | Schulz and Officer Moriarity's police vehicle? |
| 15:30:08 | 12 | A.   It depends on the situation, the type |
| 15:30:10 | 13 | of call.   It possibly could be tactical.   It |
| 15:30:14 | 14 | depends on what we're responding to. |
| 15:30:16 | 15 | Q.   Okay.   Based on what you have seen in |
| 15:30:16 | 16 | this -- in this video, would there be any reason |
| 15:30:19 | 17 | why you would park your police vehicle behind |
| 15:30:21 | 18 | Officer Moriarity and Officer Schulz's police |
| 15:30:23 | 19 | vehicle? |
| 15:30:24 | 20 | A.   No particular reason. |
| 15:30:30 | 21 | Q.   Officer Moriarity, was he in training |
| 15:30:33 | 22 | at this time? |
| 15:30:33 | 23 | A.   Yes. |

*Velez - Davenport - 02/26/2020*

289

| 15:30:34 | 1 | Q. Field training? |
|---|---|---|
| 15:30:36 | 2 | A. Yes. |

15:30:36  3      Q.   Okay.  What do you think that he is

15:30:40  4  discussing with Officer Schulz?

15:30:43  5      MS. HUGGINS:  Form.

15:30:43  6      THE WITNESS:  I don't know.

15:30:45  7      BY MR. DAVENPORT:

15:30:45  8      Q.   Okay.  Have you ever done field

15:30:46  9  training for any police officers in C District?

15:30:49 10      A.   I've never been a field training

15:30:52 11  officer, no.

15:30:52 12      Q.   Okay.  As a lieutenant, what would you

15:30:55 13  expect a field training officer to be discussing

15:30:57 14  with their trainee in this situation?

15:31:00 15      MS. HUGGINS:  Form.

15:31:00 16      THE WITNESS:  Again, I have never been

15:31:03 17  trained as a field training officer, so I don't

15:31:06 18  know what that field training officer has been

15:31:10 19  trained to discuss or do or the -- the steps that

15:31:17 20  they would take to ensure that the trainee is

15:31:20 21  getting everything they need or how to respond to

15:31:25 22  questions that they may have.  I don't know what

15:31:27 23  their training encompasses.

*Velez - Davenport - 02/26/2020*

290

| | | |
|---|---|---|
| 15:31:28 | 1 | BY MR. DAVENPORT: |
| 15:31:29 | 2 | Q. Okay. Now, if Officer Moriarity never |
| 15:31:35 | 3 | asked for the identification of this individual, |
| 15:31:38 | 4 | would you expect the field training officer to tell |
| 15:31:41 | 5 | Officer Moriarity to ask for that identification? |
| 15:31:44 | 6 | MS. HUGGINS: Form. |
| 15:31:45 | 7 | THE WITNESS: Can you repeat that? |
| 15:31:46 | 8 | BY MR. DAVENPORT: |
| 15:31:47 | 9 | Q. If Officer Moriarity never asked for |
| 15:31:49 | 10 | the identification of the complainant, would you |
| 15:31:52 | 11 | expect the field training officer to tell Officer |
| 15:31:56 | 12 | Moriarity to ask for the ID from that complainant? |
| 15:32:00 | 13 | MS. HUGGINS: Form. |
| 15:32:01 | 14 | THE WITNESS: Again, that would depend on |
| 15:32:02 | 15 | the scenario. I don't know what information |
| 15:32:06 | 16 | Officer Moriarity discussed with that person, if he |
| 15:32:08 | 17 | knows who it is, if he's already been identified, |
| 15:32:13 | 18 | if Officer Schulz identified him. |
| 15:32:15 | 19 | I don't know what they're discussing, so |
| 15:32:15 | 20 | I -- I couldn't say what I would expect him to do, |
| 15:32:19 | 21 | because I don't know what information they have |
| 15:32:19 | 22 | right now. |
| 15:32:20 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

291

15:32:22  1        Q.   So if Officer Moriarity did not know

15:32:24  2    the individual and Officer Schulz did not ask the

15:32:27  3    individual for an identification, would you expect

15:32:29  4    Officer Schulz to tell Officer Moriarity to ask for

15:32:32  5    the identification of that individual?

15:32:33  6        **MS. HUGGINS:**   Form.

15:32:34  7        **MR. DAVENPORT:**   What's the form objection?

15:32:35  8        **MS. HUGGINS:**   Same, it calls for -- it calls

15:32:36  9    for speculation.

15:32:37 10        **MR. DAVENPORT:**   No, I'm asking in her

15:32:40 11    capacity as a lieutenant what would she

15:32:42 12    ask -- expect a field training officer to do.

15:32:42 13        **MS. HUGGINS:**   You may disagree with my form

15:32:44 14    objection.   I'm simply making it on the record.

15:32:46 15    I've not prevented her from answering that question

15:32:49 16    and I'm trying to do it in as minimal way as

15:32:51 17    possible as to not influence her testimony.

15:32:54 18        So I'm not going to debate with you my form

15:32:58 19    objections.   You can proceed and ask her questions

15:33:00 20    if you would like.

15:33:00 21        **MR. DAVENPORT:**   Well, I just want to make

15:33:01 22    sure that the record is clear exactly what your

15:33:02 23    objection is and then I can make my response to

| | | |
|---|---|---|
| 15:33:05 | 1 | your objection. |
| 15:33:06 | 2 | MS. HUGGINS:  No, I'm not debating you. |
| 15:33:09 | 3 | This is an officer's deposition, please proceed |
| 15:33:11 | 4 | with her deposition.  I'm not going to debate you |
| 15:33:12 | 5 | right now. |
| 15:33:13 | 6 | MR. DAVENPORT:  So just so -- |
| 15:33:15 | 7 | MS. HUGGINS:  You're distracting from your |
| 15:33:15 | 8 | own deposition. |
| 15:33:17 | 9 | MR. DAVENPORT:  Just so that way we're |
| 15:33:17 | 10 | clear, Ms. Huggins, your objection is form, |
| 15:33:19 | 11 | speculation. |
| 15:33:20 | 12 | MS. HUGGINS:  As I stated on the record. |
| 15:33:22 | 13 | MR. DAVENPORT:  Okay.  Can you please read |
| 15:33:24 | 14 | back the last question. |
| 15:33:26 | 15 | (The above-requested question was then read |
| 15:34:21 | 16 | by the reporter.) |
| 15:34:21 | 17 | THE WITNESS:  I would -- again, with the |
| 15:34:24 | 18 | field training, I don't know that Officer |
| 15:34:29 | 19 | Schulz -- like, again, it's speculation and there's |
| 15:34:32 | 20 | a million different things that can happen while |
| 15:34:34 | 21 | investigating.  At some point the identification of |
| 15:34:38 | 22 | the complainant would need to be made. |
| 15:34:40 | 23 | BY MR. DAVENPORT: |

*Velez - Davenport - 02/26/2020*

293

15:34:41  1          Q.    Okay.   That works.   Just at some point
15:34:43  2     identification would need to be made of that
15:34:46  3     individual, correct?
15:34:47  4          A.    Correct.
15:34:47  5                    (Playing video.)
15:34:47  6          Q.    Okay.   Now, Officer McDermott pulled
15:34:55  7     her vehicle up; do you see that?
15:34:57  8          A.    Yes.
15:34:57  9          Q.    Do you know why she pulled her vehicle
15:35:00 10     up?
15:35:00 11          A.    It appears to speak to Officer
15:35:03 12     Moriarity.
15:35:03 13          Q.    Okay.   Do you have any idea what
15:35:07 14     Ms. McDermott said to Officer Moriarity?
15:35:09 15          A.    I do not.
15:35:11 16          Q.    Did you say anything to Officer
15:35:14 17     Moriarity?
15:35:14 18          A.    Not that I could recall.
15:35:20 19          Q.    Okay.   So I'm now going to show you
15:35:30 20     what has been marked as Exhibit 11 with the last
15:35:35 21     four digits 2529.
15:35:38 22          So when did you first see or did you ever
15:35:41 23     see Mr. Kistner enter the street?

*Velez - Davenport - 02/26/2020*

294

15:35:45  1          A.    I did not ever see him enter the
15:35:48  2   street.
15:35:48  3          Q.    Okay.  Did you ever see Mr. Kistner
15:35:51  4   before he entered the street?
15:35:53  5          A.    No.
15:35:53  6          Q.    What were you doing at this incident?
15:35:56  7          A.    I don't recall exactly what I was doing
15:35:59  8   at that moment.
15:35:59  9          Q.    Okay.  What -- were you looking forward
15:36:05 10   at this time?
15:36:08 11          A.    I don't recall.  I just know that I
15:36:13 12   didn't see him and I -- at all.
15:36:17 13          Q.    Okay.
15:36:17 14          A.    I don't recall seeing him at all.
15:36:19 15          Q.    Okay.  Did you hear Officer McDermott
15:36:22 16   say that she saw an individual out in the street?
15:36:26 17          A.    Not that I could recall.
15:36:28 18          Q.    Do you recall anything that was said by
15:36:32 19   Mr. Kistner to anybody while he was out in the
15:36:35 20   street?
15:36:35 21          A.    No.
15:36:36 22          Q.    Okay.  Do you recall any of the
15:36:39 23   officers saying anything to Mr. Kistner while he

*Velez - Davenport - 02/26/2020*

| | | |
|---|---|---|
| 15:36:42 | 1 | was in the street? |
| 15:36:43 | 2 | A.   No. |
| 15:36:44 | 3 | Q.   Okay.  Do you know, were you on your |
| 15:36:55 | 4 | way to go somewhere after this call prior to, you |
| 15:36:59 | 5 | know, the events that transpired shortly after? |
| 15:37:03 | 6 | A.   Not that I could recall.  After the |
| 15:37:05 | 7 | event? |
| 15:37:05 | 8 | Q.   Well, do you recall, were you |
| 15:37:10 | 9 | dispatched to another location from Schmarbeck? |
| 15:37:14 | 10 | A.   Well, from Schmarbeck we did go to |
| 15:37:17 | 11 | ECMC. |
| 15:37:20 | 12 | Q.   Were you dispatched prior to any |
| 15:37:23 | 13 | collision between Mr. Kistner and a police vehicle? |
| 15:37:26 | 14 | MS. HUGGINS:  Form.  You can answer. |
| 15:37:29 | 15 | THE WITNESS:  Prior to? |
| 15:37:31 | 16 | BY MR. DAVENPORT: |
| 15:37:32 | 17 | Q.   Prior to -- well, after arriving at |
| 15:37:35 | 18 | Schmarbeck and prior to a collision that was made |
| 15:37:38 | 19 | with Mr. Kistner, were you and Officer McDermott |
| 15:37:41 | 20 | dispatched to any other location? |
| 15:37:43 | 21 | A.   Not that I could recall. |
| 15:37:44 | 22 | Q.   Okay.  Do you know if Officer Schulz or |
| 15:37:47 | 23 | Officer Moriarity were dispatched to another |

15:37:50  1  situation?

15:37:50  2          A.    I don't recall.

15:37:51  3          Q.    Did you ever dispatch to Schmarbeck for

15:37:55  4  the 33 Schmarbeck call?

15:37:58  5          A.    I didn't, no.

15:38:00  6          Q.    Okay.   Did Officer McDermott ever

15:38:03  7  dispatch in for the 33 Schmarbeck call?

15:38:06  8          A.    Not that I could recall.

15:38:27  9          Q.    Now, Ms. Velez, based on what you just

15:38:30 10  saw right there, was the police vehicle moving

15:38:33 11  after Mr. Kistner was struck?

15:38:36 12          A.    It appeared to be so.   Well, when

15:38:39 13  Mr. Kistner walked into the vehicle, it appears

15:38:41 14  from this angle of the video to slightly be moving

15:38:46 15  forward.

15:38:46 16          Q.    Now, when you were in the police

15:38:48 17  vehicle, did you hear any sort of a noise that

15:38:52 18  indicated that a collision had been made?

15:38:53 19          MS. HUGGINS:   Form.   You can answer.

15:38:55 20          THE WITNESS:   I did hear a noise.

15:38:57 21          BY MR. DAVENPORT:

15:38:57 22          Q.    Okay.   What sort of a noise was that?

15:38:59 23          A.    It was like a -- it sounded like

*Velez - Davenport - 02/26/2020*

297

| 15:39:03 | 1 | plastic, like a plastic break. |
|---|---|---|

15:39:03   1  plastic, like a plastic break.

15:39:05   2        Q.   Okay.  At the time did you know --

15:39:09   3        A.   It wasn't -- I'm sorry.

15:39:09   4        Q.   No, it's okay.  At the time did you

15:39:12   5  know what that was?

15:39:12   6        A.   No.

15:39:13   7        Q.   Okay.  Did Officer McDermott say

15:39:17   8  anything after you heard that noise?

15:39:19   9        A.   She did.

15:39:19  10        Q.   What did she say?

15:39:21  11        A.   Again, I don't recall if she said that

15:39:22  12  he had put himself into the vehicle or if he had

15:39:25  13  threw himself into the vehicle.

15:39:28  14        I don't remember which word was used, but

15:39:31  15  she stated that he had put himself into the

15:39:33  16  vehicle.

15:39:33  17        Q.   Okay.  Did she yell that, did she sound

15:39:37  18  excited when she said it?

15:39:39  19        A.   I don't remember the exact tone.

15:39:40  20        Q.   Okay.  Did she say that before you

15:39:44  21  exited the vehicle?

15:39:44  22        A.   Yes.

15:39:45  23        Q.   Okay.  At that time had you seen

*Velez - Davenport - 02/26/2020*

298

15:39:50   1    Mr. Kistner up until that point of Ms. McDermott

15:39:53   2    yelling that he either threw himself at the police

15:39:56   3    vehicle or -- I'm sorry, what was the other phrase

15:40:01   4    that she may have possibly said?

15:40:03   5         A.   Put himself.

15:40:04   6         Q.   Okay.  So asking the question again.

15:40:07   7         At any point did you see Mr. Kistner before

15:40:10   8    Ms. McDermott said that Mr. Kistner threw himself

15:40:14   9    at the vehicle or put himself into the police

15:40:17  10    vehicle?

15:40:17  11         A.   No.

15:40:18  12         Q.   Okay.  When was the first time that you

15:40:23  13    saw Mr. Kistner?

15:40:23  14         A.   On the ground.

15:40:25  15         Q.   Was he grabbing any part of his body?

15:40:29  16         A.   No.

15:40:31  17         Q.   Okay.  Where was he positioned relative

15:40:33  18    to the car?

15:40:34  19         A.   I recall him laying parallel to the

15:40:37  20    car.

15:40:38  21         Q.   Okay.  Was Mr. Kistner saying anything?

15:40:45  22         A.   Not that I could recall.

15:40:47  23         Q.   Did you say anything to Mr. Kistner?

Velez - Davenport - 02/26/2020

299

| | | |
|---|---|---|
| 15:40:49 | 1 | A.   No. |
| 15:40:50 | 2 | Q.   Okay.   Did you perform any sort of a |
| 15:40:55 | 3 | physical assessment of Mr. Kistner or a physical |
| 15:40:59 | 4 | examination? |
| 15:41:00 | 5 | A.   When I came around the car, the side of |
| 15:41:03 | 6 | the car, he was moving his body side to side, like |
| 15:41:08 | 7 | rolling side to side. |
| 15:41:09 | 8 | And that's what I could recall that he had |
| 15:41:12 | 9 | the ability to move.   Like he had the ability to -- |
| 15:41:15 | 10 | to move his arms and legs and his body. |
| 15:41:18 | 11 | Q.   Okay.   So what does that tell you if |
| 15:41:20 | 12 | he's able to move? |
| 15:41:21 | 13 | A.   That he can move.   Like it didn't |
| 15:41:24 | 14 | appear from the way he was moving that he had any |
| 15:41:27 | 15 | of his limbs were broken. |
| 15:41:29 | 16 | Q.   Okay.   Did you perform any sort of an |
| 15:41:32 | 17 | assessment to see if he had a head injury at that |
| 15:41:35 | 18 | time? |
| 15:41:35 | 19 | A.   I did not. |
| 15:41:36 | 20 | Q.   Okay.   Do you know if any of the other |
| 15:41:38 | 21 | officers performed an assessment to see if he had a |
| 15:41:41 | 22 | head injury at that time? |
| 15:41:42 | 23 | A.   I do not. |

*Velez - Davenport - 02/26/2020*

300

15:41:42   1          Q.    Do you know if Mr. Kistner ever

15:41:45   2    complained of a head injury at Schmarbeck Avenue?

15:41:47   3          A.    Not that I could recall.

15:41:48   4          Q.    Okay.  So why was Mr. Kistner taken to

15:41:52   5    ECMC for a physical assessment?

15:41:54   6          A.    For a medical evaluation.

15:41:55   7          Q.    What were -- what did you expect them

15:41:57   8    to evaluate?

15:41:58   9          A.    To clear him medically, to -- based on

15:42:01  10    him being on the ground rolling back and forth,

15:42:04  11    what I had seen.

15:42:05  12          Q.    Okay.  Did you have an expectation that

15:42:07  13    they would examine any certain part of his body?

15:42:10  14          A.    I'm not a medical professional, so I

15:42:13  15    don't know exactly what -- what criteria they would

15:42:14  16    need to determine the extent of an evaluation.

15:42:18  17          Q.    Is a medical examination required for

15:42:21  18    an individual who is on the ground after a

15:42:23  19    collision with a vehicle?

15:42:24  20          MS. HUGGINS:  Form.  You can answer.

15:42:26  21          THE WITNESS:  It would depend.  It would

15:42:31  22    depend on -- it could be a multitude of different

15:42:34  23    things.

15:42:34   1          BY MR. DAVENPORT:

15:42:34   2          Q.   Was a physical examination required in

15:42:37   3    this case?

15:42:37   4          A.   Based on the officers stating that he

15:42:42   5    put himself into a vehicle and now he's on the

15:42:45   6    ground, it would make sense to have him medically

15:42:49   7    cleared, evaluated.

15:42:49   8          Q.   Okay.   Was there any sort of a

15:42:52   9    discussion amongst the officers about potential

15:42:55  10    injuries that Mr. Kistner may have had?

15:42:57  11          A.   Not that I could recall.

15:42:59  12          Q.   Did anybody ever ask Mr. Kistner if

15:43:01  13    anything was hurting him?

15:43:02  14          A.   I did not.

15:43:03  15          Q.   Did any of the other officers?

15:43:04  16          A.   I don't know.

15:43:05  17          Q.   Not -- no one asked in your presence,

15:43:08  18    correct?

15:43:08  19          A.   Correct.

15:43:08  20          Q.   Okay.   So, now, watching this vehicle

15:43:12  21    again -- or this video again.

15:43:16  22          A.   Or I would say no one asked that I

15:43:22  23    could recall, because there was three other

*Velez - Davenport - 02/26/2020*

302

15:43:23  1  officers there.

15:43:24  2       Q.   Sure.  So I want you to watch this

15:43:27  3  video and pay particular attention to your and

15:43:32  4  Ms. McDermott's vehicle and Mr. Kistner as well.

15:43:32  5            (Playing video.)

15:43:32  6       BY MR. DAVENPORT:

15:43:41  7       Q.   Did it appear to you that Mr. Kistner

15:43:44  8  intentionally threw himself at the vehicle?

15:43:46  9       A.   Yes.

15:43:47 10       Q.   And what led you to believe that?

15:43:49 11       A.   I could -- it appears that he's

15:43:51 12  reaching his arm out into the vehicle.

15:43:54 13       Q.   Would it be possible that he was trying

15:43:56 14  brace himself for a collision?

15:43:59 15       A.   I can't speculate what he may have

15:44:02 16  thought.  I only see what I see here and what was

15:44:05 17  told to me by officers.

15:44:07 18       Q.   I guess I'm just asking is there an

15:44:07 19  alternative explanation for why Mr. Kistner may

15:44:07 20  have stuck his arm out for the police vehicle?

15:44:14 21       MS. HUGGINS:   Form.

15:44:14 22       THE WITNESS:   Again, in my opinion based on

15:44:16 23  the video and what was told to me by two other

15:44:19  1  officers, no.

15:44:20  2          BY MR. DAVENPORT:

15:44:20  3       Q.   So let's exclude anything that was told

15:44:24  4  to you by the other officers.  Based on what you

15:44:27  5  see in this video, does it appear that Mr. Kistner

15:44:30  6  intentionally threw himself at the vehicle?

15:44:31  7       A.   Unfortunately I can't take away my

15:44:33  8  thoughts on what was told to me and the video now.

15:44:39  9       In retrospect I can't -- what I see and what

15:44:39 10  I've been told is the totality of what my opinion

15:44:42 11  is based on.

15:44:43 12       Q.   How much of your opinion is based on

15:44:45 13  what you see in this video?  Again, does it look as

15:44:54 14  if Mr. Kistner intentionally threw himself at that

15:44:58 15  police vehicle?

15:44:58 16       MS. HUGGINS:   Form.

15:45:00 17       THE WITNESS:   Again, from my perspective

15:45:02 18  this -- the perception of this video -- the angle

15:45:05 19  of this video is difficult.

15:45:06 20       But as I said, my opinion on what -- what I

15:45:11 21  can see on here he appears to reach into the

15:45:14 22  vehicle.

15:45:14 23           BY MR. DAVENPORT:

15:45:14  1      Q.   Does it at least appear questionable

15:45:15  2  that Mr. Kistner may have not intentionally thrown

15:45:18  3  himself at a police vehicle?

15:45:19  4          MS. HUGGINS:   Form.

15:45:19  5          THE WITNESS:   Not from my perspective.

15:45:22  6          BY MR. DAVENPORT:

15:45:22  7      Q.   Okay.   If it was questionable whether

15:45:24  8  an individual threw himself at a police vehicle or

15:45:27  9  if the police vehicle negligently struck him, would

15:45:30 10  you expect there to be an investigation?

15:45:32 11      A.   Can you repeat that.

15:45:33 12      Q.   If there was a question as to whether

15:45:36 13  the police vehicle negligently struck the

15:45:39 14  individual or if the individual intentionally threw

15:45:41 15  himself at the police vehicle, would you expect

15:45:43 16  there to be an investigation by the accident

15:45:46 17  investigation unit?

15:45:46 18      A.   That's speculative as well.   There's a

15:45:50 19  lot of ifs in there.   So when we have two officers

15:45:53 20  who witnessed the event that I have knowledge of at

15:46:00 21  that point, no.

15:46:01 22          If a pedestrian is struck by a vehicle, it's

15:46:05 23  a different -- different scenario and yes.

15:46:08  1          Q.   Okay.  So I understand what these

15:46:13  2   police officers told you at the scene, but I guess

15:46:17  3   taking yourself away from what this video is, if

15:46:22  4   there is a question at the scene as to whether an

15:46:25  5   officer observed a police vehicle negligently

15:46:29  6   striking an individual or another police officer

15:46:32  7   saying that that individual threw himself at the

15:46:35  8   police vehicle, would you expect there to be an

15:46:38  9   investigation --

15:46:38 10          MS. HUGGINS:  Form.

15:46:39 11          BY MR. DAVENPORT:

15:46:39 12          Q.   -- of that situation?

15:46:42 13          A.   As a patrol officer, I would defer to

15:46:45 14   the supervisor and give them all the information we

15:46:48 15   have and let them determine whether or not accident

15:46:53 16   investigation needs to come out or what type of

15:46:55 17   investigation would need to -- need to be done, if

15:46:57 18   any.

15:46:58 19          Q.   As a supervisor, if you had one of your

15:47:00 20   police officers in C District telling you that the

15:47:02 21   individual intentionally threw himself at the

15:47:04 22   police vehicle and you had another police officer

15:47:08 23   who was at the scene who said that the police

*Velez - Davenport - 02/26/2020*

306

15:47:09  1   vehicle negligently struck the individual, would

15:47:12  2   you order an investigation of that situation?

15:47:14  3           MS. HUGGINS:   Form.

15:47:17  4           THE WITNESS:   You have two sworn officers

15:47:18  5   giving two different version of events, I would

15:47:20  6   come to the scene to determine what type of

15:47:22  7   investigation had been conducted at that point to

15:47:24  8   determine what fact pattern we have and then make a

15:47:27  9   decision.

15:47:27 10           BY MR. DAVENPORT:

15:47:28 11           Q.   But you would go to the scene, correct?

15:47:30 12           A.   Yes.

15:47:30 13                (Playing video.)

15:47:30 14           Q.   Okay.  Do you know who this individual

15:47:42 15   is who's on the sidewalk and now appearing to run

15:47:45 16   towards the street?

15:47:46 17           A.   I believe that's Mr. Kistner's son.

15:47:48 18           Q.   And what led you to believe that that

15:47:51 19   was Mr. Kistner's son?

15:47:52 20           A.   Because I recall him being there.

15:47:54 21           Q.   Did he say anything to you that would

15:47:58 22   have made you think that this was Mr. Kistner's

15:47:59 23   son?

*Velez - Davenport - 02/26/2020*

307

| | | |
|---|---|---|
| 15:47:59 | 1 | A.   I believe he was yelling, not to me |
| 15:48:01 | 2 | specifically, but I believe he was yelling dad. |
| 15:48:04 | 3 | Q.   Okay.  Did you hear him make those |
| 15:48:08 | 4 | statements? |
| 15:48:08 | 5 | A.   I heard him say dad, I believe it was |
| 15:48:11 | 6 | dad. |
| 15:48:12 | 7 | Q.   Okay. |
| 15:48:13 | 8 | A.   Not at this point, but when we were |
| 15:48:16 | 9 | obviously out of the vehicle. |
| 15:48:18 | 10 | Q.   Now, you saw yourself exit the police |
| 15:48:22 | 11 | vehicle there, correct? |
| 15:48:24 | 12 | A.   Yes. |
| 15:48:24 | 13 | Q.   At this time, did you know that there |
| 15:48:29 | 14 | was an individual who was lying on the ground next |
| 15:48:32 | 15 | to a police vehicle? |
| 15:48:33 | 16 | A.   Yes. |
| 15:48:33 | 17 | Q.   Okay.  And how did you know that? |
| 15:48:35 | 18 | A.   Because when I heard the noise, Officer |
| 15:48:38 | 19 | McDermott had said he had -- like I said, I can't |
| 15:48:41 | 20 | remember the exact verbiage he put himself or threw |
| 15:48:44 | 21 | himself into the vehicle, so I -- I knew he was |
| 15:48:46 | 22 | there. |
| 15:48:47 | 23 | Q.   Okay.  As you're exiting the police |

*Velez - Davenport - 02/26/2020*

308

| | | |
|---|---|---|
| 15:48:49 | 1 | vehicle, what -- what are you going to go do at |
| 15:48:53 | 2 | this situation? |
| 15:48:55 | 3 | A.    I'm going to see what happened. |
| 15:48:57 | 4 | Q.    Are you going to go examine the |
| 15:49:00 | 5 | individual on the ground? |
| 15:49:01 | 6 | A.    I went around and -- visual and I -- |
| 15:49:08 | 7 | oh, I'm sorry.  I went -- I was going to go around |
| 15:49:10 | 8 | to do a visual to see what had happened. |
| 15:49:12 | 9 | Q.    Okay.  Now, at this time, did you see |
| 15:49:19 | 10 | the individual who you've identified as |
| 15:49:23 | 11 | Mr. Kistner's son? |
| 15:49:24 | 12 | A.    I don't know if I seen him at that |
| 15:49:27 | 13 | point.  He walked past me, but I don't know if I |
| 15:49:30 | 14 | made eye -- you know what I mean, if I had made eye |
| 15:49:33 | 15 | contact with him at that point. |
| 15:49:34 | 16 | Q.    Were you ever concerned about that |
| 15:49:36 | 17 | individual at any point when you saw him run past |
| 15:49:40 | 18 | your police vehicle? |
| 15:49:42 | 19 | A.    As I said, I don't -- at that moment I |
| 15:49:49 | 20 | don't exactly recall if I had made eye contact with |
| 15:49:53 | 21 | him as he went by. |
| 15:49:53 | 22 | Q.    At any point when Mr. Kistner's son was |
| 15:49:56 | 23 | out in the street, did you ever feel concern for |

*Velez - Davenport - 02/26/2020*

309

| | | |
|---|---|---|
| 15:49:58 | 1 | your safety? |
| 15:49:59 | 2 | A. At that point? |
| 15:50:01 | 3 | Q. Well, at any point that Mr. Kistner's |
| 15:50:04 | 4 | son was out in the street, did you ever feel that |
| 15:50:08 | 5 | your safety was threatened? |
| 15:50:10 | 6 | A. Not that I could recall. |
| 15:50:23 | 7 | Q. Now, knowing at that time that there |
| 15:50:27 | 8 | was an individual where there was a collision with |
| 15:50:30 | 9 | the police vehicle and that he was on the ground, |
| 15:50:33 | 10 | why did you not -- it appears that you're walking, |
| 15:50:37 | 11 | you're standing still, you're looking at Officer |
| 15:50:41 | 12 | Schulz and Officer Moriarity, did you have any |
| 15:50:44 | 13 | concern for the individual's potential physical |
| 15:50:46 | 14 | condition at that time? |
| 15:50:47 | 15 | A. Well, as I was looking at Officer |
| 15:50:50 | 16 | Schulz, he as he was walking toward me, as I was |
| 15:50:53 | 17 | coming around the front of the car, that's when he |
| 15:50:55 | 18 | told me I had seen the whole thing. He said I had |
| 15:50:57 | 19 | seen him throw himself into the patrol vehicle. |
| 15:51:01 | 20 | Q. And that was Officer Schulz that told |
| 15:51:04 | 21 | you that? |
| 15:51:05 | 22 | A. Yes. |
| 15:51:05 | 23 | Q. Okay. Did Officer Moriarity say |

*Velez - Davenport - 02/26/2020*

310

15:51:09   1    anything at that time?

15:51:10   2         A.    Not that I could recall.

15:51:14   3         Q.    Okay.  So Officer Schulz would have

15:51:17   4    made that statement to you.  Was it at this point

15:51:17   5    right here where it appears that you're facing

15:51:35   6    Officer Schulz and Officer Moriarity that that

15:51:35   7    statement was made to you?

15:51:36   8         A.    Most likely, yes.

15:51:38   9         Q.    Okay.  So now you've had two officers

15:51:42  10    that have told you that Mr. Kistner intentionally

15:51:45  11    threw himself at the police vehicle, correct?

15:51:47  12         A.    Correct.

15:51:47  13         Q.    Okay.  So with that knowledge, what

15:51:51  14    steps would you take knowing that there's an

15:51:55  15    individual on the ground?

15:51:56  16         A.    Well, having that information now and

15:51:59  17    when I come around the car, I see the individual.

15:52:01  18    The two officers who had actually eye witnessed the

15:52:06  19    incident, they're -- they're there.

15:52:09  20         So I have no -- aside from what they told me

15:52:13  21    at that point, I didn't observe anything, so they

15:52:13  22    would have more information and they would know

15:52:17  23    better how to proceed than I would, because I

*Velez - Davenport - 02/26/2020*

311

| | | |
|---|---|---|
| 15:52:18 | 1 | didn't see it. |
| 15:52:19 | 2 | Q.   If you have two officers that are |
| 15:52:21 | 3 | telling you that somebody intentionally threw |
| 15:52:24 | 4 | themselves at a police vehicle, is that a crime to |
| 15:52:27 | 5 | throw yourself at a police vehicle? |
| 15:52:29 | 6 | A.   It could be. |
| 15:52:30 | 7 | Q.   Okay.  Would you arrest that |
| 15:52:31 | 8 | individual? |
| 15:52:32 | 9 | A.   Depending on the totality of the |
| 15:52:35 | 10 | circumstance. |
| 15:52:35 | 11 | Q.   Would you detain that individual? |
| 15:52:37 | 12 | A.   Yes. |
| 15:52:37 | 13 | Q.   Okay.  Would you detain that individual |
| 15:52:39 | 14 | and then determine the totality of the |
| 15:52:42 | 15 | circumstances? |
| 15:52:42 | 16 | A.   It depends on the information that we |
| 15:52:42 | 17 | have. |
| 15:52:45 | 18 | Q.   Is that what you did in this situation? |
| 15:52:48 | 19 | A.   In this situation we had information. |
| 15:52:50 | 20 | Like I said, we had two officers witness what was |
| 15:52:53 | 21 | told to me that this individual threw himself into |
| 15:52:56 | 22 | the vehicle and we had damage to the vehicle.  So, |
| 15:52:59 | 23 | yes, he was detained. |

*Velez - Davenport - 02/26/2020*

312

| | | |
|---|---|---|
| 15:53:12 | 1 | (Playing video.) |
| 15:53:12 | 2 | Q. Now, it appears that there's you, |

15:53:16  3  Officer Schulz, and Officer Moriarity.  You were

15:53:19  4  all around the individual at this point.  Was

15:53:22  5  anything being said to Mr. Kistner?

15:53:25  6  A.  I don't recall.

15:53:26  7  Q.  Did anybody tell Mr. Kistner to get up?

15:53:29  8  A.  I don't recall.

15:53:30  9  Q.  Did you tell Mr. Kistner to get up?

15:53:32  10  A.  I did not.

15:53:33  11  Q.  Did anybody tell Mr. Kistner that he

15:53:36  12  would be arrested?

15:53:37  13  A.  I don't recall.

15:53:38  14  Q.  Did you tell Mr. Kistner that he would

15:53:40  15  be arrested?

15:53:41  16  A.  I did not.

15:53:58  17  Q.  Now, it appears that either Officer

15:54:00  18  Schulz or Officer Moriarity are reaching down.  Are

15:54:07  19  they picking up Mr. Kistner at that point?

15:54:09  20  A.  I don't recall.

15:54:09  21  Q.  Was Mr. Kistner ever brought into a

15:54:13  22  seated position?

15:54:13  23  A.  I don't recall.

*Velez - Davenport - 02/26/2020*

313

15:54:15  1          Q.   If an individual has been struck on

15:54:17  2     their head, would you examine that individual for a

15:54:21  3     head injury while he's lying down on the ground or

15:54:24  4     while he's in a seated position?

15:54:25  5          A.   If I had -- that's -- again, it's

15:54:27  6     situational, it's circumstantial.

15:54:30  7          Q.   Assuming that there's a potential for a

15:54:32  8     head injury, should that individual be brought to a

15:54:36  9     seated position?

15:54:37 10          MS. HUGGINS:   Form.

15:54:37 11          THE WITNESS:   Again, that depends on their

15:54:39 12     physical abilities, capabilities, if there's a

15:54:39 13     visible injury, if there's a complaint, if we can

15:54:42 14     see blood, it depends.

15:54:43 15          BY MR. DAVENPORT:

15:54:43 16          Q.   But what if -- what if there's an

15:54:46 17     internal injury, should that individual be brought

15:54:49 18     to a seated position?

15:54:50 19          A.   I'm not a medical --

15:54:50 20          MS. HUGGINS:   Form.

15:54:50 21          THE WITNESS:   -- professional.

15:54:53 22          BY MR. DAVENPORT:

15:54:53 23          Q.   Do they give you any sort of training

*Velez - Davenport - 02/26/2020*

314

15:54:56  1    on how to handle these situations?

15:54:57  2         A.   We have first aid.

15:54:59  3         Q.   Okay.  During your first aid training

15:54:59  4    did they ever discuss how to handle an individual

15:55:01  5    who may have an internal head injury while lying

15:55:04  6    down on the ground?

15:55:04  7         A.   Yes.

15:55:05  8         Q.   Okay.  And what do they teach you?

15:55:07  9         A.   If we know that they -- they have an

15:55:11 10    injury, they've expressed to us that they have some

15:55:15 11    type of injury that they believe they're immobile

15:55:16 12    and they cannot move, something of that nature,

15:55:17 13    then we would not move them.

15:55:20 14         Q.   Okay.  Now, if that person has

15:55:22 15    expressed to you that they have a head injury and

15:55:26 16    they're still rolling down on the ground, would you

15:55:30 17    bring that person into a seated position?

15:55:31 18         A.   It depends on their physical

15:55:35 19    capabilities, abilities.  If we ask them to and

15:55:38 20    they can, it depends.

15:55:40 21         Q.   Okay.  Was -- were handcuffs put on

15:55:45 22    Mr. Kistner by any of the officers?

15:55:47 23         A.   I believe so.

*Velez - Davenport - 02/26/2020*

315

| | | |
|---|---|---|
| 15:55:48 | 1 | Q.   And who put those handcuffs on |
| 15:55:51 | 2 | Mr. Kistner? |
| 15:55:51 | 3 | A.   I do not recall. |
| 15:55:52 | 4 | Q.   Okay.   How was Mr. Kistner handcuffed, |
| 15:55:55 | 5 | was he handcuffed while he was sitting down, while |
| 15:55:59 | 6 | he was laying down on the ground? |
| 15:56:00 | 7 | A.   I don't recall. |
| 15:56:01 | 8 | Q.   Was he handcuffed while he was standing |
| 15:56:04 | 9 | up? |
| 15:56:04 | 10 | A.   I don't recall. |
| 15:56:05 | 11 | Q.   How was Mr. Kistner brought from a |
| 15:56:07 | 12 | seated position to a standing position? |
| 15:56:07 | 13 | A.   I don't recall how Mr. Kistner was |
| 15:56:09 | 14 | brought up. |
| 15:56:09 | 15 | Q.   Did you bring -- |
| 15:56:10 | 16 | A.   If he was. |
| 15:56:11 | 17 | Q.   Did you bring Mr. Kistner into -- from |
| 15:56:13 | 18 | a seated position to a standing position? |
| 15:56:16 | 19 | A.   I did not. |
| 15:56:17 | 20 | Q.   Do you recall who did bring Mr. Kistner |
| 15:56:20 | 21 | from a seated position to a standing position? |
| 15:56:20 | 22 | A.   I don't recall what officer handcuffed |
| 15:56:22 | 23 | him or how he was brought up.   I'm not certain. |

*Velez - Davenport - 02/26/2020*

316

| | | |
|---|---|---|
| 15:56:25 | 1 | Q.   Now, at any point during this was there |
| 15:56:33 | 2 | any discussion that was had between any of the |
| 15:56:36 | 3 | officers at this point about what just happened? |
| 15:56:38 | 4 | A.   I don't recall. |
| 15:56:40 | 5 | Q.   Did Mr. Kistner say anything to any of |
| 15:56:42 | 6 | the officers? |
| 15:56:43 | 7 | A.   I don't recall. |
| 15:56:48 | 8 | Q.   Was he being belligerent? |
| 15:56:51 | 9 | A.   I don't recall. |
| 15:56:54 | 10 | Q.   What was Mr. Kistner's son saying at |
| 15:56:58 | 11 | this point? |
| 15:56:58 | 12 | A.   I don't know. |
| 15:57:01 | 13 | Q.   Based on where is he positioned, is he |
| 15:57:04 | 14 | in the police scene? |
| 15:57:06 | 15 | A.   Pardon? |
| 15:57:07 | 16 | Q.   Based on where Mr. Kistner's son is |
| 15:57:10 | 17 | located, is he within the police scene? |
| 15:57:13 | 18 | A.   Well, they're in the midst of bringing |
| 15:57:16 | 19 | him over to the other vehicle, so it's technically |
| 15:57:21 | 20 | part of where we were working. |
| 15:57:27 | 21 | Q.   Where Mr. Kistner's son is standing is |
| 15:57:29 | 22 | part of where the officers are working? |
| 15:57:29 | 23 | A.   Well, they're going to go past that |

*Velez - Davenport - 02/26/2020*

317

15:57:32  1    area, so technically for right now as

15:57:33  2    they're -- they're moving this individual, that's

15:57:35  3    our -- our workable area.

15:57:36  4         So the scene where the incident happened is

15:57:38  5    where the patrol car is, but we're still in control

15:57:41  6    of everything happening while we have someone in

15:57:45  7    our custody and make sure they safely get to where

15:57:48  8    they need to go.

15:57:49  9         Q.   Okay.  Is Mr. Kistner's son doing

15:57:52 10    anything threatening at this point?

15:57:54 11         A.   I can't see exactly what he's doing.

15:57:54 12    His back is facing me right now --

15:57:54 13         Q.   Does it appear from the video --

15:57:58 14         A.   -- from this video.

15:57:58 15         Q.   -- that Mr. Kistner's son is doing

15:58:00 16    anything threatening at this point?

15:58:01 17         A.   I can't speculate what he's doing that

15:58:05 18    I cannot see.

15:58:08 19         Q.   But you agree that you can't see

15:58:10 20    anything that is threatening any of the officers,

15:58:14 21    correct?

15:58:14 22         A.   Again, I don't know what he's doing or

15:58:19 23    saying, if he's saying or doing anything, because I

*Velez - Davenport - 02/26/2020*

318

| | | |
|---|---|---|
| 15:58:24 | 1 | can't tell and I don't recall. |
| 15:58:24 | 2 | Q. Sure. Do you see Mr. Kistner's son's |
| 15:58:28 | 3 | right hand? |
| 15:58:29 | 4 | A. I do. |
| 15:58:30 | 5 | Q. Okay. And is it positioned where his |
| 15:58:34 | 6 | hand is on the right side of his face? |
| 15:58:39 | 7 | A. Yes. |
| 15:58:40 | 8 | Q. Okay. What do you think he's doing? |
| 15:58:46 | 9 | MS. HUGGINS: Form. |
| 15:58:47 | 10 | THE WITNESS: I have no idea what he's |
| 15:58:49 | 11 | doing. |
| 15:58:50 | 12 | BY MR. DAVENPORT: |
| 15:58:50 | 13 | Q. When you hold a cell phone, do you hold |
| 15:58:53 | 14 | it up next to your ear? |
| 15:58:55 | 15 | A. Yes. |
| 15:58:56 | 16 | Q. Is it possible that he has a cell phone |
| 15:58:59 | 17 | in his right hand and it's next to his ear? |
| 15:59:02 | 18 | MS. HUGGINS: Form. |
| 15:59:03 | 19 | THE WITNESS: It could be. |
| 15:59:04 | 20 | BY MR. DAVENPORT: |
| 15:59:04 | 21 | Q. Okay. Now, would there be any reason |
| 15:59:09 | 22 | for any of the officers to go speak with this |
| 15:59:11 | 23 | individual while he's on his cell phone? |

15:59:15  1        A.   I don't know what the other officers,

15:59:17  2   what information they have, what they're observing,

15:59:21  3   if a conversation ensued that would cause them to.

15:59:23  4   I don't know.

15:59:23  5        Q.   What kind of a conversation would ensue

15:59:25  6   where an officer would need to go speak with an

15:59:29  7   individual who's on his cell phone?

15:59:29  8        A.   I don't know if he's engaging them

15:59:30  9   first.  I don't know.  It's speculation.  It

15:59:32 10   depends on if he asked them to come over.

15:59:36 11        We have lots of times when people are on

15:59:37 12   their cell phone and they still want to talk to us.

15:59:40 13        They sometimes are still with 911 on the

15:59:41 14   phone and they want to talk to us.  And we're like

15:59:42 15   we're here now, you can hang up the phone.

15:59:43 16        And so there's lots of times where we engage

15:59:46 17   and they're on their phone or they engage us and

15:59:48 18   they're on their phone.

15:59:48 19        Q.   Do you recall any time where

15:59:50 20   Mr. Kistner's son asked to speak with a police

15:59:53 21   officer?

15:59:53 22        A.   I don't recall.

15:59:53 23        Q.   Okay.  Do you know what officer is

*Velez - Davenport - 02/26/2020*

320

16:00:03  1  facing towards Mr. Kistner's son?

16:00:07  2          A.    I believe that's Officer Schulz.

16:00:10  3          Q.    Okay.  Do you have -- do you know what

16:00:13  4  Mr. Schulz is saying to Mr. Kistner's son?

16:00:16  5          A.    I do not.

16:00:24  6          Q.    Now, at this time, does it appear that

16:00:26  7  Mr. Kistner's son is walking away from Mr. Schulz?

16:00:30  8          A.    I can't tell, he's half off the video.

16:00:33  9          Q.    He's not taking steps towards

16:00:37 10  Mr. Schulz, though, correct?

16:00:37 11          A.    If you could back it up, I could see it

16:00:40 12  again.

16:00:40 13          Q.    Sure?

16:00:42 14          A.    Where he was moving to.

16:00:49 15          Q.    At any time did he take steps towards

16:00:53 16  Mr. Schulz before he left the view of the camera?

16:00:55 17          A.    He took a few steps to the right and

16:00:59 18  then I couldn't tell.

16:01:03 19          Q.    Why would Officer Schulz be following

16:01:06 20  this individual at this point?

16:01:07 21          A.    You would have to ask Officer Schulz.

16:01:15 22          Q.    At this time, does it appear that

16:01:19 23  Mr. Kistner's son is voluntarily walking out into

*Velez - Davenport - 02/26/2020*

321

16:01:22  1    the street?

16:01:24  2          A.    Possibly, I can't tell.

16:01:27  3          Q.    Does it appear that Mr. Schulz has his

16:01:30  4    arm on Mr. Kistner's son?

16:01:32  5          A.    There's a line through the middle.   I

16:01:35  6    can't tell.

16:01:35  7          Q.    I'll try to get rid of that.

16:01:39  8          Well, we'll just continue forward with the

16:01:43  9    video a little bit.

16:02:02  10         At this time, does it appear that Officer

16:02:04  11   Schulz's arm is on Mr. Kistner's son?

16:02:07  12         A.    Yes.

16:02:07  13         Q.    Okay.   Do you think that Mr. Kistner's

16:02:09  14   son is voluntarily walking out into the street?

16:02:12  15         A.    I'm not certain if he was voluntarily

16:02:16  16   or Officer Schulz is guiding him.   I'm -- again,

16:02:19  17   I'm not -- I don't know the circumstance of what

16:02:21  18   was happening there.

16:02:28  19         Q.    Now, at this time, does it appear that

16:02:31  20   Officer Schulz is controlling the movement of

16:02:33  21   Mr. Kistner's son?

16:02:35  22         A.    It's off screen.   I honestly can't

16:02:37  23   tell.

*Velez - Davenport - 02/26/2020*

322

16:02:38  1          Q.    Does it appear that he has his right

16:02:40  2   hand and his left arm raised towards Mr. Kistner's

16:02:44  3   son?

16:02:44  4          A.    I can't see that.

16:02:46  5          Q.    We'll get another view of that.

16:02:49  6          A.    Okay.

16:02:56  7          Q.    What happened right there between

16:02:58  8   Mr. Kistner's son and Mr. Schulz?

16:03:00  9          A.    It appears to be some type of furtive

16:03:03  10  movement, but I can't tell the specifics of what

16:03:06  11  happened, it's pixilated.

16:03:08  12         Q.    Does it appear that there was some sort

16:03:11  13  of a struggle between the two of them?

16:03:13  14         A.    Again, I would describe it as a furtive

16:03:18  15  movement.  I can't -- based on with the pixilation

16:03:21  16  of the video, I can't say what exactly was

16:03:24  17  happening there and I don't recall.

16:03:26  18         Q.    Okay.  Does it appear that there's now

16:03:35  19  another officer who's put their hands on

16:03:39  20  Mr. Kistner's son?

16:03:40  21         A.    Could you play it again?

16:03:42  22         Q.    Sure.  At any point, did you see

16:03:58  23  another officer put their hands on Mr. Kistner's

*Velez - Davenport - 02/26/2020*

323

16:04:01  1    son?

16:04:02  2         A.    Yes.

16:04:02  3         Q.    Okay.  And would you -- how would you

16:04:06  4    describe what you just saw?  Was there any sort of

16:04:11  5    resistance between Mr. Kistner's son and the

16:04:14  6    officers?

16:04:14  7         MS. HUGGINS:    Form.

16:04:15  8         THE WITNESS:    I -- I can't speculate as to

16:04:21  9    what was happening.  I don't -- I don't recall.

16:04:27 10    And this view --

16:04:28 11         BY MR. DAVENPORT:

16:04:28 12         Q.    Now, at this time, based on this view,

16:04:31 13    does it appear that you and Officer McDermott are

16:04:33 14    facing whatever is going on between Officer Schulz,

16:04:37 15    Officer Moriarity, and Mr. Kistner's son?

16:04:39 16         A.    Yes.

16:04:39 17         Q.    Okay.  So at any time you and Officer

16:04:43 18    McDermott could have stopped what was transpiring

16:04:46 19    between Officer Schulz, Officer Moriarity, and

16:04:49 20    Mr. Kistner's son?

16:04:50 21         A.    Could you repeat that?

16:04:52 22         Q.    At any time you or Officer McDermott

16:04:54 23    could have stopped what was transpiring between

*Velez - Davenport - 02/26/2020*

324

16:04:57  1  Officer Schulz, Officer Moriarity, and

16:04:59  2  Mr. Kistner's son?

16:05:00  3          A.   We were present.  If we felt there was

16:05:03  4  a need to intervene, we could have, we were there.

16:05:06  5          Q.   Okay.  Do you recall what Mr. Kistner's

16:05:09  6  son looks like?

16:05:10  7          A.   I don't.

16:05:11  8          Q.   Do you remember his physical stature?

16:05:14  9          A.   I don't.

16:05:15 10          Q.   Was he a tall guy, a short guy?

16:05:18 11          A.   I don't recall.

16:05:19 12          Q.   Was he skinny or was he fat?

16:05:21 13          A.   I believe he was more slender, but I

16:05:26 14  don't recall his exact physique.

16:05:29 15          Q.   Was he taller or shorter than you?

16:05:32 16          A.   I don't recall.

16:05:33 17          Q.   How tall are you?

16:05:34 18          A.   Five-two.

16:05:39 19          Q.   Now, it appears that Officer Schulz is

16:05:44 20  radioing in from his shoulder radio; do you see

16:05:51 21  that?

16:05:51 22          A.   Is he the one on the far -- I'm not

16:05:55 23  certain.

*Velez - Davenport - 02/26/2020*

325

| | | |
|---|---|---|
| 16:05:55 | 1 | MS. HUGGINS:  Just ask for a replay. |
| 16:05:57 | 2 | THE WITNESS:  Yeah, if you could just replay |
| 16:05:58 | 3 | it. |
| 16:05:58 | 4 | BY MR. DAVENPORT: |
| 16:05:59 | 5 | Q.  Sure.  Do you see that right there? |
| 16:06:05 | 6 | A.  Yes. |
| 16:06:06 | 7 | Q.  Does it appear that Officer Schulz is |
| 16:06:09 | 8 | radioing in? |
| 16:06:09 | 9 | A.  It appears so, yes. |
| 16:06:11 | 10 | Q.  Okay.  Do you know what Officer Schulz |
| 16:06:13 | 11 | was radioing in at that point? |
| 16:06:14 | 12 | A.  I do not. |
| 16:06:15 | 13 | Q.  Okay.  Was anything being said amongst |
| 16:06:20 | 14 | the officers? |
| 16:06:22 | 15 | A.  I don't recall. |
| 16:06:23 | 16 | Q.  Was anything being said to |
| 16:06:26 | 17 | Mr. Kistner's son? |
| 16:06:26 | 18 | A.  I don't recall. |
| 16:06:28 | 19 | Q.  Why was Mr. Kistner's son standing in |
| 16:06:32 | 20 | the street at this time? |
| 16:06:32 | 21 | A.  I don't recall. |
| 16:06:33 | 22 | Q.  Why would he have been standing in the |
| 16:06:36 | 23 | street at this time? |

*Velez - Davenport - 02/26/2020*

326

16:06:36 1        A.   I don't recall.

16:06:36 2        MS. HUGGINS:   Form.

16:06:37 3        THE WITNESS:   So I can't speculate.

16:06:39 4        BY MR. DAVENPORT:

16:06:45 5        Q.   If there's an individual who is

16:06:47 6   invading a crime scene, would you have that

16:06:51 7   individual then stand where other officers can view

16:06:54 8   that person to detain them?

16:06:57 9        MS. HUGGINS:   Form.

16:06:58 10       THE WITNESS:   It depends on the situation.

16:07:00 11       BY MR. DAVENPORT:

16:07:01 12       Q.   Was Mr. Kistner's son being detained at

16:07:04 13  this time?

16:07:04 14       A.   He wasn't in my custody, so I'm not

16:07:08 15  certain.  I don't recall what he was doing standing

16:07:10 16  there.

16:07:10 17       Q.   Whose custody was he in?

16:07:13 18       A.   I don't know if he was in anyone's

16:07:16 19  custody at that point.  I'm not certain.

16:07:19 20       Q.   Okay.  I'm now going to show you what

16:07:22 21  has been marked as Exhibit 11 and the last four

16:07:25 22  numbers are 5233.

16:08:08 23       Now, it appears that there are now five

16:08:10  1   police officers within the view of this video; do

16:08:10  2   you see that?

16:08:13  3       A.   Yes.

16:08:13  4       Q.   Who is that fifth police officer that

16:08:16  5   arrived at the scene?

16:08:16  6       A.   Officer Dave Santana.

16:08:18  7       Q.   Okay.  Have you worked with Mr. Santana

16:08:19  8   in the past?

16:08:20  9       A.   Yes.

16:08:21 10       Q.   Have you ever ridden along with him in

16:08:24 11   the same police vehicle?

16:08:25 12       A.   Not that I could recall.

16:08:26 13       Q.   Okay.  Do you know why Officer Santana

16:08:28 14   arrived at the scene that day?

16:08:30 15       A.   I don't.

16:08:30 16       Q.   Okay.  Do you recall what he was saying

16:08:33 17   to you at this time?

16:08:34 18       A.   I don't.

16:08:36 19       Q.   Did he have any sort of a conversation

16:08:39 20   with Lieutenant McHugh before he arrived at the

16:08:47 21   scene?

16:08:47 22       A.   I don't know.

16:08:47 23       THE REPORTER:  Lieutenant who?

*Velez - Davenport - 02/26/2020*

328

16:08:47  1        BY MR. DAVENPORT:

16:08:47  2        Q.   McHugh.

16:08:48  3        Did any of the officers at the scene have a

16:08:51  4   conversation with Lieutenant McHugh at the scene?

16:08:54  5        A.   I believe so, yes.

16:08:55  6        Q.   And which officers were they?

16:08:57  7        A.   Officer McDermott and Schulz.

16:09:02  8        Q.   Do you recall what was said --

16:09:04  9        A.   I don't.

16:09:05 10        Q.   -- to Mr. McHugh?

16:09:11 11        So after Mr. Kistner has been placed in the

16:09:15 12   back of the police vehicle, what sort of a

16:09:18 13   conversation would be had between officers in this

16:09:20 14   situation?

16:09:21 15        A.   I don't recall what the conversation

16:09:23 16   was.

16:09:25 17        Q.   Would there have been anything that you

16:09:28 18   would have had to have discussed at this point?

16:09:30 19        MS. HUGGINS:   Form.

16:09:31 20        THE WITNESS:   Possibly, but I don't recall.

16:09:34 21        BY MR. DAVENPORT:

16:09:41 22        Q.   Did anybody -- at any point after the

16:09:44 23   complaint summary report was closed for 33

*Velez - Davenport - 02/26/2020*

329

| | | |
|---|---|---|
| 16:09:49 | 1 | Schmarbeck, did anybody go talk with that |
| 16:09:53 | 2 | complainant again while at the scene of Schmarbeck? |
| 16:09:55 | 3 | **A.** I'm not certain. |
| 16:10:09 | 4 | **Q.** Did you see that gesture that was just |
| 16:10:12 | 5 | made by the police officer who's closest to the |
| 16:10:15 | 6 | camera at this point? |
| 16:10:16 | 7 | **A.** No, could you back it up. |
| 16:10:18 | 8 | **Q.** Well, with my curser on this |
| 16:10:21 | 9 | individual, I just want you to focus on that |
| 16:10:25 | 10 | individual. Now, did you see his left hand right |
| 16:10:25 | 11 | there? |
| 16:10:33 | 12 | **A.** Uh-huh, yes. |
| 16:10:34 | 13 | **Q.** Okay. What sort of a gesture is he |
| 16:10:37 | 14 | making? |
| 16:10:40 | 15 | **A.** He moved his arm from left to right. |
| 16:10:42 | 16 | **Q.** Okay. |
| 16:10:44 | 17 | **A.** Or she. I don't know who that is. |
| 16:10:46 | 18 | **Q.** Was he discussing the incident at that |
| 16:10:49 | 19 | point? |
| 16:10:49 | 20 | **A.** I don't recall. |
| 16:10:53 | 21 | **Q.** At any point before you arrived at |
| 16:10:56 | 22 | ECMC, did you and the other officers discuss about |
| 16:10:59 | 23 | what you saw on Schmarbeck Avenue? |

16:11:03  1          A.    Possibly, I just don't recall it.  I

16:11:07  2    don't recall the content or the context of

16:11:11  3    the -- of the conversation.

16:11:11  4          Q.    What's the physical stature of

16:11:14  5    Mr. Santana, is he a big guy?

16:11:17  6          A.    He's taller than me.

16:11:20  7          Q.    What's his weight, is he a skinny guy,

16:11:23  8    a bigger guy?

16:11:25  9          A.    He's medium.  I can't estimate his

16:11:25  10   weight.

16:11:25  11         Q.    Okay.

16:11:30  12         A.    I would say medium.

16:11:31  13         Q.    How long has Officer Santana worked in

16:11:34  14   the C District?

16:11:35  15         A.    I don't know.

16:11:36  16         Q.    Has he worked continuously in the C

16:11:40  17   District since January 1st of 2017?

16:11:43  18         A.    I believe so.

16:11:45  19         Q.    Okay.  Have you had any conversations

16:11:51  20   with Officer Santana since January 1st of 2017

16:11:55  21   regarding this incident?

16:11:58  22         A.    Aside from scheduling and if he has

16:12:05  23   appearances coming up, no.

*Velez - Davenport - 02/26/2020*

331

| | | |
|---|---|---|
| 16:12:06 | 1 | Q.   Okay.  Have you had any discussions |
| 16:12:08 | 2 | with any of the officers in the City of Buffalo |
| 16:12:12 | 3 | Police Department regarding this incident with |
| 16:12:15 | 4 | Mr. Kistner? |
| 16:12:15 | 5 | A.   Not that I could recall. |
| 16:12:16 | 6 | Q.   No discussions were had after a news |
| 16:12:20 | 7 | report came out regarding this incident? |
| 16:12:23 | 8 | A.   With other officers, not that I could |
| 16:12:26 | 9 | recall. |
| 16:12:26 | 10 | Q.   That you were present for? |
| 16:12:28 | 11 | A.   Correct. |
| 16:12:28 | 12 | Q.   Okay.  Now, it appears that you are all |
| 16:12:34 | 13 | dispersing at this point.  Did you know that you |
| 16:12:36 | 14 | would be going to ECMC from Schmarbeck? |
| 16:12:39 | 15 | A.   I believe so, yes. |
| 16:12:41 | 16 | Q.   Why isn't Officer Santana going with |
| 16:12:45 | 17 | you guys -- with you officers to ECMC? |
| 16:12:50 | 18 | A.   I -- I don't know.  We wouldn't need |
| 16:12:53 | 19 | him to come with us, but I don't know exactly why |
| 16:12:57 | 20 | he didn't come. |
| 16:12:58 | 21 | Q.   Okay.  Why does it require four |
| 16:13:00 | 22 | officers to transport Mr. Kistner to ECMC? |
| 16:13:03 | 23 | A.   Sometimes both cars will go up.  It's |

*Velez - Davenport - 02/26/2020*

332

16:13:07  1   not uncommon.

16:13:08  2         Q.   Have you ever experienced that before

16:13:11  3   where two patrol vehicles are used to transport one

16:13:15  4   individual to ECMC besides January 1st of 2017?

16:13:19  5         A.   Yes, I've seen it before.

16:13:20  6         Q.   Have you ever participated, have you

16:13:22  7   ever been a passenger in that vehicle or driven a

16:13:26  8   vehicle where there's been more than one patrol car

16:13:29  9   to transport an individual?

16:13:30 10         A.   Yes.

16:13:31 11         Q.   Okay.   How many times has that

16:13:31 12   happened?

16:13:31 13         A.   I don't recall a specific number of

16:13:34 14   times.

16:13:34 15         Q.   Is it more or less than five?

16:13:35 16         A.   I would say more than five.

16:13:37 17         Q.   Is it more or less than 10?

16:13:41 18         A.   I -- I don't know.   I don't recall.   I

16:13:46 19   can't put an exact number on it.

16:13:48 20         Q.   More or less than 20?

16:13:51 21         A.   Possibly more.   I've been on for about

16:13:54 22   seven years now, so.

16:13:55 23         Q.   More or less than 50?

*Velez - Davenport - 02/26/2020*

333

| 16:13:57 | 1 | A. Maybe, possibly less than 50. |
| 16:14:00 | 2 | Q. More or less than a hundred? |
| 16:14:03 | 3 | A. Possibly, possibly less. |
| 16:14:08 | 4 | Q. Okay. Is there any sort of a |

16:14:23  5  circumstance that would -- that would indicate to

16:14:27  6  you as a police officer that more than one police

16:14:31  7  vehicle is required to transport an individual to

16:14:35  8  ECMC?

| 16:14:35 | 9 | A. Could you repeat that? |
| 16:14:36 | 10 | Q. Is there anything that you would |

16:14:38 11  observe as a police officer that would tell you

16:14:38 12  that more than one patrol vehicle is required to

16:14:41 13  transport an individual to ECMC?

16:14:43 14  A. Required, no. I mean, not required.

16:14:45 15  It would -- it depends, it's circumstantial.

16:14:47 16  Q. On January 1st of 2017 were two patrol

16:14:51 17  vehicles required to transport Mr. Kistner to ECMC?

16:14:54 18  A. Required, not that I can recall, no.

16:14:57 19  Q. So it would have been voluntary that

16:15:00 20  for one of the patrol vehicles to have gone to

16:15:04 21  ECMC?

16:15:04 22  A. Correct. But, again, I don't remember

16:15:06 23  the exact -- the -- the totality of that

*Velez - Davenport - 02/26/2020*

334

16:15:10  1   circumstance.  I'm not certain at what

16:15:19  2   point -- like I said, sir, like in the -- in the

16:15:22  3   CAD call, primary -- primary officer was changed.

16:15:25  4        There are conversations that I don't recall

16:15:28  5   that were had with other officers.  So at that

16:15:31  6   point I don't exactly recall why both cars went up.

16:15:34  7        It wouldn't have been required, but I don't

16:15:37  8   recall the exact reasoning for both cars going up,

16:15:40  9   but it's not completely uncommon.

16:15:43 10        Q.   Is it more typical where the injuries

16:15:46 11   are more serious that two patrol vehicles would be

16:15:48 12   required to go to ECMC?

16:15:48 13        A.   If injuries were deemed to be more

16:15:50 14   serious, an ambulance would have been required to

16:15:57 15   take somebody up.  We wouldn't transport them.

16:16:00 16        And possibly too, depending on how many

16:16:05 17   people were there.  It's circumstantial, it

16:16:06 18   depends.

16:16:06 19        Q.   Under what circumstances would an

16:16:11 20   officer cancel an ambulance and drive that

16:16:15 21   individual to ECMC himself?

16:16:17 22        A.   It would depend.

16:16:18 23        Q.   In this situation why was an ambulance

*Velez - Davenport - 02/26/2020*

335

16:16:20   1   canceled and Mr. Kistner driven to ECMC by Officer

16:16:24   2   Schulz and Officer Moriarity?

16:16:24   3        A.   You would have to ask the officer who

16:16:25   4   canceled the ambulance.

16:16:26   5        Q.   Did you agree that an ambulance should

16:16:29   6   be canceled at that point?

16:16:31   7        A.   I wasn't a part of that decision, so

16:16:34   8   and, again, I didn't witness the incident.  And

16:16:36   9   other officers were present who did and that was

16:16:37  10   the determination that was made.

16:16:39  11        Q.   If during your physical examination of

16:16:42  12   Mr. Kistner you deemed that an ambulance was

16:16:45  13   necessary to bring Mr. Kistner to ECMC, could you

16:16:48  14   have called for an ambulance?

16:16:49  15        A.   Based on what I had observed, he was

16:16:53  16   moving, he was able to stand up, he walked over to

16:16:57  17   the patrol car, he sat down.  So at that point he

16:17:01  18   was mobile and he was moving.

16:17:02  19        Q.   Well, Ms. Velez --

16:17:04  20        A.   He was conscious.

16:17:05  21        Q.   Ms. Velez, my question was if you

16:17:08  22   deemed it necessary to call an ambulance when

16:17:11  23   another officer had canceled that ambulance, could

*Velez - Davenport - 02/26/2020*

336

| | | |
|---|---|---|
| 16:17:14 | 1 | you call and have that ambulance arrive? |
| 16:17:17 | 2 | **A.** If I deemed it necessary that he needed |
| 16:17:20 | 3 | an ambulance and another officer canceled the |
| 16:17:24 | 4 | ambulance, if I deemed it necessary, then I could |
| 16:17:25 | 5 | always call an ambulance. |
| 16:17:26 | 6 | **Q.** Okay. Do you know why Officer Schulz |
| 16:17:29 | 7 | or Officer Moriarity or Officer McDermott canceled |
| 16:17:33 | 8 | the ambulance? |
| 16:17:33 | 9 | **A.** I do not. |
| 16:18:14 | 10 | (Playing video.) |
| 16:18:14 | 11 | **Q.** Okay. Do you recognize the individual |
| 16:18:15 | 12 | who is now standing on the sidewalk on the left |
| 16:18:18 | 13 | part of the screen? |
| 16:18:18 | 14 | **A.** Yes. |
| 16:18:18 | 15 | **Q.** And who is that individual? |
| 16:18:19 | 16 | **A.** Mr. Kistner's son. |
| 16:18:19 | 17 | **Q.** Okay. Do you know who the officer is |
| 16:18:22 | 18 | who is now facing Mr. Kistner's son? |
| 16:18:24 | 19 | **A.** I believe that's Officer Schulz. |
| 16:18:26 | 20 | **Q.** Okay. Did you see Mr. Kistner's son |
| 16:18:36 | 21 | raise his left arm? |
| 16:18:38 | 22 | **A.** Could you play it back? |
| 16:18:39 | 23 | **Q.** Yes. Do you see Mr. Kistner's son |

*Velez - Davenport - 02/26/2020*

337

| | | |
|---|---|---|
| 16:19:03 | 1 | raise his left arm? |
| 16:19:04 | 2 | A.   Yes. |
| 16:19:05 | 3 | Q.   Okay.  Did he also take steps away from |
| 16:19:08 | 4 | Mr. Schulz? |
| 16:19:08 | 5 | A.   Yes. |
| 16:19:09 | 6 | Q.   Based on those two actions by |
| 16:19:12 | 7 | Mr. Kistner's son, do you think that he was looking |
| 16:19:14 | 8 | to speak with Mr. Schulz? |
| 16:19:16 | 9 | A.   I don't know what he was doing. |
| 16:19:18 | 10 | Q.   If an individual raises their left arm |
| 16:19:21 | 11 | and starts to walk away from you as a police |
| 16:19:25 | 12 | officer, do you think that that individual wants to |
| 16:19:26 | 13 | speak with you? |
| 16:19:26 | 14 | A.   Possibly, they could.  I don't know |
| 16:19:28 | 15 | what he's doing.  There's -- he could be saying |
| 16:19:32 | 16 | wait a minute, hold on, I still want to talk.  I |
| 16:19:35 | 17 | don't know.  I don't recall. |
| 16:19:35 | 18 | Q.   Would you follow that individual if |
| 16:19:37 | 19 | they took steps away from you and put their left |
| 16:19:40 | 20 | arm up and said wait a minute? |
| 16:19:43 | 21 | A.   It depends. |
| 16:19:46 | 22 | Q.   I'm sorry.  Ms. Velez, can you watch |
| 16:19:50 | 23 | the video? |

*Velez - Davenport - 02/26/2020*

338

16:19:51  1        A.    Yes, I didn't know if you had more

16:19:54  2   questions.

16:19:54  3        Q.    No, that was it.

16:20:23  4        Now, watching this video, it appears -- does

16:20:25  5   it appear that Mr. Kistner's son has his right arm

16:20:30  6   raised?

16:20:30  7        And I can go back, if you need me to.

16:20:32  8        A.    No, I can see it.  It appears that he

16:20:36  9   does have his right arm raised.

16:20:38 10        Q.    Okay.  And does it appear that his

16:20:40 11   right hand is on the right side of his face?

16:20:43 12        A.    Yes.

16:20:44 13        Q.    What would you expect Mr. Kistner's son

16:20:48 14   to be doing in this situation if his right arm is

16:20:48 15   raised to his face in that way?

16:20:51 16        A.    He could be on the phone.

16:20:53 17        Q.    Okay.  Now, if Mr. Kistner's son is on

16:21:01 18   the phone, what reason would Mr. Schulz have to

16:21:05 19   grab Mr. Kistner's son and drag him back out into

16:21:09 20   the street?

16:21:09 21        MS. HUGGINS:    Form.

16:21:10 22        THE WITNESS:    You would have to ask Officer

16:21:15 23   Schulz about his interaction at that point.

16:21:16   1          BY MR. DAVENPORT:

16:21:17   2          Q.   Is there anything that Mr. Kistner's

16:21:19   3   son could have said on the phone that would have

16:21:22   4   caused Officer Schulz to drag him out into the

16:21:25   5   street?

16:21:25   6          A.   I don't know.

16:21:25   7          Q.   Have you ever encountered somebody

16:21:28   8   where you had to drag them out into the street

16:21:29   9   based on something that they said during a phone

16:21:29  10   call?

16:21:30  11          A.   Me, personally?

16:21:32  12          Q.   You, personally.

16:21:33  13          A.   Not that I could recall.

16:21:34  14          Q.   Okay.  Now, at any time did it appear

16:21:45  15   that Mr. Kistner's son walked out there voluntarily

16:21:49  16   or was he guided out there by Mr. Schulz?

16:21:53  17          A.   Can you play it back?

16:21:55  18          Q.   I can play it again.

16:21:57  19          A.   Thank you.

16:22:20  20          Q.   At any time did it appear that

16:22:23  21   Mr. Kistner's son voluntarily walked out into the

16:22:25  22   street?

16:22:25  23          A.   It appears as though he was guided by

*Velez - Davenport - 02/26/2020*

340

16:22:26  1  Officer Schulz.

16:22:28  2        Q.   Now, I want you to watch Mr. Kistner's

16:22:35  3  son's right hands and I want you to tell me if at

16:22:40  4  any point it leaves from the right side of his head.

16:22:55  5        At any time did Mr. Kistner's hand leave the

16:22:59  6  right side of his head before Officer Schulz

16:23:05  7  reached across Mr. Kistner's son's body?

16:23:05  8        A.   I see his arm away from his head right

16:23:10  9  now at 10:27:15 mark.

16:23:10 10        Q.   But would that have been done before or

16:23:13 11  after Officer Schulz reached across Mr. Kistner's

16:23:14 12  son's body?

16:23:14 13        A.   It happened so fast and it's pixilated,

16:23:17 14  I can't tell which action was first.

16:23:20 15        Q.   I'll play it again and I want you to

16:23:22 16  watch his right hand carefully.

16:23:42 17        Prior to Officer Schulz reaching across

16:23:45 18  Mr. Kistner's son's body, did Mr. Kistner's son's

16:23:49 19  hand ever leave the right side of his face?

16:23:52 20        A.   It appears that happened -- it appears

16:23:53 21  as if Officer Schulz's body turns in, the right arm

16:23:59 22  of the subject comes down.

16:24:03 23        Q.   When Mr. Schulz turns his body towards

*Velez - Davenport - 02/26/2020*

341

| | | |
|---|---|---|
| 16:24:07 | 1 | Mr. Kistner's son, Mr. Kistner's son, does |
| 16:24:12 | 2 | Mr. Schulz reach across Mr. Kistner's son's body? |
| 16:24:16 | 3 | MS. HUGGINS:  Form. |
| 16:24:16 | 4 | THE WITNESS:  I can't tell. |
| 16:24:17 | 5 | BY MR. DAVENPORT: |
| 16:24:18 | 6 | Q.   I'll play it again. |
| 16:24:45 | 7 | Prior -- well, in this case when Mr. -- when |
| 16:24:47 | 8 | Mr. Schulz turned his body towards Mr. Kistner's |
| 16:24:50 | 9 | son, did he reach across Mr. Kistner's son's body? |
| 16:24:54 | 10 | A.   My answer doesn't change.  I can't |
| 16:24:57 | 11 | tell.  And it appears to me as if Officer Schulz |
| 16:25:01 | 12 | turns his body, Mr. Kistner's son's arm comes down, |
| 16:25:01 | 13 | his right arm comes down at the same time. |
| 16:25:03 | 14 | Q.   Does it appear that Mr. Schulz grabbed |
| 16:25:06 | 15 | something from Mr. Kistner's son? |
| 16:25:09 | 16 | A.   I can't tell. |
| 16:25:15 | 17 | Q.   Now, I want to play this video again. |
| 16:25:32 | 18 | Now, as this whole exchange is happening between |
| 16:25:36 | 19 | Mr. Schulz and Mr. Kistner's son, I want you to |
| 16:25:40 | 20 | watch and see where are you located at this time, |
| 16:25:56 | 21 | where are you located? |
| 16:25:57 | 22 | A.   Top left. |
| 16:25:58 | 23 | Q.   Okay.  Are you facing the incident at |

*Velez - Davenport - 02/26/2020*

342

16:26:02   1   this point?

16:26:02   2           A.    Yes.

16:26:03   3           Q.    Okay.  Were you facing the incident

16:26:05   4   when Mr. Kistner's son was led out into the

16:26:08   5   driveway or into the street?

16:26:10   6           A.    I don't recall.

16:26:31   7           Q.    While Mr. Kistner's son is being

16:26:35   8   dragged out into the street, are you facing

16:26:38   9   Mr. Kistner's son and Mr. Schulz?

16:26:40  10           MS. HUGGINS:    Form.

16:26:40  11           THE WITNESS:    As Mr. Kistner's son is being

16:26:40  12   guided out, what appears to be guided out into the

16:26:43  13   street, I am standing in the middle of the street.

16:26:47  14   I can't tell which way I'm looking and I don't

16:26:49  15   recall.

16:26:49  16           BY MR. DAVENPORT:

16:26:49  17           Q.    Okay.  Does it appear at this point

16:26:51  18   that Mr. Son -- Mr. Kistner's son was being guided

16:26:56  19   with that exchange right there?

16:26:57  20           And I can replay it again for you.

16:27:01  21           A.    I -- I can see it.

16:27:06  22           Q.    Is Mr. Kistner's son being guided?

16:27:09  23           A.    Mr. Kistner's son looks like he's

*Velez - Davenport - 02/26/2020*

343

| | | |
|---|---|---|
| 16:27:14 | 1 | pulling away. |
| 16:27:14 | 2 | Q.   Does it appear that the officers, |
| 16:27:18 | 3 | Officer Schulz and Officer Moriarity, both have |
| 16:27:21 | 4 | their hands on Mr. Kistner's son? |
| 16:27:24 | 5 | A.   At this point it looks like only one |
| 16:27:27 | 6 | officer has their hands on Mr. Kistner's son. |
| 16:27:30 | 7 | Q.   At any point does it appear that |
| 16:27:31 | 8 | Mr. Schulz and Mr. Moriarity both have their hands |
| 16:27:33 | 9 | on Mr. Kistner's son? |
| 16:27:33 | 10 | A.   Yes. |
| 16:27:34 | 11 | Q.   Okay.   What are they doing right here? |
| 16:27:40 | 12 | A.   They both have their hands on him.   I |
| 16:27:44 | 13 | don't know the exact scenario of the situation |
| 16:27:48 | 14 | that's happening.   I don't recall it. |
| 16:27:49 | 15 | Q.   But you were standing there, correct? |
| 16:27:51 | 16 | A.   Correct. |
| 16:27:53 | 17 | Q.   And if you thought that there was any |
| 16:27:53 | 18 | incorrect police conduct that was going on at this |
| 16:27:53 | 19 | point, you could have stopped it? |
| 16:27:55 | 20 | A.   I could have intervened. |
| 16:27:57 | 21 | Q.   Okay.   Have you ever taken an |
| 16:27:59 | 22 | individual's cell phone away from them at a police |
| 16:28:03 | 23 | scene, Ms. Velez? |

*Velez - Davenport - 02/26/2020*

344

16:28:08  1   **A.** I'm trying to think of a specific

16:28:12  2 incident, but I can't recall.  I'm sure I have, but

16:28:15  3 I just can't recall anything specific at this time.

16:28:17  4   **Q.** What reasons would you take away an

16:28:20  5 individual's cell phone at a scene?

16:28:23  6   **MS. HUGGINS:** Form.

16:28:23  7   **THE WITNESS:** If we're taking them into

16:28:26  8 custody, we would take their property, they cannot

16:28:29  9 have it if it's evidence.

16:28:30 10   **BY MR. DAVENPORT:**

16:28:31 11   **Q.** Was Mr. Kistner's son being taken into

16:28:34 12 custody at this time?

16:28:34 13   **A.** I don't know what was happening at this

16:28:35 14 time.  I don't recall.

16:28:35 15   **Q.** Was Mr. Kistner's son ever taken into

16:28:39 16 custody at this -- on this day?

16:28:41 17   **A.** Not that I could recall.

16:28:43 18   **Q.** Okay.  So if Mr. Kistner's son wasn't

16:28:46 19 being taken into custody, why would his cell phone

16:28:48 20 be taken away from him?

16:28:50 21   **MS. HUGGINS:** Form.

16:28:51 22   **THE WITNESS:** I don't know that it was taken

16:28:53 23 from him.

*Velez - Davenport - 02/26/2020*

345

16:28:53   1           BY MR. DAVENPORT:

16:28:54   2           Q.   Assuming that a cell phone was taken

16:28:54   3   away from Mr. Kistner's son, why would a cell phone

16:28:57   4   be taken away from him?

16:28:57   5           A.   Again, it depends on the situation.

16:28:59   6           Q.   Besides if he's being taken into

16:29:02   7   custody, when would -- when would he have his cell

16:29:06   8   phone taken away from him?

16:29:08   9           A.   I've already discussed that in

16:29:09  10   different scenarios.  If it's evidence, it was used

16:29:11  11   as a weapon.  If somebody is using it to obstruct.

16:29:13  12           I'm not -- there's a bunch of different

16:29:14  13   scenarios.  It would depend on the circumstance,

16:29:15  14   the situation, the totality of what was happening

16:29:17  15   at the time.

16:29:19  16           Q.   How would Mr. Kistner's son have used

16:29:21  17   his cell phone to obstruct what you police officers

16:29:24  18   were doing?

16:29:24  19           MS. HUGGINS:   Form.

16:29:24  20           THE WITNESS:   I don't know at that time.

16:29:26  21           BY MR. DAVENPORT:

16:29:26  22           Q.   Have you ever taken away an

16:29:28  23   individual's cell phone because they were

*Velez - Davenport - 02/26/2020*

346

| | | |
|---|---|---|
| 16:29:30 | 1 | obstructing what police officers were doing? |
| 16:29:33 | 2 | A.   I have not. |
| 16:29:37 | 3 | Q.   Now, Ms. Velez -- can we just turn on |
| 16:29:41 | 4 | the -- thank you. |
| 16:30:00 | 5 | Ms. Velez, were you ever paid a witness fee |
| 16:30:05 | 6 | for Mr. Kistner's criminal proceeding? |
| 16:30:07 | 7 | A.   A witness fee? |
| 16:30:08 | 8 | Q.   Yes. |
| 16:30:09 | 9 | A.   No. |
| 16:30:09 | 10 | Q.   Okay.  Were you paid any sort of a wage |
| 16:30:13 | 11 | involving Mr. Kistner's criminal proceeding for an |
| 16:30:16 | 12 | appearance that you made? |
| 16:30:18 | 13 | MS. HUGGINS:  Form. |
| 16:30:19 | 14 | THE WITNESS:  I would -- I could get court |
| 16:30:21 | 15 | time if it's on my scheduled day off. |
| 16:30:24 | 16 | BY MR. DAVENPORT: |
| 16:30:24 | 17 | Q.   Okay.  What is court time? |
| 16:30:27 | 18 | A.   It's paid for your appearance at court, |
| 16:30:28 | 19 | it's paid time for your appearance at court. |
| 16:30:30 | 20 | Q.   Is that just for criminal matters? |
| 16:30:32 | 21 | A.   No. |
| 16:30:32 | 22 | Q.   It's for civil matters as well? |
| 16:30:34 | 23 | A.   Yes. |

*Velez - Davenport - 02/26/2020*

347

16:30:35  1        Q.   Are you being paid a court fee for your

16:30:39  2   appearance today?

16:30:39  3        A.   Yes.

16:30:39  4        Q.   And is that your normal rate?

16:30:42  5        A.   I don't recall exactly what it is.

16:30:44  6        Q.   Is today one of your scheduled days off?

16:30:48  7        A.   It is.

16:30:49  8        Q.   Okay.  Are you being paid overtime for

16:30:51  9   your appearance today?

16:30:51 10        A.   I know that it's not an overtime rate.

16:30:54 11        Q.   Okay.  When you appeared for

16:30:57 12   Ms. McDermott's deposition, were you paid an

16:31:01 13   appearance fee or a court fee?

16:31:03 14        MS. HUGGINS:   Form.

16:31:04 15        THE WITNESS:   I believe I was on duty that

16:31:06 16   day, so, no.

16:31:07 17        BY MR. DAVENPORT:

16:31:07 18        Q.   Were you still paid your normal -- your

16:31:09 19   normal duty wage?

16:31:10 20        A.   Yes.

16:31:11 21        MR. DAVENPORT:   Okay.  No further questions.

16:31:24 22        (Deposition concluded at 4:31 p.m.)

         23              *    *    *

348

1          I hereby CERTIFY that I have read the

2     foregoing 347 pages, and that they are a true and

3     accurate transcript of the testimony given by me in

4     the above-entitled action on February 26, 2020.

5

6

7                         ------------------------
                          JENNY VELEZ
8

9     Sworn to before me this

10

11    -------- day of  ---------, 2020.

12

13    -------------------------

14    NOTARY PUBLIC.

15

16

17

18

19

20

21

22

23

349

```
 1  STATE OF NEW YORK )

 2                        ss:

 3  COUNTY OF ERIE    )

 4

 5      I DO HEREBY CERTIFY as a Notary Public in and

 6  for the State of New York, that I did attend and

 7  report the foregoing deposition, which was taken

 8  down by me in a verbatim manner by means of machine

 9  shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17

18                        _Lynne E. DiMarco_

19                        LYNNE E. DiMARCO,
                          Notary Public.
20

21

22

23
```

**JACK W. HUNT & ASSOCIATES, INC.**
*1120 Liberty Building*
*Buffalo, New York  14202  -  (716) 853-5600*

350

1                      INDEX TO EXHIBITS

2     Exhibit                Description                Page

3     EXH. 24        Buffalo Police Academy              44
                     Training Record
4
      EXH. 25        Dispatch Monitor Unit              118
5                    History Report
6     EXH. 26        Arresting Report                   250

7     EXH. 27        Buffalo Police Department          252
                     Prisoner Property Receipt
8
      EXH. 28        Department of Law Letter           259
9                    dated 12/17/19

10    EXH. 29        Verification Document              265

11

12

13    * Exhibits 24 - 29 retained by Mr. Davenport.

14

15

16

17

18

19

20

21

22

23

351

1                     INDEX TO WITNESSES

2   Witness                 Examination                Page

3     JENNY VELEZ           BY MR. DAVENPORT:             3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23