

# CITY OF BUFFALO

## DEPARTMENT OF LAW

# EXHIBIT

# I

# ORIGINAL

### VIDEO DEPOSITION
### KYLE T. MORIARITY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------------
JAMES C. KISTNER,

                          Plaintiff,

                - vs -        Civil Action No.
                              18-cv-402

THE CITY OF BUFFALO,
  c/o Corporation Counsel,
BYRON LOCKWOOD, individually and in
  his capacity as Police Commissioner
  of the Buffalo Police Department,
DANIEL DERENDA, individually and in his
  capacity as Police Commissioner of the
  Buffalo Police Department,
LAUREN McDERMOTT, individually and
  in her capacity as a Buffalo Police Officer,
JENNY VELEZ, individually and in her
  capacity as a Buffalo Police Officer,
KARL SCHULZ, individually and in his
  capacity as a Buffalo Police Officer,
KYLE MORIARTY, individually and in his
  capacity as a Buffalo Police Officer,
DAVID T. SANTANA, individually and in his
  capacity as a Buffalo Police Officer,
JOHN DOE(S), individually and in his/their
  capacity as a Buffalo Police Officer(s),

                          Defendants.
------------------------------------------

*JACK W. HUNT & ASSOCIATES, INC.*

CITY OF BUFFALO
DEPARTMENT OF LAW

MAR 0 6 2020

RECEIVED



2

1          Video deposition of **KYLE T. MORIARITY**,

2   Defendant, taken pursuant to the Federal Rules of

3   Civil Procedure, in the offices of JACK W. HUNT &

4   ASSOCIATES, INC., 1120 Liberty Building, Buffalo,

5   New York, on February 21, 2020, commencing at

6   10:09 a.m., before ANNE T. BARONE, RPR, Notary

7   Public.

8

9   APPEARANCES:      RUPP BAASE
                      PFALZGRAF & CUNNINGHAM, LLC,
10                    By CHAD DAVENPORT, ESQ.,
                      1600 Liberty Building,
11                    Buffalo, New York  14202,
                      (716) 854-3400,
12                    davenport@ruppbaase.com,
                      Appearing for the Plaintiff.

13

14                    TIMOTHY A. BALL, ESQ.,
                      Corporation Counsel,
15                    By MAEVE E. HUGGINS, ESQ.,
                      Assistant Corporation Counsel,
16                    1137 City Hall,
                      Buffalo, New York  14202,
17                    (716) 851-4334,
                      mhuggins@city-buffalo.com,
18                    Appearing for the Defendants.

19

20   PRESENT:         JAMES KISTNER

21                    NOLAN HALE, Rupp Baase
                      Pfalzgraf & Cunningham, LLC

22                    TIMOTHY M. HUNT, CLVS, Videographer

23

09:43:42

3

10:07:53   1        THE REPORTER:  Read and sign?

10:07:56   2        MS. HUGGINS:  45 days, please.

10:07:57   3        THE REPORTER:  And Ms. Huggins will be

10:08:00   4   supplied?

10:08:00   5        MR. DAVENPORT:  Yes.

10:08:01   6        THE REPORTER:  Thank you.

10:08:01   7

10:09:53   8   K Y L E   T.   M O R I A R I T Y, 695 Main Street,

10:10:06   9   Buffalo, New York, after being duly called and

10:10:06  10   sworn, testified as follows:

10:10:11  11

10:10:11  12        EXAMINATION BY MR. DAVENPORT:

10:10:11  13

10:10:15  14        Q.   Good morning, Mr. Moriarity.

10:10:16  15        A.   Good morning.

10:10:16  16        Q.   My name is Chad Davenport.  I'm an

10:10:18  17   attorney with Rupp Baase Pfalzgraf & Cunningham,

10:10:21  18   representing the plaintiff.

10:10:23  19        So we're here today to discuss a -- an

10:10:26  20   incident that happened on January 1st, 2017.

10:10:29  21   Before we start, I just want to explain

10:10:31  22   a few of the ground rules for this deposition.

10:10:33  23        So our discussion today is being transcribed

10:10:38   1   by a stenographer.  In order to have an accurate

10:10:40   2   testimony here today and an accurate record of that

10:10:43   3   testimony, I'm going to ask that you wait until

10:10:45   4   I finish any question before giving your answer.

10:10:49   5   Can you do that for me?

10:10:51   6        A.   Yeah.  Yeah.

10:10:51   7        Q.   So, in addition, I just want to make

10:10:53   8   sure that you use verbal responses for each of the

10:10:58   9   questions that I ask of you.  Head nods, shaking of

10:11:00  10   the head, neither of those will be able to appear

10:11:02  11   on our transcript, so I'm going to ask that you

10:11:05  12   respond to each question verbally.  Can you do that

10:11:08  13   for me?

10:11:08  14        A.   Yes.

10:11:10  15        Q.   Thank you.

10:11:10  16        And if any time you don't understand

10:11:13  17   a question, if you want me to rephrase it, simply

10:11:17  18   ask me and I'm more than happy to do so.  Can you

10:11:19  19   do that for me?

10:11:20  20        A.   Yes.

10:11:21  21        Q.   And if at any time you need to take --

10:11:23  22   take a break, you're more than welcome to.  Just

10:11:26  23   let me know, let the court reporter know, and we

| | | |
|---|---|---|
| 10:11:29 | 1 | can take that break for you. |
| 10:11:30 | 2 | A.     Okay. |
| 10:11:31 | 3 | Q.     Have you taken any drugs or alcohol |
| 10:11:33 | 4 | that would affect your testimony here today -- |
| 10:11:35 | 5 | A.     No. |
| 10:11:36 | 6 | Q.     -- within the last 24 hours? |
| 10:11:37 | 7 | A.     Sorry.  No. |
| 10:11:39 | 8 | Q.     Thank you. |
| 10:11:40 | 9 | Where were you born? |
| 10:11:44 | 10 | A.     Here in Buffalo. |
| 10:11:46 | 11 | Q.     Okay.  Where do you live currently? |
| 10:11:49 | 12 | MS. HUGGINS:  Well, form, and I would |
| 10:11:52 | 13 | object.  He is an active duty police officer.  He's |
| 10:11:54 | 14 | given a business address.  He's currently employed |
| 10:11:57 | 15 | by the City of Buffalo. |
| 10:11:58 | 16 | MR. DAVENPORT:  We're also suing them in |
| 10:11:59 | 17 | their individual capacity, so that means we would |
| 10:12:02 | 18 | have to know where their residence is as well.  You |
| 10:12:04 | 19 | can put your objections on the record. |
| 10:12:06 | 20 | But you may answer.  You can answer. |
| 10:12:08 | 21 | MS. HUGGINS:  What I would -- what I would |
| 10:12:11 | 22 | propose to counsel is I would provide that |
| 10:12:13 | 23 | information, not in the form of a video deposition, |

*Moriarity - Davenport - 2/21/20*

6

| | | |
|---|---|---|
| 10:12:17 | 1 | but I -- |
| 10:12:17 | 2 | BY MR. DAVENPORT: |
| 10:12:17 | 3 | Q. You can answer. |
| 10:12:17 | 4 | MS. HUGGINS: -- would provide that. |
| 10:12:19 | 5 | MR. DAVENPORT: You don't have to -- you |
| 10:12:20 | 6 | can't tell him to not answer that question. He can |
| 10:12:22 | 7 | answer that question. You can't direct him to not |
| 10:12:25 | 8 | answer the question. |
| 10:12:25 | 9 | You may answer the question. |
| 10:12:27 | 10 | MS. HUGGINS: Counsel, I -- I've indicated |
| 10:12:28 | 11 | I would provide that information to you but in -- |
| 10:12:28 | 12 | MR. DAVENPORT: I understand that you will |
| 10:12:30 | 13 | provide -- |
| 10:12:30 | 14 | MS. HUGGINS: -- another form. |
| 10:12:31 | 15 | MR. DAVENPORT: -- that information in |
| 10:12:33 | 16 | another form, but he can answer that question, and |
| 10:12:35 | 17 | you cannot direct him to not answer that question. |
| 10:12:37 | 18 | You may answer the question. |
| 10:12:40 | 19 | You cannot direct him to not answer the |
| 10:12:43 | 20 | question. |
| 10:12:43 | 21 | You may answer the question. |
| 10:12:45 | 22 | THE WITNESS: I'll keep it as 695 Main Street. |
| 10:12:48 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

7

| | | | |
|---|---|---|---|
| 10:12:48 | 1 | Q. | Is that here in Buffalo? |
| 10:12:49 | 2 | A. | Yes. |
| 10:12:51 | 3 | Q. | Have you served in the military? |
| 10:12:53 | 4 | A. | Yes. |
| 10:12:54 | 5 | Q. | Were you honorably discharged? |
| 10:12:57 | 6 | A. | Yes. |
| 10:12:58 | 7 | Q. | Do you have any criminal convictions? |
| 10:13:01 | 8 | A. | No. |
| 10:13:03 | 9 | Q. | What is your highest level of |

10:13:05 10   education?

| | | | |
|---|---|---|---|
| 10:13:06 | 11 | A. | College.  Associate's degree. |
| 10:13:09 | 12 | Q. | And what was that associate's degree |

10:13:11 13   in?

| | | | |
|---|---|---|---|
| 10:13:11 | 14 | A. | Criminal justice. |
| 10:13:13 | 15 | Q. | So did you go -- did you go for your |

10:13:16 16   associate's degree before or after the military?

| | | | |
|---|---|---|---|
| 10:13:18 | 17 | A. | After. |
| 10:13:19 | 18 | Q. | And what years did you go for education |

10:13:23 19   for your associate's degree?

| | | | |
|---|---|---|---|
| 10:13:24 | 20 | A. | 2014 -- or I'm sorry.  2012, 2014. |
| 10:13:29 | 21 | Q. | And then did you go into police academy |

10:13:33 22   training immediately after?

| | | | |
|---|---|---|---|
| 10:13:35 | 23 | A. | I went in 2015.  January 2015. |

*Moriarity - Davenport - 2/21/20*

8

| | | |
|---|---|---|
| 10:13:41 | 1 | Q.    So what did you do between 2014 to |
| 10:13:45 | 2 | 2015? |
| 10:13:45 | 3 | A.    Side jobs. |
| 10:13:48 | 4 | Q.    Did you have a plan, after your |
| 10:13:51 | 5 | associate's degree, to become a police officer? |
| 10:13:52 | 6 | A.    Yes. |
| 10:13:53 | 7 | Q.    Where did you want to serve? |
| 10:13:57 | 8 | Did you have any municipality that you |
| 10:13:59 | 9 | wished to go to? |
| 10:14:00 | 10 | A.    Buffalo. |
| 10:14:01 | 11 | Q.    City of Buffalo? |
| 10:14:02 | 12 | A.    Yeah. |
| 10:14:02 | 13 | Q.    Did you take any training as part of |
| 10:14:04 | 14 | your ECC courses? |
| 10:14:08 | 15 | A.    What do you mean by that? |
| 10:14:09 | 16 | Q.    So with Erie County, you did some |
| 10:14:11 | 17 | training before you were able to enter as a city |
| 10:14:15 | 18 | police -- Buffalo police officer, correct? |
| 10:14:17 | 19 | MS. HUGGINS:  Form.  You can answer. |
| 10:14:18 | 20 | THE WITNESS:  Yeah.  As a pre-employment. |
| 10:14:20 | 21 | I paid -- paid my way through academy before I was |
| 10:14:23 | 22 | hired. |
| 10:14:23 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

9

| | | |
|---|---|---|
| 10:14:23 | 1 | Q.   Okay.  And so you started in 2015? |
| 10:14:26 | 2 | A.   2015, yeah. |
| 10:14:27 | 3 | Q.   And how long did that last for?  How |
| 10:14:29 | 4 | long was the training? |
| 10:14:30 | 5 | A.   Six months. |
| 10:14:30 | 6 | Q.   Six months?  Okay. |
| 10:14:32 | 7 | So would that have been in 2016 that you |
| 10:14:35 | 8 | completed that training? |
| 10:14:36 | 9 | A.   No.  It was 2015. |
| 10:14:37 | 10 | Q.   End of 2015? |
| 10:14:39 | 11 | Do you remember roughly what month that was? |
| 10:14:41 | 12 | A.   January to June. |
| 10:14:42 | 13 | Q.   Okay.  So did you immediately start |
| 10:14:50 | 14 | working in the City of Buffalo as a police officer? |
| 10:14:52 | 15 | A.   No.  The exam -- the exam was given |
| 10:14:58 | 16 | three or four months after I completed academy. |
| 10:15:01 | 17 | Q.   Okay. |
| 10:15:01 | 18 | A.   And then I waited on the list and |
| 10:15:04 | 19 | waited to get hired. |
| 10:15:05 | 20 | Q.   Okay.  So when would that have been |
| 10:15:08 | 21 | that you had been hired? |
| 10:15:10 | 22 | A.   November 4th of 2016. |
| 10:15:12 | 23 | Q.   Of 2016? |

10:15:13   1          A.    Yeah.

10:15:13   2          Q.    Okay.  So was there an interim in between

10:15:17   3   when you finished your training and before you were

10:15:20   4   hired?

10:15:21   5          Because I -- I think you said that at the

10:15:22   6   end of 2015 was when you completed that training,

10:15:25   7   correct?

10:15:25   8          A.    I completed -- I completed academy in

10:15:28   9   2015.

10:15:29  10          Q.    Okay.

10:15:29  11          A.    June.  Got hired November 4th of 2016.

10:15:35  12   Was sent back to Erie Community College for the

10:15:39  13   rest of phase 2 for academy.  So firearms, there

10:15:44  14   was some more like motor vehicle stuff.  There was

10:15:48  15   some other terrorism classes.

10:15:50  16          And then I came back to the Buffalo Police

10:15:54  17   unit's academy, where I went through policy

10:15:57  18   training, and I was done with that in late

10:16:02  19   December.

10:16:03  20          Q.    Okay.  So there's two phases then to

10:16:08  21   your training with --

10:16:10  22          A.    There's two phases --

10:16:11  23          Q.    Okay.

10:16:12   1          A.      -- through -- through a police academy,

10:16:16   2    yeah.

10:16:16   3          Q.      Okay.  So what would the first phase

10:16:18   4    consist of?

10:16:18   5          A.      Article 35, penal law, drug recognition,

10:16:24   6    EVOC training, so like motor, driving stuff.

10:16:26   7          Q.      Okay.  And then what would the second

10:16:29   8    phase consist of?

10:16:30   9          A.      Firearms.  I believe there was

10:16:32  10    a terrorism class in there.  There might have been

10:16:38  11    like an explosive class in there.

10:16:41  12          Q.      Okay.  So do you have to pass the first

10:16:44  13    phase in order to make it to the second phase, or

10:16:47  14    does everybody who enters the academy move on to

10:16:49  15    the second phase?

10:16:49  16          MS. HUGGINS:  Well, form.  Do you mean for

10:16:52  17    this officer in particular, his academy experience,

10:16:56  18    or in general?

10:16:57  19          MR. DAVENPORT:  I'm just asking him

10:16:58  20    a general question.

10:16:59  21          MS. HUGGINS:  Okay.

10:17:00  22          THE WITNESS:  You have to pass every event

10:17:04  23    daily as they -- as they come through to move on to

*Moriarity - Davenport - 2/21/20*

12

| | | |
|---|---|---|
| 10:17:06 | 1 | the next.  But, yeah, you would have to pass |
| 10:17:09 | 2 | phase 1 to go to phase 2. |
| 10:17:11 | 3 | BY MR. DAVENPORT: |
| 10:17:11 | 4 | Q.   Okay.  And so you passed phase 1? |
| 10:17:13 | 5 | A.   Yeah. |
| 10:17:13 | 6 | Q.   Okay.  So you ended phase 1 I believe |
| 10:17:16 | 7 | at the end of 2015, and then did you begin phase 2 |
| 10:17:20 | 8 | during 2016?  Is that how that worked? |
| 10:17:22 | 9 | A.   So I -- I ended phase 1 in June of |
| 10:17:27 | 10 | 2015, was hired in November 4th of 2016, completed |
| 10:17:33 | 11 | phase 2 by middle of December -- |
| 10:17:37 | 12 | Q.   Okay. |
| 10:17:38 | 13 | A.   -- 2016. |
| 10:17:40 | 14 | Q.   So you -- you wait until after you're |
| 10:17:42 | 15 | hired then before you begin phase 2? |
| 10:17:43 | 16 | A.   I have to be hired to do phase 2. |
| 10:17:46 | 17 | Q.   Okay.  Okay.  So from 2015, when you |
| 10:17:51 | 18 | completed phase 1, to beginning phase 2, did you |
| 10:17:52 | 19 | work at all with any City of Buffalo departments? |
| 10:17:56 | 20 | A.   No.  I entered my first semester at |
| 10:18:00 | 21 | Buff State, which I did not complete. |
| 10:18:02 | 22 | Q.   Okay.  And what were you going for? |
| 10:18:04 | 23 | A.   Criminal justice. |

*Moriarity - Davenport - 2/21/20*

13

| | | |
|---|---|---|
| 10:18:06 | 1 | Q. It was criminal justice? |
| 10:18:07 | 2 | Would that be -- have been beyond your |
| 10:18:10 | 3 | associate's degree? |
| 10:18:10 | 4 | A. Yes. |
| 10:18:10 | 5 | Q. Okay. So, now, after you completed |
| 10:18:15 | 6 | phase 2, did you begin any training with the City |
| 10:18:18 | 7 | of Buffalo Police Department? |
| 10:18:18 | 8 | A. Yes. |
| 10:18:22 | 9 | Q. And what kind of training did you do |
| 10:18:24 | 10 | for that? |
| 10:18:24 | 11 | A. I did additional driving training. |
| 10:18:31 | 12 | I did some policy training. |
| 10:18:39 | 13 | I'm un -- I'm unsure of what else was on |
| 10:18:42 | 14 | that training. |
| 10:18:45 | 15 | Q. Now, would you have done -- |
| 10:18:46 | 16 | A. Yeah, I don't remember. |
| 10:18:47 | 17 | Q. I'm sorry. |
| 10:18:49 | 18 | Would you have done that training before you |
| 10:18:50 | 19 | actually entered a patrol car, or would that |
| 10:18:53 | 20 | training have been done concurrently with some |
| 10:18:55 | 21 | training -- field training that you would have |
| 10:18:58 | 22 | received? |
| 10:18:58 | 23 | A. This would have been -- |

10:18:59  1          MS. HUGGINS:  Form.  You can answer.

10:19:00  2          THE WITNESS:  This would have been before.

10:19:02  3          BY MR. DAVENPORT:

10:19:02  4          Q.   Okay.  Did you have to complete any

10:19:04  5    courses administered by the Buffalo Police

10:19:07  6    Department before you were able to enter the field

10:19:10  7    training portion?

10:19:10  8          A.   The training that I'm referring to,

10:19:12  9    yes.

10:19:13 10          MR. DAVENPORT:  Okay.  So I'm -- I have --

10:19:16 11    I'm not really sure what exhibit we're on at this

10:19:24 12    point.  I believe, I want to say, 24, but I'm not

10:19:27 13    a hundred percent sure.

10:19:28 14          THE REPORTER:  22.

10:19:29 15          MR. DAVENPORT:  22?  Okay.

10:19:30 16          So I'll have this marked as Exhibit 22.

         17    **The following was marked for Identification:**

         18     **EXH. 22**                **Buffalo Police Academy**

         19                                 **training record, two pages**

         20          BY MR. DAVENPORT:

10:20:06 21          Q.   Sir, I'm showing -- showing you what's

10:20:08 22    been marked as Exhibit 22.  Do you recognize this

10:20:10 23    document?

*Moriarity - Davenport - 2/21/20*

15

| | | |
|---|---|---|
| 10:20:10 | 1 | **A.**   Yes. |
| 10:20:10 | 2 | **Q.**   And what do you recognize it to be? |
| 10:20:12 | 3 | **A.**   This is a list of academy training that |
| 10:20:14 | 4 | I did with the BPD. |
| 10:20:16 | 5 | **Q.**   And would you -- reading through the |
| 10:20:19 | 6 | document very quickly, would you agree that it |
| 10:20:21 | 7 | shows all courses that you've taken with the |
| 10:20:24 | 8 | Buffalo Police Department? |
| 10:20:25 | 9 | **A.**   Up to date, yes. |
| 10:20:31 | 10 | **Q.**   So now starting with the first one, |
| 10:20:33 | 11 | drug test policy, that was administered November 4th, |
| 10:20:35 | 12 | 2016, to the same day, November 4th, 2016. |
| 10:20:39 | 13 | Was that drug test administered to you |
| 10:20:41 | 14 | before you started your field training? |
| 10:20:43 | 15 | **MS. HUGGINS:**   Form. |
| 10:20:45 | 16 | **THE WITNESS:**   No.   That was -- if it -- if |
| 10:20:47 | 17 | it says that it's on there that day, that's -- |
| 10:20:49 | 18 | that's the date that I did it. |
| 10:20:51 | 19 | **BY MR. DAVENPORT:** |
| 10:20:51 | 20 | **Q.**   Okay. |
| 10:20:52 | 21 | **A.**   Because I would -- I would have signed |
| 10:20:53 | 22 | something. |
| 10:20:54 | 23 | **Q.**   Okay.   So you also did, on the same |

10:20:58    1    day, EAP training.  What would that refer to?

10:21:02    2          A.    I don't know what EAP training is.

10:21:06    3          Q.    Okay.  What about rules and

10:21:08    4    regulations?  That was also on the same day.

10:21:10    5          A.    Yeah, I did that then.

10:21:11    6          Q.    What would that refer to?

10:21:13    7          A.    You're probably going over MOP stuff.

10:21:17    8    BPD's like operational handbook.  Your uniform

10:21:23    9    regulations.  Rules of wearing certain things or

10:21:29   10    speaking to, you know, a lieutenant a certain way.

10:21:35   11    That -- that type of stuff.

10:21:36   12          Q.    Do you remember any specific sections

10:21:38   13    that they went over for the MOP?

10:21:42   14          And that would be referring to the

10:21:44   15    procedures -- policies and procedures.

10:21:45   16          A.    The handbook, yeah.

10:21:46   17          Q.    Okay.

10:21:48   18          A.    No, I wouldn't remember.

10:21:49   19          Q.    Okay.  Did they discuss at all, you

10:21:51   20    know, how to arrest individuals?

10:21:55   21          Did they go over certain procedures for

10:21:58   22    accidents with patrol vehicles or --

10:22:00   23          MS. HUGGINS:  Form.  You can answer.

*Moriarity - Davenport - 2/21/20*

17

10:22:01   1        **THE WITNESS:**  It's -- it's in there.

10:22:03   2   I don't remember what we did that day.

10:22:06   3        **BY MR. DAVENPORT:**

10:22:06   4        Q.   Okay.   So you also did sexual harassment,

10:22:11   5   discrimination in the workplace.   I would assume

10:22:14   6   that we all know what that is.

10:22:16   7        Rules and regulations, chapter 3, general

10:22:18   8   conduct.   What does general conduct refer to in the

10:22:23   9   procedure -- policies and procedures handbook?

10:22:26 10        A.   I'd have to -- I'd have to open up a --

10:22:30 11   open up the handbook.

10:22:32 12        Q.   When they were going through these

10:22:34 13   sections in the handbook, did they go through the

10:22:36 14   individual sections of the handbook?

10:22:38 15        Did they go through what those provisions

10:22:40 16   said?

10:22:40 17        **MS. HUGGINS:**   Form.

10:22:41 18        **THE WITNESS:**   They briefly skimmed over

10:22:43 19   them, so I -- I'm -- I honestly don't know.   Or

10:22:47 20   don't remember.   I'm sorry.

10:22:48 21        **BY MR. DAVENPORT:**

10:22:48 22        Q.   Did they ask if you understood what

10:22:50 23   those sections meant?

10:22:53  1          MS. HUGGINS:  Form.  You can answer.

10:22:56  2          THE WITNESS:  It's a long time ago.  I -- I

10:22:58  3  don't remember.  I'm -- I'm sorry.

10:22:59  4          BY MR. DAVENPORT:

10:23:00  5          Q.    So, now, on November 23rd, you did

10:23:03  6  MOP 1 training.

10:23:05  7          A.    Yep.

10:23:06  8          Q.    Do you know what that refers to?

10:23:09  9          A.    More MOP training on the -- on the

10:23:14 10  procedural handbook.

10:23:15 11          Q.    So that's procedural handbook training?

10:23:17 12          A.    Yeah.

10:23:17 13          Q.    Okay.  So now it's 1.  Does that refer

10:23:20 14  to the first phase?

10:23:24 15          MS. HUGGINS:  Form.

10:23:25 16          THE WITNESS:  Maybe it's chapter 1.  I'm --

10:23:29 17  I'm really un -- unsure of what --

10:23:33 18          BY MR. DAVENPORT:

10:23:33 19          Q.    But this would have all been training

10:23:35 20  that you would have had to complete before -- or

10:23:37 21  while concurrently you were doing your field

10:23:39 22  training exercises; is that correct?

10:23:40 23          A.    This was done prior to field training.

*Moriarity - Davenport - 2/21/20*

19

10:23:42  1        Q.    Okay.  So, now, at what point do you

10:23:46  2    actually enter in and begin field training?

10:23:49  3            Was there a certain course that you needed

10:23:51  4    to complete on this training course outline before

10:23:54  5    you could actually enter the field?

10:24:13  6        A.    It looks like there's going to be

10:24:14  7    a break between December 1st and December 29th,

10:24:19  8    where I went to phase 2.

10:24:24  9        Q.    So this would have been --

10:24:26  10        A.    And completed my --

10:24:28  11        Q.    This would have been phase 2 of the

10:24:31  12    field training with the Buffalo Police Department,

10:24:33  13    correct?

10:24:33  14        MS. HUGGINS:   Form.

10:24:34  15        THE WITNESS:   I'm sorry.  I'm going to be

10:24:37  16    completing phase 2 right through here.

10:24:39  17        BY MR. DAVENPORT:

10:24:39  18        Q.    Okay.

10:24:39  19        A.    During -- during the --

10:24:40  20        Q.    So from November 4th to --

10:24:43  21        A.    To the 23rd.

10:24:44  22        Q.    Okay.

10:24:44  23        A.    And then --

10:24:46  1          Q.   You would have been completing phase 2

10:24:47  2    at that point?

10:24:48  3          A.   Yeah, I would have been completing

10:24:49  4    phase 2 then, and then between December 1st and

10:24:54  5    December 29th -- I don't know.  I wasn't in

10:25:03  6    a vehicle yet because I was waiting for a vest up

10:25:05  7    in the camera room.

10:25:09  8          Q.   Okay.  So what would phase 1 have

10:25:11  9    consisted of?

10:25:12  10          Would it just be these training courses that

10:25:14  11    are listed on your training course outline?

10:25:15  12          MS. HUGGINS:   Form.

10:25:16  13          THE WITNESS:   Phase 1 of academy?

10:25:18  14          BY MR. DAVENPORT:

10:25:18  15          Q.   Well, it would have been phase 1 of

10:25:20  16    your Buffalo Police Department field training,

10:25:22  17    correct?

10:25:24  18          MS. HUGGINS:   Form.

10:25:26  19          BY MR. DAVENPORT:

10:25:26  20          Q.   Because I -- I guess what you're saying

10:25:28  21    is that phase 2 was completed and you began your

10:25:31  22    field training on November 23rd, correct?

10:25:33  23          A.   Yeah.   Yeah.

*Moriarity - Davenport - 2/21/20*

21

10:25:34 1      Q.   Was there a phase 1 specifically just

10:25:36 2  for --

10:25:36 3      A.   They didn't --

10:25:36 4      Q.   -- the police department?

10:25:36 5      A.   They didn't -- no.  They didn't -- they

10:25:39 6  didn't call it anything like that.

10:25:40 7      We just went straight from phase 2 of police

10:25:43 8  academy, straight to the academy unit at -- at

10:25:46 9  headquarters, and we just sat in there and got all

10:25:49 10 these classes.

10:25:50 11     Q.   Okay.  So it would have been phase 2 at

10:25:58 12 the Erie County Academy and --

10:25:58 13     A.   Yeah.  Yeah.

10:25:59 14     Q.   -- then phase 2 --

10:25:59 15     THE REPORTER:  Hold on.  Hold on.

10:25:59 16     THE WITNESS:  Sorry.

10:25:59 17     (Discussion off the record.)

10:25:59 18     BY MR. DAVENPORT:

10:26:00 19     Q.   Okay.  So it would have been phase 2 at

10:26:00 20 the Erie County academy, and then you would have

10:26:00 21 immediately gone into phase 2 at the Buffalo

10:26:03 22 academy?

10:26:03 23     A.   Yeah.

*Moriarity - Davenport - 2/21/20*

22

| | |
|---|---|
| 10:26:03 1 | Q.   Okay.  So there's no phase 1 at the |
| 10:26:06 2 | Buffalo -- |
| 10:26:06 3 | A.   No. |
| 10:26:07 4 | Q.   -- training academy?  Okay. |
| 10:26:09 5 | So now phase 2, is there a mix of actually |
| 10:26:13 6 | being out in the field, as well as classroom |
| 10:26:16 7 | training, or was it just limited to classroom |
| 10:26:19 8 | training at that point? |
| 10:26:20 9 | A.   Not -- they're not concurrent.  It's |
| 10:26:23 10 | just classroom training, then we were waiting for |
| 10:26:27 11 | our gear up in the camera room, and then once we |
| 10:26:31 12 | got our gear, then we went to field training. |
| 10:26:33 13 | Q.   Besides the security vest, was there |
| 10:26:36 14 | any other equipment that you needed at that time? |
| 10:26:38 15 | A.   That was the only thing I was waiting |
| 10:26:40 16 | on. |
| 10:26:40 17 | Q.   Okay.  What other -- other equipment do |
| 10:26:45 18 | they give you as a field training officer? |
| 10:26:47 19 | A.   Your duty belt and your -- your |
| 10:26:49 20 | assignment room. |
| 10:26:51 21 | MS. HUGGINS:  Just slow down too. |
| 10:26:53 22 | THE WITNESS:  Okay. |
| 10:26:53 23 | MS. HUGGINS:  You're speaking fast. |

*Moriarity - Davenport - 2/21/20*

23

10:26:56  1          BY MR. DAVENPORT:

10:26:57  2          Q.   So now this vest that they gave to you,

10:26:59  3   were you wearing that immediately when you went out

10:27:01  4   into the field?

10:27:01  5          A.   Yes.

10:27:02  6          Q.   And when did you receive that again?

10:27:07  7          A.   I don't remember.

10:27:08  8          Q.   Would it have been between November --

10:27:09  9   or December 1st of 2016 and December 29th of 2016?

10:27:14 10          A.   Yeah.  Closer to the 29th.

10:27:16 11          Q.   Closer to the 29th?

10:27:18 12          So what were you doing from December 1st of

10:27:20 13   2016 to December 29th of 2016?

10:27:24 14          A.   Sitting around at headquarters and then

10:27:26 15   sitting around in the camera room at headquarters.

10:27:30 16          Q.   Okay.  What kinds of things would they

10:27:34 17   have you doing when you were sitting there?

10:27:38 18          A.   In the camera room, observing city

10:27:41 19   camera locations and just writing things down of

10:27:43 20   what we were observing.

10:27:47 21          Q.   So you would have been observing city

10:27:49 22   cameras.  Where would those cameras typically be

10:27:53 23   located?

*Moriarity - Davenport - 2/21/20*

24

10:27:53  1          A.    All over.  All over the city.

10:27:56  2    Intersections.

10:27:56  3          Q.    Would -- would they be located in -- so

10:27:58  4    you -- you eventually went to C District, correct?

10:28:01  5          A.    Yes.

10:28:01  6          Q.    Would some of those cameras be located

10:28:03  7    in C District?

10:28:04  8          A.    Yes.

10:28:04  9          Q.    Did they have you exclusively looking

10:28:06 10    at those cameras at C District?

10:28:07 11          A.    No.

10:28:08 12          Q.    They would have been in A District,

10:28:09 13    B District, C District?

10:28:11 14          MS. HUGGINS:  She needs a verbal answer.

10:28:13 15          THE WITNESS:  Yes.  I'm sorry.  Yes.

10:28:15 16          BY MR. DAVENPORT:

10:28:15 17          Q.    So were you there, looking at these

10:28:18 18    cameras, with any other lieutenants or other field

10:28:22 19    training -- or other police officers who were out

10:28:25 20    in the field?

10:28:25 21          A.    I don't think there were any

10:28:27 22    lieutenants.  There was 14 to 16 other police

10:28:33 23    officers that were with -- with me.

*Moriarity - Davenport - 2/21/20*

25

10:28:38  1          Q.    Where were these other police officers?
10:28:40  2     Where were they located?
10:28:42  3          Were they also in the C District, or were
10:28:44  4     they in other districts?
10:28:45  5          A.    No.   No.   They were in other districts
10:28:47  6     too.
10:28:47  7          Q.    Okay.   Were they all field training
10:28:49  8     officers?
10:28:50  9          A.    No.   These were probationary officers.
10:28:54  10         Q.    They were probationary officers?
10:28:56  11         So what kinds of things would you observe on
10:28:58  12    these cameras?
10:29:00  13         **MS. HUGGINS:**   Form.
10:29:03  14         **THE WITNESS:**   At -- at the time, I would say
10:29:07  15    I didn't -- we didn't really know what we were
10:29:09  16    looking at.   It was just people walking around.
10:29:11  17         **BY MR. DAVENPORT:**
10:29:12  18         Q.    Did they ever say, you know, this
10:29:14  19    person's committing a crime?   You know, we need to
10:29:18  20    dispatch police officers over into that area?
10:29:20  21         A.    No.   It was just us in the room.   There
10:29:23  22    was no one --
10:29:24  23         Q.    So what kinds of --

*Moriarity - Davenport - 2/21/20*

26

10:29:25  1          A.    -- with us.

10:29:26  2          Q.    -- things were you guys looking for on

10:29:28  3  those cameras?

10:29:31  4          A.    I don't remember at the time.  We

10:29:32  5  weren't given much instruction.

10:29:34  6          Q.    Okay.  Were you instructed to take

10:29:36  7  notes on what you saw?

10:29:38  8          A.    We were.

10:29:39  9          Q.    And did you have to turn those notes

10:29:41 10  over to a lieutenant or anybody else to check your

10:29:43 11  work?

10:29:43 12          A.    No.

10:29:44 13          Q.    You just kept those for yourself?

10:29:46 14          A.    I threw mine out, I believe.

10:29:48 15          Q.    Okay.  Did you have to report to

10:29:49 16  anybody what you saw on those cameras?

10:29:51 17          A.    No.

10:29:53 18          Q.    Did you have any cameras that were

10:29:55 19  located on Schmarbeck Avenue?

10:29:58 20          A.    No.

10:30:01 21          Q.    Where, typically, would these cameras

10:30:04 22  be located?

10:30:05 23          Would they be mostly at busy intersections

| | | |
|---|---|---|
| 10:30:07 | 1 | or businesses? |
| 10:30:08 | 2 | MS. HUGGINS:  Form. |
| 10:30:10 | 3 | THE WITNESS:  I don't know the rhyme or |
| 10:30:13 | 4 | reason to where the cameras are placed. |
| 10:30:16 | 5 | BY MR. DAVENPORT: |
| 10:30:17 | 6 | Q.   So this is what you would have done |
| 10:30:19 | 7 | from December 1st, 2016, to December 29th of 2016, |
| 10:30:23 | 8 | correct? |
| 10:30:24 | 9 | A.   I don't know if it's exactly until the |
| 10:30:26 | 10 | 29th.  I got my vest a week -- a week or so before |
| 10:30:33 | 11 | the incident. |
| 10:30:34 | 12 | Q.   Okay. |
| 10:30:36 | 13 | A.   So -- |
| 10:30:36 | 14 | Q.   So you would have received that either |
| 10:30:39 | 15 | shortly before or right around Christmas of 2016? |
| 10:30:42 | 16 | A.   Yeah. |
| 10:30:44 | 17 | Q.   Did you immediately go out into the |
| 10:30:46 | 18 | field after that? |
| 10:30:46 | 19 | A.   Yes. |
| 10:30:47 | 20 | Q.   Who did you go out with? |
| 10:30:49 | 21 | Who -- who was, you know, taking you around |
| 10:30:51 | 22 | to help you with your training? |
| 10:30:53 | 23 | A.   Police Officer Schultz. |

*Moriarity - Davenport - 2/21/20*

28

10:30:55   1       Q.   Did you do any other training with any

10:30:56   2  other officers at that time?

10:30:58   3       A.   No.

10:30:59   4       Q.   How long did your training last for?

10:31:01   5       A.   16 weeks.

10:31:03   6       Q.   And so that 16 weeks would have been

10:31:06   7  beginning on November 4th of 2016, or would it have

10:31:10   8  been beginning when you received your vest in

10:31:14   9  December of 2016?

10:31:14  10       A.   The day I received my vest.

10:31:17  11       Q.   Okay.  And so those 16 weeks were just

10:31:19  12  with Officer Schultz?

10:31:21  13       A.   Yes.

10:31:24  14       Q.   What kinds of things would you -- what

10:31:27  15  kinds of calls would you make with Officer Schultz?

10:31:30  16       A.   Our calls --

10:31:32  17     MS. HUGGINS:   Form.

10:31:33  18     THE WITNESS:   Our calls varied.  Shootings,

10:31:37  19  domestics, car accidents, unknown troubles.

10:31:42  20     BY MR. DAVENPORT:

10:31:43  21       Q.   Do you remember the first week of

10:31:44  22  training with Officer Schultz?

10:31:47  23       A.   I remember the first day.

*Moriarity - Davenport - 2/21/20*

29

| | | |
|---|---|---|
| 10:31:48 | 1 | Q. The first day? What happened on the |
| 10:31:51 | 2 | first day? |
| 10:31:51 | 3 | A. There was a shots fired on Deshler. |
| 10:31:54 | 4 | Q. Did you respond to that call? |
| 10:31:56 | 5 | A. Yes. |
| 10:31:56 | 6 | Q. With Officer Schultz? |
| 10:31:58 | 7 | A. Yes. |
| 10:31:59 | 8 | Q. What was the outcome of that call? |
| 10:32:03 | 9 | A. Afternoon -- the afternoon shift took |
| 10:32:07 | 10 | it over, and me and Karl Schultz left around |
| 10:32:13 | 11 | 10 minutes before 4 because we were done. |
| 10:32:16 | 12 | Q. Were you working the day shift at the |
| 10:32:17 | 13 | time then? |
| 10:32:18 | 14 | A. We were working the day shift, yeah. |
| 10:32:19 | 15 | Q. Did you work the day shift after your |
| 10:32:22 | 16 | first 16 weeks? |
| 10:32:23 | 17 | A. No. I went to afternoons. |
| 10:32:24 | 18 | Q. Afternoon shift? |
| 10:32:25 | 19 | Did you work any other shifts besides |
| 10:32:26 | 20 | day shift and afternoon shift? |
| 10:32:28 | 21 | A. No. |
| 10:32:30 | 22 | Q. So what time, approximately, did you |
| 10:32:33 | 23 | recall to that call on your first day? |

| | | |
|---|---|---|
| 10:32:38 | 1 | **A.**   Later in the day.   I'm not -- I don't |
| 10:32:41 | 2 | remember. |
| 10:32:41 | 3 | **Q.**   Do you remember approximately how long |
| 10:32:42 | 4 | you were at that first call for? |
| 10:32:47 | 5 | **A.**   I do not know.   I don't remember. |
| 10:32:49 | 6 | **Q.**   Was anybody injured at that call? |
| 10:32:51 | 7 | **A.**   No. |
| 10:32:56 | 8 | **Q.**   So how do you typically begin each day, |
| 10:33:02 | 9 | you know, during your first 16 weeks -- we'll -- |
| 10:33:04 | 10 | we'll start with your first 16 weeks. |
| 10:33:06 | 11 | During your first 16 weeks, how would you |
| 10:33:08 | 12 | begin each shift during the day shift? |
| 10:33:12 | 13 | **A.**   We show up to work at 5:30.   We get |
| 10:33:17 | 14 | dressed.   6 o'clock is brief by the lieutenant. |
| 10:33:20 | 15 | Lieutenant McHugh.   And then we start going to |
| 10:33:25 | 16 | calls. |
| 10:33:25 | 17 | **Q.**   Was Lieutenant McHugh your lieutenant |
| 10:33:27 | 18 | at the time? |
| 10:33:27 | 19 | **A.**   Yes. |
| 10:33:29 | 20 | **Q.**   Did you report to any other lieutenants |
| 10:33:31 | 21 | at that time? |
| 10:33:32 | 22 | **A.**   No. |
| 10:33:36 | 23 | **Q.**   Did you have a set schedule for when |

| 10:33:38 | 1 | you would work during that time, besides the day |
| 10:33:40 | 2 | shift?  Did you have set days that you would work? |
| 10:33:43 | 3 | A.   We work four days on, four days off; |
| 10:33:47 | 4 | four days on, three days off. |
| 10:33:51 | 5 | Q.   And that was consistent for your entire |
| 10:33:53 | 6 | 16 weeks? |
| 10:33:53 | 7 | A.   Yes. |
| 10:33:53 | 8 | Q.   Do you remember if you worked the day |
| 10:33:55 | 9 | before the incident on January 1st, 2016 -- or |
| 10:34:02 | 10 | 2017? |
| 10:34:03 | 11 | A.   I don't remember. |
| 10:34:03 | 12 | Q.   Do you remember if you worked the day |
| 10:34:04 | 13 | after? |
| 10:34:09 | 14 | A.   I don't, no.  Sorry. |
| 10:34:11 | 15 | Q.   Do you remember what you did the night |
| 10:34:12 | 16 | before January 1st, 20 -- 2017? |
| 10:34:18 | 17 | A.   No. |
| 10:34:19 | 18 | Q.   Did you celebrate the new year? |
| 10:34:21 | 19 | A.   No. |
| 10:34:21 | 20 | Q.   No? |
| 10:34:22 | 21 | A.   No. |
| 10:34:23 | 22 | Q.   What time did you report to work on |
| 10:34:29 | 23 | January 1st, 2017? |

| | | |
|---|---|---|
| 10:34:29 | 1 | A.   6.   6 a.m. |
| 10:34:30 | 2 | Q.   Okay.  And did you get a briefing from |
| 10:34:34 | 3 | Lieutenant McHugh? |
| 10:34:35 | 4 | A.   Yes. |
| 10:34:36 | 5 | Q.   Do you remember what he said that day? |
| 10:34:38 | 6 | A.   I do not. |
| 10:34:40 | 7 | Q.   Do you remember if you made any calls |
| 10:34:43 | 8 | before going to Schmarbeck? |
| 10:34:45 | 9 | A.   If I -- I'm sorry? |
| 10:34:46 | 10 | MS. HUGGINS:  Form. |
| 10:34:46 | 11 | BY MR. DAVENPORT: |
| 10:34:47 | 12 | Q.   Did you remember responding to any |
| 10:34:49 | 13 | calls before going to Schmarbeck? |
| 10:34:52 | 14 | A.   One.  I responded to the first call. |
| 10:34:55 | 15 | I think it was a robbery. |
| 10:34:56 | 16 | Q.   Okay.  Approximately what time was that |
| 10:35:09 | 17 | robbery that you responded to? |
| 10:35:12 | 18 | A.   It was early.  I don't remember, |
| 10:35:16 | 19 | though. |
| 10:35:16 | 20 | Q.   Was it before you arrived at Schmarbeck |
| 10:35:21 | 21 | or was it on Schmarbeck? |
| 10:35:22 | 22 | A.   It was before Schmarbeck. |
| 10:35:25 | 23 | Q.   Okay.  So I'm going to show you what's |

| | | |
|---|---|---|
| 10:35:27 | 1 | been marked as Exhibit 7. |
| 10:35:42 | 2 | So the only robbery that I'm finding is on |
| 10:35:47 | 3 | Schmarbeck.  Do you see any other robberies or |
| 10:35:50 | 4 | anything that could possibly have been a robbery? |
| 10:35:52 | 5 | A.   Well, Schmarbeck is a larceny, but |
| 10:35:55 | 6 | Sattler was the robbery. |
| 10:35:56 | 7 | Q.   Okay.  So it's listed as a fight. |
| 10:35:59 | 8 | Do you know why it was listed as a fight instead |
| 10:36:02 | 9 | of a robbery? |
| 10:36:02 | 10 | A.   I don't.  I don't know why that's |
| 10:36:04 | 11 | listed as a fight. |
| 10:36:05 | 12 | Q.   So what was that situation?  What |
| 10:36:09 | 13 | happened there? |
| 10:36:12 | 14 | MS. HUGGINS:  Form.  You can answer. |
| 10:36:16 | 15 | THE WITNESS:  I don't remember the nature of |
| 10:36:19 | 16 | the call, because Karl was talking to the |
| 10:36:25 | 17 | complainant, but I looked down a driveway and |
| 10:36:28 | 18 | a dude was hopping the fence, and apparently that |
| 10:36:31 | 19 | was the guy that we were looking for. |
| 10:36:32 | 20 | BY MR. DAVENPORT: |
| 10:36:32 | 21 | Q.   Did you go after him? |
| 10:36:33 | 22 | A.   I didn't. |
| 10:36:34 | 23 | Q.   Did you catch him? |

*Moriarity - Davenport - 2/21/20*

34

| | | |
|---|---|---|
| 10:36:35 | 1 | A.    I didn't. |
| 10:36:35 | 2 | Q.    Did Karl catch him? |
| 10:36:38 | 3 | A.    No.   There were other officers that |
| 10:36:41 | 4 | caught him. |
| 10:36:42 | 5 | Q.    Would they have been other C District |
| 10:36:45 | 6 | officers? |
| 10:36:45 | 7 | A.    Yes. |
| 10:36:46 | 8 | Q.    Do you remember who? |
| 10:36:47 | 9 | A.    I don't. |
| 10:36:48 | 10 | Q.    If you saw a list of officers that were |
| 10:36:51 | 11 | working that shift that day, would that possibly |
| 10:36:53 | 12 | refresh your recollection? |
| 10:36:54 | 13 | A.    It's -- it's not going to, just because |
| 10:36:59 | 14 | I was so brand new, I wouldn't know who -- I |
| 10:37:06 | 15 | wouldn't know who caught him. |
| 10:37:07 | 16 | Q.    Okay.   So how did you decide, between |
| 10:37:12 | 17 | you and Karl, who would go to go speak with the |
| 10:37:14 | 18 | person initially?   Who would leave the car to go |
| 10:37:17 | 19 | speak with somebody? |
| 10:37:18 | 20 | MS. HUGGINS:   Form. |
| 10:37:19 | 21 | THE WITNESS:   At -- at this point in time, |
| 10:37:20 | 22 | I'm so brand new that Karl is doing everything. |
| 10:37:23 | 23 | BY MR. DAVENPORT: |

10;37:23   1          Q.    Would there have been any times that

10:37:25   2    you would have gone to go speak with the

10:37:27   3    complainant rather than Karl?

10:37:29   4          A.    On -- on things that weren't as high of

10:37:34   5    a priority.

10:37:35   6          Q.    Okay.

10:37:35   7          A.    Maybe things that are less dangerous.

10:37:37   8          Q.    Okay.   Was there any set priority that

10;37:42   9    it would be Karl going instead of you to go make

10:37:45  10    that first initial contact with the complainant?

10:37:48  11          MS. HUGGINS:    Form.

10:37:48  12          THE WITNESS:    No.   He -- he would just

10:37:53  13    observe whether or not it was something that he

10:37:56  14    wanted me to handle.

10:37:58  15          BY MR. DAVENPORT:

10:37:59  16          Q.    Okay.   And how would he make that

10:38:00  17    decision?

10:38:00  18          MS. HUGGINS:    Form.

10;38:01  19          THE WITNESS:    I can't -- I can't answer

10:38:02  20    that.   You would have to ask -- ask him.

10:38:05  21          BY MR. DAVENPORT:

10:38:05  22          Q.    What kinds of calls would he allow you

10:38:07  23    to go speak with the complainant rather than Karl

*Moriarity - Davenport - 2/21/20*

36

10:38:10  1  to go speak with the complainant?

10:38:15  2        A.   I -- I don't remember the nature of the

10:38:17  3  call, but I know he let me do the 33 Schmarbeck

10:38:22  4  call.

10:38:22  5        Q.   Do you remember if he let you do -- to

10:38:25  6  go speak with the complainant for any of the other

10:38:27  7  calls that you responded to before 33 Schmarbeck?

10:38:29  8        A.   I don't.

10:38:31  9        Q.   So this -- this first call where there

10:38:34 10  was an accident or injury over at Sycamore, and the

10:38:38 11  time would have been 6:14 a.m., do you remember

10:38:41 12  that call?

10:38:42 13        A.   I don't.

10:38:42 14        Q.   No?

10:38:44 15        What about the alarm that was at

10:38:46 16  1830 Genesee Street?

10:38:48 17        A.   I don't remember.

10:38:49 18        Q.   Do you know why, for that accident or

10:38:52 19  injury, you would have been going to the next call

10:38:56 20  four minutes after the accident or injury call?

10:39:01 21        A.   What do --

10:39:01 22        Q.   So --

10:39:03 23        A.   -- you mean?  Just -- just why it goes

*Moriarity - Davenport - 2/21/20*

37

10:39:03  1  from 6:14 to 6:18?

10:39:06  2      Q.   Well, I -- I guess what I'm saying is:

10:39:08  3  If there's an accident or injury that you responded

10:39:09  4  to, would you know why it would only take four

10:39:12  5  minutes for responding to that accident or injury?

10:39:15  6      A.   I don't remember -- I don't remember

10:39:18  7  the specifics of that.

10:39:20  8      Q.   Okay.  Did you ever respond to any

10:39:23  9  other accidents or injuries that day?

10:39:30  10      A.   Yeah.  The one on 37 Schmarbeck.  And

10:39:35  11  then it looks like that's it.

10:39:40  12      Q.   After 37 Schmarbeck, where was the next

10:39:45  13  call that you responded to?

10:39:49  14      A.   The traffic stop at 1773 Bailey.

10:39:53  15      Q.   And what time would that have been at?

10:39:57  16      A.   1314.

10:39:58  17      Q.   And that would refer to 1:14 p.m.?

10:40:01  18      A.   Yes.

10:40:03  19      Q.   So it looks like you were there at that

10:40:06  20  call for four minutes.  Would that be accurate?

10:40:10  21  Because your next dispatch --

10:40:11  22      A.   Oh, okay.

10:40:12  23      Q.   -- was at 1:18 p.m.

*Moriarity - Davenport - 2/21/20*

38

10:40:15  1          A.    Yeah, that's what it says.

10:40:18  2          Q.    Is there any reason to expect that that

10:40:21  3  would not be accurate?

10:40:22  4          Was there some times where they would have

10:40:26  5  you dispatched for the next call before you had

10:40:29  6  actually finished at the call that you were

10:40:32  7  responding to?

10:40:32  8          MS. HUGGINS:   Form.  You've just asked two

10:40:34  9  questions in a row.

10:40:35  10         MR. DAVENPORT:   So I'll start with my first

10:40:37  11 question.

10:40:40  12         Is there any reason to believe that this

10:40:41  13 record is not accurate?

10:40:43  14         THE WITNESS:   No.  This is -- this is

10:40:44  15 accurate.

10:40:45  16         BY MR. DAVENPORT:

10:40:45  17         Q.    Is there any time where you would

10:40:48  18 respond to a call and it would not be entered on

10:40:51  19 your dispatch monitor until sometime after you had

10:40:55  20 actually responded to that call?

10:40:56  21         A.    No.  We -- we respond to the calls when

10:40:59  22 they're given.

10:41:00  23         Q.    And how do you respond to those calls?

*Moriarity - Davenport - 2/21/20*

39

10:41:02  1       A.    We drive there and we go speak to

10:41:04  2   someone.

10:41:04  3       Q.    Do you have to call in when you're

10:41:07  4   responding to a call?

10:41:09  5       A.    Can you rephrase that?

10:41:11  6       Q.    Do you have to radio in when you're

10:41:13  7   responding to a call?

10:41:16  8       A.    They'll dispatch a call and then we

10:41:18  9   say, clear, and then we go to it.

10:41:21 10       Q.    Is there any other way to respond to

10:41:24 11   a call and have it entered on this form?

10:41:28 12       A.    I mean, if these are -- if these are

10:41:30 13   self-initiated traffic stops, we call radio and

10:41:32 14   say, hey, we're at a traffic stop.

10:41:34 15       Q.    And who enters these entries?  Is it

10:41:38 16   made by the Buffalo Police Department or is it made

10:41:40 17   by another entity?

10:41:42 18       A.    Dispatch, so, yeah, BPD.

10:41:45 19       Q.    It would be the Buffalo Police

10:41:48 20   Department?

10:41:48 21       A.    Yeah.

10:41:48 22       Q.    They control the dispatching?

10:41:51 23       MS. HUGGINS:   Form.

*Moriarity - Davenport - 2/21/20*

40

| | | |
|---|---|---|
| 10:41:52 | 1 | **THE WITNESS:**  Who -- yeah, whoever controls |
| 10:41:54 | 2 | the dispatching. |
| 10:41:55 | 3 | **BY MR. DAVENPORT:** |
| 10:41:56 | 4 | Q.   Okay.  Do you know who controls the |
| 10:41:58 | 5 | dispatch?  Do you know any individuals who -- |
| 10:42:01 | 6 | A.   No. |
| 10:42:01 | 7 | Q.   -- are in charge of that? |
| 10:42:03 | 8 | Do you ever speak with them over the radio |
| 10:42:05 | 9 | besides saying clear or that you're responding to |
| 10:42:07 | 10 | a call? |
| 10:42:09 | 11 | A.   In what context? |
| 10:42:11 | 12 | Q.   Do you, you know, speak to them about |
| 10:42:13 | 13 | any personal matters? |
| 10:42:14 | 14 | A.   No. |
| 10:42:15 | 15 | Q.   Just about work? |
| 10:42:17 | 16 | A.   Yes. |
| 10:42:17 | 17 | Q.   Do you ever get names of those |
| 10:42:19 | 18 | individuals? |
| 10:42:21 | 19 | A.   No, I don't know their names. |
| 10:42:24 | 20 | Q.   So the criminal mischief that was at |
| 10:42:26 | 21 | 1964 Bailey Avenue, do you remember anything about |
| 10:42:29 | 22 | that call? |
| 10:42:30 | 23 | A.   No. |

*Moriarity - Davenport - 2/21/20*

41

| | | |
|---|---|---|
| 10:42:32 | 1 | Q.   So I'm actually going to direct your |
| 10:42:34 | 2 | attention to at -- it would be 2:27 p.m., there was |
| 10:42:39 | 3 | an assault that was on North Ogden Street. |
| 10:42:42 | 4 | Do you see where that is? |
| 10:42:45 | 5 | A.   Yes. |
| 10:42:48 | 6 | Q.   Now, that says that you were at that |
| 10:42:50 | 7 | call until 1816, and that would refer to 6:16 p.m., |
| 10:42:56 | 8 | correct? |
| 10:42:56 | 9 | MS. HUGGINS:   Form. |
| 10:42:57 | 10 | THE WITNESS:   Yes. |
| 10:42:58 | 11 | BY MR. DAVENPORT: |
| 10:43:00 | 12 | Q.   Do you remember anything about that |
| 10:43:01 | 13 | assault?   About that call? |
| 10:43:03 | 14 | A.   I do not. |
| 10:43:05 | 15 | Q.   Do you have any reason to know why you |
| 10:43:07 | 16 | were there at that call for four hours? |
| 10:43:10 | 17 | A.   I do not. |
| 10:43:12 | 18 | Q.   Is there any reason to believe that |
| 10:43:15 | 19 | that time would not be accurate for 6:16 p.m.? |
| 10:43:18 | 20 | A.   I do not know. |
| 10:43:25 | 21 | Q.   How long have you been with the Buffalo |
| 10:43:27 | 22 | Police Department now? |
| 10:43:27 | 23 | A.   A little over three years. |

*Moriarity - Davenport - 2/21/20*

42

| | | |
|---|---|---|
| 10:43:28 | 1 | Q. Are you still with the C District? |
| 10:43:31 | 2 | A. No. |
| 10:43:31 | 3 | Q. Where are you now? |
| 10:43:32 | 4 | A. I'm in Bravo. |
| 10:43:33 | 5 | Q. How long have you been with the |
| 10:43:34 | 6 | B District? |
| 10:43:35 | 7 | We'll refer to it as B District. |
| 10:43:37 | 8 | A. Since October. |
| 10:43:38 | 9 | Q. And were you with C District prior to |
| 10:43:41 | 10 | that? |
| 10:43:41 | 11 | A. I was in C District prior to that. |
| 10:43:44 | 12 | Q. So that would have been about two years |
| 10:43:45 | 13 | that you were with C District? |
| 10:43:47 | 14 | A. I was in Delta District for two months |
| 10:43:52 | 15 | somewhere in there. |
| 10:43:54 | 16 | Q. That would have been during your time |
| 10:43:56 | 17 | at C District? |
| 10:43:57 | 18 | MS. HUGGINS: Form. |
| 10:43:58 | 19 | BY MR. DAVENPORT: |
| 10:43:58 | 20 | Q. During the two years that you would |
| 10:44:00 | 21 | have been in C District? |
| 10:44:01 | 22 | A. Yeah. Somewhere in there I was in |
| 10:44:02 | 23 | Delta for -- for two months. Two or three months. |

*Moriarity - Davenport - 2/21/20*

43

| 10:44:05 | 1 | Q. And what was that reason for |
| 10:44:06 | 2 | transferring over to Delta District? |
| 10:44:08 | 3 | A. Just wanted to see something new. |
| 10:44:10 | 4 | Q. Okay. Do you get to make that |
| 10:44:12 | 5 | decision, as a police officer, where you want |
| 10:44:13 | 6 | to patrol? |
| 10:44:14 | 7 | A. We have to request a transfer. |
| 10:44:15 | 8 | Q. Okay. And then who approves those |
| 10:44:18 | 9 | transfers? |
| 10:44:20 | 10 | A. Commissioner Lockwood. |
| 10:44:22 | 11 | Q. Okay. Is there any other officers that |
| 10:44:25 | 12 | can approve those transfers? |
| 10:44:27 | 13 | A. It all goes through Commissioner |
| 10:44:31 | 14 | Lockwood. |
| 10:44:31 | 15 | Q. So now to go to C District, you had to |
| 10:44:34 | 16 | request a transfer as well, correct? |
| 10:44:35 | 17 | A. Yes. |
| 10:44:38 | 18 | Q. When did you request that transfer to |
| 10:44:45 | 19 | Bravo District? |
| 10:44:46 | 20 | A. I -- I don't remember. I know I went |
| 10:44:48 | 21 | to Bravo in October, though. |
| 10:44:53 | 22 | Q. When -- was there any time gap |
| 10:45:00 | 23 | in between at C District and Bravo District? |

*Moriarity - Davenport - 2/21/20*

44

| | | |
|---|---|---|
| 10:45:02 | 1 | **A.**   I don't know what you mean. |
| 10:45:04 | 2 | **Q.**   Did you finish working at C District |

10:45:08    3    and then take some time off before entering in

10:45:10    4    Bravo District?

10:45:11    5         **A.**   No.

10:45:12    6         **Q.**   Okay.  After you finished -- completed

10:45:16    7    your first 16 weeks of training in C District, who

10:45:19    8    would you patrol with mostly?

10:45:22    9         **A.**   Other C District officers.

10:45:24   10         **Q.**   Okay.  Was there anybody in particular?

10:45:28   11         **A.**   I don't -- I don't understand what you

10:45:30   12    mean.  That was my -- my unit.

10:45:32   13         **Q.**   No.  I understand that --

10:45:33   14         **A.**   Okay.

10:45:34   15         **Q.**   -- C District was your unit, but we

10:45:36   16    talked about how, you know, during your first

10:45:38   17    16 weeks, you were always with Karl Schultz.

10:45:40   18         **A.**   Oh, okay.

10:45:41   19         **Q.**   So after your first 16 weeks, were

10:45:43   20    there any other officers that you would patrol

10:45:45   21    with besides Karl Schultz?

10:45:47   22         **A.**   Yes.  There were other officers at C

10:45:51   23    that were in my platoon.  They've all changed and

*Moriarity - Davenport - 2/21/20*

45

| | | |
|---|---|---|
| 10:45:55 | 1 | went to other areas. |
| 10:45:57 | 2 | Q.   So going back to going to D District |
| 10:46:02 | 3 | and now B District, were there any reasons for your |
| 10:46:05 | 4 | request to transfer out of C District besides |
| 10:46:07 | 5 | seeing something new? |
| 10:46:09 | 6 | Were you happy in C District? |
| 10:46:11 | 7 | MS. HUGGINS:   Form. |
| 10:46:11 | 8 | THE WITNESS:   Indifferent.   My partner |
| 10:46:17 | 9 | wanted to go to Bravo, so I went with him. |
| 10:46:21 | 10 | BY MR. DAVENPORT: |
| 10:46:21 | 11 | Q.   Okay.   Who -- who's your partner that |
| 10:46:22 | 12 | wanted to leave? |
| 10:46:23 | 13 | A.   Christopher Brigett. |
| 10:46:25 | 14 | Q.   Okay.   And how do you get assigned |
| 10:46:26 | 15 | a partner in a certain district? |
| 10:46:29 | 16 | A.   We can choose. |
| 10:46:30 | 17 | Q.   Okay.   Was this individual somebody |
| 10:46:33 | 18 | that you chose while you were in C District? |
| 10:46:36 | 19 | A.   Yes. |
| 10:46:38 | 20 | Q.   And when, approximately, did you make |
| 10:46:42 | 21 | that request to have him be your partner? |
| 10:46:47 | 22 | A.   When I came back from Delta. |
| 10:46:49 | 23 | Q.   Okay.   Did you work with him at all |

| | | |
|---|---|---|
| 10:46:51 | 1 | before you went to Delta District? |
| 10:46:53 | 2 | A.    We went to academy together. |
| 10:46:54 | 3 | Q.    Okay.  Did you patrol with him at all? |
| 10:46:56 | 4 | A.    Never. |
| 10:46:57 | 5 | Q.    Okay.  So he would have been training |
| 10:46:59 | 6 | around the same time as you, correct? |
| 10:47:00 | 7 | A.    Same exact time. |
| 10:47:01 | 8 | Q.    Okay.  Did he receive his vest at the |
| 10:47:03 | 9 | same time? |
| 10:47:08 | 10 | A.    I'm unsure. |
| 10:47:09 | 11 | Q.    Did he start with the Buffalo training |
| 10:47:10 | 12 | academy approximately at the same time? |
| 10:47:12 | 13 | A.    Same time. |
| 10:47:29 | 14 | Q.    So I want to go back to your dispatch |
| 10:47:31 | 15 | monitor. |
| 10:47:33 | 16 | So the first time that you went to |
| 10:47:34 | 17 | Schmarbeck on that day was 10:56 a.m., correct? |
| 10:47:40 | 18 | A.    Yes.  That's what it says, yeah. |
| 10:47:43 | 19 | Q.    And you made -- did you happen to drive |
| 10:47:46 | 20 | on Schmarbeck at all as part of your patrol duties |
| 10:47:49 | 21 | prior to that day? |
| 10:47:51 | 22 | A.    I don't know.  I don't remember. |
| 10:47:55 | 23 | Q.    Would you ever make driving through |

| | | |
|---|---|---|
| 10:47:58 | 1 | Schmarbeck part of your normal patrol duties for |
| 10:48:00 | 2 | a day if you weren't responding to a call there? |
| 10:48:03 | 3 | **MS. HUGGINS:**   Form. |
| 10:48:04 | 4 | **THE WITNESS:**   Back then, I -- I can tell you |
| 10:48:08 | 5 | that I don't -- I don't remember. |
| 10:48:15 | 6 | **BY MR. DAVENPORT:** |
| 10:48:16 | 7 | **Q.**   So even if it wasn't back then, |
| 10:48:17 | 8 | recently, because you were in C District as close |
| 10:48:20 | 9 | to as last year, in 2019, during that time in 2019, |
| 10:48:24 | 10 | would you ever patrol on Schmarbeck if it wasn't |
| 10:48:27 | 11 | for responding to a call there? |
| 10:48:28 | 12 | **A.**   Rarely. |
| 10:48:29 | 13 | **Q.**   Rarely? |
| 10:48:30 | 14 | **A.**   Rarely. |
| 10:48:32 | 15 | **Q.**   Were there any streets that you would |
| 10:48:34 | 16 | typically patrol, as opposed to others? |
| 10:48:36 | 17 | **A.**   Broadway. |
| 10:48:41 | 18 | **Q.**   Besides Broadway, were there any other |
| 10:48:44 | 19 | streets that you would typically patrol? |
| 10:48:49 | 20 | **A.**   I mean, C District is a small district, |
| 10:48:52 | 21 | so a lot of them, but -- |
| 10:49:00 | 22 | **Q.**   I'm sorry.  I've just got to find an |
| 10:49:03 | 23 | exhibit really quickly. |

*Moriarity - Davenport - 2/21/20*

48

| | | |
|---|---|---|
| 10:49:40 | 1 | So I'm going to show you what's been marked |
| 10:49:43 | 2 | as Exhibit 3. |
| 10:50:06 | 3 | All right.  So do you recognize this |
| 10:50:07 | 4 | document? |
| 10:50:09 | 5 | A.   This one, yes. |
| 10:50:10 | 6 | Q.   And what do you recognize it to be? |
| 10:50:12 | 7 | A.   A CAD report. |
| 10:50:14 | 8 | Q.   Did you review any documents before |
| 10:50:17 | 9 | your deposition today? |
| 10:50:19 | 10 | A.   Yes. |
| 10:50:19 | 11 | Q.   And what documents did you review? |
| 10:50:21 | 12 | A.   Actually, it was these three. |
| 10:50:23 | 13 | Q.   It was just those three documents? |
| 10:50:26 | 14 | MS. HUGGINS:  Form.  Did you -- did you |
| 10:50:27 | 15 | review this before your testimony today? |
| 10:50:32 | 16 | THE WITNESS:  Yeah.  Yeah.  You did show |
| 10:50:34 | 17 | this to me. |
| 10:50:35 | 18 | MS. HUGGINS:  Did you review any other CAD |
| 10:50:37 | 19 | reports? |
| 10:50:38 | 20 | THE WITNESS:  No, no other CAD reports. |
| 10:50:40 | 21 | MS. HUGGINS:  Did you review the CAD report |
| 10:50:41 | 22 | for 37 Schmarbeck call? |
| 10:50:43 | 23 | THE WITNESS:  Oh, yes, I did do that. |

10:50:46  1   I did.

10:50:47  2           BY MR. DAVENPORT:

10:50:47  3           Q.   Besides these -- those four documents,

10:50:49  4   did you review any other documents?

10:50:53  5           A.   There was a -- that thick one.

10:50:56  6           MS. HUGGINS:  Only for the preparation of

10:50:57  7   your testimony --

10:50:57  8           THE WITNESS:  Oh.

10:50:58  9           MS. HUGGINS:  -- is what he's asking you.

10:50:59 10           THE WITNESS:  Then no.

10:51:01 11           BY MR. DAVENPORT:

10:51:02 12           Q.   What was the thick document that you're

10:51:03 13   referring to?

10:51:03 14           A.   I don't know the name of it.

10:51:05 15           MS. HUGGINS:  I think he's referring to the

10:51:06 16   interrogatories, when they were prepared and

10:51:07 17   reviewed by him.

10:51:08 18           MR. DAVENPORT:  Okay.

10:51:08 19           MS. HUGGINS:  But, obviously, not for the

10:51:10 20   deposition.

10:51:10 21           MR. DAVENPORT:  I understand.

10:51:11 22           Did you watch any videos?

10:51:11 23           THE WITNESS:  Yes.

10:51:13  1       BY MR. DAVENPORT:

10:51:13  2       Q.   What video did you watch?

10:51:15  3       A.   His -- his video.

10:51:16  4       Q.   Okay.  Did you watch any other videos

10:51:18  5  in preparation for this?

10:51:19  6       A.   No.

10:51:21  7       Q.   So now going -- turning back to the

10:51:23  8  complaint summary report, this says that it was

10:51:27  9  reported at 10:32 a.m.  Does that -- is that

10:51:31 10  accurate to you?

10:51:33 11       A.   It -- I mean, if it's on here, yes,

10:51:36 12  it's accurate.

10:51:37 13       Q.   Okay.  And it says that -- I -- I

10:51:40 14  believe it would refer to you, Kyle Moriarity, and

10:51:44 15  Karl Schultz being dispatched at 10:56 a.m.; is

10:51:49 16  that correct?

10:51:49 17       A.   Yeah, 10:56.

10:51:51 18       Q.   So what is the difference between

10:51:53 19  dispatched and received?

10:51:57 20       Does -- what -- what does received refer to?

10:51:59 21  Let's start with that.

10:52:00 22       A.   I -- I don't know what received means,

10:52:03 23  but 10:56 is when they give us the call.

*Moriarity - Davenport - 2/21/20*

51

10:52:07  1          Received might mean that that's when 911

10:52:12  2  gets it to dispatch.

10:52:14  3          Q.   So what is the difference between 911

10:52:17  4  and dispatch?

10:52:19  5          A.   Someone calls 911 and then 911 will

10:52:23  6  give it to dispatch to give to us.

10:52:25  7          Q.   What does 911 refer to?

10:52:27  8          A.   911 is where the 91 -- 911 call goes

10:52:32  9  to.

10:52:33 10          Q.   Okay.  And where does it go to?

10:52:35 11          A.   Wherever that office is.  I have no

10:52:37 12  idea.

10:52:37 13          Q.   Okay.  And then dispatch is the Buffalo

10:52:42 14  Police Department?

10:52:42 15          A.   Yes.

10:52:43 16          Q.   Okay.  So now there's a 20-minute gap

10:52:47 17  in between it going from 911 to dispatch with the

10:52:52 18  Buffalo Police Department?

10:52:53 19          A.   Yes.

10:52:54 20          Q.   Okay.  Is that typical for 20 minutes

10:52:58 21  to elapse before --

10:53:00 22          A.   Yes.

10:53:00 23          MS. HUGGINS:   Form.

10:53:02   1        BY MR. DAVENPORT:

10:53:02   2        Q.   Is there a certain type of call that

10:53:04   3  wouldn't take 20 minutes?

10:53:05   4        A.   Shootings.

10:53:07   5        Q.   Okay.  And what would be the typical

10:53:10   6  response time for that?

10:53:11   7        MS. HUGGINS:   Form.

10:53:15   8        THE WITNESS:   It's -- it's one of those

10:53:16   9  things you just go to immediately.

10:53:18  10        BY MR. DAVENPORT:

10:53:18  11        Q.   Okay.  Okay.  So now when it says

10:53:24  12  dispatched, does that refer to dispatch receiving

10:53:27  13  it, or does that refer to somebody accepting that

10:53:30  14  call from dispatch?

10:53:31  15        MS. HUGGINS:   Form.

10:53:32  16        THE WITNESS:   Someone accepting the call

10:53:35  17  from dispatch.

10:53:35  18        BY MR. DAVENPORT:

10:53:36  19        Q.   And would that somebody be a police

10:53:38  20  officer in the C District?

10:53:39  21        A.   Yes.

10:53:42  22        Q.   Do you know if you were responding to

10:53:44  23  another call at that time?

*Moriarity - Davenport - 2/21/20*

53

| | | |
|---|---|---|
| 10:53:46 | 1 | A.    I don't. |
| 10:53:48 | 2 | Q.    So turning back to Exhibit 7 on the |
| 10:53:50 | 3 | dispatch monitor, it looks like you would have been |
| 10:53:55 | 4 | on scene at 145 Sprenger Avenue? |
| 10:54:00 | 5 | A.    Yeah. |
| 10:54:00 | 6 | Q.    Do you see that? |
| 10:54:01 | 7 | A.    Yes. |
| 10:54:02 | 8 | Q.    And then it's -- it look -- it appears |
| 10:54:05 | 9 | that you would have been on scene starting at |
| 10:54:07 | 10 | 9:27, until would that be 10:56 when you became |
| 10:54:12 | 11 | available? |
| 10:54:12 | 12 | A.    Yes. |
| 10:54:12 | 13 | Q.    Okay.  So turning back towards Exhibit 3, |
| 10:54:21 | 14 | what type of call was it that you responded to at |
| 10:54:25 | 15 | 33 Schmarbeck? |
| 10:54:26 | 16 | A.    Larceny. |
| 10:54:29 | 17 | Q.    And do you remember the nature of that |
| 10:54:30 | 18 | call? |
| 10:54:30 | 19 | A.    I don't. |
| 10:54:33 | 20 | Q.    Do you remember the individual that you |
| 10:54:34 | 21 | spoke to that day? |
| 10:54:35 | 22 | A.    No. |
| 10:54:38 | 23 | Q.    When it says that the location is |

10:54:40  1  1800 Broadway and that -- what does that refer

10:54:40  2  to?

10:54:47  3          Do you see on --

10:54:48  4          A.   Oh, yeah.  I don't know what that

10:54:51  5  refers to.

10:54:53  6          Q.   Okay.  And then when it says the phone

10:54:55  7  number, do you know what that refers to?

10:54:58  8          A.   That's the phone number that was used

10:54:59  9  to call 911.

10:55:01 10          Q.   That would have been the complainant's

10:55:02 11  phone call?

10:55:03 12          A.   Yeah.

10:55:03 13          Q.   Okay.  So at 10:33, the entry says,

10:55:11 14  male, known, took items from his home.

10:55:13 15          Do you know what that entry would refer to?

10:55:16 16          A.   Whoever the complainant is knows the

10:55:18 17  male who took items from his home.

10:55:20 18          Q.   Now, would that information have been

10:55:22 19  conveyed to you who that individual was that took

10:55:26 20  the items from this individual's home?

10:55:28 21          MS. HUGGINS:   Form.

10:55:29 22          THE WITNESS:   The -- yeah.  I mean, the --

10:55:33 23  the complainant would have -- would have told me.

*Moriarity - Davenport - 2/21/20*

55

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 10:55:35 | 1  | BY MR. DAVENPORT:                                         |
| 10:55:35 | 2  | Q.   Do you remember if the complainant told             |
| 10:55:37 | 3  | you who took the items from his home?                     |
| 10:55:39 | 4  | A.   I don't remember.                                     |
| 10:55:40 | 5  | Q.   Okay.  Do you remember if dispatch told              |
| 10:55:42 | 6  | you who the individual was that took items from his       |
| 10:55:45 | 7  | home?                                                      |
| 10:55:45 | 8  | A.   No, I don't remember.                                 |
| 10:55:46 | 9  | Q.   But that's what that entry refers to is              |
| 10:55:50 | 10 | that it's known who the individual was that took          |
| 10:55:52 | 11 | items from this complainant's home?                       |
| 10:55:54 | 12 | A.   Yes.                                                  |
| 10:55:56 | 13 | Q.   Okay.  So now the next entry that                    |
| 10:55:59 | 14 | I want you to look at is en route, C230.                  |
| 10:56:03 | 15 | What does that refer to?                                   |
| 10:56:04 | 16 | A.   We are en route to the location.                     |
| 10:56:07 | 17 | Q.   So when you say we, that refers to Karl             |
| 10:56:10 | 18 | Schultz and you?                                           |
| 10:56:11 | 19 | A.   Yes.                                                  |
| 10:56:12 | 20 | Q.   Was your call sign C230?                             |
| 10:56:15 | 21 | A.   Yes.                                                  |
| 10:56:15 | 22 | Q.   And that's how it would appear on these             |
| 10:56:18 | 23 | complaint summary reports?                                 |

*Moriarity - Davenport - 2/21/20*

56

10:56:19  1        A.    Yes.

10:56:21  2        Q.    Now, when it says dispatched at the

10:56:23  3   same time, what does that refer to?

10:56:28  4        A.    We're --

10:56:32  5        MS. HUGGINS:   Form.

10:56:33  6        THE WITNESS:   We're en route at the same

10:56:34  7   time that we're dispatched.   They dispatch it and

10:56:36  8   we're on our way.

10:56:38  9        BY MR. DAVENPORT:

10:56:38 10        Q.    Okay.   Now, do you see that at

10:56:40 11   10:56:53 -- so this would have been six seconds

10:56:43 12   after -- that a disposition has been added --

10:56:45 13        A.    Yes.

10:56:45 14        Q.    -- to that complaint summary report?

10:56:48 15        So now I guess what you're telling me is

10:56:51 16   that you would have been dispatched and en route at

10:56:54 17   10:56:47 and that you would have disposed of the

10:56:57 18   case in six seconds?

10:56:58 19        MS. HUGGINS:   Form.

10:56:59 20        THE WITNESS:   I don't -- I don't know why --

10:57:05 21   I don't remember.

10:57:06 22        BY MR. DAVENPORT:

10:57:06 23        Q.    And then that last entry says archived

*Moriarity - Davenport - 2/21/20*

57

| | | |
|---|---|---|
| 10:57:09 | 1 | at the same exact time, correct? |
| 10:57:11 | 2 | A.    Yes. |
| 10:57:11 | 3 | Q.    Okay.  And what does archived refer to? |
| 10:57:13 | 4 | A.    This was dispo'd as archived for |
| 10:57:19 | 5 | whatever reason. |
| 10:57:21 | 6 | Q.    Do officers receive any sort of |
| 10:57:23 | 7 | training for what these complaint summary reports |
| 10:57:24 | 8 | are and how to read them? |
| 10:57:27 | 9 | A.    Not -- not really, no. |
| 10:57:28 | 10 | Q.    Do they give you any -- does the |
| 10:57:31 | 11 | Buffalo Police Academy give you any training how to |
| 10:57:35 | 12 | make entries onto complaint summary reports? |
| 10:57:36 | 13 | A.    We don't make these entries.  Dispatch |
| 10:57:39 | 14 | does. |
| 10:57:39 | 15 | Q.    Just dispatch? |
| 10:57:40 | 16 | A.    Yeah. |
| 10:57:40 | 17 | Q.    Is it possible for an officer to make |
| 10:57:43 | 18 | entries on the complaint summary reports? |
| 10:57:45 | 19 | A.    We can add things to it. |
| 10:57:47 | 20 | Q.    And then how would you make those |
| 10:57:49 | 21 | additions? |
| 10:57:49 | 22 | A.    On the computer in the vehicle. |
| 10:57:51 | 23 | Q.    Okay.  Have you ever done that before? |

*Moriarity - Davenport - 2/21/20*

58

| | | |
|---|---|---|
| 10:57:55 | 1 | A.   Yes. |
| 10:57:55 | 2 | Q.   And did they give you any training on |
| 10:57:57 | 3 | how to make those entries from your computer? |
| 10:57:59 | 4 | A.   No. |
| 10:58:03 | 5 | Q.   Is it a certain program that you use |
| 10:58:05 | 6 | for making those entries? |
| 10:58:08 | 7 | A.   Yes. |
| 10:58:09 | 8 | Q.   Do you know what kind of a program that |
| 10:58:11 | 9 | is? |
| 10:58:11 | 10 | A.   I do not. |
| 10:58:11 | 11 | Q.   Okay.   How does that appear on your |
| 10:58:16 | 12 | computer screen? |
| 10:58:19 | 13 | How -- how does the complaint summary report |
| 10:58:21 | 14 | where you can make entries, how does that appear on |
| 10:58:23 | 15 | your computer screen? |
| 10:58:24 | 16 | MS. HUGGINS:   Form. |
| 10:58:26 | 17 | THE WITNESS:   It does not look like this. |
| 10:58:27 | 18 | BY MR. DAVENPORT: |
| 10:58:28 | 19 | Q.   Okay.   Can you generally describe what |
| 10:58:30 | 20 | that -- what it kind of looks like? |
| 10:58:32 | 21 | A.   Something similar to it.   I mean, all |
| 10:58:34 | 22 | this -- all the same information shows up. |
| 10:58:37 | 23 | Q.   Okay.   And what kinds of changes can |

| | | |
|---|---|---|
| 10:58:41 | 1 | you make from your computer screen? |
| 10:58:43 | 2 | A.   I can't change anything.  I can just |
| 10:58:45 | 3 | add to it. |
| 10:58:45 | 4 | Q.   Okay.  Okay.  So if -- if the time was |
| 10:58:48 | 5 | incorrect, you wouldn't be able to change that? |
| 10:58:50 | 6 | A.   No.  I can call dispatch and then they |
| 10:58:53 | 7 | can change it. |
| 10:58:53 | 8 | Q.   Okay. |
| 10:58:54 | 9 | A.   But it will just continue on with |
| 10:58:56 | 10 | adding.  It won't change it change it. |
| 10:58:58 | 11 | Q.   Okay.  Besides this lawsuit here, have |
| 10:59:03 | 12 | you been involved with any other lawsuits? |
| 10:59:05 | 13 | A.   No. |
| 10:59:05 | 14 | Q.   What about have you been involved with |
| 10:59:07 | 15 | any criminal proceedings? |
| 10:59:08 | 16 | A.   No. |
| 10:59:09 | 17 | MS. HUGGINS:   Form.  Do you mean as |
| 10:59:11 | 18 | a witness? |
| 10:59:12 | 19 | MR. DAVENPORT:   Well, yeah.  I was going to |
| 10:59:13 | 20 | get to that. |
| 10:59:14 | 21 | MS. HUGGINS:   You were going to get to that. |
| 10:59:14 | 22 | Okay. |
| 10:59:14 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

60

| 10:59:15 | 1 | Q. As a witness, have you ever been called |
| 10:59:16 | 2 | to testify in a criminal proceeding? |
| 10:59:19 | 3 | A. Yes. |
| 10:59:20 | 4 | Q. What kinds of documents would you |
| 10:59:21 | 5 | review for those criminal proceedings? |
| 10:59:24 | 6 | A. Similar documents. Arrest forms, crime |
| 10:59:31 | 7 | reports. |
| 10:59:32 | 8 | Q. Would they have you review the |
| 10:59:33 | 9 | complaint summary report? |
| 10:59:34 | 10 | A. Sometimes. |
| 10:59:35 | 11 | Q. And would you have to give testimony on |
| 10:59:37 | 12 | those complaint summary reports? |
| 10:59:38 | 13 | A. Yes. |
| 10:59:38 | 14 | Q. What kinds of things would you have to |
| 10:59:40 | 15 | give testimony on? |
| 10:59:42 | 16 | MS. HUGGINS: Form. |
| 10:59:42 | 17 | BY MR. DAVENPORT: |
| 10:59:43 | 18 | Q. What kinds of entries on the complaint |
| 10:59:44 | 19 | summary report would you have to give testimony on? |
| 10:59:47 | 20 | MS. HUGGINS: Form. You can answer. |
| 10:59:48 | 21 | THE WITNESS: Just like here. Maybe things |
| 10:59:51 | 22 | that were -- were written on here or time frames. |
| 10:59:55 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

61

| | | |
|---|---|---|
| 10:59:56 | 1 | Q. Have you ever found that a complaint |
| 10:59:58 | 2 | summary report was entered incorrectly? |
| 11:00:02 | 3 | A. I'm confused. What do you mean? |
| 11:00:04 | 4 | Q. In your three years as a Buffalo police |
| 11:00:07 | 5 | officer, have you ever found that a complaint |
| 11:00:09 | 6 | summary report did not accurately reflect a call |
| 11:00:12 | 7 | that you made specifically or a call that you |
| 11:00:14 | 8 | responded to? |
| 11:00:14 | 9 | A. Well, just like -- just like here, they |
| 11:00:17 | 10 | entered it as a fight but it was a robbery. |
| 11:00:19 | 11 | Q. Okay. |
| 11:00:20 | 12 | A. So -- |
| 11:00:22 | 13 | Q. So those types of errors then? |
| 11:00:23 | 14 | A. Yeah. |
| 11:00:24 | 15 | Q. Have you ever encountered any |
| 11:00:28 | 16 | discrepancies with the time that are on the |
| 11:00:30 | 17 | complaint summary report? |
| 11:00:34 | 18 | MS. HUGGINS: Form. |
| 11:00:34 | 19 | THE WITNESS: Can you -- |
| 11:00:36 | 20 | BY MR. DAVENPORT: |
| 11:00:36 | 21 | Q. So on the complaint summary report it |
| 11:00:37 | 22 | gives a general time for when these actions would |
| 11:00:40 | 23 | have occurred. |

| | | |
|---|---|---|
| 11:00:41 | 1 | Have you ever noticed that there may be |
| 11:00:43 | 2 | errors with the entry for the time on those |
| 11:00:46 | 3 | complaint summary reports? |
| 11:00:46 | 4 | A.   No.  So everything is computer |
| 11:00:50 | 5 | documented -- |
| 11:00:51 | 6 | Q.   Right. |
| 11:00:51 | 7 | A.   -- as it -- as it occurs.  So the entry |
| 11:00:54 | 8 | initiated at 10:32:23.  That's when said person |
| 11:00:59 | 9 | called from this number, and then it just -- it |
| 11:01:01 | 10 | just goes. |
| 11:01:02 | 11 | Q.   Okay. |
| 11:01:04 | 12 | A.   There will never be a discrepancy |
| 11:01:06 | 13 | with -- with the time. |
| 11:01:06 | 14 | Q.   Is that entered by a computer or is it |
| 11:01:10 | 15 | entered by a person at dispatch? |
| 11:01:14 | 16 | MS. HUGGINS:  Form. |
| 11:01:15 | 17 | THE WITNESS:  I don't -- I don't know. |
| 11:01:16 | 18 | MR. DAVENPORT:  Okay.  So now I want to turn |
| 11:01:19 | 19 | your attention to the video. |
| 11:01:21 | 20 | And would you mind if we could get the |
| 11:01:23 | 21 | lights?  That way there's no glare on the screen. |
| 11:01:28 | 22 | They just have to be the lights right in |
| 11:01:31 | 23 | front of the TV. |

11:01:44  1          **MS. HUGGINS:**  It may be the shades to the

11:01:45  2     window.

11:01:46  3          **MR. DAVENPORT:**  Okay.  Could we redirect the

11:02:08  4     camera towards the television rather than towards

11:02:10  5     the witness for this segment?  Is that possible?

11:02:17  6          **THE VIDEOGRAPHER:**  Could we go off the

11:02:18  7     record?

11:02:18  8          **MR. DAVENPORT:**  Yes, we can.

11:02:18  9          **THE VIDEOGRAPHER:**  Thank you.

11:02:18 10          (A recess was then taken at 11:02 a.m.)

11:17:11 11          (On the record at 11:17 a.m.)

11:17:11 12          **MR. DAVENPORT:**  All right, Mr. Moriarity, so

11:17:14 13     I asked you a few questions about the complaint

11:17:16 14     summary report for the first call that you made on

11:17:18 15     Schmarbeck at 33 Schmarbeck Avenue.

11:17:20 16          We are now going to watch a video that

11:17:23 17     depicts the events from that day for that first

11:17:26 18     call.

11:17:28 19          Mr. Hunt, would you please turn the video

11:17:30 20     camera towards the TV screen.

11:17:32 21          **MS. HUGGINS:**  Form.

11:17:33 22          (Video clip played.)

11:17:33 23          BY MR. DAVENPORT:

11:17:33  1          Q.   So, now, Mr. Moriarity, watching this

11:17:36  2     video, do you remember what the weather was like

11:17:39  3     that day?

11:17:41  4          A.   I -- I don't.  I don't remember what it

11:17:43  5     was like.

11:17:47  6          Q.   Do you remember, was it cold?  Was it

11:17:49  7     warm?

11:17:49  8          A.   January 1st, it was probably cold.

11:17:50  9          Q.   Did you have to wear any sort of a hat

11:17:52 10     or gloves?

11:17:54 11          A.   I -- I think I was wearing a beanie.

11:17:57 12          Q.   A beanie?

11:17:58 13          A.   Yeah.

11:18:00 14          Q.   Now, this red van, have you seen this

11:18:02 15     red van before?

11:18:02 16          A.   No.

11:18:05 17          Q.   Did you happen to see that red van when

11:18:08 18     you appeared on Schmarbeck Avenue on January 1st,

11:18:12 19     2017?

11:18:12 20          A.   I don't remember.

11:18:13 21          Q.   Seeing this red van here today, does

11:18:15 22     that refresh your recollection of seeing a van that

11:18:18 23     day?

*Moriarity - Davenport - 2/21/20*

65

11:18:19   1          A.    No.

11:18:20   2          Q.    No?

11:18:21   3          Do you know who this individual is walking

11:18:30   4    out of the van?

11:18:30   5          And I would say for the record that the time

11:18:32   6    stamp is 9:53:16.  You don't have to verify the

11:18:36   7    time, but the individual who is now walking out of

11:18:38   8    the van, do you -- do you remember this individual?

11:18:44   9          A.    I don't remember.

11:18:45   10          Q.    Do you remember talking to that

11:18:47   11    individual on January 1st of 2017?

11:18:49   12          A.    I do not.

11:18:55   13          Q.    Do you remember what type of a call it

11:18:56   14    was that you responded to on January 1st of 2017,

11:19:01   15    at 33 Schmarbeck?

11:19:02   16          A.    From the complaint summary report, it

11:19:04   17    was a larceny.

11:19:05   18          Q.    Do you remember anything about that

11:19:07   19    call besides what's written on the complaint

11:19:09   20    summary report?

11:19:09   21          A.    I don't.

11:19:12   22          Q.    Do you remember how that call was

11:19:14   23    initiated?

*Moriarity - Davenport - 2/21/20*

66

11:19:16  1        A.   I -- I -- I don't.  It says that it was

11:19:18  2   dispatched.

11:19:21  3        Q.   And dispatched refers to you accepting

11:19:23  4   the call and going to that call, correct?

11:19:25  5        A.   Yes.

11:19:26  6        Q.   But the 911 call was made by the

11:19:28  7   individual, Mike Wolfe?

11:19:29  8        MS. HUGGINS:   Form.

11:19:30  9        THE WITNESS:   I don't know if it was Mike

11:19:34 10   Wolfe, but someone -- someone called 911.

11:19:37 11        BY MR. DAVENPORT:

11:19:38 12        Q.   If I told you that the individual who

11:19:39 13   made the call was Mike Wolfe, would you have any

11:19:41 14   reason to dispute what I say?

11:19:44 15        MS. HUGGINS:   Form.

11:19:46 16        BY MR. DAVENPORT:

11:19:46 17        Q.   Would you have any reason to believe

11:19:48 18   that it was somebody besides Mike Wolfe?

11:19:49 19        MS. HUGGINS:   Form.

11:19:50 20        THE WITNESS:   No, but I also don't remember.

11:19:58 21        MR. DAVENPORT:   All right.

11:20:01 22        MS. HUGGINS:   Do you want to indicate for

11:20:02 23   the record what exhibit you've played?

*Moriarity - Davenport - 2/21/20*

67

11:20:05   1          MR. DAVENPORT:  Yes.

11:20:05   2          So for the record, I played the first video

11:20:08   3    of Exhibit A that was turned over to the City as

11:20:10   4    part of our complaint.  The last four digits of

11:20:16   5    that video file -- can you go back to it, please?

11:20:23   6          The last four digits of that video file are

11:20:25   7    5252.

11:20:28   8          We are now turning to the second video file

11:20:31   9    of Exhibit A that was provided to the City as part

11:20:35  10    of the plaintiff's complaint.  The last four digits

11:20:40  11    are 1342.

11:20:43  12          MS. HUGGINS:  The exhibit number, just for

11:20:45  13    the purposes of the deposition.

11:20:46  14          MR. DAVENPORT:  This exhibit number is

11:20:48  15    Exhibit number 11.

11:20:51  16          MS. HUGGINS:  Thank you.

11:20:59  17          (Video clip played.)

11:20:59  18          BY MR. DAVENPORT:

11:20:59  19          Q.   Do you see the three digits that are on

11:21:02  20    top of that police vehicle?

11:21:03  21          A.   Yeah.  It's kind of clear.

11:21:07  22          Q.   And what are those three digits?

11:21:12  23          A.   I know the -- I know the truck to be

11:21:15  1    532.

11:21:16  2                Oh, that's clear now.  Yeah, 532.

11:21:18  3          Q.    Do you recognize that police vehicle?

11:21:19  4          A.    Yes.

11:21:20  5          Q.    And what do you recognize it as?

11:21:22  6          A.    Buffalo Police vehicle.

11:21:24  7          Q.    Have you ever been in that vehicle

11:21:26  8    before?

11:21:26  9          A.    Yes.

11:21:28 10          Q.    How many times before January 1st?

11:21:31 11          A.    I'm -- yeah.  I'm unsure.

11:21:33 12          Q.    Were you in that vehicle after

11:21:36 13    January 1st of 2017?

11:21:37 14          A.    Yeah.

11:21:39 15          Q.    Was that a car that you would typically

11:21:41 16    use during your shifts at C District?

11:21:44 17          A.    No.   We -- we change depending on what

11:21:49 18    goes to the garage because it's broke.

11:21:51 19          Q.    Okay.  Was there a typical vehicle that

11:21:53 20    you would drive?

11:21:55 21          A.    This was Karl's assigned truck.

11:22:00 22          Q.    Okay.  So Karl Schultz would typically

11:22:03 23    drive this truck then?

*Moriarity - Davenport - 2/21/20*

69

| 11:22:04 | 1 | A.   Yeah.   Yeah. |

11:22:04  1      A.   Yeah.   Yeah.

11:22:04  2      Q.   So during your first 16 weeks of

11:22:06  3  training, this was the vehicle that you were using?

11:22:08  4      A.   Unless it was at the garage, yes.

11:22:11  5      Q.   Okay.   Now, the video shows that you

11:22:15  6  drove past the red van at first.   Do you know why

11:22:18  7  you drove past that red van?

11:22:20  8      A.   I do not.

11:22:21  9      Q.   The video also shows now, at 10:14, in

11:22:24 10  the top corner, that you were now backing up the

11:22:27 11  vehicle down Schmarbeck to where the red van is.

11:22:30 12  Do you know why you did that?

11:22:30 13      MS. HUGGINS:   Form.

11:22:31 14      THE WITNESS:   I don't.

11:22:32 15      BY MR. DAVENPORT:

11:22:33 16      Q.   Were you going to this individual who

11:22:36 17  was out in the -- the sidewalk at this point?

11:22:39 18      A.   I -- I don't remember, but it looks

11:22:43 19  that way.

11:22:47 20      Q.   Now, you parked behind the red van.

11:22:49 21  Was there any reason that you would have done that?

11:22:53 22      A.   Safety.

11:22:54 23      Q.   And what would that safety reason have

*Moriarity - Davenport - 2/21/20*

70

| | | |
|---|---|---|
| 11:22:56 | 1 | been? |
| 11:22:58 | 2 | A.   I mean, so I can see someone in case |
| 11:23:02 | 3 | they're going to shoot me or something. |
| 11:23:03 | 4 | Q.   Okay.  And who would that person have |
| 11:23:05 | 5 | been? |
| 11:23:06 | 6 | MS. HUGGINS:   Form. |
| 11:23:07 | 7 | THE WITNESS:   Yeah.   That -- that's just |
| 11:23:09 | 8 | a -- a general safety thing, so, I mean, I'm pretty |
| 11:23:14 | 9 | sure that that's the complainant for the call. |
| 11:23:18 | 10 | BY MR. DAVENPORT: |
| 11:23:18 | 11 | Q.   Okay.  So it wasn't necessarily that |
| 11:23:20 | 12 | you were driving behind the red van.  You were |
| 11:23:22 | 13 | trying to get a visual on the individual who was |
| 11:23:23 | 14 | standing on the sidewalk, correct? |
| 11:23:25 | 15 | A.   Yeah. |
| 11:23:26 | 16 | Q.   Okay. |
| 11:23:26 | 17 | A.   In the safest way. |
| 11:23:27 | 18 | Q.   And that was a safety procedure? |
| 11:23:30 | 19 | A.   Yeah. |
| 11:23:30 | 20 | Q.   Was that something that Karl Schultz |
| 11:23:32 | 21 | told you to do? |
| 11:23:33 | 22 | A.   I -- I don't think he told me to do |
| 11:23:36 | 23 | anything, no. |

11:23:37  1          Q.   Was that part of your training with the

11:23:39  2   ECC, Erie County Training Academy?

11:23:43  3          A.   No, not really.

11:23:43  4          Q.   Was that part of your training with

11:23:45  5   Buffalo Police Academy?

11:23:48  6          A.   No, not really.

11:23:49  7          Q.   So was that something that you were

11:23:51  8   ever taught by ECC or the Buffalo Police Academy?

11:23:54  9          A.   No.

11:23:55 10          Q.   So that was just something that you did

11:23:56 11   on your own?

11:23:57 12          A.   Yes.

11:23:57 13          Q.   Okay.   Who's that individual who's

11:24:01 14   getting out of the police vehicle?

11:24:03 15          A.   Looks like it's me.

11:24:04 16          Q.   Were you driving that day?

11:24:07 17          A.   Yes.

11:24:08 18          Q.   Did you drive the entire day, or did

11:24:10 19   Karl Schultz drive at any point?

11:24:13 20          A.   I don't --

11:24:13 21          Q.   On January 1st of 2017?

11:24:16 22          A.   I don't know if I drove the whole day.

11:24:19 23          Q.   During your first 16 weeks of training,

*Moriarity - Davenport - 2/21/20*

72

11:24:21  1   who predominantly did most of the driving?

11:24:26  2          A.   The whole 16 weeks, I would say

11:24:29  3   predominantly it was me.

11:24:30  4          Q.   Okay.  Was there any reason why you

11:24:32  5   drove instead of Karl?

11:24:34  6          A.   So I can learn the streets.

11:24:36  7          Q.   Okay.  Did he give you any sort of

11:24:40  8   directions on where to go and how to go to a call?

11:24:42  9          A.   Tons of directions.

11:24:44  10         Q.   Okay.  Do you have any sort of a GPS in

11:24:46  11  your vehicle?

11:24:48  12         A.   They have a map on the computer that we

11:24:52  13  use, but we do not use it for GPS.

11:24:56  14         Q.   Okay.  What do you use that map for?

11:25:01  15         A.   I -- I never used the map.

11:25:05  16         Q.   Okay.

11:25:05  17         A.   But people learn how to GPS calls that

11:25:09  18  way.  You can also identify where other officers

11:25:12  19  are.

11:25:12  20         Q.   Okay.  So you had a pretty good

11:25:16  21  understanding of all the streets on C District and

11:25:18  22  you didn't use the map?

11:25:18  23         A.   No, I didn't --

*Moriarity - Davenport - 2/21/20*

11:25:19  1          MS. HUGGINS:  Form.

11:25:20  2          THE WITNESS:  I didn't have a good

11:25:21  3  understanding at all.  Karl said it's better to

11:25:23  4  learn the streets by driving them rather than

11:25:27  5  GPS-ing them and staring at a computer.

11:25:29  6          BY MR. DAVENPORT:

11:25:29  7          Q.   Okay.  Would Karl then give you oral

11:25:32  8  directions of where to drive?

11:25:33  9          A.   Yes.

11:25:33 10          Q.   Okay.  And you never referred to that

11:25:35 11  map during your first 16 weeks then?

11:25:39 12          A.   I can't say never, but I was --

11:25:43 13          Q.   Do you refer to that map at all?

11:25:44 14          MS. HUGGINS:  Well --

11:25:45 15          MR. DAVENPORT:  He said never.

11:25:46 16          MS. HUGGINS:  I wasn't sure if he was

11:25:48 17  finished answering.

11:25:49 18          THE WITNESS:  I can't say -- I can't say

11:25:50 19  never, but we really tried hard to stay away from

11:25:55 20  it.

11:25:56 21          BY MR. DAVENPORT:

11:25:57 22          Q.   Okay.  After your first 16 weeks, have

11:25:58 23  you ever used the map to go respond to a call?

11:26:02  1        A.   Not to respond to a call, but to find

11:26:05  2   out where an officer was.

11:26:06  3        Q.   Okay.  So now you're walking behind the

11:26:13  4   police vehicle; is that accurate?

11:26:15  5        A.   Yeah.

11:26:15  6        Q.   Was there any reason why you walked

11:26:17  7   behind the police vehicle rather than in front?

11:26:22  8        A.   I don't -- I don't remember that day.

11:26:24  9        Q.   Do you remember any difficulty with

11:26:26 10   walking on the Schmarbeck Drive that day?

11:26:30 11        MS. HUGGINS:  Form.

11:26:31 12        THE WITNESS:  Can you explain that?

11:26:33 13        BY MR. DAVENPORT:

11:26:34 14        Q.   Was it icy?  Was it slippery?

11:26:44 15        A.   I don't remember.

11:26:45 16        Q.   Okay.

11:26:46 17        A.   I don't -- I don't remember.

11:26:47 18        Q.   Okay.  What kinds of shoes were you

11:26:50 19   wearing that day?

11:26:51 20        A.   Boots.

11:26:52 21        Q.   Boots?

11:26:53 22        Did you ever have difficulty walking on

11:26:55 23   streets with those boots?

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 11:26:57 | 1 | A.   Sometimes. |
| 11:26:58 | 2 | Q.   Sometimes? |
| 11:26:58 | 3 | And when would that be? |
| 11:27:00 | 4 | A.   Like snow, icy, Buffalo conditions. |
| 11:27:03 | 5 | Q.   Did you see any snow on the street that |
| 11:27:05 | 6 | day? |
| 11:27:05 | 7 | A.   No. |
| 11:27:06 | 8 | Q.   Any ice? |
| 11:27:07 | 9 | A.   It's not that clear, but, yeah, I don't |
| 11:27:13 | 10 | know. |
| 11:27:13 | 11 | Q.   But as you sit here today, you don't |
| 11:27:16 | 12 | remember any difficulty with walking that day, |
| 11:27:18 | 13 | correct? |
| 11:27:18 | 14 | A.   No.   There was no -- not for me. |
| 11:27:20 | 15 | Q.   Okay.   Now, it seems that you are |
| 11:27:28 | 16 | approaching the individual who is standing on the |
| 11:27:30 | 17 | sidewalk; is that correct? |
| 11:27:31 | 18 | A.   Yes. |
| 11:27:31 | 19 | Q.   Why is it just you that is going out to |
| 11:27:34 | 20 | go speak with that individual? |
| 11:27:38 | 21 | A.   Excuse me.   I -- I don't remember. |
| 11:27:42 | 22 | I think Karl was letting me deal with a low-priority |
| 11:27:46 | 23 | call. |

| | | |
|---|---|---|
| 11:27:47 | 1 | Q.    And how was that determined to be a |
| 11:27:49 | 2 | low-priority call? |
| 11:27:52 | 3 | A.    I mean, there's a lot of variables. |
| 11:27:55 | 4 | You look at officer safety.  There's -- it -- it |
| 11:27:58 | 5 | says right here priority 5, whereas a shooting |
| 11:28:01 | 6 | would be priority 1. |
| 11:28:02 | 7 | Q.    Sure. |
| 11:28:03 | 8 | A.    Things like that. |
| 11:28:04 | 9 | I'm not saying that a priority 5 can't go in |
| 11:28:08 | 10 | a southern direction, but assessing the video and |
| 11:28:14 | 11 | assessing the scene, you can kind of determine. |
| 11:28:18 | 12 | Q.    Now, prior to January 1st, 2017, have |
| 11:28:22 | 13 | you ever -- had you ever responded to a call on |
| 11:28:24 | 14 | Schmarbeck and spoken with this individual? |
| 11:28:26 | 15 | A.    I don't -- I don't remember. |
| 11:28:28 | 16 | Q.    Do you recall if after January 1st, |
| 11:28:33 | 17 | 2017, did you ever respond to a call on Schmarbeck |
| 11:28:35 | 18 | and speak with this individual? |
| 11:28:36 | 19 | A.    No. |
| 11:28:37 | 20 | Q.    Now, at this point you know that you're |
| 11:28:39 | 21 | responding to a larceny or a theft, correct? |
| 11:28:42 | 22 | A.    Yes. |
| 11:28:43 | 23 | Q.    What's part of the normal procedure for |

*Moriarity - Davenport - 2/21/20*

11:28:46   1  responding to a larceny or theft?

11:28:48   2        Is there a typical procedure that you would

11:28:49   3  follow?

11:28:50   4        MS. HUGGINS:   Form.

11:28:54   5        THE WITNESS:   I want to get the complainant's

11:28:55   6  name, date of birth, phone number, address, and

11:28:58   7  then find out the story of what had happened.

11:29:01   8        BY MR. DAVENPORT:

11:29:01   9        Q.   And how would you get that information?

11:29:04  10        A.   Just by talking to him.

11:29:06  11        Q.   Would you have to get any sort of

11:29:08  12  identification or anything else to verify what the

11:29:11  13  complainant is telling you?

11:29:12  14        A.   ID.

11:29:13  15        Q.   ID?   Is that typical?

11:29:15  16        A.   Yes.

11:29:15  17        Q.   Did you do that on this occasion?

11:29:18  18        A.   I don't -- I don't remember.

11:29:20  19        Q.   Would you have to look at the

11:29:22  20  license plate number for the vehicle?   Would --

11:29:25  21  what would Karl Schultz be -- excuse me.   Strike

11:29:28  22  that.

11:29:28  23        What would Karl Schultz be doing in the

*Moriarity - Davenport - 2/21/20*

78

| | | |
|---|---|---|
| 11:29:30 | 1 | vehicle at this point? |
| 11:29:31 | 2 | MS. HUGGINS:  Form. |
| 11:29:31 | 3 | THE WITNESS:  I don't -- I don't know what |
| 11:29:32 | 4 | Karl Schultz could be doing right now. |
| 11:29:34 | 5 | BY MR. DAVENPORT: |
| 11:29:34 | 6 | Q.   I'm not asking what could he be doing. |
| 11:29:37 | 7 | I would be asking more so what should he be doing, |
| 11:29:40 | 8 | if he's not going out to go speak with the |
| 11:29:42 | 9 | individual? |
| 11:29:42 | 10 | MS. HUGGINS:  Form. |
| 11:29:43 | 11 | THE WITNESS:  I -- I think he's just letting |
| 11:29:45 | 12 | me -- me handle a low-priority call to see how I do |
| 11:29:52 | 13 | on it. |
| 11:29:52 | 14 | BY MR. DAVENPORT: |
| 11:29:52 | 15 | Q.   Assuming -- |
| 11:29:53 | 16 | A.   And evaluate me.  He's evaluating me. |
| 11:29:56 | 17 | Q.   I'm sorry. |
| 11:29:56 | 18 | So assuming that he wasn't evaluating you |
| 11:29:58 | 19 | and that you were out with a partner, somebody |
| 11:30:01 | 20 | who's not in training, would two officers go speak |
| 11:30:06 | 21 | with the individual or would just one officer go |
| 11:30:09 | 22 | speak with the individual? |
| 11:30:09 | 23 | MS. HUGGINS:  Form. |

11:30:10   1          THE WITNESS:   I -- I'm not going to assume.

11:30:14   2   There's a bunch of different variables that can be

11:30:19   3   taken into place -- or can be taken into

11:30:22   4   consideration for various different calls.

11:30:24   5          BY MR. DAVENPORT:

11:30:24   6          Q.   Okay.   What types of various

11:30:27   7   circumstances would there be?

11:30:29   8          Would it be based off of the priority of the

11:30:31   9   call?

11:30:34  10          You know, I guess what other variables

11:30:34  11   would you --

11:30:34  12          A.   It --

11:30:36  13          Q.   -- take into consideration?

11:30:37  14          A.   It could be --

11:30:38  15          MS. HUGGINS:   Form.

11:30:39  16          THE WITNESS:   It could be based off the

11:30:41  17   priority of the call.   It could be based off the

11:30:44  18   complainant's actions.   It could be based off of

11:30:48  19   third-, fourth-, fifth-party people that are

11:30:51  20   on scene.

11:30:53  21          BY MR. DAVENPORT:

11:30:53  22          Q.   If there's one individual complainant,

11:30:56  23   would it be typical for one police officer to go

*Moriarity - Davenport - 2/21/20*

80

11:30:59 1  respond to that individual rather than two police

11:31:02 2  officers for a priority 5 larceny/theft?

11:31:05 3       MS. HUGGINS:  Form.

11:31:05 4       THE WITNESS:  No.  I've done both depending

11:31:10 5  on other variables.

11:31:13 6       BY MR. DAVENPORT:

11:31:13 7       Q.  Was there any reason why, on January 1st,

11:31:17 8  2017, there was only one officer that responded and

11:31:19 9  went out to go talk with that individual?

11:31:22 10      A.  I don't -- I don't remember why I was

11:31:25 11 the only one that -- that got out --

11:31:29 12      Q.  But --

11:31:29 13      A.  -- of the vehicle.

11:31:30 14      Q.  -- at this point, what kind of

11:31:33 15 information besides that basic information are you

11:31:36 16 trying to get from this complainant?

11:31:38 17      A.  Just -- just the basic info.

11:31:40 18      Q.  Would you be asking him any details

11:31:42 19 about what his complaint is?

11:31:45 20      MS. HUGGINS:  Form.

11:31:49 21      THE WITNESS:  Yeah.  I would say that

11:31:50 22 I would be asking him about details about what had

11:31:54 23 happened to him.

*Moriarity - Davenport - 2/21/20*

81

| 11:31:54 | 1 | BY MR. DAVENPORT: |
| 11:31:54 | 2 | Q.   Do you remember if this individual told |
| 11:31:56 | 3 | you -- told you any details about what his |
| 11:31:59 | 4 | complaint was? |
| 11:31:59 | 5 | A.   I don't.  I don't remember. |
| 11:32:08 | 6 | Q.   Do you know what he was pointing to, |
| 11:32:10 | 7 | that individual complainant? |
| 11:32:12 | 8 | A.   I don't. |
| 11:32:19 | 9 | Q.   Was there any reason why you were still |
| 11:32:21 | 10 | standing on the street, away from the individual on |
| 11:32:25 | 11 | the sidewalk? |
| 11:32:26 | 12 | A.   Safety. |
| 11:32:27 | 13 | Q.   And what would those safety reasons be? |
| 11:32:31 | 14 | A.   When someone's really close to you, |
| 11:32:32 | 15 | they can punch you or stab you. |
| 11:32:56 | 16 | Q.   Do you remember if Karl Schultz was |
| 11:32:57 | 17 | saying anything from the police vehicle at this |
| 11:32:59 | 18 | time? |
| 11:32:59 | 19 | A.   I don't remember. |
| 11:32:59 | 20 | Q.   Can you see if his window is up or down |
| 11:33:01 | 21 | at this time? |
| 11:33:02 | 22 | A.   No, not -- no, I can't. |
| 11:33:08 | 23 | Q.   Do you remember if his window was up or |

*Moriarity - Davenport - 2/21/20*

82

11:33:10  1   down at this time?

11:33:11  2           A.     I don't.

11:33:14  3           Q.     Do you remember if Karl Schultz was

11:33:17  4   giving you any sort of directions on how to handle

11:33:19  5   the call?

11:33:20  6           A.     I don't remember.

11:33:33  7           Q.     Now, at the time 10:15:11, there's

11:33:36  8   a second police vehicle arriving.   Do you agree

11:33:38  9   with that?

11:33:38 10           A.     Yes.

11:33:41 11           Q.     Do you happen to --

11:33:42 12         MS. HUGGINS:   Form.

11:33:43 13         BY MR. DAVENPORT:

11:33:45 14           Q.     Do you agree that there is a second

11:33:47 15   police vehicle arriving at this time?

11:33:49 16           A.     Yes.

11:33:49 17           Q.     Do you know who the two police officers

11:33:52 18   were in that police vehicle?

11:33:54 19           A.     At -- at the time, I believe I just met

11:33:58 20   them.

11:33:59 21           Q.     Okay.   Do you remember, as you sit here

11:34:03 22   today, who was in that police vehicle?

11:34:05 23           A.     As I sit here today, yes.

*Moriarity - Davenport - 2/21/20*

83

| | | |
|---|---|---|
| 11:34:06 | 1 | Q. Who are those two individuals? |
| 11:34:08 | 2 | A. Lauren McDermott and Jenny Velez. |
| 11:34:10 | 3 | Q. Did you have any prior conversations |
| 11:34:12 | 4 | with them before January 1st of 2017? |
| 11:34:15 | 5 | A. No. I -- I just met them this day. |
| 11:34:18 | 6 | Q. Okay. Did you meet them on this first |
| 11:34:20 | 7 | initial call? |
| 11:34:21 | 8 | A. No. I believe I met them on Sattler. |
| 11:34:25 | 9 | Q. Okay. So they were with you at a prior |
| 11:34:29 | 10 | call then, according to -- what exhibit is it? |
| 11:34:35 | 11 | A. 7. |
| 11:34:35 | 12 | Q. -- Exhibit 7, that would have been at |
| 11:34:40 | 13 | 8:02 a.m.; is that correct? |
| 11:34:43 | 14 | MS. HUGGINS: Form. |
| 11:34:44 | 15 | THE WITNESS: Looks like 6:51. |
| 11:34:49 | 16 | BY MR. DAVENPORT: |
| 11:34:49 | 17 | Q. Excuse me. I didn't realize that there |
| 11:34:51 | 18 | were two of them. |
| 11:34:54 | 19 | Did you see them when you went back to |
| 11:34:56 | 20 | Sattler at 8:02 a.m.? |
| 11:35:01 | 21 | A. I don't remember if -- it was -- it was |
| 11:35:04 | 22 | during that call, so -- |
| 11:35:07 | 23 | Q. It was during the 6:51 a.m. call? |

*Moriarity - Davenport - 2/21/20*

84

11:35:09  1      A.   Yeah, it was during the 6:51.

11:35:12  2      Q.   Okay.  Did you speak both with Lauren

11:35:14  3 McDermott and Jenny Velez at that time?

11:35:16  4      A.   Nothing beyond an introduction.

11:35:18  5      Q.   Okay.  Who were the primary officers on

11:35:21  6 that call?

11:35:22  7      A.   That was --

11:35:23  8      MS. HUGGINS:  Form.

11:35:23  9      THE WITNESS:  Yeah.  I'd have to see the CAD

11:35:26 10 on that.

11:35:27 11      BY MR. DAVENPORT:

11:35:27 12      Q.   Okay.

11:35:28 13      A.   Yeah.  I'd have to see the -- the

11:35:30 14 complaint summary -- summary report on that.

11:35:32 15      Q.   Was it you and Karl Schultz?

11:35:34 16      A.   I would -- I would have to see the

11:35:38 17 complaint summary report.  I know we were the first

11:35:41 18 ones on scene for that.

11:35:42 19      Q.   Okay.  Were Jenny Velez and Lauren

11:35:48 20 McDermott -- were they driving around at that time,

11:35:52 21 or were they dispatched to that call?

11:35:54 22      MS. HUGGINS:  Form.

11:35:55 23      THE WITNESS:  I don't know if they were

*Moriarity - Davenport - 2/21/20*

85

| | | |
|--|--|--|
| 11:35:58 | 1 | driving around or not.  I -- yeah, I can't speak on |
| 11:36:07 | 2 | what they were -- what they were doing. |
| 11:36:08 | 3 | And I don't remember if -- if they were |
| 11:36:10 | 4 | dispatched or not.  I would need to see the summary |
| 11:36:12 | 5 | report for that. |
| 11:36:13 | 6 | BY MR. DAVENPORT: |
| 11:36:14 | 7 | Q.   Okay.  Besides introductions, did you |
| 11:36:16 | 8 | have any sort of a conversation with Lauren |
| 11:36:19 | 9 | McDermott and Jenny Velez? |
| 11:36:20 | 10 | A.   No. |
| 11:36:20 | 11 | Q.   Okay.  Besides 6:51 a.m., was the next |
| 11:36:24 | 12 | time that you saw Jenny Velez and Lauren McDermott |
| 11:36:28 | 13 | at 33 Schmarbeck? |
| 11:36:33 | 14 | A.   I don't -- I don't remember. |
| 11:36:35 | 15 | Q.   Okay.  Now, at this time, you're still |
| 11:36:41 | 16 | speaking with the individual complainant, correct? |
| 11:36:44 | 17 | A.   Yes. |
| 11:36:46 | 18 | Q.   Were Lauren McDermott and Jenny Velez, |
| 11:36:48 | 19 | were they saying anything to you at this time? |
| 11:36:51 | 20 | A.   I don't remember.  It doesn't -- it |
| 11:36:53 | 21 | doesn't look that way, but I don't remember. |
| 11:36:55 | 22 | Q.   Would they have also been evaluating |
| 11:36:57 | 23 | how you responded to the call? |

11:36:58  1          **MS. HUGGINS:**  Form.

11:36:59  2          **THE WITNESS:**  Not an official form of

11:37:02  3  evaluation like Karl.

11:37:04  4          **BY MR. DAVENPORT:**

11:37:05  5          Q.   Okay.  Would it be an informal

11:37:06  6  evaluation?

11:37:08  7          A.   I don't know if they were evaluating me

11:37:10  8  or not.

11:37:11  9          Q.   Okay.  What type of an evaluation would

11:37:14 10  Karl Schultz do?

11:37:15 11          Would it just be what he sees, or would he

11:37:18 12  also have to put together some sort of

11:37:21 13  documentation?

11:37:22 14          A.   Every day of the 16 weeks, there was

11:37:26 15  a form that he filled out at the end of the -- the

11:37:29 16  shift.  There was an evaluation form.

11:37:32 17          Q.   Would that evaluation form take into

11:37:34 18  account each of the calls that you made that day,

11:37:36 19  or would it only take into account certain calls

11:37:39 20  that you responded to?

11:37:40 21          A.   No.  Every call.

11:37:40 22          Q.   Every call?

11:37:42 23          Now, you would have taken the background

| | | |
|---|---|---|
| 11:37:46 | 1 | information for this individual. Would you then go |
| 11:37:50 | 2 | report that background information to Karl Schultz |
| 11:37:52 | 3 | in the car? |
| 11:37:56 | 4 | A. Yeah. |
| 11:37:56 | 5 | Q. Did you do that on this occasion? |
| 11:38:02 | 6 | A. I don't -- I don't remember. |
| 11:38:03 | 7 | Q. Would there be any reason to not report |
| 11:38:05 | 8 | that information to Karl Schultz? |
| 11:38:08 | 9 | A. No, there wouldn't be any reason. |
| 11:38:10 | 10 | Q. Would that be normal police procedure |
| 11:38:13 | 11 | is to take the background information and go report |
| 11:38:15 | 12 | it back to the officer who's in the car? |
| 11:38:17 | 13 | MS. HUGGINS: Form. |
| 11:38:18 | 14 | THE WITNESS: To a field training officer, |
| 11:38:19 | 15 | yes. |
| 11:38:21 | 16 | BY MR. DAVENPORT: |
| 11:38:21 | 17 | Q. Do you remember, did you report that |
| 11:38:24 | 18 | information to Jenny Velez or Lauren McDermott? |
| 11:38:28 | 19 | A. No, I wouldn't -- I wouldn't report it |
| 11:38:30 | 20 | to them. I would report it to Karl. |
| 11:38:46 | 21 | Q. Now, at this moment, you've walked back |
| 11:38:48 | 22 | to the police vehicle, correct? |
| 11:38:49 | 23 | A. Yes. |

*Moriarity - Davenport - 2/21/20*

88

11:38:50   1         Q.   Did you see yourself, prior to this,

11:38:53   2    grabbing anything from the individual?

11:38:56   3         A.   No.

11:39:00   4         Q.   But you would have checked his ID or

11:39:02   5    verified his background information with some sort

11:39:05   6    of documentation, correct?

11:39:06   7         MS. HUGGINS:   Form.

11:39:06   8         THE WITNESS:   I don't know if I verified it

11:39:08   9    or not.

11:39:09  10         BY MR. DAVENPORT:

11:39:09  11         Q.   Okay.   Would there be any reason to not

11:39:13  12    verify his background information?

11:39:15  13         A.   One of the -- I mean, one of the

11:39:17  14    reasons why I'm being evaluated is to make sure

11:39:20  15    I started doing those things, so maybe I -- maybe

11:39:22  16    I didn't do it on scene.

11:39:23  17         Q.   Would Karl Schultz have told you -- if

11:39:26  18    you did or did not ask for that ID, would he have

11:39:30  19    told you to go back and get the ID from the

11:39:32  20    individual?

11:39:32  21         A.   Yeah, he would have told me.

11:39:34  22         Q.   Did he tell you on this occasion?

11:39:36  23         A.   I have no idea.

*Moriarity - Davenport - 2/21/20*

89

| | | |
|---|---|---|
| 11:39:36 | 1 | **MR. DAVENPORT:** So I'm playing the video |
| 11:39:38 | 2 | back, and I want you to see if you did or did not |
| 11:39:41 | 3 | ever grab anything -- any item whatsoever from this |
| 11:39:45 | 4 | individual. |
| 11:39:45 | 5 | (Video clip played.) |
| 11:39:45 | 6 | **BY MR. DAVENPORT:** |
| 11:40:38 | 7 | Q.   Mr. Moriarity, before you went back to |
| 11:40:40 | 8 | your police vehicle, did you ever grab any items or |
| 11:40:42 | 9 | any identification from that individual? |
| 11:40:43 | 10 | A.   No. |
| 11:40:45 | 11 | Q.   I want you to watch after you've gone |
| 11:40:47 | 12 | back to the police vehicle and spoken -- are you |
| 11:40:49 | 13 | speaking now with Karl Schultz? |
| 11:40:50 | 14 | A.   Yes. |
| 11:40:52 | 15 | Q.   I want you to now watch and see if you |
| 11:40:53 | 16 | ever go back to the individual to grab any sort of |
| 11:40:56 | 17 | identification. |
| 11:41:08 | 18 | Now, Officer Moriarity, I just also want to |
| 11:41:10 | 19 | ask you very quickly:  Why did Lauren McDermott and |
| 11:41:13 | 20 | Jenny Velez pull up their vehicle directly behind |
| 11:41:16 | 21 | that minivan? |
| 11:41:18 | 22 | **MS. HUGGINS:** Form. |
| 11:41:18 | 23 | **THE WITNESS:** I have no idea. |

11:41:19  1          BY MR. DAVENPORT:

11:41:19  2          Q.   Would there be any Buffalo Police

11:41:21  3  procedure reason why they would have to pull up

11:41:23  4  their vehicle at that time?

11:41:25  5          A.   No.   I don't know.

11:41:28  6          Q.   No safety reasons or anything like

11:41:30  7  that?   Okay.

11:41:33  8          MS. HUGGINS:   She just needs a verbal

11:41:34  9  answer.

11:41:34 10          THE WITNESS:   I'm sorry.   I'm -- I'm unsure

11:41:36 11  why they -- why they pulled up their vehicle, if

11:41:38 12  for a safety reason, maybe they were listening,

11:41:41 13  maybe they wanted to hear what I was saying or what

11:41:43 14  the complainant was saying, maybe the complainant

11:41:46 15  was talking to them, maybe Karl was talking to

11:41:48 16  them.

11:41:49 17          BY MR. DAVENPORT:

11:41:49 18          Q.   Okay.

11:41:49 19          A.   I don't know.

11:41:50 20          Q.   All right.   Now, Mr. Moriarity, would

11:41:58 21  you agree that at this time, you were talking with

11:42:00 22  the driver of that second police vehicle, or at

11:42:04 23  least standing next to the window of that?

*Moriarity - Davenport - 2/21/20*

11:42:06  1        A.    I'm standing somewhere in between the

11:42:08  2   two vehicles, yes.

11:42:09  3        Q.    Are you facing the second police

11:42:11  4   vehicle?

11:42:12  5        A.    It looks that way, yeah.

11:42:13  6        Q.    Would there be any reason to stand

11:42:16  7   facing the direction of that police vehicle besides

11:42:19  8   speaking to the driver of that second police

11:42:21  9   vehicle?

11:42:22 10        **MS. HUGGINS:**   Form.

11:42:23 11        **THE WITNESS:**   I mean, if they were talking

11:42:24 12   to me, I'm -- I'm acknowledging the fact that they

11:42:28 13   were talking to me and I'm saying something in

11:42:31 14   response.

11:42:32 15        **BY MR. DAVENPORT:**

11:42:32 16        Q.    Do you remember any details of that

11:42:34 17   conversation?

11:42:35 18        **MS. HUGGINS:**   Form.

11:42:35 19        **THE WITNESS:**   No.

11:42:36 20        **BY MR. DAVENPORT:**

11:42:36 21        Q.    They wouldn't have been giving you any

11:42:39 22   directions on how to handle that call?

11:42:40 23        A.    I don't even know if we're -- I don't

*Moriarity - Davenport - 2/21/20*

11:42:43  1   know what we're talking about, so no.

11:42:45  2       Q.   But there would be no reason why they

11:42:47  3   would give you directions on how to handle the call

11:42:49  4   correctly, correct?

11:42:51  5       A.   They could be.

11:43:06  6       Q.   Now, Mr. Moriarity, after you went back

11:43:08  7   to the police vehicle, you did not see yourself

11:43:11  8   check the identification of that individual,

11:43:12  9   correct?

11:43:13  10       MS. HUGGINS:   Form.

11:43:14  11       THE WITNESS:   With the video provided, I --

11:43:20  12   the one that we just watched, I did not go back to

11:43:22  13   the complainant.

11:43:23  14       BY MR. DAVENPORT:

11:43:23  15       Q.   Would there be any sort of a document

11:43:25  16   that would say whether you checked the ID of that

11:43:28  17   individual or not?

11:43:32  18       A.   No.

11:43:33  19       Q.   Is there any sort of a document that's

11:43:36  20   generated for when you do check the ID of somebody?

11:43:43  21       A.   No.

11:43:43  22       Q.   What would be the reason for checking

11:43:45  23   the ID of somebody?

*Moriarity - Davenport - 2/21/20*

11:43:46  1          MS. HUGGINS:  Form.

11:43:47  2          THE WITNESS:  The reason why I do it is to

11:43:50  3  make sure that I'm talking to the person that

11:43:52  4  they're claiming to be.

11:43:55  5          BY MR. DAVENPORT:

11:43:55  6          Q.   And there's no sort of documentation

11:43:56  7  that comes back to verify that this is a valid

11:43:59  8  license or anything else to help you verify that

11:44:04  9  fact?

11:44:04 10          MS. HUGGINS:  Form.

11:44:05 11          THE WITNESS:  If I'm running someone's

11:44:07 12  license to see if they have a suspended license or

11:44:10 13  something, then yeah, there is, but, I mean, if I'm

11:44:13 14  just looking at an ID and seeing if that's the

11:44:17 15  person that's on the ID, then no, there's no --

11:44:20 16  there's no form.

11:44:21 17          BY MR. DAVENPORT:

11:44:21 18          Q.   Okay.  So you would only check at that

11:44:22 19  point if there was a suspended license, correct?

11:44:27 20          That would be the only time a document is

11:44:28 21  generated?

11:44:29 22          MS. HUGGINS:  Form.

11:44:31 23          THE WITNESS:  I just want -- I just want to

*Moriarity - Davenport - 2/21/20*

94

11:44:34 1   be clear.  It's not -- there's no document that's

11:44:37 2   generated.  It just shows up on our computer, the

11:44:40 3   person's info, when we type in their -- their

11:44:44 4   license.  There's no -- there's no document that is

11:44:47 5   spit out of a computer or anything like that.

11:44:53 6         MR. DAVENPORT:  Now, as part of -- and you

11:44:55 7   can turn the camera back towards the witness.

11:45:00 8         Could we also maybe just go off the record

11:45:02 9   just to get the lights back on?

11:45:02 10        THE VIDEOGRAPHER:  Yes.

11:45:02 11        MR. DAVENPORT:  Okay.

11:45:02 12        (A recess was then taken at 11:45 a.m.)

11:46:26 13        (On the record at 11:46 a.m.)

11:46:26 14        BY MR. DAVENPORT:

11:46:26 15        Q.   Now, Mr. Moriarity, we just

11:46:28 16   watched a video of you responding to the call

11:46:31 17   at 33 Schmarbeck.  At this time, you would have

11:46:33 18   asked the individual for his background

11:46:37 19   information.

11:46:39 20        Now, at this time, do you -- do you recall

11:46:45 21   what you did after going back to go talk with Karl

11:46:51 22   Schultz?

11:46:52 23        Did you go back to go speak with the

| 11:46:53 | 1 | complaint? |
| 11:46:54 | 2 | MS. HUGGINS: Form. |
| 11:46:54 | 3 | THE WITNESS: No, I don't remember. |
| 11:46:55 | 4 | BY MR. DAVENPORT: |
| 11:46:55 | 5 | Q. Do you remember going into the house at |
| 11:46:58 | 6 | that time? |
| 11:46:58 | 7 | A. No, I don't. |
| 11:46:59 | 8 | Q. Okay. |
| 11:47:00 | 9 | A. No. |
| 11:47:01 | 10 | Q. Would there be any sort of a document |
| 11:47:03 | 11 | or some sort of a recording or anything else that |
| 11:47:05 | 12 | would help to refresh your recollection? |
| 11:47:09 | 13 | A. If I went back into the house? |
| 11:47:11 | 14 | Q. If you went back into the house. |
| 11:47:12 | 15 | A. I -- I -- I never -- I don't think |
| 11:47:14 | 16 | I went in the house. But no, I mean, there |
| 11:47:18 | 17 | wouldn't -- there wouldn't be a -- a paper that |
| 11:47:20 | 18 | would say that I did. |
| 11:47:23 | 19 | Q. Now, prior to this occasion on |
| 11:47:26 | 20 | January 1st, have you ever responded to a call |
| 11:47:29 | 21 | where a tenant had stole property from a landlord? |
| 11:47:33 | 22 | A. I don't -- I don't know. I don't |
| 11:47:35 | 23 | remember. |

*Moriarity - Davenport - 2/21/20*

96

| | | |
|---|---|---|
| 11:47:35 | 1 | Q. Have you ever responded to one of those |
| 11:47:37 | 2 | types of calls after January 1st of 2017? |
| 11:47:41 | 3 | A. Yes. |
| 11:47:42 | 4 | Q. How many of those types of calls where |
| 11:47:45 | 5 | a tenant stole property from a landlord? |
| 11:47:48 | 6 | A. I don't -- I don't know an approximate |
| 11:47:50 | 7 | number. Not as often as you think. |
| 11:47:56 | 8 | Q. Would it be more or less than ten? |
| 11:48:00 | 9 | A. Over three years, probably more. |
| 11:48:02 | 10 | Q. Would it be more or less than 50? |
| 11:48:06 | 11 | A. Over three years, probably around that |
| 11:48:09 | 12 | maybe. |
| 11:48:11 | 13 | Q. Okay. Did you ever respond to a call |
| 11:48:13 | 14 | on Schmarbeck Avenue where a tenant stole property |
| 11:48:16 | 15 | from a landlord? |
| 11:48:19 | 16 | A. I don't remember if that was the nature |
| 11:48:21 | 17 | of this call, but I -- I haven't had many calls on |
| 11:48:27 | 18 | Schmarbeck, so -- |
| 11:48:29 | 19 | Q. Did you ever respond to a call where an |
| 11:48:31 | 20 | individual was walking out with appliances from |
| 11:48:35 | 21 | their apartment that belonged to the landlord? |
| 11:48:41 | 22 | A. I -- no, I don't -- I don't remember. |
| 11:48:43 | 23 | Q. Would you agree with me that if |

11:48:44   1   an individual wanted to take appliances from

11:48:48   2   a landlord, they would need to drive a large

11:48:50   3   vehicle?

11:48:50   4         **MS. HUGGINS:**   Form.

11:48:52   5         **THE WITNESS:**   Yeah, I mean, I don't -- just

11:49:01   6   to pull appliances out of a house and put them in

11:49:03   7   a -- in a vehicle and drive off, I would say that's

11:49:08   8   probably smart to have a big vehicle.

11:49:12   9         **BY MR. DAVENPORT:**

11:49:12 10         Q.   At this time did you know if the

11:49:14 11   individual that you were speaking to at

11:49:16 12   33 Schmarbeck was a tenant or if he owned the

11:49:20 13   property?

11:49:22 14         A.   I -- I do not remember the nature of

11:49:25 15   the -- the call and what was said between me and

11:49:28 16   the complainant for 33.

11:49:30 17         Q.   Any of those instances that you

11:49:32 18   responded to a tenant who was stealing property

11:49:37 19   from a landlord, were there ever any times where

11:49:39 20   the crime was actually in progress at the time of

11:49:43 21   you responding to that call?

11:49:44 22         A.   No.

11:49:44 23         Q.   Have you ever witnessed a tenant taking

*Moriarity - Davenport - 2/21/20*

98

11:49:48  1  property from a police -- from a landlord, whether

11:49:51  2  that be in your personal capacity or official

11:49:53  3  capacity?

11:49:55  4        MS. HUGGINS:   Form.

11:49:55  5        THE WITNESS:   I wouldn't -- yeah, no,

11:49:58  6  I don't think so.

11:49:58  7        BY MR. DAVENPORT:

11:49:59  8        Q.   Now, at this time, did you know if

11:50:01  9  the individual had a valid driver's license at

11:50:05 10  33 Schmarbeck?

11:50:06 11        A.   From -- from the video that you played

11:50:09 12  for me, I don't -- I didn't see myself on there

11:50:12 13  ever checking his ID, so I don't really know if

11:50:15 14  I did check his ID or not.

11:50:17 15        Q.   As part of your normal procedure for

11:50:21 16  responding to a -- an accusation of larceny or

11:50:25 17  theft, would you ever have to check the license

11:50:28 18  plate on a -- a vehicle that is at the location --

11:50:28 19        A.   If --

11:50:32 20        Q.   -- of the --

11:50:33 21        A.   If it's apparent that the vehicle was

11:50:36 22  involved, then yes.

11:50:39 23        Q.   Do you recall if on January 1st of 2017,

| | | |
|---|---|---|
| 11:50:42 | 1 | you had checked the license plate of that red van? |
| 11:50:45 | 2 | A.   I don't remember. |
| 11:50:46 | 3 | Q.   Would there be any sort of a document |
| 11:50:49 | 4 | that would depict whether you had checked the |
| 11:50:52 | 5 | license of that red van or not? |
| 11:50:58 | 6 | A.   I would say -- I would say no. |
| 11:51:04 | 7 | I don't -- I mean, just by the video, again, |
| 11:51:08 | 8 | I don't know if I -- I don't know what the rest |
| 11:51:09 | 9 | of the video showed, so I don't remember if -- if |
| 11:51:14 | 10 | I did anything else with the complainant. |
| 11:51:18 | 11 | Q.   Do you recall, as you sit here today, |
| 11:51:22 | 12 | or do you know, as you sit here today, whether that |
| 11:51:24 | 13 | red van belonged to the complainant or not? |
| 11:51:26 | 14 | A.   I do not know. |
| 11:51:29 | 15 | Q.   So I'm going to ask you a few questions |
| 11:51:32 | 16 | about what happened immediately after that call to |
| 11:51:35 | 17 | 33 Schmarbeck. |
| 11:51:38 | 18 | Do you recall an individual walking out into |
| 11:51:44 | 19 | the street after you responded to that call at |
| 11:51:46 | 20 | 33 Schmarbeck? |
| 11:51:46 | 21 | MS. HUGGINS:   Form. |
| 11:51:47 | 22 | THE WITNESS:   The videos that we reviewed, |
| 11:51:51 | 23 | yes, I remember, based off the videos we reviewed. |

| | | |
|---|---|---|
| 11:51:54 | 1 | BY MR. DAVENPORT: |
| 11:51:54 | 2 | Q.   But that's only based off of what you |
| 11:51:56 | 3 | saw in the videos? |
| 11:51:59 | 4 | A.   Yeah, I mean, I don't -- again, this |
| 11:52:01 | 5 | was a very, very long time ago, and I was very new. |
| 11:52:06 | 6 | Q.   As you sit here today, do you know who |
| 11:52:08 | 7 | that individual was that's depicted in the video |
| 11:52:11 | 8 | walking out in the street? |
| 11:52:12 | 9 | MS. HUGGINS:   Form. |
| 11:52:13 | 10 | THE WITNESS:   Yes. |
| 11:52:13 | 11 | BY MR. DAVENPORT: |
| 11:52:14 | 12 | Q.   And who is that individual? |
| 11:52:15 | 13 | A.   Mr. Kistner. |
| 11:52:18 | 14 | Q.   Okay.   Do you remember any of the |
| 11:52:19 | 15 | details of a conversation that could have been had |
| 11:52:24 | 16 | between you and Mr. Kistner or Mr. Schultz and |
| 11:52:27 | 17 | Mr. Kistner when he was out in the street? |
| 11:52:30 | 18 | A.   I don't think I had a conversation with |
| 11:52:34 | 19 | Mr. Kistner. |
| 11:52:35 | 20 | Q.   Did Mr. Schultz say anything to |
| 11:52:39 | 21 | Mr. Kistner? |
| 11:52:41 | 22 | A.   No, I don't -- I don't -- I don't think |
| 11:52:45 | 23 | so.   Not when we were trying to drive off. |

| | | |
|---|---|---|
| 11:52:48 | 1 | Q.   Why were you trying to drive off as |
| 11:52:51 | 2 | there was an individual in the street? |
| 11:52:53 | 3 | MS. HUGGINS:  Form. |
| 11:52:54 | 4 | THE WITNESS:  At the time, he wasn't |
| 11:52:57 | 5 | involved with our call, so we were leaving. |
| 11:52:59 | 6 | BY MR. DAVENPORT: |
| 11:52:59 | 7 | Q.   Did he ask to speak to the officers at |
| 11:53:01 | 8 | that time? |
| 11:53:02 | 9 | A.   I don't know if he said anything to us. |
| 11:53:04 | 10 | Q.   Do you know if he said anything to |
| 11:53:06 | 11 | Ms. McDermott or Ms. Velez? |
| 11:53:11 | 12 | A.   I -- yeah, I don't know.  I wouldn't -- |
| 11:53:13 | 13 | MS. HUGGINS:  Form. |
| 11:53:13 | 14 | THE WITNESS:  I don't remember. |
| 11:53:15 | 15 | BY MR. DAVENPORT: |
| 11:53:16 | 16 | Q.   Now, do you recall, as you sit here |
| 11:53:20 | 17 | today, even if it was the video that helped to |
| 11:53:23 | 18 | refresh your recollection, did you drive past the |
| 11:53:25 | 19 | individual who was out in the street? |
| 11:53:27 | 20 | A.   I did drive past him, yeah. |
| 11:53:29 | 21 | Q.   And how long were you driving -- how |
| 11:53:31 | 22 | far past that individual did you drive? |
| 11:53:34 | 23 | A.   I don't remember how -- how far. |

11:53:36  1      Q.   Even based off of the video that you

11:53:41  2  saw, would you know approximately how far that you

11:53:44  3  drove?

11:53:44  4      MS. HUGGINS:   Form.

11:53:44  5      THE WITNESS:   I can't -- I can't judge

11:53:46  6  distance like that.

11:53:47  7      BY MR. DAVENPORT:

11:53:48  8      Q.   Do you know approximately how fast you

11:53:49  9  were driving?

11:53:49 10      A.   I -- I don't know how fast I was

11:53:51 11  driving.  I know from -- it's a small street.

11:53:56 12  I can't get up too high in speeds.

11:53:59 13      Q.   How long is Schmarbeck Avenue?

11:54:02 14      A.   I wouldn't -- I wouldn't be able to

11:54:03 15  tell you that.  It's a small city street, though.

11:54:06 16      Q.   Okay.  Is it a one way or a two way?

11:54:09 17      A.   Two way.

11:54:11 18      Q.   Were there any other cars that were

11:54:13 19  coming in the opposite direction from you?

11:54:15 20      MS. HUGGINS:   Form.

11:54:16 21      THE WITNESS:   I mean, from what the video

11:54:19 22  you guys have, it didn't show any.

11:54:23 23      BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

103

11:54:24  1          Q.   It didn't show any other vehicles

11:54:26  2  coming in the opposite direction?

11:54:27  3          A.   It didn't show any, yeah, coming in the

11:54:31  4  opposite direction, that I remember.

11:54:32  5          Q.   Do you normally wear your seat belt as

11:54:36  6  you're driving?

11:54:38  7          A.   Sometimes.

11:54:40  8          Q.   And that's driving a police vehicle,

11:54:42  9  sometimes you wear a seat belt?

11:54:44 10          MS. HUGGINS:   Form.

11:54:45 11          THE WITNESS:   Yeah, sometimes.

11:54:46 12          BY MR. DAVENPORT:

11:54:47 13          Q.   What situations would you wear

11:54:49 14  a seat belt?

11:54:51 15          MS. HUGGINS:   Form.

11:54:55 16          THE WITNESS:   Situations where I remember or

11:55:00 17  I think it's icy or something.

11:55:04 18          BY MR. DAVENPORT:

11:55:05 19          Q.   As a police officer, are you required

11:55:06 20  to wear a seat belt?

11:55:10 21          MS. HUGGINS:   Form.

11:55:13 22          THE WITNESS:   I'm not sure actually if it's

11:55:15 23  in our Manual of Procedures.

*Moriarity - Davenport - 2/21/20*

104

11:55:17  1          BY MR. DAVENPORT:

11:55:18  2          Q.   Is it a violation of the New York

11:55:19  3  traffic law to not wear your seat belt?

11:55:22  4          A.   It is a violation for moving cars,

11:55:24  5  yeah, but if you look up our New York State VTL,

11:55:30  6  we're exempt from doing a lot of things.

11:55:32  7          Q.   Do you know if you are exempt from

11:55:34  8  wearing a seat belt?

11:55:35  9          A.   I don't actually.

11:55:36 10          Q.   Was that ever told to you by Karl

11:55:39 11  Schultz?

11:55:39 12          A.   No.

11:55:39 13          Q.   Was that told to you by any other

11:55:42 14  officer, that you were not -- that you were exempt

11:55:44 15  from wearing a seat belt?

11:55:45 16          A.   No.

11:55:45 17          Q.   Do you know if Karl Schultz was wearing

11:55:47 18  a seat belt on that day?

11:55:48 19          A.   I don't know.

11:55:49 20          Q.   Do you know if Jenny Velez and Lauren

11:55:52 21  McDermott were wearing a seat belt on that day?

11:55:54 22          A.   They were in a different car.  I don't

11:55:56 23  know.

| 11:55:56 | 1 | Q. With any of the other officers that you |

11:55:56  1      Q.   With any of the other officers that you
11:55:58  2  have been with in their -- in the vehicle, have any
11:56:00  3  of those officers worn a seat belt in the police
11:56:03  4  vehicle that you were driving?
11:56:04  5      A.   Yeah, some do.
11:56:05  6      MS. HUGGINS:   Form.
11:56:06  7      BY MR. DAVENPORT:
11:56:08  8      Q.   Now, when you were driving -- when you
11:56:13  9  typically go to go drive a vehicle, do you check
11:56:16  10  any of your mirrors before you pull away?
11:56:19  11      A.   Yes.
11:56:19  12      Q.   What mirrors do you check?
11:56:21  13      A.   I check all of them because a lot of
11:56:23  14  people are different heights.
11:56:24  15      Q.   Okay.  Now, do you check your mirror to
11:56:27  16  see what's around you or just to make sure that you
11:56:30  17  are able to see and you have a good vantage point
11:56:33  18  for looking through your mirrors?
11:56:35  19      MS. HUGGINS:   Form.
11:56:35  20      THE WITNESS:   To make sure I have a good
11:56:37  21  vantage point and I can see other cars and people
11:56:40  22  and whatnot.
11:56:41  23      BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 11:56:42 | 1 | Q.   Okay.  Do you check your left mirror? |
| 11:56:43 | 2 | Your driver's side mirror? |
| 11:56:44 | 3 | A.   Yes. |
| 11:56:44 | 4 | Q.   Do you check your passenger side |
| 11:56:45 | 5 | mirror? |
| 11:56:45 | 6 | A.   Yes. |
| 11:56:46 | 7 | Q.   And then do you check your rearview |
| 11:56:48 | 8 | mirror? |
| 11:56:48 | 9 | A.   Yeah. |
| 11:56:48 | 10 | Q.   Do you look behind you at all? |
| 11:56:49 | 11 | A.   No.  You can't really see because of |
| 11:56:52 | 12 | the cage. |
| 11:56:52 | 13 | Q.   Okay. |
| 11:56:53 | 14 | A.   It's a little difficult. |
| 11:56:54 | 15 | Q.   Okay.  After you make that initial |
| 11:56:56 | 16 | check, do you ever look at your driver's side |
| 11:56:59 | 17 | mirror, your passenger mirror, or your rearview |
| 11:57:02 | 18 | mirror, as you're driving forward? |
| 11:57:03 | 19 | A.   Often. |
| 11:57:04 | 20 | Q.   Often? |
| 11:57:05 | 21 | And what are you looking for typically? |
| 11:57:08 | 22 | A.   Other cars and -- and people to see |
| 11:57:11 | 23 | what -- what they're doing. |

| | | |
|---|---|---|
| 11:57:12 | 1 | Q.   Okay.   On this occasion do you recall |
| 11:57:16 | 2 | if you looked into your driver's side mirror or |
| 11:57:18 | 3 | your passenger side mirror or your rearview mirror |
| 11:57:22 | 4 | as you were driving away? |
| 11:57:22 | 5 | MS. HUGGINS:   Form. |
| 11:57:24 | 6 | THE WITNESS:   I remember looking in my |
| 11:57:26 | 7 | driver's side mirror. |
| 11:57:28 | 8 | BY MR. DAVENPORT: |
| 11:57:28 | 9 | Q.   Okay.   And why were you looking at your |
| 11:57:31 | 10 | driver's side mirror? |
| 11:57:32 | 11 | A.   Karl told me to -- he directed my |
| 11:57:35 | 12 | attention to the mirror and said, hold on; let's |
| 11:57:39 | 13 | make sure they get out okay. |
| 11:57:42 | 14 | Q.   Okay.   Did you stop your vehicle at |
| 11:57:45 | 15 | that point? |
| 11:57:45 | 16 | A.   I don't -- I don't remember. |
| 11:57:47 | 17 | Q.   Okay.   Were you -- were you looking |
| 11:57:52 | 18 | only at your driver's side mirror at that point |
| 11:57:54 | 19 | when Karl said, let's hold on; let's wait to see if |
| 11:57:57 | 20 | they make it out okay? |
| 11:57:59 | 21 | A.   In between that and looking forward. |
| 11:58:01 | 22 | Q.   Okay.   What was the reason for Karl |
| 11:58:06 | 23 | saying, let's make sure that they make it out okay? |

*Moriarity - Davenport - 2/21/20*

108

11:58:09  1          MS. HUGGINS:  Form.

11:58:09  2          THE WITNESS:  At the time, I'm too new.

11:58:12  3   I don't -- I was just doing what he told me --

11:58:15  4          BY MR. DAVENPORT:

11:58:15  5          Q.    Okay.

11:58:16  6          A.    -- to do.

11:58:17  7          Q.    Okay.  With your experience that you've

11:58:20  8   gained since this incident, would there be any

11:58:22  9   reason why Karl would have told you to make sure

11:58:25  10  that they make it out okay?

11:58:27  11         MS. HUGGINS:  Form.

11:58:27  12         THE WITNESS:  Yeah, I mean, there could have

11:58:29  13  been a whole bunch of reasons why someone would

11:58:31  14  walk up to a police vehicle, so for officer safety,

11:58:36  15  he would have told me to look out -- look out the

11:58:39  16  mirror.

11:58:39  17         BY MR. DAVENPORT:

11:58:39  18         Q.    Do you know, on January 1st, why that

11:58:42  19  individual was walking up to a police vehicle?

11:58:43  20         MS. HUGGINS:  Form.

11:58:44  21         THE WITNESS:  I -- I don't.  I don't know.

11:58:45  22         BY MR. DAVENPORT:

11:58:46  23         Q.    Did Karl Schultz know why that

| | | |
|---|---|---|
| 11:58:49 | 1 | individual was walking up to a police vehicle? |
| 11:58:50 | 2 | MS. HUGGINS:  Form. |
| 11:58:50 | 3 | THE WITNESS:  He didn't tell me.  No, I don't |
| 11:58:53 | 4 | know. |
| 11:58:53 | 5 | BY MR. DAVENPORT: |
| 11:58:53 | 6 | Q.   Do you remember Karl Schultz ever |
| 11:58:55 | 7 | saying, we're leaving, to that individual? |
| 11:59:00 | 8 | A.   I -- I don't.  I don't remember. |
| 11:59:03 | 9 | Q.   Would you have any reason to think that |
| 11:59:04 | 10 | he didn't say, we're leaving? |
| 11:59:08 | 11 | A.   Again, I don't -- I don't remember. |
| 11:59:11 | 12 | I don't remember what he said. |
| 11:59:16 | 13 | Q.   Now, as Karl Schultz said, wait; let's |
| 11:59:19 | 14 | see what happens; let's make it out of there |
| 11:59:21 | 15 | okay -- let's make sure that they make it out of |
| 11:59:23 | 16 | there okay, were you still driving forward at that |
| 11:59:29 | 17 | time? |
| 11:59:29 | 18 | A.   I don't know if I -- I don't remember |
| 11:59:31 | 19 | if I was stopped or slowing to a stop or continuing |
| 11:59:38 | 20 | straight. |
| 11:59:39 | 21 | Q.   Okay.  As you were driving away -- as |
| 11:59:49 | 22 | your vehicle was driving away from the incident, |
| 11:59:52 | 23 | did you see anything that was happening behind you? |

*Moriarity - Davenport - 2/21/20*

110

| | | |
|---|---|---|
| 11:59:57 | 1 | **A.**    I remember having a conversation with |
| 11:59:59 | 2 | Karl about how it looked like Mr. Kistner threw |
| 12:00:05 | 3 | himself on the vehicle.  I -- I can't remember |
| 12:00:12 | 4 | exactly how it looked because I was so new.  I just |
| 12:00:18 | 5 | remember having the conversation with him. |
| 12:00:19 | 6 | **Q.**    And where did you have that |
| 12:00:21 | 7 | conversation? |
| 12:00:22 | 8 | **A.**    In the -- in the police vehicle. |
| 12:00:24 | 9 | **Q.**    Okay.  Would that have been before or |
| 12:00:26 | 10 | after you got out of the police vehicle after the |
| 12:00:32 | 11 | collision was made with Mr. Kistner? |
| 12:00:34 | 12 | **MS. HUGGINS:**  Form. |
| 12:00:34 | 13 | **THE WITNESS:**  That would have been before. |
| 12:00:41 | 14 | **BY MR. DAVENPORT:** |
| 12:00:41 | 15 | **Q.**    Okay.  So the collision would have |
| 12:00:43 | 16 | happened, you would have been in your police |
| 12:00:44 | 17 | vehicle, and Karl Schultz would have told you that |
| 12:00:48 | 18 | Mr. Kistner threw himself at the police vehicle? |
| 12:00:50 | 19 | **MS. HUGGINS:**  Form. |
| 12:00:50 | 20 | **THE WITNESS:**  Like I said, I remember having |
| 12:00:53 | 21 | a conversation talking about it.  I don't -- I don't |
| 12:00:54 | 22 | remember if we both said it or if he just said it, |
| 12:00:57 | 23 | but the conversation took place, then we exited the |

12:00:59  1   vehicle, and walked back.

12:01:01  2          BY MR. DAVENPORT:

12:01:01  3          Q.   Okay.   How long did that conversation

12:01:02  4   last?

12:01:04  5          A.   It probably didn't last very long, but

12:01:08  6   I don't know an approximate time.

12:01:11  7          Q.   Did he happen to say what your next

12:01:13  8   steps should be at that point?

12:01:16  9          A.   I don't remember.   I just -- we just

12:01:19  10  got out, I think.

12:01:24  11         Q.   Did you exit the police vehicle because

12:01:25  12  Karl Schultz exited the police vehicle?

12:01:27  13         A.   Yes.

12:01:28  14         Q.   Did he tell you to exit the police

12:01:30  15  vehicle?

12:01:30  16         A.   No.   I just did it because he did it.

12:01:32  17         Q.   As you were walking back to the scene,

12:01:34  18  did you have any personal viewpoints on what had

12:01:40  19  happened at that point?

12:01:41  20         A.   Can you -- can you explain that?   What

12:01:44  21  do you mean?

12:01:44  22         Q.   Did you happen to view yourself any of

12:01:46  23  the incident, or were you just going based off of

| | | |
|---|---|---|
| 12:01:49 | 1 | what Karl Schultz told you? |
| 12:01:50 | 2 | A.  No.  We were -- we were both walking |
| 12:01:52 | 3 | back.  We would have both seen Mr. Kistner. |
| 12:01:59 | 4 | Q.  Where -- where would you have seen |
| 12:02:01 | 5 | Mr. Kistner as you were walking back? |
| 12:02:03 | 6 | MS. HUGGINS:  Form. |
| 12:02:03 | 7 | THE WITNESS:  On the ground. |
| 12:02:04 | 8 | BY MR. DAVENPORT: |
| 12:02:05 | 9 | Q.  So I guess my question is:  With what |
| 12:02:08 | 10 | Karl Schultz said, that Mr. Kistner threw himself |
| 12:02:10 | 11 | at the police vehicle, did you happen to watch any |
| 12:02:13 | 12 | of that incident unfold before you exited the |
| 12:02:16 | 13 | police vehicle? |
| 12:02:17 | 14 | A.  Well, like I said, I -- I remember |
| 12:02:19 | 15 | having a short conversation with Karl about what |
| 12:02:26 | 16 | we -- what we saw from the mirror, but that would |
| 12:02:31 | 17 | have been it. |
| 12:02:32 | 18 | Q.  So now you're saying, what we saw from |
| 12:02:35 | 19 | the mirror.  Were you also looking at the driver's |
| 12:02:37 | 20 | side mirror when the collision was made with |
| 12:02:39 | 21 | Mr. Kistner? |
| 12:02:39 | 22 | A.  Well, yeah, that's what I said.  I said |
| 12:02:42 | 23 | I was looking in the driver's side mirror and |

| | | |
|---|---|---|
| 12:02:43 | 1 | then -- |
| 12:02:43 | 2 | Q.   And -- |
| 12:02:45 | 3 | MS. HUGGINS:   Well, let -- |
| 12:02:45 | 4 | THE WITNESS:   -- and then also looking |
| 12:02:46 | 5 | forward. |
| 12:02:47 | 6 | BY MR. DAVENPORT: |
| 12:02:48 | 7 | Q.   Okay.  So now you're -- you're looking |
| 12:02:49 | 8 | forward and looking at the driver's side mirror. |
| 12:02:51 | 9 | Were you looking at the driver's side mirror as the |
| 12:02:53 | 10 | collision was made? |
| 12:02:54 | 11 | MS. HUGGINS:   Form. |
| 12:02:54 | 12 | THE WITNESS:   I don't -- I don't remember. |
| 12:02:58 | 13 | In order for me to have the conversation with Karl, |
| 12:03:03 | 14 | I would say I was looking in the mirror at the |
| 12:03:05 | 15 | time. |
| 12:03:06 | 16 | BY MR. DAVENPORT: |
| 12:03:06 | 17 | Q.   And did you have any sort of an opinion |
| 12:03:09 | 18 | of what happened? |
| 12:03:11 | 19 | MS. HUGGINS:   Form. |
| 12:03:11 | 20 | THE WITNESS:   From -- from my perspective |
| 12:03:17 | 21 | looking into the mirror, it looked as though he |
| 12:03:20 | 22 | threw himself on her vehicle. |
| 12:03:23 | 23 | BY MR. DAVENPORT: |

12:03:24  1      Q.    And what led you to believe that

12:03:27  2  Mr. Kistner threw himself on the police vehicle?

12:03:29  3      A.    Again, I don't -- all I remember was

12:03:33  4  having the conversation with Karl about his

12:03:36  5  approach to the vehicle, and then from our -- from

12:03:40  6  our perspective, our vehicle was straight down the

12:03:44  7  street, and then we were looking in the mirror, and

12:03:47  8  then her vehicle was -- I don't know the word --

12:03:52  9  just --

12:03:52 10      Q.    Diagonal?

12:03:53 11      A.    Diagonal, yeah.  So it looked like he

12:03:56 12  threw himself on the vehicle.

12:03:57 13      Q.    So besides the fact that Mr. Kistner

12:03:59 14  was walking towards the vehicle and her vehicle was

12:04:01 15  diagonal, what other things did you see that led

12:04:04 16  yourself to believe that Mr. Kistner threw himself

12:04:08 17  at the vehicle, rather than the vehicle colliding

12:04:10 18  with Mr. Kistner?

12:04:11 19      MS. HUGGINS:  Form.

12:04:11 20      THE WITNESS:  Again, long time ago.  I was

12:04:13 21  very, very new, and from our -- from my perspective,

12:04:17 22  because I can't speak on Karl's perspective, from

12:04:19 23  my perspective, that's all I was going off of.

| 12:04:23 | 1 | BY MR. DAVENPORT: |
| 12:04:23 | 2 | Q. Were you going off of what Karl told |
| 12:04:26 | 3 | you, or were you going off of what you saw? |
| 12:04:27 | 4 | A. No, no, no. From -- from what I saw. |
| 12:04:30 | 5 | Like I said, from my perspective, that's what it |
| 12:04:32 | 6 | looked like. But, I mean, even as I sit here right |
| 12:04:35 | 7 | now, I can't remember what it looked like. It |
| 12:04:38 | 8 | was -- |
| 12:04:38 | 9 | Q. Do you remember if the police vehicle |
| 12:04:39 | 10 | that Lauren McDermott or Jenny Velez, that they |
| 12:04:42 | 11 | were in, was that vehicle stopped or was it moving |
| 12:04:46 | 12 | at the time of the collision? |
| 12:04:47 | 13 | MS. HUGGINS: Form. |
| 12:04:47 | 14 | THE WITNESS: From -- from my perspective as |
| 12:04:51 | 15 | I was looking in the mirror, it appeared as though |
| 12:04:53 | 16 | it was stopped. |
| 12:04:55 | 17 | BY MR. DAVENPORT: |
| 12:04:55 | 18 | Q. How long, approximately, was it stopped |
| 12:04:58 | 19 | before that collision was made? |
| 12:05:00 | 20 | MS. HUGGINS: Form. |
| 12:05:00 | 21 | THE WITNESS: I -- I -- I can't judge time |
| 12:05:03 | 22 | like that, but the whole -- the whole incident |
| 12:05:06 | 23 | looked pretty quick. |

12:05:08  1            BY MR. DAVENPORT:

12:05:09  2                Q.   Now, what part of Mr. Kistner's body

12:05:11  3    initially contacted the police vehicle?

12:05:14  4                A.   I -- I don't remember.

12:05:16  5                Q.   Do you recall if Mr. Kistner stuck his

12:05:18  6    arm out at all?

12:05:19  7                A.   I don't.

12:05:20  8                Q.   Do you recall how he fell to the

12:05:25  9    ground?

12:05:26 10                A.   I remember having a conversation with

12:05:29 11    Karl about him squatting down, leaning back, and

12:05:36 12    then putting his hand on the ground, and then

12:05:39 13    completing the fall.

12:05:40 14                Q.   Now --

12:05:41 15                A.   But I don't -- I don't remember seeing

12:05:42 16    that because it was so long ago and I was so

12:05:45 17    brand new.

12:05:46 18                Q.   Now, was that something that you saw

12:05:48 19    independently, or was that just something that Karl

12:05:50 20    said?

12:05:51 21                Because you're saying that we had it --

12:05:53 22                A.   That was -- yeah.   That -- well, that

12:05:54 23    was something that I saw and then had the

12:05:57  1  conversation with Karl about.  But, again, as I sit

12:06:02  2  here right now, I don't remember.

12:06:03  3       I mean, it -- it was -- like I said, it was

12:06:04  4  so long ago and I was so brand new.

12:06:06  5       Q.   Okay.  At the time of the incident, is

12:06:09  6  that what you believed was that Mr. Kistner stuck

12:06:12  7  his arm out and then fell to the ground, as the

12:06:15  8  police vehicle was stopped?

12:06:15  9       A.   At the time of the incident, yes, that

12:06:17 10  is -- that is what I believe.

12:06:19 11       Q.   Okay.  Now, as Mr. Kistner's falling to

12:06:25 12  the ground, is your police vehicle stopped or is it

12:06:27 13  moving at that time?

12:06:28 14       A.   I -- I don't remember.

12:06:30 15       Q.   When approximately did you stop your

12:06:33 16  police vehicle?

12:06:35 17       A.   I -- I don't remember when I stopped

12:06:38 18  it, if it was before the incident or after or

12:06:42 19  during.

12:06:42 20       Q.   Did Karl ask you to stop the police

12:06:44 21  vehicle?

12:06:47 22       A.   I don't remember if he asked me or not.

12:06:50 23  All I know is I did.

| 12:06:51 | 1 | Q. Did you back up the police vehicle |
| 12:06:53 | 2 | after? |
| 12:06:54 | 3 | A. Yes. |
| 12:06:54 | 4 | Q. Okay. Approximately how far did you |
| 12:06:57 | 5 | back up the police vehicle? |
| 12:06:58 | 6 | A. I can't judge distance like that. |
| 12:07:00 | 7 | I don't -- I don't -- I don't know. I don't even |
| 12:07:02 | 8 | know where I stopped it. |
| 12:07:03 | 9 | Q. Okay. Now, why did you back up the |
| 12:07:07 | 10 | police vehicle at that time? |
| 12:07:08 | 11 | A. I probably didn't want to walk very |
| 12:07:11 | 12 | far. |
| 12:07:11 | 13 | Q. Okay. |
| 12:07:14 | 14 | A. Or it was quicker. |
| 12:07:16 | 15 | Could have been either of those. |
| 12:07:17 | 16 | Q. Before you and Karl got out of the car, |
| 12:07:19 | 17 | were Jenny Velez or Lauren McDermott out of the |
| 12:07:23 | 18 | police vehicle? |
| 12:07:23 | 19 | A. Before -- before me and Karl got out of |
| 12:07:25 | 20 | the car? |
| 12:07:26 | 21 | Q. Before you and Karl got out of the car. |
| 12:07:27 | 22 | A. I -- I don't know. |
| 12:07:28 | 23 | Q. Okay. |

*Moriarity - Davenport - 2/21/20*

119

12:07:29  1      A.    I couldn't -- I couldn't see who was --

12:07:32  2    who was doing what at that point in time.  I was

12:07:35  3    focused on reversing.

12:07:36  4      Q.    Now, as you were walking back towards

12:07:40  5    Mr. Kistner, were you and Karl having any sort of

12:07:42  6    a conversation?

12:07:43  7      A.    I don't remember if we were or not.

12:07:45  8      Q.    Okay.  As you were walking back towards

12:07:49  9    the police vehicle, what did you notice about

12:07:52  10   Mr. Kistner?

12:07:54  11     A.    As we were walking back towards Lauren

12:07:56  12   and --

12:07:57  13     Q.    Yes.  Back towards the second police

12:07:59  14   vehicle.

12:08:02  15     A.    I just remember him being on the

12:08:03  16   ground.

12:08:05  17     Q.    Was he saying anything at that time?

12:08:08  18     A.    Don't remember.

12:08:09  19     Q.    Do you remember any other individuals

12:08:11  20   besides Jim Kistner being out anywhere in that

12:08:16  21   police scene?

12:08:16  22     MS. HUGGINS:  Form.

12:08:17  23     THE WITNESS:  I don't know for sure if it