*Moriarty - Davenport - 2/21/20*

120

| | | |
|---|---|---|
| 12:08:21 | 1 | was his son, but a young -- young male came out |
| 12:08:26 | 2 | from -- from that house. |
| 12:08:27 | 3 | BY MR. DAVENPORT: |
| 12:08:27 | 4 | Q.   What led you to believe that it may |
| 12:08:29 | 5 | have been Mr. Kistner's son? |
| 12:08:30 | 6 | A.   I don't -- I don't know if it was ever |
| 12:08:38 | 7 | said that it was his son, but he came out of the |
| 12:08:41 | 8 | same house that Mr. Kistner came out of. |
| 12:08:43 | 9 | Q.   So you did see Mr. Kistner come out of |
| 12:08:45 | 10 | the house, the same house that that individual came |
| 12:08:48 | 11 | out of? |
| 12:08:49 | 12 | A.   Yeah. |
| 12:08:49 | 13 | Q.   Okay.  Did you watch Mr. Kistner leave |
| 12:08:53 | 14 | that house initially? |
| 12:08:55 | 15 | A.   It -- it wasn't too important enough |
| 12:08:59 | 16 | for me at the time.  We were just leaving. |
| 12:09:03 | 17 | Q.   Was -- were you in your police vehicle |
| 12:09:06 | 18 | when you saw Mr. Kistner first? |
| 12:09:09 | 19 | MS. HUGGINS:  Form. |
| 12:09:12 | 20 | THE WITNESS:  Yeah, I don't remember. |
| 12:09:13 | 21 | BY MR. DAVENPORT: |
| 12:09:13 | 22 | Q.   Were you out in the street? |
| 12:09:16 | 23 | A.   No.  I would have been in the car. |

| | | |
|---|---|---|
| 12:09:18 | 1 | Q.   Okay.  And so how long approximately |
| 12:09:21 | 2 | was it, after you first saw Mr. Kistner, that you |
| 12:09:24 | 3 | then made it out into the street? |
| 12:09:29 | 4 | A.   From when we were trying to leave, to |
| 12:09:32 | 5 | when I saw him come into the street?  Is that what |
| 12:09:35 | 6 | you're saying? |
| 12:09:36 | 7 | Q.   Well, I guess what you were telling me |
| 12:09:38 | 8 | is that you saw that Mr. Kistner walked out of the |
| 12:09:40 | 9 | same house that the second person came out of. |
| 12:09:42 | 10 | So I guess what my question is:  After you |
| 12:09:46 | 11 | first saw Mr. Kistner come out of that house, how |
| 12:09:48 | 12 | long was it before he entered the street? |
| 12:09:49 | 13 | MS. HUGGINS:  Form.  You can answer. |
| 12:09:50 | 14 | THE WITNESS:  I don't -- I don't -- I don't |
| 12:09:57 | 15 | know if I'd be able to judge that time.  I'm -- I'm |
| 12:10:01 | 16 | thinking it was quick. |
| 12:10:02 | 17 | BY MR. DAVENPORT: |
| 12:10:02 | 18 | Q.   Was it minutes or was it seconds? |
| 12:10:05 | 19 | A.   Not many minutes. |
| 12:10:07 | 20 | Q.   But you're thinking it would have been |
| 12:10:10 | 21 | minutes? |
| 12:10:10 | 22 | A.   Like maybe one or maybe seconds. |
| 12:10:14 | 23 | Q.   Okay. |

*Moriarity - Davenport - 2/21/20*

122

| 12:10:16 | 1 | A.    Yeah, I don't know. |

12:10:17   2      Q.    Do you know why you and Karl Schultz

12:10:20   3   would have been sitting in your police vehicle for

12:10:22   4   a few minutes after you first entered your police

12:10:25   5   vehicle?

12:10:26   6      MS. HUGGINS:  Form.

12:10:26   7      THE WITNESS:  I -- I don't remember.

12:10:29   8   He could have been giving me an on-the-spot

12:10:33   9   evaluation.  We could have just been talking about

12:10:38  10   nothing.  We could have been just sitting there.

12:10:42  11      And like I said, I don't remember what --

12:10:45  12   what all we did on the larceny at 33 Schmarbeck, so

12:10:50  13   we could have just been talking about that right

12:10:53  14   before we were leaving.

12:10:54  15      BY MR. DAVENPORT:

12:10:54  16      Q.    Would that be something that he would

12:10:56  17   normally do is give you an on-the-spot evaluation?

12:10:58  18      A.    Sometimes.

12:10:59  19      Q.    Was that often or --

12:11:02  20      A.    Over 16 weeks, yeah, I mean, sometimes

12:11:05  21   he would just be like:  You did a good job, or,

12:11:08  22   hey, do this, do this better.

12:11:09  23      Q.    What kinds of things would he ask you

12:11:12  1 | to -- you know, what kind -- sorry.  Strike that.

12:11:15  2 |         What kinds of procedures would he point out

12:11:17  3 | that you didn't possibly do correctly during your

12:11:20  4 | training?

12:11:20  5 |         MS. HUGGINS:  Form.

12:11:21  6 |         THE WITNESS:  Well, like I said, basic

12:11:25  7 | information, if you -- if you get their name, date

12:11:28  8 | of birth, and phone number, maybe you forget

12:11:30  9 | a phone number to write down or something or, you

12:11:34 10 | know, something -- something small like that, he

12:11:37 11 | would be like:  Hey, go back out there and do this.

12:11:39 12 | Or, hey, make sure you do this better next time.

12:11:44 13 |         BY MR. DAVENPORT:

12:11:44 14 |     Q.   Now, would you have -- I'm sorry.

12:11:50 15 | Strike that.

12:11:51 16 |         For -- when you were walking back towards

12:11:54 17 | Mr. Kistner towards the police vehicle, you said

12:11:56 18 | that you saw him on the ground, correct?

12:11:59 19 |     A.   Yeah.

12:12:00 20 |     Q.   Was he sitting up, or was he laying

12:12:02 21 | down?

12:12:10 22 |     A.   I think he was laying down, but

12:12:12 23 | I can't -- I can't be too sure.

| | | |
|---|---|---|
| 12:12:15 | 1 | Q.   Okay. |
| 12:12:16 | 2 | A.   Very long time ago. |
| 12:12:17 | 3 | Q.   No.   Sure.   Sure. |
| 12:12:20 | 4 | Was he holding any part of his body at that |
| 12:12:24 | 5 | time? |
| 12:12:24 | 6 | A.   I don't remember. |
| 12:12:24 | 7 | Q.   Okay.   Was he complaining about his |
| 12:12:27 | 8 | head hurting him? |
| 12:12:27 | 9 | A.   I don't remember. |
| 12:12:31 | 10 | Q.   Who was the first person that made it |
| 12:12:34 | 11 | to Mr. Kistner?   Who first spoke to him? |
| 12:12:36 | 12 | MS. HUGGINS:   Form. |
| 12:12:38 | 13 | THE WITNESS:   I -- at this point in time, it |
| 12:12:40 | 14 | was not me, so I don't know who spoke to him first. |
| 12:12:45 | 15 | BY MR. DAVENPORT: |
| 12:12:45 | 16 | Q.   Okay.   Once somebody did speak to |
| 12:12:52 | 17 | Mr. Kistner, do you remember what was said to him? |
| 12:12:54 | 18 | A.   No. |
| 12:12:54 | 19 | Q.   What kinds of things would have been |
| 12:12:56 | 20 | said to him? |
| 12:12:56 | 21 | MS. HUGGINS:   Form. |
| 12:12:57 | 22 | THE WITNESS:   I'm -- I'm unsure of what type |
| 12:13:00 | 23 | of things could have or would have been said to |

*Moriarity - Davenport - 2/21/20*

125

12:13:05  1  him.  Very new in a very chaotic situation.

12:13:09  2  I didn't do much but attempt to observe as much

12:13:13  3  as I could.

12:13:14  4        BY MR. DAVENPORT:

12:13:14  5        Q.   And what were you trying to observe?

12:13:17  6        A.   What other officers were -- were doing,

12:13:21  7  what Mr. Kistner was doing.

12:13:22  8        Q.   Now, I understand that you were new at

12:13:24  9  the time --

12:13:24 10        A.   Yeah.

12:13:24 11        Q.   -- but based on the experience that

12:13:27 12  you've been able to gain, what should have been

12:13:29 13  done if there was an individual -- whether he threw

12:13:31 14  himself at the police vehicle or whether the police

12:13:33 15  vehicle struck him, if he was on the ground, what

12:13:36 16  should have been done next?

12:13:37 17        MS. HUGGINS:  Form.

12:13:37 18        THE WITNESS:  Well, I mean, it's not so much

12:13:40 19  as what should have been done, it's what we did.

12:13:42 20  And what we did was observe what had just taken

12:13:46 21  place in front of us, and then other senior

12:13:51 22  officers assessed what to do.

12:13:53 23        BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

126

12:13:53   1          Q.   Okay.  And was there any sort of an

12:13:54   2   assessment of any physical injuries or medical

12:13:57   3   conditions that he may have had?

12:14:00   4          A.   Yeah.  I mean, as we're -- as we were

12:14:02   5   walking up, you can -- you can assess the person as

12:14:07   6   they are visually in front of you.

12:14:12   7          You know, he didn't have bones sticking out.

12:14:17   8   There was no tons of blood or anything leaking out

12:14:21   9   anywhere.  That was the assessment that I made.

12:14:24  10   I don't know what the other officers -- senior

12:14:28  11   officers did.  Or observed.  I'm sorry.

12:14:31  12          Q.   Right.

12:14:32  13          Now, would it only take bones sticking out

12:14:35  14   or blood gushing all over the place for that person

12:14:37  15   to have a physical examination by a physician of

12:14:40  16   any injuries he may have had?

12:14:41  17          MS. HUGGINS:   Form.

12:14:44  18          THE WITNESS:   No, but we did take him to

12:14:46  19   ECMC.

12:14:46  20          BY MR. DAVENPORT:

12:14:46  21          Q.   And how long, approximately, after he

12:14:49  22   had been on the ground, was he taken to ECMC?

12:14:51  23          A.   I'm -- I'm unsure.

| | | |
|---|---|---|
| 12:14:53 | 1 | Q. What would be the appropriate response |
| 12:14:56 | 2 | time for getting him to ECMC after a car -- a |
| 12:14:59 | 3 | collision with a car? |
| 12:14:59 | 4 | MS. HUGGINS: Form. |
| 12:15:00 | 5 | THE WITNESS: I -- I would say that there's -- |
| 12:15:03 | 6 | the appropriate response time would be determined |
| 12:15:08 | 7 | by the actions of the person that was -- that was |
| 12:15:12 | 8 | hit and the officer's assessment. |
| 12:15:15 | 9 | BY MR. DAVENPORT: |
| 12:15:15 | 10 | Q. Now, why would the actions of the |
| 12:15:17 | 11 | individual play a part in whether that person |
| 12:15:20 | 12 | should go to the hospital for an assessment of |
| 12:15:21 | 13 | physical injuries? |
| 12:15:22 | 14 | A. Well, I say -- I say the actions of the |
| 12:15:25 | 15 | person because I'm going off of what I had |
| 12:15:28 | 16 | previously stated about observations. |
| 12:15:30 | 17 | If you're bleeding from a gunshot wound, and |
| 12:15:33 | 18 | sometimes ADI, there's just no -- I'm sorry. Not |
| 12:15:36 | 19 | ADI, but an ambulance, sometimes there's no |
| 12:15:38 | 20 | ambulance even available, so we might take them |
| 12:15:41 | 21 | immediately. |
| 12:15:42 | 22 | Q. Now, even assuming that there might not |
| 12:15:45 | 23 | be blood gushing, would you sometimes take |

12:15:49  1  individuals to ECMC yourself rather than waiting

12:15:51  2  for an ambulance to arrive?

12:15:53  3      A.   There are -- there are times, yes.

12:15:56  4      Q.   And what would be those times where an

12:15:58  5  officer rather than an ambulance would take that

12:16:01  6  individual to assess them for physical injuries?

12:16:04  7      MS. HUGGINS:  Form.

12:16:05  8      THE WITNESS:  Maybe because -- I mean, this

12:16:08  9  goes back to where I said that there's a lot of

12:16:10 10  different variables.

12:16:11 11      Maybe the officer wants to just get them

12:16:14 12  there quicker.  Maybe there's no ambulance

12:16:17 13  available.  Maybe they're saying that the ambulance

12:16:20 14  is taking too long.  The observed potential

12:16:26 15  injuries.

12:16:27 16      I mean, there's -- there's a lot of

12:16:28 17  different variables that would -- that would make

12:16:31 18  someone take them to ECMC in their patrol vehicle

12:16:35 19  or not to.

12:16:36 20      BY MR. DAVENPORT:

12:16:36 21      Q.   So what types of observed personal

12:16:39 22  injuries would make it where an officer rather than

12:16:41 23  an ambulance would take that person to ECMC?

```
12:16:45   1              MS. HUGGINS:  Form.

12:16:45   2              THE WITNESS:  So -- so, again, it would

12:16:48   3    go -- it would go back to other different variables.

12:16:51   4              If -- there's -- there's been times where

12:16:52   5    people have been shot and we let them go in an

12:16:55   6    ambulance.  There's other times where we rush them

12:16:58   7    there in our -- in our patrol car.

12:16:59   8              BY MR. DAVENPORT:

12:17:00   9              Q.   Well, sure, but let's move away from

12:17:02  10    a gunshot wound.  Let's say that a person had some

12:17:06  11    sort of a head injury, because that's, you know,

12:17:09  12    more pertinent to this case.

12:17:10  13              What sorts of circumstances would make it

12:17:12  14    where a police officer rather than an ambulance

12:17:16  15    would drive that individual to the hospital?

12:17:19  16              MS. HUGGINS:  Form.

12:17:24  17              THE WITNESS:  Maybe we're just trying to get

12:17:27  18    them quicker attention, and it's -- it's -- if

12:17:33  19    the -- maybe if the subject is still moving around,

12:17:35  20    we know that there's no neck injury, so you can

12:17:38  21    still take them.

12:17:40  22              BY MR. DAVENPORT:

12:17:40  23              Q.   Is that --
```

*Moriarity - Davenport - 2/21/20*

130

| | | |
|---|---|---|
| 12:17:41 | 1 | A.    There's other -- there's a lot of |
| 12:17:43 | 2 | different variables. |
| 12:17:46 | 3 | Q.    Now -- |
| 12:17:46 | 4 | A.    Going off of observations from that |
| 12:17:50 | 5 | specific time.  There's no -- there's no set rule |
| 12:17:53 | 6 | that one follows. |
| 12:17:56 | 7 | Q.    Now, would you agree with me that if |
| 12:17:59 | 8 | there was some sort of internal brain bleeding, |
| 12:18:01 | 9 | that would be something that would be not |
| 12:18:03 | 10 | observable, correct? |
| 12:18:04 | 11 | MS. HUGGINS:  Form. |
| 12:18:05 | 12 | THE WITNESS:  Internal brain bleeding would |
| 12:18:06 | 13 | not be observable, that is correct. |
| 12:18:07 | 14 | BY MR. DAVENPORT: |
| 12:18:07 | 15 | Q.    And would that be part of your |
| 12:18:09 | 16 | assessment of the individual, whether he should be |
| 12:18:12 | 17 | driven by police officers or driven by an ambulance? |
| 12:18:15 | 18 | MS. HUGGINS:  Form. |
| 12:18:16 | 19 | THE WITNESS:  Can you -- can you say that |
| 12:18:18 | 20 | again? |
| 12:18:19 | 21 | BY MR. DAVENPORT: |
| 12:18:19 | 22 | Q.    Would it be part of your consideration |
| 12:18:21 | 23 | as a police officer, if that person may have |

12:18:23   1   internal brain bleeding, that that person should go

12:18:26   2   by ambulance or by a police vehicle?

12:18:30   3        A.   Sure, if there was something that we

12:18:33   4   thought was happening internally.

12:18:35   5        Q.   And what kinds of things would you

12:18:38   6   observe that would lead you to believe that

12:18:40   7   something was happening internally?

12:18:41   8        MS. HUGGINS:   Form.

12:18:42   9        THE WITNESS:   Maybe discoloration of the

12:18:45  10   face.   Maybe there was some breathing problems.

12:18:52  11   Before we might do something like that, maybe an

12:18:55  12   officer with experience might make some type of

12:18:59  13   decision as far as whether or not to take someone.

12:19:05  14        BY MR. DAVENPORT:

12:19:05  15        Q.   If a person had an abrasion on their

12:19:07  16   head after a car accident, would it be an ambulance

12:19:11  17   or a police officer that would drive that individual

12:19:13  18   to the hospital?

12:19:14  19        MS. HUGGINS:   Form.

12:19:15  20        THE WITNESS:   That can be determined on scene.

12:19:20  21   That can change from -- from accident to accident.

12:19:24  22        BY MR. DAVENPORT:

12:19:24  23        Q.   And what sorts of things in your

*Moriarity - Davenport - 2/21/20*

132

| | | |
|---|---|---|
| 12:19:26 | 1 | training would lead you to believe that that is |
| 12:19:28 | 2 | something that is an officer's discretion rather |
| 12:19:30 | 3 | than something that you are mandated to do? |
| 12:19:32 | 4 | MS. HUGGINS:   Form. |
| 12:19:37 | 5 | THE WITNESS:   You mean taking them in the |
| 12:19:39 | 6 | patrol vehicle -- |
| 12:19:40 | 7 | BY MR. DAVENPORT: |
| 12:19:40 | 8 | Q.    Rather than an ambulance. |
| 12:19:41 | 9 | A.    -- up to ECMC? |
| 12:19:43 | 10 | Maybe the -- the -- the person is |
| 12:19:47 | 11 | complaining of pain -- severe pain and there's no |
| 12:19:50 | 12 | ambulance available.  Or maybe we're just trying to |
| 12:19:53 | 13 | get them quicker medical attention. |
| 12:19:55 | 14 | Q.    If somebody noticed an abrasion on |
| 12:19:57 | 15 | their head, would they have to be medically |
| 12:20:00 | 16 | examined? |
| 12:20:00 | 17 | MS. HUGGINS:   Form. |
| 12:20:02 | 18 | THE WITNESS:   No, not necessarily.  They |
| 12:20:03 | 19 | don't have to be.  They can deny medical attention. |
| 12:20:07 | 20 | BY MR. DAVENPORT: |
| 12:20:07 | 21 | Q.    If that person doesn't deny medical |
| 12:20:09 | 22 | attention, are you obligated, as a police officer, |
| 12:20:11 | 23 | to ensure that that person gets medical attention? |

*Moriarity - Davenport - 2/21/20*

133

12:20:13   1          A.    Yeah.

12:20:13   2          Q.    Do you, as you sit here today, know if

12:20:17   3    Mr. Kistner had an abrasion on his head that day?

12:20:19   4          A.    I don't -- I don't remember.  I was

12:20:23   5    observing what the other officers were doing.

12:20:24   6          Q.    Now, if somebody was complaining that

12:20:28   7    their head hurt, are you obligated, as a police

12:20:30   8    officer, to then go and check that person's head?

12:20:39   9          A.    Yeah.

12:20:41  10          Q.    Do you know, as you sit here today, if

12:20:43  11    anybody went to go check Mr. Kistner's head?

12:20:46  12          A.    I don't know if -- I don't know if --

12:20:49  13    if the other officers were just observing from

12:20:52  14    where they were standing or not.

12:20:56  15          They very well could have been just

12:20:59  16    observing from where -- where they were standing.

12:21:02  17          Q.    Do you agree that if a person has hair

12:21:04  18    rather than no hair, it may not be something that's

12:21:08  19    observable without actually putting your hands

12:21:11  20    through that individual's hair to notice if there's

12:21:13  21    an abrasion or not?

12:21:14  22          MS. HUGGINS:    Form.

12:21:19  23          THE WITNESS:    I would say that the relevance

12:21:23   1    to do that wouldn't be there when we can just have

12:21:27   2    a medical professional do that and be the -- be the

12:21:31   3    judge on that.

12:21:33   4         BY MR. DAVENPORT:

12:21:33   5         Q.   Now, I agree that, you know, this

12:21:36   6    person should eventually be checked by a medical

12:21:38   7    professional, but if at the scene that person is

12:21:41   8    complaining of a head injury, you don't observe any

12:21:44   9    abrasions, and they might be located in the hair

12:21:45   10   somewhere where there's hair located, what would

12:21:49   11   determine whether that person needs to go directly

12:21:52   12   to the hospital through an ambulance or whether the

12:21:55   13   police officer can drive that person to go get the

12:22:00   14   medical attention that they need?

12:22:02   15        MS. HUGGINS:   Form.   Asked and answered.

12:22:03   16        THE WITNESS:   There's -- there's a -- it's

12:22:05   17   just police discretion.

12:22:06   18        Like I said, I've -- I've done that a few

12:22:09   19   times where I've just driven them up there and

12:22:12   20   never observed any -- any -- any physical or

12:22:16   21   medical injury and just took them in there to see

12:22:18   22   a medical professional.

12:22:20   23        There's other times where I just call on the

*Moriarity - Davenport - 2/21/20*

135

| | |
|---|---|
| 12:22:25 | 1 |
| 12:22:28 | 2 |
| 12:22:29 | 3 |

12:22:25   1  scene and I've never observed anything, and there's

12:22:28   2  times where I have observed things and I've taken

12:22:29   3  them to ECMC or let an ambulance come to the scene.

12:22:34   4        I mean, it just depends on -- on the call.

12:22:36   5  But I wasn't making that call that day.

12:22:37   6        BY MR. DAVENPORT:

12:22:37   7        Q.   Sure.

12:22:38   8        If somebody has an abrasion on their

12:22:41   9  forehead, would they be required to get medical

12:22:44  10  attention?

12:22:44  11        A.   They're not required to, if they can

12:22:47  12  decline medical attention, if they choose to.

12:22:49  13        Q.   If they decline -- if they don't

12:22:51  14  decline medical attention, are you required, as

12:22:53  15  a police officer, to make sure that they have their

12:22:55  16  head checked, if you see an --

12:22:55  17        A.   If they --

12:22:58  18        Q.   -- abrasion on there?

12:22:59  19        A.   If they -- if they don't decline, yeah.

12:23:01  20  I mean, there's times where -- like I said, it

12:23:03  21  depends on what -- what the person wants, because

12:23:06  22  people have said, well, I'll just go get it checked

12:23:09  23  out later.

12:23:09   1          They've told us that, and we don't have to --

12:23:13   2          Q.   Did Mr. --

12:23:14   3          A.   -- to wait for them.

12:23:15   4          Q.   Did Mr. Kistner tell you that he was

12:23:17   5   going to go get his head checked out later?

12:23:19   6          A.   I don't remember if Mr. Kistner told

12:23:21   7   me -- anything specifically to me.  He could have

12:23:25   8   told other officers that.

12:23:27   9          Q.   Now, when you were walking back towards

12:23:30  10   Mr. Kistner, you said that he was on the ground,

12:23:32  11   correct?

12:23:33  12          A.   Yeah.  Yeah.

12:23:34  13          Q.   And when you first got to Mr. Kistner,

12:23:38  14   did you make your own visual assessment of

12:23:40  15   Mr. Kistner?

12:23:42  16          A.   Yeah.

12:23:42  17          Q.   Was he on the ground, or was he sitting

12:23:45  18   up at that time?

12:23:47  19          MS. HUGGINS:   Form.

12:23:48  20          THE WITNESS:   I don't -- I don't --

12:23:49  21          MS. HUGGINS:   Asked and answered.

12:23:51  22          THE WITNESS:   I don't remember if he was

12:23:52  23   sitting down.  I'm pretty sure he was laying down.

*Moriarity - Davenport - 2/21/20*

137

12:23:54  1          BY MR. DAVENPORT:

12:23:54  2          Q.   Did Mr. Kistner ever sit up at any

12:23:56  3  time?

12:23:58  4          A.   I don't remember.

12:23:59  5          Q.   Did anybody bring Mr. Kistner to his

12:24:03  6  feet?

12:24:03  7          A.   I know that I helped him walk back to

12:24:08  8  the truck.  I don't know if I was one of the ones

12:24:10  9  that sat him up and helped him to his feet.

12:24:18 10          Q.   Do you remember who put the handcuffs

12:24:20 11  on Mr. Kistner?

12:24:21 12          A.   I don't.

12:24:22 13          Q.   Were handcuffs put on Mr. Kistner?

12:24:24 14          A.   I believe so.

12:24:26 15          Q.   And who would have been the person to

12:24:28 16  put those handcuffs on Mr. Kistner?

12:24:30 17          A.   I don't remember.

12:24:31 18          Q.   Up until this point, have you ever put

12:24:35 19  handcuffs on an individual?

12:24:36 20          A.   Yes.

12:24:36 21          Q.   And was that something that you did

12:24:38 22  before January 1st of 2017?

12:24:44 23          A.   I don't know if I had used my own cuffs

12:24:47   1   on someone up until this point.

12:24:49   2          Q.   Had you ever used somebody else's

12:24:51   3   handcuffs before January 1st of 2017?

12:24:56   4          A.   I don't remember yet.

12:24:58   5          Q.   Okay.  During your 16 weeks, do you

12:25:00   6   have an approximation for how many times you used

12:25:03   7   handcuffs on an -- an individual?

12:25:05   8          A.   It was -- it was often, but up until

12:25:09   9   this date, I don't -- I don't remember if I had

12:25:10  10   done that yet.

12:25:11  11          Q.   Okay.  As you were walking Mr. Kistner

12:25:14  12   back towards your vehicle, what was the purpose for

12:25:16  13   walking him towards your vehicle rather than Lauren

12:25:21  14   McDermott and Jenny Velez's vehicle?

12:25:23  15          A.   I don't remember why that call was

12:25:24  16   made.

12:25:25  17          Q.   Do you know who that call was made by?

12:25:30  18          A.   I don't remember.

12:25:31  19          Q.   Who was the most senior officer at that

12:25:34  20   situation?

12:25:36  21          A.   I don't know how much time Lieutenant

12:25:39  22   Velez has on.

12:25:40  23          Q.   Okay.

| | | |
|---|---|---|
| 12:25:41 | 1 | A.    Maybe -- maybe Karl, though. |
| 12:25:42 | 2 | Q.    Okay.  Who -- at that point, was there |
| 12:25:46 | 3 | any conversation that was had between any of the |
| 12:25:49 | 4 | officers? |
| 12:25:50 | 5 | A.    What do you mean? |
| 12:25:53 | 6 | Q.    Was there any sort of a conversation, |
| 12:25:55 | 7 | prior to getting Mr. Kistner to his feet, between |
| 12:25:58 | 8 | you, Mr. Schultz, Ms. McDermott, and Ms. Velez? |
| 12:26:04 | 9 | A.    I don't know what anyone would be |
| 12:26:07 | 10 | talking about.  I think I was more in the state of |
| 12:26:11 | 11 | trying to observe what was going on. |
| 12:26:17 | 12 | Q.    Did you at all help -- well, you said |
| 12:26:20 | 13 | that you helped Mr. Kistner walk him back towards |
| 12:26:23 | 14 | your police vehicle, correct? |
| 12:26:25 | 15 | A.    Yeah.  Per -- per the video that you |
| 12:26:28 | 16 | guys have, yeah.  That's -- |
| 12:26:29 | 17 | Q.    Okay. |
| 12:26:30 | 18 | A.    That's what I was going off of. |
| 12:26:32 | 19 | Q.    And do you know who else was helping to |
| 12:26:34 | 20 | get Mr. Kistner back to the police vehicle? |
| 12:26:35 | 21 | A.    I'd have to see the video again. |
| 12:26:36 | 22 | Q.    Okay.  Okay.  Where did you put |
| 12:26:39 | 23 | Mr. Kistner after you walked him back to your |

*Moriarity - Davenport - 2/21/20*

140

| | | |
|---|---|---|
| 12:26:42 | 1 | police vehicle? |
| 12:26:43 | 2 | A.   It was me and another officer.  I don't |
| 12:26:47 | 3 | remember which one.  We put him in the back of 532. |
| 12:26:51 | 4 | Q.   Now, was he arrested at that point? |
| 12:26:55 | 5 | A.   At -- at this point I don't -- I didn't |
| 12:26:58 | 6 | know.  I was way too brand new. |
| 12:27:00 | 7 | Q.   Okay. |
| 12:27:00 | 8 | A.   I didn't -- I didn't know what was |
| 12:27:01 | 9 | going on. |
| 12:27:04 | 10 | Q.   Now, at any point before handcuffs were |
| 12:27:07 | 11 | put on Mr. Kistner, was -- did anybody read him his |
| 12:27:10 | 12 | Miranda rights? |
| 12:27:12 | 13 | A.   I don't remember. |
| 12:27:13 | 14 | Q.   After handcuffs were put on Mr. Kistner, |
| 12:27:16 | 15 | did anybody read him his Miranda rights? |
| 12:27:18 | 16 | A.   If -- if they didn't, I don't -- I |
| 12:27:27 | 17 | don't remember. |
| 12:27:27 | 18 | Q.   Now, once Mr. Kistner was in the back |
| 12:27:29 | 19 | of your police vehicle, what were the next steps at |
| 12:27:37 | 20 | that point? |
| 12:27:37 | 21 | A.   I believe I just referred to whatever |
| 12:27:40 | 22 | Karl Schultz was -- was doing. |
| 12:27:42 | 23 | Q.   Do you recall what was done after |

*Moriarity - Davenport - 2/21/20*

141

| 12:27:44 | 1 | Mr. Kistner was put in the back of the police |
| 12:27:46 | 2 | vehicle? |
| 12:27:46 | 3 | A.   I don't. |
| 12:27:49 | 4 | Q.   Was there any reason to keep him in the |
| 12:27:51 | 5 | back of the police vehicle rather than outside the |
| 12:27:53 | 6 | police vehicle? |
| 12:27:55 | 7 | A.   I wouldn't know what the senior |
| 12:27:57 | 8 | officers were -- were thinking at the time. |
| 12:28:00 | 9 | Q.   But as you sit here today, with the |
| 12:28:02 | 10 | experience that you now have, would there be any |
| 12:28:05 | 11 | reason to have Mr. Kistner in the back of the |
| 12:28:06 | 12 | police vehicle rather than outside the police |
| 12:28:08 | 13 | vehicle? |
| 12:28:09 | 14 | MS. HUGGINS:   Form. |
| 12:28:09 | 15 | THE WITNESS:   If -- if the officers had him |
| 12:28:13 | 16 | under arrest, then yeah, we would -- we would have |
| 12:28:18 | 17 | him in the back of a vehicle. |
| 12:28:23 | 18 | BY MR. DAVENPORT: |
| 12:28:23 | 19 | Q.   Would there be any reason to have him |
| 12:28:26 | 20 | in the back of the police vehicle if he was not |
| 12:28:27 | 21 | arrested? |
| 12:28:29 | 22 | A.   Yeah, you can detain people in the back |
| 12:28:31 | 23 | of a vehicle. |

| | | |
|---|---|---|
| 12:28:32 | 1 | Q.   And could you explain to me what is the |
| 12:28:34 | 2 | difference between being detained, as opposed to |
| 12:28:36 | 3 | arrested? |
| 12:28:37 | 4 | A.   Someone that -- someone that is not |
| 12:28:39 | 5 | free to go and they're going to go to jail is under |
| 12:28:42 | 6 | arrest. |
| 12:28:42 | 7 | There's other times where I've detained |
| 12:28:44 | 8 | people to write them tickets and they're totally |
| 12:28:48 | 9 | free to go.  You know what I mean? |
| 12:28:51 | 10 | They can -- they can still be in the back of |
| 12:28:53 | 11 | a patrol vehicle and not be under arrest. |
| 12:28:55 | 12 | Q.   Now, when a person is detained, do you |
| 12:28:57 | 13 | have to read that person their Miranda rights? |
| 12:29:00 | 14 | MS. HUGGINS:  Form. |
| 12:29:00 | 15 | THE WITNESS:  No. |
| 12:29:01 | 16 | BY MR. DAVENPORT: |
| 12:29:03 | 17 | Q.   Is it only when they're arrested that |
| 12:29:05 | 18 | you then have to read them their Miranda rights? |
| 12:29:07 | 19 | A.   Yeah. |
| 12:29:07 | 20 | MS. HUGGINS:  Form. |
| 12:29:07 | 21 | THE WITNESS:  Yeah. |
| 12:29:09 | 22 | BY MR. DAVENPORT: |
| 12:29:11 | 23 | Q.   Okay.  Do you know at what point it |

| | | |
|---|---|---|
| 12:29:13 | 1 | went from Mr. Kistner being detained, as opposed to |
| 12:29:15 | 2 | arrested? |
| 12:29:15 | 3 | A.   I -- the day that I was on scene, no, |
| 12:29:17 | 4 | I don't. |
| 12:29:17 | 5 | Q.   Was it on Schmarbeck? |
| 12:29:27 | 6 | A.   I'm unsure.  I can't speak for -- for |
| 12:29:29 | 7 | Lauren and -- and Jenny.  I don't -- I don't know |
| 12:29:32 | 8 | when it is -- when it was that it was determined |
| 12:29:35 | 9 | that they were going to arrest him. |
| 12:29:37 | 10 | Q.   Now, why do you say that it would have |
| 12:29:39 | 11 | been Lauren and Jenny that would have made that |
| 12:29:42 | 12 | determination to arrest Mr. Kistner? |
| 12:29:43 | 13 | MS. HUGGINS:   Form. |
| 12:29:44 | 14 | THE WITNESS:   They were directly involved |
| 12:29:46 | 15 | with the incident. |
| 12:29:46 | 16 | BY MR. DAVENPORT: |
| 12:29:47 | 17 | Q.   Why wouldn't Karl Schultz have any sort |
| 12:29:49 | 18 | of a say in when Mr. Kistner was arrested? |
| 12:29:52 | 19 | MS. HUGGINS:   Form. |
| 12:29:53 | 20 | THE WITNESS:   The incident didn't involve |
| 12:29:55 | 21 | me, Karl, or our truck.  It involved Jenny Velez |
| 12:29:59 | 22 | and Lauren and -- and their truck. |
| 12:30:02 | 23 | BY MR. DAVENPORT: |

12:30:02  1          Q.   Would you have been able to make the

12:30:05  2    arrest even though it did not involve your truck?

12:30:15  3          A.   I wouldn't see any reason why we would

12:30:17  4    make that arrest.

12:30:18  5          MS. HUGGINS:   Form.

12:30:22  6          BY MR. DAVENPORT:

12:30:22  7          Q.   Now, once you got Mr. Kistner back to

12:30:25  8    your police vehicle, he was sitting down in your

12:30:29  9    police vehicle, in the back of your police vehicle;

12:30:31  10   is that correct?

12:30:31  11         A.   Yes.

12:30:35  12         Q.   Now, were any sort of assessments of

12:30:37  13   his physical condition made at that time?

12:30:40  14         A.   I don't -- I don't remember.

12:30:41  15         Q.   What about emotionally?

12:30:44  16         Are you obligated, as a police officer, to

12:30:45  17   check on a person emotionally when they're placed

12:30:48  18   under arrest or detained?

12:30:49  19         A.   Sure.

12:30:49  20         MS. HUGGINS:   Form.

12:30:50  21         BY MR. DAVENPORT:

12:30:51  22         Q.   Was there anything concerning about

12:30:54  23   Mr. Kistner's emotional or psychological state at

*Moriarity - Davenport - 2/21/20*

145

| | | |
|---|---|---|
| 12:31:00 | 1 | that time? |
| 12:31:00 | 2 | A.   Not that I -- not that I remember. |
| 12:31:04 | 3 | Q.   Did Mr. Kistner say anything in the |
| 12:31:05 | 4 | back of the police vehicle? |
| 12:31:07 | 5 | A.   I don't know.  I think -- I think the |
| 12:31:09 | 6 | video you guys have, we walked away from the |
| 12:31:12 | 7 | vehicle. |
| 12:31:12 | 8 | Q.   Okay. |
| 12:31:13 | 9 | A.   So I don't -- I don't -- the time that |
| 12:31:15 | 10 | I was in the vehicle with Karl, taking him to ECMC, |
| 12:31:19 | 11 | I don't even remember what was said in there. |
| 12:31:20 | 12 | Q.   Okay.  So after you walked away from |
| 12:31:24 | 13 | the police vehicle, where did you go next? |
| 12:31:32 | 14 | A.   I have to refer back to the -- the |
| 12:31:36 | 15 | video. |
| 12:31:36 | 16 | Q.   Do you remember at all where Jim's son |
| 12:31:38 | 17 | was at that point, or the other individual who ran |
| 12:31:41 | 18 | out from the same house as Jim? |
| 12:31:43 | 19 | MS. HUGGINS:  Form. |
| 12:31:44 | 20 | THE WITNESS:  I don't remember at this |
| 12:31:45 | 21 | point. |
| 12:31:45 | 22 | BY MR. DAVENPORT: |
| 12:31:48 | 23 | Q.   Okay.  Was there ever a concern with |

*Moriarity - Davenport - 2/21/20*

146

12:31:50  1  this individual who ran out from Jim's house?

12:31:53  2          A.   We would have to refer back to the

12:31:57  3  video.

12:31:58  4          Q.   Well, I guess not --

12:32:00  5          A.   He -- he approached -- he approached

12:32:04  6  officers.  He approached officers and wanted to

12:32:11  7  speak to us.  I remember that.

12:32:17  8          And I remember for purposes of officer

12:32:19  9  safety, we made him pat down, and we gave him

12:32:23 10  a -- a waistband pat-down.  Make sure there was

12:32:25 11  no weapons or anything.

12:32:26 12          Q.   Now, when was that pat-down done?

12:32:29 13  Was it when he initially made contact with the

12:32:33 14  police officers, or was that done later, the

12:32:35 15  pat-down of this individual?

12:32:35 16          A.   We'd have to look at the video.

12:32:38 17  I don't remember.

12:32:38 18          Q.   Okay.  So this pat-down was made

12:32:42 19  because why?

12:32:43 20          MS. HUGGINS:   Form.  Asked and answered.

12:32:45 21          THE WITNESS:   For safety reasons.

12:32:46 22          BY MR. DAVENPORT:

12:32:46 23          Q.   And those safety reasons were why?

*Moriarity - Davenport - 2/21/20*

147

| | | |
|---|---|---|
| 12:32:50 | 1 | What? |
| 12:32:51 | 2 | A.   It's -- it's common that people |
| 12:32:53 | 3 | approach police with weapons on them. |
| 12:32:55 | 4 | Q.   Okay.  Did you have any reason to |
| 12:32:57 | 5 | believe that this individual approached police |
| 12:32:59 | 6 | officers with weapons? |
| 12:33:00 | 7 | A.   There's no reason why I would believe |
| 12:33:03 | 8 | that anyone would walk up to us without weapons. |
| 12:33:06 | 9 | Q.   There's never a time that individuals |
| 12:33:09 | 10 | would walk up to police officers without weapons? |
| 12:33:11 | 11 | MS. HUGGINS:   Form. |
| 12:33:12 | 12 | THE WITNESS:   It happens often. |
| 12:33:13 | 13 | BY MR. DAVENPORT: |
| 12:33:14 | 14 | Q.   I guess -- I understand that it happens |
| 12:33:16 | 15 | often. |
| 12:33:16 | 16 | A.   So -- so for -- for -- for my safety |
| 12:33:18 | 17 | and everyone else that's nearby, yeah, we always -- |
| 12:33:21 | 18 | or I'm not going to say always, but often we'll -- |
| 12:33:24 | 19 | we'll do pat-downs for weapons. |
| 12:33:26 | 20 | Q.   Okay.  So -- |
| 12:33:27 | 21 | A.   Because even someone that's just trying |
| 12:33:29 | 22 | to talk to us or make a complaint, they have |
| 12:33:32 | 23 | weapons on them. |

*Moriarity - Davenport - 2/21/20*

148

| | | |
|---|---|---|
| 12:33:33 | 1 | Q. Okay. So I guess that's my question is |
| 12:33:35 | 2 | that I understand that, you know, for officer |
| 12:33:38 | 3 | safety -- |
| 12:33:38 | 4 | A. Yeah. |
| 12:33:38 | 5 | Q. -- you would always want to have that |
| 12:33:41 | 6 | pant-down, but there are other instances where |
| 12:33:44 | 7 | individuals approach police officers without |
| 12:33:45 | 8 | weapons, correct? |
| 12:33:46 | 9 | A. Yeah, correct. |
| 12:33:47 | 10 | Q. Okay. Now, do you remember approximately |
| 12:33:51 | 11 | what this individual looked like that was coming |
| 12:33:53 | 12 | out of the house? |
| 12:33:54 | 13 | MS. HUGGINS: Form. |
| 12:33:55 | 14 | THE WITNESS: Younger, white male. |
| 12:33:58 | 15 | BY MR. DAVENPORT: |
| 12:33:58 | 16 | Q. Okay. Do you remember approximately |
| 12:34:01 | 17 | what his size was? |
| 12:34:02 | 18 | A. I don't. |
| 12:34:05 | 19 | Q. Okay. |
| 12:34:07 | 20 | A. Yeah, I don't. |
| 12:34:08 | 21 | Q. Okay. Was he saying anything at that |
| 12:34:14 | 22 | time, when he first initially came out? |
| 12:34:19 | 23 | A. I think he was trying to find out what |

*Moriarity - Davenport - 2/21/20*

149

12:34:21  1  was going on, but I don't remember anything, what

12:34:24  2  he was saying.

12:34:24  3       Q.   Okay.  Do you know, was he using his

12:34:27  4  cell phone or any other sort of communicating

12:34:31  5  device?

12:34:31  6       A.   I don't.  I don't remember.

12:34:33  7       Q.   Okay.  Do you remember if he was trying

12:34:36  8  to make a call to an ambulance?

12:34:42  9       A.   I don't remember if he had a phone or

12:34:44  10  not.  I know that 911 calls were made.

12:34:50  11       Q.   Do you remember him referring to an

12:34:52  12  ambulance being called?

12:34:53  13       A.   I don't.

12:34:53  14       Q.   Do you remember Jim being on the

12:34:56  15  ground, asking for an ambulance?

12:34:58  16       A.   I don't.

12:34:59  17       Q.   Okay.  Where was that individual

12:35:04  18  standing when you performed the pat-down?

12:35:08  19       MS. HUGGINS:   Form.

12:35:08  20       THE WITNESS:   We'd -- we'd have to look at

12:35:10  21  the video that was provided.

12:35:12  22       BY MR. DAVENPORT:

12:35:12  23       Q.   Okay.

12:35:13   1      **A.**   Because I don't -- I don't remember.

12:35:15   2      **Q.**   Okay.  And what would generally consist

12:35:17   3   of that pat-down?

12:35:19   4      **MS. HUGGINS:**  Form.

12:35:20   5      **THE WITNESS:**  Just patting -- patting down

12:35:22   6   the outside of his pants pockets, waistband.

12:35:27   7   Anyplace where I would think he might have a knife

12:35:30   8   or a gun or something.

12:35:31   9      But it was quite clear that, after the

12:35:33  10   pat-down, he didn't -- I mean, he didn't have

12:35:35  11   anything.  I don't remember, but maybe he just

12:35:40  12   wanted to find out what was going on.

12:35:42  13      **BY MR. DAVENPORT:**

12:35:42  14      **Q.**   If an individual went into -- close to

12:35:46  15   police officers and then walked away from those

12:35:48  16   police officers and tried to go back into their

12:35:50  17   home, would there be any reason to begin, commence

12:35:55  18   a pat-down of that individual?

12:35:57  19      **MS. HUGGINS:**  Form.

12:35:58  20      **THE WITNESS:**  Can you --

12:36:00  21      **MR. DAVENPORT:**  So if -- I'm sorry.  You can

12:36:03  22   strike that.

12:36:04  23      If -- if an individual approached police

12:36:06   1   officers and then walked away from those police

12:36:08   2   officers, and then he tried to go back into the

12:36:10   3   house where he came from, would there be any reason

12:36:14   4   to do a pat-down of that individual?  Bring him

12:36:17   5   back out, away from the house?

12:36:18   6          MS. HUGGINS:  Form.

12:36:19   7          THE WITNESS:  He could have -- he could have

12:36:22   8   said something that one of the officers might have

12:36:24   9   wanted to investigate further.

12:36:26  10          BY MR. DAVENPORT:

12:36:26  11          Q.   And what kind of --

12:36:27  12          A.   And then --

12:36:32  13          Q.   -- things would those have been?

12:36:34  14          MS. HUGGINS:  Form.

12:36:36  15          THE WITNESS:  Could be tons of things.

12:36:38  16   I don't want to speculate what other officers heard

12:36:41  17   or what judgment calls or decisions they were

12:36:43  18   making.

12:36:43  19          BY MR. DAVENPORT:

12:36:43  20          Q.   If that individual was saying that he

12:36:45  21   was going to call an ambulance, would that be

12:36:46  22   a reason to do a pat-down of that individual?

12:36:48  23          MS. HUGGINS:  Form.

12:36:48  1        THE WITNESS:  No.

12:36:49  2        BY MR. DAVENPORT:

12:36:49  3        Q.   Okay.  So after the pat-down was done,

12:36:53  4   what would be the next steps?

12:36:55  5        Would you have to get background information

12:36:58  6   for that individual?

12:37:03  7        A.   You know, you're -- I mean, it's not

12:37:05  8   required.  Maybe -- like maybe we're just having

12:37:07  9   the conversation that he wanted to have now, now

12:37:10 10   that we know that the scene is safer.

12:37:12 11        Q.   So after having that conversation -- to

12:37:16 12   have that conversation with somebody, would you

12:37:18 13   also want to verify any sort of identification or

12:37:21 14   anything like that?

12:37:23 15        A.   I mean, you might want to, you might

12:37:26 16   not want to.

12:37:27 17        Q.   What would be the reasons that you

12:37:29 18   would want to verify the identification?

12:37:31 19        MS. HUGGINS:  Form.

12:37:31 20        THE WITNESS:  Maybe his -- who he's claiming

12:37:36 21   to be is relevant to the scene that we were at.

12:37:40 22   Maybe -- for example, if he told us that

12:37:45 23   Mr. Kistner was his father, maybe I didn't -- or,

12:37:47  1  you know, no one needed to really look into him

12:37:53  2  being who he says.  Like it's:  Okay.  You're his

12:37:57  3  son.  We believe you.

12:37:59  4      BY MR. DAVENPORT:

12:38:01  5      Q.  Was anything said to him about where

12:38:03  6  his father was going or how his father was doing?

12:38:06  7      A.  I don't -- I don't remember.

12:38:07  8      Q.  Okay.  Was there anything that was said

12:38:11  9  to this individual, whether he could go speak to

12:38:14 10  his father or not?

12:38:18 11      Would there be any reason why a police

12:38:20 12  officer would allow a son to speak with his

12:38:22 13  officer?  I -- I got --

12:38:23 14      MS. HUGGINS:  Form.  Now that's two

12:38:26 15  questions in a row.

12:38:27 16      THE WITNESS:  If -- if I was present for

12:38:28 17  that conversation, I don't remember.  Sometimes we

12:38:32 18  do let people speak to subjects in the back of our

12:38:38 19  patrol vehicle, other times we don't.

12:38:40 20      BY MR. DAVENPORT:

12:38:40 21      Q.  Do you remember if you let this

12:38:41 22  individual speak to the individual in the back of

12:38:42 23  your police vehicle?

*Moriarity - Davenport - 2/21/20*

154

12:38:43  1      A.    It was never asked of me, that

12:38:45  2   I remember.  If it was asked of me, I deferred

12:38:50  3   to senior officers.

12:38:53  4      Q.    Do you have any reason to believe that

12:38:54  5   this individual did speak to the -- Mr. Kistner in

12:38:57  6   the back of the police vehicle?

12:38:59  7      A.    I don't want to speculate if he did or

12:39:02  8   didn't.  It was never anything that was mentioned

12:39:06  9   to me that I remember, and I would have deferred.

12:39:08 10      Q.    Okay.  Do you remember seeing that

12:39:10 11   individual at all after leaving Schmarbeck that

12:39:16 12   day?

12:39:16 13      A.    I don't think I've had a run-in with

12:39:20 14   Mr. Kistner or his son since that day.

12:39:21 15      MR. DAVENPORT:  Okay.

12:39:21 16      (Discussion off the record.)

12:39:21 17      BY MR. DAVENPORT:

12:39:35 18      Q.    So when you say run-ins with Mr. Kistner,

12:39:38 19   does that pertain to just calls, or does that

12:39:41 20   pertain to any times that you may have seen him on

12:39:43 21   the street when you weren't necessarily responding

12:39:45 22   to a call?

12:39:46 23      MS. HUGGINS:  Form.

*Moriarty - Davenport - 2/21/20*

155

| | | |
|---|---|---|
| 12:39:46 | 1 | THE WITNESS:  What I mean by that is -- by |
| 12:39:49 | 2 | a run-in is I don't think I've ever seen him |
| 12:39:52 | 3 | outside of that call, period.  I don't think I've |
| 12:39:57 | 4 | ever seen him in a store, no other calls.  Yeah, |
| 12:40:03 | 5 | I don't think I've ever seen him or his son since. |
| 12:40:07 | 6 | BY MR. DAVENPORT: |
| 12:40:08 | 7 | Q.   Now, did you have any conversations |
| 12:40:09 | 8 | with anybody about this incident on January 1st of |
| 12:40:15 | 9 | 2017? |
| 12:40:15 | 10 | MS. HUGGINS:  Well -- |
| 12:40:16 | 11 | THE WITNESS:  Her and -- |
| 12:40:18 | 12 | MS. HUGGINS:  He's asking outside of me. |
| 12:40:20 | 13 | THE WITNESS:  Oh, outside of -- Karl and |
| 12:40:24 | 14 | Jenny and Lauren. |
| 12:40:28 | 15 | BY MR. DAVENPORT: |
| 12:40:28 | 16 | Q.   Did you ever have any conversations |
| 12:40:29 | 17 | with your lieutenant, McHugh? |
| 12:40:31 | 18 | A.   I did not. |
| 12:40:32 | 19 | Q.   Okay.  Do you know if anybody had |
| 12:40:34 | 20 | conversations with Lieutenant McHugh? |
| 12:40:35 | 21 | A.   I believe someone on scene made |
| 12:40:38 | 22 | a phone call to him, but I don't remember which |
| 12:40:40 | 23 | officer that was. |

*Moriarity - Davenport - 2/21/20*

156

12:40:44  1        Q.   Do you remember, besides January 1st of
12:40:47  2    2017, any of the officers that were on scene having
12:40:50  3    a conversation with Lieutenant McHugh about the
12:40:52  4    incident on January 1st of 2017?
12:40:53  5        A.   Not that I was present for.
12:40:54  6        Q.   What about other senior officers?  Any
12:40:58  7    captains or anybody higher than lieutenant?
12:41:01  8        A.   Definitely not while I was present for.
12:41:04  9        Q.   Have you ever been investigated by
12:41:05 10    internal affairs?
12:41:06 11        MS. HUGGINS:  Form, and 50-a objection, to
12:41:10 12    the extent that applies.  You can answer.
12:41:11 13        THE WITNESS:  Okay.  No suspensions or
12:41:14 14    anything like that, no.
12:41:15 15        BY MR. DAVENPORT:
12:41:16 16        Q.   Have you ever been -- had a discussion
12:41:18 17    with internal affairs about January 1st of 2017?
12:41:21 18        A.   No.
12:41:24 19        Q.   When was the first time that you were
12:41:27 20    aware that a lawsuit had been commenced against
12:41:31 21    you?
12:41:31 22        A.   I believe I saw it on the news.
12:41:32 23        Q.   That was the first time?

*Moriarity - Davenport - 2/21/20*

157

| | | |
|---|---|---|
| 12:41:33 | 1 | **A.** Yes. |
| 12:41:34 | 2 | **Q.** Did you receive a summons or a complaint? |
| 12:41:38 | 3 | **A.** I received some type of packet that I was |
| 12:41:43 | 4 | served with that I gave to our union. |
| 12:41:46 | 5 | **Q.** Okay. When, approximately, did you |
| 12:41:50 | 6 | receive that packet? |
| 12:41:50 | 7 | **A.** Or I'm -- I'm sorry. I received the |
| 12:41:52 | 8 | packet before I saw it on the news, but yeah, I'm |
| 12:41:55 | 9 | sorry, yeah, I remember, yeah, I received the |
| 12:41:59 | 10 | packet first. That's when I knew that this whole |
| 12:42:02 | 11 | thing was taking place, and then I saw it on -- on |
| 12:42:05 | 12 | the news. |
| 12:42:05 | 13 | **Q.** Okay. Okay. |
| 12:42:06 | 14 | **A.** Yeah. |
| 12:42:07 | 15 | **Q.** Did you happen to look at any of the |
| 12:42:09 | 16 | materials that were in that packet? |
| 12:42:10 | 17 | **A.** I read it over with a union rep. |
| 12:42:12 | 18 | **Q.** Okay. When, approximately, did that |
| 12:42:15 | 19 | take place? |
| 12:42:17 | 20 | **A.** I don't -- I don't remember exactly |
| 12:42:21 | 21 | when I was served with those papers. |
| 12:42:23 | 22 | **Q.** Okay. So if you were served with those |
| 12:42:26 | 23 | papers in 2018, would it have been during that year |

12:42:29   1   that you sat down with the union rep?

12:42:34   2        A.   I -- like I said, I don't remember the

12:42:36   3   date that I was served the --

12:42:40   4        Q.   Sure.

12:42:41   5        A.   -- the papers.  I either gave the union

12:42:43   6   rep the papers the day of or the day after I was

12:42:46   7   served with those papers.

12:42:47   8        Q.   Okay.  And when you gave the papers to

12:42:50   9   that union rep, did you sit down that day?

12:42:53  10        A.   Yeah.

12:42:54  11        Q.   Okay.  What did the union rep say to

12:42:57  12   you?

12:42:57  13        A.   He said he -- he gave me her phone

12:43:00  14   number and that someone would be contacting me

12:43:03  15   about it, but he didn't -- he didn't really say --

12:43:06  16   say much.

12:43:07  17        Q.   Okay.  Now, did you reach out to

12:43:10  18   Ms. Huggins, or did Ms. Huggins reach out to you

12:43:12  19   first?

12:43:13  20        MS. HUGGINS:  Well, form.  I -- I don't know

12:43:15  21   why you're inquiring into contact between counsel

12:43:17  22   and client.

12:43:18  23        MR. DAVENPORT:  Well, I just want to know,

*Moriarity - Davenport - 2/21/20*

159

12:43:19   1  you know, after he received these papers, you know,

12:43:21   2  what were the next steps that you took?

12:43:23   3        Did you reach out to your attorney, or did

12:43:25   4  you wait for your attorney to contact you?

12:43:27   5        MS. HUGGINS:  Again --

12:43:27   6        MR. DAVENPORT:  You -- you can answer,

12:43:28   7  because I'm not asking what the substance was.

12:43:30   8  I'm just asking when you contacted -- whether you

12:43:33   9  contacted Ms. Huggins or whether she contacted you.

12:43:36  10        That's not attorney-compliant privilege.

12:43:38  11  I'm just merely asking when he contacted you or you

12:43:41  12  contacted him.  I don't want to know --

12:43:41  13        MS. HUGGINS:  I'm asking for the basis of

12:43:43  14  inquiry into contact with counsel, and I'm allowed

12:43:46  15  to ask the basis of --

12:43:46  16        MR. DAVENPORT:  Are you going -- are you

12:43:47  17  going to direct him to not answer the question?

12:43:48  18        MS. HUGGINS:  I just inquired the basis of

12:43:50  19  your question.  That's what --

12:43:53  20        MR. DAVENPORT:  Well, I'm asking because --

12:43:53  21        MS. HUGGINS:  -- I just did.

12:43:53  22        THE REPORTER:  Don't talk over each other,

12:43:53  23  please.

*Moriarity - Davenport - 2/21/20*

160

| | | |
|---|---|---|
| 12:43:53 | 1 | MR. DAVENPORT:  Okay. |
| 12:43:53 | 2 | So what I'm asking is:  Why -- or if he |
| 12:43:57 | 3 | received these papers and if he discussed them with |
| 12:44:00 | 4 | the union rep, what was his concern level? |
| 12:44:02 | 5 | I want to know his concern level with what |
| 12:44:04 | 6 | happened. |
| 12:44:04 | 7 | MS. HUGGINS:  So that was not your question. |
| 12:44:06 | 8 | MR. DAVENPORT:  Well, I know, it's -- |
| 12:44:06 | 9 | it's -- |
| 12:44:06 | 10 | MS. HUGGINS:  You can pose -- |
| 12:44:07 | 11 | MR. DAVENPORT:  -- different, but -- |
| 12:44:08 | 12 | MS. HUGGINS:  You can pose your question to |
| 12:44:09 | 13 | him. |
| 12:44:09 | 14 | MR. DAVENPORT:  It's certainly relevant to |
| 12:44:12 | 15 | that.  It's relevant to that inquiry. |
| 12:44:14 | 16 | MS. HUGGINS:  Sir, I objected to a totally |
| 12:44:16 | 17 | different question that veers on attorney-client |
| 12:44:19 | 18 | privilege.  You have now posed a different question. |
| 12:44:21 | 19 | You can ask that of the witness, but |
| 12:44:23 | 20 | I am allowed to ask the basis of your question for |
| 12:44:26 | 21 | an objection.  That's -- that's all I'm doing. |
| 12:44:28 | 22 | You may ask. |
| 12:44:28 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

161

| | | |
|---|---|---|
| 12:44:29 | 1 | Q.   You can answer. |
| 12:44:29 | 2 | A.   I received a court notification |
| 12:44:32 | 3 | by the court liaison. |
| 12:44:34 | 4 | Q.   Okay.  So when did you receive that |
| 12:44:36 | 5 | court notification? |
| 12:44:37 | 6 | A.   There would be records of it somewhere, |
| 12:44:40 | 7 | but no, I don't -- I don't remember. |
| 12:44:42 | 8 | Q.   Okay. |
| 12:44:43 | 9 | A.   There's definitely records of it at |
| 12:44:46 | 10 | City Court or something. |
| 12:44:47 | 11 | Q.   Okay.  So now when you reached out to |
| 12:44:49 | 12 | that court liaison -- |
| 12:44:50 | 13 | A.   No, no.  They -- |
| 12:44:52 | 14 | Q.   Or they -- they reached out to you. |
| 12:44:54 | 15 | A.   Yeah. |
| 12:44:54 | 16 | Q.   Okay.  Or when you got notification of |
| 12:44:55 | 17 | that court liaison, had you contacted an attorney |
| 12:44:58 | 18 | at that point? |
| 12:44:58 | 19 | A.   No. |
| 12:44:59 | 20 | Q.   Okay. |
| 12:45:00 | 21 | A.   No. |
| 12:45:00 | 22 | Q.   Was it after you received that |
| 12:45:02 | 23 | notification? |

*Moriarity - Davenport - 2/21/20*

162

| | | |
|---|---|---|
| 12:45:03 | 1 | MS. HUGGINS:  Form. |
| 12:45:04 | 2 | BY MR. DAVENPORT: |
| 12:45:05 | 3 | Q.   That you contacted an attorney? |
| 12:45:06 | 4 | A.   I never contacted an attorney. |
| 12:45:07 | 5 | Q.   Okay.  Okay.  So did you watch the |
| 12:45:14 | 6 | video when you received that packet? |
| 12:45:16 | 7 | A.   No.  The video wasn't provided at that |
| 12:45:19 | 8 | time. |
| 12:45:20 | 9 | Q.   Okay.  You didn't receive any exhibits |
| 12:45:25 | 10 | or anything else besides that initial complaint in |
| 12:45:28 | 11 | that packet? |
| 12:45:29 | 12 | A.   No.  The packet was -- it was pretty |
| 12:45:35 | 13 | thick.  There was like a list of -- a list of |
| 12:45:39 | 14 | charges in there.  If there were -- if there were |
| 12:45:41 | 15 | exhibits in there, I don't remember -- I don't |
| 12:45:45 | 16 | remember reading -- reading that or -- or -- or it |
| 12:45:48 | 17 | being a topic of discussion with the union rep. |
| 12:45:51 | 18 | Q.   Okay.  What kinds of things did you |
| 12:45:56 | 19 | discuss with the union rep about the complaint? |
| 12:45:57 | 20 | A.   It was along the lines of me handing |
| 12:46:00 | 21 | him the packet.  He flipped through it a couple |
| 12:46:05 | 22 | times and just said, just wait for court to notify |
| 12:46:09 | 23 | you.  And then that's what I did. |

*Moriarity - Davenport - 2/21/20*

163

12:46:13   1          Q.   Were you ever -- did you ever have
12:46:15   2   another discussion with that union rep?
12:46:17   3          A.   No.
12:46:25   4          Q.   How long, approximately, was that
12:46:27   5   initial meeting with the union rep?
12:46:32   6          A.   It was a pretty informal thing.  It
12:46:37   7   wasn't long.  Five minutes or so for him to just
12:46:41   8   skim through it.
12:46:41   9          Q.   Okay.
12:46:43  10          A.   And I went on my way.
12:46:45  11          Q.   Have you had to meet with that union
12:46:46  12   rep or any other union reps for any other lawsuits
12:46:49  13   that were commenced against you?
12:46:50  14          A.   No.
12:46:51  15          Q.   Okay.  Is this the only lawsuit that
12:46:54  16   has ever been commenced against you?
12:46:56  17          A.   Yeah.  Yes.
12:46:57  18          Q.   Okay.  When was the next time that you
12:46:58  19   spoke to somebody about this lawsuit?
12:47:02  20          A.   Whenever we have court notifications to
12:47:05  21   talk to her.  I might have talked to Karl about it
12:47:15  22   two or three times, but it's not a huge discussion.
12:47:21  23          Q.   Okay.

*Moriarity - Davenport - 2/21/20*

164

12:47:22  1          A.   You know, me and Karl are on two

12:47:25  2   different shifts, and we talk about two different

12:47:28  3   things.

12:47:28  4          Q.   Okay.  So when you say two different

12:47:31  5   shifts, are you referring to like maybe --

12:47:33  6          A.   I'm -- I'm sorry.  He's on -- he's on

12:47:35  7   day shift and I'm on afternoons.

12:47:36  8          Q.   Okay.

12:47:37  9          A.   So we don't -- we don't really cross

12:47:39 10   paths as much.

12:47:41 11          Q.   Sure.

12:47:41 12          So after that first initial 16 weeks, did

12:47:44 13   you automatically go to the afternoon shift?

12:47:46 14          A.   Yes.

12:47:46 15          Q.   Okay.  So the only time that you would

12:47:50 16   have seen Karl Schultz, would that be typically

12:47:52 17   during briefing --

12:47:53 18          MS. HUGGINS:   Form.

12:47:54 19          BY MR. DAVENPORT:

12:47:54 20          Q.   -- before you started the afternoon

12:47:55 21   shift?

12:47:55 22          A.   No.  I went to -- so when he was

12:48:01 23   working, I was on my off days, and then when I was

| 12:48:05 | 1 | working, he was on his off days, so I didn't really |
|---|---|---|
| 12:48:08 | 2 | see him too much in Charlie. |

12:48:11  3          He transferred to Bravo, and then I went to

12:48:13  4    Delta for a little bit and came back, and he was

12:48:15  5    still in Bravo.

12:48:16  6          Q.   Okay.

12:48:17  7          A.   And now we're -- we're both in Bravo,

12:48:19  8    and I don't see him too often because he's usually

12:48:22  9    on calls when I'm in briefing.

12:48:24 10          Q.   Okay.  Were you involved in the

12:48:26 11    criminal proceedings at all against Mr. Kistner?

12:48:32 12          A.   I don't remember if I was notified to

12:48:35 13    go to court for that.

12:48:36 14          Q.   Okay.  Which officers are typically

12:48:40 15    notified to go to court for criminal proceedings?

12:48:42 16          A.   The arresting and assisting officers.

12:48:44 17    It could also be whoever is on the case history,

12:48:49 18    but they don't always notify everyone in.

12:48:53 19          Q.   Okay.

12:48:55 20          A.   And I don't really know how that's

12:48:57 21    determined.

12:48:57 22          Q.   Okay.

12:48:58 23          A.   But definitely the arresting officer.

*Moriarity - Davenport - 2/21/20*

166

12:49:01  1          Q.    What would be the circumstances where

12:49:03  2    an assisting officer would be required to go into

12:49:07  3    court for a court proceeding -- a criminal

12:49:09  4    proceeding?

12:49:09  5          MS. HUGGINS:   Form.

12:49:12  6          THE WITNESS:   I don't know the requirements

12:49:15  7    for an assisting officer because on -- on an arrest

12:49:20  8    form, there's the arresting officer and assisting

12:49:23  9    officer, and they've gone sometimes and not

12:49:27 10    notified the assisting officer and notified way

12:49:31 11    down the case history list, other people.  So I'm

12:49:34 12    not -- I'm not sure how that is determined.

12:49:36 13          BY MR. DAVENPORT:

12:49:36 14          Q.    Okay.  Now, after you received that

12:49:42 15    initial packet, when did you first watch the video

12:49:47 16    that was provided as part of the complaint?

12:49:53 17          A.    One of the times I met with my

12:49:55 18    attorney, and I don't know which time that was.

12:49:57 19          Q.    Okay.  Okay.  Do you know if it was

12:50:01 20    shortly after the lawsuit was commenced?

12:50:04 21          A.    I don't know.

12:50:05 22          Q.    Okay.  Do you know, was it within

12:50:07 23    a year of the lawsuit being commenced?

*Moriarity - Davenport - 2/21/20*

167

12:50:15  1      A.    I don't remember the time that my first

12:50:18  2  court notification was with my attorney and the

12:50:22  3  time that I received the packet.

12:50:26  4      Q.    How do you receive those court

12:50:28  5  notifications?

12:50:28  6      A.    They're given to our -- our stationhouse,

12:50:31  7  and then a report technician will contact us via

12:50:36  8  phone or -- I'm sorry -- there's -- depending on

12:50:41  9  the stationhouse, they might just put your

12:50:44  10 notification in your -- your mailbox.  Other ones

12:50:46  11 it's in a binder and you have to check yourself.

12:50:48  12     Q.    Okay.  Do you know where those court

12:50:51  13 notifications come from?

12:50:52  14     A.    The Court Liaison Bureau.

12:50:54  15     Q.    Okay.  Do you have records of those

12:50:57  16 court notifications from the liaison?

12:51:01  17     A.    I usually throw mine out once the court

12:51:05  18 date is over.  I mean, they -- I don't know if they

12:51:11  19 keep it or not or how long they would keep it.

12:51:13  20     Q.    Do you know, is the court liaison, is

12:51:17  21 that somebody affiliated with the courts or the

12:51:18  22 Buffalo Police Department?

12:51:21  23     A.    Courts, and then it goes to BPD.

*Moriarity - Davenport - 2/21/20*

168

```
12:51:23   1        Q.    Okay.  Do you know who that individual
12:51:25   2   is for the court liaison?
12:51:27   3        A.    I don't, actually.
12:51:28   4        Q.    Okay.  How often did you receive
12:51:32   5   notifications from the court liaison?
12:51:33   6        A.    It depends on how frequently you arrest
12:51:36   7   or you're -- you're -- you're needed in -- in court.
12:51:40   8        Q.    Okay.  Pertaining to this lawsuit,
12:51:45   9   how -- how often were you notified by the court
12:51:47  10   liaison?
12:51:49  11        MS. HUGGINS:  Form.  And, again, to the
12:51:52  12   extent that you're going into contact he's had with
12:51:55  13   counsel, I mean --
12:51:55  14        MR. DAVENPORT:  I'm not.
12:51:56  15        MS. HUGGINS:  -- that would be privileged.
12:51:57  16        MR. DAVENPORT:  Well, no.  Not --
12:51:58  17        MS. HUGGINS:  He's already indicated that
12:52:00  18   that's --
12:52:00  19        MR. DAVENPORT:  Not the times that he's had
12:52:01  20   contact with you.  What is said during that contact
12:52:03  21   is absolutely privileged.  I am not asking that.
12:52:05  22        I'm just simply asking:  Pertaining to this
12:52:08  23   lawsuit, how many notifications did you receive
```

| | | |
|---|---|---|
| 12:52:10 | 1 | from the court liaison? |
| 12:52:11 | 2 | And if you want to argue that that's |
| 12:52:12 | 3 | privileged, you can make that argument, but he can |
| 12:52:15 | 4 | answer it, and then you can make that objection |
| 12:52:17 | 5 | later, and it can be struck from the record. |
| 12:52:19 | 6 | So you may answer. |
| 12:52:20 | 7 | MS. HUGGINS: Well, that's not how |
| 12:52:22 | 8 | objections work. If something is privileged, |
| 12:52:24 | 9 | that's an objection that is preserved and he would |
| 12:52:27 | 10 | not answer during a deposition. |
| 12:52:28 | 11 | MR. DAVENPORT: Are you going to direct him |
| 12:52:29 | 12 | to not answer? |
| 12:52:30 | 13 | MS. HUGGINS: Sir, you can ask that |
| 12:52:32 | 14 | question, but I object to the -- to the extent that |
| 12:52:35 | 15 | you're veering towards that. |
| 12:52:37 | 16 | He's already indicated that court liaison is |
| 12:52:40 | 17 | the mechanism by which counsel directs him to come |
| 12:52:44 | 18 | meet with him. |
| 12:52:45 | 19 | MR. DAVENPORT: And I just asked him how |
| 12:52:47 | 20 | many times he received that notification from the |
| 12:52:48 | 21 | court liaison for this case. |
| 12:52:52 | 22 | You can answer. |
| 12:52:55 | 23 | MS. HUGGINS: You may answer. |

| | | |
|---|---|---|
| 12:52:56 | 1 | THE WITNESS:  I think two or three. |
| 12:52:57 | 2 | BY MR. DAVENPORT: |
| 12:52:58 | 3 | Q.   Okay.  Would those have been the only |
| 12:53:01 | 4 | times that you would have met with Ms. Huggins? |
| 12:53:04 | 5 | A.   Yep.  Yes. |
| 12:53:05 | 6 | Q.   Okay.  When, approximately, was that |
| 12:53:09 | 7 | first notification? |
| 12:53:10 | 8 | Was it recently or was it a while ago? |
| 12:53:12 | 9 | MS. HUGGINS:  Form.  Asked and answered. |
| 12:53:14 | 10 | THE WITNESS:  No.  That would have been |
| 12:53:16 | 11 | a while ago. |
| 12:53:17 | 12 | BY MR. DAVENPORT: |
| 12:53:18 | 13 | Q.   Like more than a year ago? |
| 12:53:19 | 14 | A.   I don't -- I don't remember. |
| 12:53:21 | 15 | Q.   Okay.  When was the second time that |
| 12:53:26 | 16 | you received that notification? |
| 12:53:29 | 17 | A.   I don't -- I don't remember -- I don't |
| 12:53:38 | 18 | remember.  I know I saw her last week -- |
| 12:53:40 | 19 | Q.   Okay. |
| 12:53:41 | 20 | A.   -- for something. |
| 12:53:41 | 21 | Q.   Did you receive a notification from the |
| 12:53:43 | 22 | court liaison? |
| 12:53:44 | 23 | A.   Yeah. |

12:53:44   1          Q.   Okay.  So one of -- one of the three

12:53:46   2   times that you received a notification was for this

12:53:48   3   deposition?

12:53:49   4          A.   Like I -- like I said, I don't remember

12:53:51   5   if it was two or three times, but I know I saw her

12:53:55   6   like last week, yeah.

12:53:56   7          Q.   Okay.  When was the first time that you

12:53:59   8   watched the video with your attorney or with

12:54:04   9   anybody else affiliated with the City of Buffalo

12:54:08  10   Law Department?

12:54:14  11          A.   I think it was the -- I think it was

12:54:17  12   the first time.

12:54:18  13          Q.   Okay.  Now, at that time, do you know

12:54:28  14   if the second notification that you received, did

12:54:33  15   you have to sign a verification at all?

12:54:37  16          MS. HUGGINS:   Form.

12:54:37  17          THE WITNESS:   What do you mean?  That

12:54:39  18   I showed up to court?

12:54:40  19          BY MR. DAVENPORT:

12:54:41  20          Q.   For the interrogatories that you

12:54:42  21   referred to earlier, the thicker packet that you

12:54:45  22   reviewed that you said that, you know, wasn't one

12:54:48  23   of the four documents in front of you?

*Moriarity - Davenport - 2/21/20*

172

| | | |
|---|---|---|
| 12:54:56 | 1 | I'm sorry. |
| 12:54:56 | 2 | MS. HUGGINS:  There might just be |
| 12:54:58 | 3 | confusion -- |
| 12:54:58 | 4 | MR. DAVENPORT:  Yeah. |
| 12:54:58 | 5 | THE WITNESS:  Yeah. |
| 12:54:58 | 6 | MS. HUGGINS:  -- between the complaint and |
| 12:54:59 | 7 | interrogatories. |
| 12:55:00 | 8 | MR. DAVENPORT:  No.  No.  I know.  I know. |
| 12:55:00 | 9 | MS. HUGGINS:  Yeah. |
| 12:55:01 | 10 | MR. DAVENPORT:  I understand. |
| 12:55:01 | 11 | THE WITNESS:  I don't -- |
| 12:55:02 | 12 | MR. DAVENPORT:  All right.  So -- |
| 12:55:02 | 13 | MS. HUGGINS:  It's your examination, but, |
| 12:55:04 | 14 | I mean, if I can help clear it up, I will. |
| 12:55:08 | 15 | MR. DAVENPORT:  Here you go. |
| 12:55:11 | 16 | Can we have this exhibit marked, please? |
| 12:55:11 | 17 | The following was marked for Identification: |
| | 18 | EXH. 23                Verification page |
| 12:55:11 | 19 | BY MR. DAVENPORT: |
| 12:55:53 | 20 | Q.   So I'm now showing you what has been |
| 12:55:56 | 21 | marked as Exhibit 23.  Do you recognize that |
| 12:55:58 | 22 | document? |
| 12:56:03 | 23 | A.   Yes. |

*Moriarity - Davenport - 2/21/20*

173

| | | |
|---|---|---|
| 12:56:03 | 1 | Q.   Okay.  Do you recall, was that document |
| 12:56:09 | 2 | given to you through the mail? |
| 12:56:14 | 3 | Was it given to you in person? |
| 12:56:15 | 4 | A.   In person. |
| 12:56:15 | 5 | Q.   Okay.  And who gave you that document? |
| 12:56:18 | 6 | A.   I don't know the dude's name.  I've |
| 12:56:23 | 7 | never -- |
| 12:56:24 | 8 | Q.   Okay. |
| 12:56:24 | 9 | A.   Yeah. |
| 12:56:24 | 10 | Q.   Okay. |
| 12:56:24 | 11 | MS. HUGGINS:  I think there's confusion |
| 12:56:26 | 12 | about what we're talking about right now. |
| 12:56:27 | 13 | MR. DAVENPORT:  Sure.  No.  That -- no. |
| 12:56:28 | 14 | I understand.  But he said that he recalled that |
| 12:56:29 | 15 | document, and he said he has seen it and that he |
| 12:56:32 | 16 | received it from some individual, so I'm just |
| 12:56:34 | 17 | asking questions about that document. |
| 12:56:37 | 18 | THE WITNESS:  Was this part -- this was part |
| 12:56:40 | 19 | of the packet, right, that I -- |
| 12:56:41 | 20 | MS. HUGGINS:  Yeah, I think there's |
| 12:56:44 | 21 | confusion. |
| 12:56:44 | 22 | THE WITNESS:  -- that I was served? |
| 12:56:44 | 23 | MS. HUGGINS:  He's confused about the |

*Moriarity - Davenport - 2/21/20*

174

| | | |
|---|---|---|
| 12:56:45 | 1 | summons and complaint -- |
| 12:56:45 | 2 | **MR. DAVENPORT:**  I'll -- I'll clarify it. |
| 12:56:46 | 3 | **MS. HUGGINS:**  -- versus this. |
| 12:56:46 | 4 | **MR. DAVENPORT:**  I'll clarify it.  Thank you. |
| 12:56:49 | 5 | So this exhibit has been marked as Exhibit |
| 12:56:51 | 6 | number 13.  Do you recognize that document? |
| 12:56:56 | 7 | **THE WITNESS:**  Yeah, I believe this is what |
| 12:56:58 | 8 | I was served with at my front doorstep, I think. |
| 12:57:02 | 9 | **BY MR. DAVENPORT:** |
| 12:57:02 | 10 | Q.  Okay.  So do you see in bold lettering |
| 12:57:08 | 11 | what that says? |
| 12:57:09 | 12 | A.  Right here? |
| 12:57:10 | 13 | Q.  Yes. |
| 12:57:11 | 14 | A.  Yeah.  Answer to first interrogatories |
| 12:57:13 | 15 | to defendants. |
| 12:57:14 | 16 | Q.  And, Mr. Moriarity, are you familiar |
| 12:57:17 | 17 | with what a complaint is? |
| 12:57:19 | 18 | A.  Yeah.  Someone makes a complaint on |
| 12:57:22 | 19 | you. |
| 12:57:22 | 20 | Q.  Like a -- a lawsuit complaint -- |
| 12:57:24 | 21 | A.  Okay. |
| 12:57:24 | 22 | Q.  -- is part of a legal proceeding; do |
| 12:57:28 | 23 | you know what that is? |

*Moriarity - Davenport - 2/21/20*

175

| 12:57:28 | 1 | A.   If you want to explain it to me so |
| 12:57:31 | 2 | I understand -- |
| 12:57:31 | 3 | Q.   Yeah.  Yeah. |
| 12:57:31 | 4 | A.   -- better. |
| 12:57:32 | 5 | Q.   Of course.  Of course. |
| 12:57:33 | 6 | All right.  So a legal complaint that |
| 12:57:34 | 7 | initiates the action, that would have been what you |
| 12:57:37 | 8 | had received on your front doorstep, that would |
| 12:57:39 | 9 | have been served to you, correct? |
| 12:57:40 | 10 | A.   Okay.  Yeah. |
| 12:57:41 | 11 | Q.   So now what I'm asking is:  These are |
| 12:57:44 | 12 | called interrogatories, so these probably would |
| 12:57:48 | 13 | have been a second document, a thicker document |
| 12:57:51 | 14 | that you would have reviewed. |
| 12:57:52 | 15 | A.   Oh, okay.  Okay. |
| 12:57:54 | 16 | Q.   So now I guess what my question is: |
| 12:57:58 | 17 | Did you receive that thick packet and then later |
| 12:58:02 | 18 | receive another criminal -- or legal document that |
| 12:58:06 | 19 | kind of looks something like this? |
| 12:58:09 | 20 | MS. HUGGINS:  Form. |
| 12:58:09 | 21 | THE WITNESS:  I received this later then. |
| 12:58:13 | 22 | BY MR. DAVENPORT: |
| 12:58:13 | 23 | Q.   Okay.  So it would have been something |

*Moriarity - Davenport - 2/21/20*

176

12:58:14  1  that was received later?

12:58:15  2          A.    Yeah.

12:58:16  3          Q.    Okay.   Now, was that received with this

12:58:19  4  verification?

12:58:22  5          MS. HUGGINS:   Form.

12:58:23  6          THE WITNESS:   That, I don't remember.

12:58:25  7  I mean, I -- I know that this is my signature.

12:58:28  8          BY MR. DAVENPORT:

12:58:28  9          Q.    Okay.

12:58:28 10          A.    And I'm not disputing that.

12:58:31 11          Q.    No.   No.   Of course.   Of course.

12:58:32 12          A.    I don't remember when --

12:58:33 13          Q.    Do you remember if this verification

12:58:34 14  was given with anything else?   Any other documents

12:58:38 15  that would have been handed to you at that time?

12:58:41 16          MS. HUGGINS:   Form.

12:58:41 17          THE WITNESS:   I -- no, I -- I don't -- I

12:58:49 18  don't remember.

12:58:49 19          BY MR. DAVENPORT:

12:58:49 20          Q.    Okay.   I'm going to direct your

12:58:55 21  attention to page 4.

12:58:58 22          A.    Page 4?

12:58:59 23          Q.    Or let's see here.

*Moriarity - Davenport - 2/21/20*

177

| | | |
|---|---|---|
| 12:59:03 | 1 | Excuse me.  Page 5.  And I want you to go to |
| 12:59:06 | 2 | demand number 2. |
| 12:59:07 | 3 | Now, that -- that interrogatory says, |
| 12:59:10 | 4 | identify the police officers shown in the video |
| 12:59:13 | 5 | attached as Exhibit A to the complaint. |
| 12:59:14 | 6 | Now, if I represent to you that Exhibit A to |
| 12:59:17 | 7 | the complaint is those four video segments that you |
| 12:59:19 | 8 | said that you have watched, are you able to |
| 12:59:23 | 9 | identify who those police officers are by watching |
| 12:59:27 | 10 | the video? |
| 12:59:28 | 11 | MS. HUGGINS:  Form. |
| 12:59:30 | 12 | THE WITNESS:  Some of them, yeah. |
| 12:59:32 | 13 | BY MR. DAVENPORT: |
| 12:59:32 | 14 | Q.  Okay.  Who were you able to identify |
| 12:59:35 | 15 | when watching the video? |
| 12:59:37 | 16 | MS. HUGGINS:  Form. |
| 12:59:37 | 17 | THE WITNESS:  Karl.  And then the other two, |
| 12:59:43 | 18 | Lauren and Jenny, I would get confused. |
| 12:59:45 | 19 | BY MR. DAVENPORT: |
| 12:59:45 | 20 | Q.  Okay.  But you knew that they were |
| 12:59:48 | 21 | there? |
| 12:59:48 | 22 | A.  I knew that they were there, yeah. |
| 12:59:50 | 23 | Q.  Okay.  Did you know -- did you watch -- |

*Moriarity - Davenport - 2/21/20*

178

| | | |
|---|---|---|
| 12:59:52 | 1 | there was a fourth video segment that was provided? |
| 12:59:54 | 2 | A.   I don't remember which video was the |
| 12:59:56 | 3 | fourth. |
| 12:59:57 | 4 | Q.   Okay.  Did you watch a video segment |
| 12:59:59 | 5 | where there was a fifth police officer on scene? |
| 13:00:01 | 6 | A.   Yes. |
| 13:00:01 | 7 | Q.   And did you know, when watching that |
| 13:00:04 | 8 | video, who that individual officer was? |
| 13:00:06 | 9 | A.   No.  I -- I -- I forgot who showed up |
| 13:00:09 | 10 | on scene. |
| 13:00:09 | 11 | Q.   Okay.  Okay. |
| 13:00:10 | 12 | A.   And when the video was replayed, it was |
| 13:00:14 | 13 | also what the -- the department refers to as |
| 13:00:17 | 14 | double-up day, so both shifts are working, and |
| 13:00:21 | 15 | I don't remember who all was on those shifts |
| 13:00:23 | 16 | because people get promoted or transferred. |
| 13:00:27 | 17 | Q.   Okay.  Now, have you later learned who |
| 13:00:28 | 18 | that fifth individual was? |
| 13:00:30 | 19 | A.   Yes. |
| 13:00:30 | 20 | Q.   Was that individual's name David |
| 13:00:32 | 21 | Santana? |
| 13:00:33 | 22 | A.   Yes. |
| 13:00:33 | 23 | Q.   Now, is that somebody that you had |

| | | |
|---|---|---|
| 13:00:35 | 1 | worked with before? |
| 13:00:37 | 2 | A.    Yeah, he was.  And like I said, I'm |
| 13:00:40 | 3 | about a week old on here. |
| 13:00:42 | 4 | Q.    Okay. |
| 13:00:42 | 5 | A.    So I had just basically met him. |
| 13:00:46 | 6 | Q.    Okay. |
| 13:00:48 | 7 | A.    So I -- I did forget that he was even |
| 13:00:51 | 8 | on scene, but then looking at the video, I mean, it |
| 13:00:55 | 9 | kind of took a little bit to realize it was him. |
| 13:01:01 | 10 | Q.    So David Santana, is that somebody that |
| 13:01:05 | 11 | you worked with after the incident on January 1st |
| 13:01:08 | 12 | of 2017? |
| 13:01:08 | 13 | A.    Only the 16 weeks -- |
| 13:01:10 | 14 | Q.    Okay. |
| 13:01:10 | 15 | A.    -- that I worked with him. |
| 13:01:12 | 16 | Q.    Okay.  So he would have been somebody |
| 13:01:16 | 17 | that worked on a different shift or a different -- |
| 13:01:18 | 18 | A.    He -- he would have been the same |
| 13:01:20 | 19 | shift. |
| 13:01:21 | 20 | Q.    He would have been the same shift, but |
| 13:01:23 | 21 | would he also work the same days that you work? |
| 13:01:26 | 22 | A.    The same, yep. |
| 13:01:26 | 23 | Q.    Okay. |

*Moriarity - Davenport - 2/21/20*

180

| | | |
|---|---|---|
| 13:01:26 | 1 | A.   Same days. |
| 13:01:28 | 2 | Q.   Okay.  Do you recall from the video |
| 13:01:30 | 3 | whether he was driving with somebody or whether he |
| 13:01:32 | 4 | was by himself? |
| 13:01:32 | 5 | A.   I don't. |
| 13:01:33 | 6 | Q.   Okay.  If I represented to you that he |
| 13:01:37 | 7 | was driving by himself, would you have any reason |
| 13:01:39 | 8 | to dispute that? |
| 13:01:40 | 9 | MS. HUGGINS:   Form. |
| 13:01:43 | 10 | THE WITNESS:   No, but again, I mean, I don't |
| 13:01:45 | 11 | know what other people were doing. |
| 13:01:47 | 12 | BY MR. DAVENPORT: |
| 13:01:48 | 13 | Q.   No.  Sure.  Sure. |
| 13:01:49 | 14 | A.   Yeah. |
| 13:01:49 | 15 | Q.   Would there be any reason why he would |
| 13:01:51 | 16 | be driving a Dodge Charger or a Charger rather than |
| 13:01:56 | 17 | the Chevy Tahoe that you and the other car were |
| 13:02:01 | 18 | driving? |
| 13:02:02 | 19 | A.   Could be a number of reasons.  I don't |
| 13:02:03 | 20 | know what the car situation was back then. |
| 13:02:06 | 21 | MR. DAVENPORT:   Okay.  Okay.  So if we could |
| 13:02:11 | 22 | just go to the video. |
| 13:02:12 | 23 | And then we can go off the record really |

*Moriarity - Davenport - 2/21/20*

181

13:02:14  1    quickly.

2              THE VIDEOGRAPHER:  Sure.

3              MR. DAVENPORT:  Okay.

4              THE WITNESS:  And can we take a break?

5              MR. DAVENPORT:  Yeah.  Yeah.  Of course.

6    Of course.

7              (A recess was then taken at 1:02 p.m.)

13:16:28  8    (On the record at 1:16 p.m.)

13:16:28  9    MR. DAVENPORT:  So, now, Mr. Moriarity, we

13:16:31 10   are going to watch the third video segment that has

13:16:33 11   been provided by the plaintiff during discovery.

13:16:36 12   The last four digits of that video are 2529.

13:16:36 13             Now can we please direct the camera towards

13:16:36 14   the TV screen?

13:16:52 15             Perfect.  Thank you.

13:16:54 16             So before we start the video, where is

13:16:58 17   the -- is there an individual that is standing in

13:17:00 18   the street?

13:17:00 19             THE WITNESS:  Yes.

13:17:02 20             BY MR. DAVENPORT:

13:17:02 21             Q.    Where is that individual standing?

13:17:05 22             MS. HUGGINS:  Form.

13:17:07 23             THE WITNESS:  From the video, in the middle

*Moriarity - Davenport - 2/21/20*

182

13:17:10  1    of the street.

13:17:10  2          BY MR. DAVENPORT:

13:17:10  3          Q.   Okay.   Is he standing in front of your

13:17:13  4    police vehicle or the other police vehicle?

13:17:19  5          A.   It looks like from the video's

13:17:21  6    perspective, in front of my vehicle.

13:17:27  7          Q.   Okay.   What direction is this

13:17:28  8    individual facing?

13:17:29  9          A.   South.

13:17:30 10          Q.   Okay.   And is that just based off of

13:17:33 11    your recollection of Schmarbeck Avenue, or is that

13:17:36 12    based off of any reference point on the video that

13:17:41 13    you know that that direction he's facing is south?

13:17:43 14          A.   No.   It's based off of my knowledge of

13:17:45 15    C District streets.

13:17:46 16          Q.   Okay.   And what direction is your car

13:17:49 17    facing?

13:17:50 18          A.   North.

13:17:51 19          MR. DAVENPORT:   Okay.   Now I'm going to play

13:17:54 20    the video.

13:18:08 21          (Video clip played.)

13:18:08 22          BY MR. DAVENPORT:

13:18:09 23          Q.   Now, what direction was that individual

*Moriarity - Davenport - 2/21/20*

183

13:18:12  1  walking for the first three seconds of the video?

13:18:19  2       A.   South.

13:18:20  3       Q.   Okay.   And your car is moving or is it

13:18:22  4  stationary?

13:18:23  5       A.   Stationary, still.

13:18:24  6       Q.   Okay.   So now what would be your

13:18:27  7  typical thing that you would do next, if you saw an

13:18:31  8  individual that was walking towards your police

13:18:33  9  vehicle and you were still stopped and -- and

13:18:36 10  hadn't been in motion?

13:18:38 11       MS. HUGGINS:   Form.

13:18:38 12       THE WITNESS:   Well, at the time, you

13:18:40 13  don't -- you can't say if you know that he's

13:18:42 14  walking towards my police vehicle or towards the

13:18:45 15  sidewalk or, you know, behind my police vehicle,

13:18:47 16  but I'm thinking officer safety.

13:18:52 17       BY MR. DAVENPORT:

13:18:52 18       Q.   Okay.

13:18:52 19       A.   But at that -- at that time, you know,

13:18:53 20  years ago, I don't remember what I was thinking.

13:18:55 21       Q.   Okay.   But the individual did take

13:19:01 22  a few steps, and he did -- he was closer to your

13:19:05 23  police vehicle than he was at the beginning of the

13:19:08  1  video, correct?

13:19:08  2       A.    Yes.

13:19:09  3       Q.    Okay.  Now -- now, we're still on three

13:19:23  4  seconds of the video.  Your video -- your car has

13:19:26  5  gone into motion at this point, correct?  It

13:19:28  6  started moving forward?

13:19:29  7       A.    Yes.

13:19:29  8       Q.    And where is the individual at this

13:19:32  9  point with reference to your police vehicle?

13:19:37  10      A.    The driver's side, in between my truck

13:19:41  11 and the grass.

13:19:43  12      Q.    Okay.  Now, what I want you to do is

13:19:46  13 I want you to make reference of the time stamp, and

13:19:49  14 I don't want you to verify its accuracy.  I just

13:19:52  15 want you to look at what the time is.

13:19:55  16      Would you agree that is 10:25:32 when your

13:19:58  17 car first starts in motion?

13:20:00  18      MS. HUGGINS:  Form.

13:20:03  19      THE WITNESS:  Based on this video and the

13:20:06  20 numbers that are on the screen, it says 10:25:32.

13:20:12  21      BY MR. DAVENPORT:

13:20:12  22      Q.    Okay.  Now, focusing on your car --

13:20:18  23      A.    You said focusing on my car?

13:20:20  1          Q.   Yes.   Oh, I'm sorry.   We'll -- we'll

13:20:22  2    play it again.   I'll start it from three seconds.

13:20:27  3          Well, we'll start it from three seconds.

13:20:27  4          THE WITNESS:   Yeah.

13:20:27  5          (Video clip played.)

13:20:27  6          BY MR. DAVENPORT:

13:20:29  7          Q.   Now, focusing on your car, I want you

13:20:31  8    to tell me when it is off the screen.   And I'll do

13:20:35  9    my best to stop the video when your car is out of

13:20:39  10   the scene.

13:20:39  11         MS. HUGGINS:   Form.

13:20:40  12         THE WITNESS:   All right.

13:20:45  13         BY MR. DAVENPORT:

13:20:46  14         Q.   Now, do you see on that top time stamp

13:20:48  15   what the time is?

13:20:50  16         A.   Yeah.   The top time stamp on the -- the

13:20:54  17   video is 10:25:37.

13:20:57  18         Q.   Okay.   So 10:25:37.

13:20:59  19         And when you first started in motion, it was

13:21:01  20   10:25:32, correct?

13:21:05  21         A.   Yeah.

13:21:05  22         MR. DAVENPORT:   Okay.   So now what I want

13:21:11  23   you to do -- well, I want to play a second video.

Moriarity - Davenport - 2/21/20

186

13:21:11   1          (Discussion off the record.)

13:21:11   2          (Video clip played.)

13:21:11   3          BY MR. DAVENPORT:

13:23:00   4      Q.   Now, assuming that these cameras are

13:23:02   5    calibrated where the times are accurately

13:23:04   6    reflecting each other -- they don't have to be

13:23:06   7    accurate in terms of what time it actually is, but

13:23:08   8    just assuming that they're all calibrated together,

13:23:11   9    what is the time stamp in that top video frame

13:23:14  10    right there?

13:23:15  11          MS. HUGGINS:   Form.

13:23:16  12          THE WITNESS:   Again, don't want to speculate

13:23:21  13    or assume anything, but the time on that screen is

13:23:26  14    10:25:38.

13:23:28  15          BY MR. DAVENPORT:

13:23:28  16      Q.   Okay.   Now, your car, although it was

13:23:30  17    in the camera view one second before, so that would

13:23:34  18    have been -- well, hold on.

13:23:37  19          Now, would you agree with me that your car

13:23:39  20    is in view at 10:25:36?

13:23:44  21      A.   Yes.

13:23:44  22          MR. DAVENPORT:   Okay.   Now watching the

13:23:46  23    video, would you agree that your car --

*Moriarity - Davenport - 2/21/20*

187

| | | |
|---|---|---|
| 13:23:46 | 1 | (Discussion off the record.) |
| 13:23:46 | 2 | BY MR. DAVENPORT: |
| 13:23:59 | 3 | Q.   All right.   Now, would you agree that |
| 13:23:59 | 4 | at 10:25:38, your car is outside of the view of the |
| 13:24:03 | 5 | camera? |
| 13:24:04 | 6 | A.   Yes. |
| 13:24:04 | 7 | MS. HUGGINS:   Form. |
| 13:24:04 | 8 | THE WITNESS:   Yes. |
| 13:24:05 | 9 | BY MR. DAVENPORT: |
| 13:24:06 | 10 | Q.   Okay.   Now, I want you to pay attention |
| 13:24:09 | 11 | and see when the next time your police vehicle is |
| 13:24:13 | 12 | in the view of the camera. |
| 13:24:19 | 13 | A.   Okay. |
| 13:24:24 | 14 | Yeah.   44, I think. |
| 13:24:27 | 15 | Q.   Okay. |
| 13:24:27 | 16 | A.   10:25:44. |
| 13:24:29 | 17 | Q.   Okay.   So the time stamp in the top |
| 13:24:32 | 18 | would have been 10:25:44, correct? |
| 13:24:35 | 19 | A.   Yeah. |
| 13:24:35 | 20 | MR. DAVENPORT:   Okay. |
| 13:24:43 | 21 | (Discussion off the record.) |
| 13:24:43 | 22 | MS. HUGGINS:   Do you want to identify the |
| 13:24:44 | 23 | discs that you've played for the record? |

*Moriarity - Davenport - 2/21/20*

188

| | | |
|---|---|---|
| 13:24:45 | 1 | MR. DAVENPORT: Sure. So the disc that |
| 13:24:46 | 2 | I just played was Exhibit 12. It is Exhibit A |
| 13:24:51 | 3 | supplement that was provided by the plaintiffs. |
| 13:24:56 | 4 | We are now playing Exhibit 11, which was |
| 13:24:58 | 5 | also provided by the plaintiffs. |
| 13:24:58 | 6 | (Video clip played.) |
| 13:24:58 | 7 | BY MR. DAVENPORT: |
| 13:25:20 | 8 | Q. So now I am playing again what has been |
| 13:25:23 | 9 | marked as Exhibit 11, for purposes of the |
| 13:25:26 | 10 | deposition. The last four digits are 2529. |
| 13:25:31 | 11 | Now, what I want you to pay attention to is |
| 13:25:34 | 12 | when the first instance that you would consider |
| 13:25:37 | 13 | contact has been made between Mr. Kistner and |
| 13:25:41 | 14 | Ms. Velez and Ms. McDermott's vehicle. |
| 13:25:45 | 15 | A. Okay. |
| 13:25:51 | 16 | MS. HUGGINS: Wait for a question. |
| 13:25:52 | 17 | BY MR. DAVENPORT: |
| 13:25:52 | 18 | Q. What time is that? |
| 13:25:54 | 19 | What time -- what's the time stamp in the |
| 13:25:55 | 20 | top part of the video? |
| 13:25:58 | 21 | MS. HUGGINS: Form. |
| 13:25:58 | 22 | THE WITNESS: 10:25:36. |
| 13:26:02 | 23 | BY MR. DAVENPORT: |

*Moriarity - Davenport - 2/21/20*

189

13:26:02   1          Q.    Okay.   Would you agree with me that

13:26:04   2    your vehicle is still in view at that point at

13:26:09   3    10:25:36?

13:26:10   4          A.    Yeah.   Yes.

13:26:11   5          Q.    Okay.   Now, would you agree with me

13:26:13   6    that based on the other camera angle, you did not

13:26:17   7    appear back within view until 10:25:44?

13:26:22   8          MS. HUGGINS:   Form.

13:26:22   9          THE WITNESS:   Yeah, that's correct.

13:26:24  10          BY MR. DAVENPORT:

13:26:24  11          Q.    And that would have been eight seconds

13:26:26  12    after initial contact was made between Mr. Kistner

13:26:28  13    and that vehicle, correct?

13:26:29  14          MS. HUGGINS:   Form.   I'd object to -- we've

13:26:34  15    already indicated that we're not -- the accuracy of

13:26:37  16    these time stamps has not been verified in any way.

13:26:42  17          BY MR. DAVENPORT:

13:26:42  18          Q.    You can answer the question.

13:26:43  19          A.    Can you -- can you repeat the question

13:26:46  20    again?

13:26:46  21          MR. DAVENPORT:   Sure.

13:26:47  22          Can you read back the question that I just

13:26:49  23    asked?

13:26:49   1          (The above-requested portion was then read

13:27:10   2    by the reporter.)

13:27:10   3          MS. HUGGINS:   Same -- same form objection.

13:27:13   4          THE WITNESS:   Yeah.   Yes, as per that time

13:27:17   5    on the camera.

13:27:19   6          BY MR. DAVENPORT:

13:27:19   7          Q.   Okay.   So now assuming that you were

13:27:21   8    moving forward for six of those seconds, you

13:27:26   9    weren't stopped at the point that contact was made

13:27:28  10    between Mr. Kistner and the police vehicle,

13:27:30  11    correct?

13:27:30  12          MS. HUGGINS:   Form.

13:27:32  13          THE WITNESS:   No.

13:27:33  14          BY MR. DAVENPORT:

13:27:34  15          Q.   Okay.   Would you have been looking into

13:27:37  16    your driver's side mirror at this point?

13:27:41  17          A.   Like I said earlier, I -- I could have

13:27:43  18    been looking at the mirror or forward, but I do

13:27:49  19    remember at some point looking at the driver's side

13:27:52  20    mirror and seeing what I thought I saw.

13:27:56  21          Q.   So now assuming that you saw

13:27:59  22    Mr. Kistner make contact with the vehicle, you're

13:28:01  23    still driving forward for a few seconds, correct?

*Moriarity - Davenport - 2/21/20*

191

| | | |
|---|---|---|
| 13:28:04 | 1 | MS. HUGGINS:  Form. |
| 13:28:04 | 2 | THE WITNESS:  Correct. |
| 13:28:06 | 3 | BY MR. DAVENPORT: |
| 13:28:06 | 4 | Q.   So why didn't you stop after contact |
| 13:28:08 | 5 | was made between Mr. Kistner and the police |
| 13:28:10 | 6 | vehicle? |
| 13:28:10 | 7 | MS. HUGGINS:  Form. |
| 13:28:10 | 8 | THE WITNESS:  Well, because you have to come |
| 13:28:12 | 9 | to a safe stop.  You can't just slam on the brakes |
| 13:28:15 | 10 | and slam your head into the steering wheel.  You |
| 13:28:18 | 11 | know what I mean?  You still have to stop. |
| 13:28:21 | 12 | BY MR. DAVENPORT: |
| 13:28:21 | 13 | Q.   Okay.  And it would have taken you, |
| 13:28:24 | 14 | let's assume, eight seconds to come back? |
| 13:28:26 | 15 | MS. HUGGINS:  Form. |
| 13:28:27 | 16 | BY MR. DAVENPORT: |
| 13:28:28 | 17 | Q.   To stop your car and come back, that |
| 13:28:30 | 18 | would be a safe stop? |
| 13:28:31 | 19 | MS. HUGGINS:  Form. |
| 13:28:32 | 20 | THE WITNESS:  Yeah. |
| 13:28:32 | 21 | BY MR. DAVENPORT: |
| 13:28:32 | 22 | Q.   Okay.  Now, let's assume that your |
| 13:28:35 | 23 | vehicle is moving away from the incident as it's |

13:28:37  1  happening.  What -- do you think that what you

13:28:43  2  would be able to see would be distorted if you're

13:28:47  3  moving away from a scene rather than closer to

13:28:49  4  a scene?

13:28:50  5          MS. HUGGINS:  Form.

13:28:50  6          THE WITNESS:  You know, your eyes see what

13:28:54  7  they see, so I don't -- I can't speak on what can

13:28:58  8  be distorted and all that.

13:29:03  9          BY MR. DAVENPORT:

13:29:03 10          Q.   But you saw Mr. Kistner make contact

13:29:06 11  with the vehicle?

13:29:07 12          MS. HUGGINS:  Form.  Asked and answered.

13:29:09 13          THE WITNESS:  Yeah.

13:29:10 14          BY MR. DAVENPORT:

13:29:10 15          Q.   And then you kept on driving forward?

13:29:12 16          MS. HUGGINS:  Form.

13:29:12 17          THE WITNESS:  I was slowing down to a stop

13:29:14 18  and then reversing, yeah.

13:29:15 19          BY MR. DAVENPORT:

13:29:15 20          Q.   Was Karl Schultz telling you to stop at

13:29:18 21  that point?

13:29:18 22          A.   Like I said, I don't -- I don't

13:29:21 23  remember if he told me to stop.  I think I -- I

13:29:24   1   think I just kind of stopped.

13:29:26   2        Q.    Okay.  Are you talking at all with Karl

13:29:31   3   Schultz as contact is initially made between the

13:29:33   4   police vehicle and Mr. Kistner?

13:29:34   5        MS. HUGGINS:  Form.

13:29:35   6        THE WITNESS:  As I already stated, I think --

13:29:40   7   I think we both -- I think either I said something,

13:29:44   8   he said something, or maybe we both said something

13:29:47   9   about what we thought we just saw.

13:29:50  10        BY MR. DAVENPORT:

13:29:50  11        Q.    Okay.  Now, I want you to watch again

13:30:02  12   the collision that is made between Mr. Kistner and

13:30:04  13   between the police vehicle, and I want you to tell

13:30:08  14   me if you still think that Mr. Kistner was the one

13:30:12  15   that threw himself at the police vehicle.

13:30:14  16        MS. HUGGINS:  Form.

13:30:21  17        (Video clip played.)

13:30:21  18        BY MR. DAVENPORT:

13:30:21  19        Q.    Does it look like Mr. Kistner threw

13:30:23  20   himself at that police vehicle?

13:30:24  21        MS. HUGGINS:  Form.

13:30:24  22        THE WITNESS:  Again, we're looking at

13:30:27  23   a camera at a different angle.  What I saw from my

13:30:31  1  perspective, it looked like he threw himself at the

13:30:36  2  vehicle.

13:30:37  3  　　　BY MR. DAVENPORT:

13:30:37  4  　　　Q.   But, again --

13:30:38  5  　　　A.   So --

13:30:39  6  　　　Q.   -- your perspective was you looking in

13:30:41  7  your driver's side mirror, as you were driving

13:30:43  8  forward.

13:30:43  9  　　　A.   Correct.

13:30:43 10  　　　Q.   And you were driving forward for eight

13:30:45 11  seconds after initial contact was made.

13:30:49 12  　　　A.   That is correct.

13:30:50 13  　　　MS. HUGGINS:   Form.

13:30:50 14  　　　BY MR. DAVENPORT:

13:30:50 15  　　　Q.   Okay.   Now, after contact was made, did

13:30:52 16  you notice that police vehicle moving forward at

13:30:56 17  all?

13:30:56 18  　　　I can replay it if you need me to.

13:30:59 19  　　　A.   I -- I just need you to say that

13:31:01 20  question again.   What do you mean?

13:31:03 21  　　　Q.   Okay.

13:31:04 22  　　　MS. HUGGINS:   Can you read it back, Anne?

13:31:04 23  　　　(The above-requested portion was then read

*Moriarity - Davenport - 2/21/20*

195

13:31:24  1  by the reporter.)

13:31:24  2          THE WITNESS:  By this video, at this angle,

13:31:28  3  that's what it looks like.

13:31:30  4          BY MR. DAVENPORT:

13:31:30  5          Q.   Okay.

13:31:30  6          A.   But from what I saw when -- again, when

13:31:33  7  I was looking in my mirror, that's not what I saw.

13:31:35  8          Q.   Okay.  Did anybody talk with -- did

13:31:41  9  either you or Karl Schultz talk with Lauren

13:31:44 10  McDermott and Jenny Velez to see what they saw?

13:31:45 11          A.   I -- I would have never have done that.

13:31:48 12  Again, because I was so brand new, I deferred

13:31:51 13  everything to -- to the other officers.

13:31:54 14          MR. DAVENPORT:  Okay.  Now, I want you to

13:32:16 15  watch.

13:32:16 16          (Video clip played.)

13:32:16 17          BY MR. DAVENPORT:

13:32:18 18          Q.   Who is that individual that just came

13:32:21 19  into the scene right here?

13:32:23 20          A.   At the time, I -- I didn't know, and,

13:32:32 21  again, I -- I don't think we ever took down info.

13:32:38 22  I'm pretty sure it -- it was his son -- it's his

13:32:40 23  son.

*Moriarity - Davenport - 2/21/20*

196

13:32:43  1        Q.   Okay.  Would it be normal for somebody

13:32:45  2   to run out after their father after they've been

13:32:48  3   hit by a police vehicle?

13:32:48  4        MS. HUGGINS:  Form.

13:32:50  5        THE WITNESS:  You can't -- you can't just

13:32:53  6   determine that from -- from not knowing who he is

13:32:55  7   or anything like that.  You know what I mean?

13:32:57  8   I don't -- I don't -- I don't know who he is.

13:32:58  9        BY MR. DAVENPORT:

13:32:58 10        Q.   But after you came to -- because you

13:33:00 11   did say that you came to learn that --

13:33:00 12        A.   Yeah.  Yeah.

13:33:02 13        Q.   -- he may have been his son or --

13:33:03 14        A.   So --

13:33:04 15        Q.   -- related to him, that it would have

13:33:07 16   been normal for him to run out after his father

13:33:09 17   after he's been hit?

13:33:11 18        MS. HUGGINS:  Form.  Asked and answered, and

13:33:11 19   misstates the testimony.

13:33:12 20        THE WITNESS:  It's normal for some people.

13:33:14 21   It's normal -- not normal for other people.

13:33:14 22   I mean --

13:33:15 23        BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

197

13:33:15  1        Q.    Would you run out after your father, if
13:33:17  2   he was hit by a police vehicle?
13:33:18  3        A.    Again, it's normal for some people.
13:33:20  4   It's normal -- not normal for --
13:33:22  5        Q.    I'm asking you for what you would
13:33:25  6   specifically do.
13:33:25  7        A.    I'm -- I'm going -- I'm going to answer.
13:33:25  8        MS. HUGGINS:    Form.
13:33:27  9        THE WITNESS:    Just let me answer.
13:33:27 10        BY MR. DAVENPORT:
13:33:28 11        Q.    Okay.
13:33:28 12        A.    It's normal for some people.  It's not
13:33:30 13   normal for other people.  I would.  There's other
13:33:31 14   people that I've seen that don't really care.  So
13:33:34 15   it is normal but it's also not normal.
13:33:36 16        Q.    Okay.  Now, at this point he runs out
13:33:40 17   and he stops really quickly.  At this point would
13:33:44 18   you say that he's made any threatening motions or
13:33:46 19   anything that would make you concerned for your
13:33:48 20   safety?
13:33:49 21        MS. HUGGINS:    Form.
13:33:50 22        THE WITNESS:    No.
13:33:51 23        BY MR. DAVENPORT:

*Moriarity - Davenport - 2/21/20*

198

13:33:51  1        Q.   Okay.  Now he runs out again -- well,

13:33:54  2  he's not even running at this point.  He's just

13:33:57  3  kind of inching his way over to see what his

13:33:59  4  father's doing.

13:34:00  5        Is he at all concerned with what you or the

13:34:02  6  other officers are doing, or is he just trying to

13:34:05  7  see what his father's doing on the other side of

13:34:07  8  the police vehicle?

13:34:07  9        MS. HUGGINS:  Form.  Calls for speculation.

13:34:10 10        THE WITNESS:  Yeah, I mean, I don't -- I

13:34:12 11  don't know what he's doing.  He's not concerned

13:34:14 12  with the officers, though.

13:34:15 13        BY MR. DAVENPORT:

13:34:15 14        Q.   Okay.

13:34:16 15        A.   It doesn't -- it doesn't look like he

13:34:19 16  is.

13:34:19 17        Q.   Now what's he doing there?

13:34:22 18        What do you think he's doing, based on the

13:34:24 19  video?

13:34:24 20        MS. HUGGINS:  Form.

13:34:24 21        THE WITNESS:  Bending over.

13:34:25 22        MS. HUGGINS:  Compound question.

13:34:26 23        BY MR. DAVENPORT:

| | | |
|---|---|---|
| 13:34:26 | 1 | Q.   Based on the video, why would he be |
| 13:34:28 | 2 | bending over? |
| 13:34:29 | 3 | MS. HUGGINS:  Form. |
| 13:34:30 | 4 | THE WITNESS:  I -- I can't answer why he's |
| 13:34:31 | 5 | bending over.  He could -- yeah.  I mean, he could |
| 13:34:34 | 6 | be checking on his dad. |
| 13:34:36 | 7 | BY MR. DAVENPORT: |
| 13:34:36 | 8 | Q.   Well, his father's on the ground, |
| 13:34:38 | 9 | right? |
| 13:34:39 | 10 | A.   Yeah. |
| 13:34:39 | 11 | Q.   Do you think maybe he's bending down to |
| 13:34:41 | 12 | get a better vantage point of his father? |
| 13:34:44 | 13 | A.   Yeah. |
| 13:34:44 | 14 | MS. HUGGINS:  Form. |
| 13:34:44 | 15 | THE WITNESS:  I just said that he could be |
| 13:34:46 | 16 | checking on his dad. |
| 13:34:48 | 17 | BY MR. DAVENPORT: |
| 13:34:48 | 18 | Q.   Okay.  Now, at this point he walks |
| 13:34:50 | 19 | right past the officers, correct? |
| 13:34:52 | 20 | A.   Yes. |
| 13:34:52 | 21 | Q.   At this point has he made any |
| 13:34:55 | 22 | threatening motions or anything -- threatening |
| 13:34:57 | 23 | maneuvers that would cause the police officers |

| | | |
|---|---|---|
| 13:34:59 | 1 | concern? |
| 13:35:04 | 2 | A.   No. |
| 13:35:05 | 3 | Q.   Okay.   Now, he walks back towards the |
| 13:35:13 | 4 | sidewalk, correct? |
| 13:35:15 | 5 | A.   Yeah. |
| 13:35:15 | 6 | Q.   Would you consider him to now be in the |
| 13:35:17 | 7 | scene of a police incident? |
| 13:35:22 | 8 | A.   No. |
| 13:35:22 | 9 | Q.   Okay.   At any point before he left the |
| 13:35:30 | 10 | view of that camera, would you consider him to be |
| 13:35:32 | 11 | in the scene of a police -- police incident? |
| 13:35:35 | 12 | MS. HUGGINS:   Form. |
| 13:35:37 | 13 | THE WITNESS:   At the time and how brand new |
| 13:35:41 | 14 | I was, I would say no. |
| 13:35:43 | 15 | I would say, given my time on the job now, |
| 13:35:46 | 16 | he was in the scene at one point in time and now |
| 13:35:49 | 17 | he's no longer in the scene. |
| 13:35:50 | 18 | BY MR. DAVENPORT: |
| 13:35:50 | 19 | Q.   Okay.   Has he made any sort of |
| 13:35:53 | 20 | threatening motions or any sort of movements that |
| 13:35:56 | 21 | would cause you alarm? |
| 13:35:57 | 22 | A.   No. |
| 13:36:02 | 23 | MR. DAVENPORT:   Okay.   Now, I want you to |

*Moriarity - Davenport - 2/21/20*

201

13:36:03  1  watch and see if this individual appears back in

13:36:05  2  the screen.

13:36:05  3         (Video clip played.)

13:36:32  4         **THE WITNESS:**  So wherever that was -- what

13:36:34  5  was that?  42?

13:36:35  6         **BY MR. DAVENPORT:**

13:36:35  7         Q.   Yes.  We'll say 10:26:42, he's back in

13:36:38  8  the scene?

13:36:39  9         **MS. HUGGINS:**  Form.

13:36:40  10        **BY MR. DAVENPORT:**

13:36:41  11        Q.   Is he in the scene at this point?

13:36:43  12  Police scene.

13:36:43  13        A.   On the -- on the -- wait.  Say that

13:36:46  14  again.

13:36:47  15        Q.   Is this individual in the police scene

13:36:49  16  at 10:40 -- 10:26:42?

13:36:52  17        A.   He's in the -- the view of the camera.

13:36:53  18  I wouldn't say he's in the scene.

13:36:57  19        Q.   Okay.  At any point does he enter the

13:37:00  20  police scene?

13:37:08  21        At any point before I stopped?

13:37:10  22        A.   No, but there's some type of contact

13:37:14  23  made.  It looks like --

*Moriarity - Davenport - 2/21/20*

202

13:37:14   1        Q.   When --

13:37:16   2        A.   It looks like there's some type of

13:37:18   3   contact made either between the officer and him or

13:37:21   4   him and the officer.

13:37:23   5        Q.   Now, when you say contact, what are you

13:37:26   6   referring to?

13:37:28   7        A.   Maybe he said something or the officer

13:37:32   8   said something to him.   I don't know.

13:37:34   9        Q.   Okay.   So contact refers to something

13:37:35   10   that is verbally said.

13:37:37   11        MS. HUGGINS:   Form.

13:37:38   12        THE WITNESS:   Verbally, physically, yeah,

13:37:41   13   but in this scenario, verbal.

13:37:44   14        BY MR. DAVENPORT:

13:37:44   15        Q.   Okay.

13:37:44   16        A.   Some -- something -- something made the

13:37:45   17   officer direct his attention to the male.

13:37:50   18        Q.   Okay.

13:37:51   19        A.   Something.

13:37:51   20        Q.   Now, I understand that it might be

13:37:53   21   different from what you saw that day, but now

13:37:55   22   watching the video, what does it appear that that

13:38:01   23   individual is doing?

13:38:01  1          MS. HUGGINS:  Form.

13:38:02  2          THE WITNESS:  It appears as though he's on

13:38:04  3  his phone.

13:38:04  4          BY MR. DAVENPORT:

13:38:04  5          Q.   Okay.  Do you have any reason to know

13:38:07  6  today why he was on his phone at that time?

13:38:12  7          A.   I -- I can't speculate why he's on his

13:38:17  8  phone.  I don't know.

13:38:17  9          Q.   Would that be something that's a

13:38:19 10  threatening motion made?

13:38:21 11          A.   No.

13:38:21 12          Q.   For a police officer, if somebody was

13:38:24 13  on their phone?

13:38:25 14          A.   No.

13:38:32 15          Q.   Okay.  Now, when initial contact is

13:38:33 16  made between a police officer and this individual,

13:38:35 17  would you have to do some sort of a visual

13:38:37 18  assessment?

13:38:38 19          A.   Can you explain that?

13:38:39 20          MS. HUGGINS:  Form.

13:38:40 21          BY MR. DAVENPORT:

13:38:40 22          Q.   Well, you -- you were saying that

13:38:41 23  contact has been made between the police officer

13:38:43  1  and this individual.

13:38:46  2          What would be the next steps after that

13:38:47  3  contact is made in this situation?

13:38:50  4          MS. HUGGINS:  Form.  Are you asking what

13:38:52  5  happened or procedure?

13:38:53  6          MR. DAVENPORT:  Procedure.

13:38:54  7          MS. HUGGINS:  Form.

13:38:55  8          THE WITNESS:  That can be dictated by other

13:39:00  9  variables.  I don't know what is about to be said

13:39:04 10  or what the subject does or acts out.

13:39:10 11          BY MR. DAVENPORT:

13:39:10 12          Q.   Okay.  So let's say in this situation,

13:39:15 13  an individual is on their cell phone and contact

13:39:19 14  has been made between the police officer and this

13:39:22 15  individual.

13:39:22 16          What should the next steps be in this

13:39:25 17  situation, knowing that some individual has been

13:39:30 18  contacted by a police vehicle?

13:39:31 19          MS. HUGGINS:  Form.

13:39:33 20          THE WITNESS:  Well, I'm confused if you're

13:39:38 21  asking about two different things.  About the --

13:39:42 22  the officers with the subject who --

13:39:47 23          BY MR. DAVENPORT:

13:39:47  1        Q.   Oh, no.   I'm --

13:39:49  2        A.   -- was contacted by the police vehicle

13:39:51  3   or -- or the subject that was contacted by this

13:39:53  4   officer.   What are you -- what are you talking

13:39:55  5   about?   Which one?

13:39:57  6        Q.   So I'm not talking about the individual

13:39:58  7   that was contacted by the police vehicle.   We were

13:40:01  8   talking about the contact that is made between the

13:40:03  9   individual who is on his phone and the individual --

13:40:06 10   the police officer who was out in the street.

13:40:09 11        What I want to know is --

13:40:10 12        A.   Yeah.   There's --

13:40:11 13        Q.   -- in this situation, you know, what --

13:40:12 14   what should he be doing if an individual is on his

13:40:15 15   phone after somebody, possibly his father, has been

13:40:18 16   struck by a police vehicle?

13:40:19 17        MS. HUGGINS:   Form.

13:40:19 18        THE WITNESS:   There's -- there's no written

13:40:21 19   procedure.   You can speak to him and leave.   You

13:40:25 20   can speak to him and stay.   You can -- I don't know

13:40:28 21   what they're talking about.

13:40:30 22        BY MR. DAVENPORT:

13:40:31 23        Q.   Okay.   Well, would there be any reason

*Moriarity - Davenport - 2/21/20*

| | | |
|---|---|---|
| 13:40:33 | 1 | to take that cell phone from that individual? |
| 13:40:35 | 2 | MS. HUGGINS:  Form. |
| 13:40:37 | 3 | THE WITNESS:  It -- it -- no, not right now. |
| 13:40:42 | 4 | BY MR. DAVENPORT: |
| 13:40:43 | 5 | Q.   Okay.  Would there be any reason -- |
| 13:40:49 | 6 | well, we'll keep on watching. |
| 13:40:56 | 7 | So now an individual -- this individual is, |
| 13:41:00 | 8 | would you agree, walking away from the police |
| 13:41:03 | 9 | officer that first made contact with him? |
| 13:41:05 | 10 | A.   Mm-hmm.  I'm sorry.  Yes. |
| 13:41:08 | 11 | Q.   And would you agree that he is still on |
| 13:41:10 | 12 | his cell phone at this point? |
| 13:41:13 | 13 | A.   Yes. |
| 13:41:13 | 14 | Q.   Okay.  Now, what reasons would the |
| 13:41:15 | 15 | police officer have to go to that individual while |
| 13:41:19 | 16 | he's on his cell phone? |
| 13:41:21 | 17 | MS. HUGGINS:  Form. |
| 13:41:23 | 18 | THE WITNESS:  I can't -- |
| 13:41:23 | 19 | MS. HUGGINS:  Calls for speculation. |
| 13:41:25 | 20 | THE WITNESS:  Yeah.  I can't speculate |
| 13:41:25 | 21 | for -- and that's -- |
| 13:41:25 | 22 | BY MR. DAVENPORT: |
| 13:41:25 | 23 | Q.   Well, you were there. |

*Moriarity - Davenport - 2/21/20*

13:41:25  1      A.    That's --

13:41:26  2      Q.    You were there.

13:41:26  3      A.    Well, let me -- let me talk.

13:41:28  4      MS. HUGGINS:  Form.

13:41:29  5      THE WITNESS:  I can't speculate for what

13:41:33  6  Karl's doing, but you can, in many scenarios, when

13:41:37  7  someone's walking away, detain them for whatever

13:41:41  8  reason.  Whatever reason is -- is legal in that

13:41:44  9  moment.

13:41:46  10      And for you to say that I was there, I wasn't.

13:41:48  11  I was over at a totally different vehicle.

13:41:50  12      BY MR. DAVENPORT:

13:41:50  13      Q.    Okay.

13:41:50  14      A.    So I don't know what they were talking

13:41:52  15  about.  That's speculation.

13:41:53  16      Q.    Okay.  So now this individual is

13:41:55  17  walking away from Karl Schultz, and Karl Schultz is

13:41:58  18  walking towards him.  I mean, this guy's still on

13:42:02  19  his cell phone, correct?

13:42:03  20      What -- what possible things could he have

13:42:04  21  said where Karl Schultz would still be following

13:42:06  22  after him?

13:42:07  23      MS. HUGGINS:  Form.  There's a lot of

| | | |
|---|---|---|
| 13:42:09 | 1 | foundational problems with that question.  It's |
| 13:42:11 | 2 | compound.  It's -- |
| 13:42:11 | 3 | MR. DAVENPORT:  It's a deposition.  He can |
| 13:42:13 | 4 | answer the question. |
| 13:42:14 | 5 | You can -- you can move to strike it if you |
| 13:42:16 | 6 | would like, but he can answer the question. |
| 13:42:18 | 7 | MS. HUGGINS:  You have to ask -- ask proper |
| 13:42:19 | 8 | questions. |
| 13:42:19 | 9 | MR. DAVENPORT:  It's a proper question. |
| 13:42:21 | 10 | I'm asking -- he's on his cell phone.  He's |
| 13:42:23 | 11 | walking away from Karl Schultz.  What possible |
| 13:42:26 | 12 | things could he have said that would need Karl |
| 13:42:29 | 13 | Schultz to keep on walking after him? |
| 13:42:31 | 14 | MS. HUGGINS:  Form.  It calls for |
| 13:42:32 | 15 | speculation, and it's a compound question. |
| 13:42:33 | 16 | MR. DAVENPORT:  I'm just asking what things |
| 13:42:35 | 17 | could have possibly been said.  He can answer the |
| 13:42:37 | 18 | question. |
| 13:42:38 | 19 | THE WITNESS:  I would still defer to Karl |
| 13:42:40 | 20 | Schultz.  I -- I don't know -- |
| 13:42:40 | 21 | BY MR. DAVENPORT: |
| 13:42:40 | 22 | Q.   Would there be any reason -- |
| 13:42:43 | 23 | A.   -- what was said. |

Moriarity - Davenport - 2/21/20

209

13:42:44    1         Q.    -- why you would go?

13:42:45    2         MS. HUGGINS:   Allow him to finish an answer.

13:42:48    3         THE WITNESS:   I don't know what was said.

13:42:53    4         In many different scenarios I've just let

13:42:57    5    people walk away.   In other scenarios I've kept

13:43:00    6    them on scene.

13:43:01    7         I don't know.   I don't know -- I don't know

13:43:01    8    what was said during the interaction between Karl

13:43:05    9    and the subject, so I don't know.

13:43:08   10         BY MR. DAVENPORT:

13:43:08   11         Q.    Now, situations where you have kept the

13:43:10   12    person on scene, what types of things did that

13:43:13   13    individual say?

13:43:14   14         MS. HUGGINS:   Form.

13:43:16   15         THE WITNESS:   They could say something

13:43:19   16    specific to the scene, and -- I don't know -- maybe

13:43:25   17    they -- they witnessed something and you need

13:43:28   18    a statement from them.

13:43:28   19         Maybe -- maybe they said something that

13:43:34   20    would elicit a disorderly conduct penal law charge

13:43:40   21    and get arrested.

13:43:41   22         You could -- you know, there's -- there's

13:43:43   23    many different things that someone would say where

*Moriarity - Davenport - 2/21/20*

210

| | | |
|---|---|---|
| 13:43:45 | 1 | you would keep someone on scene and detain them and |
| 13:43:49 | 2 | take it from there. |
| 13:43:51 | 3 | BY MR. DAVENPORT: |
| 13:43:51 | 4 | Q.   Now, assuming that this person said |
| 13:43:54 | 5 | something about the scene that would have made them |
| 13:43:57 | 6 | a witness, did anybody take a statement from him |
| 13:44:02 | 7 | that day? |
| 13:44:03 | 8 | MS. HUGGINS:  Form. |
| 13:44:04 | 9 | THE WITNESS:  I never said that he was |
| 13:44:05 | 10 | a witness.  I don't know if any statement was |
| 13:44:09 | 11 | taken.  I would have deferred to the senior |
| 13:44:11 | 12 | officers. |
| 13:44:11 | 13 | BY MR. DAVENPORT: |
| 13:44:11 | 14 | Q.   Okay.  Now, would you agree that the |
| 13:44:22 | 15 | individual is now out of the scene and so is |
| 13:44:25 | 16 | Officer Karl Schultz at this point? |
| 13:44:28 | 17 | A.   Yes. |
| 13:44:28 | 18 | Q.   Okay.  Where are you at this point? |
| 13:44:29 | 19 | A.   I'm in the lower right-hand corner of |
| 13:44:32 | 20 | the video screen. |
| 13:44:33 | 21 | Q.   And what direction are you facing? |
| 13:44:36 | 22 | A.   East. |
| 13:44:38 | 23 | Q.   And east would be in the -- you were |

*Moriarity - Davenport - 2/21/20*

13:44:40  1  facing the direction where that individual was,

13:44:44  2  correct?

13:44:45  3       A.   The subject with Karl, yes.

13:44:48  4       Q.   Okay.  Do you know how -- approximately

13:44:53  5  how far away from the subject you were?

13:44:55  6       A.   I -- I -- no, I don't.

13:44:57  7       Q.   Okay.  Now, at this point is Karl

13:45:05  8  Schultz leading the individual out -- back out into

13:45:07  9  the street?

13:45:09 10       A.   Yes.

13:45:09 11       Q.   Does it look like he's going out there

13:45:11 12  voluntarily, the individual?

13:45:13 13       A.   No.  It looks from -- from this camera,

13:45:16 14  he was being detained for some reason.

13:45:19 15       Q.   Okay.  Where were you at this time?

13:45:23 16       A.   On the left side of Karl.

13:45:25 17       Q.   Okay.  Were you facing the individual?

13:45:28 18       A.   Yeah.  And -- yeah.  Karl and the

13:45:30 19  individual, yeah.

13:45:31 20       Q.   Okay.  Now, where is the individual at

13:45:41 21  this time?

13:45:41 22       A.   Lower right.

13:45:42 23       Q.   Okay.  Is any officer touching the

*Moriarity - Davenport - 2/21/20*

212

13:45:47  1    individual?

13:45:48  2          A.    Yes.

13:45:49  3          Q.    And who is that individual?

13:45:50  4          A.    Karl Schultz.

13:45:51  5          Q.    And where are you at this time?

13:45:53  6          A.    On the same side.  The left side of

13:45:57  7    Karl Schultz.

13:45:57  8          Q.    Okay.  And are you facing the

13:45:59  9    individual?

13:46:00 10          A.    Yes.

13:46:01 11          Q.    Okay.  Has any pat-down been done of

13:46:03 12    the individual at this point?

13:46:04 13          A.    Not yet.

13:46:05 14          Q.    Okay.  Has any pat-down been done of

13:46:14 15    the individual at this point?

13:46:14 16          A.    You can't really see, but I don't -- I

13:46:17 17    don't believe so.

13:46:18 18          Q.    Well, you told me that the pat-down

13:46:21 19    would consist of patting down the pant legs,

13:46:23 20    correct?

13:46:23 21          A.    Yeah.

13:46:23 22          Q.    Has any -- does it look like Karl

13:46:25 23    Schultz has reached down at all, or does he still

13:46:28  1    have his hands up, near the individual's head?

13:46:30  2         MS. HUGGINS:  Form.

13:46:30  3         THE WITNESS:  This camera view, it looks

13:46:32  4    like they're still up, upper body.

13:46:34  5         BY MR. DAVENPORT:

13:46:34  6         Q.   Okay.  Now, what just happened there?

13:46:40  7         A.   A little bit of resistance.

13:46:45  8         Q.   So when you say there was a little bit

13:46:47  9    of resistance, by who?  The individual or the

13:46:49 10    police officer?

13:46:50 11         A.   It looks like the subject, but that

13:46:54 12    doesn't always mean anything.  It's an emotional

13:46:59 13    state.  People sometimes act on emotion and kind of

13:47:06 14    pull away and push off a cop and then -- and then

13:47:10 15    they calm down.

13:47:13 16         Q.   Now, where -- where are you at this

13:47:15 17    time?  Can you be seen in the camera?

13:47:18 18         A.   Can you start it over two seconds

13:47:20 19    before this so I can see exactly where I am?

13:47:23 20         Q.   Sure.  It might skip, so I might have

13:47:28 21    to go back again.

13:47:33 22         A.   It looks like I'm on the right side.

13:47:36 23         Q.   I'm sorry.  I'm sorry.  One second.

Moriarity - Davenport - 2/21/20

214

13:47:40   1          A.    Oh, sorry.

13:47:40   2          Q.    Okay.  All right.  So we have it the

13:47:42   3   two seconds before my previous question, so now my

13:47:44   4   question is:  From the time stamp 10:27:16, until

13:47:50   5   the time stamp 10:27:18, where we were previously

13:47:54   6   stopped, just kind of watch yourself, and tell me

13:47:57   7   where you're positioned at 10:27:18.

13:48:00   8          A.    Okay.

13:48:01   9          Q.    Or where -- you know, where you would

13:48:03  10   think that you are.

13:48:04  11          MS. HUGGINS:   Form.

13:48:07  12          THE WITNESS:   So I'm on the western side of

13:48:11  13   the subject that Karl made contact with, or he made

13:48:15  14   contact with Karl.

13:48:16  15          BY MR. DAVENPORT:

13:48:16  16          Q.    Okay.  So, now, when an individual

13:48:19  17   tries to struggle to get away from an officer or

13:48:22  18   there's some sort of resistance, did you receive

13:48:25  19   any training at that point on how to handle that

13:48:28  20   situation?

13:48:29  21          A.    Yeah.  There's like some -- they call

13:48:35  22   it verbal judo.  You just kind of talk and

13:48:38  23   deescalate situations.

*Moriarity - Davenport - 2/21/20*

215

| | | |
|---|---|---|
| 13:48:40 | 1 | Q.   But verbal, not physical? |
| 13:48:42 | 2 | A.   You can -- you can be physical to help |
| 13:48:45 | 3 | calm someone down, yeah, absolutely. |
| 13:48:46 | 4 | Q.   Was that part of your training? |
| 13:48:51 | 5 | A.   I don't remember if it was part of |
| 13:48:53 | 6 | academy or anything. |
| 13:48:54 | 7 | Q.   Okay.  At this point have you -- had |
| 13:48:59 | 8 | you encountered any individuals who had tried to |
| 13:49:01 | 9 | resist a police officer? |
| 13:49:02 | 10 | A.   Yeah.  Yeah.  This morning, on the |
| 13:49:04 | 11 | Sattler call. |
| 13:49:05 | 12 | Q.   Okay.  And what sort of resistance did |
| 13:49:09 | 13 | you encounter in that situation? |
| 13:49:12 | 14 | A.   Totally different scenario.  Someone |
| 13:49:15 | 15 | that was running from police. |
| 13:49:17 | 16 | Q.   And what -- what did you do in that |
| 13:49:19 | 17 | situation? |
| 13:49:19 | 18 | A.   I ran after him. |
| 13:49:21 | 19 | Q.   Okay.  Did you actually catch the |
| 13:49:24 | 20 | individual -- |
| 13:49:24 | 21 | A.   I didn't. |
| 13:49:25 | 22 | Q.   -- that was trying to run away? |
| 13:49:26 | 23 | A.   I didn't. |

*Moriarity - Davenport - 2/21/20*

216

13:49:26   1        **MS. HUGGINS:**   Form.   Asked and answered.

13:49:28   2        **THE WITNESS:**   I did not apprehend him, no.

13:49:30   3        **BY MR. DAVENPORT:**

13:49:30   4        Q.   Were you involved at all in trying to

13:49:33   5   keep the individual from resisting?

13:49:37   6        A.   The one from the Sattler call?

13:49:38   7        Q.   Sattler.

13:49:39   8        A.   No.

13:49:40   9        Q.   Okay.   So was that the only other time

13:49:42  10   that you had encountered somebody resisting being

13:49:46  11   detained by a police officer?

13:49:47  12        A.   At that -- at that time I don't

13:49:49  13   remember any other incidents before -- before this

13:49:56  14   where someone had resisted.   Very -- still very

13:50:01  15   new.

13:50:01  16        Q.   Okay.   Now, at this point we're at

13:50:08  17   10:27:21.   It's three seconds after you had been on

13:50:11  18   the right side of the individual.   Has there been

13:50:14  19   any pat-down that's been done of the subject?

13:50:18  20        A.   It didn't -- didn't look -- look like

13:50:20  21   it so far, no.

13:50:21  22        Q.   Okay.

13:50:34  23        A.   So he's emptying out his own pockets

*Moriarity - Davenport - 2/21/20*

217

13:50:37  1  right now.

13:50:37  2          Q.    Okay.  Why would he be emptying his

13:50:39  3  pockets?

13:50:41  4          A.    Discretion.  Maybe -- you know, I've

13:50:44  5  had people just empty out their pockets and pull up

13:50:47  6  their shirt to make sure they don't have anything

13:50:50  7  in their waistband.

13:50:51  8          I don't have to touch anybody if I don't

13:50:53  9  want to on a pat-down.  They can pat themselves

13:50:55 10  down, and I can see inside their pockets -- well,

13:50:58 11  not see inside their pockets, but they can print

13:51:01 12  their pockets, fine.

13:51:03 13          Q.    Okay.

13:51:03 14          A.    You know, I don't need to -- I don't

13:51:04 15  need to do it myself.

13:51:06 16          And he was willing to and then spoke to us.

13:51:08 17          Q.    If he was shaking his pockets, would

13:51:10 18  that count as a pat-down?

13:51:14 19          Would that be a proper pat-down?

13:51:16 20          MS. HUGGINS:   Form.

13:51:18 21          THE WITNESS:   I mean, if -- I guess if the

13:51:20 22  officer was satisfied with it.

13:51:23 23          BY MR. DAVENPORT:

```
13:51:23  1        Q.    So it would be officer discretion then?
13:51:25  2        A.    Yeah.
13:51:28  3        Q.    Now, at this point does it appear that
13:51:33  4   he's patting his pants or is he checking his coat?
13:51:38  5        A.    It looks like he could have been doing
13:51:40  6   something with his coat.  Maybe emptying out coat
13:51:42  7   pockets or something.  I don't --
13:51:43  8        Q.    Okay.
13:51:44  9        A.    I don't know.  Or I'm sorry.  I don't
13:51:46 10   remember.
13:51:46 11        Q.    It looks like he pulled something out
13:51:50 12   of his coat pocket.  Do you know what that would
13:51:52 13   be?
13:51:52 14        A.    I -- no.  I don't remember.
13:51:53 15        Q.    Okay.  In this situation, what would
13:51:55 16   you expect him to pull out of his pockets?
13:51:57 17        MS. HUGGINS:    Form.
13:51:58 18        THE WITNESS:    I don't remember if anyone
13:52:01 19   asked him to go in his pockets or to get anything
13:52:06 20   out of his pockets.
13:52:07 21        BY MR. DAVENPORT:
13:52:07 22        Q.    Okay.
13:52:10 23        A.    Just because of the fact that I was so
```

13:52:13  1 | brand new, I don't know.

13:52:14  2 |          Q.    Sure.

13:52:15  3 |          Would it be proper to ask this person for

13:52:18  4 | an identification in this situation?

13:52:20  5 |          A.    I mean, it -- it -- it falls back on

13:52:22  6 | officer discretion.  I think that if someone

13:52:27  7 | said -- let's say in this example he did, and, of

13:52:30  8 | course, I don't want to speculate -- if he was

13:52:31  9 | like, that's my dad, then I can just ask someone

13:52:35 10 | their name, and I could be okay with that, and then

13:52:39 11 | other cops would still want to see an ID.

13:52:42 12 |          Q.    Okay.

13:52:46 13 |          A.    Or maybe what -- whatever he pulled out

13:52:48 14 | of his pockets was an ID.  I don't -- I don't know.

13:52:50 15 |          Q.    Okay.  Did he pat down his pants at all

13:52:52 16 | during that exchange?

13:52:54 17 |          A.    Yeah.  There was a few seconds prior to

13:52:57 18 | this that you showed where he was doing stuff with

13:53:00 19 | his pants.

13:53:01 20 |          MR. DAVENPORT:  Okay.  We'll watch it again.

13:53:01 21 |          (Video clip played.)

13:53:01 22 |          BY MR. DAVENPORT:

13:53:19 23 |          Q.    Did you notice him pat his pants at any

13:53:21   1   point?

13:53:22   2          A.   Yeah.   You've just got to rewind it

13:53:25   3   further, because he did it on camera.

13:53:27   4          Q.   Okay.   So it would have been before the

13:53:28   5   point that I went back to?

13:53:31   6          THE WITNESS:   Yeah.

13:53:31   7          (Video clip played.)

13:53:37   8          BY MR. DAVENPORT:

13:53:37   9          Q.   Now, I just want you to focus on any

13:53:39  10   time that he patted his pants, and then I would ask

13:53:41  11   you to please tell me to stop.

13:53:42  12          MS. HUGGINS:   Form.

13:53:43  13          THE WITNESS:   So right there.

13:53:44  14          BY MR. DAVENPORT:

13:53:44  15          Q.   He's patting his pants at that point?

13:53:45  16          A.   Well, he's already on to his coat, but

13:53:49  17   it looked like he was patting his pants down real

13:53:51  18   quick.

13:53:54  19          Q.   Did he pat his pants at any point

13:53:56  20   during that?

13:53:57  21          A.   No.   No.   That was his coat.

13:54:16  22          Q.   Okay.   Now, during a pat-down, would

13:54:19  23   you expect somebody to reach down towards their

| | | |
|---|---|---|
| 13:54:21 | 1 | ankles to show that they don't have a weapon in |
| 13:54:23 | 2 | their sock or shoe? |
| 13:54:24 | 3 | MS. HUGGINS:  Form. |
| 13:54:26 | 4 | THE WITNESS:  That's discretion. |
| 13:54:27 | 5 | BY MR. DAVENPORT: |
| 13:54:28 | 6 | Q.   What would be proper for a pat-down? |
| 13:54:29 | 7 | MS. HUGGINS:  Form. |
| 13:54:29 | 8 | THE WITNESS:  Again, that's -- that's |
| 13:54:32 | 9 | discretion.  I've -- I've given full pat-downs |
| 13:54:35 | 10 | before and -- and I went from their sleeves, all |
| 13:54:39 | 11 | the way down to their ankles, and then other times |
| 13:54:42 | 12 | I've had someone lift up their shirt to make sure |
| 13:54:46 | 13 | they didn't have a gun in their waistband and left |
| 13:54:49 | 14 | it as that. |
| 13:54:49 | 15 | BY MR. DAVENPORT: |
| 13:54:49 | 16 | Q.   Okay. |
| 13:54:50 | 17 | A.   So it all falls on discretion. |
| 13:54:52 | 18 | Q.   Okay.  How many times have you allowed |
| 13:54:53 | 19 | the individual to pat themselves down, as opposed |
| 13:54:56 | 20 | to you doing that pat-down? |
| 13:54:57 | 21 | MS. HUGGINS:  Form. |
| 13:54:57 | 22 | THE WITNESS:  I don't know specifics. |
| 13:54:59 | 23 | MR. DAVENPORT:  I would ask also what's the |

Moriarity - Davenport - 2/21/20

222

13:55:01  1  form objection there?

13:55:02  2        MS. HUGGINS:  How many times have you asked

13:55:03  3  a person to pat down themselves before you doing

13:55:06  4  it?

13:55:08  5        MR. DAVENPORT:  I don't think that was the

13:55:09  6  question.

13:55:09  7        MS. HUGGINS:  We can read back the question.

13:55:11  8        MR. DAVENPORT:  Yes, please.

13:55:11  9        (The above-requested portion was then read

13:55:32 10  by the reporter.)

13:55:32 11        MS. HUGGINS:  It's the use of the term

13:55:33 12  pat-down.

13:55:34 13        MR. DAVENPORT:  Okay.  You can answer.

13:55:34 14        THE WITNESS:  Yeah, I wouldn't have

13:55:38 15  a specific number on that.

13:55:39 16        BY MR. DAVENPORT:

13:55:40 17        Q.    But you have done that before?

13:55:43 18        A.    Yeah.

13:55:44 19        Q.    Okay.  Now, at this point it appears

13:56:00 20  that you are no longer in the camera view and

13:56:02 21  Officer Schultz is no longer in the camera view,

13:56:05 22  but the individual's still standing in the street.

13:56:08 23        What would have been done -- what was being

*Moriarity - Davenport - 2/21/20*

223

| | | |
|---|---|---|
| 13:56:11 | 1 | done at this point? |
| 13:56:15 | 2 | A.   I don't remember.  I would -- I would |
| 13:56:17 | 3 | defer to Karl on that. |
| 13:56:18 | 4 | Q.   Okay.  Why would you go back to the |
| 13:56:21 | 5 | police vehicle at that point? |
| 13:56:23 | 6 | A.   I was probably following Karl around |
| 13:56:25 | 7 | and shadowing him. |
| 13:56:34 | 8 | Q.   Okay. |
| 13:56:42 | 9 | A.   So in the lower -- lower right. |
| 13:56:53 | 10 | Q.   Now, at this point it appears that Karl |
| 13:56:56 | 11 | is radioing in.  Would you agree to that? |
| 13:56:58 | 12 | A.   Yes. |
| 13:56:59 | 13 | Q.   Do you know what he was radioing in? |
| 13:57:01 | 14 | A.   I don't.  I don't remember. |
| 13:57:02 | 15 | Q.   What would he possibly be radioing in |
| 13:57:04 | 16 | at that point? |
| 13:57:05 | 17 | MS. HUGGINS:  Form. |
| 13:57:09 | 18 | THE WITNESS:  I don't -- I actually don't |
| 13:57:12 | 19 | recall.  I don't know -- I don't know.  I mean, |
| 13:57:16 | 20 | I -- I did hear the -- the radio things over the |
| 13:57:19 | 21 | radio, but I didn't -- I don't know what he was |
| 13:57:22 | 22 | calling in right now. |
| 13:57:30 | 23 | BY MR. DAVENPORT: |

Moriarity - Davenport - 2/21/20

224

| | | |
|---|---|---|
| 13:57:30 | 1 | Q.   Okay.  Did you have access to a radio |
| 13:57:35 | 2 | at this point? |
| 13:57:35 | 3 | A.   I did have access to a radio, yeah. |
| 13:57:37 | 4 | Q.   Okay. |
| 13:57:38 | 5 | A.   I didn't -- I didn't use it. |
| 13:57:39 | 6 | Q.   What situations would you have used |
| 13:57:43 | 7 | that radio? |
| 13:57:43 | 8 | MS. HUGGINS:  Form. |
| 13:57:44 | 9 | THE WITNESS:  At -- at this point in time, |
| 13:57:47 | 10 | I probably -- and, again, I -- I don't remember in |
| 13:57:55 | 11 | total.  I probably wasn't on the radio at all |
| 13:57:57 | 12 | because I was so brand new. |
| 13:57:59 | 13 | This -- this would have been Karl on the |
| 13:58:01 | 14 | radio, and I think I just started driving. |
| 13:58:08 | 15 | BY MR. DAVENPORT: |
| 13:58:08 | 16 | Q.   Okay.  Now, it appears at this point |
| 13:58:39 | 17 | that you're just walking around.  Would there have |
| 13:58:44 | 18 | been anything that you would have had to do in this |
| 13:58:48 | 19 | situation? |
| 13:58:48 | 20 | Was -- were you receiving any directions |
| 13:58:49 | 21 | from any of the other officers? |
| 13:58:51 | 22 | A.   I don't -- I don't think so. |
| 13:58:53 | 23 | Q.   Okay.  Why would that individual still |

*Moriarity - Davenport - 2/21/20*

225

| | | |
|---|---|---|
| 13:59:01 | 1 | be in the street at this point? |
| 13:59:06 | 2 | MS. HUGGINS:  Form. |
| 13:59:06 | 3 | THE WITNESS:  Honestly, I don't -- I don't |
| 13:59:09 | 4 | know.  I'm sorry.  I don't remember. |
| 13:59:12 | 5 | MR. DAVENPORT:  Okay. |
| 13:59:19 | 6 | THE VIDEOGRAPHER:  Mr. Davenport, for the |
| 13:59:20 | 7 | purposes of the media, could we take a quick |
| 13:59:22 | 8 | off-the-record break and -- |
| 13:59:22 | 9 | MR. DAVENPORT:  Yes, we can. |
| 13:59:23 | 10 | THE VIDEOGRAPHER:  -- then start back up? |
| 13:59:24 | 11 | MR. DAVENPORT:  Yes, we can. |
| 13:59:28 | 12 | THE VIDEOGRAPHER:  Okay. |
| 13:59:28 | 13 | (A recess was then taken at 1:59 p.m.) |
| 13:59:28 | 14 | (On the record at 2:01 p.m.) |
| 14:02:18 | 15 | (Video clip played.) |
| 14:02:18 | 16 | BY MR. DAVENPORT: |
| 14:02:19 | 17 | Q.   Now, at this point it's 10:25:48.  The |
| 14:02:21 | 18 | police vehicle has just stopped, and it appears |
| 14:02:24 | 19 | that the person on the passenger side door has |
| 14:02:27 | 20 | opened the door.  Would you agree with that? |
| 14:02:29 | 21 | A.   Yeah.  It -- it looks that way through |
| 14:02:31 | 22 | the trees. |
| 14:02:32 | 23 | Q.   Okay.  So now you -- it appears that |

Moriarity - Davenport - 2/21/20

226

14:02:37  1  you and Officer Schultz have exited the vehicle?

14:02:41  2          A.    Yes.

14:02:43  3          Q.    It --

14:02:44  4          A.    I'm sorry.

14:02:44  5          Q.    No.   I'm sorry.

14:02:45  6          And the time is 10:25:51.  I'm not asking

14:02:48  7  you to verify the accuracy of it, just whether you

14:02:52  8  see 10:25:51 on the screen.

14:02:54  9          A.    Oh, yeah.

14:02:57 10          Q.    Okay.   Thank you.

14:03:10 11          Do you know what that car -- the beige car

14:03:37 12  or gray car that was there?

14:03:38 13          A.    No.

14:03:39 14          Q.    Okay.   Now, the subject that we were

14:04:03 15  referring to before who was on his cell phone, does

14:04:07 16  he appear in the screen at 10:26:42?

14:04:11 17          A.    Yes.

14:04:11 18          Q.    Okay.   Once again, not asking you to

14:04:13 19  verify the accuracy, just what time you see on the

14:04:16 20  screen.

14:04:23 21          So now at this point, do you see the subject

14:04:30 22  who was struck by the car walking back towards your

14:04:33 23  police vehicle?

| | | |
|---|---|---|
| 14:04:36 | 1 | A.   The subject, yeah, that threw himself |
| 14:04:39 | 2 | on the car and the officer's walking him back, |
| 14:04:42 | 3 | yeah. |
| 14:04:44 | 4 | Q.   Now, when you say, threw himself at the |
| 14:04:46 | 5 | car, is that based on what you remember or based on |
| 14:04:49 | 6 | what you saw on the video? |
| 14:04:50 | 7 | A.   No.   That's based off what I remember |
| 14:04:52 | 8 | seeing. |
| 14:04:53 | 9 | Q.   Okay.   What about based off of what you |
| 14:04:56 | 10 | see in the video, what do you think? |
| 14:04:57 | 11 | MS. HUGGINS:   Form. |
| 14:04:58 | 12 | THE WITNESS:   Based on what I see in the |
| 14:04:59 | 13 | video, it's a different perspective than what I saw |
| 14:05:02 | 14 | in real life. |
| 14:05:03 | 15 | BY MR. DAVENPORT: |
| 14:05:03 | 16 | Q.   Okay.   Now, at 10:27:00, we see an |
| 14:05:21 | 17 | officer that's walking towards the sidewalk; is |
| 14:05:23 | 18 | that correct? |
| 14:05:23 | 19 | A.   Yeah.   Yes. |
| 14:05:24 | 20 | Q.   Do you know who that officer was? |
| 14:05:28 | 21 | A.   Karl Schultz. |
| 14:05:29 | 22 | Q.   Okay.   Now, at 10:27:04, we see the |
| 14:05:39 | 23 | individual.   Is he facing Karl Schultz? |

*Moriarity - Davenport - 2/21/20*

228

14:05:43   1          A.    In a bladed stance, yeah.

14:05:46   2          Q.    What do you mean by a bladed stance?

14:05:48   3          A.    It looks like his feet are facing

14:05:50   4    north, but his upper body is facing Karl, which is

14:05:53   5    west.

14:05:55   6          Q.    Okay.  I just want to rewind.

14:05:57   7          A.    It looks like that.

14:05:59   8          Q.    Okay.  Okay.  Now, immediately before

14:06:16   9    this 10:27 time stamp, did you see Karl Schultz

14:06:19  10    make any sort of gestures?

14:06:21  11          And I'll replay it.

14:06:23  12          A.    Yeah.  Can you go -- can you go back,

14:06:24  13    please?

14:06:24  14          Q.    Yeah.

14:06:28  15          THE WITNESS:  Thank you.

14:06:28  16          (Video clip played.)

14:06:41  17          THE WITNESS:  He did something with his left

14:06:42  18    hand.

14:06:43  19          BY MR. DAVENPORT:

14:06:43  20          Q.    Could you tell what that was?

14:06:46  21          A.    Not -- not with this camera, no.

14:06:48  22          Q.    Did it look like he was motioning for

14:06:50  23    someone to come towards him?

14:06:54  1          A.    Either that or he was gesturing

14:06:56  2    towards -- towards someone.

14:06:57  3          Q.    Okay.  Did he make that same gesture

14:07:01  4    again?

14:07:02  5          A.    Yeah.  Yes.  I'm sorry.

14:07:10  6          Q.    Okay.  Now, at this point, where is the

14:07:14  7    subject's right hand?

14:07:16  8          MS. HUGGINS:  Form.

14:07:16  9          THE WITNESS:  Up by his face.

14:07:18  10         BY MR. DAVENPORT:

14:07:18  11         Q.    Okay.  Does it appear that it's on the

14:07:22  12   side of his face?  In front of his face?

14:07:24  13         A.    The side of his face.

14:07:26  14         Q.    Okay.  Why do you think his hand would

14:07:28  15   be on the side of his face?

14:07:29  16         MS. HUGGINS:  Form.

14:07:31  17         THE WITNESS:  As we discussed earlier, it

14:07:32  18   appeared as though he was on his phone.

14:07:34  19         BY MR. DAVENPORT:

14:07:34  20         Q.    Okay.  So now the individual's still on

14:07:38  21   his phone, correct?

14:07:40  22         A.    Yes.

14:07:40  23         Q.    And did the officer make contact --

*Moriarity - Davenport - 2/21/20*

230

| | | |
|---|---|---|
| 14:07:44 | 1 | physical contact with the subject? |
| 14:07:46 | 2 | A.   It -- you can't tell, but it looks as |
| 14:07:51 | 3 | though, with Karl's right arm, he might have made |
| 14:07:55 | 4 | contact with the left side of the subject's body. |
| 14:07:57 | 5 | Q.   Okay.  I'll just play it in one |
| 14:08:00 | 6 | continuous motion so that way hopefully you can see |
| 14:08:03 | 7 | that a little bit better. |
| 14:08:04 | 8 | MS. HUGGINS:  Do you want to even go back |
| 14:08:06 | 9 | like one more second? |
| 14:08:09 | 10 | MR. DAVENPORT:  Yeah. |
| 14:08:10 | 11 | MS. HUGGINS:  I don't want it to skip. |
| 14:08:10 | 12 | (Video clip played.) |
| 14:08:24 | 13 | BY MR. DAVENPORT: |
| 14:08:24 | 14 | Q.   So now did you see the subject also |
| 14:08:26 | 15 | raise his left arm? |
| 14:08:27 | 16 | A.   I did. |
| 14:08:28 | 17 | Q.   What did it look like he was doing? |
| 14:08:31 | 18 | A.   I -- I -- I don't know what they |
| 14:08:33 | 19 | were -- I'm sorry -- I don't remember what they |
| 14:08:35 | 20 | were talking about, so I don't -- I don't know what |
| 14:08:39 | 21 | he was doing. |
| 14:08:39 | 22 | Q.   Someone -- |
| 14:08:40 | 23 | A.   I just came around from the other side |

14:08:42  1  of the vehicle, as we just watched, so I don't know

14:08:44  2  what is taking place between the officer and the

14:08:49  3  subject.

14:08:49  4      Q.   So, now, when somebody raises their

14:08:51  5  left hand, as the subject did, and then they start

14:08:55  6  walking away from the officer, what would that say

14:08:57  7  to you?

14:08:57  8      MS. HUGGINS:   Form.

14:08:58  9      THE WITNESS:   I -- it could mean a whole

14:09:00  10  bunch of things, and I don't know because, you

14:09:04  11  know -- and I can't even tell what I'm looking at,

14:09:07  12  you know, behind -- behind the tree.

14:09:08  13      Maybe I'm talking to, you know, Lauren.

14:09:10  14  Maybe I'm saying something to Lauren.  Because I'm

14:09:13  15  still bladed south, so I -- I don't know exactly

14:09:16  16  what they were talking about, and I -- and I --

14:09:18  17  maybe I didn't even see him, you know, raise his

14:09:22  18  left hand, and maybe I didn't see Karl make the

14:09:24  19  motions with -- with his hands.  I don't know

14:09:26  20  what's going on there.

14:09:27  21      BY MR. DAVENPORT:

14:09:27  22      Q.   Sure.   No.   And I'm -- I'm sorry,

14:09:29  23  Officer Moriarity.   I'm not talking about what you

*Moriarity - Davenport - 2/21/20*

232

| | | |
|---|---|---|
| 14:09:32 | 1 | saw. |
| 14:09:32 | 2 | A.    Okay. |
| 14:09:32 | 3 | Q.    I'm just merely talking about what you |
| 14:09:34 | 4 | are seeing currently in the video.  I understand |
| 14:09:36 | 5 | that on the day of the incident, you may have not |
| 14:09:38 | 6 | have seen every event that unfolded.  I'm just |
| 14:09:41 | 7 | merely asking your opinion on what you just saw |
| 14:09:43 | 8 | between the subject and Officer Schultz. |
| 14:09:44 | 9 | MS. HUGGINS:  Form. |
| 14:09:44 | 10 | THE WITNESS:  Yeah, I mean, I -- I don't -- |
| 14:09:46 | 11 | I don't know what that hand motion could have been. |
| 14:09:49 | 12 | BY MR. DAVENPORT: |
| 14:09:49 | 13 | Q.    Okay.  But he did raise out his left |
| 14:09:52 | 14 | arm and then walk away from Officer Schultz, |
| 14:09:55 | 15 | correct? |
| 14:09:55 | 16 | A.    Yes, he definitely did do that. |
| 14:09:57 | 17 | Q.    Okay.  So, now, did you see that |
| 14:10:01 | 18 | contact was made between Officer Schultz and the |
| 14:10:04 | 19 | individual? |
| 14:10:04 | 20 | A.    Yes, I did. |
| 14:10:05 | 21 | Q.    Physical contact. |
| 14:10:08 | 22 | I'm sorry, Officer Moriarity. |
| 14:10:08 | 23 | A.    Yes. |

*Moriarity - Davenport - 2/21/20*

233

| | | |
|---|---|---|
| 14:10:09 | 1 | Q.   Physical contact? |
| 14:10:10 | 2 | A.   Yeah.   Yeah. |
| 14:10:13 | 3 | Q.   Okay.   Now, at this point, |
| 14:10:14 | 4 | Officer Schultz is bringing the individual |
| 14:10:16 | 5 | out, back towards the street, correct? |
| 14:10:19 | 6 | A.   Yes. |
| 14:10:19 | 7 | Q.   And where are you at that point? |
| 14:10:21 | 8 | A.   Right in front of him. |
| 14:10:22 | 9 | Q.   Right in front of him?   Okay. |
| 14:10:24 | 10 | Are you facing the -- the subject? |
| 14:10:25 | 11 | A.   I am. |
| 14:10:26 | 12 | Q.   Okay.   Now, at this point does it |
| 14:10:32 | 13 | appear that the individual still had his right arm |
| 14:10:36 | 14 | up near his face? |
| 14:10:37 | 15 | And I'll rewind it a little bit just so we |
| 14:10:40 | 16 | can see it again. |
| 14:10:41 | 17 | A.   Correct, he does. |
| 14:10:41 | 18 | Q.   Okay. |
| 14:10:46 | 19 | A.   Excuse me. |
| 14:10:56 | 20 | Q.   So now I just want you to pay attention |
| 14:10:59 | 21 | and see, did that individual ever take his right |
| 14:11:01 | 22 | arm away from the side of his face? |
| 14:11:03 | 23 | A.   No. |

*Moriarity - Davenport - 2/21/20*

234

14:11:03  1        Q.   Okay.  And what would that lead you to

14:11:06  2   believe?

14:11:06  3        MS. HUGGINS:  Form.

14:11:06  4        THE WITNESS:  He -- he could still be on his

14:11:08  5   phone.

14:11:15  6        BY MR. DAVENPORT:

14:11:15  7        Q.   Okay.  Now, did you see Officer Schultz

14:11:17  8   grab something from the individual?

14:11:20  9        And I can replay it.

14:11:22 10        A.   Yeah, could you, please?  Thank you.

14:11:26 11        MR. DAVENPORT:  Sure.

14:11:26 12        (Video clip played.)

14:11:26 13        BY MR. DAVENPORT:

14:11:44 14        Q.   Did it appear that he grabbed something

14:11:46 15   out of the individual's right hand?

14:11:48 16        A.   It looked that way.

14:11:50 17        Q.   Okay.  What do you think he grabbed?

14:11:52 18        A.   He could have grabbed his phone.

14:11:54 19        MS. HUGGINS:  Form.

14:11:55 20        BY MR. DAVENPORT:

14:11:56 21        Q.   Where are you facing at that time?

14:11:57 22        A.   It looks like I'm facing them.

14:11:59 23        Q.   So you would assume that you probably

*Moriarity - Davenport - 2/21/20*

235

| | | |
|---|---|---|
| 14:12:00 | 1 | saw that? |
| 14:12:01 | 2 | MS. HUGGINS:  Form. |
| 14:12:01 | 3 | THE WITNESS:  Yeah.  I mean, I -- I -- yeah. |
| 14:12:09 | 4 | BY MR. DAVENPORT: |
| 14:12:09 | 5 | Q.   Okay.  So what did you just see right |
| 14:12:11 | 6 | there? |
| 14:12:11 | 7 | A.   I don't know what I just -- I don't -- |
| 14:12:13 | 8 | it looked like he pulled away and resisted whatever |
| 14:12:19 | 9 | Karl was doing. |
| 14:12:22 | 10 | Q.   Did it look like it needed two officers |
| 14:12:25 | 11 | to keep that subject under control? |
| 14:12:28 | 12 | A.   I would -- I would think so, yeah. |
| 14:12:29 | 13 | Q.   Is that something that's typically done |
| 14:12:32 | 14 | is two officers -- |
| 14:12:33 | 15 | A.   Yes. |
| 14:12:33 | 16 | Q.   -- to keep someone under control? |
| 14:12:37 | 17 | MS. HUGGINS:  Form. |
| 14:12:44 | 18 | BY MR. DAVENPORT: |
| 14:12:44 | 19 | Q.   Now, we talked about verbal cues before |
| 14:12:46 | 20 | as something that was part of your training.  When |
| 14:12:48 | 21 | would it be appropriate to use verbal cues as |
| 14:12:51 | 22 | opposed to physical cues to subdue somebody who is |
| 14:12:54 | 23 | trying to resist detainment? |

14:12:56   1          A.    It all depends on --

14:12:56   2          MS. HUGGINS:    Form.

14:12:58   3          THE WITNESS:   -- the actions of the person.

14:13:00   4          BY MR. DAVENPORT:

14:13:00   5          Q.    What actions that you see in this video

14:13:02   6    would lead you to believe that physical methods

14:13:06   7    rather than verbal methods should have been used

14:13:08   8    for that individual?

14:13:09   9          A.    Right now it's verbal, and then if you

14:13:13  10    press play, right now.

14:13:16  11          Q.    And what -- what leads you to believe

14:13:18  12    that physical --

14:13:20  13          A.    He did a pushing off or a jerking

14:13:23  14    motion from Karl when Karl was trying to talk to

14:13:26  15    him and continue whatever contact he was originally

14:13:31  16    trying to make with him in -- in -- in detainment.

14:13:36  17    In a form of detainment.

14:13:38  18          Q.    Now, who pushed away first?  Was it the

14:13:41  19    subject?

14:13:41  20          A.    It appeared that way, yeah.

14:13:43  21          Q.    Okay.  We'll watch it again.

14:14:01  22          At what point --

14:14:02  23          A.    Yeah.

| | | |
|---|---|---|
| 14:14:02 | 1 | Q.    -- did he -- |
| 14:14:02 | 2 | A.    Right -- |
| 14:14:04 | 3 | Q.    -- push -- |
| 14:14:04 | 4 | A.    Right -- |
| 14:14:04 | 5 | Q.    -- away? |
| 14:14:04 | 6 | A.    Right before -- right before he turned |

to face Karl, he pushed.  He pushed away.

        Q.    Did he extend his arm?

        A.    You don't need to extend your arm.  You
can keep your arm close to your body and -- and use
your legs to power away.

        Q.    So it wouldn't have necessarily been
a push with the arms.  He was just trying to escape
the officer's grasp?  Would that be a more fair
characterization?

        MS. HUGGINS:   Form.

        THE WITNESS:   I don't know if he was trying
to escape the officer's grasp.  He was in an
emotional state, as per the video.

        People -- people react in certain ways.
And after this, he was fine, from what the video
showed.

        BY MR. DAVENPORT:

14:14:44   1        Q.   But I guess did he ever use his legs to
14:14:46   2   try to push away from the officer?
14:14:48   3        A.   Play it again, please.
14:14:52   4        Q.   Yeah.
14:14:53   5        I guess a couple of quick questions while
14:16:05   6   we're waiting for this to load up.
14:16:07   7        Do you receive an hourly wage, or are you
14:16:09   8   salaried?
14:16:10   9        A.   Salaried.
14:16:11  10        Q.   You're salaried?
14:16:13  11        A.   Yeah.
14:16:13  12        Q.   Okay.  Do you have to hit a certain
14:16:16  13   number of hours to receive your salary for a week?
14:16:18  14        A.   40.
14:16:19  15        Q.   Okay.  Do you receive any overtime
14:16:22  16   beyond what your salary is?
14:16:24  17        A.   If I choose to take it, yeah.
14:16:25  18        Q.   Okay.  And how is your overtime rate
14:16:28  19   determined?
14:16:29  20        A.   Time and a half.
14:16:31  21        Q.   Time and -- so how do you determine
14:16:34  22   what time and a half is if you're not paid hourly?
14:16:38  23        MS. HUGGINS:   Form.

```
14:16:38   1        THE WITNESS:  Yeah.  That's broken down by
14:16:45   2   payroll.  I mean, yeah, there -- there's an hourly
14:16:47   3   rate, but I make -- I made -- at the time, I think
14:16:51   4   it was forty-three seven.
14:16:55   5        BY MR. DAVENPORT:
14:16:55   6        Q.   Okay.  So were you salaried at that
14:16:57   7   time as well?
14:16:58   8        A.   Yeah.
14:16:59   9        Q.   Okay.  Are all officers salaried
14:17:01  10   workers or are some of them hourly?
14:17:03  11        A.   No.  It's all salary.
14:17:04  12        Q.   It is all salary?  Okay.
14:17:07  13        So, now, just so that way we can go back to
14:17:16  14   what we were trying to look at before, I just want
14:17:19  15   you to focus on whether the subject ever extends
14:17:22  16   his arm or uses his legs in any sort of fashion
14:17:24  17   that would lead you to believe that he's trying to
14:17:27  18   push away from Officer Karl Schultz.
14:17:28  19        MS. HUGGINS:  If it's possible, can you go
14:17:30  20   back one more second?
14:17:31  21        MR. DAVENPORT:  Yeah, I'll try.
14:17:34  22        MS. HUGGINS:  I know it's not cooperating,
14:17:37  23   but --
```