14:17:37   1          (Video clip played.)

14:17:51   2          **MS. HUGGINS:**  Okay.  Thank you.

14:17:57   3          **THE WITNESS:**  So, yeah, with his left leg,

14:18:01   4   he kind of made a -- a sudden -- a sudden I would

14:18:04   5   say minorly chaotic movement to face Karl, and Karl

14:18:11   6   completed the motion to spin him around and kind of

14:18:15   7   get him under control real quick.

14:18:18   8          **BY MR. DAVENPORT:**

14:18:18   9          Q.    So what's -- I guess in your terms,

14:18:21  10   what a minor chaotic move is?

14:18:23  11          A.    Just moving -- moving real quick in --

14:18:25  12   in front of officers when a number 1 concern for

14:18:29  13   everyone -- everyone involved in a scene --

14:18:33  14   subjects, officers, defendants, victims -- moving

14:18:38  15   real quick can mean someone's, you know, got

14:18:41  16   a knife that passed maybe a -- a pat-down or -- or

14:18:44  17   they're going to punch someone or something.

14:18:47  18          So, yeah, a chaotic movement.  I know I did

14:18:51  19   a pat-down.  I've been punched in the face before

14:18:54  20   because I was too close to someone because they

14:18:57  21   made a chaotic movement.  It's -- it's normal.  It

14:19:00  22   happens.

14:19:00  23          Q.    Sure.  But the only minor chaotic move

*Moriarity - Davenport - 2/21/20*

241

14:19:03   1   that you have seen at that point was something that

14:19:05   2   he did with his left leg to face towards Karl

14:19:08   3   Schultz?

14:19:08   4        A.    Yeah.   In a not normal way to face

14:19:11   5   someone.   It looks from the video, and, again,

14:19:14   6   it's -- it's from a -- a viewpoint that's not on

14:19:17   7   street level, it looks -- it looked a little

14:19:23   8   chaotic, and it looks like not a normal turning,

14:19:25   9   facing movement.

14:19:26  10        Q.    All right.   I just want to watch it one

14:19:28  11   more time --

14:19:28  12        A.    Sure.

14:19:28  13        Q.    -- just to make sure that there was

14:19:30  14   nothing else besides that left leg movement that

14:19:32  15   you noticed.

14:19:32  16        MS. HUGGINS:   Form.

14:21:50  17        (Discussion off the record.)

14:21:50  18        MR. DAVENPORT:   So we're just watching one

14:21:52  19   more time to make sure there was nothing besides

14:21:55  20   that left leg movement that you saw.

14:21:56  21        MS. HUGGINS:   From his view of the video?

14:21:58  22        MR. DAVENPORT:   Correct.

14:21:58  23        (Video clip played.)

14:21:58   1          BY MR. DAVENPORT:

14:22:05   2              Q.   So did you notice anything else?

14:22:07   3          I can replay it if you would like me to.

14:22:09   4              A.   No.   No.   I mean, yeah, the -- the

14:22:11   5    left leg movement, and then if -- if you want to

14:22:15   6    continue pressing play, once -- once he was under

14:22:19   7    control, for lack of better terms, from whatever

14:22:26   8    this was, he was fine.

14:22:28   9              MR. DAVENPORT:   Okay.   So I want you to

14:22:35  10    watch again.

14:22:35  11              (Video clip played.)

14:22:36  12              THE WITNESS:   There's your pat-down.

14:22:38  13          BY MR. DAVENPORT:

14:22:38  14              Q.   Okay.   Now, why would Karl Schultz be

14:23:03  15    going back to the vehicle at that point?

14:23:04  16              MS. HUGGINS:   Form.

14:23:04  17              THE WITNESS:   I -- I don't remember what he

14:23:06  18    went back to the vehicle for.

14:23:08  19          BY MR. DAVENPORT:

14:23:08  20              Q.   Is it possible that he took his ID?

14:23:11  21              MS. HUGGINS:   Form.

14:23:11  22              THE WITNESS:   It's a possibility.   I would

14:23:13  23    defer to -- to Karl.

14:23:14  1          BY MR. DAVENPORT:

14:23:14  2          Q.   Okay.   For what reasons would somebody

14:23:17  3    take their ID in this situation?

14:23:21  4          MS. HUGGINS:   Form.

14:23:21  5          THE WITNESS:   Now that he's made contact

14:23:27  6    with him or he made contact with Karl, you can

14:23:31  7    check someone's ID and find out who they are and,

14:23:35  8    you know, you can search for whatever reason

14:23:40  9    you're -- you're looking at him for.

14:23:43  10         You can find out if he's got warrants.   I'm

14:23:45  11   not saying it was ever a thing that we thought he

14:23:50  12   did have.   I don't know why he -- I'm sorry.   I

14:23:53  13   don't remember why he ran his ID, if he's even

14:23:58  14   running his ID.

14:24:00  15         BY MR. DAVENPORT:

14:24:00  16         Q.   Okay.   Do you recall what was said to

14:24:23  17   the subject at this point?

14:24:25  18         A.   I don't remember, no.

14:24:26  19         Q.   Do you see that Karl Schultz is now

14:24:29  20   radioing in?

14:24:30  21         A.   Yes.

14:24:30  22         Q.   What reason would he be radioing in at

14:24:33  23   that point?

*Moriarity - Davenport - 2/21/20*

244

14:24:33  1        **MS. HUGGINS:**  Form.

14:24:35  2        **THE WITNESS:**  There's -- there's a radio

14:24:38  3  log.  I mean, whatever -- whatever he said

14:24:40  4  immediately goes on a radio log.  I don't know --

14:24:43  5  I don't remember what he said over the radio.

14:24:45  6        **BY MR. DAVENPORT:**

14:24:46  7        Q.   Let's say he had checked that person's

14:24:48  8  ID, what things would he have to call into dispatch?

14:24:52  9        A.   He doesn't have to call anything in if

14:24:56 10  he doesn't want to call anything in about -- about

14:24:58 11  an ID check.  He could have just checked the ID --

14:25:03 12  if he did check an ID, he could have checked it

14:25:05 13  over the computer.

14:25:06 14        Q.   Would it be required for that

14:25:07 15  individual, that subject to stand there and wait

14:25:10 16  for his ID to be checked?

14:25:12 17        **MS. HUGGINS:**  Form.

14:25:12 18        **THE WITNESS:**  If -- if Karl was detaining

14:25:15 19  him, then -- then, yeah, I mean, he's not under

14:25:24 20  arrest.  He didn't -- he's free to leave, though,

14:25:24 21  too, so --

14:25:27 22        **BY MR. DAVENPORT:**

14:25:27 23        Q.   But if you're detained, are you allowed

*Moriarity - Davenport - 2/21/20*

245

| | | |
|---|---|---|
| 14:25:30 | 1 | to leave? |
| 14:25:30 | 2 | MS. HUGGINS:  Form. |
| 14:25:31 | 3 | THE WITNESS:  Yeah, when everything's done. |
| 14:25:32 | 4 | BY MR. DAVENPORT: |
| 14:25:32 | 5 | Q.  But he's not -- he's not allowed to |
| 14:25:34 | 6 | leave at this point, correct? |
| 14:25:35 | 7 | MS. HUGGINS:  Form. |
| 14:25:37 | 8 | THE WITNESS:  I would still defer to -- to |
| 14:25:40 | 9 | Karl. |
| 14:25:41 | 10 | BY MR. DAVENPORT: |
| 14:25:42 | 11 | Q.  At any point did anybody hand him back |
| 14:25:43 | 12 | that cell phone that was taken earlier? |
| 14:25:45 | 13 | MS. HUGGINS:  Form. |
| 14:25:46 | 14 | THE WITNESS:  I am -- I don't remember if he |
| 14:25:49 | 15 | snatched a cell phone from him or not.  I don't |
| 14:25:51 | 16 | know what that motion was in front of his face. |
| 14:25:55 | 17 | BY MR. DAVENPORT: |
| 14:25:55 | 18 | Q.  But whatever -- |
| 14:25:56 | 19 | A.  So -- |
| 14:25:58 | 20 | Q.  -- was taken from him, did anybody ever |
| 14:26:02 | 21 | hand back whatever was taken from him initially? |
| 14:26:02 | 22 | MS. HUGGINS:  Form. |
| 14:26:05 | 23 | THE WITNESS:  I can't honestly say |

14:26:06  1 | I remember if anything was taken yet.

14:26:07  2 |      BY MR. DAVENPORT:

14:26:07  3 |      Q.   Okay.  But no -- nothing in the

14:26:09  4 | video -- well, would that be the first time, at

14:26:11  5 | 10:30:08, that something was handed back to the

14:26:16  6 | individual?

14:26:16  7 |      A.   I don't know about handed back to the

14:26:17  8 | individual.  I know that I handed him something

14:26:20  9 | right there.

14:26:21 10 |      Q.   Okay.  We'll just go back a little bit.

14:26:24 11 | I just want to make sure that nothing was handed to

14:26:27 12 | the individual before then.

14:26:39 13 |      I want to go back to the moment it looked

14:26:40 14 | like something may have been taken from him.

14:27:29 15 |      Now, I just want you to watch and see.  Are

14:27:31 16 | officers handing anything to him at this point?

14:27:33 17 |      MS. HUGGINS:  Form.

14:27:39 18 |      BY MR. DAVENPORT:

14:27:39 19 |      Q.   Has anything been handed to him at this

14:27:41 20 | point?

14:27:41 21 |      A.   No, not yet.

14:27:42 22 |      Q.   Okay.  At 10:28:24, has anything been

14:28:11 23 | handed to the subject at that point?

*Moriarity - Davenport - 2/21/20*

247

| | | |
|---|---|---|
| 14:28:12 | 1 | **A.**   No, not yet. |
| 14:28:44 | 2 | **Q.**   Okay.   At 10:29, has anything been |
| 14:28:46 | 3 | handed back to the individual? |
| 14:28:48 | 4 | **A.**   No. |
| 14:29:20 | 5 | **Q.**   Okay.   10:29:35, had anything been |
| 14:29:23 | 6 | handed to the individual? |
| 14:29:24 | 7 | **A.**   No. |
| 14:29:51 | 8 | **Q.**   Now, at 10:30:06, is that the first |
| 14:29:55 | 9 | time anything had been handed to the individual? |
| 14:29:57 | 10 | **MS. HUGGINS:**   Form. |
| 14:29:57 | 11 | **THE WITNESS:**   Yeah, it looks that way, yeah. |
| 14:29:59 | 12 | **MR. DAVENPORT:**   Thank you. |
| 14:30:04 | 13 | We are now going to Exhibit 11. |
| 14:30:45 | 14 | Now I'm showing what has been marked Exhibit |
| 14:30:47 | 15 | 11.   The last four digits are 5233. |
| 14:31:59 | 16 | (Video clip played.) |
| 14:31:59 | 17 | **BY MR. DAVENPORT:** |
| 14:31:59 | 18 | **Q.**   Now, what's the time at that upper -- |
| 14:32:01 | 19 | upper section?   What -- what does it read? |
| 14:32:03 | 20 | I'm not asking you to verify the accuracy. |
| 14:32:06 | 21 | Just what does it read? |
| 14:32:07 | 22 | **A.**   The time on the video is 10:52:36. |
| 14:32:11 | 23 | **Q.**   Okay.   So you guys -- what -- what's |

*Moriarity - Davenport - 2/21/20*

248

14:32:15  1  depicted in the video currently right now is the

14:32:19  2  five officers -- there's now five officers standing

14:32:23  3  in a circle -- circular kind of --

14:32:26  4          A.   Correct.

14:32:26  5          Q.   -- formation?

14:32:28  6          What was going on here?

14:32:31  7          A.   I don't -- I don't remember what we all

14:32:34  8  were talking about.  I -- I can tell you that I was

14:32:38  9  probably just standing there watching them all,

14:32:41  10  but --

14:32:41  11          Q.   Do you remember what types of things

14:32:43  12  were being said?

14:32:44  13          A.   No.  No, I don't.

14:32:46  14          Q.   Do you remember approximately what time

14:32:48  15  that fifth police officer arrived at the scene?

14:32:52  16          A.   I don't.

14:32:52  17          Q.   Like, you know, roughly, let's use as

14:32:55  18  a reference point the time that the collision was

14:32:58  19  made.

14:32:59  20          What time -- or how much time elapsed before

14:33:04  21  that fifth police officer arrived at the scene?

14:33:05  22          MS. HUGGINS:   Form.

14:33:06  23          THE WITNESS:   I don't -- I don't remember.

*Moriarity - Davenport - 2/21/20*

249

14:33:06  1          BY MR. DAVENPORT:

14:33:07  2          Q.   Okay.  Do you remember anything

14:33:08  3   appreciable happening in between the time of the

14:33:12  4   end of that third video segment and this fourth

14:33:16  5   video segment, where we see a fifth police officer

14:33:18  6   arriving at the scene?

14:33:19  7          MS. HUGGINS:  Form.

14:33:21  8          THE WITNESS:  I don't -- no, I don't --

14:33:21  9          BY MR. DAVENPORT:

14:33:21 10          Q.   Okay.

14:33:23 11          A.   I don't think there was anything.

14:33:25 12   Yeah, I don't -- I don't think there was -- there

14:33:26 13   was anything.

14:33:27 14          Q.   Okay.  Do you see the individual

14:33:30 15   standing by the red van?

14:33:33 16          A.   Yeah.  Yes.

14:33:35 17          Q.   Now, what initially did you arrive at

14:33:40 18   the scene for for this individual standing near the

14:33:44 19   red van?

14:33:44 20          MS. HUGGINS:  Form.  Asked and answered.

14:33:46 21          THE WITNESS:  Yeah.  I -- I went to

14:33:48 22   33 Schmarbeck for a larceny.  I don't know if

14:33:52 23   that's the same -- same complainant.  I don't know

*Moriarity - Davenport - 2/21/20*

250

| | | |
|---|---|---|
| 14:33:54 | 1 | if that's the same person. |
| 14:33:56 | 2 | BY MR. DAVENPORT: |
| 14:33:56 | 3 | Q.   Okay.  Is that individual holding |
| 14:33:58 | 4 | something in his hand? |
| 14:34:01 | 5 | A.   Yeah.  It looks like something. |
| 14:34:02 | 6 | Q.   What do you -- what does it look like? |
| 14:34:04 | 7 | A.   Something blue. |
| 14:34:05 | 8 | Q.   Okay.  Does it look like a bag? |
| 14:34:08 | 9 | A.   It could be a bag, yeah.  I don't know. |
| 14:34:14 | 10 | Q.   Okay.  So, now, going back towards the |
| 14:34:21 | 11 | beginning, you know that you have an individual, |
| 14:34:26 | 12 | who there was a collision with a -- with a police |
| 14:34:30 | 13 | vehicle, that's sitting in the back of your police |
| 14:34:33 | 14 | vehicle, correct? |
| 14:34:33 | 15 | MS. HUGGINS:  Form. |
| 14:34:33 | 16 | THE WITNESS:  Yes. |
| 14:34:34 | 17 | BY MR. DAVENPORT: |
| 14:34:36 | 18 | Q.   Had any other assessments been done to |
| 14:34:38 | 19 | assess his physical condition at this point? |
| 14:34:42 | 20 | A.   Not by -- not by me.  I don't know if |
| 14:34:45 | 21 | other officers did. |
| 14:34:46 | 22 | Q.   Okay.  So, now, the time is 10:52:33, |
| 14:34:53 | 23 | and there's five police officers that are standing |

14:34:56  1  in a circle, correct?

14:34:58  2          A.    Yes.

14:34:58  3          MS. HUGGINS:  Form.

14:34:58  4          MR. DAVENPORT:  Okay.  So we're just going to

14:35:02  5  watch through, and we're going to see what time --

14:35:04  6  at what time the officers breaked at that point for

14:35:08  7  their police vehicles.

14:35:08  8          (Video clip played.)

14:35:08  9          BY MR. DAVENPORT:

14:35:29 10          Q.    What kinds of discussions would have

14:35:30 11  been had by the police officers at this time?

14:35:32 12          MS. HUGGINS:  Form.

14:35:33 13          THE WITNESS:  There could have been many

14:35:37 14  discussions.  Maybe about what took place on

14:35:39 15  Sattler.  It's New Year's Day.  They could have

14:35:42 16  been talking about what was taking place on

14:35:44 17  New Year's Eve.

14:35:47 18          It could have been anything.  I know at one

14:35:50 19  point in time someone called Lieutenant McHugh.

14:35:52 20          BY MR. DAVENPORT:

14:35:52 21          Q.    Was it at this time that that call was

14:35:54 22  made?

14:35:55 23          A.    I -- I don't remember.  I remember -- I

14:35:57 1 remember that someone did contact him.

14:36:00 2        Q. Okay. Okay. Were you there present

14:36:02 3 for that conversation with Lieutenant McHugh?

14:36:04 4        A. I don't -- I don't think so. I don't

14:36:08 5 think so, but I wouldn't -- I wouldn't remember if

14:36:15 6 I was.

14:36:15 7        Q. Have you ever used your cell phone to

14:36:17 8 contact a lieutenant before?

14:36:18 9        A. Yeah.

14:36:19 10        Q. Okay. How often do you do that?

14:36:20 11        A. It depends on the lieutenant. Some

14:36:21 12 like it over the phone, some like it over the

14:36:24 13 radio.

14:36:24 14        Q. Okay.

14:36:24 15        A. Some -- yeah.

14:36:25 16        Q. But, I mean, roughly, how many times

14:36:27 17 have you had to do that?

14:36:28 18        MS. HUGGINS: Form.

14:36:29 19        THE WITNESS: Tons.

14:36:31 20        BY MR. DAVENPORT:

14:36:31 21        Q. Okay. Would you -- Lieutenant McHugh

14:36:35 22 was your lieutenant at the time at C District --

14:36:37 23        A. At the time, yeah.

| | | |
|---|---|---|
| 14:36:39 | 1 | Q.   -- correct? |
| 14:36:40 | 2 | Did Lieutenant McHugh prefer that officers |
| 14:36:44 | 3 | contact him by phone? |
| 14:36:45 | 4 | A.   He was probably indifferent. |
| 14:36:46 | 5 | Q.   Okay.  Did you ever contact Lieutenant |
| 14:36:46 | 6 | McHugh -- |
| 14:36:46 | 7 | A.   No. |
| 14:36:49 | 8 | Q.   -- by phone? |
| 14:36:50 | 9 | A.   Karl would do that.  He's the FTO. |
| 14:36:52 | 10 | Q.   Okay.  After your 16 weeks of training |
| 14:36:54 | 11 | were over with Karl Schultz, did you ever contact |
| 14:36:56 | 12 | Lieutenant McHugh? |
| 14:36:57 | 13 | A.   No. |
| 14:36:57 | 14 | Q.   You would have had a different |
| 14:36:59 | 15 | lieutenant at the time? |
| 14:37:00 | 16 | A.   Yeah, I had a different lieutenant. |
| 14:37:01 | 17 | Q.   Do you remember who that lieutenant |
| 14:37:02 | 18 | was? |
| 14:37:03 | 19 | A.   Yes. |
| 14:37:03 | 20 | Q.   Who was your lieutenant? |
| 14:37:05 | 21 | A.   Lieutenant Long and Lieutenant Nigrelli. |
| 14:37:08 | 22 | Q.   Okay.  Did you ever use your phone to |
| 14:37:10 | 23 | contact either of those two lieutenants? |

Moriarity - Davenport - 2/21/20

254

14:37:11  1          A.    For sure, yeah.

14:37:12  2          Q.    Okay.  About how often did you contact

14:37:14  3   those two lieutenants?

14:37:15  4          A.    Job related, not often.

14:37:18  5          Q.    Okay.  So it would have been more so

14:37:20  6   nonjob-related instances?

14:37:21  7          A.    Yeah.  Yeah.

14:37:21  8          Q.    Okay.  How many times have you contacted

14:37:24  9   a lieutenant for a job-related situation?

14:37:28 10          A.    A lieutenant in general, and when

14:37:32 11   I say tons, maybe 20 -- 20 or so.

14:37:39 12          Q.    Okay.  And what --

14:37:40 13          A.    Over the course of years.

14:37:41 14          Q.    What types of situations would lead

14:37:42 15   you to use your phone rather than radio to contact

14:37:45 16   a lieutenant?

14:37:45 17          A.    Like I said, some lieutenants just

14:37:47 18   don't want to be contacted over the radio, so --

14:37:51 19          Q.    Is there a specific lieutenant that

14:37:53 20   you're thinking of that doesn't want to be

14:37:55 21   contacted by radio?

14:37:56 22          A.    No.

14:37:57 23          Q.    So it wasn't a lieutenant that --

*Moriarity - Davenport - 2/21/20*

255

| | | |
|---|---|---|
| 14:38:02 | 1 | A.   But some -- some don't, so -- |
| 14:38:03 | 2 | Q.   But no lieutenants that you ever worked |
| 14:38:05 | 3 | with that don't like to be contacted by radio? |
| 14:38:07 | 4 | A.   None that I've worked -- |
| 14:38:09 | 5 | MS. HUGGINS:   Form. |
| 14:38:11 | 6 | THE WITNESS:   None that I've worked for |
| 14:38:12 | 7 | directly, but there are other lieutenants that |
| 14:38:14 | 8 | work around you that don't like to be contacted by |
| 14:38:16 | 9 | radio. |
| 14:38:16 | 10 | (Video clip played.) |
| 14:38:16 | 11 | BY MR. DAVENPORT: |
| 14:38:16 | 12 | Q.   Okay.   Did you see that motion that was |
| 14:38:44 | 13 | just made right there? |
| 14:38:45 | 14 | A.   I did. |
| 14:38:46 | 15 | Q.   What do you think that was in reference |
| 14:38:48 | 16 | to? |
| 14:38:48 | 17 | MS. HUGGINS:   Form. |
| 14:38:49 | 18 | THE WITNESS:   That would be speculation, |
| 14:38:54 | 19 | and, again, I -- I don't remember.   I'm taking it |
| 14:38:58 | 20 | all in like the first week or two that I was even |
| 14:39:01 | 21 | on. |
| 14:39:02 | 22 | BY MR. DAVENPORT: |
| 14:39:02 | 23 | Q.   Sure. |

*Moriarity - Davenport - 2/21/20*

256

14:39:02   1          A.    So I'm standing there.  I don't even

14:39:04   2    know what's going on.

14:39:05   3          Q.    But it looked like he took himself and

14:39:09   4    kind of thrusted his legs out and his midsection,

14:39:14   5    correct?

14:39:15   6          A.    Yeah.

14:39:16   7          Q.    Do you know which officer that was?

14:39:18   8          A.    I don't.

14:39:18   9          Q.    Okay.  Can you tell from this video who

14:39:21  10    that officer is?

14:39:23  11          A.    No, not really.

14:39:24  12          Q.    Okay.  Now, at this time, was there

14:39:43  13    another officer who was in that Dodge Charger in

14:39:49  14    the back?

14:39:50  15          MS. HUGGINS:   Form.

14:39:50  16          THE WITNESS:   There -- I wouldn't even

14:39:52  17    remember.

14:39:52  18          BY MR. DAVENPORT:

14:39:52  19          Q.    Okay.  So it was double-up that --

14:39:55  20    double-up day --

14:39:56  21          A.    Double-up day, yes.

14:39:58  22          Q.    -- that day, correct?

14:39:59  23          How often does double-up day occur?

Moriarity - Davenport - 2/21/20

257

14:40:00  1        A.    Twice a month.

14:40:01  2        Q.    Okay.   Now, when there's double-up day,

14:40:05  3   are there ever any police vehicles for C District

14:40:08  4   that are left over that are not being used by any

14:40:11  5   of the officers?

14:40:11  6        A.    Sometimes.

14:40:12  7        Q.    Sometimes?   Okay.

14:40:14  8        Would it be typical for an officer, on

14:40:16  9   double-up day, to drive by themselves, without

14:40:19  10  another officer present?

14:40:21  11       A.    Yes.

14:40:21  12       Q.    That has happened before?

14:40:23  13       A.    Yes.

14:40:23  14       Q.    Okay.   Okay.

14:40:35  15       So now at this time, you still know that

14:40:37  16  there's an individual in your car who was on the

14:40:39  17  ground after colliding -- a collision with

14:40:42  18  a vehicle, correct?

14:40:43  19       A.    Yes.

14:40:43  20       MS. HUGGINS:   Form.

14:40:44  21       BY MR. DAVENPORT:

14:40:44  22       Q.    Okay.   And nobody's doing any sort of

14:40:47  23  a physical assessment of him at this time.

14:40:50  1          A.    I would defer to the senior officers

14:40:52  2   that had already done their physical assessment

14:40:57  3   with their years of experience.

14:40:59  4          Q.    But one of the things that we talked

14:41:00  5   about before was you would be able to know if

14:41:04  6   somebody had some sort of internal bleeding if

14:41:06  7   maybe they had gone pale --

14:41:08  8          A.    Right.

14:41:08  9          Q.    -- or you noticed some other

14:41:10  10  circumstances, but nobody's checking for that at

14:41:12  11  this point.

14:41:12  12         A.    No.   At 10:54:25 is when they all split

14:41:17  13  up.

14:41:18  14         Q.    Okay.

14:41:18  15         A.    We all split up.

14:41:19  16         Q.    Okay.   Where were you guys going next

14:41:21  17  at this point?

14:41:24  18         A.    I don't -- excuse me.

14:41:29  19         It was E -- ECMC.   I don't remember how that

14:41:32  20  was all determined, though.

14:41:34  21         Q.    Okay.   Have you ever been involved, as

14:41:40  22  either a driver or a passenger, in any sort of

14:41:43  23  motor vehicle collision --

*Moriarity - Davenport - 2/21/20*

259

| | | | |
|---|---|---|---|
| 14:41:43 | 1 | **A.** | No. |
| 14:41:43 | 2 | **Q.** | -- with a police vehicle? |
| 14:41:45 | 3 | **A.** | No. |

14:41:45  4   **Q.**   Okay.  Do you know what the proper

14:41:47  5  procedure is if a police vehicle is involved in

14:41:50  6  some sort of a motor -- motor vehicle collision?

14:41:53  7   **A.**   In a motor vehicle accident between two

14:41:58  8  vehicles, you would call a lieutenant and accident

14:42:03  9  investigation unit.

14:42:04 10   **Q.**   What about if that police vehicle

14:42:07 11  struck an individual?  What would be the --

14:42:10 12   **A.**   If --

14:42:11 13   **Q.**   -- proper procedure?

14:42:12 14   **A.**   If the police vehicle struck

14:42:14 15  a pedestrian, it would be the same thing.  You

14:42:18 16  would call a lieutenant and accident investigation

14:42:22 17  unit.

14:42:23 18       If -- in this case, which I think the other

14:42:28 19  officers made the call to contact the lieutenant --

14:42:32 20  or our -- our lieutenant, it was determined by them

14:42:37 21  that it was not a motor vehicle accident and a

14:42:42 22  penal law issue.  There was an arrest made.

14:42:46 23   **Q.**   So if it's a penal law issue, some sort

14:42:49  1  of a crime, the accident investigation unit does

14:42:51  2  not need to arrive --

14:42:52  3         A.    No.

14:42:52  4         Q.    -- at the scene?

14:42:53  5         Now, if the accident investigation unit

14:42:56  6  arrives at the scene, do you know if statements are

14:42:58  7  supposed to be take -- taken by witnesses?

14:43:00  8         A.    Accident investigation unit would do

14:43:02  9  that.

14:43:02 10         Q.    Do you know if the accident

14:43:03 11  investigation unit would need to investigate or

14:43:06 12  take a statement from the individual that was

14:43:08 13  struck by the police vehicle?

14:43:10 14         A.    In -- in an accident, yeah, they

14:43:15 15  take -- they take the statement.

14:43:16 16         Q.    Of the individual that's been struck?

14:43:18 17         A.    Of the individual, yeah.

14:43:19 18         Q.    Okay.  And they would also need to take

14:43:21 19  statements from anybody who possibly witnessed?

14:43:23 20         A.    Yes.

14:43:24 21         Q.    Okay.  Now, as part of accident

14:43:36 22  investigation unit's investigation, are they taking

14:43:38 23  photographs of the vehicle?  The scene?  Is that

14:43:40  1  part of what they --

14:43:40  2          A.    I'm --

14:43:41  3          Q.    -- do?

14:43:42  4          A.    I'm not in that -- that unit.  I wouldn't

14:43:44  5  know what determines whether or not they take

14:43:47  6  pictures or don't take pictures of -- I wouldn't --

14:43:50  7  I wouldn't know.

14:43:50  8          Q.    Let me ask you, I guess, a different

14:43:53  9  question.

14:43:53 10          Have you ever been involved with somebody

14:43:55 11  damaging a police vehicle intentionally?

14:43:58 12          A.    This would be -- this would be one of

14:44:04 13  them, and then there was another time where someone

14:44:08 14  was in the back seat, kicking out a window.

14:44:10 15          Q.    Okay.  Now --

14:44:10 16          A.    And, again, that was not my vehicle.

14:44:15 17          Q.    The person whose vehicle it was, do you

14:44:18 18  recall who was driving that vehicle?

14:44:20 19          A.    No.

14:44:20 20          Q.    Okay.  Do you remember if they took

14:44:21 21  a photograph of the window?

14:44:24 22          A.    No.

14:44:25 23          Q.    Do you recall if --

*Moriarity - Davenport - 2/21/20*

262

14:44:26 1          **A.**    I didn't -- I didn't help with that

14:44:28 2   arrest.

14:44:28 3          **Q.**    Do you recall if anybody took

14:44:29 4   a photograph of the vehicle, the window that was

14:44:32 5   kicked out?

14:44:33 6          **A.**    No.

14:44:34 7          **Q.**    No, they didn't take one, or no, you

14:44:38 8   don't recall?

14:44:38 9          **A.**    No, I don't -- I don't recall.

14:44:38 10         **Q.**    Okay.

14:44:42 11         **A.**    Sorry.

14:44:42 12         **Q.**    Now, in this case, what does it appear

14:44:46 13  that that officer is doing?

14:44:48 14         **MS. HUGGINS:**  Well, to be fair, there's

14:44:50 15  three people in the screen.

14:44:51 16         **MR. DAVENPORT:**  I'll go back.

14:44:58 17         Now, there's an individual who was walking

14:45:00 18  away from the driver's side vehicle --

14:45:00 19         **THE WITNESS:**  Right.

14:45:00 20         **BY MR. DAVENPORT:**

14:45:02 21         **Q.**    -- of the Chevy Tahoe that is currently

14:45:04 22  in view of the camera, correct?

14:45:06 23         **A.**    Right.  Yes.

14:45:06  1        Q.   And that individual is now standing in

14:45:08  2   the center of the street -- in the center of the

14:45:12  3   street?

14:45:13  4        A.   Mm-hmm.   Yes.   I'm sorry.

14:45:14  5        Q.   Okay.   What direction is she now

14:45:18  6   facing?

14:45:18  7        A.   South.

14:45:19  8        Q.   South, towards the police vehicle?

14:45:20  9        A.   Yes.

14:45:21 10        Q.   Okay.   Why do you think that she would

14:45:23 11   have walked away from the police vehicle and then

14:45:27 12   faced in the direction of the police vehicle after

14:45:29 13   walking up to the driver's side door?

14:45:31 14        MS. HUGGINS:   Form.

14:45:32 15        THE WITNESS:   So I can't -- I can't speak on

14:45:33 16   her behalf.   I'm already at my vehicle off screen.

14:45:37 17   I don't know -- I don't know if I'm in the truck

14:45:40 18   yet, or I don't know -- I don't know what she's

14:45:40 19   doing.

14:45:43 20        BY MR. DAVENPORT:

14:45:43 21        Q.   So I guess --

14:45:44 22        A.   I mean, you -- you can't even really

14:45:47 23   see what's in front of her because it's -- it's

14:45:49  1  pretty pixilated or -- or blurry or whatever you

14:45:51  2  want to call it, but I -- I don't know.

14:45:54  3          Q.   Okay.  Now --

14:45:57  4          A.   You know, you can't even really see

14:45:59  5  what she -- if she's -- you can't see what she's

14:46:02  6  doing.

14:46:02  7          Q.   Is she standing in front of the police

14:46:04  8  vehicle?

14:46:04  9          A.   She's definitely standing in front of

14:46:06  10  the police vehicle, yeah, but --

14:46:06  11          Q.   And she's standing stationary?

14:46:08  12          A.   Yeah.

14:46:08  13          Q.   Okay.  Now she's walking towards the

14:46:14  14  police vehicle, correct?

14:46:15  15          A.   Correct.

14:46:16  16          Q.   Okay.  Were you ever shown any pictures

14:46:21  17  or photographs of the police vehicle in question

14:46:24  18  that day?

14:46:25  19          A.   No.

14:46:25  20          Q.   Okay.  Do you know if anybody was shown

14:46:28  21  any pictures of the police vehicle that day?

14:46:30  22          A.   No, I don't know.

14:46:33  23          Q.   Are you familiar with the penal law

14:46:35   1  statute for criminal mischief in the third degree,

14:46:38   2  which is a felony?

14:46:40   3       A.   Yeah, I'm familiar with it.  I would

14:46:42   4  have to have it in front of me to recite it.

14:46:44   5       Q.   Sure.

14:46:45   6       Do you recall if there's a threshold in

14:46:46   7  damage that's required in order to meet the burden

14:46:50   8  of proving that criminal statute?

14:46:53   9       MS. HUGGINS:   Form.

14:46:53  10       THE WITNESS:   I would have to have it in

14:46:55  11  front of me to -- to recite it.

14:46:57  12       MR. DAVENPORT:   Okay.   Can we point the

14:47:02  13  camera back at the witness?

14:47:05  14       THE VIDEOGRAPHER:   Sure.

14:47:05  15       MR. DAVENPORT:   Thank you.

14:47:06  16       And then we can turn on the lights too.

14:47:09  17  Thank you.

14:47:41  18       Okay.   So I'm going to show you what's been

14:47:42  19  marked as Exhibit 4A.   I only have a copy of

14:47:48  20  Exhibit 4.

14:47:51  21       MS. HUGGINS:   That's okay.   I know what it

14:47:55  22  is.   Why don't you keep this as your original.

14:47:57  23  I believe I have 4A.

Moriarity - Davenport - 2/21/20

266

14:47:58  1          MR. DAVENPORT:  Okay.

14:48:02  2          So, now, after you've left the scene at

14:48:04  3  Schmarbeck, you went to ECMC; is that correct?

14:48:04  4          THE WITNESS:  Yes.

14:48:07  5          BY MR. DAVENPORT:

14:48:07  6          Q.   Okay.  Were you having any discussions

14:48:10  7  with Karl Schultz at that time?

14:48:12  8          A.   I don't -- I don't remember.  We

14:48:15  9  probably were, yeah.

14:48:16  10         Q.   Okay.  Do you remember any discussions

14:48:19  11 about a 941 procedure?

14:48:21  12         A.   No, I -- I don't.  And I -- even at the

14:48:23  13 time, I wouldn't have had a clue what it was.

14:48:25  14         Q.   Okay.  That wasn't any training that

14:48:27  15 you had received beforehand?

14:48:28  16         A.   It -- you know, it -- it -- it was.  It

14:48:31  17 was very, very quick training in academy, but --

14:48:36  18         Q.   Which academy?  Was it the Buffalo --

14:48:38  19         A.   This was -- this was the police

14:48:39  20 academy, not Buffalo academy.

14:48:41  21         Q.   Okay.  Okay.  So when you arrived at

14:48:46  22 ECMC, do you remember approximately how long you

14:48:48  23 stayed there?

*Moriarity - Davenport - 2/21/20*

267

| | | |
|---|---|---|
| 14:48:49 | 1 | A.   I -- no, I don't.  I don't remember. |
| 14:48:52 | 2 | Q.   Okay.  At any point during your shift, |
| 14:48:54 | 3 | did you have anything to eat?  Lunch or anything |
| 14:48:56 | 4 | like that? |
| 14:48:58 | 5 | A.   Yeah.  I don't remember what time or |
| 14:48:59 | 6 | what I ate or nothing, though. |
| 14:49:00 | 7 | Q.   Do you remember what you had to eat |
| 14:49:01 | 8 | that day? |
| 14:49:02 | 9 | A.   No. |
| 14:49:02 | 10 | Q.   Okay.  Do you remember if you ate at |
| 14:49:05 | 11 | the hospital? |
| 14:49:05 | 12 | A.   I definitely didn't eat there.  I don't |
| 14:49:07 | 13 | eat there. |
| 14:49:07 | 14 | Q.   Okay.  And when you say you definitely |
| 14:49:10 | 15 | don't eat there -- |
| 14:49:11 | 16 | A.   Yeah. |
| 14:49:11 | 17 | Q.   -- what reason is that? |
| 14:49:12 | 18 | A.   I just don't.  I just don't eat at |
| 14:49:15 | 19 | hospitals, Tim Hortons.  I just don't do it. |
| 14:49:19 | 20 | Q.   Okay.  So more so the food, not like -- |
| 14:49:20 | 21 | A.   Yeah. |
| 14:49:20 | 22 | Q.   -- germs or anything like that? |
| 14:49:22 | 23 | A.   Oh, no.  No, no, no. |

*Moriarity - Davenport - 2/21/20*

14:49:24   1        Q.   Okay.  Okay.  So do you see on -- now,

14:49:33   2   do you see at 11:22:34, there's a location change

14:49:38   3   for C230 to ECMC?

14:49:40   4        A.   Yes.

14:49:40   5        Q.   Okay.  And C230, on the day of the

14:49:45   6   incident, that was your call sign, correct?

14:49:47   7        A.   That was -- yeah, that was mine and

14:49:49   8   Karl's, yeah.

14:49:49   9        Q.   Okay.  So, now, when it says location

14:49:51  10   changed, is that somebody radioing in to say where

14:49:56  11   you are located at that point, or is there some

14:49:57  12   sort of a tracker on your car?

14:49:59  13        A.   No.  That would be someone calling in

14:50:01  14   over the radio saying we're going to ECMC.

14:50:04  15        Q.   Okay.  Did Karl Schultz make that call?

14:50:06  16        A.   We would have to look -- listen to

14:50:09  17   the --

14:50:09  18        Q.   Okay.

14:50:09  19        A.   -- to the radio, yeah.

14:50:10  20        Q.   Okay.  So, now, do you see at 11:23:01,

14:50:18  21   C230 will be a 941?  Do you see that entry?

14:50:21  22        A.   Yes.

14:50:22  23        Q.   Is there any way to enter that

14:50:23  1  manually, or would that have to be something that's

14:50:26  2  over the radio?

14:50:26  3       A.   So it looks like it was entered in over

14:50:30  4  the radio because the numbers before that, 000478,

14:50:38  5  is going to be one of these other -- other

14:50:41  6  personnel, not the officers.  And I don't know

14:50:45  7  why --

14:50:45  8       Q.   Okay.

14:50:46  9       A.   That's -- that's dispatch, the -- the

14:50:48  10  Sal Polizzi.  Salvatore Polizzi.

14:50:51  11       Q.   Yep.

14:50:51  12       A.   That would be like one of -- one of

14:50:53  13  them or something.

14:50:54  14       Q.   Okay.  So now we have on scene C230.

14:51:01  15  Would that still be referring to ECMC?

14:51:03  16       A.   That would be referring to -- to ECMC.

14:51:06  17  So now we're on scene at ECMC at 11:30.

14:51:11  18       Q.   Okay.  And then there's a call in at

14:51:13  19  11:30:35, C230, suspect broke mirror on car 473

14:51:19  20  intentionally.

14:51:19  21       Would that be something that's radioed in,

14:51:21  22  or would that be something that is entered by the

14:51:24  23  police officer?

14:51:24  1      A.    So that would be radioed in because of

14:51:26  2   who -- whoever entered it in had, you know, the --

14:51:28  3   their work ID number is 000478.

14:51:31  4      Q.    Okay.  Is there ever any time that

14:51:34  5   there's an entry made for somebody that would have

14:51:37  6   had an officer radio something in, but really it

14:51:41  7   was the officer that manually entered it in?

14:51:43  8      A.    It would be --

14:51:43  9      MS. HUGGINS:    Form.

14:51:44 10      THE WITNESS:    It would be -- so like in

14:51:47 11   front of Karl Schultz, the numbers 169325, that

14:51:51 12   would be where the 000470 would be.

14:51:55 13      BY MR. DAVENPORT:

14:51:55 14      Q.    Okay.  Now, we have at -- let's see

14:52:00 15   here.

14:52:01 16      Let's go back to the previous exhibit.

14:52:17 17   I think it's Exhibit 7 for you.

14:52:35 18      So now we have an entry at 11:22 that says,

14:52:38 19   location change to ECMC, which matches up with

14:52:42 20   what's on the complaint summary report.

14:52:44 21      Do you see that between Exhibit 7 and

14:52:46 22   Exhibit 4A?

14:52:48 23      A.    Yeah.  11:22, location change, and then

*Moriarity - Davenport - 2/21/20*

271

14:52:51  1   over here, 11:22, location change.

14:52:54  2            Q.   Okay.  And then we have an entry at

14:52:56  3   11:30 saying that you are on scene.  That's on

14:52:58  4   Exhibit 7.  And that would still be referring to

14:53:02  5   you being on scene at ECMC, correct?

14:53:05  6            A.   Wait a minute.

14:53:06  7            Q.   For Exhibit 7, there's a time 11:30 a.m.

14:53:10  8            A.   Oh, yeah.  Yeah.

14:53:12  9            Q.   Okay.

14:53:13 10            A.   Yep, 11:30 a.m.

14:53:16 11            Q.   Now, at the point that it says, on your

14:53:19 12   dispatch monitor -- so that would be Exhibit 7 --

14:53:24 13   1314, that would be in reference to 1:14 p.m.,

14:53:24 14   correct?

14:53:24 15            A.   Yes.

14:53:27 16            Q.   And it says available?

14:53:28 17            A.   I'm available now.  I'm available --

14:53:28 18            Q.   Okay.

14:53:30 19            A.   -- to take a call.

14:53:31 20            Q.   Okay.  So would you have made your

14:53:33 21   availability as you were leaving ECMC?

14:53:35 22            A.   I don't -- I don't remember when I made

14:53:37 23   myself available.  I'm pretty sure Karl's going to

14:53:41 1  be the one that made us available, not me.

14:53:44 2      Q.    Sure.

14:53:44 3      A.    And you can do it at ECMC.  You can do

14:53:47 4  it anywhere driving around.  The stationhouse.  You

14:53:50 5  can do it -- you can do it whenever.

14:53:51 6      Q.    Okay.

14:53:53 7      A.    So yeah.

14:53:54 8      Q.    Okay.  So we wouldn't necessarily know

14:53:57 9  if he made himself available at ECMC or if he made

14:53:59 10  himself available at the stationhouse?

14:54:02 11      A.    Or -- or like I said, or -- or

14:54:04 12  anywhere.

14:54:04 13      Q.    Okay.

14:54:05 14      A.    But no, I wouldn't -- I wouldn't be

14:54:06 15  able to remember that -- that.

14:54:08 16      Q.    Okay.  So the next time, according to

14:54:12 17  your dispatch monitor, it looks like you were

14:54:17 18  dispatched at 1:14 p.m.?

14:54:19 19      A.    Yeah, 1:14.

14:54:20 20      Q.    For a traffic stop?

14:54:22 21      A.    Yes.

14:54:23 22      Q.    Okay.  Is there any reason why you

14:54:27 23  would have made yourself available at the same

14:54:29  1  time that you were responding to an incident for

14:54:33  2  a traffic stop?

14:54:35  3       Is that -- is that something that you ever

14:54:36  4  do?

14:54:36  5       A.   So, yeah, you can -- you can be on --

14:54:41  6  you can -- you can be on a call, like the

14:54:45  7  accident/injury at Schmarbeck, and then you can

14:54:47  8  call back in service on something else, and then

14:54:51  9  they just put you back in as available, and then

14:54:53 10  immediately put you on whatever you're either

14:54:56 11  calling out on -- or no matter what, dispatch is

14:54:59 12  going to say you're available first and then, boom,

14:55:02 13  you're at a call.

14:55:02 14       Q.   Okay.

14:55:04 15       A.   So even if -- even if I'm not

14:55:07 16  initiating the traffic stop, let's say -- let's say

14:55:09 17  it was the criminal mischief instead of the traffic

14:55:12 18  stop, it's still going to say, you know, available,

14:55:14 19  boom, criminal mischief, you know?

14:55:16 20       Q.   Mm-hmm.

14:55:18 21       So on the day of the accident, did you ever

14:55:21 22  investigate or get a visual of what the mirror was?

14:55:25 23       A.   I didn't.   I didn't look at the truck

*Moriarity - Davenport - 2/21/20*

274

| | | |
|---|---|---|
| 14:55:27 | 1 | at all. |
| 14:55:27 | 2 | Q.   Okay. |
| 14:55:27 | 3 | A.   Not that I -- not that I remember, but, |
| 14:55:31 | 4 | you know. |
| 14:55:31 | 5 | Q.   Okay.  Do you know if it was broken or |
| 14:55:34 | 6 | not? |
| 14:55:35 | 7 | A.   I don't even know if I looked. |
| 14:55:38 | 8 | Q.   Okay.  Okay.  Did you hear any of the |
| 14:55:44 | 9 | other officers talking about any difficulties with |
| 14:55:46 | 10 | using the driver's side mirror? |
| 14:55:49 | 11 | A.   No. |
| 14:55:50 | 12 | Q.   Okay. |
| 14:55:51 | 13 | A.   No. |
| 14:55:51 | 14 | Q.   And that was on the day of the |
| 14:55:53 | 15 | incident, you didn't hear anybody talking about |
| 14:55:55 | 16 | any difficulties with the driver's side mirror? |
| 14:55:57 | 17 | A.   If -- maybe if it was said at ECMC, but |
| 14:56:01 | 18 | I don't remember.  I was out in the hallway the |
| 14:56:03 | 19 | whole time. |
| 14:56:04 | 20 | Q.   Okay.  Driver's side window.  Also you |
| 14:56:06 | 21 | didn't hear anybody say that they had any |
| 14:56:08 | 22 | difficulties with that? |
| 14:56:09 | 23 | A.   No, not that I remember. |

*Moriarity - Davenport - 2/21/20*

275

14:56:12  1          Q.    Okay.  Did you ever go into the room

14:56:13  2     where Mr. Kistner was --

14:56:14  3          A.    I did not.

14:56:15  4          Q.    -- at that time?

14:56:16  5          Okay.  Did you have any discussions with any

14:56:19  6     of the hospital staff while you were there?

14:56:21  7          A.    My mouth was shut the entire time I was

14:56:23  8     at ECMC.

14:56:23  9          Q.    Okay.  Was that a direction that was

14:56:26 10     given to you?

14:56:26 11          A.    No.  That was just me knowing my place

14:56:30 12     as someone brand new.

14:56:31 13          Q.    Okay.  Was that ever something that was

14:56:34 14     told to you by Karl Schultz, that as a new person,

14:56:38 15     you shouldn't say anything unless directed to say

14:56:41 16     something?

14:56:41 17          A.    No.  No.  That was just something

14:56:43 18     I felt wasn't appropriate at the time.

14:56:45 19          MR. DAVENPORT:  Okay.  I'm going to show you

14:56:48 20     something that's been marked as Exhibit 16.

14:56:51 21          And I'm sorry that I don't have --

14:56:51 22          MS. HUGGINS:  I have --

14:56:51 23          MR. DAVENPORT:  -- another one.

14:56:52  1          MS. HUGGINS:  I have one.  Thank you.

14:56:53  2          MR. DAVENPORT:  Okay.  Okay.

14:56:55  3          So, now, directing your attention to shift

14:57:00  4    2nd, do you know what that's referring to?

14:57:03  5          THE WITNESS:  Day shift.

14:57:03  6          BY MR. DAVENPORT:

14:57:03  7          Q.   Okay.  So day shift would be considered

14:57:07  8    the second shift?

14:57:08  9          A.   Yes.

14:57:10  10         Q.   Was there different designations that

14:57:12  11   were used for officers working one day as opposed

14:57:16  12   to another?

14:57:17  13         Like, did you guys ever -- excuse me.

14:57:19  14   Strike that.

14:57:20  15         Did you ever reference to platoons for

14:57:23  16   people on day shift?

14:57:27  17         A.   Some -- some people do.  Like this

14:57:31  18   would be McHugh's platoon.

14:57:34  19         Q.   Okay.

14:57:34  20         A.   You know.

14:57:36  21         I -- I don't make references like that,

14:57:38  22   though.

14:57:38  23         Q.   Okay.  What -- what do you use for your

*Moriarity - Davenport - 2/21/20*

277

| | | |
|---|---|---|
| 14:57:40 | 1 | reference? |
| 14:57:40 | 2 | A.   I just say day shift. |
| 14:57:41 | 3 | Q.   Okay.  Now, looking at this list, who |
| 14:57:47 | 4 | was the officer that had the most experience at |
| 14:57:51 | 5 | that time? |
| 14:57:53 | 6 | MS. HUGGINS:   Form. |
| 14:57:55 | 7 | THE WITNESS:   Yeah, I mean, some of -- some |
| 14:58:01 | 8 | of these guys, like Ronnie Daniels, and I don't |
| 14:58:03 | 9 | know who William Johnson is.  Clarence Sampson, |
| 14:58:07 | 10 | he's been retired.  So those guys. |
| 14:58:12 | 11 | BY MR. DAVENPORT: |
| 14:58:12 | 12 | Q.   Okay.  Looking over this list, were |
| 14:58:16 | 13 | these all the officers who typically worked |
| 14:58:18 | 14 | C District at that time? |
| 14:58:23 | 15 | A.   Some of them, like, like I said, |
| 14:58:25 | 16 | Clarence and Ronnie Daniels, those guys were not on |
| 14:58:28 | 17 | my platoon.  I don't think Kevin Quinn was on -- |
| 14:58:35 | 18 | was there. |
| 14:58:37 | 19 | I don't know who Erin is.  Erin Heidinger. |
| 14:58:42 | 20 | I don't know who that is. |
| 14:58:42 | 21 | Q.   So is it possible that they were people |
| 14:58:45 | 22 | who were working the other platoon for day shift? |
| 14:58:49 | 23 | A.   That -- yeah, that could be. |

14:58:52  1          Q.   Okay.   After police officers complete

14:58:57  2   the academy, where are they typically sent to if

14:59:01  3   they're working in the City of Buffalo?

14:59:02  4          Is there a certain district that they're

14:59:04  5   normally sent to?

14:59:04  6          A.   No.   They're sent to one of the five.

14:59:06  7          Q.   Did you choose, at that time, to be in

14:59:08  8   the C District, as opposed to the other districts?

14:59:11  9          A.   You don't get to choose.

14:59:12 10          Q.   Okay.

14:59:12 11          A.   As -- as far as the FTO, field

14:59:15 12   training, no, you don't get to choose.

14:59:17 13          Q.   Okay.   How would you classify

14:59:19 14   C District, as opposed to the other districts?

14:59:23 15          MS. HUGGINS:   Form.

14:59:23 16          THE WITNESS:   Can you explain that question?

14:59:25 17          BY MR. DAVENPORT:

14:59:25 18          Q.   What's the crime rate in C District,

14:59:27 19   as opposed to the other districts in the City of

14:59:35 20   Buffalo?

14:59:35 21          A.   I mean, different crimes vary in

14:59:39 22   different areas.

14:59:40 23          C District has a lot of -- a lot of

| | | |
|---|---|---|
| 14:59:41 | 1 | violence.  E district has a lot of violence.  But |
| 14:59:45 | 2 | then so do all the other ones. |
| 14:59:47 | 3 | Maybe certain neighborhoods -- neighborhoods |
| 14:59:49 | 4 | have more car thefts, like Hertel, you know, |
| 14:59:55 | 5 | North Buffalo has a lot of car thefts.  Bravo's got |
| 15:00:00 | 6 | a lot of car thefts.  You know, I mean, it -- it -- |
| 15:00:04 | 7 | it varies. |
| 15:00:04 | 8 | Q.   Okay.  But, I guess, going back to what |
| 15:00:07 | 9 | you were saying before, does C District have more |
| 15:00:09 | 10 | violent crimes, as opposed to -- |
| 15:00:10 | 11 | A.   I would -- |
| 15:00:11 | 12 | Q.   -- other districts? |
| 15:00:12 | 13 | A.   I would say so, yeah, as of C and E. |
| 15:00:16 | 14 | Q.   And you're currently in Bravo District |
| 15:00:18 | 15 | now. |
| 15:00:18 | 16 | A.   I'm in Bravo. |
| 15:00:19 | 17 | Q.   Okay.  Is that because you didn't want |
| 15:00:21 | 18 | to have to deal with the more violent crimes? |
| 15:00:23 | 19 | A.   No.  No. |
| 15:00:24 | 20 | Q.   Not really something that phases you |
| 15:00:26 | 21 | then? |
| 15:00:26 | 22 | A.   No.  That -- it -- yeah, that doesn't |
| 15:00:29 | 23 | phase me, but it's nice to see Christmas lights |

15:00:31  1  sometimes, so it's good to see something different.

15:00:34  2        MR. DAVENPORT:  So I'm going to show you

15:00:36  3  something that's been marked as Exhibit 17.

15:00:38  4        And, again, I apologize.  I don't have

15:00:40  5  another copy of Exhibit 17.

15:00:42  6        It's the complaint -- the criminal

15:00:45  7  complaint.

15:00:45  8        MS. HUGGINS:  I have all the exhibits except

15:00:47  9  for the first day.  No copies were provided from

15:00:49 10  the first day.

15:00:51 11        MR. DAVENPORT:  Okay.

15:00:51 12        MS. HUGGINS:  And I also -- just in general,

15:00:53 13  cover pages with the exhibit tabs can be sent to me

15:00:58 14  at some point.

15:00:59 15        MR. DAVENPORT:  Okay.

15:01:01 16        Now, reading after what's in the middle

15:01:05 17  listed as criminal mischief in the third degree?

15:01:09 18        THE WITNESS:  Mm-hmm.  Yes.

15:01:10 19        BY MR. DAVENPORT:

15:01:10 20        Q.   Okay.  Now, I know -- I understand that

15:01:13 21  you didn't sign this, but in terms of the

15:01:16 22  accusations that are made in this criminal

15:01:19 23  document, I just want to see if you agree with what

15:01:21  1  was written.

15:01:23  2          So for the first sentence it says, in that

15:01:26  3  the defendant, while at 37 Schmarbeck, did with

15:01:30  4  intent to damage.

15:01:31  5          Now, would you agree that the subject

15:01:35  6  intended to damage the police vehicle?

15:01:36  7          **MS. HUGGINS:**  Form.

15:01:40  8          **THE WITNESS:**  Look -- I'm -- I'm looking

15:01:42  9  through a -- a driver's side mirror, so, I mean,

15:01:44 10  I don't have the -- the view of the person driving

15:01:47 11  the vehicle, so I'm not going to be the one that

15:01:53 12  says with intent or -- or -- or whatnot.

15:01:56 13          I mean, that's why Lauren signed off on the

15:01:59 14  charges, not me.

15:02:00 15          **BY MR. DAVENPORT:**

15:02:00 16          Q.   What about based off of what you saw in

15:02:02 17  the video?  Would you say that the subject intended

15:02:04 18  to damage the vehicle?

15:02:04 19          A.   I can't --

15:02:04 20          **MS. HUGGINS:**  Form.

15:02:05 21          **THE WITNESS:**  -- because that's not --

15:02:06 22  that's not the view that I had.  I had a view from

15:02:09 23  my driver's side mirror, and -- and through my

15:02:11  1  driver's side mirror, I would say yes.

15:02:13  2        BY MR. DAVENPORT:

15:02:13  3        Q.   That the subject did intend to damage

15:02:15  4  the vehicle?

15:02:15  5        A.   From my driver's side mirror, yeah.

15:02:17  6        Q.   Okay.  What about the view that you saw

15:02:19  7  on the TV screen?

15:02:21  8        A.   I -- I mean, I'm -- I'm not -- I -- I'm

15:02:23  9  not going to say that because I didn't -- that's

15:02:25 10  not the viewpoint that I had.  I mean, I'm looking

15:02:31 11  through my -- my driver's side mirror.  That's what

15:02:34 12  I'm looking through.

15:02:35 13        Q.   Sure, but I guess just what I'm asking

15:02:37 14  is:  After watching that video, do you think that

15:02:39 15  the subject intended to damage the vehicle?

15:02:41 16        MS. HUGGINS:   Form.

15:02:42 17        THE WITNESS:   The way that he walked up to

15:02:44 18  a moving vehicle, and then it looks like the

15:02:47 19  vehicle was stopping or stopped, and then all of

15:02:51 20  a sudden he falls down, yeah, I would say -- I

15:02:53 21  would say, yeah, it does look like he intended

15:02:56 22  to -- to throw himself into the vehicle, so --

15:02:59 23        BY MR. DAVENPORT:

15:02:59  1          Q.   But we talked about before, when we

15:03:01  2   were watching the -- when we were watching the

15:03:03  3   video, the car seemed to still be moving after

15:03:06  4   contact was made, correct?

15:03:07  5          MS. HUGGINS:  Form.

15:03:07  6          THE WITNESS:  From -- from wherever this

15:03:09  7   viewpoint was, I mean, it -- it can look like all

15:03:12  8   types of stuff, but what -- what did -- what did

15:03:14  9   the officers on the ground view?

15:03:17 10          You know, Lauren is the best person to ask

15:03:19 11   this question to.  I didn't -- I wasn't right here,

15:03:23 12   you know, I --

15:03:23 13          BY MR. DAVENPORT:

15:03:23 14          Q.   Right.  No.  I -- I understand.

15:03:24 15          A.   I'm way up the street, you know?

15:03:26 16          Q.   And, you know, she signed this under

15:03:28 17   the penalties of perjury --

15:03:28 18          A.   Yeah.

15:03:30 19          Q.   -- so it's -- you know, this is more so

15:03:31 20   what she said, but I'm just merely asking if you

15:03:33 21   agree with what was written.

15:03:34 22          A.   I -- I do agree with what --

15:03:36 23          MS. HUGGINS:  Form.

Moriarity - Davenport - 2/21/20

284

| | | |
|---|---|---|
| 15:03:37 | 1 | THE WITNESS:  -- was -- what was written. |
| 15:03:37 | 2 | BY MR. DAVENPORT: |
| 15:03:37 | 3 | Q.   So after what you saw on the video, he |
| 15:03:39 | 4 | intended to damage the vehicle? |
| 15:03:40 | 5 | MS. HUGGINS:  Form.  Asked and answered. |
| 15:03:41 | 6 | THE WITNESS:  Yeah. |
| 15:03:42 | 7 | BY MR. DAVENPORT: |
| 15:03:42 | 8 | Q.   Okay.  So going towards the next line: |
| 15:03:45 | 9 | The property of another person, City of Buffalo |
| 15:03:48 | 10 | Police Department, and having no right to do so, |
| 15:03:51 | 11 | nor any reasonable ground to believe that he had |
| 15:03:54 | 12 | such right, did damage the property, to wit, |
| 15:03:58 | 13 | driver's side mirror and driver's side mirror of |
| 15:04:01 | 14 | patrol vehicle, in the amount of more than $250. |
| 15:04:04 | 15 | Now, my question is:  At any point during |
| 15:04:07 | 16 | that day, was there ever a second opinion that was |
| 15:04:11 | 17 | received, besides the officers on scene, for what |
| 15:04:13 | 18 | the damage to the police vehicle was at that time? |
| 15:04:16 | 19 | A.   I would have absolutely no idea if -- |
| 15:04:19 | 20 | if anyone else looked at -- looked at it. |
| 15:04:23 | 21 | I wouldn't even know who to -- who to ask |
| 15:04:26 | 22 | that to. |
| 15:04:27 | 23 | Q.   Okay. |

*Moriarity - Davenport - 2/21/20*

285

| | | |
|---|---|---|
| 15:04:27 | 1 | **A.**   Maybe the -- I know -- I mean, did they |
| 15:04:29 | 2 | take it to the Seneca garage?  I don't know |
| 15:04:32 | 3 | these -- I don't know those answers. |
| 15:04:33 | 4 | **Q.**   Okay. |
| 15:04:33 | 5 | **A.**   I don't know what they did with -- with |
| 15:04:36 | 6 | anything. |
| 15:04:37 | 7 | **Q.**   So I'm going to show you what's been |
| 15:04:39 | 8 | marked as Exhibit 18. |
| 15:04:42 | 9 | **A.**   What is this? |
| 15:04:45 | 10 | **Q.**   Can you read the date that's right |
| 15:04:48 | 11 | underneath service information? |
| 15:04:53 | 12 | **A.**   Oh, the one that's circled?  1/5/2017. |
| 15:04:57 | 13 | **Q.**   Okay.  So, now, it's been represented |
| 15:04:58 | 14 | to us by your counsel that this is the first |
| 15:05:02 | 15 | maintenance work order after that incident, so -- |
| 15:05:06 | 16 | **A.**   Okay. |
| 15:05:06 | 17 | **MS. HUGGINS:**  Form. |
| 15:05:08 | 18 | **BY MR. DAVENPORT:** |
| 15:05:10 | 19 | **Q.**   Do you see anything that's on there |
| 15:05:12 | 20 | where it refers to fixing or repairing a driver's |
| 15:05:19 | 21 | side window or driver's side mirror? |
| 15:05:21 | 22 | **A.**   No. |
| 15:05:21 | 23 | **Q.**   Okay.  Was does it refer to? |

15:05:24  1        A.    It says service cooling system.   And

15:05:26  2   then remarks -- I don't know what RR means, but

15:05:29  3   water pump and then serp belt.   Maybe serpentine

15:05:36  4   belt.

15:05:36  5        Q.    Okay.   And would you agree that there's

15:05:38  6   no estimate as to what the cost will be for

15:05:42  7   repairing the vehicle?

15:05:43  8        MS. HUGGINS:   Form.

15:05:44  9        THE WITNESS:   Yeah.   It's blank.

15:05:45 10        BY MR. DAVENPORT:

15:05:45 11        Q.    Okay.   And you would also agree with me

15:05:48 12   that it in no way refers to the driver's side

15:05:51 13   mirror or the driver's side window.

15:05:52 14        A.    Correct.

15:05:53 15        Q.    Okay.   So now turning back to Exhibit 17,

15:06:00 16   would you agree that it was speculation that the

15:06:03 17   amount of the damage was more than $250?

15:06:06 18        MS. HUGGINS:   Form.

15:06:06 19        THE WITNESS:   That would be speculation,

15:06:11 20   I've got to defer to Lauren.   I don't -- she --

15:06:14 21   again, you know, she signed off on the charges, so

15:06:16 22   I -- I don't know.

15:06:17 23        BY MR. DAVENPORT:

15:06:17  1      Q.    Okay.

15:06:18  2      A.    I'm not a mechanic either.  I don't

15:06:20  3  know how much a mirror costs.

15:06:21  4      Q.    Sure.

15:06:21  5      All right.  So next sentence:  In that the

15:06:24  6  defendant did intentionally throw his body into the

15:06:27  7  driver's side mirror of patrol vehicle number 473,

15:06:31  8  causing the mirror to become dislodged from the

15:06:34  9  vehicle.

15:06:34 10      Now, on that day, did you observe the

15:06:36 11  driver's side mirror becoming dislodged from the

15:06:39 12  vehicle?

15:06:40 13      MS. HUGGINS:  Form.

15:06:40 14      THE WITNESS:  I don't even think I looked at

15:06:43 15  the truck.

15:06:43 16      BY MR. DAVENPORT:

15:06:43 17      Q.    Okay.  And also causing the driver's

15:06:47 18  side window to malfunction.  The value of said

15:06:49 19  damage to exceed $250.

15:06:53 20      Now, did anybody at any point talk about the

15:06:58 21  driver's side mirror or the driver's side window

15:07:01 22  being either dislodged or malfunctioning on the

15:07:03 23  day?

15:07:05   1        A.    It --

15:07:05   2        MS. HUGGINS:   Form.

15:07:06   3        THE WITNESS:   If -- if they -- they did,

15:07:09   4   they didn't say it to me, because why would you

15:07:11   5   talk to me?  I'm brand new.  If they said it in

15:07:15   6   front of me, then I don't -- I don't remember,

15:07:17   7   because I probably wasn't either -- I don't know.

15:07:20   8   I wasn't paying attention or I just didn't

15:07:22   9   remember.

15:07:27  10        BY MR. DAVENPORT:

15:07:28  11        Q.    All right.  So we'll turn to the next

15:07:30  12   criminal complaint, which is for disorderly

15:07:33  13   conduct.

15:07:33  14        So now it says, the said defendant, at the

15:07:37  15   aforesaid time and place, with intent to cause

15:07:40  16   public inconvenience, annoyance, or alarm, or

15:07:43  17   recklessly creating a risk thereof, while in

15:07:46  18   a public place, did use abusive or obscene language

15:07:51  19   or made an obscene gesture.

15:07:54  20        Now, at any time that you were with

15:07:57  21   Mr. Kistner, did he ever make an obscene gesture to

15:08:00  22   any of the officers?

15:08:01  23        A.    I mean, even -- even on the video, it

15:08:05  1    just shows us taking off.  I -- I didn't have any

15:08:11  2    confrontation with him, with the exception of

15:08:13  3    walking him back to patrol vehicle 532 and placing

15:08:18  4    him in the back, and then -- and then that was it.

15:08:22  5         Q.   Now, when you say a confrontation, what

15:08:24  6    are you referring to?

15:08:24  7         A.   Just -- just me in contact with him,

15:08:28  8    bringing him back to the patrol vehicle.  That --

15:08:32  9    that was it.  That's the confrontation.

15:08:34 10         Q.   Okay.  Did he ever make any sort of

15:08:36 11    rude remarks or use any obscene language directed

15:08:40 12    towards you or Mr. Schultz?

15:08:42 13         A.   Not to me.  Not from what I remember.

15:08:45 14         Q.   Okay.  What about to Mr. Schultz?

15:08:49 15         A.   Not to -- not to what I remember.

15:08:50 16         Q.   Okay.  Now, in that the defendant did

15:08:56 17    intentionally throw his body into the driver's side

15:08:59 18    mirror of patrol vehicle number 473, causing the

15:09:02 19    mirror to become dislodged from the vehicle and

15:09:04 20    also causing the driver's side window to

15:09:06 21    malfunction, the value of said damage to exceed

15:09:10 22    $250.

15:09:11 23         Now, do you know if for disorderly conduct,

15:09:14  1    is there some sort of a threshold amount of damage

15:09:17  2    that's recovered -- required in order to charge

15:09:19  3    somebody with that penal law statute?

15:09:21  4         MS. HUGGINS:   Form.

15:09:21  5         THE WITNESS:   No, there's not.

15:09:23  6         BY MR. DAVENPORT:

15:09:23  7         Q.   Okay.  And while being treated at ECMC,

15:09:27  8    the defendant did use obscene and offensive

15:09:30  9    language toward officers and medical staff.

15:09:33  10        Do you remember the individual, Mr. Kistner,

15:09:38  11   ever using obscene language towards the medical

15:09:40  12   staff there?

15:09:41  13        A.   I wasn't in the room with him.

15:09:43  14        Q.   Okay.  Now, have you ever used

15:09:53  15   a strip search or a body cavity search before,

15:09:57  16   after somebody's been taken to cell block or

15:10:01  17   booking?

15:10:01  18        A.   No.

15:10:01  19        Q.   Never before?

15:10:02  20        A.   No.  Cell block does their formal

15:10:05  21   searches, but no.

15:10:06  22        Q.   Have you ever directed a cell block

15:10:08  23   attendant to use a body cavity or a strip search?

*Moriarity - Davenport - 2/21/20*

291

15:10:11  1          A.    I don't have the authority to do that.

15:10:13  2          Q.    Okay.  Are you aware of any

15:10:14  3   strip searches or body cavity searches that

15:10:17  4   were done by cell block attendants from someone

15:10:20  5   that you arrested?

15:10:21  6          MS. HUGGINS:  Form.

15:10:21  7          THE WITNESS:  Can you -- can you explain

15:10:23  8   what you mean by that?

15:10:24  9          Their policy is you have to strip down to

15:10:26 10   your boxers.

15:10:27 11          BY MR. DAVENPORT:

15:10:27 12          Q.    Right.

15:10:27 13          A.    Okay.

15:10:28 14          Q.    No.  I understand what the policy is.

15:10:29 15   I guess what I'm asking is:  Are you aware of

15:10:31 16   anyone that you arrested then having a strip search

15:10:34 17   or a body cavity search while at cell block?

15:10:38 18          MS. HUGGINS:  Form.

15:10:38 19          THE WITNESS:  No to body cavity searches.

15:10:41 20   I didn't know that that was a thing.

15:10:42 21          And then strip search, yeah, everyone we

15:10:45 22   arrest gets stripped down to -- for males, they get

15:10:48 23   stripped down to their boxers.

15:10:50  1          BY MR. DAVENPORT:

15:10:50  2               Q.    Okay.   And that's every arrest, for any

15:10:53  3      offense whatsoever?

15:10:54  4               A.    That's correct.

15:10:54  5               Q.    Okay.   How many arrests have you made

15:10:57  6      personally?

15:10:58  7               A.    The number's up there, but I don't

15:11:00  8      know.

15:11:00  9               Q.    Okay.   Would it be more or less than

15:11:03 10      a hundred?

15:11:03 11               A.    More.

15:11:04 12               Q.    Okay.   So for each of those hundred

15:11:08 13      individuals, you have -- you are aware that

15:11:09 14      a strip search was done?

15:11:10 15               A.    Yeah, absolutely.

15:11:11 16               Q.    Okay.   Now, at this time, after

15:11:20 17      Mr. Kistner has been criminally charged according

15:11:22 18      to those criminal complaints, did you ever talk

15:11:24 19      with Mr. Schultz or Ms. McDermott or Ms. Velez

15:11:28 20      about the criminal charges against Mr. Kistner?

15:11:30 21               A.    I never knew what was actually charged.

15:11:32 22               Q.    Okay.   So no further conversations with

15:11:35 23      those individuals about what happened on January 1st?

*Moriarity - Davenport - 2/21/20*

293

15:11:38    1        A.    No.

15:11:39    2        MR. DAVENPORT:   Okay.   All right.   I think

15:11:41    3   I'm all set.

15:11:42    4        Do you have any questions?

15:11:43    5        MS. HUGGINS:   I have no questions.

15:11:44    6        MR. DAVENPORT:   All right.   Thank you.

            7        (Proceedings of 2/21/20 were then concluded

            8   at 3:11 p.m.)

            9

           10                    *     *     *

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

1       I hereby CERTIFY that I have read the
2   foregoing 293 pages, and that except as to those
3   changes (if any) as set forth in an attached errata
4   sheet, they are a true and accurate transcript of
5   the testimony given by me in the above entitled
6   action on February 21, 2020.
7
8
9                       - - - - - - - - - - - - - - - - - - - - - - - -
                            KYLE T. MORIARITY
10
11
12
13
14
15
16
17
18
19
20
21
22
23

295

1    STATE OF NEW YORK)

2                        ss:

3    COUNTY OF ERIE    )

4

5         I DO HEREBY CERTIFY as a Notary Public in and

6    for the State of New York, that I did attend and

7    report the foregoing deposition, which was taken

8    down by me in a verbatim manner by means of machine

9    shorthand.  Further, that the deposition was then

10   reduced to writing in my presence and under my

11   direction.  That the deposition was taken to be

12   used in the foregoing entitled action.  That the

13   said deponent, before examination, was duly sworn

14   to testify to the truth, the whole truth and

15   nothing but the truth, relative to said action.

16

17

18                         _Anne T. Barone_____

19                         ANNE T. BARONE, RPR,
                           Notary Public.

20

21

22

23