*Santana - Davenport - 9/8/20*

120

12:41:15  1  anything like that, we'll cancel it.

12:41:19  2        **Q.**   Okay.  Are there any other circumstances

12:41:24  3  where you would cancel an ambulance?

12:41:27  4        **A.**   That's pretty much it.

12:41:28  5        **Q.**   Okay.  So you would never cancel an

12:41:31  6  ambulance because you believed that you could get

12:41:33  7  the individual to ECMC quicker?

12:41:35  8        **A.**   I would not cancel ADI for that.

12:41:38  9  That's their job, so I'd rather them take them to

12:41:41 10  the hospital.

12:41:42 11        But I mean, for -- from my experience, the

12:41:45 12  only time I cancel ADI is when they don't want it,

12:41:51 13  when they refuse to go to the hospital because they

12:41:53 14  don't seem like they don't need it.

12:41:56 15        **Q.**   Okay.  So when you say "they," you're

12:41:58 16  referring to --

12:41:59 17        **A.**   I'm referring to injured parties.

12:42:03 18  Yeah, that's what I'm referring to.

12:42:05 19        **Q.**   Okay.  Is that something that officers

12:42:10 20  are trained on, when to cancel ADI?

12:42:14 21        **A.**   No, there's no -- to my recollection,

12:42:19 22  there's no training with regards to when to cancel

12:42:22 23  ADI.

*Santana - Davenport - 9/8/20*

121

12:42:23  1        I do it just so that if the ambulance does

12:42:26  2   respond and that injured person doesn't require

12:42:29  3   them, I want that ambulance to go back in service

12:42:31  4   so they can serve someone else.  That's why I do

12:42:34  5   it, but that's just me.

12:42:37  6        **Q.**   Have you ever received training that

12:42:39  7   says anywhere in that training to cancel ADI if an

12:42:42  8   officer feels that they can get the injured party

12:42:45  9   to the hospital quicker?

12:42:46  10        **MS. HUGGINS:**   Form.

12:42:46  11        **THE WITNESS:**   I can't -- I can't recall.

12:42:47  12        **BY MR. DAVENPORT:**

12:42:48  13        **Q.**   All right.  Do you know if there's any

12:42:50  14   training that says that an officer should not

12:42:52  15   cancel ADI just because they believe that they can

12:42:55  16   get the individual to the hospital quicker?

12:42:56  17        **A.**   I am not sure.

12:43:01  18        **Q.**   But as you sit here today, you do not

12:43:05  19   recall being told one way or the other whether to

12:43:08  20   cancel --

12:43:10  21        **A.**   Yes, I don't recall ever being trained

12:43:11  22   on how to cancel or when to cancel the ambulance.

12:43:14  23   This is just going on my own experience.

*Santana - Davenport - 9/8/20*

122

12:43:16  1          **Q.**   Okay.  Are you aware of officers who

12:43:26  2   cancel ambulances because they believe that they

12:43:29  3   can get the injured party to the hospital quicker?

12:43:31  4          **MS. HUGGINS:**  Form.  You can answer.

12:43:32  5          **THE WITNESS:**  I've been aware of certain

12:43:35  6   situations of a life-and-death situation where it

12:43:40  7   was best that they transported that individual.

12:43:44  8          **BY MR. DAVENPORT:**

12:43:44  9          **Q.**   Is that something that happens

12:43:46 10   routinely or is that --

12:43:48 11          **A.**   No, it's just you can't control that.

12:43:50 12   I mean, it just happens, so you just have to use

12:43:52 13   your judgment.

12:43:53 14          **Q.**   Okay.  So it's rare that those officers

12:43:57 15   are faced with those types of situations?

12:44:00 16          **A.**   It is a rare event, yes.

12:44:02 17          **Q.**   And that's generally only in

12:44:04 18   life-and-death situations that you've heard of

12:44:06 19   officers canceling ambulances to drive the

12:44:09 20   individual to ECMC?

12:44:10 21          **MS. HUGGINS:**  Form.

12:44:10 22          **THE WITNESS:**  Well, it's not pretty much

12:44:13 23   canceling, it's just putting that individual and

*Santana - Davenport - 9/8/20*

123

12:44:15  1 │ transporting them to the hospital.

12:44:17  2 │      But yes, there's been circumstances where in

12:44:20  3 │ regards to that person's life-or-death situation

12:44:23  4 │ that they've transported them to the hospital, yes.

12:44:25  5 │      **BY MR. DAVENPORT:**

12:44:25  6 │      **Q.**   Okay.  Are you aware of any other times

12:44:28  7 │ when an officer has canceled an ambulance besides

12:44:32  8 │ life-and-death situation for the injured party?

12:44:35  9 │      **A.**   Like I mentioned earlier in regards to

12:44:37 10 │ accidents, it's pretty much that injured person

12:44:39 11 │ whether or not they want to be seen or taken to the

12:44:41 12 │ hospital.  It's up to them.

12:44:43 13 │      **Q.**   So besides life-and-death situations

12:44:46 14 │ and instances where the injured party says that

12:44:48 15 │ they do not want to go to a hospital by an

12:44:52 16 │ ambulance, are you aware of any other circumstances

12:44:54 17 │ where officers canceled ambulances for an injured

12:44:57 18 │ party?

12:44:57 19 │      **MS. HUGGINS:**   Form.

12:44:57 20 │      **THE WITNESS:**   No.  No, I can't speak to --

12:45:01 21 │ in regards to other officers.  I'm just saying in

12:45:03 22 │ regards to myself, and what I've been through.

12:45:06 23 │      **BY MR. DAVENPORT:**

*Santana - Davenport - 9/8/20*

124

12:45:06   1         **Q.**   But also for yourself, have you heard

12:45:08   2   of any other circumstances or instances where an

12:45:11   3   officer has canceled an ambulance besides

12:45:14   4   life-and-death situations and instances where an

12:45:16   5   injured party has refused an ambulance?

12:45:20   6         **A.**   No.

12:45:20   7         **MS. HUGGINS:**   Form.

12:45:20   8         **THE WITNESS:**   No.

12:45:22   9         **BY MR. DAVENPORT:**

12:45:22 10         **Q.**   Okay.   Are you aware that the officers

12:45:29 11   on the scene canceled the ambulance for this

12:45:32 12   incident?

12:45:33 13         **A.**   No, I was not aware.

12:45:35 14         **Q.**   Is this the first time, me telling you

12:45:38 15   that that happened?

12:45:38 16         **A.**   I'm not aware because I don't recall.

12:45:41 17         **Q.**   Before this deposition today, were you

12:45:44 18   aware that the officers canceled the ambulance to

12:45:50 19   arrive at 33 Schmarbeck?

12:45:51 20         **A.**   No.

12:45:51 21         **Q.**   So this is the first time that you are

12:45:53 22   learning of that?

12:45:54 23         **A.**   Yes.

*Santana - Davenport - 9/8/20*

125

| | | |
|---|---|---|
| 12:45:54 | 1 | **Q.**   What's your opinion of those |
| 12:45:56 | 2 | officers -- strike that. |
| 12:46:02 | 3 | **A.**   I don't -- I'm not going to -- |
| 12:46:04 | 4 | **MS. HUGGINS:**  No, no. |
| 12:46:05 | 5 | **MR. DAVENPORT:**  That's okay. |
| 12:46:05 | 6 | **MS. HUGGINS:**  Yeah, he didn't complete his |
| 12:46:11 | 7 | question. |
| 12:46:14 | 8 | **BY MR. DAVENPORT:** |
| 12:46:14 | 9 | **Q.**   Is that something that you would expect |
| 12:46:15 | 10 | for a male getting hit by a car, if that male did |
| 12:46:18 | 11 | not request to have the ambulance canceled that |
| 12:46:22 | 12 | that ambulance would actually still be canceled? |
| 12:46:24 | 13 | **MS. HUGGINS:**  Form.  That calls for |
| 12:46:25 | 14 | speculation. |
| 12:46:27 | 15 | **THE WITNESS:**  If I dealt with the situation |
| 12:46:30 | 16 | where someone that was hit by a car and they told |
| 12:46:32 | 17 | me that they didn't require the ambulance, then I'm |
| 12:46:35 | 18 | going to respect their wishes and cancel the |
| 12:46:38 | 19 | ambulance. |
| 12:46:40 | 20 | **BY MR. DAVENPORT:** |
| 12:46:40 | 21 | **Q.**   But if the individual didn't say that |
| 12:46:42 | 22 | they wanted to have the ambulance canceled, you |
| 12:46:45 | 23 | would not cancel the ambulance? |

*Santana - Davenport - 9/8/20*

126

12:46:48  1          **MS. HUGGINS:**   Form.

12:46:49  2          **THE WITNESS:**   Well, I will not, no and

12:46:51  3   that's their wishes.   If they want to be

12:46:53  4   transported, they can be transported.

12:46:54  5          **BY MR. DAVENPORT:**

12:46:55  6      **Q.**   Okay.   So we've heard testimony before

12:46:57  7   from Officer Schultz that his reason -- that he

12:47:02  8   canceled the ambulance, but this is the first time

12:47:05  9   that you learned of that.   Correct?

12:47:06  10     **A.**   That's correct.

12:47:08  11     **Q.**   And Officer Schultz testified that the

12:47:12  12  reason why he canceled the ambulance was because he

12:47:15  13  believed that he could get the pedestrian to -- the

12:47:19  14  injured party to the hospital quicker than an

12:47:21  15  ambulance would.

12:47:22  16     **A.**   Okay.

12:47:23  17     **Q.**   Okay.   Now, in looking at the complaint

12:47:30  18  summary report, what is the time between the time

12:47:34  19  stamp 10:55:42, male hit by police car, and the

12:47:38  20  time that the location was changed to ECMC?

12:47:43  21     **A.**   11:22:34 for the first.

12:47:48  22     **Q.**   Okay.   So would it be safe to assume

12:47:53  23  that it was approximately a half an hour before

*Santana - Davenport - 9/8/20*

127

12:47:56  1 | that individual was transported to the ECMC?

12:48:00  2 |          **A.**    No, 28 minutes.

12:48:03  3 |          **Q.**    But it was approximately a half an

12:48:05  4 | hour?

12:48:06  5 |          **A.**    It wasn't a half-hour according to the

12:48:08  6 | document right here.

12:48:09  7 |          **Q.**    28 minutes is roughly close to 30

12:48:12  8 | minutes.

12:48:12  9 |          **A.**    Yeah, but it's not a half-hour.

12:48:14 10 |          **Q.**    Would you be more comfortable if I said

12:48:17 11 | 28 minutes?

12:48:18 12 |          **A.**    According this documentation, yes, that

12:48:19 13 | is correct.

12:48:19 14 |          **Q.**    Okay.  So 28 minutes was the time that

12:48:23 15 | elapsed between a male being hit by the car and the

12:48:26 16 | officer's transporting the individual to ECMC?

12:48:28 17 |          **A.**    Yes, according to this document in

12:48:30 18 | front of me.

12:48:30 19 |          **Q.**    Okay.  How long does it take an

12:48:32 20 | ambulance to arrive at a scene after they are

12:48:34 21 | notified?

12:48:35 22 |          **A.**    I cannot give you the times on when

12:48:37 23 | they respond on scenes.  It could be minutes and

*Santana - Davenport - 9/8/20*

128

12:48:40  1  they could call back and say it's going to take

12:48:43  2  some time, so I don't know.  It depends on how busy

12:48:46  3  they are.

12:48:47  4       Q.   Do you know how long it takes to drive

12:48:54  5  from 33 Schmarbeck to ECMC roughly?

12:48:58  6       A.   It also depends on various -- it -- it

12:49:03  7  could be heavy traffic.  Heavy traffic could be

12:49:05  8  over 20 minutes; light traffic probably 10, 15

12:49:09  9  minutes.  It all depends on really how many cars

12:49:13 10  are on the road.

12:49:14 11       Q.   What about lights and sirens?

12:49:16 12       MS. HUGGINS:   Form.

12:49:17 13       THE WITNESS:   It's depending on traffic,

12:49:19 14  too, because even if you do have your lights and

12:49:22 15  sirens, you have to like find your way around it,

12:49:25 16  but I could say 10 minutes, maybe.

12:49:29 17       BY MR. DAVENPORT:

12:49:29 18       Q.   So maybe 10 minutes with lights and

12:49:31 19  sirens?

12:49:31 20       A.   Yeah, but that's not even -- that's a

12:49:33 21  residential area and you're not like going like

12:49:36 22  super-fast because there's people all around that.

12:49:39 23  So you have to be -- you're going fast but you're

*Santana - Davenport - 9/8/20*

129

12:49:41  1  not going so fast because of the pedestrians that

12:49:45  2  are all over the streets.

12:49:47  3      **Q.**   Is there a general speed that officers

12:49:49  4  are expected to not surpass when they're driving

12:49:53  5  through residential areas?

12:49:54  6      **MS. HUGGINS:**   Form.

12:49:55  7      **THE WITNESS:**   Generally, and this is from my

12:49:57  8  point of view, while at patrol, I follow the rules

12:50:01  9  of the road.

12:50:02  10      I don't know if you want to expand that to

12:50:05  11  when I respond to a priority call, which -- which

12:50:07  12  is like a -- it could be a rescue, it could be a

12:50:14  13  burglary in progress.

12:50:16  14      I'm not pushing over 60 because, like I

12:50:18  15  said, I'm watching out for pedestrians.  I'm going

12:50:20  16  with haste but I'm also going -- like safety is my

12:50:25  17  number one priority when I'm responding to calls.

12:50:28  18      **BY MR. DAVENPORT:**

12:50:28  19      **Q.**   When you're not responding to a

12:50:29  20  high-priority call, what general speed are you

12:50:32  21  driving through residential areas?

12:50:34  22      **MS. HUGGINS:**   Form.

12:50:36  23      **THE WITNESS:**   25, 30.  Within 20, 30.  But

*Santana - Davenport - 9/8/20*

130

| | | |
|---|---|---|
| 12:50:44 | 1 | if I'm like on Broadway, the main intersection, I'm |
| 12:50:47 | 2 | going 30, 35, but if I'm driving the streets, kind |
| 12:50:51 | 3 | of like between 20 and 30 miles an hour. |
| 12:50:53 | 4 | **BY MR. DAVENPORT:** |
| 12:50:54 | 5 | **Q.**   Okay.  Besides the speed limit, are |
| 12:50:56 | 6 | there other vehicle and traffic laws that you abide |
| 12:51:01 | 7 | by? |
| 12:51:01 | 8 | **A.**   Everything. |
| 12:51:03 | 9 | **Q.**   Does that include wearing a seatbelt? |
| 12:51:04 | 10 | **A.**   Oh, yeah, absolutely. |
| 12:51:06 | 11 | **Q.**   All right.  Does that include checking |
| 12:51:08 | 12 | your mirrors? |
| 12:51:09 | 13 | **A.**   Every morning, I check my entire patrol |
| 12:51:12 | 14 | vehicle to make sure that it's functioning. |
| 12:51:15 | 15 | **Q.**   Okay.  Do officers ever face discipline |
| 12:51:24 | 16 | for driving too fast through residential areas? |
| 12:51:27 | 17 | **MS. HUGGINS:**   Form. |
| 12:51:27 | 18 | **THE WITNESS:**   I've never heard of anything, |
| 12:51:32 | 19 | so I can't really answer that question. |
| 12:51:33 | 20 | **BY MR. DAVENPORT:** |
| 12:51:35 | 21 | **Q.**   Do officers ever face discipline for |
| 12:51:38 | 22 | not wearing a seatbelt? |
| 12:51:39 | 23 | **A.**   Again, I've never heard of anything |

*Santana - Davenport - 9/8/20*

131

| | | |
|---|---|---|
| 12:51:42 | 1 | from my point of view, so I can't really answer |
| 12:51:45 | 2 | that.  But I've never heard of anything, no. |
| 12:51:47 | 3 | **Q.**   Do you receive training on how to drive |
| 12:51:49 | 4 | a vehicle? |
| 12:51:51 | 5 | **A.**   The only training that we receive is |
| 12:51:54 | 6 | during the academy.  And that's all -- that's all |
| 12:51:59 | 7 | the training I received in regards to driving. |
| 12:52:03 | 8 | **Q.**   So that would have been through your |
| 12:52:05 | 9 | first initial six months of training? |
| 12:52:07 | 10 | **A.**   Yes. |
| 12:52:08 | 11 | **Q.**   And what kind of things are they |
| 12:52:12 | 12 | teaching you about vehicle and traffic safety |
| 12:52:14 | 13 | during those initial classes? |
| 12:52:16 | 14 | **A.**   In a vehicle, it's driving the patrol |
| 12:52:20 | 15 | car at a high rate of speed.  Stopping.  Driving |
| 12:52:24 | 16 | backwards.  Yeah, that's all I can remember in |
| 12:52:29 | 17 | regards to that. |
| 12:52:31 | 18 | **Q.**   With regard to driving backwards, what |
| 12:52:36 | 19 | specifically do they train you on? |
| 12:52:39 | 20 | **A.**   As far as I know, driving backwards, |
| 12:52:42 | 21 | when I did it, it was pretty much like going over |
| 12:52:47 | 22 | 30 miles an hour and pretty much just driving, just |
| 12:52:50 | 23 | driving backwards and positioning yourself when you |

*Santana - Davenport - 9/8/20*

132

12:52:54  1  do drive backwards to be like within certain cones

12:52:58  2  or whatever.  But that was a long time ago, but

12:53:01  3  that's pretty much all I remember in regards to

12:53:03  4  that.

12:53:04  5        **Q.**    Do they do anything -- do they do any

12:53:07  6  training for driving backwards and then pulling

12:53:10  7  forwards?

12:53:10  8        **A.**    During that training, yes.  Not only do

12:53:12  9  you drive backwards, I mean, it's turning the

12:53:15 10  vehicle over and there's an obstacle that you have

12:53:18 11  to avoid like at certain points.

12:53:20 12        And you have to like make a split-second

12:53:21 13  decision whether you need to take a right or a

12:53:24 14  left.  Yeah, that's pretty much all I could -- I

12:53:27 15  could remember.

12:53:28 16        **Q.**    Is there somebody who was in the car

12:53:30 17  with you during this training?

12:53:32 18        **A.**    Yes.  There's an instructor with you.

12:53:35 19        **Q.**    All right.  And how long during this

12:53:38 20  training are you actually driving for?

12:53:41 21        **A.**    We were there the entire day, so we

12:53:44 22  were driving that whole day.  I don't know what day

12:53:48 23  it was, but I do remember it was a whole day that

*Santana - Davenport - 9/8/20*

133

12:53:51  1  we were there training in vehicles.

12:53:53  2      **Q.**   Okay.  As part of that day, were you

12:53:56  3  also doing some in-class instruction?

12:53:59  4      **A.**   No.  I don't recall back then when we

12:54:03  5  did classrooms, no.

12:54:05  6      **Q.**   Okay.

12:54:08  7      **MR. DAVENPORT:**  I'm sorry, could we go off

12:54:09  8  the record really quick?

12:55:16  9      (Discussion off the record.)

12:55:16 10      **BY MR. DAVENPORT:**

12:55:26 11      **Q.**   Now, sticking with Exhibit 4-A, do you

12:55:30 12  see at 11:30:35, it says that the suspect broke the

12:55:35 13  mirror on car 473 intentionally?

12:55:38 14      **A.**   I do see that.

12:55:39 15      **Q.**   Okay.  And what does that tell you when

12:55:45 16  you read that?

12:55:47 17      **A.**   That the suspect broke the mirror

12:55:49 18  intentionally, with intent.

12:55:52 19      **Q.**   Okay.  Do you see at 11:07:31 where it

12:56:01 20  says cameras have -- on 37 has video of the man

12:56:06 21  flopping on the ground?

12:56:07 22      **A.**   I do see that.

12:56:09 23      **Q.**   And what does that tell you?

*Santana - Davenport - 9/8/20*

134

12:56:10  1      **A.**   The cameras on 37 has a video of the

12:56:13  2   man flopping on the ground, so some man flopping on

12:56:17  3   the ground.

12:56:18  4      **Q.**   Okay.  Would that tell you that the

12:56:21  5   suspect was flopping on the ground?

12:56:24  6      **A.**   No, it just says a man flopping on the

12:56:26  7   ground, so it doesn't specify who.

12:56:29  8      **Q.**   Okay.  So I'm going to show you what's

12:56:32  9   been previously marked as Exhibit 11.  And it is

12:56:39  10  video number 06_20170101102529.  I'm just going to

12:56:52  11  rewind it so you can see the beginning.  So I would

12:56:55  12  just like you to watch this video.

12:58:18  13      Now, at this portion of the video segment,

12:58:20  14  we are a minute and 13 seconds into the video clip.

12:58:26  15  Do you agree that the individual has been taken

12:58:30  16  into custody or detained at this time?

12:58:32  17      **MS. HUGGINS:**   Form.  You can answer.

12:58:33  18      **THE WITNESS:**   All I can see is that there's

12:58:35  19  officers on either side of him, but I don't know

12:58:38  20  whether or not he's in custody because of the

12:58:40  21  quality of this video.

12:58:41  22      **BY MR. DAVENPORT:**

12:58:41  23      **Q.**   Okay.  Is the individual standing at

12:58:43  1  this time?

12:58:44  2       **A.**    Yes, he is.

12:58:45  3       **Q.**    Okay.  At any point before that man was

12:58:49  4  standing, did you see him flopping around on the

12:58:51  5  ground?

12:58:52  6       **A.**    No, I did not.

12:58:54  7       **Q.**    Okay.  So I'm going to play that exact

12:59:08  8  segment again and I just want you to generally

12:59:10  9  describe what you see in the video.

12:59:17 10       **A.**    The patrol vehicle is driving away

12:59:22 11  initially, so he's walking towards the other one as

12:59:25 12  the patrol vehicle is pulling out.  And that's when

12:59:29 13  vehicle and person collide with each other.

12:59:33 14       **Q.**    Okay.

12:59:34 15       **MS. HUGGINS:**  Form.  The exhibit speaks for

12:59:36 16  itself.

12:59:37 17       **BY MR. DAVENPORT:**

12:59:38 18       **Q.**    What do you see right here?

12:59:40 19       **A.**    I don't know who that individual is

12:59:41 20  walking up there.  I see two officers approaching

12:59:46 21  the vehicle and someone exiting the patrol vehicle.

12:59:50 22       The person who is not on officer is walking

12:59:53 23  back towards the sidewalk and now I see three

*Santana - Davenport - 9/8/20*

136

12:59:57  1  officers on the driver's side door.

13:00:00  2          MS. HUGGINS:  Form to the last question.

13:00:02  3          BY MR. DAVENPORT:

13:00:03  4          Q.   Now, at any point for that individual

13:00:07  5  who is not an officer who appeared on the screen,

13:00:09  6  did he do anything that was threatening to the

13:00:11  7  officers?

13:00:12  8          MS. HUGGINS:  Form.

13:00:13  9          THE WITNESS:  I can't see anything because

13:00:14 10  the view is obstructed by the truck itself.

13:00:19 11          BY MR. DAVENPORT:

13:00:19 12          Q.   Besides the part that was obstructed by

13:00:21 13  the truck, did you see that individual do anything

13:00:23 14  threatening to the officers?

13:00:25 15          MS. HUGGINS:  Form.

13:00:26 16          THE WITNESS:  The quality of this video, you

13:00:27 17  can't see anything.

13:00:29 18          BY MR. DAVENPORT:

13:00:30 19          Q.   Well, I mean, you can see something on

13:00:31 20  the video, right?

13:00:32 21          A.   I can't see him on that video.  All I

13:00:35 22  can see is the officers standing around him.  I

13:00:37 23  didn't see anything else because the view is

*Santana - Davenport - 9/8/20*

137

| | | |
|---|---|---|
| 13:00:39 | 1 | obstructed by the truck. |
| 13:00:42 | 2 | He was obstructed by the truck.  The |
| 13:00:43 | 3 | officers were around the truck.  That's all I saw. |
| 13:00:46 | 4 | Q.   Did you see the portion where he was |
| 13:00:48 | 5 | standing out in the middle of the street? |
| 13:00:51 | 6 | A.   Before he got with the vehicle?  Yes, I |
| 13:00:54 | 7 | seen that before, but you're asking me in regards |
| 13:00:57 | 8 | to if I seen an incident with the officers. |
| 13:00:59 | 9 | And I'm telling you no because the -- the |
| 13:01:03 | 10 | view is obstructed by the truck so you can't see |
| 13:01:05 | 11 | anything.  All I can see is two officers on the |
| 13:01:07 | 12 | driver's side of that vehicle.  That's it. |
| 13:01:10 | 13 | Q.   When he was standing or walking in the |
| 13:01:13 | 14 | middle of the street, was he doing anything |
| 13:01:15 | 15 | threatening to the officers? |
| 13:01:17 | 16 | MS. HUGGINS:  Form. |
| 13:01:18 | 17 | THE WITNESS:  No. |
| 13:01:18 | 18 | BY MR. DAVENPORT: |
| 13:01:19 | 19 | Q.   Okay.  Based on what you saw on that |
| 13:01:21 | 20 | video? |
| 13:01:21 | 21 | A.   Based on what I saw on that |
| 13:01:25 | 22 | grainy-quality video, yes. |
| 13:01:26 | 23 | Q.   Okay.  Now, as an officer, do you ever |

*Santana - Davenport - 9/8/20*

138

13:01:31  1  use surveillance footage when you're at a crime

13:01:34  2  scene?

13:01:35  3      **A.**   If that individual has footage, yes.

13:01:42  4  If the owner has access to it, I will view it, but

13:01:45  5  it's pertaining on a particular crime.

13:01:48  6      You would have to like specify what type of

13:01:51  7  view you want me to talk about, but yes, I have

13:01:54  8  used surveillance videos in the past.

13:01:57  9      **Q.**   Okay.  Have you ever let's say gone to

13:02:00  10  a gas station to respond to a potential crime and

13:02:03  11  the gas station owner has surveillance cameras that

13:02:06  12  are set up?

13:02:07  13      **A.**   Yes.

13:02:08  14      **Q.**   Okay.  And how would you say the

13:02:11  15  quality of those videos compares to this video?

13:02:14  16      **MS. HUGGINS:**  Form.

13:02:16  17      **THE WITNESS:**  Gas stations, some of them, I

13:02:18  18  mean, they're not really good quality and others,

13:02:21  19  they're really fine quality, so.

13:02:24  20      I mean, it depends on whether or not they

13:02:27  21  want to spend money on a top-notch security system.

13:02:30  22  I mean, I've seen some that are really good quality

13:02:33  23  and I've seen a lot that are not that great.

*Santana - Davenport - 9/8/20*

139

| | | |
|---|---|---|
| 13:02:35 | 1 | **BY MR. DAVENPORT:** |
| 13:02:36 | 2 | **Q.**   Okay.  Do you ever watch the |
| 13:02:40 | 3 | surveillance footage with the gas station owner? |
| 13:02:42 | 4 | **A.**   Yes, I have, actually. |
| 13:02:43 | 5 | **Q.**   Okay.  Have you watched surveillance |
| 13:02:45 | 6 | footage with a gas station owner who has a |
| 13:02:48 | 7 | lower-quality surveillance camera? |
| 13:02:50 | 8 | **A.**   I have. |
| 13:02:51 | 9 | **MS. HUGGINS:**  Form. |
| 13:02:51 | 10 | **BY MR. DAVENPORT:** |
| 13:02:51 | 11 | **Q.**   And when you're watching that |
| 13:02:53 | 12 | surveillance footage, do you typically tell the gas |
| 13:02:57 | 13 | station owner that they're low-quality grainy video |
| 13:02:59 | 14 | that can't -- you can't see anything that's |
| 13:03:01 | 15 | happening in the video? |
| 13:03:02 | 16 | **MS. HUGGINS:**  Form. |
| 13:03:02 | 17 | **THE WITNESS:**  If it's something that's |
| 13:03:04 | 18 | not -- if it's a video that doesn't have that much |
| 13:03:06 | 19 | clarity, that's something that I can't use because |
| 13:03:09 | 20 | I'm going to need something that actually has a |
| 13:03:10 | 21 | specific item on that person. |
| 13:03:11 | 22 |      So if he shows me a video of someone grainy |
| 13:03:15 | 23 | and stuff like that, that's nothing I can go |

*Santana - Davenport - 9/8/20*

13:03:17  1  forward with.

13:03:17  2      Maybe if that video shows a -- like a

13:03:19  3  colored shirt or something like that, that's

13:03:20  4  something to go on.

13:03:21  5      And then for like be on the lookout for this

13:03:27  6  individual, if it's something that's low quality,

13:03:28  7  to me, it's not that reliable because it's -- it's

13:03:31  8  low quality.  It's not that good.

13:03:33  9      **BY MR. DAVENPORT:**

13:03:33  10     **Q.**   But you still watch it and you try to

13:03:35  11 decipher as much as you can from that video, you

13:03:38  12 don't just blanketly say that it's low-quality

13:03:41  13 grainy video.  Correct?

13:03:43  14     **A.**   Yeah, I --

13:03:43  15     **MS. HUGGINS:**  Form.

13:03:44  16     **THE WITNESS:**  -- do.  I still watch it.  I

13:03:45  17 mean, you can pretty much put everything in place,

13:03:48  18 but in regards to like a situation that you're

13:03:50  19 trying to get me to explain in regards to an

13:03:53  20 incident with him and the officers, I don't see

13:03:55  21 anything because it's obstructed by that truck.

13:03:57  22     **BY MR. DAVENPORT:**

13:03:57  23     **Q.**   Right.

*Santana - Davenport - 9/8/20*

141

13:03:58  1        **A.**    So I can't see whether or not there was

13:04:00  2  an incident or something that happened because

13:04:02  3  that's me basing it on what I'm seeing on this

13:04:04  4  video.

13:04:05  5        **Q.**    But I also asked the question of did

13:04:08  6  you see the individual do anything threatening when

13:04:10  7  he was not obstructed by the truck, correct?

13:04:13  8        **A.**    No, because I --

13:04:14  9        **MS. HUGGINS:**   Form.

13:04:15 10        **THE WITNESS:**   -- can't really attest to

13:04:16 11  that, too, because I wasn't on the scene.  So I

13:04:18 12  don't know whether or not his demeanor was a

13:04:20 13  threatening manner.

13:04:22 14        So I can't attest to that, but on this

13:04:24 15  video, I don't see it, but it's a different

13:04:27 16  perspective if you're officers on the scene, which

13:04:30 17  I can't attest to because I wasn't there.

13:04:32 18        **BY MR. DAVENPORT:**

13:04:32 19        **Q.**    And that's all I'm asking you, just

13:04:33 20  based on what you see on this video just so that

13:04:35 21  we're clear, you know.  I don't want you to attest

13:04:36 22  to what the officer saw --

13:04:36 23        **A.**    Right.

Santana - Davenport - 9/8/20

142

13:04:37   1        Q.    -- I just want you to say --

13:04:38   2        A.    Yeah.

13:04:38   3        Q.    -- what you see on this video.

13:04:40   4        A.    Yeah.

13:04:41   5        Q.    Do you see this video do anything

13:04:42   6   threatening to any of the officers besides the time

13:04:45   7   that he is obstructed by the vehicle?

13:04:47   8        MS. HUGGINS:    Form.  You're asking for his

13:04:48   9   opinion of the video.

13:04:50  10        MR. DAVENPORT:    No, I'm asking does he see

13:04:52  11   anything on the video that shows this individual

13:04:54  12   doing anything threatening.

13:05:00  13        MS. HUGGINS:    Form objection.  It's not --

13:05:04  14   it's been asked and answered several times.

13:05:06  15        THE WITNESS:    Yeah, I already touched base

13:05:07  16   on that.  This video that I'm viewing, no, I don't

13:05:11  17   see anything threatening, but like I said, there's

13:05:14  18   different perspectives from the person who was

13:05:16  19   actually there in that vehicle.

13:05:18  20        I mean, it's totally different from what

13:05:19  21   they see and what I see on video, but to answer

13:05:21  22   your question, I don't see anything threatening

13:05:23  23   from this video from my point of view sitting in

*Santana - Davenport - 9/8/20*

143

13:05:26   1  this chair.

13:05:26   2         **BY MR. DAVENPORT:**

13:05:26   3         **Q.**   Okay.   Thank you.   That was the

13:05:28   4  question that I asked.

13:05:29   5         Did you see anything -- well, do you recall

13:05:38   6  seeing the individual that the car collided with?

13:05:42   7         **MS. HUGGINS:**   Form.   Just at what time frame

13:05:45   8  are you talking about?

13:05:45   9         **THE WITNESS:**   Right.

13:05:46  10         **BY MR. DAVENPORT:**

13:05:47  11         **Q.**   Well, it was at the beginning of this

13:05:48  12  video.   Do you recall seeing an individual where a

13:05:51  13  car collided with an individual?

13:05:54  14         **MS. HUGGINS:**   Form.

13:05:54  15         **THE WITNESS:**   On this video right here or

13:05:56  16  are you talking about me at that date and time?

13:05:59  17         **BY MR. DAVENPORT:**

13:05:59  18         **Q.**   I'm saying what you're seeing right

13:06:01  19  here on this video.

13:06:02  20         **A.**   Did I see him colliding with the

13:06:04  21  vehicle?

13:06:04  22         **Q.**   Well, did you see an individual and a

13:06:06  23  car collide with each other?

*Santana - Davenport - 9/8/20*

144

| | | |
|---|---|---|
| 13:06:07 | 1 | **A.**   Yes. |
| 13:06:08 | 2 | **Q.**   Okay.  And we can just replay it really |
| 13:06:11 | 3 | quickly. |
| 13:06:18 | 4 | **MS. HUGGINS:**  I'm not sure why you're |
| 13:06:20 | 5 | replaying it.  He just answered your question. |
| 13:06:21 | 6 | **THE WITNESS:**  Yeah, I'm getting -- |
| 13:06:21 | 7 | **MR. DAVENPORT:**  Well, it seems that there's |
| 13:06:23 | 8 | some confusion over what we're talking about, so I |
| 13:06:25 | 9 | want to make sure that we're absolutely crystal |
| 13:06:28 | 10 | clear on what we're seeing. |
| 13:06:29 | 11 | **MS. HUGGINS:**  He asked if are you talking |
| 13:06:30 | 12 | about the day and time or the video and you said |
| 13:06:32 | 13 | the video.  And then he answered your question |
| 13:06:35 | 14 | directly.  We can read it back. |
| 13:06:36 | 15 | **MR. DAVENPORT:**  I just don't understand why |
| 13:06:38 | 16 | we just can't play the video and just that way, we |
| 13:06:40 | 17 | can have him refreshed and watch the video. |
| 13:06:40 | 18 | **MS. HUGGINS:**  Because that's asking and |
| 13:06:42 | 19 | answering a question repeatedly. |
| 13:06:43 | 20 | **MR. DAVENPORT:**  Okay.  I'm going to play the |
| 13:06:45 | 21 | video. |
| 13:06:57 | 22 | **BY MR. DAVENPORT:** |
| 13:06:58 | 23 | **Q.**   Okay.  Now, on the video, did you just |

*Santana - Davenport - 9/8/20*

145

13:07:06  1  see a car and a person collide together?

13:07:08  2       **A.**   Yes.

13:07:08  3       **MS. HUGGINS:**  Form.

13:07:09  4       **THE WITNESS:**  On the video, I seen the

13:07:10  5  person and the car collide with each other.

13:07:13  6       **BY MR. DAVENPORT:**

13:07:13  7       **Q.**   Based on what you saw in the video, did

13:07:15  8  you see a crime occur?

13:07:16  9       **MS. HUGGINS:**  Form.  That's definitely an

13:07:17 10  opinion question.

13:07:18 11       **MR. DAVENPORT:**  Well, he's an officer.  He

13:07:20 12  can certainly testify as to whether based on what

13:07:22 13  he sees in this video actually if he thinks that a

13:07:25 14  crime just occurred.

13:07:26 15       **THE WITNESS:**  Well, based on this video --

13:07:27 16       **MS. HUGGINS:**  No, no.  No, no.  Wait a

13:07:28 17  minute.  That is an opinion question.

13:07:32 18       **MR. DAVENPORT:**  He's watching a video, so he

13:07:34 19  can provide factually if he thinks that a -- that a

13:07:37 20  crime just occurred when a car and an individual

13:07:40 21  were struck together.

13:07:43 22       If you want to instruct him not to answer

13:07:44 23  it, I'll just -- I'll preserve it for the record

*Santana - Davenport - 9/8/20*

146

13:07:46  1  and we'll bring him back in.  That's perfectly

13:07:49  2  fine.

13:07:49  3        **MS. HUGGINS:**  Your question is if watching a

13:07:51  4  video he is able to say whether he observed a crime

13:07:54  5  take place?

13:07:55  6        **MR. DAVENPORT:**  Yeah.  Based on what he just

13:07:56  7  saw, was there any criminal action that took place.

13:07:59  8        **MS. HUGGINS:**  On the part of who?

13:08:02  9        **MR. DAVENPORT:**  Well, I don't know.  You

13:08:05 10  tell me.

13:08:06 11        **MS. HUGGINS:**  I'm objecting -- I'm objecting

13:08:09 12  on the -- to the form of the question and that it's

13:08:12 13  asking for an opinion of the video that clearly

13:08:16 14  speaks for itself.

13:08:17 15        So I mean, I want to get this over with, so

13:08:20 16  he can answer this, but I'm...

13:08:23 17        **MR. DAVENPORT:**  You can preserve your

13:08:25 18  objection.

13:08:26 19        **BY MR. DAVENPORT:**

13:08:26 20        **Q.**   Do you think a crime occurred based on

13:08:28 21  what you just saw?

13:08:29 22        **A.**   In viewing this video, no, I don't

13:08:33 23  think a crime occurred because I'm just getting a

*Santana - Davenport - 9/8/20*

147

| | | |
|---|---|---|
| 13:08:36 | 1 | little bit of it from this video. |
| 13:08:38 | 2 | If you asked me if I was there, yeah, it |
| 13:08:40 | 3 | would be a totality different opinion.  But from |
| 13:08:43 | 4 | viewing this video right here, no, I do not see a |
| 13:08:46 | 5 | crime being occurred. |
| 13:08:48 | 6 | But that's all I have, so you can't ask me a |
| 13:08:52 | 7 | question on whether something has been like committed |
| 13:08:56 | 8 | just by seeing this little snippet of a video. |
| 13:08:59 | 9 | Q.   Okay.  At this point of the video, do |
| 13:09:01 | 10 | you see a second police car that's in the video? |
| 13:09:03 | 11 | A.   No, I don't see one. |
| 13:09:06 | 12 | Q.   Okay.  Do you know who these two |
| 13:09:36 | 13 | officers are that are walking back toward the |
| 13:09:38 | 14 | scene? |
| 13:09:38 | 15 | A.   No, I do not know them. |
| 13:09:40 | 16 | Q.   Do you have any reason to believe that |
| 13:09:42 | 17 | they are not Officer Moriarity and Officer Schultz? |
| 13:09:46 | 18 | A.   They're wearing the same colors as the |
| 13:09:49 | 19 | officers that got out of that Tahoe, that Chevy |
| 13:09:51 | 20 | Tahoe, so I'm assuming they're officers, too. |
| 13:09:53 | 21 | Q.   Okay.  But do you have any reason to |
| 13:09:56 | 22 | believe that they're not Officer Schultz and |
| 13:09:58 | 23 | Officer Moriarity, the officers that were walking |

*Santana - Davenport - 9/8/20*

148

| | | |
|---|---|---|
| 13:10:00 | 1 | down the street? |
| 13:10:00 | 2 | **A.** That, I can't tell you because you |
| 13:10:02 | 3 | can't get a look at their faces on the video. |
| 13:10:04 | 4 | **Q.** My question is do you have any reason |
| 13:10:06 | 5 | to believe that they are not those two individuals? |
| 13:10:08 | 6 | **A.** No. |
| 13:10:08 | 7 | **MS. HUGGINS:** And form. |
| 13:10:08 | 8 | **THE WITNESS:** No. |
| 13:10:09 | 9 | **MS. HUGGINS:** He answered your question. |
| 13:10:10 | 10 | **THE WITNESS:** No. |
| 13:10:11 | 11 | **BY MR. DAVENPORT:** |
| 13:10:12 | 12 | **Q.** Okay. Thank you. Does it appear that |
| 13:10:22 | 13 | this individual may have been arrested or detained |
| 13:10:24 | 14 | at this time? |
| 13:10:25 | 15 | **A.** Like I said earlier, I don't know |
| 13:10:27 | 16 | whether or not he was handcuffed. All I see is |
| 13:10:29 | 17 | just two officers walking to that gentleman. |
| 13:10:32 | 18 | **Q.** Okay. Based on what you see on |
| 13:10:34 | 19 | Exhibit 4-A, was this individual arrested? |
| 13:10:44 | 20 | **A.** Yes. |
| 13:10:46 | 21 | **Q.** Okay. And what tells you that? |
| 13:10:48 | 22 | **A.** The CB, central booking. The CB on |
| 13:10:53 | 23 | this document here. |

*Santana - Davenport - 9/8/20*

149

13:10:55  1      Q.   Did you also discern that from the

13:10:58  2  disposition that says P1375 crime report?

13:11:01  3      A.   Well, doing a P1375 crime report

13:11:04  4  doesn't constitute an arrest because you do it

13:11:06  5  without even doing no arrests.  What got me to that

13:11:11  6  conclusion was CB.

13:11:14  7      Q.   Okay.  What times would you do a

13:11:16  8  criminal report without arresting or detaining

13:11:19  9  somebody?

13:11:19 10      A.   What time would you do it?

13:11:21 11      Q.   What instances.

13:11:22 12      A.   Every single call that requires an

13:11:25 13  incident that a crime did occur.  So an example, a

13:11:30 14  broken window, you could do it.  Harassment, phone

13:11:35 15  harassment.  There's many outcomes for you to do

13:11:37 16  the 1375.

13:11:39 17      Q.   Okay.  As you sit here today, do you

13:11:50 18  know what Mr. Kistner was charged with on January 1st

13:11:53 19  of 2017?

13:11:54 20      A.   No, I do not.

13:11:58 21      Q.   Would you believe me if I told you that

13:12:00 22  he was charged with a felony for what happened on

13:12:02 23  January 1st of 2017?

*Santana - Davenport - 9/8/20*

150

13:12:04  1        **A.**    It's not that I don't believe you, it's

13:12:06  2    that I don't know what he's been charged with.

13:12:09  3    That's up to the officers, whether or not they want

13:12:11  4    to charge a specific crime to an individual, but

13:12:15  5    whatever they charge is what they charge.

13:12:17  6        **Q.**    Based on what you saw on that video,

13:12:20  7    did a felony occur?

13:12:21  8        **MS. HUGGINS:**  Form.  Same -- same objection

13:12:24  9    as to calling for opinion testimony.

13:12:26 10        **THE WITNESS:**  That, I can't tell you.

13:12:27 11        **BY MR. DAVENPORT:**

13:12:28 12        **Q.**    Based on what you saw on the video --

13:12:30 13        **A.**    Based on what I saw, no.

13:12:32 14        **Q.**    Okay.

13:12:33 15        **A.**    But it's just video, there's more to

13:12:35 16    it, so.  And I wasn't there, so I wouldn't know.

13:12:38 17        **Q.**    Are you familiar with the crime

13:12:45 18    criminal mischief in the third degree?

13:12:47 19        **A.**    I am.

13:12:48 20        **Q.**    Okay.  Do you know the elements that

13:12:51 21    are required for the crime of criminal mischief in

13:12:55 22    the third degree?

13:12:56 23        **A.**    It's damage over a specified amount.  I

*Santana - Davenport - 9/8/20*

151

13:13:00  1  can't recall what amount.  I believe it's $1,500.

13:13:05  2      **Q.**   So do you know if -- what the

13:13:13  3  designation of that crime is?  Is it a felony, a

13:13:15  4  violation, a misdemeanor?

13:13:17  5      **A.**   That, I can't tell you unless I have

13:13:18  6  the penal law book in front of me.

13:13:20  7      **Q.**   Okay.  So I'm going to show you what's

13:13:27  8  been marked as Exhibit 17.

13:13:35  9      **A.**   Okay.

13:13:36 10      **Q.**   Do you recognize this document?

13:13:38 11      **A.**   I do.

13:13:39 12      **Q.**   And what do you recognize it to be?

13:13:42 13      **A.**   It's the charge, what they are charging

13:13:45 14  the defendant.

13:13:47 15      **Q.**   Okay.  Do you see in the part at the

13:13:52 16  very top -- well, close to the top where it says

13:13:55 17  criminal mischief third with damages greater than

13:14:04 18  250?

13:14:05 19      **A.**   I do see that.

13:14:06 20      **Q.**   Okay.  Does that indicate to you that

13:14:09 21  the damage must be in excess of $250?

13:14:13 22      **A.**   Yes.

13:14:14 23      **Q.**   So that would be the threshold amount

*Santana - Davenport - 9/8/20*

152

| | | |
|---|---|---|
| 13:14:16 | 1 | that's required? |
| 13:14:17 | 2 | **A.** Yes. For that penal law charge, that's |
| 13:14:21 | 3 | correct. |
| 13:14:21 | 4 | **Q.** Okay. Now, do you see where it |
| 13:14:26 | 5 | describes the damage that was done to the vehicle |
| 13:14:29 | 6 | to support this criminal charge? |
| 13:14:33 | 7 | **A.** Driver's side mirror and driver's side |
| 13:14:36 | 8 | mirror of patrol vehicle. That's what they have |
| 13:14:39 | 9 | listed. And it's causing the mirror to be |
| 13:14:43 | 10 | dislodged from the vehicle and also causing the |
| 13:14:46 | 11 | driver's side window to malfunction. |
| 13:14:49 | 12 | **Q.** Okay. Do you remember looking at the |
| 13:14:57 | 13 | vehicle that was parked next to you on the day of |
| 13:14:59 | 14 | the incident? |
| 13:14:59 | 15 | **A.** No, I don't recall. |
| 13:15:00 | 16 | **Q.** Do you recall seeing a mirror that was |
| 13:15:03 | 17 | dislodged on any of the vehicles? |
| 13:15:04 | 18 | **A.** I don't recall. |
| 13:15:06 | 19 | **Q.** Did any of the officers complain about |
| 13:15:14 | 20 | a window not being able to function properly on |
| 13:15:17 | 21 | this date? |
| 13:15:17 | 22 | **A.** I don't recall. |
| 13:15:21 | 23 | **Q.** When you -- have you ever sent one of |

*Santana - Davenport - 9/8/20*

153

13:15:27  1  your patrol cars in for service?

13:15:28  2      **A.**    Yes, I have.

13:15:29  3      **Q.**    Okay.  Do you ever review those

13:15:33  4  documents that -- that has to do with the car

13:15:37  5  repair?

13:15:37  6      **A.**    I do.  The person who is taking the

13:15:39  7  vehicle out to the garage has to fill out a form.

13:15:42  8  You have to do like your own personal inspection of

13:15:45  9  it, so yes.

13:15:48 10      **Q.**    Okay.  So you being the person that's

13:15:50 11  taking the vehicle also has to complete a form for

13:15:53 12  what needs to be completed?

13:15:54 13      **A.**    Yes.

13:15:55 14      **Q.**    Okay.

13:16:14 15      **MR. DAVENPORT:**  Now, I don't believe that we

13:16:16 16  received that form from Ms. Velasquez on McDermott,

13:16:20 17  so to the extent that that form does exist, we are

13:16:22 18  just putting on the record that we are requesting

13:16:24 19  the document that was filled out when they took the

13:16:26 20  car in for service.

13:16:33 21      **MS. HUGGINS:**  So that was a part of your

13:16:35 22  discovery demand and there was a response

13:16:37 23  indicating that there's no such form.

*Santana - Davenport - 9/8/20*

154

13:16:39  1        **MR. DAVENPORT:**  Okay.

13:16:39  2        **BY MR. DAVENPORT:**

13:16:41  3        **Q.**   Is that a requirement, for officers to

13:16:43  4  fill out that form?

13:16:44  5        **A.**   To my understanding, yes.

13:16:46  6        **Q.**   How often do you take your car in for

13:16:49  7  service in a given year?

13:16:51  8        **A.**   Generally, I take my patrol vehicle in

13:16:54  9  for an oil change.  If there's something that

13:16:58 10  occurs, I document it and then take it to the

13:17:01 11  garage.  And they service it for whatever I wrote

13:17:05 12  it up for.

13:17:06 13        **Q.**   Okay.  But my question is do you have a

13:17:10 14  rough estimate for how many times in a given year

13:17:13 15  you would take your patrol vehicle in?

13:17:14 16        **A.**   I would say four to six times a year.

13:17:16 17        **Q.**   And each those four to six times, you

13:17:18 18  would be expected to fill out a form when taking it

13:17:22 19  into service?

13:17:22 20        **A.**   Well, I do, yes.

13:17:23 21        **Q.**   Okay.  Are there any circumstances or

13:17:29 22  instances that you would take your patrol vehicle

13:17:31 23  in for service where you would not fill out that

*Santana - Davenport - 9/8/20*

155

13:17:35   1   form?

13:17:36   2        **A.**   Me, I fill it out whenever I go to the

13:17:38   3   garage whether I need a new tire replaced or this

13:17:41   4   or that.  That's me.

13:17:43   5        In regards to other officers, I don't know

13:17:45   6   what their preference is.  But I'm all about paper

13:17:49   7   details, so I have to have something documented.

13:17:52   8        **Q.**   Okay.  The Dodge Charger that you were

13:17:57   9   driving on January 1st, 2017, is that the car that

13:18:00   10  you typically drive?

13:18:01   11       **A.**   Yes.

13:18:01   12       **Q.**   Okay.  Is that the car that you also

13:18:05   13  typically take in for service and repair?

13:18:07   14       **A.**   Yes.

13:18:07   15       **Q.**   Okay.  Now, I understand that there may

13:18:13   16  be days where you don't specifically drive this

13:18:15   17  vehicle, but has car number 625 generally been the

13:18:20   18  car that you have driven from January 1st, 2017, to

13:18:24   19  today?

13:18:25   20       **A.**   I don't drive 625 anymore.

13:18:29   21       **Q.**   Okay.  What car do you drive?

13:18:31   22       **A.**   810, Charger 810.

13:18:34   23       **Q.**   And when approximately did you switch

Santana - Davenport - 9/8/20

156

13:18:37  1  over to the Charger 810?

13:18:39  2       A.   I can't give you -- I don't know.  I

13:18:43  3  don't recall when I took over that.  It could be

13:18:46  4  two years.

13:18:48  5       Q.   Okay.

13:18:50  6       A.   Because the designators on the vehicle

13:18:53  7  like 625, six being 16, so that's the year of the

13:18:57  8  car.  So 810 is -- 18 was when the vehicle was

13:19:02  9  manufactured.

13:19:03 10       Q.   Okay.

13:19:05 11       A.   But, yeah.

13:19:11 12       Q.   So then since car 625 would have been

13:19:15 13  in 2016, the 2016 model, from 2016 to 2018, that

13:19:18 14  was your primary vehicle, was 625?

13:19:21 15       A.   That was it, but on patrol, you're not

13:19:24 16  assigned like -- there's a preference of a vehicle

13:19:27 17  that you want.

13:19:28 18       625 was the vehicle because I took care of

13:19:31 19  it.  When that was out of service, that vehicle,

13:19:34 20  you pretty much had whatever what was left on the

13:19:38 21  lot.

13:19:38 22       So it could be a Tahoe that you get one day

13:19:40 23  and it can be like a Crown Vic the next day and

*Santana - Davenport - 9/8/20*

157

13:19:42  1  stuff because you're just waiting for your car to

13:19:45  2  come back from being serviced.

13:19:47  3          So you're not assigned a particular car,

13:19:49  4  it's just you have a preference for that one

13:19:51  5  vehicle.

13:19:52  6          **Q.**   Okay.  Being that car 625 was your

13:19:58  7  preference, that was generally the car that you

13:20:00  8  drove, though, from 2016 to 2018?

13:20:02  9          **A.**   That's correct.

13:20:03 10          **Q.**   Okay.  And also it's generally your

13:20:05 11  understanding that every time that you take -- took

13:20:07 12  in car 625 for service, you filled out a form

13:20:11 13  before the service actually took place?

13:20:13 14          **A.**   That's correct.

13:20:14 15          **Q.**   Okay.  Would it be your expectation

13:20:19 16  that this type of damage that was caused to a

13:20:21 17  vehicle would have been filled out on some type of

13:20:25 18  form?

13:20:25 19          **MS. HUGGINS:**   Form.

13:20:26 20          **THE WITNESS:**   On my -- my expectations, yes,

13:20:29 21  because I will take care of it and that's me.  I

13:20:32 22  can't speak on other officers and how they do

13:20:34 23  things, but if it was me, yes.

*Santana - Davenport - 9/8/20*

158

| | | |
|---|---|---|
| 13:20:37 | 1 | **BY MR. DAVENPORT:** |
| 13:20:37 | 2 | **Q.**   Now, are your expectations shared with |
| 13:20:40 | 3 | your supervisor? |
| 13:20:42 | 4 | **A.**   They're aware of my expectations and |
| 13:20:44 | 5 | they know how I operate, so yes, they assume |
| 13:20:49 | 6 | nothing but the best with me. |
| 13:20:51 | 7 | **Q.**   Okay.  Is it your -- well, who was your |
| 13:20:54 | 8 | supervisor? |
| 13:20:54 | 9 | **A.**   Anthony McHugh and Jenny Velez. |
| 13:20:59 | 10 | **Q.**   Okay.  Now, does your supervisor expect |
| 13:21:04 | 11 | other officers in the C District to fill out the |
| 13:21:09 | 12 | forms that are required for the necessary repairs? |
| 13:21:11 | 13 | **MS. HUGGINS:**  Form. |
| 13:21:14 | 14 | **THE WITNESS:**  Every officer? |
| 13:21:15 | 15 | **MS. HUGGINS:**  That question calls for |
| 13:21:16 | 16 | speculation. |
| 13:21:16 | 17 | **MR. DAVENPORT:**  No, I mean, he's a |
| 13:21:17 | 18 | C District officer.  He knows what a supervisor's |
| 13:21:20 | 19 | expectations are. |
| 13:21:20 | 20 | **THE WITNESS:**  It's not just on the |
| 13:21:21 | 21 | expectations of the supervisors, it's on the |
| 13:21:25 | 22 | officer itself.  Like you have the manual |
| 13:21:28 | 23 | procedures and you have to like follow pretty much |

*Santana - Davenport - 9/8/20*

159

| | | |
|---|---|---|
| 13:21:30 | 1 | what they state. |
| 13:21:31 | 2 | It's not up to the supervisors to come up |
| 13:21:33 | 3 | behind your back and say, hey, make sure you take |
| 13:21:37 | 4 | care of this and that.  You as an officer have to |
| 13:21:40 | 5 | take it upon yourself to take care of that issue. |
| 13:21:43 | 6 | Q.   So would you face any discipline if you |
| 13:21:46 | 7 | didn't fill out the necessary paperwork for these |
| 13:21:49 | 8 | repairs? |
| 13:21:49 | 9 | A.   Absolutely, yes. |
| 13:21:50 | 10 | Q.   And who would discipline you? |
| 13:21:52 | 11 | A.   Internal affairs. |
| 13:21:53 | 12 | Q.   Okay.  Not your supervisor? |
| 13:21:55 | 13 | A.   The supervisor will be aware of the |
| 13:21:58 | 14 | incident and they will be brought up to internal |
| 13:22:03 | 15 | affairs, but it's the person who did the |
| 13:22:05 | 16 | infraction, their immediate supervisor.  Then it |
| 13:22:08 | 17 | goes up the chain.  So they're aware of the |
| 13:22:10 | 18 | situation, too. |
| 13:22:10 | 19 | Q.   Okay.  Would you ever have any sort of |
| 13:22:13 | 20 | a conference with your lieutenants, Anthony McHugh |
| 13:22:18 | 21 | or Jenny Velez, if you weren't meeting the |
| 13:22:20 | 22 | expectations that were expected of you as an |
| 13:22:22 | 23 | officer? |

*Santana - Davenport - 9/8/20*

160

13:22:23  1          **MS. HUGGINS:**  Form.  You can answer.

13:22:24  2          **THE WITNESS:**  Well, if an incident did not

13:22:26  3   occur, then you're not going to have a conference.

13:22:29  4   Generally, the only time you're talking to a

13:22:32  5   supervisor in regards to -- I don't know.  What

13:22:33  6   situation do you want me to talk about?

13:22:35  7          **BY MR. DAVENPORT:**

13:22:35  8          **Q.**  I'm just talking about filling out

13:22:38  9   paperwork for car repairs.

13:22:39 10          **A.**  Yes, because it goes to the supervisor

13:22:40 11   and they have to sign it, too.  It could be my

13:22:43 12   immediate supervisors or it could be the person who

13:22:45 13   is running the police garage.  But it's -- my

13:22:49 14   signature is not the only signature that goes on

13:22:51 15   that document.

13:22:52 16          **Q.**  Okay.  So the supervisor would also put

13:22:54 17   their signature on the form for a repair?

13:22:57 18          **A.**  Yes.  Because they will see everything,

13:22:59 19   yes.

13:22:59 20          **Q.**  Okay.  Now, as an officer, do you

13:23:07 21   typically document evidence that's required to

13:23:11 22   prove a crime that you accuse someone with?

13:23:13 23          **A.**  Yes.

*Santana - Davenport - 9/8/20*

161

13:23:13  1        Q.   Okay.  In the instance of accusing

13:23:17  2   somebody of intentionally dislodging a driver's

13:23:21  3   side mirror and causing damage to the malfunction

13:23:25  4   or function of the driver's side mirror(sic), how

13:23:28  5   would you document that evidence?

13:23:30  6        **MS. HUGGINS:**  Form.

13:23:32  7        **THE WITNESS:**  Okay.  For me in regards to

13:23:34  8   that, generally you have -- if it's vehicle --

13:23:37  9   damage done to your patrol vehicle, you have to

13:23:40 10   notify your supervisor.

13:23:41 11        And they will notify the accident

13:23:43 12   investigation unit.  And they will come by and they

13:23:46 13   will take pictures and collect evidence.

13:23:50 14        **BY MR. DAVENPORT:**

13:23:51 15        Q.   Would an officer ever be able to take

13:23:53 16   their own photographs to document it?

13:23:54 17        A.   Well, it depends on that officer, but

13:23:56 18   if they want their phones taken away or whatever, I

13:24:00 19   mean, by all means they could do that.

13:24:02 20        But generally if they do do that, it's up to

13:24:05 21   them.  But it's usually the specialized units that

13:24:07 22   will take the photos, not the officers.

13:24:12 23        Q.   Okay.  Why would the officer have to

*Santana - Davenport - 9/8/20*

162

13:24:14   1  have their phone taken away if they took a

13:24:17   2  photograph?

13:24:17   3          **A.**   I'm not saying --

13:24:17   4          **MS. HUGGINS:**   Form.

13:24:18   5          **THE WITNESS:**   -- per se.  Generally, it's

13:24:21   6  the courts or whatever.  I mean, if you have

13:24:22   7  something on your phone, then the Court will

13:24:25   8  subpoena that and grab your phone.

13:24:26   9          But it's -- it's more or less -- like I

13:24:29  10  said, I don't know what everyone else does, but for

13:24:32  11  me, I usually let our units take care of that and

13:24:36  12  let them collect the evidence.

13:24:38  13          **BY MR. DAVENPORT:**

13:24:39  14          **Q.**   Okay.  Are you aware of officers who

13:24:42  15  take photographs on their phone and use it as

13:24:44  16  evidence?

13:24:45  17          **A.**   No, I'm not.

13:24:46  18          **Q.**   Now, if you appeared in court and there

13:24:59  19  was no evidence to support the crime that you

13:25:01  20  accuse somebody with, how would that reflect on you

13:25:05  21  as an officer?

13:25:07  22          **MS. HUGGINS:**   Form.

13:25:08  23          **THE WITNESS:**   My opinion?  If something like

*Santana - Davenport - 9/8/20*

163

13:25:11  1  that didn't turn out the way I want it to turn out

13:25:14  2  in regards to a court case?

13:25:16  3        I mean, it's due process.  It's the courts.

13:25:19  4  If the Court finds that the person is not guilty,

13:25:21  5  then I did my job, I did it to the best of my

13:25:24  6  ability, and then I just move on.  I don't hold any

13:25:27  7  grudges or anything like that.

13:25:28  8        **BY MR. DAVENPORT:**

13:25:28  9        **Q.**   What if you accuse somebody of

13:25:30  10  something and you didn't have any evidence to

13:25:31  11  support the crime that you charged that individual

13:25:34  12  with, how would that reflect on you?

13:25:35  13        **A.**   It wouldn't --

13:25:35  14        **MS. HUGGINS:**  Form.

13:25:36  15        **THE WITNESS:**  -- have reflected --

13:25:39  16        **MS. HUGGINS:**  And that calls for

13:25:39  17  speculation.  What do you mean, how -- what do you

13:25:41  18  mean by the phrase "how it reflects on you"?

13:25:43  19        **BY MR. DAVENPORT:**

13:25:44  20        **Q.**   Well, would a supervisor have to talk

13:25:45  21  to you about why you brought charges against

13:25:48  22  somebody without evidence?

13:25:49  23        **MS. HUGGINS:**  Form.  Calls for speculation.

*Santana - Davenport - 9/8/20*

164

13:25:51  1 | You can answer.

13:25:52  2 |       **THE WITNESS:**  I wouldn't know because I've

13:25:53  3 | never been in that situation.

13:25:55  4 |       **BY MR. DAVENPORT:**

13:25:55  5 |       **Q.**   Are you aware of officers who have been

13:25:57  6 | in that situation?

13:25:57  7 |       **A.**   I wouldn't know, either.

13:25:59  8 |       **Q.**   Do you not talk with other officers?

13:26:01  9 |       **A.**   I do talk to other officers but I don't

13:26:03 10 | talk in regards to stuff at work, incidents that

13:26:10 11 | occurred at work.

13:34:39 12 |       (A recess was then taken.)

13:34:39 13 |       **BY MR. DAVENPORT:**

13:34:47 14 |       **Q.**   So showing you what has been marked as

13:34:50 15 | Exhibit 11, it is the fourth video segment.  The

13:34:54 16 | number is 06_20170101105233.  The timestamp is one

13:35:08 17 | minute and 44 seconds into this video segment.

13:35:15 18 |       Now, Officer Santana, I just want you to

13:35:18 19 | tell me, do you see all five officers currently

13:35:21 20 | standing in a group?

13:35:22 21 |       **A.**   Yes.

13:35:22 22 |       **Q.**   Okay.  Now, does it appear that the

13:35:32 23 | officers are breaking from the group and walking

*Santana - Davenport - 9/8/20*

165

| | | |
|---|---|---|
| 13:35:34 | 1 | back towards their respective vehicles? |
| 13:35:37 | 2 | **A.**   Yes. |
| 13:35:38 | 3 | **Q.**   Do you see one officer who is currently |
| 13:35:49 | 4 | standing in the middle of the street at timestamp |
| 13:35:52 | 5 | two minutes and four seconds into the video |
| 13:35:56 | 6 | segment? |
| 13:35:56 | 7 | **A.**   Yes. |
| 13:35:57 | 8 | **Q.**   Okay.  I just want you to generally |
| 13:35:59 | 9 | describe what you see this officer doing from this |
| 13:36:02 | 10 | moment forward. |
| 13:36:04 | 11 | **MS. HUGGINS:**  Form. |
| 13:36:07 | 12 | **THE WITNESS:**  He's standing in the middle of |
| 13:36:09 | 13 | the street. |
| 13:36:12 | 14 | **BY MR. DAVENPORT:** |
| 13:36:12 | 15 | **Q.**   What reason do you think that she was |
| 13:36:14 | 16 | standing in front of the car? |
| 13:36:16 | 17 | **MS. HUGGINS:**  Form. |
| 13:36:17 | 18 | **THE WITNESS:**  I can't tell you.  I don't |
| 13:36:18 | 19 | know. |
| 13:36:19 | 20 | **BY MR. DAVENPORT:** |
| 13:36:19 | 21 | **Q.**   Is it possible that she was taking a |
| 13:36:21 | 22 | photograph? |
| 13:36:21 | 23 | **MS. HUGGINS:**  Form. |

*Santana - Davenport - 9/8/20*

166

13:36:22  1      **THE WITNESS:**  You can't tell from that

13:36:24  2  video.

13:36:24  3      **BY MR. DAVENPORT:**

13:36:27  4      **Q.**  Is it possible that she was taking a

13:36:29  5  photograph to document the damage to her vehicle?

13:36:31  6      **MS. HUGGINS:**  Form.

13:36:32  7      **THE WITNESS:**  I can't see a camera.  I can't

13:36:36  8  see anything from this video.  I can't see it.

13:36:38  9      **BY MR. DAVENPORT:**

13:36:38  10      **Q.**  Okay.  Do you recall if anybody told

13:36:42  11  that officer to take a photograph of the vehicle?

13:36:44  12      **A.**  I don't recall.

13:36:46  13      **Q.**  Okay.  Do you recall anything about any

13:36:50  14  of those discussions with any of those officers

13:36:53  15  that day?

13:36:54  16      **A.**  No, I don't recall.

13:36:55  17      **Q.**  All right.  Do you recall any

13:37:07  18  individuals talking to any of the officers at the

13:37:11  19  scene?

13:37:12  20      **A.**  No, I don't recall.

13:37:13  21      **Q.**  Nobody from the apartment complex or

13:37:17  22  the houses that were nearby?

13:37:19  23      **A.**  No, I don't recall.

*Santana - Davenport - 9/8/20*

167

| | | |
|---|---|---|
| 13:37:20 | 1 | **Q.**   Okay.  Nobody was screaming from a |
| 13:37:24 | 2 | window or anything like that? |
| 13:37:25 | 3 | **A.**   I don't recall. |
| 13:37:27 | 4 | **Q.**   Do you recall if at any point any |
| 13:37:31 | 5 | pedestrian or anybody from a house said that we |
| 13:37:33 | 6 | have this on video? |
| 13:37:34 | 7 | **A.**   No, I don't recall. |
| 13:37:36 | 8 | **Q.**   Okay.  Did you know at this time that |
| 13:37:39 | 9 | there was surveillance video that was focused on |
| 13:37:43 | 10 | where the officers were standing? |
| 13:37:45 | 11 | **A.**   No. |
| 13:37:46 | 12 | **Q.**   Did you come to learn of that fact at |
| 13:37:48 | 13 | any point on that day? |
| 13:37:49 | 14 | **A.**   No. |
| 13:37:51 | 15 | **Q.**   Did you come to learn of that fact at |
| 13:37:53 | 16 | any point before your deposition today? |
| 13:37:55 | 17 | **A.**   No. |
| 13:37:56 | 18 | **Q.**   Not even when you saw on the news story |
| 13:37:59 | 19 | that there was surveillance footage of everything |
| 13:38:01 | 20 | that happened? |
| 13:38:02 | 21 | **A.**   Well, besides the news story, no. |
| 13:38:04 | 22 | **Q.**   And then when you watched the video |
| 13:38:06 | 23 | this morning, correct? |

*Santana - Davenport - 9/8/20*

168

13:38:07  1        **A.**    That's correct.

13:38:08  2        **Q.**    And then when you watched the video for

13:38:10  3  your interrogatories?

13:38:10  4        **A.**    That's correct.

13:38:11  5        **Q.**    And at all those times, you knew that

13:38:13  6  there was surveillance footage of the incident on

13:38:15  7  that day?

13:38:16  8        **A.**    That's correct, from viewing it.

13:38:17  9        **Q.**    Okay.  Thank you.  I'm going to show

13:38:33 10  you what has been marked as Exhibit 18.  Do you

13:38:42 11  recognize this document?

13:38:43 12        **A.**    No, I do not.

13:38:44 13        **Q.**    Do you know generally what this

13:38:47 14  document is used for?

13:38:49 15        **A.**    No, I do not.

13:38:51 16        **Q.**    Have you ever seen this document

13:38:52 17  before?

13:38:53 18        **A.**    No, I haven't.

13:38:54 19        **Q.**    Have you ever seen a general form of

13:38:56 20  this document?

13:38:56 21        **A.**    No, I haven't.

13:38:57 22        **Q.**    Okay.  Do you have any reason to

13:39:00 23  believe that this is not a fleet management

*Santana - Davenport - 9/8/20*

169

| | | |
|---|---|---|
| 13:39:03 | 1 | maintenance work order? |
| 13:39:04 | 2 | **A.**   No. |
| 13:39:05 | 3 | **Q.**   Okay.  Who fills out this work order? |
| 13:39:09 | 4 | **A.**   I do not know. |
| 13:39:10 | 5 | **Q.**   Okay.  But it's not the officers who |
| 13:39:13 | 6 | fill it out? |
| 13:39:13 | 7 | **A.**   No. |
| 13:39:14 | 8 | **Q.**   Do you think it's filled out by the |
| 13:39:16 | 9 | garage? |
| 13:39:16 | 10 | **A.**   Probably filled out by the maintenance |
| 13:39:19 | 11 | work -- the worker within the maintenance shop. |
| 13:39:21 | 12 | **Q.**   Okay.  Does the City of Buffalo have |
| 13:39:24 | 13 | its own maintenance shop? |
| 13:39:25 | 14 | **A.**   That, I can't tell you. |
| 13:39:28 | 15 | **Q.**   Where do you take your car when it |
| 13:39:30 | 16 | needs to be repaired? |
| 13:39:31 | 17 | **A.**   Seneca garage, but it's -- I don't know |
| 13:39:35 | 18 | if they work for the city or they're contracted |
| 13:39:37 | 19 | with the city.  I don't know. |
| 13:39:38 | 20 | **Q.**   Do you ever take your vehicle to any |
| 13:39:40 | 21 | other garage? |
| 13:39:41 | 22 | **A.**   No. |
| 13:39:43 | 23 | **Q.**   Okay.  And that's where you've taken |

*Santana - Davenport - 9/8/20*

170

13:39:45  1  your vehicle to -- that's the garage that you've

13:39:49  2  taken your vehicle to since you started?

13:39:50  3      **A.**   That's correct.

13:39:51  4      **Q.**   Do you ever see other police vehicles

13:39:53  5  that are there at Seneca garage?

13:39:55  6      **A.**   In regards to what?  From different

13:39:57  7  agencies or?

13:39:58  8      **Q.**   Specifically for the City of Buffalo.

13:40:00  9      **A.**   No, just -- just our vehicles, anything

13:40:04 10  with the City of Buffalo.

13:40:05 11      **Q.**   Okay.  So it's more than just your

13:40:07 12  vehicle that goes to Seneca garage?

13:40:09 13      **A.**   Yes, it's any city vehicle.

13:40:11 14      **Q.**   Okay.  So the form that you typically

13:40:13 15  fill out that you would give to the service garage

13:40:16 16  is different from this form?

13:40:18 17      **A.**   Yes.

13:40:18 18      **Q.**   Okay.  Do you know what car number this

13:40:21 19  form refers to?

13:40:23 20      **A.**   It refers to vehicle number 473.

13:40:27 21      **Q.**   Okay.  And then looking again at

13:40:29 22  Exhibit 16, who was driving vehicle number 473 on

13:40:34 23  January 1st of 2017?

*Santana - Davenport - 9/8/20*

171

| | | |
|---|---|---|
| 13:40:36 | 1 | **A.**  Officer McDermott and Officer Velez. |
| 13:40:40 | 2 | **Q.**  Okay.  Do you see on the service |
| 13:40:44 | 3 | information the date that this service took place? |
| 13:40:50 | 4 | **A.**  January 5th of 2017. |
| 13:40:53 | 5 | **Q.**  Okay.  And do you see where it says |
| 13:40:55 | 6 | what the service was done right below it? |
| 13:40:57 | 7 | **A.**  Cooling system. |
| 13:40:58 | 8 | **Q.**  Okay.  And then what about the line |
| 13:41:00 | 9 | right below that? |
| 13:41:01 | 10 | **A.**  R&R water pump, serp belt. |
| 13:41:15 | 11 | (Discussion off the record.) |
| 13:41:19 | 12 | **BY MR. DAVENPORT:** |
| 13:41:20 | 13 | **Q.**  Do you see anything that would indicate |
| 13:41:21 | 14 | that the driver's side mirror was fixed on this |
| 13:41:24 | 15 | date? |
| 13:41:25 | 16 | **A.**  No. |
| 13:41:25 | 17 | **Q.**  Okay.  Anything that says that the |
| 13:41:27 | 18 | driver's side mirror was dislodged from the |
| 13:41:29 | 19 | vehicle? |
| 13:41:30 | 20 | **A.**  No. |
| 13:41:31 | 21 | **Q.**  Okay.  Anything that talks about a |
| 13:41:33 | 22 | driver's side window malfunctioning? |
| 13:41:42 | 23 | **A.**  No. |

*Santana - Davenport - 9/8/20*

172

| | | |
|---|---|---|
| 13:41:42 | 1 | **Q.**   Okay.  Did you ever speak to Ms. Velez |
| 13:41:47 | 2 | and Ms. McDermott about the condition of their |
| 13:41:50 | 3 | vehicle after January 1st of 2017? |
| 13:41:52 | 4 | **A.**   No. |
| 13:41:52 | 5 | **Q.**   Okay.  Did they ever make any general |
| 13:41:54 | 6 | complaints about their vehicle after January 1st of |
| 13:41:57 | 7 | 2017? |
| 13:41:57 | 8 | **A.**   I would not know. |
| 13:41:59 | 9 | **Q.**   Well, did they ever make any general |
| 13:42:01 | 10 | complaints to you? |
| 13:42:02 | 11 | **A.**   No. |
| 13:42:03 | 12 | **Q.**   Okay.  How often do you talk to |
| 13:42:06 | 13 | Ms. McDermott and Ms. Velez? |
| 13:42:07 | 14 | **A.**   Not often. |
| 13:42:09 | 15 | **Q.**   Maybe once a week? |
| 13:42:11 | 16 | **A.**   No. |
| 13:42:12 | 17 | **Q.**   Okay.  Less than once a week? |
| 13:42:14 | 18 | **A.**   Yes. |
| 13:42:15 | 19 | **Q.**   Once a month? |
| 13:42:16 | 20 | **A.**   I don't know.  Whenever I walk by, hi, |
| 13:42:18 | 21 | 'bye and that's it, but we don't have |
| 13:42:20 | 22 | conversations. |
| 13:42:20 | 23 | **Q.**   Okay.  How many people are in your |

*Santana - Davenport - 9/8/20*

173

| | | |
|---|---|---|
| 13:42:23 | 1 | platoon for day shift? |
| 13:42:25 | 2 | **A.**   Right now, 12, I believe. |
| 13:42:28 | 3 | **Q.**   Of those 12 people, do you have anybody |
| 13:42:33 | 4 | that you speak to on a regular basis at work? |
| 13:42:36 | 5 | **A.**   At work or outside of work? |
| 13:42:39 | 6 | **Q.**   At work. |
| 13:42:40 | 7 | **A.**   I talk to everybody that I work with. |
| 13:42:42 | 8 | **Q.**   But regularly that you speak to them? |
| 13:42:44 | 9 | **A.**   Yes. |
| 13:42:45 | 10 | **Q.**   What do you define regularly as? |
| 13:42:49 | 11 | **A.**   How many times -- it's pretty much just |
| 13:42:52 | 12 | basically in the morning when we arrive at work and |
| 13:42:54 | 13 | we have briefings and pretty much just -- usually |
| 13:43:00 | 14 | just how it's going and this and that, but that's |
| 13:43:02 | 15 | pretty much it, so just once. |
| 13:43:04 | 16 | **Q.**   During those briefings, did Ms. McDermott |
| 13:43:07 | 17 | or Ms. Velez ever bring up complaints of their |
| 13:43:10 | 18 | after January 1st of 2017? |
| 13:43:11 | 19 | **A.**   No. |
| 13:43:12 | 20 | **Q.**   I'm going to show what's been marked as |
| 13:43:43 | 21 | Exhibit 9.  Do you recognize that document? |
| 13:43:48 | 22 | **A.**   Yes. |
| 13:43:48 | 23 | **Q.**   What do you otherwise recognize it to |

*Santana - Davenport - 9/8/20*

174

| | | |
|---|---|---|
| 13:43:50 | 1 | be? |
| 13:43:50 | 2 | **A.**   It's the case history. |
| 13:43:52 | 3 | **Q.**   Okay.  And what kind of information |
| 13:43:53 | 4 | goes on a case history? |
| 13:43:55 | 5 | **A.**   Who did what in the incident. |
| 13:43:56 | 6 | **Q.**   Okay.  Do you see your name listed at |
| 13:43:59 | 7 | all on this case history? |
| 13:44:00 | 8 | **A.**   No. |
| 13:44:01 | 9 | **Q.**   Okay.  Do officers who respond to a |
| 13:44:05 | 10 | call typically end up on a case history? |
| 13:44:07 | 11 | **A.**   If they're assigned to that call, yes, |
| 13:44:10 | 12 | but it depends on the primary officer whether or |
| 13:44:14 | 13 | not they have them do a specific function with that |
| 13:44:16 | 14 | call. |
| 13:44:17 | 15 | **Q.**   Okay.  Are there only four officers who |
| 13:44:27 | 16 | are listed on this case history? |
| 13:44:28 | 17 | **A.**   That's correct. |
| 13:44:28 | 18 | **Q.**   Okay.  And what is this case history |
| 13:44:33 | 19 | used for?  What's the purpose? |
| 13:44:34 | 20 | **A.**   The purpose of this case history is to |
| 13:44:36 | 21 | have it in one sheet who did what in that incident. |
| 13:44:41 | 22 | That's the main purpose of this. |
| 13:44:42 | 23 | **Q.**   Okay.  Is this something that's |

*Santana - Davenport - 9/8/20*

175

13:44:46  1   reviewed by anybody?

13:44:49  2         A.    Generally this goes to the court

13:44:51  3   paperwork.

13:44:53  4         Q.    Besides the courts, is there any other

13:44:55  5   officer supervisors who review this document?

13:44:57  6         A.    Not that I'm aware of, no.

13:44:59  7         Q.    So it's just mostly used for court

13:45:02  8   purposes then?

13:45:03  9         A.    That's correct.

13:45:04 10         Q.    Okay.  And so it generally describes

13:45:06 11   the functions that took place for each of the

13:45:09 12   officers who responded to the incident?

13:45:11 13         A.    That's correct.

13:45:50 14         Q.    Do you still maintain a copy of the

13:45:52 15   complaint that was served upon you?

13:45:54 16         A.    No.

13:45:56 17         Q.    Where did you give that complaint to?

13:46:00 18   Who has it?

13:46:01 19         A.    In regards to the copy that's given to

13:46:02 20   us?

13:46:03 21         Q.    Uh-huh.

13:46:04 22         A.    A shredder place.

13:46:08 23         Q.    You guys shred the complaints?

*Santana - Davenport - 9/8/20*

176

13:46:11  1       **A.**    No, we have bins in the station house

13:46:13  2  where we recycle documentation.  It's a locked bin

13:46:16  3  that -- I believe the company is called White

13:46:18  4  Mountain.  I don't keep anything on file.

13:46:20  5       **MS. HUGGINS:**  When you say complaint, just

13:46:22  6  to be clear, what are you referring to?

13:46:23  7       **MR. DAVENPORT:**  The complaint that he was

13:46:24  8  served with when he was notified of this lawsuit.

13:46:26  9       **MS. HUGGINS:**  Did you understand the

13:46:27 10  question to refer to that?

13:46:29 11       **THE WITNESS:**  Yeah, whether or not I kept a

13:46:31 12  copy of this thing myself.  My answer to that is

13:46:33 13  I'll view it and I'll go to it and I'll get rid of

13:46:37 14  that paperwork in that respective bin.

13:46:40 15       **BY MR. DAVENPORT:**

13:46:40 16       **Q.**    So when you drop off the paperwork into

13:46:43 17  the bin, do you know what happens to it afterwards?

13:46:46 18       **A.**    Well, it's up to the company and the

13:46:47 19  city.  I'm assuming they destroy everything.

13:46:50 20       **Q.**    What other types of paperwork do you

13:46:53 21  put into that bin?

13:46:53 22       **A.**    Anything work related, any information.

13:46:58 23       **Q.**    And how often are you putting documents

*Santana - Davenport - 9/8/20*

177

| | | |
|---|---|---|
| 13:47:00 | 1 | into that bin? |
| 13:47:01 | 2 | **A.**   Every day. |
| 13:47:09 | 3 | **Q.**   Do you think that that may have been a |
| 13:47:11 | 4 | document that you would want to hold on to if you |
| 13:47:14 | 5 | were named in a lawsuit? |
| 13:47:15 | 6 | **A.**   If I was named in a lawsuit, I would |
| 13:47:17 | 7 | assume that the city attorneys will have all that |
| 13:47:21 | 8 | documentation.  I don't need to carry that with me. |
| 13:47:25 | 9 | **Q.**   What happens if you wanted to go to |
| 13:47:26 | 10 | your own attorney besides the city attorney, would |
| 13:47:29 | 11 | you want to keep that complaint? |
| 13:47:31 | 12 | **MS. HUGGINS:**   Form. |
| 13:47:32 | 13 | **THE WITNESS:**   Absolutely. |
| 13:47:37 | 14 | **BY MR. DAVENPORT:** |
| 13:47:38 | 15 | **Q.**   If you got rid of the document, would |
| 13:47:40 | 16 | there be another way of notifying a new attorney of |
| 13:47:43 | 17 | what the allegations are in that complaint? |
| 13:47:45 | 18 | **A.**   That, I don't know the ins and outs of |
| 13:47:48 | 19 | that, so I'm not sure.  It's got to be with the |
| 13:47:51 | 20 | city attorneys in their department. |
| 13:47:54 | 21 | **Q.**   Is that something that's generally done |
| 13:47:56 | 22 | in the City of Buffalo, is recycle complaints that |
| 13:48:00 | 23 | are served upon their officers? |

*Santana - Davenport - 9/8/20*

178

13:48:02  1        **A.**    Well, that's what I do.  I don't know

13:48:04  2    what other officers do.

13:48:05  3        **Q.**    How many lawsuits have you been named

13:48:08  4    in?

13:48:08  5        **A.**    One.

13:48:11  6        **Q.**    Just this one?

13:48:12  7        **A.**    No, there's another one.

13:48:14  8        **Q.**    So two then?

13:48:15  9        **A.**    Yes.

13:48:16  10        **Q.**    Okay.  Do you know when the file date

13:48:22  11    was for that other lawsuit?

13:48:25  12        **A.**    It's when I broke my arm in a

13:48:29  13    city-involved accident.  I can't tell you the exact

13:48:31  14    year.  I believe it's 2014.

13:48:36  15        **Q.**    So was that a complaint that was filed

13:48:38  16    by you?

13:48:39  17        **A.**    No.  It was an insurance company trying

13:48:41  18    to go after me on behalf of their client.

13:48:45  19        **Q.**    Okay.

13:48:56  20        **A.**    Did you have a question about that?

13:48:59  21        **Q.**    No, he can't ask questions.  Don't

13:49:01  22    worry about it.

13:49:11  23        So after you were served with the complaint,

13:49:13  1  did you read any of the allegations that were in

13:49:15  2  there?

13:49:15  3       **A.**   No.   The only thing I read was to

13:49:18  4  report to Corporation Counsel and that's pretty

13:49:21  5  much it.

13:49:22  6       **Q.**   Okay.   Did it give you like a date when

13:49:25  7  to report or anything like that?

13:49:26  8       **A.**   Yes, there was a date and time given to

13:49:28  9  me.

13:49:28  10      **Q.**   And then did you calendar it and make

13:49:30  11 that scheduled appointment?

13:49:32  12      **A.**   Yeah, I kept it in my mailbox at work.

13:49:35  13 And then after I showed up, after I went, when I

13:49:39  14 came back to work, I used the recycling.

13:49:41  15      **MS. HUGGINS:**   I think there's another

13:49:42  16 terminology confusion.   Are you talking about the

13:49:45  17 court liaison notice to come and appear for court?

13:49:48  18      **THE WITNESS:**   Yes, that's what he --

13:49:49  19      **MS. HUGGINS:**   I think he's unsure what you

13:49:51  20 mean by complaint.

13:49:52  21      **MR. DAVENPORT:**   Got you.   Okay.

13:49:58  22      **MS. HUGGINS:**   So when he said served with a

13:50:00  23 complaint, are you thinking of a court liaison

*Santana - Davenport - 9/8/20*

180

13:50:03  1   document?

13:50:03  2        **THE WITNESS:**  Yeah, serving me saying that

13:50:04  3   you have to show up for this and that.  Is that

13:50:07  4   what you were talking about?

13:50:09  5        **BY MR. DAVENPORT:**

13:50:09  6        **Q.**   No.  So I'm talking about at the

13:50:14  7   initial stages of the lawsuit, were you ever

13:50:16  8   handed -- it was about a 60-page document that

13:50:20  9   would have had the allegations for this lawsuit as

13:50:23 10   well as a recording of what happened?

13:50:25 11        **A.**   Thanks for clearing it up.  No.

13:50:28 12        **Q.**   You never received that document?

13:50:29 13        **A.**   Never did.

13:50:30 14        **Q.**   Are you aware if somebody at your

13:50:33 15   office received that document on your behalf?

13:50:35 16        **A.**   No.

13:50:36 17        **Q.**   Okay.  But as you sit here today, you

13:50:39 18   have never seen that document before?

13:50:40 19        **A.**   Never did.

13:50:42 20        **Q.**   Okay.  For the other lawsuit that you

13:50:49 21   were named in, did you ever review the allegations

13:50:51 22   in that complaint?

13:50:51 23        **A.**   With my attorney I had, yes.

*Santana - Davenport - 9/8/20*

181

13:50:54  1        **Q.**   But you haven't done the same thing

13:50:56  2   here?

13:50:56  3        **A.**   No.

13:50:59  4        **Q.**   Do you know any of the details of

13:51:03  5   anything that happened on January 1st of 2017?

13:51:06  6        **A.**   No.

13:51:07  7        **MS. HUGGINS:**   Just to be clear since there

13:51:10  8   was confusion on terminology, when you were

13:51:13  9   referring to shredding a document, the document was

13:51:15 10   the court liaison notice?

13:51:16 11        **THE WITNESS:**   Yes.  That document stating

13:51:19 12   that I have to show up at court at a specific date

13:51:21 13   and time, that's what I'm talking about.

13:51:23 14        **BY MR. DAVENPORT:**

13:51:24 15        **Q.**   But you've never reviewed the 60-page

13:51:27 16   complaint that initiated this lawsuit --

13:51:29 17        **A.**   No.

13:51:30 18        **Q.**   -- against you?  Okay.  But you did

13:51:34 19   review the complaint for the other incident that

13:51:37 20   you were involved in?

13:51:38 21        **A.**   Yes.

13:51:38 22        **Q.**   Okay.  Did you keep that complaint?

13:51:42 23        **A.**   No, I don't have it anymore.

*Santana - Davenport - 9/8/20*

182

| | | |
|---|---|---|
| 13:51:44 | 1 | **Q.**   Well, did you keep it at the time? |
| 13:51:46 | 2 | **A.**   I didn't keep it but my attorney did. |
| 13:51:48 | 3 | **Q.**   Okay.  Did you also shred that |
| 13:51:51 | 4 | complaint? |
| 13:51:51 | 5 | **A.**   Well, everything that I have, yes, I |
| 13:51:53 | 6 | do.  I don't keep anything.  I don't keep files. |
| 13:51:56 | 7 | **Q.**   Okay.  Have you ever been subjected to |
| 13:52:06 | 8 | an internal affairs investigation? |
| 13:52:08 | 9 | **A.**   No. |
| 13:52:10 | 10 | **Q.**   Not once? |
| 13:52:12 | 11 | **A.**   No.  I was a witness but I wasn't the |
| 13:52:14 | 12 | target. |
| 13:52:14 | 13 | **Q.**   Okay.  Were you a witness for this |
| 13:52:17 | 14 | incident that transpired on January 1st of 2017? |
| 13:52:20 | 15 | **MS. HUGGINS:**  Form. |
| 13:52:21 | 16 | **THE WITNESS:**  No, I don't recall. |
| 13:52:23 | 17 | **BY MR. DAVENPORT:** |
| 13:52:23 | 18 | **Q.**   Were you ever interviewed or deposed by |
| 13:52:26 | 19 | anybody with internal affairs for this incident? |
| 13:52:29 | 20 | **A.**   No. |
| 13:52:29 | 21 | **Q.**   Okay.  Are you aware of any officers |
| 13:52:35 | 22 | who were deposed or required to give statements as |
| 13:52:39 | 23 | witnesses for this incident? |

*Santana - Davenport - 9/8/20*

183

| | | |
|---|---|---|
| 13:52:40 | 1 | **MS. HUGGINS:**  I'm going to object to that |
| 13:52:43 | 2 | under the language in the order to show cause. |
| 13:52:48 | 3 | That is very broad language there.  I don't know |
| 13:52:51 | 4 | what it encompasses and I am -- |
| 13:52:53 | 5 | **MR. DAVENPORT:**  Well, I have a copy if you |
| 13:52:54 | 6 | want to look at it. |
| 13:52:55 | 7 | **MS. HUGGINS:**  I have a copy as well with me. |
| 13:52:56 | 8 | **MR. DAVENPORT:**  Okay. |
| 13:52:56 | 9 | **MS. HUGGINS:**  The issue is that it's still |
| 13:52:58 | 10 | the subject of litigation and I don't believe the |
| 13:53:00 | 11 | Court has specifically ruled with regard to |
| 13:53:04 | 12 | deposition testimony. |
| 13:53:07 | 13 | **MR. DAVENPORT:**  So I think on the safe side, |
| 13:53:10 | 14 | we should probably ask the questions.  You can |
| 13:53:11 | 15 | object to it and then it will stricken from the |
| 13:53:13 | 16 | record. |
| 13:53:14 | 17 | **MS. HUGGINS:**  Well, no.  Here's the problem. |
| 13:53:17 | 18 | That says no public disclosure and that is a |
| 13:53:20 | 19 | lawsuit -- |
| 13:53:20 | 20 | **MR. DAVENPORT:**  For documents.  It doesn't |
| 13:53:22 | 21 | say anything about deposition testimony.  It also |
| 13:53:24 | 22 | doesn't say anything if you're involved -- Jim, |
| 13:53:26 | 23 | don't say anything. |

*Santana - Davenport - 9/8/20*

184

13:53:28  1      It doesn't say anything about if you are

13:53:30  2  named as a party in lawsuit.  This is just talking

13:53:33  3  about general disclosure under Public Officers Law.

13:53:35  4  This is a lawsuit.  You've been named in a lawsuit,

13:53:38  5  respectfully, sir.

13:53:39  6      So, you know, you can object to the

13:53:41  7  production of documents, I'm not -- I'm not asking

13:53:44  8  for any documents to be produced, but this does not

13:53:46  9  say anything about deposition testimony.

13:53:47 10      **MS. HUGGINS:**  It says publicly disclosing

13:53:51 11  records --

13:53:52 12      **MR. DAVENPORT:**  Documents.

13:53:53 13      **MS. HUGGINS:**  Okay.  The issue is that that

13:53:56 14  language is incredibly broad.  I am fine if you ask

13:54:00 15  the questions.  I'm not going to permit him to

13:54:02 16  answer them.

13:54:04 17      This is why I raised this earlier with you,

13:54:06 18  is that that -- if we run afoul of that, we are

13:54:18 19  subject to further suit by the PBA.

13:54:20 20      And I cannot put the city or this officer in

13:54:24 21  that position or myself in that position as a City

13:54:28 22  of Buffalo employee.

13:54:29 23      So I understand maybe you want to preserve

*Santana - Davenport - 9/8/20*

185

13:54:31  1   the record by indicating what questions you wish to

13:54:34  2   ask, but my concern is him answering any of those

13:54:36  3   questions that may reveal the contents of records.

13:54:41  4       **MR. DAVENPORT:**  Your concern is noted.

13:54:45  5       **MS. HUGGINS:**  So in citing that order to

13:54:47  6   show cause, depending on what your question is, I

13:54:50  7   may instruct him not to answer it.

13:54:52  8       But it's only -- my concern is, is having --

13:54:56  9   having a verbal answer here inadvertently disclose

13:55:00  10  the contents of an investigation.

13:55:01  11      **MR. DAVENPORT:**  Okay.  Plaintiff preserves

13:55:03  12  his rights to be able to bring Mr. Santana back in

13:55:05  13  for a deposition to answer the questions that

13:55:07  14  counsel will, it seems --

13:55:07  15      **MS. HUGGINS:**  And that's --

13:55:09  16      **MR. DAVENPORT:**  -- object to.

13:55:10  17      **MS. HUGGINS:**  And that's fine.  On this

13:55:12  18  issue, specifically because of this order to show

13:55:15  19  cause, that is my concern.

13:55:16  20      **MR. DAVENPORT:**  Okay.  So I would just like

13:55:18  21  to say on the record that it says records.  It does

13:55:22  22  not say anything about deposition testimony.

13:55:23  23      So plaintiff respectfully disagrees that

*Santana - Davenport - 9/8/20*

186

| | | |
|---|---|---|
| 13:55:27 | 1 | this TRO has anything to do with this deposition |
| 13:55:30 | 2 | testimony here today. |
| 13:55:30 | 3 | And we will preserve that right to move |
| 13:55:34 | 4 | forward with asking Mr. Santana the questions that |
| 13:55:37 | 5 | we are about to ask in a further deposition. |
| 13:55:40 | 6 | **BY MR. DAVENPORT:** |
| 13:55:41 | 7 | **Q.** So Mr. Santana, are you aware of any |
| 13:55:44 | 8 | officers who were investigated or asked to provide |
| 13:55:48 | 9 | a statement as a witness by internal affairs for |
| 13:55:50 | 10 | this January 1st, 2017, incident? |
| 13:55:52 | 11 | **A.** No. |
| 13:55:53 | 12 | **Q.** Are you aware of the process that |
| 13:56:02 | 13 | internal affairs goes through for investigating |
| 13:56:04 | 14 | complaints against officers? |
| 13:56:06 | 15 | **A.** No. |
| 13:56:07 | 16 | **Q.** When you participated as a witness, |
| 13:56:12 | 17 | what was the outcome of that complaint? |
| 13:56:15 | 18 | **MS. HUGGINS:** Well, that, I am going to |
| 13:56:17 | 19 | object to. I don't know the answer to that |
| 13:56:18 | 20 | question, but you're saying what is the outcome of |
| 13:56:21 | 21 | the complaint. That could reveal -- |
| 13:56:23 | 22 | **MR. DAVENPORT:** Because if it was |
| 13:56:25 | 23 | substantiated, then I would be able to ask him |

*Santana - Davenport - 9/8/20*

187

13:56:27  1  questions.  This TRO has nothing to do with

13:56:30  2  substantiated complaints.

13:56:30  3        MS. HUGGINS:  It says settled.

13:56:31  4        MR. DAVENPORT:  Okay.  Well, how do you

13:56:33  5  interpret settled?

13:56:34  6        MS. HUGGINS:  I'm not interpreting settled.

13:56:37  7  In the labor context, settled is anything that --

13:56:40  8  settled is anything that is ranging from an other

13:56:44  9  disposition to a settled disposition.

13:56:49 10        MR. DAVENPORT:  Okay.  So what you're saying

13:56:50 11  is that if the outcome was not settled, then you're

13:56:55 12  going to object and direct Mr. Santana not to

13:56:57 13  answer?

13:56:58 14        MS. HUGGINS:  The way that that is written

13:57:00 15  and --

13:57:01 16        MR. DAVENPORT:  I have it if you need it.

13:57:02 17        MS. HUGGINS:  I have it.  Hang on.

13:57:04 18        MR. DAVENPORT:  Okay.  I'm reading this and

13:57:06 19  it says that:  Disclosure is not allowed if there

13:57:09 20  is pending unsubstantiated, unfounded, exonerated,

13:57:13 21  or otherwise found not guilty.  It doesn't say

13:57:16 22  anything about settled.

13:57:16 23        MS. HUGGINS:  It is the --

*Santana - Davenport - 9/8/20*

188

13:57:19  1        **MR. DAVENPORT:**  Or regarding settlement

13:57:23  2    agreements.

13:57:23  3        **MS. HUGGINS:**  It is on page 2, the middle

13:57:26  4    paragraph:  It is further ordered that pending the

13:57:28  5    hearing schedule above for the preliminary

13:57:30  6    injunction, a temporary restraining order is hereby

13:57:32  7    issued restraining respondents and those acting in

13:57:35  8    concert with them from publicly disclosing any

13:57:38  9    records concerning unsubstantiated and pending

13:57:42 10    allegations or settlement agreements entered into

13:57:44 11    prior to June 12, 2020.

13:57:46 12        **MR. DAVENPORT:**  I see nothing in there about

13:57:47 13    settled, so I'd just --

13:57:49 14        **MS. HUGGINS:**  Settlement agreement.

13:57:50 15        **MR. DAVENPORT:**  Well, you said settled and I

13:57:53 16    have no idea what settled means, but if I'm looking

13:57:55 17    at this and if what happens in this internal

13:57:59 18    affairs investigation was a finding of

13:58:03 19    substantiated, then there's nothing in this TRO

13:58:05 20    that would prevent Mr. Santana from talking about

13:58:07 21    it.

13:58:09 22        **MS. HUGGINS:**  Respectfully, the TRO

13:58:11 23    restrains the City of Buffalo, its employees from

*Santana - Davenport - 9/8/20*

189

13:58:15   1    publicly disclosing any records that would fall

13:58:17   2    into that.

13:58:19   3          Those concerns may not trouble you as a

13:58:22   4    nonlabor attorney who does not understand what

13:58:25   5    settlement agreement means, but I am telling you as

13:58:27   6    his attorney, out of an abundance of caution, I'm

13:58:31   7    going to object to the answer to that question

13:58:33   8    based upon this order to show cause.

13:58:34   9          I understand you may want to bring him back

13:58:37  10    once this litigation is completed and ask those

13:58:38  11    questions and that is different and we can address

13:58:40  12    that with the Court.

13:58:41  13          This is -- is very much an order from the

13:58:44  14    Court that I have concerns regarding.

13:58:47  15          **MR. DAVENPORT:**  So does a settlement

13:58:48  16    agreement mean anything besides a lawsuit that is

13:58:52  17    put forth against an officer where it results in a

13:58:54  18    settlement agreement?

13:58:56  19          **MS. HUGGINS:**  Lawsuit is different.  We're

13:58:57  20    talking about internal affairs.

13:58:59  21          **MR. DAVENPORT:**  Are there settlement

13:59:01  22    agreements for what internal affairs investigates?

13:59:03  23          **MS. HUGGINS:**  My understanding is that there

*Santana - Davenport - 9/8/20*

190

| 13:59:04 | 1 | is. |

13:59:05  2       **MR. DAVENPORT:**  Okay.  All right.

13:59:05  3       **MS. HUGGINS:**  And that where is my concern

13:59:07  4  lies.

13:59:08  5       **MR. DAVENPORT:**  All right.

13:59:08  6       **BY MR. DAVENPORT:**

13:59:09  7       **Q.**  Well, I'm going to ask the question and

13:59:12  8  it sounds like Ms. Huggins will object to it.  What

13:59:14  9  was the outcome of that other internal affairs

13:59:16 10  investigation?

13:59:17 11       **MS. HUGGINS:**  And citing Judge Sedita's

13:59:19 12  order to show cause, I'm going to object to that

13:59:23 13  question and ask that the witness not answer it.

13:59:28 14       **BY MR. DAVENPORT:**

13:59:28 15       **Q.**  As a witness, what sort of information

13:59:30 16  did you provide for that internal affairs

13:59:32 17  investigation?

13:59:34 18       **A.**  Pretty much it's just --

13:59:35 19       **MS. HUGGINS:**  Wait just a second.  Can you

13:59:35 20  read that back to me?

13:59:35 21       (The above-requested question was then read

13:59:47 22  by the reporter.)

13:59:47 23       **MS. HUGGINS:**  I'll allow that question to be

*Santana - Davenport - 9/8/20*

191

13:59:54  1  asked and answered generally without revealing the

14:00:08  2  specifics of what may be contained in that

14:00:10  3  investigation citing this order to show cause.

14:00:16  4       **BY MR. DAVENPORT:**

14:00:16  5       **Q.**   As a witness, what sort of information

14:00:18  6  were you required or did you provide as part of

14:00:21  7  this internal affairs investigation?

14:00:24  8       **A.**   Generally what happened in relating to

14:00:27  9  that incident where I was involved in as a witness.

14:00:34  10      **Q.**   Were you there present at the scene

14:00:36  11 when this incident took place that was the subject

14:00:37  12 of the internal affairs investigation?

14:00:39  13      **A.**   Are you talking about this incident or

14:00:41  14 are you just talking about in general?

14:00:42  15      **Q.**   Well, I'm talking about the previous

14:00:43  16 incident that you acted as a witness for.

14:00:46  17      **A.**   Yes, I was.

14:00:47  18      **Q.**   So you were present at the scene?

14:00:48  19      **A.**   Yes.  I was in the call log.  It didn't

14:00:51  20 mean that I was present when the incident happened.

14:00:54  21 Somehow it could have been where I was involved in

14:00:56  22 a call and they called me in to see what my role

14:00:59  23 was within that call.

*Santana - Davenport - 9/8/20*

192

14:01:00  1        Q.   So is it your understanding that only

14:01:03  2   those officers who are involved on the call log are

14:01:06  3   asked to give a witness statement for internal

14:01:09  4   affairs investigations?

14:01:10  5        A.   Everybody involved in that call whether

14:01:12  6   or not they were there or not.

14:01:15  7        Q.   But if they're listed on the call log,

14:01:17  8   correct?

14:01:18  9        A.   Yes.

14:01:18  10        Q.   Okay.  Because you weren't listed on

14:01:20  11   the call log for this incident that we're talking

14:01:22  12   about today.

14:01:23  13        A.   No.

14:01:24  14        Q.   Okay.  So that's why you wouldn't be

14:01:26  15   expected to provide a statement as a witness for

14:01:28  16   this internal affairs investigation?

14:01:31  17        MS. HUGGINS:  Form.  You're asking him to

14:01:32  18   speculate why internal affairs would do something.

14:01:35  19        MR. DAVENPORT:  No.  He said that we --

14:01:38  20   witnesses -- witness statements are expected of

14:01:40  21   people who are on a call log, so I'm just merely

14:01:43  22   clarifying that the reason why he was not expected

14:01:45  23   to give a witness statement was because he was not

*Santana - Davenport - 9/8/20*

193

14:01:48  1  listed on the call log.  It's -- it's already

14:01:50  2  been --

14:01:51  3       **MS. HUGGINS:**  Form.  Form.

14:01:52  4       **MR. DAVENPORT:**  Okay.  All right.

14:01:53  5       **MS. HUGGINS:**  Do you know why you didn't --

14:01:55  6  why you did or did not give a statement?

14:01:56  7       **MR. DAVENPORT:**  That's not the question I

14:01:57  8  asked.

14:01:58  9       **BY MR. DAVENPORT:**

14:01:59 10       **Q.**   My question is, is it because you were

14:02:01 11  not listed on the call log for this incident that

14:02:02 12  you were not asked to give a witness statement for

14:02:04 13  this incident that transpired on January 1st, 2017?

14:02:08 14       **MS. HUGGINS:**  Form.

14:02:09 15       **THE WITNESS:**  No, it's because I didn't see

14:02:11 16  the incident.  That's why I wasn't called.

14:02:14 17       **BY MR. DAVENPORT:**

14:02:14 18       **Q.**   Did they ask you if --

14:02:15 19       **A.**   I wasn't there.

14:02:16 20       **Q.**   -- you saw the incident?

14:02:18 21       **A.**   No one ever asked me anything, but I

14:02:20 22  wasn't there and I didn't see the incident, so

14:02:22 23  that's why they didn't call me in.

14:02:24   1        Q.   Okay.  Well, how do they know that you

14:02:27   2   didn't see the incident?

14:02:27   3        A.   I don't know.

14:02:28   4        MS. HUGGINS:  Form.

14:02:29   5        BY MR. DAVENPORT:

14:02:29   6        Q.   They never asked you, though, right?

14:02:30   7        MS. HUGGINS:  Form.

14:02:31   8        THE WITNESS:  No, I never got notified to go

14:02:33   9   up to internal affairs, no.

14:02:35  10        BY MR. DAVENPORT:

14:02:35  11        Q.   Did anybody besides somebody with

14:02:39  12   internal affairs ask you if you saw the incident?

14:02:41  13        A.   No.

14:02:41  14        Q.   So nobody ever asked you if you saw

14:02:43  15   what happened on January 1st of 2017 that's with

14:02:51  16   the City of Buffalo?

14:02:51  17        A.   No one asked, no.

14:02:54  18        Q.   But you yourself, you have never been

14:02:56  19   the target of an internal affairs investigation?

14:02:58  20        MS. HUGGINS:  No. That, I'm going to object

14:02:59  21   to under this TRO.

14:03:03  22        MR. DAVENPORT:  Okay.  I'm just going to

14:03:04  23   preserve the record and our ability to ask that

*Santana - Davenport - 9/8/20*

195

14:03:07  1  question.

14:03:07  2       **MS. HUGGINS:**  That's understood and then I

14:03:10  3  expect that we will probably have a conference and

14:03:11  4  address it with the Court.

14:03:12  5       **MR. DAVENPORT:**  I'm fine with that.

14:03:13  6       **MS. HUGGINS:**  Yeah.

14:03:16  7       **BY MR. DAVENPORT:**

14:03:17  8       **Q.**   Were you involved at all in the

14:03:18  9  criminal proceeding for Mr. Kistner?

14:03:21 10       **A.**   No.

14:03:23 11       **Q.**   Do you know the outcome --

14:03:25 12       **A.**   No, I --

14:03:26 13       **Q.**   -- of that criminal proceeding?

14:03:27 14       **A.**   -- do not.

14:03:31 15       **MR. DAVENPORT:**  All right.  I think that's

14:03:31 16  all that I have.

14:03:36 17       (Discussion off the record.)

14:03:36 18  **The following was marked for Identification:**

         19   **EXH. 37**              **Proposed Order to Show Cause**

14:04:15 20       **MR. DAVENPORT:**  I think we're all set for

14:04:16 21  today.

14:04:17 22       (Deposition concluded at 2:04 p.m.)

         23                    *   *   *

196

1        I hereby CERTIFY that I have read the

2   foregoing 195 pages, and that except as to those

3   changes (if any) as set forth in an attached errata

4   sheet, they are a true and accurate transcript of

5   the testimony given by me in the above entitled

6   action on September 8, 2020.

7

8

9                        ------------------------
                         DAVID SANTANA
10

11

12

13

14

15

16

17

18

19

20

21

22

23

197

```
 1  STATE OF NEW YORK )

 2                         ss:

 3  COUNTY OF ERIE    )

 4

 5       I DO HEREBY CERTIFY as a Notary Public in and

 6  for the State of New York, that I did attend and

 7  report the foregoing deposition, which was taken

 8  down by me in a verbatim manner by means of machine

 9  shorthand.  Further, that the deposition was then

10  reduced to writing in my presence and under my

11  direction.  That the deposition was taken to be

12  used in the foregoing entitled action.  That the

13  said deponent, before examination, was duly sworn

14  to testify to the truth, the whole truth and

15  nothing but the truth, relative to said action.

16

17                        _____

18                        RICHARD B. WHALEN, CM,
                           Notary Public.
19

20

21

22

23
```