UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES C. KISTNER,

        Plaintiff,

vs.                                             Civil No.:  18-CV-00402

LAUREN McDERMOTT
JENNY VELEZ
KARL SCHULTZ, and
KYLE MORIARITY, *et al.*,

        Defendants.
_____

### STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULES OF CIVIL PROCEDURE 7(a)(5) AND 56 SUBMITTED BY PLAINTIFF JAMES C. KISTNER

        Pursuant to Local Rules of Civil Procedure 7(a)(5) and 56, it is submitted by the moving party, plaintiff James C. Kistner, that there is no genuine issue to be tried with respect to the following material facts:

        1.        The motor vehicle accident that led to Mr. Kistner's arrest occurred on January 1, 2017, between 10:00 am and 11:00 am, near 33 and 37 Schmarbeck Avenue in Buffalo, New York.  *See* Declaration of R. Anthony Rupp III ("Rupp Decl."), Exhibit M.

        2.        Plaintiff James Kistner owned the properties located at 33 and 37 Schmarbeck Avenue at the time of the incident.  *See* Rupp Decl., Exhibit E, p. 32.

3. The incident was captured by surveillance cameras mounted on 37 Schmarbeck. *See* Affidavit of Dr. Jennifer Yaek ("Yaek Aff."), Exhibit C. The surveillance cameras were owned by Mr. Kistner. *See* Rupp Decl., Exhibit B, pp. 6-7; Exhibit E, pp. 10-15.

4. On January 1, 2017, Officers Karl Schultz and Kyle Moriarity were dispatched to 33 Schmarbeck to respond to an unrelated theft complaint. The two officers arrived in a Buffalo Police Department ("BPD") SUV identified as vehicle No. 532. *See* Rupp Decl., Exhibit F, p. 89; Exhibit H, pp. 53, 67-68, 76.

5. Moriarity was a new officer who was being trained by Officer Schultz. *See* Rupp Decl., Exhibit F, pp. 32-33; Exhibit H, pp. 27-28.

6. Officer Moriarity was driving BPD vehicle No. 532 and Schultz was sitting in the passenger seat. *See* Rupp Decl., Exhibit F, p. 93; Exhibit H, p. 71.

7. Moriarity parked the BPD vehicle in the middle of Schmarbeck, near a red van that can be seen in the surveillance footage of the incident. Moriarity's vehicle was parked in a way that blocked all traffic on Schmarbeck. *See* Rupp Decl., Exhibit H, pp. 67-69; *see also* Yaek Aff., Exhibits C and D.

8. A second BPD vehicle marked as vehicle No. 473 arrived shortly after Officers Schultz and Moriarity appeared on Schmarbeck Avenue. That BPD vehicle was driven

by Officer Lauren McDermott, with Officer Jenny Velez riding as a passenger. *See* Rupp Decl., Exhibit G, pp. 16-17, 88, and 146-47; Exhibit I, pp. 144, 153, 156-57, and 202.

9. McDermott parked her BPD vehicle on Schmarbeck Avenue next to the curb and behind the red van seen in the video. *See* Rupp Decl., Exhibit G, p. 146; *see also* Yaek Affidavit, Exhibits C and D.

10. Mr. Kistner observed the police vehicles pull up to his rental property located at 33 Schmarbeck, which prompted him to go downstairs and attempt to speak with the on-scene officers to determine why they were there. *See* Rupp Decl., Exhibit B, p. 26-33; Exhibit E, pp. 71-72 and 81-82.

11. Officers Schultz and Moriarity resolved the initial theft complaint and prepared to leave the scene. *See* Rupp Decl., Exhibit F, p. 89.

12. Mr. Kistner approached BPD vehicle No. 532, which was driven by Officer Moriarity. *See* Rupp Decl., Exhibit B, pp. 33-34; Exhibit H, pp. 100-01; *see also* Yaek Aff., Exhibit C.

13. Mr. Kistner asked to speak with the officers, but Schultz indicated that he would not speak to Kistner and that they were leaving the scene. *See* Rupp Decl., Exhibit B, pp. 33-35; Exhibit E, pp. 82-85; Exhibit F, p. 225.

14. Moriarity then drove his vehicle past Mr. Kistner and proceeded down Schmarbeck Avenue. *See* Rupp Decl., Exhibit B, p. 36; *see also* Yaek Aff., Exhibits C and D.

15. Mr. Kistner then approached the second BPD vehicle marked as No. 473, which was parked diagonally behind the first BPD vehicle. Officer McDermott was the driver of that vehicle. *See* Rupp Decl., Exhibit E, pp. 85-87; Exhibit G, at pp. 108-09; *see also* Yaek Affidavit, Exhibits C and D.

16. McDermott was in the process of leaving the scene and backed her vehicle up to give herself more room to pull forward and follow Officers Moriarity and Schultz down Schmarbeck Avenue. *See* Rupp Decl., Exhibit G, pp. 108-09 and 153-54; *see also* Yaek Aff. Exhibit C.

17. McDermott admitted that she took her eyes off Mr. Kistner while reversing her vehicle. *See* Rupp Decl., Exhibit G, pp. 108-114 and 153-55.

18. Although McDermott stated that she first saw Mr. Kistner when he exited his house and walked along the sidewalk towards the BPD vehicles, she was unable to articulate at what point she first saw Kistner prior to pulling her vehicle forward to follow Officers Moriarity and Schultz in leaving Schmarbeck. *See* Rupp Decl., Exhibit G, pp. 172-78.

19. As shown in the video, McDermott put her vehicle into drive, pulled forward, and struck Mr. Kistner with her BPD vehicle. The force of that collision knocked Mr. Kistner to the ground. *See* Rupp Decl., Exhibit G, pp. 114 and 163-65; Exhibit B, p. 38; Exhibit E, p. 90; *see also* Yaek Aff., Exhibit C.

20. Kistner braced for impact and stuck out his arms immediately before the collision. *See* Rupp Decl., Exhibit B, p. 38.

21. McDermott's vehicle was moving forward at the time of impact. *See* Rupp Decl., Exhibit G, pp. 163-65; Exhibit F, p. 228; Exhibit H, pp. 194-95; Exhibit I, p. 296; *see also* Yaek Affidavit, Exhibits B and C.

22. McDermott first testified that Kistner "purposely" threw himself at her police vehicle. *See* Rupp Decl., Exhibit G, pp. 101 and 179.

23. However, upon further examination, McDermott admitted that she did not recall what direction she was looking as she began to pull forward, and she did not recall seeing Mr. Kistner approaching her vehicle after she shifted it into drive. *See* Rupp Decl., Exhibit G, pp. 113-15, 171, and 173-178.

24. McDermott also could not explain how much time elapsed from when she allegedly first saw Mr. Kistner and the point of impact. *See* Rupp Decl., Exhibit G, pp. 179-80.

25. Officer Velez, who was sitting in the passenger seat in McDermott's vehicle, did not witness the incident. *See* Rupp Decl., Exhibit I, pp. 114 and 199-200.

26. Officer Moriarity testified that after he drove by Kistner, Schultz instructed him to stop the vehicle and watch to make sure Officers McDermott and Velez were able to leave the scene safely. *See* Rupp Decl., Exhibit H, pp. 107-08; Exhibit F, pp. 93-94 and 226.

27. Moriarity testified that, as he was leaving the scene and driving down Schmarbeck Avenue, he was shifting his attention between the driver's side mirror and the road in front of him. *See* Rupp Decl., Exhibit H, pp. 107 and 112-13.

28. Moriarity's vehicle was still moving away from the scene when McDermott's vehicle struck Mr. Kistner, and it continued to move away from the scene for several seconds thereafter. *See* Rupp Decl., Exhibit H, pp. 190-91 and 194-95; Yaek Affidavit, Exhibits C and D.

29. Moriarity could not recall whether he personally witnessed the incident. *See* Rupp Decl., Exhibit H, pp. 109-11 and 113-17.

30. Officer Schultz was sitting in the passenger seat of the vehicle driven by Moriarity. *See* Rupp Decl., Exhibit F, pp. 93.

31. Schultz claimed that he observed the entire incident in the ***driver's side*** mirror while sitting as a ***passenger*** in the vehicle driven by Officer Moriarity. *See* Rupp Decl., Exhibit F, pp. 93-94 and 225-26.

32. Schultz claimed that, on the day of the incident, he observed McDermott's vehicle stop abruptly and further claims to have observed Kistner initiate contact with McDermott's stopped BPD vehicle. *See* Rupp Decl., Exhibit F, pp. 95-98.

33. Although Schultz testified that the BPD vehicle in which he was a passenger was stopped when he made those observations, the surveillance footage of the incident reveals that his vehicle was still in motion at the time of impact between Officer McDermott's vehicle and Kistner. *See* Rupp Decl., Exhibit H, pp. 190-91 and 194-95; *see also* Yaek Aff., Exhibits C and D.

34. Schultz testified that, based on his alleged observations the day of the incident, he and the other officers accused Kistner of intentionally throwing himself at McDermott's vehicle with the intent to damage it. *See* Rupp Decl., Exhibit F, pp. 173-74.

35. During his deposition, Schultz was shown the surveillance footage of the incident and admitted that it did not appear that Mr. Kistner intentionally threw himself at the police vehicle. *See* Rupp Decl., Exhibit F, p. 226.

36. Schultz also admitted that McDermott's vehicle did not stop prior to impact with Kistner. *See* Rupp Decl., Exhibit F, p. 228.

37. After the incident, the on-scene Officers exited their vehicles and approached Kistner, who was lying on the ground. *See* Rupp Decl., Exhibit H, p. 123; Exhibit F, p. 101; Exhibit G, pp. 182-84.

38. McDermott demanded that Mr. Kistner "get up" off the ground or else he would be arrested. Kistner was unable to get up off the ground. *See* Rupp Decl., Exhibit G, p. 184; *see also* Yaek Aff., Exhibit C.

39. Officers Schultz and Moriarity then placed Mr. Kistner in handcuffs, picked him up off the ground, and escorted him to the police vehicle driven by Moriarity. *See* Rupp Decl., Exhibit F, pp. 104, 107, and 110-11; *see also* Yaek Aff., Exhibit C.

40. Schultz then called his supervisor, Lieutenant Anthony McHugh. After that phone conversation, the on-scene Officers decided to charge Kistner with felony criminal mischief. *See* Rupp Decl., Exhibit F, pp. 115-16, 122, and 202-03; Exhibits K, L, and M.

41. The criminal mischief charge was based on Schultz's alleged observation that Kistner intentionally threw himself at Officer McDermott's BPD vehicle with the intent to cause damage to the mirror and window. *See* Rupp Decl., Exhibit G, p. 285; Exhibit F, pp. 115-18 and 173-74; Exhibits J, K, and M.

42. The criminal complaint alleged that Kistner caused the driver's side "mirror to become dislodged from the vehicle and also causing the driver's side window to malfunction." *See* Rupp Decl., Exhibit M; Exhibit I, pp. 200-01.

43. The on-scene officers estimated that the vehicle sustained $250.00 in damages, which is the threshold amount required to charge Kistner with a felony. *See* Rupp Decl., Exhibit F, p. 184-85; Exhibit G, pp. 358-59.

44. The on-scene officers could not articulate the basis for their $250.00 estimate of damages. *See* Rupp Decl., Exhibit F, pp. 184-85; Exhibit G, pp. 358-59; Exhibit H, pp. 284 and 287-88; Exhibit I, p. 205.

45. BPD vehicle No. 473—the vehicle driven by McDermott that was allegedly damaged by the collision—was brought into the Buffalo Police service garage on Seneca Street for routine maintenance on January 5, 2017, just four days after the accident. *See* Rupp Decl., Exhibit D; Exhibit G, pp. 206-09.

46. The vehicle's "cooling system" was serviced, but no repairs were made to the mirror or window, despite McDermott's allegation in criminal complaint that the driver's side mirror was "dislodged" from BPD vehicle No. 473. *See* Rupp Decl., Exhibits J, K, and M; Exhibit G, pp. 363-65.

47. McDermott did not take any steps to document the alleged damage to her vehicle or ensure that her vehicle was repaired for purposes of pursuing the felony charge against Kistner. *See* Rupp Decl., Exhibit G, pp. 128-30 and 250-58.

48. The on-scene officers were aware that the incident was captured by Kistner's surveillance cameras, but they did not take any steps to obtain and review the footage prior to charging Kistner with criminal mischief. *See* Rupp Decl., Exhibit G, pp. 32-33, 76-77, 139, 275-78, and 397-98; Exhibit F, pp. 128-29; Exhibit J.

49. The on-scene officers also did not interview any witnesses to the incident, including Kistner's son and girlfriend. *See* Rupp Decl., Exhibit F, pp. 127-28; Exhibit G, pp. 397-98.

50. After placing Kistner under arrest, Officers Moriarity and Schultz transported Kistner to ECMC for a 941 evaluation. *See* Rupp Decl., Exhibit F, pp. 129-30; Exhibit J (time entry 11:23:01 "C230 will be a 941").

51. Approximately 20-30 minutes after transporting Kistner to ECMC, Officers Schultz and Moriarity left ECMC and went back on patrol. *See* Rupp Decl., Exhibit F, p. 133.

52. After ECMC staff determined that Mr. Kistner would not be admitted for a 9.41 mental health evaluation, Officers McDermott and Velez transported him to central booking. *See* Rupp Decl., Exhibit G, pp. 279-80.

53. Kistner was processed at central booking, stripped, searched, and issued an appearance ticket for his criminal charges. *See* Rupp Decl., Exhibit G, pp. 294-301; Exhibit B, pp. 120-26; Exhibits K, L, and M.

54. After he was processed at central booking, Officers McDermott and Velez transported him from central booking back to ECMC for a ***second*** mental health evaluation. *See* Rupp Decl., Exhibit G, pp. 85-86, 317-18; Exhibit I, pp. 76-77, 173.

55. Officers McDermott and Velez left Kistner at ECMC to be processed. *See* Rupp Decl., Exhibit G, pp. 328-29; Exhibit I, p. 91.

56. Kistner was examined by ECMC staff who quickly determined that he was not a risk to himself or others. *See* Rupp Decl., Exhibit B, pp. 82-84.

57. The ECMC physician who evaluated Kistner ordered his immediate release from the CPEP unit. *See* Rupp Decl., Exhibit B, pp. 82-84.

58. Kistner was arraigned approximately 12 days after the incident. *See* Rupp Decl., Exhibit B, p. 87; Exhibit L.

59. Kistner and/or his attorneys returned to court on 6 or 7 occasions before all charges ultimately were dropped. *See* Rupp Decl., Exhibit B, pp. 87-89; Exhibit O; *see also* Dkt. 65, ¶ 160.

All cited authority has been filed in conjunction with the present motion.

Dated: April 28, 2021
        Buffalo, New York

                                    **RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
                                    *Attorneys for Plaintiff, James C. Kistner*

                              By:     *s/R. Anthony Rupp III*
                                      R. Anthony Rupp III
                                      Jill L. Yonkers
                                      Chad A. Davenport
                              1600 Liberty Building, 424 Main Street
                              Buffalo, New York  14202
                              (716) 854-3400
                              rupp@ruppbaase.com
                              yonkers@ruppbaase.com
                              davenport@ruppbaase.com

**TO:** **CITY OF BUFFALO**
      Corporation Counsel
      Attorneys for Defendants
      Maeve E. Huggins, Esq.
      65 Niagara Square, 11th Floor
      Buffalo, New York 14202
      (716) 851-4317