UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| **JAMES C. KISTNER,** | **DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS** |
| Plaintiff, | |
| v. | Case No.: 18-cv-00402 |
| **THE CITY OF BUFFALO,** *et al.*, | |
| Defendants. | |

---

The Defendants, Lauren McDermott (hereinafter "McDermott"), Jenny Velez (hereinafter "Velez"), Karl Schultz (hereinafter "Schultz"), Kyle Moriarity (sued incorrectly here as "KYLE MORIARTY"; hereinafter "Moriarity") (collectively hereinafter "Defendants"), submit this response to Plaintiff's purported "Statement of Material Facts Pursuant to Local Rules of Civil Procedure 7(a)(5) and 56 submitted by Plaintiff James C. Kistner" (Dkt. No. 96)[1] pursuant to Local Rule of Civil Procedure 56(a)(1) as follows:

1.  *The motor vehicle accident that led to Mr. Kistner's arrest occurred on January 1, 2017, between 10:00 am and 11:00 am, near 33 and 37 Schmarbeck Avenue in Buffalo, New York. See Declaration of R. Anthony Rupp III ("Rupp Decl."), Exhibit M.*

    Response:   The Defendants do not dispute that they came to interact with Plaintiff on January 1, 2017, between 10:00 am and 11:00 am, near 33 and 37 Schmarbeck

---

[1] Plaintiff's statements of allegedly undisputed material facts are set forth in *italics*; the Defendants' responses immediately follow in upright typeface. The Exhibits cited herein as "Ex." refer to those Exhibits attached to the Defendants' opposition to Plaintiff's motion and electronically filed on May 14, 2021, Dkt. Nos. 84-95.

1

Avenue in Buffalo, New York, but deny the characterization of the interaction to be a motor vehicle accident that led to Plaintiff's arrest. McDermott did not consider Plaintiff's interaction with her police vehicle to be an accident. Ex. F at 198, 201-202. The Defendants do not dispute that Plaintiff was arrested.

2. *Plaintiff James Kistner owned the properties located at 33 and 37 Schmarbeck Avenue at the time of the incident. See Rupp Decl., Exhibit E, p. 32.*

Response: The Defendants admit that Plaintiff owns 33 Schmarbeck Avenue at the time of the incident. The Defendants dispute that Plaintiff owned 37 Schmarbeck Avenue; that property is owned by Rachel Glurich. Ex. D at 10, 30, 31, 70.

3. *The incident was captured by surveillance cameras mounted on 37 Schmarbeck. See Affidavit of Dr. Jennifer Yaek ("Yaek Aff."), Exhibit C. The surveillance cameras were owned by Mr. Kistner. See Rupp Decl., Exhibit B, pp. 6-7; Exhibit E, pp. 10-15.*

Response: The Defendants dispute this statement. The Defendants dispute that the circumstances of the entire January 1, 2017 incident occurring on Schmarbeck Avenue involving Plaintiff and the Defendants are captured by surveillance cameras. Footage of only portions of the incident were captured. Ex. D at 21-23. Plaintiff does not own the system. Rachel Glurich purchased the surveillance camera system. Ex. D at 11, 15.

4. *On January 1, 2017, Officers Karl Schultz and Kyle Moriarity were dispatched to 33 Schmarbeck to respond to an unrelated theft complaint. The two officers arrived in a Buffalo Police Department ("BPD") USV identified as vehicle No. 532. See Rupp Decl., Exhibit F, p. 89; Exhibit H, pp. 53, 67-68, 76.*

Response: The Defendants do not dispute this statement.

5. *Moriarity was a new officer who was being trained by Officer Schultz. See Rupp Decl., Exhibit F, pp. 32-33; Exhibit H, pp. 27-28.*

Response: The Defendants do not dispute this statement.

6. *Officer Moriarity was driving BPD vehicle No. 532 and Schultz was sitting in the passenger seat. See Rupp Decl., Exhibit F, p. 93; Exhibit H, p. 71.*

Response: The Defendants do not dispute this statement.

7. *Moriarity parked the BPD vehicle in the middle of Schmarbeck, near a red van that can be seen in the surveillance footage of the incident. Moriarity's vehicle was parked in a way that blocked all traffic on Schmarbeck. See Rupp Decl., Exhibit H, pp. 67-69; see also Yaek Aff., Exhibits C and D.*

Response: The Defendants do not dispute that Moriarity parked the BPD vehicle in the middle of Schmarbeck Avenue near a red van parked outside of 33 Schmarbeck. The Defendants dispute that the BPD vehicle was parked in a way that blocked all traffic on Schmarbeck. Plaintiff testified that Schmarbeck Avenue is a two lane road where three vehicles could safely be abreast. Ex. D at 72. As shown in the video clip contained within the exhibits to Dr. Yaek's purported report, the red van could have pull out and driven down Schmarbeck notwithstanding the manner in which Moriarity parked the police vehicle.

8. *A second BPD vehicle marked as vehicle No. 473 arrived shortly after Officers Schultz and Moriarity appeared on Schmarbeck Avenue. That BPD vehicle was driven by Officer Lauren McDermott, with Officer Jenny Velez riding as passenger. See Rupp Decl., Exhibit G, pp. 16-17, 88, and 146-47; Exhibit I, pp. 144, 153, 156-57, and 202.*

3

Response:   The Defendants do not dispute this statement.

9.   *McDermott parked her BPD vehicle on Schmarbeck Avenue next to the curb and behind the red van seen in the video.  See Rupp Decl., Exhibit G, p. 146; see also Yaek Affidavit, Exhibits C and D.*

Response:   The Defendants do not dispute this statement.

10.   *Mr. Kistner observed the police vehicles pull up to his rental property located at 33 Schmarbeck, which prompted him to go downstairs and attempt to speak with the on-scene officers to determine why they were there.  See Rupp Decl., Exhibit B, p. 26-33; Exhibit E, pp. 71-72 and 81-82.*

Response:   The Defendants dispute that Plaintiff observed the police vehicles pull up to 33 Schmarbeck.  Plaintiff testified that he later watched the arrival of the police vehicles on the video system.  Ex. C at 31.  When he looked out his window, Plaintiff noted that the police were there.  Ex. C at 31; Ex. D at 81.  The Defendants do not dispute the remaining allegations.

11.   *Officers Schultz and Moriarity resolved the initial theft complaint and prepared to leave the scene.  See Rupp Decl., Exhibit F, p. 89.*

Response:   The Defendants do not dispute this statement other than to clarify that the disposition of the larceny/theft call was "advised."  Ex. A.

12.   *Mr. Kistner approached BPD vehicle No. 532, which was driven by Officer Moriarity.  See Rupp Decl., Exhibit B, pp. 33-34; Exhibit H, pp. 100-01; see also Yaek Aff., Exhibit C.*

Response:   The Defendants do not dispute this statement.

13. *Mr. Kistner asked to speak with the officers, but Schultz indicated that he would not speak to Kistner and that they were leaving the scene. See Rupp Decl., Exhibit B, pp. 33-35; Exhibit E, pp. 82-85; Exhibit F, p. 225.*

Response: The Defendants dispute this statement. Officer Schultz testified that he stated in sum and substance "we're leaving" and that he did not believe that Plaintiff tried to talk to him. Ex. H at 91.

14. *Moriarity then drove his vehicle past Mr. Kistner and proceeded down Schmarbeck Avenue. See Rupp. Decl., Exhibit B, p. 36; see also Yaek Aff., Exhibits C and D.*

Response: The Defendants do not dispute that Moriarity drove his vehicle down Schmarbeck past Plaintiff.

15. *Mr. Kistner then approached the second BPD vehicle marked as No. 473, which was parked diagonally behind the first BPD vehicle. Officer McDermott was the drive of that vehicle. See Rupp Decl., Exhibit E, pp. 85-87; Exhibit G, at pp. 108-09; see also Yaek Affidavit, Exhibits C and D.*

Response: The Defendants do not dispute this statement other than to clarify that Officer McDermott's vehicle was parked directly behind the red van. Ex. F at 148.

16. *McDermott was in the process of leaving the scene and backed her vehicle up to give herself more room to pull forward and follow Officers Moriarity and Schultz down Schmarbeck Avenue. See Rupp Decl., Exhibit G, pp. 108-09 and 153; see also Yaek Aff. Exhibit C.*

Response: The Defendants do not dispute this statement other than to clarify that Officers McDermott and Velez were going to go back in service and not necessarily to follow Officers Moriarity and Schultz. Ex. F at 152-153.

17. *McDermott admitted that she took her eyes off Mr. Kistner while reversing her vehicle. See Rupp Decl., Exhibit G, pp. 108-114 and 153-55.*

Response: The Defendants dispute this statement. Officer McDermott testified that she did not remember exactly where she was looking when Plaintiff made contact with her vehicle. Ex. F at 108, 110, 114, 115, 154.

18. *Although McDermott stated that she first saw Mr. Kistner when he exited his house and walked along the sidewalk towards the BPD vehicles, she was unable to articulate at what point she first saw Kistner prior to pulling her vehicle forward to follow Officers Moriarity and Schultz in leaving Schmarbeck. See Rupp Decl., Exhibit G, pp. 172-78.*

Response: The Defendants dispute this statement. Officer McDermott saw Plaintiff prior to Officer Moriarity's car pulling away walking while he was on the sidewalk and when he entered the street approaching her vehicle. Ex. F at 173, 175-179.

19. *As shown in the video, McDermott put her vehicle into drive, pulled forward, and struck Mr. Kistner with her BPD vehicle. The force of that collision knocked Mr. Kistner to the ground. See Rupp Decl., Exhibit G, pp. 114 and 163-65; Exhibit B, p. 38; Exhibit E, p. 90; see also Yaek Aff., Exhibit C.*

Response: The Defendants dispute this statement. The video does not depict the interior of the vehicle such that it is discernible when the vehicle is put into drive. Plaintiff walked towards the side of the driver's side of the vehicle, without stopping. Ex.

6

F at 103-105, 162.  Plaintiff extended his hands and closed his eyes.  Ex. D at 90; Ex. F at 158, 160, 162; Ex. H at 97, 207. His hands came into contact with the vehicle.  Ex. C at 39; Ex. F at 95-97, 163-164; Ex. H at 97.  The force of the collision cannot be discerned from the video.  However, Erie County Medical Center medical records from Plaintiff's evaluation immediately after the incident indicate that he suffered no serious physical injury.  Ex. E.

20. *Kistner braced for impact and stuck out his arms immediately before the collision. See Rupp Decl., Exhibit B, p. 38.*

Response:   The Defendants dispute this statement.  Plaintiff testified that he did not know the vehicle was moving.  Ex. D at 90.  He put his hands out in front of him and closed his eyes.  Ex. D at 90.

21. *McDermott's vehicle was moving forward at the time of impact.  See Rupp Decl., Exhibit G, pp. 163-65; Exhibit F, p. 228; Exhibit H, pp. 194-95; Exhibit I, p. 296; see also Yaek Affidavit, Exhibits B and C.*

Response:   The Defendants do not dispute this statement but clarify that Officer McDermott does not remember the vehicle moving forward.  Ex. F at 44.

22. *McDermott first testified that Kistner "purposely" threw himself at her police vehicle.  See Rupp Decl., Exhibit G, pp. 101 and 179.*

Response:   The Defendants dispute this statement as mischaracterizing the testimony.  Officer McDermott testified: "My assessment was that he purposely walked towards the vehicle and threw himself into it."  Ex. F at 101.

7

23. *However, upon further examination, McDermott admitted that she did not recall what direction she was looking as she began to pull forward, and she did not recall seeing Mr. Kistner approaching her vehicle after she shifted it into drive. See Rupp Decl., Exhibit G, pp. 113-15, 171, and 173-178.*

Response:   The Defendants do dispute this statement as mischaracterizing the testimony. Ex. F at 113-115, 171, 173-178.

24. *McDermott also could not explain how much time elapsed from when she allegedly first saw Mr. Kistner and the point of impact. See Rupp Decl., Exhibit G, pp. 179-80.*

Response:   The Defendants dispute this statement in that it mischaracterizes the testimony. Officer McDermott testified that she did not remember how much time was between the first time she saw Plaintiff in the street and the time of contact. Ex. F at 180.

25. *Officer Velez, who was sitting in the passenger seat in McDermott's vehicle, did not witness the incident. See Rupp Decl., Exhibit I, pp. 114 and 199-200.*

Response:   The Defendants clarify that Officer Velez did not observe the contact between the vehicle and Plaintiff. Ex. G at 200. Officer Velez is a witness to other aspects of the incident, including damage to the vehicle's mirror. Ex. G at 200-201.

26. *Officer Moriarity testified that after he drove by Kistner, Schultz instructed him to stop the vehicle and watch to make sure Officers McDermott and Velez were able to leave the scene safely. See Rupp Decl., Exhibit H, pp. 107-08; Exhibit F, pp. 93-94 and 226.*

Response:   The Defendants do not dispute this statement.

27.     *Moriarity testified that, as he was leaving the scene and driving down Schmarbeck Avenue, he was shifting his attention between the driver's side mirror and the road in front of him. See Rupp Decl., Exhibit H, pp. 107 and 112-13.*

Response:    The Defendants do not dispute this statement.

28.     *Moriarity's vehicle was still moving away from the scene when McDermott's vehicle struck Mr. Kistner, and it continued to move away from the scene for several seconds thereafter. See Rupp Decl., Exhibit H, pp. 190-91 and 194-95; Yaek Affidavit, Exhibits C and D.*

Response:    The Defendants do not dispute this statement.

29.     *Moriarity could not recall whether he personally witnessed the incident. See Rupp Decl., Exhibit H, pp. 109-11 and 113-17.*

Response:    The Defendants dispute this statement. Officer Moriarity testified that he thought he saw Plaintiff make contact with the vehicle. Ex. I at 112-117, 190, 192-194.

30.     *Officer Schultz was sitting in the passenger seat of the vehicle driven by Moriarity. See Rupp Decl., Exhibit F, pp. 93.*

Response:    The Defendants do not dispute this statement.

31.     *Schultz claimed that he observed the entire incident in the driver's side mirror while sitting as a passenger in the vehicle driven by Officer Moriarity. See Rupp Decl., Exhibit F, pp. 93-94 and 225-26.*

Response:    The Defendants do not dispute this statement.

32. *Schultz claimed that, on the day of the incident, he observed McDermott's vehicle stop abruptly and further claims to have observed Kistner initiate contact with McDermott's stopped BPD vehicle. See Rupp Decl., Exhibit F, pp. 95-98.*

Response:   The Defendants do not dispute this statement.

33. *Although Schultz testified that the BPD vehicle in which he was a passenger was stopped when he made those observations, the surveillance footage of the incident reveals that his vehicle was still in motion at the time of impact between Officer McDermott's vehicle and Kistner. See Rupp Decl., Exhibit H, pp. 190-91 and 194-95; see also Yaek Aff., Exhibits C and D.*

Response:   The Defendants do not dispute this statement.

34. *Schultz testified that, based on his alleged observations the day of the incident, he and other officers accused Kistner of intentionally throwing himself at McDermott's vehicle with the intent to damage it. See Rupp Decl., Exhibit F, pp. 173-74.*

Response:   The Defendants dispute this statement in that it mischaracterizes Officer Schultz's testimony. He testified that his belief that Plaintiff broke the vehicle's mirror intentionally was "from. . . just [his] vantage point, [Plaintiff's] location, and the vehicle's location. How, you know, [he] had seen the vehicle abruptly stop, and [Plaintiff's] arm was outstretched to the vehicle." Ex. H at 173-174.

35. *During his deposition, Schultz was shown the surveillance footage of the incident and admitted that it did not appear that Mr. Kistner intentionally threw himself at the police vehicle. See Rupp Decl., Exhibit F, p. 226.*

10

Response:   The Defendants do not dispute that this was Officer Schultz's testimony and further respond that Officer Schultz also testified that the surveillance footage does not show the vantage point that he had from his car.  Ex. H at 228.

36. *Schultz also admitted that McDermott's vehicle did not stop prior to impact with Kistner.  See Rupp Decl., Exhibit F, p. 228.*

Response:   The Defendants do not dispute that this statement reflects Officer Schultz's testimony on that transcript page.

37. *After the incident, the on-scene Officers exited their vehicles and approached Kistner, who was lying on the ground.  See Rupp Decl., Exhibit H, p. 123; Exhibit F, p. 101; Exhibit G, pp. 182-84.*

Response:   The Defendants do not dispute this statement.

38. *McDermott demanded that Mr. Kistner "get up" off the ground or else he would be arrested.  Kistner was unable to get up off the ground.  See Rupp Decl., Exhibit G, p. 184; see also Yaek Aff., Exhibit C.*

Response:   The Defendants dispute this statement.  Officer McDermott told Plaintiff to get up.  Ex. F at 184.  Plaintiff was able to get up but went back down when he claimed to have felt pain in the back of his head.  Ex. C at 42.  He refused to get off the ground.  Ex. C at 43.

39. *Officers Schultz and Moriarity then placed Mr. Kistner in handcuffs, picked him up off the ground, and escorted him to the police vehicle driven by Moriarity.  See Rupp Decl., Exhibit F, pp. 104, 107, and 110-11; see also Yaek Aff., Exhibit C.*

Response: The Defendants dispute this statement in that Officer Schultz does not recall if Plaintiff was handcuffed on the ground or after he was stood up. Ex. H at 107-108. The Defendants do not otherwise dispute the statement.

40. *Schultz then called his supervisor, Lieutenant Anthony McHugh. After that phone conversation, the on-scene Officers decided to charge Kistner with felony criminal mischief. See Rupp Decl., Exhibit F, pp. 115-16, 122, and 202-03; Exhibits K, L, and M.*

Response: The Defendants do not dispute this statement in that after the phone conversation with Lieutenant McHugh it was determined that Plaintiff would be charged with criminal mischief. Ex. H at 115. Officer McDermott signed on the felony criminal mischief charge. Ex. B.

41. *The criminal mischief charge was based on Schultz's alleged observation that Kistner intentionally threw himself at Officer McDermott's BPD vehicle with the intent to cause damage to the mirror and window. See Rupp Decl., Exhibit G, p. 285; Exhibit F, pp. 115-18 and 173-74; Exhibits J, K, and M.*

Response: The Defendants only dispute the use of the word "alleged" in this statement. McDermott observed Plaintiff walk towards the driver's side of the patrol vehicle without stopping (Ex. F at 103-105, 162), so she did not consider this to be an accident. Ex. F at 198, 201-202.

42. *The criminal complaint alleged that Kistner caused the driver's side "mirror to become dislodged from the vehicle and also causing the driver's side window to malfunction." See Rupp Decl., Exhibit M; Exhibit I, pp. 200-01.*

Response: The Defendants do not dispute this statement.

43. *The on-scene officers estimated that the vehicle sustained $250.00 in damages, which is the threshold amount required to charge Kistner with a felony. See Rupp Decl., Exhibit F, p. 184-85; Exhibit G, pp. 358-59.*

Response:    The Defendants dispute this statement in that Officer McDermott signed on the felony charge with the damage estimate.  Ex. F at 289-290; Ex. B.

44. *The on-scene officers could not articulate the basis for their $250.00 estimate of damages.  See Rupp Decl., Exhibit F, pp. 184-85; Exhibit G, pp. 358-59; Exhibit H, pp. 284 and 287-88; Exhibit I, p. 205.*

Response:    The Defendants dispute this statement.  Officer McDermott signed on the felony charge with the damage estimate.  Ex. F at 289-290; Ex. B.  Officer Schultz does not recall making an estimate.  Ex. H at 184-185.  Officer Moriarity did not make an estimate.  Ex. I at 286.  Officer Velez did not make an estimate.  Ex. G at 205.

45. *BPD vehicle No. 473 - the vehicle driven by McDermott that was allegedly damaged by the collision- was brought into the Buffalo Police service garage on Seneca Street for routine maintenance on January 5, 207, just four days after the accident.  See Rup Decl., Exhibit D; Exhibit G, pp. 206-09.*

Response:    The Defendants do not dispute this statement.

46. *The vehicle's "cooling system" was serviced, but no repairs were made to the mirror or window, despite McDermott's allegation in criminal complaint that the driver's side mirror was "dislodged" from BPD vehicle No. 473.  See Rupp Decl., Exhibits J, K, and M; Exhibit G, pp. 363-65.*

13

Response: The Defendants dispute that the Buffalo Police service garage had any knowledge of McDermott's allegation in the criminal complaint. There is no evidence to support that statement. The Defendants do not otherwise dispute that the "cooling system" was serviced.

47. *McDermott did not take any steps to document the alleged damage to her vehicle or ensure that her vehicle was repaired for purposes of pursuing the felony charge against Kistner. See Rupp Decl., Exhibit G, pp. 128-30 and 250-58.*

Response: The Defendants dispute this statement in that video surveillance depicts McDermott appearing to take a photograph of the police vehicle but she does not recall doing so or have the access to the cellular phone presently. Ex. F at 249-254.

48. *The on-scene officers were aware that the incident was captured by Kistner's surveillance cameras, but they did not take any steps to obtain and review the footage prior to charging Kistner with criminal mischief. See Rupp Decl., Exhibit G, pp. 32-33, 76-77, 139, 275-78, and 397-98; Exhibit F, pp. 128-29; Exhibit J.*

Response: The Defendants do not dispute this statement.

49. *The on-scene officers also did not interview any witnesses to the incident, including Kistner's son and girlfriend. See Rupp, Decl., Exhibit F, pp. 127-28; Exhibit G, pp. 397-98.*

Response: The Defendants do not dispute this statement.

50. *After placing Kistner under arrest, Officers Moriarity and Schultz transported Kistner to ECMC for a 941 evaluation. See Rupp Decl., Exhibit F, pp. 129-30; Exhibit J (time entry 11:23:01 "C230 will be a 941").*

Response: The Defendants dispute this statement. After transport from Schmarbeck Avenue to Erie County Medical Center, Plaintiff taken only to the emergency room. Ex. C at 59; Ex. F at 238, 262; Ex. H at 130, 132. Plaintiff received a physical examination and diagnostic testing by the Emergency Room Department only. Ex. E at 1-28. He was discharged from the Emergency Room at 3:20 PM. Ex. E at 23. No request for a mental health examination pursuant to Mental Hygiene Law §9.41 was made at that time.

51. *Approximately 20-30 minutes after transporting Kistner to ECMC, Officers Schultz and Moriarity left ECMC and went back on patrol. See Rupp Decl., Exhibit F, p. 133.*

Response: The Defendants do not dispute this statement.

52. *After ECMC staff determined that Mr. Kistner would not be admitted for a 9.41 mental health evaluation, Officers McDermott and Velez transported him to central booking. See Rupp Decl., Exhibit G, pp. 279-80.*

Response: The Defendants dispute this statement. After transport from Schmarbeck Avenue to Erie County Medical Center, Plaintiff taken only to the emergency room. Ex. C at 59; Ex. F at 238, 262; Ex. H at 130, 132. Plaintiff received a physical examination and diagnostic testing by the Emergency Room Department only. Ex. E at 1-28. He was discharged from the Emergency Room at 3:20 PM after being medically cleared Plaintiff following evaluation for physical injuries. Ex. E; Ex. F at 280. No request for a mental health examination pursuant to Mental Hygiene Law §9.41 was made at that time.

53. *Kistner was processed at central booking, stripped, searched, and issued an appearance ticket for his criminal charges. See Rupp Decl., Exhibit G, pp. 294-301; Exhibit B, pp. 120-26; Exhibit K, L, and M.*

    Response: The Defendants do not dispute this statement.

54. *After he was processed at central booking, Officers McDermott and Velez transported him from central booking back to ECMC for a second mental health evaluation. See Rupp Decl., Exhibit G, pp. 85-86, 317-18; Exhibit I, pp. 76-77, 173.*

    Response: The Defendants dispute this statement. During his initial visit to Erie County Medical Center on January 1, 2017, Plaintiff received a physical examination and diagnostic testing by the Emergency Room Department only. Ex. E at 1-28. He did not receive any psychiatric evaluation at the Comprehensive Psychiatric Emergency Program ("CPEP") unit during the initial visit. Ex. E at 33. A request for an examination pursuant to Mental Hygiene Law §9.41 was only made one. Ex. B. McDermott and Velez transported Plaintiff to ECMC for a mental health evaluation. Ex. B at 9; Ex. C at 80; Ex. F at 317; Ex. G at 76-77, 80. Velez filled out a request for evaluation. Ex. B at 9; Ex. G at 73, 78-9, 117. McDermott and Velez dropped Plaintiff off for the examination and left. Ex. F at 328-329; Ex. G at 94.

55. *Officers McDermott and Velez left Kistner at ECMC to be processed. See Rupp Decl., Exhibit G, pp. 328-29; Exhibit I, p. 91.*

    Response: The Defendants dispute the use of the word "processed" in this statement. McDermott and Velez dropped Plaintiff off for the mental health examination and left. Ex. F at 328-329; Ex. G at 94.

56. *Kistner was examined by ECMC staff who quickly determined that he was not a risk to himself or others. See Rupp Decl., Exhibit B, pp. 82-84.*

Response: The Defendants dispute this statement. McDermott and Velez transported Plaintiff to ECMC at 4:46 pm. Ex. A at 2. ECMC records indicate that his psychiatric evaluation occurred at 6:50 pm with his discharge following thereafter. Ex. E at 33.

57. *The ECMC physician who evaluated Kistner ordered his immediate release from the CPEP unit. See Rupp Decl., Exhibit B, pp. 82-84.*

Response: The Defendants dispute this statement. The ECMC records detail the psychiatric evaluation findings and discharge. Ex. E at 33-34.

58. *Kistner was arraigned approximately 12 days after the incident. See Rupp Decl., Exhibit B, p. 87; Exhibit L.*

Response: The Defendants lack sufficient information to respond to this statement but respond that the appearance ticket did indicate an initial court appearance date of January 12, 2017. Ex. B at 9.

59. *Kistner and/or his attorneys returned to court on 607 occasions before all charges ultimately were dropped. See Rupp Decl., Exhibit B, pp. 87-89; Exhibit O; see also Dkt. 65, ¶ 160.*

Response: The Defendants lack information sufficient to respond to this statement.

Dated: May 21, 2021
      Buffalo, New York

                                    Timothy A. Ball, Esq.
                                    Corporation Counsel

        *Attorney for Defendants*

By: */s/ Maeve E. Huggins*
   Maeve E. Huggins
   Assistant Corporation Counsel
   1112 City Hall
   65 Niagara Square
   Buffalo, New York 14202
   Telephone: (716) 851-4317
   Facsimile: (716) 851-4105
   E-Mail: mhuggins@city-buffalo.com