UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


JAMES C. KISTNER,                *          Docket Number:
                                            1:19-CV-00402-LJV-JJM
                                 *
Plaintiff,    *
                                 *
                                 *          Buffalo, New York
              v.                 *          June 7, 2021
                                 *          11:01 a.m.
                                 *
THE CITY OF BUFFALO,                        ORAL ARGUMENT
BRYON LOCKWOOD, individually
and in his capacity as Police
Commissioner of the Buffalo
Police Department,
DANIEL DERENDA, individually
and in his capacity as Police
Commissioner of the Buffalo
Police Department,
LAUREN McDERMOTT,
individually and in her
capacity as a Buffalo Police
Officer,
JENNY VELEZ, individually and
in her capacity as a Buffalo
Police Officer,
KARL SCHULZ, individually and
in his capacity as a Buffalo
Police Officer
KYLE MORIARTY, individually
and in his capacity as a
Buffalo Police Officer,
JOHN DOE(S),
DAVID T. SANTANA,
individually and in his
capacity as a Buffalo Police
Officer,
ANTHONY McHUGH, individually
and in his capacity as a
Lieutenant for the City of
Buffalo Police Department.  *
                                 *
Defendants.                 *
                                 *
* * * * * * * * * * * * * *  *

```
  1                        TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JEREMIAH J. McCARTHY
  2                  UNITED STATES MAGISTRATE JUDGE


  3
        APPEARANCES:
  4


  5     For the Plaintiff:        RUPP, BAASE, PFALZGRAF
                                  & CUNNINGHAM, LLC.,
  6                               By R. ANTHONY RUPP, III, ESQ.,
                                     CHAD A. DAVENPORT, ESQ.,
  7                               1600 Liberty Building,
                                  Buffalo, New York  14202.
  8


  9     For the Defendants:       CITY OF BUFFALO LAW DEPARTMENT,
                                  By MAEVE E. HUGGINS, ESQ.,
 10                               Suite 1112,
                                  City Hall,
 11                               Buffalo, New York  14202.


 12     The Courtroom Deputy:     ERIC GLYNN

 13     Court Reporter/Transcriber:
                                  BONNIE S. WEBER,
 14                               Notary Public,
                                  Robert H. Jackson Courthouse,
 15                               2 Niagara Square,
                                  Buffalo, New York  14202,
 16                               Bonnie_Weber@nywd.uscourts.gov.

 17
                Proceedings recorded by mechanical stenography,
 18                  transcript produced by computer.

 19


 20           THE CLERK:  All rise.  We're on the record in civil

 21     proceeding 18-CV-402 Kistner versus the City of Buffalo, et al,

 22     for oral argument on the parties' cross motion for summary

 23     judgement.

 24           Present for plaintiff are attorneys Anthony Rupp and

 25     Chad Davenport.
```

1          Present for the defendant is attorney Maeve Huggins.

2          The Honorable Jeremiah J. McCarthy presiding.

3          **THE COURT:**  Good morning, everyone.  And thanks for

4    coming over on short notice, and it's great to be seeing people

5    in person again.

6          Anyone who is vaccinated and doesn't wish to wear a

7    mask, you don't have to, so it's up to you.

8          You young folks in the back are interns?

9          **MR. RUPP:**  I would like to introduce our summer

10   associates at Rupp Baase for the '21 summer, we have Tony, we

11   have Josh, we have Margaret, we have Eddie and we have Taylor.

12         **THE COURT:**  Maeve, you are seriously outnumbered.

13         **MR. RUPP:**  I can lend her a few, Judge.

14         **THE COURT:**  Okay.  And I'd like to introduce Emily

15   Thompson, my summer intern, who started with us last week.

16         So -- all right.  I have reviewed the papers and it's

17   safe to say I will be reviewing them repeatedly again.  I have

18   reviewed the videos as well, so I will hear from counsel as you

19   prefer.

20         And I don't -- I don't know if you have spoken between

21   yourselves as to who would like to go first, because we have two

22   motions and you may either argue from counsel table or from the

23   podium.

24         Any preference?

25         **MR. RUPP:**  I think it was our motion was first in

1  time, so I will take the first stab at it, if that's okay with

2  the Court.

3          THE COURT:  Okay.

4          Any objection to that?

5          MS. HUGGINS:  No.  It was filed first.

6          THE COURT:  Pardon?

7          MS. HUGGINS:  No.  Their motion was filed first.

8          THE COURT:  Okay.  All right.  And you are going to

9  come up -- fine.

10          MR. RUPP:  I think so, Judge.

11          (Inaudible).

12          THE COURT:  All right.

13          MR. RUPP:  May it please the Court, Judge, this is the

14  rare case where we are moving for summary judgement on behalf of

15  the plaintiff in a section 1983 case, I believe.

16          THE COURT:  Can I interrupt -- no.  I won't ask can I,

17  because I'm going to --

18          MR. RUPP:  I know.

19          THE COURT:  -- anyway.  There are -- I believe, from

20  your brief there are some claims that you are acknowledging

21  should be dismissed; is that correct?

22          MR. DAVENPORT:  That's right, Judge.

23          THE COURT:  Can you just list those for me?

24          MR. RUPP:  Sure.  I -- Judge, the claims that we

25  articulated as independent claims for respondeat superior

1   punitive damages and attorneys' fees, those are not standalone

2   causes of action, so we rely on our prayer for relief, our

3   wherefore clauses for our section 1988 entitlement to fees, for

4   example, and our entitlement to punitive damages under State

5   law.

6         So we would agree that those causes of action --

7         **THE COURT:**  But I thought you argued that under State

8   law respondeat superior would apply.

9         **MR. RUPP:**  We did.  We do, Your Honor.  We absolutely

10   would, under the State law theory.

11         So, I mean, we -- in the reply memorandum of law or

12   the responding memorandum of law to the defendants' motion for

13   summary judgement, I think we laid out pretty clearly which ones

14   we're -- we're going to let go.

15         And I don't want to speak out of turn here.  I did

16   make some quick notes, but, yes.  We do believe that respondeat

17   superior stays.

18         Then under the State law theory is out, other than

19   Monell theory and supervisory liability, under the Federal

20   theories and those are mutually exclusive.

21         So if the Court decides to keep the Monell claims

22   alive, the supervisory liability claim against the commissioners

23   would be out and vice versa.

24         **THE COURT:**  Okay.  Do you also agree that the -- the

25   official capacity claims are duplicative?

 1              **MR. RUPP:**  Yes, Judge.  Those are duplicative of --

 2              **THE COURT:**  Okay.

 3              **MR. RUPP:**  We also made reference to the intentional

 4    infliction of emotional distress and negligent infliction of

 5    emotional distress claims, that those would be out, to the

 6    extent that the State law false arrest, false imprisonment and

 7    the malicious prosecution claims remain viable or, in fact, are

 8    the subject of a summary judgement order from Your Honor.

 9              **THE COURT:**  Okay.  And I think you said an assault

10    claim is out as well?

11              **MR. RUPP:**  The assault claim is out.

12              **THE COURT:**  Okay.

13              **MR. RUPP:**  I'm confirming with my colleague.

14              **THE COURT:**  Okay.  And then there was a negligence

15    claim, wasn't there?

16              **MR. RUPP:**  Well, Judge, we believe that the negligence

17    claim --

18              **THE COURT:**  But --

19              **MR. RUPP:**  -- remains intact.  We do not think that

20    the defendant came forward with proof in admissible form.

21              The medical records on which counsel relies are not

22    certified.  There is no expert talking about the serious injury

23    threshold of the injuries.

24              **THE COURT:**  Okay.  But you do agree that the serious

25    injury threshold under New York Insurance Law would govern the

1  negligence claim, correct?

2          **MR. RUPP:**  We do.

3          **THE COURT:**  Okay.

4          **MR. RUPP:**  We do, Judge.  But it is -- it would also

5  about their burden to demonstrate the lack of a serious injury

6  in this case.

7          And we don't believe they have met that burden, so we

8  don't waive that claim.

9          **THE COURT:**  Okay.  Okay.  Now, I'll shut up for you.

10          **MR. RUPP:**  Thank you, Judge.  And we knew you were

11  going to want to clarify that, so, again, this is the rare case

12  where plaintiff in a section 1983 case is moving for summary

13  judgement.

14          But in the 2007 Supreme Court case of Scott versus

15  Harris, the Supreme Court clarified that in the context of a

16  civil rights case, a 1983 case, that when there is videotape

17  evidence that shows the incident in question, and that there is

18  no question as to the authenticity of that videotape, there is

19  no suggestions that it's been altered or that it doesn't depict

20  what it depicts, and there are none here, that the Court is not

21  required to accept the self-serving conclusory -- and we

22  believe, false representations of the arresting officers that

23  are flatly contradicted by the videotape evidence.

24          And that's a relatively new creature.  I mean, that's

25  a -- that case is now 14 years old, but it's been only recently

1   in the civil rights realm, where a lot of what has been the

2   subject of litigation over the years, under section 1983, has

3   been captured on video.

4          We're seeing more and more of that on the news,

5   seemingly every day, unfortunately, but more and more cameras

6   are capturing more and more events.  In more and more instances,

7   courts are not required --

8          **THE COURT:**  Sorry to interrupt again.

9          **MR. RUPP:**  That's okay, Judge.  Feel free.

10         **THE COURT:**  It occurs to me, has Mr. Kistner called

11   in?  Is he listening?

12         **MR. RUPP:**  He was hopefully to do so.

13         **THE CLERK:**  I'm sorry, Judge.  I had forgotten about

14   that.

15         **THE COURT:**  Yeah.  Because I just remembered that he

16   wanted to --

17         **MR. RUPP:**  Thank you, Judge.  I appreciate that.

18         **THE COURT:**  -- do that, so --

19         **MR. RUPP:**  I'll pretend we just started, so --

20         (Discussion off the record.)

21         **THE CLERK:**  It doesn't sound like anyone else is on

22   the line right now.

23         Mr. Kistner, are you on?

24         **THE COURT:**  You want to try to reach him or --

25         **MR. RUPP:**  Judge, I don't have a cell phone with me.

1          **MR. DAVENPORT:**  I didn't bring my cell phone either.

2          **THE COURT:**  We can call him if --

3          **MR. RUPP:**  That would be in my cell phone.

4          **MR. DAVENPORT:**  That would be in my cell phone, too.

5          **MR. RUPP:**  I suggest we just proceed, Judge.

6          **THE COURT:**  Okay.

7          **MR. RUPP:**  I'll fill him in in detail.

8          **MR. DAVENPORT:**  It will be okay.

9          **THE COURT:**  You can blame me, okay?

10          **MR. RUPP:**  Yes.

11          **THE COURT:**  All right.

12          **MR. RUPP:**  It's not your fault.  We should have

13  clarified earlier.  I heard a phone thing earlier and I just

14  assumed it was already going, so --

15          **THE COURT:**  Okay.  All right.  We'll just proceed

16  then.

17          **MR. RUPP:**  All right.  So, Judge, in this case,

18  similar to the Scott versus Harris case, we have surveillance

19  video of the event in question that shows clearly that my client

20  did not throw himself into either police SUV on Schmarbeck

21  Avenue that day.

22          In fact, what the video depicts from a plain eye view

23  is the second SUV, operated by officer Lauren McDermott, moving

24  forward and striking Mr. Kistner and throwing him to the ground.

25          As a consequence of that incident, however,

1    Mr. Kistner was charged with a felony for criminal mischief,

2    allegedly, for deliberately throwing himself at the side of the

3    police vehicle and damaging the mirror, which was alleged to be

4    hanging; and the window, which was alleged to be inoperable.

5         Part of our motion goes to the veracity of those

6    claims, because four days later the vehicle went in for service

7    at the Buffalo Police garage, where all of the police SUVs are

8    served, and there was no service done either to the mirror or to

9    the door or the window.

10         Also, Officer McDermott somehow managed to misplace

11   the photograph that she claims that she took of the damage

12   showing the $250 felony threshold cutoff and damages.

13         Beyond arresting Mr. Kistner for criminal mischief,

14   the felony, the officers also tried to have him admitted to the

15   CPAP unit, which is the psych ward at ECMC on a involuntary

16   basis, claiming, of course, when they arrived at the hospital,

17   that he had attacked the SUV and thrown himself into it.

18         All of --

19   **THE COURT:**  Wasn't -- wasn't that also due to --

20   apparently, I think, it's undisputed that when he got to the

21   hospital, he was ranting and raving about many things, but he

22   was also yelling at hospital personnel and using obscene

23   language toward them and others; is that right?

24   **MR. RUPP:**  Judge, he was very unhappy with the way he

25   had been treated, from the moment he was struck by the vehicle.

1           And that is true, however -- however, and this is

2    important, in the police dispatch records, Officer Schulz

3    radioed in from the scene, before any of those things had

4    happened at the hospital, that he was taking Mr. Kistner to ECMC

5    for a 941, which is a psych consultation and a psych admit.

6           We questioned Officer Schulz extensively about that at

7    his deposition, because his statements to the internal affairs

8    investigating lieutenant were that the psych treatment and the

9    referral was only from the emergency department at ECMC.

10          That was categorically untrue.  There was a decision

11   made by the officer at the scene to try to get Mr. Kistner

12   locked up in the psych ward for what we believe, Judge, is a ten

13   day mandatory minimum involuntary psychiatric, essentially

14   incarceration.

15          The purpose of that would have been to take

16   Mr. Kistner essentially out of circulation, so that he could not

17   articulate what he believes actually happened to him at the

18   scene that day that he was struck by the negligently driven

19   vehicle operated by Lauren McDermott.

20          And we have all of this, Judge, I think it is salient

21   to the circumstances that result in these competing motions, all

22   of this is captured on surveillance video.

23          Mr. Kistner being knocked down; Mr. Kistner being

24   handcuffed; Mr. Kistner being walked to the first SUV to leave

25   the scene.

 1          And then being left -- and the dispatch record confirm

 2     this -- in that vehicle for 30 minutes, while the four initial

 3     on scene officers, Schulz, Moriarty, McDermott and Velez, joined

 4     by a fifth officer, Officer Santana, proceed to have a 30-minute

 5     discussion in the middle of the street.

 6          Now, in the course of that discussion, they -- they

 7     rough up Mr. Kistner's son, without probable cause; confiscate

 8     an illegally -- seize under the Fourth Amendment, his cell phone

 9     and send him on his way for merely trying to get medical

10     attention for his father.

11          Calling 911 -- they dispatched into the 911 call

12     center disregard any calls for medical attention on Schmarbeck.

13     We have it.

14          That was a violation of police procedures in many

15     ways, as our expert refers to, and as we discuss with the

16     officers at the depositions.

17          But in any event, Judge, all of this captured

18     30-minute conversation between and among these five officers,

19     where they come up with what we believe is the plan that has

20     resulted in this lawsuit, and the reason we're here today.

21          They will deny that Officer McDermott struck

22     Mr. Kistner with her vehicle.  They will obviate the requirement

23     in the Buffalo Police procedures manual to call out the City of

24     Buffalo accident investigation unit, which investigates all

25     accidents mandatorily, that involve City owned vehicles,

1    including police and fire vehicles.

2            It's a joint operation of both the fire department and

3    the police department.  They avoided that investigation by

4    blaming Mr. Kistner for attacking the vehicle.

5            They also avoided an internal affairs investigation

6    into the accident itself -- not the conduct of the officers,

7    that came later, but it was mandatory because it was a

8    City-owned vehicle involved in a pedestrian accident.

9            That they would have a second investigation conducted

10   by an internal affairs lieutenant.  That didn't happen because

11   of the path they took.

12           And the third thing they were supposed to do was

13   contact their lieutenant and have the lieutenant come to the

14   scene, which is a requirement, again, when a City-owned police

15   vehicle was involved in an accident.

16           **THE COURT:**  And that was McHugh, right?

17           **MR. RUPP:**  That was McHugh, Judge.

18           **THE COURT:**  Okay.

19           **MR. RUPP:**  They did contact the lieutenant.  But in

20   violation of the police procedures manual, he did not come to

21   the scene.

22           And he, in fact, was the one who authorized the on

23   scene officers to arrest Mr. Kistner.  And, in fact, advised

24   them what charge they could use to arrest him for.

25           But the point, Judge, is this, by accusing Mr. Kistner

1    falsely of a crime and alleging that he attacked the police SUV

2    and then trying to get him psychiatrically admitted to the CPAP

3    unit at ECMC, what they were trying to do was cover for Officer

4    McDermott's, we believe, negligence in driving the vehicle into

5    Mr. Kistner.

6         It's not really germane to the motion, because our

7    affirmative motion, Judge, goes to the issues of false arrest,

8    false imprisonment and malicious prosecution.

9         But it goes without saying that underlying those

10   theories were the idea that Mr. Kistner was injured by the

11   negligent operation of the vehicle by Lauren McDermott.

12        And rather than own up to that, the five officers --

13   four, later joined by Officer Santana on the scene, came up with

14   this -- I guess there is no other way to call it, Judge -- I'm

15   not going to sugarcoat it -- a sequence of lies and perjured

16   testimony and perjured police reports, all designed to blame

17   Mr. Kistner, so Lauren McDermott would not have to go through

18   those multiple investigations and probably receive a slap on her

19   wrist for not looking where she was going when she struck

20   Mr. Kistner.

21        **THE COURT:**  Let me just ask you -- and, you know, I

22   recognize we're on the summary judgement motions here, but if as

23   you say what she likely would have received is just a slap on

24   the wrist, this is really quite obviously -- it's very serious

25   charges against them, but why would they do that?

1          **MR. RUPP:**  Judge, you know, the answer I think is

2     found in the questions we asked of all levels in the depositions

3     that the paperwork and the interviews and the number of steps

4     that they all would have to go through as part of this

5     investigation, being interviewed by an internal affairs

6     lieutenant, being interviewed by the accident investigation

7     team, going before the lieutenant and the captain at the

8     B-District, all of those things, Judge, involve tremendous

9     amounts of paperwork, downtime, hassle and annoyance.

10          And when I say slap on the wrist, Judge, I don't know.

11     I'm assuming slap on the wrist, because part of our Monell claim

12     against the city here is there is never any adverse consequence

13     for anything these officers do.

14          So I'm assuming that they if they had followed proper

15     procedure, and there had been a full investigation, and they had

16     obtained the surveillance video, and they had concluded that

17     Officer McDermott had negligently operated her vehicle, that

18     they would have used the same process and procedure to

19     essentially find claims against her not sustained or exonerate

20     her or, you know, give her a half day without pay or whatever is

21     the traditional slap on the wrist.

22          I'm not saying that's what should have happened,

23     Judge.  And I'm not saying that it was an absolute guarantee,

24     because perhaps Lauren McDermott had some other issues in her

25     past involving her driving that could have been more significant

 1    to her.

 2              But for whatever the reason, Judge, by adopting this

 3    approach to the incident of blaming -- falsely blaming

 4    Mr. Kistner, falsely arresting him, falsely imprisoning him and

 5    falsely prosecuting him, they avoid all of that paperwork, all

 6    of those steps.

 7              Our expert, Your Honor, in this case unrebutted --

 8    and, in fact, confirmed by a lot of the testimony from the

 9    police commissioners, found 13 separate violations of the police

10    procedure manual and four separate crimes committed by the

11    officers on the scene that day, from his review of the dispatch

12    records, the paperwork and the surveillance videos.

13              And it -- I think it goes without saying that the

14    officers had significant motivation to protect Lauren McDermott

15    from the consequence of her unsafe driving.

16              Ms. McDermott acknowledged that she saw Mr. Kistner

17    crossing the street.  The first SUV was blocking Schmarbeck, so

18    there is no problem with him coming into the street.

19              And she admits that she took her eyes off him to look

20    in her rearview mirror and then started forward and didn't know

21    where he was, so she lost sight of him.

22              And I'm not saying that that's the worst thing that

23    ever happened to anybody.  I'm -- you know, it's -- if at worst,

24    negligence, but what she did afterwards -- what she did

25    afterwards, to cover it up, is why we're here, Judge, and to get

1    into the meat and potatoes of it.

2            The video shows what we claim it shows.  It doesn't

3    need expert interpretation.  We had Jennifer Yaek break it down

4    frame by frame, but it's not necessary.

5            The video shows the vehicle striking Mr. Kistner.  It

6    does not show Mr. Kistner suicidally attacking the side of the

7    SUV.

8            But what Officer McDermott said in her deposition

9    said:  Well, I didn't see it, but I perceived that he must have

10   attacked my vehicle.

11           Well, why should she perceive it?

12           **THE COURT:**  Okay.  Well -- and I'll go back and

13   re-review her deposition testimony, but I did review it just

14   this morning.

15           And, I mean, she said a couple times, he came at me

16   and he stuck his hand out.  And so when she saw this or -- or

17   whether she could have seen it, obviously, those are issues, but

18   she did say that a couple of times.

19           And he -- and, in fact, when you -- or was it you

20   questioning her?

21           **MR. DAVENPORT:**  I questioned her, Your Honor, yes.

22           **THE COURT:**  Okay.  Because a couple of times you said,

23   when your vehicle struck him.

24           And she said:  I didn't strike him.

25           **MR. RUPP:**  Judge, I think in totality, when -- and it

1   was, look.  I attached segments from her deposition, so Your

2   Honor could get a flavor for her veracity and truthfulness.

3        And I think that's relevant to the City's motion for

4   summary judgement, which I will address on rebuttal.  She's not

5   a credible person, she denies things, even when they are put in

6   front of her.

7        I mean, she would deny that I'm standing at a podium

8   right now, but beyond that, Judge, on the issue of what she saw

9   and when she saw it, she did acknowledge under my cross

10  examination, all of which is before the Court, and this record,

11  that she did not see Mr. Kistner before she started to pull

12  forward.  That she does not know what happened and she said that

13  she relied on Officer Schulz's corroboration.

14       Now, Officer Schulz is another interesting case

15  because he's in the first SUV that's departed the scene.  His

16  testimony is that he has a trainee driver, whom he's the officer

17  in charge of the training officer.

18       **THE COURT:**  That's Moriarty, right?

19       Is that Moriarty?

20       **MR. DAVENPORT:**  Moriarty.

21       **THE COURT:**  Yeah.

22       **MR. RUPP:**  And Moriarty is driving and Schulz, in the

23  sixth sense, he thinks he knows that something is going to go

24  down.

25       He thinks he knows that Mr. Kistner is -- although

1   Mr. Kistner walked right by his SUV and didn't throw himself

2   into the side of that, Mr. Schulz somehow knows that Kistner is

3   going to do something with the McDermott SUV, so he tells

4   Moriarty to stop.

5          And then he claims while seated in the passenger seat

6   of the SUV, that he looks across Moriarty's body into the, you

7   know, a few inches --

8          **THE COURT:**  Of the side view.

9          **MR. RUPP:**  -- of the rearview mirror, on the driver's

10  side.

11         **THE COURT:**  Yeah.

12         **MR. RUPP:**  And then is able, from a stationary

13  position, to see everything.  And he says he saw Mr. Kistner

14  throw himself into the side of Lauren McDermott's SUV.

15         Now, we realize, Judge, on a motion for a summary

16  judgement, Your Honor cannot decide facts.  That's the province

17  of the jury.

18         Our first argument, Judge, is simply that the video

19  belies everything that Officer Schulz says and everything

20  Officer McDermott says.

21         And under the authority of the Supreme Court in the

22  Scott versus Harris case, Your Honor doesn't need to look at

23  anything else.

24         They don't challenge the veracity of the videotape or

25  it's authenticity or foundation and it shows that Lauren

1  McDermott struck Mr. Kistner, not the other way around.  End of

2  story.

3          We think that's all we need, but to make sure that we

4  came forward with the most powerful motion we could bring,

5  Judge, we hired Jennifer Yaek and we had Jennifer Yaek look at

6  three things.

7          Number one, did Mr. Kistner affirmatively throw

8  himself into the SUV or was he struck by it?

9          Number two, was the Moriarty driven SUV stationary, as

10 Mr. Schulz said it was when he allegedly saw the entire incident

11 through the driver's side rearview mirror, while seated in the

12 passenger seat.

13         And there was a third issue that she looked at, Judge,

14 but I can't remember off the top of my head.

15         But for the purposes of what I'm talking about right

16 now, Jennifer Yaek concluded, number one, that the SUV struck

17 Mr. Kistner.

18         That he was walking at normal speed.  He slowed down,

19 as it approached him.  Puts his arm out and was struck and

20 driven backwards.

21         And then the third thing she looked at was did the SUV

22 continue to proceed forward, even after he was knocked to the

23 ground.

24         And officer -- and Jennifer Yaek concluded by her

25 frame-by-frame analysis, which was unrebutted in the record,

1    that, indeed, it did.

2         The third thing she looked at was could Officer Schulz

3    have seen what he claim to have seen in the driver's side

4    rearview mirror, whether stationary or otherwise.

5         And she used the laws of physics, Judge.  She used the

6    law of reflection to conclude that he could not.

7         And it makes sense -- and I asked the police

8    commissioner this.  I said:  You know, Mr. Police Commissioner,

9    you've been driving for a number of years.  I mean, is it --

10   have you typically been able to see things directly behind a

11   vehicle, while seated in the passenger seat looking in the

12   driver's side rearview mirror?

13        He wasn't sure whether he could or not.  But I would

14   submit as a -- the Court can almost take judicial notice of the

15   fact that if the driver's side mirror is positioned for the eyes

16   and the view of the driver, it is not positioned for the

17   different -- very different angle, view and eyes of the

18   passenger.

19        And that's why a driver's ed student is taught to

20   check his mirrors before he starts driving a vehicle, which

21   Jennifer Yaek said was that the -- the incident of reflection --

22   I've got to get this right, Judge -- the angle of reflection

23   equals the angle of incident.

24        Which means that because Officer Schulz was seated at

25   a much more -- more of an angle for the mirror than the

1    perpendicular line it kind of forms around the flat -- the flat

2    surface of it, that his angle now is reflected back the other

3    way at the same depth.

4           So if he's at a 30 agree angle, which he

5    conservatively estimated, he's seeing 30 degrees from the

6    mirror, which is going to show him the side of the road and the

7    trees and the yards of the people on Schmarbeck.

8           It is not going to show him, from this angle, an angle

9    straight back behind the SUV, many, many, many feet in the

10   rearview mirror.

11          It's not possible.  Again, the angle of reflection

12   equals the angle of incidents.  And that is the law of physics

13   that can not be refuted.

14          And more importantly, Judge, it's not refuted.

15   Because the City here chose not to retain an expert of its

16   own -- I don't know what that expert would have said, other than

17   challenge the laws of physics, but they also chose not to depose

18   Jennifer Yaek.

19          Now, in their reply papers or opposition papers to the

20   motion, Judge, they take issue with Jennifer Yaek, all pure

21   attorney-created arguments.

22          There is nothing to back that up.  There is not even

23   any scientific literature citing to back up counsel's

24   representations to the Court that it should throw out on some --

25   somewhat of a Dawber (phonetic) theory, Jennifer Yaek's

1    affidavit and her conclusions.

2            And the typical way -- and we have cited case law to

3    the Court, and I'm sure Your Honor knows this, is to attack the

4    findings of a expert is either through another expert, in a

5    competing affidavit, which they don't have or through vigorous

6    cross examination, which they don't have, or to show that

7    something that the expert relied on in the record is just

8    completely false.

9            That it was critical to her analysis and she relied on

10   it and she just got it wrong.  And they don't do that, Judge.

11           They take a couple of potshots by saying that the

12   Tahoe she used for her experiment, which was unnecessary even,

13   because the laws of physics don't change, she just did an

14   experiment to confirm what the laws of physics said they said.

15           Well, the police SUV is a little bit different,

16   because they buy it, you know, for a police vehicle, as a police

17   cruiser than a standard off-the-lot Tahoe that you can buy at a

18   dealership.

19           She doesn't indicate -- counsel does not indicate why

20   that's relevant or why that's important or that the mirrors are

21   different or that the laws of reflection don't apply to police

22   SUVs, as they apply to passenger -- you know, traditional, you

23   know, civilian vehicles.

24           The other issue she takes with the motion, Judge, is

25   that Jennifer Yaek did not have the two exemplar people, the

1    models that she used to seat simulate -- similar height of

2    Schulz and a similar height Moriarty in the vehicle.

3          Sat them down, put them in the seats the way Moriarty

4    and Schulz would have sat.  She says that they were not in

5    proper police uniforms, so therefore what they couldn't see when

6    they are wearing the GoPros and the angles somehow would change

7    if they were in full police regalia.

8          I submit to the Court, Judge, that on the basis of

9    that, Jennifer Yaek's affidavit stands unrebutted to this Court.

10   Which means, Judge, that we have two ways to be get to summary

11   judgement on our malicious prosecution, false arrest and false

12   imprisonment claims.

13         Number one, under the authority of Scott versus Harris

14   and progeny cases, the Court can simply look at the undisputed

15   video and conclude that what Schulz says he saw is false.

16         We already know that what Schulz claimed, that

17   Moriarty stopped the vehicle and he had a panoramic view of the

18   entire episode out the rearview was false, because Jennifer Yaek

19   showed and provided a video to the Court, showing that the

20   Moriarty driven SUV was still in motion throughout and beyond

21   the point, driving away from the scene, that Mr. Kistner was

22   struck.

23         So we already know he's lying.  The vehicle didn't

24   stop.  He didn't see what he said he saw.  But we know from

25   Jennifer Yaek's affidavit that he could not have seen what he

1    said he saw.

2          The laws of physics, the law of reflection does not

3    allow it.  And what that triggers, Your Honor, is the doctrine

4    that's well known in the law that the Court is not required to

5    accept essentially self-serving nonsense to raise an issue of

6    fact, in opposition to a summary judgement motion.

7          And I readily acknowledge the standard and the burden

8    that we have to meet on this motion, Judge.  That there must be

9    no genuine issues of material fact that are still in dispute

10   between the parties.

11         And I submit to you that the issues of fact -- and I

12   put that in air quotes, that have been raised here, Judge, are

13   not genuine.

14         They are not genuine because Officer Schulz did not

15   and could not have seen what he said he saw.  And Officer

16   McDermott, if you take the totality of her testimony with the

17   cross questions, acknowledges that she was looking behind her or

18   in her rearview when she started forward again.  She had lost

19   track of Mr. Kistner and she did not see it with her own two

20   eyes.

21         **THE COURT:**  Well, let me just -- and, obviously, I'm

22   going to hear from Ms. Huggins at length I'm sure -- but aside

23   from the issues that you've been focusing on, one of the

24   arguments that the defendants make is personal involvement.

25         Now, based on what you have said, if your facts are,

```
 1   you know, found to be true, there would be personal involvement

 2   by McDermott and by Schulz.

 3           And then you said that for a period of 30 minutes, all

 4   of them are standing in the street while he's in -- he's in

 5   Schulz's car at that point, right?

 6           MR. RUPP:  He is, Judge.  Yes.  The backseat.

 7           THE COURT:  Okay.

 8           MR. RUPP:  Handcuffed.

 9           THE COURT:  And when you -- when you say all of them,

10   just --

11           MR. RUPP:  Four.  We move for summary judgement

12   against the four.  Not Officer Santana, because he arrived after

13   the fact.

14           We have him in the case on a failure to intervene

15   claim, but we have not moved for summary judgement on it.

16           THE COURT:  Okay.  So --

17           MR. RUPP:  The basis for --

18           THE COURT:  So -- just a minute.

19           MR. RUPP:  Yeah.

20           THE COURT:  So those four would be McDermott,

21   Schulz --

22           MR. RUPP:  Moriarty.

23           THE COURT:  -- Moriarty.

24           MR. RUPP:  And Velez.

25           THE COURT:  He's a rookie, right?  Moriarty?
```

1          **MR. RUPP:**  He is, Judge.

2          **THE COURT:**  Probably wishes he wasn't.

3          **MR. RUPP:**  Probably wishes he wasn't assigned Officer

4   Schulz as his training officer, because he has followed in

5   Officer Schulz's footsteps, being one of the most complained

6   about officers on the City of Buffalo force in just the four

7   years he's been on it.

8          **THE COURT:**  Okay.  But so those four are the ones you

9   say were standing in the street.

10         Now --

11         **MR. RUPP:**  With Santana, Judge.  All discussing, but

12   their involvement varies.

13         **THE COURT:**  Why not Santana?

14         **MR. RUPP:**  Santana arrived later, Judge.

15         **THE COURT:**  Okay.

16         **MR. RUPP:**  Was not claiming to have seen anything.

17   You know, there may have been a basis to move against him.  We

18   decided not to.

19         We think he's more there on a failure to intervene

20   claim.  You know, telling these officers, you know, look.  Don't

21   do this.  You can't do this.

22         **THE COURT:**  Uh-huh.

23         **MR. RUPP:**  But for the sake of today and our motion,

24   at least, you know, we think he's out of the picture.

25         But the other four, Judge, were, in fact, involved.

1    Schulz and Moriarty drove Mr. Kistner to first, ECMC.  The exact

2    sequence of events is set forth in our papers, Judge, and how

3    they each have individual involvement.

4              Velez swore out, I believe, the arrest document or the

5    supporting deposition.

6              **MR. DAVENPORT:**  941.

7              **MR. RUPP:**  The 941.  The psych admit.  Officer Velez

8    signed that out.  And, of course, Lauren McDermott was the

9    driver of the vehicle and claimed to have --

10             **THE COURT:**  She signed the criminal complaint, too,

11   right?  On both of them?  McDermott did.

12             **MR. RUPP:**  I believe so.

13             **THE COURT:**  Yeah.  I got them here.

14             **MR. DAVENPORT:**  McDermott signed both of those.

15             **MR. RUPP:**  Yeah.  McDermott signed both of them,

16   Judge.

17             **THE COURT:**  Yeah.

18             **MR. RUPP:**  That's confirmed.

19             **THE COURT:**  All right.

20             **MR. RUPP:**  So we did go through -- I don't have it in

21   my notes at the ready, Judge, but we did go through in one of

22   our memorandum of law, all of the different points of individual

23   involvement of those officers, recognizing as we do, that they

24   each have to have their own participation --

25             **THE COURT:**  Right.

1        **MR. RUPP:**  -- to be held liable under Section 1983.

2        **THE COURT:**  Okay.  All right.  Let me -- let me

3   just -- and I suspect you have other things to argue, but

4   what -- why don't we break at this point.

5        I'd like to hear from Ms. Huggins on the affect of the

6   video and everything else that you have argued and we'll come

7   back to you.

8        **MR. RUPP:**  Inaudible.

9        **THE COURT:**  And you can stay at counsel table or you

10  can come up, whatever you prefer.

11       **MS. HUGGINS:**  Your Honor, I think I will stay at

12  counsel table.

13       **THE COURT:**  Okay.

14       **MS. HUGGINS:**  As we navigate returning back to normal

15  life.

16       **THE COURT:**  Yeah, yeah.  No.  That's fine.  That's

17  fine.

18       **MS. HUGGINS:**  And is it acceptable to the Court remain

19  seated or would the court --

20       **THE COURT:**  Sure.  Absolutely.

21       **MS. HUGGINS:**  -- prefer --

22       **THE COURT:**  Absolutely.

23       **MS. HUGGINS:**  I would just like to address, I think,

24  initially comments that counsel has made and then arguments that

25  are made in defendants' papers that address the specific claims.

1          I think rightfully, as Your Honor pointed out when we

2   began this morning, a number of claims have been conceded or

3   withdrawn.

4          I also submit to the Court --

5          **THE COURT:**  Well, you know just so I don't

6   misunderstand anything, what I would like to do ask -- probably

7   in the brief, because it must be, because that's why I raise the

8   issue, but so there is no misunderstanding, I would like in

9   writing a confirmation of which claims are voluntarily

10  withdrawn, okay?

11         **MS. HUGGINS:**  Your Honor, I think that -- I believe

12  that occurred in docket entry 82-4, at page two, footnote one,

13  was the claims that plaintiff has affirmatively conceded or

14  withdrawn.

15         **THE COURT:**  Yeah.  Okay.  Yeah.  That's where I saw

16  it.  Okay.

17         **MS. HUGGINS:**  And I would submit to the Court that --

18  that plaintiff has actually conceded dismissal of a number of

19  other claims, that they have either just neglected to even

20  address or that they can't proceed on, because they did not --

21  they are State law claims, that did not appear in the

22  plaintiff's Notice of Claim, pursuant to the General Municipal

23  Law.

24         **THE COURT:**  Right.  Well, again, what -- all right.  I

25  don't mean to interrupt you.

1          Go ahead.

2          **MS. HUGGINS:**  Sure.  I was going to list those for

3    Your Honor.

4          **THE COURT:**  But let's -- yeah.  Okay.  But let's, you

5    know, go back right now to the incident itself --

6          **MS. HUGGINS:**  Absolutely.

7          **THE COURT:**  -- and the affect of the video and so

8    forth.

9          **MS. HUGGINS:**  The one -- the one point I would -- I

10   would like to address, just that I -- that is relevant to that,

11   Your Honor, is the defendants' moved for judgment on the

12   pleadings and for summary judgement for dismissal of the entire

13   action.

14          And we made arguments on all causes of action,

15   including the negligence cause of action that Your Honor rightly

16   pointed out, that the New York State Vehicle and Traffic Law and

17   the Insurance Law requires a serious physical injury in order to

18   prove negligence.

19          We moved on that point.  And, certainly, the absence

20   of medical record evidence is one of the things that we noted

21   demonstrates and adequately meets the defendants' burden to

22   demonstrate summary judgement on the point that this plaintiff

23   did not suffer a serious physical injury and then thus cannot

24   continue with his negligence claim.

25          So I just point that out because that's something --

1          **THE COURT:**  Well, but wait, wait.  You are attacking

2    that claim on the pleadings?

3          **MS. HUGGINS:**  I point out, generally, Your Honor, we

4    moved pursuant to Rule 12(c) and --

5          **THE COURT:**  Right.

6          **MS. HUGGINS:**  -- and Rule 56, on that claim itself we

7    rule -- we moved on Rule 56.

8          **THE COURT:**  Okay.  But then on that, on the issue of

9    negligence, isn't it your burden to show that he did not sustain

10   a serious injury?

11         **MS. HUGGINS:**  It's our burden to show that there was

12   no serious physical injury under the Insurance Law.

13         **THE COURT:**  Right.

14         **MS. HUGGINS:**  Correct, Your Honor.  But New York State

15   authority is clear that the absence of medical treatment can go

16   to that point.

17         And we cite that law in our -- in our memorandum of

18   law here.  We have a plaintiff, who simply did not treat for a

19   single injury, that he acknowledges, as a result of this motor

20   vehicle accident.

21         The only medical treatment that can reasonably go

22   towards this motor vehicle accident is the medical treatment

23   that the defendant officers take him for -- you know, the

24   evaluation that he receives from ECMC on the date of this

25   incident.

1              And those are the medical records that are attached to

2    the defendants' motion.

3              And plaintiff is clear in his deposition and the

4    record is -- clearly lacks any other treatment.  That he did not

5    get medical treatment for anything he claims purportedly

6    happened as a result of this motor vehicle accident.

7              **THE COURT:**  Okay.  Just a second.

8              Mr. Rupp, are you claiming that the records are not

9    properly authenticated?  Is that what your argument is?

10             **MR. RUPP:**  That's right, Judge.  You know, it's --

11             **THE COURT:**  You can sit down, so I pick you up on --

12             **MR. RUPP:**  Yeah.  The serious injury threshold, Judge,

13   requires them to make an affirmative showing.

14             They haven't done it.  They -- in fact, they have put

15   medical records that are not sworn, not authenticated, with no

16   foundation before the Court, that show that there was medical

17   treatment.

18             So they have to come forward with an affidavit of a

19   medical expert to say that those injuries do not meet the

20   serious injury threshold.

21             **THE COURT:**  All right.

22             **MR. RUPP:**  And they they have failed to come forward

23   with that.  They have failed to come forward -- put the medical

24   records in evidentiary form.

25             There is no doctrine that says that they can slam

 1   un -- you know, medical records with no foundation before the

 2   Court and then just ask Your Honor to sort it out.

 3          There are --

 4          **THE COURT:**  All right.  Well -- okay.  Then I will

 5   take a -- another look at that issue.

 6          But in any event, it strikes me that the physical

 7   injury component of this case is not the major aspect of it.

 8          I could be wrong, but that's the way I look at it

 9   right now.

10          **MR. RUPP:**  I would agree with that, Judge, for the

11   sake of that comment.

12          **THE COURT:**  Yeah.  Okay.

13          Ms. Huggins --

14          **MS. HUGGINS:**  Your Honor, just to that point, there

15   has been argument made today that there is no actual substantive

16   addressing of the defense motion on --

17          **THE COURT:**  Okay.

18          **MS. HUGGINS:**  -- negligence.

19          **THE COURT:**  I'll take -- I'll take another look at

20   that.

21          **MS. HUGGINS:**  So -- and if I could just briefly

22   address some of the comments that counsel made, and then I will

23   turn to the -- the thrust of the argument, in general, with

24   regard to the video and the incident itself.

25          But I would submit to the Court that counsel's

 1    overstated the principals that are in Scott versus Harris.

 2    Those principals are true, had we had a video here that would be

 3    dispositive.

 4            We have a video that's at an angle, at a distance

 5    with -- that does not capture the entire incident.  What has

 6    been submitted, and what was only preserved by this plaintiff,

 7    who was clearly contemplating litigation from the moment this

 8    incident occurred, is short clips that did -- do not depict his

 9    entire interaction with the police.

10            Nor do they depict the angle and perspective of

11    himself or the officers on the scene.  It is from a number of

12    houses down, at an angle, at a height.  Nor does it show the

13    vehicle side that this contact was made.

14            There is no damage --

15            **THE COURT:**  Yeah.  The -- what was this, his security

16    video, right?

17            **MS. HUGGINS:**  Correct.

18            **THE COURT:**  So it's above and it's from the -- I

19    guess, angled, but at the passenger seat of the vehicle.

20            So what actually happened on the other side -- I mean,

21    it's depicted -- whether it's depicted as a matter of law, I

22    guess, that's your position, right?

23            **MS. HUGGINS:**  Correct, Your Honor.  My point is -- is

24    that it's a video surveillance system.  That it's affixed two

25    houses down.

1          The plaintiff's fiancé owns the system; owns that

2    property affixed it and it is at a distance.  And it goes on the

3    opposite side of the vehicle, where the contact takes place.

4          **THE COURT:**  Okay.

5          **MS. HUGGINS:**  What I would submit to Your Honor is,

6    essentially, when you boil this down to the material facts that

7    are not in dispute, there is not -- there is not actually much

8    difference here.

9          The defendant officers agree there is contact made.

10   That would be the basis for the criminal mischief charges.  It

11   is -- here the difference is what the plaintiff perceived to

12   have happened versus what the defendant officers perceived to

13   have happened.

14         And I submit to the Court that this video, other than

15   confirming that contact was made, and that these are the

16   individuals who were there, and there was indeed the police

17   vehicles and indeed plaintiff is there, does not actually shed

18   much light on what happened on that driver's side of the

19   vehicle; the mirror, which, of course, is not depicted because

20   it's the opposite side of the vehicle, and the intent of the

21   parties at the time that this happens.

22         **THE COURT:**  Okay.  Now -- and maybe I'm jumping ahead

23   into your motion -- and if so, I apologize, but that's what I'm

24   going to do, because one of your arguments is that the false

25   arrest claims and false malicious prosecution claims, et cetera,

1    should be dismissed, because Officer McDermott had probable

2    cause to believe that a crime was committed, right?

3            **MS. HUGGINS:**  Correct.

4            **THE COURT:**  Okay.  Now, in that regard and putting

5    aside for a minute the video all together, here's some aspects

6    of that position that trouble me.

7            First of all, apparently it's not a hundred percent

8    sure or clear from her deposition transcript, but apparently one

9    of the videos seems to be taking -- seems to depict her using

10   her cell phone to take a photo of the mirror and yet and she

11   admitted in her deposition that if there was going to be a

12   criminal charge in which damage was an element, which it clearly

13   was here, that photo would be important.

14           She doesn't know what -- she doesn't even know if she

15   took it and doesn't know, if so, what happened to it.

16           And with regard to the -- you know, the amount of

17   damage -- well, the fact of damage, as Mr. Rupp pointed out,

18   that that vehicle was serviced, I guess, four days later and

19   there is no mention of any -- any problem with the mirror or the

20   window.

21           And it's -- as far as the amount of the damage, having

22   to exceed $250, neither she, nor Officer Schulz really had any

23   idea as to how they came to that figure.

24           Now, I'm just saying -- I'm not saying who will

25   ultimately prevail on this, but doesn't that make it difficult

1  for me to conclude, as a matter of law, that she had probable

2  cause to believe that that crime had been committed?

3          **MS. HUGGINS:**  Your Honor, that I think overstates what

4  a probable cause requires.  It does not require proof beyond a

5  reasonable doubt.

6          It's a determination that is based upon the totality

7  of circumstances.  And she is clear in her testimony, first, as

8  to the picture.

9          She concedes it looks like on this on this video, that

10  I am standing in front of there and taking a picture.  I don't

11  recall that, but nevertheless that -- that cell phone, I no

12  longer have.

13          I don't have any thing that was on it, so it's not

14  like it's not a matter of she took a picture and then does not

15  have it now, conveniently, in this lawsuit, where she is being

16  accused of some fantastical conspiracy.

17          I'm sure she wishes she had that picture, if it

18  existed, but she is saying:  Yes.  I'm not saying that that

19  video looks otherwise.

20          It looks like I'm taking a picture, but I don't have

21  anything that was on camera -- that cell phone.  I don't have

22  that cell phone anymore.  It's now broken.

23          In terms of the estimate, anytime in selecting these

24  charges, you select a charge based upon probable cause, not

25  proof beyond a -- proof beyond a reasonable doubt.

 1           And it's certainly not a proof beyond all doubt.  That

 2    would be not what our criminal justice system is set up on.

 3    It's reasonable doubt to get the conviction.  At the time of

 4    charging, it is just probable cause.

 5           But even if Your Honor does not find that there is

 6    probable cause that supports arrest on what charge, we move for

 7    qualified immunity, where the standard is forgiving and it is

 8    for arguable probable cause.  A lesser standard than probable

 9    cause itself, so --

10           **THE COURT:**  But -- but what concerns me is it seems

11    there are facts -- or because this is your motion to dismiss,

12    I've got to give the plaintiff the benefit of all reasonable

13    inference.

14           And it just seems to me -- to cite again one example,

15    that four days later, there is no mention of any repair work

16    being done to the mirror or the window would suggest -- one

17    could reasonably infer from that that there was no damage.

18           And that therefore, the complaint statement, under

19    oath, that there was damage over $250, and everything in that

20    complaint is false.

21           Again, not -- not determining that issue, but wouldn't

22    that be a reasonable inference?

23           **MS. HUGGINS:**  Your Honor, the -- the damage amount is

24    an element of that charge.

25           **THE COURT:**  Right.

1           **MS. HUGGINS:**  Certainly, at trial, to obtain a

2    conviction, the District Attorneys -- the People would have to

3    prove beyond a reasonable doubt that the damage exceeded that

4    amount.

5           But all that she does at that time, in signing off on

6    that charge, is -- is making a probable cause determination that

7    there is reasonable suspicion that that crime -- that those

8    elements were committed in the course -- in -- of that incident

9    and based on the totality and circumstances.

10          **THE COURT:**  No.  Understood.  But for example, Schulz

11   testified that he called McHugh -- Lieutenant McHugh.  And that

12   it was Lieutenant McHugh who told them to issue the criminal

13   complaint.

14          And Schulz -- this is at page 117 of his deposition

15   transcript, Docket Number 68-2, at lines 22 and 23.  He says:  I

16   don't recall the extent of the damage to the mirror.

17          And then at page 185, lines three through six, he

18   said:  How would you have determined that the amount exceeded

19   $250?

20          Answer:  That, I'm unsure of.

21          I mean, doesn't all this at least cast doubt on

22   whether there was even probable cause to large -- lodge these

23   criminal -- this criminal complaint?

24          **MS. HUGGINS:**  Your Honor, I disagree on that point,

25   respectfully.

1          **THE COURT:**  Well, it's --

2          **MS. HUGGINS:**  Officer Schulz is not the individual who

3     signs off on the criminal complaint.

4          **THE COURT:**  But she doesn't know either.  She

5     doesn't --

6          **MS. HUGGINS:**  She does not.

7          **THE COURT:**  She was asked --

8          **MS. HUGGINS:**  She does not recall, years later, now

9     sitting at her deposition how they came up with that estimated

10    dollar amount.

11         But she does not deny -- you know, certainly this

12    isn't something where she gets up there and says, I don't recall

13    any damage, period.

14         There is testimony from both her and Officer Velez as

15    to the damage to the vehicle, the mirror and the noise that the

16    window then made when it was moving up and down.

17         Again, Your Honor, this is not proof beyond a

18    reasonable doubt.  This is probable cause.

19         **THE COURT:**  Understood.  Understood, again.

20         But the one thing that's undisputed -- or correct me

21    if I'm wrong, but as I see it, it's undisputed, is that neither

22    that mirror nor the window were ever repaired.

23         And if -- if that -- if they had been damaged, as the

24    defendant suggests, they would have had to be repaired, because

25    the mirror wasn't hanging off, but it was dislodged.

1          And I think McDermott said it wiggled when you drove,

2     and the mirror was off its track, so its screeched.

3          I mean, there would have had -- that would have had to

4     be repaired and there is no record of it having been repaired,

5     right?

6          **MS. HUGGINS:**  Your Honor, I don't -- certainly there

7     is not a record produced that says those things were repaired.

8     I -- I don't --

9          **THE COURT:**  Well, I would certainly hope that there

10    will be no record produced between now and time of trial, if we

11    get to a trial.

12         I mean, discovery is closed, right?

13         **MS. HUGGINS:**  Right.  And we're not saying that it was

14    repaired.  That is -- that is true.

15         We're not saying that there is some record at the

16    garage that these things were later repaired.  There is a record

17    that says that no repair work was done on those parts of the

18    vehicle.

19         But there is not -- again -- and I understand Your

20    Honor's point, and it's -- and I respectfully am arguing to the

21    Court that that's not the standard as to when they are selecting

22    these charges and when Officer Mcdermott is signing the

23    accusatory instrument.

24         It is not, do I have proof in the form of a -- a

25    garage repair record.  She's, of course, signing the accusatory

1    instrument before any of that would ever have taken place.

2         She doesn't have the ability to take it to the garage.

3    You know, there is nothing in the record that suggests she could

4    have taken it to the garage during the course of this arrest and

5    obtained that estimate and then returned back with the plaintiff

6    and had his arrest process happened.  That is not how this

7    system works.

8         **THE COURT:**  Right.  Okay.

9         And, Ms. Huggins, just so we're all clear, you know, I

10   am extremely concerned about this case because of the extremely

11   serious nature of the charges that are made.

12        And that's why I asked Mr. Rupp, you know, you're

13   essentially claiming that multiple police officers got together

14   and concocted a fabulated story of something that didn't happen.

15   You can't get more serious than those charges.

16        On the other hand -- on the other hand, though, I

17   mean, what Ms. McDermott says in her sworn complaint on

18   January 1st, the day of the incident, she says:  Let's see -- he

19   did damage the property, to wit, the driver's side mirror and

20   driver's side mirror of the patrol vehicle in the amount of more

21   than $250.

22        The defendant did intentionally throw his body into

23   the driver's side mirror of the vehicle, causing the mirror to

24   become dislodged from the vehicle and also causing the driver's

25   side window to malfunction.

1          And what troubles me so much is irrespective of the

2    amount of the damage, if that had occurred that would have had

3    to be repaired and there is no record that it was repaired.

4          So couldn't somebody conclude then that this was a

5    lie?

6          **MS. HUGGINS:**  Except that, Your Honor, there is there

7    is -- there is evidence that supports the damage to the vehicle

8    in the form of the testimony and observations of the other

9    police officers present.

10          **THE COURT:**  Well, well, what -- what Mr. Rupp is

11    saying is that, yeah.  They all stood in the street for

12    30 minutes and put this story together.

13          Now, again, that is extremely troubling to me, the

14    thought that that could happen.  But on the other hand, I'm only

15    dealing with a summary judgement motion here.

16          And the question is, are there facts from which that

17    conclusion could be drawn.  That's what I've got to wrestle

18    with.

19          **MS. HUGGINS:**  And, Your Honor, I would argue that I

20    understand we are arguing a motion here.  And counsel's made

21    representations as to what essentially boils down to a fantastic

22    conspiracy, all to cover up a motor vehicle accident, which Your

23    Honor has noted.

24          And why I understand the Court's concern is you have

25    an officer swearing out a complaint, getting an action in

1    criminal court.

2          These are -- with the exception of Officer Moriarty,

3    these are experienced officers.  They know that by doing that,

4    they are -- not only that Officer McDermott is swearing out an

5    allegation in court, under penalty of perjury, but that the

6    District Attorneys Office will then take that case, evaluate it

7    and possibly prosecute it, requiring them to either come in for

8    a conference or to provide testimony in court.

9          That this would then create some fantastical

10   conspiracy, on top of a conspiracy where they would then have to

11   be perjuring themselves in criminal court or possibly in a Grand

12   Jury, as one of the charges was a felony.

13         All of those things are just fantastic and based on

14   pure conjecture and speculation; something that there is no

15   evidence in the record that supports it.

16         And I bring it back to originally what I said to Your

17   Honor is, when you boil it down, what are the material facts

18   that are not in dispute is you have contact between this

19   vehicle -- between the plaintiff and the vehicle.

20         And how the individuals there have perceived it is

21   what dictates the actions that happened through the -- that day

22   and ultimately the arrest of the plaintiff.

23         I would there is -- there is two more things I would

24   like to just address, specifically, that counsel said in his

25   argument and then I'm going to turn more -- substantively, to

1    the motions itself.

2           There was a number of statements made that the -- that

3    the officers attempted twice to involuntarily admit the

4    plaintiff for psychiatric incarceration or hold of some kind.

5           The police do not have the legal authority to do that,

6    number one.  Under the mental hygiene -- New York State Mental

7    Hygiene Law, number two, is he was only taken to the CPAP unit.

8           Once at Erie County Medical Center -- and there was

9    only one request for a mental health evaluation completed.

10          That is a form that is just a request asking for the

11   CPAP unit to do a mental health evaluation of someone.  It is

12   not sworn out under penalty of perjury.

13          The form is in the record and it clearly indicates a

14   number of the observations of the officers, but also medical

15   staff, from when the plaintiff was originally taken to ECMC for

16   evaluation by the emergency room department, following the

17   contact with the vehicle.

18          THE COURT:  Okay.  But what about Mr. Rupp's statement

19   that there was a -- that there is a record of a communication

20   from the scene of the accident, before they get to ECMC, that

21   there are going to take him in for a 941.

22          MS. HUGGINS:  So that is a radio transmission --

23          THE COURT:  Okay.

24          MS. HUGGINS:  -- from Officer Schulz.  He does not --

25   what I would say to the Court is it's really of no consequence.

1            That radio transmission, it appears to have taken

2    place prior to the conversation with Lieutenant McHugh.

3            Certainly, a radio transmission over to dispatch has

4    no dispositive, you know, control over what happens at ECMC or

5    when he is ultimately actually taken for CPAP evaluation.

6            When he is taken to ECMC, it is clear that he goes

7    from the records to the emergency room department.  He does not

8    go to CPAP the first time that he is there.

9            It is only after his behavior and his words -- and as

10   the Court has already noted, ranting and raving at ECMC, coupled

11   with what the officers observed prior that they end up putting

12   in the request for the mental health evaluation.

13           It is Officer Velez who fills out that form and it is

14   not sworn under penalty of perjury.  It is simply a form saying

15   these are the observations and these are the reasons why we are

16   asking for a mental health evaluation of this person.

17           That is delivered to the CPAP unit when he was

18   ultimately brought back later that day for that evaluation.

19           So the radio transmission, again -- also, when it's

20   placed in context, you know, Officer Schulz said he was going to

21   be charged with fraud.

22           Certainly, we know there is no penal law section for

23   fraud, other than insurance fraud.  And he's certainly not

24   charged with insurance fraud here.

25           So what I would say to the Court is -- is it of no

1    moment to these motions that radio transmission and certainly

2    that radio transmission in and of itself is not dispositive of

3    whether a 941 evaluation occurs or does not at that time.

4          **THE COURT:**  Okay.

5          **MS. HUGGINS:**  So those are -- if I could turn to the

6    actual -- and I think I may have addressed some of these

7    already, but in terms of plaintiff's motion for partial summary

8    judgement against Officers McDermott, Velez, Schulz and

9    Moriarty, essentially, it comes down to -- and what many of the

10   claims that remain and that the defendants' actually move for

11   affirmatively on is whether there is probable cause or not.

12         Now, I understand the Court's concerns.  I'm not

13   dismissing them, but what I would point the Court to in the

14   record is certainly there are observations by all four of the

15   officers that are on scene, when this contact occurs.

16         And, again, when you take these -- the material facts,

17   as distilled here, there is no doubt contact between the

18   plaintiff and the officer -- and officer McDermott's vehicle.

19         But the probable cause determination is not from the

20   perspective of the plaintiff.  It is not from the perspective of

21   this video that, of course, does not depict the side of the

22   impact of the vehicle.

23         It is from the point of view of the officers on the

24   scene, and it's based upon the totality of circumstances.

25         When you take Officer Mcdermott's testimony about how

1   she quite clearly observed the plaintiff approaching and walking

2   without stopping in her direction, a point that plaintiff does

3   not dispute -- that he reaches out with his hands, another point

4   the plaintiff does not dispute and then contact is made with the

5   side of the mirror, that is something that gives her ample

6   probable cause for the criminal mischief charge that ultimately

7   she comes to after having the conversation with Lieutenant

8   McHugh, discussing what happened during the incident.

9         Alternatively, you know, we move on qualified immunity

10  grounds.  And in that, it's not a full blown probable cause,

11  that it needs to support it.  It's just arguable probable cause,

12  which is a lesser standard.

13        And, again, Your Honor, her testimony of what she

14  observed is not disputed by the plaintiff.  I would note that

15  counsel did not actually talk a whole heck of a lot about his

16  own client's testimony here.

17        And, secondly, it is supported by the observations of

18  the other officers present.  You have Officer Moriarty, who

19  agrees in his testimony that he had a discussion with Officer

20  Schulz, where they said:  Did we just see what we think we saw?

21        And Schulz says:  Yes.  I saw him.  I saw him throw

22  himself into the vehicle.

23        When that's combined with the observations of

24  Lieutenant McDermott, that corroborates what she saw and how she

25  perceived that contact to her car.

1          Now, Officer Velez, she did not see the impact.  She

2    was not looking.  At the time, she was looking away, but she is

3    the officer who also corroborates the damage to the vehicle that

4    she observed, herself, after -- during the course of the day, on

5    January 1st.

6          I think I have adequately addressed all of counsel's

7    points, but if Your Honor has a specific question, I will -- I

8    will address it.

9          We're sort of taking these out of turn, but if Your

10   Honor wants me to continue with the defendants' motion, I'm

11   happy to do so.

12          **THE COURT:**  Yeah -- no.  That's fine.

13          And, again, I recognize I'm kind of jumping back and

14   forth, but the motions' obviously are interrelated, so --

15          **MS. HUGGINS:**  Your Honor, I've looked at my notes and

16   I realize that there are two small points that I wanted to make

17   that I have neglected to do.

18          So there was obviously discussions of violations of

19   the police manual procedures.  That, of course, is not a plea to

20   a constitutional violation.

21          What is at stake here is is there probable cause to

22   support the arrest and the ultimate criminal charges that were

23   pressed.

24          And, finally, there was much discussion about

25   plaintiff's expert.  All of those -- all of her conclusions

1   would be true, if she had completed a complete review of the

2   record.

3         Here, we have pointed out a number of things that she

4   did not review.  She did not review the plaintiff's own medical

5   records, where -- and, again, I'm not submitting this for the

6   truth of the matter, where oddly plaintiff himself says he might

7   have slipped on ice.

8         No actual person who was there that day actually

9   thinks that there was ice there.

10        Number two, the -- the basis of the expert's opinion

11  in terms of what could have been seen by Officer Schulz is based

12  on an incomplete review of this evidence.

13        She does not inspect the actual vehicle.  There is no

14  evidence in the record of what was Officer Schulz wearing.  He

15  was wearing a police uniform that is outfitted in not just

16  regular clothing, but a duty belt, a -- a vest.

17        There is no question, never once did plaintiff's

18  counsel pose to him a question of how was your body positioned

19  as you were looking through this mirror; how was your seat

20  adjusted; what were you able to see.

21        Instead, you just have an expert saying this other

22  random person that I used in an experiment wasn't able to see

23  what Officer Schulz was there to see that day.

24        It's not based on the same information and testimony

25  of how his body was positioned; what he was wearing; how his

1    seat was adjusted.

2           It's not even using the same vehicle.  And there was

3    no -- you know, no request to ever inspect the vehicle or have

4    their expert inspect the vehicle.

5           So while I understand the expert's opinions, what we

6    submit to the Court is they are not opinions that can be

7    credited here.

8           And even if it is something that the -- that would be,

9    of course, something for the jury to do; to listen and evaluate

10   that evidence.

11          Not something that is proper at a summary judgement

12   motion or that would meet plaintiff's burden under summary

13   judgement to -- to have summary judgement entered against these

14   four officers.

15          **THE COURT:**  Okay.  Let me -- I want to turn for a

16   minute to the second complaint.

17          Well, when I say second, I mean they are both sworn

18   out on January 1st, but -- so we've talked about the criminal

19   mischief complaint.

20          The second is the disorderly conduct.  And that

21   repeats the allegations, concerns the initial incident on

22   Schmarbeck, but then it goes on to say that "while being treated

23   at ECMC, the defendant did use obscene and offensive language

24   towards officers and medical staff.  Said actions by the

25   defendant did cause a public annoyance and alarm."

1          Mr. Rupp, in terms of probable cause, I think it's

2    undisputed -- in fact, I think it's even alleged in your -- in

3    your amended complaint that at the hospital -- and I'm not

4    saying whether he was justified in being upset or not, but he

5    was using language such as feminazis and he was swearing -- and

6    perhaps using even worse language in terms of probable cause.

7          Wouldn't -- wouldn't that create probable cause for

8    disorderly conduct?  Again, completely independent of the first

9    complaint, but just focusing on this complaint now.

10          **MR. RUPP:**  Yeah.  I understand the question, Judge.

11    And I think there -- we again reference the fact that the

12    medical records that counsel relied on for meeting her

13    affirmative burden on her summary judgement motion were not in

14    certified form or otherwise authenticated.

15          So the statements that are attributed to him in the

16    hearsay medical records are not properly before the Court, so

17    they can't form the basis of a summary judgement motion.

18          **THE COURT:**  No.  I'm talking about your amended

19    complaint.  I thought there was an allegation in there that

20    he -- let's see.  I can pull it up, because I -- I don't often

21    see the word feminazis in pleadings, so it kind of jumped out at

22    me.

23          Where -- anybody remember what the date of the amended

24    complaint was?

25          **MR. DAVENPORT:**  I believe that it would have been May

1   of 2019.

2           **THE COURT:**  Okay.

3           **MR. DAVENPORT:**  Some time in that general area.

4           **THE COURT:**  Okay.  Yeah.  Just a second here.

5           **MR. DAVENPORT:**  No wait.  No, actually.  I'm sorry.

6   It would have been --

7           **THE COURT:**  No.  It is.

8           **MR. DAVENPORT:**  It would have been October of last

9   year, because there was an amended complaint -- no.  Lieutenant

10  McHugh -- after the motion that was made --

11          **THE COURT:**  Okay.

12          **MR. DAVENPORT:**  -- late last year.

13          **THE COURT:**  Okay.  All right.  Okay.

14          So --

15          **MS. HUGGINS:**  To Your Honor's point, plaintiff

16  actually concedes in his motion that he -- that he used that

17  language.

18          **THE COURT:**  Yeah.  Okay.  Okay.

19          It's in there somewhere, either in the brief or the --

20  yeah.  Yeah.  Where -- Ms. Huggins, can you point me to that or

21  I remember seeing it from plaintiff's papers, so it wasn't that

22  I'm crediting what you --

23          **MS. HUGGINS:**  Your Honor, it actually appears in a

24  number of places in plaintiff's motions, but it is -- if you

25  look at their response and their own statement of material

1    facts, it is --

2            **THE COURT:**  Do we have a Docket Number or a date that

3    you can refer me to?  Anybody?  Bueller --

4            **MS. HUGGINS:**  You to -- I apologize.  The -- the

5    copies that I brought --

6            **THE COURT:**  No.  That's okay.

7            **MS. HUGGINS:**  -- were not the --

8            **THE COURT:**  Yeah.

9            **MS. HUGGINS:**  -- the electronically filed.

10           **THE COURT:**  Okay.  How about the date of it?  All

11   right.

12           So the second amended complaint, I'm looking at now is

13   October --

14           **MR. RUPP:**  Judge, may I interject something here?

15           **THE COURT:**  Yeah -- yeah.

16           **MR. RUPP:**  We have alleged that there is no proof that

17   any of the staff were disrupted by these alleged comments.

18   That's part of the prima facie moving burden and it's part of

19   the criminal statute for disorderly conduct.

20           It's not enough just to say he used a word or a

21   language that the Court might find or anyone might find

22   offensive.

23           You have to prove -- and they have an affirmative

24   moving burden to prove that the language disrupted the staff at

25   ECMC.

1          They have come forward with nothing.  Nobody was

2  deposed from ECMC.  There are no affidavits from ECMC.  And even

3  to the extent that this could be implied or inferred from

4  medical records, those medical records are not properly before

5  the Court, so there is no proof of the elements of the crime

6  here to establish the probable cause.

7          **THE COURT:**  Right.  I don't have the penal law section

8  in front of me, but it's 240.20 --

9          **MS. HUGGINS:**  Subsection one, Your Honor.  And

10  certainly, again, it's probable cause.

11          **THE COURT:**  No.  Actually the complaint refers to

12  240.20, subsection three.

13          **MS. HUGGINS:**  Which is engaging in a course of conduct

14  that causes a public disturbance.

15          **THE COURT:**  Okay.

16          **MR. RUPP:**  No indication of a disturbance, Judge.

17  There is no indication that anybody was disturbed by anybody.

18          **THE COURT:**  Well, wait.  Somebody --

19          **MS. HUGGINS:**  Yeah.

20          **THE COURT:**  And, again, bearing in mind we're only

21  talking about probable cause.  That yelling feminazis wouldn't

22  cause a -- for the purposes of probable cause wouldn't cause a

23  disturbance.

24          **MR. RUPP:**  I don't think Your Honor can infer that.  I

25  see where you're going with it, Judge, but I don't think that

1    they have an affirmative moving burden, as the moving party of

2    the summary judgement motion.

3           And they have not proven that anybody was disturbed by

4    that.  For all we know, everybody in the ECMC emergency

5    department was screaming things at the top of their lungs that

6    day and there is no disturbance at all caused by Mr. Kistner.

7           We don't know that.  And to ask the Court to define

8    that from what has been submitted, I think would be

9    inappropriate.

10          **THE COURT:**  What do you say to that, Ms. Huggins?

11          **MS. HUGGINS:**  Well, Your Honor, it's -- it's

12   established that a police officer's observations is evidence.

13   And, certainly, what they observed that day can form the basis

14   of probable cause.

15          But, again, as Your Honor noted both in plaintiff's

16   second amended complaint, as well as plaintiff's own moving

17   papers himself, he has conceded that he had that -- that he

18   engaged and used that language.

19          So, Your Honor, I think that -- again, it is probable

20   cause based on the totality of circumstances is not proof beyond

21   a reasonable doubt for them to level at that that violation.

22          **THE COURT:**  Okay.  Counsel, it's now ten after 12 and

23   we've been at it for a little over an hour.

24          I recognize that formally speaking I haven't given

25   everybody the opportunity to argue their motions, but I think

1    we've covered a lot -- most, if not all of the territory,

2    bearing in mind that I am going to be again re-reviewing all of

3    your papers.

4            But if there is anything either of you want to say in

5    addition to what you have said, very briefly, I'll -- I'll hear

6    you, okay?

7            **MR. RUPP:**  Judge, if I may, I jotted down --

8            **THE COURT:**  And you why don't you just stay at --

9            **MR. RUPP:**  Okay.

10           **THE COURT:**  -- counsel table, just move things along.

11           **MR. RUPP:**  Judge, I did jot down a couple of things,

12   but if you would give me a second, I can probably cut some of

13   them down.

14           I do want to point out that for probable cause to

15   exist, the arresting officers must believe that all elements of

16   the charge have been satisfied.

17           That goes to the question we were just addressing

18   about whether a disturbance was caused by inappropriate

19   language.

20           But more importantly, Judge -- and that's not my hill

21   to die on here today -- it goes to the question of the $250 in

22   damage.

23           It's not enough -- even if we disregard the video and

24   even if we disregard --

25           **THE COURT:**  No.  I understand and I've --

1          **MR. RUPP:**  No, no.  I get that.

2          **THE COURT:**  We've talked about that.

3          **MR. RUPP:**  I'm not saying you are going to, Judge.

4    I'm saying, but even if we disregarded the video and Jennifer

5    Yaek's analysis of it, which stands unrebutted in the record as

6    to how this incident happened, they still have a huge problem

7    with the $250 in damage.

8          Because to have probable cause to arrest for the

9    felony -- they wanted to arrest Mr. Kistner for a felony and

10   they needed to show the damage to the vehicle.

11         They needed to have some probable cause for that.  And

12   as Your Honor -- I think your questions have pointed out, there

13   is absolutely zero indication that there was any damage to the

14   vehicle whatsoever.

15         It is very hard for me to believe looking at the video

16   that they caused damage to the mirror or the other mirror, the

17   driver's side or the driver's mirror itself from that degree of

18   impact, which counsel has obviously characterized in her own

19   motion is de minimis because it didn't even cause injury to

20   Mr. Kistner.

21         But yet -- yet we have a impact that allegedly didn't

22   injure Mr. Kistner at all, but somehow did grave damage to a

23   police SUV Tahoe.  It doesn't make sense, Judge, and that goes

24   to the -- to the issue whether they have probable cause.

25         I do take umbrage and considerable issue with the idea

1    that the officers did not conspire, not only to charge

2    Mr. Kistner with a felony, but that they did not make the

3    decision to take him for a consult to ECMC until they arrived at

4    ECMC, when they then conveniently have his language to rely on.

5            Mr. Schulz dispatched, as he was leaving the scene,

6    that he was taking Mr. Kistner on a 941.  What Jennifer Velez

7    later filled out at the hospital is irrelevant.

8            But this proves, Judge, that, again, objective facts

9    that were testified to, you know, by Mr. -- by Officer Schulz

10   were false.  The 941 stands on the official dispatch orders that

11   is -- that is a psychiatric consult.

12           And remember, the context was Mr. Kistner had been

13   arrested.  He is seen on the video, walking calmly.  He is

14   walked to the vehicle.  He is seated in the vehicle for 30 to

15   35 minutes, while the officers come up with their story against

16   him.

17           And then as they are leaving, they say they are taking

18   him for a psych consult.  There is no indication on that video

19   that Mr. Kistner acted or even spoke with a way that was an

20   affama (phonetic) to his mental health.

21           That it was -- that suggested -- he's not shown

22   walking or ambulating in an errant fashion.  He's not -- he

23   didn't throw himself suicidally at the Moriarty driven vehicle.

24           He let it go by.  He didn't throw himself at the -- at

25   the McDermott-driven vehicle.  He didn't fight with the

1    officers.

2         He's walked calmly back to the Schulz/Moriarty

3    vehicle, placed in the backseat and left there without medical

4    care and attention -- which by the way is another violation of

5    the police procedures manual -- for 35 minutes, while they talk

6    about it.

7         And then at the end of that talk, as soon as Schulz

8    gets back to the vehicle -- and this is required by the dispatch

9    rules relating to Buffalo Police Department, required by the

10   police procedures manual, he says:  I'm taking him for a 941.

11        Where?  On what basis?  How?  And we know, Judge, that

12   they wanted to get him charged with a felony.  And we know that

13   they wanted to get him involuntarily admitted to ECMC.

14        And the records show, Judge, contrary to counsel's

15   representation, he was taken back to ECMC a second time.

16        They refused to admit him on a psych admit, and they

17   waited until there was a shift change and there was a new doctor

18   in the CPAP unit at ECMC and they took him back and tried again,

19   because they desperately wanted to take him out of circulation,

20   so he could not articulate his version of what had happened that

21   day, Judge.

22        And this is important.  You know, counsel would like

23   the Court to -- to ignore the facts that show that Schulz and

24   Velez and McDermott were lying and just look at whether their

25   perception -- I disagree that this is about perception versus

1    perception.

2            Counsel said that that's really what this is.  It's

3    what -- what Mr. Kistner perceived and it's what maybe Lauren

4    McDermott perceived.

5            It's not, Judge.  It's about what happened.  And the

6    video shows what happened.  It's not about perception any

7    longer.

8            When the perception is untrue, when it's false, when

9    it's perjured, when it's created and manufactured, the Court is

10   not required to -- to accept what Ms. McDermott says is her

11   perception.

12           How do we know that -- that these officers are lying?

13   Well, Schulz testified that when he was looking in the side view

14   mirror of the driver's side mirror of -- of Moriarty's --

15   Moriarty's side of the car, that he told Moriarty, his trainee,

16   "stop the vehicle.  I think something is going to go down."

17           He says Moriarty stopped.  He then said he had a

18   bird's eye view of what happened.  That is completely and

19   utterly false.

20           Jennifer Yaek has provided the video to the Court.

21           **THE COURT:**  Okay.  Now, we're kind of getting into

22   territory that's already been covered.

23           **MR. RUPP:**  Okay.  But, Judge, but the point is that we

24   have -- counsel said there is nothing to support the idea of the

25   grand conspiracy.  Nothing.

 1          These things all support the grand conspiracy.

 2   Obviously, we don't have audio of what the officers talked about

 3   when they decided to charge my client with a felony and get him

 4   psych admitted.

 5          But we do know that things that they affirmatively

 6   testified to prove to be false.  And those are not accidents,

 7   Judge.  They are not just little, oh, don't worry about the

 8   dispatch order that says we're taking him for a 941 psych

 9   consult.  That doesn't mean anything.  You know, Officer Schulz

10   also thought he was going to charge him with fraud.

11          No, Judge.  That's part of the conspiracy that I've

12   alleged, when Schulz says that the Moriarty vehicle was stopped

13   and he sees things that, again, is false.  It's part of the

14   falsity of the entire picture.

15          And finally, Judge, you know, there is no question

16   that these officers knew that even if what they said was true,

17   that Kistner threw himself into the side of the vehicle -- even

18   if that's true, they were required -- and the police

19   commissioner's testified to this -- our expert, Mr. Campanella

20   (phonetic) testified to this, they were required to call out the

21   accident investigation unit and internal affairs to investigate

22   this accident.

23          Even if what they said was true, even if Kistner threw

24   himself into the side of the vehicle, they did not.  Why?

25          Again, when counsel says there is no other proof to

1   support my theory that they conspired to perjure themselves and

2   bring felony charges and psych admit against my client, there is

3   lots of other proof that they deviated from 13 different

4   requirements of the police procedures manual, committed four

5   crimes, as our expert unrebuttedly testified to -- provides in

6   his affidavit.

7          Lied about whether the Moriarty vehicle was

8   stationary.  Lied about whether Schulz could see it.  Lied about

9   whether they were taking my client for a psych admit.

10          And all of that, Judge, is before the Court in the

11  record and it is not refuted and it speaks to this grand lie.

12  And the rest of it, Judge, I will rely on the video.

13          **THE COURT:**  Okay.

14          **MR. RUPP:**  And Ms. Yaek's very considered evaluation

15  of that video.

16          Thank you, Judge.

17          **THE COURT:**  Okay.  Thank you.

18          Ms. Huggins, anything you wish to add?

19          **MS. HUGGINS:**  Your Honor, in terms of the evaluation

20  of whether there is a section 1983 constitutional violation for

21  not only the arrest, but the charging, it is again a probable

22  cause determination that's based upon the totality of

23  circumstances.

24          It is a probable cause determination that is not even

25  dependent on -- for the false arrest, the actual crimes that are

1   charged.

2           It is does probable cause exist, based here, to make

3   that arrest.  So, you know, we've gone through each of the

4   charges, the criminal mischief.

5           But, again, as Your Honor spent time at the disorderly

6   conduct charge at ECMC, it's not is there probable cause period

7   to make that arrest from, from the scene.

8           And that is clear.  It is not should we have charged

9   him with a felony versus a misdemeanor.  And this idea that they

10  were intent on charging a felony -- I mean, there is nothing in

11  the record that says:  Oh, I knew I had to charge him with a

12  felony, you know, or I knew I had to get him admitted to the

13  CPAP unit.

14          There is nothing in the record that says that, so

15  that's -- that's just pure conjecture.

16          But, Your Honor, had they charged him with a

17  misdemeanor, you know, the focus on the dollar amount, the

18  difference between the misdemeanor criminal -- criminal mischief

19  charge and the felony criminal mischief charge is the dollar

20  amount for the damage.

21          Had they charged him with a misdemeanor, again, I

22  submit that that does not matter.  The dollar amount in and of

23  itself is not determinative of is there a constitutional

24  violation.

25          It's is there probable cause here to support what the

1    officers did.  And, again, we moved on both probable cause and

2    qualified immunity arguments.

3            Your Honor, I just want to briefly touch on a few

4    quick other things that certainly the record does not support

5    that they tried to admit him into the CPAP unit, period.

6            Because not only do they not have the authority to do

7    that, but they did not do it in the first visit.  It's clear he

8    only went to the emergency room department for evaluation.

9            Back to the -- the personal involvement of all the

10   defendants who are sued herein, Your Honor, there has been

11   discussion as to the failure to intervene claims relating to

12   specifically Officer Santana.

13           And we make this point in our papers, but certainly

14   there is no proof in the record that Officer Santana or

15   Lieutenant McHugh had actual knowledge.

16           This is presupposing that there is even a

17   constitutional violation, which, obviously, we disagree with,

18   but knowledge of this, that there was something to intervene

19   with.

20           It's undisputed that Officer Santana is not present

21   when the contact between the plaintiff and the vehicle occurs.

22   He comes after the fact.

23           And it is undisputed that Lieutenant McHugh is not

24   there.  And the only information he has of this incident is from

25   the officers, when they have the telephone call.

 1          So on that basis alone, they lack the personal

 2   involvement to remain in this lawsuit.

 3          Your Honor, we have moved and our papers are robust;

 4   they are lengthy; I will -- does the Court have specific

 5   questions that I can speak to?

 6      **THE COURT:**  No.  I mean -- you know, as I said

 7   previously, I'm going -- I have reviewed the papers.  I will be

 8   reviewing them again and probably again.

 9          So maybe what I will do -- just if the parties wish, I

10   will give -- I will give both of you a week to submit a letter

11   brief, if you wish -- you don't have to -- as to anything that

12   you would like to emphasize, based on, you know, what's been

13   said today, provided that it's in the record.

14          And if you don't want to do, that -- that's fine, too.

15          Okay.  Is that all right?

16      **MR. RUPP:**  Judge, for the status update on which

17   claims are withdrawn, do you want that as a letter status

18   update?

19      **THE COURT:**  Yeah.  Even though it's -- I think it's

20   pretty clear on that footnote, but I would like it just

21   confirmed, okay?

22      **MR. RUPP:**  Okay.

23      **THE COURT:**  All right.  Thank you, both.  This is

24   well -- well briefed and well argued on both sides.

25          And why don't we -- Eric, why don't we go off the

1   record.

2            (Discussion off the record.)

3

4                        (Proceedings concluded)

5                              *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2     "I certify that the foregoing is a correct transcript, to the

3      best of my ability, from the record of proceedings in the

4                      above-entitled matter."

5

6

7      *s/ Bonnie S. Weber*                   June 22, 2021
         Signature                              Date

8

9     BONNIE S. WEBER

10    Official Court Reporter
      United States District Court
11    Western District of New York

12

13

14

15

16

17

18

19

20

21

22

23

24

25