UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JAMES C. KISTNER,

**REPORT AND
RECOMMENDATION**

                                    Plaintiff,

v.                                                     1-18-cv-00402-LJV-JJM

CITY OF BUFFALO, BYRON LOCKWOOD,
DANIEL DERENDA, LAUREN
MCDERMOTT, JENNY VELEZ, KARL
SCHULTZ, KYLE MORIARITY, JOHN
DOE(S), DAVID T. SANTANA, and
ANTHONY MCHUGH,

                                    Defendants.

_____

          This extremely disturbing action arises from a January 1, 2017 incident in which

plaintiff James C. Kistner was allegedly struck by a Buffalo Police Department ("BPD") patrol

vehicle on Schmarbeck Avenue in the City of Buffalo and subsequently arrested. Kistner seeks

relief against all defendants under 42 U.S.C. §1983 for unlawful seizure and arrest (First Claim

for Relief); abuse of process and malicious prosecution (Second Claim for Relief); First

Amendment retaliation (Third Claim for Relief); and negligent hiring, supervision and training

(Fourth Claim for Relief). Second Amended Verified Complaint [61].[1]

          He also seeks relief against all defendants under New York State law for false

arrest and false imprisonment (Fifth Claim for Relief); abuse of prosecution and malicious

prosecution (Sixth Claim for Relief); assault (Seventh Claim for Relief); battery (Eighth Claim

for Relief); intentional infliction of emotional distress (Ninth Claim for Relief); negligence

_____

[1]      Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF
pagination (upper right corner of the page).

(Tenth Claim for Relief); failure to intervene (Twelfth Claim for Relief); defamation (Thirteenth Claim for Relief); official misconduct, tampering with evidence and spoliation (Fourteenth Claim for Relief); and punitive damages (Fifteenth Claim for Relief). He further asserts a claim against the City of Buffalo for respondeat superior liability under state law (Eleventh Claim for Relief). Finally, he seeks attorneys' fees and costs against all defendants under 42 U.S.C. §1988 (Sixteenth Claim for Relief). Id.

The action has been referred to me by District Judge Lawrence J. Vilardo for supervision of pretrial proceedings, including initial consideration of dispositive motions [5]. Before the court are Kistner's Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P ("Rule") 56 [68] and defendants' Motion for Judgment on the Pleadings and Summary Judgment pursuant to Rules 12(c) and 56 [69]. Having reviewed the parties' submissions [68, 69-79, 81-100, 103, 104] and heard oral argument [105], for the following reasons I recommend that the Motions be granted in part and denied in part.

## BACKGROUND

Kistner owns a home located at 33 Schmarbeck Avenue. Kistner's deposition [70] at 32. On the morning of January 1, 2017, City of Buffalo Police Officers Karl Schultz and Kyle Moriarty were dispatched to that address in a BPD patrol vehicle, driven by Officer Moriarty, to investigate a theft complaint. They were followed shortly thereafter by Officers Lauren McDermott and Jenny Velez in a second patrol vehicle, driven by McDermott.

Kistner testified that as Schulz and Moriarty prepared to leave the scene, he approached their vehicle to find out what was going on, but they would not speak to him. [70] at 86. He stated that as he then approached the second vehicle (driven by McDermott), "she crashed

into me . . . . I saw the car was coming at me, I put my hands out in front of me, and I closed my eyes. The next thing I know, I was on the ground and the back of my head hurt." Id. at 90, 91. However, later that day he "stated he thinks he slipped on ice and hit his head on the ground". [71] at 10.

By contrast, McDermott testified that Kistner "purposely walked towards the vehicle and threw himself into it" ([74] at 102) while her vehicle was stopped. Id. at 94. Schultz testified that "Kistner threw himself at a car that was parked". [75-1] 91-2.  Moriarty testified that "he threw himself on her vehicle". [73] at 114. Velez testified that although she did not witness the incident herself, McDermott and Schultz told her that Kistner threw himself at the vehicle. [72] at 115, 201, 336.

As McDermott got out of her vehicle, she saw Kistner "kind of rolling on the ground . . . from side to side". [74] at 104. "[H]e claimed to be injured." Id. at 97.  Schultz testified that Kistner was placed in handcuffs and escorted to Schultz's patrol vehicle. [75] at 109. "He was not free to . . . leave, but at that point we were still assessing . . . what our actions were going to be moving forward." [75-1] at 2. Although an ambulance had been requested, Schultz cancelled the request "[b]ecause it would have been a lot quicker for us to get him up to ECMC and get the treatment than waiting right there for an ambulance to show up . . . . [W]e advised him that we were taking him up to ECMC to get treated. To, you know, get further treatment and evaluation from the medical professionals". [75-1] at 17, 18.

Although McDermott admitted that Kistner was complaining of head pain ([74-2] at 9, 18) and Schultz acknowledged that he was not competent to diagnose head injuries ([75] at 106), the officers did not immediately transport Kistner to ECMC. Instead, Schultz, Moriarty, McDermott, Velez and Officer David Santana (who arrived after the incident) waited nearly a

half hour before leaving for ECMC ([76-1] at 12; [82-2] at 128), "continuing talking about the situation at hand and how we were going to move forward with dealing with it". Schultz, [75-2] at 17.

They called their supervisor, Lieutenant Anthony McHugh. McDermott "explained the situation" to him. [74-1] at 90.  Schultz told him that "from my vantage point, Officer McDermott and Velez did not strike the individual. That the individual . . . had stuck his hand out, coming into contact with the police vehicle, and that there was damage to the mirror". [75-1] at 8. McDermott "made a comment about  . . . the driver's side mirror not being able to function . . . . [I]t was immobile". Id. at 9. According to Schultz, "that is when, with [McHugh's] recommendation, we had come to the conclusion that we were going to . . . take Mr. Kistner up to ECMC . . . but also to charge him with criminal mischief to the police vehicle". Id. at 6. "[A]t that point . . . we had determined that [McHugh] did not need to come out, internal affairs did not need to come out, and that it was more of a criminal instead of an accident call." Id. at 8. Although somebody mentioned that there was a video of the incident, Schultz did not retrieve it because "[t]hat's not part of patrol duties". Id. at 19.

After Kistner was placed under arrest ([74-2] at 63), Schultz and Moriarty drove him to ECMC, followed by McDermott and Velez. Upon arrival, McDermott told hospital personnel "that he had deliberately flung himself into [her] vehicle". Id. at 44. Kistner's attorney arrived and asked to speak with him, but she did not allow that "[b]ecause he was in custody, and it was not something that we would normally do". Id. at 55. She stated that "[t]he lawyer told me something about there being video, which I had already known that there was video", but she did not seek to retrieve the video footage. Id. at 56.

After Kistner was medically cleared by ECMC, McDermott and Velez drove him to Central Booking, still in handcuffs and under arrest. Id. at 61. At that point McDermott signed two criminal Complaints against Kistner, under penalty of perjury. [74-3] at 24-5. The first Complaint charged him with criminal mischief in the 3rd degree in violation of N.Y. Penal Law §145.05(2), a class E felony, alleging that he "did intentionally throw his body into the driver's side mirror of patrol vehicle #47, causing the mirror to become dislodged from the vehicle and also causing the driver's side window to malfunction, the value of said damage to exceed $250.00". [68-3] at 331.[2] The second Complaint charged him with disorderly conduct in violation N.Y. Penal Law §240.20(3), alleging that "while being treated at ECMC the defendant did use obscene and offensive language toward officers and medical staff", which "did cause a public annoyance and alarm". Id. at 332.[3] He was also issued an Appearance Ticket requiring him to appear in Buffalo City Court on January 12, 2017. Id. at 329.

McDermott and Velez then returned Kistner to ECMC for a second time, dropped him off and left. [74-2] at 109-10. Although the dispatch log reflected a report of "male hit by police car" at 10:55:42 a.m. ([68-3] at 323), at 16:41:01 p.m. a request was made to "change this call to criminal mischief". Id. According to McDermott, "[w]e simply had it changed to criminal mischief so this reflected properly". [74-2] at 91.

---

[2]     Penal Law §145.05(2) provides that "[a] person is guilty of criminal mischief in the third degree when, with intent to damage property of another person, and having no right to do so nor any reasonable ground to believe that he or she has such right, he or she . . . damages property of another person in an amount exceeding two hundred fifty dollars. Criminal mischief in the third degree is a class E felony".

[3]     Penal Law §240.20(3) provides that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [i]n a public place, he uses abusive or obscene language, or makes an obscene gesture".

Even though the examining physician had concluded during Kistner's initial visit to ECMC that no further mental examination was warranted,[4]  Velez presented the hospital with a "Request for Examination of Person Under Section 9.41 of the NYS Mental Hygiene Law" ([68-3] at 334), stating that Kistner "did intentionally throw himself at patrol vehicle. Repeatedly called officers Nazis and fascists". McDermott assisted Velez in completing that form. [74-2] at 103. Among the boxes which they checked on the form as "indicat[ing] that the individual might be a danger to self or others" was the box entitled "talks repeatedly about a single subject". [68-3] at 334.

When asked what that referred to, McDermott replied "I believe he used the word conspiracy quite a bit . . . . He used it a few different times". [74-2] at 106. When asked whether Kistner was "talking about being the victim of a conspiracy that you guys were covering up the fact that you had negligently struck him with the vehicle and decided to blame him for it", McDermott replied "[h]e may have". Id. at 107. That is confirmed by defendants' "Notice of Intention to Offer Evidence at Trial", [69-6] at 8: "While at ECMC, the defendant did spontaneously state to the Dr. and PO L. McDermott and PO J. Velez, 'You hide fascist uniforms. That's what you do and those t[w]o Nazis that were driving in front. Fascists . . . . Charge me criminally to cover yourselves. You're scared. You and your lily white p**ssies . . . . If you keep telling your lies so wildly, someone might believe you. You're [sic] story ain't going

---

[4]      "He will be stable for discharge to police custody . . . . Patient's mental status is much improved. He is alert, oriented, and able to provide an appropriate history . . . . I do not believe he warrants CPEP evaluation." [71] at 5. ECMC's website (www.ecmc.edu) defines CPEP as "Comprehensive Psychiatric Emergency Program".

to fly. Internal Affairs is going to eat you're [*sic*] a\*\* alive . . . . I'm tired of listening to this c\*\*t, the three Nazi bitches'."[5]

Kistner was discharged from ECMC for the second time at 6:50 p.m., the examining physician noting that "he is rational and logic[al] . . . . There is clearly no indication for acute psych admission . . . [H]e is going to be d/ced [discharged] back to home". [71] at 34.

On March 31, 2017 Kistner filed a Notice of Claim with the City of Buffalo pursuant to N.Y. General Municipal Law §50-e, alleging "vehicular negligence or assault, false arrest, assault, battery, and malicious prosecution against [him] under state and federal law". [69-4] at 2. The Notice of Claim included copies of the two criminal Complaints executed by McDermott. Id. at 6, 7. On April 4, 2017 the criminal charges against him were dismissed in the "Interest/Furtherance of Justice" pursuant to N.Y. Criminal Procedure Law §70.30(1)(g). [82-2] at 219. On June 17, 2017 he was examined under oath by counsel for the City, pursuant to N.Y. General Municipal Law §50-h. [69-7] at 2-110.

Kistner commenced this action on March 30, 2018 [1]. Nearly a year later, on February 8, 2019, he wrote to BPD Commissioner Byron Lockwood, stating that he was "surprised to learn during the discovery process in my action that none of the officers involved were ever investigated or disciplined for what they did to me and my family. I am writing to you directly, asking that you remedy this oversight. Please forward this letter to your Internal Affairs Division immediately. I have enclosed a copy of the complaint that my attorneys filed on my behalf. It will provide you with all the information needed for the IA investigation. Please let me

---

[5]     Kistner himself admits that "[w]hile he was at ECMC, [he] used four-letter language to criticize his unlawful and unconstitutional arrest. He also referred to the defendants and certain ECMC personnel as 'Nazis' or 'Feminazis'". Second Amended Verified Complaint [61], ¶112.

know when your investigation begins, and if you need to speak with me about the officers' acts and omissions. Thank you." [82-2] at 221.

However, Internal Affairs did not open an investigation until December 19, 2019 - the same day that WIVB-TV ran a story concerning the incident. [82-7], ¶75. The Internal Affairs Investigator, Lieutenant Louis Kelly, "[r]eviewed a copy of [the] surveillance video provided by Mr. Kistner's attorney", which showed that McDermott's vehicle "pulls away from curb [and] appears to collide with Kistner who falls to the ground". [82-3] at 59. McDermott told Kelly that when she saw Kistner approaching, she "attempted to stop", but admitted that "in video [her] vehicle appears to be in motion". Id. at 61. She stated that Kistner "[s]tarted screaming to someone to call for an ambulance, he was hit by a police car", that she "[t]old him to get up or he would be charged", and that she "[d]ecided to arrest him because he wouldn't get up". Id. at 61-2.

In August 2020, Commissioner Lockwood met with Kelly to review the results of the Internal Affairs investigation. [82-1] at 112, 148-9. He did not review the video with Kelly at that time, because he had already seen it. Id. at 227. "The video that I saw was the video of the impact and . . . I was making my determination off of that video." Id. at 228. Considering whether McDermott "intentionally hit [Kistner] with the police vehicle", Lockwood stated that he "couldn't see . . . in that video where it was anything intentional . . . . [I]t looks like, you know, an accident to me". [82-1] at 228, 229, 230. When asked whether he thought "there was enough evidence on that video to support the charges brought by your C district officers against Mr. Kistner", he responded "Felony, I wouldn't say". Id. at 229.

On August 13, 2020, Kelly wrote to Kistner, stating that "[b]ased on a thorough review of this case, the Commissioner of Police has determined that there is not sufficient

evidence at this time to clearly prove your case and has determined that the case disposition be carried as 'not sustained'". [82-2] at 223.

## DISCUSSION

### A.      Defendants' Motion for Judgment on the Pleadings

Before considering the parties' motions for partial summary judgment, I must first address defendants' Motion for Judgment on the Pleadings under Rule 12(c), because "[b]y framing the dispute, the pleadings affect the availability of summary judgment". 11 Moore's Federal Practice, §56.05[1][a] (Matthew Bender 3d ed. 2021). "[P]leadings are not [mere] placeholders while a party pursues discovery of wrongdoing." Detroit Will Breathe v. City of Detroit, 524 F. Supp. 3d 704, 711 (E.D. Mich. 2021). Instead, they "frame the issues to be litigated in each case, and the parties are circumscribed by the positions they take there". Walker v. City of Wilmington, 360 F. App'x 305, 316 (3d Cir. 2010) (Summary Order).

"[A] motion for judgment on the pleadings differs from a summary judgment motion because these motions are decided on the pleadings alone." Moore's, §56.04[3][b]. While it would have been preferable to test the sufficiency of the pleadings at a much earlier stage of this litigation, Rule 12(h)(2)(C) allows such a challenge to be raised even as late as "at trial". The requirements for proper pleading under Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009) have been clear since long before this action was commenced, and Kistner has always been on notice that defendants challenged the sufficiency of his pleadings.[6]  Although Rule 15(b)(2) states that "an issue not raised by the pleadings . . . tried by the parties' express or implied consent . . . must be treated in all respects as if raised in the

---

[6]      See Answer to Complaint [4], ¶256; Answer to Amended Complaint [24], ¶256; Answer to Second Amended Complaint [65], ¶269.

pleadings", defendants' Rule 12(c) motion makes clear that they do not consent to this court's consideration of matters which have not first been properly alleged.

"The test for evaluating a 12(c) motion is the same as that applicable to a motion to dismiss under [Rule] 12(b)(6)." Irish Lesbian and Gay Organization v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678. The complaint must offer more than "naked assertions devoid of further factual enhancement . . . . [M]ere conclusory statements[ ] do not suffice". Id.

Defendants first argue that Kistner has improperly incorporated by reference certain allegations and exhibits from his prior pleadings into his Second Amended Verified Complaint, in violation of L. R. Civ. P. ("Local Rule") 15(a) ("[n]o portion of the prior pleading shall be incorporated into the proposed amended pleading by reference"). Defendants' Memorandum of Law [69-1] at 8-9. However, "the district court has the inherent power to decide when a departure from its Local Rules should be excused or overlooked", Wight v. BankAmerica Corp., 219 F.3d 79, 85 (2d Cir. 2000), and since defendants do not point to any prejudice from this violation, I will excuse it. See Solar v. Annetts, 707 F. Supp. 2d 437, 439, n. 2 (S.D.N.Y. 2010) ("Solar failed to attach to the Second Amended Complaint the exhibits he attached to the First Amended Complaint. However, this Court considers the attachments to the First Amended Complaint here").

In response to defendants' Rule 12(c) Motion, Kistner has voluntarily withdrawn his standalone claims for respondeat superior liability, punitive damages and attorneys' fees, as well as his assault, intentional infliction of emotional distress, and official capacity claims. See Kistner's Letter Brief [104] at 1. Defendants also argue for dismissal of his claims against the

"John Doe" defendants. Defendants' Memorandum of Law [69-1] at 9-10. By failing to address

that argument, Kistner concedes that those claims should be dismissed. *See* CVS Pharmacy, Inc.

v. Press America, Inc., 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019) ("a party may be deemed to

have conceded an argument by failing to address it in its briefing").

        Defendants also argue that Kistner "plainly did not plead a false imprisonment,

'abuse of prosecution,' battery, . . . defamation, or 'official misconduct, tampering with evidence

and spoliation' claim in his Notice of Claim . . . . Therefore, such state law derived claims cannot

proceed now and are subject to dismissal". Defendants' Memorandum of Law [69-1] at 16.

While Kistner does not respond to this argument, I note that although his Notice of Claim does

not specifically allege false imprisonment, it does allege false arrest ([69-4] at 2), which "is a

species of false imprisonment". Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir.

1995). It also alleges battery, which is distinct from his withdrawn claim of assault. *See* 6A N.Y.

Jur. 2d Assault - Civil Aspects, §1. Finally, it alleges malicious prosecution, which for purposes

of this action is synonymous with "abuse of prosecution" (Second Amended Verified Complaint

[61], Sixth Claim for Relief). Therefore, these claims should not be dismissed at the pleading

stage. However, his claims for defamation, official misconduct, tampering with evidence and

spoliation should be dismissed, as they were not mentioned in his Notice of Claim.

        In moving to dismiss Kistner's §1983 claims against Lockwood, Derenda,

Santana, and McHugh, defendants argue that Kistner's "complaint lacks any meaningful

allegations that [they] had any personal involvement in the events of January 1, 2017.

Defendants' Memorandum of Law [69-1] at 11.  "[T]o establish individual liability under 42

U.S.C. § 1983, a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution . . . . [B]ald and conclusory

allegations are insufficient to establish individual liability." <u>Hydrick v. Hunter</u>, 669 F.3d 937, 942 (9th Cir. 2012).

Kistner argues that Santana "may be held liable for his failure to intervene and prevent the false arrest and prosecution". Kistner's Memorandum of Law [82-4] at 3. "To establish such a claim of failure to intervene, a plaintiff must prove . . . that the officers knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed." <u>Id.</u> at 21, <i>quoting</i> <u>Krzeminski v. City of Buffalo</u>, 2018 WL 10335659, *6 (W.D.N.Y. 2018). However, Santana arrived on the scene <i>after</i> the incident had occurred (Second Amended Verified Complaint [61], ¶86), and while Kistner alleges that Santana "failed to obtain proper medical treatment" for him (<u>id.</u>, ¶87) and "violated the Buffalo Police Department's policies and procedures of documenting and recording a motor vehicle accident that involves a Buffalo police vehicle" (<u>id.</u>, ¶102), neither of these allegations plausibly suggest how Santana knew or should have known that Kistner was being falsely arrested and/or prosecuted.[7] Therefore, Kistner's §1983 claim of personal involvement by Santana should be dismissed.

Kistner argues that the personal involvement of Police Commissioners Derenda and Lockwood "is demonstrated through their 'creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue'". Kistner's Memorandum of Law [82-4] at 7, <i>quoting</i> <u>Guillory v. Cuomo</u>, 616 F. Appx. 12, 13 (2d Cir. 2015) (Summary Order).  However, the Second Amended Verified Complaint's conclusory allegations concerning this policy ([61], ¶¶194-201) are not sufficiently

---

[7]       As will be discussed, the record contains evidence suggesting that Santana should have known of the violation. However, the basis for imputing that knowledge to him has not been alleged in the Second Amended Complaint.

factual to meet Iqbal's plausibility threshold. "[T]o survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists . . . . Put another way, mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details." Masciotta v. Clarkstown Central School District, 136 F. Supp. 3d 527, 546 (S.D.N.Y. 2015). Therefore, Kistner's §1983 claims against Derenda and Lockwood should be dismissed.

As to McHugh, Kistner argues that he "knew, or should have known, that Shultz repeatedly had violated the civil rights of Buffalo citizens, as Schultz was identified as being within the top 10% of Buffalo police officers who received excessive-force and other general complaints from 2015 to 2020 . . . . 12 of which occurred before January 1, 2017", and that this knowledge "should have caused him to question the veracity of Schultz's purported observations" before suggesting that Kistner be charged. Kistner's Memorandum of Law [82-4] at 5. However, since the Second Amended Verified Complaint does not allege that any of the complaints against Schultz preceding the date of the incident were sustained,[8] it does not plausibly explain why McHugh could not have believed Schultz's statement as to how the incident occurred. Therefore, Kistner's claims of personal involvement by McHugh should be dismissed.

Defendants also argue that Kistner fails to plausibly allege a basis for imposing liability upon the City of Buffalo under §1983. Defendants' Memorandum of Law [69-1] at 11-15. Although under state law "a municipality may be held vicariously liable for torts committed

---

[8]      In fact, according to Schultz's disciplinary record, none of the complaints lodged against him prior to January 1, 2017 were sustained. [82-3] at 24.

by its employee while acting within the scope of his or her employment, including false arrest"
(Graham v. City of New York, 128 F. Supp. 3d 681, 711 (E.D.N.Y. 2015)), "a municipality
cannot be held liable under §1983 on a *respondeat superior* theory". Monell v. Department of
Social Services of the City of New York, 436 U.S. 658, 691 (1978). Instead, it is only "when
execution of a government's policy or custom, whether made by its lawmakers or by those
whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the
government as an entity is responsible under §1983." Id. at 694.

Defendants argue that Kistner "fails to plead sufficiently any municipal custom or
policy beyond . . . conclusory allegations". Defendants' Memorandum of Law [69-1] at 14.
Kistner responds that his "allegations and the evidence before the court support a viable Monell
claim against the City of Buffalo" (Kistner's Memorandum of Law [82-4] at 8), and that he "has
come forward with substantial evidence demonstrating flaws in the City's investigation and
discipline process for its officers". Id. at 13.

Kistner "evinces a deep confusion over the difference between pleadings and
evidence". Cisneros v. DAKM, Inc., 2014 WL 258755, *4 (S.D. Tex. 2014).  Whereas a
summary judgment motion focuses on the evidence, a Rule 12(c) motion focuses on the
pleadings. While Kistner argues that the evidence supports his claim for municipal liability
(Kistner's Memorandum of Law [82-4], Argument II), not once in that argument does he point to
the allegations of his Second Amended Verified Complaint. To cite but one example, he suggests
that "the scope of [the Internal Affairs] investigation was circumscribed in curious fashion" (id.
at 11), but the Second Amended Verified Complaint does not even mention the Internal Affairs
investigation.

- 14 -

Therefore, I conclude that Kistner's Second Amended Verified Complaint does not plausibly allege a basis for imposing <u>Monell</u> liability against the City of Buffalo, and unless a further amendment is both requested and granted,[9] that claim should be dismissed. However, recognizing the possibility that Judge Vilardo may take a different view, in the interest of judicial efficiency I will analyze the parties' summary judgment motions as though Kistner's claims had been properly alleged.

**B.    Kistner's Motion for Partial Summary Judgment**

Kistner moves for partial summary judgment determining that McDermott, Velez, Schultz, and Moriarty are liable for false arrest, false imprisonment and malicious prosecution, both under 42 U.S.C. §1983 and under state law, relating to the charge of criminal mischief in the third degree. Kistner's Memorandum of Law [68-5].

Initially, defendants argue that the Motion should be denied because it was not accompanied by the Statement of Undisputed Material Facts required by Local Rule 56(a)(1). Defendants' Memorandum of Law [83], Point I. Although Kistner's Motion for Partial Summary Judgment refers to a Statement of Material Facts ([68] at 1), that Statement, dated April 28, 2021, was not filed until May 15, 2021. [96]. However, as previously noted, district courts have discretion to overlook a party's failure to comply with local court rules (<u>Wight</u>, *supra*), and since defendants do not show how they were prejudiced by the late filing, I will excuse it.

---

[9]      As stated in my September 24, 2020 Decision and Order, "absent truly compelling reasons, no further pleading amendments will be allowed". [59] at 3, n. 3.

1.      **False Arrest/False Imprisonment**

"The common law tort of false arrest is a species of false imprisonment . . . .

Under New York law, the elements of a false imprisonment claim are: (1) the defendant intended

to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did

not consent to the confinement and (4) the confinement was not otherwise privileged . . . . The

elements of a claim of false arrest under §1983 are substantially the same as the elements of a

false arrest claim under New York law." Singer, 63 F.3d at 118.

Since the parties do not dispute whether the first three elements have been

satisfied, the dispositive question is whether Kistner's confinement was "otherwise privileged".

Confinement is privileged "if it stems from a lawful arrest supported by probable cause".

Hernandez v. United States, 939 F.3d 191, 199 (2d Cir. 2019). Therefore, "[t]he existence of

probable cause is a complete defense to a false arrest claim, even where the plaintiff was

ultimately acquitted of the criminal charges". Lehman v. Kornblau, 134 F. Supp. 2d 281, 290

(E.D.N.Y. 2001).

"Probable cause to arrest exists when the arresting officer has knowledge or

reasonably trustworthy information of facts and circumstances that are sufficient to warrant a

person of reasonable caution in the belief that the person to be arrested has committed or is

committing a crime." Figueroa v. Mazza, 825 F.3d 89, 99 (2d Cir. 2016). As defendants note, the

probable cause determination is "based on 'the assessment of probabilities in a particular factual

context' given the totality of circumstances". Defendants' Memorandum of Law [83] at 10-11,

*quoting* Illinois v. Gates, 462 U.S. 213, 232-3 (1983). Although the existence of "[p]robable

cause is a mixed question of law and fact", Dufort v. City of New York, 874 F.3d 338, 348 (2d

Cir. 2017), "where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." Id.

Defendants suggest that "when you boil this down to the material facts that are not in dispute . . . there is not actually much difference here. The defendant officers admit that there is contact made. That would be the basis for the criminal mischief charges . . . . [T]he difference is what the plaintiff perceived to have happened versus what the defendant officers perceived to have happened". [105] at 36. However, "[t]he probable cause determination is objective; it should be made without regard to the officer's subjective motives or belief as to the existence of probable cause". Rupp v. City of Buffalo, 2021 WL 1169182, *9 (W.D.N.Y. 2021).

In this case, the surveillance video [68-6] (submitted to the court in both flashdrive and CD-ROM formats), taken from a camera located at 37 Schmarbeck Avenue ([68-2] at 7), provides objective evidence of what occurred. "As every schoolchild knows, a picture is worth a thousand words", F.C.C. v. CBS Corp., 567 U.S. 953 (2012) (Roberts, C.J., concurring), and "when there is reliable objective evidence - such as a [video] recording - the evidence may speak for itself". Oakley v. MSG Networks, et al., 2021 WL 5180229, *4 (S.D.N.Y. 2021).[10]

Because the impact occurred on the opposite side of McDermott's vehicle from the surveillance camera, the video does not show the precise point of impact or whether the vehicle was damaged. Defendants' Reply Memorandum of Law [99] at 7. However, what *can* be seen on the video conclusively disproves the officers' testimony that McDermott's patrol vehicle

---

[10]     Kistner's expert, Jennifer Yaek, Ph.D., P.E., offers "[a] detailed second-by second analysis of the surveillance footage". [68-4], ¶6. However, I have not considered this analysis, since the video speaks for itself.  *See* Prosper v. Martin, 989 F.3d 1242, 1249 (11th Cir.), cert. denied, 142 S. Ct. 435 (2021) ("Knox's interpretation of the Biscayne Air Video was not helpful because it did not offer anything the jury could not discern on its own").

was stopped at the time of impact. After viewing the video, McDermott admitted that her patrol vehicle "appears to be" moving forward at that time. [74-1] at 54. Kelly and Lockwood agreed, with Kelly reporting that the video shows that McDermott's vehicle "pulls away from curb appears to collide with Kistner who falls to the ground" ([82-3] at 59), and Lockwood testifying that "when they collided it was in motion . . . . The SUV was moving forward, yes". [82-1] at 168, 170.

The video also conclusively disproves the officers' testimony that Kistner threw himself at McDermott's vehicle. Schultz admitted as much after viewing the video:

"Q.    Did you see him throw himself on the vehicle?

A.      No, not on the vehicle.

Q.     Did you see him throw himself at the vehicle?

A.       No." [75-2] at 7.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment". Scott v. Harris, 550 U.S. 372, 380 (2007). Instead, the court must "view[ ] the facts in the light depicted by the videotape" (id. at 381); and as Santana testified, "[i]n viewing this video . . . I don't think a crime occurred". [82-2] at 147.

Defendants argue that "[t]he video is not dispositive on the issue of vehicle damage. The side of [the] vehicle depicted is the opposite side as the driver's mirror and window that both McDermott and Velez observed to be broken". Defendants' Reply Memorandum of Law [99] at 7. McDermott testified that "where the mirror connects to the actual vehicle was . . . disconnected and it was shaking, so when you drove, the whole mirror frame would shake" ([74-

1] at 19-20), and that the driver's side window "was not working on the track properly . . . .
When it would be up and down, it would go very slowly, and it would make a very harsh
screeching sound". Id. at 12. Velez testified that the mirror was "partially detached from the car",
and that the driver's side window "made a noise and it like wiggled and hesitated to go up and
down". [72] at 202, 203.

   This testimony must be gauged "ultimately, [by] the extent to which it withstands
a common sense test of reason and logic". United States v. Murphy, 402 F. Supp. 2d 561, 569
(W.D. Pa. 2005). Common sense, reason and logic dictate that if damage of this type *had*
occurred, it would have to have been repaired, and there would be records of the repair. As
Lockwood testified, "if there's damage . . . there should have been records". [82-1] at 280. He
agreed that "if somebody's been charged with a felony and the police are going to have the
obligation of proving that the damage exceeded $250 . . . they'd want to have records of the
repairs". Id.

   However, the only repair record shows that on January 5, 2017 (four days after
the incident), the vehicle's cooling system was serviced. [68-2] at 29. When asked "where's the
proof that the vehicle sustained any damage at all, much less $250 which was needed to charge
Mr. Kistner with a felony for throwing himself at the vehicle?", Lockwood admitted that
"[t]here's no record". Id. at 279. In fact, at oral argument defendants admitted that "we're not
saying that it was repaired. That is - - that is true . . . . There is a record that says no repair work
was done on those parts of the vehicle". [105] at 42.

   Defendants argue that "there is evidence that supports the damage to the vehicle
in the form of the testimony and observations of the other police officers present". [105] at 44.
However, "the testimony of a witness is not to be judged more or less credible because the

- 19 -

witness is a law enforcement officer . . . . [G]overnment witnesses are not *per se* credible, or even presumed to be credible". Murphy, 402 F. Supp. 2d at 569; United States v. Lawson, 961 F. Supp. 2d 496, 504 (W.D.N.Y. 2013). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005).

Although defendants dismiss Kistner's claims as "bizarre" (defendants' Memorandum of Law [83] at 20), what is more bizarre is the officers' explanation for what occurred, in light of the surveillance video and defendants' admission that McDermott's patrol vehicle was not repaired. Considered in that light, the officers' testimony that Kistner intentionally damaged that vehicle, "which was largely unsubstantiated by any other direct evidence - was so replete with . . . improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit" it. Jeffreys, 426 F.3d at 551; *see also* Pinero v. Burbran, 2021 WL 4224727, *2 (S.D.N.Y. 2021) ("[t]he Court is not required to adopt a version of events so utterly discredited by the record that no reasonable jury could have believed it").

While it is undisputed that McDermott, Velez, Schultz and Moriarty were each personally involved in Kistner's arrest and detention (*see* BPD Case History, [69-6] at 9, listing McDermott as the arresting officer, assisted by Velez, Schultz and Moriarty), defendants argue that they are entitled to qualified immunity. Defendants' Memorandum of Law [83], Point IV. "A police officer is entitled to qualified immunity if (1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established constitutional right." Hartline v. Gallo, 546 F.3d 95, 102 (2d. Cir. 2008).

Defendants contend that "[b]ased upon the manner in which the incident occurred, these officers reasonably believed that Plaintiff deliberately came into contact with McDermott's patrol vehicle when he walked without stopping as the vehicle began to leave . . . and caused damage . . . . Given the totality of January 1, 2017 incident on Schmarbeck Avenue, it was objectively reasonable for the officers to believe that their actions did not violate clearly established law." Defendants' Memorandum of Law [83] at 19-20.

However, for the reasons already discussed, the officers could not have reasonably believed that Kistner damaged McDermott's patrol vehicle. Since defendants admit that "where the factual record[ ] is not in serious dispute . . . it is for the court to decide the issue of qualified immunity as a matter of law, preferably on a pretrial motion for summary judgment when possible" (defendants' Memorandum of Law [83] at 16, *quoting* Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir. 1990)), I conclude as a matter of law that defendants are not entitled to qualified immunity, and that Kistner is entitled to summary judgment against McDermott, Velez, Schultz and Moriarty on his claims for false arrest and false imprisonment.


2.      **Malicious Prosecution**

Kistner and defendants agree that the elements of a claim for malicious prosecution under 42 U.S.C. §1983 are substantially the same as a malicious prosecution claim under state law. *See* Kistner's Memorandum of Law [68-5] at 15; defendants' Memorandum of Law [83] at 14. However, the elements of these claims are not identical.

"A malicious prosecution claim under New York law requires the plaintiff to prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding;

and (4) actual malice as a motivation for defendant's actions." <u>Jocks v. Tavernier</u>, 316 F.3d 128,

136 (2d Cir. 2003). However, "federal law defines the elements of a §1983 malicious

prosecution claim", <u>Lanning v. City of Glens Falls</u>, 908 F.3d 19, 25 (2d Cir. 2018), and the

requirement of "affirmative indications of innocence to establish 'favorable termination'

therefore continue to govern §1983 malicious prosecution claims, regardless of developments in

New York State malicious prosecution law." <u>Id.</u>

   As previously noted, the criminal charges against Kistner were dismissed "in the

Interest/Furtherance of Justice" pursuant to N.Y. Criminal Procedure Law §70.30(1)(g). [82-2] at

219. Because it does not indicate innocence, a dismissal of that type is fatal to Kistner's §1983

claim for malicious prosecution. *See* <u>Hygh v. Jacobs</u>, 961 F.2d 359, 368 (2d Cir. 1992) ("[a]

dismissal 'in the interest of justice' is neither an acquittal of the charges nor any determination of

the merits. Rather, it leaves the question of guilt or innocence unanswered . . . . Consequently, as

a matter of law, it cannot provide the favorable termination required as the basis for a claim of

malicious prosecution"). Therefore, Kistner's §1983 claim for malicious prosecution should be

dismissed. [11]

   Unlike federal law, however, "New York law does not require a malicious

prosecution plaintiff to prove . . . that the termination of the criminal proceeding was indicative

of innocence. Rather, the plaintiff's burden is to demonstrate a final termination that is not

inconsistent with innocence". <u>Rothstein v. Carriere</u>, 373 F.3d 275, 286 (2d Cir. 2004). The

dismissal of the criminal charges against Kistner satisfies that requirement.

---

[11]  Although defendants did not argue this point, it may be raised by the court *sua sponte* pursuant to
Rule 56(f)(2). If Kistner disagrees with my reasoning, he may either ask me to reconsider or file an
objection with Judge Vilardo.

"As for the fourth prong, 'actual malice' means acting with a wrong or improper motive, something other than a desire to see the ends of justice served or with awareness of conscious falsity." Barua v. Barua, 2015 WL 4925028, *5 (E.D.N.Y. 2015). For the reasons discussed, it is clear that McDermott, Velez, Schultz and Moriraty were consciously aware of the falsity of the claim that Kistner had intentionally damaged McDermott's vehicle.

However, defendants argue that "Schultz, Moriarty, and Velez lack the requisite personal involvement to sustain . . . a state law malicious prosecution claim . . . . The record is clear that McDermott alone signed on the charges . . . . *See* Givans v. Jefferson County Sheriff's Office, 2015 WL 13540492, *10 (N.D.N.Y. 2015) ('[a]n officer who does sign not a charging document, and does not otherwise provide a basis for the plaintiff's prosecution such as by . . . providing information to be used in a criminal complaint . . . cannot be held liable for malicious prosecution')". Defendants' Memorandum of Law [83] at 15. However, by falsely telling McHugh that Kistner had intentionally damaged McDermott's vehicle, Schultz caused McHugh to instruct the officers to file the criminal mischief charge. Therefore, Kistner is entitled to summary judgment against McDermott and Schultz for malicious prosecution of the criminal mischief charge under New York law.

C.      **Defendants' Motion for Summary Judgment**[12]

1.      **Unlawful Seizure/False Arrest/Malicious Prosecution**

While defendants argue that Kistner's claims of unlawful seizure/false arrest

relating to the incident on Schmarbeck Avenue are barred by the existence of probable cause,

they address probable cause as only as perceived by McDermott and Schultz: "McDermott did

not appreciate the incident to be a motor vehicle accident . . . . On the contrary, she perceived the

contact between her patrol vehicle and Plaintiff to be the result of him walking into the vehicle

and observing damages after . . . . This perception [was] supported by Schultz's observations".

Defendants' Memorandum of Law [69-1] at 21. For reasons previously discussed, that argument

fails.

Defendants further argue that "probable cause supported the charge of disorderly

conduct signed on by Officer McDermott". Id. at 22. I agree. N.Y. Penal Law §240.20(3)

provides that "[a] person is guilty of disorderly conduct when, with intent to cause public

inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [i]n a public place,

he uses abusive or obscene language, or makes an obscene gesture". McDermott testified that

while he was at ECMC, Kistner "was screaming at people. He was yelling at people. He was

calling us feminazis and c**ts and bitches". [74-2] at 49. Kistner himself admits that he yelled at

the hospital staff and "was rather boisterous and loud".[69-7] at 73, 74. In fact, his Second

Amended Complaint alleges that "[w]hile he was at ECMC, [he] used four-letter language to

---

[12]      Defendants ask the court to reject Kistner's "Counter-Statement of Material Facts" in opposition
to their Motion ([82-7], ¶¶37-87), as being in violation of Local Rule 56(a)(2). Defendants' Reply
Memorandum of Law [99], Point I. However, since the Counter-Statement does not violate the Local
Rule, that request is denied.

criticize his unlawful and unconstitutional arrest. He also referred to the defendants and certain ECMC personnel as 'Nazis' or 'Feminazis' [61], ¶112.

While Kistner argues that "there is no proof that any of the staff were disrupted by these alleged comments" ([105] at 55), such proof is not necessary. "[T]he risk of public disorder does not have to be realized but the circumstances must be such that [an] intent to create such a threat (or reckless disregard thereof) can be readily inferred." People v. Baker, 20 N.Y.3d 354, 360 (2013). The abusive and obscene words which Kistner yelled while at ECMC clearly support an inference that he either intended to create public disorder or recklessly disregarded the possibility thereof. Since the charge of disorderly conduct was supported by probable cause, Kistner's claims relating to that charge, namely false arrest/imprisonment and state/federal malicious prosecution, should be dismissed.

With respect to Kistner's claim under state law for malicious prosecution relating to criminal mischief, defendants argue that "Lockwood, Derenda, Schultz, Moriarty, Santana, and McHugh lack sufficient personal involvement to establish liability for malicious prosecution". Defendants' Memorandum of Law [69-1] at 23. As previously discussed, I have already concluded that Schultz (along with McDermott) was personally involved the malicious prosecution claim. With respect to the others, personal involvement may be established by: "(1) direct participation; (2) learning of the deprivation but failing to remedy the wrong; (3) creating a policy or custom under which the deprivation occurred, or allowing such a policy or custom to continue; or (4) gross negligence in managing subordinates who caused the deprivation." Girard v. Howard, 2021 WL 1737758, *4 (W.D.N.Y. 2021).

Applying these criteria, the record contains sufficient evidence to create an issue of fact as to the personal involvement of Moriarty, Santana, McHugh and Lockwood - but not

Derenda - in Kistner's prosecution for criminal mischief. Schultz told McHugh that Kistner had intentionally damaged McDermott's vehicle, causing McHugh to direct that the charge be filed. Along with McDermott and Schultz, Velez, Moriarty and Santana then remained in the street for nearly 30 minutes, "continuing talking about the situation at hand and how we were going to move forward with dealing with it" (Schultz, [75-2] at 17), before taking Kistner (who was complaining of a head injury) to ECMC.

Given defendants' admission that McDermott's vehicle was not repaired, it is reasonable to infer that the vehicle was not damaged. It is also reasonable to infer that Velez, Moriarty and Santana would have seen that the vehicle was not damaged while the officers stood in the street planning their next move, and would have realized that absent damage, there was no crime to be charged. Therefore, it is also reasonable to infer that each of them was personally involved by "learning of the deprivation but failing to remedy the wrong". Girard, supra. In opposing defendants' motion, Kistner is entitled to the benefit of each of these inferences. See Horror Inc. v. Miller, 15 F.4th 232, 240 (2d Cir. 2021) ("[w]hen ruling on a summary judgment motion, the court . . . draws all reasonable inferences against the moving party").

Although McHugh was not present at the scene, Santana testified that "if it's . . . damage done to your patrol vehicle, you have to notify your supervisor. And they will notify the accident investigation unit. And they will come by and they will take pictures and collect evidence". [82-2] at 162. Lockwood agreed, stating that both the Lieutenant and Internal Affairs should be notified and dispatched to the scene any time there is damage to a police vehicle, even if caused intentionally by a third party. [82-1] at 103-04. Therefore, by relying solely on what Schultz told him, rather than ordering a further investigation which would have revealed that there was no damage to McDermott's vehicle (and therefore no crime), McHugh could also be

deemed to be personally involved in the malicious prosecution, by "gross negligence in managing subordinates who caused the deprivation". Girard, *supra*.

For reasons to be discussed (pp. 28-30, *infra*), Lockwood may have been personally involved, both by "learning of the deprivation but failing to remedy the wrong", and by "gross negligence in managing subordinates who caused the deprivation". Girard, *supra*. However, I find no basis for concluding that Derenda was personally involved in Kistner's malicious prosecution, as there is no evidence that he was even made aware that it had occurred.

## 2.     First Amendment Retaliation

Kistner's claim for First Amendment retaliation (Second Amended Verified Complaint [61], Third Claim for Relief) "is based on the disorderly conduct charge (for language allegedly used by Kistner at the hospital)". Kistner's Memorandum of Law [82-4] at 3. Defendants argue that this claim cannot survive because there was probable cause to support the disorderly conduct charge. Defendants' Memorandum of Law [69-1] at 22-24.

I agree. "The existence of probable cause will defeat a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive, in an attempt to silence him." Mangino v. Incorporated Village of Patchogue, 808 F.3d 951, 956 (2d Cir. 2015). For the reasons already discussed, defendants had probable cause to charge Kistner with disorderly conduct. Accordingly, Kistner's First Amendment retaliation claim should be dismissed.

- 27 -

**3.**      __Monell__ **Liability**

"[W]hen a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority. One means of doing so, of course, is to establish that a policymaker ordered or ratified the subordinates' actions", by "show[ing] that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them." Amnesty America v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2004). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may be properly thought of as a city policy or custom that is actionable under §1983." Id.

"[T]he disposition of the policymaker may be inferred from his conduct after the events giving rise to the constitutional violation." McLennon v. City of New York, 171 F. Supp. 3d 69, 97 (E.D.N.Y. 2016). Thus, "the lack of any corrective action might . . . reflect a tacit policy on [the policymaker's] part to condone whatever his subordinates deemed necessary". Collins v. City of New York, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013). *See also* Miller v. City of New London, 2015 WL 2240269, *10 (D. Conn. 2015) ("a failure to investigate the challenged incident and punish the responsible parties is the type of ratification of the illegal acts found to be a sufficient official policy of a municipality").

In seeking dismissal of Kistner's claim for municipal liability, defendants argue that "[t]he record is devoid of any evidence . . . of an official's awareness of and failure to rectify unconstitutional conduct previously committed by any of the officers". Defendants' Memorandum of Law [69-1] at 30. However, the record is replete with such evidence. Although

Kelly assured Kistner that Lockwood had conducted "a thorough review of this case" ([82-2] at 223), Lockwood's review was anything but.

Lockwood testified that Kistner's March 31, 2017 Notice of Claim should have triggered an Internal Affairs investigation. [82-1] at 251. However, the investigation did not commence until December 19, 2019 (id. at 252), after WIVB-TV televised a report about the incident. Id. at 253-54. Lockwood admitted that this delay "would be a concern . . . It would be a problem". Id. at 130. "The Notice of Claim was filed in '17. I became the commissioner in '18 and it came to me in '20 . . . . [T]his thing happened three years ago . . . . [W]hy are we just dealing with it[?]". Id. at 120.

He acknowledged that McDermott's vehicle "ma[d]e contact with Mr. Kistner while it was moving forward" (id. at 170), and that this "would absolutely then be a police vehicle involved accident that would trigger a radio call to dispatch, a lieutenant, the Accident Investigation Unit, and [Internal Affairs] all going to the scene". Id. at 163-64. He admitted that this did not occur. Id. at 164. When asked "What corrective actions did you impose against the officers who did not report that incident as required by the MOP [Manual of Operating Procedures]", he replied "None". Id. at 164-65.

Lockwood testified that it "wouldn't be appropriate" for McDermott to threaten Kistner with arrest if he did not get up ([82-1] at 182),[13] and that Kistner should have been given medical attention immediately. Id. at 183, 184. He admitted that it was not appropriate for the officers to wait 27-28 minutes to get him medical attention. Id. at 189. He had "no idea the reason why they canceled the ambulance" (id. at 191), stating that he would "want to go back and find out why was the officers standing around . . . why wasn't they transporting the guy, Mr.

---

[13]     In fact, not only did McDermott *threaten* to arrest Kistner for failing to get up, she *did* arrest him for that reason. [82-3] at 61-62.

Kistner. If they were going to take him to the hospital, take him to the hospital. Why was, you know, they standing around there talking . . . . That's a little concerning there." Id. at 225.

While admitting that the absence of records to substantiate the damage to McDermott's vehicle "would raise concerns" (id. at 280), Lockwood did not bother to explore that issue. When asked "[d]id anybody ask Lauren McDermott hey, you charged this guy with a felony for attacking your vehicle, where's the proof that there was any damage to it? Where's the photograph, where's the repair records, where's your work order to get the SUV fixed?", he responded "I didn't ask those questions . . . . As far as the damage to the vehicle, no, I didn't ask". Id. at 281, 282. While initially admitting that "[my] job is to ask those questions" (id. at 281), he then backtracked, stating that "[i]t's not my job to question. It's internal affair's job to question them on those incidents". Id. at 283.

Notwithstanding his review of the surveillance video showing that the incident appeared to be an accident, coupled with the absence of any repair records, Lockwood did not press his officers for an explanation as to why they charged Kistner with a crime, nor did he discipline them for doing so. His failure to do so justifies a reasonable inference that he ratified their actions in a manner sufficient to impose Monell liability upon the City of Buffalo.


### 4.    Failure to Intervene

Although Kistner's claim for failure to intervene purports to be "against all defendants" (Second Amended Verified Complaint [61], Twelfth Claim for Relief), he specifically names only McDermott, Velez, Schultz, Moriarty, Santana, and McHugh. Id., ¶¶245, 246.  Therefore, I consider the claim to apply only to those defendants, rather than to all defendants.

In moving to dismiss that claim, defendants argue that "[b]ecause there was no Constitutional violation, there was no reason for any of the officers to intervene. Alternatively, the officers acted reasonably and in good faith. Qualified immunity . . . shields them from civil liability for their conduct on January 1, 2017". Defendants' Memorandum of Law [69-1] at 31. For reasons previously discussed, neither argument warrants dismissal of this claim.

### 5.    Negligence

Defendants argue that Kistner's negligence claim fails because he did not sustain a serious injury within the meaning of New York Insurance Law §5102(d). Defendants' Memorandum of Law [69-1] at 35-40. While Kistner suggested during oral argument that "the negligence claim . . . remains intact" ([105] at 6), "[t]his Court need not consider an argument raised for the first time at oral argument". Ferrari Club of America, Inc. v. Bourdage, 2017 WL 1498080, *7 (W.D.N.Y. 2017). By failing to address defendants' argument in his Memorandum of Law [82-4], Kistner has conceded that his negligence claim should be dismissed. CVS Pharmacy, supra.

### CONCLUSION

For these reasons, I recommend: (1) that Kistner be granted summary judgment against McDermott, Velez, Schultz and Moriarty for false arrest and false imprisonment under §1983 and state law relating to the criminal mischief charge; (2) that Kistner be granted summary judgment against McDermott and Schultz for malicious prosecution relating to the criminal mischief charge; (3) that defendants' Rule 12(c) motion for dismissal of the "John Doe" defendants and Kistner's state law claims for defamation, official misconduct, tampering with

evidence and spoliation be granted; (4) that unless leave to amend is sought and granted, defendants' Rule 12(c) motion for dismissal of Kistner's claims against Santana, McHugh, Lockwood and his §1983 claim against the City of Buffalo be granted; (5) that for reasons raised by the court *sua sponte*, Kistner's §1983 claim for malicious prosecution of the criminal mischief charge be dismissed; and (6) that defendants' motion for summary judgment dismissing Kistner's §1983 and state law claims for false arrest/imprisonment and malicious prosecution relating to the disorderly conduct charge, his claims against Derenda, and his claims for negligence and First Amendment retaliation be granted, but that the motion be otherwise denied.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the clerk of this court by January 25, 2022. Any requests for extension of this deadline must be made to Judge Vilardo. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision." Wesolek v. Canadair Ltd., 838 F.2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law, or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal [or] factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge." Failure to comply

with these provisions may result in the district judge's refusal to consider the objections.

Dated: January 11, 2022.

/s/Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge