UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES C. KISTNER,

           Plaintiff,

    vs.                                            Civil No.:  18-CV-00402

THE CITY OF BUFFALO, BYRON LOCKWOOD,
DANIEL DERENDA, LAUREN McDERMOTT,
JENNY VELEZ, KARL SCHULTZ, KYLE MORIARITY,
DAVID T. SANTANA, and ANTHONY McHUGH,

           Defendants.
_____

# PLAINTIFF'S RESPONSE TO THE DEFENDANTS' OBJECTIONS TO THE REPORT AND RECOMMENDATION

**RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
*Attorneys for Plaintiff*
R. Anthony Rupp III
Chad A. Davenport
1600 Liberty Building
Buffalo, New York 14202
(716) 854-3400
rupp@ruppbaase.com
davenport@ruppbaase.com

## PRELIMINARY STATEMENT

Plaintiff, James C. Kistner, respectfully submits the following in response to the defendants' objections to the January 11, February 28, and April 12, 2022 Reports and Recommendations (collectively referred to as the "R&R") of the Hon. Jeremiah J. McCarthy ("Magistrate"). As explained below, the defendants have failed to establish grounds for the Court to reject or modify the Magistrate's R&R, and the defendants' objections should therefore be rejected. However, for the reasons stated in his objections, the plaintiff has raised sufficient grounds for rejection and/or modification of the R&R in whole or in part, and he fully incorporates the arguments set forth in that submission as if restated herein. Thus, after conducting a de novo review, the Court should issue an order consistent with the objections filed by the plaintiff on June 15, 2022. (*See* Dkt. No. 132).

## ARGUMENT

I.     **The Magistrate's Recommendation to Deny the Defendants' Motion for Judgment on the Pleadings Regarding Certain State Claims Based on Alleged Pleading Deficiencies Should Be Accepted.**

In the defendants' objections, they assert the Magistrate erred in denying their motion for judgment on the pleadings regarding the plaintiff's state law claims for false imprisonment, abuse of prosecution,[1] and battery based solely on the argument that "plaintiff did not respond" to their argument that these claims were subject to dismissal "because they were not included in plaintiff's notice of claim." (*See* Dkt. No. 133, at p. 2). Defendants' objection should be denied because the plaintiff *did* respond to this argument (*see* Dkt. No. 98, at pp. 6-7), and for the additional reason that it lacks merit.

---

[1] Plaintiff does not oppose the defendants' request for dismissal of his abuse of prosecution claim.

Initially, the defendants' argument that the plaintiff's false imprisonment and battery claims "were not included" in the notice of claim legally is incorrect.  Indeed, courts analyzing similar arguments made by other defendants have held that specific notice of the legal theory or theories upon which liability is predicated is not required; rather, to comply with New York's General Municipal Law, a notice of claim must give the municipality notice of the "essential facts" that underlie the plaintiff's claim.  *See, e.g., Felice v. Eastport/South Manor Cent. School Dist.*, 50 A.D.3d 138, 148 (2d Dept. 2008); *Szymkowiak v. New York Power Authority*, 162 A.D.3d 1652, 1655 (4th Dept. 2018) (citing *Felice*, 50 A.D.3d at 148).  Here, because the plaintiff's notice of claim provided the defendants with notice of the "essential facts" underlying his false imprisonment and battery claims, the Magistrate was correct to recommend that "these claims should not be dismissed at the pleading stage."  (Dkt. No. 108, at p. 11 ("I note that although [the plaintiff's] Notice of Claim does not specifically allege false imprisonment, it does allege false arrest . . ., which 'is a species of false imprisonment' . . . It also alleges battery, which is distinct from his withdrawn claim of assault.")  Thus, the R&R's finding that the plaintiff complied with the pleading requirements contained in New York's General Municipal Law should not be disturbed.  (*Id.*)

Additionally, the elements for the plaintiff's false arrest and false imprisonment claims are _exactly_ the same (*see Solomon v. City of Rochester*, 449 F. Supp. 3d 104, 114 (W.D.N.Y. 2020)), and therefore the same facts in his notice of claim that indisputably support his false arrest claim equally support his false imprisonment claim.  As such, for this additional reason, the Magistrate's denial of the defendants' motion for judgment on the pleadings regarding the plaintiff's false imprisonment claim should be accepted.

II.     **The Magistrate's Recommendation to Deny the Defendants' Request for**
        **Dismissal of the Plaintiff's *Monell* Claim Should be Accepted.**

        In their objections, the defendants argue that the plaintiff's *Monell* claim should

be dismissed because "[p]laintiff offers no evidence of the existence of any policy or custom that

would subject the City to *Monell* liability, let alone a causal connection between that policy or

custom and plaintiff's alleged injuries."  (*See* Dkt. No. 133, at pp. 3-4).

        First, despite the defendants' assertion to the contrary, the Second Circuit has

stated that a showing of multiple, similar Constitutional violations is not necessary to show the

existence of a "policy or custom" sufficient to hold a municipality liable under a *Monell* theory

of liability; "rather, a single action taken by a municipality is sufficient to expose it to liability."

*Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004); *see, e.g.,*

*Greenway v. County of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015) ("single instance of

deliberate indifference to subordinate's actions" is sufficient to expose municipality to liability);

*Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) (denying City's motion

for summary judgment regarding the plaintiff's *Monell* claim concluding "[t]he single action or

inaction of a municipal policy maker, such as a specific failure to adequately supervise or

discipline an officer, can also form an official policy or custom attributable to a municipality for

purposes of municipal liability").  Additionally, a municipality can be found to be deliberately

indifferent based on a single instance of a failure to discipline or retrain officers after a clear civil

rights violation.  *See, e.g., Greenway*, 97 F. Supp. 3d at 238 ("policymaker's failure to

investigate or rectify the situation evidences deliberate indifference rather than mere negligence

or bureaucratic inaction") (citing *Amnesty*, 261 F.3d at 128; *Vann v. City of New York*, 72 F.3d

1040, 1049 (2d Cir. 1995)); *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 331-32 (2d Cir.

1986) (City's "uninterested and superficial" response to complaint "would have been viewed by

the officers and should have been viewed by an objective observer, as reflecting an indifference by the City" to civil-rights violations by its officers).

Second, regarding the defendants' contention that the plaintiff cannot show a causal connection between the alleged policy or custom and the harm that he suffered, courts in this Circuit consistently have held that post-incident conduct is relevant and may on its own be sufficient to show the existence of a policy or custom that existed at the time of the incident underlying the plaintiff's *Monell* claim.  *See, e.g., Ramos v. County of Suffolk*, No. 07-CV-1250, 2009 WL 10708571, at *5 (E.D.N.Y. Sept. 8, 2009); *see also McLennon v. City of New York*, 171 F. Supp. 3d 69, 97 (E.D.N.Y. 2016) ("the disposition of the policymaker may be inferred from his conduct after the events giving rise to the constitutional violation").

Here, the plaintiff presented substantial evidence demonstrating that there exists in the City of Buffalo an informal policy or custom that allows BPD officers to violate the civil rights of others without any serious consequences.  *See Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) ("municipal policy may be pronounced or tacit and reflected in either action or inaction").  During Lockwood's deposition, he stated that when reviewing the IAD case file for this incident, his only concern was whether "Officer McDermott *intentionally* [struck] James Kistner with her patrol car?"  (*See* Dkt. No. 82-7, Exhibit A at pp. 156-73) (emphasis added).  Upon further examination, when questioned on whether he was at all concerned with any of the other policy violations that he admitted were committed by the defendants earlier in his deposition, Lockwood testified as follows:

> Q:   You knew that . . . [the] incident that's depicted in that video that you saw at some point was never reported to the lieutenant, to IAD, or AIU to perform the types of investigation that we spoke about at length earlier today, correct?
>
> A:   Correct.

Q:      What corrective actions did you take or discipline did you impose against the officers who did not report that incident as required by the MOP?

A:      None.

(*See* Dkt. No. 82-7, at pp. 163-64).

As a result of the narrow investigation, the City of Buffalo, through its official policymaker Byron Lockwood, ignored or failed to consider evidence of <u>thirteen</u> violations of the MOP and <u>four</u> crimes committed by the on-scene officers.  (*See* Dkt. No. 82-5, Exhibit B at p. 34).  This evidence is sufficient to raise a jury issue that the City of Buffalo had at the time of the incident (and still today) an informal policy or custom that allows BPD officers to commit clear civil-rights violations with absolute impunity.  Thus, the City of Buffalo's failure properly to investigate, retrain, and discipline the on-scene officers for their clear misconduct in this single incident is sufficient to subject the City to liability under a *Monell* theory of liability. *See, e.g., Amnesty*, 361 F.3d at 125; *Greenway*, 97 F. Supp. 3d at 239; *Pipitone*, 57 F. Supp. 3d at 173.

However, even if the Court were to disagree and find that this single instance of deliberate indifference to the on-scene officers' conduct is not sufficient to trigger *Monell* liability, the plaintiff has presented substantial evidence demonstrating that Lockwood's lack of care for disciplining and retraining these officers is merely a continuation of former BPD Commissioner Derenda's informal policy of not disciplining officers who violate the MOP or engage in criminal behavior.  Indeed, prior to the New Year's Day 2017 incident, Schultz had eleven IAD complaints against him, one of which included an officer-involved shooting that led to a $4.5 million settlement paid by The City.  (*See* Dkt. No. 82-3, Exhibit Q).[2]  The IAD

---

[2] The Court may take judicial notice of the public settlement made by the City of Buffalo: https://www.investigativepost.org/2020/02/04/police-shooting-costs-buffalo-4-5-million/

investigation of the 2012 shooting concluded with former Commissioner Derenda finding the allegations of wrongdoing by Schultz were "not sustained." (*Id*.) Here, the defendants behaved in a way demonstrating they relied on the City of Buffalo's informal policy of not disciplining subordinates when they falsely arrested the plaintiff.

Accordingly, the Court should affirm the Magistrate's finding that "the record is replete with such evidence" demonstrating triable issues regarding the plaintiff's *Monell* claim, and it should find that Lockwood's failure to discipline the defendants after his eventual review of the surveillance video "justifies a reasonable inference that he ratified [the defendants'] actions in a manner sufficient to impose <u>Monell</u> liability upon the City of Buffalo." (Dkt. No. 108, at pp. 28-30).

### III.    The Magistrate's Recommendation to Grant the Plaintiff's Motion for Summary Judgment for His False Arrest Claims Against Defendants <u>McDermott, Velez, Schultz, and Moriarity Should be Accepted.</u>

In their third objection to the Magistrate's R&R, the defendants argue that their arrest of the plaintiff for criminal mischief in the third degree was supported by probable cause or arguable probable cause based solely on Schultz's sham observation that Mr. Kistner intentionally threw himself at McDermott's vehicle. (*See* Dkt. No. 133, at pp. 4-6). In making the assertion that the plaintiff's arrest was based on probable cause or arguable probable cause, defendants raise a new argument, not previously presented to the Magistrate, that they could have charged the plaintiff with criminal mischief in the fourth degree—a criminal statute that does not include the $250 minimum threshold for property damage. (*Id*., at pp. 5-6 ("Here, even though there is no repair record showing that the amount of damage to the police vehicle exceeded the statutory threshold of $250 for third degree criminal mischief, the officers'

testimony that the mirror was damaged, coupled with officers' perspective that plaintiff intentionally threw himself at the vehicle, was enough to establish probable cause to arrest plaintiff.")

There are numerous issues with the defendants' argument, not the least of which includes their utter failure to address the plaintiff's expert testimony that establishes Schultz is not a credible witness and therefore no reasonable jury could believe him.  First, the video evidence itself demonstrates that there is no genuine dispute that Schultz's vehicle, driven by Moriarity, was still in motion at the time the impact occurred.  (*See* Dkt. No. 68-4, Exhibits C and D).  However, even though it is clear from the video itself that Schultz's testimony on this point is not credible, the plaintiff's unchallenged expert, Dr. Jennifer Yaek, performed a frame-by-frame analysis of all available surveillance videos and concluded that Schultz's vehicle was still in motion at the time of the collision between Mr. Kistner and McDermott's vehicle.  (*Id*., Exhibits B and D).  Schultz's testimony that his vehicle was stopped at or around the time of impact blatantly is contradicted by the video footage and Dr. Yaek's analysis of the same, and therefore it is incredible as a matter of law and should not be accepted by the Court.  *See, e.g., Deutsche Bank AG v. Amba Credit Prods., LLC*, No. 04-CV-5594, 2006 WL 1867497, at *8 (S.D.N.Y. July 6, 2006) (noting that the evidence submitted to rebut the testimony of movant's experts was "flimsy at best" because it "relie[d] primarily on . . . [non-movant's] self-serving assertions"); *Calloway v. Richter*, No. 97-CV-0671, 1998 WL 3430142, at *4 (W.D.N.Y. Dec. 30, 1998) (granting summary judgment in favor of defendants where "the plaintiff ha[d] failed to present any evidence, other than his self-serving, conclusory statements, to rebut defendant's expert's conclusion that the September 3, 1994 letter could not have been written in 1994").

Second, the evidence before the Court establishes that there is no genuine dispute that it would have been *physically impossible* for Schultz to view the accident through the driver's side mirror while he was sitting in the front passenger seat.  As explained by Dr. Yaek, the Law of Reflection establishes that the angle of reflection equals the angle of incidence. (*See* Dkt. No. 68-4, Exhibit B).  Schultz, sitting in the passenger seat, would have viewed the driver's side mirror at a conservative estimate of 30 degrees, and therefore he would only be able to view objects 30 degrees parallel to the mirror on the opposite side of the vehicle.  (*Id*.)  Thus, Schultz would have observed lawns and houses on the west side of the roadway, not the collision between the plaintiff and McDermott's vehicle.  (*Id*.)

While this principle alone sufficiently establishes that it physically would have been impossible for Schultz to view the accident through the driver's side mirror, Dr. Yaek went a step further and reenacted what Schultz would have observed through a driver's side mirror while sitting in the passenger seat of a 2015 Chevy Tahoe.  (*See* Dkt. No. 68-4, Exhibit E). Dr. Yaek's testing showed that a passenger of a vehicle looking through a driver's side mirror would *not* have been able to view the collision that occurred behind the Tahoe in the middle of the roadway.  (*Id*.)  This reenactment further established that Schultz's testimony is incredible as a matter of law since it was *physically impossible* for him to have seen what he claims he saw. *See, e.g., United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992), *cert. denied*, 514 U.S. 1038 (1995) (concluding that a court must disregard testimony from a witness about occurrences that "def[y] physical realities") (citations omitted); *Espinal v. Trezechahn 1065 Ave. of Americas, LLC*, 94 A.D.3d 611 (1st Dept. 2012) (finding the non-movant's version of the incident "incredible as a matter of law" because the movant's expert established "the incident was mechanically and physically impossible") (citations and quotations omitted).

-8-

And third, while it is clear from the video that the plaintiff did not throw himself at McDermott's vehicle, Dr. Yaek performed a frame-by-frame analysis of the surveillance videos, concluding from her review of the same that Mr. Kistner maintained a normal walking speed in the moments leading up to the collision and at no point did he lunge or jump into the vehicle, as Schultz initially testified that he saw.  (*See* Dkt. No. 68-4, Exhibit B).  Thus, the Court should not credit the defendants' self-serving testimony that the plaintiff threw himself at McDermott's vehicle with intent to damage it.  *See, e.g., Bellsouth Telecommunications, Inc. v. W.R. Grace & Company-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) ("conclusory statements are insufficient to raise a triable issue of material fact"); *Issac v. City of New York*, No. 16-CV-4729, 2020 WL 1694300, at *4 (E.D.N.Y. Apr. 6, 2020) (same); *Zuckerman v. City of New York*, 49 N.Y.2d 557, 562 (1980) ("mere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient" to raise a triable issue of fact).[3]

Additionally, with regard to the defendants' assertion that the defendants observed damage to McDermott's vehicle, the Court should not give the officers' testimony any weight as there is <u>no</u> evidence in the record to support their false observations.  (*See* Dkt. No. 133, at p. 5 ("Schultz, McDermott and Velez testified that the mirror was damaged")).  First, no visible damage to the vehicle is seen on the surveillance video, and from the degree and point of impact it is hard to believe that the vehicle could have suffered any damage of the nature and severity described by the defendants in their testimony and criminal complaints against the plaintiff.  (*See* Dkt. No. 68-4, Exhibits B and C).  Second, the vehicle was serviced at the BPD

---

[3] Moreover, although the defendants assert that "Moriarity and McDermott also testified that plaintiff threw himself into the vehicle" (*see* Dkt. No. 133, at p. 4), this assertion misconstrues their testimony.  Both witnesses testified that they did not see the collision (*see* Dkt. No. 68-3, Exhibit H at pp. 109-10, 113; *id.*, Exhibit G at pp. 108-15, 153-54, 171-80), and therefore the Court should not give their testimony any weight with respect to whether they believed that the plaintiff intentionally threw himself at McDermott's vehicle.

Garage four days after the incident, and there is no record of the mirror or window being repaired at that time (or ever for that matter).  (*See* Dkt. No. 82-1, Exhibit B).  And third, McDermott testified and the surveillance video shows that she took a photograph of the alleged damage to the vehicle after the incident, but that photograph was either discarded or lost, and never was disclosed to the plaintiff or the district attorney's office despite repeated demands that it be produced.  (*See* Dkt. No. 68-4, Exhibit C; Dkt. No. 74-2, at pp. 247-49).

Defendants do not address any of this evidence except for the lack of a service record.  (*See* Dkt. No. 133, at pp. 4-6).  However, there is ample evidence in the record that shows McDermott's vehicle sustained no damage, and the defendants' claims to the contrary are as false as they are convenient.  Accordingly, the Court should accept the Magistrate's recommendation that the plaintiff's motion for summary judgment be granted regarding his false arrest claim for the criminal mischief charge as no reasonable jury could believe the defendants' incredible testimony.  *See, e.g., Kaminski v. Anderson*, 792 F. Supp. 2d 657, 661 (W.D.N.Y. 2011) ("it is insufficient for a party opposing summary judgment 'merely to assert a conclusion without supplying supporting arguments or facts'") (quoting *BellSouth Telecomm., Inc.*, 77 F.3d at 615); *see also Cinquemani v. Otis Elevator Company*, 179 A.D.3d 588, 588-89 (1st Dept. 2020) ("In opposition, plaintiffs failed to raise a triable issue of fact.  Their expert's statements that defendants were negligent were conclusory and failed to rebut defendants' showing that it was impossible for the incident to have occurred in the manner plaintiffs allege.")

**IV.    The Magistrate's Recommendation to Deny the Defendants' Motion for
Summary Judgment Regarding the Plaintiff's Malicious Prosecution Claim
<u>Should be Accepted.</u>**

In their fourth objection, the defendants argue that the prosecution of Mr. Kistner

for criminal mischief was supported by probable cause or arguable probable cause, essentially

relying on the same faulty arguments that are discussed above, but adding that the probable cause

standard for malicious prosecution is "slightly higher" than the standard for false arrest cases.

(*See* Dkt. No. 133, at pp. 6-8).  However, the defendants ignore that the central issue with respect

to malicious-prosecution claims is whether probable cause exists "at the time the judicial

proceeding is commenced," as opposed to at the time of the arrest.  *Peterson v. Regina*,

935 F. Supp. 2d 628, 642 (S.D.N.Y. 2013) (citation omitted).

As explained above, the Magistrate was correct to find that the defendants did not

have probable cause to arrest the plaintiff.  (*See* Point III, supra).  However, assuming that this

Court finds an issue of fact regarding probable cause to arrest the plaintiff, the defendants

absolutely did not have probable cause to prosecute Mr. Kistner due to their utter failure to

perform <u>any</u> investigation of the criminal charges that they lodged against him.  *See Manganiello*

*v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) ("the failure to make a further inquiry

when a reasonable person would have done so may be evidence of lack of probable cause")

(citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).

Here, at the time of the plaintiff's initial arrest, the defendants were aware that the

accident was recorded on surveillance cameras owned by the plaintiff.  In fact, the BPD

"Complaint Summary Report" explicitly notes that cameras on 37 Schmarbeck captured the

incident. (*See* Dkt. No. 68-3, Exhibit J (this entry to the BPD CAD report was made at 11:07

a.m. on January 1, 2017)).  Not one of the defendants, however, made any attempt to view or

obtain copies of the surveillance footage.  Rather, the defendants continued their lawless

prosecution of the plaintiff, even though the video of the accident establishes that Mr. Kistner did

_not_ throw himself at McDermott's vehicle.  (*See* Dkt. No. 68-4, Exhibit C).  Defendants' failure

to pursue "reasonable avenues of investigation" to establish material facts relied upon for the

prosecution of Mr. Kistner evidences a lack of probable cause as a matter of law.  *See, e.g.,*

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571-72 (2d Cir. 1996).

       Additionally, the defendants lacked probable cause to prosecute the plaintiff for

criminal mischief because there is no evidence that he caused any damage to McDermott's

vehicle.  The criminal complaint alleged that the driver's side mirror was "dislodged" from the

vehicle and that the driver's side window was malfunctioning.  (*See* Dkt. No. 68-3, Exhibits K

and M).  Although it should have been obvious that the vehicle was not damaged by no later than

January 5, 2017 when it was serviced at the BPD Garage and no repairs were made to the

vehicle's side mirror and window, Mr. Kistner nonetheless was arraigned twelve days after the

accident and forced to return to court on several occasions to defend himself against the criminal

mischief charge.  (*See* Dkt. No. 68-3, Exhibit O).  Defendants lacked probable cause to prosecute

the plaintiff once it was determined that McDermott's vehicle was not damaged, yet they

continued to pursue the criminal charges without probable cause.  *See, e.g., Ackerson v. City of*

*White* Plains, 702 F.3d 15, 19-22 (2d Cir. 2012) (probable cause requires that there be sufficient

evidence to believe that _all_ elements of the charge have been met).  Accordingly, the Magistrate

correctly recommended the denial of defendants' motion for summary judgment regarding the

plaintiff's malicious prosecution claim.

**V.      The Magistrate's Recommendation to Deny the Defendants' Motion for Summary Judgment Regarding the Plaintiff's Failure to Intervene Claim <u>Should be Accepted</u>.**

Similar to their argument to the Magistrate, the defendants argue that the plaintiff's failure-to-intervene claims should be dismissed because there was no Constitutional violation, and so there was no reason for them to intervene.  (Dkt. No. 133, at p. 9).  As explained above, however, the Magistrate was correct to find <u>*multiple*</u> violations of the plaintiff's Constitutional rights, and so the Magistrate equally was correct in finding that the defendants failed to meet their burden for dismissal of the plaintiff's failure-to-intervene claim.  (Dkt. No. 108, at p. 31 ("In moving to dismiss [the plaintiff's failure-to-intervene] claim, defendants argue that '[b]ecause there was no Constitutional violation, there was no reason for any of the officers to intervene.  Alternatively, the officers acted reasonably and in good faith.  Qualified immunity . . . shields them from civil liability for their conduct on January 1, 2017' . . . For reasons previously discussed, neither argument warrants dismissal of this claim.")  Thus, should this Court agree and accept the Magistrate's findings with respect to their being even just one violation of the plaintiff's Constitutional rights, then the Court also should accept the Magistrate's recommendation to deny the defendants' request for dismissal of the plaintiff's failure-to-intervene claim.  *See, e.g., Krzeminski v. City of Buffalo*, No. 17-CV-00245, 2018 WL 10335659, at *6 (W.D.N.Y. Dec. 10, 2018) ("Since I have concluded that triable issues of fact exist concerning at least some of plaintiffs' alleged constitutional violations, I recommend that plaintiffs' related failure to intervene claims also not be dismissed.") (McCarthy, J.)

-13-

**VI.    The Magistrate's Recommendation to Deny the Defendants' Request for
Summary Judgment Regarding the Plaintiff's Battery Claim Under
New York State Law Should be Accepted.**

In their objections, the defendants argue that "the court should dismiss plaintiff's

battery claim . . . because there is no evidence that [the] contact [with plaintiff] was

unreasonable."  (Dkt. No. 133, at p. 9).  However, under New York state law, where "an arrest is

determined to be unlawful, any force against a plaintiff may constitute an assault and battery,

regardless of whether the force would be deemed reasonable if applied during a lawful arrest."

*Rucks v. City of New York*, 96 F. Supp. 3d 138, 152 (S.D.N.Y. 2015); *see, e.g., 5 Borough Pawn,

LLC v. Marti*, 753 F. Supp. 2d 186, 201 (S.D.N.Y. 2010) (same) (quoting *Sulkowska v. City of

New York*, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001)).

In fact, New York courts repeatedly have held that an officer and police

department are liable for battery where the officer merely touched the plaintiff while unlawfully

detaining and/or arresting the individual.  *See, e.g., Mendez v. City of New York*, 137 A.D.3d 468,

471 (1st Dept. 2016) (citing *Johnson v. Suffolk County Police Dept.*, 245 A.D.2d 340, 341

(2d Dept. 1997) ("[a]s the arrest of the plaintiff by the defendant police officer [ ] was unlawful,

Brussell committed a battery when he touched the plaintiff during that arrest"); *Wyllie v. District

Atty. of County of Kings*, 2 A.D.3d 714, 718 (2d Dept. 2003) ("an assault and battery cause of

action may be based on contact during an unlawful arrest . . . [and] the questions of fact

regarding whether the plaintiff's arrest was supported by probable cause also preclude summary

judgment on the cause of action for assault and battery as against the State defendants").

Here, the defendants do not deny that they touched the plaintiff during the course

of the arrest.  (*See* Dkt. No. 133, at p. 9 ("Plaintiff was assisted to his feet and escorted away in

handcuffs.")).  Thus, to the extent that this Court agrees that there are at least triable issues as to

-14-

whether the defendants falsely arrested the plaintiff, then it similarly should conclude that the Magistrate was correct to recommend the denial of the defendants' summary judgment motion regarding the plaintiff's battery claim under New York state law.  *See Mendez*, 137 A.D.3d at 471.


## **CONCLUSION**

Accordingly, for the reasons stated above, and the reasons set forth in the plaintiff's previously filed objections, it respectfully is submitted that the Court should reject the defendants' objections to the Magistrate's R&R, and instead it should issue an order consistent with the objections filed by the plaintiff on June 15, 2022.  Plaintiff also requests that the Court grant to the plaintiff any and all other relief that the Court deems just and proper.


Dated: July 28, 2022
       Buffalo, New York

**RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
*Attorneys for Plaintiff*


By: _____*s/Chad A. Davenport*_____
       R. Anthony Rupp III
       Chad A. Davenport
       1600 Liberty Building
       Buffalo, New York 14202
       (716) 854-3400

4861-2239-3383, v. 1

-15-