UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JAMES C. KISTNER,

              Plaintiff,

     v.                                       18-CV-402-LJV-JJM
                                            DECISION & ORDER

CITY OF BUFFALO, *et al.*,[1]

              Defendants.

_____


       On March 30, 2018, the plaintiff, James C. Kistner, commenced this action under

42 U.S.C. § 1983 and New York State law.  Docket Item 1.  He has sued the City of

Buffalo; Byron Lockwood, Commissioner of the Buffalo Police Department ("BPD");

Daniel Derenda, former Commissioner of the BPD; and Anthony McHugh, a BPD

Lieutenant, as well as a John Doe BPD officer or officers and several named BPD

Officers: Lauren McDermott, Jenny Velez, Karl Schultz, Kyle Moriarity, and David T.

Santana.  Docket Item 61.  The action arises from a January 1, 2017 incident that

began when defendant McDermott allegedly struck Kistner with her patrol car and

ended when Kistner was arrested and prosecuted for two violations of the New York

Penal Law: (1) criminal mischief in the third degree, N.Y. Penal Law § 145.05(2); and

(2) disorderly conduct, N.Y. Penal Law § 240.20(3).  *Id.*

---

      [1] Defendant Byron Lockwood has been incorrectly sued as "Bryon Lockwood."
Defendant Karl Schultz has been incorrectly sued as "Karl Schulz."  Defendant Kyle
Moriarity has been incorrectly sued as "Kyle Moriarty."  The Clerk of the Court shall
correct the electronic docket to reflect the defendants' correct names.

On June 20, 2018, the case was referred to United States Magistrate Judge Jeremiah J. McCarthy for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 5.  After extensive discovery, on April 28, 2021, Kistner moved for summary judgment against defendants McDermott, Velez, Schultz, and Moriarity on his claims under section 1983 and state law for false arrest, false imprisonment, and malicious prosecution relating to the criminal mischief charge.  Docket Item 68.  Two days later, the defendants moved for judgment on the pleadings on some claims and for summary judgment on the rest.  Docket Item 69.  The parties briefed those motions, *see* Docket Items 82-100, and on June 7, 2021, Judge McCarthy heard oral argument, Docket Item 101.

On January 11, 2022, Judge McCarthy issued a Report and Recommendation ("R&R") finding that both sides' motions should be granted in part and denied in part. Docket Item 108 at 2.  Kistner moved twice for reconsideration of that R&R, Docket Items 112 and 124, and Judge McCarthy issued two more R&Rs addressing those motions for reconsideration, Docket Items 119 and 129.

On June 15, 2022, both the plaintiff and the defendants objected to the R&R[2] on several grounds.  Docket Item 132 (Kistner's objections); Docket Item 133 (defendants' objections).  On July 27 and 28, 2022, both sides responded to each other's objections. Docket Item 137 (defendants' response); Docket Item 138 (Kistner's response).  And on August 3 and 4, 2022, both sides replied.  Docket Item 139 (defendants' reply); Docket Item 140 (Kistner's reply).

---

[2] Throughout the remainder of this decision, the Court will refer to Judge McCarthy's three R&Rs collectively as the R&R unless the Court specifically notes that it is referring to only one of the three R&Rs.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the record in this case; the objections, responses, and replies; and the materials submitted to Judge McCarthy.  Based on that *de novo* review, the Court accepts in part and respectfully rejects in part Judge McCarthy's recommendation to grant in part and deny in part the parties' motions.

## FACTUAL BACKGROUND[3]

Kistner owns a home at 33 Schmarbeck Avenue.  Docket Item 96 at ¶ 2; Docket Item 100 at ¶ 2.  Both sides agree that on January 1, 2017, Officers Schultz and Moriarity were dispatched to that address to respond to a theft complaint and that a short time later, Officers McDermott and Velez arrived at Schmarbeck Avenue in a second vehicle.  Docket Item 96 at ¶¶ 4, 8; Docket Item 100 at ¶¶ 4, 8.  But after that, the parties' stories diverge.

---

[3] On a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party.  *See Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The following facts are taken from Kistner's statement of undisputed material facts, Docket Item 96; the defendants' response to Kistner's statement of undisputed material facts, Docket Item 100; the defendants' statement of undisputed material facts, Docket Item 69-2; Kistner's response to the defendants' statement of undisputed material facts, Docket Item 82-7; and the exhibits incorporated in those filings.  The Court assumes the reader's familiarity with the facts alleged in the second and third amended complaints, *see* Docket Items 61 and 122, and with Judge McCarthy's analysis and recitation of the factual background in the R&R, *see* Docket Items 108, 119, 129.

According to Kistner, he noticed the police cars near his property, and as Moriarity and Schultz prepared to leave, he approached their vehicle to ask why they were there.  Docket Item 96 at ¶¶ 12-13.  Kistner says that Schultz refused to talk to him and that Moriarity started to drive himself and Schultz away.  *Id.* at ¶¶ 13-14.

So Kistner approached McDermott's and Velez's vehicle.  *Id.* at ¶ 15.  As he did, McDermott was backing up the vehicle so that she and Velez could leave.  *Id.* at ¶ 16.  Kistner says that McDermott then shifted the car into drive, pulled forward, and hit him with such force that he fell to the ground.  *Id.* at ¶ 19.

The defendants tell a different story.  McDermott says that Kistner "purposely walked towards [her] vehicle and threw himself into it" while it was stopped.  Docket Item 74 at 94, 102.  Schultz, who saw the collision in the mirror of his and Moriarity's vehicle, also says that Kistner came into contact with McDermott's vehicle while it was stopped.  Docket Item 75 at 97-99.  And according to McDermott and Schultz, by doing that Kistner damaged the driver's side mirror of McDermott's vehicle.  Docket Item 74-1 at 11-12; Docket Item 75-1 at 8-9.

After the incident, McDermott, Velez, Moriarity, and Schultz exited their vehicles and approached Kistner.  Docket Item 96 at ¶ 37; Docket Item 100 at ¶ 37.  Kistner claimed to be injured and complained of head pain, Docket Item 74 at 97; Docket Item 74-2 at 9, 18, but the officers did not immediately seek medical treatment for him beyond performing a visual assessment of his condition, Docket Item 74 at 97; Docket Item 75 at 103-05; Docket Item 82-1 at 188-90.  Instead, Schultz and Moriarity handcuffed Kistner and escorted him to Moriarity's police car.  Docket Item 96 at ¶ 39;

Docket Item 100 at ¶ 39.  At some point, another officer, Santana, arrived at the scene. Docket Item 69-2 at ¶ 19; Docket Item 82-7 at ¶ 19.

Schultz called his supervisor, Lieutenant McHugh, and told him what had happened.  Docket Item 96 at ¶ 40; Docket Item 100 at ¶ 40.  According to Schultz, he told McHugh that "from [his] vantage point, Officer[s] McDermott and Velez did not strike the individual"; that Kistner "had stuck his hand out, coming into contact with the police vehicle"; and that "there was damage to the mirror."  Docket Item 75-1 at 8.  Schultz says that consistent "with [McHugh's] recommendation," the officers decided to take Kistner to Erie County Medical Center ("ECMC") for medical attention and "charge him with criminal mischief."  *Id.* at 6.  According to Schultz, they also determined that McHugh and Internal Affairs "did not need to come out."  *Id.* at 8.

After they arrested Kistner, Schultz and Moriarity drove him to ECMC; McDermott and Velez went to ECMC as well.  Docket Item 96 at ¶¶ 50-51; Docket Item 100 at ¶¶ 50-51.  While in a private room at ECMC, Kistner "was angry" and "criticize[d] his . . . arrest."  Docket Item 122 at ¶¶ 110, 112.  Both sides agree that he was "boisterous and loud," cursed, and insulted the officers and some ECMC staff, *id.* at ¶ 112; Docket Item 69-7 at 73-74; Docket Item 69-2 at ¶ 21, but both sides dispute whether Kistner's conduct disrupted ECMC personnel, *see* Docket Item 69-2 at ¶ 21; Docket Item 82-7 at ¶ 21.

Once Kistner was medically cleared, McDermott and Velez took him to central booking.  Docket Item 96 at ¶ 52; Docket Item 100 at ¶ 52.  McDermott then signed two criminal complaints, one charging Kistner with criminal mischief in the third degree in connection with the encounter on Schmarbeck Avenue and the other charging him with

disorderly conduct for what occurred on Schmarbeck Avenue and at ECMC.  Docket Item 74-3 at 24-35; Docket Item 68-3 at 331-32 (criminal complaints).

Velez then completed a request for an examination under section 9.41 of the Mental Hygiene Law, Docket Item at 68-3 at 334, and McDermott and Velez took Kistner back to ECMC for a mental health evaluation, Docket Item 96 at ¶ 54; Docket Item 100 at ¶ 54.  In the request for an examination, Velez said that Kistner "did intentionally throw himself at [a] patrol vehicle" and that he "[r]epeatedly called officers Nazis and fascists."  Docket Item 68-3 at 334.  Kistner admits that "[w]hile he was at ECMC, [he] used four-letter language to criticize his . . . arrest" and that he called "the defendants and certain ECMC personnel 'Nazis' or 'Feminazis.'"  Docket Item 122 at ¶ 112.  But he says that his words only protested his arrest and that he directed them toward the defendants in a private room at ECMC.  *Id.*; Docket Item 83-4 at 75-76.  And he denies throwing himself at a police car.  Docket Item 122 at ¶ 106.

After ECMC staff conducted a mental health examination, Kistner was discharged.  Docket Item 96 at ¶ 56; Docket Item 100 at ¶ 56.  The examining physician found that Kistner was "rational and logic[al] . . . [and] [t]here [was] clearly no indication for acute psych admission."  Docket Item 71 at 34.

About fifteen months later, the criminal charges against Kistner were dismissed in the in the "[i]nterest/[f]urtherance of [j]ustice."  Docket Item 82-2 at 219.

## PROCEDURAL BACKGROUND

On March 30, 2018, Kistner commenced this action, alleging violations of his First, Fourth, and Fifth Amendment rights under section 1983 as well as several claims under state law.  Docket Item 1.  More specifically, he asserts claims against all

defendants under both section 1983 and state law for false arrest, false imprisonment, and malicious prosecution on all charges. Docket Item 122. He asserts two more claims under section 1983, alleging that the defendants retaliated against him in violation of his First Amendment rights and that certain defendants were negligent in their hiring, supervision, and training of BPD officers. *Id.* And he asserts additional claims against all defendants under state law for battery, defamation, official misconduct, tampering with evidence, spoliation, and failure to intervene.[4] *Id.*

As noted above, on April 28, 2021, Kistner moved for summary judgment on his state and federal claims for false arrest, false imprisonment, and malicious prosecution, but only as those claims related to the charge of criminal mischief in connection with the incident on Schmarbeck Avenue. Docket Item 68. Two days later, the defendants moved for judgment on the pleadings on certain claims and for summary judgment on all other claims. Docket Item 69.

On January 11, 2022, Judge McCarthy issued his first R&R. Docket Item 108. He began by addressing the defendants' motion for judgment on the pleadings. *Id.* at 9-15. Judge McCarthy recommended that this Court deny that motion insofar as it seeks dismissal of Kistner's state law claims for false imprisonment, battery, and malicious prosecution. *Id.* at 11. But Judge McCarthy recommended that the Court otherwise

---

[4] Kistner initially pleaded several other claims but later withdrew them. As Judge McCarthy noted, in response to the defendants' motion for judgment on the pleadings, Kistner "voluntarily withdr[ew] his stand[-]alone claims for *respondeat superior* liability, punitive damages[,] and attorneys' fees, as well as his assault, intentional infliction of emotional distress, and official[-]capacity claims." Docket Item 108 at 10. Accordingly, those claims are dismissed.

grant the defendants' motion for judgment on the pleadings. *Id.* at 9-15.  Specifically, he recommended:

- dismissing all claims against any John Doe defendants, *id.* at 10-11;

- dismissing Kistner's state law claims for defamation, official misconduct, tampering with evidence, and spoliation because Kistner failed to include those claims in the Notice of Claim required under New York State law, *id.* at 11;

- dismissing Kistner's section 1983 claims against Lockwood, Derenda, Santana, and McHugh because Kistner did not plausibly allege those defendants' personal involvement, *id.* at 11-13; and

- dismissing Kistner's section 1983 claims against the City of Buffalo because Kistner did not plausibly allege a basis for municipal liability, *id.* at 13-15.

Judge McCarthy then turned to the parties' cross-motions for summary judgment, first addressing Kistner's motion for partial summary judgment on his malicious prosecution, false arrest, and false imprisonment claims relating to the criminal mischief charge. *Id.* at 15-23.  Judge McCarthy *sua sponte* recommended dismissing Kistner's section 1983 claim for malicious prosecution because the dismissal of the criminal charges against Kistner did not affirmatively "indicate innocence."  *Id.* at 22.  With respect to the rest of Kistner's motion, Judge McCarthy recommended:

- granting Kistner summary judgment against McDermott, Velez, Schultz, and Moriarity on Kistner's state and federal claims for false arrest and false imprisonment relating to the criminal mischief charge, *id.* at 21;

- granting Kistner summary judgment against McDermott and Schultz on Kistner's state law claim for malicious prosecution of the criminal mischief charge, *id.* at 23; and

- denying Kistner summary judgment against Moriarity and Velez on Kistner's state law claim for malicious prosecution of the criminal mischief charge, *id.*

Even though Judge McCarthy recommended dismissal of Kistner's section 1983 claims against Lockwood, Derenda, Santana, McHugh, and the City of Buffalo, he recognized that this Court might not accept that recommendation.  *Id.* at 15.  He therefore analyzed the defendants' motion for summary judgment on those claims, *id.* at 24-31, and he recommended:

- granting summary judgment to the defendants on Kistner's claims relating to the disorderly conduct charge—specifically, his state and federal claims for false arrest, false imprisonment, and malicious prosecution as well as his section 1983 First Amendment retaliation claim, *id.* at 25-27;

- denying Moriarity's, Santana's, McHugh's, and Lockwood's motion for summary judgment on Kistner's state malicious prosecution claim relating to the criminal mischief charge, *id.*;

- granting Derenda's motion for summary judgment on Kistner's state claims for false arrest and false imprisonment and for malicious prosecution relating to the criminal mischief charge, *id.*;

- denying the City of Buffalo's motion for summary judgment on Kistner's section 1983 claims based on municipal liability, *id.* at 30;

9

- construing Kistner's failure-to-intervene claim as brought against only McDermott, Velez, Schultz, Moriarity, Santana, and McHugh and denying the defendants' motion for summary judgment on that claim, *id.* at 30-31; and

- granting the defendants' motion for summary judgment on Kistner's negligence claim, *id.* at 31.

Kistner moved for partial reconsideration of the first R&R on January 25, 2022. Docket Item 112. He asked Judge McCarthy to reconsider the recommendation to dismiss the claims against Santana, McHugh, Lockwood, and the City of Buffalo for pleading deficiencies and, in the alternative, he asked for leave to amend his complaint to cure the deficiencies noted in the R&R. *Id.* Kistner also asked Judge McCarthy to reconsider the recommendation to grant summary judgment to the defendants on the section 1983 malicious prosecution claims. *Id.*

On February 28, 2022, Judge McCarthy recommended granting in part Kistner's motion for reconsideration. Docket Item 119. Specifically, Judge McCarthy recommended that Kistner be given leave to amend the complaint to add allegations against the City of Buffalo, and based on those new allegations, he recommended that the claims against the City of Buffalo no longer be dismissed for pleading deficiencies. *Id.* at 7. But Judge McCarthy otherwise declined to modify his first R&R. *Id.* Kistner then filed a third amended complaint to add the allegations against the City of Buffalo. Docket Item 122.

On April 6, 2022, Kistner again asked Judge McCarthy to reconsider his recommendation to grant summary judgment to the defendants on Kistner's section

1983 malicious prosecution claims.  Docket Item 124.  This time, Kistner based his argument on an intervening change of law: the United States Supreme Court's April 2022 decision in *Thompson v. Clark*, 142 S. Ct. 1332 (2022).  In *Thompson*, the Court held that a plaintiff does not need "to show that the criminal prosecution ended with some affirmative indication of innocence" to succeed on a section 1983 malicious prosecution claim.  *Id.* at 1341.

On April 12, 2022, Judge McCarthy recommended that Kistner's second motion for reconsideration be granted, and he modified the R&R to recommend that the Court grant Kistner summary judgment on his section 1983 claim against McDermott and Schultz for malicious prosecution of the criminal mischief charge.  Docket Item 129.

Both Kistner and the defendants then objected to the R&R as noted above.

## **LEGAL PRINCIPLES**

### I.    **MOTION FOR JUDGMENT ON THE PLEADINGS**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  The standard for deciding a Rule 12(c) motion is "the same . . . standard [that applies] to dismissals pursuant to [Rule] 12(b)(6).  Thus, [courts] will accept all factual allegations in the [c]omplaint as true and draw all reasonable inferences in [the plaintiff's] favor."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## II.   SUMMARY JUDGMENT

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant." *Id.* (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); then quoting *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 467 (1962)). Conversely, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." *Id.* "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence." *Id.*

## DISCUSSION

## I.   MOTION FOR JUDGMENT ON THE PLEADINGS

Kistner objects to Judge McCarthy's recommendation to dismiss the section 1983 claims against Lockwood, Santana, and McHugh for pleading deficiencies.[5]

---

[5] Kistner did not object to Judge McCarthy's recommendation to dismiss the section 1983 claims against Derenda. *See* Docket Item 132. This Court therefore need not review this portion of the R&R. *See Thomas v. Arn*, 474 U.S 140, 149-50 (1985). In

Docket Item 132 at 5-20.  More specifically, he argues that Judge McCarthy erred in finding that he had not plausibly alleged the personal involvement of those defendants in the section 1983 claims.  *Id.* at 14-20.  Alternatively, he argues that Judge McCarthy should have (1) deemed the complaint amended "to conform to the proof offered by the parties in support of their . . . motions for summary judgment," *id.* at 5-10; or (2) granted Kistner leave to amend his claims against Lockwood, Santana, and McHugh to cure any pleading deficiencies, *id.* at 10-14.

This Court agrees with Kistner that he has plausibly alleged the personal involvement of Santana and McHugh, and his section 1983 claims against Santana and McHugh therefore will not be dismissed on that basis.  But Kistner has not plausibly alleged that Lockwood was personally involved in the January 1, 2017 incident, and the Court agrees with Judge McCarthy that the section 1983 claims against Lockwood should be dismissed.

To establish liability against an official under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citing *Iqbal*, 556 U.S. at 676).  It is not enough to assert that the defendant is a "link[] in the [entity's] chain of command."  *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004).  Moreover, the theory of *respondeat superior* is not available in a section 1983 action.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).  Instead,

---

any event, this Court agrees with Judge McCarthy's recommendation to dismiss the claims against Derenda.

"[t]he violation must be established against the supervisory official directly."  *Tangreti*, 983 F.3d at 618.

###### A.    Lockwood

Kistner argues that he has plausibly alleged Lockwood's personal involvement because the "allegations in the complaint support that Lockwood 'learn[ed] of the deprivation but fail[ed] to remedy the wrong' and exhibited 'gross negligence in managing subordinates who caused the deprivation.'"  Docket Item 132 at 15-17.  But under the Second Circuit's recent decision in *Tangreti*, Lockwood may not be held liable under either of those theories.

In *Tangreti*, the Second Circuit clarified that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution" and that "there is no special rule for supervisory liability."  *Tangreti*, 983 F.3d at 618.  The two theories on which Kistner relies to establish Lockwood's involvement invoke pre-*Tangreti* principles of supervisory liability that did not survive *Tangreti*.  *See id.* at 616 (noting that the Second Circuit previously allowed supervisory liability where the supervisor "was grossly negligent in supervising subordinates who committed the wrongful acts" and where the supervisor "after being informed of the violation . . . failed to remedy the wrong" (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995))).

Furthermore, even if these theories were available to Kistner, he has not pleaded that Lockwood was the BPD Commissioner at the time of the January 1, 2017 incident and the alleged constitutional violations—nor could he in good faith, as Lockwood did

not become Commissioner until January 2018.[6]  It is unclear to this Court how Lockwood, whose liability the complaint alleges only in connection with his role as Commissioner, *see* Docket Item 122 at ¶¶ 39-40, 165-69, might be held liable for acts that occurred before he became Commissioner, and Kistner offers no reason why Lockwood might.  Accordingly, the claims against Lockwood are dismissed.

### B.    Santana

Judge McCarthy found that Kistner did not plausibly allege Santana's personal involvement.  Docket Item 108 at 12.  Specifically, he found that although Kistner alleged that Santana violated BPD policies on documenting an accident involving a police car, those allegations did not plausibly suggest that Santana knew or should have known that Kistner was being falsely arrested and prosecuted.  *Id.*  But this Court sees it a bit differently.

Although Kistner has not alleged that Santana witnessed the incident, he has alleged that Santana arrived on the scene shortly after Kistner and the police car collided.  Docket Item 122 at ¶¶ 86, 250.  It is fair to infer that Santana would have learned about the incident and seen Kistner in Moriarity's and Schultz's vehicle when he responded to the incident.  And on the defendants' motion for judgment on the

---

[6] The Court takes judicial notice that Lockwood did not become BPD Commissioner until January 2018.  *See* City of Buffalo Press Release, *Mayor Brown Announces Appointment of Byron Lockwood as Interim Police Commissioner* (Jan. 17, 2018), https://www.buffalony.gov/CivicAlerts.aspx?AID=185; *see also Diaz v. Bowles*, 2022 WL 2047241, at *1 n.2 (D. Conn. June 6, 2022) (taking judicial notice of who was Commissioner at the relevant time); Docket Item 82-1 at 10.

pleadings, the Court must draw all reasonable inferences in favor of Kistner.  *L-7 Designs, Inc.*, 647 F.3d at 429.

Kistner alleges that the officers on the scene, including Santana, failed to follow BPD policies and procedures for documenting an accident involving a police car or police officer.  Docket Item 122 at ¶ 102.  So even if the other officers told Santana only their allegedly false stories about the incident, it is reasonable to infer that the other officers' failure to follow policies and procedures for documenting an accident should have alerted Santana that something was amiss.  But rather than do something about it, Kistner alleges, Santana likewise failed to follow BPD policies and procedures and participated in Kistner's allegedly illegal confinement.  *See id.*

Therefore, drawing all reasonable inferences in favor of Kistner, this Court finds that Kistner has plausibly alleged Santana's personal involvement in the events giving rise to Kistner's section 1983 claims.

### C.    McHugh

For similar reasons, Kistner's allegations against McHugh plausibly suggest McHugh's personal involvement.

Kistner alleges that shortly after Schultz and Moriarity handcuffed him, Schultz called McHugh, his supervisor, and told him that Kistner had thrown himself at the vehicle and damaged it.  *Id.* at ¶¶ 90-91.  Kistner says that under the BPD's policies and procedures, even Schultz's version of events should have prompted McHugh to go to the scene of the incident.  *Id.* at ¶ 98.  But McHugh did not go to the scene; instead, he directed the officers to charge Kistner with criminal mischief.  *See id.* at ¶¶ 98-99.  Accepting those allegations as true and drawing all reasonable inferences in Kistner's

16

favor suggests that McHugh knowingly joined in the false story, or at the very least ignored BPD procedures for documenting, investigating, and resolving accidents involving police cars—procedures that might have revealed the falsity of the on-scene officers' story.

Because this Court must draw those reasonable inferences in Kistner's favor, Kistner has plausibly alleged McHugh's personal involvement.

## II.   MOTIONS FOR SUMMARY JUDGMENT

Having resolved the motion to dismiss, the Court now turns to the parties' objections to Judge McCarthy's recommendations on their cross-motions for summary judgment.

### A.   Claims Relating to the Criminal Mischief Charge

Judge McCarthy recommended that the Court grant Kistner summary judgment against McDermott, Velez, Schultz, and Moriarity on Kistner's state and federal claims for false arrest and false imprisonment in connection with the criminal mischief charge. Docket Item 108 at 21.  He also recommended that the Court grant Kistner's motion for summary judgment against McDermott and Schultz—but not Velez and Moriarity—on his state claim for malicious prosecution on the criminal mischief charge, *id.* at 23; he later modified that recommendation to include Kistner's federal claim for malicious prosecution on that charge based on the Supreme Court's recent decision in *Thompson*, 142 S. Ct. at 1341.  Docket Item 129.  And Judge McCarthy recommended denying Moriarity's, Velez's, Santana's, McHugh's, and Lockwood's motion for summary judgment—based on the lack of their personal involvement—on the state and federal claims for malicious prosecution of the criminal mischief charge because he found there

17

were issues of fact as to those defendants' personal involvement.[7]  Docket Item 108 at

25-27.

The defendants object to each of those recommendations, arguing that the arrest

and the prosecution for criminal mischief in the third degree were supported by probable

cause or arguable probable cause, which would shield the defendants from liability at

least on the ground of qualified immunity.[8]  Docket Item 133 at 5-8.  So they say that the

defendants—not Kistner—are entitled to summary judgment on the claims of false

arrest, false imprisonment, and malicious prosecution in connection with the criminal

mischief charge for what occurred on Schmarbeck Avenue.  *Id.*

---

[7] Although Judge McCarthy addressed how *Thompson* affected his recommendation regarding summary judgment on Kistner's federal claim of malicious prosecution for criminal mischief as to McDermott and Schultz, he did not explicitly address how *Thompson* affected his recommendation regarding this claim as to the remaining defendants.  *See* Docket Item 129.  The Court presumes that by recommending that the Court grant Kistner's second motion for reconsideration, *see id.* at 2, Judge McCarthy intended to modify the R&R to recommend denying Moriarity's, Velez's, Santana's, McHugh's, and Lockwood's motion for summary judgment based on their lack of personal involvement in the state *and federal* claims of malicious prosecution for criminal mischief.

[8] The defendants did not, however, object to Judge McCarthy's finding that there was an issue of fact regarding Moriarity's, Santana's, McHugh's, and Lockwood's personal involvement in Kistner's prosecution for criminal mischief.  *See* Docket Item 133.  This Court therefore need not review that portion of the R&R.  *See Thomas*, 474 U.S at 149-50.  Moreover, in the defendants' motion for summary judgment, they never argued that the claims against Velez for malicious prosecution should be dismissed because Velez was not personally involved, *see* Docket Item 69-1 at 23 (arguing that "Lockwood, Derenda, Schultz, Moriarity, Santana, and McHugh lack sufficient personal involvement to establish liability for malicious prosecution"), and so this Court need not review the R&R and the record as to whether Velez should have been granted summary judgment for that reason.  *See, e.g.*, *Davis v. N.Y.C. Hous. Auth.*, 379 F. Supp. 3d 237, 256 (S.D.N.Y. 2019) ("declin[ing] to construct arguments that [the defendants] have not raised themselves").

Under section 145.05(2) of the New York Penal Law, "[a] person is guilty of criminal mischief in the third degree when, with intent to damage property of another person, and having no right to do so nor any reasonable ground to believe that he or she has such right, he or she . . . damages property of another person in an amount exceeding two hundred fifty dollars." *Id.* "The existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state law or under [section] 1983." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (citations omitted). "[C]ontinuing probable cause is a complete defense to a constitutional claim of malicious prosecution." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (citation omitted). Likewise, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (citation omitted). Therefore, the question is whether the defendants had probable cause—or at least arguable probable cause—to arrest and prosecute Kistner for criminal mischief based on what occurred on Schmarbeck Avenue.

"Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Betts*, 751 F.3d at 82 (citation omitted). It can exist "even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citation omitted).

While Kistner and the defendants tell different stories about what caused the contact between Kistner and McDermott's patrol car, a camera located at 37 Schmarbeck captured the January 1, 2017 incident.  *See* Docket Item 68-6.  That video resolves some of the differences between Kistner's and the defendants' stories, but it does not resolve them all.  And for that reason, neither side is entitled to summary judgment in connection with what occurred on Schmarbeck Avenue.

McDermott testified that Kistner "purposely walked towards [her] vehicle and threw himself into it" while it was stationary.  Docket Item 74 at 94, 102.  The video footage, however, conclusively disproves McDermott's claim that the vehicle was stopped when the contact occurred.  Docket Item 68-6.  Indeed, McDermott admitted as much after viewing the video.  *See* Docket Item 74-1 at 54 (admitting that her patrol car "appears to be" moving forward when coming into contact with Kistner).

Judge McCarthy concluded that the video also "conclusively disproves the officers' testimony that Kistner threw himself at McDermott's vehicle."  Docket Item 108 at 18.  The defendants argue, however, that from their viewpoints—different than the vantage point of the video—they saw Kistner throw himself at McDermott's vehicle and make contact with the driver's side mirror.  Docket Item 133 at 4-5; *see also* Docket Item 75-1 at 8 (Schultz's deposition); Docket Item 74 at 102 (McDermott's deposition); Docket Item 73 at 114 (Moriarity's deposition).  This Court has viewed the video and respectfully disagrees with Judge McCarthy.

The video shows Kistner walking toward McDermott's moving vehicle as it slowly moves away.  As he approaches the vehicle, Kistner raises his arm in front of his body, but the angle of the video makes it difficult to tell why he does that.  He may be doing

that to strike the mirror as the defendants allege.  He may be doing that for some other reason.  And so there is a question of fact about whether Kistner's actions caused or contributed to the collision and therefore whether Kistner was guilty of criminal mischief or whether the defendants at least reasonably believed that he was.

Moreover, although the video generally shows the collision and Kistner falling to the ground from the impact, the impact occurred on the side of the vehicle away from the camera, and the point of contact between Kistner and the patrol car therefore cannot be seen.  Likewise, the mirror that Schultz, McDermott, and Velez all testified was damaged, *see* Docket Item 75-1 at 8-9 (Schultz's deposition); Docket Item 74-1 at19-20 (McDermott's deposition); Docket Item 72 at 202-03 (Velez's deposition), cannot be seen on the video.[9]  So while the video answers some questions about the incident, other questions of material fact remain—most important, whether the officers are entitled at least to qualified immunity because they reasonably believed that Kistner threw himself at the vehicle with the intent to damage the side mirror.  And for that reason, Kistner is not entitled to summary judgment on his claims for false arrest or malicious prosecution on the charge of criminal mischief.

---

[9] Judge McCarthy discounted the officers' testimony regarding damage to the mirror, noting that 1) there were no records of any mirror repair, 2) there were records of other service on the car four days after the incident, and 3) Lockwood testified that there should be records if any repair had been made.  Docket Item 108 at 19.  In fact, Judge McCarthy noted, the defendants conceded at oral argument that "we're not saying that it was repaired."  *Id.*  But in ruling on Kistner's motion for summary judgment, the Court must give the defendants "the benefit of all permissible inferences and all credibility assessments."  *Soto*, 862 F.3d at 157.  While lack of repair may well permit an inference that the mirror was not damaged, it is possible that there was damage that the defendants chose not to repair or were negligent in documenting.  So whether the lack of such documentation renders the defendants' observation of damage to the mirror wholly unbelievable is a question for the jury, not this Court.

The defendants ask the Court to go a step further and find that probable cause or arguable probable cause supported the arrest and subsequent charge for criminal mischief.  Docket Item 133 at 4-8; *see also* Docket Item 69-1 at 18-28.  They assert that because "the probable cause determination is an objective one based upon 'those facts available to the officer at the time of the arrest and immediately before it,'" what is important is not what Kistner says or the video shows but what the officers perceived to be happening.  Docket Item 133 at 4 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).  Therefore, the defendants argue, probable cause or arguable probable cause supported the arrest and charge because the officers perceived that Kistner threw himself into and damaged the vehicle.  *Id.* at 4-8.

Although the defendants are correct that in "determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis omitted), exactly what facts were available to the officers is in dispute.  The video neither conclusively proves nor disproves the officers' accounts of what they saw, and the officers' perceptions were not necessarily what they say they were.  A jury may find that the officers reasonably believed what they say they believed; on the other hand, a jury may well find that the video casts doubt on the truth of what the officers say they perceived when Kistner and McDermott's vehicle collided.  And under those circumstances, summary judgment is not appropriate for either side.

For all those reasons, this Court concludes that there are issues of fact as to whether Kistner's arrest and prosecution for criminal mischief were supported by probable cause or arguable probable cause.  And those issues of fact preclude

summary judgment on Kistner's state and federal claims for false arrest, false

imprisonment, and malicious prosecution for the criminal mischief charge.[10]

### B.   Claims Relating to the Disorderly Conduct Charge

Judge McCarthy recommended that this Court dismiss Kistner's false arrest,

false imprisonment, and malicious prosecution claims related to the disorderly conduct

charge because that charge was supported by probable cause.  Docket Item 108 at

25.[11]  And because "[t]he existence of probable cause will defeat a First Amendment

claim that is premised on the allegation that defendants prosecuted a plaintiff out of a

---

[10] Kistner objected to Judge McCarthy's recommendation to deny Kistner summary judgment on his state and federal claims against Velez and Moriarity for malicious prosecution of the criminal mischief charge, arguing that there is no issue of material fact as to Velez's and Moriarity's involvement in the prosecution.  Docket Item 132 at 21-22.  Because the Court finds that there are issues of material fact as to whether any defendant had probable cause or arguable probable cause to arrest and prosecute Kistner for criminal mischief precluding summary judgment on those claims against all defendants, it need not reach that objection.

The defendants opposed Kistner's objection, arguing that he was not entitled to summary judgment against Velez and Moriarity on the state and federal malicious prosecution claims.  Docket Item 137 at 4.  But for some reason they did not object to Judge McCarthy's recommendation that this Court deny Moriarity's motion for summary judgment based on Moriarity's lack of personal involvement in Kistner's prosecution.  *See supra* at 18 n.8.  And they did not advance that argument as to Velez in their own motion for summary judgment.  *See id.*  For that reason, while this Court declines to grant Kistner summary judgment against Velez and Moriarity on the state and federal malicious prosecution claims, those claims remain.

[11] Although the "Information/Complaint" charging disorderly conduct referred to the events on Schmarbeck Avenue as well as at ECMC, Docket Item 68-3 at 332 (some capitalization omitted), the parties and Judge McCarthy analyzed the disorderly conduct arrest and prosecution as relating only to what occurred at ECMC, *see* Docket Item 68-5 at 13 n.7; Docket Item 69-1 at 22; Docket Item 108 at 24-25.  This Court therefore does so as well.  In other words, this Court assumes that Kistner was arrested for and charged with criminal mischief only in connection with the incident on Schmarbeck Avenue.  And this Court assumes that he was arrested for and charged with disorderly conduct only in connection with what occurred at ECMC.

retaliatory motive," Judge McCarthy also recommended dismissing Kistner's First Amendment retaliation claim. *Id.* at 27 (citation omitted).

Kistner argues that Judge McCarthy erred in finding that the officers had probable cause as to the "public harm" element of a disorderly conduct charge. Docket Item 132 at 23-25. He argues that "there is no proof that anyone other than the officers were disrupted by his speech" and there was "no risk of public disorder created by his speech" because Kistner made the comments at issue in a private room at the hospital and directed them at the officers. *Id.* And this Court agrees with Kistner that questions of fact preclude the conclusion that the defendants had probable cause—or even arguable probable cause—as a matter of law to arrest Kistner for disorderly conduct.

"A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance[,] or alarm, or recklessly creating a risk thereof . . . [i]n a public place, he uses abusive or obscene language, or makes an obscene gesture." New York Penal Law § 240.20(3). "The conduct of the offender must be 'public in nature.'" *Thorpe v. City of New York*, 2021 WL 3811238, at *5 (S.D.N.Y. Aug. 25, 2021) (citation omitted). "Critical to a charge of disorderly conduct is a finding that [the offender's] disruptive statements and behavior were of a public rather than an individual dimension." *People v. Baker*, 20 N.Y.3d 354, 359, 984 N.E.2d 902, 905 (2013).

Therefore, a person "may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem." *Id.* at 359-60, 984 N.E.2d at 905 (citation omitted). The "risk of public disorder does not have to be realized," however, *id.* at 360, 984 N.E.2d at 906; it is enough that "the conduct 'recklessly creates a risk of

such public disruption,'" *Hughes v. Lebron*, 2016 WL 5107030, at *8 (S.D.N.Y. Sept. 19, 2016) (quoting *People v. Weaver*, 16 N.Y.3d 123, 128, 944 N.E.2d 634, 636 (2011)). In other words, disorderly conduct requires public harm or the reckless creation of a risk of public harm. *Baker*, 20 N.Y.3d at 359-60, 984 N.E.2d at 905.

"[W]hether conduct risks giving rise to 'public inconvenience, annoyance[,] or alarm' is a fact-intensive question." *Thorpe*, 2021 WL 3811238, at *6 (collecting cases). In determining whether there is public harm or a risk of public harm, courts consider "many factors, including 'the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances.'" *Baker*, 20 N.Y.3d at 360, 984 N.E.2d at 906 (quoting *Weaver*, 16 N.Y.3d at 128, 444 N.E.2d at 636).

Kistner does not dispute that he used insulting and profane language at the hospital; on the contrary, in the complaint and in his testimony, he admits that he did. *See* Docket Item 122 at ¶ 112 ("While he was at ECMC, [] Kistner used four-letter language to criticize his unlawful and unconstitutional arrest. He also referred to the defendants and certain ECMC personnel as 'Nazis' or 'Feminazis.'"); Docket Item 69-7 at 73-74 (Q: "Did you ever swear or yell at the police while you were [at ECMC]?" A: "I was rather boisterous and loud . . . .") (Q: "What were the words you were using?" A: "I think . . . I called the two women feminazis."). But both sides disagree about who was present when Kistner used insulting and profane language and to whom Kistner directed his comments. And that gives rise to an issue of fact as to whether Kistner's words created a public harm or a risk of such harm.

The defendants claim that Kistner's "language disrupted [hospital] staff." *See* Docket Item 82-7 at ¶ 21. More specifically, McDermott testified that at ECMC, Kistner "was screaming at people. He was yelling at people. He was calling us feminazis and c**ts and bitches." Docket Item 74-2 at 49.

Kistner disagrees and says that he did not disrupt any hospital staff. *See* Docket Item 82-7 at ¶ 21. In fact, he testified that when he made the statements at issue he was in a "private room" of ECMC without "other people—doctors, patients—around." Docket Item 83-4 at 75-76. And he notes that the medical records that the defendants cite for the proposition that Kistner disrupted ECMC staff do not say that staff was disrupted. Docket Item 82-7 at ¶ 21.

The Court agrees that the medical records do not document ECMC staff disruption. *See* Docket Item 71. But that alone is not enough to defeat the defendants' motion for summary judgment on the claims related to the disorderly conduct charge. As Judge McCarthy correctly explained, proof of actual disruption is not necessary for an offender to be guilty of disorderly conduct. Docket Item 108 at 25; *see Baker*, 20 N.Y.3d at 360, 984 N.E.2d at 906. Instead, it is sufficient if the circumstances are "such that [an] intent to create such a threat (or reckless disregard thereof) can be readily inferred." *Baker*, 20 N.Y.3d at 360, 984 N.E.2d at 906.

Nevertheless, the Court agrees with Kistner that issues of fact preclude summary judgment on the claims related to the disorderly conduct charge. As just noted, the parties dispute the circumstances under which Kistner made his comments, who was nearby, and to whom Kistner directed his words. If hospital workers were there as the defendants contend, there may have been a risk of a public disturbance. On the other

hand, if Kistner and the officers were alone in the room, then there likely was no such risk.[12]  *See id.* at 363, 984 N.E.2d at 908 ("The fact that defendant's abusive statements were directed exclusively at a police officer—a party trained to defuse situations involving angry or emotionally distraught persons—further undermines any inference that there was a threat of public harm.").  And even if ECMC staff were present for Kistner's comments, Kistner's tone and volume, as well as the specific context in which he made his comments and how frequently he made them, are relevant to assessing whether he created a risk of public harm.

The defendants appear to argue that public harm may be inferred because Kistner made the profane comments at ECMC, a public place.  *See* Docket Item 137 at 5 (citing N.Y. Penal Law § 240.00(1)).  But the mere fact "that [the p]laintiff was misbehaving in a public place . . . is insufficient, in and of itself, to create the risk of 'public harm.'"  *Thorpe*, 2021 WL 3811238, at *7 (denying summary judgment on claim of false arrest for disorderly conduct where there was a disputed issue of fact as to what occurred in the lobby of public hospital).  And that is especially so here, where Kistner

---

[12]  Kistner argues that if his speech was directed at state actors there can be no risk of public disturbance because the "First Amendment upholds an individual's right to speak freely to government officials."  Docket Item 132 at 24.  But freedom of speech— even speech directed at public officials—is not without its limits; indeed, "[w]hen clear and present danger" of "immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious."  *Feiner v. New York*, 340 U.S. 315, 320 (1951) (citation omitted).  And public harm or a risk of public harm may result from a verbal exchange even between an individual and a police officer.  *See Baker*, 20 N.Y.3d at 363, 984 N.E.2d at 908 ("[The Court] do[es] not suggest that the public harm element can never be present in such encounters" between an individual and police officers.); *see, e.g.*, *People v. Tichenor*, 89 N.Y.2d 769, 776-77, 680 N.E.2d 606, 610 (1997) (finding public harm element met even though offender directed his initial comments at police officer).

claims that the events occurred in a private room at that public place. Docket Item 132 at 23.

In sum, because there are factual disputes about the circumstances under which Kistner made his comments at ECMC, this Court cannot conclude as a matter of law that the defendants had probable cause—or even arguable probable clause—to believe that the "public harm" element of a disorderly conduct charge was met. The Court therefore denies the defendants' motion for summary judgment on Kistner's state and federal false arrest, false imprisonment, and malicious prosecution claims related to the disorderly conduct charge, as well as their motion for summary judgment on the First Amendment retaliation claim.[13]

### C.      Failure to Intervene

Judge McCarthy found that Kistner's failure-to-intervene claim should be construed as brought against only McDermott, Velez, Schultz, Moriarity, Santana, and McHugh,[14] and he recommended that the Court deny the defendants' motion for

---

[13] In their objections, the defendants also argue that Kistner's battery claim should be dismissed on the merits because "there is no evidence that [the] contact [between the police and Kistner] was unreasonable." Docket Item 133 at 9. But their argument on the battery claim rises and falls with the viability of Kistner's claims for false arrest. *See Wyllie v. Dist. Att'y of Cnty. of Kings*, 2 A.D.3d 714, 718-19, 770 N.Y.S.2d 110, 114 (2d Dep't 2003) ("Since an assault and battery cause of action may be based on contact during an unlawful arrest, the questions of fact regarding whether the plaintiff's arrest was supported by probable cause also preclude summary judgment on the cause of action for assault and battery as against the State defendants." (citations omitted)). Because the Court finds that there are issues of fact as to whether the defendants falsely arrested Kistner, those issues of fact also preclude summary judgment on Kistner's battery claims.

[14] Kistner argues that Judge McCarthy erred in not construing the failure-to-intervene claim as brought against Commissioner Lockwood as well. Docket Item 132 at 25-26. Because this Court finds that the section 1983 claims raised against

28

summary judgment on that claim.  Docket Item 108 at 30-31. The defendants object,
arguing that because "there can be no failure to intervene where there was no
constitutional violation," Kistner's failure-to-intervene claim must fail.  Docket Item 133 at
9 (citation omitted).  But the same issues of fact that preclude summary judgment for
the defendants on Kistner's constitutional claims for false arrest, false imprisonment,
and malicious prosecution, *see supra* at 17-28, also preclude summary judgment on his
failure-to-intervene claim.

### D.     Claims Against City of Buffalo Based on *Monell* Liability

Judge McCarthy recommended that Kistner be granted leave to amend his
claims against the City of Buffalo for *Monell* liability, Docket Item 119 at 7, and that the
Court deny the City of Buffalo summary judgment based on the amended section 1983
claims against it, *see* Docket Item 108 at 30.  The City of Buffalo argues that Judge
McCarthy erred in recommending that the Court deny the motion for summary judgment
because "[t]here is no evidence . . . of a municipal policy or custom that caused the
alleged deprivations of [Kistner's] constitutional rights."  Docket Item 133 at 2-4.

A municipality cannot be held liable under section 1983 unless the challenged
action was undertaken pursuant to a municipal policy, custom, or practice.  *See Monell
v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  To hold a
municipality liable under section 1983, "a plaintiff is required to plead and prove three
elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to

---

Lockwood in his individual capacity fail for pleading deficiencies, *see supra* at 14-15, it
need not and does not reach Kistner's objection regarding the failure-to-intervene claim.

(3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (citation omitted).

"Absent an express municipal policy, the plaintiff may prove a municipal custom, policy[,] or practice in several ways." *Ramos v. County of Suffolk*, 2009 WL 10708571, at *2 (E.D.N.Y. Sept. 8, 2009). One way is to demonstrate a policymaker's "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (citation omitted). In limited circumstances, a municipality also may be held liable for its failure to train, supervise, or discipline its employees. *See Wray*, 490 F.3d at 195 (failure to train or supervise employees may be official policy or custom); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("persistent failure to discipline" employees may show a "policy of ratification of unconstitutional conduct").

But "[w]here plaintiffs seek to hold a municipality liable under a theory of failure to [train,] supervise[,] or discipline, . . . they must also show that the municipal policymaker acted with deliberate indifference." *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)); *see also Wray*, 490 F.3d at 195 ("The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." (citation omitted)). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation and internal quotation marks omitted). "To establish 'deliberate indifference,' a plaintiff must show that: [1] a policymaker knows 'to

a moral certainty' that city employees will confront a particular situation; [2] the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation;' and [3] 'the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'" *Wray*, 490 F.3d at 195-96 (citation omitted).

Alternatively, "deliberate indifference may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to [the] plaintiff[].'" *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (citations omitted). "While the Supreme Court has left open the possibility that a single incident could give rise to liability for failure to train or supervise, the Court has cautioned that only a 'narrow range' of circumstances would support such single-incident liability, where the 'unconstitutional consequences of failing to train [were] patently obvious.'" *Schnitter v. City of Rochester*, 931 F. Supp. 2d 469, 475 (W.D.N.Y. 2013), *aff'd* 556 F. App'x 5 (2d Cir. 2014) (citation omitted); *see Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (citation omitted)).

Similarly, the Second Circuit has noted that a policy of acquiescing in or ratifying illegal conduct "'cannot be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality'; instead, there must be 'more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct.'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020) (citation

omitted).  Indeed, courts in the Second Circuit routinely dismiss claims based only on a single instance of failing to discipline an employee after an alleged unconstitutional event.  *See, e.g.*, *Santiago v. City of Rochester*, 2022 WL 856780, at *4 (W.D.N.Y. Mar. 23, 2022) (failure to discipline employee "after the incident does not, standing alone, . . . 'give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*'" (citing *Batista*, 702 F.2d at 397)); *Askew v. Lindsey*, 2016 WL 4992641, at *5 (S.D.N.Y. Sept. 16, 2016) (collecting cases holding that singular failure to discipline "cannot give rise to an inference of deliberate indifference without further evidence of a municipal policy or practice").

Kistner claims that the City is subject to *Monell* liability because it had an informal policy or custom of not investigating complaints against officers and failing to discipline officers who violated the civil rights of others.  Docket Item 138 at 5-6.  To establish that informal policy or custom, Kistner principally relies on the alleged failure to properly investigate and discipline the officers involved in the January 1, 2017 incident.  *See id.* The defendants argue that the failure to properly investigate this incident is insufficient "to give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*."  Docket item 133 at 3 (quoting *Santiago*, 2022 WL 856780, at *4).  But a closer look at this investigation—and its deficiencies—suggests otherwise.[15]

---

[15] Although Kistner has not adequately alleged that Lockwood was personally involved in the events of January 1, 2017, *see supra* at 14-15, Lockwood's conduct regarding the investigation following those events is relevant to assessing whether the City of Buffalo had a policy or custom of ratifying unconstitutional conduct that would justify imposing *Monell* liability.

32

To start, while Lockwood acknowledged that Kistner's Notice of Claim—filed on March 31, 2017—should have triggered an Internal Affairs investigation, no such investigation began until more than two-and-a-half years later in December 2019 after a television report on the incident.  Docket Item 82-1 at 251-54.  Nevertheless, in that television report, Captain Jeff Rinaldo, Lockwood's chief of staff and a spokesman for his office, was interviewed and incorrectly said that an Internal Affairs case *had* been opened by the time of the report.  *Id.* at 142-44.  Furthermore, Rinaldo characterized the commencement of an Internal Affairs investigation as "customary practice any time there's some type of civil litigation concerning a Buffalo police officer."  *Id.* at 144.  Lockwood later said that this delay in opening the investigation "would be a concern" and a "problem."  *Id.* at 130.

Once the investigation was opened, it was "anything but [thorough]."  *See* Docket Item 108 at 29.  According to Lockwood, the conduct of the on-scene officers did not comport with BPD policy in several ways.  For example, although the incident was "a police[-]vehicle[-]involved accident that would trigger a radio call to dispatch," as well as "a lieutenant, the Accident Investigation Unit, and [Internal Affairs] all going to the scene," none of those things happened.  Docket Item 82-1 at 163-64, 170-71.  Lockwood also said that it "wouldn't be appropriate" for the on-scene officers to threaten Kistner with arrest if he did not get up after the collision, as McDermott allegedly did.  *Id.* at 182.  And Lockwood said the same about waiting 27 or 28 minutes to get Kistner medical attention.  *Id.* at 183-84, 189-91.

Lockwood also said that to comply with BPD policy, officers should help "a man who is lying on the ground after being hit by an SUV" by "see[ing] if there's any injuries"

and then "get[ting] immediate help for him." *Id.* at 182-83.  But despite the on-scene officers' failures to follow BPD policy, Lockwood did not take any corrective action against those officers or discipline them in any way. *Id.* at 164-65.  Finally, Lockwood acknowledged that the lack of evidence showing damage to McDermott's vehicle "would raise concerns" but that he "didn't ask those questions" about the proof of damage even though it is "[his] job is to ask those questions."[16]  *Id.* at 280-82.

So while a "single incident" of failure to investigate or discipline a "single police officer" does not ordinarily support the imposition of *Monell* liability, *see Lucente*, 980 F.3d at 306, the circumstances here show a series of distinct failures arising from the "single incident" on January 1, 2017:  the more than two-and-a-half year delay between Kistner's Notice of Claim and the commencement of an Internal Affairs investigation; the incorrect statement during the television report that an investigation had been opened; the failure to discipline any of the five on-scene officers who disregarded BPD policy; and the failure to investigate the lack of repair documentation for McDermott's car.

Although it is a close call, that series of events is sufficient to support an inference that Lockwood ratified the officers' actions and that the City was deliberately indifferent in supervising and disciplining BPD officers or had an informal policy of not disciplining its officers.  The City of Buffalo's motion for summary judgment therefore is denied.[17]

---

[16] Lockwood later clarified:  "It's not my job to question.  It's internal affair's job to question [the officers] on those incidents."  Docket Item 82-1 at 283.

[17] The City of Buffalo also asked the Court to dismiss the state law claims against it, arguing that the City may not be held liable under a theory of *respondeat superior* where "there exists no underlying state law tort."  Docket Item 69-1 at 16-17 (citation omitted).  Because the Court concludes that Kistner's state law claims for false arrest,

## **CONCLUSION**

For the reasons stated above, this Court accepts in part and respectfully rejects in part Judge McCarthy's recommendations.  The plaintiff's motion for summary judgment, Docket Item 68, is DENIED; the defendants' motions for judgment on the pleadings and for summary judgment, Docket Item 69, are GRANTED in part and DENIED in part.  The following claims may proceed:

- Kistner's federal false arrest, false imprisonment, and malicious prosecution claims arising from his charges of criminal mischief in the third degree and disorderly conduct as against the City of Buffalo, McDermott, Velez, Schultz, Moriarity, McHugh, and Santana;

- Kistner's state false arrest and false imprisonment claims arising from his charges of criminal mischief in the third degree and disorderly conduct as against the City of Buffalo, Lockwood, Derenda, McDermott, Velez, Schultz, Moriarity, McHugh, and Santana;

- Kistner's state malicious prosecution claims arising from his charges of criminal mischief in the third degree and disorderly conduct as against the City of Buffalo, Lockwood, McDermott, Velez, Schultz, Moriarity, McHugh, and Santana;

- Kistner's First Amendment retaliation claim as against McDermott, Velez, Schultz, Moriarity, McHugh, and Santana;

---

false imprisonment, malicious prosecution, and battery may proceed, that argument is without merit.  The state law claims against the City of Buffalo therefore may proceed.

- Kistner's battery claim as against the City of Buffalo, Lockwood, Derenda, McDermott, Velez, Schultz, Moriarity, McHugh, and Santana; and

- Kistner's failure-to-intervene claim as against McDermott, Velez, Schultz, Moriarity, McHugh, and Santana.

The following claims are dismissed:

- Kistner's section 1983 claims against Derenda and Lockwood;

- Kistner's state malicious prosecution claims against Derenda;

- Kistner's state claims against all defendants for assault, intentional infliction of emotional distress, defamation, official misconduct, tampering with evidence, spoliation, and negligence;

- Kistner's claims against the defendants in their official capacities; and

- Kistner's claims against the "John Doe" defendants.

**The parties shall contact the Court within 30 days of the date of this order to schedule a status conference to set a trial date.**


SO ORDERED.


Dated:       November 8, 2022
             Buffalo, New York


                                   */s/ Lawrence J. Vilardo*
                                   LAWRENCE J. VILARDO
                                   UNITED STATES DISTRICT JUDGE